# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## COLUMBUS DIVISION

| | |
|---|---|
| LOUISIANA SHERIFFS' PENSION & RELIEF FUND, individually and on behalf of all others similarly situated, <br><br>             Plaintiff, <br><br>      v. <br><br> CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C. KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON, <br><br>             Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Cardinal Health, Inc. ("Cardinal" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Cardinal; and (d) other public information regarding the Company.

## I.    <u>INTRODUCTION</u>

1.     This securities class action is brought on behalf of all purchasers of Cardinal common stock between March 2, 2015 and May 2, 2018, inclusive (the "Class Period"). The claims asserted herein are alleged against Cardinal and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Cardinal is a global, integrated healthcare services and products company. This action arises from Defendants' misrepresentations and omissions relating to Cardinal's integration of Cordis Corp. ("Cordis"), a medical device manufacturer Cardinal purchased from Johnson & Johnson ("J&J") in March 2015, and the inventory and supply chain problems at Cordis. Throughout the Class Period, Defendants misled investors by stating that Cordis would benefit from Cardinal's advanced inventory management and supply chain information technology solutions. Defendants also falsely represented that the Company properly "reserve[d] for inventory obsolescence" and that "[i]nventories presented in the consolidated balance sheets [were] net of reserves for excess and obsolete inventory." In truth, the inventory tracking and

supply chain technology that Defendants said the Company would use to improve Cordis's performance was never implemented. Moreover, Cordis's existing inventory control systems were deficient such that the Company lacked the ability to track Cordis's inventory. Consequently, the Company materially overstated Cordis's inventory balances by failing to account for significant amounts of unsellable or expired Cordis medical devices. Further, Cardinal falsely stated that Cordis was "performing well" and that the integration of Cordis was "on track," "largely on plan," and "going incredibly well," while failing to disclose serious supply chain issues that were hurting the Company's operational performance and financial results.

3.      The first indications of the truth about Cordis's inventory and supply chain issues were revealed on August 2, 2017. That day, Cardinal reported weak earnings for its fourth quarter and fiscal year 2017 and lowered its earnings guidance for fiscal year 2018 due in part to "higher-than-planned write-offs for excess inventory" at Cordis. On this news, the price of Cardinal stock declined over 8 percent.

4.      Defendants, however, falsely assured Cardinal's investors that Cordis's operational deficiencies had been addressed, that the Company had built the necessary infrastructure and IT systems for Cordis such that it now had "visibility" of Cordis's inventory, and that the Cordis business was "going into a phase of a lot more stability."

5.      Then, on May 3, 2018, Cardinal announced disappointing results for its third quarter fiscal year 2018 and cut its fiscal year 2018 earnings guidance. The Company explained that the "biggest variable driving these results" was the "disappointing performance" of the Cordis business. On this news, the Company's stock price dropped over 21 percent. The Company subsequently took a $1.4 billion non-cash goodwill impairment charge driven by continued

2

"inventory and cost challenges within [the] Cordis business" representing almost 70% of Cordis's acquisition price.

## II.     JURISDICTION AND VENUE

6.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Cardinal maintains its corporate headquarters in Dublin, Ohio, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

8.     Plaintiff Louisiana Sheriffs is a multi-employer, defined benefit, governmental retirement plan providing retirement, disability and death benefits to approximately 25,000 active and retired employees of the sheriff's offices in all 64 Louisiana parishes.  As of June 30, 2016, Plaintiff managed roughly $3 billion in assets.  As indicated on the certification submitted herewith, Plaintiff purchased shares of Cardinal stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the federal securities laws alleged herein.

9.     Defendant Cardinal is a global, integrated healthcare services and products company.  Incorporated in Ohio, the Company maintains its headquarters at 7000 Cardinal Place, Dublin, Ohio 43017.  The Company's common stock trades on the NASDAQ, which is an efficient market, under ticker symbol "CAH."  As of January 31, 2019, Cardinal had over 298 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

10.     Defendant George S. Barrett ("Barrett") was Cardinal's Chief Executive Officer ("CEO") from August 31, 2009 to January 1, 2018.  Barrett also served as the Executive Chairman of the Board of Cardinal from August 31, 2009 to November 7, 2018.

11.     Defendant Donald M. Casey, Jr. ("Casey") was the CEO of the Medical Segment at Cardinal from April 2012 until February 2018, where he had full management responsibility for the Company's Medical Segment including medical-surgical products and services for hospitals, physician offices, clinical laboratories, ambulatory surgery centers, long-term care facilities and other health care providers.  The Cordis business reported to Casey, and Casey was responsible for managing Cordis's integration into Cardinal's operations.

