FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 JUN 19 PM 12: 13

U.S. DISTRICT COURT
SOUTHERN DISTRICT
EASTERN DIV. COLUMBUS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LOUISIANA SHERIFFS' PENSION &
RELIEF FUND, Individually and on
Behalf of All Others Similarly Situated,

   Plaintiff,

v.

CARDINAL HEALTH, INC., *et al.*,

   Defendants.

Case No. 2:19-CV-3347
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth A. Preston Deavers

## OPINION AND ORDER

This class action arises from several lawsuits that allege securities fraud claims against Defendant Cardinal Health, Inc., *et al.*. The instant matter is before the Court for consideration of a Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (ECF No. 12) filed by Plaintiff Louisiana Sheriffs' Pension & Relief Fund, Movant City of Fort Lauderdale General Employees Retirement System and Movant Houston Municipal Employees Pension System (collectively, "Public Pension Funds") as well as a Motion to Appoint Counsel and for Appointment as Lead Plaintiff (ECF No. 13) filed by Movant 1199 SEIU Health Care Employees Pension Fund ("1199 SEIU"). The requisite responses and replies have been filed, and the instant matter is ripe for review. For the reasons that follow, 1199 SEIU's Motion to Appoint Counsel and for Appointment as Lead Plaintiff is **GRANTED** (ECF No. 13), and Public Pension Funds' Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel is **DENIED**. (ECF No. 12). Accordingly, 1199 SEIU is **APPOINTED** Lead Plaintiff, and Robbins Geller Rudman & Down LLP is **APPOINTED** Lead Counsel.

I

**A. Background**

The securities class action in this case was initiated on behalf of individuals and entities who, between March 2, 2015 and May 2, 2018 (the "Class Period"), purchased Cardinal Health, Inc. ("Cardinal") common stock. (the "Class") (ECF No. 1 at ¶ 1). The Class alleges that Cardinal and five of its senior executive officers ("Defendants") engaged in conduct that violated the Securities Exchange Act of 1934. (The "1934 Act") and the rules promulgated therefrom. (*Id.*).

Cardinal is an integrated and global distributor of drugs, medical devices and health care services based in Dublin, Ohio, and it has publicly traded common stock on the New York Stock Exchange under the stock ticker CAH. (*Id.* at ¶ 2, 9 & 16). The company operates through two segments: Pharmaceutical and Medical. (*Id.* at ¶ 16). Cardinal's Medical segment offers low-tech and low-margin products which include laboratory equipment, gloves and surgical apparel, and, historically, hospitals, ambulatory surgery centers, clinical laboratories, and other health care providers have formed. (*Id.*). In the last decade, Cardinal has expanded its Medical segment through numerous acquisitions. (*Id.* at ¶ 17).

The Class Period began on March 2, 2015 when Cardinal announced that it would acquire Cordis Corp. ("Cordis"). (*Id.* at ¶ 17-18). Cordis is a global manufacturer and distributor of interventional cardiology devices and endovascular solutions. (*Id.*). The company is owned by Ethicon, Inc. which is a wholly-owned Johnson and Johnson subsidiary, and Cardinal acquired Cordis for approximately $1.944 billion dollars to broaden its medical products portfolio and facilitate its global expansion strategy. (*Id.* at ¶ 17-20).

The following claims are made in the Complaint. Cardinal announced that the acquisition would add brand name stents and catheters to its proffered medical products and provide an entry

into higher margin cardiovascular markets. (*Id.* at ¶ 19). Cardinal also announced that the acquisition would create a global footprint and platform for future growth through leverage of its existing product line and cross-selling opportunities that would arise from new markets. (*Id.* at ¶ 20). At the time, these announcements synced with Cordis' global operations which were taking place in China, Japan, Germany, Italy, France, Brazil, and the United Kingdom. (*Id.* at ¶ 18 & 20). In that same vein, Cordis had reported annual sales of approximately $780 million in 2014 which were split between its cardiology and endovascular products. (*Id.*).

