UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 2:19-cv-03347 |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | Chief Judge Edmund A. Sargus, Jr. |
| | ) | Magistrate Judge Elizabeth A. Preston Deavers |
| vs. | ) ) | |
| CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C. KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON, | ) ) ) ) ) | |
| Defendants. | | |
| | | <u>DEMAND FOR JURY TRIAL</u> |

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................1

II.    JURISDICTION AND VENUE ........................................................................3

III.   PARTIES .........................................................................................................4

IV.   BACKGROUND ..............................................................................................6

      A.    Cardinal's Motivation to Acquire Cordis .............................................6

      B.    The Cordis Acquisition .......................................................................8

V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS .....................9

VI.   DEFENDANTS ISSUED FALSE PUBLIC FINANCIAL STATEMENTS ...................39

      1.     Failure to Timely Write-Off Excess, Obsolete, Expired and Missing Cordis Inventory ...........................................................40

      2.     Accounting Rules Required that Cardinal Record Losses for This Expired and Missing Corbis Inventory When It Was Known or Knowable ........................................................................41

VII.  ADDITIONAL SCIENTER .............................................................................44

      A.    Defendants' Public Statements Support a Strong Inference of Scienter ...............44

      B.    Defendants Casey and Wilson Lead the Cordis Integration, Which Supports a Strong Inference of Scienter ...............................................46

      C.    Executive Departures Support a Strong Inference of Scienter .............................46

      D.    Defendants Barrett and Casey Dumped Over 1.3 Million Shares of Cardinal for Over $113 Million in Proceeds...........................................................47

      E.    Defendants' Class Period Compensation Constitutes Additional Evidence of Scienter ...............49

      F.    The Magnitude of the Post-Class Period Impact from Cordis's Inventory Issues Supports a Strong Inference of Scienter......................................................53

VIII. LOSS CAUSATION AND ECONOMIC LOSS................................................54

IX.   PRESUMPTION OF RELIANCE....................................................................57

X.     NO SAFE HARBOR ......................................................................................58

- i -

**Page**

XI.     CLASS ACTION ALLEGATIONS ..................................................................................58

4837-5708-8962.v1

Lead Plaintiff, 1199 SEIU Health Care Employees Pension Fund ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Cardinal Health, Inc. ("Cardinal" or the "Company"), Company press releases and earnings call transcripts, public information regarding Cardinal including information posted on the Company website, analyst reports and media reports about the Company, and interviews with former Cardinal and Cordis employees.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This securities class action is brought on behalf of all purchasers of Cardinal common stock between March 2, 2015 and May 2, 2018, inclusive (the "Class Period"), against Cardinal and certain of its current and former senior executives (collectively "Defendants") for violations of §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

2.    Throughout the Class Period, Defendants made false or misleading statements about Cardinal's Cordis Corporation ("Cordis"), a global manufacturer of cardiology and endovascular devices which Cardinal acquired for $1.9 billion from Johnson & Johnson ("J&J") in October 2015. Specifically, Defendants misrepresented that they conducted adequate due diligence of Cordis, and that Cardinal was able to implement, and was implementing, its supply chain expertise and inventory management solutions worldwide at Cordis, which would drive sales growth and reduce any of Cordis's expired and lost products, and lower Cordis's managed inventory levels.  Defendants said that as a result of leveraging these capabilities at Cordis, the acquisition would be accretive to

Cardinal's non-GAAP diluted earnings per share by the end of Cardinal's 2017 fiscal year (July 1, 2016-June 30, 2017) and increasingly accretive thereafter, add annual synergies of $100 million exiting FY 2018, and be a growth driver for Cardinal in FY 2017, FY 2018 and beyond.  Defendants also misrepresented that the Cordis integration was on track and that Cordis was performing well and as expected.

       3.      Defendants' statements about Cordis, were materially false and misleading because, among other things, Cordis's inventory controls and demand forecasting capabilities were materially deficient before the acquisition and for two and a half years afterward and Defendants knew these facts all along.  The failure to forecast demand resulted in an accumulation of excess and/or obsolete inventory, product backorders, and Cordis losing customers to its competitors.  Also, Cordis had been carrying *at least $300 million* in excess, obsolete and missing or unaccounted for inventory in its warehouses during the Class Period, which Defendants knew about and failed to account for appropriately.  Compounding Cordis's inventory woes, its inventory tracking system outside the United States, where 70% of Cordis's sales occurred, was deficient and completely shut down in the summer of 2017, preventing any visibility into its inventories and negatively impacting its sales.

       4.      Three of the highest ranking individual Defendants who oversaw the acquisition and Cordis's operations abruptly resigned their positions between August 2017 and February 2018, amidst the undisclosed Cordis disaster.  Two of these insiders *sold over 1.3 million shares* of Cardinal stock at artificially inflated prices, reaping *over $113 million in proceeds* before leaving the Company.

       5.      Then, on May 3, 2018, Cardinal shocked investors and analysts by announcing before the markets opened that Cardinal's GAAP diluted EPS for 3Q FY 2018 *decreased* 33% to $0.81 because of *higher than expected Cordis inventory reserves* and that the Cordis business was a disaster and would not see profitable growth until the end of FY 2019.  Defendants admitted that day

- 2 -

that Cardinal **lacked demand planning capabilities** *"to have the right inventory in the right markets to capitalize on sales opportunities and reduce inventory reserves*."  On the news that Cordis's inventory and sales issues negatively affected Cardinal's earnings, Cardinal's stock price fell over 21% on May 3 on huge trading volume of 15,594,300 shares – by far the biggest trading day since the beginning of the Class Period.  Analysts were shocked by the news, with one analyst summarizing the obvious: "with the acquisition having closed in October 2015, we are disappointed by the lack of visibility, lack of good inventory controls, and lack of understanding of the full required investment."

6.      Then, after the Class Period in August 2018, Cardinal announced a $1.4 billion non-cash goodwill impairment charge, primarily driven by "inventory and cost challenges within [the] Cordis business."  That news confirmed the May 3 news – that the acquisition was a failure and Defendants had misrepresented its success throughout the Class Period.

## II.    JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa.  Cardinal is headquartered in this district, Defendants conduct business in this district, and a significant portion of Defendants' activities took place in this district.

10.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

- 3 -

## III.    PARTIES

11.    Plaintiff 1199 SEIU Health Care Employees Pension Fund purchased shares of Cardinal common stock during the Class Period.  *See* Certification Pursuant to Federal Securities Laws (ECF No. 13-4).  The 1199 SEIU Health Care Employees Pension Fund is a multi-employer Taft-Hartley defined benefit plan.  The Fund has approximately $11,000,000 in assets and approximately 260,000 participants who are current or former health care workers in New York City and the surrounding areas.  The Fund is administered by a Board of Trustees with equal representation of contributing employers and the 1199 SEIU United Healthcare Workers East.

12.    Defendant Cardinal is a global, integrated healthcare services and products company. Incorporated in Ohio, the Company maintains its headquarters at 7000 Cardinal Place, Dublin, Ohio 43017.  The Company's common stock trades on the New York Stock Exchange ("NYSE"), which is an efficient market, under ticker symbol "CAH."

13.    Defendant George S. Barrett ("Barrett") was Cardinal's Chief Executive Officer ("CEO") from August 31, 2009 to January 1, 2018.  Barrett also served as the Executive Chairman of the Board of Cardinal from August 31, 2009 to November 7, 2018.

14.    Defendant Donald M. Casey, Jr. ("Casey") was the CEO of the Medical Segment at Cardinal from April 2012 until February 2018, when he left the Company.  As CEO of the Medical Segment, Casey had full management responsibility for the Medical Segment including medical-surgical products and services for hospitals, physician offices, clinical laboratories, ambulatory surgery centers, long-term care facilities and other health care providers.  The Cordis business reported directly to Casey, and Casey was responsible for managing Cordis's integration into Cardinal's operations.  Prior to working at Cardinal, Casey spent 24 years at J&J, the company from which Cardinal acquired Cordis.

- 4 -

15.     Defendant Michael C. Kaufmann ("Kaufmann) has been CEO and a member of the Company's Board of Directors since January 1, 2018.  Prior to being appointed a Director and CEO, Kaufmann served as Chief Financial Officer ("CFO") of Cardinal from November 2014 to December 31, 2017, where he oversaw all financial activities for the Company including external reporting, investor relations, tax strategy/planning, and capital deployment as well as global sourcing for both the Pharmaceutical and Medical Segments.

16.     Defendant Jorge M. Gomez ("Gomez") was CFO of Cardinal from January 1, 2018 to August 2019.  Prior to assuming this role, Gomez served as CFO of Cardinal's Medical Segment from July 2015 to December 31, 2017, managing the financial strategy, merger and acquisition analysis and execution, performance tracking and capital development of the segment.

17.     Defendant David J. Wilson ("Wilson") was President of Cordis from March 2015 through August 2017.  As president of Cordis, Wilson was responsible for integrating Cordis into Cardinal's operations.  Prior to joining Cardinal in March 2015, Wilson worked for close to 20 years at the J&J family of companies, including eleven years at Cordis prior to Cardinal's acquisition. Wilson was hired by Cardinal to run Cordis because of Wilson's expertise and familiarity with Cordis's business and operations.

18.     Defendants Barrett, Kaufmann, Casey, Wilson and Gomez are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Cardinal, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual

- 5 -

Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.    BACKGROUND

### A.    Cardinal's Motivation to Acquire Cordis

19.    Cardinal, based in Dublin, Ohio, is a global distributor of drugs and medical devices. The Company operates through two segments: Pharmaceutical and Medical.  The Company's Medical Segment has traditionally offered low-tech, low-margin medical products, such as laboratory equipment, gloves and surgical apparel, and its core customer base has been hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States. In the years preceding the Class Period, Defendants were desperate to convince investors that Cardinal's multi-year plan known as the Medical Business Transformation initiative designed to improve Cardinal's Medical Segment contribution to Cardinal's overall financial performance was successful.  Cardinal's primary method to achieve improved contributions from the Medical Segment was via acquisitions.  By the beginning of the Class Period, through business segment acquisitions and strong financial gains in the Pharmaceutical Segment from strong generic price inflation, Cardinal's stock price had more than doubled since early 2013.  By early 2015, however, the Medical Segment's performance had stagnated and Defendants were desperate to show they could turn the fortunes of this segment around via a successful acquisition.

20.    This case arises out of Defendants' misrepresentations and omissions regarding Cardinal's acquisition and integration of Cordis, a manufacturer of cardiovascular and endovascular devices, and Cordis's performance following the acquisition.  Cardinal announced its plans to acquire Cordis for $1.9 billion from J&J in March 2015 as part of its strategy to broaden its Medical Segment product portfolio to include higher margin cardiovascular and endovascular products, to

- 6 -

boost profitability in its Medical Segment, and to expand its Medical Segment footprint globally. Cordis was one of Cardinal's largest acquisitions as of March 2015, having revenues of approximately $780 million in 2014 and operating in over 50 countries. Seventy percent of Cordis's sales were outside the United States.

21.     Prior to announcing the acquisition of Cordis, Defendants had been eager to demonstrate to investors that they could increase Cardinal's overall profitability. In the two years prior to the Class Period, Cardinal acquired AssuraMed and AccessClosure, but Medical Segment profitability was mixed. Cardinal's overall results were being driven largely by unsustainable generic drug price inflation enjoyed by its Pharmaceutical Segment.

22.     Defendants were desperate to demonstrate that Cardinal's Medical Segment could reverse its mixed profitability.

23.     On February 21, 2015, rumors that Cardinal was a leading candidate to acquire the Cordis business from J&J leaked to the media. Analysts expressed excitement about the possibility of Cardinal's acquisition of Cordis. For example, Morgan Stanley stated:

> "[W]e view a deal as both consistent with CAH's medical strategy and in-line with expectations outlined in our 2015 outlook report. . . .
>
> Cordis' portfolio of cardiovascular devices including guidewires, catheters, & stents fits with CAH's 'genericization' device strategy and is consistent with our 2015 outlook view and investor sentiment that CAH could do a medical devices deal. While no longer the dominant cardio player it once was when the Cypher drug eluting stent had 100% market share, Cordis' (a JNJ company, covered by MS Medtech Analyst David Lewis) remaining assets fit the profile of lower end physician preference devices Cardinal has discussed as a growth opportunity following deals to enter orthopedics (via a strategic agreement with Emerge Medical in 7/2012) and cardio (via the 4/2014 AccessClosure acquisition). Given Cardinal Medical CEO Don Casey came from JNJ, where he was the chairman of the comprehensive care group overseeing global cardio, diabetes & vision care, we view it likely he has a deep understanding of the Cordis franchise & positioning and how it would fit with the CAH strategy."

24.     Shortly after rumors of the Cordis acquisition leaked, defendant Kaufmann and Ericka Wadlinger, head of Investor Relations at Cardinal, attended a conference hosted by RBC

- 7 -

Healthcare and told analysts that the rate of generic drug inflation that allowed Cardinal to report increasing revenues and profitability in the Pharmaceutical Segment would decline in the second half of 2015.  Defendants needed to demonstrate to the market that Cardinal could replace the profits lost because of declining generic drug inflation with acquisitions in the Medical Segment.

25.     Defendants' long-term incentive compensation was paid via stock options, Restricted Stock Units ("RSUs") which vested over a three-year time period and Performance Stock Units ("PSUs") which cliff-vested at the end of three years.  The RSUs and PSUs were priced, however, when they were granted.  By the beginning of the Class Period, Defendants were well-aware that if they could not replace the declining revenue and profit generated via generic drug price inflation, Cardinal's stock price and the value of their stock options would decline, and the RSUs and PSUs granted to them would become worthless.

