**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **LOUISIANA SHERIFFS' PENSION & RELIEF FUND**, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> **v.** <br><br> **CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C. KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON**, <br><br> Defendants. | **Case No. 2:19-cv-3347** <br><br> Judge Edmund A. Sargus <br> Chief Magistrate Judge Elizabeth A. Preston Deavers |

**DECLARATION OF DAVID S. BLOOMFIELD, JR. IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

I, David S. Bloomfield, Jr., declare under the penalty of perjury and state as follows:

1.       I am an attorney licensed to practice in the State of Ohio and in the Southern District of Ohio.  I am a partner in the firm of Porter, Wright, Morris & Arthur LLP, which is counsel of record for Defendants Cardinal Health, Inc., George S. Barrett, Donald M. Casey, Jr., Michael C. Kaufmann, Jorge M. Gomez, and David J. Wilson.  I submit this Declaration in support of Defendants' Motion to Dismiss the Consolidated Amended Complaint.  I am over the age of eighteen.  I have verified that the documents attached to this Declaration are true and accurate copies of the exhibits attached to this Declaration, and if called as a witness under oath, I could and would competently testify that these are true and accurate copies of the documents attached.

13861915v1

2.      A true and accurate copy of each of the following exhibits is attached to my Declaration (though electronically filed in four parts, with Exhibits 1-25 included as attachments to this filing; Exhibits 26-51 in Part II; Exhibits 52-77 in Part III; and Exhibits 78-102 in Part IV):

| Date | Description | Exhibit |
|---|---|---|
| 2/20/14 | Cardinal Health's announcement of recent acquisition of WaveMark and its RFID technology | 1 |
| 9/15/14 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 2 |
| 2/10/15 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 3 |
| 2/24/15 | Transcript of Cardinal Health's presentation at the RBC Health Care Conference | 4 |
| 3/02/15 | Cardinal Health's Form 8-K announcing its planned acquisition of Cordis | 5 |
| 3/02/15 | Transcript of Cardinal Health's conference call regarding its planned acquisition of Cordis | 6 |
| 3/02/15 | Slide deck accompanying Cardinal Health's conference call regarding its planned acquisition of Cordis | 7 |
| 3/03/15 | Transcript of Cardinal Health's presentation at the Cowen & Company 35th Annual Health Care Conference | 8 |
| 3/03/15 | Transcript of Cardinal Health's presentation at the breakout session of the Cowen & Company 35th Annual Health Care Conference | 9 |
| 3/03/15 | Slide deck accompanying Cardinal Health's presentation at the Cowen & Company 35th Annual Health Care Conference | 10 |
| 3/10/15 | Transcript of Cardinal Health's presentation at the Barclays Health Care Conference | 11 |
| 4/10/15 | Clinica Medtech Intelligence's publication titled "Interview:  The bigger value picture behind Cardinal Health's Cordis buy" | 12 |
| 4/16/15 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 13 |
| 4/30/15 | Transcript of Cardinal Health's conference call regarding its third quarter FY2015 results | 14 |
| 4/30/15 | Slide deck accompanying Cardinal Health's conference call regarding its third quarter FY2015 results | 15 |
| 5/11/15 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 16 |
| 5/13/15 | Transcript of Cardinal Health's presentation at the Bank of America Merrill Lynch Health Care Conference | 17 |
| 5/13/15 | Slide deck accompanying Cardinal Health's presentation at the Bank of America Merrill Lynch Health Care Conference | 18 |

| Date | Description | Exhibit |
|---|---|---|
| 8/04/15 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 19 |
| 8/04/15 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 20 |
| 8/13/15 | Cardinal Health's Form 10-K for the fiscal year ending June 30, 2015 | 21 |
| 8/15/15 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 22 |
| 8/15/15 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 23 |
| 8/20/15 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 24 |
| 10/00/15 | Endovascular Today's publication titled "Insights From David J. Wilson, President of Cordis Corporation" | 25 |
| 10/04/15 | Cardinal Health's announcement that it has completed acquisition of Cordis | 26 |
| 11/10/15 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 27 |
| 11/19/15 | Transcript of Cardinal Health's Investor and Analyst Meeting | 28 |
| 11/19/15 | Slide deck accompanying Cardinal Health's Investor and Analyst Meeting | 29 |
| 1/12/16 | Transcript of Cardinal Health's presentation at the J.P. Morgan Health Care Conference | 30 |
| 1/12/16 | Slide deck accompanying Cardinal Health's presentation at the J.P. Morgan Healthcare Conference | 31 |
| 2/01/16 | Cardinal Health's Form 8-K announcing its second quarter 2016 results | 32 |
| 2/01/16 | Transcript of Cardinal Health's conference call regarding its second quarter FY2016 results | 33 |
| 2/01/16 | Slide deck accompanying Cardinal Health's conference call regarding its second quarter FY2016 results | 34 |
| 2/02/16 | Cardinal Health's Form 10-Q for the quarter ending December 31, 2015 | 35 |
| 2/10/16 | Transcript of Cardinal Health's presentation at the Leerink Partners Global Healthcare Conference | 36 |
| 3/07/16 | Transcript of Cardinal Health's presentation at the Raymond James Institutional Investors Conference | 37 |
| 4/28/16 | Cardinal Health's Form 8-K announcing its third quarter FY2016 results | 38 |
| 4/28/16 | Transcript of Cardinal Health's conference call regarding its third quarter FY2016 results | 39 |
| 4/28/16 | Slide deck accompanying Cardinal Health's conference call regarding its third quarter FY2016 results | 40 |
| 5/03/16 | Cardinal Health's Form 10-Q for the quarter ending March 31, 2016 | 41 |
| 6/15/16 | Transcript of Cardinal Health's presentation at the William Blair Growth Stock Conference | 42 |
| 6/17/16 | Transcript of Cardinal Health's Dublin Day Conference | 43 |
| 6/17/16 | Slide deck accompanying Cardinal Health's Dublin Day Conference | 44 |

-3-

| Date | Description | Exhibit |
|---|---|---|
| 8/02/16 | Cardinal Health's Form 8-K announcing its fourth quarter 2016 and fiscal 2016 results | 45 |
| 8/02/16 | Transcript of Cardinal Health's conference call regarding its fourth quarter FY2016 results | 46 |
| 8/02/16 | Slide deck accompanying Cardinal Health's conference call regarding its fourth quarter FY2016 results | 47 |
| 8/04/16 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 48 |
| 8/04/16 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 49 |
| 8/08/16 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 50 |
| 8/09/16 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 51 |
| 8/12/16 | Cardinal Health's Form 10-K for the fiscal year ending June 30, 2016 | 52 |
| 8/15/16 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 53 |
| 8/15/16 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 54 |
| 9/15/16 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 55 |
| 10/31/16 | Cardinal Health's Form 8-K announcing its first quarter 2017 results | 56 |
| 10/31/16 | Transcript of Cardinal Health's conference call regarding its first quarter FY2017 results | 57 |
| 10/31/16 | Slide deck accompanying Cardinal Health's conference call regarding its first quarter FY2017 results | 58 |
| 11/02/16 | Cardinal Health's Form 10-Q for the quarter ending September 30, 2016 | 59 |
| 11/10/16 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 60 |
| 12/16/16 | Transcript of Cardinal Health's Dublin Day Conference | 61 |
| 12/16/16 | Slide deck accompanying Cardinal Health's Dublin Day Conference | 62 |
| 1/10/17 | Transcript of Cardinal Health's presentation at the J.P. Morgan Healthcare Conference | 63 |
| 1/10/17 | Slide deck accompanying Cardinal Health's presentation at the J.P. Morgan Healthcare Conference | 64 |
| 2/07/17 | Cardinal Health's Form 8-K announcing its second quarter 2017 results | 65 |
| 2/07/17 | Transcript of Cardinal Health's conference call regarding its second quarter FY2017 results | 66 |
| 2/07/17 | Slide deck accompanying Cardinal Health's conference call regarding its second quarter FY2017 results | 67 |
| 2/07/17 | Cardinal Health's Form 10-Q for the quarter ending December 31, 2016 | 68 |
| 2/10/17 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 69 |

| Date | Description | Exhibit |
|---|---|---|
| 4/18/17 | Cardinal Health's Form 8-K announcing an update to its fiscal 2017 guidance and providing a preliminary view on fiscal 2018 and 2019 | 70 |
| 5/01/17 | Cardinal Health's Form 8-K announcing its third quarter 2017 results | 71 |
| 5/01/17 | Transcript of Cardinal Health's conference call regarding its third quarter FY2017 results | 72 |
| 5/01/17 | Slide deck accompanying Cardinal Health's conference call regarding its third quarter FY2017 results | 73 |
| 5/02/17 | Cardinal Health's Form 10-Q for the quarter ending March 31, 2017 | 74 |
| 8/02/17 | Cardinal Health's Form 8-K announcing its fourth quarter 2017 and fiscal 2017 results | 75 |
| 8/02/17 | Transcript of Cardinal Health's conference call regarding its fourth quarter 2017 and fiscal 2017 results | 76 |
| 8/02/17 | Slide deck accompanying Cardinal Health's conference call regarding its fourth quarter 2017 and fiscal 2017 results | 77 |
| 8/08/17 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 78 |
| 8/08/17 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 79 |
| 8/10/17 | Cardinal Health's Form 10-K for the fiscal year ending June 30, 2017 | 80 |
| 8/15/17 | Form 4 Statement of Changes in Beneficial Ownership for George Barrett | 81 |
| 8/15/17 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 82 |
| 9/11/17 | Transcript of Cardinal Health's presentation at the Morgan Stanley Healthcare Conference | 83 |
| 9/15/17 | Form 4 Statement of Changes in Beneficial Ownership for Donald Casey | 84 |
| 11/06/17 | Cardinal Health's Form 8-K announcing its first quarter FY2018 results | 85 |
| 11/06/17 | Transcript of Cardinal Health's conference call regarding its first quarter FY2018 results | 86 |
| 11/06/17 | Slide deck accompanying Cardinal Health's conference call regarding its first quarter FY2018 results | 87 |
| 11/07/17 | Cardinal Health's Form 10-Q for the quarter ending September 30, 2017 | 88 |
| 1/08/18 | Transcript of Cardinal Health's presentation at the J.P. Morgan Healthcare Conference | 89 |
| 1/08/18 | Slide deck accompanying Cardinal Health's presentation at the J.P. Morgan Healthcare Conference | 90 |
| 2/08/18 | Cardinal Health's Form 8-K announcing its second quarter FY2018 results | 91 |
| 2/08/18 | Transcript of Cardinal Health's conference call regarding its second quarter FY2018 results | 92 |
| 2/08/18 | Slide deck accompanying Cardinal Health's conference call regarding its second quarter FY2018 results | 93 |
| 2/08/18 | Cardinal Health's Form 10-Q for the quarter ending December 31, 2017 | 94 |

| Date | Description | Exhibit |
|---|---|---|
| 2/15/18 | Transcript of Cardinal Health's presentation at the Leerink Partners Global Healthcare Conference | 95 |
| 3/13/18 | Transcript of Cardinal Health's presentation at the Barclays Global Healthcare Conference | 96 |
| 5/03/18 | Cardinal Health's Form 8-K announcing its third quarter FY2018 results | 97 |
| 5/03/18 | Transcript of Cardinal Health's conference call regarding its third quarter FY2018 results | 98 |
| 5/03/18 | Slide deck accompanying Cardinal Health's conference call regarding its third quarter FY2018 results | 99 |
| 5/09/18 | Cardinal Health's Form 10-Q for the quarter ending March 31, 2018 | 100 |
| 8/06/18 | Cardinal Health's Form 8-K announcing its fourth quarter and fiscal 2018 results | 101 |
| 8/22/18 | Cardinal Health's Form 10-K for the fiscal year ending June 30, 2018 | 102 |

I declare, under penalty of perjury under the laws of the United States of America and 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 6th day of November, 2020, in Columbus, Ohio.

/s/ David S. Bloomfield, Jr.
David S. Bloomfield, Jr.

-6-

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **LOUISIANA SHERIFFS' PENSION & RELIEF FUND**, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>**CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C. KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON**,<br><br>Defendants. | **Case No. 2:19-cv-3347**<br><br>Judge Edmund A. Sargus<br>Chief Magistrate Judge Elizabeth A. Preston Deavers |

**DECLARATION OF DAVID S. BLOOMFIELD, JR., EXHIBITS (PART I)**

# EXHIBITS 1-25

# EXHIBIT 1

Cardinal Health News & Media

# Cardinal Health Showcases Newly Acquired RFID Technology at HIMSS14

**WaveMark RFID Technology Now Part of Cardinal Health Inventory Management Solutions**

Dublin, Ohio, Feb. 20, 2014 ─ Cardinal Health announces its recent acquisition of WaveMark and will feature its newly acquired radio frequency identification (RFID) technology at the Healthcare Information and Management Systems Society (HIMSS) annual meeting in Orlando, Fla. next week. With the WaveMark RFID technology, the company's inventory management solution now is the first, end-to-end solution of its kind — powered by a SaaS-based analytics platform and optimizing the configuration of various inventory management tools to track high-priced physician preference items as well as low-cost, high-volume consumables.

"Our experience and insights showed us that our customers are looking for solutions to help them better manage their supplies and their limited human resources to drive more informed decision making across their supply spend — from low-priced bandages to high-cost devices," said Steve Inacker, president of Hospital Sales and Services at Cardinal Health. "The acquisition of WaveMark and its RFID technology fit perfectly into Cardinal Health Inventory Management Solutions."

With the integration of WaveMark technologies, the newly formed Cardinal Health Inventory Management Solutions (CIMS) enables real-time tracking and management of inventory across the entire supply chain, from manufacturer to point of care. The improved product visibility and inventory control resulting from the solution's use can help hospitals, integrated delivery networks, medical device manufacturers and distributors.

"CIMS isn't just about tracking inventory," said Jean Claude Saghbini, vice president and general manager of Cardinal Health Inventory Management Solutions at Cardinal Health. "With point-of-use capture and powerful analytics, teams can streamline workflow, better manage recalls and reduce waste. The integration of RFID effectively leverages technology so everyone in the system can focus more time on what matters most—the patient."

The new system is compatible with the industry's leading hospital information systems and is in place in hospital systems such as the Veteran's Health Administration; Emory- St. Joseph's in Atlanta, and Florida Hospital in Orlando, Fla. The flexible software platform leverages RFID, barcode, and demand signaling methodologies to enable acute and ambulatory care centers to assemble customized inventory management workflows that are accurate, clinician-friendly and appropriate for all supplies.

WaveMark technology will now be marketed as a component of Cardinal Health Inventory Management Solutions. Cardinal Health Inventory Management Solutions will be featured in the HIMSS Intelligent Hospital Pavilion, which simulates real-life scenarios within a hospital environment. Pavilion visitors can gain a practical overview of how innovative technologies are seamlessly integrated to enhance patient care, optimize workflow and manage resources. To register for Intelligent Hospital Pavilion tours, visit intelligenthospital.org/himss14.

**About Cardinal Health**
Headquartered in Dublin, Ohio, Cardinal Health, Inc. (NYSE: CAH) is a $101 billion health care services company that improves the cost-effectiveness of health care. As the business behind health care, Cardinal Health helps pharmacies, hospitals, ambulatory surgery centers, clinical laboratories and physician offices

focus on patient care while reducing costs, enhancing efficiency and improving quality. Cardinal Health is an essential link in the health care supply chain, providing pharmaceuticals and medical products and services to more than 100,000 locations each day and is also the industry-leading direct-to-home medical supplies distributor. The company is a leading manufacturer of medical and surgical products, including gloves, surgical apparel and fluid management products. In addition, the company operates the nation's largest network of radiopharmacies that dispense products to aid in the early diagnosis and treatment of disease. Ranked #19 on the Fortune 500, Cardinal Health employs 33,000 people worldwide. More information about the company may be found at www.cardinalhealth.com and @CardinalHealth on Twitter.

**About Cardinal Health Inventory Management Solutions**
Cardinal Health Inventory Management Solutions helps health care decision makers improve financial, operational and clinical outcomes through several modular offerings. This portfolio offers a range of inventory management solutions that healthcare administrators can use to optimize the management of their supplies from high-cost physician preference items to low-cost medical consumables.  A powerful, SaaS-based analytics platform unifies these offers and allows unprecedented visibility across the hospital and across the IDN. More information about Cardinal Health Inventory management Solutions may be found at http://cardinalhealth.com/cims.

https://cardinalhealth.mediaroom.com/newsreleasearchive?item=122946

# EXHIBIT 2

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Casey Donald M Jr. | CARDINAL HEALTH INC [ CAH ] | Director ___ 10% Owner ___ |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 09/15/2014 | X Officer (give title below) ___ Other (specify below) ___ |
| 7000 CARDINAL PLACE | | CEO, Medical Segment |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| DUBLIN    OH    43017 | | X Form filed by One Reporting Person |
| (City) (State) (Zip) | | ___ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 09/15/2014 | | A [(1)] | | 20,011 | A | $0 | 87,171 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Grant of restricted share units that vest in two equal annual installments on the second and third anniversaries of the grant date.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact        09/16/2014
** Signature of Reporting Person            Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 3

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

**1. Name and Address of Reporting Person**\*

Barrett George S

| (Last) | (First) | (Middle) |
|---|---|---|

7000 CARDINAL PLACE

(Street)

| DUBLIN | OH | 43017 |
|---|---|---|
| (City) | (State) | (Zip) |

**2. Issuer Name and Ticker or Trading Symbol**

CARDINAL HEALTH INC [ CAH ]

**3. Date of Earliest Transaction (Month/Day/Year)**
02/10/2015

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer (Check all applicable)**

X Director    10% Owner

X Officer (give title below)    Other (specify below)

Chairman and CEO

**6. Individual or Joint/Group Filing (Check Applicable Line)**

X Form filed by One Reporting Person

Form filed by More than One Reporting Person

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 12/03/2014 | | G | V | 24,391 | D | $0 | 348,694 | D | |
| Common Shares | 02/10/2015 | | M[1] | | 300,000 | A | $27.29 | 648,694 | D | |
| Common Shares | 02/10/2015 | | S[1] | | 300,000 | D | $84.87[2] | 348,694 | D | |

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $27.29 | 02/10/2015 | | M | | | 300,000 | [3] | 09/15/2016 | Common Shares | 300,000 | $0 | 9,954 | D | |

**Explanation of Responses:**

1. The exercise and sale reported on this Form 4 were effected pursuant to a Rule 10b5-1 trading plan adopted by the reporting person on November 6, 2014.

2. The price reported in column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $84.48 to $85.17, inclusive. The reporting person undertakes to provide to Cardinal Health, Inc., any security holder of Cardinal Health, Inc., or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of shares sold at each separate price within the range set forth in footnote 2 to this Form 4.

3. The option, representing a right to purchase a total of 309,954 shares, vested and became exercisable in three equal annual installments beginning on September 15, 2010.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact        02/11/2015

\*\* Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 4

**Cardinal Health Inc at RBC Healthcare Conference**

New York Feb 24, 2015 (Thomson StreetEvents) -- Edited Transcript of Cardinal Health Inc presentation Tuesday, February 24, 2015 at 1:00:00pm GMT

CORPORATE PARTICIPANTS
   Mike Kaufmann, Cardinal Health, Inc. - CFO
CONFERENCE CALL PARTICIPANTS
   Dave Francis, RBC Capital Markets - Analyst

**PRESENTATION**

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

While we're getting teed up here, I'll do this exciting opening that you guys all know that we need to do. So during this presentation, I will be making forward-looking statements. Our actual results could differ materially from those projected here today.

For information about these factors that could cause actual results to differ from today's projections, please refer to our SEC filings, which you can find on the investors page of our website. How's that for a --

**Dave Francis**, RBC Capital Markets - Analyst

That was well done.

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

-- stellar opening?

**Dave Francis**, RBC Capital Markets - Analyst

Questions?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Yes, questions? (laughter)

**Dave Francis**, RBC Capital Markets - Analyst

Good morning, everybody. For those who don't know me, I'm Dave Francis. I run the healthcare IT and pharmaceutical distribution research group here at RBC. And I appreciate you all making the trip out on an extraordinarily cold morning.

And kicking things off for the whole conference, I am pleased to introduce Mike Kaufmann. Mike is the relatively new CFO at Cardinal Health -- been at the Company for quite a long time and has had a lot of senior operating roles there. So knows the business extraordinarily well. But how long have you been in the CFO chair now?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

About 100 days.

**Dave Francis**, RBC Capital Markets - Analyst

100 days.

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Yes. I've been with the Company 24 years, almost 25, but in the CFO role about 100 days.

**Dave Francis**, RBC Capital Markets - Analyst

Well, you are doing a great job so far. So, thanks.

And, again, the breakout session is just after the meeting here. But to kick things off, you guys have been in the news here a little bit -- a lot of rumors swirling around on the M&A front. And I figured we would just jump right into the fire. Is there anything you want to share with us this morning or anything new that we can talk about relative to the business?

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

No. Other than I can't comment on rumors. I will take -- if you set the rumor aside, we have been talking for a while that we are not afraid to deploy our capital for the right assets. So things that are going to be a strategic fit for us, and make sense for us, and fit our core, we will continue to look at. And we constantly have different types of acquisitions that we are looking at in our pipelines. But I can't obviously comment on any specific ones.

**Dave Francis**, RBC Capital Markets - Analyst

Before we jump off that topic, you guys have done a great job over the last several years of repositioning the business and looking at things a little bit differently from some of your competitors in terms of where you focus the business. As you look to deploy capital strategically on the M&A front, is it fair to say that extending the physician preference platform is a priority of yours; extending the specialty platform is a priority of yours; and looking in the international markets is a priority of yours? Is there anything else that might fit in that bucket?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Yes, I'm happy to walk through that if you want -- kind of through our strategic priorities and where/how I see our deployment of capital. First of all, as a new CFO, I'm not planning on changing any of our capital deployment policies. When I was CEO of the segment, the largest segment that generated the majority of the cash, anyways, I was heavily involved in our capital deployment.

So we're still going to deploy it first towards our business internally, and then make sure we continue with our dividend policy, and then we'll be focused on M&A. I would say we look at M&A through a couple buckets.

So if you remember our strategic priorities that George has talked about, first one is generics. So anything where we continue to look to get scale in generics, we would make opportunities to deploy capital. So, for instance, if a regional wholesaler came up -- just like, I'm sure, our competitors -- that would be an area that's right in the sweet spot. We take a look at those. Haven't been one up for a while, so that's there. So probably not an area that's likely; but if something were to pop in that area, that would be an area we would consider.

Internationally I would say China continues to be our big focus, since -- last time we spoke, I had mentioned that we were in 10 cities right now. We just completed a small acquisition to go to our 11th city. We are on track to get to 25 cities -- is where we would like to be.

So we have acquisitions in the pipeline there across China to get to the top 25 cities. And we are continuing to open up some of our own specialty pharmacies in China. So we'll deploy some capital there, so that will be a focus for us.

And then I would say in the area of the home, that's going to be an area where we will take a look at deploying capital. We really feel like we have the best asset in that space with the AssuraMed business that we acquired.

So as we find opportunities to find complementary businesses that we can roll under the home business, we'll do that. I think there is some decent amount of opportunities out there in that space, especially as an area we would look to do more acquisitions; but, honestly -- most of you know this -- the problem is most of the assets tend to be overpriced in that space, in our opinion.

So we're going to continue to -- while we'd like to, we are going to be disciplined first. And we are not going to overpay for something. So opportunistically, if there's something out there, we are going to take a look at it. But, again, as you know, it's tough to find those assets that make sense.

Our most recent one was Sonexus, which was the hub business which we were really excited about. And that's going well.

And then the last bucket will really be in that physician preference items, products -- either to buy volume that will make us more efficient in our current products -- say, like, gloves; or drapes and gowns; or fluid section containers -- things we manufacture or things that we source. If we find some opportunities to gain scale there, we might. Or if it's to buy new assets in that area.

We've had three acquisitions in the last 12 months in AccessClosure in interventional cardiology, innovative therapies, and negative wound pressure; and Emerge Medical in ortho trauma. So I think that's where you are going to see us deploy capital. All of them we are comfortable with; some just have more assets available than others, and we think we can be better financial disciplined.

**Dave Francis**, RBC Capital Markets - Analyst

Understood. That's helpful. Switching gears to some of the hot-button issues for folks in this room and listening online -- some things that sometimes you guys prefer not to talk about -- but generic pricing, to start with.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Sure.

**Dave Francis**, RBC Capital Markets - Analyst

You guys have been fairly consistent in terms of your commentary over the last several quarters about an inflationary, but moderately inflationary, kind of environment -- one that's volatile, but that you don't have a lot of control over, and working with what you've got. How do you see that dynamic shaping up kind of in the first half of this calendar year? What are some of the dynamics that might change that, either to be more inflationary or less inflationary as the year rolls on?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

So maybe I'll just ground everybody on kind of where our thoughts are on the numbers, and I'll give you a few factors that we are looking at. So as we said, really, from the beginning of the year, we thought our FY 2015, which would be June 30 year-end, would be less than our FY 2014. So that would be a little bit of a headwind for us.

And then, as you know, we've most recently said that our second half would moderate from the first half of this year. So we do expect to see less inflation in the next two quarters than we did in the first two. So that's kind of where we are generally.

**Dave Francis**, RBC Capital Markets - Analyst

To put a finer point on that, less inflation rather than deflation?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Right, right. Less inflation, probably. I'm not sure whether it will end up being a net inflation or deflation. I haven't really looked at it from that perspective; I've kind of looked at it more from the dollars. And depending on the items, and the price increases, and the size, and the margins, it can have different impacts. But from a dollar standpoint we see it moderating.

Now, generally, we're conservative -- we have historically been on this, because we can't control it. We don't make the decision whether a price goes up or not. So it's hard to put big projections out there when it's something that's not in your own control. So I would admit that generally, we as a company have been conservative on inflation.

Whether or not we are for the second half, it's hard to say yet; it's still early. But the factors that I've seen -- you know, a couple of different things. I think these hearings are probably the one thing that is negative towards inflation continuing to be robust, with some of the hearings that are in Washington.

But really that's about the only thing that stands out there on the negative side. When you looked at the other side of why I think it would continue, at some level it's because when you look at the generic pipeline, in general a lot of manufacturers don't have a lot of launches coming up. And historically they've had a launch -- whether it's every month or every couple of months -- to get their P&L rolling. They don't have those right now.

So if you're a general manager, as I have been in the past, sometimes you have to pull different levers to deliver your results. And I think pricing is still going to be one of those things that's going to be one of the most important levers they are going to be able to pull in order to drive results.

I know the FDA is trying to hire more folks; they are talking about doing that. But they've been talking about that for an incredibly long time, and I never see them actually get that done. So I don't think the FDA is going to get any easier to deal with. I don't think they are going to push a significantly new amount of items through the pipeline. So I don't think that's going to relieve the pressure.

I don't think China is ready to come to the United States yet. They are still several years off. And so several years back, a lot of Indian companies came. I think that put some pressure on pricing. I don't anticipate that in the near future on China.

And then the last thing I would say is a new phenomenon that I've seen. Historically, in the early 2000s and stuff, when we would see price increases, it was always -- followed the traditional model of you have five, six, seven players. The API gets shut down for five of them, and all of a sudden you are down to one, two players, and something happens.

Or there's three or four, and two get shut down by the FDA. And there's one or two left, and they raise prices. It's always kind of been that opportunistic price increasing that we've historically seen.

What I've seen significantly more of recently is three- and four- and even five-player price increases. And I did that work right before I had gone out to JPMorgan to take a look at the history of where we were on price increases, and I

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

found it interesting to find many circumstances where there was three or more players raising price. I think a lot of that has to do with the speed and transparency of data as people talk. So that has been another thing that we've seen that I think has had some impact on seeing more price increases.

**Dave Francis**, RBC Capital Markets - Analyst

That's fine. We've got a panel discussion this afternoon on the whole generic pricing dynamic, and bringing in one of those folks that are trying to bring more transparency into the marketplace to talk about what they are seeing on the data front.

But just, again, to kind of attack this from a different direction, we did have the director of the generic drug program at the generic drug conference a couple of weeks ago talk about setting these target action dates and some new things that kind of -- again, it's all a little soft and squishy as to exactly how the FDA goes from the backlog that they've got right now to pushing this huge volume of ANDAs through the pipe.

But just basic supply/demand -- if they were to get that done, is that kind of bolus of new drugs to come on the generic side behind that enough to drive pricing down in your space? Or how would you look at that dynamic?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

I guess I would look at it this way, is that -- if all of a sudden, the floodgates open and a lot more ANDAs were out there, you could have certain molecules where you might see less price increase activity. But, again, they've been talking about that for years. It's been out there for a long time. Manufacturers are paying more fees, pushing for this for years. And it never seems to happen.

Also, I think if it does happen, it's unlikely to open up -- like, in a really short period of time, dump a whole bunch of molecules into the market. I think it will be spread out over time. So I don't think you are going to see some falling off of the cliff all of a sudden because of that action.

**Dave Francis**, RBC Capital Markets - Analyst

That makes sense. You talked about China earlier. In terms of your work to extend your footprint there, what do you see as the logical endgame for you there? How big can Cardinal be? What are your desires in terms of how influential you can be in that marketplace? And candidly, what are some of the barriers, particularly on the government side, that could keep you from becoming what you want to be in China?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Yes. So far the government has been great to work with for us. They have been very encouraging for us to be there. We've seen really no issue with them working with us for licenses and contracts and working with us. So far we haven't seen the government be a barrier.

Now, do we believe the government would probably let us get to be the number one or number two wholesaler in China? Probably not. Things could change someday. I don't necessarily think that's our goal.

Right now we are in the top 10 -- we believe we are number nine in China right now. Whether or not that -- you know, it's hard to get those numbers and know for sure, but we believe we're in the top 10. And we want to continue to move up some spots in there, but it's not critical for us necessarily to be one or two in that market.

We want to be important enough; we want to cover the top 25 cities. We want to be a great option for the pharma manufacturers that really believe total control over the supply chain and transparency, which is what we give them and which is one of our differentiators. We like the idea that we're not competing with any customers over there. So we can open pharmacies if we want to and be a specialty pharmacy, or we can become a data business. We can become whatever we want to in China.

So we like the fact that we don't have any limits over there. So I think that we are just going to continue to focus on being smart, acquiring small tuck-ins in individual cities, making sure that we bring in our controls and procedures so we don't have any FCPA issues, and then get those businesses -- get them where we want to, and then grow them, and just continue to keep our eyes on the horizon here as healthcare kind of changes in China. But like we said, for the first half we drew again over 20%. And we still continue to see robust growth in China.

**Dave Francis**, RBC Capital Markets - Analyst

Is it fair to say that China is still your primary international focus point today? Or is there -- do you ever see an opportunity to kind of take the big three here in the States, and do something in Europe, and pick up the kind of one remaining player that's over there?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

I think right now, our focus clearly is going to be China. We have a game plan there. So that's there. We'll look opportunistically in Canada. We are one of the largest, if not largest, distributors of medical surgical products to long-term care and hospitals in Canada. So we'll continue to look opportunistically in Canada as things arise, particularly if we can drive it to our own products.

But for right now -- I would not say never would we ever be a European wholesaler, but from our point of view, we don't see it as the right strategic fit for us. One of the main reasons of doing it, maybe in the past, for us would have been to get generic scale. And we don't need generic scale. With Red Oak, we are already the largest in the United States in terms of generic sourcing.

We believe we're the largest globally with Red Oak in generic sourcing. So we don't really need to do a European acquisition in terms of generic scale. There's a lot going on in Europe these days that you'd have to deal with if you got into one of those.

So for right now we are going to continue to look at it. I wouldn't say never. If it looks right, if it pans out, we have options. We continue to talk to folks, and understand the market, and stay on top of it. But for right now it's probably not a high priority for us.

**Dave Francis**, RBC Capital Markets - Analyst

Okay. We have about 10 minutes left -- there are three other key areas I wanted to touch on.

First, that biosimilars have kind of exploded here from an investor's perspective as a focal point for growth opportunities for Cardinal Health. As you guys look at the biosimilar opportunity, obviously a lot of biologics that are coming -- or that will be losing patent protection, anyway, over the next five years. Tens of billions of dollars of potential revenue there.

I guess two questions for you: one, how do you see the biosimilars moving forward, a la the generic -- the small-molecule generics? Do you see a similar dynamic in terms of the margin opportunity for you there, or is it likely to be more a brand-versus-brand kind of opportunity? And second, how quickly can that manifest itself to have a meaningful impact on your P&L?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Sure. So a couple comments. I guess the first thing is that biosimilars have been three years away for a long time now.

**Dave Francis**, RBC Capital Markets - Analyst

Right. But they are here now!

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

They are supposedly here now, right? We haven't quite got it through. So -- and as you know that just getting one through, it could take years before another one gets through.

So timing is a real issue on this. It's really hard to predict these. We've always thought generic launches are tough to predict. These biosimilar launches are incredibly hard.

So the first thing is that right now we are constantly looking at it, but it's hard to really predict when and how -- what type of impact it will have on us. The second thing I would tell you is we look at biosimilars from two perspectives. So I think it's important -- and then I'll break down one of them even more.

So you've got to look either upstream: do you have the services that you can offer to the manufacturer for those that are going to launch biosimilars? And then downstream: how are you going to go about working with them to gain money, and distribute them, and do that?

And so the first thing to think about is: do we have the type of services? Are we well positioned? I believe that we are equal to or better than anybody out there to provide services to a manufacturer, if they were going to launch a biosimilar.

With our purchase of Sonexus and where that is going, we believe we have the best hub. So whether it be patient access services, reimbursement services, logistics services, contract management, 3PL -- we have a complete offering across our portfolio on the specialty side to be able to offer the manufacturer, if a manufacturer is going to choose limited distribution for that biosimilar.

Now that being taken -- you know, thinking about that, I don't think many will. Unless the competing drug is in limited distribution, I doubt the biosimilar is going to want to launch in limited distribution, because I think that could put them

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

at a competitive disadvantage.

But if they do, the first thing is: are we positioned well? And I feel really comfortable that we'll be able to either compete for that business, if it's given exclusively. And if it's not, I think we'll be fine to be able to get approved by the manufacturer to be one of their distributors.

And then the way we really look at it is -- we look at two things. Is it substitutable? If it's AB-rated -- if it comes out AB-rated substitutable, then I think the margin dynamics are going to be more like generics'. If it's not substitutable, it's just therapeutically equivalent, or -- then I think it's going to act more like a brand.

Because if the pharmacy customers can't substitute it, and I don't have the power to say, no, I'm not going to give you product A; I'm going to force you to product B, then I won't have any leverage over the manufacturer like you do in generics, where we control the channel, to be able to get higher margins. So I think AB substitutability is the key trigger as to whether -- you know, if you've got a spectrum of here is what you make on brand, which is on the lower end; and here is what you make on generics -- AB rated pushes it more this way. No AB rating pushes it more towards the brand side.

My gut says you'll make a little bit more money than normal brands on these; but, again, that's just a guess. And that's probably just because there are some additional services they may want in terms of data and information that they may be willing to pay for, being a new launch startup, and you are helping them manage inventory and stuff. So I think that's the second thing to think about.

And then what channel we put it in will really be dependent upon what our customer wants. So if the customer says -- if the manufacturer is indifferent, and they say, we don't care whether you go through specialty-only or pharma distribution, my assumption is almost every customer is going to say, I would rather get it next-day through your pharma distribution business. Order it with everything else, deliver it with everything else. And that's probably the way most of them will go, unless the manufacturer says we are not going to allow that; you've got to put it in your specialty-only to control.

**Dave Francis**, RBC Capital Markets - Analyst

It sounds like, though, the services portfolio that you guys have amassed around your whole specialty business is going to be incredibly important and of significant value to the manufacturers who are able to get the biosimilars approved. And depending on substitutability or not, you will be able to lever significant value into the channel on that basis. Is that fair to say?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

It could be. It just depends on the item. So if you think about it, most of the items where there are biosimilars already -- whether you think about Remicade, or Epogen, or any of those -- they are all going through our normal pharmaceutical distribution business now. I don't think those drugs are going to need any different type of storage requirements, or billing or shipping requirements.

So we may just buy them right at their national logistics center, move them to our four DCs, and put them right in the DCs. And they just act like anything else. All I'm saying is that if that manufacturer is a smaller manufacturer, and they need 3PL, contract management, hub services, we have all of those things to provide for them.

So I think each one is kind of an N of one. But I think what -- our key was: we need to be positioned on both in its. We couldn't be out of play, depending on where they want to go. And I'm comfortable we are in good shape either way.

**Dave Francis**, RBC Capital Markets - Analyst

Two quickies. Red Oak: how are things going now that you are seven, eight months in?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Really good so far. We were able to ramp it up a little faster than we expected. So just so you know -- again, everybody is on the same page -- our payment of $25.6 million -- we have 39 payments to make to CVS, 50%/50% JV. That payment started in our second quarter. We started to see some benefits in our first quarter. The second quarter we made the payment; we did mention that are savings was accretive when you net out the payment.

We finished second quarter at a little higher run rate than we expected. We've now been through -- over 95% of the contracts have converted to Red Oak contracts. And so we will continue to see ramp-up in the second half. And we expect to exit fourth quarter near our expected run rate for the year.

**Dave Francis**, RBC Capital Markets - Analyst

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

So let me ask you: are volumes such that as you anniversary the contracts that you have renegotiated upfront -- the 95% that you've been able to get done so far -- as you get into that next contract renegotiation stage a year from now, is there sufficient volume that there may be some additional juice that you guys can get out of that next renegotiation? Or have you essentially kind of hit the levels that you are going to get, and pricing becomes a little bit less elastic for you?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

So first of all, at least from an FY 2016 compared to FY 2015 standpoint --

**Dave Francis**, RBC Capital Markets - Analyst

You see a lot of room.

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

There's still room, right? Because we didn't even have the full run rate until the fourth quarter. So 2016 versus 2015, there is definitely going to be tailwind. Then, as you begin to look out, you look at the size of the business -- ours isn't really structured around an annual contract. Each contract is different, our relationship different.

And so we are going to continue to look with the manufacturer. We really see that there needs to be a balance here. We didn't try and go in and look at our manufacturers as just vendors that we wanted to beat up. We wanted to have a relationship with them. And we said, okay, here is where we'd like to be right now. Work with us, and we'll continue to work together.

And then going forward, we are going to continue to go back to them and look for opportunities. So I would expect -- obviously, I think this year and next year are going to be the two biggest years as you begin to do it. But I expect this to continue to be a tailwind for the significant future.

**Dave Francis**, RBC Capital Markets - Analyst

Great. 45 seconds. Canada: you guys have talked about some operational difficulties there that have kept you from hitting the margin profile that you want to. Walk us through real quick -- what have you done so far? And what's still ahead to kind of get you where you want to be?

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Absolutely. So I would put the buckets -- in two buckets for our challenges in Canada. One would be general reimbursement pressure. The government up in Canada has put significant reimbursement pressure on the providers, long-term care and the acute space. They, in turn, have put some pressure on us to work with them. So that's caused a little bit of pressure on us in that marketplace due to that.

And then second of all, we had a couple customers that -- where we were using as a 3PL. 3PL is a different decent portion of our business up there. We had a couple customers decide to insource instead of using us externally as their 3PL, and one that just switched to a competitor up there in the distribution space.

So we had a couple customer losses up there that are also affecting our numbers. So that's how, when I take a look at it, it will continue to be a headwind for us for Q3 and Q4 for us this year and also for Q1 and Q2 for us for next year.

But I've seen the pipeline that we are looking at. New business to pick up. We've adjusted our cost structures. We've changed out the management team. And I think we are beginning to see the signs it will be a turnaround, but we've got to anniversary those losses first. And I then I think we will be in good shape.

**Dave Francis**, RBC Capital Markets - Analyst

Makes sense. We are out of time. That was great. Thank you.

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Thanks. Absolutely.

StreetEvents transcripts content provided by Thomson Reuters

THOMSON REUTERS

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): March 1, 2015**

---

# Cardinal Health, Inc.
**(Exact name of registrant as specified in its charter)**

---

| **Ohio** | **1-11373** | **31-0958666** |
|:---:|:---:|:---:|
| **(State or other Jurisdiction** | **(Commission** | **(IRS Employer** |
| **of Incorporation)** | **File Number)** | **Identification No.)** |

**7000 Cardinal Place, Dublin, Ohio 43017**
**(Address of Principal Executive Offices) (Zip Code)**

**(614) 757-5000**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.     Entry into a Material Definitive Agreement.**

On March 1, 2015, Cardinal Health, Inc. (the "Company") entered into a binding offer letter (the "Offer Letter") with Ethicon, Inc. ("Ethicon"), a wholly-owned subsidiary of Johnson & Johnson, pursuant to which the Company made a binding offer (the "Offer") to purchase certain assets of the Cordis business of Johnson & Johnson, for a purchase price of $1,944 million in cash, subject to certain adjustments and on a cash-free, debt-free basis (the "Acquisition"). The assets subject to the proposed Acquisition relate to the development, manufacture and distribution of medical devices for use in connection with interventional cardiology and endovascular procedures (the "Business").

The Offer expires on the earlier of (a) May 30, 2015 and (b) the second business day after the date on which each of the employees' representative bodies of Ethicon and its affiliates in France and Germany have concluded certain statutory information or consultation processes in connection with the Acquisition and delivered their final opinions. The Offer can be extended by either party in certain circumstances, to no later than July 29, 2015. Upon completion of the employee consultation processes, the Company expects that Ethicon will accept the Offer by countersigning the stock and asset purchase agreement attached to the Offer Letter (the "Purchase Agreement"). The Offer Letter provides that, until the Offer is accepted or the Offer Letter is terminated, Ethicon is prohibited from soliciting proposals from, negotiating or discussing with, or entering into an agreement with, third parties with respect to an alternative transaction relating to 25% or more of the assets of the Business. If Ethicon does not accept the Offer prior to its expiration, the Offer Letter requires Ethicon to pay the Company $19.44 million as reimbursement for the Company's expenses. The Offer Letter requires Ethicon to pay a termination fee of $77.76 million if (a) the Company terminates the Offer Letter as a result of Ethicon's breach of its exclusivity obligations or (b) if any person has made an alternative proposal prior to the termination of the Offer, Ethicon fails to accept the Offer and Ethicon enters into a definitive agreement with respect to any alternative proposal within 12 months after the termination of the Offer Letter.

The Purchase Agreement provides that completion of the Acquisition is subject to the satisfaction or waiver of customary closing conditions, including, among other things, the expiration or early termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, receipt of anti-trust approval in other specified jurisdictions and the transfer of certain product registrations required for the operation of the Business .

The foregoing summary of the Offer Letter, the Purchase Agreement attached thereto and the transactions contemplated by the Offer Letter and the Purchase Agreement does not purport to be complete and is subject to, and qualified in its entirety by reference to, the full text of the Offer Letter, which is filed as Exhibit 10.1 to this current report on Form 8-K, and the full text of the Purchase Agreement, which is attached thereto as Exhibit 1.

The Offer Letter, the Purchase Agreement and the above descriptions have been included to provide investors and security holders with information regarding the terms of the Acquisition. They are not intended to provide any other factual information about the Company, the Business, Johnson & Johnson or their respective subsidiaries, affiliates, businesses or

equityholders. The representations, warranties and covenants contained in the Purchase Agreement are made only for purposes of that agreement and as of specific dates, are solely for the benefit of the parties and may be subject to limitations agreed upon by the parties, including being qualified by schedules and other disclosures made by each contracting party to the other for the purposes of allocating contractual risk between them that differ from those applicable to investors. Investors should be aware that the representations, warranties and covenants or any description thereof may not reflect the actual state of facts or condition of the Company, the Business, Johnson & Johnson or any of their respective subsidiaries, affiliates, businesses, or equityholders. Moreover, information concerning the subject matter of the representations, warranties and covenants may change after the dates of the Offer Letter and the Purchase Agreement, which subsequent information may or may not be fully reflected in public disclosures by the Company. Accordingly, investors should read the representations and warranties in the Purchase Agreement only in the context of the transactions contemplated by the Offer Letter and the Purchase Agreement that the Company includes in reports, statements and other filings that it makes with the U.S. Securities and Exchange Commission.

**Item 7.01.    Regulation FD Disclosure.**

The Company issued a news release and fact sheet on March 2, 2015 regarding the Acquisition. Copies of the news release and fact sheet, which are attached to this current report on Form 8-K as Exhibits 99.1 and 99.2, respectively, are hereby furnished pursuant to this Item 7.01.

The Company is hosting a webcast and conference call on March 2, 2015 to discuss the Acquisition. The slide presentation for the webcast and conference call and an audio replay of the conference call will be available on the Investors page at *ir.cardinalhealth.com* .

**Item 8.01.    Other Events.**

On March 2, 2015, in connection with the Acquisition and its financing, the Company obtained a commitment letter from Goldman Sachs Bank USA for a new $1.0 billion senior unsecured bridge term loan (the "Bridge Facility"). The Company plans to issue $1.0 billion of senior unsecured notes prior to the completion of the Acquisition and then terminate the commitment under the Bridge Facility.

**Item 9.01.    Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 10.1 | Binding Offer Letter, dated March 1, 2015, together with the Purchase Agreement, executed by the Company, attached as Exhibit 1 thereto |
| 99.1 | News release issued by the Company on March 2, 2015 |
| 99.2 | Fact sheet issued by the Company on March 2, 2015 |

**Cautionary Statement Concerning Forward-Looking Statements**

This current report on Form 8-K contains forward-looking statements addressing the Acquisition and the other transactions contemplated in the Offer Letter and the Purchase Agreement and other statements about future expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include the ability to successfully complete the Acquisition on a timely basis, including receipt of required regulatory approvals; the occurrence of any event, change or other circumstance that could give rise to the termination of the Offer Letter or the Purchase Agreement (once executed); the outcome of any legal proceedings that may be instituted against the parties and others related to the Acquisition; the satisfaction of certain conditions to the completion of the Acquisition; or the conditions of the credit markets and an ability to issue debt on acceptable terms. The Company is subject to additional risks and uncertainties described in the Company's annual report on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K and exhibits to those reports. This current report on Form 8-K reflects management's views as of March 2, 2015. Except to the extent required by applicable law, the Company undertakes no obligation to update or revise any forward-looking statement.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**CARDINAL HEALTH, INC.**

Dated: March 2, 2015

By:     /s/ Stephen T. Falk

Name:  Stephen T. Falk

Title:   Executive Vice President, General Counsel and Corporate Secretary

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 10.1 | Binding Offer Letter, dated March 1, 2015, together with the Purchase Agreement, executed by the Company, attached as Exhibit 1 thereto |
| 99.1 | News release issued by the Company on March 2, 2015 |
| 99.2 | Fact sheet issued by the Company on March 2, 2015 |

Exhibit 10.1

EXECUTION VERSION

C ARDINAL H EALTH , I NC .
7000 Cardinal Place
Dublin, OH 43017

March 1, 2015

To the attention of:

Ethicon, Inc.
Route 22 West
Somerville, NJ 08876
Attention: Vice President, Law

**STRICTLY PRIVATE AND CONFIDENTIAL**

**Re:  Final Binding Offer**

Ladies and Gentlemen:

1. Submission of Offer . Cardinal Health, Inc. (" Buyer ") is pleased to submit this final, binding and irrevocable offer (this " Offer ") to Ethicon, Inc. (" Seller ") for the acquisition of certain assets and equity interests, and the assumption of certain liabilities, of the Business (as defined in the Stock and Asset Purchase Agreement referred to below) (the " Acquisition "), on the terms and subject only to the conditions set forth in the Stock and Asset Purchase Agreement attached to this Offer as Exhibit 1 and duly executed and delivered by Buyer (including the Schedules and Exhibits thereto, the " Stock and Asset Purchase Agreement "). Buyer hereby confirms that if the Principal Closing Date occurred on the date hereof, the conditions set forth in Section 5.02(a) of the Stock and Asset Purchase Agreement would be satisfied and that Buyer will not take any action prior to the earlier of (x) the Offer Acceptance (as defined below) and (y) the Offer Termination Time (as defined below) which would cause such condition to not be satisfied. Buyer agrees that it will comply with, and will cause its Affiliates that are or will be parties to any Transaction Document to comply with, the covenants set forth in Article VI and Section 8.01(a) of the Stock and Asset Purchase Agreement during the period from the date of this Offer to the Offer Termination Time (or, if this Offer is accepted by Seller in the manner contemplated herein, to the time as set forth in the Stock and Asset Purchase Agreement). Capitalized terms used in this Offer shall have the meanings ascribed to them in the Stock and Asset Purchase Agreement unless otherwise defined herein.

2. Offer Termination Time . This Offer will remain valid until 11:59 P.M., New York time, on the earlier of (a) the second business day after the date on which each of the employees' representative bodies of Seller and its Affiliates in France and Germany have concluded the information and/or consultation processes in connection with the Acquisition and delivered their respective final opinions, if applicable, in connection therewith (the " Consultation Processes ") and (b) May 30, 2015; provided that, if the Consultation Processes shall not have concluded by such date and Buyer or Seller, as the case may be, shall have complied in all material respects with its obligations with respect to such Consultation Processes pursuant to paragraph 7 below, then Buyer or Seller, as the case may be, shall be permitted to extend this

date from time to time in consecutive increments of up to 30 days each, but in any event no later than July 29, 2015 (this time, as such time may be so extended by Buyer or Seller, the " Offer Termination Time "). The party extending the Offer Termination Time shall provide notice to the other party of any extension of the Offer Termination Time no later than one business day prior to the then current Offer Termination Time.

3. Offer Acceptance and Extension . Seller may accept this Offer by executing and delivering to Buyer a countersignature to the Stock and Asset Purchase Agreement no later than the Offer Termination Time. Delivery of the executed countersignature to the Stock and Asset Purchase Agreement may be made by Seller to Buyer in accordance with the notice provisions set forth in Section 11.07 of the Stock and Asset Purchase Agreement (the " Offer Acceptance "). Seller agrees that no later than the second business day after the date on which each of the employees' representative bodies of Seller and its Affiliates in France and Germany have concluded their respective Consultation Processes, Seller shall promptly make a decision whether or not to accept the Offer, and following such decision, Seller shall promptly communicate such decision to Buyer and, in the event such decision is to accept the Offer, promptly deliver the Offer Acceptance.

4. Acknowledgement . Buyer hereby confirms to Seller that this Offer is binding in accordance with its terms and, except in the event of termination of this Offer pursuant to paragraph 8, may not be revoked by Buyer in any respect or for any reason prior to the Offer Termination Time. Each of Buyer and Seller hereby acknowledges that the other party is relying on this Offer and the promises, representations, warranties and covenants contained herein.

5. Exclusivity .

    a.     Seller hereby agrees that, during the period beginning on the date hereof and continuing until the earlier of (x) the Offer Acceptance and (y) the Offer Termination Time (the " Exclusivity Period "), Seller will not, nor will it permit any of its Affiliates, the Transferred Companies and its and their respective directors, officers or employees, or any attorney, accountant or other representative retained by any of them (collectively, " Representatives ") to, directly or indirectly, (i) solicit, initiate or knowingly encourage (including by way of furnishing non-public information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal that constitutes, or could reasonably be expected to lead to, any Alternative Proposal (as defined below), (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or otherwise cooperate in any way with, or assist or participate in any effort or attempt by any Person with respect to, any Alternative Proposal or (iii) enter into or approve any agreement with respect to any Alternative Proposal. None of Seller, any of its Affiliates or any of the Transferred Companies shall release any third party from, or waive any provision of, any confidentiality agreement with respect to the Business to which it is a party and which was entered into with respect to any potential Alternative Proposal. Seller and its Affiliates shall, and shall cause their respective Representatives to, with respect to third parties with whom discussions or negotiations with respect to an Alternative Proposal have been terminated on or prior to the date of this Offer, use its reasonable best efforts to obtain the return or destruction of, in accordance with the terms of the applicable confidentiality agreement, confidential information previously furnished by Seller or any of its Affiliates, or its or their Representatives, with respect to the Business.

b. Seller will promptly notify Buyer orally (and then in writing within twenty-four (24) hours) after it or any of its Affiliates has received any proposal, inquiry, offer or request relating to or constituting, or that could reasonably be expected to lead to, an Alternative Proposal, any request for discussions or negotiations, or any request for information relating to the Business in connection with an Alternative Proposal or a potential Alternative Proposal or for access to the properties or books and records thereof of which Seller or any of its Affiliates is or becomes aware, or any amendments to the foregoing. Such notice to Buyer shall indicate the identity of the person making such proposal and the terms and conditions of such proposal, if any. Seller shall also promptly provide Buyer with (i) a copy of any written notice or other written communication from any person informing Seller or any of its Affiliates that it is considering making, or has made a proposal regarding, an Alternative Proposal, (ii) a copy of any Alternative Proposal (or any amendment thereof) received by Seller or any of its Affiliates and (iii) such other details of any such Alternative Proposal that Buyer may reasonably request. Thereafter, Seller shall promptly keep Buyer reasonably informed on a reasonably current basis of any material change to the terms of any such Alternative Proposal.

c. For purposes of this paragraph 5, the term " <u>Alternative Proposal</u> " means any inquiry, proposal or offer, or any expression of interest by any third party relating to Seller's or any of its Affiliates' willingness or ability to receive or discuss a proposal or offer, other than a proposal or offer by Buyer or any of its Affiliates, for any merger, amalgamation, consolidation, share exchange, recapitalization, liquidation, dissolution, acquisition or other business combination, in each case relating to twenty-five percent (25%) or more of the assets of the Business.

6. <u>Publicity</u> . With respect to this Offer and the transactions contemplated hereby and by the Stock and Asset Purchase Agreement, Buyer and Seller each hereby agree to comply with the restrictions set forth in Section 6.05 of the Stock and Asset Purchase Agreement; <u>provided</u> , <u>however</u> , that, without limiting either party's ability to make such disclosures as may be required by applicable Law, in connection with the Consultation Processes, Seller may make available to the applicable employees' representative bodies of Seller and its Affiliates such information as Seller determines is reasonably necessary to effect such Consultation Processes.

7. <u>Consultation Process; Representations; Covenants</u> .

a. Seller shall, and shall cause its Affiliates to, comply in all material respects with all appropriate requirements and procedures in connection with the Consultation Processes and shall convene meetings of the appropriate works councils as soon as reasonably practicable with a view to obtaining expeditious delivery of the opinions of the works councils. Seller shall keep Buyer regularly informed of the status of matters relating to the delivery of the opinions of the works councils, including furnishing Buyer promptly of copies of notices or details of any substantive material communications obtained by Seller whether orally or in writing as part of the Consultation Processes. Without limiting the generality of the foregoing, Seller undertakes to inform Buyer in writing as soon as possible (and in any event no later than two (2) business days) after any Consultation Process has been completed.

b. Without limiting the generality of paragraph 1 of this Offer, Buyer hereby agrees to cooperate and use its commercially reasonable efforts to assist Seller (as set forth in

Section 6.06 of the Stock and Asset Purchase Agreement) in effecting the Consultation Processes, including providing such information (including information in respect of Buyer's employee benefit plans, if any) to, and attending such meetings with, the applicable employees' representative bodies, in each case as may be required by applicable Laws or practices or as may be reasonably requested by Seller or such employees' representative bodies or their respective agents or advisors in connection with the Consultation Processes.

c. Seller agrees that it will comply with, and will cause its Affiliates that are or will be parties to any Transaction Document to comply with, the covenants set forth in Article VI and Section 8.01(b) of the Stock and Asset Purchase Agreement during the period from the date of this Offer to the Offer Termination Time (or, if this Offer is accepted by Seller in the manner contemplated herein, to the time as set forth in the Stock and Asset Purchase Agreement).

d. Seller hereby confirms that, if the Principal Closing Date occurred on the date hereof, the conditions set forth in Section 5.01 (a) of the Stock and Asset Purchase Agreement would be satisfied, and Seller hereby agrees to not take any action prior to the earlier of (x) the Offer Acceptance and (y) the Offer Termination Time which would cause such condition to not be satisfied.

8. <u>Termination</u> . This Offer may be terminated:

a. by the mutual written consent of Buyer and Seller; or

b. by Buyer, by written notice to Seller (such notice to be delivered in accordance with the notice provisions set forth in Section 11.07 of the Stock and Asset Purchase Agreement), at any time prior to the Offer Acceptance, if Seller shall have breached in any material respect any of Seller's covenants or agreements contained in clause (a) of paragraph 5; <u>provided</u> , <u>however</u> , that Buyer may only terminate this Offer pursuant to this clause (b) if at the time of termination Buyer is not in material breach of any of its covenants or agreements contained in this Offer.

9. <u>Termination Fees</u> .

a. If (i) this Offer is terminated by Buyer pursuant to clause (b) of paragraph 8 or (ii) (A) any Person shall have made an Alternative Proposal after the date hereof but prior to the Offer Termination Time, (B) Seller fails to deliver the Offer Acceptance by the Offer Termination Time and (C) within twelve (12) months after the Offer Termination Time, Seller or any of its Affiliates shall have entered into a definitive agreement with respect to any Alternative Proposal or shall have consummated a transaction contemplated by any Alternative Proposal, then, in each of the cases of clause (i) or (ii), Seller shall pay to Buyer, in immediately available funds by wire transfer to a bank account designated in writing by Buyer, an amount equal to four percent (4.0%) of the Purchase Price (the " <u>Termination Fee</u> "). Any payment of the Termination Fee pursuant to clause (i) shall be made no later than five (5) Business Days following the termination of this Offer by Buyer, and payment of the Termination Fee pursuant to clause (ii) shall be made no later than five (5) Business Days following the earlier of the date on which Seller or its Affiliate executes the definitive agreement with respect to the Alternative Proposal or the date on which Seller or its Affiliate consummates any transaction contemplated by any Alternative Proposal. In

the event that Seller shall have made the Expense Reimbursement payment to Buyer pursuant to paragraph 9(b) below, then the amount of any Termination Fee shall be reduced by the amount of such Expense Reimbursement payment.

b.  If the Offer Acceptance has not been made for any reason prior to the Offer Termination Time, Seller shall promptly (but in any event not more than five (5) Business Days following the Offer Termination Time) pay to Buyer, in immediately available funds by wire transfer to a bank account designated in writing by Buyer, an amount of cash in respect of Buyer's expenses equal to one percent (1.0%) of the Purchase Price (the " Expense Reimbursement ").

c.  The parties hereto acknowledge and agree that the agreements contained in this paragraph 9 are an integral part of the transactions contemplated by this Offer, and that, without these agreements, neither Seller nor Buyer would have entered into this Offer. Accordingly, if Seller fails to promptly pay any amount due pursuant to this paragraph 9, and, in order to obtain such payment, Buyer commences any action which results in an award of, or a judgment against Seller for, the Termination Fee or the Expense Reimbursement (or any portion thereof), Seller shall pay Buyer's reasonable costs and expenses (including reasonable attorney's fees and expenses of enforcement) in connection with such action.

d.  Notwithstanding anything herein to the contrary, in the event that this Offer terminates because the Consultation Processes shall have not concluded by the Offer Termination Time, Buyer has materially breached its obligations with respect to the Consultation Processes pursuant to clause (b) of paragraph 7 of the failure of Consultation Process, and such breach was the proximate cause of the failure of the Consultation Processes to conclude by the Offer Termination Time (and Seller shall have complied with its obligations with respect to such Consultation Processes), then Buyer shall not be entitled to receive the Termination Fee pursuant to clause (ii) of paragraph 9(a) or the Expense Reimbursement pursuant to paragraph 9(b).

10.  Date of the Stock and Asset Purchase Agreement; Anti-Trust Filings . Buyer and Seller hereby agree that, upon acceptance of the Offer and the execution and delivery of the Stock and Asset Purchase Agreement by Seller, (x) the date of the Stock and Asset Purchase Agreement as used therein shall be deemed to be the date hereof and (y) the Stock and Asset Purchase Agreement shall be treated for all purposes as if executed and delivered by Buyer and Seller on the date hereof, notwithstanding the execution and delivery thereof by Seller at a later date. Buyer and Seller hereby agree, as permitted by applicable Law, to commence the filing and obtaining of consents, approvals, authorizations, qualifications and orders of Governmental Entities and other third parties as set forth in Section 6.06 of the Stock and Asset Purchase Agreement as soon as reasonably practicable after the date hereof.

11.  Governing Law and Dispute Resolution . This Offer shall be governed by the law of the State of New York without reference to any provisions thereof that would require the application of the laws of any other jurisdiction. Any dispute, claim or controversy arising from or related in any way to this Offer or the interpretation, application, breach, termination or validity thereof, including any claim of inducement of this Offer by fraud or otherwise, will be subject to the provisions of Section 11.12 of the Stock and Asset Purchase Agreement.

12.  Incorporation by Reference . Sections 11.04 through 11.15 of the Stock and Asset Purchase Agreement are hereby incorporated by reference into this Offer, the terms of which shall apply to this Offer, *mutatis mutandis* , as though set forth herein, with references to "this Agreement" interpreted to refer to "this Offer."

13.    <u>Countersignature</u> . Seller's countersignature of this Offer shall in no event be construed as an acceptance by Seller of this Offer and Seller shall not be under any obligation to sell or transfer to Buyer or any of its Affiliates any portion of the Business or to execute the Stock and Asset Purchase Agreement or any other agreements in respect of the Acquisition, and, subject to paragraph 9, Seller shall have no liability to Buyer or any of its Affiliates as a result of Seller's determination not to accept this Offer.

[ *Signature Page Follows* ]

Very truly yours,

**CARDINAL HEALTH, INC.**

By:    <u>/s/ Donald M. Casey, Jr.</u>

Name:  Donald M. Casey, Jr.

Title:   CEO Medical Segment

[Buyer Signature Page to the Final Binding Offer Letter]

Acknowledged and agreed to
as of the date set forth above:

**ETHICON, INC.**

By:    /s/ Alan Rae
Name: Alan Rae
Title:  Vice President, Business Development

[Seller Signature Page to the Final Binding Offer Letter]

**Exhibit 1**

**Stock and Asset Purchase Agreement**

STOCK AND ASSET PURCHASE AGREEMENT

between

ETHICON, INC.

and

CARDINAL HEALTH, INC.

Dated as of March 1, 2015

TABLE OF CONTENTS

Page

ARTICLE I

Definitions and Interpretations

SECTION 1.01. Definitions ................................................................................................. 1

SECTION 1.02. Interpretation and Construction ................................................................ 15

ARTICLE II

Closings

SECTION 2.01. Closings ..................................................................................................... 16

SECTION 2.02. Transferred Assets and Transferred Equity Interests/Excluded Assets; Assumed/Excluded Liabilities ... 17

SECTION 2.03. Purchase Price ........................................................................................... 20

SECTION 2.04. Purchase Price Adjustment ....................................................................... 21

SECTION 2.05. Allocation of Purchase Price ..................................................................... 23

SECTION 2.06. Transfer Taxes and Other Costs ............................................................... 25

SECTION 2.07. Withholding Taxes .................................................................................... 27

SECTION 2.08. Delivery by Seller ..................................................................................... 27

SECTION 2.09. Delivery by Buyer ..................................................................................... 28

ARTICLE III

Representations and Warranties of Seller

SECTION 3.01. Organization and Good Standing ............................................................. 29

SECTION 3.02. Authority .................................................................................................... 29

SECTION 3.03. Title to Tangible Property and Transferred Equity Interests ................... 30

SECTION 3.04. Assets of the Business .............................................................................. 30

SECTION 3.05. Transferred Real Property ......................................................................... 30

SECTION 3.06. Financial Information; No Undisclosed Liabilities .................................. 31

SECTION 3.07. Consents and Approvals; Absence of Violation or Conflicts .................. 31

SECTION 3.08. Compliance with Laws; Licenses and Permits 32

SECTION 3.09. Transferred Contracts and Material Contracts 32

SECTION 3.10. Intellectual Property Rights 34

SECTION 3.11. Legal Proceedings, etc. 36

SECTION 3.12. Labor and Employee Matters 36

SECTION 3.13. Employee Plans 37

SECTION 3.14. Environmental Matters 38

SECTION 3.15. Absence of Certain Developments 39

SECTION 3.16. Brokerage Fees 39

SECTION 3.17. Product Registrations; Recalls 39

SECTION 3.18. Taxes 40

SECTION 3.19. Certain Compliance Matters 42

SECTION 3.20. Information Technology 44

SECTION 3.21. Significant Distributors; Significant Suppliers 44

ARTICLE IV

Representations and Warranties of Buyer

SECTION 4.01. Buyer's Organization; Power; Execution 44

SECTION 4.02. Consents and Approvals; Absence of Violation or Conflicts 45

SECTION 4.03. Litigation 45

SECTION 4.04. Sufficient Funds 46

SECTION 4.05. Brokerage Fees 46

ARTICLE V

Conditions to Closing

SECTION 5.01. Conditions Precedent to Buyer's Obligations on the Principal Closing Date 46

SECTION 5.02. Conditions Precedent to Seller's Obligations on the Principal Closing Date 47

ii

SECTION 5.03. Conditions Precedent to Seller's and Buyer's Obligations on a Non-Principal Country Unit Closing Date     49

ARTICLE VI

Certain Covenants

SECTION 6.01. Conduct of Business     49

SECTION 6.02. Certain Covenants Regarding the Transferred Companies     52

SECTION 6.03. Reserved     53

SECTION 6.04. Disclosure     53

SECTION 6.05. Publicity     53

SECTION 6.06. Commercially Reasonable Efforts; Regulatory Approvals; Access     54

SECTION 6.07. Financing     56

SECTION 6.08. Transferred Companies Assets and Liabilities     57

SECTION 6.09. Exclusivity     57

ARTICLE VII

Post-Closing Covenants

SECTION 7.01. Transfer of Trademarks; Use of Excluded Trademarks by Buyer; Use of Transferred Know-How     58

SECTION 7.02. Use of Trademarks by Seller During Transition Period     59

SECTION 7.03. Access     59

SECTION 7.04. Insurance     60

SECTION 7.05. Payments from Third Parties     60

SECTION 7.06. Assurances     61

SECTION 7.07. Returned Goods     61

SECTION 7.08. Tax Matters     61

SECTION 7.09. Ancillary Agreements     68

SECTION 7.10. Bulk Transfer Laws     68

SECTION 7.11. Other Transaction Matters     68

SECTION 7.12. Retained Claims 69

## ARTICLE VIII

### Employees

SECTION 8.01. Employee Benefits Matters 70

## ARTICLE IX

### Termination

SECTION 9.01. Buyer Termination 76

SECTION 9.02. Seller Termination 77

SECTION 9.03. Effect of Termination 77

SECTION 9.04. Buyer Termination Fee 77

## ARTICLE X

### Indemnification

SECTION 10.01. Survival 78

SECTION 10.02. Indemnification by Seller 79

SECTION 10.03. Indemnification by Buyer 79

SECTION 10.04. Scope of Liability 79

SECTION 10.05. Claims 80

SECTION 10.06. Defense of Actions 81

SECTION 10.07. Limitation, Exclusivity, No Duplicate Recovery 82

SECTION 10.08. Calculation of Damages 82

SECTION 10.09. Tax Treatment of Indemnity Payments 82

## ARTICLE XI

### Miscellaneous

SECTION 11.01. No Additional Representations 83

SECTION 11.02. Financial Information and Projections 83

SECTION 11.03. To the knowledge 83

| | |
|---|---|
| SECTION 11.04. Waivers | 83 |
| SECTION 11.05. Modifications and Amendments | 83 |
| SECTION 11.06. Assignability, Beneficiaries, Governing Law and Enforcement | 84 |
| SECTION 11.07. Notices | 84 |
| SECTION 11.08. Headings | 86 |
| SECTION 11.09. Counterparts | 86 |
| SECTION 11.10. Entire Agreement | 86 |
| SECTION 11.11. Payment of Expenses | 86 |
| SECTION 11.12. Consent to Jurisdiction; Waivers | 86 |
| SECTION 11.13. Reserved | 87 |
| SECTION 11.14. Fulfillment of Obligations | 87 |
| SECTION 11.15. Severability | 87 |

Annexes and Exhibits

Annex 2.02(a)        Transferred Assets
Annex 2.02(b)        Excluded Assets
Annex 2.02(c)        Assumed Liabilities
Annex 2.02(d)        Excluded Liabilities

Exhibit A        Products
Exhibit B        Form of General Assignment
Exhibit C        Form of Patent Assignment
Exhibit D        Form of Trademark Assignment
Exhibit E        Form of Assumption Agreement
Exhibit F        Form of Transition Services Agreement
Exhibit G        Form of Transition Manufacturing Services Agreement
Exhibit H        Form of Reverse Transition Manufacturing Services and Access Agreement

Exhibit I        Form of Trademark License Agreement
Exhibit J        Form of FIRPTA Certificate

STOCK AND ASSET PURCHASE AGREEMENT (this " Agreement "), dated as of March 1, 2015, between Ethicon, Inc., a New Jersey corporation (" Seller "), and Cardinal Health, Inc., an Ohio corporation (" Buyer ").

W I T N E S S E T H :

WHEREAS, Seller's subsidiary, Cordis Corporation, a Florida corporation, directly and indirectly through certain of its Affiliates (as defined below), currently conducts in the United States and certain other countries and territories the business of researching, developing, manufacturing or having made, marketing, distributing and selling, as the case may be, the products set forth on Exhibit A (the " Products "), and, for the avoidance of doubt, excluding the business and technology of (i) Biosense Webster, Inc., which will be retained by Seller in accordance with Section 6.07 and (ii) the Codman Neuro division of DePuy Orthopaedics, Inc., which will be retained by an Affiliate of Seller (collectively, the " Business "); and

WHEREAS, Seller desires to sell (or to cause to be sold), and Buyer desires to purchase or cause certain of its Affiliates to purchase, certain assets, including the Transferred Equity Interests (as defined below), related to the Business as a going concern and Buyer is willing to assume or cause certain of its Affiliates to assume certain liabilities related to the Business, in each case upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in view of the foregoing premises and in consideration of the mutual covenants, agreements, representations and warranties herein contained, the parties hereto agree as follows:

ARTICLE I

Definitions and Interpretations

SECTION 1.01. Definitions . (a) The following terms used in this Agreement shall have the respective meanings assigned to them below:

" Affiliate ", with respect to any specified Person, means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person.

" Ancillary Agreements " means, other than this Agreement, the agreements and instruments, including any Country Transfer Agreements and any related instruments of transfer, the Transition Services Agreement, the Transition Manufacturing Services Agreement, the Reverse Transition Manufacturing Services and Access Agreement, the License Agreement and the Final Binding Offer Letter, executed and delivered in connection with the transactions contemplated by this Agreement.

2

" Anti-Trust Approvals " means all authorizations, orders, grants, consents, clearances, permissions and approvals and all expirations, lapses and terminations of any required waiting periods (including extensions thereof), in each case under any merger control or similar legislation in order to consummate the Transactions.

" Anti-Trust Filings " means all applicable notifications to or filings with an anti-trust or competition authority in the United States, the European Union (or any member state thereof) or any other jurisdiction required to consummate the Transactions.

" Applicable Closing " means (a) with respect to the Principal Country Units, the Principal Closing and (b) with respect to any Non-Principal Country Unit, the applicable Non-Principal Country Unit Closing.

" Applicable Closing Date " means (a) with respect to the Principal Country Units, the Principal Closing Date and (b) with respect to any Non-Principal Country Unit, the applicable Non-Principal Country Unit Closing Date.

" Asset Selling Affiliates " means all of the Affiliates of Seller that own or hold the rights to any Transferred Assets or that have obligations or liabilities in respect of any Assumed Liabilities.

" Assumed Benefit Plan " means any Business Employee Benefit Plan (a) that is maintained or sponsored by a Transferred Company or (b) for which liabilities and/or assets transfer to Buyer or its Affiliates under applicable Law as a result of the transactions contemplated by this Agreement.

" Assumed Liabilities " means the obligations and liabilities set forth or described on Annex 2.02(c) .

" Benefits Continuation Period " means (a) with respect to any Transferred Employee primarily providing service to a Principal Country Unit, other than any Juarez Employee, a period of time commencing on the Principal Closing Date and ending eighteen (18) months from the Principal Closing Date and (b) with respect to any Transferred Employee primarily providing service to any Non-Principal Country Unit or any Juarez Employee, a period of time commencing on the Applicable Closing Date and ending on the later of (i) eighteen (18) months from the Principal Closing Date and (ii) twelve (12) months from such Applicable Closing Date.

" Business Employee Benefit Plan " means each employee benefit plan (as defined in Section 3(3) of ERISA, whether or not subject thereto) or other compensatory or employee benefit plan, program, agreement or arrangement sponsored, contributed to or maintained by Seller or any of its Affiliates in which any Employee of the Business (or former employee of the Business) participates (or to which any such individual is party), excluding any plan, program, agreement or arrangement required by applicable Law or regulation ( e.g. , government mandated severance plans).

" Buyer Tax Act " means the following: (A) at or after the Applicable Closing, any election made by Buyer or any of its Affiliates (including any Transferred

3

Company) under any provision of the Code or foreign Tax Law for any Pre-Closing Tax Period, which election is made at or after the Applicable Closing with respect to any Transferred Company, the Transferred Assets or the Business, but not (i) any such election that is set forth on a Tax Return required to be filed by Buyer under Section 7.08(a)(ii) and which election is consistent with past practice or (ii) any such election that is expressly required by this Agreement if made with respect to Transfer Taxes, is made with Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed), (B) any actions by Buyer that cause the Section 338(h)(10) Election to be invalid provided that the Section 338(h)(10) Election would not have been invalid but for such actions, and (C) any action taken by Buyer on the Applicable Closing Date after such Applicable Closing other than in the ordinary course of business or as required or contemplated by this Agreement or applicable Law or with Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed). For the absence of doubt, neither the Section 338(h)(10) Election nor any election under Section 338 of the Code with respect to Japan NewCo (nor any transaction deemed to result therefrom) shall constitute a Buyer Tax Act.

" Closing " means the Principal Closing or any Non-Principal Country Unit Closing, as applicable.

" Closing Date " means the date on which the relevant Closing shall occur.

" Code " means the Internal Revenue Code of 1986, as amended.

" Commingled Contract " means any contract, contract right, bid, tender, purchase order or other agreement, whether written or oral, relating both to (a) the Business and (b) one or more other businesses of Seller or any Affiliate of Seller.

" Confidentiality Agreement " means the Confidential Disclosure Agreement, dated as of July 23, 2014, between Johnson & Johnson and Buyer.

" Controlled Group Liability" means any and all liabilities (a) under Title IV of ERISA, (b) under Section 302 of ERISA, (c) under Sections 412 and 4971 of the Code, (d) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4890B of the Code and (e) other than with respect to Assumed Benefit Plans, under corresponding or similar provisions of foreign laws or regulations related to defined benefit pension plan funding requirements or post-termination medical insurance plan coverage.

" Country Unit " means the Transferred Assets and Assumed Liabilities related to a part of the Business conducted in a particular country by Seller or a particular Asset Selling Affiliate (or, in the case of the United States (and, if applicable, Japan), by the relevant Transferred Company).

" Damages " means any and all claims of any kind, losses, liabilities, damages, awards, deficiencies, fines, fees, interest, penalties and costs and expenses incurred or suffered (and, if applicable, reasonable fees of attorneys, auditors, consultants and other agents associated therewith), whether or not based on contract, tort, warranty

4

claims or otherwise, but shall not include punitive, exemplary or speculative damages, or any other type of damages that are not reasonably foreseeable (in each case other than any damages payable to third parties that may be imposed or otherwise incurred).

" Data Room " means the electronic data room containing documents and materials relating to the Business as constituted as of 9:00 A.M. New York City time on the day prior to the date hereof.

" Disclosure Letter " means the confidential disclosure letter delivered to Buyer by Seller prior to or simultaneously with entering into this Agreement.

" Employee of the Business " means each employee of Seller and the Selling Affiliates (a) who as of the Applicable Closing Date spends at least fifty percent (50%) of his or her work time in the operation of the Business, (b) whose employment will transfer to Buyer or one of its Affiliates on the Applicable Closing Date by operation of applicable Law or pursuant to the transfer of the Transferred Equity Interests to Buyer or (c) who is set forth on Schedule 1.01(b) to the Disclosure Letter, including in all cases, each such employee who as of the Applicable Closing Date is on leave of absence (including medical leave, military leave, workers compensation leave and short-term or long-term disability) or vacation; provided , that any individual set forth on Schedule 1.01(c) to the Disclosure Letter shall not be an "Employee of the Business."

" Environment " means soil, land surface or subsurface strata, surface water, groundwater, sediments and ambient air.

" Environmental Claim " means any claim, action, cause of action, suit, proceeding or written notice alleging liability (including liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) relating to, arising out of, based on or resulting from (a) the presence, Release or threatened Release of any Hazardous Materials at any Transferred Real Property or (b) circumstances forming the basis of any violation of or liability under any Environmental Law.

" Environmental Law " means applicable federal, state, local or foreign Law relating to pollution or protection or restoration of the Environment or natural resources relating to the Release, threatened Release, or disposal of or response actions with respect to Hazardous Materials or relating to the exposure to Hazardous Materials in the Environment, including the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

" ERISA " means the Employee Retirement Income Security Act of 1974, as amended.

" Estimated Prepaid Tax Amount " means Seller's good faith estimate of the Prepaid Tax Amount as of the Principal Closing Date.

" Excluded Assets " means the property and other rights set forth or described on Annex 2.02(b) , which property is not to be transferred to Buyer hereunder.

5

" Excluded Liabilities " means the liabilities and obligations set forth or described on Annex 2.02(d) , which are not to be assumed by Buyer hereunder.

" Excluded Taxes " means (a) (i) any Taxes for any Pre-Closing Tax Period imposed on or payable by or with respect to any Transferred Company and (ii) any Taxes for any Pre-Closing Tax Period arising out of, relating to or in respect of the Business, the Transferred Assets or the Assumed Liabilities, in each case including any Taxes imposed as a result of the transactions described in Section 2.02(i) of this Agreement, (b) any Taxes (including Non-Resident Capital Gains Taxes but not including any Transfer Taxes for which Buyer is responsible under Section 2.06) of Seller, any Selling Affiliate or any of their respective Affiliates (other than any Transferred Company) for any period and any Taxes relating to any Excluded Assets or relating to or constituting Excluded Liabilities for any period, (c) any Taxes for which any Transferred Company is liable under Treasury Regulation Section 1.1502-6 or 1.338(h)(10)-1(d)(2) (or any similar provision of state, local or foreign Law) by reason of such entity having been a member of any consolidated, combined, unitary, or affiliated Tax group, as a transferee or successor, by contract or otherwise, (d) any obligation or other liability, obligation or commitment of any Transferred Company to indemnify any other Person in respect of or relating to Taxes or to pay an amount pursuant to any Tax sharing, allocation, indemnity or similar agreement or arrangement, (e) any Taxes arising out of, attributable to, relating to or resulting from the failure of any of the representations or warranties made by Seller in Section 3.18 of this Agreement to be true and correct on the date hereof and at and as of the Applicable Closing Date (the amount of such Taxes determined without references to the terms "material," "materially," "Material Adverse Effect," "material adverse effect" or other similar qualifications as to materiality (including specific monetary thresholds) contained or incorporated in any such representation or warranty, but such qualifications, to the extent contained or incorporated in any such representation or warranty, shall apply for the purposes of determining whether any such inaccuracy or breach has occurred) or the failure of the certificates delivered pursuant to Section 2.08(a)(viii) to be true and correct at and as of the Applicable Closing Date, (f) any Taxes arising out of, attributable to, relating to or resulting from any breach by the Seller of any of its covenants or agreements contained herein, (g) any Taxes resulting from or attributable to the deemed sale of assets of Cordis Corporation as a result of the Section 338(h)(10) Election, (h) any Taxes resulting from any action of Seller that causes the Section 338(h)(10) Election to be invalid, and (i) any costs and expenses, including reasonable legal fees and expenses, attributable to any item in clauses (a)-(h); provided that clauses (a), (c), (d) and (g) above shall not include any liability for Transfer Taxes for which Buyer is responsible pursuant to Section 2.06(a) or Taxes to the extent resulting from Buyer Tax Acts (other than such actions taken with Seller's consent).

" Final Binding Offer Letter " means the letter regarding Buyer's final binding offer, dated as of March 1, 2015.

" Financial Information " means (a) the Combined Pro Forma Income Statements for the periods ended December 30, 2012, December 29, 2013 and December 28, 2014 and (b) the Combined Pro Forma Transferred Net Assets as of December 29, 2013 and December 28, 2014, in each case, attached as Schedule 1.01(h) to the Disclosure Letter.

6

" Foreign Currency " means any currency other than U.S. dollars.

" GAAP " means generally accepted accounting principles in the United States, applied on a consistent basis.

" Governmental Entity " means any domestic or foreign court, administrative body or regulatory agency or other governmental authority (or any department, agency or political subdivision thereof) or any other body or Person lawfully empowered to exercise regulatory, taxing or other governmental authority.

" Hazardous Materials " means any substance, material or waste that contains asbestos, any urea formaldehyde insulation, polychlorinated biphenyls, petroleum or any petroleum-based products or constituents or radon gas or any other substance, material, pollutant, contaminant or waste that, in relevant form and concentration, is defined, classified, listed or regulated under any Environmental Law.

" Inventory " means, with respect to each Country Unit, the inventory of all finished Products (including consignment stock), Product specific work in process and Product specific raw materials.

" Inventory Target " means, with respect to each Country Unit, the Inventory target amount set forth with respect to such Country Unit on Schedule 1.01(d) to the Disclosure Letter.

" IP Rights " means the following, in any and all countries: (a) patents and patent applications, utility models and industrial designs, and all applications and registrations therefor, together with all reissuances, divisions, renewals, revisions, extensions (including any supplementary protection certificates), reexaminations, provisionals, continuations and continuations-in-part with respect thereto and including all foreign equivalents, and all international applications under the Patent Cooperation Treaty and all corresponding national stage applications filed in all countries with respect thereto (collectively, " Patents "), (b) trademarks, servicemarks, trade dress, logos, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals therefor (collectively, " Trademarks "), (c) all copyrights, applications and registrations and renewals therefor (collectively, " Copyrights ") and (d) all trade secrets (including inventions, rights in research and development, clinical trial results, know-how, discoveries, improvements, formulas, compositions, commercially practiced processes, technical data, designs, drawings and specifications) (collectively, " Know-How ").

" Japan Corporate-Split Law " means (i) the Companies Act of Japan (Law No. 86 of 2005, as amended) that provides for "corporate splits," (ii) the Supplemental Provisions of the Amendment of the Commercial Code of Japan (Law No. 90 of 2000) and (iii) the Law Concerning the Succession Etc. of Labor Contracts, upon Corporate Split (Law No. 103 of 2000, as amended).

" Judgment " means any judgment, award, order, writ, injunction, legally binding agreement with a Governmental Entity, stipulation or decree.

" Law " or " Laws " means any statute, law, ordinance, treaty, rule, code, regulation, Judgment or other binding directive issued, promulgated or enforced by any Governmental Entity.

" Lien " means any deed of trust, option, claim, mortgage, pledge, lien, charge, security interest, hypothecation, declaration, covenant, right-of-way, easement, encroachment, restriction, title defect, right of first refusal or first offer or other similar third party (or governmental) right or encumbrance of any kind.

" Major Market Countries " means the countries comprising the Principal Country Units.

" Material Adverse Effect " means any effect, event, occurrence, circumstance or change that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to the business, assets, results of operations or financial condition of the Business, taken as a whole; provided that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or would reasonably be expected to be, a "Material Adverse Effect": (a) the failure of the Business to meet projections or forecasts (it being agreed that any underlying cause for or contributing factor to any such failure shall not be excluded by this clause (a) unless otherwise excluded by the following clause (b)); or (b) any adverse effect, event, occurrence, circumstance or change arising from or resulting from (i) the economy in general, or the securities, syndicated loan, credit or financial markets in general, (ii) the economic, business or healthcare regulatory environment (including changes with respect to pricing or reimbursement by insurance providers, other commercial entities or governmental payors generally stemming from United States healthcare reform initiatives or otherwise) or financial conditions generally affecting the industries or geographic markets in which the Business operates, (iii) an act of terrorism or an outbreak or escalation of hostilities or war (whether declared or not declared) or any natural disasters or any national or international calamity or crisis, (iv) an Excluded Asset or Excluded Liability (except to the extent such Excluded Asset or Excluded Liability affects the business, assets, results of operations or financial condition of the Business), (v) changes after the date hereof in applicable Law or GAAP (or the applicable accounting standards in any jurisdiction outside of the United States) or definitive interpretations thereof, (vi) the announcement of the Transactions, including any loss of employees or customers or any disruption in customer, supplier, distributor or similar relationships to the extent resulting from the announcement of the Transactions, (vii) any labor strikes, labor stoppages or loss of employees with respect to the Business, to the extent resulting from the announcement of the Transactions or an action taken or a statement made by Buyer or any of its Affiliates, in each case after the date hereof, regarding a future action intended to be taken by Buyer or any of its Affiliates with respect to the Business, or (viii) changes or effects that are the result of actions or omissions of Buyer or any of its Affiliates, or actions or omissions of Seller or any of its Affiliates that are consented to in writing by Buyer or any of its

8

Affiliates; provided , further , however , that any effect or change referred to in clauses (b)(i), (ii), (iii) or (v) may be taken into account in determining whether there has been or would reasonably be expected to be, a "Material Adverse Effect" to the extent such effect, event, occurrence, circumstance or change has a disproportionate adverse effect on the Business, taken as a whole, as compared to other participants in the industries in which the Business operates.

" Non-Principal Country Unit " means the Country Units set forth on Schedule 1.01(e) to the Disclosure Letter.

" Non-Principal Country Unit Closing " means the closing of the transfer of the Transferred Assets and Transferred Equity Interests relating to a Non-Principal Country Unit and the assumption of the Assumed Liabilities relating to such Non-Principal Country Unit.

" Non-Resident Capital Gain Tax " means any Taxes imposed on a non-resident of the Taxing jurisdiction (whether imposed by withholding or otherwise and whether calculated by reference to transfer price, net gain or otherwise).

" Non-U.S. Transferred Employee " means any Transferred Employee who is not a U.S. Transferred Employee.

" Outside Date " means December 18, 2015.

" Permitted Liens " means (a) such Liens as are set forth on Schedule 3.03(b) to the Disclosure Letter, (b) mechanics', carriers', workmen's, repairmen's or other like Liens imposed by Law arising or incurred in the ordinary course of business, (c) Liens arising under purchase price conditional sales contracts or equipment leases with third parties entered into in the ordinary course of business consistent with past practice, (d) Liens for Taxes or other governmental charges that are not yet delinquent and may thereafter be paid without penalty, or that the taxpayer is contesting in good faith through appropriate proceedings and for which adequate reserves have been established in the accounting books and records prior to the date hereof, (e) restrictions under leases, subleases, licenses or occupancy agreements that constitute Transferred Assets, none of which materially interferes with the present use of the related real property, (f) easements, covenants, rights-of-way and other similar restrictions of record, none of which materially interferes with the present use of the related real property, (g) zoning, building and other similar restrictions, none of which materially interferes with the present use of the related real property, (h) Liens created by or for the benefit of Buyer or its Affiliates, (i) Liens that are removed prior to the Applicable Closing and (j) with respect to real property, other imperfections of title or encumbrances, if any, which do not materially interfere with the present use of such real property.

" Person " means any individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, Governmental Entity or other entity.

9

" Personal Information " means (i) any information that is identifying or can be reasonably used to identify an individual, including individual demographic information; (ii) social security numbers and their foreign equivalents; and (iii) any information or data that is defined as "personal information" or "personal data" under applicable Law, in each case, only to the extent applicable to Transferred Employees.

" PIS/COFINS " means the Brazilian social contributions of Programa de Integração Social (Social Integration Program) and Contribuição para o Financiamento da Seguridade Social (Contribution for Social Security Financing).

" Post-Closing Tax Period " means any taxable period beginning after the Applicable Closing Date and the portion of any Straddle Period beginning after such Applicable Closing Date.

" Pre-Closing Tax Period " means any taxable period ending on or before the Applicable Closing Date and the portion of any Straddle Period ending on or before such Applicable Closing Date.

" Prepaid Tax Amount " means the amount of any *ad* valorem property Taxes paid with respect to any Straddle Period by Seller or any Selling Affiliate with respect to the Transferred Assets or by any Transferred Company, but only to the extent such Taxes are allocable to, and reduce the amount of Taxes otherwise payable by Buyer with respect to, the Post-Closing Tax Period (as determined pursuant to Section 7.08) and are not Excluded Taxes or Excluded Liabilities.

" Principal Country Units " means Australia, Austria, Belgium, Canada, China, France, Germany, Ireland, Italy, Japan, Luxembourg, Mexico, the Netherlands, New Zealand, Portugal, South Korea, Spain, Sweden, Switzerland, the United Kingdom (including UK export) and the United States (including Puerto Rico).

" Release " means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor Environment or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

" Reliance Opinion " means a Tax opinion at a "should" level issued by a third-party counsel or Tax adviser, provided that with respect to an opinion issued to Buyer for Transfer Taxes, Seller shall have the right to review and comment on the facts and assumptions on which the third-party counsel or Tax adviser is relying on to issue such Tax opinion.

" Retained Claims " means collectively, the Retained Plaintiff Claims and the Retained Defendant Liabilities.

" Section 338 Forms " mean all Tax Returns that are required to be submitted to any Federal, state or local Governmental Entity in connection with a Section 338(h)(10) Election.

10

" <u>Selling Affiliates</u> " means together the Asset Selling Affiliates and the Stock Selling Affiliates.

" <u>Shared Services</u> " means those shared services and systems provided to the Business by Seller and/or its Affiliates, or on their behalf, and which are listed on <u>Schedule 2.02(b)(vi)</u> to the Disclosure Letter.

" <u>Stock Selling Affiliates</u> " means all of the Affiliates of Seller that own any Transferred Equity Interests.

" <u>Straddle Period</u> " means a taxable period that includes but does not end on the Applicable Closing Date.

" <u>Tax</u> " and " <u>Taxes</u> " means all taxes, charges, duties, fees, levies or other assessments, including income, excise, property, business, goods and services, sales or use, value added, profits, license, withholding (with respect to compensation or otherwise), payroll, employment, net worth, capital gains, transfer, stamp, social security, environmental, occupation and franchise taxes, imposed by any Governmental Entity, and including any interest, penalties and additions attributable thereto.

" <u>Tax Proceeding</u> " means any audit, request for information, investigation, hearing, litigation, legal action, administrative or judicial contest or proceeding relating to Taxes.

" <u>Tax Return</u> " means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

" <u>Taxing Authority</u> " means any Governmental Entity exercising any authority to impose, regulate or administer the imposition of Taxes.

" <u>Transaction Documents</u> " means this Agreement and the Ancillary Agreements.

" <u>Transactions</u> " mean, collectively, the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of the Transferred Assets and the Transferred Equity Interests and the assumption of the Assumed Liabilities.

" <u>Transfer Taxes</u> " mean any federal, state, county, local, foreign and other sales, use, transfer, value added, PIS/COFINS, conveyance, documentary transfer, stamp duty, recording or other similar Tax, fee or charge imposed in connection with the Transactions or the recording of any sale, transfer, or assignment of property (or any interest therein) effected pursuant to this Agreement.

" <u>Transferred Assets</u> " means the properties and other rights set forth or described on <u>Annex 2.02(a)</u> , which expressly exclude the Excluded Assets.

11

" Transferred Companies " means the entities set forth on Schedule 1.01(f) to the Disclosure Letter.

" Transferred Employee " means each Employee of the Business who, as of the Applicable Closing Date (or, if applicable, such later date that such employee commences employment with Buyer or one of its Affiliates), becomes an employee of Buyer or one of its Affiliates whether by operation of Law, pursuant to the transfer of the Transferred Equity Interests to Buyer or by acceptance of Buyer's or one of its Affiliate's offer of employment pursuant to Section 8.01.

" Transferred Equity Interests " means all the issued and outstanding shares of capital stock of each of the Transferred Companies.

" U.S. Transferred Employee " means any Transferred Employee who is principally employed in the United States as of the Applicable Closing Date (or, if applicable, such later date that such employee commences employment with Buyer or one of its Affiliates).

" VAT " means any value added Tax, goods and services Tax or similar Tax, including such Tax as may be levied in accordance with (but subject to derogation from) EEC Directive 77/388/EEC (and other EEC directives relating to VAT) and/or local legislation imposing value added tax in the relevant jurisdiction.

(b) The following terms used in this Agreement shall have the meanings assigned to them in the respective Sections of this Agreement or Schedules to the Disclosure Letter set forth below:

| Term | Location |
| --- | --- |
| Accounting Firm | §2.04(d) |
| Accounting Policies | §2.04(c) |
| Affiliate | §1.01 |
| Agreement | Preamble |
| Allocated Purchase Price | §2.05(g)(ii) |
| Allocation | §2.05(a) |
| Allocation Schedule | §2.05(b) |
| Alternative Proposal | §6.09(c) |
| Ancillary Agreements | §1.01 |
| Anti-Trust Approvals | §1.01 |
| Anti-Trust Filings | §1.01 |
| Applicable Closing | §1.01 |
| Applicable Closing Date | §1.01 |
| Asset Selling Affiliates | §1.01 |
| Assumed Benefit Plan | §1.01 |
| Assumed Liabilities | §1.01 |
| Assumption Agreement | §2.02(c) |
| Benefits Continuation Period | §1.01 |
| Business | Recitals |

12

| Term | Location |
|------|----------|
| Business Claims | Annex 2.02(c) |
| Business Employee Benefit Plan | §1.01 |
| Buyer | Preamble |
| Buyer Fundamental Representations | §5.02(a) |
| Buyer Indemnitees | §10.02 |
| Buyer Plans | §8.01(g) |
| Buyer Tax Act | §1.01 |
| Buyer Termination Fee | §9.04(a) |
| BWI Equipment | Annex 2.02(b) |
| Claim | §10.05 |
| Closing | §1.01 |
| Closing Date | §1.01 |
| Closing Inventory | §2.04(b) |
| Code | §1.01 |
| Collective Bargaining Agreements | §3.12(a) |
| Commingled Contract | §1.01 |
| Confidentiality Agreement | §1.01 |
| Contracts | Annex 2.02(a) |
| Controlled Group Liability | §1.01 |
| Copyrights | §1.01 |
| Country Transfer Agreement | §2.02(e) |
| Country Unit | §1.01 |
| Damages | §1.01 |
| Data Room | §1.01 |
| Debt Financing | §6.07(a) |
| Deductible | §10.04(a) |
| DES Business | Annex 2.02(a) |
| Directive | §8.01(m) |
| Disclosure Letter | §1.01 |
| Employee of the Business | §1.01 |
| Environment | §1.01 |
| Environmental Claim | §1.01 |
| Environmental Law | §1.01 |
| Environmental Permits | §3.14(a) |
| ERISA | §1.01 |
| Estimated Prepaid Tax Amount | §1.01 |
| Exchange Rate | §1.02(c) |
| Excluded Assets | §1.01 |
| Excluded Contracts | Annex 2.02(b) |
| Excluded IP Rights | Annex 2.02(b) |
| Excluded Jurisdictions | Annex 2.02(b) |
| Excluded Liabilities | §1.01 |
| Excluded Taxes | §1.01 |
| Expiration Period | §7.01(b) |
| FCPA | §3.19(a) |

| Term | Location |
|---|---|
| Final Binding Offer Letter | §1.01 |
| Financial Information | §1.01 |
| Foreign Currency | §1.01 |
| Forward-Looking Statements | §11.02 |
| Fundamental Representations | §10.01 |
| GAAP | §1.01 |
| General Assignment | §2.02(a) |
| Governmental Entity | §1.01 |
| Hazardous Materials | §1.01 |
| Inactive Employee | §8.01(c) |
| Indemnified Party | §10.05 |
| Indemnifying Party | §10.05 |
| Indemnitees | §10.03 |
| Inventory | §1.01 |
| Inventory Target | §1.01 |
| IP Rights | §1.01 |
| Japan Corporate-Split Law | §1.01 |
| Japan NewCo | §2.02(i) |
| Juarez Employees | §8.01(q) |
| Juarez Line Employees | §8.01(q) |
| Juarez Non-Line Employee | §8.01(q) |
| Juarez Severance Period | §8.01(q) |
| Judgment | §1.01 |
| Know-How | §1.01 |
| Law | §1.01 |
| Laws | §1.01 |
| Licensed IP Contracts | §3.10(b) |
| Lien | §1.01 |
| Listed Plans | §3.13(a) |
| Major Market CBAs | §3.12(a) |
| Major Market Countries | §1.01 |
| Major Market Plans | §3.13(a) |
| Material Adverse Effect | §1.01 |
| Material Commingled Contracts | §3.09(d) |
| Material Distribution Contract | §6.01(b)(xii) |
| Material Transferred Contracts | §3.09(b) |
| Non-Principal Closing Legal Impediment | §5.03(b) |
| Non-Principal Country Unit | §1.01 |
| Non-Principal Country Unit Closing | §1.01 |
| Non-Principal Country Unit Closing Date | §2.01(b) |
| Non-Resident Capital Gain Tax | §1.01 |
| Non-U.S. Transferred Employee | §1.01 |
| Notice of Disagreement | §2.04(d) |
| Outside Date | §1.01 |
| Patent Assignment | §2.02(a) |

| Term | Location |
|---|---|
| Patents | §1.01 |
| Permitted Liens | §1.01 |
| Person | §1.01 |
| Personal Information | §1.01 |
| PIS/COFINS | §1.01 |
| Post-Closing Tax Period | §1.01 |
| Pre-Closing Accounts Payable | Annex 2.02(d) |
| Pre-Closing Tax Period | §1.01 |
| Prepaid Tax Amount | §1.01 |
| Price Adjustment Statement | §2.04(b) |
| Principal Closing | §2.01(a) |
| Principal Closing Date | §2.01(a) |
| Principal Closing Legal Impediment | §5.01(e) |
| Principal Country Units | §1.01 |
| Product Claims | Annex 2.02(c) |
| Product Registrations | §3.17(a) |
| Products | Recitals |
| Proposed Allocation | §2.05(b) |
| Public Official | §3.19(b) |
| Purchase Price | §2.03(c) |
| Purchase Price Adjustment Due Date | §2.04(h) |
| Release | §1.01 |
| Reliance Opinion | §1.01 |
| Representatives | §6.09(a) |
| Retained Claims | §1.01 |
| Retained Defendant Liabilities | Annex 2.02(d) |
| Retained Plaintiff Claims | Annex 2.02(d) |
| Reverse Transition Manufacturing Services and Access Agreement | §7.09 |
| Section 338 Forms | §1.01 |
| Section 338(h)(10) Election | §7.08(f)(i)(1) |
| Seller | Preamble |
| Seller Fundamental Representations | §10.01 |
| Seller Indemnitees | §10.03 |
| Seller Trademarked Items | §7.01(b) |
| Selling Affiliates | §1.01 |
| Shared Services | §1.01 |
| Significant Distributors | §3.21(a) |
| Significant Suppliers | §3.21(b) |
| Stock Selling Affiliates | §1.01 |
| Straddle Period | §1.01 |
| Tax | §1.01 |
| Tax Proceeding | §1.01 |
| Tax Return | §1.01 |
| Taxes | §1.01 |

15

| Term | Location |
|---|---|
| Taxing Authority | §1.01 |
| Trademark Assignment | §2.02(a) |
| Trademark License Agreement | §7.09 |
| Trademarks | §1.01 |
| Transaction Documents | §1.01 |
| Transactions | §1.01 |
| Transfer Regulations | §8.01(m) |
| Transfer Taxes | §1.01 |
| Transfer Time | §8.01(c) |
| Transferred Assets | §1.01 |
| Transferred Companies | §1.01 |
| Transferred Contracts | Annex 2.02(a) |
| Transferred Employee | §1.01 |
| Transferred Employee Liabilities | Annex 2.02(c) |
| Transferred Equity Interests | §1.01 |
| Transferred IP | Annex 2.02(a) |
| Transferred IP Licenses | Annex 2.02(a) |
| Transferred IT | Annex 2.02(a) |
| Transferred Minority Interests | Annex 2.02(a) |
| Transferred Real Property | Annex 2.02(a) |
| Transferred Records | Annex 2.02(a) |
| Transition Manufacturing Services Agreement | §7.09 |
| Transition Services Agreement | §7.09 |
| U.S. Transferred Employee | §1.01 |
| VAT | §1.01 |

SECTION 1.02. Interpretation and Construction . (a) Unless otherwise provided herein, all monetary values stated herein are expressed in United States currency and all references to "dollars" or "$" will be deemed references to the lawful money of the United States.

(b) Each accounting term set forth herein and not otherwise defined shall have the meaning accorded it under GAAP.

(c) Except as provided in Section 2.03(b), whenever conversion of values from any Foreign Currency for a particular date or period shall be required, such conversion shall be made using the rate provided by Bloomberg at 5:00 A.M. New York City time (the " Exchange Rate ") three (3) business days prior to the applicable date or dates.

(d) The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal,

16

state, local or foreign Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. When a reference is made in this Agreement to a party or to a Section or Exhibit, such reference shall be to a party to, a Section of, or an Exhibit to, this Agreement, unless otherwise indicated. When a reference is made in this Agreement to a Schedule, such reference shall be to a Schedule to the Disclosure Letter, unless otherwise indicated. All terms defined in this Agreement shall have their defined meanings when used in any Exhibit to this Agreement or Schedule to the Disclosure Letter, as applicable, or any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein. Whenever used in this Agreement, "business day" shall mean any day, other than a Saturday or a Sunday or a day on which banking and savings and loan institutions are authorized or required by applicable Law to be closed in the State of New York. Whenever the words "include," "includes," "including" or "such as" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "or" when used in this Agreement is not exclusive. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." Whenever used in this Agreement, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders. Any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, supplemented or modified, including (i) (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and (ii) all attachments thereto and instruments incorporated therein. The words "asset" and "property" shall be construed to have the same meaning and effect. References to a Person are also to its permitted successors and assigns. In the event of any conflict between this Agreement and any Country Transfer Agreement, the terms of this Agreement shall control.

ARTICLE II

Closings

SECTION 2.01. Closings . (a) The closing of the purchase and sale of the Transferred Assets and Transferred Equity Interests relating to the Principal Country Units and the assumption of the Assumed Liabilities relating to the Principal Country Units (the " Principal Closing ") shall take place at the offices of Cravath, Swaine & Moore LLP in New York, New York, at 10:00 A.M., New York City time, on the second business day following the satisfaction (or, to the extent permitted by applicable Law, waiver) of the conditions set forth in Article V with respect to the Principal Closing (excluding those conditions intended to be satisfied at the Principal Closing but subject to their satisfaction or, to the extent permitted by applicable Law, waiver at such time). The date on which the Principal Closing occurs is referred to in this Agreement as the " Principal Closing Date ." The Principal Closing shall be deemed to occur and be effective at 11:59 P.M., local time, on the date of such Principal Closing. The parties

17

hereto specifically acknowledge that time is of the essence because Seller's intention to exit the Business is or will become known to its employees, customers, suppliers and others having dealings with Seller.

(b) The closing of the transfer of the Transferred Assets and Transferred Equity Interests relating to each Non-Principal Country Unit and the assumption of the Assumed Liabilities relating to such Non-Principal Country Unit will occur as soon as reasonably practicable following the Principal Closing Date on the date agreed to by Buyer and Seller within the period specified in Exhibit E to the Transition Services Agreement, so long as the conditions set forth in Article V with respect to such Non-Principal Country Unit (excluding those conditions intended to be satisfied at such Closing but subject to their satisfaction or, to the extent permitted by applicable Law, waiver at such time) have been satisfied or, to the extent permitted by applicable Law, waived by such date (each such date, a " Non-Principal Country Unit Closing Date "). During the period from the Principal Closing until the occurrence of the applicable Non-Principal Country Unit Closing, none of the assets or liabilities of the applicable Non-Principal Country Unit shall be transferred to or assumed by Buyer, as the case may be, but Seller shall hold and operate such Non-Principal Country Unit in a manner consistent with Seller's obligations under Section 6.01. The parties shall enter into a distribution arrangement with respect to such Non-Principal Country Unit giving effect to the foregoing, pursuant to the Transition Services Agreement.

SECTION 2.02. Transferred Assets and Transferred Equity Interests/Excluded Assets; Assumed/Excluded Liabilities . (a)  Transferred Assets and Transferred Equity Interests . Pursuant to the terms and subject to the conditions set forth in this Agreement, at the Applicable Closing, Seller will, and will cause the relevant Asset Selling Affiliates to, sell, convey, assign, and transfer to Buyer, and Buyer will purchase, acquire and accept, the Transferred Assets related to the applicable Country Unit, free and clear of all Liens other than Permitted Liens. Accordingly, Seller will, or will cause the relevant Asset Selling Affiliates to, execute and deliver at the Principal Closing a general assignment and bill of sale in the form of Exhibit B (the " General Assignment "), a general patent assignment in the form of Exhibit C (the " Patent Assignment ") and a general trademark assignment in the form of Exhibit D (the " Trademark Assignment ") and at each Applicable Closing such other instruments of conveyance, assignment and transfer as Buyer reasonably requests (the form and substance of which shall be mutually agreed between the parties), in each case to convey to Buyer all of Seller's or each Asset Selling Affiliate's right, title and interest in and to the applicable Transferred Assets. In addition, pursuant to the terms and subject to the conditions set forth in this Agreement, at the Applicable Closing, Seller will, and will cause the relevant Stock Selling Affiliates to, sell, convey, assign, and transfer to Buyer, and Buyer will purchase, acquire and accept, the Transferred Equity Interests (and will indirectly acquire and accept by means of such purchase acquisition and acceptance, the equity interests in any Transferred Company that is a wholly-owned subsidiary of another Transferred Company) related to the applicable Country Unit, free and clear of all Liens. Accordingly, Seller will, or will cause the relevant Stock Selling Affiliates to, deliver at the Applicable Closing stock certificates representing the Transferred Equity Interests, together with a stock power endorsed in blank.

18

(b) <u>Excluded Assets</u> . Anything to the contrary herein notwithstanding, Buyer is not purchasing, pursuant to this Agreement or any of the Transactions, Seller's (or any of its Affiliates') right, title or interest in any asset that is not a Transferred Asset or Transferred Equity Interest. Specifically, Seller's (and any of its Affiliates') right, title or interest in any Excluded Asset is not being conveyed to Buyer.

(c) <u>Assumed Liabilities</u> . At the Applicable Closing, Buyer shall assume the Assumed Liabilities related to the applicable Country Unit and shall agree to satisfy and discharge when due the Assumed Liabilities related to the applicable Country Unit. After the Applicable Closing, Buyer shall pay all Assumed Liabilities related to the applicable Country Units as and when such liabilities become due. Buyer will execute and deliver to Seller at the Principal Closing an assumption agreement in the form of <u>Exhibit E</u> (the " <u>Assumption Agreement</u> ") and at each Non-Principal Country Unit Closing such other agreements and instruments as Seller reasonably requests (the form and substance of which shall be mutually agreed between the parties), whereby Buyer agrees to assume and undertakes to pay, perform and discharge as and when due, the Assumed Liabilities related to the applicable Country Units. For the avoidance of doubt, at the Applicable Closing, by means of the acquisition of the Transferred Equity Interests and not by means of a direct assumption of such liabilities by Buyer, Buyer shall be responsible for the liabilities of the Transferred Companies that would otherwise constitute Assumed Liabilities pursuant to <u>Annex 2.02(c)</u> (as more specifically set forth in Section 6.08).

(d) <u>Excluded Liabilities</u> . Anything to the contrary herein notwithstanding, neither Buyer nor any of its Affiliates shall assume or be obligated to pay, perform or otherwise discharge, pursuant to this Agreement or any of the Transactions, any Excluded Liability. Seller and its Affiliates will remain liable to pay, perform and discharge when due, all Excluded Liabilities. For the avoidance of doubt, at the Applicable Closing, the acquisition of the Transferred Equity Interests shall not result in the assumption by Buyer of the liabilities and obligations of the Transferred Companies that would otherwise constitute Excluded Liabilities pursuant to <u>Annex 2.02(d)</u> (as more specifically set forth in Section 6.08).

(e) <u>Country Transfer Agreements</u> . To the extent required by applicable Law or as deemed necessary by either of the parties hereto, the transfer of each Country Unit will be effected pursuant to a short-form agreement or one or more instruments of transfer, such as a bill of sale, share transfer agreement, business transfer agreement, real estate transfer agreement or other asset assignment document, which agreement shall be prepared by Seller and shall be on terms mutually agreed between the parties hereto and consistent with and as close as reasonably possible to the applicable terms of this Agreement (each, a " <u>Country Transfer Agreement</u> "). The parties shall enter into the Country Transfer Agreements as soon as reasonably practicable after the date hereof and not later than the relevant Applicable Closing.

(f) <u>Designation of Affiliates</u> . To the extent that any of the Transferred Assets or Transferred Equity Interests are under the control of any of Seller's Affiliates, Seller shall cause its Affiliates to promptly take such legal action as may be necessary to

19

consummate the transfer to Buyer and its Affiliates of such Transferred Assets or Transferred Equity Interests under terms and conditions which are consistent with and subject to the terms of this Agreement. Prior to, and in any event at least 30 days in advance of, any Applicable Closing, Buyer may designate, with the consent of Seller (which consent shall not be unreasonably withheld), one or more Affiliates to, at such Applicable Closing, (i) acquire all or part of the Transferred Assets or Transferred Equity Interests, (ii) assume all or part of the Assumed Liabilities or (iii) pay a designated portion of the Purchase Price pursuant to Section 2.03, in each case related to the applicable Country Unit, as the case may be, in which event all references herein to Buyer will be deemed to refer to such Affiliates, as appropriate; provided , however , that no such designation will in any event limit or affect the obligations of Buyer under this Agreement to the extent not performed by such Affiliates.

(g) Transferred Assets Subject to Third-Party Consent . To the extent that the sale, assignment, transfer, conveyance or delivery or attempted sale, assignment, transfer, conveyance or delivery to Buyer (or one of its Affiliates) of any Transferred Asset is prohibited by any applicable Law or would require any governmental or third-party authorizations, approvals (including Anti-Trust Approvals), consents or waivers and such authorizations, approvals, consents or waivers shall not have been obtained prior to the Applicable Closing, this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery thereof. From the date hereof until eighteen (18) months after the Applicable Closing Date, the parties shall use their respective reasonable best efforts to cooperate with each other to obtain promptly such authorizations, approvals, consents or waivers and to give any notices required for the transfer of such Transferred Asset and to obtain from third parties an approval or consent to establish a new contract with Buyer or its designated Affiliate with respect to the portion of any Commingled Contract related to the Business, pursuant to which Buyer or its designated Affiliate will have access to the rights and benefits of such Commingled Contract with respect to the Business on substantially the same terms and conditions provided to Seller and its Affiliates prior to the Applicable Closing, or to assign such portion to Buyer or its designated Affiliate; provided , however , that Seller shall not be required to pay any consideration (other than customary filing and application fees typically paid by a seller or transferee) or make any concession therefor. If such authorization, approval, consent or waiver is obtained, Seller shall promptly assign, transfer, convey or deliver any such Transferred Asset or, if applicable, that portion of any Commingled Contract, as the case may be, to Buyer or its designee pursuant to Section 2.02(f) at no additional cost. Pending the earlier of obtaining such authorization, approval, consent or waiver or the expiration of such eighteen-month (18 month) period, insofar as reasonably practicable and to the extent permitted by applicable Law, Seller shall hold such Transferred Assets for the benefit of Buyer and shall operate such Transferred Assets in a manner to place Buyer in a substantially similar position as if such Transferred Assets had been sold, conveyed, assigned and transferred. Buyer shall use its reasonable best efforts to cooperate with Seller in connection with any actions taken by Seller pursuant to this Section 2.02(g). Buyer further agrees that, if Seller shall have complied with its obligations under this Agreement with respect to using reasonable best efforts to obtain such authorization, approval, consent or waiver, Seller shall not be in breach of this Agreement solely as a result of the failure to obtain any such authorization, approval, consent or waiver.

20

(h) <u>Buyer's Recording and Similar Responsibilities</u>. Notwithstanding the foregoing provisions of this Section 2.02, it shall be Buyer's responsibility (i) to prepare the applicable country patent assignments and trademark assignments in respect of the Transferred IP and to record such assignments following execution thereof by Seller (or its applicable Affiliate), (ii) to apply for its own marketing authorizations for the Products to the relevant regulatory authorities where it is not within the power of Seller to cause, by giving notice to the applicable regulatory authority or otherwise, the transfer directly to Buyer of the existing marketing authorizations that are Transferred Assets and (iii) to bear the fees and other costs in accordance with Section 2.06(d). Seller shall, and shall cause its Affiliates to, provide all reasonable assistance to Buyer in connection with the foregoing at Buyer's expense.

(i) <u>Japan Corporate Split</u>. Seller may elect (on notice to Buyer no later than forty-five (45) calendar days after the date of this Agreement) to transfer, assign and convey to Buyer on the Applicable Closing Date the Transferred Assets and Assumed Liabilities relating to Japan by way of a "corporate split" pursuant to Japan Corporate-Split Law. If Seller so elects, Seller and Buyer shall, and shall cause their Affiliates to, execute and deliver a Country Transfer Agreement or other document, the form and substance of which shall be mutually agreed between the parties (it being understood that, in the event of any conflict between this Agreement and any Country Transfer Agreement or other document, the terms of this Agreement shall control), and to take such other actions, as may be necessary or desirable to give effect to the foregoing, including, if applicable, amending <u>Schedule 3.01(b)</u> to the Disclosure Letter to include a newly formed subsidiary of either Seller or an Affiliate of Seller (" <u>Japan NewCo</u> "), in which case Japan NewCo shall be deemed to be a Transferred Company for all purposes hereof.

SECTION 2.03. <u>Purchase Price</u>. (a) Subject to the terms and conditions of this Agreement, at the Principal Closing, Buyer shall (or shall cause one or more of its Affiliates as Buyer may designate pursuant to Section 2.02(f) to) pay or cause to be paid to Seller (or one or more of its Affiliates as Seller may designate), in immediately available funds by wire transfer to one or more bank accounts designated in writing by Seller at least two business days prior to the Principal Closing Date, cash in U.S. dollars (subject to Section 2.03(b)) in an amount exclusive of any Transfer Taxes equal to the Purchase Price.

(b) Buyer shall pay the portion of the Purchase Price applicable to the Country Units identified on Schedule 2.03(b) to the Disclosure Letter in the applicable Foreign Currency set forth on such Schedule. The conversion rate from U.S. dollars to the applicable Foreign Currency shall be the closing rate provided by Bloomberg at 5:00 A.M. New York City time two (2) business days prior to the Principal Closing Date; <u>provided</u> , <u>however</u> , that if applicable Law in a Country Unit identified on Schedule 2.03(b) to the Disclosure Letter requires that the applicable portion of the Purchase Price be paid by a legal entity organized under the laws of such Country Unit, and Buyer reasonably requires more than two business days to convert U.S. dollars into the

21

applicable Foreign Currency and thereafter transfer such funds to one of its Affiliates so organized, then Buyer and Seller shall negotiate in good faith to agree on an alternative conversion mechanism that will allow Buyer to pay the applicable portion of the Purchase Price on the Principal Closing Date in accordance with applicable Law. Schedule 2.03(b) to the Disclosure Letter sets forth Seller's good-faith estimate as of the date of this Agreement of the portion of the Purchase Price to be allocated to each Country Unit identified therein for payment in a Foreign Currency.

(c) The " Purchase Price " shall be equal to one billion nine hundred forty four million dollars ($1,944,000,000) increased or decreased as a result of the inventory adjustment, if any, pursuant to Section 2.04, and shall be allocated as described in Section 2.05.

SECTION 2.04. Purchase Price Adjustment . (a) For the purposes of clarification only, Seller is retaining all accounts payable and accounts receivable with respect to each Country Unit arising out of the operation and conduct of the Business before the Applicable Closing for such Country Unit and the only purchase price adjustment after any Closing with respect to changes in the working capital of the Business will be the adjustment of the Inventory pursuant to this Section 2.04.

(b) Within ninety (90) days after the Applicable Closing Date, Seller shall prepare and deliver to Buyer a statement in the form of Schedule 2.04(b) to the Disclosure Letter (in its draft form, a " Price Adjustment Statement "), setting forth, with respect to each applicable Country Unit, (i) the book value of the Inventory, prepared in accordance with the Accounting Policies, transferred to Buyer in respect of such Country Unit as of the Applicable Closing Date (the " Closing Inventory ") and (ii) the Prepaid Tax Amount as of the Principal Closing Date. To the extent that the book value of the applicable Closing Inventory is greater than the applicable Inventory Target or less than the applicable Inventory Target, the Purchase Price shall be adjusted as described in Section 2.04(f) below. To the extent that the Prepaid Tax Amount (once final and binding pursuant to the provisions of this Section 2.04) as of the Principal Closing Date is greater than the Estimated Prepaid Tax Amount or less than the Estimated Prepaid Tax Amount, the Purchase Price shall be adjusted as described in Section 2.04(g) below.

(c) In connection with the preparation of each Price Adjustment Statement, (i) Buyer shall (A) assist, and shall cause its Affiliates to assist, Seller, its accountants, advisors and other representatives in its preparation of each Price Adjustment Statement and (B) afford to Seller, its accountants, advisors and other representatives, reasonable access during normal business hours to the personnel, properties, books and records of the Business to the extent relevant to the preparation of any Price Adjustment Statement (including taking and preparing physical counts of Inventory) and (ii) Seller shall, and shall cause its Affiliates to, consult with Buyer in good faith and provide Buyer, its accountants, advisors and other representatives with any reasonably requested information, data or back-up materials with respect to the calculation of the Closing Inventory. For purposes of this Section 2.04, the calculation of book value of the Inventory will reflect any accounting reserves or adjustments (net of obsolescence) and otherwise be determined in a manner consistent with Seller's

22

Inventory and other relevant accounting policies used in the preparation of the Financial Information, set forth in Schedule 2.04(c) to the Disclosure Letter (the " Accounting Policies ").

(d) Each Price Adjustment Statement shall become final and binding upon the parties on the forty-fifth (45th) day following receipt thereof by Buyer unless Buyer gives written notice of its disagreement (a " Notice of Disagreement ") to Seller prior to such date. Any Notice of Disagreement shall specify in reasonable detail the nature and amount of any disagreement so asserted. If a timely Notice of Disagreement is received by Seller, then the relevant Price Adjustment Statement (as revised in accordance with clause (x) or (y) below) shall become final and binding upon the parties on the earlier of (x) the date the parties hereto resolve any differences they have with respect to any matter specified in the Notice of Disagreement or (y) the date any matters in dispute are resolved by an accounting firm (in accordance with the procedure set forth in this Section 2.04) selected by Seller and Buyer or, if the parties are unable to agree, an independent accounting firm selected by Seller's and Buyer's independent accounting firms (such firm, the " Accounting Firm ").

(e) Buyer and Seller acknowledge and agree that the dispute resolution provisions set forth in Section 11.12 shall not apply to any dispute described in this Section 2.04. During the thirty-(30) day period immediately following the delivery of a Notice of Disagreement, Seller and Buyer shall seek in good faith to resolve in writing any differences they may have with respect to any matter specified in the Notice of Disagreement. At the end of such thirty- (30) day period, Seller and Buyer shall submit for review and resolution by the Accounting Firm any and all matters which remain in dispute and which were included in the Notice of Disagreement, and the Accounting Firm shall make a final determination of the values set forth on the relevant Price Adjustment Statement (and shall use such determination to prepare the relevant final Price Adjustment Statement), which determination shall be binding on the parties; provided , however , the scope of such determination by the Accounting Firm shall be limited to: (i) those matters that remain in dispute and that were included in the Notice of Disagreement; (ii) whether, for each calculation of Inventory, such calculation was prepared in accordance with this Section 2.04, specifically, whether the Accounting Policies were used; and (iii) whether there were mathematical errors in the relevant Price Adjustment Statement, and the Accounting Firm is not authorized or permitted to make any other determination. Without limiting the generality of the foregoing, the Accounting Firm is not authorized or permitted to make any determination as to the accuracy of Section 3.06 or any other representation or warranty in this Agreement or as to compliance by Seller, Buyer or any of their respective Affiliates with any of the covenants in this Agreement (other than this Section 2.04). The relevant Price Adjustment Statement shall become final and binding on Buyer and Seller on the date the Accounting Firm delivers the relevant final Price Adjustment Statement to the parties. The fees and expenses of the Accounting Firm pursuant to this Section 2.04 shall be borne one-half each by Buyer and Seller.

(f) If the Price Adjustment Statement discloses that the book value of the applicable Closing Inventory exceeds the applicable Inventory Target, then the amount of

23

such excess shall be added on a dollar-for-dollar basis to the Purchase Price. If the Price Adjustment Statement discloses that the book value of the applicable Closing Inventory is less than the applicable Inventory Target, then the Purchase Price shall be reduced on a dollar-for-dollar basis by the amount of such deficit. If the Price Adjustment Statement discloses that the book value of the applicable Closing Inventory is equal to the applicable Inventory Target, then there shall be no Inventory adjustment to the Purchase Price in respect of the Applicable Closing.

(g) If the Price Adjustment Statement discloses that the Prepaid Tax Amount as of the Principal Closing Date exceeds the Estimated Prepaid Tax Amount, then the amount of such excess shall be added on a dollar-for-dollar basis to the Purchase Price. If the Price Adjustment Statement discloses that the Prepaid Tax Amount as of the Principal Closing Date is less than the Estimated Prepaid Tax Amount, then the Purchase Price shall be reduced on a dollar-for-dollar basis by the amount of such deficit. If the Price Adjustment Statement discloses that the Prepaid Tax Amount as of the Principal Closing Date is equal to the Estimated Prepaid Tax Amount, then there shall be no Prepaid Tax Amount adjustment to the Purchase Price in respect of the Principal Closing.

(h) No payment pursuant to Section 2.04(f) or Section 2.04(g) need be made by either party until the date that is fifteen (15) business days after the determination of each final Price Adjustment Statement (the " Purchase Price Adjustment Due Date "); provided that, on or before any Purchase Price Adjustment Due Date, (i) Buyer (or one or more of its Affiliates as may be designated by Buyer) shall pay or cause to be paid to Seller (or one or more of the Selling Affiliates as may be designated by Seller), in immediately available funds by wire transfer to one or more bank accounts designated in writing by Seller at least two business days prior to such Purchase Price Adjustment Due Date, cash in U.S. dollars in an amount equal to the positive Purchase Price adjustment under Section 2.04(f) or Section 2.04(g), if any, or (ii) Seller (or one or more of its Affiliates as may be designated by Seller) shall pay or cause to be paid to Buyer (or one or more of its Affiliates as may be designated by Buyer), in immediately available funds by wire transfer to one or more bank accounts designated in writing by Buyer at least two business days prior to such Purchase Price Adjustment Due Date, cash in U.S. dollars in an amount equal to the negative Purchase Price adjustment under Section 2.04(f) or Section 2.04(g), if any.

SECTION 2.05. Allocation of Purchase Price . (a)Buyer and Seller shall use commercially reasonable efforts to agree on an allocation of the Purchase Price (the " Allocation ") prior to the Principal Closing Date. The Allocation shall allocate the Purchase Price and Assumed Liabilities among each of the Transferred Assets and Transferred Equity Interests (and among the assets held by Cordis Corporation) in a manner that incorporates, reflects and is consistent with Sections 1060 and 338 of the Code and this Section 2.05(a).

(b) Within forty-five (45) calendar days after the date of this Agreement, Seller shall deliver a reasonable draft of the Allocation (the " Proposed Allocation ") to Buyer. Except as provided in subparagraphs (c) and (d) of this Section 2.05, at the close of business on the forty-fifth (45th) calendar day after delivery of the Proposed

24

Allocation, the Proposed Allocation shall become binding upon Buyer and Seller, shall be set forth on Schedule 2.05(b) to the Disclosure Letter (the " Allocation Schedule "), and shall be the Allocation.

(c) Buyer shall raise any objection (so long as such objection is reasonable) to the Proposed Allocation in writing within forty-five (45) calendar days of the delivery of the Proposed Allocation. Buyer and Seller shall negotiate in good faith to resolve any differences within thirty (30) calendar days after delivery of Buyer's objection. If Buyer and Seller reach written agreement amending the Proposed Allocation within such thirty (30) calendar day period the Proposed Allocation, as so amended, shall become binding upon Buyer and Seller, shall be set forth in the Allocation Schedule, and shall be the Allocation.

(d) Buyer and Seller acknowledge and agree that the dispute resolution provisions set forth in Section 11.12 of this Agreement shall not apply to any dispute described in this Section 2.05. If Buyer and Seller cannot agree on the Allocation within thirty (30) calendar days after delivery of Buyer's objection, then all remaining disputed items shall be submitted for resolution by an independent appraisal firm mutually selected by Buyer and Seller. Buyer and Seller shall each request that the independent appraisal firm make a final determination as to the disputed items within thirty (30) calendar days after such submission. The Proposed Allocation shall be amended in accordance with the findings of such independent appraisal firm, and the Proposed Allocation, as so amended, shall become binding upon Buyer and Seller, shall be set forth in the Allocation Schedule, and shall be the Allocation. The fees, costs and expenses of the independent appraisal firm shall be borne equally by Buyer and Seller.

(e) The Allocation shall be amended to reflect any adjustments (including those described in Section 2.04) to the Purchase Price under this Agreement. If, after all adjustments to the Allocation are made, the Allocation with respect to the Closing Inventory of any Selling Affiliate, when expressed in the relevant local currency at the Exchange Rate used to determine the Closing Inventory is different from the local currency net book value recorded on the statutory books for the Closing Inventory of such Selling Affiliate as of the Applicable Closing Date, then the Allocation with respect to the Closing Inventory of such Selling Affiliate shall be adjusted so that it is equal to such local currency net book value, and the parties will agree to a corresponding upward or downward adjustment (as appropriate) elsewhere in the Allocation.

(f) Each of Seller, Buyer and their respective Affiliates shall prepare and file its Tax Returns (including Internal Revenue Service Form 8594) on a basis consistent with the Allocation and shall take no position inconsistent with the Allocation on any Tax Return or in any proceeding before any Taxing Authority or otherwise. In the event that the Allocation is disputed by any Taxing Authority, the party receiving notice of the dispute shall promptly notify the other party hereto, and both Seller and Buyer agree to use their commercially reasonable efforts to defend such Allocation in any audit or similar proceeding.

25

(g) In the event that the Allocation has not become final pursuant to this Section 2.05 by the Applicable Closing:

(i) The allocated purchase prices included in the Proposed Allocation shall be used for the purpose of (A) including allocated purchase prices in the Country Transfer Agreements for each Country Unit and (B) determining the amount of any payments made on the Principal Closing Date to the applicable Selling Affiliate with respect to such Country Unit. The inclusion of such allocated purchase prices shall not be deemed to waive, amend or otherwise alter any of the rights or obligations of the parties set forth in this Section 2.05 and shall not be used for any purpose in resolving, or result in any prejudice with respect to, any dispute with respect to the Proposed Allocation or the Allocation.

(ii) To the extent that the amounts paid to any Selling Affiliate on the Principal Closing Date are not equal to the portion of the Purchase Price allocated to such Selling Affiliate in the Allocation (with respect to any Selling Affiliate, the " Allocated Purchase Price "), the parties shall and shall cause their respective Affiliates to take all necessary actions to refund, repay and redistribute as promptly as reasonably practicable any amounts paid to any Selling Affiliate in excess of such Selling Affiliate's Allocated Purchase Price, such that, after giving effect to any such refunds, repayments and redistributions, the amounts received by each Selling Affiliate shall be equal to such Selling Affiliate's Allocated Purchase Price.

SECTION 2.06. Transfer Taxes and Other Costs . (a) All Transfer Taxes imposed on the transfer of the Transferred Equity Interests and the Transferred Assets to Buyer and assumption of the Assumed Liabilities by Buyer shall be borne and paid solely by Buyer when due in compliance with applicable Transfer Tax laws; provided , however , that if Seller is required by applicable Law to pay any such Transfer Taxes, then Seller shall pay such Transfer Taxes, and Buyer shall, subject to receipt of reasonably satisfactory evidence of Seller's payment thereof, promptly reimburse Seller, whether or not such Transfer Taxes were correctly or legally imposed by the applicable Governmental Entity.

(b) Subject to Buyer providing Seller, at Seller's request, with a list of Buyer's Affiliates that Buyer has designated pursuant to Section 2.02(f) to purchase Transferred Assets or Transferred Equity Interests at least thirty (30) calendar days prior to the Applicable Closing Date, Seller shall deliver to Buyer at least twenty-five (25) calendar days before the Applicable Closing Date a schedule of expected Transfer Taxes with respect to the Applicable Closing by Seller or any Selling Affiliate as reasonably determined by Seller. Seller shall cooperate, as reasonably requested by Buyer, to minimize the amount of Transfer Taxes payable, including by claiming any available exemption or any available refund, credit or other recovery, and by executing and filing any invoices, forms or certificates reasonably required. The parties shall provide each other with any information reasonably requested in order to comply with applicable Transfer Tax Laws, where such information is connected with the Transfer Tax treatment or position in connection with the Transactions. The amount of any refund, credit or other recovery received or utilized by Seller of any Transfer Taxes shall be paid promptly by Seller to Buyer.

26

(c) Seller and Buyer shall file all necessary Tax Returns and other documentation required to be filed by it with respect to all Transfer Taxes, and, if required by applicable Law, the parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation. Seller and Buyer shall cooperate to minimize any Transfer Taxes described in Section 2.06(a) to the greatest extent permitted by applicable Law, including pursuant to any available exemption. Subject to the provisions of Section 2.06(d), the parties intend that, to the extent permitted by applicable Law, sales of the Transferred Assets pursuant to this Agreement will be treated as a transfer of a going concern for VAT purposes.

(d) As between Buyer and Seller, the determination of the amount of any Transfer Taxes (including whether any exemption from (or reduction in) Transfer Taxes is available) required to be paid to a Governmental Entity with respect to the consummation of the Transactions shall be made by Seller in good faith in its sole reasonable discretion; provided , however , that if Buyer reasonably disagrees with Seller's determination with respect to any Transfer Tax and obtains prior to the applicable due date of the Transfer Tax (or prior to any other relevant date) a Reliance Opinion (which Reliance Opinion shall be addressed to Buyer or an Affiliate of Buyer, and not to Seller, but a copy of which is provided to Seller) to support Buyer's position (it being agreed that Seller shall reimburse Buyer for half of any cost and expense incurred in obtaining such Reliance Opinion), then Buyer's position shall control. Subject to the above, Seller shall control any Tax Proceeding relating to the availability of any exemption from Transfer Taxes required to be paid with respect to the consummation of the Transactions ; provided that Seller shall provide Buyer with a timely and reasonably detailed account of each phase of such Tax Proceeding, shall consult with Buyer before taking any significant action in connection with such Tax Proceeding, shall provide Buyer with drafts of any written materials prepared in connection with such Tax Proceeding, shall reflect any reasonable comments provided by Buyer in respect of any written materials prepared in connection with such Tax Proceeding and shall not settle, compromise or abandon any such Tax Proceeding without obtaining the prior written consent of Buyer, such consent not to be unreasonably withheld.

(e) All costs and fees (other than Transfer Taxes, Seller's legal expenses and any allocation of corporate overhead of Seller or any of its Affiliates) associated with transferring to Buyer or one of its Affiliates the Transferred IP, the Transferred IT and marketing authorizations for the Products conveyed to Buyer at the Applicable Closing shall be borne and paid solely by Buyer and when due; provided , however , that if any such amount shall be incurred by Seller, Buyer shall, subject to receipt of satisfactory evidence of Seller's payment thereof, promptly reimburse Seller.

(f) All costs and expenses (other than Transfer Taxes) associated with removing and moving any tangible Transferred Asset to a location designated by Buyer shall be borne and paid solely by Buyer when due; provided , however , that if any such amount shall be incurred by Seller, Buyer shall, subject to receipt of satisfactory evidence of Seller's payment thereof, promptly reimburse Seller.

27

SECTION 2.07. <u>Withholding Taxes</u>

(a) Notwithstanding any provisions contained herein to the contrary, Buyer shall be permitted and entitled to deduct and withhold from any amount otherwise payable to any Person pursuant to this Agreement and any other Transaction Document such amounts as are required to be deducted and withheld under applicable Law. Any amounts so deducted and withheld shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made. Within fifteen (15) days of the expected Applicable Closing Date, Buyer shall deliver a schedule of expected withholding amounts to Seller. Furthermore, Buyer and Seller shall reasonably cooperate with each other to reduce the amount of withholding Taxes imposed on the payment of any amount to any Person pursuant to this Agreement and any other Transaction Document to the extent permitted by applicable Law, including by reasonably cooperating in order to execute and file any forms or certificates reasonably required to claim an available reduced rate of, or exemption from, withholding Taxes.

SECTION 2.08. <u>Delivery by Seller</u> . (a) At the Principal Closing, Seller will deliver or cause to be delivered to Buyer (unless delivered previously), the following:

(i) the officer's certificate referred to in Section 5.01(c) hereof;

(ii) the secretary's certificate referred to in Section 5.01(d) hereof;

(iii) duly executed counterparts of the Ancillary Agreements as contemplated by Section 7.09;

(iv) stock certificates representing the Transferred Equity Interests, together with a stock power endorsed in blank;

(v) unless otherwise requested by Buyer, resignation letters from the directors and officers of the Transferred Companies;

(vi) duly executed counterparts of any Country Transfer Agreement related to the Principal Country Units;

(vii) a duly executed General Assignment, Patent Assignment and Trademark Assignment as contemplated by Section 2.02(a); and

(viii) a duly executed certificate by Seller substantially in the form of Exhibit J and with respect to Seller and any Selling Affiliate that is a U.S. person, a duly executed certificate of non-foreign status in accordance with Treasury Regulations Section l.1445-2(b)(2), in form reasonably agreed upon by the parties.

28

(b) At each Non-Principal Country Unit Closing, Seller shall deliver or cause to be delivered any applicable Country Transfer Agreement and any other documents specified therein or as contemplated by Section 2.02(a) with respect to each Country Unit to be transferred at such Non-Principal Country Unit Closing.

SECTION 2.09. <u>Delivery by Buyer</u> . (a) At the Principal Closing, Buyer will deliver or cause to be delivered to Seller or, as designated by Seller, one or more of Seller's Affiliates (unless previously delivered), the following:

(i) the Purchase Price;

(ii) the officer's certificate referred to in Section 5.02(c) hereof;

(iii) the secretary's certificate referred to in Section 5.02(d) hereof;

(iv) duly executed counterparts of the Ancillary Agreements as contemplated by Section 7.09;

(v) duly executed counterparts of any Country Transfer Agreement related to the Principal Country Units;

(vi) a duly executed Assumption Agreement as contemplated by Section 2.02(c); and

(vii) the Estimated Prepaid Tax Amount.

(b) At each Non-Principal Country Unit Closing, Buyer shall deliver or cause to be delivered any applicable Country Transfer Agreement and any other documents specified therein with respect to each Country Unit to be transferred at such Non-Principal Country Unit Closing (including a duly executed assumption agreement with respect to the Assumed Liabilities of the applicable Non-Principal Country Unit as contemplated by Section 2.02(c)).

ARTICLE III

Representations and Warranties of Seller

Buyer acknowledges and agrees that the Transferred Assets are sold "as is, where is" and Buyer agrees to accept the Transferred Assets on the relevant Closing Date in the condition they are in at the place they are located on such Closing Date based on its own inspection, examination and determination with respect to all matters, and without reliance upon any express or implied representations or warranties of any nature made by, on behalf of or imputed to Seller, other than the representations and warranties of Seller expressly set forth in this Agreement. BUYER AGREES THAT THE REPRESENTATIONS AND WARRANTIES GIVEN HEREIN BY SELLER ARE IN

29

LIEU OF, AND BUYER HEREBY EXPRESSLY WAIVES ALL RIGHTS TO, ANY IMPLIED WARRANTIES THAT MAY OTHERWISE BE APPLICABLE BECAUSE OF THE PROVISIONS OF THE UNIFORM COMMERCIAL CODE OR ANY OTHER STATUTE, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Subject to the foregoing and except as set forth in the Disclosure Letter, Seller represents and warrants to Buyer as follows:

SECTION 3.01. <u>Organization and Good Standing</u> . (a) Each of Seller, the Selling Affiliates and the Transferred Companies is a legal entity duly organized, validly existing and in good standing (where such concept is recognized in the relevant jurisdiction) under the Laws of its jurisdiction of incorporation or formation, and has all requisite corporate power and authority to own or lease and operate its respective properties relating to the Business and to carry on the Business as now being operated and conducted. True and complete copies of the articles of incorporation and by-laws (or other charter documents) of the Transferred Companies have been made available in the Data Room.

(b) <u>Schedule 3.01(b)(i)</u> to the Disclosure Letter sets forth the authorized capitalization of each of the Transferred Companies and the number of shares of each class of capital stock or other equity interests in each of the Transferred Companies. There are no outstanding warrants, options, agreements, subscriptions, convertible or exchangeable securities or other Contracts pursuant to which any of the Transferred Companies is or may become obligated to issue, sell, purchase, return or redeem any shares of capital stock or other securities or other equity interests of any of the Transferred Companies, and no equity securities or other equity interests of any of the Transferred Companies are reserved for issuance for any purpose. Except as set forth on <u>Schedule 3.01(b)(i)</u> to the Disclosure Letter, none of the Transferred Companies has any subsidiaries and, except as set forth on <u>Schedule 3.01(b)(ii)</u> to the Disclosure Letter, none of the Transferred Companies own any equity interests, limited liability company interests or capital stock in any other Person.

SECTION 3.02. <u>Authority</u> . Seller has full power and authority to execute and deliver this Agreement and the Final Binding Offer Letter and to carry out, or cause to be carried out, the transactions contemplated hereby and thereby. Seller and each of the Selling Affiliates have, or will have at the Applicable Closing, full power and authority to execute and deliver each Transaction Document (other than this Agreement and the Final Binding Offer Letter) to which it is or will be a party and to carry out, or cause to be carried out, the transactions contemplated by each of the Transaction Documents (other than this Agreement and the Final Binding Offer Letter) to which it is or will be a party. This Agreement and the Final Binding Offer Letter have been duly authorized by all necessary action on the part of Seller and have been duly executed and delivered by Seller and constitute valid and legally binding obligations of Seller in accordance with their terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (b) the availability of injunctive relief and other

30

equitable remedies. Each of the Transaction Documents (other than this Agreement and the Final Binding Offer Letter) has been duly authorized by all necessary action on the part of Seller and each Selling Affiliate and has been, or will be at the Applicable Closing, duly executed and delivered by Seller and each such Selling Affiliate and constitutes or will constitute a valid and legally binding obligation of Seller and each such Selling Affiliate in accordance with its terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (b) the availability of injunctive relief and other equitable remedies.

SECTION 3.03. Title to Tangible Property and Transferred Equity Interests . (a) Except as otherwise set forth on Schedule 3.03(a) to the Disclosure Letter, or as otherwise disclosed in this Agreement, Seller or a Selling Affiliate has good and valid title to all the owned tangible Transferred Assets and valid rights to all the leased tangible Transferred Assets, and has the right to transfer or assign (or cause to be transferred or assigned), in accordance with the terms of this Agreement, such title to the owned tangible Transferred Assets and such rights to the leased tangible Transferred Assets, in each case, free and clear of any Liens other than Permitted Liens. This Section 3.03(a) does not relate to Transferred Real Property or interests in Transferred Real Property, such items being the subject of Section 3.05.

(b) Seller or a Selling Affiliate has good and valid title to the Transferred Equity Interests and the certificates representing the Transferred Equity Interests, free and clear of any Liens and is the record and the beneficial owner of all shares of Transferred Equity Interests. The Transferred Equity Interests are (to the extent applicable) duly authorized, validly issued, fully paid and nonassessable.

SECTION 3.04. Assets of the Business . The Transferred Assets, together with (a) the Shared Services, (b) the services and licenses to be provided by the Selling Affiliates to Buyer and its Affiliates pursuant to the Ancillary Agreements and (c) the Excluded Assets identified in clauses (i) – (xvii) of Annex 2.02(b) , constitute all of the assets used in the Business as it is conducted as of the date of this Agreement. Except as set forth on Schedule 3.04 to the Disclosure Letter, the Transferred Assets, together with (i) the Shared Services, (ii) the services to be provided by the Selling Affiliates to Buyer and its Affiliates pursuant to the Ancillary Agreements and (iii) the Excluded Assets identified in clauses (i) – (iv), (vi), (vii), (xiii), (xv) and (xvi) of Annex 2.02(b) , are sufficient in all material respects for the conduct of the Business as currently conducted. Neither Biosense Webster, Inc. nor the Codman Neuro division of DePuy Orthopaedics, Inc. is involved in the development, manufacturing, marketing, distribution or sale of Products, other than being party to certain Commingled Contracts and other than immaterial collaboration on marketing activities such as shared trade show booths.

SECTION 3.05. Transferred Real Property . (a) (i) Seller or a Transferred Company has good and valid title to the Transferred Real Property, free and clear of any Liens, other than Permitted Liens, and (ii) Schedule 3.05(a) to the Disclosure Letter sets forth all leases, subleases, licenses, concessions or other agreements, written or oral, granting to any party or parties the right of use or occupancy of any portion of the Transferred Real Property. None of the Transferred Real Property is subject to any first refusal, purchase option, right to purchase or other similar right.

31

(b) Except as set forth on Schedule 3.05(b) to the Disclosure Letter and except as would not be material to the Business, (i) all improvements located on the Transferred Real Property have received all necessary approvals of Governmental Entities (including licenses and permits) required in connection with the use thereof being made as of the date of this Agreement, (ii) there are no judicial or administrative actions or proceedings pending or, to Seller's knowledge, threatened in writing under any condemnation, environmental, zoning, eminent domain, land-use or other Law applicable to the Transferred Real Property which, if adversely decided, would interfere with the present use in the Business of the Transferred Real Property and (iii) there are no outstanding unpaid assessment notices against any of the Transferred Real Property.

(c) The Transferred Companies do not own any real property other than the Transferred Real Property.

(d) This Section 3.05 does not relate to any environmental matters, such items being the subject of Section 3.14.

SECTION 3.06. Financial Information; No Undisclosed Liabilities . (a) The Financial Information provided to Buyer has been prepared from the books and records of Seller and has been prepared in accordance with the Accounting Policies, applied on a consistent basis throughout the periods covered thereby, and fairly presents in all material respects the net inventory and net property, plant and equipment of the Business as of the respective dates indicated therein, and the sales to customers, gross profit and operating income of the Business for the periods covered thereby.

(b) There are no material liabilities included in the Assumed Liabilities, except (i) as included, reserved against or reflected in the Financial Information, (ii) as covered by the subject matter of the representations and warranties set forth in this Article III (other than this Section 3.06), (iii) as set forth on Schedule 3.06(b) to the Disclosure Letter or (iv) for those arising in the ordinary course of business consistent with past practice since December 28, 2014.

SECTION 3.07. Consents and Approvals; Absence of Violation or Conflicts . Neither the execution and delivery of this Agreement or any of the other Transaction Documents by Seller and the Selling Affiliates, nor the consummation by Seller and the Selling Affiliates of the Transactions nor compliance by Seller and the Selling Affiliates with any of the provisions hereof or thereof shall: (i) conflict with or result in any breach of any provisions of the respective certificate of incorporation, by-laws or similar organizational documents of Seller, the Transferred Companies or any of the Selling Affiliates; (ii) require any material consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, except (a) in connection with the Anti-Trust Filings and (b) any consent, approval, authorization or permit required to be obtained by Buyer or filing or notification required to be made by Buyer in order to take title to the Transferred Assets or otherwise operate the Business, which

32

consent, approval, authorization or permit is standard in transactions of the type contemplated hereby; (iii) violate in any material respect any Law applicable to Seller or the Transferred Assets; (iv) result in any material violation or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation, material modification or acceleration of any material obligation under any of the terms, conditions or provisions of any Material Transferred Contract or Material Distribution Contract or (v) result in the creation of any material Lien (other than Permitted Liens) upon any of the Transferred Assets, except, in the case of the foregoing clause (ii), where the failure to obtain any such consent, approval, authorization or permit, or to make such filing or notification, would not reasonably be expected, individually or in the aggregate, to adversely affect, in any material respect, the ability of Seller or any of the Selling Affiliates to perform their obligations under this Agreement or consummate the Transactions.

SECTION 3.08. Compliance with Laws; Licenses and Permits . (a) Seller's conduct of the Business and ownership and use of the Transferred Assets are, and since January 1, 2013, have been, in material compliance with all applicable Laws. Seller (or one of its Affiliates) has all material permits, approvals, registrations, licenses, grants, authorizations, exemptions, orders and consents with respect to the Business as it is now being conducted, each of which is valid and in full force and effect.

(b) This Section 3.08 does not relate to labor and employee matters, employee benefit matters or environmental matters, such items being the subject of Sections 3.12, 3.13 and 3.14, respectively. This Section 3.08 also does not relate to product registrations, product recalls or product defect matters or Taxes, such items being the subject of Section 3.17 and 3.18, respectively.

SECTION 3.09. Transferred Contracts and Material Contracts . (a)  Schedule 3.09(a) (i) to the Disclosure Letter sets forth all of the Material Transferred Contracts, Schedule 3.09(a)(ii) to the Disclosure Letter sets forth all of the Material Distribution Contracts and Schedule 3.09(a)(iii) to the Disclosure Letter sets forth all of the Material Commingled Contracts, in each case, as of the date of this Agreement.

(b) " Material Transferred Contracts " means (other than the Transferred IP Licenses and Collective Bargaining Agreements) each Transferred Contract:

(i) the performance of which is reasonably expected to involve annual payments on the part of Seller, any Selling Affiliate or any Transferred Company, or pursuant to which Seller, any Selling Affiliate or any Transferred Company reasonably expects to receive annual revenue in excess of one million dollars ($1,000,000) (excluding sales orders and purchase orders issued in the ordinary course of business);

(ii) with respect to a joint venture, partnership or other similar agreement;

(iii) which (A) limits or purports to limit the ability of Seller, any Selling Affiliate or any Transferred Company to compete in any line of business or with

33

any Person or in any geographic area or during any period of time or (B) contains exclusivity obligations or restrictions binding on Seller, any Selling Affiliate or any Transferred Company or that would be binding on Buyer or any of its Affiliates (including the Transferred Companies) after the Principal Closing, other than, in the case of each of clauses (A) and (B), customary exclusive distribution agreements for the Products entered into in the ordinary course of business consistent with past practice;

(iv) that contains any material indemnification rights or obligations, or credit support relating to such indemnification rights or obligations, other than any of such indemnification rights or obligations incurred in the ordinary course of business;

(v) that grants a Lien (other than a Permitted Lien) on any material Transferred Asset (other than a Lien that will be released as of the Applicable Closing Date);

(vi) that is a Transferred Real Property Lease;

(vii) that provides for the sale of any material Transferred Asset (other than sales of Inventory in the ordinary course of business) or the grant of any preferential rights (including most favored nation pricing provisions, a right of first offer or first refusal or any option) to purchase any material Transferred Asset, which Contract is valued at an amount in excess of two hundred fifty thousand dollars ($250,000);

(viii) under which (A) any Person has directly or indirectly guaranteed any liabilities or obligations of Seller or any Selling Affiliate or (B) Seller or any Selling Affiliate has guaranteed any liabilities or obligations of any other Person;

(ix) that is (A) a settlement or similar Contract with any Governmental Entity or (B) an order or consent of any Governmental Entity to which Seller, any Selling Affiliate or any Transferred Company is subject, involving material performance by Seller, such Selling Affiliate or such Transferred Company after the date of this Agreement;

(x) that provides for the manufacture of Products (or any part thereof) or the supply of raw materials or other components used in the manufacture of Products (or any part thereof), in each case excluding any sales orders and purchase orders in the ordinary course of business, for Seller, any Selling Affiliate or any Transferred Company; or

(xi) that is between Seller or any Selling Affiliate and the Notified Body or Notified Bodies in the European Union and Turkey.

(c) Except as set forth on Schedule 3.09(c) to the Disclosure Letter, (i) subject to bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally, each Material Transferred Contract and

34

Material Distribution Contract is valid, binding and in full force and effect with respect to Seller, the relevant Selling Affiliate or the relevant Transferred Company and, to the knowledge of Seller, each other party thereto and (ii) none of Seller, the relevant Selling Affiliate or the relevant Transferred Company is, or, as of the date of this Agreement, has received written notice alleging that it is, in material default or breach under any Material Transferred Contract or Material Distribution Contract. To the knowledge of Seller, as of the date of this Agreement, none of the other parties to any Material Transferred Contract or Material Distribution Contract is in material default thereunder. Seller has made available to Buyer a true and complete copy of each Material Transferred Contract and Material Distribution Contract (including all material modifications and amendments thereto and waivers thereunder) or form of Material Transferred Contract and Material Distribution Contract.

(d) " Material Commingled Contracts " means each Commingled Contract the performance of which is reasonably expected to involve, in each case solely with respect to the Business, annual payments on the part of Seller, any Selling Affiliate or any Transferred Company, or pursuant to which Seller, any Selling Affiliate or any Transferred Company reasonably expects to receive annual revenue in excess of one million dollars ($1,000,000) (excluding sales orders and purchase orders issued in the ordinary course of business).

SECTION 3.10. Intellectual Property Rights . (a) Except as set forth on Schedule 3.10(a)(i) to the Disclosure Letter, Seller, a Transferred Company or a Selling Affiliate is the sole and exclusive owner of all right, title and interest in and to the Transferred IP. Except as set forth on Schedule 3.10(a)(ii) to the Disclosure Letter, the Transferred IP contains all of the Trademarks used exclusively in the conduct of the Business, and all of the Patents and other material IP Rights under which the Business operates as conducted by Seller immediately prior to the date of this Agreement. The Patents included in the Transferred IP include all unexpired patents and pending patent applications worldwide that cover the Products, but not including any Excluded IP Rights. The Transferred IP comprises all of the IP Rights of Seller or any of its Affiliates that are necessary to operate the Business in all material respects as currently conducted.

(b) Except with respect to non-exclusive licenses granted to third parties in the ordinary course of business to the extent not material to the Business, agreements with suppliers, distributors or customers entered into in the ordinary course of business or as otherwise contemplated by this Agreement, and except for "shrink wrap," "commercially available off the shelf software package" or "click through" licenses, Schedule 3.10(b) to the Disclosure Letter lists, as of the date of this Agreement, all of the Contracts: (i) pursuant to which Seller and its Affiliates obtained the right to use or practice rights under third-party IP Rights (excluding Copyright rights) that are used primarily in and are material to the conduct of the Business, (ii) by which Seller or any of its Affiliates has licensed or otherwise authorized a third party to use any Transferred IP, (iii) otherwise granting or restricting the right to use Transferred IP and (iv) transferring, assigning or indemnifying with respect to the Transferred IP, including, in each case, license agreements, settlement agreements and covenants not to sue (collectively, the " Licensed IP Contracts "). Subject to bankruptcy, insolvency, reorganization, moratorium

35

or other similar Laws affecting or relating to creditors' rights generally, each Licensed IP Contract is valid, binding and in full force and effect with respect to Seller or the relevant Selling Affiliate and, to the knowledge of Seller, the other party thereto. Neither Seller nor the relevant Selling Affiliate is in material default under any Licensed IP Contract and to the knowledge of Seller, as of the date of this Agreement, none of the other parties to any Licensed IP Contract is in material default thereunder.

(c) Seller or its Affiliates have taken reasonable measures to protect the confidentiality of their respective trade secrets included in the Transferred IP. Seller or its Affiliates have used commercially reasonable efforts to maintain the secrecy of their respective confidential IP Rights currently used in the Business.

(d) Except as set forth on Schedule 3.10(d) to the Disclosure Letter, (i) to the knowledge of Seller, the Transferred Companies have not materially infringed on, and the operation of the Business as currently conducted does not materially infringe on, the IP Rights of any Person and (ii) there are no material adverse third-party actions or claims pending against Seller or any of its Affiliates by any Person in any court, arbitration or by or before any Governmental Entity, and since January 1, 2013, there have been no written third-party allegations, in any such case (A) to the effect that the operation or conduct of the Business constitutes a material infringement of the IP Rights of such Person or (B) challenging or seeking to deny or restrict in any material respect the rights of Seller or its Affiliates in the Transferred IP.

(e) Except as set forth on Schedule 3.10(e) to the Disclosure Letter, as of the date of this Agreement, there are no claims pending or, to the knowledge of Seller, threatened in writing by Seller or any of its Affiliates against any Person, nor has Seller or any of its Affiliates sent any written notice to any Person, regarding any actual or potential infringement, dilution, misappropriation or other unauthorized use in any material respect of any material Transferred IP.

(f) Except as set forth on Schedule 3.10(f) to the Disclosure Letter, Seller and its Affiliates have taken commercially reasonable measures to maintain the material Transferred IP under any applicable Law (including making and maintaining in full force and effect all necessary filings, registrations and issuances). To the knowledge of Seller, none of Seller, the Transferred Companies or the Selling Affiliates are using the material Transferred IP in a manner that would reasonably be expected to result in the cancellation or unenforceability of such Transferred IP (other than abandonments, expirations, cancellations and the like occurring in the ordinary course of business that are not material to the Business). The material Transferred IP is subsisting and, to the knowledge of Seller, valid and enforceable.

(g) No current or former employee, consultant or contractor of Seller or any of its Affiliates has any valid claim of ownership, in whole or in part, to the material Transferred IP or derivative works thereof, or has asserted in writing any such claim of ownership or right. All material Transferred IP that is owned (or purported to be owned) by Seller, any Transferred Company or any Selling Affiliate was (i) developed by employees of Seller, such Transferred Company or such Selling Affiliate within the

36

scope of their employment; or (ii) developed by independent contractors who have irrevocably assigned the entire right, title, and interest in and to such material Transferred IP to Seller, a Transferred Company and/or a Selling Affiliate pursuant to written agreements.

SECTION 3.11. Legal Proceedings, etc. (a) Except as set forth on Schedule 3.11(a) to the Disclosure Letter, (i) as of the date of this Agreement, there are no Business Claims pending or, to the knowledge of Seller, threatened in writing, against Seller or any of its Affiliates with respect to which liability is reasonably anticipated to exceed one hundred and fifty thousand dollars ($150,000) and (ii) as of the Principal Closing Date, there are no material Business Claims pending or, to the knowledge of Seller, threatened in writing, against Seller or any of its Affiliates.

(b) This Section 3.11 does not relate to intellectual property matters, labor and employee matters, employee benefit matters or environmental matters, such items being the subject of Sections 3.10, 3.12, 3.13 and 3.14, respectively. This Section 3.11 also does not relate to product registrations, product recalls or product defect matters, or Taxes, such items being the subject of Sections 3.17 and 3.18, respectively.

SECTION 3.12. Labor and Employee Matters . (a)  Schedule 3.12(a) to the Disclosure Letter contains a complete and accurate list, as of the date of this Agreement, of each collective bargaining, works council or other material labor union contract or labor arrangement covering any Employee of the Business located in the Major Market Countries, excluding any national or industry contract or arrangement (the " Major Market CBAs "). True and complete copies of all Major Market CBAs have been made available in the Data Room. As soon as practicable after the date of this Agreement and in no event later than thirty (30) days prior to the Principal Closing Date, Seller shall provide Buyer a revised Schedule 3.12(a) to the Disclosure Letter, which shall list, as of the date of this Agreement, each collective bargaining, works council or other material labor union contract or labor arrangement covering any Employee of the Business, excluding any national or industry contract or arrangement (the " Collective Bargaining Agreements "), and true and complete copies of all Collective Bargaining Agreements will be made available in the Data Room at least thirty (30) days prior to the Principal Closing Date. As of the date of this Agreement, no other union or labor organization is currently certified or recognized and, there are no ongoing, pending (for which Seller has received notice) or, to the knowledge of Seller, threatened strikes, material work stoppages, material requests for representation, material pickets or material walkouts that involve the labor or employment relations of Seller and its Affiliates with any Employee of the Business. As of the date of this Agreement, there is no material unfair labor practice, charge or complaint ongoing, pending (for which Seller has received notice), unresolved or, to the knowledge of Seller, threatened before any court, arbitrator, the National Labor Relations Board or any other Governmental Entity relating to any Employee of the Business.

(b) With respect to the Employees of the Business, each of Seller and its Affiliates is in material compliance with the terms of the Collective Bargaining Agreements and all applicable Laws pertaining to employment, employment practices

and the employment of labor, including all such Laws relating to employment agreements, labor relations, employee Personal Information, equal employment opportunities, fair employment practices, prohibited discrimination or distinction, consultation and/or information, wages, hours, working time, safety and health and workers' compensation.

SECTION 3.13. Employee Plans . (a)  Schedule 3.13(a) to the Disclosure Letter lists, as of the date of this Agreement, each material Business Employee Benefit Plan (excluding any offer letter or employment agreement required by applicable Law or any Collective Bargaining Agreement) in which any Employee of the Business located in the Major Market Countries is entitled to participate or to which he or she is a party (the " Major Market Plans ") and each such Major Market Plan that is an Assumed Benefit Plan sponsored by a Transferred Company is identified with an asterisk on Schedule 3.13(a) to the Disclosure Letter. As soon as practicable after the date hereof and in no event later than thirty (30) days prior to the Principal Closing Date, Seller shall provide Buyer a revised Schedule 3.13(a) to the Disclosure Letter, which shall list, as of the date such revised Schedule 3.13(a) to the Disclosure Letter is provided, each Business Employee Benefit Plan (other than any offer letter or employment agreement required by applicable Law or by any Collective Bargaining Agreement) (the " Listed Plans ") in which any Employee of the Business is entitled to participate or to which he or she is a party, and such revised Schedule 3.13(a) to the Disclosure Letter shall identify with an asterisk each Listed Plan that is an Assumed Benefit Plan sponsored by a Transferred Company.

(b) With respect to each Major Market Plan that is an equity-based compensation plan in the United States, true and complete copies have been filed with the SEC as of the date of this Agreement. With respect to each Major Market Plan that is a defined benefit pension or retiree medical benefit plan in the United States, a summary of material terms thereof has been made available in the Data Room as of the date of this Agreement. Except as set forth in this Section 3.13(b), (i) with respect to each Major Market Plan, true and complete copies of all plan documents (including all amendments and modifications thereof) or a summary of material terms thereof, or a form or sample of each material employment agreement (including an actual copy of any such agreement that contains material individualized terms, other than, for the avoidance of doubt, terms with respect to information covered by Section 8.01(b) or employee names or addresses) have been made available in the Data Room as of the date of this Agreement; (ii) with respect to each Listed Plan other than any equity based compensation, defined benefit pension or retiree medical benefit plan in the United States, true and complete copies of all plan documents (including amendments and modifications thereof) or a summary of material terms thereof, or a form or sample of each material employment agreement (including an actual copy of any such agreement that contains material individualized terms, other than, for the avoidance of doubt, terms with respect to information covered by Section 8.01(b) or employee names or addresses), shall have been made available in the Data Room as soon as practicable after the date hereof and in no event later than thirty (30) days prior to the Principal Closing Date; (iii) with respect to each Assumed Benefit Plan sponsored by a Transferring Company, each writing constituting a part of such Assumed Benefit Plan, or, with respect to any such plan in a jurisdiction outside of the United States in which formal plan documents are not customary, a summary of the

material terms of such plan, shall have been made available in the Data Room as of the Date of this Agreement; (iv) with respect to any Assumed Benefit Plan that provides defined benefit pension or retiree medical benefits, a good faith estimate of the accumulated benefit obligation or accumulated postretirement benefit obligation of such Assumed Benefit Plan, as applicable, with respect to liabilities that, to the knowledge of Seller, may become obligations of Buyer and its Affiliates, shall have been delivered to Buyer as of the date of this Agreement; and (v) with respect to any Assumed Benefit Plan described in the preceding clause (iv) that is funded, a good faith estimate of the value of the assets of such plan that, to the knowledge of Seller, may transfer to Buyer pursuant to Annex 2.02(a)(xii), shall have been delivered to Buyer as of the date of this Agreement.

(c) There does not now exist, nor do any circumstances exist that could reasonably be expected to result in, any Controlled Group Liability that could be a liability of Buyer and its Affiliates following the Closing in respect of any employee benefit plan maintained or contributed to by Seller and its Affiliates and that is not an Assumed Benefit Plan.

(d) Each Assumed Benefit Plan (and each related trust, insurance contract or fund) (i) has been maintained, contributed to, funded, operated and administered in all material respects in accordance with the terms of such Assumed Benefit Plan and in accordance in all material respects with ERISA, the Code and any other applicable Law, (ii) if intended to qualify for special Tax treatment, meets in all material respects all requirements for such treatment and (iii) if intended to be funded and/or book-reserved, is fully funded and/or book reserved, as appropriate, based upon reasonable actuarial assumptions and as required by applicable Law. There are no material pending or threatened claims (other than claims for benefits in the ordinary course), lawsuits or arbitrations that have been asserted in respect of Assumed Benefit Plans that could reasonably be expected to result in any material liability to any Governmental Entity, any participant in any Assumed Benefit Plan or any other party.

(e) Neither the execution of this Agreement nor the consummation of the Transactions (whether alone or together with any other events) will, subject to Buyer's compliance with its obligations under Section 8.01 of this Agreement, result in or cause the accelerated vesting, funding or delivery of or increase the amount of any, payment or benefit to any Employee of the Business, in each case, except for arrangements relating to the exercise by an Employee of the Business of any rights under applicable Law (including any right to object to a mandatory transfer of employment to Buyer or any of its Affiliates and any right to reject an offer of employment from Buyer or any of its Affiliates). No amount paid or payable (whether in the form of cash, property or other benefits) by Seller in connection with the Transactions hereby (whether alone or together with any other events) will be an "excess parachute payment" within the meaning of Section 280G of the Code.

SECTION 3.14. Environmental Matters .

(a) Seller and its Affiliates, with respect to the Business, (i) are and, since January 1, 2013, have been, in compliance in all material respects with Environmental

Laws; (ii) have not received any written or, to the knowledge of Seller, oral communication from any Person alleging that Seller or any of its Affiliates is in material violation of or has any material liability arising under any Environmental Law, except to the extent the substance of any such communication has been materially resolved; (iii) have obtained, or have timely applied for, all material approvals and permits required under Environmental Laws to conduct the Business as conducted as of the date of this Agreement (" Environmental Permits "); (iv) are, and since January 1, 2013, have been, in material compliance with all terms and conditions of such Environmental Permits; (v) to the knowledge of Seller, have not Released any Hazardous Materials at any Transferred Real Property that require material remediation under any Environmental Law; and (vi) are not subject to any pending or, to the knowledge of Seller, threatened, material Environmental Claim against Seller, its Affiliates or any Person whose liability Seller has retained or assumed either contractually or by operation of Law.

(b) To the knowledge of Seller, none of the following are present at any of the Transferred Real Property in a manner or to an extent that would result in a material liability under Environmental Law: (i) underground storage tanks containing, or landfills used for the disposal of, Hazardous Materials; (ii) wetlands that have been filled in by Seller; (iii) "toxic mold"; or (iv) asbestos-containing building materials.

(c) Seller has provided materially true and accurate copies of all material Phase I and Phase II environmental site assessment reports completed during, and material Seller annual environmental, health and safety compliance management action plans for each of, the five (5) years prior to the date hereof with respect to the Transferred Real Properties that are in Seller's or its Affiliates' possession or control.

(d) Notwithstanding any provision to the contrary, this Section 3.14 shall constitute the sole representations and warranties with respect to environmental matters.

SECTION 3.15. Absence of Certain Developments . Except as set forth on Schedule 3.15 to the Disclosure Letter, from December 28, 2014 to the date of this Agreement, (a) the Business has been operated in the ordinary course of business consistent with past practice in all material respects, (b) there have not been any effects, events, occurrences, circumstances or changes that, individually or in the aggregate, have resulted or would reasonably be expected to result in a Material Adverse Effect and (c) there has not been any action taken by Seller or its Affiliates that, if taken during the period from the date of this Agreement through the applicable Closing Date without Buyer's consent, would constitute a breach of clauses (iv)-(ix), (xi), (xiii) and (xiv) (insofar as it relates to clauses (iv)-(ix), (xi) and (xiii)) of Section 6.01(b).

SECTION 3.16. Brokerage Fees . There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Transactions based on any arrangement or agreement made by or on behalf of Seller or any Selling Affiliate.

SECTION 3.17. Product Registrations; Recalls . (a)  Schedule 3.17(a) to the Disclosure Letter sets forth, as of the date of this Agreement, a list of the marketing

40

approvals, clearances or other authorizations used to market the Products and granted or pending with any Governmental Entity (the " Product Registrations "), except for those approvals, clearances and authorizations that are not material to the Business.

(b) Seller has exclusive ownership, or has obtained beneficial use, of all material Product Registrations, and all such Product Registrations are and, to the extent freely transferrable by Seller, will be immediately after the Applicable Closing, valid and in full force and effect. No proceedings are (i) pending against Seller or, to the knowledge of Seller, against any third-party holding a Product Registration, or (ii) to the knowledge of Seller, threatened in writing to revoke, suspend, or modify in any material respect any Product Registration, other than in the case of clauses (i) and (ii) those that would not be material to the Business. To the knowledge of Seller, there is no false, misleading or unreliable data or information or material omission in any Product Registration.

(c) Since January 1, 2013, there has not been conducted or requested in writing, nor, to the knowledge of Seller, is there any current consideration by Seller or any Governmental Entity of, any material recall in respect of any Product, except as set forth on Schedule 3.17(c) to the Disclosure Letter.

(d) Except for ordinary course inquiries by Governmental Entities or as set forth on Schedule 3.17(d) to the Disclosure Letter, there are not presently pending, or, to the knowledge of Seller, threatened in writing, (i) any Product Claims as of the date of this Agreement, with respect to which liability is reasonably anticipated to exceed one hundred fifty thousand dollars ($150,000) or (ii) as of the Principal Closing Date, any material Product Claims. No Product is (i) adulterated within the meaning of 21 U.S.C. § 351, (ii) misbranded within the meaning of 21 U.S.C. § 352 or (iii) in violation of 21 U.S.C. §§ 360 or 360e, in each case as would be a material violation of applicable Law.

SECTION 3.18. Taxes .

(a) All material Tax Returns that are required to be filed by or on behalf of each Transferred Company have been filed (taking into account any applicable extensions). All such Tax Returns were correct and complete in all material respects and were prepared and filed in material compliance with all applicable Laws.

(b) All material Taxes of, or required to be paid by, each Transferred Company have been paid, except for Taxes being contested in good faith through appropriate proceedings and for which adequate reserves have been established in the accounting books and records prior to the date hereof.

(c) There are no Liens for a material amount of Taxes upon any of the Transferred Assets or any other assets of the Business, except for Permitted Liens.

(d) For purposes of the election under Section 338(h)(10) of the Code, Cordis Corporation is a member of the consolidated group of which Johnson & Johnson is the common parent. Neither Seller nor any Stock Selling Affiliates has taken or agreed to take any action or is aware of any fact or circumstances that would prevent or impede, or could reasonably be expected to prevent or impede, the making of the Section 338(h)(10) Election with respect to Cordis Corporation.

41

(e) No Transferred Company is the subject of a Tax audit, examination or other proceeding with respect to material Taxes, and no such audit, examination or other proceeding has been threatened in writing.

(f) There are no outstanding agreements or consents extending or waiving (or having the effect of extending or waiving) the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, material Taxes due from any Transferred Company for any taxable period and no request for any such waiver or extension is currently pending.

(g) No Transferred Company (i) is a party to, bound by, or obligated under any Tax sharing, allocation or similar agreement or arrangement, (ii) is or was a member of any affiliated, consolidated, combined, unitary or other group for Tax purposes (other than any such group the common parent of which is Johnson & Johnson, Cordis Corporation or any of their Subsidiaries), (iii) has any material liability for Taxes of any Person (other than a Transferred Company) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Tax Law), as transferee, successor or otherwise or (iv) is subject to any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non-U.S. Tax Law), private letter ruling, or other written agreement with a Taxing Authority regarding Taxes or Tax matters.

(h) No Transferred Company has participated in a "listed transaction," as such term is defined in Treasury Regulations Section 1.6011-4 (b)(2).

(i) All material Taxes which each Transferred Company is obligated to withhold from amounts owing to any employee, creditor, shareholder, related party, third party or other Person have been duly and timely withheld and paid over to the relevant Taxing Authority.

(j) No claim has been made by any Taxing Authority in a jurisdiction where any Transferred Company has not filed a Tax Return that it is or may be subject to Tax by such jurisdiction. No Transferred Company is or has been subject to Tax in any foreign jurisdiction other than its place of incorporation by virtue of having a permanent establishment or other place of business or taxable presence in that jurisdiction.

(k) Since December 31, 2010, no Transferred Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(l) No Transferred Company will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) that begins after the Applicable Closing Date as a result of (i) any change in method of accounting for a taxable period ending on or before

42

the Applicable Closing Date, (ii) installment sale or open transaction disposition, intercompany transaction or intercompany account made or existing on or before the Applicable Closing Date, (iii) prepaid amount received on or prior to the Applicable Closing Date, (iv) "closing agreement" within the meaning of Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. Tax Law) executed on or before the Applicable Closing Date or (v) election pursuant to Section 108(i) of the Code (or any similar provision of state, local or foreign Tax Law).

(m) No net operating loss or other Tax attribute of any Transferred Company is subject to limitation under Section 382 of the Code or any similar provision of applicable Tax law.

(n) Each of the Transferred Companies is classified, and has at all times since the date of its formation been classified, as an association taxable as a corporation for U.S. federal, state and local income Tax purposes. Neither the Transferred Assets nor any assets owned by the Transferred Companies include any asset treated for federal income Tax purposes as an equity interest in any Person.

(o) Neither the Tax treatment of Buyer nor any of its Affiliates (including the Transferred Companies) will be impacted by the occurrence or failure to occur of the transaction described in Section 2.02(i), including, without limitation, the adjustment of the Tax bases of the Transferred Assets relating to Japan to their fair market value, provided that this Section 3.18(o) shall not apply to any depreciation or amortization deductions that would otherwise have arisen during the period between the closing of the transaction described in Section 2.02(i) and the relevant Applicable Closing Date.

(p) None of the Non-U.S. Selling Affiliates are transferring U.S. real property interests as defined in Section 897(c) of the Code.

SECTION 3.19. Certain Compliance Matters . (a) Neither Seller nor any Affiliate, director, officer or employee, nor, to the knowledge of Seller, any distributor, agent, representative, sales intermediary or other third party acting on behalf of Seller or any of its Affiliates, in any way relating to the Business, the Transferred Companies or the Transferred Assets: (i) has taken any action in material violation of any applicable anticorruption Law, including the U.S. Foreign Corrupt Practices Act (" FCPA ") (15 U.S.C. § 78 dd-1 et seq.) or (ii) has corruptly offered, paid, given, promised to pay or give or authorized the payment or gift of anything of value, directly or indirectly, to any "Public Official," as defined in this Section 3.19(b), for purposes of (A) influencing any act or decision of any Public Official in his official capacity; (B) inducing such Public Official to do or omit to do any act in violation of his lawful duty; (C) securing any improper advantage; or (D) inducing such Public Official to use his or her influence with a government, Governmental Entity, or commercial enterprise owned or controlled by any government (including state-owned or controlled medical facilities), in order to assist the Business or any Person related in any way to the Business, the Transferred Companies or the Transferred Assets, in obtaining or retaining business or directing any business to any Person, in each case, as would be a material violation of applicable Law.

43

(b) For purposes of this Section 3.19, " Public Official " means: (i) any officer, employee or representative of any regional, federal, state, provincial, county or municipal government or government department, agency, or other division; (ii) any officer, employee or representative of any commercial enterprise that is owned or controlled, or partially owned or controlled, by a government, including any state-owned or controlled medical facility; (iii) any officer, employee or representative of any public international organization, such as the African Union, the International Monetary Fund, the United Nations or the World Bank; (iv) any person acting in an official capacity for any government or government entity, enterprise, or organization identified above; and (v) any political party, party official or candidate for political office.

(c) None of Seller or any Selling Affiliate, nor, to the knowledge of Seller, any of their respective officers or directors, (i) appears on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury; (ii) is otherwise a party with whom, or has its principal place of business or the majority of its business operations (measured by revenues) located in a country in which, transactions are prohibited by (A) United States Executive Order 13224, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism (B) the United States Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, (C) the United States Trading with the Enemy Act of 1917, as amended, (D) the United States International Emergency Economic Powers Act of 1977, as amended or (E) the foreign asset control regulations of the United States Department of the Treasury; (iii) has been convicted of or charged with a felony relating to money laundering; or (iv) to the knowledge of Seller, is under investigation by any Governmental Entity for money laundering.

(d) Seller and its Affiliates maintain auditing and monitoring processes and systems of internal controls as part of their healthcare compliance program that are reasonably adequate to ensure compliance by the Business with all Laws pertaining to the FCPA, anti-corruption, and healthcare fraud and abuse, including the anti-kickback provisions of the Medicare and Medicaid Law, 42 U.S.C. § 1320a-7b, as amended, the Federal Physician Self-Referral Act, 42 U.S.C. § 1395nn, as amended, the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, and the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, as amended.

(e) Seller and its Affiliates maintain global trade compliance and operations processes and systems of internal controls as part of their compliance and logistics programs that are reasonably adequate to ensure compliance by the Business with all Laws pertaining to import and export matters, including those administered by U.S. Customs and Border Protection, U.S. Bureau of Industry and Security, U.S. Treasury, U.S. FDA and other comparable government agencies in all jurisdictions in which the Business operates global trade compliance and operations activities.

(f) To the extent related to the Business, to the knowledge of Seller, none of the current employees or suppliers of Seller or its Affiliates are debarred or suspended, or threatened in writing with debarment or suspension for the award of contract by any Governmental Entity or for participation in governmental healthcare programs such as Medicare or Medicaid.

44

SECTION 3.20. <u>Information Technology</u> . (a) Seller, the applicable Selling Affiliate or the applicable Transferred Company is the exclusive owner or is validly licensed or otherwise authorized to use the Transferred IT; and (b) since January 1, 2013, there have been no material security breaches or data loss pertaining to the Transferred IT.

SECTION 3.21. <u>Significant Distributors; Significant Suppliers</u> . (a) <u>Schedule 3.21</u> to the Disclosure Letter lists the names of each of the ten (10) most significant distributors of the Business (measured by dollar volume) for the twelve (12)-month period ended December 28, 2014 (the " <u>Significant Distributors</u> "). As of the date hereof, none of the Significant Distributors has terminated its relationship with Seller, the applicable Selling Affiliate or the applicable Transferred Company. As of the date hereof, none of Seller, any Selling Affiliate or any Transferred Company has received any written notice that any Significant Distributor has ceased or will cease to act as a distributor of the Business or that such Significant Distributor intends to terminate or materially modify existing Contracts with Seller, any Selling Affiliate or any Transferred Company.

(b) <u>Schedule 3.21(b)</u> to the Disclosure Letter lists the names of each of the ten (10) most significant suppliers of the Business (measured by dollar volume) for the twelve (12)-month period ended December 28, 2014 (the " <u>Significant Suppliers</u> "). As of the date hereof, none of the Significant Suppliers has terminated its relationship with Seller, the applicable Selling Affiliate or the applicable Transferred Company. As of the date hereof, none of Seller, any Selling Affiliate or any Transferred Company has received any written notice that any Significant Supplier has ceased or will cease to act as a supplier of the Business or that such Significant Supplier intends to terminate or materially modify existing Contracts with Seller, any Selling Affiliate or any Transferred Company.

ARTICLE IV

Representations and Warranties of Buyer

Buyer represents and warrants to Seller as follows:

SECTION 4.01. <u>Buyer's Organization; Power; Execution</u> . Buyer and each Affiliate of Buyer that is a party to any Transaction Document are legal entities duly organized, validly existing and in good standing (where such concept is recognized in the relevant jurisdiction) under the Laws of their respective jurisdictions of incorporation or formation. Buyer has full power and authority to execute and deliver this Agreement and the Final Binding Offer Letter and to carry out, or cause to be carried out, the transactions contemplated hereby and thereby. Buyer and each Affiliate of Buyer that is a party to any Transaction Document (other than this Agreement and the Final Binding Offer Letter) have, or will have at the Applicable Closing, full power and authority to execute

45

and deliver each Transaction Document (other than this Agreement and the Final Binding Offer Letter) to which it is or will be a party and to carry out, or cause to be carried out, the transactions contemplated by each of the Transaction Documents (other than this Agreement and the Final Binding Offer Letter) to which it is or will be a party. This Agreement and the Final Binding Offer Letter have been duly authorized by all necessary action on the part of Buyer and have been duly executed and delivered by Buyer and constitute valid and legally binding obligations of Buyer in accordance with their terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (b) the availability of injunctive relief and other equitable remedies. Each of the Transaction Documents (other than this Agreement and the Final Binding Offer Letter) has been duly authorized by all necessary action on the part of Buyer and each Affiliate of Buyer that is a party to any Transaction Document (other than this Agreement and the Final Binding Offer Letter) and has been, or will be at the Applicable Closing, duly executed and delivered by Buyer and each such Affiliate of Buyer and constitutes or will constitute a valid and legally binding obligation of Buyer and each such Affiliate of Buyer in accordance with its terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (b) the availability of injunctive relief and other equitable remedies.

SECTION 4.02. <u>Consents and Approvals; Absence of Violation or Conflicts</u> . Neither the execution and delivery of this Agreement or any of the other Transaction Documents by Buyer and each Affiliate of Buyer that is a party to any Transaction Document, nor the consummation by Buyer and each Affiliate of Buyer that is a party to any Transaction Document of the Transactions nor compliance by Buyer and each Affiliate of Buyer that is a party to any Transaction Document with any of the provisions hereof or thereof, shall: (i) conflict with or result in any breach of any provisions of the respective certificate of incorporation, by-laws or similar organizational documents; (ii) require any material consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, except (a) in connection with the Anti-Trust Filings and (b) any consent, approval, authorization or permit required to be obtained by Seller or filing or notification required to be made by Seller in order to transfer title to the Transferred Assets or otherwise operate the Business, which consent, approval, authorization or permit is standard in transactions of the type contemplated hereby; (iii) violate in any material respect any Law applicable to Buyer or any Affiliate of Buyer that is a party to any Transaction Document; or (iv) require any material consent, approval, authorization, or permit under any contract, agreement or commitment between Buyer or any Affiliate of Buyer that is a party to any Transaction Document and a third party, except, in the case of the foregoing clause (ii), where the failure to obtain any such consent, approval, authorization or permit, or to make such filing or notification, would not reasonably be expected, individually or in the aggregate, to adversely affect, in any material respect, the ability of Buyer to perform its obligations under this Agreement or consummate the Transactions.

SECTION 4.03. <u>Litigation</u> . As of the date hereof, there are no actions, suits, proceedings, claims or investigations pending or, to the knowledge of Buyer, threatened in writing concerning Buyer or any of its Affiliates relating to the Transactions.

46

SECTION 4.04. <u>Sufficient Funds</u> . As of immediately prior to or substantially simultaneously with the Principal Closing, Buyer will have sufficient funds to (a) satisfy all of Buyer's obligations under this Agreement, including the obligations under Article II, (b) pay any other amounts required to be paid by Buyer in connection with the consummation of the Transactions and (c) pay all related fees and expenses of Buyer.

SECTION 4.05. <u>Brokerage Fees</u> . Except for fees payable to Goldman, Sachs & Co. (which fees are payable by Buyer), there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Transactions based on any arrangement or agreement made by or on behalf of Buyer or any Affiliate thereof.

ARTICLE V

Conditions to Closing

SECTION 5.01. <u>Conditions Precedent to Buyer's Obligations on the Principal Closing Date</u> . All of the obligations of Buyer hereunder are subject to fulfillment, prior to or at the Principal Closing, of the following conditions (compliance with which or the occurrence of which may be waived, to the extent permitted by applicable Law, in whole or in part by Buyer in writing):

(a) The representations and warranties of Seller contained herein (other than the representations and warranties of Seller set forth in Sections 3.01 (Organization and Good Standing), 3.02 (Authority), 3.03(b) (Title to Transferred Equity Interests), 3.15(b) (Absence of Certain Developments) and 3.16 (Brokerage Fees)) shall be true and correct (without giving effect to any references to "material," "materially," "Material Adverse Effect," "material adverse effect" or other similar materiality qualifications contained or incorporated in any such representation or warranty) on and as of the Principal Closing Date (other than representations and warranties made as of a specified date, which shall be true and correct as of the date specified), except for such failures to be true and correct that do not, individually or in the aggregate, have a Material Adverse Effect. Each of the representations and warranties of Seller set forth in Sections 3.01 (Organization and Good Standing), 3.02 (Authority), 3.03(b) (Title to Transferred Equity Interests) and 3.16 (Brokerage Fees) shall be true and correct in all material respects on and as of the Principal Closing Date (other than representations and warranties made as of a specified date, which shall be true and correct as of the date specified). The representation and warranty of Seller set forth in Section 3.15 (b) (Absence of Certain Developments) shall be true and correct on and as of the Principal Closing Date.

47

(b) Seller shall have performed and complied in all material respects with all the terms, provisions and conditions of this Agreement and the other Transaction Documents to be complied with and performed by Seller at or before the Principal Closing.

(c) Seller shall have delivered to Buyer a certificate dated the Principal Closing Date and executed by an authorized officer of Seller to the effect that each of the conditions specified in Sections 5.01(a), (b) and (g) is satisfied in all respects.

(d) Seller shall have delivered to Buyer a certificate of a secretary or other authorized signatory of Seller enclosing a copy of (i) its certified certificate of incorporation, (ii) its by-laws and (iii) board of directors resolutions authorizing Seller to enter into this Agreement and the other Transaction Documents and to consummate the Transactions.

(e) No Law enacted, entered, promulgated, enforced or issued by any Governmental Entity or other legal restraint or prohibition preventing the consummation of any of the Transactions with respect to the Principal Country Units (each, a " Principal Closing Legal Impediment ") shall be in effect.

(f) All Anti-Trust Approvals in the jurisdictions specified on Schedule 5.01(f) to the Disclosure Letter shall have been obtained.

(g) Since the date of this Agreement there has not been a Material Adverse Effect.

(h) Seller shall have signed and delivered, or caused one or more of its Affiliates, to sign and deliver the Ancillary Agreements contemplated under Section 7.09.

(i) The actions set forth in Section 2.08(a) shall have been completed.

(j) Either (i) the Product Registrations used to market the Products in the Principal Country Units shall have transferred to, or shall have been approved in writing by the applicable Governmental Entity for transfer to, Buyer or its designee or (ii) Buyer or its designee otherwise shall have either (A) acceded to Seller's rights in respect of marketing such Products under such Product Registrations, including by Seller designating Buyer or its designee as an authorized agent with respect to such Products, or (B) been designated as a sales or distribution agent with respect to the Products in the Principal Country Units, in the case of this clause (ii), pursuant to reasonable, lawful and customary arrangements to effectuate the foregoing.

SECTION 5.02. Conditions Precedent to Seller's Obligations on the Principal Closing Date . All of the obligations of Seller hereunder are subject to the fulfillment, prior to or at the Principal Closing, of the following conditions (compliance with which or the occurrence of which may be waived, to the extent permitted by applicable Law, in whole or in part by Seller in writing):

48

(a) The representations and warranties of Buyer contained herein (other than the Buyer Fundamental Representations) shall be true and correct (without giving effect to any references to "material", "materially" or other similar materiality qualifications contained or incorporated in any such representation or warranty) on and as of the Principal Closing Date (other than representations and warranties made as of a specified date, which shall be true and correct as of the date specified), except for such failures to be true and correct that do not, individually or in the aggregate, have a material adverse effect on the ability of Buyer and its Affiliates to perform their obligations under this Agreement or to consummate the Transactions. Each of the representations and warranties of Buyer set forth in Sections 4.01 (Buyer's Organization; Power; Execution) and 4.05 (Brokerage Fees) (collectively, the " Buyer Fundamental Representations ") shall be true and correct in all material respects on and as of the Principal Closing Date (other than representations and warranties made as of a specified date, which shall be true and correct as of the date specified).

(b) Buyer shall have performed and complied in all material respects with all the terms, provisions and conditions of this Agreement and the other Transaction Documents to be complied with and performed by Buyer at or before the Principal Closing.

(c) Buyer shall have delivered to Seller a certificate dated the Principal Closing Date and executed by an authorized officer of Buyer to the effect that each of the conditions specified above in Sections 5.02(a) and (b) is satisfied in all respects.

(d) Buyer shall have delivered to Seller a certificate of a secretary or other authorized signatory of Buyer enclosing a copy of (i) its certified certificate of incorporation, (ii) its by-laws and (iii) board of directors resolutions authorizing Buyer to enter into this Agreement and the other Transaction Documents and to consummate the Transactions, or the equivalent of the documents referred to in clauses (i), (ii) and (iii) above under applicable Law governing Buyer.

(e) No Principal Closing Legal Impediment shall be in effect.

(f) All Anti-Trust Approvals in the jurisdictions specified on Schedule 5.01(f) to the Disclosure Letter shall have been obtained.

(g) Buyer shall have signed and delivered, or caused one or more of its Affiliates to sign and deliver, the Ancillary Agreements contemplated under Section 7.09.

(h) The actions set forth in Section 2.09(a) shall have been completed.

49

SECTION 5.03. <u>Conditions Precedent to Seller's and Buyer's Obligations on a Non-Principal Country Unit Closing Date</u>. All of the respective obligations of Seller and Buyer hereunder with respect to each Non-Principal Country Unit Closing are subject to the fulfillment, prior to or at such Non-Principal Country Unit Closing, of the following conditions (compliance with which or the occurrence of which may be waived, to the extent permitted by applicable Law, in whole or in part by the applicable party in writing):

(a) The Principal Closing shall have occurred.

(b) No Law enacted, entered, promulgated, enforced or issued by any Governmental Entity or other legal restraint or prohibition preventing the consummation of any of the Transactions with respect to such Non-Principal Country Unit (each, a " <u>Non-Principal Closing Legal Impediment</u> ") shall be in effect.

(c) Either (i) the Product Registrations used to market the Products in such Non-Principal Country Unit shall have transferred to, or shall have been approved in writing by the applicable Governmental Entity for transfer to Buyer or its designee or (ii) Buyer or its designee otherwise shall have either (A) acceded to Seller's rights in respect of marketing such Products under such Product Registrations, including by Seller designating Buyer or its designee as an authorized agent with respect to such Products, or (B) been designated as a sales or distribution agent with respect to the Products in such Non-Principal Country Unit, in the case of this clause (ii), pursuant to reasonable, lawful and customary arrangements to effectuate the foregoing.

(d) The actions set forth in Sections 2.08(b) and 2.09(b) with respect to such Non-Principal Country Unit Closing shall have been completed.

ARTICLE VI

<u>Certain Covenants</u>

During the period from the date of this Agreement to the Applicable Closing Date:

SECTION 6.01. <u>Conduct of Business</u> . (a) Except as otherwise permitted by this Agreement or consented to by Buyer in writing, Seller agrees to (and to cause the Selling Affiliates and Transferred Companies to) use commercially reasonable efforts to run the Business in the ordinary course consistent with past practice and to:

(i) preserve the business relationships of the Business and keep available the services of its key employees and maintain its relations and goodwill with its key suppliers, customers, employees and others having business relationships with the Business other than in connection with the termination or winding up of any business in respect of the Excluded Jurisdictions;

50

(ii) maintain in effect all IP Rights included in the Transferred IP and material applications and registrations for Trademarks and Patents included in the Transferred IP (other than (A) as set forth on Schedule 3.10(f) to the Disclosure Letter and (B) abandonments, expirations, cancellations and the like occurring in the ordinary course of business that are not material, individually or in the aggregate, to the Business); and

(iii) maintain all material structures, equipment and other tangible personal property of the Business in their present repair, order and condition, except for depletion and wear and tear occurring in the ordinary course of business.

Without limiting the foregoing, from the Principal Closing Date through the applicable Non-Principal Country Unit Closing, Seller agrees to (and to cause the applicable Selling Affiliates) use commercially reasonable efforts to run (x) the Business in the applicable Non-Principal Country Unit in the ordinary course consistent with past practice (including devoting similar resources to so run the Business consistent with past practice) other than in connection with the termination or winding up of any business in respect of the Excluded Jurisdictions and in compliance with the specific restrictions set forth in Section 6.01(b) and (y) reasonably consult with Buyer in good faith (through the Coordinators (as defined in the Transition Services Agreement)), in connection with the operation of the Business in such Non-Principal Country Unit.

(b) Except as set forth in Schedule 6.01(b) to the Disclosure Letter, as required by applicable Law or as otherwise expressly required by the terms of this Agreement, Seller will not, and shall cause the Selling Affiliates and the Transferred Companies to not, without the prior written consent of Buyer (which consent shall not be unreasonably withheld) and to the extent primarily related to the Business or with respect to any Transferred Asset, any Transferred Company or any Assumed Liability (but excluding any Excluded Asset or Excluded Liability):

(i) (A) adopt, grant, extend, amend, vary, terminate or materially increase the rate or terms of any Business Employee Benefit Plan, bonus, insurance, pension or other employee benefit plan, payment or arrangement made to, for or with any employee who is expected to be an Employee of the Business, or (B) increase the compensation or employee benefits of any such individual, except, in each case, (1) as required by any applicable Law or any Collective Bargaining Agreement, (2) as contemplated in Section 8.01 of this Agreement, (3) as may be initiated by Seller or one or more of Seller's Affiliates (other than the Transferred Companies) with respect to their employees generally in the applicable jurisdiction or geographic location (so long as the action is designed to apply uniformly to eligible Employees of the Business and a material number of eligible similarly situated other employees of Seller or its applicable Affiliate) and (4) arrangements that will not result in any liability under this Agreement or otherwise to Buyer or its Affiliates (including any retention or similar arrangements that will be paid solely by Seller);

51

(ii) enter into or materially amend any Collective Bargaining Agreement or other agreement with a labor union, works council or similar organization covering any Employee of the Business, except, in each case, (A) as required by any applicable Law or any Collective Bargaining Agreement as in effect on the date of this Agreement (or as modified as contemplated in this Agreement) or (B) where such agreement or amendment of any Collective Bargaining Agreement applies uniformly to a material number of eligible similarly situated employees of Seller or any of its Affiliates other than the Employees of the Business;

(iii) except as required by applicable Law, or as reasonably necessary to avoid a violation of applicable Law, transfer internally (including in response to a request for transfer by an employee), or otherwise alter the duties and responsibilities of, any employee of Seller and its Affiliates in a manner that would affect whether such employee is or is not classified as an Employee of the Business, other than (A) in the case of any Employee of the Business (including Juarez Employees), such actions that are taken in order to fill a vacancy in the ordinary course of business consistent with past practice or upon a termination for cause or due to death or disability; and (B) in the case of any Juarez Employee, such actions that are taken in the ordinary course of business or in order to address circumstances that may arise out of Section 8.01(q) ;

(iv) make any material change in any of its present financial accounting methods and practices of the Business or the Transferred Companies other than changes as may be initiated by Johnson & Johnson or one of its Affiliates with respect to Johnson & Johnson's businesses generally and other than as may be appropriate to conform to GAAP or applicable Law or that are consistent with the Accounting Policies;

(v) pledge, sell, lease, transfer, license, assign, encumber, dispose of or make subject to a Lien (other than any Permitted Liens) any Transferred Equity Interest or material Transferred Asset (other than Transferred IP, which is addressed in clause (vii) below) other than the sale of Inventory or obsolete, worn-out or excess equipment or assets in the ordinary course of business consistent with past practice;

(vi) waive or settle any claims or rights of value that relate primarily to the Business which claims or rights, individually or in the aggregate, are material to the Business;

(vii) transfer, assign or grant any license or sublicense of any material rights under or with respect to any material Transferred IP, other than non-exclusive licenses to customers, distributors and suppliers granted in the ordinary course of business consistent with past practice;

52

(viii) create or allow the Business to create, incur, assume or guarantee any indebtedness for borrowed money (other than any such indebtedness that will be discharged on or prior to the Applicable Closing);

(ix) make any acquisition of any assets or business that, individually or in the aggregate, would be material to the Business, other than acquisitions of Inventory, equipment or machinery in the ordinary course of business;

(x) fail to make capital expenditures necessary to operate the Business in the ordinary course of business consistent with past practice;

(xi) with respect to any Transferred Company and, except as would not affect Buyer or any of its Affiliates, with respect to the Transferred Assets and the Business, make, change or revoke any material Tax election, change any material Tax accounting method, file any material amended Tax Return, settle or compromise any audit or other proceeding relating to a material amount of Tax, enter into any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or foreign Law), apply for or request any Tax ruling, or surrender any right to claim a material Tax refund;

(xii) (A) terminate any Material Transferred Contract or any contract that provides for the distribution of Products pursuant to which Seller, any Selling Affiliate or any Transferred Company reasonably expects to receive annual revenue in excess of five hundred thousand dollars ($500,000) (a " Material Distribution Contract ") or (B) enter into a new Contract that would be a Material Transferred Contract if entered into prior to the date hereof or a new Material Distribution Contract, in each case other than in the ordinary course of business consistent with past practice and except for renewals or terminations in accordance with the terms of any Material Transferred Contract or Material Distribution Contract, as applicable;

(xiii) modify in any material respect any payment terms with any customers or suppliers pursuant to any Material Transferred Contract or Material Distribution Contract, other than changes as may be initiated by Johnson & Johnson or one of its Affiliates with respect to the applicable Johnson & Johnson businesses generally; or

(xiv) agree, whether in writing or otherwise, to do any of the foregoing.

(c) Notwithstanding the foregoing, nothing in this Section 6.01 will prevent Seller or any of its Affiliates from taking any actions (i) contemplated by Section 6.08 or (ii) to terminate or wind up the operation of the Business in any Excluded Jurisdiction.

SECTION 6.02. Certain Covenants Regarding the Transferred Companies . Except as otherwise required by this Agreement or permitted pursuant to Section 2.02(i), Seller agrees not to, and to cause each of the Transferred Companies not to issue or sell any capital stock or other equity interests or options, warrants, calls, subscriptions or

53

equity rights to purchase any capital stock or other equity interests of such Transferred Company or any subsidiary of such Transferred Company or split, combine or subdivide the capital stock or other equity interests of such Transferred Company or any subsidiary of such Transferred Company in each case to a person other than to Seller or a Stock Selling Affiliate; or authorize or effect any amendment to or otherwise change in any material respect the organizational documents of any Transferred Company or any subsidiary of such Transferred Company.

SECTION 6.03. Reserved .

SECTION 6.04. Disclosure . Seller shall give prompt notice to Buyer of (a) any notice received by Seller subsequent to the date of this Agreement and prior to the Applicable Closing Date of (or other communication relating to, or the occurrence of), any material default under any Material Transferred Contract or Material Distribution Contract, (b) any notice or other communication from any third party alleging that the consent of such third party is required in connection with the Transactions and (c) any effect, event, occurrence, circumstance or change that, to the knowledge of Seller, would constitute a breach of any representation or warranty or covenant of Seller contained in this Agreement that could reasonably be expected to cause any of the conditions set forth in Section 5.01(a) or 5.01(b) not to be satisfied, it being understood and agreed, however, that if Seller fails to provide notice pursuant to this Section 6.04 such failure to provide notice shall not constitute a breach of covenant for purposes of Article V or Article X.

SECTION 6.05. Publicity . No party to this Agreement shall originate any publicity, news release or other similar public announcement, written or oral, whether relating to this Agreement or any of the other Transaction Documents or the existence of any arrangement between the parties, without the prior written consent of the other party whether or not named in such publicity, news release or other similar public announcement, except (x) each party may issue a press release (or, if the parties agree, a joint press release) in connection with the receipt of the Final Binding Offer Letter, acceptance of the Final Binding Offer Letter and the execution and delivery of this Agreement and each party may, from time to time, refer to the Transactions in customary investor calls, investor meetings and other investor relations activities (including any such calls, meetings or activities specifically related to the Transactions), (y) either party may originate any such publicity, news release or other similar public announcement as may be required by Law (including the rules and regulations of the U.S. Securities and Exchange Commission), listing rules or any listing or trading agreement concerning its publicly traded securities and (z) to the extent the contents of such publicity, news release or other similar public announcement have previously been released publicly or are consistent in all material respects with materials that have previously been released (without violation of this Section 6.05); provided that in such event under clauses (x) and (y), the party issuing same shall still be required to consult with the other party, whether or not named in such publicity, news release or other similar public announcement, a reasonable time prior to its release (to the extent practicable) to allow the other party to comment thereon and, after its release, shall provide the other party with a copy thereof. If Buyer, based on the advice of its counsel, determines that this Agreement, or any of the other Transaction Documents, must be publicly filed with a Governmental Entity (other

54

than filings required to be made with the U.S. Securities and Exchange Commission), then Buyer, prior to making any such filing, shall provide Seller and its counsel with a redacted version of this Agreement (and any other Transaction Document) which it intends to file, and will give due consideration to any comments provided by Seller or its counsel.

SECTION 6.06. Commercially Reasonable Efforts; Regulatory Approvals; Access . Subject to any obligation imposed by Law, including all anti-trust and competition Laws:

(a) Subject to the terms and conditions set forth in this Agreement, including Section 2.02(g), each of Seller and Buyer shall use its commercially reasonable efforts to (i) make the Anti-Trust Filings and any other filings required by applicable Law, (ii) obtain consents, approvals (including Anti-Trust Approvals), authorizations, qualifications and orders of Governmental Entities and other third parties and (iii) take other actions, in each case as is necessary to consummate the Transactions as soon as reasonably practical following the date of this Agreement; provided that Seller shall have no obligation to pay money (other than customary filing and application fees typically paid by a seller or transferee) or make any concessions to obtain such consents. In addition to the foregoing, Buyer agrees to provide such evidence as to financial capability, resources and creditworthiness as may be reasonably requested by any third party whose consent or approval is sought hereunder. Subject to appropriate confidentiality protections, each of the parties hereto will cooperate with and furnish to the other party such necessary information and assistance as such other party may reasonably request in connection with the foregoing.

(b) As soon as reasonably practicable after the date hereof, Seller and Buyer shall file the Anti-Trust Filings and any other filings required under any applicable Laws. With respect to filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, Seller and Buyer shall make their respective filings no later than ten (10) business days following the date hereof (unless a later date is mutually agreed between the parties). Seller and Buyer shall provide to any Governmental Entity whose consent, authorization, order or approval is required in connection with the Transactions any additional information required under any applicable Laws or otherwise properly requested. The parties shall use their commercially reasonable efforts to obtain early termination of any applicable waiting period, to the extent required, from the applicable Governmental Entities. The parties also shall use their commercially reasonable efforts to cooperate by providing information reasonably requested by the other party in order to fulfill the foregoing obligations as promptly as reasonably practicable.

(c) Subject to applicable Law relating to the exchange of information, Buyer and Seller and their respective counsel shall (i) have the right to review in advance, and to the extent practicable each shall consult or, where required by applicable Law, cooperate with the other on, any filing made with, or written

55

materials to be submitted to, any Governmental Entity in connection with the Transactions, (ii) promptly inform each other of any communication (or other correspondence or memoranda) received from, or given to, any Governmental Entity in connection with the Transactions, (iii) consult with the other party, and consider in good faith the views of the other party, prior to entering into any agreement with any Governmental Entity with respect to the Transactions and (iv) furnish each other with copies of all correspondence, filings and written communications between them or their subsidiaries or Affiliates, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to the Transactions. Buyer and Seller shall, to the extent practicable, provide each other and their respective counsel with advance notice of and the opportunity to participate in any in-person discussion or meeting with any Governmental Entity in respect of any filing, investigation or other inquiry in connection with the Transactions and to participate in the preparation for such discussion or meeting. Buyer and Seller also agree to keep the other fully informed about any anti-trust issues raised by any Governmental Entity.

(d) For purposes of this Section 6.06, to the extent necessary to obtain the waiver or consent from any Governmental Entity required to satisfy the conditions set forth in Sections 5.01(f) or 5.02(f), as applicable, to obtain consents, approvals, authorizations, qualifications or orders of Governmental Entities or to avoid the entry of or have lifted, vacated or terminated any Principal Closing Legal Impediment or Non-Principal Closing Legal Impediment, Buyer shall, subject to the last sentence of this Section 6.06(d): (i) propose, negotiate, offer to commit and effect (and if such offer is accepted, commit to and effect), by consent decree, hold separate order or otherwise, and in connection with the consummation of the Transactions, the sale, divestiture or disposition (including by licensing any intellectual property rights) of any assets of the Business; (ii) terminate or modify any existing relationships and contractual rights and obligations of the Business; (iii) otherwise offer to take or offer to commit to take any action which it is capable of taking and, if the offer is accepted, take or commit to take such action, that limits its freedom of action with respect to, or its ability to retain, any of the assets of the Business; and (iv) take promptly, in the event that any permanent or preliminary injunction or other order is entered or becomes reasonably foreseeable to be entered in any proceeding that would make consummation of the Transactions unlawful or that would prevent or delay consummation of the Transactions, any and all steps (including the posting of a bond or the taking of the steps contemplated by clauses (i) and (ii) of this subsection (d)) necessary to vacate, modify or suspend such injunction or order. Buyer shall use commercially reasonable efforts to take any such action or do any thing to satisfy the conditions in Sections 5.01(f) and 5.02(f) on or before the date that is the six-month anniversary of the date hereof. Notwithstanding the foregoing or anything to the contrary contained in this Agreement, nothing in this Agreement shall be construed to require Buyer or any of its Affiliates to take any action or do any thing if the taking of such action or doing of such thing, individually or in the aggregate, would reasonably be expected to result in a material adverse effect on Buyer after giving effect to the Transactions (measured on a scale relative to a company the size of the Business).

56

(e) Seller shall give Buyer and its accountants, legal counsel and other representatives reasonable access, during normal business hours and without undue interruption of the Business throughout the period prior to the Applicable Closing, to all of the properties, books and records (other than records relating to income Taxes and attorney-client privileged communications and, for the avoidance of doubt, other than where access to such information is prohibited by applicable Law) relating to the Business, and will furnish, at Buyer's expense, Buyer, its accountants, legal counsel and other representatives during such period all such information (other than records relating to income Taxes and attorney-client privileged communications and, for the avoidance of doubt, other than where access to such information is prohibited by applicable Law) concerning the affairs of the Business as Buyer may reasonably request; provided that this Section 6.06(e) shall not entitle Buyer or its accountants, legal counsel or other representatives to contact any third party doing business with Seller or access the properties, books or records of any such third party, in each case without Seller's prior written consent (which consent shall not be unreasonably withheld). Buyer will hold in confidence all information so obtained.

(f) From the date hereof until the Applicable Closing Date, Seller shall timely prepare, and promptly deliver to Buyer, with respect to the Business, a statement of sales, on a monthly basis, and a statement of profit and loss, on a quarterly basis, in each case to be consistent with such financial information previously provided to Buyer by Seller.

(g) Seller shall, and shall cause the Selling Affiliates and the Transferred Companies to, use commercially reasonable efforts to make available to Buyer prior to the thirtieth (30th) day after the date hereof or as promptly as practicable thereafter each Material Distribution Contract; provided that, solely for the purposes of this Section 6.06(g), the expected annual revenue threshold in the definition of "Material Distribution Contract" shall be deemed to be two hundred fifty thousand dollars ($250,000).

SECTION 6.07. Financing . (a) Seller shall, and shall cause its Affiliates to, and shall use its commercially reasonable efforts to cause its and its Affiliates' respective officers, directors, employees, accountants, consultants, legal counsel, agents and other advisors and representatives to, provide commercially reasonable cooperation in connection with the arrangement by Buyer of bank financing and/or bond offerings for the purpose of financing the Transactions, the fees and expenses incurred in connection therewith and the other transactions contemplated hereby (the " Debt Financing ") as may be reasonably requested by Buyer; provided that (i) such requested cooperation shall not unreasonably interfere with the ongoing operations of Seller and its Affiliates, (ii) Seller and its Affiliates shall not be required to provide any audited or unaudited "carve-out" financial statements of the Business and (iii) Seller and its Affiliates shall not be required to provide any updates to the Financial Information. Buyer shall, promptly upon request

57

by Seller, reimburse Seller for all out-of-pocket costs incurred by Seller or any of its Affiliates in connection with such cooperation. Buyer and its Affiliates shall, on a joint and several basis, indemnify and hold harmless Seller and its Affiliates from and against any Damages suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith. Seller shall have the right to consent to the use of its and its Affiliates' logos in connection with the Debt Financing (which consent shall not be unreasonably withheld).

(b) Notwithstanding anything to the contrary in this Section 6.07, Buyer acknowledges and agrees that its obligation to consummate the Transactions on the terms and subject to the conditions set forth herein are not contingent on any debt or equity financing (including the Debt Financing) or the receipt of the proceeds therefrom.

SECTION 6.08. Transferred Companies Assets and Liabilities . Prior to the Applicable Closing, Seller shall take or cause to be taken, such action as is necessary or appropriate to transfer, assign or convey (i) any assets owned or held by the Transferred Companies other than those that would constitute Transferred Assets or (ii) any liabilities or obligations of the Transferred Companies other than those that would constitute Assumed Liabilities, in each case, to Seller or an Affiliate of Seller such that as of the Applicable Closing, (i) the assets owned or held by the Transferred Companies consist solely of assets that would otherwise constitute Transferred Assets pursuant to clauses (i) – (xvii) and (xix) – (xxi) of Annex 2.02(a) and (ii) the liabilities and obligations of the Transferred Companies consist solely of liabilities and obligations that would otherwise constitute Assumed Liabilities pursuant to clauses (i) – (ix) of Annex 2.02(c) . Prior to or following the Applicable Closing, Buyer shall provide to Seller the necessary information and deliver such assignments, transfers, consents and other documents and instruments as may be reasonably required to permit Seller at its expense to effect and perfect the transfer of any registrations of Patents and Trademarks that constitute Excluded Assets but which are held by a Transferred Company.

SECTION 6.09. Exclusivity . (a) From the date of this Agreement until the earlier of the Applicable Closing Date or termination of this Agreement in accordance with its terms, Seller shall not, and shall cause its Affiliates, the Transferred Companies and its and their respective directors, officers or employees, or any attorney, accountant or other representative retained by any of them (collectively, " Representatives ") not to, directly or indirectly (i) solicit, initiate or knowingly encourage (including by way of furnishing non-public information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal that constitutes, or could reasonably be expected to lead to, any Alternative Proposal, (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or otherwise cooperate in any way with, or assist or participate in any effort or attempt by any Person with respect to, any Alternative Proposal or (iii) enter into or approve any agreement with respect to any Alternative Proposal. None of Seller, any of its Affiliates or any of the Transferred Companies shall release any third party from, or waive any provision of, any confidentiality agreement with respect to the Business to which it is a party and which was entered into with respect to any potential Alternative Proposal. Seller and its Affiliates shall, and shall cause their respective Representatives to, with respect to third

58

parties with whom discussions or negotiations with respect to an Alternative Proposal have been terminated on or prior to the date of this Agreement, use its reasonable best efforts to obtain the return or destruction of, in accordance with the terms of the applicable confidentiality agreement, confidential information previously furnished by Seller or any of its Affiliates, or its or their Representatives, with respect to the Business.

(b) Seller will promptly notify Buyer orally (and then in writing within twenty-four (24) hours) after it or any of its Affiliates has received any proposal, inquiry, offer or request relating to or constituting, or that could reasonably be expected to lead to, an Alternative Proposal, any request for discussions or negotiations, or any request for information relating to the Business in connection with an Alternative Proposal or a potential Alternative Proposal or for access to the properties or books and records thereof of which Seller or any of its Affiliates is or becomes aware, or any amendments to the foregoing. Such notice to Buyer shall indicate the identity of the person making such proposal and the terms and conditions of such proposal, if any. Seller shall also promptly provide Buyer with (i) a copy of any written notice or other written communication from any person informing Seller or any of its Affiliates that it is considering making, or has made a proposal regarding, an Alternative Proposal, (ii) a copy of any Alternative Proposal (or any amendment thereof) received by Seller or any of its Affiliates and (iii) such other details of any such Alternative Proposal that Buyer may reasonably request. Thereafter, Seller shall promptly keep Buyer reasonably informed on a reasonably current basis of any material change to the terms of any such Alternative Proposal.

(c) " Alternative Proposal " means any inquiry, proposal or offer, or any expression of interest by any third party relating to Seller's or any of its Affiliates' willingness or ability to receive or discuss a proposal or offer, other than a proposal or offer by Buyer or any of its Affiliates, for any merger, amalgamation, consolidation, share exchange, recapitalization, liquidation, dissolution, acquisition or other business combination, in each case relating to twenty-five percent (25%) or more of the assets of the Business.

ARTICLE VII

Post-Closing Covenants

During the period commencing after the Principal Closing:

SECTION 7.01. Transfer of Trademarks; Use of Excluded Trademarks by Buyer; Use of Transferred Know-How . (a) Buyer covenants that, except as hereinafter set forth in paragraph (b) below, neither Buyer nor any of its Affiliates shall use in any manner the names JOHNSON & JOHNSON, JOHNSON & JOHNSON MEDICAL, J&J, BIOSENSE, BIOSENSE WEBSTER, CODMAN, CODMAN NEURO, certain trade dress associated with the Transferred Assets that include such names and other marks including the terms JOHNSON, J's and J in script logo form. Buyer acknowledges and agrees that, except as set forth in Section 7.01(b), neither it nor any of its Affiliates is obtaining or receiving any rights to use in any manner any Trademarks or trade dress of Seller or any of its Affiliates other than the Trademarks included in the Transferred IP.

59

(b) Seller hereby grants, and shall cause its Affiliates, to grant to Buyer and its Affiliates permission to use the Trademarks currently used in the Business as of the Applicable Closing Date (other than the Trademarks included in the Transferred IP) as specifically set forth on Schedule 3.10(a)(ii) to the Disclosure Letter, solely to the extent that such Trademark appears on any Transferred Asset conveyed pursuant hereto, including Inventory (collectively, the " Seller Trademarked Items ") until the earlier of (i) the depletion of such Seller Trademarked Items or (ii) eighteen (18) months from the Applicable Closing Date (the " Expiration Period "). When the Expiration Period expires, Buyer is responsible for the destruction and disposal of any remaining Seller Trademarked Items bearing the name or trademark of Seller or its Affiliates then in Buyer's possession or returned to Buyer after the Expiration Period. Buyer and its Affiliates hereby agree to indemnify Seller and the other Seller Indemnitees from and against any and all Damages incurred or suffered as a result of such permitted use of Seller Trademarked Items in this Section 7.01(b), except to the extent that any such Damages result from the fraud or willful misconduct of Seller or any of its Affiliates.

(c) For a period of up to two (2) years after any Applicable Closing Date, (i) Seller shall provide to Buyer, and Buyer shall provide to Seller, as applicable, the necessary information and deliver such assignments, transfers, consents and other documents and instruments as may be reasonably required to permit Buyer at its expense to effect and perfect the transfer of the registrations of the Patents and Trademarks included in the Transferred IP in accordance with Section 2.02(a), 2.02(d) and 2.02(h) and to permit Seller at its expense to effect and perfect the transfer of the registrations of any Patents and Trademarks that constitute Excluded Assets but which are held by a Transferred Company and (ii) Seller will reasonably cooperate with Buyer, and Buyer will reasonably cooperate with Seller, as applicable, in filing appropriate documents to cancel all "registered user" filings worldwide in connection with the foregoing. After such period, neither Seller nor Buyer shall have any further obligation hereunder.

(d) Buyer hereby grants, and shall cause its Affiliates to grant, to Seller and its Affiliates a non-exclusive, royalty free, fully paid-up, perpetual, irrevocable and worldwide license to use all manufacturing Know-How included in the Transferred IP that was used by Seller or its Affiliates in connection with their businesses other than the Business prior to the Closing Date.

SECTION 7.02. Use of Trademarks by Seller During Transition Period . Buyer hereby grants to Seller and its Affiliates permission to use the Trademarks transferred to Buyer pursuant to this Agreement during the terms of the Transition Services Agreement and the Transition Manufacturing Services Agreement to the extent required by Seller and its Affiliates to provide the services described therein to Buyer or its Affiliates.

SECTION 7.03. Access . Subject to customary confidentiality undertakings comparable to those included in the Confidentiality Agreement, (a) to the extent reasonably required for tax, accounting, regulatory, compliance, litigation or investigation purposes, or otherwise reasonably requested by Seller (other than in connection with a dispute, claim or litigation between Buyer and Seller or any of their

60

respective Affiliates), Buyer will permit Seller and its duly authorized representatives access during normal business hours (upon twenty-four (24) hours' written notice to Buyer) to all contracts, books, records and other data relating to the Transferred Assets and Assumed Liabilities conveyed and assumed at any Closing to the extent that such materials were delivered to Buyer, except where such access is prohibited by applicable Law and (b) to the extent reasonably required for tax, accounting, regulatory, compliance, litigation or investigation purposes, or otherwise reasonably requested by Buyer (other than in connection with a dispute, claim or litigation between Buyer and Seller or any of their respective Affiliates), Seller will permit Buyer and its duly authorized representatives access during normal business hours (upon twenty-four (24) hours' written notice to Seller) to all contracts, books, records and other data relating to the Excluded Assets and Excluded Liabilities retained at any Closing to the extent that such materials were retained by Seller and relate to the Business, except where such access is prohibited by applicable Law. Seller agrees that after the Applicable Closing, Buyer or its authorized representatives may, at Buyer's cost and expense, have access to and make copies of any books and records (or redacted portions thereof) that have not been transferred to Buyer and that relate to the Business, except where providing copies is prohibited by applicable Law. Buyer will cooperate with Seller, and Seller will cooperate with Buyer, with respect to any Tax examinations, audits, contests or other Tax proceedings, relating to the Business. Such cooperation shall include making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and shall include providing copies of any relevant Tax Returns and supporting work schedules. Seller shall reimburse Buyer for reasonable expenses incurred in providing such assistance.

SECTION 7.04. <u>Insurance</u> . Except with respect to insurance proceeds that constitute Transferred Assets pursuant to clause (xv) of <u>Annex 2.02(a)</u> , the coverage under all insurance policies related to the Business and arranged or maintained by Seller or its Affiliates is only for the benefit of Seller and its Affiliates, and not for the benefit of Buyer or the Business. As of the Applicable Closing Date and consistent with Section 2.02(a), Buyer agrees to arrange for its own insurance policies (including self-insurance or similar arrangements funded directly or indirectly by Buyer or any of its Affiliates) with respect to the Business covering all periods following the Applicable Closing and, without prejudice to any right to indemnification pursuant to this Agreement or any other Transaction Document, agrees not to seek, through any means, to benefit from any of Seller's or its Affiliates' insurance policies which may provide coverage for claims relating in any way to the Business.

SECTION 7.05. <u>Payments from Third Parties</u> . In the event that, on or after the Applicable Closing Date, either party shall receive any payments or other funds due to the other pursuant to the terms of any of the Transaction Documents, then the party receiving such funds shall promptly forward such funds to the proper party. The parties acknowledge and agree there is no right of offset regarding such payments and a party may not withhold funds received from third parties for the account of the other party in the event there is a dispute regarding any other issue under any of the Transaction Documents.

61

SECTION 7.06. <u>Assurances</u> . For a period of up to the later of (i) eighteen (18) months after the Principal Closing Date and (ii) six (6) months after any Applicable Closing Date, if either Buyer or Seller becomes aware that any of the Transferred Assets has not been transferred to Buyer or that any of the Excluded Assets has been transferred to Buyer, it shall promptly notify the other and the parties hereto shall, as soon as reasonably practicable and, subject to Section 2.02(g) and Section 2.06, ensure that such property is transferred, with any necessary prior third-party consent or approval, to:

(a) Buyer, in the case of any Transferred Asset which was not transferred at the Applicable Closing; or

(b) Seller, in the case of any Excluded Asset which was transferred at the Applicable Closing.

SECTION 7.07. <u>Returned Goods</u> . For a period of one hundred eighty (180) days after the Applicable Closing Date, Buyer agrees to use commercially reasonably efforts to adhere to the returned goods policy set forth on <u>Schedule 7.07</u> to the Disclosure Letter with respect to all Products of the Business received from customers, whether sold by Buyer or Seller, to the extent any such returned Product has the name or trademark of Seller or an Affiliate of Seller on it.

SECTION 7.08. <u>Tax Matters</u> .

(a) <u>Preparation and Filing of Tax Returns; Payment of Taxes</u> .

(i) Seller shall prepare and file all Tax Returns of the Transferred Companies or in respect of the Transferred Assets or the Business that are due (including applicable extensions) before the Applicable Closing. Seller shall prepare and file all Tax Returns (other than Tax Returns of the Transferred Companies) in respect of the Transferred Assets or the Business for all taxable periods ending on or before the Applicable Closing Date. Seller shall also prepare and file all Tax Returns for Transferred Companies that are required to be included in (or filed with) a Tax Return of an affiliated, consolidated, combined, unitary or aggregate group of which Seller or any of its Affiliates (other than a Transferred Company) is parent for Pre-Closing Tax Periods. Any Tax Returns required to be prepared pursuant to this Section 7.08(a)(i) shall be prepared on a basis consistent with the past practices of the Transferred Company or with respect to the Transferred Assets or the Business, respectively.

(ii) From and after the Closing, Buyer shall prepare and timely file, or cause to be prepared and timely filed, all other Tax Returns (other than those relating to Transfer Taxes, such Tax Returns being addressed by Section 2.06) required to be filed by the Transferred Companies, or in respect of the Transferred Assets or the Business, and any such Tax Returns of Transferred Companies for any Pre-Closing Tax Period or Straddle Period shall be prepared on a basis consistent with the past practices of the Transferred Companies as applicable, unless Buyer notifies Seller in writing that a different position is

62

required by applicable Law, and the parties mutually agree on the resolution of such issue (and each party shall reasonably endeavor to reach such mutual agreement). With respect to any Tax Return required to be filed by Buyer for or including a Pre-Closing Tax Period, Buyer shall deliver to Seller for its approval, at least thirty (30) days prior to the due date for the filing of such Tax Return in the case of an income Tax Return, and at least ten (10) days prior to the due date for the filing of such Tax Return in the case of a non-income Tax Return (in each case taking into account any applicable extensions), a statement setting forth the amount of Tax for which Seller is responsible pursuant to Section 7.08(d)(i) and a copy of such Tax Return, together with any additional information that Seller may reasonably request. Seller shall have the right to review such Tax Return, statement and additional information, if any, prior to the filing of such Tax Return, and Buyer shall reflect on such Tax Return any reasonable comments submitted by Seller at least five (5) days prior to the due date of such Tax Return. Any Tax Return of a Transferred Company or an Asset Selling Affiliate for a Tax period that would otherwise be a Straddle Period shall, to the extent permitted by applicable Law, be filed on the basis that the relevant Tax period ended as of the close of business on the Applicable Closing Date. Neither Buyer nor any of its Affiliates (including any Transferred Company) shall file an amended Tax Return or agree to any waiver or extension of the statute of limitations relating to Taxes with respect to any Transferred Company, the Transferred Assets or the Business for a Pre-Closing Tax Period (or a Straddle Period), to the extent such amendment, waiver or extension would reasonably be expected to increase Seller's liability for Taxes under this Agreement, without the prior written consent of Seller, which consent shall not be unreasonably withheld.

(iii) All Taxes due and payable with respect to Tax Returns described in Section 7.08(a) will be paid by the filer, subject to reimbursement by the other party pursuant to Section 7.08(d); provided that, with respect to any Tax Return described in Section 7.08(a)(ii) for any Pre-Closing Tax Period or any Straddle Period, Seller shall pay any Excluded Taxes or any Taxes that are Excluded Liabilities, in each case relating to such Tax Return, to Buyer no later than five (5) days prior to the due date for the filing of such Tax Return.

(b) Carryforwards and Carrybacks . Buyer, on its own behalf and on behalf of its Affiliates and to the extent permitted by applicable Law, hereby waives any right to use or apply with respect to the consolidated federal income Tax Return of the consolidated group of which the Johnson & Johnson is the common parent in any Pre-Closing Tax Period any Tax asset, including any net capital loss, net operating loss, foreign Tax credit, charitable contribution credit or research and development credit, of any Transferred Company arising in any Tax period ending after the Applicable Closing Date.

63

(c) <u>Refunds</u> .

     (i) <u>Refunds</u> . Seller shall be entitled to retain, or receive prompt payment from Buyer or any of its subsidiaries or Affiliates (including the Transferred Companies) of, any refund (including any credit in lieu of a refund, which credit arises as a result of an overpayment and which otherwise would have been payable in cash by the relevant Taxing Authority at the election of the taxpayer) received or realized in cash with respect to Taxes attributable to any Transferred Company, the Transferred Assets or the Business for any Pre-Closing Tax Period (other than Transfer Taxes), including any such amounts arising by reason of amended Tax Returns filed after the Applicable Closing Date, but only to the extent that (A) such refund (or credit) is not the result of an event that occurred after the Applicable Closing Date and does not relate to the Prepaid Tax Amount, and (B) such refund (or credit) is not attributable to, and does not result from, a carry back or other use of any item of loss, deduction, credit or other similar item arising in a Post-Closing Tax Period or, in the case of a refund (or credit) of Taxes for a Straddle Period, the use of any such item arising in a Post-Closing Tax Period. In connection with the foregoing, if Seller determines that any of the Transferred Companies is entitled to file or make a formal or informal claim for a refund (to which Seller would be entitled under the first sentence of this Section 7.08(c)(i)) of Taxes (including by filing an amended Tax Return) with respect to a Pre-Closing Tax Period, Seller shall be entitled, at Seller's expense, to file or make, or to request that Buyer cause the applicable Transferred Company to file or make, such formal or informal claim for refund, and Seller shall be entitled to control the prosecution of such claim for refund, provided that Seller shall not take any action in connection therewith that would bind Buyer or any of its Affiliates (including any Transferred Company) for a Post-Closing Tax Period or otherwise adversely affect Buyer or any of its Affiliates (including any Transferred Company). Buyer will cooperate, and cause the Transferred Companies to cooperate, with respect to such claim for refund, and will pay, or cause the relevant Transferred Company to pay, to Seller the amount (including interest received from any Taxing Authority) of any related refund (including any credit in lieu of a refund, which credit arises as a result of an overpayment and which otherwise would have been payable in cash by the relevant Taxing Authority at the election of the taxpayer) (to which Seller would be entitled under the first sentence of this Section 7.08(c)(i)) received or realized in cash by Buyer or any Affiliate thereof (including any Transferred Company), net of any unreimbursed costs incurred by Buyer and its Affiliates in respect of such refund and reduced by the amount of any Taxes arising or that would arise as a result of the receipt of such refund or interest thereon, within five (5) days of receipt (or realization in cash) thereof. Buyer and the Transferred Companies shall be entitled to retain, or receive prompt payment from Seller with respect to, any other refund, credit, offset or other similar benefit received or realized with respect to Taxes attributable to any Transferred Company, the Transferred Assets or the Business. Notwithstanding any other provision, Buyer shall be entitled to any refund, credit or reimbursement arising from or relating to any Transfer Taxes.

64

(ii) For the avoidance of doubt, any Tax basis, net operating loss, credit or other item that reduces Taxes paid or payable that may exist in any Transferred Company in a Post-Closing Tax Period or may be carried forward to a Post-Closing Tax Period shall be for the account of Buyer.

(d) <u>Tax Indemnification</u> .

(i) Seller shall indemnify, defend and hold Buyer and its Affiliates (including the Transferred Companies) harmless from and against all liability for Excluded Taxes;

(ii) Reserved;

(iii) Reserved; and

(iv) Buyer and its Affiliates (including the Transferred Companies) shall indemnify, defend and hold Seller and its Affiliates harmless from and against: (A) for any Post-Closing Tax Period (i) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) of the Transferred Companies and (ii) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) with respect to the Transferred Assets or the Business, in the case of each of clauses (i) and (ii), other than any such Tax liabilities that are Excluded Taxes, (B) all liability for Transfer Taxes for which Buyer is responsible pursuant to Section 2.06(a), (C) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) attributable to a Buyer Tax Act, unless such Buyer Tax Act is effected with the written consent of Seller or (D) Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) attributable to any breach by Buyer or its Affiliates (including, after the Applicable Closing, any Transferred Company) of any covenant or other agreement hereunder;

(v) In the case of any Straddle Period:

(i) The periodic Taxes of the Transferred Companies and Seller and Selling Affiliates that are not based on income or receipts (e.g., property Taxes) for the Pre-Closing Tax Period shall be computed based upon the ratio of the number of days in the Pre-Closing Tax Period and the number of days in the entire Tax period; and

(ii) Taxes of the Transferred Companies and Seller and Selling Affiliates for the Pre-Closing Tax Period, other than Taxes described in Section 7.08(d)(v)(i) above, shall be computed as if such Tax period ended as of the close of business on the Applicable Closing Date and, in the case of any Taxes of the Transferred Companies and Seller and Selling

65

Affiliates attributable to the ownership of any equity interest in any partnership or other "flowthrough" entity, as if the Tax period of such partnership or other "flowthrough" entity ended as of the close of business on the Applicable Closing Date.

(vi) Any indemnity payment required to be made pursuant to this Section 7.08(d) shall be made within thirty (30) days after the indemnified party makes written demand upon the indemnifying party, but in no case earlier than five (5) business days prior to the date on which the relevant Taxes are required to be paid to the applicable Taxing Authority.

(vii) Any indemnification payment made pursuant to this Section 7.08(d) shall be treated as an adjustment to the Purchase Price, for Tax purposes, unless otherwise required by applicable Tax Law. Each party shall notify the other party if it receives notice that any Taxing Authority proposes to treat any indemnification payment made pursuant to this Section 7.08(d) as other than an adjustment to the Purchase Price for Tax purposes, or if it otherwise determines that an indemnification payment under this Section 7.08(d) is required by applicable Tax Law to be treated as other than an adjustment to the Purchase Price for Tax purposes.

(e) Tax Contests .

(i) Buyer shall notify Seller within ten (10) business days of a Tax Proceeding for a Pre-Closing Tax Period with respect to a Transferred Company, provided that the failure to so notify Seller shall not affect Seller's indemnification obligation under Section 7.08(d) except to the extent of any material prejudice actually incurred by Seller. With respect to any Tax Proceeding relating to (A) a Pre-Closing Tax Period with respect to a Transferred Company, the Transferred Assets or the Business (other than a Straddle Period or a Tax Proceeding with respect to a Transfer Tax) or (B) a consolidated Tax Return of which Johnson & Johnson, Cordis Corporation or any of their Subsidiaries (other than a Transferred Company) is the common parent, Seller may choose in its sole discretion (at its expense) to control all proceedings and may make all decisions taken in connection with such Tax Proceeding (including selection of counsel), and, without limiting the foregoing, may, in its sole discretion, pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the applicable Tax liability and sue for a refund or contest the Tax at issue in such Tax Proceeding, provided that, to the extent such Tax Proceeding or the resolution or settlement thereof could have an impact on Buyer or any of its Affiliates (including the Transferred Companies) after the Principal Closing Date, (x) Seller shall provide Buyer with a timely and reasonably detailed account of each phase of such Tax Proceeding and shall consult with Buyer before taking any significant action in connection with such Tax Proceeding and (y) Seller shall not settle, compromise or abandon any such Tax Proceeding without obtaining the prior written consent

66

of Buyer, which consent shall not be unreasonably withheld. With respect to any Tax Proceeding relating to a Straddle Period with respect to a Transferred Company, the Transferred Assets or the Business, Buyer may choose in its sole discretion (at its expense) to control all proceedings and may make all decisions taken in connection with such Tax Proceeding (including selection of counsel), and, without limiting the foregoing, may, in its sole discretion, pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the applicable Tax liability and sue for a refund or contest the Tax at issue in such Tax Proceeding, provided that, to the extent such Tax Proceeding or the resolution or settlement thereof could have an impact on Seller or any of its Affiliates with respect to the Pre-Closing Tax Period resulting in an increase of Seller's liability for Taxes pursuant to this Agreement, (a) Buyer shall provide Seller with a timely and reasonably detailed account of each phase of such Tax Proceeding and shall consult with Seller before taking any significant action in connection with such Tax Proceeding and (b) Buyer shall not settle, compromise or abandon any such Tax Proceeding without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld.

(ii) Except as otherwise provided in Section 7.08(e)(i), Buyer shall exclusively control all proceedings with respect to Taxes of the Transferred Companies or Taxes otherwise relating to the Transferred Assets or the Business. Notwithstanding anything in Section 2.06(d) or Section 7.08(e)(i) to the contrary, Buyer shall have the exclusive right to control any Tax Proceeding described in Section 2.06(d) or Section 7.08(e)(i) if Seller fails to, or notifies Buyer in writing that Seller elects not to, defend such Tax Proceeding.

(iii) Buyer, the Transferred Companies and each of their respective Affiliates, on the one hand, and Seller and its respective Affiliates, on the other hand, shall cooperate in contesting any Tax Proceeding, which cooperation shall include the retention and, upon request, the provision to the requesting party of records and information which are reasonably relevant to such Tax Proceeding, and making employees available on a mutually convenient basis to provide additional information or explanation of any material provided hereunder or to testify at proceedings relating to such Tax Proceeding. Buyer and Seller shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Section 7.08(e).

(f) Miscellaneous .

(i) Section 338(h)(10) Election.

(1) Buyer and Seller shall join in timely making a valid election under Section 338(h)(10) of the Code (and any comparable election under state or local Tax Law) (a " Section 338(h)(10) Election ") with respect to Cordis Corporation.

67

(2) Neither Seller nor Buyer nor any of their respective Affiliates (including the Transferred Companies) shall undertake any action or engage in, or cause to be engaged in, any transaction that would jeopardize the validity of the Section 338(h)(10) Election.

(3) Seller shall prepare and file all Section 338 Forms in accordance with applicable Tax Laws and shall deliver a draft of such Section 338 Forms to Buyer at least forty-five (45) days prior to the date such Section 338 Forms are required to be filed. Seller shall make any changes to such forms reasonably requested by Buyer. Buyer shall execute and deliver to Seller such Section 338 Forms (as amended) at least twenty (20) days prior to the date such Section 338 Forms are required to be filed. Nothing in this Section 7.08(f)(i)(3) shall affect the rights and obligations of Buyer and Seller under Section 2.05. Notwithstanding the foregoing, IRS Form 8023 shall be filed on the date of the relevant Applicable Closing Date, and such date shall be treated as the date such form is required to be filed for purposes of this Section 7.08(f)(i)(3).

(4) Buyer and Seller agree to report the transfers under this Agreement consistent with the Section 338(h)(10) Election and shall take no position contrary thereto unless required to do so by applicable Tax Law.

(ii) Each of Buyer and Seller shall provide the other with such information and records, and make such of its officers, directors, employees and agents available, as may reasonably be requested by such other party in connection with the preparation of any Tax Return or the conduct of any Tax Proceeding of the Transferred Companies, the Transferred Assets or the Business for any Pre-Closing Tax Period or a Straddle Period. Buyer shall, within one hundred twenty (120) days after the end of the applicable Tax period, at Seller's cost and expense, prepare, or cause the Transferred Companies to prepare, in either case in a manner consistent with the Transferred Companies' past practices, all Tax work paper preparation packages necessary to enable Seller to prepare, or cause to be prepared, all Tax Returns that Seller is obligated to prepare, or cause to be prepared, with respect to such Tax period under this Agreement. Notwithstanding anything herein to the contrary, Seller shall not be required to provide Buyer with a copy of, or otherwise disclose the contents of, any consolidated Tax Return and Buyer shall not be required to provide Seller with a copy of, or otherwise disclose the contents of, any consolidated Tax Return.

(iii) Notwithstanding anything herein to the contrary, indemnification for any and all Taxes, any claims with respect to Taxes, and the procedures with respect to claims for Taxes (in each case other than any Taxes referenced in, described in, or governed by Section 3.13 or Article VIII) shall be governed exclusively by this Section 7.08 and Sections 2.06(a)-(d) and 10.01 and

68

shall not be governed by the provisions of Article X (other than Section 10.01), and for the avoidance of doubt, none of Annexes 2.02(a)-(d) shall govern or apply to Tax assets or Tax liabilities.

(iv) Notwithstanding anything in this Agreement to the contrary, Seller shall terminate (or cause to be terminated) on or before each Applicable Closing Date all Tax sharing, allocation, indemnity or similar agreements or arrangements (other than this Agreement or any other Transaction Documents), if any, to which any of the Transferred Companies, on the one hand, and any person (other than the Transferred Companies), on the other hand, are parties to, and neither Buyer nor any of the Transferred Companies or their respective Affiliates shall have any obligations thereunder after the Applicable Closing.

(v) Notwithstanding anything in this Agreement, Buyer shall, or shall cause one of its Affiliates to, make an election under Section 338 of the Code with respect to Japan NewCo (if Seller makes the election set forth in Section 2.02(i)). Neither Seller nor any of its Affiliates shall take any action that would prevent Buyer or any of its Affiliates from making such an election.

(g) <u>Survival</u> . The obligation to indemnify and hold harmless pursuant to Section 7.08(d) shall survive the consummation of the transactions contemplated hereby until sixty (60) days following the expiration of the applicable statute of limitations except for such claims for indemnification asserted prior to such date, which claims (and, if applicable, any representation or warranty the breach of which gives rise to such claim) shall survive until final resolution thereof.

SECTION 7.09. <u>Ancillary Agreements</u> . At the Principal Closing, Buyer and Seller shall enter into, execute and deliver the Transition Services Agreement, substantially in the form attached as <u>Exhibit F</u> (the " <u>Transition Services Agreement</u> "), the Transition Manufacturing Services Agreement, substantially in the form attached as <u>Exhibit G</u> (the " <u>Transition Manufacturing Services Agreement</u> "), the Reverse Transition Manufacturing Services and Access Agreement, substantially in the form attached as <u>Exhibit H</u> (the " <u>Reverse Transition Manufacturing Services and Access Agreement</u> ") and the Trademark License Agreement, substantially in the form attached as <u>Exhibit I</u> (the " <u>Trademark License Agreement</u> ").

SECTION 7.10. <u>Bulk Transfer Laws</u> . Buyer acknowledges that Seller and the Selling Affiliates have not taken, and do not intend to take, any action required to comply with any applicable bulk sale or bulk transfer Laws or similar Laws of any jurisdiction. Buyer hereby waives compliance by Seller and the Selling Affiliates with the provisions of any bulk sale or bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions.

SECTION 7.11. <u>Other Transaction Matters</u> . Each of Seller and Buyer shall, and shall cause each of its Affiliates to, comply with the applicable obligations set forth on <u>Schedule 7.11</u> to the Disclosure Letter.

69

SECTION 7.12. <u>Retained Claims</u> .

(a) Subject to the remaining provisions of this Section 7.12, Seller and its Affiliates shall retain complete control of any Retained Claim (including any appeals thereof) with full authority to prosecute, defend or institute a new lawsuit, counterclaim or other proceeding relating thereto, and Seller and its Affiliates shall have the sole and exclusive right, at their own expense, to settle or otherwise dispose of the same (in their sole discretion). Buyer will provide reasonable cooperation (at Seller's request and expense) in such prosecution, settlement or disposition, as applicable, including providing reasonable access during normal business hours to the personnel, properties, books and records of the Business to the extent related to the Retained Claim; <u>provided</u> that Seller and its Affiliates will not, in the prosecution or defense of any such action, suit, proceeding, claim, demand or assessment, except with the prior written consent of Buyer, consent to the entry of any Judgment or enter into any settlement (w) that restricts the operations of Buyer, its Affiliates, the Business or a Transferred Company, (x) admits liability or wrongdoing on the part of Buyer, its Affiliates, the Business or a Transferred Company, (y) that grants any rights under or to any Transferred Asset or (z) acknowledges the invalidity or unenforceability of any Transferred IP. If a Transferred Company, Buyer or any of its Affiliates is party to any action, suit, proceeding, claim, demand or assessment related to any Retained Defendant Liability, any settlement of the same shall include as an unconditional term thereof the giving by the third-party claimant to the Transferred Company, Buyer or such Affiliate, as applicable, a release from all liability in respect thereof.

(b) Seller shall use its commercially reasonable efforts to assign to, or otherwise substitute for the applicable Transferred Company, Seller or an Affiliate of Seller in any action, suit, proceeding, claim, demand or assessment related to any Retained Claim; <u>provided</u> that, if it is necessary for a Transferred Company to remain a party to any such action, suit, proceeding, claim, demand or assessment, or if any such assignment or substitution would result in the dismissal of, or Seller or its Affiliates waiving any defenses or forfeiting any rights or remedies or otherwise materially prejudice Seller or its Affiliates in respect of, any Retained Claim, then, notwithstanding Section 6.08, such Retained Claim shall not be transferred out of the Transferred Companies and Seller shall not be obligated to assign such Retained Claim or substitute itself or an Affiliate for the applicable Transferred Company, and Buyer shall use commercially reasonable efforts to cause the applicable Transferred Company to continue to prosecute or defend such Retained Claim at the direction of Seller; <u>provided</u> that (a) Seller shall remain responsible for such Retained Claim; and (b) neither Buyer nor any of its Affiliates (including any Transferred Company) shall be required to take action pursuant to such prosecution or defense (w) that restricts the operations of Buyer, its Affiliates, the Business or a Transferred Company, (x) admits liability or wrongdoing on the part of Buyer, its Affiliates, the Business or a Transferred Company, (y) that grants any rights under or to any Transferred Asset or (z) acknowledges the invalidity or unenforceability of any Transferred IP.

70

## ARTICLE VIII

### Employees

SECTION 8.01. Employee Benefits Matters . (a) From and after the date of this Agreement until the Applicable Closing Date, Buyer shall consult with Seller and obtain Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed) before distributing any communications to any Employee of the Business whether relating to employee benefits, post-Closing terms of employment or otherwise; provided that this sentence shall not apply to any (i) offer letters or other individual communications regarding post-Closing employment of Employees of the Business (including proposed terms of employment, compensation and employee benefits, or role and organizational structure) or (ii) individual conversations or communications regarding matters not covered by any of the Transaction Documents.

(b) To the extent permitted by applicable Law and as soon as practicable, but in no event later than five (5) business days, after the date of this Agreement, Seller shall provide Buyer with a list on Schedule 8.01(b) to the Disclosure Letter containing an identification number, date of hire, position, location, and base salary, wage rate and bonus opportunity (and, in no event later than thirty (30) calendar days after the date of this Agreement, for sales employees, sales incentive targets, as well as actual sales incentive paid during the prior fiscal year), outstanding equity awards (including vesting schedule and exercise price, as applicable), expatriate status and any additional information that is necessary for Buyer to establish payroll systems or employee benefit plans as of the Transfer Time, as applicable, of each individual identified by Seller as expected to be an Employee of the Business, and Seller shall update such information periodically prior to the Applicable Closing Date to reflect new hires, leaves of absence and employment terminations and any other material changes thereto and provide copies of such updated lists and information to Buyer.

(c) In the event the employment of an Employee of the Business does not automatically transfer to Buyer or its Affiliates upon the occurrence of the Applicable Closing by operation of Law or pursuant to the transfer of the Transferred Equity Interests to Buyer, (i) Seller shall take, or cause its respective Affiliates to take, all actions required in accordance with applicable Law in respect of the transfer of employment of such Employees of the Business to Buyer or one of its Affiliates, and Seller shall encourage each Employee of the Business to accept any offers of employment pursuant to this Section 8.01(c) in its communications with such individuals; provided that, for the avoidance of doubt, nothing herein shall be interpreted as requiring Seller or any of its subsidiaries to provide any such Employee of the Business with any additional compensation or benefits or otherwise incur any material liability; (ii) in respect of Employees of the Business who are principally employed in Mexico, such Employees of the Business will be transferred to Buyer or one of its Affiliates as of the Applicable Closing Date through "employer substitution mechanics," and (iii) except in respect of Employees of the Business who are principally employed in Mexico, not less than ten (10) business days prior to the Applicable Closing, Buyer or one of its Affiliates will offer employment, effective at 11:59 P.M., local time, on the Applicable Closing

71

Date (the " Transfer Time "), to such Employee of the Business in accordance with this Agreement. Offers pursuant to this Section 8.01(c) shall (A) be for a position commensurate with the skills and experience of such Employee of the Business and at a geographic work location within fifty (50) miles of the applicable Employee of the Business' primary work location immediately prior to the Applicable Closing Date (or, to the extent applicable in jurisdictions other than the United States, within such lesser radius as is necessary to ensure severance is not due in connection with such relocation), and (B) otherwise comply in all respects with applicable Law (including with respect to compensation and benefits). With respect to any Employee of the Business to whom Buyer or one of its Affiliates is required to make an offer of employment pursuant to this Section 8.01(c), and who, as of the Applicable Closing Date, is on approved leave of absence from work with Seller or its Affiliates (each, an " Inactive Employee "), Buyer shall offer employment to such individual on the earliest practicable date following the return of such individual to work with Seller and its Affiliates and otherwise on terms and conditions consistent with this Section 8.01; provided that such employee returns to work within one hundred eighty (180) days following the Applicable Closing Date or such later time as required by applicable Law or the terms of the applicable Collective Bargaining Agreement upon presenting themselves for duty to the Business. Seller shall promptly notify Buyer of the occurrence and end of any such leave of absence. In the case of any Inactive Employee who becomes a Transferred Employee following the Applicable Closing Date, all references in this Agreement to (1) the Applicable Closing Date shall be deemed to be references to the date on which such individual becomes a Transferred Employee and (2) the Transfer Time shall be deemed to be references to 11:59 P.M., local time, on the date that such individual becomes a Transferred Employee. In any jurisdiction where the employment of an Employee of the Business can transfer automatically to Buyer and its Affiliates upon the occurrence of the Applicable Closing by operation of Law or pursuant to the transfer of the Transferred Equity Interests to Buyer, Buyer and Seller agree to take, or cause their respective Affiliates to take, all actions required under applicable Law and all other actions as are necessary or appropriate such that the employment of such Employee of the Business will transfer to Buyer or its Affiliates automatically as of the Transfer Time.

(d) Buyer or its Affiliates shall bear all the liabilities, obligations and costs relating to, and shall indemnify and hold harmless Seller and the Selling Affiliates from and against, any claims made by any Employee of the Business for any statutory or common law severance or other separation benefits, any contractual or other severance or separation benefits and any other legally mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments pursuant to a Judgment of a court having jurisdiction over the parties) and for any other claim, cost, liability or obligation (whether related to compensation, benefits or otherwise), in each case, arising out of (i) Buyer's breach of its obligations under this Article VIII or (ii) any claims for severance or other separation benefits in connection with the involuntary termination of employment by Buyer or its Affiliates of any Transferred Employee after the Transfer Time. Seller or its Affiliates shall bear all the liabilities, obligations and costs relating to, and shall indemnify and hold harmless Buyer and its Affiliates from and against, any claims made by any Employee of the Business for any statutory or common law severance or other separation benefits, any contractual or

other severance or separation benefits and any other legally mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments pursuant to a Judgment of a court having jurisdiction over the parties) and for any other claim, cost, liability or obligation (whether related to compensation, benefits or otherwise), in each case, not arising out of Buyer's breach of its obligations under this Article VIII or under clause (ii) above, including without limitation, any such claim that arising out of (A) the applicable Employee of the Business' refusal to accept an offer of employment made in compliance with this Article VIII from (or to commence employment with), or objection to the automatic transfer of employment to, Buyer or its Affiliates, and (B) any claims made by any Employee of the Business in China or other jurisdictions for any statutory severance or other separation benefits (including statutory economic compensation and statutory compensation payable in respect of accrued but not yet taken vacation days or other paid time off for the calendar year in which the Applicable Closing Date occurs) that arise as a result of any such employee who accepts an offer of employment from Buyer or any of its Affiliates making a request that such severance or other separation benefits be paid or provided by Seller or any of its subsidiaries. Buyer shall not encourage any Employee of the Business regarding a request described in the immediately preceding sentence, and in the event an Employee of the Business asks Buyer a question regarding such request, Buyer shall refer such Employee of the Business to an applicable representative of Seller with respect to such request.

(e) With respect to U.S. Transferred Employees, during the Benefits Continuation Period, Buyer or its Affiliates (i) shall provide to each Transferred Employee a total compensation opportunity and employee benefits that are no less favorable, in the aggregate, than those in effect for such Transferred Employee as of immediately prior to the Applicable Closing Date; provided that Buyer shall provide such Transferred Employee no less favorable base salary, wage rate and bonus opportunity, as applicable, than as set forth on Schedule 8.01(b) to the Disclosure Letter; and (ii) shall provide each Transferred Employee an office within a commute of no more than 50 miles from his or her office as of immediately prior to the Applicable Closing Date; provided that if a relocation beyond that distance is required and such Transferred Employee's employment terminates as a result of his or her desire not to accept such a relocation, such Transferred Employee shall receive the severance benefits at the level set forth in Section 8.01(f). Notwithstanding the foregoing, nothing contemplated by this Agreement shall be construed as requiring either Buyer or any of its Affiliates to continue the employment of any U.S. Transferred Employee for any period after the Applicable Closing Date; provided that such employee shall receive the severance benefits set forth in Section 8.01(f) if terminated under the circumstances described therein.

(f) With respect to U.S. Transferred Employees, during the Benefits Continuation Period, in the event of a termination of any Transferred Employee's employment by Buyer or its Affiliates without cause (as reasonably determined by Buyer or its Affiliate), Buyer or its Affiliates shall provide severance benefits to such Transferred Employee that are no less favorable than those severance or termination benefits applicable to such Transferred Employee as of immediately prior to the Applicable Closing Date; provided that such severance benefits shall be provided only if the Transferred Employee executes (and does not revoke) a release of claims in favor of Seller, Buyer and their respective Affiliates in a form reasonably satisfactory to Buyer.

(g) With respect to U.S. Transferred Employees, effective from and after the Transfer Time, Buyer or its Affiliates shall (i) recognize, for all purposes (other than benefit accrual under a defined benefit pension plan) under all plans, programs and arrangements established or maintained by Buyer or its Affiliates for the benefit of the Transferred Employees (the " Buyer Plans "), service with Seller and the Selling Affiliates prior to the Transfer Time to the extent such service was recognized under the corresponding Listed Plan covering such Transferred Employees, including for purposes of eligibility, vesting and benefit levels and accruals, in each case, except (x) where it would result in a duplication of benefits or (y) with respect to newly established Buyer Plans that do not provide credit for past service to such similarly situated employees of Buyer and its Affiliates and in which at least a comparable number of similarly situated of employees of Buyer and its Affiliates (other than the Transferred Employees or newly hired employees) participate, (ii) waive any preexisting condition exclusion, actively-at-work requirement or waiting period under all employee health and other welfare benefit plans established or maintained by Buyer or its Affiliates for the benefit of the Transferred Employees, except to the extent such pre-existing condition, exclusion, requirement or waiting period would have applied to such individual under the corresponding Listed Plan, and (iii) provide full credit for any co-payments, deductibles or similar payments made or incurred prior to the Transfer Time for the plan year in which the Applicable Closing occurs.

(h) If permitted by applicable Law, Seller shall pay to the Transferred Employees (i) all accrued but unpaid vacation for periods prior to the Transfer Time, and (ii) all base salary, wages, commissions or other amounts (but not including any annual bonuses or incentives) in respect of services performed by each Employee of the Business for Seller or its Affiliates that are earned and accrued but unpaid as of the Transfer Time, as applicable, in each case, to be paid as soon as administratively practicable after the Transfer Time or as required by law, but in no event later than thirty (30) business days after the Transfer Time. If, under applicable Law, Seller cannot pay the amounts described in the preceding sentence to Transferred Employees, Seller shall reimburse Buyer for any such amounts that Buyer pays to such Transferred Employees. Buyer will cooperate in good faith with Transferred Employees with respect to vacation commitments purchased or reserved by such Transferred Employees prior to the applicable Transfer Time in respect of periods occurring subsequent to such applicable Transfer Time; it being understood that any such vacation commitments ultimately honored by Buyer shall count against the applicable Transferred Employee's paid time off accrued during his or her service with Buyer or be unpaid.

(i) Subject to Seller providing all reasonably necessary support and information in a timely manner, no later than the Applicable Closing Date, Buyer shall establish or cause to be established (or utilize existing Buyer Plans), at its own expense, all necessary retirement, pension, employee welfare and employee benefit plans for Transferred Employees, as applicable. Effective as of the Transfer Time, each Transferred Employee shall cease to be an employee of Seller or the applicable Affiliate

74

and shall cease to participate in any Business Employee Benefit Plan (other than any Assumed Benefit Plan) as an active employee. Other than with respect to a government-sponsored benefit plan, (i) Seller shall be, or shall cause its Affiliates to be, responsible for all (A) medical, vision, dental and prescription drug claims for expenses incurred by any Transferred Employee or his or her dependents, (B) claims for short-term and long-term disability income benefits incurred by any Transferred Employee, (C) claims for group life, travel and accident, and accidental death and dismemberment insurance benefits incurred by any Transferred Employee and (D) claims relating to COBRA coverage attributable to "qualifying events" with respect to any Transferred Employee and his or her beneficiaries and dependents, in each case, prior to or as of the Transfer Time and (ii) Buyer shall be, or shall cause its Affiliates to be, responsible for all (A) medical, vision, dental and prescription drug claims for expenses incurred by any Transferred Employee or his or her dependents, (B) claims for short-term and long-term disability income benefits incurred by any Transferred Employee, (C) claims for group life, travel and accident, and accidental death and dismemberment insurance benefits incurred by any Transferred Employee and (D) claims relating to COBRA coverage attributable to "qualifying events" with respect to any Transferred Employee and his or her beneficiaries and dependents, in each case, after the Transfer Time. Except in the event of any claim for workers compensation benefits, for purposes of this Agreement, the following claims and liabilities shall be deemed to be incurred as follows: (1) medical, vision, dental and/or prescription drug benefits (including hospital expenses), upon provision of the services, materials or supplies comprising any such benefits and (2) short and long-term disability, life, accidental death and dismemberment and business travel accident insurance benefits, upon the death, illness, injury or accident giving rise to such benefits. Seller and its Affiliates shall be responsible for all claims for workers compensation benefits that are incurred prior to the Transfer Time by any Transferred Employee. Buyer and its Affiliates shall be responsible for all claims for workers compensation benefits that are incurred on or after the Transfer Time by any Transferred Employee. A claim for workers compensation benefits shall be deemed to be incurred on the date the injury giving rise to the claim occurs.

(j) Notwithstanding any other provision of this Section 8.01 to the contrary, with respect to each Non-U.S. Transferred Employee, during the applicable Benefits Continuation Period, or such longer period required by applicable Law, Buyer or its Affiliates shall provide to such employees terms and conditions of employment (including seniority and other service credit) that individually, are no less than as required by applicable Law, and in the aggregate, are no less favorable than those provided by Seller and its Affiliates immediately prior to the Transfer Time and (ii) amounts (and, to the extent required by applicable Law, types) of compensation and benefits (including severance and equity compensation benefits) that, individually, are no less than as required by applicable Law and, in the aggregate, are no less favorable than those provided by Seller and its Affiliates immediately prior to the Transfer Time. For the avoidance of doubt, Buyer may satisfy its obligations pursuant to the preceding sentence by providing cash payments or other benefits in lieu of equity compensation benefits. Without limiting the generality of Section 8.01 or Buyer's obligations hereunder, with respect to Transferred Employees covered by Collective Bargaining Agreements, effective from and after the Transfer Time, Buyer or one of its Affiliates shall comply with applicable Law concerning Collective Bargaining Agreements in the context of this Agreement.

75

(k) If any Employee of the Business requires a work permit or employment pass or other legal or regulatory approval for his or her employment with Buyer or its Affiliates, Buyer shall, and shall cause its Affiliates to, use their commercially reasonable efforts to cause any such permit, pass or other approval to be obtained and in effect prior to the Transfer Time (and Seller shall, and shall cause its Affiliates to, use their commercially reasonable efforts to transfer any such permit, pass or other approval to Buyer, to the extent permitted by applicable Law and to cooperate with Buyer or its applicable Affiliate with respect to any ongoing approval processes). Notwithstanding the foregoing, to the extent permitted by applicable Law or any Collective Bargaining Agreement, in the event an applicable work permit for an Employee of the Business is not in place with Buyer or its Affiliate as of the Transfer Time, such Employee of the Business shall be treated as an Inactive Employee hereunder; provided , however , that Buyer shall, and shall cause its Affiliates to, continue to use their commercially reasonable efforts to obtain the applicable work permit; provided , further , that Seller shall not be obligated to provide for the services of such Employee of the Business to be made available to Buyer or any substitute for such services.

(l) As of the Transfer Time, Seller shall provide to Buyer and its Affiliates copies of all employment records for each Transferred Employee required to be provided to Buyer and its Affiliates under applicable Law or as necessary for Buyer to establish payroll systems or employee benefit plans as of the Transfer Time. Seller shall be permitted to retain copies of such employment records, except where prohibited by applicable Law. Buyer and its Affiliates shall ensure that all such records are used only in connection with the employment of such Transferred Employee or as otherwise permitted by applicable Law.

(m) To the extent applicable, the parties hereto acknowledge the application of the European Council Directive of March 12, 2001 (2001/23/EC) (the " Directive "), relating to the safeguarding of employees' rights in the event of transfers of undertakings, businesses or parts of businesses and any country legislation implementing the Directive and any other similar Law (collectively, the " Transfer Regulations "). The parties hereto acknowledge and agree that they shall, and shall cause their respective Affiliates to, comply with the Transfer Regulations to the extent applicable.

(n) Seller and its Affiliates shall bear all the liabilities, costs and obligations relating to any claim or potential claim that is a benefit payable to a Transferred Employee under any Major Market Plan that is a defined benefit plan in the United Kingdom has transferred to and is a liability of Buyer or its Affiliates (including as a result of the transfer of the Transferred Equity Interests to Buyer and including, for the avoidance of doubt, all such liabilities, contingent or otherwise, that exist as of the Applicable Closing Date).

76

(o) In the United States, pursuant to IRS Revenue Procedure 2004-53, Buyer and Seller and their respective Affiliates shall apply the "standard" method for purposes of employee payroll reporting with respect to any Employee of the Business.

(p) The provisions contained in this Agreement with respect to any Employee of the Business are included for the sole benefit of the respective parties hereto and shall not create any right in any other person, including any Employee of the Business (or dependent or beneficiary of any of the foregoing). Nothing herein shall be deemed an amendment of any plan providing benefits to any Employee of the Business or of any other employee benefit plan.

(q) Notwithstanding anything to the contrary in this Agreement, references to the "Applicable Closing" and "Applicable Closing Date" in this Section 8.01 shall be deemed to mean, with respect to (i) any Employee of the Business at the Juarez Facility (as defined in the Transition Manufacturing Services Agreement) who works on a production line used to manufacture the Products (the " Juarez Line Employees "), the time and date, as applicable, of the Line Transfer in respect of such production line and (ii) any other Employee of the Business at the Juarez Facility (a "Juarez Non-Line Employee", and together with the Juarez Line Employees, the " Juarez Employees "), the time and date, as applicable, of the Non-Line Role Transfer in respect of such Juarez Non-Line Employee, each as set forth (and defined) in Schedule 7.11 to the Disclosure Letter, and in each case to the extent permitted by and in accordance with applicable Law. Seller and Buyer shall cause the employment of each Juarez Employee to transfer from Seller and its Affiliates to Buyer and its Affiliates through "employer substitution mechanics" as required by Mexican Federal Labor Law at the applicable time set forth in the immediately preceding sentence in accordance with this Section 8.01 and through the delivery to each of such Juarez Employees of a notice of employer substitution to be furnished to them by Seller and Buyer (directly or through the local Conciliation and Arbitration Board) on the Applicable Closing Date.

ARTICLE IX

Termination

SECTION 9.01. Buyer Termination . This Agreement may be terminated by Buyer: (a) at any time prior to the Principal Closing, if (i) Seller shall have failed to comply, in any material respect, with any of Seller's covenants or agreements contained in this Agreement or (ii) any one or more of the representations or warranties of Seller contained in this Agreement shall prove to have been inaccurate in any material respect when made and, in the case of clauses (i) and (ii), such failure or inaccuracy (A) would give rise, if occurring or continuing on the Principal Closing Date, to the failure of a condition set forth in Section 5.01(a) or Section 5.01(b), as applicable and (B) has not been or is incapable of being cured by Seller prior to the earlier of (1) the Outside Date and (2) the twentieth (20 th ) business day after Seller's receipt of written notice thereof from Buyer; provided that such twentieth (20 th ) business day shall be extended (up to the Outside Date) so long as Seller is using its commercially reasonable efforts to cure any such breach; (b) at any time prior to the Principal Closing, if any of the conditions

77

precedent to the performance of Buyer's obligations at the Principal Closing shall have become incapable of fulfillment by the Outside Date; or (c) if the Principal Closing shall not have occurred on or before the Outside Date. Notwithstanding anything herein to the contrary, Buyer may only terminate this Agreement pursuant to the preceding clauses (a), (b) or (c) if at the time of termination Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

SECTION 9.02. <u>Seller Termination</u> . This Agreement may be terminated by Seller: (a) at any time prior to the Principal Closing, if (i) Buyer shall have failed to comply, in any material respect, with any of Buyer's covenants or agreements contained in this Agreement or (ii) any one or more of the representations or warranties of Buyer contained in this Agreement shall prove to have been inaccurate in any material respect when made and, in the case of clauses (i) and (ii), such failure or inaccuracy (A) would give rise, if occurring or continuing on the Principal Closing Date, to the failure of a condition set forth in Section 5.02(a) or Section 5.02(b), as applicable, and (B) has not been or is incapable of being cured by Buyer prior to the earlier of (1) the Outside Date and (2) the twentieth (20th) business day after Buyer's receipt of written notice thereof from Seller; <u>provided</u> that such twentieth (20th) business day shall be extended (up to the Outside Date) so long as Buyer is using its commercially reasonable efforts to cure any such breach; (b) at any time prior to the Principal Closing, if any of the conditions precedent to the performance of Seller's obligations at the Principal Closing shall have become incapable of fulfillment by the Outside Date; or (c) if the Principal Closing shall not have occurred on or before the Outside Date. Notwithstanding anything herein to the contrary, Seller may only terminate this Agreement pursuant to the preceding clauses (a), (b) or (c) if at the time of termination Seller is not in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

SECTION 9.03. <u>Effect of Termination</u> . If this Agreement is terminated pursuant to this Article IX, it will become void and of no further force and effect, with no liability on the part of any party to this Agreement (or any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents), except that the provisions of this Section 9.03, Section 9.04 and Article XI will survive any termination of this Agreement; <u>provided</u> , <u>however</u> , that nothing herein shall relieve any party from liability for Damages incurred or suffered by any other party as a result of any fraud, willful misconduct or intentional breach of any covenant contained in this Agreement.

SECTION 9.04. <u>Buyer Termination Fee</u> . (a) In the event that (i) this Agreement is terminated pursuant to (A) Section 9.01(c) or 9.02(c) and, at the time of such termination, any of the conditions to the Principal Closing set forth in Section 5.01(e) (if such Principal Closing Legal Impediment giving rise to such termination is in respect of an Anti-Trust Approval in any of the jurisdictions specified on <u>Schedule 5.01(f)</u> to the Disclosure Letter) or 5.01(f) shall not have been satisfied or (B) pursuant to Section 9.01(b) or 9.02(b) (as a result of a Principal Closing Legal Impediment in respect of an Anti-Trust Approval in any of the jurisdictions specified on <u>Schedule 5.01(f)</u> to the Disclosure Letter or the inability of the condition in Section 5.01(f) to be satisfied), (ii) the failure of one or more of such conditions giving

rise to such termination is caused by the failure of Buyer to sell, divest or dispose (including by licensing any intellectual property rights) of any assets or businesses of Buyer or any of its Affiliates (or equity interests held by Buyer or any of its Affiliates in entities with assets or businesses) under circumstances in which Buyer would have been required to sell, divest or dispose of any assets of the Business pursuant to Section 6.06(d) and (iii) at the time of such termination, all conditions set forth in Section 5.01 would have been satisfied if the Principal Closing would have occurred on the date of such termination (other than (x) the condition in Section 5.01(e) if the failure of such condition to be satisfied is solely the result of a Principal Closing Legal Impediment in respect of an Anti-Trust Approval in any of the jurisdictions specified on Schedule 5.01(f) to the Disclosure Letter, (y) the condition in Section 5.01(f) and (z) the condition in Section 5.01(j) if the failure of such condition to be satisfied is solely the result of the failure to obtain the requisite Anti-Trust Approval in the applicable jurisdiction or the existence of a Principal Closing Legal Impediment in respect of an Anti-Trust Approval in the applicable jurisdiction), then Buyer shall pay to Seller a termination fee of thirty eight million, eight hundred eighty thousand dollars ($38,880,000) in cash (the " Buyer Termination Fee ").

(b) Any payment required to be made pursuant to Section 9.04(a) shall be made to Seller promptly following termination of this Agreement (and in any event no later than five (5) business days following the termination of this Agreement). Such payment shall be made by wire transfer of immediately available funds to an account designated in writing by Seller.

(c) Buyer acknowledges and agrees that the agreement contained in this Section 9.04 is an integral part of the Transactions, and that, without this agreement, Seller would not enter into this Agreement; accordingly, if Buyer fails promptly to pay any amount due pursuant to this Section 9.04, and, in order to obtain such payment, Seller commences a suit that results in a judgment against Buyer for the Buyer Termination Fee, Buyer shall pay to Seller its costs and expenses (including attorneys' fees and expenses) in connection with such suit, together with interest on the amount of the Buyer Termination Fee from the date such payment was required to be made until the date of payment at the prime rate of JPMorgan Chase Bank, N.A., in effect on the date such payment was required to be made.

ARTICLE X

Indemnification

SECTION 10.01. Survival . All representations and warranties contained in this Agreement shall survive the Principal Closing until the date that is eighteen (18) months from the Principal Closing Date, and shall then expire and be of no force or effect; provided , however , that (a) the representations and warranties set forth in Section 3.18 (Taxes) shall survive each Closing until sixty (60) calendar days following the expiration of the applicable statute of limitations, (b) the representations and warranties of Seller set forth in Section 3.10 (Intellectual Property) shall survive the Principal Closing until the date that is twenty four (24) months from the Principal Closing Date and

(c) the representations and warranties of Seller set forth in Sections 3.01 (Organization and Good Standing), 3.02 (Authority), 3.03(b) (Title to Transferred Equity Interests), and 3.16 (Brokerage Fees) (collectively, the " Seller Fundamental Representations ") and the Buyer Fundamental Representations (together with the Seller Fundamental Representations, the " Fundamental Representations ") shall survive indefinitely. Any representation or warranty that is the subject of any Claim with respect to which notice is delivered by the Indemnified Party to the Indemnifying Party prior to the expiration of the applicable survival period set forth in this Section 10.01 shall survive with respect to such Claim until such Claim is fully and finally resolved. The covenants and agreements contained in this Agreement shall survive indefinitely.

SECTION 10.02. Indemnification by Seller . Subject to the provisions of this Article X, from and after the Principal Closing Date, in addition to the indemnification set forth in Section 7.08(d), Seller shall indemnify and hold harmless Buyer and its directors, officers, employees, Affiliates (including the Transferred Companies), agents and representatives (collectively, the " Buyer Indemnitees ") against and from any and all Damages which any Buyer Indemnitee may incur or suffer to the extent such Damages arise out of or result from (a) the breach of any representation or warranty made by Seller in this Agreement (other than the representations and warranties contained in clauses (iv) and (v) of Section 3.13(b)) as if made on the Principal Closing Date, (b) any breach by Seller or any of its Affiliates of its covenants or agreements contained herein or (c) any of the Excluded Liabilities. Notwithstanding that a claim for Damages may fall into multiple categories of this Section 10.02, a Buyer Indemnitee may recover such Damages one time only.

SECTION 10.03. Indemnification by Buyer . Subject to the provisions of this Article X, from and after the Principal Closing Date, in addition to the indemnification set forth in Section 6.07(a), Section 7.01(b), Section 7.08(d), Section 8.01(d) and Section 8.01(q), Buyer shall indemnify and hold harmless Seller against and from any and all Damages which Seller and any of its directors, officers, employees, Affiliates (other than the Transferred Companies), agents and representatives (collectively, the " Seller Indemnitees " and, together with the Buyer Indemnitees, the " Indemnitees ") may incur or suffer to the extent such Damages arise out of or result from (a) the breach of any representation or warranty made by Buyer in this Agreement as if made on the Principal Closing Date, (b) any breach by Buyer or any of its Affiliates of its covenants or agreements contained herein or (c) without limiting the indemnification obligations of Seller pursuant to Section 10.02, any of the Assumed Liabilities. Notwithstanding that a claim for Damages may fall into multiple categories of this Section 10.03, a Seller Indemnitee may recover such Damages one time only.

SECTION 10.04. Scope of Liability . The rights of the Indemnitees to indemnification pursuant to the provisions of this Article X are subject to the following:

   (a) Indemnification shall be available to the Buyer Indemnitees or the Seller Indemnitees under clause (a) of Section 10.02 or clause (a) of Section 10.03 (as applicable) with respect to breaches of representations or warranties only to the extent the aggregate amount of Damages otherwise due to the Buyer

80

Indemnitees or the Seller Indemnitees, respectively, for all Claims under clause (a) of Section 10.02 or clause (a) of Section 10.03 (as applicable) exceeds nineteen million four hundred forty thousand dollars ($19,440,000) (the " Deductible ") and then indemnification shall be available to the Buyer Indemnitees or the Seller Indemnitees, respectively, for the amount of all payments due to the Buyer Indemnitees or the Seller Indemnitees, respectively, in excess of the Deductible, but only for all such Damages up to one hundred ninety four million four hundred thousand dollars ($194,400,000); provided , however , that the limitations set forth in this Section 10.04(a) shall not apply to Damages in respect of claims for breach of any Fundamental Representation.

(b) None of the Buyer Indemnitees or the Seller Indemnitees shall be entitled to indemnification under clause (a) of Section 10.02 or clause (a) of Section 10.03 (as applicable) with respect to breaches of representations or warranties unless the Damages arising out of or resulting from such breach (or aggregated Damages arising out of or resulting from the same or similar facts, events or circumstances) are greater than one hundred fifty thousand dollars ($150,000) (it being understood that any such Claims for amounts less than $150,000 shall be ignored in determining whether the Deductible has been exceeded and thereafter); provided , however , that the limitations set forth in this Section 10.04(b) shall not apply to Damages in respect of claims for breach of any Fundamental Representation.

(c) The amount of Damages resulting from any inaccuracy or breach of the representations and warranties contained in this Agreement shall be determined without references to the terms "material," "materially," "Material Adverse Effect," "material adverse effect" or other similar qualifications as to materiality (including specific monetary thresholds) contained or incorporated in any such representation or warranty, but such qualifications, to the extent contained or incorporated in any such representation or warranty, shall apply for the purposes of determining whether any such inaccuracy or breach has occurred.

(d) The right of the Indemnitees to seek indemnification pursuant to this Article X shall not be affected or deemed waived by reason of the fact that, based on any facts or circumstances known, or that should have been known, to Seller, Buyer or any other Indemnitee, including from any investigation made by or on behalf of such Indemnitee, the information provided in the Management Presentation, the Data Room or given in writing to such Indemnitee prior to the date of this Agreement (except, for the avoidance of doubt, any disclosure of any fact or item in any portion to the Disclosure Letter), such Indemnitee or any of its representatives knew or should have known that any representation or warranty is, was or might be inaccurate.

SECTION 10.05. Claims . Any Buyer Indemnitee or Seller Indemnitee claiming it may be entitled to indemnification under this Article X (the " Indemnified Party ") shall give prompt written notice to the other party (the " Indemnifying Party ") of each matter, action, cause of action, claim, demand, proceeding, assessment, fact or other

81

circumstances upon which a claim for indemnification (a " Claim ") hereunder may be based. Such notice shall contain, with respect to each Claim and only to the extent known to such Indemnified Party, such facts and information as are then reasonably available, including the estimated amount of Damages and the specific basis for indemnification hereunder. Failure to give prompt notice of a Claim hereunder shall not affect the Indemnifying Party's obligations hereunder, except to the extent the Indemnifying Party is prejudiced by such failure.

SECTION 10.06. Defense of Actions . The Indemnified Party shall permit the Indemnifying Party, at the Indemnifying Party's option and expense, to assume the complete defense of any Claim by any third party within thirty (30) calendar days of receipt of notice of such Claim by the Indemnifying Party, with full authority to conduct such defense, through counsel reasonably acceptable to the Indemnified Party at the expense of the Indemnifying Party, and to settle or otherwise dispose of the same and the Indemnified Party will reasonably cooperate in such defense; provided that the Indemnifying Party will (a) permit the Indemnified Party to participate in such defense, settlement or disposal through counsel chosen by the Indemnified Party (provided that the fees and expenses of such counsel shall be paid by such Indemnified Party) and (b) not, in defense of any such Claim, except with the prior written consent of the Indemnified Party, consent to the entry of any Judgment or enter into any settlement (i) which provides for any relief other than the payment of monetary damages, (ii) which does not include as an unconditional term thereof the giving by the third-party claimant to the Indemnified Party of a release from all liability in respect thereof and/or (iii) which includes any admission of wrongdoing or misconduct by the Indemnified Party. If the Indemnifying Party elects to assume the defense of any third-party Claim, the Indemnifying Party shall not enter into any settlement of such Claim for the payment of monetary damages unless (A) the Indemnified Party consents in writing to such settlement or (B) the Indemnifying Party confirms in writing to the Indemnified Party that the Indemnifying Party will be responsible for indemnifying the Indemnified Party for the Damages resulting from such Claim, to the extent provided in (and subject to the parameters of) this Article X. The Indemnifying Party shall not be entitled to assume the defense of any third-party Claim without the consent of the Indemnified Party if such third-party Claim (x) seeks an injunction or other equitable or non-monetary relief against the Indemnified Party (other than equitable or non-monetary relief that is incidental to monetary damages as the primary relief sought) and not also against the Indemnifying Party or (y) is related to or otherwise arises in connection with any criminal matter, in which case the Indemnified Party shall allow the Indemnifying Party a reasonable opportunity to participate in such defense with its own counsel and at its own expense. Notwithstanding an election by the Indemnifying Party to assume the defense of any third-party Claim, the Indemnified Party shall have the right to employ one separate co-counsel and to participate in the defense in such action or proceeding, and the Indemnifying Party shall bear the reasonable fees, costs and expenses of such separate counsel, if, based on advice from counsel, there exists any actual or potential conflict of interest between the Indemnified Party and the Indemnifying Party in connection with the defense of the third-party Claim. In any event, the Indemnified Party and the Indemnifying Party and their respective counsel shall cooperate in the defense of any third-party Claim subject to this Article X and keep each other informed of all significant

82

developments relating to any such third-party Claim, and provide copies of all relevant correspondence and documentation relating thereto. In all circumstances, the Indemnified Party will not settle any Claim without the prior written consent of the Indemnifying Party, such consent not to be unreasonably withheld.

SECTION 10.07. <u>Limitation, Exclusivity, No Duplicate Recovery</u> . No Claim for indemnification for a breach of any representation or warranty shall be made or have any validity unless the Indemnified Party shall have given written notice of such Claim to the Indemnifying Party prior to the expiration of the applicable representation or warranty pursuant to Section 10.01. This Article X, Section 6.07(a), Section 7.01(b), Section 7.08(d), Section 8.01(d) and Section 8.01(q) provide the exclusive means by which a party may assert and remedy claims for monetary relief pursuant to this Agreement following the Principal Closing Date, including any breach of any representation, warranty, covenant or agreement contained in this Agreement, and Section 11.12 provides the exclusive means by which a party may bring actions against the other party under this Agreement. With respect to any Damages arising under this Agreement, Buyer agrees that it shall only seek such Damages from Seller and the Selling Affiliates, and Buyer hereby waives the right to seek Damages from or equitable remedies, such as injunctive relief, against any Affiliate of Seller (other than the Selling Affiliates) or any director, officer or employee of Seller (or any of its Affiliates); <u>provided</u> that such limitations shall not apply in connection with claims for successor liability or fraudulent conveyance. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Indemnified Party be entitled to indemnification under this Article X with respect to any matter to the extent that such matter was reflected in the calculation of the adjustment to the Purchase Price, if any, pursuant to Section 2.04. For the avoidance of doubt, the indemnification obligations of Buyer and Seller in respect of the allocation of Assumed Liabilities and Excluded Liabilities shall not govern the allocation of responsibility for liabilities between Buyer and Seller and their respective Affiliates in respect of any future commercial arrangements unrelated to this Agreement between the parties, such matters being addressed in the terms thereof.

SECTION 10.08. <u>Calculation of Damages</u> . Except as otherwise provided in this Article X, in any case where the Indemnified Party subsequently recovers from third parties any amount in respect of a matter with respect to which an Indemnifying Party has indemnified it pursuant to this Article X, such Indemnified Party shall promptly pay over to the Indemnifying Party the amount so recovered (after deducting therefrom the full amount of the expenses incurred by it in procuring such recovery), solely to avoid duplicative recovery for the same Damage, but not in excess of any amount previously so paid by the Indemnifying Party to or on behalf of the Indemnified Party in respect of such matter.

SECTION 10.09. <u>Tax Treatment of Indemnity Payments</u> . Any indemnity payment under this Agreement shall be treated as an adjustment to the Purchase Price for Tax purposes unless there is no reasonable basis for doing so under the applicable Tax Law.

83

ARTICLE XI

Miscellaneous

SECTION 11.01. <u>No Additional Representations</u> . Buyer is relying, in addition to the representations, warranties, covenants and agreements set forth in this Agreement and the other Transaction Documents, on its own investigation, examination and valuation of the Business, including the Transferred Assets, in effecting the transactions covered by this Agreement and the other Transaction Documents. Buyer is purchasing the Transferred Assets based on the results of its inspections and investigations and the representations, warranties, covenants and agreements set forth in this Agreement and the other Transaction Documents, and not on any representation or warranty of Seller or any of its Affiliates not expressly set forth in this Agreement or any of the other Transaction Documents.

SECTION 11.02. <u>Financial Information and Projections</u> . In connection with Buyer's investigation of the Business, Buyer has received from Seller various forward-looking statements regarding the Business (including the estimates, assumptions, projections, forecasts and plans furnished to it) (the " <u>Forward-Looking Statements</u> "). Buyer acknowledges and agrees (i) there are uncertainties inherent in attempting to make the Forward-Looking Statements; (ii) Buyer is familiar with such uncertainties; and (iii) that Seller makes no representation or warranty with respect to any Forward-Looking Statement.

SECTION 11.03. <u>To the knowledge</u> . "To the knowledge of Seller" or other references to the knowledge or awareness of Seller or its Affiliates means the actual knowledge of those individuals set forth on <u>Schedule 11.03(a)</u> to the Disclosure Letter. "To the knowledge of Buyer" or other references to the knowledge or awareness of Buyer or its Affiliates means the actual knowledge of those individuals set forth on <u>Schedule 11.03(b)</u> to the Disclosure Letter.

SECTION 11.04. <u>Waivers</u> . At any time and from time to time prior to the Applicable Closing, the parties hereto may by written agreement signed by both parties, (a) extend the time for, or waive in whole or in part, the performance of any obligation of any party hereto under this Agreement, (b) waive any inaccuracy in any representation, warranty or statement of any party hereto or (c) waive any condition or compliance with any covenant contained in this Agreement. The failure of a party hereto to require performance of any provision hereof at any time shall in no manner affect such party's right at a later time to enforce such provision. No waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

SECTION 11.05. <u>Modifications and Amendments</u> . This Agreement shall not be altered or otherwise amended except pursuant to an instrument in writing executed and delivered by each of the parties hereto.

84

SECTION 11.06. <u>Assignability, Beneficiaries, Governing Law and Enforcement</u> . (a) This Agreement and the rights and obligations hereunder shall be binding upon and inure solely to the benefit of the parties hereto, their respective successors and permitted assigns, but this Agreement shall not be assignable by either party hereto without the express written consent of the other party hereto, which will not be unreasonably withheld; <u>provided</u> that, without such consent, either party may assign its rights and obligations hereunder (in whole but not in part) to an Affiliate at any time (but no such assignment shall relieve such assigning party of its obligations under this Agreement), or to a third party in connection with a sale or transfer (by means of a merger, stock sale or otherwise) of all or substantially all of such party's business. Other than as explicitly set forth herein, including in Sections 10.02 and 10.03, nothing contained herein is intended to confer upon any Person, other than the parties to this Agreement and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement. This Agreement shall be governed by the law of the State of New York without reference to the choice of law doctrine of such state.

(b) The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at law if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement without proof of actual damages, this being in addition to any other remedy to which any party is entitled at law or in equity. Each party further agrees that (i) no other party hereto or any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 11.06, and each party hereto irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument and (ii) it will not oppose the granting of such remedy.

SECTION 11.07. <u>Notices</u> . Any notice, request, instruction or other communication to be given hereunder by either party to the other party shall be in writing and delivered personally, or sent by postpaid registered or certified mail, or by email (provided confirmation of email receipt is obtained):

85

if to Seller, addressed to:

Ethicon, Inc.
Route 22 West
Somerville, NJ 08876
Attention: Vice President, Law

with a copy to:

Johnson & Johnson Law Department
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attn: General Counsel MD&D
Email: rfletch@its.jnj.com

and

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Attn:    Robert I. Townsend, III, Esq.
         Damien R. Zoubek, Esq.
Email:  rtownsend@cravath.com
        dzoubek@cravath.com

and if to Buyer, addressed to:

Cardinal Health, Inc.
7000 Cardinal Place
Dublin, OH 43017
Attn:    General Counsel
Email:  steve.falk@cardinalhealth.com

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Attn:    David A. Katz, Esq.
         David K. Lam, Esq.
Email:  DAKatz@wlrk.com
        DKLam@wlrk.com

or to such other address for either party as such party shall hereafter designate by like notice.

86

SECTION 11.08. <u>Headings</u> . The Article and Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning and interpretation of this Agreement.

SECTION 11.09. <u>Counterparts</u> . This Agreement may be executed in two or more counterparts and such counterparts may be delivered in electronic format (including by fax or in portable document format (.pdf)), each of which shall be deemed to be an original and all of which shall be deemed to constitute the same Agreement.

SECTION 11.10. <u>Entire Agreement</u> . This Agreement, together with the Exhibits expressly contemplated hereby and attached hereto, the Disclosure Letter, the Transaction Documents, the Confidentiality Agreement and the other agreements and certificates delivered in connection herewith or therewith, contain the entire agreement between the parties with respect to the Transactions and supersedes all prior agreements or understandings between the parties. Other than the Confidentiality Agreement entered into between the parties, the Transaction Documents are intended to define the full extent of the legally enforceable undertakings and representations of the parties hereto, and no promise or representation, written or oral, which is not set forth in such agreements is intended by either party to be legally binding.

SECTION 11.11. <u>Payment of Expenses</u> . Except as otherwise set forth in this Agreement, all costs and expenses associated with this Agreement and the Transactions, including the fees of counsel and accountants, shall be borne by the party incurring such expenses.

SECTION 11.12. <u>Consent to Jurisdiction; Waivers</u> . (a) All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in the United States District Court for the Southern District of New York. The parties hereto hereby (i) submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York for the purpose of any action arising out of or relating to this Agreement brought by any party hereto and (ii) irrevocably waive, and agree not to assert by way of motion, defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named court, that its property is exempt or immune from attachment or execution, that the action is brought in an inconvenient forum, that the venue of the action is improper or that this Agreement or the transactions may not be enforced in or by the above-named court.

(b) **IN CONNECTION WITH ANY DISPUTE HEREUNDER, EACH PARTY HERETO WAIVES ITS RIGHT TO TRIAL OF ANY ISSUE BY JURY.**

(c) **IN CONNECTION WITH ANY DISPUTE HEREUNDER, EACH PARTY HERETO WAIVES ANY CLAIM TO PUNITIVE, EXEMPLARY OR SPECULATIVE DAMAGES, OR ANY OTHER TYPE OF DAMAGES THAT ARE NOT REASONABLY FORESEEABLE, IN EACH CASE FROM THE OTHER PARTY HERETO (OR ANY AFFILIATE OF SUCH OTHER PARTY HERETO) (IT BEING UNDERSTOOD THAT THIS WAIVER DOES NOT COVER ANY RIGHT TO INDEMNITY FOR ANY DAMAGES PAYABLE TO THIRD PARTIES THAT MAY BE IMPOSED OR OTHERWISE INCURRED).**

87

(d) **IN CONNECTION WITH ANY DISPUTE HEREUNDER, EACH PARTY HERETO WAIVES ANY CLAIM FOR PREJUDGMENT INTEREST FROM THE OTHER.**

SECTION 11.13. <u>Reserved</u>

SECTION 11.14. <u>Fulfillment of Obligations</u> . Any obligation of any party to any other party under this Agreement, which obligation is performed, satisfied or fulfilled by an Affiliate of such party, shall be deemed to have been performed, satisfied or fulfilled by such party.

SECTION 11.15. <u>Severability</u> . It is the desire and intent of the parties hereto that the provisions of this Agreement will be enforced to the fullest extent permissible under the Laws in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement will be determined to be invalid or unenforceable, such provision will be deemed amended to delete therefrom the portion thus determined to be invalid or unenforceable, such deletion to apply to the extent of such invalidity or unenforceability, without affecting in any way the remaining provisions hereof only with respect to the operation of such provision in the particular jurisdiction in which such determination is made.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

88

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**CARDINAL HEALTH, INC.**

By /s/ Donald M. Casey, Jr.
  Name: Donald M. Casey, Jr.
  Title: CEO Medical Segments

**ETHICON, INC.**

By _____
  Name:
  Title:

89
Annex 2.02(a)
Transferred Assets

The Transferred Assets consist of Seller's and the relevant Selling Affiliates' right, title and interest in, to and under the following as they exist at the time of the Applicable Closing:

(i) <u>Real Property</u> . (A) The real property and any buildings, improvements and fixtures thereon, as set forth on Schedule 2.02(a)(i)(A) to the Disclosure Letter (collectively, the " <u>Transferred Real Property</u> "), together with all improvements, fixtures and appurtenances thereto and rights in respect thereof to the extent leased, licensed or owned by Seller or any of the relevant Selling Affiliates;

(ii) <u>Inventory</u> . All Inventory owned or held by Seller or any Asset Selling Affiliate at the time of the Applicable Closing;

(iii) <u>Equipment</u> . The machinery, equipment (including any associated machine control systems and associated data acquisition hardware resident on the transferring equipment and including any dedicated software applications, but not including any shared computer systems on which the applications run), tools, furniture, fixtures and other tangible personal property (but excluding (x) the Inventory and Transferred IT which are identified separately on this Annex 2.02(a) and (y) personal computers, which are to be retained by Seller and leased to Buyer pursuant to the Transition Services Agreement) that is (A) owned or leased by Seller or any Asset Selling Affiliate and (B) primarily related to or primarily used in the Business, whether located at the sites of Seller, at a customer facility or the property of any vendor performing manufacturing, warehousing or other services for the Business, together with the interests of Seller or any Asset Selling Affiliate in respect of any rights of use or warranties relating thereto, other than, for the avoidance of doubt, the BWI Equipment;

(iv) <u>Goodwill</u> . The goodwill generated by or associated with the Business;

(v) <u>Permits</u> . All permits, licenses and authorizations, franchises, approvals, orders, registrations (but excluding the Product Registrations which are identified separately on this Annex 2.02(a)), certificates, variances or similar rights granted to Seller or any Asset Selling Affiliate by a Governmental Entity primarily related to or primarily used in connection with the operation of to the Business prior to the Applicable Closing Date;

(vi) <u>Business Records</u> . The following records, files, data and other materials, whether in hard copy or electronic form, to the extent primarily related to the Business and in the possession of Seller or any Asset Selling Affiliate: (1) vendor lists, (2) customer lists, (3) a list of the distributors for the Products, (4) pricing lists for the Products, (5) testing and clinical data, market research reports, marketing plans and other marketing-related information and materials (including Personal Information), (6) subject to Section 7.01, advertising, marketing data,

90

marketing plans, sales and promotional materials, (7) quality control, vigilance and regulatory records and (8) ledgers, and other business records, and (8) Tax Returns (but only to the extent Tax Returns are related solely to the Transferred Companies or solely related to the Business or Transferred Assets) (collectively, the " Transferred Records "); provided that, to the extent practicable, Buyer shall be entitled to copies or extracts of any such materials relating to the Business that are not included in the Transferred Records;

(vii) Product Registrations . The Product Registrations;

(viii) Intellectual Property . (A) All IP Rights owned or licensed by Seller or any Asset Selling Affiliate primarily related to or primarily used in the Business, other than any IP Rights included in the Excluded Assets, including (whether or not primarily related to or primarily used in the Business) (1) the Trademarks set forth on Schedule 2.02(a)(viii)(A)(1) to the Disclosure Letter and (2) the Patents set forth on Schedule 2.02(a)(viii)(A)(2) to the Disclosure Letter (collectively, the " Transferred IP ") and (B) the Licensed IP Contracts and all other licenses, settlements or covenants not to sue relating primarily to Patents and Trademarks included in the Transferred IP (collectively, the " Transferred IP Licenses ");

(ix) Domain Names . The Internet domain names set forth on Schedule 2.02(a)(ix) to the Disclosure Letter;

(x) IT Systems . All (A) object code and source code versions of software programs, scripts, web code, application interfaces and similar software tools, including development kits and support programs, and (B) stand-alone information technology hardware used to run such software and manage such data, in each case, owned or licensed by Seller or any Asset Selling Affiliate and dedicated exclusively to the Business, including as set forth on Schedule 2.02(a)(x) to the Disclosure Letter (collectively, the " Transferred IT ");

(xi) Contracts . All leases, licenses (other than Transferred Real Property Leases and Transferred IP Licenses which are identified separately on this Annex 2.02(a)), bids, tenders, purchase orders, consulting agreements, supply agreements, distribution contracts, manufacturing contracts, maintenance contracts, agreements, commitments and other contracts, whether or not reduced to writing (collectively, " Contracts ") exclusively relating to the Business or any of the Transferred Assets but specifically excluding the Excluded Contracts (collectively, the " Transferred Contracts ");

(xii) Benefit Plans . All assets of or relating to (including all assets held in trust in any form) and any insurance, administration or other contracts relating to Assumed Benefit Plans to the extent such assets are required to transfer to Buyer and its Affiliates under applicable Law (including where transfer is required in order to apply the Transfer Regulations or to effect a mandatory transfer of employment under the Transfer Regulations, as applicable) or pursuant to the transfer of the Transferred Equity Interests to Buyer;

91

(xiii) <u>Corporate Organizational Records</u> . With respect to each Transferred Company, the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance and existence of such Transferred Company;

(xiv) <u>DES Business.</u> All assets of or exclusively relating to the drug-eluting stent business of the Transferred Companies, which business has been discontinued (the " <u>DES Business</u> "), including (A) the Trademarks set forth on Schedule 2.02(a)(xiv)(A)(1) to the Disclosure Letter; and (B) to the extent in the possession of a Transferred Company (but excluding records or files not reasonably separable from documents or databases that do not relate exclusively to the DES Business): (x) testing and clinical data records and files and (y) quality control, vigilance and regulatory records;

(xv) <u>Insurance Proceeds</u> . All insurance proceeds actually received by Seller or any Selling Affiliate prior to or after the Applicable Closing under any insurance policy written prior to the Applicable Closing in connection with (i) the damage or destruction of any of the Transferred Assets from and after the date hereof and prior to the Applicable Closing that is, or would have been but for such damage or destruction, included in the Transferred Assets or (ii) any Assumed Liability (other than, in the case of this clause (ii), where insurance proceeds are directly or indirectly funded by Seller or any of its Affiliates through self-insurance or other similar arrangement);

(xvi) <u>Cash Proceeds of Sales and Dispositions</u> . All net cash proceeds actually received by Seller or any Selling Affiliate prior to or after the Applicable Closing in connection with any sales or other dispositions from and after the date hereof through the Applicable Closing of any asset that would have been included in the Transferred Assets but for such sale or disposition, other than with respect to sales of Inventory in the ordinary course of business consistent with past practice;

(xvii) <u>Claims; Settlement Proceeds</u> . Any and all claims, causes of action, defenses and rights of offset or counterclaim, or settlement agreements (in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) arising out of the Transferred Contracts (other than any accounts receivable described in clause (i) of Annex 2.02(b)) and all proceeds of any settlement from and after the date hereof through the Applicable Closing of any such claims, causes of action, defenses and rights of offset or counterclaim that would have been included in the Transferred Assets but for such settlement;

(xviii) <u>Transferred Company Assets</u> . All assets of the Transferred Companies that would be Transferred Assets if the Transferred Companies were Asset Selling Affiliates (but specifically excluding any assets of the Transferred Companies that would be Excluded Assets), it being understood that the transfer of the Transferred Equity Interests will constitute transfer of such assets;

92

(xix) Miami Lakes Facility Assets . All assets, properties, machinery, equipment, tools, furniture, fixtures and other tangible personal property located at the facility of the Business in Miami Lakes, Florida, that is owned or leased by Seller or any Asset Selling Affiliate, in each case, other than (A) the BWI Equipment and (B) those assets exclusively related to any business of Seller or its Affiliates other than the Business;

(xx) Equity Interests . All right, title and interest to (A) the equity interests marked as "(minority investment)" in Schedule 3.01(b)(ii) to the Disclosure Letter and (B) the equity interests of QTVascular Pte. Ltd. held by JJDC, Inc. (collectively, the " Transferred Minority Interests ");

(xxi) Other . All other assets, properties, Contracts and claims of every nature, tangible and intangible, primarily related to or primarily used in the Business, other than any asset of the type described in clauses (i) through (xvii) of Annex 2.02(b).

93
Annex 2.02(b)
Excluded Assets

The Excluded Assets consist of any assets of Seller or any of its Affiliates that do not constitute Transferred Assets as described on Annex 2.02(a) to the Disclosure Letter, including the following:

(i)      Accounts Receivable . All accounts receivable, notes receivable and similar rights to receive payments of Seller or any of its Affiliates existing on the Applicable Closing Date to the extent arising out of the operation or conduct of the Business prior to the Applicable Closing Date;

(ii)     Cash and Cash Equivalents . All cash and cash equivalents (including marketable securities and other investment assets and all monies received in respect of the sale of warranty programs), other than cash and cash equivalents in respect of clauses (xv), (xvi) and (xvii) of Annex 2.02(a), held by Seller or any of its Affiliates on the Applicable Closing Date;

(iii)    Hedging or Other Currency Exchange Agreements . All rights to receive payments of Seller or any of its Affiliates pursuant to a hedging or other currency exchange agreement existing on the Applicable Closing Date;

(iv)     Benefit Plans . Except with respect to Assumed Benefit Plans as set forth in Schedule 2.02(a)(xii) to the Disclosure Letter, all the assets of and all the assets relating to and all rights under any employee compensation, benefit or welfare plan or any related contract between any Person and Seller or any of its Affiliates (including Business Employee Benefit Plans);

(v)      Certain Records . Any records and files not identified as Transferred Records, including (A) the personnel records maintained by Seller or any of its Affiliates, (B) Tax Returns (other than Tax Returns solely related to any Transferred Company), (C) records (including accounting records) relating to Taxes paid or payable by Seller or any of its Affiliates and all financial and Tax records relating to the Business that form part of Seller's or any of its Affiliates' general ledger or otherwise constitute accounting records, (D) records prepared in connection with the Transactions, including bids received from other Persons and analyses relating to the Business and (E) file copies of the Transferred Records retained by Seller, in each case whether generated before or after the Applicable Closing Date;

(vi)     Certain Contracts and Contract Rights . All rights of Seller and its Affiliates under (A) this Agreement and the Ancillary Agreements, (B) the Commingled Contracts (subject to Section 2.02(g)), (C) those Contracts related to Shared Services, and (D) any contracts between Seller and any of its Affiliates or between Affiliates of Seller, whether arising before or after the Applicable Closing Date (collectively, the " Excluded Contracts ");

(vii)    Insurance . Other than insurance proceeds specified in clause (xv) of Annex 2.02(a), all current and prior insurance policies arranged or maintained by Seller

94

or any of its Affiliates and all rights of any nature with respect thereto, including all rights to insurance recoveries thereunder and to assert claims with respect to any such insurance recoveries, whether arising before or after the Applicable Closing Date;

(viii) Corporate Organizational Records . Except with respect to the Transferred Companies, the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance and existence of Seller and each of its Affiliates as a corporation or other entity;

(ix) Capital Stock . Other than the Transferred Minority Interests and the Transferred Equity Interests, all shares of capital stock of Seller's Affiliates, including the capital stock of Biosense Webster, Inc. and Cordis de Mexico S.A. de C.V.;

(x) Real Property . Each of the following: (A) any real property and any buildings, improvements and fixtures thereon, including, for the avoidance of doubt, the Juárez, Mexico facility and the former Miami Lakes site (located at 14201 NW 60th Avenue, Miami Lakes, Florida), other than the Transferred Real Property; and (B) any leasehold interests, including any prepaid rent, security deposits and options to renew or purchase in connection therewith, of Seller or any of its Affiliates (other than the Transferred Real Property Leases), including, for the avoidance of doubt, in respect of the Fremont, CA facility and the Cashel, Ireland offices;

(xi) Intellectual Property . Except for Transferred IP and rights under the Transferred IP Licenses, all other IP Rights, including, for the avoidance of doubt, the IP Rights in respect of the Llanos patent family and the IP Rights primarily used or held for use in the operation or conduct of the business of Biosense Webster, Inc. (including any such IP Rights registered in the name of Cordis Corporation) (collectively, the " Excluded IP Rights ");

(xii) Domain Names . All Internet domain names other than those set forth on Schedule 2.02(a)(ix) to the Disclosure Letter;

(xiii) Excluded IT Systems . All property in the nature of databases, software programs, computer hardware, source code and object code owned or licensed by Seller or any of its Affiliates, in each case that is not otherwise included in the Transferred IT;

(xiv) BWI Equipment . Any machinery, equipment, tools and other personal property of Biosense Webster, Inc. and, without limiting the generality of the foregoing, the equipment set forth on Schedule 2.02(b)(xiv) to the Disclosure Letter (collectively the " BWI Equipment ");

95

(xv)  BWI Biologics Business . All property primarily related to Biosense Webster, Inc.'s Biologics Delivery Systems (BD) business;

(xvi)  Excluded Jurisdictions . Any assets to the extent related to the operation or conduct of the Business or the sale of Products in any jurisdiction set forth on Schedule 2.02(b)(xvi) to the Disclosure Letter (the " Excluded Jurisdictions "); and

(xvii)  Retained Plaintiff Claims . All assets, proceeds or property arising from or relating to the lawsuits or other claims set forth in Schedule 2.02(b)(xvii) to the Disclosure Letter (collectively, the " Retained Plaintiff Claims ").

96
Annex 2.02(c)
Assumed Liabilities

The Assumed Liabilities consist of any and all liabilities and obligations of Seller or any of its Affiliates, other than Tax Liabilities (Tax Liabilities being governed as provided in Section 7.08(f)(iii)), to the extent arising from or relating to the Business or any Transferred Asset, in each case other than the Excluded Liabilities, including any of the following of such liabilities and obligations, other than Tax Liabilities (Tax Liabilities being governed as provided in Section 7.08(f)(iii)), of Seller and the Selling Affiliates:

(i) Accounts Payable . All accrued receipts and accounts payable arising from or relating to the Business after the Applicable Closing Date;

(ii) Transferred Contract Liabilities . All liabilities and obligations under the Transferred Contracts, whether arising before or after the Applicable Closing Date, but excluding those in respect of the Pre-Closing Accounts Payable;

(iii) Asset Ownership . All liabilities and obligations to the extent arising from or relating to any Transferred Asset, or to the extent arising from or relating to the ownership by Buyer and its Affiliates of any Transferred Asset or associated with the realization of the benefits of any Transferred Asset, in each case arising on or after the Applicable Closing Date;

(iv) Product Claims . Liabilities and obligations to the extent arising from or relating to lawsuits or other claims, regardless of when commenced or made and irrespective of the legal theory asserted, or the design, manufacture, testing, advertising, marketing, distribution or sale of the Products, whether prior to or after the Principal Closing, including all liabilities and obligations to the extent arising from or relating to (A) warranty obligations, (B) infringement, dilution, misappropriation or other violation of IP Rights, (C) alleged or actual hazard or defect in design, manufacture, materials or workmanship, including any failure to warn or alleged or actual breach of express or implied warranty or representation or (D) the return after the Principal Closing of any Product sold prior to or after the Principal Closing (collectively, " Product Claims "), in each case other than any Excluded Liability;

(v) Environmental Liabilities . All liabilities and obligations to the extent arising from or relating to the Transferred Real Property, the Business or any Transferred Asset (or, in each case, the ownership or operation thereof) and arising under any Environmental Law, or with respect to any Environmental Claim or Hazardous Materials, in each case, whether arising before or after the Applicable Closing Date;

(vi) Business Claims. Except as otherwise set forth in this Agreement and except for the matters specifically identified as Excluded Liabilities, all obligations and liabilities in respect of any criminal, civil or administrative suit, action or proceeding, pending or threatened, and claims, whether or not presently asserted, to the extent arising from or relating to the Business before or after the Principal Closing Date (collectively, " Business Claims ");

(vii)    <u>Employment Matters</u> . Except as otherwise provided in Article VIII, all employment, labor, compensation, pension, employee welfare and employee benefits related liabilities, obligations, commitments, claims and losses relating to each (A) Transferred Employee (or any dependent or beneficiary of any Transferred Employee) that (1) arise as a result of an event or events that occur after the Transfer Time, (2) Buyer or its Affiliates have specifically agreed to assume pursuant to this Agreement or (3) transfer to Buyer or its Affiliates under applicable Law (including in connection with the application of the Transfer Regulations or the mandatory transfer of employment as contemplated by this Agreement, as applicable) or pursuant to the transfer of the Transferred Equity Interests to Buyer and (B) Employee of the Business (or any dependent or beneficiary of any such employee) who does not become a Transferred Employee as contemplated by this Agreement as a result of a breach by Buyer or any of its subsidiaries of applicable Law, any Collective Bargaining Agreement or this Agreement that arise as a result of such breach (such liabilities, obligations, commitments, claims and losses, the " <u>Transferred Employee Liabilities</u> ");

(viii)   <u>Liabilities to Suppliers</u> . Other than the Pre-Closing Accounts Payable, liabilities and obligations to suppliers or other third parties, such as licensors, for materials and services, to the extent arising from or relating to the Business, ordered in the ordinary course of business on or prior to the Principal Closing Date, but scheduled to be delivered or provided after the Principal Closing Date;

(ix)     <u>Liabilities to Customers</u> . Liabilities and obligations to customers under purchase orders for Products (and for which a related account receivable has not yet been recorded) that have not yet been shipped at the Applicable Closing Date; and

(x)      <u>Liabilities of the Transferred Companies</u> . All liabilities of the Transferred Companies to the extent arising from or related to the Business or any Transferred Asset (but specifically excluding any liabilities of the Transferred Companies that are Excluded Liabilities), it being understood that the transfer of the Transferred Equity Interests will constitute assumption of such liabilities.

98
Annex 2.02(d)
Excluded Liabilities

The Excluded Liabilities consist of the following liabilities and obligations of Seller or any of its Affiliates, other than Tax Liabilities (Tax Liabilities being governed as provided in Section 7.08(f)(iii)):

(i) Accounts Payable . All accrued receipts and accounts payable arising out of the operation or conduct of the Business before the Applicable Closing Date (the " Pre-Closing Accounts Payable ");

(ii) Employment Matters . Except as otherwise provided in Article VIII, all employment, labor, compensation, pension, employee welfare and employee benefits related liabilities, obligations, commitments, claims and losses relating to (A) each employee of Seller and its Affiliates, including all former Employees of the Business (or any dependent or beneficiary of any such employee), other than the Transferred Employees and their dependents and beneficiaries or as described in clause (B) of the definition of Transferred Employee Liabilities, in each case, that arise out of an event or events that occur at any time, (B) each Transferred Employee (or any dependent or beneficiary of any Transferred Employee) that arise as a result of an event or events that occur prior to or as of the Transfer Time, except for any such liabilities, obligations, commitments, claims and losses described in clause (A)(2) or (3) of the definition of Transferred Employee Liabilities, (C) Business Employee Benefit Plans that are not Assumed Benefit Plans and (D) all Controlled Group Liabilities;

(iii) Excluded Asset Liabilities . Each liability, obligation or commitment to the extent arising from or relating to any Excluded Asset or the distribution to, or ownership by, Seller or any of the Selling Affiliates of any Excluded Asset or associated with the realization of the benefits of any Excluded Asset, whether arising before or after the Principal Closing Date;

(iv) Liabilities of the Transferred Companies . All liabilities of the Transferred Companies, other than Tax Liabilities (Tax Liabilities being governed as provided in Section 7.08(f)(iii)), to the extent not arising from or related to the Business or the Transferred Assets;

(v) Retained Defendant Liabilities . Liabilities and obligations to the extent arising from or relating to the lawsuits or other claims set forth on Schedule 2.02(d)(v) to the Disclosure Letter (collectively, the " Retained Defendant Liabilities ");

(vi) Retained DES Liabilities . Liabilities and obligations to the extent arising from or relating to the operation or conduct of the DES Business prior to the Principal Closing Date; for the avoidance of doubt, any liabilities or obligations to the extent arising from or relating to the operation or conduct of a drug-eluting stent business by Buyer following the Principal Closing, whether utilizing the Transferred Assets or otherwise, shall be the responsibility of Buyer and shall not constitute Excluded Liabilities;

99

(vii) <u>Indebtedness for Borrowed Money</u> . All indebtedness for borrowed money of the Seller and its Affiliates; and

(viii) <u>Other</u> . (A) To the extent not otherwise specified in clauses (i) – (x) of Annex 2.02(c), any liabilities of Seller and its Affiliates to the extent not arising from or related to the Business or the Transferred Assets; (B) any obligations of Seller or any of its Affiliates pursuant to the terms of the Transaction Documents; and (C) other liabilities or obligations of Seller or any Selling Affiliate that Seller designates as an Excluded Liability by a written notice delivered to Buyer prior to the Applicable Closing Date.

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

| | | | |
|---|---|---|---|
| Media: | Debbie Mitchell | Investors: | Sally Curley |
| | (614) 757-6225 | | (614) 757-7115 |
| | debbie.mitchell@cardinalhealth.com | | sally.curley@cardinalhealth.com |

### CARDINAL HEALTH TO ACQUIRE CORDIS, A WORLDWIDE LEADER IN CARDIAC AND ENDOVASCULAR MEDICAL PRODUCTS FOR $1.944 BILLION IN CASH

- *Significantly advances Cardinal Health's offering of interventional cardiology and endovascular solutions for integrated health systems and their patients*

- *Creates immediate global scale and scope*

- *Fiscal 2017, first full post-close year, accretion is expected to be greater than $0.20 in non-GAAP diluted earnings per share from continuing operations; increasingly accretive thereafter*

**DUBLIN, Ohio, March 2, 2015** —Cardinal Health today announced plans to acquire Johnson & Johnson's Cordis business, a leading global manufacturer of cardiology and endovascular devices, for $1.944 billion in cash, or approximately $1.594 billion, net of the present value of tax benefits. The acquisition is expected to be financed with a combination of $1.0 billion in new senior unsecured notes and the remainder with existing cash. The transaction is expected to close in the United States and key non-U.S. countries towards the end of calendar 2015.

Assuming this timing, Cardinal Health expects fiscal 2017 accretion in non-GAAP diluted earnings per share (EPS [1] ) from continuing operations of greater than $0.20 per share, which includes the cost of an incremental $0.07-$0.08 per share of interest expense associated with financing the transaction. The company expects the acquisition to be increasingly accretive thereafter and assumes that synergies will exceed $100 million annually by the end of fiscal 2018.

Headquartered in Fremont, Calif., Cordis had annual sales in 2014 of approximately $780 million, split almost evenly between cardiology and endovascular products. Cordis is a global company with a growing portfolio of products and talented people serving healthcare systems throughout the world. While the U.S. is the largest single market, 70 percent of total sales come from outside the U.S. Cordis' international presence includes operations in more than 50 countries, including China, Japan, Germany, Italy, France, the United Kingdom, and Brazil.

"We are extremely excited about the acquisition of Cordis. This is a significant step forward in our cardiovascular strategy. Cordis brings with it a long and proud legacy of cardiovascular innovation. This move highlights our commitment to address a major pain point in healthcare systems through innovative new approaches to the management of physician preference items. This acquisition follows a sequence of strategic moves for Cardinal Health in the areas of cardiology, wound management and orthopedics. We are well-positioned to help customers standardize around mature medical devices, while bringing them innovative solutions around supply chain management, inventory optimization, and work flow tools and data to support the most effective management of the patient," said George Barrett, chairman and CEO.

"With an aging population and the accompanying demand for less invasive medical treatments, health systems around the world are searching for the best way to bring quality care to their patients in the most cost-effective way. The acquisition of Cordis reinforces our strategic position to address this need and strengthens an important growth driver in the Cardinal Health portfolio," Barrett continued.

Once the transaction is complete, the business will report to Don Casey, Cardinal Health's Medical Segment chief executive officer and a medical device industry veteran.

Casey noted that Cardinal Health and Cordis have complementary skills and expertise, creating a combined talent base that will be world class in cardiovascular solutions. "We look forward to drawing heavily on the knowledge and innovative spirit of Cordis team members around the world. Additionally, Cordis' global expertise and footprint provide an exciting opportunity to leverage scale in sourcing and manufacturing," said Casey.

**Proposed Acquisition Details**

Cardinal Health has made a binding offer to acquire Johnson & Johnson's Cordis business for $1.944 billion in cash. The information and consultation process with the employees' representative bodies in applicable jurisdictions, including France and Germany, is under way. Upon completion of that process, Cardinal Health expects to enter into a definitive purchase and sale agreement in respect of the proposed acquisition. The proposed transaction will also be subject to customary closing conditions, including regulatory approvals, and is expected to close in the approximately 20 principal countries towards the end of calendar year 2015 and in the remaining countries on a rolling basis afterward.

Cardinal Health has obtained a commitment letter from Goldman Sachs Bank USA for a new $1.0 billion unsecured bridge loan in connection with the planned acquisition. The company plans to issue long-term debt prior to the transaction closing later this calendar year and terminate the bridge loan.

Wachtell, Lipton, Rosen and Katz and Jones Day served as legal advisors, and Goldman, Sachs & Co. served as Cardinal Health's financial advisor on this transaction.

For more information on the Cordis acquisition, visit the Investors page at ir.cardinalhealth.com .

**CONFERENCE CALL**

Cardinal Health will host a webcast and conference call today at 8:30 a.m. Eastern to discuss plans to acquire Cordis. To access the call and corresponding slide presentation, go to the Investors page at ir.cardinalhealth.com . The call also can be accessed by dialing 913-312-0400, conference ID#9328139. There is no pre-registration for the call; however, participants are advised to dial into the call at least 10 minutes prior to the start time.

Presentation slides and an audio replay will be archived on the website after the conclusion of the meeting. The audio replay will be available until Monday, March 9, 12 p.m. Eastern by dialing 719-457-0820, and using the conference call ID#9328139.

**NON-GAAP FINANCIAL MEASURES (INCLUDING FOOTNOTE)**

Footnote (1) Non-GAAP diluted earnings per share from continuing operations: (A) earnings from continuing operations, excluding (1) restructuring and employee severance, (2) amortization and acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits), and (6) loss on extinguishment of debt, each net of tax, (B) divided by diluted weighted average shares outstanding.

2

Cardinal Health presents non-GAAP diluted earnings per share from continuing operations on a forward-looking basis. The most directly comparable forward-looking GAAP measure is diluted earnings per share from continuing operations. Cardinal Health is unable to provide a quantitative reconciliation of this forward-looking non-GAAP measure to the most directly comparable forward-looking GAAP measure, because Cardinal Health cannot reliably forecast restructuring and employee severance, amortization and acquisition-related costs (which Cardinal Health expects to increase significantly as a result of the Cordis acquisition), impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net, and LIFO charges/(credits), which are difficult to predict and estimate. Please note that the unavailable reconciling items could significantly impact Cardinal Health's future financial results.

**About Cardinal Health**

Headquartered in Dublin, Ohio, Cardinal Health, Inc. (NYSE: CAH) is a $91 billion health care services company that improves the cost-effectiveness of health care. As the business behind health care , Cardinal Health helps pharmacies , hospitals , ambulatory surgery centers, clinical laboratories and physician offices focus on patient care while reducing costs, enhancing efficiency and improving quality . Cardinal Health is an essential link in the health care supply chain, providing pharmaceuticals and medical products and services to more than 100,000 locations each day and is also the industry-leading direct-to-home medical supplies distributor. The company is a leading manufacturer of medical and surgical products, including gloves , surgical apparel and fluid management products. In addition, the company operates the nation's largest network of radiopharmacies that dispense products to aid in the early diagnosis and treatment of disease. Ranked #22 on the Fortune 500, Cardinal Health employs 34,000 people worldwide. More information about the company may be found at www.cardinalhealth.com and @CardinalHealth on Twitter.

**Cautions Concerning Forward-Looking Statements**

This release contains forward-looking statements addressing Cardinal Health's plans to acquire Cordis and other statements about future expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include: the ability to successfully complete the acquisition of Cordis on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the ability to retain customers and employees of the acquired business and to successfully integrate the acquired business into Cardinal Health's operations, if the acquisition is completed; the ability to achieve the expected synergies as well as accretion in earnings, if the acquisition is completed; the occurrence of any event, change or other circumstance that could give rise to the termination of the binding offer or the purchase agreement (once executed); the conditions of the credit markets and an ability to issue debt on acceptable terms; or the outcome of any legal proceedings that may be instituted against the parties and others related to the planned acquisition. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This release reflects management's views as of March 2, 2015. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

3

Exhibit 99.2

# Cardinal Health NYSE: CAH
# Cordis acquisition

## Strategic Rationale

A major step forward in Cardinal Health's strategy to address a major pain point in the U.S. healthcare system through innovative, new approaches to the management of physician preference items (PPI) in the areas of cardiovascular, wound management and orthopedics. Cordis, along with AccessClosure, will serve as a centerpiece of our strategy around interventional cardiology.

- **Aligns with demographic trends.** As populations age across the world, the demand for interventional cardiology will only increase. This is true in virtually every market in the world.

- **Dramatically increases the scale and breadth** of Cardinal Health's interventional cardiology product line. The Cordis product line complements the interventional cardiology platform established through the AccessClosure acquisition.

- The Cordis name brings an **excellent heritage, a reputation for quality and innovation** — and a deep and talented group of people versed in cardiology. In the medical device space, clinical knowledge and credibility matter — and a trusted name that insprires confidence with physicians and patients alike.

- **International platform** which can be leveraged for existing Cardinal Health brand products as part of the growing Cardinal Health device portfolio.

- **Gain talent from the Cordis team** that will provide outstanding regional and country leadership in many markets.

## Overview

### About Cordis

- **Cardiology and Endovascular medical device company** with a global commercial footprint and operations in more than 50 countries

- **Robust product line of mature, well-established cardiovascular products** and related global manufacturing and commercialization assets

- In calendar 2014, **annual revenues were approximately $780M** with roughly **70% of sales coming from outside the United States**

- **2014 annual revenues were evenly split** between Cardiology and Endovascular



**Cardinal**Health

Essential to care™

# Cordis product portfolio



**Cardiology**

**Sheath** – tube inserted into the body to provide access point for insertion of other instruments into an artery

**Wires / Guides** – instruments that assist in guiding catheters, balloons, and stents into place

**Dx Cath** – hollow tube inserted into arteries for the purpose of measuring pressure, collecting samples, or injecting x-ray dye for imaging

**Balloon** – an inflation device inserted into an artery and expanded to compress blockage against the wall and allow blood to flow through during a Percutaneous Transluminal Coronary Angioplasty procedure

**Closure**

**Endovascular**

**Sx Stent** – self-expanding stent (mesh wire tube placed in artery to hold the passage open)

**Carotid** – stent for the carotid artery, which supplies blood to the head and neck

**Bx Stent** – balloon-expanding stent

**PTA** – Percutaneous Transluminal Angioplasty dilatation balloon catheter for the treatment of patients with peripheral arterial disease

**CTO** – catheter that enables controlled crossing of Chronic Total Occlusions

**VCF**

**Access/Dx & closure**

**AAA** – treat abdominal aortic aneurysms by stenting across the defect

# Deal highlights

- **Purchase price:** Purchase price of **$1.944B** in cash; $1.594B net of approximately $350M net present value of tax benefits

- **Funded through $1.0B in new debt and remainder in cash on hand**

- **Closing will be after securing clearances from principal countries,** including: United States, China, Japan, and major European countries

- **Other international:** Sequencing of closing will be based on **securing the appropriate regulatory approvals**

- **Close anticipated toward the end of calendar 2015,** Cardinal Health's fiscal 2016

- **Expect greater than $0.20 accretion in non-GAAP EPS in fiscal 2017,** the first full fiscal year post-close (including $0.07-$0.08 of incremental financing costs)

- **Expect slight non-GAAP EPS dilution in fiscal 2016** with impact of **inventory fair value step-up between ($0.13) and ($0.15)**

- **Operational synergies** of at least **$100M annually to be realized by exit of fiscal 2018**



**Cardinal**Health
*Essential to care™*

© 2015 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. All other marks are the property of their respective owners. Lit. No. SIR15-29500 (02/2015)

cardinalhealth.com

## Cautions Concerning Forward-Looking Statements

This document contains forward-looking statements addressing Cardinal Health's plans to acquire Cordis and other statements about future expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include: the ability to successfully complete the acquisition of Cordis on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the ability to retain customers and employees of the acquired business and to successfully integrate the acquired business into Cardinal Health's operations, if the acquisition is completed; the ability to achieve the expected synergies as well as accretion in earnings, if the acquisition is completed; the occurrence of any event, change or other circumstance that could give rise to the termination of the binding offer or the purchase agreement (once executed); the conditions of the credit markets and an ability to issue debt on acceptable terms; or the outcome of any legal proceedings that may be instituted against the parties and others related to the planned acquisition. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This document reflects management's views as of March 2, 2015. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

## Non-GAAP Financial Measures

Cardinal Health presents non-GAAP diluted earnings per share from continuing operations (or non-GAAP EPS) on a forward-looking basis. Non-GAAP diluted earnings per share from continuing operations is (A) earnings from continuing operations, excluding (1) restructuring and employee severance, (2) amortization and acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits), and (6) loss on extinguishment of debt, each net of tax, (B) divided by diluted weighted average shares outstanding. The most directly comparable forward-looking GAAP measure is diluted earnings per share from continuing operations. Cardinal Health is unable to provide a quantitative reconciliation of this forward-looking non-GAAP measure to the most directly comparable forward-looking GAAP measure, because Cardinal Health cannot reliably forecast restructuring and employee severance, amortization and acquisition-related costs (which Cardinal Health expects to increase significantly as a result of the Cordis acquisition), impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net, and LIFO charges/(credits), which are difficult to predict and estimate. Please note that the unavailable reconciling items could significantly impact Cardinal Health's future financial results.

**Description of Tax Benefits (noted under "Deal Highlights")**
Tax benefits are derived primarily from the amortization of goodwill and other intangible assets.



# EXHIBIT 6

**Cardinal Health Inc To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash M&A Call**

DUBLIN Mar 2, 2015 (Thomson StreetEvents) -- Edited Transcript of Cardinal Health Inc M&A conference call or presentation Monday, March 2, 2015 at 1:30:00pm GMT

 CORPORATE PARTICIPANTS
    Sally Curley, Cardinal Health Inc - SVP, IR
    George Barrett, Cardinal Health Inc - Chairman & CEO
    Donald Casey, Cardinal Health Inc - CEO - Medical Segment
    Michael Kaufmann, Cardinal Health Inc - CFO
 CONFERENCE CALL PARTICIPANTS
    Robert Jones, Goldman Sachs - Analyst
    Glen Santangelo, Credit Suisse - Analyst
    Ricky Goldwasser, Morgan Stanley - Analyst
    David Francis, RBC Capital Markets - Analyst
    Ross Muken, Evercore ISI - Analyst
    David Larsen, Leerink. - Analyst
    Eric Percher, Barclays - Analyst
    Melissa Gill, JP Morgan - Analyst
    Garen Sarafian, Citigroup - Analyst
    Steven Valiquette, UBS - Analyst
    Eric Coldwell, Robert W. Baird - Analyst
    George Hill, Deutsche Bank - Analyst
    Kristen Stewart, Deutsche Bank - Analyst

# PRESENTATION

**Operator**

Good day and welcome to the Cardinal Health proposed acquisition of Cordis Conference Call. Today's conference is being recorded. At this time, I would like to turn the conference over to Sally Curley, Senior Vice President, Investor Relations. Please go ahead.

**Sally Curley**, Cardinal Health Inc - SVP, IR

Great, thank you, Lisa, and welcome to this morning's call. With me today are Chairman and CEO, George Barrett, our Medical Segment CEO, Don Casey and our CFO, Mike Kaufmann.

Before I turn the call over to George, since we will be making forward-looking statements, we need to remind you that the matters addressed in these statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied. Please refer to our SEC filings and the forward-looking statements, slides at the beginning of presentation found on the Investor page of our website for a description of risks and uncertainties. We will be ending today's conference call promptly at 9:30 AM. To more efficiently get through our question-and-answer queue, we are asking you to limit your question to one only. The IR team will be available throughout the day to answer any additional questions you may have. Thank you for being respectful.

Finally, I wanted to mention that we will be presenting at the Cowen and Barclays healthcare conferences over the next several weeks, and we look forward to see many of you at these venues. Now, I'd like to turn the call over to Cardinal Health Chairman and CEO, George Barrett.

**George Barrett**, Cardinal Health Inc - Chairman & CEO

Thanks, Sally, and good morning everyone. Earlier today, we announced that we are acquiring the Cordis Cardiovascular business from Johnson & Johnson for $1.944 billion in cash or approximately $1.6 billion, net of the present value of tax benefits. Let me give you an order of events for this morning's call, I'll provide a strategic overview of this important acquisition, Don will give some color on Cordis, the market and Cordis's to fit into the Cardinal Health portfolio, and Mike will provide more details on the economics of the transaction. Following that, we'll be happy to take some questions.

First, let me say really excited about this morning's announcement. The plan to acquire Cordis is a significant step forward in our strategy to address major pain point in many health systems today, bringing innovative new approaches to the management of physician preference items in the areas of cardiology, wound management and orthopedics.

This aligns closely with the priorities we have shared with you and we'll start to accelerate a key growth driver in the Cardinal Health portfolio on four strategic fronts. First, in one move, we dramatically increased the scale and breadth of our cardiovascular product line to complement the access closure acquisition, which we completed in May of 2014. Together, these businesses create a formidable presence. Second, the acquisition of Cordis aligns with powerful, demographic trends. As we've discussed before an aging population suffering from multiple chronic illnesses will only increase the demand for less invasive cardiovascular procedures. This is true in virtually every market in the world. But in the US, it's being uniquely fueled by policy and payment models, which focus on outcomes and bundled procedure fee designs. Third, the Cordis name brings a terrific heritage, reputation for quality and innovation, and a deep and talented group of people immersed in the cardiovascular field. As we have told many of you in discussing our physician preference items strategy, clinical knowledge, customer relationships and credibility matter. We've been building this capability internally over the last few years, but the addition of a trusted name like Cordis inspires confidence with physicians and patients alike.

And lastly, Cordis offers us an increased international presence which we can leverage for our existing products and from which we

could add additional products and services as part of our growing portfolio. And in relation to this, we will gain some truly outstanding regional and country leadership in markets around the world. We are fortunate that they'll be joining us and look forward to welcoming the many Cordis employees to Cardinal Health. It's worth noting that many of them will be reuniting with Don Casey, who had responsibility for this organization during his J&J years. As you'll be hearing from Mike, our agreement provides for some continuing collaboration with the J&J organization. We have a long and strong relationship with J&J and we're excited to work together both on Cordis related activities and other work across the two companies.

Finally, the economics associated with this acquisition are very attractive. We expect the deal to be accretive by more than $0.20 in fiscal 2017, the first full fiscal year post our anticipated close. We expect that number to grow in the years thereafter. Mike will provide more details on the financials during his commentary. As many of you have heard us say, we believe there are new ways to bring value to healthcare, addressing changes in the marketplace with product and process innovation. This is very true for interventional procedures. You should expect that we will be an innovator in the cardiovascular area, but our approach will not be built around a traditional product research platform, rather we will take a disciplined approach to bringing innovative new solutions to improving the quality and the cost of care. This involves not only the ability to help IDNs standardize around a full portfolio of mature medical products, but also new ways of serving these customers, bringing innovative solutions around supply chain management, inventory optimization and workflow tools and data to support the most effective management of the patient.

This is even more important as payment models undergo change. Our people take pride in our commitment to the customer and are disciplined in executing on our strategic priorities. We've taken an innovative approach across our lines of business to bring the entire portfolio of Cardinal Health to assist them in need of integrated solutions. The acquisition of Cordis is aligned with this strategy. Healthcare is changing and Cardinal Health is changing healthcare. And with that, I'll turn the call over to Don.

**Donald Casey**, Cardinal Health Inc - CEO - Medical Segment

Thanks, George. I would like to build on what you've outlined and provide details around the following areas. Why this market, why Cordis, how it fits in the Cardinal Health, and finally, how we expect to operate the business when we close.

First, a bit of background. As George mentioned, Cardinal Health has been pursuing a physician preference item or PPI strategy as a major growth platform. We have focused on categories that show high physician preference with limited clinical differentiation, inefficient supply chains and ones which represent a pain point for healthcare providers. We believe that our unique combination of customer access, clinical capabilities product scale and supply chain assets allow us to create a sustainable competitive advantage for Cardinal Health. In many ways, Cordis represents a perfect strategic fit for our PPI strategy. We estimate that the combined addressable market for these devices is about $7 billion and growing in the low single digits.

In the US and Europe, the cath lab has become an area that hospitals and payers have focus on to manage procedure costs. They are looking for solutions that will allow them to deliver great patient care in the most cost-efficient manner. This focus on value is a relatively new feature in the market. As a result, the cardiovascular space has evolved and the pace of innovation in certain areas has slowed. This results in many products now being viewed as clinically similar. We believe that the market is looking for an alternative. And as we've seen in the early days of our work around access closure, customers are very receptive to Cardinal Health participating.

In Cordis, we believe we will acquire a unique asset. It has been one of the real pioneers in the category responsible for many of the major innovations in this space. It has an outstanding product line with the well-deserved reputation for quality. The company has also developed a highly regarded portfolio in the faster growing and the vascular segment, and in fact, cardiology and end of vascular each contribute about half of Cordis' revenue today. It is built a loyal position following globally over the past 25 years. This global presence will be critical in creating the scale we need going forward.

It comes with commercial capabilities globally, including such key countries as the US, UK, France, Germany, China, Japan and Brazil. The brand is highly regarded globally and its employees bring deep expertise and knowledge of the category. It is truly a one of a kind asset in this space. As we go forward, we believe, Cardinal Health brings a formidable combination of scale and access as well as clinically affected physically responsible solutions for cardiology. The Cordis portfolio nicely complements the base we have with Access Closure. We will now have commercial capabilities in more than 50 countries and we'll have one of the larger cardiovascular focused sales forces in the US. We believe this will allow us to be very competitive in this space, as well as positioning us to become a partner of choice for companies looking for go-to-market support in commercializing cardiovascular products.

Cardinal Health also brings unique access to be increasingly important supply chain functions of these large integrated delivery networks. We will also leverage our highly efficient delivery model and investments we have made in RFID technology by virtue of our WaveMark acquisition. This shared platform connects manufacturers and providers with supply chain visibility and analytics. Using this technology, we have been able to demonstrate meaningful benefits in the area of reducing expired and lost products, lowering managed inventory levels and decreasing holding costs. All this adds up to significant potential operating efficiencies. Our ability to bring all these pieces together into a broader Cardinal Health offering will not only benefit our cardiovascular products, but we'll also make our overall offering more competitive.

Finally, bringing a brand name like Cordis into our product portfolio enhances the overall reputation of all our PPI offerings. While we have a lot of work to do before we close, we see several opportunities to drive sales and cost synergies once we are operating the business. On the sales side we will clearly build out our cardiovascular offering and overall Cardinal Health value proposition. This platform gives us a base from which we will expand sales of our product and service offerings globally through the network we are acquiring. It will also us to expand our sales force coverage in the United States.

Once the transaction is closed, there are many cost efficiencies that this new combination will bring to the market in North America. It will benefit from our efficient shared distribution system to drive significant supply chain savings. There are also be synergies in the manufacturing area as we combine that with a large international Cardinal Health manufacturing network. As we bring together Access Closure and Cordis, we will be able to leverage the best approaches of two strong and complementary teams. The final area will be R&D. We believe that the innovation is important in the marketplace. As George mentioned, our pursuit of innovation though will be broader than just products. It will focus on delivering complete solution that includes products, supply chain, data and analytics, as well as services. In the area of product innovation, we will be focusing on more development of product improvement and external partnerships, and not on internally generated major research platforms.

I would summarize by saying this is a unique asset. It comes with a world-class group of employees, a great reputation for quality and innovation, and a tradition of delivering for their physicians and patients. It gives us immediate global scale and enhances the credibility of not only our cardiology offerings, but also our entire PPI portfolio. We look forward to bringing this important acquisition into Cardinal Health. I would now like to turn it over to Mike Kaufmann to describe the structure and financial impact of

**Michael Kaufmann**, Cardinal Health Inc - CFO

Thanks, Don, and good morning everyone. I'm also very excited about today's announcement to acquire Cordis. As you've heard from George and Don, this is a great fit for us strategically, culturally and financially. Since they've laid out our strategic rationale and provided a good overview of Cordis, I'll jump into the details of the transaction, its structure, bonding and financial impact.

First, an overview of the deal valuation and financing. We're acquiring Cordis for $1.944 billion in cash or approximately $1.6 billion, net of roughly $350 million in cash tax benefits. These cash tax benefits represent the net present value derived from the amortization of goodwill and other intangible assets that arise from the transaction. We plan to issue $1 billion of debt sometime in the next several months, obviously subject to market conditions. The remaining portion will be funded with cash on hand. As a contingency, we have secured a bridge loan facility for up to $1 billion. In terms of estimated financial impact to us from a non-GAAP EPS perspective, we expect the transaction to be greater than $0.20 accretive in fiscal 2017, which is the first full year post close, and we expect this to be increasingly accretive thereafter. These expectations are net of the cost of the incremental $0.07 to $0.08 of estimated annual interest expense associated with our transaction financing plan. From a GAAP perspective, it's too early in the process to provide any specific guidance on the intangible asset amortization. Once the transaction closes and the fair value estimates are complete. We will provide additional details. This amortization will of course be included in our future GAAP results but excluded from the non-GAAP financials, consistent with our past practice. We expect operational synergies of at least $100 million annually to be realized by the time we exit our fiscal 2018. While this transaction is significantly accretive beginning in FY17, based on the mechanics and timing of the transaction, it is expected to be slightly dilutive to FY16. This slight dilution is mainly due to a few factors.

First, we anticipate that FY16 will only contain a partial year of contribution from Cordis. This is a relatively complicated close given the international profile of the assets, so it is not expected to close until Q2 FY16. More on that in a few minutes. Second, due to the requirements of purchase accounting, we expect an inventory fair value step up, which will result in a $0.13 to $0.15 unfavorable impact to cost of sales during the first couple of quarters post close. Further, as you would expect, we will incur annual financing costs of $0.07 to $0.08 related to the $1 billion debt funding for this deal. Finally, we expect some transition costs as we transfer Cordis employees and stand up the global operations. As I mentioned these financial expectations are based on the timing of the close, which is not certain.

So now let me walk through the close process at a high level. During the initial acceptance periods for the binding offer, which ends on May 30, 2015, J&J will be working to complete the works council consultation processes in France and Germany. Once these consultations are complete, we expect that J&J would formally accept our binding offer. The deal is then predicated upon receiving certain regulatory clearances and that's closing in about 20 principal countries first. They include the US, China, Japan and major European countries. At the close of all principal countries, we will remit the full purchase consideration to J&J and Cordis financials will begin to be included in our consolidated results. We anticipate this will be complete towards the end of calendar 2015 or our second quarter of fiscal 2016. Following the principle close, there will continue to be staggered closings of the remaining non-principle countries as we work through the respective processes.

J&J will pass through to us, the economics related to these countries while we wait for them to close. To support a successful integration, the combination of our team with the highly experienced team from Cordis will create the know-how to operate this business both in the US and globally. Additionally, there will be extended transition support from J&J that will provide us with the time required to stand up these businesses as part of our infrastructure. Cordis will be reported in our Medical segment financials. This acquisition is expected to expand both our Medical segment and total company non-GAAP margins. As we've said in the past, our aspirational goal of 5.75% Medical segment operating margin rate was predicated upon both organic and inorganic initiatives. This acquisition will significantly help us on the path to attain the goal as we exit fiscal 2017.

In summary, Cordis is a great strategic, cultural and financial fit and is entirely consistent with the future direction of healthcare. We expect our entire company along with our customers, partners and shareholders to see sustainable benefits from this transaction. Now I'll turn the call back to Sally to quarterback the Q&A.

**Sally Curley**, Cardinal Health Inc - SVP, IR

Thanks, Mike, and thanks, Lisa. Why don't we go ahead and open up the line to Q&A.

# QUESTIONS AND ANSWERS

**Answer – Operator:** (Operator Instructions) Robert Jones, Goldman Sachs.

---

**Analyst:** Robert Jones, Goldman Sachs - Analyst

**Question – Robert Jones:** I just wonder, I guess, maybe around the go-to-market strategy, anything you plan on changing on how Cordis currently approaches the market? Maybe if you could just share how you're viewing sales and marketing and pricing? That would be really helpful.

**Answer – George Barrett:** Good morning, Bob. Thanks for the question. It's George. I will start, then I'll turn it to Don. At this point, we have discussed the idea of a broader notion of the value proposition through all of our physician preference strategies and as Don said, this is not just about the device being used, it's about the services that we provide, the way we can reduce costs, the way we can reduce waste and improve efficiency in the suite. So again our go-to market model will be, I would say modernized compared historical practices. But, Don, anything you want to add to that?

**Answer – Donald Casey:** Yes, Bob, thanks for the question. I think there is a couple of key things when you think about, particularly in the US market. I mean, the first is that with the combination of Access Closure and Cordis, it gives us a very much expanded footprint. The second issue is we look at this is going to be well beyond selling products where they will specifically go in with these analytic solution, service solutions, RFID solutions that will wrap around the product and give total value to the account, which we think will be very competitive.

In just the last issue as we look forward over the next, it's going to take us a couple of months to close this but once this comes into Cardinal it would become part of our SAT or Strategic Account Selling Teams that have very, very good relationships with the senior levels of these large IDNs and we really look forward to bringing that total value play to them, because that will have a lot of residents there as well as touching at the physicians to really talk about the clinical efficacy of our products.

**Answer – George Barrett:** I'll just add we close ABC that again because there are these international markets as well, so each of these markets has its own characteristics and so largely our commentary in the last couple minutes has been a little bit US focused, but each market has unique characteristics. And so will be thrilled to pick up some of the talent that we're going to get in those markets as we work to our go-to market model in each market.

**Answer – Operator:** Glen Santangelo, Credit Suisse.

---

**Analyst:** Glen Santangelo, Credit Suisse - Analyst

**Question – Glen Santangelo:** Yes. Thanks and good morning. George, I Just want to follow up. I mean you seem to suggest that the growth rate in this business is kind of low single digits. But it kind of feels like it's a very competitive somewhat commoditized type product offering that you're distributed and it kind of feels like you're trying to maybe distribute the product to a customer in a slightly different way. Could you maybe discuss like the margin profile of this business and how you plan to sort of maintain those margins as competition sort of intensifies, others may innovated a greater pace on the traditional product than you? And if you could just kind of give us a historic view of the margins and maybe where you see those trending that'd be helpful.

**Answer – George Barrett:** Yes, good morning, Glen. First on the margin rates, again, we're not breaking out the specific margin rates of this business as you might expect given its historical profile and its manufacturing part of business, that margins are obviously significantly accretive to our traditional services business. A couple things to remind you, first the markets are actually growing. And this is true globally, and I would say demographics will reinforce that. But you are right in highlighting that these are products that really fall in the, let's say more limited clinical differentiation category. That's actually at the heart of our strategy. So we think there's opportunity go-to-market in those parts of the cardiovascular field and orthopedics and wound management quite differently than we've done or that others have done historically. So we actually expect to see growth by approaching these markets very, very differently. So you're correct in saying that these are parts of the market that as you're describing a little more commoditized. We probably say more limited clinical differentiation that allows us to approach the market differently with our products and services. And we think that we are going to have a unique value proposition for our customers and at the same time keeping margins quite robust.

**Answer – Operator:** Ricky Goldwasser, Morgan Stanley.

---

**Analyst:** Ricky Goldwasser, Morgan Stanley - Analyst

**Question – Ricky Goldwasser:** So you quantified operational synergies of at least $100 million by 2018. Can you give us more detail on source of the synergies and how should we think about the timeline that you can realize over the next three years? How should we kind of like think about it when we model? And also are you assuming any revenue synergies in that accretion assumption?

**Answer – Michael Kaufmann:** Yes, this is Mike. I'll just make a couple comments. Obviously, we can't give you the exact uptake of the synergies as we go along, but we do expect synergies of $100 million in FY18, and there are both revenue and cost synergies in the model at this point in time. Now, we do expect, you know we -- we have sales force we can -- we're obviously are going to maximize we have supply chain. We're going to take a look at. And obviously overall go-to-market cost in our R&D areas. So we're really looking at all those areas, but we are excited to have both cost and revenue synergies in this model.

**Answer – Operator:** Ross Muken, Evercore ISI.

---

**Analyst:** Ross Muken, Evercore ISI - Analyst

**Question – Ross Muken:** Maybe can you expand a little bit on some of the cross-sell opportunities? It seems like the Access Closure acquisition now makes a lot more sense in the context of the broader portfolio. And then also, you have a big presence in China. You've talked about the ex-US opportunity here. That's a pretty sizable market. How do you through those two in as kind of key cross sells for this transaction?

**Answer – George Barrett:** Ross, good morning, it's George. I think probably best for Don to address that.

**Answer – Donald Casey:** Ross, I think it's a great question. Look, when we did Access Closure, one of the things that we were excited about is how do we expand the portfolio. And now we've done that in a very significant way. And then as we began to look at how do we need to create scale, being able to develop a business globally was also important and we start with our base in China. As we've gone through this process, we think there's a significant opportunity to bring supply chain efficiencies as well as the overall efficiency of our China business into a really, really important market for these products. So again we look at Access Closure as a step and we've now built on that portfolio.

**Question – Ross Muken:** I guess let me be a quick. I was just going to say, just a follow-up, I mean, does it seem like we'll continue to see more of those sort of tuck-in deals as well like Access Closure, because one of the big trend has been sort of a broadening out of the portfolio and in certainly cardiology and then now you guys have developed a base, it seems like the ability to cross sell in there will be kind of large. I'm just trying to get a sense for how this kind of the long term.

**Answer – Michael Kaufmann:** It's a fair question. I think the general notion of full bag as a sales organization is really helpful. When you're going in with sort of a comprehensive solution, I think it is much more challenging when you have a limited product line. To the extent that we can fill up that product line in every one of these areas, it strengthens our proposition. So there are going to be opportunities I think as we look forward, I'd also argue that many companies are doing portfolio analysis on their overall businesses and I think they have to look at their futures and say, what's the best way for us to grow and where to re-prioritize. So I think what we might find is that as companies think about their future. Some are going to move up market more aggressively research based and then they'll only think about the parts of their product lines that might be a bit more limited clinical differentiation and that may present certain opportunities.

**Answer – Operator:** David Larsen, Leerink.

---

**Analyst:** David Larsen, Leerink. - Analyst

**Question – David Larsen:** Hey, congratulations on the deal. I just want to clarify, see if $0.20 of accretion and then in addition to

that, there's $100 million of synergies, and then I'm assuming the $0.10 to $0.45 in inventory costs will be excluded from adjusted EPS. Is that correct?

**Answer – George Barrett:** Well, let me walk you through it. The $100 million of synergies wouldn't be an addition to the $0.20 accretion. We're just saying that the accretion in FY18 would be affected by $100 million of synergies in that year. We're obviously going to be starting to get some synergies. Early on in the business. It's just that they ramp up over time, because there is a transition period. And for us, the most important thing is doing this right. We're looking at this over the long term. We're not going to get caught up in getting this very short-term focus, and so we're making sure that we do all the right things to make sure that this is flawless execution and bring the sales teams on and the operations, et cetera, and then we'll be able to get to that $100 million annual number in FY18.

**Answer – Operator:** Dave Francis, RBC Capital Markets.

---

**Analyst:** David Francis, RBC Capital Markets - Analyst

**Question – David Francis:** Hi, good morning, guys, congratulations. I want to go back to the R&D spending issue one more time if we could. Just very briefly, you guys, I understand you're not talking about building out a new R&D platform and what have you doing things a little bit differently, but it would appear as though to at least keep the product portfolio relevant and margins at a level that you would want going forward that you're going to need to invest meaningfully on the R&D side. Can you talk about how that plays into your overall investment plans for the business?

**Answer – George Barrett:** Sure. Let me touch on that. Good morning, Dave. Yes, I think the way to think about it is that we will need to do plenty of D, the development side. That's par for the course for being part of the medical device world and we do that today. The question that in a way we try to make sure we articulate this is that we're not likely to be investing in a major research effort in this product line, it's really more around product development. And so it will show up perhaps in an R&D line, but it would look different than what you might see, let's say, in a traditional research-based med-tech environment.

**Answer – Operator:** Eric Percher, Barclays.

---

**Analyst:** Eric Percher, Barclays - Analyst

**Question – Eric Percher:** Thank you. Don, I know your history with this business goes back some time. Are you getting a call option here on Cypher Stent? No, just specifically to this question on Cypher Stent. I know that was quite controversial when that business was exited, and I imagine there might be some value in a equivalent generic the PPI offering there. Do you see any value in that?

**Answer – Donald Casey:** On Cypher, it was discontinued and I'll let J&J comment on the reasons for that, but I think George just articulated the idea that what we will look to fill out the bag. We're probably not going to do major R&D platforms, but if there is partner that is potentially looking for commercialization capability, we believe that we'd be very attractive there.

**Answer – Operator:** Melissa Gill, JP Morgan.

---

**Analyst:** Melissa Gill, JP Morgan - Analyst

**Question – Melissa Gill:** Thanks very much. George, we clearly understand the PPI market here in the US, but with Cordis having such a big presence outside the US, can you maybe just talk to us about how you see, for example, the European and Asian markets today? I know there's a lot of fee for value here in the US, but there is a single-payer there. How do they look at things and what are some of the opportunities?

**Answer – George Barrett:** Yes, good morning, Lisa. Yes, it's actually quite different and actually different by market. So in some places, we would see an environment that is not altogether different than some of the evolution we're beginning to see in the US, where you have again in particular markets a tender based system or a national payer system. So I think the answer is that it's going to vary market by market, will do a very careful analysis that we go through this. I mean let Don just touch based on, on the international part of it for the moment.

**Answer – Donald Casey:** Yes, I would say that we actually look at this as a real mix. Europe is probably where the US is going to trend to over time where you do have tender markets as George has indicated. And its value is absolutely important in some of those major markets as is in Japan. In China, it tends to be a little bit different. China, it tends to be a very much a fee-for-service environment and we believe that we're very competitive there. And we'll learn from all these markets and how do we bring best practices from China or Europe into the US and vice versa. But we think first scale is critical. Second, a broad portfolio was critical taking a global approach to this as critical. And as we look at it, we think some of the markets will serve as a precursor to other markets. So we believe this is where globalization really helps us.

**Answer – Operator:** Steven Valiquette, UBS.

---

**Analyst:** Steven Valiquette, UBS - Analyst

**Question – Steven Valiquette:** Thanks, good morning. Congrats on the transaction. So, things are pretty positive deal. One thing I was curious about, remember back about six years ago, the Cardinal Health board agree to spin off CareFusion because the overall Cardinal company had become a little bit too complex, and needed to go, simplify back to the more basic your distribution, and drug and medical. Now, the Cordis, your manufacturing asset seems to be a little bit complex relative to the current Cardinal mix. I guess I'm just curious, there were mixed emotions from the board on this deal or was this a no-brainer from the board point of view to the strategic value longer term? And also just to clarify quickly on that dilution for FY16, assuming many companies do exclude those inventory step up charges when closing transactions, just wanted to clarify, based on the numbers you gave, would the transaction be accretive to FY16 if we exclude those inventory step up charges? Thanks.

**Answer – George Barrett:** Fair. What I'll do, Steve, I'll answer the first part of the question and turn it to Mike for the second. The spin off CareFusion was not really about complexity, it was just about the relevance of the two segments or activities of business. The larger part of that business was really medical capital equipment and our view was that had it was a different line of business with different call points in the system, different sales cycles and very broadly different needs. And so we've really not seen this in

the same context, our board is very excited about this transaction, as is our management team. So it's a fair question, but it important distinction between what I'd call sort of the capital equipment side that the med device or med product business versus what we see in this kind of in asset. And Mike?

**Answer – Michael Kaufmann:** Yes, absolutely. Steve, thanks for the question because I missed it when Dave asked the question earlier and I wanted to get back to it. So, you helped me here. On the inventory step-up, as I mentioned, we're estimating it to be $0.13 to $0.15. We are not carving out of our non-GAAP numbers. So your question since we said it will be slightly dilutive to $0.16, if you carved down to $0.13 to $0.15, than it would be accretive in FY16.

**Answer – Operator:** Garen Sarafian, Citigroup.

---

**Analyst:** Garen Sarafian, Citigroup - Analyst

**Question – Garen Sarafian:** I guess to touch on a comment in the prepared remarks, George, you mentioned the continued collaboration with J&J on other activities. Are there any formalized agreements in other areas then? So if you could just elaborate a bit more, and --

**Answer – George Barrett:** I'll be a little bit careful here because we are generally pretty sensitive if that how we describe our relationships with our partners. We have a pretty broad relationship with J&J, recognized they have a quite a diverse portfolio of businesses. And so over the years we've matched up very nicely with them across multiple lines of business and across our segments. So beyond that, I probably can't be more specific other than to say, it's been a long and very, very strong relationship over the years and we expect that to continue.

**Answer – Operator:** Eric Coldwell, Robert W Baird.

---

**Analyst:** Eric Coldwell, Robert W. Baird - Analyst

**Question – Eric Coldwell:** Ross actually hit on a couple of my questions earlier. I'll just begin for a little more detail. First off, given the complexity, timing and size of the transaction, do you intend to or anticipate pursuing another sizable M&A in either medical or elsewhere at Cardinal over the next year? And how does this process impact your capital structure or capital deployment strategies? For example, should we be thinking about slowing down perhaps the pace of share repurchases or debt adjustments, things of that sort? Thanks so much.

**Answer – George Barrett:** Good morning, Eric. Thanks for the question. So our organization is deep. Our balance sheet is strong. We've got, I think, tremendous management capacity. And so we'll continue to look for the opportunities to grow our business. A lot of that is through our organic internal initiatives, many of those priorities you've heard us talk about. But I think we've got the financial capacity and the managerial capacity to do the things to continue to grow our business when those opportunities present themselves. So you should expect we'll continue to be a company thinking about the future and how best to make sure we're growing and thriving and competing in changing marketplace. In terms of our overall strategy on capital plan. Mike, you want to jump in?

**Answer – Michael Kaufmann:** Yes. Again, I agree with George. I don't think this changes, our overall capital deployment policy. We're going to continue to invest in the business first. This will not change our dividend policy, we don't expect any changes to that going forward. And then third, we'll continue to focus on other M&A, whether it'd be a tuck-in, or we could also do other large ones and then at the end, we'll still look at share repo as another opportunity to deploy cash and I don't really see any changes based on this acquisition.

**Answer – Operator:** George Hill, Deutsche Bank.

---

**Analyst:** George Hill, Deutsche Bank - Analyst

**Question – George Hill:** Hi guys, thanks for taking my question. I guess, George, one of the things I'm thinking about is if you guys are pursuing what I call a limited differentiation strategy that has pretty good return, I would expect more low cost competitors to market. I'm wondering if the distribution strategy alone in the distribution channel enough to kind of control market position? So kind of how do you keep new entrants out of the market? And is it safe to assume that the distribution model is kind of a better to enter than most competition?

**Answer – George Barrett:** Yes, George, it's a good question. Here's the way I would put this. I think the reach into the system that we have because of the broad service lines that we provide obviously including distribution is that really I think powerful competitive advantage. It gives us great access, our relationships with major customers are long and they're very deep. But of course we expect competition, always do. Any time we're in any market, we think about what that competitive landscape looks like, but we think we have unique position in the market. The other thing that we have, which is really important is we have experience with these kinds of products, both as a manufacturer and as a sourcer of products globally for many years. So the combination of that manufacturing and sourcing experience with our distribution platforms and our service platform, we think it's a pretty formidable combination.

**Answer – Donald Casey:** And George, I'd just add. It's interesting, if a few other companies started coming into a few of these categories that might push the whole market towards more of a tipping point than where it is today. And ultimately, we're very excited about our market position and we're certainly not afraid of competition.

**Answer – Operator:** (Operator Instructions) Kristen Stewart, Deutsche Bank.

---

**Analyst:** Kristen Stewart, Deutsche Bank - Analyst

**Question – Kristen Stewart:** Hi, thanks for taking my question. I just want to return back to the R&D profile of the business, and I was just curious, are there any different product lines that J&J had been developing that were more R&D intensive that you plan on discontinuing? You had AAA product in Europe. I'm not sure where that pathway was in the United States. And then just what's the overall growth profile that you would expect from this franchise? There's a lot of innovation, a lot of med-tech companies all talking about, bundling across product lines, broader in cardiology. So just how do you plan on competing I guess on that level?

**Answer – George Barrett:** Let me just touch on the first and I'm going to turn it over to Don. One of the advantages of broadening our product lines is really as you think about any competitive move to bundle has to bump up against such not just with a broad product line now, but with a broad line of service component. So I think that our ability to offer a pretty comprehensive value proposition to customers is important and maybe, Don, you could talk a little bit about thinking around the research side.

**Answer – Donald Casey:** Sure. As we said, our focus will be principally on the deep part of R&D and how do we take products and continue to update them as we move forward. The second question is what does the research profile looks like going forward? Again I'd say we're going to be very focused on the D. The other area that Cordis has been successful and I believe might be a path forward is looking at outside partnerships. If you look at their Chocolate Balloon and other brands that they brought on some of that has been developed outside and finished within the Cordis environment, and it shows a more cost effective way to do R&D. And in regards to the AAA product, it is approved in Europe. They are expecting approval in the US in the back half of this year.

We're in the process of evaluating what the best path forward on that is. And just a last point around bundling, it's interesting, I think if you actually look at aggregate sales of Cardinal into hospitals, you'll see it's very, very significant. So as we look at bundles, you might see a bundle in a specific area in cardiology. One of the discussions that we're having with our strategic accounts is how do we bring value across a very broad line of not only PPI products, but also the services we provide as well as the traditional distribution areas, which we believe gives us a sustainable competitive advantage on the size of that bundle.

**Question – Kristen Stewart:** It looks like the business at Cordis had been more declining as their Electrophysiology business is growing. What's the growth profile that you would expect as you take over this franchise?

**Answer – George Barrett:** So Kristen, this is George. We're not going to get exactly growth projections for this specific business. I would just offer the following. This is really about priorities. J&J has been very explicit. I think in their public comments about evaluating their portfolio and making sure that they are prioritizing the businesses that they see as leveraging their future commitment on innovation. I think for us, this is a high priority business and that's a very important distinction. And so, we'll see this as a growth business, very excited about it and really looking forward to getting a chance to meet some of you who follow this space that we haven't known in the past.

**Answer – Sally Curley:** Operator, do we have anyone else in the queue?

**Answer – Operator:** At this time we have no further questions. I would like to turn the call back over to George Barrett for any addition or closing comments.

**Answer – George Barrett:** Great, thank you. Well look, I'll just conclude by saying we're really excited about today's announcement. We thank all of you for joining us on short notice today. And I suspect we'll see many of you in the coming weeks. Thanks for dialing in.

**Answer – Operator:** That does conclude today's conference. We thank you for your participation.

StreetEvents transcripts content provided by Thomson Reuters

# EXHIBIT 7

# Cardinal Health To Acquire Cordis, A Leading Cardiology and Endovascular Company

**March 2, 2015**



© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.

# Forward-looking statements and GAAP reconciliation

This presentation contains forward-looking statements addressing Cardinal Health's plans to acquire Cordis and other statements about future expectations, prospects, estimates and other matters that are dependent upon future events or developments.  These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals.  These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied.  These risks and uncertainties include:  the ability to successfully complete the acquisition of Cordis on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the ability to retain customers and employees of the acquired business and to successfully integrate the acquired business into Cardinal Health's operations, if the acquisition is completed; the ability to achieve the expected synergies as well as accretion in earnings, if the acquisition is completed; the occurrence of any event, change or other circumstance that could give rise to the termination of the binding offer or the purchase agreement (once executed); the conditions of the credit markets and an ability to issue debt on acceptable terms; or the outcome of any legal proceedings that may be instituted against the parties and others related to the planned acquisition.  Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports.  This presentation reflects management's views as of March 2, 2015.  Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.  In addition, this presentation includes future non-GAAP financial measures.  Cardinal Health provides definitions and reconciling information in the appendix at the end of this presentation and on its Investors page at ir.cardinalhealth.com.  An audio replay of the conference call will be available on the Investors page at ir.cardinalhealth.com.

2

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# Strategic rationale

- ✓ Significant step forward in our strategy to address a major pain point in many health systems today -- physician preference items (PPI)
  - ✓ **Cardiology**, wound management, orthopedics
- ✓ Aligns closely with our priorities and will serve to accelerate key growth driver in our portfolio:
  - ✓ In one move, significantly increases scale and breadth of cardiovascular product line to complement AccessClosure
  - ✓ Aligns with powerful demographic trends; aging population only increases demand for cardiovascular procedures
  - ✓ Brings a terrific heritage, reputation for quality and innovation, and deep talent pool immersed in field of cardiology
  - ✓ Increases our international presence:  can leverage with our existing products, and with new products and services we may add as part of our growing portfolio; gain outstanding regional and country leadership in markets worldwide
- ✓ Economics are extremely attractive; enhances enterprise growth characteristics and expands margin rates

- ✓ Ability to help IDNs standardize around full portfolio of mature medical products and bring new innovative ways of serving these customers

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# Each organization brings substantial assets to the table

**Why Cordis?**

- Early innovator responsible for several key breakthroughs in cardiology and endovascular (EV) minimally invasive procedures
- Unique asset in cardiovascular space in both product reach and scale, and with extensive global footprint
- Substantial brand equity
- Strong provider relationships

**Why Cardinal Health?**

- Significantly advances our physician preference item (PPI) strategy
- Builds upon existing strong customer relationships with health systems
- Partner of choice for other companies seeking market access
- Brings supply chain expertise and inventory management solutions to Cordis

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# Cardinal Health and Cordis:
# What this means for us and the marketplace

| | | |
|---|---|---|
| **Compelling value proposition** |  | • Addresses PPI – a major system pain point<br>• Broad product offering – will deliver value through an innovative approach to price, mix and product efficiency<br>• Well-deserved reputation for product quality and reliability |
| **Leverages CAH supply chain expertise** |  | • Extensive and deep supply chain relationship with IDNs<br>• Wrap-around services (e.g., RFID inventory management)<br>• Increases scale, lowering acquisition / manufacturing costs |
| **Integrated go-to-market model** |  | • Expanded sales presence in cardiovascular space<br>• Integrating into existing Cardinal Health strategic account sales teams<br>• Focused on total value of offering (product and service) |
| **OUS growth opportunity** |  | • Expertise and talent in growing markets ex-U.S.<br>• Leverages existing China platform<br>• Potential for future growth |

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# Acquisition supports our Physician Preference Item (PPI) strategy

- Major marketplace shifts have created new opportunities to serve a growing customer need and accelerate a significant growth engine in PPI

- We have a unique combination of customer access, clinical capabilities, and supply chain assets to create a sustainable, lower-cost and high-quality alternative

- 3 major categories – Cardiovascular, Wound Management and Orthopedics – identified, comprehensive go-to-market approach

- We defined these categories based on the following attributes: higher physician preference but limited clinical differentiation, inefficient supply chains, customer's need to standardize

- Recent moves in PPI:  Emerge Medical, Access Closure, Innovative Therapies….and now Cordis

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# A financially compelling acquisition[1]

✓ Business to be acquired for $1.944B in cash; ~$1.6B net of the present value of tax benefits (~$350M)

✓ Expect to be significantly accretive to Medical Segment margin rates

✓ Expect greater than $0.20 in non-GAAP EPS accretion in FY17 (first full fiscal year post-close; closing assumed toward end of calendar 2015); increasingly accretive thereafter (figure is net of $0.07 to $0.08 of estimated, incremental annual financing-related interest expense); FY16 slightly dilutive due to inventory fair value step-up

✓ Expect to fund with $1.0B of term debt and remainder with existing cash

✓ Annual synergies of at least $100M expected exiting FY18

[1]See appendix for non-GAAP definitions

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# Mechanics of transaction close

✓ Transaction expected to close by end of calendar 2015

✓ Binding offer in place until Works Council consultative processes completed in France and Germany; expect binding agreement thereafter

✓ Overall deal closes once applicable closing conditions met in approximately 20 principal countries

    ✓ Principal countries include U.S., major Europe, China and Japan

✓ Other international countries close on a rolling basis afterwards, as country-specific approvals received

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# Cordis:  at a glance



- ✓ U.S. largest single market; ~70% revenues outside the U.S.
- ✓ Calendar 2014 sales of ~$780M
- ✓ Excellent growth platform in a large channel
- ✓ 25-year outstanding reputation for quality / product consistency
- ✓ Experienced salesforce / management team with proven track record
- ✓ Approximately 3,000 employees coming with acquisition
- ✓ Growing, recurring revenue streams and strong customer retention
- ✓ Headquartered in Fremont, CA; manufacturing operations in the U.S. (Florida) and Mexico
- ✓ Meaningful presence in all major ex-U.S. healthcare markets: China, Japan, Germany, Italy, France, UK, Brazil



**9**

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**

# Cordis's product portfolio

**Cardiology**



| Sheaths | Wires | Dx Caths | Guides | PTCA Balloon | Closure |

**Sheath** – tube inserted into the body to provide access point for insertion of other instruments into an artery

**Wires** / **Guides** – instruments that assist in guiding catheters, balloons, and stents into place

**Dx Cath** – hollow tube inserted into arteries for the purpose of measuring pressure, collecting samples, or injecting x-ray dye for imaging

**Balloon** – an inflation device inserted into an artery and expanded to compress blockage against the wall and allow blood to flow through during a Percutaneous Transluminal Coronary Angioplasty procedure

**Endovascular**



| Sx Stents | Carotid | BX Stents | PTA | CTO | VCF | Access / Dx and Closure |

**Sx Stent** – self-expanding stent (mesh wire tube placed in artery to hold the passage open)

**Carotid** – stent for the carotid artery, which supplies blood to the head and neck

**Bx Stent** – balloon-expanding stent

**PTA** – Percutaneous Transluminal Angioplasty dilatation balloon catheter for the treatment of patients with peripheral arterial disease

**CTO** – catheter that enables controlled crossing of Chronic Total Occlusions

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# Cordis expands our global presence[1]



**Legend:**
- 🔴 CAH commercial operations
- 🟢 CAH manufacturing / sourcing operations
- 🔵 Cordis operations

[1] *Areas in blue to be included when Cordis principal and non-principal countries are closed.*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**

CardinalHealth
*Essential to care™*

# In summary:  scale and strategic fit

- Cordis represents a unique opportunity to accelerate our PPI

- Major move in cardiovascular space; complementary to AccessClosure

- Will fill out our portfolio, brings global commercial capabilities and immediately makes us a leader in this space

- The scale, product quality, and brand equity from the combination will allow us to modernize the model and deliver a high-quality, value-based cardiovascular portfolio

- Cordis' global footprint is an exciting opportunity to leverage scale in sourcing/manufacturing, and provides a platform for future growth

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# Appendix: Non-GAAP Definition, GAAP Reconciliation and Tax Benefit Description

## Non-GAAP Definition

Non-GAAP diluted earnings per share from continuing operations: (A) earnings from continuing operations, excluding (1) restructuring and employee severance, (2) amortization and acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits), and (6) loss on extinguishment of debt, each net of tax, (B) divided by diluted weighted average shares outstanding.

## Non-GAAP Financial Measures

Cardinal Health presents non-GAAP diluted earnings per share from continuing operations on a forward-looking basis. The most directly comparable forward-looking GAAP measure is diluted earnings per share from continuing operations. Cardinal Health is unable to provide a quantitative reconciliation of this forward-looking non-GAAP measure to the most directly comparable forward-looking GAAP measure, because Cardinal Health cannot reliably forecast restructuring and employee severance, amortization and acquisition-related costs which Cardinal Health expects to increase significantly as a result of the Cordis acquisition, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net, and LIFO charges/(credits), which are difficult to predict and estimate and are primarily dependent on future events. Please note that the unavailable reconciling items could significantly impact Cardinal Health's future financial results.

## Description of Tax Benefits (noted on slide 7)

Tax benefits are derived primarily from the amortization of goodwill and other intangible assets.

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health. **All other marks are the property of their respective owners.**



# EXHIBIT 8

# THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

## CAH - Cardinal Health Inc at Cowen Health Care Conference

## EVENT DATE/TIME: MARCH 03, 2015 / 3:40PM GMT

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

## MARCH 03, 2015 / 3:40PM, CAH - Cardinal Health Inc at Cowen Health Care Conference

### CORPORATE PARTICIPANTS

**George Barrett** *Cardinal Health - Chairman and CEO*

### CONFERENCE CALL PARTICIPANTS

**Charles Rhyee** *Cowen & Co. - Analyst*

### PRESENTATION

**Charles Rhyee** *- Cowen & Co. - Analyst*

Thank you everyone for joining us for the next presentation. We are very pleased to have with us Cardinal Health. Presenting for the company is George Barrett, Chairman and Chief Executive Officer. Also we have in the room Ms. Sally Curley, Senior Vice President, Investor Relations. George will give some opening comments and then we will kind of sit down and kind of have a little bit of dialogue and then there will be a breakout after the session.

---

**George Barrett** *- Cardinal Health - Chairman and CEO*

Thank you Charles. So I'm going to be buzzing through this relatively quickly to make sure that we have time do some Q&A. So again, during the presentation, I'll be making some forward-looking statements. Actual results may differ from those we discuss, so you can certainly find all the information on our website with our SEC filings and with that let me just give you a quick overview.

I think many of you know us, so I'm not going to spend a lot of time on this. Obviously, we are company with some considerable reach and it's really important an part of our business model. Actually, it is important part of our value proposition. This is really a picture primarily of the US, but again think about us touching virtually every part of system, 75% of the hospitals in the US, 20,000 pharmacies. We're delivering more than 10 million doses a day of radiopharmaceuticals. We are a company that touches every single component of what's happening here in the US and I think it gives us a bit of a unique perspective and vantage point from which to seek any changes in the system. And the changes have been very real and I know you guys know this who follow healthcare, so I'm sure we'd be talking about this along the way. I give you this slide, this is little bit of a backward looking slide. I give it to you just to highlight something that is really important for us. We are very executional-oriented company. We take seriously our obligations and in 2010, just post spin-off, we gave some goals around our long-term growth rates. What we've saw is some goals around TSR, gross margin expansion, our non-GAAP margin expansion and dividend increase. And you can see, we've substantially exceeded all of those goals during that time. It will continue to be our goal to drive value through you for you. And again, we expect continued growth of our operating margins and growth of our contribution profits. Dividend increase roughly in line with our growth rate. So we'll continue to drive these metrics going forward. We have talked to you often about our approach to capital deployment which is really one of balance. You can see here the breakdown between acquisitions, share repurchase, capital expenditures and dividends. We had felt that having a strong dividend is important line in the sand for us and for you and we've continued to pursue that strategy in light of yesterday's acquisition announcement and we'll come back to that. Nothing really is changed. Our view is just as it was. We have, I think, a strong balance sheet, great access to capital, we'll continue to drive the dividend, we'll continue to look for opportunities externally, make sure we're reinforcing our business internally in terms of capital and of course, we're not in the business of trying to pile up cash and to the extent that we're doing that obviously, we'll always be looking at share repurchase as part of the arrows in the quiver.

So again, I think, $4.6 billion cumulative return to shareholders since the spin, a record that we're proud of and we'll continue to hope to drive that. These are trends, I think you guys know well and particularly those of you who focus entirely on healthcare. And I just want to highlight a few. Again, the demographic issue is extraordinary. When I listen to people talk about healthcare, we often sort of work from micro to the macro. And I always have to remind us we have to start from the top, which is an aging population in virtually every country of the world is driving powerful changes. That's also creating powerful challenges for us all systems in the world. And I think it continued for innovation and the announcement we made yesterday is really another move along that path. We are going to need to deliver care in more cost-effective ways in different settings with less waste with more coordination and often with different kind of caregivers. So I think, there is going to be some significant changes there.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



MARCH 03, 2015 / 3:40PM, CAH - Cardinal Health Inc at Cowen Health Care Conference

We're seeing some very big changes in the world of biology and the combination, I call it the collision of biology and Big Data has been an extraordinary change. And what we're going to see is more products with very unique patient population and our growth in specialty is tied to that. Increased consumerism, I'm sure you've been hearing this theme generally. We will eventually have patients who are beginning to act like consumers. That is beginning to happen here to some extent, but as you know, historically, that's not been the case. And we are seeing these changes in payment models. We are not going to see an overnight switch from a fee-for-service system into a paper outcomes. But that is the direction we were going and we are going to see different kinds forms of adaptation of our health system and our payment systems, whether or not we call that capitation or a bundle system or a payment for outcome, we are going to see some migration away from the traditional fee-for-service and clearly, our government has become a much more active player in every sense in healthcare and I think that's true everywhere in the world. So nothing unique there. These are the strategic priorities we've outlined for you over the last couple of years and we continue to view this as the highest priorities. I'm going to focus on a couple of these in my commentary and then we'll come back to them no doubt in the Q&A.

First on generics, we are really excited about our venture with CVS Health. The combination of these two organizations in generics gives us enormous scale, far and away, the largest procurer and purchaser of generic drugs in the US and now stand on a global basis, really, right there among the leaders and perhaps the leader. We bring together great talent and that's important. Knowledge in generics is everything and it's knowledge of a global system. So I'll just share with you, generally, the venture has gone up to a great start. We are probably ramping a little bit faster than we originally modeled, but we see this not sort of as a one-time kind of opportunity but it's a sustained opportunity to continue to create value from the scale and the capabilities that we bring in generics.

Let me jump here a little bit to the health and hospital systems. We've focused on a couple of key areas; one is medical consumables particularly using more of our Cardinal brand products going through the system. We see standardization as a great need in this system. We also see the evolution of care moving as I talked earlier into new settings and that is going to mean ambulatory settings and the home and we made an acquisition a couple years ago of a company called AssuraMed. That business continues to do very well, delivering products into the home and again, we see more and more patients being cared for outside the future setting. And with a population of 80-year-old and higher of more than 10 million today and probably doubling over the next decade, it's hard to imagine that we're not going to have more patients being cared for in the home. So we're really thrilled about that opportunity.

I'm going to come back to the physician preference item strategy in a moment when I talk about the Cordis acquisition. I will take one moment on the post-acute to talk about our relationship with Henry Schein. We formed an alliance with Schein largely to address the small physician practices. That was the one area, when we looked at our entire portfolio, our ability to touch patients across the consumer care. This is the area where we were the least strong. Schein was very complementary to our business model, very strong in small practice management and so our ability to collaborate with them to have our products flowing through that combined selling force into the small physician practices was really the origins of that deal. So we're really excited about that.

Let's go to Cordis really quickly, and leave some time for Charles and we'll talk about this. So we are really excited about the acquisition we announced yesterday. On the physician preference item strategy is really important for us. There are significant pain points at every system around the world, particularly in certain areas, orthopedics and trauma, cardiovascular and wound management. And we believe that there is an opportunity to bring to the market more mature medical products in a different way. That's not just the product itself, but actually the services that's around that. So, it's really very closely linked with this idea of addressing major pain points in the system. How do we take these mature products and the services surrounding them and do that more cost effectively for the system. This was a unique opportunity for us, in one move substantially increasing our scale and scope, it's complementary to the work that we're doing with our AccessClosure acquisition. It aligns perfectly with the demographic trends. There is no question that with an aging population we'll see more cardiovascular disease and more attention to less invasive treatment areas.

The economics of this deal extremely attractive. We expect it to be more than $0.20 accretive in fiscal FY17. We expect by the end of 2018 to achieve about $100 million or more of synergies. And we think this is really important driver for us. I probably touched on this, so I won't cover this. The combination of that product line and those skill sets with our ability to touch this system and the international presence that they bring us is a really wonderful complement to the businesses that we have and the way we go to market. Remember the more that we can commercialize our products whether those are gloves or drapes or gowns in multiple markets, the greater we can take advantage of scale. So really excited about that opportunity. It builds on our IDM relationships here in the US.

3

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

And I think bringing supply chain expertise, all the tools that we can bring into the cath lab that we can bring into the surgical suite in ortho, those are all part of the model for us which is changing the paradigm around the way these products flow into the system. I mentioned the economics of this deal. Mechanically, it has got some complexity, I will walk you through this very quickly and then we'll stop and take questions. We expect to close the transaction by the end of calendar 2015. It's got a series of countries that we need to work through this. There is a binding offer in place until the Works Council consultative process completes in France and Germany and then we'll go to the binding agreement thereafter. Overall, the deal closes once all the applicable conditions are met in approximately 20 countries. Other international countries will come forward on a rolling basis.

So we are really excited about this move. Again, it is sort of instantaneous step forward and an acceleration in our physician preference item strategy, an opportunity for us to bring a new way of doing business I think in the cath lab and we've already talked about this in ortho, we talked about it wound management and really excited about it. They bring some great in house, some great people and very attractive financials. So Charles, we'll go from there.

## QUESTIONS AND ANSWERS

**Charles Rhyee** - *Cowen & Co. - Analyst*

Definitely want to spend a lot of time here on Cordis, but you made another announcement yesterday where you signed distribution agreement with PharMerica or at least -- I'm sorry, they announced it, where they announced it yesterday as part of it, maybe you could talk about it from your end sort of just where --?

**George Barrett** - *Cardinal Health - Chairman and CEO*

Just very, very pleased to be able to pick up this business, obviously, there's been some complexity in their existing relationship. They felt the need to have a different partner given all the dynamics at work and we're excited to be able to do this. It'll be both branded and generic distribution for them. And beyond that, there's probably not that much to add.

**Charles Rhyee** - *Cowen & Co. - Analyst*

I know you used to do a lot of repackaging for Omnicare, is that something that you're doing with them here as well?

**George Barrett** - *Cardinal Health - Chairman and CEO*

No, this is primarily a distribution deal. What we -- we had fairly significant repackaging operation, we deploy that for many kinds of customers. But that's not really central to this. This is really largely more traditional distribution deal on branded and generic products.

**Charles Rhyee** - *Cowen & Co. - Analyst*

And then just to see how it falls into Red Oak here. Is it simply that they are not just part of your volume that just goes through just the Red Oak pricing.

**George Barrett** - *Cardinal Health - Chairman and CEO*

So again, I won't talk about pricing. But the way you ought to think about it is the venture with Cardinal -- between Cardinal and CVS Health is the two of us. Our customers can derive the benefit from the scale that we bring to bear and the more scale that we bring into the system, I think the

4

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## MARCH 03, 2015 / 3:40PM, CAH - Cardinal Health Inc at Cowen Health Care Conference

virtuous cycle is at work. So I think for us the opportunity to bring in more business in generics is generally a good thing, so we're excited about that.

---

**Charles Rhyee** - *Cowen & Co. - Analyst*

Okay and then impact to, I think the deal technical starts April 1?

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

Mechanically, I think just to go through the transition for you Charles, we won't expect any impact to this year and then it will begin to impact us in our next fiscal year.

---

**Charles Rhyee** - *Cowen & Co. - Analyst*

Is that just generic piece [reps] up over time or just the on-boarding takes --?

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

Just the on-boarding process. So you should -- it is mechanical, largely, it's just we should think of it as FY16 economic event rather than (inaudible).

---

**Charles Rhyee** - *Cowen & Co. - Analyst*

Okay, perfect. Let's move back to Cordis. So when I look at that Cordis business or what I understand it right, I mean, I think if you look they have been, actually having declining revenues actually over the last couple of years and when you talk to some people, but it's been so uncompetitive maybe not having the full suite of products, some of the competitors do and obviously earlier, there is this kind of falling back here, how should we think about it when you're coming in, what are you doing here? I mean, is the goal to stabilize the sales, how we go about that?

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

So first, let me back in step, actually it's been growing in certain markets and actually is a real market leader in various markets around the world. Actually, US business is little more challenging. So actually that's an important distinction. In fact, I would say in many markets of the world, it's Number 1 or Number 2. This is just probably what happens, and again I think it's true for all companies and I think, I don't want to speak for Johnson & Johnson, but again, they've been very explicit about portfolio assessment. And I think like every company, we do the same. You look at where you want to prioritize your business and I think based on greater opportunities in other areas and what they saw, which was making us less attractive, we saw as a more attractive, which is these are more mature products at a different stage in their life cycles. We think there is a different way to bring value to the market around those products. It's not just a product and account of those products. It's the way that they are managed in the cath lab, it's how much inventory you are carrying, it's whether or not, you can tag them to prevent leakage or loss of a product, prevent a product from expiring. So they are all kinds of supply chain tools built around the this that could change the paradigm, and it's actually largely what we see. Again, there is a, this is what happens often when you look at portfolio management is what can be attractive to one company to another is seen as no longer fitting the profile of the strategy or the corporation. So we see this as a growth opportunity actually in this area. And I'm really excited about it and totally understand how they do that portfolio analysis, just the way we do all time, as we look at what are the areas that we want to double down on. They concluded this is not one of those areas. For us, we see a great opportunity and then combining it with our supply chain expertise, our work with AccessClosure, the combination of those two is a pretty formidable combination. So we'll go to market, I think with unique value proposition and I think we're really excited about that.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## MARCH 03, 2015 / 3:40PM, CAH - Cardinal Health Inc at Cowen Health Care Conference

**Charles Rhyee** - *Cowen & Co. - Analyst*

Can you talk more about the service part of model? Obviously, buying the product is one thing and selling it. Can you talk about how, with the services that, the J&Js of the world, they wrap around that and how you do that differently? I mean, it's my understanding is kind of high price model of, high price people that go into scrub in for these cath labs and can you tell that how you could, how you would approach that that differently?

**George Barrett** - *Cardinal Health - Chairman and CEO*

So again, I don't want to go into too much detail at this point, but again, the services that we would bring are going to be a little bit different than other company. Again, our experience around supply chain management, inventory management are below of the room. These are all contemplated in specific services that we can provide today. We've been able to demonstrate reduction of inventory, reduction of errors, I think that we bring to that suite. And just remember, when we talk about the package that we bring, in some cases, this is part of an IDN where we're talking enormous suite of Cardinal offering. So you can't think of it just as a -- in a vacuum. So we're also broadly talking about institutions that are looking at their entire areas as a physician preference item and they are thinking about how do we standardize. Standardization for them and you know this happens outside of healthcare all the time and remarkably and frequently inside healthcare, which is something we need to do, which is, when we standardize, we know we get better outcomes for the repetition and lower cost. So I think the model for us is going to be different. We will probably go to market a little differently in terms of selling organizations, how we see that, we'll approach R&D differently. You won't see us with a big R in this business. So if you drew a P&L under the J&J business and you draw P&L under the Cardinal business, you would see two different looking P&Ls, different emphasis, probably different kind of SG&A spend and probably different kind of art and very different kind of model. So we see real opportunity here and then we see an expansion opportunity in multiple markets and again remember combining this with our AccessClosure lines, it will be very interesting.

**Charles Rhyee** - *Cowen & Co. - Analyst*

I know last quarter, you've been selling a brand product, brand pricing, I mean, that's sort of what it is -- high-end device. Would you see the Cordis business line similarly like that or is it something where you might think of private label and brand as a Cardinal little more competitively?

**George Barrett** - *Cardinal Health - Chairman and CEO*

Yes, so I don't want to say Charles too much about pricing at this point, not a smart thing to do in internal setting. But we'll be very creative about how we think we can create value for our customers and at the same time have an exciting business that's growing, expanding margins and growing its market position. Again, a good thing to note, this is significantly accretive to our margin rate. And again, I think, as we are speaking today, we've got our folks all over in California meeting with people both in the Cordis business and again, reminder, we are still two companies for the time being. So obviously, there the things we can't to do and say today but looking forward to that --.

**Charles Rhyee** - *Cowen & Co. - Analyst*

I'm sure, some of the people this room know it better than probably me, when you think about, it's not like, when you are speaking about trauma, you are really extending the line in trauma to go to the market, getting closer to (inaudible). With Cordis, how do you see your ability to service entire line at this point? Are there still some gaps, that's just probably my --?

**George Barrett** - *Cardinal Health - Chairman and CEO*

Yes. So we have a pretty broad line right now. There are other products that we have access to. I think this also makes us a very interesting partner for companies that are taking access to the market. I've seen this play, many, many years ago in the what we call generic drug world, where those that had presence and we are able to access market down to that, certainly there were a lot of interested parties who wanted access and would

6

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



leverage their facilities and so we see those opportunities, both from companies that are, let's say a little more research based, but want a company that can be doing the distribution and maybe those companies today that are in a broad-based model where they say, look, I want to move up market and I've got product lines that are a little bit more commoditized or a little bit more mature and maybe a company like Cardinal is an interesting outlet for those. So we see other interesting ways of filling out that portfolio and as you could imagine we have already explored some of those.

**Charles Rhyee** - *Cowen & Co. - Analyst*

It's great. We talked about your strategy and your preference items, let's move to standardization and in part right, where you are going from fee-for-service to outcomes. I think when you first started talking about this a couple of years ago, part of the discussion was that we want to have Cardinal in that dialog with C-suite, can you talk about like where you are at this, because maybe years ago, you were talking about purchasing manager, how is that elevation of discussion going on?

**George Barrett** - *Cardinal Health - Chairman and CEO*

It's a great question. This is really a very discernable difference in the dialog with many of our IDN and hospital customers. Historically, and again, this is not a criticism, historically, and again, if you think the way the hospital was built, it was built essentially from department out. Department built inside a system and then sort of working their way up into an enterprise. What is happening as the system is changing is that the C-suite is a much more active participant in thinking about the portfolio of the institution not just thinking about the effectiveness of some department. And their position competitively in a very new landscape and so we are now having very different kinds of discussions with IDNs about how they're positioning their businesses to be most effective in a changing landscape and also in a landscape with a payment model undergoing transition. We are clearly not fully moved from one model to another. Most of the system is still fee-for-service based, but you can feel that tension of the shifting sands. Virtually, all leaders of the health system understands this and I think it's changed the dialog for us and it give us the opportunity to talk more broadly about ways that we can help them in a new world. And that's why when we go to market, we're not going to market as medical products or as physician preference items or as AssuraMed or as pharmaceutical distribution. We're going to those customers at Cardinal Health being able to touch a very large part of their pie and say look, we think we can help create value for you given these changes and it's really the key to value proposition is it's just not about a business line. Now, again, there are going to be places where they say look there are four of the activities that are really relevant for us, find and we'll focus on those. It really requires a very segmented strategy to deal with each one of these IDNs that use the world a little differently.

**Charles Rhyee** - *Cowen & Co. - Analyst*

This transition though, I mean, you say you feel the tension, but (inaudible) surgeons do have, I mean, I think in orthopedics they probably, how do you think cardiologists will view this landscape?

**George Barrett** - *Cardinal Health - Chairman and CEO*

It varies a lot by system. It varies a lot by system, we were just (inaudible) in the last 10 days with a major systems sitting with Chief Medical Officer, CFO, Chief Operating Officer, basically saying we are telling these guys that where there is clinical differentiation you need to demonstrate that, show that to us where there is not we can standardize, we can aggregate demand, we can build scale and we can leverage that. That is the conversation, that's new conversation. So that is happening in orthopedics, that's happening in cardiovascular and that's happening wound management. That's why we sort of highlighted those three areas, but there will still be systems where that doesn't happen as effectively and part of our job is to know the systems more likely to say we're going to be having that kind of dialog with our clinicians and other systems, where they are going to be more hands up. My view is over time, if you say it is your gravitational pull, it is more activist, not less activist. I probably shouldn't use that word because that is a --.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## MARCH 03, 2015 / 3:40PM, CAH - Cardinal Health Inc at Cowen Health Care Conference

**Charles Rhyee** - *Cowen & Co. - Analyst*

Specific definition.

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

Exactly.

---

**Charles Rhyee** - *Cowen & Co. - Analyst*

So maybe let's move on, probably to other areas of topics and I know one of your favorite topics is generics. A lot of discussion obviously on how well Red Oak is doing. As we have been with relative importance though, so obviously, a lot of people, we spend a lot of time thinking about inflation, when we stack inflation against the benefits through Red Oak versus just the calendar itself. How would you stack, what would you say like this is biggest driver, I mean, maybe a little bit less, can you kind of put in more perspective for us, so that we are not chasing after something?

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

So let me just say couple of things with no intention to be dismissed about anybody concern about pricing. When we're sitting around talking about the big picture for us as Cardinal internally, we're not spending our time talking about whether products are inflating or deflating. It is not the central driver of our business. The central driver in generics is scale, global knowledge, global sourcing expertise and having a customer base that want to buy generics from you because they realize that is the most efficient way to do it. The swing between inflation and deflation in a given year can hit a couple of products. And frankly, it's not strategic or even financially the biggest driver. So I think you need some of amount of attention to understand that. I, you guys when you hear me, you probably hear less of that because it's just not. It is a swing, a swing dynamic but it's just swing from quarter-to-quarter, period-to-period. Our view on this really hasn't changed all that much over the year. We started the year let's say in August when we guided for the year and we said we were modeling our FY15 which starts in July to be slightly less than what we thought in fiscal 2014, not because we had an incredible crystal ball, but because that was an unusual high year and we just as a matter of sort of good modeling, we moderated it. Then as we came through Q1, the numbers looked a lot like they did in Q4, so we said, let's -- it's going to be a little higher. But as we came to Q2, we said, we still believe that over time, this will moderate some. And that's where we are and we haven't really changed our respective on that. So this gets a lot of attention, I understand why but my perspective is probably too much. I don't think it's a major driver of our business. And clearly, for us the Red Oak venture is really the big strategic move for us in generics and our dramatic growth in our customer base. Why generics, we now have about 10,000 customers, primary source of generic products, five years ago, that was probably 3,000, it's huge swing, it's really big difference.

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

So let's touch on that a little bit, so not only you have more customers by generics, but what's your penetration with winning those customers where you, so how much of their total spend you get, I get compliance?

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

That's a really hard to measure, it's a really hard thing to get precisely. What I will say is this, when I arrived, seven years ago, I was disappointed at our level of shared wallet in each customer. I thought we could be doing a lot better, thought we'd have fair amount of leakage. We are probably now at par with the best. And I can't give you exact numbers, probably in 80s or somewhere, there's always some, I'm going to say there's always some leakage along the top and there are assortment of reasons for that, but I would say our compliance is quite good. That doesn't mean we can't get a little bit better, but the big gap, I think we've done a lot to change the dynamic, and that's just really around what it.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

## MARCH 03, 2015 / 3:40PM, CAH - Cardinal Health Inc at Cowen Health Care Conference

**George Barrett** - *Cardinal Health - Chairman and CEO*

Okay. So you've obliviously kind of close that gap, question out there?

---

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

Sure. I'll repeat the question because we're being webcast. The question was distinguishing CareFusion from the decision around Cordis. So let me speak to that quite explicitly. And I had someone in the call yesterday talk about you do this because of complexity, we did not spin-off just because of complexity. All businesses have complexity and we're no different, before Cordis, we were probably complex business. What we really saw with two different kinds of businesses, the part of the CareFusion business that really didn't fit with the capital equipment side, and that's what it felt like to us, which is the capital equipment business with a different sale point and very different selling cycle. And so that really created a dynamic of two different kinds of businesses. There wasn't a consumable replenishable kind of business. To be candid, (inaudible) product in line CareFusion line that stayed I would have loved to have kept. I know said that before, because they would have, I think it would fit to our model very nicely, the fusion well. So that is the primary distinction. So the Cordis is really about products that are constantly being reused, which is more natural to our call point or cell cycle in our model and it leverages our skill more appropriately. Two questions.

---

**Charles Rhyee** - *Cowen & Co. - Analyst*

I mean, I just want to add, are there other questions anyone like to ask?

---

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

So the question is about the AAA product for us and we're still doing some assessment on that. As you know, it's being sold in Europe. One of the things that we will do as we get into it is some portfolio assessment both in terms of product, research program and maybe even some market assessment. That's why we want to be exactly the way we're looking in every market. So it's a little early to say, so that's completely a candid answer, I can give you at this stage.

---

**Charles Rhyee** - *Cowen & Co. - Analyst*

Any questions. Maybe we are in the last couple minutes, I think we have here. Why don't we touch on specialty. Maybe just share, I guess, if you think about how you're positioned in terms of, let's say, topline, you still sort of rank behind Amerisource and (inaudible) but how do you think about positioning in terms of what you want to do with it and what you can do with it?

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

So let's start, I'm going to take back us a couple of years. We are getting finished. I'll answer the question and we'll get right back, is that okay? So we were about $1 billion business four, five years ago. It is a business that's going to exceed $5 billion, we have dramatically increased topline, our skill set, our clinical knowledge, our ability to provide services to the providers and to pharma is really dramatically improving. So we would sort of a little bit late to that party, but I think we are doing really well in a sense the good news of growing quickly in the recent years, is that (inaudible)

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## MARCH 03, 2015 / 3:40PM, CAH - Cardinal Health Inc at Cowen Health Care Conference

a lot of time on undoing historical model that might be changing. We're really trying to address problems in a way that look more current to the current needs of the providers, and the pharma companies. So I actually like the progress we're making there. We can touch virtually every therapeutic area now we got clinical knowledge in every one of those areas and we'll continue to grow in that space. So I'm sorry, we lost that to the webcast, but what will take more of this in the breakout.

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2015, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



# EXHIBIT 9

# THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

CAH - Cardinal Health Inc at Cowen Health Care Conference (Breakout Session)

EVENT DATE/TIME: MARCH 03, 2015 / 4:20PM GMT

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## MARCH 03, 2015 / 4:20PM, CAH - Cardinal Health Inc at Cowen Health Care Conference (Breakout Session)

### CORPORATE PARTICIPANTS

**George Barrett** *Cardinal Health - Chairman and CEO*
**Sally Curley** *Cardinal Health - IR*

### QUESTIONS AND ANSWERS

**George Barrett** *- Cardinal Health - Chairman and CEO*

So we are official. Greetings all.

---

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

---

**George Barrett** *- Cardinal Health - Chairman and CEO*

So here is the question for example. Your historical perspective, historical model of, let's say, oncology. An oncologist making a lot of their money actually buying and selling drugs is going to change, right. I think that it's going to change in steps but I think oncologist will increasingly be compensated for practicing oncology which is exactly why they started into this world to do this. So I think for us, we're really focused on what are the changes that are going to be experienced in the system and the way the providers are going to be compensated with the insurers are going to pay for the world of the way biopharmaceutical companies are trying to touch patients.

---

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

---

**George Barrett** *- Cardinal Health - Chairman and CEO*

Yes, for example, clinical pathway is an example. So just again, so designing a system in which it is the practice has an incentive to a year to standardize clinical pathways. The payers should be emphasizing that and actually should be encouraging that behavior and compensating for that behavior because that provides the best outcomes at the lowest cost. And so we've done some work around that area. Actually, doing some interesting connecting providers and payers together. I think the world of the biopharmaceutical company, the biotech and the pharma companies is changing. Remember that ability to touch the patient is really a critical dynamic in relation to a decade ago when it was the critical dynamic that was touching that physician. Of every biotech company, every pharma company wants to have a deep relationship with the customer and the things they need to do touch that customer. The more we can provide some of those tools that enable that interaction and facilitate it the better that will be. So that's part of the reason that we bought Sonexus, which was to create the sort of this patient hub to allow us to be able to go to a pharma company, so that we can provide some of those touch points services that you need with that consumer or that patient.

---

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

---

**George Barrett** *- Cardinal Health - Chairman and CEO*

So the question again, I think I'll repeat the question for the webcast. So there is a question about the fact that some practices, many practices now are being acquired or affiliated into larger IDNs, doesn't that sort of move more towards our historical strength. I think the answer is yes, the answer

2

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



is yes. And again, there is a lot of complexity in there. As you know, [Terrie] about how the compensation models work. But in general, we are seeing across physician areas more affiliation and I think that's likely to continue. There are certain specialties as you know that have been sort of late movers and some that are had been earlier movers and more heavily integrated into [Allianz]. But I think that that general trend will continue and that probably does not hurt us. I mean, we have these pretty deep relationships with the Allianz, it's probably not a bad thing for us.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So there are obviously internally for every line of business we've got goals, not (inaudible) and they're pretty ambitious, and I hope you guys feel that over these last couple of years we have been ambitious in growing this business and we'll continue to be. Some of these we don't share, it's not the way we report the business, specialty is part of our Pharma segment. But I do expect the specialty part of the business starting to continue to grow. It will also grow other parts of our business and I think the margins I think over time will begin to expand. We needed to get to a certain scale actually for the margins. I would like to say except of the value to stick to the bones you need to have a certain amount of scale, because you are really just building the capabilities. Going back to biosimilars, I think what is really important there and we've had this conversation number of us in the room, I don't really see biosimilars the same way I see traditional generic, I see them as unique products. It may turn out that some of those products look more like generics in the way they posted the system and some that go with look more like brand. For that reason, we think it is absolutely critical to have a clinical capability in every key therapeutic area where there could be a biosimilar. Because you may need to deliver some of the services that have historically been completely associated with the brand. Right. So that's part of the reason that we have made certain moves even some very small moves that you don't see to build on not just our distribution network, but our touch points into certain therapeutic areas, urology is important, hematology, rheumatology so and the sub-segment of oncology. So I tend to see the biosimilar world carried by product and because I think the characteristics are going to be specific to that product and the competitive landscape is going to be very unique on these products.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

Yeah. I don't know, let me just repeat that. So the question was, would we expect to see the margin rates different by how the product flows through the system. I think the answer is yes, but the second part, I'm not sure I would say yes, which is the hypothesis would be if it's generic, more traditionally if its generic channel, the margin rates would be higher than if it runs more like a branded entity. And the answer is, I can't really answer that for sure. It depends. It may be that the services needed to sell that biogeneric in a more branded form is a high value activity and we're compensated relatively well for doing that. Right? So I don't know if I could give you quick answer on that, that's a really good question and I think it's going to be a one-off answer, it depends on what services you're providing to the pharma company, in this case, pharma generic company to get that product to the patient in the most efficient way. And to make sure that patient is got all the services that they need. That might create a margin opportunity that would be different. So that's what I can answer.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

3

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## MARCH 03, 2015 / 4:20PM, CAH - Cardinal Health Inc at Cowen Health Care Conference (Breakout Session)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So let me answer, first of all the question. The first question is about our pricing strategy, discounting strategy, which I hope you will certainly understand is not something that I will be able to discuss in a public setting is not a very smart competitive move.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

Exactly. Even I do that (inaudible) and even if we did, I have a hard time answering that question. Our value proposition will be the entire stuff, the suite of things that we offer into that cath lab and part of that will be the cost of the unit. But there's more to that, again just imagine a world in which what's happening is you are not necessarily paying for each component of the service but for a bundled treatment. And so not to think carefully about my cost of doing that treatment and the outcomes. So that was the first part of the question. The second was -- remind me, about the price yesterday. Why do we not see a bigger growth in the share price yesterday from the announcement. Right. So obviously I can't answer for you guys that's the share price, by the way I'm always happy when our share price goes up. So just generally speaking, I can't -- how you guys, I'm going to give chance to (inaudible).

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So what are people missing. I'm not sure what they're missing. I think for a lot of folks, they don't understand how much we do today. I still hear people call it a drug absorb. By the way, I'm proud of being really, really, really good drug distributor. And I'm proud of it. And by the way, it creates a huge touch point for us into the system, because in many cases we are hospital's biggest supplier dollars and that's creates a unique dynamic. But people don't think today we are already working in surgical suites of surgical kitting. We are working with gowns and drapes to the ICU. We are working with fluid management, is the awful euphemism tools which are necessary in an operating room. I don't need to give more description on that but we are working in orthopedic now in trauma. So in many ways this is actually an extension of what we're doing. I think people are still struggling with, but you've got rid of CareFusion which was a medical device business, so like explains with that and someone asked in the last (inaudible) your question. But for us, one, this is really an extension of our strategy. If you look at the things we've been saying for the last three years around physician preference items, this is actually just a big accelerant to that strategy. And I think what people are missing is, what a unique opportunity for us to get this kind of line with this kind of payment, by the way we will be discovered over years of doing this is reputation matters. So we've got a reputation, a name, talented people, global presence, a very nice product line, credibility to support a strategy that we think is really important. There is no question in my mind when I talk to hospitals and I talk hospital executives that they recognize they need to do things a little differently in the surgical suite, in the cath lab, you name it. So that does mean there's not going to be a place for pure product innovation. And if you look at the medical device world, I think we're going to see many of the great medical device companies that you guys know and invest in, will move up market on the innovation side. We're not going to be spending those kinds of research dollars, that's not going to be our model here. So I think maybe that's what people are going after sort of digest, and it's our job to make that case for you. When we saw this asset, the other thing likely to brew we a unique opportunity. It's just very attractive in so many ways But we totally understand that this is going to be, when people said digest, I'm ready to make the case for everybody else.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

4

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## MARCH 03, 2015 / 4:20PM, CAH - Cardinal Health Inc at Cowen Health Care Conference (Breakout Session)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So I'm not going to, again, give you -- I have to repeat the question. The question was do we believe we can accelerate revenues in this segment if I would. We will absolutely accelerate our physician preference item growth. My hope is it we will -- given the size of our business it will be more noticeable in the profit line and in the (inaudible) run this at twice the market and the big picture of Cardinal on revenue side, you're not going to see that much the nature of our $100 billion revenue line. But I think we'll see is the expansion of our margin rates. But what I wanted do is I want to grow our share, I want to grow opportunity. In the US I think there is a really great opportunity because again, it hasn't been a high priority for J&J, and they've been sort of explicit about that. One of things that we are going to tell all the Cordis people, one of the reason we are really excited to have them and I hope they are going to be really excited to be a part of Cardinal Health, we will prioritize its businesses, giving it support. There's an opportunity do you think with that business. Now we will do it differently that J&J would have done it but anyway there is a long way to go to finish line but maybe I hope that's a bit of an answer that question.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So the question is about manufacturing. So we will pick up some manufacturing facilities with this acquisition. I would say two key ones we will keep, it just so happens, which is wonderful. One of them is literally adjacent to a Cardinal facility, which is sort of amazing. So actually in terms of people and resources that is leadership for the control systems that is really nice to have. We believe there is an opportunity for manufacturing synergies that will take a little longer as you know that because of regulatory issues that never require you to go a little more slowly, but I would say over the next three to four years we will start to see some synergy on the manufacturing side. But studied out their capabilities.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

You will see very, very little. I would say on manufacturing if you look at our numbers that we projected for 2017 probably not much in that 18 number you will start to see a little bit.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

I am sorry, I can't break it. The question is, is gross margins of business and I cant break that out. You guys probably know the medical device business or your colleagues that do, and you can --.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## MARCH 03, 2015 / 4:20PM, CAH - Cardinal Health Inc at Cowen Health Care Conference (Breakout Session)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So I'm not completely clear what your question is. The start of the question was we'd expect margin rates of X in the medical device segment. But I didn't really follow the exact question.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So I think, let me see if I can rephrase it and make sure I get it. Are you asking why it's not a bigger, bigger accretion.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

Yes. But let's do this, again I'm just trying to be careful here. Recognize this, we have to sort of roll into this program, number one. Number two is some of the synergies -- we're going to have some start-up cost. Some of the synergies will start to flow through over time, we're not out to guiding breaking and we just wanted to give a rough synergy number for -- just to give you a sense of that. But for 2016, this is the best early shout we can give and we said at least 20, obviously our hope is at least is important. So I'm not going to try to be too precise with you other than to say this is extremely attractive opportunity for us economically. We will approach the business a little differently, as I said earlier, I think the P&L each line will probably look a little different than what you'd see inside a traditional med tech company. The selling model probably a little bit different, the service model will be a little bit different, the research line will be a little bit different. So we will do some things that make this business look a little different, but we expect it to be a significant contributor. And I can't give you an exact answer to this.

**Sally Curley** - *Cardinal Health - IR*

Let me just add one thing, I wanted to make sure that you understand, the greater than $0.20 that we talked about in fiscal 2017, the first fiscal year post close is net of, right, so if you look at fiscal 2016 and you figure that the close is going to be towards the end of this fiscal -- towards the end of calendar 2015 which would be our second quarter's fiscal 2016, the reason it's slightly dilutive in fiscal 2016 is because there is $0.13 to $0.15 of inventory step-up that needs to happen. So, I just want to make sure when people look at the numbers that they're understanding that piece of it is driving the dilution piece in fiscal 2016. Okay, all right.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So let me try and answer because there is really like three questions embedded in there and I'm going to try to person out. So the question was, this is a big move in this strategy and do you need to sort of like just lock in this one and not do anything else or is there more than you can do. So let me start with the basic. First from a capital standpoint, we've got a strong balance sheet, we're generating a lot of cash, our business is going

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



really well and we can do more if we want to. Second, managerially we are extremely good company. And actually we are going to pick up some wonderful talent in this acquisition. So managerially, we got the capacity to do the thing. Having said that, this is might be one of every acquisition, execute, execute, execute. So when you do a deal especially when that has some complexity, our priority, when we talk about how we're going to organize it, I have a very simple starting point with organizations. We're going to prioritize first around execution. Make sure that we execute because we want to make sure we're still doing really well in all those markets in the world while we are tinkering with the model. So it'll be very execution focused. Having said that, with an international platform, and again, it needs to be built out and we need to make sure a strong and robust. It does allow us to do some other things with that platform. And again, use the basics. We produce things today, talk about that are nice drivers in our business. Surgeons those should be going in every market, there is no excuse for that not going in every market in the world. So can't have different structure to do that. So we'll have some capability to do that, but we won't rush it. Our priorities are the same that we've talked about. Generic, specialty, growth in the home, ambulatory settings, new tools for IDNs, services that help them run those big institutions, physician preference items and consumables. Those are things that are still high priority for us. So we're going to look at opportunities in every one of those areas and when we see them and do the right economic, we will go for it. But you don't -- again this was a little bit of a unique -- from our view, you don't get this kind of scale very often in this kind of opportunity. Typically what do you see in these kind of businesses are sort of tuck-ins, this was a bigger opportunity and now we can use it to create some leverage.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So the interesting question is -- the question was what makes us excited about this, it wasn't growing for J&J and it wasn't strategic, you just answered the question. To a great extent what we -- this is true for your organizations, as well as ours. What you say is important and what you drive set aggressive goals on measure, reinforce, is typically what grows and those are your priorities. Companies that struggle, can't figure out what's important to them or they keep a whole amount of things that are not important and they (inaudible). And I think that can happen with every organization, so yet it's sort of cyber support to you. J&J I think is doing some what many companies do which is important portfolio analysis to figure out where they want to spend their bucks and where they want to prioritize. So again, I won't speak for them. But I think just to some extent, everybody inside Cordis, this has been understood that hasn't been a priority area for a while. So I think our opportunity in a way is to say look, we are going to set aggressive goals. I shared this with you, when I joined Cardinal Health, in some ways (inaudible) in our biggest business. When we were -- that our pharmaceutical distribution business wasn't seen necessarily the strategic driver of the business, but was really steady solid business and my view of the world was, this is a strategic growth engine of this business and we just reset the organization around that goal in creating that opportunity out of incredible set of assets. So I think there's opportunity for, we'll have to do some things differently. Again, we will have to do little differently than J&J did them, we'll have to do something to the portfolio with its strategy and with the services, but the due diligence confirmed our belief that we can do it.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So we have relationships with sort of everybody. Now in fairness J&J the enterprise probably has relationships with everybody too, it's really about how you go to market. Right. I think their organization is as you know sort of traditionally been, more driven around the units. But again, I won't speak for them, they're probably even doing some different things today, all of us, every company is evolving. But I think our touch points into the high-end historically is a really strong asset for us. So again, I think J&J has their historical model they've got their own priorities today. By the way one thing I liked about this week, we have a great relationship with J&J and we'll continue to do some more together in transition and I would love

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



the opportunity to spend more time with the department because invariably you start to talk about another and just one find more ways to create value for one another. So I am just happy that we have got a good relationship, but yeah.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

Well, I think, -- say it again, I'm going to make sure I got the question right.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

So I think virtually anything. I mean, some of them we sell today through distribution partners but you know those are uneven in terms of our capability when you're working with a third party agent as to how effective you're going to be. So I think we'll start looking, again, the first priority here is going to be making sure that cardiology line that we just acquired is doing well and this is like what I said about AsureMed, makes sure AsureMed is doing well and then layer in more product that's what is beginning to happen. So the first priority for us, do no harm, make sure you are doing well in each of those markets, put your leadership at stable, position with customers is good and then we can start building in position with customers is good and then we can start building in trauma products, clinical apparel, whatever it takes.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

The question is about the Schein relationship and whether or not had an international dimension. The priority in that transaction was opportunities with sort of the US market in this position, smaller physician practices that were not our sweet spot and for them to take advantage of the strength of our product line. There's nothing that preclude us from doing work outside the US, but that was not the strategic driver of the deal. So if we decide there's opportunity there, where companies that know one another well and we can always pursue those opportunities, but it was driven around a strategic need in the US.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

We are trying to be very creative and forward thinking about partnerships. I really do believe and I've said this before to many of you, the world of healthcare there used to be these very discrete individual pockets of content capabilities is coming together in so many different ways on the customer side, on the supplier side, so just starting what used to be a health insurer from what is a provider or used to be a retail versus what is

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



now delivery of care in a different way, a service -- a wholesaler from a broader service company and product companies, those distinctions are blurring and so the opportunities to see partnership to see in a business partner a unique new way of creating value, I love. I think it's a really exciting time to be in healthcare, because not all us do everything perfectly and the opportunity to find few got this synergies where there is really effect.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

Well on a revenue basis -- the question is what is our mix look like on a revenues going five years out. Look, because of the nature of pharmaceutical distribution, the revenue is always going to be heavy pharma. But I think again, what you should start to see and we haven't been other than the goals that we laid out, which was in front for 2017, we expect that just by the nature of the product line in what we call the medical segment you're probably going to see an increasing part of the pie coming from that -- a profitability coming from that pie that makes sense. The margins should, the kind of things that we're doing are accretive to margins, whether at the home, physician preference items, consumables those tend to be larger than the margin rates that you see in traditional pharmaceutical distribution. So having said that by the way our margin rates, we've been doing really well on the pharma side and part of it is I think the strength of our mix, the new customer base, the generics program, the venture with CVS Health, are really positive for us.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

The question is about PharMerica, there's not much, we don't, they announced it. Typically not something we announced just wouldn't. It is, think of it as a pharmaceutical distribution relationship, it's not complex in thinking about it branded and generic drugs. It does create of course more opportunity for us to do more generics, which is not a bad thing more volume in generics, there is a bit of this virtuous cycle, which is scale creates more value, which allows us to create more value for our partners and our customers. So, yes --.

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

**George Barrett** - *Cardinal Health - Chairman and CEO*

Yes, I can't break out individual margin pieces, as you probably know, in our business, Tom, there is, if you look at our portfolio and pharmaceutical distribution, margin rate are going to be different in different areas and that's driven by a by a couple of things, but including the cost to serve this summer for us incredibly straight forward for us to serve, we can operate with a lower margin rate. But there is value creation because it is leveraging this infrastructure we have. So I can't go into specifics on this other than to say -- there are two things. One, happy to have it, b, there is some complexity that they have in their legal stuff, we feel confident that we have adequate protections and that they have to sort out their issues and we are happy to have the business.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**MARCH 03, 2015 / 4:20PM, CAH - Cardinal Health Inc at Cowen Health Care Conference (Breakout Session)**

**Unidentified Audience Member**

(inaudible - microphone inaccessible)

---

**George Barrett** - *Cardinal Health - Chairman and CEO*

Probably nothing that would be any in sense material. But we're feeling, we will probably coming to close. We're feeling good about the position of the business. I feel like the -- in virtually every strategic driver of our business. And again, like every business we have our challenges. We wish Canada weren't going through this reset that it went over the last year, but we are adjusting. We're doing the things that we need to do, but generally speaking there is a sense in the organization. We actually just finished doing sort of employee surveys, clear sense in the organization what our priorities are, where we are going strategically, enthusiasm about being there, a real sense of career development opportunities for the people inside the organization and that's what I want and it's one of the things as a leader you walk in the organization, that's what you are looking for, is that palpable sense that people feel like we are in the right place and I feel that today. So it's exciting time in healthcare, it's an exciting time at Cardinal Health. Plenty of challenges, this is not an industry where you can fall asleep for very long. It's pretty amazing, but it's a fun time, and not without its challenges, but I think we got a clear sense of where we are going and I think where we can create for us and it just really needs some creative thinking.

---

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2015, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



# EXHIBIT 10

# Healthcare is changing …
# We're changing healthcare.

**George Barrett**
Chairman and CEO

**Sally Curley**
SVP, Investor Relations

Cowen and Company 35th Annual Health Care Conference
*March 3, 2015*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Cautions concerning forward-looking statements

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the ability to achieve the expected benefits from the generic sourcing venture with CVS Health; the frequency or rate of pharmaceutical price appreciation or deflation and the timing of generic and branded pharmaceutical introductions; the non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; the ability to successfully complete the Cordis acquisition on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the ability to achieve the expected synergies as well as accretion in earnings, if the Cordis acquisition is completed; the occurrence of any event, change or other circumstance that could give rise to the termination of the binding offer or the purchase agreement (once executed) with respect to the Cordis acquisition; the conditions of the credit markets and an ability to issue debt on acceptable terms to fund the Cordis acquisition; the ability to achieve the expected benefits from the AccessClosure acquisition; uncertainties due to government health care reform including federal health care reform legislation; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of March 3, 2015. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, these presentations contain Non-GAAP financial measures. Cardinal Health provides GAAP numbers, definitions and reconciling information in the Financial Appendix at the end of these presentations and on its Investors page at ir.cardinalhealth.com. An audio replay of the conference call will be available on the Investors page at ir.cardinalhealth.com.

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Essential facts about Cardinal Health
## A global, integrated healthcare services company









© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Sustained strong financial performance

| What we promised in 2010 | What we delivered |
|---|---|
| Long-term non-GAAP EPS[1] growth **at least double digit** | **14.4% CAGR[2]** |
| **Modified TSR ≥ 11%** (Non-GAAP EPS[1] growth + dividend yield) | **16.4%[3]** |
| **Gross margin expansion** (TTM) | **+186bps** |
| **Non-GAAP operating margin expansion** (TTM) | **+96bps** |
| **Dividend increase** | **14.7% CAGR[2]** |

*Unless otherwise noted, the actuals presented above reflect the period of Q4FY10-Q2FY15.*
*[1] Non-GAAP diluted earnings per share from continuing operations; Please see appendix for definitions and reconciling information.*
*[2] FY10 – FY14*
*[3] Modified TSR calculated using  FY10 – FY14 non-GAAP EPS[1] CAGR  plus 2.0% dividend yield on 6/30/2014.*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth
*Essential to care™*

# Thoughtful capital deployment approach

## Capital deployment post CareFusion spin[1]

**$4.6B**
cumulatively returned to shareholders

- Dividends
- Share repurchases
- Capital expenditures
- Acquisitions, net of divestitures

[1] *Capital deployment from Q1 FY10 to December 31, 2014 (FY15).*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth
*Essential to care™*

# Our priorities are driven by **key trends** in healthcare

**Demographics and public health issues driving demand**

| Need to deliver care more cost-effectively: new settings, less waste, more coordination | Biology advances and big data | Increased consumerism in healthcare | Transition from fee-for-service to payment for outcomes | Increased participation of government, both as payor and regulator |

## Continued innovation in healthcare

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# FY15 strategic priorities



## Generics

- Use scale and know how to deliver value via **Red Oak**
- Tailored programs to a segmented customer base



## Specialty and biopharma

- Continue to increase scale
- Increase therapeutic range
- Enhance programs for biopharma



## International

- Expand Chinese footprint
- Reposition Canada for growth
- Grow medical product scale through international markets



## Health system and hospital solutions

Provide health systems with scaled solutions including:

- Integrated strategic account solutions
- Physician preference products
- Medical consumables
- Performance management tools and services



## Alternate sites of care

- Accelerate growth in home
- Post-acute and ambulatory settings, leveraging IDN experience and **HENRY SCHEIN®** partnership
- Expand product lines, services, capabilities and touch points

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth
*Essential to care™*

# Our pending acquisition of Cordis



© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.

# Strategic rationale

- ✓ Significant step forward in our strategy to address a major pain point in many health systems today -- physician preference items (PPI)
    - ✓ **Cardiology**, wound management, orthopedics
- ✓ Aligns closely with our priorities and will serve to accelerate key growth driver in our portfolio:
    - ✓ In one move, significantly increases scale and breadth of cardiovascular product line to complement AccessClosure
    - ✓ Aligns with powerful demographic trends; aging population only increases demand for cardiovascular procedures
    - ✓ Brings a terrific heritage, reputation for quality and innovation, and deep talent pool immersed in field of cardiology
    - ✓ Increases our international presence: can leverage with our existing products, and with new products and services we may add as part of our growing portfolio; gain outstanding regional and country leadership in markets worldwide
- ✓ Economics are extremely attractive; enhances enterprise growth characteristics and expands margin rates
- ✓ Ability to help IDNs standardize around full portfolio of mature medical products and bring new innovative ways of serving these customers

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Each organization brings substantial assets to the table

**Why Cordis?**

- Early innovator responsible for several key breakthroughs in cardiology and endovascular (EV) minimally invasive procedures
- Unique asset in cardiovascular space in both product reach and scale, and with extensive global footprint
- Substantial brand equity
- Strong provider relationships

**Why Cardinal Health?**

- Significantly advances our physician preference item (PPI) strategy
- Builds upon existing strong customer relationships with health systems
- Partner of choice for other companies seeking market access
- Brings supply chain expertise and inventory management solutions to Cordis

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth

*Essential to care™*

# A financially compelling acquisition[1]

✓ Business to be acquired for $1.944B in cash; ~$1.6B net of the present value of tax benefits (~$350M)

✓ Expect to be significantly accretive to Medical Segment margin rates

✓ Expect greater than $0.20 in non-GAAP EPS accretion in FY17 (first full fiscal year post-close; closing assumed toward end of calendar 2015); increasingly accretive thereafter (figure is net of $0.07 to $0.08 of estimated, incremental annual financing-related interest expense); FY16 slightly dilutive due to inventory fair value step-up

✓ Expect to fund with $1.0B of term debt and remainder with existing cash

✓ Annual synergies of at least $100M expected exiting FY18

[1]See appendix for non-GAAP definitions

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Mechanics of transaction close

✓ Transaction expected to close by end of calendar 2015

✓ Binding offer in place until Works Council consultative processes completed in France and Germany; expect binding agreement thereafter

✓ Overall deal closes once applicable closing conditions met in approximately 20 principal countries

    ✓ Principal countries include U.S., major Europe, China and Japan

✓ Other international countries close on a rolling basis afterwards, as country-specific approvals received

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Strong portfolio driving growth; positioned for the future

Case: 2:19-cv-03347-EAS-EPD Doc #: 29 Filed: 11/06/20 Page: 208 of 428  PAGEID #: 697

- ✓ Believe we are positioned on the "right side" of healthcare

- ✓ Innovating to fulfill needs of increasingly integrated customers

- ✓ Thoughtful capital deployment

- ✓ A balance of short- and long-term growth drivers

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Financial appendix



© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | **Year-to-Date 2015** | | | | | |
| **GAAP** | $ 1,012 | 2 % | $ 886 | $ 331 | $ 555 | (10)% | $ 1.65 | (7)% |
| Restructuring and employee severance | 26 | | 26 | 9 | 17 | | 0.05 | |
| Amortization and other acquisition-related costs | 112 | | 112 | 41 | 71 | | 0.21 | |
| Impairments and (gain)/loss on disposal of assets | (18) | | (18) | (10) | (8) | | (0.02) | |
| Litigation (recoveries)/charges, net | 72 | | 72 | 4 | 68 | | 0.20 | |
| Loss on extinguishment of debt | - | | 60 | 23 | 37 | | 0.11 | |
| **Non-GAAP** | $ 1,204 | 8 % | $ 1,138 | $ 399 | $ 740 | 7 % | $ 2.19 | 10 % |
| | | | **Year-to-Date 2014** | | | | | |
| GAAP | $ 990 | 3 % | $ 934 | $ 320 | $ 614 | 7 % | $ 1.78 | 7 % |
| Restructuring and employee severance | 20 | | 20 | 7 | 13 | | 0.04 | |
| Amortization and other acquisition-related costs | 105 | | 105 | 38 | 67 | | 0.19 | |
| Impairments and (gain)/loss on disposal of assets | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | (13) | | (13) | (5) | (8) | | (0.02) | |
| Loss on extinguishment of debt | - | | - | - | - | | - | |
| Non-GAAP | $ 1,111 | 12 % | $ 1,055 | $ 363 | $ 691 | 16 % | $ 2.00 | 15 % |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings[1] | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate[2] |
|---|---|---|---|---|---|---|---|---|
| | | | **Fiscal Year 2014** | | | | | |
| **GAAP** | $ 1,885 | 89 % | $ 1,798 | $ 635 | $ 1,163 | 247 % | $ 3.37 | 247 % |
| Restructuring and employee severance | 31 | | 31 | 11 | 20 | | 0.06 | |
| Amortization and other acquisition-related costs | 223 | | 223 | 79 | 144 | | 0.42 | |
| Impairments and loss on disposal of assets | 15 | | 15 | 5 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (21) | | (21) | (8) | (13) | | (0.04) | |
| **Non-GAAP** | $ 2,133 | 4 % | $ 2,047 | $ 722 | $ 1,324 | 3 % | $ 3.84 | 3 % |
| | | | **Fiscal Year 2013** | | | | | |
| GAAP | $ 996 | (44)% | $ 888 | $ 553 | $ 335 | (69)% | $ 0.97 | (68)% |
| Restructuring and employee severance | 71 | | 71 | 27 | 44 | | 0.13 | |
| Amortization and other acquisition-related costs | 158 | | 158 | 52 | 106 | | 0.31 | |
| Impairments and loss on disposal of assets | 859 | | 859 | 37 | 822 | | 2.39 | |
| Litigation (recoveries)/charges, net | (38) | | (38) | (15) | (23) | | (0.07) | |
| Non-GAAP | $ 2,046 | 10 % | $ 1,938 | $ 654 | $ 1,284 | 15 % | $ 3.73 | 16 % |

[1] The 4-year compound annual growth rate for GAAP and non-GAAP operating earnings was 10 percent and 11 percent, respectively.

[2] The 4-year compound annual growth rate for GAAP and non-GAAP diluted EPS from continuing operations was 20 percent and 14 percent, respectively.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | **Fiscal Year 2012** | | | | | |
| GAAP | $ 1,792 | 18 % | $ 1,698 | $ 628 | $ 1,070 | 11 % | $ 3.06 | 12 % |
| Restructuring and employee severance | 21 | | 21 | 8 | 13 | | 0.04 | |
| Amortization and other acquisition-related costs | 33 | | 33 | 9 | 24 | | 0.07 | |
| Impairments and loss on disposal of assets | 21 | | 21 | 8 | 13 | | 0.04 | |
| Litigation (recoveries)/charges, net | (3) | | (3) | (1) | (2) | | (0.01) | |
| Other Spin-Off costs | 2 | | 2 | 1 | 1 | | - | |
| Non-GAAP | $ 1,866 | 13 % | $ 1,772 | $ 653 | $ 1,119 | 13 % | $ 3.21 | 15 % |
| | | | **Fiscal Year 2011** | | | | | |
| GAAP | $ 1,514 | 16 % | $ 1,518 | $ 552 | $ 966 | 65 % | $ 2.74 | 69 % |
| Restructuring and employee severance | 15 | | 15 | 5 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | 90 | | 90 | 22 | 68 | | 0.19 | |
| Impairments and loss on disposal of assets | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | 6 | | 6 | (1) | 7 | | 0.02 | |
| Other Spin-Off costs | 10 | | 10 | 4 | 6 | | 0.02 | |
| Gain on sale of CareFusion stock | - | | (75) | - | (75) | | (0.21) | |
| Non-GAAP | $ 1,644 | 18 % | $ 1,573 | $ 585 | $ 988 | 22 % | $ 2.80 | 25 % |
| | | | **Fiscal Year 2010** | | | | | |
| GAAP | $ 1,307 | 1 % | $ 1,212 | $ 625 | $ 587 | (23)% | $ 1.62 | (23)% |
| Restructuring and employee severance | 91 | | 91 | 32 | 59 | | 0.16 | |
| Amortization and other acquisition-related costs | 18 | | 18 | 6 | 12 | | 0.03 | |
| Impairments and loss on disposal of assets | 29 | | 29 | (5) | 34 | | 0.09 | |
| Litigation (recoveries)/charges, net | (62) | | (62) | (23) | (39) | | (0.11) | |
| Other Spin-Off Costs | 11 | | 53 | (149) | 202 | | 0.56 | |
| Gain on sale of CareFusion stock | - | | (45) | - | (45) | | (0.12) | |
| Non-GAAP | $ 1,394 | (3)% | $ 1,296 | $ 486 | $ 810 | (2)% | $ 2.24 | (2)% |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| | | | | | | | | | | Rolling Quarter | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | | 2014 | | | | 2013 | | | | 2012 | | | | 2011 | | | | 2010 |
| (in millions) | Q2 | Q1 | Q4 | Q3 | Q2 | Q1 | Q4 | Q3 | Q2 | Q1 | Q4 | Q3 | Q2 | Q1 | Q4 | Q3 | Q2 | Q1 | Q4 |
| Revenue | $ 93,929 | $ 90,631 | $ 91,084 | $ 93,610 | $ 96,735 | $ 99,727 | $ 101,093 | $ 102,437 | $ 104,803 | $ 106,648 | $ 107,552 | $ 107,551 | $ 106,705 | $ 104,999 | $ 102,644 | $ 100,340 | $ 98,612 | $ 98,160 | $ 98,503 |
| GAAP operating earnings | $ 1,907 | $ 1,880 | $ 1,885 | $ 1,056 | $ 1,023 | $ 1,011 | $ 996 | $ 1,842 | $ 1,893 | $ 1,836 | $ 1,792 | $ 1,747 | $ 1,668 | $ 1,562 | $ 1,514 | $ 1,489 | $ 1,408 | $ 1,431 | $ 1,307 |
| Restructuring and employee severance | 36 | 39 | 31 | 57 | 85 | 76 | 71 | 48 | 22 | 23 | 21 | 17 | 16 | 17 | 15 | 17 | 25 | 33 | 91 |
| Amortization and other acquisition-related costs | 231 | 228 | 223 | 212 | 209 | 179 | 158 | 117 | 37 | 34 | 33 | 37 | 94 | 106 | 90 | 86 | 58 | 28 | 19 |
| Impairments and (gain)/loss on disposal of assets | (13) | 15 | 15 | 843 | 863 | 859 | 859 | 29 | 25 | 21 | 21 | 20 | 7 | 8 | 9 | 9 | 9 | 7 | 29 |
| Litigation (recoveries)/charges, net | 65 | 6 | (21) | (24) | (18) | (15) | (38) | (37) | (34) | (22) | (3) | (9) | (4) | 2 | 6 | (22) | (29) | (60) | (62) |
| Other Spin-Off Costs | - | - | - | - | - | - | - | 1 | 1 | 1 | 2 | 4 | 4 | 8 | 10 | 9 | 12 | 12 | 11 |
| Non-GAAP operating earnings | $ 2,227 | $ 2,167 | $ 2,133 | $ 2,144 | $ 2,163 | $ 2,109 | $ 2,046 | $ 1,999 | $ 1,943 | $ 1,893 | $ 1,866 | $ 1,816 | $ 1,786 | $ 1,703 | $ 1,644 | $ 1,588 | $ 1,483 | $ 1,451 | $ 1,394 |
| GAAP operating earnings margin rate | 2.03 % | 2.07 % | 2.07 % | 1.13 % | 1.06 % | 1.01 % | 0.99 % | 1.80 % | 1.81 % | 1.72 % | 1.67 % | 1.62 % | 1.56 % | 1.49 % | 1.48 % | 1.48 % | 1.43 % | 1.46 % | 1.33 % |
| Non-GAAP operating earnings margin rate | 2.37 % | 2.39 % | 2.34 % | 2.29 % | 2.24 % | 2.11 % | 2.02 % | 1.95 % | 1.85 % | 1.77 % | 1.73 % | 1.69 % | 1.67 % | 1.62 % | 1.60 % | 1.58 % | 1.50 % | 1.48 % | 1.42 % |
| Q4FY10-Q2FY15 GAAP operating earnings margin rate expansion | 70bp | | | | | | | | | | | | | | | | | | |
| Q4FY10-Q2FY15 Non-GAAP operating earnings margin rate expansion | 96bp | | | | | | | | | | | | | | | | | | |

The sum of the components may not equal the total due to rounding.

**Forward-Looking Non-GAAP Financial Measures**

We present non-GAAP earnings from continuing operations (and presentations derived from these financial measures, including per share calculations) on a forward-looking basis. The most directly comparable forward-looking GAAP measures are earnings from continuing operations. We are unable to provide a quantitative reconciliation of these forward-looking non-GAAP measures to the most directly comparable forward-looking GAAP measures because we cannot reliably forecast restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net, LIFO charges/(credits) and loss on extinguishment of debt which are difficult to predict and estimate and are primarily dependent on future events. Please note that the unavailable reconciling items could significantly impact our future financial results.

**Cardinal Health, Inc. and Subsidiaries**

In fiscal 2015, the Company began excluding last-in, first-out ("LIFO") inventory charges/(credits)[5] from its non-GAAP earnings, for consistency with the presentation by some of its peers. The Company did not record any LIFO charges or credits in the first or second quarters of fiscal 2015 or 2014, respectively. In the second quarter of fiscal 2015, the Company has excluded the loss on extinguishment of debt[6] related to the early redemption of debt that occurred in December 2014 from its non-GAAP earnings.

**Definitions**

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total shareholders' equity).

**Non-GAAP Diluted EPS from Continuing Operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Earnings from Continuing Operations:** earnings from continuing operations excluding (1) restructuring and employee severance[1], (2) amortization and other acquisition-related costs[2], (3) impairments and (gain)/loss on disposal of assets[3], (4) litigation (recoveries)/charges, net[4], (5) LIFO charges/(credits) and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Effective Tax Rate from Continuing Operations:** (provision for income taxes adjusted for (1) restructuring and employee severance, (2) amortization and other acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits) and (6) loss on extinguishment of debt) divided by (earnings before income taxes and discontinued operations adjusted for the same six items).

**Non-GAAP Operating Earnings:** operating earnings excluding (1) restructuring and employee severance, (2) amortization and other acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net and (5) LIFO charges/(credits).

**Non-GAAP Operating Earnings Margin Rate**: current period non-GAAP operating earnings divided by revenue.

**Non-GAAP Return on Equity:** (annualized current period net earnings excluding (1) restructuring and employee severance, (2) amortization and other acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits), and (6) loss on extinguishment of debt, each net of tax) divided by average shareholders' equity.

**Return on Equity**: annualized current period net earnings divided by average shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.

**Tax benefits related to Cordis acquisition:** Tax benefits derived primarily from the amortization of goodwill and other intangible assets.

[1] Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel) and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[2] Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs and changes in the fair value of contingent consideration obligations.

[3] Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[4] Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[5] The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market. These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[6] Charges related to the make-whole premium on the redemption of notes.

# EXHIBIT 11

**Cardinal Health Inc at Barclays Healthcare Conference**

Miami Mar 10, 2015 (Thomson StreetEvents) -- Edited Transcript of Cardinal Health Inc presentation Tuesday, March 10, 2015 at 12:30:00pm GMT

CORPORATE PARTICIPANTS
   Eric Percher, Barclays - Analyst
   George Barrett, Cardinal Health, Inc. - CEO

**PRESENTATION**

**Eric Percher**, Barclays - Analyst

Good morning, everyone. Welcome to the first day of the Barclays Global Healthcare Conference. I'm pleased to -- well first let me introduce myself, I'm Eric Percher, I'm covering the healthcare services, it feels like it's been a while, it's been a year. Last year I was introducing myself to everyone up here and a year ago we had George Barrett CEO from Cardinal with us here, quite a bit has changed I'm looking forward to discussing that, we also have Sally Curley, SVP of Investor Relations with us up on the stage.

But before we begin, you'll notice that both Josh Raskin and I, across all the healthcare services companies are doing a series of ARS questions and we will be comparing the results across, so I highly encourage your participation, let's run through those quickly.

So first, very simple. What will utilization trends look like in 2015 for the company and what we're looking for here has increased versus decreased from prior years. We'll give a couple of seconds for this.

So we are expecting an increase, maybe not the maximum possible but 71% which I think is an improvement from last year. We'll move on to the second question, which I think is the most important, which factor will have the greatest impact on corporate shares over the next 12 months, we've got core distribution, generic sourcing execution of the Medtech strategy, specially growth. And I've added in all Cardinal employees issues (inaudible) to accommodate trunk stock. You can tell me that's not an efficient way for us to run the supply (inaudible) much trunk stock exists at Cardinal in the future. Execution of Medtech's strategy, well that's where we'll begin today.

**Eric Percher**, Barclays - Analyst

(inaudible - microphone inaccessible) Question 3, how would you like to see the company deploy capital will be sure to throw this one on to Mike, can go ahead and start running this one, M&A, share repo, dividends, core Investments.

**George Barrett**, Cardinal Health, Inc. - CEO

Interesting mix that investment in the core is almost 50% followed by share repurchase.

**Eric Percher**, Barclays - Analyst

Question 4, do you believe the company will grow earnings faster in 2016 relative to 2015. Please go ahead around that.

**George Barrett**, Cardinal Health, Inc. - CEO

Of course we've got the generic sourcing agreement coming through this year, creating unique growth and bias toward the significantly faster end but pretty well in the middle.

**Eric Percher**, Barclays - Analyst

(Microphone Inaccesible) And finally, a question 5, do you currently own shares.

**George Barrett**, Cardinal Health, Inc. - CEO

So we've got a wide-open space for you George and maybe if you spoke to (inaudible) in the Medtech space.

**Eric Percher**, Barclays - Analyst

And then we'll end with the last question, question 6 which is your bias on the stock, which will be very interesting since we only have 25% ownership in the room.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

So I thank you for joining us. I want to make sure that we start given that this is a general presentation with an overview of the company, a little bit of background on where we are, or what got us to where we are today.

**George Barrett**, Cardinal Health, Inc. - CEO

Well, good morning, Eric, and thanks, heard it's just about your first anniversary here. And many regards to, Sally. So this is been an exciting stretch for Cardinal Health and it's exciting time in healthcare, think over the last five years we've done a huge amount of work, not only to drive performance but to position the company to be on what we think of as the right side of where healthcare trends are going.

And then we are going to have the powerful changes that in the system, you guys all know that's certainly happening at different paces, episodically in some cases, but there are certain trend that are incredibly powerful. I assume the important one of them frankly is not (inaudible) systemic chain, which is a huge demographic shift, which is a population that's aging and suffering from multiple chronic illnesses. We often talk about the sides of the Medicare population and the number of people entering Medicare today, we know that's in excess of 10,000. We forget that we have 10 million people that are over the age of 80 today, which is quite extraordinary and that number is going to double over the next decade.

So that's a very, very different population than we've seen (inaudible). So one of the natural thing that I often talked around (inaudible) incredible poise, the natural demand coming from public health and demographic issues. We've done some very important things, I think, in all of our businesses, tried to align with those. In the pharmaceutical business, two areas have been high priority for us. One is to make sure that we are in the best possible position in generic drugs, 85% of all drugs are filled generically in the US and for us it was very important to create the scale, scope and also the best global knowledge possible to source these products which really is a global marketplace.

Our venture with CVS Health has been really exciting in this regard. We were growing very dramatically as it was but I am thrilled about the idea that we can work together and create this organization called Red Oak, which is our sourcing operation. That same time we rebalanced our mix, that more customers are actually buying generic drugs from us and today of our customers, probably 10,000 or so use us as their primary source of generic drugs (inaudible).

Second is specialty pharmaceuticals. You've seen obviously the growth in specialty pharmaceuticals, we were relatively small player five or six years ago. Today that business is running at a rate of excess of $5 million. We're beginning to position ourselves in all therapeutic categories. We do think that the evolution sort of this explosion where you combine the biological sciences and big data is creating a whole new wave of innovation (inaudible). In our, what we call, our medical segment, we've really seen a couple of key areas for us, using our historical strength in medical and surgical distribution to build-out a portfolio of products and services that are valuable to our IDN customers. So that includes all the services that we might provide around distribution is that inventory management tools, technology, product management, tracking tools also doubling down in the areas of consumables where we can use more of our private label products, standardized across systems and grow and there is physician preference item strategy, which we're going to come back to no doubt, which is areas where -- are significant pain points for hospitals where I think at the low end of the medical device there is an opportunity for standardization.

Finally, we believe that growth is going to be significant in the home, if you look at this demographic wave and we made an acquisition of AccessClosure a couple of years ago, which has been a fantastic opportunity for us to serve patients in the home. And I think China is going to be a really exciting opportunity, that business is now running at well in excess of $2.5 billion and really that's system in its infancy. So in general terms, it's going to be a exciting five years, our compound annual growth rate has been well into the mid-double digits. We returned between $4.5 million and $5 million to shareholders through that period of time, stock price has done reasonably well. Our team is tremendous. We really have, I think as deep a team as you are going to find in the industry, which I think is, three course of battle, so with that quick introduction, we're excited about where we are excited about being (inaudible).

**Eric Percher**, Barclays - Analyst

So given that 75% of folks in the room are not owners and that 50% now in actually believe that Medical will drive or be the most important driver of the stock in the next year, that's a very radical change in and of itself. And I think it flows from a radical re-envisioning of what the medical business at Cardinal is and as we've talked over the last couple of months about this strategy, which was first outlined a year and a half ago and then in September on your call you really made it a point of emphasis, it's been very interesting to see that this goes back to 2009 in CareFusion. And I think if you can provide us an understanding of how this germinated over time, that is useful.

**George Barrett**, Cardinal Health, Inc. - CEO

So first I am going to come back and argue that it's not that radical and that's probably actually important but let me just start and take us back to 2009, the spin up of CareFusion, people have often said to me in the last week or so, you eliminated some complexity with that move, why did you add and it really wasn't about complexity, we are a -- post CareFusion, Cardinal Health is a very complex business and I've been doing this for a long time and there's a lot

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

of moving parts. It's a very exciting business with many lines of business. Well we really saw in at that moment was two different kinds of business, one was sort of a more considerable replenishable business and then a capital equipments business and part of what we saw in the CareFusion line that we taught probably look like a separate kind of business, so it's larger than the capital equipment side, different on call cycle, different compositions, different cell cycles, so we've always been in the medical device business and in fact post CareFusion we were actually in certain areas, what I'll call the consumable part of medical devices. So that actually is not new, what has happened is over the -- and I would say it's not as recent news to you, it's really within that next 12 months as we continue to talk to our customers. Again, particularly in the big IDNs and seeing that consolidation and the integration of IDNs with physicians practices and clinics and surgery centers was that there were certain areas that were really a struggle for them, which was particularly in and around orthopedics and trauma, wound management cardiology and this was primarily thinking what they call physician preference items. These are areas where you would have many products that actually will mature where the development innovation on the product had not really changed much in the last 25 years and where they still saw this proliferation of products and that was creating in an efficiency in the system and we were in that conversation, we recognized we had chance to bring some efficiency and standardization to those product lines and we started in trauma, which was a pretty natural place for us to start and we've been building out - we've actually quite a small company called EMERGE Medical, been building out that capability, again these are along the more mature element of the medical device area.

We made a move with a business called Innovative Therapies and Wound Management, another area we think that there's some mature products that have the opportunity for us to standardize across our portfolio of customers and we acquired AccessClosure, which was a interventional cardiovascular company, that has all been happening over the last couple of years as this has been building, the opportunity to acquire Cordis was really a significant step forward in size, scale, scope.

And actually in reputation in a way because this is an area where credibility is very important. I mean, if you're asking an organization, if you are asking a group of surgeons or interventional cardiologists to consolidate and to standardize around one set of tools, you have to have the data and it's important to do that and again Cordis have a long legacy in cardiovascular, interventional and endovascular. So we're really excited about the opportunity, it gave us international scope, a broad product line, it created some opportunities for leverage, the work that we've done with AccessClosure and really in one move allowed us to leapfrog in this strategy. So really excited about it and it brought some really great people and I think again I keep coming back to that issue of having the talent to do this kind of work.

People often don't see again even prior quarter, how deeply knowledgeable we are in certain areas clinically. The number of people that work for us that are clinically back trained is pretty significant. So we are really excited about this. I would say in a way again not the radical of departure, because if you think about our business, which is all about the cost effectiveness of healthcare, this was an area where we saw the opportunity to standardize, to take advantage of our scale to aggregate demand and sort of build value for our customers and for ourselves and our shareholders through that kind of strategy. So probably a little bit more the stairway than people realize, but nonetheless a significant move with some significant international presence and we're really, really kind of --

**Eric Percher**, Barclays - Analyst

So it makes this down the stairway, as well is your background in logistics and the services you provide to the hospitals and I know that there's been a lot of concern about what occurs in this market in pricing. Some of the discussion is around a more efficient delivery mechanism. And I think there is also an inherent or an implied view that that means a lower price for lower service where lower service is right, now when you look at how you go to market. Tell me out the balance of developing the service aspect of the long side developing what the pricing model looks like post acquisition, closure as you move forward.

**George Barrett**, Cardinal Health, Inc. - CEO

So it's not lower price for lower service, actually our service I think in many ways is going to be much more valuable than what has historically been done.

If you look at any of these areas, whether it's cardiovascular or orthopedics, the amount of waste in the system is extraordinary, you are talking about the stuff in the (inaudible), that model is completely inefficient, and I think, we realized given our history in supply chain management that there are tools that we can bring, and services that we can bring, and we can validate this now, that can reduce cost, eliminate waste, prevent redundancy, reduce errors, these are all valuable to those customers. So as for the service model, we'll be very uniquely Cardinal.

I want to back up and just remind you of something here. I am a big believer in Medtech, an innovative medtech, (inaudible) actually quite to the contrary. If we are going to continue to be able to integrate in areas, we need to be more efficient in those areas that are more mature, so actually think that the great innovative companies in the Medtech world are going to do very well, it's a great opportunity. They're going to see the same demographics that we're all seeing.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

But I just think there is a different focus for those businesses, just like J&J decided their course was not a core asset for them that they are going prioritize other areas, those are opportunities for us to take advantage of our scale, our services, our ability to aggregate demand.

So, it's actually -- the model is really about bringing a solution set to that cath lab or to that surgical suite, or to that wound center. And that's really the heart of the strategy.

**Eric Percher**, Barclays - Analyst

So there's one more question on medical, and it's actually a pleasure to talk about medical. I'm sure for you (inaudible) 17 inflation questions though we'll get that. If you look at the core medical business, and I do think, some of what you've done of late is, as I said redefine it and this will be the driver going forward. But the perception or is it reality of that business is, it's been quite challenged. Going back to the CareFusion point in time. In the last year or two, we've seen a couple of fairly unique challenges, Canadian reimbursement being one of them, commodity cost, now you've got a reversal of that. How do you look at that core business, which I know is still important to you next to what may be the real growth driver in (inaudible)?

**George Barrett**, Cardinal Health, Inc. - CEO

That's a great question. Again, let's start with the really important statement. We don't go market as the medical segment, the pharmaceutical side of thing. Our national account managers are going to the market as Cardinal Health, selling a suite of offerings to hospital that really go into tremendous change and need solution. So this is a really important statements to make.

If you look at the history to go back to sort of the original sort of the net surge distribution, the problem in that area over a decade have been changing. What has been critical process is to use that distribution capability, our touch points to probably 70 some odd %, 80% of the hospitals in the country to use that touchpoint to build products and services that are valuable and necessary to those customers, whether that customer is an integrated health system, it's a surgery center, it's a cath lab, it's a physician's office. So our strategy has really been around using those pipes into the system, very important pipes in the system to continue to provide good products and services.

Interestingly, that medical surgical part of business is incredibly hot. We were talking about this last night. It's a very, very difficult thing to do. Just because of the sheer number of products that any hospital uses or the number of contacts that they made at single hospital IDN may be connected to. So it's actually a very challenging business, but what we've been able to do is to use that core business to build other tools.

Going back to the performance, our performance in the first half was largely on our forecast internally. The big difference was Canada has gone through a real reset and we've got to make some hard choices in Canada to make sure that we're adjusting to a market that's got different reimbursement dynamics and it did two years ago.

The other big swing in our quarter was simply, we increased our forecast, which by definition required us to increase the allocation of 401(k) employees, which I'm choicely happy to do.

So actually, the performance of this segment was pretty solid. But we do see some new kinds of growth drivers in that part of business and we're pretty excited about that.

**Eric Percher**, Barclays - Analyst

So moving to the pharmaceutical distribution business, which has been a little bit of a focus for you since you joined. We know that a year ago, we were talking about generic sourcing agreements, we were talking about Red Oak that's now in place, and we've begun to see a little bit of movement in between distributors. We never see the billion-dollar moves and we don't see them often. But it's been notable to see Catamaran and Fred's and mostly recently PharMerica. And, I love to hear a little bit about what's driving or what do you think there is leading to that magnetism to Cardinal. And then also as you look at your installed base of brand buyers, there have to be an opportunity to pull more of that direct generic purchasing and how big is that in (inaudible)

**George Barrett**, Cardinal Health, Inc. - CEO

(inaudible) first of all, I am glad (inaudible) that you want to see us investing on our core business. We love that business, our pharmaceutical distribution business is a really high performing organization through -- it's a part of our organization that people want to take out. Whatever they're doing they want to have some opportunity to work in that organization, it's got a great tradition that's really, really solid. I'm really proud of the work that they do.

So the alliance or the venture with (inaudible) some of you know (inaudible) long history in the pharmaceutical industry and lot of in generics. And we really want to be a major market maker and again scale matters tremendously to the manufacturers, our ability to move market share for the manufacturer is extremely important and our ability to source in the most efficient way is important for customers who are under reimbursement pressures.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

So that dynamic is probably why people often forget as we're talking about generics that we have customers that need those products and they need those in a way that allow them to compete effectively in the reimbursement environment, as it really is.

So we are really excited about the work done there, what has also been really important for us, it's not just about having access to the most efficient way to the products produced globally, is about having customers that actually want to source those products from you which comes back.

Coming to the second part of your question and that group has really dramatically increased. I think probably to go back 6 years, we probably had 3,000 customers roughly, who used us as their primary source for generic drugs that's about 10,000 today.

So it sort of a virtual cycle, which is building scale, having more customers having more customers create more scale and again that's what the flywheel that's at work. So we really excited about the partnership with CVS Health has been long and deep and there is a lot of trust, which is necessary creating these kinds of ventures and we've been up and running probably faster than you and we would have expected.

I can't overstate how complex this is to put these kinds of lines, we are talking about 4,000 plus SKUs, hundreds of suppliers all new agreements. It's really been a large piece of work, but we're really excited about that. Going back to why people might find 2 businesses. First a fall, (inaudible) that the pharma distribution business, where business really changes hands over price, it rarely changes hands over price, it changes hands because there is some other value that's either created or something that's disrupted a relationship with an incumbent. Because the price is a price and everybody -- the incumbent always has the opportunity to beat our net, again we're a moment -- for us a perfect couple of years ago, when ExpressScripts and Medco came together, there were 2 incumbents and so had much more of a pricing (inaudible). But in general, that's not what happened, and I think we've devoted ourselves being incredibly attentive to those customers and listening carefully.

And so for example when people talk about price increases and how that might create value price, we also know that we have to deal with customers under the side of this and we're very attentive to those things. So I think what we've done is build an organization, (inaudible) we are there to serve you in every sense. And I talk about this all the time in our organization, it's powerful to get an organization that actually believes that in their bones that this is sort of what we do. So when there is a situation up in Boston with the bombing or Hurricane Katrina or the tornado in Joplin, Missouri, our people call the Homeoffice and know what to do. They understand our mission in what we're all about and they got customers get that. So there have been a lot of good things I think happening for us and I think we're delivering that message consistently to customers and I think that's creating a little bit of an opportunity for us to grab more business.

### Unidentified Participant

All right, in the time we left, there's been a lot of talk in the last week around biosimilars. At the point where you left the industry that felt like it was a long time off, right. Now it's approaching and I do think there is a question of what is the role of a distributor, who of course has full line distribution and specialty distribution and in your case in Specialty Pharmacy. As Biosimilars come to market what is your value proposition and what will this look like overtime as the market develops.

### George Barrett, Cardinal Health, Inc. - CEO

So ironically as I left that part of the industry seven years ago, little over seven years ago now. I probably (inaudible) but it has been longer. The answer to your question is, it depends on the product and so for us we want to have the capabilities if a product is AB rated obviously that is more naturally a familiar turf to us and to others, right, in the case of the product that we just got approved for (inaudible) that is not an AB rated product. So if the products turns out to be AB rated or substitutable that have certain characteristics.

If the product is not, then it's going to be really product specific, it is going to depend on what that product is used for, what's the patient population, how does it go to the channel today, what are the services required to support that patient. And physicians or in this case the payers, that they start to push, they are going to be conscious not just at the price of the product, but making sure that patient can have the services that they need and that they're used to having. And so what we've wanted to do is to make sure that we have all those services that touch patients. So one of the reason that we bought Synexxus, which is essentially a patient hub, once we've able to connect a biopharmaceutical company or in this case a biosimilar company to that patient that there are unique services that are required. We've also made some moves to broaden our footprint across therapeutic areas and specialty. So we're not just oncology, we're rheumatology, we're urology, we're hematology it's an area so that we know if a biosimilar occurs that we have the technical and clinical capabilities to service that business with other tools.

Now of course distribution and supply chain is always going to be sort of like right down the middle for us.

### Unidentified Participant

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

So this is really very much on where the end market is, infused in the physician office is going look very different.

**George Barrett**, Cardinal Health, Inc. **- CEO**

I think so, I think it's going to be one of those if you've seen one, you've seen one stories. I think each of these (inaudible) can be its own distinct market and with market characteristics that distinct that product.

**Eric Percher**, Barclays - Analyst

George and Sally thank you, we're going to continue the conversation with your questions and we will be in the breakout room Poinciana 4. Please join us.

StreetEvents transcripts content provided by Thomson Reuters  THOMSON REUTERS

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

# EXHIBIT 12



# Clinica
## Medtech Intelligence

# INTERVIEW: The bigger value picture behind Cardinal Health's Cordis buy



**Clinica** provides you with up to the minute coverage and opinion on company, product, market and regulatory developments as well as market size, growth and sales forecasts.

## www.clinica.co.uk



# Clinica
## Medtech Intelligence

# INTERVIEW: The bigger value picture behind Cardinal Health's Cordis buy

▶ Tina Tan– **April 10, 2015**

**WHEN JOHNSON & JOHNSON** agreed to sell Cordis to Cardinal Health for nearly $2bn last month, many saw Cardinal Health taking on a portfolio of mature medical devices – albeit of a well-established and globally recognized brand – that did not offer that much differentiation from the competition. So what's in it for Cardinal Health and what's the overriding objective behind the move? Tina Tan speaks to Don Casey, CEO of Cardinal Health's Medical Segment, who spent nearly 26 years at J&J, to find out more about the underlying market changes and the strategy that motivated the company to make not only this particular acquisition, but likely more similar deals in the future

• • •

In order to succeed in today's budget-constrained healthcare environment, suppliers of medical devices are learning to push the value message to their customers. For the likes of Medtronic, Johnson & Johnson and their medtech peers, this value comes from offering innovative products designed to bring benefits to patients and physicians, which then translate into cost efficiencies for the healthcare provider in terms of quicker procedure times, fewer complications, faster recovery and shorter hospital stay.

Cardinal Health, however, is taking a different angle with its value message by focusing on innovative ways to improve the distribution and supply of products to healthcare providers, and thus bring about cost efficiencies, rather than to focus on innovative products per se.



Don Casey

"Demographic trends show that we are seeing an aging population [and this is] creating a greater demand for healthcare all around the world. But with that greater demand, many places are not necessarily seeing a commensurate interest in investing in healthcare – whether it's from governments or private payers – so we have to learn how to do more with the same amount of money," Don Casey, CEO of Cardinal Health's Medical Segment, tells *Clinica*.

This, says Mr Casey, has put pressure on Cardinal Health and other medical device manufacturers to not only deliver high-quality products that can be used efficiently, but deliver them efficiently to allow for greater patient care.

"When we look at medical devices, whether it is in Europe, Asia or the US, there hasn't been a great deal of investment in the infrastructure of delivery systems and

Reprinted by Clinica (www.clinica.co.uk). Unauthorized photocopying prohibited.



INCRAFT® AAA Stent Graft System

creating information-driven supply chains. We're going to invest millions of dollars around creating information enablement through the use of RFID technology – whether it's in the cath lab or other healthcare institutions. This will be a shared resource for the entire industry and allow a much more information-enabled transaction loop," says the CEO.

This RFID technology that Mr Casey is referring to comes courtesy of WaveMark, which Cardinal Health acquired in 2013. Simply put, the technology works by tagging a medical device with an RFID chip, which gives the device a unique identifier and holds information such as its expiration date and details of its location – for example, if it is in a warehouse and which warehouse; when the device arrives at a hospital or ambulatory care center; when it is in an operating room; when it is withdrawn from the cabinet that it is placed in; and when the device has been used.

Cardinal Health already has some compelling figures to back claims about the cost-efficiencies this information-enabled system can bring. "This system has been used predominantly in the Veterans Affairs hospitals within the US but there are six other institutions. And what they've seen are inventory holding cost reduction of between 5-10%, aggregate inventory reduction levels of 5%, expired products completely eliminated and lost product completely eliminated. So in aggregate, we believe that

hospital or surgery center would see probably in the range of 8-15% savings on their sides," says Mr Casey.

For Cardinal Health, this technology is an integral part of its physician preference item (PPI) strategy which it has been pursuing the last few years as a major growth platform. The company's recent M&A activity reflect this strategy, like the $1.9bn deal it signed last month to acquire Johnson & Johnson's interventional cardiology business Cordis.

A pioneer in the stent market, Cordis has established a solid reputation in the interventional cardiology space but is now, nonetheless, a mature, slow-growing business. While recognizing that Cordis' portfolio of cardio- and endovascular products brings limited clinical differentiation, the devices fit the PPI bill: products that are typically the costliest for the healthcare providers not only because of high physician preference and usage, but also because they are most prone to waste and loss, and therefore have the biggest potential for cost savings.

By leveraging its RFID-enabled supply chain capabilities, Cardinal Health believes it can continue to see growth and get more mileage from mature, but well-respected products such those offered by Cordis.

"J&J and [chairman and CEO] Alex Gorsky have been articulate about their need to focus on investing in innovation and be technology-driven and they would like to be leaders in that category – Cordis didn't necessarily fit that model so the business was not really a priority," says Mr Casey, who had spent 26 years at J&J before joining Cardinal Health in 2012. "By comparison, Cordis in Cardinal's portfolio will become a major priority…From this transaction, we can bring a different perspective into the market."

Mr Casey foresees more potential acquisition targets further ahead that fit into Cardinal Health's PPI strategy, as companies such as J&J continue to balance their portfolio and "focus aggressively on innovation". "That creates a different set of market dynamics that we hope to take advantage of," he tells *Clinica*, adding that Cardinal Health would keep a lookout for both product and service acquisitions.

"I've been in healthcare for over 30 years. Healthcare is changing faster today than any time in the past – a lot of the traditional ways of going to market and approaches to delivering medical devices as well as services in the healthcare environment are going to change and continue to change as the system looks to meet the demand created by an aging population and increase in chronic illnesses. It will spawn a lot of innovation in terms of products but also innovation in terms of service models and analytics. We think Cardinal Health can play a very important role there."

 Reprinted by Clinica (www.clinica.co.uk). Unauthorized photocopying prohibited.

# EXHIBIT 13

SEC Form 4

| | |
|---|---|
| **FORM 4** | **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**<br>Washington, D.C. 20549 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden hours per response: | 0.5 |

| 1. Name and Address of Reporting Person[*]<br>Casey Donald M Jr. | 2. Issuer Name **and** Ticker or Trading Symbol<br>CARDINAL HEALTH INC [ CAH ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

| (Last) | (First) | (Middle) |
|---|---|---|
| 7000 CARDINAL PLACE | | |

| 3. Date of Earliest Transaction (Month/Day/Year)<br>04/16/2015 |
|---|

| | Director | | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) | | Other (specify below) |

CEO, Medical Segment

| (Street) |
|---|

| 4. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|

| 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|
| X  Form filed by One Reporting Person |
| Form filed by More than One Reporting Person |

| (City) | (State) | (Zip) |
|---|---|---|
| DUBLIN | OH | 43017 |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 04/16/2015 | | F[(1)] | | 251 | D | $90.15[(2)] | 86,920 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 4,107 restricted share units.
2. Reflects closing price on prior business day.

**Remarks:**

| /s/ James E. Barnett, Attorney-in-fact | 04/20/2015 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 14



# Q3 FY15 Cardinal Health, Inc. Earnings Conference Call

**April 30, 2015 8:30AM Eastern**

Operator:  Please stand by. We're about to begin.

Good day and welcome to the Cardinal Health Third Quarter Fiscal 2015 Earnings Conference Call. Today's conference is being recorded. At this time I'd like to turn the call over to Sally Curley. Please go ahead.

Sally Curley:  Thank you, Jennifer. Welcome to our Third Quarter Fiscal 2015 Earnings call today. We'll be making forward looking statements and matters addressed in these statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied.

Please refer to the SEC filings and the Forward-looking statement slide at the beginning of the presentation found on the Investor page of our website for a description of risks and uncertainties. In addition, we'll reference non-GAAP financial measures. Information about these measures and reconciliations to GAAP is included at the end of the slides.

I'd also like to remind you of a few upcoming investment conferences and events. We will be webcasting our presentations at the Bank of America Merrill Lynch 2015 Healthcare Conference on May 13 at 8:00 a.m. local time in Las Vegas and at the Goldman Sachs 36th Annual Global Healthcare Conference on June 10 at 10:00 a.m. local time in Rancho Palos Verdes, California.

Today's press release and details for any webcasted events are or will be posted on the IR section of our website at cardinalhealth.com. So please make sure to visit this site often for updated information. We hope to see many of you in an upcoming event.

Now I'd like to turn the call over to our Chairman and CEO, George Barrett. George.

George Barrett:  Thanks Sally. Good morning everyone and thanks to all of you for joining us on our third quarter call. I'm pleased to report another strong period of results with third quarter revenues of $25.4 billion, an increase of 18%. Third quarter non-GAAP diluted EPS was $1.19, up 18% from last year.

Based on the strength of our performance year-to-date, we're increasingly confident that we'll finish our fiscal 2015 in the upper half of our full year non-GAAP EPS guidance range of $4.28 to $4.38. This is an extraordinary time in healthcare and our organization is doing an outstanding job of serving today's needs while at the same time leveraging our experience to address the demands of a system in transition.

Our people have done this through a disciplined focus on execution while using our capabilities and insights to anticipate change and commit to providing solutions to emerging health care challenges. With this as backdrop, since we last reported earnings we've made some important moves in areas of strategic focus. On March 2, we announced our plan to acquire the Cordis cardiology business from Johnson and Johnson.

And earlier this month we completed the acquisition of the specialty distribution business of Metro Medical, expanding our presence and reach in Specialty business. I'll come back to each of these important initiatives in my segment remarks, first our Pharmaceutical segment.

Our Pharmaceutical segment had a very strong third quarter with revenue of $22.6 billion, an increase of 20% compared to the prior year third quarter - and our Pharmaceutical segment profit was up 25%. The Pharmaceutical segment continues to operate with great efficiency, attention to detail and strong strategic positioning.

Red Oak Sourcing, our joint venture with CVS Health, continues to operate extremely well. We can now report that suppliers representing nearly 100% of the total generic spend have transitioned into the venture. At a time of great change, it's not just the scale which brings value to our customers, but also the combined knowledge of our two experienced organizations.

Our Specialty Solutions business continues to achieve extremely high growth rates. Earlier this month, we closed the acquisition of the specialty distribution business of Metro Medical, the largest privately owned specialty distributor in the U.S. This move strengthens our presence in the therapeutic areas of Rheumatology, Nephrology and Oncology, expands our scale and positions us to provide more cost-effective services to our customers.

For clarity, we expect to exceed the $5 billion Specialty revenue figure for fiscal 2015, which we highlighted in our last earnings call even without the contribution of the Metro Medical specialty business.

As you know, over the last few months we've seen some important developments in the world of biosimilars. As we've said to you before, it's very difficult to make categorical predictions on the evolution of this new subset of products. We continue to believe that each product will have its own characteristics driven by many factors, including regulatory interchangeability, the disease which the drug addresses, the need for patient support, the location and mode of delivery and of course the competitive response. We feel well positioned to participate in each of these opportunities as they emerge and the acquisition of Metro Medical expands our reach.

**CardinalHealth**
*Essential to care™*

Turning to our Medical segment, we reported revenues for the quarter of $2.8 billion, an increase of 4% versus the prior year. Our segment profit was down 8% in an operating environment largely similar to that which we've outlined in prior quarters. I'd like to take a few minutes to address this and give some perspective on the Medical segment's performance, positioning and role in Cardinal Health's growth plans.

This is commentary I'd more typically provide at year end, but as our Medical numbers in the last few quarters have lagged below our high standards, I wanted to address it directly now. We take great pride in being "best in class" in the distribution of traditional branded med/surg products, but market forces have put pressure on prices in this legacy line of business. This is not new.

Over recent years, we've been purposefully building a range of new products and services that are strategically aligned with healthcare trends are highly valuable to our customers, expand margins and build on our base in traditional distribution.

Why has this been a more difficult year for our Medical segment? Simply put, price erosion in that legacy branded med/surg distribution business combined with the challenges in the Canadian market, have been more pronounced in this past year. And while we've seen uplift from the newer services and products, the uplift has not been large enough to offset those factors.

How have we been responding to this? We are relentlessly driving cost efficiency, while at the same time continuing to reposition our Medical segment portfolio to ensure we're bringing to market the products and services that meet the future needs of our customers in a rapidly environment. I'd like to highlight a few of these moves.

**CardinalHealth**
*Essential to care™*

We've expanded our consumable product line to position us to drive more Cardinal Health medical products and through more channels. Our move to acquire Cordis significantly enhances our scale, product line and capabilities in cardiology - building on our acquisition of AccessClosure and aligning with our overall strategy around physician preference items.

Together, they complement our moves in orthopedics and wound management to bring standardization and efficiency to medical devices - a major pain point for our IDN customers and a meaningful driver of profit growth in the coming years. More about Cordis in a few moments.

Cardinal Health at Home, formerly AssuraMed, continues to grow significantly in excess of market growth. We have unique capabilities in the fulfillment and the complex administration of serving patients in the home. Our colleagues at Cardinal Health at Home interact with these patients every day, are extremely well trained and totally committed to supporting the needs of these patients. We did complete one small home-health tuck-in acquisition during the quarter. We continue to see great potential as more care is delivered in the home.

Our strategic partnership with Henry Schein is off to a good start. While still new, we're now able to bring the Schein physician practice capability to our IDN customers. We're beginning to ship products to Schein facilities and plans are to have the integration substantially completed during the June quarter. I had the opportunity in recent weeks to address the combined teams at Schein's National Sales Meeting and it was clear that the group is extremely optimistic about the opportunities in front of them.

To be clear, these strategic initiatives are not a departure from our traditional distribution. Rather, they draw upon our expertise, our considerable channel strength and the Cardinal Health name to bring the additional products and services that our customers and patients need to thrive in this dynamic healthcare environment.

**CardinalHealth**
*Essential to care™*

What do we see going forward in our Medical segment? We don't expect major changes in the environment over the next few quarters and we could see a bit of choppiness. But as we look forward and into the back half of FY16, we would expect to see the new and growing business lines in the Medical segment, and increased utilization, giving us a more sustainable uplift.

Coming back to the Cordis acquisition which we announced on March 2, we're making excellent progress in our work to move towards closing. Leadership teams and organizational design have been defined in all key markets and recently we received early termination of the Hart-Scott-Rodino waiting period, the first of a series of steps to close.

Finally, China continues its track record of double-digit growth. We continue to see great opportunities in this expansive market. It's very clear that the growth of the healthcare market in China will continue to outpace general economic growth driven by demographics, lifestyle changes, and strong government prioritization.

Overall, Cardinal Health is performing at a high level generating strong cash flow and showing consistent growth. The repositioning of our portfolio over the last half-decade has been driven by a clear perspective on how we see healthcare evolving. Most of our customers across multiple channels are experiencing new dynamics as both public and private sector forces push them to deliver care more cost-effectively, in a more coordinated fashion, into emerging sites of care, and in such a way as to bring the patient more into the equation.

Our ability to offer a broad and integrated set of solutions across the continuum of care and to continue to innovate around our customer base has enabled new opportunities for growth, and at the same time helped us to absorb the bumps that can occur in a system going through rapid change. I think it's an indicator of the overall

strength of our portfolio that even through these transitions, we expect to deliver non-GAAP Operating Earnings growth for this full fiscal year in the mid-teens.

There is no other healthcare company that has quite the range of tools we can bring to the market and do so at a time when comprehensive solutions are the need of the day. Put another way, we can address a larger percentage of virtually any customer's overall business than any other company in healthcare. And with that, I'll turn the call over to Mike.

Mike Kaufmann:  Thanks George and thanks to everyone joining us on the call today to hear about our strong third quarter results. My comments will walk through our third quarter consolidated financial performance as well as expectations for the quarter ahead as we close out our 2015 fiscal year.

You can refer to the slide presentation posted on our website as a guide to this discussion. Third quarter non-GAAP earnings per share grew 18% to $1.19. Total company revenues were $25.4 billion which was also an increase of more than 18%. Total company gross margin dollars were up more than 12% versus the same quarter in the prior year.

Consolidated SG&A increased 9% versus the prior year with the largest driver being acquisitions. Next, non-GAAP Operating Earnings in the quarter were $656.7 million, which is a 17% growth versus the prior year.

Moving below the operating line, Net Interest and other expense came in at $32.7 million in the quarter. As a reminder, Q3 of the prior fiscal year included a 6 cent per share after-tax gain related to the sale of our minority equity interests in two investments.

Our non-GAAP effective tax rate in the quarter was 36.5% and our diluted weighted average shares outstanding were about 334 million.

Moving to operating cash flows, we generated $658 million in the quarter. At March close, our cash balance was $3.2 billion with $447 million of this held offshore. We remain committed to our previously stated balanced capital deployment policy of focusing on reinvesting in our business and maintaining our differentiated dividend while pursuing strategic M&A and stock buybacks on an opportunistic basis.

Next, I'll review each Segment's performance. Let's start with the Pharmaceutical segment. Revenues were up 20% year-over-year to $22.6 billion due to growth of existing and new customers across all business lines in the segment. Segment profit was $567 million, an increase of 25% versus the prior year. This was due to strong performance of our generics program, including the net benefit of Red Oak Sourcing, as well as growth from our existing customers and contribution from new customers.

Segment profit margin rate increased by 10 basis points driven by the performance of our generics program which offset the impact of customer price changes and the dilutive impact of sales of branded hepatitis C therapies.

Clearly, the performance of our generics program has been excellent. Enhanced sourcing under Red Oak, customer wins, and growth of existing accounts have all been key drivers. Manufacturer price inflation or deflation, new item launches, penetration of existing accounts and advanced pricing analytics are also factors in determining our program's success. I remain confident we can balance all of these for continued growth in our generics program.

Besides the contribution from generics, our branded drug business continues to go well with strong performance under our fee for service agreements. As has been typical over the past several years, inflation tends to be a larger component in the third quarter versus other quarters. The rate of inflation was essentially the same as the prior year, in the low double digits.

As George mentioned, in our specialty business we closed the acquisition of Metro Medical earlier this month. Let me give you a few details. Metro Medical has various business lines. We acquired their specialty distribution, specialty GPO, specialty Pharmacy and private label medical/surgical disposable products business. The Metro Medical Online and Metro Medical Partners pieces of the business were not included in the acquisition.

This acquisition will provide us the opportunity to expand our specialty distribution scale and deepen our reach into the Rheumatology, Nephrology and Oncology markets. We've been working on this deal for several months and had already contemplated the bottom line impact in our FY15 EPS guidance range. Now, let's move to our Medical segment performance.

Third quarter revenue grew 4% to $2.8 billion, primarily due to the contribution from acquisitions. Segment profit declined by $9.1 million to $101.5 million. This was a result of the decline in the contribution of national brand med/surg distribution and the continued impact of the previously communicated challenges in the business in Canada. These same drivers contributed to a margin rate decline of 50 basis points versus the prior year period.

Let me give you a few other highlights to consider. First, revenues from our Strategic Accounts continue to significantly outpace our remaining book of business. In addition, topline growth from our higher margin wrap-around services is outpacing overall Medical segment revenues.

Our Cardinal Health at Home business has grown at or above market each quarter of this fiscal year. And finally, we're continuing to build out the physician preference item strategy. In this space, our acquisitions of AccessClosure and Innovative Therapies are off to a good start and are performing better than the business case.

Our recent announcement of our intent to acquire Cordis - which we still expect to close before the end of the calendar year - will only accelerate our work in this space. Let me reiterate some key points surrounding this deal.

First, we'll be acquiring Cordis for $1.944 billion in cash or approximately $1.6 billion net of roughly $350 million in cash tax benefits.

Next, we plan to finance the acquisition with debt and cash on hand. Our intent is to issue debt sometime in the next few months and take out the $1 billion bridge financing that we secured as a contingency.

From a non-GAAP EPS perspective, we expect slight dilution in FY16 as a result of three factors that we mentioned at the time of the announcement. First, FY16 will only include a partial year of Cordis earnings. Second, we expect approximately a full year of interest expense, estimated at 7 to 8 cents and third, there will be 13 to 15 cents of unfavorable impact due to an inventory fair value step up.

Then in fiscal 2017, the first full year post close, we expect the transaction to be greater than 20 cents accretive and increasingly accretive thereafter. We still expect operational synergies of at least $100 million annually by the time we exit fiscal 2018.

Before I move to our outlook for the rest of the fiscal year, I'd like to add a few updates on China, which reports into both segments. Our businesses in China continue to perform well. We continued to see strong double-digit revenue growth for the quarter, up 25%. Also during the quarter, we closed on an acquisition of a local distributor in Northeastern China which expands our local direct distribution to 11 cities.

Turning to slide number 6, you'll see our consolidated GAAP results for the quarter. The variance to non-GAAP results was primarily driven by amortization and other acquisition-related costs, which reduced our GAAP results by 15 cents per share.

Looking forward, we're increasingly confident in the upper half of our non-GAAP EPS range of $4.28 to $4.38.

Let me finish with the following updates around our corporate assumptions. We continue to expect our full year non-GAAP tax rate range to be between 36% and 37%. This obviously implies that our fourth quarter rate will be higher, likely between 38% and 41%, based on the timing and outcome of various discussions we are having with tax authorities.

We're expecting capital expenditures to come in at about $330 million; and our full year amortization expectations increased to about $190 million based on the acquisitions we've completed as of March 31. We don't expect the Metro Medical acquisition to add a significant amount to our final number for the year.

In closing, we're pleased with our overall performance in the third quarter, recognizing that we've got some important work to do in Medical to shift the trajectory. We've taken great steps during the past several years to

**Cardinal**Health

*Essential to care™*

build a strong foundation for sustainable future growth. That's why, across the enterprise, I expect a solid finish to our fiscal year. With that, let's begin Q&A. Operator, please take our first question.

Operator:  Thank you. If you'd like to ask a question press signal by pressing star 1 on your telephone key pad. If you're using a speakerphone please make sure your mute function is turned off to allow your signal to reach our equipment. Please limit yourself to one question and one follow up question.

Once again press star 1 to ask a question and we'll pause for just a moment to allow everyone an opportunity to signal for questions. We'll go first to Bob Jones with Goldman Sachs.

Bob Jones:  Thanks for the question. As we think about the performance in Medical, George, it seems like volumes have been improving on the inpatient side. You added some accretive margin deals. It sounds like private label is still growing yet the business has struggled.

I know you mentioned Canada being an issue for the balance of the year but I'm just curious if maybe you can give us some insight on when you think this business can really start to turn around.

George Barrett:  Good morning, Bob. Thanks for the question. Yes, well, look Canada's definitely been a tough challenge all year and as you said, we tried to be pretty clear about the work that we need to do and are doing in the Medical segment.

I think we just have to get through some short-term choppiness. I mentioned during the call that the traditional, the legacy lines of traditional branded med/surg has been a largely the challenge, and it's really been largely repricing of some accounts.

I think we'll start to see the benefit of all the initiatives that we've described begin to more sustainably feel like uplift as we get in the second half of fiscal 2016, but I actually like our positioning. I think we're doing really good work if you look underneath the numbers over the last three years. For example, we've had very good growth of our private label products and good contribution of margin from it.

So it's really about a shift in the model where the legacy line is becoming a smaller component of the overall mix and those newer products and services are beginning to grow. We've done some really important work there. We've made some big moves this year to strengthen that and feel good about that.

Bob Jones: If I could sneak one in on Specialty I know in the quarter you acquired Metro Medical. Just curious maybe if you could give a little bit more on how that business specifically enhances your Specialty footprint. And then I know broadly, George, you've gotten this question in the past but increasingly it seems like Specialty is obviously a very important channel for the wholesalers. And I'm just curious, how do you feel about your footprint even in light of the Metro Medical deal and are there bigger deals out there that could really give you greater exposure to this important channel?

George Barrett: Yes, let me answer that and I just want to follow up a little bit on the first part of the question again. Metro Medical really just helps us expand our reach. We've been growing at a pretty hefty clip over these last couple of years and I think our scale is now at a point where we really are a meaningful factor in the market. I think that's

CardinalHealth
*Essential to care™*

important given some of the trends in healthcare and Metro Medical just expands that reach and that footprint so we're excited about it.

Whether or not there are other opportunities out there, we continue to look at every opportunity in our areas of strategic focus. Obviously Specialty is one. Whether or not you find the assets at the right moment at the right price is always the question for us, but this is clearly an area of priority and - so we'll continue to look for opportunities, but we're excited about the Metro Medical.

Again just backing up, I wanted to make sure I highlight this on the Medical side, just as a reminder, that our customers are really becoming much more complex. They're no longer a single line of activity, and so I do think that part of what we've felt strongly about it is that these complex systems need products and services across all of the lines of business. So that's really important at a time where you're seeing the changing incentives which have been completely activity-based over the year, just a different kind of incentive system.

I think the tools that we really bring are going to become increasingly important. I don't want to miss the opportunity to say that related to the first part of the question.

Sally Curley: Operator, next question.

Operator: We'll go next to Ricky Goldwasser with Morgan Stanley.

Ricky Goldwasser:  Yes hello, good morning. Question on M&A post Cordis, what is your appetite for M&A? Obviously you did Metro Medical which is on the smaller side, but what leverage are you comfortable going up to? And when you think about the areas you're interested in obviously Specialty is one but maybe if you can rank order them for us?

George Barrett:  Good morning Ricky. So again appetite is that we want to grow the business. We want sustainable competitive positioning and we believe there are key areas strategically that are aligned with where care is going and we've been pretty clear about that. It's around generic. It's around Specialty.

It's around every opportunity to improve performance management for large integrated customers. It's the home. Opportunities in China, which is a unique market. So we'll continue to look for those opportunities. Obviously we have a strong balance sheet but again we're going to be very disciplined about the moves we make, when we make them and how we make them to make sure that we can execute. And that's always been a priority for us but we feel well positioned, a strong balance sheet. I don't know if Mike wants to add anything to that.

Mike Kaufmann:  Yes Ricky. I think again it's going to depend on whether it's a strategic fit, whether the culture fits for us, the growth trajectory, all those types of things of the acquisition. But from a balance sheet standpoint, we've said that we'd like to keep our debt ratio to 1.5x to 1.75x as a range that we're comfortable in.  Could we at times make a decision to go slightly above that for the right type of acquisition and stretch ourselves some?  Sure, we'd be open to doing that.

We're always going to want to be concerned about where the debt rating agencies see us and that's an important thing for us to consider in how they view us. And so sometimes the type of acquisition matters when we deal with those folks and remember the last thing too we like to keep about $1 billion to $1.5 billion of cash on hand just for

our everyday working capital and needs because of the fluctuations in the business. So those are some of the things that we try to keep in mind.

Ricky Goldwasser:  Okay then, just one quick follow up. Obviously in the prepared remarks you talked about the strong branded inflation. I think it was in the low double-digits. We're hearing strong inflation on generics. Where do you think we are in the pricing cycle in the sustainability of the trend across the portfolio, because we're seeing in both in brand, generic and specialty?

George Barrett:  Ricky, I'll start with it but then I'll welcome Mike to join in. Predicting this going forward is always difficult. The branded side, as you've seen, has been on average relatively consistent throughout.  But actually inside that average is a lot of different rates, and so it's one of the things that makes it very hard to predict, but in some ways a little easier because you have this moving effect.

On generics, it's such a tough call because as you know it's an enormous product line that we call "generics", and so the number of products that can move the needle can be relatively small and you could talk about 50, 75, 100 products that move the needle. So it's really difficult for us to get a forward looking guidance on what we see.

We've done this in the past and I'd probably just say we're talking about the environment and what are the conditions of the environment. And I'm not sure that those conditions have changed materially from last period, but we have seen some variation. Mike can touch on that.

Mike Kaufmann:  Yes I'd agree with George. I think on the branded space it's been pretty consistent over the last several years. That branded inflation rate has stayed in that double-digits, low double-digits area and we've not seen a lot

of fluctuation there. I just wanted to really call out this quarter, remind folks of the seasonality component and why the third quarter tends to be bigger than some of the other quarters.

And again we all know the majority of the fees are earned on the fee-for-service agreement, so inflation on brand is a much lower component of our margins than it used to be in the buy and hold periods. But again in third quarter, it's important so that's really why we called it out.

On generics, it's important, but one of the things we keep trying to emphasize is that in our mind it probably gets a little bit too much attention at times because there are a lot of other levers in our generics program that are going to help us perform over the years. And we really believe confidently that even in a - if generic inflation were to decline, there's a lot of other levers for us around our penetration, around our pricing and analytics capabilities, around the new business that we've won, etc., that we can still compete effectively and perform well.

Sally Curley: Operator next question.

Operator: We'll go next to Eric Percher.

George Barrett: Hello?

Sally Curley: Eric?

Eric Percher: Can you hear me now?

George Barrett:  Yes.

Eric Percher:  There we go, dead headset. Okay so med/surg, two questions. One would be your comment in the press release on national brand distribution. Is that meant to reflect your commentary on pricing erosion or is there anything else meant by that?

And then also relative to Canada, have we now reached a point where next quarter we'll anniversary some of those initial issues and customer departures or movement in-house? Does that help in the second half?

George Barrett:  Yes Eric, good morning. What we're talking about primarily is really pricing on traditional med/surg. It's probably not much more complicated than that, and a lot of that is actually re-pricing some meaningful accounts for us which we're happy to have in the long run important customers - strategic customers. I'm sorry, the second part of your question?

Eric Percher:  Within Canada, it feels like it's been about a year since we first saw some of those issues. I know there are a couple of customers that moved in-house. Will we now anniversary that?

George Barrett:  So here's what I'd say and I mentioned this earlier. I'd say probably a couple of choppy quarters and then I think we're taking some pretty significant actions in Canada to address some changes in that market, and I think then we'll start to feel a more normalized rate.

**CardinalHealth**
*Essential to care™*

Mike Kaufmann:  Yes Eric. I'd expect us to still see some pressures in Canada through the end of the calendar year, so it'll still affect us for the first two quarters of FY 16 and then beginning in our Q3 of fiscal '16 we begin to see a more normal and leveling off in the Canadian business.

Sally Curley:  Operator next question.

Operator:  We'll go next to David Larson with Leerink.

David Larson:  Hello. Can you guys talk a bit about biosimilars and what sort of opportunity you're looking at, maybe just touch on the different channels that biosimilars will flow through, if they ship to the member at home where they self-inject, if they ship to the doc office?  Are you better positioned in any one of those channels than the other? Thanks.

George Barrett:  Good morning, David. I'm not sure I can add that much to what I said in my earlier comments but again I'll highlight them. I think many of you have asked us over the years what have we been anticipating in terms of biosimilars. We always felt that there'd be some uniqueness to each product and as you said, the route of administration, which channel it goes through, whether or not there's substitutability - these are all things that'll influence what kind of services the patient needs.

We actually feel well positioned regardless of route, is what I'd tell you. So as you know, we've got an extremely strong position in hospitals. We've expanded our position at all kinds of clinics. We're very strong in Pharmacy. We've got specialty Pharmacy. So clinics are an area, and now obviously we've got some enhanced strength in the small physician practices.

CardinalHealth
*Essential to care™*

So I think from our standpoint we've got great reach across therapeutic areas which is very important, and from a channel perspective I think we're in a pretty good position regardless of that route.

Mike Kaufmann:  The only thing I'd add to that George is that also from a services standpoint upstream to the manufacturer we feel that we're in as good a position as anybody in the industry to provide any type of services that they might need, whether it be specific cold chain or other type of transportation need, whether it be HUB services, data analytics. We know that we can provide all of those services too. So we really feel that we're in a great position both upstream and downstream on biosimilars.

David Larson:  Thanks a lot.

George Barrett:  Thank you.

Sally Curley:  Next question?

Operator:  We'll go next to John Kreger with William Blair.

John Kreger:  Hi, thanks very much. George and Mike if you're willing - thinking about some of the puts and takes for next fiscal year, how do you feel about the outlook, realizing it's early compared to some of your longer term growth goals?

George Barrett:  John, good morning. It's a little early for us to be saying a lot about fiscal '16. We're finishing our budget process out at year end. We provide guidance but in terms of our long-term goals we still feel good about those. The organization right now has a feel like a lot of momentum actually and I think if you go around Cardinal Health I think you'd see a group that's very energized.

We're very clear about our goals, very disciplined in managing to those and we'll have a little bit of bump in any part of the business, but the overall Cardinal enterprise feels good and on target to achieve the goals that we've set.  Go ahead Mike.

Mike Kaufmann:  I'd agree with you. We do need to get through the budgeting process this summer. That's really important. Probably the only thing that we really mentioned about next year that I can give you a quick update on, was around the commodities and we did say that for FY16 that they'd be about $10 million to $20 million of benefit from commodities. We've updated that work and we can still continue to believe that that's the right number for next year.

I know that's only one small component that goes into it, but it's the only thing that we've really given you any clarity on.

George Barrett:  And the Cordis mechanics.

Mike Kaufmann:  And then the Cordis mechanics that I've walked through.

John Kreger:  Very helpful thanks, just one quick follow up on Red Oak. As you move into year two it sounds like you pretty much finished your work with supplier re-contracting. What happens next? Is there an opportunity for meaningful growth in year two as well?

Mike Kaufmann:  I'm real excited about where we are in Red Oak. I serve on the board of Red Oak and recently had a board meeting and continue to be incredibly impressed with the team. We've again been able to retain all of the key folks from both companies and have decades of generic buying experience there, which again to get though essentially 100% of the spend in this short a period of time has been exciting.

We do expect there to be uplift in FY16. A big piece of that would just be that we'll have a full year of all of the benefits while we were ramping this year. But even on top of that, we do expect to continue to generate value and, as I met with the team, they're constantly looking at different ways to work with the manufacturers to try to create more incremental value for both parties.

Sally Curley:  Operator next question.

Operator:  We'll go next to Glen Santangelo with Credit Suisse.

Glen Santangelo:  Thanks. George, I just want to come back and revisit this Medical segment issue a little bit further. You talked obviously a lot on the call about the pricing pressure within the segment. Is that repricing certain GPO customers that you got hit with, and is there anything else on the horizon that would impact the pricing as we go forward over the next 12 months?

I'm also kind of curious. Can you talk about the overall pricing of the underlying inventory you're selling? Are you seeing price deflation on the products you're selling or is that still somewhat inflationary and is that impacting the profit margins at all either?

George Barrett: I'm going to come back to the second part as I'm not completely sure I understand the question. We'll make sure we do and then Mike will address that. But this is really not a GPO issue, Glen. This is just individual accounts that happen to fall during the period of time where we're signing some long-term agreements.

No single one of them by the way is big enough to call out and necessarily move the needle. It's just a general dynamic. Again, what I wanted to highlight during the call is that this - over many years the traditional -- of what we call branded Med/Surg business -- has gone through this dynamic and so that's really not new. So I don't want to make it sound like there's one big contract that was the key. We just - some repricing in that aspect of the business we felt and I hope that answers that part of it. The second part of the question, Mike, did you get?

Mike Kaufmann: Let me take a stab at it and even if I don't get it right please Glen, just ask again. I agree with George as far as the GPOs. We always work with them but in tandem we work individually with the hospitals. And if you take a look at the product portfolios, I don't think this is really necessarily a deflationary environment on all the items.

You're going to see certain items that they go up and some that will go down but I wouldn't say there's any one trend. Either way that's actually affecting this. This is just our ultimate net price to the customer themselves, not the items driving it.

Glen Santangelo: Okay, maybe if I just ask one follow up. Could you maybe elaborate a little bit more on what the challenge is in the Canadian market because it sounds like it's going to persist for another two to three quarters? I think it'd be helpful for you to just remind us exactly what that issue is.

Mike Kaufmann: Really two things, one is similar to what we just described, some re-pricing of customers. And as we mentioned last time, there were a couple customers that we did lose in Canada that we won't actually anniversary until the end of the calendar year. One of those brought in-house the services they were doing and one switched to a competitor. So that's really what's driving it, is a loss of a couple of larger customers as well as some pricing and retention of some other customers. Those are really two big factors.

George Barrett: The other piece that I mentioned is some shifting of reimbursement dynamics around that market. So that is a component of that pricing aspect.

Mike Kaufmann: And remember those customer losses are not new. Those are the ones I mentioned last quarter that they're out there. Just that it was going to take until the end of the calendar year for us to anniversary them.

Sally Curley: Operator next question?

Operator: We'll go next to Ross Muken with Evercore ISI.

Ross Muken: Good morning. I wanted to just touch base regarding Cordis. So, obviously you haven't closed the deal yet but you do have a very close relationship. Some of you are positioned in hospital partners. You've got some key

**Cardinal**Health

*Essential to care™*

thought leaders in the field that you interact with on a regular basis. What's the dialogue been post the announcement, now that you've seen or have been with those individuals and what other sort of things does it spark in your mind as you think about the long term strategic value of the endeavor?

George Barrett: Good morning Ross. Yes, so this is - it's been actually a really interesting period since the announcement. A couple of things happened, many of which we thought can happen which is just a high amount of energy around this. Inside our organization I think the people that are going to be joining us from Cordis are pretty excited about where this falls for us in terms of priority.

We're getting great feedback from our advisory board. I think it was mentioned before, that we've got really world-class advisory boards who are working with us. We started to, as you might imagine, hear from other players in the market who recognize that we might be an interesting partner for them as we expand our commercial capabilities both here and outside the U.S. in these medical products.

So I think what we're seeing is a pretty high level of enthusiasm across the board. Obviously, we've got a lot of work to do to get to the finish line in the closing, but it's been really well received. And I think the one thing that I'd highlight is people are now beginning to realize that it's not just about the product. And so we're talking about a different service offering in terms of being able to bring the medical device and some wrap-around services that help manage inventory, eliminate waste or prevent errors.

These are all part of the strategy in helping in the physician preference areas. So I think what's happening both internally and externally is that our excitement about joining those two components, the service component and the product component, are giving us a pretty good sense of optimism about the future on this.

CardinalHealth
*Essential to care™*

Ross Mucken:  Great thanks George.

George Barrett:  You're welcome.

Sally Curley:  Operator next question.

Operator:  We'll go next to Lisa Gill with JP Morgan.

Lisa Gill:  Hello, thank you. I'm just wondering can you give me some color, George, around the size of Metro Medical? Obviously you talked about it being in 2015 numbers, but maybe on a revenue basis how big is this?

George Barrett:  Lisa, good morning. Unfortunately I can't provide that information right now. I think what we've - as we come out of our year and we start guiding into next year, I think some of that will become a little bit more apparent but at this point I can't provide more information. I'm sorry.

Lisa Gill:  Okay. And then secondly as we think about Red Oak, we think about relationships with manufacturers. There's a lot of talk about continued consolidation of generic manufacturers. Can you talk at all about your expectation, you or Mike around Red Oak and how that'll impact you going forward?

George Barrett:  Yes. Let me just start and then Mike can speak more specifically to Red Oak. As you know, consolidation isn't really new to the industry. It's been happening for quite some time. It's something we're used to.  It's a

dynamic we understand. And it's one of the reasons that having scale is real important, and it's also what having a knowledge base of each supplier strategy is all about.

That actually matters because those labels we're looking for in a benefit situation those win-win moments. So I think we understand the landscape well and we know the players well. And so consolidation can be a double-edged sword but I think for us, we see the opportunity work more closely with companies. We see that as an opportunity.  Mike, I don't want know if you want to add to it more narrowly from the Red Oak perspective.

Mike Kaufmann:  Probably the only thing I'd add is, first I guess I'd emphasize I really like where our relationships are with the manufacturers. They value us. They understand the simplicity and the speed of our model and particularly the transparency, and the feedback we're getting from manufacturers around those components has been incredibly positive.

And what that leads to is us being willing to try new things with them. And we're also focused on not only the large manufacturers but also small- and medium-sized ones that have really mentioned that they appreciate that they've been able to be part of the program. And so again consolidation is part of the industry but we like where we're at and we think in certain situations if we needed to - we can work with folks to try to create the right type of competitive environment to get the type of pricing we need.

Sally Curley:  Operator next question?

Operator:  We'll go next to Steven Valiquette with UBS.

**Cardinal**Health
*Essential to care™*

Steven Valiquette:  Thanks, good morning George and Mike. Just within the Medical segment I'm curious in relation to the Cordis acquisition. Is your plate going to be pretty full over the next year just on the integration of this fairly large asset or if let's say other medical manufacturing has said they're potentially available for acquisition? Would you have the bandwidth to do additional medical manufacturing M&A deals over the next year? Thanks.

George Barrett:  Yes thanks Steve, good morning. Obviously I'm going to answer this with some care. Let me start with the basics. As I mentioned earlier our balance sheet is strong. Our organizational capacity is very significant but we always put a high priority on execution and so we think about when we look at acquisitions it's not just the financial capacity to execute and integrate but the organizational capacity to do that.

So we're very mindful of that. I'd also note though that we have a very broad-based employee population. For example we can have a group of folks that are very deeply dedicated to the integration of one asset and literally another group whose lives are untouched by that.

And so what we're mindful of as we look across at opportunities externally is making sure we're not doubling down on those people who are trying to do execution of one deal. Always mindful of that, but I think we have a pretty talented diverse organization with a lot of capacity but we'll always think about execution.

Steven Valiquette:  Okay got it. Okay thanks.

Sally Curley:  Okay next question?

Operator: We'll go next to John Ransom with Raymond James.

John Ransom: Hi, just had a question about the independent Pharmacy channel. Are you seeing any more signs of stress in that channel just given some of the fundamentals around generic inflation and reimbursement squeeze? And if so, are you approaching that marketplace differently than you were three or four years ago?

George Barrett: John, let me start. Good morning, first, and then I'm going to turn it Mike. Again we'll probably have two angles on this. We've been doing really well providing value to the independent Pharmacy customers. And so I think the key is recognizing that there are certain market dynamics and market pressures that they deal with. And what we do is focus on how do we relieve those pressures, how do we bring value in that environment.

So I think what's happened is we've become increasingly targeted on how we create value for those kinds of customers in this kind of environment. And our organization's done a really good job in terms of expanding our position there, and growing some share, and I feel good about our position with how we're creating value. Certainly there are pressures out there that they have to deal with. I think we're doing a lot to help them.

Mike Kaufmann: I can think of a couple specific examples. First of all obviously Red Oak and our ability to be competitive for the generic programs in recognizing the need in how we price generics at different life cycles of reimbursement. That's always important to do that. Our PSAO has growing steadily and we've added a lot of members and we've been able to do some unique things with them and get out and market our PSAO and work with our customers to help them on their Star Ratings to make sure that they're the type of customers that the PBMs want to do business with. And we're incredibly excited about those.

And then in other areas in the out front part of the store, we've been expanding our programs and opportunities there to work with the folks, and we really like where we're headed with some of our Cardinal private label line in our opportunity to help them manage inventory both on the out-front and behind the counter. So, we have a lot that we're doing.

I wouldn't say that we're seeing any decline, that we've seen in this. We continue to grow our share in that space and that's how I feel. One thing, if you didn't know what I meant for those on the phone about a PSAO, that's our third-party contracting arm where we work with third-party payers on behalf of our retail independents to get them reimbursements.

John Ransom:  And my other question just checking in on your other channel, you sell into a lot to IDNs. What are they asking for from you that they weren't asking for two years ago, and is there any affect yet that you're seeing from the ACA in terms of what capabilities you need?

George Barrett:  Yes. It's a really interesting question because I think what they're seeing is - I think many of the big acute care and integrated systems are recognizing that in a world where there's probably some shifting incentives and, we're looking at bundles of care and payment, where there are penalties for re-admission.

They're just beginning to look at each line more holistically. So I think one of the changes that we've seen certainly, it still can be very competitive in each line is that the institution at the enterprise level of the IDN is thinking holistically about how do we compete? How do we thrive in this new environment?

And I think that's why our work across the enterprise is particularly resonating right now because we're really not just able - we're not just talking about lines of business. We're talking about being able to address the huge percentage of their activity and I think we're the only one that can do this in quite that way.

John Ransom:  All right, thanks a lot.

George Barrett:  You're welcome.

Sally Curley:  Operator next question?

Operator:  We'll go next to Garen Sarafian with Citigroup.

Garen Sarafian:  Good morning everyone. I just had a couple questions on the quarter. So first on the Pharmaceutical segment, could you elaborate a little bit more on the revenue growth of 20%? You called out growth from both new and existing customers so maybe if you could break those two out or give us an idea. And then any other relevant metrics such as volume growth or other inflation, hepatitis C, and so forth.

Mike Kaufmann:  I can give you a little color. First of all the hepatitis C component of our growth is still less than 25% of the overall growth. It's an important driver but it's less than 25%. *Existing customers would be the largest component of our growth and then growth of our new customers would be next.*  Keep in mind with branded drug inflation being in the low double-digits, that's going to be a huge driver of overall top-line revenue growth

particularly in the market where you haven't seen very large generic launches that would be taking away some top-line volume. So I think those would be the key drivers to help you understand that.

Garen Sarafian: That's useful. And then as a follow up, on the branded side of the business has the non fee-for-service so the buy-and-hold portion of the business remained the same as a percent of the entire business? And what's in it, have the mechanics in the past few quarters, maybe a couple years to alter the profitability of the profile in any meaningful way?

Mike Kaufmann: That's been really steady. Over an annual period it's still averaging about 80% is non-contingent of our branded buy-side piece. And then as I mentioned in the third quarter it's a little bit more slanted towards inflation. But again over a whole year period it's still running 80%.

The agreements continue to be about the same. Often they renew very similar terms and conditions. We continue to tweak them but this is an area that we continue to feel good about.

Garen Sarafian: Got it, great. Thank you.

Sally Curley: Operator next question?

Operator: We'll go next to Robert Willoughby with Bank of America Merrill Lynch.

Robert Willoughby: Hello George or Mike maybe this is more a J&J question, but can you give us any color on the quarter results or hopefully post change of control announcement the wheels don't come off there, and maybe remind us

of your budget plans there and what infrastructure you'd want to put in place internationally to really maximize that opportunity?

George Barrett:  Good morning, Bob. Unfortunately the first part to your question is a J&J question and I can't answer for them. Regarding the second, we've been really hard at work on really working across the globe on what that organization is going to look like. I think it all feels like it's going very well.

In the U.S., as you know we have some cardiology assets here so that we've been looking at how we're going to coordinate and integrate those activities, have a very clear game plan. Ex-U.S., I think we've got organizational design under our control. I think we've got the leadership in all key markets looking at key positions.

We want to make sure that we retain some of the great tradition of that existing Cordis, but we want to bring some of that Cardinal approach to it. And so I think what we're - one of the things I mentioned earlier, Bob, that I think is pretty interesting is that as we go outside the U.S. and we talk to the organization, again recognizing that there certain conversations we can't have at this stage as two separate companies, they're particularly interested in our service model and how we can help bring additional efficiency to the medical device side of it. So I think people are beginning to realize that we can bring more than product skill. Again short-term critical issue for us, I talked of execution earlier. We're adopting the Hippocratic Oath -- do no harm. So when the businesses are performing very well and there are many markets where they are one or two in the market, we're going to make sure that we do no harm there and keep the business executing.  So I hope that helps to answer.

Robert Willoughby:  Maybe just a point to drill down, you're looking at the services side of things obviously, but is there ever an R&D line item that you'll be breaking out with this in other assets that you have in place now requiring a bit more investment on that front?

George Barrett:  That's a good question. In terms of how we break it out I can't answer it fully yet. What I can tell you in strategy; this isn't going to be a big research-based business unit inside of us. There'll be development and we do that today by the way. As a medical device company today we're doing "D" as a development all the, but you shouldn't expect us to be a research-based medical device company. That's not really the game plan here.

Robbery Willoughby:  Thank you.

Sally Curley:  Operator next question.

Operator:  We'll go next to Dave Francis with RBC Capital Markets.

Dave Francis:  Thanks, good morning. I wanted to go after the Specialty piece from a little bit of a different angle. Looking at the fact that you guys are at a $5 billion revenue level or will be as you exit the year there, is the business now either from a critical mass of revenue perspective or service portfolio perspective now at that place where you think you're big enough to grow the business organically through internal development efforts above the market rate, or do you still need to deploy capital externally to get to the point where you're able to capture additional market share?

George Barrett:  Yes, good morning. Actually the answer is we are growing it organically quite rapidly so that's the good news. I think we have the scale. We've got great talent. It's a really innovative group. We've got a pretty good group behind that driving new models for how to create value for our specialty customers and our suppliers.

So I think we're actually getting very strong organic growth and we'd continue to expect to, but, we'll look for opportunities to deploy capital if we see opportunity but we're getting very strong organic growth.

Dave Francis:  A quick follow up, looking back at the med/surg business, you guys have been spending a lot of time trying to get the business repurposed, a little more focused on the ambulatory side of the business as well. Can you talk about trends that you're seeing in terms of actual utilization or actual volumes being pushed outside of the inpatient environment that might be starting to pay dividends for you in terms of the investments in the home health and other ambulatory environments?

George Barrett:  Yes. I'd say these trends, in terms of care moving relative to ambulatory setting, is probably unambiguous. This is absolutely happening across the board. Getting actual exact numbers on this is difficult because I think our system is not used to tracking this. I don't mean Cardinal's system. I mean those who track this kind of data. But when we talk to IDN customers who look at our data it's pretty clear that more activity is being driven to different sites of care and I think that plays to the strategy.

It helps explain some of the moves that we've made and I think it's really going to be, for us, as we go forward, a tailwind because I think that is a natural byproduct of some of the changes in the incentive system in the industry.

Mike Kaufmann:  And we've seen a lot of that with our at home business already with those changes in dynamics and it continues to grow not only significantly but above market itself. So, for example, the ambulatory surgery center business where we continue to have very large share. That's another area we really like.

Sally Curley:  Operator next question.

Operator: We'll go next to Charles Rhyee with Cowen & Company

Charles Rhyee: Thanks for putting me in here at the end. Obviously, a lot of discussion on Medical. I guess maybe one last question on the topic but maybe following up on last question here, I think part of, George, when you talked about repurposing the Medical business you also talked about having more extensive dialogue with the C-suite of your hospital customers.

And there was something maybe that the organization wasn't really in deep with previously. Can you talk about where you are in that progress to really explain what Cardinal can do for IDNs in general, maybe where we are at that stage and what inning and how much further can we get do we need to go before we can really drive that? Thanks.

George Barrett: Good morning Charles. That C-suite question that you guys think about what inning are we in and that's always a hard question because the system is going through this change. Let me highlight a couple of things.

Again I'd say our largest customers across healthcare are becoming more complex, more integrated and their needs now cross more products and services than we've seen historically. So we've been at the same time aligning with that and one thing that we did over the last year is to create these strategic account teams.

We always had strength in our selling organization selling lines of business. We'll continue to do that, but I think part of what we've been trying to leverage -- and this is what you're touching on -- is that need for the integrated system for that complex customer to think about a changing world and which are the partners who can help them.

So again as they think about changing from an industry which has been activity-based to one with different incentives it's a pay-for-outcome or fee-for-outcome. I think all the tools that we bring, standardized consumables, private label medical products, services that enable increased sufficiency, helping them navigate across their channels, our physician preference strategy or work in the home, these are all valuable to them. And then you combine this with our Pharmaceutical line and our Specialty and I think we have a unique set of offerings.

We're trying to make sure that we're positioned to address that the most senior levels of the organizations because it's really now about competing in a world that looks in the future a little bit different than historically.

Charles Rhyee:  Great. That's all I had. Thanks a lot guys.

Sally Curley:  Thanks Charles. Operator, next question?

Operator:  We'll take our last question from George Hill with Deutsche Bank.

George Hill:  Hello guys. One upping Charles -- thanks for squeezing me at the end. Good morning guys. I just want to touch on something quickly. I thought I heard you say in your prepared comments but I might've gotten the notes wrong, did you say the customer price changes were serving as a headwind in the drug distribution business? And if you did say that, can you put a little more color around what that meant?

George Barrett:  It was one of the offsets so we said the positives was a growth in new customers and the net benefits from Red Oak that were offsetting some of the customer price changes. And those wouldn't be anything other

than the normal types of day to day renewals we see with all of our customers. So, there's really nothing new there, no new news. It's just typical. It always tends to be one of our largest headwinds and we're constantly working on the opposite side obviously to more than offset those.

George Hill:  Okay fair enough. So just the normal pricing pressure that part of renewals. And then maybe just - as we talked about pricing pressure in the med/surg business, I guess George or Mike how should we think about that pricing pressure impacts what will be the Cordis business, and is that business immune from that pricing pressure or will that see pricing pressure as well?

George Barrett:  Well I'm not going to say they are immune from pricing pressure. That is obviously a big statement to make, but I think we've really been talking primarily about something that's a dynamic that's occurring over sometime in what I'm going to call the traditional legacy medical surgical business.

I really wouldn't connect that necessarily in the line of business. This is just a trend that we've seen for some time, and I think what we're seeing with the other lines of business is actually they're drivers in the opposite direction.

George Hill:  Great, thanks George.

Sally Curley:  Thanks George. Operator do we have any other questions?

Operator:  At this time, there are no further questions. I'll turn the call back to George Barrett.



George Barrett:  All right. Well thanks for all the questions and for being on this call. We appreciate you doing this. We

      look forward to getting a chance to talk to you and see many of you in the near future. Thanks again.

Operator:  This does conclude today's conference. We thank you for your participation.

*Corrected for accuracy.  The speaker actually said, "*New customers would be the largest component of our growth and then growth of our existing customers would be next.*"

# EXHIBIT 15

# Q3 FY2015 earnings investor/analyst call

April 30, 2015



© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the ability to achieve the expected benefits from the generic sourcing venture with CVS Health; the frequency or rate of pharmaceutical price appreciation or deflation and the timing of generic and branded pharmaceutical introductions; the ability to successfully complete the acquisition of Cordis on a timely basis and if completed to achieve the anticipated results from the Cordis acquisition; the non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; the ability to achieve the expected benefits from the AccessClosure acquisition; uncertainties due to government health care reform including federal health care reform legislation; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of April 30, 2015. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, these presentations contain Non-GAAP financial measures.  Cardinal Health provides GAAP numbers, definitions and reconciling information in the Financial Appendix at the end of these presentations and on its Investors page at ir.cardinalhealth.com. An audio replay of the conference call will be available on the Investors page at ir.cardinalhealth.com.

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Q3 FY2015
Case: 2:19-cv-03347-EAS-EPD Doc #: 29 Filed: 11/06/20 Page: 271 of 428  PAGEID #: 760

# Financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | Q3 FY15 | Q3 FY14 | Q3 FY15 | Q3 FY14 |
| Revenue | $25,375 | $21,427 | | |
| *% change* | *18%* | *(13)%* | | |
| Operating earnings | $591 | $508 | $657 | $561 |
| *% change* | *16%* | *7%* | *17%* | *(3)%* |
| *Ratio to revenue* | *2.33%* | *2.37%* | *2.59%* | *2.62%* |
| Earnings from continuing ops | $365 | $315 | $396 | $349 |
| *% change* | *16%* | *(9)%* | *13%* | *(15)%* |
| *Ratio to revenue* | *1.44%* | *1.47%* | *1.56%* | *1.63%* |
| Diluted EPS from continuing ops | $1.09 | $0.91 | $1.19 | $1.01 |
| *% change* | *20%* | *(9)%* | *18%* | *(16)%* |

*The sum of the components may not equal the total due to rounding*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth
*Essential to care™*

# Pharmaceutical segment business analysis

|  | Q3 FY15 ($M) | Q3 FY14 ($M) | % Change |
|---|---|---|---|
| Revenue | $22,605 | $18,762 | 20% |
| Segment profit | $567 | $452 | 25% |
| Segment profit margin | 2.51% | 2.41% | |

Highlights:

- Revenue increased due to growth from existing and new customers.
- Segment profit increased, driven by strong performance under our generics program, which includes the net benefit of Red Oak Sourcing, as well as the growth from existing and new customers.
- Segment profit margin rate increased primarily due to strong performance under our generics program, partially offset by customer pricing changes and the impact from branded hepatitis C therapies.

*The sum of the components may not equal the total due to rounding*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth

*Essential to care™*

Case: 2:19-cv-03347-EAS-EPD Doc #: 29 Filed: 11/06/20 Page: 273 of 428 PAGEID #: 762

# Medical segment business analysis

| | Q3 FY15 ($M) | Q3 FY14 ($M) | % Change |
|---|---|---|---|
| Revenue | $2,774 | $2,657 | 4% |
| Segment profit | $102 | $111 | (8)% |
| Segment profit margin | 3.66% | 4.16% | |

Highlights:

- Revenue increased primarily due to contributions from acquisitions.
- Segment profit and profit margin rate decreased as a result of reduced contribution from national brand distribution and the continued impact of market pressures in Canada.

*The sum of the components may not equal the total due to rounding*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# GAAP to non-GAAP reconciliation

|  | Q3 FY 2015 | | | Q3 FY 2014 | | |
|---|---|---|---|---|---|---|
|  | Operating Earnings ($M) | Earnings from Continuing Operations ($M) | Diluted EPS from Continuing Operations | Operating Earnings ($M) | Earnings from Continuing Operations ($M) | Diluted EPS from Continuing Operations |
| **GAAP** | **$591** | **$365** | **$1.09** | **$508** | **$315** | **$0.91** |
| Restructuring and employee severance | 7 | 4 | 0.01 | 5 | 3 | 0.01 |
| Amortization and other acquisition-related costs[1] | 77 | 48 | 0.15 | 56 | 36 | 0.10 |
| Impairments and (gain)/loss on disposal of assets | (1) | - | - | - | - | - |
| Litigation (recoveries)/charges, net | (18) | (21) | (0.07) | (8) | (5) | (0.01) |
| **Non-GAAP** | **$657** | **$396** | **$1.19** | **$561** | **$349** | **$1.01** |

[1] Amortization of acquisition-related intangible assets included in Amortization and other acquisition-related costs are as follows:

|  | | | | | | |
|---|---|---|---|---|---|---|
| Amortization of acquisition-related intangible assets | $48 | $30 | $0.09 | $46 | $29 | $0.08 |

*The sum of the components may not equal the total due to rounding*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# FY2015 outlook

© Copyright 2015 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



Case: 2:19-cv-03347-EAS-EPD Doc #: 29 Filed: 11/06/20 Page: 276 of 428  PAGEID #: 765

# CAH FY2015 financial expectations

## FY2015 non-GAAP diluted EPS from continuing operations:

## $4.28 - $4.38

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth

*Essential to care™*

# FY15 corporate assumptions

|  | FY15 outlook | FY14 actual |
|---|---|---|
| Non-GAAP effective tax rate | 36.0% – 37.0%[1] | 35.3% |
| Diluted weighted average shares outstanding | 336M – 337M | 345.2M |
| Interest and other, net | $135M – $145M | $86.8M |
| Capital expenditures | ~$330M | $249M |
| Acquisition-related intangible amortization | ~$190M or ~$0.36[2] | $187M or $0.34 |

[1]*May fluctuate quarterly due to unique items affecting periods.*

[2]*Includes only acquisitions closed as of March 31, 2015.*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth

*Essential to care™*



© Copyright 2015 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Q3 FY2015  trailing five quarters and GAAP to Non-GAAP reconciliation statements

© Copyright 2015 Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Segment analysis

## Pharmaceutical segment

|                      | Q3 FY14 | Q4 FY14 | Q1 FY15 | Q2 FY15 | Q3 FY15 |
|----------------------|---------|---------|---------|---------|---------|
| Revenue ($M)         | 18,762  | 20,092  | 21,209  | 22,627  | 22,605  |
| Segment Profit ($M)  | 452     | 377     | 451     | 542     | 567     |

## Medical segment

|                      | Q3 FY14 | Q4 FY14 | Q1 FY15 | Q2 FY15 | Q3 FY15 |
|----------------------|---------|---------|---------|---------|---------|
| Revenue ($M)         | 2,657   | 2,794   | 2,852   | 2,914   | 2,774   |
| Segment Profit ($M)  | 111     | 96      | 113     | 115     | 102     |

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth

*Essential to care™*

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

### Third Quarter 2015

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| GAAP | $ 591 | 16 % | $ 558 | $ 193 | $ 365 | 16 % | $ 1.09 | 20 % |
| Restructuring and employee severance | 7 | | 7 | 3 | 4 | | 0.01 | |
| Amortization and other acquisition-related costs | 77 | | 77 | 29 | 48 | | 0.15 | |
| Impairments and (gain)/loss on disposal of assets | (1) | | (1) | (1) | - | | - | |
| Litigation (recoveries)/charges, net | (18) | | (18) | 3 | (21) | | (0.07) | |
| Non-GAAP | $ 657 | 17 % | $ 624 | $ 228 | $ 396 | 13 % | $ 1.19 | 18 % |

### Third Quarter 2014

| | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| GAAP | $ 508 | 7 % | $ 507 | $ 192 | $ 315 | (9)% | $ 0.91 | (9)% |
| Restructuring and employee severance | 5 | | 5 | 2 | 3 | | 0.01 | |
| Amortization and other acquisition-related costs | 56 | | 56 | 20 | 36 | | 0.10 | |
| Impairments and (gain)/loss on disposal of assets | - | | - | - | - | | - | |
| Litigation (recoveries)/charges, net | (8) | | (8) | (3) | (5) | | (0.01) | |
| Non-GAAP | $ 561 | (3)% | $ 560 | $ 211 | $ 349 | (15)% | $ 1.01 | (16)% |

### Year-to-Date 2015

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| GAAP | $ 1,603 | 7 % | $ 1,444 | $ 524 | $ 920 | (1)% | $ 2.74 | 2 % |
| Restructuring and employee severance | 33 | | 33 | 12 | 21 | | 0.06 | |
| Amortization and other acquisition-related costs | 190 | | 190 | 69 | 121 | | 0.36 | |
| Impairments and (gain)/loss on disposal of assets | (19) | | (19) | (10) | (9) | | (0.03) | |
| Litigation (recoveries)/charges, net | 54 | | 54 | 8 | 46 | | 0.14 | |
| Loss on extinguishment of debt | - | | 60 | 23 | 37 | | 0.11 | |
| Non-GAAP | $ 1,861 | 11 % | $ 1,763 | $ 627 | $ 1,136 | 9 % | $ 3.38 | 12 % |

### Year-to-Date 2014

| | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| GAAP | $ 1,498 | 4 % | $ 1,441 | $ 512 | $ 929 | 1 % | $ 2.69 | -% |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 160 | | 160 | 58 | 102 | | 0.30 | |
| Impairments and (gain)/loss on disposal of assets | 10 | | 10 | 4 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | (21) | | (21) | (8) | (13) | | (0.04) | |
| Loss on extinguishment of debt | - | | - | - | - | | - | |
| Non-GAAP | $ 1,672 | 6 % | $ 1,615 | $ 575 | $ 1,040 | 3 % | $ 3.01 | 2 % |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings | | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | | Provision for Income Taxes | | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations[1] | | Diluted EPS from Continuing Operations Growth Rate[1,2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **GAAP** | $ | 1,885 | 89 % | $ | 1,798 | $ | 635 | $ 1,163 | 247 % | $ 3.37 | | 247 % |
| Restructuring and employee severance | | 31 | | | 31 | | 11 | 20 | | 0.06 | | |
| Amortization and other acquisition-related costs | | 223 | | | 223 | | 79 | 144 | | 0.42 | | |
| Impairments and loss on disposal of assets | | 15 | | | 15 | | 5 | 10 | | 0.03 | | |
| Litigation (recoveries)/charges, net | | (21) | | | (21) | | (8) | (13) | | (0.04) | | |
| **Non-GAAP** | $ | 2,133 | 4 % | $ | 2,047 | $ | 722 | $ 1,324 | 3 % | $ 3.84 | | 3 % |

Fiscal Year 2014

[1] The fourth quarter of fiscal 2013 and fiscal 2013 both include an $829 million goodwill impairment charge related to our Nuclear Pharmacy Services division. The related tax benefit was $30 million and GAAP diluted EPS from continuing operations decreased $2.32.

[2] Excluding a $63 million benefit related to the settlement of federal and state tax controversies, partially offset by a $56 million charge related to the remeasurement of unrecognized tax benefits, the fiscal 2014 growth rates for diluted EPS from continuing operations and non-GAAP diluted EPS from continuing operations would have been 324 percent and 8 percent, respectively.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**Total Company Business Analysis**

| (in millions) | Third Quarter | | Non-GAAP Third Quarter | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | 2015 | 2014 |
| **Revenue** | | | | |
| Amount | $ 25,375 | $ 21,427 | | |
| Growth rate | 18 % | (13)% | | |
| | | | | |
| **Operating earnings** | | | | |
| Amount | $ 591 | $ 508 | $ 657 | $ 561 |
| Growth rate | 16 % | 7 % | 17 % | (3)% |
| | | | | |
| **Earnings from continuing operations** | | | | |
| Amount | $ 365 | $ 315 | $ 396 | $ 349 |
| Growth rate | 16 % | (9)% | 13 % | (15)% |
| | | | | |
| Return on equity | 23.4 % | 19.2 % | 25.4 % | 21.3 % |
| | | | | |
| Effective tax rate from continuing operations | 34.6 % | 38.0 % | 36.5 % | 37.7 % |
| | | | | |
| Debt to total capital | 39 % | 38 % | | |
| Net debt to capital | | | 11 % | 12 % |

| (in millions) | Year-to-Date | | Non-GAAP Year-to-Date | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | 2015 | 2014 |
| **Revenue** | | | | |
| Amount | $ 74,983 | $ 68,190 | | |
| Growth rate[1] | 10 % | (10)% | | |
| | | | | |
| **Operating earnings** | | | | |
| Amount | $ 1,603 | $ 1,498 | $ 1,861 | $ 1,672 |
| Growth rate | 7 % | 4 % | 11 % | 6 % |
| | | | | |
| **Earnings from continuing operations** | | | | |
| Amount | $ 920 | $ 929 | $ 1,136 | $ 1,040 |
| Growth rate | (1)% | 1 % | 9 % | 3 % |
| | | | | |
| Return on equity | 19.5 % | 19.6 % | 24.1 % | 21.9 % |
| | | | | |
| Effective tax rate from continuing operations | 36.3 % | 35.5 % | 35.6 % | 35.6 % |

[1] Revenue from Walgreens was $3.3 billion for the nine months ended March 31, 2014.  Excluding the impact of the Walgreens contract expiration, the fiscal 2015 year-to-date revenue growth rate would have been 16 percent.

Refer to the GAAP/Non-GAAP reconciliation for definitions and calculations supporting the Non-GAAP balances.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Third Quarter | | | (in millions) | Third Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | **2015** | | 2014 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **22,605** | $ 18,762 | Amount | $ | **2,774** | $ 2,657 |
| Growth rate | | **20 %** | (15)% | Growth rate | | **4 %** | 7 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **567** | $ 452 | Amount | $ | **102** | $ 111 |
| Growth rate | | **25 %** | (9)% | Growth rate | | **(8)%** | 11 % |
| Segment profit margin | | **2.51 %** | 2.41 % | Segment profit margin | | **3.66 %** | 4.16 % |

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the three months ended March 31, 2015 was $25,375 million, which included total segment revenue of $25,379 million and Corporate revenue of $(4) million. Total consolidated revenue for the three months ended March 31, 2014 was $21,427 million, which included total segment revenue of $21,419 million and Corporate revenue of $8 million.  Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended March 31, 2015 were $591 million, which included total segment profit of $669 million and Corporate costs of $(78) million. Total consolidated operating earnings for the three months ended March 31, 2014 were $508 million, which included total segment profit of $563 million and Corporate costs of $(55) million. Corporate includes, among other things, restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Year-to-Date | | | (in millions) | Year-to-Date | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Pharmaceutical** | **2015** | | 2014 | **Medical** | **2015** | | 2014 |
| | | | | | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **66,440** | $ 60,018 | Amount | $ | **8,540** | $ 8,168 |
| Growth rate[1] | | **11 %** | (12)% | Growth rate | | **5 %** | 11 % |
| | | | | | | | |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **1,559** | $ 1,368 | Amount | $ | **330** | $ 348 |
| Growth rate | | **14 %** | 2 % | Growth rate | | **(5)%** | 30 % |
| Segment profit margin | | **2.35 %** | 2.28 % | Segment profit margin | | **3.86 %** | 4.26 % |

[1] Revenue from Walgreens was $3.3 billion for the nine months ended March 31, 2014.  Excluding the impact of the Walgreens contract expiration, the fiscal 2015 year-to-date Pharmaceutical segment revenue growth rate would have been 17 percent.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the nine months ended March 31, 2015 was $74,983 million, which included total segment revenue of $74,980 million and Corporate revenue of $3 million. Total consolidated revenue for the nine months ended March 31, 2014 was $68,190 million, which included total segment revenue of $68,186 million and Corporate revenue of $4 million.  Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the nine months ended March 31, 2015 were $1,603 million, which included total segment profit of $1,889 million and Corporate costs of $(286) million. Total consolidated operating earnings for the nine months ended March 31, 2014 were $1,498 million, which included total segment profit of $1,716 million and Corporate costs of $(218) million. Corporate includes, among other things, restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Third Quarter | |
| --- | --- | --- |
| | **2015** | 2014 |
| **GAAP return on equity** | **23.4 %** | 19.2 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings | $ 365 | $ 315 |
| Restructuring and employee severance, net of tax, in continuing operations | 4 | 3 |
| Amortization and other acquisition-related costs, net of tax, in continuing operations | 48 | 36 |
| Impairments and (gain)/loss on disposal of assets, net of tax, in continuing operations | - | - |
| Litigation (recoveries)/charges, net, net of tax, in continuing operations | (21) | (5) |
| Adjusted net earnings | $ 396 | $ 349 |
| Annualized | $ 1,584 | $ 1,396 |

| | **Third Quarter 2015** | **Second Quarter 2015** | Third Quarter 2014 | Second Quarter 2014 |
| --- | --- | --- | --- | --- |
| Total shareholders' equity | $ 6,369 | $ 6,100 | $ 6,532 | $ 6,589 |
| Divided by average shareholders' equity | $ 6,235 | | $ 6,560 | |
| **Non-GAAP return on equity** | **25.4 %** | | 21.3 % | |

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Year-to-Date | |
| --- | --- | --- |
| | **2015** | **2014** |
| **GAAP return on equity** | **19.5 %** | **19.6 %** |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings | $ 920 | $ 932 |
| Restructuring and employee severance, net of tax, in continuing operations | 21 | 16 |
| Amortization and other acquisition-related costs, net of tax, in continuing operations | 121 | 102 |
| Impairments and (gain)/loss on disposal of assets, net of tax, in continuing operations | (9) | 6 |
| Litigation (recoveries)/charges, net, net of tax, in continuing operations | 46 | (13) |
| Loss on extinguishment of debt, net of tax, in continuing operations | 37 | - |
| Adjusted net earnings | $ 1,136 | $ 1,043 |
| Annualized | $ 1,515 | $ 1,391 |

| | Third Quarter 2015 | Second Quarter 2015 | First Quarter 2015 | Fourth Quarter 2014 | Third Quarter 2014 | Second Quarter 2014 | First Quarter 2014 | Fourth Quarter 2013 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Total shareholders' equity | $ 6,369 | $ 6,100 | $ 6,256 | $ 6,401 | $ 6,532 | $ 6,589 | $ 6,297 | $ 5,975 |
| Divided by average shareholders' equity | $ 6,281 | | | | $ 6,348 | | | |
| **Non-GAAP return on equity** | **24.1 %** | | | | **21.9 %** | | | |

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| | Third Quarter | | Year-to-Date | |
|---|---|---|---|---|
| (in millions) | 2015 | 2014 | 2015 | 2014 |
| **GAAP effective tax rate from continuing operations** | **34.6 %** | 38.0 % | **36.3 %** | 35.5 % |
| | | | | |
| **Non-GAAP effective tax rate from continuing operations** | | | | |
| Earnings before income taxes and discontinued operations | $ **558** | $ 507 | $ **1,444** | $ 1,441 |
| Restructuring and employee severance | **7** | 5 | **33** | 25 |
| Amortization and other acquisition-related costs | **77** | 56 | **190** | 160 |
| Impairments and (gain)/loss on disposal of assets | **(1)** | - | **(19)** | 10 |
| Litigation (recoveries)/charges, net | **(18)** | (8) | **54** | (21) |
| Loss on extinguishment of debt | **-** | - | **60** | - |
| Adjusted earnings before income taxes and discontinued operations | $ **624** | $ 560 | $ **1,763** | $ 1,615 |
| | | | | |
| Provision for income taxes | $ **193** | $ 192 | $ **524** | $ 512 |
| Restructuring and employee severance tax benefit | **3** | 2 | **12** | 9 |
| Amortization and other acquisition-related costs tax benefit | **29** | 20 | **69** | 58 |
| Impairments and (gain)/loss on disposal of assets tax benefit/(expense) | **(1)** | - | **(10)** | 4 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | **3** | (3) | **8** | (8) |
| Loss on extinguishment of debt tax benefit | **-** | - | **23** | - |
| Adjusted provision for income taxes | $ **228** | $ 211 | $ **627** | $ 575 |
| | | | | |
| **Non-GAAP effective tax rate from continuing operations** | **36.5 %** | 37.7 % | **35.6 %** | 35.6 % |

| | Third Quarter | |
|---|---|---|
| | 2015 | 2014 |
| **Debt to total capital** | **39 %** | 38 % |
| | | |
| **Net debt to capital** | | |
| Current portion of long-term obligations and other short-term borrowings | $ **283** | $ 241 |
| Long-term obligations, less current portion | **3,720** | 3,679 |
| Debt | $ **4,003** | $ 3,920 |
| Cash and equivalents | **(3,183)** | (3,041) |
| Net debt | $ **820** | $ 879 |
| Total shareholders' equity | **6,369** | 6,532 |
| Capital | $ **7,189** | $ 7,411 |
| **Net debt to capital** | **11 %** | 12 % |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| | Fiscal Year |
| --- | --- |
| (in millions) | **2014** |
| **GAAP effective tax rate from continuing operations** | **35.3 %** |
| | |
| **Non-GAAP effective tax rate from continuing operations** | |
| Earnings before income taxes and discontinued operations | $ 1,798 |
| Restructuring and employee severance | 31 |
| Amortization and other acquisition-related costs | 223 |
| Impairments and loss on disposal of assets | 15 |
| Litigation (recoveries)/charges, net | (21) |
| Adjusted earnings before income taxes and discontinued operations | $ 2,047 |
| | |
| Provision for income taxes | $ 635 |
| Restructuring and employee severance tax benefit | 11 |
| Amortization and other acquisition-related costs tax benefit | 79 |
| Impairments and loss on disposal of assets tax benefit | 5 |
| Litigation (recoveries)/charges, net tax expense | (8) |
| Adjusted provision for income taxes | $ 722 |
| | |
| **Non-GAAP effective tax rate from continuing operations** | **35.3 %** |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Forward-Looking Non-GAAP Financial Measures**

We present non-GAAP earnings from continuing operations and non-GAAP effective tax rate from continuing operations (and presentations derived from these financial measures, including per share calculations) on a forward-looking basis. The most directly comparable forward-looking GAAP measures are earnings from continuing operations and effective tax rate from continuing operations. We are unable to provide a quantitative reconciliation of these forward-looking non-GAAP measures to the most directly comparable forward-looking GAAP measures because we cannot reliably forecast restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net, LIFO charges/(credits) and loss on extinguishment of debt, which are difficult to predict and estimate and are primarily dependent on future events. Please note that the unavailable reconciling items could significantly impact our future financial results.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

In fiscal 2015, the Company began excluding last-in, first-out ("LIFO") inventory charges/(credits)[5] from its non-GAAP earnings, for consistency with the presentation by some of its peers.  The Company did not record any LIFO charges or credits in the first, second, or third quarters of fiscal 2015 or 2014, respectively.  In the second quarter of fiscal 2015, the Company excluded the loss on extinguishment of debt[6] related to the early redemption of debt that occurred in December 2014 from its non-GAAP earnings.

**Definitions**

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total shareholders' equity).

**Non-GAAP Diluted EPS from Continuing Operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Earnings from Continuing Operations:** earnings from continuing operations excluding (1) restructuring and employee severance[1], (2) amortization and other acquisition-related costs[2], (3) impairments and (gain)/loss on disposal of assets[3], (4) litigation (recoveries)/charges, net[4], (5) LIFO charges/(credits) and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Effective Tax Rate from Continuing Operations:** (provision for income taxes adjusted for (1) restructuring and employee severance, (2) amortization and other acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits) and (6) loss on extinguishment of debt) divided by (earnings before income taxes and discontinued operations adjusted for the same six items).

**Non-GAAP Operating Earnings:** operating earnings excluding (1) restructuring and employee severance, (2) amortization and other acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net and (5) LIFO charges/(credits).

**Non-GAAP Return on Equity:** (annualized current period net earnings excluding (1) restructuring and employee severance, (2) amortization and other acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits) and (6) loss on extinguishment of debt, each net of tax) divided by average shareholders' equity.

**Return on Equity**: annualized current period net earnings divided by average shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.

[1] Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel) and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[2] Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs and changes in the fair value of contingent consideration obligations.

[3] Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[4] Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[5] The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market.  These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[6] Charges related to the make-whole premium on the redemption of notes.

# EXHIBIT 16

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
| --- | --- | --- |
| Barrett George S | CARDINAL HEALTH INC [ CAH ] | X Director          10% Owner |
| (Last)     (First)     (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below)     Other (specify below) |
| 7000 CARDINAL PLACE | 05/11/2015 | Chairman and CEO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| DUBLIN     OH     43017 | | X Form filed by One Reporting Person |
| (City)     (State)     (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 05/11/2015 | | M[1] | | 9,954 | A | $27.29 | 358,648 | D | |
| Common Shares | 05/11/2015 | | M[1] | | 290,046 | A | $27.29 | 648,694 | D | |
| Common Shares | 05/11/2015 | | S[1] | | 300,000 | D | $86.44[2] | 348,694 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $27.29 | 05/11/2015 | | M | | | 9,954 | [3] | 09/15/2016 | Common Shares | 9,954 | $0 | 0 | D | |
| Employee Stock Option (right to buy) | $27.29 | 05/11/2015 | | M | | | 290,046 | [4] | 09/15/2016 | Common Shares | 290,046 | $0 | 354,658 | D | |

**Explanation of Responses:**

1. The exercises and sale reported on this Form 4 were effected pursuant to a Rule 10b5-1 trading plan adopted by the reporting person on November 6, 2014.

2. The price reported in column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $86.11 to $86.82, inclusive. The reporting person undertakes to provide to Cardinal Health, Inc., any security holder of Cardinal Health, Inc., or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of shares sold at each separate price within the range set forth in footnote 2 to this Form 4.

3. The option, representing a right to purchase a total of 309,954 shares, vested and became exercisable in three equal annual installments beginning on September 15, 2010.

4. The option, representing a right to purchase a total of 644,704 shares, vested and became exercisable in three equal annual installments beginning on September 15, 2010.

**Remarks:**

<u>/s/ Elaine S. Natsis, Attorney-in-fact</u>    <u>05/12/2015</u>

      ** Signature of Reporting Person      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 17

# Cardinal Health Inc at Bank of America Merrill Lynch Health Care Conference

Las Vegas Jun 23, 2017 (Thomson StreetEvents) -- Edited Transcript of Cardinal Health Inc presentation Wednesday, May 13, 2015 at 3:00:00pm GMT

CORPORATE PARTICIPANTS
    Mike Kaufmann, Cardinal Health, Inc. - CFO
CONFERENCE CALL PARTICIPANTS
    Robert Willoughby, BofA Merrill Lynch - Analyst

# PRESENTATION

**Robert Willoughby**, BofA Merrill Lynch - Analyst

Welcome to the Bank of America Merrill Lynch Las Vegas Healthcare Conference day two. I am Robert Willoughby for healthcare technology and distribution.

We are very pleased to have Cardinal Health here to present today. Here from the Company are Mike Kaufmann who is the CFO. He's joined by Erika Wadlinger from Investor Relations.

**Mike Kaufmann**, Cardinal Health, Inc. - CFO

Well, thanks Bob. Disciplined, innovative, solid dependable growth, thoughtful capital deployment, delivers on commitment and a broad portfolio that crosses all of healthcare. Those are just some of the things I want you to think about today when you think about Cardinal Health.

Now before I get started, kind of breaking these out and talking about these in a little bit more detail I do have to do this part of the presentation which is I need to remind you that I will be making forward-looking statements today and actually results may differ materially. And I would refer you to our SEC filings on our website for the list of risks and opportunities.

Most of you know our Company very well but if you don't we are a global healthcare services company. We have about 34,000 employees with a significant portion of those ex-US. And we have the global reach, scale breadth and scope to be a very successful company.

And we have been successful. If you remember back in FY10 or our fiscal year 2010 we spun out our capital equipment company which was CareFusion which was most recently bought by BD.

And that that time we said we would deliver long-term non-GAAP EPS growth of at least double digits. So if we actually finish FY15 within our guidance range of $4.28 to $4.38 we will be about 14% growth over that five-year period from a compounded annual growth rate for our EPS.

So how are we going to be successful going forward? I think it starts with setting the right strategic priorities for the business. Thus those strategic priorities need to be informed by the trends in healthcare.

So besides having great talent which I think we do when we look at these trends in healthcare I think these of the things that we see that are driving the strategic priorities. First, demographics. We believe it is inescapable with the aging population in the United States that there is not going to be a greater need for healthcare.

Second of all, care is going to have to be delivered more cost-effectively. Data is going to have to be mined. Consumers, we're going to have to pay attention to consumers.

Payments are going to need to be more outcome based than fee-for-service. And everyone is going to have to understand the important role of government whether it be in reimbursement, policy or regulatory. And innovation is going to continue to be key.

So with these as a backdrop we formed our five strategic priorities. These five strategic priorities are generics, specialty and biopharma, international, health systems and hospital solutions, and finally alternate sites of care. I will take a minute and talk about each one of these for a little bit.

First in generics, pharmaceutical distribution is our largest and most important business at Cardinal. In order to be successful in this business you must be able to source generics successfully.

We really believe that we are doing this incredibly well through our joint partnership with CVS Health. This 50/50 JV is based is powering the buying entity and making sure that we have the scale, speed, simplicity and transparency that manufacturers will appreciate and want to work with us.

Besides this very successful JV we also need to make sure that we tailor our generic programs to our customers whether they be regional or national chains, independents, hospitals, nursing homes, etc., you must be able to deliver them pricing, service levels and other service offerings. And we believe we are doing this also very successfully.

The next strategic priority is specialty and biopharma. This is really can to be split into two components. If you look at this slide you will see that in specialty it's important to have a meaningful downstream presence with customers and all of the service offerings that the suppliers or manufacturers upstream are going to need.

Downstream when we started this business about four years ago we really started with a base of about $1 billion which mostly was our blood plasma business and some of our other specialty business like our 3PL business. Since that time we have grown the business that we will exceed revenues of over $5 billion this year in total in our specialty group and most of that and none of that includes our recent acquisition of Metro Medical.

When you look downstream we have not only now have access to be able to acquire the products both brand and generic at the right price at the right time, we also have put together the technology offerings that are important for the doctors' offices and hospitals that we serve. Upstream we've acquired a great portfolio of products that include not only the third-party logistics

business and blood plasma business that we've had for a long time but we also have our scientific and regulatory business, our data and analytics business and a hub that we bought about a year ago called Sonexus that is also very successful. So we think we have the right offering both upstream and downstream to play in the specialty market.

We're also very excited about our acquisition of Metro Medical. This is a business that was the largest independent specialty distributor in the United States and we acquired them a few weeks ago. We were able to acquire their specialty distribution, their GPO, their business of selling medical supplies into the doctors' offices and their specialty pharmacy business.

We know that large hospitals are looking for complete solutions from their providers. We know that they don't look at Cardinal Health as either M or P, they look at Cardinal Health in total. And so we've created a strategic selling team that sells across all of the offerings in Cardinal Health, not only the core distribution offerings that you know us well for but also our service offerings and our product offerings.

From a product offering we have not only our broad line of the Cardinal Health consumable products and then our traditional products that we've been manufacturing for years, our drapes and gowns, our fluid suction containers, our surgeon gloves and our kits, these are all products that we've had years of manufacturing capabilities on and we continue to emphasize those. But also we've done some recent acquisitions in the spaces of orthopedic trauma, cardiovascular and negative wound therapy.

And then what I'm going to dig a little bit deeper on is our most recent acquisition in the cardiovascular space called Cordis that we're very excited about. Cordis increases our scale and breadth in both interventional cardiology and endovascular.

In the US market it will build on our acquisition AccessClosure. This is a business that we acquired about a year or so ago. So this space is a space that we had targeted prior to the availability of Cordis and we were already in the space and we saw Cordis as a great way to accelerate our strategy in the cardiovascular space.

Let me tell you a little bit more about Cordis. We really like Cordis for several reasons and we believe it has a great fit for us.

First of all we again believe it really accelerates our overall move from being a distribution business to more of a product business. We want to take advantage of the rails that we have going every day to our customers on the med/surg side by not only providing the brand products they need but also being able to have a full offering of Cardinal manufactured products. Cordis incredibly accelerates this strategy.

We also believe we have current other businesses like our RFID technology business called WaveMark that when we with Cordis that we're going to be able to take a waste out of the system, reduce obsolescence, reduce inventory. We also like the fact that besides having a sales force that will call on physicians we also have already have the call point of the materials management group which we think is going to be more and more influential on these types of lower tier physician preference items.

We believe when you combine altogether the sales force that we have, our team that calls on materials management as well as our breadth and scope globally in cardiovascular and other med/surg product lines people are going to look at us as a partner of choice to be able to market and sell their products for them. And finally this gives us more geographic reach from a sales perspective. Cordis is about 70% of Cordis' sales are non-US.

Another business within our medical segment that we're incredibly excited about is our at-home business. This is the business that you might remember that when we acquired was the AssuraMed business. This is a business that has higher margins and a better growth rate than the traditional medical distribution business.

And again based on demographic trends that we know we believe more and more care is going to be at the home because it's often safer and more cost-effective. So we like this business and we also believe there's a great opportunity to begin to sell more and more of the Cardinal product through our at-home business.

Finally international. We have been global for a really time. We have glove plants in Thailand, manufacturing plants in the Dominican Republic, Mexico, etc.

We have leading distribution capabilities in Canada and in Puerto Rico. We have significant sourcing capabilities in Singapore. And we also chose China because we felt that this market gave us a great growth opportunity.

To put this besides this business just in China just a little bit, in FY14 we finished the year at about $2.6 billion in sales and in this most recent quarter we told you that we grew about 25% from the prior year. We have businesses in China that have the quality and regulatory knowhow and culture and skills. We have a management team that has been trained and raised in the United States and bring the type of quality and culture we need over there and we have the brand recognition in China that's going to help us be successful.

Also we believe that the healthcare market will continue to be a growing market in China. Regardless there's a lot of other types of markets that may have ebbs and flows we believe healthcare is going to consistently grow in China and we see this as it continues to be a great market for us.

Next I want to switch gears a little bit to capital deployment. I really do believe our capital deployment over the years and will continue to believe is a really thoughtful blend of reinvesting in our business first and then returning dollars to our shareholders through both dividends and stock buybacks and then finally opportunistically taking advantage of acquisitions as we see them.

Additionally you will note on this slide that from a dividend standpoint when we spun out CareFusion again in FY10 we said we would grow EPS at least double digits and I showed you that we expect it to be around 14%. If you also take a look at our dividend growth since that time it will average about 14.4% which we said again would be closely tied to our EPS growth.

So in conclusion I would say that we are a business that is on the right side of healthcare. We are innovating, we are deploying capital effectively and we are balancing our short- and long-term growth drivers. So with that I will turn it over to Bob or the audience for any questions.

# QUESTIONS AND ANSWERS

**Analyst:** Robert Willoughby, BofA Merrill Lynch - Analyst

**Question – Robert Willoughby:** (inaudible) in terms of the medical business we've seen a number of issues recur over the years and yet the enthusiasm for Cardinal remains -- I mean, why is this is the time now to really get on board and say you're going to drive a real return on that franchise?

**Answer – Mike Kaufmann:** Great, thank you for that question. I'll tell you a couple of things come to mind. First of all, Cardinal has identified several years back that we really needed to convert our medical business from a branded a distribution business to more of a product distribution business.

When the customer wants those branded items we're going to utilize the rails we'll get them those products but we really believe in order to have the margin rate that we want to have to be able to grow this business we really need to convert to a product business. I think we were a little bit too slow on that historically and we got a little bit caught in the middle of well are we going to offend the branded guys or not going to offend the branded guys.

And I think under Don Casey's leadership when Don came a couple of years ago he's an excellent leader. He brings with us over 25 years experience from J&J. He was a vice chairman there.

In fact he ran the Cordis business at one time so knows that business well. Don brings a real product knowledge to us and he has really done a lot of things to switch out the team to really accelerate our opportunity to get into that.

Also if you look back at the medical business and you look at the mix besides growing the products I've talked about like Cordis and some of the physician preference items we've really accelerated around the consumable products. This is an area again where we need to take advantage of everything like tongue depressor, a cane, a bedpan, those basic things that physicians or the hospitals really don't care about, we need to make sure we have a complete offering there and higher margin, more cost-effective product for our customers. So we're focusing on that.

We've got the midterm drivers of the AccessClosure innovative therapies, the wound management. We've got Cordis which brings more breadth and scale. Don has made some changes to the management team where we're ramping up all of these product launches better.

We brought in the at-home business a couple of years ago that is growing faster. And it has a higher margin rate.

We're also significantly investing in our services business for some tuck-in acquisitions we've done. That is also a much higher margin rate.

And then as you know many of you heard us talk about the fact that the Canadian business has been a little bit of a struggle for us over the last several quarters. And we have said that it will continue to be a little bit choppy for us through the end of this calendar year.

But that business will lap some of its customer losses and the things that we switched out the executive team, both CEO and CFO up there, and we're really getting after switching out Cardinal products.

So I think when you blend all of those things together I think you're going to see probably what we would tell you the second half of our fiscal 2016 when we get through the choppiness over the next couple of quarters we expect our medical business to begin growing steadily going forward from there.

**Question – Robert Willoughby:** And maybe where are you from an evolution of the strategy here how big does the product portfolio really need to be? What can you add on in addition to Cordis?

**Answer – Mike Kaufmann:** Obviously it's hard to talk about specific things but I would tell you that we still see opportunities in the product space. As we've said we've targeted wound management and ortho trauma. Those are areas that obviously if the right opportunity comes along would be opportunities for us.

But I really think that based on the Cordis acquisition, one of the big accelerators that I forgot to mention a minute ago that I think will help us going forward is that a lot of folks that are either smaller manufacturers or potentially large manufacturers but maybe don't have as much of a presence in the United States are now coming to us once we announced the Cordis acquisition because they look at our complete bag of products and they say, wow, Cardinal is going to have a lot of reps going into the cardiology space, the cardiovascular space.

They already have people covering the materials management group. They look like a great marketing go-to-market partner for us as a company. And so like you see on the pharma side where you see the large pharma companies often have smaller companies come to them so that they can rep their products and use their vast sales force to get in we are beginning to see people beginning to come to us and saying hey, maybe in this area you don't have this type of product, would you represent ours?

So we think partnerships are going to be another way for us to cost-effectively deploy capital because there will hopefully be very little capital there. And we can work through partnerships or continued acquisitions because we do have the ability in our balance sheet to do that. But I think you've already heard that our target areas for the most part will probably be ortho trauma, cardiovascular and negative wound pressure.

**Question – Robert Willoughby:** And maybe one more, Mike, just everybody people are coming in talking about their generic sourcing joint ventures. Everybody's got these solutions. Can you speak to some of the differentiated aspects of Red Oak and maybe the competitive advantages you think it has relative to some of the other relationships that are out there?

**Answer – Mike Kaufmann:** Absolutely. I think first of all any partnership starts with a relationship and trust. And we have had a long history of successful partnership with CVS over the years. So I think it starts with having really good relationships, both like George Barrett and Larry Merlo work together very effectively as well as myself with many of the other folks from the CVS team.

So you have to have trust. Because anytime you put any type of joint venture together somewhere along the line especially with one that's 10 years long you could have some type of blip in that and you need to know that you have partners and so I feel incredibly confident about our relationship with CVS.

And I've seen that through the Board meetings that we've had. It is a Board that's made up of an equal member of CVS and Cardinal folk.

Second of all I think what we did is the other thing is any business the way any business is successful is it starts with the talent. If

Client Id: 77 PAGEID #: 787

And I think that one of the biggest differentiators if not the biggest differentiator in our JV is that we have decades and decades of experience. We were able to essentially get all of CVS' team and the majority of the senior folk and key folks from the Cardinal sourcing team to move into the Red Oak joint venture.

One of the reasons we put it in Foxborough, Mass. was so that we could attract the CVS folks as well as put it near a great city like Boston where folks like Cardinal would want to move or at least commute to over a period of time. And so that has been incredibly successful whereas our competitors I believe have had to restart a lot of their JVs with a lot less experience than we have.

Manufacturers get a lot of comfort when they walk in and they are talking with everybody on the sourcing team has multiple years of sourcing experience. Scale is important. We think we're the largest sorcerer of generics in the United States and also globally so scale is it.

And I think the model that we created the got after being simple, we didn't change the operational, the logistics of the business, it's transparent with the manufacturers. They know exactly what they're getting. And so you put all those things together I think those are what give us the competitive advantage.

**Question – Robert Willoughby:** Other questions from the audience? Mike, if you think --

---

**Analyst:** Unidentified Audience Member

**Question – Unidentified Audience Member:** Can you elaborate on some of the issues that hurt you last quarter on med/surg and how transient they are? Are they going to bleed through the rest of the year?

**Answer – Mike Kaufmann:** Yes, so last quarter the biggest thing for us is we've seen and it erosion in pricing in our national brand distribution pricing for years. It's a business that quarter after quarter there's always a certain amount of customers that are repricing and so we've always seen that phenomenon. So it's nothing new.

Historically though every quarter we've had different things that we've been able to offset it with, either growth in our Cardinal branded products, growth in our services or other things cutting our expenses or whatever and we've been able to offset that and continue to grow that business. We were not as successful in those areas being able to offset that pricing erosion. So again nothing really new than historically just not as good a job from us offsetting that erosion as we have done in the past.

And so we believe that as I mentioned Canada is going to continue to be choppy for us through the end of the year. We did lose a couple of customers over there in our third-party logistics business. One merged with another company and they felt that their distribution footprint was adequate to do it themselves, so they in-sourced their third-party logistics business and another one contract was up for bid and they actually went to another global third-party provider versus us in Canada.

So those two losses have really been a key issue for us in Canada. We anniversary those losses at the end of this calendar year so it would be Q3 of our fiscal 2016. So we will anniversary those products.

I think we've done all the right things in terms of we're getting after costs, switched out the management team up there. We're beginning to accelerate our move to Cardinal branded products in Canada.

And then also when you take a look at some of our other initiatives around launching products we reorganized our sales force back at the beginning of the year and took our sales force and restructured them into being big bag reps versus individual reps and that we begin to believe will begin to take hold. So I think you're going to see us be a little bit choppy in medical through the end of the calendar year and then get to a consistent growth pattern come the back half of fiscal 2015.

**Question – Unidentified Audience Member:** I have another one on the medical side. Could you just elaborate on your strategy on Cordis just given that 70% or so of that business is O-US and that's not a geographic area where you guys have experience?

**Answer – Mike Kaufmann:** Well, we do have a lot of experience globally. Again we have a large group in Singapore, Thailand, Dominican, Mexico, etc. So it's not like we're without global experience.

But to your point of selling cardiovascular products in Japan and England, etc., that is a new area for us. We actually see that as they are number one or two in that market and a lot of these marketplaces go overseas. We're not going to do any harm and change things big over there.

We're going to continue to leverage what J&J and the Cordis team have been doing over there in those countries. And then I think the nice opportunity for us is once we are in those countries selling the Cordis products we can sit down with our distribution network that we will have over there and we can begin to put our other products. There's no reason our glove, our fluid suction containers, our kits, etc., can't be sold overseas.

So we actually see that as an accelerant to selling more of our Cardinal portfolio overseas. And so we hope to combine those and utilize those distribution resources and well as reps overseas as positive as a positive way to drive the business.

I will tell you one thing about Cordis, as a guy that has spent most of his career as a general manager at Cardinal over the years one of the things I've always felt is that when I was running our pharma business it was 16 diverse businesses within pharma and I always felt that no matter how small a business was that if you weren't going to pay attention to it and treat it like it was your only business and expect that general manager to truly understand his or her market, what they needed to win, etc. then you might as well get out of the business. So I've always made sure that we had general managers in place to run those businesses and effectively compete.

And I think what I've seen with Cordis as Don Casey and the team and others and us have gone out to meet with whether it be the plant in Mexico or various sales offices is we have walked into most all of these places and you will see hundreds of employees dressed in red T-shirts that clap when we come in and say finally we have a great business, someone is going to pay attention to us, someone is going to tell us that we're important and we are all in. And so the reception that we are getting from the Cordis employees what that will be worth I don't know but I know it is going to be worth a significant amount as we begin to get momentum on that business.

**Question – Unidentified Audience Member:** Just a quick follow-up there. Is some of that employee excitement does that give

you some confidence that you guys might be able to hold onto the vast majority of the sales reps whether it be US and overseas?

**Answer – Mike Kaufmann:** I do. Right now Don Casey has been and his team have traveled to meet a ton of the sales reps. J&J has been great with us in helping us look to how we hold onto them, what the various packages are, a way that we can work with them.

They feel like they may have an opportunity to have more things in their bag besides just the Cordis product. And so I don't think that initially that we're going to see a lot of the reps leave.

Now the proof will be in the pudding for us to be able to prove that to them over a longer period of time. But right now the buzz from the reps, the feedback they are giving us, their commitment to want to win has been incredibly exciting. So we feel really good about it right now.

---

**Analyst:** Robert Willoughby, BofA Merrill Lynch - Analyst

**Question – Robert Willoughby:** Are there other questions? Mike maybe a CFO-type question, the hard part of our ROIC analysis is we catch you for the capital that goes out the door which for Cordis and some of the other deals that you've done over the past few quarters shows up there in the denominator there.

Can you point to some of the things you're doing from an income statement balance sheet standpoint that would be offset by the amount of capital that are coming out the door? I can think of Red Oak but maybe deleveraging, what other kinds of things might we see financially that really enhance that metric?

**Answer – Mike Kaufmann:** Yes, I think first of all I think we're going to continue and you've pointed this out in the past. I think we've been incredibly creative in the way we deploy capital.

I think first of all Red Oak is a perfect example when you compare to our competitors and how they have made their decisions to get scale in generics. We think our way of deploying capital was much more effective over the long term.

Second of all or partnership with Henry Schein, also another very capital efficient product, here we are able to transfer our ambulatory business and essentially take the sales and the reps and move them and those expenses. And then on the flipside they are going to buy our Cardinal branded products from us in an amount that will allow us to exceed our earnings on those products sales will exceed the amount of earnings that we gave up so that it will be accretive for us in FY16.

We're we to continue to look at these product partnerships. We think that going forward that being able to be a good partner is going to be a really important capability of companies.

And so in the medical side we don't want to have to put more products in our portfolio every time have to do that through acquisition. Sure we're going to do some of those through acquisition and we have the balance sheet to do that but a lot of them we hope to put in our bag through partnerships. And we think that could be a cost-effective way to deploy capital.

We do have $3.2 billion of cash on our balance sheet at this time. We will always focus on CapEx first.

And as you know we just raised our dividend so we're going to continue to focus on our differentiated dividend and then we will look at M&A next opportunistically as well as stock buyback. We're going to continue to look at our balance sheet in terms of working capital making sure that we're always driving our inventory to as low a level as possible, etc., our focus on that to generate more cash flow.

**Question – Robert Willoughby:** Any last questions? Great, I think we're good.

**Answer – Mike Kaufmann:** All right, thanks Bob. I appreciate it.

---

# EXHIBIT 18

# Healthcare is changing …
# We're changing healthcare.

Mike Kaufmann
Chief Financial Officer

*Bank of America Merrill Lynch 2015 Health Care Conference*
*May 13, 2015*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Cautions concerning forward-looking statements

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the ability to achieve the expected benefits from the generic sourcing venture with CVS Health; the frequency or rate of pharmaceutical price appreciation or deflation and the timing of generic and branded pharmaceutical introductions; the non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; the ability to successfully complete the Cordis acquisition on a timely basis and if completed, to achieve the anticipated results from the Cordis acquisition; the ability to achieve the expected benefits from the AccessClosure acquisition; uncertainties due to government health care reform including federal health care reform legislation; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of May 13, 2015.  Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, these presentations contain Non-GAAP financial measures.  Cardinal Health provides GAAP numbers, definitions and reconciling information in the Financial Appendix at the end of these presentations and on its Investors page at ir.cardinalhealth.com.

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Essential facts about Cardinal Health
## *A global, integrated healthcare services company*









© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Non-GAAP diluted earnings per share from continuing operations

5-yr Projected CAGR 13.8-14.4%[1]

| | | | | | |
|---|---|---|---|---|---|
| $2.24 | $2.80 | $3.21 | $3.73 | $3.84 | $4.28-$4.38 |
| FY10 | FY11 | FY12 | FY13 | FY14 | FY15 Guidance |

EPS Growth[2]

Q3 FY15 18%

YTD FY15 12%

*Please see appendix for GAAP/non-GAAP definitions and reconciling information.*
*[1] CAGR range based off of FY15 Guidance range provided on April 30, 2015 of $4.28-$4.38.*
*[2] Non-GAAP diluted earnings per share from continuing operations growth rate versus the prior year.  Q3 and year-to-date (YTD) are the 3 and 9 months ending March 31, 2015, respectively.*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Our priorities are driven by **key trends** in healthcare

## Demographics and public health issues driving demand

| | | | | |
|---|---|---|---|---|
| **Need to deliver care more cost-effectively: new settings, less waste, more coordination** | **Biology advances and big data** | **Increased consumerism in healthcare** | **Transition from fee-for-service to payment for outcomes** | **Increased participation of government, both as payor and regulator** |

## Continued innovation in healthcare



© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.

# FY15 strategic priorities



## Generics

- Use scale and know how to deliver value via **Red Oak**
- Tailored programs to a segmented customer base



## Specialty and biopharma

- Continue to increase scale
- Increase therapeutic range
- Enhance programs for biopharma



## International

- Expand Chinese footprint
- Reposition Canada for growth
- Grow medical product scale through international markets





## Health system and hospital solutions

Provide health systems with scaled solutions including:

- Integrated strategic account solutions
- Physician preference products
- Medical consumables
- Performance management tools and services



## Alternate sites of care

- Accelerate growth in home
- Post-acute and ambulatory settings, leveraging IDN experience and HENRY SCHEIN® partnership
- Expand product lines, services, capabilities and touch points

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.





# Largest generics sourcing entity in U.S., world's largest generic market



- **50/50 JV created in July 2014**
- **Single point of negotiation**
- **Simple, straightforward model**

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# In **Specialty** we bring enhanced value through integration of component services



Regulatory Sciences

3PL Services / Direct Distribution

Patient Access & Support

Specialty Pharmacy

Marketing Communications

Market Analytics

Health Economics Outcomes Research

VitalSource™ GPO

Specialty Pharma Distribution

Practice Management Technology

Radio Frequency Inventory Mgt.

**Partnerships for continued Innovation:**
- **KEW Group**

**Upstream solutions**



**Downstream Solutions**

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.





# Integrated solutions for integrated health systems

Orthopedic Trauma

Emerge Medical



Cardiovascular

AccessClosure
Cordis *



Negative Pressure Wound Therapy

Innovative Therapies, Inc.



## Solutions to help standardize physician preference items

*Announced intent to acquire Cordis on March 2, 2015. Completion of the acquisition is subject to regulatory approval and customary closing conditions.*

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth
Essential to care™

# About Cordis

**Cardiology and Endovascular**
medical device company

**Robust product line** of
mature, well-established
**cardiovascular products**

**Annual revenues were approximately
$780M,** 70% of sales coming from
outside the United States

2014 annual **revenues were evenly split**
between Cardiology and Endovascular





 
 
 
 



© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.

# Cardinal Health and Cordis:
# What this means for us and the marketplace



- Compelling value proposition
- Leverages CAH supply chain expertise
- Integrated go-to-market model
- OUS growth opportunity
- Gain talent from the Cordis team

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.

#  **Cardinal Health** supports care **At Home**; Opportunities extend across care continuum

**Cardinal Health**

**Edgepark® referral sources**

| DME | Pharmacies | Hospital systems | Hospitals | Home healthcare agency | Surgery centers | Physician offices | Payors |

**Independence Medical®**

**✛edgepark®** Medical Supplies

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.


**CardinalHealth**
*Essential to care™*



# **International**: China, growing into the future

✓ **Broaden geographic reach**

- – Expand from 11 to ~25 local wholesaling companies through tuck-in acquisitions
- – Approximately 30 direct-to-patient specialty pharmacies

✓ **Expand direct-to-patient for chronic care**

- – Focus on disease-centric, patient support model

✓ **Invest in innovative healthcare solutions**

- – Hospital and retail pharmacy focused

✓ **Accelerate brand recognition**



© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Thoughtful capital deployment approach

## Capital deployment post CareFusion spin[1]

**$4.7B** cumulatively returned to shareholders

- Dividends
- Share repurchases
- Capital expenditures
- Acquisitions, net of divestitures

**Dividend Increase 14.4% CAGR[2]**

---

[1] Capital deployment from Q1 FY10 to March 31, 2015 (FY15).
[2] Annual dividend paid per share from FY10 through FY15 including dividend paid on 4/15/15.

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



CardinalHealth
Essential to care™

# Strong portfolio driving growth; positioned for the future

✓ Believe we are positioned on the "right side" of healthcare

✓ Innovating to fulfill needs of increasingly integrated customers

✓ Thoughtful capital deployment

✓ A balance of short- and long-term growth drivers

© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.



# Financial appendix



© Copyright 2015, Cardinal Health. All rights reserved. CARDINAL HEALTH, the Cardinal Health LOGO and ESSENTIAL TO CARE are trademarks or registered trademarks of Cardinal Health.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

### Third Quarter 2015

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| GAAP | $ 591 | 16 % | $ 558 | $ 193 | $ 365 | 16 % | $ 1.09 | 20 % |
| Restructuring and employee severance | 7 | | 7 | 3 | 4 | | 0.01 | |
| Amortization and other acquisition-related costs | 77 | | 77 | 29 | 48 | | 0.15 | |
| Impairments and (gain)/loss on disposal of assets | (1) | | (1) | (1) | - | | - | |
| Litigation (recoveries)/charges, net | (18) | | (18) | 3 | (21) | | (0.07) | |
| **Non-GAAP** | $ 657 | 17 % | $ 624 | $ 228 | $ 396 | 13 % | $ 1.19 | 18 % |

### Year-to-Date 2015

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| GAAP | $ 1,603 | 7 % | $ 1,444 | $ 524 | $ 920 | (1)% | $ 2.74 | 2 % |
| Restructuring and employee severance | 33 | | 33 | 12 | 21 | | 0.06 | |
| Amortization and other acquisition-related costs | 190 | | 190 | 69 | 121 | | 0.36 | |
| Impairments and (gain)/loss on disposal of assets | (19) | | (19) | (10) | (9) | | (0.03) | |
| Litigation (recoveries)/charges, net | 54 | | 54 | 8 | 46 | | 0.14 | |
| Loss on extinguishment of debt | - | | 60 | 23 | 37 | | 0.11 | |
| **Non-GAAP** | $ 1,861 | 11 % | $ 1,763 | $ 627 | $ 1,136 | 9 % | $ 3.38 | 12 % |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations[1] | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | **Fiscal Year 2014** | | | | | |
| **GAAP** | $ 1,885 | 89 % | $ 1,798 | $ 635 | $ 1,163 | 247 % | $ 3.37 | 247 % |
| Restructuring and employee severance | 31 | | 31 | 11 | 20 | | 0.06 | |
| Amortization and other acquisition-related costs | 223 | | 223 | 79 | 144 | | 0.42 | |
| Impairments and loss on disposal of assets | 15 | | 15 | 5 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (21) | | (21) | (8) | (13) | | (0.04) | |
| **Non-GAAP** | $ 2,133 | 4 % | $ 2,047 | $ 722 | $ 1,324 | 3 % | $ 3.84 | 3 % |
| | | | **Fiscal Year 2013** | | | | | |
| **GAAP** | $ 996 | (44)% | $ 888 | $ 553 | $ 335 | (69)% | $ 0.97 | (68)% |
| Restructuring and employee severance | 71 | | 71 | 27 | 44 | | 0.13 | |
| Amortization and other acquisition-related costs | 158 | | 158 | 52 | 106 | | 0.31 | |
| Impairments and loss on disposal of assets | 859 | | 859 | 37 | 822 | | 2.39 | |
| Litigation (recoveries)/charges, net | (38) | | (38) | (15) | (23) | | (0.07) | |
| **Non-GAAP** | $ 2,046 | 10 % | $ 1,938 | $ 654 | $ 1,284 | 15 % | $ 3.73 | 16 % |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

[1] The 5-year compound annual growth rate for non-GAAP diluted earnings per share from continuing operations is projected to be between 13.8 percent and 14.4 percent, based on FY15 non-GAAP diluted earnings per share from continuing operations guidance of $4.28 to $4.38, respectively, provided on April 30, 2015. The 4-year compound annual growth rate for GAAP diluted earnings per share from continuing operations for FY10 to FY14 was 20.1 percent.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

### Fiscal Year 2012

| | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **GAAP** | $ 1,792 | 18 % | $ 1,698 | $ 628 | $ 1,070 | 11 % | $ 3.06 | 12 % |
| Restructuring and employee severance | 21 | | 21 | 8 | 13 | | 0.04 | |
| Amortization and other acquisition-related costs | 33 | | 33 | 9 | 24 | | 0.07 | |
| Impairments and loss on disposal of assets | 21 | | 21 | 8 | 13 | | 0.04 | |
| Litigation (recoveries)/charges, net | (3) | | (3) | (1) | (2) | | (0.01) | |
| Other Spin-Off costs | 2 | | 2 | 1 | 1 | | - | |
| **Non-GAAP** | $ 1,866 | 13 % | $ 1,772 | $ 653 | $ 1,119 | 13 % | $ 3.21 | 15 % |

### Fiscal Year 2011

| | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **GAAP** | $ 1,514 | 16 % | $ 1,518 | $ 552 | $ 966 | 65 % | $ 2.74 | 69 % |
| Restructuring and employee severance | 15 | | 15 | 5 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | 90 | | 90 | 22 | 68 | | 0.19 | |
| Impairments and loss on disposal of assets | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | 6 | | 6 | (1) | 7 | | 0.02 | |
| Other Spin-Off costs | 10 | | 10 | 4 | 6 | | 0.02 | |
| Gain on sale of CareFusion stock | - | | (75) | - | (75) | | (0.21) | |
| **Non-GAAP** | $ 1,644 | 18 % | $ 1,573 | $ 585 | $ 988 | 22 % | $ 2.80 | 25 % |

### Fiscal Year 2010

| | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes and Discontinued Operations | Provision for Income Taxes | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **GAAP** | $ 1,307 | 1 % | $ 1,212 | $ 625 | $ 587 | (23)% | $ 1.62 | (23)% |
| Restructuring and employee severance | 91 | | 91 | 32 | 59 | | 0.16 | |
| Amortization and other acquisition-related costs | 18 | | 18 | 6 | 12 | | 0.03 | |
| Impairments and loss on disposal of assets | 29 | | 29 | (5) | 34 | | 0.09 | |
| Litigation (recoveries)/charges, net | (62) | | (62) | (23) | (39) | | (0.11) | |
| Other Spin-Off Costs | 11 | | 53 | (149) | 202 | | 0.56 | |
| Gain on sale of CareFusion stock | - | | (45) | - | (45) | | (0.12) | |
| **Non-GAAP** | $ 1,394 | (3)% | $ 1,296 | $ 486 | $ 810 | (2)% | $ 2.24 | (2)% |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

We present non-GAAP operating earnings and non-GAAP diluted earnings per share from continuing operations (and presentations derived from these financial measures, including per share calculations) on a forward-looking basis. The most directly comparable forward-looking GAAP measures are operating earnings and diluted earnings per share from continuing operations. We are unable to provide a quantitative reconciliation of these forward-looking non-GAAP measures to the most directly comparable forward-looking GAAP measures because we cannot reliably forecast restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and LIFO charges/(credits), which are difficult to predict and estimate and are primarily dependent on future events. Please note that the unavailable reconciling items could significantly impact our future financial results.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This presentation contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP"). In general, the measures exclude items and charges that (i) management does not believe reflect Cardinal Health, Inc.'s (the "Company") core business and relate more to strategic, multi-year corporate activities; or (ii) relate to activities or actions that may have occurred over multiple or in prior periods without predictable trends. Management uses these non-GAAP financial measures internally to evaluate the Company's performance, evaluate the balance sheet, engage in financial and operational planning and determine incentive compensation.

In fiscal 2015, the Company began excluding last-in, first-out ("LIFO") inventory charges/(credits)[5] from its non-GAAP earnings, for consistency with the presentation by some of its peers. The Company did not record any LIFO charges or credits in the first, second, or third quarters of fiscal 2015 or 2014, respectively. In the second quarter of fiscal 2015, the Company excluded the loss on extinguishment of debt[7] related to the early redemption of debt that occurred in December 2014 from its non-GAAP earnings.

Management provides these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on its financial and operating results and in comparing the Company's performance to that of its competitors. However, the non-GAAP financial measures used by the Company may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies.

The non-GAAP financial measures disclosed by the Company should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth above should be carefully evaluated.

**Definitions**

**Non-GAAP Earnings from Continuing Operations:** earnings from continuing operations excluding (1) restructuring and employee severance[1], (2) amortization and other acquisition-related costs[2], (3) impairments and (gain)/loss on disposal of assets[3], (4) litigation (recoveries)/charges, net[4], (5) LIFO charges/(credits), (6) Other Spin-Off costs[6], (7) Gain on sale of CareFusion stock and (8) loss on extinguishment of debt, each net of tax.

**Non-GAAP Diluted EPS from Continuing Operations and growth rate calculation[8]:** non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

[1] Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel) and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[2] Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs and changes in the fair value of contingent consideration obligations.

[3] Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[4] Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[5] The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market. These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[6] Costs incurred in connection with our Spin-Off of CareFusion which are included in distribution, selling, general and administrative expenses.

[7] Charges related to the make-whole premium on the redemption of notes.

[8] Except for compound annual growth rates (CAGR), growth rates in this presentation are determined by dividing the difference between current period results and prior period results by prior period results. CAGR is determined by subtracting one from ((the ending value divided by the beginning value) raised to the power of (one divided by the number of years)).

# EXHIBIT 19

SEC Form 4

**FORM 4**

| | |
|---|---|
| ☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b). | |

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Barrett George S | CARDINAL HEALTH INC [ CAH ] | X  Director                                    10% Owner |
| (Last)          (First)          (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)  08/04/2015 | X  Officer (give title below)        Other (specify below) |
| 7000 CARDINAL PLACE | | Chairman and CEO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| DUBLIN          OH          43017 | | X  Form filed by One Reporting Person |
| (City)          (State)          (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/04/2015 | | A(1) | | 85,861 | A | $0 | 434,555 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Reflects performance share units that will settle on August 15, 2015.

**Remarks:**

|  |  |
|---|---|
| /s/ Elaine S. Natsis, Attorney-in-fact | 08/06/2015 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 20

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden hours per response: | 0.5 |

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|
| Casey Donald M Jr. | CARDINAL HEALTH INC [ CAH ] | Director | 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 08/04/2015 | X Officer (give title below) | Other (specify below) |
| 7000 CARDINAL PLACE | | CEO, Medical Segment | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | |
| DUBLIN  OH  43017 | | X Form filed by One Reporting Person | |
| (City) (State) (Zip) | | Form filed by More than One Reporting Person | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/04/2015 | | A[(1)] | | 23,387 | A | $0 | 110,307 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Reflects performance share units that will settle on August 15, 2015.

**Remarks:**

| /s/ Elaine S. Natsis, Attorney-in-fact | 08/06/2015 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 21

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 30, 2015

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

**CardinalHealth**
*Essential to care™*

# Cardinal Health, Inc.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**

*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| *Title of class* | *Name of each exchange on which registered* |
|---|---|
| **Common shares (without par value)** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑          Accelerated filer ☐

Non-accelerated filer ☐   (Do not check if a smaller reporting company)     Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of voting stock held by non-affiliates or registrant on December 31, 2014, was the following: $26,604,792,216.

The number of the registrant's common shares, without par value, outstanding as of July 31, 2015, was the following: 327,359,492.

**Documents Incorporated by Reference:**

Portions of the registrant's Definitive Proxy Statement to be filed for its 2015 Annual Meeting of Shareholders are incorporated by reference into the sections of this Form 10-K addressing the requirements of Part III of Form 10-K.

# Cardinal Health

**Fiscal 2015 Form 10-K**

## Table of Contents

| | Page |
|---|---|
| Key Highlights | 3 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 8 |
| Supplemental Information | 23 |
| Selected Financial Data | 25 |
| Quantitative and Qualitative Disclosures About Market Risk | 26 |
| Business | 28 |
| Risk Factors | 34 |
| Properties | 37 |
| Legal Proceedings | 37 |
| Market for Registrant's Common Equity | 38 |
| Reports | 40 |
| Financial Statements and Supplementary Data | 43 |
| Directors, Executive Officers, and Corporate Governance | 72 |
| Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 73 |
| Exhibits | 74 |
| Form 10-K Cross Reference Index | 78 |
| Signatures | 79 |
| Additional Information | 80 |

# Introduction

This Key Highlights section provides a brief overview of Cardinal Health, Inc. and does not contain all of the information you should consider. Please read the entire Form 10-K carefully before voting or making an investment decision. As used in this report, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise.

**References to Fiscal Years**
Our fiscal year ends on June 30.  References to fiscal 2015, 2014 and 2013 are to the fiscal years ended June 30, 2015, 2014 and 2013, respectively.  Except as otherwise specified, information in this Form 10-K is provided as of June 30, 2015.

**Non-GAAP Financial Measures**
In the accompanying financial analysis of information, we sometimes use information derived from consolidated financial data but not presented in our financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP").  Certain of these data are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules.  The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Supplemental Information" section following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in this Form 10-K.

**Important Information Regarding Forward-Looking Statements**
This Form 10-K (including information incorporated by reference) includes forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in MD&A, but there are others throughout this document, which may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. The most significant of these risks and uncertainties are described in "Risk Factors" and in Exhibit 99.1 to this Form 10-K. Forward-looking statements in this document speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

Case: 2:19-cv-03347-EAS-EPD Doc #: 29 Filed: 11/06/20 Page: 329 of 428  PAGEID #: 818



# Healthcare is everywhere.
## So is Cardinal Health.

Cardinal Health helps customers to reduce costs, increase efficiency, and improve quality, outcomes and access. From hospitals to home and everywhere in between, we serve the entire continuum of care with **logistics, business, product and patient solutions**.

# Financial summary

| | GAAP Basis ($M) | | | | | Non-GAAP[1] Basis ($M) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **FY15** | FY14 | FY13 | FY12 | FY11 | **FY15** | FY14 | FY13 | FY12 | FY11 |
| **Revenue** | **$102,531** | $91,084 | $101,093 | $107,552 | $102,644 | | | | | |
| % change | 13% | (10)% | (6)% | 5% | 4% | | | | | |
| **Operating earnings** | **$2,161** | $1,885 | $996 | $1,792 | $1,514 | **$2,472** | $2,133 | $2,046 | $1,866 | $1,644 |
| % change | 15% | 89% | (44)% | 18% | 16% | 16% | 4% | 10% | 13% | 18% |
| Ratio to revenue (operating margin) | 2.11% | 2.07% | 0.99% | 1.67% | 1.48% | 2.41% | 2.34% | 2.02% | 1.73% | 1.60% |
| **Earnings from continuing operations** | **$1,212** | $1,163 | $335 | $1,070 | $966 | **$1,469** | $1,324 | $1,284 | $1,119 | $988 |
| % change | 4% | 247% | (69)% | 11% | 65% | 11% | 3% | 15% | 13% | 22% |
| **Diluted EPS[2]** | **$3.61** | $3.37 | $0.97 | $3.06 | $2.74 | **$4.38** | $3.84 | $3.73 | $3.21 | $2.80 |
| % change | 7% | 247% | (68)% | 12% | 69% | 14% | 3% | 16% | 15% | 25% |

# Sustained strong financial performance for five years

The growth presented below reflects fiscal 2011 compared to fiscal 2015.



**Diluted EPS from continuing operations growth**

Non-GAAP[1] 11.8% CAGR

GAAP 7.1% CAGR

**Total shareholder return[3]**

176.1%

**Operating earnings growth**

Non-GAAP[1] 10.7% CAGR

GAAP 9.3% CAGR

**Dividend per share increase**

15.1% CAGR

[1] Non-GAAP financial measures. See "Supplemental Information" section following the MD&A for definitions and reconciling information.

[2] Diluted earnings per share from continuing operations ("Diluted EPS").

[3] Total shareholder return is the total return of our shares expressed as a percentage (calculated based on changes in stock price over the measurement period and assuming reinvestment of dividends).

# Capital deployment for five years

Fiscal 2011 through fiscal 2015



**$7.0B**
cumulatively invested in our businesses*

Acquisitions, net of divestitures $5.7B

Dividends $1.8B

Share repurchases $2.9B

Capital expenditures $1.3B

**$4.7B**
cumulatively returned to shareholders

# Corporate Social Responsibility and Governance

We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen and with a belief that doing "the right thing" serves everyone.



**$19.3M**
corporate and Cardinal Health Foundation charitable and product donations worldwide in FY15



**9 years**
included on the Dow Jones Sustainability Index



**Over ⅓**
of our board members are diverse

*Includes only acquisitions closed as of June 30, 2015 (does not include Harvard Drug or Cordis acquisitions discussed in the MD&A).

# Board of directors

**David J. Anderson** (A)
Retired Senior Vice President and
Chief Financial Officer, Honeywell International Inc.

**Colleen F. Arnold** (N)
Senior Vice President, Sales and Distribution,
International Business Machines Corp.

**George S. Barrett** (E)
Chairman and Chief Executive Officer,
Cardinal Health, Inc.

**Carrie S. Cox** (H)
Chairman and Chief Executive Officer,
Humacyte, Inc.
Former Executive Vice President and President,
Global Pharmaceuticals, Schering-Plough Corp.

**Calvin Darden** (H)
Retired Senior Vice President, U.S. Operations,
United Parcel Service, Inc.

**Bruce L. Downey** (A)
Partner, New Spring Health Capital II, LP
Retired Chairman and Chief Executive Officer,
Barr Pharmaceuticals, Inc.

**Patricia A. Hemingway Hall** (A,N)
President and Chief Executive Officer,
Health Care Service Corp.

**Clayton M. Jones** (E,A)
Retired Chairman, President and Chief Executive Officer,
Rockwell Collins, Inc.

**Gregory B. Kenny** (E,I,N)
Retired President and Chief Executive Officer,
General Cable Corp.

**David P. King** (E,H)
Chairman, President and Chief Executive Officer,
Laboratory Corp. of America Holdings

**Richard C. Notebaert\*** (E,H,N)
Retired Chairman and Chief Executive Officer,
Qwest Communications International Inc.

A: Audit Committee member
E: Executive Committee member
H: Human Resources and Compensation Committee member
N: Nominating and Governance Committee member
I: Independent Lead Director
\*Mr. Notebaert has decided not to stand for re-election when
his term expires at the 2015 Annual Meeting of Shareholders.

# Executive team

**George S. Barrett**
Chairman and Chief Executive Officer

**Donald M. Casey Jr.**
Chief Executive Officer, Medical Segment

**Stephen T. Falk**
Executive Vice President,
General Counsel and Corporate Secretary

**Meghan M. FitzGerald**
Executive Vice President,
Strategy and Health Policy

**Jon L. Giacomin**
Chief Executive Officer, Pharmaceutical Segment

**Michael C. Kaufmann**
Chief Financial Officer

**Craig S. Morford**
Chief Legal and Compliance Officer

**Patricia B. Morrison**
Executive Vice President,
Customer Support Services
and Chief Information Officer

**Carole S. Watkins**
Chief Human Resources Officer

# Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A)

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979. As used in this report, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. We are a healthcare services and products company that improves the cost-effectiveness of health care. We help pharmacies, hospitals, and other healthcare providers focus on patient care while reducing costs, enhancing efficiency and improving quality. We also provide medical products to patients in the home.

We manage our business and report our financial results in two segments: Pharmaceutical and Medical.



## Pharmaceutical Segment

Our Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical, over-the-counter healthcare and consumer products in the United States. This segment also operates nuclear pharmacies and cyclotron facilities, provides pharmacy operations, medication therapy management and patient outcomes services to hospitals and other healthcare providers, provides services to healthcare companies supporting the marketing, distribution and payment for specialty pharmaceutical products and manufacturers and repackages generic pharmaceuticals and over-the-counter healthcare products. This segment also imports and distributes pharmaceuticals, over-the-counter healthcare and consumer products as well as provides specialty pharmacy and other services in China.

## Medical Segment

Our Medical segment distributes a broad range of medical, surgical and laboratory products and provides services to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China and to patients in the home in the United States. This segment also manufactures, sources and develops our own Cardinal Health brand medical and surgical products, which are sold in the United States, Canada, Europe and other regions internationally.

## Non-GAAP Financial Measures

We use "non-GAAP financial measures" in the "Fiscal 2015 Overview" section and include the reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures in the "Supplemental Information" section following MD&A. The remaining sections of MD&A refer to GAAP measures only.

# Consolidated Results



# Fiscal 2015 Overview

## Revenue

Revenue for fiscal 2015 was $102.5 billion, a 13 percent increase from the prior-year period due primarily to sales growth from existing and new pharmaceutical distribution customers. Revenue growth was negatively impacted in fiscal 2015 due to the previously disclosed expiration of our pharmaceutical distribution contract with Walgreen Co. ("Walgreens") on August 31, 2013.

## GAAP and Non-GAAP Operating Earnings

| (in millions) | 2015 | 2014 | Change |
|---|---|---|---|
| **GAAP** | **$2,161** | $1,885 | **15%** |
| Restructuring and employee severance | **44** | 31 | |
| Amortization and other acquisition-related costs | **281** | 223 | |
| Impairments and (gain)/loss on disposal of assets | **(19)** | 15 | |
| Litigation (recoveries)/charges, net | **5** | (21) | |
| **Non-GAAP** | **$2,472** | $2,133 | **16%** |

GAAP operating earnings increased 15 percent to $2.2 billion compared to the prior year, reflecting sales growth from existing and new customers and strong performance from our Pharmaceutical segment generics program, offset in part by customer pricing changes and the Walgreens contract expiration in the prior-year period. Non-GAAP operating earnings increased 16 percent to $2.5 billion during fiscal 2015 also due to the factors impacting GAAP operating earnings.

## GAAP and Non-GAAP Diluted EPS

| | 2015 | 2014 | Change |
|---|---|---|---|
| **GAAP** | **$ 3.61** | $ 3.37 | **7%** |
| Restructuring and employee severance | **0.09** | 0.06 | |
| Amortization and other acquisition-related costs | **0.54** | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | **(0.03)** | 0.03 | |
| Litigation (recoveries)/charges, net | **0.06** | (0.04) | |
| Loss on extinguishment of debt | **0.11** | — | |
| **Non-GAAP** | **$ 4.38** | $ 3.84 | **14%** |

GAAP diluted EPS increased $0.24 or 7 percent to $3.61 during fiscal 2015 and non-GAAP diluted EPS increased $0.54 or 14 percent to $4.38 during fiscal 2015. GAAP and non-GAAP diluted EPS increased primarily due to the factors impacting GAAP and non-GAAP operating earnings as well as a lower share count driven by share repurchases and partially offset by an increase in income taxes. GAAP diluted EPS was also impacted by a $37 million after-tax loss on extinguishment of debt in the current year.

## Cash and Equivalents

Our cash and equivalents balance was $4.6 billion and $2.9 billion at June 30, 2015 and 2014, respectively. In June 2015, we issued $1.5 billion of additional debt to fund a portion of the acquisitions of The Harvard Drug Group ("Harvard Drug"), which closed on July 2, 2015, and the Cordis business of Johnson & Johnson, which is expected to close during the second quarter of fiscal 2016. These acquisitions are both discussed in more detail in "Significant Developments in Fiscal 2015 and Trends" that follows this section. During fiscal 2015, net cash provided by operating activities of $2.5 billion was deployed for share repurchases of $1.0 billion, acquisitions of $503 million and cash dividends of $460 million. In addition, during the second quarter of fiscal 2015, we refinanced $1.2 billion of long-term debt at lower interest rates and longer maturities.

# Significant Developments in Fiscal 2015 and Trends

## Acquisitions

**Harvard Drug**

On July 2, 2015 we completed the acquisition of Harvard Drug for $1.1 billion, net of cash acquired, using existing cash and proceeds from the debt offering in June 2015. The acquisition of Harvard Drug, a distributor of generic pharmaceuticals, over-the-counter healthcare and related products to retail, institutional and alternate care customers, is expected to enhance our Pharmaceutical segment's generic pharmaceutical distribution and services businesses. Harvard Drug also manufactures and repackages generic pharmaceuticals and over-the-counter healthcare products.

**Cordis**

On March 1, 2015, we entered into a binding offer letter with Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, to purchase its Cordis business for a purchase price of $1.9 billion in cash, subject to certain adjustments. On May 27, 2015, Ethicon accepted the offer. The acquisition of Cordis, a manufacturer and distributor of interventional cardiology devices and endovascular solutions, is expected to expand our Medical segment's portfolio of self-manufactured products and its geographic scope. Cordis is a global company, with operations in more than 50 countries. The acquisition is expected to close in approximately 20 principal countries during the second quarter of fiscal 2016 and in the remaining countries afterward, subject to regulatory approval and customary closing conditions. We expect this acquisition to significantly reduce GAAP operating earnings and earnings before income taxes and discontinued operations in fiscal 2016, largely due to the expected impact of amortization and other acquisition-related costs.

## Generic Sourcing Venture with CVS Health

In July 2014, we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS Health Corporation ("CVS Health") with an initial term of 10 years. Both companies have contributed sourcing and supply chain expertise to the 50/50 venture and have committed to source generic pharmaceuticals through arrangements negotiated by the venture. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. We are required to pay 39 quarterly payments of $25.6 million to CVS Health which commenced in October 2014. Due to the achievement of a milestone, the quarterly payment to CVS Health will increase by $10 million beginning in fiscal 2016. In addition, if an additional milestone is achieved, the quarterly payment will increase in fiscal 2017 by a further $10 million resulting in a maximum quarterly payment of $45.6 million if all milestones are met.

## Trends

Within our Pharmaceutical segment, pharmaceutical price appreciation on brand products and some generic products positively impacted our earnings during fiscal 2015, but, as is generally the case, the frequency and magnitude of future brand and generic product price appreciation is uncertain and the impact on earnings may be less in fiscal 2016 than in fiscal 2015.

Additionally within our Pharmaceutical segment, as is generally the case, the impact and timing of future generic pharmaceutical product launches is uncertain and the impact on earnings may be less in fiscal 2016 than in fiscal 2015. See the Pharmaceutical Segment discussion within the "Business" section for additional information regarding pharmaceutical price appreciation and generic pharmaceutical product launches.

# Results of Operations

## Revenue





|                       |          | Revenue |         | Change |       |
|-----------------------|----------|---------|---------|--------|-------|
| (in millions)         | **2015** | 2014    | 2013    | **2015** | 2014 |
| Pharmaceutical        | **$91,116** | $80,110 | $91,097 | **14%** | (12)% |
| Medical               | **11,395** | 10,962 | 10,060 | **4%** | 9 % |
| Total segment revenue | **102,511** | 91,072 | 101,157 | **13%** | (10)% |
| Corporate             | **20** | 12 | (64) | **N.M.** | N.M. |
| **Total revenue**     | **$102,531** | $91,084 | $101,093 | **13%** | (10)% |

### Fiscal 2015 Compared to Fiscal 2014

**Pharmaceutical Segment**

Revenue growth for fiscal 2015 compared to fiscal 2014 was primarily due to sales growth from existing and new pharmaceutical distribution customers, which increased revenue by $13.7 billion during fiscal 2015. The growth was primarily driven by increased sales to existing customers, including continued branded pharmaceutical price inflation and newly launched hepatitis C pharmaceutical products. The increase was partially offset by the Walgreens contract expiration in the prior-year period ($3.3 billion).

**Medical Segment**

Revenue growth for fiscal 2015 compared to fiscal 2014 was primarily due to acquisitions ($344 million).

### Fiscal 2014 Compared to Fiscal 2013

**Pharmaceutical Segment**

Revenue for fiscal 2014 compared to fiscal 2013 was negatively impacted by the Walgreens contract expiration ($16.9 billion) and by the expiration of our pharmaceutical distribution contract with Express Scripts, Inc. ("Express Scripts") on September 30, 2012 ($2.0 billion). This decrease was partially offset by sales growth from existing pharmaceutical distribution customers ($7.1 billion).

**Medical Segment**

Revenue growth for fiscal 2014 compared to fiscal 2013 was primarily due to acquisitions ($816 million).

# Cost of Products Sold

As a result of the same factors affecting the change in revenue, consolidated cost of products sold increased $10.9 billion (13 percent) and decreased $10.2 billion (11 percent) during fiscal 2015 and 2014, respectively. See the gross margin discussion for additional drivers impacting cost of products sold.

# Gross Margin

**Gross Margin
(in billions)**



**Gross Margin as a Percent
of Revenue**



| (in millions) | Consolidated Gross Margin | | | Change | |
| --- | --- | --- | --- | --- | --- |
|  | **2015** | 2014 | 2013 | **2015** | 2014 |
| Gross margin | **$ 5,712** | $ 5,161 | $ 4,921 | **11%** | 5% |

### Fiscal 2015 Compared to Fiscal 2014

Consolidated gross margin increased during fiscal 2015 compared to fiscal 2014 by $551 million.

Consolidated gross margin growth during fiscal 2015 was positively impacted by sales growth from existing and new pharmaceutical distribution customers and was negatively impacted by the Walgreens contract expiration in the prior-year period. The net impact of these factors increased consolidated gross margin for fiscal 2015 by $516 million. In addition, acquisitions positively impacted gross margin by $101 million.

Consolidated gross margin rate contracted slightly during fiscal 2015, reflecting the adverse impact of customer pricing changes, the lower margin rate impact of newly launched hepatitis C pharmaceutical products, and new customer mix, largely offset by strong performance from our generics program, including benefits from Red Oak Sourcing.

### Fiscal 2014 Compared to Fiscal 2013

Consolidated gross margin increased during fiscal 2014 compared to fiscal 2013 by $240 million.

Gross margin for fiscal 2014 was positively impacted by $32 million due to sales growth, which primarily reflects growth from existing customers, and was largely offset by the impact of the Walgreens contract expiration. In addition, acquisitions positively impacted gross margin by $221 million.

Gross margin rate, apart from the impact of the Walgreens contract expiration, was flat for fiscal 2014. Gross margin rate was positively impacted by strong performance from our generics program, including the impact of generic pharmaceutical price appreciation, and was adversely impacted by customer pricing changes.

# Distribution, Selling, General and Administrative ("SG&A") Expenses

| (in millions) | SG&A Expenses | | | Change | |
| --- | --- | --- | --- | --- | --- |
|  | **2015** | 2014 | 2013 | **2015** | 2014 |
| SG&A expenses | **$ 3,240** | $ 3,028 | $ 2,875 | **7%** | 5% |

### Fiscal 2015 Compared to Fiscal 2014

The increase in SG&A expenses during fiscal 2015 over 2014 was primarily due to acquisitions ($97 million) and an overall increase in volume of sales to existing and new customers.

### Fiscal 2014 Compared to Fiscal 2013

SG&A expenses increased during fiscal 2014 over 2013 primarily due to acquisitions ($129 million).

# Segment Profit

We evaluate segment performance based upon segment profit, among other measures. See Note 15 of the "Notes to Consolidated Financial Statements" for additional information on segment profit.



**Pharmaceutical Segment Profit (in billions)**
FY13 $1.7  FY14 $1.7  FY15 $2.1

**Medical Segment Profit (in billions)**
FY13 $0.37  FY14 $0.44  FY15 $0.43

**Consolidated Operating Earnings (GAAP) (in billions)**
FY13 $1.0  FY14 $1.9  FY15 $2.2

| | Segment Profit and Operating Earnings | | | Change | |
|---|---|---|---|---|---|
| (in millions) | 2015 | 2014 | 2013 | 2015 | 2014 |
| Pharmaceutical | $ 2,094 | $ 1,745 | $ 1,734 | 20 % | 1% |
| Medical | 433 | 444 | 372 | (3)% | 19% |
| Total segment profit | 2,527 | 2,189 | 2,106 | 15 % | 4% |
| Corporate | (366) | (304) | (1,110) | N.M. | N.M. |
| Total consolidated operating earnings | $ 2,161 | $ 1,885 | $ 996 | 15 % | 89% |

## Fiscal 2015 Compared to Fiscal 2014

### Pharmaceutical Segment Profit

The increase in Pharmaceutical segment profit in fiscal 2015 over 2014 reflected sales growth from existing and new pharmaceutical distribution customers and strong performance from our generics program, including benefits from Red Oak Sourcing, partially offset by the adverse impact of customer pricing changes and the Walgreens contract expiration in the prior-year period.

### Medical Segment Profit

The decrease in Medical segment profit in fiscal 2015 compared to fiscal 2014 was primarily due to a decline in contribution from distribution of national brand products. This was partially offset by contributions from the strategic expansion of our portfolio of Cardinal Health brand products and services, driven by acquisitions and targeted cost reductions.

### Corporate

As discussed further in sections that follow, the principal driver for the change in Corporate in fiscal 2015 compared to fiscal 2014 was amortization and other acquisition-related costs primarily due to costs incurred in connection with the pending acquisition of Cordis.

## Fiscal 2014 Compared to Fiscal 2013

### Pharmaceutical Segment Profit

The increase in fiscal 2014 over fiscal 2013 reflected the positive impact of sales growth, which primarily reflects growth from existing customers, and was largely offset by the impact of the Walgreens contract expiration. The impact of gross margin rate, apart from the impact of the Walgreens contract expiration, was flat for fiscal 2014. Gross margin rate was positively impacted by strong performance from our generics program, including the impact of generic pharmaceutical price appreciation, and was adversely impacted by customer pricing changes.

### Medical Segment Profit

The principal driver for the increase in fiscal 2014 over fiscal 2013 was the positive impact of acquisitions.

### Corporate

As discussed further in sections that follow, the principal driver for the change in Corporate in fiscal 2014 compared to fiscal 2013 was an $829 million non-cash goodwill impairment charge recognized in fiscal 2013 related to our Nuclear Pharmacy Services division.

# Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Restructuring and employee severance | $ 44 | $ 31 | $ 71 |
| Amortization and other acquisition-related costs | 281 | 223 | 158 |
| Impairments and (gain)/loss on disposal of assets, net | (19) | 15 | 859 |
| Litigation (recoveries)/charges, net | 5 | (21) | (38) |

**Restructuring and Employee Severance**

The majority of restructuring and employee severance incurred during fiscal 2015, 2014 and 2013 were related to activities within our Medical segment.

**Amortization and Other Acquisition-Related Costs**

Amortization of acquisition-related intangible assets was $189 million, $187 million and $118 million for fiscal 2015, 2014 and 2013, respectively. During 2015, amortization and other acquisition-related costs included $44 million of transaction and integration costs associated with the pending acquisition of Cordis. We anticipate a significant increase in amortization of acquisition-related intangible assets in fiscal 2016 as a result of the Harvard Drug and Cordis acquisitions and in other acquisition-related costs due to the size and complexity of the Cordis integration.

**Impairments and (Gain)/Loss on Disposal of Assets**

During fiscal 2013, we recognized an $829 million ($799 million, net of tax) goodwill impairment charge related to our Nuclear Pharmacy Services division, as discussed further in Note 4 of the "Notes to Consolidated Financial Statements".

**Litigation (Recoveries)/Charges, Net**

During fiscal 2015, we incurred litigation charges of $41 million related to the DEA investigation and related matters and $27 million related to the FTC investigation and we recognized litigation recoveries of $71 million, primarily consisting of settlements of class action antitrust claims in which we were a class member. These matters are discussed further in Note 9 of the "Notes to Consolidated Financial Statements." We recognized litigation recoveries resulting from settlements of class action antitrust claims of $24 million and $38 million during 2014 and 2013, respectively.

# Earnings Before Income Taxes and Discontinued Operations

In addition to the items discussed above, earnings before income taxes and discontinued operations were impacted by the following:

| (in millions) | Earnings Before Income Taxes and Discontinued Operations | | | Change | |
|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2015 | 2014 |
| Other income, net | $ (7) | $ (46) | $ (15) | N.M. | N.M. |
| Interest expense, net | 141 | 133 | 123 | 6% | 8% |
| Loss on extinguishment of debt | 60 | — | — | N.M. | N.M |

**Other Income, Net**

Other income, net for fiscal 2014 included a $32 million pre-tax gain related to the sale of our minority interest in two investments.

**Interest Expense, Net**

We expect interest expense to increase in fiscal 2016 as a result of the additional $1.5 billion of debt issued to fund the Harvard Drug acquisition and pending Cordis acquisition.

**Loss on Extinguishment of Debt**

In December 2014, we redeemed certain debt resulting in a loss on the extinguishment of debt of $60 million ($37 million, net of tax). See Note 7 of "Notes to Consolidated Financial Statements" for additional information.

# Provision for Income Taxes

The provision for income taxes increased $120 million in fiscal 2015 over fiscal 2014 due to an increase in earnings before income taxes and discontinued operations and an increase in our effective tax rate of 3.1 percentage points.

Generally, fluctuations in the effective tax rate are due to changes within international and U.S. state effective tax rates resulting from our business mix and discrete items. A reconciliation of the provision based on the federal statutory income tax rate to our effective income tax rate from continuing operations is as follows (see Note 8 of the "Notes to Consolidated Financial Statements" for a detailed disclosure of the effective tax rate reconciliation):

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Provision at Federal statutory rate | 35.0% | 35.0% | 35.0% |
| State and local income taxes, net of federal benefit | 4.1 | 2.2 | 2.5 |
| Foreign tax rate differential | (2.4) | (1.2) | (4.0) |
| Nondeductible/nontaxable items | 0.7 | (0.2) | (0.5) |
| Nondeductible goodwill impairment | — | — | 33.2 |
| Change in measurement of uncertain tax positions and impact of IRS settlements | 0.9 | (0.4) | (5.7) |
| Other | 0.1 | (0.1) | 1.8 |
| **Effective income tax rate** | **38.4%** | 35.3% | 62.3% |

## Fiscal 2015

The fiscal 2015 effective income tax rate was impacted by the state and local income tax rate, which increased 1.9 percentage points due to the de-recognition of certain state tax benefits. The foreign tax rate differential also increased 1.2 percentage points primarily due to recognition of deferred tax benefits resulting from new tax legislation. In addition, the change in measurement of uncertain tax positions increased 1.3 percentage points primarily as a result of proposed assessment of additional tax.

**Ongoing Audits**
The IRS is currently conducting audits of fiscal years 2006 through 2010.

## Fiscal 2014

The fiscal 2014 effective tax rate was impacted by net favorable discrete items of $37 million, which reduced the rate by 2.1 percentage points. The discrete items include the favorable impact of the settlement of federal and state tax controversies ($80 million) and release of valuation allowances ($12 million) and the unfavorable impact of remeasurement of unrecognized tax benefits ($65 million), primarily as a result of proposed assessments of additional tax.

## Fiscal 2013

The fiscal 2013 effective tax rate was unfavorably impacted by 33.2 percentage points ($295 million) due to the nondeductibility of substantially all of the goodwill impairment related to our Nuclear Pharmacy Services division, which was partially offset by the favorable impact of the revaluation of our deferred tax liability and related interest on unrepatriated foreign earnings as a result of an agreement with tax authorities ($64 million or 7.2 percentage points).

# Liquidity and Capital Resources

We currently believe that, based upon available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures, currently anticipated business growth and expansion (including the pending acquisition of Cordis); contractual obligations; tax payments; and current and projected debt service requirements, dividends and share repurchases. If we decide to engage in one or more additional acquisitions, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $4.6 billion at June 30, 2015 and $2.9 billion at June 30, 2014. We acquired Harvard Drug on July 2, 2015 for $1.1 billion, net of cash acquired, and expect to acquire Cordis during the second quarter of fiscal 2016 for $1.9 billion. At June 30, 2015, our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

During fiscal 2015, net cash provided by operating activities of $2.5 billion was positively impacted by working capital improvements. These funds were deployed for $1.0 billion of share repurchases, $503 million of acquisitions and $460 million of cash dividends. In addition, during the second quarter of fiscal 2015, we refinanced $1.2 billion of long-term debt at lower interest rates and longer maturities and during the fourth quarter of fiscal 2015, we received proceeds from the issuance of additional long-term debt of $1.5 billion to fund the Harvard Drug and Cordis acquisitions.

The cash and equivalents balance at June 30, 2015 included $423 million of cash held by subsidiaries outside of the United States. Although the vast majority of this cash is available for repatriation, permanently bringing the money into the United States could trigger U.S. federal, state and local income tax obligations. As a U.S. parent company, we may temporarily access cash held by our foreign subsidiaries without becoming subject to U.S. federal income tax through intercompany loans.

During fiscal 2014 we deployed $673 million of cash on share repurchases, $519 million on acquisitions and $415 million on dividends. Net cash provided by operating activities of $2.5 billion benefited from a net working capital decrease in excess of $500 million as a result of the Walgreens contract expiration.

During fiscal 2013, we deployed $2.2 billion of cash on acquisitions, $450 million on share repurchases and $353 million on dividends. During fiscal 2013, we received net proceeds from the issuance of long-term debt of $981 million, which were used for the acquisition of AssuraMed, Inc. Net cash provided by operating activities was $1.7 billion.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Financial Instruments and Other Financing Arrangements

### Credit Facilities and Commercial Paper

On November 3, 2014, we renewed our committed receivables sales facility program through Cardinal Health Funding, LLC until November 3, 2017 and increased the size of the facility from $700 million to $950 million with the inclusion of certain receivables from the Medical segment. Other sources of liquidity include a $1.5 billion revolving credit facility and a commercial paper program of up to $1.5 billion, backed by the revolving credit facility. At both June 30, 2015 and 2014, we had no outstanding balances or borrowings under these facilities, except for standby letters of credit of $41 million under the committed receivables sales facility program.

Our revolving credit facility and committed receivables sales facility program require us to maintain, as of any fiscal quarter end, a consolidated interest coverage ratio of at least 4-to-1 and a consolidated leverage ratio of no more than 3.25-to-1. As of June 30, 2015, we were in compliance with these financial covenants.

### Available-for-Sale Securities

At June 30, 2015 and 2014, we held $193 million and $100 million, respectively, of marketable securities, which are classified as available-for-sale.

### Long-Term Obligations

In June 2015, we sold $550 million aggregate principal amount of 1.95% Notes that mature on June 15, 2018, $500 million aggregate principal amount of 3.75% Notes that mature on September 15, 2025 and $450 million aggregate principal amount of 4.9% Notes that mature on September 15, 2045. We used a portion of the proceeds from this offering to acquire Harvard Drug on July 2, 2015 and plan to use the remainder to acquire Cordis during the second quarter of fiscal 2016.

In November 2014, we sold $450 million aggregate principal amount of 2.4% Notes that mature on November 15, 2019, $400 million aggregate principal amount of 3.5% Notes that mature on November 15, 2024, and $350 million aggregate principal amount of 4.5% Notes that mature on November 15, 2044.

In December 2014, we used the net proceeds from the November offering, together with cash on hand, to redeem all of our outstanding 4.0% Notes due 2015, 5.8% Notes due 2016, 5.85% Notes due 2017 and 6.0% Notes due 2017 at a redemption price equal to 100% of the principal amount and accrued but unpaid interest, plus the make-whole premium applicable to each series of notes. As a result of this redemption, during the second quarter of fiscal 2015, we incurred a loss on the extinguishment of debt of $60 million ($37 million, net of tax).

## Risk Management

We use interest rate swaps, foreign currency contracts and commodity contracts to manage our exposure to cash flow variability. We also use interest rate swaps to protect the value of our debt and use foreign currency forward contracts to protect the value of our existing and forecasted foreign currency assets and liabilities. See the "Quantitative and Qualitative Disclosures About Market Risk" section as well as Notes 1 and 12 of the "Notes to Consolidated Financial Statements" for information regarding the use of financial instruments and derivatives as well as foreign currency, interest rate and commodity exposures.

# Capital Deployment

### Capital Expenditures

Capital expenditures during fiscal 2015, 2014 and 2013 were $300 million, $249 million and $195 million, respectively.

We expect capital expenditures in fiscal 2016 to be between $510 million and $540 million primarily for growth projects in our core businesses, information technology projects and integration of the Cordis acquisition.

### Dividends

During fiscal 2015, we paid quarterly dividends totaling $1.37 per share, an increase of 13 percent from fiscal 2014. On May 6, 2015 our Board of Directors approved a 13 percent increase in our quarterly dividend to $0.3870 per share, or $1.55 per share on an annualized basis, which was paid on July 15, 2015 to shareholders of record on July 1, 2015.

On August 5, 2015, our Board of Directors approved a quarterly dividend of $0.3870 per share, or $1.55 per share on an annualized basis, payable on October 15, 2015 to shareholders of record on October 1, 2015.

### Share Repurchases

During fiscal 2015, we repurchased $1.0 billion of our common shares.

On October 29, 2013, our Board of Directors approved a $1.0 billion share repurchase program and on August 6, 2014, the Board of Directors authorized an additional $1.0 billion under the program, for a total of $2.0 billion. This program expires on December 31, 2016. At June 30, 2015, we had $693 million remaining under this repurchase authorization.

### Acquisitions

In fiscal 2015, we acquired a number of businesses in both the Pharmaceutical and Medical segments for an aggregate of $503 million, and as previously noted, entered into agreements to acquire Harvard Drug and Cordis. We expect these acquired businesses to enhance our core strategic areas of generics, health systems and hospital solutions (including manufactured medical products), specialty pharmaceutical products and services, international and alternate sites of care.

Case: 2:19-cv-03347-EAS-EPD Doc #: 29 Filed: 11/06/20 Page: 344 of 428  PAGEID #: 833

# Contractual Obligations

At June 30, 2015, our contractual obligations, including estimated payments due by period, are as follows:

| (in millions) | 2016 | 2017 to 2018 | 2019 to 2020 | There-after | Total |
|---|---|---|---|---|---|
| Long-term debt and short-term borrowings (1) | $ 280 | $ 1,242 | $ 450 | $ 3,487 | $ 5,459 |
| Interest on long-term debt | 197 | 348 | 294 | 1,591 | 2,430 |
| Capital lease obligations (2) | 1 | 24 | 4 | 4 | 33 |
| Other liabilities (3) | 3 | — | — | — | 3 |
| Operating leases (4) | 103 | 146 | 80 | 77 | 406 |
| Purchase obligations and other payments (5) | 324 | 308 | 248 | 426 | 1,306 |
| Total contractual obligations | $ 908 | $ 2,068 | $ 1,076 | $ 5,585 | $ 9,637 |

(1)   Represents maturities of our long-term debt obligations and other short-term borrowings excluding capital lease obligations described below. See Note 7 of the "Notes to Consolidated Financial Statements" for further information.

(2)   Represents maturities of our capital lease obligations included within long-term debt in our consolidated balance sheets.

(3)   Represents cash outflows by period for certain of our liabilities in which cash outflows could be reasonably estimated. Long-term liabilities, such as unrecognized tax benefits and deferred taxes, have been excluded from the table above because of the inherent uncertainty of the underlying tax positions or because of the inability to reasonably estimate the timing of any cash outflows. See Note 8 of the "Notes to Consolidated Financial Statements" for further discussion of income taxes.

(4)   Represents minimum rental payments and the related estimated future interest payments for operating leases having initial or remaining non-cancelable lease terms as described in Note 9 of the "Notes to Consolidated Financial Statements."

(5)   A purchase obligation is defined as an agreement to purchase goods or services that is legally enforceable and specifies all significant terms, including fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and approximate timing of the transaction. The purchase obligation amounts disclosed above represent estimates of the minimum for which we are obligated and the time period in which cash outflows will occur. Purchase orders and authorizations to purchase that involve no firm commitment from either party are excluded from the above table. In addition, contracts that can be unilaterally canceled with no termination fee or with proper notice are excluded from our total purchase obligations except for the amount of the termination fee or the minimum amount of goods that must be purchased during the requisite notice period. Purchase obligations and other payments also includes 39 quarterly payments of $25.6 million that we are required to pay CVS Health, which commenced in October 2014 in connection with the establishment of Red Oak Sourcing. Purchase obligations and other payments does not include contingent payments under the sourcing venture that were not yet determined as of June 30, 2015, including the quarterly $10 million increase that began in fiscal 2016. See Note 9 of the "Notes to Consolidated Financial Statements" for additional information.

# Off-Balance Sheet Arrangements

We had no significant off-balance sheet arrangements at June 30, 2015.

# Recent Financial Accounting Standards

See Note 1 of the "Notes to Consolidated Financial Statements" for a discussion of recent financial accounting standards.

# Critical Accounting Policies and Sensitive Accounting Estimates

Critical accounting policies are those accounting policies that (i) can have a significant impact on our financial condition and results of operations and (ii) require the use of complex and subjective estimates based upon past experience and management's judgment. Other people applying reasonable judgment to the same facts and circumstances could develop different estimates. Because estimates are inherently uncertain, actual results may differ. In this section, we describe the significant policies applied in preparing our consolidated financial statements that management believes are the most dependent on estimates and assumptions. For a discussion of additional accounting policies, see Note 1 of the "Notes to Consolidated Financial Statements."

## Allowance for Doubtful Accounts

Trade receivables are primarily comprised of amounts owed to us through our distribution businesses and are presented net of an allowance for doubtful accounts of $135 million and $137 million at June 30, 2015 and 2014, respectively. We also provide financing to various customers. Such financing arrangements range from 270 days to 5 years, at interest rates that are generally subject to fluctuation. Interest income on these arrangements is recognized as it is earned. The financings may be collateralized, guaranteed by third parties or unsecured. Finance notes and related accrued interest are reported net of an allowance for doubtful accounts of $14 million and $18 million at June 30, 2015 and 2014, respectively, and are included in other assets (current portion is included in prepaid expenses and other) in the consolidated balance sheets. We must use judgment when deciding whether to extend credit and when estimating the required allowance for doubtful accounts.

The allowance for doubtful accounts includes general and specific reserves. We determine the appropriate allowance by reviewing accounts receivable aging, industry trends, customer financial strength and credit standing, historical write-off trends and payment history. We also regularly evaluate how changes in economic conditions may affect credit risks.

Our methodology for estimating the allowance for doubtful accounts is assessed annually based on historical losses and economic, business and market trends. In addition, the allowance is reviewed quarterly and updated if appropriate. We may adjust the allowance for doubtful accounts if changes in customers' financial condition or general economic conditions make defaults more frequent or severe.

The following table gives information regarding the allowance for doubtful accounts over the past three fiscal years:

| (in millions, except percentages) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Allowance for doubtful accounts | $ 150 | $ 156 | $ 152 |
| Reduction to allowance for customer deductions and write-offs | 70 | 51 | 34 |
| Charged to costs and expenses | 59 | 51 | 41 |
| Allowance as a percentage of customer receivables | 2.2% | 2.8% | 2.3% |
| Allowance as a percentage of revenue | 0.15% | 0.17% | 0.15% |

A hypothetical 0.1 percent increase or decrease in the reserve as a percentage of trade receivables and finance notes receivables at June 30, 2015, would result in an increase or decrease in bad debt expense of $7 million.

We believe the reserve maintained and expenses recorded in fiscal June 30, 2015 are appropriate. At this time, we are not aware of any analytical findings or customer issues that might lead to a significant future increase in the allowance for doubtful accounts as a percentage of revenue.

## Inventories

A substantial portion of our inventories (58 percent and 61 percent at June 30, 2015 and 2014, respectively) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These are primarily merchandise inventories at the core pharmaceutical distribution facilities within our Pharmaceutical segment. The LIFO impact on the consolidated statements of earnings in a given year depends on pharmaceutical price appreciation and the level of inventory. Prices for branded pharmaceuticals generally tend to rise, which results in an increase in cost of products sold, whereas prices for generic pharmaceuticals generally tend to decline, which results in a decrease in cost of products sold.

The LIFO method presumes that the most recent inventory purchases are the first items sold, so LIFO helps us better match current costs and revenue. Using LIFO, if there is a decrease in inventory levels that have experienced pharmaceutical price appreciation, the result generally will be a decrease in future cost of products sold as our older inventory is held at a lower cost. Conversely, if there is a decrease in inventory levels that have experienced a pharmaceutical price decline, the result generally will be an increase in future cost of products sold as our older inventory is held at a higher cost. We believe that the average cost method of inventory valuation reasonably approximates the current cost of replacing inventory within the core pharmaceutical distribution facilities. Accordingly, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation.

The remaining inventory is stated at the lower of cost, using the first-in, first-out method, or market. If we had used the average cost method of inventory valuation for all inventory within the Pharmaceutical distribution facilities, the value of our inventories would not have changed in fiscal 2015 or 2014. Inventories valued at LIFO were $114 million and $98 million higher than the average

cost value at June 30, 2015 and 2014, respectively. We do not record inventories in excess of replacement cost. As such, we did not record any changes in our LIFO reserve in fiscal 2015 and 2014.

Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $57 million and $44 million at June 30, 2015 and 2014, respectively. We reserve for inventory obsolescence using estimates based on historical experience, sales trends, specific categories of inventory and age of on-hand inventory. If actual conditions are less favorable than our assumptions, additional inventory reserves may be required.

# Business Combinations

The assets acquired and liabilities assumed in a business combination, including identifiable intangible assets, are based on their estimated fair values as of the acquisition date. The excess of the purchase price over the estimated fair value of the identifiable net assets acquired is recorded as goodwill. We base the fair values of identifiable intangible assets on detailed valuations that require management to make significant judgments, estimates and assumptions. Critical estimates and assumptions include: expected future cash flows for customer relationships, trademarks, trade names, patents, developed technology and other identifiable intangible assets; discount rates that reflect the risk factors associated with future cash flows; and estimates of useful lives. When

an acquisition involves contingent consideration, we recognize a liability equal to the fair value of the contingent consideration obligation at the acquisition date. The estimate of fair value of a contingent consideration obligation requires subjective assumptions to be made regarding future business results, discount rates and probabilities assigned to various potential business result scenarios. Subsequent revisions to these assumptions could materially change the estimate of the fair value of contingent consideration obligations and therefore could materially affect our financial position or results of operations. See Note 2 of the "Notes to Consolidated Financial Statements" for additional information regarding our acquisitions.

# Goodwill and Other Intangible Assets

Purchased goodwill and intangible assets with indefinite lives are not amortized, but instead are tested for impairment annually or when indicators of impairment exist. Intangible assets with finite lives, primarily customer relationships, trademarks and patents, and non-compete agreements, are amortized over their useful lives.

Goodwill impairment testing involves a comparison of the estimated fair value of reporting units to the respective carrying amount, which may be performed utilizing either a qualitative or quantitative assessment. A reporting unit is defined as an operating segment or one level below an operating segment (also known as a component). If the estimated fair value exceeds the carrying amount, then no impairment exists. If the carrying amount exceeds the estimated fair value, then a second step is performed to determine the amount of impairment, if any. An impairment charge is the amount by which the carrying amount of goodwill exceeds the estimated implied fair value of goodwill. We estimate the implied fair value of goodwill as the excess of the estimated fair value of the reporting unit over the estimated fair value of its identifiable net assets. This is the same manner we use to recognize goodwill from a business combination. Goodwill impairment testing involves judgment, including the identification of reporting units, the estimation of the fair value of each reporting unit and, if necessary, the estimation of the implied fair value of goodwill.

We have two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. These operating segments are comprised of divisions (components), for which discrete financial information is available. Components are aggregated into reporting units for purposes of goodwill impairment testing to the extent that they share similar economic characteristics. Our reporting units are: Pharmaceutical operating segment (excluding our Nuclear Pharmacy Services division and Cardinal

Health China - Pharmaceutical division); Nuclear Pharmacy Services division; Cardinal Health China - Pharmaceutical division; Medical operating segment (excluding our Cardinal Health at Home division); and Cardinal Health at Home division.

Fair value can be determined using market, income or cost-based approaches. Our determination of estimated fair value of the reporting units is based on a combination of the income-based and market-based approaches. Under the income-based approach, we use a discounted cash flow model in which cash flows anticipated over several future periods, plus a terminal value at the end of that time horizon, are discounted to their present value using an appropriate risk-adjusted rate of return. We use our internal forecasts to estimate future cash flows and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for each reporting unit. Actual results may differ materially from those used in our forecasts. We use discount rates that are commensurate with the risks and uncertainty inherent in the respective reporting units and in our internally-developed forecasts. Discount rates used in our reporting unit valuations ranged from 8.5 to 11 percent. Under the market-based approach, we determine fair value by comparing our reporting units to similar businesses or guideline companies whose securities are actively traded in public markets. To further confirm fair value, we compare the aggregate fair value of our reporting units to our total market capitalization. Estimating the fair value of reporting units requires the use of estimates and significant judgments that are based on a number of factors including actual operating results. The use of alternate estimates and assumptions or changes in the industry or peer groups could materially affect the determination of fair value for each reporting unit and potentially result in goodwill impairment.

We performed annual impairment testing in fiscal 2015, 2014 and 2013 and, with the exception of our Nuclear Pharmacy Services

division which was fully impaired in fiscal 2013, concluded that there were no impairments of goodwill as the estimated fair value of each reporting unit exceeded its carrying value. With the exception of our Nuclear Pharmacy Services division in fiscal 2013, if we were to alter our impairment testing by increasing the discount rate in the discounted cash flow analysis by 1 percent, there still would not be any impairment indicated for any of these reporting units for fiscal 2015, 2014 or 2013. As discussed further in Note 4 of the "Notes to Consolidated Financial Statements", during the fourth quarter of fiscal 2013 we recognized an $829 million ($799 million, net of tax) non-cash goodwill impairment charge related to our Nuclear Pharmacy Services division.

We review intangible assets with finite lives for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable. Determining whether an impairment loss occurred requires a comparison of the carrying amount to the sum of the undiscounted cash flows expected to be generated by the asset.

## Vendor Reserves

In the ordinary course of business, our vendors may dispute deductions taken against payments otherwise due to them or assert other billing disputes. These disputed transactions are researched and resolved based upon our policy and findings of the research performed. At any given time, there are outstanding items in various stages of research and resolution. In determining appropriate reserves for areas of exposure with our vendors, we assess historical experience and current outstanding claims. We have established various levels of reserves based on the type of claim and status of review. Though the transaction types are relatively consistent, we periodically refine our methodology by updating the reserve estimate percentages to reflect actual historical experience. Changes to the estimate percentages affect the cost of products sold in the period in which the change was made.

Vendor reserves were $88 million and $82 million at June 30, 2015 and 2014, respectively. Approximately 75 percent of the vendor reserve at the end of fiscal 2015 pertained to the Pharmaceutical segment compared to 68 percent at the end of fiscal 2014. The reserve balance will fluctuate due to variations of outstanding claims from period-to-period, timing of settlements, and specific vendor issues, such as bankruptcies.

The ultimate outcome of specific claims may be different than our original estimate and may require adjustment. We believe, however, that reserves recorded for such disputes are adequate based upon current facts and circumstances.

## Loss Contingencies

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events.

We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates. See Note 9 of the "Notes to Consolidated Financial Statements" for additional information regarding loss contingencies.

## Provision for Income Taxes

Our income tax expense, deferred income tax assets and liabilities, and unrecognized tax benefits reflect management's assessment of estimated future taxes to be paid on items in the consolidated financial statements.

Deferred income taxes arise from temporary differences between financial reporting and tax reporting bases of assets and liabilities, as well as net operating loss and tax credit carryforwards for tax purposes. The following table presents information about our tax position at June 30:

| (in millions) | 2015 | 2014 |
|---|---|---|
| Net deferred income tax assets | $ 498 | $ 444 |
| Net deferred income tax liabilities | 1,853 | 1,653 |
| Loss and credit carryforwards included in net deferred income tax assets | 197 | 191 |
| Net valuation allowance against deferred income tax assets (1) | 87 | 94 |

(1) This valuation allowance primarily relates to federal, state and international loss carryforwards for which the ultimate realization of future benefits is uncertain.

Expiring loss and credit carryforwards and the required valuation allowances are adjusted annually. After applying the valuation

allowances, we do not anticipate any limitations on our use of any of the other net deferred income tax assets described above.

We believe that our estimates for the valuation allowances against deferred tax assets and unrecognized tax benefits are appropriate based on current facts and circumstances. However, others applying reasonable judgment to the same facts and circumstances could develop different estimates. The amount we ultimately pay when matters are resolved may differ from the amounts accrued.

Tax benefits from uncertain tax positions are recognized when it is more likely than not that the position will be sustained upon examination of the technical merits of the position, including resolutions of any related appeals or litigation processes. The amount recognized is measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon settlement. See Note 8 of the "Notes to Consolidated Financial Statements" for additional information regarding unrecognized tax benefits.

If any of our assumptions or estimates were to change, an increase or decrease in our effective income tax rate by 1 percent would have caused income tax expense to increase or decrease $20 million for fiscal 2015.

# Share-Based Compensation

Share-based compensation to employees is recognized in the consolidated statements of earnings based on the grant date fair value of the awards. The fair value of restricted share units and performance share units is determined by the grant date market price of our common shares. The compensation expense associated with nonvested performance share units is dependent on our periodic assessment of the probability of the targets being achieved and our estimate, which may vary over time, of the number of shares that ultimately will be issued. The fair value of stock options is determined using a lattice valuation model. We believe the lattice model provides reasonable estimates because it has the ability to take into account employee exercise patterns based on changes in our stock price and other variables and it provides for a range of input assumptions.

We analyze historical data to estimate option exercise behaviors and post-vesting forfeitures to be used within the lattice model. The expected life of the options granted is calculated from the option valuation model and represents the length of time in years that the options granted are expected to be outstanding. Expected volatilities are based on implied volatility from traded options on our common shares and historical volatility over a period of time commensurate with the contractual term of the option grant (up to ten years). As required, the forfeiture estimates are adjusted to reflect actual forfeitures when an award vests. The actual forfeitures in future reporting periods could be higher or lower than our current estimates. See Note 16 of the "Notes to Consolidated Financial Statements" for additional information regarding share-based compensation.

# Supplemental Information

## Financial Measures That Supplement U.S. Generally Accepted Accounting Principles Measures (Non-GAAP Financial Measures)

The 'Key Highlights" section and the "Fiscal 2015 Overview" discussion within MD&A in this Form 10-K contains financial measures that are not calculated in accordance with GAAP. In general, the measures exclude items and charges that we do not believe reflect our core business and relate more to strategic, multi-year corporate activities, or the items and charges relate to activities or actions that may have occurred over multiple or in prior periods without predictable trends. We use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning and determine incentive compensation.

We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results and in comparing our performance to that of our competitors. However, the non-GAAP financial measures used by us may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies.

The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements should be carefully evaluated.

Following are definitions of the non-GAAP financial measures presented in this Form 10-K and reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

## Definitions

**Growth rate calculation:** Except for compound annual growth rates (CAGR), growth rates in this Form 10-K are determined by dividing the difference between current period results and prior period results by prior period results.  CAGR is determined by subtracting one from ((the ending value divided by the beginning value) raised to the power of (one divided by the number of years)), calculated using fiscal 2011 as the base year.

**Non-GAAP diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP earnings from continuing operations**: earnings from continuing operations excluding (1) restructuring and employee severance, (2) amortization and other acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits)[1], (6) loss on extinguishment of debt, (7) other spin-off costs[2] and (8) gain on sale of CareFusion stock, each net of tax.

**Non-GAAP operating earnings**: operating earnings excluding (1) restructuring and employee severance, (2) amortization and other acquisition-related costs, (3) impairments and (gain)/loss on disposal of assets, (4) litigation (recoveries)/charges, net, (5) LIFO charges/(credits) and (6) other spin-off costs.

---

[1]   The inventories of our core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market.  These charges or credits are included in cost of products sold, and represent changes in our LIFO inventory reserve. We did not record any LIFO charges or credits in fiscal 2015, 2014 or 2013, respectively.

[2]   Costs incurred in connection with our spin-off of CareFusion which are included in distribution, selling, general and administrative expenses.

Supplemental Information · GAAP to Non-GAAP Reconciliations

# GAAP to Non-GAAP Reconciliations

| | Fiscal Year 2015 | | | | | |
|---|---|---|---|---|---|---|
| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings from Continuing Operations | Earnings from Continuing Operations Growth Rate | Diluted EPS from Continuing Operations | Diluted EPS from Continuing Operations Growth Rate |
| GAAP | $ 2,161 | 15 % | $ 1,212 | 4 % | $ 3.61 | 7 % |
| Restructuring and employee severance | 44 | | 29 | | 0.09 | |
| Amortization and other acquisition-related costs | 281 | | 181 | | 0.54 | |
| Impairments and (gain)/loss on disposal of assets | (19) | | (9) | | (0.03) | |
| Litigation (recoveries)/charges, net | 5 | | 19 | | 0.06 | |
| Loss on extinguishment of debt | — | | 37 | | 0.11 | |
| **Non-GAAP** | $ 2,472 | 16 % | $ 1,469 | 11 % | $ 4.38 | 14 % |
| | **Fiscal Year 2014** | | | | | |
| GAAP | $ 1,885 | 89 % | $ 1,163 | 247 % | $ 3.37 | 247 % |
| Restructuring and employee severance | 31 | | 20 | | 0.06 | |
| Amortization and other acquisition-related costs | 223 | | 144 | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | 15 | | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (21) | | (13) | | (0.04) | |
| Non-GAAP | $ 2,133 | 4 % | $ 1,324 | 3 % | $ 3.84 | 3 % |
| | **Fiscal Year 2013** | | | | | |
| GAAP | $ 996 | (44)% | $ 335 | (69)% | $ 0.97 | (68)% |
| Restructuring and employee severance | 71 | | 44 | | 0.13 | |
| Amortization and other acquisition-related costs | 158 | | 106 | | 0.31 | |
| Impairments and (gain)/loss on disposal of assets | 859 | | 822 | | 2.39 | |
| Litigation (recoveries)/charges, net | (38) | | (23) | | (0.07) | |
| Non-GAAP | $ 2,046 | 10 % | $ 1,284 | 15 % | $ 3.73 | 16 % |
| | **Fiscal Year 2012** | | | | | |
| GAAP | $ 1,792 | 18 % | $ 1,070 | 11 % | $ 3.06 | 12 % |
| Restructuring and employee severance | 21 | | 13 | | 0.04 | |
| Amortization and other acquisition-related costs | 33 | | 24 | | 0.07 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 13 | | 0.04 | |
| Litigation (recoveries)/charges, net | (3) | | (2) | | (0.01) | |
| Other Spin-Off costs | 2 | | 1 | | — | |
| Non-GAAP | $ 1,866 | 13 % | $ 1,119 | 13 % | $ 3.21 | 15 % |
| | **Fiscal Year 2011** | | | | | |
| GAAP | $ 1,514 | 16 % | $ 966 | 65 % | $ 2.74 | 69 % |
| Restructuring and employee severance | 15 | | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | 90 | | 68 | | 0.19 | |
| Impairments and (gain)/loss on disposal of assets | 9 | | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | 6 | | 7 | | 0.02 | |
| Other Spin-Off costs | 10 | | 6 | | 0.02 | |
| Gain on sale of CareFusion stock | — | | (75) | | (0.21) | |
| Non-GAAP | $ 1,644 | 18 % | $ 988 | 22 % | $ 2.80 | 25 % |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

# Selected Financial Data

The consolidated financial data below includes all business combinations as of the date of acquisition that occurred during these periods. The following selected consolidated financial data should be read in conjunction with the consolidated financial statements and related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| (in millions, except per common share amounts) | 2015 | 2014 | 2013(1) | 2012 | 2011 |
|---|---|---|---|---|---|
| **Earnings Data:** | | | | | |
| Revenue | $ 102,531 | $ 91,084 | $ 101,093 | $ 107,552 | $ 102,644 |
| | | | | | |
| Operating Earnings | $ 2,161 | $ 1,885 | $ 996 | $ 1,792 | $ 1,514 |
| Earnings from continuing operations | $ 1,212 | $ 1,163 | $ 335 | $ 1,070 | $ 966 |
| Earnings/(loss) from discontinued operations | 3 | 3 | (1) | (1) | (7) |
| **Net earnings** | $ 1,215 | $ 1,166 | $ 334 | $ 1,069 | $ 959 |
| | | | | | |
| **Basic earnings/(loss) per common share:** | | | | | |
| Continuing operations | $ 3.65 | $ 3.41 | $ 0.98 | $ 3.10 | $ 2.77 |
| Discontinued operations | 0.01 | 0.01 | — | — | (0.02) |
| **Net basic earnings per common share** | $ 3.66 | $ 3.42 | $ 0.98 | $ 3.10 | $ 2.75 |
| | | | | | |
| **Diluted earnings/(loss) per common share:** | | | | | |
| Continuing operations | $ 3.61 | $ 3.37 | $ 0.97 | $ 3.06 | $ 2.74 |
| Discontinued operations | 0.01 | 0.01 | — | — | (0.02) |
| **Net diluted earnings per common share** | $ 3.62 | $ 3.38 | $ 0.97 | $ 3.06 | $ 2.72 |
| | | | | | |
| Cash dividends declared per common share | $ 1.4145 | $ 1.2500 | $ 1.0900 | $ 0.8825 | $ 0.8000 |
| | | | | | |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 30,142 | $ 26,033 | $ 25,819 | $ 24,260 | $ 22,846 |
| Long-term obligations, less current portion | 5,211 | 3,171 | 3,686 | 2,418 | 2,175 |
| Shareholders' equity | 6,256 | 6,401 | 5,975 | 6,244 | 5,849 |

(1)    During the fourth quarter of fiscal 2013, we recognized a non-cash goodwill impairment charge of $829 million ($799 million, net of tax) related to our Nuclear Pharmacy Services division.

# Quantitative and Qualitative Disclosures About Market Risk

We are exposed to cash flow and earnings fluctuations as a result of certain market risks. These market risks primarily relate to foreign exchange, interest rate and commodity price-related changes. We maintain a hedging program to manage volatility related to these market exposures which employs operational, economic and derivative financial instruments in order to mitigate risk. See Notes 1 and 12 of the "Notes to Consolidated Financial Statements" for further discussion regarding our use of derivative instruments.

## Foreign Exchange Rate Sensitivity

By nature of our global operations, we are exposed to cash flow and earnings fluctuations resulting from foreign exchange rate variation. These exposures are transactional and translational in nature. Principal drivers of this foreign exchange exposure include the Canadian dollar, Chinese renminbi, Thai baht, Mexican peso, European euro, Singapore dollar, Japanese yen, and the Australian dollar.

### Transactional Exposure

Transactional exposure arises from the purchase and sale of goods and services in currencies other than our functional currency or the functional currency of our subsidiaries. As part of our risk management program, at the end of each fiscal year we perform a sensitivity analysis on our forecasted transactional exposure for the upcoming fiscal year. These analyses include the estimated impact of our hedging program, which mitigates transactional exposure. At June 30, 2015 and 2014, we had hedged approximately 37 and 48 percent of transactional exposures, respectively.

The following table summarizes the analysis as it relates to transactional exposure and the impact of a hypothetical 10 percent fluctuation in foreign currencies, assuming rates collectively shift in the same direction and we are unable to change customer pricing in response to those shifts, for the upcoming fiscal year period:

| | June 30 | | | |
|---|---|---|---|---|
| (in millions) | 2015 (1) | | 2014 (1) | |
| Net estimated transactional exposure | $ | 392 | $ | 378 |
| | | | | |
| Sensitivity gain/loss | $ | 39 | $ | 38 |
| Estimated offsetting impact of hedges | | (15) | | (18) |
| **Estimated net gain/loss** | $ | **24** | $ | 20 |

(1)    This analysis excludes exposures that may be added as a result of acquisitions that have not yet closed as of June 30, 2015.

### Translational Exposure

We have exposure related to the translation of financial statements of our foreign operations into U.S. dollars, our functional currency. We perform a similar analysis to that described above related to this translational exposure. We do not typically hedge any of our translational exposure and no hedging impact was included in our analysis at June 30, 2015 and 2014.

The following table summarizes translational exposure and the impact of a hypothetical 10 percent strengthening or weakening in the U.S. dollar, assuming rates collectively shift in the same direction and we are unable to change customer pricing in response to those shifts, for the upcoming fiscal year period:

| | June 30 | | | |
|---|---|---|---|---|
| (in millions) | 2015 (1) | | 2014 (1) | |
| Net estimated translational exposure | $ | 55 | $ | 62 |
| Sensitivity gain/loss | | 6 | | 6 |

(1)    This analysis excludes exposures that may be added as a result of acquisitions that have not yet closed as of June 30, 2015.

## Interest Rate Sensitivity

We are exposed to changes in interest rates primarily as a result of our borrowing and investing activities to maintain liquidity and fund operations. The nature and amount of our long-term and short-term debt can be expected to fluctuate as a result of business requirements, market conditions and other factors. Our policy is to manage exposures to interest rates using a mix of fixed and floating rate debt as deemed appropriate by management. We utilize interest rate swap instruments to mitigate our exposure to interest rate movements.

As part of our risk management program, we perform an annual sensitivity analysis on our forecasted exposure to interest rates for the upcoming fiscal year. This analysis assumes a hypothetical 10 percent change in interest rates. At June 30, 2015 and 2014, the

potential increase or decrease in annual interest expense under this analysis as a result of this hypothetical change was $3 million and $4 million, respectively.

During fiscal 2015 and 2014, we purchased marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. The fair value is subject to change primarily as a result of changes in market interest rates and investment risk related to the issuers' credit worthiness. At June 30, 2015 and 2014, a hypothetical increase or decrease of 100 basis points in interest rates would cause a potential increase or decrease of up to $2 million and $1 million, respectively, in the estimated fair value.

## Commodity Price Sensitivity

We are directly exposed to market price changes for certain commodities, including oil-based resins, nitrile, cotton, diesel fuel and latex. We typically purchase raw materials at either market prices or prices tied to a commodity index and some finished goods at prices based in part on a commodity price index. We also are indirectly exposed to fluctuations in certain commodity prices through the purchase of finished goods and various energy-related commodities, including natural gas and electricity, through our normal course of business where our contracts are not directly tied to a commodity index. As part of our risk management program, we perform sensitivity analysis on our forecasted commodity exposure for the upcoming fiscal year. Our forecasted commodity exposure at June 30, 2015 increased from the prior year primarily as a result of changes in purchasing volumes and commodity pricing. At June 30, 2015 and 2014, we had hedged a portion of these direct commodity exposures (see Note 12 of the "Notes to Consolidated Financial Statements" for further discussion).

The table below summarizes our analysis of these forecasted direct and indirect commodity exposures and the potential gain/loss given a hypothetical 10 percent fluctuation in commodity prices, assuming pricing collectively shifts in the same direction, for the upcoming fiscal year period:

| | June 30 | | |
|---|---|---|---|
| (in millions) | 2015 (1) | | 2014 (1) |
| Estimated commodity exposure | $ 405 | $ | 321 |
| | | | |
| Sensitivity gain/loss | $ 41 | $ | 32 |
| Estimated offsetting impact of hedges | (1) | | (1) |
| **Estimated net gain/loss** | $ 40 | $ | 31 |

(1) This analysis excludes exposures that may be added as a result of acquisitions that have not yet closed as of June 30, 2015.

We believe our total gross range of direct and indirect exposure to commodities, including the items listed in the table above but excluding exposures that may be added as a result of acquisitions that have not yet closed as of June 30, 2015, is $400 million to $500 million for fiscal 2016.

# Business

## General

We are a healthcare services and products company that improves the cost-effectiveness of health care. We help pharmacies, hospitals, and other healthcare providers focus on patient care while reducing costs, enhancing efficiency and improving quality. We also provide medical products to patients in the home.

## Pharmaceutical Segment

In the United States, our Pharmaceutical segment:

- distributes branded and generic pharmaceutical, over-the-counter healthcare and consumer products through its Pharmaceutical Distribution division to retailers (including chain and independent drug stores and pharmacy departments of supermarkets and mass merchandisers), hospitals and other healthcare providers. This division:
  - maintains prime vendor relationships that streamline the purchasing process resulting in greater efficiency and lower costs for our customers;
  - renders services to pharmaceutical manufacturers including distribution, inventory management, data reporting, new product launch support, and contract pricing and chargeback administration;
  - provides pharmacy operations, medication therapy management and patient outcomes services to hospitals and other healthcare providers; and
  - manufactures and repackages generic pharmaceuticals and over-the-counter healthcare products;
- operates nuclear pharmacies and cyclotron facilities through its Nuclear Pharmacy Services division that manufacture, prepare and deliver radiopharmaceuticals for use in nuclear imaging and other procedures in hospitals and physician offices; and
- distributes specialty pharmaceutical products; provides services to pharmaceutical manufacturers, third-party payors and healthcare providers supporting the development, marketing, distribution and payment for specialty pharmaceutical products; and provides specialty pharmacy services through its Specialty Solutions division.

In China, the Pharmaceutical segment distributes branded, generic and specialty pharmaceutical, over-the-counter healthcare and consumer products, provides logistics, marketing and other services and operates direct-to-patient specialty pharmacies through Cardinal Health China.

See Note 15 of the "Notes to Consolidated Financial Statements" for Pharmaceutical segment revenue, profit and assets for fiscal 2015, 2014 and 2013.

### Pharmaceutical Distribution

Our Pharmaceutical Distribution division generates gross margin when the aggregate selling price to our customers exceeds the aggregate cost of products sold. Gross margin includes margin from our generic pharmaceutical program, margin from pharmaceutical distribution agreements with branded manufacturers and margin from over-the-counter healthcare and consumer products. It also includes cash discounts. Margin from our generic pharmaceutical program includes price discounts and rebates from manufacturers and may include price appreciation on some products. Our earnings on generic pharmaceuticals are generally highest during the period immediately following the initial launch of a generic product because generic pharmaceutical selling prices are generally highest during that period and tend to decline over time. Margin from pharmaceutical distribution agreements with branded manufacturers refers primarily to fees we receive for rendering a range of distribution and related services to manufacturers and also includes benefits from pharmaceutical price appreciation.

### Sourcing Venture With CVS Health

In July 2014, we established Red Oak Sourcing, a U.S.-based generic pharmaceutical sourcing venture with CVS Health with an initial term of 10 years. Both companies have contributed sourcing and supply chain expertise to the 50/50 venture and have committed to source generic pharmaceuticals through arrangements negotiated by the venture. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies.

### Specialty Pharmaceutical Products and Services

We refer to products and services offered by our Specialty Solutions division as "specialty pharmaceutical products and services." The Specialty Solutions division distributes oncology, rheumatology, urology, nephrology and other pharmaceutical products ("specialty pharmaceutical products") and human-derived plasma products to hospitals, dialysis clinics, physician offices and other healthcare providers; provides consulting, patient support, logistics and other services to pharmaceutical manufacturers, third-party payors and healthcare providers primarily supporting the development, marketing, distribution and payment for specialty pharmaceutical products; and provides specialty pharmacy services. Our use of the terminology "specialty pharmaceutical products and services" may not be comparable to the terminology used by other industry participants.

# Medical Segment

Our Medical segment distributes a broad range of national brand and our own Cardinal Health brand medical, surgical and laboratory products and provides services to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China and to patients in the home in the United States through our Cardinal Health at Home division. During fiscal 2015, we entered into an agreement with Henry Schein, Inc. to consolidate our physician office organization into Henry Schein, Inc. as part of a broader commercial relationship.

This segment also manufactures, sources and develops our own higher-margin, Cardinal Health brand medical and surgical products. Manufactured products include: single-use surgical drapes, gowns and apparel; exam and surgical gloves; fluid suction and collection systems; cardiovascular products; wound care products; and orthopedic products. We will expand this segment's product line to include the cardiac and endovascular products manufactured by Cordis once our acquisition of Cordis, which is discussed elsewhere in this Form 10-K, is completed. We expect to continue to expand our manufactured products through acquisitions and internal development. Our manufactured products are sold directly or through third-party distributors in the United States, Canada, Europe and other regions internationally.

This segment also assembles and offers sterile and non-sterile procedure kits. In addition, the segment provides supply chain services, including spend management, distribution management and inventory management services, to healthcare providers.

See Note 15 of the "Notes to Consolidated Financial Statements" for Medical segment revenue, profit and assets for fiscal 2015, 2014 and 2013.

# Acquisitions

We have acquired a number of businesses over the last several years that have enhanced our core strategic areas of generics, health systems and hospital solutions (including manufactured medical products), specialty pharmaceutical products and services, international and alternate sites of care. We expect to continue to pursue additional acquisitions in the future.

Since July 1, 2010, we have completed, or expect to complete, the following six larger acquisitions:

In addition, we completed several smaller acquisitions during the last five fiscal years, including in fiscal 2015, Tradex International, Inc., a supplier of disposable gloves, and Metro Medical Supply, Inc., a distributor of specialty pharmaceuticals and medical and surgical products; in fiscal 2014, Access Closure, Inc., a manufacturer and distributor of extravascular closure devices; and in fiscal 2012, Futuremed Healthcare Products Corporation, a Canadian medical product distributor.

| Date | Company | Location | Line of Business | Acquisition Price (in millions) | |
|---|---|---|---|---|---|
| Pending | Cordis business of Johnson & Johnson | Fremont, CA | Cardiac and endovascular products | $ 1,944 | |
| 07/15 | The Harvard Drug Group | Livonia, MI | Pharmaceutical product distribution | $ 1,115 | |
| 03/13 | AssuraMed, Inc. | Twinsburg, OH | Medical product distribution | $ 2,070 | |
| 12/10 | Kinray, Inc. | Whitestone, NY | Pharmaceutical product distribution | $ 1,336 | |
| 11/10 | Yong Yu | Shanghai, China | Pharmaceutical and medical product distribution | $ 458 | (1) |
| 07/10 | Healthcare Solutions Holding, LLC | Ellicott City, MD | Specialty pharmaceutical services | $ 520 | (2) |

(1) Includes the assumption of approximately $57 million in debt.
(2) Includes $506 million in cash paid on the acquisition date and $14 million paid in fiscal 2012 and 2013 in connection with a contingent consideration obligation. The contingent consideration obligation had an acquisition date fair value of $92 million.

## Customers

Our largest customer, CVS Health, accounted for 27 percent of our fiscal 2015 revenue. In the aggregate, our five largest customers, including CVS Health, accounted for 41 percent of our fiscal 2015 revenue.

In addition, we have agreements with group purchasing organizations ("GPOs") that act as agents to negotiate vendor contracts on behalf of their members. Our two largest GPO relationships in terms of member revenue are with Novation, LLC and Premier Purchasing Partners, L.P. Sales to members of these two GPOs, under numerous contracts across all of our businesses, collectively accounted for 18 percent of our revenue in fiscal 2015.

## Suppliers

We rely on many different suppliers. Products obtained from our five largest suppliers accounted for an aggregate of 22 percent of our revenue during fiscal 2015, but no single supplier's products accounted for more than 7 percent of revenue.

The Pharmaceutical Distribution division is a party to distribution service agreements with most pharmaceutical manufacturers. These agreements have terms ranging from one year to five years. Most provide for an automatic renewal feature of one year. Some agreements allow either party, and in some instances, only the manufacturer to terminate the agreement without cause subject to a defined notice period.

## Competition

We operate in a highly competitive environment in the distribution of pharmaceuticals and related healthcare services. We also operate in a highly competitive environment in the development, manufacturing and distribution of medical and surgical products. We compete on many levels, including price, service offerings, support services and breadth of product lines.

In the Pharmaceutical segment, we compete with wholesale distributors with national reach (including McKesson Corporation and AmerisourceBergen Corporation), regional wholesale distributors, self-warehousing chains, specialty distributors, third-party logistics companies, companies that provide services supporting the development, marketing, distribution and payment for specialty pharmaceutical products and nuclear pharmacies, among others. In addition, the Pharmaceutical segment has experienced competition from a number of organizations offering generic pharmaceuticals, including telemarketers. We also compete with manufacturers that sell all or part of their product offerings directly.

In the Medical segment, we compete with many different national medical product distributors, including Owens & Minor, Inc., McKesson Corporation and Medline Industries, Inc. We also compete with regional medical product distributors and companies that distribute medical products to patients in the home as well as third-party logistics companies. In addition, we compete with manufacturers that sell all or part of their product offerings directly. Competitors of the Medical segment's manufacturing and procedural kit businesses include diversified healthcare companies as well as companies that are more focused on specific product categories.

## Employees

At June 30, 2015, we had approximately 24,400 employees in the United States and approximately 10,100 employees outside of the United States. Overall, we consider our employee relations to be good.

## Intellectual Property

We rely on a combination of trade secret, patent, copyright and trademark laws, nondisclosure and other contractual provisions, and technical measures to protect our products, services and intangible assets. We hold patents relating to some medical and surgical products and to distribution of our nuclear pharmacy products and service offerings. We also operate under licenses for certain proprietary technologies, and in certain instances we license our technologies to third parties.

We believe that we have taken all necessary steps to protect our proprietary rights, but no assurance can be given that we will be able to successfully enforce or protect our rights in the event that they are infringed upon by a third party. While all of these proprietary rights are important to our operations, we do not consider any particular patent, trademark, license, franchise or concession to be material to our overall business.

# Regulatory Matters

Our business is highly regulated in the United States at both the federal and state level and in foreign countries. Depending upon their specific business, our subsidiaries may be subject to regulation by government entities including:

- the U.S. Drug Enforcement Administration (the "DEA");

- the U.S. Food and Drug Administration (the "FDA") and other agencies within the U.S. Department of Health and Human Services, including the Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights;

- the U.S. Nuclear Regulatory Commission (the "NRC");

- the U.S. Federal Trade Commission; (the "FTC");

- U.S. Customs and Border Protection;

- state boards of pharmacy;

- state controlled substance agencies;

- state health departments, insurance departments, Medicaid departments or other comparable state agencies; and

- foreign agencies that are comparable to those listed above.

These regulatory agencies have a variety of civil, administrative and criminal sanctions at their disposal for failure to comply with applicable legal or regulatory requirements. They can suspend our ability to distribute products or can initiate product recalls; they can seize products or impose criminal, civil and administrative sanctions; and they can seek injunctions to halt the manufacture and distribution of products.

## Distribution

The FDA, DEA and various state authorities regulate the marketing, purchase, storage and distribution of pharmaceutical and medical products under various state and federal statutes including the Prescription Drug Marketing Act of 1987 and the Federal Controlled Substances Act (the "CSA"), which governs the sale, packaging, storage and distribution of controlled substances. Wholesale distributors of controlled substances must hold valid DEA registrations and state-level licenses, meet various security and operating standards, and comply with the CSA.

## Manufacturing and Marketing

The FDA and other domestic and foreign governmental agencies administer requirements that cover the design, testing, safety, effectiveness, manufacturing (including good manufacturing practices), quality systems, labeling, promotion and advertising, distribution, importation and post-market surveillance of most of our manufactured products. In addition, we need specific approval or clearance from regulatory authorities before we can market and sell some of these products in the United States and certain other countries. Even after we obtain approval or clearance to market a product, the product and our manufacturing processes are subject to continued regulatory oversight. It can be costly and time-consuming to obtain regulatory approvals or clearances to market a

medical device, and such approvals or clearances might not be granted on a timely basis, if at all.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action, which may include withdrawing the product from the market, correcting the product at the customer location, revising product labeling, and notifying customers.

### Nuclear Pharmacies and Related Businesses

Our nuclear pharmacies and cyclotron facilities require licenses or permits and must abide by regulations issued by the NRC, applicable state boards of pharmacy and the radiologic health agency or department of health of each state in which we operate. In addition, our cyclotron facilities must comply with the FDA's good manufacturing practices regulations for positron emission tomography, or PET, drugs.

### Prescription Drug Tracing and Supply Chain Integrity

In November 2013, the U.S. Congress enacted the Drug Supply Chain Security Act. This law establishes a phased-in national system for tracing pharmaceutical products through the pharmaceutical distribution supply chain to prevent the introduction of counterfeit, adulterated or mislabeled drugs. The first phase of implementation began on January 1, 2015, and upon full implementation in 2023, we and other supply chain stakeholders will participate in an electronic, interoperable, prescription drug tracing system.

### Government Healthcare Programs

We are subject to U.S. federal healthcare fraud and abuse laws. These laws generally prohibit persons from soliciting, offering, receiving or paying any compensation in order to induce someone to order or purchase items or services that are in any way paid for by Medicare, Medicaid or other federally-funded healthcare programs. They also prohibit submitting or causing to be submitted any fraudulent claim for payment by the federal government. There are similar state healthcare fraud and abuse laws that apply to Medicaid and other state-funded healthcare programs. Violations of these laws may result in criminal or civil penalties, as well as breach of contract claims and *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments).

Our Cardinal Health at Home business and a few of our other businesses are Medicare-certified suppliers or participate in state Medicaid programs. These businesses are subject to accreditation and quality standards and other rules and regulations, including applicable billing, payment and record-keeping requirements. In addition, a few of our businesses manufacture or repackage pharmaceuticals and are subject to federal and state laws that establish eligibility for reimbursement by federal and state healthcare programs. Failure to comply with applicable standards and regulations could result in civil or criminal sanctions, including the

loss of our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

In addition, our U.S. federal and state government contracts are subject to specific procurement regulations. Failure to comply with applicable rules or regulations or with contractual or other requirements may result in monetary damages and criminal or civil penalties as well as termination of our government contracts or our suspension or debarment from government contract work.

### Health and Personal Information Practices

We collect, handle and maintain patient-identifiable healthcare information. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as augmented by the Health Information Technology for Economic and Clinical Health Act, as well as some state and foreign laws, regulate the use and disclosure of patient-identifiable health information, including requiring specified privacy and security measures.

We also collect, handle and maintain other sensitive personal information that is subject to federal and state laws protecting such information. Security and disclosure of personal information is also highly regulated in many other countries in which we operate.

In Europe, we are subject to the European Union ("EU") data protection regulations, including the EU Directive on Data Protection, which requires member states to impose minimum restrictions on the collection and use of personal data that, in some respects, are more stringent, and impose more significant burdens on subject businesses, than current privacy standards in the United States.

### Antitrust Laws

The U.S. federal government and most states have enacted antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. Violations of federal or state antitrust laws can result in various sanctions, including criminal and civil penalties. Private plaintiffs also could bring civil lawsuits against us for alleged antitrust law violations, including claims for treble damages. As previously disclosed, in April 2015, we settled allegations by the FTC resulting

from an investigation into supplier arrangements involving our Nuclear Pharmacy Services division primarily focused on the period between 2003 and 2008. In that settlement, we agreed to a court order and injunction under federal antitrust laws, and agreed, among other things, to pay $27 million to the FTC, which the FTC has stated will be used to establish a fund for allegedly aggrieved third parties.

### Environmental, Health and Safety Laws

In the United States and other countries, we are subject to various federal, state and local environmental laws, as well as laws relating to safe working conditions and laboratory practices.

### Laws Relating to Foreign Trade and Operations

U.S. and foreign laws require us to abide by standards relating to the import and export of finished goods, raw materials and supplies and the handling of information. We also must comply with various export control and trade embargo laws, which may require licenses or other authorizations for transactions within some countries or with some counterparties.

Similarly, we are subject to U.S. and foreign laws concerning the conduct of our foreign operations, including the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws, the U.K. Bribery Act and other foreign anti-bribery laws. Among other things, these laws generally prohibit companies and their intermediaries from offering, promising or making payments to officials of foreign governments for the purpose of obtaining or retaining business.

### Regulation in China

Our China operations are subject to national, regional and local regulations, including licensing and regulatory requirements of the China National Health and Family Planning Commission, the State Administration of Industry and Commerce, the Ministry of Commerce, the Ministry of Finance, the China Food and Drug Administration, the National Development and Reform Commission, the General Administration of Customs, the Ministry of Industrial and Information Technology and the China Insurance Regulatory Commission.

# Other Information

Although our agreements with manufacturers sometimes require us to maintain inventory levels within specified ranges, our distribution businesses are generally not required by our customers to maintain particular inventory levels other than as needed to meet service level requirements. Certain supply contracts with U.S. government entities require us to maintain sufficient inventory to meet emergency demands, but we do not believe those requirements materially affect

inventory levels.

Our customer return policies generally require that the product be physically returned, subject to restocking fees. We only allow customers to return products that can be added back to inventory and resold at full value, or that can be returned to vendors for credit.

We offer market payment terms to our customers.

# Revenue and Long-Lived Assets by Geographic Area

See Note 15 of the "Notes to Consolidated Financial Statements" for revenue and long-lived assets by geographic area.

## Available Information

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports are available free of charge on our website (www.cardinalhealth.com), under the "Investors—Financial Reporting—SEC Filings" caption, as soon as reasonably practicable after we electronically file them with, or furnish them to, the Securities and Exchange Commission (the "SEC").

You may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website (www.sec.gov) where you can search for annual, quarterly and current reports, proxy and information statements, and other information regarding us and other public companies.

# Risk Factors

The risks described below could materially and adversely affect our results of operations, financial condition, liquidity and cash flows. These are not the only risks we face. Our businesses also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

**We could suffer the adverse effects of competitive pressures.**
As described in greater detail in the "Business" section, we operate in markets that are highly competitive. Because of competition, our businesses face continued pricing pressure from our customers and suppliers. If we are unable to offset margin reductions caused by these pricing pressures through steps such as sourcing or cost control measures, additional service offerings and sales of higher margin products, our results of operations and financial condition could be adversely affected.

In addition, in recent years, the healthcare industry has continued to consolidate. Further consolidation among our customers and suppliers could give the resulting enterprises greater bargaining power, which may adversely impact our results of operations.

**Our Pharmaceutical segment's margins are affected by prices established by manufacturers, the frequency and magnitude of generic pharmaceutical launches, and other factors that are beyond our control.**
Gross margin in our Pharmaceutical segment is impacted by pharmaceutical price appreciation and the number and value of pharmaceutical launches. In past years, these items have impacted year-over-year margins.

Prices for generic pharmaceuticals generally decline over time. But at times, some generic products experience price appreciation, which may positively impact our margins. The frequency and magnitude of future generic product price appreciation is uncertain.

Prices for branded pharmaceuticals, on the other hand, generally increase over time. The frequency and magnitude of branded product price appreciation also is uncertain, and branded manufacturers may determine not to increase prices or to implement only modest increases, which can limit our margins.

The number of new generic pharmaceutical launches varies from year to year, and the margin impact of new launches varies from product to product. Fewer generic pharmaceutical launches or launches that are less profitable than those previously experienced will have an adverse effect on our year-over-year margins.

**Our business is subject to rigorous regulatory and licensing requirements.**
The healthcare industry is highly regulated. As described in greater detail in the "Business" section, we are subject to regulation in the United States at both the federal and state level and in China and other foreign countries. If we fail to comply with these regulatory requirements, or if allegations are made that we fail to comply, our results of operations and financial condition could be adversely affected.

To lawfully operate our businesses, we are required to obtain and hold permits, licenses and other regulatory approvals from, and to comply with operating and security standards of, numerous governmental bodies. Failure to maintain or renew necessary permits, licenses or approvals, or to comply with required standards, could have an adverse effect on our results of operations and financial condition.

Products that we manufacture, source, distribute or market must comply with regulatory requirements. Noncompliance or concerns over noncompliance may result in suspension of our ability to distribute, import or manufacture products, product recalls or seizures, or criminal or civil sanctions. In addition, it can be costly and time-consuming to obtain regulatory approvals to market a medical device, and such approvals might not be granted on a timely basis, if at all.

We are required to comply with laws relating to healthcare fraud and abuse. The requirements of these laws are complex and subject to varying interpretations, and it is possible that regulatory authorities could challenge our policies and practices. If we fail to comply with these laws, we could be subject to federal or state government investigations or *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments), which could result in civil or criminal sanctions, including the loss of licenses or the ability to participate in Medicare, Medicaid and other federal and state healthcare programs.  Such sanctions and damages could adversely affect our results of operations and financial condition.

Our Cardinal Health at Home business and a few of our other businesses are Medicare-certified suppliers, participate in state Medicaid programs or manufacture or repackage pharmaceuticals that are purchased through federal or state healthcare program. Their failure to comply with applicable standards and regulations could result in civil or criminal sanctions, including the loss of our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

Our government contracts are subject to specific procurement regulations. Failure to comply with applicable rules or regulations or with contractual or other requirements may result in monetary damages and criminal or civil penalties as well as termination of our government contracts or our suspension or debarment from government contract work.

We collect, handle and maintain patient-identifiable healthcare information and other sensitive personal information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information. Regulations currently in place continue to evolve, and new laws in this area could further restrict our ability to collect, handle and maintain personal or patient information, or could require us to incur additional compliance costs, either of which could have an adverse impact on our results of operations. Violations of federal, state or foreign laws concerning

privacy and data protection could subject us to civil or criminal penalties, breach of contract claims, costs for remediation and harm to our reputation.

The U.S. federal government and most states have enacted antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. Violations of federal or state antitrust laws can result in various sanctions, including criminal and civil penalties. Private plaintiffs also could bring civil lawsuits against us for alleged antitrust law violations, including claims for treble damages.

Our global operations are required to comply with the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws, the U.K. Bribery Act and similar anti-bribery laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws. If we fail to comply with any of these laws, we could suffer civil or criminal sanctions.

Our China operations are subject to national, regional and local regulations. The regulatory environment in China is evolving, and officials in the Chinese government exercise broad discretion in deciding how to interpret and apply regulations. It is possible that the Chinese government's current or future interpretation and application of existing or new regulations will negatively impact our China operations, result in regulatory investigations or lead to fines or penalties.

**CVS Health is a large customer that generates a significant amount of our revenue.**

Our sales and credit concentration is significant. CVS Health accounted for 27 percent of our fiscal 2015 revenue and 20 percent of our gross trade receivable balance at June 30, 2015. If CVS Health were to terminate the agreement due to an alleged default by us, default in payment or significantly reduce its purchases of our products and services, our results of operations and financial condition could be adversely affected.

**The anticipated benefits of our generic pharmaceutical sourcing venture with CVS Health may not be realized.**

In July 2014, we established the Red Oak Sourcing venture with CVS Health with an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. We are required to pay quarterly payments to CVS Health. If the venture does not continue to be successful, our results of operations and financial condition could be adversely affected.

**We could be subject to adverse changes in the tax laws or challenges to our tax positions.**

We are a large multinational corporation with operations in the United States and many foreign countries. As a result, we are subject to the tax laws of many jurisdictions. From time to time, legislative initiatives are proposed in the United States, such as the repeal of last-in, first-out, or LIFO, treatment of inventory or a change in the current U.S. taxation of income earned by foreign subsidiaries, that could adversely affect our tax positions, effective tax rate, tax payments or financial condition. Tax laws are complex and subject to varying interpretations. Tax authorities have challenged some of our tax positions and it is possible that they will challenge others. These

challenges may adversely affect our effective tax rate, tax payments or financial condition.

**The U.S. healthcare environment is changing in many ways, some of which may not be favorable to us.**

The healthcare industry continues to undergo significant changes designed to increase access to medical care, improve safety, contain costs and increase efficiencies. Medicare and Medicaid reimbursement levels have generally declined and the basis for payments is changing, shifting away from fee-for-service and towards value-based payments and risk-sharing models. The use of managed care has increased. Distributors, manufacturers, healthcare providers and pharmacy chains have consolidated and have formed strategic alliances. And large purchasing groups are prevalent. The industry also is experiencing a shift away from traditional healthcare venues like hospitals and into clinics and physician offices, and, in some cases, patients' homes. We could be adversely affected directly or indirectly (if our customers are adversely affected) by these and other changes in the delivery, pricing or utilization of, or reimbursement for, pharmaceuticals, medical products or healthcare services.

**Our business and operations depend on the proper functioning of information systems and critical facilities.**

We rely on our information systems to obtain, rapidly process, analyze and manage data to:

- facilitate the purchase and distribution of inventory items from numerous distribution centers;
- receive, process and ship orders on a timely basis;
- manage the accurate billing and collections for thousands of customers;
- process payments to suppliers;
- facilitate the manufacturing and assembly of medical products; and
- generate financial information.

Our business also depends on the proper functioning of our critical facilities, including our national logistics center. Our results of operations could be adversely affected if our information systems or critical facilities, or our customers' access to them, are interrupted; these systems or facilities are damaged; or these systems or facilities fail, whether due to physical disruptions, such as fire, natural disaster, pandemic or power outage, or due to cyber security incidents or other actions of third parties.

Our business relies on the secure transmission, storage and hosting of patient-identifiable health information, financial information and other sensitive information relating to our customers, company and workforce. The techniques used by those seeking to obtain unauthorized access to our information systems or to those of a third-party service provider, or to disable them, degrade their service or sabotage them, change frequently. In addition, these techniques may be difficult to detect for a long time and often are not recognized until launched against a target. As a result, we may be unable to anticipate these techniques or to implement adequate preventative measures. Any compromise of our information systems or those of a third-party

service provider, including the unauthorized access, use or disclosure of sensitive information, could adversely impact our operations, results of operations or our ability to satisfy legal requirements, including those related to patient-identifiable health information.

The Pharmaceutical segment is in the initial phases of a multi-year upgrade of certain finance and operating systems. If these system upgrades are not effectively implemented or they fail to operate as intended, it could adversely affect the Pharmaceutical segment's supply chain operations and the effectiveness of our internal control over financial reporting.

**Because of the nature of our business, we may become involved in legal proceedings that could adversely impact our cash flows or results of operations.**

Due to the nature of our businesses, which includes the manufacture and distribution of healthcare products, we may from time to time become involved in disputes or legal proceedings. For instance, some of the products that we manufacture or distribute may be alleged to cause personal injury, subjecting us to product liability claims. We also may be named in breach of contract claims or *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments).

Our Medical segment's manufacturing businesses operate in an industry characterized by extensive intellectual property litigation. Patent litigation can result in significant damage awards and injunctions that could prevent the manufacture and sale of affected products or force us to make royalty payments in order to continue selling the affected products.

Litigation is inherently unpredictable, and the unfavorable resolution of one or more of these legal proceedings could adversely affect our cash flows or results of operations.

**Acquisitions can have unanticipated results.**

An important element of our growth strategy has been to acquire other businesses that expand or complement our existing businesses. In fiscal 2015, we spent $503 million to acquire other businesses, and we acquired Harvard Drug in July 2015 for $1.1 billion and entered into an agreement to acquire Cordis for $1.9 billion. Acquisitions involve risks: we may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition; future developments may impair the value of our purchased goodwill or intangible assets; or we may encounter unforeseen accounting, internal control, regulatory or compliance issues. Once completed, the Cordis acquisition will subject us to additional risks relating to regulatory matters, legal proceedings, tax laws or positions and, as discussed later in this section, global operations.

**We depend on certain suppliers to make their raw materials and products available to us and are subject to fluctuations in costs of raw materials and products.**

We depend on the availability of various components, compounds, raw materials (including radioisotopes) and energy supplied by others for our operations. Any of our supplier relationships could be interrupted due to events beyond our control, including natural

disasters, or could be terminated. A sustained supply interruption could have an adverse effect on our business.

Our manufacturing businesses use oil-based resins, cotton, latex and other commodities as raw materials in many products. Prices of oil and gas also affect our distribution and transportation costs. Prices of these commodities are volatile and can fluctuate significantly, causing our costs to produce and distribute our products to fluctuate. Due to competitive dynamics and contractual limitations, we may be unable to pass along cost increases through higher prices. If we cannot fully offset cost increases through other cost reductions, or recover these costs through price increases or surcharges, our results of operations could be adversely affected.

**Our results of operations may suffer upon the bankruptcy, insolvency, or other credit failure of a customer or supplier that has a substantial amount owed to us.**

Most of our customers buy products and services from us on credit, which is made available to customers based on our assessment of creditworthiness. In addition, our relationships with suppliers give rise to amounts owed to us for returned or defective goods and chargebacks, and amounts due to us for services provided to the suppliers. The bankruptcy, insolvency or other credit failure of any customer or supplier that has a substantial amount owed to us could adversely affect our results of operations.

**Our global operations are subject to economic, political and currency risks.**

We conduct our operations in various regions of the world outside of the United States, including North America, South America, Europe and Asia. The scope and complexity of our international operations will expand with the acquisition of Cordis. Global economic and regulatory developments can affect our business in many ways. Our global operations are affected by local economic environments, including inflation, recession, currency volatility and competition. Political changes also can disrupt our global operations, as well as our customers and suppliers, in a particular location. We may not be able to hedge to protect us against these risks, and any hedges may not successfully mitigate these risks. Divergent or unfamiliar regulatory systems and labor markets can increase the risks and burdens of operating in numerous countries.

**Economic conditions may adversely affect demand for our products and services**.

Deterioration in general economic conditions in the United States and other countries in which we do business could adversely affect the amount of prescriptions filled and the number of medical procedures undertaken and, therefore, reduce purchases of our products and services by our customers, which could adversely affect our results of operations. In addition, deteriorating economic conditions may increase bankruptcies, insolvencies or other credit failures of customers or suppliers, which, if they have a substantial amount owed to us, also could adversely affect our results of operations.

# Properties

In the United States, at June 30, 2015, the Pharmaceutical segment operated 22 primary pharmaceutical distribution facilities and one national logistics center; six specialty distribution facilities; and over 150 nuclear pharmacy and cyclotron facilities. The Medical segment operated 78 medical-surgical distribution, assembly, manufacturing and other facilities. Our U.S. operating facilities are located in 45 states and in Puerto Rico.

Outside the United States, at June 30, 2015, our Medical segment operated over 20 facilities in Canada, the Dominican Republic, Malaysia, Malta, Mexico and Thailand that engage in manufacturing, distribution or research. In addition, our Pharmaceutical and Medical segments utilized various distribution and pharmacy facilities in China.

At June 30, 2015, we owned over 70 operating facilities and leased more than 200 operating facilities. Our principal executive offices are headquartered in an owned building located at 7000 Cardinal Place in Dublin, Ohio.

We consider our operating properties to be in satisfactory condition and adequate to meet our present needs. However, we regularly evaluate operating properties and may make further additions and improvements or consolidate locations as we seek opportunities to expand or enhance the efficiency of our business.

# Legal Proceedings

In addition to the proceedings described below, the legal proceedings described in Note 9 of the "Notes to Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

In June 2015, Erste-Sparinvest Kapitalanlagegesellschaft m.b.H., the plaintiff in a derivative action in the U.S. District Court for the Southern District of Ohio, voluntarily dismissed its complaint and the court dismissed the action without prejudice. The plaintiff, a purported shareholder, had filed the action in January 2015 against the current and certain former members of our Board of Directors alleging that the defendants breached their fiduciary duties by failing to implement and maintain a system to prevent diversion of controlled substances in connection with, among other things, the DEA's past suspensions of our distribution centers' registrations. The derivative complaint sought, among other things, unspecified money damages against the defendants and an award of attorney's fees.  In dismissing the complaint, the plaintiff stated that it believed it was unlikely to be able to sustain its burden of proof regarding the allegations.  Neither we nor any of the other defendants made any payments or other concessions in connection with the dismissal.

# Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

Our common shares are listed on the New York Stock Exchange under the symbol "CAH." The following table reflects the range of the reported high and low closing prices of our common shares as reported on the New York Stock Exchange Composite Tape and the per share dividends declared for the fiscal years ended June 30, 2015 and 2014 and paid quarterly. It also reflects the range of the reported high and low closing prices of our common shares from July 1, 2015 through the period ended on July 31, 2015 and the per share dividends declared from July 31, 2015 through the period ended on August 5, 2015:

| | High | Low | Dividends |
|---|---|---|---|
| **Fiscal 2014** | | | |
| Quarter Ended: | | | |
| September 30, 2013 | $ 53.57 | $ 47.02 | $ 0.3025 |
| December 31, 2013 | 67.48 | 52.95 | 0.3025 |
| March 31, 2014 | 73.54 | 65.26 | 0.3025 |
| June 30, 2014 | 71.31 | 63.80 | 0.3425 |
| **Fiscal 2015** | | | |
| Quarter Ended: | | | |
| September 30, 2014 | $ 77.66 | $ 69.59 | $ 0.3425 |
| December 31, 2014 | 83.04 | 72.13 | 0.3425 |
| March 31, 2015 | 91.25 | 79.19 | 0.3425 |
| June 30, 2015 | 91.50 | 83.65 | 0.3870 |
| **Fiscal 2016** | $ 87.02 | $ 82.29 | $ 0.3870 |

At July 31, 2015 there were approximately 9,693 shareholders of record of our common shares.

We anticipate that we will continue to pay quarterly cash dividends in the future. The payment and amount of future dividends remain, however, within the discretion of our Board of Directors and will depend upon our future earnings, financial condition, capital requirements and other factors.

## Issuer Purchases of Equity Securities

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Program (2) (in millions) |
|---|---|---|---|---|
| April 2015 | 150 | $ 90.23 | — | $ 1,043 |
| May 2015 | 1,959,760 | 88.10 | 1,959,563 | 870 |
| June 2015 | 2,006,653 | 88.39 | 2,006,458 | 693 |
| **Total** | **3,966,563** | **$ 88.25** | **3,966,021** | **$ 693** |

(1)   Reflects 150, 197 and 195 common shares purchased in April, May and June 2015, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2)   On October 29, 2013, our Board of Directors approved a $1.0 billion share repurchase program and on August 6, 2014, the Board of Directors authorized an additional $1.0 billion under the program, for a total of $2.0 billion. This program expires on December 31, 2016.  During the three months ended June 30, 2015, we repurchased 4.0 million common shares under this program.

## Five Year Performance Graph

The following line graph compares the cumulative total return of our common shares with the cumulative total return of the Standard & Poor's Composite—500 Stock Index (the "S&P 500 Index") and the Standard & Poor's Composite—500 Healthcare Index (the "S&P 500 Healthcare Index"). The line graph assumes, in each case, an initial investment of $100 on June 30, 2010, based on the market prices at the end of each fiscal year through and including June 30, 2015, and reinvestment of dividends. The S&P 500 Index and S&P 500 Healthcare Index investments are weighted on the basis of market capitalization at the beginning of each period.



| | June 30 | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | **2015** |
| Cardinal Health, Inc. | $ 100.00 | $ 137.92 | $ 130.26 | $ 150.19 | $ 222.46 | **$ 276.10** |
| S&P 500 Index | 100.00 | 130.68 | 137.75 | 166.10 | 206.92 | **222.24** |
| S&P 500 Healthcare Index | 100.00 | 128.54 | 141.09 | 180.23 | 234.38 | **290.99** |

# Management Reports

## Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2015. Based on this evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were effective as of June 30, 2015 to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

## Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also controls deemed effective now may become inadequate in the future because of changes in conditions, or because compliance with the policies or procedures has deteriorated or been circumvented.

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2015. In making this assessment, management used the criteria established in the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the "COSO criteria"). Based on management's assessment and the COSO criteria, management believes that our internal control over financial reporting was effective as of June 30, 2015.

Our independent registered public accounting firm, Ernst & Young LLP, has issued a report on our internal control over financial reporting. Ernst & Young LLP's report appears following this "Management Reports" section and expresses an unqualified opinion on the effectiveness of our internal control over financial reporting.

## Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended June 30, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

# Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting

The Board of Directors and Shareholders of Cardinal Health, Inc.

We have audited Cardinal Health, Inc. and subsidiaries' internal control over financial reporting as of June 30, 2015, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). Cardinal Health, Inc. and subsidiaries' management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying "Management's Report on Internal Control Over Financial Reporting." Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Cardinal Health, Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of June 30, 2015, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Cardinal Health, Inc. and subsidiaries as of June 30, 2015 and 2014 and the related consolidated statements of earnings, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended June 30, 2015 of Cardinal Health, Inc. and subsidiaries and our report dated August 13, 2015 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Columbus, Ohio
August 13, 2015

**Reports**

# Report of Independent Registered Public Accounting Firm

The Board of Directors and Shareholders of Cardinal Health, Inc.

We have audited the accompanying consolidated balance sheets of Cardinal Health, Inc. and subsidiaries as of June 30, 2015 and 2014, and the related consolidated statements of earnings, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended June 30, 2015. Our audits also included the financial statement schedule listed in the Index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Cardinal Health, Inc. and subsidiaries at June 30, 2015 and 2014, and the consolidated results of their operations and their cash flows for each of the three years in the period ended June 30, 2015, in conformity with U.S. generally accepted accounting principles.  Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Cardinal Health, Inc. and subsidiaries' internal control over financial reporting as of June 30, 2015, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated August 13, 2015 expressed an unqualified opinion thereon.

 /s/ Ernst & Young LLP

 Columbus, Ohio
 August 13, 2015

| | **Page** |
|---|---|
| Consolidated Financial Statements and Schedule: | |
| Consolidated Statements of Earnings for the Fiscal Years Ended June 30, 2015, 2014 and 2013 | **44** |
| Consolidated Statements of Comprehensive Income for the Fiscal Years Ended June 30, 2015, 2014 and 2013 | **45** |
| Consolidated Balance Sheets at June 30, 2015 and 2014 | **46** |
| Consolidated Statements of Shareholders' Equity for the Fiscal Years Ended June  30, 2015, 2014 and 2013 | **47** |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2015, 2014 and 2013 | **48** |
| Notes to Consolidated Financial Statements | **49** |

# Consolidated Statements of Earnings

| (in millions, except per common share amounts) | | **2015** | | 2014 | | 2013 |
|---|---|---|---|---|---|---|
| Revenue | $ | **102,531** | $ | 91,084 | $ | 101,093 |
| Cost of products sold | | **96,819** | | 85,923 | | 96,172 |
| Gross margin | | **5,712** | | 5,161 | | 4,921 |
| | | | | | | |
| **Operating expenses:** | | | | | | |
| Distribution, selling, general and administrative expenses | | **3,240** | | 3,028 | | 2,875 |
| Restructuring and employee severance | | **44** | | 31 | | 71 |
| Amortization and other acquisition-related costs | | **281** | | 223 | | 158 |
| Impairments and (gain)/loss on disposal of assets, net | | **(19)** | | 15 | | 859 |
| Litigation (recoveries)/charges, net | | **5** | | (21) | | (38) |
| Operating earnings | | **2,161** | | 1,885 | | 996 |
| | | | | | | |
| Other income, net | | **(7)** | | (46) | | (15) |
| Interest expense, net | | **141** | | 133 | | 123 |
| Loss on extinguishment of debt | | **60** | | — | | — |
| Earnings before income taxes and discontinued operations | | **1,967** | | 1,798 | | 888 |
| | | | | | | |
| Provision for income taxes | | **755** | | 635 | | 553 |
| Earnings from continuing operations | | **1,212** | | 1,163 | | 335 |
| | | | | | | |
| Earnings/(loss) from discontinued operations, net of tax | | **3** | | 3 | | (1) |
| **Net earnings** | $ | **1,215** | $ | 1,166 | $ | 334 |
| | | | | | | |
| **Basic earnings per common share:** | | | | | | |
| Continuing operations | $ | **3.65** | $ | 3.41 | $ | 0.98 |
| Discontinued operations | | **0.01** | | 0.01 | | — |
| **Net basic earnings per common share** | $ | **3.66** | $ | 3.42 | $ | 0.98 |
| | | | | | | |
| **Diluted earnings per common share:** | | | | | | |
| Continuing operations | $ | **3.61** | $ | 3.37 | $ | 0.97 |
| Discontinued operations | | **0.01** | | 0.01 | | — |
| **Net diluted earnings per common share** | $ | **3.62** | $ | 3.38 | $ | 0.97 |
| | | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | | |
| Basic | | **332** | | 341 | | 341 |
| Diluted | | **335** | | 345 | | 344 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Statements of Comprehensive Income

| (in millions) | | **2015** | | 2014 | | 2013 |
|---|---|---|---|---|---|---|
| Net earnings | $ | **1,215** | $ | 1,166 | $ | 334 |
| | | | | | | |
| **Other comprehensive income/(loss):** | | | | | | |
| Foreign currency translation adjustments | | **(104)** | | 9 | | 18 |
| Net unrealized gain/(loss) on derivative instruments, net of tax | | **11** | | (7) | | 13 |
| Total other comprehensive income/(loss), net of tax | | **(93)** | | 2 | | 31 |
| **Total comprehensive income** | $ | **1,122** | $ | 1,168 | $ | 365 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Balance Sheets

| (in millions) | | June 30 | |
|---|---|---|---|
| | | **2015** | 2014 |
| **Assets** | | | |
| **Current assets:** | | | |
| Cash and equivalents | $ | **4,616** | $ 2,865 |
| Trade receivables, net | | **6,523** | 5,380 |
| Inventories, net | | **9,211** | 8,266 |
| Prepaid expenses and other | | **1,402** | 1,428 |
| Total current assets | | **21,752** | 17,939 |
| | | | |
| Property and equipment, net | | **1,506** | 1,459 |
| Goodwill and other intangibles, net | | **6,018** | 5,870 |
| Other assets | | **866** | 765 |
| Total assets | $ | **30,142** | $ 26,033 |
| | | | |
| **Liabilities and Shareholders' Equity** | | | |
| **Current liabilities:** | | | |
| Accounts payable | $ | **14,368** | $ 12,149 |
| Current portion of long-term obligations and other short-term borrowings | | **281** | 801 |
| Other accrued liabilities | | **2,594** | 2,165 |
| Total current liabilities | | **17,243** | 15,115 |
| | | | |
| Long-term obligations, less current portion | | **5,211** | 3,171 |
| Deferred income taxes and other liabilities | | **1,432** | 1,346 |
| | | | |
| **Shareholders' equity:** | | | |
| Preferred shares, without par value: | | | |
| Authorized—**500 thousand** shares, Issued—**none** | | **—** | — |
| Common shares, without par value: | | | |
| Authorized—**755 million** shares, Issued—**364 million** shares at **June 30, 2015** and 2014 | | **3,003** | 2,980 |
| Retained earnings | | **5,521** | 4,774 |
| Common shares in treasury, at cost: **36 million** shares and 27 million shares at **June 30, 2015** and 2014, respectively | | **(2,245)** | (1,423) |
| Accumulated other comprehensive income/(loss) | | **(23)** | 70 |
| Total shareholders' equity | | **6,256** | 6,401 |
| Total liabilities and shareholders' equity | $ | **30,142** | $ 26,033 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Statements of Shareholders' Equity

| (in millions) | Common Shares | | Retained Earnings | Treasury Shares | | Accumulated Other Comprehensive Income/(Loss) | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares Issued | Amount | | Shares | Amount | | |
| Balance at June 30, 2012 | 364 | $ 2,930 | $ 4,093 | (21) | $ (816) | $ 37 | $ 6,244 |
| Net earnings | | | 334 | | | | 334 |
| Other comprehensive income, net of tax | | | | | | 31 | 31 |
| Employee stock plans activity, including tax impact of $19 million | — | 23 | | 6 | 182 | | 205 |
| Treasury shares acquired | | | | (10) | (450) | | (450) |
| Dividends declared | | | (374) | | | | (374) |
| Other | | | (15) | | | | (15) |
| Balance at June 30, 2013 | 364 | 2,953 | 4,038 | (25) | (1,084) | 68 | 5,975 |
| Net earnings | | | 1,166 | | | | 1,166 |
| Other comprehensive income, net of tax | | | | | | 2 | 2 |
| Employee stock plans activity, including tax impact of $39 million | — | 27 | | 8 | 334 | | 361 |
| Treasury shares acquired | | | | (10) | (673) | | (673) |
| Dividends declared | | | (430) | | | | (430) |
| Balance at June 30, 2014 | 364 | 2,980 | 4,774 | (27) | (1,423) | 70 | 6,401 |
| Net earnings | | | 1,215 | | | | 1,215 |
| Other comprehensive loss, net of tax | | | | | | (93) | (93) |
| Employee stock plans activity, including tax impact of $52 million | — | 23 | | 4 | 214 | | 237 |
| Treasury shares acquired | | | | (13) | (1,036) | | (1,036) |
| Dividends declared | | | (471) | | | | (471) |
| Other | | | 3 | | | | 3 |
| **Balance at June 30, 2015** | **364** | **$ 3,003** | **$ 5,521** | **(36)** | **$ (2,245)** | **$ (23)** | **$ 6,256** |

The accompanying notes are an integral part of these consolidated statements.

**Financial Statements**

# Consolidated Statements of Cash Flows

| (in millions) | | 2015 | | 2014 | | 2013 |
|---|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | | |
| Net earnings | $ | 1,215 | $ | 1,166 | $ | 334 |
| Earnings/(loss) from discontinued operations, net of tax | | (3) | | (3) | | 1 |
| Earnings from continuing operations | | 1,212 | | 1,163 | | 335 |
| | | | | | | |
| Adjustments to reconcile earnings from continuing operations to net cash provided by operating activities: | | | | | | |
| Depreciation and amortization | | 451 | | 459 | | 397 |
| Loss on extinguishment of debt | | 60 | | — | | — |
| Gain on sale of other investments | | (5) | | (32) | | — |
| Impairments and (gain)/loss on disposal of assets, net | | (19) | | 15 | | 859 |
| Share-based compensation | | 110 | | 96 | | 93 |
| Provision for deferred income taxes | | 219 | | 26 | | 21 |
| Provision for bad debts | | 52 | | 42 | | 31 |
| Change in fair value of contingent consideration obligation | | 8 | | — | | — |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | | | |
| Decrease/(increase) in trade receivables | | (870) | | 925 | | 216 |
| Decrease/(increase) in inventories | | (779) | | 142 | | (370) |
| Increase/(decrease) in accounts payable | | 1,948 | | (196) | | 426 |
| Other accrued liabilities and operating items, net | | 153 | | (116) | | (281) |
| Net cash provided by operating activities | | 2,540 | | 2,524 | | 1,727 |
| | | | | | | |
| **Cash flows from investing activities:** | | | | | | |
| Acquisition of subsidiaries, net of cash acquired | | (503) | | (519) | | (2,239) |
| Additions to property and equipment | | (300) | | (249) | | (195) |
| Purchase of available-for-sale securities and other investments | | (342) | | (129) | | (12) |
| Proceeds from sale of available-for-sale securities and other investments | | 206 | | 47 | | — |
| Proceeds from maturities of available-for-sale securities and held-to-maturity securities | | 37 | | — | | 71 |
| Proceeds from divestitures and disposal of held for sale assets | | 53 | | — | | — |
| Net cash used in investing activities | | (849) | | (850) | | (2,375) |
| | | | | | | |
| **Cash flows from financing activities:** | | | | | | |
| Payment of contingent consideration obligation | | (7) | | — | | (4) |
| Net change in short-term borrowings | | (12) | | 114 | | (1) |
| Reduction of long-term obligations | | (1,221) | | (2) | | (305) |
| Proceeds from long-term obligations, net of issuance costs | | 2,672 | | — | | 1,286 |
| Net proceeds from issuance of common shares | | 72 | | 227 | | 121 |
| Tax proceeds/(disbursements) from share-based compensation | | 52 | | 39 | | (19) |
| Dividends on common shares | | (460) | | (415) | | (353) |
| Purchase of treasury shares | | (1,036) | | (673) | | (450) |
| Net cash provided by/(used in) financing activities | | 60 | | (710) | | 275 |
| | | | | | | |
| Net increase/(decrease) in cash and equivalents | | 1,751 | | 964 | | (373) |
| Cash and equivalents at beginning of period | | 2,865 | | 1,901 | | 2,274 |
| **Cash and equivalents at end of period** | $ | 4,616 | $ | 2,865 | $ | 1,901 |
| | | | | | | |
| **Supplemental Information:** | | | | | | |
| Cash payments for interest | $ | 150 | $ | 152 | $ | 128 |
| Cash payments for income taxes | | 529 | | 632 | | 899 |

The accompanying notes are an integral part of these consolidated statements.

# Notes to Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

Cardinal Health, Inc. is a healthcare services and products company that improves the cost-effectiveness of health care. Cardinal Health, Inc. helps pharmacies, hospitals, and other healthcare providers focus on patient care while reducing costs, enhancing efficiency and improving quality. Cardinal Health, Inc. also provides medical products to patients in the home. References to "we", "our" and similar pronouns in these consolidated financial statements are to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context otherwise requires.

Our fiscal year ends on June 30. References to fiscal 2015, 2014 and 2013 in these consolidated financial statements are to the fiscal years ended June 30, 2015, 2014 and 2013, respectively.

### Basis of Presentation

Our consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. The results of businesses acquired or disposed of are included in the consolidated financial statements from the date of the acquisition or up to the date of disposal, respectively.

### Use of Estimates

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). The preparation of financial statements in accordance with GAAP requires us to make estimates, judgments and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates, judgments and assumptions are used in the accounting and disclosure related to, among other items, allowance for doubtful accounts, inventory valuation, business combinations, goodwill and other intangible asset impairment, vendor reserves, loss contingencies, income taxes and share-based compensation. Actual amounts could ultimately differ from these estimated amounts.

### Cash Equivalents

We consider liquid investments purchased with a maturity of three months or less to be cash equivalents. The carrying value of cash equivalents approximates fair value.

### Receivables

Trade receivables are primarily comprised of amounts owed to us through our distribution businesses and are presented net of an allowance for doubtful accounts of $135 million and $137 million at June 30, 2015 and 2014, respectively. An account is considered past due on the first day after its due date. In accordance with contract terms, we generally have the ability to charge customers service fees or higher prices if an account is considered past due. We continuously monitor past due accounts and establish appropriate reserves to cover potential losses, which are based primarily on historical collection rates and the credit worthiness of the customer. We write

off any amounts deemed uncollectible against the established allowance for doubtful accounts.

We provide financing to various customers. Such financing arrangements range from 270 days to 5 years, at interest rates that are generally subject to fluctuation. Interest income on these arrangements is recognized as it is earned. The financings may be collateralized, guaranteed by third parties or unsecured. Finance notes and related accrued interest were $161 million (current portion $53 million) and $158 million (current portion $51 million) at June 30, 2015 and 2014, respectively, and are included in other assets (current portion is included in prepaid expenses and other) in the consolidated balance sheets. Finance notes receivable are reported net of an allowance for doubtful accounts of $14 million and $18 million at June 30, 2015 and 2014, respectively. We estimate an allowance for these financing receivables based on historical collection rates and the credit worthiness of the customer. We write off any amounts deemed uncollectible against the established allowance for doubtful accounts.

### Concentrations of Credit Risk

We maintain cash depository accounts with major banks, and we invest in high quality, short-term liquid instruments and in marketable securities. Our short-term liquid instruments mature within three months and we have not historically incurred any related losses. Investments in marketable securities consist of a portfolio of high-grade instruments. Such investments are made only in instruments issued by highly-rated institutions, whose financial condition we monitor.

Our trade receivables and finance notes and related accrued interest are exposed to a concentration of credit risk with customers in the retail and healthcare sectors. Credit risk can be affected by changes in reimbursement and other economic pressures impacting the healthcare industry. Such credit risk is limited due to supporting collateral and the diversity of the customer base, including its wide geographic dispersion. We perform ongoing credit evaluations of our customers' financial conditions and maintain reserves for credit losses. Historically, such losses have been within our expectations. Refer to the "Receivables" section within this Note 1 for additional information on the accounting treatment of reserves for credit losses.

## Major Customers

The following table summarizes all of our customers that individually account for at least 10 percent of revenue and their corresponding percent of gross trade receivables. The customers in the table below are primarily serviced through our Pharmaceutical segment.

| | Percent of Revenue | | | Percent of Gross Trade Receivables at June 30 | |
|---|---|---|---|---|---|
| | **2015** | 2014 | 2013 | **2015** | 2014 |
| CVS Health | **27%** | 28% | 23% | **20%** | 22% |
| Walgreen Co. | **—%** | 4% | 20% | **—%** | —% |

Our pharmaceutical distribution contract with Walgreen Co. ("Walgreens") expired on August 31, 2013.

We have entered into agreements with group purchasing organizations ("GPOs") which act as purchasing agents that negotiate vendor contracts on behalf of their members. Novation, LLC and Premier Purchasing Partners, L.P. are our two largest GPO member relationships in terms of revenue. Sales to members of these two GPOs collectively accounted for 18 percent, 17 percent and 13 percent of revenue for fiscal 2015, 2014 and 2013, respectively. Our trade receivable balances are with individual members of the GPO, and therefore no significant concentration of credit risk exists with these types of arrangements.

## Inventories

A substantial portion of our inventories (58 percent and 61 percent at June 30, 2015 and 2014, respectively) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These inventories are included within the core pharmaceutical distribution facilities of our Pharmaceutical segment ("distribution facilities") and are primarily merchandise inventories. The LIFO method presumes that the most recent inventory purchases are the first items sold, so LIFO helps us better match current costs and revenue. We believe that the average cost method of inventory valuation provides a reasonable approximation of the current cost of replacing inventory within these distribution facilities. As such, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation.

If we had used the average cost method of inventory valuation for all inventory within the distribution facilities, the value of our inventories would not have changed in fiscal 2015 or 2014. Inventories valued at LIFO were $114 million and $98 million higher than the average cost value at June 30, 2015 and 2014, respectively. We do not record inventories in excess of replacement cost. As such, we did not record any changes in our LIFO reserve in fiscal 2015 and 2014. Our remaining inventory is primarily stated at the lower of cost, using the first-in, first-out method, or market.

Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $57 million and $44 million at June 30, 2015 and 2014, respectively. We reserve for inventory obsolescence using estimates based on historical experience, sales trends, specific categories of inventory and age of on-hand inventory.

## Cash Discounts

Manufacturer cash discounts are recorded as a component of inventory cost and recognized as a reduction of cost of products sold when the related inventory is sold.

## Property and Equipment

Property and equipment are carried at cost less accumulated depreciation. Property and equipment held for sale are recorded at the lower of cost or fair value less cost to sell. When certain events or changes in operating conditions occur, an impairment assessment may be performed on the recoverability of the carrying amounts.

Depreciation expense is computed using the straight-line method over the estimated useful lives of the assets, including capital lease assets which are depreciated over the terms of their respective leases. We generally use the following range of useful lives for our property and equipment categories: buildings and improvements—3 to 39 years; machinery and equipment—3 to 20 years; and furniture and fixtures—3 to 7 years. We recorded depreciation expense of $254 million, $265 million and $269 million for fiscal 2015, 2014 and 2013, respectively.

The following table presents the components of property and equipment, net at June 30:

| (in millions) | 2015 | 2014 |
|---|---|---|
| Land, building and improvements | $ **1,465** | $ 1,419 |
| Machinery and equipment | **2,440** | 2,326 |
| Furniture and fixtures | **129** | 125 |
| Total property and equipment, at cost | **4,034** | 3,870 |
| Accumulated depreciation and amortization | **(2,528)** | (2,411) |
| **Property and equipment, net** | $ **1,506** | $ 1,459 |

Repairs and maintenance expenditures are expensed as incurred. Interest on long-term projects is capitalized using a rate that approximates the weighted-average interest rate on long-term obligations, which was 2.54 percent at June 30, 2015. The amount of capitalized interest was immaterial for all periods presented.

## Business Combinations

The assets acquired and liabilities assumed in a business combination, including identifiable intangible assets, are recorded at their estimated fair values as of the acquisition date. The excess of the purchase price over the estimated fair value of the identifiable net assets acquired is recorded as goodwill. We base the fair values of identifiable intangible assets on detailed valuations that require management to make significant judgments, estimates and assumptions. Critical estimates and assumptions include: expected future cash flows for customer relationships, trade names and other identifiable intangible assets; discount rates that reflect the risk factors associated with future cash flows; and estimates of useful lives. When an acquisition involves contingent consideration, we recognize a liability equal to the fair value of the contingent consideration obligation at the acquisition date. The estimate of fair

value of a contingent consideration obligation requires subjective assumptions to be made regarding future business results, discount rates, discount periods and probabilities assigned to various potential business result scenarios. Subsequent revisions to these assumptions could materially change the estimate of the fair value of contingent consideration obligations and therefore could materially affect our financial position or results of operations. See Note 2 for additional information regarding our acquisitions.

## Goodwill and Other Intangible Assets

Purchased goodwill and intangible assets with indefinite lives are not amortized, but instead are tested for impairment annually or when indicators of impairment exist. Intangible assets with finite lives, primarily customer relationships; trademarks, trade names and patents; and developed technology, are amortized over their useful lives.

Goodwill impairment testing involves a comparison of the estimated fair value of reporting units to the respective carrying amount, which may be performed utilizing either a qualitative or quantitative assessment. A reporting unit is defined as an operating segment or one level below an operating segment (also known as a component). If the estimated fair value exceeds the carrying amount, then no impairment exists. If the carrying amount exceeds the estimated fair value, then a second step is performed to determine the amount of impairment, if any. An impairment charge is the amount by which the carrying amount of goodwill exceeds the estimated implied fair value of goodwill. We estimate the implied fair value of goodwill as the excess of the estimated fair value of the reporting unit over the estimated fair value of its identifiable net assets. This is the same manner we use to recognize goodwill from a business combination. Goodwill impairment testing involves judgment, including the identification of reporting units, the estimation of the fair value of each reporting unit and, if necessary, the estimation of the implied fair value of goodwill.

We have two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. These operating segments are comprised of divisions (components), for which discrete financial information is available. Components are aggregated into reporting units for purposes of goodwill impairment testing to the extent that they share similar economic characteristics. Our reporting units are: Pharmaceutical operating segment (excluding our Nuclear Pharmacy Services division and Cardinal Health China - Pharmaceutical division); Nuclear Pharmacy Services division; Cardinal Health China - Pharmaceutical division; Medical operating segment (excluding our Cardinal Health at Home division); and our Cardinal Health at Home Division.

Fair value can be determined using market, income or cost-based approaches. Our determination of estimated fair value of the reporting units is based on a combination of the income-based and market-based approaches. Under the income-based approach, we use a discounted cash flow model in which cash flows anticipated over several future periods, plus a terminal value at the end of that time horizon, are discounted to their present value using an appropriate risk-adjusted rate of return. We use our internal forecasts to estimate future cash flows and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for each reporting unit. Actual results may differ materially from those used in our forecasts. We use discount rates that are commensurate with the risks and uncertainty inherent in the respective reporting units and in our internally-developed forecasts. Discount rates used in our reporting unit valuations ranged from 8.5 to 11 percent. Under the market-based approach, we determine fair value by comparing our reporting units to similar businesses or guideline companies whose securities are actively traded in public markets. To further confirm fair value, we compare the aggregate fair value of our reporting units to our total market capitalization. Estimating the fair value of reporting units requires the use of estimates and significant judgments that are based on a number of factors including forecasted operating results. The use of alternate estimates and assumptions or changes in the industry or peer groups could materially affect the determination of fair value for each reporting unit and potentially result in goodwill impairment.

We performed annual impairment testing in fiscal 2015, 2014 and 2013 and, with the exception of our Nuclear Pharmacy Services division in fiscal 2013, concluded that there were no impairments of goodwill as the estimated fair value of each reporting unit exceeded its carrying value. As discussed further in Note 4, during the fourth quarter of fiscal 2013 we recognized an $829 million ($799 million, net of tax) goodwill impairment charge related to our Nuclear Pharmacy Services division, which is included in impairments and loss on disposal of assets in our consolidated statements of earnings.

We review intangible assets with finite lives for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable. Determining whether an impairment loss occurred requires a comparison of the carrying amount to the sum of the future forecasted undiscounted cash flows expected to be generated by the asset. Actual results may differ materially from those used in our forecasts.

## Investments

Investments in non-marketable equity securities are accounted for under either the cost or equity method of accounting and are included in other assets in the consolidated balance sheets. For investments in which we can exercise significant influence, we use the equity method of accounting and our share of the earnings and losses, which was immaterial, both individually and in the aggregate, for all periods presented, is recorded in other income, net in the consolidated statements of the earnings. We monitor investments for other-than-temporary impairment by considering factors such as the operating performance of the investment and current economic and market conditions.

During fiscal 2014, we sold our minority equity interests in two investments for proceeds of $47 million, which resulted in a pre-tax gain of $32 million ($20 million, net of tax) included in other income, net in the consolidated statements of earnings.

Also during fiscal 2014, we purchased marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. Unrealized gains and losses on

available-for-sale securities, net of applicable taxes, are included within shareholders' equity in accumulated other comprehensive income ("AOCI"). We monitor these securities for other-than-temporary impairment by considering factors such as the duration that, and the extent to which, the fair value is below cost, the operating performance and credit worthiness of the issuer of the securities and current economic and market conditions. See Note 6 for additional information regarding available-for-sale securities.

We previously held $72 million of investments in fixed income corporate debt securities, which were classified as held-to-maturity and matured during fiscal 2013.

## Vendor Reserves

In the ordinary course of business, our vendors may dispute deductions taken against payments otherwise due to them or assert other billing disputes. These disputed transactions are researched and resolved based upon our policy and findings of the research performed. At any given time, there are outstanding items in various stages of research and resolution. In determining appropriate reserves for areas of exposure with our vendors, we assess historical experience and current outstanding claims. We have established various levels of reserves based on the type of claim and status of review. Though the claim types are relatively consistent, we periodically refine our methodology by updating the reserve estimate percentages to reflect actual historical experience. The ultimate outcome of certain claims may be different than our original estimate and may require an adjustment. All adjustments to vendor reserves are included in cost of products sold. In addition, the reserve balance will fluctuate due to variations of outstanding claims from period-to-period, timing of settlements and specific vendor issues, such as bankruptcies. Vendor reserves were $88 million and $82 million at June 30, 2015 and 2014, respectively, excluding third-party returns. See separate section in Note 1 for a description of third-party returns.

## Distribution Service Agreement and Other Vendor Fees

Our Pharmaceutical segment recognizes fees received from its distribution service agreements and other fees received from vendors related to the purchase or distribution of the vendors' inventory when those fees have been earned and we are entitled to payment. Since the benefit provided to a vendor is related to the purchase and distribution of the vendor's inventory, we recognize the fees as a reduction in the carrying value of the inventory that generated the fees, and as such, a reduction of cost of products sold in our consolidated statements of earnings when the inventory is sold.

## Loss Contingencies

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss

may differ from these estimates. See Note 9 for additional information regarding loss contingencies.

## Income Taxes

We account for income taxes using the asset and liability method. The asset and liability method requires recognition of deferred tax assets and liabilities for expected future tax consequences of temporary differences that currently exist between the tax bases and financial reporting bases of our assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates in the respective jurisdictions in which we operate. Deferred taxes are not provided on the unremitted earnings of subsidiaries outside of the United States when it is expected that these earnings are permanently reinvested.

Tax benefits from uncertain tax positions are recognized when it is more likely than not that the position will be sustained upon examination of the technical merits of the position, including resolutions of any related appeals or litigation processes. The amount recognized is measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon settlement. See Note 8 for additional information regarding income taxes.

## Other Accrued Liabilities

Other accrued liabilities represent various current obligations, including certain accrued operating expenses and taxes payable.

## Share-Based Compensation

Share-based compensation to employees is recognized in the consolidated statements of earnings based on the grant date fair value of the awards. The fair value of stock options is determined on the grant date using a lattice valuation model. The fair value of restricted share units and performance share units is determined by the grant date market price of our common shares. The compensation expense associated with nonvested performance share units is dependent on our periodic assessment of the probability of the targets being achieved and our estimate, which may vary over time, of the number of shares that ultimately will be issued. The compensation expense recognized for share-based awards is net of estimated forfeitures and is recognized ratably over the service period of the awards. We classify share-based compensation expense in distribution, selling, general and administrative ("SG&A") expenses to correspond with the same line item as the majority of the cash compensation paid to employees. If awards are modified in connection with a restructuring activity, the incremental share-based compensation expense is classified in restructuring and employee severance. See Note 16 for additional information regarding share-based compensation.

## Dividends

We paid cash dividends per common share of $1.37, $1.21 and $1.025 in fiscal 2015, 2014 and 2013, respectively.

## Revenue Recognition

We recognize revenue when persuasive evidence of an arrangement exists, product delivery has occurred or the services have been

rendered, the price is fixed or determinable, and collectability is reasonably assured.

### Pharmaceutical Segment

The Pharmaceutical segment recognizes distribution revenue when title transfers to its customers and we have no further obligation to provide services related to such merchandise.

Revenue for deliveries that are directly shipped to customer warehouses from the manufacturer when we act as an intermediary in the ordering and delivery of products is recorded gross. This is in accordance with accounting standards addressing reporting revenue on a gross basis as a principal versus on a net basis as an agent. This revenue is recorded on a gross basis since we incur credit risk from the customer, bear the risk of loss for incomplete shipments and do not receive a separate fee or commission for the transaction and, as such, are the primary obligor. Revenue from these sales is recognized when title transfers to the customer and we have no further obligation to provide services related to such merchandise.

Radiopharmaceutical revenue is recognized upon delivery of the product to the customer and we have no further obligation to provide services related to such merchandise.

### Medical Segment

The Medical segment recognizes revenue when title transfers to its customers and we have no further obligation to provide services related to such merchandise.

## Sales Returns and Allowances

Revenue is recorded net of sales returns and allowances. Our customer return policies generally require that the product be physically returned, subject to restocking fees, in a condition suitable to be added back to inventory and resold at full value, or returned to vendors for credit ("merchantable product"). Product returns are generally consistent throughout the year and typically are not specific to any particular product or customer.

We accrue for estimated sales returns and allowances at the time of sale based upon historical customer return trends, margin rates and processing costs. Our accrual for sales returns is reflected as a reduction of revenue and cost of products sold for the sales price and cost, respectively. At June 30, 2015 and 2014, the accrual for estimated sales returns and allowances was $305 million and $273 million, respectively, the impact of which is reflected in trade receivables, net and inventories, net in the consolidated balance sheets. Sales returns and allowances were $2.0 billion, $1.7 billion and $2.3 billion, for fiscal 2015, 2014 and 2013, respectively.

## Third-Party Returns

Since we generally do not accept non-merchantable product returns from our customers, many of our customers return non-merchantable pharmaceutical products to the manufacturer through third parties. Since our customers generally do not have a direct relationship with manufacturers, our vendors pass the value of such returns to us (usually in the form of an accounts payable deduction) for distribution to customers. We, in turn, pass the value received, less an administrative fee, to our customer. In certain instances, we pass the

estimated value of the return to our customer prior to our receipt of the value from the vendor. Although we believe we have satisfactory protections, we could be subject to claims from customers or vendors if our administration of this overall process was deficient in some respect or our contractual terms with vendors are in conflict with our contractual terms with our customers. We have maintained reserves for some of these situations based on their nature and our historical experience with their resolution.

## Shipping and Handling

Shipping and handling costs are primarily included in SG&A expenses in our consolidated statements of earnings. Shipping and handling costs include all delivery expenses as well as all costs to prepare the product for shipment to the end customer. Shipping and handling costs were $454 million, $430 million and $419 million, for fiscal 2015, 2014 and 2013, respectively. Revenue received for shipping and handling was immaterial for all periods presented.

## Restructuring and Employee Severance

We consider restructuring activities to be programs by which we fundamentally change our operations, such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel) and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions). See Note 3 for additional information regarding our restructuring activities.

## Amortization and Other Acquisition-Related Costs

We classify costs incurred in connection with acquisitions as amortization and other acquisition-related costs in our consolidated statements of earnings. These costs consist of amortization of acquisition-related intangible assets, transaction costs, integration costs and changes in the fair value of contingent consideration obligations. Transaction costs are incurred during the initial evaluation of a potential acquisition and primarily relate to costs to analyze, negotiate and consummate the transaction as well as due diligence activities. Integration costs relate to activities required to combine the operations of an acquired enterprise into our operations and, in the case of Cordis (a business of Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, as further described in Note 2) to stand-up the systems and processes needed to support its global footprint. We record changes in the fair value of contingent consideration obligations relating to acquisitions as income or expense in amortization and other acquisition-related costs. See Note 5 for additional information regarding amortization of acquisition-related intangible assets and Note 11 for additional information regarding contingent consideration.

## Translation of Foreign Currencies

Financial statements of our subsidiaries outside the United States are generally measured using the local currency as the functional currency. Adjustments to translate the assets and liabilities of these foreign subsidiaries into U.S. dollars are accumulated in shareholders' equity AOCI utilizing period-end exchange rates.

Revenues and expenses of these foreign subsidiaries are translated using average exchange rates during the year.

The foreign currency translation gains/(losses) included in AOCI at June 30, 2015 and 2014 are presented in Note 13. Foreign currency transaction gains and losses for the period are included in the consolidated statements of earnings in other income, net, and were immaterial for all periods presented.

## Interest Rate, Currency and Commodity Risk

All derivative instruments are recognized at fair value on the consolidated balance sheets and all changes in fair value are recognized in net earnings or shareholders' equity through AOCI, net of tax.

For contracts that qualify for hedge accounting treatment, the hedge contracts must be effective at reducing the risk associated with the exposure being hedged and must be designated as a hedge at the inception of the contract. Hedge effectiveness is assessed periodically. Any contract not designated as a hedge, or so designated but ineffective, is adjusted to fair value and recognized immediately in net earnings. If a fair value or cash flow hedge ceases to qualify for hedge accounting treatment, the contract continues to be carried on the balance sheet at fair value until settled and future adjustments to the contract's fair value are recognized immediately in net earnings. If a forecasted transaction is no longer considered probable of occurring, amounts previously deferred in AOCI are recognized immediately in net earnings. See Note 12 for additional information regarding our derivative instruments, including the accounting treatment for instruments designated as fair value, cash flow and economic hedges.

## Earnings per Common Share

Basic earnings per share ("EPS") is computed by dividing net earnings (the numerator) by the weighted-average number of common shares outstanding during each period (the denominator). Diluted EPS is similar to the computation for basic EPS, except that the denominator is increased by the dilutive effect of vested and nonvested stock options, restricted share units and performance share units, computed using the treasury stock method. The total number of common shares outstanding is the number of common shares issued, less those held in treasury. See Note 14 for additional information regarding EPS.

## Fair Value Measurements

Fair value is defined as the price that would be received upon selling an asset or the price paid to transfer a liability on the measurement date. It focuses on the exit price in the principal or most advantageous market for the asset or liability in an orderly transaction between willing market participants. A three-tier fair value hierarchy is established as a basis for considering such assumptions and for inputs used in the valuation methodologies in measuring fair value. This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair values are:

Level 1 - Observable prices in active markets for identical assets and liabilities.

Level 2 - Observable inputs other than quoted prices in active markets for identical assets and liabilities.

Level 3 - Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets and liabilities.

See Note 11 for additional information regarding fair value measurements.

## Recent Financial Accounting Standards

In July 2015, the Financial Accounting Standards Board ("FASB") issued amended accounting guidance that simplifies the current guidance surrounding the measurement of inventory. Under this amended guidance, inventory is measured at the lower of cost and net realizable value, which eliminates the need to determine replacement cost and evaluate whether the inventory is above or below net realizable value. Net realizable value is defined as the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. The amended guidance does not apply to inventory measured under the LIFO method. This amendment will be effective for us in the first quarter of fiscal 2018. We are currently evaluating the impact of adoption on our financial position and results of operations.

In April 2015, the FASB issued amended accounting guidance that clarifies the circumstances under which a cloud computing customer would account for the arrangement as a license of internal-use software. If it is determined that a software license does not exist in the arrangement, the customer would account for this arrangement as a service contract. This amendment will be effective for us in the first quarter of fiscal 2017, with early adoption permitted. We are currently evaluating the impact of adoption on our financial position and results of operations and the timing of adoption.

Also in April 2015, the FASB issued amended accounting guidance related to the presentation of debt issuance costs in the financial statements. This guidance requires an entity to present such costs in the balance sheet as a direct deduction from the related debt rather than as an asset. This amendment will be effective for us in the first quarter of fiscal 2017, with early adoption permitted. Adoption of the guidance would reclassify debt issuance costs from other assets to long-term obligations, less current portion within the consolidated balance sheet. We do not expect the adoption to have a material impact on our financial position or results of operations, and are currently evaluating the timing of adoption.

In August 2014, the FASB issued amended accounting guidance related to uncertainties about an entity's ability to continue as a going concern. This guidance requires management to evaluate whether there is substantial doubt about a company's ability to continue as a going concern. This amendment will be effective for us in the fourth quarter of fiscal 2017, with early adoption permitted. We do not expect the adoption of this guidance to impact our financial statement disclosures.

In June 2014, the FASB issued guidance on accounting for share-based payments with performance targets. This guidance requires

that a performance target that affects vesting and that could be achieved after the requisite service period be treated as a performance condition. This guidance will be effective for us in the first quarter of fiscal 2017, with early adoption permitted. We do not expect the adoption of this guidance to have a material impact on our financial position or results of operations.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. In July 2015, the FASB finalized a proposal to defer the effective date for one year beyond the originally specified effective date. This amendment will be effective for us in the first quarter of fiscal 2019. We are continuing to evaluate the options for adoption and the impact on our financial position and results of operations.

In April 2014, the FASB issued amended accounting guidance related to the reporting of discontinued operations and disclosures of disposals of components of an entity. The amended guidance changes the thresholds for disposals to qualify as discontinued operations and requires additional disclosures. This amendment will be effective for us in the first quarter of fiscal 2016, with early adoption permitted. We will adopt this guidance on a prospective basis, and we do not expect the adoption to impact our financial position or results of operations.

In July 2013, the FASB issued amended accounting guidance related to the presentation of an unrecognized tax benefit when a net operating loss carryforward, a similar tax loss, or a tax credit carryforward exists. This guidance requires an entity to present an unrecognized tax benefit, or a portion of an unrecognized tax benefit, as a reduction to a deferred tax asset for a net operating loss carryforward, a similar tax loss, or a tax credit carryforward, unless certain conditions exists. We adopted this guidance in the first quarter of fiscal 2015. The adoption of this guidance did not impact our financial position or results of operations.

In March 2013, the FASB issued amended accounting guidance related to a parent company's accounting for the cumulative translation adjustment upon derecognition of certain subsidiaries or group of assets within a foreign entity or of an investment in a foreign entity. The amended guidance requires the release of any cumulative translation adjustment into net income only upon complete or substantially complete liquidation of a controlling interest in a subsidiary or a group of assets within a foreign entity. Also, it requires the release of all or a pro rata portion of the cumulative translation adjustment to net income in the case of sale of an equity method investment that is a foreign entity. We adopted this amended guidance in the first quarter of fiscal 2015. The adoption of this guidance did not impact our financial position or results of operations.

## 2. Acquisitions

While we have completed acquisitions impacting both the Pharmaceutical and Medical segments during fiscal 2015, the pro forma results of operations and the results of operations for acquired businesses since the acquisition dates have not been separately disclosed because the effects were not significant compared to the consolidated financial statements, individually or in the aggregate. The cash paid for these acquisitions, net of cash acquired, was $503 million. During the three months ended June 30, 2015, we completed the largest of these acquisitions for a purchase price of approximately $193 million, which was paid in cash, and potential maximum contingent payments of $30 million.

### The Harvard Drug Group

On July 2, 2015, we completed the acquisition of The Harvard Drug Group ("Harvard Drug") for $1.1 billion, net of cash acquired, using existing cash and proceeds from the debt offering in June 2015. The acquisition of Harvard Drug, a distributor of generic pharmaceuticals, over-the-counter healthcare and related products to retail, institutional and alternate care customers, is expected to enhance our Pharmaceutical segment's generic pharmaceutical distribution and related service businesses. Harvard Drug also manufactures and repackages generic pharmaceuticals and over-the-counter health care products.

### Cordis

On March 1, 2015, we entered into a binding offer letter with Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, to purchase its Cordis business for a purchase price of $1.9 billion in cash, subject to certain adjustments. On May 27, 2015, Ethicon accepted the offer and countersigned the stock and asset purchase agreement, which we previously executed. The acquisition of Cordis, a manufacturer and distributor of interventional cardiology devices and endovascular solutions, is expected to expand the Medical segment's portfolio of self-manufactured products and its geographic scope. We expect to finance the acquisition using proceeds from the registered debt offering in June 2015, as described in Note 7, and cash on hand.

Cordis is a global company, with operations in more than 50 countries. The acquisition is expected to close in approximately 20 principal countries during the second quarter of fiscal 2016 and in the remaining countries afterward, subject to regulatory approval and customary closing conditions. Transaction and integration costs associated with the acquisition of Cordis were $44 million during fiscal 2015, and are included in amortization and other acquisition-related costs in the consolidated statements of earnings.

### AccessClosure

On May 9, 2014, we completed the acquisition of Access Closure, Inc. ("AccessClosure") for $320 million in an all-cash transaction. We funded the acquisition with cash on hand. The acquisition of AccessClosure, a manufacturer and distributor of extravascular closure devices, expands the Medical segment's portfolio of self-manufactured products.

The assessment of the fair value of assets acquired and liabilities assumed for AccessClosure was completed during fiscal 2015 and

resulted in goodwill of $152 million and identifiable intangible assets, primarily developed technology, of $133 million, with a weighted-average useful life of 9 years.

Our fair value estimates utilize significant unobservable inputs and thus represent Level 3 fair value measurements. The estimated fair value of the identifiable intangible assets was determined primarily using an income-based approach, which includes market participant expectations of the cash flows that an asset could generate over its remaining useful life, discounted back to present value using an appropriate rate of return. The useful lives were determined primarily using inputs of projected technology obsolescence rates. The discount rate used to arrive at the present value of identifiable intangible assets was 10 percent to reflect the internal rate of return and uncertainty in the cash flow projections.

## 3. Restructuring and Employee Severance

The following table summarizes restructuring and employee severance costs related to our restructuring activities:

| (in millions) | 2015 (3) | 2014 (4) | 2013 (5) |
|---|---|---|---|
| Employee-related costs (1) | $ 34 | $ 13 | $ 59 |
| Facility exit and other costs (2) | 10 | 18 | 12 |
| **Total restructuring and employee severance** | $ 44 | $ 31 | $ 71 |

(1) Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2) Facility exit and other costs primarily consist of lease termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

(3) The majority of the restructuring and employee severance incurred during fiscal 2015 were related to restructuring activities within our Medical segment.

(4) Includes $10 million of primarily facility exit and other costs related to the restructuring within our Medical segment described further below.

(5) Includes $30 million of employee-related costs and $10 million of facility exit and other costs related to the restructuring within our Medical segment described further below.

On January 30, 2013, we announced a restructuring plan within our Medical segment. Under this restructuring plan, among other things, we have reorganized our Medical segment, moved production of procedure kits from our facility in Waukegan, Illinois to other facilities, consolidated office space and sold property in Waukegan, Illinois, and exited our gamma sterilization business in El Paso, Texas.

We did not recognize significant costs associated with this restructuring plan during fiscal 2015. We recognized costs, on a pre-tax basis, associated with this restructuring plan of $18 million and $51 million in fiscal 2014 and 2013, respectively. Costs recognized in fiscal 2014 included the loss to write down the property in Waukegan, Illinois as discussed in Note 4. Costs recognized in fiscal 2013 included the loss to write down our gamma sterilization assets as discussed in Note 4.

During the fourth quarter of fiscal 2013, we recognized $11 million of employee-related costs related to a restructuring plan within our Nuclear Pharmacy Services division.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | | Facility Exit and Other Costs | | Total | |
|---|---|---|---|---|---|---|
| Balance at June 30, 2012 | $ | 16 | $ | 2 | $ | 18 |
| Additions | | 63 | | 2 | | 65 |
| Payments and other adjustments | | (24) | | (2) | | (26) |
| Balance at June 30, 2013 | $ | 55 | $ | 2 | $ | 57 |
| Additions | | 23 | | 1 | | 24 |
| Payments and other adjustments | | (54) | | (3) | | (57) |
| Balance at June 30, 2014 | $ | 24 | $ | — | $ | 24 |
| Additions | | 34 | | 1 | | 35 |
| Payments and other adjustments | | (36) | | (1) | | (37) |
| **Balance at June 30, 2015** | $ | 22 | $ | — | $ | 22 |

## 4. Impairments and (Gain)/Loss on Disposal of Assets

In connection with our Medical segment restructuring plan announced on January 30, 2013 as discussed in Note 3, the property in Waukegan, Illinois met the criteria for classification as held for sale at June 30, 2014. As a result, during fiscal 2014, we recognized an $8 million loss to write down this property to the estimated fair value, less costs to sell, of $24 million, which was included in prepaid expenses and other in the consolidated balance sheets at June 30, 2014. The fair value was estimated using inputs such as broker listings and sales agreements and thus represents a Level 2 nonrecurring fair value measurement. We completed the sale of our property in Waukegan, Illinois during the second quarter of fiscal 2015, which resulted in a $1 million loss on disposal of assets held for sale.

Also in connection with our Medical segment restructuring plan, during fiscal 2013 we recognized an $11 million loss to write down our gamma sterilization assets in El Paso, Texas.

During fiscal 2013, we recognized an $829 million ($799 million, net of tax) goodwill impairment charge related to our Nuclear Pharmacy Services division, as previously disclosed.

We performed interim goodwill impairment testing for our Nuclear Pharmacy Services division during the three months ended December 31, 2012 as a result of significant softness in the low-energy diagnostics market, and determined that there was no impairment. During the second half of fiscal 2013, we experienced sustained volume declines and price erosion for the core, low-energy products provided by this division. In addition, we experienced reduced sales for some existing high-energy diagnostic products, slower-than-expected adoption of new high-energy diagnostic products, and reimbursement developments that could have adversely impacted the future growth of these products. Using this information, we adjusted our outlook and long-term business plans for this division during our annual budgeting process. This update resulted in significant reductions in the anticipated future cash flows and estimated fair value for this reporting unit.

We completed our annual goodwill impairment test for fiscal 2013, which we perform annually in the fourth quarter, in conjunction with the preparation of our fiscal 2013 consolidated financial statements. Using a combination of the income-based approach (using a discount rate of 10 percent) and the market-based approach, the fair value of this reporting unit was estimated to be below the carrying amount and therefore indicated impairment. The second step of the impairment test resulted in the impairment of the entire $829 million carrying amount of goodwill for this reporting unit. Our fair value estimates utilize significant unobservable inputs and thus represent Level 3 fair value measurements. This impairment charge did not impact our liquidity, cash flows from operations, or compliance with debt covenants.

We also recognized an $8 million loss during fiscal 2013 to write down commercial software under development within our Pharmaceutical segment in connection with our decision to discontinue this project.

## 5. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill, by segment and in total:

| (in millions) | Pharmaceutical (1) | Medical | Total |
|---|---|---|---|
| Balance at June 30, 2013 | $ 2,094 | $ 2,507 | $ 4,601 |
| Goodwill acquired, net of purchase price adjustments | $ 68 | $ 216 | $ 284 |
| Foreign currency translation adjustments and other | $ (4) | $ (3) | $ (7) |
| Balance at June 30, 2014 | $ 2,158 | $ 2,720 | $ 4,878 |
| Goodwill acquired, net of purchase price adjustments | 41 | 179 | 220 |
| Foreign currency translation adjustments and other | — | (28) | (28) |
| Balance at June 30, 2015 | $ 2,199 | $ 2,871 | $ 5,070 |

(1) At June 30, 2015, 2014 and 2013 the accumulated goodwill impairment loss was $829 million.

The increase in the Medical segment goodwill during fiscal 2014 was primarily due to the AccessClosure acquisition. Goodwill recognized in connection with this acquisition primarily represents the expected benefits from synergies of integrating this business, the existing workforce of the acquired entity, expected growth from new customers and new products, and improvements to existing technologies. See Note 2 for further discussion of this acquisition.

### Other Intangible Assets

Other intangible assets are amortized over periods ranging from one to twenty years. The following tables summarize other intangible assets by class at June 30:

| (in millions) | 2015 Gross Intangible | 2015 Accumulated Amortization | 2015 Net Intangible |
|---|---|---|---|
| **Indefinite-life intangibles:** | | | |
| Trademarks and other | $ 14 | $ — | $ 14 |
| Total indefinite-life intangibles | 14 | — | 14 |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,103 | 501 | 602 |
| Trademarks, trade names and patents | 237 | 91 | 146 |
| Developed technology and other | 320 | 134 | 186 |
| Total definite-life intangibles | 1,660 | 726 | 934 |
| Total other intangible assets | $ 1,674 | $ 726 | $ 948 |

| (in millions) | 2014 Gross Intangible | 2014 Accumulated Amortization | 2014 Net Intangible |
|---|---|---|---|
| **Indefinite-life intangibles:** | | | |
| Trademarks and other | $ 14 | $ — | $ 14 |
| Total indefinite-life intangibles | 14 | — | 14 |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,043 | 388 | 655 |
| Trademarks, trade names and patents | 213 | 69 | 144 |
| Developed technology and other | 258 | 79 | 179 |
| Total definite-life intangibles | 1,514 | 536 | 978 |
| Total other intangible assets | $ 1,528 | $ 536 | $ 992 |

Total amortization of intangible assets was $191 million, $188 million and $121 million for fiscal 2015, 2014 and 2013, respectively. For acquisitions that have closed on or before June 30, 2015, estimated annual amortization of intangible assets for the remainder of fiscal 2016 through 2020 is as follows: $194 million, $184 million, $136 million, $88 million and $79 million. These estimates do not include amortization of intangibles relating to the Harvard Drug and Cordis acquisitions, which may be significant.

## 6. Available-for-Sale Securities

During fiscal 2015 and 2014, we purchased marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. We held the following investments in marketable securities at fair value at June 30:

| (in millions) | 2015 | 2014 |
|---|---|---|
| **Current available-for-sale securities:** | | |
| Commercial paper | $ 4 | $ 4 |
| Treasury bills | 12 | 85 |
| International bonds | 2 | 1 |
| Corporate bonds | 34 | 3 |
| U.S. agency bonds | 5 | — |
| Asset-backed securities | 8 | — |
| U.S. agency mortgage-backed securities | 26 | — |
| Total current available-for-sale securities | 91 | 93 |
| **Long-term available-for-sale securities:** | | |
| Corporate bonds | 33 | 5 |
| U.S. agency bonds | 18 | 2 |
| Asset-backed securities | 41 | — |
| U.S. agency mortgage-backed securities | 10 | — |
| Total long-term available-for-sale securities | 102 | 7 |
| **Total available-for-sale securities** | $ 193 | $ 100 |

Gross unrealized gains and losses were immaterial at both June 30, 2015 and 2014. We did not recognize any other-than-temporary impairments during fiscal 2015 or 2014. At June 30, 2015, the weighted-average effective maturity of our current and long-term investments was approximately 8 months and 16 months, respectively.

## 7. Long-Term Obligations and Other Short-Term Borrowings

The following table summarizes long-term obligations and other short-term borrowings at June 30:

| (in millions) | **2015** | 2014 |
|---|---|---|
| 1.7% Notes due 2018 | $ **404** | $ 401 |
| 1.9% Notes due 2017 | **251** | 251 |
| 1.95% Notes due 2018 | **550** | — |
| 2.4% Notes due 2019 | **450** | — |
| 3.2% Notes due 2022 | **249** | 248 |
| 3.2% Notes due 2023 | **549** | 549 |
| 3.5% Notes due 2024 | **398** | — |
| 3.75% Notes due 2025 | **500** | — |
| 4.0% Notes due 2015 | **—** | 513 |
| 4.5% Notes due 2044 | **345** | — |
| 4.6% Notes due 2043 | **349** | 349 |
| 4.625% Notes due 2020 | **524** | 525 |
| 4.9% Notes due 2045 | **450** | — |
| 5.8% Notes due 2016 | **—** | 301 |
| 5.85% Notes due 2017 | **—** | 158 |
| 6.0% Notes due 2017 | **—** | 197 |
| 7.0% Debentures due 2026 | **124** | 124 |
| 7.8% Debentures due 2016 | **37** | 37 |
| Other obligations | **312** | 319 |
| Total | $ **5,492** | $ 3,972 |
| Less: current portion of long-term obligations and other short-term borrowings | **281** | 801 |
| **Long-term obligations, less current portion** | $ **5,211** | $ 3,171 |

Maturities of existing long-term obligations and other short-term borrowings for fiscal 2016 through 2020 and thereafter are as follows: $281 million, $310 million, $956 million, $2 million, $452 million, and $3,491 million.

### Long-Term Debt

The 1.7%, 1.9%, 1.95%, 2.4%, 3.2%, 3.2%, 3.5%, 3.75%, 4.5%, 4.6%, 4.625%, and 4.9% Notes represent unsecured obligations of Cardinal Health, Inc. and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. The 7.0% and 7.8% Debentures represent unsecured obligations of Allegiance Corporation (a wholly-owned subsidiary), which Cardinal Health, Inc. has guaranteed. None of these obligations are subject to a sinking fund and the Allegiance obligations are not redeemable prior to maturity. Interest is paid pursuant to the terms of the obligations. These notes are effectively subordinated to the liabilities of our subsidiaries, including trade payables of $14 billion.

In June 2015, we sold $550 million aggregate principal amount of 1.95% Notes that mature on June 15, 2018, $500 million aggregate principal amount of 3.75% Notes that mature on September 15, 2025, and $450 million aggregate principal amount of 4.9% Notes that mature on September 15, 2045. We used a portion of the net proceeds from the offering to acquire Harvard Drug on July 2, 2015,

as discussed further in Note 2, and intend to use the remainder of the net proceeds from the offering and cash on hand to consummate the pending Cordis acquisition, as discussed further in Note 2. In the event that the principal closing of the Cordis acquisition has not occurred on or prior to March 31, 2016, or the Cordis Purchase Agreement is terminated, we will be required to redeem all outstanding 1.95% Notes due 2018 and 4.9% Notes due 2045 at a redemption price equal to 101% of the aggregate principal amount, plus accrued and unpaid interest.

In November 2014, we sold $450 million aggregate principal amount of 2.4% Notes that mature on November 15, 2019, $400 million aggregate principal amount of 3.5% Notes that mature on November 15, 2024 and $350 million aggregate principal amount of 4.5% Notes that mature on November 15, 2044.

In December 2014, we used the net proceeds from the November 2014 offering, together with cash on hand, to redeem all of the outstanding 4.0% Notes due 2015, 5.8% Notes due 2016, 5.85% Notes due 2017 and 6.0% Notes due 2017 at a redemption price equal to 100% of the principal amount and any accrued but unpaid interest, plus the applicable make-whole premium. As a result of the redemption, we incurred a loss on the extinguishment of debt of $60 million ($37 million, net of tax), which included a make-whole premium of $80 million, write-off of $2 million of unamortized debt issuance costs, and an offsetting $22 million fair value adjustment to the respective debt related to previously terminated interest rate swaps.

In June 2013, we used cash on hand to repay $300 million of our 5.5% Notes that were due on June 15, 2013.

In February 2013, we sold $400 million aggregate principal amount of 1.7% Notes that mature on March 15, 2018, $550 million aggregate principal amount of 3.2% Notes that mature on March 15, 2023 and $350 million aggregate principal amount of 4.6% Notes that mature on March 15, 2043. We used the proceeds to fund a portion of the purchase price of AssuraMed, Inc. in fiscal 2013.

The 1.7% Notes due 2018, 1.9% Notes due 2017, 1.95% Notes due 2018, 2.4% Notes due 2019, 3.2% Notes due 2022, 3.2% Notes due 2023, 3.5% Notes due 2024, 3.75% Notes due 2025, 4.5% Notes due 2044, 4.6% Notes due 2043, 4.625% Notes due 2020, and 4.9% Notes due 2045 require us to offer to purchase the notes at 101% of the principal amount plus accrued and unpaid interest if we undergo a change of control, as defined in the notes, and if the notes receive specified ratings below investment grade by each of Standard & Poor's Ratings Services, Moody's Investors Service, Inc. and Fitch Ratings.

## Other Financing Arrangements

In connection with the binding offer to purchase the Cordis business discussed in Note 2, we entered into a $1.0 billion 364-day senior unsecured bridge term loan in March 2015. We incurred fees of $4 million related to this bridge loan, which are included in interest expense, net in the consolidated statements of earnings. No amounts were drawn under this bridge loan and we terminated the bridge loan in June 2015.

In addition to cash and cash equivalents at June 30, 2015 and 2014, our sources of liquidity include a $1.5 billion revolving credit facility and commercial paper program of up to $1.5 billion, backed by the revolving credit facility. The revolving credit facility exists largely to support issuances of commercial paper as well as other short-term borrowings for general corporate purposes. We had no outstanding balance under the revolving credit facility at June 30, 2015 and 2014, respectively. Commercial paper outstanding under our commercial paper program ranged from approximately zero to $100 million during fiscal 2015. We had no outstanding borrowings from the commercial paper program at June 30, 2015 and 2014.

On November 3, 2014, we renewed our committed receivables sales facility program through Cardinal Health Funding, LLC ("CHF") until November 3, 2017 and increased the size of the facility from $700 million to $950 million. CHF was organized for the sole purpose of buying receivables and selling undivided interests in those receivables to third-party purchasers. Although consolidated in accordance with GAAP, CHF is a separate legal entity from Cardinal Health and from our subsidiary that sells receivables to CHF. CHF is designed to be a special purpose, bankruptcy-remote entity whose assets are available solely to satisfy the claims of its creditors. We had no outstanding balance under the committed receivable sales facility program at June 30, 2015 and 2014, except for standby letters of credit of $41 million at both June 30, 2015 and 2014.

Our revolving credit facility and committed receivables sales facility program require us to maintain a consolidated interest coverage ratio, as of any fiscal quarter end, of at least 4-to-1 and a consolidated leverage ratio of no more than 3.25-to-1. As of June 30, 2015, we were in compliance with these financial covenants.

We also maintain other short-term credit facilities and an unsecured line of credit that allowed for borrowings up to $439 million and $369 million at June 30, 2015 and 2014, respectively. The $312 million and $319 million balance of other obligations at June 30, 2015 and 2014, respectively, consisted of short-term borrowings and capital leases.

## 8. Income Taxes

Earnings before income taxes and discontinued operations are:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| U.S. Operations | $ 1,733 | $ 1,665 | $ 651 |
| Non-U.S. Operations | 234 | 133 | 237 |
| **Earnings before income taxes and discontinued operations** | $ 1,967 | $ 1,798 | $ 888 |

The provision for income taxes from continuing operations consists of the following:

| (in millions) | | **2015** | | 2014 | | 2013 |
|---|---|---|---|---|---|---|
| **Current:** | | | | | | |
| Federal | $ | **424** | $ | 521 | $ | 451 |
| State and local | | **83** | | 51 | | 62 |
| Non-U.S. | | **29** | | 37 | | 19 |
| Total current | $ | **536** | $ | 609 | $ | 532 |
| **Deferred:** | | | | | | |
| Federal | $ | **196** | $ | 24 | $ | 28 |
| State and local | | **24** | | 3 | | (5) |
| Non-U.S. | | **(1)** | | (1) | | (2) |
| Total deferred | | **219** | | 26 | | 21 |
| **Provision for income taxes** | $ | **755** | $ | 635 | $ | 553 |

The following table presents a reconciliation of the provision based on the federal statutory income tax rate to our effective income tax rate from continuing operations:

| | **2015** | 2014 | 2013 |
|---|---|---|---|
| Provision at Federal statutory rate | **35.0%** | 35.0% | 35.0% |
| State and local income taxes, net of federal benefit | **4.1** | 2.2 | 2.5 |
| Foreign tax rate differential | **(2.4)** | (1.2) | (4.0) |
| Nondeductible/nontaxable items | **0.7** | (0.2) | (0.5) |
| Nondeductible goodwill impairment | **—** | — | 33.2 |
| Change in measurement of uncertain tax positions and impact of IRS settlements | **0.9** | (0.4) | (5.7) |
| Other | **0.1** | (0.1) | 1.8 |
| **Effective income tax rate** | **38.4%** | 35.3% | 62.3% |

The fiscal 2015 effective tax rate was impacted by net unfavorable discrete items of $15 million, which increased the rate by 0.8 percentage points. There were no individually significant discrete items.

The fiscal 2014 effective tax rate was impacted by net favorable discrete items of $37 million, which reduced the rate by 2.1 percentage points. The discrete items include the favorable impact of the settlement of federal and state tax controversies ($80 million) and release of valuation allowances ($12 million) and the unfavorable impact of remeasurement of unrecognized tax benefits ($65 million), primarily as a result of proposed assessments of additional tax.

The fiscal 2013 effective tax rate was unfavorably impacted by 33.2 percentage points ($295 million) due to the nondeductibility of substantially all of the goodwill impairment which was partially offset by the favorable impact of the revaluation of our deferred tax liability and related interest on unrepatriated foreign earnings as a result of an agreement with tax authorities ($64 million or 7.2 percentage points).

At June 30, 2015, we had $1.9 billion of undistributed earnings from non-U.S. subsidiaries that are intended to be permanently reinvested in non-U.S. operations. Because these earnings are considered permanently reinvested, no U.S. tax provision has been accrued

related to the repatriation of these earnings. It is not practicable to estimate the amount of U.S. tax that might be payable on the eventual remittance of such earnings.

Deferred income taxes arise from temporary differences between financial reporting and tax reporting bases of assets and liabilities and operating loss and tax credit carryforwards for tax purposes. The following table presents the components of the deferred income tax assets and liabilities at June 30:

| (in millions) | | **2015** | | 2014 |
|---|---|---|---|---|
| **Deferred income tax assets:** | | | | |
| Receivable basis difference | $ | **47** | $ | 59 |
| Accrued liabilities | | **138** | | 111 |
| Share-based compensation | | **53** | | 51 |
| Loss and tax credit carryforwards | | **197** | | 191 |
| Deferred tax assets related to uncertain tax positions | | **100** | | 84 |
| Other | | **50** | | 42 |
| Total deferred income tax assets | | **585** | | 538 |
| Valuation allowance for deferred income tax assets | | **(87)** | | (94) |
| **Net deferred income tax assets** | $ | **498** | $ | 444 |
| **Deferred income tax liabilities:** | | | | |
| Inventory basis differences | $ | **(1,344)** | $ | (1,164) |
| Property-related | | **(155)** | | (142) |
| Goodwill and other intangibles | | **(352)** | | (340) |
| Other | | **(2)** | | (7) |
| **Total deferred income tax liabilities** | | **(1,853)** | | (1,653) |
| **Net deferred income tax liability** | $ | **(1,355)** | $ | (1,209) |

Deferred income tax assets and liabilities in the preceding table, after netting by taxing jurisdiction, are in the following captions in the consolidated balance sheets at June 30:

| (in millions) | | **2015** | | 2014 |
|---|---|---|---|---|
| Current deferred income tax asset (1) | $ | **22** | $ | 18 |
| Noncurrent deferred income tax asset (2) | | **17** | | 15 |
| Current deferred income tax liability (3) | | **(1,066)** | | (918) |
| Noncurrent deferred income tax liability (4) | | **(328)** | | (324) |
| **Net deferred income tax liability** | $ | **(1,355)** | $ | (1,209) |

(1) Included in prepaid expenses and other in the consolidated balance sheets.
(2) Included in other assets in the consolidated balance sheets.
(3) Included in other accrued liabilities in the consolidated balance sheets.
(4) Included in deferred income taxes and other liabilities in the consolidated balance sheets.

At June 30, 2015, we had gross federal, state and international loss and credit carryforwards of $210 million, $1.2 billion and $72 million, respectively, the tax effect of which is an aggregate deferred tax asset of $197 million. Substantially all of these carryforwards are available for at least three years. Approximately $86 million of the valuation allowance at June 30, 2015 applies to certain federal, state and international loss carryforwards that, in our opinion, are more likely than not to expire unutilized. However, to the extent that tax benefits related to these carryforwards are realized in the future, the reduction in the valuation allowance would reduce income tax expense.

We had $542 million, $510 million and $650 million of unrecognized tax benefits at June 30, 2015, 2014 and 2013, respectively. The June 30, 2015, 2014 and 2013 balances include $357 million, $322 million and $371 million, respectively, of unrecognized tax benefits that, if recognized, would have an impact on the effective tax rate. The remaining unrecognized tax benefits relate to tax positions for which ultimate deductibility is highly certain but for which there is uncertainty as to the timing of such deductibility. Recognition of these tax benefits would not affect our effective tax rate. We include the full amount of unrecognized tax benefits in deferred income taxes and other liabilities in the consolidated balance sheets. The following table presents a reconciliation of the beginning and ending amounts of unrecognized tax benefits:

| (in millions) | **2015** | | 2014 | | 2013 |
|---|---|---|---|---|---|
| Balance at beginning of fiscal year | **$** | **510** | $ | 650 | $ 654 |
| Additions for tax positions of the current year | | **15** | | 16 | 22 |
| Additions for tax positions of prior years | | **69** | | 94 | 97 |
| Reductions for tax positions of prior years | | **(42)** | | (40) | (30) |
| Settlements with tax authorities | | **(10)** | | (210) | (93) |
| **Balance at end of fiscal year** | **$** | **542** | $ | 510 | $ 650 |

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is a net decrease of zero to $210 million, exclusive of penalties and interest.

We recognize accrued interest and penalties related to unrecognized tax benefits in the provision for income taxes. At June 30, 2015, 2014 and 2013, we had $169 million, $143 million and $198 million, respectively, accrued for the payment of interest and penalties. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the consolidated balance sheets. During both fiscal 2015 and fiscal 2013, we recognized $24 million of expense for interest and penalties in income tax expense, respectively. During fiscal 2014, we recognized $46 million of benefit for interest and penalties in income tax expense.

We file income tax returns in the U.S. federal jurisdiction, various U.S. state jurisdictions and various foreign jurisdictions. We are subject to audit by the IRS for fiscal years 2006 through the current fiscal year. We are generally subject to audit by taxing authorities in various U.S. state and foreign jurisdictions for fiscal years 2003 through the current fiscal year.

During fiscal 2014, the IRS closed audits of fiscal years 2003 through 2005. The IRS is currently conducting audits of fiscal years 2006 through 2010, and our transfer pricing arrangements continue to be under consideration as part of these audits. While the IRS has made and could make proposed adjustments to our transfer pricing arrangements, or other matters, we are defending our reported tax

positions, and have accounted for the unrecognized tax benefits associated with our tax positions.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $219 million and $210 million at June 30, 2015 and 2014, respectively, and is included in other assets in the consolidated balance sheets.

## 9. Commitments, Contingent Liabilities and Litigation

### Commitments

The future minimum rental payments for operating leases having initial or remaining non-cancelable lease terms in excess of one year at June 30, 2015 for fiscal 2016 through 2020 and thereafter are as follows: $103 million, $83 million, $63 million, $45 million, $35 million and $77 million. Rental expense relating to operating leases was $104 million, $107 million and $92 million in fiscal 2015, 2014 and 2013, respectively. Sublease rental income was immaterial for all periods presented.

#### Generic Sourcing Venture With CVS Health Corporation

In July 2014, we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS Health Corporation ("CVS Health") with an initial term of 10 years. Both companies have contributed sourcing and supply chain expertise to the 50/50 venture and have committed to source generic pharmaceuticals through arrangements negotiated by the venture. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. We are required to pay 39 quarterly payments of $25.6 million to CVS Health which commenced in October 2014. Due to the achievement of a milestone, the quarterly payment to CVS Health will increase by $10 million beginning in fiscal 2016. In addition, if an additional milestone is achieved, the quarterly payment will increase in fiscal 2017 by a further $10 million resulting in a maximum quarterly payment of $45.6 million if all milestones are met.

#### Cordis

As described in Note 2, on March 1, 2015, we entered into a binding offer letter with Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, to purchase its Cordis business for a purchase price of $1.9 billion in cash, subject to certain adjustments. On May 27, 2015, Ethicon accepted the offer. The acquisition is expected to close in approximately 20 principal countries during the second quarter of fiscal 2016 and in the remaining countries afterward, subject to regulatory approval and customary closing conditions.

### Legal Proceedings

We become involved from time to time in disputes, litigation and regulatory matters incidental to our business.

We may be named from time to time in *qui tam* actions, which are initiated by private third parties purporting to act on behalf of federal

or state governments, that allege that false claims have been submitted or have been caused to be submitted for payment by the government. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own on behalf of the government.

From time to time, we receive subpoenas or requests for information from various government agencies relating to our business or to the business of a customer, supplier or other industry participant. Most of these matters are resolved without incident; however, such subpoenas or requests can lead to the assertion of claims, or the commencement of legal proceedings, against us.

In addition, we occasionally may suspect that products we manufacture, market or distribute do not meet product specifications, published standards or regulatory requirements. In such circumstances, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales and action by regulators.

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

With respect to the unresolved matters described below, we are unable to estimate a range of reasonably possible loss for matters for which there is no accrual, or additional loss for matters for which we have recorded an accrual, since damages or fines have not been specified or the proceedings are at stages where significant uncertainty exists as to legal or factual issues and as to whether such matters will proceed to trial. We do not believe, based on currently available information, that the outcomes of these matters will have a material adverse effect on our financial position, results of operations or cash flows, though the outcome of one or more of these matters could be material to our results of operations for a particular period.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges, net in our consolidated statements of earnings.

**DEA Investigation and Related Matters**
In February 2012, the U.S. Drug Enforcement Administration (the "DEA") issued an order to show cause and immediate suspension of our Lakeland, Florida distribution center's registration to distribute controlled substances, asserting that we failed to maintain required controls against the diversion of controlled substances. In May 2012, we entered into a settlement agreement with the DEA that resolved the administrative aspects of the DEA's action but did not resolve potential liability for civil fines in Florida or elsewhere for the conduct covered by the settlement agreement. In that regard, we are continuing to engage in discussions with several offices of the U.S. Department of Justice (the "DOJ"), including discussions regarding a possible settlement. We incurred litigation charges of $41 million for this matter during fiscal 2015. Our total accrual for this matter at June 30, 2015 is $41 million, which is included in other accrued liabilities in the consolidated balance sheet.

**State of West Virginia vs. Cardinal Health, Inc.**
In June 2012, the West Virginia Attorney General filed complaints, which have been amended, against 13 pharmaceutical wholesale distributors, including us and Harvard Drug, which we acquired on July 2, 2015, as described in Note 2, in the Circuit Court of Boone County, West Virginia alleging, among other things, that the distributors failed to maintain effective controls to guard against diversion of controlled substances in West Virginia, failed to report suspicious orders of controlled substances in accordance with the West Virginia Uniform Controlled Substances Act and were negligent in distributing controlled substances to pharmacies that serve individuals who abuse controlled substances. In addition to injunctive and other equitable relief, the complaints seek monetary damages and the creation of a court-supervised fund, to be financed by the defendants in these actions, for a medical monitoring program focused on prescription drug abuse. We are vigorously defending ourselves in this matter.

**FTC Investigation**
As previously disclosed, the Federal Trade Commission ("FTC") investigated supplier arrangements involving our Nuclear Pharmacy Services division during the period between 2003 and 2008. In April 2015, we settled this matter, without admitting liability, by agreeing to a court order and injunction under federal antitrust laws. We agreed, among other things, to pay $27 million to the FTC, which the FTC has stated will be used to establish a fund for allegedly aggrieved third parties. We incurred a litigation charge in the settlement amount during fiscal 2015. On April 23, 2015, the United States District Court for the Southern District of New York approved the settlement and entered the order and injunction resolving the matter.

***Qui Tam* Action**
Our Cardinal Health at Home division was named as a defendant by a private third-party plaintiff in an amended *qui tam* complaint that was filed in November 2014 in the U.S. District Court for the District of Massachusetts against several manufacturers and distributors of ostomy and continence care products. The complaint, which was subsequently amended again in June 2015, sought damages and penalties on behalf of the United States for alleged violations of the federal healthcare fraud and abuse laws, Medicare regulations and the federal False Claims Act in connection with the marketing and sale of these products. Following an investigation, in July 2015, the

**Notes to Financial Statements**

DOJ declined to intervene as to us and the plaintiff voluntarily dismissed us from the action.

**Antitrust Litigation Proceeds**

We recognized income resulting from settlements of class action antitrust claims in which we were a class member of $71 million, $24 million, and $38 million during fiscal 2015, 2014 and 2013, respectively.

## 10. Guarantees

In the ordinary course of business, we agree to indemnify certain other parties under acquisition and disposition agreements, customer agreements, intellectual property licensing agreements, and other agreements. Such indemnification obligations vary in scope and, when defined, in duration. In many cases, a maximum obligation is not explicitly stated, and therefore the overall maximum amount of the liability under such indemnification obligations cannot be reasonably estimated. Where appropriate, such indemnification obligations are recorded as a liability. Historically, we have not, individually or in the aggregate, made payments under these indemnification obligations in any material amounts. In certain circumstances, we believe that existing insurance arrangements, subject to the general deduction and exclusion provisions, would cover portions of the liability that may arise from these indemnification obligations. In addition, we believe that the likelihood of a material liability being triggered under these indemnification obligations is not significant.

From time to time we enter into agreements that obligate us to make fixed payments upon the occurrence of certain events. Such obligations primarily relate to obligations arising under acquisition transactions, where we have agreed to make payments based upon the achievement of certain financial performance measures by the acquired business. Generally, the obligation is capped at an explicit amount. See Note 11 for detail regarding contingent consideration obligations.

## 11. Fair Value Measurements

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at June 30:

| (in millions) | 2015 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents (1) | $ 1,809 | $ — | $ — | $ 1,809 |
| Forward contracts (2) | — | 5 | — | 5 |
| Available-for-sale securities (3) | — | 193 | — | 193 |
| Other investments (4) | 111 | — | — | 111 |
| **Liabilities:** | | | | |
| Contingent Consideration (5) | — | — | (53) | (53) |
| **Total** | $ 1,920 | $ 198 | $ (53) | $ 2,065 |

| (in millions) | 2014 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents (1) | $ 740 | $ — | $ — | $ 740 |
| Forward contracts (2) | — | 10 | — | 10 |
| Available-for-sale securities (3) | — | 100 | — | 100 |
| Other investments (4) | 106 | — | — | 106 |
| **Liabilities:** | | | | |
| Contingent Consideration (5) | — | — | (12) | (12) |
| **Total** | $ 846 | $ 110 | $ (12) | $ 944 |

(1) Cash equivalents are comprised of highly liquid investments purchased with a maturity of three months or less. The carrying value of these cash equivalents approximates fair value due to their short-term maturities.

(2) The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the consolidated balance sheets.

(3) We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 6 for additional information regarding available-for-sale securities.

(4) The other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(5) Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or from achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Failure to meet current expectations of progress could increase the probability of not achieving the targets within the measurement periods and result in a reduction in the fair value of the contingent consideration obligation.

The following table presents a reconciliation of those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
|---|---:|
| Balance at June 30, 2013 | $ — |
| Additions from acquisitions | 12 |
| Changes in fair value of contingent consideration (1) | — |
| Payment of contingent consideration | — |
| Balance at June 30, 2014 | $ 12 |
| Additions from acquisitions | 40 |
| Changes in fair value of contingent consideration (1) | 8 |
| Payment of contingent consideration | (7) |
| **Balance at June 30, 2015** | **$ 53** |

(1)    Amount is included in amortization and other acquisition-related costs in the consolidated statements of earnings.

## 12. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to current fair value through earnings at the end of each period.

We are exposed to counterparty credit risk on all of our derivative instruments. Accordingly, we have established and maintain strict counterparty credit guidelines and enter into derivative instruments only with major financial institutions that are investment grade or better. We do not have significant exposure to any one counterparty and we believe the risk of loss is remote. Additionally, we do not require collateral under these agreements.

### Interest Rate Risk Management
We are exposed to the impact of interest rate changes. Our objective is to manage the impact of interest rate changes on cash flows and the market value of our borrowings. We utilize a mix of debt maturities along with both fixed-rate and variable-rate debt to manage changes in interest rates. In addition, we enter into interest rate swaps to further manage our exposure to interest rate variations related to our borrowings and to lower our overall borrowing costs.

### Currency Exchange Risk Management
We conduct business in several major international currencies and are subject to risks associated with changing foreign exchange rates. Our objective is to reduce earnings and cash flow volatility associated with foreign exchange rate changes to allow management to focus its attention on business operations. Accordingly, we enter into various contracts that change in value as foreign exchange rates change to protect the value of existing foreign currency assets and liabilities, commitments and anticipated foreign currency revenue and expenses.

### Commodity Price Risk Management
We are exposed to changes in the price of certain commodities. Our objective is to reduce earnings and cash flow volatility associated with forecasted purchases of these commodities to allow management to focus its attention on business operations. Accordingly, we enter into derivative contracts when possible to manage the price risk associated with certain forecasted purchases.

The following table summarizes the fair value of our assets and liabilities related to derivatives designated as hedging instruments and the respective line items in which they were recorded in the consolidated balance sheets at June 30:

| (in millions) | 2015 | | 2014 | |
|---|---:|---|---:|---|
| **Assets:** | | | | |
| Foreign currency contracts (1) | $ | 3 | $ | 1 |
| Forward interest rate swaps (1) | | — | | 10 |
| Pay-floating interest rate swaps (2) | | 8 | | 5 |
| Commodity contracts (2) | | — | | 1 |
| Total assets | $ | 11 | $ | 17 |
| | | | | |
| **Liabilities:** | | | | |
| Foreign currency contracts (3) | $ | 2 | $ | 1 |
| Forward interest rate swaps (4) | | — | | 1 |
| Pay-floating interest rate swaps (4) | | 1 | | 5 |
| Commodity contracts (3) | | 2 | | — |
| Commodity contracts (4) | | 1 | | — |
| Total liabilities | $ | 6 | $ | 7 |

(1)    Included in prepaid expenses and other in the consolidated balance sheets.
(2)    Included in other assets in the consolidated balance sheets.
(3)    Included in other accrued liabilities in the consolidated balance sheets.
(4)    Included in deferred income taxes and other liabilities in the consolidated balance sheets.

## Fair Value Hedges
We enter into pay-floating interest rate swaps to hedge the changes in the fair value of fixed-rate debt resulting from fluctuations in interest rates. These contracts are designated and qualify as fair value hedges. Accordingly, the gain or loss recorded on the pay-floating interest rate swaps is directly offset by the change in fair value of the underlying debt. Both the derivative instrument and the underlying debt are adjusted to market value at the end of each period with any resulting gain or loss recorded in interest expense, net in the consolidated statements of earnings.

During fiscal 2015, we entered into pay-floating interest rate swaps with total notional amounts of $1,050 million, of which $250 million and $450 million were in connection with the debt offerings in June 2015 and November 2014, respectively, as described in Note 7. During fiscal 2014, we entered into pay-floating interest rate swaps with total notional amounts of $300 million. These swaps have been designated as fair value hedges of our fixed rate debt and are included

in other assets and deferred income taxes and other liabilities in the consolidated balance sheet.

Also, during fiscal 2015, we terminated notional amounts of $875 million of pay-floating interest rate swaps in connection with the debt redemption in December 2014 described in Note 7. These swaps were previously designated as fair value hedges.

The following tables summarize the outstanding interest rate swaps designated as fair value hedges at June 30:

| (in millions) | 2015 | | |
|---|---|---|---|
| | Notional Amount | Maturity Date | |
| Pay-floating interest rate swaps | $ 1,613 | Jun 2017 - | Jun 2022 |

| (in millions) | 2014 | | |
|---|---|---|---|
| | Notional Amount | Maturity Date | |
| Pay-floating interest rate swaps | $ 1,438 | Jun 2015 - | Jun 2022 |

The following table summarizes the gain/(loss) recognized in earnings for interest rate swaps designated as fair value hedges:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Pay-floating interest rate swaps (1) (2) | $ 14 | $ 23 | $ 28 |
| Fixed-rate debt (1) | (14) | (23) | (28) |

(1) Included in interest expense, net in the consolidated statements of earnings.
(2) Excludes $22 million fair value adjustment to the previously terminated interest rate swaps as a result of the December 2014 debt extinguishment as disclosed in Note 7.

There was no ineffectiveness associated with these derivative instruments for all periods presented.

## Cash Flow Hedges

We enter into derivative instruments to hedge our exposure to changes in cash flows attributable to interest rate, foreign currency and commodity price fluctuations associated with certain forecasted transactions. These derivative instruments are designated and qualify as cash flow hedges. Accordingly, the effective portion of the gain or loss on the derivative instrument is reported as a component of other comprehensive income and reclassified into earnings in the same line item associated with the forecasted transaction and in the same period during which the hedged transaction affects earnings. The ineffective portion of the gain or loss on the derivative instrument is recognized in earnings immediately.

During fiscal 2015 and 2014 we entered into forward interest rate swaps with a total notional amount of $850 million and $50 million, respectively, to hedge probable, but not firmly committed, future transactions associated with our debt.

Additionally, during fiscal 2015 we terminated $1,150 million in forward interest rate swaps that were previously designated as cash-flow hedges.

We enter into foreign currency contracts to protect the value of anticipated foreign currency revenues and expenses. At June 30, 2015 and 2014, we held contracts to hedge probable, but not firmly committed, revenue and expenses. The principal currencies hedged are the Canadian dollar, Mexican peso, European euro and Thai baht.

We enter into commodity contracts to manage the price risk associated with forecasted purchases of certain commodities used in our Medical segment.

The following tables summarize the outstanding cash flow hedges at June 30:

| (in millions) | 2015 | | |
|---|---|---|---|
| | Notional Amount | Maturity Date | |
| Foreign currency contracts | $ 146 | Jul 2015 - | Jun 2016 |
| Commodity contracts | 22 | Jul 2015 - | Mar 2018 |

| (in millions) | 2014 | | |
|---|---|---|---|
| | Notional Amount | Maturity Date | |
| Forward interest rate swaps | $ 300 | Jun 2025 - | Oct 2026 |
| Foreign currency contracts | 182 | Jul 2014 - | Jun 2015 |
| Commodity contracts | 24 | Jul 2014 - | Mar 2017 |

The following table summarizes the gain/(loss) included in AOCI for derivative instruments designated as cash flow hedges at June 30:

| (in millions) | 2015 | 2014 |
|---|---|---|
| Forward interest rate swaps | $ — | $ 9 |
| Commodity contracts | (3) | 1 |
| Foreign currency contracts | 2 | (1) |

The following table summarizes the gain/(loss) reclassified from AOCI into earnings for derivative instruments designated as cash flow hedges:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Foreign currency contracts (1) | $ 1 | $ — | $ 1 |
| Foreign currency contracts (2) | 4 | 2 | 1 |
| Foreign currency contracts (3) | (2) | 1 | 1 |
| Commodity contracts (3) | (1) | — | 1 |
| Forward interest rate swaps (4) | — | — | 1 |

(1) Included in revenue in the consolidated statements of earnings.
(2) Included in cost of products sold in the consolidated statements of earnings.
(3) Included in SG&A expenses in the consolidated statements of earnings.
(4) Included in interest expense, net in the consolidated statements of earnings.

The amount of ineffectiveness associated with these derivative instruments was immaterial for all periods presented.

## Economic (Non-Designated) Hedges

We enter into foreign currency contracts to manage our foreign exchange exposure related to intercompany financing transactions and other balance sheet items subject to revaluation that do not meet the requirements for hedge accounting treatment. Accordingly, these derivative instruments are adjusted to current market value at the end of each period through earnings. The gain or loss recorded on these instruments is substantially offset by the remeasurement adjustment on the foreign currency denominated asset or liability. The settlement of the derivative instrument and the remeasurement adjustment on the foreign currency denominated asset or liability are

Cardinal Health | Fiscal 2015 Form 10-K

both recorded in other (income)/expense, net at the end of each period.

The following tables summarize the outstanding economic (non-designated) derivative instruments at June 30:

|  | **2015** | | |
|---|---|---|---|
| (in millions) | **Notional Amount** | **Maturity Date** | |
| Foreign currency contracts | $  398 | **Jul 2015** - | **Jul 2015** |

|  | 2014 | | |
|---|---|---|---|
| (in millions) | Notional Amount | Maturity Date | |
| Foreign currency contracts | $  461 | Jul 2014 - | Sep 2014 |

The following table summarizes the gain/(loss) recognized in earnings for economic (non-designated) derivative instruments:

| (in millions) | **2015** | 2014 | 2013 |
|---|---|---|---|
| Foreign currency contracts (1) | $  (45) | $  12 | $  6 |

(1)   Included in other income, net in the consolidated statements of earnings.

## Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, net, accounts payable and other accrued liabilities at June 30, 2015 and 2014 approximate fair value due to their short-term maturities.

Cash balances are invested in accordance with our investment policy. These investments are exposed to market risk from interest rate fluctuations and credit risk from the underlying issuers, although this is mitigated through diversification.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at June 30:

| (in millions) | **2015** | 2014 |
|---|---|---|
| Estimated fair value | $  5,521 | $  4,115 |
| Carrying amount | 5,492 | 3,972 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

The following table is a summary of the fair value gain/(loss) of our derivative instruments, based upon the estimated amount that we would receive (or pay) to terminate the contracts at June 30:

|  | **2015** | | 2014 | |
|---|---|---|---|---|
| (in millions) | **Notional Amount** | **Fair Value Gain/(Loss)** | Notional Amount | Fair Value Gain/(Loss) |
| Pay-floating interest rate swaps | $  1,613 | $  7 | $  1,438 | $  — |
| Foreign currency contracts | 544 | 1 | 643 | — |
| Forward interest rate swaps | — | — | 300 | 9 |
| Commodity contracts | 22 | (3) | 24 | 1 |

The fair values are based on quoted market prices for the same or similar instruments, which represents a Level 2 measurement.

## 13. Shareholders' Equity

At June 30, 2015 and 2014, authorized capital shares consisted of the following: 750 million Class A common shares, without par value; 5 million Class B common shares, without par value; and 500 thousand non-voting preferred shares, without par value. The Class A common shares and Class B common shares are collectively referred to below as "common shares". Holders of common shares are entitled to share equally in any dividends declared by the Board of Directors and to participate equally in all distributions of assets upon liquidation. Generally, the holders of Class A common shares are entitled to one vote per share, and the holders of Class B common shares are entitled to one-fifth of one vote per share on proposals presented to shareholders for vote. Under certain circumstances, the holders of Class B common shares are entitled to vote as a separate class. Only Class A common shares were outstanding at June 30, 2015 and 2014.

We repurchased $2.2 billion of our common shares, in the aggregate, through share repurchase programs during fiscal 2015, 2014 and 2013, as described below. We funded the repurchases with available cash. The common shares repurchased are held in treasury to be used for general corporate purposes.

During fiscal 2015, we repurchased 13.1 million common shares having an aggregate cost of $1.0 billion. The average price paid per common share was $79.02.

During fiscal 2014, we repurchased 9.9 million common shares having an aggregate cost of $673 million. The average price paid per common share was $67.85.

During fiscal 2013, we repurchased 10.2 million common shares having an aggregate cost of $450 million. The average price paid per common share was $44.11.

## Accumulated Other Comprehensive Income/(Loss)

The following table summarizes the changes in the balance of accumulated other comprehensive income/(loss) by component and in total:

| (in millions) | Foreign Currency Translation Adjustments | | Unrealized Gain/(Loss) on Derivatives, net of tax | | Accumulated Other Comprehensive Income/(Loss) | |
|---|---|---|---|---|---|---|
| Balance at June 30, 2013 | $ | 54 | $ | 14 | $ | 68 |
| Other comprehensive income/(loss), net of tax before reclassifications | | 9 | $ | (10) | | (1) |
| Amounts reclassified to earnings | | — | | 3 | | 3 |
| Total other comprehensive income/(loss), net of tax of $5 million | | 9 | $ | (7) | | 2 |
| Balance at June 30, 2014 | $ | 63 | $ | 7 | $ | 70 |
| Other comprehensive income/(loss), net of tax before reclassifications | | (104) | | 9 | | (95) |
| Amounts reclassified to earnings | | — | | 2 | | 2 |
| Total other comprehensive income/(loss), net of tax of $7 million | | (104) | | 11 | | (93) |
| **Balance at June 30, 2015** | **$** | **(41)** | **$** | **18** | **$** | **(23)** |

Activity related to realized and unrealized gains and losses on available-for-sale securities as described in Note 6, was immaterial during fiscal 2015 and 2014.

## 14. Earnings Per Share

The following table reconciles the number of common shares used to compute basic and diluted earnings per share:

| (in millions) | **2015** | 2014 | 2013 |
|---|---|---|---|
| Weighted-average common shares–basic | **332** | 341 | 341 |
| **Effect of dilutive securities:** | | | |
| Employee stock options, restricted share units and performance share units | **3** | 4 | 3 |
| **Weighted-average common shares–diluted** | **335** | 345 | 344 |

The potentially dilutive employee stock options, restricted share units and performance share units that were antidilutive for fiscal 2015, 2014 and 2013 were 1 million, zero and 9 million, respectively.

## 15. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical, over-the-counter healthcare and consumer products in the United States. This segment also operates nuclear pharmacies and cyclotron facilities, provides pharmacy operations, medication therapy management and patient outcomes services to hospitals and other healthcare

providers, provides services to healthcare companies supporting the marketing, distribution and payment for specialty pharmaceutical products and manufactures and repackages generic pharmaceuticals and over-the-counter healthcare products. This segment also imports and distributes pharmaceuticals, over-the-counter healthcare and consumer products as well as provides specialty pharmacy and other services in China.

The Medical segment distributes a broad range of medical, surgical and laboratory products and provides services to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China and to patients in the home in the United States. This segment also manufactures, sources and develops our own Cardinal Health brand medical and surgical products, which are sold directly or through third-party distributors in the United States, Canada, Europe and other regions internationally.

The following tables present revenue for each reportable segment and Corporate:

| (in millions) | **2015** | | 2014 | | 2013 | |
|---|---|---|---|---|---|---|
| Pharmaceutical (1) | **$** | **91,116** | $ | 80,110 | $ | 91,097 |
| Medical | | **11,395** | | 10,962 | | 10,060 |
| Total segment revenue | | **102,511** | | 91,072 | | 101,157 |
| Corporate (2) | | **20** | | 12 | | (64) |
| **Total revenue** | **$** | **102,531** | $ | 91,084 | $ | 101,093 |

(1) Our pharmaceutical distribution contract with Walgreen Co. expired on August 31, 2013.

(2) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based upon segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment SG&A expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial and customer care shared services, human resources, information technology and legal and compliance. Corporate expenses are allocated to the segments based upon headcount, level of benefit provided and other ratable allocation methodologies.

We do not allocate the following items to our segments: LIFO inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for income taxes. We did not recognize any LIFO charges or credits during fiscal 2015, 2014, or 2013. In addition, certain investment and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon executive management, the

expenses for such projects are often retained at Corporate. Investment spending within Corporate was $26 million, $33 million and $37 million for fiscal 2015, 2014 and 2013, respectively.

Beginning in fiscal 2016, we are changing our methodology for allocating certain portions of enterprise-wide incentive compensation expenses among Corporate and the segments. This change does not impact consolidated operating earnings or net earnings.

The following tables present segment profit by reportable segment and Corporate:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Pharmaceutical | $ 2,094 | $ 1,745 | $ 1,734 |
| Medical | 433 | 444 | 372 |
| Total segment profit | 2,527 | 2,189 | 2,106 |
| Corporate | (366) | (304) | (1,110) |
| Total operating earnings | $ 2,161 | $ 1,885 | $ 996 |

The following tables present depreciation and amortization and additions to property and equipment by reportable segment and at Corporate:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Pharmaceutical | $ 124 | $ 128 | $ 125 |
| Medical | 119 | 130 | 137 |
| Corporate | 208 | 201 | 135 |
| Total depreciation and amortization | $ 451 | $ 459 | $ 397 |

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Pharmaceutical | $ 90 | $ 72 | $ 46 |
| Medical | 87 | 72 | 48 |
| Corporate | 123 | 105 | 101 |
| Total additions to property and equipment | $ 300 | $ 249 | $ 195 |

The following table presents total assets for each reportable segment and Corporate at June 30:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Pharmaceutical | $ 17,385 | $ 15,361 | $ 16,258 |
| Medical | 7,095 | 6,768 | 6,521 |
| Corporate | 5,662 | 3,904 | 3,040 |
| Total assets | $ 30,142 | $ 26,033 | $ 25,819 |

The following tables present revenue and property and equipment, net by geographic area:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| United States | $ 98,435 | $ 87,449 | $ 97,994 |
| International | 4,096 | 3,635 | 3,099 |
| Total revenue | $ 102,531 | $ 91,084 | $ 101,093 |

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| United States | $ 1,327 | $ 1,301 | $ 1,355 |
| International | 179 | 158 | 134 |
| Property and equipment, net | $ 1,506 | $ 1,459 | $ 1,489 |

## 16. Share-Based Compensation and Savings Plans

### Share-Based Compensation Plans

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees. At June 30, 2015, 22 million shares remain available for future grants under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan ("2011 LTIP"). Under the 2011 LTIP's fungible share counting provisions, stock options are counted against the plan as one share for every share issued; awards other than stock options are counted against the plan as two and one-half shares for every share issued. This means that only 9 million shares could be issued under awards other than stock options while 22 million shares could be issued under stock options. Shares are issued out of treasury shares when stock options are exercised and when restricted share units and performance share units vest.

The following table provides total share-based compensation expense by type of award:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Restricted share unit expense | $ 69 | $ 62 | $ 60 |
| Employee stock option expense | 21 | 21 | 23 |
| Performance share unit expense | 20 | 13 | 10 |
| Total share-based compensation | $ 110 | $ 96 | $ 93 |

The total tax benefit related to share-based compensation was $38 million, $33 million and $32 million for fiscal 2015, 2014 and 2013, respectively.

### Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for periods ranging from seven to ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share | |
|---|---|---|---|
| Outstanding at June 30, 2013 | 15 | $ | 36.97 |
| Granted | 2 | | 51.77 |
| Exercised | (7) | | 38.29 |
| Canceled and forfeited | — | | — |
| Outstanding at June 30, 2014 | 10 | $ | 39.16 |
| Granted | 1 | | 72.15 |
| Exercised | (3) | | 36.21 |
| Canceled and forfeited | — | | — |
| **Outstanding at June 30, 2015** | **8** | **$** | **46.50** |
| **Exercisable at June 30, 2015** | **4** | **$** | **37.19** |

The following tables provide additional detail related to stock option activity:

| (in millions, except per share amounts) | 2015 | | 2014 | | 2013 |
|---|---|---|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ **281** | $ | 282 | $ | 156 |
| Aggregate intrinsic value of exercisable options at period end | **193** | | 185 | | 113 |
| Aggregate intrinsic value of exercised options | **132** | | 155 | | 64 |
| Cash received upon exercise | **72** | | 227 | | 121 |
| Cash tax proceeds/(disbursements) realized related to exercise | **52** | | 39 | | (19) |
| Total compensation cost, net of estimated forfeitures, related to unvested stock options not yet recognized, pre-tax | **23** | | 24 | | 22 |
| Total fair value of shares vested during the year | **20** | | 20 | | 28 |
| Weighted-average grant date fair value per stock option | **15.80** | | 10.32 | | 8.15 |

| (in years) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Weighted-average remaining contractual life of outstanding options | **6** | 6 | 4 |
| Weighted-average remaining contractual life of exercisable options | **5** | 4 | 3 |
| Weighted-average period over which stock option compensation cost is expected to be recognized | **2** | 2 | 2 |

Stock options are granted to our officers and certain employees. The fair values were estimated on the grant date using a lattice valuation model. We believe the lattice model provides reasonable estimates because it has the ability to take into account individual exercise patterns based on changes in our stock price and other variables, and it provides for a range of input assumptions, which are disclosed in the table below. The risk-free rate is based on the U.S. Treasury yield curve at the time of the grant. We analyzed historical data to estimate option exercise behaviors and employee terminations to be used within the lattice model. The expected life of the options granted was calculated from the option valuation model and represents the

length of time in years that the options granted are expected to be outstanding. Expected volatilities are based on implied volatility from traded options on our common shares and historical volatility over a period of time commensurate with the contractual term of the option grant (up to ten years). The following table provides the range of assumptions used to estimate the fair value of stock options:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Risk-free interest rate | **1.8% - 2.1%** | 1.9% - 2.0% | 1.1% - 1.3% |
| Expected volatility | **26%** | 27% | 29% |
| Dividend yield | **1.7% - 1.9%** | 1.8% - 2.4% | 2.1% - 2.5% |
| Expected life in years | **7** | 6 | 6 |

## Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years. Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share | |
|---|---|---|---|
| Nonvested at June 30, 2013 | 3 | $ | 38.74 |
| Granted | 1 | | 52.40 |
| Vested | (1) | | 37.59 |
| Canceled and forfeited | — | | — |
| Nonvested at June 30, 2014 | 3 | $ | 45.65 |
| Granted | 1 | | 72.33 |
| Vested | (1) | | 44.94 |
| Canceled and forfeited | — | | — |
| **Nonvested at June 30, 2015** | **3** | **$** | **59.69** |

The following table provides additional data related to restricted share unit activity:

| (in millions) | 2015 | | 2014 | | 2013 |
|---|---|---|---|---|---|
| Total compensation cost, net of estimated forfeitures, related to nonvested restricted share unit awards not yet recognized, pre-tax | $ **77** | $ | 75 | $ | 67 |
| Weighted-average period in years over which restricted share unit cost is expected to be recognized (in years) | **2** | | 2 | | 2 |
| Total fair value of shares vested during the year | $ **61** | $ | 55 | $ | 60 |

## Performance Share Units

Performance share units vest over a three-year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

**Notes to Financial Statements**

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|
| Nonvested at June 30, 2013 | 0.8 | $ 41.37 |
| Granted | 0.3 | 51.49 |
| Vested (1) | (0.2) | 41.60 |
| Canceled and forfeited | — | — |
| Nonvested at June 30, 2014 | 0.9 | $ 44.41 |
| Granted | 0.2 | 71.63 |
| Vested (2) | (0.2) | 41.59 |
| Canceled and forfeited | — | — |
| **Nonvested at June 30, 2015** | **0.9** | **$ 50.31** |

(1)   Vested based on achievement of 143 percent of the target performance goal.
(2)   Vested based on achievement of 120 percent of the target performance goal.

The following table provides additional data related to performance share unit activity:

| (in millions) | 2015 | 2014 | 2013 |
|---|---|---|---|
| Total compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized, pre-tax | $ 16 | $ 15 | $ 12 |
| Weighted-average period over which performance share unit cost is expected to be recognized (in years) | 2 | 2 | 2 |
| Total fair value of shares vested during the year | $ 8 | $ 7 | $ — |

## Employee Retirement Savings Plans

Substantially all of our domestic non-union employees are eligible to be enrolled in our company-sponsored contributory retirement savings plans, which include features under Section 401(k) of the Internal Revenue Code of 1986, and provide for matching and profit sharing contributions by us. Our contributions to the plans are determined by the Board of Directors subject to certain minimum requirements as specified in the plans. The total expense for our employee retirement savings plans was $91 million, $75 million and $68 million for fiscal 2015, 2014 and 2013, respectively.

## 17. Selected Quarterly Financial Data (Unaudited)

The following is selected quarterly financial data for fiscal 2015 and 2014. The sum of the quarters may not equal year-to-date due to rounding.

| (in millions, except per common share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **Fiscal 2015** | | | | |
| Revenue | $ 24,070 | $ 25,537 | $ 25,375 | $ 27,547 |
| Gross margin | 1,341 | 1,454 | 1,459 | 1,458 |
| Distribution, selling, general and administrative expenses | 775 | 815 | 803 | 847 |
| Earnings from continuing operations | 266 | 289 | 365 | 293 |
| Earnings from discontinued operations, net of tax | — | — | — | 2 |
| Net earnings | 266 | 289 | 365 | 295 |
| **Earnings from continuing operations per common share:** | | | | |
| Basic | $ 0.79 | $ 0.87 | $ 1.10 | $ 0.89 |
| Diluted | 0.78 | 0.86 | 1.09 | 0.88 |

| (in millions, except per common share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **Fiscal 2014** | | | | |
| Revenue | $ 24,523 | $ 22,240 | $ 21,427 | $ 22,894 |
| Gross margin | 1,264 | 1,345 | 1,297 | 1,256 |
| Distribution, selling, general and administrative expenses | 732 | 766 | 736 | 795 |
| Earnings from continuing operations | 340 | 275 | 315 | 234 |
| Earnings/(loss) from discontinued operations, net of tax | (1) | 3 | — | — |
| Net earnings | 339 | 278 | 315 | 234 |
| **Earnings from continuing operations per common share:** | | | | |
| Basic | $ 1.00 | $ 0.80 | $ 0.92 | $ 0.69 |
| Diluted | 0.99 | 0.79 | 0.91 | 0.68 |

## 18. Subsequent Events

On July 2, 2015 we completed the acquisition of Harvard Drug for $1.1 billion, net of cash acquired, as discussed in Note 2.

# Cardinal Health, Inc. and Subsidiaries

## Schedule II - Valuation and Qualifying Accounts [1]

| (in millions) | Balance at Beginning of Period | | Charged to Costs and Expenses [2] | | Charged to Other Accounts [3] | | Deductions [4] | | Balance at End of Period | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Fiscal 2015** | | | | | | | | | | |
| Accounts receivable | $ | 137 | $ | 59 | $ | 5 | $ | (66) | $ | 135 |
| Finance notes receivable | | 18 | | — | | — | | (4) | | 14 |
| Sales returns and allowances [5] | | 273 | | 1,988 | | — | | (1,956) | | 305 |
| Other | | 1 | | — | | — | | — | | 1 |
| | $ | 429 | $ | 2,047 | $ | 5 | $ | (2,026) | $ | 455 |
| | | | | | | | | | | |
| Fiscal 2014 | | | | | | | | | | |
| Accounts receivable | $ | 134 | $ | 51 | $ | 2 | $ | (50) | $ | 137 |
| Finance notes receivable | | 17 | | — | | 2 | | (1) | | 18 |
| Sales returns and allowances [5] | | 291 | | 1,735 | | — | | (1,753) | | 273 |
| Other | | 1 | | — | | — | | — | | 1 |
| | $ | 443 | $ | 1,786 | $ | 4 | $ | (1,804) | $ | 429 |
| | | | | | | | | | | |
| Fiscal 2013 | | | | | | | | | | |
| Accounts receivable | $ | 126 | $ | 40 | $ | 2 | $ | (34) | $ | 134 |
| Finance notes receivable | | 16 | | 1 | | — | | — | | 17 |
| Sales returns and allowances [5] | | — | | 291 | | — | | — | | 291 |
| Other | | 1 | | — | | — | | — | | 1 |
| | $ | 143 | $ | 332 | $ | 2 | $ | (34) | $ | 443 |

(1)   Amounts included herein pertain to the continuing operations of the Company.

(2)   Fiscal 2015, 2014 and 2013 include $7 million, $9 million and $10 million, respectively, for reserves related to customer pricing disputes, excluded from provision for bad debts on the consolidated statements of cash flows and classified as a reduction in gross margin in the consolidated statements of earnings.

(3)   Recoveries of amounts provided for or written off in prior years were $1 million, $3 million and $1 million for fiscal 2015, 2014 and 2013, respectively.

(4)   Write-off of uncollectible accounts or actual sales returns.

(5)   Effective June 30, 2013, we prospectively updated our policy to accrue for estimated sales returns and allowances at the time of sale based upon historical customer return trends, margin rates and processing costs. Prior to this change in policy, we recognized sales returns as a reduction of revenue and cost of products sold for the sales price and cost, respectively, when products were returned.

# Directors, Executive Officers and Corporate Governance

The following is a list of our executive officers:

| Name | Age | Position |
|------|-----|----------|
| George S. Barrett | 60 | Chairman and Chief Executive Officer |
| Michael C. Kaufmann | 52 | Chief Financial Officer |
| Donald M. Casey Jr. | 55 | Chief Executive Officer, Medical segment |
| Jon L. Giacomin | 50 | Chief Executive Officer, Pharmaceutical segment |
| Craig S. Morford | 56 | Chief Legal and Compliance Officer |
| Patricia B. Morrison | 56 | Executive Vice President, Customer Support Services and Chief Information Officer |
| Carole S. Watkins | 55 | Chief Human Resources Officer |
| Stephen T. Falk | 50 | Executive Vice President, General Counsel and Corporate Secretary |
| Meghan M. FitzGerald | 44 | Executive Vice President, Health Policy and Strategy |

The business experience summaries provided below for our executive officers describe positions held during the last five years (unless otherwise indicated).

Mr. Barrett has served as Chairman and Chief Executive Officer since August 2009.

Mr. Kaufmann has served as Chief Financial Officer since November 2014. From August 2009 until November 2014, he served as Chief Executive Officer, Pharmaceutical segment.

Mr. Casey has served as Chief Executive Officer, Medical segment, since April 2012. Before joining us, he served as Chief Executive Officer of the Gary and Mary West Wireless Health Institute, a non-profit research organization focused on lowering the cost of healthcare through novel technology solutions, from March 2010 to March 2012.

Mr. Giacomin has served as Chief Executive Officer, Pharmaceutical segment since November 2014. From January 2011 until November 2014, he served as President, U.S. Pharmaceutical Distribution. Prior to that, he served as Executive Vice President, Pharmaceutical Operations from July 2008 to January 2011.

Mr. Morford has served as Chief Legal and Compliance Officer since May 2009.

Ms. Morrison has served as Executive Vice President, Customer Support Services and Chief Information Officer since June 2011, and prior to that was Executive Vice President and Chief Information Officer from August 2009 until June 2011.

Ms. Watkins has served as Chief Human Resources Officer since 2000.

Mr. Falk has served as Executive Vice President, General Counsel and Corporate Secretary since May 2009.

Ms. FitzGerald has served as Executive Vice President, Health Policy and Strategy since May 2015. From October 2010 until May 2015, she served as President, Specialty Solutions. Prior to that, she was Senior Vice President, New Markets International Division and Business Development, with Medco Health Solutions, Inc. from March 2008 to July 2010. From January 2006 until March 2008, Ms. FitzGerald was Vice President and Chief Business Officer with Vion Pharmaceuticals, Inc. ("Vion"). Vion filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in December 2009 and filed a Chapter 11 Plan of Liquidation in February 2010.

We have adopted *Standards of Business Conduct* that apply to all of our directors, officers and employees. The *Standards of Business Conduct* outline our corporate values and standards of integrity and behavior and are designed to protect and promote our reputation. The full text of the *Standards of Business Conduct* is posted on our website at www.cardinalhealth.com under "About us — Corporate Governance — Environmental, Social and Governance — Ethics and Compliance."

Any waiver of the *Standards of Business Conduct* for directors or executive officers must be approved by the Audit Committee. As required under SEC and New York Stock Exchange rules, we will disclose future amendments to our *Standards of Business Conduct* and waivers from the *Standards of Business Conduct* for our principal executive officer, principal financial officer, and principal accounting officer, or persons performing similar functions, and our other executive officers and directors on our website within four business days following the date of the amendment or waiver.

The other information called for by Item 10 of Form 10-K is incorporated by reference to our Definitive Proxy Statement (which will be filed with the SEC pursuant to Regulation 14A under the Exchange Act) relating to our 2015 Annual Meeting of Shareholders (our "2015 Proxy Statement") under the captions "Proposal 1—Election of Directors," "Section 16(a) Beneficial Ownership Reporting Compliance" and "Corporate Governance."

# Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

## Equity Compensation and Plan Information

The table below summarizes information relating to our equity compensation plans at June 30, 2015.

### Equity Compensation Plan Information

| Plan Category | Common Shares to be Issued Upon Exercise of Outstanding Options and Rights | | Weighted Average Exercise Price of Outstanding Options | | Common Shares Remaining Available for Future Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) | |
|---|---|---|---|---|---|---|
| | (a) | | (b) | | (c) | |
| Equity compensation plans approved by shareholders | 11,386,967 | (1) | $ 46.50 | (1) | 22,280,426 | (2)(3) |
| Equity compensation plans not approved by shareholders (4) | 5,625 | (5) | $ — | (5) | — | |
| Total at June 30, 2015 | 11,392,592 | | $ 46.50 | | 22,280,426 | |

(1) In addition to stock options outstanding under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (the "2011 LTIP") and the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (the "2005 LTIP"), also includes 1,274,997 PSUs and 2,316,847 RSUs outstanding under the 2011 LTIP, 10,214 PSUs and 93,018 RSUs outstanding under the 2005 LTIP, 8,605 RSUs outstanding under the Cardinal Health, Inc. Amended and Restated Equity Incentive Plan (the "EIP") and 142,851 RSUs outstanding under the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (the "Director EIP") that are payable solely in common shares. PSUs and RSUs do not have an exercise price, and therefore were not included for purposes of computing the weighted-average exercise price. PSUs granted in fiscal 2013 are reported in this table at the actual amounts that vested. PSUs granted in fiscal 2014 and 2015 are reported in this table at the maximum payout level (200% of target) in accordance with SEC rules.

(2) Includes 21,567,519 common shares available under the 2011 LTIP in the form of stock options and other stock-based awards. The number of shares authorized for issuance under the 2011 LTIP will increase by shares that are not issued under outstanding equity awards. Under the 2011 LTIP's fungible share counting provisions, stock options are counted against the plan as one share for every common share issued; awards other than stock options are counted against the plan as two and one-half shares for every common share issued. This means that only 8,627,007 shares could be issued under awards other than stock options while 21,567,519 shares could be issued under stock options.

(3) In addition to common shares remaining available under the 2011 LTIP, this also includes 712,907 common shares remaining available for future issuance under the Directors EIP in the form of stock options and other stock-based awards.

(4) Does not include stock options to purchase 1,019 common shares at a weighted-average exercise price of $39.81 that we assumed in connection with acquisition transactions.

(5) Includes 5,625 RSUs outstanding under the Cardinal Health, Inc. Amended and Restated Outside Directors Equity Incentive Plan (the "ODEIP") that are payable solely in common shares. RSUs do not have an exercise price, and therefore were not included for purposes of computing the weighted-average exercise price. The ODEIP was replaced by the Director EIP in 2007, and no new awards may be granted to non-employee directors under the ODEIP.

The other information called for by Item 12 of Form 10-K is incorporated by reference to our 2015 Proxy Statement under the caption "Share Ownership Information."

# Exhibits, Financial Statement Schedules

(a)(1) The following financial statements are included in the "Financial Statements" section of this report:

**Page**

Consolidated Financial Statements and Schedule:

| | |
|---|---|
| Consolidated Statements of Earnings for the Fiscal Years Ended June 30, 2015, 2014 and 2013 | **44** |
| Consolidated Statements of Comprehensive Income for the Fiscal Years Ended June 30, 2015, 2014 and 2013 | **45** |
| Consolidated Balance Sheets at June 30, 2015 and 2014 | **46** |
| Consolidated Statements of Shareholders' Equity for the Fiscal Years Ended June  30, 2015, 2014 and 2013 | **47** |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2015, 2014 and 2013 | **48** |
| Notes to Consolidated Financial Statements | **49** |

(a)(2) The following Supplemental Schedule is included in this report:

**Page**

| | |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | **71** |

All other schedules not listed above have been omitted as not applicable or because the required information is included in the Consolidated Financial Statements or in the Notes thereto.

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Final Binding Offer dated March 1, 2015 by and between Cardinal Health, Inc. and Ethicon, Inc. (incorporated by reference to Exhibit 10.1 of Cardinal Health's Current Report on Form 8-K filed on March 2, 2015, File No. 1-11373) |
| 2.2 | Stock and Asset Purchase Agreement, dated March 1, 2015 between Ethicon, Inc. and Cardinal Health, Inc. (incorporated by reference to Exhibit 2.1 to Cardinal Health's Current Report on Form 8-K filed on May 28, 2015, File No. 1-11373) |
| 2.3 | Letter Agreement between Ethicon, Inc. and Cardinal Health, Inc., dated May 29, 2015 relating to mechanics of agreeing to purchase price allocation |
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on July 1, 2015, File No. 1-11373) |
| 4.1 | Specimen Certificate for Common Shares of Cardinal Health, Inc. (incorporated by reference to Exhibit 4.01 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2001, File No. 1-11373) |
| 4.2.1 | Indenture, dated as of April 18, 1997, between Cardinal Health, Inc. and Bank One, Columbus, NA, Trustee (incorporated by reference to Exhibit 1 to Cardinal Health's Current Report on Form 8-K filed on April 21, 1997, File No. 1-11373) |
| 4.2.2 | Supplemental Indenture, dated October 3, 2006, between Cardinal Health, Inc. and The Bank of New York Trust Company, N.A., as trustee (successor to J.P. Morgan Trust Company, National Association, successor to Bank One, N.A., formerly known as Bank One, Columbus, N.A.) (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on October 4, 2006, File No. 1-11373) |
| 4.2.3 | Second Supplemental Indenture, dated June 8, 2007, between Cardinal Health, Inc. and The Bank of New York Trust Company, N.A., (successor to J.P. Morgan Trust Company, National Association, successor to Bank One, N.A., formerly known as Bank One, Columbus, N.A.), as trustee (incorporated by reference to Exhibit 4.01 to Cardinal Health's Current Report on Form 8-K filed on June 8, 2007, File No. 1-11373) |
| 4.2.4 | 4.00% Notes due 2015 (incorporated by reference to Exhibit 4.2.8 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, File No. 1-11373) |
| 4.2.5 | 5.85% Notes due 2017 (incorporated by reference to Exhibit 4.2.9 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, File No. 1-11373) |
| 4.2.6 | 5.80% Notes due 2016 (incorporated by reference to Exhibit 4.2.11 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, File No. 1-11373) |
| 4.2.7 | 6.00% Notes due 2017 (incorporated by reference to Exhibit 4.2.12 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, File No. 1-11373) |
| 4.3.1 | Indenture, dated as of June 2, 2008, between Cardinal Health, Inc. and The Bank of New York Trust Company, N.A. (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 2, 2008, File No. 1-11373) |
| 4.3.2 | 4.625% Notes due 2020 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on December 14, 2010, File No. 1-11373) |
| 4.3.3 | 1.900% Notes due 2017 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on May 21, 2012, File No. 1-11373) |
| 4.3.4 | 3.200% Notes due 2022 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on May 21, 2012, File No. 1-11373) |
| 4.3.5 | 1.700% Notes due 2018 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.3.6 | 3.200% Notes due 2023 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.3.7 | 4.600% Notes due 2043 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |

**Exhibits**

4.3.8      2.400% Notes due 2019 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373)

4.3.9      3.500% Notes due 2024 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373)

4.3.10      4.500% Notes due 2044 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373)

4.3.11      1.950% Notes due 2018 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373)

4.3.12      3.750% Notes due 2025 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373)

4.3.13      4.900% Notes due 2045 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373)

4.4      Agreement to furnish to the Securities and Exchange Commission upon request a copy of instruments defining the rights of holders of certain long-term debt of Cardinal Health, Inc. and consolidated subsidiaries (incorporated by reference to Exhibit 4.07 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2005, File No. 1-11373)

10.1.1      Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)*

10.1.2      First Amendment to Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)*

10.1.3      Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grant made to executive officer in April 2012) (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)*

10.1.4      Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in August 2012) (incorporated by reference to Exhibit 10.1.3 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)*

10.1.5      Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in August 2013 and thereafter) (incorporated by reference to Exhibit 10.1.4 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)*

10.1.6      Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in April and August 2012) (incorporated by reference to Exhibit 10.3 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)*

10.1.7      Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in August 2013) (incorporated by reference to Exhibit 10.1.7 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)*

10.1.8      Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in August 2014 and thereafter) (incorporated by reference to Exhibit 10.1.8 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)*

10.1.9      Form of Performance Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)*

10.1.10      Form of Amendment to Stock Option and Restricted Share Units Agreements under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan, the Cardinal Health, Inc. 2005 Long-Term Incentive Plan, the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan and the Cardinal Health, Inc. Amended and Restated Outside Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.1.9 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)*

10.1.11      Form of Amendment to Performance Share Units Agreements under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan and the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.10 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)*

10.2.1      Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373)*

10.2.2      First Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)*

10.2.3      Second Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)*

10.2.4      Third Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.4 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)*

10.2.5      Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (grants made to executive officers in February and August 2008) (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, File No. 1-11373)*

10.2.6      Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (grants made to executive officers in September 2009) (incorporated by reference to Exhibit 10.1.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)*

10.2.7      Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (grants made to executive officers in August 2011) (incorporated by reference to Exhibit 10.1.12 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2011, File No. 1-11373)*

10.2.8      Form of Performance Share Units Agreement under the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 4, 2011, File No. 1-11373)*

10.3.1      Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, File No. 1-11373)*

10.3.2      First Amendment to Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.2.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)*

10.3.3      Second Amendment to the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the Quarter ended December 31, 2011, File No. 1-11373)*

10.3.4      Form of Directors' Stock Option Agreement under the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (grants made in November 2008) (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, File No. 1-11373)*

**Exhibits**

10.3.5   Form of Directors' Restricted Share Units Agreement under the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (grants made in November 2013 and thereafter) (incorporated by reference to Exhibit 10.5.7 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)*

10.4.1   Cardinal Health, Inc. Broadly-based Equity Incentive Plan (incorporated by reference to Exhibit 10.52 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2002, File No. 1-11373)*

10.4.2   Second Amendment to the Cardinal Health, Inc. Broadly-based Equity Incentive Plan (incorporated by reference to Exhibit 10.4.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2007, File No. 1-11373)*

10.4.3   Third Amendment to the Cardinal Health, Inc. Broadly-based Equity Incentive Plan (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2009, File No. 1-11373)*

10.5.1   Cardinal Health Deferred Compensation Plan, amended and restated effective January 1, 2009 (incorporated by reference to Exhibit 10.6.5 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, File No. 1-11373)*

10.5.2   First Amendment to Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373)*

10.5.3   Second Amendment to Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010, File No. 1-11373)*

10.5.4   Third Amendment to Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2010, File No. 1-11373)*

10.5.5   Fourth Amendment to the Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, File No. 1-11373)*

10.5.6   Fifth Amendment to the Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2012, File No. 1-11373)*

10.6.1   Cardinal Health, Inc. Amended and Restated Management Incentive Plan (incorporated by reference to Exhibit 10.02 to Cardinal Health's Current Report on Form 8-K filed on November 13, 2006, File No. 1-11373)*

10.6.2   First Amendment to the Cardinal Health, Inc. Amended and Restated Management Incentive (incorporated by reference to Exhibit 10.7.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2007, File No. 1-11373)*

10.6.3   Cardinal Health, Inc. Management Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Periodic Report on Form 8-K filed on November 10, 2014, File No. 1-11373)*

10.7   Cardinal Health, Inc. Policy Regarding Shareholder Approval of Severance Agreements (incorporated by reference to Exhibit 10.09 to Cardinal Health's Current Report on Form 8-K filed on August 7, 2006, File No. 1-11373)*

10.8.1   Employment Agreement, dated September 4, 2012, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on September 6, 2012, File No. 1-11373)*

10.8.2   Amendment, dated August 5, 2015, to Employment Agreement, dated September 4, 2012, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 6, 2015, File No. 1-11373)*

10.8.3   Amended and Restated Aircraft Time Sharing Agreement, effective February 5, 2014, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, File No. 1-11373)*

10.8.4   Aircraft Time Sharing Agreement, effective August 5, 2015, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 6, 2015, File No. 1-11373)*

10.9   Confidentiality and Business Protection Agreement, effective as of February 15, 2010, between Cardinal Health, Inc. and Michael C. Kaufmann (incorporated by reference to Exhibit 10.15 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2010, File No. 1-11373)*

10.10   Confidentiality and Business Protection Agreement, effective as of April 9, 2012, between Cardinal Health, Inc. and Donald M. Casey Jr. (incorporated by reference to Exhibit 10.14.1 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)*

10.11   Confidentiality and Business Protection Agreement, effective as of September 9, 2014, between Cardinal Health, Inc. and Jon L. Giacomin (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, File No. 1-11373)*

10.12.1   Retirement Letter Agreement, dated June 10, 2014, between Cardinal Health, Inc. and Jeffrey W. Henderson (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on June 11, 2014, File No. 1-11373)*

10.12.2   Confidentiality and Business Protection Agreement, dated June 10, 2014, between Cardinal Health, Inc. and Jeffrey W. Henderson (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K filed on June 11, 2014, File No. 1-11373)*

10.12.3   Restricted Share Units Agreement between Cardinal Health, Inc. and Jeffrey W. Henderson (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, File No. 1-11373)*

10.13.1   Form of Indemnification Agreement between Cardinal Health, Inc. and certain individual directors (incorporated by reference to Exhibit 10.38 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, File No. 1-11373)

10.13.2   Form of Indemnification Agreement between Cardinal Health, Inc. and certain individual executive officers (incorporated by reference to Exhibit 10.39 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, File No. 1-11373)

10.14.1   Issuing and Paying Agency Agreement, dated August 9, 2006, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.01 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373)

10.14.2   First Amendment to Issuing and Paying Agency Agreement, dated February 28, 2007, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.01 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373)

10.14.3   Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and J.P. Morgan Securities Inc. (incorporated by reference to Exhibit 10.02 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373)

10.14.4   First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and J.P. Morgan Securities Inc. (incorporated by reference to Exhibit 10.02 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373)

| | |
|---|---|
| 10.14.5 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and J.P. Morgan Securities LLC (formerly known as J.P. Morgan Securities Inc.) (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.6 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Banc of America Securities LLC (incorporated by reference to Exhibit 10.03 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.14.7 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Banc of America Securities LLC (incorporated by reference to Exhibit 10.03 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.14.8 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, f/k/a Banc of America Securities LLC (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.9 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.04 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.14.10 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.04 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.14.11 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Wells Fargo Securities, LLC, as successor in interest to Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.6 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.12 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.05 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.14.13 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.05 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.14.14 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.7 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.15 | Form of Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc. (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K filed on April 21, 2009, File No. 1-11373) |
| 10.14.16 | Form of First Amendment to Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc. (incorporated by reference to Exhibit 10.8 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.15.1 | Five-Year Credit Agreement, dated as of May 12, 2011, among the Company, certain lenders, JPMorgan Chase Bank, N.A. as Administrative Agent, Bank of America, N.A. and Morgan Stanley Senior Funding, Inc. as Syndication Agents, Barclays Bank PLC and Deutsche Bank Securities Inc. as Documentation Agents, and J.P. Morgan Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley Senior Funding, Inc. as Joint Lead Arrangers and Book Managers (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on May 13, 2011, File No. 1-11373) |
| 10.15.2 | Amendment No. 1 to Five-Year Credit Agreement (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on June 5, 2013, File No. 1-11373) |
| 10.16.1 | Fourth Amended and Restated Receivables Purchase Agreement, dated as of November 1, 2013, among Cardinal Health Funding, LLC, as Seller, Griffin Capital, LLC, as Servicer, the Conduits party thereto, the Financial Institutions party thereto, the Managing Agents party thereto, the LC Banks party thereto and The Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch, as the Agent (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, File No. 1-11373) |
| 10.16.2 | First Amendment and Joinder, dated as of November 3, 2014, to the Fourth Amended and Restated Receivables Purchase Agreement, dated as of November 1, 2013 (incorporated by reference to Exhibit 10.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, File No. 1-11373) |
| 10.16.3 | Fifth Amended and Restated Performance Guaranty, dated as of November 1, 2013, executed by Cardinal Health, Inc. in favor of Cardinal Health Funding, LLC (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, File No. 1-11373) |
| 10.16.4 | Sixth Amended and Restated Performance Guaranty, dated as of November 3, 2014, executed by Cardinal Health, Inc. in favor of Cardinal Health Funding, LLC (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, File No. 1-11373) |
| 10.17.1 | Tax Matters Agreement, dated as of August 31, 2009, by and between Cardinal Health, Inc. and CareFusion Corporation (incorporated by reference to Exhibit 10.3 to Cardinal Health's Current Report on Form 8-K filed on September 4, 2009, File No. 1-11373) |
| 10.17.2 | First Amendment to Tax Matters Agreement, dated as of May 28, 2012, by and between Cardinal Health, Inc. and CareFusion Corporation (incorporated by reference to Exhibit 10.20.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373) |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges |
| 21.1 | List of Subsidiaries of Cardinal Health, Inc. |
| 23.1 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.1 | Statement Regarding Forward-Looking Information |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

\* Management contract or compensatory plan or arrangement.

77      Cardinal Health | Fiscal 2015 Form 10-K

# Form 10-K Cross Reference Index

| Item | | Page(s) |
|------|---|---------|
| | **Part 1** | |
| 1 | Business | **28** |
| 1A | Risk Factors | **34** |
| 1B | Unresolved Staff Comments | **N/A** |
| 2 | Properties | **37** |
| 3 | Legal Proceedings | **37** |
| 4 | Mine Safety Disclosures | **N/A** |
| | **Part II** | |
| 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | **38** |
| 6 | Selected Financial Data | **25** |
| 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | **8** |
| 7A | Quantitative and Qualitative Disclosures about Market Risk | **26** |
| 8 | Financial Statements and Supplementary Data | **43** |
| 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | **N/A** |
| 9A | Controls and Procedures | **40** |
| 9B | Other Information | **N/A** |
| | **Part III** | |
| 10 | Directors, Executive Officers and Corporate Governance | **72** |
| 11 | Executive Compensation | **(a)** |
| 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | **73** |
| 13 | Certain Relationships and Related Transactions, and Director Independence | **(b)** |
| 14 | Principal Accounting Fees and Services | **(c)** |
| | **Part IV** | |
| 15 | Exhibits, Financial Statement Schedules | **74** |
| | Signatures | **79** |

**N/A**    Not applicable

**(a)**    The information called for by Item 11 of Form 10-K is incorporated by reference to our 2015 Proxy Statement under the captions "Compensation Discussion and Analysis," "Executive Compensation" and "Director Compensation."

**(b)**    The information called for by Item 13 of Form 10-K is incorporated by reference to our 2015 Proxy Statement under the caption "Corporate Governance."

**(c)**    The information called for by Item 14 of Form 10-K is incorporated by reference to our 2015 Proxy Statement under the caption "Audit Committee Report and Audit Matters."

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on August 13, 2015.

Cardinal Health, Inc.

By:  /s/   GEORGE S. BARRETT

**George S. Barrett**

**Chairman and Chief Executive Officer**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed below by the following persons on behalf of the registrant and in the capacities indicated on August 13, 2015.

| Name | Title |
|---|---|
| /s/   GEORGE S. BARRETT<br>**George S. Barrett** | Chairman and Chief Executive Officer and Director (principal executive officer) |
| /s/   MICHAEL C. KAUFMANN<br>**Michael C. Kaufmann** | Chief Financial Officer (principal financial officer) |
| /s/   STUART G. LAWS<br>**Stuart G. Laws** | Senior Vice President and Chief Accounting Officer (principal accounting officer) |
| /s/   DAVID J. ANDERSON<br>**David J. Anderson** | Director |
| /s/   COLLEEN F. ARNOLD<br>**Colleen F. Arnold** | Director |
| /s/   CARRIE S. COX<br>**Carrie S. Cox** | Director |
| /s/   CALVIN DARDEN<br>**Calvin Darden** | Director |
| /s/   BRUCE L. DOWNEY<br>**Bruce L. Downey** | Director |
| /s/   PATRICIA A. HEMINGWAY HALL<br>**Patricia A. Hemingway Hall** | Director |
| /s/   CLAYTON M. JONES<br>**Clayton M. Jones** | Director |
| /s/   GREGORY B. KENNY<br>**Gregory B. Kenny** | Director |
| /s/   DAVID P. KING<br>**David P. King** | Director |
| /s/   RICHARD C. NOTEBAERT<br>**Richard C. Notebaert** | Director |

# Corporate and investor information

**Corporate offices**

Cardinal Health
7000 Cardinal Place
Dublin, Ohio 43017
614.757.5000
www.cardinalhealth.com
Twitter: @CardinalHealth

**Common shares**

Cardinal Health common shares are listed on the New York Stock Exchange under the ticker symbol "CAH" and are a component of the Standard & Poor's 500 Index.

**Annual meeting**

The 2015 Annual Meeting of Shareholders will be held at 8 a.m. local time on November 4, 2015, at Cardinal Health headquarters in Dublin, Ohio. Shareholders are cordially invited to attend.

**Auditors**

Ernst & Young LLP

**Transfer agent and registrar**

Shareholders with inquiries regarding address corrections, dividend payments, lost certificates or changes in registered ownership should contact the Cardinal Health stock transfer agent:

Computershare Trust Company, N.A.
211 Quality Circle
Suite 210
College Station, TX 77845
877.498.8861
www.computershare.com/investor

**Financial information**

Comprehensive financial and other information about Cardinal Health can be obtained by visiting the Investors page at ir.cardinalhealth.com.

Available information includes historical stock information, research analyst coverage, past and present financial statements, recent company presentations, SEC filings, corporate governance guidelines and board committee charters. This information — including the Cardinal Health Forms 10-K, 10-Q, 8-K and other published corporate literature — is also available without charge upon written request to the Investor Relations department at the corporate office, or by calling Investor Relations at 614.757.4757.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the Investors page at ir.cardinalhealth.com. In addition, the Cardinal Health website allows investors and other interested persons to sign up to automatically receive email alerts when the company posts news releases, SEC filings and certain other information on its website.

For non-investor related inquiries, please call the company's main telephone number at 614.757.5000.

## Fiscal 2015 cash dividend declarations

| Fiscal quarter | Record date | Payment date | Per common share amount |
|---|---|---|---|
| 1st | October 1, 2014 | October 15, 2014 | $0.3425 |
| 2nd | January 2, 2015 | January 15, 2015 | $0.3425 |
| 3rd | April 1, 2015 | April 15, 2015 | $0.3425 |
| 4th | July 1, 2015 | July 15, 2015 | $0.3870 |

Exhibit 2.3

**Cardinal Health, Inc.**
7000 Cardinal Place
Dublin, OH 43017

May 29, 2015

Ethicon, Inc.
Route 22 West
Somerville, NJ 08876
Attn.:  Vice President, Law

Johnson & Johnson Law Department
One Johnson & Johnson Plaza
New Brunswick, NJ  08933
Attn.:  General Counsel MD&D

Re:  Project Valentine/Orkney - Allocation of Purchase Price

Ladies and Gentlemen:

Reference is made to the Stock and Asset Purchase Agreement (the "SAPA"), dated as of March 1, 2015, between Ethicon, Inc. ("Seller") and Cardinal Health, Inc. ("Buyer").  Capitalized terms used but not defined herein have the meanings assigned thereto in the SAPA.

Each of Seller and Buyer acknowledges that (a) Seller delivered the Proposed Allocation to Buyer on April 16, 2015 and (b) Section 2.05 of the SAPA requires Buyer to raise any objection thereto no later than May 31, 2015.  Seller and Buyer hereby agree that the deadline for raising any objection to the Proposed Allocation pursuant to Section 2.05 of the SAPA shall be extended from May 31, 2015 to June 15, 2015.

[*Signature Pages Follow*]

[*Signature Page to Allocation Extension Letter*]

Very truly yours,

**CARDINAL HEALTH, Inc.**,
By

/s/ Sam Samad
Name: Sam Samad
Title: Senior Vice President & Treasurer

Acknowledged and agreed to
as of the date set forth above:

**ETHICON, INC.**,
By

/s/ Alan J. Rae
Name: Alan J. Rae
Title: Vice President, New Business
Development

**Exhibit 12.1**

# Cardinal Health, Inc. and Subsidiaries

## Computation of Ratio of Earnings to Fixed Charges

| (in millions, except ratios) | | June 30 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2011 | | 2012 | | 2013 | | 2014 | | 2015 |
| Earnings before income taxes and discontinued operations | $ | 1,518.3 | $ | 1,698.1 | $ | 888.3 | $ | 1,798.3 | $ | 1,967.3 |
| **Plus fixed charges:** | | | | | | | | | | |
| Interest expense | | 95.2 | | 92.3 | | 119.2 | | 129.4 | | 137.0 |
| Capitalized interest | | 5.7 | | 6.0 | | 1.7 | | 1.2 | | 1.8 |
| Amortization of debt offering costs | | 1.8 | | 2.8 | | 3.5 | | 3.6 | | 7.6 |
| Interest portion of rent expense | | 7.1 | | 7.8 | | 8.3 | | 9.8 | | 9.6 |
| **Fixed charges** | | 109.8 | | 108.9 | | 132.7 | | 144.0 | | 156.0 |
| Plus: amortization of capitalized interest | | 5.3 | | 3.2 | | 3.4 | | 2.9 | | 2.4 |
| Less: capitalized interest | | (5.7) | | (6.0) | | (1.7) | | (1.2) | | (1.8) |
| **Earnings** | $ | 1,627.7 | $ | 1,804.2 | $ | 1,022.7 | $ | 1,944.0 | $ | 2,123.9 |
| **Ratio of earnings to fixed charges (1)** | | 14.8 | | 16.6 | | 7.7 | | 13.5 | | 13.6 |

(1) The ratio of earnings to fixed charges is computed by dividing fixed charges into earnings before income taxes and discontinued operations plus fixed charges and capitalized interest. Fixed charges include interest expense, amortization of debt offering costs and the portion of rent expense that is deemed to be representative of the interest factor. Interest expense recorded on tax exposures has been recorded in income tax expense and has therefore been excluded from the calculation.

Exhibit 21.1

## Subsidiaries of the Registrant

Listed below are majority-owned subsidiaries of Cardinal Health, Inc. as of June 30, 2015.  Subsidiaries excluded from the list below would not, considered in the aggregate as a single subsidiary, constitute a "significant subsidiary" of Cardinal Health, Inc. as that term is defined in Rule 1-02(w) of Regulation S-X.

| Subsidiary Name | State/Jurisdiction of Incorporation | Subsidiary Name | State/Jurisdiction of Incorporation |
|---|---|---|---|
| Access Closure, Inc. | California | Cardinal Health (H.K.) Co. Ltd. | Hong Kong |
| Allegiance Corporation | Delaware | Cardinal Health IPS, LLC | Delaware |
| AssuraMed, Inc. | Delaware | Cardinal Health Ireland 419 Limited | Ireland |
| Cardinal Health 2, LLC | Nevada | Cardinal Health (L) Co., Ltd. | Malaysia |
| Cardinal Health 3, LLC | Delaware | Cardinal Health Luxembourg 420 S.a.r.l. | Luxembourg |
| Cardinal Health 5, LLC | Delaware | Cardinal Health Malaysia 211 Sdn. Bhd. | Malaysia |
| Cardinal Health 6, Inc. | Nevada | Cardinal Health Malta 212 Limited | Malta |
| Cardinal Health 7, LLC | Delaware | Cardinal Health Managed Care Services, LLC | Delaware |
| Cardinal Health 100, Inc. | Indiana | Cardinal Health Pharmaceutical Contracting, LLC | Delaware |
| Cardinal Health 104 LP | Ohio | Cardinal Health Pharmacy Services, LLC | Delaware |
| Cardinal Health 105, Inc. | Ohio | Cardinal Health P.R. 120, Inc. | Puerto Rico |
| Cardinal Health 107, LLC | Ohio | Cardinal Health P.R. 218, Inc. | Puerto Rico |
| Cardinal Health 108, LLC | Delaware | Cardinal Health Singapore 225 Pte. Ltd. | Singapore |
| Cardinal Health 110, LLC | Delaware | Cardinal Health Specialty Pharmacy, LLC | Delaware |
| Cardinal Health 112, LLC | Delaware | Cardinal Health Systems, Inc. | Ohio |
| Cardinal Health 114, Inc. | Delaware | Cardinal Health Technologies, LLC | Nevada |
| Cardinal Health 115, LLC | Ohio | Cardinal Health Technologies Switzerland GmbH | Switzerland |
| Cardinal Health 116, LLC | Delaware | Cirpro de Delicias S.A. de C.V. | Mexico |
| Cardinal Health 118, LLC | Delaware | Convertors de Mexico S.A. de C.V. | Mexico |
| Cardinal Health 119, LLC | Delaware | Dutch American Manufacturers II (D.A.M. II) B.V. | Netherlands |
| Cardinal Health 121, LLC | Delaware | EPIC Insurance Company | Vermont |
| Cardinal Health 122, LLC | Delaware | Griffin Capital, LLC | Nevada |
| Cardinal Health 123, LLC | Delaware | Innovative Therapies, Inc. | Delaware |
| Cardinal Health 124, LLC | Delaware | Kinray, LLC | New York |
| Cardinal Health 126, LLC | Delaware | Leader Drugstores, Inc. | Delaware |
| Cardinal Health 127, Inc. | Kansas | Medicine Shoppe International, Inc. | Delaware |
| Cardinal Health 200, LLC | Delaware | Metro Medical Supply, LLC | Tennessee |
| Cardinal Health 201, Inc. | Delaware | One Cloverleaf, LLC | Delaware |
| Cardinal Health 222 (Thailand) Ltd. | Thailand | Parmed Pharmaceuticals, LLC | Delaware |
| Cardinal Health 247, Inc. | Colorado | Pinnacle Intellectual Property Services, Inc. | Nevada |
| Cardinal Health 249, LLC | Delaware | Pinnacle Intellectual Property Services-International, Inc. | Nevada |
| Cardinal Health 411, Inc. | Ohio | Quiroproductos de Cuauhtmoc S. de R.L. de C.V. | Mexico |
| Cardinal Health 414, LLC | Delaware | RGH Enterprises, Inc. | Ohio |
| Cardinal Health Canada Inc. | Canada | Rxealtime, Inc. | Nevada |
| Cardinal Health D.R. 203 II Ltd. | Bermuda | Sonexus Health, LLC | Texas |
| Cardinal Health Foundation | Ohio | Tradex International, Inc. | Ohio |
| Cardinal Health Funding, LLC | Nevada | WaveMark, Inc. | Delaware |

Exhibit 23.1

### Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

(1)  Registration Statement on Form S-3 No. 333-190741 of Cardinal Health, Inc.,

(2)  Registration Statements on Form S-4 No. 333-62938 and No. 333-74761 of Cardinal Health, Inc., and

(3)  Registration Statements on Form S-8 No. 33-42357, No. 33-64337, No. 333-72727, No. 333-90423, No. 333-91849, No. 333-92841, No. 333-38192, No. 333-38198, No. 333-56010, No. 333-120006, No. 333-129725, No. 333-144368, No. 333-149107, No. 333-155156, No. 333-163128, No. 333-164736, No. 333-177728, No. 333-183471 of Cardinal Health, Inc.;

of our reports dated August 13, 2015, with respect to the consolidated financial statements and schedule of Cardinal Health, Inc. and subsidiaries and the effectiveness of internal control over financial reporting of Cardinal Health, Inc. and subsidiaries, included in this Annual Report (Form 10-K) of Cardinal Health, Inc. and subsidiaries for the year ended June 30, 2015.

/s/ Ernst & Young LLP

Columbus, Ohio

August 13, 2015

Exhibit 31.1

I, George S. Barrett, certify that:

1.  I have reviewed this Form 10-K of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 13, 2015

/s/ GEORGE S. BARRETT
George S. Barrett
Chairman and Chief Executive Officer

Exhibit 31.2

I, Michael C. Kaufmann, certify that:

1.  I have reviewed this Form 10-K of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 13, 2015

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Financial Officer

Exhibit 32.1

**Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Each of George S. Barrett, Chairman and Chief Executive Officer of Cardinal Health, Inc. (the "Company"), and Michael C. Kaufmann, Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)     the Annual Report on Form 10-K for the fiscal year ended June 30, 2015 containing the financial statements of the Company (the "Periodic Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 13, 2015

/s/ GEORGE S. BARRETT
_____
George S. Barrett
Chairman and Chief Executive Officer


/s/ MICHAEL C. KAUFMANN
_____
Michael C. Kaufmann
Chief Financial Officer

Exhibit 99.1

## Statement Regarding Forward-Looking Information

As used in this exhibit, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the fiscal year ended June 30, 2015 (the "2015 Form 10-K"), our quarterly reports on Form 10-Q or our current reports on Form 8-K (along with any exhibits and amendments to such reports), as well as our news releases or any other written or oral statements made by or on behalf of us, may include, directly or by incorporation by reference, forward-looking statements that reflect our current view (as of the date the forward-looking statement is first made) about future events, prospects, projections or financial performance. The matters discussed in these forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied in or by such statements. These risks and uncertainties include:

- competitive pressures in the markets in which we operate, including pricing pressures;

- increasing consolidation in the healthcare industry, which could give the resulting enterprises greater bargaining power and may increase pressure on prices for our products and services;

- uncertainties due to government healthcare reform;

- changes to the prescription drug reimbursement formula and related reporting requirements for generic pharmaceuticals under Medicaid;

- material reductions in purchases, non-renewal or early termination of contracts, or delinquencies or defaults by key customers;

- risks associated with the generic pharmaceutical sourcing venture with CVS Health Corporation, including those relating to our ability to realize and maintain the benefits from the sourcing venture;

- actions of regulatory bodies and other governmental authorities, including the U.S. Drug Enforcement Administration ("DEA"), the U.S. Food and Drug Administration and other agencies within the U.S. Department of Health and Human Services, including the Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights, the U.S. Nuclear Regulatory Commission, the U.S. Federal Trade Commission, the U.S. Customs and Border Protection, various state boards of pharmacy, state controlled substance agencies, state health departments, state insurance departments, state Medicaid departments or comparable regulatory bodies or governmental authorities or foreign equivalents that could delay, limit or suspend product development, manufacturing, distribution, importation or sales or result in warning letters, recalls, seizures, injunctions or monetary sanctions;

- the possibility of civil fines levied against us (in excess of the reserve we have accrued) by the U.S. Department of Justice for conduct covered by the settlement agreement that we entered into in connection with the DEA's suspension of our Lakeland, Florida distribution center's registration to distribute controlled substances;

- the loss of, or default by, one or more key suppliers for which alternative suppliers may not be readily available;

- unfavorable changes to the terms of key customer or supplier relationships, or changes in customer mix;

- changes in manufacturers' pricing, selling, inventory, distribution or supply policies or practices;

- changes in hospital buying groups or hospital buying practices;

- changes in the frequency or magnitude of brand or generic pharmaceutical price appreciation, restrictions in the amount of inventory available to us, or changes in the timing or frequency of generic launches or the introduction of brand pharmaceuticals;

- uncertainties relating to market conditions for pharmaceuticals;

- uncertainties relating to demand for our products and services;

- changes in distribution or sourcing models for pharmaceutical and medical/surgical products and services, including an increase in direct and limited distribution;

- the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition;

- uncertainties relating to our ability to achieve the anticipated results from the acquisition of The Harvard Drug Group;

- risks and uncertainties relating to our pending acquisition of Cordis, including, if completed, the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition will subject us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility;

- risks arising from certain of our businesses being Medicare-certified suppliers or participating in state Medicaid programs, which business are subject to accreditation and quality standards and other rules and regulations, including applicable billing, payment and record-keeping requirements;

- risks arising from certain of our businesses manufacturing or repackaging pharmaceuticals, which businesses are subject to federal and state laws that establish eligibility for reimbursement by federal and state healthcare programs;

- risks arising from possible violations of the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws and other similar anti-corruption laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws;

- risks arising from possible violations of healthcare fraud and abuse laws;

- risks arising from our collecting, handling and maintaining patient-identifiable healthcare information and other sensitive personal information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information;

- changes in laws or changes in the interpretation or application of laws or regulations, as well as possible failures to comply with applicable laws or regulations, including as a result of possible misinterpretations or misapplications;
- our ability to introduce and market new products and our ability to keep pace with advances in technology;
- our ability to maintain adequate intellectual property protections;
- costs or claims resulting from potential errors or defects in our manufacturing of medical devices or other products or in our compounding, repackaging, information systems or pharmacy management services that may injure persons or damage property or operations, including costs from remediation efforts or recalls;
- the results, costs, effects or timing of any commercial disputes, government contract compliance matters, patent infringement claims, *qui tam* actions or other legal proceedings;
- disruption or damage to, or failure of, our information or controls systems, including in the event that the Pharmaceutical segment's planned multi-year systems upgrade is not effectively implemented or fails to operate as intended, or a data security breach;
- disruptions to the proper functioning of our critical facilities, including our national logistics center;
- the costs, effects, timing or success of restructuring programs or plans;
- significant charges to earnings if goodwill or intangible assets become impaired;
- increased costs for commodities used in the Medical segment including various components, compounds, raw materials or energy such as oil-based resins, cotton, latex and other commodities;
- shortages in commodities, components, compounds, raw materials or energy used by our businesses, including supply disruptions of radioisotopes;
- the risks of counterfeit products in the supply chain;
- risks associated with volatility and disruption to the global capital and credit markets, which may adversely affect our ability to access credit, our cost of credit and the financial soundness of our customers and suppliers;
- bankruptcy, insolvency or other credit failure of a customer or supplier that has a substantial amount owed to us;
- risks associated with global operations, including the effect of local economic environments, inflation, recession, currency volatility and global competition, in addition to risks associated with compliance with U.S and international laws relating to global operations;
- difficulties or delays in the development, production, manufacturing, sourcing and marketing of new or existing products and services, including difficulties or delays associated with obtaining requisite regulatory consents or approvals associated with those activities;
- adverse changes in U.S. or foreign tax laws, unfavorable challenges to our tax positions and payments to settle these challenges; and
- uncertainties relating to general political, business, industry, regulatory and market conditions;
- other factors described in the "Risk Factors" section of the 2015 Form 10-K.

The words "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions generally identify "forward-looking statements," which speak only as of the date the statements were made, and also include statements reflecting future results or guidance, statements of outlook and expense accruals. We undertake no obligation to update or revise any forward-looking statements, except to the extent required by applicable law.

# EXHIBIT 22

SEC Form 4

| **FORM 4** | **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**<br>Washington, D.C. 20549 | OMB APPROVAL |
|---|---|---|

| OMB Number: | 3235-0287 |
|---|---|
| Expires: | December 31, 2014 |
| Estimated average burden hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person[*]<br>Barrett George S | 2. Issuer Name **and** Ticker or Trading Symbol<br>CARDINAL HEALTH INC [ CAH ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

| (Last) | (First) | (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>08/15/2015 |
|---|---|---|---|
| 7000 CARDINAL PLACE | | | |

Relationship:
X Director
X Officer (give title below)    10% Owner    Other (specify below)
Chairman and CEO

| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|---|---|
| DUBLIN    OH    43017 | | X Form filed by One Reporting Person<br>Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/15/2015 | | A[(1)] | | 39,457 | A | $0 | 474,012 | D | |
| Common Shares | 08/15/2015 | | F[(2)] | | 67,878 | D | $84.27[(3)] | 406,134 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $84.27 | 08/15/2015 | | A | | 189,695 | | [(4)] | 08/15/2025 | Common Shares | 189,695 | $0 | 189,965 | D | |

**Explanation of Responses:**

1. Grant of restricted share units ("RSUs") that vest in three equal annual installments beginning on August 15, 2016.
2. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 57,187 RSUs and 85,861 performance share units.
3. Reflects closing price on prior business day.
4. Stock option vests in three equal annual installments beginning on August 15, 2016.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact          08/18/2015

\*\* Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 23

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Casey Donald M Jr. | CARDINAL HEALTH INC [ CAH ] | Director ___ 10% Owner ___ |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 08/15/2015 | X Officer (give title below) ___ Other (specify below) ___ CEO, Medical Segment |
| 7000 CARDINAL PLACE (Street) DUBLIN OH 43017 (City) (State) (Zip) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) Code | V | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) Amount | (A) or (D) | Price | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Shares | 08/15/2015 | | A[1] | | 9,553 | A | $0 | 119,860 | D | |
| Common Shares | 08/15/2015 | | F[2] | | 4,653 | D | $84.27[3] | 115,207 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code | V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) (A) | (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Stock Option (right to buy) | $84.27 | 08/15/2015 | | A | | 45,926 | | [4] | 08/15/2025 | Common Shares | 45,926 | $0 | 45,926 | D | |

**Explanation of Responses:**

1. Grant of restricted share units ("RSUs") that vest in three equal annual installments beginning on August 15, 2016.
2. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 14,603 RSUs and 23,387 performance share units.
3. Reflects closing price of prior business day.
4. Stock option vests in three equal annual installments beginning on August 15, 2016.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact      08/18/2015

** Signature of Reporting Person      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 24

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Barrett George S | CARDINAL HEALTH INC [ CAH ] | X Director  10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below)  Other (specify below) |
| 7000 CARDINAL PLACE | 08/20/2015 | Chairman and CEO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| DUBLIN  OH  43017 | | X Form filed by One Reporting Person |
| (City) (State) (Zip) | | Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/20/2015 | | M(1) | | 300,000 | A | $27.29 | 706,134 | D | |
| Common Shares | 08/20/2015 | | S(1) | | 300,000 | D | $83.08(2) | 406,134 | D | |

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $27.29 | 08/20/2015 | | M | | | 300,000 | (3) | 09/15/2016 | Common Shares | 300,000 | $27.29 | 54,658 | D | |

**Explanation of Responses:**

1. The exercise and sale reported on this Form 4 were effected pursuant to a Rule 10b5-1 trading plan adopted by the reporting person on November 6, 2014.

2. The price reported in column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $82.20 to $84.98, inclusive. The reporting person undertakes to provide to Cardinal Health, Inc., any security holder of Cardinal Health, Inc., or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of shares sold at each separate price within the range set forth in footnote 2 to this Form 4.

3. The option, representing a right to purchase a total of 644,704 shares, vested and became exercisable in three equal annual installments beginning on September 15, 2010.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact                     08/20/2015

** Signature of Reporting Person                              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 25

# Insights From David J. Wilson, President of Cordis Corporation

As Cordis Corporation joins Cardinal Health, the Cordis President reflects on the company's legacy of innovation and shares goals for the future.



*David J. Wilson is the Worldwide President of Cordis Corporation in Fremont, California.*

**David, you started your career at the Johnson & Johnson Family of Companies with Cordis Corporation, followed by multiple leadership roles within the Johnson & Johnson Family of Companies. Now, you are leading Cordis Corporation, while becoming part of Cardinal Health. What do you think about this move to Cardinal Health?**

After 20 years with the Johnson & Johnson Family of Companies, including over 11 years with Cordis Corporation, I'm tremendously excited to be leading Cordis at this moment in time. Cordis is known for delivering meaningful, innovative products to patients and customers, and I am proud to have spent the earlier part of my career in the Cordis Research & Development labs. Cordis is now joining a corporation, Cardinal Health, that deeply values our people and their work, our global capabilities, and our strong customer relationships. The Cordis business is a priority for Cardinal Health. Cardinal Health is looking forward to working with Cordis to continue building on our market reputation and expanding our growth.

**Cordis has a long legacy of innovation and of bringing many firsts to the cardiovascular field. How do you envision Cordis innovating in the future?**

Today, Cordis is a recognized leader in the development and manufacturing of interventional vascular technology with its more than 50-year history of delivering pioneering products to treat millions of patients worldwide. We will build on this rich history working together with Cardinal Health, utilizing their complementary skills and new expertise. Recognizing the important role we play across the cardiovascular market, Cardinal Health is eager and committed to investing in the Cordis business to drive growth and innovation, and in turn, enhance patient care. Leveraging Cordis' deep experience in product innovation and Cardinal Health's business and operational expertise, we will be uniquely positioned to continue meeting the evolving needs of our customers and their patients.

**The United States health care industry has been going through significant changes over the past several years. Which of these changes has had the most profound impact on Cordis and its plans for the future?**

Health care is changing faster today than at any time in the past. With an aging population and an increase in chronic illnesses, there's greater demand for innovative yet affordable solutions for quality health care. At the same time, in order to deliver better patient care, hospitals today need to provide more access to more patients while being operationally efficient.

For over 50 years, Cordis' mission has been to advance less-invasive therapies, leading to better experiences for patients by innovating across both products and education. This rich legacy of innovation will continue to strengthen the Cordis brand worldwide going forward. Cordis, with Cardinal Health, is committed to doing much more to help health care providers increase access by addressing delivery of care and operational efficiencies that will be critical in this evolving industry. This will also include expanding our high-quality training and service, as well as ensuring our strong clinical acumen.

**Physicians are trading private practice for hospital employment, hospitals are becoming larger, and medical device companies and insurance companies are merging at unprecedented levels. What does this significant consolidation mean to the industry and Cordis?**

Integrating primary care physicians, specialists, and hospitals into consolidated health care delivery organizations is a strategy intended to help deliver better clinical outcomes at a greater value. Medical device companies are taking a similar approach, by bundling complimentary

Case: 2:19-cv-03347-EAS-EPD Doc #: 29 Filed: 11/06/20 Page: 428 of 428  PAGEID #: 917



**David J. Wilson contributing to a specialized catheter design while working in Cordis R&D in 1996.**

products and services. There is more we can learn about the effectiveness of integrated health care delivery systems, as well as the consolidation we are seeing in the medical device and insurance companies. At the core of these consolidations is the need for efficiency and coordination of care. It is clear this trend will continue.

Cordis already has a solid reputation in the interventional cardiology and endovascular space, and we plan to continue delivering technology-driven innovation! With Cardinal Health, we also have a significant opportunity to focus on operational efficiencies with information-enabled systems (eg, RFID). Investment in the infrastructure of delivery systems will result in cost savings seen through inventory holding cost reduction, the decrease of inventory levels, and the elimination of costs associated with expired or lost products. This should allow Cordis to drive better patient care, while also helping our customers with efficiencies that support better access for more patients.

**With products spanning aortic endografts to chronic total occlusion (CTO) devices, where do you see Cordis' growth opportunities?**

While we believe the next phase of health care will focus on innovating *both* technology and services, in the short term we have some promising technological advances for the treatment of both abdominal aortic aneurysms (AAAs) and CTOs resulting from peripheral artery disease.

An estimated 24 million people worldwide are afflicted with AAAs, and millions more suffer from CTOs in

peripheral arteries. The INCRAFT® AAA Stent Graft System, which has been cleared for use in Europe and Canada, brings an innovative advancement to the field of endovascular aneurysm repair, entering a growth segment that further diversifies Cordis' strong portfolio of products. The INCRAFT® System is currently approved for investigational device use only in the United States and is being evaluated in a pivotal clinical trial in the United States and Japan (the INSPIRATION Trial), which completed enrollment in 2013.

The latest additions to our CTO Crossing Portfolio underscore Cordis' longstanding commitment to advancing care for the complex critical limb ischemia patient. This began in 2005 with the acquisition of Lumend, Inc. Our workhorse solutions, the FRONTRUNNER® XP CTO Catheter and the AQUATRACK® Nitinol Guidewire, are now supported with our most recent additions, the OUTBACK® Elite Re-Entry Catheter and the soon-to-be launched ELITECROSS™ Support Catheter, which has been cleared for use in the United States. We look forward to continuing the expansion of these new lines and coming up with new complementary products.

Significant technological strides have been made in the treatment of aortic aneurysms and CTOs, and more work needs to be done to provide the most comprehensive offering of products to help treat these conditions.

**With Cardinal Health's acquisition of Cordis complete, can you share with us what this means for the entire business?**

I truly believe this is a very exciting time for Cordis and Cardinal Health. Cordis is a leader in interventional vascular technology and plans to continue building on our rich history as part of Cardinal Health. This transaction brings together two remarkable players in the health care industry to deliver greater access to quality products, creating an unmatched offering in the cardiovascular space.

From high-quality daily use products to reliable, trackable inventory and logistics with deep analytic capabilities, the Cordis and Cardinal Health venture will result in comprehensive offerings for the entire episode of care. As we move forward, our customers and the patients they serve remain our highest priority. We are excited and look forward to ensuring a continuation of our high-quality, innovative products and exceptional customer service. ■

Third party trademarks used herein are trademarks of their respective owners.
Cordis Corporation © Cordis Corporation 2015