12.     Defendant Michael C. Kaufmann ("Kaufmann) has been CEO and a member of the Company's Board of Directors since January 1, 2018.  Prior to being appointed a Director and CEO, Kaufmann served as Chief Financial Officer ("CFO") of Cardinal from November 2014 to December 31, 2017, where he oversaw all financial activities for the Company including external reporting, investor relations, tax strategy/planning, and capital deployment as well as global sourcing for both the Pharmaceutical and Medical segments.

13.     Defendant Jorge M. Gomez ("Gomez") has been the CFO of Cardinal since January 1, 2018.  Prior to assuming this role, Gomez served as CFO of Cardinal's Medical segment from July 2015 to December 31, 2017, managing the financial strategy, merger and acquisition analysis

4

and execution, performance tracking and capital development of the segment.

14.     Defendant David J. Wilson was Worldwide President of Cordis from March 2015 through August 2017.  Wilson was "[r]ecruited to lead turn around and growth of Cordis franchise for Cardinal [] and to further globalize Cardinal as a multi-national organization.  During his tenure as Worldwide President of Cordis, Wilson was responsible for integrating Cordis into Cardinal's operations, attaining value improvement targets within Cordis's supply chain and implementing radio-frequency identification ("RFID") inventory technology to streamline consignment and a global enterprise resource planning system to improve inventory visibility and reduce scrap.[1]

15.     Defendants Barrett, Kaufmann, Casey, Wilson, and Gomez are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Cardinal, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.     **BACKGROUND**

16.     Cardinal, based in Dublin, Ohio, is a global distributor of drugs and medical

---

[1] *See* David Wilson, Profile, *available at* LinkedIn, https://www.linkedin.com/in/david-wilson-854980148 (last visited November 19, 2018).

devices. The Company operates through two segments: Pharmaceutical and Medical. The Company's Medical segment has traditionally offered low-tech, low-margin medical products, such as laboratory equipment, gloves, and surgical apparel, and its core customer base has been hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States.

17. Over the past ten years, Cardinal has made numerous acquisitions to grow its Medical segment. One of the Company's largest acquisitions to date was its $1.944 billion purchase of Cordis, a medical device manufacturer.

18. In March 2015, as part of the Company's global expansion strategy and aim to grow its medical products portfolio, Cardinal announced that it had agreed to acquire Fremont, California-based Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions owned by Ethicon, Inc., a wholly-owned subsidiary of J&J. Cordis had annual sales in calendar year 2014 of approximately $780 million, split almost evenly between cardiology and endovascular products.

19. The Company stated that the Cordis acquisition would allow it to enter into the higher-margin cardiovascular market and add brand name stents and catheters to its list of medical products.

20. In addition, Cordis would provide the Company with a global footprint and platform for future growth by leveraging its existing product line and providing cross-selling opportunities in new markets. While the U.S. is its largest single national market, 70% of total sales come from outside the United States. Cordis's international presence includes operations in China, Japan, Germany, Italy, France, the United Kingdom, and Brazil, among others.

21.     The Company also emphasized how Cordis's business would improve by coming under Cardinal's umbrella.  In particular, the Company claimed Cordis could immediately draw on Cardinal's existing IT platforms, including Cardinal Health Inventory Management Solutions ("CIMS"), the Company's supply chain and inventory management system.  By leveraging RFID inventory technology to automatically identify and track tags attached to medical supplies, together with a cloud-based software platform to transmit that data in real-time, the Company claimed CIMS provided ultimate visibility, accuracy, and control, and was therefore ideal for managing high-cost supplies and physician preference items, such as stents.

22.     The acquisition was completed on October 4, 2015.  The parties structured the transaction such that Cordis's assets and operations in its principal markets – Australia, Austria, Belgium, Canada, China, France, Germany, Ireland, Italy, Japan, Luxembourg, Mexico, the Netherlands, New Zealand, Portugal, South Korea, Spain, Sweden, Switzerland, the United Kingdom and the United States – would be transferred effective October 2, 2015.  Cordis's assets and operations in the remaining markets, such as Brazil, Russia, India, South Africa, various central European countries, and various Middle Eastern countries, which the Company deemed as "Second Day Countries," were planned to close on a rolling basis after the Company received regulatory approval and satisfied customary closing conditions.

23.     To facilitate an orderly transfer of business operations, the Company entered into Transition Service Agreements ("TSAs") and Transition Manufacturing Agreements ("TMAs") with J&J.  Under these transaction contracts, Cardinal had reasonable access rights to all Second Day Country properties, books and records.