According to the Complaint, the acquisition was finalized on October 4, 2015. (*Id.* at ¶ 22). From the date of acquisition until the fall of 2017, Defendants consistently stated that the integration of the two companies would result in superior operating efficiencies. (*Id.* at ¶ 26-48). Yet, on August 2, 2017, Cardinal issued an earnings report for its fourth quarter and fiscal year 2017 that fell short of expectations, and the company lowered its earnings projections for fiscal year 2018. (*Id.* at ¶ 50). Cardinal attributed these shortcomings to disappointing earnings on "higher-than-planned write-offs for excess inventory" at Cordis, explaining that the cost of moving manufacturing and standing up Cordis's back-office services had been more expensive than originally modeled. (*Id.*). That same day, during Cardinal's earnings call, Defendants stated that "much of the heavy lifting is behind us" and that the business was "getting some commercial momentum," including "solid sales growth in Asia Pacific, Latin America and Europe." *Id.*

The Complaint makes further allegations that Cardinal's stock fell over eight percent following these disclosures. (*Id.* at ¶ 51). Thereafter, Cardinal announced lower-than-expected earnings on May 3, 2018 for the third quarter of fiscal year 2018, attributing the decrease to "unanticipated disappointing performance from our Cordis business." (*Id.* at ¶ 57). As a result, the company's share price dropped again, this time over twenty-one percent. (*Id.* at ¶ 60). On August 6, 2018, Cardinal released its fourth quarter and fiscal year 2018 results which revealed that annual operating profits jettisoned from $2.120

3

billion in 2017 to $126 million in 2018. (*Id.* at ¶ 61). Cardinal explained that this decline was mainly the result of a $1.4 billion non-cash goodwill impairment that it acquired to mitigate the "inventory and cost challenges within [the] Cordis business." (*Id.*).

Cardinal also announced in its 2018 annual report that it had increased its reserves of excess and obsolete inventory from $76 million to $147 million in light of new discoveries concerning Cordis' inventory. (*Id.*). Cardinal's CEO, Kaufmman, announced that if Cardinal had initiated its IT platform earlier, it would have written off the inventory sooner. (*Id.* at ¶ 58). The write offs that resulted reduced Cardinal's Medical division profits and raised Cardinal's effective tax rate from 32.3 % to 45.1 %, representing an increase that was 7% higher than what was projected the previous quarter. (*Id.*). The defective product lines caused Cordis to encounter losses in foreign jurisdictions which prevented Cardinal from acquiring certain tax benefits. (*Id.*). Further, Cardinal announced that its lack of "visibility" into Cordis' overseas operations created inefficiencies at Cordis manufacturing plants. (*Id.*).

Defendants stated that Cardinal "need[ed to put] several tools in place" to deal with Cordis's operational challenges, including "implementing new process[es] and technology improvements that will better manage our Cordis consigned inventory." (*Id.*). Cardinal also announced its expectation that "operational challenges with Cordis will continue through Q4 and fiscal '19." (*Id.*). The Complaint alleges that these circumstances caused Cardinal's stock to decline dramatically, resulting in significant losses for several investors.

**B. Procedure.**

On August 1, 2019, Louisiana Sheriffs Pension & Relief Fund ("Louisiana Sheriffs'") filed a class action complaint against Cardinal pursuant to the Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). (*See generally* ECF No. 1). That same

4

day, in compliance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), counsel for Louisiana Sheriffs' published the required notice to members of the Class. (ECF No. 11 at ¶ 2). Thereafter, the Court issued an Order requiring potential members of the Class to move for appointment as lead plaintiff by September 30, 2019. (*Id.*). Accordingly, Public Pension Funds and 1199 SEIU filed timely motions for their appointment as lead plaintiff and for the appointment of their choice of lead counsel. (ECF No.s 12 & 13). Their motions are the subject of this Opinion and Order.

## II

The most significant procedural change effected by the PSLRA is the requirement that the Court appoint, at the initial stages of litigation, a "lead plaintiff." Specifically, the PSLRA states that:

> the court . . . shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff").

15 U.S.C. § 78u-4(a)(3)(B)(i). The PSLRA creates a rebuttable presumption that the most adequate plaintiff:

> is the *person or group of persons* that--
>
> (aa) has either filed the complaint or made a motion in response to a notice . . . ;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (emphasis added). This presumption may be "rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff--(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique

defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

### A. Subsection (aa)

The PSLRA creates a rebuttable presumption that the most adequate plaintiff "is the person or group of persons that-- (aa) has either filed the complaint or made a motion in response to a notice . . . ." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Subsection (aa) refers to the notice provision of the PSLRA, which provides:

> **(i) In general**. Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class --
>
> (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
>
> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.
>
> **(ii) Multiple Actions**. If more than one action on behalf of a class asserting substantially the same claim or claims arising under this title is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (i).