**B.     The Cordis Acquisition**

26.     On March 2, 2015, Cardinal confirmed the rumors and announced that it planned to acquire the Cordis business from J&J.  Cardinal made a binding offer to purchase Cordis for $1.9 billion and announced that the acquisition "created immediate global scale and scope" and that the Cordis business would bolster the Medical Segment's performance.

27.     The acquisition was completed on October 4, 2015.  The parties structured the transaction such that Cordis's assets and operations in its principal markets would be transferred effective October 2, 2015.  Cordis's principal markets included Australia, Austria, Belgium, Canada, China, France, Germany, Ireland, Italy, Japan, Luxembourg, Mexico, the Netherlands, New Zealand, Portugal, South Korea, Spain, Sweden, Switzerland, the United Kingdom and the United States. Cordis's assets and operations in the remaining markets ("Second Day Countries"), such as Brazil, Russia, India, South Africa, various central European countries, and various Middle Eastern

countries, were planned to close on a rolling basis after the Company received regulatory approval and satisfied customary closing conditions.

28.     To facilitate an orderly transfer of business operations, the Company entered into Transition Service Agreements ("TSAs") and Transition Manufacturing Agreements ("TMAs") with J&J.  Under these transaction contracts, Cardinal had reasonable access rights to all Second Day Country properties, books and records.

29.     Cardinal's manufacturing of interventional cardiovascular products represented a significant departure from the low-tech medical supplies that the Company traditionally distributed. Moreover, while the acquisition expanded Cardinal's presence worldwide, Cordis's presence in countries outside of Cardinal's existing geographic footprint posed significant challenges, as did the complexity of integrating Cordis's processes, management and personnel.  Accordingly, the Company's prompt and cost-effective integration of Cordis's business into Cardinal's operations was particularly important to investors.

30.     Critically, unlike Cardinal's other medical supply products, heart stints and catheters have strict product expiration dates, which must be closely monitored to comply with regulatory and quality standards.  Thus, Cardinal's implementation of effective inventory control systems and control of inventory levels at Cordis would be key to the success of the Cordis acquisition and integration.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

31.     The Class Period starts on March 2, 2015, the day Cardinal publicly announced its plans to acquire Cordis.  On that day, Cardinal filed an SEC Form 8-K announcing that on March 1, 2015 Cardinal had made a binding offer to purchase the Cordis business of J&J for $1.9 billion. Cardinal's Form 8-K included a press release issued the same day stating that the planned acquisition "[c]reates immediate global scale and scope" and that "Fiscal 2017, first full post-close year,

accretion [from Cordis] is expected to be greater than $0.20 in non-GAAP diluted earnings per share from continuing operations; increasingly accretive thereafter."  The Form 8-K also included a Cordis acquisition fact sheet with "Deal highlights" that repeated the press release's accretive statement and added that Cardinal also expected a slight non-GAAP dilution in FY 2016 ($0.13 to $0.15 per share), due to the impact of the fair value step-up Cardinal would have to realize for the Cordis inventory it was acquiring in the acquisition, which led investors to believe there were no significant issues with Cordis's inventory.

32.     On March 2, 2015, Defendants also hosted a conference call to provide investors with more detail about the Cordis acquisition.  During the conference call, which began before the market opened, Defendants made an investor presentation during which Defendants highlighted that Cardinal "brings supply chain expertise and inventory management solutions to Cordis" and that Cordis "[l]everages CAH supply chain expertise" and "[e]xtensive and deep supply chain relationship with IDNs [Integrated Delivery Networks]."  In the slides presented at the conference, Defendants repeated, and expanded on, the financial benefit Cordis would bring to Cardinal, stating that the acquisition was expected to be "significantly accretive to [Cardinal's] Medical Segment margin Rates," expected to be "greater than $0.20 in non-GAAP EPS accretion in FY 17" and "increasingly accretive thereafter," with "[a]nnual synergies of at least $100M expected exiting FY18."

33.     Defendant Casey, a former J&J executive who was tasked to lead the Cordis business once acquired, also gave more detail on the supply chain expertise and inventory management solutions Cardinal would bring to Cordis.  During the conference call, Casey told investors that Cordis will "leverage [Cardinal's] highly efficient delivery model and investments we have made in RFID [radio-frequency identification] technology by virtue of our WaveMark acquisition."  Casey explained that "this shared platform connects manufacturers and providers with supply chain

- 10 -

visibility and analytics" and "reduc[es] expired and lost products, lowering managed inventory levels and decreasing holding costs." Casey concluded, "[a]ll this adds up to significant potential operating efficiencies." Casey also assured investors that Cordis would leverage Cardinal's advanced supply chain solutions, stating that Cordis would "benefit from our efficient shared distribution system to drive significant supply chain savings."

34.    On the conference call, Cardinal's CEO and CFO both repeated to investors the attractive economics of the Cordis acquisition. Barrett told investors "the economics associated with this acquisition are very attractive. We expect the deal to be accretive by more than $0.20 in fiscal 2017, the first full fiscal year post our anticipated close. We expect that number to grow in the years thereafter." Kaufmann confirmed, stating: "we expect the transaction to be greater than $0.20 accretive in fiscal 2017, which is the first full year post close, and we expect this to be increasingly accretive thereafter. . . . We expect operational synergies of at least $100 million annually to be realized by the time we exit our fiscal 2018."

35.    Analysts reacted positively to the announcement of the Cordis acquisition. For example:

(a)    S&P Capital reported that the Cordis acquisition "is likely to result in at least $0.20 in EPS accretion in FY17, we expect, the first full year after closing (expected by mid FY16)."

(b)    Leerink reported that "following the Cordis deal we have a much higher degree of confidence in management's ability to deliver on significant growth in the Medical Division's margins."

(c)    J.P. Morgan noted that "execution will be key" and "we are optimistic that Don Casey's former experience running the Cordis business for JNJ will allow CAH to garner the expected benefit and accretion from the transaction."

- 11 -

4837-5708-8962.v1

(d)     Cowen and Company reported that they "like the deal and how it significantly accelerates CAH's Medical strategy" and that by their "estimate, that means Cordis could significantly and instantly expand CAH's Medical unit operating margins towards 5.2% from about 4% today. This should help quell concerns that CAH would not be able to hit its FY 2017 Medical operating margin target of 5.75%, and even makes it possible for CAH to exceed this target." Cowen and Company also reported that "[o]n the cost side, we expect the sales forces and supply chains to be optimized as CAH integrates distribution and manufacturing functions while bringing its RFID inventory mgmt to Cordis."

(e)     Evercore ISI reported that "[w]e expect management (whom has great familiarity w/ [Cordis] via Don Casey and likely even Mike Kauffman [sic] given JNJ roots) to utilize its supply chain prowess . . . ."

(f)     Evercore ISI, in an updated report later on March 2, 2015, reported that the "'Heart' of [Cardinal's] Medical business transformed via Cordis" and that "[w]hile entering new product markets (particularly those as challenged as cardiology) does present some new risks, we believe the financial merits currently outweigh those concerns and also entrust in management to execute (especially given historical comfort w/ business)."

(g)     On March 3, 2015, RBC Capital Markets reported that "Cordis alone is $0.08 and $0.23 accretive to our fiscal 2016 and fiscal 2017 EPS estimates" and with a "boost to the medical/surgical business from acquiring Cordis, we continue to believe that Cardinal Health is strategically and operationally well positioned for continued growth."

36.     On March 3, 2015, the day after the Cordis announcement, Cardinal attended an investor health care conference hosted by Cowen and Company and spoke again about the Cordis acquisition. During the March 3, 2015 conference, Barrett repeated to investors that the "economics of this deal are extremely attractive. We expect it to be more than $0.20 accretive in fiscal FY17.

We expect by the end of 2018 to achieve about $100 million or more of synergies.  And we think this is really important driver for us."

37.     At the March 3, 2015 conference, Barrett also repeated earlier statements that Cardinal brought value to Cordis because of the Company's supply chain expertise and inventory management.  In response to an analyst's question about how Cardinal was going to stabilize Cordis's sales since it had been on a decline in previous years, Barrett stated:

> We think there is a different way to bring value to the market around those products. It's not just a product and account of those products.  It's the way that they are managed in the cath lab, it's how much inventory you are carrying, it's whether or not, you can tag them to prevent leakage or loss of a product, prevent a product from expiring.  So they are all kinds of supply chain tools built around . . . this that could change the paradigm, and it's actually largely what we see. . . .  So we see this as a growth opportunity actually in this area. . . .  For us, we see a great opportunity and then combining it with our supply chain expertise.

38.     During a breakout session with analysts at the Cowen Health Care Conference, Barrett also talked to investors about how the Cordis acquisition was a reset in Cardinal's growth strategy for its Medical Segment given that its Pharmaceutical Segment, while solid, was not the driver of Cardinal's business anymore.  Barrett told investors that the Company's due diligence on the Cordis acquisition confirmed Cardinal's decision to change its strategic direction within the Medical Segment:

> When we were – that our pharmaceutical distribution business wasn't seen necessarily the strategic driver of the business, but was really steady solid business and my view of the world was, this is a strategic growth engine of this business and we just reset the organization around that goal in creating that opportunity out of incredible set of assets.  So I think there's opportunity for, we'll have to do some things differently.  Again, we will have to do [things a] little differently than J&J did them, we'll have to do something to the portfolio with its strategy and with the services, but the due diligence confirmed our belief that we can do it.

39.     After the Cowen Health Care Conference, on March 4, 2015, Cowen and Company reported that "management was very positive on Cordis, and we think investors are mistaken in thinking Cordis is outside CAH's competency.  Cordis is very consistent with CAH's longstanding

- 13 -

message of driving standardization in medical devices.  We see accretion guidance as conservative . . . ."

40.     In the months that followed, Defendants talked extensively about Cordis to investors, repeating their statements that Cordis would leverage Cardinal's supply chain expertise and advanced inventory management systems to create a sustainable growth platform for the Company and that the Cordis business would be $0.20 accretive by end of FY 2017 and beyond.  These statements led investors to believe that once the Cordis acquisition closed, Cardinal would be able to use its supply chain expertise and its sophisticated inventory management systems to efficiently manage Cordis inventory, which in turn would provide value to the Company in the form of profitable sales, lower inventory related costs, and increased earnings.

41.     For example, on March 10, 2015, Cardinal presented at a Barclays Healthcare Conference.  At the conference, Barrett confirmed "we realized given our history in supply chain management that there are tools that we can bring, and services that we can bring, and we can validate this now, that can reduce cost, eliminate waste, prevent redundancy, reduce errors . . . ." Similarly in a April 10, 2015 article in the Clinica Medtech Intelligence, Casey stated "By leveraging its RFID-enabled supply chain capabilities, [Cardinal] believes it can continue to see growth and get more mileage from mature, but well-respected products such [as] those offered by Cordis."  On an April 30, 2015 Cardinal earnings conference call for 3Q 2015, Kaufmann confirmed "in FY17, the first full year post-close, we expect the transaction to be greater than $0.20 accretive and increasingly accretive thereafter.  We still expect operational synergies of at least $100 million annually by the time we exit FY18."

42.     On May 13, 2015, Cardinal presented at the Bank of America Merrill Lynch Health Care Conference.  At the conference, Kaufmann again affirmed that with Cordis's use of Cardinal's internal radio-frequency identification ("RFID") inventory technology, then called WaveMark and

- 14 -

now known as CIMS, "we're going to be able to take a waste out of the system, reduce obsolescence, reduce inventory."

43.     On October 4, 2015, Defendants issued a press release announcing the completion of the Cordis acquisition.  The press release stated that "Integration teams have been engaged since the acquisition announcement in March 2015, and the integration process is off to a successful start." The press release also stated that "Collectively, Cardinal Health and Cordis will now be able to offer . . . reliable, trackable inventory and logistics[] and deep analytic capabilities" and confirmed the Company "expects fiscal 2017 accretion in non-GAAP diluted EPS of greater than $0.20 per share, . . . and for the acquisition to be increasingly accretive thereafter.  The company continues to assume that synergies will exceed $100 million annually exiting fiscal 2018."

44.     In October 2015, *Endovascular Today* published an interview with Cordis's then President David Wilson entitled, "Insights From David J. Wilson, President of Cordis Corporation." During the interview, Wilson stated, "With Cardinal Health, we also have a significant opportunity to focus on operational efficiencies with information-enabled systems (*e.g.*, RFID).  Investment in the infrastructure of delivery systems will result in cost savings seen through inventory holding cost reduction, the decrease of inventory levels, and the elimination of costs associated with expired or lost products."

45.     On November 19, 2015, the Company hosted the Cardinal Health, Inc. Investor and Analyst Day meeting.  At the meeting, defendant Casey again touted the benefits CIMS (formerly WaveMark) would bring to Cordis, stating that it was "attaching RFID," and that it was "going to change the game from our ability to manage lost products, dated products, it's going to provide the analytics people need to begin to understand how we can do a much better job of managing inventory."  Casey further noted that "Cordis [was] going to benefit immediately from share[d] distribution, becoming part of our 360 program, and then begins to ride on a smart distribution

- 15 -

system around [CIMS], that's going to be a differential advantage and will allow us to deliver value."

46.     On January 12, 2016, J.P. Morgan hosted a conference call during which both Kaufmann and Barrett assured investors that everything was going as planned on the Cordis integration.  Kaufmann stated "I just wanted to let you know right now everything's going as planned on Cordis.  A couple weeks from now when we have our second quarter release, we will give you some more detailed information around how the inventory step-up looks, and overall how things are going in Cordis.  But for right now, I just want you to know from everything we see things are going as planned and as expected."  Likewise, Barrett confirmed that "the integration has gone well."