24.     Cardinal's manufacturing of interventional cardiovascular products represented a significant departure from the low-tech medical supplies that the Company traditionally

7

distributed. Moreover, while the acquisition expanded Cardinal's presence worldwide, Cordis's presence in countries outside of Cardinal's existing geographic footprint posed significant challenges, as did the complexity of integrating Cordis's processes, management and personnel. Accordingly, the Company's prompt and cost-effective integration of Cordis's business into Cardinal's operations was particularly important to investors.

25.     Critically, unlike Cardinal's other medical supply products, heart stints and catheters have strict product expiration dates, which must be closely monitored to comply with regulatory and quality standards. Thus, Cardinal's implementation of effective inventory control systems and control of inventory levels at Cordis would be key to the success of the Cordis acquisition and integration.

## V.     CARDINAL DEFRAUDS INVESTORS

26.     The Class Period starts on March 2, 2015, the day Cardinal hosted an investor conference announcing its acquisition of Cordis. During the conference, which began before the market opened on March 2, 2015, Defendants broadcasted an investor presentation containing slides representing to investors that Cardinal "brings supply chain expertise and inventory management solutions to Cordis" and that Cordis "[l]everages CAH supply chain expertise" and "[e]xtensive and deep supply chain relationship with IDNs [Integrated Delivery Networks]."

27.     At the conference, Defendant Casey provided further detail to investors regarding the inventory systems that Cardinal would implement at Cordis, stating that Cordis will "leverage our highly efficient delivery model and investments we have made in RFID [radio-frequency identification] technology by virtue of our WaveMark acquisition." Casey explained that "this shared platform connects manufacturers and providers with supply chain visibility and analytics" and reduc[es] expired and lost products, lowering managed inventory levels and decreasing holding costs." Casey concluded, "All this adds up to significant potential operating efficiencies."

8

Defendant Casey also assured investors that Cordis would leverage Cardinal's advanced supply chain solutions, stating that Cordis would "benefit from our efficient shared distribution system to drive significant supply chain savings."

28.     Thereafter, Cardinal executives continued with this refrain, repeatedly telling investors that Cordis would leverage Cardinal's advanced inventory management systems.  For example, on May 13, 2015, Cardinal presented at the Bank of America Merrill Lynch Health Care Conference.  At the conference, Defendant Kaufmann affirmed that with Cordis's use of Cardinal's internal RFID inventory technology, then called WaveMark and now known as CIMS, "we're going to be able to take a waste out of the system, reduce obsolescence, reduce inventory."

29.     Similarly, on June 10, 2015, Cardinal presented at the Goldman Sachs Healthcare Conference.  At the conference, in response to an analyst's inquiry as to how Cardinal planned to leverage Cordis's "international footprint," Defendant Barrett stated, "We're still not closed, and we're two separate companies, but they are very excited about some of the tools that we bring, like WaveMark, which is the ability to tag those products so you don't have [wait] so you don't implant an expired device.  All those service components we can bring."

30.     On October 4, 2015, Defendants issued a press release announcing the completion of the Cordis acquisition, wherein Cardinal stated, "Collectively, Cardinal Health and Cordis will now be able to offer . . . reliable, trackable inventory and logistics[] and deep analytic capabilities."

31.     In October 2015, *Endovascular Today* published an interview with Cordis's then President David Wilson entitled, "Insights From David J. Wilson, President of Cordis Corporation."  During the interview, Mr. Wilson stated, "With Cardinal Health, we also have a significant opportunity to focus on operational efficiencies with information-enabled systems (e.g., RFID).  Investment in the infrastructure of delivery systems will result in cost savings seen through

9

inventory holding cost reduction, the decrease of inventory levels, and the elimination of costs associated with expired or lost products. This should allow Cordis to drive better patient care, while also helping our customers with efficiencies that support better access for more patients."

32. On November 19, 2015, the Company hosted the Cardinal Health, Inc. Investor and Analyst Day meeting. At the meeting, Defendant Casey again touted the benefits CIMS (formerly WaveMark) would bring to Cordis, stating that it was "attaching RFID," and that it was "going to change the game from our ability to manage lost products, dated products, it's going to provide the analytics people need to begin to understand how we can do a much better job of managing inventory." Casey further noted that "Cordis [was] going to benefit immediately from share[d] distribution, becoming part of our 360 program, and then begins to ride on a smart distribution system around CIMS, that's going to be a differentiated advantage and will allow us to deliver value."