15 U.S.C. §§ 78u-4(a)(3)(A)(i)-(ii).

First, the Court considers who filed a complaint or moved for appointment in response to the notice issued to the Class. Louisiana Sheriffs', a member of Public Pension Funds, initiated this matter by filing the first and only Complaint. (ECF No. 1). Yet, the PSLRA creates a rebuttable presumption in favor of whoever "filed the complaint *or* made a motion in response to a notice." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (emphasis added). The record demonstrates that Public Pension Funds and 1199 SEIU timely moved the Court for appointment as lead plaintiff. (ECF No.s 12 & 13). Neither party disputes that the statutory notice in this case was published on August 1, 2019.

(ECF No.s 12-1 at 5 & 13-1 at 5), and both parties filed their respective motions for selection as lead plaintiff on September 30, 2019, in compliance with the PSLRA's 60-day requirement. (*Id.*). Both parties, therefore, satisfy the statutory requirements of subsection (aa).

### B. Subsection (bb)

While the Court is satisfied that both movants have met the PSLRA's procedural requirements, it must still determine which of the two has the largest financial interest in this case. Before making this determination, however, the Court must address whether the individual entities aggregated into Public Pension Funds may contend for appointment as co-lead plaintiffs. *Eshe Fund v. Fifth Third Bancorp*, Case No.s 1:08-cv-421,1:08-cv-487, 1:08-cv-537, 1:08-cv-539, 2008 U.S. Dist. LEXIS 128466, *23 (S.D. Ohio Dec. 16, 2008) (explaining that, "[t]he Court cannot determine which party has the largest financial interest without first determining whether to treat Shelton and the Pension Trust Funds as co-lead plaintiffs"). Courts "examine each proposed lead plaintiff group on a case by case basis." (*Id.* at * 24) (citing *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 307 (S.D. Ohio 2005).

In *Eshe Fund v. Fifth Third Bank*, this Court examined whether two institutional investors and one individual investor could be aggregated for the purpose of being appointed lead plaintiff. *Id.* The Court considered the size of the group, noting that, typically, groups of five or less investors is appropriate. *Id.* On the subject of the group's relationship, this Court explained that there are two competing approaches that outline the necessary relationship group members must have to be appointed co-lead plaintiff. *Id.* at * 25. The first approach requires either that the group members have a prior relationship or that they prove they were not aggregated at the behest of their attorneys. *Id.* The second looks to the quality of representation that the group will provide to the class. *Id.*

7

Noting that the goal of the PSLRA is "to appoint the most adequate person or group of persons as lead plaintiff," this Court adopted the latter approach. *Id.* at * 24-25.

With respect to the question of aggregation, the Court finds *Eshe Fund* instructive and, thus, will consider whether Public Pension Funds meets the criteria set forth therein. Public Pension Funds' size is appropriate considering that it is made up of only three investors. (ECF No. 12-1 at 1). Likewise, the individual institutions making up Public Pension Funds have demonstrated, through Joint Declaration and Certification, that they are willing to cooperate for the advancement of the Class' interest. (*See generally* ECF No.s 12-3 & 12-5). Based on these criteria, Public Pension Funds is eligible to contend for appointment as lead plaintiff. This conclusion is consistent with the text of the PSLRA which explicitly permits more than one entity to come together to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(I) & (iii)(I) (authorizing the appointment of a "person or group of persons" as lead plaintiff).

Accordingly, the Court must now determine whether Public Pension Funds or 1199 SEIU has the largest financial interest in the relief sought by the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). With respect to this inquiry, the movants offer two different standards for the Court's consideration.

1199 SEIU argues that this Court should employ a three-factor test to determine which movant has the largest financial interest. (ECF No. 17 at 2). The test that 1199 SEIU advances was adopted by the Third Circuit in *In re Cendant Corp. Litig.*, and it requires courts to "consider, among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3rd Cir. 2001). Applying this test, 1199 SEIU asserts that, in comparison to each member of Public Pension Funds, it has

8

purchased the most shares, expended the greatest amount of net funds and has suffered the most significant financial loss. (ECF No. 17 at 2). In that same vein, 1199 SEIU contends that, "without aggregation, none of the members of the Public Pension Funds Group comes close to the 1199 Pension Fund's financial interest." (*Id.* at 3).