47.     On February 1, 2016, Cardinal hosted an earning conference call to discuss with investors and analysts the Company's 2Q 2016 financial results, which was the first quarter to include the results for the entire Cordis business in all countries following the acquisition.  Barrett and Kaufmann reported again on the progress of the integration, with Barrett stating the "integration of Cordis has gone well and is on target" and Kaufmann stating "Cordis is off to a good start, with all key personnel in place, and day-to-day operations up and running."

48.     During the conference call, Kaufmann reported that Cardinal's Medical Segment's top-line revenue performance was strong for the quarter due in part to Cordis and confirmed and "in FY17 we still expect the transaction to be greater than $0.20 accretive, and increasingly accretive thereafter.  We are also working towards achieving the $100 million of annual synergies as we exit our FY18."

49.     Following the 2Q 2016 earnings conference call, Barrett continued to update investors on the progress of the Cordis integration.  On February 10, 2016, Barrett spoke at an analyst conference hosted by Leerink Partners Global.  In response to an analyst's question about

- 16 -

how Cordis was performing, Barrett stated, "We're off to a very good start.  As we said at the end of our second quarter, things are going as expected."  Similarly, on March 7, 2016, Barrett attended the Raymond James Institutional Investors Conference.  At the conference, Barrett stated, "Again, for us the Cordis acquisition, which is very early on and going well thus far."  Barrett added, "Cordis is off to a very good start, and nothing I've seen makes me less enthusiastic about this part of the strategy."

50.     On April 28, 2016, Cardinal hosted an earnings conference call to discuss with investors and analysts the Company's 3Q 2016 financial results.  During the call Barrett spoke about Cordis's growth in Europe and continued to assure investors that "the integration of Cordis remains on track."  Defendant Kaufmann shared the same assessment, stating, "First, the onboarding of Cordis continues to progress well.  We have filled the key roles with excellent talent and are focused on execution."  In response to analyst's questions regarding Cordis, Kaufmann also promoted Cordis's operational performance, "But again, I think it's really important to know that the underlying Cordis business is doing really well – done an excellent job of staffing up, both from management and the sales teams."

51.     On June 15, 2016, Barrett attended an analyst conference hosted by William Blair.  During the call, Barrett talked up the benefits of the Cordis acquisition with regard to Cardinal's ability to also sell inventory management solutions to its hospital customers.  During the call a William Blair analyst asked Barrett about Cordis's performance to date and the lessons learned thus far from the integration.  In response, Barrett spoke only positively about the Cordis acquisition, stating:

> So it is still early, we are still in full integration mode.  Let me give you the good.  There is probably only one bad and that is not a terrible bad, it is just foreign exchange over the last year has been relatively difficult and we have said that in our last call.
>
> That aside, operationally the integration is going extremely well.  Market share is going well, we have retained the talent we want, we have attracted additional talent and on a global basis, we are actually about where we modeled it with again

some swings in foreign exchange.  But otherwise Cordis is off to a strong start.  We are really excited about the leadership team.  We are operational fully across the globe.  We've got a European headquarters in Zurich, Switzerland and I think right now we are off to a good start in the integration.

52.     On June 17, 2016, Cardinal hosted its annual Dublin Day investor conference in Dublin, Ohio, the Company's worldwide headquarters.  At the conference, Casey updated analysts on the status of Cordis's integration into Cardinal's operations, stating, "[W]e've spent a lot of time as well as focused effort on really beginning to take the commercial capabilities that come with Cordis and beginning to build an infrastructure underneath that.  That has gone well."  Casey concluded, "I will tell you we are pretty comfortable that Cordis is performing about where we thought it would be.  There are puts and takes but Cordis is doing what we thought it would do."

53.     During the Dublin Day conference call, analysts asked whether Cordis was still on track to achieve $0.20 EPS accretion by end of FY 2017.  In response, Casey confirmed the Cordis accretion previously given, stating:

> [W]e are going to meet what we said and the guidance where we are, we are still pretty comfortable with where that is.  A lot of this is really going to fall where FX, FX can move that business up, down, or sideways so it will. . . .

54.     On August 2, 2016, Cardinal hosted an earning conference call to discuss with investors and analysts the Company's 4Q 2016 and FY 2016 financial results.  At the onset of his comments about Cordis, Barrett praised the Cordis team, telling investors that "Don Casey and his team did a tremendous job closing the Cordis acquisition on time and managing the integration into Cardinal Health . . . and we hit our integration and performance benchmarks."  Kaufmann also raved about the progress of the integration, stating, "First of all, I just want to make sure, we feel really excited about Cordis.  We think things are going really well.  We've got all of the key employees, management teams, sales folks in place, things are going incredibly well."

55.     During the conference call, Kaufmann also talked about the expectations and assumptions around the Company's Medical Segment for FY 2017.  Kaufmann announced that

- 18 -

Cardinal lowered Cordis's expected fiscal year 2017 accretion in non-GAAP diluted earnings from $0.20 to $0.15 per share, "largely due to currency impacts, as well as some increased SG&A investments compared to our original business case."  Notwithstanding this revised outlook, Kaufmann told investors that the Company was still expecting "double-digit segment . . . growth and margin . . . expansion" from the Medical Segment due to "expect[ed] great performance from Cordis."

56.     On October 31, 2016, Cardinal hosted an earnings conference call with investors and analysts to discuss the Company's financial results for 1Q FY 2017.  During the call, Barrett again praised Casey for his work on the Cordis integration, stating, "[Don] Casey and his team have done a tremendous job leading the integration, thoughtfully phasing in new systems and processes and building out an important platform."  Barrett added:

> The integration of Cordis has proved to be an excellent example of how we can bring together best practices across borders.  We have seen over this past year, that taking the time to do things right is essential to best serve our customers.  We have also seen growth in some important markets including Europe, where we believe that taking an integrated cohesive approach to our customers will position us for measurable growth over the long term.

57.     On the same call, Kaufmann repeated the positive statements regarding Cordis, stating, "Specific to Cordis, it continues to meet our performance expectations and make real and measurable progress," and "Cordis continues to perform well and we are confident in both the fundamentals and growth initiatives in that business."

58.     On December 16, 2016, Cardinal hosted another Dublin Day investor conference in Dublin Ohio.  During the call, Barrett reported on Cardinal's progress in getting its inventory management system (CIMS) into US interventional cardiology labs, which were Cordis's main customers.  Barrett emphasized the system's ability to address problems with wasted and expired product, thereby reducing inventory management costs. During the call Barrett told investors:

One of the things I'll tell you that we did, probably inordinately excited about, which – that's just because we are optimistic about a lot of stuff – this CIMS program, Cardinal Health inventory management system, which is our RFID program that we've begun to put forward. And it is actually made most progress in the US right now in the interventional cardiology lab.

The amount of product that is either wasted . . . we think is between 5% and 10%. The amount of product that is expired might be between 0 and 5%. That's just a tremendous cost that this RFID program effectively eliminates.

And then if you begin to look at the costs associated with managing consignment inventory and other things, you begin to see the value of something that – like this inventory management program.

59. On January 10, 2017, defendants Barrett and Kaufmann answered questions during a Webcast at the J.P. Morgan Healthcare Conference, which was attended by analysts and investors. In response to an audience member's request for "an update on Cordis," defendant Barrett responded that "[i]t's going really well."

60. On February 7, 2017, before the markets opened, Cardinal issued a press release reporting its financial results for 2Q FY 2017 and reducing its non-GAAP diluted EPS outlook for FY 2017 from $5.40-$5.60 to $5.35-$5.50. While GAAP and non-GAAP operating earnings had declined 4 percent due to generic pricing in the Pharmaceutical Segment, Cardinal reported positive news for the Medical Segment, partly due to Cordis:

[Medical] Segment profit increased 50 percent to $159 million due to the contribution from Cardinal Health Brand products, which includes Cordis. The increase reflects the $21 million unfavorable impact of the Cordis-related inventory fair value step-up in the second quarter of fiscal year 2016. Excluding this step-up, year-over-year Medical segment profit growth was 25%.

Defendant Barrett said, "[o]f particular note, we saw strong growth in . . . our Medical Segment, where virtually every part of that business grew."

61. Following Cardinal's 2Q FY 2017 earnings release on February 7, 2017, Cardinal held a conference call for analysts and investors, during which Barrett said, "[o]ur Cordis acquisition

- 20 -

is largely on plan . . . ." and Kaufmann added "Cordis is performing well, particularly in Europe and Latin America."

62.     Analysts reiterated Defendants' positive statements about Cordis' performance and integration following Cardinal's February 7, 2017 earnings release and call.  For example:

(a)     UBS reported the same day: "Growth accelerates across the Medical business in particular, aided by better conversion of the Cordis acquisition into the products portfolio."

(b)     Leerink's "bottom line" after the call was: "Following the quarter we are more positive on CAH . . . .  We are impressed with CAH's ability to keep SG&A costs under control . . . .  In our view . . . Medical is showing significant growth given the integration of Cordis.  We increase our PT to $81 (from $75)."

(c)     ISI reported following the call: "Cordis is progressing well in Europe and Latin America" and "we look to potential upside to our forecast from more active capital allocation, with Medical a likely focus given we are now well into Cordis integration and Don [Casey] has execute[d] well on accelerating growth and improving margins."

(d)     Barclays reported it was "encouraged to hear that the [Cordis] business continued to grow in Europe."

(e)     Argus reported on March 20, 2017: "The Cordis acquisition has expanded Cardinal's portfolio of medical products and its overseas distribution capabilities.  The company is also boosting profitability in the Medical segment by increasing its distribution of self-sourced and self-manufactured products."

(f)     On March 22, 2017, J.P. Morgan noted, "[t]he Cordis deal increased the scale/breadth of Cardinal's cardiovascular product line, and brought strong provider relationships in the U.S. and an increased global footprint (operations in >50 countries and 70% of revenues coming

from outside of the U.S.), which will allow Cardinal to leverage scale in sourcing and manufacturing, and provide a platform for adding new products and services."

63.     Two weeks before announcing 3Q FY 2017 results, on April 18, 2017, Cardinal issued a press release announcing that its fiscal 2017 non-GAAP EPS would be "at the bottom of its previous guidance range of $5.35 to $5.50," which Defendants said was "attributable to expected fourth-quarter results." Defendants said the disappointing fiscal 2018 outlook was due to "[s]everal company-specific discrete items that, in the aggregate, will have a negative impact on EPS of at least $0.50," half of which was due to the generic drug pricing deflation in its Pharmaceutical Segment. Cardinal fiscal's 2018 non-GAAP EPS was therefore expected "to be flat to down mid-single digits." As a result of this news, Cardinal's stock price declined approximately 9%.

64.     Following Cardinal's April 18, 2017 announcements and call, analysts continued to view Cordis as a positive in the Cardinal story. For instance, UBS reported the same day that an "Upside" for Cardinal was, "Growth accelerates across the Medical business in particular, aided by better conversion of the Cordis acquisition into the products portfolio as well as contribution from the Medtronic deal." CFRA reported the same day, "Margins narrowed less than we expected as deflationary generic drug pricing and the loss of a large customer was mostly offset by improved purchasing and accretion from the acquisition of Cordis."

65.     On May 1, 2017, Cardinal held a conference call with investors and analysts to discuss Cardinal's 3Q FY 2017 results. The slides presented at the conference reiterated that Cordis was expected to be at least $0.15 accretive to Cardinal's FY 2017 non-GAAP diluted EPS, and increasingly accretive after FY 2017. During the call, Barrett continued to represent the Cordis acquisition was proving a success, stating that "we were encouraged by our commercial momentum on a global basis." On the call, Kaufmann reported a decline in Cordis profit for 3Q FY 2017 due to increased SG&A expenses and disclosed that Cardinal took an unquantified inventory reserve

- 22 -

increase in 3Q FY 2017 for Cordis inventory based on information provided by third parties. Kaufmann, however, continued to conceal the multitude of problems Cordis was facing due to its inventory and operational deficiencies, as set forth in ¶67 below, and downplayed to investors the Cordis profit decline and unquantified inventory reserve as a one quarter event by assuring investors on the conference call "that the Cordis business would return to growth in Q4."

66.     Encouraged by Defendants' statements that Cordis would return to profitable growth the next quarter, analysts issued reports following the May 1, 2017 conference call, that confirmed Cordis's financial results would improve in 4Q FY 2017:

(a)     Cowen and Company reported on May 18, 2017:

Medical strategy is taking shape and is poised to deliver needed earnings growth. We continue to believe that CAH's strategy to grow its Medical business is of strategic importance.  In our view, as the generic cycle continues to slow, core growth in the drug distribution will also slow (although generating a lot of cash).  We believe deploying capital toward faster growth areas makes sense.  In this regard, management noted that Cordis (acquired in 2015) has performed as expected in the United States and a bit better internationally.  Importantly, Cordis has grown since being acquired by CAH, which is different from when it was part of JNJ and was declining y/y.

(b)     Leerink reported on May 1, 2017: "Cordis earnings should rebound next quarter.  While SG&A was higher than we expected we applaud CAH's investments into technology because these systems are critical to maintaining good buy and sell-side rates."

(c)     William Blair reported on May 1, 2017: "Management expects better Cordis performance in the fourth quarter . . . ."