33. In addition, throughout the Class Period, the Company presented in its Quarterly Reports filed with the SEC on Forms 10-Q and Annual Reports filed with the SEC on Forms 10-K the following inventory balances in its Consolidated Balance Sheets:

| Quarter and Fiscal Year | Inventories, net (millions) |
|---|---|
| Second Quarter – Fiscal Year 2016 | 11,007 |
| Third Quarter – Fiscal Year 2016 | 10,910 |
| Fourth Quarter – Fiscal Year 2016 | 10,615 |
| First Quarter – Fiscal Year 2017 | 10,917 |
| Second Quarter – Fiscal Year 2017 | 11,915 |
| Third Quarter – Fiscal Year 2017 | 11,641 |
| Fourth Quarter – Fiscal Year 2017 | 11,301 |
| First Quarter – Fiscal Year 2018 | 12,121 |
| Second Quarter – Fiscal Year 2018 | 12,087 |

34. Defendants repeatedly assured investors that its inventories were properly accounted for, including those of Cordis. In its Annual Reports filed throughout the Class Period, the Company represented that it carefully tracked and properly reported its inventory levels. For

example, Cardinal stated, "We reserve for inventory obsolescence using estimates based on historical experience, historical and projected sales trends, specific categories of inventory and age of on-hand inventory." Moreover, Cardinal made clear, "Inventories presented in the [Company's] consolidated balance sheets are net of reserves for excess and obsolete inventory."

35.     Further, throughout the Class Period, Defendants continuously promoted the successful integration of Cordis and Cordis's superior performance. For example, on January 12, 2016, Cardinal presented at the JPMorgan Healthcare Conference. During the question and answer session with analysts, Defendant Kaufmann represented to investors that Cordis's integration "was going as planned" and "as expected." Defendant Barrett supported Kaufmann's comments, noting that "the integration has gone well."

36.     On February 1, 2016, Cardinal hosted an earnings conference call with investors and analysts, announcing the Company's second quarter fiscal year 2016 financial results. On the call, Defendant Barrett stated, "The integration of Cordis has gone well and is on target." Barrett added, "Our new Cordis leadership team is off to a strong start, and this reinforces our optimism that Cordis will serve as a platform for growth."

37.     On the same call, Defendant Kaufmann reinforced Barrett's comments, stating, "[A]s George mentioned, Cordis is off to a good start, with all key personnel in place, and day-to-day operations up and running. As we integrate the Cordis business through the remainder of our fiscal year, we continue to be excited and will work to drive efficiencies. As we previously shared, in FY17 we still expect the transaction to be greater than $0.20 accretive, and increasingly accretive thereafter. We are also working towards achieving the $100 million of annual synergies as we exit our FY18."

38. Thereafter, on February 10, 2016, Cardinal presented at the Leerink Partners Global Healthcare Conference. In response to an analyst's question inquiring how Cordis was performing, Defendant Barrett stated, "We're off to a very good start. As we said at the end of our second quarter, things are going as expected."

39. On March 7, 2016, Cardinal presented at the Raymond James Institutional Investors Conference. At the conference, Defendant Barrett stated, "Again, for us the Cordis acquisition, which is very early on and going well thus far." Barrett added, "Cordis is off to a very good start, and nothing I've seen makes me less enthusiastic about this part of the strategy."

40. On April 28, 2016, Cardinal hosted an earnings call announcing the Company's third quarter fiscal year 2016 financial results. On the call, Defendants again affirmed the successful integration of Cordis into the Company's medical segment. For example, Defendant Barrett stated, "Finally, on Medical, the integration of Cordis remains on track." Defendant Kauffmann shared the same assessment, stating, "First, the onboarding of Cordis continues to progress well. We have filled the key roles with excellent talent and are focused on execution." In response to analyst's questions regarding Cordis, Kaufmann also promoted Cordis's operational performance, "But again, I think it's really important to know that the underlying Cordis business is doing really well -- done an excellent job of staffing up, both from management and the sales teams."

41. On June 15, 2016, Defendants presented at the William Blair Growth Stock Conference. At the conference, Defendant Barrett provided analysts with an update on the integration of Cordis, stating, "[W]e are still in full integration mode. . . . [O]perationally the integration is going extremely well. Market share is going well, we have retained the talent we want, we have attracted additional talent and on a global basis, we are actually about where we

modeled it with again some swings in foreign exchange. But otherwise Cordis is off to a strong start. . . . We are operational fully across the globe."