Conversely, Public Pension Funds offers a four-factor test to determine the movant with the greatest financial interest. (ECF No. 16 at 3). Substantially overlapping with the three-factor test employed in *Cendant*, the four-factor test asserted by Public Pension Funds requires consideration of: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered. (*Id.*) (citing *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. at 303). With respect to the first factor, Public Pension Funds concede that 1199 SEIU purchased the largest number of shares. (*Id.* at 4). Yet, Public Pension Funds argues that the latter three factors weigh in its favor. (*Id.*). Specifically, Public Pension Funds advance that 1199 SEIU opted to sell a substantial amount of its shares during the Class Period which resulted in retention of only 8,370 net shares, whereas Public Pension Funds retained a total of 57,866 net shares. (*Id,*). Further, Public Pension Funds contends that it expended $4,432,596 in net funds, which is nearly $2.7 million more than 1199 SEIU's expenditure of $1,722,740. (*Id.* at 3). Finally, Public Pensions Funds argues that it has suffered the greatest approximate loss under the LIFO method and that 1199 SEIU's contentions to the contrary are based on the highly disfavored FIFO method. (*Id.* at 4-5).

As a fundamental matter, the parties offer two similar, yet competing, standards for determining who has the largest financial interest. Although virtually identical, the test proposed by the parties differ in one respect. The four-factor test requires consideration of the number of net shares purchased during the class period, whereas the three-factor test does not.

9

Although this district has not explicitly adopted either approach, for the purposes of this case, the Court accepts the four-factor inquiry, commonly referred to as the *Olsten-Lax* test, for the reasons set forth in *In re Cardinal Health, Inc. Sec. Litig.*. 226 F.R.D. at 303-304 (explaining that, "[t]he four-factor inquiry has been widely accepted in the case law and various treatises because it provides courts with additional information" and "the four-factor inquiry reveals whether plaintiffs actually profited during the Class Period from the inflated stock prices."); *see Ansfield v. Omnicare, Inc.*, Case No. 11-173, 2012 U.S. Dist. LEXIS 198236, at * 7-8 (E.D. Ky. Mar. 12, 2012) (noting that courts in this circuit frequently rely on the *Olsten-Lax* test). In weighing the *Olsten-Lax* factors, the Court notes that its determinations are restricted to resolving the instant motions for lead plaintiff and in no way represent an ultimate decision on liability or damages.

Thus, the Court will begin with the first of the four factors which requires consideration of the number of shares purchased during the class period. *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. at 303. Here, 1199 SEIU purchased 167,603 shares during the Class Period which is 57,000 more than Public Pension Funds' purchase of 110,569 shares during the same. (ECF No.s 16 at 3-4 & 17 at 2). Accordingly, the first factor supports 1199 SEIU's appointment as lead plaintiff.

Turning to the second factor, the Court must consider which movant purchased the greatest amount of net shares. *Id.* The record in this case establishes that Public Pension Funds purchased a total of 57,866 net shares during the Class Period, whereas 1199 SEIU purchased 8,370 shares on a net basis. (ECF No. 16 at 4). Accordingly, this factor weighs in favor of Public Pension Funds.

The third factor is the total net funds expended during the Class Period. *Id.* 1199 SEIU advances that it expended a total of $1,722,740 in total net funds during that period, while Public Pension Funds avers that it expended a total of $4,432,596 during the same. (ECF No.s 16 at 3-4 & 17 at 2). This factor, likewise, supports Public Pension Funds' appointment as lead plaintiff.

The fourth and final factor is where the lion's share of contention lies between the movants. This factor requires the Court to assess the approximate losses that each movant suffered. *Id.* 1199 SEIU relies on the FIFO method of accounting, asserting that its FIFO losses of approximately $2.1 million exceed Public Pension Funds' FIFO losses of $1.7 million. (ECF No.s 12 at 6, 17 at 2 & 19 at 1). Conversely, in its initial motion, Public Pension Funds argues that it "sustained total losses of approximately $1.76 million when calculated on a FIFO basis, and approximately $1.63 million when calculated on a LIFO basis, on their Class Period purchases of 110,569 shares of Cardinal stock." (ECF No. 12-1 at 6). In its subsequent response and reply, however, Public Pension Funds advocates only for the LIFO method, highlighting that it suffered LIFO losses of $1,629,504 in comparison to 1199 SEIU's LIFO losses of $1,435,686. (ECF No.s 16 at 4 & 18 at 1-2).