67.     Defendants' statements alleged in ¶¶31-65 were materially false or misleading at the times they were made, and/or omitted material information required to be disclosed, because they failed to disclose the following adverse information that was known to Defendants or recklessly disregarded by them:

(a)     Defendants were unable to accurately track, how much Cordis consignment and warehouse inventory existed, how much of it was excess and obsolete or about to expire, how much of it was missing or unaccounted for and where it was located around the world.  Defendants lacked fundamental visibility into Cordis's global inventories, the largest and most critical physical component of Cardinal's acquisition, for the following reasons:

(i)     Before completing the acquisition of Cordis, Cardinal did not perform adequate due diligence, and also did not conduct nearly the financial due diligence it customarily did for other acquisitions for several reasons.  First, Defendants relied heavily on defendant Casey's knowledge about Cordis to assess the deal, as Casey claimed to be familiar with Cordis from his time at J&J preceding his employment at Cardinal.  In addition, Cordis was one of eight or nine business lines within a J&J business segment, which made separating Cordis from the rest of these businesses difficult for purposes of pre-acquisition due diligence.  For example, inventory from the other eight or nine business lines was comingled with Cordis inventory, and therefore difficult to separate for analysis.  Further, J&J was reluctant to allow Cardinal to closely examine its books and records related to Cordis.  Defendants therefore knew they lacked an adequate understanding of Cordis's inventories globally before and following the acquisition.

(ii)     J&J had failed to manage, account for and accurately track Cordis's warehouse and consignment inventory and to integrate inventory control and supply chain systems for Cordis throughout the world before Cardinal acquired it, so that J&J did not accurately forecast demand for Cordis products and manufactured excess quantities of them.  In acquiring Cordis, Cardinal inherited J&J's inadequate inventory and internal controls and the incapacity to demand forecast for Cordis products in Cordis's largest regions, including the United States and Europe Middle East Asia ("EMEA") region.  In the first two and a half years following the acquisition,

- 24 -

Defendants discovered hundreds of millions of dollars in Cordis consignment and warehouse inventory.  For example:

        1)      J&J manufactured 80%-90% of Cordis products in Juarez, Mexico.  J&J stored Cordis products in Juarez and in a third party warehouse in El Paso, Texas where they were stored before and after being sterilized at a Steris facility in El Paso.  The El Paso warehouse and/or the Steris facility shipped the products back to Juarez after sterilization.  The third-party El Paso warehouse and J&J's Juarez warehouse inventory controls were never integrated, so that J&J had no visibility into the inventory stored in and shipped across the international border to and from those warehouses.  J&J therefore manufactured vast amounts of product that were stockpiled in its warehouses and were unaccounted for before the acquisition.  For instance, immediately after the acquisition, J&J shipped 100 trailers of Cordis inventory worth millions of dollars from its third party El Paso warehouse and its Juarez warehouse to Cardinal's Global Trade Center in El Paso.  Cardinal was also not prepared to store the products from the 100 trailers, and was forced to identify and retain third party logistic centers to warehouse all of the inventory in the trailers, because the products could not be exposed to the high temperatures in El Paso and Juarez.

        2)      Defendants discovered during this period that Cordis had been carrying between at least $200 million and $300 million dollars in excess, obsolete, missing and/or unaccounted for inventory in its warehouses around the world, including El Paso, Colombia, Brazil, Mississippi, Belgium and Japan.

        3)      In addition to its warehouse inventory, J&J had been unable to locate, accurately count and analyze Cordis consignment inventory around the world before Cardinal acquired Cordis.  J&J used iTrak, a barcode-centric inventory management system, to track Cordis inventory globally.  Before the acquisition, J&J had been unable to track Cordis inventory stickers that include expiration dates and locations of Cordis inventory in EMEA.  J&J was therefore unable

to accurately count and locate Cordis's inventory throughout EMEA, and to determine whether it was expired or close to expiring.  Defendants inherited iTrak in October 2015, which prevented Cardinal from accurately tracking, locating and identifying expired inventory throughout EMEA.  As a result, Cardinal was forced to hire staff to conduct manual counts of Cordis consigned inventory in EMEA, hospital by hospital and product by product.  The process took at least one year, until late 2016 or early 2017, during which time Cardinal lacked visibility into EMEA inventory.  Cardinal discovered during these manual counts that J&J held large amounts of expired Cordis consignment inventory in medical centers in EMEA at the time of the acquisition.  Cardinal senior management in EMEA discussed and documented the lack of visibility into EMEA inventory every week at weekly internal leadership meetings.

4)  In or around January 2016, Cardinal planned to open a Global Replenishment Center ("GRC") in El Paso to manage Cordis inventory by April 2017.  The GRC would ship inventory to eleven or more distribution centers throughout the world, which would then distribute the products to customers.  However, the deadline was pushed back twice for the GRC to be able to begin distribution, in part because of setbacks in establishing the necessary information technology to allow Cardinal's SAP system to interface with Cordis's legacy Manhattan warehouse system.  The GRC was not opened and ready to distribute inventory until October 2017.  As the GRC was being built out, it received millions of dollars' worth of Cordis inventory, some of which sat for a year or longer before the GRC opened.

5)  J&J also had been unable to track Cordis consignment inventory in North America, so that Cardinal was also forced to manually track that inventory. Following the acquisition, North American Territory Sales Managers ("TSMs") were given one quarter to manually reconcile lists of Cordis consigned inventory that had not been managed by J&J, an initiative that took place sometime between October 2015 and March 2016.  Bar coding teams

- 26 -

were sent to hospitals throughout the United States to bar code Cordis inventory on hospital shelves, and sales representatives then used electronic wands to scan the inventory, which indicated the products' expiration dates. Sales Managers discovered during that time that Cordis's consignment inventory with short shelf lives of one to two years had either been sitting unused and expired or about to expire on hospital shelves in several United States regions, and that many hospitals were also missing large quantities of Cordis inventory that had been provided to them but was now gone, unaccounted for and unpaid for. For example, TSMs in the Great Lakes Region discovered that the vast majority of the consigned inventory on their lists was missing or had expired. Almost all Cordis consigned inventory Cardinal had acquired in Toledo, Northwest Ohio and Eastern Michigan had to be written off. One hospital in Ohio was missing over $200,000 of Cordis products. In the Great Lakes Region, many hospitals ceased business with Cordis and went to competitors because of prior abandonment by legacy Cordis sales representatives, and because of missing consignment inventory for which Cardinal tried to collect payment and alienated clients in the process. Similarly in Colorado, Cordis had zeroed out a consignment account in 2014 because all of the inventory had expired, but Cordis continued to carry the inventory in its system through 2017.

(iii)     Even after discovering that Cordis lacked inventory controls around the globe, Defendants failed to implement adequate inventory control systems that would allow them to accurately track Cordis inventory and identify obsolete and excess inventory in most or all Cordis jurisdictions. Cardinal lacked adequate inventory control systems for Cordis inventory for at least two and a half years following the acquisition.

(b)     J&J's inability to track and analyze Cordis's inventory created another debilitating problem which Defendants were unable to remedy for years after the acquisition: Cordis's most popular products were constantly backordered in the EMEA and North American regions. For example:

- 27 -

(i)     J&J's sole Global Distribution Center ("GDC") in Belgium was a "black hole" for inventory and orders because of poor inventory controls. All J&J orders for Cordis products in EMEA went through the Belgium GDC. J&J had routinely manufactured products to fill orders even though inventory already existed to fill them because J&J did not know the previously manufactured inventory existed. Cordis products were therefore constantly on backorder in EMEA because of the time it took to manufacture products compared to the time it would have taken to simply ship products that were already manufactured. Cardinal inherited the same backorder cause and effect because J&J's inventory system, JD Edwards, could not communicate with Cardinal's SAP system while the two businesses were being integrated.

(ii)    Cordis's most commonly used and popular stents, such as S.M.A.R.T. and Palmaz stents, were constantly on back order for months in the Great Lakes regions of North America. Customers ordered stents but never received them, causing customers to go to competitors while waiting for Cordis products, and then dropping Cardinal altogether.

(iii)   Cardinal's backorders thus negatively impacted consignment and direct sales in North America and EMEA.

(c)     Cardinal did not acquire with Cordis a supply chain, customer service or distribution capabilities, because Cordis was a portfolio of inventory, intellectual property and a sales force. Cardinal was therefore required to put in place a supply chain and marketing and distribution capabilities in all 50-plus countries in which Cordis products were sold. Creating a supply chain and customer service infrastructure for Cordis outside the United States was an enormous undertaking for which Cardinal was not prepared. For example:

(i)     Cardinal engaged third party logistics ("3PL") companies such as Keuhne & Nagel to create a makeshift supply chain for Cordis products and connect supply and manufacturing with demand and sales. However, aligning manufacturing sites with demand

- 28 -

planning was extremely challenging, and Defendants were unable to forecast demand for Cordis products.

(ii)     Defendants Casey and Wilson therefore ramped up the manufacturing of Cordis products, most of which had short, one to two year shelf lives, causing Cordis to manufacture and accumulate excessive amounts of inventories. In addition, products that Cardinal attempted to distribute through its makeshift supply chain were often lost en route to distribution centers because Cardinal had no visibility as to products that went to 3PLs, and it was often impossible for Cardinal to determine when those products left 3PL distribution centers. This was a problem in all 50-plus countries in which Cordis products were sold.

(d)     Cordis was losing employees, sales and customers for the following reasons:

(i)     Cordis did not have enough sales representatives to service customers when Cardinal acquired Cordis, and many sales representatives also left after the acquisition. Cardinal then failed miserably to train its own sales representatives to sell Cordis's products, which were much more complicated and difficult to understand than Cardinal's legacy products and Access Closure products. In order to sell Cordis products, Cardinal's salespeople were required to be able to accurately advise healthcare professionals on their use and be able to proctor procedures using Cordis products. Properly training Cordis sales representative required months and up to an entire year. Cardinal, however, trained its sales representatives over a period of two weekends in Atlanta, which was not nearly sufficient time to train them in Cordis's full cardiovascular and endovascular portfolios. In addition, Cardinal did not train its representatives to know Cordis's competitors' products, which was critical to retain customers.

(ii)     Daily sales reports for Cordis's North American operations showed actual sales were materially below plan for almost all Territory Sales Manager in 2015-2016.

- 29 -

(iii)     Many of Cordis's Territory Managers and salespeople left in 2015-2017 out of frustration with failed integration efforts.

(e)     As alleged at ¶¶92-103 Cardinal improperly failed to take timely charges against earnings to write-off losses for excess, obsolete, expired and missing Cordis inventory in its publicly filed financial statements during parts of the Class Period.  By failing to take the necessary inventory write-offs, Cardinal artificially inflated its consolidated Operating earnings, Earnings before income taxes, Net earnings and Earnings per share, and Medical Segment profit in each of its annual financial statements filed with the SEC on Forms 10-K and 10-Q for the fiscal years ended June 30, 2016, and June 30, 2017, and in each of its quarterly financial statements for the fiscal quarters ended December 31, 2015, March 31, 2016, September 30, 2016, December 31, 2016 and March 31, 2017.

68.     On August 2, 2017, Cardinal issued a press release before the markets opened reporting 4Q and FY 2017 results, and further lowering the Company's FY 2018 guidance range for non-GAAP diluted EPS from continuing operations to $4.85 to $5.10.  While the 4Q FY 2017 Medical Segment profit increased by 13% to $138 million, it was "partially offset by performance in Cardinal Branded products (including Cordis)."  Cardinal's 4Q FY 2017 GAAP diluted EPS decreased 16% to $0.86, while full year GAAP diluted EPS decreased 7% to $4.03.

69.     Following the 4Q FY 2017 release and before the markets opened for trading, Defendants held a conference call for analysts and investors on August 2, 2017, during which Defendants disclosed for the first time that Cardinal did not achieve its FY 2017 accretion target for Cordis of $0.15 due to sales, inventory, and related cost issues.  Kaufmann said that the miss was due to continuing increased SG&A costs for Cordis, lower than anticipated sales from partnership agreements and "higher than planned write-offs for excess inventory" at Cordis.

70.     As a result of this partial corrective disclosure, Cardinal's stock price declined over 8% from a close of $77.33 on August 1, 2017 to a close of $70.99 on August 2, 2017, on unusually high volume of over 7.3 million shares.

71.     However, Defendants' August 2, 2017 statements were a partial disclosure and were materially false or misleading because Defendants failed to disclose, among other things, a serious crisis at Cordis's ex-U.S. operations that was referred to internally at Cardinal as the "Dark Period" or "Blackout Period."  The Dark Period commenced in or about the summer of 2017 when Cordis's iTrak inventory management system, which was used in almost all Cordis's ex-U.S. operations, completely shut-down due to being stressed by the amount of Cordis's inventory outside the United States.  As a result, Defendants lacked visibility into Cordis inventories globally from the summer of 2017 and continuing for the next year, and Cordis personnel in its foreign regions such as EMEA were required to track inventory manually, a daunting task.  The Dark Period exacerbated the problems Cardinal had been experiencing since October 2015, including high back-orders for Cordis products, inability to forecast and meet demand for Cordis products, customer defections to competitors, and accumulating excess and obsolete inventories.

72.     Later in August 2017, shortly into the Dark Period, David Wilson, Cordis's President, left Cardinal and was replaced by Patrick Holt.