42.     On June 17, 2016, Defendants hosted the Company's "Dublin Day Conference" with investors and analysts. At the conference, Defendant Casey updated analysts on the status of Cordis's integration into Cardinal's operations, stating, "[W]e've spent a lot of time as well as focused effort on really beginning to take the commercial capabilities that come with Cordis and beginning to build an infrastructure underneath that. That has gone well." Casey concluded, "I will tell you we are pretty comfortable that Cordis is performing about where we thought it would be. There are puts and takes but Cordis is doing what we thought it would do."

43.     On August 2, 2016, Cardinal hosted an earnings call to discuss the Company's results for the fourth quarter and fiscal year 2016. At the conference, Defendant Barrett lauded the Company's efforts to integrate Cordis, stating, "Don Casey and his team did a tremendous job closing the Cordis acquisition on time and managing the integration into Cardinal Health with discipline and a focus on the patient. Our global cross-functional teams have been performing at a high level, and we hit our integration and performance benchmarks." Defendant Kaufmann further promoted Cordis's performance, stating, "Our integration team has worked hard this year and all day-one countries are stood up and providing solutions that drive efficiency, standardization, and improved patient outcomes. In fact, the Cordis team has already demonstrated measurable growth in certain geographic regions, such as Europe, which hasn't seen that type of growth in a number of years." While the Company announced that same day that it had lowered Cordis's expected fiscal year 2017 accretion in non-GAAP diluted earnings from $0.20 to $0.15 per share, the Company blamed the lower accretion figure on a multitude of factors unrelated to Cordis's operational and inventory deficiencies, such as foreign exchange costs, start-up costs and

increased expenditures associated with moving off of TSAs with J&J.  In fact, in response to an analyst's question regarding Cordis, Kaufmann remarked, "First of all, I just want to make sure, we feel really excited about Cordis.  We think things are going really well.  We've got all of the key employees, management teams, sales folks in place, things are going incredibly well."

44.     Thereafter, Defendants continued to make similar positive statements concerning Cordis's integration and performance.  For example, on October 31, 2016, Cardinal held a conference call with investors and analysts to discuss the Company's earnings for the first quarter fiscal year 2017.  During the call, Defendant Barrett emphasized Cordis's ability to leverage Cardinal's existing supply chain management and inventory control information systems.  Specifically, Defendant Barrett stated, "October 2 marked a year since we closed the Cordis acquisition.  John Casey and his team have done a tremendous job leading the integration, thoughtfully phasing in new systems and processes and building out an important platform." Barrett added, "The integration of Cordis has proved to be an excellent example of how we can bring together best practices across borders.  We have seen over this past year, that taking the time to do things right is essential to best serve our customers.  We have also seen growth in some important markets including Europe, where we believe that taking an integrated cohesive approach to our customers will position us for measurable growth over the long term."

45.     Defendant Kaufmann echoed the same positive sentiments regarding Cordis, stating, "Specific to Cordis, it continues to meet our performance expectations and make real and measurable progress," and "Cordis continues to perform well and we are confident in both the fundamentals and growth initiatives in that business."  Defendant Kaufmann also touted the team involved with integrating Cordis, stating, "We've put some great people in charge there.  It's a business that we're paying a lot of attention to. . . .  I think there's a lot of be said for when you

14

have people that are excited, know you're investing in the business, really are committed to that – and we've hired some great people – I think that's driving some of the things we're seeing in Cordis too."

46. In addition to repeatedly touting Cordis's integration, Defendants also continuously confirmed their ability to track Cordis's customer demand in its overseas markets.  For example, on February 7, 2017, Cardinal held a conference call with analysts and investors to discuss the Company's earnings for the second quarter fiscal year 2017.  Addressing the Cordis acquisition specifically, Defendant Barrett stated, "Our Cordis acquisition is largely on plan, and I'm proud of the way in which our teams have come together around the world during this first year.  We feel very confident that we can add value to any system in their interventional cardiology activity."  On the same call, Defendant Kaufmann highlighted Cordis's performance in international markets, stating, "First, Cordis is performing well, particularly in Europe and Latin America; and second, the China team continues to execute well and they are on track to achieve double-digit top and bottom line growth for the full fiscal year."

47. Similarly, on May 1, 2017, Cardinal held a conference call with investors and analysts to discuss the Company's earnings for the third quarter fiscal year 2017.  During the call, Defendant Barrett again assured investors that Cordis had "commercial momentum on a global basis."  Later, in responding to an analyst's question regarding the Company's experience with Cordis in the medical segment, Defendant Barrett underscored Cordis's growth, "particularly outside the U.S.," stating, "Commercially, we're actually feeling very good about the way we're positioning.  We're seeing some really interesting growth, particularly outside the U.S.  And we're also seeing what we always like to see, which is some demand from our global operations for other

15

services that Cardinal has to offer.  And that's always been part of our thesis.  So on the commercial side, some things that we see that are very optimistic."