Because the movants offer both FIFO and LIFO as a means to calculate losses, the Court must determine which method is optimal based on the facts of this case. While some courts in this circuit, such as our sister court in the Northern District of Ohio, have chosen LIFO as its preferred method of calculating losses, this district has neither accepted LIFO nor FIFO as supreme in all cases. *Compare Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, Case No. 3:16-cv-1106, 2017 U.S. Dist. LEXIS 195118, at * 26 (N.D. Ohio Nov. 28, 2017) (clarifying that in the Northern District of Ohio, "LIFO has been held to be the appropriate method for calculating losses") *with In re Cardinal Health, Inc. Sec. Litig.,* 226 F.R.D. 298, 305 (applying the FIFO method but explaining that the decision to do so "in no way demonstrates a modicum of approval of FIFO").

Turning to the facts of this case, the Court is inclined to apply the FIFO method of accounting to calculate each movant's losses. Although Public Pension Funds contends that this Court should consider only those losses calculated under the LIFO method, 1199 SEIU is correct in its rebuttal

11

that Public Pension Funds did not advocate for exclusive acceptance of the LIFO method until it filed its response to 1199 SEIU's motion for appointment as lead plaintiff. The record in this case demonstrates that, in its initial application for lead plaintiff, Public Pension Funds relied on both the FIFO and LIFO methods to support its contention that it had suffered the largest financial loss. (ECF No. 12-1 at 9). Yet, in its subsequent motions, Public Pension Funds abandoned the FIFO method, condemning it as misleading and exaggerative. (ECF No.s 16 at 4-5 & 18 at 2).

The Sixth Circuit has expressed disproval for vacillating advocacy such as this, especially as it pertains to calculating losses for appointment as lead plaintiff. *Garden City Emples. Ret. Sys. v. Psychiatric Solutions, Inc.*, Case Nos. 3:09-cv-00882 & 3:09-01211, 2010 U.S. Dist. LEXIS 42915, at *12-13 (M.D. Tenn. Apr. 30, 2010). As such, the Court is inclined to accept the FIFO method of accounting which both parties adopted in their initial motions. Under FIFO, 1199 SEIU has suffered the largest financial loss at $2.1 million compared to Public Pension Funds' loss of $1.7 million. The fourth and final factor, therefore, supports 1199 SEIU's appointment as lead plaintiff.

After considering the four *Olsten-Lax* factors, the Court notes that the first and fourth favor 1199 SEIU, while the second and third support Public Pension Funds. At first glance, the factors appear to place the movant's financial losses on equal footing. Yet, most courts have emphasized that greater consideration ought to be given to the fourth factor: approximate losses suffered. *See Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, Nos. 3:11—cv—0433, 3:11—cv—0451, 3:11—cv—0601, 2011 U.S. Dist. LEXIS 149899, 2011 WL 6202585, at *7 (M.D. Tenn. Nov. 28) (treating the largest alleged loss as dispositive after concluding that the first three factors "do not necessarily provide an appropriate measurement for identifying the Plaintiff with the largest financial interest"); *Ansfield v. Omnicare, Inc.*, 2012 U.S. Dist. LEXIS 198236, at * 8 (noting that

12

most courts emphasize the fourth factor – approximate loss suffered); *see also Vladimir v. Bioenvision, Inc.*, Case No. 07 Civ. 6416, 2007 WL 4526532, at *5 (S.D.N.Y. Dec. 21, 2007) (explaining that "[m]ost courts have found the fourth factor, the approximate loss suffered during the class period, to be the most important factor in determining who should be the lead plaintiff"); *In re Vicuron Pharms., Inc. Sec. Litig.*, 225 F.R.D. 508, 511 (E.D. Penn. Oct. 6, 2004) (explaining that the amount of financial loss is the most significant element). Bearing in mind that the *Olsten-Lax* factors are equally divided among the movants and that the fourth factor carries the greatest weight, the Court finds that 1199 SEIU has demonstrated the largest financial interest in this matter.