73.     On September 11, 2017, defendant Kaufmann spoke at a Morgan Stanley Healthcare Conference attended by investors and analysts.  During the conference Kaufmann admitted more about the Cordis inventory write-offs Cardinal announced on August 1, 2017 (FY 2017) stating "we took a lot of inventory write-offs for obsolete inventory because we had inventory that was either on consignment or in our warehouses with third-party logistics providers, so we didn't have a good insight."  Kaufmann admitted that Cardinal was now installing additional IT systems to better track inventory almost two years later.  Kaufmann, however, continued to conceal from investors that

- 31 -

Defendants had known of these inventory problems as far back as March 2015, when Cardinal announced its plans to acquire Cordis, and that the Cordis inventory problems were still ongoing due to an inventory Dark Period that continued well into 2018. *See* ¶¶71, 83(a). Instead, during the conference, Kaufmann assured investors that Cordis has "still been a positive for us. And we expect it to grow this year" and that Cardinal would "have much better insights to inventory by the end of [2017]," which was just three months away.

74.    During the Morgan Stanley conference call, Kaufmann was also asked by analysts, "what are you hearing from your customers?" Kaufmann responded that:

> [F]rom a top line, Cordis is performing very close to where we expected it to be. And that has been one of the absolute most important things for us because if you lose the sales, it's incredibly hard to get them back. And so while we're a little bit behind where we expected in some markets and ahead in other markets, overall, the overall sales volume of Cordis is about where we expected it to be.

75.    On November 6, 2017, Cardinal announced 1Q FY 2018 results in a press release in which Barrett said, "[f]iscal year 2018 started largely as we expected and included strong performance from many of our business lines across the segments." Cardinal posted a presentation on its website for use in its earnings call, reporting that excluding the newly acquired Patient Recovery Business, Cardinal saw "solid growth" from Medical businesses, which included Cordis, and that its 2Q FY 2018 Medical Segment profit margin rate would exceed 6%.

76.    During the earnings call on the same day, defendant Barrett remained positive on Cordis, stating, "[t]he Cordis business performed as we expected this quarter."

77.    On January 8, 2018, defendant Kaufmann spoke positively about Cordis and Cardinal's Medical Segment at the J.P. Morgan Healthcare Conference, assuring attendees that Cordis's struggles were last year's news, and Defendants were making progress in "some issues around inventory obsolescence," for which Defendants would provide an update in a month after the close of 2Q FY 2018:

- 32 -

As you've – as we've said in the past, our Cordis business has been a business that was struggling last year.  We went through a lot of the reasons behind that related to some of the – underestimating some of the SG&A cost that we would incur ex U.S., some issues around inventory obsolescence and the little bit slower-than-anticipated pickup on those partnership agreements.  As I said in the first quarter, we are making progress in all of those areas.  And in the first quarter, the Cordis business performed about as we expected in that quarter, and we'll give you more color as appropriate when we get to the end of the second quarter.  So overall, when you look across the rest of our Medical segment, whether it be our services businesses, for instance our naviHealth, the OptiFreight business and some of our other services businesses, those are going very well.

78.  On January 17, 2018, it was announced that Don Casey, the architect and chief advocate of Cardinal's Cordis acquisition, had left Cardinal.

79.  On February 8, 2018, Cardinal issued a press release before the markets opened, reporting positive 2Q FY 2018 results and raising its FY 2018 outlook for non-GAAP EPS to $5.25 to $5.50 per share to reflect a $.40 per share benefit from a lower federal tax rate of 28% due to United States tax reform.  Defendants reported that Medical Segment profit was up 38% to $220 million, partially offset by performance in Cardinal Branded products, including Cordis.

80.  During the February 8, 2018 earnings call before the markets opened, Kaufmann said, "at Cordis, the good news is we continue to generate top line growth.  However, profitability has been softer than we expected, reflecting higher than anticipated cost . . . .  As a result, we now anticipate Cordis results to be lower than previously expected for the balance of the year."  Jorge Gomez, the newly appointed CFO, said:

> With respect to Cordis, let me provide some additional details around the ongoing performance and overall trajectory of this business.  Overall, we are encouraged that in each of the last 2 quarters, Cordis revenue grew driven by our business outside the U.S.  And we are excited to see the acceleration of our product partnership agreements.

*     *     *

> [T]he overall earnings performance of Cordis was impacted by inefficiencies in the global supply chain and elevated SG&A outside the U.S. [the team] is fully focused on these issues and we have implemented robust remediation plans to address both inventory and SG&A challenges.

- 33 -

81.     On February 15, 2018, defendant Gomez spoke positively about Cordis at a Leerink Partners Global Healthcare Conference attended by analysts and investors:

> [F]rom a demand perspective, from a commercial standpoint, the [Cordis] business is doing well.  We've been growing.  The top line has been growing in the mid-single digits, which is good in the cardiology space, cardiovascular, endovascular.  The performance of our OUS operations is really good.  So top line is we feel good about it.  We have cost issues.  We have supply chain issues in terms of building infrastructure, but we're making progress.  And as we invest in technology and improve certain processes, we believe that a lot of those headwinds that we now have will be more manageable, and we will put Cordis back into a growth trajectory.

82.     On March 13, 2018, Gomez again spoke at Barclays Global Healthcare Conference and, after again rehashing Cordis's high integration costs, he said:

> We have faced, as you said, a lot of challenges along the way.  But we feel like we are going into a phase of a lot more stability. . . .  We have gone live with a pretty significant IT platform that is going to enable us to have better visibility into the supply chain.  One of the key challenges we faced in the last couple of years, we've talked about this a couple of times, is write-offs of inventory because we didn't have enough visibility in all the overseas markets with respect to levels.  And so we faced some challenges with expiration of product, and we had to write off some certain volumes.  Now we have visibility to that and things are going to start getting better.  They are starting to get better.  From a commercial standpoint, Cordis is actually going very well. . . .  So we're very excited about the fact that from a go-to-market perspective, things are going better overall. . . .  I feel like as we go into '19, we are going to see that business go – getting back to the growth trajectory that we want, especially on a capital-efficient basis.

83.     Defendants' statements alleged in ¶¶68-82 were materially false or misleading at the times they were made, and/or omitted material information required to be disclosed, for the reasons alleged in ¶¶67, 71, and also because of the following undisclosed adverse information that was known to Defendants or recklessly disregarded by them:

(a)     Defendants did not "now" have "visibility" into Cordis's inventories, things were not "getting better" in that regard and Cordis's inventory woes were not becoming more stable but instead were worsening.  Cardinal had entered its Dark Period crisis in the summer of 2017 and lost all visibility into Cordis's inventory in regions around the world for the next year.  The Dark Period exacerbated the problems Cardinal had been experiencing since October 2015, including

- 34 -

high back-orders for Cordis's most popular products, inability to forecast and meet demand for Cordis products, customer defections to competitors, and accumulating excess and obsolete inventories.  Cordis continued to lack integrated, reliable inventory controls through 2018, and Defendants had failed to begin implementing systems that allowed them to track Cordis inventory globally through at least March 2018.  Defendants therefore could not speak accurately and completely about Cordis's inventories and sales.

(b)     Cordis was losing sales and customers for the following reasons:

(i)     Cardinal's sales representatives and Territory Managers missed their sales quotas each quarter for many reasons, including that backorders on every day Cordis products such as catheters, were not immediately available to fill customer orders, and because Cordis had few new product offerings, but offered older products which were not competitive in the cardiovascular and endovascular market.  Customers left Cordis for competitors such as Boston Scientific, St. Jude Medical and Penumbra in 2017-2018 because of backordered and outdated products.  Only 10%-15% of United States Territory Managers were close to meeting their sales quotas in 2017-2018.

(ii)     Cordis's backorders also increased in the United States beginning in summer 2017, so that many Cordis orders were not filled for six to twelve weeks, causing customers to cancel their orders and go to competitors.  For example, Cordis backorders increased to about 10% of sales in Cordis's New York City North territory.  In the Great Lakes Region, backorders for Cordis's staple products were common.

(c)     As alleged at ¶¶92-103, Cardinal improperly failed to take timely charges against earnings to write-off losses for excess, obsolete, expired and missing Cordis inventory in its publicly filed financial statements during parts of the Class Period.  By failing to take the necessary inventory write-offs, Cardinal artificially inflated it consolidated Operating earnings, Earnings

- 35 -

before income taxes, Net earnings and Earnings per share, and Medical Segment profit in each of its annual financial statements filed with the SEC on Forms 10-K and 10-Q for the fiscal years ended June 30, 2016, and June 30, 2017, and in each of its quarterly financial statements for the fiscal quarters ended December 31, 2015, March 31, 2016, September 30, 2016, December 31, 2016, March 31, 2017, September 30, 2017 and December 31, 2017.

84.     Then, on May 3, 2018, Defendants shocked investors and analysts by announcing before the markets opened that Cardinal's 3Q FY 2018 EPS declined significantly and it was reducing Cardinal's FY 2018 and earnings due to problems with the Cordis business, including inventory and sales.  As a result, GAAP diluted EPS for 3Q FY 2018 decreased 33% to $0.81, and non-GAAP diluted EPS *decreased* 9% to $1.39, which Kaufmann said were "adversely affected by a significant negative change in our effective tax rate primarily associated with our Cordis business." Outlook for FY 2018 non-GAAP EPS was accordingly reduced from the recently increased amount of $5.25-$5.50 down to $4.85 to $4.95, "reflect[ing] the company's updated view on the performance of Cordis and its negative effect on the tax rate."  Defendants also stated that they anticipated that the operational challenges with Cordis would continue through 4Q and FY 2019.

85.     During the May 3, 2018 conference call, Kaufmann revealed that Cordis's inventory reserves had been "even higher than expected this quarter" and impacted Cardinal's profitability:

> [W]e recognize that today's results did not meet your expectations or ours.  The biggest variable driving these results was some unanticipated disappointing performance from our Cordis business, which masked an otherwise better-than-expected quarter.
>
> *          *          *
>
> [A] higher than expected non-GAAP effective tax rate resulted in a $0.19 negative impact to non-GAAP EPS.  $0.13 of this was related to the current and forecasted results of Cordis.

86.     Kaufmann admitted during the May 3, 2018 earnings call, that Cardinal lacked demand planning capabilities to "have the right inventory in the right markets to capitalize on sales

opportunities and reduce inventory reserves." Rather than having all the technology systems in place to manage inventory and sales as Defendants had been telling investors since the fall of 2017, Defendants admitted this was not the case and Cardinal was only now implementing a "new" system. During the call Kaufmann stated "we are implementing new process and technology improvements that will better manage our Cordis consigned inventory."

87.     Gomez further admitted that Cardinal had only recently "implemented several supply chain work streams to enhance our global demand planning capabilities and consignment process." Specifically, Cardinal had finally implemented in 3Q FY 2018 – almost three years after it acquired Cordis – an ERP functionality which allowed Cardinal to identify inventory positions in certain geographies that require higher inventory reserves.

88.     Kaufmann also admitted that Cardinal had been unable to forecast demand for Cordis products and manufacture according to demand, while simultaneously lacking visibility into consigned inventory and Cordis inventory:

> [I]nventory reserves are one of the biggest issues we're having. As we came off the TSAs [transition service agreements] and have been working through this, our ability to be able to understand all of the demand signals, roll those demand signals up, turn those into manufacturing plans and then, correspondingly, having visibility to both the consigned inventory as well as our own inventory across our network on Cordis, particularly outside the U.S. – it's obviously much easier for us in the U.S. – but outside the U.S. has been much more difficult than we expected it to be.

89.     On the news that Cordis's sales and inventory issues impacted earnings, Cardinal's stock price plummeted over 21% on May 3 to $50.80, on huge trading volume of 15,594,300 shares – by far the biggest trading day since the beginning of the Class Period.

90.     Analysts widely reported their shock at Defendants' news:

(a)     RBC Capital Markets issued a report on May 3, 2018 titled, "Titanic, and We Don't Mean the Movie: Weak F3Q and Outlook Sink CAH Shares," in which it stated, "[t]he poor

- 37 -

performance was in large part due to a large inventory write-down as a result of better insight into proper inventory levels for the segment."

(b)     Leerink issued a report on May 3, "Cordis Issues Weigh on Results," commenting that "[w]ith the acquisition having closed in October 2015, we are disappointed by the lack of visibility, lack of good inventory controls, and lack of understanding of the full required investment."

(c)     Cowen and Company issued a May 3 report, "F3Q18 Miss and Lowered Guide; Cordis Again Drags Results Despite Solid Pharma," noting that

> [T]he current issue with Cordis . . . stems from inventory reserves as a result of greater visibility into inventory from the newly implemented inventory management system . . . [E]ven past the inventory adjustment issue it seems clear there is still a process issue that needs to be worked out (demand forecasting, input cost mgmt, etc.) that will take additional time.  We see Cordis remaining an overhang with no clear resolution, at least over the near term.

91.     Cardinal does not report inventory reserves on a quarterly basis, so that the increase in inventory reserves for Cordis announced on May 3, 2018 was not quantified until results for the full year of 2018 were reported in August 2018.  At that time, Cordis revealed that its inventory reserves had almost doubled from FY 2017 levels of $76 million to $147 million for FY 2018 due to increased Cordis inventory reserves.  Also in August 2018, Cardinal announced that its FY 2018 operating profit declined 94% from $2.12 billion (2017) to $126 million (2018), impacted by a $1.4 billion non-cash goodwill impairment charge related to the Medical Segment.  The impairment charge, which was only $500 million less than what Cardinal paid to acquire Cordis, was primarily driven by "inventory and cost challenges within [the] Cordis business which furthered in the fourth quarter of fiscal 2018."

## VI.   DEFENDANTS ISSUED FALSE PUBLIC FINANCIAL STATEMENTS

92.    In addition to the materially false or misleading statements alleged in ¶¶31-65, 68-82, Defendants also publically filed materially false or misleading Cardinal financial statements with the SEC during the Class Period by failing to properly account for Cordis inventory losses.