48.      Analysts accepted management's positive depictions of Cordis.  For example, in a February 2, 2016 report, William Blair noted, "Cordis began contributing sooner than we had initially expected and appears to be tracking in line with expectations thus far."  Similarly, a Leerink analyst noted in a February 7, 2017 report, "Medical is showing significant growth given the integration of Cordis."

49.      Defendants' statements referenced above in ¶¶26-48 were materially false and misleading.  The RFID inventory tracking technology and advanced supply chain solutions that Defendants told investors the Company would to use to improve Cordis's performance were never implemented across Cordis.  Moreover, Cordis's existing global supply chain and inventory control systems were antiquated and ineffective, which were causing operational and inventory problems at Cordis.  Specifically, Cordis's inventory and supply chain platforms were so deficient that the Company lacked visibility into customer demand and existing inventory levels, particularly with respect to products consigned to third-party vendors overseas. As a result, Cordis manufactured and accumulated excessive amounts of cardiovascular product inventories.  As the excess inventory sat on the shelf, products became unsellable and/or expired.  Under Cardinal's internal policies for accounting for inventory balances, the Company should have established reserves, written off expired products and subtracted that inventory from the Company's assets on Cardinal's balance sheets.  By failing to do so, the Company materially overstated Cordis's inventory balances.   Moreover, contrary to Defendants' representations, Cordis was not "performing well" and its integration was not "on track," "going incredibly well" or "largely on plan."  The integration of Cordis into Cardinal's operations was plagued from the very beginning,

as the Company struggled separating the Cordis business from J&J due to operational, manufacturing and personnel deficiencies.  To correct Cordis's deficiencies, the Company would have to make substantial investments in Cordis's IT and supporting infrastructure, thereby incurring significant Selling, General and Administrative Expenses ("SG&A") charges beyond the levels internally budgeted or projected by Cardinal and diminishing operating earnings.

## VI.  THE TRUTH BEGINS TO EMERGE

50.    The first indication that Cardinal had misled investors came on August 2, 2017, when the Company reported weak earnings for its fourth quarter and fiscal year 2017 and lowered its earnings guidance for fiscal year 2018.  Defendants blamed these disappointing earnings on "higher-than-planned write-offs for excess inventory" at Cordis.  Defendants further explained that the cost of moving manufacturing and standing up Cordis's back-office services had been more expensive than Cardinal modeled.  During the August 2, 2017 earnings call, however, Defendants attempted to downplay concerns about Cordis.  Defendant Barrett stated, "We are creating a global platform, and the actions we've taken to build this infrastructure will prove particularly valuable as we integrate the 25% of the patient recovery business, which operates outside of the U.S." Defendant Barrett additionally stated that "much of the heavy lifting is behind us," and that the business was "getting some commercial momentum," including "solid sales growth in Asia Pacific, Latin America and Europe."

51.    Despite Defendants' attempt to soften Cordis's poor performance, the price of Cardinal stock declined from a closing price of $77.33 per share on August 1, 2017, to a closing price of $70.99 per share on August 2, 2017, or over 8%.

52.    Thereafter, the Company continued to release confirmatory information regarding higher than anticipated costs and inventory issues at Cordis, including on February 8, 2018, when

17

Cardinal released its second quarter fiscal year 2018 earnings.  Nevertheless, the Company continued to emphasize Cordis's solid performance overseas and stating that the Company had "implemented robust remediation plan to address both inventory and SG&A challenges."

53.   For example, on a February 8, 2018 conference call with investors, Defendant Gomez, the Company's CFO, touted Cordis's performance, stating, "Overall, we are encouraged that in each of the last two quarters, Cordis revenue grew driven by our business outside the U.S. And we are excited to see the acceleration of our product partnership agreements."

54.   Similarly, on February 15, 2018, at the Leerink Partners Global Healthcare Conference, Defendant Gomez discussed the health of the Cordis business, stating, "The business is actually – from a demand perspective, from a commercial standpoint, the business is doing well. We've been growing.  The top line has been growing in the mid-single digits, which is good in the cardiology space, cardiovascular, endovascular.  The performance of our OUS operations is really good.  So top line is we feel good about it."  Gomez concluded that Cordis was "making progress" and that "as we invest in technology and improve certain processes, we believe that a lot of those headwinds that we have now will be more manageable, and we will put Cordis back into a growth trajectory."