Thus, the Court will now look to whether 1199 SEIU's appointment as lead plaintiff comports with the factors enumerated in Rule 23 of the Federal Rules of Civil Procedure and, if so, whether Public Pension Funds has rebutted the presumption of adequacy that supports 1199 SEIU's appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)-(II).

### C. Subsection (cc)

The PSLRA instructs the courts to consider whether the party "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). According to Rule 23(a), a party may sue on behalf of a class if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). "But for purposes of determining the lead plaintiff under the PSLRA, only typicality and adequacy 'directly address the personal characteristics of

class representatives.'" *Eshe Fund v. Fifth Third Bancorp*, 2008 U.S. Dist. LEXIS 128466, at * 27 (citing *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. at 304).

### i. Typicality

1199 SEIU's claims are typical of the Class. A plaintiff satisfies the typicality requirement if the claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re American Medical Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996). Here, 1199 SEIU purchased Cardinal common stock during the Class Period, the prices it paid for the stock were allegedly inflated and it claims to have suffered losses as a result. These circumstances are typical of the Class and therefore satisfy the typicality requirement of Rule 23(a).

### ii. Adequacy

1199 SEIU will also fairly and adequately protect the interests of the class. "The Sixth Circuit looks to two criteria in determining the adequacy of a potential class representative: '1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" Neither movant in this case contends that the other bears interests antagonistic to the Class.

1199 SEIU contends that it is the most adequate lead plaintiff for several reasons. (ECF No. 13 at 6-7). First, 1199 SEIU asserts that its interests are aligned with those of the Class because its claims deal with the same issues to pertain to the other class members. *Id.* Second, 1199 SEIU highlights its background as a "sophisticated institutional investor with more than $11.5 billion in assets under management overseen for the benefit of more than 260,000 participants." *Id.* Third, 1199 SEIU maintains that it is "familiar with the requirements and responsibilities of being a lead

14

plaintiff in a securities class action and is willing to undertake those responsibilities on behalf of the putative class in this case." *Id.* And, fourth, 1199 SEIU contends that it has "selected experienced and qualified counsel, further evidencing its ability to fairly and competently represent the interests of the putative class." (*Id.* at 7).

1199 SEIU's assertions are well taken, and the Court is convinced that it has sufficiently demonstrated not only a common interest with unnamed members of the Class, but also that it will vigorously prosecute the interests of the Class through qualified Counsel. In addition, Public Pension Funds does not argue that 1199 SEIU will fail to capably or adequately represent the Class. As such, the Court is satisfied that 1199 SEIU meets the adequacy requirements of Rule 23.

### D. Rebuttal

For the aforementioned reasons, the Court concludes that 1199 SEIU is entitled to the PSLRA's presumption of adequacy as lead plaintiff which may only be "rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff--(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Because Public Pension Funds does not argue that 1199 SEIU is incapable of fairly and adequately protecting the interests of the Class or that it is subject to unique defenses, the Court will order 1199 SEIU's appointment as lead plaintiff.

### E. Lead Counsel

The PSLRA permits the Lead Plaintiff to select the Lead Counsel of their choice. 15 U.S.C. § 78u-4(a)(3)(B)(v). The most adequate plaintiff shall, subject to the approval of this court, select and retain counsel to represent the class. 5 U.S.C. § 78u-4(a)(3)(B)(v). "Courts typically do not disturb a lead plaintiff's choice of counsel unless doing so is necessary to protect the interests of

the class." *In re Cardinal Health*, 226 F.R.D. at 305 (citing *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002)). Nothing in the record indicates that 1199 SEIU's selection for lead counsel, Robbins Geller Rudman & Down LLP, is inadequate or inexperienced and therefore incapable of handling a large securities class action. On the contrary, the firm's robust resources and experience in the arena of securities class actions demonstrates that its appointment as lead counsel will benefit the Class. (ECF No. 13-1 at 7-9).

## IV.

For these reasons, SEIU Pension Fund's Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Plaintiff is **GRANTED** (ECF No. 13), and Public Pension Fund's Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel is **DENIED**. (ECF No. 12). Consequently, the Court **APPOINTS** 1199 SEIU as Lead Plaintiff and the law firm Robbins Geller Rudman & Down LLP as Lead Counsel.

**IT IS SO ORDERED.**

6-19-2020
**DATE**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**