93.    SEC regulations require that public company registrants like Cardinal file regular year-end and quarterly public financial statements on Forms 10-K and 10-Q respectively.  The SEC requires that such financial statements must be prepared in accordance with Generally Accepted Accounting Principles ("GAAP").[1]

94.    While Cardinal disclosed in each of its quarterly and fiscal year-end financial statements filed with the SEC on Forms 10-Q and 10-K during the class period that "[its] consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')", these disclosures were false or misleading.  Cardinal's quarterly and year-end public financial statements were in fact not prepared or presented in accordance with GAAP because Cardinal improperly failed to take timely charges against earnings to write-off losses for excess, obsolete, expired and missing Cordis inventory in violation of GAAP.  By failing to take the necessary inventory write-offs, Cardinal artificially inflated it consolidated Operating earnings, Earnings before income taxes, Net earnings and Earnings per share, and Medical Segment profit in each of its annual financial statements filed with the SEC on Forms 10-K and 10-Q for the fiscal years ended June 30, 2016 and June 30, 2017, and in each of its quarterly financial

---

[1]       GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices.  The SEC has the statutory authority for the promulgation of the GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board ("FASB").  The FASB's promulgated standards are generally contained within the FASB Accounting Standards Codification ("ASC"), which are considered to be the highest standards of GAAP.  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

statements for the fiscal quarters ended December 31, 2015, March 31, 2016, September 30, 2016, December 31, 2016, March 31, 2017, September 30, 2017 and December 31, 2017.

1. **Failure to Timely Write-Off Excess, Obsolete, Expired and Missing Cordis Inventory**

95. As alleged in ¶¶67, 71, 83, during the due diligence process, and continuing after the close of Cardinal's October 2015 Cordis acquisition, Defendants learned that it was unable to properly track or account for material portions of both Cordis legacy and newly manufactured inventory. This was true for inventory located both in the United States as well as abroad, inventory located at Cordis operated inventory facilities, inventory stored at third-party shipping and logistics warehouses, and consigned inventory located at various customer locations globally. It also became clear to Defendants that material portions of Cordis inventory recorded in both the inventory and accounting and financial reporting systems were either expired, obsolete, unable to be located, or simply no longer existed.

96. For example, it quickly became clear that while high-level inventory reports often listed particular inventory as in stock, the actual inventory could not be physically located when it came time to ship it to customers. In many instances, if the inventory was eventually located, the product was already expired. The failure to address these known inadequacies in the inventory tracking systems after the acquisition resulted in an endless cycle of product manufacturing, followed by an almost immediate loss of the inventory once it disappeared into the broken shipping and distribution system, followed again by remanufacturing the product to replace the misplaced or expired inventory. This problem snowballed throughout calendar years 2016 and 2017 causing Cordis's reported inventory balances to balloon, yet material portions of these inflated inventory balances were not be supported by actual inventory that could be located, or that was not expired.

97. This disconnect between the higher reported inventory levels and the inventory that could actually be located or identified was well known to the Cordis accounting and financial

department.  Cordis accounting and financial department was appraised of the situation and the need to increase inventory reserves to accurately reflect the true inventory value on a regular basis soon after the acquisition.  For example, as alleged herein, while employees at Cordis's El Paso locations continually identified missing or expired inventory lots each quarter after the acquisition and alerted the Cordis accounting and financial department that additional inventory reserves increases were needed to accurately reflect the identified losses, Cardinal's response to these warnings was insufficient to identify or quantify the scope of the expired, missing or unsalable inventory.

> **2.     Accounting Rules Required that Cardinal Record Losses for This Expired and Missing Corbis Inventory When It Was Known or Knowable**

98.     GAAP and SEC reporting rules generally require that inventory be valued at the lower of the cost to purchase or manufacture the inventory, or the market or net realizable value of the inventory.  This fundamental financial reporting requirement is known simply as the "lower of cost or market" rule, and requires that if the value of inventory is later diminished by obsolescence, excess quantities, expiration or other circumstances, a loss must recognized by a charge against income in the accounting period in which the loss occurs, by a write-down of the inventory to its lower net realizable value, either by a direct write-off or by establishing an adequate inventory valuation reserve.[2]  FASB ASC 330-10-35-1, *Inventory*, states in pertinent part:

> **Adjustments to Lower of Cost or Market**
>
> 35-1  A departure from the cost basis of pricing [the] inventory . . . is required when the utility of the goods is no longer as great as their cost.  Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period.  This is generally accomplished by stating such goods at a lower level commonly designated as market.

---

[2]     Inventory acquired through an acquisition is revalued at net realizable value at the time of acquisition.  As with all inventory, if net realizable value of acquired inventory later diminishes, a loss is recognized in the accounting period the loss occurs in the same manner.

99.     Cardinal mislead investors by falsely disclosing in its fiscal year end June 30, 2016 consolidated financial statements that its inventories were properly valued at the lower of cost or net realizable value, and that it had provided adequate reserves for inventory by a charge against earnings, based on, among other things, experience and age of inventory:

**Inventories**

A substantial portion of our inventories (58 percent at both June 30, 2016 and 2015) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market.

*       *       *

Our remaining inventory is stated at the lower of cost, using the first-in, first-out method, or market.

Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $79 million and $57 million at June 30, 2016 and 2015, respectively.  We reserve for inventory obsolescence using estimates based on historical experience, historical and projected sales trends, specific categories of inventory and age of on-hand inventory.

100.    Cardinal made a substantially similar disclosure in its fiscal 2017 Form 10-K. Additionally, Cardinal's quarterly financial statements filed on Form 10-Q during the class period each continued to reference these misleading year-end disclosures by alerting investors that the quarterly financial statements "should be read in conjunction with the audited consolidated financial statements and related notes contained in our Annual Report on Form 10-K for the fiscal year ended."

101.    In the Company's Quarterly Reports filed with the SEC on Forms 10-Q and Annual Reports filed with the SEC on Forms 10-K, Cardinal reported the following operating earnings, net earnings and earnings per share during the Class Period as follows:

**Cardinal Health Consolidated Earnings, As Reported**
(in millions, except Earnings Per Share)

| Fiscal Period | Operating Earnings | Net Earnings | Earnings Per Share (Basic) |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Q2 ended 12/31/2015 | $563 | $326 | $0.99 |
| Q3 ended 3/31/2016 | $656 | $386 | $1.18 |
| Fiscal Year 6/30/2016 | $2,459 | $,1427 | $4.36 |
| Q1 ended 9/30/2016 | $535 | $309 | $0.97 |
| Q2 ended 12/31/2016 | $542 | $324 | $1.02 |
| Q3 ended 3/31/2017 | $605 | $381 | $1.21 |
| Fiscal Year 6/30/2017 | $2,120 | $1,288 | $4.06 |
| Q1 ended 9/30/2017 | $262 | $115 | $0.36 |
| Q2 ended 12/31/2017 | $399 | $1,053 | $3.35 |

102.    The statements in ¶¶99-101, however, were false when made.  Contrary to its inventory accounting policy statements made in the footnotes to its public financial statements, Cardinal knew, or was reckless in not knowing, that its reported excess and obsolete reserves for Cordis inventory during the final three quarters of fiscal 2016, the fiscal years ended 2016, the 2017 fiscal quarters, and the first two quarters of fiscal 2018 were woefully inadequate, as Cordis had identified at least $300 million in expired, missing or otherwise unsalable inventory during this time period, yet prior to the 3rd quarter ended March 31, 2018, Cardinal had only written off or reserved for a small portion of these losses when known.  Despite this knowledge, the Company failed to take the necessary charges against earnings during FY 2016, FY 2017 and the first two fiscal quarters of FY 2018 to reflect this diminished value of its expired, missing or unsalable Cordis inventory as required by GAAP.  The impact of this misstatement on the Company's publically disseminated financial statements was material.

103.    As a result of Cardinal's failure to timely write off excess, obsolete and unsalable inventory during the class period, the Company's publicly filed financial statements filed on SEC Forms 10-K and 10-Q for the fiscal years ended 2016 and 2017, and the fiscal quarters ended December 31, 2015, March 31, 2016, September 30, 2016, December 31, 2016, March 31, 2017, September 30, 2017 and December 31, 2017 were materially false or misleading, in violation of

GAAP, and materially inflated the Company's reported operating earnings, net earnings and earnings per share.

## VII.   ADDITIONAL SCIENTER

104.   By virtue of the facts set forth below at ¶¶105-130 and the other facts set forth at ¶¶67, 71, 83, *supra*, it may be strongly inferred that Defendants knew or recklessly disregarded that their Class Period statements were materially false or misleading to investors.

### A.    Defendants' Public Statements Support a Strong Inference of Scienter

105.   First, the Individual Defendants each had detailed knowledge of Cordis's operations and performance and repeatedly spoke about Cordis on conference calls with investors during the Class Period, which supports a strong inference of scienter.  For example, during almost every conference call Cardinal attended during the Class Period, Barrett, Kaufmann and/or Gomez spoke to investors about the progress of Cordis's integration and reported on its contribution to Cardinal's Medical Segment's financial results and outlook.  For example, as CEO of Cardinal, Barrett spoke frequently about the Cordis integration telling investors "things are going as . . . expected,"(¶49) "the integration of Cordis remains on track," (¶50) "operationally the integration is going extremely well. . . . Cordis is off to a strong start,"(¶51) "we hit our integration and performance benchmarks," (¶54) and "[o]ur Cordis acquisition is largely on plan" (¶61).  Barrett also repeatedly told investors that the "economics associated with [the Cordis] acquisition are very attractive" and that investors could expect Cordis to be "accretive by more than $0.20 in fiscal 2017, the first full fiscal year post our anticipated close.  *See* ¶¶34, 36.  We expect that number to grow in the years thereafter."  Barrett also signed Sarbanes-Oxley Act of 2002 ("SOX") certifications in which he attested that he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him.

- 44 -

106.    Kaufmann, as CFO of Cardinal until December 31, 2017, likewise spoke frequently about Cordis on conference calls with investors. For example, with regard to the Cordis integration, Kaufmann told investors "everything's going as planned on Cordis. . . . I just want you to know from everything we see things are going as planned and as expected," (¶46) "I think it's really important to know that the underlying Cordis business is doing really well," (¶50) "[s]pecific to Cordis, it continues to meet our performance expectations and make real and measurable progress," (¶57) and "Cordis continues to perform well and we are confident in both the fundamentals and growth initiatives in that business." (¶57). Kaufmann also repeatedly confirmed "we expect the transaction to be greater than $0.20 accretive in fiscal 2017, which is the first full year post close, and we expect this to be increasingly accretive thereafter. . . . We expect operational synergies of at least $100 million annually to be realized by the time we exit our fiscal 2018." *See* ¶¶34, 41, 48. Kaufmann also signed SOX certifications in which he attested that he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him.

107.    Gomez, as CFO of Cardinal from January 2018 through the end of the Class Period, also spoke about Cordis's financial performance and its operations, including those outside of the United States. ¶¶80-82. Prior to becoming Cardinal's CFO, Gomez was the CFO of Cardinal's Medical Segment, which was the segment that included Cordis. Gomez also signed SOX certifications in which he attested that he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him.

108.    In light of these positive statements about Cordis to the market on topics that were material to both investors and Cardinal, it was incumbent on Barrett, Kaufmann and Gomez to insure they understood the true and full facts concerning the topics on which they spoke. Either they

- 45 -

Case: 2:19-cv-03347-EAS-EPD Doc #: 28 Filed: 09/08/20 Page: 49 of 70  PAGEID #: 468

possessed the knowledge of the Cordis integration they claimed to have, in which case they knew their statements were false or misleading, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless.

**B.      Defendants Casey and Wilson Lead the Cordis Integration, Which Supports a Strong Inference of Scienter**

109.      Casey's and Wilson's roles in the Cordis integration and prior experience with Cordis while employed by J&J also support an inference they knew of and were aware of the issues with Cordis inventory by the beginning of the Class Period.  Prior to joining Cardinal, Casey spent several years at J&J and as a result had extensive knowledge and familiarity with Cordis and its business operations.  Casey, as CEO of Cardinal's Medical Segment, was responsible for and led the Cordis integration.  In fact, during the Class Period Barrett repeatedly acknowledged Casey as head of the Cordis integration team.  ¶¶54, 56.

110.      Similarly, Wilson was specifically hired to lead the Cordis business and work with Casey on its integration into Cardinal.  Like Casey, Wilson was a former J&J employee for close to 20 years and worked at Cordis for 11 years.  As a result, Wilson had extensive knowledge and familiarity with Cordis and its business operations when he was hired by Cardinal in March 2015 to lead the Cordis business.

**C.      Executive Departures Support a Strong Inference of Scienter**

111.      The resignations of three of Cardinals' top executives – Wilson, Casey and Barrett – further supports a strong inference of scienter.  Defendant Wilson, who served as Cordis's president, and had worked at Cordis for 11 years while it was part of J&J, abruptly left his position as Cordis's president in August 2017 without any explanation.  Wilson's departure came at the same time the truth about Cordis's inventory was beginning to emerge.  Three months later, on November 6, 2017, Cardinal announced that defendant Barrett, who spoke repeatedly, and positively, about the Cordis integration during the Class Period, would be resigning as CEO in January 2018.  Shortly thereafter,

- 46 -

defendant Casey, who served as CEO of Cardinal's Medical Segment and who directly oversaw the Cordis acquisition and integration, also abruptly left the Company in early February 2018.