55.   Further, on March 13, 2018, at the Barclays Global Healthcare Conference, Defendant Gomez stated that Cordis "[is] going into a phase of a lot more stability."  Gomez stated that "[o]ne of the key challenges we faced in the last couple of years . . . is write-offs of inventory because we didn't have enough visibility in all the overseas markets with respect to levels.  And so we faced some challenges with expiration of product, and we had to write off some certain volumes."  Gomez assured investors, however, that the Company had "gone live" with new IT

platforms and "[n]ow we have visibility to that and things are going to start getting better.  They are starting to get better."

56.     Analysts accepted Defendants' encouraging news concerning Cordis.  After hearing Gomez's statements, a Cowen analyst noted that the "[t]urnaround in Cordis appears on track. Progress in turning around Cordis appears to be going well."

57.     On May 3, 2018, however, Defendants surprised investors by announcing lower-than-expected earnings for Cardinal's third quarter fiscal year 2018 due to the "unanticipated disappointing performance from our Cordis business."   Contrary to the Company's prior statements that it had visibility into Cordis's inventory and that the Company properly reserved for obsolete inventory, the Company revealed that after launching a new global supply chain IT platform over the last quarter at Cordis, it discovered millions of dollars of unsellable and expired heart stents and catheters stationed overseas that had to be written off.

58.     Significantly, Cardinal CEO Kaufmann admitted that if the Company had put this IT platform in place last quarter, Cardinal "absolutely" would have written off expired inventory at that time.  Apart from reducing profits in the Medical segment, Cordis's large inventory write-offs also raised Cardinal's expected effective tax rate to 45.1%, up from 32.3% just a year earlier and over 7% higher than projected the previous quarter.   In particular, Cordis's performance created losses in certain foreign jurisdictions where Cardinal could not take out the benefit of those operating losses from a tax perspective.   Further, the Company disclosed that the lack of "visibility" into Cordis's overseas inventories created operational inefficiencies for Cordis's manufacturing plants.  Cardinal stated that it "need[ed to put] several tools in place" to deal with Cordis's operational challenges, including "implementing new process[es] and technology improvements that will better manage our Cordis consigned inventory."  As a result, the Company

announced that it anticipated that "the operational challenges with Cordis will continue through Q4 and fiscal '19."

59.     Analysts covering the Company were stunned.  On the earnings call, a Cowen analyst reminded Cardinal executives of their recent positive comments concerning Cordis and pressed the Company to explain "what changed really in the last 3 months that – because it seemed like last quarter, things were actually going in the right direction."  After the call, a William Blair analyst characterized the news regarding Cordis's inventory problems as "surprising[]," stating that it "expect[ed] investors will be much more skeptical of the accretion potential of [Cordis]," and that the news "calls into question the company's broader strategy for the medical segment— the recipient of billions of dollars of capital deployment in the last decade."

60.     As a result of the May 3, 2018 disclosures, the price of Cardinal's stock declined from a closing price of $64.65 per share on May 2, 2018, to a closing price of $50.80 per share on May 3, 3018, or over 21%.

61.     Cordis's woes continued to weigh on Cardinal.  On August 6, 2018, Cardinal released its fourth quarter and fiscal year 2018 results, reporting that annual operating profit had declined from $2.120 billion in 2017 to $126 million in 2018, or by 94%.  The Company explained that profitability was most adversely impacted by a $1.4 billion non-cash goodwill impairment charge related to their Medical segment, primarily driven by "inventory and cost challenges within [the] Cordis business which furthered in the fourth quarter of fiscal 2018."  In addition, in its 2018 annual report, Cardinal disclosed that reserves for excess and obsolete inventory increased to $147 million in fiscal year 2018, compared to $76 million the prior year because of "increased Cordis inventory."

## VII. LOSS CAUSATION

62. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Cardinal securities and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Cardinal stock fell precipitously. As a result of their purchases of Cardinal securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII. CLASS ACTION ALLEGATIONS

63. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of Cardinal during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors and officers of Cardinal and their families and affiliates.

64. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Cardinal has approximately over 298 million shares of common stock outstanding, owned by hundreds or thousands of investors.

65. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      (a)     Whether Defendants violated the Exchange Act;

      (b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether Defendants' conduct impacted the price of Cardinal's common stock;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

66.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

67.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

69.     Cardinal's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

70.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement

was false or misleading and the statement was authorized and/or approved by an executive officer of Cardinal who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.    PRESUMPTION OF RELIANCE

71.    At all relevant times, the market for Cardinal's common stock was an efficient market for the following reasons, among others:

(a)    Cardinal common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Cardinal filed periodic public reports with the SEC and NASDAQ;

(c)    Cardinal regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Cardinal was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

23

72.     As a result of the foregoing, the market for Cardinal common stock promptly digested current information regarding Cardinal from all publicly available sources and reflected such information in the price of Cardinal common stock.   Under these circumstances, all purchasers of Cardinal common stock during the Class Period suffered similar injury through their purchase of Cardinal common stock at artificially inflated prices and the presumption of reliance applies.