### D. Defendants Barrett and Casey Dumped Over 1.3 Million Shares of Cardinal for Over $113 Million in Proceeds

112.    While in possession of material, non-public information concerning Cardinal's failure to integrate Cordis's business in the United States and internationally, and Cordis's debilitating inventory and supply chain issues, Individual Defendants Barrett and Casey *sold over 1.3 million shares* of Cardinal at artificially inflated prices, reaping *over $113 million in proceeds* during the Class Period. The following chart summarizes Barrett and Casey's insider sales during the Class Period:

**Cardinal Health (CAH)**
**03/02/2015 -05/02/2018**

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Barrett, George**<br>☐  CEO/Chairman | 05/11/2015 | $86.44 | 300,000 | $25,932,000 |
| | 08/20/2015 | $83.08 | 300,000 | $24,924,000 |
| | 11/10/2015 | $87.73 | 54,658 | $4,795,146 |
| | 08/08/2016 | $83.75 | 20,428 | $1,710,845 |
| | 08/09/2016 | $83.76 | 129,818 | $10,873,556 |
| | 08/10/2016 | $83.44 | 99,754 | $8,323,474 |
| | 11/10/2016 | $71.35 | 194,441 | $13,873,365 |
| | 11/10/2016 | $70.40 | 16,954 | $1,193,562 |
| | 11/10/2016 | $71.82 | 6,600 | $474,012 |
| | 02/10/2017 | $77.23 | 217,994 | $16,835,677 |
| **Insider Class Period Total** | | | **1,340,647** | **$108,935,636** |

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Casey Jr., Donald**<br>☐  CEO of Medical Segment | 08/09/2016 | $83.81 | 26,484 | $2,219,624 |
| | 08/10/2016 | $83.42 | 32,696 | $2,727,500 |
| **Insider Class Period Total** | | | **59,180** | **$4,947,124** |

4837-5708-8962.v1

| | TOTAL SHARES SOLD | TOTAL PROCEEDS |
|---|---|---|
| **GRAND TOTAL** | **1,399,827** | **$113,882,760** |

113.    Defendant Barrett's sales were suspicious both in timing and magnitude. Sixty-eight percent of Barrett's Class Period sales occurred *within the first six months after the announcement of the Cordis acquisition*. During those first six months, defendant Barrett disposed of 600,000 shares of Cardinal stock at record high prices of between $83.08 and $87.73 for proceeds of *over $50 million*. Then, during the six month period from August 2016 to February 2017, Barrett reaped *an additional $58 million* in proceeds as Cordis's integration, inventory and supply chain troubles worsened while Defendants told investors that the integration was going well and Cordis was performing as well as expected. During that selling spree, Barrett sold 250,000 shares for over $20.9 million in just three days between August 8 and August 10, 2016, during which time defendant Casey also reaped almost $5 million in insider sales as alleged in the following paragraph. Thus, in less than two years after announcing the Cordis acquisition, and only 16 months after completing the acquisition, Barrett reaped a total windfall of *$108,935,636*. The number of shares defendant Barrett sold during the Class Period – 1,340,647 – suspiciously increased by 71% as compared to his sales in the three years immediately preceding the Class Period. During the three years before the Class Period, Barrett sold 783,416 shares of his Cardinal stock for prices as low as $52.09, for total proceeds of $55,785,222.

114.    Defendant Casey similarly dumped over 59,000 shares *in two consecutive days* on August 9 and August 10, 2016, at record high prices of $83.42 and $83.81, for proceeds of *almost $5 million* during the Class Period. Casey's sales were suspicious in magnitude, as during the three years prior to the Class Period, defendant Casey had *no reported sales* of Cardinal stock. Casey's sales were also suspicious in timing, as they coincided with Barrett's August 8-August 10, 2016 sales of 250,000 shares for almost $21 million.

- 48 -

E. **Defendants' Class Period Compensation Constitutes Additional Evidence of Scienter**

115.    The Individual Defendants were also highly motivated to materially misstate the successful integration of the Cordis business and omit the massive inventory problems and escalating costs of the Cordis integration by the terms of their "performance-based compensation" at the Company, including Cardinal's Management Incentive Program ("MIP").   The Individual Defendant's compensation was directly tied to Cardinal's performance on both a short-term and long-term basis by "providing Employees in leadership positions with an annual bonus incentive to achieve [the Company's] strategic objectives."   One purpose of Cardinal's MIP was to "[f]ocus management on key measures that drive superior financial and management performance and that result in enhanced value of the Company."  The Individual Defendants executive compensation was directly tied to the performance of Cardinal's medical business segment, which included the Cordis business, to the extent Cordis impacted the medical business segment's non-GAAP operating earnings growth and thus the Company's overall performance which was a key metric to determine executive compensation.

116.    The chart below summarizes defendants Barrett, Casey and Kaufmann's total compensation for 2015-2017.

**Summary Compensation Table**

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($)(2) | Option Awards ($)(3) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| George S. Barrett | 2017 | 1,320,000 | — | 6,333,255 | 3,166,434 | — | — | 165,488 | 10,985,177 |
| Chairman and Chief Executive Officer | 2016 | 1,320,000 | — | 6,491,739 | 3,330,665 | 2,386,755 | — | 131,928 | 13,661,087 |
| | 2015 | 1,320,000 | — | 5,983,334 | 3,320,657 | 2,510,508 | — | 135,232 | 13,269,731 |
| Michael C. Kaufmann | 2017 | 746,438 | 186,609 | 1,947,561 | 997,432 | — | — | 14,979 | 3,893,019 |
| Chief Financial Officer | 2016 | 721,311 | — | 1,575,006 | 826,402 | 880,723 | — | 27,251 | 4,030,693 |
| | 2015 | 688,630 | — | 4,540,005 | 841,018 | 1,053,260 | — | 36,338 | 7,159,251 |
| Donald M. Casey Jr. | 2017 | 705,014 | 176,253 | 1,947,561 | 997,432 | — | — | 10,800 | 3,837,060 |
| Chief Executive Officer—Medical Segment | 2016 | 671,311 | — | 1,505,062 | 806,369 | 894,188 | — | 22,830 | 3,899,760 |
| | 2015 | 650,000 | — | 3,005,055 | 805,967 | 618,118 | — | 31,653 | 5,110,793 |

- 49 -

117.    According to the Company's September 16, 2014 DEF 14A Proxy Statement, Cardinal's executive compensation package consisted of: (1) a base salary; (2) an annual incentive compensation (cash award); and (3) long-term incentives.  Defendants' "long-term incentive" was calculated on the combined non-GAAP earnings per share annual growth rate and dividend yield over a three year period.  The long-term incentive, granted the Individual Defendants stock options, Restricted Stock Units ("RSUs") and Performance Stock Units ("PSUs").  The RSUs vested over a three-year time period and the PSUs cliff-vested at the end of three years.  With this package, the Individual Defendants' executive compensation was 64% performance-based and 72% was a long-term incentive.  For 2014, the Cardinal Board of Directors' Compensation Committee "set the fiscal 2014 annual incentive goal based on EBIT (adjusted non-GAAP earnings) because it is one of our primary measures of operating performance."

118.    Specifically for 2015, according to Cardinal's September 15, 2015 DEF 14A Proxy Statement ("2015 Proxy"), Cardinal highlighted the following factors as the bases for awarding annual incentive awards to Barrett, Kaufmann and Casey: (a) "Mr. Barrett received 146% of his target annual incentive based on the substantial over-achievement of our financial goals and the important strategic actions in fiscal 2015 taken under his leadership. . . .  He also was instrumental in expanding our physician preference item portfolio with the planned acquisition of Cordis;" (b) Mr. Kaufmann received 153% of his target annual incentive because of "[p]harmaceutical segment performance above our expectations" and "[e]xceptional tangible capital and operating cash flow performance;" and (c) Casey only received 95% of his target annual incentive because "medical segment financial results below our expectations" but he "accelerated the segment's physician preference items strategy with pending Cordis acquisition."

119.    In total, for 2015, defendant Barrett had a target annual incentive award of $1,716,000 but actually received $2,510,508.  Defendant Kaufmann had a target annual incentive award of

- 50 -

$699,630 but actually received $1,053,260. Defendant Casey had a target annual incentive of $650,000 but actually received $618,118.

120.    As for their long-term incentive awards, the Company's 2015 Proxy stated that defendants Barrett, Kaufmann and Casey were awarded long-term incentive grants well in excess of 2015 targets. Defendant Barrett's long-term incentive compensation target was $8,000,000 but he actually received $9,300,000. Defendant Kaufmann's long-term incentive compensation target was $2,100,000 but he actually received $5,380,000. Defendant Casey's long-term incentive compensation target was $2,100,000 but he actually received $3,810,000.

121.    According to the 2015 Proxy, regarding long-term incentives, Barrett's "fiscal 2015 grants reflect the Compensation Committee's assessment of his fiscal 2014 individual performance, leading the Company to grow earnings that exceeded our goals." The 2015 Proxy stated that Kaufmann was awarded $2,999,974 in RSUs which constituted his above target grant "in connection with his appointment to Chief Financial Officer and in recognition of his responsibilities for company-wide global sourcing and his significant leadership role in our generics program, which has grown sales." The 2015 Proxy also stated that Casey was awarded $1,500,025 which constituted his above target grant "for continuity of executive leadership during the executive transitions in fiscal 2015 as well as in recognition of his leadership of the repositioning of the Medical segment and company-wide initiatives."

122.    According to the Company's September 16, 2016 DEF 14A Proxy Statement ("2016 Proxy"), Cardinal highlighted the following factors as the bases for awarding annual incentive awards to Barrett, Kaufmann and Casey: (a) "Mr. Barrett's annual incentive was based on our record revenue, operating earnings and operating cash flow and the strong strategic positioning of the company to achieve long-term growth;" (b) "Mr. Kaufmann's annual incentive was based on our strong financial performance and discipline, his significant leadership role with Red Oak Sourcing,

- 51 -

and talent development and leadership in company-wide workplace diversity initiatives;" and (c) "Mr. Casey's annual incentive was based on the strong repositioning and performance of the Medical segment, ***the successful completion of the Cordis acquisition***, the development of market-leading capabilities in post-acute care, and talent development."

123.    In total, for 2016, defendant Barrett had a target annual incentive award of $1,954,754 but actually received $2,386,755.  Defendant Kaufmann had a target annual incentive award of $721,311 but actually received $880,723.  Defendant Casey had a target annual incentive of $671,311 but actually received $894,188.

124.    As for their long-term incentive awards, the 2016 Proxy stated that defendants Barrett, Kaufmann and Casey were awarded Long-Term Incentive Grants in excess of 2016 targets. Defendant Barrett's long-term incentive compensation target was $9,500,000 but he actually received $9,816,667.  Defendant Kaufmann's long-term incentive compensation target was $2,250,000 but he actually received $2,400,000.  Defendant Casey's long-term incentive compensation target was $2,100,000 but he actually received $2,310,000.

125.    According to the 2016 Proxy, regarding long-term incentives, Barrett's "grant made in August 2016 reflects the Compensation Committee's assessment of his performance, placing the company in a strong strategic position and leading meaningful strategic initiatives, including Red Oak Sourcing and the Harvard Drug and Cordis acquisitions, as well as the Committee's assessment of his expected future performance and contribution to the company."

126.    Thus, the personal wealth of each of the Individual Defendants was enhanced by the repeated dissemination of materially misleading statements regarding the operating results of the Medical Segment by failing to disclose the material integration, inventory and escalating cost problems plaguing the Cordis business.  As a result of their false or misleading statements, defendants Barrett, Kaufmann and Casey personally profited.

127.     During the Class Period, Defendants Barrett, Kaufmann and Casey's RSUs and PSUs vested as follows:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| Barrett | 105,863 | 143,048 | 135,230 |
| Kaufmann | 28,959 | 51,920 | 48,167 |
| Casey | 29,737 | 37,990 | 45,043 |

128.     For 2015, in total, Barrett, Kaufmann and Casey received $25,539,775 in salary and annual and long-term incentives – an increase of more than 22% than they earned in 2014 – materially enhanced as a result of deceiving the investing public about Cordis business performance which enhanced the performance measures for which they were being rewarded.   In 2016, defendants Barrett, Kaufmann and Casey received $21,591,540 in salary and annual and long-term incentives based in part on successfully deceiving the investing public regarding the Cordis business. Again in 2017, defendants Barrett, Kaufmann and Casey received $18,715,256 in salary and annual and long-term incentives based in part on concealing the enormous inventory, operational and escalating costs plaguing the Cordis business.

**F.     The Magnitude of the Post-Class Period Impact from Cordis's Inventory Issues Supports a Strong Inference of Scienter**

129.     Cardinal's $1.4 billion write down of goodwill and tangible assets just three months after the Class Period, "driven by inventory and cost challenges within [the] Cordis business," further supports a strong inference of scienter.   ¶91.   To put the magnitude of this goodwill impairment and Cardinal's loss on its Cordis investment in context, Cardinal's $1.4 billion "non-cash" goodwill write-down erased 100% of the goodwill recorded for the Cordis acquisition, representing nearly 74% of the $1.9 billion purchase price that Cardinal paid to acquire Cordis on October 4, 2015.   In other words, Cardinal paid $1.9 billion to acquire Cordis in October 2015, but wrote off $1.4 billion of the purchase price in non-cash goodwill related to Cordis just two and a half years later.   Moreover, the $1.4 billion write down negatively impacted Cardinal's FY 2018

- 53 -

operating profits, which declined 94% from $2.12 billion (2017) to $126 million (2018). ¶91. Cardinal does not report inventory reserves on a quarterly basis, so that the increase in inventory reserves for Cordis disclosed on May 3, 2018, was not quantified until results for FY 2018 were reported in August 2018. ¶91. When the Company did quantify that its inventory reserves almost doubled from FY 2017 levels of $76 million to $147 million for FY 2018, they said the vast majority was driven by its Cordis business. ¶91.