73.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding integration and inventory control systems of its recently acquired cardiovascular devise business, Cordis – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the performance of Cordis, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5 Against All Defendants

74.     Plaintiff repeats, incorporates and realleges each and every allegation contained above as if fully set forth herein.

75.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Cardinal common stock at artificially inflated prices.

76.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Cardinal common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

78.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Cardinal's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

80.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cardinal common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they

been aware that the market prices for Cardinal common stock had been artificially inflated by Defendants' fraudulent course of conduct.

81.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

82.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>COUNT II</u>

**For Violations of Section 20(a) of the
Exchange Act Against the Individual Defendants**

83.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

84.     The Individual Defendants acted as controlling persons of Cardinal within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Cardinal, the Individual Defendants had the power and ability to control the actions of Cardinal and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**XI.     <u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members

26

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.   <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

DATED: August 1, 2019

*/s/ Todd A. Long*
Todd A. Long (#0082296)
**MCNEES WALLACE & NURICK LLC**
21 East State Street, Suite 1700
Columbus, Ohio 43215
Telephone: (614) 719-2843
Facsimile: (614) 614-469-4653
tlong@mcneeslaw.com

*Liaison Counsel for Plaintiff Louisiana Sheriffs'
Pension & Relief Fund*


Avi Josefson (*pro hac vice* forthcoming)
Michael D. Blatchley (*pro hac vice* forthcoming)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiff Louisiana Sheriffs'
Pension & Relief Fund*

Robert D. Klausner
**KLAUSNER KAUFMAN JENSEN**
  **& LEVINSON**
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for Louisiana Sheriffs'*
*Pension & Relief Fund*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Osey McGee, on behalf of Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Louisiana Sheriffs. I have reviewed the complaint with the Fund's legal counsel, and based on the legal counsel's knowledge and advice, authorize its filing.

2. Louisiana Sheriffs did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Louisiana Sheriffs is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Louisiana Sheriffs' transactions in the Cardinal Health, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Louisiana Sheriffs has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Sanchez v. Centene Corp.*, No. 17-cv-806 (E.D. Mo.)
*Louisiana Sheriffs' Pension & Relief Fund v. Intel Corporation,*
No. 18-cv-1460 (N.D. Cal.)
*Giugno v. Bristol-Myers Squibb Company,* No. 18-cv-878 (N.D. Cal.)
*In re Evoqua Water Technologies Corp. Securities Litigation,* No. 18-cv-10320
(S.D.N.Y.)

6. Louisiana Sheriffs has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

*In re Eaton Corporation Securities Litigation,* No. 16-cv-5894 (S.D.N.Y.)

7. Louisiana Sheriffs will not accept any payment for serving as a representative party on behalf of the Class beyond Louisiana Sheriffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

Louisiana Sheriffs has relied on the research and analysis of the complaint provided by legal counsel Bernstein Litowitz Berger & Grossmann LLP. The undersigned declares that the statements made and information provided are, to the best of his knowledge, true and correct.

Executed this 1st day of August, 2019.


_____
Osey McGee
Executive Director
*Louisiana Sheriffs' Pension & Relief Fund*

**Louisiana Sheriffs' Pension & Relief Fund**
**Transactions in Cardinal Health, Inc. (CAH)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/2/2015 | 4,157 | 81.0289 |
| Purchase | 9/3/2015 | 9,375 | 81.9380 |
| Purchase | 9/8/2015 | 6,900 | 81.4291 |
| Purchase | 1/12/2018 | 125 | 68.9500 |
| Purchase | 1/18/2018 | 400 | 71.5587 |
| Purchase | 1/19/2018 | 2,825 | 71.4892 |
| Purchase | 1/30/2018 | 9,142 | 73.3549 |
| Purchase | 1/31/2018 | 5,133 | 73.0466 |
| Sale | 9/28/2015 | (5,892) | 78.3039 |
| Sale | 10/2/2015 | (3,710) | 75.7937 |
| Sale | 10/2/2015 | (3,585) | 77.5172 |
| Sale | 10/14/2015 | (636) | 78.9700 |
| Sale | 10/15/2015 | (6,609) | 78.5440 |