130.    Given the massive size of Cardinal's goodwill write down at the end of FY 2018 and the increase in inventory reserves for Cordis inventory, the inference can be drawn that Cordis's inventory problems that led to these events existed, and were known by Defendants, during the Class Period. The post-Class Period goodwill write-down supports that, contrary to Defendants' Class Period statements that the Cordis integration was a success and Cardinal's inventory tracking systems was being implemented at the Cordis business, Defendants had no working inventory systems in place at Cordis during the Class Period that gave them accurate visibility into the quality and quantity of the Cordis inventory.

## VIII.   LOSS CAUSATION AND ECONOMIC LOSS

131.    The market for Cardinal's common stock was open, well-developed and efficient at all relevant times. Throughout the Class Period, Cardinal's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiff and other members of the Class purchased or otherwise acquired Cardinal common stock relying upon the integrity of the market price for Cardinal's common stock and market information relating to Cardinal, and have been damaged thereby.

132.    When the relevant truth began to emerge, the price of Cardinal's common stock declined immediately as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiff and the Class.

133.    As set forth above in ¶¶68-69, on August 2, 2017, Cardinal reported weak earnings for its 4Q and FY 2017 and lowered its earnings guidance for fiscal year 2018 due to lost sales and cost issues including "higher-than-planned write-offs for excess inventory" at Cordis.  As a result of the August 2, 2017 disclosures, the price of Cardinal stock declined from a closing price of $77.33 per share on August 1, 2017, to a closing price of $70.99 per share on August 2, 2017, or over 8%. While Cardinal's stock price dropped over 8%, the S&P 500 Index and S&P 500 Healthcare Index (the two comparative indexes identified in Cardinal's FY 2017 10-K), decreased -0.22% and rose 0.05%, respectively.  The new Company-specific material information released on that day was directly related to the false or misleading statements previously made by Defendants.  However, Defendants continued their scheme and limited Cardinal's stock price decline and Cardinal's stock price remained inflated because Defendants continued to conceal the full impact of their fraudulent scheme from investors.

134.    As set forth above in ¶¶84-88, on May 3, 2018, before the markets opened, Defendants shocked investors and analysts by announcing lower-than-expected earnings for Cardinal's third quarter fiscal year 2018 due to the poor performance of its Cordis business and an increase in inventory reserves.  The Company also reduced expected earnings for FY 2018 and told investors that Cordis would not be profitable until the end of FY 2019.

135.    Analysts covering the Company were stunned.  A William Blair analyst characterized the news regarding Cordis's inventory problems as "surprising[]," and that the news "calls into question the company's broader strategy for the medical segment – the recipient of billions of dollars of capital deployment in the last decade."  Evercore ISI issued a report titled "Striking a Tough

- 55 -

'Chord'" and reported that "[t]here is no way to sugar coat this Q and there isn't really a silver lining here either unfortunately. The challenges at Cordis are disappointing" and noted that Cardinal's "ability to understand all the demand signals and turn them into manufacturing plans and then having visibility to both consigned inventory and as well as the company's own (particularly outside of the United States), has been much more difficult than originally expected." Similarly, Leerink reported that "[w]ith the acquisition having closed in October 2015, we are disappointed by the lack of visibility, lack of good inventory controls, and lack of understanding of the full required investment." RBC Capital Markets issued a report called "Titanic, and We Don't Mean the Movie: Weak F3Q and Outlook Sink CAH Shares" and reported that the "poor performance was in large part due to a large inventory writedown as a result of better insight into proper inventory levels for the segment."

136. As a result of the May 3, 2018 disclosures, the price of Cardinal's stock declined over 21% from a closing price of $64.65 per share on May 2, 2018, to a closing price of $50.80 per share on May 3, 3018, on an unusually large trading volume of 15,594,300 shares. While Cardinal's stock price declined over 21%, the S&P 500 Healthcare Index decreased -0.87% and the S&P 500 Index decreased -0.23%. The new Company-specific material information released that day was directly related to the false or misleading statements previously made by Defendants.

137. Each disclosure of adverse facts that removed inflation from Cardinal's stock price was connected to Defendants' material false statements and omissions and the fraudulent conduct alleged herein. The timing and magnitude of Cardinal's price declines also negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. As a direct result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Cardinal, Plaintiff and the Class have suffered significant losses and damages.

- 56 -

## IX.    PRESUMPTION OF RELIANCE

138.    At all relevant times, the market for Cardinal common stock was an efficient market for the following reasons, among others:

(a)    Cardinal common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's quarterly report on Form 10-Q filed on May 9, 2018, the Company had close to 311 million shares of common stock outstanding as of April 30, 2018, demonstrating a very active and broad market for Cardinal common stock;

(c)    as a regulated issuer, Cardinal filed periodic public reports with the SEC;

(d)    Cardinal regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures;

(e)    Cardinal was followed by numerous securities analysts employed by major brokerage firms, such as Leerink Partners, LLC, J.P. Morgan, Cowen and Company, and William Blair & Company, who wrote reports that were distributed to the brokerage firms' sales forces and the public; and

(f)    The Company's stock price reacted to new material company specific news during the Class Period.

139.    As a result of the foregoing, the market for Cardinal common stock promptly digested current information regarding Cardinal from publicly available sources and reflected such information in Cardinal's common stock price.  Under these circumstances, a presumption of reliance applies to Plaintiff's purchases of Cardinal common stock.

## X.      NO SAFE HARBOR

140.    The false or misleading statements alleged herein were not forward-looking.  To the extent any of the alleged false or misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply.  Many of the specific statements alleged were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were absent from Cardinal's Class Period filings and oral disclaimers.

141.    Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Cardinal who knew that those statements were false or misleading when made.

142.    Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned of and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.     CLASS ACTION ALLEGATIONS

143.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Cardinal common stock during the Class Period.  Excluded from the Class are: Defendants, the current and Class Period officers and directors of the Company, the members of the immediate families and the legal

representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

144.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Cardinal common stock was actively traded on the NYSE.  According to the Company's quarterly report on Form 10-Q filed on May 9, 2018, the Company had close to 311 million shares of common stock outstanding as of April 30, 2018.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

145.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

146.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

147.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

(c)    Whether the price of Cardinal common stock was artificially inflated during the Class Period; and

- 59 -

(d)     To what extent the members of the Class have sustained damages and the proper measure of damages.

148.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.  Plaintiff is not aware of any difficulty in the management of this action as a class action.

### COUNT I

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
Against Cardinal and the Individual Defendants**

149.    Plaintiff incorporates the foregoing paragraphs by reference.

150.    During the Class Period, Cardinal and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.    These Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 60 -

(c)      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Cardinal common stock.

152.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff, and other members of the Class, suffered damages in connection with their respective purchases of Cardinal common stock during the Class Period, because, in reliance on the integrity of the market, Plaintiff and other members of the Class paid artificially inflated prices for Cardinal common stock and experienced losses when the artificial inflation was released from Cardinal common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiff and other members of the Class would not have purchased Cardinal common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' false or misleading statements.

153.     By virtue of the foregoing, Cardinal and the Individual Defendants have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of §20(a) of the Exchange Act Against the Individual Defendants**

154.     Plaintiff incorporates the foregoing paragraphs by reference.

155.     The Individual Defendants acted as controlling persons of Cardinal within the meaning of §20(a) of the Exchange Act.

156.     By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures and the Cordis business, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false or misleading.  The

- 61 -

Individual Defendants were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

157. As set forth above, Cardinal violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## COUNT III

### For Violation of §20A of the Exchange Act Against Defendant Barrett

158. Plaintiff incorporates the foregoing paragraphs by reference.

159. This count is brought by 1199 SEIU Health Care Employees Pension Fund on behalf of itself and the members of the Class who purchased Cardinal common stock contemporaneously with defendant Barrett's sale of Cardinal common stock.

160. Defendant Barrett's sales and an example of Plaintiff's contemporaneous purchases[3] with defendant Barrett during the Class Period are set forth below:

---

[3] Plaintiff's purchases during the Class Period, including all contemporaneous purchases with Defendant Barrett, are described in the previously filed Certification incorporated herein by reference. (ECF No. 13-4).

| Defendant Barrett Sale Date | Price | Shares Sold | Proceeds | 1199 SEIU Health Care Employees Pension Fund Purchase Date | Price | Shares Purchased |
|---|---|---|---|---|---|---|
| 05/11/2015 | $86.44 | 300,000 | $25,932,000 | 05/21/2015 | $88.41 | 50 |
| 08/20/2015 | $83.08 | 300,000 | $24,924,000 | 08/24/2015 | $79.27 | 20 |
| | | | | 08/24/2015 | $79.67 | 288 |
| | | | | 08/24/2015 | $79.48 | 411 |
| | | | | 08/24/2015 | $78.25 | 1,844 |
| 11/10/2015 | $87.73 | 54,658 | $4,795,146 | 11/11/2015 | $87.16 | 209 |
| 08/08/2016 | $83.75 | 20,428 | $1,710,845 | 08/31/2016 | $79.67 | 406 |
| | | | | 08/31/2016 | $79.66 | 1,058 |
| 08/09/2016 | $83.76 | 129,818 | $10,873,556 | 08/31/2016 | $79.67 | 406 |
| | | | | 08/31/2016 | $79.66 | 1,058 |
| 08/10/2016 | $83.44 | 99,754 | $8,323,474 | 08/31/2016 | $79.67 | 406 |
| | | | | 08/31/2016 | $79.66 | 1,058 |
| 11/10/2016 | $71.35 | 194,441 | $13,873,365 | 11/10/2016 | $70.76 | 102 |
| 11/10/2016 | $70.40 | 16,954 | $1,193,562 | 11/10/2016 | $70.76 | 102 |
| 11/10/2016 | $71.82 | 6,600 | $474,012 | 11/10/2016 | $70.76 | 102 |
| 02/10/2017 | $77.23 | 217,994 | $16,835,677 | 02/22/2017 | $81.00 | 81 |

161.    During the Class Period, defendant Barrett was privy to confidential information concerning Cardinal's operations, finances, financial condition and future business prospects, including, but not limited to, the false statements disseminated to the investing public. Notwithstanding his duty to refrain from trading in Cardinal common stock without disclosing the foregoing materially adverse facts, and in violation of his fiduciary duties to Class members, defendant Barrett sold Cardinal common stock contemporaneously with Plaintiff's purchase and the purchases of Cardinal common stock by other Class members.

162.    Defendant Barrett sold his Cardinal shares as alleged above at prices artificially inflated by the non-disclosure of material adverse non-public facts, misrepresentations of fact, and the public statements released during the Class Period.

163.    Defendant Barrett was aware that he was in possession of material adverse information that was not known to the investing public, including Plaintiff and other members of the

- 63 -

Class.  Defendant Barrett was obligated to disclose the material non-public adverse information to Plaintiff and other members of the Class before selling his stock.

164.    By reason of the foregoing, defendant Barrett directly and indirectly, by use of the means of instrumentalities of interstate commerce, electronic communications mailing and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, and engage in acts and transactions in a course of business which operated as a fraud or deceit upon members of the investing public who purchased Cardinal common stock contemporaneously with the sales of defendant Barrett.

165.    As a result of the foregoing, Plaintiff and the other members of the Class who purchased Cardinal common stock contemporaneously with the sale of Cardinal common stock by defendant Barrett have suffered substantial damages measured by the amount of profits gained or losses not incurred by reason of defendant Barrett's stock sales.

166.    This action was commenced within five years after defendant Barrett made sales while in the possession of material, non-public adverse information.

167.    By reason of the foregoing, defendant Barrett violated §20A of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

4837-5708-8962.v1

C.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D.      Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury.

DATED:  September 8, 2020                    MURRAY MURPHY MOUL + BASIL LLP


                                            s/ JOSEPH F. MURRAY
                                            JOSEPH F. MURRAY (0063373)
                                            1114 Dublin Road
                                            Columbus, OH  43215
                                            Telephone:  614/488-0400
                                            614/488-0401 (fax)
                                            murray@mmmb.com

                                            Local Counsel for Lead Plaintiff

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SPENCER A. BURKHOLZ
                                            LAURIE L. LARGENT
                                            JENNIFER N. CARINGAL
                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)
                                            spenceb@rgrdlaw.com
                                            llargent@rgrdlaw.com
                                            jcaringal@rgrdlaw.com

                                            Lead Counsel for Lead Plaintiff

- 65 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on September 8, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ JOSEPH F. MURRAY
JOSEPH F. MURRAY

MURRAY MURPHY MOUL + BASIL LLP
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)

E-mail:  murray@mmmb.com

## Mailing Information for a Case 2:19-cv-03347-EAS-EPD Louisiana Sheriffs Pension & Relief Fund v. Cardinal Health, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Laura M Andracchio**
  lauraa@csgrr.com

- **David S Bloomfield , Jr**
  dbloomfield@porterwright.com,mruyf@porterwright.com,rtrafford@porterwright.com,CLShike@wlrk.com,APSadinsky@wlrk.com,wdsavitt@WLRK.com

- **Spencer Burkholz**
  SpenceB@rgrdlaw.com

- **Jennifer Caringal**
  JCaringal@rgrdlaw.com

- **Laurie Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Todd Aaron Long**
  tlong@mcneeslaw.com,llowe@mcneeslaw.com,talattorney@gmail.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,murray@ecf.courtdrive.com

- **Darren J Robbins**
  tedp@rgrdlaw.com

- **Henry Rosen**
  henryr@rgrdlaw.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`