**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LOUISIANA SHERIFFS' PENSION & RELIEF FUND**, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>**CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C. KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON**,<br><br>Defendants. | **Case No. 2:19-cv-3347**<br><br>Judge Edmund A. Sargus<br>Chief Magistrate Judge Elizabeth A. Preston Deavers |

**DECLARATION OF DAVID S. BLOOMFIELD, JR., EXHIBITS (PART III)**

# EXHIBITS 52-77

# EXHIBIT 52

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 30, 2016

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

**CardinalHealth**
*Essential to care™*

# Cardinal Health, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**

*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

| *Title of class* | *Name of each exchange on which registered* |
|---|---|
| **Common shares (without par value)** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑                                    Accelerated filer ☐

Non-accelerated filer ☐   (Do not check if a smaller reporting company)          Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of voting stock held by non-affiliates or registrant on December 31, 2015, was the following: $29,344,021,222.

The number of the registrant's common shares, without par value, outstanding as of July 29, 2016, was the following: 318,588,961.

**Documents Incorporated by Reference:**

Portions of the registrant's Definitive Proxy Statement to be filed for its 2016 Annual Meeting of Shareholders are incorporated by reference into the sections of this Form 10-K addressing the requirements of Part III of Form 10-K.

# Cardinal Health
**Fiscal 2016 Form 10-K**

## Table of Contents

---

|  | Page |
|---|---|
| Key Highlights | **2** |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | **8** |
| Explanation and Reconciliation of Non-GAAP Financial Measures | **23** |
| Selected Financial Data | **26** |
| Quantitative and Qualitative Disclosures about Market Risk | **27** |
| Business | **29** |
| Risk Factors | **35** |
| Properties | **39** |
| Legal Proceedings | **39** |
| Market for Registrant's Common Equity | **40** |
| Reports | **42** |
| Financial Statements and Supplementary Data | **45** |
| Directors, Executive Officers, and Corporate Governance | **74** |
| Exhibits | **75** |
| Form 10-K Cross Reference Index | **79** |
| Signatures | **80** |
| Additional Information | **81** |

# Introduction

This "Key Highlights" section provides a brief overview of Cardinal Health, Inc. and does not contain all of the information you should consider. Please read the entire Form 10-K carefully before voting or making an investment decision. As used in this report, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise.

**References to Fiscal Years**

Our fiscal year ends on June 30.  References to fiscal 2016, 2015, 2014, 2013 and 2012 and to FY16, FY15, FY14, FY13 and FY12 are to the fiscal years ended June 30, 2016, 2015, 2014, 2013 and 2012, respectively. Except as otherwise specified, information in this Form 10-K is provided as of June 30, 2016.

**Non-GAAP Financial Measures**

In this "Key Highlights" section and the "Fiscal 2016 Overview" section of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), we use financial measures that are derived from consolidated financial data but are not presented in our financial statements that are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this Form 10-K.

**Important Information Regarding Forward-Looking Statements**

This Form 10-K (including information incorporated by reference) includes forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in MD&A, but there are others throughout this document, which may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. The most significant of these risks and uncertainties are described in "Risk Factors" and in Exhibit 99.1 to this Form 10-K. Forward-looking statements in this document speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

**Key Highlights**



**We serve** more than 25,000 pharmacies.



**We deliver** nearly 10,000,000 time-critical radiopharmaceutical doses annually.



**We support** more than 70% of U.S. hospitals.



**We serve** 2 million patients with nearly 40,000 home healthcare products.



**We manufacture** or source nearly 2.8 billion individual consumer healthcare, home medical equipment, and over-the-counter products each year.



**We have** more than 37,000 employees worldwide.

For those tasked with navigating the complexities of healthcare, Cardinal Health brings scaled solutions that help our customers thrive in a changing world.

We apply our nearly 100 years of experience and expertise to reduce the total cost of healthcare and to improve the lives of patients. Our scale and experience lead to solutions across the entire care continuum — from hospital to home and everywhere in between — through **logistics, business, product and patient solutions**.

# Financial summary

| | GAAP Basis ($M) | | | | | Non-GAAP[1] Basis ($M) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **FY16** | FY15 | FY14 | FY13 | FY12 | **FY16** | FY15 | FY14 | FY13 | FY12 |
| **Revenue** | **$121,546** | $102,531 | $91,084 | $101,093 | $107,552 | | | | | |
| % change | 19% | 13% | (10)% | (6)% | 5% | | | | | |
| **Operating earnings** | **$2,459** | $2,161 | $1,885 | $996 | $1,792 | **$2,895** | $2,472 | $2,133 | $2,046 | $1,866 |
| % change | 14% | 15% | 89% | (44)% | 18% | 17% | 16% | 4% | 10% | 13% |
| Ratio to revenue (operating margin) | 2.02% | 2.11% | 2.07% | 0.99% | 1.67% | 2.38% | 2.41% | 2.34% | 2.02% | 1.73% |
| **Net earnings from continuing operations[2]** | **$1,427** | $1,212 | $1,163 | $335 | $1,070 | **$1,732** | $1,469 | $1,324 | $1,284 | $1,119 |
| % change | 18% | 4% | 247% | (69)% | 11% | 18% | 11% | 3% | 15% | 13% |
| **Diluted EPS[3]** | **$4.32** | $3.61 | $3.37 | $0.97 | $3.06 | **$5.24** | $4.38 | $3.84 | $3.73 | $3.21 |
| % change | 20% | 7% | 247% | (68)% | 12% | 20% | 14% | 3% | 16% | 15% |

# Sustained strong financial performance over five years

The growth presented below reflects fiscal 2011 compared to fiscal 2016.



Diluted EPS from continuing operations growth — GAAP 9.5% CAGR — Non-GAAP[1] 13.4% CAGR

Total shareholder return[4] — 90.4%

Operating earnings growth — GAAP 10.2% CAGR — Non-GAAP[1] 12.0% CAGR

Dividend per share growth — 14.7% CAGR

[1] Non-GAAP financial measures. See "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A for definitions and reconciling information.
[2] Attributable to Cardinal Health, Inc.
[3] Diluted earnings per share from continuing operations attributable to Cardinal Health, Inc.
[4] Total shareholder return is the total return of our shares expressed as a percentage (calculated based on changes in stock price over the measurement period and assuming reinvestment of dividends).

Case: 2:19-cv-03347-EAS-EPD Doc #: 29-2 Filed: 11/06/20 Page: 9 of 963 PAGEID #: 1575

# Capital deployment for five years

Fiscal 2012 through fiscal 2016



**$8.5B** cumulatively invested in our businesses

Acquisitions, net of divestitures $7.0B

Dividends $2.0B

Share repurchases $3.3B

Capital expenditures $1.5B

**$5.3B** cumulatively returned to shareholders

# Corporate citizenship

We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen and with a belief that doing "the right thing" serves everyone.

 **$92M** corporate and Cardinal Health Foundation charitable and product donations worldwide from fiscal 2012 through fiscal 2016

 **10 years** included on the Dow Jones Sustainability Index

 **Over ⅓** of our Board of Directors is gender or ethnically diverse.

# Board of directors

**David J. Anderson** (A)
Retired Senior Vice President and
Chief Financial Officer, Honeywell International Inc.

**Colleen F. Arnold** (N)
Retired Senior Vice President, Sales and Distribution,
International Business Machines Corp.

**George S. Barrett** (E)
Chairman and Chief Executive Officer,
Cardinal Health, Inc.

**Carrie S. Cox** (H)
Chairman and Chief Executive Officer,
Humacyte, Inc.
Former Executive Vice President and President,
Global Pharmaceuticals, Schering-Plough Corp.

**Calvin Darden** (H)
Retired Senior Vice President, U.S. Operations,
United Parcel Service, Inc.

**Bruce L. Downey** (A)
Partner, New Spring Health Capital II, LP
Retired Chairman and Chief Executive Officer,
Barr Pharmaceuticals, Inc.

**Patricia A. Hemingway Hall** (A,N)
Retired President and Chief Executive Officer,
Health Care Service Corp.

**Clayton M. Jones** (E,A)
Retired Chairman, President and Chief Executive Officer,
Rockwell Collins, Inc.

**Gregory B. Kenny** (E,I,N)
Retired President and Chief Executive Officer,
General Cable Corp.

**Nancy Killefer** (H)
Retired Senior Partner,
Public Sector Practice, McKinsey & Company, Inc.

**David P. King** (E,H)
Chairman, President and Chief Executive Officer,
Laboratory Corp. of America Holdings

A: Audit Committee member
E: Executive Committee member
H: Human Resources and Compensation Committee member
N: Nominating and Governance Committee member
I: Independent Lead Director

# Executive team

**George S. Barrett**
Chairman and Chief Executive Officer

**Donald M. Casey Jr.**
Chief Executive Officer, Medical Segment

**Jon L. Giacomin**
Chief Executive Officer, Pharmaceutical Segment

**Michael C. Kaufmann**
Chief Financial Officer

**Pamela O. Kimmet**
Chief Human Resources Officer

**Craig S. Morford**
Chief Legal and Compliance Officer

**Patricia B. Morrison**
Executive Vice President,
Customer Support Services
and Chief Information Officer

# Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A)

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a global integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. We provide clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. We connect patients, providers, payers, pharmacists, and manufacturers for integrated care coordination and better patient management.

We manage our business and report our financial results in two segments: Pharmaceutical and Medical.



## Pharmaceutical Segment

Our Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical, over-the-counter healthcare and consumer products in the United States. This segment also operates nuclear pharmacies and cyclotron facilities, provides pharmacy management services to hospitals as well as medication therapy management and patient outcomes services to hospitals, other healthcare providers and payers, provides services to healthcare companies supporting the development, marketing, and distribution of specialty pharmaceutical products, and repackages generic pharmaceuticals and over-the-counter healthcare products. This segment also imports and distributes pharmaceuticals, over-the-counter healthcare and consumer products as well as provides specialty pharmacy and other services in China.

## Medical Segment

Our Medical segment distributes a broad range of medical, surgical and laboratory products and provides services to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China. This segment distributes medical products to patients in the home in the United States. This segment also manufactures, sources and develops our own Cardinal Health brand medical and surgical products, which are sold in the United States, Canada, Europe and other regions internationally. This segment also provides post-acute care management and transition services and software to hospitals, other healthcare providers and payers.

## Non-GAAP Financial Measures

We use "non-GAAP financial measures" as well as GAAP financial measures in the "Fiscal 2016 Overview" section. We include the reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A. The remaining sections of MD&A refer to GAAP measures only.

# Consolidated Results



| Revenue (in billions) | Operating Earnings (in billions) | Diluted EPS ($ per share) |

## Fiscal 2016 Overview

### Revenue

Revenue for fiscal 2016 was $121.5 billion, a 19 percent increase from the prior year, due primarily to sales growth from existing and new pharmaceutical distribution customers and from acquisitions.

### GAAP and Non-GAAP Operating Earnings

| (in millions) | 2016 | 2015 | Change |
|---|---|---|---|
| **GAAP** | $2,459 | $2,161 | 14% |
| Restructuring and employee severance | 25 | 44 | |
| Amortization and other acquisition-related costs | 459 | 281 | |
| Impairments and (gain)/loss on disposal of assets | 21 | (19) | |
| Litigation (recoveries)/charges, net | (69) | 5 | |
| **Non-GAAP** | $2,895 | $2,472 | 17% |

The sum of the components may not equal the total due to rounding.

During fiscal 2016, GAAP operating earnings increased 14 percent to $2.5 billion and non-GAAP operating earnings increased 17 percent to $2.9 billion. The increases in both GAAP and non-GAAP operating earnings were due to sales growth from existing and new pharmaceutical distribution customers, performance under our Pharmaceutical segment generics program, and acquisitions, partially offset by the adverse impact of customer pricing changes. GAAP operating earnings were negatively impacted by increased acquisition-related amortization, partially offset by litigation recoveries.

### GAAP and Non-GAAP Diluted EPS

| ($ per share) | 2016 | 2015 | Change |
|---|---|---|---|
| **GAAP** | $ 4.32 | $ 3.61 | 20% |
| Restructuring and employee severance | 0.05 | 0.09 | |
| Amortization and other acquisition-related costs | 0.96 | 0.54 | |
| Impairments and (gain)/loss on disposal of assets | 0.04 | (0.03) | |
| Litigation (recoveries)/charges, net | (0.13) | 0.06 | |
| Loss on extinguishment of debt | — | 0.11 | |
| **Non-GAAP** | $ 5.24 | $ 4.38 | 20% |

The sum of the components may not equal the total due to rounding.

During fiscal 2016, GAAP diluted earnings per share attributable to Cardinal Health, Inc. ("diluted EPS") increased 20 percent to $4.32 and non-GAAP diluted EPS increased 20 percent to $5.24. GAAP and non-GAAP diluted EPS increased primarily due to the same factors impacting GAAP and non-GAAP operating earnings described above. The increase in fiscal 2016 GAAP diluted EPS also reflects the prior-year loss on extinguishment of debt.

### Cash and Equivalents

Our cash and equivalents balance was $2.4 billion at June 30, 2016 compared to $4.6 billion at June 30, 2015. The decrease in cash and equivalents during the fiscal 2016 was driven by $3.6 billion deployed for acquisitions, $512 million paid in dividends, $651 million paid for share repurchases, and $465 million in capital expenditures, partially offset by $3.0 billion in cash provided by operating activities.

**MD&A**          **Results of Operations**

# Significant Developments in Fiscal 2016 and Trends

## Acquisitions

**Cordis**

On October 2, 2015, we completed the acquisition of the Cordis business ("Cordis") from Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, for $1.9 billion using cash on hand and proceeds from our debt offering in June 2015. The acquisition of Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions with operations in more than 50 countries, expands our Medical segment's portfolio of self-manufactured products and its geographic scope.

**naviHealth**

On August 26, 2015, we acquired a 71 percent ownership interest in naviHealth Holdings, LLC ("naviHealth") for $238 million, net of cash acquired of $53 million. We funded the acquisition with cash on hand. The acquisition of naviHealth, a leader in post-acute care management solutions, expands our ability to help hospitals, other healthcare providers, and payers manage the complex processes of patient discharge. We consolidate the results of naviHealth in our consolidated financial statements and report its results in our Medical segment. The portion of naviHealth net earnings attributable to third-party interest holders is reported as a reduction to net earnings in the consolidated statements of earnings. At June 30, 2016, our ownership interest in naviHealth was 82 percent due to an additional capital contribution in connection with an acquisition by naviHealth. Refer to Note 12 for further information on this acquisition.

**Harvard Drug**

On July 2, 2015, we completed the acquisition of The Harvard Drug Group ("Harvard Drug") for $1.1 billion using cash on hand and proceeds from our debt offering in June 2015. The acquisition of Harvard Drug, a distributor of generic pharmaceuticals, over-the-counter healthcare and related products to retail, institutional, and alternate care customers, enhances our Pharmaceutical segment's generic pharmaceutical distribution and related services businesses. Harvard Drug also repackages generic pharmaceuticals and over-the-counter healthcare products.

Refer to Note 2 of the "Notes to Consolidated Financial Statements" for additional information on acquisitions.

## Trends

Within our Pharmaceutical segment, we expect segment profit for fiscal 2017 to be essentially flat compared to fiscal 2016. The factors contributing to our expectation include less profit growth from the segment's generics program and the loss of a large pharmaceutical distribution customer beginning April 1, 2016, combined with the adverse impact of customer pricing changes similar to those in fiscal 2016. While we expect that the segment's generics program will be positively impacted by benefits from both Red Oak Sourcing and new generic pharmaceutical launches, we expect that both of these items will have significantly less of a year-over-year positive segment profit impact in fiscal 2017 than fiscal 2016. The impact of these factors will be more pronounced in the first quarter of fiscal 2017, when we expect Pharmaceutical segment profit to be significantly less than in the prior-year period and consolidated operating earnings to be less than in the prior-year period. However, as is generally the case, the frequency, magnitude and profit impact of future generic pharmaceutical product launches (as well as other factors impacting our generics program) are uncertain, and their impact on fiscal 2017 Pharmaceutical segment profit and consolidated operating earnings could be more or less than we expect.

| MD&A | Results of Operations |
|---|---|

# Results of Operations

## Revenue

**Pharmaceutical Segment (in billions)**



$80.1 (FY14)   $91.1 (FY15)   $109.1 (FY16)

**Medical Segment (in billions)**



$11.0 (FY14)   $11.4 (FY15)   $12.4 (FY16)

| | Revenue | | | Change | |
|---|---|---|---|---|---|
| (in millions) | **2016** | 2015 | 2014 | **2016** | 2015 |
| Pharmaceutical | $ **109,131** | $ 91,116 | $ 80,110 | **20%** | 14% |
| Medical | **12,430** | 11,395 | 10,962 | **9%** | 4% |
| Total segment revenue | **121,561** | 102,511 | 91,072 | **19%** | 13% |
| Corporate | **(15)** | 20 | 12 | **N.M.** | N.M. |
| **Total revenue** | $ **121,546** | $102,531 | $ 91,084 | **19%** | 13% |

### Fiscal 2016 Compared to Fiscal 2015

**Pharmaceutical Segment**

Fiscal 2016 Pharmaceutical segment revenue grew primarily due to sales growth from existing and new pharmaceutical distribution customers, including continued branded pharmaceutical price appreciation, all of which increased revenue by $16.9 billion. Acquisitions also contributed $2.1 billion to revenue growth.

**Medical Segment**

Fiscal 2016 Medical segment revenue grew primarily due to acquisitions, net of divestitures, which contributed $645 million, and sales growth from existing businesses.

### Fiscal 2015 Compared to Fiscal 2014

**Pharmaceutical Segment**

Fiscal 2015 Pharmaceutical segment revenue grew primarily due to sales growth from existing and new pharmaceutical distribution customers, which increased revenue by $13.7 billion. The growth was primarily driven by increased sales to existing customers, including continued branded pharmaceutical price appreciation and newly launched hepatitis C pharmaceutical products. The increase was partially offset by $3.3 billion due to the Walgreens contract expiration in the prior-year period.

**Medical Segment**

Fiscal 2015 Medical segment revenue grew primarily due to acquisitions which contributed $344 million.

## Cost of Products Sold

As a result of the same factors affecting the change in revenue, consolidated cost of products sold increased $18.2 billion (19 percent) and $10.9 billion (13 percent) during fiscal 2016 and 2015, respectively. See the gross margin discussion for additional drivers impacting cost of products sold.

# Gross Margin



**Gross Margin (in billions)**

FY14: $5.2 | FY15: $5.7 | FY16: $6.5



**Gross Margin Rate (Gross Margin as a Percent of Revenue)**

FY14: 5.67% | FY15: 5.57% | FY16: 5.38%

| (in millions) | Consolidated Gross Margin | | | Change | |
|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | **2016** | 2015 |
| Gross margin | **$6,543** | $5,712 | $5,161 | **15%** | 11% |

### Fiscal 2016 Compared to Fiscal 2015

Fiscal 2016 consolidated gross margin increased $831 million (15 percent), and was favorably impacted by sales growth from existing and new pharmaceutical distribution customers ($510 million) and acquisitions, net of divestitures ($576 million).

Gross margin rate contracted during fiscal 2016, primarily due to changes in product mix driven by the on-boarding of a new mail order customer starting in October 2015, and also due to the adverse impact of customer pricing changes. Our gross margin rate was favorably impacted by performance under our Pharmaceutical segment generics program. Our generics program had strong year-over-year performance from Red Oak Sourcing.

### Fiscal 2015 Compared to Fiscal 2014

Fiscal 2015 consolidated gross margin increased $551 million (11 percent), and was favorably impacted by sales growth from existing and new pharmaceutical distribution customers, offset in part by the Walgreens contract expiration in the prior year. The net impact of these factors increased consolidated gross margin by $516 million. In addition, acquisitions favorably impacted gross margin by $101 million.

Gross margin rate contracted slightly during fiscal 2015, reflecting the adverse impact of customer pricing changes, the lower margin rate impact of newly launched hepatitis C pharmaceutical products, and new customer mix, largely offset by strong performance from our Pharmaceutical segment generics program, including benefits from Red Oak Sourcing.

# Distribution, Selling, General, and Administrative ("SG&A") Expenses

| (in millions) | SG&A Expenses | | | Change | |
|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | **2016** | 2015 |
| SG&A expenses | **$3,648** | $3,240 | $3,028 | **13%** | 7% |

### Fiscal 2016 Compared to Fiscal 2015

Fiscal 2016 SG&A expenses increased primarily due to acquisitions, net of divestitures ($370 million).

### Fiscal 2015 Compared to Fiscal 2014

Fiscal 2015 SG&A expenses increased primarily due to acquisitions ($97 million) and an overall increase in volume of sales to existing and new customers.

# Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 15 of the "Notes to Consolidated Financial Statements" for additional information on segment profit.



| | Segment Profit and Operating Earnings | | | Change | |
|---|---|---|---|---|---|
| (in millions) | **2016** | 2015 | 2014 | **2016** | 2015 |
| Pharmaceutical | $ **2,488** | $ 2,094 | $ 1,745 | **19%** | 20 % |
| Medical | **457** | 433 | 444 | **6%** | (3)% |
| Total segment profit | **2,945** | 2,527 | 2,189 | **17%** | 15 % |
| Corporate | **(486)** | (366) | (304) | **33%** | 20 % |
| **Total consolidated operating earnings** | $ **2,459** | $ 2,161 | $ 1,885 | **14%** | 15 % |

## Fiscal 2016 Compared to Fiscal 2015

### Pharmaceutical Segment Profit
Fiscal 2016 Pharmaceutical segment profit increased due to sales growth from existing and new pharmaceutical distribution customers and performance under our generics program, partially offset by the adverse impact of customer pricing changes. Acquisitions also contributed to Pharmaceutical segment profit growth. Our generics program benefited from strong year-over-year performance from Red Oak Sourcing.

### Medical Segment Profit
Fiscal 2016 Medical segment profit increased due to the contribution from Cardinal Health Brand products. Acquisitions, net of divestitures, which included the unfavorable impact on cost of products sold from the fair value step up of inventory acquired with Cordis, also contributed to segment profit growth. Fiscal 2016 Medical segment profit growth was partially offset by a decline in the results from our Canada business.

### Corporate
As discussed further in sections that follow, the principal driver for the change in Corporate during fiscal 2016 were increased amortization and other acquisition-related costs primarily related to the acquisitions of Cordis and Harvard Drug, partially offset by litigation recoveries.

## Fiscal 2015 Compared to Fiscal 2014

### Pharmaceutical Segment Profit
Fiscal 2015 Pharmaceutical segment profit increased due to sales growth from existing and new pharmaceutical distribution customers and strong performance from our generics program, including benefits from Red Oak Sourcing, partially offset by the adverse impact of customer pricing changes and the Walgreens contract expiration in the prior-year period.

### Medical Segment Profit
Fiscal 2015 Medical segment profit decreased primarily due to a decline in contribution from distribution of national brand products. This was partially offset by contributions from the strategic expansion of our portfolio of Cardinal Health Brand products and services, driven by acquisitions and targeted cost reductions.

### Corporate
As discussed further in sections that follow, the principal driver for the change in Corporate in fiscal 2015 were increased amortization and other acquisition-related costs primarily due to costs incurred in connection with the acquisition of Cordis.

**MD&A**        **Results of Operations**

# Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin, and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Restructuring and employee severance | $ 25 | $ 44 | $ 31 |
| Amortization and other acquisition-related costs | 459 | 281 | 223 |
| Impairments and (gain)/loss on disposal of assets, net | 21 | $ (19) | $ 15 |
| Litigation (recoveries)/charges, net | (69) | 5 | (21) |

**Amortization and Other Acquisition-Related Costs**
Amortization of acquisition-related intangible assets was $355 million, $189 million and $187 million for fiscal 2016, 2015 and 2014, respectively. The increase in amortization of acquisition-related intangible assets during fiscal 2016 was largely due to the Cordis and Harvard Drug acquisitions. Transaction and integration costs associated with the Cordis acquisition were $78 million and $44 million during fiscal 2016 and 2015, respectively.

**Litigation (Recoveries)/Charges, Net**
During fiscal 2016 and 2015, we received and recognized income of $80 million and $71 million, respectively, from settlements of class action antitrust lawsuits in which we were a class member.

During fiscal 2015, we incurred litigation charges of $68 million related to government investigations.

# Earnings From Continuing Operations Before Income Taxes

In addition to the items discussed above, earnings from continuing operations before income taxes was impacted by the following:

| (in millions) | Earnings from Continuing Operations Before Income Taxes | | | Change | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2016 | 2015 |
| Other (income)/expense, net | $ 5 | $ (7) | $ (46) | N.M. | N.M. |
| Interest expense, net | 178 | 141 | 133 | 26% | 6% |
| Loss on extinguishment of debt | — | 60 | — | N.M. | N.M. |

**Other Income, Net**
Other income, net for fiscal 2014 included a $32 million pre-tax gain related to the sale of our minority interest in two investments.

**Interest Expense, Net**
Fiscal 2016 interest expense increased primarily as a result of the additional $1.5 billion of debt issued in June 2015 to fund the Harvard Drug and Cordis acquisitions.

**Loss on Extinguishment of Debt**
In December 2014, we redeemed certain debt resulting in a loss on the extinguishment of debt of $60 million ($37 million, net of tax).

# Provision for Income Taxes

The provision for income taxes increased $90 million in fiscal 2016 due to an increase in earnings from continuing operations before income taxes. Our effective tax rate decreased 1.3 percentage points during fiscal 2016.

Generally, fluctuations in the effective tax rate are due to changes in the distribution of income among non-U.S. taxing jurisdictions with lower income tax rates and discrete items. A reconciliation of the provision based on the federal statutory income tax rate to our effective income tax rate from continuing operations is as follows (see Note 7 of the "Notes to Consolidated Financial Statements" for additional information):

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| Provision at Federal statutory rate | 35.0% | 35.0% | 35.0% |
| State and local income taxes, net of federal benefit | 1.5 | 4.1 | 2.2 |
| Foreign tax rate differential | (0.6) | (2.4) | (1.2) |
| Nondeductible/nontaxable items | 1.0 | 0.7 | (0.2) |
| Other | 0.2 | 1.0 | (0.5) |
| Effective income tax rate | 37.1% | 38.4% | 35.3% |

## Fiscal 2016

The fiscal 2016 effective income tax rate was favorably impacted by the state and local income tax rate, which decreased 2.6 percentage points due to resolutions with state taxing authorities and a shift in the distribution of income among jurisdictions. The foreign tax rate differential decreased 1.8 percentage points primarily due to the deferred tax benefits recognized in fiscal 2015.

### Ongoing Audits

The IRS is currently conducting audits of fiscal years 2006 through 2014.

## Fiscal 2015 and Fiscal 2014

The fiscal 2015 effective income tax rate was unfavorably impacted by the state and local income tax rate, which increased 1.9 percentage points due to the de-recognition of certain state tax benefits. The foreign tax rate differential also increased 1.2 percentage points primarily due to recognition of deferred tax benefits resulting from new tax legislation. In addition, the change in measurement of uncertain tax positions increased 1.3 percentage points primarily as a result of proposed assessment of additional tax.

The fiscal 2014 effective tax rate was impacted by net favorable discrete items of $37 million, which reduced the rate by 2.1 percentage points. The discrete items include the favorable impact of the settlement of federal and state tax controversies ($80 million) and release of valuation allowances ($12 million) and the unfavorable impact of remeasurement of unrecognized tax benefits ($65 million), primarily as a result of proposed assessments of additional tax.

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends, and share repurchases. If we decide to engage in one or more additional acquisitions, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $2.4 billion at June 30, 2016 compared to $4.6 billion at June 30, 2015. The decrease in cash and equivalents during fiscal 2016 was driven by $3.6 billion deployed for acquisitions, $512 million paid in dividends, $651 million paid for share repurchases, and $465 million in capital expenditures, partially offset by $3.0 billion in cash provided by operating activities. Net cash provided by operating activities was positively impacted by increased net earnings and working capital improvements. At June 30, 2016, our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

The cash and equivalents balance at June 30, 2016 included $475 million of cash held by subsidiaries outside of the United States. Although the vast majority of cash is available for repatriation, bringing the cash into the United States could trigger U.S federal, state and local income tax obligations. Because the earnings are considered permanently reinvested, no U.S. tax provision has been accrued related to the repatriation of these earnings. It is not practicable to evaluate the amount of U.S. tax that might be payable on the eventual remittance of such earnings.

During fiscal 2015, net cash provided by operating activities of $2.5 billion was positively impacted by working capital improvements. These funds were deployed for $1.0 billion of share repurchases, $503 million of acquisitions and $460 million of cash dividends. In addition, during the second quarter of fiscal 2015, we refinanced $1.2 billion of long-term debt at lower interest rates and longer maturities and during the fourth quarter of fiscal 2015 we received proceeds from the issuance of additional long-term debt of $1.5 billion to fund the Harvard Drug and Cordis acquisitions.

During fiscal 2014 we deployed $673 million of cash on share repurchases, $519 million on acquisitions and $415 million on dividends. Net cash provided by operating activities of $2.5 billion benefited from a net working capital decrease in excess of $500 million as a result of the Walgreens contract expiration.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity at June 30, 2016 include a $1.75 billion revolving credit facility and a $700 million committed receivables sales facility program.  In June 2016, we increased our revolving credit facility from $1.5 billion to $1.75 billion and decreased our committed receivables facility program from $950 million to $700 million. We also have a commercial paper program of up to $1.5 billion, backed by the revolving credit facility. At June 30, 2016, we had no amounts outstanding under the revolving credit facility. Availability on the revolving credit facility was reduced by outstanding letters of credit of $14 million at June 30, 2016. We also had standby letters of credit of $40 million issued under the committed receivables sales facility program at June 30, 2016.

Our revolving credit facility and committed receivables sales facility program require us to maintain a consolidated leverage ratio of no more than 3.25-to-1 and our committed receivables sales facility also requires us to maintain a consolidated interest coverage ratio, as of the end of any calendar quarter, of at least 4-to-1. As of June 30, 2016, we were in compliance with these financial covenants.

### Available-for-Sale Securities

At June 30, 2016 and 2015, we held $200 million and $193 million, respectively, of marketable securities, which are classified as available-for-sale.

### Long-Term Obligations

At June 30, 2016, we had total long-term obligations of $5.0 billion.

### Risk Management

We use interest rate swaps, foreign currency contracts and commodity contracts to manage our exposure to cash flow variability. We also use interest rate swaps to protect the value of our debt and use foreign currency forward contracts to protect the value of our existing and forecasted foreign currency assets and liabilities. See the "Quantitative and Qualitative Disclosures About Market Risk" section as well as Notes 1 and 11 of the "Notes to Consolidated Financial Statements" for information regarding the use of financial instruments and derivatives as well as foreign currency, interest rate and commodity exposures.

# Capital Deployment

## Capital Expenditures

Capital expenditures during fiscal 2016, 2015 and 2014 were $465 million, $300 million and $249 million, respectively.

We expect capital expenditures in fiscal 2017 to be between $400 million and $450 million primarily for information technology projects, growth projects in our core business and integration of the Cordis acquisition.

## Dividends

During fiscal 2016, we paid quarterly dividends totaling $1.55 per share, an increase of 13 percent from fiscal 2015.

On May 4, 2016, our Board of Directors approved a quarterly dividend of $0.4489 per share, or $1.80 per share on an annualized basis, payable on July 15, 2016 to shareholders of record on July 1, 2016.

## Share Repurchases

Our Board of Directors has approved a $2.0 billion share repurchase program, which was completed in July 2016. On May 4, 2016, our Board of Directors also approved an additional $1.0 billion share repurchase program that expires on December 31, 2019. During fiscal 2016, we repurchased $651 million of our common shares and from July 1, 2016 through August 5, 2016, we repurchased an additional $250 million of our common shares. We funded the repurchases with available cash. At August 5, 2016, we had $793 million remaining under the new repurchase authorization.

## Acquisitions

On July 2, 2015, August 26, 2015 and October 2, 2015, we acquired Harvard Drug, naviHealth and Cordis for $1.1 billion (net of cash acquired of $44 million), $238 million (net of cash acquired of $53 million) and $1.9 billion, respectively.

MD&A      Other

# Contractual Obligations

At June 30, 2016, our contractual obligations, including estimated payments due by period, are as follows:

| (in millions) | 2017 | 2018 to 2019 | 2020 to 2021 | There-after | Total |
|---|---|---|---|---|---|
| Long-term debt and short-term borrowings (1) | $ 585 | $ 959 | $ 989 | $ 2,973 | $ 5,506 |
| Interest on long-term debt | 164 | 308 | 278 | 1,465 | 2,215 |
| Capital lease obligations (2) | 2 | 26 | 3 | 2 | 33 |
| Other liabilities (3) | 3 | — | — | — | 3 |
| Operating leases (4) | 119 | 181 | 117 | 127 | 544 |
| Purchase obligations and other payments (5) | 386 | 329 | 254 | 313 | 1,282 |
| **Total contractual obligations** | **$1,259** | **$ 1,803** | **$ 1,641** | **$ 4,880** | **$ 9,583** |

(1) Represents maturities of our long-term debt obligations and other short-term borrowings excluding capital lease obligations described below. See Note 6 of the "Notes to Consolidated Financial Statements" for further information.

(2) Represents maturities of our capital lease obligations included within long-term obligations in our consolidated balance sheets.

(3) Represents cash outflows by period for certain of our liabilities in which cash outflows could be reasonably estimated. Long-term liabilities, such as unrecognized tax benefits and deferred taxes, have been excluded from the table above because of the inherent uncertainty of the underlying tax positions or because of the inability to reasonably estimate the timing of any cash outflows.

See Note 7 of the "Notes to Consolidated Financial Statements" for further discussion of income taxes. Additionally, the carrying value of redeemable noncontrolling interests are excluded from the table, as the ultimate amount and timing of any future cash payments related to the redemption amount are uncertain. See Note 1 and Note 12 of the "Notes to Consolidated Financial Statements" for for additional information regarding redeemable noncontrolling interests.

(4) Represents minimum rental payments for operating leases having initial or remaining non-cancelable lease terms as described in Note 8 of the "Notes to Consolidated Financial Statements."

(5) A purchase obligation is defined as an agreement to purchase goods or services that is legally enforceable and specifies all significant terms, including fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and approximate timing of the transaction. The purchase obligation amounts disclosed above represent estimates of the minimum for which we are obligated and the time period in which cash outflows will occur. Purchase orders and authorizations to purchase that involve no firm commitment from either party are excluded from the above table. In addition, contracts that can be unilaterally canceled with no termination fee or with proper notice are excluded from our total purchase obligations except for the amount of the termination fee or the minimum amount of goods that must be purchased during the requisite notice period. Purchase obligations and other payments also includes quarterly payments of $25.6 million that we are required to pay CVS Health Corporation ("CVS Health"), which commenced in October 2014 in connection with the establishment of Red Oak Sourcing and will be in place for the remaining eight years of the agreement. Purchase obligations and other payments does not include contingent payments under the sourcing venture that were not yet determined as of June 30, 2016, including the quarterly $10 million increase that began in fiscal 2016 and the additional $10 million beginning in the first quarter of fiscal 2017. See Note 8 of the "Notes to Consolidated Financial Statements" for additional information.

# Off-Balance Sheet Arrangements

We had no significant "off-balance sheet arrangements" at June 30, 2016, as that term is defined in the SEC rules.

# Recent Financial Accounting Standards

See Note 1 of the "Notes to Consolidated Financial Statements" for a discussion of recent financial accounting standards.

# Critical Accounting Policies and Sensitive Accounting Estimates

Critical accounting policies are those accounting policies that (i) can have a significant impact on our financial condition and results of operations and (ii) require the use of complex and subjective estimates based upon past experience and management's judgment. Other people applying reasonable judgment to the same facts and circumstances could develop different estimates. Because estimates are inherently uncertain, actual results may differ. In this section, we describe the significant policies applied in preparing our consolidated financial statements that management believes are the most dependent on estimates and assumptions. For further discussion of accounting policies for items within this section and of additional accounting policies, see Note 1 of the "Notes to Consolidated Financial Statements."

## Allowance for Doubtful Accounts

Trade receivables are presented net of an allowance for doubtful accounts of $135 million at both June 30, 2016 and 2015. We must use judgment when deciding whether to extend credit to customers and when estimating the required allowance for doubtful accounts.

The allowance for doubtful accounts includes general and specific reserves. We determine the appropriate allowance by reviewing accounts receivable aging, industry trends, customer financial strength and credit standing, historical write-off trends and payment history. We also regularly evaluate how changes in economic conditions may affect credit risks.

Our methodology for estimating the general reserve is assessed annually based on historical losses and economic, business and market trends. In addition, the allowance is reviewed quarterly and updated if appropriate. We may adjust the allowance for doubtful accounts if changes in customers' financial condition or general economic conditions make defaults more frequent or severe.

The following table gives information regarding the allowance for doubtful accounts over the past three fiscal years:

| (in millions, except percentages) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Allowance for doubtful accounts | $ 135 | $ 135 | $ 137 |
| Reduction to allowance for customer deductions and write-offs | 74 | 66 | 50 |
| Charged to costs and expenses | 74 | 64 | 53 |
| Allowance as a percentage of customer receivables | 1.8% | 2.0% | 2.5% |
| Allowance as a percentage of revenue | 0.11% | 0.13% | 0.15% |

A hypothetical 0.1 percent increase or decrease in the reserve as a percentage of trade receivables at June 30, 2016, would result in an increase or decrease in bad debt expense of $8 million.

We believe the reserve maintained and expenses recorded in fiscal 2016 are appropriate. At this time, we are not aware of any analytical findings or customer issues that are likely to lead to a significant future increase in the allowance for doubtful accounts as a percentage of revenue.

## Inventories

A substantial portion of our inventories (58 percent at both June 30, 2016 and 2015) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These are primarily merchandise inventories at the core pharmaceutical distribution facilities within our Pharmaceutical segment. The LIFO impact on the consolidated statements of earnings in a given year depends on pharmaceutical price appreciation and the level of inventory. Prices for branded pharmaceuticals generally tend to rise, which results in an increase in cost of products sold, whereas prices for generic pharmaceuticals generally tend to decline, which results in a decrease in cost of products sold.

The LIFO method presumes that the most recent inventory purchases are the first items sold, so LIFO helps us better match current costs and revenue. Using LIFO, if there is a decrease in inventory levels that have experienced pharmaceutical price appreciation, the result generally will be a decrease in future cost of products sold as our older inventory is held at a lower cost. Conversely, if there is a

decrease in inventory levels that have experienced a pharmaceutical price decline, the result generally will be an increase in future cost of products sold as our older inventory is held at a higher cost. We believe that the average cost method of inventory valuation reasonably approximates the current cost of replacing inventory within the core pharmaceutical distribution facilities. Accordingly, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation.

If we had used the average cost method of inventory valuation for all inventory within the core pharmaceutical distribution facilities, the value of our inventories would not have changed in fiscal 2016 or 2015 because inventories valued at LIFO were $9 million and $114 million higher than the average cost value at June 30, 2016 and June 30, 2015, respectively. We do not record inventories in excess of replacement cost. As such, the LIFO reserve was zero at both June 30, 2016 and 2015. Our remaining inventory is stated at the lower of cost, using the first-in, first-out method, or market.

Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $79 million and $57 million at June 30, 2016 and 2015, respectively. The increase primarily reflects inventory reserves pertaining to Cordis.

We reserve for inventory obsolescence using estimates based on historical experience, historical and projected sales trends, specific categories of inventory and age of on-hand inventory. If actual conditions are less favorable than our assumptions, additional inventory reserves may be required.

# Business Combinations

The assets acquired and liabilities assumed in a business combination, including identifiable intangible assets, are recorded at their estimated fair values as of the acquisition date. The excess of the purchase price over the estimated fair value of the identifiable net assets acquired is recorded as goodwill. We base the fair values of identifiable intangible assets on detailed valuations that require management to make significant judgments, estimates and assumptions. Critical estimates and assumptions include: expected future cash flows for customer relationships, trademarks, trade names, patents, developed technology, in-process research and development and other identifiable intangible assets; discount rates that reflect the risk factors associated with future cash flows; and estimates of useful lives. See Note 2 of the "Notes to Consolidated Financial Statements" for additional information regarding our acquisitions.

# Goodwill and Other Intangible Assets

Purchased goodwill and intangible assets with indefinite lives are tested for impairment annually or when indicators of impairment exist.

Goodwill impairment testing involves judgment, including the identification of reporting units, the estimation of the fair value of each reporting unit and, if necessary, the estimation of the implied fair value of goodwill.

Our determination of estimated fair value of our reporting units is based on a combination of the income-based and market-based approaches. Under the income-based approach, we use a discounted cash flow model in which cash flows anticipated over several future periods, plus a terminal value at the end of that time horizon, are discounted to their present value using an appropriate risk-adjusted rate of return. We use our internal forecasts to estimate future cash flows, which we believe are consistent with those of a market participant, and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for each reporting unit. Actual results may differ materially from those used in our forecasts. We use discount rates that are commensurate with the risks and uncertainty inherent in the respective reporting units and in our internally-developed forecasts. Discount rates used in our reporting unit valuations ranged from 8.5 percent to 12.5 percent. Under the market-based approach, we determine fair value by comparing our reporting units to similar businesses or guideline companies whose securities are actively traded in public markets. Estimating the fair value of reporting units requires the use of estimates and significant judgments that are based on a number of factors including actual operating results. The use of alternate estimates and assumptions or changes in the industry or peer groups could materially affect the determination of fair value for each reporting unit and potentially result in goodwill impairment.

We performed annual impairment testing in fiscal 2016, 2015 and 2014 and concluded that there were no impairments of goodwill as the estimated fair value of each reporting unit exceeded its carrying value. If we were to alter our impairment testing by increasing the discount rate in the discounted cash flow analysis by 1 percent, there still would not be any impairment indicated for any of our reporting units for fiscal 2016, 2015 or 2014.

The impairment test for indefinite-lived intangibles other than goodwill (primarily in-process research and development ("IPR&D")) requires comparing the fair value of the indefinite-lived intangible asset to the carrying value of the asset as of the impairment testing date. We estimate the fair value of our indefinite-lived intangibles under the income approach using a discounted cash flow model. We use our internal forecasts to estimate future cash flows, which we believe are consistent with those of a market participant, and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for the indefinite-lived intangible including, among other factors, assumptions on regulatory approval for IPR&D.

Intangible assets with finite lives, primarily customer relationships; trademarks, trade names and patents; and developed technology, are amortized using a combination of straight-line and accelerated methods based on the expected cash flows from the asset over their estimated useful lives. We review intangible assets with finite lives for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable. Determining whether an impairment loss occurred requires estimating future undiscounted cash flows expected to be generated by the asset group. Actual results may differ materially from those used in our forecasts.

# Vendor Reserves

In the ordinary course of business, our vendors may dispute deductions taken against payments otherwise due to them or assert other disputes. These disputed transactions are researched and resolved based upon findings of the research performed. At any given time, there are outstanding items in various stages of research and resolution. In determining appropriate reserves for areas of exposure with our vendors, we assess historical experience and current outstanding claims. We have established various levels of reserves based on the type of claim and status of review. Though the transaction types are relatively consistent, we periodically refine our methodology by updating the reserve estimate percentages to reflect actual historical experience. Changes to the estimate percentages affect the cost of products sold in the period in which the change was made.

Vendor reserves were $62 million and $88 million at June 30, 2016 and 2015, respectively. Approximately 66 percent of the vendor reserve at the end of fiscal 2016 pertained to the Pharmaceutical segment compared to 75 percent at the end of fiscal 2015. The reserve balance will fluctuate due to variations in outstanding claims from period-to-period, timing of settlements and specific vendor issues.

The ultimate outcome of specific claims may be different than our original estimate and may require adjustment. We believe, however, that reserves recorded for such disputes are reasonable based upon current facts and circumstances.

# Loss Contingencies

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events.

We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates. See Note 8 of the "Notes to Consolidated Financial Statements" for additional information regarding loss contingencies.

# Provision for Income Taxes

Our income tax expense, deferred income tax assets and liabilities, and unrecognized tax benefits reflect management's assessment of estimated future taxes to be paid on items in the consolidated financial statements.

The following table presents information about our tax position at June 30:

| (in millions) | 2016 | 2015 |
|---|---|---|
| Total deferred income tax assets (1) | $  567 | $  585 |
| Valuation allowance for deferred income tax assets (2) | (93) | (87) |
| Net deferred income tax assets | 474 | 498 |
| Total deferred income tax liabilities | (2,130) | (1,853) |
| Net deferred income tax liability | $(1,656) | $(1,355) |

(1)    Total deferred income tax assets included $193 million and $197 million of loss and tax credit forwards at June 30, 2016 and 2015, respectively.

(2)    This valuation allowance primarily relates to federal, state and international loss carryforwards for which the ultimate realization of future benefits is uncertain.

Expiring loss and credit carryforwards and the required valuation allowances are adjusted quarterly. After applying the valuation

allowances, we do not anticipate any limitations on our use of any of the other net deferred income tax assets described above.

We believe that our estimates for the valuation allowances against deferred tax assets and unrecognized tax benefits are appropriate based on current facts and circumstances. However, others applying reasonable judgment to the same facts and circumstances could develop different estimates. The amount we ultimately pay when matters are resolved may differ from the amounts accrued.

Tax benefits from uncertain tax positions are recognized when it is more likely than not that the position will be sustained upon examination of the technical merits of the position, including resolutions of any related appeals or litigation processes. The amount recognized is measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon settlement. See Note 7 of the "Notes to Consolidated Financial Statements" for additional information regarding unrecognized tax benefits.

If any of our assumptions or estimates were to change, an increase or decrease in our effective income tax rate by 1 percent would have caused income tax expense to increase or decrease $23 million for fiscal 2016.

# Share-Based Compensation

Share-based compensation provided to employees is recognized in the consolidated statements of earnings based on the grant date fair value of the awards. The fair value of restricted share units and performance share units is determined by the grant date market price of our common shares. The compensation expense associated with nonvested performance share units is dependent on our periodic assessment of the probability of the targets being achieved and our estimate, which may vary over time, of the number of shares that ultimately will be issued. The fair value of stock options is determined using a lattice valuation model. We believe the lattice model provides reasonable estimates because it has the ability to take into account employee exercise patterns based on changes in our stock price and other variables and it provides for a range of input assumptions.

We analyze historical data to estimate option exercise behaviors and post-vesting forfeitures to be used within the lattice model. The expected life of the options granted is calculated from the option valuation model and represents the length of time in years that the options granted are expected to be outstanding. Expected volatilities are based on implied volatility from traded options on our common shares and historical volatility over a period of time commensurate with the contractual term of the option grant (up to ten years). As required, the forfeiture estimates are adjusted to reflect actual forfeitures when an award vests. The actual forfeitures in future reporting periods could be higher or lower than our current estimates. See Note 16 of the "Notes to Consolidated Financial Statements" for additional information regarding share-based compensation.

# Explanation and Reconciliation of Non-GAAP Financial Measures

The "Key Highlights" section and "Fiscal 2016 Overview" section within MD&A in this Form 10-K contains financial measures that are not calculated in accordance with GAAP.

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

The differences between the non-GAAP measures presented in this Form 10-K and the most directly comparable GAAP measure are represented by the following items, which management believes are useful to exclude for its own and for investors' assessment of the business for the reasons identified below:

- restructuring and employee severance costs, which include charges for programs in which we fundamentally change our operations and are excluded because they are not part of the ongoing operations of our underlying business, which includes normal levels of reinvestment in the business;

- amortization and other acquisition-related costs. We began excluding amortization costs in fiscal 2013 primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, these non-cash amounts are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of forecasted, current and historical financial results. Other acquisition-related costs are excluded because they are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. They are also significantly impacted by the timing and size of acquisitions;

- impairments and gains or loss on disposal of assets, which are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance;

- litigation recoveries or charges, net, which often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount;

- LIFO charges and credits, which we began excluding in fiscal 2015 because the factors that drive LIFO charges or credits such as pharmaceutical manufacturer price appreciation/deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. We also believe that exclusion of LIFO charges from non-GAAP metrics allows for better comparison of our financial results to our historical operations and to our peer group companies;

- loss on extinguishment of debt, which does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of these notable one-time charges is not consistent and is significantly impacted by the timing and size of debt financing transactions.

- other spin-off costs, incurred in connection with our spin-off of CareFusion, which are included in distribution, selling, general and administrative expenses and are excluded because they do not relate to or reflect our ongoing business operations.

The tax effect for each of the non-GAAP items described above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

# Definitions

**Growth rate calculation**: Except for compound annual growth rates ("CAGR"), growth rates in this Form 10-K are determined by dividing the difference between current period results and prior period results by prior period results. CAGR is determined by subtracting one from ((the ending value divided by the beginning value) raised to the power of (one divided by the number of years)).

**Non-GAAP operating earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) other CareFusion spin-off costs.

**Non-GAAP Earnings from continuing operations before income taxes**: earnings from continuing operations before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt.

**Non-GAAP net earnings from continuing operations attributable to Cardinal Health, Inc.**: net earnings attributable to Cardinal Health, Inc. excluding (1) earnings from discontinued operations (2) LIFO charges/(credits), (3) restructuring and employee severance, (4) amortization and other acquisition-related costs, (5) impairments and (gain)/loss on disposal of assets, (6) litigation (recoveries)/charges, net, (7) loss on extinguishment of debt, and (8) other CareFusion spin-off costs, each net of tax.

**Non-GAAP diluted EPS from continuing operations attributable to Cardinal Health, Inc. or "Non-GAAP diluted EPS"**: non-GAAP net earnings from continuing operations attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings[1] Before Income Taxes | Provision for Income Taxes | Net Earnings from Continuing Operations[2] | Net Earnings from Continuing Operations[2] Growth Rate | Diluted EPS[1,2] | Diluted EPS[1,2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | **Fiscal Year 2016** | | | | |
| **GAAP** | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and loss on disposal of assets | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | (69) | | (69) | (27) | (42) | | (0.13) | |
| **Non-GAAP** | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |
| | | | | Fiscal Year 2015 | | | | |
| GAAP | $ 2,161 | 15 % | $ 1,967 | $ 755 | $ 1,212 | 4 % | $ 3.61 | 7 % |
| Restructuring and employee severance | 44 | | 44 | 15 | 29 | | 0.09 | |
| Amortization and other acquisition-related costs | 281 | | 281 | 100 | 181 | | 0.54 | |
| Impairments and (gain)/loss on disposal of assets | (19) | | (19) | (10) | (9) | | (0.03) | |
| Litigation (recoveries)/charges, net | 5 | | 5 | (14) | 19 | | 0.06 | |
| Loss on extinguishment of debt | — | | 60 | 23 | 37 | | 0.11 | |
| Non-GAAP | $ 2,472 | 16 % | $ 2,339 | $ 870 | $ 1,469 | 11 % | $ 4.38 | 14 % |
| | | | | Fiscal Year 2014 | | | | |
| GAAP | 1,885 | 89 % | $ 1,798 | $ 635 | 1,163 | 247 % | 3.37 | 247 % |
| Restructuring and employee severance | 31 | | $ 31 | $ 11 | 20 | | 0.06 | |
| Amortization and other acquisition-related costs | 223 | | $ 223 | $ 79 | 144 | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | 15 | | $ 15 | $ 5 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (21) | | $ (21) | $ (8) | (13) | | (0.04) | |
| Non-GAAP | $ 2,133 | 4 % | $ 2,047 | $ 722 | $ 1,324 | 3 % | $ 3.84 | 3 % |
| | | | | Fiscal Year 2013 | | | | |
| GAAP | $ 996 | (44)% | $ 888 | $ 553 | $ 335 | (69)% | $ 0.97 | (68)% |
| Restructuring and employee severance | 71 | | 71 | $ 27 | 44 | | 0.13 | |
| Amortization and other acquisition-related costs | 158 | | 158 | $ 52 | 106 | | 0.31 | |
| Impairments and (gain)/loss on disposal of assets | 859 | | 859 | $ 37 | 822 | | 2.39 | |
| Litigation (recoveries)/charges, net | (38) | | (38) | $ (15) | (23) | | (0.07) | |
| Non-GAAP | $ 2,046 | 10 % | $ 1,938 | $ 654 | $ 1,284 | 15 % | $ 3.73 | 16 % |
| | | | | Fiscal Year 2012 | | | | |
| GAAP | $ 1,792 | 18 % | $ 1,698 | $ 628 | $ 1,070 | 11 % | $ 3.06 | 12 % |
| Restructuring and employee severance | 21 | | 21 | 8 | 13 | | 0.04 | |
| Amortization and other acquisition-related costs | 33 | | 33 | 9 | 24 | | 0.07 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 21 | 8 | 13 | | 0.04 | |
| Litigation (recoveries)/charges, net | (3) | | (3) | (1) | (2) | | (0.01) | |
| Other spin-off costs | 2 | | 2 | 1 | 1 | | — | |
| Non-GAAP | $ 1,866 | 13 % | $ 1,772 | $ 653 | $ 1,119 | 13 % | $ 3.21 | 15 % |

[1]  from continuing operations
[2]  attributable to Cardinal Health, Inc.
The sum of the components may not equal the total due to rounding.
We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

# Selected Financial Data

The consolidated financial data below includes all business combinations as of the date of acquisition that occurred during these periods. The following selected consolidated financial data should be read in conjunction with the consolidated financial statements and related notes and MD&A.

| (in millions, except per common share amounts) | 2016 | 2015 | 2014 | 2013 (1) | 2012 |
|---|---|---|---|---|---|
| **Earnings Data:** | | | | | |
| Revenue | $ **121,546** | $ 102,531 | $ 91,084 | $ 101,093 | $ 107,552 |
| Operating earnings | $ **2,459** | $ 2,161 | $ 1,885 | $ 996 | $ 1,792 |
| Earnings from continuing operations | $ **1,431** | $ 1,212 | $ 1,163 | $ 335 | $ 1,070 |
| Earnings/(loss) from discontinued operations, net of tax | **—** | 3 | 3 | (1) | (1) |
| Net earnings | **1,431** | 1,215 | 1,166 | 334 | 1,069 |
| Less: Net earnings attributable to noncontrolling interests | **(4)** | — | — | — | — |
| Net earnings attributable to Cardinal Health, Inc. | $ **1,427** | $ 1,215 | $ 1,166 | $ 334 | $ 1,069 |
| **Basic earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Continuing operations | $ **4.36** | $ 3.65 | $ 3.41 | $ 0.98 | $ 3.10 |
| Discontinued operations | **—** | 0.01 | 0.01 | — | — |
| Net basic earnings per common share attributable to Cardinal Health, Inc. | $ **4.36** | $ 3.66 | $ 3.42 | $ 0.98 | $ 3.10 |
| **Diluted earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Continuing operations | $ **4.32** | $ 3.61 | $ 3.37 | $ 0.97 | $ 3.06 |
| Discontinued operations | **—** | 0.01 | 0.01 | — | — |
| Net diluted earnings per common share attributable to Cardinal Health, Inc. | $ **4.32** | $ 3.62 | $ 3.38 | $ 0.97 | $ 3.06 |
| Cash dividends declared per common share | $ **1.6099** | $ 1.4145 | $ 1.2500 | $ 1.0900 | $ 0.8825 |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ **34,122** | $ 30,142 | $ 26,033 | $ 25,819 | $ 24,260 |
| Long-term obligations, less current portion | **4,952** | 5,211 | 3,171 | 3,686 | 2,418 |
| Total Cardinal Health, Inc. shareholders' equity | **6,554** | 6,256 | 6,401 | 5,975 | 6,244 |

(1)     During fiscal 2013, we recognized a non-cash goodwill impairment charge of $829 million ($799 million, net of tax) related to our Nuclear Pharmacy Services division.

# Quantitative and Qualitative Disclosures About Market Risk

We are exposed to cash flow and earnings fluctuations as a result of certain market risks. These market risks primarily relate to foreign exchange, interest rate, and commodity price-related changes. We maintain a hedging program to manage volatility related to these market exposures which employs operational, economic, and derivative financial instruments in order to mitigate risk. See Note 1 and Note 11 of the "Notes to Consolidated Financial Statements" for further discussion regarding our use of derivative instruments.

## Foreign Exchange Rate Sensitivity

By nature of our global operations, we are exposed to cash flow and earnings fluctuations resulting from foreign exchange rate variation. These exposures are transactional and translational in nature. Principal drivers of this foreign exchange exposure include the Canadian dollar, euro, Thai baht, Chinese renminbi, Japanese yen, Mexican peso, British pound, Singapore dollar, Australian dollar, Malaysian ringgit.

### Transactional Exposure

Transactional exposure arises from the purchase and sale of goods and services in currencies other than our functional currency or the functional currency of our subsidiaries. As part of our risk management program, at the end of each fiscal year we perform a sensitivity analysis on our forecasted transactional exposure for the upcoming fiscal year. These analyses include the estimated impact of our hedging program, which is designed to mitigate transactional exposure. Our forecasted transactional exposure at June 30, 2016 increased from the prior year primarily as a result of changes in the volume of transactions in foreign currencies due to the acquisition of Cordis. At June 30, 2016 and 2015, we had hedged approximately 29 and 37 percent of transactional exposures, respectively.

The following table summarizes the analysis as it relates to transactional exposure and the impact of a hypothetical 10 percent fluctuation in foreign currencies, assuming rates collectively shift in the same direction and we are unable to change customer pricing in response to those shifts, for the upcoming fiscal year:

| | June 30 | | | |
|---|---|---|---|---|
| (in millions) | **2016** | | 2015 | |
| Net hypothetical transactional exposure | $ | **621** | $ | 392 |
| | | | | |
| Sensitivity gain/loss | $ | **62** | $ | 39 |
| Estimated offsetting impact of hedges | | **(18)** | | (15) |
| **Hypothetical net gain/loss** | $ | **44** | $ | 24 |

### Translational Exposure

We have exposure related to the translation of financial statements of our foreign operations into U.S. dollars, our functional currency. We perform a similar analysis to that previously described related to this translational exposure. Our forecasted translational exposure at June 30, 2016 increased from the prior year primarily as a result of changes in the number of financial statements translated from foreign currencies due to the acquisition of Cordis. We do not typically hedge any of our translational exposure and no hedging impact was included in our analysis at June 30, 2016 and 2015.

The following table summarizes translational exposure and the impact of a hypothetical 10 percent strengthening or weakening in the U.S. dollar, assuming rates collectively shift in the same direction, for the upcoming fiscal year:

| | June 30 | | | |
|---|---|---|---|---|
| (in millions) | **2016** | | 2015 | |
| Net hypothetical translational exposure | $ | **201** | $ | 55 |
| Sensitivity gain/loss | | **20** | | 6 |

Disclosures about Market Risk

# Interest Rate Sensitivity

We are exposed to changes in interest rates primarily as a result of our borrowing and investing activities to maintain liquidity and fund operations. The nature and amount of our long-term and short-term debt can be expected to fluctuate as a result of business requirements, market conditions and other factors. Our policy is to manage exposures to interest rates using a mix of fixed and floating rate debt as deemed appropriate by management. We utilize interest rate swap instruments to mitigate our exposure to interest rate movements.

As part of our risk management program, we perform an annual sensitivity analysis on our forecasted exposure to interest rates for the upcoming fiscal year. This analysis assumes a hypothetical 10 percent change in interest rates. At June 30, 2016 and 2015, the potential increase or decrease in annual interest expense under this analysis as a result of this hypothetical change was $3 million for both periods.

During fiscal 2016 and 2015, we held marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. The fair value is subject to change primarily as a result of changes in market interest rates and investment risk related to the issuers' credit worthiness. At both June 30, 2016 and 2015, a hypothetical increase or decrease of one percentage point in interest rates would cause a potential increase or decrease of up to $2 million in the estimated fair value.

# Commodity Price Sensitivity

We are directly exposed to market price changes for certain commodities, including oil-based resins, nitrile, cotton, diesel fuel and latex. We typically purchase raw materials at either market prices or prices tied to a commodity index and some finished goods at prices based in part on a commodity price index. We also are indirectly exposed to fluctuations in certain commodity prices through the purchase of finished goods and various energy-related commodities, including natural gas and electricity, through our normal course of business where our contracts are not directly tied to a commodity index. As part of our risk management program, we perform sensitivity analysis on our forecasted commodity exposure for the upcoming fiscal year. Our forecasted commodity exposure at June 30, 2016 increased from the prior year primarily as a result of changes in purchasing volumes and commodity pricing. At June 30, 2016 and 2015, we had hedged a portion of these direct commodity exposures (see Note 11 of the "Notes to Consolidated Financial Statements" for further discussion).

The table below summarizes our analysis of these forecasted direct and indirect commodity exposures and the potential gain/loss given a hypothetical 10 percent fluctuation in commodity prices, assuming pricing collectively shifts in the same direction and we are unable to change customer pricing in response to those shifts, for the upcoming fiscal year:

|  | June 30 | | | |
| --- | --- | --- | --- | --- |
| (in millions) | 2016 | | 2015 | |
| Hypothetical commodity exposure | $ | 417 | $ | 405 |
| | | | | |
| Sensitivity gain/loss | $ | 42 | $ | 41 |
| Hypothetical offsetting impact of hedges | | (1) | | (1) |
| **Hypothetical net gain/loss** | $ | 41 | $ | 40 |

We believe our total gross range of direct and indirect exposure to commodities is $400 million to $525 million for fiscal 2017.

# Business

## General

Cardinal Health, Inc. is a global integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. We provide clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. We connect patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management.

## Pharmaceutical Segment

In the United States, our Pharmaceutical segment:

- distributes branded and generic pharmaceutical, over-the-counter healthcare and consumer products through its Pharmaceutical Distribution division to retailers (including chain and independent drug stores and pharmacy departments of supermarkets and mass merchandisers), hospitals and other healthcare providers. This division:
  - maintains prime vendor relationships that streamline the purchasing process resulting in greater efficiency and lower costs for our customers;
  - provides services to pharmaceutical manufacturers including distribution, inventory management, data reporting, new product launch support and contract pricing and chargeback administration;
  - provides pharmacy management services to hospitals as well as medication therapy management and patient outcomes services to hospitals, other healthcare providers and payers; and
  - repackages generic pharmaceuticals and over-the-counter healthcare products;
- operates nuclear pharmacies and cyclotron facilities through its Nuclear Pharmacy Services division that manufacture, prepare and deliver radiopharmaceuticals for use in nuclear imaging and other procedures in hospitals and physician offices; and
- distributes specialty pharmaceutical products to hospitals and other healthcare providers; provides consulting, patient support and other services for specialty pharmaceutical products to pharmaceutical manufacturers and healthcare providers; and provides specialty pharmacy services through its Specialty Solutions division.

The Pharmaceutical segment is also constructing a sterile facility to contract manufacture a radiopharmaceutical for prostate cancer treatment.

In China, the Pharmaceutical segment distributes branded, generic and specialty pharmaceutical, over-the-counter healthcare and consumer products, provides logistics, marketing and other services and operates direct-to-patient specialty pharmacies through Cardinal Health China.

See Note 15 of the "Notes to Consolidated Financial Statements" for Pharmaceutical segment revenue, profit and assets for fiscal 2016, 2015 and 2014.

### Pharmaceutical Distribution

Our Pharmaceutical Distribution division's gross margin includes margin from our generic pharmaceutical program, margin from pharmaceutical distribution agreements with branded manufacturers and margin from over-the-counter healthcare and consumer products. It also includes cash discounts. Margin from our generic pharmaceutical program includes price discounts and rebates from manufacturers and may include price appreciation on some products. Our earnings on generic pharmaceuticals are generally highest during the period immediately following the initial launch of a generic product because generic pharmaceutical selling prices are generally highest during that period and tend to decline over time. Overall, our generic pharmaceutical program's performance is driven by several factors, including increased utilization of generic pharmaceuticals, our ability to sell generic pharmaceuticals to new customers, our ability to sell more generic pharmaceuticals to existing customers, generic pharmaceutical price appreciation, our data and analytic capabilities to predict market trends, enhanced sourcing of generic pharmaceuticals through Red Oak Sourcing (which is discussed below) and new generic product launches. Margin from pharmaceutical distribution agreements with branded manufacturers refers primarily to fees we receive for providing a range of distribution and related services to manufacturers and also includes benefits from pharmaceutical price appreciation on branded pharmaceutical products.

### Sourcing Venture With CVS Health

In July 2014, we established Red Oak Sourcing, a U.S.-based generic pharmaceutical sourcing venture with CVS Health with an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies.

### Specialty Pharmaceutical Products and Services

We refer to products and services offered by our Specialty Solutions division as "specialty pharmaceutical products and services." The Specialty Solutions division distributes oncology, rheumatology, urology, nephrology and other pharmaceutical products ("specialty pharmaceutical products") and human-derived plasma products to hospitals, dialysis clinics, physician offices and other healthcare

providers; provides consulting, patient support, logistics, group purchasing and other services to pharmaceutical manufacturers and healthcare providers primarily supporting the development, marketing and distribution of specialty pharmaceutical products; and provides specialty pharmacy services. Our use of the terminology "specialty pharmaceutical products and services" may not be comparable to the terminology used by other industry participants.

# Medical Segment

Our Medical segment distributes a broad range of national and Cardinal Health Brand medical, surgical and laboratory products and provides services to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China. It also distributes medical products to patients in the home in the United States through our Cardinal Health at Home division.

This segment also manufactures, sources and develops higher-margin, Cardinal Health Brand medical and surgical products. Manufactured products include: single-use surgical drapes, gowns and apparel; exam and surgical gloves; fluid suction and collection systems; cardiovascular and endovascular products; wound care products; and orthopedic products. In fiscal 2016, we completed the acquisition of Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions with operations in more than 50 countries. We expect to continue to expand our lines of manufactured products through acquisitions, strategic partnerships and internal development. Our manufactured products are sold directly or through third-party distributors in the United States, Canada, Europe, Asia, Latin America and other regions internationally. We are expanding our direct distribution network through Cordis.

Through naviHealth and other companies acquired within naviHealth during fiscal 2016, the Medical segment provides services and software to hospitals, other healthcare providers and payers that help manage the complex processes of patient discharge from an acute-care facility ("post-acute care").

This segment also assembles and offers sterile and non-sterile procedure kits. In addition, the segment provides supply chain services, including spend management, distribution management and inventory management services, to healthcare providers.

See Note 15 of the "Notes to Consolidated Financial Statements" for Medical segment revenue, profit and assets for fiscal 2016, 2015 and 2014.

# Acquisitions

We have acquired a number of businesses over the last several years that have enhanced our core strategic areas of generics, health systems and hospital solutions (including manufactured medical products), specialty pharmaceutical products and services, international and post-acute care. We expect to continue to pursue additional acquisitions in the future.

Since July 1, 2011, we have completed the following three large acquisitions:

| Date | Company | Location | Line of Business | Acquisition Price (in millions) |
|---|---|---|---|---|
| 10/15 | Cordis business of Johnson & Johnson | Fremont, CA | Cardiovascular and endovascular products | $1,944 |
| 07/15 | The Harvard Drug Group | Livonia, MI | Pharmaceutical product distribution | $1,115 |
| 03/13 | AssuraMed, Inc. | Twinsburg, OH | Medical product distribution | $2,070 |

In addition, we completed several smaller acquisitions during the last five fiscal years, including: in fiscal 2016, the acquisition of a 71 percent ownership interest in naviHealth, a provider of post-acute care management services, and CuraSpan Health Group, Inc., a provider of discharge planning and care transition software; in fiscal 2015, Tradex International, Inc., a supplier of disposable gloves, and Metro Medical Supply, Inc., a distributor of specialty pharmaceuticals and medical and surgical products; in fiscal 2014, Access Closure, Inc., a manufacturer and distributor of extravascular closure devices; and in fiscal 2012, Futuremed Healthcare Products Corporation, a Canadian medical product distributor.

**Business**

## Customers

Our largest customer, CVS Health, accounted for 25 percent of our fiscal 2016 revenue. In the aggregate, our five largest customers, including CVS Health, accounted for 40 percent of our fiscal 2016 revenue. Our pharmaceutical distribution agreements with CVS Health extend through June 2019.

In addition, we have agreements with group purchasing organizations ("GPOs") that act as agents to negotiate vendor contracts on behalf of their members. Our two largest GPO relationships in terms of member revenue are with Vizient (formerly Novation, LLC) and Premier, Inc. Sales to members of these two GPOs, under numerous contracts across all of our businesses, collectively accounted for 17 percent of our revenue in fiscal 2016.

## Suppliers

We rely on many different suppliers. Products obtained from our five largest suppliers accounted for an aggregate of 27 percent of our revenue during fiscal 2016, but no single supplier's products accounted for more than 8 percent of revenue.

## Competition

We operate in a highly competitive environment in the distribution of pharmaceuticals and related healthcare services. We also operate in a highly competitive environment in the development, manufacturing and distribution of medical and surgical products. We compete on many levels, including price, service offerings, support services and breadth of product lines.

In the Pharmaceutical segment, we compete with wholesale distributors with national reach (including McKesson Corporation and AmerisourceBergen Corporation), regional wholesale distributors, self-warehousing chains, specialty distributors, third-party logistics companies, companies that provide specialty pharmaceutical services and nuclear pharmacies, among others. In addition, the Pharmaceutical segment has experienced competition from a number of organizations offering generic pharmaceuticals, including telemarketers. We also compete with manufacturers that sell their products directly.

In the Medical segment, we compete with many different national medical product distributors, including Owens & Minor, Inc., Medline Industries, Inc. and McKesson Corporation. We also compete with regional medical product distributors and companies that distribute medical products to patients in the home as well as third-party logistics companies. In addition, we compete with manufacturers that sell their products directly. Competitors of the Medical segment's manufacturing and procedural kit businesses include diversified healthcare companies as well as companies that are more focused on specific product categories.

## Employees

At June 30, 2016, we had approximately 26,500 employees in the United States and approximately 10,800 employees outside of the United States. Overall, we consider our employee relations to be good.

## Intellectual Property

We rely on a combination of trade secret, patent, copyright and trademark laws, nondisclosure and other contractual provisions, and technical measures to protect our products, services and intangible assets. We hold patents relating to medical and surgical products and to distribution of our nuclear pharmacy products and service offerings. We also operate under licenses for certain proprietary technologies, and in certain instances we license our technologies to third parties.

We believe that we have taken all necessary steps to protect our proprietary rights, but no assurance can be given that we will be able to successfully enforce or protect our rights in the event that they are infringed upon by a third party. While all of these proprietary rights are important to our operations, we do not consider any particular patent, trademark, license, franchise or concession to be material to our overall business.

# Regulatory Matters

Our business is highly regulated in the United States, at both the federal and state level, and in foreign countries. Depending upon their specific business, our subsidiaries may be subject to regulation by government entities including:

- the U.S. Drug Enforcement Administration (the "DEA");
- certain agencies within the U.S. Department of Health and Human Services, including the U.S. Food and Drug Administration (the "FDA"), the Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights;
- the U.S. Nuclear Regulatory Commission (the "NRC");
- the U.S. Federal Trade Commission (the "FTC");
- U.S. Customs and Border Protection;
- state boards of pharmacy;
- state controlled substance agencies;
- state health departments, insurance departments, Medicaid departments or other comparable state agencies; and
- agencies comparable to those listed above in various regions, such as Europe, Asia and Latin America.

These regulatory agencies have a variety of civil, administrative and criminal sanctions at their disposal for failure to comply with applicable legal or regulatory requirements. They can suspend our ability to manufacture and distribute products, initiate product recalls, seize products or impose criminal, civil and administrative sanctions.

## Distribution

The FDA, DEA and various state authorities regulate the marketing, purchase, storage and distribution of pharmaceutical and medical products under various federal and state statutes including the federal Prescription Drug Marketing Act of 1987, Drug Quality and Security Act of 2013 (the "DQSA"), and Controlled Substances Act (the "CSA"). The CSA governs the sale, packaging, storage and distribution of controlled substances. Wholesale distributors of controlled substances must hold valid DEA registrations and state-level licenses, meet various security and operating standards, and comply with the CSA.

## Manufacturing and Marketing

The FDA and other domestic and foreign governmental agencies administer requirements that cover the design, testing, safety, effectiveness, manufacturing (including good manufacturing practices), quality systems, labeling, promotion and advertising (including restrictions on promoting or advertising a product other than for the uses set forth in the approved product label), distribution, importation and post-market surveillance of most of our manufactured products. In addition, we need specific approval or clearance from regulatory authorities and may have to register products with regulatory authorities before we can market and sell some of these products in the United States and certain other countries.

In the United States, authorization to commercially distribute a new medical device is generally received in one of two ways. The first, known as pre-market notification or the 510(k) process, requires us to demonstrate that our new medical device is substantially equivalent to a legally marketed medical device. The second, more rigorous process, known as pre-market approval ("PMA"), requires us to independently demonstrate that the new medical device is safe and effective, and is much more detailed than the 510(k) process. Many of our Medical segment products are cleared through the 510 (k) process and certain Cordis products must be approved through the PMA process. It can be costly and time-consuming to obtain regulatory approvals, clearances and registrations of medical devices, and such approvals, clearances and registrations might not be granted on a timely basis, if at all. Even after we obtain approval or clearance to market a product or obtain product registrations, the product and our manufacturing processes are subject to continued regulatory oversight.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action, which may include recalling the product, correcting the product at the customer location, revising product labeling and notifying customers.

## Nuclear Pharmacies and Related Businesses

Our nuclear pharmacies and radiopharmaceutical manufacturing facilities require licenses or permits and must abide by regulations issued by the NRC, applicable state boards of pharmacy and the radiologic health agency or department of health of each state in which we operate. In addition, our radiopharmaceutical manufacturing facilities must comply with the FDA's good manufacturing practices. Once completed, our sterile radiopharmaceutical manufacturing facility also will be subject to NRC and FDA regulation. Changes to pharmacy sterile compounding standards and practices are being considered by the FDA, state boards of pharmacy and standards setting organizations that may affect our Nuclear Pharmacy Services division and could require additional infrastructure requirements and modifications to our current practices and impose additional costs.

## Product Tracing and Supply Chain Integrity

Title II of the DQSA, known as the Drug Supply Chain Security Act, establishes a phased-in national system for tracing pharmaceutical products through the pharmaceutical distribution supply chain to prevent the introduction of counterfeit, adulterated or mislabeled drugs. The first phase of implementation began on January 1, 2015, and upon full implementation in 2023, we and other supply chain stakeholders will participate in an electronic, interoperable, prescription drug tracing system. In addition, the FDA also has issued regulations requiring most medical device labeling to bear a unique device identifier. These regulations are being phased in through 2020.

### Government Healthcare Programs

We are subject to U.S. federal healthcare fraud and abuse laws. These laws generally prohibit persons from soliciting, offering, receiving or paying any compensation in order to induce someone to order or purchase items or services that are in any way paid for by Medicare, Medicaid or other federally-funded healthcare programs. They also prohibit submitting or causing to be submitted any fraudulent claim for payment by the federal government. There are similar state healthcare fraud and abuse laws that apply to Medicaid and other state-funded healthcare programs. Violations of these laws may result in criminal or civil penalties, as well as breach of contract claims and *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments).

Our Cardinal Health at Home business and a few of our other businesses are Medicare-certified suppliers or participate in state Medicaid programs. These businesses are subject to accreditation and quality standards and other rules and regulations, including applicable billing, payment and record-keeping requirements. In addition, we manufacture pharmaceutical and medical products and repackage pharmaceuticals that are purchased through federal or state healthcare programs and are subject to laws that establish eligibility for reimbursement by federal and state healthcare programs. Failure to comply with applicable standards and regulations could result in civil or criminal sanctions, including the loss of our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

In addition, our U.S. federal and state government contracts are subject to specific procurement regulations. Failure to comply with applicable rules or regulations or with contractual or other requirements may result in monetary damages and criminal or civil penalties as well as termination of our government contracts or our suspension or debarment from government contract work.

### Health and Personal Information Practices

We collect, handle and maintain patient-identifiable health information. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as augmented by the Health Information Technology for Economic and Clinical Health Act, as well as some state and foreign laws, regulate the use and disclosure of patient-identifiable health information, including requiring specified privacy and security measures.

We also collect, handle and maintain other sensitive personal and financial information that is subject to federal and state laws protecting such information. Security and disclosure of personal information is also highly regulated in many other countries in which we operate.

In Europe, we are subject to the European Union ("EU") data protection regulations, including the EU Directive on Data Protection, which requires member states to impose minimum restrictions on the collection, use and transfer of personal data that, in some respects, are more stringent, and impose more significant burdens on subject businesses, than current privacy standards in the United States. A new EU General Data Protection Regulation that will apply uniformly across the EU will become effective in 2018 and includes, among other things, a requirement for prompt notice of data breaches to data subjects and supervisory authorities in certain circumstances and significant fines for non-compliance.

### Antitrust Laws

The U.S. federal government, most U.S. states and many foreign countries have antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. Violations of antitrust laws can result in various sanctions, including criminal and civil penalties. Private plaintiffs also could bring civil lawsuits against us in the United States for alleged antitrust law violations, including claims for treble damages. As previously disclosed, in April 2015, we settled allegations by the FTC resulting from an investigation into supplier arrangements involving our Nuclear Pharmacy Services division primarily focused on the period between 2003 and 2008.

### Environmental, Health and Safety Laws

In the United States and other countries, we are subject to various federal, state and local environmental laws, as well as laws relating to safe working conditions and laboratory practices.

### Laws Relating to Foreign Trade and Operations

U.S. and foreign laws require us to abide by standards relating to the import and export of finished goods, raw materials and supplies and the handling of information. We also must comply with various export control and trade embargo laws, which may require licenses or other authorizations for transactions within some countries or with some counterparties.

Similarly, we are subject to U.S. and foreign laws concerning the conduct of our foreign operations, including the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws, the U.K. Bribery Act and other foreign anti-bribery laws. Among other things, these laws generally prohibit companies and their intermediaries from offering, promising or making payments to officials of foreign governments for the purpose of obtaining or retaining business.

**Business**

## Other Information

Although our agreements with manufacturers sometimes require us to maintain inventory levels within specified ranges, our distribution businesses are generally not required by our customers to maintain particular inventory levels other than as needed to meet service level requirements. Certain supply contracts with U.S. government entities require us to maintain sufficient inventory to meet emergency demands, but we do not believe those requirements materially affect inventory levels.

Our customer return policies generally require that the product be physically returned, subject to restocking fees. We only allow customers to return products that can be added back to inventory and resold at full value, or that can be returned to vendors for credit.

We offer market payment terms to our customers.

## Revenue and Long-Lived Assets by Geographic Area

See Note 15 of the "Notes to Consolidated Financial Statements" for revenue and long-lived assets by geographic area.

## Available Information

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports are available free of charge on our website (www.cardinalhealth.com), under the "Investors — Financial Reporting — SEC Filings" caption, as soon as reasonably practicable after we electronically file them with, or furnish them to, the SEC.

You may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC

20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website (www.sec.gov) where you can search for annual, quarterly and current reports, proxy and information statements, and other information regarding us and other public companies.

# Risk Factors

The risks described below could materially and adversely affect our results of operations, financial condition, liquidity and cash flows. These are not the only risks we face. Our businesses also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

**We could suffer the adverse effects of competitive pressures.**

As described in greater detail in the "Business" section, we operate in markets that are highly competitive. Because of competition, our businesses face continued pricing pressure from our customers and suppliers. If we are unable to offset margin reductions caused by these pricing pressures through steps such as sourcing or cost control measures, additional service offerings and sales of higher margin products, our results of operations and financial condition could be adversely affected.

**Our Pharmaceutical segment's generic pharmaceutical program could be adversely affected by price declines and fewer generic product launches.**

Prices for generic pharmaceuticals generally decline over time. Although some generic products may experience price appreciation which can positively affect our margins, we may not be able to predict whether (and if so, for how long and at what magnitude) such price appreciation will be sustained. The number of generic products experiencing price declines or appreciation and the magnitude of price changes is uncertain in future fiscal years, and could have a negative impact on our year-over-year margins.

The number of new generic pharmaceutical launches also varies from year to year, and the margin impact of these launches varies from product to product. Fewer generic product launches or launches that are less profitable than prior launches will have an adverse effect on our year-over-year margin growth.

Our generic pharmaceutical program has benefited from sourcing generic pharmaceuticals through our Red Oak Sourcing venture with CVS Health, which sources for both us and CVS Health. If the venture does not continue to be successful, our margins could be adversely affected.

**Our Pharmaceutical segment's margins under our distribution agreements with branded pharmaceutical manufacturers are affected by service fees we receive from the manufacturers and prices established by the manufacturers.**

Our distribution agreements with branded pharmaceutical manufacturers generally provide that we receive fees from the manufacturers to compensate us for the services we provide them. Under some agreements, branded pharmaceutical price appreciation also serves as part of our compensation. If our service fees are reduced or, in cases where part of our compensation is branded price appreciation, if manufacturers determine not to increase prices or to implement only modest increases, our margins may be adversely affected.

**Our business is subject to rigorous regulatory and licensing requirements.**

As described in greater detail in the "Business" section, our business is highly regulated in the United States, at both the federal and state level, and in foreign countries. If we fail to comply with regulatory requirements, or if allegations are made that we fail to comply, our results of operations and financial condition could be adversely affected.

To lawfully operate our businesses, we are required to obtain and hold permits, product registrations, licenses and other regulatory approvals from, and to comply with operating and security standards of, numerous governmental bodies. Failure to maintain or renew necessary permits, product registrations, licenses or approvals, or to comply with required standards, could have an adverse effect on our results of operations and financial condition.

Products that we manufacture, source, distribute or market must comply with regulatory requirements. Noncompliance or concerns over noncompliance may result in suspension of our ability to distribute, import or manufacture products, product bans, recalls or seizures or criminal or civil sanctions, which, in turn, could result in product liability claims and lawsuits, including class actions. In addition, it can be costly and time-consuming to obtain regulatory approvals or product registrations to market a medical device, and such approvals or registrations might not be granted on a timely basis, if at all.

We are required to comply with laws relating to healthcare fraud and abuse. The requirements of these laws are complex and subject to varying interpretations, and it is possible that regulatory authorities could challenge our policies and practices. If we fail to comply with these laws, we could be subject to federal or state government investigations or *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments), which could result in civil or criminal sanctions, including the loss of licenses or the ability to participate in Medicare, Medicaid and other federal and state healthcare programs. Such sanctions and damages could adversely affect our results of operations and financial condition.

Our Cardinal Health at Home business and a few of our other businesses are Medicare-certified suppliers or participate in state Medicaid programs. In addition, we manufacture pharmaceutical and medical products and repackage pharmaceuticals that are purchased through federal or state healthcare programs. Failure to comply with applicable standards and regulations could result in civil or criminal sanctions, including the loss of our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

Our government contracts are subject to specific procurement regulations. Failure to comply with applicable rules or regulations or with contractual or other requirements may result in monetary damages and criminal or civil penalties as well as termination of our government contracts or our suspension or debarment from government contract work.

**Risk Factors**

We collect, handle and maintain patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information. Regulations currently in place continue to evolve, and new laws in this area could further restrict our ability to collect, handle and maintain personal or patient information, or could require us to incur additional compliance costs, either of which could have an adverse impact on our results of operations. Violations of federal, state or foreign laws concerning privacy and data protection could subject us to civil or criminal penalties, breach of contract claims, costs for remediation and harm to our reputation.

The U.S. federal government, most U.S. states and many foreign countries have antitrust laws that prohibit certain types of conduct deemed to be anti-competitive. Violations of antitrust laws can result in various sanctions, including criminal and civil penalties. Private plaintiffs also could bring civil lawsuits against us in the United States for alleged antitrust law violations, including claims for treble damages.

Our global operations are required to comply with the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws, the U.K. Bribery Act and similar anti-bribery laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws. If we fail to comply with any of these laws, we could suffer civil or criminal sanctions.

Our China operations are subject to national, regional and local regulations. The regulatory environment in China is evolving, and officials in the Chinese government exercise broad discretion in deciding how to interpret and apply regulations. It is possible that the Chinese government's current or future interpretation and application of existing or new regulations will negatively impact our China operations, result in regulatory investigations or lead to fines or penalties.

The acquisition of Cordis significantly expanded the number of countries in which we sell products directly. We are required to comply with the regulatory requirements of each of these countries, including requirements related to product registrations and licensing of medical devices. Additionally, as a result of the Cordis acquisition, we now manufacture and distribute a greater number of products that are implanted in the human body, subjecting us to more complex regulations within the United States and in the foreign countries in which Cordis operates. If we fail to comply with any of these laws, we could suffer civil or criminal sanctions.

**CVS Health is a large customer that generates a significant amount of our revenue.**

Our sales and credit concentration is significant. CVS Health accounted for 25 percent of our fiscal 2016 revenue and 22 percent of our gross trade receivable balance at June 30, 2016. If CVS Health were to terminate our agreements with them due to an alleged default by us, default in payment or significantly reduce its purchases of our products and services, our results of operations and financial condition could be adversely affected.

**We could be subject to adverse changes in the tax laws or challenges to our tax positions.**

We are a large multinational corporation with operations in the United States and many foreign countries. As a result, we are subject to the tax laws of many jurisdictions.

From time to time, legislative initiatives are proposed in the United States and other jurisdictions in which we operate that could adversely affect our tax positions, effective tax rate, tax payments or financial condition. Examples of such initiatives include the repeal of the LIFO (last-in, first-out) method of inventory accounting for income tax purposes, a change in the current U.S. taxation treatment of income from foreign operations, the establishment or increase in taxation at the U.S. state level on the basis of gross revenues, recommendations of the base erosion and profit shifting project undertaken by the Organization for Economic Cooperation and Development and the European Commission's investigation into illegal state aid.

Tax laws are complex and subject to varying interpretations. Tax authorities have challenged some of our tax positions and it is possible that they will challenge others. These challenges may adversely affect our effective tax rate, tax payments or financial condition.

**The U.S. healthcare environment is changing in many ways, some of which may not be favorable to us.**

The U.S. healthcare industry continues to undergo significant changes designed to increase access to medical care, improve safety and patient outcomes, contain costs and increase efficiencies. Medicare and Medicaid reimbursement levels have generally declined and the basis for payments is changing, shifting away from the traditional fee-for-service model towards value-based payments and risk-sharing models. The U.S. Department of Health and Human Services has set a goal of tying 50 percent of Medicare reimbursements to alternative payment models by the end of 2018. The use of managed care has increased. Distributors, manufacturers, healthcare providers, insurers and pharmacy chains have consolidated and have formed strategic alliances. Large purchasing groups are also prevalent. The industry is experiencing a shift away from traditional healthcare venues like hospitals and into clinics and physician offices, and, in some cases, patients' homes. We could be adversely affected directly or indirectly (if our customers or suppliers are adversely affected) by these and other changes in the delivery, pricing or utilization of, or reimbursement for, pharmaceuticals, medical products or healthcare services.

**Consolidation in the healthcare industry may negatively impact our results of operations.**

In recent years, the healthcare industry has continued to consolidate. Manufacturers are combining, which may leave us less able to negotiate our service fees with them. Some of our customers also are consolidating, creating larger enterprises with greater negotiating power. Customer consolidations also could result in the possible loss of a customer where the combined enterprise selects one distributor from two incumbents. We expect this consolidation trend among manufacturers and customers to continue, which could adversely affect our results of operations.

**Our business and operations depend on the proper functioning of information systems, critical facilities and distribution networks. Our business could be adversely affected if we experience a cyber-attack or other systems breach.**

We rely on our information systems to obtain, rapidly process, analyze and manage data to:

- facilitate the purchase and distribution of inventory items from numerous distribution centers;

- receive, process and ship orders on a timely basis;

- manage the accurate billing and collections for thousands of customers;

- process payments to suppliers;

- facilitate the manufacturing and assembly of medical products; and

- generate financial information.

Our business also depends on the proper functioning of our critical facilities, including our national logistics center, and our distribution networks. Our results of operations could be adversely affected if:

- our information systems, critical facilities or distribution networks, or our customers' access to these systems, facilities or networks, are disrupted;

- our information systems, critical facilities or distribution networks are damaged; or

- our information systems, critical facilities or distribution networks fail,

whether due to physical disruptions, such as fire, natural disaster, pandemic or power outage, or due to cyber security incidents or other actions of third parties, including terrorism or labor strikes.

The Pharmaceutical segment is in a multi-year project to replace certain of its finance and operating information systems. If these new systems are not effectively implemented or they fail to operate as intended, it could adversely affect the Pharmaceutical segment's supply chain operations and our internal control over financial reporting. In addition, from time to time, other businesses perform business process improvements or infrastructure modernizations or may use third-party service providers for key systems and processes, such as order to cash, customer service and accounts payable. If any of these initiatives are not successfully or efficiently implemented or maintained, they could adversely affect our business and our internal control over financial reporting.

Our business relies on the secure transmission, storage and hosting of patient-identifiable health information, financial information and other sensitive information relating to our customers, company and workforce. We have programs in place to detect, contain and respond to information security incidents. However, because the techniques used to obtain unauthorized access, disable or degrade service or sabotage systems change frequently and may be difficult to detect for long periods of time, we may be unable to anticipate these techniques or to implement adequate preventative measures. In addition, hardware, software or applications we develop or procure from third parties may contain defects in design or manufacture or other problems that could unexpectedly compromise information

security. Unauthorized parties may also attempt to gain access to our systems or facilities, or to those of third parties with whom we do business, through fraud, trickery or other forms of deceiving our employees, contractors or vendors. Any compromise of our information systems or of the information systems of a third-party with whom we do business, including unauthorized access to or use or disclosure of sensitive information, could adversely impact our operations, results of operations or our ability to satisfy legal requirements, including those legal requirements related to patient-identifiable health information.

**Because of the nature of our business, we may become involved in legal proceedings that could adversely impact our cash flows or results of operations.**

Due to the nature of our businesses, which includes the manufacture and distribution of healthcare products, we may from time to time become involved in disputes or legal proceedings. These include commercial disputes, government contract compliance matters, product liability claims or lawsuits, patent infringement claims, *qui tam* actions or other legal proceedings.

Some of the products that we manufacture or distribute, including the cardiovascular and endovascular products manufactured and distributed by Cordis, have been and may in the future be alleged to cause personal injury, subjecting us to product liability claims. Although we maintain product liability insurance for many products that we manufacture, there are substantial self-insured retentions, conditions or exclusions. There are no guarantees that we can obtain product liability insurance for a particular product we manufacture or if we do obtain insurance, the amount maintained would be adequate to cover any or all current or future claims settlements or judgments. Where we self-insure, we establish reserves based on actuarial methodologies and historical loss trends. However, any settlement or judgment in excess of our insurance limits or that is not otherwise covered could adversely affect our results of operations and financial condition.

Our manufacturing businesses operate in an industry characterized by extensive intellectual property litigation. Patent litigation can result in significant damage awards and injunctions that could prevent the manufacture and sale of affected products or force us to make royalty payments in order to continue selling the affected products.

Litigation is inherently unpredictable, and the unfavorable resolution of one or more of these legal proceedings could adversely affect our cash flows or results of operations.

**Acquisitions can have unanticipated results.**

An important element of our growth strategy has been to acquire other businesses that expand or complement our existing businesses. In fiscal 2016, we spent $3.6 billion to acquire other businesses, including $1.1 billion to acquire Harvard Drug and $1.9 billion to acquire Cordis. Acquisitions involve risks: we may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition; our management's attention may be diverted to integration efforts; we may fail to retain key personnel of the acquired business; future developments may impair the value of our purchased goodwill or intangible assets; we may face difficulties establishing or combining operations and systems; we may assume

liabilities related to litigation or other legal proceedings involving the acquired business; we may face challenges retaining the customers of the acquired business; or we may encounter unforeseen internal control, regulatory or compliance issues.

**We depend on certain suppliers to make their raw materials and products available to us and are subject to fluctuations in costs of raw materials and products.**

We depend on the availability of various components, compounds, raw materials (including radioisotopes) and energy supplied by others for our operations. Any of our supplier relationships could be interrupted due to events beyond our control, including natural disasters, or could be terminated. A sustained supply interruption could have an adverse effect on our business.

Our manufacturing businesses use oil-based resins, cotton, latex and other commodities as raw materials in many products. Prices of oil and gas also affect our distribution and transportation costs. Prices of these commodities are volatile and can fluctuate significantly, causing our costs to produce and distribute our products to fluctuate. Due to competitive dynamics and contractual limitations, we may be unable to pass along cost increases through higher prices. If we cannot fully offset cost increases through other cost reductions, or recover these costs through price increases or surcharges, our results of operations could be adversely affected.

**Our results of operations may suffer upon the bankruptcy, insolvency, or other credit failure of a customer that has a substantial amount owed to us.**

Most of our customers buy products and services from us on credit, which is made available to customers based on our assessment of creditworthiness. The bankruptcy, insolvency or other credit failure of any customer that has a substantial amount owed to us could adversely affect our results of operations.

**Our Cordis acquisition increased the extent of our exposure to the economic, political and currency risks of international operations.**

We conduct our operations in various regions of the world outside of the United States, including North America, South America, Europe and Asia. The scope and complexity of our international operations expanded with the acquisition of Cordis and we may continue to expand our operations outside the United States. Global developments can affect our business in many ways. Our global operations are affected by local economic environments, including inflation, recession and competition. In addition, we conduct our business in U.S. dollars and various functional currencies of our foreign subsidiaries. Changes in foreign currency exchange rates could adversely affect our financial results, which are reported in U.S. dollars. We may not be able to hedge to protect us against these exposures, and any hedges may not successfully mitigate these exposures. Political changes also can disrupt our global operations, as well as our customers and suppliers, in a particular location. Divergent or unfamiliar regulatory systems and labor markets also can increase the risks and burdens of operating in numerous countries.

**Economic conditions may adversely affect demand for our products and services**.

Deterioration in general economic conditions in the United States and other countries in which we do business could adversely affect the amount of prescriptions filled and the number of medical procedures undertaken and, therefore, reduce purchases of our products and services, which could adversely affect our results of operations. In addition, deteriorating economic conditions may increase bankruptcies, insolvencies or other credit failures of customers or suppliers, which, if they have a substantial amount owed to us, also could adversely affect our results of operations.

# Properties

In the United States, at June 30, 2016, the Pharmaceutical segment operated 24 primary pharmaceutical distribution facilities and one national logistics center; six specialty distribution facilities; and more than 140 nuclear pharmacy and cyclotron facilities. The Medical segment operated more than 70 medical-surgical distribution, assembly, manufacturing and other operating facilities. Our U.S. operating facilities are located in 45 states and in Puerto Rico.

Outside the United States, at June 30, 2016, our Medical segment operated more than 20 facilities in Canada, the Dominican Republic, Malaysia, Malta, Mexico and Thailand that engage in manufacturing, distribution or research. In addition, our Pharmaceutical and Medical segments utilized various distribution and pharmacy facilities in China.

At June 30, 2016, we owned more than 70 operating facilities and leased more than 240 operating facilities around the world. Our principal executive offices are headquartered in an owned building located at 7000 Cardinal Place in Dublin, Ohio.

We consider our operating properties to be in satisfactory condition and adequate to meet our present needs. However, we regularly evaluate operating properties and may make further additions and improvements or consolidate locations as we seek opportunities to expand or enhance the efficiency of our business.

# Legal Proceedings

The legal proceedings described in Note 8 of the "Notes to Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

**Market for Registrant's Common Equity**

# Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

Our common shares are listed on the New York Stock Exchange under the symbol "CAH." The following table reflects the range of the reported high and low closing prices of our common shares as reported on the New York Stock Exchange Composite Tape and the per share dividends declared for the fiscal years ended June 30, 2016 and 2015 and paid quarterly. It also reflects the range of the reported high and low closing prices of our common shares from July 1, 2016 through the period ended on July 29, 2016 and the per share dividends declared from July 1, 2016 through the period ended on August 5, 2016:

| | High | | Low | | Dividends Declared |
|---|---|---|---|---|---|
| **Fiscal 2015** | | | | | |
| Quarter Ended: | | | | | |
| September 30, 2014 | $ | 77.66 | $ | 69.59 | $ | 0.3425 |
| December 31, 2014 | | 83.04 | | 72.13 | | 0.3425 |
| March 31, 2015 | | 91.25 | | 79.19 | | 0.3425 |
| June 30, 2015 | | 91.50 | | 83.65 | | 0.3870 |
| | | | | | |
| **Fiscal 2016** | | | | | |
| Quarter Ended: | | | | | |
| September 30, 2015 | $ | 87.02 | $ | 76.72 | $ | 0.3870 |
| December 31, 2015 | | 90.85 | | 77.12 | | 0.3870 |
| March 31, 2016 | | 89.68 | | 76.16 | | 0.3870 |
| June 30, 2016 | | 87.20 | | 73.69 | | 0.4489 |
| | | | | | |
| **Fiscal 2017** | $ | 83.64 | $ | 78.23 | $ | 0.4489 |

At July 29, 2016 there were approximately 9,184 shareholders of record of our common shares.

We anticipate that we will continue to pay quarterly cash dividends in the future. The payment and amount of future dividends remain, however, within the discretion of our Board of Directors and will depend upon our future earnings, financial condition, capital requirements and other factors.

## Issuer Purchases of Equity Securities

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Programs (2) (in millions) |
|---|---|---|---|---|
| April 2016 | 191 | $ 84.50 | — | $ 393 |
| May 2016 | 2,802,649 | 77.36 | 2,802,453 | 1,176 |
| June 2016 | 1,711,419 | 77.67 | 1,711,249 | 1,043 |
| **Total** | **4,514,259** | **$ 77.48** | **4,513,702** | **$ 1,043** |

(1)    Reflects 191, 196 and 170 common shares purchased in April, May and June 2016, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2)    On October 29, 2013, our Board of Directors approved a $1.0 billion share repurchase program and on August 6, 2014, the Board of Directors authorized an additional $1.0 billion under the program, for a total of $2.0 billion. This program was completed in July 2016. On May 4, 2016, our Board of Directors also approved a $1.0 billion share repurchase program that expires on December 31, 2019. During the three months ended June 30, 2016, we repurchased 4.5 million common shares under these programs. We repurchased an additional 3 million common shares from July 1, 2016 through August 5, 2016. After these repurchases, we have $793 million available under our new repurchase program.

**Market for Registrant's Common Equity**

## Five Year Performance Graph

The following line graph compares the cumulative total return of our common shares with the cumulative total return of the Standard & Poor's Composite—500 Stock Index (the "S&P 500 Index") and the Standard & Poor's Composite—500 Healthcare Index (the "S&P 500 Healthcare Index"). The line graph assumes, in each case, an initial investment of $100 on June 30, 2011, based on the market prices at the end of each fiscal year through and including June 30, 2016, and reinvestment of dividends. The S&P 500 Index and S&P 500 Healthcare Index investments are weighted on the basis of market capitalization at the beginning of each period.



|  | June 30 | | | | | |
|---|---|---|---|---|---|---|
|  | 2011 | 2012 | 2013 | 2014 | 2015 | **2016** |
| Cardinal Health, Inc. | $ 100.00 | $ 94.45 | $ 108.90 | $ 161.30 | $ 200.19 | **$ 190.43** |
| S&P 500 Index | 100.00 | 105.42 | 127.11 | 158.34 | 170.07 | **176.83** |
| S&P 500 Healthcare Index | 100.00 | 109.76 | 140.21 | 182.34 | 226.38 | **221.81** |

41                                    Cardinal Health | Fiscal 2016 Form 10-K

# Management Reports

## Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2016. Based on this evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were effective as of June 30, 2016 to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

## Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, controls deemed effective now may become inadequate in the future because of changes in conditions, or because compliance with policies or procedures has deteriorated or been circumvented.

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2016. In making this assessment, management used the criteria established in the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the "COSO criteria"). Based on management's assessment and the COSO criteria, management believes that our internal control over financial reporting was effective as of June 30, 2016.

Our independent registered public accounting firm, Ernst & Young LLP, has issued a report on our internal control over financial reporting. Ernst & Young LLP's report appears following this "Management Reports" section and expresses an unqualified opinion on the effectiveness of our internal control over financial reporting.

On October 2, 2015, we completed the acquisition of Cordis. As permitted by guidelines established by the SEC, management excluded Cordis from the scope of its assessment of the effectiveness of internal control over financial reporting as of June 30, 2016. Cordis constituted 7 percent and 29 percent of our total and net assets, respectively, as of June 30, 2016 and less than 1 percent of both our revenue and operating earnings for the fiscal year then ended.

## Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended June 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Implementation of New Software Systems

The Pharmaceutical segment is in a multi-year project implementing a replacement of certain finance and operating information systems, which is expected to affect internal control over financial reporting. This project did not impact internal control over financial reporting during fiscal 2016. If these new systems are not effectively implemented or fail to operate as intended, it could adversely affect our internal control over financial reporting.

# Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting

The Board of Directors and Shareholders of Cardinal Health, Inc.

We have audited Cardinal Health, Inc. and subsidiaries' internal control over financial reporting as of June 30, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). Cardinal Health, Inc. and subsidiaries' management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying "Management's Report on Internal Control Over Financial Reporting." Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

As indicated in the accompanying "Management's Report on Internal Control Over Financial Reporting", management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Cordis, which is included in the 2016 consolidated financial statements of Cardinal Health, Inc. and subsidiaries and constituted 7 percent and 29 percent of total and net assets, respectively, as of June 30, 2016 and less than 1 percent of both revenues and operating earnings for the year then ended. Our audit of internal control over financial reporting of Cardinal Health, Inc. and subsidiaries also did not include an evaluation of the internal control over financial reporting of Cordis.

In our opinion, Cardinal Health, Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of June 30, 2016, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Cardinal Health, Inc. and subsidiaries as of June 30, 2016 and 2015 and the related consolidated statements of earnings, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended June 30, 2016 of Cardinal Health, Inc. and subsidiaries and our report dated August 12, 2016 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Columbus, Ohio
August 12, 2016

# Report of Independent Registered Public Accounting Firm

The Board of Directors and Shareholders of Cardinal Health, Inc.

We have audited the accompanying consolidated balance sheets of Cardinal Health, Inc. and subsidiaries as of June 30, 2016 and 2015, and the related consolidated statements of earnings, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended June 30, 2016. Our audits also included the financial statement schedule listed in the Index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Cardinal Health, Inc. and subsidiaries at June 30, 2016 and 2015, and the consolidated results of their operations and their cash flows for each of the three years in the period ended June 30, 2016, in conformity with U.S. generally accepted accounting principles.  Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Cardinal Health, Inc. and subsidiaries' internal control over financial reporting as of June 30, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated August 12, 2016 expressed an unqualified opinion thereon.

 /s/ Ernst & Young LLP

 Columbus, Ohio
 August 12, 2016

# Financial Statements and Supplementary Data

|  | **Page** |
|---|---|
| Consolidated Financial Statements and Schedule: | |
| Consolidated Statements of Earnings for the Fiscal Years Ended June 30, 2016, 2015 and 2014 | **46** |
| Consolidated Statements of Comprehensive Income for the Fiscal Years Ended June 30, 2016, 2015 and 2014 | **47** |
| Consolidated Balance Sheets at June 30, 2016 and 2015 | **48** |
| Consolidated Statements of Shareholders' Equity for the Fiscal Years Ended June 30, 2016, 2015 and 2014 | **49** |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2016, 2015 and 2014 | **50** |
| Notes to Consolidated Financial Statements | **51** |

**Financial Statements**

# Consolidated Statements of Earnings

| (in millions, except per common share amounts) | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Revenue | $ | **121,546** | $ | 102,531 | $ | 91,084 |
| Cost of products sold | | **115,003** | | 96,819 | | 85,923 |
| Gross margin | | **6,543** | | 5,712 | | 5,161 |
| | | | | | | |
| **Operating expenses:** | | | | | | |
| Distribution, selling, general, and administrative expenses | | **3,648** | | 3,240 | | 3,028 |
| Restructuring and employee severance | | **25** | | 44 | | 31 |
| Amortization and other acquisition-related costs | | **459** | | 281 | | 223 |
| Impairments and (gain)/loss on disposal of assets, net | | **21** | | (19) | | 15 |
| Litigation (recoveries)/charges, net | | **(69)** | | 5 | | (21) |
| Operating earnings | | **2,459** | | 2,161 | | 1,885 |
| | | | | | | |
| Other (income)/expense, net | | **5** | | (7) | | (46) |
| Interest expense, net | | **178** | | 141 | | 133 |
| Loss on extinguishment of debt | | **—** | | 60 | | — |
| Earnings from continuing operations before income taxes | | **2,276** | | 1,967 | | 1,798 |
| | | | | | | |
| Provision for income taxes | | **845** | | 755 | | 635 |
| Earnings from continuing operations | | **1,431** | | 1,212 | | 1,163 |
| | | | | | | |
| Earnings from discontinued operations, net of tax | | **—** | | 3 | | 3 |
| Net earnings | | **1,431** | | 1,215 | | 1,166 |
| | | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | **(4)** | | — | | — |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | **1,427** | $ | 1,215 | $ | 1,166 |
| | | | | | | |
| **Basic earnings per common share attributable to Cardinal Health, Inc.:** | | | | | | |
| Continuing operations | $ | **4.36** | $ | 3.65 | $ | 3.41 |
| Discontinued operations | | **—** | | 0.01 | | 0.01 |
| **Net basic earnings per common share attributable to Cardinal Health, Inc.** | $ | **4.36** | $ | 3.66 | $ | 3.42 |
| | | | | | | |
| **Diluted earnings per common share attributable to Cardinal Health, Inc.:** | | | | | | |
| Continuing operations | $ | **4.32** | $ | 3.61 | $ | 3.37 |
| Discontinued operations | | **—** | | 0.01 | | 0.01 |
| **Net diluted earnings per common share attributable to Cardinal Health, Inc.** | $ | **4.32** | $ | 3.62 | $ | 3.38 |
| | | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | | |
| Basic | | **327** | | 332 | | 341 |
| Diluted | | **330** | | 335 | | 345 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Statements of Comprehensive Income

| (in millions) | | **2016** | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Net earnings | $ | **1,431** | $ | 1,215 | $ | 1,166 |
| | | | | | | |
| **Other comprehensive income/(loss):** | | | | | | |
| Foreign currency translation adjustments and other | | **(82)** | | (104) | | 9 |
| Net unrealized gain/(loss) on derivative instruments, net of tax | | **(11)** | | 11 | | (7) |
| Total other comprehensive income/(loss), net of tax | | **(93)** | | (93) | | 2 |
| | | | | | | |
| Total comprehensive income | $ | **1,338** | $ | 1,122 | $ | 1,168 |
| | | | | | | |
| Less: comprehensive income attributable to noncontrolling interests | | **(4)** | | — | | — |
| **Total comprehensive income attributable to Cardinal Health, Inc.** | $ | **1,334** | $ | 1,122 | $ | 1,168 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Balance Sheets

| (in millions) | | June 30 2016 | | 2015 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | **2,356** | $ | 4,616 |
| Trade receivables, net | | **7,405** | | 6,523 |
| Inventories, net | | **10,615** | | 9,211 |
| Prepaid expenses and other | | **1,580** | | 1,402 |
| Total current assets | | **21,956** | | 21,752 |
| | | | | |
| Property and equipment, net | | **1,796** | | 1,506 |
| Goodwill and other intangibles, net | | **9,426** | | 6,018 |
| Other assets | | **944** | | 866 |
| Total assets | $ | **34,122** | $ | 30,142 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests, and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | **17,306** | $ | 14,368 |
| Current portion of long-term obligations and other short-term borrowings | | **587** | | 281 |
| Other accrued liabilities | | **1,808** | | 2,594 |
| Total current liabilities | | **19,701** | | 17,243 |
| | | | | |
| Long-term obligations, less current portion | | **4,952** | | 5,211 |
| Deferred income taxes and other liabilities | | **2,781** | | 1,432 |
| | | | | |
| Redeemable noncontrolling interests | | **117** | | — |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized—**500 thousand** shares, Issued—**none** | | **—** | | — |
| Common shares, without par value: | | | | |
| Authorized—**755 million** shares, Issued—**364 million** shares at **June 30, 2016** and 2015 | | **3,010** | | 3,003 |
| Retained earnings | | **6,419** | | 5,521 |
| Common Shares in treasury, at cost: **42 million** shares and 36 million shares at **June 30, 2016** and 2015, respectively | | **(2,759)** | | (2,245) |
| Accumulated other comprehensive loss | | **(116)** | | (23) |
| **Total Cardinal Health, Inc. shareholders' equity** | | **6,554** | | 6,256 |
| Noncontrolling interests | | **17** | | — |
| Total shareholders' equity | | **6,571** | | 6,256 |
| Total liabilities, redeemable noncontrolling interests, and shareholders' equity | $ | **34,122** | $ | 30,142 |

The accompanying notes are an integral part of these consolidated statements.

**Financial Statements**

# Consolidated Statements of Shareholders' Equity

| (in millions) | Common Shares Shares Issued | Amount | Retained Earnings | Treasury Shares Shares | Amount | Accumulated Other Comprehensive Income/(Loss) | Noncontrolling Interests | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|---|
| Balance at June 30, 2013 | 364 | $ 2,953 | $ 4,038 | (25) | $ (1,084) | $ 68 | $ — | $ 5,975 |
| Net earnings | | | 1,166 | | | | | 1,166 |
| Other comprehensive income, net of tax | | | | | | 2 | | 2 |
| Employee stock plans activity, including tax impact of $39 million | — | 27 | | 8 | 334 | | | 361 |
| Treasury shares acquired | | | | (10) | (673) | | | (673) |
| Dividends declared | | | (430) | | | | | (430) |
| Balance at June 30, 2014 | 364 | 2,980 | 4,774 | (27) | (1,423) | 70 | — | 6,401 |
| Net earnings | | | 1,215 | | | | | 1,215 |
| Other comprehensive loss, net of tax | | | | | | (93) | | (93) |
| Employee stock plans activity, including tax impact of $52 million | — | 23 | | 4 | 214 | | | 237 |
| Treasury shares acquired | | | | (13) | (1,036) | | | (1,036) |
| Dividends declared | | | (471) | | | | | (471) |
| Other | | | 3 | | | | | 3 |
| Balance at June 30, 2015 | 364 | 3,003 | 5,521 | (36) | (2,245) | (23) | — | 6,256 |
| Net earnings | | | 1,427 | | | | 3 | 1,430 |
| Other comprehensive loss, net of tax | | | | | | (93) | | (93) |
| Purchase of noncontrolling interests | | | | | | | (7) | (7) |
| Employee stock plans activity, including tax impact of $33 million | — | 7 | | 2 | 137 | | | 144 |
| Treasury shares acquired | | | | (8) | (651) | | | (651) |
| Dividends declared | | | (529) | | | | | (529) |
| Other | | | — | | | | 21 | 21 |
| **Balance at June 30, 2016** | 364 | $ 3,010 | $ 6,419 | (42) | $ (2,759) | $ (116) | $ 17 | $ 6,571 |

The accompanying notes are an integral part of these consolidated statements.

49    

# Consolidated Statements of Cash Flows

| (in millions) | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | |
| Net earnings | $ | **1,431** | $ | 1,215 | $ 1,166 |
| Earnings from discontinued operations, net of tax | | **—** | | (3) | (3) |
| Earnings from continuing operations | | **1,431** | | 1,212 | 1,163 |
| Adjustments to reconcile earnings from continuing operations to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | | **641** | | 451 | 459 |
| Loss on extinguishment of debt | | **—** | | 60 | — |
| Gain on sale of other investments | | **—** | | (5) | (32) |
| Impairments and (gain)/loss on disposal of assets, net | | **21** | | (19) | 15 |
| Share-based compensation | | **111** | | 110 | 96 |
| Provision for deferred income taxes | | **87** | | 219 | 26 |
| Provision for bad debts | | **73** | | 52 | 42 |
| Change in fair value of contingent consideration obligation | | **(16)** | | 8 | — |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | | |
| Decrease/(increase) in trade receivables | | **(866)** | | (870) | 925 |
| Decrease/(increase) in inventories | | **(1,179)** | | (779) | 142 |
| Increase/(decrease) in accounts payable | | **2,815** | | 1,948 | (196) |
| Other accrued liabilities and operating items, net | | **(147)** | | 153 | (116) |
| Net cash provided by operating activities | | **2,971** | | 2,540 | 2,524 |
| **Cash flows from investing activities:** | | | | | |
| Acquisition of subsidiaries, net of cash acquired | | **(3,614)** | | (503) | (519) |
| Additions to property and equipment | | **(465)** | | (300) | (249) |
| Purchase of available for sale securities and other investments | | **(200)** | | (342) | (129) |
| Proceeds from sale of available-for-sale securities and other investments | | **136** | | 206 | 47 |
| Proceeds from maturities of available-for-sale securities | | **50** | | 37 | — |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | | **13** | | 53 | — |
| Net cash used in investing activities | | **(4,080)** | | (849) | (850) |
| **Cash flows from financing activities:** | | | | | |
| Payment of contingent consideration obligation | | **(25)** | | (7) | — |
| Net change in short-term borrowings | | **26** | | (12) | 114 |
| Net purchase of noncontrolling interests | | **(10)** | | — | — |
| Reduction of long-term obligations | | **(6)** | | (1,221) | (2) |
| Proceeds from long-term obligations, net of issuance costs | | **—** | | 2,672 | — |
| Net proceeds from share-based compensation | | **6** | | 72 | 227 |
| Excess tax benefits from share-based compensation | | **33** | | 52 | 39 |
| Dividends on common shares | | **(512)** | | (460) | (415) |
| Purchase of treasury shares | | **(651)** | | (1,036) | (673) |
| Net cash provided by/(used in) financing activities | | **(1,139)** | | 60 | (710) |
| Effect of exchange rates changes on cash and equivalents | | **(12)** | | — | — |
| Net increase/(decrease) in cash and equivalents | | **(2,260)** | | 1,751 | 964 |
| Cash and equivalents at beginning of period | | **4,616** | | 2,865 | 1,901 |
| **Cash and equivalents at end of period** | $ | **2,356** | $ | 4,616 | $ 2,865 |
| **Supplemental Information:** | | | | | |
| Cash payments for interest | $ | **174** | $ | 150 | $ 152 |
| Cash payments for income taxes | | **635** | | 529 | 632 |

The accompanying notes are an integral part of these consolidated statements.

# Notes to Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

Cardinal Health, Inc. is a global integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically proven, medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. Cardinal Health, Inc. connects patients, providers, payers, pharmacists, and manufacturers for integrated care coordination and better patient management. References to "we", "our" and similar pronouns in these consolidated financial statements are to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context otherwise requires.

Our fiscal year ends on June 30. References to fiscal 2016, 2015 and 2014 in these consolidated financial statements are to the fiscal years ended June 30, 2016, 2015 and 2014, respectively.

### Basis of Presentation

Our consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. The results of businesses acquired or disposed of are included in the consolidated financial statements from the date of the acquisition or up to the date of disposal, respectively.

### Use of Estimates

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). The preparation of financial statements in accordance with GAAP requires us to make estimates, judgments and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates, judgments and assumptions are used in the accounting and disclosure related to, among other items, allowance for doubtful accounts, inventory valuation, business combinations, goodwill and other intangible asset impairment, vendor reserves, loss contingencies, income taxes and share-based compensation. Actual amounts could ultimately differ from these estimated amounts.

### Cash Equivalents

We consider liquid investments purchased with an initial maturity of three months or less to be cash equivalents. The carrying value of cash equivalents approximates fair value.

### Receivables

Trade receivables are presented net of an allowance for doubtful accounts of $135 million at both June 30, 2016 and 2015. An account is considered past due on the first day after its due date. In accordance with contract terms, we generally have the ability to charge customers service fees or higher prices if an account is considered past due. We regularly monitor past due accounts and establish appropriate reserves to cover potential losses, which are based primarily on

historical collection rates and the credit worthiness of the customer. We write off any amounts deemed uncollectible against the established allowance for doubtful accounts.

We provide financing to various customers. Such financing arrangements range from 270 days to 5 years at interest rates that are generally subject to fluctuation. Interest income on these arrangements is recognized as it is earned. The financings may be collateralized, guaranteed by third parties or unsecured. Finance notes and related accrued interest were $145 million (current portion $31 million) and $161 million (current portion $53 million) at June 30, 2016 and 2015, respectively, and are included in other assets (current portion is included in prepaid expenses and other) in the consolidated balance sheets. Finance notes receivable are reported net of an allowance for doubtful accounts of $19 million and $14 million at June 30, 2016 and 2015, respectively. We estimate an allowance for these financing receivables based on historical collection rates and the credit worthiness of the customer. We write off any amounts deemed uncollectible against the established allowance for doubtful accounts.

### Concentrations of Credit Risk

We maintain cash depository accounts with major banks, and we invest in high quality, short-term liquid instruments, and in marketable securities. Our short-term liquid instruments mature within three months and we have not historically incurred any related losses. Investments in marketable securities consist of a portfolio of high-grade instruments. Such investments are made only in instruments issued by highly-rated institutions, whose financial condition we monitor.

Our trade receivables and finance notes and related accrued interest are exposed to a concentration of credit risk with customers in the retail and healthcare sectors. Credit risk can be affected by changes in reimbursement and other economic pressures impacting the healthcare industry. Such credit risk is limited due to supporting collateral and the diversity of the customer base, including its wide geographic dispersion. We perform regular credit evaluations of our customers' financial conditions and maintain reserves for credit losses. Historically, such losses have been within our expectations. Refer to the "Receivables" section within this Note 1 for additional information on the accounting treatment of reserves for credit losses.

### Major Customers

CVS Health Corporation ("CVS Health"), which is primarily serviced through our Pharmaceutical segment, is our only customer that individually accounts for at least 10 percent of revenue and gross trade receivables. The table below summarizes historical percent of revenue and gross trade receivables from CVS Health.

| | Percent of Revenue | | | Percent of Gross Trade Receivables at June 30 | |
|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | **2016** | 2015 |
| CVS Health | **25%** | 27% | 28% | **22%** | 20% |

**Notes to Financial Statements**

We have entered into agreements with group purchasing organizations ("GPOs") which act as purchasing agents that negotiate vendor contracts on behalf of their members. Vizient (formerly Novation, LLC) and Premier, Inc. are our two largest GPO member relationships in terms of revenue. Sales to members of these two GPOs collectively accounted for 17 percent, 18 percent and 17 percent of revenue for fiscal 2016, 2015 and 2014, respectively. Our trade receivable balances are with individual members of the GPO, and therefore no significant concentration of credit risk exists with these types of arrangements.

## Inventories

A substantial portion of our inventories (58 percent at both June 30, 2016 and 2015) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These inventories are included within the core pharmaceutical distribution facilities of our Pharmaceutical segment ("distribution facilities") and are primarily merchandise inventories. The LIFO method presumes that the most recent inventory purchases are the first items sold, so LIFO helps us better match current costs and revenue. We believe that the average cost method of inventory valuation provides a reasonable approximation of the current cost of replacing inventory within these distribution facilities. As such, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation.

Our remaining inventory is stated at the lower of cost, using the first-in, first-out method, or market. If we had used the average cost method of inventory valuation for all inventory within the core pharmaceutical distribution facilities, the value of our inventories would not have changed in fiscal 2016 or 2015 because inventories valued at LIFO were $9 million and $114 million higher than the average cost value at June 30, 2016 and June 30, 2015, respectively. We do not record inventories in excess of replacement cost. As such, we did not record any changes in our LIFO reserve in fiscal 2016 and 2015.

Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $79 million and $57 million at June 30, 2016 and 2015, respectively. We reserve for inventory obsolescence using estimates based on historical experience, historical and projected sales trends, specific categories of inventory and age of on-hand inventory.

## Cash Discounts

Manufacturer cash discounts are recorded as a component of inventory cost and recognized as a reduction of cost of products sold when the related inventory is sold.

## Property and Equipment

Property and equipment are carried at cost less accumulated depreciation. Property and equipment held for sale are recorded at the lower of cost or fair value less cost to sell. When certain events or changes in operating conditions occur, an impairment assessment may be performed on the recoverability of the carrying amounts.

Depreciation expense is computed using the straight-line method over the estimated useful lives of the assets, including capital lease assets which are depreciated over the terms of their respective leases. We generally use the following range of useful lives for our property and equipment categories: buildings and improvements—3 to 39 years; machinery and equipment—3 to 20 years; and furniture and fixtures—3 to 7 years. We recorded depreciation expense of $277 million, $254 million and $265 million for fiscal 2016, 2015 and 2014, respectively.

The following table presents the components of property and equipment, net at June 30:

| (in millions) | 2016 | | 2015 |
|---|---|---|---|
| Land, building and improvements | $ | 1,735 | $ | 1,465 |
| Machinery and equipment | | 2,608 | | 2,440 |
| Furniture and fixtures | | 133 | | 129 |
| Total property and equipment, at cost | | 4,476 | | 4,034 |
| Accumulated depreciation and amortization | | (2,680) | | (2,528) |
| **Property and equipment, net** | $ | 1,796 | $ | 1,506 |

Repairs and maintenance expenditures are expensed as incurred. Interest on long-term projects is capitalized using a rate that approximates the weighted-average interest rate on long-term obligations, which was 3.38 percent at June 30, 2016. The amount of capitalized interest was immaterial for all periods presented.

## Business Combinations

The assets acquired and liabilities assumed in a business combination, including identifiable intangible assets, are recorded at their estimated fair values as of the acquisition date. The excess of the purchase price over the estimated fair value of the identifiable net assets acquired is recorded as goodwill. We base the fair values of identifiable intangible assets on detailed valuations that require management to make significant judgments, estimates and assumptions. Critical estimates and assumptions include: expected future cash flows for customer relationships, trade names and other identifiable intangible assets; discount rates that reflect the risk factors associated with future cash flows; and estimates of useful lives. When an acquisition involves contingent consideration, we recognize a liability equal to the fair value of the contingent consideration obligation at the acquisition date. The estimate of fair value of a contingent consideration obligation requires subjective assumptions to be made regarding future business results, discount rates, discount periods and probabilities assigned to various potential business result scenarios. See Note 2 for additional information regarding our acquisitions.

## Goodwill and Other Intangible Assets

Purchased goodwill and intangible assets with indefinite lives are not amortized, but instead are tested for impairment annually or when indicators of impairment exist.

Goodwill impairment testing involves a comparison of the estimated fair value of reporting units to the respective carrying amount, which may be performed utilizing either a qualitative or quantitative assessment. A reporting unit is defined as an operating segment or one level below an operating segment (also known as a component). Goodwill impairment testing involves judgment, including the identification of reporting units, the estimation of the fair value of each

**Notes to Financial Statements**

reporting unit and, if necessary, the estimation of the implied fair value of goodwill.

We have two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. These operating segments are comprised of divisions (components), for which discrete financial information is available. Components are aggregated into reporting units for purposes of goodwill impairment testing to the extent that they share similar economic characteristics. Our reporting units are: Pharmaceutical operating segment (excluding our Nuclear Pharmacy Services division and Cardinal Health China - Pharmaceutical division); Nuclear Pharmacy Services division; Cardinal Health China - Pharmaceutical division; Medical operating segment (excluding our Cardinal Health at Home division and naviHealth division); Cardinal Health at Home division; and naviHealth division.

Fair value can be determined using market, income or cost-based approaches. Our determination of estimated fair value of the reporting units is based on a combination of the income-based and market-based approaches. Under the income-based approach, we use a discounted cash flow model in which cash flows anticipated over several future periods, plus a terminal value at the end of that time horizon, are discounted to their present value using an appropriate risk-adjusted rate of return. We use our internal forecasts to estimate future cash flows, which we believe are consistent with those of a market participant, and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for each reporting unit. Actual results may differ materially from those used in our forecasts. We use discount rates that are commensurate with the risks and uncertainty inherent in the respective reporting units and in our internally-developed forecasts. Discount rates used in our reporting unit valuations ranged from 8.5 percent to 12.5 percent. Under the market-based approach, we determine fair value by comparing our reporting units to similar businesses or guideline companies whose securities are actively traded in public markets. To further confirm fair value, we compare the aggregate fair value of our reporting units to our total market capitalization. Estimating the fair value of reporting units requires the use of estimates and significant judgments that are based on a number of factors including forecasted operating results. The use of alternate estimates and assumptions or changes in the industry or peer groups could materially affect the determination of fair value for each reporting unit and potentially result in goodwill impairment.

We performed annual impairment testing in fiscal 2016, 2015 and 2014 and concluded that there were no impairments of goodwill as the estimated fair value of each reporting unit exceeded its carrying value.

The impairment test for indefinite-lived intangibles other than goodwill (primarily in-process research and development ("IPR&D")) consists of a comparison of the fair value of the indefinite-lived intangible asset to the carrying value of the asset as of the impairment testing date. If the carrying amount of the indefinite-lived intangible exceeds its fair value, an impairment loss must be recognized in an amount equal to that excess. We estimate the fair value of our indefinite-lived intangibles under the income approach using a discounted cash flow

model. We use our internal forecasts, which we believe are consistent with those of a market participant, to estimate future cash flows and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for the indefinite-lived intangible including, among other factors, assumptions on regulatory approval for IPR&D.

Intangible assets with finite lives, primarily customer relationships; trademarks, trade names and patents; and developed technology, are amortized using a combination of straight-line and accelerated methods based on the expected cash flows from the asset over their estimated useful lives. We review intangible assets with finite lives for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable. Determining whether an impairment loss occurred requires a comparison of the carrying amount to the sum of the future forecasted undiscounted cash flows expected to be generated by the asset group. Actual results may differ materially from those used in our forecasts.

### Investments

Investments in non-marketable equity securities are accounted for under either the cost or equity method of accounting and are included in other assets in the consolidated balance sheets. For investments in which we can exercise significant influence, we use the equity method of accounting. Our share of the earnings and losses was immaterial, both individually and in the aggregate, for all periods presented and is recorded in other income, net in the consolidated statements of the earnings. We monitor investments for other-than-temporary impairment by considering factors such as the operating performance of the investment and current economic and market conditions.

During fiscal 2014, we sold our minority equity interests in two investments for proceeds of $47 million, which resulted in a pre-tax gain of $32 million ($20 million, net of tax) included in other income, net in the consolidated statements of earnings.

Marketable securities are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. Unrealized gains and losses on available-for-sale securities, net of applicable taxes, are included within shareholders' equity in accumulated other comprehensive income ("AOCI"). We monitor these securities for other-than-temporary impairment by considering factors such as the duration that, and the extent to which, the fair value is below cost, the operating performance and credit worthiness of the issuer of the securities and current economic and market conditions. See Note 5 for additional information regarding available-for-sale securities.

### Vendor Reserves

In the ordinary course of business, our vendors may dispute deductions taken against payments otherwise due to them or assert other disputes. These disputes are researched and resolved based upon the findings of the research performed. At any given time, there are outstanding items in various stages of research and resolution. In determining appropriate reserves for areas of exposure with our vendors, we assess historical experience and current outstanding claims. We have established various levels of reserves based on the

type of claim and status of review. Though the claim types are relatively consistent, we periodically refine our methodology by updating the reserve estimate percentages to reflect actual historical experience. The ultimate outcome of certain claims may be different than our original estimate and may require an adjustment. All adjustments to vendor reserves are included in cost of products sold. In addition, the reserve balance will fluctuate due to variations of outstanding claims from period-to-period, timing of settlements and specific vendor issues, such as bankruptcies. Vendor reserves were $62 million and $88 million at June 30, 2016 and 2015, respectively, excluding third-party returns. See separate section in Note 1 for a description of third-party returns.

## Distribution Service Agreement and Other Vendor Fees

Our Pharmaceutical segment recognizes fees received from its distribution service agreements and other fees received from vendors related to the purchase or distribution of the vendors' inventory when those fees have been earned and we are entitled to payment. Since the benefit provided to a vendor is related to the purchase and distribution of the vendor's inventory, we recognize the fees as a reduction in the carrying value of the inventory that generated the fees, and as such, a reduction of cost of products sold in our consolidated statements of earnings when the inventory is sold.

## Loss Contingencies

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates. See Note 8 for additional information regarding loss contingencies.

## Income Taxes

We account for income taxes using the asset and liability method. Deferred tax assets and liabilities are measured using enacted tax rates in the respective jurisdictions in which we operate. Deferred taxes are not provided on the unremitted earnings of subsidiaries outside of the United States when it is expected that these earnings are permanently reinvested.

Tax benefits from uncertain tax positions are recognized when it is more likely than not that the position will be sustained upon examination of the technical merits of the position, including resolutions of any related appeals or litigation processes. The amount recognized is measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon settlement. See Note 7 for additional information regarding income taxes.

## Other Accrued Liabilities

Other accrued liabilities represent various current obligations, including certain accrued operating expenses and taxes payable.

## Noncontrolling Interests and Redeemable Noncontrolling Interests

Noncontrolling interests represent the portion of net earnings, comprehensive income and net assets that is not attributable to Cardinal Health, Inc.

The redeemable noncontrolling interests relate to our ownership interest in naviHealth Holdings, LLC. ("naviHealth"), which we acquired during fiscal 2016. The redeemable noncontrolling interests are redeemable at the option of the third-party noncontrolling interest holders at any time after the two-year anniversary of the closing, or earlier if a trigger event occurs. As such, the noncontrolling interests have been presented as redeemable noncontrolling interests in our consolidated balance sheets. The noncontrolling interests will be adjusted each period for net earnings and dividends attributable to the noncontrolling interests and changes in the noncontrolling ownership interests, if any. An additional adjustment to the carrying value of the noncontrolling interests may be required if the redemption value under the terms of the agreement exceeds the carrying value. Changes in the carrying value of the noncontrolling interests related to a change in the redemption value will be recorded through retained earnings and will not affect net earnings attributable to Cardinal Health, Inc. See Note 2 and Note 12 for additional information regarding redeemable noncontrolling interests.

## Share-Based Compensation

Share-based compensation provided to employees is recognized in the consolidated statements of earnings based on the grant date fair value of the awards. The fair value of stock options is determined on the grant date using a lattice valuation model. The fair value of restricted share units and performance share units is determined by the grant date market price of our common shares. The compensation expense associated with nonvested performance share units is dependent on our periodic assessment of the probability of the targets being achieved and our estimate, which may vary over time, of the number of shares that ultimately will be issued. The compensation expense recognized for share-based awards is net of estimated forfeitures and is recognized ratably over the service period of the awards. We classify share-based compensation expense in distribution, selling, general and administrative ("SG&A") expenses to correspond with the same line item as the majority of the cash compensation paid to employees. If awards are modified in connection with a restructuring activity, the incremental share-based compensation expense is classified in restructuring and employee severance. See Note 16 for additional information regarding share-based compensation.

## Dividends

We paid cash dividends per common share of $1.55, $1.37 and $1.21 in fiscal 2016, 2015 and 2014, respectively.

## Revenue Recognition

We recognize revenue when persuasive evidence of an arrangement exists, product delivery has occurred or the services have been rendered, the price is fixed or determinable, and collectability is reasonably assured.

**Pharmaceutical Segment**

The Pharmaceutical segment recognizes distribution revenue when title transfers to its customers and we have no further obligation to provide services related to such merchandise.

Revenue for deliveries that are directly shipped to customers from the manufacturer when we act as an intermediary in the ordering and delivery of products is recorded gross. This is in accordance with accounting standards addressing reporting revenue on a gross basis as a principal versus on a net basis as an agent. This revenue is recorded on a gross basis since we incur credit risk from the customer, bear the risk of loss for incomplete shipments and do not receive a separate fee or commission for the transaction and, as such, are the primary obligor. Revenue from these sales is recognized when title transfers to the customer and we have no further obligation to provide services related to such merchandise.

Radiopharmaceutical revenue is recognized upon delivery of the product to the customer and we have no further obligation to provide services related to such merchandise.

**Medical Segment**

The Medical segment recognizes revenue when title transfers to its customers and we have no further obligation to provide services related to such products.

## Sales Returns and Allowances

Revenue is recorded net of sales returns and allowances. Our customer return policies generally require that the product be physically returned, subject to restocking fees, in a condition suitable to be added back to inventory and resold at full value, or returned to vendors for credit ("merchantable product"). Product returns are generally consistent throughout the year and typically are not specific to any particular product or customer.

We accrue for estimated sales returns and allowances at the time of sale based upon historical customer return trends, margin rates and processing costs. Our accrual for sales returns is reflected as a reduction of revenue and cost of products sold for the sales price and cost, respectively. At June 30, 2016 and 2015, the accrual for estimated sales returns and allowances was $386 million and $305 million, respectively, the impact of which is reflected in trade receivables, net and inventories, net in the consolidated balance sheets. Sales returns and allowances were $2.2 billion, $2.0 billion and $1.7 billion, for fiscal 2016, 2015 and 2014, respectively.

## Third-Party Returns

Since we generally do not accept non-merchantable product returns from our customers, many of our customers return non-merchantable pharmaceutical products to the manufacturer through third parties. Since our customers generally do not have a direct relationship with manufacturers, our vendors pass the value of such returns to us (usually in the form of an accounts payable deduction) for distribution to customers. We, in turn, pass the value received, less an administrative fee, to our customer. In certain instances, we pass the estimated value of the return to our customer prior to our receipt of the value from the vendor. Although we believe we have satisfactory protections, we could be subject to claims from customers or vendors if our administration of this overall process was deficient in some

respect or our contractual terms with vendors are in conflict with our contractual terms with our customers. We have maintained reserves for some of these situations based on their nature and our historical experience with their resolution.

## Shipping and Handling

Shipping and handling costs are primarily included in SG&A expenses in our consolidated statements of earnings. Shipping and handling costs include all delivery expenses as well as all costs to prepare the product for shipment to the end customer. Shipping and handling costs were $504 million, $454 million and $430 million, for fiscal 2016, 2015 and 2014, respectively. Revenue received for shipping and handling was immaterial for all periods presented.

## Restructuring and Employee Severance

We consider restructuring activities to be programs by which we fundamentally change our operations, such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel) and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions). See Note 3 for additional information regarding our restructuring activities.

## Amortization and Other Acquisition-Related Costs

We classify certain costs incurred in connection with acquisitions as amortization and other acquisition-related costs in our consolidated statements of earnings. These costs consist of amortization of acquisition-related intangible assets, transaction costs, integration costs and changes in the fair value of contingent consideration obligations. Transaction costs are incurred during the initial evaluation of a potential acquisition and primarily relate to costs to analyze, negotiate and consummate the transaction as well as due diligence activities. Integration costs relate to activities required to combine the operations of an acquired enterprise into our operations and, in the case of the Cordis business, to stand-up the systems and processes needed to support its global footprint. We record changes in the fair value of contingent consideration obligations relating to acquisitions as income or expense in amortization and other acquisition-related costs. See Note 4 for additional information regarding amortization of acquisition-related intangible assets and Note 10 for additional information regarding contingent consideration.

## Translation of Foreign Currencies

Financial statements of our subsidiaries outside the United States are generally measured using the local currency as the functional currency. Adjustments to translate the assets and liabilities of these foreign subsidiaries into U.S. dollars are accumulated in shareholders' equity through AOCI utilizing period-end exchange rates. Revenues and expenses of these foreign subsidiaries are translated using average exchange rates during the year.

The foreign currency translation gains/(losses) included in AOCI at June 30, 2016 and 2015 are presented in Note 13. Foreign currency transaction gains and losses for the period are included in the

consolidated statements of earnings in their respective financial statement line item.

## Interest Rate, Currency and Commodity Risk

All derivative instruments are recognized at fair value on the consolidated balance sheets and all changes in fair value are recognized in net earnings or shareholders' equity through AOCI, net of tax.

For contracts that qualify for hedge accounting treatment, the hedge contracts must be effective at reducing the risk associated with the exposure being hedged and must be designated as a hedge at the inception of the contract. Hedge effectiveness is assessed periodically. Any contract not designated as a hedge, or so designated but ineffective, is adjusted to fair value and recognized immediately in net earnings. If a fair value or cash flow hedge ceases to qualify for hedge accounting treatment, the contract continues to be carried on the balance sheet at fair value until settled and future adjustments to the contract's fair value are recognized immediately in net earnings. If a forecasted transaction is probable not to occur, amounts previously deferred in AOCI are recognized immediately in net earnings. See Note 11 for additional information regarding our derivative instruments, including the accounting treatment for instruments designated as fair value, cash flow and economic hedges.

## Fair Value Measurements

Fair value is defined as the price that would be received upon selling an asset or the price paid to transfer a liability on the measurement date. It focuses on the exit price in the principal or most advantageous market for the asset or liability in an orderly transaction between willing market participants. A three-tier fair value hierarchy is established as a basis for considering such assumptions and for inputs used in the valuation methodologies in measuring fair value. This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair values are:

Level 1 - Observable prices in active markets for identical assets and liabilities.

Level 2 - Observable inputs other than quoted prices in active markets for identical assets and liabilities.

Level 3 - Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets and liabilities.

See Note 10 for additional information regarding fair value measurements.

## Recent Financial Accounting Standards

In June 2016, the Financial Accounting Standards Board ("FASB") issued amended accounting guidance that will require entities to measure credit losses on trade and other receivables, held-to-maturity debt securities, loans and other instruments using an "expected credit loss" model that considers historical experience, current conditions and reasonable supportable forecasts. This guidance also requires that credit losses on available-for-sale debt securities with unrealized losses be recognized as allowances rather than as deductions in the amortized cost of the securities. This

guidance will be effective for us in the first quarter of fiscal 2021. We are currently evaluating the impact of adoption on our consolidated financial statements.

In March 2016, the FASB issued amended accounting guidance that will change the accounting for certain aspects of share-based compensation to employees. The guidance requires all income tax effects of share-based awards to be recognized in the statement of earnings as awards vest or are settled. Additionally, the guidance increases the amount employers can withhold in shares to cover employee income taxes without requiring liability classification and allows a policy election for accounting for forfeitures. This guidance will be effective for us in the first quarter of fiscal 2018, with early adoption permitted. We are currently evaluating the impact of the adoption on our consolidated financial statements and the timing of adoption.

In February 2016, the FASB issued amended accounting guidance that requires lessees to recognize most leases on the balance sheet as a lease liability and corresponding right-of-use asset. This guidance will be effective for us in the first quarter of fiscal 2020, with early adoption permitted. We are currently evaluating the impact of the adoption on our consolidated financial statements.

In January 2016, the FASB issued amended accounting guidance intended to improve the recognition and measurement of financial instruments. The amended guidance primarily changes the accounting for equity investments, financial liabilities under the fair value option, the method for assessing the realizability of deferred tax assets related to available-for-sale securities, and the presentation and disclosure requirements for financial instruments. This classification and measurement guidance will be effective for us in the first quarter of fiscal 2019, with early adoption permitted. We are currently evaluating the impact of the adoption on our consolidated financial statements.

In November 2015, the FASB issued amended accounting guidance that simplifies the accounting for income taxes. Under this amended guidance, deferred tax assets and liabilities must be classified as noncurrent on the balance sheet instead of separating deferred tax items into current and noncurrent amounts. We adopted this guidance on a prospective basis in the second quarter of fiscal 2016. In accordance with the adoption of this guidance, balances were not retrospectively adjusted. Upon adoption of this guidance, current deferred tax assets of $20 million and current deferred tax liabilities of $1.1 billion in our December 31, 2015 condensed consolidated balance sheet were reclassified as noncurrent. The adoption of this guidance had no impact on our consolidated statements of earnings, comprehensive income or cash flows.

In September 2015, the FASB issued amended accounting guidance that eliminates the requirement that an acquirer in a business combination account for measurement-period adjustments on a retrospective basis. Under this amended guidance, the acquirer will recognize a measurement-period adjustment during the period in which it determines the amount of the adjustment. We adopted this guidance in the second quarter of fiscal 2016. The adoption of this guidance did not materially impact our consolidated financial statements.

In July 2015, the FASB issued amended accounting guidance that simplifies the current guidance surrounding the measurement of inventory. Under this amended guidance, inventory is measured at the lower of cost and net realizable value, which eliminates the need to determine replacement cost and evaluate whether the inventory is above or below net realizable value. Net realizable value is defined as the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. The amended guidance does not apply to inventory measured under the LIFO method. This amendment will be effective for us in the first quarter of fiscal 2018. We are currently evaluating the impact of adoption on our financial position and results of operations.

In April 2015, the FASB issued amended accounting guidance that clarifies the circumstances under which a cloud computing customer would account for the arrangement as a license of internal-use software. If it is determined that a software license does not exist in the arrangement, the customer would account for this arrangement as a service contract. This amendment will be effective for us in the first quarter of fiscal 2017. We do not expect the adoption to have a material impact on our financial position or results of operations.

Also in April 2015, the FASB issued amended accounting guidance related to the presentation of debt issuance costs in the financial statements. This guidance requires an entity to present such costs in the balance sheet as a direct deduction from the related debt rather than as an asset. This amendment will be effective for us in the first quarter of fiscal 2017. Adoption of the guidance would reclassify debt issuance costs from other assets to long-term obligations, less current portion within the consolidated balance sheet. We do not expect the adoption to have a material impact on our financial position or results of operations.

In August 2014, the FASB issued amended accounting guidance related to uncertainties about an entity's ability to continue as a going concern. This guidance requires management to evaluate whether there is substantial doubt about a company's ability to continue as a going concern. This amendment will be effective for us in the fourth quarter of fiscal 2017, with early adoption permitted. We do not expect the adoption of this guidance to impact our financial statement disclosures.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. In July 2015, the FASB deferred the effective date for one year beyond the originally specified effective date. This amendment will be effective for us in the first quarter of fiscal 2019. We are in the process of assessing any differences between the amended and existing guidance that could impact our consolidated financial statements and continuing to evaluate the options for adoption.

In April 2014, the FASB issued amended accounting guidance related to the reporting of discontinued operations and disclosures of disposals of components of an entity. The amended guidance changes the thresholds for disposals to qualify as discontinued operations and requires additional disclosures. We adopted this guidance in the first quarter of fiscal 2016. The adoption of this guidance did not impact our consolidated financial statements.

## 2. Acquisitions

During fiscal 2016, we completed several acquisitions, the most significant of which are described in more detail below. The pro forma results of operations and the results of operations for acquired businesses since the acquisition dates have not been separately disclosed because the effects were not significant compared to the consolidated financial statements, individually or in the aggregate.

### Cordis

On October 2, 2015, we acquired Cordis from Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, for $1.9 billion using cash on hand and proceeds from our debt offering in June 2015. The acquisition of Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions with operations in more than 50 countries, expands our Medical segment's portfolio of self-manufactured products and its geographic scope. We closed the Cordis acquisition in 20 principal countries on October 2, 2015, and acquired control of, as described in GAAP, and the rights to, the net economic benefit from the entire Cordis business in the remaining countries at that time. We are in the process of transitioning legal ownership in the remaining non-principal countries, which we expect to complete by the end of calendar 2017. The results for the entire Cordis business in all countries are included in the consolidated financial statements beginning October 2, 2015.

Transaction and integration costs associated with the acquisition of Cordis were $78 million and $44 million during fiscal 2016 and 2015, respectively, and are included in amortization and other acquisition-related costs in the consolidated statements of earnings.

### naviHealth

On August 26, 2015, we acquired a 71 percent ownership interest in naviHealth for $238 million, net of cash acquired of $53 million. We funded the acquisition with cash on hand. The acquisition of naviHealth, a leader in post-acute care management solutions, expands our ability to serve hospitals, other healthcare providers, and payers. We consolidate the results of naviHealth in our consolidated financial statements and report its consolidated results in our Medical segment. The terms of the agreement provide us with the option to acquire any remaining noncontrolling interests at any time after the two-year anniversary of the closing. The third-party noncontrolling interest holders also hold an option, which allows them to sell their noncontrolling interests to us at any time after the two-year anniversary of the closing, or earlier if a trigger event occurs. Refer to Note 12 for further information on the redeemable noncontrolling interests. We also completed acquisitions within naviHealth during fiscal 2016 for $242 million, which were paid in cash.

## Harvard Drug

On July 2, 2015, we completed the acquisition of The Harvard Drug Group ("Harvard Drug") for $1.1 billion using cash on hand and proceeds from our debt offering in June 2015. The acquisition of Harvard Drug, a distributor of generic pharmaceuticals, over-the-counter healthcare and related products to retail, institutional, and alternate care customers, enhances our Pharmaceutical segment's generic pharmaceutical distribution and related services businesses. Harvard Drug also repackages generic pharmaceuticals and over-the-counter healthcare products.

## Fair Value of Assets Acquired and Liabilities Assumed

The allocation of the purchase price for the acquisitions of Cordis, naviHealth and Harvard Drug are not yet finalized and are subject to adjustment as we complete the valuation analysis for these acquisitions. The purchase prices were subject to adjustment based on working capital requirements as set forth in the acquisition agreements.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed as of the acquisition dates for Cordis, naviHealth and Harvard Drug:

| (in millions) | Cordis | naviHealth | Harvard Drug |
|---|---|---|---|
| **Identifiable intangible assets:** | | | |
| Customer relationships (1) | $ 225 | $ 38 | $ 470 |
| Trade names (2) | 125 | 16 | 130 |
| Developed technology (3) | 395 | 61 | — |
| In-process research and development (4) | 55 | — | — |
| Total identifiable intangible assets acquired | 800 | 115 | 600 |
| | | | |
| Cash and equivalents | — | 53 | 44 |
| Trade receivables | — | 38 | 67 |
| Inventories | 207 | — | 49 |
| Prepaid expenses and other | 4 | 14 | 11 |
| Property and equipment | 97 | 5 | 16 |
| Other assets | 20 | 1 | — |
| Accounts payable | (93) | (2) | (47) |
| Other accrued liabilities | (16) | (95) | (37) |
| Deferred income taxes and other liabilities | (7) | (48) | (188) |
| Redeemable noncontrolling interests | — | (119) | — |
| Total identifiable net assets/ (liabilities) acquired | 1,012 | (38) | 515 |
| Goodwill | 861 | 329 | 634 |
| **Total net assets acquired** | $ 1,873 | $ 291 | $ 1,149 |

(1) The weighted-average useful lives of customer relationships range from 4 to 13 years.

(2) The weighted-average useful lives of trade names range from 10 to 17 years.

(3) The weighted-average useful life of developed technology is 10 years.

(4) Acquired in-process research and development intangible assets have an indefinite life.

## 3. Restructuring and Employee Severance

The following tables summarize restructuring and employee severance costs:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Employee-related costs (1) | $ 15 | $ 34 | $ 13 |
| Facility exit and other costs (2) | 10 | 10 | 18 |
| **Total restructuring and employee severance** | $ 25 | $ 44 | $ 31 |

(1) Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2) Facility exit and other costs primarily consist of lease termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | Facility Exit and Other Costs | Total |
|---|---|---|---|
| Balance at June 30, 2013 | $ 55 | $ 2 | $ 57 |
| Additions | 23 | 1 | 24 |
| Payments and other adjustments | (54) | (3) | (57) |
| Balance at June 30, 2014 | $ 24 | $ — | $ 24 |
| Additions | 34 | 1 | 35 |
| Payments and other adjustments | (36) | (1) | (37) |
| Balance at June 30, 2015 | $ 22 | $ — | $ 22 |
| Additions | 17 | 2 | 19 |
| Payments and other adjustments | (24) | (1) | (25) |
| **Balance at June 30, 2016** | $ 15 | $ 1 | $ 16 |

## 4. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical (1) | Medical | Total |
|---|---|---|---|
| Balance at June 30, 2014 | $ 2,158 | $ 2,720 | $ 4,878 |
| Goodwill acquired, net of purchase price adjustments | 41 | 179 | 220 |
| Foreign currency translation adjustments and other | — | (28) | (28) |
| Balance at June 30, 2015 | $ 2,199 | $ 2,871 | $ 5,070 |
| Goodwill acquired, net of purchase price adjustments | 738 | 1,382 | 2,120 |
| Foreign currency translation adjustments and other | (18) | (5) | (23) |
| **Balance at June 30, 2016** | $ 2,919 | $ 4,248 | $ 7,167 |

(1) At June 30, 2016 the accumulated goodwill impairment loss was $829 million.

The increase in the Pharmaceutical segment goodwill during fiscal 2016 is primarily due to the Harvard Drug acquisition. Goodwill recognized in connection with this acquisition primarily represents the expected benefits from synergies of integrating this business, the

existing workforce of the acquired entity and the expected growth from new customers. The goodwill acquired in connection with the Harvard Drug acquisition is not deductible for tax purposes.

The increase in the Medical segment goodwill during fiscal 2016 is primarily due to the Cordis and naviHealth acquisitions. Goodwill recognized in connection with the Cordis acquisition primarily represents the expected benefits from synergies of integrating the business, the existing workforce of the acquired entity, the expected growth from new customers and the expected growth from improvements to existing technology. The majority of the goodwill acquired in connection with the acquisition of Cordis is deductible for tax purposes. Goodwill recognized in connection with the naviHealth acquisition primarily represents the existing workforce of the acquired entity, expected growth from new customers, new service offerings and the expected growth from improvements to existing technology. The goodwill acquired in connection with the naviHealth acquisition is not deductible for tax purposes.

See Note 2 for further discussion of these acquisitions.

## Other Intangible Assets

The following tables summarize other intangible assets by class at June 30:

| (in millions) | 2016 | | | |
| --- | --- | --- | --- | --- |
| | Gross Intangible | Accumulated Amortization | Net Intangible | Weighted-Average Remaining Amortization Period (Years) |
| **Indefinite-life intangibles:** | | | | |
| IPR&D, trademarks and other | $ 72 | $ — | $ 72 | N/A |
| Total indefinite-life intangibles | 72 | — | 72 | N/A |
| **Definite-life intangibles:** | | | | |
| Customer relationships | **1,946** | 737 | 1,209 | 9 |
| Trademarks, trade names, and patents | **508** | 140 | 368 | 13 |
| Developed technology and other | **808** | 198 | 610 | 8 |
| Total definite-life intangibles | **3,262** | 1,075 | 2,187 | 10 |
| **Total other intangible assets** | $ **3,334** | $ 1,075 | $ 2,259 | N/A |

| (in millions) | 2015 | | |
| --- | --- | --- | --- |
| | Gross Intangible | Accumulated Amortization | Net Intangible |
| **Indefinite-life intangibles:** | | | |
| Trademarks and other | $ 14 | $ — | $ 14 |
| Total indefinite-life intangibles | 14 | — | 14 |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,103 | 501 | 602 |
| Trademarks, trade names, and patents | 237 | 91 | 146 |
| Developed technology and other | 320 | 134 | 186 |
| Total definite-life intangibles | 1,660 | 726 | 934 |
| **Total other intangible assets** | $ 1,674 | $ 726 | $ 948 |

Total amortization of intangible assets was $355 million, $191 million and $188 million for fiscal 2016, 2015 and 2014, respectively. Estimated annual amortization of intangible assets for fiscal 2017 through 2021 is as follows: $376 million, $345 million, $276 million, $250 million and $203 million.

## 5. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. We held the following investments in marketable securities at fair value at June 30:

| (in millions) | 2016 | 2015 |
| --- | --- | --- |
| **Current available-for-sale securities:** | | |
| Commercial paper | $ — | $ 4 |
| Treasury bills | 3 | 12 |
| International bonds | 2 | 2 |
| Corporate bonds | 58 | 34 |
| U.S. agency bonds | 6 | 5 |
| Asset-backed securities | 28 | 8 |
| International equity securities | 2 | — |
| U.S. agency mortgage-backed securities | 14 | 26 |
| Total current available-for-sale securities | 113 | 91 |
| **Long-term available-for-sale securities:** | | |
| Treasury bills | 10 | — |
| International bonds | 1 | — |
| Corporate bonds | 36 | 33 |
| U.S. agency bonds | 9 | 18 |
| Asset-backed securities | 17 | 41 |
| U.S. agency mortgage-backed securities | 14 | 10 |
| Total long-term available-for-sale securities | 87 | 102 |
| **Total available-for-sale securities** | $ 200 | $ 193 |

Gross unrealized gains and losses were immaterial at both June 30, 2016 and 2015. During fiscal 2016, 2015 and 2014 gross realized gains and losses were immaterial and we did not recognize any other-than-temporary impairments. At June 30, 2016, the weighted-average effective maturity of our current and long-term investments was approximately 6 months and 15 months, respectively.

## 6. Long-Term Obligations and Other Short-Term Borrowings

The following table summarizes long-term obligations and other short-term borrowings at June 30:

| (in millions) | | 2016 | | 2015 |
|---|---|---|---|---|
| 1.7% Notes due 2018 | $ | 405 | $ | 404 |
| 1.9% Notes due 2017 | | 251 | | 251 |
| 1.95% Notes due 2018 | | 554 | | 550 |
| 2.4% Notes due 2019 | | 461 | | 450 |
| 3.2% Notes due 2022 | | 253 | | 249 |
| 3.2% Notes due 2023 | | 549 | | 549 |
| 3.5% Notes due 2024 | | 398 | | 398 |
| 3.75% Notes due 2025 | | 505 | | 500 |
| 4.5% Notes due 2044 | | 345 | | 345 |
| 4.6% Notes due 2043 | | 349 | | 349 |
| 4.625% Notes due 2020 | | 528 | | 524 |
| 4.9% Notes due 2045 | | 450 | | 450 |
| 7.0% Debentures due 2026 | | 124 | | 124 |
| 7.8% Debentures due 2016 | | 37 | | 37 |
| Other obligations | | 330 | | 312 |
| Total | $ | 5,539 | $ | 5,492 |
| Less: current portion of long-term obligations and other short-term borrowings | | 587 | | 281 |
| Long-term obligations, less current portion | $ | 4,952 | $ | 5,211 |

Maturities of existing long-term obligations and other short-term borrowings for fiscal 2017 through 2021 and thereafter are as follows: $587 million, $982 million, $3 million, $463 million, $529 million and $2,975 million.

### Long-Term Debt

The 1.7%, 1.9%, 1.95%, 2.4%, 3.2%, 3.2%, 3.5%, 3.75%, 4.5%, 4.6%, 4.625% and 4.9% Notes represent unsecured obligations of Cardinal Health, Inc. and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. The 7.0% and 7.8% Debentures represent unsecured obligations of Allegiance Corporation (a wholly-owned subsidiary), which Cardinal Health, Inc. has guaranteed. None of these obligations are subject to a sinking fund and the Allegiance obligations are not redeemable prior to maturity. Interest is paid pursuant to the terms of the obligations. These notes are effectively subordinated to the liabilities of our subsidiaries, including trade payables of $17 billion.

In June 2015, we sold $550 million aggregate principal amount of 1.95% Notes that mature on June 15, 2018, $500 million aggregate principal amount of 3.75% Notes that mature on September 15, 2025, and $450 million aggregate principal amount of 4.9% Notes that mature on September 15, 2045. We used the net proceeds from the offering to pay part of the purchase price to acquire Harvard Drug on July 2, 2015 and Cordis on October 2, 2015, as discussed further in Note 2.

In November 2014, we sold $450 million aggregate principal amount of 2.4% Notes that mature on November 15, 2019, $400 million

aggregate principal amount of 3.5% Notes that mature on November 15, 2024 and $350 million aggregate principal amount of 4.5% Notes that mature on November 15, 2044.

In December 2014, we used the net proceeds from the November 2014 offering, together with cash on hand, to redeem all of the outstanding 4.0% Notes due 2015, 5.8% Notes due 2016, 5.85% Notes due 2017 and 6.0% Notes due 2017 at a redemption price equal to 100% of the principal amount and any accrued but unpaid interest, plus the applicable make-whole premium. As a result of the redemption, we incurred a loss on the extinguishment of debt of $60 million ($37 million, net of tax), which included a make-whole premium of $80 million, write-off of $2 million of unamortized debt issuance costs, and an offsetting $22 million fair value adjustment to the respective debt related to previously terminated interest rate swaps.

The 1.7% Notes due 2018, 1.9% Notes due 2017, 1.95% Notes due 2018, 2.4% Notes due 2019, 3.2% Notes due 2022, 3.2% Notes due 2023, 3.5% Notes due 2024, 3.75% Notes due 2025, 4.5% Notes due 2044, 4.6% Notes due 2043, 4.625% Notes due 2020 and 4.9% Notes due 2045 require us to offer to purchase the notes at 101% of the principal amount plus accrued and unpaid interest if we undergo a change of control, as defined in the notes, and if the notes receive specified ratings below investment grade by each of Standard & Poors Ratings Services, Moodys Investors Service, Inc. and Fitch Ratings.

### Other Financing Arrangements

In addition to cash and cash equivalents, our sources of liquidity include a revolving credit facility, which we increased from $1.5 billion at June 30, 2015 to $1.75 billion at June 30, 2016 and a commercial paper program of up to $1.5 billion, backed by the revolving credit facility. The revolving credit facility exists largely to support issuances of commercial paper as well as other short-term borrowings for general corporate purposes. We had no outstanding balance under the revolving credit facility at June 30, 2016 and 2015, respectively. Availability on the revolving credit facility was reduced by outstanding letters of credit of $14 million and zero at June 30, 2016 and 2015, respectively. We had no outstanding borrowings from the commercial paper program at June 30, 2016 and 2015, respectively.

On November 3, 2014, we renewed our committed receivables sales facility program through Cardinal Health Funding, LLC ("CHF") until November 3, 2017 and increased the size of the facility from $700 million to $950 million. During fiscal 2016, we reduced the size of the committed receivables sales facility program from $950 million to $700 million in connection with the increase of credit under the revolving credit facility as noted above. CHF was organized for the sole purpose of buying receivables and selling undivided interests in those receivables to third-party purchasers. Although consolidated with Cardinal Health, Inc. in accordance with GAAP, CHF is a separate legal entity from Cardinal Health, Inc. and from our subsidiary that sells receivables to CHF. CHF is designed to be a special purpose, bankruptcy-remote entity whose assets are available solely to satisfy the claims of its creditors. We had no outstanding balance under the committed receivable sales facility program at June 30, 2016 and 2015. Availability on the committed

**Notes to Financial Statements**

receivable sales facility program was reduced by outstanding letters of credit of $40 million and $41 million on June 30, 2016 and 2015, respectively.

Our revolving credit facility and committed receivables sales facility program require us to maintain a consolidated leverage ratio of no more than 3.25-to-1 and our committed receivables sales facility also requires us to maintain a consolidated interest coverage ratio, as of the end of any calendar quarter, of at least 4-to-1. As of June 30, 2016, we were in compliance with these financial covenants.

We also maintain other short-term credit facilities and an unsecured line of credit that allowed for borrowings up to $699 million and $439 million at June 30, 2016 and 2015, respectively. The $330 million and $312 million balance of other obligations at June 30, 2016 and 2015, respectively, consisted of short-term borrowings and capital leases.

## 7. Income Taxes

The following table summarizes earnings from continuing operations before income taxes:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| U.S. Operations | $ 2,050 | $ 1,733 | $1,665 |
| Non-U.S. Operations | 226 | 234 | 133 |
| **Earnings from continuing operations before income taxes** | $ 2,276 | $ 1,967 | $1,798 |

The following table summarizes the components of provision for income taxes from continuing operations:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| **Current:** | | | |
| Federal | $ 611 | $ 424 | $ 521 |
| State and local | 74 | 83 | 51 |
| Non-U.S. | 73 | 29 | 37 |
| Total current | $ 758 | $ 536 | $ 609 |
| **Deferred:** | | | |
| Federal | $ 96 | $ 196 | $ 24 |
| State and local | 12 | 24 | 3 |
| Non-U.S. | (21) | (1) | (1) |
| Total deferred | 87 | 219 | 26 |
| **Provision for income taxes** | $ 845 | $ 755 | $ 635 |

The following table presents a reconciliation of the provision based on the federal statutory income tax rate to our effective income tax rate from continuing operations:

| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Provision at Federal statutory rate | 35.0% | 35.0% | 35.0% |
| State and local income taxes, net of federal benefit | 1.5 | 4.1 | 2.2 |
| Foreign tax rate differential | (0.6) | (2.4) | (1.2) |
| Nondeductible/nontaxable items | 1.0 | 0.7 | (0.2) |
| Other | 0.2 | 1.0 | (0.5) |
| **Effective income tax rate** | 37.1% | 38.4% | 35.3% |

The fiscal 2016 effective tax rate was impacted by net favorable discrete items of $29 million, which decreased the rate by 1.3 percentage points. There were no individually significant discrete items.

The fiscal 2015 effective tax rate was impacted by net unfavorable discrete items of $15 million, which increased the rate by 0.8 percentage points. There were no individually significant discrete items.

The fiscal 2014 effective tax rate was impacted by net favorable discrete items of $37 million, which reduced the rate by 2.1 percentage points. The discrete items include the favorable impact of the settlement of federal and state tax controversies ($80 million) and release of valuation allowances ($12 million) and the unfavorable impact of remeasurement of unrecognized tax benefits ($65 million), primarily as a result of proposed assessments of additional tax.

At June 30, 2016, we had $2.1 billion of undistributed earnings from non-U.S. subsidiaries that are intended to be permanently reinvested in non-U.S. operations. Because these earnings are considered permanently reinvested, no U.S. tax provision has been accrued related to the repatriation of these earnings. It is not practicable to estimate the amount of U.S. tax that might be payable on the eventual remittance of such earnings.

Deferred income taxes arise from temporary differences between financial reporting and tax reporting bases of assets and liabilities and operating loss and tax credit carryforwards for tax purposes. The following table presents the components of the deferred income tax assets and liabilities at June 30:

| (in millions) | 2016 | 2015 |
|---|---|---|
| **Deferred income tax assets:** | | |
| Receivable basis difference | $ 44 | $ 47 |
| Accrued liabilities | 133 | 138 |
| Share-based compensation | 56 | 53 |
| Loss and tax credit carryforwards | 193 | 197 |
| Deferred tax assets related to uncertain tax positions | 95 | 100 |
| Other | 46 | 50 |
| Total deferred income tax assets | 567 | 585 |
| Valuation allowance for deferred income tax assets | (93) | (87) |
| **Net deferred income tax assets** | $ 474 | $ 498 |
| | | |
| **Deferred income tax liabilities:** | | |
| Inventory basis differences | $ (1,351) | $ (1,344) |
| Property-related | (172) | (155) |
| Goodwill and other intangibles | (607) | (352) |
| Other | — | (2) |
| **Total deferred income tax liabilities** | $ (2,130) | $ (1,853) |
| **Net deferred income tax liability** | $ (1,656) | $ (1,355) |

**Notes to Financial Statements**

Deferred income tax assets and liabilities in the preceding table, after netting by taxing jurisdiction, are in the following captions in the consolidated balance sheets at June 30:

| (in millions) | 2016 (5) | 2015 |
|---|---|---|
| Current deferred income tax asset (1) | $ — | $ 22 |
| Noncurrent deferred income tax asset (2) | 42 | 17 |
| Current deferred income tax liability (3) | — | (1,066) |
| Noncurrent deferred income tax liability (4) | (1,698) | (328) |
| **Net deferred income tax liability** | $ (1,656) | $ (1,355) |

(1) Included in prepaid expenses and other in the consolidated balance sheets.

(2) Included in other assets in the consolidated balance sheets.

(3) Included in other accrued liabilities in the consolidated balance sheets.

(4) Included in deferred income taxes and other liabilities in the consolidated balance sheets.

(5) In the second quarter of fiscal 2016, we adopted amended accounting guidance that deferred tax assets and liabilities should be classified as noncurrent on the consolidated balance sheet. See Note 1 for further discussion.

At June 30, 2016 we had gross federal, state and international loss and credit carryforwards of $199 million, $1.2 billion and $94 million, respectively, the tax effect of which is an aggregate deferred tax asset of $193 million. Substantially all of these carryforwards are available for at least three years. Approximately $92 million of the valuation allowance at June 30, 2016 applies to certain federal, state and international loss carryforwards that, in our opinion, are more likely than not to expire unutilized. However, to the extent that tax benefits related to these carryforwards are realized in the future, the reduction in the valuation allowance would reduce income tax expense.

We had $527 million, $542 million and $510 million of unrecognized tax benefits at June 30, 2016, 2015 and 2014, respectively. The June 30, 2016, 2015 and 2014 balances include $355 million, $357 million and $322 million, respectively, of unrecognized tax benefits that, if recognized, would have an impact on the effective tax rate. The remaining unrecognized tax benefits relate to tax positions for which ultimate deductibility is highly certain but for which there is uncertainty as to the timing of such deductibility. Recognition of these tax benefits would not affect our effective tax rate. We include the full amount of unrecognized tax benefits in deferred income taxes and other liabilities in the consolidated balance sheets. The following table presents a reconciliation of the beginning and ending amounts of unrecognized tax benefits:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Balance at beginning of fiscal year | $ 542 | $ 510 | $ 650 |
| Additions for tax positions of the current year | 22 | 15 | 16 |
| Additions for tax positions of prior years | 42 | 69 | 94 |
| Reductions for tax positions of prior years | (48) | (42) | (40) |
| Settlements with tax authorities | (30) | (10) | (210) |
| Expiration of the statute of limitations | (1) | — | — |
| **Balance at end of fiscal year** | $ 527 | $ 542 | $ 510 |

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is a net decrease of zero to $155 million, exclusive of penalties and interest.

We recognize accrued interest and penalties related to unrecognized tax benefits in the provision for income taxes. At June 30, 2016, 2015 and 2014, we had $145 million, $169 million and $143 million, respectively, accrued for the payment of interest and penalties. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the consolidated balance sheets. During fiscal 2016 and 2014, we recognized $9 million and $46 million of benefit for interest and penalties in income tax expense, respectively. During fiscal 2015, we recognized $24 million of expense for interest and penalties in income tax expense.

We file income tax returns in the U.S. federal jurisdiction, various U.S. state and local jurisdictions, and various foreign jurisdictions. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2006 through the current fiscal year.

During fiscal 2014, the IRS closed audits of fiscal years 2003 through 2005. The IRS is currently conducting audits of fiscal years 2006 through 2014, and our transfer pricing arrangements continue to be under consideration as part of these audits. While the IRS has made and could make proposed adjustments to our transfer pricing arrangements, or other matters, we are defending our reported tax positions, and have accounted for the unrecognized tax benefits associated with our tax positions.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $172 million and $219 million at June 30, 2016 and 2015, respectively, and is included in other assets in the consolidated balance sheets.

## 8. Commitments, Contingent Liabilities and Litigation

### Commitments
#### Operating Leases
The future minimum rental payments for operating leases having initial or remaining non-cancelable lease terms in excess of one year at June 30, 2016 for fiscal 2017 through 2021 and thereafter are as follows: $119 million, $100 million, $81 million, $67 million, $50 million and $127 million. Rental expense relating to operating leases was $126 million, $104 million and $107 million in fiscal 2016, 2015 and 2014, respectively. Sublease rental income was immaterial for all periods presented.

#### Generic Sourcing Venture With CVS Health Corporation
In July 2014, we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS Health with an initial term of 10 years. Red Oak Sourcing

negotiates generic pharmaceutical supply contracts on behalf of both companies. We are required to pay 39 quarterly payments of $25.6 million to CVS Health which commenced in October 2014. Due to the achievement of predetermined milestones, the quarterly payment to CVS Health increased by $10 million beginning in fiscal 2016 and by an additional $10 million beginning in the first quarter of fiscal 2017, resulting in a maximum quarterly payment of $45.6 million.

## Legal Proceedings

We become involved from time to time in disputes, litigation, and regulatory matters.

We may be named from time to time in *qui tam* actions, which are initiated by private third parties purporting to act on behalf of federal or state governments and which allege that false claims have been submitted or have been caused to be submitted for payment by the government. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own on behalf of the government.

From time to time, we receive subpoenas or requests for information from various government agencies relating to our business or to the business of a customer, supplier, or other industry participant. Most of these matters are resolved without incident; however, such subpoenas or requests can lead to the assertion of claims or the commencement of legal proceedings against us.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators, and product liability claims and lawsuits, including class actions.

We accrue for contingencies related to disputes, litigation, and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

With respect to the matters described below, we are unable to estimate a range of reasonably possible loss for matters for which there is no accrual, or additional loss for matters for which we have recorded an accrual, since damages or fines have not been specified or the proceedings are at stages where significant uncertainty exists as to legal or factual issues and as to whether such matters will proceed to trial. We do not believe, based on currently available information, that the outcomes of these matters will have a material adverse effect on our financial position, results of operations, or cash flows. However, the outcome of one or more of these matters could

be material to our results of operations for a particular quarterly period.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges, net in our consolidated statements of earnings.

### DEA Investigation and Related Matters

In February 2012, the U.S. Drug Enforcement Administration (the "DEA") issued an order to show cause and immediate suspension of our Lakeland, Florida distribution center's registration to distribute controlled substances, asserting that we failed to maintain required controls against the diversion of controlled substances. In May 2012, we entered into a settlement agreement with the DEA that resolved the administrative aspects of the DEA's action but did not resolve potential liability for civil fines in Florida or elsewhere for the conduct covered by the settlement agreement. In that regard, we are continuing to discuss a settlement with the U.S. Department of Justice. We incurred litigation charges of $3 million and $41 million for this matter during fiscal 2016 and 2015, respectively. Our total accrual for this matter at June 30, 2016 and 2015 was $44 million and $41 million, respectively, which is included in other accrued liabilities in the consolidated balance sheets.

### State of West Virginia vs. Cardinal Health, Inc.

Since June 2012, the West Virginia Attorney General has filed complaints against a number of pharmaceutical wholesale distributors, including us. The complaints, which were filed in the Circuit Court of Boone County, West Virginia, allege, among other things, that the distributors failed to maintain effective controls to guard against diversion of controlled substances in West Virginia, failed to report suspicious orders of controlled substances in accordance with the West Virginia Uniform Controlled Substances Act, and were negligent in distributing controlled substances to pharmacies that serve individuals who abuse controlled substances. The complaints seek, among other things, injunctive and other equitable relief and monetary damages. We are vigorously defending ourselves in this matter.

### Product Liability Lawsuits

We and our Cordis business have been named as defendants in product liability lawsuits, including at August 9, 2016, 18 lawsuits involving claims by approximately 180 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these matters.

### Antitrust Litigation Proceeds

We received and recognized income resulting from settlements of class action antitrust lawsuits, in which we were a class member, of $80 million, $71 million and $24 million during fiscal 2016, 2015 and 2014, respectively.

## 9. Guarantees

In the ordinary course of business, we agree to indemnify certain other parties under acquisition and disposition agreements, customer agreements, intellectual property licensing agreements, and other agreements. Such indemnification obligations vary in scope and, when defined, in duration. In many cases, a maximum obligation is not explicitly stated, and therefore the overall maximum amount of the liability under such indemnification obligations cannot be reasonably estimated. Where appropriate, such indemnification obligations are recorded as a liability. Historically, we have not, individually or in the aggregate, made payments under these indemnification obligations in any material amounts. In certain circumstances, we believe that existing insurance arrangements, subject to the general deduction and exclusion provisions, would cover portions of the liability that may arise from these indemnification obligations. In addition, we believe that the likelihood of a material liability being triggered under these indemnification obligations is not probable.

From time to time we enter into agreements that obligate us to make fixed payments upon the occurrence of certain events. Such obligations primarily relate to obligations arising under acquisition transactions, where we have agreed to make payments based upon the achievement of certain financial performance measures by the acquired business. Generally, the obligation is capped at an explicit amount. See Note 10 for detail regarding contingent consideration obligations.

## 10. Fair Value Measurements

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at June 30:

| (in millions) | 2016 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 516 | $ — | $ — | $ 516 |
| Forward contracts (1) | — | 19 | — | 19 |
| Available-for-sale securities (2) | — | 200 | — | 200 |
| Other investments (3) | 103 | — | — | 103 |
| **Liabilities:** | | | | |
| Contingent Consideration (4) | — | — | (19) | (19) |

| (in millions) | 2015 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 1,809 | $ — | $ — | $ 1,809 |
| Forward contracts (1) | — | 5 | — | 5 |
| Available-for-sale securities (2) | — | 193 | — | 193 |
| Other investments (3) | 111 | — | — | 111 |
| **Liabilities:** | | | | |
| Contingent Consideration (4) | — | — | (53) | (53) |

(1) The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using

discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the consolidated balance sheets.

(2) We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 5 for additional information regarding available-for-sale securities.

(3) The other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(4) Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods, and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
| --- | --- |
| Balance at June 30, 2014 | $ 12 |
| Additions from acquisitions | 40 |
| Changes in fair value of contingent consideration (1) | 8 |
| Payment of contingent consideration | (7) |
| Balance at June 30, 2015 | $ 53 |
| Additions from acquisitions | 7 |
| Changes in fair value of contingent consideration (1) | (16) |
| Payment of contingent consideration | (25) |
| **Balance at June 30, 2016** | $ 19 |

(1) Amount is included in amortization and other acquisition-related costs in the consolidated statements of earnings.

## 11. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk, and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to current fair value through earnings at the end of each period.

We are exposed to counterparty credit risk on all of our derivative instruments. Accordingly, we have established and maintain strict

counterparty credit guidelines and only enter into derivative instruments with major financial institutions that are investment grade or better. We do not have significant exposure to any one counterparty and we believe the risk of loss is remote. Additionally, we do not require collateral under these agreements.

## Interest Rate Risk Management

We are exposed to the impact of interest rate changes. Our objective is to manage the impact of interest rate changes on cash flows and the market value of our borrowings. We utilize a mix of debt maturities along with both fixed-rate and variable-rate debt to manage changes in interest rates. In addition, we enter into interest rate swaps to further manage our exposure to interest rate variations related to our borrowings and to lower our overall borrowing costs.

## Currency Exchange Risk Management

We conduct business in several major international currencies and are subject to risks associated with changing foreign exchange rates. Our objective is to reduce earnings and cash flow volatility associated with foreign exchange rate changes to allow management to focus its attention on business operations. Accordingly, we enter into various contracts that change in value as foreign exchange rates change to protect the value of existing foreign currency assets and liabilities, commitments and anticipated foreign currency revenue and expenses.

## Commodity Price Risk Management

We are exposed to changes in the price of certain commodities. Our objective is to reduce earnings and cash flow volatility associated with forecasted purchases of these commodities to allow management to focus its attention on business operations. Accordingly, we enter into derivative contracts when possible to manage the price risk associated with certain forecasted purchases.

The following table summarizes the fair value of our assets and liabilities related to derivatives designated as hedging instruments and the respective line items in which they were recorded in the consolidated balance sheets at June 30:

| (in millions) | 2016 | | 2015 | |
|---|---|---|---|---|
| **Assets:** | | | | |
| Foreign currency contracts (1) | $ | **1** | $ | 3 |
| Pay-floating interest rate swaps (2) | | **33** | | 8 |
| Pay-floating interest rate swaps (1) | | **1** | | — |
| **Total assets** | $ | **35** | $ | 11 |
| | | | | |
| **Liabilities:** | | | | |
| Foreign currency contracts (3) | $ | **3** | $ | 2 |
| Forward interest rate swaps (4) | | **10** | | — |
| Pay-floating interest rate swaps (4) | | **—** | | 1 |
| Commodity contracts (3) | | **2** | | 2 |
| Commodity contracts (4) | | **1** | | 1 |
| **Total liabilities** | $ | **16** | $ | 6 |

(1)    Included in prepaid expenses and other in the consolidated balance sheets.
(2)    Included in other assets in the consolidated balance sheets.
(3)    Included in other accrued liabilities in the consolidated balance sheets.
(4)    Included in deferred income taxes and other liabilities in the consolidated balance sheets.

## Fair Value Hedges

We enter into pay-floating interest rate swaps to hedge the changes in the fair value of fixed-rate debt resulting from fluctuations in interest rates. These contracts are designated and qualify as fair value hedges. Accordingly, the gain or loss recorded on the pay-floating interest rate swaps is directly offset by the change in fair value of the underlying debt. Both the derivative instrument and the underlying debt are adjusted to market value at the end of each period with any resulting gain or loss recorded in interest expense, net in the consolidated statements of earnings.

During fiscal 2016, we entered into pay-floating interest rate swaps with total notional amounts of $600 million. These swaps have been designated as fair value hedges of our fixed rate debt and are included in other assets in the consolidated balance sheets.

During fiscal 2016, we terminated notional amounts of $250 million of pay-floating interest rate swaps that were previously designated as fair value hedges.

During fiscal 2015, we entered into pay-floating interest rate swaps with total notional amounts of $1,050 million, of which $250 million and $450 million was in connection with the registered debt offerings in June 2015 and November 2014, respectively. These swaps have been designated as fair value hedges of our fixed rate debt and are included in other assets in the consolidated balance sheets.

Also during fiscal 2015, we terminated notional amounts of $875 million of pay-floating interest rate swaps in connection with the debt redemption in December 2014 as described in Note 6. These swaps were previously designated as fair value hedges.

The following tables summarize the outstanding interest rate swaps designated as fair value hedges at June 30:

| (in millions) | 2016 | | |
| | Notional Amount | Maturity Date | |
|---|---|---|---|
| Pay-floating interest rate swaps | $ 1,963 | Jun 2017 | - Sep 2025 |

| (in millions) | 2015 | | |
| | Notional Amount | Maturity Date | |
|---|---|---|---|
| Pay-floating interest rate swaps | $ 1,613 | Jun 2017 | - Jun 2022 |

The following table summarizes the gain/(loss) recognized in earnings for interest rate swaps designated as fair value hedges:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Pay-floating interest rate swaps (1) (2) | $ 23 | $ 14 | $ 23 |
| Fixed-rate debt (1) | (23) | (14) | (23) |

(1) Included in interest expense, net in the consolidated statements of earnings.

(2) Fiscal 2015 excludes $22 million fair value adjustment to the previously terminated interest rate swaps as a result of the December 2014 debt extinguishment as disclosed in Note 6.

There was no ineffectiveness associated with these derivative instruments for any periods presented.

## Cash Flow Hedges

We enter into derivative instruments to hedge our exposure to changes in cash flows attributable to interest rate, foreign currency and commodity price fluctuations associated with certain forecasted transactions. These derivative instruments are designated and qualify as cash flow hedges. Accordingly, the effective portion of the gain or loss on the derivative instrument is reported as a component of other comprehensive income and reclassified into earnings in the same line item associated with the forecasted transaction and in the same period during which the hedged transaction affects earnings. The ineffective portion of the gain or loss on the derivative instrument is recognized in earnings immediately.

During fiscal 2016 and 2015 we entered into forward interest rate swaps with a total notional amount of $300 million and $850 million, respectively, to hedge probable, but not firmly committed, future transactions associated with our debt.

Additionally, during fiscal 2015 we terminated $1,150 million in forward interest rate swaps that were previously designated as cash-flow hedges.

We enter into foreign currency contracts to protect the value of anticipated foreign currency revenues and expenses. At June 30, 2016 and 2015, we held contracts to hedge probable, but not firmly committed, revenue and expenses. The principal currencies hedged are the Canadian dollar, Mexican peso, Thai baht, Chinese renminbi and euro.

We enter into commodity contracts to manage the price risk associated with forecasted purchases of certain commodities used in our Medical segment.

The following tables summarize the outstanding cash flow hedges at June 30:

| (in millions) | 2016 | | |
| | Notional Amount | Maturity Date | |
|---|---|---|---|
| Forward interest rate swaps | $ 300 | Jun 2018 | - Jun 2028 |
| Foreign currency contracts | 183 | Jul 2016 | - Jun 2017 |
| Commodity contracts | 22 | Jul 2016 | - Mar 2019 |

| (in millions) | 2015 | | |
| | Notional Amount | Maturity Date | |
|---|---|---|---|
| Foreign currency contracts | 146 | Jul 2015 | - Jun 2016 |
| Commodity contracts | 22 | Jul 2015 | - Mar 2018 |

The following table summarizes the gain/(loss) included in AOCI for derivative instruments designated as cash flow hedges at June 30:

| (in millions) | 2016 | 2015 |
|---|---|---|
| Forward interest rate swaps | $ (10) | $ — |
| Commodity contracts | (3) | (3) |
| Foreign currency contracts | (4) | 2 |

The following table summarizes the gain/(loss) reclassified from AOCI into earnings for derivative instruments designated as cash flow hedges:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Foreign currency contracts (1) | $ 1 | $ 1 | $ — |
| Foreign currency contracts (2) | 5 | 4 | 2 |
| Foreign currency contracts (3) | (3) | (2) | 1 |
| Commodity contracts (3) | (5) | (1) | — |

(1) Included in revenue in the consolidated statements of earnings.

(2) Included in cost of products sold in the consolidated statements of earnings.

(3) Included in SG&A expenses in the consolidated statements of earnings.

The amount of ineffectiveness associated with these derivative instruments was immaterial for all periods presented.

## Economic (Non-Designated) Hedges

We enter into foreign currency contracts to manage our foreign exchange exposure related to intercompany financing transactions and other balance sheet items subject to revaluation that do not meet the requirements for hedge accounting treatment. Accordingly, these derivative instruments are adjusted to current market value at the end of each period through earnings. The gain or loss recorded on these instruments is substantially offset by the remeasurement adjustment on the foreign currency denominated asset or liability. The settlement of the derivative instrument and the remeasurement adjustment on the foreign currency denominated asset or liability are both recorded in other (income)/expense, net. The principal currencies managed through foreign currency contracts are the Canadian dollar, Mexican peso, euro, Thai baht and Chinese renminbi.

**Notes to Financial Statements**

The following tables summarize the outstanding economic (non-designated) derivative instruments at June 30:

|  | 2016 | |
| --- | --- | --- |
| (in millions) | Notional Amount | Maturity Date |
| Foreign currency contracts | $ 492 | Jul 2016 - Jul 2016 |

|  | 2015 | |
| --- | --- | --- |
| (in millions) | Notional Amount | Maturity Date |
| Foreign currency contracts | $ 398 | Jul 2015 - Jul 2015 |

The following table summarizes the gain/(loss) recognized in earnings for economic (non-designated) derivative instruments:

| (in millions) | 2016 | 2015 | 2014 |
| --- | --- | --- | --- |
| Foreign currency contracts (1) | $ (17) | $ (45) | $ 12 |

(1)    Included in other income, net in the consolidated statements of earnings.

### Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, net, accounts payable, and other accrued liabilities at June 30, 2016 and 2015 approximate fair value due to their short-term maturities.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at June 30:

| (in millions) | 2016 | 2015 |
| --- | --- | --- |
| Estimated fair value | $ 5,780 | $ 5,521 |
| Carrying amount | 5,539 | 5,492 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

The following table is a summary of the fair value gain/(loss) of our derivative instruments based upon the estimated amount that we would receive (or pay), considering counter-party credit risk, to terminate the contracts at June 30:

|  | 2016 | | 2015 | |
| --- | --- | --- | --- | --- |
| (in millions) | Notional Amount | Fair Value Gain/(Loss) | Notional Amount | Fair Value Gain/(Loss) |
| Pay-floating interest rate swaps | $ 1,963 | $ 34 | $ 1,613 | $ 7 |
| Foreign currency contracts | 675 | (2) | 544 | 1 |
| Forward interest rate swaps | 300 | (10) | — | — |
| Commodity contracts | 22 | (3) | 22 | (3) |

## 12. Redeemable Noncontrolling Interests

In connection with the acquisition of a 71 percent ownership interest in naviHealth during fiscal 2016 as described in Note 2, we recognized redeemable noncontrolling interests with a fair value of $119 million at the acquisition date. At June 30, 2016, our ownership interest in naviHealth was 82 percent. The increase in our ownership interest was due to an additional capital contribution in connection with an acquisition by naviHealth.

The reconciliation of the changes in redeemable noncontrolling interests are as follows:

| (in millions) |  |
| --- | --- |
| Balance at June 30, 2015 | $ — |
| Redeemable noncontrolling interests acquired | 119 |
| Net earnings attributable to redeemable noncontrolling interests | 1 |
| Net purchase of redeemable noncontrolling interests | (3) |
| Balance at June 30, 2016 | $ 117 |

## 13. Shareholders' Equity

At June 30, 2016 and 2015, authorized capital shares consisted of the following: 750 million Class A common shares, without par value; 5 million Class B common shares, without par value; and 500 thousand non-voting preferred shares, without par value. The Class A common shares and Class B common shares are collectively referred to below as "common shares". Holders of common shares are entitled to share equally in any dividends declared by the Board of Directors and to participate equally in all distributions of assets upon liquidation. Generally, the holders of Class A common shares are entitled to one vote per share, and the holders of Class B common shares are entitled to one-fifth of one vote per share on proposals presented to shareholders for vote. Under certain circumstances, the holders of Class B common shares are entitled to vote as a separate class. Only Class A common shares were outstanding at June 30, 2016 and 2015.

We repurchased $2.4 billion of our common shares, in the aggregate, through share repurchase programs during fiscal 2016, 2015 and 2014, as described below. We funded the repurchases with available cash. The common shares repurchased are held in treasury to be used for general corporate purposes.

During fiscal 2016, we repurchased 8.2 million common shares having an aggregate cost of $651 million. The average price paid per common share was $78.98.

During fiscal 2015, we repurchased 13.1 million common shares having an aggregate cost of $1.0 billion. The average price paid per common share was $79.02.

During fiscal 2014, we repurchased 9.9 million common shares having an aggregate cost of $673 million. The average price paid per common share was $67.85.

**Notes to Financial Statements**

## Accumulated Other Comprehensive Income/(Loss)

The following table summarizes the changes in the balance of accumulated other comprehensive income/(loss) by component and in total:

| (in millions) | Foreign Currency Translation Adjustments and other | Unrealized Gain/(Loss) on Derivatives, net of tax | Accumulated Other Comprehensive Income/(Loss) |
|---|---|---|---|
| Balance at June 30, 2014 | $ 63 | $ 7 | $ 70 |
| Other comprehensive income/(loss), net of tax before reclassifications | (104) | 9 | (95) |
| Amounts reclassified to earnings | — | 2 | 2 |
| Total other comprehensive income/(loss), net of tax of $7 million | (104) | 11 | (93) |
| Balance at June 30, 2015 | $ (41) | $ 18 | $ (23) |
| Other comprehensive loss, net of tax before reclassifications | (82) | (9) | (91) |
| Amounts reclassified to earnings | — | (2) | (2) |
| Total other comprehensive loss, net of tax of $6 million | (82) | (11) | (93) |
| Balance at June 30, 2016 | $ (123) | $ 7 | $ (116) |

Activity related to realized and unrealized gains and losses on available-for-sale securities, as described in Note 5, was immaterial during fiscal 2016 and 2015.

## 14. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the computation of basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| (in millions, except per share amounts) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Earnings from continuing operations | $ 1,431 | $ 1,212 | $ 1,163 |
| Net earnings attributable to noncontrolling interest | (4) | — | — |
| Net earnings from continuing operations attributable to Cardinal Health, Inc. | 1,427 | 1,212 | 1,163 |
| Earnings from discontinued operations, net of tax | — | 3 | 3 |
| **Net earnings attributable to Cardinal Health, Inc.** | $ 1,427 | $ 1,215 | $ 1,166 |
| Weighted-average common shares–basic | 327 | 332 | 341 |
| **Effect of dilutive securities:** | | | |
| Employee stock options, restricted share units, and performance share units | 3 | 3 | 4 |
| **Weighted-average common shares–diluted** | 330 | 335 | 345 |
| | | | |
| **Basic earnings per common share attributable to Cardinal Health, Inc.:** | | | |
| Continuing operations | $ 4.36 | $ 3.65 | $ 3.41 |
| Discontinued operations | — | 0.01 | 0.01 |
| **Net basic earnings per common share attributable to Cardinal Health, Inc.** | $ 4.36 | $ 3.66 | $ 3.42 |
| **Diluted earnings per common share attributable to Cardinal Health, Inc.:** | | | |
| Continuing operations | $ 4.32 | $ 3.61 | $ 3.37 |
| Discontinued operations | — | 0.01 | 0.01 |
| **Net diluted earnings per common share attributable to Cardinal Health, Inc.** | $ 4.32 | $ 3.62 | $ 3.38 |

The potentially dilutive employee stock options, restricted share units and performance share units that were antidilutive for fiscal 2016, 2015 and 2014 were 2 million, 1 million and zero, respectively.

## 15. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical, over-the-counter healthcare and consumer products in the United States. This segment also operates nuclear pharmacies and cyclotron facilities, provides pharmacy management services to hospitals as well as medication therapy management and patient outcomes services to hospitals, other healthcare providers and payers, provides services to healthcare companies supporting the development, marketing, and distribution of specialty pharmaceutical products, and

**Notes to Financial Statements**

repackages generic pharmaceuticals and over-the-counter healthcare products. This segment also imports and distributes pharmaceuticals, over-the-counter healthcare and consumer products as well as provides specialty pharmacy and other services in China.

The Medical segment distributes a broad range of medical, surgical and laboratory products and provides services to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China. This segment distributes medical products to patients in the home in the United States. This segment also manufactures, sources and develops our own Cardinal Health brand medical and surgical products, which are sold directly or through third-party distributors in the United States, Canada, Europe and other regions internationally. This segment also provides post-acute care management and transition services and software to hospitals, other healthcare providers, and payers.

The following table presents revenue for each reportable segment and Corporate:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Pharmaceutical | $109,131 | $ 91,116 | $ 80,110 |
| Medical | 12,430 | 11,395 | 10,962 |
| Total segment revenue | 121,561 | 102,511 | 91,072 |
| Corporate (1) | (15) | 20 | 12 |
| Total revenue | $121,546 | $102,531 | $ 91,084 |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general, and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial and customer care shared services, human resources, information technology, and legal and compliance. The results attributable to noncontrolling interests of consolidated entities are recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided, and other ratable allocation methodologies.

We do not allocate the following items to our segments: LIFO inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation, and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon

executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $34 million, $26 million and $33 million for fiscal 2016, 2015 and 2014, respectively.

Beginning in fiscal 2016, we changed our methodology for allocating certain portions of enterprise-wide incentive compensation expenses among Corporate and the segments. This change did not impact consolidated operating earnings or net earnings and did not materially impact either segment during fiscal 2016.

The following tables present segment profit by reportable segment and Corporate:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Pharmaceutical | $ 2,488 | $ 2,094 | $ 1,745 |
| Medical | 457 | 433 | 444 |
| Total segment profit | 2,945 | 2,527 | 2,189 |
| Corporate | (486) | (366) | (304) |
| Total operating earnings | $ 2,459 | $ 2,161 | $ 1,885 |

The following tables present depreciation and amortization and additions to property and equipment by reportable segment and Corporate:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Pharmaceutical | $ 128 | $ 124 | $ 128 |
| Medical | 136 | 119 | 130 |
| Corporate | 377 | 208 | 201 |
| Total depreciation and amortization | $ 641 | $ 451 | $ 459 |

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Pharmaceutical | $ 88 | $ 90 | $ 72 |
| Medical | 96 | 87 | 72 |
| Corporate | 281 | 123 | 105 |
| Total additions to property and equipment | $ 465 | $ 300 | $ 249 |

The following table presents total assets for each reportable segment and Corporate at June 30:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Pharmaceutical | $ 20,662 | $ 17,385 | $ 15,361 |
| Medical | 10,236 | 7,095 | 6,768 |
| Corporate | 3,224 | 5,662 | 3,904 |
| Total assets | $ 34,122 | $ 30,142 | $ 26,033 |

The following tables present revenue and property and equipment, net by geographic area:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| United States | $ 116,864 | $ 98,435 | $ 87,449 |
| International | 4,682 | 4,096 | 3,635 |
| Total revenue | $ 121,546 | $ 102,531 | $ 91,084 |

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| United States | $ 1,558 | $ 1,327 | $ 1,301 |
| International | 238 | 179 | 158 |
| **Property and equipment, net** | $ 1,796 | $ 1,506 | $ 1,459 |

## 16. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees. At June 30, 2016, 20 million shares remain available for future grants under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan ("2011 LTIP"). Under the 2011 LTIP's fungible share counting provisions, stock options are counted against the plan as one share for every share issued; awards other than stock options are counted against the plan as two and one-half shares for every share issued. This means that only 8 million shares could be issued under awards other than stock options while 20 million shares could be issued under stock options. Shares are issued out of treasury shares when stock options are exercised and when restricted share units and performance share units vest.

The following table provides total share-based compensation expense by type of award:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Restricted share unit expense | $ 69 | $ 69 | $ 62 |
| Employee stock option expense | 21 | 21 | 21 |
| Performance share unit expense | 21 | 20 | 13 |
| **Total share-based compensation expense from continuing operations** | $ 111 | $ 110 | $ 96 |

The total tax benefit related to share-based compensation was $38 million, $38 million and $33 million for fiscal 2016, 2015 and 2014, respectively.

### Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for periods ranging from seven to ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share |
|---|---|---|
| Outstanding at June 30, 2014 | 10 | $ 39.16 |
| Granted | 1 | 72.15 |
| Exercised | (3) | 36.21 |
| Canceled and forfeited | — | — |
| Outstanding at June 30, 2015 | 8 | 46.50 |
| Granted | 1 | 84.11 |
| Exercised | (2) | 39.06 |
| Canceled and forfeited | — | — |
| **Outstanding at June 30, 2016** | 7 | $ 54.09 |
| **Exercisable at June 30, 2016** | 5 | $ 42.82 |

The following table provides additional detail related to stock options:

| (in millions, except per share amounts) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ 181 | $ 281 | $ 282 |
| Aggregate intrinsic value of exercisable options at period end | 161 | 193 | 185 |
| Aggregate intrinsic value of exercised options | 63 | 132 | 155 |
| Net proceeds from share-based compensation | 6 | 72 | 227 |
| Excess tax benefits from share based compensation | 33 | 52 | 39 |
| Total compensation cost, net of estimated forfeitures, related to unvested stock options not yet recognized, pre-tax | 22 | 23 | 24 |
| Total fair value of shares vested during the year | 20 | 20 | 20 |
| Weighted-average grant date fair value per stock option | 17.40 | 15.80 | 10.32 |

Stock options are granted to our officers and certain employees. The fair values were estimated on the grant date using a lattice valuation model. We believe the lattice model provides reasonable estimates because it has the ability to take into account individual exercise patterns based on changes in our stock price and other variables, and it provides for a range of input assumptions, which are disclosed in the table below. The risk-free rate is based on the U.S. Treasury yield curve at the time of the grant. We analyzed historical data to estimate option exercise behaviors and employee terminations to be used within the lattice model. The expected life of the options granted was calculated from the option valuation model and represents the length of time in years that the options granted are expected to be outstanding. Expected volatilities are based on implied volatility from traded options on our common shares and historical volatility over a period of time commensurate with the contractual term of the option grant (up to ten years).

**Notes to Financial Statements**

The following table provides the range of assumptions used to estimate the fair value of stock options:

|  | **2016** | | 2015 | | 2014 | |
|---|---|---|---|---|---|---|
| Risk-free interest rate | **1.5% -** | **1.9%** | 1.8% - | 2.1% | 1.9% - | 2.0% |
| Expected volatility | **23%** | | 26% | | 27% | |
| Dividend yield | **1.8% -** | **2.0%** | 1.7% - | 1.9% | 1.8% - | 2.4% |
| Expected life in years | **7** | | 7 | | 6 | |

## Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years. Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|
| Nonvested at June 30, 2014 | 3 | $ 45.65 |
| Granted | 1 | 72.33 |
| Vested | (1) | 44.94 |
| Canceled and forfeited | — | — |
| Nonvested at June 30, 2015 | 3 | 59.69 |
| Granted | 1 | 83.89 |
| Vested | (2) | 54.29 |
| Canceled and forfeited | — | — |
| **Nonvested at June 30, 2016** | **2** | **$ 71.73** |

The following table provides additional data related to restricted share unit activity:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Total compensation cost, net of estimated forfeitures, related to nonvested restricted share and share unit awards not yet recognized, pre-tax | $ **79** | $ 77 | $ 75 |
| Weighted-average period in years over which restricted share and share unit cost is expected to be recognized (in years) | **2** | 2 | 2 |
| Total fair value of shares vested during the year | $ **65** | $ 61 | $ 55 |

## Performance Share Units

Performance share units vest over a three-year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|
| Nonvested at June 30, 2014 | 0.9 | $ 44.41 |
| Granted | 0.2 | 71.63 |
| Vested (1) | (0.2) | 41.59 |
| Canceled and forfeited | — | — |
| Nonvested at June 30, 2015 | **0.9** | **$ 50.31** |
| Granted | 0.3 | 84.26 |
| Vested (2) | (0.4) | 39.81 |
| Canceled and forfeited | — | — |
| **Nonvested at June 30, 2016** | **0.8** | **$ 63.96** |

(1) Vested based on achievement of 120 percent of the target performance goal.

(2) Vested based on achievement of 133 percent of the target performance goal.

The following table provides additional data related to performance share unit activity:

| (in millions) | 2016 | 2015 | 2014 |
|---|---|---|---|
| Total compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized, pre-tax | $ **17** | $ 16 | $ 15 |
| Weighted-average period over which performance share unit cost is expected to be recognized (in years) | **2** | 2 | 2 |
| Total fair value of shares vested during the year | $ **16** | $ 8 | $ 7 |

## Employee Retirement Savings Plans

Substantially all of our domestic non-union employees are eligible to be enrolled in our company-sponsored contributory retirement savings plans, which include features under Section 401(k) of the Internal Revenue Code of 1986, and provide for matching and profit sharing contributions by us. Our contributions to the plans are determined by the Board of Directors subject to certain minimum requirements as specified in the plans. The total expense for our employee retirement savings plans was $84 million, $91 million and $75 million for fiscal 2016, 2015 and 2014, respectively.

## 17. Selected Quarterly Financial Data (Unaudited)

The following is selected quarterly financial data for fiscal 2016 and 2015. The sum of the quarters may not equal year-to-date due to rounding.

| (in millions, except per common share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **Fiscal 2016** | | | | |
| Revenue | $ 28,055 | $ 31,445 | $ 30,662 | $ **31,384** |
| Gross margin (1) | 1,579 | 1,609 | 1,689 | **1,665** |
| Distribution, selling, general and administrative expenses | 842 | 922 | 914 | **970** |
| Earnings from continuing operations | 384 | 326 | 386 | **335** |
| Earnings from discontinued operations, net of tax | — | — | — | — |
| Net earnings | 384 | 326 | 386 | **335** |
| Less: Net earnings attributable to noncontrolling interests | (1) | — | — | (2) |
| Net earnings attributable to Cardinal Health, Inc. | 383 | 326 | 386 | 333 |
| **Net earnings from continuing operations attributable to Cardinal Health, Inc. per common share:** | | | | |
| Basic | $ 1.17 | $ 0.99 | $ 1.18 | $ **1.03** |
| Diluted | 1.15 | 0.98 | 1.17 | **1.02** |

(1) Gross margin is impacted by LIFO benefit/(charges) of ($39) million, ($12) million and $51 million in the second, third and fourth quarter, respectively.

| (in millions, except per common share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **Fiscal 2015** | | | | |
| Revenue | $ 24,070 | $ 25,537 | $ 25,375 | $ 27,547 |
| Gross margin | 1,341 | 1,454 | 1,459 | 1,458 |
| Distribution, selling, general and administrative expenses | 775 | 815 | 803 | 847 |
| Earnings from continuing operations | 266 | 289 | 365 | 293 |
| Earnings from discontinued operations, net of tax | — | — | — | 2 |
| Net earnings | 266 | 289 | 365 | 295 |
| Less: Net earnings attributable to noncontrolling interests | — | — | — | — |
| Net earnings attributable to Cardinal Health, Inc. | 266 | 289 | 365 | 295 |
| **Net earnings from continuing operations attributable to Cardinal Health, Inc. per common share:** | | | | |
| Basic | $ 0.79 | $ 0.87 | $ 1.10 | $ 0.89 |
| Diluted | 0.78 | 0.86 | 1.09 | 0.88 |

## 18. Subsequent Events

We repurchased 3 million common shares having an aggregate cost of $250 million from July 1, 2016 through August 5, 2016. The average price paid per common share was $81.45. We funded the repurchases with available cash.

# Cardinal Health, Inc. and Subsidiaries

## Schedule II - Valuation and Qualifying Accounts [1]

| (in millions) | Balance at Beginning of Period | Charged to Costs and Expenses [2] | Charged to Other Accounts [3] | Deductions [4] | Balance at End of Period |
|---|---|---|---|---|---|
| **Fiscal 2016** | | | | | |
| Accounts receivable | $ 135 | $ 72 | $ 2 | $ (74) | $ 135 |
| Finance notes receivable | 14 | 6 | — | (1) | 19 |
| Sales returns and allowances | 305 | 2,207 | — | (2,126) | 386 |
| Other | 1 | — | — | — | 1 |
| | $ 455 | $ 2,285 | $ 2 | $ (2,201) | $ 541 |
| | | | | | |
| Fiscal 2015 | | | | | |
| Accounts receivable | $ 137 | $ 59 | $ 5 | $ (66) | $ 135 |
| Finance notes receivable | 18 | — | — | (4) | 14 |
| Sales returns and allowances | 273 | 1,988 | — | (1,956) | 305 |
| Other | 1 | — | — | — | 1 |
| | $ 429 | $ 2,047 | $ 5 | $ (2,026) | $ 455 |
| | | | | | |
| Fiscal 2014 | | | | | |
| Accounts receivable | $ 134 | $ 51 | $ 2 | $ (50) | $ 137 |
| Finance notes receivable | 17 | — | 2 | (1) | 18 |
| Sales returns and allowances | 291 | 1,735 | — | (1,753) | 273 |
| Other | 1 | — | — | — | 1 |
| | $ 443 | $ 1,786 | $ 4 | $ (1,804) | $ 429 |

(1)    Amounts included herein pertain to the continuing operations of the Company.

(2)    Fiscal 2016, 2015 and 2014 include $5 million, $7 million and $9 million, respectively, for reserves related to customer pricing disputes, excluded from provision for bad debts on the consolidated statements of cash flows and classified as a reduction in revenue in the consolidated statements of earnings.

(3)    Recoveries of amounts provided for or written off in prior years were $2 million, $1 million and $3 million for fiscal 2016, 2015 and 2014, respectively.

(4)    Write-off of uncollectible accounts or actual sales returns.

# Directors, Executive Officers and Corporate Governance

The following is a list of our executive officers:

| Name | Age | Position |
|------|-----|----------|
| George S. Barrett | 61 | Chairman and Chief Executive Officer |
| Michael C. Kaufmann | 53 | Chief Financial Officer |
| Donald M. Casey, Jr. | 56 | Chief Executive Officer, Medical segment |
| Jon L. Giacomin | 51 | Chief Executive Officer, Pharmaceutical segment |
| Pamela O. Kimmet | 58 | Chief Human Resources Officer |
| Craig S. Morford | 57 | Chief Legal and Compliance Officer |
| Patricia B. Morrison | 57 | Executive Vice President, Customer Support Services and Chief Information Officer |

The business experience summaries provided below for our executive officers describe positions held during the last five years (unless otherwise indicated).

Mr. Barrett has served as Chairman and Chief Executive Officer since August 2009.

Mr. Kaufmann has served as Chief Financial Officer since November 2014. From August 2009 until November 2014, he served as Chief Executive Officer, Pharmaceutical segment.

Mr. Casey has served as Chief Executive Officer, Medical segment, since April 2012. Before joining us, he served as Chief Executive Officer of the Gary and Mary West Wireless Health Institute, a non-profit research organization focused on lowering the cost of healthcare through novel technology solutions, from March 2010 to March 2012.

Mr. Giacomin has served as Chief Executive Officer, Pharmaceutical segment since November 2014. From January 2011 until November 2014, he served as President, U.S. Pharmaceutical Distribution.

Ms. Kimmet has served as Chief Human Resources Officer since June 2016. Prior to joining us, Ms. Kimmet served as Senior Vice President, Human Resources at Coca-Cola Enterprises, Inc. from October 2010 to June 2016.

Mr. Morford has served as Chief Legal and Compliance Officer since May 2009.

Ms. Morrison has served as Executive Vice President, Customer Support Services and Chief Information Officer since June 2011, and prior to that was Executive Vice President and Chief Information Officer from August 2009 until June 2011.

We have adopted *Standards of Business Conduct* that apply to all of our directors, officers and employees. The *Standards of Business Conduct* outline our corporate values and standards of integrity and behavior and are designed to protect and promote our reputation. The full text of the *Standards of Business Conduct* is posted on our website at www.cardinalhealth.com under "About Us — Corporate Citizenship — Ethics and Governance — Ethics and Compliance."

Any waiver of the *Standards of Business Conduct* for directors or executive officers must be approved by the Audit Committee. As required under SEC and New York Stock Exchange rules, we will disclose future amendments to our *Standards of Business Conduct* and waivers from the *Standards of Business Conduct* for our principal executive officer, principal financial officer, and principal accounting officer, or persons performing similar functions, and our other executive officers and directors on our website within four business days following the date of the amendment or waiver.

The other information called for by Item 10 of Form 10-K is incorporated by reference to our Definitive Proxy Statement (which will be filed with the SEC pursuant to Regulation 14A under the Exchange Act) relating to our 2016 Annual Meeting of Shareholders (our "2016 Proxy Statement") under the captions "Proposal 1—Election of Directors," "Section 16(a) Beneficial Ownership Reporting Compliance" and "Corporate Governance."

**Exhibits**

# Exhibits, Financial Statement Schedules

(a)(1) The following financial statements are included in the "Financial Statements" section of this report:

**Page**

Consolidated Financial Statements and Schedule:

| | |
|---|---|
| Consolidated Statements of Earnings for the Fiscal Years Ended June 30, 2016, 2015 and 2014 | **46** |
| Consolidated Statements of Comprehensive Income for the Fiscal Years Ended June 30, 2016, 2015 and 2014 | **47** |
| Consolidated Balance Sheets at June 30, 2016 and 2015 | **48** |
| Consolidated Statements of Shareholders' Equity for the Fiscal Years Ended June 30, 2016, 2015 and 2014 | **49** |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2016, 2015 and 2014 | **50** |
| Notes to Consolidated Financial Statements | **51** |

(a)(2) The following Supplemental Schedule is included in this report:

**Page**

| | |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | **73** |

All other schedules not listed above have been omitted as not applicable or because the required information is included in the Consolidated Financial Statements or in the Notes thereto.

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Final Binding Offer dated March 1, 2015 by and between Cardinal Health, Inc. and Ethicon, Inc. (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on March 2, 2015, File No. 1-11373) |
| 2.2 | Stock and Asset Purchase Agreement, dated March 1, 2015 between Ethicon, Inc. and Cardinal Health, Inc. (incorporated by reference to Exhibit 2.1 to Cardinal Health's Current Report on Form 8-K filed on May 28, 2015, File No. 1-11373) |
| 2.3 | Amendment No. 1, dated as of October 2, 2015, to the Stock and Asset Purchase Agreement, dated as of March 1, 2015, by and between Ethicon, Inc. and Cardinal Health, Inc. (incorporated by reference to Exhibit 2.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2015, File No. 1-11373) |
| 2.4 | Letter Agreement between Ethicon, Inc. and Cardinal Health, Inc., dated May 29, 2015 relating to mechanics of agreeing to purchase price allocation (incorporated by reference to Exhibit 2.3 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2015, File No. 1-11373) |
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 4.1 | Specimen Certificate for Common Shares of Cardinal Health, Inc. (incorporated by reference to Exhibit 4.01 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2001, File No. 1-11373) |
| 4.2.1 | Indenture, dated as of April 18, 1997, between Cardinal Health, Inc. and Bank One, Columbus, NA, Trustee (incorporated by reference to Exhibit 1 to Cardinal Health's Current Report on Form 8-K filed on April 21, 1997, File No. 1-11373) |
| 4.2.2 | Supplemental Indenture, dated October 3, 2006, between Cardinal Health, Inc. and The Bank of New York Trust Company, N.A., as trustee (successor to J.P. Morgan Trust Company, National Association, successor to Bank One, N.A., formerly known as Bank One, Columbus, N.A.) (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on October 4, 2006, File No. 1-11373) |
| 4.2.3 | Second Supplemental Indenture, dated June 8, 2007, between Cardinal Health, Inc. and The Bank of New York Trust Company, N.A., (successor to J.P. Morgan Trust Company, National Association, successor to Bank One, N.A., formerly known as Bank One, Columbus, N.A.), as trustee (incorporated by reference to Exhibit 4.01 to Cardinal Health's Current Report on Form 8-K filed on June 8, 2007, File No. 1-11373) |
| 4.3.1 | Indenture, dated as of June 2, 2008, between Cardinal Health, Inc. and The Bank of New York Trust Company, N.A. (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 2, 2008, File No. 1-11373) |
| 4.3.2 | 4.625% Notes due 2020 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on December 14, 2010, File No. 1-11373) |
| 4.3.3 | 1.900% Notes due 2017 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on May 21, 2012, File No. 1-11373) |
| 4.3.4 | 3.200% Notes due 2022 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on May 21, 2012, File No. 1-11373) |
| 4.3.5 | 1.700% Notes due 2018 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.3.6 | 3.200% Notes due 2023 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.3.7 | 4.600% Notes due 2043 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.3.8 | 2.400% Notes due 2019 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |

Cardinal Health | Fiscal 2016 Form 10-K

| 4.3.9 | 3.500% Notes due 2024 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |
|---|---|
| 4.3.10 | 4.500% Notes due 2044 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |
| 4.3.11 | 1.950% Notes due 2018 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |
| 4.3.12 | 3.750% Notes due 2025 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |
| 4.3.13 | 4.900% Notes due 2045 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |
| 4.4 | Agreement to furnish to the Securities and Exchange Commission upon request a copy of instruments defining the rights of holders of certain long-term debt of Cardinal Health, Inc. and consolidated subsidiaries (incorporated by reference to Exhibit 4.07 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2005, File No. 1-11373) |
| 10.1.1 | Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.2 | First Amendment to Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.1.3 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grant made to executive officer in April 2012) (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.4 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in August 2012) (incorporated by reference to Exhibit 10.1.3 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)* |
| 10.1.5 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in August 2013 and thereafter) (incorporated by reference to Exhibit 10.1.4 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.1.6 | Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in August 2013) (incorporated by reference to Exhibit 10.1.7 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.1.7 | Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (grants made to executive officers in August 2014 and thereafter) (incorporated by reference to Exhibit 10.1.8 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.1.8 | Form of Performance Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.9 | Form of Amendment to Stock Option and Restricted Share Units Agreements under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan, the Cardinal Health, Inc. 2005 Long-Term Incentive Plan, the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan and the Cardinal Health, Inc. Amended and Restated Outside Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.1.9 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.2.1 | Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373)* |
| 10.2.2 | First Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.2.3 | Second Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.2.4 | Third Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.4 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.2.5 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (grants made to executive officers in September 2009) (incorporated by reference to Exhibit 10.1.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.2.6 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (grants made to executive officers in August 2010 and August 2011) (incorporated by reference to Exhibit 10.1.11 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2010, File No. 1-11373)* |
| 10.3.1 | Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, File No. 1-11373)* |
| 10.3.2 | First Amendment to Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.2.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.3.3 | Second Amendment to the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the Quarter ended December 31, 2011, File No. 1-11373)* |
| 10.3.4 | Form of Directors' Restricted Share Units Agreement under the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (grants made in November 2013 and thereafter) (incorporated by reference to Exhibit 10.5.7 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.4.1 | Cardinal Health Deferred Compensation Plan, amended and restated effective January 1, 2009 (incorporated by reference to Exhibit 10.6.5 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, File No. 1-11373)* |
| 10.4.2 | First Amendment to Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373)* |
| 10.4.3 | Second Amendment to Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010, File No. 1-11373)* |
| 10.4.4 | Third Amendment to Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2010, File No. 1-11373)* |

| | |
|---|---|
| 10.4.5 | Fourth Amendment to the Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, File No. 1-11373)* |
| 10.4.6 | Fifth Amendment to the Cardinal Health Deferred Compensation Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2012, File No. 1-11373)* |
| 10.4.7 | Cardinal Health Deferred Compensation Plan, as amended and restated effective January 1, 2016 (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2015, File No. 1-11373)* |
| 10.5 | Cardinal Health, Inc. Management Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Periodic Report on Form 8-K filed on November 10, 2014, File No. 1-11373)* |
| 10.6 | Cardinal Health, Inc. Policy Regarding Shareholder Approval of Severance Agreements (incorporated by reference to Exhibit 10.09 to Cardinal Health's Current Report on Form 8-K filed on August 7, 2006, File No. 1-11373)* |
| 10.7.1 | Employment Agreement, dated September 4, 2012, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on September 6, 2012, File No. 1-11373)* |
| 10.7.2 | Amendment, dated August 5, 2015, to Employment Agreement, dated September 4, 2012, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 6, 2015, File No. 1-11373)* |
| 10.7.3 | Amended and Restated Aircraft Time Sharing Agreement, effective February 5, 2014, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, File No. 1-11373)* |
| 10.7.4 | Aircraft Time Sharing Agreement, effective August 5, 2015, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 6, 2015, File No. 1-11373)* |
| 10.8 | Confidentiality and Business Protection Agreement, effective as of February 15, 2010, between Cardinal Health, Inc. and Michael C. Kaufmann (incorporated by reference to Exhibit 10.15 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2010, File No. 1-11373)* |
| 10.9 | Confidentiality and Business Protection Agreement, effective as of April 9, 2012, between Cardinal Health, Inc. and Donald M. Casey Jr. (incorporated by reference to Exhibit 10.14.1 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)* |
| 10.10 | Confidentiality and Business Protection Agreement, effective as of September 9, 2014, between Cardinal Health, Inc. and Jon L. Giacomin (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, File No. 1-11373)* |
| 10.11.1 | Form of Indemnification Agreement between Cardinal Health, Inc. and certain individual directors (incorporated by reference to Exhibit 10.38 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, File No. 1-11373) |
| 10.11.2 | Form of Indemnification Agreement between Cardinal Health, Inc. and certain individual executive officers (incorporated by reference to Exhibit 10.39 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, File No. 1-11373) |
| 10.12.1 | Issuing and Paying Agency Agreement, dated August 9, 2006, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.01 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.12.2 | First Amendment to Issuing and Paying Agency Agreement, dated February 28, 2007, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.01 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.12.3 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and J.P. Morgan Securities Inc. (incorporated by reference to Exhibit 10.02 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.12.4 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and J.P. Morgan Securities Inc. (incorporated by reference to Exhibit 10.02 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.12.5 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and J.P. Morgan Securities LLC (formerly known as J.P. Morgan Securities Inc.) (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.12.6 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Banc of America Securities LLC (incorporated by reference to Exhibit 10.03 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.12.7 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Banc of America Securities LLC (incorporated by reference to Exhibit 10.03 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.12.8 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, f/k/a Banc of America Securities LLC (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.12.9 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.04 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.12.10 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.04 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.12.11 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Wells Fargo Securities, LLC, as successor in interest to Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.6 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.12.12 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.05 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.12.13 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.05 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.12.14 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.7 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.12.15 | Form of Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc. (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K filed on April 21, 2009, File No. 1-11373) |
| 10.12.16 | Form of First Amendment to Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc. (incorporated by reference to Exhibit 10.8 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |

**Exhibits**

10.13.1    Five-Year Credit Agreement, dated as of May 12, 2011, among the Company, certain lenders, JPMorgan Chase Bank, N.A. as Administrative Agent, Bank of America, N.A. and Morgan Stanley Senior Funding, Inc. as Syndication Agents, Barclays Bank PLC and Deutsche Bank Securities Inc. as Documentation Agents, and J.P. Morgan Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley Senior Funding, Inc. as Joint Lead Arrangers and Book Managers (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on May 13, 2011, File No. 1-11373)

10.13.2    Amendment No. 1 to Five-Year Credit Agreement (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on June 5, 2013, File No. 1-11373)

10.13.3    Amended and Restated Five-Year Credit Agreement, dated as of June 16, 2016, among Cardinal Health, Inc., JPMorgan Chase Bank, N.A. as Administrative Agent, Joint Lead Arranger and Joint Book Manager, Bank of America, N.A. as Syndication Agent, The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Syndication Agent, Joint Lead Arranger and Joint Book Manager, Barclays Bank PLC, Deutsche Bank Securities Inc., Goldman Sachs Bank USA, HSBC Bank USA, National Association, Morgan Stanley Senior Funding, Inc. and Wells Fargo Bank, National Association, as Documentation Agents, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Joint Lead Arranger and Joint Book Manager (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on June 21, 2016, File No. 1-11373)

10.14.1    Tax Matters Agreement, dated as of August 31, 2009, by and between Cardinal Health, Inc. and CareFusion Corporation (incorporated by reference to Exhibit 10.3 to Cardinal Health's Current Report on Form 8-K filed on September 4, 2009, File No. 1-11373)

10.14.2    First Amendment to Tax Matters Agreement, dated as of May 28, 2012, by and between Cardinal Health, Inc. and CareFusion Corporation (incorporated by reference to Exhibit 10.20.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)

12.1    Computation of Ratio of Earnings to Fixed Charges

21.1    List of Subsidiaries of Cardinal Health, Inc.

23.1    Consent of Independent Registered Public Accounting Firm

31.1    Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2    Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1    Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

99.1    Statement Regarding Forward-Looking Information

101.INS    XBRL Instance Document

101.SCH    XBRL Taxonomy Extension Schema Document

101.CAL    XBRL Taxonomy Extension Calculation Linkbase Document

101.DEF    XBRL Taxonomy Definition Linkbase Document

101.LAB    XBRL Taxonomy Extension Label Linkbase Document

101.PRE    XBRL Taxonomy Extension Presentation Linkbase Document

* Management contract or compensatory plan or arrangement.

**Form 10-K Cross Reference Index**

# Form 10-K Cross Reference Index

| Item | | Page(s) |
|---|---|---|
| | **Part 1** | |
| 1 | Business | 29 |
| 1A | Risk Factors | 35 |
| 1B | Unresolved Staff Comments | N/A |
| 2 | Properties | 39 |
| 3 | Legal Proceedings | 39 |
| 4 | Mine Safety Disclosures | N/A |
| | **Part II** | |
| 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 40 |
| 6 | Selected Financial Data | 26 |
| 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 8 |
| 7A | Quantitative and Qualitative Disclosures about Market Risk | 27 |
| 8 | Financial Statements and Supplementary Data | 45 |
| 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | N/A |
| 9A | Controls and Procedures | 42 |
| 9B | Other Information | N/A |
| | **Part III** | |
| 10 | Directors, Executive Officers and Corporate Governance | 74 |
| 11 | Executive Compensation | (a) |
| 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | (b) |
| 13 | Certain Relationships and Related Transactions, and Director Independence | (c) |
| 14 | Principal Accounting Fees and Services | (d) |
| | **Part IV** | |
| 15 | Exhibits, Financial Statement Schedules | 75 |
| | Signatures | 80 |

**N/A**  Not applicable

**(a)**  The information called for by Item 11 of Form 10-K is incorporated by reference to our 2016 Proxy Statement under the captions "Compensation Discussion and Analysis," "Executive Compensation" and "Director Compensation."

**(b)**  The information called for by Item 12 of Form 10-K is incorporated by reference to our 2016 Proxy Statement under the captions "Share Ownership Information" and "Equity Compensation Plan Information."

**(c)**  The information called for by Item 13 of Form 10-K is incorporated by reference to our 2016 Proxy Statement under the caption "Corporate Governance."

**(d)**  The information called for by Item 14 of Form 10-K is incorporated by reference to our 2016 Proxy Statement under the caption "Audit Committee Report and Audit Matters."

Additional Information

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on August 12, 2016.

Cardinal Health, Inc.

By: /s/ GEORGE S. BARRETT

**George S. Barrett**
**Chairman and Chief Executive Officer**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed below by the following persons on behalf of the registrant and in the capacities indicated on August 12, 2016.

| Name | Title |
|---|---|
| /s/ GEORGE S. BARRETT<br>**George S. Barrett** | Chairman and Chief Executive Officer and Director (principal executive officer) |
| /s/ MICHAEL C. KAUFMANN<br>**Michael C. Kaufmann** | Chief Financial Officer (principal financial officer) |
| /s/ STUART G. LAWS<br>**Stuart G. Laws** | Senior Vice President and Chief Accounting Officer (principal accounting officer) |
| /s/ DAVID J. ANDERSON<br>**David J. Anderson** | Director |
| /s/ COLLEEN F. ARNOLD<br>**Colleen F. Arnold** | Director |
| /s/ CARRIE S. COX<br>**Carrie S. Cox** | Director |
| /s/ CALVIN DARDEN<br>**Calvin Darden** | Director |
| /s/ BRUCE L. DOWNEY<br>**Bruce L. Downey** | Director |
| /s/ PATRICIA A. HEMINGWAY HALL<br>**Patricia A. Hemingway Hall** | Director |
| /s/ CLAYTON M. JONES<br>**Clayton M. Jones** | Director |
| /s/ GREGORY B. KENNY<br>**Gregory B. Kenny** | Director |
| /s/ NANCY KILLEFER<br>**Nancy Killefer** | Director |
| /s/ DAVID P. KING<br>**David P. King** | Director |

# Corporate and investor information

**Corporate offices**

Cardinal Health
7000 Cardinal Place
Dublin, Ohio 43017
614.757.5000
www.cardinalhealth.com
Twitter: @CardinalHealth

**Common shares**

Cardinal Health common shares are listed on the
New York Stock Exchange under the ticker symbol "CAH"
and are a component of the Standard & Poor's 500 Index.

**Annual meeting**

The 2016 Annual Meeting of Shareholders will be
held at 8 a.m. local time on November 3, 2016,
at Cardinal Health headquarters in Dublin, Ohio.
Shareholders are cordially invited to attend.

**Auditors**

Ernst & Young LLP

**Transfer agent and registrar**

Shareholders with inquiries regarding address corrections,
dividend payments, lost certificates or changes in
registered ownership should contact the Cardinal Health
stock transfer agent:

Computershare Trust Company, N.A.
211 Quality Circle
Suite 210
College Station, TX 77845
877.498.8861
www.computershare.com/investor

**Financial information**

Comprehensive financial and other information about
Cardinal Health can be obtained by visiting the Investors
page at ir.cardinalhealth.com.

Available information includes historical stock information,
research analyst coverage, past and present financial statements,
recent company presentations, SEC filings, corporate
governance guidelines and board committee charters. This
information — including the Cardinal Health Forms 10-K, 10-Q,
8-K and other published corporate literature —
is also available without charge upon written request
to the Investor Relations department at the corporate office,
or by calling Investor Relations at 614.757.4757.

Cardinal Health uses its website as a channel of distribution
for material company information. Important information,
including news releases, financial information, earnings and
analyst presentations, and information about upcoming
presentations and events is routinely posted and accessible
on the Investors page at ir.cardinalhealth.com. In addition, the
Cardinal Health website allows investors and other interested
persons to sign up to automatically receive email alerts when
the company posts news releases, SEC filings and certain other
information on its website.

For non-investor related inquiries, please call the company's
main telephone number at 614.757.5000.

## Fiscal 2016 cash dividend declarations

| Fiscal quarter | Record date | Payment date | Per common share amount |
|---|---|---|---|
| 1st | October 1, 2015 | October 15, 2015 | $0.3870 |
| 2nd | January 2, 2016 | January 15, 2016 | $0.3870 |
| 3rd | April 1, 2016 | April 15, 2016 | $0.3870 |
| 4th | July 1, 2016 | July 15, 2016 | $0.4489 |

Exhibit 12.1

## Computation of Ratio of Earnings to Fixed Charges

| (in millions, except ratios) | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Earnings from continuing operations before income taxes | $ 1,698.1 | $ 888.3 | $ 1,798.3 | $ 1,967.3 | $ 2,275.6 |
| | | | | | |
| **Plus fixed charges:** | | | | | |
| Interest expense | 92.3 | 119.2 | 129.4 | 137.0 | **178.2** |
| Capitalized interest | 6.0 | 1.7 | 1.2 | 1.8 | **5.6** |
| Amortization of debt offering costs | 2.8 | 3.5 | 3.6 | 7.6 | **5.6** |
| Interest portion of rent expense | 7.8 | 8.3 | 9.8 | 9.6 | **11.5** |
| **Fixed charges** | 108.9 | 132.7 | 144.0 | 156.0 | **200.9** |
| Plus: amortization of capitalized interest | 3.2 | 3.4 | 2.9 | 2.4 | **2.5** |
| Less: capitalized interest | (6.0) | (1.7) | (1.2) | (1.8) | **(5.6)** |
| **Earnings** | $ 1,804.2 | $ 1,022.7 | $ 1,944.0 | $ 2,123.9 | $ **2,473.4** |
| | | | | | |
| **Ratio of earnings to fixed charges (1)** | 16.6 | 7.7 | 13.5 | 13.6 | **12.3** |

(1) The ratio of earnings to fixed charges is computed by dividing fixed charges into earnings from continuing operations before income taxes plus fixed charges and capitalized interest. Fixed charges include interest expense, amortization of debt offering costs and the portion of rent expense that is deemed to be representative of the interest factor. Interest expense recorded on tax exposures has been recorded in income tax expense and has therefore been excluded from the calculation.

Exhibit 21.1

## Subsidiaries of the Registrant

Listed below are majority-owned subsidiaries of Cardinal Health, Inc. as of June 30, 2016.  Subsidiaries excluded from the list below would not, considered in the aggregate as a single subsidiary, constitute a "significant subsidiary" of Cardinal Health, Inc. as that term is defined in Rule 1-02(w) of SEC Regulation S-X.

| Subsidiary Name | State/Jurisdiction of Incorporation | Subsidiary Name | State/Jurisdiction of Incorporation |
|---|---|---|---|
| Access Closure, Inc. | California | Cardinal Health Japan G.K. | Japan |
| Allegiance Corporation | Delaware | Cardinal Health Korea Limited | Korea |
| AssuraMed, Inc. | Delaware | Cardinal Health (L) Co., Ltd. | Malaysia |
| Cardinal Health 2, LLC | Nevada | Cardinal Health Luxembourg 420 S.a.r.l. | Luxembourg |
| Cardinal Health 3, LLC | Delaware | Cardinal Health Luxembourg 522 S.a.r.l. | Luxembourg |
| Cardinal Health 5, LLC | Delaware | Cardinal Health Malaysia 211 Sdn. Bhd. | Malaysia |
| Cardinal Health 6, Inc. | Nevada | Cardinal Health Malta 212 Limited | Malta |
| Cardinal Health 7, LLC | Delaware | Cardinal Health Managed Care Services, LLC | Delaware |
| Cardinal Health 100, Inc. | Indiana | Cardinal Health Mexico 244 S. de R.L. de C.V. | Mexico |
| Cardinal Health 104 LP | Ohio | Cardinal Health Mexico 514 S. de R.L. de C.V. | Mexico |
| Cardinal Health 105, Inc. | Ohio | Cardinal Health Netherlands 502 B.V. | Netherlands |
| Cardinal Health 107, LLC | Ohio | Cardinal Health Pharmaceutical Contracting, LLC | Delaware |
| Cardinal Health 108, LLC | Delaware | Cardinal Health Pharmacy Services, LLC | Delaware |
| Cardinal Health 110, LLC | Delaware | Cardinal Health Portugal 513 Unipessoal Lda. | Portugal |
| Cardinal Health 112, LLC | Delaware | Cardinal Health P.R. 120, Inc. | Puerto Rico |
| Cardinal Health 114, Inc. | Delaware | Cardinal Health P.R. 218, Inc. | Puerto Rico |
| Cardinal Health 115, LLC | Ohio | Cardinal Health Singapore 225 Pte. Ltd. | Singapore |
| Cardinal Health 116, LLC | Delaware | Cardinal Health Spain 511 S.L. | Spain |
| Cardinal Health 118, LLC | Delaware | Cardinal Health Specialty Pharmacy, LLC | Delaware |
| Cardinal Health 119, LLC | Delaware | Cardinal Health Switzerland 515 GmbH | Switzerland |
| Cardinal Health 121, LLC | Delaware | Cardinal Health Systems, Inc. | Ohio |
| Cardinal Health 122, LLC | Delaware | Cardinal Health Technologies, LLC | Nevada |
| Cardinal Health 123, LLC | Delaware | Cardinal Health Technologies Switzerland GmbH | Switzerland |
| Cardinal Health 124, LLC | Delaware | Cardinal Health UK 432 Limited | United Kingdom |
| Cardinal Health 126, LLC | Delaware | Cirpro de Delicias S.A. de C.V. | Mexico |
| Cardinal Health 127, Inc. | Kansas | Convertors de Mexico S.A. de C.V. | Mexico |
| Cardinal Health 200, LLC | Delaware | Cordis Cashel Company Unlimited | Ireland |
| Cardinal Health 201, Inc. | Delaware | Cordis Corporation | Florida |
| Cardinal Health 222 (Thailand) Ltd. | Thailand | Cordis (Shanhai) Medical Devices Co., Ltd. | China |
| Cardinal Health 247, Inc. | Colorado | Cornerstone Partners G.P.O., L.P. | Tennessee |
| Cardinal Health 249, LLC | Delaware | Curaspan Health Group, Inc. | Delaware |
| Cardinal Health 414, LLC | Delaware | Dutch American Manufacturers II (D.A.M. II) B.V. | Netherlands |
| Cardinal Health Australia 503 Pty. Ltd. | Australia | EPIC Insurance Company | Vermont |
| Cardinal Health Austria 504 GmbH | Austria | Griffin Capital, LLC | Nevada |
| Cardinal Health Belgium 505 BVBA | Belgium | Innovative Therapies, Inc. | Delaware |
| Cardinal Health Canada Inc. | Canada | Instant Diagnostic Systems, Inc. | Alabama |
| Cardinal Health D.R. 203 II Ltd. | Bermuda | Kinray, LLC | New York |
| Cardinal Health Foundation | Ohio | Leader Drugstores, Inc. | Delaware |
| Cardinal Health France 506 SAS | France | Marin Apothecaries | California |
| Cardinal Health Funding, LLC | Nevada | Medicine Shoppe International, Inc. | Delaware |
| Cardinal Health Germany 507 GmbH | Germany | Metro Medical Supply, LLC | Tennessee |
| Cardinal Health (H.K.) Co. Ltd. | Hong Kong | NaviHealth, Inc. | Delaware |
| Cardinal Health IPS, LLC | Delaware | One Cloverleaf, LLC | Delaware |
| Cardinal Health Ireland 419 Limited | Ireland | Pinnacle Intellectual Property Services, Inc. | Nevada |
| Cardinal Health Ireland 508 Limited | Ireland | Pinnacle Intellectual Property Services-International, Inc. | Nevada |
| Cardinal Health Italy 509 Srl | Italy | Post-Acute Care Center for Research, LLC | Delaware |

| Subsidiary Name | State/Jurisdiction of Incorporation |
|---|---|
| Quiroproductos de Cuauhtmoc S. de R.L. de C.V. | Mexico |
| R Cubed, Inc. | Delaware |
| RainTree GPO, LLC | Delaware |
| RGH Enterprises, Inc. | Ohio |
| RightCare Solutions, Inc. | Delaware |
| Rxealtime, Inc. | Nevada |
| Sonexus Health, LLC | Texas |
| The Harvard Drug Group | Michigan |
| Tradex International, Inc. | Ohio |
| WaveMark, Inc. | Delaware |

Exhibit 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)  Registration Statement on Form S-3 No. 333-190741 of Cardinal Health, Inc.,

(2)  Registration Statements on Form S-4 No. 333-62938 and No. 333-74761 of Cardinal Health, Inc., and

(3)  Registration Statements on Form S-8 No. 33-42357, No. 33-64337, No. 333-72727, No. 333-90423, No. 333-91849, No. 333-38192, No. 333-38198, No. 333-56010, No. 333-129725, No. 333-144368, No. 333-149107, No. 333-155156, No. 333-163128, No. 333-164736, No. 333-177728, No. 333-183471, No. 333-206339, and No. 333-206340 of Cardinal Health, Inc.;

of our reports dated August 12, 2016, with respect to the consolidated financial statements and schedule of Cardinal Health, Inc. and subsidiaries and the effectiveness of internal control over financial reporting of Cardinal Health, Inc. and subsidiaries, included in this Annual Report (Form 10-K) of Cardinal Health, Inc. and subsidiaries for the year ended June 30, 2016.

 /s/ Ernst & Young LLP


 Columbus, Ohio
 August 12, 2016

Exhibit 31.1

I, George S. Barrett, certify that:

1. I have reviewed this Form 10-K of Cardinal Health, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 12, 2016

/s/ GEORGE S. BARRETT

George S. Barrett
Chairman and Chief Executive Officer

Exhibit 31.2

I, Michael C. Kaufmann, certify that:

1.  I have reviewed this Form 10-K of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 12, 2016

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Financial Officer

Exhibit 32.1

**Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Each of George S. Barrett, Chairman and Chief Executive Officer of Cardinal Health, Inc. (the "Company"), and Michael C. Kaufmann, Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)     the Annual Report on Form 10-K for the fiscal year ended June 30, 2016 containing the financial statements of the Company (the "Periodic Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 12, 2016

/s/ GEORGE S. BARRETT
_____
George S. Barrett
Chairman and Chief Executive Officer


/s/ MICHAEL C. KAUFMANN
_____
Michael C. Kaufmann
Chief Financial Officer

Exhibit 99.1

## Statement Regarding Forward-Looking Information

As used in this exhibit, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K"), our quarterly reports on Form 10-Q or our current reports on Form 8-K (along with any exhibits and amendments to such reports), as well as our news releases or any other written or oral statements made by or on behalf of us, may include, directly or by incorporation by reference, forward-looking statements that reflect our current view (as of the date the forward-looking statement is first made) about future events, prospects, projections or financial performance. The matters discussed in these forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied in or by such statements. These risks and uncertainties include:

- competitive pressures in the markets in which we operate, including pricing pressures;
- uncertainties relating to the pricing of generic pharmaceuticals;
- uncertainties relating to the timing, frequency and profitability of generic pharmaceutical launches;
- our ability to maintain the benefits our generic pharmaceutical sourcing venture with CVS Health Corporation;
- with respect to our distribution agreements with branded pharmaceutical manufacturers, changes in the amount of service fees we receive or, in cases where part of our compensation under these agreements is branded pharmaceutical price appreciation, changes in the frequency or magnitude of such price appreciation;
- changes in the timing or frequency of the introduction of branded pharmaceuticals;
- actions of regulatory bodies and other governmental authorities, including the U.S. Drug Enforcement Administration ("DEA"), certain agencies within the U.S. Department of Health and Human Services (including the U.S. Food and Drug Administration, Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights), the U.S. Nuclear Regulatory Commission, the U.S. Federal Trade Commission, the U.S. Customs and Border Protection, various state boards of pharmacy, state controlled substance agencies, state health departments, state insurance departments, state Medicaid departments or comparable regulatory bodies or governmental authorities or foreign equivalents that, in each case, could delay, limit or suspend product development, manufacturing, distribution, importation or sales or result in warning letters, recalls, seizures, injunctions or monetary sanctions;
- difficulties or delays in the development, production, manufacturing, sourcing and marketing of new or existing products and services, including difficulties or delays associated with obtaining requisite regulatory consents or approvals associated with those activities;
- risks arising from possible violations of healthcare fraud and abuse laws;
- costs or claims resulting from potential errors or defects in our manufacturing of medical devices or other products or in our compounding, repackaging, information systems or pharmacy management services that may injure persons or damage property or operations, including costs from remediation efforts or recalls and related product liability claims and lawsuits, including class actions;
- risks arising from possible violations of the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws and other similar anti-corruption laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws;
- risks arising from our collecting, handling and maintaining patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information;
- risks arising from certain of our businesses being Medicare-certified suppliers or participating in state Medicaid programs, which businesses are subject to accreditation and quality standards and other rules and regulations, including applicable billing, payment and record-keeping requirements;
- risks arising from certain of our businesses manufacturing pharmaceutical and medical products or repackaging pharmaceuticals that are purchased through federal or state healthcare programs, which businesses are subject to federal and state laws that establish eligibility for reimbursement by such programs;
- the possibility of civil fines levied against us (in excess of the reserve we have accrued) by the U.S. Department of Justice for conduct covered by the settlement agreement that we entered into in connection with the DEA's suspension of our Lakeland, Florida distribution center's registration to distribute controlled substances;
- changes in laws or changes in the interpretation or application of laws or regulations, as well as possible failures to comply with applicable laws or regulations, including as a result of possible misinterpretations or misapplications;
- material reductions in purchases, non-renewal or early termination of contracts, or delinquencies or defaults by key customers;
- unfavorable changes to the terms of key customer or supplier relationships, or changes in customer mix;
- adverse changes in U.S. or foreign tax laws, unfavorable challenges to our tax positions and payments to settle these challenges;
- uncertainties due to government healthcare reform;
- changes in manufacturers' pricing, selling, inventory, distribution or supply policies or practices;
- changes in regulatory policies regarding pharmaceutical manufacturer product pricing practices;
- changes in hospital buying groups or hospital buying practices;

- changes in distribution or sourcing models for pharmaceutical and medical and surgical products, including an increase in direct and limited distribution;

- the risks of counterfeit products in the supply chain;

- changes to the prescription drug reimbursement formula and related reporting requirements for generic pharmaceuticals under Medicaid;

- increasing consolidation in the healthcare industry, which could give the resulting enterprises greater bargaining power and may increase pressure on prices for our products and services or result in the loss of customers;

- disruption or damage to, or failure of, our information systems, critical facilities, including our national logistics center, or distribution networks;

- risks to our business and information and controls systems in the event that the Pharmaceutical segment's planned multi-year systems replacement project or other business process improvements, infrastructure modernizations or initiatives to use a third-party service providers for key systems and processes are not effectively implemented;

- any compromise of our information systems or those of a third-party with whom we do business, including unauthorized access to or use or disclosure of sensitive information;

- the results, costs, effects or timing of any commercial disputes, government contract compliance matters, product liability claims or lawsuits, patent infringement claims, *qui tam* actions or other legal proceedings;

- whether we can obtain product liability insurance for a particular product and if so, whether such insurance is adequate to cover all future claims, settlements and judgments;

- our ability to maintain adequate intellectual property protections;

- the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition, and uncertainties relating to our ability to achieve the anticipated results from acquisitions;

- risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility;

- increased costs for commodities used in the Medical segment including various components, compounds, raw materials or energy such as oil-based resins, cotton, latex and other commodities;

- shortages in commodities, components, compounds, raw materials or energy used by our businesses, including supply disruptions of radioisotopes;

- the loss of, or default by, one or more key suppliers for which alternative suppliers may not be readily available;

- bankruptcy, insolvency or other credit failure of a customer or supplier that owes us a substantial amount;

- risks associated with global operations, including the effect of local economic environments, inflation, recession, currency volatility and global competition, in addition to risks associated with compliance with U.S and international laws relating to global operations;

- risks associated with volatility and disruption to the global capital and credit markets, which may adversely affect our ability to access credit, our cost of credit and the financial soundness of our customers and suppliers;

- our ability to introduce and market new products and our ability to keep pace with advances in technology;

- the costs, effects, timing or success of restructuring programs or plans;

- significant charges to earnings if goodwill or intangible assets become impaired;

- uncertainties relating to general political, business, industry, regulatory and market conditions; and

- other factors described in the "Risk Factors" section of the 2016 Form 10-K.

The words "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions generally identify "forward-looking statements," which speak only as of the date the statements were made, and also include statements reflecting future results or guidance, statements of outlook and expense accruals. We undertake no obligation to update or revise any forward-looking statements, except to the extent required by applicable law.

2

# EXHIBIT 53

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Barrett George S | CARDINAL HEALTH INC [ CAH ] | X Director       10% Owner |
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 08/15/2016 | X Officer (give title below)    Other (specify below) |
| 7000 CARDINAL PLACE | | Chairman and CEO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| DUBLIN    OH    43017 | | X Form filed by One Reporting Person |
| (City)    (State)    (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/15/2016 | | A(1) | | 38,065 | A | $0 | 528,399 | D | |
| Common Shares | 08/15/2016 | | F(2) | | 64,168 | D | $83.6(3) | 464,231 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $83.19 | 08/15/2016 | | A | | 189,380 | | (4) | 08/15/2026 | Common Shares | 189,380 | $0 | 189,380 | D | |

**Explanation of Responses:**

1. Grant of restricted share units ("RSUs") that vest in three equal annual installments beginning on August 15, 2017.
2. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 47,187 RSUs and 88,043 performance share units.
3. Reflects closing price on prior business day.
4. Stock option vests in three equal annual installments beginning on August 15, 2017.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact        08/17/2016

** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 54

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

**1. Name and Address of Reporting Person[*]**

Casey Donald M Jr.

| (Last) | (First) | (Middle) |
|---|---|---|

7000 CARDINAL PLACE

(Street)

| DUBLIN | OH | 43017 |
|---|---|---|
| (City) | (State) | (Zip) |

**2. Issuer Name and Ticker or Trading Symbol**
CARDINAL HEALTH INC [ CAH ]

**3. Date of Earliest Transaction (Month/Day/Year)**
08/15/2016

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer (Check all applicable)**

|   | Director |   | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) |   | Other (specify below) |

CEO, Medical Segment

**6. Individual or Joint/Group Filing (Check Applicable Line)**

| X | Form filed by One Reporting Person |
|---|---|
|   | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/15/2016 | | A[(1)] | | 11,991 | A | $0 | 150,310 | D | |
| Common Shares | 08/15/2016 | | F[(2)] | | 15,361 | D | $83.6[(3)] | 134,949 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $83.19 | 08/15/2016 | | A | | 59,655 | | [(4)] | 08/15/2026 | Common Shares | 59,655 | $0 | 59,655 | D | |

**Explanation of Responses:**

1. Grant of restricted share units ("RSUs") that vest in three equal annual installments beginning on August 15, 2017.

2. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 11,926 RSUs and 23,112 performance share units.

3. Reflects closing price on prior business day.

4. Stock option vests in three equal annual installments beginning on August 15, 2017.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact     08/17/2016

** Signature of Reporting Person     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 55

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Casey Donald M Jr. | CARDINAL HEALTH INC [ CAH ] | |

| (Last) | (First) | (Middle) |
|---|---|---|
| 7000 CARDINAL PLACE | | |

| 3. Date of Earliest Transaction (Month/Day/Year) |
|---|
| 09/15/2016 |

|   |   |
|---|---|
| | Director | 10% Owner |
| X | Officer (give title below) | Other (specify below) |
| | CEO, Medical Segment | |

| 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|---|
| | X Form filed by One Reporting Person |
| | Form filed by More than One Reporting Person |

| (Street) | | |
|---|---|---|
| DUBLIN | OH | 43017 |
| (City) | (State) | (Zip) |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 09/15/2016 | | F[(1)] | | 4,748 | D | $75.26[(2)] | 130,201 | D | |

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 10,005 restricted share units.

2. Reflects closing price on prior business day.

**Remarks:**

|   |   |
|---|---|
| /s/ Elaine S. Natsis, Attorney-in-fact | 09/19/2016 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 56

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): October 31, 2016**

# Cardinal Health, Inc.

(Exact name of registrant as specified in its charter)

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place, Dublin, Ohio 43017**

(Address of principal executive offices) (Zip Code)

**(614) 757-5000**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instructions A.2. below):

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 2.02: Results of Operations and Financial Condition

On October 31, 2016 , Cardinal Health, Inc. (the "Company") issued a news release announcing its results for the quarter ended September 30, 2016 . A copy of the news release is included as Exhibit 99.1 to this report.

## Item 7.01: Regulation FD Disclosure

During a webcast scheduled to be held at 8:30 a.m. Eastern time on October 31, 2016 , the Company's Chairman and Chief Executive Officer and Chief Financial Officer will discuss the Company's results for the quarter ended September 30, 2016 and outlook for the fiscal year ending June 30, 2017 . The slide presentation for the webcast will be available on the Investors page at ir.cardinalhealth.com . An audio replay of the webcast also will be available on the Investors page at ir.cardinalhealth.com .

## Item 9.01: Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Exhibit Description |
|---|---|
| 99.1 | News release issued by the Company on October 31, 2016 announcing first-quarter results. |

2

# Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Cardinal Health, Inc.**

(Registrant)

Date: October 31, 2016　　　　　　　　By:　　/s/ Stuart G. Laws

Stuart G. Laws

Senior Vice President and Chief Accounting Officer

3

# Exhibit Index

| Exhibit Number | Exhibit Description |
| --- | --- |
| 99.1 | News release issued by the Company on October 31, 2016 announcing first-quarter results. |

4

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

Media: Ellen Barry                                   Investors: Lisa Capodici

(614) 553-3858                                        (614) 757-5035

ellen.barry@cardinalhealth.com                       lisa.capodici@cardinalhealth.com

# Cardinal Health Reports First-quarter Results for Fiscal Year 2017

- **Revenue increased 14 percent to $32 billion**
- **GAAP [1] operating earnings decreased 14 percent to $535 million , and non-GAAP operating earnings decreased 9 percent to $669 million**
- **GAAP diluted earnings per share decreased 17 percent to $0.96 , and non-GAAP diluted earnings per share decreased 10 percent to $1.24**
- **Fiscal 2017 earnings per share guidance adjusted**

**DUBLIN, Ohio, Oct. 31, 2016** - Cardinal Health (NYSE: CAH) today reported first-quarter fiscal year 2017 revenue of $32 billion , an increase of 14 percent from the comparable quarter last year. The company also reported a decline in GAAP operating earnings of 14 percent to $535 million and in non-GAAP operating earnings of 9 percent to $669 million . GAAP diluted earnings per share (EPS) decreased 17 percent to $0.96 , while non-GAAP diluted EPS decreased 10 percent to $1.24 .

"Our first-quarter results were largely as we suggested they would be, with a healthy increase in revenue and a decrease in our operating earnings largely driven by conditions in the pharmaceutical distribution market," said George Barrett, chairman and CEO of Cardinal Health. "While short-term headwinds, particularly around pharmaceuticals, are quite challenging, our Medical segment had an excellent quarter building on the momentum coming out of fiscal year 2016. From an operating perspective, our metrics were strong in both of our reporting segments, and our strategic positioning is well-aligned with the changing needs of the market."

## Q1 FY17 summary

|  |  | Q1 FY17 |  | Q1 FY16 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | **32.0 billion** | $ | 28.1 billion | 14% |
| Operating earnings | $ | **535 million** | $ | 620 million | (14)% |
| Non-GAAP operating earnings | $ | **669 million** | $ | 737 million | (9)% |
| Net earnings attributable to Cardinal Health Inc. | $ | **309 million** | $ | 383 million | (19)% |
| Non-GAAP net earnings attributable to Cardinal Health Inc. | $ | **399 million** | $ | 458 million | (13)% |
| Diluted EPS attributable to Cardinal Health Inc. | $ | **0.96** | $ | 1.15 | (17)% |
| Non-GAAP diluted EPS attributable to Cardinal Health Inc. | $ | **1.24** | $ | 1.38 | (10)% |

## Segment results

### Pharmaceutical segment

First-quarter revenue for the Pharmaceutical segment increased 14 percent to $28.8 billion due to growth from net new and existing Pharmaceutical Distribution customers and, to a lesser extent, performance from the Specialty business.

Segment profit for the quarter decreased 19 percent to $534 million . This decrease was driven by generic pharmaceutical pricing and, to a lesser extent, reduced levels of branded inflation and the previously announced loss of a large Pharmaceutical Distribution customer. This was partially offset by solid performance from Red Oak Sourcing.

|  |  | Q1 FY17 |  | Q1 FY16 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | **28.8 billion** | $ | 25.1 billion | 14% |
| Segment profit | $ | **534 million** | $ | 657 million | (19)% |

**Cardinal Health**
**Page 2**

*Medical segment*

First-quarter revenue for the Medical segment increased 12 percent to $3.3 billion driven by contributions from acquisitions and net new and existing customers.

Segment profit increased 26 percent to $127 million due to contributions from acquisitions and Cardinal Health Brand products.

| | | Q1 FY17 | | Q1 FY16 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | 3.3 billion | $ | 2.9 billion | 12% |
| Segment profit | $ | 127 million | $ | 101 million | 26% |

## Fiscal 2017 outlook

The company does not provide GAAP EPS outlook, because it is unable to reliably forecast most of the items that are excluded from GAAP EPS to calculate non-GAAP EPS. These items could cause EPS to differ materially from non-GAAP EPS. See "Use of Non-GAAP Measures" following the attached schedules for additional explanation.

Full-year Pharmaceutical segment profit is now expected to be down as a percentage in the mid-to-high single digits compared to fiscal year 2016, with the changes coming primarily from generic pharmaceutical pricing and, to a lesser extent, reduced levels of branded inflation. Based on first-quarter results and second-quarter expectations, the company slightly lowered its fiscal year 2017 guidance range for non-GAAP diluted EPS from continuing operations to $5.40 to $5.60 from $5.48 to $5.73, representing growth of approximately 3 to 7 percent from the prior year.

More details about this outlook can be found on the company's webcast and accompanying slides; see below for details.

## Additional first-quarter and recent highlights

- Onboarded Medical segment customer Kaiser Permanente

- Expanded the existing distribution agreement between Cordis and Biosensors, enabling Cordis to be the exclusive distributor for Biosensors' coronary interventional products in Japan

- Acquired TelePharm, a company that focuses on establishing telepharmacies in rural areas

- Granted Cardinal Health Foundation funds to 17 community-based non-profit organizations nationwide to combat prescription drug misuse

## Webcast

Cardinal Health will host a webcast today at 8:30 a.m. Eastern to discuss first-quarter results. To access the webcast and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com . No access code is required.

Presentation slides and a webcast replay will be available on the Cardinal Health website at ir.cardinalhealth.com until Oct. 30, 2017.

## Upcoming webcasted investor events

- 2016 Annual Meeting of Shareholders on Nov. 3 at 8 a.m. Eastern

- Credit Suisse 25th Annual Healthcare Conference on Nov. 8 at 8:30 a.m. Mountain

## About Cardinal Health

Cardinal Health, Inc. (NYSE: CAH), is a global integrated healthcare services and products company, providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically-proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. Backed by nearly 100 years of experience, with more than 37,000 employees in nearly 60 countries, Cardinal Health ranks among the top 25 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter and connect on LinkedIn at linkedin.com/company/cardinal-health .

[1.] GAAP refers to U.S. generally accepted accounting principles. This news release includes GAAP financial measures as well as non-GAAP financial measures, which are financial measures not calculated in accordance with GAAP.  See "Use of non-GAAP Measures" following the attached schedules for definitions of the non-GAAP financial measures presented in this news release, and see the attached schedules for reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the Investor Relations page at ir.cardinalhealth.com .  In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

**Cardinal Health**
**Page 3**

## Cautions concerning forward-looking statements

This news release contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and branded pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the ability to successfully integrate and realize the benefits from the acquisition of Cordis; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including federal health care reform legislation; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This news release reflects management's views as of Oct. 31, 2016 . Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**Schedule 1**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | First Quarter | | | | % Change |
| --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2016 | |
| Revenue | $ | 32,039 | $ | 28,055 | 14 % |
| Cost of products sold | | 30,449 | | 26,476 | 15 % |
| Gross margin | | 1,590 | | 1,579 | 1 % |
| | | | | | |
| **Operating expenses:** | | | | | |
| Distribution, selling, general, and administrative expenses | | 920 | | 842 | 9 % |
| Restructuring and employee severance | | 9 | | 12 | N.M. |
| Amortization and other acquisition-related costs | | 122 | | 105 | N.M. |
| Impairments and (gain)/loss on disposal of assets | | 3 | | — | N.M. |
| Litigation (recoveries)/charges, net | | 1 | | — | N.M. |
| Operating earnings | | 535 | | 620 | (14)% |
| | | | | | |
| Other (income)/expense, net | | (3) | | 8 | N.M. |
| Interest expense, net | | 44 | | 44 | — % |
| Earnings before income taxes | | 494 | | 568 | (13)% |
| | | | | | |
| Provision for income taxes | | 184 | | 184 | — % |
| Net earnings | | 310 | | 384 | (19)% |
| | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | (1) | | (1) | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 309 | $ | 383 | (19)% |
| | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Basic | $ | 0.97 | $ | 1.17 | (17)% |
| Diluted | | 0.96 | | 1.15 | (17)% |
| | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | |
| Basic | | 320 | | 328 | |
| Diluted | | 322 | | 331 | |

<u>**Schedule 2**</u>

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets (Unaudited)**

| (in millions) | | September 30, 2016 | | June 30, 2016 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 2,001 | $ | 2,356 |
| Trade receivables, net | | 7,708 | | 7,405 |
| Inventories, net | | 10,917 | | 10,615 |
| Prepaid expenses and other | | 1,657 | | 1,580 |
| Total current assets | | 22,283 | | 21,956 |
| | | | | |
| Property and equipment, net | | 1,823 | | 1,796 |
| Goodwill and other intangibles, net | | 9,427 | | 9,426 |
| Other assets | | 873 | | 944 |
| **Total assets** | $ | 34,406 | $ | 34,122 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests, and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 17,597 | $ | 17,306 |
| Current portion of long-term obligations and other short-term borrowings | | 616 | | 587 |
| Other accrued liabilities | | 1,788 | | 1,808 |
| Total current liabilities | | 20,001 | | 19,701 |
| | | | | |
| Long-term obligations, less current portion | | 4,916 | | 4,952 |
| Deferred income taxes and other liabilities | | 2,842 | | 2,781 |
| | | | | |
| Redeemable noncontrolling interests | | 116 | | 117 |
| | | | | |
| Total Cardinal Health, Inc. shareholders' equity | | 6,512 | | 6,554 |
| Noncontrolling interests | | 19 | | 17 |
| Total shareholders' equity | | 6,531 | | 6,571 |
| **Total liabilities, redeemable noncontrolling interests, and shareholders' equity** | $ | 34,406 | $ | 34,122 |

**Schedule 3**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (Unaudited)**

| (in millions) | First Quarter | |
| --- | --- | --- |
| | 2017 | 2016 |
| **Cash flows from operating activities:** | | |
| Net earnings | $ 310 | $ 384 |
| | | |
| Adjustments to reconcile net earnings to net cash provided by/(used in) operating activities: | | |
| Depreciation and amortization | 173 | 137 |
| Impairments and loss on disposal of assets, net | 3 | — |
| Share-based compensation | 23 | 30 |
| Provision for bad debts | 7 | 17 |
| Change in fair value of contingent consideration obligation | — | (1) |
| Change in operating assets and liabilities, net of effects from acquisitions: | | |
| Increase in trade receivables | (306) | (348) |
| Increase in inventories | (298) | (495) |
| Increase in accounts payable | 279 | 425 |
| Other accrued liabilities and operating items, net | (87) | (201) |
| Net cash provided by/(used in) operating activities | 104 | (52) |
| | | |
| **Cash flows from investing activities:** | | |
| Acquisition of subsidiaries, net of cash acquired | (9) | (1,399) |
| Additions to property and equipment | (100) | (83) |
| Purchase of available-for-sale securities and other investments | (52) | (26) |
| Proceeds from sale of available-for-sale securities and other investments | 34 | 25 |
| Proceeds from maturities of available-for-sale securities | 17 | 5 |
| Net cash used in investing activities | (110) | (1,478) |
| | | |
| **Cash flows from financing activities:** | | |
| Payment of contingent consideration obligation | — | (23) |
| Net change in short-term borrowings | 25 | 36 |
| Net purchase of noncontrolling interests | (10) | — |
| Reduction of long-term obligations | (1) | (4) |
| Proceeds from interest rate swap terminations | 14 | — |
| Net tax withholdings from share-based compensation | (9) | (21) |
| Excess tax benefits from share-based compensation | 30 | 31 |
| Dividends on common shares | (149) | (131) |
| Purchase of treasury shares | (250) | — |
| Net cash used in financing activities | (350) | (112) |
| | | |
| Effect of exchange rate changes on cash and equivalents | 1 | — |
| | | |
| Net decrease in cash and equivalents | (355) | (1,642) |
| Cash and equivalents at beginning of period | 2,356 | 4,616 |
| **Cash and equivalents at end of period** | $ 2,001 | $ 2,974 |

**Schedule 4**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | First Quarter | | | (in millions) | First Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **28,762** | $ 25,140 | Amount | $ | **3,279** | $ 2,919 |
| Growth rate | | **14 %** | 19% | Growth rate | | **12%** | 2 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **534** | $ 657 | Amount | $ | **127** | $ 101 |
| Growth rate | | **(19)%** | 46% | Growth rate | | **26%** | (11)% |
| Segment profit margin | | **1.86 %** | 2.62% | Segment profit margin | | **3.87%** | 3.45 % |

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the three months ended September 30, 2016 was $32,039 million , which included total segment revenue of $32,041 million and Corporate revenue of $(2) million . Total consolidated revenue for the three months ended September 30, 2015 was $28,055 million , which included total segment revenue of $28,059 million and Corporate revenue of $(4) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended September 30, 2016 were $535 million , which included total segment profit of $661 million and Corporate costs of $(126) million . Total consolidated operating earnings for the three months ended September 30, 2015 were $620 million , which included total segment profit of $758 million and Corporate costs of $(138) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net, and certain investment spending that are not allocated to the segments.

**Schedule 5**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation [1]**

### First Quarter 2017

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| GAAP | $ 535 | (14)% | $ 494 | $ 184 | $ 309 | (19)% | $ 0.96 | (17)% |
| Restructuring and employee severance | 9 | | 9 | 4 | 5 | | 0.02 | |
| Amortization and other acquisition-related costs | 122 | | 122 | 40 | 82 | | 0.25 | |
| Impairments and (gain)/loss on disposal of assets | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | 1 | | 1 | — | 1 | | — | |
| Non-GAAP | $ 669 | (9)% | $ 629 | $ 229 | $ 399 | (13)% | $ 1.24 | (10)% |

### First Quarter 2016

| | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| GAAP | $ 620 | 33 % | $ 568 | $ 184 | $ 383 | 44 % | $ 1.15 | 47 % |
| Restructuring and employee severance | 12 | | 12 | 5 | 7 | | 0.02 | |
| Amortization and other acquisition-related costs | 105 | | 105 | 37 | 68 | | 0.21 | |
| Impairments and (gain)/loss on disposal of assets | — | | — | — | — | | — | |
| Litigation (recoveries)/charges, net | — | | — | — | — | | — | |
| Non-GAAP | $ 737 | 30 % | $ 685 | $ 226 | $ 458 | 35 % | $ 1.38 | 38 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Measures and Definitions schedules.

[2] attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no LIFO charges/(credits) or losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This earnings release contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP").

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

**Exclusions from Non-GAAP Financial Measures**

The differences between the non-GAAP measures presented in this Form 8-K and the most directly comparable GAAP measure are represented by the following items, which management believes are useful to exclude for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits , which we began excluding in fiscal 2015 because the factors that drive last-in first-out ("LIFO") inventory charges or credits such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. We also believe that exclusion of LIFO charges from non-GAAP metrics allows for better comparison of our current financial results to our historical financial results and to our peer group companies;

- restructuring and employee severance costs , which include charges for programs in which we fundamentally change our operations and are excluded because they are not part of the ongoing operations of our underlying business, which includes normal levels of reinvestment in the business;

- amortization and other acquisition-related costs . We exclude amortization costs primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, these non-cash amounts are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of forecasted, current and historical financial results. We exclude other acquisition-related costs because they are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. They are also significantly impacted by the timing and size of acquisitions;

- impairments and gains or loss on disposal of assets , which are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance;

- litigation recoveries or charges, net , which often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount; and

- loss on extinguishment of debt , which does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of these types of charges is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the non-GAAP items described above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Forward Looking Non-GAAP Measures**

In this earnings release, the Company presents its outlook for fiscal 2017 non-GAAP EPS. The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2017 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.14 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Definitions**

**Growth rate calculation** : Growth rates in this Form 8-K are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, and (6) loss on extinguishment of debt.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# EXHIBIT 57



# Q1 FY17 Cardinal Health, Inc. Earnings Conference Call

**October 31, 2016 8:30AM Eastern**

Operator: Good day and welcome to the Cardinal Health first quarter fiscal year 2017 earnings conference call. Today's conference is being recorded. At this time, I would like to turn the conference over to Sally Curley. Please go ahead.

Sally Curley: Thank you Ashley and welcome to Cardinal Health's first-quarter fiscal year 2017 earnings call. As a reminder, during the Q&A, please limit your questions to one, and one follow-up so that we may get to everyone in queue. We'll do our best this morning to get to everyone, but if we don't, then please feel free as always, to reach out to the IR team after this call with any additional questions.

Also, today, we will be making forward-looking statements. The matters addressed in the statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied. Please refer to the SEC filings and the forward-looking statement slide at the beginning of the presentation, found on the investor page of our website for a description of risks and uncertainties.

In addition, we will reference non-GAAP financial measures. Information about these measures and reconciliations to GAAP are included at the end of the slides. In terms of upcoming events, we will be webcasting our 2016 Annual Meeting of Shareholders on November 3rd at 8:00 a.m. eastern and our presentation at the Credit Suisse 25th Annual Healthcare Conference on November 8th at 8:30 a.m. mountain time.

Today's press release and details for any webcasted events are, or will be posted on the IR section of our website at CardinalHealth.com, so please make sure to visit the site often for updated information. We hope to see many of you at an upcoming event. Now, I'd like to turn the call over to our Chairman and CEO, George Barrett. George?

George Barrett: Thanks Sally. Good morning everyone and thanks to all of you for joining us. Allow me to start by being direct. Our first quarter of fiscal 2017 certainly had its share of challenges, but it came in much as we suggested to you that it would, with healthy and growing revenues up 14% versus the prior year and non-GAAP operating earnings down 9% versus the first quarter of last year.

I'll focus my commentary on the broad outlook for our business and our future and Mike will walk you through our financials for the quarter with more detail and specificity. Let me frame the start to our fiscal year with two lenses - one, the operating performance of our integrated business lines, and the other the environment in which we compete.

Our teams continue to demonstrate their commitment to strong operating performance. Our service levels are extremely high. We are experiencing very high rates of customer retention and our enterprise-wide customer reach is expanding, including the on boarding of some very strategically important customers in the med segment. We also continue to launch new products and service offerings, increasing our value to our customers as they navigate significant change in the industry.

As is imbedded in our DNA, we are taking a disciplined and determined approach to managing our working capital. But make no mistake; this is a very challenging near term environment. This is particularly true for our pharmaceutical distribution business. The public discourse around drug pricing has - at least for the moment - had a significant impact on the way pharmaceutical companies are pricing their products on both the branded and generic side. Combining this with limited generic product launches and significant reimbursement pressure on our customers, the competitive intensity has increased. As a result, price erosion during the period has been more pronounced than it has been in quite some time for our industry.

Our commitment has been and will continue to be to providing world-class service, tools, technology and solutions to help our customers thrive in a challenging environment and better serve their patients. This is central to our value proposition. At the same time that our retail pharmacy customers are experiencing unique dynamics, we are also working closely with our large integrated system customers to help them adapt to a changing environment - one where pressures to be efficient are relentless, where the configuration of their own businesses and portfolios are more complex and where the need to operate across their own internal boundaries is a high priority.

As a result, the historically siloed or departmentally-driven operating model is evolving to one that places a premium on operating coordination across the system and strategic alignment with other healthcare players who can enable their strategies.  This is who we are.

Our focus is on finding more efficient and effective ways to create real value for our customers across our lines of business.  Today, our customers look to us for our integrated solutions to help them reduce costs, increase efficiency and improve quality.  All of this requires deep, multi-disciplinary healthcare expertise and real strategic partnership, which we deliver every day for those we serve.

These are the characteristics of the moment - some very encouraging - others creating short-term headwinds.  Of course, I'd like some of that to be different, but this is the environment in which we must compete now.  We will play for the long game with a strategic eye on the future, mobilizing the best talent and building the right lines of business to help our customers compete in this changing world.

With this as backdrop and modeling in an adjustment for the current pricing environment, we are slightly lowering our fiscal 2017 non-GAAP EPS guidance to $5.40 - $5.60 from a prior range of $5.48 - $5.73.  Let me be clear, we remain committed to navigating today's challenges, embracing tomorrow's opportunities for our customers and shareholders.

Within our pharmaceutical segment, revenue was up 14% versus the prior year to $28.8 billion, and segment profit declined 19% versus the prior year to $534 million.  This was primarily driven by generic pharmaceutical pricing, reduced levels of branded inflation, and the loss of Safeway, which we previously discussed.

However, the work that we have done over the past few years has strategically positioned us to more effectively support our customers.  The range of our retail service offerings has never been stronger and the Red Oak sourcing venture with CVS Health continues to be an effective, productive and profitable partnership.  We see this as a long-term driver of value for us and our customers.

Our specialty solutions group continues to perform well, driven by both our provider facing and biopharma offerings, once again showing strong double-digit growth.  We are confident that our growing portfolio of services is well aligned with and valuable to the strategies of our biopharmaceutical partners.  I want to thank Jon

Giacomin and his pharma segment teams for their commitment to navigating these challenging dynamics and remaining focused on our customers with a clear eye towards managing efficiency.

Our medical segment had a strong first quarter across multiple dimensions. First, revenues for the medical segment were up 12% versus the prior year to $3.3 billion. Second, segment profit was up 26% versus the prior year to $127 million. And third, our medical segment customer base has been expanding, a testament to the value we've created across our lines of business and the strong partnerships we've developed with our customers. Every day, we see our customers focusing more on the total care of the patient and they recognize the growing shift to value-based reimbursement models.

Discussions with our customers reinforce that they are looking to us as a broad-based, integrated solutions provider and a source of expertise across the continuum of care. Our Cardinal Health branded products continue to be a driver of growth for the segment as we increase our account penetration and growth in our strategic accounts is outpacing the market.

During the quarter, we onboarded a large complex customer in our medical segment. We learned a lot from this rapid deployment and we are very grateful, both to our employees and to our new partner for working together to move us towards the finish line.

October 2nd marked a year since we closed the Cordis acquisition. Don Casey and his team have done a tremendous job leading the integration, thoughtfully phasing in new systems and processes and building out an important platform. The integration of Cordis has proved to be an excellent example of how we can bring together best practices across borders. We have seen over this past year that taking the time to do things right is essential to best serve our customers.

We have also seen growth in some important markets, including Europe, where we believe that taking an integrated cohesive approach to our customers will position us for measurable growth over the long term. Cordis is also providing us with additional partnership opportunities to build out our products, tools and services. As an example, we have signed an exclusive distribution agreement with Biosensors to bring their coronary interventional products to our customers in Europe and Japan as another offering in the bag to deliver even greater value.

CardinalHealth
*Essential to care™*

While we are operating today in a tough and unique environment, we believe that we are well prepared to lead and quick to adapt.  By working with our customers holistically, driving our own efficiencies and delivering integrated effective solutions, we have developed strong partnerships with our customers.

We remain committed to focusing our product lines and capabilities around the patient to position ourselves to capitalize on the changes in our industry.  And through the collective drive and dedication of our 37,000 people, we'll continue to deliver meaningful results and measurable growth for our customers, patients and shareholders.  With that, I'd like to turn the call over to Mike for a detailed review of the financials.  Mike?

Mike Kaufmann: Thanks George and thanks to everyone joining us on the call today to discuss the first quarter.  I'd like to begin by reviewing our first quarter financial performance and then walk through our full year, fiscal 2017 expectations.  Please note that with all of my comments, I'll begin with GAAP and then provide the comparable non-GAAP figure.  The slide presentation on our website should be a helpful guide throughout this discussion as it includes our GAAP to non-GAAP reconciliation tables.

Our first-quarter fiscal 2017 results were about as we expected, with GAAP diluted EPS at $0.96 and non-GAAP EPS at $1.24, a 17% and 10% decrease respectively.  In our August call, I mentioned this would be due to some challenging trends and some tough year-over-year comps, particularly on some key generic items in our pharmaceutical segment, as well as discrete tax items, partially offset by strong performance in the medical segment.  That's largely what we saw.  I'll discuss both segments in greater detail later, but let me start with consolidated company results.

Revenues increased 14% year-over-year, totalling $32 billion.  Total company gross margin dollars were up 1% versus the same quarter in the prior year.  Consolidated SG&A increased 9% versus the prior year, primarily driven by strategic acquisitions.  If you exclude acquisitions, SG&A was favorable for the quarter.

Both consolidated GAAP and Non-GAAP operating earnings declined versus the prior year by 14% and 9% respectively.  Moving below the operating line, net interest and other expense was approximately $41 million in the quarter, a decrease versus the prior year.  The GAAP effective tax rate for the first quarter was 37.3%.  Our non-GAAP effective tax rate this quarter was 36.4%, which is 3.5 percentage points higher on a comparative

basis, primarily due to several favorable discrete items that occurred in last year's first quarter. We continue to expect our full-year non-GAAP effective tax rate to be between 35% and 37%.

Our first-quarter diluted average shares outstanding were 322 million, about 9 million shares fewer than the first quarter of fiscal 2016. This was due to the benefit from our opportunistic share repurchases over the last 12 months, which includes $250 million of share repurchases in the first quarter. We have just under $800 million remaining on our board authorized share repurchase program.

In addition, we generated approximately $104 million in operating cash flow during the quarter. And, due to efficient and effective working capital management by our teams, we ended September 30th, with a strong balance sheet. Our cash balance, including short-term investments was $2.2 billion, of which $622 million were held internationally. Now let's move to segment performance starting with pharma.

Our pharmaceutical segment revenue increased 14% to $28.8 billion. This increase was from growth in net new and existing pharmaceutical distribution customers, driven mainly by the win of a previously announced large mail order customer and the impact of branded inflation. While a smaller driver, the strong performance of our specialty business also drove the revenue increase.

Despite the revenue growth, segment profit for the quarter decreased 19% to $534 million. This decrease was a result of generic pharmaceutical pricing and to a lesser extent, reduced levels of branded inflation, as well as the previously announced loss of a large pharmaceutical distribution customer. This was partially offset by solid performance from Red Oak sourcing.

These same factors as well as changes in our product and customer mix, mainly the onboarding of a previously discussed large mail-order customer, reduced our segment profit rate by 76 basis points, to 1.86%. As a reminder, next quarter, we will fully lap the onboarding of this large mail-order customer.

Getting back to Red Oak, as we've mentioned in the past, if it achieved certain milestones, it would trigger the second of two predetermined payments beginning in FY17. Because of excellent performance, Red Oak met these milestones, so we've made our second and final $10 million increase to the quarterly payment to CVS Health beginning in Q1. As anticipated, our new quarterly payment is $45.6 million for the remaining eight years of the agreement.

Let's now go to the medical segment performance, which had a strong first quarter. Revenues for the quarter grew 12% to $3.3 billion, primarily driven by contributions from our strategic acquisitions and growth from net new and existing customers. Medical segment profit increased 26% to $127 million during the quarter due to contributions from acquisitions and Cardinal Health Brand products.

Segment profit margin rate increased 42 basis points in the quarter to 3.87%, driven by acquisitions and Cardinal Health Brand products, partially offset by the change in customer mix. This change primarily comes from the accelerated onboarding of a new large medical distribution customer.

The recent wins in the medical segment on the distribution side are exciting and very important. They add to our profitability but are dilutive to our medical segment margin rates. Specific to Cordis, it continues to meet our performance expectations and make real and measurable progress.

As we mentioned last quarter, our integration team is on track to have our operations fully stood up and exit the TSA agreements by the end of this fiscal year, while our transition manufacturing agreements will extend for a couple of years. Until we exit these TSAs, they can create some variability in our segment profit rate. Although this quarter, it was about on track. Overall, our team has done an outstanding job driving strong, healthy growth in the medical segment.

Before moving to our fiscal year 17 outlook, you can turn to slide number 7 where you'll see our consolidated GAAP to non-GAAP adjustments for the quarter. The $0.28 variance to non-GAAP diluted EPS results was primarily driven by amortization and other acquisition-related costs.

Next, I'd like to discuss our Fiscal 2017 non-GAAP earnings guidance range and assumptions. But, before doing that, let me comment on Q2. While we don't typically provide quarterly guidance, we want to keep you informed when there are meaningful shifts. So, as it relates to the second quarter, the generic pricing environment, and to a lesser extent the brand inflation rates lead us to now expect the second quarter fiscal 2017 pharma segment profit decline to be relatively in line with the first quarter on a percentage basis.

Now, you can follow along starting on slide 9 of the presentation. As George mentioned earlier, based on Q1 actuals, second quarter expectations and trends we noted, we are slightly lowering our non-GAAP earnings per

share guidance range we provided in August to $5.40 - $5.60, from $5.48 - $5.73. Let me give you some color around this adjustment by walking through our corporate and segment assumptions.

Turning to slide 10, all but two of our fiscal year 2017 corporate assumptions remain unchanged. First, we have updated our weighted average shares outstanding assumption to 320 million to 322 million shares, which is lower than the initial range provided of 324 million to 326 million shares. This new range reflects potential additional repurchases.

Second, our assumption for acquisition-related intangible amortization increased to approximately 385 million, or about $0.79 per share. That does not affect our non-GAAP earnings.

On slide 11, there are three updates to our full year pharmaceutical segment assumptions that I would like to take a minute to highlight. First, we previously expected pharma segment profit for FY17 to be essentially flat. We now expect full-year segment profit to be down mid to high single digits versus the prior year, due to the generic pharmaceutical pricing environment and while much less of an impact, lower than anticipated brand pharmaceutical inflation.

To clarify, when we refer to generic drug pricing, we are referring to a combination of all factors affecting generic selling price such as manufacturer inflation and deflation and customer pricing. We now expect this to be in the mid to high single digit deflation for the full fiscal year.

Lastly, we have adjusted our brand manufacturer inflation assumptions to a range of 7% - 9% from approximately 10%. Overall, we still expect pharma segment profit to be back half-weighted.

Now, turning to the medical segment, all of our fiscal year 2017 medical segment assumptions remain on target and unchanged. We are still on track to achieve mid-single digit percentage growth in revenue and double-digit growth in segment profit.

Now turning back to overall company guidance, since we are slightly lowering our overall fiscal 2017 earnings guidance range to 3% - 7% growth from 5% - 9% growth versus the prior year, we've updated some of our original assumptions to achieve that growth on slide 13. The line titled Business Growth is now assumed to be flat to 3%, and Capital Deployment is now assumed to contribute 3%-4% for the year.

From a corporate standpoint, we are focused on expense management and other actions to achieve these results. Keep in mind that the benefits related to these important items are held at the corporate level and not reflected at the segment level. And while we aren't providing the EPS bridge slide we presented on our August Q4 call, you can infer that based on my comments about the generic pricing environment being more challenging, it would result in a decrease to that line item, while increasing our capital deployment assumptions would result in an increase to that line item.

Net customer activity remains about the same, but our existing or remaining businesses bucket would increase as it includes the corporate actions I just referenced. Additionally, we told you on our fourth quarter call that we were assessing the timing of the adoption of new accounting treatment for the tax effect of share-based compensation.

Our 2017 guidance does not include this, as we believe it is simpler to adopt the new treatment in our first quarter of fiscal 2018, according to the required schedule. So, as you can see, we've now aligned our guidance range given the current pricing environment I just described.

To close, let me highlight a few key points before I turn to your questions. First, while we are experiencing a tough near-term environment, we continue to aspire to the long-term goals we communicated before. In our pharmaceutical segment, we do see generic pharmaceutical pricing and to a lesser extent, branded inflation as challenges. However, we continue to see strong performance from Red Oak sourcing, continued focus on operational excellence and positive feedback from our robust customer base.

In addition, Harvard Drug, Specialty and Nuclear are all delivering value for our customers and our business. On the medical side, we've also won some important new medical distribution customers, which should help us gain scale in sourcing and leverage our cost structure to create greater efficiencies. In addition, we continue to see strong growth in our Cardinal Health Brand products and services, and above-market revenue growth in Cardinal Health at Home.

Finally, Cordis continues to perform well and we are confident in both the fundamentals and growth initiatives in that business.

Overall, it was a challenging quarter, but I want to acknowledge our team for their strong execution and focus in a tough environment.  I believe this excellent execution and focus combined with our broad portfolio and balanced capital deployment will allow us to drive long-term sustainable growth.  With that, Operator, let's begin our Q&A.

Operator: Thank you.  If you would like to ask a question, please signal by pressing *1 on your telephone keypad.  If you're using a speakerphone, please make sure your mute function is turned off to allow your signal to reach our equipment.  We ask that you limit yourself with one question with one follow-up question.  Once again, it is *1 to ask a question.  We'll take our first question from Bob Jones with Goldman Sachs.

Bob Jones: Great, good morning.  Thanks for the questions.

George Barrett: Good morning.

Bob Jones: Yeah, good morning.  George, you talked about the moderation in the pricing environment, but I think your comments seemed largely focused on the buy side part of the business.  I just obviously wanted to get your views on the sell side of the business given your peer last week talked about more aggressive pricing in the retail independent channels.  I just wanted to see what you are seeing there currently.

George Barrett:  Hi, Bob. Good morning.  Yeah, actually my comments really were about the overall pricing environment, so I was talking about sell side as well.  It might - here's my perspective, there are, as I mentioned before, a number of factors coming together to make this a bit of a unique moment.  We're not going to overact to that moment.

Our position, our plans for growth really aren't different today than they were six months ago. Our value proposition is very clear.  We're an extraordinary attentive partner to our customers.  We have a unique ability to follow the patient across the continuum of care - service to offerings are extensive - that's really at the heart of our

**CardinalHealth**
*Essential to care™*

positioning so that's, I think, important to state up front. But, I think we're describing some similar characteristics to what you describe.

Bob Jones: Okay, great. Then I guess, Mike, if I could just go over to the guidance. Overall, it looks like the range is coming down by $0.11 at the midpoint. You talked a lot about generic inflation getting a little bit worse than previously thought and then modestly less branded inflation.

But if I look at the guidance for the pharma segment specifically, it seems like that take down in what you're assuming around profit margins there - or overall profits there - mid to high single digits - would actually indicate something more in the $0.25-$0.40 headwind. Just trying to square those two things, relative to the overall amount coming down compared to what you're suggesting is going on with the pharma segment for the rest of the year.

Mike Kaufmann: Thanks, Bob. Let me hit a few different things. I think, first of all, just to be clear, when we talk - when I was talking about generic pharmaceutical pricing, I wasn't really talking about the headwind/tailwind you used to hear over the last couple of years of inflation and deflation on generic products. Because, that's about where we model it to be this year. We're not really seeing that.

We expected it to be a net deflation environment, and that's what we're seeing. So, that's not really the driver. What we're talking about is more the downstream pricing component of our generic pricing. That's where we're seeing an uptick in competitiveness or a little more erosion than we had expected to be. That really was the main driver of us taking down our pharmaceutical distribution numbers. As I mentioned a couple of times, to a lesser extent brand inflation. So we has said about 10% before on brand inflation. We're now modelling in the 7%-9%.

That impact - I guess I would put it this way - if that were the only thing going on this year, then it wouldn't - we probably wouldn't be adjusting guidance. It's more the combination of the generic pricing and then that on top of that. I think that's the first thing I want to say.

The second thing, I can understand why you're maybe having a little trouble with your numbers. I can't quote exactly or comment on exactly what the numbers should be, but remember, I did make a comment in here that we

CardinalHealth
Essential to care™

have some significant initiatives around expenses and other initiatives. That will be captured in our corporate numbers, and so, those aren't going to show up in the segment numbers because we don't push those down at the end of the year.

Probably the piece that you're missing as you try to reconcile having pharma down, capital deployment up, midpoint down, the last bucket that you're missing is that the corporate numbers, we're going to have savings there that'll be in the overall corporate bucket.

Operator: Our next question comes from Charles Rhyee with Cowen and Company.

Sally Curley: Hi, Charles?

George Barrett: Hello.

Sally Curley: You may need to take your phone off mute.

Operator: Hearing no response.

George Barrett: Maybe go back

Sally Curley: Hey operator, yeah let's go back to Cowen if they get back in queue. Let's go to the next.

Operator: Okay. Our next question comes from Garen Sarafian with Citi Group.



Garen Sarafian: Good morning everyone.  Thanks for taking the questions.  Mike and George, you guys just commented a little bit on the downstream, the sell side dynamics, but on the independent front, you guys aren't as active as some of your peers.  Just wondering what specific segments are you seeing that, and if you could just give a little more flavor as to, sort of, the more recent trends into this month, as to the dynamics and how they're trending.  That'd be great.

George Barrett: Garen, good morning.  Let me start and then Mike jump in.  Actually, we have a strong position with independents and have for quite some years.  The dynamic Mike described, we are seeing in that segment.  I don't know what else to add to that.  Mike, anything?

Mike Kaufmann: Yeah, I mean we have a lot of programs, services.  We continue to stay very, very focused on that bunch of customers.  We continue to have very high retention rates and so we feel really good about where we're positioned in the generic independent space.

Garen Sarafian: I guess, do you, sort of - are you seeing that in other segments other than just the independents, which was, sort of, where I was trying to lead to.  Or is this still - is this focused specifically and only that segment?

George Barrett:  Let me try.  I think it's probably been most intense there.  We often have to deal on a - this is sort of a normal thing with repricing of a contract - thankfully as you know, we have not had a lot of big contracts up for renewal.  But I think it has been a distinctly noteworthy environment in the independents, would you say Mike?

Mike Kaufmann: Yeah, I would totally agree with that.  I think, you have to think about the way contracts are written and just certain customer's contracts are written in ways that the generic pricing or the way it works is - one way in other areas it's much more competitive where they haven't committed to buy all the generics and so they're

constantly shopping them. That's where you're going to see - and that's typically an independence base - and that's where you're going to see some more of these competitive pressures.

Garen Sarafian: Okay, that's useful. Then just as a follow-up on the upstream on the branded inflation side with the branded manufacturers, the moderating inflation has been, sort of, a factor that has been discussed in prior quarters. I thought that at some point, there was an opportunity to go back to the branded manufacturers and re-adjust and realign the contract so it benefits all. I'm wondering, have you done that in between contracts yet, or is this, sort of, still waiting until the contract renews where those conversations come again. I'll stop there. Thank you.

Mike Kaufmann: Yeah, thanks. Good question, and I would say that's really, kind of, across the board. It just depends on the individual manufacturer. As you know, about 15% of our branded margins are based on a contingent basis, which means that generic - or branded inflation is a piece of the driver of the value that we receive. Every one of those where we are not getting the value that we believe we should be compensated for the services that we deliver, we are having discussions with the manufacturers.

Some of those are going to move quicker than others depending on contract dates, and based on prior discussions with those manufacturers on how those deals were arrived. You can imagine with every manufacturer where we believe we're being compensated less than we should have been or should be, we are working with those manufacturers.

Sally Curley: Next question.

Operator: We now have Charles Rhyee with Cowen and Company. Please go ahead.



Charles Rhyee: Yes, sorry about that earlier.  Thanks George.  You were talking in your - also your comments about - sorry Mike, you were talking about your comments - making the second payment to CVS as related to Red Oak.  How much - can you kind of help us understand how much more of a benefit you think you're getting right now this year on your generic procurement and how much of a benefit could we anticipate that we should get the rest of this year?

I guess the point I'm trying to get at is, you talk about your overall estimate on generic deflation.  How much is this procurement benefit you think is helping offset?  Because I think, George - in relation to your earlier comment to Bob's question - you did, kind of, mention that you are seeing similar characteristics in the market relative to comments from last week?  Thanks.

Mike Kaufmann: Yeah, I would say clearly the number one offset to what we're seeing in the competitive pricing on generics has been and should continue to be Red Oak Sourcing.  I continue to be impressed with the team there, the depth of talent we have on the team, the way they're looking at things, the creative ways they're working with manufacturing partners, and you know CVS Health couldn't be a better partner working together with us to drive value at Red Oak.  So, Red Oak would continue to be a positive driver for us when it comes to offsetting that.

Charles Rhyee: Then is there any other things that we can think about that can be offsets.  Or, I guess the other way I'd say this - when you think about the impact that you are seeing potentially in the independence, does your guidance, kind of, extrapolate out potentially what that might look like throughout your entire book of business, or are you only, kind of, anticipating what you're seeing currently?  Thanks. I'll stop there.

Mike Kaufmann: Yeah, we said that, we have lots of different things.  One of the things that I think is really helpful for Cardinal in general is our broad portfolio.  So while we are seeing pressure from generic pricing and, as I said to a lesser extent, branded inflation, when you look across the rest of the 'P' segment, whether it be how we'll perform particularly in specialty, how we're getting and working through with nuclear and some of our other components within that business, we continue to drive value in other areas.

As you could imagine when you're in a challenging environment like that, everyone - whether you're in 'P,' 'M,' or corporate is focused on expense control and making sure we're very diligent on those types of things. We have that benefit. As I mentioned medical is continuing to do very well. We expect them to have a very good year, and they are going, you know, moving along as planned.

I do think our broad portfolio of having medical, being able to drive some initiatives at a corporate level, which are going to show up at the end of the year, as well as some of the other parts of pharma, are what we'll be able to use and, using our balance sheet too, from a capital deployment standpoint through M&A and stock repo is how we're going to continue to manage the rest of the year.

Charles Rhyee: Great, thank you.

Operator: Our next question comes from Eric Percher with Barclays.

Eric Percher: Thank you. I'm going to return to the question of the independence and pricing. It feels like there's a pretty big difference in the magnitude of pressure that we see in your guidance as compared to one of your peers. Mike, I know you've been willing to go into some of the mechanics on items like brand inflation in the past.

If we think about the mechanics of independent contracting, could you tell us a little bit about how much of the book is truly small and mid-size customers versus larger buying groups of independents? Do you see significant differences in those? Maybe the last part of that would be, do you have any major contracts that may be coming up, or how much or how important are those?

Mike Kaufmann: Yeah, let me try a couple of things and feel free to follow-up with another question if I miss it. But a couple different things. First of all, I hate to ever comment on our competitor's numbers. We always want to be careful of those. But remember mix matters. What I mean by mix is how much of their mix may be brand and generic versus our mix.

**CardinalHealth**
*Essential to care™*

You look at the other components of our pharmaceutical distribution segment with our growth in specialty, nuclear and other things, and so it's hard to comment on all the various moving parts of any of our competitors on what's in those segments.

Second of all, you hit on something which is customer re-pricings and we didn't have very - we basically had very few major re-pricings this year. Honestly, over the next couple years, we don't have a ton of those. We're in pretty good shape, particularly with some of our larger customers.

I think that may be a different thing as where we're seeing some of our competitors may or may not have more large re-pricings with some of their customers, which can affect each one of us in different timing within the years.

I think it really gets back to a mix of customers, timing of re-pricings and those types of things can drive differences between each one of us, as well as maybe the expectations that we originally set at the beginning of the year and how we looked at things.

Eric Percher: That's helpful. My follow-up would just be - having exposure to telesales and Harvard, has that changed your insight into the market and/or your exposure to the market?

Mike Kaufmann: Yeah, I think in some ways a little bit of both. Because a lot of their sales are into the independent market, you can imagine we're seeing some competitive generic pricing against our telesales business, which obviously is a little bit of a headwind for that group. But on the flip side, because we do have so many contacts into the independent and the regional chain space with our telemarketing business, it gives us a lot of competitive intel on what market price is.

We stay very focused at trying to make sure that we're pricing at that market price and not trying to do anything outside of that, because we believe we have a great service offering that we don't need to price below market in order to win and compete effectively.

Eric Percher: Very helpful. Thank you.

**CardinalHealth**
*Essential to care™*

Operator: Our next question is from Ross Muken with Evercore ISI.  Please go ahead.

Ross Muken: Good morning guys.

George Barrett:  Hey Ross.

Ross Muken: You guys compete on the pharma side, in industry structured primarily as an oligopoly, so for many years, we haven't seen these sort of, spurts of aggressive competitiveness and obviously, it's a tough environment.  But, when you look back at prior periods and talk to folks in the organization that have been looking at this longer than probably myself, what are the key tell-tale signs of the end of that?

So looking for, okay, we saw a flare up, something happened and then behavior returned back to more normal.  Is it - and then - so one, what should we be looking for to judge whether or not this is, sort of, temporal?  Then secondarily, how do you ultimately go back to that customer group and recapture some value?  Because inherently, your business model had been delivering a ton of value to the independent base for a very long time.  Obviously the margin levels take a hit and then, historically, they've come back.  Help us think about the sequence of, sort of, what happens next, I guess.

George Barrett: Ross, why don't I start.  First, let me start by saying, we always operate in a competitive environment.  That is the nature of our business.  Obviously, I've been doing this - as has Mike - for quite some time.  We've lived through multiple cycles - for me in multiple parts of the industry.

You see these periods - I mentioned that this is a bit of a unique moment.  You've got all of the public discourse around health care costs and pharma costs.  It's loud and it's emotional, and at the same time healthcare is going through some changes.  I don't think it's shocking that there is some near term disturbance.  You know, experience - my experience tells me that over time you see some shifting out and just essentially settling of the

dust. Sometimes when aggressive moves don't result in much change or value creation, things just sort of stabilize. We've lived through different cycles in the past and that's what I would expect here.

For us, again the important thing is for us to be creating new value sources for our customers and our manufacture partners. We work - you've heard the positioning that we've had over these last seven or eight years. It's really been about broad value creation.

We'll continue to focus on that as our priority, and I think, ultimately, the reason that our business has been improving in recent years is essentially the ability to create value. We'll continue to focus on those dynamics. But, we have seen occasionally these kinds of cycles, for me, unfortunately, over many decades and different parts of the industry. That's my general point of view.

Ross Muken: That's helpful. Maybe just quickly, Mike, on the balance sheet. I mean you guys are in a pretty strong position here. You talk about dislocations a bit in some of the pharma service part of the market. I'm assuming to private and other competitors that's also painful. I mean, what about the M&A pipeline at this point, and obviously you're doing a lot on the repurchase and you have a healthy dividend, but there's a lot of balance sheet capacity there. Could we see you guys get more active again?

Mike Kaufmann: Yeah. A couple comments - I think, it's good to hear you mention the dividend because that's something I would like to stress as I think we have a very differentiated dividend and it's something that we continue to be committed to our 30%-35% payout. I think that is a very - very much a differentiator between us and others. I agree with that on one side.

Again, I would tell you that when it comes to deployment of capital, we would like to find great M&A targets - that's probably where we would lean over stock repo, but we're going to stay disciplined. If we can't find the right target at the right price and it has the right culture that fits into our business, then we're not going to move forward.

If that means there's some excess cash on the balance sheet, then we will take a look at deploying that in the stock repo. I think our pipeline is still decent right now. As you can imagine, we look at dozens of items before we ever purchase one, and so it's always hard to tell exactly when something might come out of that. But we're

continuing to be very active in the M&A front, but won't trap cash on the balance sheet either, if we can't find the right opportunities.

Ross Muken: Thanks Mike.

Operator: Next, we have Ricky Goldwasser with Morgan Stanley.

Ricky Goldwasser: Yeah, hey, good morning.  A couple of questions here.  First of all, does your guidance assume any additional stepdown in distribution sell side pricing for your independent book?  Did you assume that the stepdown in the pricing that you're seeing in the marketplace to date will spill over to your entire independent book?

Mike Kaufmann: Well, I guess the only way I can respond to that is as I mentioned in my remarks, our guidance includes not only what we saw in Q1, what I've foreshadowed in Q2, but also that it was based on some of the trends we're seeing in Q1 and Q2.  So yes, it does include some continued challenges with generic pricing and branded inflation.

George Barrett:  Let me just add to this Ricky.  I mean, generally, market price is very, it's very effective - very efficient market.  So, the market just tends to be the market.  It - and so - you can't think of this as necessarily individual customers.

Ricky Goldwasser: So, but George, doesn't that mean that there's a risk that you may have to lower your prices in the future to match a new lower price point –

George Barrett: Ricky, I think –

Ricky Goldwasser: - in the market point. So I guess the question is, is there a new lower price point in the market place?

Mike Kaufmann: We're always lowering our pricing in the generic market. It always has been that way, and so, generally you constantly are competing on generics. All we're saying is that right now, it's just a little bit of an unusual period of time where we're seeing a little more aggressive re-pricing. But there's always some re-pricing built into your go forward. We're always going to price to market. We're not ever trying to leave the market down, but we believe the best competitive position from a cost standpoint that we can always stay competitive.

Operator: Our next question comes from Greg Bolan with Avondale Partners.

Greg Bolan: Oh, great. Thanks guys. If I could just, maybe, qualify what you said here is on the distribution side, your margins on the buy side are about the same, your margins on the sell side downstream have gotten a little bit worse, and so that's A. And then B - my, if we could go back to this time last year, if I remember correctly, you guys were already, kind of, dealing with a little bit of a difficult comp on the distribution margin side. If I remember correctly, you guys got about - I think called out $0.08 of incremental tail wind from generic pricing, this time last year, and I think about $0.03 from synergies from acquisitions. Could you maybe talk a little bit about that and how much of this year-over-year difficult comp has, kind of, played into 1Q? Thanks.

Mike Kaufmann: Yeah, thank you. I did mention that in my remarks. That part of the reason for our Q1 is the comps and that's why we called out Q1 being down and you were right on with that. We did have $0.08 last year that we called out, a favorability largely from benefits related to certain competitive dynamics on a few key generic items that we thought were going to deflate last year that didn't - and they stayed up.

Since then, they have deflated. Then as you mentioned, $0.03 on accelerated integration of some acquisitions. Those were favorable items last year, as well as from an overall basis. Remember, we had a favorable tax component last year, too. Then in last year, we did see in the first quarter, branded inflation was a little higher than we had anticipated. So, that's right. Those were the positive things.

You also summarized accurately the generic piece. When you really break it down into two components - one is the manufacturing actions which is them either raising or lowering price - we're seeing, for instance, less inventory inflation on generics. But it's really no different than we had originally anticipated.

As we mentioned in the past, FY14 was a good year, '15, you know was a solid year and then it started coming down in '16 and we kept calling that, and we said we expected that to be down. That's how we essentially budgeted and looked at it for this year. Again, we're not seeing anything real different when it comes to what the manufacturing actions are related to inflation and deflation. It is the competitive environment downstream and our actual pricing out to the customers.

Greg Bolan: That's great. And then just real quickly, if I, kind of, think back to Kinray six years ago now and what you guys have been able to do there with Kinray and other organic build outs on the community pharmacy side. I think you guys are now, one of the largest if not the largest in the independent pharmacy space in the high 20% market share. As I think about, you know, the competitive dynamics around that market, you guys have, kind of, lived in a world where you've been constantly trying to take share and have been successful at that.

It doesn't sound to me like - it certainly doesn't sound as - what you're saying today is as draconian as maybe what we were, kind of, what I was setup for going into the weekend. If you think about - you keep saying short term - you think it's transient George - I mean, what needs to happen over the next year or so for you guys to, kind of, maybe mitigate this on the downstream margin side and how you're positioned to continue to maintain or even grow market share going forward? Thanks.

George Barrett: Greg let me start - this is really important - our market share independent has grown over years, basically. This is not a sudden phenomenon. Actually right now, it's relatively stable. It's probably been growing

over the seven years of this team's leadership here. Obviously, the Kinray acquisition gave us a very significant boost there. That's not a sudden thing. It's been a thoughtful, purposeful strategy to make sure that we have a good balance to our business. We really feel like we create a huge amount of value for those independents, to the surface offerings and product lines, especially as the world has unfolded as it is so I'll start by that.

I don't think there's a discrete moment of change. We're obviously in the middle of a lot of things. So, the election cycle clearly is creating an enormous amount of discussion and noise, which I do think has an effect on the way people behave. I do think generic cycles come in lumps, and we see that they tend to have some cyclicality. We'll see some growth coming from biosimilars, which will affect the market each - probably each product differently. I think again, most times in competitive moments you have companies just adjusting to what's working and what's not.

That's my experience over a lot of years, and so, I think that the moment right now has a lot of factors coming together to make for a tough environment. But we're going to stick to our value proposition and our long term view as to how we compete in the market and how important product and service offerings are.

Operator: Our next question comes from Lisa Gill with JP Morgan.

Lisa Gill: Thank you and good morning. George, I just want to go back to your comments around the branded side and that primarily everything stays driven more on the generic side and pricing competition. But, you've brought the branded expectation down from roughly 10% down to the expectation of 7% - 9%, can you talk - is that what you're seeing right now? Is that, kind of, your future look?

We've heard from a number of manufacturers that they're lowering their expectation into what their price inflation will be in calendar year '17. I want to understand that, number one. And number two, I just want to understand - because the way that I've historically thought about this is that, that 15% that's on a contingent basis was probably more profitable than a fee for service contract and so, drug price inflation would have a bigger impact on that component of the business. I just want to know if I'm thinking about that correctly?

CardinalHealth
*Essential to care™*

George Barrett: Mike, you want to start on this one and then I can jump in.

Mike Kaufmann: Yeah, sure. Actually, the 15% piece was margin dollars. It wasn't number of contracts. It was assumed to be of our margin dollars generated. I wouldn't say that that group was a lot more profitable. A lot of the folks that are in there obviously the smaller manufacturers, but - so it's going to have to an overall little higher average rate because it's just by the nature of being smaller manufacturers - but I don't think that's a big component of it.

As far as what we've seen so far, I would tell you that what we've seen so far has been pretty light when it comes to manufacture inflation. But that all being said really, you know, January as you know, our Q3 or the first quarter of a calendar year is always a big quarter for the branded manufacturer price increases. The 7%-9% is really an average for the entire year.

While it's a little lighter than we would have expected now, that's what we're building into why we're lowering, is that we would expect it hopefully, after election and looking at all those other components we'll see a little bit more normalcy - probably not as high, obviously, as what it used to be. But, we think we'll get back in that 7% - 9% range. If that adjusts much differently than that, then we'll have other updates after that. But right now, that's what we're expecting.

Operator: Our next question comes from George Hill with Deutsche Bank.

George Hill: Hey, good morning guys and I appreciate you taking the questions.

George Barrett: Pleasure.

George Hill: I guess, Mike, first off, if we think about the change in the guidance on the generic side, are you able to quantify, I guess, kind of, from down mid-single digits to mid to high single digits, how much of that change is due

**Cardinal**Health

*Essential to care*™

to the underlying pricing environment of the drugs themselves - the deflationary environment versus how much of that is the sell side margin pressure?

My second question would be, you started to run down the rabbit hole of purchasing compliance, a little bit. I guess could you talk about what you're seeing in the contracting environment and how that - how pricing is leading into - how pricing is tying into the purchasing compliance discussion?

Mike Kaufmann: Yeah, so as far as the adjustment from mid-single to mid to high single digit net deflation, really that entire adjustment is due to what we're seeing in the generic pricing environment. As I've mentioned, we're not really seeing the inflation/deflation piece to be significantly different than what we modelled. You can assume all of that is essentially related to generic pricing. And, then as far as –

George Hill: The sell side part?

Mike Kaufmann: Yes, the sell side part. That's right, the sell side part. And as far as compliance goes, that's highly contract dependent. When we have customers we're very diligent about the way we write our contracts. If we have a customer contract that says that they've got to buy X% of the generics from us, then we monitor that and we make sure that they do. On the piece that they don't have to directly buy from us in order to make that deal work, they can shop that piece, and we've always known that. So that's the component that we would see obviously so more pricing pressure on.

George Hill: Okay and maybe if I could just steal a real quick follow up for George - when we talk about this increase in the sell side competitive environment - how far off normal are we, if you think about historical spikes and when we've seen heightened competition?

George Barrett: I don't think I'm able to give you a specific number here. What I can say is the kind of erosion that we've seen typically - and it's been relatively predictable - has just been different over these last couple of months. It is different and noteworthy and I think is the largest component as to why we're adjusting our model for the year. The branded part, as Mike said, is much smaller. But, I can't quantify that for you, George, but it is noticeably different.

George Hill: Okay, thank you.

Operator: As a reminder, if you would like to ask a question, it is *1. We'll take our next question from Michael Cherny with UBS.

Michael Cherny: Good morning guys and thanks for all the detail so far.

George Barrett: Morning, Mike.

Michael Cherny: I think the pharma questions been, kind of, beaten to death, so I'll at least ask one on the medical side. You guys talked a little bit about the recent share gains you have - obviously Kaiser is a very notable contract win, can you maybe talk, especially with Cordis anniversary over the last year as you think about now your go to market strategy versus maybe two years ago, what are the biggest differences? Obviously, Cordis is one component, but in terms of being able to gain competitive scale, what's changed the most, or at least most improved your competitive win rate?

George Barrett: Michael, thank you for the question. You're making Don happy - question on medical. Let me just give you a perspective. Our go to market model over recent years has really been focused broadly on a couple of

**Cardinal**Health
*Essential to care™*

really important changes.  A lot of our customers are getting much more complex.  They're bigger systems.  So, what historically might have been a single hospital is now an academic medical center, plus some community hospital, plus a few surgery centers and oncology clinics and now some doctor's offices.  That requires a different partner.

I think our ability - and we've seen this.  We've built our business around that expectation, and I think what's happening is our ability to serve across that continuum of care to create value in different ways for systems that are much more complex than they once were is important.  One of the shifts I want to describe is a little bit more of an elevation of those conversations away from the purely departmentally driven ones into a conversation that's more broadly at the system level.

I think that's playing to our strength.  Now again, we have to be very strong in each of the departments.  We have to be content experts, and we are still that.  But I do think that the reason that we've been growing, I think, is largely that we're positioning well to adapt.  We anticipated these changes in the way that these big health systems were going to look, and I think that's been beneficial to us.

Mike Kaufmann: Yeah, I think the only thing I would add to that is, I think part of that growth is the really measured and smart approach I think we've taken to expanding our portfolio in the medical segment.  Our reps are able to leverage a lot more products in the bag and so when we call on a customer, we have more to sell them.  We can leverage our expense structure.  We can be more meaningful to them.

I think it would be - I don't think we should also ignore the fact that we've given a lot of energy to the Cordis business.  We've put some great people in charge there.  It's a business that we're paying a lot of attention to.  Don, himself, has a lot of experience in this area, as does David Wilson that is running it.  I think there's a lot to be said for when you have people that are excited, know that you're investing in the business, really are committed to that and we've hired some great people.  I think that's driving some of the things we're seeing in Cordis, too.

**Cardinal**Health
*Essential to care™*

George Barrett: If I could, I just want to add one piece because we're talking primarily in this context about the medical, but it does connect to our pharmaceutical business and our medical business and many of these customers are part of that overall offering so I didn't want to miss the opportunity to show that.

Michael Cherny: Thanks, guys, I'll let you get to the rest of the queue. Thank you.

George Barrett: Thanks, Mike.

Operator: Our next question comes from David Larsen with Leerink

David Larsen: Hi, Mike, can you talk a bit about your efforts to improve your cost structure in the corporate division? What's going to drive that? Any sort of quantification to clear around that would be very helpful, thanks.

Mike Kaufmann: Good question and I mentioned it is a big driver when you think about that EPS bridge, as we mentioned, with the generics slightly going down and net customer activity staying the same. We needed to actually have a real focus on that expense initiative so a lot of the corporate departments across the company are located in corporate.

A lot of the initiatives and things that we fund, we fund out of corporate. So all of those things we're taking a really good hard look at, making sure we're investing in the right things. We're being very targeted on those things and just driving discipline throughout our corporate departments in all lines of our P&L to make sure that we can help contribute to offsetting some of the decline we're seeing on generics pricing.

**CardinalHealth**
*Essential to care™*

David Larsen: Ok, great.  So can you just remind me again so that the 2Q operating income expectations for the pharma division, pretty significant change there relative to comments last quarter.  Can you remind me what's driving that and what's going to cause the re-acceleration in growth in the back half of the year?

Mike Kaufmann: Yes, so Q2 is really being driven by the same trends that we discussed when we take a look at that, the trends that we saw in Q1, related again to generic pricing as well as branded inflation rates being lower than we had anticipated are the two key drivers in Q2 and why we gave you some early information that it would be similar to the percentage decline we saw in Q1.

As far as what's going on back half weighted, some of it has to do with comps and things that are going to happen in the quarter, like branded inflation tends to always be stronger in our Q3 and we have a lot of other initiatives that we're working on that we believe will deliver value in the second half.

Remember we have the step up in Cordis that impacted our Q2 and Q3 last year that doesn't impact our Q2 and Q3 this year.  Plus, we'll have a full year of growing and getting up to that business as well as onboarding some other new customers.  We think we have enough initiatives in the back half to be able to get us to where we need to for the year.

Operator: Our next question comes from Bob Willoughby with Credit Suisse.

Bob Willoughby: Good morning, George and Mike.  While we know absolutely no one speculates on inflation anymore it did appear your competitor bought some inventory in the inflationary market last year, liquidated this year.  You bought less year over year, maybe the medical skews that somewhat, but isn't it safe to assume there are some buckets of profit that have fallen out of the model here, year over year?

Mike Kaufmann: I think in the sense if we're relating it specifically to branded manufacturing, when you do have less branded manufacturer inflation, you do, as I've mentioned a couple of times, when that happens quickly you have

**CardinalHealth**
*Essential to care™*

those immediate adjustments where that 15% of your portfolio that is dependent upon that inflation sees less inflation. You do have to go through and renegotiate your agreements with manufacturers. That's the first important piece as I've mentioned.

We are doing that with manufacturers. Anytime you see a sudden change you have to go do that. As far as speculating on generics or on brand, no, again, that was something that we quit doing a long time ago, several years ago because of the nature of our relationships with generic manufacturers with Red Oak as well as our agreements on the branded side. Speculation is minimal to almost none of an impact.

Bob Willoughby: Mike, can you re-affirm a cash flow target for the year or is that not the call today?

Mike Kaufmann: Yeah, we don't give cash flow targets for the year, but again, there's nothing I would say that when I look at what's going on in our business that would make me think that we're not going to be able to deliver strong cash flow this year.

Bob Willoughby: Thank you.

George Barrett: Thanks, Bob.

Operator: Our next question comes from John Kreger with William Blair.

John Kreger: Hi, thanks very much. Could you give us an update on what sort of brand inflation you're seeing within the specialty bucket? What sort of assumption you're making in guidance for that category?

Mike Kaufmann: We don't break that out specifically. Generally, inflation on specialty tends to be a little lower because they're higher priced items than in the overall bucket, but our overall 7 to 9 target is across the board for all branded pharmaceuticals including specialty and what's going through our normal pharmaceutical distribution bucket.

John Kreger: Thanks, Mike. One other one on the medical front, can you give us a sense about what your organic revenue growth was in the quarter now with your year lap in Cordis. We were thinking about 6%. Is that about right?

Mike Kaufmann: I can't give you the exact number but I would definitely tell you that we were positive growth in the medical segment without Cordis. We don't still expect Cordis to deliver $0.15 for FY17 and so if you were to back Cordis out you would still see nice growth, healthy growth in the medical segment.

John Kreger: Great, thank you.

George Barrett: Thank you.

Operator: We'll take our final question from Steven Valiquette with Bank of America.

Steven Valiquette: Thanks, just one more here on the sell side customer pricing. I guess I'm just curious, is there any evidence of a change in the actual price methodology in the market being offered by some wholesalers? The reason why I ask is that there was some chatter about maybe a shift to a cost plus pricing model on generics as opposed to just a random spot pricing. Thanks.

age 31 of 32

Mike Kaufmann: I think all the time people are always trying to be creative on how they price and how to work with customers and different customers have different needs. I don't see a wholesale change in the way people are pricing in the market. The majority of the areas where we're seeing the pricing pressure are just in that normal day-to-day pricing.

Whether or not that's changing on larger deals, it's hard for me to speak to our competitors on how they might be doing that. Deals can often get very complicated on how you compare one to another, but I wouldn't notice any notable change at this point in time.

Steven Valiquette: Ok, great. Ok, thanks.

Mike Kaufmann: Thanks.

Operator: That concludes today's question and answer session. At this time I would like to turn the conference back over to George Barrett for any additional or closing remarks.

George Barrett: Thanks to all of you for your good questions and for joining us today. I know that we'll be seeing many of you in the coming weeks and we look forward to that. With that we'll close the call. Thank you all.

Operator: That concludes today's presentation. We thank you all for your participation and you may now disconnect.

# EXHIBIT 58

# Q1 FY2017

Cardinal Health, Inc. Earnings Investor/Analyst call
October 31, 2016



© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and brand pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the ability to successfully integrate and realize the benefits from the acquisition of Cordis; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including federal health care reform legislation; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of October 31, 2016. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, this presentation contains Non-GAAP financial measures. Cardinal Health provides definitions and reconciliations of the differences between the Non-GAAP financial measures and their most directly comparable GAAP financial measures in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com. An audio replay of the webcast will be available at ir.cardinalhealth.com.

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q1 FY2017 results



© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q1 FY17 financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | Q1 FY17 | Q1 FY16 | Q1 FY17 | Q1 FY16 |
| **Revenue** | **$32,039** | **$28,055** | N/A | N/A |
| *% change* | 14% increase YoY | 17% increase YoY | | |
| **Operating Earnings** | **$535** | **$620** | **$669** | **$737** |
| *% change* | 14% decrease YoY | 33% increase YoY | 9% decrease YoY | 30% increase YoY |
| *Ratio to revenue* | 1.67% | 2.21% | 2.09% | 2.63% |
| **Net Earnings[1]** | **$309** | **$383** | **$399** | **$458** |
| *% change* | 19% decrease YoY | 44% increase YoY | 13% decrease YoY | 35% increase YoY |
| *Ratio to revenue* | 0.96% | 1.37% | 1.24% | 1.63% |
| **Diluted EPS[1]** | **$0.96** | **$1.15** | **$1.24** | **$1.38** |
| *% change* | 17% decrease YoY | 47% increase YoY | 10% decrease YoY | 38% increase YoY |

[1]*Attributable to Cardinal Health, Inc.*
*Please see appendix for GAAP to Non-GAAP reconciliations.*

4    © Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q1 FY17 Pharmaceutical segment business analysis

|  | Q1 FY17 ($M) | Q1 FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$28,762** | **$25,140** | **14%** |
| **Segment Profit** | **$534** | **$657** | **(19)%** |
| **Segment Profit Margin** | **1.86%** | **2.62%** | **-76 bps** |

## Highlights:

- **Revenue** for the Pharmaceutical segment increased 14 percent to $28.8 billion due to growth from net new and existing Pharmaceutical Distribution customers and, to a lesser extent, performance from the Specialty business.

- **Segment profit** for the quarter decreased 19 percent to $534 million. This decrease was driven by generic pharmaceutical pricing and, to a lesser extent, reduced levels of branded inflation and the previously announced loss of a large Pharmaceutical Distribution customer. This was partially offset by solid performance from Red Oak Sourcing.

- **Segment profit margin rate** decreased largely due to generic pharmaceutical pricing and changes in product and customer mix.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
*Essential to care™*

# Q1 FY17 Medical segment business analysis

| | Q1 FY17 ($M) | Q1 FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | $3,279 | $2,919 | 12% |
| **Segment Profit** | $127 | $101 | 26% |
| **Segment Profit Margin** | 3.87% | 3.45% | +42 bps |

## Highlights:

- **Revenue** for the Medical segment increased 12 percent to $3.3 billion driven by contributions from acquisitions and net new and existing customers.

- **Segment profit** increased 26 percent to $127 million due to contributions from acquisitions and Cardinal Health Brand products.

- **Segment profit margin rate** increased due to contributions from acquisitions and Cardinal Health Brand products. This was partially offset by the accelerated onboarding of a new large distribution customer.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q1 FY17 GAAP to non-GAAP adjustments[1,2]

| | Q1 FY 2017 | | | Q1 FY 2016 | | |
|---|---|---|---|---|---|---|
| | Operating Earnings ($M) | Net Earnings[3] ($M) | Diluted EPS[3] | Operating Earnings ($M) | Net Earnings[3] ($M) | Diluted EPS[3] |
| **GAAP** | **$535** | **$309** | **$0.96** | **$620** | **$383** | **$1.15** |
| Restructuring and employee severance | 9 | 5 | 0.02 | 12 | 7 | 0.02 |
| Amortization and other acquisition-related costs | 122 | 82 | 0.25 | 105 | 68 | 0.21 |
| Impairments and (gain)/loss on disposal of assets | 3 | 2 | 0.01 | - | - | - |
| Litigation (recoveries)/charges, net | 1 | 1 | - | - | - | - |
| **Non-GAAP** | **$669** | **$399** | **$1.24** | **$737** | **$458** | **$1.38** |

| | Q1 FY 2017 | | | Q1 FY 2016 | | |
|---|---|---|---|---|---|---|
| Amortization of acquisition-related intangible assets | $101 | $69 | $0.21 | $67 | $42 | $0.13 |

[1]Please see appendix for GAAP to Non-GAAP reconciliations.
[2]There were no LIFO charges/credits or losses on extinguishment of debt during the periods presented.
[3]Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

7    © Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
Essential to care™

# FY2017 Outlook

*The company presents its outlook for fiscal 2017 non-GAAP EPS, non-GAAP effective tax rate and other forward-looking goals on the following pages.  The company does not provide a GAAP EPS or GAAP effective tax rate outlook because it is unable to reliably forecast many of the items that the company excludes from GAAP EPS and effective tax rate to calculate them. See "Forward-Looking non-GAAP Measures" following the attached schedules for additional information.*



© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# FY17 financial expectations

|  | **FY2017 Outlook** | **FY2016 Actual** |
|---|---|---|
| **Revenue** | High-single digit percentage growth vs. PY | $121.5B |
| **Non-GAAP Diluted EPS** | $5.40 to $5.60 | $5.24 |

*Red font indicates a change since previous guidance.*

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY17 corporate assumptions

|  | **FY2017 Outlook** | **FY2016 Actual** |
|---|---|---|
| **Non-GAAP effective tax rate** | 35% - 37%[1] | 36.0%[4] |
| **Diluted weighted average Shares outstanding** | 320M – 322M[2] | 330M |
| **Interest and other, net** | $190M - $205M | $183M |
| **Capital expenditures** | $400M - $450M | $465M |
| **Acquisition-related intangible amortization** | ~$385M or ~$0.79[3] | $355M or $0.70 |

[1]*May fluctuate quarterly due to unique items affecting periods.*

[2]*Reflects the impact from a total of $250M of share repurchases in Q1FY17 and potential additional repurchases.*

[3]*Includes only acquisitions closed as of September 30, 2016.*

[4]*FY2016 GAAP ETR 37.1%, Please see appendix for GAAP to Non-GAAP reconciliations.*

*Red font indicates a change since previous guidance.*

10    © Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Pharmaceutical segment FY17(E)

- **High-single digit percentage increase in revenue versus prior year**

- **Full-year segment profit down mid-to-high single digits versus prior year and back half-weighted**

- **Q2FY17 segment profit decline expected to be relatively in line with Q1FY17 segment profit decline on a percentage basis**

## Key assumptions

- Loss of a large pharmaceutical distribution customer contract, which expired on March 31, 2016

- Generic drug price assumption of mid-to-high single digit deflation for full fiscal year

- Brand drug manufacturer price assumption of 7% to 9% inflation for full fiscal year

- Increased expense related to investment in information systems to support growth

- Incremental contribution from new generic launches, but Y-o-Y benefit significantly less

- Incremental contribution from Red Oak Sourcing, but Y-o-Y benefit significantly less

- Additional contributions from Metro Medical and Harvard Drug Group

- Double-digit revenue and profit growth from both Specialty and Cardinal Health China[1]

[1]Cardinal Health China reports in both segments, but primarily contributes to the Pharmaceutical segment

*Red font indicates a change since previous guidance.*

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

CardinalHealth
*Essential to care™*

# Medical segment FY17(E)

- **Mid-single digit percentage increase in revenue vs. prior year**

- **Double-digit segment profit growth vs. prior year**

## Key assumptions

- Cordis accretive by >$0.15 vs. prior year; net of transaction-related interest expense of $0.07-$0.08; increasingly accretive thereafter

- Above-market revenue growth in Cardinal Health at Home

- Double-digit profit growth from Cardinal Health Brand products

 © Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Cardinal Health outlook

| | FY17 non-GAAP EPS growth contribution |
|---|---|
| Business growth[1] | 0% - 3% |
| Capital deployment | 3% - 4% |
| **Total company growth** | **3% - 7%** |

| | Multi-year aspirations |
|---|---|
| Non-GAAP EPS growth | 10% – 15% |
| Dividend payout[2] | 30% – 35% |

[1]*Defined as growth excluding acquisitions and share repurchase completed in FY17*
[2]*Defined as a percentage of non-GAAP EPS*

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



Appendix

# Q1 FY2017 trailing five quarters, GAAP to Non-GAAP reconciliation statements and supplemental financial information



© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q1 FY2017 segment analysis

## Pharmaceutical segment

|  | Q1 FY16 | Q2 FY16 | Q3 FY16 | Q4 FY16 | Q1 FY17 |
|---|---|---|---|---|---|
| Revenue ($M) | 25,140 | 28,287 | 27,527 | 28,177 | 28,762 |
| Segment Profit ($M) | 657 | 627 | 660 | 542 | 534 |

## Medical segment

|  | Q1 FY16 | Q2 FY16 | Q3 FY16 | Q4 FY16 | Q1 FY17 |
|---|---|---|---|---|---|
| Revenue ($M) | 2,919 | 3,162 | 3,138 | 3,210 | 3,279 |
| Segment Profit ($M) | 101 | 106 | 128 | 122 | 127 |

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care™*

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[1] | Net Earnings[1] Growth Rate | Diluted EPS[1] | Diluted EPS[1] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | **First Quarter 2017** | | | | |
| **GAAP** | $ 535 | (14)% | $ 494 | $ 184 | $ 309 | (19)% | $ 0.96 | (17)% |
| Restructuring and employee severance | 9 | | 9 | 4 | 5 | | 0.02 | |
| Amortization and other acquisition-related costs | 122 | | 122 | 40 | 82 | | 0.25 | |
| Impairments and (gain)/loss on disposal of assets | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | 1 | | 1 | - | 1 | | - | |
| **Non-GAAP** | $ 669 | (9)% | $ 629 | $ 229 | $ 399 | (13)% | $ 1.24 | (10)% |
| | | | | First Quarter 2016 | | | | |
| GAAP | $ 620 | 33 % | $ 568 | $ 184 | $ 383 | 44 % | $ 1.15 | 47 % |
| Restructuring and employee severance | 12 | | 12 | 5 | 7 | | 0.02 | |
| Amortization and other acquisition-related costs | 105 | | 105 | 37 | 68 | | 0.21 | |
| Impairments and (gain)/loss on disposal of assets | - | | - | - | - | | - | |
| Litigation (recoveries)/charges, net | - | | - | - | - | | - | |
| Non-GAAP | $ 737 | 30 % | $ 685 | $ 226 | $ 458 | 35 % | $ 1.38 | 38 % |

[1] Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no LIFO charges/(credits) or losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings[1] Before Income Taxes | Provision for Income Taxes | Net Earnings from Continuing Operations[2] | Net Earnings from Continuing Operations[2] Growth Rate | Diluted EPS[1,2] | Diluted EPS[1,2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | Fiscal Year 2016 | | | | |
| **GAAP** | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | (69) | | (69) | (27) | (42) | | (0.13) | |
| **Non-GAAP** | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |

[1] From continuing operations

[2] Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**Total Company Business Analysis**

| (in millions) | First Quarter 2017 | First Quarter 2016 | Non-GAAP First Quarter 2017 | Non-GAAP First Quarter 2016 |
|---|---|---|---|---|
| **Revenue** | | | | |
| Amount | $ 32,039 | $ 28,055 | | |
| Growth rate | 14 % | 17 % | | |
| | | | | |
| **Operating earnings** | | | | |
| Amount | $ 535 | $ 620 | $ 669 | $ 737 |
| Growth rate | (14)% | 33 % | (9)% | 30 % |
| | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | |
| Amount | $ 309 | $ 383 | $ 399 | $ 458 |
| Growth rate | (19)% | 44 % | (13)% | 35 % |
| | | | | |
| Return on equity | 19 % | 24.0 % | 24.4 % | 28.7 % |
| | | | | |
| Effective tax rate | 37.3 % | 32.3 % | 36.4 % | 32.9 % |
| | | | | |
| Debt to total capital | 46 % | 46 % | | |
| Net debt to capital | | | 35 % | 28 % |

Refer to the GAAP/Non-GAAP reconciliation for definitions and calculations supporting the Non-GAAP balances.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | First Quarter | | | (in millions) | First Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **28,762** | $ 25,140 | Amount | $ | **3,279** | $ 2,919 |
| Growth rate | | **14 %** | 19 % | Growth rate | | **12 %** | 2 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **534** | $ 657 | Amount | $ | **127** | $ 101 |
| Growth rate | | **(19)%** | 46 % | Growth rate | | **26 %** | (11)% |
| Segment profit margin | | **1.86 %** | 2.62 % | Segment profit margin | | **3.87 %** | 3.45 % |

Total consolidated revenue for the three months ended September 30, 2016 was $32,039 million, which included total segment revenue of $32,041 million and Corporate revenue of $(2) million. Total consolidated revenue for the three months ended September 30, 2015 was $28,055 million, which included total segment revenue of $28,059 million and Corporate revenue of $(4) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended September 30, 2016 were $535 million, which included total segment profit of $661 million and Corporate costs of $(126) million. Total consolidated operating earnings for the three months ended September 30, 2015 were $620 million, which included total segment profit of $758 million and Corporate costs of $(138) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | First Quarter | |
| --- | --- | --- |
| | 2017 | 2016 |
| **GAAP return on equity** | 19.0 % | 24.0 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings attributable to Cardinal Health, Inc. | $ 309 | $ 383 |
| Restructuring and employee severance, net of tax | 5 | 7 |
| Amortization and other acquisition-related costs, net of tax | 82 | 68 |
| Impairments and (gain)/loss on disposal of assets, net of tax | 2 | - |
| Litigation (recoveries)/charges, net, net of tax | 1 | - |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $ 399 | $ 458 |
| Annualized | $ 1,596 | $ 1,832 |

| | First Quarter 2017 | Fourth Quarter 2016 | First Quarter 2016 | Fourth Quarter 2015 |
| --- | --- | --- | --- | --- |
| Total Cardinal Health, Inc. shareholders' equity | $ 6,512 | $ 6,554 | $ 6,505 | $ 6,256 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $ 6,533 | | $ 6,380 | |
| **Non-GAAP return on equity** | 24.4 % | | 28.7 % | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | First Quarter | | | |
| --- | --- | --- | --- | --- |
| | **2017** | | 2016 | |
| **GAAP effective tax rate** | **37.3 %** | | 32.3 % | |
| | | | | |
| **Non-GAAP effective tax rate** | | | | |
| Earnings before income taxes | $ | **494** | $ | 568 |
| Restructuring and employee severance | | **9** | | 12 |
| Amortization and other acquisition-related costs | | **122** | | 105 |
| Impairments and (gain)/loss on disposal of assets | | **3** | | - |
| Litigation (recoveries)/charges, net | | **1** | | - |
| Adjusted earnings before income taxes | $ | **629** | $ | 685 |
| | | | | |
| Provision for income taxes | $ | **184** | $ | 184 |
| Restructuring and employee severance tax benefit | | **4** | | 5 |
| Amortization and other acquisition-related costs tax benefit | | **40** | | 37 |
| Impairments and (gain)/loss on disposal of assets tax benefit/(expense) | | **1** | | - |
| Adjusted provision for income taxes | $ | **229** | $ | 226 |
| | | | | |
| **Non-GAAP effective tax rate** | **36.4 %** | | 32.9 % | |

| | First Quarter | | | |
| --- | --- | --- | --- | --- |
| | **2017** | | 2016 | |
| **Debt to total capital** | **46 %** | | 46 % | |
| | | | | |
| **Net debt to capital** | | | | |
| Current portion of long-term obligations and other short-term borrowings | $ | **616** | $ | 319 |
| Long-term obligations, less current portion | | **4,916** | | 5,231 |
| Debt | $ | **5,532** | $ | 5,550 |
| Cash and equivalents | | **(2,001)** | | (2,974) |
| Net debt | $ | **3,531** | $ | 2,576 |
| Total Cardinal Health, Inc. shareholders' equity | | **6,512** | | 6,505 |
| Capital | $ | **10,043** | $ | 9,081 |
| **Net debt to capital** | **35 %** | | 28 % | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | | Fiscal Year 2016 |
|---|---|---|
| **GAAP effective tax rate** | | **37.1 %** |
| | | |
| **Non-GAAP effective tax rate** | | |
| Earnings before income taxes | $ | **2,276** |
| Restructuring and employee severance | | **25** |
| Amortization and other acquisition-related costs | | **459** |
| Impairments and (gain)/loss on disposal of assets | | **21** |
| Litigation (recoveries)/charges, net | | **(69)** |
| Adjusted earnings before income taxes | $ | **2,711** |
| | | |
| Provision for income taxes | $ | **845** |
| Restructuring and employee severance tax benefit | | **9** |
| Amortization and other acquisition-related costs tax benefit | | **143** |
| Impairments and (gain)/loss on disposal of assets tax benefit/(expense) | | **6** |
| Litigation (recoveries)/charges, net tax benefit/(expense) | | **(27)** |
| Adjusted provision for income taxes | $ | **976** |
| | | |
| **Non-GAAP effective tax rate** | | **36.0 %** |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

<u>Forward Looking non-GAAP Measures</u>

In this presentation, the Company presents its outlook for fiscal 2017 non-GAAP EPS and non-GAAP Effective Tax Rate (ETR).  The Company does not provide EPS or ETR outlook, which are the most directly comparable GAAP measures to non-GAAP EPS and non-GAAP ETR, respectively, because changes in the items that the Company excludes from GAAP EPS and GAAP ETR to calculate these measures can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on EPS or ETR outlook numbers.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2017 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.14 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Cardinal Health, Inc. and Subsidiaries**

### Definitions

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total Cardinal Health, Inc. shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total Cardinal Health, Inc. shareholders' equity).

**Non-GAAP Diluted EPS attributable to Cardinal Health, Inc. or "Non-GAAP Diluted EPS" or "Non-GAAP Diluted Earnings Per Share"**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP Diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Effective Tax Rate**: (provision for income taxes adjusted for (1) LIFO charges/(credits)[1], (2) restructuring and employee severance[2], (3) amortization and other acquisition-related costs[3], (4) impairments and (gain)/loss on disposal of assets[4], (5) litigation (recoveries)/charges, net[5], and (6) loss on extinguishment of debt[6]) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP Gross Margin**: Gross margin excluding LIFO charges/(credits).

[1] The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market. These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[2] Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel), and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[3] Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs, and changes in the fair value of contingent consideration obligations.

[4] Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[5] Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[6] Charges related to the make-whole premium on the redemption of notes.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Non-GAAP Net Earnings attributable to Cardinal Health, Inc. or "Non-GAAP Net Earnings"**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Earnings from Continuing Operations:** earnings from continuing operations excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Operating Earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net.

**Non-GAAP Return on Equity**: (annualized current period net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax) divided by average Cardinal Health, Inc. shareholders' equity.

**Return on Equity**: annualized current period net earnings attributable to Cardinal Health, Inc. divided by average Cardinal Health, Inc. shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general, and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.

# EXHIBIT 59

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-Q

☑  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2016

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

CardinalHealth
Essential to care™

# Cardinal Health, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**

*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes  ☑      No  ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes  ☑      No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer  ☑ | Accelerated filer  ☐ |
| Non-accelerated filer  ☐   (Do not check if a smaller reporting company) | Smaller reporting company  ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes  ☐      No  ☑

The number of the registrant's common shares, without par value, outstanding as of October 27, 2016 , was the following: 320,063,302 .

# Cardinal Health

**Q1 Fiscal 2017 Form 10-Q**

# Table of Contents

| | Page |
|---|---|
| Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Explanation and Reconciliation of Non-GAAP Financial Measures | **11** |
| Quantitative and Qualitative Disclosures about Market Risk | **14** |
| Controls and Procedures | **14** |
| Legal Proceedings | **14** |
| Risk Factors | **15** |
| Unregistered Sales of Equity Securities and Use of Proceeds | **15** |
| Financial Statements and Supplementary Data | **16** |
| Exhibits | **28** |
| Form 10-Q Cross Reference Index | **29** |
| Signatures | **30** |

# About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a globally integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physicians' offices. We provide clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. We connect patients, providers, payers, pharmacists, and manufacturers for integrated care coordination and better patient management. We manage our business and report our financial results in two segments: Pharmaceutical and Medical. As used in this report, "we," "our," "us," and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise.

# Forward-Looking Statements

This Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 (this "Form 10-Q") (including information incorporated by reference) includes "forward-looking statements" addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), but there are others in the document, which may be identified by the words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. The matters discussed in these forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from those made, projected or implied in the forward-looking statements. The most significant of these risks, uncertainties and other factors are described in Exhibit 99.1 to this Form 10-Q and in "Risk Factors" of our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (our "2016 Form 10-K"). Forward-looking statements in this document speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

# Non-GAAP Financial Measures

In the "Overview of Consolidated Results" section of MD&A, we use financial measures that are derived from our consolidated financial data but are not presented in our condensed consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this Form 10-Q.

**MD&A**       **Overview**

# Management's Discussion and Analysis of Financial Condition and Results of Operations

The discussion and analysis presented below is concerned with material changes in financial condition and results of operations between the periods specified in our condensed consolidated balance sheets at September 30, 2016 and June 30, 2016 , and in our condensed consolidated statements of earnings for the three months ended September 30, 2016 and 2015 . All comparisons presented are with respect to the prior-year period, unless stated otherwise. This discussion and analysis should be read in conjunction with the MD&A included in our 2016 Form 10-K .

Cardinal Health | Q1  Fiscal 2017 Form 10-Q      **2**

**MD&A**  Overview

# Overview of Consolidated Results

## Revenue



Revenue for the three months ended September 30, 2016 was $32.0 billion , a 14 percent increase, due primarily to sales growth from new and existing pharmaceutical distribution customers.

## GAAP and Non-GAAP Operating Earnings



| | | Three Months Ended September 30, | | |
|---|---:|---:|---:|---:|
| (in millions) | | **2016** | 2015 | **Change** |
| **GAAP** | $ | **535** | $ 620 | **(14)%** |
| Restructuring and employee severance | | **9** | 12 | |
| Amortization and other acquisition-related costs | | **122** | 105 | |
| Impairments and (gain)/loss on disposal of assets | | **3** | — | |
| Litigation (recoveries)/charges, net | | **1** | — | |
| **Non-GAAP** | $ | **669** | $ 737 | **(9)%** |

The sum of the components may not equal the total due to rounding.

During the three months ended September 30, 2016 , GAAP operating earnings decreased 14 percent to $535 million and non-GAAP operating earnings decreased 9 percent to $669 million . The decreases in both GAAP and non-GAAP operating earnings were due to generic pharmaceutical customer pricing changes, reduced levels of branded pharmaceutical inflation and the loss of a large pharmaceutical distribution customer. These were partially offset by other aspects of our Pharmaceutical segment generics program, which exclude the above-mentioned pricing changes.

| MD&A | Overview |
|------|----------|

## GAAP and Non-GAAP Diluted EPS



|  |  | Three Months Ended September 30, | | |
|---|---|---|---|---|
| ($ per share) |  | 2016 | 2015 | Change |
| **GAAP** | $ | **0.96** | $ 1.15 | (17)% |
| Restructuring and employee severance |  | 0.02 | 0.02 |  |
| Amortization and other acquisition-related costs |  | 0.25 | 0.21 |  |
| Impairments and (gain)/loss on disposal of assets |  | 0.01 | — |  |
| Litigation (recoveries)/charges, net |  | — | — |  |
| **Non-GAAP** | $ | **1.24** | $ 1.38 | (10)% |

The sum of the components may not equal the total due to rounding.

During the three months ended September 30, 2016 , GAAP diluted earnings per share attributable to Cardinal Health, Inc. ("diluted EPS") decreased 17 percent to $0.96 per share and non-GAAP diluted EPS decreased 10 percent to $1.24 per share. GAAP and non-GAAP diluted EPS decreased primarily due to the factors impacting GAAP and non-GAAP operating earnings.

## Cash and Equivalents

Our cash and equivalents balance was $2.0 billion at September 30, 2016 compared to $2.4 billion at June 30, 2016 . The decrease in cash and equivalents during the three months ended September 30, 2016 was driven by $250 million paid for share repurchases, $149 million paid in dividends and $100 million in capital expenditures, offset in part by net cash provided by operating activities of $104 million .

# Significant Developments

## Acquisitions

On October 2, 2015, we completed the acquisition of the Cordis business from Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, for $1.9 billion. The acquisition of Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions with operations in more than 50 countries, expands our Medical segment's portfolio of self-manufactured products and its geographic scope.

## Trends

Within our Pharmaceutical segment, we now expect fiscal 2017 segment profit to be less than fiscal 2016 segment profit due to the factors described below under "Results of Operations" that impacted results in the three months ended September 30, 2016. However, as is generally the case, the frequency, timing, magnitude, and profit impact of pharmaceutical customer pricing changes and branded and generic pharmaceutical manufacturer pricing changes remains uncertain and their impact on Pharmaceutical segment profit and consolidated operating

earnings in fiscal 2017 could be more or less than we expect.

| MD&A | Results of Operations |
|------|----------------------|

# Results of Operations

## Revenue



| (in millions) | Three Months Ended September 30, | | |
|---|---|---|---|
|  | **2016** | 2015 | **Change** |
| Pharmaceutical | **$ 28,762** | $ 25,140 | **14%** |
| Medical | **3,279** | 2,919 | **12%** |
| Total segment revenue | **32,041** | 28,059 | **14%** |
| Corporate | **(2)** | (4) | **N.M.** |
| **Total revenue** | **$ 32,039** | $ 28,055 | **14%** |

### Pharmaceutical Segment

Pharmaceutical segment revenue growth for the three months ended September 30, 2016 was primarily due to $3.9 billion in sales growth from new and existing pharmaceutical distribution customers, including the on-boarding of a new mail order customer.

### Medical Segment

Medical segment revenue growth for the three months ended September 30, 2016 was due to acquisitions, which contributed $194 million, and sales growth from new and existing customers.

## Cost of Products Sold

Cost of products sold increased $4.0 billion ( 15 percent ) compared to the prior-year period, as a result of the same factors affecting the change in revenue and gross margin.

| MD&A | Results of Operations |
|------|----------------------|

## Gross Margin



| (in millions) | Three Months Ended September 30, | | |
|---|---|---|---|
| | **2016** | 2015 | **Change** |
| Gross margin | **$ 1,590** | $ 1,579 | **1%** |

Gross margin during the three months ended September 30, 2016 was essentially flat versus the prior-year period.

Acquisitions and additional sales to new and existing pharmaceutical distribution customers increased gross margin by $116 million and $109 million, respectively. These were partially offset by the loss of a large pharmaceutical distribution customer.

Gross margin as a percent of revenue declined 67 basis points during the three months ended September 30, 2016 due to generic pharmaceutical customer pricing changes and changes in product mix resulting from the on-boarding of a new mail order customer. While the new mail order customer contributes positively to gross margin dollars it has a dilutive impact on our overall gross margin rate.

## Distribution, Selling, General, and Administrative ("SG&A") Expenses

| (in millions) | Three Months Ended September 30, | | |
|---|---|---|---|
| | **2016** | 2015 | **Change** |
| SG&A expenses | **$ 920** | $ 842 | **9%** |

The increase in SG&A expenses during the three months ended September 30, 2016 was due to the impact of acquisitions ($95 million).

| MD&A | Results of Operations |
|---|---|

# Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 13 of the "Notes to Condensed Consolidated Financial Statements" for additional information on segment profit.



| (in millions) | Three Months Ended September 30, | | |
|---|---|---|---|
| | 2016 | 2015 | Change |
| Pharmaceutical | $ 534 | $ 657 | (19)% |
| Medical | 127 | 101 | 26 % |
| Total segment profit | 661 | 758 | (13)% |
| Corporate | (126) | (138) | 9 % |
| Total consolidated operating earnings | $ 535 | $ 620 | (14)% |

## Pharmaceutical Segment Profit

The decrease in Pharmaceutical segment profit during the three months ended September 30, 2016 was largely due to generic pharmaceutical customer pricing changes. Reduced levels of branded pharmaceutical inflation and the loss of a large pharmaceutical distribution customer beginning April 1, 2016 also contributed to the decrease in Pharmaceutical segment profit. These were partially offset by other aspects of our generics program, which exclude the above-mentioned pricing changes.

## Medical Segment Profit

The increase in Medical segment profit during the three months ended September 30, 2016 was primarily due to acquisitions and contributions from Cardinal Health Brand products.

| MD&A | Results of Operations |
|------|----------------------|

## Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin, and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | **2016** | | 2015 | |
| Restructuring and employee severance | $ | **9** | $ | 12 |
| Amortization and other acquisition-related costs | | **122** | | 105 |
| Impairments and (gain)/loss on disposal of assets, net | | **3** | | — |
| Litigation (recoveries)/charges, net | | **1** | | — |

**Amortization and Other Acquisition-Related Costs**
Amortization of acquisition-related intangible assets was $101 million and $67 million for the three months ended September 30, 2016 and 2015 , respectively.

## Earnings Before Income Taxes

In addition to the items discussed above, earnings before income taxes was impacted by the following:

| (in millions) | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | **2016** | 2015 | Change | |
| Other (income)/expense, net | $ **(3)** | $ 8 | **N.M.** | |
| Interest expense, net | **44** | 44 | **—%** | |

## Provision for Income Taxes

During the three months ended September 30, 2016 and 2015, the effective tax rate was 37.3 percent and 32.3 percent, respectively. The effective tax rate for the three months ended September 30, 2015 included net favorable discrete items of $28 million.

**MD&A** | Liquidity and Capital Resources

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends, and share repurchases. If we decide to engage in one or more additional acquisitions, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $2.0 billion at September 30, 2016 compared to $2.4 billion at June 30, 2016 . At September 30, 2016 , our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

During the three months ended September 30, 2016 , we deployed $250 million on share repurchases, $149 million for cash dividends and $100 million for capital expenditures; net cash provided by operating activities was $104 million , driven by net earnings and changes in working capital.

The cash and equivalents balance at September 30, 2016 included $622 million of cash held by subsidiaries outside of the United States. Although the vast majority of cash is available for repatriation, bringing the cash into the United States could trigger U.S federal, state and local income tax obligations.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $1.75 billion revolving credit facility and a $700 million committed receivables sales facility program. We also have a commercial paper program of up to $1.5 billion , backed by the revolving credit facility. At September 30, 2016 , we had no amounts outstanding under the revolving credit facility; however, availability was reduced by outstanding letters of credit of $14 million . We also had no amounts outstanding under the committed receivables sales facility program; however, availability was reduced by outstanding standby letters of credit of $38 million at September 30, 2016 .

Our revolving credit facility and committed receivables sales facility program require us to maintain a consolidated leverage ratio of no more than 3.25-to-1 and our committed receivables sales facility also requires us to maintain a consolidated interest coverage ratio, as of the end of any calendar quarter, of at least 4-to-1 . As of September 30, 2016 , we were in compliance with these financial covenants.

### Available-for-Sale Securities

At both September 30, 2016 and June 30, 2016 , we held $200 million of marketable securities, which are classified as available-for-sale.

## Capital Deployment

### Capital Expenditures

Capital expenditures during the three months ended September 30, 2016 and 2015 were $100 million and $83 million , respectively.

### Dividends

On August 8, 2016, our Board of Directors approved a quarterly dividend of $0.4489 per share, or $1.80 per share on an annualized basis, payable on October 15, 2016 to shareholders of record on October 3, 2016.

### Share Repurchases

During the three months ended September 30, 2016 we repurchased $250 million of our common shares. We funded the repurchases with available cash. At September 30, 2016 , we had $793 million remaining under our existing share repurchase program.

# Other Items

The MD&A in our 2016 Form 10-K addresses our contractual obligations, critical accounting policies and sensitive accounting estimates, and off-balance sheet arrangements, as of and for the fiscal year ended June 30, 2016 . There have been no subsequent material changes outside of the ordinary course of business to those items.

# Explanation and Reconciliation of Non-GAAP Financial Measures

The "Overview of Consolidated Results" section within MD&A in this Form 10-Q contains financial measures that are not calculated in accordance with GAAP.

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

The differences between the non-GAAP measures presented in this Form 10-Q and the most directly comparable GAAP measure are represented by the following items, which management believes are useful to exclude for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits , which we began excluding in fiscal 2015 because the factors that drive last-in first-out ("LIFO") inventory charges or credits such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. We also believe that the exclusion of LIFO charges from non-GAAP metrics allows for a better comparison of our current financial results to our historical financial results and to our peer group companies;

- restructuring and employee severance costs , which include charges for programs in which we fundamentally change our operations and are excluded because they are not part of the ongoing operations of our underlying business, which includes normal levels of reinvestment in the business;

- amortization and other acquisition-related costs . We exclude amortization costs primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, these non-cash amounts are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of forecasted, current and historical financial results. We exclude other acquisition-related costs because they are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. They are also significantly impacted by the timing and size of acquisitions;

- impairments and gains or loss on disposal of assets , which are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance;

- litigation recoveries or charges, net , which often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount; and

- loss on extinguishment of debt , which does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of these types of charges is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the non-GAAP items described above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

# Definitions

**Growth rate calculation** : Growth rates in this Form 10-Q are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, and (5) litigation (recoveries)/charges.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Explanation and Reconciliation of Non-GAAP Financial Measures**

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [1] | Net Earnings [1] Growth Rate | Diluted EPS [1] | Diluted EPS [1] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | **First Quarter Fiscal 2017** | | | | | |
| **GAAP** | $ 535 | (14)% | $ 494 | $ 184 | $ 309 | (19)% | $ 0.96 | (17)% |
| Restructuring and employee severance | 9 | | 9 | 4 | 5 | | 0.02 | |
| Amortization and other acquisition-related costs | 122 | | 122 | 40 | 82 | | 0.25 | |
| Impairments and loss on disposal of assets | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | 1 | | 1 | — | 1 | | — | |
| **Non-GAAP** | $ 669 | (9)% | $ 629 | $ 229 | $ 399 | (13)% | $ 1.24 | (10)% |
| | | | | | | | | |
| | | | First Quarter Fiscal 2016 | | | | | |
| GAAP | $ 620 | 33 % | $ 568 | $ 184 | $ 383 | 44 % | $ 1.15 | 47 % |
| Restructuring and employee severance | 12 | | 12 | 5 | 7 | | 0.02 | |
| Amortization and other acquisition-related costs | 105 | | 105 | 37 | 68 | | 0.21 | |
| Impairments and loss on disposal of assets | — | | — | — | — | | — | |
| Litigation (recoveries)/charges, net | — | | — | — | — | | — | |
| Non-GAAP | $ 737 | 30 % | $ 685 | $ 226 | $ 458 | 35 % | $ 1.38 | 38 % |

[1] attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no LIFO charges/(credits) or losses on extinguishment of debt during the periods presented.

# Quantitative and Qualitative Disclosures About Market Risk

There have been no material changes in the quantitative and qualitative market risk disclosures included in our 2016 Form 10-K since the end of fiscal 2016 through September 30, 2016 .

# Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2016 . Based on this evaluation, our principal executive officer and principal financial officer have concluded that as of September 30, 2016 , our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

### Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended September 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Implementation of New Software Systems

The Pharmaceutical segment is in a multi-year project implementing a replacement of certain finance and operating information systems, which is expected to affect internal control over financial reporting. This project did not impact internal control over financial reporting during the quarter ended September 30, 2016. The Pharmaceutical segment plans to begin transitioning selected processes to the new systems later in fiscal 2017. If these new systems are not effectively implemented or fail to operate as intended, it could adversely affect our internal control over financial reporting.

# Legal Proceedings

The legal proceedings described in Note 7 of the "Notes to Condensed Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

# Risk Factors

You should carefully consider the information in this Form 10-Q and the risk factors discussed in "Risk Factors" and other risks discussed in our 2016 Form 10-K and our filings with the SEC since June 30, 2016 . These risks could materially and adversely affect our results of operations, financial condition, liquidity, and cash flows. Our business also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

# Unregistered Sales of Equity Securities and Use of Proceeds

**Issuer Purchases of Equity Securities**

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Program (2) (in millions) |
|---|---|---|---|---|
| July 2016 | 3,072,428 | $ 81.37 | 3,072,251 | $ 793 |
| August 2016 | 331 | 80.68 | — | 793 |
| September 2016 | 2,620 | 80.66 | — | 793 |
| **Total** | **3,075,379** | **$ 81.37** | **3,072,251** | **$ 793** |

(1) Reflects 177 , 331 and 2,620 common shares purchased in July, August and September 2016, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2) On October 29, 2013, our Board of Directors approved a $1.0 billion share repurchase program and on August 6, 2014, the Board of Directors authorized an additional $1.0 billion under the program, for a total of $2.0 billion. This program was completed in July 2016. On May 4, 2016, our Board of Directors also approved a $1.0 billion share repurchase program that expires on December 31, 2019. During the three months ended September 30, 2016 , we repurchased 3 million common shares under these programs. After these repurchases, we have $793 million available under our new repurchase program.

**Financial Statements**

# Condensed Consolidated Statements of Earnings

**(Unaudited)**

| (in millions, except per common share amounts) | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| Revenue | $ | 32,039 | $ | 28,055 |
| Cost of products sold | | 30,449 | | 26,476 |
| Gross margin | | 1,590 | | 1,579 |
| | | | | |
| **Operating expenses:** | | | | |
| Distribution, selling, general, and administrative expenses | | 920 | | 842 |
| Restructuring and employee severance | | 9 | | 12 |
| Amortization and other acquisition-related costs | | 122 | | 105 |
| Impairments and (gain)/loss on disposal of assets, net | | 3 | | — |
| Litigation (recoveries)/charges, net | | 1 | | — |
| Operating earnings | | 535 | | 620 |
| | | | | |
| Other (income)/expense, net | | (3) | | 8 |
| Interest expense, net | | 44 | | 44 |
| Earnings before income taxes | | 494 | | 568 |
| | | | | |
| Provision for income taxes | | 184 | | 184 |
| Net earnings | | 310 | | 384 |
| | | | | |
| Less: Net earnings attributable to noncontrolling interests | | (1) | | (1) |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 309 | $ | 383 |
| | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | |
| Basic | $ | 0.97 | $ | 1.17 |
| Diluted | | 0.96 | | 1.15 |
| | | | | |
| **Weighted-average number of common shares outstanding:** | | | | |
| Basic | | 320 | | 328 |
| Diluted | | 322 | | 331 |
| | | | | |
| Cash dividends declared per common share | $ | 0.4489 | $ | 0.3870 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Statements of Comprehensive Income

**(Unaudited)**

| (in millions) | | Three Months Ended September 30, | | |
|---|---|---|---|---|
| | | **2016** | | 2015 |
| Net earnings | $ | **310** | $ | 384 |
| | | | | |
| **Other comprehensive income/(loss):** | | | | |
| Foreign currency translation adjustments and other | | **(1)** | | (44) |
| Net unrealized gain/(loss) on derivative instruments, net of tax | | **1** | | (1) |
| Total other comprehensive income/(loss), net of tax | | **—** | | (45) |
| | | | | |
| Total comprehensive income | | **310** | | 339 |
| | | | | |
| Less: comprehensive income attributable to noncontrolling interests | | **(1)** | | (1) |
| **Total comprehensive income attributable to Cardinal Health, Inc.** | $ | **309** | $ | **338** |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Balance Sheets

**(Unaudited)**

| (in millions) | | September 30, 2016 | | June 30, 2016 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | **2,001** | $ | 2,356 |
| Trade receivables, net | | **7,708** | | 7,405 |
| Inventories, net | | **10,917** | | 10,615 |
| Prepaid expenses and other | | **1,657** | | 1,580 |
| Total current assets | | **22,283** | | 21,956 |
| | | | | |
| Property and equipment, net | | **1,823** | | 1,796 |
| Goodwill and other intangibles, net | | **9,427** | | 9,426 |
| Other assets | | **873** | | 944 |
| **Total assets** | $ | **34,406** | $ | 34,122 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests, and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | **17,597** | $ | 17,306 |
| Current portion of long-term obligations and other short-term borrowings | | **616** | | 587 |
| Other accrued liabilities | | **1,788** | | 1,808 |
| Total current liabilities | | **20,001** | | 19,701 |
| | | | | |
| Long-term obligations, less current portion | | **4,916** | | 4,952 |
| Deferred income taxes and other liabilities | | **2,842** | | 2,781 |
| | | | | |
| Redeemable noncontrolling interests | | **116** | | 117 |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized— **500 thousand** shares, Issued— **none** | | **—** | | — |
| Common shares, without par value: | | | | |
| Authorized— **755 million** shares, Issued— **364 million** shares at **September 30, 2016** and June 30, 2016 | | **2,958** | | 3,010 |
| Retained earnings | | **6,582** | | 6,419 |
| Common Shares in treasury, at cost: **44 million** shares and 42 million shares at **September 30, 2016** and June 30 2016, respectively | | **(2,912)** | | (2,759) |
| Accumulated other comprehensive loss | | **(116)** | | (116) |
| **Total Cardinal Health, Inc. shareholders' equity** | | **6,512** | | 6,554 |
| Noncontrolling interests | | **19** | | 17 |
| **Total shareholders' equity** | | **6,531** | | 6,571 |
| **Total liabilities, redeemable noncontrolling interests, and shareholders' equity** | $ | **34,406** | $ | 34,122 |

See notes to condensed consolidated financial statements.

**Financial Statements**

# Condensed Consolidated Statements of Cash Flows

**(Unaudited)**

| (in millions) | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | **2016** | | 2015 | |
| **Cash flows from operating activities:** | | | | |
| Net earnings | $ | **310** | $ | 384 |
| | | | | |
| Adjustments to reconcile net earnings to net cash provided by/(used in) operating activities: | | | | |
| Depreciation and amortization | | **173** | | 137 |
| Impairments and loss on disposal of assets, net | | **3** | | — |
| Share-based compensation | | **23** | | 30 |
| Provision for bad debts | | **7** | | 17 |
| Change in fair value of contingent consideration obligation | | **—** | | (1) |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | |
| Increase in trade receivables | | **(306)** | | (348) |
| Increase in inventories | | **(298)** | | (495) |
| Increase in accounts payable | | **279** | | 425 |
| Other accrued liabilities and operating items, net | | **(87)** | | (201) |
| Net cash provided by/(used in) operating activities | | **104** | | (52) |
| | | | | |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | | **(9)** | | (1,399) |
| Additions to property and equipment | | **(100)** | | (83) |
| Purchase of available for sale securities and other investments | | **(52)** | | (26) |
| Proceeds from sale of available-for-sale securities and other investments | | **34** | | 25 |
| Proceeds from maturities of available-for-sale securities | | **17** | | 5 |
| Net cash used in investing activities | | **(110)** | | (1,478) |
| | | | | |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | | **—** | | (23) |
| Net change in short-term borrowings | | **25** | | 36 |
| Net purchase of noncontrolling interests | | **(10)** | | — |
| Reduction of long-term obligations | | **(1)** | | (4) |
| Proceeds from interest rate swap terminations | | **14** | | — |
| Net tax withholdings from share-based compensation | | **(9)** | | (21) |
| Excess tax benefits from share-based compensation | | **30** | | 31 |
| Dividends on common shares | | **(149)** | | (131) |
| Purchase of treasury shares | | **(250)** | | — |
| Net cash used in financing activities | | **(350)** | | (112) |
| | | | | |
| Effect of exchange rates changes on cash and equivalents | | **1** | | — |
| | | | | |
| Net decrease in cash and equivalents | | **(355)** | | (1,642) |
| Cash and equivalents at beginning of period | | **2,356** | | 4,616 |
| **Cash and equivalents at end of period** | $ | **2,001** | $ | 2,974 |

See notes to condensed consolidated financial statements.

# Notes to Condensed Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

### Basis of Presentation

Our condensed consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. References to "we," "our," and similar pronouns in this Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 (this "Form 10-Q") refer to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context requires otherwise.

Our condensed consolidated financial statements have been prepared in accordance with the U.S. Securities and Exchange Commission ("SEC") instructions to Quarterly Reports on Form 10-Q and include the information and disclosures required by accounting principles generally accepted in the United States ("GAAP") for interim financial reporting. The preparation of financial statements in conformity with GAAP requires us to make estimates and assumptions that affect amounts reported in the condensed consolidated financial statements and accompanying notes. Actual amounts may differ from these estimated amounts. In our opinion, all adjustments necessary for a fair presentation of the condensed consolidated financial statements have been included. Except as disclosed elsewhere in this Form 10-Q, all such adjustments are of a normal and recurring nature. In addition, financial results presented for this fiscal 2017 interim period are not necessarily indicative of the results that may be expected for the full fiscal year ending June 30, 2017 . These condensed consolidated financial statements are unaudited and, accordingly, should be read in conjunction with the audited consolidated financial statements and related notes contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the " 2016 Form 10-K ").

### Recent Financial Accounting Standards

In August 2016, the Financial Accounting Standards Board (the "FASB") issued accounting guidance which clarifies the classification of certain cash receipts and cash payments in the statement of cash flows, including those related to contingent consideration payments made after a business combination, distributions received from equity method investees, debt prepayment or debt extinguishment costs, and proceeds from the settlement of insurance claims. This guidance will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In April 2015, the FASB issued amended accounting guidance that clarifies the circumstances under which a cloud computing customer would account for the arrangement as a license of internal-use software. If it is determined that a software license does not exist in the arrangement, the customer would account for this arrangement as a service contract. We adopted this guidance in the first quarter

of fiscal 2017. The adoption of this guidance did not have a material impact on our financial position or results of operations.

Also in April 2015, the FASB issued amended accounting guidance related to the presentation of debt issuance costs in the financial statements. This guidance requires an entity to present such costs in the balance sheet as a direct deduction from the related debt rather than as an asset. We adopted this guidance in the first quarter of fiscal 2017. Upon adoption of this guidance, debt issuance costs of $29 million were reclassified from other assets to long-term obligations, less current portion within the condensed consolidated balance sheet.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. This amendment will be effective for us in the first quarter of fiscal 2019. We are in the process of assessing any differences between the amended and existing guidance that could impact our consolidated financial statements and continuing to evaluate the options for adoption.

## 2. Acquisitions

### Cordis

On October 2, 2015 , we acquired the Cordis business from Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, for $1.9 billion using cash on hand and proceeds from our debt offering in June 2015 . The acquisition of Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions with operations in more than 50 countries, expands our Medical segment's portfolio of self-manufactured products and its geographic scope. We closed the Cordis acquisition in 20 principal countries on October 2, 2015 , and acquired control of, as described in GAAP, and the rights to, the net economic benefit from the entire Cordis business in the remaining countries at that time.

Transaction and integration costs associated with the acquisition of Cordis were $14 million and $21 million during the three months ended September 30, 2016 and 2015 , respectively, and are included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

### Fair Value of Assets Acquired and Liabilities Assumed

The allocation of the fair value of assets acquired and liabilities assumed for the acquisitions of Cordis, naviHealth Holdings, LLC. ("naviHealth"), and The Harvard Drug Group ("Harvard Drug") were finalized during the three months ended September 30, 2016, resulting in goodwill of $943 million , $334 million , and $634 million , respectively. There were no significant adjustments to the allocation

of the fair value of assets acquired and liabilities assumed for the naviHealth and Harvard Drug acquisitions from those disclosed in our fiscal 2016 Form 10-K. We recorded additional goodwill for Cordis of $82 million , substantially all of which was to increase an accrual for assumed pre-acquisition product liability lawsuits. See Note 7 for further discussion of the product liability lawsuits.

## 3. Restructuring and Employee Severance

The following table summarizes restructuring and employee severance costs:

| | Three months ended September 30, | |
|---|---|---|
| (in millions) | 2016 | 2015 |
| Employee-related costs (1) | $ 7 | $ 6 |
| Facility exit and other costs (2) | 2 | 6 |
| **Total restructuring and employee severance** | $ 9 | $ 12 |

(1) Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2) Facility exit and other costs primarily consist of lease termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | Facility Exit and Other Costs | Total |
|---|---|---|---|
| Balance at June 30, 2016 | $ 15 | $ 1 | $ 16 |
| Additions | 6 | — | 6 |
| Payments and other adjustments | (4) | (1) | (5) |
| **Balance at September 30, 2016** | $ 17 | $ — | $ 17 |

## 4. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical | Medical | Total |
|---|---|---|---|
| Balance at June 30, 2016 | $ 2,919 | $ 4,248 | $ 7,167 |
| Goodwill acquired, net of purchase price adjustments | 9 | 86 | 95 |
| Foreign currency translation adjustments and other | (2) | 1 | (1) |
| **Balance at September 30, 2016** | $ 2,926 | $ 4,335 | $ 7,261 |

### Other Intangible Assets

The following tables summarize other intangible assets by class at:

| | September 30, 2016 | | | |
|---|---|---|---|---|
| (in millions) | Gross Intangible | Accumulated Amortization | Net Intangible | Weighted-Average Remaining Amortization Period (Years) |
| **Indefinite-life intangibles:** | | | | |
| IPR&D, trademarks and other | $ 70 | $ — | $ 70 | N/A |
| Total indefinite-life intangibles | 70 | — | 70 | N/A |
| **Definite-life intangibles:** | | | | |
| Customer relationships | 1,931 | 793 | 1,138 | 9 |
| Trademarks, trade names, and patents | 527 | 156 | 371 | 14 |
| Developed technology and other | 812 | 225 | 587 | 8 |
| Total definite-life intangibles | 3,270 | 1,174 | 2,096 | 10 |
| **Total other intangible assets** | $ 3,340 | $ 1,174 | $ 2,166 | N/A |

| | June 30, 2016 | | |
|---|---|---|---|
| (in millions) | Gross Intangible | Accumulated Amortization | Net Intangible |
| **Indefinite-life intangibles:** | | | |
| IPR&D, trademarks and other | $ 72 | $ — | $ 72 |
| Total indefinite-life intangibles | 72 | — | 72 |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,946 | 737 | 1,209 |
| Trademarks, trade names, and patents | 508 | 140 | 368 |
| Developed technology and other | 808 | 198 | 610 |
| Total definite-life intangibles | 3,262 | 1,075 | 2,187 |
| **Total other intangible assets** | $ 3,334 | $ 1,075 | $ 2,259 |

Total amortization of intangible assets was $101 million and $67 million for the three months ended September 30, 2016 and 2015 , respectively. Estimated annual amortization of intangible assets for the remainder of fiscal 2017 through 2021 is as follows: $285 million , $350 million , $281 million , $254 million , and $207 million .

**Notes to Financial Statements**

## 5. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. We held the following investments in marketable securities at fair value at:

| (in millions) | September 30, 2016 | | June 30, 2016 |
|---|---|---|---|
| **Current available-for-sale securities:** | | | |
| Treasury bills | $ | — | $ 3 |
| International bonds | | 3 | 2 |
| Corporate bonds | | 58 | 58 |
| U.S. agency bonds | | 7 | 6 |
| Asset-backed securities | | 31 | 28 |
| International equity securities | | 2 | 2 |
| U.S. agency mortgage-backed securities | | 7 | 14 |
| Total current available-for-sale securities | | 108 | 113 |
| **Long-term available-for-sale securities:** | | | |
| Treasury bills | | 29 | 10 |
| International bonds | | 3 | 1 |
| Corporate bonds | | 32 | 36 |
| U.S. agency bonds | | 8 | 9 |
| Asset-backed securities | | 8 | 17 |
| U.S. agency mortgage-backed securities | | 12 | 14 |
| Total long-term available-for-sale securities | | 92 | 87 |
| **Total available-for-sale securities** | $ | 200 | $ 200 |

Gross unrealized gains and losses were immaterial at both September 30, 2016 and June 30, 2016 . During the three months ended September 30, 2016 and 2015 , gross realized gains and losses were immaterial and we did not recognize any other-than-temporary impairments. At September 30, 2016 , the weighted-average effective maturity of our current and long-term investments was approximately 6 months and 17 months , respectively.

## 6. Income Taxes

Fluctuations in our provision for income taxes as a percentage of pretax earnings ("effective tax rate") are due to changes in international and U.S. state effective tax rates resulting from our business mix and discrete items.

During the three months ended September 30, 2016 and 2015 , the effective tax rate was 37.3 percent and 32.3 percent , respectively. The effective tax rate for the three months ended September 30, 2015 included net favorable discrete items of $28 million .

At September 30, 2016 and June 30, 2016 , we had $532 million and $527 million of unrecognized tax benefits, respectively. The September 30, 2016 and June 30, 2016 , balances include $358 million and $355 million of unrecognized tax benefits, respectively, that if recognized, would have an impact on the effective tax rate.

At September 30, 2016 and June 30, 2016 , we had $149 million and $145 million , respectively, accrued for the payment of interest and penalties related to unrecognized tax benefits, which we recognize in the provision for income taxes in the condensed consolidated

statements of earnings. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the condensed consolidated balance sheets.

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is between zero and a net decrease of $175 million , exclusive of penalties and interest.

We file income tax returns in the U.S. federal jurisdiction, various U.S. state jurisdictions, and various foreign jurisdictions. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2006 through the current fiscal year.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $126 million and $172 million at September 30, 2016 and June 30, 2016 , respectively, and is included in other assets in the condensed consolidated balance sheets.

## 7. Commitments, Contingent Liabilities and Litigation

### Commitments

**Generic Sourcing Venture with CVS Health Corporation ("CVS Health")**
In July 2014 , we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS Health for an initial term of 10 years . Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. Due to the achievement of predetermined milestones, we are required to make quarterly payments of $45.6 million to CVS Health for the remainder of the initial term.

### Legal Proceedings

We become involved from time to time in disputes, litigation, and regulatory matters.

We may be named from time to time in *qui tam* actions, which are initiated by private third parties purporting to act on behalf of federal or state governments and which allege that false claims have been submitted or have been caused to be submitted for payment by the government. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own on behalf of the government.

From time to time, we receive subpoenas or requests for information from various government agencies relating to our business or to the business of a customer, supplier, or other industry participant. Most

**Notes to Financial Statements**

of these matters are resolved without incident; however, such subpoenas or requests can lead to the assertion of claims or the commencement of legal proceedings against us.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators, and product liability claims and lawsuits, including class actions.

We accrue for contingencies related to disputes, litigation, and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

With respect to the matters described below, except as otherwise stated, we are unable to estimate a range of reasonably possible loss for matters for which there is no accrual, or additional loss for matters for which we have recorded an accrual, since damages or fines have not been specified or the proceedings are at stages where significant uncertainty exists as to legal or factual issues and as to whether such matters will proceed to trial. We do not believe, based on currently available information, that the outcomes of these matters will have a material adverse effect on our financial position, results of operations, or cash flows. However, the outcome of one or more of these matters could be material to our results of operations for a particular quarterly period.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

Except as otherwise stated below, we recognize estimated loss contingencies for litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges, net in our condensed consolidated statements of earnings.

**DEA Investigation and Related Matters**

In February 2012, the U.S. Drug Enforcement Administration (the "DEA") issued an order to show cause and immediate suspension of our Lakeland, Florida distribution center's registration to distribute controlled substances, asserting that we failed to maintain required controls against the diversion of controlled substances. In May 2012, we entered into a settlement agreement with the DEA that resolved the administrative aspects of the DEA's action but did not resolve potential liability for civil fines in Florida or elsewhere for the conduct covered by the settlement agreement. In that regard, we are continuing to discuss a settlement with the U.S. Department of Justice. Our total accrual for this matter was $44 million at both September 30, 2016 and June 30, 2016 , which is included in other accrued liabilities in the condensed consolidated balance sheets.

**State of West Virginia vs. Cardinal Health, Inc.**

Since June 2012, the West Virginia Attorney General has filed complaints against a number of pharmaceutical wholesale distributors, including us. The complaints, which were filed in the Circuit Court of Boone County, West Virginia, allege, among other things, that the distributors failed to maintain effective controls to guard against diversion of controlled substances in West Virginia, failed to report suspicious orders of controlled substances in accordance with the West Virginia Uniform Controlled Substances Act, and were negligent in distributing controlled substances to pharmacies that serve individuals who abuse controlled substances. The complaints seek, among other things, injunctive and other equitable relief and monetary damages. We are vigorously defending ourselves in this matter.

**Product Liability Lawsuits**

As of October 31, 2016, we and our Cordis business have been named as defendants in 31 product liability lawsuits involving claims by approximately 250 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these matters.

Based on currently available information, we have recorded an accrual, most of which relates to legal defense costs, as an adjustment to pre-acquisition liabilities assumed in the Cordis acquisition. Refer to Note 2 for further information regarding this adjustment. We do not believe that reasonably possible losses in excess of this accrued amount will be material to our financial statements.

**Notes to Financial Statements**

## 8. Fair Value Measurements

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at:

| (in millions) | September 30, 2016 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 176 | $ — | $ — | $ 176 |
| Forward contracts (1) | — | 2 | — | 2 |
| Available-for-sale securities (2) | — | 200 | — | 200 |
| Other investments (3) | 109 | — | — | 109 |
| **Liabilities:** | | | | |
| Contingent Consideration (4) | — | — | (21) | (21) |

| (in millions) | June 30, 2016 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 516 | $ — | $ — | $ 516 |
| Forward contracts (1) | — | 19 | — | 19 |
| Available-for-sale securities (2) | — | 200 | — | 200 |
| Other investments (3) | 103 | — | — | 103 |
| **Liabilities:** | | | | |
| Contingent Consideration (4) | — | — | (19) | (19) |

(1)   The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the condensed consolidated balance sheets.

(2)   We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 5 for additional information regarding available-for-sale securities.

(3)   The other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(4)   Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods, and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
|---|---|
| Balance at June 30, 2016 | $ 19 |
| Additions from acquisitions | 2 |
| Changes in fair value of contingent consideration (1) | — |
| **Balance at September 30, 2016** | **$ 21** |

(1)   Amount is included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

## 9. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk, and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to fair value through earnings at the end of each period. Our derivative and hedging programs are consistent with those described in the 2016 Form 10-K. The amount of ineffectiveness associated with these derivative instruments was immaterial for the three months ended September 30, 2016 and 2015 .

During the three months ended September 30, 2016 , we entered into forward interest rate swap locks with a total notional amount of $200 million to hedge probable, but not firmly committed, future transactions associated with our debt.

During the three months ended September 30, 2016 , we terminated notional amounts of $200 million of pay-floating interest rate swaps. We received net settlement proceeds of $ 14 million related to the pay-floating interest rate swaps terminated during the three months ended September 30, 2016 and the pay-floating interest rate swaps terminated in fiscal 2016, as previously disclosed in our 2016 Form 10-K. These swaps were previously designated as fair value hedges. There was no immediate impact to the condensed consolidated statements of earnings; however, the fair value adjustment to debt is being amortized over the life of the underlying debt as a reduction to interest expense, net in the condensed consolidated statements of earnings.

### Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, accounts payable, and other accrued liabilities at September 30, 2016 and June 30, 2016 approximate fair value due to their short-term maturities.

**Notes to Financial Statements**

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at:

| (in millions) | September 30, 2016 | | June 30, 2016 | |
|---|---|---|---|---|
| Estimated fair value | $ | 5,884 | $ | 5,780 |
| Carrying amount | | 5,532 | | 5,539 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

## 10. Redeemable Noncontrolling Interests

Redeemable noncontrolling interest represents the third parties' share of the net assets of naviHealth. The third-party noncontrolling interest holders hold an option that allows them to sell their noncontrolling interests to us at any time after the two-year anniversary of the closing, or earlier if a trigger event occurs. The terms of the agreement also provide us with the option to acquire any remaining noncontrolling interests at any time after the two-year anniversary of the closing, which is August 26, 2017. Our ownership interest in naviHealth was 82 percent at September 30, 2016 .

The reconciliation of the changes in redeemable noncontrolling interests are as follows:

| (in millions) | Redeemable Noncontrolling Interest | |
|---|---|---|
| Balance at June 30, 2016 | $ | 117 |
| Net earnings attributable to redeemable noncontrolling interests | | 1 |
| Net purchase of redeemable noncontrolling interests | | (2) |
| **Balance at September 30, 2016** | $ | **116** |

## 11. Shareholders' Equity

During the three months ended September 30, 2016 , we repurchased 3 million common shares having an aggregate cost of $250 million . The average price paid per common share was $81.37 .

During the three months ended September 30, 2015 , we did not repurchase any common shares.

We funded the repurchases with available cash. The common shares repurchased are held in treasury to be used for general corporate purposes.

## Accumulated Other Comprehensive Loss

The following table summarizes the changes in the balance of accumulated other comprehensive loss by component and in total:

| (in millions) | Foreign Currency Translation Adjustments | | Unrealized Gain/(Loss) on Derivatives, net of tax | | Accumulated Other Comprehensive Loss | |
|---|---|---|---|---|---|---|
| Balance at June 30, 2016 | $ | (123) | $ | 7 | $ | (116) |
| Other comprehensive income/(loss), before reclassifications | | (1) | | 2 | | 1 |
| Amounts reclassified to earnings | | — | | (1) | | (1) |
| Other comprehensive income/(loss), net of tax | | (1) | | 1 | | — |
| **Balance at September 30, 2016** | $ | **(124)** | $ | **8** | $ | **(116)** |

Activity related to realized and unrealized gains and losses on available-for-sale securities, as described in Note 5 , was immaterial during the three months ended September 30, 2016 .

## 12. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the number of common shares used to compute basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| (in millions) | Three Months Ended September 30, | |
|---|---|---|
| | **2016** | 2015 |
| Weighted-average common shares–basic | **320** | 328 |
| **Effect of dilutive securities:** | | |
| Employee stock options, restricted share units, and performance share units | **2** | 3 |
| **Weighted-average common shares–diluted** | **322** | 331 |

The potentially dilutive employee stock options, restricted share units, and performance share units that were antidilutive for the three months ended September 30, 2016 and 2015 were 3 million and 2 million , respectively.

## 13. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

**Notes to Financial Statements**

The following table presents revenue for each reportable segment and Corporate:

| | | Three Months Ended September 30, | | |
|---|---|---|---|---|
| (in millions) | | **2016** | | 2015 |
| Pharmaceutical | $ | **28,762** | $ | 25,140 |
| Medical | | **3,279** | | 2,919 |
| Total segment revenue | | **32,041** | | 28,059 |
| Corporate (1) | | **(2)** | | (4) |
| **Total revenue** | $ | **32,039** | $ | 28,055 |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial, and customer care shared services, human resources, information technology, and legal and compliance. The results attributable to noncontrolling interests are recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided and other ratable allocation methodologies.

We do not allocate the following items to our segments: last-in first-out, or ("LIFO"), inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation, and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $1 million and $6 million for the three months ended September 30, 2016 and 2015 , respectively.

The following table presents segment profit by reportable segment and Corporate:

| | | Three Months Ended September 30, | | |
|---|---|---|---|---|
| (in millions) | | **2016** | | 2015 |
| Pharmaceutical | $ | **534** | $ | 657 |
| Medical | | **127** | | 101 |
| Total segment profit | | **661** | | 758 |
| Corporate | | **(126)** | | (138) |
| **Total operating earnings** | $ | **535** | $ | 620 |

The following table presents total assets for each reportable segment and Corporate at:

| (in millions) | | **September 30, 2016** | | June 30, 2016 |
|---|---|---|---|---|
| Pharmaceutical | $ | **21,034** | $ | 20,662 |
| Medical | | **10,553** | | 10,236 |
| Corporate | | **2,819** | | 3,224 |
| **Total assets** | $ | **34,406** | $ | 34,122 |

## 14. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees.

The following table provides total share-based compensation expense by type of award:

| | | Three Months Ended September 30, | | |
|---|---|---|---|---|
| (in millions) | | **2016** | | 2015 |
| Restricted share unit expense | $ | **17** | $ | 13 |
| Employee stock option expense | | **5** | | 5 |
| Performance share unit expense | | **1** | | 12 |
| **Total share-based compensation** | $ | **23** | $ | 30 |

The total tax benefit related to share-based compensation was $8 million and $11 million for the three months ended September 30, 2016 and 2015 , respectively.

### Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years . Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|---|
| Nonvested at June 30, 2016 | 2 | $ | 71.73 |
| Granted | 1 | | 83.15 |
| Vested | (1) | | 68.14 |
| Canceled and forfeited | — | | — |
| **Nonvested at September 30, 2016** | **2** | $ | **80.22** |

At September 30, 2016 , the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested restricted share units not yet recognized was $121 million , which is expected to be recognized over a weighted-average period of two years .

### Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for periods ranging from seven to ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

**Notes to Financial Statements**

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share | |
|---|---|---|---|
| Outstanding at June 30, 2016 | 7 | $ | 54.09 |
| Granted | 2 | | 83.14 |
| Exercised | (1) | | 37.83 |
| Canceled and forfeited | — | | — |
| **Outstanding at September 30, 2016** | **8** | **$** | **60.65** |
| **Exercisable at September 30, 2016** | **5** | **$** | **49.96** |

At September 30, 2016 , the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested stock options not yet recognized was $35 million , which is expected to be recognized over a weighted-average period of two years . The following tables provide additional detail related to stock options:

| (in millions) | September 30, 2016 | June 30, 2016 | |
|---|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ | 147 $ | 181 |
| Aggregate intrinsic value of exercisable options at period end | | 145 | 161 |

| (in years) | September 30, 2016 | June 30, 2016 |
|---|---|---|
| Weighted-average remaining contractual life of outstanding options | 7 | 6 |
| Weighted-average remaining contractual life of exercisable options | 6 | 5 |

**Performance Share Units**

Performance share units vest over a three -year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share | |
|---|---|---|---|
| Nonvested at June 30, 2016 | **0.8** | **$** | **63.96** |
| Granted | 0.2 | | 83.19 |
| Vested (1) | (0.4) | | 51.49 |
| Canceled and forfeited | — | | — |
| **Nonvested at September 30, 2016** | **0.6** | **$** | **77.72** |

(1) Vested based on achievement of 170 percent of the target performance goal.

At September 30, 2016 , the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized was $23 million , which is expected to be recognized over a weighted-average period of two years .

# Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 2.1 | Letter Agreement by and between Ethicon, Inc. and Cardinal Health, Inc. regarding pre-closing product registration transfer process for certain Day 2 Countries, dated August 8, 2016 |
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of the Chief Executive Officer and the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.1 | Statement Regarding Forward-Looking Information |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

## Cardinal Health Website

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible at ir.cardinalhealth.com. In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

**Form 10-Q Cross Reference Index**

# Form 10-Q Cross Reference Index

| Item Number | | Page |
|---|---|---|
| **Part I. Financial Information** | | |
| Item 1 | Financial Statements | **16** |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Item 3 | Quantitative and Qualitative Disclosures about Market Risk | **14** |
| Item 4 | Controls and Procedures | **14** |
| **Part II. Other Information** | | |
| Item 1 | Legal Proceedings | **14** |
| Item 1A | Risk Factors | **15** |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | **15** |
| Item 3 | Defaults Upon Senior Securities | **N/A** |
| Item 4 | Mine Safety Disclosures | **N/A** |
| Item 5 | Other Information | **N/A** |
| Item 6 | Exhibits | **28** |
| | Signatures | **30** |

**N/A**    Not applicable

**29**                    Cardinal Health | Q1  Fiscal 2017 Form 10-Q

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Cardinal Health, Inc.

Date:     November 2, 2016                         /s/   GEORGE S. BARRETT

**George S. Barrett**

**Chairman and Chief Executive Officer**


/s/   MICHAEL C. KAUFMANN

**Michael C. Kaufmann**

**Chief Financial Officer**

**Exhibit 2.1**



August 8, 2016

Cardinal Health, Inc.
7000 Cardinal Place
Dublin, OH 43017

> RE:     Side Letter regarding Pre-Closing Product Registration Transfer Process for Certain Remaining Day 2 Countries.

Dear Sir or Madam:

Reference is made to the Stock and Asset Purchase Agreement, dated as of March 1, 2015 (the " SAPA "), by and between Ethicon, Inc., a Delaware corporation and Cardinal Health, Inc., an Ohio corporation (" Buyer "), pursuant to which Buyer purchased the Business (as such term is defined in the SAPA) from Seller. Each capitalized term used and not defined in this letter agreement shall have the meaning assigned to it in the SAPA.

Seller and Cardinal Health Switzerland 515 GMBH, an Affiliate of Buyer (" Cardinal Switzerland ") are parties to the Transition Services Agreement (the " TSA "), dated October 2, 2015, pursuant to which Seller and certain of its Affiliates provide certain services to Cardinal Switzerland and its Affiliates to facilitate the transition of the Business.

Seller and Cardinal Switzerland are also parties to a Distribution Agreement (the " Distribution Agreement ") dated October 2, 2015, with respect to the Non-Principal Country Units, including those set forth in Exhibit A (each, together with each country into which they sell the Products, a " Day 2 Territory " and together, the " Day 2 Territories "), pursuant to which Seller has agreed to provide Distribution Services (as such term is defined in the Distribution Agreement) for the Day 2 Products (as such term is defined in the Distribution Agreement) in such Day 2 Territories until the applicable Closing for such Day 2 Territories (the " Day 2 Closings ").

In accordance with Section 11.05 of the SAPA, Seller and Buyer wish to amend Section 2.01(b) of the SAPA to permit Buyer and its Affiliates to undertake certain actions set forth below with respect to the Day 2 Products in the applicable Day 2 Territories in advance of the applicable Day 2 Closings (the " Closing Facilitation Steps "). For the avoidance of doubt, this letter agreement shall apply only to the Day 2 Products in the applicable Day 2 Territories, and shall not modify or otherwise affect the rights and obligations of Seller and its Affiliates or Buyer and its Affiliates in any other Non-Principal Country Unit.

In order to better position the Business in each Day 2 Territory to transfer to Buyer, Buyer may take, or cause Buyer's Affiliates to take (and Seller hereby expressly consents to and shall cooperate with and use commercially reasonable efforts to assist Buyer with), the following Closing Facilitation Steps:

1.  Seller or its Affiliates in the Day 2 Territories shall deliver to Buyer, promptly following request from Buyer, product registration certificates and other applicable documentation required for Buyer to obtain market authorization holder registration for the Day 2 Products listed in the Distribution Agreement for such Day 2 Territory. Product registration certificates and other applicable documentation shall be provided in the local language if required by applicable Law and in English, where available.

2.  Promptly following the delivery of the certificates described in clause 1 above, Buyer shall initiate the local regulatory processes required to obtain requisite marketing authorization, permissions, approvals and other

documentation (collectively, the " Product Licenses ") from the Food and Drug Administration or similar Governmental Entity of the applicable Day 2 Territory (for each Day 2 Territory, the " Regulatory Authority ") necessary to allow the Buyer to market and sell the Day 2 Products upon the applicable Day 2 Closing.

3. Seller shall use commercially reasonable efforts to assist Buyer in effecting the Closing Facilitation Steps, including providing all information requested by Buyer to Buyer on a timely basis, and attending such meetings (in person or telephonically) with the applicable Regulatory Authority, in each case as may be required by applicable Laws or practices or as may be reasonably requested by Buyer in connection with the Closing Facilitation Steps.

4. For each Day 2 Territory, Buyer or an Affiliate or representative thereof shall notify Seller of the receipt of the applicable Product Licenses from the applicable Regulatory Authority as soon as practical (and in any event not later than 10 days) after receipt by Buyer. Seller shall have no liability for any Damages (as such term is defined in the SAPA) including importation delays or disruption to Business operations in the applicable Day 2 Territory, caused by or arising out of Buyer's failure to deliver such notice to Seller. Upon the receipt of the applicable Product Licenses in such Day 2 Territory from the applicable Regulatory Authority, Buyer shall fully assume all responsibility for holding and maintaining such Product Licenses including the performance of all legal, regulatory, quality assurance, compliance and other obligations stemming from ownership of such Product Licenses and, notwithstanding any provisions of the SAPA, the TSA, the Distribution Agreement or any other Transaction Documents to the contrary, Seller and its Affiliates shall bear no liability to Buyer or its Affiliates with respect thereto and shall be indemnified by Buyer against any third-party claims resulting therefrom.

5. In the event that Buyer receives the applicable Product Licenses required to market and sell the applicable Day 2 Products in a Day 2 Territory prior to such Day 2 Closing and, as a consequence, Seller and its Affiliates are no longer able to import, sell or distribute Product in such Day 2 Territory, Buyer agrees to (i) waive any claim against Seller or its Affiliates under the SAPA, the TSA, the Distribution Agreement or any other Transaction Document with respect to the performance of the applicable Service (as such term is defined in the TSA), and (ii) indemnify Seller against any Damages resulting therefrom.

6. Provided Seller has complied with its obligations in the SAPA and clause 3 above, Buyer acknowledges and agrees that the risk of any Damages incurred by the Business arising from Buyer filing to obtain and/or receiving the applicable Product Licenses in advance of the applicable Day 2 Closing shall be solely born by Buyer. Buyer takes full responsibility to establish appropriate Day 2 Product inventories at Buyer's expense prior to the transfer of such Product Licenses or the issuance of Product Licenses in the name of Buyer or an Affiliate thereof, as applicable, in order to mitigate any Business disruption stemming from such transfer or issuance. Buyer shall use commercially reasonable efforts to obtain the necessary Product Licenses for each Day 2 Territory on or prior to such Day 2 Closing.  In the event that Buyer is unable through no fault of its own to obtain such Product License on or prior to the respective Day 2 Closing, and Buyer believes that additional post-closing regulatory support for the Products (" Post-Closing Services ") is required, Buyer shall promptly notify Seller and request such Post-Closing Services. The terms and duration of such Post-Closing Services, if any, shall be as mutually agreed upon by the parties.

7. Provided Seller has complied with its obligations in the SAPA and clause 3 above, Buyer shall indemnify and hold harmless Seller against and from any and all Damages which Seller and any Seller Indemnities may incur or suffer to the extent such Damages arise out of or result from the Closing Facilitation Steps set forth in this letter agreement, including any Damages that Seller and its Affiliates may incur due to any action by a third-party service provider, distributor or other agent engaged by Buyer to assist in the Closing Facilitation Steps or receive any Product License on behalf of Buyer (each a " Third Party Market Authorization Holder ")

2

in accordance with the provisions of Article X of the SAPA. Buyer agrees and acknowledges that Seller and its Affiliates and Service Providers (as such term is defined in the TSA) are not party to any agreement or arrangement between Buyer and any Third Party Market Authorization Holder, and Seller and its Affiliates and Service Providers shall not be liable in any way for any claims arising out of or any Damages suffered by either Buyer or such Third Party Market Authorization Holder or such party's affiliates and assigns pursuant thereto.

In the event that a Regulatory Authority for an applicable Day 2 Territory enacts any rule, regulation or other regulatory guideline that would prohibit Seller or its Affiliates or Buyer or its Affiliates from completing the actions contemplated herein or as required by the SAPA, the parties shall reasonably cooperate to reassess the approach and modify the terms of this letter agreement as may be necessary.

Except as expressly set forth herein, this Letter Agreement shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of Seller or Buyer or their respective Affiliates under the SAPA or other Transaction Documents, and, except as otherwise expressly agreed to herein, shall not alter, modify or amend any of the terms, conditions, obligations or agreements of Seller or Buyer or their respective Affiliates contained in the Transaction Documents, all of which shall continue in full force and effect.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

If this letter agreement is acceptable to you, please so indicate by signing below, at which time this letter will become binding upon the parties hereto as of the date first written above.

Sincerely,

ETHICON, INC.

/s/ Alan Rae

Name:   Alan Rae
Title:   Vice President
          New Business Development

4

Acknowledged, accepted and agreed to as of the date first written above:

CARDINAL HEALTH, INC.

/s/ Mike Kaufmann

Name: Mike Kaufmann
Title: Chief Financial Officer

5

**Exhibit 12.1**

## Computation of Ratio of Earnings to Fixed Charges

| (in millions, except ratios) | | Fiscal Year Ended June 30 | | | | | | | | | | Three Months Ended September 30, 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | | |
| Earnings from continuing operations before income taxes | $ | 1,698.1 | $ | 888.3 | $ | 1,798.3 | $ | 1,967.3 | $ | 2,275.6 | $ | 490.5 |
| **Plus fixed charges:** | | | | | | | | | | | | |
| Interest expense | | 92.3 | | 119.2 | | 129.4 | | 137.0 | | 178.2 | | 43.9 |
| Capitalized interest | $ | 6.0 | $ | 1.7 | $ | 1.2 | $ | 1.8 | $ | 5.6 | $ | 2.2 |
| Amortization of debt offering costs | | 2.8 | | 3.5 | | 3.6 | | 7.6 | | 5.6 | | 1.4 |
| Interest portion of rent expense | $ | 7.8 | $ | 8.3 | $ | 9.8 | $ | 9.6 | $ | 11.5 | $ | 3.3 |
| **Fixed charges** | | 108.9 | | 132.7 | | 144.0 | | 156.0 | | 200.9 | | 50.8 |
| Plus: amortization of capitalized interest | $ | 3.2 | $ | 3.4 | $ | 2.9 | $ | 2.4 | $ | 2.5 | $ | 0.7 |
| Less: capitalized interest | | (6.0) | | (1.7) | | (1.2) | | (1.8) | | (5.6) | | (2.2) |
| **Earnings** | $ | 1,804.2 | $ | 1,022.7 | $ | 1,944.0 | $ | 2,123.9 | $ | 2,473.4 | $ | 539.8 |
| **Ratio of earnings to fixed charges (1)** | $ | 16.6 | $ | 7.7 | $ | 13.5 | $ | 13.6 | $ | 12.3 | $ | 10.6 |

(1) The ratio of earnings to fixed charges is computed by dividing fixed charges into earnings from continuing operations before income taxes plus fixed charges and capitalized interest. Fixed charges include interest expense, amortization of debt offering costs and the portion of rent expense that is deemed to be representative of the interest factor. Interest expense recorded on tax exposures has been recorded in income tax expense and has therefore been excluded from the calculation.

**Exhibit 31.1**

I, George S. Barrett, certify that:

1. I have reviewed this Form 10-Q of Cardinal Health, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 2, 2016

/s/ GEORGE S. BARRETT

George S. Barrett
Chairman and Chief Executive
Officer

**Exhibit 31.2**

I, Michael C. Kaufmann, certify that:

1. I have reviewed this Form 10-Q of Cardinal Health, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 2, 2016

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Financial Officer

**Exhibit 32.1**

**Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Each of George S. Barrett, Chairman and Chief Executive Officer of Cardinal Health, Inc. (the "Company"), and Michael C. Kaufmann, Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)     the Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 containing the financial statements of the Company (the "Periodic Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 2, 2016

/s/ GEORGE S. BARRETT

George S. Barrett
Chairman and Chief Executive Officer

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Financial Officer

**Exhibit 99.1**

## Statement Regarding Forward-Looking Information

As used in this exhibit, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K"), our quarterly reports on Form 10-Q or our current reports on Form 8-K (along with any exhibits and amendments to such reports), as well as our news releases or any other written or oral statements made by or on behalf of us, may include, directly or by incorporation by reference, forward-looking statements that reflect our current view (as of the date the forward-looking statement is first made) about future events, prospects, projections or financial performance. The matters discussed in these forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied in or by such statements. These risks and uncertainties include:

- competitive pressures in the markets in which we operate, including pricing pressures;

- uncertainties relating to the pricing of generic pharmaceuticals;

- uncertainties relating to the timing, frequency and profitability of generic pharmaceutical launches;

- our ability to maintain the benefits our generic pharmaceutical sourcing venture with CVS Health Corporation;

- with respect to our distribution agreements with branded pharmaceutical manufacturers, changes in the amount of service fees we receive or, in cases where part of our compensation under these agreements is branded pharmaceutical price appreciation, changes in the frequency or magnitude of such price appreciation;

- changes in the timing or frequency of the introduction of branded pharmaceuticals;

- uncertainties relating to the frequency or magnitude of branded pharmaceutical price appreciation;

- actions of regulatory bodies and other governmental authorities, including the U.S. Drug Enforcement Administration ("DEA"), certain agencies within the U.S. Department of Health and Human Services (including the U.S. Food and Drug Administration, Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights), the U.S. Nuclear Regulatory Commission, the U.S. Federal Trade Commission, the U.S. Customs and Border Protection, various state boards of pharmacy, state controlled substance agencies, state health departments, state insurance departments, state Medicaid departments or comparable regulatory bodies or governmental authorities or foreign equivalents that, in each case, could delay, limit or suspend product development, manufacturing, distribution, importation or sales or result in warning letters, recalls, seizures, injunctions or monetary sanctions;

- difficulties or delays in the development, production, manufacturing, sourcing and marketing of new or existing products and services, including difficulties or delays associated with obtaining requisite regulatory consents or approvals associated with those activities;

- risks arising from possible violations of healthcare fraud and abuse laws;

- costs or claims resulting from potential errors or defects in our manufacturing of medical devices or other products or in our compounding, repackaging, information systems or pharmacy management services that may injure persons or damage property or operations, including costs from remediation efforts or recalls and related product liability claims and lawsuits, including class actions;

- risks arising from possible violations of the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws and other similar anti-corruption laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws;

- risks arising from our collecting, handling and maintaining patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information;

- risks arising from certain of our businesses being Medicare-certified suppliers or participating in state Medicaid programs, which businesses are subject to accreditation and quality standards and other rules and regulations, including applicable billing, payment and record-keeping requirements;

- risks arising from certain of our businesses manufacturing pharmaceutical and medical products or repackaging pharmaceuticals that are purchased through federal or state healthcare programs, which businesses are subject to federal and state laws that establish eligibility for reimbursement by such programs;

- the possibility of civil fines levied against us (in excess of the reserve we have accrued) by the U.S. Department of Justice for conduct covered by the settlement agreement that we entered into in connection with the DEA's suspension of our Lakeland, Florida distribution center's registration to distribute controlled substances;

- changes in laws or changes in the interpretation or application of laws or regulations, as well as possible failures to comply with applicable laws or regulations, including as a result of possible misinterpretations or misapplications;

- material reductions in purchases, non-renewal or early termination of contracts, or delinquencies or defaults by key customers;

- unfavorable changes to the terms of key customer or supplier relationships, or changes in customer mix;

- adverse changes in U.S. or foreign tax laws, unfavorable challenges to our tax positions and payments to settle these challenges;

- uncertainties due to government healthcare reform;

- changes in manufacturers' pricing, selling, inventory, distribution or supply policies or practices;

- changes in regulatory policies regarding pharmaceutical manufacturer product pricing practices;

- changes in hospital buying groups or hospital buying practices;

- changes in distribution or sourcing models for pharmaceutical and medical and surgical products, including an increase in direct and limited distribution;

- the risks of counterfeit products in the supply chain;

- changes to the prescription drug reimbursement formula and related reporting requirements for generic pharmaceuticals under Medicaid;

- increasing consolidation in the healthcare industry, which could give the resulting enterprises greater bargaining power and may increase pressure on prices for our products and services or result in the loss of customers;

- disruption or damage to, or failure of, our information systems, critical facilities, including our national logistics center, or distribution networks;

- risks to our business and information and controls systems in the event that the Pharmaceutical segment's planned multi-year systems replacement project or other business process improvements, infrastructure modernizations or initiatives to use third-party service providers for key systems and processes are not effectively implemented;

- any compromise of our information systems or those of a third-party with whom we do business, including unauthorized access to or use or disclosure of sensitive information;

- the results, costs, effects or timing of any commercial disputes, government contract compliance matters, product liability claims or lawsuits, patent infringement claims, *qui tam* actions or other legal proceedings;

- possible losses relating to product liability claims regarding products for which we cannot obtain product liability insurance or for which such insurance is not adequate to cover our losses;

- our ability to maintain adequate intellectual property protections;

- the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition, and uncertainties relating to our ability to achieve the anticipated results from acquisitions;

- risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility;

- increased costs for commodities used in the Medical segment including various components, compounds, raw materials or energy such as oil-based resins, cotton, latex and other commodities;

- shortages in commodities, components, compounds, raw materials or energy used by our businesses, including supply disruptions of radioisotopes;

- the loss of, or default by, one or more key suppliers for which alternative suppliers may not be readily available;

- bankruptcy, insolvency or other credit failure of a customer or supplier that owes us a substantial amount;

- risks associated with global operations, including the effect of local economic environments, inflation, recession, currency volatility and global competition, in addition to risks associated with compliance with U.S. and international laws relating to global operations;

- risks associated with volatility and disruption to the global capital and credit markets, which may adversely affect our ability to access credit, our cost of credit and the financial soundness of our customers and suppliers;

- our ability to introduce and market new products and our ability to keep pace with advances in technology;

- the costs, effects, timing or success of restructuring programs or plans;

- significant charges to earnings if goodwill or intangible assets become impaired;

- uncertainties relating to general political, business, industry, regulatory and market conditions; and

- other factors described in the "Risk Factors" section of the 2016 Form 10-K.

The words "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions generally identify "forward-looking statements," which speak only as of the date the statements were made, and also include statements reflecting future results or guidance, statements of outlook and expense accruals. We undertake no obligation to update or revise any forward-looking statements, except to the extent required by applicable law.

# EXHIBIT 60

SEC Form 4

**FORM 4**

| | | |
|---|---|---|
| | **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**<br>Washington, D.C. 20549 | OMB APPROVAL |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Barrett George S | CARDINAL HEALTH INC [ CAH ] | |
| (Last)          (First)          (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>11/10/2016 | X  Director            10% Owner<br>X  Officer (give title below)   Other (specify below)<br>Chairman and CEO |
| 7000 CARDINAL PLACE | | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| DUBLIN          OH          43017 | | X  Form filed by One Reporting Person |
| (City)          (State)          (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 11/10/2016 | | M[1] | | 217,995 | A | $30.94 | 682,226 | D | |
| Common Shares | 11/10/2016 | | S[1] | | 16,954 | D | $70.4[2] | 665,272 | D | |
| Common Shares | 11/10/2016 | | S[1] | | 194,441 | D | $71.35[3] | 470,831 | D | |
| Common Shares | 11/10/2016 | | S[1] | | 6,600 | D | $71.82[4] | 464,231 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Common Shares | $30.94 | 11/10/2016 | | M | | | 217,995 | [5] | 08/16/2017 | Common Shares | 217,995 | $0 | 217,994 | D | |

**Explanation of Responses:**

1. The exercise and sales reported on this Form 4 were effected pursuant to a 10b5-1 plan adopted by the reporting person on August 8, 2016.

2. The price reported in column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $69.76 to $70.75, inclusive. The reporting person undertakes to provide to Cardinal Health, Inc., any security holder of Cardinal Health, Inc., or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of shares sold at each separate price within the range set forth in footnotes 2 through 4 to this Form 4.

3. The price reported in column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $70.76 to $71.75, inclusive.

4. The price reported in column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $71.76 to $71.93, inclusive.

5. The option, representing a right to purchase a total of 685,989 shares, vested and became exercisable in three equal annual installments beginning on August 16, 2011.

**Remarks:**

<u>/s/ James E. Barnett, Attorney-in-fact</u>    <u>11/14/2016</u>

            ** Signature of Reporting Person       Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 61



# Cardinal Health, Inc. Dublin Day

**December 16, 2016 10:00AM Eastern**

Sally Curley:  Good morning everybody.  I'm Sally Curley, for those on the webcast, Senior Vice President Investor Relations.  On behalf of the Investor Relations and Cardinal Health Management teams - welcome to our Dublin Day and thank you for joining us here in the room and on the webcast.

Many of you have actually participated in Dublin Day in the past so you know that this is largely a Q&A.  We try to keep it as informal as possible, however we started last June with a slight change in our format and that was to take the opportunity when we do these Dublin Days twice a year to highlight some of our smaller businesses, those that you wouldn't necessarily get to hear much about but that we're very excited about.  I'll go into today's highlighted business in a moment, but with me here today are Chairman and CEO George Barrett, Chief Financial Officer Mike Kaufmann, Pharma segment CEO Jon Giacomin, and Medical segment CEO Don Casey.  We also have the Senior Vice President of our Retail Independent Operation, Steve Lawrence.  It is his business that we've chosen to highlight today given some of the questions that we've had from our constituents, you.

Let me just say before I get started that we will be making forward-looking statements; actual results may differ materially.  You can find information on risks and uncertainties in our SEC filings in the IR section of our website.

A few additional housekeeping items and a review of the agenda: I will be keeping us on track through the meeting as we're webcasting the event.  We will end at 1pm Eastern.  For those on the webcast we're seeing slides in the room.  You should also have access to the slides on our website.  For those in the room, if you do need transportation after the meeting please let one of the IR team members know.

Now, just to cover the agenda, we're going to start with George.  George is going to turn it over to Jon for a few remarks to introduce the Pharma segment and to introduce Steve.  Steve will cover actually our offerings in the Retail Independent area.  At 11:00 Steve is going to leave us and we'll continue with any Q&A on the Pharma segment business.  Then at 11:30 we'll take a short 15 minute break for lunch, but I want to note at this point we will pause the webcast and then rejoin it at 11:45 for a working lunch discussion with Don Casey and Mike Kaufmann on the Medical segment and on capital deployment.  We tried to build in plenty of time for questions

today. I would encourage those of you listening to the webcast to also feel free to submit your questions as indicated on the webcast link. Hopefully we'll get to everybody's question but if not please feel free as always to reach out to the Investor Relations team if we don't get to your questions.

With that, I'll turn it over to George.

George Barrett: Thanks, Sally. Good morning everyone. Good to see you all, and good morning to those who are not here with us in Dublin, Ohio. So, incredible times and we're going to try to give you a pretty broad pass of Cardinal Health today. As Sally mentioned, obviously we have Mike and Don and Jon here who you guys know, but I'm delighted that Steve is able to join us. There's been so much discussion in the last few months about the Independent Retail space. I'm not sure there's a better expert on Retail Independents than Steve Lawrence so we're glad he's here to join us and you'll get a chance to hear from him.

Let me just share with you, because I'm really here to tee up the day; I have a good role. I want to share with you this is just about two days after the election we had—we do several times a year a strategic planning forum and it's really, it's a relatively good-sized group of about 100 people. Again, we have very small strategy teams that are working quite regularly but this is really a chance for us to bring people in from all over the globe and just to discuss sort of broad direction for the organization and where we're going, make sure we're aligned in our priorities. It's just a great opportunity for us. It was a fascinating moment to do this because it's two days after the election which all of us predicted perfectly, and I started the meeting, I said, "I want to do something. I want to put the basic trends and strategy of the organization up in front of you because we've all been obviously surprised by this outcome that we saw a couple of days ago, and tell me what we should change. What do we change based on this?"

I shared this with them and we talked about increasing global demand and demographics and we talked about payment models and transitions from fee for service to fee for value or outcomes. We talked about healthcare consumerism and how consumers are going to play a role more actively, probably in their own wellness and healthcare; shifts in how care is delivered, where it's delivered and sort of how the integration of that works. We talked about this continued bifurcation between, on the Pharmaceutical side, generics and specialty and what it takes to participate in that, and then finally government's role in this, and increasing role in healthcare. What was

CardinalHealth
Essential to care™

interesting—we'll come to the last one I just mentioned in a second—on every one of the first we all looked at each other and said, "We're on the right side of this." Now, there will be policy as we start to hear more and more from the new Administration; we'll start to feel what that policy looks like. Are we going to see they must behave same way that we did? We'll probably see some shifting, but fundamentally the strategy that we've built, we built before the Affordable Care Act. We basically built it around saying look there are certain inescapable facts about healthcare, particularly here in the United States that we think are going to drive certain kinds of changes and we're going to build our strategy around that, and that's what we did.

I guess what came out as we were talking about this is that we're actually well positioned to continue to thrive in an environment, recognizing that we're going to have to be incredibly nimble and agile to adapt to whatever sort of policy shifts occur, and that comes back to this last piece which is government's role and how this government comes into play.

There are two aspects to this, really. One is government as payor. Clearly we have a Medicaid program. We have a Medicare program. There have been very specific commitments from the Trump camp that they want Medicare to be there; they don't want to touch it. Now, obviously in the policy side of this there'll be some shifting landscape but the government is going to continue to be active. Having said that, we certainly see a government that has a different perspective on where that control should be and how much is pushed to the states and how much is done in Washington, and I think we'll see those kinds of changes, but the federal government is still going to be a large payor in our system.

As a regulator, time will tell how this administration—we've heard a lot of commentary around common sense regulation and making sure that we get that right. We certainly would love to see that happen, but I think we're well positioned. We have an operation that can handle a highly regulated environment. We, as an organization that understands I think where activities are driven by the states and where they're driven at the federal level. So, we'll be like all of you watching carefully to see some of the policy activities. It's been very clear from the incoming Administration that they intend to repeal the Affordable Care Act to reconciliation which, as you guys know, is a budgetary process. What exactly gets repealed, it will be in some ways determined by the parliamentarian who decides what actually is budget and what's not.

CardinalHealth
Essential to care™

But I think having said that, we've also heard very clear messaging from the Administration that they don't want to disturb the system; they don't want people who have insurance now to suddenly be without insurance, so I think there's going to be some real planning. We can talk about that later in the day. I don't want to try to give a whole perspective on that, but happy to answer questions and give my thoughts on that later.

The main point I was trying to make is that I think our basic strategy is really on the right side of where care is going, and I think that's true globally. You have here the people that are leading those activities. I'm excited about our team. I've said this to you guys before, to come up against any organization in any industry, deeply committed, really knowledgeable and able to work across boundaries which I think in a world that we're experiencing today where the lines of demarcation are really blurry, I think we did that reasonably well and we do it with a lot of enthusiasm.

It's been a really exciting last few years. We see the next few years as really exciting times for us. I think we believe that we certainly are uniquely positioned to help the system continue to be a better healthcare system.

With that, I'll turn the mic or the floor over to Jon, who I think is up next. Again, along the way, feel free to ask questions. I can come back to any of those subjects along the way, during lunch, however you want to do that. So, welcome.

Jon Giacomin: Thanks, George. What I thought I would do is just remind everybody of what my responsibilities are. I have responsibility for the pharmaceutical distribution business, the specialty solutions business, nuclear pharmacy services and then also our China business. What I thought I'd do before I introduce Steve is just give you a little bit of an overview, maybe touching a little bit on what George said relative to the environment.

Within the P segment we've been really all about trying to make sure that we're well positioned against what we believe are the key trends in healthcare going forward, and some of those key trends that we've identified that particularly impact the Pharmaceutical segment really are around specialty drugs, the growth in specialty drugs which I don't think is new news to anybody out there, and also a move towards value-based care and ensuring that as our customers navigate through all of that that we're able to support them and really provide them with

**Cardinal**Health

*Essential to care™*

scaled solutions that are going to help them be successful, and quite honestly us be successful in that changing environment.

So that's really what we've been about, and as George said I think that sort of transcends everything going on with the election because whether or not you thought it was Hillary Clinton or whether or not it was Donald Trump, it's hard to believe that value-based care isn't going to be here to stay as we think about the sustainability of the healthcare costs in our country. Yes?

Audience Member: Sorry, Jon. Could you give us an example of how you're helping clients on the Pharma Distribution side in a value-based environment?

Jon Giacomin: I will. Can you just hold that? If I don't answer that when I—I'm going to just give you a very brief overview on that and then we're going to get into what I think are probably some very specific examples around that, if you can just hold, please.

What I thought I'd do, to that exact point, is just provide a little bit of an overview on a couple of the businesses and not go deep in all of those areas, but let me start with specialty. Our Specialty Solutions business as we re-entered the business about five or so years ago has seen, I think, some really nice and strong growth. We're seeing that today in our business and honestly, it's led by a number of different factors but let me touch on just a few of those.

On the provider side, we've actually increased sort of our exposure or our coverage relative to the categories that we touch. So, oncology obviously but we also touch now urology, nephrology, rheumatology, and that has been a result of some acquisitions that we've made in this particular area, and so we're seeing some nice benefits from that increased exposure along those lines in those categories.

Additionally I would tell you that technology is a big part of that specialty space, so whether it's practice analytics, whether it's ordering platforms, inventory management and other things that help a practice actually operate more efficiently and effectively, we've been able to leverage technology. I think as we've spoken before, we have an innovation center called Fuse which is down the street here that we've relied quite heavily on relative to consulting with our customers and really coming up with solutions that are customer-driven, and rolling those solutions then

into our existing technologies and in some cases standing up new. So, we're very pleased in terms of what's been going on on the provider side.

The manufacturing side of the business, we have a collection of different services that we offer. We've sort of strung those together as an integrated offer to manufacturers. We're seeing more and more traction relative to those offerings, in particular our hub services offering. We've seen some nice growth in that area and I think manufacturers are showing some considerable interest. So, we're really quite pleased in terms of how that's all come together and the services that we've pulled together there.

On the Pharmaceutical Distribution side of the business, obviously you're all pretty well aware of the environment that we're in and so it's a little bit of a challenging environment we find ourselves in today, but I would say this: the business is executing at a very high level. When you look top to bottom at our metrics, starting with one that's probably most important to our customers which is service level, highest it's ever been within my tenure at Cardinal Health, by far.

Audience Member: How many years?

Jon Giacomin: Fifteen years at Cardinal. We're serving customers incredibly well. I think our Customer Service organization is also pointed very nicely at customers and obviously they're facing a lot of very new and different challenges.

In addition I would tell you as customers are experiencing some of those challenges and some of those pressures, they're open to a lot more discussion around more things that we can do. You've heard us talk before and I know we're going to talk a little bit about it today relative to our Medical segment, and in particular what's going on in our acute space, but I would say those customers are more and more receptive than ever to talking about the full value that Cardinal can bring to them, not just Pharmaceutical Distribution and us delivering product and supply chain management and those sorts of things and wraparound services, but really saying, "Hey Cardinal Health, you're a big organization, a big enterprise. You should be able to deliver value across multiple points," and so as we've talked in the past I think our message is resonating there, and resonating quite well. The way we sort of positioned it and how we've gone to market is really along the lines of we have logistics or

distribution solutions which you're all well aware of; they've been the core of our business really since the beginning. We have product solutions which include all of the various products, brand, generic, home healthcare products, OTC, private label, and then of course a complete swath of products on the Medical side of the business. We have business solutions that can improve revenue, expand margins, lower costs, improve working capital, and then we have patient solutions. So I think a lot of those things now are coming together and resonating with customers as they're looking at taking on challenges across the system and really having to think differently and more holistically than they've had to do in the past.

Relative to a couple of examples, Charles, you asked about can I have an example of where you've seen us apply some of the value-based solutions. I guess I would point to probably one that seems to be gaining the most traction and that's Outcomes MTM. It turns out MTM, Medication Therapy Management, is something that's generally delivered in a retail setting and that's expanding and we'll talk a little bit more about that here in a minute, but what we've also seen though is the need for telepharmacy and people are now thinking very, very differently about the role the pharmacist plays in the delivery of care. It's no longer just show up at your retail pharmacy, someone will dispense the medications to you and go about your business. People are now thinking that telepharmacy in conjunction with pharmacy delivery, obviously in a retail setting, in addition to maybe other tools around adherence and compliance will actually make a difference. So MTM Outcomes is about delivering this medication therapy management service which includes comprehensive medication reviews and also we're looking at other aspects that can be delivered telephonically or face to face. The whole idea and the whole goal here is really to improve patient adherence and compliance. The patient obviously wellness goes higher but then the cost of delivering the care to the patient goes lower.

That's having some nice intersections with points in Don's business, particularly with NaviHealth which I think we talked about six months ago when we had Dublin Day in June. We talked a little bit about NaviHealth. So there's some nice intersections there relative to how NaviHealth is focused on value-based care, taking risk and outcomes as also focusing on that and the combination of the two and maybe some other things actually really can improve the overall care delivery and lower the costs.



George Barrett:  You guys know the percentage of readmissions that are associated with medication is quite, quite high. So again, our ability to deliver value both at the retail but also with the institutional level.  If there's going to be risk bearing and we can reduce the probability of an adverse event that brings that patient back, MTM is really helpful.

Audience Member:  So who's paying for this service?  Is it the pharmacy or the provider that's paying to you for that service? Do they get a higher reimbursement as a result from payors?

Jon Giacomin:  Generally it's going to be the payor that is paying for these services, although the provider may pay as well, but predominantly it's the payor because the payor sees that an intervention into a particular disease state with a particular patient profile might have a better outcome than if they just let the patient go on and continue with care, maybe not be adherent on their medications, etc., or maybe not actually get counselling or receive counselling relative to their medications and taking them.

George Barrett:  This is a place, by the way, where you may see some interesting policy discussion around, what do we actually pay for?  If we are paying for things that actually reduce the probability of adverse — or improve health, I think you're going to start to see discussions on these kinds of things and I think that's important.  It's important for us but for our customers as well - really, look, if you're a pharmacist you would love to be as people talk about compensated for the cognitive care that you deliver on some level and that's really where we've got to go for if we're really going to do this effectively as a system.

Audience Member:  I'm sorry, just to clarify.  So this is a standalone business that sells to the payor market?

Jon Giacomin:  Yes, it does.

Audience Member:  Does it work in conjunction with your Retail Independent arm so that …

Jon Giacomin:  Yes, and so we'll talk a little bit about that.  I'm going to let Steve touch on that piece.  I guess transitioning then, Charles, off what you said maybe a little bit into Retail Independent, as Sally started, the reason why we asked Steve to be here today is because there's been a lot of discussion around the retail independent marketplace, etc., and we thought it would be a good idea to talk to you a little bit about our Retail Independent offering.  In particular, about some of the solutions we're talking about here and Steve is going to go into a little bit more depth on that, but also I would tell you with some of these solutions - again along the lines of value-based

CardinalHealth

Essential to care™

care and pay for performance - really about the evolving role of the pharmacist as seen as a provider that is probably underutilized in the delivery of care today doing a lot more in the way of reviewing prescriptions, making sure that the right medications are in the right vial and they get to the right patient. There's a lot more that pharmacists can deliver, so Steve is going to go into that.

I know there's probably a lot of questions around pricing and what's going on in the market, etc. We'll be able to touch on that but really wanted … Go ahead.

George Barrett: Just one thing before we go to Retail because I just want to make sure that everybody knows this. If you look at hospital pharmacy and institutional pharmacy, we're one of the largest clinical pharmacy organizations in the world, so we have—so in many cases we're actually running the hospital pharmacies. In some cases the hospital pharmacies use us, we've got a whole organization. So during the middle of the night there's an adverse event or there's some question on a clinical pharmacy matter, we've got people that are right there, online, sort of navigating that. So actually we're really, really active behind the scenes in areas that you wouldn't necessarily see.

Jon Giacomin: Yes. Effectively we're running 200 hospital pharmacies today. Those are Cardinal employees. We employ roughly 1,000 clinical pharmacists and so ideally we're very well positioned as you think about transitions of care and discharging out of a hospital to really make sure that the appropriate handoffs occur but also that the patient has the right medications as they leave the hospital, know how to take those medications and then the handoffs occur from there.

So with that, I'm going to turn it to Steve, and just to give you just a little bit of background on Steve Lawrence, I think you've spent your entire career in and around 30 some-odd years in and around pharmacy and retail pharmacy, but for the last 13 to 14, we as an organization I think have been very fortunate to have Steve lead our Retail independent sales organization and also at time handling the marketing as well. So, he is that resident expert as we talked about. He's been in and around this space for a considerable amount of time and I think you're going to enjoy hearing from him about our solutions and how they're resonating with this particular customer class. So, Steve, I'll turn it over to you.



Steve Lawrence: Okay. Thank you, Jon. Good morning everybody. Talked a lot about our Retail Independent class of trade. This is really a very important market for us at Cardinal for a lot of reasons but the biggest reason is that they look to us for products and services. We're not just selling pharmaceuticals and out front items to our retail independents. They look to us to provide a lot of services. We're their back office. If you look at the chains in retail, they have a whole back office that takes the administrative burden off the pharmacist to try to allow them to do pharmacy work. That's why our retail independents rely on us and that's the foundation that we've built our whole strategy in the retail independent market around, is we build, either we build or partner with people to provide services to all these customers to allow the pharmacist to get out from behind the counter and spend more time with the patient because that's really where you get the value-based care and that's where the pharmacist really wants to work is touching the patient and not doing administrative stuff. So we do all kinds of things, and I'll go through those as we go through a few slides here.

We'll start with a very important part of our retail strategy is our annual customer meeting. It's really not a meeting for Cardinal; it's really a meeting for our customers and we get quotes and I get letters constantly from our customers that come to our trade show that basically say they get a lot of value from this because it gets them out of their pharmacy. You've got to remember these are small independent business people. When they're in the pharmacy, they are swamped with everything that's going on, trying to take care of the patients and run the business. This gives them two or three or four days a years where they get out of the pharmacy and they're surrounded by 4,000 or 5,000 of their peers and they share all kinds of ideas about how are they making their pharmacy profitable, what are they running into, what roadblocks and how are they getting around them? The biggest thing that they come out of this is they then diversify their pharmacies. So they don't sit back and just fill prescriptions. Your retail independent pharmacies constantly diversify their business. They'll get into things, some get very big into front of store, others get into things like servicing a local nursing home; they get into HME/DME; some get into specialty. There's all kinds of places that they get into. Many of ours recently have partnered with hospitals to take care of their discharges to make sure the readmission rates are as low as possible. So, a lot of those ideas come from them getting out of their pharmacy and coming to our show.



This show has grown into the industry's largest. You can see there we had almost 9,000 people attend this year. We had roughly 5,800 pharmacies represented at this trade show, and again, they get to sit at dinner with many of their peers across the country and they get to share ideas and that's the biggest thing they take away from. We provide them with a lot of education. There's a lot of continuing education there so they can get their full year's CE at the show. Then we also provide them with some great industry speakers, so they get to talk to these people one-on-one; they also get to see our executives. Jon spends a lot of time in this community anyways but this gets them a chance to see everybody on our executive team and George is good enough to be there. He actually played guitar on stage one year and entertained our troops, so they got a lot out of that. But it gets them the time to talk to George and let George talk about the vision that Cardinal has for healthcare in general because they don't hear that a lot. I mean they're in the local community; they really want to know what Cardinal has to say about the direction of healthcare and then they'll understand how we then are taking that direction that we believe healthcare is going, create our services to help them move their business in the right trajection.

From this, I'll move a little bit into our services.

Jon Giacomin: Just one more thing before you go there. What's interesting is we ask for feedback constantly. We do a lot of surveying of our customers about what they need from this type of setting because they're sacrificing a lot, right? You're an individual business owner/operator and you're going out of town someplace for a week. Usually it's difficult to find a substitute so you have to go where there's value. We've been highly sensitive to ensure that they are getting value out of it, so we've done a lot of surveying. If you look at the make up of our show, probably three, four or five years ago, a lot of it was us bringing experts in to talk to them about certain things, and what we've got back from the surveying and just to underscore a little bit of what Steve said is they want to hear from their peers. So a lot the people now on stage are really our customers talking to our customers and their peers and colleagues about best practices that they're seeing. So whether it's in Washington state where provider status has been given for roughly 30 different types of drugs, or it's something else, they're sharing all of that with—and I think what we're seeing is as we sort of adapted our show to make sure that we're in line with where customers see value, our attendance numbers continue to grow, which is really important, obviously, for us to ensure that we continue to deliver value. Sorry, go ahead.



Steve Lawrence:  No, that's a great segue.  The other thing that comes out of that trade show is a lot of best practices. We collect best practices from around the country.  We actually create a magazine and we put those best practice people up on stage and let them tell their story.  These can be simple things, like we had one person create a vitamin club for kids where it gave away free vitamins, children's vitamins to kids.  Grew his business dramatically. All of a sudden moms started bringing their children in.  All of a sudden the whole family's prescriptions went to that pharmacy.  It can be little things like that to complete game changers, so best practice is big piece of this.

On our services, we basically take our services into three categories.  The first one we'll talk about here is what we call our Retail Advantage.  We help our stores maximize their front of store.  Retail independent pharmacists went to school and became pharmacists and they love taking care of patients; generally speaking they're not the best business people.  Their front of store sometimes depict that.  So, we'll go into pharmacies where they've got holes on their shelves; they're just not really focused on it.  We bring in retail experts to help them manage that front of store.  Our goal is always to expand the growth of their front of store and many of our customers we've coached into actually hiring front end managers on their staff.  When they do that we've seen double and triple sales growth in front of store and so that's the real critical component that we provide.  Obviously we provide all the products to complete their front of store package from all the OTC's to diabetic supplies to HME/DME products, but the real value that we bring to them is we bring that retail expertise to their store to help teach them how to be a retailer because they know how to be a pharmacist but a lot of times they'll forget about the companion product.  Most prescription medications deplete some element in your body and there's all kinds of vitamins that should be taken when you take almost every drug out there.  Most pharmacists forget about that, so we provide them the service and the training and the tools to make sure that that is something they talk to about with the patient so that they can maximize the basket when the patient walks out of the store.

So, this is a really important part for us.  We have people all around the country that spend their entire day going into our pharmacies, working with their front of stores and what we've tried to do recently over the last two years is not go in and stock their shelves because that doesn't benefit anybody; we're just stocking their shelves and their shelves are going to look really bad when we leave and we come back next month.  It's to teach them how to take care of their front of store and run it and maximize their sales in their front of store, and when they do that, like I said, we've seen tremendous growth in the front of store which obviously helps everything in the business.

Our next group of services is around really the back office, the business part of our pharmacy. This is an area where we really spend a lot of time. If you look at the back office of retail pharmacy today, it is very, very complex. With the reimbursement world the way it is, with DIR fees and everything, it is very hard to actually balance your books and understand what you got paid for a claim and understand did you get paid appropriately or did you misbill something, and if you did misbill something how can you rebill that? We spend a lot of time and effort and have a lot of services that run the gamut of the back office for the pharmacy to allow them to not focus on that. We'll look at their data, we'll help them do those things. We'll help them correct billing errors. We'll help them reconcile all their claims and make sure that they're getting the appropriate amount of money, and we'll take all that work off of their shoulders so that, again, we want them out in front of the pharmacy counter talking to patients, taking care of patients, ultimately getting better outcomes.

So this whole group of services runs the gamut and you can see on the slide from inventory management to obviously our managed care. In the managed care area we do a lot around the whole star ratings, which you've probably heard about the star ratings. We have seen a tremendous growth in our network of improvement in star ratings. Some 75% of our customers are over 5-star rated which is the highest rating they can be, which ultimately drives better outcomes for the patients because they're really rated on adherence, compliance and a few key measures based on the disease state of the patient.

George Barrett: I just want to add on this ownership issue just as a side note where we've tried to be really creative and our organization has and our customers have. A high percentage of graduates of pharmacy schools are women. Sixty some-odd percent now, roughly? The percentage of pharmacy owners that are women, very small. So again, we've worked with this group using in a way this meeting as a platform to help women think about how they might turn that professional training into a career as an owner. It's a really exciting opportunity and it in a sense touches so many points that are important to us. I just wanted to share that with you guys.

Steve Lawrence: Yes, we create a whole what we call Women In Pharmacy initiative, and so we have a Facebook page called Women In Pharmacy. We basically set up a peer-to-peer network for women that are in pharmacy so they can reach out to some of their peers to learn. Again, these are independent business people that struggle with things like payroll and HR issues and all kinds of stuff and so we through this network we've created and the

Facebook pages, they can get on there and share things and learn things and basically ultimately be better business people.

Audience Member: How do you get paid for all this?

Steve Lawrence:  Well, most of our services have a fee, but one of the things we've learned and I've learned through my career is if you give stuff away for free it has no value and they won't use the service.  So these services have a fee.  They're market based.  They have to provide more value than what the fee is but that's how we get paid for it.

Audience Member:  So is this segment of the market more profitable as a result of that for you?

Steve Lawrence: On the services side - we do a lot of services on the hospital side.

Audience Member:  In the overall Independent, the Independent side for sure.

Sally Curley: I think with the retail independents – are you profitable?

Steve Lawrence: Yes, I would say so.

Audience Member:  Just to clarify, is this business, is this an overlay onto their back office operation or is this like a total outsourcing service?

Steve Lawrence: It's a bit of both.

Audience Member:  Do you have like a centralized back office?

Steve Lawrence: It's a bit of both and why I say that is because one of the ways that I think we differentiate ourselves from our competitors is that we really go deep and understand our customers, and we à la carte our services where the customers need.  If they need a complete back office outsourced service, we'll do that.  If they just need inventory management then we'll do that.  So a lot of customers—every retail independent is a different customer and so if you try to take a box to them and say here's what you need, it's not going to work.

CardinalHealth
Essential to care™

Audience Member:  Do you see trends moving in one direction?  Do you see a trend moving towards total outsourcing?

Steve Lawrence: Not really.  Again, they have niches where they understand what they're good at it.  We have a lot of customers that are very good at marketing so we don't really need to help them with their marketing.  We have some that do great inventory control because some of their pharmacy systems have a good piece of inventory management, some don't.  It really is an à la carte and I don't see a trend going either way.  I do see a trend of them looking for us for programs for the future and that's where we try to focus is where's pharmacy going over the next five years?  Where do we need to start building offers so that we can be your back office of the future?  The back office changes.

George Barrett: Again, I'm playing the other side for a second here but I just think it's useful and I've had this conversation with a couple of you before.  If you had asked many of us 15 years ago how many of these independent, we'll call them community or independent pharmacies, would exist today, we would have probably picked a much smaller—today the number is, what?  About …

Steve Lawrence: About 22,000 or 23,000.

George Barrett:  Twenty-three.  If you had asked me 15 years ago there's no way I would have come up with that number, so I guess the question, Steve, that might be useful just what do you think we would have all gotten wrong?  What's happened?

Steve Lawrence:  I think the issue is they're very resilient business people.  If you just take it down to the base of everything, they've got kids they've got to put through college.  They've got families they've got to feed and they're going to go out and find a way to make money.  Whether it be filling a prescription or servicing long-term care or doing immunizations which they didn't do 15 years ago, travel vaccines, they're going to service the population.  You also got to look where a lot of these people are.  They're in very urban areas or very rural areas.  Those are a lot of underserved areas, so in a lot of cases they're also the doctors.  I mean a lot of these rural areas the pharmacists are the doctors.

George Barrett:  Point of care for everybody.



Steve Lawrence: They're going to the home at midnight to take care of the kid that's got a 102 degree temperature. That's what happens and they get paid for that. They basically own the town. They're the—you look at many of these small towns, they're the mayor, they're everything.

George Barrett: Literally.

Steve Lawrence: I think that's what you miss is they're resilient.

George Barrett: And fair to say that the other thing is that the work that we do and others do, again-

Steve Lawrence: Absolutely.

George Barrett: Have essentially…

Jon Giacomin: Freed them up to do that.

George Barrett: Freed them.

Steve Lawrence: They couldn't, they wouldn't be able to do that without us being the back office, but our back office always has to continue to change also because pharmacy is changing.

Sally Curley: Steve, I think Craig and Steve have questions.

Audience Member: So you describe these services as being à la carte. Is that irrespective of whether they're distribution customers and how much of a distribution customer, or are these services really tied to distribution?

Steve Lawrence: Most of these services are for our distribution customers because we've got sales people going in there and we get to know them very, very well. There are some services like Outcomes MTM that it doesn't matter.

Jon Giacomin: It becomes really hard to support these if you don't have a distribution business underlying it because of exactly what he said. We've got support teams and other things around the customer that will help in either standing these things up, the ongoing running and maintaining of them so it just becomes a little challenging.

CardinalHealth
*Essential to care™*

I guess one other final point, an exclamation point to put on it, when we were talking about the pharmacist as being the mayor, actually, the relationships they have with their patients/customers is phenomenal and just a very quick story. I'll take you right back to RBC. Steve said we have motivational speakers come in every now and again. Two years ago we had Colin Powell come in and Colin Powell was surprisingly, not surprisingly lives in McLean, Virginia, and we asked him to speak to a group of retail independent pharmacists and honestly he had no idea who he was speaking to. He had to figure out well who is this customer? I don't know who this is. He went to his own hometown in McLean, Virginia and he looked around and said is there one there, and he found the one there. It was in an old building built back in I think the early 1800s. So he was really surprised and shocked because he had—around that there's a Walmart, there's a CVS, there's a Walgreen's, there are a number of different chains including grocery stores, etc. and so he walked in and he spent some time with the owner and the staff. As he was talking to them and asking them about their business he was seeing their patients come in and engage. What he quickly surmised was that their relationships are very tight because as they were walking up to give prescriptions or walking up to ask the pharmacist a question, etc., the pharmacist was very quickly to engage on, "How's your family? Where's Jimmy going? Did the dog—what happened with the dog?" They have made some incredibly personal connections that I think have really helped their business, and so those connections have stood the test of time which has allowed those customers then to keep those customers and even grow their business.

That's a really important aspect I think and a really important differentiator which I believe has kept retail independents around.

George Barrett: And what's really interesting is there's a role for all of these. If you look at what we're experiencing now, which is really challenges with primary care, you're going to see pharmacy, whether—again, changes to pharmacy as well. You're going to see pharmacies play a more active role: nursing and nurse practitioners, so I think these guys play a role in the system and our job is to have enough knowledge and intimacy to know as Steve said, the difference between what that pharmacy needs and that pharmacy needs, and they can be wildly different.

Sally Curley: Let's go to Steve and then Dan.

George Barrett: I don't want to—make sure we talk a little bit on pricing because I know Dan said that …

Sally Curley: Yes.

Audience Member: Maybe I'll get into the numbers then, Steve. A couple of questions. The Red Oak opportunity is obviously important for most of these independents because they can channel that business through one point of contact but given some of the disruptions in the market recently, have you had meaningful re-pricings of your generic basket in those kind of prime vendor traditional clients in the independent awning?

Steve Lawrence: I would say that our pricings—there's a market out there and the market kind of sets the pricing, and we have to price to market and we have to keep our customers to market. They have children to put through college and kids to feed so if we aren't priced at market, they're going to look elsewhere.

There is a little bit of a differentiation when you get deep with them with the services but you can't profitize that customer over and above or else they'll start looking.

Audience Member: Fair to characterize it as it waxes and wanes but you're constantly keeping those clients competitive?

Steve Lawrence: There's ups and downs but you're constantly keeping—you're keeping to market and real time.

Audience Member: Steve, there's no big board where somebody's looking at, "Hey, here's the price of omeprazole," but there is a market out there and people know pricing.

Steve Lawrence: And it's regional too.

Audience Member: Maybe two others that are kind of germane to that whole discussion about these guys finding profit centers. You guys have a specialty presence which you characterize, Jon, as kind of emerging. How many of your independents rely on you for specialty in particular and how many of these independents have kind of put that stake in the ground and said, "I want to be a guy who's servicing MS patients or cancer patients." Is that an important part of your business?

Jon Giacomin: It is. There's a—specialty as you all know is a complex area and if you're a retail independent you're either in it or you're out of it.

CardinalHealth
*Essential to care™*

Audience Member: Right.

Jon Giacomin:  So they rely on us for some products.  A rough number would be that we have about 200 pharmacies in our retail independent space that do specialty, and I'm not just talking about the one hep C prescription here or there.  They're doing it in a big way, probably 10 million a year plus, and we have some of our independents that do upwards of $100 million in specialty, so they become true large specialty pharmacies.  Again, it's a whole separate business they create.  They create a specialty pharmacy, they have retail pharmacies, they have long-term care pharmacies and they become a diversified kind of healthcare provider.

Audience Member:  So that segment specifically we've seen some disruption, suffice it to say, around access and around various network fees that have reared their head with the independents.  How is that impacting your customers in the last six months?

Steve Lawrence:  If you look at the specialty market, there's a pie that's retail independents.  That pie has never changed from a percentage over the last six or seven years.

Audience Member:  Ten percent?  Twenty?

Steve Lawrence:  It's between 10 and 20.  It's somewhere 15, 16% of the market.  It has been for many, many years.  I don't see that changing.  Again, they are resilient.  We have a couple that get access to products that we can't get access to.  Again, they build that physician/patient relationship that goes beyond the other issues and the pharmacist physician patient will override the PBM, the manufacturer or whatever and will get that product to that pharmacy, if you build that relationship tight enough.  We've seen people do it constantly.

So, they get access to those products even though they're not a pharmacy, so you see these limited distributed products that go out to six pharmacies; there's really probably more like 30 pharmacies that get it but six are huge volume, the others are small independents that might have four or five of these scripts in a year but they get it and they get access to it because the doctor demanded it.  So, that's where we really see them.

Jon Giacomin:  Steve, talk a little bit about how they've got to that point.  I mean some of these people have selling organizations and other things that are attached to their pharmacy now.

**CardinalHealth**
*Essential to care™*

Steve Lawrence:  Again, like I said, they're either in it or they're out of it.  If they are in it they have people that—they have marketing people that sell right to the physicians, that live out in the field, that are selling to the physicians, they're recruiting the patients.  They have clinical pharmacists on staff that take care of the patients.  They have nurses on staff.  They do 24 hour call centers because they have to.  To cover the drug protocols of these specialty drugs, they have to have these nurses on staff and the clinical pharmacists, and like I said, they create a whole separate business.  They become a closed-door specialty pharmacy.  They have to basically mail these products that cover—like our largest one covers about 14 states.  He's mailing to 14 states and he's covering all these patients.  So it's a whole different business than a retail independent pharmacy, so they either get in it or they stay out of it.

George Barrett:  We probably have groups that are completely focused on long-term care, right?

Steve Lawrence:  Absolutely.

George Barrett: Like they totally specialize.  It's really interesting how this—there are these subsets inside the system.

Audience Member: It's just that one seems to be a point of some pressure right now in terms of, frankly, reimbursement and profits.  Your clients sound like they're well embedded in specialty, perhaps less affected by some of these access fees and some other things that seem to have been thrown about here in recent quarters.

Steve Lawrence: I think they go under the radar a lot of times and sometimes when, in specialty, being under the radar is a good thing in our customers, especially from a reimbursement rate perspective.

George Barrett: And they're deep with their customers.

Steve Lawrence: Very deep.

Audience Member: Just 340B, how many of your guys participate in 340B?

Steve Lawrence: You know, I don't have the exact number.  It's a lot.  I mean most—I wouldn't say most but it's probably 30% of our customers do some form of 340B.  It just depends on their geography to 340B facilities, if they're close, if they're in the network, that kind of stuff.  Again, a lot of our rural stores - they treat it a little bit different.  Most of our 340B retail independents are in the urban areas.



Jon Giacomin:  That's another example of how they're trying to redefine themselves, go to us or the covered entity and say I could be a contract pharmacy for you and some of them have had some pretty good success in doing it.

Sally Curley:  I think we have one more question before we break for lunch from the webcast.

Audience Member:  Thank you.

Audience Member:  How differentiated are these services versus your competitors?

Steve Lawrence:  Some services that we provide our customers are - everybody has to provide this service, so if you look at a PSAO, we all have to have a PSAO.

Sally Curley:  Explain what that is, just to make sure everybody knows.

Steve Lawrence:  A Pharmacy Service Administrative Organization, which we basically contract on their behalf with managed care organizations, the PBMs.  That way the PBMs don't have to go out and have contracts with 23,000 pharmacies.  They can contract with us for 5,500 stores.  Some of those are me-too that you have to have, some are differentiated.  Like our inventory management is differentiated.  A lot of our other—some of our marketing programs—a marketing program by definition is differentiated because it's customized to the pharmacy.  So a lot of those—it's a mixed bag.  We have a few that you just have to have, they're stalwarts that everybody has to have, but we constantly try to figure out how to create new programs that will differentiate us and I think the biggest part is what I said before, is it's how you go to the customer is how we differentiate ourselves.  We don't say you have to have these 10 programs.  If you only need two of them then that's what you provide because, again, we're charging a fee for them, so if they're paying us and they're not getting the value for it, they're going to quit paying for it.

Audience Member:  So are you gaining share, losing share or steady?

Steve Lawrence:  We've been slowly gaining share for the last probably, what, Jon?  Six, seven, eight years.  It's been-

Jon Giacomin: We've had a couple of key acquisitions along the way.

George Barrett: That's true.  That helps.

Jon Giacomin:  That helped out tremendously … in a couple of markets where we didn't have a whole lot of exposure, so that's been quite good and the Kinray acquisition...

Steve Lawrence:  But if you partner with the right customers, they're growing and so you organically grow share—our customers, our organic growth in this space is really good, it's higher than market.  It shows that we are partnering with the right customers that are growing.

George Barrett:  Again, I'm going to say this and it ties in a little bit to Steve's question about pricing.  Again, these are not dramatic step function movements of share other than through the acquisition.  This is sort of just slow growth.

Slow growth, in my view - and Steve, you can tell me if I'm overstating it - is a customer believing that you have an intimacy with their business, their community that will allow them to compete effectively and with their pharmacy and grow their pharmacy.  It's not about price.  Everybody can match price.  Price never moves share. It may for a minute on a product but it never really moves share.  Share moves because that pharmacy says I am basically entrusting—they are entrusting a huge amount of what they do to us and so they have to really believe that you get their business and I think that it's all about intimacy.

Audience Member:  But George, I mean if you listen to some of the commentary from last quarter, right, it was kind of suggested that you had some participants offering some pretty aggressive pricing and there was the impression that that could actually move some share.  Are you saying that…?

George Barrett:  We actually said the opposite.

Mike Kaufmann:  There was a situation that, as you guys know, that's been out there that someone did lower price in the market and that created some of this market pricing discussion that some of our competitors including ourself have talked about and impacting our earnings, but it's really important to know no share moved.

George Barrett:  That's the challenge.

Mike Kaufmann: So it's not-



George Barrett: We can't—by the way, we can't speak to whether or not someone else had a group that shifted.  I mean that may have happened but I would say generally speaking much of the activity doesn't really move share if it's in pricing. If it's pricing alone-

Audience Member:  But did everyone have to kind of reset to … Did that really kind of reset what the market was and so the market all had to change?

Steve Lawrence:  A little but I think loyalty is what moves share in this market and George made an interesting comment there about the community.  The biggest thing that I saw as the sales leader when we moved share in the market was when we got our sales people to become more like our customers and get involved with their communities through things like GenerationRx and some of the things that we've done to help the communities; all of a sudden we actually got—we did a lot of work with colleges doing scholarships, we did a lot of work with GenerationRx.  All of a sudden we've got customers saying, "You believe in pharmacy at the community level?  Then we want to do business with you."

George Barrett: I don't want to dog Charles' observation about pricing.  We did experience—I would say during that period there was sort of a reset and the answer is because we need to keep our customers competitive.  We can't be in a position where they think we're out of market.  So I do think that when you have that kind of flurry I think it does…  Again, as Mike said, it doesn't really create value because the share doesn't really move.

Sally Curley: May I ask that we cover the last slide and then Kevin I know has a question and then we can take any other questions, including we've had at least one come through on the web about Red Oak and the sourcing and opportunities so maybe afterwards…Steve, if you can stay to answer those that would great.

Steve Lawrence:  Yes, sure thing. Our last slide really is kind of the—it talks a little bit about the future.  We spend a lot of time in this saying where is pharmacy going?  I personally believe and I think we all believe that community pharmacy, retail pharmacy is going more clinical and so we are building in a lot of services.  If you look at, you know, immunizations, travel vaccines, collaborative practice agreements with physicians, those didn't exist before.  Jon brought up Washington state.  One of our customers was one of the leading pharmacists in Washington state.  He now has the ability to diagnose and prescribe minor ailments, has her own clinic in her pharmacy, has

completely changed her pharmacy to basically become a healthcare destination. Now, this is a retail independent pharmacy that now has a collaborative practice agreement with physicians and can diagnose and prescribe. So instead of going to urgent care, the people in her community go to her pharmacy. That's the vision that we have for community pharmacy.

There's things that we've created like diabetes specialized care center, and diabetes is a huge problem. We have education for our customers. We sell them products to sell to diabetics. They become diabetes educators. It transforms their pharmacy from just a place to get your prescription to basically become a healthcare destination and that's what we see our independents, our better ones doing, and I see that going forward. I mean one of the biggest issues I think we have in healthcare is access, yet you have 50-some thousand community pharmacies out there that could be access points for healthcare. So if you take that person in Washington and you said, "We're all consumers of healthcare." When your child gets sick or whatever, if you could go to the local pharmacy and get them diagnosed and prescribed and be out of there in 10 minutes at a much lower cost to the system, it makes total sense. So, we're pushing real hard for provider status, all those kind of things in this whole wellness advantage part of our portfolio of offers.

George Barrett: Again, this is to offer proper balance. You guys all know how important the major chain pharmacies are in the system, so there's—obviously and critical to us—but there is a role here for community pharmacy and they're shaping their own role in a way and it's sort of, it's almost like first responders.

Audience Member: Just a financial question on your business. In the last six or eight years you've added tons of services, you're gaining a little bit of share, partly through acquisitions. In absolute dollars, has retail pharmacy, is it growing in the top line? Is it growing faster on the profit line? I don't need to know the exact but just trend line, what's happened if you were just to P&L that business?

Steve Lawrence: The top line is growing, not just with us but in the market.

Audience Member: So the market is actually growing.

Mike Kaufmann: Compared to some of the other businesses it's growing a little slower as you would look at IMS data by various components-



George Barrett: And scripts.

Mike Kaufmann: We're outgrowing the market there.  Again, a lot of that growth, remember is just generic introductions and it takes a brand at $100 down to $10 so that doesn't mean—so from a unit standpoint it's clearly growing as a business and it continues to expand its profitability for us.

Audience Member: So margins keep expanding.  I mean is that the trend you expect to see?  Are margins—with all these services, is there a way to keep-

Mike Kaufmann: Well obviously we've had, because of this pricing event that we've talked about we've had some margin erosion which is what translated through to what you earlier heard from one of our competitors last quarter and then us with our follow-up is that we did see some margin erosion in that standpoint due to the competitiveness on the generic pricing, but over the long term this has been a margin-growing and a margin dollar-growing business.

Sally Curley: I have three questions from the web, if that's okay.  So first is—and they're all on Retail Independent.  The first is where there are still large and small pharmacies that we hear can buy generics directly for materially lower cost from what they can buy from Cardinal Health or Red Oak.  How can that be true?

Steve Lawrence: Retail Independents have a lot of options when it comes to generics.  I don't know many of them can buy direct from the manufacturer but there are smaller organizations, telesales organizations, a lot of the buying groups in the retail independent space have warehouses that we constantly compete against.  So to say that they can buy them at dramatically lower prices, again, that's a market.  Those prices that they can get from other places come into the market and we adjust to them.

George Barrett: But I would say as a broad answer that's not going to happen.  There may be individual product, individual telemarketed in from one company but I would say if you look at the overall it just—that's not a realistic.

Audience Member: You bought a telemarketing firm here a couple of years ago, so how has that changed your interaction with your independents?

CardinalHealth
*Essential to care™*

Steve Lawrence: It's actually helped us. I mean it's helped us get our share of wallet with our independents from a generic perspective. The way that most wholesalers go to market with generics is a contract with a large number of customers all pay the same price for a product. In today's market in generics, that doesn't work. You need to be more fluid than that, and so it's allowed us to be more fluid. It's allowed us to stay at market. It's allowed us to offer the right pricing at the right time and the right place for the right customers because generic pricing is regional. It's a very complex market and that telemarketing arm has allowed us to go where the market needs to go.

George Barrett: It is a really complex market.

Mike Kaufmann: Yes, I was going to say that one thing, and Steve kind of alluded at it is that telemarketing arm, because they are talking to thousands of independents on a daily, sometimes hourly basis, I believe we have the best market intel of what's actually going on in the marketplace, so besides our feet on the street listening to customers every day and bringing that competitive intel back, we have telemarketers that are all of a sudden they're selling something at $50 a bottle; they seem to be able to get all what they need and then all of a sudden they can't sell a bottle at it and they realize the market has dropped to $40, that information is coming back in a very quick basis to us and then we can determine do we have a pricing problem? Do we have a costing problem? What do we need to do?

Audience Member: Is it a one-off?

Mike Kaufmann: Is it a one-off? Is it somebody just trying to do something and so we shouldn't respond, or do we need to lower price? We use all of that to help us in our market intelligence.

Sally Curley: We've got a three-part question. Here we go.

George Barrett: That sounds like three parts.

Mike Kaufmann: With a sub-part.

Sally Curley: With a sub-part, exactly. How many total independent stores do we serve?

Steve Lawrence: We serve around 10,000.



Sally Curley: What percentage of your independent customers use you exclusively for distribution? Then what are the barriers to switching distributors?

Steve Lawrence: Of the 10,000, it's hard to have an exact number of what percent use us primarily for distribution but it's somewhere around 4,000.

Sally Curley: Then barriers to switching?

Steve Lawrence: It varies depending on the distributor. If a distributor is like us—you know, if you look at our longevity of our customer base, it's 10-plus years because we go deep with these programs. That's why we wanted to talk about these. It's very difficult to take one of our customers and move it because we're embedded in their business. If we run into competitors where the customers are not—the competition isn't embedded into that customer, those are easy for us to move over to our business. So it really depends on how good the provider is that's providing services to them because they need these services. They can't do them themselves and so the deeper that we get into the customers the harder it is to move.

George Barrett: This is true for our competitors. If our competitors do really good job of embedding themselves deeply into a pharmacy then they're smart.

Jon Giacomin: The more value you demonstrate, one quick sort of side note here, back to RBC again. What's funny is those that go to RBC tend to be more loyal customers. We end up selling them more solutions; they're willing to take on more solutions. They take on more of the programs, etc. and the reason is, is because they see value. So if we can get them to RBC where we can actually highlight many of these solutions, they are more inclined to buy and when they buy we're delivering more value and it becomes more difficult to switch. So, I think it's all about value delivery.

George Barrett: But this is a case where—I used to joke that the definition of strategy, Butch Cassidy which is the competitor is looking and somebody looks at it and says, "Who are those? How do they do that?" To me that's one. The other is the customer that says, "I really depend on you." Not like, "I'm stuck with you." Stickiness is a word in some ways I sort of hate because it really is, I depend on you. You know you've got the right strategy when people say, "Who are those guys?" and when your customers say, "I really depend on you."

Sally Curley: So, I have one more on Retail Independents then I'm going to switch the topic here, this one I can handle.

Can you provide any color on top line? A rough percentage of top line or margin profile for the Retail Independent versus other customers other than to say that they are our most profitable customer for all of the reasons?

For Jon and Mike, talking about Red Oak. Generic sourcing penetration for your retail pharmacy customers, how much more room do you have to increase?

Jon Giacomin: I don't know that we would get into the specifics in and around that but what I would say is not every customer is buying 100% of their generic needs from us and so all of that represents opportunity. Steve's team, as we talked a little bit about in conjunction with I think really putting together a compelling financial offer in addition to a lot of the solutions is how we're going after that. So I think we have very good intelligence around our customers. We know what they're buying, we know what their needs are, and we know, to Steve's point, we're getting deeper and deeper into their business and able to understand what solutions they have and the whole idea is to create more value and along with solutions also pull through the generics.

George Barrett: Is it reasonable to say—obviously it's a lot more mature than it was, but is it reasonable to say generally on this set of customers, that they're lower penetration than you're going to see in the major chains, right? So there's more…

Jon Giacomin: They're pretty well penetrated.

George Barrett: … that the chains would have a higher …

Mike Kaufmann: I would say it depends because you know with the chains, a lot of the chains that we have will commit to 100% because they can drive compliance to their stores, if the corporate office says you're buying 100% then...

George Barrett: I was talking total penetration.

Mike Kaufmann: Oh, total penetration of-

George Barrett: Generics, yes.



Mike Kaufmann: Oh, generics. Yes, but then I guess chains would be slightly higher but all the work that Steve and the team are doing around our star ratings is we help provide them with reports because that's one of the things you can't allow to happen. Our independents need to look like they're as effective as chains if they want to stay in the networks, which is important, and so our team looks at generic dispensing rates to help those customers and say, "Your dispensing rate is lower than it should be; that's a key driver of star ratings," and we help provide them with the data. "Here's the scripts you missed. Here's where you can do better," so they can drive that penetration. I think we are helping our customers and what helps lower overall healthcare costs.

Sally Curley: We have a couple of more but let's-

Audience Member: Can I follow up? Yes. On the star ratings, right, my understanding is that it's only in the last couple of years that DIR fees have been attached now to star ratings and some of the compliance metrics and I think that has caused some of the uncertainty around what you're going to be faced with in DIR. Can you talk about on the Pharmacy side or can you kind of maybe elaborate on how you guys look at the DIRs in general and how much does it really impact your customers?

Steve Lawrence: It is over the last couple of years the DIRs have come into play in the PBM space. Most of them are tied to their star ratings or a rating that the PBM has of their own—a lot of them are generic dispensing rates because they want to push generic dispensing rates up as high as possible. I think the NCPA Digest says that retail independents are at like 82% and they were trying to push them over 80. So a lot of the DIR fees you don't get hit with them, but they do affect our customers, absolutely. The biggest challenge is how do you reconcile? I mean how do you actually understand what you got paid for that prescription because the DIR fee comes out, it could be 30, 45 days later, so sometimes it could be up to three or four months later actually when they look at the quarter. Some of these are based on quarter results, and so it does affect them, but like Mike said, our job is to constantly understand what the ratings are and so when I talked about our PSAO we're negotiating the contracts with the PBMs so we understand what the DIR fees are based on, and then we actually provide services to our customers to maximize their ability to match it so they don't get hit with DIR fees.

Hopefully, again, when you look at the stickiness of customers and how hard it is to change, our customers are getting less DIR fees pulled from them than others because they're more compliant to whatever the actual PBM's

calculation is. They're not all just star ratings but they vary, and then we build that into our services to look at their data and say, "Here's an opportunity, here's an opportunity and if you make these changes you'll maximize and lower your DIR fees."

Jon Giacomin: It definitely has an impact though because of the uncertainty and there's the amplitude of it.

Audience Member: Is it—it seems like it's become more pronounced in the specialty pharmacy and specialty has really no generics. Do you find that for your customers that have a specialty pharmacy it's being applied across their entire business or it's really applied just to the business where..

Steve Lawrence: The challenge with DIR fees and specialty is they're a percent of the price of prescription. So in a specialty script that's much higher priced, the dollars are bigger, and so that's really what hurts them.

Mike Kaufmann: That's often too why they separate the pharmacy, the specialty pharmacy from the regular pharmacy and all that.

Audience Member: That 30%, have your clients come back to you, Steve, saying, "Boy, we're getting hammered. We need to find some ways to meet these metrics and/or either move away from specialty or find some other profit center," because just broadly speaking I guess our expectation is independent pharmacies have been doing pretty well for a period of time and that may be shifting, that the profit profile of these guys may be a little tighter than it was say, 9, 12 months ago. Is that fair?

Steve Lawrence: Yes, so if you look at, again, the NCPA Digest, if you look at their latest book, the gross profit of retail independent pharmacies actually has ticked up a little bit above—and this is calendar year 2015. It's actually ticked up a little bit above 2014, which is interesting. So, with specialty, the DIR fees are there, but again, there's not a DIR fee on every prescription. It also depends on the mix of your patients, how much are government paid and how much are private pay. The independents have a different mix than your typical large specialty pharmacies so the DIR fees don't hit them quite as much. So, it's more complicated. I wouldn't just say that the overall market.

Audience Member: Are your customers are facing a huge headwind there that…

Steve Lawrence: No, we're not seeing it.

George Barrett: Yes, I think it's a really interesting distinction between those who are like singly focused on specialty pharmacy and so it's more a direct frontal hit. This is a part, a subset of a mix of things that they do.

Steve Lawrence: If you look over the history of reimbursement rates and you look at retail independents, you know, if specialty comes under a little bit of attack, they'll grow their long-term care business or they'll grow their retail business. When that moves, long-term care reimbursements will move, then they'll grow another part of their business, and that's why they want to diversify. If you're just a retail pharmacy sitting on the corner competing with Walgreens or CVS, you're challenged and we know that. So our best customers have long-term care, they have a specialty, they have an HME/DME business that's not really part of their retail independent but they own it all and so they diversified and that way as healthcare reimbursements change, their portfolios will diversify to handle that.

Audience Member: We haven't even asked about DME. I'd be very interested in those 10,000 customers. What kind of pull-through have you gotten from Don's business with the home health opportunity in the last two years?

Steve Lawrence: So there's a lot of crossover between his business and our business when you come to front of store, especially in the HME/DME space. We have a lot of customers that, again, they're retail independent pharmacy but they own an HME/DME distributor. Don's business services a lot of those customers, a good majority of them. So there's a lot of crossover.

George Barrett: Like at RBC we have a booth right?

Jon Giacomin: We have a booth there.

Audience Member: Independents, but of those 10,000, have 500 added DME in the last two years? A couple hundred?

Steve Lawrence: If I had to say it would probably be more—it would probably be closer to your 500 than it would be the 100.

Mike Kaufmann: Steve, this wouldn't be them like changing a store and putting in walkers and chairs and all this.

Steve Lawrence: The advantage the retail independents have again is their geography. So one of the problems with HME/DME is competitive bidding and a lot of them in their geographies the competitive bidding isn't there. So if you look at these rural areas they are growing in HME/DME because there isn't a provider anywhere near.

Audience Member: But just to be clear, not a lot of—I think the storefront DME business is contracting still, is that fair?

Steve Lawrence: Yes.

Audience Member: From Bill's Drug to home.

Sally Curley: This is their independent medical business.

Jon Giacomin: Actually Bill's doesn't even do it. It comes from us on behalf of Bill's.

Sally Curley: Chris?

Audience Member: You mentioned buying groups. Can you just talk a little bit about the role there and what kind of customers are using them and how and just kind of what that looks like and whether it's changed significantly in the last few years?

Steve Lawrence: Yes, buying groups have been in the retail independent space for as long as I can remember. Our mix is probably 50/50 buying group and non-buying group. There's not a particular profile of person that's in a buying group or out of a buying group. I would say that the more diversified a customer gets and the larger they get, the more they tend to go out of a buying group. A buying group is going to benefit a small store because of the size. Most of them want everybody to get a similar price and so a really small store is going to benefit from it. So you do—if you had to have any kind of a profile you would say you're smaller stores tend to be in buying groups. That's not always the case but it probably is the majority. But as we see customers get more sophisticated, they tend to go out of buying groups, but they've been around for a long time. We have great relationships with them. We probably have more buying group relationships than about anybody but, you know, we know them and they've been around for a long time. They're like half our business and so it's real important to us.

CardinalHealth
*Essential to care™*

Audience Member: GDR fees, have they changed from like a flat dollar amount?

Steve Lawrence: There's a mix. It depends on the PBM. Some are percentages, some are flat dollars. Purely on the contract.

Audience Member: Can there be benefits to your independent customers if their GDR is higher than say an overall average of PDP plan?

Steve Lawrence: They're not just generic dispensing rates; it's other categories. Like on the 5-star rating, if they're 5-star they benefit from it. They don't get the DIR fees, they get a lower DIR fee than if they're not a 5-star rating.

George Barrett: I assume that's very specialized to the contract, right?

Steve Lawrence: Absolutely.

George Barrett: Each of these contracts are very distinct.

Audience Member: Then you own the PSAO, right?

Steve Lawrence: Correct. The way we do it though is we have a board of our customers, so that no Cardinal employee is a member of, that we basically negotiate a contract as good as we think we can get it and we present it to that board and that board says thumbs up or thumbs down. Our customers actually say they want it or they don't want it. So we'll negotiate as much as we can; if they turn it down we'll go back to the PBM and say, "They turned it down. Is there anything else we can do?" and we'll keep negotiating if possible. So we don't actually say yes or no, it's our customers.

Audience Member: Do you think more PBMs in the future will get how their calculating DIR fees?

Steve Lawrence: You know, PBMs like anything else are under pressure to grow and we constantly see that they're going to—they get more aggressive to our lower reimbursement rates. So George has said it, across all of healthcare there's always pressure on reimbursement rates.

George Barrett: I think you need to put DIR fees, it's just a component of reimbursement.

Steve Lawrence: A component of reimbursement.

George Barrett: So you could do away with them tomorrow but if reimbursement, it's just another tool for managing reimbursement.

Audience Member: Maybe a more general reimbursement question. There's this kind of assumption several years ago that independents benefited within retail networks because the PBMs wanted to have these extra access, so they were beating up on the big guys and there's a halo effect around sort of the retail independents. Has that dynamic changed? As they've kind of had more pressure, is that—are they kind of coming down harder on the independents now?

Steve Lawrence: The benefit that retail independents bring a network is the rural stores, in a lot of cases. So if you're building a network you need some retail independents and so that's really the benefit they bring. Outside of that they're just like anybody else. It's tough. I mean they have narrow networks that they get shut out of. They have narrow networks that they get into, but the big benefit that they bring overall, if you look at the entire market, retail independents are needed in a network because of rural stores. So, some will partner with ours, some will partner with others.

George Barrett: But they have probably debated whether they got a halo, right?

Steve Lawrence: They would say there's no halo. Because I mean they lose to mail order, they lose to narrow networks, they lose—it's tough for them and it's like—but it's not any different than, it's the same for the chains. It's a retail—this is really a retail pharmacy phenomenon. I wouldn't say retail independents benefit or don't benefit other than the rural areas.

George Barrett: Or underserved.

Steve Lawrence: Or underserved.

George Barrett: I mean I think there's some very unique needs in terms of network design when you think about making sure you've got coverage and I think a lot of these guys offer that full balance.

Sally Curley: There's actually a question from the web that's a little bit of a follow-up to that so I want to go to it. What is the demographic profile EG age of customers of our retail independents, the retail pharmacy customers? Then secondly, a clarification: did you say that our customers are located in urban locations in addition to rural?

Steve Lawrence: Yes, so if you look at the demographics of the customers in our retail independents, or not just ours but all retail independents, it is an older population, it's also a sicker population. A lot of it is because they need more attention and more attention to care. The retail independent will come out from behind the counter and they'll take care of them, and they'll do other things that are necessary. Some of it is just where they're located also.

I did say that retail independents, if you look at them, you're not going to find them in Dublin, Ohio. You're going to find them in Downtown Columbus or you're going to find them out in Delaware, Ohio, out in the rural areas. So they are in the urban areas. You look at New York City, it's full of—any of your large populations, L.A., Miami, New York City, Chicago, they're full of retail independents in the urban areas because some of that is underserved. There are truly pharmacy deserts in some of these urban areas and so you do see them there and you do see them in the rural areas. That's pretty much where they're located.

Jon Giacomin: And does line up by ethnicity. Ethnicity in New York City is very big, and Hispanic.

Steve Lawrence: We've seen more move in retail independent ethnic pharmacies over the last probably five years than I've ever seen.

Mike Kaufmann: They can speak the language. They carry up front merchandise and the cultural need

Steve Lawrence: We have some Korean pharmacies that actually don't speak English so we have Korean sales people that go into those stores and they service that population, and you see the same thing with some other ethnic populations.

Sally Curley: I just want to give a time check for everyone. We've got about 10 minutes. Steve has been kind enough to keep going, if you're able to keep going for another 10 minutes?

Steve Lawrence: Sure.



Sally Curley: We'll just keep you on to the break. There are two questions that have come through on the webcast. For those that asked them on the webcast, I just want to let you know, we'll actually pick that up after the break, so I want to keep going on the Retail Independent side while we've got Steve here still.

Audience Member: A policy question, kind of back to George's introductory commentary. The new Secretary of Health and Human Services has perhaps a different perspective, presuming he's in fact approved, and has a legacy of kind of focus on certain issues, one of which I think in concert with Rep. Carter down in Georgia, is the independent pharmacy. They've been very adamant about full disclosure, about provider status. I mean as a practical matter, are these issues that you're hearing from your customers now where the national independents are lobbying around some of the changes coming, or is that just sort of pie in the sky, we'll see if it happens?

Steve Lawrence: Our independents are lobbying around a lot of those. Provider status is a huge one. Any provider actually has been a huge benefit to retail independents and a lot in the specialty area. A lot of our retail independents have pulled a provider card in some of the states and been able to get access to some of these products. So, they have a very large lobbying arm with NCPA and I would say even APHA lobbies a lot for the retail independents around provider status, but the associations, they lobby hard. I mean DIR fees, it's your constant things that you'd read about in the press. Whether the incoming administration will be more favorable or not, I go back to George and Jon's comment is it's really about outcomes and what we focus with our retail independents is how do you get better outcomes? That's why some of the sicker people sometimes go to the retail independents because they'll focus on diabetics and some of these people and they'll get better outcomes and they'll prove it.

George Barrett: I will add this political aspect to it. Community pharmacy punches above its weight in Washington. They'll probably punch even higher above its weight, but this is not just healthcare. It's not just a discussion about healthcare; it's a discussion about small business.

Audience Member: If you think about drug pricing in general, right, how much does sort of the actions, I think just part of looking at generic price collusion, this idea of collusion in drug pricing. How do you think that affects you? Then secondly, if the Administration, depending on the comments of President-elect Trump is talking about wants to do

CardinalHealth
Essential to care™

something like drug pricing, outside of rewriting legislation to let CMS negotiate, what other—what would happen like if they changed let's say the protected classes, or eliminated some of them?

George Barrett: I'm going to suggest if we could—I will not avoid that question. I just want to make sure while we have Steve, because I want to make sure we come back to that—if there's any more that's specific to the retail independents, and then I'll make sure that I—because this is sort of a broader subject that touches us.

Sally Curley: Go ahead, Andrew.

George Barrett: I'll come back to you.

Audience Member: For your most embedded customers, are those people coming to you through a GPO or not? Is the top of the funnel for people like that, the purchasing organization, your PSAO or some other thing that leads them to Cardinal? The guy that you're describing, are they like sort of model customers that are...

Steve Lawrence: There's a mix. Our most embedded customers, some are in GPOs, some are not. It's really—now, if you're talking about customer acquisitions?

Audience Member: Yes.

Steve Lawrence: It's typically we're acquiring them in a direct manner because if they were in the GPO we would already be embedded with them and when they come to us with that many services, typically they're going past the GPO services and we're basically bringing them in in a direct manner. But our currently heavily embedded customers, it's a mix. Some are in GPOs and some—we don't really try to steer them. If they feel like they can get benefit from GPO they should do that. We're still going to provide the services that we need to provide to them, embed ourself deeply into them. That way sometimes through the GPO we've got the relationship with the customer, we're still in good standing.

Audience Member: That's actually my sort of follow-on question to that. Do you see any changes in the stability of the GPO organizations whereas for whatever reasons, either yours that are under contract or others are gaining or losing meaningful numbers of members?

**CardinalHealth**
*Essential to care™*

Steve Lawrence:  There is some consolidation going on in the GPO space, so some of the smaller GPOs have consolidated with some of the larger.  We've seen that over the last two or three years, but I wouldn't say that there's any meaningful shift between the GPOs.  In our case we have longstanding, long-term relationships and contracts with those GPOs so I think we're in a good space right now with our GPO partners, but I haven't seen huge shifts from one GPO to another, but I have seen consolidation.  We didn't see that before.

Audience Member: But no numbers?

Jon Giacomin: Membership is not dropping off.

Steve Lawrence: Nothing different than the normal.  I mean members move so if that happens, but I haven't seen any dramatic shifts lately.

Audience Member: Okay, thank you.

George Barrett: Sal, would you like us to … it's about 11:30.  So the question is do you want us to grab food and then I'll come back and touch on Charles' question or do you want us to do that now?  Tell me what's better for you.

Sally Curley: Why don't we—can we do three quick questions and then break.  Then we'll break for the webcast and then come back?  Maybe if you want to start with Charles' question and then jump on the other two.

George Barrett: I'll do my best, yes.  Let me start and then Mike—we've got a bunch of people close to it in various ways.  It's hard for us to comment on.  We've seen basically exactly what you've seen, the public announcement.  In terms of the implications and effect of that.  Here's what we had said.

We started to see and we have been very public about that, generic pricing reverting more back to typical patterns for quite some time.  I don't know how many quarters but for a while now.  So I don't really see this changing.  I mean I don't see—again, forgetting about whether or not this affects any individual company or an executive, that's a completely separate question I wouldn't comment on.  But in terms of the pattern of what's going on in a general way, the system prices, I would not expect to see this.  We've already seen some more reversion back to typical pattern.

Frankly, you will always see some price increases, right? It's just—and I think it's necessary, having sat on the other side. You have to do this at times but I think we'll see more typical patterns. That's what we've been seeing and we've commented on that.

As it relates to the broader question about—this is a hard one to answer—on pharma pricing and the policy tools and the discussion and the rhetoric. I'll do the best I can.

Obviously it's been a subject that's gotten tremendous attention. The policy options are tricky, as you know, and some of the policy solutions would be really I don't think very good for America, honestly. I mean in price controls, we know what the impact of price controls can be generally: distortions and hoarding and shortages and I think that there's a lot of economic data that that's a troubling outcome.

Reimportation has its own really complex problems if you thought about that as a tool. We have the most secure, stable supply chain in the world, the United States. There's almost no counterfeiting, unless you're sort of messing around through the Internet. So I don't think from what we've heard there's a lot of draw to that as a solution. Having said that, I think pharma companies have done some—as you know, some have been very public about some commitments. I do think we'll see some, I'm going to call voluntary moderation. We're already seeing that and we've commented on that. So I think it's possible that it's not so much a clear policy solution. It is the market behaving like a market. Competition, various kinds of pressures that influence the way people price.

I would also say given if we're committed to curing disease, we're probably going to continue to see some price increases because I think they're necessary, but I think we've seen moderation, we've commented on that, and I think that's largely been self-regulated, and some companies that have been very explicit about that, and that wouldn't surprise me if that's a pattern.

I don't know if that's helpful. It's just really hard to comment on this because we're really early stages in terms of this Administrations executing on some of the commentary, but I wouldn't be surprised to see again.

Audience Member: There were these state AGs, I think there were 20 of them in this lawsuit that came up this week. They sued on behalf of their state Medicaid programs, presumably. Are there other parties that would be



potentially including independent drug stores, wholesalers?  Pile on, follow on who are participants in some claim for damages?

George Barrett: Yes, I mean we've seen that before.  That's a good question.  We've got one of our legal people here but that's a good question.  I don't know the answer but it's not unusual when there is an activity that there's the periphery starts to watch and see, see how they can participate in that.  So, it's certainly possible.

Sally Curley: A further website questions and then we're going to go ahead and to break.  Do you expect further pricing headwinds on renewals?  We talked about the market resetting and so I think this question, I'm going to talk about customer contract.

Mike Kaufmann: You know, as Steve mentioned early on, generics are priced at market on daily basis and so we raise and lower prices and they are not necessarily a fixed contract.  The rebates we may have with a customer are fixed but the invoice prices change on a daily basis.  So I don't see that what we're seeing in the increased competitiveness that we saw over the last couple of quarters, and again, what we translated into a takedown for our earning guidance for the year and the impact of it really affecting the rest of our renewals because again we've already had to keep all of our customers competitive and so I don't see that having a big effect against other renewals.  Those we still continue to believe that the repricings that we see on a yearly basis are always a headwind, have always been a headwind.  We don't see those being any different than we've seen historically.

Sally Curley: The second question is CVS has recently highlighted 40 million script losses to Walgreens.  Are those 40 million losses also losses for you?

Mike Kaufmann: A couple of things to think about on those losses.  I don't think they all went to Walgreens, which I think is important.  Some of those losses have gone to other customers of ours.  That's one piece of it.  Also, it was 40 million scripts was what they talked about.  A large portion of those scripts are going to be generics.  As you know, generics are 85% of the scripts anyways out there, so a large portion of those are going to be generics of which we don't sell CVS all of their generics.  We buy all of them through Red Oak, or we—Red Oak has the purchasing power of all of the generics of CVS and Cardinal, but CVS still buys their generics direct into their warehouses as we do, a portion of them, so all the scripts related to those, again, have no impact on us as far as

downstream volume. Now, the impact on Red Oak would be so miniscule, so if you net that against all the wins and increases in Red Oak with Target, OmniCare, our wins, etc. over the last couple of years, Red Oak is much bigger than it was when we formed.

To summarize in few ways, the script loss to Red Oak won't de-lever Red Oak; it will be small. The scripts lost, a lot of them will not affect Cardinal or will move to Cardinal customers, and bottom line, they were all contemplated when we set guidance the last time. We already kind of generally knew about those wins and losses and they were already contemplated in our numbers.

Sally Curley: So, we're just about 11:35. We are going to pause the webcast. We're going to—for those in the room, lunch is served right outside. We'll come back in about 10 minutes, so 11:45, and do a working lunch. Steve, thank you very much for being here today, and George, Mike, Jon, Don and the rest of the IR team will be here and we can pick up where we left off.

Mike Kaufmann: Yes, and let's make sure that we keep the questions off for 10 minutes because we want to go back—we don't want to be public and non-public, so let's keep it, have some lunch and then we'll come back.

Sally Curley: Excellent. So, thank you. For the webcast, we'll join you at about 11:45am Eastern.

# (BREAK)



Sally Curley: I think we're live back on the webcast. For those on the webcast, welcome. Bear with us if you hear us unwrapping the sandwiches, etc., on the live webcast, but I think what we'll try do is—Jon Giacomin is certainly still here, but what I'd like to try to do is actually hand it over Don to just make a few comments, update folks on the Medical segment progress, Cordis, NaviHealth, some of other businesses there, and then we can go straight into Q&A on Medical. Certainly, if there's anything on the Pharmaceutical side that we haven't covered, we can always come back to it with Jon—and then, Mike, I think maybe you wanted to make a couple of comments beyond just capital deployment and different thoughts there. So, Don?

Don Casey: Good, Sally. Thank you for feeding people here, so I'm anticipating that prevents any serious questions as we go through. On the Medical side, we've been pretty consistent about talking about a journey that we've gone on and it really reflects changes in the acute care space, and all after what Jon said, I feel like today, by focusing on our customer needs, both at the enterprise level, Cardinal is more relevant when you start talking about the Pharmaceutical side, as well as the Medical side, and then as you get into the Medical side of the business, we really feel that we've been changing how we look at serving the customer, so that we've gone well beyond a classic straight-forward distribution company.

If you just step back, so much of what we've talked about today with Steve Lawrence is a lot about scale, how do we bring scaled solutions to our customers, and that's what we're doing in the acute space, almost if the journey and the parallels—because the fortunate thing at Cardinal, we get to touch the healthcare business in so many different places, and not too many people are linking independent pharmacies and hospitals, but if you think about Dublin Lutheran, which is literally right down the road, you can almost see it from here, that used to be a hospital, and then hospitals begat multiple hospitals, so it became changed, and then, okay, what are we going to do, we might need to buy our physicians, get into urgent care, and begin to move beyond just the four walls of a hospital, and then you saw fee-for-value. So, you really saw just a very dynamic market in the acute care space over the last 10 years, and really accelerated over the last five, where they have a different set of problems, and what we've been doing on the Medical side is really trying to focus aggressively on what are these customers' needs. We kind of box it up into like three or four kind of major opportunities to grow.

The first is sit there and say, "Okay, what are their pain points?" A lot of them are saying, product. We would like to put as much pressure on getting and availing ourselves of the best product pricing, whether that's on commodity-oriented items or physician-preference items. As such, we've had to grow strategies designed to meet that, the first being very strong expansion of our commodity play. We, today, believe we are at parity with the market, if not better, in terms of offering a broad range of what you would call medical commodities. If you actually look at the technical definition, there's about a thousand categories that would show up as a GHX definition of what goes into distribution. We're in over 90% of those categories, where either we source or make that today, which puts us in a very competitive position.

The second is physician preference and we've talked about—if you look at certain categories, where you have a high physician preference category, where there may not be that much clinical differentiation anymore, that you see IP kind of moving away, intellectual property, and you see it, increasingly, the material management side of the institution involved in making that decision, we think that there's an opportunity in several categories. We've identified three over time, and I'll talk in depth about one and we can answer questions about it, but if you look interventional cardiology, as an example, we had purchased AccessClosure and we have purchased Cordis, with the idea that we believe looking at that space, you know, drug-eluting stents, kind of south of that—what I mean by "south," less technical—we believe there's a combination of services, products and, basically, analytics that go along with that, that would allow us to compete differently than how the market has competed in the past. We bought these assets and we've gone—I think people have seen deals, like Biosensors, where we've now created kind of a different R&D model, which is we're not going to spend huge on the R, as George always goes "the big R"—I can't quite do an R, I can do an O. But, we're really focused on availing ourselves of partners who have invested in technology in the spaces that are relevant to us and take advantage of what is now a very compelling and complete global sales force. So, whether it's Tryton, whether it's Mared, whether it's others, you see Kaneka and others—not Mared, Merrill—where we've been able to basically build out our interventional cardiology bag and be very competitive on a global basis. So, let's think about products, both high and low.

CardinalHealth
Essential to care™

Then, the second area, you say, how do we serve the continuum of care, because it's no longer about just how do you serve a patient and hospital, and that's where our Cardinal Health at Home business came. We've now owned that business for a little over three years and we're more excited about that business today than we were when we acquired it. It's really given us a broad look at how not only do we service the hospital by helping them follow the patients out—you know, Steve here needs a hip or a knee and he goes home and is going to need a slew of medical products, we believe we can service that, and our Edgepark and Independence business offers us two different ways of getting that done. That business continues to show growth on both the top line and bottom line, and we are excited about the prospects as we move forward, because we believe the home is going to be a very important place.

The last kind of big swath is, as our customers really kind of wrestle around with how do they participate in fee-for-value, a lot of this is going to be looking at bundles. So, whether that's a payor looking at patients being discharged through a Medicare Advantage program or whether that's a hospital serving as a convener and looking at a bundle, they're really beginning to look at the continuum of what that bundle and where the costs are, and in a lot of cases those costs are in post-acute care. Our Navi product, NaviHealth, which is a company we've owned for probably about 15 months, is really a scaled benefit here for them, because we can help them manage that post-acute risk. So, basically, what Navi does—and Clay was here six months ago and talked about it—it'll sit there and say, "We'll take a patient. We'll profile that against all the discharges we have and we'll have the algorithm," and then say, "This person should go to a SNP, this person should go to an ERF, this person should go to LTAC. Dave gets to home. Andrew, you get to go to augmented home." We basically do that. We've made two acquisitions to really boost the capabilities in there. We bought a company, Curaspan, which is a work flow management tool that gives additional capabilities to Navi, and we bought a company, RightCare, which really soups up our health risk assessment when combined with Navi.

The interesting topic, as we get through, we believe that we are really competing at the acute level very effectively, because we're offering a much broader range of products that we've ever launched, that made available. We can follow the patient across the care continuum, whether that's serving at home, something I highlighted, but we think we're very effective going into surgery centers and other alternate sites of care, and then we believe we can help them take risks.



So, that, in kind of a nutshell, is where we are and what we're doing. We feel that, that offer has been validated in the marketplace when you see a win like a Kaiser, but we've had other people that we've brought in to—it's not let's get into exactly what accounts we're winning or losing, but we feel that we've won more business this year than we've had in the past by a long shot, and we're excited about where we are. We're excited about competing. We're excited to be able to put forward results that we're pretty proud of, and George is always nice to acknowledge he's got a good team here. We've put together a pretty terrific team on the Medical side, as well.

George Barrett: So, just maybe a little bit of additional color. If you remember back to our last New York Analyst Day, Don sort of laid out the evolution of the components of these business, right, and you could sort of layer in the traditional, let's say, historical legacy Medical Surgical commodity business, that was primarily branded Medical Surgical, and then whatever, and a little surgical kitting. So, if you look at that model and what sort of emerged from out of that Allegiance American Supply tradition, that's primarily what that business looked like, and as Don said, over time, that business—the profit flow in that business has shrunk, but through other components, products, services, post-acute, PPI, etc., that we're going to be growing out. What's been interesting, I would say, for us, too, over the last six/nine months, is that that business that we're saying has come down—and it's certainly very competitive—we're actually seeing sort of a little bit of a resurgence in that business, growth in that business, in addition to seeing these other components which are high-priority avenues of growth for us in our Medical segment, and that's been sort of interesting. I think, as we've studied it, I think what it's really been about is our customers are becoming much more complex with greater needs, and they're looking for solutions, and the more that that discussion becomes a big solution, "How can we help you, not just on a line of business?" "How can we help you compete in this world?" it seems to be benefiting the overall portfolio.

Don Casey: Just to build on that, it's a virtual cycle. It's like you get scale on some of these solutions, you win more distribution, you win more distribution, and then you have a very tight relationship that you can bring product and services in. The other thing I would just add, George, to that is they're not talking about—when you go into an acute care setting, they're not talking to Medical anymore, they want to talk to Cardinal, which is another opportunity. Jon and I spend a ton of time now together, because so many of our customers who sit there might have started as a P customer that's now an M customer or an M customer that's now a P customer. Two-and-a-half years ago, we executed an enterprise selling approach in the acute care space that represents both M&P,



because we have to look across the enterprise to provide solutions. So, when you talk about medication therapy management, and that might be a pharmacy, well, you—one of the things that we talk about is like NaviHealth can go in and sit there and say, "Dave may be home, as he has been discharged, but he tends to be poly-pharmaceutical, where there might be eight or nine prescriptions, which is actually a risk profile to bring him back on a readmission and actually managing the pharmaceuticals in addition to the other care becomes really important," and that's an example of where we think we have a pretty compelling offering.

Audience Member: What percentage of your customers are you going in at the enterprise level?

Don Casey: If you were to look at our top hundred, Charles—again, we serve literally thousands of customers. If you kind of look at the top hundred, it's probably more than half we have a relationship on what we would refer to as both sides of the house. It is our intent, though, in 100% of our accounts to go in at the …

Jon Giacomin: It's the enterprise.

Don Casey: We always pitch, and then, being the ever-practical people we are, if they want to do Pharmaceutical first, that's great, and then it's up to us to build off that relationship. It's been very interesting. Jon, you've got—I'm coming up on five years, so I've got five years of experience, but cumulatively here, we probably have—I hate to say it—close to 60 years, but we're probably doing more enterprise pitching today. Not everybody wants to buy it as an enterprise, but the point being is if you're a hospital CEO today, you're in a whole different bailiwick than you were five years ago. They actually want to hear the plethora of things that we can bring to them and "Can you integrate it?" because sometimes their system isn't integrated.

George Barrett: There are going to be moments, and we're finding this, where even someone who's sort of only a customer and a very small line of products with us wants to talk about the direction of where things are going. Those are conversations we'd rather have. That's a good place for us to be. Because, if we're listening carefully, and we try to, and I think we're pretty intimate again here, as we're trying to understand where our customers are gone, we usually have some ideas, probably can create value that they haven't necessarily thought about. So, once we get into those conversations, I think we have a lot of tools that are intriguing to these kinds of customers.



Sally Curley: Will you touch on—there's a question from the web that I want to give you, but will you also touch on—because we've gotten a lot of questions about the Affordable Care Act, repeal and replace or repeal and delay, volume, utilization, just you're in the thick of it, what are you seeing out there—and, George, maybe you can …

George Barrett: Yes.

Don Casey: Yes, sure. I'm going to echo what George said. I mean, literally, our strategy for the last five—close to five years has been we bring scaled solutions to the acute care space to allow then to deliver better patient care at better prices—at better value, not better prices, better value. Whether the Affordable Care Act is in place or not, there's not too many hospitals that are not looking to provide, you know, a more comprehensive set of care at better prices. So, we believe we're fully aligned with them.

Now, look, are the hospitals asking questions about how they're going to be reimbursed and what are some specific angles about the Affordable Care Act? Absolutely. But on a strategic level, on a strategic level, we don't see the emphasis in the acute care space moving off to "Oh, great, the Affordable Care Act doesn't exist anymore. We want to make sure that we take what we pay for products up 15%." That's just not going to happen.

George Barrett: Yes, I think the direction—I was just at a meeting this week, which was sort of a cross-sector meeting, and to a person, the answer on the question of pay-for-value, directionally, I don't think you can put the horse back in the barn on that. Whether or not some of the impetus coming—for example, could CMS or CMMI be different in terms of less mandatory things, for example. So, we could see some like subtle policy changes, but directionally, Don hit it. I think this is going to happen both in the commercial sector and from the public sector. It'll be implemented in different ways, there's no question, but I think the general direction. But, having said that, we will still live in a combo world of fee-for service, and if you can't do both, you have to be able to live in both worlds and I think we'll be in that.

Audience Member: Just specific to, say, NaviHealth, which has been a huge driver for you in recent quarters, with all the noise around revoke and the demonstration projects, hip and knees, I think most people assume will continue, but

now they've thrown out CABG and some other procedures. Any signal from those customers that they're backing off implementation of some of the NaviHealth products or some of the services?

Don Casey: Well, if you actually pull back, Steve, again, I think it's going to take a while for people to get fully educated as to what Navi is. Navi's got two components. It's got a BPCI bundled component which will be aimed directly at the hospitals. Are a couple of people scratching their heads and saying, "What does this mean?" Yes, but by the way they're saying, "What does it mean?" but BPCI, as part of the Affordable Care Act, isn't going to be up for renewal for another 18 months, so they're basically looking at that and saying, "Is this an opportunity for us to do it?"

There's also a large MA component, Medicare Advantage component to the business, which, again, depending on which way the payment reforms go, if you start seeing more people sign up into, say, the Medicare Advantage arena, we believe that we are very, very well positioned to take advantage of that.

To build on George's last point, the commercial payors have been doing bundling for a while. So, if it's not a CMMI-led bundling payment, you know, whether it's a comprehensive joint replacement, whether it's CABG or other stuff, you're still seeing the commercial payors look for the bundling, so it lets them compete on a more competitive basis.

The other thing that we have done on the Navi side, with the acquisitions of Curaspan and RightCare, we've also built into this a work flow management tool that not only facilitates the efficiency of the bundles, but it also creates a different way for Navi to engage in the hospitals. Basically, the Curaspan tool is an opportunity to—think of it as a work flow management augmentation, where, Steve, I guess we were discharging you from the hospital—if you were being discharged from Hospital A, B or C, it automates the process of "Mr. Slaughter is going to be coming out to this hospital, from this hospital to this SNF," and it actually automates that process. So, that's now a service that Navi begins to bring into the process. You can either do that as an augment, where you're going to use the algorithms and just do as a work flow management. So, we believe that Navi's position in the marketplace, in terms of not only managing post-acute discharge spending, but actually managing the process, we've really built a pretty compelling engine.



George Barrett: I'd like to just add to this, because you mentioned it's had a big impact on us. Economically, it's been a relatively small impact on our business, but I think the impact in terms of positioning has been bigger. I think Don's exactly right, I think Med Advantage will be on.

Sally Curley: Don, just to drill down a little bit further on that, there's a question—two questions, actually, from the web with bundling. So, with bundling gaining steam, how have the different areas of post-discharge care changed, ERF, home, SNF; and then the second piece of that is what percentage of patients do you recommend for home healthcare and has that dynamic changed?

Don Casey: Well, first, I think we're in the very early innings of how we're actually going to see a much more analytically driven post-acute discharge process. So, I'd say it's early innings. I don't think the tide has really shifted to the point where you're going say there's been a huge difference. If you were going to look at that as a pie and say SNFs represented 18% of the business—this is totally hypothetically numbers—it now all of a sudden represents 15%. Post-acute discharge across the entire continuum of care is a multi-billion-billion-dollar business and I think it's going to take a little while before we see changes.

However, what we do see is that there has been a tendency where we've been able to analytically focus on a particular market or particular set of surgeries and post-acute discharge, that there tends to be kind of a knee-jerk reflex on the part of some of the physicians to sit there and say, "Let's push this person …" If this doctor has had great experiences with ERFs or this one with LTACs, they tend to follow that almost as habit, as opposed to a more careful assessment, as to based on this patient's history and based on a cost benefit, where they would go. Look, I think I would speak for almost every patient that's ever been discharged. They want to be discharged all the way to the home. They would rather be discharged there. So, what Navi does is actually built on millions of discharges analytically say, "The chances for this person to get the best outcome in terms of length of stay and quality of outcome, they should be looking at this level of discharge." What we tend to see is you tend to see people discharged to the right place. Over time, we expect that to begin to impact the macro numbers, and over time, I think the most cost-efficient place, in most cases, to serve these patients is going to be at the home. It just becomes a question as to, clinically, what is the most appropriate place to put these people.



George Barrett:  We have been able to demonstrate through our data—again, this is that sort of big data virtuous cycle, which is the more clinical data you have, the more effectively your predictive modeling is working.  But, we're able to demonstrate reduced readmissions, reduced costs and higher functionality for the patient.  So, I think we're building—I always say this.  I have to qualify it by saying it's still a relatively small business, but the capability is enormously important, and we hope to exploit that capability.

Audience Member:  How good is the—I understand that you're saying with NaviHealth you understand what is the best care setting for that patient go get into.  How good is the data right now within a channel of care setting; within, let's say, "This patient should go to a skilled nursing?"  How good is the data to understand which of the skilled nursing providers is actually going to give you the best outcome or the best value for the costs?  Because, some might be just keeping them the full length of stay or …

Don Casey: Yes, it's really relative.  It almost depends geographically, over time, how much data we have there.  On a national basis, we can certainly say, "This is the place to go."  We're not at the position today where we go in with our customers and say, "We would recommend this SNF versus that SNF," but the data—to George's point, the big data we have certainly is letting us begin to do that, and we'll have to evaluate when and if that service becomes appropriate.

Mike Kaufmann:  When you say we have a huge head start on anybody else with the amount of data, we keep getting bigger every single day, which is kind of an advantage for us.

Don Casey:  Absolutely, Mike.  It's a network effect, though.  I mean, the more data you get the better your data is, the more data you get the better your data is.

Audience Member: With all that big data, and based on average patient population, is there an optimal mix that you would say were sent to SNFs versus ERFs, LTAC, home health?

Don Casey:  No, it's—we can roll the whole thing up and we can say there may be overutilization at some end of the spectrum in a specific condition of care, but, by and large, this is an individual thing.  You would be individually profiled.  You might be an 80-year-old woman who was on—she's diabetic, hypertensive and on eight prescriptions, and might not have a—from a social setting, she might be—if she was discharged home, there

might not be anybody there to receive her or might not be there to be able to get the ride back into the doctor, so that would all be factored into the algorithm that said, "She may be best served going to a SNF."

George Barrett: It's an interesting question though, and it's not really what we're doing right now, but it is—what we're now doing is to say, for an individual, based on people with like characteristics it's the optimal side of care. But, it's an interesting question that you're asking. If you get enough data, might start telling you, as an example, we are sending too many people to SNFs or the long-term cares or too many people home. We're probably not—that's not the way we're using the data right now. I suppose at some point we may have enough to actually start to see some patterns that have policy implications. But I think today we're really focused on like characteristics clinically and not individuals. But, it's a really interesting question.

Audience Member: Has Kaiser expressed any interest in that product, given their fairly sophisticated ACO?

Don Casey: We have a relationship with Kaiser.

Audience Member: So, banned in Northern and Southern California?

George Barrett: Probably no. But totally respectable.

Audience Member: As a kind of market where service providers look to thought leaders, are there opportunities for you to leverage that? I hear what you're saying, George, it may not be a huge revenue contributor but are there places where you've got centers of excellence that have had successes with that software and this combined entity, I guess, with these two tuck-ins, that you can actually do referrals and you can put people in contact with each other for the purposes of kind of spreading that word?

Don Casey: Well, first, we do have a thought leadership program around that that we've been publishing. Clay Richards and others, have been relatively public in terms of what we think we can do. The interesting dynamic, and this—I think Jon said this really well. Our challenge with Navi is every single one of our hospital relationships wants to talk to Navi. I mean, there's not enough humans in Navi to get to almost meet the demand. I think George said it really well. It's not necessarily that we expect every one of our hospital partners to move into a BPCI bundle where we may be a convener, but they want to talk about it, they want to understand. Some of those conversations lead directly to a financial relationship. Some, it's an advisory relationship that's important to our



overall strategic relationship. But, it certainly has been important to us, as we begin to try and having more global conversation about what we can do to help you navigate an increasingly complex healthcare world.

Sally Curley: Don, there's a question from the Internet, from the web … Can you quantify the savings that NaviHealth has been able to save for customers?

Don Casey: It really ranges by what the relationship is with the customer and how much risk, but it's significant. We've kind of stayed away, Sally, from ever specifically quantifying that, but we have an extremely high renewal rate of people that we've been doing business with Navi over time, and our partners have saved a significant amount of money, to the point where—I can almost inversely tell you, like, we might have had one person not sign up across all the hospitals or the MA relationships. We've had an extremely high rate of renewal.

George Barrett: Again, this is population-specific, but generally speaking, our ability to both reduce costs and reduce readmissions.

Don Casey: Yes, and like I said, I mean, it's really—a lot of this is going to stay driven.

Sally Curley: So, just raising it to the level—and keeping with the webcast question—raising it to the level of the Medical segment, there's two financial questions. The first is what percentage of cost of goods in Medical is now Cardinal Health brands? The second is are you comfortable that the Med segment EBIT margin can improve over time? Why hasn't it improved more given the layering on of Cordis' high-teens EBIT margins?

Mike Kaufmann: I can help on the first one. We don't actually do it as a percentage of cost of goods, but as a percentage of segment gross profit, our sales would be in the mid-20s, and as a percentage of our earnings in that section, it's going to be in the high 30s. Our goal is to be around 45% is what we have stated publicly, and we're well on our way there to be able to achieve that.

Don Casey: Then, the margin expansion question, specifically in 2013, we laid out a 5.75 goal as an aspirational target, which we continue to keep as an aspirational target. The interesting dynamic that Sally actually mentioned, as we have brought things like Cordis on and the expansion of products, we've actually winning more distribution, which tends to be a little bit dilutive to the margin expansion. So, when you bring on a customer the size of Cordis …excuse me, Kaiser—some hard C that lives in California—when you bring on somebody like a Kaiser—and

CardinalHealth
Essential to care™

we've won other business that's significant, that does put some downward pressure on the aggregate margin of the business if you rate, but again, once you bring these people on, we expect to be able to begin to monetize that relationship by bringing the product and service bundles. So, we continue to believe that this business will be margin accretive. We will be focusing on margin-accretive activity for a long time.

Audience Member: That 5.75, is it still realistic now with the different business mix?

Don Casey: Yes, we had said we wanted to get there kind of—the run rate going out this year, next year, probably not going to hit it this year, next year, given—again, we've won a considerable amount of business, but, yes, we do think it's realistic over time.

George Barrett: I think there are things that contribute to it. It's always so mix-sensitive. I think, generally speaking, you would—I think you'd find that the things that we're doing to grow margin rate, we're still doing. We've had this slightly unexpected uptick in lower margin parts of the distribution business, but when Don brings …

Mike Kaufmann: It's good, uptick.

George Barrett: Yes, I know, actually, and by the way—this is such an important point to make and I probably should have said it upfront. We treasure our distribution businesses. I mean, what we have now is balance. But, those distribution businesses, as Don often likes to say, and Jon says, they're the pipes into the system. So, we're getting more efficient at that every day. We're really good at this. Our service rates are extremely high across our business. It creates touch points and relevance to those customers; they need us every day. So, we think those are really important businesses. They are, by definition, lower margin rate businesses, and so when they grow they're going to distort the picture. But, when Don adds a new product in to that Cordis bag, again, just that kind of thing that expands margin. So, we're sort of always doing things that are directed at expanding those margins, but on a mix basis, will be affected, just the way—it's more dramatic in Pharma when you pick up an Optum, for example, but it still can happen in Med.

Don Casey: Yes, the exact same thing in Pharma; they did pick up Optum as we picked up Kaiser, big business.

Audience Member: Don, when you look at interventional cardiology now and then you think about what percentage of the kit you're able to deliver, and you hear from the larger device manufacturers, you know, they're bundling their

products, as well, how often do you run into a situation where a provider, you know, they have to break open two different kits and then you could have issues like wastage? Earlier more so than …

Don Casey: You know, that's actually changed a little bit, Charles. Where we actually see that business going is they're beginning to ask for more custom kitting, so it's less that "Hey look, I'm going to have an XYZ bundle come in and an ABC bundle come, I'm going to take the best of both." We actually have a large custom procedure kitting business that, again, we're starting to see good pickup on the Cordis side, where, "Hey look, we want a base bundle," if you will. "We want to basically have everything we need to do the opening, the closures, and then if we want to use somebody's drug-eluting stent or we want to have somebody's X, Y or Z," they actually pull that separately and do it off more of a base kit. But, yes, if they were purchasing two different bundles that had overlap, that's wastage.

One of the things that I'll tell you that did, probably inordinately excited about, which—it's just because we're optimistic about a lot of stuff—this CIMS program, Cardinal Health Inventory Management System, which is our RFID program that we've begun to put forward—and it's actually made the most progress in the U.S. right now in the interventional cardiology lab. The amount of product that is either wasted, Charles, to your exact point, we think is between 5% and 10%. The amount of product that is expired might be between zero and 5%. That's just a tremendous cost that this RFID program effectively eliminates. Then, if you begin to look at the cost associated with managing consignment inventory, and other things, you begin to see the value of something like this inventory management program. We've had excellent pickup, particularly in some of the larger academic medical centers that are beginning to recognize that the way that they've been managing inventory is not sustainable. You can't get 42 FedEx boxes going up in what they refer to as the Pro Shop every day and having to order the inventory management program - there is a challenge.

Audience Member: Is it the idea that the device manufacturers, in order to protect some of their product portfolio, might try to bundle it together themselves? If a provider wants custom kitting, do they go to the—they go to you and say, "We want this base kit," and then they have negotiate separately with the kit manufacturers specifically what they need?

Don Casey: I think you might benefit from thinking about the bundle as more financial than physical.



Audience Member: Okay.

Don Casey: Sure, they'll look to protect the landscape by saying, "Hey, we can represent 60/70% of the procedure if you use our guidewires, our catheters, our closure devices, our drug-eluting stent." What we've seen, there's some accounts that have purchased that way, they're looking to see what the bundle is, but the accounts have gotten pretty sophisticated, because, over time, you might have seen some of the device manufacturers loss lead in one area to protect another area. The level of sophistication the accounts have today, have really sat there and said, "Well, if somebody is going to offer me this price on this, you know, the drug-eluting stent, but the accessories are going to be this price, maybe I should bid that separately." So, it really depends on how the account approaches the procurement angle of that, but they've gotten very sharp.

Audience Member: I guess the follow-up is what percent of accounts you say clients are that sophisticated now, to be able to say, "Hey, we're going to look at each of the pieces, because we really need to drive value here?

Don Casey: I think it would be easier to say not, you know. I'd say, you know, in excess of 70% are sophisticated enough to really think through that.

George Barrett: Again, I think the customers, largely, are sophisticated. Now, they may conclude that, whether it's a bundle from a particular device manufacturer or from Cardinal Health, which is product and services, it's an economic model they're looking at. Ultimately, they still have to ask the fundamental question, "Are the products and the services valuable?" If I had to say what's one of the directions that we'll continue to see, which is that data is going to matter, right? I mean, what is clinically valuable and cost-effective? That probably was less in everybody's eye, in a way, 10 years ago. I think that's a healthy thing for us, as consumers. So, we'll continue to see bundling as a financial tool, but with sophisticated buyers.

Audience Member: You touched on the bundling and hips and knees and the like. You guys are a little bit ahead of that kind of opportunity. What's the next opportunity that might be—part of the med-tech industry that might be commoditized, in your idea, for lack of – using your words, not mine.

Don Casey: I think there's a lot of categories that you could take a hard look at. Categories that we like and we're participating in—like, negative pressure wound, we made a small acquisition and we're making some incremental

progress there. It's not showing up yet, because it's small. Some of the bets we're making back. But look, the big three and four categories, these are not areas that we are committing to go and participate in, but if you look ex-US at places like the UK that have begun to look at things like a drug-eluting stent, and they've kind of said a drug-eluting stent is – them and Germany, they've kind of said the same thing. They're beginning to see ortho, they're beginning to see areas like cardiac rhythm management where they see some interchangeability. You might see interventional radiology ex-US. In the U.S., those categories haven't necessarily—you haven't seen the same move yet there.

George Barrett: Yes, I mean, I think I'd add to this, you know, the word "commoditized" is always tricky, because it has other implications that—I would say this, there are—again, the data is going to be important. So, I think there are going to be categories where the clinical differentiation just is not clear. I think, where sophisticated systems are looking at that, or government payors around the world, then you'll see the dynamic around competition a little bit different, versus where they're going to say, "Look, this really is clinically different than that and it has value to the patient," and the decision-making will be done strictly by clinicians, versus something where the clinicians have collectively said, "There's not a lot of difference," and then it's possible the decision-making may move to a different manner and maybe in a different place than it has been. So, we have to just stay close to that.

Don Casey: You almost need to look at it as a continuum in terms of—and we look at it as almost a tipping point as to— and the evolution toward that tipping point. In the beginning, there was complete physician preference, and there's still going to be categories where it's going to be all about 100% physician preference. Over time, you know—and orthopedics is a very good example where they talk about it. You've seen kind of a merger, where the physician is given a part of the decision and the material manager is showing up and saying, "Hey, do we need this many trauma people, this many spine people, this many orthopedic people?" and then you see some stuff where—like, traditionally, where we are, you know, where a shoe cover is not necessarily going to be a physician preference item, so that's what falls into distribution, where the material managers can make 100% of the decision. You could almost draw a heat map in terms of where those categories are in their mind. There are some categories, I think, particularly about really new innovation that are going to be almost completely physician preference driven.

George Barrett: I think if you drew a chart of …

Audience Member: You won't compete in any of those?

George Barrett: No.

Audience Member:Even internationally, with the footprint you have with Cordis?

Don Casey: I think what you're seeing, Steve, internationally is that the Cordis footprint we have will allow somebody who has developed a new technology to take advantage of our commercial engine, but it's not something—we're not going go invest in the R&D to go do that.

Audience Member: A tuck-in?

Don Casey: Yes, but …

George Barrett: That's actually a really important distinction.  We may be the commercializing and sell in these areas where physicians are very active.  The likelihood that we're going to be doing heavy R on that is very low.  That's not really going to be our model.  But, one way to think about this, if you drew it out, is that the line is going to change over time, and that's actually what happened in the drug world, and that's even with an AB rating system.  There was still for many years, and some of you know this, resistance, right, and then over time it just became understood.  Now, it's trickier because there's not an AB rating system.  It means that it'll happen more gradually than the way it did in generic drugs, where it just popped.

Audience Member: You guys have a really meaningful commercial distribution presence in cardiology by virtue of the Cordis transaction.  Should we think of that as, "Okay, we're going to take three years or five years, we're going to move through the TSAs, we're going to get this where we want it, and then we'll think about …"  pick another therapeutic category.  I'm not going to pick one, but we talked about orthopedics here a minute ago.  Or should we think about you as actively thinking, "Geez, there may be another platform play and another disease state that would be a good use of capital, to put that to work."?



Don Casey:  I think, Steve, we believe in a broad position preference strategy.  We've made the progress in interventional cardiology.  I think, if you want to look at that over the next three to five—again, I'm just echoing what George says.  We're not going to spend a ton on R&D, but we're active.  We just did Tryton, as an example, which is a bifurcated stent.  That's a great example for us, which is a little bit more sophisticated than what we do.  It actually gives us a reason to go in and talk to the doctor, it was something new, but then present the entire value.  So, I think that the Biosensors, as an ex-US platform, is another good example of that, and we will continue to look to refresh and expand that bag, but we think there are other categories.  Again, there's a number of physician-preference items that we think we could bring our product, analytics and service to.  We're going to do that based on bandwidth, based on opportunity, and based on opportunities to do with partners.

Mike Kaufmann: The other thing I would just say to add to that is, if part of your question is have we absorbed Cordis enough that we could do something else, and that the timing is—the answer to that is yes.  I think Don and his team have done an excellent job across the corporate entity, and everybody working together, to get that where we wanted it to be.  So, we have both the balance sheet firepower and the internal capabilities, that if the right asset came along that was the right culture, right fit, right price, we could do it.  So, we're constantly looking for those types of things to expand our capabilities.

George Barrett: Yes, and it's a great add, which is that we look at them as broadly parallel, as activities, but six months ago, we would not have tried to do it.  We really needed to execute on Cordis.  It's a heavy lift.  There's a lot of global things that we needed to do.  So, we're always conscious of that, as well as both the strategy element, Steve, and we need to execute on this, and to do something where you can't execute, it's just not going to be where we are.  We'll try to make sure we're disciplined about it.

Sally Curley: About half-a-dozen from the web, if I can jump in here.  One, Don, very specifically, how big of a headwind is the medical device tax and what might be the benefit if it is repealed?  Just as a reminder, we've had a one-year free tax year.

Mike Kaufmann: Well, the medical device tax repeal is really already baked into all of the numbers and guidance we've given for the year, so at this point in time our expectation is that it's probably—I mean, at least the way we're



looking at it is it's probably permanently repealed. Now, that may change and then that would adjust our thought processes going forward, but at this time that is kind of already in our numbers.

Sally Curley: Yes, and the last—this is from the web—the last historical, you know, commentary that we made, when it actually was in place, it was somewhere between 5 million and 15 million a year pretty small. Now, that was a different footprint a couple of years ago.

Mike Kaufmann: Yes, correct.

Sally Curley: The question is probably more suited for Mike and for George, although, any of you please chime in. Corporate tax reforms, impact on us? Thoughts?

George Barrett: Well, just as a starting point, you guys know what our corporate tax rate is, right? We've been in the 36 range. So, certainly, we would look to see a reduced corporate tax, and we'd probably love to see our territorial tax, if we could have our way. Mike, what do you want to add to it?

Mike Kaufmann: I'd say the only thing I would say, again, it's way too early to tell because there's a lot of different proposals out there, but the vast majority of those proposals, you know, have corporate tax rates between 15% and 25%. Obviously, as currently a 36%, roughly, payer, that's going to be a net gain to us, compared to maybe some of our competitors who are already maybe a little bit lower for different reasons in their mix. The only offset, I would say, that could be that is out there is the importation taxes. Because, we do manufacture our gloves, our drapes and gowns, and some of our kits outside of the country, in Mexico, Thailand, Dominican Republic, etc., there could be some offset, depending on that portion of the tax regulations that if that were to go into place could offset some of the gains there. The other piece that somewhat people talk about a little bit as LIFO. Again, I think there's a lot of people that would be affected, particularly small businesses that would be highly impacted by LIFO, but if they did, it doesn't really affect our rate, it's just a catch-up from a cash flow standpoint, which is something, again, that we can handle. So, again, I'd say net, probably net net, probably a win for us, but a little too early to tell.

George Barrett: I just should add, the import thing is getting an enormous pushback.



Mike Kaufmann: Yes.

Audience Member: Does it change how you think about capital planning long term?  If we had—let's just say we had a 15% corporate income tax codified in law in two years, do you think about, not to turn this into a Carrier discussion, but is there a change in how you do that type of planning?

Mike Kaufmann: I think it would be unrealistic to say there wouldn't be, right?   I mean, with that type of a tax rate differential, you would look at some of your tax planning and capital deployment ideas a little bit differently, but with that would be exactly and how we would look at it and what it would mean, it's just so hard to tell right now, but I think you would have to take it into account.

George Barrett: Yes, and then I'd say, generally speaking, we've been—our deployment, our manufacturing strategy, has really been driven on strategic value, you know, literally how we best position and compete.  We'll watch all these tax proposals to see whether or not any of them suggest that we should be doing anything differently.  Certainly, as it relates to capital deployment, if suddenly we get this significant change, we would want to look at it.  But, you know, we've tried to make sure that we keep our eye on the ball here, which is how do we most effectively create value for shareholders.  So, it's driven really all over it.

Sally Curley: Here's another one for you.  Mike, you might want to chime in.  So, what percentage of your overall revenues is self-manufacturing products versus sourcing; and then how does commodities impact that?

Mike Kaufmann: Commodity costs.

Sally Curley:Commodity costs, yes, exactly.

Don Casey:Yes, yes.  Commodities have actually been kind of quiet for the last, you know, 18 months, 24 months, we haven't seen big movements commodity-wise.  Then, on the self-manufactured percentage side, we typically don't talk about that, and it also flexes a heck of a lot, because one of the things—and, Steve, it almost goes to your question—is we're always making a decision about whether you source or manufacture, and that will literally move depending on where we see the efficiencies in the system.  So, we tend to look at that as not a target that we have mind that we want to be this much self-manufacturing.  It's more we're trying to look at our aggregate cost of product to make available to a customer, and we'll make a buy decision based on that.



George Barrett: It is nice to have the capability to make in a lot of categories, and particularly when we can bolt things on, but it gives us the optionality. There are times where it's more efficient for us to actually source.

Sally Curley: A couple of questions now more for Jon, in general, so back to Pharma a little bit. One is IMS data indicates that total script, total adjusted script growth was 1.9%. In your view, what do you expect from overall script growth in 2017?

Jon Giacomin: I think that's an interesting question. It strikes me as there's a lot of moving pieces and parts now, given the fact that you're staring at ACA, repeal, replace, what's the impact? I think that's unclear at the moment, so I'm not sure what that ultimately means. The other aspect of it though is the demographics and the continued people getting older, 10,000 a day turning age 65, and presumably they're consuming more healthcare, more prescriptions, and they're living longer, so it's hard to say. I guess, you know, all things being equal, maybe it stays about the same, but I think the ACA and the repeal and replace, and what pieces and parts of that go away, I think are going to be interesting to see the overall dynamic.

George Barrett: Yes, I mean, for us—I'd like to comment on a couple things, on the ACA volume and then I'm going to comment more on the prescription. We said, and we have said consistently, that we were not really able—we were never able to discern an increase in volume to us from the ACA, which actually makes a lot of sense, because many of the at-risk patients that had no coverage were coming through the system through the ER, and they were touching us in some point. So, the absence of that, also, for us, we couldn't even measure it, and I'm not sure it's discernible or meaningful, and I don't think those people are coming off the system in the short term, and we know that.

I think the question about scripts is really interesting and I would just offer the following. It is, logically, sort of improbable that we're not going to see—and we're not seeing—increased demand. Our population is aging in an unprecedented way. We know for certain that that aging population consumes more healthcare and needs more healthcare. So, it's been interesting to watch the prescription data and the utilization, really choppy. Prescription is a little smoother, but that's partly because—I think IMS has been doing this for such a long time, actually, as a platform for doing this. Medical data has been unbelievably hard to get and it's been unbelievably choppy. My observation again, this is not based absolutely on perfect data, is that all the increment benefit design is distorting

those data, but you cannot—if you look over, let's say a five-year period, it is almost incomprehensible that we're not going to see increased demand, and you can call that your knees, hips, prescriptions, products for cardiovascular disease, diabetes, etc., etc. That is just pure demographics at work.

So, I think what we've been seeing, and it's probably been true for, I'm going to say, a couple of years, it's just choppiness as the system experiments with benefit design and consumers start to behave differently. So, it will depend on what happens to benefit design. For example, if part of the replace bill—this is complete speculation— had something that limited out-of-pocket expense you'd suddenly see this differently, right? You'd see the more normalized pattern. So, I think we just have to be aware that there are some policy issues—and that's not just from the government, it's from commercial payors—that are probably have been distorting or causing some choppiness.

Audience Member: Maybe a corollary question off of the potential for an ACA repeal. If there's a slow bleed in those lives, or 11 million or so non-Medicaid lives, and your hospital customers as a result see a meaningful uptick in uncompensated care, do you have something baked into your numbers to reflect that, maybe, on the med-surg side in particular?

George Barrett: We don't, we don't. I would have a hard time believing, given the mix of our business, that this would be material, and we wouldn't even know—honestly, we just wouldn't even know how to model it. So, I think the assumption is there's nothing built into it. That would be probably one of the things that you'd watch for, which is our hospitals feeling suddenly an increase in uncompensated care.

I think, just for clarity, as I'm spending time on the Hill the last few weeks, there is a very clear message from a lot of stakeholders saying, "Okay, repeal it is what you need to do, but recognize that if you don't acknowledge the following five things, you're going to have some distortions that are hurtful," and I think that that is understood.

Don Casey: Just to build on that point, Steve, if you actually go back pre-ACA—we got the ACA and there was supposed to be a surge in med-surg demand, if you will, associated with that because also some hospitals are …

Audience Member: But the hospital balance sheets were, arguably, much healthier under that scenario than they may be going forward. Is that a fair statement?



Don Casey: It is a fair statement, but it hasn't necessarily affected the amount of demand. So, what their financial statement looks like is different, but the actual amount of care they're delivering is not. So, are you seeing slight, in some cases, hospitals look a little healthier because they're being compensated for that? Absolutely. But, the absolute amount of demand is going to be reflected on population than it is on anything.

George Barrett: That word that you just expressed is being communicated.

Audience Member: What about generic deflation? What are you seeing now in terms of that trend since the last time we've spoken?

George Barrett: So, again, we can't give an update from our last quarter, but again, I think we gave some numbers at that point which …

Sally Curley: We gave our guidance.

Mike Kaufmann: Well, we talked about—remember at the beginning of the year, we talked about the total bucket of generic deflation being in the mid-single-digits, net deflation. Remember that that bucket includes several things. It includes the actual inflation and deflation you get from the manufacturer, the actual price increases and decreases you get from the manufacturer. It also includes our selling price inflation and deflation to our customers, and so that is all netted into that net, that number. So, back at the Q1 earnings, we said that that number was mid-single-digits down, was our projection, and we changed it to be mid-single to high-single down, which is really the difference between the two, not because of the manufacturer portion of the up and down increases—that, we seem to have predicted so far pretty well. It's been more this competitive sell price issue that we talked about very early in the conversation and have spent a lot of time on, that's really what drove it from mid-singles to mid to high.

Sally Curley: I have two questions from the web. One, I don't think we're going to be able to answer, but I'm going to ask it anyway just to get it out there. Can you estimate what percentage of generic c-cell CDS? We've seen street estimates of 10% to 15%. Is that the right ballpark? We can't really …



Mike Kaufmann: We can't speak—yes, disclose that specific.

Sally Curley: Customer contracts, so … Here's a broader level, or higher level, broader question. Can you discuss the evolution of value-based care from a private market approach, such as new programs like UNH's expanded joint bundling program, and how Cardinal Health thinks about attacking some of these free market based opportunities?

George Barrett: Don, do you want to start?

Don Casey: Yes, I'll go first. You know, it's interesting. With all the conversation about the ACA—and CJR is the best example of where there was a government sponsored bundle. We had seen in the commercial market a move toward bundling in a lot of cases where you would see people appeal to a large employer and saying, "We're going to look at these three or four areas, and disease state management," or something, but there were bundles around that. We had seen that. I mean, again, I've been doing this for a long time and we started seeing that 10 years ago. Actually, unfortunately, if any of you guys are old enough to remember the original managed care organizations, like US Healthcare, I mean, they were actually doing bundles all the way back then, back in the HMO days. But specifically, how we've looked at this across the board, whether it was a government or whether it was a private payor, is almost the same, which is, "Look, if you assume there's going to be a bundle and there's going to be a product component, a labor component and a post-acute discharge component to it, we believe that we want to assemble the assets, whether it's a product or service, so that we can offer best-in-class pieces, that we could be really relevant in the bundle," and that's what we've been doing for the last five years.

Again, the conversations we're having increasingly with commercial payors, a lot of whom we know because of our Cardinal Health at Home business, among other things, we're very relevant to them in those conversations. I would say, Sally,that we've seen a lot more of those in the last two or three and we expect that to continue.

George Barrett: I'd a little—just a little historical context to this. BMMI, a lot of what they're doing in their early days was taking what they were seeing and experimentation in the commercial market, and looking at that and trying to weave sort of a best-in-class best practices around what they had already seen started to emerge in the commercial market. So, I think Don's exactly right, which is we've seen this along both dimensions of the payor

world, on the commercial side and on the government side. Again, whether or not the policy implications push it a little differently, or don't push it, we're still directionally, I think, moving there.

Sally Curley: We're going to take the last question, just to keep us on time here, the last question from the web. Again, if you have any questions that we haven't gotten to, please feel free to reach out to the IR team and we'd be happy to help you out. So, that question is—CMS cancelled the Part B demo this morning. What are the implications for Cardinal Health? Then, George, when you're done, I'd love for Jon to just maybe touch on specialty and nuclear for a little bit, and then, Mike, I don't know if you want to make any comments about capital deployment, and then we'll wrap it up.

George Barrett: Yes, let me touch base on—touch the Part B demo and then I'll turn it to Jon. So, again, this is one of those—you know, CMMI has done some really interesting work, and I'd be very honest, I actually think there's an important place for that kind of experimentation in the system. Part B demo, as you know, got a lot of pushback in the oncology world in particular, so I think this is sort of the right call. The one thing I would say, to their credit, is that there have been incidences where there has been experimentation and some pushback and they've listened. So, I think that for many of our customers in the oncology world is good news.

Directly, for us, it's probably—again, I don't think it's a material issue, but I think sort of broadly speaking, and I don't mind saying it, I think CMMI has done some interesting pilot work and I think this probably is the right call, based on industry response, and I think it's good and healthy that they responded to the industry that said this had some by-products that are not good. So, I'm a believer that there's some reasons, not just Part B, but, you know, just using a part of CMMI to experiment a little bit.

Audience Member: What about bringing drugs into episodes of care? My understanding is that most—when they're talking about bundling, drugs are separate, right, so there's no—and people argue that you can't really do value-based pricing on drugs by itself, but if you put the drugs into the episode of care …

George Barrett: I wouldn't be—so here's the thing. It is probably harder, but it depends on the disease area or the episode of care. So, for example, if it's an elderly patient experiencing some of the early signs of Alzheimer's, you have so many comorbidities, it's just extremely hard to define outcomes. In other cases, there may be—you

know, if it's connected into a hip procedure. So, there may be places where this is more easily done, but we're not going to be able to say there's an across-the-board way to do this. I think it's going to depend on the episode of care and whether or not you can isolate the outcome in combination with the whole procedure, but I think we'll see experimentation here in pricing models.

Don Casey: I think that's right. You almost want to distinguish whether it's an acute condition versus a chronic disease management, which is what George was saying, just to chop it. The 90-day care around a hip or knee is pretty measurable and you could look at that, versus the comorbidities George is describing. For somebody who may need a hip or knee, it would require a lot of pharmaceutical treatment over a longer period of time.

George Barrett: Or some of the complex behavioral issues, really, really hard.

Audience Member:Even in a chronic management program down the road, you don't think there's a way you could - like diabetes care or …

George Barrett: I wouldn't reject it out of hand. I'm just saying it's just—I think the early work will be in areas that are more easily walled, where you can say, "I can get a boundary around this."

Audience Member: Yes.

George Barrett: I think we'll see experimentation everywhere, but it's just going to be much harder in places that are big chronic care diseases with likely comorbidity.

Jon Giacomin: I'll mention a couple specialties. So, just to pick up a little bit on what I said in the sort of opening comments, our specialty business has seen some nice growth. In fact, I think we communicated earlier this year that we expect to see double-digit revenue and earnings growth out of that business. I think we're on track relative to that. We have absolutely expanded into some of the ologies, oncology and then the other ones that I mentioned, so it's our list of ologies, and I think that's gone off exceedingly well, as has the RainTree acquisition that we did earlier in the year. That's added, actually, some nice scale in oncology for us, both on the contracting side, as well as additional services, and we're really pleased with that acquisition, how it's performed and how it's integrated,. So, feeling really good on the provider side and feeling like we've got a lot of momentum, and as I said, there's probably not a week that goes by where we don't have customers visiting our Fuse Innovation

Center and talking to us about different ideas relative to existing technologies we have and enhancements we might do, as well as even thinking about new things that we might even bring to market that would have more applicability across an entire ology. So, we're really excited about the progress in the provider space and think good things are coming there.

Audience Member: What ologies aren't you in?

Jon Giacomin: There's more ologies we're probably not in. We're in oncology, urology, nephrology, rheumatology. I would say those are the main...

Audience Member: What enables you to be in an ology and not be in an ology? Is it just the definition of the ology, or is there actually new things that you need to bring on board to …

Mike Kaufmann: Servicing those kinds of doctors. Each one of those has some unique needs, and so we provide services to them and sales reps that have the relationships to …

Audience Member: Direct interface with them.

Jon Giacomin: It's really just finding the right doctors and finding the right reps who can visit the doctors and be able to service them the right way.

Audience Member: That's right.

Jon Giacomin: What's interesting is, when we acquired Metro Medical, they brought, actually, a lot of that with them, and so they had established relationships. As Mike pointed out, the sales team was calling on them. They had some pretty good scale within those particular practices. They knew the needs of those practices, and they had solutions, suites and services around that, that we honestly looked to scale up even as they've come over. So we've taken advantage of the presence that they've had there, and even grown it since.

George Barrett: And you also need some clinical chops.

Jon Giacomin: So, again, this isn't like pure supply chain management. If you're going to interface with a rheumatology office or an oncologist, you have to speak the language. It's not as simple as saying, "We can move a cold chain

product that requires special handling from here to there," and suddenly we're in the business. It's not really the way it works. You have to be fluent. There's different work flows and different practices, and they look for practice analytics to be slightly tweaked for the different aspects and uniqueness of their practices.

As I said earlier, on the biopharma side, I think the thing we can talk about is certainly our hub services, we've seen continued interest on that, and, honestly, some continued growth. We feel good about what we've done there. We're sort of offering a standard type of offering and then some services à la carte, and even will customize, obviously, if you're willing to pay for the value that customization brings. So, that business has continued to grow. As you probably know, it's down in Dallas and is doing really a nice job. So, manufacturer interest, I would say couldn't be higher right now.

Audience Member: Hub services – is that based on clear…

Jon Giacomin: Patient programs 24/7 lines of...That's with Sonexus. Yes, Sonexus acquisition.

Audience Member: So, are you finding that more manufacturers are saying, "Hey, let's just go through you guys for the hub services versus building our own hub."?

Jon Giacomin: Yes, I think so, that's exactly right, and so …

Audience Member: Because that seems like that kind of vulcanization actually slows down access, right, or it slows down that first build for patients …

Jon Giacomin: You mean if it's all done separately?

Audience Member: Yes, like, if a doctor has to go to different hubs, because he's got three drugs for a patient …

George Barrett: Again, I think doing things at scale, generally speaking, matters.

Jon Giacomin: Our 3PL business, just to offer one more highlight, probably had one of the best years it's ever had in the last few years. We've actually moved into a new facility down there. We've added—it's quite a large facility, and added quite a number of customers over the last year. On the bio, we see some great momentum on the provider side and we're seeing some very good momentum on the manufacturer side, as well.



Mike Kaufmann: I'll wrap up my piece before turning it over to George to close us. You know, we've talked a lot individually about M&P, which we should, but I also think that there's also a lot of corporate departments that service both M&P, and so we leverage scale where we can in areas like IT and customer service and finance and legal and QRA, and so a big piece of Cardinal is taking these corporate departments and then managing and servicing the businesses, but also a part is—you look to our second half and you think about the various initiatives. You've heard what's going on in the segments. There's also a lot of focus from the corporate to teams to be able to pay attention to our expenses, make sure we're managing all of our expenses right, and providing that, and you've heard us talk a little bit about that, that we're going to be very focused to make sure we're spending the right things in order to deliver upon the financial commitments there. So, I just want to mention that quickly.

I think, also, as you think about Cardinal and you think about the moving parts—before, it was kind of this negative piece about Medical and all this great flavor, feelings around P, and now P is having a little bit of a struggle and now we've got M going in the right direction, with a lot of really good activity there. What I like is the breadth of our business. I think what really truly differentiates us from our competitors in this space is we're not wholly dependent on one individual piece of the business. In fact, when you take our significant cash flow and you then have the ability to leverage it across not only M&P, but within M&P, several different very large-scale businesses, to either acquire or invest in organic types of growth opportunities, I think that's what differentiates us to be able to continue to grow going forward.

Specifically, as it relates to the cash flow and our capital deployment, nothing's really changed there. We're going to continue to focus first on capital expenditures; as we mentioned in our Q1 earnings release, you know, the $400 million to $450 million range this year. We also are committed to our differentiated dividend, to stay in the 30% to 35% payout area for our dividend. As far as then the remaining cash, we're going to split it between M&A and stock repo. I'd love to do M&A, but it's got to be—you know, we've got to be very, very focused and on top of making sure it's, first of all, a strategic fit, cultural fit, and then at the right price, and so when we find businesses that meet all three of those, we would be more than happy to deploy capital against those opportunities. You're going to see us take smaller bets in areas like NaviHealth that might be one degree from some of the cores, and then bigger bets in businesses like Cordis that are more in the core, and our products and services businesses.

But, I will commit to you, we're not going to hoard cash, either. So, we're not going to let large amounts of cash build up on our balance sheet, particularly when we think our stock is undervalued, although we always think our stock is undervalued, that we're going to take opportunities to do targeted stock buybacks, but we're always going to try to balance doing those with keeping some powder dry to take advantage of opportunities. I'll turn it over to George to wrap things up.

George Barrett: Well, look, I don't want to keep you guys. I know many of you have flights and you're getting ready for the holiday season. So, first, thank you for being here. For those calling in, thank you for calling in. We do wish everybody a chance to have a good holiday season, restful and recharged for what's going to be an interesting year. I'll just finish by saying a couple of things.

I think of this sort of in four components. In terms of positioning, we've been really focused on where we think healthcare is going here in the U.S. and globally and how we position to be a solution provider at scale, and we continue to focus there.

Second is discipline. Mike talked to you about discipline in terms of capital deployment. If you watch our operations internally and you try to figure out how a company this big can grow this much and manage their inventory that well, that's just pure discipline. It's expertise, it's knowledge, and it's folks that really have their eye on the ball and they don't get distracted.

Third is balance. I'd love for all of our lines of business to be cruising at every moment. It's just not the nature of life. It's nice to have some balance in the portfolio, increasingly.

Probably, finally, is the ability to bring integrated solutions. We have to organize in some way and we have to report in some way, but the reality is we are operating as an integrated company and when we go to our customers that's the way they are increasingly seeing us, and that's valuable. That's the place we want to be.

So, an exciting time, we're going to—like everybody else, there are bumps and bruises, but we've got a really good team. We're very optimistic about where we are and where we're positioned, and we look forward to the New Year. For us, it's the second half of the year fiscally but look forward with excitement to what's happening in

**Cardinal**Health

*Essential to care™*

front of us.  I think you should expect Cardinal will be a player.  We'll always have a seat at the table in terms of where care is going because that's a big part of our mission.

So, we appreciate you taking the time to join us and wish everybody a happy holiday.  Thanks.

Sally Curley: Thanks, everyone.  That concludes the webcast and we wish you all a happy holiday.

# EXHIBIT 62

# Welcome

Cardinal Health, Inc. Dublin Day
December 16, 2016



© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Healthcare is changing…
# We're changing healthcare.

**<u>Speakers</u>**

George Barrett
Chairman and CEO

Mike Kaufmann
Chief Financial Officer

Don Casey
CEO, Medical Segment

Jon Giacomin
CEO, Pharmaceutical Segment

Steve Lawrence
SVP, Retail Independent Sales

Sally Curley
SVP, Investor Relations



© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and brand pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the ability to successfully integrate and realize the benefits from the acquisition of Cordis; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including federal health care reform legislation; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of December 16, 2016. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Agenda

| Time | Topics | Speakers |
|---|---|---|
| 10:00 AM – 10:15 AM | Welcome & agenda overview | *Sally Curley* |
| | Introductory comments | *George Barrett* |
| 10:15 AM – 11:00 AM | Introduction of Steve | *Jon Giacomin* |
| | Retail independent offerings | *Steve Lawrence* |
| 11:00 AM – 11:30 AM | Pharmaceutical segment Q&A | *Jon Giacomin* |
| **11:30 AM – 11:45 AM** | *Break for lunch (note that we will pause the webcast)* | |
| 11:45 AM – 12:30 PM | Medical segment Q&A | *Don Casey* |
| 12:30 PM – 1:00 PM | Final Q&A | *All* |
| **1:00 PM** | *Adjourn* | |

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Retail Business Conference





**8,804**
total attendance







The industry's **largest trade show** for independent pharmacies



**22k** sq. ft. Cardinal Health solutions showcase

**216k** sq. ft. show floor

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care™*

# Retail Advantage

Our solutions help customers implement retail best practices, from planograms and point-of-purchase materials to monthly ad programs.



© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Business Advantage

We support our customers with trusted expertise and proactive solutions designed to help protect the pharmacies core business – the prescription.



**Patient access and business expansion**



**Pharmacy ownership and transitions**



**Inventory management and back office support**

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Wellness Advantage

Helping independents make their store a preferred destination for healthcare and wellness in their community



7   © Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# Agenda

| Time | Topics | Speakers |
|---|---|---|
| 10:00 AM – 10:15 AM | Welcome & agenda overview | *Sally Curley* |
| | Introductory comments | *George Barrett* |
| 10:15 AM – 11:00 AM | Introduction of Steve | *Jon Giacomin* |
| | Retail independent offerings | *Steve Lawrence* |
| 11:00 AM – 11:30 AM | Pharmaceutical segment Q&A | *Jon Giacomin* |
| **11:30 AM – 11:45 AM** | *Break for lunch (note that we will pause the webcast)* | |
| 11:45 AM – 12:30 PM | Medical segment Q&A | *Don Casey* |
| 12:30 PM – 1:00 PM | Final Q&A | *All* |
| **1:00 PM** | *Adjourn* | |

© Copyright 2016, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# EXHIBIT 63

**Cardinal Health Inc at JPMorgan Healthcare Conference- Q&A**

San Francisco Jan 10, 2017 (Thomson StreetEvents) -- Edited Transcript of Cardinal Health Inc presentation Tuesday, January 10, 2017 at 12:00:00am GMT

CORPORATE PARTICIPANTS
   Sally Curley, Cardinal Health, Inc. - SVP of IR
   George Barrett, Cardinal Health, Inc. - Chairman and CEO
   Mike Kaufmann, Cardinal Health, Inc. - CFO
CONFERENCE CALL PARTICIPANTS
   Lisa Gill, JP Morgan - Analyst

## QUESTIONS AND ANSWERS

**Answer – Sally Curley:** Okay, thanks. And welcome everyone. This is Sally Curley. I'm the head of investor relations for Cardinal Health, and we are starting our breakout session webcast for the JP Morgan Healthcare conference. Thank you again, Lisa, for hosting us. So I'm going to quickly turn it over to Mike and George. Mike Kaufmann, our CFO, and George Barret, our Chairman and CEO, for any questions from the audience.

---

**Analyst:** Unidentified Audience Member

**Question – Unidentified Audience Member:** (inaudible - off mic)

**Answer – George Barrett:** Yes, you know, it's a great question. So the question is around tax reform and the potential impact on Cardinal. And I guess personally I would start with is we're a high tax payer. So, you know, we are likely to be somewhere in between 35% and 37% tax, so at least we're starting, if you want to look at it one way, from a high point. So if there's tax reform, there's at least probably a potential to have a lot of good guys on at least the pure rate part of it.

The part that's so hard to understand is the piece you mentioned on importation. And so, as you know, we manufacture a lot of our products overseas. Almost huge amounts of the drugs that we buy are manufactured overseas, as well as other medical products. And so the impact of what that reimportation tax could be is a really complicated piece. And then there's also LIFO, which is an unknown out there.

So when you think around all the moving parts, it's hard to know exactly where we'll be, but at least I will tell you, unlike a lot of other companies, we are starting from a high point, so to me there's at least a lot of potential good that could happen for us. If you're talking about a difference between a 36% and a 20% or 25% tax rate right off the top, even though you might have some negatives in the other part, it's hard to say exactly where it will --

**Answer – Mike Kaufmann:** I'll just add to this. There's a lot of discussion going on behind the scenes about -- what you don't want to do is, they're called poor adjustments that can have a perverse impact. We're trying to reduce the cost of healthcare to the American people and then suddenly you're going to do something that would create a -- exactly, increase the cost. So there are a lot of stakeholders not at this table who will have a strong point of view on that. And I think for good reason. You know, I think we want to make sure that we're not doing something that has a perverse outcome.

**Answer – George Barrett:** Sure. Great question. Thank you.

**Question – Unidentified Audience Member:** Could you actually comment on your China strategy as China is one of the, you know, large pharmaceutical market in the world.

**Answer – George Barrett:** Sure. For anybody who didn't hear the question, it was about our China strategy. So let me, I'll start, and then, Mike, you just pile on (inaudible) anybody. So, we operate sort of on two dimensions in China. One is our distribution and our services business, and we acquired our way into China about six years ago, six at this point, through a company called Yong Yu, which has given us a really nice position. And from that we've grown pretty dramatically in China geographically, and actually vertically because, as you may know, in China there are multiple hand offs to get from the manufacturer into the consumers' hands.

So we've continued to grow, both organically and through acquisition in China. It is a relatively high rate growth still in relation to the rest of our business. We are probably still a little disproportionately along the coast, which is where the population is, but we're moving a little bit more inland. And we've grown that business in a lot of different ways.

The other dimension is really in our medical device side, and we've been both producing and selling medical devices there for a lot of years. And with Cordis, we've increased our position in the Chinese market in the cardiovascular

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

medicine. So we're both a distributor and a service provider in China, and we're a provider of products that go through multiple channels into the Chinese healthcare market.

**Answer – Mike Kaufmann:** Yes, just to give you a quick sense of scale. We would be somewhere in the top 10 in terms of size of distributors. And it's been growing both the top and bottom line in the double digits.

**Answer – George Barrett:** And revenues most recently, we reported a what --

**Answer – Mike Kaufmann:** Yes, over $3 billion in fiscal 2016 in revenues.

**Question – Unidentified Audience Member:** Thanks a lot.

**Answer – George Barrett:** Good question. Yes, sir?

**Question – Unidentified Audience Member:** (inaudible - off mic).

**Answer – George Barrett:** Yes. The question was about independent pharmacies and DIR fees. And I think primarily the -- and I may not have fully answered you I realize now on the specialty pharmacy. That has been a sort of bigger issue among specialty pharmacies, and so I'm going to touch back on Lisa's question and get there. Our specialty pharmacy work that we do is primarily on the behalf of the manufacturer. So we are really working on very, very specialized, often ultra-orphan drugs.

For our pharmacies, you know our independent pharmacies in the US, primarily the things that they are conscious of is reimbursement rates, and making sure that they are in the best possible position to be a network. And, what are the services that companies like Cardinal can provide for them that allow them to be freed up from the administrative tasks of receiving and ordering and purchasing and doing planograms. And their source of competitive advantage in their view is their ability to do personal care and to identify something in their community, some unique part of the community that they can serve better than someone else.

And so in a sense our job is to provide those tools and services to them. And I would say when we win business in the independent pharmacy, it's primarily because they see some kind of service component that we provide to them that allows them to compete effectively in the marketplace. So I would say that's, if I had to say what are the driving things that they think about, is primarily reimbursement rate and its inclusion in networks. Thanks for the question.

**Question – Unidentified Audience Member:** (inaudible - off mic)

**Answer – George Barrett:** Again, maybe I'll start but, Mike --

**Answer – Mike Kaufmann:** Sure, go ahead.

**Answer – George Barrett:** You guys know that Mike ran our pharmaceutical segment for a number of years before taking over the CFO spot, so Mike will probably have a lot more detail, but. I think there has been in general, as we've been through the last few years, multiple programs of inclusion in networks. So you have the tiers of kind of networks designed from the payers.

And I think part of our work is to make sure that as a company that we can provide the ability to aggregate their scale to make sure that they're participating in these networks. And I think we've done pretty well in doing that. Mike, what else would you like --

**Answer – Mike Kaufmann:** Yes, I think if you about this area, whether it's DIR fees or anything else, the payers for the reimbursement are looking for services that differentiate the independent pharmacies. They want to pay for value, and so it's our job to help them perform at the highest levels. And so we help pharmacies understand, is their generic dispensing rate high enough? Are they doing enough medication therapy management type of interactions with their customers? All those things that the third party payers want to make sure they're putting together the best, highest performing network, we know what those are because we work with all these payers, so we understand what they're going to value. And then we try to understand how they're measuring those, and then we put together programs to help our customers make sure that they can compete at the highest level and perform at the highest level so that they're going to want to be included in the networks.

And then also, as far as the valuation of networks go, we can also negotiate on the behalf of our customers with these third party payers, which actually makes it convenient with both sides. If you're a third part payer, you don't want to negotiate with thousands of pharmacies, so negotiating with one is convenient. And on the vice versa, you don't want as one independent to try to deal with the contracting and all the issues that go along with that. So we work together to play that role in the middle, but our customers ultimately decide whether they want to participate. We have a board of directors of our customers that decide, do they want to be in these various networks, and we try to help them understand what the value will be in it, and then also how to perform at the highest possible levels once they decide to enter into the network.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Answer – George Barrett:** By the way, my apologies I didn't repeat the question. The question was really about networks and whether or not we've seen changes in the narrowing of networks or inclusive, non-inclusive networks. So my apologies.

**Question – Unidentified Audience Member:** (inaudible - off mic)

**Answer – George Barrett:** Interesting question. So the question is about independent pharmacies and whether or not growth rate has slowed or been stagnant. And the second question is sort of a demographic question in a way, whether or not there's sort of many pharmacies getting to the point of independent pharmacists [that are retiring].

I would say there's, over the years, and it's been a trend for quite some time, a fairly steady, slow erosion of the number of independent pharmacies. Having said that, what's actually quite striking is if you had asked many of you 10 years ago how many independent pharmacies we'd have, you probably would have been way off. There is still more than 20,000 independent pharmacies in the US. And I think it's because they play a unique role, and it's also because a company like ours, and some of our competitors, provide enormous services to them to enable them to compete effectively. Mike, do you want to touch on the rest of it?

**Answer – Mike Kaufmann:** Yes. I think some of the other -- you know, they all learned -- if you think about them, they're entrepreneurs. So they're not just a pharmacy, they have the ability to do things very unique. They can serve as a go to place for folks that have cancer, you know, and provide wigs or prosthetics or things like that. They can provide the large home healthcare market. A lot of times delivery, if you're in a local town and you need a bed, or you need a certain types of DME equipment, you're going to go to some local independent who just capitalizes on that market and is very good at doing that. So I think they're very good at understanding the niches within the area of where they can play and drive value. And I think that's why they've been able to stay in business as long as they have done.

As far as the retiring of folks, I think that's a really big interesting thing to think about. And one of the things that we recognized several years ago about that is not only the age, but if you look at who's graduating from pharmacy school today, over 60% are female. And so that's really important where a few of the owners -- a small percentage of owners are female, but the people graduating from pharmacy school are female. And so we've been working over the last several years with our women in pharmacy program to help women to send them to boot camp, to help work with them, to connect them with women already that own their own independent pharmacies, to help them train and develop so that we can create a pipeline of future owners of retail independent pharmacies.

I think that's an important job that we have because a lot of these people want their pharmacies to continue and they need someone. We work hard to do that too.

**Answer – George Barrett:** It's been a really great program, by the way, and real exciting. And Mike and Jon Giacomin, who is also out here, runs our pharma segment, have been really involved in that leadership of that initiative, which has been really exciting. Yes, sir?

**Question – Unidentified Audience Member:** Red Oak, that's a couple of years old now. Is that still a meaningful driver of incremental year-on-year profit or has that kind of [tapped] down?

**Answer – George Barrett:** The question is, Red Oak has been a -- which is our joint venture in generic sourcing with CVS Health -- has been a source of value for us. And the question is, is it done? And the answer is, no. It's actually quite vibrant and still growing and still creating value, and we expect that to continue.

Now, having said that, if you compare FY2016 to 2015, we had a large first year, full year step up. But I would say we continue to see great value from Red Oak. It's operating really smoothly. We continue to see it as a platform where we can do more things. So we're excited about Red Oak. It's not out of gas, if that's the question. Yes, Lisa?

---

**Analyst:** Lisa Gill, JP Morgan - Analyst

**Question – Lisa Gill:** (inaudible - off mic) we talked a lot about branded price inflation in the other room but we didn't really talk about generic price deflation (inaudible - off mic) talked specifically about sort of it dropping dramatically. Can you talk about the impact (inaudible - off mic). I mean clearly you would think there is some opportunity on the Red Oak side to be able to buy much better, but when you think about the reimbursement dollars, what are you seeing in the marketplace today and how do we think about inflation versus your expectations?

**Answer – George Barrett:** So the rate of deflation that we're seeing now is roughly what we modeled, as I think you know. And we've said -- oh, I'm sorry. The question was about generic deflation, and generic pricing. And we talked about branded pricing inside and Lisa is asking now about generic pricing. So I think the pattern that we're seeing is actually more normal. You know, I look at this from a long cycle. That's another way of saying I'm old. And so I've seen this before and so in a period where there were relatively larger number of products going up in price, and so the

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

net effect was in the aggregate inflation. But we're now seeing what I would say is more typical rates of deflation, and it's the environment in which we're used to competing. Mike, anything to add to this?

**Answer – Mike Kaufmann:** Yes, I would just emphasize that I think what we used to -- when we saw net inflationary environments, it was a handful of items. It wasn't thousands and thousands of items going up, it was a relatively small handful of items that were going up. We are seeing less of those going up and less dramatic price increases. But the rest of it, the majority of the items were always deflating, and I don't think that we're seeing a lot difference than what we've historically seen in that.

**Question – Lisa Gill:** (inaudible - off mic)

**Answer – Mike Kaufmann:** Not in the majority of the population, which is historically deflated. There's always been some big items like the Concerta out there that all of a sudden you get a third, fourth, fifth competitor and you see the market erosion on those.

**Question – Lisa Gill:** (inaudible - off mic)

**Answer – Mike Kaufmann:** It can over periods of time. You know, particularly, you know when they first launch, sometimes, depending on the number of competitors, it can be more profitable when you only have a few competitors early on. And then when you have multiple, you'll make higher margin rates but potentially less margin dollars. And so it just depends over time, in the life cycle of the drug, but in any period of time, if you have a -- you could have a small subset of items. Actually you have a relatively material impact for periods of time on distributors' earnings.

**Answer – George Barrett:** I would say generally we can model them, and we get them roughly right. But occasionally we're wrong. You know, we'll expect four competitors and it's a complex drug and two come out. Or we are hearing that it's just going to be one player and then suddenly a couple of other players are fast followers. So generally speaking we've got line of sight we can model, but it can have an effect, and certainly in a short period.

**Answer – Mike Kaufmann:** Yes.

**Answer – George Barrett:** Vince, you had a question.

---

**Analyst:** Unidentified Audience Member

**Question – Unidentified Audience Member:** Two questions on generics. First, what do need to grow generic gross profit or to show leverage in the (inaudible - off mic)? If generic margin is -- is there room for generic margin expansion on the gross profit line?

**Answer – George Barrett:** Yes. So the question is really about what can you do to grow generic gross margin. And I don't mean this to be flip, but basically we're talking at the difference between our sell price and our acquisition cost. So -- and mix. And mix. So we generally expect a certain amount of deflation on the price. That just goes with the market. That's sort of typical. We have periods that are a little different, or quarters that can be suddenly a little bit more unusual, but that's something we model. And then it's just about being an incredibly efficient scaled purchaser of the products, and understanding how to manage mix for us. And I think we do those well. In general I would expect our gross margin to expand.

We can have a period of time where there's suddenly a drop in -- as we had over the last months where there was a more steep drop in sell price and the acquisition cost wasn't coming down as quickly. But in general, I think our increased scale creates sort of a flywheel for us.

**Answer – Mike Kaufmann:** Yes. I mean you always have what I will call kind of somewhat permanent tailwinds is generic launches. While they may decline year-over-year and so you may have less of a tailwind, they tend to be a tailwind. Red Oak we continue to believe has gas in it. That will continue to be a tailwind. While it's decreasing from a year-over-year benefit, it's still a benefit. We can still get after penetration within existing accounts. And so as George said, there's multiple levers that we can pull to make sure that we continue to grow those gross profit dollars.

**Answer – George Barrett:** And I think the jury is still out a little bit, Vince, on the biosimilar side. To the extent that a product doesn't have an AB rating, it typically, as you know, operates a little bit more like a branded product. But as we go forward, and there's going to be I think a lot of pressure I think inside the regulatory agencies to try to create some competition here. And so we could see some changes in that dynamic as well, and I think that would also be another expander.

**Question – Unidentified Audience Member:** (inaudible - off mic)

**Answer – George Barrett:** Yes, the question was, any big renewals that are imminent or big wins. We have nothing of particular note that's in the public domain. Typically we're only talking about larger contracts. We've got thousands

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

of contracts that are in operation all the time. We have had a couple of notable wins in the last six months, and some of which really haven't been yet up to speed and just getting there. So for example Kaiser in our medical/surgical business has been a really important win for us, and you know the first few months really were ramp up. There was more cost than value creation for us, but we're now beginning to operate at scale and excited about that. So, Mike, anything else that I left out?

**Answer – Mike Kaufmann:** No, (multiple speakers).

**Question – Unidentified Audience Member:** (inaudible - off mic)

**Answer – George Barrett:** So the question is about the Walgreens' acquisition of -- potential acquisition of Rite-Aid and the potential divestiture of stores, and that Fred's has been publically in that discussion. It's public knowledge that we are a supplier --

**Answer – Mike Kaufmann:** Yes, we supply Fred's but --

**Answer – George Barrett:** -- of Fred's, and that's probably all we can say at this point.

**Question – Unidentified Audience Member:** (inaudible - off mic)

**Question – Unidentified Audience Member:** Can you give us a little bit of an update on Cordis (inaudible - off mic).

**Answer – George Barrett:** The question is about Cordis and how it's going, and is it going sort of according to model. It's going really well. It's a big complex business, global business, as you know. So there was some startup costs, particularly in some markets where we didn't have an existing infrastructure sort of order to cash and we had to do some TSA agreements with J&J, and then are moving -- transitioning those off. So other than those going a little more slowly than we modeled, and really going more slowly because we chose to go more slowly to make sure we got them right because we didn't want to do anything that could disrupt patient care, it's actually going well.

What we did announce at the beginning of the year, because of that, our accretion that we expected was a little bit slower than the original model, but it really was just about the costs associated with these transition agreements. But market wise we're doing well. Each market is a little different than we modeled, but net/net it's roughly as we modeled it. So it's going pretty well.

**Question – Unidentified Audience Member:** You talked about a 10% to 15% compound earnings per share growth rate but I don't recall your giving us a clear sense of what the underpinnings of that would be. If we were to just look at pharmaceutical (inaudible - off mic), what are the drivers for your operating profit growth there, and what should we think on a five year compound basis of that pharmaceutical (inaudible - off mic) earnings growth, operating earnings growth?

**Answer – George Barrett:** So the question is really around our growth targets and expectations of pharmaceutical. So we don't breakout individually what our model is for any business line. I'll give you some of the dynamics at work. Both specialty and generics continue to be drivers of growth for us. Demographics, again, it's the inescapable reality. We are not a population getting younger. We are consuming more and more healthcare products and services. That's not going to diminish. Our efficiencies get bigger. I would describe generics as sort of a classic flywheel model where the ability to service customers long enough to capture their share creates more value for us, creates the opportunity to drive more value through our Red Oak sourcing model. And so we feel, you know this continues to be a good exciting business for us.

We had sort of two periods of sort of rough going there, but part of that was comparing to a first quarter of last year that grew by 40%. So we're going to come through -- some of this is math -- we're going to come through some really difficult comps. Our medical business is growing at a really nice clip. We obviously can't talk about Q2 at this stage. We've said all along that we'll continue to acquire when we see opportunities to create value through acquisition. And we always regard capital deployment through dividends and share repurchases as a -- at least share repurchases as another tool in the toolbox. What did I leave out?

**Answer – Mike Kaufmann:** No, the only thing I would stress is that I think our key and our differentiators, we don't go to market as only a pharma segment. We go to market as one Cardinal Health. And I think it is the breadth of our portfolio that allows us to feel confident over the long term to be able to have growth is that if any one business might be slowing for whatever dynamics at some time, we have a very large scaled business in other areas. And so when I look at growth of pharma, significant growth in med and capital deployment, that's what I think. When you have to add -- you have to look at the whole breadth in order to add it up to feel good about it.

**Answer – Sally Curley:** Time for one more question. We have a minute left (inaudible - off mic).

**Question – Unidentified Audience Member:** One more question?

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Answer – George Barrett:** Yes.

**Question – Unidentified Audience Member:** (inaudible - off mic)

**Answer – George Barrett:** It's a really interesting question. The question is about -- and again, I didn't hear this comment, but some of the generic companies apparently have been mentioning, according to the question, that they see a lot more launches but less classic blockbuster drugs.

And the answer is, the conversion to value for us, or even for the generic company, is not always directly related to the size of the brand drug. It relates to the characteristics of the market for that generic drug. The same is true for us. So we can do very well with a string of smaller drugs, and it's about creating the right dynamics, the right ability to source that product on a global basis, and what are the characteristics of the individual market of that product. So it is always very hard, and it's true if you're (inaudible) the generics industry or (inaudible) us, to directly relate the size of a brand drug to the value creation of a generic drug. They just don't correlate perfectly.

I think we are done. Thank you all for your questions. Good to see you. Thanks.

StreetEvents transcripts content provided by Thomson Reuters

THOMSON REUTERS

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

# EXHIBIT 64

# Healthcare is changing…
# We're changing healthcare.

George S. Barrett
Chairman and Chief Executive Officer

*35th Annual J.P. Morgan Healthcare Conference*
*Monday, January 9, 2017*



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and brand pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the ability to successfully integrate and realize the benefits from the acquisition of Cordis; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including federal health care reform legislation; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of January 9, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.  In addition, this presentation contains Non-GAAP financial measures.  Cardinal Health provides definitions and reconciliations of the differences between the Non-GAAP financial measures and their most directly comparable GAAP financial measures in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com. An audio replay of the webcast will be available at ir.cardinalhealth.com.



2   © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**For those tasked with navigating the complexities of healthcare…**

# Cardinal Health brings **scaled solutions** that **help our customers thrive** in a changing world.

3

## Essential facts about Cardinal Health

*A global, integrated healthcare products & services company*

**>$121B** in FY16 revenues

**~$2.9B** in FY16 non-GAAP operating earnings, ~$2.5B in FY16 GAAP operating earnings

**>70%** of U.S. hospitals use our resources

**>25K** U.S. pharmacies served

**>60** countries in which we operate

**>37K** employees worldwide

**~2.8B** healthcare products manufactured or sourced each year

**>2M** patients served in home healthcare, with nearly **40K** products

*Please see appendix for GAAP to Non-GAAP reconciliation.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

4



## Healthcare trends shaping the next 5 years

1. Increasing global demand driven by aging demographics
2. Pressured by rising cost of care: U.S. payment models transitioning from fee-for-service to value and outcomes
3. Healthcare consumerism: U.S. consumers more engaged and financially responsible for own health
4. Shifts in how and where care is delivered: Integrated Delivery Networks take more risk, coordinate and shift care to most efficient settings
5. Traditional branded pharmaceuticals increasingly displaced by generics on one end and high-priced specialty agents on the other
6. Government's role as both payer and regulator



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

## While organized into 2 financial reporting segments…

### *Pharmaceutical*



### *Medical*



| FY16 revenues of $109B | FY16 revenues of $12B |
| --- | --- |
| FY16 segment profit of $2.5B | FY16 segment profit of $457M |



 © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

...Cardinal Health goes to market with enterprise-wide capabilities in 4 areas



**Logistics** Solutions

**Enable a more efficient way of bringing healthcare to market**



**Business** Solutions

**Optimize the process and performance of healthcare**



**Patient** Solutions

**Connect clinicians and patients for smarter population management, better patient wellness**



**Product** Solutions

**Provide a comprehensive healthcare product offering**



7   © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

## Capital deployment for the past five years



¹Acquisitions are net of divestitures.
8    © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# Sustained strong financial performance over five years

**Diluted EPS from continuing operations growth[1]**

**9.5%**
*GAAP CAGR*

**13.4%**
*Non-GAAP[2] CAGR*

**Long-term goals**

**Annual Dividend Payout**

**30-35%**

**Total shareholder return[3]**

**90.4%**

**Multi-Year Non-GAAP EPS CAGR**

**10-15%**

**Dividend per share growth**

**14.7%**
*CAGR*

[1] *Diluted earnings per share from continuing operations attributable to Cardinal Health, Inc.*
[2] *Non-GAAP financial measures. See "Explanation and Reconciliation of Non-GAAP Financial Measures" section for definitions and reconciling information.*
[3] *Total shareholder return is the total return of our shares expressed as a percentage (calculated based on changes in stock price over the measurement period and assuming reinvestment of dividends).*



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

Healthcare is changing…We're changing healthcare.

**Our business is positioned to grow WELL into the future**

Our strategic priorities are on **the right side** of healthcare trends

We are **excellent, disciplined stewards of capital**

We have strong and valuable **strategic partnerships**

We have a **relentless focus** on serving our **customers**, and the **patients** they care for

We will execute to deliver **meaningful** and **measurable results**

**Driven by a team with a proven track record in the business of healthcare**



10 © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings[1] Before Income Taxes | Provision for Income Taxes | Net Earnings from Continuing Operations[2] | Net Earnings from Continuing Operations[2] Growth Rate | Diluted EPS[1,2] | Diluted EPS[1,2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **Fiscal Year 2016** | | | | | | | | |
| **GAAP** | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | (69) | | (69) | (27) | (42) | | (0.13) | |
| **Non-GAAP** | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |
| **Fiscal Year 2015** | | | | | | | | |
| GAAP | $ 2,161 | 15 % | $ 1,967 | $ 755 | $ 1,212 | 4 % | $ 3.61 | 7 % |
| Restructuring and employee severance | 44 | | 44 | 15 | 29 | | 0.09 | |
| Amortization and other acquisition-related costs | 281 | | 281 | 100 | 181 | | 0.54 | |
| Impairments and (gain)/loss on disposal of assets | (19) | | (19) | (10) | (9) | | (0.03) | |
| Litigation (recoveries)/charges, net | 5 | | 5 | (14) | 19 | | 0.06 | |
| Loss on extinguishment of debt | - | | 60 | 23 | 37 | | 0.11 | |
| Non-GAAP | $ 2,472 | 16 % | $ 2,339 | $ 870 | $ 1,469 | 11 % | $ 4.38 | 14 % |
| **Fiscal Year 2014** | | | | | | | | |
| GAAP | $ 1,885 | 89 % | $ 1,798 | $ 635 | $ 1,163 | 247 % | $ 3.37 | 247 % |
| Restructuring and employee severance | 31 | | 31 | 11 | 20 | | 0.06 | |
| Amortization and other acquisition-related costs | 223 | | 223 | 79 | 144 | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | 15 | | 15 | 5 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (21) | | (21) | (8) | (13) | | (0.04) | |
| Non-GAAP | $ 2,133 | 4 % | $ 2,047 | $ 722 | $ 1,324 | 3 % | $ 3.84 | 3 % |

[1] from continuing operations

[2] attributable to Cardinal Health, Inc.

The sum of the components may not equal to the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.



11 © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| | Operating Earnings | Operating Earnings Growth Rate | Earnings[1] Before Income Taxes | Provision for Income Taxes | Net Earnings from Continuing Operations[2] | Net Earnings from Continuing Operations[2] Growth Rate | Diluted EPS[1,2] | Diluted EPS[1,2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | **Fiscal Year 2013** | | | | |
| GAAP | $ 996 | (44)% | $ 888 | $ 553 | $ 335 | (69)% | $ 0.97 | (68)% |
| Restructuring and employee severance | 71 | | 71 | 27 | 44 | | 0.13 | |
| Amortization and other acquisition-related costs | 158 | | 158 | 52 | 106 | | 0.31 | |
| Impairments and (gain)/loss on disposal of assets | 859 | | 859 | 37 | 822 | | 2.39 | |
| Litigation (recoveries)/charges, net | (38) | | (38) | (15) | (23) | | (0.07) | |
| Non-GAAP | $ 2,046 | 10 % | $ 1,938 | $ 654 | $ 1,284 | 15 % | $ 3.73 | 16 % |
| | | | | **Fiscal Year 2012** | | | | |
| GAAP | $ 1,792 | 18 % | $ 1,698 | $ 628 | $ 1,070 | 11 % | $ 3.06 | 12 % |
| Restructuring and employee severance | 21 | | 21 | 8 | 13 | | 0.04 | |
| Amortization and other acquisition-related costs | 33 | | 33 | 9 | 24 | | 0.07 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 21 | 8 | 13 | | 0.04 | |
| Litigation (recoveries)/charges, net | (3) | | (3) | (1) | (2) | | (0.01) | |
| Other Spin-Off Costs | 2 | | 2 | 1 | 1 | | - | |
| Non-GAAP | $ 1,866 | 13 % | $ 1,772 | $ 653 | $ 1,119 | 13 % | $ 3.21 | 15 % |
| | | | | **Fiscal Year 2011** | | | | |
| GAAP | $ 1,514 | 16 % | $ 1,518 | $ 552 | $ 966 | 65 % | $ 2.74 | 69 % |
| Restructuring and employee severance | 15 | | 15 | 5 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | 90 | | 90 | 22 | 68 | | 0.19 | |
| Impairments and (gain)/loss on disposal of assets | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | 6 | | 6 | (1) | 7 | | 0.02 | |
| Other Spin-Off Costs | 10 | | 10 | 4 | 6 | | 0.02 | |
| Gain on sale of CareFusion stock | - | | (75) | - | (75) | | (0.21) | |
| Non-GAAP | $ 1,644 | 18 % | $ 1,573 | $ 585 | $ 988 | 22 % | $ 2.80 | 25 % |

[1] from continuing operations
[2] attributable to Cardinal Health, Inc.

The 5-year compound annual growth rate for GAAP and non-GAAP operating earnings was 10.2 percent and 12.0 percent, respectively.

The 5-year compound annual growth rate for GAAP and non-GAAP diluted earnings per share from continuing operations attributable to Cardinal Health, Inc. was 9.5 percent and 13.4 percent, respectively.

The sum of the components may not equal to the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.



12 © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal Health, Inc. and Subsidiaries**

Forward Looking non-GAAP Measures

In this presentation, the Company presents its outlook for fiscal 2017 non-GAAP EPS.  The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2017 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.14 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

Definitions

**Non-GAAP diluted EPS from continuing operations attributable to Cardinal Health, Inc. or "Non-GAAP diluted EPS"**:  non-GAAP net earnings from continuing operations attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP earnings before income taxes and discontinued operations**: earnings before income taxes and discontinued operations excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt.

**Non-GAAP gross margin**: gross margin excluding LIFO charges/(credits).

**Non-GAAP net earnings from continuing operations attributable to Cardinal Health, Inc.**: earnings from continuing operations before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt.

**Non-GAAP operating earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) other spin off costs.

**Segment profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general, and administrative expenses).

**Segment profit margin**: segment profit divided by segment revenue.



13  © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# EXHIBIT 65

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): February 7, 2017**

# Cardinal Health, Inc.

(Exact name of registrant as specified in its charter)

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place, Dublin, Ohio 43017**

(Address of principal executive offices) (Zip Code)

**(614) 757-5000**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instructions A.2. below):

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 2.02: Results of Operations and Financial Condition

On February 7, 2017 , Cardinal Health, Inc. (the "Company") issued a news release announcing its results for the quarter ended December 31, 2016 . A copy of the news release is included as Exhibit 99.1 to this report.

## Item 7.01: Regulation FD Disclosure

During a webcast scheduled to be held at 8:30 a.m. Eastern time on February 7, 2017 , the Company's Chairman and Chief Executive Officer and Chief Financial Officer will discuss the Company's results for the quarter ended December 31, 2016 and outlook for the fiscal year ending June 30, 2017 . The slide presentation for the webcast will be available on the Investors page at ir.cardinalhealth.com . An audio replay of the webcast also will be available on the Investors page at ir.cardinalhealth.com .

## Item 9.01: Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 99.1 | News release issued by the Company on February 7, 2017 announcing second-quarter results. |

2

# Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Cardinal Health, Inc.**

(Registrant)

Date: February 7, 2017         By:    /s/ Stuart G. Laws

                                                Stuart G. Laws

                                                Senior Vice President and Chief Accounting Officer

# Exhibit Index

| Exhibit Number | Exhibit Description |
|---|---|
| 99.1 | News release issued by the Company on February 7, 2017 announcing second-quarter results. |

4

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

| | | | |
|---|---|---|---|
| Media: | Ellen Barry | Investors: | Lisa Capodici |
| | (614) 553-3858 | | (614) 757-5035 |
| | ellen.barry@cardinalhealth.com | | lisa.capodici@cardinalhealth.com |

# Cardinal Health Reports Second-quarter Results for Fiscal Year 2017

- **Revenue increased 5 percent to $33.1 billion**
- **GAAP [1] operating earnings decreased 4 percent to $542 million , and non-GAAP operating earnings decreased 4 percent to $701 million**
- **GAAP diluted earnings per share increased 4 percent to $1.02 , and non-GAAP diluted earnings per share increased 3 percent to $1.34**
- **Company updates fiscal year 2017 outlook**

**DUBLIN, Ohio, Feb. 7, 2017** - Cardinal Health (NYSE: CAH) today reported second-quarter fiscal year 2017 revenue of $33.1 billion , an increase of 5 percent . The company also reported a decline in GAAP operating earnings of 4 percent to $542 million and in non-GAAP operating earnings of 4 percent to $701 million . GAAP diluted earnings per share (EPS) increased 4 percent to $1.02 , while non-GAAP diluted EPS increased 3 percent to $1.34 .

"Our organization has shown great resilience in the first half of our fiscal 2017. While pricing in the generic pharmaceutical market was a significant headwind for our Pharmaceutical segment profit and our enterprise operating earnings, overall we are seeing greater growth in more lines of business than we've seen in some time," said George Barrett, chairman and CEO of Cardinal Health. "Of particular note, we saw strong growth in our Specialty Solutions group, and our Medical segment, where virtually every part of that business grew.

"As we enter the second half of the year, our organization continues to work with a clear sense of purpose - patient-centered and squarely focused on helping our partners improve the quality, safety and efficiency of the healthcare system."

## Q2 FY17 summary

| | | Q2 FY17 | | Q2 FY16 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | **33.1 billion** | $ | 31.4 billion | 5% |
| Operating earnings | $ | **542 million** | $ | 563 million | (4)% |
| Non-GAAP operating earnings | $ | **701 million** | $ | 726 million | (4)% |
| Net earnings attributable to Cardinal Health, Inc. | $ | **324 million** | $ | 326 million | N.M |
| Non-GAAP net earnings attributable to Cardinal Health, Inc. | $ | **427 million** | $ | 430 million | (1)% |
| Diluted EPS attributable to Cardinal Health, Inc. | $ | **1.02** | $ | 0.98 | 4% |
| Non-GAAP diluted EPS attributable to Cardinal Health, Inc. | $ | **1.34** | $ | 1.30 | 3% |

Diluted EPS for the quarter benefitted from a lower effective tax rate and fewer weighted average shares outstanding than the same quarter in the prior fiscal year.

## Segment results

### *Pharmaceutical segment*

Second-quarter revenue for the Pharmaceutical segment increased 5 percent to $29.7 billion due to growth from existing Pharmaceutical Distribution customers and strong performance from the Specialty business.

Segment profit for the quarter decreased 14 percent to $537 million . This decrease was driven by generic pharmaceutical pricing and, to a lesser extent, the previously announced loss of a large Pharmaceutical Distribution customer. This was partially offset by solid performance from Red Oak Sourcing.

| | | Q2 FY17 | | Q2 FY16 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | **29.7 billion** | $ | 28.3 billion | 5% |
| Segment profit | $ | **537 million** | $ | 627 million | (14)% |

**Cardinal Health**
**Page 2**

*Medical segment*
Second-quarter revenue for the Medical segment increased 8 percent to $3.4 billion , driven by contributions from net new and existing customers.

Segment profit increased 50 percent to $159 million due to the contribution from Cardinal Health Brand products, which includes Cordis. The increase reflects the $21 million unfavorable impact of the Cordis-related inventory fair value step-up in the second quarter of fiscal year 2016. Excluding this step-up, year-over-year Medical segment profit growth was 25 percent.

|  | Q2 FY17 | | Q2 FY16 | Y/Y |
|---|---|---|---|---|
| Revenue | $ | **3.4 billion** | $ 3.2 billion | 8% |
| Segment profit | $ | **159 million** | $ 106 million | 50% |

## Fiscal year 2017 outlook

As previously disclosed, the company does not provide GAAP EPS outlook, because it is unable to reliably forecast most of the items that are excluded from GAAP EPS to calculate non-GAAP EPS. These items could cause EPS to differ materially from non-GAAP EPS. See "Use of Non-GAAP Measures" following the attached schedules for additional explanation.

Having completed more than half its fiscal year, the company is adjusting its fiscal year 2017 guidance range for non-GAAP diluted EPS from continuing operations to $5.35 to $5.50 from $5.40 to $5.60. This now reflects non-GAAP EPS growth of 2 to 5 percent for the fiscal year.

More details about this outlook can be found on the company's webcast and accompanying slides; see below for details.

## Additional second-quarter and recent highlights

- Renewed Department of Defense medical/surgical distribution prime vendor agreement

- Signed several new strategic distribution agreements that will enable Cordis, Cardinal Health's interventional vascular business, to rapidly expand its product portfolio in select countries globally

- Recognized Cincinnati Children's Hospital Medical Center as the recipient of the 2016 Award for Excellence in Medication Safety from the Cardinal Health Foundation and the American Society of Health-System Pharmacists Foundation

- Chairman and CEO George Barrett named chairman of the Healthcare Leadership Council; Pharmaceutical Segment CEO Jon Giacomin named chairman of the Healthcare Distribution Alliance board

## Webcast

Cardinal Health will host a webcast today at 8:30 a.m. Eastern to discuss second-quarter results. To access the webcast and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com . No access code is required.

Presentation slides and a webcast replay will be available on the Cardinal Health website at ir.cardinalhealth.com until Feb. 6, 2018.

## Upcoming webcasted investor events

- Barclays Global Healthcare Conference on March 16 at 8:30 a.m. Eastern in Miami

## About Cardinal Health

Cardinal Health Inc. is a global integrated healthcare services and products company, providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically-proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. Backed by nearly 100 years of experience, with more than 37,000 employees in nearly 60 countries, Cardinal Health ranks among the top 25 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter and connect on LinkedIn at linkedin.com/company/cardinal-health .

[1.] GAAP refers to U.S. generally accepted accounting principles. This news release includes GAAP financial measures as well as non-GAAP financial measures, which are financial measures not calculated in accordance with GAAP. See "Use of non-GAAP Measures" following the attached schedules for definitions of the non-GAAP financial measures presented in this news release, and see the attached schedules for reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the

**Cardinal Health**
**Page 3**

Investor Relations page at ir.cardinalhealth.com . In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

## Cautions Concerning Forward-Looking Statements

This news release contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and branded pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the ability to successfully integrate and realize the benefits from the acquisition of Cordis; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including recent proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax and trade laws, including proposals relating to a "border adjustment tax" and new import tariffs; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This news release reflects management's views as of Feb. 7, 2017 . Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**Schedule 1**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | | Second Quarter | | % Change |
|---|---|---|---|---|
| | | 2017 | 2016 | |
| Revenue | $ | **33,150** | $ 31,445 | 5 % |
| Cost of products sold | | **31,548** | 29,836 | 6 % |
| Gross margin | | **1,602** | 1,609 | — % |
| | | | | |
| **Operating expenses:** | | | | |
| Distribution, selling, general and administrative expenses | | **910** | 922 | (1)% |
| Restructuring and employee severance | | **7** | 2 | N.M. |
| Amortization and other acquisition-related costs | | **115** | 114 | N.M. |
| Impairments and loss on disposal of assets, net | | **9** | 17 | N.M. |
| Litigation (recoveries)/charges, net | | **19** | (9) | N.M. |
| Operating earnings | | **542** | 563 | (4)% |
| | | | | |
| Other (income)/expense, net | | **7** | (2) | N.M. |
| Interest expense, net | | **44** | 45 | (2)% |
| Earnings before income taxes | | **491** | 520 | (6)% |
| | | | | |
| Provision for income taxes | | **167** | 194 | (14)% |
| Net earnings | | **324** | 326 | — % |
| | | | | |
| Less: Net earnings attributable to noncontrolling interests | | **—** | — | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | **324** | $ 326 | — % |
| | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | |
| Basic | $ | **1.02** | $ 0.99 | 3 % |
| Diluted | | **1.02** | 0.98 | 4 % |
| | | | | |
| **Weighted-average number of common shares outstanding:** | | | | |
| Basic | | **318** | 329 | |
| Diluted | | **319** | 332 | |

**Schedule 2**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | Year-to-Date | | % Change |
|---|---|---|---|
| | 2017 | 2016 | |
| Revenue | $ 65,189 | $ 59,499 | 10 % |
| Cost of products sold | 61,997 | 56,311 | 10 % |
| Gross margin | 3,192 | 3,188 | — % |
| | | | |
| **Operating expenses:** | | | |
| Distribution, selling, general and administrative expenses | 1,831 | 1,764 | 4 % |
| Restructuring and employee severance | 16 | 14 | N.M. |
| Amortization and other acquisition-related costs | 237 | 219 | N.M. |
| Impairments and loss on disposal of assets, net | 12 | 17 | N.M. |
| Litigation (recoveries)/charges, net | 20 | (9) | N.M. |
| Operating earnings | 1,076 | 1,183 | (9)% |
| | | | |
| Other expense, net | 3 | 6 | N.M. |
| Interest expense, net | 88 | 90 | (2)% |
| Earnings before income taxes | 985 | 1,087 | (9)% |
| | | | |
| Provision for income taxes | 351 | 377 | (7)% |
| Net earnings | 634 | 710 | (11)% |
| | | | |
| Less: Net earnings attributable to noncontrolling interest | (1) | (1) | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ 633 | $ 709 | (11)% |
| | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | |
| Basic | $ 1.99 | $ 2.16 | (8)% |
| Diluted | 1.97 | 2.14 | (8)% |
| | | | |
| **Weighted-average number of common shares outstanding:** | | | |
| Basic | 319 | 329 | |
| Diluted | 321 | 332 | |

**Schedule 3**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets (Unaudited)**

| (in millions) | | December 31, 2016 | | June 30, 2016 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,881 | $ | 2,356 |
| Trade receivables, net | | 7,533 | | 7,405 |
| Inventories, net | | 11,915 | | 10,615 |
| Prepaid expenses and other | | 1,824 | | 1,580 |
| Total current assets | | 23,153 | | 21,956 |
| | | | | |
| Property and equipment, net | | 1,856 | | 1,796 |
| Goodwill and other intangibles, net | | 9,276 | | 9,426 |
| Other assets | | 736 | | 944 |
| **Total assets** | $ | 35,021 | $ | 34,122 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 18,857 | $ | 17,306 |
| Current portion of long-term obligations and other short-term borrowings | | 603 | | 587 |
| Other accrued liabilities | | 1,554 | | 1,808 |
| Total current liabilities | | 21,014 | | 19,701 |
| | | | | |
| Long-term obligations, less current portion | | 4,859 | | 4,952 |
| Deferred income taxes and other liabilities | | 2,692 | | 2,781 |
| | | | | |
| Redeemable noncontrolling interests | | 115 | | 117 |
| | | | | |
| Total Cardinal Health, Inc. shareholders' equity | | 6,323 | | 6,554 |
| Noncontrolling interests | | 18 | | 17 |
| Total shareholders' equity | | 6,341 | | 6,571 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 35,021 | $ | 34,122 |

**Schedule 4**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (Unaudited )**

| (in millions) | Second Quarter 2017 | 2016 | Year-to-Date 2017 | 2016 |
|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | |
| Net earnings | $ 324 | $ 326 | $ 634 | $ 710 |
| | | | | |
| Adjustments to reconcile net earnings to net cash from operating activities: | | | | |
| Depreciation and amortization | 166 | 169 | 339 | 306 |
| Impairments and loss on sale of other investments | 3 | — | 3 | — |
| Impairments and loss on disposal of assets, net | 9 | 17 | 12 | 17 |
| Share-based compensation | 24 | 26 | 47 | 56 |
| Provision for bad debts | 22 | 18 | 29 | 35 |
| Change in fair value of contingent consideration obligation | — | (13) | — | (14) |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | |
| Decrease/(increase) in trade receivables | 160 | (45) | (146) | (393) |
| Increase in inventories | (996) | (1,070) | (1,294) | (1,565) |
| Increase in accounts payable | 1,284 | 2,006 | 1,563 | 2,431 |
| Other accrued liabilities and operating items, net | (442) | 29 | (529) | (172) |
| Net cash provided by operating activities | 554 | 1,463 | 658 | 1,411 |
| | | | | |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | (2) | (1,885) | (11) | (3,284) |
| Additions to property and equipment | (113) | (92) | (213) | (175) |
| Purchase of available-for-sale securities and other investments | (73) | (62) | (125) | (88) |
| Proceeds from sale of available-for-sale securities and other investments | 38 | 32 | 72 | 57 |
| Proceeds from maturities of available-for-sale securities | 22 | 14 | 39 | 19 |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | 1 | — | 1 | — |
| Net cash used in investing activities | (127) | (1,993) | (237) | (3,471) |
| | | | | |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | — | — | — | (23) |
| Net change in short-term borrowings | 8 | 3 | 33 | 39 |
| Net purchase of noncontrolling interests | (2) | — | (12) | — |
| Reduction of long-term obligations | (59) | — | (60) | (4) |
| Proceeds from interest rate swap terminations | — | — | 14 | — |
| Net tax proceeds/(withholdings) from share-based compensation | 9 | 14 | — | (7) |
| Tax proceeds from share-based compensation | 2 | 1 | 32 | 32 |
| Dividends on common shares | (144) | (128) | (293) | (259) |
| Purchase of treasury shares | (350) | — | (600) | — |
| Net cash used in financing activities | (536) | (110) | (886) | (222) |
| | | | | |
| Effect of exchange rates changes on cash and equivalents | (11) | (10) | (10) | (10) |
| | | | | |
| Net decrease in cash and equivalents | (120) | (650) | (475) | (2,292) |
| Cash and equivalents at beginning of period | 2,001 | 2,974 | 2,356 | 4,616 |
| **Cash and equivalents at end of period** | $ 1,881 | $ 2,324 | $ 1,881 | $ 2,324 |

**Schedule 5**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Second Quarter | | | (in millions) | Second Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2017** | 2016 | | | **2017** | 2016 | |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ **29,743** | $ 28,287 | | Amount | $ **3,410** | $ 3,162 | |
| Growth rate | **5 %** | 25% | | Growth rate | **8%** | 9 % | |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ **537** | $ 627 | | Amount | $ **159** | $ 106 | |
| Growth rate | **(14)%** | 16% | | Growth rate [1] | **50%** | (8)% | |
| Segment profit margin | **1.81 %** | 2.22% | | Segment profit margin | **4.68%** | 3.36 % | |

[1]  Segment profit for three months ended December 31, 2015 includes a $21 million unfavorable impact of Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit growth was 25 percent and 10 percent for the three months ended December 31, 2016 and 2015, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the three months ended December 31, 2016 was $33,150 million , which included total segment revenue of $33,153 million and Corporate revenue of $(3) million . Total consolidated revenue for the three months ended December 31, 2015 was $31,445 million , which included total segment revenue of $31,449 million and Corporate revenue of $(4) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended December 31, 2016 were $542 million , which included total segment profit of $696 million and Corporate costs of $(154) million . Total consolidated operating earnings for the three months ended December 31, 2015 were $563 million , which included total segment profit of $733 million and Corporate costs of $(170) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Schedule 6**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Year-to-Date | | | (in millions) | Year-to-Date | | |
|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **58,505** | $ 53,427 | Amount | $ | **6,690** | $ 6,081 |
| Growth rate | | **10 %** | 22% | Growth rate | | **10%** | 5 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **1,071** | $ 1,285 | Amount | $ | **286** | $ 207 |
| Growth rate | | **(17)%** | 29% | Growth rate [1] | | **39%** | (10)% |
| Segment profit margin | | **1.83 %** | 2.41% | Segment profit margin | | **4.28%** | 3.40 % |

[1] Segment profit for the six months ended December 31, 2015 includes the $21 million unfavorable impact of the Cordis-related inventory step-up. Excluding this step-up, year-over-year Medical segment profit growth was 25 percent and flat for the six months ended December 31, 2016 and 2015, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the six months ended December 31, 2016 was $65,189 million , which included total segment revenue of $65,195 million and Corporate revenue of $(6) million . Total consolidated revenue for the six months ended December 31, 2015 was $59,499 million , which included total segment revenue of $59,508 million and Corporate revenue of $(9) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the six months ended December 31, 2016 were $1,076 million , which included total segment profit of $1,357 million and Corporate costs of $(281) million . Total consolidated operating earnings for the six months ended December 31, 2015 were $1,183 million , which included total segment profit of $1,492 million and Corporate costs of $(309) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Schedule 7**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation [1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2,3,4] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Second Quarter 2017** | | | | | | |
| GAAP | $ 1,602 | — % | $ 542 | (4)% | $ 491 | $ 167 | $ 324 | — % | $ 1.02 | 4% |
| LIFO charges/(credits) | 9 | | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | — | | 7 | | 7 | 2 | 5 | | 0.01 | |
| Amortization and other acquisition-related costs | — | | 115 | | 115 | 39 | 76 | | 0.24 | |
| Impairments and (gain)/loss on disposal of assets | — | | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | — | | 19 | | 19 | 7 | 12 | | 0.04 | |
| Non-GAAP | $ 1,611 | (2)% | $ 701 | (4)% | $ 650 | $ 222 | $ 427 | (1)% | $ 1.34 | 3% |
| | | | | **Second Quarter 2016** | | | | | | |
| GAAP | $ 1,609 | 11 % | $ 563 | 3 % | $ 520 | $ 194 | $ 326 | 13 % | $ 0.98 | 14% |
| LIFO charges/(credits) | 39 | | 39 | | 39 | 15 | 24 | | 0.07 | |
| Restructuring and employee severance | — | | 2 | | 2 | 1 | 1 | | — | |
| Amortization and other acquisition-related costs | — | | 114 | | 114 | 41 | 73 | | 0.22 | |
| Impairments and (gain)/loss on disposal of assets | — | | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | — | | (9) | | (9) | (5) | (4) | | (0.01) | |
| Non-GAAP | $ 1,648 | 13 % | $ 726 | 14 % | $ 683 | $ 253 | $ 430 | 7 % | $ 1.30 | 8% |

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Year-to-Date 2017** | | | | | | |
| GAAP | $ 3,192 | — % | $ 1,076 | (9)% | $ 985 | $ 351 | $ 633 | (11)% | $ 1.97 | (8)% |
| LIFO charges/(credits) | 9 | | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | — | | 16 | | 16 | 6 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | — | | 237 | | 237 | 79 | 158 | | 0.49 | |
| Impairments and (gain)/loss on disposal of assets | — | | 12 | | 12 | 4 | 8 | | 0.02 | |
| Litigation (recoveries)/charges, net | — | | 20 | | 20 | 8 | 12 | | 0.04 | |
| Non-GAAP | $ 3,201 | (1)% | $ 1,370 | (6)% | $ 1,279 | $ 452 | $ 826 | (7)% | $ 2.57 | (4)% |
| | | | | **Year-to-Date 2016** | | | | | | |
| GAAP | $ 3,188 | 14 % | $ 1,183 | 17 % | $ 1,087 | $ 377 | $ 709 | 28 % | $ 2.14 | 30 % |
| LIFO charges/(credits) | 39 | | 39 | | 39 | 15 | 24 | | 0.07 | |
| Restructuring and employee severance | — | | 14 | | 14 | 5 | 9 | | 0.02 | |
| Amortization and other acquisition-related costs | — | | 219 | | 219 | 78 | 141 | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | — | | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | — | | (9) | | (9) | (5) | (4) | | (0.01) | |
| Non-GAAP | $ 3,227 | 15 % | $ 1,463 | 22 % | $ 1,368 | $ 479 | $ 889 | 20 % | $ 2.68 | 22 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Measures and Definitions schedules.

[2] attributable to Cardinal Health, Inc.

[3] GAAP diluted EPS for the three months ended December 31, 2016 compared to the prior year period was favorably impacted by $0.09, which includes $0.05 due to change in the effective tax rate and $0.04 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate)))

divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

[4] Non-GAAP diluted EPS for the three months ended December 31, 2016 compared to the prior year period was favorably impacted by $0.11, which includes $0.06 due to change in the effective tax rate and $0.05 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no losses on extinguishment of debt during the periods presented.

**Schedule 8**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | | Second Quarter 2017 | | 2016 |
|---|---|---|---|---|
| **GAAP effective tax rate** | | **34.0%** | | 37.3% |
| | | | | |
| **Non-GAAP effective tax rate** | | | | |
| Earnings before income taxes | $ | **491** | $ | 520 |
| LIFO charges | | **9** | | 39 |
| Restructuring and employee severance | | **7** | | 2 |
| Amortization and other acquisition-related costs | | **115** | | 114 |
| Impairments and loss on disposal of assets | | **9** | | 17 |
| Litigation (recoveries)/charges, net | | **19** | | (9) |
| Adjusted earnings before income taxes | $ | **650** | $ | 683 |
| | | | | |
| Provision for income taxes | $ | **167** | $ | 194 |
| LIFO charges tax benefit | | **4** | | 15 |
| Restructuring and employee severance tax benefit | | **2** | | 1 |
| Amortization and other acquisition-related costs tax benefit | | **39** | | 41 |
| Impairments and loss on disposal of assets tax benefit | | **3** | | 7 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | | **7** | | (5) |
| Adjusted provision for income taxes | $ | **222** | $ | 253 |
| | | | | |
| **Non-GAAP effective tax rate** | | **34.2%** | | 37.1% |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This earnings release contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP").

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

**Exclusions from Non-GAAP Financial Measures**

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this earnings release for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics allows for a better comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business, which includes normal levels of reinvestment in the business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, these non-cash amounts are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of historical, current and forecasted financial results. We exclude other acquisition-related costs because they are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. They are also significantly impacted by the timing and size of acquisitions.

- Impairments and gains or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the items listed above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Forward Looking Non-GAAP Measures**

In this earnings release, the Company presents its outlook for fiscal 2017 non-GAAP EPS. The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2017 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.14 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Definitions**

**Growth rate calculation** : Growth rates in this earnings release are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP effective tax rate** : (provision for income taxes adjusted for (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# EXHIBIT 66



# Q2 FY17 Cardinal Health, Inc. Earnings Conference Call

**February 7, 2017 8:30AM Eastern**

Operator: Good day and welcome to the Cardinal Health second-quarter fiscal year 2017 earnings conference call. Today's conference is being recorded. At this time, I would like to turn the conference over to Sally Curley. Please go ahead ma'am.

Sally Curley: Hi. Thank you Eric and good morning everyone. Welcome to Cardinal's second-quarter fiscal 2017 Earnings Call. I'm Sally Curley, Senior Vice President of Investor Relations and joining me on the call this morning are Chairman and CEO, George Barrett and CFO, Mike Kaufmann. Today we will be making forward-looking statements. The matters addressed in these statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied.

Please refer to the SEC filings in the forward-looking statements provided at the beginning of the presentation found on the investor page of our website for a description of risks and uncertainties. In addition, we will reference non-GAAP financial measures. Information about these measures and reconciliations to GAAP are included at the end of the end of the slides.

As a reminder, during the Q&A, we ask that you please limit your questions to one, with one follow-up, so that we can address everyone in queue. We'll do our best this morning to get to everyone's questions, but if we don't, please feel free to reach out to IR VP, Lisa Capodici or myself after the call.

In terms of upcoming events, we will be webcasting our presentation at the Barclays Global Healthcare Conference on March 16th at 8:30 a.m. Eastern. Today's press release and details for any webcasted events are or will be posted on the IR Section of the website at cardinalhealth.com, so please make sure to visit the site often for updated information. We hope to see many of you at an upcoming event. Also, please note that neither this

**Cardinal**Health

*Essential to care™*

call nor any other Cardinal Health event can be rebroadcast without the express written permission of Cardinal Health.  Now I'd like to turn the call over to our Chairman and CEO, George Barrett.  George?

George Barrett: Thanks Sally.  Good morning everyone, and thank you for joining us this morning.  As I typically do, I'll spend a few minutes of my discussion covering, at a high level, our performance for the quarter.  However, these are not typical times and on the surface, not a typical year for Cardinal Health.

The impact of this year's generic pricing environment accounts for the primary headwind on our financials.  It is masking the fact that we are seeing growth in more key initiatives and priorities than we have seen in quite some time.  In that context, I want to make sure that woven throughout my comments we address the following three questions: how are we executing and competing in the market?  How would I characterize some of the more recent market dynamics; and how are we positioned for long-term sustainable growth?

Before I get to that, I want to acknowledge that in spite of the extraordinary dynamism in the industry, we at Cardinal Health remain focused on the millions of people that we touch every day.  We embrace our vital role at the center of the healthcare continuum, and our responsibility remains unchanged.  Our role, providing the highest quality products and services to all of our partners and their patients around the world, lies at the core of who we are and what we do.

Certainly, healthcare discussion in the U.S. has been so prominent; my commentary today will be more focused on the U.S.  So how did we do this quarter?  To summarize the performance for the Q2, revenue was up 5% vs. the prior year to $33.1 billion.  Non-GAAP earnings per share increased 3% to $1.34 vs. the prior year.  And non-GAAP operating earnings were down 4% vs. the second quarter of last year to $701 million.

At the segment level, our pharmaceutical segment performed a bit better than we had expected this quarter.  Revenue was up 5% vs. the prior year to $29.7 billion, and segment profit declined 14% vs. the prior year to $537 million.  This decline was almost entirely the result of generic pharmaceutical pricing, and the loss of Safeway, both of which we covered in our last call.

Our medical segment had another strong quarter continuing its repositioning to better serve the needs of its evolving market.  Revenue for the medical segment was up 8% vs. the prior year to $3.4 billion and segment

profit was up 50% versus the prior year. I would note here that about half of this is attributable to the mechanics of last year's inventory step-up. Still, these are really strong numbers.

As you know, our guidance for the year which we provided in early August was based on both our plans for the upcoming year, as well as our assessment of market conditions at the time. By the time we reported our first quarter, we had seen a stepdown in generic pricing, which prompted us to make a small change to our guidance for the year to reflect that dynamic. At that time, Mike also provided you with the key factors which could dictate where we might fall in that range.

With actual data from Q2 and preliminary data from January, we can now forecast that the top end of that range is unlikely. This is more a function of the math rather than any further deterioration of market conditions. With that in mind, and wanting to provide enough of a range to account for the normal variables, we are adjusting our guidance range for FY17 to $5.35 to $5.50 from our prior range of $5.40 to $5.60. Mike will provide some additional color on how the various factors were included in this decision.

Across the board, Cardinal Health is seeing the results of our teams' dedication to addressing the needs of our customers and the people they treat every day. This team's hard work is evident as our lines of business are showing strong fundamentals. Unit sales look strong, our customer service levels have never been higher, and our ability to operate across the continuum of care with a broad range of products and services creates a uniqueness to our model, which is resonating with our customers across the enterprise.

Our rates of customer retention are extraordinarily high, and we are growing with our customers - building on a sustainable value proposition that aligns with long-term trends. We are confident that we can improve efficiency for virtually any part of our customer base and do so with a valuable and integrated portfolio. At a time of rapid change, we know how essential it is to demonstrate customer intimacy in ways that meet their specific needs and enable them to adapt to a shifting landscape.

I've had the chance in recent weeks to meet with many of our customers - both upstream and downstream. And I came away from those conversations with the clear sense that they are eager to work closely with us. Together we are better equipped to address the complexities of the system with Cardinal Health well positioned as a

CardinalHealth

*Essential to care™*

partner.  Reinforced through these conversations, I'd like to focus on five major initiatives which should be familiar to you.  They are:

1.      Growing our generics program

2.      Driving growth in our specialty solutions group

3.      Increasing our offerings of valuable products and services to our acute and integrated delivery customers

4.      Driving additional penetration of Cardinal Health consumable medical products and physician preference items

5.      Establishing a leading position in the post-acute space

Let me walk through these one by one.  On generics, as I said, industry pricing dynamics were challenging throughout the first half of our fiscal 17.  We are, however, seeing some signs of a return back to more typical patterns.  While it may be too early to characterize this as a trend, we see it as encouraging.

Our customer base is solid, and we continue to offer tremendous value for any retail or institutional customer looking to offer an industry-leading generics program.  Our team's innovative approach to generics serves our customers well.  And our joint venture with CVS Health, Red Oak, continues to be a driver of value, and in our view, a unique source of competitive advantage.

Turning to specialty solutions, our group continues its high rate of growth increasing our reach across key therapeutic areas and strengthening our suite of services that we can offer our pharmaceutical partners who seek to get closer to their patients.  We've more than doubled the number of clients in our specialty hub and significantly grown the client base in our 3PL business.  We are beginning to see the first wave of biosimilars entering the market.  We've built the right therapeutic footprint to effectively serve any part of this system with these products and have a team of experts in place to support this business.

With regards to our acute and integrated delivery customers, these providers of healthcare are experiencing significant changes.  Changes in the size and complexity of their systems, the new technologies which they employ, the shifting sites of care, the adoption of more integrated delivery models, which are directed towards more patient-centered value designs, and the accompanying evolution of payment systems which align with that

value-based model.  As their partners, we've built a suite of products and services that are designed to address these forces.

Let me give you some examples.  We offer critical supply chain and inventory management solutions that allow clinicians to focus on their patients and remove themselves from supply chain activities and administrative documentation.  Our solutions provide visibility to real-time analytics enabling customers to make data driven decisions around products supporting patient safety up to the point of care.

This past week, we celebrated the third anniversary of our Academy for Excellence in Healthcare kicking off our eleventh cohort.  This program, based on our deep expertise in operational excellence – lean, and six sigma techniques - has been designed to help healthcare organizations identify and solve their greatest operating challenges, ultimately driving results that can significantly reduce costs and improve patient outcomes.

To date, we've worked with 36 hospitals, training and coaching 49 teams comprised of hundreds of medical providers, and the group has published 16 white papers.  Through this work, we have helped our partners reduce readmissions, improve the discharge management process, reduce length of stay and surgical wait times and increase patient satisfaction.  Our medical surgical distribution business is highly efficient and growing again and we continue to see growth in Cardinal Health brand products, which, as you know, includes Cordis.

We continue to grow the number of products and product categories in our Cardinal Health brand and now offer more than 19,000 skus in 110 product families.  Our Cordis acquisition is largely on plan, and I'm proud of the way in which our teams have come together, around the world during this first year.  We feel very confident that we can add value to any system in their interventional cardiology activities.

Demographics and delivery system shifts remain key drivers behind our focus on the post-acute world.  We believe that patients can be treated more efficiently, more safely and with better outcomes using the right tools.  In our Cardinal Health at Home business, we continue to focus on bringing medical products to patients in their homes, and the work we are doing at naviHealth in post-acute care management and care transitions, is industry leading and growing quite dramatically.  That business uses the tools and clinical data needed to create the optimal care experience for patients.

CardinalHealth
*Essential to care™*

In summary, our value proposition is increasingly resonating with our customers and this includes our manufacturer partners, who are also dealing with a dynamic and shifting landscape. We have a unique capacity to navigate through environmental road bumps. Our portfolio is robust, balanced and fully integrated. Our organization has critical scale, but is still nimble enough to deal with short-term disturbances. And our team has proven their mettle - they're mission driven and possess a clear sense of where we are going. Because of this, as an enterprise, we are positioned for sustainable and enduring value creation for our business partners and for you, our shareholders.

Finally, we are an active participant in the unfolding policy discussions around healthcare. We bring to those conversations our key tenets - all people should have access to coverage for healthcare, which most experts agree requires a stable insurance system. We need to support our providers of care, most of whom recognize that healthcare can be centered more around the patient. It can be more clearly coordinated and incentives can be designed to encourage innovation, including ways to drive the best outcomes in the most affordable and accessible way. And we know that the overwhelming power of demographics will continue to fuel demand.

Those are the inescapable realities which guide our course. This commitment to our True North helps us serve our customers and the people that they treat every day. So, with that, I'll turn the call over to Mike and get back to you during the Q&A.

Mike Kaufmann: Thanks George and thanks to everyone joining us on the call today. This morning I'll start with a review of our second-quarter financial performance and then provide some additional color around our expectations for the remainder of the fiscal year. Please note that with all of my comments, I'll begin with GAAP and then provide the comparable non-GAAP figure. The slide presentation on our website should be a helpful guide throughout this discussion as it includes our GAAP to non-GAAP reconciliation tables.

Starting on slide 4, our second-quarter fiscal results were slightly better than expected with GAAP diluted EPS at $1.02 and non-GAAP diluted EPS at $1.34, a 4% and 3% increase respectively. Note that both the GAAP and non-GAAP diluted EPS for the quarter benefitted from a lower effective tax rate and fewer outstanding shares as

compared to the prior year.  I'll review both segments in greater detail later, but let me start with consolidated results.

Revenue increased 5% year over year to $33.1 billion.  Consolidated GAAP gross margin dollars were flat, while non-GAAP gross margin dollars were down 2% versus the same quarter in the prior year.  GAAP gross margin rates were down 29 basis points for the quarter, while non-GAAP gross margins rates were down 38 basis points.  The decline in rates is best described in the explanations of the pharma and medical segment profit rate changes which I will cover in a few minutes.  Consolidated SG&A was down by 1%.

As you would expect, we continue to have a disciplined approach to managing costs while still investing in our future.  Both consolidated GAAP and non-GAAP operating earnings declined by 4% versus the prior year.  Below the operating line, net interest and other expense, was $51 million for the quarter, a moderate increase over the prior year.  For the second quarter, the GAAP effective tax rate was 34.0% and the non-GAAP effective tax rate was 34.2%, both somewhat lower than historical norms.  Both declined 3 percentage points versus the prior year, and these lower rates were primarily due to a few favorable discrete tax items.

Our second quarter diluted weighted average shares outstanding were 319 million, 13 million shares fewer than the second quarter of fiscal 2016.  This is a result of our share repurchases including 350 million dollars worth of shares repurchased during the quarter.  We now have 443 million dollars remaining on our board-authorized share re-purchase program.

As I've said in the past, we will continue to evaluate share repurchases opportunistically in the context of our overall capital deployment strategy.  We generated $554 million in operating cash flow during the quarter.  At the end of the second quarter, our cash balance, including short-term investments, was $2.1 billion, with $552 million held outside the United States.

Now I'll move to the segment reviews.  You can follow along on slides 5 and 6.  Our pharmaceutical segment revenue increased 5% to $29.7 billion.  This increase was a result of growth from existing pharmaceutical distribution customers, as well as strong performance from the Specialty business.  Segment profit for the quarter decreased 14% to $537 million.  Generic pharmaceutical pricing and, to a lesser extent, the previously announced loss of Safeway, partially offset by solid performance from Red Oak Sourcing, drove this decrease.

Note that while profits tied to branded inflation were a headwind in Q2, this headwind had a smaller impact than the loss of Safeway. Remember that less than 15% of our branded margin is tied to inflation, and we continue to work with our branded partners to ensure that we receive fair value for our services. My expectation is that this contingent component will be less than 10% in the near future. Segment profit margin rate for the quarter was down 41 basis points to 1.81% largely due to generic pharmaceutical pricing.

Last quarter we told you we expected that generic pricing and brand inflation would cause Q2 pharma segment profit to decline a percentage similar to Q1. While these items came in about as expected, our better than anticipated performance in Specialty distribution, as well as SG&A, contributed to the pharma segment's better than expected results. The excellent performance in Specialty was driven by growth in the acute space and Metro Medical on the provider facing side and growth in our 3PL and regulatory science service offerings on the biopharma side.

Now let's go the medical segment which had another strong quarter. Revenue for the quarter grew 8% to $3.4 billion driven by contributions from net, new and existing customers. Segment profit increased 50% to $159 million due to the contribution from Cardinal Health Brand products, which includes Cordis. This increase reflects the $21 million unfavorable impact of the Cordis-related inventory fair value step-up in the second quarter of fiscal year 2016. Excluding this step-up, year-over-year medical segment profit growth was a robust 25%.

Please remember that in the Q3 comparison, we will have the same $21 million inventory step-up from fiscal year 2016. Segment profit margin rate increased 132 basis points to 4.68% due to the Cardinal Health Brand products, which as noted above, includes Cordis. Overall, the medical segment team is working well together to drive results. My comments until now have been largely U.S. focused, so I want to highlight two global items. First, Cordis is performing well, particularly in Europe and Latin America.

And second, the China team continues to execute well, and they're on track to achieve double-digit top and bottom line growth for the full fiscal year. On a related note, during the quarter, we didn't see much of an impact resulting from foreign exchange or commodities. Before I discuss our outlook for the full year, you can turn to slide number 7 to see our consolidated GAAP to non-GAAP results for the quarter. The 32-cent variance to non-GAAP diluted EPS results was primarily driven by amortization and other acquisition-related costs.

Let me move to our fiscal year 2017 non-GAAP earnings guidance range and assumptions on slides 9 through 12. As George mentioned earlier, with six months of data behind us, and a good view into January, we believe achieving the upper half of our $5.40 to $5.60 guidance range will be challenging. So, to adjust for this and provide some room for variability, we are modifying our guidance range to $5.35 to $5.50.

To be specific, the most significant moving parts for the second half are mainly environmental. They are generic market pricing, taxes and brand inflation. So all this translates to a non-GAAP EPS growth rate of between 2% and 5% for the fiscal year, a minor adjustment from our prior guidance. With that context as a backdrop, I'll walk through our updated corporate assumptions on slide 10.

We expect diluted weighted-average shares outstanding to be between 320 and 321 million shares. Additionally, our updated assumption for acquisition-related intangible amortization will be about $384 million or 77 cents per share, which does not affect our non-GAAP earnings. As you can see, all of our other corporate assumptions, remain unchanged.

On slide 11, there are two updates to our full-year pharmaceutical segment assumptions. First, based on our six months of data, plus a good view into January, we are updating our generic drug price assumption from mid-to-high single digit inflation to high-single inflation for the full fiscal year. Second, our Q1 assumptions expected pharma segment profits for FY17 to be down mid-to-high single digits versus the prior year. Based on the factors I discussed earlier, we now expect full year pharma segment profit to be down high-single to low-double digits. All other pharma segment assumptions are unchanged.

Now turning to the medical segment assumptions on slide 12. We are on track to achieve mid-to-high single digit percentage growth in revenue, up from our previous assumption of mid-single digit percentage revenue growth. All of our other medical segment assumptions are unchanged, and we expect to see double-digit profit growth versus the prior year for the segment. One final comment - as you can see, based upon our first half performance and updated total year guidance, we expect our second half to be somewhat better than our first half, with Q3 slightly larger than Q4. Overall, we believe that we are well-positioned to manage the changing healthcare landscape with a clear, well-defined strategy across the enterprise. The vast majority of our businesses and initiatives are going very well, and we know our key priorities and how to get after them. With that, Operator, let's go to the questions.

Operator:  Thank you.  If you would like to ask a question, please signal by pressing *1 on your telephone keypad.  If you're using the speaker phone, please make sure your mute functions turned off to allow your signal to reach our equipment.  As a reminder, we ask that you limit yourself to one question and one follow-up question during the question and answer session.  Again, press *1 to ask a question.  And we'll go first to Ricky Goldwasser with Morgan Stanley.

Ricky Goldwasser: Yeah, hi.  Good morning and thank you for all the details.

Mike Kaufmann: Good morning.

Ricky Goldwasser:  Just to follow up on how we should think about the update to guidance and kind of how we think about the different factors that are getting worse in the second half, are these things that you think are gonna be isolated to one - the third or fourth quarter or should we expect some of these headwinds to persist throughout the year?  And basically, what I'm trying to get is will some of these things carry, carry-over or flow through to fiscal year 18?  How should we think about that?

George Barrett:  Ricky, good morning its George – I'll start and then I'll let Mike pick up.  Again, it's important in my commentary I made the observation that actually we're not seeing a further deterioration that, in fact, as we started to come to the very end of our Q2, we started to see more normal patterns on generics.  So largely, and I'll let Mike touch on this, the base sort of reset lower but Mike want to add to that?

Mike Kaufmann: Yeah.  I would just emphasize, Ricky, as I look across all of our businesses and all of the various factors that contribute to our overall results, I would emphasize that as we been saying for the last couple quarters, it's really this generic pharmaceutical pricing that is the number one factor.  And all we're saying here is that it basically ended up finishing a little lower than we expected to.

In the sense that our base is reset a little bit lower than we expected it to, but the actual activity that we saw in December and January looks to be stabilizing in that we just set at a little bit lower base. And so, when we took that lower base and spread it across our second half, that's really essentially what lowered our overall guidance. So as you think about the various components, I mentioned three things, generic pricing being the biggest factor that can have a little bit of variability to it.

But again, as George mentioned and I mentioned, it's looking much better over the last couple of months. Branded inflation - we did see some branded inflation in January, and it seems to be about where we're expecting it to be. But again, depending on what happens over the last five months, we just want to call that out.

And lastly taxes, which I call that as the third factor. It's more about timing within quarters than overall being concerned that we're going to fall outside our 35 to 37% guidance range. It's really that you might see it be a little better in one quarter and a little worse in the other, but overall for the year we expect it to be.

George Barrett: So right, Ricky, my comments were specifically about the generic environmental issues that I thought you were asking about. I think Mike actually had the more broad perspective on this.

Mike Kaufmann: Yeah, and I would emphasize I think, you know, it's really just a slight EPS reduction because of the, again, this variability in the generic market pricing.

Ricky Goldwasser: And just go clarify on - on the generic pricing and deflation, I know last quarter you mentioned that generic deflation is also a mix, right? So it's the sell side versus buy side. So should we read into your comments, that you've seen both the sell side and buy side environment stabilizing? Are they centered?

Mike Kaufmann: Yeah, I would say - I would say that the answer's yes. That'd be, as far as price activity from manufactures to us, that's been tracking all year about as what we expected. It was really the side - the sell side

CardinalHealth
Essential to care™

that started out for the first couple quarters lower than we had originally anticipated, but again, we see it stabilizing now.

George Barrett: Thanks Ricky.

Operator: And we'll go next to Lisa Gill with J.P. Morgan.

Lisa Gill: Hi, thanks very much. Can I just start and just follow up there just so that I understand this, George? When we talk about it stabilizing, but yet we think about the fact that you're lowering the back half of the year, I guess I'm just trying to understand that math - how that works. So if it's stabilized in the most recent quarter, and SG&A and specialty drove a little bit of better upside, was it just that your anticipation was that things were going to get better in your fiscal back half of the year, and now they're somewhat carrying through although they've stabilized?

Mike Kaufmann: Yeah, that's a fair question, Lisa. I would say that's pretty much accurate. I'd say that, you know, where it stabilized at, which is the little bit lower than we had originally anticipated when we projected our second half, and so that even though specialities over performing, and we're seeing some really good controls in SG&A, that when mix the two together, then that net was a little bit potentially lower for us. And then we just wanted to give ourselves a little bit of variability when we first thought about taking off the top half of the range and having just a 10 cents range. That seems a little tight for us only halfway through the year. And so we thought that adding another 5 cents to give us a little bit of room would be the smart thing to do.

Lisa Gill: Okay, and then, Mike, you also made a comment about Q3 being better than Q4. Can you just talk about is there something specific that you're anticipating on either side of your business in Q3 or was that comment specific to drug distributions?

**CardinalHealth**
*Essential to care™*

Mike Kaufmann: No, that was just specific overall just to try to be helpful. Obviously, you'll be able to estimate we think the second half will be. And then I just wanted to give you a little thought that Q3 would be bigger than Q4, mainly because that's the quarter where you see the majority of the branded inflation anyways. As you know, that's typically the quarter where you see it, and so I thought you guys were all going to be thinking Q3 is bigger than Q4 generally because it historically always is. But I just wanted to give you a little thought around that it should about, you know, slightly bigger than Q4 to give you a little a little help.

George Barrett: Thanks Lisa.

Operator: The next question is from Ross Muken with Evercore.

Ross Muken: Ah, good morning guys, George, appreciate the commentary I've listened to - it's a tough environment for all us to kind of navigate, and amongst your peers you have the commentary regarding the outlook. It's been slightly different in terms of various drivers. I guess from your standpoint, what do you think are the one or two things we need to be spending the most time thinking about as we analyze and grade how this business is doing, given all these macro factors.

And, obviously you've felt, as if underlying, you know, was better than sort of what the guidance or the quarter showed. And so help us think through what sort of KPI's you're looking at or - or how your thinking about the evolution relative to kind of how the last 12 months played out because it's obviously been a pretty volatile environment relative to what this business has been used to.

George Barrett: Sure, thank Ross. Yeah, let me try to do this. And I'll comment a little bit on the unique dynamic of having some of our peer's report was actually different year-ends, and Mike will touch on it, cause I actually think it's an interesting dynamic at work. For us the drivers - we do know that economically, as we've said, that the

generic pharmaceutical pricing environment is a big factor. We'll watch to see for us that those rates look more normalized.

We started to see that towards the end of the quarter at the beginning of January. Obviously, as I've said, a little early to declare trends, but I thought that was an encouraging sign of something. I - I said to you guys I thought it would start to happen. The other thing is all of our priorities have to be going in the right direction. Specialty - our specialty businesses is in really good position right now. We're seeing really good signs of growth broadly, both downstream and upstream.

Across our medical segment, we're seeing really encouraging signs. Even in what I think of as our legacy medical surgical business, it's really beginning to get a little of wind in their sails. So watching for all the components. Our service lines in medical, our Cardinal Health Branded products, our work in naviHealth, our activity with our med-surg products, these are all for us, key indicators of our long-term positioning playing out the way we want.

And actually, the general growth and customer base. We - we want customers to see us as that go-to company at a time of complexity. So we're beginning to see that, and so, actually we're feeling quite optimistic about where we are. We're having to navigate and have had to navigate through a little bit of tough environment in generics, but as we've said to you, that happens from time to time, and we're keeping disciplined about how it is to the future of the business. Anything to add to that, Mike?

Mike Kaufmann: I think the only thing I would add is that, as you mentioned, generic pharmaceutical pricing is a key driver, and I think the timing of the three distributors' year-end is an important factor to consider when you think that where we really saw the impact of that was really in our Q1. And if our - I'll just put it simply - if our year-end had been three months later, we'd probably wouldn't be revising guidance because we'd of had some insight and built that into the year.

If our year-end had been three months earlier, we probably would have had a bigger mess because we would have had even less insight into it. So it's difficult to compare when you have three different year-ends.

Ross Muken: Thanks, and obviously, George, you talked about just in terms of key priorities.  On the medical business, the growth there has been obviously quite good - you gained some share, you've executed on the deals.  The balance sheet still has - had some capability, and then in terms of any incremental adds to the mix, and continuing to evolve that strategy, where are you in terms of appetite for having digested Cortis contemplating whether or not it makes sense to add more into the bag there in medical?

George Barrett:  Yeah - thanks Ross.  I'll just do this very generally and probably consistent with comments we've made in the past.  We continue to look for opportunities to grow our business organically and certainly through the strength of our balance sheet.  So to the extent that we see opportunities to grow capabilities that we think have sustainable, competitive advantage positioning us for this continuing evolving market, we will not be shy to look at those opportunities.

But again, hopefully you'll expect from us discipline in doing that.  But certainly, part of the equation for us is how we use our balance sheet, and that may be true through our activities that are available external to us and the other ways that we deploy capital.

Operator: We'll go next to Eric Percher with Barclays.

Eric Percher: Thank you.  I think I'd like to maybe split hairs a little bit on the direct pricing conversation.   So I heard you loud and clear on the impact of this quarter from generic drug pricing assumptions moving to high-single digit deflation.  Can you just - I want to make sure I understand perfectly that commentary relative to competition in the marketplace and your view.  Did that competition element impact the change in guidance or are we really focused on the element and the assumption that you focused on?

Mike Kaufmann: Well, I think one feeds the other.  The competitiveness in the generic market is what drove the revision to the generics being down net on single digit deflation for the year because it's made up of two key components,

**Cardinal**Health

*Essential to care™*

pricing from the manufacturers which we said we haven't seen really much variability from what we expected from the year. And then, our pricing downstream to the customers. The combination of those two drive that factor. And so since we've seen, like we said, more aggressive pricing in the market early on in the year, although we didn't - we've seen some positive signs lately, that is what drove that number to be down high single digits.

Eric Percher: Okay, now I get it relative to the math expectations, but that's helpful. And then, your comment on Q3 versus Q4, Mike, we've been trying to understand the ramp through the year. Should I expect that we're still down high-single digits in Q3? Then potentially up as get to Q4 and you lap some of the headwinds?

Mike Kaufmann: As far as actually given growth percentages, I don't want to necessarily step right into that, but I do think that, again, just trying to be helpful, if you take what you obviously think the guidance for the year is and take a look at the second half, we just want to give you a little bit of color that Q3 would be slightly larger than Q4.

Operator: The next question is from Robert Jones with Goldman Sachs.

Robert Jones: Great. Thanks for the questions. Just following up, Mike, on the back half commentary, you know, seeing some of the key metrics stabilizing as you move into the back half? You know, other than maybe some residual impact from something like Safeway, do you feel that the back half, as you look at it today, is more representative of, you know, the New World Order? Is this how we should think about how the business can perform in this environment as you think about, obviously a little about a difference between 3Q and 4Q? But taken together, is that how you envision the business performing going forward?

Mike Kaufmann: Generally, probably overall that's not a bad assumption. Again I'd have to think through all the pieces and how it relates over a full year because you've got, you know, comps and stuff for the prior year. But if you think about certain things like, if the generic market has stabilized, which again we say early results we've seen

will lap Safeway in the fourth quarter, then you have the 21 million dollar step-up in Q3 that completely goes away.

You do have some large moving parts that kind of settle out during the year. But you're going to continue to have positives like Red Oak and some of the other initiatives that were driving, that continue to be tailwinds for us. But a lot of those things that have created some noise in the P&L should either be stabilizing or we should be lapping.

Robert Jones: Okay, got it. And I know we've spent a lot of time on the generic pricing side, but just - can you remind us on the branded side, what's factored in for the year? I guess specifically, is there another assumption in your - in your fiscal 4Q that you would see another round of, you know, more significant branded price increases?

Mike Kaufmann: Yean, a great question. It's hard to know whether or not we'll another set of increases or what they'll be for rest of the year, but we still believe that our estimate of 7 to 9% for the full fiscal year is approximately the right number to be at. Again, that's, you know, a range that obviously there's some variability into that, so we're trying to take into account all of those factors as to whether or not there should be. I would also mention that, again, most of the price increases in the second half do happen in January. So we have seen a lot of it. So the amount of it in the second half that's left to go is not necessarily huge.

George Barrett: Yeah, and I think the other thing again just as a moving part - movement here is not as relevant as - economically - as what we were describing in generic.

Operator: And we'll take a question from George Hill with Deutsche Bank.

George Hill: Yes, good morning guys and thanks for taking my question. I guess, Mike and George, I ask what type of insights is Red Oaks giving you in the ability to kind of forecast generic drug pricing, and does Red Oak provide you any protection from downward price activity that might differentiate you from your peers?

George Barrett: It's George.  Okay, I'll start with that and then Mike.  So on the buying side - remember there are two components to this.  There is the buy and the sell.  Red Oak - I think we've got really sophisticated analytics and capabilities and just great dialogue with our manufacturer partners.  So, as much as you can obviously, these are products that as you know change frequently in the generic world.  But I would say we've got pretty good line of sight and really good analytics and great teams.  This sell side is a different story and to Mike - thoughts on that?

Mike Kaufmann: I'd say I guess the first comment again kind of emphasizes what George said on Red Oak, right?  The ultimate, lack of what's a better word, game in generics is while you can have a deflating sell price, but if your managing your costs better, you can always be expanding your margins.  So if you're asking me do I think we're in a great position with Red Oak - absolutely, based on what George said.  I have a ton of faith in the team, the analytics, the fact that we're, you know, the largest in that standpoint.

I feel really good about that.  As far as Red Oak working together with the sell-side, there's actually no cut over.  Red Oak doesn't do anything or have anything to do with what our sell price should be.  Their goal is to ultimately go out and get us the best absolute cost, and then we actually have a firewall between the two because I think it's incredibly important that our selling side folks aren't actually seeing the cost of our generics, because I don't want that to influence how they decide to price.

We want to price to market, and we want to make sure we're overall evaluating our overall selling proposition.  So we actually have a very strong firewall between our sell-side decisions and our costing decisions with Red Oak.

George Barrett: What I would add to this, George, is I do think our telemarketing operations give us on the sell side probably a very nice line of sight because we're having so much daily dialogue with the pharmacy world.  So I think, I think we're - as good a line of sight as can, but, as this year it's been little bit more difficult to model than past years.  But we're a little bit encouraged by the more recent signs.

George Hill: Okay. And then maybe quick follow-up might just be your largest customer seems poised for some market share launches - losses. I know for you guys that's largely brand business. Is there any impact to kind of market share shifts on retail end factored into the guidance or is it immaterial?

Mike Kaufmann: Yeah, we knew about all of that in the past as we mentioned before. All that was factored in - into our guidance.

Operator: The next question is from Steven Valiquette with Bank of America Merrill Lynch.

Steven Valiquette: Thanks. Good morning George and Mike. Just on the generics and the signs of returning that to more normal, typical pricing patterns, I'm just curious to get more color on what you think are the drivers of the improving generic deflation rate? You don't have to throw things out there. I'm just curious. Are you seeing maybe some pricing increase activity to, you know, offset price erosion on others? Is it just anniversary and other times? I just want to get more color on what you're seeing that's leading to the better trend?

George Barrett: Steve, I'll do the best I can - these are complex markets. I would say in general we saw what we felt to be a pretty unusual flurry of activity in the early part of our fiscal year. And our expectation just based on sort of history was - we see those things from time to time, and they tend to stabilize and become back to more normal patterns when - if you don't see significant movement of share. And I would say that's probably what we saw.

So what happened during a period of time was that the steepness of the curve was sharper. It was a more steep, downward curve. There's always been - there's always erosion on the sell price. That's sort of the normal pattern. But the rate - the steepness of that curve was a little heightened, and our feeling was that what me might see and we expected to see was a bit of a calming down of that at some point. And I think that's largely as best as we can describe that dynamic.

**CardinalHealth**
*Essential to care™*

Steven Valiquette: Okay, and then just quickly on the brand side.  You mentioned that 15% of the profits may be tied to brand inflation.  If for whatever reason it seems like investors have a higher than normal amount of focus on the upcoming mid-year round of brand pricing increases for the industry, in my sense kind of as you touched on a little earlier, it's just not that critical to the overall earnings picture in any year.  I'm just wondering is there any breakdown of how much of that 15% of those economics occurs around the January round of brand inflation versus the mid-year round?  I'm guessing the overwhelming majority is tied to the January round.   Thanks.

Mike Kauffmann: Yeah, absolutely.  When you take a look at the historical patterns and even so far what we've seen this year is the branded price increases are heavily more weighted to the January timeframe than any other time.  Probably that mid-summer timeframe is the second largest, but it's by far larger in the January timeframe.  And again, to emphasize, if I had to talk about the three variables, I would rank them in order of generics by far being the largest, and then the taxes, only because of its variability between quarters, and then brand being the smallest of the three, at least for our mix of products and what we're expecting.

Operator: The next question is from Charles Rhyee from Cowen & Company.

Charles Rhyee: Yeah, hey, thank for taking the question.  George, if we, and Mike, if we go back to the Dublin Day in December, you have talked about the competitive environment of the sell-side, highlighting your independent book, and, George, if I recall, you made a comment saying that you had factored in sort of the competitive sort of step down of the pricing into your guidance here.  So that when I think about your comments today, are you saying that we continue to see more competitive price erosion or was it, you know, your assumptions of what you needed to give in terms of maintaining your book had changed?  Thanks.

George Barrett: Yeah - hey Charles, good morning.  No, I think largely what we're saying is that as we came to the tail end of Q2, we started to see more typical rates of erosion in comparison to what we had seen in the early fall, which was more sharp.  So actually again, we're being a little cautious here because it's - we wish we had more

CardinalHealth
*Essential to care™*

data to say this a discernible trend.  But I'll say it's a good sign that we did see some stabilization to the more normalized rates.  Mike, do you want to add to it?

Mike Kaufmann: I just again emphasize that at the time in December, we didn't have quite as much information as we did by the end, and the bottom line is it just settled out a little lower than what we expected it to across all the channels where we saw generics but, the good news is it seemed to have stabilized at that lower level, and we just needed to update where we were for the rest of the year.

Charles Rhyee: Great.  And then as a follow-up, you mentioned earlier you expect the component of your fee for service service that's contingent to be less than 10%.  I missed what - sort of the timeframe that you expect that to happen.  Is that sort of as we get into fiscal '18 or that a contracting cycle within the next few years?  Thanks.

Mike Kaufmann: Yeah.  I would say that would be more of a next 12 months type of a thing.  Right now it's than 15.  I would expect it to get to that 10 cent range within the next 12 months.

Operator: The next question is from John Kreger with William Blair.

John Kreger: And good morning.  This is Jon Kaufman on for John Kreger.  Thanks for taking the question.  So you noticed strong growth in your specialty businesses this quarter, so could you touch on how your discussions specialty drug manufacturers are going?  And then, how quickly is your specialty distribution business growing compared to the house services piece?  And how confident are you that grow in specialty over the long run won't cause some downward pressures on margins?



George Barrett: Yeah, so there were a couple of parts to that question, Jon. I want to make them right. One is, I think you're saying what's driving it? If I got right, again, the most component that's driving it, do we see it as sustainable and the impact to margin rates. So let me start with the basics. I think we're driving it and have been very consistently been driving growth for two - in two primary areas. One is our reach across therapeutic areas has just become dramatically larger over these last three to four years. So we were present in certain areas in institution, and then we started to grow our oncology businesses.

We've expanded into urology and rheumatology. So I would say our overall footprint downstream in therapeutic areas right now is very strong. And that just makes us a stronger partner for anyone. On the upstream, I think we've started to build more tools and capabilities for the manufacturer partners and particularly, I'd like to highlight our patient hub. And this is a time where manufacturers really want to connect with their patients, and I think our hub allows us to do that. So we do see continued progress in our specialty business.

As it relates to margin rates, we don't break out the specific margin rates in specialty versus sort of traditional pharma. Having said that, we don't see the specialties being dilutive to it. And again, Mike, I'll ask you to add anything here.

Mike Kaufmann: Yeah. Just a couple quick comments. I would say if you think about specialty just separated in two different businesses, services upside, the biopharma downstream to the providers, both are growing significantly on the downstream side, although we've lapped the Metro Medical acquisition, it continues to perform very well in some of the areas where we weren't as strong before the acquisition.

For instance, we were strong in oncology. They were very strong and rheumatology and nephrology. And those areas continue to go very well for us, and the team down there executes very well. So we're seeing very strong growth downstream on the provider side. That's going to be our more lower margin typical distribution type of margin business. And then upside on the biopharma side, the strong areas have really been our hub, our 3PL business and our scientific and regulatory businesses are all doing very nicely. And these are gonna be much higher margins services businesses. So when you blend it together, it makes for a nice mix for us.

**Cardinal**Health
*Essential to care™*

John Kreger: Okay, great. Thank you.

Operator: Next is David Larsen with Leerink.

David Larsen: Hey, congratulations on a good quarter. Mike, can you talk about the - yeah - very good quarter on both divisions - can you talk about your SG&A costs. I mean those looked like the lowest percentage of revenue that I've seen in four years. Are there any focused efforts going on at Cardinal to maybe reduce costs? Can you talk about that please?

Mike Kaufmann: Sure. As you can imagine anytime when you not performing at the level that you would expect yourself and hold yourself accountable to delivering, you're gonna get after managing your expenses even - maybe even tighter than you normally would. And so I think that both the pharma and the med team, even though the med team's performing very strongly, they're also paying attention to their expenses too because we're all one company - we're all Cardinal.

But the pharma side is just being very thoughtful about where they're making investments, trying to prioritize. And I do want to emphasize, we're still making investments. It's important to know that while we're paying attention to our SG&A, we're also at the same time prioritizing things that are still important to our future and investing in those. So I would say it's really about tight focus, prioritization and just managing through those types of things.

David Larsen: Okay and then on the medical side, if Don is in maybe he can comment on the margins?

Mike Kaufmann: Yeah, I think we're going to continue to see some fluctuation in our margin rates in medical, but I do think that you're now starting to see a margin rate where we would expect it to be as you said. We've never given up on our goal to be 5.75 both through our organic growth and inorganic moves that we'll continue to make. I think

that you're gonna see big wins like Kaiser that we talked about. While that's a distribution customer, it's gonna be margin dilutive because it's more margin - it's more of a distribution business.

And then you're gonna see adding businesses like Cordis, which are gonna be higher margins. Then you're gonna see us convert our customers to more Cardinal Health Brand products, which is gonna increase our margin rates, grow our At-Home business which is growing our market rates as well as naviHealth. So I think we have a lot of moving parts in medical that should continue to help us with the momentum on growing our margin rates on that side of the business.

Operator: The next questions from Michael Cherny with UBS.

Michael Cherny: Ah, good morning guys. Most of my questions have been answered. Just quickly, Mike, one for you. It's a more technical question than anything else. It looks like just from your update share count of assumption that we're pretty much assuming no real incremental buyback based on current levels of the back half of the year. Is that how you guys are thinking about it and will you be opportunistic if you see fit?

Mike Kaufmann: Mike, you said it about perfectly. Yeah, we're not anticipating any more stock repurchases in the second half, however, if is there an opportunity and depending on where our cash sits, we may opportunistically do that. But right now, we're not planning to do that at this point.

Michael Cherny: Got it. Must be the Patriot's blood in me. And then, George, one big picture question for you, particularly as you move into your role as head of healthcare leadership council, as you think about all the moving pieces in D.C., and whether it's the uncertainty around stuff around tax reform, be it corporate tax reform in the U.S., border adjustability.

All of the moving pieces related to the changing landscape to healthcare reform and the will they - won't they on the Obamacare repeal, how do you think about positioning the business and positioning the company so that

you're as nimble as possible as some of these changes come down the landscape. Is there any way you can even essentially pre-prepare the business or for something that's a moving target?

George Barrett: That's a great question, Mike. I appreciate it. So let me do the best that I can. One of the interesting things about our business is that our fundamental strategic direction has been set really for a number of years, and we actually have a strategic planning process that we do with about a hundred or so people in the organization a couple times a year. As it turns out, we had one just a few days after the election. The first thing we did with the group was clip out a chart in front of them that these are our priorities. These are the trends in healthcare.

What changes? And with the exception of the fact that we're going to have to deal with some policy issues along the way, fundamentally the directions are clear. Demographics will not turn backwards. We know it's an inexorable marg. We know that care is gonna move to more ambulatory settings - move to different settings. We know that there's going to be focus on efficiency and coordination of care. That the post-acute world is gonna be important. So we've built our strategy around those things. So it's been really interesting to try to sort of navigate the short-term stuff, but keep our eyes very much on the long term.

Here's what I say just very, very generally about the two things you mentioned - the Affordable Care Act and the tax-related issues. The President and the majority party have made it very clear that their intentions are to repeal the Act through the budget reconciliation process. And through that, as you probably know, they can eliminate components of the law, but they've also reaffirmed their commandment to retain certain aspects of the law, like the pre-existing conditions requirement.

So, again, these are complex moving parts, and so the thing that we're doing is making sure that we're there as an educator, that we're reminding people about whether we're gonna replace or rebuild or repair or whatever the right term is. We want to make sure that there's a stable insurance foundation to support it, and that sort of is a key opening a part to it. And we think that's at this point well understood, and that the timelines are probably going to adjust a little bit as people try to figure out how to navigate that. We'll make sure our voice is heard. On the tax proposals, we generally have been a supporter, as you know of tax reform, but again, we want to make

CardinalHealth
Essential to care™

sure that we are educators and informers on certain dynamics.  So for example, we know that many medical products, including some of ours, are made outside of the U.S. in regulated facilities, and so we just want to make sure that information is well understood as policies are starting to come through.  So, yeah, so it's interesting times, both as Cardinal Health and certainly in my new role as a Chair of HLC, but I think we're well positioned broadly, and I think we're nimble enough to continue to adapt to short-term dynamics at work.

Operator: The next questions from Eric Coldwell with Baird.

Eric Coldwell: Thanks very much.  Medical, obviously I think everyone's feeling a little about it today, that being said you do a very large win with Kaiser.  I'm just trying to pull back the layers of the onion a here a little bit.  If we could strip out Kaiser, my guess is gross looks like 3 to 4%.  What is the growth in acute care stand-alone ex-Kaiser?  You've got a lot small businesses that are growing faster doing better.  I'm just trying to make sure that the acute care distribution piece stand-alone, ex -market share isn't actually flat to shrinking at this point, or maybe it is?

Mike Kaufmann: Yeah, so.  Eric, thanks for the question.  I don't want to pull Kaiser out for two reasons.  One is I wouldn't want to talk specifically about the size of any one customer, but second of all, it is part of our business.  It is the result of all of the work that the team has done to reposition the businesses.  It is a business that has lots of other services, a broad product line.  And so, to me, it is more of the result of all of the work we've done, so to pull it out doesn't make sense.  Now business is still definitely growing without the Kaiser piece in it, but it's hard to break it down.  I don't know that that would be appropriate - George?

George Barrett: Yeah, Eric, if it's okay, I'll do this because we don't break down individual pieces, and we certainly don't want to break down individual customers.  But, remember I talked to you about, and someone asked earlier about lead indicators.  So, they're all looking green.  Our pharmaceutical - excuse me, our medical surgical distribution business is probably in the healthiest position we've seen in some quite some time.  So we're seeing really a very

**Cardinal**Health

*Essential to care*™

good organic activity and growth there, so I think can answer qualitatively without breaking out the individual pieces to it.

Mike Kaufmann: Eric, if you even - if you set aside Kaiser and make it Cordis, the business wouldn't grow without…

Eric Coldwell: I mean, I don't want to take - I don't want to take Kaiser from you.  I actually think your're structurally advantaged perhaps versus some in the market.  I'm just trying to get a sense of where the market is in distribution.

Mike Kaufmann: I understand.  Yeah, absolutely, and I didn't mean it any other way, but I appreciate that.

Eric Coldwell: Okay.  Thank you.  We can take it offline.  Thanks.

Operator: The next question from Garen Sarafian with Citi.

Garen Sarafian:  Ah, good morning George and Mike.  High level question on procurement and generics.  One of your peers is in the market getting updated pricing that includes the volume of a large new retail client.  So how has that impacted that market and how long do you think whatever changes are going on take to flow through.

Mike Kaufmann: That's a tough question because I don't really want speak for our competitors, and I'm not sure of the timing of exactly when their launching and all the different pieces of when they go to market.  But I will say that, as you can imagine, our Red Oak team is paying attention to that, has great relationships with the manufacturers and will be paying attention to that to make sure that we are costed appropriately for our size and simplicity and transparency of our model.  And other than that, it's probably all I can say.

Garen Sarafian: Okay, fair enough. And how long in generic terms when there's a large new client it takes to flow through the system. But the follow-up was actually going to be to pose a product question on the impact of branded price increases and impact to Cardinal. So could you put some sort of, any broad weightings around impact of January price increases versus the mid-year. Is it more two-thirds - one-third, or is more 80-20, or something else that you could share. Thank you.

Mike Kaufmann: Yeah. I probably can't share that level of detail because it's obviously hard to know, and manufacturers move slightly between month to month and quarter to quarter. So, again, I'll just emphasize, January's bigger, the biggest month, but other than that, George?

George Barrett: Yeah, can I just add to this. I mean typically January's bigger like Mike said. The other thing that we need to note is it's been an unusual stretch for some time. And so, again, predicting exact behavior is always a little bit tricky. As you know, years ago it was very, very systematic and today it's a little bit more one-off. But I think, as Mike said, January typically is a bigger month. But I think we have to recognize that that things are a little bit different and maybe not as predictable in terms of exactly when things occurred as they might have been five years ago.

Mike Kaufmann: To answer your other question around generics and being able to execute on it, I think that just depends very differently on how you go to market, the size of that customer, whether it even deserves repricing, and then how you go about that. How your relationships are with the manufacturers, so I think that can vary drastically and dramatically between different players in the marketplace. I know we feel really good about when we combine how quickly we executed, but I'm not sure I can say that anybody else would go faster or slower than us.

Operator: And the final question will come from Greg Bolan with Avondale Partners.



Greg Bolan: Hi. Thanks guys, and I hate to ask this at the very of the call, George, but - and by the way, I very much enjoyed the white paper on DIR's, and that just was issued last month. But from the standpoint of your ability to defend or protect independent pharmacies and obviously maintain, maybe even gain market share in the independent pharmacy space as it relates to DIR's, where do you guys sit in the spectrum - because it does feel like this is obviously - these revelations that we're starting to see on DIR's. I mean, it's a very painful experience for your pharmacy customers and I just wanted to kind of see how you guys could possibly - or how you are potentially defending and protecting them, when they're obviously experiencing these pretty massive detrimental margins - 90 - 120 days after the fact.

George Barrett: Well, so there's two points to this. So let me answer the second part first. I'm not sure there's as company more focused on the community pharmacy and pharmacy industry in general. We believe that they're gonna be a key player as healthcare continues to evolve. We have shortages of primary-care physicians. We think pharmacists will and should play a more active role.

We're doing an incredible amount of work through Jon Giacomin's organization to make sure that we are close to them and providing all the solutions and tools that can help them compete in the market, and actually help them provide cognitive care, which we think is very important. Going back to your first point, I want to make an important note about this because we've gotten a few questions.

We are a player in oncology and as such, we've been a member of Community Oncology Alliance. And as a member of that, we have funded research. But you specifically refer to a particular project. We do not direct the researchers set the subject. So it's just important for me to comment on that. So we've had questions about that paper. We didn't specifically fund a paper on this we are basically part of an alliance, and that group does research.

But the summary of what I'm describing is our work around community pharmacy and on pharmacy in general is very much a part of what we do. Whether it's through generic programs, the ability to help them tie to a hospital system or to a post-acute facility, or to set up a diabetes center, we've done a huge amount of work in providing tools to help community pharmacies compete in what is, for all of us, an interesting and challenging environment.

Operator: And this concludes our question and answer session. Mr. Barrett, I'll turn the call back you for any additional remarks.

George Barrett: Sure. Thank you, Eric, and thanks all of you for your questions today. Our organization, just in summary, remains focused on execution, on driving our strategic priorities, on making sure that we are creating, what I've been saying, is, sustainable value creation for our partners and for patients and for you all and we look forward to seeing you all in the near future and thank for joining us on the call today.

# EXHIBIT 67

# Q2 FY2017

Cardinal Health, Inc. Earnings Investor/Analyst call
February 7, 2017



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and branded pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the ability to successfully integrate and realize the benefits from the acquisition of Cordis; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws, including proposals relating to a "border adjustment tax" or new import tariffs; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of February 7, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.  In addition, this presentation contains Non-GAAP financial measures.  Cardinal Health provides definitions and reconciliations of the differences between the Non-GAAP financial measures and their most directly comparable GAAP financial measures in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com. An audio replay of the webcast will be available at ir.cardinalhealth.com.



2   © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# Q2 FY2017 results



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q2 FY17 financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | Q2 FY17 | Q2 FY16 | Q2 FY17 | Q2 FY16 |
| **Revenue** | $33,150 | $31,445 | N/A | N/A |
| *% change* | *5% increase YoY* | *23% increase YoY* | | |
| **Gross Margin** | $1,602 | $1,609 | $1,611 | $1,648 |
| *% change* | *0% decrease YoY* | *11% increase YoY* | *2% decrease YoY* | *13% increase YoY* |
| *Ratio to revenue* | *4.83%* | *5.12%* | *4.86%* | *5.24%* |
| **Operating Earnings** | $542 | $563 | $701 | $726 |
| *% change* | *4% decrease YoY* | *3% increase YoY* | *4% decrease YoY* | *14% increase YoY* |
| *Ratio to revenue* | *1.63%* | *1.79%* | *2.11%* | *2.31%* |
| **Net Earnings[1]** | $324 | $326 | $427 | $430 |
| *% change* | *0% decrease YoY* | *13% increase YoY* | *1% decrease YoY* | *7% increase YoY* |
| *Ratio to revenue* | *0.98%* | *1.04%* | *1.29%* | *1.37%* |
| **Diluted EPS[1]** | $1.02 | $0.98 | $1.34 | $1.30 |
| *% change* | *4% increase YoY* | *14% increase YoY* | *3% increase YoY* | *8% increase YoY* |

*[1]Attributable to Cardinal Health, Inc.*
*Please see appendix for GAAP to Non-GAAP reconciliations.*

4   © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q2 FY17 Pharmaceutical segment business analysis

|  | Q2 FY17 ($M) | Q2 FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$29,743** | **$28,287** | **5%** |
| **Segment Profit** | **$537** | **$627** | **(14)%** |
| **Segment Profit Margin** | **1.81%** | **2.22%** | **-41 bps** |

## Highlights:

- **Revenue** for the Pharmaceutical segment increased 5 percent to $29.7 billion due to growth from existing Pharmaceutical Distribution customers and strong performance from the Specialty business.

- **Segment profit** for the quarter decreased 14 percent to $537 million. This decrease was driven by generic pharmaceutical pricing and, to a lesser extent, the previously announced loss of a large Pharmaceutical Distribution customer. This was partially offset by solid performance from Red Oak Sourcing.

- **Segment profit margin rate** decreased largely due to generic pharmaceutical pricing.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q2 FY17 Medical segment business analysis

| | Q2 FY17 ($M) | Q2 FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$3,410** | **$3,162** | **8%** |
| **Segment Profit** | **$159** | **$106** | **50%** |
| **Segment Profit Margin** | **4.68%** | **3.36%** | **+132 bps** |

**Highlights:**

- **Revenue** for the Medical segment increased 8 percent to $3.4 billion driven by contributions from net new and existing customers.

- **Segment profit** increased 50 percent to $159 million due to the contribution from Cardinal Health Brand products, which includes Cordis. The increase reflects the $21 million unfavorable impact of the Cordis-related inventory fair value step-up in the second quarter of fiscal year 2016. Excluding this step-up, year-over-year Medical segment profit growth was 25 percent.

- **Segment profit margin rate** increased due to Cardinal Health Brand products, which includes Cordis.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q2 FY17 GAAP to non-GAAP adjustments[1]

| | Q2 FY 2017 | | | | Q2 FY 2016 | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] |
| **GAAP** | **$1,602** | **$542** | **$324** | **$1.02** | **$1,609** | **$563** | **$326** | **$0.98** |
| LIFO charges/(credits) | 9 | 9 | 5 | 0.02 | 39 | 39 | 24 | 0.07 |
| Restructuring and employee severance | - | 7 | 5 | 0.01 | - | 2 | 1 | - |
| Amortization and other acquisition-related costs | - | 115 | 76 | 0.24 | - | 114 | 73 | 0.22 |
| Impairments and (gain)/loss on disposal of assets | - | 9 | 6 | 0.02 | - | 17 | 10 | 0.03 |
| Litigation (recoveries)/charges, net | - | 19 | 12 | 0.04 | - | (9) | (4) | (0.01) |
| **Non-GAAP** | **$1,611** | **$701** | **$427** | **$1.34** | **$1,648** | **$726** | **$430** | **$1.30** |
| | | | | | | | | |
| Amortization of acquisition-related intangible assets[3] | - | $95 | $63 | $0.20 | - | $100 | $65 | $0.20 |

[1]Please see appendix for GAAP to Non-GAAP reconciliations.
[2]Attributable to Cardinal Health, Inc.
[3]Amortization of acquisition-related intangible assets is included in Amortization and other acquisition-related costs

The sum of the components may not equal the total due to rounding.

 © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
Essential to care™

# FY2017 Outlook

*The company presents its outlook for fiscal 2017 non-GAAP EPS, non-GAAP effective tax rate and other forward-looking goals on the following pages. As previously disclosed, the company does not provide a GAAP EPS or GAAP effective tax rate outlook because it is unable to reliably forecast many of the items that the company excludes from GAAP EPS and effective tax rate to calculate them. See "Forward-Looking non-GAAP Measures" following the attached schedules for additional information.*



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# FY17 financial expectations

|  | **FY2017 Outlook** | **FY2016 Actual** |
|---|---|---|
| **Revenue** | High-single digit percentage growth vs. PY | $121.5B |
| **Non-GAAP Diluted EPS** | <span style="color:red">$5.35 to $5.50</span> | $5.24 |

*Red font indicates a change since previous guidance.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY17 corporate assumptions

| | FY2017 Outlook | FY2016 Actual |
|---|---|---|
| **Non-GAAP effective tax rate** | 35% - 37%[1] | 36.0%[3] |
| **Diluted weighted average Shares outstanding** | 320M - 321M | 330M |
| **Interest and other, net** | $190M - $205M | $183M |
| **Capital expenditures** | $400M - $450M | $465M |
| **Acquisition-related intangible amortization** | ~$384M or ~$0.77[2] | $355M or $0.70 |

[1]*May fluctuate quarterly due to unique items affecting periods.*

[2]*Includes only acquisitions closed as of December 31, 2016.*

[3]*FY2016 GAAP ETR 37.1%, Please see appendix for GAAP to Non-GAAP reconciliations.*

*Red font indicates a change since previous guidance.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Pharmaceutical segment FY17(E)

- **High-single digit percentage increase in revenue versus prior year**

- **Full-year segment profit down high-single to low-double digits versus prior year**

## Key assumptions

- Loss of a large pharmaceutical distribution customer contract, which expired on March 31, 2016

- Generic drug price assumption of high-single digit deflation for full fiscal year

- Brand drug manufacturer price assumption of 7% to 9% inflation for full fiscal year

- Increased expense related to investment in information systems to support growth

- Incremental contribution from new generic launches, but Y-o-Y benefit significantly less

- Incremental contribution from Red Oak Sourcing, but Y-o-Y benefit significantly less

- Additional contributions from Metro Medical and Harvard Drug Group

- Double-digit revenue and profit growth from both Specialty and Cardinal Health China[1]

[1]*Cardinal Health China reports in both segments, but primarily contributes to the Pharmaceutical segment; growth is on a U.S. dollar basis*
*Red font indicates a change since previous guidance.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Medical segment FY17(E)

- **Mid to high-single digit percentage increase in revenue vs. prior year**

- **Double-digit segment profit growth vs. prior year**

## Key assumptions

- Cordis accretive by >$0.15 vs. prior year; net of transaction-related interest expense of $0.07-$0.08; increasingly accretive thereafter

- Above-market revenue growth in Cardinal Health at Home

- Double-digit profit growth from Cardinal Health Brand products

*Red font indicates a change since previous guidance.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# A balanced approach with capital

| Capital Deployment | | | |
|---|---|---|---|
| **Capital Expenditures** | **Acquisitions**[1] | **Dividends** | **Share Repurchases** |
| **FY12 - FY16** $1.5B | $7.0B | $2.0B | $3.3B |
| **YTD FY17** $213M | $11M | $293M | $600M |

**Invested**

## $224M

for sustainable growth[2]

**Returned**

## $893M

to our shareholders[2]

[1]Acquisitions are net of divestitures.
[2]Six months ended 12/31/2016

13  © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care*™

Appendix

# Q2 FY2017 trailing five quarters, GAAP to Non-GAAP reconciliation statements and supplemental financial information



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q2 FY2017 segment analysis

## Pharmaceutical segment

|  | Q2 FY16 | Q3 FY16 | Q4 FY16 | Q1 FY17 | Q2 FY17 |
|---|---|---|---|---|---|
| Revenue ($M) | 28,287 | 27,527 | 28,177 | 28,762 | 29,743 |
| Segment Profit ($M) | 627 | 660 | 542 | 534 | 537 |

## Medical segment

|  | Q2 FY16 | Q3 FY16 | Q4 FY16 | Q1 FY17 | Q2 FY17 |
|---|---|---|---|---|---|
| Revenue ($M) | 3,162 | 3,138 | 3,210 | 3,279 | 3,410 |
| Segment Profit ($M) | 106 | 128 | 122 | 127 | 159 |

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care*™

# Year-to-date financial summary[1]

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | H1 FY17 | H1 FY16 | H1 FY17 | H1 FY16 |
| **Revenue** | **$65,189** | **$59,499** | **N/A** | **N/A** |
| *% change* | 10% increase YoY | 20% increase YoY | | |
| **Gross Margin** | **$3,192** | **$3,188** | **$3,201** | **$3,227** |
| *% change* | 0% increase YoY | 14% increase YoY | 1% decrease YoY | 15% increase YoY |
| *Ratio to revenue* | 4.90% | 5.36% | 4.91% | 5.42% |
| **Operating Earnings** | **$1,076** | **$1,183** | **$1,370** | **$1,463** |
| *% change* | 9% decrease YoY | 17% increase YoY | 6% decrease YoY | 22% increase YoY |
| *Ratio to revenue* | 1.65% | 1.99% | 2.10% | 2.46% |
| **Net Earnings[2]** | **$633** | **$709** | **$826** | **$889** |
| *% change* | 11% decrease YoY | 28% increase YoY | 7% decrease YoY | 20% increase YoY |
| *Ratio to revenue* | 0.97% | 1.19% | 1.27% | 1.49% |
| **Diluted EPS[2]** | **$1.97** | **$2.14** | **$2.57** | **$2.68** |
| *% change* | 8% decrease YoY | 30% increase YoY | 4% decrease YoY | 22% increase YoY |

*[1] Six months ended 12/31/2016*
*[2] Attributable to Cardinal Health, Inc.*
*Please see appendix for GAAP to Non-GAAP reconciliations.*



16    © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2,3,4] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Second Quarter 2017 | | | | | |
| **GAAP** | $ 1,602 | - % | $ 542 | (4)% | $ 491 | $ 167 | $ 324 | - % | $ 1.02 | 4 % |
| LIFO charges/(credits) | 9 | | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | - | | 7 | | 7 | 2 | 5 | | 0.01 | |
| Amortization and other acquisition-related costs | - | | 115 | | 115 | 39 | 76 | | 0.24 | |
| Impairments and (gain)/loss on disposal of assets | - | | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | - | | 19 | | 19 | 7 | 12 | | 0.04 | |
| **Non-GAAP** | $ 1,611 | (2)% | $ 701 | (4)% | $ 650 | $ 222 | $ 427 | (1)% | $ 1.34 | 3 % |
| | | | | | Second Quarter 2016 | | | | | |
| GAAP | $ 1,609 | 11 % | $ 563 | 3 % | $ 520 | $ 194 | $ 326 | 13 % | $ 0.98 | 14 % |
| LIFO charges/(credits) | 39 | | 39 | | 39 | 15 | 24 | | 0.07 | |
| Restructuring and employee severance | - | | 2 | | 2 | 1 | 1 | | - | |
| Amortization and other acquisition-related costs | - | | 114 | | 114 | 41 | 73 | | 0.22 | |
| Impairments and (gain)/loss on disposal of assets | - | | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | - | | (9) | | (9) | (5) | (4) | | (0.01) | |
| Non-GAAP | $ 1,648 | 13 % | $ 726 | 14 % | $ 683 | $ 253 | $ 430 | 7 % | $ 1.30 | 8 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2] Attributable to Cardinal Health, Inc.

[3] GAAP diluted EPS for the three months ended December 31, 2016 compared to the prior year period was favorably impacted by $0.09, which includes $0.05 due to change in the effective tax rate and $0.04 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

[4] Non-GAAP diluted EPS for the three months ended December 31, 2016 compared to the prior year period was favorably impacted by $0.11, which includes $0.06 due to change in the effective tax rate and $0.05 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**

**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Year-to-Date 2017 | | | | | |
| **GAAP** | $ 3,192 | - % | $ 1,076 | (9)% | $ 985 | $ 351 | $ 633 | (11)% | $ 1.97 | (8)% |
| LIFO charges/(credits) | 9 | | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | - | | 16 | | 16 | 6 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | - | | 237 | | 237 | 79 | 158 | | 0.49 | |
| Impairments and (gain)/loss on disposal of assets | - | | 12 | | 12 | 4 | 8 | | 0.02 | |
| Litigation (recoveries)/charges, net | - | | 20 | | 20 | 8 | 12 | | 0.04 | |
| **Non-GAAP** | $ 3,201 | (1)% | $ 1,370 | (6)% | $ 1,279 | $ 452 | $ 826 | (7)% | $ 2.57 | (4)% |
| | | | | | Year-to-Date 2016 | | | | | |
| GAAP | $ 3,188 | 14 % | $ 1,183 | 17 % | $ 1,087 | $ 377 | $ 709 | 28 % | $ 2.14 | 30 % |
| LIFO charges/(credits) | 39 | | 39 | | 39 | 15 | 24 | | 0.07 | |
| Restructuring and employee severance | - | | 14 | | 14 | 5 | 9 | | 0.02 | |
| Amortization and other acquisition-related costs | - | | 219 | | 219 | 78 | 141 | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | - | | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | - | | (9) | | (9) | (5) | (4) | | (0.01) | |
| Non-GAAP | $ 3,227 | 15 % | $ 1,463 | 22 % | $ 1,368 | $ 479 | $ 889 | 20 % | $ 2.68 | 22 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2] Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings[1] Before Income Taxes | Provision for Income Taxes | Net Earnings from Continuing Operations[2] | Net Earnings from Continuing Operations[2] Growth Rate | Diluted EPS[1,2] | Diluted EPS[1,2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | **Fiscal Year 2016** | | | | |
| **GAAP** | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| LIFO charges/(credits) | - | | - | - | - | | - | |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | (69) | | (69) | (27) | (42) | | (0.13) | |
| **Non-GAAP** | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |

[1] From continuing operations

[2] Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

Cardinal Health, Inc. and Subsidiaries
Total Company Business Analysis

| (in millions) | Second Quarter | | | | Non-GAAP Second Quarter | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2017** | | 2016 | | **2017** | | 2016 | |
| **Revenue** | | | | | | | | |
| Amount | $ | **33,150** | $ | 31,445 | | | | |
| Grow th rate | | **5 %** | | 23 % | | | | |
| | | | | | | | | |
| **Gross margin** | | | | | | | | |
| Amount | $ | **1,602** | $ | 1,609 | $ | **1,611** | $ | 1,648 |
| Grow th rate | | **- %** | | 11 % | | **(2)%** | | 13 % |
| | | | | | | | | |
| **Operating earnings** | | | | | | | | |
| Amount | $ | **542** | $ | 563 | $ | **701** | $ | 726 |
| Grow th rate | | **(4)%** | | 3 % | | **(4)%** | | 14 % |
| | | | | | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | | | | | |
| Amount | $ | **324** | $ | 326 | $ | **427** | $ | 430 |
| Grow th rate | | **- %** | | 13 % | | **(1)%** | | 7 % |
| | | | | | | | | |
| Return on equity | | **20.2 %** | | 19.7 % | | **26.6 %** | | 26.0 % |
| | | | | | | | | |
| Effective tax rate | | **34.0 %** | | 37.3 % | | **34.2 %** | | 37.1 % |
| | | | | | | | | |
| Debt to total capital | | **46 %** | | 45 % | | | | |
| Net debt to capital | | | | | | **36 %** | | 32 % |

| (in millions) | Year-to-Date | | | | Non-GAAP Year-to-Date | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2017** | | 2016 | | **2017** | | 2016 | |
| **Revenue** | | | | | | | | |
| Amount | $ | **65,189** | $ | 59,499 | | | | |
| Grow th rate | | **10 %** | | 20 % | | | | |
| | | | | | | | | |
| **Gross margin** | | | | | | | | |
| Amount | $ | **3,192** | $ | 3,188 | $ | **3,201** | $ | 3,227 |
| Grow th rate | | **- %** | | 14 % | | **(1)%** | | 15 % |
| | | | | | | | | |
| **Operating earnings** | | | | | | | | |
| Amount | $ | **1,076** | $ | 1,183 | $ | **1,370** | $ | 1,463 |
| Grow th rate | | **(9)%** | | 17 % | | **(6)%** | | 22 % |
| | | | | | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | | | | | |
| Amount | $ | **633** | $ | 709 | $ | **826** | $ | 889 |
| Grow th rate | | **(11)%** | | 28 % | | **(7)%** | | 20 % |
| | | | | | | | | |
| Return on equity | | **19.6 %** | | 21.8 % | | **25.6 %** | | 27.4 % |
| | | | | | | | | |
| Effective tax rate | | **35.6 %** | | 34.7 % | | **35.3 %** | | 35.0 % |

Refer to the GAAP/Non-GAAP reconciliation for definitions and calculations supporting the Non-GAAP balances.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Second Quarter | | | (in millions) | Second Quarter | | |
| | 2017 | | 2016 | | 2017 | | 2016 |
|---|---|---|---|---|---|---|---|
| **Pharmaceutical** | | | | **Medical** | | | |
| | | | | | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **29,743** | $ 28,287 | Amount | $ | **3,410** | $ 3,162 |
| Growth rate | | **5 %** | 25 % | Growth rate | | **8 %** | 9 % |
| | | | | | | | |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **537** | $ 627 | Amount | $ | **159** | $ 106 |
| Growth rate | | **(14)%** | 16 % | Growth rate[1] | | **50 %** | (8)% |
| Segment profit margin | | **1.81 %** | 2.22 % | Segment profit margin | | **4.68 %** | 3.36 % |

[1] Segment profit for three months ended December 31, 2015 includes a $21 million unfavorable impact of Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit growth was 25 percent and 10 percent for the three months ended December 31, 2016 and 2015, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the three months ended December 31, 2016 was $33,150 million, which included total segment revenue of $33,153 million and Corporate revenue of $(3) million. Total consolidated revenue for the three months ended December 31, 2015 was $31,445 million, which included total segment revenue of $31,449 million and Corporate revenue of $(4) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended December 31, 2016 were $542 million, which included total segment profit of $696 million and Corporate costs of $(154) million. Total consolidated operating earnings for the three months ended December 31, 2015 were $563 million, which included total segment profit of $733 million and Corporate costs of $(170) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**

**Segment Business Analysis**

| (in millions) | Year-to-Date | | | (in millions) | Year-to-Date | | |
|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **58,505** | $ 53,427 | Amount | $ | **6,690** | $ 6,081 |
| Growth rate | | **10 %** | 22 % | Growth rate | | **10 %** | 5 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **1,071** | $ 1,285 | Amount | $ | **286** | $ 207 |
| Growth rate | | **(17)%** | 29 % | Growth rate[1] | | **39 %** | (10)% |
| Segment profit margin | | **1.83 %** | 2.41 % | Segment profit margin | | **4.28 %** | 3.40 % |

[1] Segment profit for the six months ended December 31, 2015 includes the $21 million unfavorable impact of the Cordis-related inventory step-up. Excluding this step-up, year-over-year Medical segment profit growth was 25 percent and flat for the six months ended December 31, 2016 and 2015, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the six months ended December 31, 2016 was $65,189 million, which included total segment revenue of $65,195 million and Corporate revenue of $(6) million. Total consolidated revenue for the six months ended December 31, 2015 was $59,499 million, which included total segment revenue of $59,508 million and Corporate revenue of $(9) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the six months ended December 31, 2016 were $1,076 million, which included total segment profit of $1,357 million and Corporate costs of $(281) million. Total consolidated operating earnings for the six months ended December 31, 2015 were $1,183 million, which included total segment profit of $1,492 million and Corporate costs of $(309) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Second Quarter | | |
| --- | --- | --- | --- |
| | 2017 | | 2016 |
| **GAAP return on equity** | **20.2 %** | | 19.7 % |
| | | | |
| **Non-GAAP return on equity** | | | |
| Net earnings attributable to Cardinal Health, Inc. | $ **324** | | $ 326 |
| LIFO charges/(credits), net of tax | **5** | | 24 |
| Restructuring and employee severance, net of tax | **5** | | 1 |
| Amortization and other acquisition-related costs, net of tax | **76** | | 73 |
| Impairments and (gain)/loss on disposal of assets, net of tax | **6** | | 10 |
| Litigation (recoveries)/charges, net, net of tax | **12** | | (4) |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $ **427** | | $ 430 |
| Annualized | $ **1,710** | | $ 1,720 |

| | Second Quarter 2017 | First Quarter 2017 | Second Quarter 2016 | First Quarter 2016 |
| --- | --- | --- | --- | --- |
| Total Cardinal Health, Inc. shareholders' equity | $ **6,323** | $ **6,512** | $ 6,711 | $ 6,505 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $ **6,418** | | $ 6,608 | |
| **Non-GAAP return on equity** | **26.6 %** | | 26.0 % | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Year-to-Date | |
|---|---|---|
| | 2017 | 2016 |
| **GAAP return on equity** | **19.6 %** | 21.8 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings from continuing operations attributable to Cardinal Health, Inc. | $ **633** | $ 709 |
| LIFO charges/(credits), net of tax | **5** | 24 |
| Restructuring and employee severance, net of tax | **10** | 9 |
| Amortization and other acquisition-related costs, net of tax | **158** | 141 |
| Impairments and (gain)/loss on disposal of assets, net of tax | **8** | 10 |
| Litigation (recoveries)/charges, net, net of tax | **12** | (4) |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $ **826** | $ 889 |
| Annualized | $ **1,652** | $ 1,778 |

| | Second Quarter 2017 | First Quarter 2017 | Fourth Quarter 2016 | Second Quarter 2016 | First Quarter 2016 | Fourth Quarter 2015 |
|---|---|---|---|---|---|---|
| Total Cardinal Health, Inc. shareholders' equity | $ **6,323** | $ **6,512** | $ **6,554** | $ 6,711 | $ 6,505 | $ 6,256 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $ **6,463** | | | $ 6,491 | | |
| **Non-GAAP return on equity** | **25.6 %** | | | 27.4 % | | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Second Quarter | | Year-to-Date | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| **GAAP effective tax rate** | **34.0 %** | 37.3 % | **35.6 %** | 34.7 % |
| | | | | |
| **Non-GAAP effective tax rate** | | | | |
| Earnings before income taxes | $ **491** | $ 520 | $ **985** | $ 1,087 |
| LIFO charges/(credits) | **9** | 39 | **9** | 39 |
| Restructuring and employee severance | **7** | 2 | **16** | 14 |
| Amortization and other acquisition-related costs | **115** | 114 | **237** | 219 |
| Impairments and (gain)/loss on disposal of assets | **9** | 17 | **12** | 17 |
| Litigation (recoveries)/charges, net | **19** | (9) | **20** | (9) |
| Adjusted earnings before income taxes | $ **650** | $ 683 | $ **1,279** | $ 1,368 |
| | | | | |
| Provision for income taxes | $ **167** | $ 194 | $ **351** | $ 377 |
| LIFO charges/(credits) tax benefit | **4** | 15 | **4** | 15 |
| Restructuring and employee severance tax benefit | **2** | 1 | **6** | 5 |
| Amortization and other acquisition-related costs tax benefit | **39** | 41 | **79** | 78 |
| Impairments and (gain)/loss on disposal of assets tax benefit/(expense) | **3** | 7 | **4** | 7 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | **7** | (5) | **8** | (5) |
| Adjusted provision for income taxes | $ **222** | $ 253 | $ **452** | $ 479 |
| | | | | |
| **Non-GAAP effective tax rate** | **34.2 %** | 37.1 % | **35.3 %** | 35.0 % |

| | Second Quarter | |
| --- | --- | --- |
| | 2017 | 2016 |
| **Debt to total capital** | **46 %** | 45 % |
| | | |
| **Net debt to capital** | | |
| Current portion of long-term obligations and other short-term borrowings | $ **603** | $ 354 |
| Long-term obligations, less current portion | **4,859** | 5,171 |
| Debt | $ **5,462** | $ 5,525 |
| Cash and equivalents | **(1,881)** | (2,324) |
| Net debt | $ **3,581** | $ 3,201 |
| Total Cardinal Health, Inc. shareholders' equity | **6,323** | 6,711 |
| Capital | $ **9,904** | $ 9,912 |
| **Net debt to capital** | **36 %** | 32 % |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| | Fiscal Year |
|---|---|
| (in millions) | **2016** |
| **GAAP effective tax rate** | **37.1 %** |
| | |
| **Non-GAAP effective tax rate** | |
| Earnings before income taxes | $ 2,276 |
| Restructuring and employee severance | 25 |
| Amortization and other acquisition-related costs | 459 |
| Impairments and (gain)/loss on disposal of assets | 21 |
| Litigation (recoveries)/charges, net | **(69)** |
| Adjusted earnings before income taxes | $ **2,711** |
| | |
| Provision for income taxes | $ 845 |
| Restructuring and employee severance tax benefit | 9 |
| Amortization and other acquisition-related costs tax benefit | 143 |
| Impairments and (gain)/loss on disposal of assets tax benefit/(expense) | 6 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | **(27)** |
| Adjusted provision for income taxes | $ **976** |
| | |
| **Non-GAAP effective tax rate** | **36.0 %** |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

<u>Forward Looking non-GAAP Measures</u>

In this presentation, the Company presents its outlook for fiscal 2017 non-GAAP EPS and non-GAAP Effective Tax Rate (ETR).  The Company does not provide EPS or ETR outlook, which are the most directly comparable GAAP measures to non-GAAP EPS and non-GAAP ETR, respectively, because changes in the items that the Company excludes from GAAP EPS and GAAP ETR to calculate these measures can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on EPS or ETR outlook numbers.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2017 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.14 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total Cardinal Health, Inc. shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total Cardinal Health, Inc. shareholders' equity).

**Non-GAAP Diluted EPS attributable to Cardinal Health, Inc. or "Non-GAAP Diluted EPS" or "Non-GAAP Diluted Earnings Per Share"**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP Diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Effective Tax Rate**: (provision for income taxes adjusted for (1) LIFO charges/(credits)[1], (2) restructuring and employee severance[2], (3) amortization and other acquisition-related costs[3], (4) impairments and (gain)/loss on disposal of assets[4], (5) litigation (recoveries)/charges, net[5], and (6) loss on extinguishment of debt[6]) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP Gross Margin**: Gross margin excluding LIFO charges/(credits).

[1]The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market. These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[2]Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel), and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[3]Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs, and changes in the fair value of contingent consideration obligations.

[4]Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[5]Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[6]Charges related to the make-whole premium on the redemption of notes.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Non-GAAP Net Earnings attributable to Cardinal Health, Inc. or "Non-GAAP Net Earnings"**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Earnings from Continuing Operations:** earnings from continuing operations excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Operating Earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net.

**Non-GAAP Return on Equity**: (annualized current period net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax) divided by average Cardinal Health, Inc. shareholders' equity.

**Return on Equity**: annualized current period net earnings attributable to Cardinal Health, Inc. divided by average Cardinal Health, Inc. shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general, and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.

# EXHIBIT 68

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-Q

☑  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended December 31, 2016

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

**CardinalHealth**
*Essential to care™*

# Cardinal Health, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The number of the registrant's common shares, without par value, outstanding as of January 31, 2017, was the following: 315,454,756.

# Cardinal Health

**Q2 Fiscal 2017 Form 10-Q**

## Table of Contents

| | Page |
|---|---|
| Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Explanation and Reconciliation of Non-GAAP Financial Measures | **11** |
| Quantitative and Qualitative Disclosures about Market Risk | **14** |
| Controls and Procedures | **14** |
| Legal Proceedings | **14** |
| Risk Factors | **15** |
| Unregistered Sales of Equity Securities and Use of Proceeds | **15** |
| Financial Statements and Supplementary Data | **16** |
| Exhibits | **29** |
| Form 10-Q Cross Reference Index | **30** |
| Signatures | **31** |

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a globally integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physicians' offices. We provide clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. We connect patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. We manage our business and report our financial results in two segments: Pharmaceutical and Medical. As used in this report, "we," "our," "us," and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise.

## Forward-Looking Statements

This Quarterly Report on Form 10-Q for the quarter ended December 31, 2016 (this "Form 10-Q") (including information incorporated by reference) includes "forward-looking statements" addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), but there are others in the document, which may be identified by the words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. The matters discussed in these forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from those made, projected or implied in the forward-looking statements. The most significant of these risks, uncertainties and other factors are described in "Risk Factors" in this form 10-Q, in Exhibit 99.1 to this Form 10-Q and in "Risk Factors" of our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (our "2016 Form 10-K"). Forward-looking statements in this document speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

## Non-GAAP Financial Measures

In the "Overview of Consolidated Results" section of MD&A, we use financial measures that are derived from our consolidated financial data but are not presented in our condensed consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this Form 10-Q.

**MD&A**            **Overview**

# Management's Discussion and Analysis of Financial Condition and Results of Operations

The discussion and analysis presented below is concerned with material changes in financial condition and results of operations between the periods specified in our condensed consolidated balance sheets at December 31, 2016 and June 30, 2016, and in our condensed consolidated statements of earnings for the three and six months ended December 31, 2016 and 2015. All comparisons presented are with respect to the prior-year period, unless stated otherwise. This discussion and analysis should be read in conjunction with the MD&A included in our 2016 Form 10-K.

| MD&A | Overview |
|------|----------|

# Overview of Consolidated Results

## Revenue



**Revenue
(in billions)**

Q2 FY16 $31.4 | Q2 FY17 $33.1 | YTD FY16 $59.5 | YTD FY17 $65.2

During the three and six months ended December 31, 2016, revenue increased 5 percent to $33.1 billion and 10 percent to $65.2 billion, respectively, due primarily to sales growth from pharmaceutical distribution customers.

## GAAP and Non-GAAP Operating Earnings

**GAAP
(in billions)**

Q2 FY16 $0.6 | Q2 FY17 $0.5 | YTD FY16 $1.2 | YTD FY17 $1.1

**Non-GAAP
(in billions)**

Q2 FY16 $0.7 | Q2 FY17 $0.7 | YTD FY16 $1.5 | YTD FY17 $1.4



| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | Change | **2016** | 2015 | Change |
| **GAAP** | $ **542** | $ 563 | **(4)%** | $ **1,076** | $ 1,183 | **(9)%** |
| LIFO charges/(credits) | **9** | 39 | | **9** | 39 | |
| Restructuring and employee severance | **7** | 2 | | **16** | 14 | |
| Amortization and other acquisition-related costs | **115** | 114 | | **237** | 219 | |
| Impairments and (gain)/loss on disposal of assets | **9** | 17 | | **12** | 17 | |
| Litigation (recoveries)/charges, net | **19** | (9) | | **20** | (9) | |
| **Non-GAAP** | $ **701** | $ 726 | **(4)%** | $ **1,370** | $ 1,463 | **(6)%** |

The sum of the components may not equal the total due to rounding.

The decreases in both GAAP and non-GAAP operating earnings were due to generic pharmaceutical customer pricing changes, the loss of a large pharmaceutical distribution customer and reduced levels of branded pharmaceutical inflation. These were partially offset by positive contribution from the rest of our Pharmaceutical segment generics program. Strong growth from our Medical segment, which included the results of the Cordis business acquired on October 2, 2015, also positively contributed to both GAAP and non-GAAP operating earnings for both the three and six months ended December 31, 2016.

| **MD&A** | Overview |
|---|---|

## GAAP and Non-GAAP Diluted EPS



**GAAP**
($ per share)

**Non-GAAP**
($ per share)

| ($ per share) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | Change | **2016** | 2015 | Change |
| **GAAP** [1] | $ **1.02** | $ 0.98 | 4% | $ **1.97** | $ 2.14 | (8)% |
| LIFO charges/(credits) | **0.02** | 0.07 | | **0.02** | 0.07 | |
| Restructuring and employee severance | **0.01** | — | | **0.03** | 0.02 | |
| Amortization and other acquisition-related costs | **0.24** | 0.22 | | **0.49** | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | **0.02** | 0.03 | | **0.02** | 0.03 | |
| Litigation (recoveries)/charges, net | **0.04** | (0.01) | | **0.04** | (0.01) | |
| **Non-GAAP** [1] | $ **1.34** | $ 1.30 | 3% | $ **2.57** | $ 2.68 | (4)% |

The sum of the components may not equal the total due to rounding.

(1)    diluted earnings per share attributable to Cardinal Health, Inc. ("diluted EPS")

During the three months ended December 31, 2016, GAAP and non-GAAP diluted EPS increased primarily due to a lower effective tax rate and fewer outstanding shares as a result of share repurchases, partially offset by lower GAAP and non-GAAP operating earnings. During the six months ended December 31, 2016 GAAP and non-GAAP diluted EPS decreased primarily due to lower GAAP and non-GAAP operating earnings, partially offset by fewer outstanding shares as a result of share repurchases.

# Cash and Equivalents

Our cash and equivalents balance was $1.9 billion at December 31, 2016 compared to $2.4 billion at June 30, 2016. The decrease in cash and equivalents during the six months ended December 31, 2016 was driven by $600 million paid for share repurchases, $293 million paid for dividends and $213 million of capital expenditures, offset in part by net cash provided by operating activities of $658 million.

# Trends

As we have previously disclosed, within our Pharmaceutical segment we continue to expect fiscal 2017 segment profit to be less than fiscal 2016 segment profit due to the factors described below under "Results of Operations" that impacted results for the three and six months ended December 31, 2016. However, as is generally the case, the frequency, timing, magnitude, and profit impact of pharmaceutical customer pricing changes and branded and generic pharmaceutical manufacturer pricing changes remain uncertain and their impact on Pharmaceutical segment profit and consolidated operating earnings in fiscal 2017 could be more or less than we expect.

# Results of Operations

## Revenue



**Pharmaceutical Segment (in billions)**

$28.3 — Q2 FY16
$29.7 — Q2 FY17
$53.4 — YTD FY16
$58.5 — YTD FY17



**Medical Segment (in billions)**

$3.2 — Q2 FY16
$3.4 — Q2 FY17
$6.1 — YTD FY16
$6.7 — YTD FY17

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2016 | 2015 | Change | 2016 | 2015 | Change |
| Pharmaceutical | $ 29,743 | $ 28,287 | 5% | $ 58,505 | $ 53,427 | 10% |
| Medical | 3,410 | 3,162 | 8% | 6,690 | 6,081 | 10% |
| Total segment revenue | 33,153 | 31,449 | 5% | 65,195 | 59,508 | 10% |
| Corporate | (3) | (4) | N.M. | (6) | (9) | N.M. |
| **Total revenue** | $ 33,150 | $ 31,445 | 5% | $ 65,189 | $ 59,499 | 10% |

### Pharmaceutical Segment

Pharmaceutical segment revenue growth for the three months ended December 31, 2016 was primarily due to $1.7 billion in sales growth from our existing pharmaceutical distribution and specialty pharmaceutical customers.

Pharmaceutical segment revenue growth for the six months ended December 31, 2016 was primarily due to $5.1 billion in sales growth from new and existing pharmaceutical distribution customers, including the on-boarding of a new mail order customer beginning in October 2015.

### Medical Segment

Medical segment revenue growth for the three months ended December 31, 2016 was primarily due to sales growth from new and existing customers.

Medical segment revenue growth for the six months ended December 31, 2016 was primarily due to sales growth from new and existing customers and $202 million in contributions from acquisitions.

## Cost of Products Sold

Cost of products sold for the three and six months ended December 31, 2016 increased $1.7 billion (6 percent) and $5.7 billion (10 percent) compared to the prior-year periods, respectively, as a result of the same factors affecting the changes in revenue and gross margin.

| MD&A | Results of Operations |
|---|---|

## Gross Margin



**Gross Margin
(in billions)**

$1.6 — Q2 FY16
$1.6 — Q2 FY17
$3.2 — YTD FY 16
$3.2 — YTD FY17



**Gross Margin Rate
(Gross Margin as a Percent of Revenue)**

5.12% — Q2 FY16
4.83% — Q2 FY17
5.36% — YTD FY16
4.90% — YTD FY17

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 | Change | 2016 | 2015 | Change |
| Gross margin | $ 1,602 | $ 1,609 | — % | $ 3,192 | $ 3,188 | —% |

### Three Months Ended December 31, 2016

Gross margin during the three months ended December 31, 2016 was essentially flat versus the prior-year period.

Pharmaceutical distribution sales growth increased gross margin by $72 million. This was partially offset by the loss of a large pharmaceutical distribution customer.

Gross margin as a percent of revenue declined 29 basis points, primarily due to generic pharmaceutical customer pricing changes.

Gross margin benefited $30 million from a lower last-in first-out ("LIFO") charge as compared to the prior-year period. See Note 1 of the "Notes to Condensed Consolidated Financial Statements" for additional information on LIFO.

### Six Months Ended December 31, 2016

Gross margin during the six months ended December 31, 2016 was essentially flat versus the prior-year period.

Pharmaceutical distribution sales growth and acquisitions in both segments increased gross margin by $181 million and $125 million, respectively. These were partially offset by the loss of a large pharmaceutical distribution customer.

Gross margin as a percent of revenue declined 46 basis points, primarily due to generic pharmaceutical customer pricing changes and changes in product mix resulting from the on-boarding of a new mail order customer. While the new mail order customer contributes positively to gross margin dollars, it has a dilutive impact on our overall gross margin rate for the six-month period.

Gross margin benefited $30 million from a lower LIFO charge compared to the prior-year period.

## Distribution, Selling, General, and Administrative ("SG&A") Expenses

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 | Change | 2016 | 2015 | Change |
| SG&A expenses | $ 910 | $ 922 | (1)% | $ 1,831 | $ 1,764 | 4% |

SG&A expenses during the three months ended December 31, 2016 were essentially flat versus the prior-year period. The increase in SG&A expenses during the six months ended December 31, 2016 over the prior-year period was driven by acquisitions ($103 million).

**MD&A** | **Results of Operations**

# Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 13 of the "Notes to Condensed Consolidated Financial Statements" for additional information on segment profit.



**Pharmaceutical Segment Profit (in millions)**



**Medical Segment Profit (in millions)**

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 | Change | 2016 | 2015 | Change |
| Pharmaceutical | $ 537 | $ 627 | (14)% | $ 1,071 | $ 1,285 | (17)% |
| Medical | 159 | 106 | 50 % | 286 | 207 | 39 % |
| Total segment profit | 696 | 733 | (5)% | 1,357 | 1,492 | (9)% |
| Corporate | (154) | (170) | 9 % | (281) | (309) | 9 % |
| **Total consolidated operating earnings** | $ 542 | $ 563 | (4)% | $ 1,076 | $ 1,183 | (9)% |

## Pharmaceutical Segment Profit

The decrease in Pharmaceutical segment profit during the three and six months ended December 31, 2016 was largely due to generic pharmaceutical customer pricing changes. The loss of a large pharmaceutical distribution customer beginning April 1, 2016 and reduced levels of branded pharmaceutical inflation also contributed to the decrease in Pharmaceutical segment profit. These were partially offset by positive contribution from the rest of our generics program.

LIFO charges/(credits) are not allocated to segment profit as explained in Note 13 of the "Notes to Condensed Consolidated Financial Statements".

## Medical Segment Profit

The increase in Medical segment profit during the three months ended December 31, 2016 was primarily due to contributions from Cardinal Health Brand products, which includes the beneficial comparison from the $21 million, prior-year unfavorable impact on cost of products sold from the Cordis inventory fair value step up.

Contributions from Cardinal Health Brand products, including the above-mentioned Cordis inventory step up as well as acquisitions, increased Medical segment profit during the six months ended December 31, 2016.

## Corporate

The changes in Corporate during the three and six months ended December 31, 2016 compared to the prior-year periods were primarily due to a lower LIFO charge described under "Gross Margin" above.

| MD&A | Results of Operations |
|------|----------------------|

## Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin, and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Restructuring and employee severance | $ 7 | $ 2 | $ 16 | $ 14 |
| Amortization and other acquisition-related costs | 115 | 114 | 237 | 219 |
| Impairments and (gain)/loss on disposal of assets, net | 9 | 17 | 12 | 17 |
| Litigation (recoveries)/charges, net | 19 | (9) | 20 | (9) |

**Amortization and Other Acquisition-Related Costs**
Amortization of acquisition-related intangible assets was $95 million and $100 million for the three months ended December 31, 2016 and 2015, respectively. Amortization of acquisition-related intangible assets was $196 million and $167 million for the six months ended December 31, 2016 and 2015, respectively.

**Litigation (Recoveries)/Charges, Net**
Litigation (recoveries)/charges, net increased over the prior-year periods primarily due to settlement of the State of West Virginia matter. See Note 7 of the "Notes to Condensed Consolidated Financial Statements" for additional information.

## Earnings Before Income Taxes

In addition to the items discussed above, earnings before income taxes were impacted by the following:

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 | Change | 2016 | 2015 | Change |
| Other (income)/expense, net | $ 7 | $ (2) | N.M. | $ 3 | $ 6 | N.M. |
| Interest expense, net | 44 | 45 | (2)% | 88 | 90 | (2)% |

## Provision for Income Taxes

During the three months ended December 31, 2016 and 2015, the effective tax rate was 34.0 percent and 37.3 percent, respectively. The effective tax rate for the three months ended December 31, 2016 was impacted by net favorable discrete items of $12 million. Net favorable discrete items were immaterial for the three months ended December 31, 2015.

During the six months ended December 31, 2016 and 2015, the effective tax rate was 35.6 percent and 34.7 percent, respectively. The effective tax rate for the six months ended December 31, 2016 and 2015 included net favorable discrete items of $15 million and $28 million, respectively.

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends, and share repurchases. If we decide to engage in one or more additional acquisitions, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $1.9 billion at December 31, 2016 compared to $2.4 billion at June 30, 2016. At December 31, 2016, our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

During the six months ended December 31, 2016, we deployed $600 million on share repurchases, $293 million for cash dividends and $213 million for capital expenditures; net cash provided by operating activities was $658 million, driven primarily by net earnings.

The cash and equivalents balance at December 31, 2016 included $552 million of cash held by subsidiaries outside of the United States. Although the vast majority of cash is available for repatriation, bringing the cash into the United States could trigger U.S federal, state and local income tax obligations. Because the earnings are considered permanently reinvested, no U.S. tax provision has been accrued related to the repatriation of these earnings. It is not practicable to evaluate the amount of U.S. tax that might be payable on the remittance of such earnings.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $1.75 billion revolving credit facility and a $700 million committed receivables sales facility program. In November 2016, we renewed our committed receivables sales facility program through November 1, 2019. In December 2016, we increased our commercial paper program, which is backed by our revolving credit facility, from $1.5 billion to $1.75 billion. At December 31, 2016, we had no amounts outstanding under the revolving credit facility; however, availability was reduced by outstanding letters of credit of $14 million. We also had no amounts outstanding under the committed receivables sales facility program; however, availability was reduced by outstanding standby letters of credit of $38 million at December 31, 2016.

Our revolving credit facility and committed receivables sales facility program require us to maintain a consolidated leverage ratio of no more than 3.25-to-1. As of December 31, 2016, we were in compliance with this financial covenant.

### Available-for-Sale Securities

At December 31, 2016 and June 30, 2016, we held $201 million and $200 million, respectively of marketable securities, which are classified as available-for-sale.

## Capital Deployment

### Capital Expenditures

Capital expenditures during the six months ended December 31, 2016 and 2015 were $213 million and $175 million, respectively.

### Dividends

On November 3, 2016, our Board of Directors approved a quarterly dividend of $0.4489 per share, or $1.80 per share on an annualized basis, which was paid on January 15, 2017 to shareholders of record on January 3, 2017.

### Share Repurchases

During the six months ended December 31, 2016, we repurchased $600 million of our common shares. We funded the repurchases with available cash. At December 31, 2016, we had $443 million remaining under our existing share repurchase program.

# Other Items

The MD&A in our 2016 Form 10-K addresses our contractual obligations, critical accounting policies and sensitive accounting estimates, and off-balance sheet arrangements, as of and for the fiscal year ended June 30, 2016. There have been no subsequent material changes outside of the ordinary course of business to those items.

# Explanation and Reconciliation of Non-GAAP Financial Measures

The "Overview of Consolidated Results" section within MD&A in this Form 10-Q contains financial measures that are not calculated in accordance with GAAP.

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this Form 10-Q for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics allows for a better comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business, which includes normal levels of reinvestment in the business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, these non-cash amounts are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of historical, current and forecasted financial results. We exclude other acquisition-related costs because they are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. They are also significantly impacted by the timing and size of acquisitions.

- Impairments and gains or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the items listed above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

# Definitions

**Growth rate calculation**: Growth rates in this Form 10-Q are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes**: earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

Explanation and Reconciliation of Non-GAAP Financial Measures

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[1] | Net Earnings[1] Growth Rate | Diluted EPS[1] | Diluted EPS[1] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **Three Months Ended December 31, 2016** | | | | | | | | |
| **GAAP** | $ 542 | (4)% | $ 491 | $ 167 | $ 324 | — % | $ 1.02 | 4 % |
| LIFO charges/(credits) | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | 7 | | 7 | 2 | 5 | | 0.01 | |
| Amortization and other acquisition-related costs | 115 | | 115 | 39 | 76 | | 0.24 | |
| Impairments and loss on disposal of assets | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | 19 | | 19 | 7 | 12 | | 0.04 | |
| **Non-GAAP** | $ 701 | (4)% | $ 650 | $ 222 | $ 427 | (1)% | $ 1.34 | 3 % |
| **Three Months Ended December 31, 2015** | | | | | | | | |
| GAAP | $ 563 | 3 % | $ 520 | $ 194 | $ 326 | 13 % | $ 0.98 | 14 % |
| LIFO charges/(credits) | 39 | | 39 | 15 | 24 | | 0.07 | |
| Restructuring and employee severance | 2 | | 2 | 1 | 1 | | — | |
| Amortization and other acquisition-related costs | 114 | | 114 | 41 | 73 | | 0.22 | |
| Impairments and loss on disposal of assets | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (9) | | (9) | (5) | (4) | | (0.01) | |
| Non-GAAP | $ 726 | 14 % | $ 683 | $ 253 | $ 430 | 7 % | $ 1.30 | 8 % |
| **Six Months Ended December 31, 2016** | | | | | | | | |
| **GAAP** | $ 1,076 | (9)% | $ 985 | $ 351 | $ 633 | (11)% | $ 1.97 | (8)% |
| LIFO charges/(credits) | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | 16 | | 16 | 6 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | 237 | | 237 | 79 | 158 | | 0.49 | |
| Impairments and loss on disposal of assets | 12 | | 12 | 4 | 8 | | 0.02 | |
| Litigation (recoveries)/charges, net | 20 | | 20 | 8 | 12 | | 0.04 | |
| **Non-GAAP** | $ 1,370 | (6)% | $ 1,279 | $ 452 | $ 826 | (7)% | $ 2.57 | (4)% |
| **Six Months Ended December 31, 2015** | | | | | | | | |
| GAAP | $ 1,183 | 17 % | $ 1,087 | $ 377 | $ 709 | 28 % | $ 2.14 | 30 % |
| LIFO charges/(credits) | 39 | | 39 | 15 | 24 | | 0.07 | |
| Restructuring and employee severance | 14 | | 14 | 5 | 9 | | 0.02 | |
| Amortization and other acquisition-related costs | 219 | | 219 | 78 | 141 | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (9) | | (9) | (5) | (4) | | (0.01) | |
| Non-GAAP | $ 1,463 | 22 % | $ 1,368 | $ 479 | $ 889 | 20 % | $ 2.68 | 22 % |

[1] attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

# Quantitative and Qualitative Disclosures About Market Risk

There have been no material changes in the quantitative and qualitative market risk disclosures included in our 2016 Form 10-K since the end of fiscal 2016 through December 31, 2016.

# Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of December 31, 2016. Based on this evaluation, our principal executive officer and principal financial officer have concluded that as of December 31, 2016, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

### Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Implementation of New Software Systems

The Pharmaceutical segment is in a multi-year project implementing a replacement of certain finance and operating information systems, which is expected to affect internal control over financial reporting. This project did not impact internal control over financial reporting during the quarter ended December 31, 2016. During the quarter ending March 31, 2017, we began transitioning selected processes to the new systems. If these new systems are not effectively implemented or fail to operate as intended, it could adversely affect our internal control over financial reporting.

# Legal Proceedings

The legal proceedings described in Note 7 of the "Notes to Condensed Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

# Risk Factors

You should carefully consider the information in this Form 10-Q, including the risk factor below, and the risk factors discussed in "Risk Factors" and other risks discussed in our 2016 Form 10-K and our filings with the SEC since June 30, 2016. These risks could materially and adversely affect our results of operations, financial condition, liquidity, and cash flows. Our business also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

**We may be impacted by possible legislative and regulatory initiatives.**
Changes in domestic policy, including significant changes in tax, trade, healthcare and other laws and regulations, could affect our business. For example, tax proposals may include changes, which could, if implemented, have an adverse or a beneficial impact on us, including a "border adjustment tax" or new import tariffs, which could adversely affect us because we sell imported products. In addition, proposals to modify or repeal the Patient Protection and Affordable Care Act may, if implemented, affect us.

# Unregistered Sales of Equity Securities and Use of Proceeds

**Issuer Purchases of Equity Securities**

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Program (2) (in millions) |
|---|---|---|---|---|
| October 2016 | 210 | $ 75.90 | — | $ 793 |
| November 2016 | 4,587,897 | 69.37 | 4,587,693 | 475 |
| December 2016 | 445,961 | 71.27 | 445,761 | 443 |
| **Total** | **5,034,068** | **$ 69.54** | **5,033,454** | **$ 443** |

(1)   Reflects 210, 205 and 199 common shares purchased in October, November and December 2016, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2)   On May 4, 2016, our Board of Directors approved a $1.0 billion share repurchase program that expires on December 31, 2019.

# Condensed Consolidated Statements of Earnings

## (Unaudited)

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| (in millions, except per common share amounts) | **2016** | 2015 | **2016** | 2015 |
| Revenue | $ **33,150** | $ 31,445 | $ **65,189** | $ 59,499 |
| Cost of products sold | **31,548** | 29,836 | **61,997** | 56,311 |
| Gross margin | **1,602** | 1,609 | **3,192** | 3,188 |
| | | | | |
| **Operating expenses:** | | | | |
| Distribution, selling, general, and administrative expenses | **910** | 922 | **1,831** | 1,764 |
| Restructuring and employee severance | **7** | 2 | **16** | 14 |
| Amortization and other acquisition-related costs | **115** | 114 | **237** | 219 |
| Impairments and loss on disposal of assets, net | **9** | 17 | **12** | 17 |
| Litigation (recoveries)/charges, net | **19** | (9) | **20** | (9) |
| Operating earnings | **542** | 563 | **1,076** | 1,183 |
| | | | | |
| Other (income)/expense, net | **7** | (2) | **3** | 6 |
| Interest expense, net | **44** | 45 | **88** | 90 |
| Earnings before income taxes | **491** | 520 | **985** | 1,087 |
| | | | | |
| Provision for income taxes | **167** | 194 | **351** | 377 |
| Net earnings | **324** | 326 | **634** | 710 |
| | | | | |
| Less: Net earnings attributable to noncontrolling interests | **—** | — | **(1)** | (1) |
| **Net earnings attributable to Cardinal Health, Inc.** | $ **324** | $ 326 | $ **633** | $ 709 |
| | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | |
| Basic | $ **1.02** | $ 0.99 | $ **1.99** | $ 2.16 |
| Diluted | **1.02** | 0.98 | **1.97** | 2.14 |
| | | | | |
| **Weighted-average number of common shares outstanding:** | | | | |
| Basic | **318** | 329 | **319** | 329 |
| Diluted | **319** | 332 | **321** | 332 |
| | | | | |
| Cash dividends declared per common share | $ **0.4489** | $ 0.3870 | $ **0.8978** | $ 0.7740 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Statements of Comprehensive Income
## (Unaudited)

| (in millions) | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | **2016** | 2015 | **2016** | 2015 |
| Net earnings | $ **324** | $ 326 | $ **634** | $ 710 |
| | | | | |
| **Other comprehensive loss:** | | | | |
| Foreign currency translation adjustments and other | **(78)** | (28) | **(80)** | (73) |
| Net unrealized gain/(loss) on derivative instruments, net of tax | **24** | (1) | **26** | (1) |
| Total other comprehensive loss, net of tax | **(54)** | (29) | **(54)** | (74) |
| | | | | |
| Total comprehensive income | **270** | 297 | **580** | 636 |
| | | | | |
| Less: comprehensive income attributable to noncontrolling interests | **—** | — | **(1)** | (1) |
| **Total comprehensive income attributable to Cardinal Health, Inc.** | $ **270** | $ 297 | $ **579** | $ 635 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Balance Sheets
## (Unaudited)

| (in millions) | | December 31, 2016 | | June 30, 2016 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,881 | $ | 2,356 |
| Trade receivables, net | | 7,533 | | 7,405 |
| Inventories, net | | 11,915 | | 10,615 |
| Prepaid expenses and other | | 1,824 | | 1,580 |
| Total current assets | | 23,153 | | 21,956 |
| | | | | |
| Property and equipment, net | | 1,856 | | 1,796 |
| Goodwill and other intangibles, net | | 9,276 | | 9,426 |
| Other assets | | 736 | | 944 |
| **Total assets** | $ | 35,021 | $ | 34,122 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 18,857 | $ | 17,306 |
| Current portion of long-term obligations and other short-term borrowings | | 603 | | 587 |
| Other accrued liabilities | | 1,554 | | 1,808 |
| Total current liabilities | | 21,014 | | 19,701 |
| | | | | |
| Long-term obligations, less current portion | | 4,859 | | 4,952 |
| Deferred income taxes and other liabilities | | 2,692 | | 2,781 |
| | | | | |
| Redeemable noncontrolling interests | | 115 | | 117 |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized—**500 thousand** shares, Issued—**none** | | — | | — |
| Common shares, without par value: | | | | |
| Authorized—**755 million** shares, Issued—**327 million** shares and 364 million shares at **December 31, 2016** and June 30, 2016, respectively | | 2,672 | | 3,010 |
| Retained earnings | | 4,604 | | 6,419 |
| Common Shares in treasury, at cost: **11 million** shares and 42 million shares at **December 31, 2016** and June 30 2016, respectively | | (783) | | (2,759) |
| Accumulated other comprehensive loss | | (170) | | (116) |
| **Total Cardinal Health, Inc. shareholders' equity** | | 6,323 | | 6,554 |
| Noncontrolling interests | | 18 | | 17 |
| **Total shareholders' equity** | | 6,341 | | 6,571 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 35,021 | $ | 34,122 |

See notes to condensed consolidated financial statements.

**Financial Statements**

# Condensed Consolidated Statements of Cash Flows
**(Unaudited)**

| (in millions) | Six Months Ended December 31, | | | |
|---|---:|---:|---:|---:|
| | **2016** | | 2015 | |
| **Cash flows provided by operating activities:** | | | | |
| Net earnings | $ | **634** | $ | 710 |
| | | | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | | |
| Depreciation and amortization | | **339** | | 306 |
| Impairments and loss on sale of other investments | | **3** | | — |
| Impairments and loss on disposal of assets, net | | **12** | | 17 |
| Share-based compensation | | **47** | | 56 |
| Provision for bad debts | | **29** | | 35 |
| Change in fair value of contingent consideration obligation | | **—** | | (14) |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | |
| Increase in trade receivables | | **(146)** | | (393) |
| Increase in inventories | | **(1,294)** | | (1,565) |
| Increase in accounts payable | | **1,563** | | 2,431 |
| Other accrued liabilities and operating items, net | | **(529)** | | (172) |
| Net cash provided by operating activities | | **658** | | 1,411 |
| | | | | |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | | **(11)** | | (3,284) |
| Additions to property and equipment | | **(213)** | | (175) |
| Purchase of available-for-sale securities and other investments | | **(125)** | | (88) |
| Proceeds from sale of available-for-sale securities and other investments | | **72** | | 57 |
| Proceeds from maturities of available-for-sale securities | | **39** | | 19 |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | | **1** | | — |
| Net cash used in investing activities | | **(237)** | | (3,471) |
| | | | | |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | | **—** | | (23) |
| Net change in short-term borrowings | | **33** | | 39 |
| Net purchase of noncontrolling interests | | **(12)** | | — |
| Reduction of long-term obligations | | **(60)** | | (4) |
| Proceeds from interest rate swap terminations | | **14** | | — |
| Net tax withholdings from share-based compensation | | **—** | | (7) |
| Tax proceeds from share-based compensation | | **32** | | 32 |
| Dividends on common shares | | **(293)** | | (259) |
| Purchase of treasury shares | | **(600)** | | — |
| Net cash used in financing activities | | **(886)** | | (222) |
| | | | | |
| Effect of exchange rates changes on cash and equivalents | | **(10)** | | (10) |
| | | | | |
| Net decrease in cash and equivalents | | **(475)** | | (2,292) |
| Cash and equivalents at beginning of period | | **2,356** | | 4,616 |
| **Cash and equivalents at end of period** | $ | **1,881** | $ | 2,324 |

See notes to condensed consolidated financial statements.

# Notes to Condensed Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

### Basis of Presentation

Our condensed consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. References to "we," "our," and similar pronouns in this Quarterly Report on Form 10-Q for the quarter ended December 31, 2016 (this "Form 10-Q") refer to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context requires otherwise.

Our condensed consolidated financial statements have been prepared in accordance with the U.S. Securities and Exchange Commission ("SEC") instructions to Quarterly Reports on Form 10-Q and include the information and disclosures required by accounting principles generally accepted in the United States ("GAAP") for interim financial reporting. The preparation of financial statements in conformity with GAAP requires us to make estimates and assumptions that affect amounts reported in the condensed consolidated financial statements and accompanying notes. Actual amounts may differ from these estimated amounts. In our opinion, all adjustments necessary for a fair presentation of the condensed consolidated financial statements have been included. Except as disclosed elsewhere in this Form 10-Q, all such adjustments are of a normal and recurring nature. In addition, financial results presented for this fiscal 2017 interim period are not necessarily indicative of the results that may be expected for the full fiscal year ending June 30, 2017. These condensed consolidated financial statements are unaudited and, accordingly, should be read in conjunction with the audited consolidated financial statements and related notes contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K").

### Inventories

A substantial portion of our inventories are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These inventories are included within the core pharmaceutical distribution facilities of our Pharmaceutical segment ("distribution facilities") and are primarily merchandise inventories. The LIFO method presumes that the most recent inventory purchases are the first items sold, so LIFO helps us better match current costs and revenue. We believe that the average cost method of inventory valuation provides a reasonable approximation of the current cost of replacing inventory within these distribution facilities. As such, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation.

Interim LIFO calculations are based on our estimates of the expected year-end inventory levels and costs, since the actual valuation of inventory under the LIFO method is computed at the end of the fiscal year based on the inventory levels, inventory mix and inventory cost inflation and deflation at that time. Based upon the year-to-date

balance and expectations for the remainder of the fiscal year, we recorded LIFO charges of $9 million and $39 million for both three and six months ended December 31, 2016 and 2015, respectively, which are included in cost of products sold in the condensed consolidated financial statements.

### Recent Financial Accounting Standards

In January 2017, the Financial Accounting Standards Board ("FASB") issued new accounting guidance that changes the definition of a business when evaluating whether a set of transferred assets and activities is considered a business. This guidance will be effective for us in the first quarter of fiscal 2019, with early adoption permitted. We are currently evaluating the impact of this standard on our consolidated financial statements.

In November 2016, the FASB issued amended accounting guidance on the presentation of restricted cash and restricted cash equivalents in the statement of cash flows. The guidance requires an entity to include restricted cash and restricted cash equivalents with cash and cash equivalents when reconciling the beginning-of-period and end-of-period amounts shown on the statements of cash flows. This amendment will be effective for us in the first quarter of fiscal 2019. Early adoption is permitted. We are currently evaluating the timing of adoption and the impact of this standard on our consolidated financial statements.

In October 2016, the FASB issued amended accounting guidance that requires an entity to recognize the income tax effect of intercompany sales and transfers of assets other than inventory at the time that the transfer occurs rather than when the asset is sold to a third party. This amendment will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In August 2016, the FASB issued accounting guidance which clarifies the classification of certain cash receipts and cash payments in the statement of cash flows, including those related to contingent consideration payments made after a business combination, distributions received from equity method investees, debt prepayment or debt extinguishment costs, and proceeds from the settlement of insurance claims. This guidance will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In April 2015, the FASB issued amended accounting guidance that clarifies the circumstances under which a cloud computing customer would account for the arrangement as a license of internal-use software. If it is determined that a software license does not exist in the arrangement, the customer would account for this arrangement as a service contract. We adopted this guidance in the first quarter of fiscal 2017. The adoption of this guidance did not have a material impact on our financial position or results of operations.

Also in April 2015, the FASB issued amended accounting guidance related to the presentation of debt issuance costs in the financial statements. This guidance requires an entity to present such costs in the balance sheet as a direct deduction from the related debt rather than as an asset. We adopted this guidance in the first quarter of

fiscal 2017. Upon adoption of this guidance, debt issuance costs of $29 million were reclassified from other assets to long-term obligations, less current portion within the condensed consolidated balance sheet.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments, and assets recognized from costs incurred to obtain or fulfill a contract. This amendment will be effective for us in the first quarter of fiscal 2019. We are in the process of assessing any differences between the amended and existing guidance that could impact our consolidated financial statements and continuing to evaluate the options for adoption.

## 2. Acquisitions

### Cordis

On October 2, 2015, we acquired the Cordis business from Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, for $1.9 billion using cash on hand and proceeds from our debt offering in June 2015. The acquisition of Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions with operations in more than 50 countries, expands our Medical segment's portfolio of self-manufactured products and its geographic scope. We closed the Cordis acquisition in 20 principal countries on October 2, 2015, and acquired control of, as described in GAAP, and the rights to, the net economic benefit from the entire Cordis business in the remaining countries at that time.

Transaction and integration costs associated with the acquisition of Cordis were $15 million and $20 million during the three months ended December 31, 2016 and 2015, respectively, and $29 million and $41 million during the six months ended December 31, 2016 and 2015, respectively, and are included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

### Fair Value of Assets Acquired and Liabilities Assumed

The allocation of the fair value of assets acquired and liabilities assumed for the acquisitions of Cordis, naviHealth Holdings, LLC ("naviHealth"), and The Harvard Drug Group ("Harvard Drug") were finalized during the six months ended December 31, 2016, resulting in goodwill of $944 million, $322 million, and $634 million, respectively. There were no significant adjustments to the allocation of the fair value of assets acquired and liabilities assumed for the naviHealth and Harvard Drug acquisitions from those disclosed in our 2016 Form 10-K. During the six months ended December 31, 2016, we recorded additional goodwill for Cordis of $83 million, substantially all of which was to increase an accrual for assumed pre-acquisition product liability lawsuits. See Note 7 for further discussion of the product liability lawsuits.

## 3. Restructuring and Employee Severance

The following table summarizes restructuring and employee severance costs:

| (in millions) | Three Months Ended December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Employee-related costs (1) | $ 6 | $ — |
| Facility exit and other costs (2) | 1 | 2 |
| Total restructuring and employee severance | $ 7 | $ 2 |

| (in millions) | Six Months Ended December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Employee-related costs (1) | $ 13 | $ 6 |
| Facility exit and other costs (2) | 3 | 8 |
| Total restructuring and employee severance | $ 16 | $ 14 |

(1) Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2) Facility exit and other costs primarily consist of lease termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | Facility Exit and Other Costs | Total |
| --- | --- | --- | --- |
| Balance at June 30, 2016 | $ 15 | $ 1 | $ 16 |
| Additions | 9 | 1 | 10 |
| Payments and other adjustments | (9) | (1) | (10) |
| Balance at December 31, 2016 | $ 15 | $ 1 | $ 16 |

## 4. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical | Medical | Total |
| --- | --- | --- | --- |
| Balance at June 30, 2016 | $ 2,919 | $ 4,248 | $ 7,167 |
| Goodwill acquired, net of purchase price adjustments | 4 | 66 | 70 |
| Foreign currency translation adjustments and other | (15) | (10) | (25) |
| Balance at December 31, 2016 | $ 2,908 | $ 4,304 | $ 7,212 |

## Other Intangible Assets

The following tables summarize other intangible assets by class at:

| (in millions) | December 31, 2016 | | | |
|---|---|---|---|---|
| | Gross Intangible | Accumulated Amortization | Net Intangible | Weighted-Average Remaining Amortization Period (Years) |
| **Indefinite-life intangibles:** | | | | |
| IPR&D, trademarks and other | $ 70 | $ — | $ 70 | N/A |
| Total indefinite-life intangibles | 70 | — | 70 | N/A |
| | | | | |
| **Definite-life intangibles:** | | | | |
| Customer relationships | 1,939 | 849 | 1,090 | 9 |
| Trademarks, trade names, and patents | 508 | 168 | 340 | 14 |
| Developed technology and other | 812 | 248 | 564 | 8 |
| Total definite-life intangibles | 3,259 | 1,265 | 1,994 | 10 |
| **Total other intangible assets** | $ 3,329 | $ 1,265 | $ 2,064 | N/A |

| (in millions) | June 30, 2016 | | |
|---|---|---|---|
| | Gross Intangible | Accumulated Amortization | Net Intangible |
| **Indefinite-life intangibles:** | | | |
| IPR&D, trademarks and other | $ 72 | $ — | $ 72 |
| Total indefinite-life intangibles | 72 | — | 72 |
| | | | |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,946 | 737 | 1,209 |
| Trademarks, trade names, and patents | 508 | 140 | 368 |
| Developed technology and other | 808 | 198 | 610 |
| Total definite-life intangibles | 3,262 | 1,075 | 2,187 |
| **Total other intangible assets** | $ 3,334 | $ 1,075 | $ 2,259 |

Total amortization of intangible assets was $95 million and $101 million for the three months ended December 31, 2016 and 2015, respectively, and $196 million and $168 million for the six months ended December 31, 2016 and 2015, respectively. Estimated annual amortization of intangible assets for the remainder of fiscal 2017 through 2021 is as follows: $189 million, $349 million, $280 million, $253 million, and $206 million.

## 5. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. We held the following investments in marketable securities at fair value at:

| (in millions) | December 31, 2016 | June 30, 2016 |
|---|---|---|
| **Current available-for-sale securities:** | | |
| Treasury bills | $ — | $ 3 |
| International bonds | 3 | 2 |
| Corporate bonds | 59 | 58 |
| U.S. agency bonds | 11 | 6 |
| Asset-backed securities | 26 | 28 |
| International equity securities | 1 | 2 |
| U.S. agency mortgage-backed securities | 10 | 14 |
| Total current available-for-sale securities | 110 | 113 |
| **Long-term available-for-sale securities:** | | |
| Treasury bills | 24 | 10 |
| International bonds | 3 | 1 |
| Corporate bonds | 29 | 36 |
| U.S. agency bonds | — | 9 |
| Asset-backed securities | 16 | 17 |
| U.S. agency mortgage-backed securities | 19 | 14 |
| Total long-term available-for-sale securities | 91 | 87 |
| **Total available-for-sale securities** | $ 201 | $ 200 |

Gross unrealized gains and losses on available-for-sale securities were immaterial at both December 31, 2016 and June 30, 2016. During the six months ended December 31, 2016 and 2015, gross realized gains and losses on available-for-sale securities were immaterial and we did not recognize any other-than-temporary impairments. At December 31, 2016, the weighted-average effective maturity of our current and long-term marketable securities was approximately 6 months and 16 months, respectively.

## 6. Income Taxes

Fluctuations in our provision for income taxes as a percentage of pretax earnings ("effective tax rate") are due to changes in international and U.S. state effective tax rates resulting from our business mix and discrete items.

During the three months ended December 31, 2016 and 2015, the effective tax rate was 34.0 percent and 37.3 percent, respectively.

During the six months ended December 31, 2016 and 2015, the effective tax rate was 35.6 percent and 34.7 percent, respectively.

At December 31, 2016 and June 30, 2016, we had $403 million and $527 million of unrecognized tax benefits, respectively. The December 31, 2016 and June 30, 2016, balances include $263 million and $355 million of unrecognized tax benefits, respectively, that if recognized, would have an impact on the effective tax rate.

At December 31, 2016 and June 30, 2016, we had $112 million and $145 million, respectively, accrued for the payment of interest and penalties related to unrecognized tax benefits, which we recognize in the provision for income taxes in the condensed consolidated

**Notes to Financial Statements**

statements of earnings. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the condensed consolidated balance sheets.

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is between zero and a net decrease of $60 million, exclusive of penalties and interest.

We file income tax returns in the U.S. federal jurisdiction, various U.S. state jurisdictions, and various foreign jurisdictions. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2008 through the current fiscal year.

During the three months ended December 31, 2016, the IRS closed audits of fiscal years 2006 and 2007, which is reflected in our condensed consolidated financial statements and in our evaluation of uncertain tax positions. The result of the settlement had an immaterial impact to our provision for income taxes. The IRS is currently conducting audits of fiscal years 2008 through 2014.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $138 million and $172 million at December 31, 2016 and June 30, 2016, respectively, and is included in other assets in the condensed consolidated balance sheets.

## 7. Commitments, Contingent Liabilities and Litigation

### Commitments

**Generic Sourcing Venture with CVS Health Corporation ("CVS Health")**

In July 2014, we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS Health for an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. Due to the achievement of predetermined milestones, we are required to make quarterly payments of $45.6 million to CVS Health for the remainder of the initial term.

### Legal Proceedings

We become involved from time to time in disputes, litigation, and regulatory matters.

We may be named from time to time in *qui tam* actions, which are initiated by private third parties purporting to act on behalf of federal or state governments and which allege that false claims have been submitted or have been caused to be submitted for payment by the government. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own on behalf of the government.

From time to time, we become aware through employees or other parties of possible compliance matters that we investigate internally, such as complaints or concerns relating to accounting, internal accounting controls, financial reporting, auditing, or other ethical matters or relating to compliance with laws such as healthcare fraud and abuse, anti-corruption, or anti-bribery laws. In addition, from time to time, we receive subpoenas or requests for information from various government agencies relating to our business or to the business of a customer, supplier, or other industry participant. While we do not believe that the outcomes of any current internal investigation or third-party subpoena or request for information will be material to our financial statements, they could lead to the assertion of claims or the commencement of legal proceedings against us or result in sanctions.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators, and product liability claims and lawsuits, including class actions.

We accrue for contingencies related to disputes, litigation, and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

Except as otherwise stated below, we recognize estimated loss contingencies for litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges, net in our condensed consolidated statements of earnings.

**DEA Investigation and Related Matters**

In February 2012, the U.S. Drug Enforcement Administration (the "DEA") issued an order to show cause and immediate suspension of our Lakeland, Florida distribution center's registration to distribute controlled substances, asserting that we failed to maintain required controls against the diversion of controlled substances. In May 2012, we entered into a settlement agreement with the DEA that resolved the administrative aspects of the DEA's action but did not resolve potential liability for civil penalties in Florida or elsewhere for the conduct covered by the settlement agreement. In December 2016, we entered into settlement agreements with the Department of Justice (the "DOJ") that resolved the civil penalties related to this and other controlled substance matters with respect to Cardinal Health, Inc. and to Kinray, LLC, which we acquired in 2010. Under these settlements, we agreed to pay $44 million to the DOJ, and the DOJ, including the DEA and the U.S. Attorneys' Offices for all 94 districts, agreed to take no further administrative or civil action on these matters.

**State of West Virginia vs. Cardinal Health, Inc.**

In January 2017, we agreed, without admitting liability, to pay $20 million to the State of West Virginia to settle a lawsuit filed against us by the West Virginia Attorney General in June 2012. As previously disclosed, the West Virginia Attorney General had filed complaints in the Circuit Court of Boone County, West Virginia against a number of pharmaceutical wholesale distributors, including us, alleging, among other things, that the distributors had failed to maintain effective controls to guard against diversion of controlled substances in West Virginia, had failed to report suspicious orders of controlled substances in accordance with the West Virginia Uniform Controlled Substances Act, and were negligent in distributing controlled substances to pharmacies that serve individuals who abuse controlled substances. We recorded a $20 million accrual for the matter in the three months ended December 31, 2016.

**Product Liability Lawsuits**

As of January 31, 2017, we and our Cordis business have been named as defendants in 41 product liability lawsuits involving claims by approximately 350 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these matters.

During the three months ended September 30, 2016, we recorded an accrual, most of which relates to legal defense costs, as an adjustment to pre-acquisition liabilities assumed in the Cordis acquisition. Refer to Note 2 for further information regarding this adjustment. We do not believe that reasonably possible losses in excess of this accrued amount will be material to our financial statements.

## 8. Fair Value Measurements

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at:

| (in millions) | December 31, 2016 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 52 | $ — | $ — | $ 52 |
| Forward contracts (1) | — | 11 | — | 11 |
| Available-for-sale securities (2) | — | 201 | — | 201 |
| Other investments (3) | 112 | — | — | 112 |
| **Liabilities:** | | | | |
| Contingent Consideration (4) | — | — | (21) | (21) |

| (in millions) | June 30, 2016 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 516 | $ — | $ — | $ 516 |
| Forward contracts (1) | — | 19 | — | 19 |
| Available-for-sale securities (2) | — | 200 | — | 200 |
| Other investments (3) | 103 | — | — | 103 |
| **Liabilities:** | | | | |
| Contingent Consideration (4) | — | — | (19) | (19) |

(1) The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the condensed consolidated balance sheets.

(2) We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 5 for additional information regarding available-for-sale securities.

(3) The other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(4) Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods, and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
|---|---|
| Balance at June 30, 2016 | $ 19 |
| Additions from acquisitions | 2 |
| Changes in fair value of contingent consideration (1) | — |
| **Balance at December 31, 2016** | **$ 21** |

(1) Amount is included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

## 9. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk, and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to fair value through earnings at the end of each period. Our derivative and hedging programs are consistent with those described in the 2016 Form 10-K. The amount of ineffectiveness associated with these derivative instruments was immaterial for the three and six months ended December 31, 2016 and 2015.

During the six months ended December 31, 2016, we entered into forward interest rate swaps with a total notional amount of $200 million to hedge probable, but not firmly committed, future transactions associated with our debt.

During the three months ended December 31, 2016 and 2015, we entered into pay-floating interest rate swaps with a total notional amounts of $100 million and $300 million, respectively. These swaps have been designated as fair value hedges of our fixed rate debt and are included in other assets in the condensed consolidated balance sheet.

During the six months ended December 31, 2016, we terminated notional amounts of $200 million of pay-floating interest rate swaps. We received net settlement proceeds of $14 million related to the pay-floating interest rate swaps terminated during the six months ended December 31, 2016 and the pay-floating interest rate swaps terminated in fiscal 2016, as previously disclosed in our 2016 Form 10-K. These swaps were previously designated as fair value hedges. There was no immediate impact to the condensed consolidated statements of earnings; however, the fair value adjustment to debt is being amortized over the life of the underlying debt as a reduction to interest expense, net in the condensed consolidated statements of earnings.

## Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, accounts payable, and other accrued liabilities at December 31, 2016 and June 30, 2016 approximate fair value due to their short-term maturities.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at:

| (in millions) | December 31, 2016 | June 30, 2016 |
|---|---|---|
| Estimated fair value | $ 5,611 | $ 5,780 |
| Carrying amount | 5,462 | 5,539 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

## 10. Redeemable Noncontrolling Interests

Redeemable noncontrolling interest represents the third parties' share of the net assets of naviHealth. The third-party noncontrolling interest holders hold an option that allows them to sell their noncontrolling interests to us at any time after the two-year anniversary of the closing, or earlier if a trigger event occurs. The terms of the agreement also provide us with the option to acquire any remaining noncontrolling interests at any time after the two-year anniversary of the closing, which is August 26, 2017. Our ownership interest in naviHealth was 82 percent at December 31, 2016.

The reconciliation of the changes in redeemable noncontrolling interests are as follows:

| (in millions) | Redeemable Noncontrolling Interest |
|---|---|
| Balance at June 30, 2016 | $ 117 |
| Net earnings attributable to redeemable noncontrolling interests | 1 |
| Net purchase of redeemable noncontrolling interests | (3) |
| **Balance at December 31, 2016** | **$ 115** |

## 11. Shareholders' Equity

During the six months ended December 31, 2016, we repurchased 8.1 million common shares having an aggregate cost of $600 million. The average price paid per common share was $74.08. We funded the repurchases with available cash. During the six months ended December 31, 2015, we did not repurchase any common shares.

During the three months ended December 31, 2016, we retired 37 million common shares in treasury. The retirement of these shares had no impact on total shareholders' equity; however, it did impact certain individual components of shareholders' equity as follows: $2.5 billion decrease in common shares in treasury, $302 million decrease in common shares, and $2.2 billion decrease in retained earnings.

## Accumulated Other Comprehensive Loss

The following table summarizes the changes in the balance of accumulated other comprehensive loss by component and in total:

| (in millions) | Foreign Currency Translation Adjustments | Unrealized Gain/(Loss) on Derivatives, net of tax | Accumulated Other Comprehensive Loss |
|---|---|---|---|
| Balance at June 30, 2016 | $ (123) | $ 7 | $ (116) |
| Other comprehensive income/(loss), before reclassifications | (80) | 24 | (56) |
| Amounts reclassified to earnings | — | 2 | 2 |
| Other comprehensive income/(loss), net of tax | (80) | 26 | (54) |
| **Balance at December 31, 2016** | **$ (203)** | **$ 33** | **$ (170)** |

Activity related to realized and unrealized gains and losses on available-for-sale securities, as described in Note 5, was immaterial during the six months ended December 31, 2016.

## 12. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the number of common shares used to compute basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| (in millions) | Three Months Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Weighted-average common shares–basic | 318 | 329 |
| **Effect of dilutive securities:** | | |
| Employee stock options, restricted share units, and performance share units | 1 | 3 |
| **Weighted-average common shares–diluted** | **319** | **332** |

| (in millions) | Six Months Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Weighted-average common shares–basic | 319 | 329 |
| **Effect of dilutive securities:** | | |
| Employee stock options, restricted share units, and performance share units | 2 | 3 |
| **Weighted-average common shares–diluted** | **321** | **332** |

The potentially dilutive employee stock options, restricted share units, and performance share units that were antidilutive were 4 million and 2 million for the three months ended December 31, 2016 and 2015, respectively, and 3 million and 2 million for the six months ended December 31, 2016 and 2015, respectively.

## 13. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The following table presents revenue for each reportable segment and Corporate:

| (in millions) | Three Months Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Pharmaceutical | $ 29,743 | $ 28,287 |
| Medical | 3,410 | 3,162 |
| Total segment revenue | 33,153 | 31,449 |
| Corporate (1) | (3) | (4) |
| **Total revenue** | **$ 33,150** | **$ 31,445** |

| (in millions) | Six Months Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Pharmaceutical | $ 58,505 | $ 53,427 |
| Medical | 6,690 | 6,081 |
| Total segment revenue | 65,195 | 59,508 |
| Corporate (1) | (6) | (9) |
| **Total revenue** | **$ 65,189** | **$ 59,499** |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial and customer care shared services, human resources, information technology, and legal and compliance. The results attributable to noncontrolling interests are recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided and other ratable allocation methodologies.

We do not allocate the following items to our segments: LIFO inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation, and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We encourage our segments and corporate functions to identify

investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $1 million and $5 million for the three months ended December 31, 2016 and 2015, respectively, and $2 million and $11 million for the six months ended December 31, 2016 and 2015, respectively.

The following table presents segment profit by reportable segment and Corporate:

| | Three Months Ended December 31, | | |
|---|---|---|---|
| (in millions) | 2016 | | 2015 |
| Pharmaceutical | $ 537 | $ | 627 |
| Medical | 159 | | 106 |
| Total segment profit | 696 | | 733 |
| Corporate | (154) | | (170) |
| Total operating earnings | $ 542 | $ | 563 |

| | Six Months Ended December 31, | | |
|---|---|---|---|
| (in millions) | 2016 | | 2015 |
| Pharmaceutical | $ 1,071 | $ | 1,285 |
| Medical | 286 | | 207 |
| Total segment profit | 1,357 | | 1,492 |
| Corporate | (281) | | (309) |
| Total operating earnings | $ 1,076 | $ | 1,183 |

The following table presents total assets for each reportable segment and Corporate at:

| | December 31, 2016 | | June 30, 2016 |
|---|---|---|---|
| (in millions) | | | |
| Pharmaceutical | $ 21,874 | $ | 20,662 |
| Medical | 10,600 | | 10,236 |
| Corporate | 2,547 | | 3,224 |
| Total assets | $ 35,021 | $ | 34,122 |

# 14. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees.

The following table provides total share-based compensation expense by type of award:

| | Three Months Ended December 31, | | |
|---|---|---|---|
| (in millions) | 2016 | | 2015 |
| Restricted share unit expense | $ 17 | $ | 17 |
| Employee stock option expense | 5 | | 5 |
| Performance share unit expense | 2 | | 4 |
| Total share-based compensation | $ 24 | $ | 26 |

| | Six Months Ended December 31, | | |
|---|---|---|---|
| (in millions) | 2016 | | 2015 |
| Restricted share unit expense | $ 34 | $ | 35 |
| Employee stock option expense | 10 | | 10 |
| Performance share unit expense | 3 | | 11 |
| Total share-based compensation | $ 47 | $ | 56 |

The total tax benefit related to share-based compensation was $8 million and $9 million for the three months ended December 31, 2016 and 2015, and $16 million and $19 million for the six months ended December 31, 2016 and 2015, respectively.

## Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years. Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share | |
|---|---|---|---|
| Nonvested at June 30, 2016 | 2 | $ | 71.73 |
| Granted | 1 | | 82.46 |
| Vested | (1) | | 68.73 |
| Canceled and forfeited | — | | — |
| Nonvested at December 31, 2016 | 2 | $ | 76.20 |

At December 31, 2016, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested restricted share units not yet recognized was $108 million, which is expected to be recognized over a weighted-average period of two years.

## Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for periods ranging from seven to ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share | |
|---|---|---|---|
| Outstanding at June 30, 2016 | 7 | $ | 54.09 |
| Granted | 1 | | 83.11 |
| Exercised | (1) | | 36.90 |
| Canceled and forfeited | — | | — |
| Outstanding at December 31, 2016 | 7 | $ | 61.30 |
| Exercisable at December 31, 2016 | 5 | $ | 50.75 |

At December 31, 2016, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested stock options not yet recognized was $31 million, which is expected to be recognized over

a weighted-average period of two years. The following tables provide additional detail related to stock options:

| (in millions) | December 31, 2016 | June 30, 2016 |
|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ 108 | $ 181 |
| Aggregate intrinsic value of exercisable options at period end | 108 | 161 |

| (in years) | December 31, 2016 | June 30, 2016 |
|---|---|---|
| Weighted-average remaining contractual life of outstanding options | 7 | 6 |
| Weighted-average remaining contractual life of exercisable options | 6 | 5 |

## Performance Share Units

Performance share units vest over a three-year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|
| Nonvested at June 30, 2016 | 0.8 | $ 63.96 |
| Granted | 0.2 | 83.19 |
| Vested (1) | (0.4) | 51.49 |
| Canceled and forfeited | — | — |
| Nonvested at December 31, 2016 | 0.6 | $ 77.72 |

(1)  Vested based on achievement of 139 percent of the target performance goal.

At December 31, 2016, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized was $18 million, which is expected to be recognized over a weighted-average period of two years.

# Exhibits

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 10.1 | First Amendment to the Cardinal Health Deferred Compensation Plan, as amended and restated effective as of January 1, 2016 |
| 10.2 | Second Amendment to Issuing and Paying Agency Agreement, effective as of December 1, 2016, between Cardinal Health, Inc. and The Bank of New York |
| 10.3 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, effective as of December 1, 2016 |
| 10.4 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Goldman Sachs & Co., effective as of December 1, 2016 |
| 10.5 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Wells Fargo Securities, LLC, effective as of December 1, 2016 |
| 10.6 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and J.P. Morgan Securities LLC, effective as of December 1, 2016 |
| 10.7 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc., effective as of December 1, 2016 |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of the Chief Executive Officer and the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.1 | Statement Regarding Forward-Looking Information |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

## Cardinal Health Website

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible at ir.cardinalhealth.com. In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

# Form 10-Q Cross Reference Index

| Item Number | | Page |
|---|---|---|
| **Part I. Financial Information** | | |
| Item 1 | Financial Statements | **16** |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Item 3 | Quantitative and Qualitative Disclosures about Market Risk | **14** |
| Item 4 | Controls and Procedures | **14** |
| **Part II. Other Information** | | |
| Item 1 | Legal Proceedings | **14** |
| Item 1A | Risk Factors | **15** |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | **15** |
| Item 3 | Defaults Upon Senior Securities | **N/A** |
| Item 4 | Mine Safety Disclosures | **N/A** |
| Item 5 | Other Information | **N/A** |
| Item 6 | Exhibits | **29** |
| | Signatures | **31** |

**N/A**     Not applicable

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Cardinal Health, Inc.

Date:   February 7, 2017

/s/   GEORGE S. BARRETT

**George S. Barrett**
**Chairman and Chief Executive Officer**

/s/   MICHAEL C. KAUFMANN

**Michael C. Kaufmann**
**Chief Financial Officer**

**Cardinal Health**
**Deferred Compensation Plan**
*Amended and Restated Effective as of January 1, 2016*

**First Amendment**

**Background Information**

A.    Cardinal Health, Inc. ("Cardinal Health") established and maintains the Cardinal Health Deferred Compensation Plan (the "Plan") for the benefit of participants and their beneficiaries.

B.    The Benefits Policy Committee of Cardinal Health (the "Committee") has been delegated authority to amend the Plan.

C.    The Committee desires to amend the Plan in order to clarify that a participant's deemed investment in common shares of Cardinal Health does not create with respect to the participant any ownership or voting rights in such shares.

D.    The Committee further desires to amend the Plan to make certain clarifications to reflect the Plan's operation.

E.    Section 7.1 of the Plan permits the amendment of the Plan at any time.

**Amendment of the Plan**

The Plan is hereby amended as follows, effective immediately:

1.    Section 2.2 of the Plan, "Specific Conditions for Active Participation" is hereby amended to replace the term "Social Security Matching Credit" with the phrase "Social Security Supplement Credit (as defined in Section 3.3 herein)" the first time it is used therein, and to replace the term "Social Security Matching Credit" with the term "Social Security Supplement Credit" each other time it is used therein.

2.    The first paragraph of Section 3.5 of the Plan, "Special Rules Applicable to Investments in Shares" is hereby amended to add the following sentence to the end thereof:

"For the avoidance of doubt, a Participant's election to have any portion of his Account deemed invested in Shares shall not create with respect to such Participant any ownership or voting rights in such Shares."

3.    Section 5.2 of the Plan, "Distribution upon Retirement or Other Separation from Service; Form of Payment" is hereby amended to delete the second to last sentence therein.

4.    Section 5.8 of the Plan, "Acceleration of Payment" is hereby amended to add a new subsection (f) to the end thereof to read as follows:

"(f)    Other Accelerations.  The Company may in its discretion accelerate any payment due under the Plan to the extent permitted by Code Section 409A and the regulations thereunder."

5.      All other terms and provisions of the Plan shall remain unchanged.

**CARDINAL HEALTH, INC.**

By:     /s/ Kendell F. Sherrer

Its:    VP, Benefits

Date:  12-19-16

Exhibit 10.2

## SECOND AMENDMENT TO ISSUING AND PAYING AGENCY AGREEMENT

The Bank of New York, as Issuing and Paying Agent
101 Barclay Street, Floor 8 West
New York, New York 10286

Attn: Corporate Trust Administration

Re: Cardinal Health, Inc.

Ladies and Gentlemen:

This letter (the "Second Amendment") sets forth the understanding between you and Cardinal Health, Inc. (the "Company"), whereby we have agreed to amend that certain Issuing and Paying Agency Agreement by and between you and the Company dated August 9, 2006 and amended February 28, 2007 (the "Issuing and Paying Agency Agreement") in order to increase to $1,750,000,000 the limit as to the aggregate principal amount of commercial paper notes which may be outstanding at any given time pursuant to such agreement.

1. **Defined Terms.** Unless the context as used herein requires otherwise, capitalized terms used but not defined in this Second Amendment shall have the meaning given to them in the Issuing and Paying Agency Agreement.

2. **Amendment.** Paragraph 4(a)(i) of the Issuing and Paying Agency Agreement is hereby deleted in its entirety and restated as follows:

> (i) date each such Certificated CP Note the date of issuance thereof (which shall be a Business Day) and insert the maturity date thereof (provided that the Authorized Representative or Dealer Representative shall ensure that such date is a Business Day and that it shall not be more than 364 days from the date of issue and that the aggregate principal amount of CP Notes outstanding shall not exceed $1,750,000,000) and the face amount (provided that the Authorized Representative or the Dealer Representative shall ensure that such face amount is not less than $250,000) thereof in figures;

3. **No Other Modifications.** Except as expressly provided in this Second Amendment, all of the terms and conditions of the Issuing and Paying Agency Agreement shall remain unchanged and in full force and effect.

4. **Binding Effect.** This Second Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5. **Governing Law.** This Second Amendment shall be governed by and construed in accordance with the laws of the State of New York.

6. **Conflict.** In the event of any inconsistency or conflict between this Second Amendment and the Issuing and Paying Agency Agreement, the terms, provisions and conditions of this Second Amendment shall govern and control.

7.      **Counterparts.**  This Second Amendment may be executed in separate counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same instrument.

*(Signatures on following page.)*

If the foregoing is acceptable to you, please indicate your agreement therewith by signing one or more counterparts of this Second Amendment in the space provided below, and returning such signed counterpart(s) to the Company, whereupon this letter when signed by you and the Company, will become a binding agreement between us.

CARDINAL HEALTH, INC.

By:     /s/ Sam Samad

Name:   Sam Samad

Agreed to and Accepted
This 23rd day of November, 2016

The Bank of New York, as Issuing and Paying Agent

By:     /s/ Mary Miselis

Name:   Mary Miselis

Exhibit 10.3

**Commercial Paper Dealer Agreement**

**4(a)(2) Program**

Between:

**Cardinal Health, Inc**., as Issuer

and

**Merrill Lynch, Pierce, Fenner & Smith Incorporated**, as Dealer

Concerning Notes to be issued pursuant to an

Issuing and Paying Agency Agreement dated as of August 9, 2006,

as amended February 28, 2007 and November 22, 2016

between the Issuer and

The Bank of New York, as Issuing

and Paying Agent

Dated as of

November 22, 2016

**Commercial Paper Dealer Agreement**
**4(a)(2) Program**

This agreement (the "Agreement") sets forth the understandings between the Issuer and the Dealer, each named on the cover page hereof, in connection with the issuance and sale by the Issuer of its short-term promissory notes (the "Notes") through the Dealer.

Certain terms used in this Agreement are defined in Section 6 hereof.

The Addendum to this Agreement, and any Annexes or Exhibits described in this Agreement or such Addendum, are hereby incorporated into this Agreement and made fully a part hereof.

**1.      Offers, Sales and Resales of Notes.**

1.1      While (i) the Issuer has and shall have no obligation to sell the Notes to the Dealer or to permit the Dealer to arrange any sale of the Notes for the account of the Issuer, and (ii) the Dealer has and shall have no obligation to purchase the Notes from the Issuer or to arrange any sale of the Notes for the account of the Issuer, the parties hereto agree that in any case where the Dealer purchases Notes from the Issuer, or arranges for the sale of Notes by the Issuer, such Notes will be purchased or sold by the Dealer in reliance on the representations, warranties, covenants and agreements of the Issuer contained herein or made pursuant hereto and on the terms and conditions and in the manner provided herein,

1.2      So long as this Agreement shall remain in effect, and in addition to the limitations contained in Section 1.7 hereof, the Issuer shall not, without the consent of the Dealer, offer, solicit or accept offers to purchase, or sell, any Notes except (a) in transactions with one or more dealers which may from time to time after the date hereof become dealers with respect to the Notes by executing with the Issuer one or more agreements which contain provisions substantially identical to those contained in Section 1 of this Agreement, of which the Issuer hereby undertakes to provide the Dealer prompt notice or (b) in transactions with the other dealers listed on the Addendum hereto, which are executing agreements with the Issuer which contain provisions substantially identical to Section 1 of this Agreement contemporaneously herewith.  In no event shall the Issuer offer, solicit or accept offers to purchase, or sell, any Notes directly on its own behalf in transactions with persons other than the Dealer or other broker-dealers as specifically permitted in this Section 1.2.

1.3      The Notes shall be in a minimum denomination of $250,000 or integral multiples of $1,000 in excess thereof, will bear such interest rates, if interest bearing, or will be sold at such discount from their face amounts, as shall be agreed upon by the Dealer and the Issuer, shall have a maturity not exceeding 364 days from the date of issuance and may have such terms as are specified in Exhibit C hereto or the Private Placement Memorandum.  The Notes shall not contain any provision for extension, renewal or automatic "rollover."

1.4      The authentication and issuance of, and payment for, the Notes shall be effected in accordance with the Issuing and Paying Agency Agreement, and the Notes shall be either individual physical certificates or book-entry notes evidenced by one or more master notes (each, a "Master Note") registered in the name of The Depository Trust Company

("DTC") or its nominee, in the form or forms annexed to the Issuing and Paying Agency Agreement.

1.5     If the Issuer and the Dealer shall agree on the terms of the purchase of any Note by the Dealer or the sale of any Note arranged by the Dealer (including, but not limited to, agreement with respect to the date of issue, purchase price, principal amount, maturity and interest rate or interest rate index and margin (in the case of interest-bearing Notes) or discount thereof (in the case of Notes issued on a discount basis), and appropriate compensation for the Dealer's services hereunder) pursuant to this Agreement, the Issuer shall cause such Note to be issued and delivered in accordance with the terms of the Issuing and Paying Agency Agreement and payment for such Note shall be made by the purchaser thereof, either directly or through the Dealer, to the Issuing and Paying Agent, for the account of the Issuer.  Except as otherwise agreed, in the event that the Dealer is acting as an agent and a purchaser shall either fail to accept delivery of or make payment for a Note on the date fixed for settlement, the Dealer shall promptly notify the Issuer, and if the Dealer has theretofore paid the Issuer for the Note, the Issuer will promptly return such funds to the Dealer against its return of the Note to the Issuer, in the case of a certificated Note, and upon notice of such failure in the case of a book-entry Note.  If such failure occurred for any reason other than default by the Dealer, the Issuer shall reimburse the Dealer on an equitable basis for the Dealer's loss of the use of such funds for the period such funds were credited to the Issuer's account,

1.6     The Dealer and the Issuer hereby establish and agree to observe the following procedures in connection with offers, sales and subsequent resales or other transfers of the Notes:

(a)     Offers and sales of the Notes by or through the Dealer shall be made only to: (i) investors reasonably believed by the Dealer to be Qualified Institutional Buyers or Institutional Accredited Investors and (ii) non-bank fiduciaries or agents that will be purchasing Notes for one or more accounts, each of which is reasonably believed by the Dealer to be an Institutional Accredited Investor.

(b)     Resales and other transfers of the Notes by the holders thereof shall be made only in accordance with the restrictions in the legend described in clause (e) below.

(c)     No general solicitation or general advertising shall be used in connection with the offering of the Notes.  Without limiting the generality of the foregoing, without the prior written approval of the Dealer, the Issuer shall not issue any press release, make any other statement to any member of the press making reference to the Notes, the offer or sale of the Notes, or this Agreement or place or publish any "tombstone" or other advertisement relating to the Notes, or the offer or sale of the Notes.  To the extent permitted by applicable securities laws, the Issuer shall (i) omit the names of the Dealer from any publicly available filing by the Issuer that makes reference to the offer or sale of the Notes or this Agreement, (ii) not include a copy of this Agreement in any such filing or as an exhibit thereto, and (iii) redact the Dealer's name and any contact or other information that could identify the Dealer from any agreement or other information included in such filing.  No sale of Notes to any one purchaser shall be for less than $250,000 principal or face amount, and no Note shall be issued in a smaller principal or face amount.  If the purchaser is a non-bank fiduciary acting on behalf of others, each person for whom

such purchaser is acting must purchase at least $250,000 principal or face amount of Notes.

(d)     Offers and sales of the Notes by the Issuer through the Dealer acting as agent for the Issuer shall be made in accordance with Section 4(a)(2) under the Securities Act and shall be subject to the restrictions described in the legend appearing on Exhibit A hereto.  A legend substantially to the effect of such Exhibit A shall appear as part of the Private Placement Memorandum used in connection with offers and sales of Notes hereunder, as well as on each individual certificate representing a Note and each Master Note representing book-entry Notes offered and sold pursuant to this Agreement.

(e)     The Dealer shall furnish or make available or shall have furnished or made available to each purchaser of Notes for which it has acted as the Dealer a copy of the then-current Private Placement Memorandum unless such purchaser has previously received or had made available to it a copy of the Private Placement Memorandum as then in effect.  The Private Placement Memorandum shall expressly state that any person to whom Notes are offered shall have an opportunity to ask questions of and receive information from, the Issuer and the Dealer and shall provide the names, addresses and telephone numbers of the persons from whom information regarding the Issuer may be obtained.

(f)     The Issuer agrees, for the benefit of the Dealer and each of the holders and prospective purchasers from time to time of the Notes that, if at any time the Issuer shall not be subject to Section 13 or 15(d) of the Exchange Act, the Issuer will furnish, upon request and at its expense, to the Dealer and to holders and prospective purchasers of Notes information required by Rule 144A(d)(4)(i) in compliance with Rule 144A(d).

(g)     In the event that any Note offered or to be offered by the Dealer would be ineligible for resale under Rule 144A, the Issuer shall immediately notify the Dealer (by telephone, confirmed in writing) of such fact and shall promptly prepare and deliver to the Dealer an amendment or supplement to the Private Placement Memorandum describing the Notes that are ineligible, the reason for such ineligibility and any other relevant information relating thereto.

(h)     The Issuer represents that it is not currently issuing commercial paper in the United States market in reliance upon the exemption provided by Section 3(a)(3) of the Securities Act.  The Issuer agrees that, if it shall issue commercial paper after the date hereof in reliance upon such exemption (a) the proceeds from the sale of the Notes will be segregated from the proceeds of the sale of any such commercial paper by being placed in a separate account; (b) the Issuer will institute appropriate corporate procedures to ensure that the offers and sales of notes issued by the Issuer pursuant to the Section 3(a)(3) exemption are not integrated with offerings and sales of Notes hereunder; and (c) the Issuer will comply with each of the requirements of Section 3(a)(3) of the Securities Act in selling commercial paper or other short-term debt securities other than the Notes in the United States.

1.7     The Issuer hereby represents and warrants to the Dealer, in connection with offers, sales and resales of Notes, as follows:

(a)     The Issuer hereby confirms to the Dealer that (except as permitted by Section 1.6 (i)) within the preceding six months neither the Issuer nor any person other than the Dealer or the other dealers referred to in Section 1.2 hereof acting on behalf of the Issuer has offered or sold any Notes, or any substantially similar security of the Issuer (including, without limitation, medium-term notes issued by the Issuer), to, or solicited offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof.  The Issuer also agrees that (except as permitted by Section 1.6(i)), as long as the Notes are being offered for sale by the Dealer and the other dealers referred to in Section 1.2 hereof as contemplated hereby and until at least six months after the offer of Notes hereunder has been terminated, neither the Issuer nor any person other than the Dealer or the other dealers referred to in Section 1.2 hereof (except as contemplated by Section 1.2 hereof) will offer the Notes or any substantially similar security of the Issuer for sale to, or solicit offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof, it being understood that such agreement is made with a view to bringing the offer and sale of the Notes within the exemption provided by Section 4(a)(2) of the Securities Act and shall survive any termination of this Agreement. The Issuer hereby represents and warrants that it has not taken or omitted to take, and will not take or omit to take, any action that would cause the offering and sale of Notes hereunder to be integrated with any other offering of securities, whether such offering is made by the Issuer or some other party or parties.

(b)     The Issuer represents and agrees that the proceeds of the sale of the Notes are not currently contemplated to be used for the purpose of buying, carrying or trading securities within the meaning of Regulation T and the interpretations thereunder by the Board of Governors of the Federal Reserve System.  In the event that the Issuer determines to use such proceeds for the purpose of buying, carrying or trading securities, whether in connection with an acquisition of another company or otherwise, the Issuer shall give the Dealer at least five business days' prior written notice to that effect.  The Issuer shall also give the Dealer prompt notice of the actual date that it commences to purchase securities with the proceeds of the Notes.  Thereafter, in the event that the Dealer purchases Notes as principal and does not resell such Notes on the day of such purchase, to the extent necessary to comply with Regulation T and the interpretations thereunder, the Dealer will sell such Notes either (i) only to offerees it reasonably believes to be Qualified Institutional Buyers or to Qualified Institutional Buyers it reasonably believes are acting for other Qualified Institutional Buyers, in each case in accordance with Rule 144A or (ii) in a manner which would not cause a violation of Regulation T and the interpretations thereunder.

2.     **Representations and Warranties of Issuer.**

The Issuer represents and warrants that:

2.1 The Issuer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all the requisite power and authority to execute, deliver and perform its obligations under the Notes, this Agreement and the Issuing and Paying Agency Agreement.

2.2 This Agreement and the Issuing and Paying Agency Agreement have been duly authorized, executed and delivered by the Issuer and constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.3 The Notes have been duly authorized, and when issued as provided in the Issuing and Paying Agency Agreement, will be duly and validly issued and will constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.4 The offer and sale of the Notes in the manner contemplated hereby do not require registration of the Notes under the Securities Act, pursuant to the exemption from registration contained in Section 4(a)(2) thereof, and no indenture in respect of the Notes is required to be qualified under the Trust Indenture Act of 1939, as amended.

2.5 The Notes will rank at least pari passu with all other unsecured and unsubordinated indebtedness of the Issuer.

2.6 No consent or action of or filing or registration with, any governmental or public regulatory body or authority, including the SEC, is required to authorize, or is otherwise required in connection with the execution, delivery or performance of, this Agreement, the Notes or the Issuing and Paying Agency Agreement, except as may be required by the securities or Blue Sky laws of the various states in connection with the offer and sale of the Notes.

2.7 Neither the execution and delivery of this Agreement and the Issuing and Paying Agency Agreement, nor the issuance of the Notes in accordance with the Issuing and Paying Agency Agreement, nor the fulfillment of or compliance with the terms and provisions hereof or thereof by the Issuer, will (i) result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of the Issuer, or (ii) violate or result in a breach or a default under any of the terms of the Issuer's charter documents or by-laws, any contract or instrument to which the Issuer is a party or by which it or its property is bound, or any law or regulation, or any order, writ, injunction or decree of any court or government instrumentality, to which the Issuer is subject or by which it or its property is bound, which breach or default is reasonably expected to have a material adverse effect on the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.8     Except as disclosed in the Private Placement Memorandum, there is no litigation or governmental proceeding pending, or to the knowledge of the Issuer threatened, against or affecting the Issuer or any of its subsidiaries that could reasonably be expected to result in a material adverse change in the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.9     The Issuer is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.10     Neither the Private Placement Memorandum nor the Company Information contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

2.11     The Issuer has implemented and maintains in effect policies and procedures designed to promote compliance by the Issuer, its subsidiaries and its respective directors, officers and employees with Anti-Corruption Laws and applicable Sanctions, and the Issuer, its subsidiaries and to the knowledge of the Issuer, their respective employees, officers, directors and agents (in their capacity as such) that will act in any capacity in connection with or benefit from the commercial paper program established hereby, is in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not engaged in any activity that would reasonably be expected to result in the Issuer being designated as a Sanctioned Person.  None of the Issuer or any subsidiary is a Sanctioned Person.

2.12     Each (a) issuance of Notes by the Issuer hereunder and (b) amendment or supplement of the Private Placement Memorandum shall be deemed a representation and warranty by the Issuer to the Dealer, as of the date thereof, that, both before and after giving effect to such issuance and after giving effect to such amendment or supplement, (i) the representations and warranties given by the Issuer set forth in this Section 2 remain true and correct on and as of such date as if made on and as of such date, (ii) in the case of an issuance of Notes, the Notes being issued on such date have been duly and validly issued and constitute legal, valid and binding obligations of the Issuer, enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and (iii) in the case of an issuance of Notes, since the date of the most recent Private Placement Memorandum, there has been no material adverse change in the financial condition, operations or business prospects of the Issuer which has not been disclosed to the Dealer in writing, and (iv) the Issuer is not in default of any of its obligations hereunder or under the Notes, or the Issuing and Paying Agency Agreement.

**3.     Covenants and Agreements of Issuer.**

The Issuer covenants and agrees that:

3.1     The Issuer will give the Dealer prompt notice (but in any event prior to any subsequent issuance of Notes hereunder) of any amendment to, modification of or waiver with respect

to, the Notes or the Issuing and Paying Agency Agreement, including a complete copy of any such amendment, modification or waiver.

3.2    The Issuer shall, whenever there shall occur any change in the Issuer's condition (financial or otherwise), operations or business prospects or any development or occurrence in relation to the Issuer that would be material to holders of the Notes or potential holders of the Notes (including any downgrading or receipt of any written notice of intended or potential downgrading or receipt of any written notice of review for potential change in the rating accorded any of the Issuer's securities by any nationally recognized statistical rating organization which has published a rating of the Notes), promptly, and in any event prior to any subsequent issuance of Notes hereunder, notify the Dealer (by telephone, confirmed in writing) of such change, development or occurrence.

3.3    The Issuer shall from time to time furnish to the Dealer such information as the Dealer may reasonably request, including, without limitation, any press releases or material provided by the Issuer to any national securities exchange, regarding (i) the Issuer's operations and financial condition, (ii) the due authorization and execution of the Notes and (iii) the Issuer's ability to pay the Notes as they mature.

3.4    The Issuer will take all such action as the Dealer may reasonably request to ensure that each offer and each sale of the Notes will comply with any applicable state Blue Sky laws; provided, however, that the Issuer shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation in any jurisdiction in which it is not so qualified or subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

3.5    The Issuer will not be in default of any of its obligations hereunder, under the Notes or under the Issuing and Paying Agency Agreement, at any time that any of the Notes are outstanding.

3.6    The Issuer shall not issue Notes hereunder until the Dealer shall have received (a) an opinion of counsel to the Issuer, addressed to the Dealer, satisfactory in form and substance to the Dealer, (b) a copy of the executed Issuing and Paying Agency Agreement as then in effect, (c) a copy of resolutions adopted by the Board of Directors of the issuer, satisfactory in form and substance to the Dealer and certified by the Secretary or similar officer of the Issuer, authorizing execution and delivery by the Issuer of this Agreement, the Issuing and Paying Agency Agreement and the Notes and consummation by the Issuer of the transactions contemplated hereby and thereby, (d) prior to the issuance of any book-entry Notes represented by a master note registered in the name of DTC or its nominee, a copy of the executed Letter of Representations among the issuer, the Issuing and Paying Agent and DTC and of the executed master note, (e) prior to the issuance of any Notes in physical form, a copy of such form (unless attached to this Agreement or the Issuing and Paying Agency Agreement) and (f) such other certificates, opinions, letters and documents as the Dealer shall have reasonably requested.

3.7    The Issuer shall reimburse the Dealer for all of the Dealer's reasonable out-of-pocket expenses related to this Agreement, including reasonable expenses incurred in connection with its preparation and negotiation, and the transactions contemplated hereby (including, but not limited to, the printing and distribution of the Private Placement Memorandum),

and, if applicable, for the reasonable fees and out-of-pocket expenses of the Dealer's outside counsel.

3.8     Without limiting any obligation of the Issuer pursuant to this Agreement to provide the Dealer with credit and financial information, the Issuer hereby acknowledges and agrees that the Dealer may share the Company Information and any other information or matters relating to the Issuer or the transactions contemplated hereby with affiliates of the Dealer, including, but not limited to, and that such affiliates may likewise share information relating to the Issuer or such transactions with the Dealer.

3.9     The Issuer shall not file a Form D (as referenced in Rule 503 under the Securities Act) at any time in respect of the offer or sale of the Notes.

3.10    The Issuer will not permit the proceeds of the Notes to be used directly or, to the knowledge of the Issuer, indirectly, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except, in each case, to the extent such use is licensed by OFAC and otherwise authorized under applicable law, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

**4.     Disclosure.**

4.1     The Private Placement Memorandum and its contents (other than the Dealer Information) shall be the sole responsibility of the Issuer.  The Private Placement Memorandum shall contain a statement expressly offering an opportunity for each prospective purchaser to ask questions of and receive answers from, the Issuer concerning the offering of Notes and to obtain relevant additional information which the Issuer possesses or can acquire without unreasonable effort or expense.

(a)     The Issuer agrees to promptly furnish the Dealer the Company Information as it becomes available; provided, however, that posting Company Information to EDGAR or on the website of the Issuer shall constitute delivery of such Company Information to the Dealer as required hereunder.

(b)     The Issuer further agrees to notify the Dealer promptly upon the occurrence of any event relating to or affecting the Issuer that would cause the Company Information then in existence to include an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading.

(c)     In the event that the Issuer gives the Dealer notice pursuant to Section 4.2(a) and the Dealer notifies the Issuer that it then has Notes it is holding in inventory, the Issuer agrees promptly to supplement or amend the Private Placement Memorandum so that the Private Placement Memorandum, as amended or supplemented, shall not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of

the circumstances under which they were made, not misleading, and the Issuer shall make such supplement or amendment available to the Dealer.

(d)     In the event that (i) the Issuer gives the Dealer notice pursuant to Section 4.2(a), (ii) the Dealer does not notify the Issuer that it is then holding Notes in inventory and (iii) the Issuer chooses not to promptly amend or supplement the Private Placement Memorandum in the manner described in clause (b) above, then all solicitations and sales of Notes shall be suspended until such time as the Issuer has so amended or supplemented the Private Placement Memorandum, and made such amendment or supplement available to the Dealer.

**5.      Indemnification and Contribution.**

5.1     Unless prohibited by the Securities Act or the Exchange Act, or the rules and regulations of the SEC promulgated thereunder, the Issuer will indemnify and hold harmless the Dealer, each individual, corporation, partnership, trust, association or other entity controlling the Dealer, any affiliate of the Dealer or any such controlling entity and their respective directors, officers, employees, partners, incorporators, shareholders, servants, trustees and agents (hereinafter the "Indemnitees") against any and all liabilities, penalties, suits, causes of action, losses, damages, claims, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) or judgments of whatever kind or nature (each a "Claim"), imposed upon, incurred by or asserted against the Indemnitees arising out of or based upon (i) any allegation that the Private Placement Memorandum, the Company Information or any information provided by the Issuer to the Dealer included (as of any relevant time) or includes an untrue statement of a material fact or omitted (as of any relevant time) or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or (ii) arising out of or based upon the breach by the Issuer of any agreement, covenant or representation made in or pursuant to this Agreement which has a material adverse effect on the Dealer or the holders of the Notes.  This indemnification shall not apply to the extent that the Claim arises out of or is based upon Dealer Information or the gross negligence or willful misconduct of the Dealer in the performance of, or the failure to perform, its obligations under this Agreement as finally determined by a court of competent jurisdiction.

5.2     Provisions relating to claims made for indemnification under this Section 5 are set forth on Exhibit B to this Agreement.

5.3     In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 5 is held to be unavailable or insufficient to hold harmless the Indemnitees, although applicable in accordance with the terms of this Section 5, the Issuer shall contribute to the aggregate costs incurred by the Dealer in connection with any Claim in the proportion of the respective economic interests of the Issuer and the Dealer; provided, however, that such contribution by the Issuer shall be in an amount such that the aggregate costs incurred by the Dealer do not exceed the aggregate of the commissions and fees earned by the Dealer hereunder with respect to the issue or issues of Notes to which such Claim relates.  The respective economic interests shall be calculated by reference to the aggregate proceeds to the Issuer of the Notes issued hereunder and the aggregate commissions and fees earned by the Dealer hereunder.

**6.     Definitions.**

6.1     "Anti-Corruption Laws" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Issuer or any of its subsidiaries from time to time concerning or relating to bribery or corruption.

6.2     "Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

6.3     "Claim" shall have the meaning set forth in Section 5.1.

6.4     "Company Information" at any given time shall mean the Private Placement Memorandum together with, to the extent applicable, (i) the Issuer's most recent report on Form 10-K filed with the SEC and each report on Form 10-Q or 8-K filed by the Issuer with the SEC since the most recent Form 10-K, (ii) the Issuer's most recent annual audited financial statements and each interim financial statement or report prepared subsequent thereto, if not included in item (1) above, (iii) the Issuer's and its affiliates' other publicly available recent reports, including, but not limited to, any publicly available filings or reports provided to their respective shareholders, (iv) any other information or disclosure prepared pursuant to Section 4.3 hereof and (v) any information prepared or approved by the Issuer for dissemination to investors or potential investors in the Notes.

6.5     "Current Issuing and Paying Agent" shall have the meaning set forth in Section 7.10.

6.6     "Dealer Information" shall mean material concerning the Dealer provided by the Dealer in writing expressly for inclusion in the Private Placement Memorandum.

6.6     "Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended.

6.7     "Indemnitee" shall have the meaning set forth in Section 5.1.

6.8     "Institutional Accredited Investor" shall mean an institutional investor that is an accredited investor within the meaning of Rule 501 under the Securities Act and that has such knowledge and experience in financial and business matters that it is capable of evaluating and bearing the economic risk of an investment in the Notes, including, but not limited to, a bank, as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

6.9     "Issuing and Paying Agency Agreement" shall mean the issuing and paying agency agreement described on the cover page of this Agreement, or any such replacement thereof, as such agreement may be amended or supplemented from time to time.

6.10    "Issuing and Paying Agent" shall mean the party designated as such on the cover page of this Agreement, as issuing and paying agent under the Issuing and Paying Agency Agreement, or any successor thereto or replacement thereof, in accordance with the Issuing and Paying Agency Agreement.

6.11 "Non-bank fiduciary or agent" shall mean a fiduciary or agent other than (a) a bank, as defined in Section 3(a)(2) of the Securities Act, or (b) a savings and loan association, as defined in Section 3(a)(5)(A) of the Securities Act.

6.12 "Person" shall mean any natural person, corporation, firm, joint venture, partnership, limited liability company, association, enterprise, trust or other entity or organization, or any government or political subdivision or any agency, department or instrumentality thereof.

6.13 "Private Placement Memorandum" shall mean offering materials prepared in accordance with Section 4 (including materials referred to therein or incorporated by reference therein, if any) provided to purchasers and prospective purchasers of the Notes, and shall include amendments and supplements thereto which may be prepared from time to time in accordance with this Agreement (other than any amendment or supplement that has been completely superseded by a later amendment or supplement).

6.14 "Qualified Institutional Buyer" shall have the meaning assigned to that term in Rule 144A under the Securities Act.

6.15 "Replacement Issuing and Paying Agent" shall have the meaning set forth in Section 7.10 (i).

6.15 "Replacement Issuing and Paying Agency Agreement" shall have the meaning set forth in Section 7.10.

6.16 "Rule 144A" shall mean Rule 144A under the Securities Act.

6.17 "Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of comprehensive Sanctions (at the time of this Agreement, Cuba, Iran, North Korea, Sudan, Syria and Crimea).

6.18 "Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or ordinarily resident in a Sanctioned Country to the extent dealing with such Person would be prohibited by applicable Sanctions or (c) any Person 50% owned by any such Person or Persons described in the foregoing clause (a).

6.19 "Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or any European Union member state.

6.20 "SEC" shall mean the U.S. Securities and Exchange Commission.

6.21 "Securities Act" shall mean the U.S. Securities Act of 1933, as amended.

**7.       General**

7.1       Unless otherwise expressly provided herein, all notices under this Agreement to parties hereto shall be in writing and shall be effective when received at the address of the respective party set forth in the Addendum to this Agreement.

7.2       This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.

7.3       The Issuer agrees that any suit, action or proceeding brought by the Issuer against the Dealer in connection with or arising out of this Agreement or the Notes or the offer and sale of the Notes shall be brought solely in the United States federal courts located in the Borough of Manhattan or the courts of the State of New York located in the Borough of Manhattan.  EACH OF THE DEALER AND THE ISSUER WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.4       This Agreement may be terminated, at any time, by the Issuer, upon one business day's prior notice to such effect to the Dealer, or by the Dealer upon one business day's prior notice to such effect to the Issuer.  Any such termination, however, shall not affect the obligations of the Issuer under Sections 1.2 (first sentence), 3.7, 5 and 7.3 hereof or the respective representations, warranties, agreements, covenants, rights or responsibilities of the parties made or arising prior to the termination of this Agreement.

7.5       This Agreement is not assignable by either party hereto without the written consent of the other party; provided, however, that the Dealer may assign its rights and obligations under this Agreement to any affiliate of the Dealer.

7.6       This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

7.7       This Agreement is for the exclusive benefit of the parties hereto, and their respective permitted successors and assigns hereunder, and shall not be deemed to give any legal or equitable right, remedy or claim to any other person whatsoever.

7.8       The Issuer acknowledges and agrees that (i) the purchase and sale of the Notes pursuant to this Agreement is an arm's-length commercial transaction between the Issuer, on the one hand, and the Dealer, on the other, (ii) in connection therewith and with the process leading to such transaction the Dealer is acting solely as a principal and not the agent or fiduciary of the Issuer, (iii) the Dealer has not assumed an advisory or fiduciary responsibility in favor of the Issuer with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether the Dealer has advised or is currently advising the Issuer on other matters) or any other obligation to the Issuer except the obligations expressly set forth in this Agreement and (iv) the Issuer has consulted its own legal and financial advisors to the extent it deemed appropriate.  The Issuer agrees that it will not claim that the Dealer has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Issuer, in connection with such transaction or the process leading thereto.

7.9     In the case of any agreement by a Dealer to purchase a Note hereunder (other than as agent) which provides for a settlement date that is three Business Days or more after the date of such agreement, the obligation of the Dealer to purchase the Note under such agreement shall be subject to the following conditions:

   (a)     the representations and warranties given by the Issuer set forth above in Section 2 shall be true and correct on and as of the settlement date as if made on and as of such date, and the Issuer shall have performed all of its obligations hereunder to be performed as of such date,

   (b)     since the date of the most recent Private Placement Memorandum, there shall have been no material adverse change in the condition (financial or otherwise), operations or business prospects of the Issuer (whether occurring before or after such agreement was entered into) which was not disclosed to the Dealer in writing prior to the time such agreement was entered into,

   (c)     the Issuer shall not be in default of any of its obligations hereunder, under the Note or under the Issuing and Paying Agency Agreement,

   (d)     on or after the date of such agreement there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading in the Issuer's securities on the New York Stock Exchange; (iii) a general moratorium in commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or services in the United States; (iv) the outbreak or escalation of emergency or war or (v) the occurrence of any other calamity or crisis or any change in financial, political or economic conditions in the United States or elsewhere, if the effect of any such event specified in clause (iv) or (v) in the reasonable judgment of the Dealer makes it impracticable or inadvisable to proceed with the offering or the delivery of the Note on the terms and in the amount contemplated in the Private Placement Memorandum.

   (e)     on or after the date of such agreement (i) downgrading shall not have occurred in the rating accorded the Issuer's debt securities by any nationally recognized statistical rating organization and such organization shall not have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Issuer's debt securities.

7.10    The parties hereto agree that the Issuer may, in accordance with the terms of this Section 7.10, from time to time replace the party which is then acting as Issuing and Paying Agent (the "Current Issuing and Paying Agent") with another party (such other party, the "Replacement Issuing and Paying Agent"), and enter into an agreement with the Replacement Issuing and Paying Agent covering the provision of issuing and paying agency functions in respect of the Notes by the Replacement Issuing and Paying Agent (the "Replacement Issuing and Paying Agency Agreement") (any such replacement, a "Replacement").

From and after the effective date of any Replacement, except to the extent that the Issuing and Paying Agency Agreement provides that the Current Issuing and

Paying Agent will continue to act in respect of Notes outstanding as of the effective date of such Replacement, the "Issuing and Paying Agent" for the Notes shall be deemed to be the Replacement Issuing and Paying Agent, all references to the "Issuing and Paying Agent" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agent, and all references to the "Issuing and Paying Agency Agreement" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agency Agreement.

This Agreement supersedes all prior agreements and understandings (whether written or oral between the Issuer and the Dealer, or any of them, with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

**Cardinal Health, Inc., as Issuer**

By:    /s/ Sam Samad

Name:  Sam Samad

Title:  Treasurer

**Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Dealer**

By:    /s/ Robert J. Little

Name:  Robert J. Little

Title:  Managing Director

Addendum

The following additional clauses shall apply to the Agreement and be deemed a part thereof,

1.      The other dealers referred to in clause (b) of Section 1.2 of the Agreement are Goldman Sachs & Co., Wells Fargo Securities, LLC, SunTrust Robinson Humphrey, Inc., and J.P. Morgan Securities LLC.

2.      The addresses of the respective parties for the purposes of notices under Section 7.1 are as follows:

For the Issuer:

Address: Cardinal Health, Inc., 7000 Cardinal Place, Dublin, Ohio 43017
Attention: Scott Zimmerman, Assistant Treasurer
Telephone:      (###) ###-####

For the Dealer:
Address: Merrill Lynch, Pierce, Fenner & Smith Incorporated
Short Term Fixed Income Origination
One Bryant Park, 8th Floor
New York, NY 10036
Attention: Robert Little
Telephone Number:     (###) ###-####
Fax Number: (###) ###-####

**Exhibit A**

**Form of Legend for Private Placement Memorandum and Notes**

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE SECURITIES LAW, AND OFFERS AND SALES THEREOF MAY BE MADE ONLY IN COMPLIANCE WITH AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.  BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER WILL BE DEEMED TO REPRESENT THAT (I) IT HAS BEEN AFFORDED AN OPPORTUNITY TO INVESTIGATE MATTERS RELATING TO THE ISSUER AND THE NOTES, (II) IT IS NOT ACQUIRING SUCH NOTE WITH A VIEW TO ANY DISTRIBUTION THEREOF AND (III) IT IS EITHER (A)(1) AN INSTITUTIONAL INVESTOR THAT IS AN ACCREDITED INVESTOR WITHIN THE MEANING OF RULE 501(a) UNDER THE ACT AND (AN "INSTITUTIONAL ACCREDITED INVESTOR") AND (2)(i) PURCHASING NOTES FOR ITS OWN ACCOUNT, (ii) A BANK (AS DEFINED IN SECTION 3(a)(2) OF THE ACT) OR A SAVINGS AND LOAN ASSOCIATION OR OTHER INSTITUTION (AS DEFINED IN SECTION 3(a)(5)(A) OF THE ACT) ACTING IN ITS INDIVIDUAL OR FIDUCIARY CAPACITY OR (iii) A FIDUCIARY OR AGENT (OTHER THAN A U.S. BANK OR SAVINGS AND LOAN ASSOCIATION) PURCHASING NOTES FOR ONE OR MORE ACCOUNTS EACH OF WHICH ACCOUNTS IS SUCH AN INSTITUTIONAL ACCREDITED INVESTOR ; OR (B) A QUALIFIED INSTITUTIONAL BUYER ("QIB") WITHIN THE MEANING OF RULE 144A UNDER THE ACT THAT IS ACQUIRING NOTES FOR ITS OWN ACCOUNT OR FOR ONE OR MORE ACCOUNTS, EACH OF WHICH ACCOUNTS IS A QIB; AND THE PURCHASER ACKNOWLEDGES THAT IT IS AWARE THAT THE SELLER MAY RELY UPON THE EXEMPTION FROM THE REGISTRATION PROVISIONS OF SECTION 5 OF THE ACT PROVIDED BY RULE 144A.  BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER THEREOF SHALL ALSO BE DEEMED TO AGREE THAT ANY RESALE OR OTHER TRANSFER THEREOF WILL BE MADE ONLY (A) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE ACT, EITHER (1) TO THE ISSUER OR TO A PLACEMENT AGENT DESIGNATED BY THE ISSUER AS A PLACEMENT AGENT FOR THE NOTES (COLLECTIVELY, THE "PLACEMENT AGENTS"), NONE OF WHICH SHALL HAVE ANY OBLIGATION TO ACQUIRE SUCH NOTE, (2) THROUGH A PLACEMENT AGENT TO AN INSTITUTIONAL ACCREDITED INVESTOR OR A QIB, OR (3) TO A QIB IN A TRANSACTION THAT MEETS THE REQUIREMENTS OF RULE 144A AND (B) IN MINIMUM AMOUNTS OF $250,000.

**Exhibit B**

**Further Provisions Relating to Indemnification**

(a)  The Issuer agrees to reimburse each Indemnitee for all expenses (including reasonable fees and disbursements of internal and external counsel) as they are incurred by it in connection with investigating or defending any loss, claim, damage, liability or action in respect of which indemnification may be sought under Section 5 of the Agreement (whether or not it is a party to any such proceedings) provided, however, that if it is found in any such action, proceeding or investigation that any loss, claim, damage or liability of an Indemnitee has resulted from the Dealer Information or the gross negligence or willful misconduct of the Indemnitee in performing the services that are the subject of this Agreement, as finally determined by a court of competent jurisdiction, the Indemnitee shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of the Indemnitee which is the subject of such finding.

(b)  Promptly after receipt by an Indemnitee of notice of the existence of a Claim, such Indemnitee will, if a claim in respect thereof is to be made against the Issuer, notify the issuer in writing of the existence thereof; provided that (i) the omission so to notify the Issuer will not relieve the Issuer from any liability which it may have hereunder unless and except to the extent it did not otherwise learn of such Claim and such failure results in the forfeiture by the Issuer of substantial rights and defenses, and (ii) the omission so to notify the Issuer will not relieve it from liability which it may have to an Indemnitee otherwise than on account of this indemnity agreement.  In case any such Claim is made against any Indemnitee and it notifies the Issuer of the existence thereof, the Issuer will be entitled to participate therein, and to the extent that it may elect by written notice delivered to the Indemnitee, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnitee; provided that if the defendants in any such Claim include both the Indemnitee and the Issuer, and the Indemnitee shall have concluded that there may be legal defenses available to it which are different from or additional to those available to the Issuer, the Issuer shall not have the right to direct the defense of such Claim on behalf of such Indemnitee, and the Indemnitee shall have the right to select separate counsel to assert such legal defenses on behalf of such Indemnitee. Upon receipt of notice from the Issuer to such Indemnitee of the Issuer's election so to assume the defense of such Claim and approval by the Indemnitee of counsel, the Issuer will not be liable to such Indemnitee for expenses incurred thereafter by the Indemnitee in connection with the defense thereof (other than reasonable costs of investigation) unless (i) the Indemnitee shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Issuer shall not be liable for the expenses of more than one separate counsel (in addition to any local counsel in the jurisdiction in which any Claim is brought), approved by the Dealer, representing the Indemnitee who is party to such Claim), (ii) the Issuer shall not have employed counsel reasonably satisfactory to the Indemnitee to represent the Indemnitee within a reasonable time after notice of existence of the Claim or (iii) the Issuer has authorized in writing the employment of counsel for the Indemnitee. The indemnity, reimbursement and contribution obligations of the Issuer hereunder shall be in addition to any other liability the Issuer may otherwise have to an Indemnitee and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Issuer and any Indemnitee.  The Issuer agrees that without the Dealer's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any Claim in respect of which indemnification may be sought under the indemnification provision of the Agreement (whether or not the Dealer or any other Indemnitee is an actual or potential party to such Claim), unless such

settlement, compromise or consent (i) includes an unconditional release of each Indemnitee from all liability arising out of such Claim and (ii) does not include a statement as to or an admission of fault, culpability or failure to act, by or on behalf of any Indemnitee.

**Exhibit C**

**Statement of Terms for Interest — Bearing Commercial Paper Notes of [Name of Issuer]**

**THE PROVISIONS SET FORTH BELOW ARE QUALIFIED TO THE EXTENT APPLICABLE BY THE TRANSACTION SPECIFIC 'PRICING' 'PRIVATE PLACEMENT MEMORANDUM' SUPPLEMENT (THE "SUPPLEMENT") (IF ANY) SENT TO EACH PURCHASER AT THE TIME OF THE TRANSACTION.**

1.  General.  (a) The obligations of the Issuer to which these terms apply (each a "Note") are represented by one or more Master Notes (each, a "Master Note") issued in the name of (or of a nominee for) The Depository Trust Company ("DTC"), which Master Note includes the terms and provisions for the Issuer's Interest-Bearing Commercial Paper Notes that are set forth in this Statement of Terms, since this Statement of Terms constitutes an integral part of the Underlying Records as defined and referred to in the Master Note.

    (b) "Business Day" means any day other than a Saturday or Sunday that is neither a legal holiday nor a day on which banking institutions are authorized or required by law, executive order or regulation to be closed in New York City and, with respect to LIBOR Notes (as defined below) is also a London Business Day.  "London Business Day" means, a day, other than a Saturday or Sunday, on which dealings in deposits in U.S.  dollars are transacted in the London interbank market.

2.  Interest.  (a) Each Note will bear interest at a fixed rate (a "Fixed Rate Note") or at a floating rate (a "Floating Rate Note").

    (b)   The Supplement sent to each holder of such Note will describe the following terms: (i) whether such Note is a Fixed Rate Note or a Floating Rate Note and whether such Note is an Original Issue Discount Note (as defined below); (ii) the date on which such Note will be issued (the "Issue Date"); (iii) the Stated Maturity Date (as defined below); (iv) if such Note is a Fixed Rate Note, the rate per annum at which such Note will bear interest, if any, and the Interest Payment Dates; (v) if such Note is a Floating Rate Note, the Base Rate, the Index Maturity, the Interest Reset Dates, the Interest Payment Dates and the Spread and/or Spread Multiplier, if any (all as defined below), and any other terms relating to the particular method of calculating the interest rate for such Note; and (vi) any other terms applicable specifically to such Note. "Original Issue Discount Note" means a Note which has a stated redemption price at the Stated Maturity Date that exceeds its Issue Price by more than a specified de minimis amount and which the Supplement indicates will be an "Original Issue Discount Note".

    (c)   Each Fixed Rate Note will bear interest from its Issue Date at the rate per annum specified in the Supplement until the principal amount thereof is paid or made available for payment.  Interest on each Fixed Rate Note will be payable on the dates specified in the Supplement (each an "Interest Payment Date" for a Fixed Rate Note) and on the Maturity Date (as defined below).  Interest on Fixed Rate Notes will be computed on the basis of a 360-day year of twelve 30-day months.

    If any Interest Payment Date or the Maturity Date of a Fixed Rate Note falls on a day that is not a Business Day, the required payment of principal, premium, if any, and/or interest will be payable on the next succeeding Business Day, and no additional interest will accrue in respect of the payment made on that next succeeding Business Day.

(d) The interest rate on each Floating Rate Note for each Interest Reset Period (as defined below) will be determined by reference to an interest rate basis (a "Base Rate") plus or minus a number of basis points (one basis point equals one-hundredth of a percentage point) (the "Spread"), if any, and/or multiplied by a certain percentage (the "Spread Multiplier"), if any, until the principal thereof is paid or made available for payment. The Supplement will designate which of the following Base Rates is applicable to the related Floating Rate Note: (a) the CD Rate (a "CD Rate Note"), (b) the Commercial Paper Rate (a "Commercial Paper Rate Note"), (c) the Federal Funds Rate (a "Federal Funds Rate Note"), (d) LIBOR (a "LIBOR Note"), (e) the Prime Rate (a "Prime Rate Note"), (f) the Treasury Rate (a "Treasury Rate Note") or (g) such other Base Rate as may be specified in such Supplement.

The rate of interest on each Floating Rate Note will be reset daily, weekly, monthly, quarterly or semiannually (the "Interest Reset Period"). The date or dates on which interest will be reset (each an "Interest Reset Date") will be, unless otherwise specified in the Supplement, in the case of Floating Rate Notes which reset daily, each Business Day, in the case of Floating Rate Notes (other than Treasury Rate Notes) that reset weekly, the Wednesday of each week; in the case of Treasury Rate Notes that reset weekly, the Tuesday of each week; in the case of Floating Rate Notes that reset monthly, the third Wednesday of each month; in the case of Floating Rate Notes that reset quarterly, the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes that reset semiannually, the third Wednesday of the two months specified in the Supplement. If any Interest Reset Date for any Floating Rate Note is not a Business Day, such Interest Reset Date will be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Reset Date shall be the immediately preceding Business Day. Interest on each Floating Rate Note will be payable monthly, quarterly or semiannually (the "Interest Payment Period") and on the Maturity Date. Unless otherwise specified in the Supplement, and except as provided below, the date or dates on which interest will be payable (each an "Interest Payment Date" for a Floating Rate Note) will be, in the case of Floating Rate Notes with a monthly Interest Payment Period, on the third Wednesday of each month; in the case of Floating Rate Notes with a quarterly Interest Payment Period, on the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes with a semiannual Interest Payment Period, on the third Wednesday of the two months specified in the Supplement. In addition, the Maturity Date will also be an Interest Payment Date.

If any Interest Payment Date for any Floating Rate Note (other than an Interest Payment Date occurring on the Maturity Date) would otherwise be a day that is not a Business Day, such interest Payment Date shall be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Payment Date shall be the immediately preceding Business Day. If the Maturity Date of a Floating Rate Note falls on a day that is not a Business Day, the payment of principal and interest will be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after such maturity.

Interest payments on each interest Payment Date for Floating Rate Notes will include accrued interest from and including the Issue Date or from and including the last date in respect of which interest has been paid, as the case may be, to, but excluding, such Interest Payment Date. On the Maturity Date, the interest payable on a Floating Rate Note will include interest accrued to, but excluding, the Maturity Date. Accrued interest will be calculated by multiplying the

principal amount of a Floating Rate Note by an accrued interest factor. This accrued interest factor will be computed by adding the interest factors calculated for each day in the period for which accrued interest is being calculated. The interest factor (expressed as a decimal) for each such day will be computed by dividing the interest rate applicable to such day by 360, in the cases where the Base Rate is the CD Rate, Commercial Paper Rate, Federal Funds Rate, LIBOR or Prime Rate, or by the actual number of days in the year, in the case where the Base Rate is the Treasury Rate. The interest rate in effect on each day will be (I) if such day is an Interest Reset Date, the interest rate with respect to the Interest Determination Date (as defined below) pertaining to such Interest Reset Date, or (ii) if such day is not an Interest Reset Date, the interest rate with respect to the Interest Determination Date pertaining to the next preceding Interest Reset Date, subject in either case to any adjustment by a Spread and/or a Spread Multiplier.

The "Interest Determination Date" where the Base Rate is the CD Rate or the Commercial Paper Rate will be the second Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is the Federal Funds Rate or the Prime Rate will be the Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is LIBOR will be the second London Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is the Treasury Rate will be the day of the week in which such Interest Reset Date falls when Treasury Bills are normally auctioned. Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is held on the following Tuesday or the preceding Friday. If an auction is so held on the preceding Friday, such Friday will be the Interest Determination Date pertaining to the Interest Reset Date occurring in the next succeeding week.

The "Index Maturity" is the period to maturity of the instrument or obligation from which the applicable Base Rate is calculated.

The "Calculation Date," where applicable, shall be the earlier of (i) the tenth calendar day following the applicable Interest Determination Date or (ii) the Business Day preceding the applicable Interest Payment Date or Maturity Date.

All times referred to herein reflect New York City time, unless otherwise specified.

The Issuer shall specify in writing to the Issuing and Paying Agent which party will be the calculation agent (the "Calculation Agent") with respect to the Floating Rate Notes. The Calculation Agent will provide the interest rate then in effect and, if determined, the interest rate which will become effective on the next Interest Reset Date with respect to such Floating Rate Note to the Issuing and Paying Agent as soon as the interest rate with respect to such Floating Rate Note has been determined and as soon as practicable after any change in such interest rate.

All percentages resulting from any calculation on Floating Rate Notes will be rounded to the nearest one hundred-thousandth of a percentage point, with five-one millionths of a percentage point rounded upwards. For example, 9.876545% (or .09876545) would be rounded to 9.87655% (or .0987655). All dollar amounts used in or resulting from any calculation on Floating Rate Notes will be rounded, in the case of U.S. dollars, to the nearest cent or, in the case of a foreign currency, to the nearest unit (with one-half cent or unit being rounded upwards).

*CD Rate Notes*

"CD Rate" means the rate on any Interest Determination Date for negotiable certificates of deposit having the Index Maturity as published by the Board of Governors of the Federal Reserve System (the "FRB") in "Statistical Release H.15(519), Selected Interest Rates" or any successor publication of the FRB ("H.15(519)") under the heading "CDs (Secondary Market)".

If the above rate is not published in H.15(519) by 3:00 p.m. on the Calculation Date, the CD Rate will be the rate on such Interest Determination Date set forth in the daily update of H.15(519), available through the world wide website of the FRB at http://www.federalreserve.gov/releases/h15/Update, or any successor site or publication or other recognized electronic source used for the purpose of displaying the applicable rate ("H.15 Daily Update") under the caption "CDs (Secondary Market)".

If such rate is not published in either H.15(519) or H.15 Daily Update by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the CD Rate to be the arithmetic mean of the secondary market offered rates as of 10:00 a.m. on such Interest Determination Date of three leading nonbank dealers[1] in negotiable U.S. dollar certificates of deposit in New York City selected by the Calculation Agent for negotiable U.S. dollar certificates of deposit of major United States money center banks of the highest credit standing in the market for negotiable certificates of deposit with a remaining maturity closest to the Index Maturity in the denomination of $5,000,000.

If the dealers selected by the Calculation Agent are not quoting as set forth above, the CD Rate will remain the CD Rate then in effect on such Interest Determination Date.

*Commercial Paper Rate Notes*

"Commercial Paper Rate" means the Money Market Yield (calculated as described below) of the rate on any Interest Determination Date for commercial paper having the Index Maturity, as published in H.15(519) under the heading "Commercial Paper-Nonfinancial". If the above rate is not published in H.15(519) by 3:00 p.m., New York City time, on the Calculation Date, then the Commercial Paper Rate will be the Money Market Yield of the rate on such Interest Determination Date for commercial paper of the Index Maturity as published in H.15 Daily Update under the heading "Commercial Paper-Nonfinancial".

If by 3:00 p.m. on such Calculation Date such rate is not published in either H.15(519) or H.15 Daily Update, then the Calculation Agent will determine the Commercial Paper Rate to be the Money Market Yield of the arithmetic mean of the offered rates as of 11:00 a.m. on such Interest Determination Date of three leading dealers of U.S. dollar commercial paper in New York City selected by the Calculation Agent for commercial paper of the Index Maturity placed for an industrial issuer whose bond rating is "AA," or the equivalent, from a nationally recognized statistical rating organization.

If the dealers selected by the Calculation Agent are not quoting as mentioned above, the Commercial Paper Rate with respect to such Interest Determination Date will remain the Commercial Paper Rate then in effect on such Interest Determination Date.

---

[1] Such nonbank dealers referred to in this Statement of Terms may include affiliates of the Dealer.

"Money Market Yield" will be a yield calculated in accordance with the following formula:

$$\text{Money Market Yield} = \frac{D \times 360}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for commercial paper quoted on a bank discount basis and expressed as a decimal and "M" refers to the actual number of days in the interest period for which interest is being calculated.

*Federal Funds Rate Notes*

"Federal Funds Rate" means the rate on any Interest Determination Date for federal funds as published in 1-1.15(519) under the heading "Federal Funds (Effective)" and displayed on Moneyline Telerate[1] (or any successor service) on page 120 (or any other page as may replace the specified page on that service) ("Telerate Page 120").

If the above rate does not appear on Telerate Page 120 or is not so published by 3:00 p.m. on the Calculation Date, the Federal Funds Rate will be the rate on such Interest Determination Date as published in H.15 Daily Update under the heading "Federal Funds/(Effective)".

If such rate is not published as described above by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Federal Funds Rate to be the arithmetic mean of the rates for the last transaction in overnight U.S. dollar federal funds arranged by each of three leading brokers of Federal Funds transactions in New York City selected by the Calculation Agent prior to 9:00 a.m. on such Interest Determination Date.

If the brokers selected by the Calculation Agent are not quoting as mentioned above, the Federal Funds Rate will remain the Federal Funds Rate then in effect on such Interest Determination Date.

*LIBOR Notes*

The London Interbank offered rate ("LIBOR") means, with respect to any Interest Determination Date, the rate for deposits in U.S. dollars having the Index Maturity that appears on the Designated LIBOR Page as of 11:00 a.m., London time, on such Interest Determination Date.

If no rate appears, LIBOR will be determined on the basis of the rates at approximately 11:00 a.m., London time, on such Interest Determination Date at which deposits in U.S. dollars are offered to prime banks in the London interbank market by four major banks in such market selected by the Calculation Agent for a term equal to the Index Maturity and in principal amount equal to an amount that in the Calculation Agent's judgment is representative for a single transaction in U.S. dollars in such market at such time (a "Representative Amount"). The Calculation Agent will request the principal London office of each of such banks to provide a quotation of its rate. If at least two such quotations are provided, LIBOR will be the arithmetic mean of such quotations. If fewer than two quotations are provided, LIBOR for such interest period will be the arithmetic mean of the rates quoted at approximately 11:00 a.m., in New York City, on such Interest Determination

---

[1] BAML: Moneyline Telerate no longer exists - please replace with Reuters, Bloomberg, or another provider throughout.

Date by three major banks in New York City, selected by the Calculation Agent, for loans in U.S. dollars to leading European banks, for a term equal to the Index Maturity and in a Representative Amount; provided, however, that if fewer than three banks so selected by the Calculation Agent are providing such quotations, the then existing LIBOR rate will remain in effect for such Interest Payment Period.

"Designated LIBOR Page" means the display designated as page "3750" on Moneyline Telerate (or such other page as may replace the 3750 page on that service or such other service or services as may be nominated by the British Bankers' Association for the purposes of displaying London interbank offered rates for U.S. dollar deposits).

*Prime Rate Notes*

"Prime Rate" means the rate on any Interest Determination Date as published in H.15(519) under the heading "Bank Prime Loan".

If the above rate is not published in H.15(519) prior to 3:00 p.m. on the Calculation Date, then the Prime Rate will be the rate on such Interest Determination Date as published in H.15 Daily Update opposite the caption "Bank Prime Loan".

If the rate is not published prior to 3:00 p.m. on the Calculation Date in either H.15(519) or H, 15 Daily Update, then the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the rates of interest publicly announced by each bank that appears on the Reuters Screen US PRIME! Page (as defined below) as such bank's prime rate or base lending rate as of 11:00 a.m., on that Interest Determination Date.

If fewer than four such rates referred to above are so published by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the prime rates or base lending rates quoted on the basis of the actual number of days in the year divided by 360 as of the close of business on such Interest Determination Date by three major banks in New York City selected by the Calculation Agent.

If the banks selected are not quoting as mentioned above, the Prime Rate will remain the Prime Rate in effect on such Interest Determination Date.

"Reuters Screen US PRIME1 Page" means the display designated as page "US PRIME1" on the Reuters Monitor Money Rates Service (or such other page as may replace the US PRIME1 page on that service for the purpose of displaying prime rates or base lending rates of major United States banks).

*Treasury Rate Notes "Treasury Rate" means:*

 (1) the rate from the auction held on the Interest Determination Date (the "Auction") of direct obligations of the United States ("Treasury Bills") having the Index Maturity specified in the Supplement under the caption "INVESTMENT RATE" on the display on Moneyline Telerate (or any successor service) on page 56 (or any other page as may replace that page on that service) ("Telerate Page 56") or page 57 (or any other page as may replace that page on that service) ("Telerate Page 57"), or

 (2) if the rate referred to in clause (1) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield (as defined below) of the rate for the applicable Treasury Bills as

published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/Auction High", or

(3) if the rate referred to in clause (2) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield of the auction rate of the applicable Treasury Bills as announced by the United States Department of the Treasury, or

(4) if the rate referred to in clause (3) is not so announced by the United States Department of the Treasury, or if the Auction is not held, the Bond Equivalent Yield of the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H,15(519) under the caption "U.S. Government Securities/Treasury Bills/Secondary Market", or

(5) if the rate referred to in clause (4) not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/Secondary Market", or

(6) if the rate referred to in clause (5) is not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date calculated by the Calculation Agent as the Bond Equivalent Yield of the arithmetic mean of the secondary market bid rates, as of approximately 3:30 p.m. on that Interest Determination Date, of three primary United States government securities dealers selected by the Calculation Agent, for the issue of Treasury Bills with a remaining maturity closest to the Index Maturity specified in the Supplement, or

(7) if the dealers so selected by the Calculation Agent are not quoting as mentioned in clause (6), the Treasury Rate in effect on the particular Interest Determination Date.

"Bond Equivalent Yield" means a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Bond Equivalent Yield} = \frac{D \times N}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for Treasury Bills quoted on a bank discount basis and expressed as a decimal, "N" refers to 365 or 366, as the case may be, and "M" refers to the actual number of days in the applicable Interest Reset Period.

3. <u>Final Maturity</u>.  The Stated Maturity Date for any Note will be the date so specified in the Supplement, which shall be no later than 364 days from the date of issuance.  On its Stated Maturity Date, or any date prior to the Stated Maturity Date on which the particular Note becomes due and payable by the declaration of acceleration, each such date being referred to as a Maturity Date, the principal amount of each Note, together with accrued and unpaid interest thereon, will be immediately due and payable,

4. <u>Events of Default</u>.  The occurrence of any of the following shall constitute an "Event of Default" with respect to a Note: (i) default in any payment of principal of or interest on such Note (including on a redemption thereof); (ii) the Issuer makes any compromise arrangement with its creditors generally including the entering into any form of moratorium with its creditors generally; (iii) a court having jurisdiction shall enter a decree or order for relief in respect of the Issuer in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or there shall be appointed a receiver, administrator, liquidator, custodian, trustee or sequestrator (or similar officer)

with respect to the whole or substantially the whole of the assets of the Issuer and any such decree, order or appointment is not removed, discharged or withdrawn within 60 days thereafter; or (iv) the Issuer shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment of or taking possession by a receiver, administrator, liquidator, assignee, custodian, trustee or sequestrator (or similar official), with respect to the whole or substantially the whole of the assets of the Issuer or make any general assignment for the benefit of creditors, Upon the occurrence of an Event of Default, the principal of each obligation evidenced by such Note (together with interest accrued and unpaid thereon) shall become, without any notice or demand, immediately due and payable. [2]

5. <u>Obligation Absolute</u>. No provision of the Issuing and Paying Agency Agreement under which the Notes are issued shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on each Note at the times, place and rate, and in the coin or currency, herein prescribed.

6. <u>Supplement</u>. Any term contained in the Supplement shall supersede any conflicting term contained herein.

---

[2] Unlike single payment notes, where a default arises only at the stated maturity. interest-bearing notes with multiple payment dates should contain a default provision permitting acceleration of the maturity if the Issuer defaults on an interest payment.

Exhibit 107

**Commercial Paper Dealer Agreement**

**4 (a)(2) Program**

Between:

**Cardinal Health, Inc**., as Issuer

and

**Goldman Sachs & Co**., as Dealer

Concerning Notes to be issued pursuant to an

Issuing and Paying Agency Agreement dated as of August 9, 2006,

as amended February 28, 2007 and November 22, 2016

between the Issuer and

The Bank of New York, as Issuing

and Paying Agent

Dated as of

November 22, 2016

**Commercial Paper Dealer Agreement**
**4(a)(2) Program**

This agreement (the "Agreement") sets forth the understandings between the Issuer and the Dealer, each named on the cover page hereof, in connection with the issuance and sale by the Issuer of its short-term promissory notes (the "Notes") through the Dealer.

Certain terms used in this Agreement are defined in Section 6 hereof.

The Addendum to this Agreement, and any Annexes or Exhibits described in this Agreement or such Addendum, are hereby incorporated into this Agreement and made fully a part hereof.

**1.      Offers, Sales and Resales of Notes.**

1.1      While (i) the Issuer has and shall have no obligation to sell the Notes to the Dealer or to permit the Dealer to arrange any sale of the Notes for the account of the Issuer, and (ii) the Dealer has and shall have no obligation to purchase the Notes from the Issuer or to arrange any sale of the Notes for the account of the Issuer, the parties hereto agree that in any case where the Dealer purchases Notes from the Issuer, or arranges for the sale of Notes by the Issuer, such Notes will be purchased or sold by the Dealer in reliance on the representations, warranties, covenants and agreements of the Issuer contained herein or made pursuant hereto and on the terms and conditions and in the manner provided herein.

1.2      So long as this Agreement shall remain in effect, and in addition to the limitations contained in Section 1.7 hereof, the Issuer shall not, without the consent of the Dealer, offer, solicit or accept offers to purchase, or sell, any Notes except (a) in transactions with one or more dealers which may from time to time after the date hereof become dealers with respect to the Notes by executing with the Issuer one or more agreements which contain provisions substantially identical to those contained in Section 1 of this Agreement, of which the Issuer hereby undertakes to provide the Dealer prompt notice or (b) in transactions with the other dealers listed on the Addendum hereto, which are executing agreements with the Issuer which contain provisions substantially identical to Section 1 of this Agreement contemporaneously herewith.  In no event shall the Issuer offer, solicit or accept offers to purchase, or sell, any Notes directly on its own behalf in transactions with persons other than the Dealer or other broker-dealers as specifically permitted in this Section 1.2.

1.3      The Notes shall be in a minimum denomination of $250,000 or integral multiples of $1,000 in excess thereof, will bear such interest rates, if interest bearing, or will be sold at such discount from their face amounts, as shall be agreed upon by the Dealer and the Issuer, shall have a maturity not exceeding 364 days from the date of issuance and may have such terms as are specified in Exhibit C hereto or the Private Placement Memorandum.  The Notes shall not contain any provision for extension, renewal or automatic "rollover."

1.4      The authentication and issuance of, and payment for, the Notes shall be effected in accordance with the Issuing and Paying Agency Agreement, and the Notes shall be either individual physical certificates or book-entry notes evidenced by one or more master notes (each, a "Master Note") registered in the name of The Depository Trust Company ("DTC") or its nominee, in the form or forms annexed to the Issuing and Paying Agency Agreement.

1.5    If the Issuer and the Dealer shall agree on the terms of the purchase of any Note by the Dealer or the sale of any Note arranged by the Dealer (including, but not limited to, agreement with respect to the date of issue, purchase price, principal amount, maturity and interest rate or interest rate index and margin (in the case of interest-bearing Notes) or discount thereof (in the case of Notes issued on a discount basis), and appropriate compensation for the Dealer's services hereunder) pursuant to this Agreement, the Issuer shall cause such Note to be issued and delivered in accordance with the terms of the Issuing and Paying Agency Agreement and payment for such Note shall be made by the purchaser thereof, either directly or through the Dealer, to the Issuing and Paying Agent, for the account of the Issuer.  Except as otherwise agreed, in the event that the Dealer is acting as an agent and a purchaser shall either fail to accept delivery of or make payment for a Note on the date fixed for settlement, the Dealer shall promptly notify the Issuer, and if the Dealer has theretofore paid the Issuer for the Note, the Issuer will promptly return such funds to the Dealer against its return of the Note to the Issuer, in the case of a certificated Note, and upon notice of such failure in the case of a book-entry Note.  If such failure occurred for any reason other than default by the Dealer, the Issuer shall reimburse the Dealer on an equitable basis for the Dealer's loss of the use of such funds for the period such funds were credited to the Issuer's account.

1.6    The Dealer and the Issuer hereby establish and agree to observe the following procedures in connection with offers, sales and subsequent resales or other transfers of the Notes:

(a)    Offers and sales of the Notes by or through the Dealer shall be made only to: (i) investors reasonably believed by the Dealer to be Qualified Institutional Buyers or Institutional Accredited Investors and (ii) non-bank fiduciaries or agents that will be purchasing Notes for one or more accounts, each of which is reasonably believed by the Dealer to be an Institutional Accredited Investor.

(b)    Resales and other transfers of the Notes by the holders thereof shall be made only in accordance with the restrictions in the legend described in clause (e) below.

(c)    No general solicitation or general advertising shall be used in connection with the offering of the Notes.  Without limiting the generality of the foregoing, without the prior written approval of the Dealer, the Issuer shall not issue any press release, make any other statement to any member of the press making reference to the Notes, the offer or sale of the Notes, or this Agreement or place or publish any "tombstone" or other advertisement relating to the Notes, or the offer or sale of the Notes.  To the extent permitted by applicable securities laws, the Issuer shall (i) omit the name of the Dealer from any publicly available filing by the Issuer that makes reference to the offer or sale of the Notes or this Agreement, (ii) not include a copy of this Agreement in any such filing or as an exhibit thereto, and (iii) redact the Dealer's name and any contact or other information that could identify the Dealer from any agreement or other information included in such filing.

(d)    No sale of Notes to any one purchaser shall be for less than $250,000 principal or face amount, and no Note shall be issued in a smaller principal or face amount.  If the purchaser is a non-bank fiduciary acting on behalf of others, each person for whom such purchaser is acting must purchase at least $250,000 principal or face amount of Notes.

(e)      Offers and sales of the Notes shall be subject to the restrictions described in the legend appearing on Exhibit A hereto.  A legend substantially to the effect of such Exhibit A shall appear as part of the Private Placement Memorandum used in connection with offers and sales of Notes hereunder, as well as on each individual certificate representing a Note and each Master Note representing book-entry Notes offered and sold pursuant to this Agreement.

(f)      The Dealer shall furnish or make available or shall have furnished or made available to each purchaser of Notes for which it has acted as the Dealer a copy of the then-current Private Placement Memorandum unless such purchaser has previously received or had made available to it a copy of the Private Placement Memorandum as then in effect.  The Private Placement Memorandum shall expressly state that any person to whom Notes are offered shall have an opportunity to ask questions of and receive information from, the Issuer and the Dealer and shall provide the names, addresses and telephone numbers of the persons from whom information regarding the Issuer may be obtained.

(g)      The Issuer agrees, for the benefit of the Dealer and each of the holders and prospective purchasers from time to time of the Notes that, if at any time the Issuer shall not be subject to Section 13 or 15(d) of the Exchange Act, the Issuer will furnish, upon request and at its expense, to the Dealer and to holders and prospective purchasers of Notes information required by Rule 144A(d)(4)(i) in compliance with Rule 144A(d).

(h)      In the event that any Note offered or to be offered by the Dealer would be ineligible for resale under Rule 144A, the Issuer shall immediately notify the Dealer (by telephone, confirmed in writing) of such fact and shall promptly prepare and deliver to the Dealer an amendment or supplement to the Private Placement Memorandum describing the Notes that are ineligible, the reason for such ineligibility and any other relevant information relating thereto.

(i)      The Issuer represents that it is not currently issuing commercial paper in the United States market in reliance upon the exemption provided by Section 3(a)(3) of the Securities Act.  The Issuer agrees that, if it shall issue commercial paper after the date hereof in reliance upon such exemption (a) the proceeds from the sale of the Notes will be segregated from the proceeds of the sale of any such commercial paper by being placed in a separate account; (b) the Issuer will institute appropriate corporate procedures to ensure that the offers and sales of notes issued by the Issuer pursuant to the Section 3(a)(3) exemption are not integrated with offerings and sales of Notes hereunder; and (c) the Issuer will comply with each of the requirements of Section 3(a)(3) of the Securities Act in selling commercial paper or other short-term debt securities other than the Notes in the United States.

1.7      The Issuer hereby represents and warrants to the Dealer, in connection with offers, sales and resales of Notes, as follows:

(a)      The Issuer hereby confirms to the Dealer that (except as permitted by Section 1.6 (i)) within the preceding six months neither the Issuer nor any person other than the Dealer or the other dealers referred to in Section 1.2 hereof acting on behalf of the Issuer has offered or sold any Notes, or any substantially similar security of the

Issuer (including, without limitation, medium-term notes issued by the Issuer), to, or solicited offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof. The Issuer also agrees that (except as permitted by Section 1.6(i)), as long as the Notes are being offered for sale by the Dealer and the other dealers referred to in Section 1.2 hereof as contemplated hereby and until at least six months after the offer of Notes hereunder has been terminated, neither the Issuer nor any person other than the Dealer or the other dealers referred to in Section 1.2 hereof (except as contemplated by Section 1.2 hereof) will offer the Notes or any substantially similar security of the Issuer for sale to, or solicit offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof, it being understood that such agreement is made with a view to bringing the offer and sale of the Notes within the exemption provided by Section 4(a)(2) of the Securities Act and shall survive any termination of this Agreement. The Issuer hereby represents and warrants that it has not taken or omitted to take, and will not take or omit to take, any action that would cause the offering and sale of Notes hereunder to be integrated with any other offering of securities, whether such offering is made by the Issuer or some other party or parties.

(b)     The Issuer represents and agrees that the proceeds of the sale of the Notes are not currently contemplated to be used for the purpose of buying, carrying or trading securities within the meaning of Regulation T and the interpretations thereunder by the Board of Governors of the Federal Reserve System. In the event that the Issuer determines to use such proceeds for the purpose of buying, carrying or trading securities, whether in connection with an acquisition of another company or otherwise, the Issuer shall give the Dealer at least five business days' prior written notice to that effect. The Issuer shall also give the Dealer prompt notice of the actual date that it commences to purchase securities with the proceeds of the Notes. Thereafter, in the event that the Dealer purchases Notes as principal and does not resell such Notes on the day of such purchase, to the extent necessary to comply with Regulation T and the interpretations thereunder, the Dealer will sell such Notes either (i) only to offerees it reasonably believes to be Qualified Institutional Buyers or to Qualified Institutional Buyers it reasonably believes are acting for other Qualified Institutional Buyers, in each case in accordance with Rule 144A or (ii) in a manner which would not cause a violation of Regulation T and the interpretations thereunder.

**2.      Representations and Warranties of Issuer.**

The Issuer represents and warrants that:

2.1     The Issuer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all the requisite power and authority to execute, deliver and perform its obligations under the Notes, this Agreement and the Issuing and Paying Agency Agreement.

2.2     This Agreement and the Issuing and Paying Agency Agreement have been duly authorized, executed and delivered by the Issuer and constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and

subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.3     The Notes have been duly authorized, and when issued as provided in the Issuing and Paying Agency Agreement, will be duly and validly issued and will constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.4     The offer and sale of the Notes in the manner contemplated hereby do not require registration of the Notes under the Securities Act, pursuant to the exemption from registration contained in Section 4(a)(2) thereof, and no indenture in respect of the Notes is required to be qualified under the Trust Indenture Act of 1939, as amended.

2.5     The Notes will rank at least pari passu with all other unsecured and unsubordinated indebtedness of the Issuer.

2.6     No consent or action of or filing or registration with, any governmental or public regulatory body or authority, including the SEC, is required to authorize, or is otherwise required in connection with the execution, delivery or performance of, this Agreement, the Notes or the Issuing and Paying Agency Agreement, except as may be required by the securities or Blue Sky laws of the various states in connection with the offer and sale of the Notes.

2.7     Neither the execution and delivery of this Agreement and the Issuing and Paying Agency Agreement, nor the issuance of the Notes in accordance with the Issuing and Paying Agency Agreement, nor the fulfillment of or compliance with the terms and provisions hereof or thereof by the Issuer, will (i) result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of the Issuer, or (ii) violate or result in a breach or a default under any of the terms of the Issuer's charter documents or by-laws, any contract or instrument to which the Issuer is a party or by which it or its property is bound, or any law or regulation, or any order, writ, injunction or decree of any court or government instrumentality, to which the Issuer is subject or by which it or its property is bound, which breach or default is reasonably expected to have a material adverse effect on the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.8     Except as disclosed in the Private Placement Memorandum, there is no litigation or governmental proceeding pending, or to the knowledge of the Issuer threatened, against or affecting the Issuer or any of its subsidiaries that could reasonably be expected to result in a material adverse change in the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.9     The Issuer is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.10    Neither the Private Placement Memorandum nor the Company Information contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

2.11    The Issuer has implemented and maintains in effect policies and procedures designed to promote compliance by the Issuer, its subsidiaries and its respective directors, officers and employees with Anti-Corruption Laws and applicable Sanctions, and the Issuer, its subsidiaries and to the knowledge of the Issuer, their respective employees, officers, directors and agents (in their capacity as such) that will act in any capacity in connection with or benefit from the commercial paper program established hereby, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not engaged in any activity that would reasonably be expected to result in the Issuer being designated as a Sanctioned Person.  None of the Issuer or any subsidiary is a Sanctioned Person.

2.12    Each (a) issuance of Notes by the Issuer hereunder and (b) amendment or supplement of the Private Placement Memorandum shall be deemed a representation and warranty by the Issuer to the Dealer, as of the date thereof, that, both before and after giving effect to such issuance and after giving effect to such amendment or supplement, (i) the representations and warranties given by the Issuer set forth in this Section 2 remain true and correct on and as of such date as if made on and as of such date, (ii) in the case of an issuance of Notes, the Notes being issued on such date have been duly and validly issued and constitute legal, valid and binding obligations of the Issuer, enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), (iii) in the case of an issuance of Notes, since the date of the most recent Private Placement Memorandum, there has been no material adverse change in the financial condition, operations or business prospects of the Issuer which has not been disclosed to the Dealer in writing and (iv) the Issuer is not in default of any of its obligations hereunder or under the Notes, or the Issuing and Paying Agency Agreement.

**3.     Covenants and Agreements of Issuer.**

The Issuer covenants and agrees that:

3.1     The Issuer will give the Dealer prompt notice (but in any event prior to any subsequent issuance of Notes hereunder) of any amendment to, modification of or waiver with respect to, the Notes or the Issuing and Paying Agency Agreement, including a complete copy of any such amendment, modification or waiver.

3.2     The Issuer shall, whenever there shall occur any change in the Issuer's financial condition, operations or business prospects or any development or occurrence in relation to the Issuer that would be material to holders of the Notes or potential holders of the Notes (including any downgrading or receipt of any written notice of intended downgrading or receipt of any written notice of review for potential change in the rating accorded any of the Issuer's securities by any nationally recognized statistical rating organization which has published a rating of the Notes), promptly, and in any event prior to any subsequent issuance of Notes

hereunder, notify the Dealer (by telephone, confirmed in writing) of such change, development or occurrence.

3.3     The Issuer shall from time to time furnish to the Dealer such information as the Dealer may reasonably request, including, without limitation, any press releases or material provided by the Issuer to any national securities exchange or rating agency, regarding (i) the Issuer's operations and financial condition, (ii) the due authorization and execution of the Notes and (iii) the Issuer's ability to pay the Notes as they mature.

3.4     The Issuer will take all such action as the Dealer may reasonably request to ensure that each offer and each sale of the Notes will comply with any applicable state Blue Sky laws; provided, however, that the Issuer shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation in any jurisdiction in which it is not so qualified or subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

3.5     The Issuer will not be in default of any of its obligations hereunder, under the Notes or under the Issuing and Paying Agency Agreement, at any time that any of the Notes are outstanding.

3.6     The Issuer shall not issue Notes hereunder until the Dealer shall have received (a) an opinion of counsel to the Issuer, addressed to the Dealer, satisfactory in form and substance to the Dealer, (b) a copy of the executed Issuing and Paying Agency Agreement as then in effect, (c) a copy of resolutions adopted by the Board of Directors of the Issuer, satisfactory in form and substance to the Dealer and certified by the Secretary or similar officer of the Issuer, authorizing execution and delivery by the Issuer of this Agreement, the Issuing and Paying Agency Agreement and the Notes and consummation by the Issuer of the transactions contemplated hereby and thereby, (d) prior to the issuance of any book-entry Notes represented by a master note registered in the name of DTC or its nominee, a copy of the executed Letter of Representations among the Issuer, the Issuing and Paying Agent and DTC and of the executed master note, (e) prior to the issuance of any Notes in physical form, a copy of such form (unless attached to this Agreement or the Issuing and Paying Agency Agreement) and (f) such other certificates, opinions, letters and documents as the Dealer shall have reasonably requested.

3.7     The Issuer shall reimburse the Dealer for all of the Dealer's reasonable out-of-pocket expenses related to this Agreement, including reasonable expenses incurred in connection with its preparation and negotiation, and the transactions contemplated hereby (including, but not limited to, the printing and distribution of the Private Placement Memorandum), and, if applicable, for the reasonable fees and out-of-pocket expenses of the Dealer's outside counsel.

3.8     Without limiting any obligation of the Issuer pursuant to this Agreement to provide the Dealer with credit and financial information, the Issuer hereby acknowledges and agrees that the Dealer may share the Company Information and any other information or matters relating to the Issuer or the transactions contemplated hereby with affiliates of the Dealer and that such affiliates may likewise share information relating to the Issuer or such transactions with the Dealer.

3.9 The Issuer shall not file a Form D (as referenced in Rule 503 under the Securities Act) at any time in respect of the offer or sales of the Notes.

3.10 The Issuer will not permit the proceeds of the Notes to be used directly or, to the knowledge of the Issuer, indirectly, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except, in each case, to the extent such use is licensed by OFAC and otherwise authorized under applicable law, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

4. **Disclosure.**

4.1 The Private Placement Memorandum and its contents (other than the Dealer Information) shall be the sole responsibility of the Issuer. The Private Placement Memorandum shall contain a statement expressly offering an opportunity for each prospective purchaser to ask questions of and receive answers from, the Issuer concerning the offering of Notes and to obtain relevant additional information which the Issuer possesses or can acquire without unreasonable effort or expense.

4.2 The Issuer agrees to promptly furnish the Dealer the Company Information as it becomes available; provided, however, that posting Company Information to the SEC's EDGAR system or on the website of the Issuer shall constitute delivery of such Company Information to the Dealer as required hereunder.

4.3 (a) The Issuer further agrees to notify the Dealer promptly upon the occurrence of any event relating to or affecting the Issuer that would cause the Company Information then in existence to include an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading.

(a) In the event that the Issuer gives the Dealer notice pursuant to Section 4.3(a) and the Dealer notifies the Issuer that it then has Notes it is holding in inventory, the Issuer agrees promptly to supplement or amend the Private Placement Memorandum so that the Private Placement Memorandum, as amended or supplemented, shall not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and the Issuer shall make such supplement or amendment available to the Dealer.

(b) In the event that (i) the Issuer gives the Dealer notice pursuant to Section 4.3(a), (ii) the Dealer does not notify the Issuer that it is then holding Notes in inventory and (iii) the Issuer chooses not to promptly amend or supplement the Private Placement Memorandum in the manner described in clause (b) above, then all solicitations and sales of Notes shall be suspended until such time as the Issuer has so amended or supplemented the Private Placement Memorandum, and made such amendment or supplement available to the Dealer.

(c)     Without limiting the generality of Section 4.3(a), the Issuer shall review, amend and supplement the Private Placement Memorandum on a periodic basis, but no less than at least once annually, to incorporate current financial information of the Issuer to the extent necessary to ensure that the information provided in the Private Placement Memorandum is accurate and complete.

**5.     Indemnification and Contribution.**

5.1     The Issuer will indemnify and hold harmless the Dealer, each individual, corporation, partnership, trust, association or other entity controlling the Dealer, any affiliate of the Dealer or any such controlling entity and their respective directors, officers, employees, partners, incorporators, shareholders, servants, trustees and agents (hereinafter the "Indemnitees") against any and all liabilities, penalties, suits, causes of action, losses, damages, claims, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) or judgments of whatever kind or nature (each a "Claim"), imposed upon, incurred by or asserted against the Indemnitees arising out of or based upon (i) any allegation that the Private Placement Memorandum, the Company Information or any information provided by the Issuer to the Dealer included (as of any relevant time) or includes an untrue statement of a material fact or omitted (as of any relevant time) or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or (ii) the breach by the Issuer of any agreement, covenant or representation made in or pursuant to this Agreement.  The indemnification provided for in clause (i) of the immediately preceding sentence shall not apply to the extent that the Claim arises out of or is based upon Dealer Information, and the indemnification provided for in clause (ii) of the immediately preceding sentence shall not apply to the extent that the Claim arises out of or is based upon the gross negligence or willful misconduct of the Dealer in the performance of, or the failure to perform, its obligations under this Agreement.

5.2     Provisions relating to claims made for indemnification under this Section 5 are set forth on Exhibit B to this Agreement.

5.3     In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 5 is held to be unavailable or insufficient to hold harmless the Indemnitees, although applicable in accordance with the terms of this Section 5, the Issuer shall contribute to the aggregate costs incurred by the Dealer in connection with any Claim in the proportion of the respective economic interests of the Issuer and the Dealer; provided, however, that such contribution by the Issuer shall be in an amount such that the aggregate costs incurred by the Dealer do not exceed the aggregate of the commissions and fees earned by the Dealer hereunder with respect to the issue or issues of Notes to which such Claim relates.  The respective economic interests shall be calculated by reference to the aggregate proceeds to the Issuer of the Notes issued hereunder and the aggregate commissions and fees earned by the Dealer hereunder.

**6.     Definitions.**

6.1     "Anti-Corruption Laws" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Issuer or any of its subsidiaries from time to time concerning or relating to bribery or corruption.

6.2 "Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

6.3 "Claim" shall have the meaning set forth in Section 5.1.

6.4 "Company Information" at any given time shall mean the Private Placement Memorandum together with, to the extent applicable, (i) the Issuer's most recent report on Form 10-K filed with the SEC and each report on Form 10-Q or 8-K filed by the Issuer with the SEC since the most recent Form 10-K, (ii) the Issuer's most recent annual audited financial statements and each interim financial statement or report prepared subsequent thereto, if not included in item (i) above, (iii) the Issuer's and its affiliates' other publicly available recent reports, including, but not limited to, any publicly available filings or reports provided to their respective shareholders, (iv) any other information or disclosure prepared pursuant to Section 4.3 hereof and (v) any information prepared or approved by the Issuer for dissemination to investors or potential investors in the Notes.

6.5 "Current Issuing and Paying Agent" shall have the meaning set forth in Section 7.10.

6.6 "Dealer Information" shall mean material concerning the Dealer provided by the Dealer in writing expressly for inclusion in the Private Placement Memorandum.

6.7 "Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended.

6.8 "Indemnitee" shall have the meaning set forth in Section 5.1.

6.9 "Institutional Accredited Investor" shall mean an institutional investor that is an accredited investor within the meaning of Rule 501 under the Securities Act and that has such knowledge and experience in financial and business matters that it is capable of evaluating and bearing the economic risk of an investment in the Notes, including, but not limited to, a bank, as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

6.10 "Issuing and Paying Agency Agreement" shall mean the issuing and paying agency agreement described on the cover page of this Agreement, or any such replacement thereof, as such agreement may be amended or supplemented from time to time.

6.11 "Issuing and Paying Agent" shall mean the party designated as such on the cover page of this Agreement, as issuing and paying agent under the Issuing and Paying Agency Agreement, or any successor thereto or replacement thereof, in accordance with the Issuing and Paying Agency Agreement.

6.12 "Non-bank fiduciary or agent" shall mean a fiduciary or agent other than (a) a bank, as defined in Section 3(a)(2) of the Securities Act, or (b) a savings and loan association, as defined in Section 3(a)(5)(A) of the Securities Act.

6.13 "Person" shall mean any natural person, corporation, firm, joint venture, partnership, limited liability company, association, enterprise, trust or other entity or organization, or any government or political subdivision or any agency, department or instrumentality thereof.

6.14    "Private Placement Memorandum" shall mean offering materials prepared in accordance with Section 4 (including materials referred to therein or incorporated by reference therein, if any) provided to purchasers and prospective purchasers of the Notes, and shall include amendments and supplements thereto which may be prepared from time to time in accordance with this Agreement (other than any amendment or supplement that has been completely superseded by a later amendment or supplement).

6.15    "Qualified Institutional Buyer" shall have the meaning assigned to that term in Rule 144A under the Securities Act.

6.16    "Replacement Issuing and Paying Agent" shall have the meaning set forth in Section 7.10.

6.17    "Replacement Issuing and Paying Agency Agreement" shall have the meaning set forth in Section 7.10.

6.18    "Rule 144A" shall mean Rule 144A under the Securities Act.

6.19    "Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of comprehensive Sanctions (at the time of this Agreement, Cuba, Iran, North Korea, Sudan, Syria and Crimea).

6.20    "Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or ordinarily resident in a Sanctioned Country to the extent dealing with such Person would be prohibited by applicable Sanctions or (c) any Person 50% owned by any such Person or Persons described in the foregoing clause (a).

6.21    "Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or any European Union member state.

6.22    "SEC" shall mean the U.S. Securities and Exchange Commission.

6.23    "Securities Act" shall mean the U.S. Securities Act of 1933, as amended.

**7.    General**

7.1    Unless otherwise expressly provided herein, all notices under this Agreement to parties hereto shall be in writing and shall be effective when received at the address of the respective party set forth in the Addendum to this Agreement.

7.2    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.

7.3    The Issuer agrees that any suit, action or proceeding brought by the Issuer against the Dealer in connection with or arising out of this Agreement or the Notes or the offer and sale of the Notes shall be brought solely in the United States federal courts located in the Borough of Manhattan or the courts of the State of New York located in the Borough of

Manhattan.  EACH OF THE DEALER AND THE ISSUER WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.4     This Agreement may be terminated, at any time, by the Issuer, upon one business day's prior notice to such effect to the Dealer, or by the Dealer upon one business day's prior notice to such effect to the Issuer.  Any such termination, however, shall not affect the obligations of the Issuer under Sections 1.2 (first sentence), 3.7, 5 and 7.3 hereof or the respective representations, warranties, agreements, covenants, rights or responsibilities of the parties made or arising prior to the termination of this Agreement.

7.5     This Agreement is not assignable by either party hereto without the written consent of the other party; provided, however, that the Dealer may assign its rights and obligations under this Agreement to any affiliate of the Dealer.

7.6     This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

7.7     This Agreement is for the exclusive benefit of the parties hereto, and their respective permitted successors and assigns hereunder, and shall not be deemed to give any legal or equitable right, remedy or claim to any other person whatsoever.

7.8     The Issuer acknowledges and agrees that (i) the purchase and sale of the Notes pursuant to this Agreement is an arm's-length commercial transaction between the Issuer, on the one hand, and the Dealer, on the other, (ii) in connection therewith and with the process leading to such transaction, the Dealer is acting solely as a principal and not the agent or fiduciary of the Issuer, (iii) the Dealer has not assumed an advisory or fiduciary responsibility in favor of the Issuer with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether the Dealer has advised or is currently advising the Issuer on other matters) or any other obligation to the Issuer except the obligations expressly set forth in this Agreement and (iv) the Issuer has consulted its own legal and financial advisors to the extent it deemed appropriate.  The Issuer agrees that it will not claim that the Dealer has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Issuer, in connection with such transaction or the process leading thereto.

7.9     In the case of any agreement by a Dealer to purchase a Note hereunder (other than as agent) which provides for a settlement date that is three Business Days or more after the date of such agreement, the obligation of the Dealer to purchase the Note under such agreement shall be subject to the following conditions:

(a)     the representations and warranties given by the Issuer set forth above in Section 2 shall be true and correct on and as of the settlement date as if made on and as of such date, and the Issuer shall have performed all of its obligations hereunder to be performed as of such date,

(b)     since the date of the most recent Private Placement Memorandum, there shall have been no material adverse change in the condition (financial or otherwise), operations or business prospects of the Issuer (whether occurring before or after

such agreement was entered into) which was not disclosed to the Dealer in writing prior to the time such agreement was entered into,

(c)     the Issuer shall not be in default of any of its obligations hereunder, under the Note or under the Issuing and Paying Agency Agreement,

(d)     on or after the date of such agreement there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading in the Issuer's securities on the New York Stock Exchange; (iii) a general moratorium in commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or services in the United States; (iv) the outbreak or escalation of emergency or war or (v) the occurrence of any other calamity or crisis or any change in financial, political or economic conditions in the United States or elsewhere, if the effect of any such event specified in clause (iv) or (v) in the reasonable judgment of the Dealer makes it impracticable or inadvisable to proceed with the offering or the delivery of the Note on the terms and in the amount contemplated in the Private Placement Memorandum, and

(e)     on or after the date of such agreement (i) downgrading shall not have occurred in the rating accorded the Issuer's debt securities by any nationally recognized statistical rating organization and such organization shall not have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Issuer's debt securities.

7.10    The parties hereto agree that the Issuer may, in accordance with the terms of this Section 7.10, from time to time replace the party which is then acting as Issuing and Paying Agent (the "Current Issuing and Paying Agent") with another party (such other party, the "Replacement Issuing and Paying Agent"), and enter into an agreement with the Replacement Issuing and Paying Agent covering the provision of issuing and paying agency functions in respect of the Notes by the Replacement Issuing and Paying Agent (the "Replacement Issuing and Paying Agency Agreement") (any such replacement, a "Replacement").

From and after the effective date of any Replacement, except to the extent that the Issuing and Paying Agency Agreement provides that the Current Issuing and Paying Agent will continue to act in respect of Notes outstanding as of the effective date of such Replacement, the "Issuing and Paying Agent" for the Notes shall be deemed to be the Replacement Issuing and Paying Agent, all references to the "Issuing and Paying Agent" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agent, and all references to the "Issuing and Paying Agency Agreement" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agency Agreement.

7.11    This Agreement supersedes all prior agreements and understandings (whether written or oral) between the Issuer and the Dealer, or any of them, with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date and year first above written

**Cardinal Health, Inc., as Issuer**

By: /s/ Sam Samad

Name: Sam Samad

Title: Treasurer

**Goldman Sachs & Co., as Dealer**

By: /s/ Nicholas Philip

Name: Nicholas Philip

Title: Authorized Signatory

Addendum

The following additional clauses shall apply to the Agreement and be deemed a part thereof,

1.      The other dealers referred to in clause (b) of Section 1.2 of the Agreement are Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wells Fargo Securities, LLC, SunTrust Robinson Humphrey, Inc., and J.P. Morgan Securities LLC.

2.      The addresses of the respective parties for the purposes of notices under Section 7.1 are as follows:

For the Issuer:

Address: Cardinal Health, Inc., 7000 Cardinal Place, Dublin, Ohio 43017
Attention: Scott Zimmerman, Assistant Treasurer
Telephone:      (###) ###-####

For the Dealer:

Address: 200 West Street, New York, New York 10282
Attention: Short Term Interest Rate Sales
Telephone Number:    (###) ###-####

**Exhibit A**

**Form of Legend for Private Placement Memorandum and Notes**

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE SECURITIES LAW, AND OFFERS AND SALES THEREOF MAY BE MADE ONLY IN COMPLIANCE WITH AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.  BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER WILL BE DEEMED TO REPRESENT THAT (I) IT HAS BEEN AFFORDED AN OPPORTUNITY TO INVESTIGATE MATTERS RELATING TO THE ISSUER AND THE NOTES, (II) IT IS NOT ACQUIRING SUCH NOTE WITH A VIEW TO ANY DISTRIBUTION THEREOF AND (III) IT IS EITHER (A)(1) AN INSTITUTIONAL INVESTOR THAT IS AN ACCREDITED INVESTOR WITHIN THE MEANING OF RULE 501(a) UNDER THE ACT (AN "INSTITUTIONAL ACCREDITED INVESTOR") AND (2)(i) PURCHASING NOTES FOR ITS OWN ACCOUNT, (ii) A BANK (AS DEFINED IN SECTION 3(a)(2) OF THE ACT) OR A SAVINGS AND LOAN ASSOCIATION OR OTHER INSTITUTION (AS DEFINED IN SECTION 3(a)(5)(A) OF THE ACT) ACTING IN ITS INDIVIDUAL OR FIDUCIARY CAPACITY OR (iii) A FIDUCIARY OR AGENT (OTHER THAN A U.S. BANK OR SAVINGS AND LOAN ASSOCIATION) PURCHASING NOTES FOR ONE OR MORE ACCOUNTS EACH OF WHICH ACCOUNTS IS SUCH AN INSTITUTIONAL ACCREDITED INVESTOR; OR (B) A QUALIFIED INSTITUTIONAL BUYER ("QIB") WITHIN THE MEANING OF RULE 144A UNDER THE ACT THAT IS ACQUIRING NOTES FOR ITS OWN ACCOUNT OR FOR ONE OR MORE ACCOUNTS, EACH OF WHICH ACCOUNTS IS A QIB; AND THE PURCHASER ACKNOWLEDGES THAT IT IS AWARE THAT THE SELLER MAY RELY UPON THE EXEMPTION FROM THE REGISTRATION PROVISIONS OF SECTION 5 OF THE ACT PROVIDED BY RULE 144A.  BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER THEREOF SHALL ALSO BE DEEMED TO AGREE THAT ANY RESALE OR OTHER TRANSFER THEREOF WILL BE MADE ONLY (A) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE ACT, EITHER (1) TO THE ISSUER OR TO A PLACEMENT AGENT DESIGNATED BY THE ISSUER AS A PLACEMENT AGENT FOR THE NOTES (COLLECTIVELY, THE "PLACEMENT AGENTS"), NONE OF WHICH SHALL HAVE ANY OBLIGATION TO ACQUIRE SUCH NOTE, (2) THROUGH A PLACEMENT AGENT TO AN INSTITUTIONAL ACCREDITED INVESTOR OR A QIB, OR (3) TO A QIB IN A TRANSACTION THAT MEETS THE REQUIREMENTS OF RULE 144A AND (B) IN MINIMUM AMOUNTS OF $250,000.

**Exhibit B**

**Further Provisions Relating to Indemnification**

(a)  The Issuer agrees to reimburse each Indemnitee for all expenses (including reasonable fees and disbursements of internal and external counsel) as they are incurred by it in connection with investigating or defending any loss, claim, damage, liability or action in respect of which indemnification may be sought under Section 5 of the Agreement (whether or not it is a party to any such proceedings) provided, however, that if it is found in any such action, proceeding or investigation that (1) any loss, claim, damage or liability of an Indemnitee (other than any Claim for which indemnification may be sought under clause (i) of Section 5.1 hereof) has resulted from the gross negligence or willful misconduct of the Indemnitee in performing the services that are the subject of this Agreement or (2) any loss, claim, damage or liability of an Indemnitee (other than any Claim for which indemnification may be sought under clause (ii) of Section 5.1 hereof) has resulted from Dealer Information, the Indemnitee shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of the Indemnitee which is the subject of such finding.

(b)  Promptly after receipt by an Indemnitee of notice of the existence of a Claim, such Indemnitee will, if a claim in respect thereof is to be made against the Issuer, notify the Issuer in writing of the existence thereof; provided that (i) the omission to so notify the Issuer will not relieve the Issuer from any liability which it may have hereunder unless and except to the extent it did not otherwise learn of such Claim and such failure results in the forfeiture by the Issuer of substantial rights and defenses, and (ii) the omission to so notify the Issuer will not relieve it from liability which it may have to an Indemnitee otherwise than on account of this indemnity agreement.  In case any such Claim is made against any Indemnitee and it notifies the Issuer of the existence thereof, the Issuer will be entitled to participate therein, and to the extent that it may elect by written notice delivered to the Indemnitee, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnitee; provided that if the defendants in any such Claim include both the Indemnitee and the Issuer, and the Indemnitee shall have concluded that there may be legal defenses available to it which are different from or additional to those available to the Issuer, the Issuer shall not have the right to direct the defense of such Claim on behalf of such Indemnitee, and the Indemnitee shall have the right to select separate counsel to assert such legal defenses on behalf of such Indemnitee. Upon receipt of notice from the Issuer to such Indemnitee of the Issuer's election to so assume the defense of such Claim and approval by the Indemnitee of counsel, the Issuer will not be liable to such Indemnitee for expenses incurred thereafter by the Indemnitee in connection with the defense thereof (other than reasonable costs of investigation) unless (i) the Indemnitee shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Issuer shall not be liable for the expenses of more than one separate counsel (in addition to any local counsel in the jurisdiction in which any Claim is brought), approved by the Dealer, representing the Indemnitee who is party to such Claim), (ii) the Issuer shall not have employed counsel reasonably satisfactory to the Indemnitee to represent the Indemnitee within a reasonable time after notice of existence of the Claim or (iii) the Issuer has authorized in writing the employment of counsel for the Indemnitee. The indemnity, reimbursement and contribution obligations of the Issuer hereunder shall be in addition to any other liability the Issuer may otherwise have to an Indemnitee and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Issuer and any Indemnitee.  The Issuer agrees that without the Dealer's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any Claim in respect of which

indemnification may be sought under the indemnification provision of the Agreement (whether or not the Dealer or any other Indemnitee is an actual or potential party to such Claim), unless such settlement, compromise or consent (i) includes an unconditional release of each Indemnitee from all liability arising out of such Claim and (ii) does not include a statement as to or an admission of fault, culpability or failure to act, by or on behalf of any Indemnitee.

**Exhibit C**

**Statement of Terms for Interest — Bearing Commercial Paper Notes of [Name of Issuer]**

**THE PROVISIONS SET FORTH BELOW ARE QUALIFIED TO THE EXTENT APPLICABLE BY THE TRANSACTION SPECIFIC PRICING SUPPLEMENT (THE "SUPPLEMENT") (IF ANY) SENT TO EACH PURCHASER AT THE TIME OF THE TRANSACTION.**

1. General.  (a) The obligations of the Issuer to which these terms apply (each a "Note") are represented by one or more Master Notes (each, a "Master Note") issued in the name of (or of a nominee for) The Depository Trust Company ("DTC"), which Master Note includes the terms and provisions for the Issuer's Interest-Bearing Commercial Paper Notes that are set forth in this Statement of Terms, since this Statement of Terms constitutes an integral part of the Underlying Records as defined and referred to in the Master Note.

   (b) "Business Day" means any day other than a Saturday or Sunday that is neither a legal holiday nor a day on which banking institutions are authorized or required by law, executive order or regulation to be closed in New York City and, with respect to LIBOR Notes (as defined below) is also a London Business Day.  "London Business Day" means a day, other than a Saturday or Sunday, on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

2. Interest.  (a) Each Note will bear interest at a fixed rate (a "Fixed Rate Note") or at a floating rate (a "Floating Rate Note").

   (b)  The Supplement sent to each holder of such Note will describe the following terms: (i) whether such Note is a Fixed Rate Note or a Floating Rate Note and whether such Note is an Original Issue Discount Note (as defined below); (ii) the date on which such Note will be issued (the "Issue Date"); (iii) the Stated Maturity Date (as defined below); (iv) if such Note is a Fixed Rate Note, the rate per annum at which such Note will bear interest, if any, and the Interest Payment Dates; (v) if such Note is a Floating Rate Note, the Base Rate, the Index Maturity, the Interest Reset Dates, the Interest Payment Dates and the Spread and/or Spread Multiplier, if any (all as defined below), and any other terms relating to the particular method of calculating the interest rate for such Note; and (vi) any other terms applicable specifically to such Note.  "Original Issue Discount Note" means a Note which has a stated redemption price at the Stated Maturity Date that exceeds its Issue Price by more than a specified de minimis amount and which the Supplement indicates will be an "Original Issue Discount Note".

   (c)  Each Fixed Rate Note will bear interest from its Issue Date at the rate per annum specified in the Supplement until the principal amount thereof is paid or made available for payment.  Interest on each Fixed Rate Note will be payable on the dates specified in the Supplement (each an "Interest Payment Date" for a Fixed Rate Note) and on the Maturity Date (as defined below).  Interest on Fixed Rate Notes will be computed on the basis of a 360-day year of twelve 30-day months.

   If any Interest Payment Date or the Maturity Date of a Fixed Rate Note falls on a day that is not a Business Day, the required payment of principal, premium, if any, and/or interest will be

payable on the next succeeding Business Day, and no additional interest will accrue in respect of the payment made on that next succeeding Business Day.

(d) The interest rate on each Floating Rate Note for each Interest Reset Period (as defined below) will be determined by reference to an interest rate basis (a "Base Rate") plus or minus a number of basis points (one basis point equals one-hundredth of a percentage point) (the "Spread"), if any, and/or multiplied by a certain percentage (the "Spread Multiplier"), if any, until the principal thereof is paid or made available for payment.  The Supplement will designate which of the following Base Rates is applicable to the related Floating Rate Note: (a) the CD Rate (a "CD Rate Note"), (b) the Commercial Paper Rate (a "Commercial Paper Rate Note"), (c) the Federal Funds Rate (a "Federal Funds Rate Note"), (d) LIBOR (a "LIBOR Note"), (e) the Prime Rate (a "Prime Rate Note"), (f) the Treasury Rate (a "Treasury Rate Note") or (g) such other Base Rate as may be specified in such Supplement.

The rate of interest on each Floating Rate Note will be reset daily, weekly, monthly, quarterly or semiannually (the "Interest Reset Period").  The date or dates on which interest will be reset (each an "Interest Reset Date") will be, unless otherwise specified in the Supplement, in the case of Floating Rate Notes which reset daily, each Business Day, in the case of Floating Rate Notes (other than Treasury Rate Notes) that reset weekly, the Wednesday of each week; in the case of Treasury Rate Notes that reset weekly, the Tuesday of each week; in the case of Floating Rate Notes that reset monthly, the third Wednesday of each month; in the case of Floating Rate Notes that reset quarterly, the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes that reset semiannually, the third Wednesday of the two months specified in the Supplement.  If any Interest Reset Date for any Floating Rate Note is not a Business Day, such Interest Reset Date will be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Reset Date shall be the immediately preceding Business Day.  Interest on each Floating Rate Note will be payable monthly, quarterly or semiannually (the "Interest Payment Period") and on the Maturity Date. Unless otherwise specified in the Supplement, and except as provided below, the date or dates on which interest will be payable (each an "Interest Payment Date" for a Floating Rate Note) will be, in the case of Floating Rate Notes with a monthly Interest Payment Period, on the third Wednesday of each month; in the case of Floating Rate Notes with a quarterly Interest Payment Period, on the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes with a semiannual Interest Payment Period, on the third Wednesday of the two months specified in the Supplement.  In addition, the Maturity Date will also be an Interest Payment Date.

If any Interest Payment Date for any Floating Rate Note (other than an Interest Payment Date occurring on the Maturity Date) would otherwise be a day that is not a Business Day, such Interest Payment Date shall be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the

next succeeding calendar month, such Interest Payment Date shall be the immediately preceding Business Day.  If the Maturity Date of a Floating Rate Note falls on a day that is not a Business Day, the payment of principal and interest will be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after such maturity.

Interest payments on each Interest Payment Date for Floating Rate Notes will include accrued interest from and including the Issue Date or from and including the last date in respect of

which interest has been paid, as the case may be, to, but excluding, such Interest Payment Date. On the Maturity Date, the interest payable on a Floating Rate Note will include interest accrued to, but excluding, the Maturity Date.  Accrued interest will be calculated by multiplying the principal amount of a Floating Rate Note by an accrued interest factor.  This accrued interest factor will be computed by adding the interest factors calculated for each day in the period for which accrued interest is being calculated.  The interest factor (expressed as a decimal) for each such day will be computed by dividing the interest rate applicable to such day by 360, in the cases where the Base Rate is the CD Rate, Commercial Paper Rate, Federal Funds Rate, LIBOR or Prime Rate, or by the actual number of days in the year, in the case where the Base Rate is the Treasury Rate.  The interest rate in effect on each day will be (i) if such day is an Interest Reset Date, the interest rate with respect to the Interest Determination Date (as defined below) pertaining to such Interest Reset Date, or (ii) if such day is not an Interest Reset Date, the interest rate with respect to the Interest Determination Date pertaining to the next preceding Interest Reset Date, subject in either case to any adjustment by a Spread and/or a Spread Multiplier.

The "Interest Determination Date" where the Base Rate is the CD Rate or the Commercial Paper Rate will be the second Business Day next preceding an Interest Reset Date.  The Interest Determination Date where the Base Rate is the Federal Funds Rate or the Prime Rate will be the Business Day next preceding an Interest Reset Date.  The Interest Determination Date where the Base Rate is LIBOR will be the second London Business Day next preceding an Interest Reset Date.  The Interest Determination Date where the Base Rate is the Treasury Rate will be the day of the week in which such Interest Reset Date falls when Treasury Bills are normally auctioned.  Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is held on the following Tuesday or the preceding Friday.  If an auction is so held on the preceding Friday, such Friday will be the Interest Determination Date pertaining to the Interest Reset Date occurring in the next succeeding week.

The "Index Maturity" is the period to maturity of the instrument or obligation from which the applicable Base Rate is calculated.

The "Calculation Date," where applicable, shall be the earlier of (i) the tenth calendar day following the applicable Interest Determination Date or (ii) the Business Day preceding the applicable Interest Payment Date or Maturity Date.

All times referred to herein reflect New York City time, unless otherwise specified.

The Issuer shall specify in writing to the Issuing and Paying Agent which party will be the calculation agent (the "Calculation Agent") with respect to the Floating Rate Notes.  The Calculation Agent will provide the interest rate then in effect and, if determined, the interest rate which will become effective on the next Interest Reset Date with respect to such Floating Rate Note to the Issuing and Paying Agent as soon as the interest rate with respect to such Floating Rate Note has been determined and as soon as practicable after any change in such interest rate.

All percentages resulting from any calculation on Floating Rate Notes will be rounded to the nearest one hundred-thousandth of a percentage point, with five-one millionths of a percentage point rounded upwards.  For example, 9.876545% (or .09876545) would be rounded to 9.87655% (or .0987655).  All dollar amounts used in or resulting from any

calculation on Floating Rate Notes will be rounded, in the case of U.S. dollars, to the nearest cent or, in the case of a foreign currency, to the nearest unit (with one-half cent or unit being rounded upwards).

*CD Rate Notes*

"CD Rate" means the rate on any Interest Determination Date for negotiable certificates of deposit having the Index Maturity as published by the Board of Governors of the Federal Reserve System (the "FRB") in "Statistical Release H.15(519), Selected Interest Rates" or any successor publication of the FRB ("H.15(519)") under the heading "CDs (Secondary Market)".

If the above rate is not published in H.15(519) by 3:00 p.m. on the Calculation Date, the CD Rate will be the rate on such Interest Determination Date set forth in the daily update of H.15(519), available through the world wide website of the FRB at http://www.federalreserve.gov/releases/h15/Update, or any successor site or publication or other recognized electronic source used for the purpose of displaying the applicable rate ("H.15 Daily Update") under the caption "CDs (Secondary Market)".

If such rate is not published in either H.15(519) or H.15 Daily Update by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the CD Rate to be the arithmetic mean of the secondary market offered rates as of 10:00 a.m. on such Interest Determination Date of three leading nonbank dealers[1] in negotiable U.S. dollar certificates of deposit in New York City selected by the Calculation Agent for negotiable U.S. dollar certificates of deposit of major United States money center banks of the highest credit standing in the market for negotiable certificates of deposit with a remaining maturity closest to the Index Maturity in the denomination of $5,000,000.

If the dealers selected by the Calculation Agent are not quoting as set forth above, the CD Rate will remain the CD Rate then in effect on such Interest Determination Date.

*Commercial Paper Rate Notes*

"Commercial Paper Rate" means the Money Market Yield (calculated as described below) of the rate on any Interest Determination Date for commercial paper having the Index Maturity, as published in H.15(519) under the heading "Commercial Paper-Nonfinancial".  If the above rate is not published in H.15(519) by 3:00 p.m. on the Calculation Date, then the Commercial Paper Rate will be the Money Market Yield of the rate on such Interest Determination Date for commercial paper of the Index Maturity as published in H.15 Daily Update under the heading "Commercial Paper-Nonfinancial".

If by 3:00 p.m. on such Calculation Date such rate is not published in either H.15(519) or H.15 Daily Update, then the Calculation Agent will determine the Commercial Paper Rate to be the Money Market Yield of the arithmetic mean of the offered rates as of 11:00 a.m. on such Interest Determination Date of three leading dealers of U.S. dollar commercial paper in New York City selected by the Calculation Agent for commercial paper of the Index Maturity placed for an industrial issuer whose bond rating is "AA," or the equivalent, from a nationally recognized statistical rating organization.

If the dealers selected by the Calculation Agent are not quoting as mentioned above, the Commercial Paper Rate with respect to such Interest Determination Date will remain the Commercial Paper Rate then in effect on such Interest Determination Date.

---

[1]   Such nonbank dealers referred to in this Statement of Terms may include affiliates of the Dealer.

"Money Market Yield" will be a yield calculated in accordance with the following formula:

$$\text{Money Market Yield} = \frac{D \times 360}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for commercial paper quoted on a bank discount basis and expressed as a decimal and "M" refers to the actual number of days in the interest period for which interest is being calculated.

*Federal Funds Rate Notes*

"Federal Funds Rate" means the rate on any Interest Determination Date for federal funds as published in H.15(519) under the heading "Federal Funds (Effective)" and displayed on Reuters Page (as defined below) FEDFUNDS1 (or any other page as may replace the specified page on that service) ("Reuters Page FEDFUNDS1") under the heading EFFECT.

If the above rate does not appear on Reuters Page FEDFUNDS1 or is not so published by 3:00 p.m. on the Calculation Date, the Federal Funds Rate will be the rate on such Interest Determination Date as published in H.15 Daily Update under the heading "Federal Funds/(Effective)".

If such rate is not published as described above by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Federal Funds Rate to be the arithmetic mean of the rates for the last transaction in overnight U.S. dollar federal funds arranged by each of three leading brokers of Federal Funds transactions in New York City selected by the Calculation Agent prior to 9:00 a.m. on such Interest Determination Date.

If the brokers selected by the Calculation Agent are not quoting as mentioned above, the Federal Funds Rate will remain the Federal Funds Rate then in effect on such Interest Determination Date.

"Reuters Page" means the display on the Reuters 3000 Xtra Service, or any successor service, on the page or pages specified in this Statement of Terms or the Supplement, or any replacement page on that service.

*LIBOR Notes*

The London Interbank offered rate ("LIBOR") means, with respect to any Interest Determination Date, the rate for deposits in U.S. dollars having the Index Maturity that appears on the Designated LIBOR Page as of 11:00 a.m., London time, on such Interest Determination Date.

If no rate appears, LIBOR will be determined on the basis of the rates at approximately 11:00 a.m., London time, on such Interest Determination Date at which deposits in U.S. dollars are offered to prime banks in the London interbank market by four major banks in such market selected by the Calculation Agent for a term equal to the Index Maturity and in principal amount equal to an amount that in the Calculation Agent's judgment is representative for a single transaction in U.S. dollars in such market at such time (a "Representative Amount"). The Calculation Agent will request the principal London office of each of such banks to provide a quotation of its rate. If at least two such quotations are provided, LIBOR will be the arithmetic mean of such quotations. If fewer than two quotations are provided, LIBOR for such interest period will be the arithmetic mean of the rates quoted at approximately 11:00 a.m., in New York City, on such Interest Determination Date by three major banks in New York City, selected by the Calculation Agent, for loans in U.S. dollars to leading

European banks, for a term equal to the Index Maturity and in a Representative Amount; provided, however, that if fewer than three banks so selected by the Calculation Agent are providing such quotations, the then existing LIBOR rate will remain in effect for such Interest Payment Period.

"Designated LIBOR Page" means the display on the Reuters 3000 Xtra Service (or any successor service) on the "LIBOR01" page (or any other page as may replace such page on such service) for the purpose of displaying the London interbank rates of major banks.

*Prime Rate Notes*

"Prime Rate" means the rate on any Interest Determination Date as published in H.15(519) under the heading "Bank Prime Loan".

If the above rate is not published in H.15(519) prior to 3:00 p.m. on the Calculation Date, then the Prime Rate will be the rate on such Interest Determination Date as published in H.15 Daily Update opposite the caption "Bank Prime Loan".

If the rate is not published prior to 3:00 p.m. on the Calculation Date in either H.15(519) or H.15 Daily Update, then the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the rates of interest publicly announced by each bank that appears on the

Reuters Screen US PRIME1 Page (as defined below) as such bank's prime rate or base lending rate as of 11:00 a.m., on that Interest Determination Date.

If fewer than four such rates referred to above are so published by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the prime rates or base lending rates quoted on the basis of the actual number of days in the year divided by 360 as of the close of business on such Interest Determination Date by three major banks in New York City selected by the Calculation Agent.

If the banks selected are not quoting as mentioned above, the Prime Rate will remain the Prime Rate in effect on such Interest Determination Date.

"Reuters Screen US PRIME1 Page" means the display designated as page "US PRIME1" on the Reuters Monitor Money Rates Service (or such other page as may replace the US PRIME1 page on that service for the purpose of displaying prime rates or base lending rates of major United States banks).

*Treasury Rate Notes*

*"Treasury Rate" means:*

(1) the rate from the auction held on the Interest Determination Date (the "Auction") of direct obligations of the United States ("Treasury Bills") having the Index Maturity specified in the Supplement under the caption "INVEST RATE" on the display on the Reuters Page designated as USAUCTION10 (or any other page as may replace that page on that service) or the Reuters Page designated as USAUCTION11 (or any other page as may replace that page on that service), or

(2) if the rate referred to in clause (1) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield (as defined below) of the rate for the applicable Treasury Bills as

published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/ Auction High", or

(3) if the rate referred to in clause (2) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield of the auction rate of the applicable Treasury Bills as announced by the United States Department of the Treasury, or

(4) if the rate referred to in clause (3) is not so announced by the United States Department of the Treasury, or if the Auction is not held, the Bond Equivalent Yield of the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H.15(519) under the caption "U.S. Government Securities/Treasury Bills/Secondary Market", or

(5) if the rate referred to in clause (4) is not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/ Secondary Market", or

(6) if the rate referred to in clause (5) is not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date calculated by the Calculation Agent as the Bond Equivalent Yield of the arithmetic mean of the secondary market bid rates, as of approximately 3:30 p.m. on that Interest Determination Date, of three primary United States government securities dealers selected by the Calculation Agent, for the issue of Treasury Bills with a remaining maturity closest to the Index Maturity specified in the Supplement, or

(7) if the dealers so selected by the Calculation Agent are not quoting as mentioned in clause (6), the Treasury Rate in effect on the particular Interest Determination Date.

"Bond Equivalent Yield" means a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Bond Equivalent Yield} = \frac{D \times N}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for Treasury Bills quoted on a bank discount basis and expressed as a decimal, "N" refers to 365 or 366, as the case may be, and "M" refers to the actual number of days in the applicable Interest Reset Period.

3. <u>Final Maturity</u>. The Stated Maturity Date for any Note will be the date so specified in the Supplement, which shall be no later than 364 days from the date of issuance. On its Stated Maturity Date, or any date prior to the Stated Maturity Date on which the particular Note becomes due and payable by the declaration of acceleration, each such date being referred to as a Maturity Date, the principal amount of such Note, together with accrued and unpaid interest thereon, will be immediately due and payable.

4. <u>Events of Default</u>. The occurrence of any of the following shall constitute an "Event of Default" with respect to a Note: (i) default in any payment of principal of or interest on such Note (including on a redemption thereof); (ii) the Issuer makes any compromise arrangement with its creditors generally including the entering into any form of moratorium with its creditors generally; (iii) a court having jurisdiction shall enter a decree or order for relief in respect of the Issuer in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or there shall be appointed a receiver, administrator, liquidator, custodian, trustee or sequestrator (or similar officer)

with respect to the whole or substantially the whole of the assets of the Issuer and any such decree, order or appointment is not removed, discharged or withdrawn within 60 days thereafter; or (iv) the Issuer shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment of or taking possession by a receiver, administrator, liquidator, assignee, custodian, trustee or sequestrator (or similar official), with respect to the whole or substantially the whole of the assets of the Issuer or make any general assignment for the benefit of creditors.  Upon the occurrence of an Event of Default, the principal of each obligation evidenced by such Note (together with interest accrued and unpaid thereon) shall become, without any notice or demand, immediately due and payable. [1]

5.  Obligation Absolute.  No provision of the Issuing and Paying Agency Agreement under which the Notes are issued shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on each Note at the times, place and rate, and in the coin or currency, herein prescribed.

6.  Supplement.  Any term contained in the Supplement shall supersede any conflicting term contained herein.

**Commercial Paper Dealer Agreement**

**4(a)(2) Program**

Between:

**Cardinal Health, Inc**., as Issuer

and

**Wells Fargo Securities, LLC**, as Dealer

Concerning Notes to be issued pursuant to an

Issuing and Paying Agency Agreement dated as of August 9, 2006,

as amended February 28, 2007 and November 22, 2016

between the Issuer and

The Bank of New York, as Issuing

and Paying Agent

Dated as of

November 22, 2016

**Commercial Paper Dealer Agreement**
**4(a)(2) Program**

This agreement (the "Agreement") sets forth the understandings between the Issuer and the Dealer, each named on the cover page hereof, in connection with the issuance and sale by the Issuer of its short-term promissory notes (the "Notes") through the Dealer.

Certain terms used in this Agreement are defined in Section 6 hereof.

The Addendum to this Agreement, and any Annexes or Exhibits described in this Agreement or such Addendum, are hereby incorporated into this Agreement and made fully a part hereof.

**1.      Offers, Sales and Resales of Notes.**

1.1      While (i) the Issuer has and shall have no obligation to sell the Notes to the Dealer or to permit the Dealer to arrange any sale of the Notes for the account of the Issuer, and (ii) the Dealer has and shall have no obligation to purchase the Notes from the Issuer or to arrange any sale of the Notes for the account of the Issuer, the parties hereto agree that in any case where the Dealer purchases Notes from the Issuer, or arranges for the sale of Notes by the Issuer, such Notes will be purchased or sold by the Dealer in reliance on the representations, warranties, covenants and agreements of the Issuer contained herein or made pursuant hereto and on the terms and conditions and in the manner provided herein.

1.2      So long as this Agreement shall remain in effect, and in addition to the limitations contained in Section 1.7 hereof, the Issuer shall not, without the consent of the Dealer, offer, solicit or accept offers to purchase, or sell, any Notes except (a) in transactions with one or more dealers which may from time to time after the date hereof become dealers with respect to the Notes by executing with the Issuer one or more agreements which contain provisions substantially identical to those contained in Section 1 of this Agreement, of which the Issuer hereby undertakes to provide the Dealer prompt notice or (b) in transactions with the other dealers listed on the Addendum hereto, which are executing agreements with the Issuer which contain provisions substantially identical to Section 1 of this Agreement contemporaneously herewith. In no event shall the Issuer offer, solicit or accept offers to purchase, or sell, any Notes directly on its own behalf in transactions with persons other than the Dealer or other broker-dealers as specifically permitted in this Section 1.2.

1.3      The Notes shall be in a minimum denomination of $250,000 or integral multiples of $1,000 in excess thereof, will bear such interest rates, if interest bearing, or will be sold at such discount from their face amounts, as shall be agreed upon by the Dealer and the Issuer, shall have a maturity not exceeding 364 days from the date of issuance and may have such terms as are specified in Exhibit C hereto or the Private Placement Memorandum. The Notes shall not contain any provision for extension, renewal or automatic "rollover."

1.4      The authentication and issuance of, and payment for, the Notes shall be effected in accordance with the Issuing and Paying Agency Agreement, and the Notes shall be either individual physical certificates or book-entry notes evidenced by one or more master notes (each, a "Master Note") registered in the name of The Depository Trust Company ("DTC") or its nominee, in the form or forms annexed to the Issuing and Paying Agency Agreement.

1.5     If the Issuer and the Dealer shall agree on the terms of the purchase of any Note by the Dealer or the sale of any Note arranged by the Dealer (including, but not limited to, agreement with respect to the date of issue, purchase price, principal amount, maturity and interest rate or interest rate index and margin (in the case of interest-bearing Notes) or discount thereof (in the case of Notes issued on a discount basis), and appropriate compensation for the Dealer's services hereunder) pursuant to this Agreement, the Issuer shall cause such Note to be issued and delivered in accordance with the terms of the Issuing and Paying Agency Agreement and payment for such Note shall be made by the purchaser thereof, either directly or through the Dealer, to the Issuing and Paying Agent, for the account of the Issuer. Except as otherwise agreed, in the event that the Dealer is acting as an agent and a purchaser shall either fail to accept delivery of or make payment for a Note on the date fixed for settlement, the Dealer shall promptly notify the Issuer, and if the Dealer has theretofore paid the Issuer for the Note, the Issuer will promptly return such funds to the Dealer against its return of the Note to the Issuer, in the case of a certificated Note, and upon notice of such failure in the case of a book-entry Note. If such failure occurred for any reason other than default by the Dealer, the Issuer shall reimburse the Dealer on an equitable basis for the Dealer's loss of the use of such funds for the period such funds were credited to the Issuer's account.

1.6     The Dealer and the Issuer hereby establish and agree to observe the following procedures in connection with offers, sales and subsequent resales or other transfers of the Notes:

(a)     Offers and sales of the Notes by or through the Dealer shall be made only to: (i) investors reasonably believed by the Dealer to be Qualified Institutional Buyers or Institutional Accredited Investors and (ii) non-bank fiduciaries or agents that will be purchasing Notes for one or more accounts, each of which is reasonably believed by the Dealer to be an Institutional Accredited Investor.

(b)     Resales and other transfers of the Notes by the holders thereof shall be made only in accordance with the restrictions in the legend described in clause (e) below.

(c)     No general solicitation or general advertising shall be used in connection with the offering of the Notes. Without limiting the generality of the foregoing, without the prior written approval of the Dealer, the Issuer shall not issue any press release, make any other statement to any member of the press making reference to the Notes, the offer or sale of the Notes, or this Agreement or place or publish any "tombstone" or other advertisement relating to the Notes, or the offer or sale of the Notes. To the extent permitted by applicable securities laws, the Issuer shall (i) omit the names of the Dealer from any publicly available filing by the Issuer that makes reference to the offer or sale of the Notes or this Agreement, (ii) not include a copy of this Agreement in any such filing or as an exhibit thereto, and (iii)redact the Dealer's name and any contact or other information that could identify the Dealer from any agreement or other information included in such filing.

(d)     No sale of Notes to any one purchaser shall be for less than $250,000 principal or face amount, and no Note shall be issued in a smaller principal or face amount. If the purchaser is a non-bank fiduciary acting on behalf of others, each person for whom such purchaser is acting must purchase at least $250,000 principal or face amount of Notes.

(e)    Offers and sales of the Notes by the Issuer through the Dealer acting as agent for the Issuer shall be made in accordance with Section 4(a)(2) of the Securities Act, and shall be subject to the restrictions described in the legend appearing on Exhibit A hereto. A legend substantially to the effect of such Exhibit A shall appear as part of the Private Placement Memorandum used in connection with offers and sales of Notes hereunder, as well as on each individual certificate representing a Note and each Master Note representing book-entry Notes offered and sold pursuant to this Agreement.

(f)    The Dealer shall furnish or make available or shall have furnished or made available to each purchaser of Notes for which it has acted as the Dealer a copy of the then-current Private Placement Memorandum unless such purchaser has previously received or had made available to it a copy of the Private Placement Memorandum as then in effect. The Private Placement Memorandum shall expressly state that any person to whom Notes are offered shall have an opportunity to ask questions of and receive information from, the Issuer and the Dealer and shall provide the names, addresses and telephone numbers of the persons from whom information regarding the Issuer may be obtained.

(g)    The Issuer agrees, for the benefit of the Dealer and each of the holders and prospective purchasers from time to time of the Notes that, if at any time the Issuer shall not be subject to Section 13 or 15(d) of the Exchange Act, the Issuer will furnish, upon request and at its expense, to the Dealer and to holders and prospective purchasers of Notes information required by Rule 144A(d)(4)(i) in compliance with Rule 144A(d).

(h)    In the event that any Note offered or to be offered by the Dealer would be ineligible for resale under Rule 144A, the Issuer shall immediately notify the Dealer (by telephone, confirmed in writing) of such fact and shall promptly prepare and deliver to the Dealer an amendment or supplement to the Private Placement Memorandum describing the Notes that are ineligible, the reason for such ineligibility and any other relevant information relating thereto.

(i)    The Issuer represents that it is not currently issuing commercial paper in the United States market in reliance upon the exemption provided by Section 3(a)(3) of the Securities Act. The Issuer agrees that, if it shall issue commercial paper after the date hereof in reliance upon such exemption (a) the proceeds from the sale of the Notes will be segregated from the proceeds of the sale of any such commercial paper by being placed in a separate account; (b) the Issuer will institute appropriate corporate procedures to ensure that the offers and sales of notes issued by the Issuer pursuant to the Section 3(a)(3) exemption are not integrated with offerings and sales of Notes hereunder; and (c) the Issuer will comply with each of the requirements of Section 3(a)(3) of the Securities Act in selling commercial paper or other short-term debt securities other than the Notes in the United States.

1.7    The Issuer hereby represents and warrants to the Dealer, in connection with offers, sales and resales of Notes, as follows:

(a)    The Issuer hereby confirms to the Dealer that (except as permitted by Section 1.6 (i)) within the preceding six months neither the Issuer nor any person other than the

Dealer or the other dealers referred to in Section 1.2 hereof acting on behalf of the Issuer has offered or sold any Notes, or any substantially similar security of the Issuer (including, without limitation, medium-term notes issued by the Issuer), to, or solicited offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof. The Issuer also agrees that (except as permitted by Section 1.6(i)), as long as the Notes are being offered for sale by the Dealer and the other dealers referred to in Section 1.2 hereof as contemplated hereby and until at least six months after the offer of Notes hereunder has been terminated, neither the Issuer nor any person other than the Dealer or the other dealers referred to in Section 1.2 hereof (except as contemplated by Section 1.2 hereof) will offer the Notes or any substantially similar security of the Issuer for sale to, or solicit offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof, it being understood that such agreement is made with a view to bringing the offer and sale of the Notes within the exemption provided by Section 4(a)(2) of the Securities Act and shall survive any termination of this Agreement. The Issuer hereby represents and warrants that it has not taken or omitted to take, and will not take or omit to take, any action that would cause the offering and sale of Notes hereunder to be integrated with any other offering of securities, whether such offering is made by the Issuer or some other party or parties.

(b)     The Issuer represents and agrees that the proceeds of the sale of the Notes are not currently contemplated to be used for the purpose of buying, carrying or trading securities within the meaning of Regulation T and the interpretations thereunder by the Board of Governors of the Federal Reserve System. In the event that the Issuer determines to use such proceeds for the purpose of buying, carrying or trading securities, whether in connection with an acquisition of another company or otherwise, the Issuer shall give the Dealer at least five business days' prior written notice to that effect. The Issuer shall also give the Dealer prompt notice of the actual date that it commences to purchase securities with the proceeds of the Notes. Thereafter, in the event that the Dealer purchases Notes as principal and does not resell such Notes on the day of such purchase, to the extent necessary to comply with Regulation T and the interpretations thereunder, the Dealer will sell such Notes either (i) only to offerees it reasonably believes to be Qualified Institutional Buyers or to Qualified Institutional Buyers it reasonably believes are acting for other Qualified Institutional Buyers, in each case in accordance with Rule 144A or (ii) in a manner which would not cause a violation of Regulation T and the interpretations thereunder.

**2.     Representations and Warranties of Issuer.**

The Issuer represents and warrants that:

2.1     The Issuer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all the requisite power and authority to execute, deliver and perform its obligations under the Notes, this Agreement and the Issuing and Paying Agency Agreement.

2.2     This Agreement and the Issuing and Paying Agency Agreement have been duly authorized, executed and delivered by the Issuer and constitute legal, valid and binding obligations of

the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.3 The Notes have been duly authorized, and when issued as provided in the Issuing and Paying Agency Agreement, will be duly and validly issued and will constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.4 The offer and sale of the Notes in the manner contemplated hereby do not require registration of the Notes under the Securities Act, pursuant to the exemption from registration contained in Section 4(a)(2) thereof, and no indenture in respect of the Notes is required to be qualified under the Trust Indenture Act of 1939, as amended.

2.6 The Notes will rank at least pari passu with all other unsecured and unsubordinated indebtedness of the Issuer.

2.7 No consent or action of or filing or registration with, any governmental or public regulatory body or authority, including the SEC, is required to authorize, or is otherwise required in connection with the execution, delivery or performance of, this Agreement, the Notes or the Issuing and Paying Agency Agreement, except as may be required by the securities or Blue Sky laws of the various states in connection with the offer and sale of the Notes.

2.8 Neither the execution and delivery of this Agreement and the Issuing and Paying Agency Agreement, nor the issuance of the Notes in accordance with the Issuing and Paying Agency Agreement, nor the fulfillment of or compliance with the terms and provisions hereof or thereof by the Issuer, will (i) result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of the Issuer, or (ii) violate or result in a breach or a default under any of the terms of the Issuer's charter documents or by-laws, any contract or instrument to which the Issuer is a party or by which it or its property is bound, or any law or regulation, or any order, writ, injunction or decree of any court or government instrumentality, to which the Issuer is subject or by which it or its property is bound, which breach or default is reasonably expected to have a material adverse effect on the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.9 Except as disclosed in the Private Placement Memorandum, there is no litigation or governmental proceeding pending, or to the knowledge of the Issuer threatened, against or affecting the Issuer or any of its subsidiaries that could reasonably be expected to result in a material adverse change in the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.10 The Issuer is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.11 Neither the Private Placement Memorandum nor the Company Information contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

2.12 The Issuer has implemented and maintains in effect policies and procedures designed to promote compliance by the Issuer, its subsidiaries and its respective directors, officers and employees with Anti-Corruption Laws and applicable Sanctions, and the Issuer, its subsidiaries and to the knowledge of the Issuer, their respective employees, officers, directors and agents (in their capacity as such) that will act in any capacity in connection with or benefit from the commercial paper program established hereby, is in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not engaged in any activity that would reasonably be expected to result in the Issuer being designated as a Sanctioned Person. None of the Issuer or any subsidiary is a Sanctioned Person.

2.13 Each (a) issuance of Notes by the Issuer hereunder and (b) amendment or supplement of the Private Placement Memorandum shall be deemed a representation and warranty by the Issuer to the Dealer, as of the date thereof, that, both before and after giving effect to such issuance and after giving effect to such amendment or supplement, (i) the representations and warranties given by the Issuer set forth in this Section 2 remain true and correct on and as of such date as if made on and as of such date, (ii) in the case of an issuance of Notes, the Notes being issued on such date have been duly and validly issued and constitute legal, valid and binding obligations of the Issuer, enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and (iii) in the case of an issuance of Notes, since the date of the most recent Private Placement Memorandum, there has been no material adverse change in the financial condition, operations or business prospects of the Issuer which has not been disclosed to the Dealer in writing and (iv) the Issuer is not in default of any of its obligations hereunder or under the Notes, or the Issuing and Paying Agency Agreement.

**3.      Covenants and Agreements of Issuer.**

The Issuer covenants and agrees that:

3.1 The Issuer will give the Dealer prompt notice (but in any event prior to any subsequent issuance of Notes hereunder) of any amendment to, modification of or waiver with respect to, the Notes or the Issuing and Paying Agency Agreement, including a complete copy of any such amendment, modification or waiver.

3.2 The Issuer will give the Dealer prompt notice (but in any event prior to any subsequent issuance of Notes hereunder) of any amendment to, modification of or waiver with respect to, the Notes or the Issuing and Paying Agency Agreement, including a complete copy of any such amendment, modification or waiver.

3.3 The Issuer shall, whenever there shall occur any change in the Issuer's financial condition, operations or business prospects or any development or occurrence in relation to the Issuer that would be material to holders of the Notes or potential holders of the Notes (including

any downgrading or receipt of any written notice of intended downgrading or receipt of any written notice of review for potential change in the rating accorded any of the Issuer's securities by any nationally recognized statistical rating organization which has published a rating of the Notes), promptly, and in any event prior to any subsequent issuance of Notes hereunder, notify the Dealer (by telephone, confirmed in writing) of such change, development or occurrence.

3.4    The Issuer shall from time to time furnish to the Dealer such information as the Dealer may reasonably request, including, without limitation, any press releases or material provided by the Issuer to any national securities exchange, regarding (i) the Issuer's operations and financial condition, (ii) the due authorization and execution of the Notes and (iii) the Issuer's ability to pay the Notes as they mature.

3.5    The Issuer will take all such action as the Dealer may reasonably request to ensure that each offer and each sale of the Notes will comply with any applicable state Blue Sky laws; provided, however, that the Issuer shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation in any jurisdiction in which it is not so qualified or subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

3.6    The Issuer will not be in default of any of its obligations hereunder, under the Notes or under the Issuing and Paying Agency Agreement, at any time that any of the Notes are outstanding.

3.7    The Issuer shall not issue Notes hereunder until the Dealer shall have received (a) an opinion of counsel to the Issuer, addressed to the Dealer, satisfactory in form and substance to the Dealer, (b) a copy of the executed Issuing and Paying Agency Agreement as then in effect, (c) a copy of resolutions adopted by the Board of Directors of the issuer, satisfactory in form and substance to the Dealer and certified by the Secretary or similar officer of the Issuer, authorizing execution and delivery by the Issuer of this Agreement, the Issuing and Paying Agency Agreement and the Notes and consummation by the Issuer of the transactions contemplated hereby and thereby, (d) prior to the issuance of any book-entry Notes represented by a master note registered in the name of DTC or its nominee, a copy of the executed Letter of Representations among the issuer, the Issuing and Paying Agent and DTC and of the executed master note, (e) prior to the issuance of any Notes in physical form, a copy of such form (unless attached to this Agreement or the Issuing and Paying Agency Agreement) and (f) such other certificates, opinions, letters and documents as the Dealer shall have reasonably requested.

3.8    The Issuer shall reimburse the Dealer for all of the Dealer's reasonable out-of-pocket expenses related to this Agreement, including reasonable expenses incurred in connection with its preparation and negotiation, and the transactions contemplated hereby (including, but not limited to, the printing and distribution of the Private Placement Memorandum), and, if applicable, for the reasonable fees and out-of-pocket expenses of the Dealer's outside counsel.

3.9    Without limiting any obligation of the Issuer pursuant to this Agreement to provide the Dealer with credit and financial information, the Issuer hereby acknowledges and agrees that the Dealer may share the Company Information and any other information or matters relating to the Issuer or the transactions contemplated hereby with affiliates of the Dealer,

including, but not limited to, Wells Fargo Bank, N.A. and that such affiliates may likewise share information relating to the Issuer or such transactions with the Dealer.

3.10   The Issuer shall not file a Form D (as referenced in Rule 503 under the Securities Act) at any time in respect of the offer or sale of the Notes.

**4.      Disclosure.**

4.1   The Private Placement Memorandum and its contents (other than the Dealer Information) shall be the sole responsibility of the Issuer. The Private Placement Memorandum shall contain a statement expressly offering an opportunity for each prospective purchaser to ask questions of and receive answers from, the Issuer concerning the offering of Notes and to obtain relevant additional information which the Issuer possesses or can acquire without unreasonable effort or expense.

4.2   (a)  The Issuer further agrees to notify the Dealer promptly upon the occurrence of any event relating to or affecting the Issuer that would cause the Company Information then in existence to include an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading.

(b)      In the event that the Issuer gives the Dealer notice pursuant to Section 4.2(a) and the Dealer notifies the Issuer that it then has Notes it is holding in inventory, the Issuer agrees promptly to supplement or amend the Private Placement Memorandum so that the Private Placement Memorandum, as amended or supplemented, shall not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and the Issuer shall make such supplement or amendment available to the Dealer.

(c)      In the event that (i) the Issuer gives the Dealer notice pursuant to Section 4.2(a), (ii) the Dealer does not notify the Issuer that it is then holding Notes in inventory and (iii) the Issuer chooses not to promptly amend or supplement the Private Placement Memorandum in the manner described in clause (b) above, then all solicitations and sales of Notes shall be suspended until such time as the Issuer has so amended or supplemented the Private Placement Memorandum, and made such amendment or supplement available to the Dealer.

**5.      Indemnification and Contribution.**

5.1   Unless prohibited by the Securities Act or the Exchange Act, or the rules and regulations of the SEC promulgated thereunder, the Issuer will indemnify and hold harmless the Dealer, each individual, corporation, partnership, trust, association or other entity controlling the Dealer, any affiliate of the Dealer or any such controlling entity and their respective directors, officers, employees, partners, incorporators, shareholders, servants, trustees and agents (hereinafter the "Indemnitees") against any and all liabilities, penalties, suits, causes of action, losses, damages, claims, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) or judgments of whatever kind or nature (each a "Claim"), imposed upon, incurred by or asserted against the Indemnitees arising out of or based upon (i) any allegation that the Private Placement Memorandum, the

Company Information or any information provided by the Issuer to the Dealer included (as of any relevant time) or includes an untrue statement of a material fact or omitted (as of any relevant time) or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or (ii) arising out of or based upon the breach by the Issuer of any agreement, covenant or representation made in or pursuant to this Agreement which has a material adverse effect on the Dealer or the holders of the Notes. This indemnification shall not apply to the extent that the Claim arises out of or is based upon Dealer Information or the gross negligence or willful misconduct of the Dealer in the performance of, or the failure to perform, its obligations under this Agreement, as finally determined by a court of competent jurisdiction.

5.2    Provisions relating to claims made for indemnification under this Section 5 are set forth on Exhibit B to this Agreement.

5.3    In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 5 is held to be unavailable or insufficient to hold harmless the Indemnitees, although applicable in accordance with the terms of this Section 5, the Issuer shall contribute to the aggregate costs incurred by the Dealer in connection with any Claim in the proportion of the respective economic interests of the Issuer and the Dealer; provided, however, that such contribution by the Issuer shall be in an amount such that the aggregate costs incurred by the Dealer do not exceed the aggregate of the commissions and fees earned by the Dealer hereunder with respect to the issue or issues of Notes to which such Claim relates. The respective economic interests shall be calculated by reference to the aggregate proceeds to the Issuer of the Notes issued hereunder and the aggregate commissions and fees earned by the Dealer hereunder.

## 6.    Definitions.

6.1    "Anti-Corruption Laws" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Issuer or any of its subsidiaries from time to time concerning or relating to bribery or corruption.

6.2    "Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

6.3    "Claim" shall have the meaning set forth in Section 5.1.

6.4    "Company Information" at any given time shall mean the Private Placement Memorandum together with, to the extent applicable, (i) the Issuer's most recent report on Form 10-K filed with the SEC and each report on Form 10-Q or 8-K filed by the Issuer with the SEC since the most recent Form 10-K, (ii) the Issuer's most recent annual audited financial statements and each interim financial statement or report prepared subsequent thereto, if not included in item (1) above, (iii) the Issuer's and its affiliates' other publicly available recent reports, including, but not limited to, any publicly available filings or reports provided to their respective shareholders,(iv) any other information or disclosure prepared pursuant to Section 4.3 hereof and (v) any information prepared or approved by the Issuer for dissemination to investors or potential investors in the Notes.

6.5     "Current Issuing and Paying Agent" shall have the meaning set forth in Section 7.10.

6.6     "Dealer Information" shall mean material concerning the Dealer provided by the Dealer in writing expressly for inclusion in the Private Placement Memorandum.

6.7     "Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended.

6.8     "Indemnitee" shall have the meaning set forth in Section 5.1.

6.9     "Institutional Accredited Investor" shall mean an institutional investor that is an accredited investor within the meaning of Rule 501 under the Securities Act and that has such knowledge and experience in financial and business matters that it is capable of evaluating and bearing the economic risk of an investment in the Notes, including, but not limited to, a bank, as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

6.10    "Issuing and Paying Agency Agreement" shall mean the issuing and paying agency agreement described on the cover page of this Agreement, or any such replacement thereof, as such agreement may be amended or supplemented from time to time.

6.11    "Issuing and Paying Agent" shall mean the party designated as such on the cover page of this Agreement, as issuing and paying agent under the Issuing and Paying Agency Agreement, or any successor thereto or replacement thereof, in accordance with the Issuing and Paying Agency Agreement.

6.12    "Non-bank fiduciary or agent" shall mean a fiduciary or agent other than (a) a bank, as defined in Section 3(a)(2) of the Securities Act, or (b) a savings and loan association, as defined in Section 3(a)(5)(A) of the Securities Act.

6.13    "Person" shall mean any natural person, corporation, firm, joint venture, partnership, limited liability company, association, enterprise, trust or other entity or organization, or any government or political subdivision or any agency, department or instrumentality thereof.

6.14    "Private Placement Memorandum" shall mean offering materials prepared in accordance with Section 4 (including materials referred to therein or incorporated by reference therein, if any) provided to purchasers and prospective purchasers of the Notes, and shall include amendments and supplements thereto which may be prepared from time to time in accordance with this Agreement (other than any amendment or supplement that has been completely superseded by a later amendment or supplement),

6.15    "Qualified Institutional Buyer" shall have the meaning assigned to that term in Rule 144A under the Securities Act.

6.16    "Replacement Issuing and Paying Agent" shall have the meaning set forth in Section 7.10 (i).

6.17    "Replacement Issuing and Paying Agency Agreement" shall have the meaning set forth in Section 7.10.

6.18　"Rule 144A" shall mean Rule 144A under the Securities Act.

6.19　"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of comprehensive Sanctions (at the time of this Agreement, Cuba, Iran, North Korea, Sudan, Syria and Crimea).

6.20　"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or ordinarily resident in a Sanctioned Country to the extent dealing with such Person would be prohibited by applicable Sanctions or (c) any Person 50% owned by any such Person or Persons described in the foregoing clause (a).

6.21　"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or any European Union member state.

6.22　"SEC" shall mean the U.S. Securities and Exchange Commission.

6.23　"Securities Act" shall mean the U.S. Securities Act of 1933, as amended.

## 7.　General

7.1　Unless otherwise expressly provided herein, all notices under this Agreement to parties hereto shall be in writing and shall be effective when received at the address of the respective party set forth in the Addendum to this Agreement.

7.2　This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.

7.3　The Issuer agrees that any suit, action or proceeding brought by the Issuer against the Dealer in connection with or arising out of this Agreement or the Notes or the offer and sale of the Notes shall be brought solely in the United States federal courts located in the Borough of Manhattan or the courts of the State of New York located in the Borough of Manhattan. EACH OF THE DEALER AND THE ISSUER WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.4　This Agreement may be terminated, at any time, by the Issuer, upon one business day's prior notice to such effect to the Dealer, or by the Dealer upon one business day's prior notice to such effect to the Issuer. Any such termination, however, shall not affect the obligations of the Issuer under Sections 1.2 (first sentence), 3.7, 5 and 7.3 hereof or the respective representations, warranties, agreements, covenants, rights or responsibilities of the parties made or arising prior to the termination of this Agreement.

7.5　This Agreement is not assignable by either party hereto without the written consent of the other party; provided, however, that the Dealer may assign its rights and obligations under this Agreement to any affiliate of the Dealer.

7.6 This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

7.7 This Agreement is for the exclusive benefit of the parties hereto, and their respective permitted successors and assigns hereunder, and shall not be deemed to give any legal or equitable right, remedy or claim to any other person whatsoever.

7.8 The Issuer acknowledges and agrees that (i) the purchase and sale of the Notes pursuant to this Agreement is an arm's-length commercial transaction between the Issuer, on the one hand, and the Dealer, on the other, (ii) in connection therewith and with the process leading to such transaction the Dealer is acting solely as a principal and not the agent or fiduciary of the Issuer, (iii) the Dealer has not assumed an advisory or fiduciary responsibility in favor of the Issuer with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether the Dealer has advised or is currently advising the Issuer on other matters) or any other obligation to the Issuer except the obligations expressly set forth in this Agreement and (iv) the Issuer has consulted its own legal and financial advisors to the extent it deemed appropriate. The Issuer agrees that it will not claim that the Dealer has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Issuer, in connection with such transaction or the process leading thereto.

7.9 In the case of any agreement by a Dealer to purchase a Note hereunder (other than as agent) which provides for a settlement date that is three Business Days or more after the date of such agreement, the obligation of the Dealer to purchase the Note under such agreement shall be subject to the following conditions:

(a) the representations and warranties given by the Issuer set forth above in Section 2 shall be true and correct on and as of the settlement date as if made on and as of such date, and the Issuer shall have performed all of its obligations hereunder to be performed as of such date,

(b) since the date of the most recent Private Placement Memorandum, there shall have been no material adverse change in the condition (financial or otherwise), operations or business prospects of the Issuer (whether occurring before or after such agreement was entered into) which was not disclosed to the Dealer in writing prior to the time such agreement was entered into,

(c) the Issuer shall not be in default of any of its obligations hereunder, under the Note or under the Issuing and Paying Agency Agreement,

(d) on or after the date of such agreement there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading in the Issuer's securities on the New York Stock Exchange; (iii) a general moratorium in commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or services in the United States; (iv) the outbreak or escalation of emergency or war or (v) the occurrence of any other calamity or crisis or any change in financial, political or economic conditions in the United States or

elsewhere, if the effect of any such event specified in clause (iv) or (v) in the reasonable judgment of the Dealer makes it impracticable or inadvisable to proceed with the offering or the delivery of the Note on the terms and in the amount contemplated in the Private Placement Memorandum, and

(e) on or after the date of such agreement (i) downgrading shall not have occurred in the rating accorded the Issuer's debt securities by any nationally recognized statistical rating organization and such organization shall not have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Issuer's debt securities.

7.10 The parties hereto agree that the Issuer may, in accordance with the terms of this Section 7.10, from time to time replace the party which is then acting as Issuing and Paying Agent (the "Current Issuing and Paying Agent") with another party (such other party, the "Replacement Issuing and Paying Agent"), and enter into an agreement with the Replacement Issuing and Paying Agent covering the provision of issuing and paying agency functions in respect of the Notes by the Replacement Issuing and Paying Agent (the "Replacement Issuing and Paying Agency Agreement") (any such replacement, a "Replacement"). From and after the effective date of any Replacement, except to the extent that the Issuing and Paying Agency Agreement provides that the Current Issuing and Paying Agent will continue to act in respect of Notes outstanding as of the effective date of such Replacement, the "Issuing and Paying Agent" for the Notes shall be deemed to be the Replacement Issuing and Paying Agent, all references to the "Issuing and Paying Agent" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agent, and all references to the "Issuing and Paying Agency Agreement" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agency Agreement.

This Agreement supersedes all prior agreements and understandings (whether written or oral between the Issuer and the Dealer, or any of them, with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

**Cardinal Health, Inc., as Issuer**

By: /s/ Sam Samad

Name: Sam Samad

Title: Treasurer

**Wells Fargo Securities, LLC, as Dealer**

By: /s/ Steven P. Shorkey

Name: Steven P. Shorkey

Title: Director

Addendum

The following additional clauses shall apply to the Agreement and be deemed a part thereof,

1.      The other dealers referred to in clause (b) of Section 1.2 of the Agreement are Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities LLC, Goldman Sachs & Co., SunTrust Robinson Humphrey, Inc.

2.      The addresses of the respective parties for the purposes of notices under Section 7.1 are as follows:

For the Issuer:

Address: Cardinal Health, Inc., 7000 Cardinal Place, Dublin, Ohio 43017
Attention: Scott Zimmerman, Assistant Treasurer
Telephone:      (###) ###-####

For the Dealer:

Address: 550 South Tryon Street, MAC D1086-051
        Charlotte, North Carolina 28202
Attention: Commercial Paper Origination
Telephone Number:    (###) ###-####
Fax Number: (###) ###-####

**Exhibit A**

**Form of Legend for Private Placement Memorandum and Notes**

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE SECURITIES LAW, AND OFFERS AND SALES THEREOF MAY BE MADE ONLY IN COMPLIANCE WITH AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER WILL BE DEEMED TO REPRESENT THAT (I) IT HAS BEEN AFFORDED AN OPPORTUNITY TO INVESTIGATE MATTERS RELATING TO THE ISSUER AND THE NOTES, (II) IT IS NOT ACQUIRING SUCH NOTE WITH A VIEW TO ANY DISTRIBUTION THEREOF AND (III) IT IS EITHER (A)(1) AN INSTITUTIONAL INVESTOR THAT IS AN ACCREDITED INVESTOR WITHIN THE MEANING OF RULE 501(a) UNDER THE ACT (AN "INSTITUTIONAL ACCREDITED INVESTOR") AND (2)(i) PURCHASING NOTES FOR ITS OWN ACCOUNT, (ii) A BANK (AS DEFINED IN SECTION 3(a)(2) OF THE ACT) OR A SAVINGS AND LOAN ASSOCIATION OR OTHER INSTITUTION (AS DEFINED IN SECTION 3(a)(5)(A) OF THE ACT) ACTING IN ITS INDIVIDUAL OR FIDUCIARY CAPACITY OR (iii) A FIDUCIARY OR AGENT (OTHER THAN A U.S. BANK OR SAVINGS AND LOAN ASSOCIATION) PURCHASING NOTES FOR ONE OR MORE ACCOUNTS EACH OF WHICH ACCOUNTS IS SUCH AN INSTITUTIONAL ACCREDITED INVESTOR ; OR (B) A QUALIFIED INSTITUTIONAL BUYER ("QIB") WITHIN THE MEANING OF RULE 144A UNDER THE ACT THAT IS ACQUIRING NOTES FOR ITS OWN ACCOUNT OR FOR ONE OR MORE ACCOUNTS, EACH OF WHICH ACCOUNTS IS A QIB; AND THE PURCHASER ACKNOWLEDGES THAT IT IS AWARE THAT THE SELLER MAY RELY UPON THE EXEMPTION FROM THE REGISTRATION PROVISIONS OF SECTION 5 OF THE ACT PROVIDED BY RULE 144A. BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER THEREOF SHALL ALSO BE DEEMED TO AGREE THAT ANY RESALE OR OTHER TRANSFER THEREOF WILL BE MADE ONLY (A) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE ACT, EITHER (1) TO THE ISSUER OR TO A PLACEMENT AGENT DESIGNATED BY THE ISSUER AS A PLACEMENT AGENT FOR THE NOTES (COLLECTIVELY, THE "PLACEMENT AGENTS"), NONE OF WHICH SHALL HAVE ANY OBLIGATION TO ACQUIRE SUCH NOTE, (2) THROUGH A PLACEMENT AGENT TO AN INSTITUTIONAL ACCREDITED INVESTOR OR A QIB, OR (3) TO A QIB IN A TRANSACTION THAT MEETS THE REQUIREMENTS OF RULE 144A AND (B) IN MINIMUM AMOUNTS OF $250,000.

**Exhibit B**

**Further Provisions Relating to Indemnification**

(a)     The Issuer agrees to reimburse each Indemnitee for all expenses (including reasonable fees and disbursements of internal and external counsel) as they are incurred by it in connection with investigating or defending any loss, claim, damage, liability or action in respect of which indemnification may be sought under Section 5 of the Agreement (whether or not it is a party to any such proceedings) provided, however, that if it is found in any such action, proceeding or investigation that any loss, claim, damage or liability of an Indemnitee has resulted from the Dealer Information or the gross negligence or willful misconduct of the Indemnitee in performing the services that are the subject of this Agreement, as finally determined by a court of competent jurisdiction, the Indemnitee shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of the Indemnitee which is the subject of such finding.

(b)     Promptly after receipt by an Indemnitee of notice of the existence of a Claim, such Indemnitee will, if a claim in respect thereof is to be made against the Issuer, notify the Issuer in writing of the existence thereof; provided that (i) the omission so to notify the Issuer will not relieve the Issuer from any liability which it may have hereunder unless and except to the extent it did not otherwise learn of such Claim and such failure results in the forfeiture by the Issuer of substantial rights and defenses, and (ii) the omission so to notify the Issuer will not relieve it from liability which it may have to an Indemnitee otherwise than on account of this indemnity agreement. In case any such Claim is made against any Indemnitee and it notifies the Issuer of the existence thereof, the Issuer will be entitled to participate therein, and to the extent that it may elect by written notice delivered to the Indemnitee, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnitee; provided that if the defendants in any such Claim include both the Indemnitee and the Issuer, and the Indemnitee shall have concluded that there may be legal defenses available to it which are different from or additional to those available to the Issuer, the Issuer shall not have the right to direct the defense of such Claim on behalf of such Indemnitee, and the Indemnitee shall have the right to select separate counsel to assert such legal defenses on behalf of such Indemnitee. Upon receipt of notice from the Issuer to such Indemnitee of the Issuer's election so to assume the defense of such Claim and approval by the Indemnitee of counsel, the Issuer will not be liable to such Indemnitee for expenses incurred thereafter by the Indemnitee in connection with the defense thereof (other than reasonable costs of investigation) unless (i) the Indemnitee shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Issuer shall not be liable for the expenses of more than one separate counsel (in addition to any local counsel in the jurisdiction in which any Claim is brought), approved by the Dealer, representing the Indemnitee who is party to such Claim), (ii) the Issuer shall not have employed counsel reasonably satisfactory to the Indemnitee to represent the Indemnitee within a reasonable time after notice of existence of the Claim or (iii) the Issuer has authorized in writing the employment of counsel for the Indemnitee. The indemnity, reimbursement and contribution obligations of the Issuer hereunder shall be in addition to any other liability the Issuer may otherwise have to an Indemnitee and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Issuer and any Indemnitee.  The Issuer agrees that without the Dealer's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any Claim in respect of which indemnification may be sought under the indemnification provision of the Agreement (whether or not the Dealer or any other Indemnitee is an actual or potential party to such Claim),

unless such settlement, compromise or consent (i) includes an unconditional release of each Indemnitee from all liability arising out of such Claim and (ii) does not include a statement as to or an admission of fault, culpability or failure to act, by or on behalf of any Indemnitee.

**Exhibit C**

**Statement of Terms for Interest — Bearing Commercial Paper Notes of [Name of Issuer]**

**THE PROVISIONS SET FORTH BELOW ARE QUALIFIED TO THE EXTENT APPLICABLE BY THE TRANSACTION SPECIFIC 'PRICING' 'PRIVATE PLACEMENT MEMORANDUM' SUPPLEMENT (THE "SUPPLEMENT") (IF ANY) SENT TO EACH PURCHASER AT THE TIME OF THE TRANSACTION.**

1. <u>General</u>. (a) The obligations of the Issuer to which these terms apply (each a "Note") are represented by one or more Master Notes (each, a "Master Note") issued in the name of (or of a nominee for) The Depository Trust Company ("DTC"), which Master Note includes the terms and provisions for the Issuer's Interest-Bearing Commercial Paper Notes that are set forth in this Statement of Terms, since this Statement of Terms constitutes an integral part of the Underlying Records as defined and referred to in the Master Note.

    (b) "Business Day" means any day other than a Saturday or Sunday that is neither a legal holiday nor a day on which banking institutions are authorized or required by law, executive order or regulation to be closed in New York City and, with respect to LIBOR Notes (as defined below) is also a London Business Day. "London Business Day" means, a day, other than a Saturday or Sunday, on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

2. <u>Interest</u>. (a) Each Note will bear interest at a fixed rate (a "Fixed Rate Note") or at a floating rate (a "Floating Rate Note").

    (b) The Supplement sent to each holder of such Note will describe the following terms: (i) whether such Note is a Fixed Rate Note or a Floating Rate Note and whether such Note is an Original Issue Discount Note (as defined below); (ii) the date on which such Note will be issued (the "Issue Date"); (iii) the Stated Maturity Date (as defined below); (iv) if such Note is a Fixed Rate Note, the rate per annum at which such Note will bear interest, if any, and the Interest Payment Dates; (v) if such Note is a Floating Rate Note, the Base Rate, the Index Maturity, the Interest Reset Dates, the Interest Payment Dates and the Spread and/or Spread Multiplier, if any (all as defined below), and any other terms relating to the particular method of calculating the interest rate for such Note; and (vi) any other terms applicable specifically to such Note. "Original Issue Discount Note" means a Note which has a stated redemption price at the Stated Maturity Date that exceeds its Issue Price by more than a specified de minimis amount and which the Supplement indicates will be an "Original Issue Discount Note".

    (c) Each Fixed Rate Note will bear interest from its Issue Date at the rate per annum specified in the Supplement until the principal amount thereof is paid or made available for payment. Interest on each Fixed Rate Note will be payable on the dates specified in the Supplement (each an "Interest Payment Date" for a Fixed Rate Note) and on the Maturity Date (as defined below). Interest on Fixed Rate Notes will be computed on the basis of a 360-day year of twelve 30-day months.

    If any Interest Payment Date or the Maturity Date of a Fixed Rate Note falls on a day that is not a Business Day, the required payment of principal, premium, if any, and/or interest will be payable on the next succeeding Business Day, and no additional interest will accrue in respect of the payment made on that next succeeding Business Day.

(d) The interest rate on each Floating Rate Note for each Interest Reset Period (as defined below) will be determined by reference to an interest rate basis (a "Base Rate") plus or minus a number of basis points (one basis point equals one-hundredth of a percentage point) (the "Spread"), if any, and/or multiplied by a certain percentage (the "Spread Multiplier"), if any, until the principal thereof is paid or made available for payment. The Supplement will designate which of the following Base Rates is applicable to the related Floating Rate Note: (a) the CD Rate (a "CD Rate Note"), (b) the Commercial Paper Rate (a "Commercial Paper Rate Note"), (c) the Federal Funds Rate (a "Federal Funds Rate Note"), (d) LIBOR (a "LIBOR Note"), (e) the Prime Rate (a "Prime Rate Note"), (f) the Treasury Rate (a "Treasury Rate Note") or (g) such other Base Rate as may be specified in such Supplement.

The rate of interest on each Floating Rate Note will be reset daily, weekly, monthly, quarterly or semiannually (the "Interest Reset Period"). The date or dates on which interest will be reset (each an "Interest Reset Date") will be, unless otherwise specified in the Supplement, in the case of Floating Rate Notes which reset daily, each Business Day, in the case of Floating Rate Notes (other than Treasury Rate Notes) that reset weekly, the Wednesday of each week; in the case of Treasury Rate Notes that reset weekly, the Tuesday of each week; in the case of Floating Rate Notes that reset monthly, the third Wednesday of each month; in the case of Floating Rate Notes that reset quarterly, the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes that reset semiannually, the third Wednesday of the two months specified in the Supplement. If any Interest Reset Date for any Floating Rate Note is not a Business Day, such Interest Reset Date will be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Reset Date shall be the immediately preceding Business Day. Interest on each Floating Rate Note will be payable monthly, quarterly or semiannually (the "Interest Payment Period") and on the Maturity Date. Unless otherwise specified in the Supplement, and except as provided below, the date or dates on which interest will be payable (each an "Interest Payment Date" for a Floating Rate Note) will be, in the case of Floating Rate Notes with a monthly Interest Payment Period, on the third Wednesday of each month; in the case of Floating Rate Notes with a quarterly Interest Payment Period, on the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes with a semiannual Interest Payment Period, on the third Wednesday of the two months specified in the Supplement. In addition, the Maturity Date will also be an Interest Payment Date.

If any Interest Payment Date for any Floating Rate Note (other than an Interest Payment Date occurring on the Maturity Date) would otherwise be a day that is not a Business Day, such interest Payment Date shall be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Payment Date shall be the immediately preceding Business Day. If the Maturity Date of a Floating Rate Note falls on a day that is not a Business Day, the payment of principal and interest will be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after such maturity.

Interest payments on each interest Payment Date for Floating Rate Notes will include accrued interest from and including the Issue Date or from and including the last date in respect of which interest has been paid, as the case may be, to, but excluding, such Interest Payment Date. On the Maturity Date, the interest payable on a Floating Rate Note will include interest accrued to, but excluding, the Maturity Date. Accrued interest will be calculated by multiplying the principal amount of a Floating Rate Note by an accrued interest factor. This accrued interest factor will be

computed by adding the interest factors calculated for each day in the period for which accrued interest is being calculated. The interest factor (expressed as a decimal) for each such day will be computed by dividing the interest rate applicable to such day by 360, in the cases where the Base Rate is the CD Rate, Commercial Paper Rate, Federal Funds Rate, LIBOR or Prime Rate, or by the actual number of days in the year, in the case where the Base Rate is the Treasury Rate. The interest rate in effect on each day will be (I) if such day is an Interest Reset Date, the interest rate with respect to the Interest Determination Date (as defined below) pertaining to such Interest Reset Date, or (ii) if such day is not an Interest Reset Date, the interest rate with respect to the Interest Determination Date pertaining to the next preceding Interest Reset Date, subject in either case to any adjustment by a Spread and/or a Spread Multiplier.

The "Interest Determination Date" where the Base Rate is the CD Rate or the Commercial Paper Rate will be the second Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is the Federal Funds Rate or the Prime Rate will be the Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is LIBOR will be the second London Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is the Treasury Rate will be the day of the week in which such Interest Reset Date falls when Treasury Bills are normally auctioned. Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is held on the following Tuesday or the preceding Friday. If an auction is so held on the preceding Friday, such Friday will be the Interest Determination Date pertaining to the Interest Reset Date occurring in the next succeeding week.

The "Index Maturity" is the period to maturity of the instrument or obligation from which the applicable Base Rate is calculated.

The "Calculation Date," where applicable, shall be the earlier of (i) the tenth calendar day following the applicable Interest Determination Date or (ii) the Business Day preceding the applicable Interest Payment Date or Maturity Date.

All times referred to herein reflect New York City time, unless otherwise specified.

The Issuer shall specify in writing to the Issuing and Paying Agent which party will be the calculation agent (the "Calculation Agent") with respect to the Floating Rate Notes. The Calculation Agent will provide the interest rate then in effect and, if determined, the interest rate which will become effective on the next Interest Reset Date with respect to such Floating Rate Note to the Issuing and Paying Agent as soon as the interest rate with respect to such Floating Rate Note has been determined and as soon as practicable after any change in such interest rate.

All percentages resulting from any calculation on Floating Rate Notes will be rounded to the nearest one hundred-thousandth of a percentage point, with five-one millionths of a percentage point rounded upwards. For example, 9,876545% (or .09876545) would be rounded to 9.87655% (or .0987655). All dollar amounts used in or resulting from any calculation on Floating Rate Notes will be rounded, in the case of U.S. dollars, to the nearest cent or, in the case of a foreign currency, to the nearest unit (with one-half cent or unit being rounded upwards).

*CD Rate Notes*

"CD Rate" means the rate on any Interest Determination Date for negotiable certificates of deposit having the Index Maturity as published by the Board of Governors of the Federal Reserve System (the

"FRB") in "Statistical Release H.15(519), Selected Interest Rates" or any successor publication of the FRB ("H.15(519)") under the heading "CDs (Secondary Market)".

If the above rate is not published in H.15(519) by 3:00 p.m., New York City time, on the Calculation Date, the CD Rate will be the rate on such Interest Determination Date set forth in the daily update of H.15(519), available through the world wide website of the FRB at http://www.federalreserve.gov/releases/h15/Update, or any successor site or publication or other recognized electronic source used for the purpose of displaying the applicable rate ("HAS Daily Update") under the caption "CDs (Secondary Market)".

If such rate is not published in either H.15(519) or H.15 Daily Update by 3:00 p.m., New York City time, on the Calculation Date, the Calculation Agent will determine the CD Rate to be the arithmetic mean of the secondary market offered rates as of 10:00 a.m., New York City time, on such Interest Determination Date of three leading nonbank dealers[1] in negotiable U.S. dollar certificates of deposit in New York City selected by the Calculation Agent for negotiable U.S. dollar certificates of deposit of major United States money center banks of the highest credit standing in the market for negotiable certificates of deposit with a remaining maturity closest to the Index Maturity in the denomination of $5,000,000.

If the dealers selected by the Calculation Agent are not quoting as set forth above, the CD Rate will remain the CD Rate then in effect on such Interest Determination Date.

*Commercial Paper Rate Notes*

"Commercial Paper Rate" means the Money Market Yield (calculated as described below) of the rate on any Interest Determination Date for commercial paper having the Index Maturity, as published in H.15(519) under the heading "Commercial Paper-Nonfinancial". The above rate is not published in H.15(519) by 3:00 p.m. on the Calculation Date, then the Commercial Paper Rate will be the Money Market Yield of the rate on such Interest Determination Date for commercial paper of the Index Maturity as published in H.15 Daily Update under the heading "Commercial Paper-Nonfinancial".

If by 3:00 p.m. on such Calculation Date such rate is not published in either H.15(519) or H.15 Daily Update, then the Calculation Agent will determine the Commercial Paper Rate to be the Money Market Yield of the arithmetic mean of the offered rates as of 11:00 a.m. on such Interest Determination Date of three leading dealers of U.S. dollar commercial paper in New York City selected by the Calculation Agent for commercial paper of the Index Maturity placed for an industrial issuer whose bond rating is "AA," or the equivalent, from a nationally recognized statistical rating organization.

If the dealers selected by the Calculation Agent are not quoting as mentioned above, the Commercial Paper Rate with respect to such Interest Determination Date will remain the Commercial Paper Rate then in effect on such Interest Determination Date.

"Money Market Yield" will be a yield calculated in accordance with the following formula:

$$\text{Money Market Yield} = \frac{D \times 360}{360 - (D \times M)} \times 100$$

---

[1]  Such nonbank dealers referred to in this Statement of Terms may include affiliates of the Dealer.

where "D" refers to the applicable per annum rate for commercial paper quoted on a bank discount basis and expressed as a decimal and "M" refers to the actual number of days in the interest period for which interest is being calculated.

*Federal Funds Rate Notes*

"Federal Funds Rate" means the rate on any Interest Determination Date for federal funds as published in 1-1.15(519) under the heading "Federal Funds (Effective)" and displayed on Moneyline Telerate[1] (or any successor service) on page 120 (or any other page as may replace the specified page on that service) ("Telerate Page 120").

If the above rate does not appear on Telerate Page 120 or is not so published by 3:00 p.m. on the Calculation Date, the Federal Funds Rate will be the rate on such Interest Determination Date as published in II.15 Daily Update under the heading "Federal Funds/(Effective)".

If such rate is not published as described above by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Federal Funds Rate to be the arithmetic mean of the rates for the last transaction in overnight U.S. dollar federal funds arranged by each of three leading brokers of Federal Funds transactions in New York City selected by the Calculation Agent prior to 9:00 a.m. on such Interest Determination Date.

If the brokers selected by the Calculation Agent are not quoting as mentioned above, the Federal Funds Rate will remain the Federal Funds Rate then in effect on such Interest Determination Date.

*LIBOR Notes*

The London Interbank offered rate ("LIBOR") means, with respect to any Interest Determination Date, the rate for deposits in U.S. dollars having the Index Maturity that appears on the Designated LIBOR Page as of 11:00 a.m., London time, on such Interest Determination Date.

If no rate appears, LIBOR will be determined on the basis of the rates at approximately 11:00 a.m., London time, on such Interest Determination Date at which deposits in U.S. dollars are offered to prime banks in the London interbank market by four major banks in such market selected by the Calculation Agent for a term equal to the Index Maturity and in principal amount equal to an amount that in the Calculation Agent's judgment is representative for a single transaction in U.S. dollars in such market at such time (a "Representative Amount"). The Calculation Agent will request the principal London office of each of such banks to provide a quotation of its rate. If at least two such quotations are provided, LIBOR will be the arithmetic mean of such quotations. If fewer than two quotations are provided, LIBOR for such interest period will be the arithmetic mean of the rates quoted at approximately 11:00 a.m., in New York City, on such Interest Determination Date by three major banks in New York City, selected by the Calculation Agent, for loans in U.S. dollars to leading European banks, for a term equal to the Index Maturity and in a Representative Amount; provided, however, that if fewer than three banks so selected by the Calculation Agent are providing such quotations, the then existing LIBOR rate will remain in effect for such Interest Payment Period.

"Designated LIBOR Page" means the display designated as page "3750" on Moneyline Telerate (or such other page as may replace the 3750 page on that service or such other service or services as may

---

[1]    WFS: Moneyline Telerate no longer exists - please replace with Reuters, Bloomberg, or another provider throughout.

be nominated by the British Bankers' Association for the purposes of displaying London interbank offered rates for U.S. dollar deposits).

*Prime Rate Notes*

"Prime Rate" means the rate on any Interest Determination Date as published in H.15(519) under the heading "Bank Prime Loan".

If the above rate is not published in H.15(519) prior to 3:00 p.m. on the Calculation Date, then the Prime Rate will be the rate on such Interest Determination Date as published in H.15 Daily Update opposite the caption "Bank Prime Loan".

If the rate is not published prior to 3:00 p.m. on the Calculation Date in either H.15(519) or H, 15 Daily Update, then the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the rates of interest publicly announced by each bank that appears on the Reuters Screen US PRIME! Page (as defined below) as such bank's prime rate or base lending rate as of 11:00 a.m., on that Interest Determination Date.

If fewer than four such rates referred to above are so published by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the prime rates or base lending rates quoted on the basis of the actual number of clays in the year divided by 360 as of the close of business on such Interest Determination Date by three major banks in New York City selected by the Calculation Agent.

If the banks selected are not quoting as mentioned above, the Prime Rate will remain the Prime Rate in effect on such Interest Determination Date.

"Reuters Screen US PRIME1 Page" means the display designated as page "US PRIME1" on the Reuters Monitor Money Rates Service (or such other page as may replace the US PRIME1 page on that service for the purpose of displaying prime rates or base lending rates of major United States banks).

*Treasury Rate Notes "Treasury Rate" means:*

(1) the rate from the auction held on the Interest Determination Date (the "Auction") of direct obligations of the United States ("Treasury Bills") having the Index Maturity specified in the Supplement under the caption "INVESTMENT RATE" on the display on Moneyline Telerate (or any successor service) on page 56 (or any other page as may replace that page on that service) ("Telerate Page 56") or page 57 (or any other page as may replace that page on that service) ("Telerate Page 57"), or

(2) if the rate referred to in clause (1) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield (as defined below) of the rate for the applicable Treasury Bills as published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/Auction High", or

(3) if the rate referred to in clause (2) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield of the auction rate of the applicable Treasury Bills as announced by the United States Department of the Treasury, or

(4) if the rate referred to in clause (3) is not so announced by the United States Department of the Treasury, or if the Auction is not held, the Bond Equivalent Yield of the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H,15(519) under the caption "U.S. Government Securities/Treasury Bills/Secondary Market", or

(5) if the rate referred to in clause (4) not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/Secondary Market", or

(6) if the rate referred to in clause (5) is not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date calculated by the Calculation Agent as the Bond Equivalent Yield of the arithmetic mean of the secondary market bid rates, as of approximately 3:30 p.m. on that Interest Determination Date, of three primary United States government securities dealers selected by the Calculation Agent, for the issue of Treasury Bills with a remaining maturity closest to the Index Maturity specified in the Supplement, or

(7) if the dealers so selected by the Calculation Agent are not quoting as mentioned in clause (6), the Treasury Rate in effect on the particular Interest Determination Date.

"Bond Equivalent Yield" means a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Bond Equivalent Yield} = \frac{D \times N}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for Treasury Bills quoted on a bank discount basis and expressed as a decimal, "N" refers to 365 or 366, as the case may be, and "M" refers to the actual number of days in the applicable Interest Reset Period.

3. <u>Final Maturity</u>. The Stated Maturity Date for any Note will be the date so specified in the Supplement, which shall be no later than 364 days from the date of issuance. On its Stated Maturity Date, or any date prior to the Stated Maturity Date on which the particular Note becomes due and payable by the declaration of acceleration, each such date being referred to as a Maturity Date, the principal amount of each Note, together with accrued and unpaid interest thereon, will be immediately due and payable,

4. <u>Events of Default</u>. The occurrence of any of the following shall constitute an "Event of Default" with respect to a Note: (i) default in any payment of principal of or interest on such Note (including on a redemption thereof); (ii) the Issuer makes any compromise arrangement with its creditors generally including the entering into any form of moratorium with its creditors generally; (iii) a court having jurisdiction shall enter a decree or order for relief in respect of the Issuer in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or there shall be appointed a receiver, administrator, liquidator, custodian, trustee or sequestrator (or similar officer) with respect to the whole or substantially the whole of the assets of the Issuer and any such decree, order or appointment is not removed, discharged or withdrawn within 60 days thereafter; or (iv) the Issuer shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment of or taking possession by a receiver, administrator, liquidator, assignee, custodian, trustee or

sequestrator (or similar official), with respect to the whole or substantially the whole of the assets of the Issuer or make any general assignment for the benefit of creditors, Upon the occurrence of an Event of Default, the principal of each obligation evidenced by such Note (together with interest accrued and unpaid thereon) shall become, without any notice or demand, immediately due and payable.[2]

5.  <u>Obligation Absolute</u>. No provision of the Issuing and Paying Agency Agreement under which the Notes are issued shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on each Note at the times, place and rate, and in the coin or currency, herein prescribed.

6.  <u>Supplement</u>. Any term contained in the Supplement shall supersede any conflicting term contained herein.

---

[2] Unlike single payment notes, where a default arises only at the stated maturity. interest-bearing notes with multiple payment dates should contain a default provision permitting acceleration of the maturity if the Issuer defaults on an interest payment.

**Commercial Paper Dealer Agreement**

**4(a)(2) Program**

Between:

**Cardinal Health, Inc**., as Issuer

and

**J.P. Morgan Securities LLC**, as Dealer

Concerning Notes to be issued pursuant to an

Issuing and Paying Agency Agreement dated as of August 9, 2006,

as amended February 28, 2007 and November 22, 2016

between the Issuer and

The Bank of New York, as Issuing

and Paying Agent

Dated as of

November 22, 2016

**Commercial Paper Dealer Agreement**
**4(a)(2) Program**

This agreement (the "Agreement") sets forth the understandings between the Issuer and the Dealer, each named on the cover page hereof, in connection with the issuance and sale by the Issuer of its short-term promissory notes (the "Notes") through the Dealer.

Certain terms used in this Agreement are defined in Section 6 hereof.

The Addendum to this Agreement, and any Annexes or Exhibits described in this Agreement or such Addendum, are hereby incorporated into this Agreement and made fully a part hereof.

**1.      Offers, Sales and Resales of Notes.**

1.1      While (i) the Issuer has and shall have no obligation to sell the Notes to the Dealer or to permit the Dealer to arrange any sale of the Notes for the account of the Issuer, and (ii) the Dealer has and shall have no obligation to purchase the Notes from the Issuer or to arrange any sale of the Notes for the account of the Issuer, the parties hereto agree that in any case where the Dealer purchases Notes from the Issuer, or arranges for the sale of Notes by the Issuer, such Notes will be purchased or sold by the Dealer in reliance on the representations, warranties, covenants and agreements of the Issuer contained herein or made pursuant hereto and on the terms and conditions and in the manner provided herein.

1.2      So long as this Agreement shall remain in effect, and in addition to the limitations contained in Section 1.7 hereof, the Issuer shall not, without the consent of the Dealer, offer, solicit or accept offers to purchase, or sell, any Notes except (a) in transactions with one or more dealers which may from time to time after the date hereof become dealers with respect to the Notes by executing with the Issuer one or more agreements which contain provisions substantially identical to those contained in Section 1 of this Agreement, of which the Issuer hereby undertakes to provide the Dealer prompt notice or (b) in transactions with the other dealers listed on the Addendum hereto, which are executing agreements with the Issuer which contain provisions substantially identical to Section 1 of this Agreement contemporaneously herewith.  In no event shall the Issuer offer, solicit or accept offers to purchase, or sell, any Notes directly on its own behalf in transactions with persons other than the Dealer or other broker-dealers as specifically permitted in this Section 1.2.

1.3      The Notes shall be in a minimum denomination of $250,000 or integral multiples of $1,000 in excess thereof, will bear such interest rates, if interest bearing, or will be sold at such discount from their face amounts, as shall be agreed upon by the Dealer and the Issuer, shall have a maturity not exceeding 364 days from the date of issuance and may have such terms as are specified in Exhibit C hereto or the Private Placement Memorandum.  The Notes shall not contain any provision for extension, renewal or automatic "rollover."

1.4      The authentication and issuance of, and payment for, the Notes shall be effected in accordance with the Issuing and Paying Agency Agreement, and the Notes shall be either individual physical certificates or book-entry notes evidenced by one or more master notes (each, a "Master Note") registered in the name of The Depository Trust Company ("DTC") or its nominee, in the form or forms annexed to the Issuing and Paying Agency Agreement.

1.5     If the Issuer and the Dealer shall agree on the terms of the purchase of any Note by the Dealer or the sale of any Note arranged by the Dealer (including, but not limited to, agreement with respect to the date of issue, purchase price, principal amount, maturity and interest rate or interest rate index and margin (in the case of interest-bearing Notes) or discount thereof (in the case of Notes issued on a discount basis), and appropriate compensation for the Dealer's services hereunder) pursuant to this Agreement, the Issuer shall cause such Note to be issued and delivered in accordance with the terms of the Issuing and Paying Agency Agreement and payment for such Note shall be made by the purchaser thereof, either directly or through the Dealer, to the Issuing and Paying Agent, for the account of the Issuer.  Except as otherwise agreed, in the event that the Dealer is acting as an agent and a purchaser shall either fail to accept delivery of or make payment for a Note on the date fixed for settlement, the Dealer shall promptly notify the Issuer, and if the Dealer has theretofore paid the Issuer for the Note, the Issuer will promptly return such funds to the Dealer against its return of the Note to the Issuer, in the case of a certificated Note, and upon notice of such failure in the case of a book-entry Note.  If such failure occurred for any reason other than default by the Dealer, the Issuer shall reimburse the Dealer on an equitable basis for the Dealer's loss of the use of such funds for the period such funds were credited to the Issuer's account,

1.6     The Dealer and the Issuer hereby establish and agree to observe the following procedures in connection with offers, sales and subsequent resales or other transfers of the Notes:

(a)     Offers and sales of the Notes by or through the Dealer shall be made only to: (i) investors reasonably believed by the Dealer to be Qualified Institutional Buyers or Institutional Accredited Investors and (ii) non-bank fiduciaries or agents that will be purchasing Notes for one or more accounts, each of which is reasonably believed by the Dealer to be an Institutional Accredited Investor.

(b)     Resales and other transfers of the Notes by the holders thereof shall be made only in accordance with the restrictions in the legend described in clause (e) below.

(c)     No general solicitation or general advertising shall be used in connection with the offering of the Notes.  Without limiting the generality of the foregoing, without the prior written approval of the Dealer, the Issuer shall not issue any press release, make any other statement to any member of the press making reference to the Notes, the offer or sale of the Notes, or this Agreement or place or publish any "tombstone" or other advertisement relating to the Notes, or the offer or sale of the Notes.  To the extent permitted by applicable securities laws, the Issuer shall (i) omit the names of the Dealer from any publicly available filing by the Issuer that makes reference to the offer or sale of the Notes or this Agreement, (ii) not include a copy of this Agreement in any such filing or as an exhibit thereto, and (iii) redact the Dealer's name and any contact or other information that could identify the Dealer from any agreement or other information included in such filing.

(d)     No sale of Notes to any one purchaser shall be for less than $250,000 principal or face amount, and no Note shall be issued in a smaller principal or face amount.  If the purchaser is a non-bank fiduciary acting on behalf of others, each person for whom such purchaser is acting must purchase at least $250,000 principal or face amount of Notes.

(e)     Offers and sales of the Notes by the Issuer through the Dealer acting as agent for the Issuer shall be made in accordance with Section 4(a)(2) of the Securities Act, and shall be subject to the restrictions described in the legend appearing on Exhibit A hereto. A legend substantially to the effect of such Exhibit A shall appear as part of the Private Placement Memorandum used in connection with offers and sales of Notes hereunder, as well as on each individual certificate representing a Note and each Master Note representing book-entry Notes offered and sold pursuant to this Agreement.

(f)     The Dealer shall furnish or make available or shall have furnished or made available to each purchaser of Notes for which it has acted as the Dealer a copy of the then-current Private Placement Memorandum unless such purchaser has previously received or had made available to it a copy of the Private Placement Memorandum as then in effect. The Private Placement Memorandum shall expressly state that any person to whom Notes are offered shall have an opportunity to ask questions of and receive information from, the Issuer and the Dealer and shall provide the names, addresses and telephone numbers of the persons from whom information regarding the Issuer may be obtained.

(g)     The Issuer agrees, for the benefit of the Dealer and each of the holders and prospective purchasers from time to time of the Notes that, if at any time the Issuer shall not be subject to Section 13 or 15(d) of the Exchange Act, the Issuer will furnish, upon request and at its expense, to the Dealer and to holders and prospective purchasers of Notes information required by Rule 144A(d)(4)(i) in compliance with Rule 144A(d).

(h)     In the event that any Note offered or to be offered by the Dealer would be ineligible for resale under Rule 144A, the Issuer shall immediately notify the Dealer (by telephone, confirmed in writing) of such fact and shall promptly prepare and deliver to the Dealer an amendment or supplement to the Private Placement Memorandum describing the Notes that are ineligible, the reason for such ineligibility and any other relevant information relating thereto.

(i)     The Issuer represents that it is not currently issuing commercial paper in the United States market in reliance upon the exemption provided by Section 3(a)(3) of the Securities Act. The Issuer agrees that, if it shall issue commercial paper after the date hereof in reliance upon such exemption (a) the proceeds from the sale of the Notes will be segregated from the proceeds of the sale of any such commercial paper by being placed in a separate account; (b) the Issuer will institute appropriate corporate procedures to ensure that the offers and sales of notes issued by the Issuer pursuant to the Section 3(a)(3) exemption are not integrated with offerings and sales of Notes hereunder; and (c) the Issuer will comply with each of the requirements of Section 3(a)(3) of the Securities Act in selling commercial paper or other short-term debt securities other than the Notes in the United States.

1.7     The Issuer hereby represents and warrants to the Dealer, in connection with offers, sales and resales of Notes, as follows:

(a)     The Issuer hereby confirms to the Dealer that (except as permitted by Section 1.6 (i)) within the preceding six months neither the Issuer nor any person other than the

Dealer or the other dealers referred to in Section 1.2 hereof acting on behalf of the Issuer has offered or sold any Notes, or any substantially similar security of the Issuer (including, without limitation, medium-term notes issued by the Issuer), to, or solicited offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1,2 hereof. The Issuer also agrees that (except as permitted by Section 1.6(i)), as long as the Notes are being offered for sale by the Dealer and the other dealers referred to in Section 1.2 hereof as contemplated hereby and until at least six months after the offer of Notes hereunder has been terminated, neither the Issuer nor any person other than the Dealer or the other dealers referred to in Section 1.2 hereof (except as contemplated by Section 1.2 hereof) will offer the Notes or any substantially similar security of the Issuer for sale to, or solicit offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof, it being understood that such agreement is made with a view to bringing the offer and sale of the Notes within the exemption provided by Section 4(a)(2) of the Securities Act and shall survive any termination of this Agreement. The Issuer hereby represents and warrants that it has not taken or omitted to take, and will not take or omit to take, any action that would cause the offering and sale of Notes hereunder to be integrated with any other offering of securities, whether such offering is made by the Issuer or some other party or parties.

(b) The Issuer represents and agrees that the proceeds of the sale of the Notes are not currently contemplated to be used for the purpose of buying, carrying or trading securities within the meaning of Regulation T and the interpretations thereunder by the Board of Governors of the Federal Reserve System. In the event that the Issuer determines to use such proceeds for the purpose of buying, carrying or trading securities, whether in connection with an acquisition of another company or otherwise, the Issuer shall give the Dealer at least five business days' prior written notice to that effect. The Issuer shall also give the Dealer prompt notice of the actual date that it commences to purchase securities with the proceeds of the Notes. Thereafter, in the event that the Dealer purchases Notes as principal and does not resell such Notes on the day of such purchase, to the extent necessary to comply with Regulation T and the interpretations thereunder, the Dealer will sell such Notes either (i) only to offerees it reasonably believes to be Qualified Institutional Buyers or to Qualified Institutional Buyers it reasonably believes are acting for other Qualified Institutional Buyers, in each case in accordance with Rule 144A or (ii) in a manner which would not cause a violation of Regulation T and the interpretations thereunder.

**2. Representations and Warranties of Issuer.**

The Issuer represents and warrants that:

2.1 The Issuer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all the requisite power and authority to execute, deliver and perform its obligations under the Notes, this Agreement and the Issuing and Paying Agency Agreement.

2.2 This Agreement and the Issuing and Paying Agency Agreement have been duly authorized, executed and delivered by the Issuer and constitute legal, valid and binding obligations of

the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.3    The Notes have been duly authorized, and when issued as provided in the Issuing and Paying Agency Agreement, will be duly and validly issued and will constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.4    The offer and sale of the Notes in the manner contemplated hereby do not require registration of the Notes under the Securities Act, pursuant to the exemption from registration contained in Section 4(a)(2) thereof, and no indenture in respect of the Notes is required to be qualified under the Trust Indenture Act of 1939, as amended.

2.5    The Notes will rank at least pari passu with all other unsecured and unsubordinated indebtedness of the Issuer.

2.6    No consent or action of or filing or registration with, any governmental or public regulatory body or authority, including the SEC, is required to authorize, or is otherwise required in connection with the execution, delivery or performance of, this Agreement, the Notes or the Issuing and Paying Agency Agreement, except as may be required by the securities or Blue Sky laws of the various states in connection with the offer and sale of the Notes.

2.7    Neither the execution and delivery of this Agreement and the Issuing and Paying Agency Agreement, nor the issuance of the Notes in accordance with the Issuing and Paying Agency Agreement, nor the fulfillment of or compliance with the terms and provisions hereof or thereof by the Issuer, will (i) result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of the Issuer, or (ii) violate or result in a breach or a default under any of the terms of the Issuer's charter documents or by-laws, any contract or instrument to which the Issuer is a party or by which it or its property is bound, or any law or regulation, or any order, writ, injunction or decree of any court or government instrumentality, to which the Issuer is subject or by which it or its property is bound, which breach or default is reasonably expected to have a material adverse effect on the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.8    Except as disclosed in the Private Placement Memorandum, there is no litigation or governmental proceeding pending, or to the knowledge of the Issuer threatened, against or affecting the Issuer or any of its subsidiaries that could reasonably be expected to result in a material adverse change in the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.9    The Issuer is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.10    Neither the Private Placement Memorandum nor the Company Information contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

2.11    The Issuer has implemented and maintains in effect policies and procedures designed to promote compliance by the Issuer, its subsidiaries and its respective directors, officers and employees with Anti-Corruption Laws and applicable Sanctions, and the Issuer, its subsidiaries and to the knowledge of the Issuer, their respective employees, officers, directors and agents (in their capacity as such) that will act in any capacity in connection with or benefit from the commercial paper program established hereby, is in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not engaged in any activity that would reasonably be expected to result in the Issuer being designated as a Sanctioned Person.  None of the Issuer or any subsidiary is a Sanctioned Person.

2.12    Each (a) issuance of Notes by the Issuer hereunder and (b) amendment or supplement of the Private Placement Memorandum shall be deemed a representation and warranty by the Issuer to the Dealer, as of the date thereof, that, both before and after giving effect to such issuance and after giving effect to such amendment or supplement, (i) the representations and warranties given by the Issuer set forth in this Section 2 remain true and correct on and as of such date as if made on and as of such date, (ii) in the case of an issuance of Notes, the Notes being issued on such date have been duly and validly issued and constitute legal, valid and binding obligations of the Issuer, enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and (iii) in the case of an issuance of Notes, since the date of the most recent Private Placement Memorandum, there has been no material adverse change in the financial condition, operations or business prospects of the Issuer which has not been disclosed to the Dealer in writing and (iv) the Issuer is not in default of any of its obligations hereunder or under the Notes, or the Issuing and Paying Agency Agreement.

**3.      Covenants and Agreements of Issuer.**

The Issuer covenants and agrees that:

3.1     The Issuer will give the Dealer prompt notice (but in any event prior to any subsequent issuance of Notes hereunder) of any amendment to, modification of or waiver with respect to, the Notes or the Issuing and Paying Agency Agreement, including a complete copy of any such amendment, modification or waiver.

3.2     The Issuer shall, whenever there shall occur any change in the Issuer's financial condition, operations or business prospects or any development or occurrence in relation to the Issuer that would be material to holders of the Notes or potential holders of the Notes (including any downgrading or receipt of any written notice of intended downgrading or receipt of any written notice of review for potential change in the rating accorded any of the Issuer's securities by any nationally recognized statistical rating organization which has published a rating of the Notes), promptly, and in any event prior to any subsequent issuance of Notes

hereunder, notify the Dealer (by telephone, confirmed in writing) of such change, development or occurrence.

3.3     The Issuer shall from time to time furnish to the Dealer such information as the Dealer may reasonably request, including, without limitation, any press releases or material provided by the Issuer to any national securities exchange, regarding (i) the Issuer's operations and financial condition, (ii) the due authorization and execution of the Notes and (iii) the Issuer's ability to pay the Notes as they mature.

3.4     The Issuer will take all such action as the Dealer may reasonably request to ensure that each offer and each sale of the Notes will comply with any applicable state Blue Sky laws; provided, however, that the Issuer shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation in any jurisdiction in which it is not so qualified or subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

3.5     The Issuer will not be in default of any of its obligations hereunder, under the Notes or under the Issuing and Paying Agency Agreement, at any time that any of the Notes are outstanding.

3.6     The Issuer shall not issue Notes hereunder until the Dealer shall have received (a) an opinion of counsel to the Issuer, addressed to the Dealer, satisfactory in form and substance to the Dealer, (b) a copy of the executed Issuing and Paying Agency Agreement as then in effect, (c) a copy of resolutions adopted by the Board of Directors of the Issuer, satisfactory in form and substance to the Dealer and certified by the Secretary or similar officer of the Issuer, authorizing execution and delivery by the Issuer of this Agreement, the Issuing and Paying Agency Agreement and the Notes and consummation by the Issuer of the transactions contemplated hereby and thereby, (d) prior to the issuance of any book-entry Notes represented by a master note registered in the name of DTC or its nominee, a copy of the executed Letter of Representations among the Issuer, the Issuing and Paying Agent and DTC and of the executed master note, (e) prior to the issuance of any Notes in physical form, a copy of such form (unless attached to this Agreement or the Issuing and Paying Agency Agreement) and (f) such other certificates, opinions, letters and documents as the Dealer shall have reasonably requested.

3.7     The Issuer shall reimburse the Dealer for all of the Dealer's reasonable out-of-pocket expenses related to this Agreement, including reasonable expenses incurred in connection with its preparation and negotiation, and the transactions contemplated hereby (including, but not limited to, the printing and distribution of the Private Placement Memorandum), and, if applicable, for the reasonable fees and out-of-pocket expenses of the Dealer's outside counsel.

3.8     Without limiting any obligation of the Issuer pursuant to this Agreement to provide the Dealer with credit and financial information, the Issuer hereby acknowledges and agrees that the Dealer may share the Company Information and any other information or matters relating to the Issuer or the transactions contemplated hereby with affiliates of the Dealer, and that such affiliates may likewise share information relating to the Issuer or such transactions with the Dealer.

3.9     The Issuer shall not file a Form D (as referenced in Rule 503 under the Securities Act) at any time in respect of the offer or sale of the Notes.

**4.     Disclosure.**

4.1     The Private Placement Memorandum and its contents (other than the Dealer Information) shall be the sole responsibility of the Issuer.  The Private Placement Memorandum shall contain a statement expressly offering an opportunity for each prospective purchaser to ask questions of and receive answers from, the Issuer concerning the offering of Notes and to obtain relevant additional information which the Issuer possesses or can acquire without unreasonable effort or expense.

4.2     (a)     The Issuer further agrees to notify the Dealer promptly upon the occurrence of any event relating to or affecting the Issuer that would cause the Company Information then in existence to include an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading.

        (b)     In the event that the Issuer gives the Dealer notice pursuant to Section 4.2(a) and the Dealer notifies the Issuer that it then has Notes it is holding in inventory, the Issuer agrees promptly to supplement or amend the Private Placement Memorandum so that the Private Placement Memorandum, as amended or supplemented, shall not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and the Issuer shall make such supplement or amendment available to the Dealer.

        (c)     In the event that (i) the Issuer gives the Dealer notice pursuant to Section 4.2(a), (ii) the Dealer does not notify the Issuer that it is then holding Notes in inventory and (iii) the Issuer chooses not to promptly amend or supplement the Private Placement Memorandum in the manner described in clause (b) above, then all solicitations and sales of Notes shall be suspended until such time as the Issuer has so amended or supplemented the Private Placement Memorandum, and made such amendment or supplement available to the Dealer.

**5.     Indemnification and Contribution.**

5.1     Unless prohibited by the Securities Act or the Exchange Act, or the rules and regulations of the SEC promulgated thereunder, the Issuer will indemnify and hold harmless the Dealer, each individual, corporation, partnership, trust, association or other entity controlling the Dealer, any affiliate of the Dealer or any such controlling entity and their respective directors, officers, employees, partners, incorporators, shareholders, servants, trustees and agents (hereinafter the "Indemnitees") against any and all liabilities, penalties, suits, causes of action, losses, damages, claims, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) or judgments of whatever kind or nature (each a "Claim"), imposed upon, incurred by or asserted against the Indemnitees arising out of or based upon (i) any allegation that the Private Placement Memorandum, the Company Information or any information provided by the Issuer to the Dealer included (as of any relevant time) or includes an untrue statement of a material fact or omitted (as of any relevant time) or omits to state any material fact necessary to make the statements

therein, in light of the circumstances under which they were made, not misleading or (ii) arising out of or based upon the breach by the Issuer of any agreement, covenant or representation made in or pursuant to this Agreement which has a material adverse effect on the Dealer or the holders of the Notes.  This indemnification shall not apply to the extent that the Claim arises out of or is based upon Dealer Information or the gross negligence or willful misconduct of the Dealer in the performance of, or the failure to perform, its obligations under this Agreement, as finally determined by a court of competent jurisdiction.

5.2     Provisions relating to claims made for indemnification under this Section 5 are set forth on Exhibit B to this Agreement.

5.3     In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 5 is held to be unavailable or insufficient to hold harmless the Indemnitees, although applicable in accordance with the terms of this Section 5, the Issuer shall contribute to the aggregate costs incurred by the Dealer in connection with any Claim in the proportion of the respective economic interests of the Issuer and the Dealer; provided, however, that such contribution by the Issuer shall be in an amount such that the aggregate costs incurred by the Dealer do not exceed the aggregate of the commissions and fees earned by the Dealer hereunder with respect to the issue or issues of Notes to which such Claim relates.  The respective economic interests shall be calculated by reference to the aggregate proceeds to the Issuer of the Notes issued hereunder and the aggregate commissions and fees earned by the Dealer hereunder.

## 6.     Definitions.

6.1     "Anti-Corruption Laws" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Issuer or any of its subsidiaries from time to time concerning or relating to bribery or corruption.

6.2     "Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

6.3     "Claim" shall have the meaning set forth in Section 5.1.

6.4     "Company Information" at any given time shall mean the Private Placement Memorandum together with, to the extent applicable, (i) the Issuer's most recent report on Form 10-K filed with the SEC and each report on Form 10-Q or 8-K filed by the Issuer with the SEC since the most recent Form 10-K, (ii) the Issuer's most recent annual audited financial statements and each interim financial statement or report prepared subsequent thereto, if not included in item (1) above, (iii) the Issuer's and its affiliates' other publicly available recent reports, including, but not limited to, any publicly available filings or reports provided to their respective shareholders, (iv) any other information or disclosure prepared pursuant to Section 4.3 hereof and (v) any information prepared or approved by the Issuer for dissemination to investors or potential investors in the Notes.

6.5     "Current Issuing and Paying Agent" shall have the meaning set forth in Section 7.10.

6.6 "Dealer Information" shall mean material concerning the Dealer provided by the Dealer in writing expressly for inclusion in the Private Placement Memorandum.

6.7 "Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended.

6.8 "Indemnitee" shall have the meaning set forth in Section 5.1.

6.9 "Institutional Accredited Investor" shall mean an institutional investor that is an accredited investor within the meaning of Rule 501 under the Securities Act and that has such knowledge and experience in financial and business matters that it is capable of evaluating and bearing the economic risk of an investment in the Notes, including, but not limited to, a bank, as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

6.10 "Issuing and Paying Agency Agreement" shall mean the issuing and paying agency agreement described on the cover page of this Agreement, or any such replacement thereof, as such agreement may be amended or supplemented from time to time.

6.11 "Issuing and Paying Agent" shall mean the party designated as such on the cover page of this Agreement, as issuing and paying agent under the Issuing and Paying Agency Agreement, or any successor thereto or replacement thereof, in accordance with the Issuing and Paying Agency Agreement.

6.12 "Non-bank fiduciary or agent" shall mean a fiduciary or agent other than (a) a bank, as defined in Section 3(a)(2) of the Securities Act, or (b) a savings and loan association, as defined in Section 3(a)(5)(A) of the Securities Act.

6.13 "Person" shall mean any natural person, corporation, firm, joint venture, partnership, limited liability company, association, enterprise, trust or other entity or organization, or any government or political subdivision or any agency, department or instrumentality thereof.

6.14 "Private Placement Memorandum" shall mean offering materials prepared in accordance with Section 4 (including materials referred to therein or incorporated by reference therein, if any) provided to purchasers and prospective purchasers of the Notes, and shall include amendments and supplements thereto which may be prepared from time to time in accordance with this Agreement (other than any amendment or supplement that has been completely superseded by a later amendment or supplement).

6.15 "Qualified Institutional Buyer" shall have the meaning assigned to that term in Rule 144A under the Securities Act.

6.16 "Replacement Issuing and Paying Agent" shall have the meaning set forth in Section 7.10 (i).

6.17 "Replacement Issuing and Paying Agency Agreement" shall have the meaning set forth in Section 7.10.

6.18 "Rule 144A" shall mean Rule 144A under the Securities Act.

6.19    "Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of comprehensive Sanctions (at the time of this Agreement, Cuba, Iran, North Korea, Sudan, Syria and Crimea).

6.20    "Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or ordinarily resident in a Sanctioned Country to the extent dealing with such Person would be prohibited by applicable Sanctions or (c) any Person 50% owned by any such Person or Persons described in the foregoing clause (a).

6.21    "Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or any European Union member state.

6.22    "SEC" shall mean the U.S. Securities and Exchange Commission.

6.23    "Securities Act" shall mean the U.S. Securities Act of 1933, as amended.

**7.    General**

7.1    Unless otherwise expressly provided herein, all notices under this Agreement to parties hereto shall be in writing and shall be effective when received at the address of the respective party set forth in the Addendum to this Agreement.

7.2    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.

7.3    The Issuer agrees that any suit, action or proceeding brought by the Issuer against the Dealer in connection with or arising out of this Agreement or the Notes or the offer and sale of the Notes shall be brought solely in the United States federal courts located in the Borough of Manhattan or the courts of the State of New York located in the Borough of Manhattan.  EACH OF THE DEALER AND THE ISSUER WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.4    This Agreement may be terminated, at any time, by the Issuer, upon one business day's prior notice to such effect to the Dealer, or by the Dealer upon one business day's prior notice to such effect to the Issuer.  Any such termination, however, shall not affect the obligations of the Issuer under Sections 1.2 (first sentence), 3.7, 5 and 7.3 hereof or the respective representations, warranties, agreements, covenants, rights or responsibilities of the parties made or arising prior to the termination of this Agreement.

7.5    This Agreement is not assignable by either party hereto without the written consent of the other party; provided, however, that the Dealer may assign its rights and obligations under this Agreement to any affiliate of the Dealer.

7.6     This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

7.7     This Agreement is for the exclusive benefit of the parties hereto, and their respective permitted successors and assigns hereunder, and shall not be deemed to give any legal or equitable right, remedy or claim to any other person whatsoever.

7.8     The Issuer acknowledges and agrees that (i) the purchase and sale of the Notes pursuant to this Agreement is an arm's-length commercial transaction between the Issuer, on the one hand, and the Dealer, on the other, (ii) in connection therewith and with the process leading to such transaction the Dealer is acting solely as a principal and not the agent or fiduciary of the Issuer, (iii) the Dealer has not assumed an advisory or fiduciary responsibility in favor of the Issuer with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether the Dealer has advised or is currently advising the Issuer on other matters) or any other obligation to the Issuer except the obligations expressly set forth in this Agreement and (iv) the Issuer has consulted its own legal and financial advisors to the extent it deemed appropriate.  The Issuer agrees that it will not claim that the Dealer has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Issuer, in connection with such transaction or the process leading thereto.

7.9     In the case of any agreement by a Dealer to purchase a Note hereunder (other than as agent) which provides for a settlement date that is three Business Days or more after the date of such agreement, the obligation of the Dealer to purchase the Note under such agreement shall be subject to the following conditions:

(a)     the representations and warranties given by the Issuer set forth above in Section 2 shall be true and correct on and as of the settlement date as if made on and as of such date, and the Issuer shall have performed all of its obligations hereunder to be performed as of such date,

(b)     since the date of the most recent Private Placement Memorandum, there shall have been no material adverse change in the condition (financial or otherwise), operations or business prospects of the Issuer (whether occurring before or after such agreement was entered into) which was not disclosed to the Dealer in writing prior to the time such agreement was entered into,

(c)     the Issuer shall not be in default of any of its obligations hereunder, under the Note or under the Issuing and Paying Agency Agreement,

(d)     on or after the date of such agreement there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading in the Issuer's securities on the New York Stock Exchange; (iii) a general moratorium in commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or services in the United States; (iv) the outbreak or escalation of emergency or war or (v) the occurrence of any other calamity or crisis or any change in financial, political or economic conditions in the United States or

elsewhere, if the effect of any such event specified in clause (iv) or (v) in the reasonable judgment of the Dealer makes it impracticable or inadvisable to proceed with the offering or the delivery of the Note on the terms and in the amount contemplated in the Private Placement Memorandum

(e)     on or after the date of such agreement (i) downgrading shall not have occurred in the rating accorded the Issuer's debt securities by any nationally recognized statistical rating organization and such organization shall not have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Issuer's debt securities.

7.10    The parties hereto agree that the Issuer may, in accordance with the terms of this Section 7.10, from time to time replace the party which is then acting as Issuing and Paying Agent (the "Current Issuing and Paying Agent") with another party (such other party, the "Replacement Issuing and Paying Agent"), and enter into an agreement with the Replacement Issuing and Paying Agent covering the provision of issuing and paying agency functions in respect of the Notes by the Replacement Issuing and Paying Agent (the "Replacement Issuing and Paying Agency Agreement") (any such replacement, a "Replacement").

From and after the effective date of any Replacement, except to the extent that the Issuing and Paying Agency Agreement provides that the Current Issuing and Paying Agent will continue to act in respect of Notes outstanding as of the effective date of such Replacement, the "Issuing and Paying Agent" for the Notes shall be deemed to be the Replacement Issuing and Paying Agent, all references to the "Issuing and Paying Agent" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agent, and all references to the "Issuing and Paying Agency Agreement" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agency Agreement.

This Agreement supersedes all prior agreements and understandings (whether written or oral between the Issuer and the Dealer, or any of them, with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

**Cardinal Health, Inc., as Issuer**       **J.P. Morgan Securities LLC, as Dealer**

By:   /s/ Sam Samad       By:   /s/ Ron Flynn

Name:  Sam Samad       Name:  Ron Flynn

Title:  Treasurer       Title:  Executive Director

Addendum

The following additional clauses shall apply to the Agreement and be deemed a part thereof,

1.　　　The other dealers referred to in clause (b) of Section 1.2 of the Agreement are Merrill Lynch, Pierce, Fenner & Smith Incorporated, Goldman Sachs & Co., Wells Fargo Securities, LLC and SunTrust Robinson Humphrey, Inc.

2.　　　The addresses of the respective parties for the purposes of notices under Section 7.1 are as follows:

For the Issuer:

Address: Cardinal Health, Inc., 7000 Cardinal Place, Dublin, Ohio 43017
Attention: Scott Zimmerman, Assistant Treasurer
Telephone:　　(###) ###-####

For the Dealer:

Address: 383 Madison Avenue, 3rd Floor, New York, NY 10179
Attention: Short Term Fixed Income Division
Telephone Number:　　(###) ###-####
Fax Number: (###) ###-####

**Exhibit A**

**Form of Legend for Private Placement Memorandum and Notes**

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE SECURITIES LAW, AND OFFERS AND SALES THEREOF MAY BE MADE ONLY IN COMPLIANCE WITH AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER WILL BE DEEMED TO REPRESENT THAT (I) IT HAS BEEN AFFORDED AN OPPORTUNITY TO INVESTIGATE MATTERS RELATING TO THE ISSUER AND THE NOTES, (II) IT IS NOT ACQUIRING SUCH NOTE WITH A VIEW TO ANY DISTRIBUTION THEREOF AND (III) IT IS EITHER (A)(1) AN INSTITUTIONAL INVESTOR THAT IS AN ACCREDITED INVESTOR WITHIN THE MEANING OF RULE 501(a) UNDER THE ACT (AN "INSTITUTIONAL ACCREDITED INVESTOR") AND (2)(i) PURCHASING NOTES FOR ITS OWN ACCOUNT, (ii) A BANK (AS DEFINED IN SECTION 3(a)(2) OF THE ACT) OR A SAVINGS AND LOAN ASSOCIATION OR OTHER INSTITUTION (AS DEFINED IN SECTION 3(a)(5)(A) OF THE ACT) ACTING IN ITS INDIVIDUAL OR FIDUCIARY CAPACITY OR (iii) A FIDUCIARY OR AGENT (OTHER THAN A U.S. BANK OR SAVINGS AND LOAN ASSOCIATION) PURCHASING NOTES FOR ONE OR MORE ACCOUNTS EACH OF WHICH ACCOUNTS IS SUCH AN INSTITUTIONAL ACCREDITED INVESTOR; OR (B) A QUALIFIED INSTITUTIONAL BUYER ("QIB") WITHIN THE MEANING OF RULE 144A UNDER THE ACT THAT IS ACQUIRING NOTES FOR ITS OWN ACCOUNT OR FOR ONE OR MORE ACCOUNTS, EACH OF WHICH ACCOUNTS IS A QIB; AND THE PURCHASER ACKNOWLEDGES THAT IT IS AWARE THAT THE SELLER MAY RELY UPON THE EXEMPTION FROM THE REGISTRATION PROVISIONS OF SECTION 5 OF THE ACT PROVIDED BY RULE 144A. BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER THEREOF SHALL ALSO BE DEEMED TO AGREE THAT ANY RESALE OR OTHER TRANSFER THEREOF WILL BE MADE ONLY (A) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE ACT, EITHER (1) TO THE ISSUER OR TO A PLACEMENT AGENT DESIGNATED BY THE ISSUER AS A PLACEMENT AGENT FOR THE NOTES (COLLECTIVELY, THE "PLACEMENT AGENTS"), NONE OF WHICH SHALL HAVE ANY OBLIGATION TO ACQUIRE SUCH NOTE, (2) THROUGH A PLACEMENT AGENT TO AN INSTITUTIONAL ACCREDITED INVESTOR OR A QIB, OR (3) TO A QIB IN A TRANSACTION THAT MEETS THE REQUIREMENTS OF RULE 144A AND (B) IN MINIMUM AMOUNTS OF $250,000.

**Exhibit B**

**Further Provisions Relating to Indemnification**

(a) The Issuer agrees to reimburse each Indemnitee for all expenses (including reasonable fees and disbursements of internal and external counsel) as they are incurred by it in connection with investigating or defending any loss, claim, damage, liability or action in respect of which indemnification may be sought under Section 5 of the Agreement (whether or not it is a party to any such proceedings) provided, however, that if it is found in any such action, proceeding or investigation that any loss, claim, damage or liability of an Indemnitee has resulted from the Dealer Information or the gross negligence or willful misconduct of the Indemnitee in performing the services that are the subject of this Agreement, as finally determined by a court of competent jurisdiction, the Indemnitee shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of the Indemnitee which is the subject of such finding.

(b) Promptly after receipt by an Indemnitee of notice of the existence of a Claim, such Indemnitee will, if a claim in respect thereof is to be made against the Issuer, notify the Issuer in writing of the existence thereof; provided that (i) the omission so to notify the Issuer will not relieve the Issuer from any liability which it may have hereunder unless and except to the extent it did not otherwise learn of such Claim and such failure results in the forfeiture by the Issuer of substantial rights and defenses, and (ii) the omission so to notify the Issuer will not relieve it from liability which it may have to an Indemnitee otherwise than on account of this indemnity agreement. In case any such Claim is made against any Indemnitee and it notifies the Issuer of the existence thereof, the Issuer will be entitled to participate therein, and to the extent that it may elect by written notice delivered to the Indemnitee, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnitee; provided that if the defendants in any such Claim include both the Indemnitee and the Issuer, and the Indemnitee shall have concluded that there may be legal defenses available to it which are different from or additional to those available to the Issuer, the Issuer shall not have the right to direct the defense of such Claim on behalf of such Indemnitee, and the Indemnitee shall have the right to select separate counsel to assert such legal defenses on behalf of such Indemnitee. Upon receipt of notice from the Issuer to such Indemnitee of the Issuer's election so to assume the defense of such Claim and approval by the Indemnitee of counsel, the Issuer will not be liable to such Indemnitee for expenses incurred thereafter by the Indemnitee in connection with the defense thereof (other than reasonable costs of investigation) unless (i) the Indemnitee shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Issuer shall not be liable for the expenses of more than one separate counsel (in addition to any local counsel in the jurisdiction in which any Claim is brought), approved by the Dealer, representing the Indemnitee who is party to such Claim), (ii) the Issuer shall not have employed counsel reasonably satisfactory to the Indemnitee to represent the Indemnitee within a reasonable time after notice of existence of the Claim or (iii) the Issuer has authorized in writing the employment of counsel for the Indemnitee. The indemnity, reimbursement and contribution obligations of the Issuer hereunder shall be in addition to any other liability the Issuer may otherwise have to an Indemnitee and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Issuer and any Indemnitee.  The Issuer agrees that without the Dealer's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any Claim in respect of which indemnification may be sought under the indemnification provision of the Agreement (whether or not the Dealer or any other Indemnitee is an actual or potential party to such Claim), unless such settlement, compromise or consent (i) includes an unconditional release of

each Indemnitee from all liability arising out of such Claim and (ii) does not include a statement as to or an admission of fault, culpability or failure to act, by or on behalf of any Indemnitee.

**Exhibit C**

**Statement of Terms for Interest — Bearing Commercial Paper Notes of Cardinal Health, Inc.**

**THE PROVISIONS SET FORTH BELOW ARE QUALIFIED TO THE EXTENT APPLICABLE BY THE TRANSACTION SPECIFIC PRICING SUPPLEMENT (THE "SUPPLEMENT") (IF ANY) SENT TO EACH PURCHASER AT THE TIME OF THE TRANSACTION.**

1. General. (a) The obligations of the Issuer to which these terms apply (each a "Note") are represented by one or more Master Notes (each, a "Master Note") issued in the name of (or of a nominee for) The Depository Trust Company ("DTC"), which Master Note includes the terms and provisions for the Issuer's Interest-Bearing Commercial Paper Notes that are set forth in this Statement of Terms, since this Statement of Terms constitutes an integral part of the Underlying Records as defined and referred to in the Master Note.

   (b) "Business Day" means any day other than a Saturday or Sunday that is neither a legal holiday nor a day on which banking institutions are authorized or required by law, executive order or regulation to be closed in New York City and, with respect to LIBOR Notes (as defined below) is also a London Business Day. "London Business Day" means, a day, other than a Saturday or Sunday, on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

2. Interest. (a) Each Note will bear interest at a fixed rate (a "Fixed Rate Note") or at a floating rate (a "Floating Rate Note").

   (b) The Supplement sent to each holder of such Note will describe the following terms: (i) whether such Note is a Fixed Rate Note or a Floating Rate Note and whether such Note is an Original Issue Discount Note (as defined below); (ii) the date on which such Note will be issued (the "Issue Date"); (iii) the Stated Maturity Date (as defined below); (iv) if such Note is a Fixed Rate Note, the rate per annum at which such Note will bear interest, if any, and the Interest Payment Dates; (v) if such Note is a Floating Rate Note, the Base Rate, the Index Maturity, the Interest Reset Dates, the Interest Payment Dates and the Spread and/or Spread Multiplier, if any (all as defined below), and any other terms relating to the particular method of calculating the interest rate for such Note; and (vi) any other terms applicable specifically to such Note.

   "Original Issue Discount Note" means a Note which has a stated redemption price at the Stated Maturity Date that exceeds its Issue Price by more than a specified de minimis amount and which the Supplement indicates will be an "Original Issue Discount Note".

   (c) Each Fixed Rate Note will bear interest from its Issue Date at the rate per annum specified in the Supplement until the principal amount thereof is paid or made available for payment. Interest on each Fixed Rate Note will be payable on the dates specified in the Supplement (each an "Interest Payment Date" for a Fixed Rate Note) and on the Maturity Date (as defined below). Interest on Fixed Rate Notes will be computed on the basis of a 360-day year of twelve 30-day months.

   If any Interest Payment Date or the Maturity Date of a Fixed Rate Note falls on a day that is not a Business Day, the required payment of principal, premium, if any, and/or interest will be payable on the next succeeding Business Day, and no additional interest will accrue in respect of the payment made on that next succeeding Business Day.

(d) The interest rate on each Floating Rate Note for each Interest Reset Period (as defined below) will be determined by reference to an interest rate basis (a "Base Rate") plus or minus a number of basis points (one basis point equals one-hundredth of a percentage point) (the "Spread"), if any, and/or multiplied by a certain percentage (the "Spread Multiplier"), if any, until the principal thereof is paid or made available for payment. The Supplement will designate which of the following Base Rates is applicable to the related Floating Rate Note: (a) the CD Rate (a "CD Rate Note"), (b) the Commercial Paper Rate (a "Commercial Paper Rate Note"), (c) the Federal Funds Rate (a "Federal Funds Rate Note"), (d) LIBOR (a "LIBOR Note"), (e) the Prime Rate (a "Prime Rate Note"), (f) the Treasury Rate (a "Treasury Rate Note") or (g) such other Base Rate as may be specified in such Supplement.

The rate of interest on each Floating Rate Note will be reset daily, weekly, monthly, quarterly or semiannually (the "Interest Reset Period"). The date or dates on which interest will be reset (each an "Interest Reset Date") will be, unless otherwise specified in the Supplement, in the case of Floating Rate Notes which reset daily, each Business Day, in the case of Floating Rate Notes (other than Treasury Rate Notes) that reset weekly, the Wednesday of each week; in the case of Treasury Rate Notes that reset weekly, the Tuesday of each week; in the case of Floating Rate Notes that reset monthly, the third Wednesday of each month; in the case of Floating Rate Notes that reset quarterly, the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes that reset semiannually, the third Wednesday of the two months specified in the Supplement. If any Interest Reset Date for any Floating Rate Note is not a Business Day, such Interest Reset Date will be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Reset Date shall be the immediately preceding Business Day. Interest on each Floating Rate Note will be payable monthly, quarterly or semiannually (the "Interest Payment Period") and on the Maturity Date. Unless otherwise specified in the Supplement, and except as provided below, the date or dates on which interest will be payable (each an "Interest Payment Date" for a Floating Rate Note) will be, in the case of Floating Rate Notes with a monthly Interest Payment Period, on the third Wednesday of each month; in the case of Floating Rate Notes with a quarterly Interest Payment Period, on the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes with a semiannual Interest Payment Period, on the third Wednesday of the two months specified in the Supplement. In addition, the Maturity Date will also be an Interest Payment Date.

If any Interest Payment Date for any Floating Rate Note (other than an Interest Payment Date occurring on the Maturity Date) would otherwise be a day that is not a Business Day, such Interest Payment Date shall be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Payment Date shall be the immediately preceding Business Day. If the Maturity Date of a Floating Rate Note falls on a day that is not a Business Day, the payment of principal and interest will be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after such maturity.

Interest payments on each Interest Payment Date for Floating Rate Notes will include accrued interest from and including the Issue Date or from and including the last date in respect of which interest has been paid, as the case may be, to, but excluding, such Interest Payment Date. On the Maturity Date, the interest payable on a Floating Rate Note will include interest accrued to, but excluding, the Maturity Date. Accrued interest will be calculated by multiplying the principal amount of a Floating Rate Note by an accrued interest factor. This accrued interest factor will be

computed by adding the interest factors calculated for each day in the period for which accrued interest is being calculated. The interest factor (expressed as a decimal) for each such day will be computed by dividing the interest rate applicable to such day by 360, in the cases where the Base Rate is the CD Rate, Commercial Paper Rate, Federal Funds Rate,

LIBOR or Prime Rate, or by the actual number of days in the year, in the case where the Base Rate is the Treasury Rate. The interest rate in effect on each day will be (i) if such day is an Interest Reset Date, the interest rate with respect to the Interest Determination Date (as defined below) pertaining to such Interest Reset Date, or (ii) if such day is not an Interest Reset Date, the interest rate with respect to the Interest Determination Date pertaining to the next preceding Interest Reset Date, subject in either case to any adjustment by a Spread and/or a Spread Multiplier.

The "Interest Determination Date" where the Base Rate is the CD Rate or the Commercial Paper Rate will be the second Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is the Federal Funds Rate or the Prime Rate will be the Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is LIBOR will be the second London Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is the Treasury Rate will be the day of the week in which such Interest Reset Date falls when Treasury Bills are normally auctioned. Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is held on the following Tuesday or the preceding Friday. If an auction is so held on the preceding Friday, such Friday will be the Interest Determination Date pertaining to the Interest Reset Date occurring in the next succeeding week.

The "Index Maturity" is the period to maturity of the instrument or obligation from which the applicable Base Rate is calculated.

The "Calculation Date," where applicable, shall be the earlier of (i) the tenth calendar day following the applicable Interest Determination Date or (ii) the Business Day preceding the applicable Interest Payment Date or Maturity Date.

All times referred to herein reflect New York City time, unless otherwise specified.

The Issuer shall specify in writing to the Issuing and Paying Agent which party will be the calculation agent (the "Calculation Agent") with respect to the Floating Rate Notes. The Calculation Agent will provide the interest rate then in effect and, if determined, the interest rate which will become effective on the next Interest Reset Date with respect to such Floating Rate Note to the Issuing and Paying Agent as soon as the interest rate with respect to such Floating Rate Note has been determined and as soon as practicable after any change in such interest rate.

All percentages resulting from any calculation on Floating Rate Notes will be rounded to the nearest one hundred-thousandth of a percentage point, with five-one millionths of a percentage point rounded upwards. For example, 9,876545% (or .09876545) would be rounded to 9.87655% (or .0987655). All dollar amounts used in or resulting from any calculation on Floating Rate Notes will be rounded, in the case of U.S. dollars, to the nearest cent or, in the case of a foreign currency, to the nearest unit (with one-half cent or unit being rounded upwards).

*CD Rate Notes*

"CD Rate" means the rate on any Interest Determination Date for negotiable certificates of deposit having the Index Maturity as published by the Board of Governors of the Federal Reserve System (the "FRB") in "Statistical Release H.15(519), Selected Interest Rates" or any successor publication of the FRB ("H.15(519)") under the heading "CDs (Secondary Market)".

If the above rate is not published in H.15(519) by 3:00 p.m. on the Calculation Date, the CD

Rate will be the rate on such Interest Determination Date set forth in the daily update of

H.15(519), available through the world wide website of the FRB at http://www.federalreserve.gov/releases/h15/Update, or any successor site or publication or other recognized electronic source used for the purpose of displaying the applicable rate ("H.15 Daily Update") under the caption "CDs (Secondary Market)".

If such rate is not published in either H.15(519) or H.15 Daily Update by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the CD Rate to be the arithmetic mean of the secondary market offered rates as of 10:00 a.m. on such Interest Determination Date of three leading nonbank dealers[1] in negotiable U.S. dollar certificates of deposit in New York City selected by the Calculation Agent for negotiable U.S. dollar certificates of deposit of major United States money center banks of the highest credit standing in the market for negotiable certificates of deposit with a remaining maturity closest to the Index Maturity in the denomination of $5,000,000.

If the dealers selected by the Calculation Agent are not quoting as set forth above, the CD

Rate will remain the CD Rate then in effect on such Interest Determination Date.

*Commercial Paper Rate Notes*

"Commercial Paper Rate" means the Money Market Yield (calculated as described below)

of the rate on any Interest Determination Date for commercial paper having the Index Maturity, as published in H.15(519) under the heading "Commercial Paper-Nonfinancial".

If the above rate is not published in H.15(519) by 3:00 p.m, New York City time on the Calculation Date, then the Commercial Paper Rate will be the Money Market Yield of the rate on such Interest Determination Date for commercial paper of the Index Maturity as published in H.15 Daily Update under the heading "Commercial Paper-Nonfinancial".

If by 3:00 p.m., on such Calculation Date such rate is not published in either H.15(519) or

H.15 Daily Update, then the Calculation Agent will determine the Commercial Paper Rate to be the Money Market Yield of the arithmetic mean of the offered rates as of 11:00 a.m. on such Interest Determination Date of three leading dealers of U.S. dollar commercial paper in New York City selected by the Calculation Agent for commercial paper of the Index Maturity placed for an industrial issuer whose bond rating is "AA," or the equivalent, from a nationally recognized statistical rating organization.

---

[1] JPMS: Such nonbank dealers referred to in this Statement of Terms may include affiliates of the Dealer.

If the dealers selected by the Calculation Agent are not quoting as mentioned above, the Commercial Paper Rate with respect to such Interest Determination Date will remain the Commercial Paper Rate then in effect on such Interest Determination Date.

"Money Market Yield" will be a yield calculated in accordance with the following formula:

$$\text{Money Market Yield} = \frac{D \times 360}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for commercial paper quoted on a bank discount basis and expressed as a decimal and "M" refers to the actual number of days in the interest period for which interest is being calculated.

*Federal Funds Rate Notes*

"Federal Funds Rate" means the rate on any Interest Determination Date for federal funds as published in H.15(519) under the heading "Federal Funds (Effective)" and displayed on Reuters Page (as defined below) FEDFUNDS1 (or any other page as may replace the specified page on that service) ("Reuters Page FEDFUNDS1") under the heading EFFECT.

If the above rate does not appear on Reuters Page FEDFUNDS1or is not so published by

3:00 p.m. on the Calculation Date, the Federal Funds Rate will be the rate on such Interest Determination Date as published in H.15 Daily Update under the heading "Federal Funds/(Effective)".

If such rate is not published as described above by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Federal Funds Rate to be the arithmetic mean of the rates for the last transaction in overnight U.S. dollar federal funds arranged by each of three leading brokers of Federal Funds transactions in New York City selected by the Calculation Agent prior to 9:00 a.m. on such Interest Determination Date.

If the brokers selected by the Calculation Agent are not quoting as mentioned above, the Federal Funds Rate will remain the Federal Funds Rate then in effect on such Interest Determination Date.

"Reuters Page" means the display on the Reuters 3000 Xtra Service, or any successor service, on the page or pages specified in this Statement of Terms or the Supplement, or any replacement page on that service.

*LIBOR Notes*

The London Interbank offered rate ("LIBOR") means, with respect to any Interest Determination Date, the rate for deposits in U.S. dollars having the Index Maturity that appears on the Designated LIBOR Page as of 11:00 a.m., London time, on such Interest Determination Date.

If no rate appears, LIBOR will be determined on the basis of the rates at approximately

11:00 a.m., London time, on such Interest Determination Date at which deposits in U.S. dollars are offered to prime banks in the London interbank market by four major banks in such market selected by the Calculation Agent for a term equal to the Index Maturity and in principal amount equal to an amount that in the Calculation Agent's judgment is representative for a single transaction in U.S. dollars in such market at such time (a "Representative Amount"). The Calculation Agent will request

the principal London office of each of such banks to provide a quotation of its rate. If at least two such quotations are provided, LIBOR will be the arithmetic mean of such quotations. If fewer than two quotations are provided, LIBOR for such interest period will be the arithmetic mean of the rates quoted at approximately 11:00 a.m., in New York City, on such Interest Determination Date by three major banks in New York City, selected by the Calculation Agent, for loans in U.S. dollars to leading European banks, for a term equal to the Index Maturity and in a Representative Amount; provided, however, that if fewer than three banks so selected by the Calculation Agent are providing such quotations, the then existing LIBOR rate will remain in effect for such Interest Payment Period.

"Designated LIBOR Page" means the display on the Reuters 3000 Xtra Service (or any successor service) on the "LIBOR01" page (or any other page as may replace such page on such service) for the purpose of displaying the London interbank rates of major banks.

*Prime Rate Notes*

"Prime Rate" means the rate on any Interest Determination Date as published in H.15(519) under the heading "Bank Prime Loan".

If the above rate is not published in H.15(519) prior to 3:00 p.m. on the Calculation Date, then the Prime Rate will be the rate on such Interest Determination Date as published in

H.15 Daily Update opposite the caption "Bank Prime Loan".

If the rate is not published prior to 3:00 p.m. on the Calculation Date in either H.15(519) or H, 15 Daily Update, then the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the rates of interest publicly announced by each bank that appears on the Reuters Screen US PRIME1 Page (as defined below) as such bank's prime rate or base lending rate as of 11:00 a.m., on that Interest Determination Date.

If fewer than four such rates referred to above are so published by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the prime rates or base lending rates quoted on the basis of the actual number of days in the year divided by 360 as of the close of business on such Interest Determination Date by three major banks in New York City selected by the Calculation Agent.

If the banks selected are not quoting as mentioned above, the Prime Rate will remain the Prime Rate in effect on such Interest Determination Date.

"Reuters Screen US PRIME1 Page" means the display designated as page "US PRIME1"

on the Reuters Monitor Money Rates Service (or such other page as may replace the US

PRIME1 page on that service for the purpose of displaying prime rates or base lending rates of major United States banks).

*Treasury Rate Notes "Treasury Rate" means:*

(1) the rate from the auction held on the Interest Determination Date (the "Auction") of direct obligations of the United States ("Treasury Bills") having the Index Maturity specified in the Supplement under the caption "INVEST RATE" on the display on the Reuters Page designated as USAUCTION10 (or any other page as may replace that page on that service)

or the Reuters Page designated as USAUCTION11 (or any other page as may replace that page on that service), or

(2) if the rate referred to in clause (1) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield (as defined below) of the rate for the applicable Treasury Bills as published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/Auction High", or

(3) if the rate referred to in clause (2) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield of the auction rate of the applicable Treasury Bills as announced by the United States Department of the Treasury, or

(4) if the rate referred to in clause (3) is not so announced by the United States Department of the Treasury, or if the Auction is not held, the Bond Equivalent Yield of the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H,15(519) under the caption "U.S. Government Securities/Treasury Bills/Secondary Market", or

(5) if the rate referred to in clause (4) is not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/Secondary Market", or

(6) if the rate referred to in clause (5) is not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date calculated by the Calculation Agent as the Bond Equivalent Yield of the arithmetic mean of the secondary market bid rates, as of approximately 3:30 p.m. on that Interest Determination Date, of three primary United States government securities dealers selected by the Calculation Agent, for the issue of Treasury Bills with a remaining maturity closest to the Index Maturity specified in the Supplement, or

(7) if the dealers so selected by the Calculation Agent are not quoting as mentioned in clause (6), the Treasury Rate in effect on the particular Interest Determination Date.

"Bond Equivalent Yield" means a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Bond Equivalent Yield} = \frac{D \times N}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for Treasury Bills quoted on a bank discount basis and expressed as a decimal, "N" refers to 365 or 366, as the case may be, and "M" refers to the actual number of days in the applicable Interest Reset Period.

3. <u>Final Maturity</u>. The Stated Maturity Date for any Note will be the date so specified in the Supplement, which shall be no later than 364 days from the date of issuance. On its Stated Maturity Date, or any date prior to the Stated Maturity Date on which the particular Note becomes due and payable by the declaration of acceleration, each such date being referred to as a Maturity Date, the principal amount of each Note, together with accrued and unpaid interest thereon, will be immediately due and payable,

4. <u>Events of Default</u>. The occurrence of any of the following shall constitute an "Event of Default" with respect to a Note: (i) default in any payment of principal of or interest on such Note

(including on a redemption thereof); (ii) the Issuer makes any compromise arrangement with its creditors generally including the entering into any form of moratorium with its creditors generally; (iii) a court having jurisdiction shall enter a decree or order for relief in respect of the Issuer in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or there shall be appointed a receiver, administrator, liquidator, custodian, trustee or sequestrator (or similar officer) with respect to the whole or substantially the whole of the assets of the Issuer and any such decree, order or appointment is not removed, discharged or withdrawn within 60 days thereafter; or (iv) the Issuer shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment of or taking possession by a receiver, administrator, liquidator, assignee, custodian, trustee or sequestrator (or similar official), with respect to the whole or substantially the whole of the assets of the Issuer or make any general assignment for the benefit of creditors, Upon the occurrence of an Event of Default, the principal of each obligation evidenced by such Note (together with interest accrued and unpaid thereon) shall become, without any notice or demand, immediately due and payable.[2]

5. <u>Obligation Absolute</u>. No provision of the Issuing and Paying Agency Agreement under which the Notes are issued shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on each Note at the times, place and rate, and in the coin or currency, herein prescribed.

6. <u>Supplement</u>. Any term contained in the Supplement shall supersede any conflicting term contained herein.

---

[2] Unlike single payment notes, where a default arises only at the stated maturity. interest-bearing notes with multiple payment dates should contain a default provision permitting acceleration of the maturity if the Issuer defaults on an interest payment.

Exhibit 10.7

**Commercial Paper Dealer Agreement**

**4(a)(2) Program**

Between:

**Cardinal Health, Inc**., as Issuer

and

**SunTrust Robinson Humphrey, Inc.**, as Dealer

Concerning Notes to be issued pursuant to an

Issuing and Paying Agency Agreement dated as of August 9, 2006,

as amended February 28, 2007 and November 22, 2016

between the Issuer and

The Bank of New York, as Issuing

and Paying Agent

Dated as of

November 22, 2016

**Commercial Paper Dealer Agreement**
**4(a)(2) Program**

This agreement (the "Agreement") sets forth the understandings between the Issuer and the Dealer, each named on the cover page hereof, in connection with the issuance and sale by the Issuer of its short-term promissory notes (the "Notes") through the Dealer.

Certain terms used in this Agreement are defined in Section 6 hereof.

The Addendum to this Agreement, and any Annexes or Exhibits described in this Agreement or such Addendum, are hereby incorporated into this Agreement and made fully a part hereof.

**1.      Offers, Sales and Resales of Notes.**

1.1      While (i) the Issuer has and shall have no obligation to sell the Notes to the Dealer or to permit the Dealer to arrange any sale of the Notes for the account of the Issuer, and (ii) the Dealer has and shall have no obligation to purchase the Notes from the Issuer or to arrange any sale of the Notes for the account of the Issuer, the parties hereto agree that in any case where the Dealer purchases Notes from the Issuer, or arranges for the sale of Notes by the Issuer, such Notes will be purchased or sold by the Dealer in reliance on the representations, warranties, covenants and agreements of the Issuer contained herein or made pursuant hereto and on the terms and conditions and in the manner provided herein,

1.2      So long as this Agreement shall remain in effect, and in addition to the limitations contained in Section 1.7 hereof, the Issuer shall not, without the consent of the Dealer, offer, solicit or accept offers to purchase, or sell, any Notes except (a) in transactions with one or more dealers which may from time to time after the date hereof become dealers with respect to the Notes by executing with the Issuer one or more agreements which contain provisions substantially identical to those contained in Section 1 of this Agreement, of which the Issuer hereby undertakes to provide the Dealer prompt notice or (b) in transactions with the other dealers listed on the Addendum hereto, which are executing agreements with the Issuer which contain provisions substantially identical to Section 1 of this Agreement contemporaneously herewith.  In no event shall the Issuer offer, solicit or accept offers to purchase, or sell, any Notes directly on its own behalf in transactions with persons other than broker-dealers as specifically permitted in this Section 1.2.

1.3      The Notes shall be in a minimum denomination of $250,000 or integral multiples of $1,000 in excess thereof, will bear such interest rates, if interest bearing, or will be sold at such discount from their face amounts, as shall be agreed upon by the Dealer and the Issuer, shall have a maturity not exceeding 364 days from the date of issuance and may have such terms as are specified in Exhibit C hereto or the Private Placement Memorandum.  The Notes shall not contain any provision for extension, renewal or automatic "rollover."

1.4      The authentication and issuance of, and payment for, the Notes shall be effected in accordance with the Issuing and Paying Agency Agreement, and the Notes shall be either individual physical certificates or book-entry notes evidenced by one or more master notes (each, a "Master Note") registered in the name of The Depository Trust Company ("DTC") or its nominee, in the form or forms annexed to the Issuing and Paying Agency Agreement.

1.5 If the Issuer and the Dealer shall agree on the terms of the purchase of any Note by the Dealer or the sale of any Note arranged by the Dealer (including, but not limited to, agreement with respect to the date of issue, purchase price, principal amount, maturity and interest rate or interest rate index and margin (in the case of interest-bearing Notes) or discount thereof (in the case of Notes issued on a discount basis), and appropriate compensation for the Dealer's services hereunder) pursuant to this Agreement, the Issuer shall cause such Note to be issued and delivered in accordance with the terms of the Issuing and Paying Agency Agreement and payment for such Note shall be made by the purchaser thereof, either directly or through the Dealer, to the Issuing and Paying Agent, for the account of the Issuer.  Except as otherwise agreed, in the event that the Dealer is acting as an agent and a purchaser shall either fail to accept delivery of or make payment for a Note on the date fixed for settlement, the Dealer shall promptly notify the Issuer, and if the Dealer has theretofore paid the Issuer for the Note, the Issuer will promptly return such funds to the Dealer against its return of the Note to the Issuer, in the case of a certificated Note, and upon notice of such failure in the case of a book-entry Note.  If such failure occurred for any reason other than default by the Dealer, the Issuer shall reimburse the Dealer on an equitable basis for the Dealer's loss of the use of such funds for the period such funds were credited to the Issuer's account,

1.6 The Dealer and the Issuer hereby establish and agree to observe the following procedures in connection with offers, sales and subsequent resales or other transfers of the Notes:

(a) Offers and sales of the Notes by or through the Dealer shall be made only to: (i) investors reasonably believed by the Dealer to be Qualified Institutional Buyers, Institutional Accredited Investors or Sophisticated Individual Accredited Investors and (ii) non-bank fiduciaries or agents that will be purchasing Notes for one or more accounts, each of which is reasonably believed by the Dealer to be an Institutional Accredited Investor or Sophisticated Individual Accredited Investor.

(b) Resales and other transfers of the Notes by the holders thereof shall be made only in accordance with the restrictions in the legend described in clause (e) below.

(c) No general solicitation or general advertising shall be used in connection with the offering of the Notes.  Without limiting the generality of the foregoing, without the prior written approval of the Dealer, the Issuer shall not issue any press release or place or publish any "tombstone" or other advertisement relating to the Notes.

(d) No sale of Notes to any one purchaser shall be for less than $250,000 principal or face amount, and no Note shall be issued in a smaller principal or face amount.  If the purchaser is a non-bank fiduciary acting on behalf of others, each person for whom such purchaser is acting must purchase at least $250,000 principal or face amount of Notes.

(e) Offers and sales of the Notes by the Issuer through the Dealer acting as agent for the Issuer shall be made in accordance with Section 4(a)(2) under the Securities Act, and shall be subject to the restrictions described in the legend appearing on Exhibit A hereto.  A legend substantially to the effect of such Exhibit A shall appear as part of the Private Placement Memorandum used in connection with offers and sales of Notes hereunder, as well as on each individual certificate representing a

Note and each Master Note representing book-entry Notes offered and sold pursuant to this Agreement.

(f)     The Dealer shall furnish or shall have furnished to each purchaser of Notes for which it has acted as the Dealer a copy of the then-current Private Placement Memorandum unless such purchaser has previously received a copy of the Private Placement Memorandum as then in effect.  The Private Placement Memorandum shall expressly state that any person to whom Notes are offered shall have an opportunity to ask questions of and receive information from, the Issuer and the Dealer and shall provide the names, addresses and telephone numbers of the persons from whom information regarding the Issuer may be obtained.

(g)     The Issuer agrees, for the benefit of the Dealer and each of the holders and prospective purchasers from time to time of the Notes that, if at any time the Issuer shall not be subject to Section 13 or 15(d) of the Exchange Act, the Issuer will furnish, upon request and at its expense, to the Dealer and to holders and prospective purchasers of Notes information required by Rule 144A(d)(4)(i) in compliance with Rule 144A(d).

(h)     In the event that any Note offered or to be offered by the Dealer would be ineligible for resale under Rule 144A, the Issuer shall immediately notify the Dealer (by telephone, confirmed in writing) of such fact and shall promptly prepare and deliver to the Dealer an amendment or supplement to the Private Placement Memorandum describing the Notes that are ineligible, the reason for such ineligibility and any other relevant information relating thereto.

(i)     The Issuer represents that it is not currently issuing commercial paper in the United States market in reliance upon the exemption provided by Section 3(a)(3) of the Securities Act.  The Issuer agrees that, if it shall issue commercial paper after the date hereof in reliance upon such exemption (a) the proceeds from the sale of the Notes will be segregated from the proceeds of the sale of any such commercial paper by being placed in a separate account; (b) the Issuer will institute appropriate corporate procedures to ensure that the offers and sales of notes issued by the Issuer pursuant to the Section 3(a)(3) exemption are not integrated with offerings and sales of Notes hereunder; and (c) the Issuer will comply with each of the requirements of Section 3(a)(3) of the Securities Act in selling commercial paper or other short-term debt securities other than the Notes in the United States.

(j)     The Issuer hereby agrees that, not later than 15 days after the first sale of Notes as contemplated by this Agreement, it will file with the SEC a notice on Form D in accordance with Rule 503 under the Securities Act and that it will thereafter file such amendments to such notice as Rule 503 may require.

1.7     The Issuer hereby represents and warrants to the Dealer, in connection with offers, sales and resales of Notes, as follows:

(a)     The Issuer hereby confirms to the Dealer that (except as permitted by Section 1.6 (i)) within the preceding six months neither the Issuer nor any person other than the Dealer or the other dealers referred to in Section 1.2 hereof acting on behalf of the Issuer has offered or sold any Notes, or any substantially similar security of the

Issuer (including, without limitation, medium-term notes issued by the Issuer), to, or solicited offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof. The Issuer also agrees that (except as permitted by Section 1.6(i)), as long as the Notes are being offered for sale by the Dealer and the other dealers referred to in Section 1.2 hereof as contemplated hereby and until at least six months after the offer of Notes hereunder has been terminated, neither the Issuer nor any person other than the Dealer or the other dealers referred to in Section 1.2 hereof (except as contemplated by Section 1.2 hereof) will offer the Notes or any substantially similar security of the Issuer for sale to, or solicit offers to buy any such security from, any person other than the Dealer or the other dealers referred to in Section 1.2 hereof, it being understood that such agreement is made with a view to bringing the offer and sale of the Notes within the exemption provided by Section 4(a)(2) of the Securities Act and shall survive any termination of this Agreement. The Issuer hereby represents and warrants that it has not taken or omitted to take, and will not take or omit to take, any action that would cause the offering and sale of Notes hereunder to be integrated with any other offering of securities, whether such offering is made by the Issuer or some other party or parties.

(b) The Issuer represents and agrees that the proceeds of the sale of the Notes are not currently contemplated to be used for the purpose of buying, carrying or trading securities within the meaning of Regulation T and the interpretations thereunder by the Board of Governors of the Federal Reserve System. In the event that the Issuer determines to use such proceeds for the purpose of buying, carrying or trading securities, whether in connection with an acquisition of another company or otherwise, the Issuer shall give the Dealer at least five business days' prior written notice to that effect. The Issuer shall also give the Dealer prompt notice of the actual date that it commences to purchase securities with the proceeds of the Notes. Thereafter, in the event that the Dealer purchases Notes as principal and does not resell such Notes on the day of such purchase, to the extent necessary to comply with Regulation T and the interpretations thereunder, the Dealer will sell such Notes either (i) only to offerees it reasonably believes to be Qualified Institutional Buyers or to Qualified Institutional Buyers it reasonably believes are acting for other Qualified Institutional Buyers, in each case in accordance with Rule 144A or (ii) in a manner which would not cause a violation of Regulation T and the interpretations thereunder.

**2. Representations and Warranties of Issuer.**

The Issuer represents and warrants that:

2.1 The Issuer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all the requisite power and authority to execute, deliver and perform its obligations under the Notes, this Agreement and the Issuing and Paying Agency Agreement.

2.2 This Agreement and the Issuing and Paying Agency Agreement have been duly authorized, executed and delivered by the Issuer and constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and

subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.3 The Notes have been duly authorized, and when issued as provided in the Issuing and Paying Agency Agreement, will be duly and validly issued and will constitute legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.4 The offer and sale of the Notes in the manner contemplated hereby do not require registration of the Notes under the Securities Act, pursuant to the exemption from registration contained in Section 4(a)(2) thereof, and no indenture in respect of the Notes is required to be qualified under the Trust Indenture Act of 1939, as amended.

2.5 The Notes will rank at least pari passu with all other unsecured and unsubordinated indebtedness of the Issuer.

2.6 Except as provided in Section 1.6(j) hereof, no consent or action of or filing or registration with, any governmental or public regulatory body or authority, including the SEC, is required to authorize, or is otherwise required in connection with the execution, delivery or performance of, this Agreement, the Notes or the Issuing and Paying Agency Agreement, except as may be required by the securities or Blue Sky laws of the various states in connection with the offer and sale of the Notes.

2.7 Neither the execution and delivery of this Agreement and the Issuing and Paying Agency Agreement, nor the issuance of the Notes in accordance with the Issuing and Paying Agency Agreement, nor the fulfillment of or compliance with the terms and provisions hereof or thereof by the Issuer, will (i) result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of the Issuer, or (ii) violate or result in a breach or a default under any of the terms of the Issuer's charter documents or by-laws, any contract or instrument to which the Issuer is a party or by which it or its property is bound, or any law or regulation, or any order, writ, injunction or decree of any court or government instrumentality, to which the Issuer is subject or by which it or its property is bound, which breach or default is reasonably expected to have a material adverse effect on the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.8 Except as disclosed in the Private Placement Memorandum, there is no litigation or governmental proceeding pending, or to the knowledge of the Issuer threatened, against or affecting the Issuer or any of its subsidiaries that is reasonably expected to result in a material adverse change in the financial condition, operations or business prospects of the Issuer or the ability of the Issuer to perform its obligations under this Agreement, the Notes or the Issuing and Paying Agency Agreement.

2.9 The Issuer is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.10    Neither the Private Placement Memorandum nor the Company Information contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

2.11    Each (a) issuance of Notes by the Issuer hereunder and (b) amendment or supplement of the Private Placement Memorandum shall be deemed a representation and warranty by the Issuer to the Dealer, as of the date thereof, that, both before and after giving effect to such issuance and after giving effect to such amendment or supplement, (i) the representations and warranties given by the Issuer set forth in this Section 2 remain true and correct on and as of such date as if made on and as of such date, (ii) in the case of an issuance of Notes, the Notes being issued on such date have been duly and validly issued and constitute legal, valid and binding obligations of the Issuer, enforceable against the Issuer in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and (iii) in the case of an issuance of Notes, since the date of the most recent Private Placement Memorandum, there has been no material adverse change in the financial condition, operations or business prospects of the Issuer which has not been disclosed to the Dealer in writing.

**3.      Covenants and Agreements of Issuer.**

The Issuer covenants and agrees that:

3.1    The Issuer will give the Dealer prompt notice (but in any event prior to any subsequent issuance of Notes hereunder) of any amendment to, modification of or waiver with respect to, the Notes or the Issuing and Paying Agency Agreement, including a complete copy of any such amendment, modification or waiver.

3.2    The Issuer shall, whenever there shall occur any change in the Issuer's financial condition, operations or business prospects or any development or occurrence in relation to the Issuer that would be material to holders of the Notes or potential holders of the Notes (including any downgrading or receipt of any written notice of intended downgrading or receipt of any written notice of review for potential change in the rating accorded any of the Issuer's securities by any nationally recognized statistical rating organization which has published a rating of the Notes), promptly, and in any event prior to any subsequent issuance of Notes hereunder, notify the Dealer (by telephone, confirmed in writing) of such change, development or occurrence.

3.3    The Issuer shall from time to time furnish to the Dealer such information as the Dealer may reasonably request, including, without limitation, any press releases or material provided by the Issuer to any national securities exchange, regarding (i) the Issuer's operations and financial condition, (ii) the due authorization and execution of the Notes and (iii) the Issuer's ability to pay the Notes as they mature.

3.4    The Issuer will take all such action as the Dealer may reasonably request to ensure that each offer and each sale of the Notes will comply with any applicable state Blue Sky laws; provided, however, that the Issuer shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation in any jurisdiction in which it is not

so qualified or subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

3.5     The Issuer will not be in default of any of its obligations hereunder, under the Notes or under the Issuing and Paying Agency Agreement, at any time that any of the Notes are outstanding.

3.6     The Issuer shall not issue Notes hereunder until the Dealer shall have received (a) an opinion of counsel to the Issuer, addressed to the Dealer, satisfactory in form and substance to the Dealer, (b) a copy of the executed Issuing and Paying Agency Agreement as then in effect, (c) a copy of resolutions adopted by the Board of Directors of the Issuer, satisfactory in form and substance to the Dealer and certified by the Secretary or similar officer of the Issuer, authorizing execution and delivery by the Issuer of this Agreement, the Issuing and Paying Agency Agreement and the Notes and consummation by the Issuer of the transactions contemplated hereby and thereby, (d) prior to the issuance of any book-entry Notes represented by a master note registered in the name of DTC or its nominee, a copy of the executed Letter of Representations among the Issuer, the Issuing and Paying Agent and DTC and of the executed master note, (e) prior to the issuance of any Notes in physical form, a copy of such form (unless attached to this Agreement or the Issuing and Paying Agency Agreement) and (f) such other certificates, opinions, letters and documents as the Dealer shall have reasonably requested.

3.7     The Issuer shall reimburse the Dealer for all of the Dealer's out-of-pocket expenses related to this Agreement, including expenses incurred in connection with its preparation and negotiation, and the transactions contemplated hereby (including, but not limited to, the printing and distribution of the Private Placement Memorandum), and, if applicable, for the reasonable fees and out-of-pocket expenses of the Dealer's counsel.

3.8     Without limiting any obligation of the Issuer pursuant to this Agreement to provide the Dealer with credit and financial information, the Issuer hereby acknowledges and agrees that the Dealer may share the Company Information and any other information or matters relating to the Issuer or the transactions contemplated hereby with affiliates of the Dealer, including, but not limited to, and that such affiliates may likewise share information relating to the Issuer or such transactions with the Dealer.

3.9     The Issuer shall not file a Form D (as referenced in Rule 503 under the Securities Act) at any time in respect of the offer or sale of the Notes.

**4.      Disclosure.**

4.1     The Private Placement Memorandum and its contents (other than the Dealer Information) shall be the sole responsibility of the Issuer.  The Private Placement Memorandum shall contain a statement expressly offering an opportunity for each prospective purchaser to ask questions of and receive answers from, the Issuer concerning the offering of Notes and to obtain relevant additional information which the Issuer possesses or can acquire without unreasonable effort or expense.

4.2     (a)      The Issuer further agrees to notify the Dealer promptly upon the occurrence of any event relating to or affecting the Issuer that would cause the Company Information then in existence to include an untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading.

(b)    In the event that the Issuer gives the Dealer notice pursuant to Section 4.2(a) and the Dealer notifies the Issuer that it then has Notes it is holding in inventory, the Issuer agrees promptly to supplement or amend the Private Placement Memorandum so that the Private Placement Memorandum, as amended or supplemented, shall not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and the Issuer shall make such supplement or amendment available to the Dealer.

(c)    In the event that (i) the Issuer gives the Dealer notice pursuant to Section 4.2(a), (ii) the Dealer does not notify the Issuer that it is then holding Notes in inventory and (iii) the Issuer chooses not to promptly amend or supplement the Private Placement Memorandum in the manner described in clause (b) above, then all solicitations and sales of Notes shall be suspended until such time as the Issuer has so amended or supplemented the Private Placement Memorandum, and made such amendment or supplement available to the Dealer.

**5.    Indemnification and Contribution.**

5.1    Unless prohibited by the Securities Act or the Exchange Act, or the rules and regulations of the SEC promulgated thereunder, the Issuer will indemnify and hold harmless the Dealer, each individual, corporation, partnership, trust, association or other entity controlling the Dealer, any affiliate of the Dealer or any such controlling entity and their respective directors, officers, employees, partners, incorporators, shareholders, servants, trustees and agents (hereinafter the "Indemnitees") against any and all liabilities, penalties, suits, causes of action, losses, damages, claims, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) or judgments of whatever kind or nature (each a "Claim"), imposed upon, incurred by or asserted against the Indemnitees arising out of or based upon (i) any allegation that the Private Placement Memorandum, the Company Information or any information provided by the Issuer to the Dealer included (as of any relevant time) or includes an untrue statement of a material fact or omitted (as of any relevant time) or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or (ii) arising out of or based upon the breach by the Issuer of any agreement, covenant or representation made in or pursuant to this Agreement which has a material adverse effect on the Dealer or the holders of the Notes.  This indemnification shall not apply to the extent that the Claim arises out of or is based upon Dealer Information or the gross negligence or willful misconduct of the Dealer in the performance of, or the failure to perform, its obligations under this Agreement.

5.2    Provisions relating to claims made for indemnification under this Section 5 are set forth on Exhibit B to this Agreement.

5.3    In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 5 is held to be unavailable or insufficient to hold harmless the Indemnitees, although applicable in accordance with the terms of this Section 5, the Issuer shall contribute to the aggregate costs incurred by the Dealer in

connection with any Claim in the proportion of the respective economic interests of the Issuer and the Dealer; provided, however, that such contribution by the Issuer shall be in an amount such that the aggregate costs incurred by the Dealer do not exceed the aggregate of the commissions and fees earned by the Dealer hereunder with respect to the issue or issues of Notes to which such Claim relates.  The respective economic interests shall be calculated by reference to the aggregate proceeds to the Issuer of the Notes issued hereunder and the aggregate commissions and fees earned by the Dealer hereunder.

**6.     Definitions.**

6.1     "Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

6.2     "Claim" shall have the meaning set forth in Section 5.1.

6.3     "Company Information" at any given time shall mean the Private Placement Memorandum together with, to the extent applicable, (i) the Issuer's most recent report on Form 10-K filed with the SEC and each report on Form 10-Q or 8-K filed by the Issuer with the SEC since the most recent Form 10-K, (ii) the Issuer's most recent annual audited financial statements and each interim financial statement or report prepared subsequent thereto, if not included in item (1) above, (iii) the Issuer's and its affiliates' other publicly available recent reports, including, but not limited to, any publicly available filings or reports provided to their respective shareholders, (iv) any other information or disclosure prepared pursuant to Section 4.3 hereof and (v) any information prepared or approved by the Issuer for dissemination to investors or potential investors in the Notes.

6.4     "Current Issuing and Paying Agent" shall have the meaning set forth in Section 7.10.

6.5     "Dealer Information" shall mean material concerning the Dealer provided by the Dealer in writing expressly for inclusion in the Private Placement Memorandum.

6.6     "Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended.

6.7     "Indemnitee" shall have the meaning set forth in Section 5.1.

6.8     "Institutional Accredited Investor" shall mean an institutional investor that is an accredited investor within the meaning of Rule 501 under the Securities Act and that has such knowledge and experience in financial and business matters that it is capable of evaluating and bearing the economic risk of an investment in the Notes, including, but not limited to, a bank, as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

6.9     "Issuing and Paying Agency Agreement" shall mean the issuing and paying agency agreement described on the cover page of this Agreement, or any such replacement thereof, as such agreement may be amended or supplemented from time to time.

6.10    "Issuing and Paying Agent" shall mean the party designated as such on the cover page of this Agreement, as issuing and paying agent under the Issuing and Paying Agency

Agreement, or any successor thereto or replacement thereof, in accordance with the Issuing and Paying Agency Agreement.

6.11   "Non-bank fiduciary or agent" shall mean a fiduciary or agent other than (a) a bank, as defined in Section 3(a)(2) of the Securities Act, or (b) a savings and loan association, as defined in Section 3(a)(5)(A) of the Securities Act.

6.12   "Private Placement Memorandum" shall mean offering materials prepared in accordance with Section 4 (including materials referred to therein or incorporated by reference therein, if any) provided to purchasers and prospective purchasers of the Notes, and shall include amendments and supplements thereto which may be prepared from time to time in accordance with this Agreement (other than any amendment or supplement that has been completely superseded by a later amendment or supplement),

6.13   "Qualified Institutional Buyer" shall have the meaning assigned to that term in Rule 144A under the Securities Act.

6.14   "Regulation D" shall mean Regulation D (Rules 501 et seq.) under the Securities Act.

6.15   "Replacement Issuing and Paying Agent" shall have the meaning set forth in Section 7.10 (i).

6.16   "Replacement Issuing and Paying Agency Agreement" shall have the meaning set forth in Section 7.10.

6.17   "Rule 144A" shall mean Rule 144A under the Securities Act.

6.18   "SEC" shall mean the U.S. Securities and Exchange Commission.

6.19   "Securities Act" shall mean the U.S. Securities Act of 1933, as amended.

6.20   "Sophisticated Individual Accredited Investor" shall mean an individual who (a) is an accredited investor within the meaning of Regulation D under the Securities Act and (b) based on his or her pre-existing relationship with the Dealer, is reasonably believed by the Dealer to be a sophisticated investor (i) possessing such knowledge and experience (or represented by a fiduciary or agent possessing such knowledge and experience) in financial and business matters that he or she is capable of evaluating and bearing the economic risk of an investment in the Notes and (ii) having not less than $5 million in investments (as defined, for purposes of this section, in Rule 2a51-1 under the Investment Company Act of 1940, as amended).

## 7.    General

7.1    Unless otherwise expressly provided herein, all notices under this Agreement to parties hereto shall be in writing and shall be effective when received at the address of the respective party set forth in the Addendum to this Agreement.

7.2    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.

7.3    The Issuer agrees that any suit, action or proceeding brought by the Issuer against the Dealer in connection with or arising out of this Agreement or the Notes or the offer and sale of the Notes shall be brought solely in the United States federal courts located in the Borough of Manhattan or the courts of the State of New York located in the Borough of Manhattan.  EACH OF THE DEALER AND THE ISSUER WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.4    This Agreement may be terminated, at any time, by the Issuer, upon one business day's prior notice to such effect to the Dealer, or by the Dealer upon one business day's prior notice to such effect to the Issuer.  Any such termination, however, shall not affect the obligations of the Issuer under Sections 3.7, 5 and 7.3 hereof or the respective representations, warranties, agreements, covenants, rights or responsibilities of the parties made or arising prior to the termination of this Agreement.

7.5    This Agreement is not assignable by either party hereto without the written consent of the other party; provided, however, that the Dealer may assign its rights and obligations under this Agreement to any affiliate of the Dealer.

7.6    This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

7.7    This Agreement is for the exclusive benefit of the parties hereto, and their respective permitted successors and assigns hereunder, and shall not be deemed to give any legal or equitable right, remedy or claim to any other person whatsoever.

7.8    The Issuer acknowledges and agrees that (i) the purchase and sale of the Notes pursuant to this Agreement is an arm's-length commercial transaction between the Issuer, on the one hand, and the Dealer, on the other, (ii) in connection therewith and with the process leading to such transaction the Dealer is acting solely as a principal and not the agent or fiduciary of the Issuer, (iii) the Dealer has not assumed an advisory or fiduciary responsibility in favor of the Issuer with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether the Dealer has advised or is currently advising the Issuer on other matters) or any other obligation to the Issuer except the obligations expressly set forth in this Agreement and (iv) the Issuer has consulted its own legal and financial advisors to the extent it deemed appropriate.  The Issuer agrees that it will not claim that the Dealer has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Issuer, in connection with such transaction or the process leading thereto.

7.9    In the case of any agreement by a Dealer to purchase a Note hereunder (other than as agent) which provides for a settlement date that is three Business Days or more after the date of such agreement, the obligation of the Dealer to purchase the Note under such agreement shall be subject to the following conditions:

    (a)    the representations and warranties given by the Issuer set forth above in Section 2 shall be true and correct on and as of the settlement date as if made on and as of such date, and the Issuer shall have performed all of its obligations hereunder to be performed as of such date,

(b)     since the date of the most recent Offering Materials, there shall have been no material adverse change in the condition (financial or otherwise), operations or business prospects of the Issuer (whether occurring before or after such agreement was entered into) which was not disclosed to the Dealer in writing prior to the time such agreement was entered into,

(c)     the Issuer shall not be in default of any of its obligations hereunder, under the Note or under the Issuing and Paying Agency Agreement.

(d)     on or after the date of such agreement there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading in the Issuer's securities on the New York Stock Exchange; (iii) a general moratorium in commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or services in the United States; (iv) the outbreak or escalation of emergency or war or (v) the occurrence of any other calamity or crisis or any change in financial, political or economic conditions in the United States or elsewhere, if the effect of any such event specified in clause (iv) or (v) in the reasonable judgment of the Dealer makes it impracticable or inadvisable to proceed with the offering or the delivery of the Note on the terms and in the amount contemplated in the Offering Materials.

(e)     on or after the date of such agreement (i) downgrading shall not have occurred in the rating accorded the Issuer's debt securities by any nationally recognized statistical rating organization and such organization shall not have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Issuer's debt securities.

7.10    The parties hereto agree that the Issuer may, in accordance with the terms of this Section 7.10, from time to time replace the party which is then acting as Issuing and Paying Agent (the "Current Issuing and Paying Agent") with another party (such other party, the "Replacement Issuing and Paying Agent"), and enter into an agreement with the Replacement Issuing and Paying Agent covering the provision of issuing and paying agency functions in respect of the Notes by the Replacement Issuing and Paying Agent (the "Replacement Issuing and Paying Agency Agreement") (any such replacement, a "Replacement").

From and after the effective date of any Replacement, except to the extent that the Issuing and Paying Agency Agreement provides that the Current Issuing and Paying Agent will continue to act in respect of Notes outstanding as of the effective date of such Replacement, the "Issuing and Paying Agent" for the Notes shall be deemed to be the Replacement Issuing and Paying Agent, all references to the "Issuing and Paying Agent" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agent, and all references to the "Issuing and Paying Agency Agreement" hereunder shall be deemed to refer to the Replacement Issuing and Paying Agency Agreement.

This Agreement supersedes all prior agreements and understandings (whether written or oral between the Issuer and the Dealer, or any of them, with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date and year first above.

**Cardinal Health, Inc., as Issuer**


**Cardinal Health, Inc., as Issuer**

By:  /s/ Sam Samad

Name:  Sam Samad

Title:  Treasurer

**SunTrust Robinson Humphrey Inc., as Dealer**

By:  /s/ Robert Nordlinger

Name:  Robert Nordlinger

Title:  Executive Director

Addendum

The following additional clauses shall apply to the Agreement and be deemed a part thereof,

1.      The other dealers referred to in clause (b) of Section 1.2 of the Agreement are Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wells Fargo Securities, LLC, Goldman Sachs & Co. and J.P. Morgan Securities LLC.

2.      The addresses of the respective parties for the purposes of notices under Section 7.1 are as follows:

For the Issuer:

Address: Cardinal Health, Inc., 7000 Cardinal Place, Dublin, Ohio 43017
Attention: Scott Zimmerman, Assistant Treasurer
Telephone:      (###) ###-####

For the Dealer:

Address: 3333 Peachtree Road N.E. - 11th Floor

        Atlanta, GA 30326
Attention: Commercial Paper Desk
Telephone Number:      (###) ###-####
Fax Number: (###) ###-####

**Exhibit A**

**Form of Legend for Private Placement Memorandum and Notes**

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE SECURITIES LAW, AND OFFERS AND SALES THEREOF MAY BE MADE ONLY IN COMPLIANCE WITH AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.  BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER WILL BE DEEMED TO REPRESENT THAT (I) IT HAS BEEN AFFORDED AN OPPORTUNITY TO INVESTIGATE MATTERS RELATING TO THE ISSUER AND THE NOTES, (II) IT IS NOT ACQUIRING SUCH NOTE WITH A VIEW TO ANY DISTRIBUTION THEREOF AND (III) IT IS EITHER (A)(1) AN INSTITUTIONAL INVESTOR OR SOPHISTICATED INDIVIDUAL INVESTOR THAT IS AN ACCREDITED INVESTOR WITHIN THE MEANING OF RULE 501(a) UNDER THE ACT AND WHICH, IN THE CASE OF AN INDIVIDUAL, (i) POSSESSES SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT HE OR SHE IS CAPABLE OF EVALUATING AND BEARING THE ECONOMIC RISK OF AN INVESTMENT IN THE NOTES AND (ii) HAD NOT LESS THAN $5 MILLION IN INVESTMENTS (AN "INSTITUTIONAL ACCREDITED INVESTOR" OR "SOPHISTICATED INDIVIDUAL ACCREDITED INVESTOR", RESPECTIVELY) AND (2)(i) PURCHASING NOTES FOR ITS OWN ACCOUNT, (ii) A BANK (AS DEFINED IN SECTION 3(a)(2) OF THE ACT) OR A SAVINGS AND LOAN ASSOCIATION OR OTHER INSTITUTION (AS DEFINED IN SECTION 3(a)(5)(A) OF THE ACT) ACTING IN ITS INDIVIDUAL OR FIDUCIARY CAPACITY OR (iii) A FIDUCIARY OR AGENT (OTHER THAN A U.S. BANK OR SAVINGS AND LOAN ASSOCIATION) PURCHASING NOTES FOR ONE OR MORE ACCOUNTS EACH OF WHICH ACCOUNTS IS SUCH AN INSTITUTIONAL ACCREDITED INVESTOR OR SOPHISTICATED INDIVIDUAL; OR (B) A QUALIFIED INSTITUTIONAL BUYER ("QIB") WITHIN THE MEANING OF RULE 144A UNDER THE ACT THAT IS ACQUIRING NOTES FOR ITS OWN ACCOUNT OR FOR ONE OR MORE ACCOUNTS, EACH OF WHICH ACCOUNTS IS A QIB; AND THE PURCHASER ACKNOWLEDGES THAT IT IS AWARE THAT THE SELLER MAY RELY UPON THE EXEMPTION FROM THE REGISTRATION PROVISIONS OF SECTION 5 OF THE ACT PROVIDED BY RULE 144A.  BY ITS ACCEPTANCE OF A NOTE, THE PURCHASER THEREOF SHALL ALSO BE DEEMED TO AGREE THAT ANY RESALE OR OTHER TRANSFER THEREOF WILL BE MADE ONLY (A) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE ACT, EITHER (1) TO THE ISSUER OR TO A PLACEMENT AGENT DESIGNATED BY THE ISSUER AS A PLACEMENT AGENT FOR THE NOTES (COLLECTIVELY, THE "PLACEMENT AGENTS"), NONE OF WHICH SHALL HAVE ANY OBLIGATION TO ACQUIRE SUCH NOTE, (2) THROUGH A PLACEMENT AGENT TO AN INSTITUTIONAL ACCREDITED INVESTOR, SOPHISTICATED INDIVIDUAL ACCREDITED INVESTOR OR A QIB, OR (3) TO A QIB IN A TRANSACTION THAT MEETS THE REQUIREMENTS OF RULE 144A AND (B) IN MINIMUM AMOUNTS OF $250,000.

**Exhibit B**

**Further Provisions Relating to Indemnification**

(a)  The Issuer agrees to reimburse each Indemnitee for all expenses (including reasonable fees and disbursements of internal and external counsel) as they are incurred by it in connection with investigating or defending any loss, claim, damage, liability or action in respect of which indemnification may be sought under Section 5 of the Agreement (whether or not it is a party to any such proceedings) provided, however, that if it is found in any such action, proceeding or investigation that any loss, claim, damage or liability of an Indemnitee has resulted from the Dealer Information or the gross negligence or willful misconduct of the Indemnitee in performing the services that are the subject of this Agreement, the Indemnitee shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of the Indemnitee which is the subject of such finding.

(b)  Promptly after receipt by an Indemnitee of notice of the existence of a Claim, such Indemnitee will, if a claim in respect thereof is to be made against the Issuer, notify the Issuer in writing of the existence thereof; provided that (i) the omission so to notify the Issuer will not relieve the Issuer from any liability which it may have hereunder unless and except to the extent it did not otherwise learn of such Claim and such failure results in the forfeiture by the Issuer of substantial rights and defenses, and (ii) the omission so to notify the Issuer will not relieve it from liability which it may have to an Indemnitee otherwise than on account of this indemnity agreement.  In case any such Claim is made against any Indemnitee and it notifies the Issuer of the existence thereof, the Issuer will be entitled to participate therein, and to the extent that it may elect by written notice delivered to the Indemnitee, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnitee; provided that if the defendants in any such Claim include both the Indemnitee and the Issuer, and the Indemnitee shall have concluded that there may be legal defenses available to it which are different from or additional to those available to the Issuer, the Issuer shall not have the right to direct the defense of such Claim on behalf of such Indemnitee, and the Indemnitee shall have the right to select separate counsel to assert such legal defenses on behalf of such Indemnitee.  Upon receipt of notice from the Issuer to such Indemnitee of the Issuer's election so to assume the defense of such Claim and approval by the Indemnitee of counsel, the Issuer will not be liable to such Indemnitee for expenses incurred thereafter by the Indemnitee in connection with the defense thereof (other than reasonable costs of investigation) unless (i) the Indemnitee shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Issuer shall not be liable for the expenses of more than one separate counsel (in addition to any local counsel in the jurisdiction in which any Claim is brought), approved by the Dealer, representing the Indemnitee who is party to such Claim), (ii) the Issuer shall not have employed counsel reasonably satisfactory to the Indemnitee to represent the Indemnitee within a reasonable time after notice of existence of the Claim or (iii) the Issuer has authorized in writing the employment of counsel for the Indemnitee.  The indemnity, reimbursement and contribution obligations of the Issuer hereunder shall be in addition to any other liability the Issuer may otherwise have to an Indemnitee and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Issuer and any Indemnitee.  The Issuer agrees that without the Dealer's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any Claim in respect of which indemnification may be sought under the indemnification provision of the Agreement (whether or not the Dealer or any other Indemnitee is an actual or potential party to such Claim), unless such settlement, compromise or consent (i) includes an unconditional release of

each Indemnitee from all liability arising out of such Claim and (ii) does not include a statement as to or an admission of fault, culpability or failure to act, by or on behalf of any Indemnitee.

**Exhibit C**

**Statement of Terms for Interest — Bearing Commercial Paper Notes of [Name of Issuer]**

**THE PROVISIONS SET FORTH BELOW ARE QUALIFIED TO THE EXTENT APPLICABLE BY THE TRANSACTION SPECIFIC 'PRICING' 'PRIVATE PLACEMENT MEMORANDUM' SUPPLEMENT (THE "SUPPLEMENT") (IF ANY) SENT TO EACH PURCHASER AT THE TIME OF THE TRANSACTION.**

1. <u>General</u>.  (a) The obligations of the Issuer to which these terms apply (each a "Note") are represented by one or more Master Notes (each, a "Master Note") issued in the name of (or of a nominee for) The Depository Trust Company ("DTC"), which Master Note includes the terms and provisions for the Issuer's Interest-Bearing Commercial Paper Notes that are set forth in this Statement of Terms, since this Statement of Terms constitutes an integral part of the Underlying Records as defined and referred to in the Master Note.

   (b) "Business Day" means any day other than a Saturday or Sunday that is neither a legal holiday nor a day on which banking institutions are authorized or required by law, executive order or regulation to be closed in New York City and, with respect to LIBOR Notes (as defined below) is also a London Business Day.  "London Business Day" means, a day, other than a Saturday or Sunday, on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

2. <u>Interest</u>. (a) Each Note will bear interest at a fixed rate (a "Fixed Rate Note") or at a floating rate (a "Floating Rate Note").

   (b)     The Supplement sent to each holder of such Note will describe the following terms: (i) whether such Note is a Fixed Rate Note or a Floating Rate Note and whether such Note is an Original Issue Discount Note (as defined below); (ii) the date on which such Note will be issued (the "Issue Date"); (iii) the Stated Maturity Date (as defined below); (iv) if such Note is a Fixed Rate Note, the rate per annum at which such Note will bear interest, if any, and the Interest Payment Dates; (v) if such Note is a Floating Rate Note, the Base Rate, the Index Maturity, the Interest Reset Dates, the Interest Payment Dates and the Spread and/or Spread Multiplier, if any (all as defined below), and any other terms relating to the particular method of calculating the interest rate for such Note; and (vi) any other terms applicable specifically to such Note.  "Original Issue Discount Note" means a Note which has a stated redemption price at the Stated Maturity Date that exceeds its Issue Price by more than a specified de minimis amount and which the Supplement indicates will be an "Original Issue Discount Note".

   (c)     Each Fixed Rate Note will bear interest from its Issue Date at the rate per annum specified in the Supplement until the principal amount thereof is paid or made available for payment. Interest on each Fixed Rate Note will be payable on the dates specified in the Supplement (each an "Interest Payment Date" for a Fixed Rate Note) and on the Maturity Date (as defined below). Interest on Fixed Rate Notes will be computed on the basis of a 360-day year of twelve 30-day months.

   If any Interest Payment Date or the Maturity Date of a Fixed Rate Note falls on a day that is not a Business Day, the required payment of principal, premium, if any, and/or interest will be payable on the next succeeding Business Day, and no additional interest will accrue in respect of the payment made on that next succeeding Business Day.

(d)     The interest rate on each Floating Rate Note for each Interest Reset Period (as defined below) will be determined by reference to an interest rate basis (a "Base Rate") plus or minus a number of basis points (one basis point equals one-hundredth of a percentage point) (the "Spread"), if any, and/or multiplied by a certain percentage (the "Spread Multiplier"), if any, until the principal thereof is paid or made available for payment.  The Supplement will designate which of the following Base Rates is applicable to the related Floating Rate Note: (a) the CD Rate (a "CD Rate Note"), (b) the Commercial Paper Rate (a "Commercial Paper Rate Note"), (c) the Federal Funds Rate (a "Federal Funds Rate Note"), (d) LIBOR (a "LIBOR Note"), (e) the Prime Rate (a "Prime Rate Note"), (f) the Treasury Rate (a "Treasury Rate Note") or (g) such other Base Rate as may be specified in such Supplement.

The rate of interest on each Floating Rate Note will be reset daily, weekly, monthly, quarterly or semiannually (the "Interest Reset Period").  The date or dates on which interest will be reset (each an "Interest Reset Date") will be, unless otherwise specified in the Supplement, in the case of Floating Rate Notes which reset daily, each Business Day, in the case of Floating Rate Notes (other than Treasury Rate Notes) that reset weekly, the Wednesday of each week; in the case of Treasury Rate Notes that reset weekly, the Tuesday of each week; in the case of Floating Rate Notes that reset monthly, the third Wednesday of each month; in the case of Floating Rate Notes that reset quarterly, the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes that reset semiannually, the third Wednesday of the two months specified in the Supplement.  If any Interest Reset Date for any Floating Rate Note is not a Business Day, such Interest Reset Date will be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Reset Date shall be the immediately preceding Business Day.  Interest on each Floating Rate Note will be payable monthly, quarterly or semiannually (the "Interest Payment Period") and on the Maturity Date.  Unless otherwise specified in the Supplement, and except as provided below, the date or dates on which interest will be payable (each an "Interest Payment Date" for a Floating Rate Note) will be, in the case of Floating Rate Notes with a monthly Interest Payment Period, on the third Wednesday of each month; in the case of Floating Rate Notes with a quarterly Interest Payment Period, on the third Wednesday of March, June, September and December; and in the case of Floating Rate Notes with a semiannual Interest Payment Period, on the third Wednesday of the two months specified in the Supplement.  In addition, the Maturity Date will also be an Interest Payment Date.

If any Interest Payment Date for any Floating Rate Note (other than an Interest Payment Date occurring on the Maturity Date) would otherwise be a day that is not a Business Day, such Interest Payment Date shall be postponed to the next day that is a Business Day, except that in the case of a LIBOR Note, if such Business Day is in the next succeeding calendar month, such Interest Payment Date shall be the immediately preceding Business Day.  If the Maturity Date of a Floating Rate Note falls on a day that is not a Business Day, the payment of principal and interest will be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after such maturity.

Interest payments on each Interest Payment Date for Floating Rate Notes will include accrued interest from and including the Issue Date or from and including the last date in respect of which interest has been paid, as the case may be, to, but excluding, such Interest Payment Date.  On the Maturity Date, the interest payable on a Floating Rate Note will include interest accrued to, but excluding, the Maturity Date.  Accrued interest will be calculated by multiplying the principal amount of a Floating Rate Note by an accrued interest factor.  This accrued interest factor will be

computed by adding the interest factors calculated for each day in the period for which accrued interest is being calculated. The interest factor (expressed as a decimal) for each such day will be computed by dividing the interest rate applicable to such day by 360, in the cases where the Base Rate is the CD Rate, Commercial Paper Rate, Federal Funds Rate, LIBOR or Prime Rate, or by the actual number of days in the year, in the case where the Base Rate is the Treasury Rate. The interest rate in effect on each day will be (I) if such day is an Interest Reset Date, the interest rate with respect to the Interest Determination Date (as defined below) pertaining to such Interest Reset Date, or (ii) if such day is not an Interest Reset Date, the interest rate with respect to the Interest Determination Date pertaining to the next preceding Interest Reset Date, subject in either case to any adjustment by a Spread and/or a Spread Multiplier.

The "Interest Determination Date" where the Base Rate is the CD Rate or the Commercial Paper Rate will be the second Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is the Federal Funds Rate or the Prime Rate will be the Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is LIBOR will be the second London Business Day next preceding an Interest Reset Date. The Interest Determination Date where the Base Rate is the Treasury Rate will be the day of the week in which such Interest Reset Date falls when Treasury Bills are normally auctioned. Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is held on the following Tuesday or the preceding Friday. If an auction is so held on the preceding Friday, such Friday will be the Interest Determination Date pertaining to the Interest Reset Date occurring in the next succeeding week.

The "Index Maturity" is the period to maturity of the instrument or obligation from which the applicable Base Rate is calculated.

The "Calculation Date," where applicable, shall be the earlier of (i) the tenth calendar day following the applicable Interest Determination Date or (ii) the Business Day preceding the applicable Interest Payment Date or Maturity Date.

All times referred to herein reflect New York City time, unless otherwise specified.

The Issuer shall specify in writing to the Issuing and Paying Agent which party will be the calculation agent (the "Calculation Agent") with respect to the Floating Rate Notes. The Calculation Agent will provide the interest rate then in effect and, if determined, the interest rate which will become effective on the next Interest Reset Date with respect to such Floating Rate Note to the Issuing and Paying Agent as soon as the interest rate with respect to such Floating Rate Note has been determined and as soon as practicable after any change in such interest rate.

All percentages resulting from any calculation on Floating Rate Notes will be rounded to the nearest one hundred-thousandth of a percentage point, with five-one millionths of a percentage point rounded upwards. For example, 9,876545% (or .09876545) would be rounded to 9.87655% (or .0987655). All dollar amounts used in or resulting from any calculation on Floating Rate Notes will be rounded, in the case of U.S. dollars, to the nearest cent or, in the case of a foreign currency, to the nearest unit (with one-half cent or unit being rounded upwards).

*CD Rate Notes*

"CD Rate" means the rate on any Interest Determination Date for negotiable certificates of deposit having the Index Maturity as published by the Board of Governors of the Federal Reserve System (the "FRB") in "Statistical Release H.15(519), Selected Interest Rates" or any successor publication of the FRB ("H.15(519)") under the heading "CDs (Secondary Market)".

If the above rate is not published in H.15(519) by 3:00 p.m. on the Calculation Date, the CD Rate will be the rate on such Interest Determination Date set forth in the daily update of H.15(519), available through the world wide website of the FRB at http://www.federalreserve.gov/releases/h15/Update, or any successor site or publication or other recognized electronic source used for the purpose of displaying the applicable rate ("H.15 Daily Update") under the caption "CDs (Secondary Market)".

If such rate is not published in either H.15(519) or H.15 Daily Update by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the CD Rate to be the arithmetic mean of the secondary market offered rates as of 10:00 a.m. on such Interest Determination Date of three leading nonbank dealers[1] in negotiable U.S. dollar certificates of deposit in New York City selected by the Calculation Agent for negotiable U.S. dollar certificates of deposit of major United States money center banks of the highest credit standing in the market for negotiable certificates of deposit with a remaining maturity closest to the Index Maturity in the denomination of $5,000,000.

If the dealers selected by the Calculation Agent are not quoting as set forth above, the CD Rate will remain the CD Rate then in effect on such Interest Determination Date.

*Commercial Paper Rate Notes*

"Commercial Paper Rate" means the Money Market Yield (calculated as described below) of the rate on any Interest Determination Date for commercial paper having the Index Maturity, as published in H.15(519) under the heading "Commercial Paper-Nonfinancial".  If the above rate is not published in H.15(519) by 3:00 p.m. on the Calculation Date, then the Commercial Paper Rate will be the Money Market Yield of the rate on such Interest Determination Date for commercial paper of the Index Maturity as published in H.15 Daily Update under the heading "Commercial Paper-Nonfinancial".

If by 3:00 p.m. on such Calculation Date such rate is not published in either H.15(519) or H.15 Daily Update, then the Calculation Agent will determine the Commercial Paper Rate to be the Money Market Yield of the arithmetic mean of the offered rates as of 11:00 a.m. on such Interest Determination Date of three leading dealers of U.S. dollar commercial paper in New York City selected by the Calculation Agent for commercial paper of the Index Maturity placed for an industrial issuer whose bond rating is "AA," or the equivalent, from a nationally recognized statistical rating organization.

If the dealers selected by the Calculation Agent are not quoting as mentioned above, the Commercial Paper Rate with respect to such Interest Determination Date will remain the Commercial Paper Rate then in effect on such Interest Determination Date.

"Money Market Yield" will be a yield calculated in accordance with the following formula:

$$\text{Money Market Yield} = \frac{D \times 360}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for commercial paper quoted on a bank discount basis and expressed as a decimal and "M" refers to the actual number of days in the interest period for which interest is being calculated.

*Federal Funds Rate Notes*

"Federal Funds Rate" means the rate on any Interest Determination Date for federal funds as published in 1-1.15(519) under the heading "Federal Funds (Effective)" and displayed on Moneyline Telerate (or any successor service) on page 120 (or any other page as may replace the specified page on that service) ("Telerate Page 120").

If the above rate does not appear on Telerate Page 120 or is not so published by 3:00 p.m. on the Calculation Date, the Federal Funds Rate will be the rate on such Interest Determination Date as published in II.15 Daily Update under the heading "Federal Funds/(Effective)".

If such rate is not published as described above by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Federal Funds Rate to be the arithmetic mean of the rates for the last transaction in overnight U.S. dollar federal funds arranged by each of three leading brokers of Federal Funds transactions in New York City selected by the Calculation Agent prior to 9:00 a.m. on such Interest Determination Date.

If the brokers selected by the Calculation Agent are not quoting as mentioned above, the Federal Funds Rate will remain the Federal Funds Rate then in effect on such Interest Determination Date.

*LIBOR Notes*

The London Interbank offered rate ("LIBOR") means, with respect to any Interest Determination Date, the rate for deposits in U.S. dollars having the Index Maturity that appears on the Designated LIBOR Page as of 11:00 a.m., London time, on such Interest Determination Date.

If no rate appears, LIBOR will be determined on the basis of the rates at approximately 11:00 a.m., London time, on such Interest Determination Date at which deposits in U.S. dollars are offered to prime banks in the London interbank market by four major banks in such market selected by the Calculation Agent for a term equal to the Index Maturity and in principal amount equal to an amount that in the Calculation Agent's judgment is representative for a single transaction in U.S. dollars in such market at such time (a "Representative Amount"). The Calculation Agent will request the principal London office of each of such banks to provide a quotation of its rate. If at least two such quotations are provided, LIBOR will be the arithmetic mean of such quotations. If fewer than two quotations are provided, LIBOR for such interest period will be the arithmetic mean of the rates quoted at approximately 11:00 a.m., in New York City, on such Interest Determination Date by three major banks in New York City, selected by the Calculation Agent, for loans in U.S. dollars to leading European banks, for a term equal to the Index Maturity and in a Representative Amount; provided, however, that if fewer than three banks so selected by the Calculation Agent are providing such quotations, the then existing LIBOR rate will remain in effect for such Interest Payment Period.

"Designated LIBOR Page" means the display designated as page "3750" on Moneyline Telerate (or such other page as may replace the 3750 page on that service or such other service or services as may be nominated by the British Bankers' Association for the purposes of displaying London interbank offered rates for U.S. dollar deposits).

*Prime Rate Notes*

"Prime Rate" means the rate on any Interest Determination Date as published in H.15(519) under the heading "Bank Prime Loan".

If the above rate is not published in H.15(519) prior to 3:00 p.m. on the Calculation Date, then the Prime Rate will be the rate on such Interest Determination Date as published in H.15 Daily Update opposite the caption "Bank Prime Loan".

If the rate is not published prior to 3:00 p.m. on the Calculation Date in either H.15(519) or H, 15 Daily Update, then the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the rates of interest publicly announced by each bank that appears on the Reuters Screen US PRIME! Page (as defined below) as such bank's prime rate or base lending rate as of 11:00 a.m., on that Interest Determination Date.

If fewer than four such rates referred to above are so published by 3:00 p.m. on the Calculation Date, the Calculation Agent will determine the Prime Rate to be the arithmetic mean of the prime rates or base lending rates quoted on the basis of the actual number of days in the year divided by 360 as of the close of business on such Interest Determination Date by three major banks in New York City selected by the Calculation Agent.

If the banks selected are not quoting as mentioned above, the Prime Rate will remain the Prime Rate in effect on such Interest Determination Date.

"Reuters Screen US PRIME1 Page" means the display designated as page "US PRIME1" on the Reuters Monitor Money Rates Service (or such other page as may replace the US PRIME1 page on that service for the purpose of displaying prime rates or base lending rates of major United States banks).

*Treasury Rate Notes "Treasury Rate" means:*

 (1) the rate from the auction held on the Interest Determination Date (the "Auction") of direct obligations of the United States ("Treasury Bills") having the Index Maturity specified in the Supplement under the caption "INVESTMENT RATE" on the display on Moneyline Telerate (or any successor service) on page 56 (or any other page as may replace that page on that service) ("Telerate Page 56") or page 57 (or any other page as may replace that page on that service) ("Telerate Page 57"), or

 (2) if the rate referred to in clause (1) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield (as defined below) of the rate for the applicable Treasury Bills as published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/ Auction High", or

 (3) if the rate referred to in clause (2) is not so published by 3:00 p.m. on the related Calculation Date, the Bond Equivalent Yield of the auction rate of the applicable Treasury Bills as announced by the United States Department of the Treasury, or

 (4) if the rate referred to in clause (3) is not so announced by the United States Department of the Treasury, or if the Auction is not held, the Bond Equivalent Yield of the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H,15(519) under the caption "U.S. Government Securities/Treasury Bills/Secondary Market", or

(5) if the rate referred to in clause (4) is not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date of the applicable Treasury Bills as published in H.15 Daily Update, under the caption "U.S. Government Securities/Treasury Bills/ Secondary Market", or

(6) if the rate referred to in clause (5) is not so published by 3:00 p.m. on the related Calculation Date, the rate on the particular Interest Determination Date calculated by the Calculation Agent as the Bond Equivalent Yield of the arithmetic mean of the secondary market bid rates, as of approximately 3:30 p.m. on that Interest Determination Date, of three primary United States government securities dealers selected by the Calculation Agent, for the issue of Treasury Bills with a remaining maturity closest to the Index Maturity specified in the Supplement, or

(7) if the dealers so selected by the Calculation Agent are not quoting as mentioned in clause (6), the Treasury Rate in effect on the particular Interest Determination Date.

"Bond Equivalent Yield" means a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Bond Equivalent Yield} = \frac{D \times N}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for Treasury Bills quoted on a bank discount basis and expressed as a decimal, "N" refers to 365 or 366, as the case may be, and "M" refers to the actual number of days in the applicable Interest Reset Period.

3. <u>Final Maturity</u>. The Stated Maturity Date for any Note will be the date so specified in the Supplement, which shall be no later than 364 days from the date of issuance. On its Stated Maturity Date, or any date prior to the Stated Maturity Date on which the particular Note becomes due and payable by the declaration of acceleration, each such date being referred to as a Maturity Date, the principal amount of each Note, together with accrued and unpaid interest thereon, will be immediately due and payable,

4. <u>Events of Default</u>. The occurrence of any of the following shall constitute an "Event of Default" with respect to a Note: (i) default in any payment of principal of or interest on such Note (including on a redemption thereof); (ii) the Issuer makes any compromise arrangement with its creditors generally including the entering into any form of moratorium with its creditors generally; (iii) a court having jurisdiction shall enter a decree or order for relief in respect of the Issuer in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or there shall be appointed a receiver, administrator, liquidator, custodian, trustee or sequestrator (or similar officer) with respect to the whole or substantially the whole of the assets of the Issuer and any such decree, order or appointment is not removed, discharged or withdrawn within 60 days thereafter; or (iv) the Issuer shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment of or taking possession by a receiver, administrator, liquidator, assignee, custodian, trustee or sequestrator (or similar official), with respect to the whole or substantially the whole of the assets of the Issuer or make any general assignment for the benefit of creditors, Upon the occurrence of

an Event of Default, the principal of each obligation evidenced by such Note (together with interest accrued and unpaid thereon) shall become, without any notice or demand, immediately due and payable. [2]

5. <u>Obligation Absolute</u>.  No provision of the Issuing and Paying Agency Agreement under which the Notes are issued shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on each Note at the times, place and rate, and in the coin or currency, herein prescribed.

6. <u>Supplement</u>.  Any term contained in the Supplement shall supercede any conflicting term contained herein.

---

[2]  Unlike single payment notes, where a default arises only at the stated maturity. interest-bearing notes with multiple payment dates should contain a default provision permitting acceleration of the maturity if the Issuer defaults on an interest payment.

Exhibit 12.1

## Computation of Ratio of Earnings to Fixed Charges

| (in millions, except ratios) | Fiscal Year Ended June 30, | | | | | Six Months Ended December 31, 2016 |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | |
| Earnings from continuing operations before income taxes | $ 1,698.1 | $ 888.3 | $ 1,798.3 | $ 1,967.3 | $ 2,275.6 | $ 984.9 |
| **Plus fixed charges:** | | | | | | |
| Interest expense | 92.3 | 119.2 | 129.4 | 137.0 | 178.2 | 87.1 |
| Capitalized interest | 6.0 | 1.7 | 1.2 | 1.8 | 5.6 | 4.7 |
| Amortization of debt offering costs | 2.8 | 3.5 | 3.6 | 7.6 | 5.6 | 3.3 |
| Interest portion of rent expense | 7.8 | 8.3 | 9.8 | 9.6 | 11.5 | 6.5 |
| **Fixed charges** | 108.9 | 132.7 | 144.0 | 156.0 | 200.9 | 101.6 |
| Plus: amortization of capitalized interest | 3.2 | 3.4 | 2.9 | 2.4 | 2.5 | 1.6 |
| Less: capitalized interest | (6.0) | (1.7) | (1.2) | (1.8) | (5.6) | (4.7) |
| **Earnings** | $ 1,804.2 | $ 1,022.7 | $ 1,944.0 | $ 2,123.9 | $ 2,473.4 | $ 1,083.4 |
| **Ratio of earnings to fixed charges (1)** | 16.6 | 7.7 | 13.5 | 13.6 | 12.3 | 10.7 |

(1)  The ratio of earnings to fixed charges is computed by dividing fixed charges into earnings from continuing operations before income taxes plus fixed charges and capitalized interest. Fixed charges include interest expense, amortization of debt offering costs and the portion of rent expense that is deemed to be representative of the interest factor. Interest expense recorded on tax exposures has been recorded in income tax expense and has therefore been excluded from the calculation.

Exhibit 31.1

I, George S. Barrett, certify that:

1. I have reviewed this Form 10-Q of Cardinal Health, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 7, 2017

/s/ GEORGE S. BARRETT
_____
George S. Barrett
Chairman and Chief Executive Officer

Exhibit 31.2

I, Michael C. Kaufmann, certify that:

1.  I have reviewed this Form 10-Q of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 7, 2017

/s/ MICHAEL C. KAUFMANN
Michael C. Kaufmann
Chief Financial Officer

Exhibit 32.6

**Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Each of George S. Barrett, Chairman and Chief Executive Officer of Cardinal Health, Inc. (the "Company"), and Michael C. Kaufmann, Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)     the Quarterly Report on Form 10-Q for the quarter ended December 31, 2016 containing the financial statements of the Company (the "Periodic Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 7, 2017

/s/ GEORGE S. BARRETT
_____
George S. Barrett
Chairman and Chief Executive Officer


/s/ MICHAEL C. KAUFMANN
_____
Michael C. Kaufmann
Chief Financial Officer

## Statement Regarding Forward-Looking Information

As used in this exhibit, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K"), our quarterly reports on Form 10-Q and our current reports on Form 8-K (along with any exhibits and amendments to such reports), as well as our news releases or any other written or oral statements made by or on behalf of us, may include, directly or by incorporation by reference, forward-looking statements that reflect our current view (as of the date the forward-looking statement is first made) about future events, prospects, projections or financial performance. The matters discussed in these forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied in or by such statements. These risks and uncertainties include:

- competitive pressures in the markets in which we operate, including pricing pressures;
- uncertainties relating to the pricing of generic pharmaceuticals;
- uncertainties relating to the timing, frequency and profitability of generic pharmaceutical launches;
- our ability to maintain the benefits of our generic pharmaceutical sourcing venture with CVS Health Corporation;
- with respect to our distribution agreements with branded pharmaceutical manufacturers, changes in the amount of service fees we receive or, in cases where part of our compensation under these agreements is branded pharmaceutical price appreciation, changes in the frequency or magnitude of such price appreciation;
- changes in the timing or frequency of the introduction of branded pharmaceuticals;
- uncertainties relating to the frequency or magnitude of branded pharmaceutical price appreciation;
- actions of regulatory bodies and other governmental authorities, including the U.S. Drug Enforcement Administration, certain agencies within the U.S. Department of Health and Human Services (including the U.S. Food and Drug Administration, Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights), the U.S. Nuclear Regulatory Commission, the U.S. Federal Trade Commission, the U.S. Customs and Border Protection, various state boards of pharmacy, state controlled substance agencies, state health departments, state insurance departments, state Medicaid departments or comparable regulatory bodies or governmental authorities or foreign equivalents that, in each case, could delay, limit or suspend product development, manufacturing, distribution, importation or sales or result in warning letters, recalls, seizures, injunctions or monetary sanctions;
- difficulties or delays in the development, production, manufacturing, sourcing and marketing of new or existing products and services, including difficulties or delays associated with obtaining requisite regulatory consents or approvals associated with those activities;
- risks arising from possible violations of healthcare fraud and abuse laws;
- costs or claims resulting from potential errors or defects in our manufacturing of medical devices or other products or in our compounding, repackaging, information systems or pharmacy management services that may injure persons or damage property or operations, including costs from remediation efforts or recalls and related product liability claims and lawsuits, including class actions;
- risks arising from possible violations of the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws and other similar anti-corruption laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws;
- risks arising from our collecting, handling and maintaining patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information;
- risks arising from certain of our businesses being Medicare-certified suppliers or participating in state Medicaid programs, which businesses are subject to accreditation and quality standards and other rules and regulations, including applicable billing, payment and record-keeping requirements;
- risks arising from certain of our businesses manufacturing pharmaceutical and medical products or repackaging pharmaceuticals that are purchased through federal or state healthcare programs, which businesses are subject to federal and state laws that establish eligibility for reimbursement by such programs;
- changes in laws or changes in the interpretation or application of laws or regulations, as well as possible failures to comply with applicable laws or regulations, including as a result of possible misinterpretations or misapplications;
- material reductions in purchases, non-renewal or early termination of contracts, or delinquencies or defaults by key customers;
- unfavorable changes to the terms of key customer or supplier relationships, or changes in customer mix;
- adverse changes in U.S. or foreign tax laws, including proposals relating to a U.S. "border adjustment tax" or import tariffs, or unfavorable challenges to our tax positions and payments to settle these challenges;
- uncertainties due to government healthcare reform, including possible modifications to, or repeal of, the Patient Protection and Affordable Care Act;
- changes in manufacturers' pricing, selling, inventory, distribution or supply policies or practices;
- changes in regulatory policies regarding pharmaceutical manufacturer product pricing practices;
- changes in hospital buying groups or hospital buying practices;

- changes in distribution or sourcing models for pharmaceutical and medical and surgical products, including an increase in direct and limited distribution;

- the risks of counterfeit products in the supply chain;

- changes to the prescription drug reimbursement formula and related reporting requirements for generic pharmaceuticals under Medicaid;

- increasing consolidation in the healthcare industry, which could give the resulting enterprises greater bargaining power and may increase pressure on prices for our products and services or result in the loss of customers;

- disruption or damage to, or failure of, our information systems, critical facilities, including our national logistics center, or distribution networks;

- risks to our business and information and controls systems in the event that the Pharmaceutical segment's planned multi-year systems replacement project or other business process improvements, infrastructure modernizations or initiatives to use third-party service providers for key systems and processes are not effectively implemented;

- any compromise of our information systems or of those of a third-party with whom we do business, including unauthorized access to or use or disclosure of sensitive information;

- the results, costs, effects or timing of any commercial disputes, government contract compliance matters, product liability claims or lawsuits, patent infringement claims, *qui tam* actions or other legal proceedings;

- possible losses relating to product liability claims regarding products for which we cannot obtain product liability insurance or for which such insurance is not adequate to cover our losses;

- our ability to maintain adequate intellectual property protections;

- the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition, and uncertainties relating to our ability to achieve the anticipated results from acquisitions;

- risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility;

- increased costs for commodities used in the Medical segment including various components, compounds, raw materials or energy such as oil-based resins, cotton, latex and other commodities;

- shortages in commodities, components, compounds, raw materials or energy used by our businesses, including supply disruptions of radioisotopes;

- the loss of, or default by, one or more key suppliers for which alternative suppliers may not be readily available;

- bankruptcy, insolvency or other credit failure of a customer or supplier that owes us a substantial amount;

- risks associated with global operations, including the effect of local economic environments, inflation, recession, currency volatility and global competition, in addition to risks associated with compliance with U.S. and international laws relating to global operations;

- risks associated with volatility and disruption to the global capital and credit markets, which may adversely affect our ability to access credit, our cost of credit and the financial soundness of our customers and suppliers;

- our ability to introduce and market new products and our ability to keep pace with advances in technology;

- the costs, effects, timing or success of restructuring programs or plans;

- significant charges to earnings if goodwill or intangible assets become impaired;

- uncertainties relating to general political, business, industry, regulatory and market conditions; and

- other factors described in the "Risk Factors" section of the 2016 Form 10-K.

The words "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions generally identify "forward-looking statements," which speak only as of the date the statements were made, and also include statements reflecting future results or guidance, statements of outlook and expense accruals. We undertake no obligation to update or revise any forward-looking statements, except to the extent required by applicable law.

# EXHIBIT 69

SEC Form 4

| | | |
|---|---|---|
| **FORM 4** | **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**<br>Washington, D.C. 20549 | OMB APPROVAL |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB Number: | 3235-0287 |
|---|---|
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person[*]<br>Barrett George S<br><br>(Last) (First) (Middle)<br>7000 CARDINAL PLACE<br><br>(Street)<br>DUBLIN   OH   43017<br><br>(City) (State) (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br>CARDINAL HEALTH INC [ CAH ]<br><br>3. Date of Earliest Transaction (Month/Day/Year)<br>02/10/2017<br><br>4. If Amendment, Date of Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br>X  Director         10% Owner<br>X  Officer (give title below)   Other (specify below)<br>Chairman and CEO<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>X  Form filed by One Reporting Person<br>   Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 02/10/2017 | | M[(1)] | | 217,994 | A | $30.94 | 682,225 | D | |
| Common Shares | 02/10/2017 | | S[(1)] | | 217,994 | D | $77.23[(2)] | 464,231 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Common Shares | $30.94 | 02/10/2017 | | M | | | 217,994 | (3) | 08/16/2017 | Common Shares | 217,994 | $0 | 0 | D | |

**Explanation of Responses:**

1. The exercise and sale reported on this Form 4 were effected pursuant to a 10b5-1 plan adopted by the reporting person on August 8, 2016.

2. The price reported in column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $76.79 to $77.66, inclusive. The reporting person undertakes to provide to Cardinal Health, Inc., any security holder of Cardinal Health, Inc., or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of shares sold at each separate price within the range set forth in footnote 2 to this Form 4.

3. The option, representing a right to purchase a total of 685,989 shares, vested and became exercisable in three equal annual installments beginning on August 16, 2011.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact       02/13/2017

** Signature of Reporting Person       Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 70

Case: 2:19-cv-03347-EAS-EPD Doc #: 29-2 Filed: 11/06/20 Page: 587 of 963 PAGEID #: 2153

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

---

**Date of report (Date of earliest event reported): April 18, 2017**

---

# Cardinal Health, Inc.

**(Exact Name of Registrant as Specified in Charter)**

---

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place**
**Dublin, Ohio 43017**     **43017**
**(Address of Principal Executive Offices)**     **(Zip Code)**

**Registrant's telephone number, including area code: (614) 757-5000**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company  ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

**Item 1.01 Entry into a Material Definitive Agreement.**

*Purchase Agreement*

On April 18, 2017, Cardinal Health, Inc., an Ohio corporation (the "Company"), and Medtronic plc, an Irish public limited company ("Medtronic"), entered into a definitive stock and asset purchase agreement (the "Purchase Agreement") pursuant to which, among other things, the Company will purchase certain equity interests and assets collectively constituting the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses of Medtronic (the "Business"), for a purchase price of $6.1 billion in cash, subject to certain adjustments (the "Acquisition").

Pursuant to the Purchase Agreement, subject to the terms and conditions set forth therein, the Company would acquire from Medtronic, among other things, (i) twelve manufacturing plants located in North America; (ii) two manufacturing plants located in Europe; and (iii) three manufacturing plants located in Asia.

The Purchase Agreement provides that closing of the Acquisition is subject to the satisfaction or waiver of certain conditions, including, among other things, the expiration or early termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the receipt of antitrust approvals in certain other specified jurisdictions .

The Purchase Agreement contains certain termination rights, including that either party will be permitted to terminate (i) in connection with certain material breaches by the other party of the other party's representations, warranties or covenants, subject to a cure period, (ii) if the closing has not occurred on or before January 18, 2018; provided, that if the only remaining unsatisfied conditions to closing at such date relate to certain antitrust matters, such date will automatically extend to April 18, 2018 (the "Outside Date") or (iii) if at any time prior to closing, the conditions precedent to the performance of a party's obligations at the closing will have become incapable of fulfillment by the Outside Date. The Company and Medtronic have each agreed, subject to specified conditions and limitations, to indemnify the other party for breaches of representations, warranties and covenants and for losses arising from certain assumed/excluded liabilities and certain tax matters, as applicable.

Investors should not rely on the representations, warranties and covenants in the Purchase Agreement or any descriptions thereof as characterizations of the actual state of facts or condition of the Company, any of its subsidiaries or affiliates, or the Business. Moreover, information concerning the subject matter of the representations and warranties may change after the date of the Purchase Agreement, which subsequent information may or may not be fully reflected in the Company's public disclosures.

*Commitment Letter*

The Company plans to issue long-term debt to finance the Acquisition. In connection with the Company entering into the Purchase Agreement, on April 18, 2017, the Company entered into a commitment letter (the "Commitment Letter") with Goldman Sachs Bank USA and Goldman Sachs Lending Partners LLC (the "Commitment Parties") pursuant to which, subject to the terms and conditions set forth therein, the Commitment Parties have committed to provide a 364-day senior unsecured bridge term loan facility in an aggregate principal amount of up to $4.5 billion (the "Bridge Facility"), the proceeds of which may be used for the payment of the purchase price contemplated by, and the payment of fees and expenses incurred in connection with, the Purchase Agreement. The commitment to provide the Bridge Facility is subject to certain conditions, consistent with the Purchase Agreement and the Commitment Letter. The Company will pay customary fees and expenses in connection with obtaining the Bridge Facility. The definitive agreement for the Bridge Facility will contain, among other terms, affirmative covenants, negative covenants, financial covenants and events of default, in each case to be negotiated by the parties consistent with the Commitment Letter. Neither the closing of the Bridge Facility nor the receipt of any other financing is a condition to the closing of the Acquisition.

From time to time, the Commitment Parties or their affiliates have performed, and may in the future perform, various commercial banking, investment banking and other financial advisory services for the Company, for which the Company pays customary fees and expenses. Goldman Sachs Bank USA is a member of the lending syndicate

under the Company's $1.75 billion revolving credit facility and Goldman Sachs & Co. serves as a dealer under the Company's commercial paper program. In addition, Goldman, Sachs & Co. served as one of the Company's financial advisors in connection with the proposed Acquisition.

The foregoing description of the Purchase Agreement and the Commitment Letter and the transactions contemplated thereby does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the Purchase Agreement attached hereto as Exhibit 2.1 and the Commitment Letter attached hereto as Exhibit 10.1, both of which are incorporated herein by reference.

### Item 7.01 Regulation FD Disclosure.

The Company issued a news release on April 18, 2017 regarding the Acquisition. The Company also issued a news release on April 18, 2017 updating fiscal 2017 guidance and providing an early outlook for future fiscal years. Copies of the news releases, which are attached to this current report on Form 8-K as Exhibits 99.1 and 99.2, respectively, are hereby furnished pursuant to this Item 7.01.

The Company hosted a webcast and conference call on April 18, 2017 to discuss the announcements. Presentation slides and an audio replay will be archived on the Company's Investor Relations page at ir.cardinalhealth.com. The audio replay will be available until Tuesday, April 25 at 12 p.m. Eastern at 719-457-0820 passcode #2495375.

### Item 9.01 Financial Statements and Exhibits.

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Stock and Asset Purchase Agreement, dated April 18, 2017, by and between Cardinal Health, Inc. and Medtronic plc† |
| 10.1 | Commitment Letter, dated April 18, 2017, by and among Goldman Sachs Bank USA and Goldman Sachs Lending Partners LLC and Cardinal Health, Inc. |
| 99.1 | News release issued by Cardinal Health, Inc. on April 18, 2017 regarding the Acquisition |
| 99.2 | News release issued by Cardinal Health, Inc. on April 18, 2017 regarding fiscal 2017 guidance and future outlook |

† Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A copy of any omitted schedule will be furnished supplementally to the Securities and Exchange Commission upon request; provided, however, that the parties may request confidential treatment pursuant to Rule 24b-2 of the Exchange Act for any document so furnished.

---

### Cautionary Statement Concerning Forward-Looking Statements

This current report on Form 8-K contains forward-looking statements addressing the Acquisition and the other transactions contemplated in the Purchase Agreement and other statements about future expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include: the ability to successfully complete the Acquisition on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the conditions of the credit markets and the Company's ability to issue debt to fund the Acquisition on acceptable terms; if the Acquisition is completed, the ability to retain the Business' customers and employees, the ability to successfully integrate the Business into the Company's operations, and the ability to achieve the expected synergies as well as accretion in earnings; competitive pressures in the Company's various lines of business; the amount or rate of generic and branded pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical

introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws, including proposals relating to a "border adjustment tax" or new import tariffs; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. The Company is subject to additional risks and uncertainties described in the Company's annual report on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K and exhibits to those reports. This current report on Form 8-K reflects management's views as of April 18, 2017. Except to the extent required by applicable law, the Company undertakes no obligation to update or revise any forward-looking statement.

**SIGNATURES**

     Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: April 18, 2017

**CARDINAL HEALTH, INC.**

By: /s/ Jessica L. Mayer
       Name:  Jessica L. Mayer
       Title:   Senior Vice President, Deputy General Counsel and Corporate Secretary

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 2.1 | Stock and Asset Purchase Agreement, dated April 18, 2017, by and between Cardinal Health, Inc. and Medtronic plc† |
| 10.1 | Commitment Letter, dated April 18, 2017, by and among Goldman Sachs Bank USA and Goldman Sachs Lending Partners LLC and Cardinal Health, Inc. |
| 99.1 | News release issued by Cardinal Health, Inc. on April 18, 2017 regarding the Acquisition |
| 99.2 | News release issued by Cardinal Health, Inc. on April 18, 2017 regarding fiscal 2017 guidance and future outlook |

† Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A copy of any omitted schedule will be furnished supplementally to the Securities and Exchange Commission upon request; provided, however, that the parties may request confidential treatment pursuant to Rule 24b-2 of the Exchange Act for any document so furnished.

Exhibit 2.1

EXECUTION VERSION

STOCK AND ASSET PURCHASE AGREEMENT

between

MEDTRONIC PLC

and

CARDINAL HEALTH, INC.

Dated as of April 18, 2017

TABLE OF CONTENTS

Page

ARTICLE I

Definitions and Interpretations

SECTION 1.01.    Definitions                                                                          7
SECTION 1.02.    Interpretation and Construction                                                     20

ARTICLE II

Closing

SECTION 2.01.    Closing                                                                             21
SECTION 2.02.    Transferred Assets and Transferred Equity Interests/Excluded Assets; Assumed/Excluded Liabilities   22
SECTION 2.03.    Purchase Price                                                                      27
SECTION 2.04.    Purchase Price Adjustment                                                           28
SECTION 2.05.    Allocation of Purchase Price                                                        30
SECTION 2.06.    Transfer Taxes; VAT                                                                 32
SECTION 2.07.    Withholding Taxes                                                                   34
SECTION 2.08.    Delivery by Seller                                                                  34
SECTION 2.09.    Delivery by Buyer                                                                   35

ARTICLE III

Representations and Warranties of Seller

SECTION 3.01.    Organization and Good Standing                                                      36
SECTION 3.02.    Authority                                                                           36
SECTION 3.03.    Title to Tangible Property and Transferred Equity Interests                         37
SECTION 3.04.    Assets of the Business                                                              37
SECTION 3.05.    Transferred Real Property                                                           38
SECTION 3.06.    Financial Information; No Undisclosed Liabilities                                   38
SECTION 3.07.    Consents and Approvals; Absence of Violation or Conflicts                           38

i

| | | |
|---|---|---|
| SECTION 3.08. | Compliance with Laws; Licenses and Permits | 39 |
| SECTION 3.09. | Transferred Contracts and Material Contracts | 39 |
| SECTION 3.10. | Intellectual Property Rights | 41 |
| SECTION 3.11. | Legal Proceedings | 43 |
| SECTION 3.12. | Labor and Employee Matters | 43 |
| SECTION 3.13. | Employee Plans | 43 |
| SECTION 3.14. | Environmental Matters | 45 |
| SECTION 3.15. | Absence of Certain Developments | 45 |
| SECTION 3.16. | Brokerage Fees | 46 |
| SECTION 3.17. | Product Registrations; Recalls | 46 |
| SECTION 3.18. | Taxes | 46 |
| SECTION 3.19. | Certain Compliance Matters | 48 |
| SECTION 3.20. | Information Technology | 50 |
| SECTION 3.21. | Significant Distributors; Significant Suppliers | 50 |

ARTICLE IV

Representations and Warranties of Buyer

| | | |
|---|---|---|
| SECTION 4.01. | Buyer's Organization; Power; Execution | 50 |
| SECTION 4.02. | Consents and Approvals; Absence of Violation or Conflicts | 51 |
| SECTION 4.03. | Litigation | 51 |
| SECTION 4.04. | Sufficient Funds | 52 |
| SECTION 4.05. | Brokerage Fees | 52 |

ARTICLE V

Conditions to Closing

| | | |
|---|---|---|
| SECTION 5.01. | Conditions Precedent to Buyer's Obligations on the Closing Date | 52 |
| SECTION 5.02. | Conditions Precedent to Seller's Obligations on the Closing Date | 53 |

## ARTICLE VI

### Certain Covenants

| | | |
|---|---|---|
| SECTION 6.01. | Conduct of Business | 54 |
| SECTION 6.02. | Certain Covenants Regarding the Transferred Companies | 57 |
| SECTION 6.03. | Disclosure | 57 |
| SECTION 6.04. | Publicity | 57 |
| SECTION 6.05. | Commercially Reasonable Efforts; Regulatory Approvals; Access | 58 |
| SECTION 6.06. | Financing | 60 |
| SECTION 6.07. | Transferred Companies Assets and Liabilities | 61 |
| SECTION 6.08. | Exclusivity | 62 |
| SECTION 6.09. | Closing Structure | 63 |
| SECTION 6.10. | Basis Calculations. | 65 |
| SECTION 6.11. | Certain Swiss Tax Matters | 65 |
| SECTION 6.12. | Certain Financial Statements | 66 |

## ARTICLE VII

### Post-Closing Covenants

| | | |
|---|---|---|
| SECTION 7.01. | Certain IP Matters | 66 |
| SECTION 7.02. | IP Cooperation | 67 |
| SECTION 7.03. | Access | 67 |
| SECTION 7.04. | Insurance | 68 |
| SECTION 7.05. | Payments from Third Parties | 69 |
| SECTION 7.06. | Assurances | 69 |
| SECTION 7.07. | Further Assurances | 70 |
| SECTION 7.08. | Tax Matters | 70 |
| SECTION 7.09. | Ancillary Agreements | 78 |
| SECTION 7.10. | Bulk Transfer Laws | 78 |
| SECTION 7.11. | Non-Solicitation of Employees; Non-Competition | 78 |

iii

| | | |
|---|---|---|
| SECTION 7.12. | Confidentiality | 80 |
| SECTION 7.13. | Replacement of Guarantees | 81 |
| SECTION 7.14. | Other Covenants | 81 |

ARTICLE VIII

Employees

| | | |
|---|---|---|
| SECTION 8.01. | Employee Benefits Matters | 81 |
| SECTION 8.02. | Pension Plan Adjustment | 90 |

ARTICLE IX

Termination

| | | |
|---|---|---|
| SECTION 9.01. | Buyer Termination | 91 |
| SECTION 9.02. | Seller Termination | 92 |
| SECTION 9.03. | Effect of Termination | 92 |

ARTICLE X

Indemnification

| | | |
|---|---|---|
| SECTION 10.01. | Survival | 92 |
| SECTION 10.02. | Indemnification by Seller | 93 |
| SECTION 10.03. | Indemnification by Buyer | 93 |
| SECTION 10.04. | Scope of Liability | 94 |
| SECTION 10.05. | Claims | 95 |
| SECTION 10.06. | Defense of Actions | 95 |
| SECTION 10.07. | Limitation, Exclusivity, No Duplicate Recovery | 96 |
| SECTION 10.08. | Calculation of Damages | 96 |
| SECTION 10.09. | Tax Treatment of Indemnity Payments | 96 |
| SECTION 10.10. | Claims Pursuant to Section 10.02(d) | 96 |

iv

ARTICLE XI

Miscellaneous

| | | |
|---|---|---|
| SECTION 11.01. | No Additional Representations | 97 |
| SECTION 11.02. | Financial Information and Projections | 97 |
| SECTION 11.03. | To the Knowledge | 97 |
| SECTION 11.04. | Waivers | 97 |
| SECTION 11.05. | Modifications and Amendments | 98 |
| SECTION 11.06. | Assignability, Beneficiaries; Enforcement | 98 |
| SECTION 11.07. | Notices | 99 |
| SECTION 11.08. | Headings | 99 |
| SECTION 11.09. | Counterparts | 99 |
| SECTION 11.10. | Entire Agreement | 100 |
| SECTION 11.11. | Payment of Expenses | 100 |
| SECTION 11.12. | Governing Law; Consent to Jurisdiction; Waivers | 100 |
| SECTION 11.13. | Fulfillment of Obligations | 101 |
| SECTION 11.14. | Severability | 101 |

Annexes and Exhibits

| | |
|---|---|
| Annex 2.02(a) | Transferred Assets |
| Annex 2.02(b) | Excluded Assets |
| Annex 2.02(c) | Assumed Liabilities |
| Annex 2.02(d) | Excluded Liabilities |
| Exhibit 1 | Maximum Cash Amount of Transferred Companies |
| Exhibit 2 | Specified Entity |
| Exhibit A-1 | Products and Product Groups |
| Exhibit A-2 | Excluded Products |
| Exhibit B | Form of General Assignment |
| Exhibit C | Form of Patent Assignment |
| Exhibit D | Form of Trademark Assignment |
| Exhibit E | Form of Assumption Agreement |
| Exhibit F-1 | French Offer Letter |
| Exhibit F-2 | Dutch Offer Letter |
| Exhibit G-1 | Form of Transition Services Agreement |

v

Exhibit G-2          Transition Services Agreement Pricing Principles
Exhibit H            Form of Master Manufacturing and Supply Agreement
Exhibit I-1          Form of Trademark License Agreement (Buyer as Licensee)
Exhibit I-2          Form of Trademark License Agreement (Seller as Licensee)
Exhibit J-1          Form of FIRPTA Certificate (non-U.S.)
Exhibit J-2          Form of FIRPTA Certificate (U.S.)
Exhibit K            Form of Lease Assignment and Assumption Agreement
Exhibit L            Closing Structure
Exhibit M            Allocation Method
Exhibit N            Form of Sorting Service Agreement

vi

STOCK AND ASSET PURCHASE AGREEMENT (this " Agreement "), dated as of April 18, 2017, between Medtronic plc, an Irish public limited company (" Seller "), and Cardinal Health, Inc., an Ohio corporation (" Buyer ").

W I T N E S S E T H:

WHEREAS, Seller and certain of its Affiliates (as defined below) currently conduct in the United States and certain other countries and territories the business of researching, developing, designing, testing, manufacturing, processing, reprocessing, labeling, packaging, marketing, commercializing, distributing, promoting, pricing, importing, exporting and selling the Products (as defined below) (collectively, the " Business "); and

WHEREAS, Seller desires to sell (or to cause to be sold), and Buyer desires to purchase or cause certain of its Affiliates to purchase, certain assets, including the Transferred Equity Interests (as defined below), related to the Business as a going concern and Buyer is willing to assume or cause certain of its Affiliates to assume certain liabilities related to the Business, in each case upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in view of the foregoing premises and in consideration of the mutual covenants, agreements, representations and warranties herein contained, the parties hereto agree as follows:

ARTICLE I

Definitions and Interpretations

SECTION 1.01. Definitions . (a) The following terms used in this Agreement shall have the respective meanings assigned to them below:

" Affiliate " with respect to any specified Person, means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person.

" Ancillary Agreements " means, other than this Agreement, the agreements and instruments, including any Country Transfer Agreements and any related instruments of transfer, the Transition Services Agreement, the Master Manufacturing and Supply Agreement, the Sorting Service Agreement, the French Offer Letter, the Dutch Offer Letter, the Lease Assignment and Assumption Agreements and the Trademark License Agreements, executed and delivered in connection with the transactions contemplated by this Agreement.

" Anti-Trust Approvals " means all authorizations, orders, grants, consents, clearances, permissions and approvals and all expirations, lapses and terminations of any required waiting periods (including extensions thereof), in each case under any merger control or similar legislation in order to consummate the Transactions.

" Anti-Trust Filings " means all applicable notifications to or filings with an anti-trust or competition authority in the United States, Canada, Germany or any other jurisdiction required to consummate the Transactions.

" Asset Selling Affiliates " means all of the Affiliates of Seller that own or hold the rights to any Transferred Assets or that have obligations or liabilities in respect of any Assumed Liabilities.

" Assumed Benefit Plan " means any Business Employee Benefit Plan (a) that is maintained or sponsored by a Transferred Company or (b) for which liabilities and/or assets transfer to Buyer or its Affiliates under applicable Law as a result of the transactions contemplated by this Agreement.

" Assumed Liabilities " means the obligations and liabilities set forth or described on Annex 2.02(c) .

" Benefits Continuation Period " means a period of time commencing on the Closing Date and ending on the later of (a) December 31, 2018 and (b) fifteen (15) months from the Closing Date.

" Business Employee Benefit Plan " means each employee benefit plan (as defined in Section 3(3) of ERISA, whether or not subject thereto) or other compensatory or employee benefit plan, program, agreement or arrangement sponsored, contributed to or maintained by Seller or any of its Affiliates in which any Employee of the Business (or former employee of the Business) participates (or to which any such individual is party), excluding any plan, program, agreement or arrangement required by applicable Law or regulation ( e.g. , government mandated severance plans).

" Buyer Tax Act " means the following: (A) at or after the Closing, any election made by Buyer or any of its Affiliates (including any Transferred Company) under any provision of the Code or non-U.S. Tax Law for any Pre-Closing Tax Period, which election is made at or after the Closing with respect to any Transferred Company, the Transferred Assets or the Business, but not (i) any such election that is set forth on a Tax Return required to be filed by Buyer under Section 7.08(a)(i) or Section 7.08(a)(ii) and which election is consistent with past practice, (ii) any such election that is expressly required by this Agreement, or (iii) any such election that is made with Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed), (B) any failure to comply with Schedule 1.01(a) to the Disclosure Letter, and (C) any action taken by Buyer on the Closing Date after such Closing other than (i) in the ordinary course of business, (ii) as required or contemplated by this Agreement or applicable Law, or (iii) with Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed). For the absence of doubt, none of the Section 338(g) Elections or any action undertaken by Seller and its Affiliates, prior to the Closing, pursuant to the Internal Restructuring Steps shall constitute a Buyer Tax Act.

" Buyer Tax Rate " means 38%.

" Cash Amount " means an amount equal to the aggregate of all cash and cash equivalents of the Transferred Companies as of immediately prior to the Closing (other than cash

-8-

and cash equivalents in respect of clauses (xiv) , (xv)(2) and (xvi)  of Annex 2.02(a) ); provided that unless the parties otherwise agree, in no event shall the Cash Amount include an amount with respect to any Transferred Company that exceeds the amount set forth opposite such Transferred Company's name on Exhibit 1 (and no amounts in excess of such amounts set forth on Exhibit 1 shall be taken into account for purposes of determining the Purchase Price adjustment in respect of the Cash Amount pursuant to Section  2.04 ).

" Code " means the Internal Revenue Code of 1986, as amended.

" Commingled Contract " means any contract, contract right, bid, tender, purchase order or other agreement, whether written or oral, relating both to (a) the Business and (b) one or more other businesses of Seller or any Affiliate of Seller.

" Controlled Group Liability " means any and all liabilities (a) under Title IV of ERISA, (b) under Section 302 of ERISA, (c) under Sections 412 and 4971 of the Code, (d) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq . of ERISA and Section 4890B of the Code and (e) other than with respect to Assumed Benefit Plans, under corresponding or similar provisions of foreign laws or regulations related to defined benefit pension plan funding requirements or post-termination medical insurance plan coverage.

" Country Unit " means the Transferred Assets and Assumed Liabilities related to a part of the Business conducted in a particular country by Seller or a particular Asset Selling Affiliate or relevant Transferred Company.

" Damages " means any and all claims of any kind, losses, liabilities, damages, awards, deficiencies, fines, fees, interest, penalties and costs and expenses incurred or suffered (and, if applicable, reasonable fees of attorneys, auditors, consultants and other agents associated therewith), whether or not based on contract, tort, warranty claims or otherwise, but shall not include punitive, exemplary or speculative damages, or any other type of damages that are not reasonably foreseeable (in each case other than any damages payable to third parties that may be imposed or otherwise incurred).

" Data Room " means the electronic data room containing documents and materials relating to the Business as constituted as of 12:01 a.m., New York City time, on the date hereof.

" Debt Financing Sources " means the entities that have committed to provide or arrange the Debt Financing, including the lender parties to any commitment letters, joinder agreements thereto, indentures or credit agreements entered pursuant thereto or relating thereto, together with their respective Affiliates, officers, directors, employees, agents and representatives.

" Disclosure Letter " means the confidential disclosure letter delivered to Buyer by Seller prior to or simultaneously with entering into this Agreement.

" Employee of the Business " means each employee of Seller or its Affiliates who is set forth on Schedule  1.01(b) to the Disclosure Letter (as such schedule may be updated in accordance with this Agreement), including each such employee who, as of the Closing Date, is on leave of absence (including medical leave, military leave, workers compensation leave and short-term or long-term disability or vacation).

-9-

" Employee Representative " means any union, works council or other employee representative body representing any Employee of the Business.

" Environment " means soil, land surface or subsurface strata, surface water, groundwater, sediments and ambient air.

" Environmental Claim " means any claim, action, cause of action, suit, proceeding or written notice alleging liability (including liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) relating to, arising out of, based on or resulting from (a) the presence, Release or threatened Release of any Hazardous Materials at any Transferred Real Property or (b) circumstances forming the basis of any violation of or liability under any Environmental Law.

" Environmental Law " means applicable federal, state, local or foreign Law relating to pollution or protection or restoration of the Environment or natural resources relating to the Release, threatened Release, or disposal of or response actions with respect to Hazardous Materials or relating to the exposure to Hazardous Materials in the Environment, including the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

" Estimated Inventory Tax Basis " means the amount set forth in Schedule 6.10(a) to the Disclosure Letter.

" Estimated Aggregate Tax Basis " means the amount set forth in Schedule 6.10(a) to the Disclosure Letter.

" Estimated Swiss Gain " means the amount set forth in Schedule 6.11(a) to the Disclosure Letter.

" ERISA " means the Employee Retirement Income Security Act of 1974, as amended.

" Excluded Assets " means the property and other rights set forth or described on Annex 2.02(b) , which property is not to be transferred to Buyer hereunder.

" Excluded Liabilities " means the liabilities and obligations set forth or described on Annex 2.02(d) , which are not to be assumed by Buyer hereunder.

" Excluded Taxes " means (a) (i) any Taxes for any Pre-Closing Tax Period imposed on or payable by or with respect to any Transferred Company and (ii) any Taxes for any Pre-Closing Tax Period arising out of, relating to or in respect of the Business, the Transferred Assets or the Assumed Liabilities, (b) any Taxes (including Non-Resident Capital Gains Taxes but not including any Transfer Taxes for which Buyer is responsible under Section 2.06 ) of Seller, any Selling Affiliate or any of their respective Affiliates (other than any Transferred

-10-

Company) for any period and any Taxes relating to any Excluded Assets or relating to or constituting Excluded Liabilities for any period, (c) any Taxes for which any Transferred Company is liable under Treasury Regulations Section 1.1502-6 (or any corresponding or similar provision of state, local or non-U.S. Tax Law) by reason of such entity having been a member of any consolidated, combined, unitary, or affiliated Tax group, as a transferee or successor, by contract or otherwise, (d) any obligation or other liability, obligation or commitment of any Transferred Company to indemnify any other Person in respect of or relating to Taxes or to pay an amount pursuant to any Tax sharing, allocation, indemnity or similar agreement or arrangement, (e) any Taxes arising out of, attributable to, relating to or resulting from the failure of any of the representations or warranties made by Seller in Section 3.18 to be true and correct on the date hereof and at and as of the Closing Date (the amount of such Taxes determined without references to the terms "material," "materially," "Material Adverse Effect," "material adverse effect" or other similar qualifications as to materiality (including specific monetary thresholds) contained or incorporated in any such representation or warranty, but such qualifications, to the extent contained or incorporated in any such representation or warranty, shall apply for the purposes of determining whether any such inaccuracy or breach has occurred) or the failure of the certificates delivered pursuant to Section 2.08(h) to be true and correct at and as of the Closing Date, (f) any Taxes arising out of, attributable to, relating to or resulting from any breach by Seller of any of its covenants or agreements contained herein, (g) any Taxes imposed with respect to any amount required to be included by Buyer or any of its Affiliates (including the Transferred Companies after the Closing Date) in income under Section 951(a) of the Code with respect to a Pre-Closing Tax Period of a Transferred Company (determined based on a "closing of the books" of such Transferred Company as of the end of the Closing Date), (h) any Taxes imposed on the Internal Restructuring Steps, (i) any Taxes for which Seller is responsible for under Section 2.06 , (j) any Taxes incurred as a result of any failure to comply with any "bulk sales", "bulk transfer" or similar Laws in connection with this Agreement or the Transactions, and (k) any costs and expenses, including reasonable legal fees and expenses, attributable to any item in clauses (a)-(j); provided that clauses (a), (c), (d), (h) and (j) above shall not include any liability for Transfer Taxes for which Buyer is responsible pursuant to Section 2.06(b) or Taxes to the extent resulting from Buyer Tax Acts (other than such actions taken with Seller's consent).

" Financial Information " means (a) the unaudited balance sheet of the Business as of April 29, 2016 and (b) the unaudited statement of income of the Business for the fiscal year ended April 29, 2016, in each case, attached as Schedule 1.01(h) to the Disclosure Letter.

" Foreign Currency " means any currency other than U.S. dollars.

" GAAP " means generally accepted accounting principles in the United States, applied on a consistent basis.

" Governmental Entity " means any domestic or foreign court, administrative body or regulatory agency or other governmental authority (or any department, agency or political subdivision thereof) or any other body or Person lawfully empowered to exercise regulatory, taxing or other governmental authority.

-11-

" Hazardous Materials " means any substance, material or waste that contains asbestos, any urea formaldehyde insulation, polychlorinated biphenyls, petroleum or any petroleum-based products or constituents or radon gas or any other substance, material, pollutant, contaminant or waste that, in relevant form and concentration, is defined, classified, listed or regulated under any Environmental Law.

" Income Taxes " means any income tax measured by or imposed on the net income, profits, revenue, capital gains, or similar measure or any franchise or similar tax imposed by a state on a Person's gross or net income and/or capital for the privilege of engaging in business in that state.

" International Trade Laws " means (a) all trade, import, customs, export control, and anti-boycott regulations imposed, administered or enforced from time to time by the U.S. government, including those administered under or orders issued by the U.S. Department of State, the U.S. Department of Commerce, the U.S. Internal Revenue Service, the U.S. Department of Homeland Security, the U.S. Customs and Border Protection, the U.S. Food and Drug Administration, and the U.S. Department of the Treasury; (b) all trade, import, customs, and export control regulations under any Laws in any country outside of the United States in which the Business operates or Products are sold; and (c) all trade embargoes imposed, administered or enforced from time to time by the U.S. government through the U.S. Department of Treasury or the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

" Inventory " means the inventory of all finished Products (including consignment stock), Product specific work in process and Product specific raw materials.

" Inventory Target " means three hundred sixty million dollars ($360,000,000).

" IP Rights " means the following, in any and all countries: (a) patents and patent applications, utility models and industrial designs, and all applications and registrations therefor, together with all reissuances, divisions, renewals, revisions, extensions (including any supplementary protection certificates), reexaminations, provisionals, continuations and continuations-in-part with respect thereto and including all foreign equivalents, and all international applications under the Patent Cooperation Treaty and all corresponding national stage applications filed in all countries with respect thereto (collectively, " Patents "), (b) trademarks, servicemarks, trade dress, logos, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals therefor (collectively, " Trademarks "), (c) all copyrights, applications and registrations and renewals therefor (collectively, " Copyrights ") and (d) all trade secrets (including inventions, rights in research and development, clinical trial results, know-how, discoveries, improvements, formulas, compositions, commercially practiced processes, technical data, designs, drawings and specifications) (collectively, " Know-How ").

" Judgment " means any judgment, award, order, writ, injunction, legally binding agreement with a Governmental Entity, stipulation or decree.

-12-

" Law " or " Laws " means any statute, law, ordinance, treaty, rule, code, regulation, Judgment or other binding directive issued, promulgated or enforced by any Governmental Entity.

" Legacy Product " means any product that is not a Product as of the Closing, but (a) is a prior product design, form, version or implementation (whether commercialized or not) of Seller, an Affiliate of Seller or a Transferred Company which product design, form, version or implementation (whether commercialized or not) was at any time prior to the Closing superseded by a Product design, form, version or implementation, (b) was within one of the product groups set forth on Exhibit A-1 and c) in which product design, form, version or implementation by Seller, any of its Affiliates or any Transferred Company owns or has the valid right to use the IP Rights.

" Lien " means any deed of trust, option, claim, mortgage, pledge, lien, charge, security interest, hypothecation, declaration, covenant, right-of-way, easement, encroachment, restriction, title defect, right of first refusal or first offer or other similar third party (or governmental) right or encumbrance of any kind.

" Material Adverse Effect " means any effect, event, occurrence, circumstance or change that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to the business, assets, results of operations or financial condition of the Business, taken as a whole; provided that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or would reasonably be expected to be, a "Material Adverse Effect": (a) the failure of the Business to meet projections or forecasts (it being agreed that any underlying cause for or contributing factor to any such failure shall not be excluded by this clause (a) unless otherwise excluded by the following clause (b)); or (b) any adverse effect, event, occurrence, circumstance or change arising from or resulting from (i) the economy in general, or the securities, syndicated loan, credit or financial markets in general, (ii) the economic, business or healthcare regulatory environment (including changes with respect to pricing or reimbursement by insurance providers, other commercial entities or governmental payors generally stemming from United States healthcare reform initiatives or otherwise) or financial conditions generally affecting the industries or geographic markets in which the Business operates, (iii) an act of terrorism or an outbreak or escalation of hostilities or war (whether declared or not declared) or any natural disasters or any national or international calamity or crisis, (iv) an Excluded Asset or Excluded Liability (except to the extent such Excluded Asset or Excluded Liability affects the business, assets, results of operations or financial condition of the Business), (v) changes after the date hereof in applicable Law or GAAP (or the applicable accounting standards in any jurisdiction outside of the United States) or definitive interpretations thereof, (vi) the announcement of the Transactions, including any loss of employees or customers or any disruption in customer, supplier, distributor or similar relationships to the extent resulting from the announcement of the Transactions, (vii) any labor strikes, labor stoppages or loss of employees with respect to the Business, to the extent resulting from the announcement of the Transactions or an action taken or a statement made by Buyer or any of its Affiliates, in each case after the date hereof, regarding a future action intended to be taken by Buyer or any of its Affiliates with respect to the Business, or (viii) changes or effects that are the result of actions or omissions of Buyer or any of its Affiliates, or actions or omissions of Seller or any of its Affiliates that are consented to in writing

-13-

by Buyer or any of its Affiliates; provided , further , however , that any effect or change referred to in clauses (b)(i), (ii), (iii) or (v) may be taken into account in determining whether there has been or would reasonably be expected to be, a "Material Adverse Effect" to the extent such effect, event, occurrence, circumstance or change has a disproportionate adverse effect on the Business, taken as a whole, as compared to other participants in the industries in which the Business operates.

" Non-Resident Capital Gains Tax " means any Tax imposed on a non-resident of the Taxing jurisdiction (whether imposed by withholding or otherwise and whether calculated by reference to transfer price, net gain or otherwise).

" Non-U.S. Transferred Employee " means any Transferred Employee who is not a U.S. Transferred Employee.

" Outside Date " means January 18, 2018; provided , that if on such date any of the conditions set forth in (a) Sections 5.01(e) or 5.02(e) (if the reason for the failure of any such condition to be satisfied is a Closing Legal Impediment under any merger control or similar legislation) or (b) Sections 5.01(f) or 5.02(f) have not been satisfied but all other conditions set forth in Article V (other than the conditions in the foregoing clause (a) or (b)) have been satisfied or waived (excluding those conditions intended to be satisfied at the Closing, provided that such conditions are reasonably capable of being satisfied), the Outside Date shall be automatically extended to April 18, 2018.

" Permitted Liens " means (a) mechanics', carriers', workmen's, repairmen's or other like Liens imposed by Law arising or incurred in the ordinary course of business, (b) Liens arising under purchase price conditional sales contracts or equipment leases with third parties entered into in the ordinary course of business consistent with past practice, (c) Liens for Taxes or other governmental charges that are not yet delinquent and may thereafter be paid without penalty, or that the taxpayer is contesting in good faith through appropriate proceedings and for which adequate reserves have been established in the accounting books and records prior to the date hereof, (d) restrictions under leases, subleases, licenses or occupancy agreements that constitute Transferred Assets, none of which materially interferes with the present use of the related real property, (e) easements, covenants, rights-of-way and other similar restrictions of record, none of which materially interferes with the present use of the related real property, (f) zoning, building and other similar restrictions, none of which materially interferes with the present use of the related real property, (g) Liens created by or for the benefit of Buyer or its Affiliates, (h) Liens that are removed prior to the Closing and (i) with respect to real property, other imperfections of title or encumbrances, if any, which do not materially interfere with the present use of such real property.

" Person " means any individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, Governmental Entity or other entity.

" Personal Information " means (a) any information that is identifying or can be reasonably used to identify an individual, including individual demographic information; (b) social security numbers and their foreign equivalents; and (c) any information or data that is defined as "personal information" or "personal data" under applicable Law, in each case, only to the extent applicable to Transferred Employees.

-14-

" PIS/COFINS " means the Brazilian social contributions of Programa de Integração Social (Social Integration Program) and Contribuição para o Financiamento da Seguridade Social (Contribution for Social Security Financing).

" Post-Closing Tax Period " means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

" Pre-Closing Tax Period " means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on or before the Closing Date.

" Products " or " Product " means, collectively or individually, (a) the products that are owned by Seller or any Affiliate of Seller (including any Transferred Company) set forth on Exhibit A-1 , in addition to (b) any other products and products in development (in each case, if any) that are owned by Seller or any Affiliate of Seller (including any Transferred Company) within the twenty-three (23) product groups which constitute the Patient Recovery Business of the Patient Monitoring & Recovery (PMR) Division in Seller's Minimally Invasive Therapies Group operating segment, which product groups are set forth on Exhibit A-1 , but in the case of this clause (b), excluding products and product groups set forth on Exhibit A-2 .

" Product Registrations " means all marketing approvals, clearances or other authorizations used to market the Products and granted or pending with any Governmental Entity, including those set forth on Schedule 3.17(a) of the Disclosure Letter.

" Release " means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor Environment or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

" Selling Affiliates " means together the Asset Selling Affiliates and the Stock Selling Affiliates.

" Shared Services " means those shared services and systems provided to the Business by Seller and/or its Affiliates, or on their behalf, and which are listed on Schedule 2.02(b)(vi) to the Disclosure Letter.

" Specified Entity " means the entity set forth on Exhibit 2 .

" Stock Selling Affiliates " means all of the Affiliates of Seller (other than a Transferred Company) that own any Transferred Equity Interests.

" Straddle Period " means a taxable period that includes but does not end on the Closing Date.

" Swiss Gross-Up " means a fraction, the numerator of which is one and the denominator of which is the excess of one minus the Swiss Tax Rate.

-15-

" Swiss Sale Amount " means the amount set forth on Schedule 6.11(a) to the Disclosure Letter.

" Swiss Tax Basis " means the aggregate Tax basis of Seller and its Affiliates in the Transferred Assets transferred pursuant to the Swiss Asset Transfer.

" Swiss Tax Rate " means the rate set forth on Schedule 6.11(a) to the Disclosure Letter, unless, prior to the Closing, Seller or its Affiliates receive a Swiss Tax Ruling, in which case "Swiss Tax Rate" means such lower rate confirmed by such Swiss Tax Ruling to be imposed on Seller or its Affiliates with respect to the Swiss Asset Transfer.

" Swiss Tax Ruling " means a Tax ruling issued by the Swiss Taxing Authority to Seller or its Affiliates confirming a Swiss income Tax rate of less than the rate set forth on Schedule 6.11(a) to the Disclosure Letter shall be imposed on Seller or its Affiliates with respect to the Swiss Asset Transfer.

" Tax " and " Taxes " means all taxes, charges, duties, fees, levies or other assessments, including income, excise, property, business, goods and services, sales or use, value added, profits, license, withholding (with respect to compensation or otherwise), payroll, employment, net worth, capital gains, transfer, stamp, social security, environmental, occupation and franchise taxes, imposed by any Governmental Entity, and including any interest, penalties and additions attributable thereto.

" Tax Proceeding " means any audit, request for information, investigation, hearing, litigation, legal action, administrative or judicial contest or proceeding relating to Taxes.

" Tax Return " means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

" Taxing Authority " means any Governmental Entity exercising any authority to impose, regulate or administer the imposition of Taxes.

" Transaction Documents " means this Agreement and the Ancillary Agreements.

" Transactions " mean, collectively, the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of the Transferred Assets and the Transferred Equity Interests and the assumption of the Assumed Liabilities.

" Transfer Taxes " mean any federal, state, county, local, foreign and other sales, use, transfer, PIS/COFINS, conveyance, documentary transfer, stamp duty, recording or other similar Tax, fee or charge imposed in connection with the Transactions or the recording of any sale, transfer, or assignment of property (or any interest therein) effected pursuant to this Agreement; provided , however , notwithstanding anything herein to the contrary, Transfer Taxes shall not include any VAT.

-16-

" Transferred Assets " means the properties and other rights set forth or described on Annex 2.02(a) , which expressly exclude the Excluded Assets.

" Transferred Companies " means the entities set forth on Schedule 1.01(f) to the Disclosure Letter, as such Schedule may be amended as permitted under Section 6.09 to reflect the Closing Structure and/or Internal Restructuring Steps.

" Transferred Employee " means each Employee of the Business who, as of the Closing Date (or, if applicable, such later date that such employee commences employment with Buyer or one of its Affiliates), becomes an employee of Buyer or one of its Affiliates whether by operation of Law, pursuant to the transfer (directly or indirectly) of the Transferred Equity Interests to Buyer or by acceptance of Buyer's or one of its Affiliate's offer of employment pursuant to Section 8.01 .

" Transferred Equity Interests " means all the issued and outstanding equity interests of each of the Transferred Companies.

" U.S. Transferred Employee " means any Transferred Employee who is principally employed in the United States as of the Closing Date (or, if applicable, such later date that such employee commences employment with Buyer or one of its Affiliates).

" VAT " means any value added Tax, goods and services Tax or similar Tax, including (a) such Tax as may be levied in accordance with (but subject to derogation from) EEC Directive 77/388/EEC (and other directives of the European Union relating to VAT) and/or local legislation imposing value added tax in the relevant jurisdiction, and (b) any other Tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such Tax referred to in the foregoing clause (a), or imposed elsewhere.

(b) The following terms used in this Agreement shall have the meanings assigned to them in the respective Sections of this Agreement or Schedules to the Disclosure Letter set forth below:

| Term | Location |
|---|---|
| Accounting Firm | Section 2.04(d) |
| Accounting Policies | Section 2.04(c) |
| Aggregate Underfunded Amount | Section 8.02(a) |
| Agreement | Preamble |
| Allocated Purchase Price | Section 2.05(g)(ii) |
| Allocation | Section 2.05(b) |
| Allocation Method | Section 2.05(a) |
| Allocation Schedule | Section 2.05(b) |
| Alternative Proposal | Section 6.08(c) |
| Assumption Agreement | Section 2.02(c) |
| Auto Policies | Section 7.04(c) |
| Business | Preamble |
| Business Claims | Annex 2.02(c)(vi) |
| Business Confidentiality Agreement | Section 7.12(a) |

-17-

| | |
|---|---|
| Buyer | Preamble |
| Buyer 401(k) Plan | Section 8.01(p) |
| Buyer Field of Use | Section 7.01(c) |
| Buyer Fundamental Representations | Section 5.02(a) |
| Buyer Indemnitees | Section 10.02 |
| Buyer Plans | Section 8.01(g) |
| Buyer's Actuary | Section 8.02(b) |
| Claim | Section 10.05 |
| Closing | Section 2.01 |
| Closing Date | Section 2.01 |
| Closing Inventory | Section 2.04(b) |
| Closing Legal Impediment | Section 5.01(e) |
| Closing Structure | Section 2.02(a) |
| Collective Bargaining Agreements | Section 3.12(a) |
| Competing Business | Section 7.11(c)(i) |
| Confidential Business Information | Section 7.12(b) |
| Confidentiality Agreements | Section 7.12(a) |
| Consultation Process | Section 2.02(i) |
| Consultation Processes | Section 8.01(k) |
| Contracts | Annex 2.02(a)(xi) |
| Country Transfer Agreement | Section 2.02(e) |
| Debt Financing | Section 6.06(a) |
| Deductible | Section 10.04(a) |
| Directive | Section 8.01(o) |
| Divestiture Action | Section 6.05(d) |
| Dutch Acceptance Notice | Section 2.02(i)(2) |
| Dutch Assets | Section 2.02(i) |
| Dutch Entity | Section 2.02(i) |
| Dutch Offer Letter | Section 2.02(i)(2) |
| Dutch Purchase Price | Section 2.02(i)(2) |
| Environmental Permits | Section 3.14(a) |
| Equipment | Annex 2.02(a)(iii) |
| Estimated Cash Amount | Section 2.03(c) |
| Exchange Rate | Section 1.02(c) |
| Excluded Contracts | Annex 2.02(b)(vi) |
| Excluded IP Rights | Annex 2.02(b)(xi) |
| Existing Guarantee | Section 7.13(b) |
| FCPA | Section 3.19(a) |
| Final Aggregate Tax Basis | Section 6.10(a) |
| Final Aggregate Underfunded Amount | Section 8.02(b) |
| Final Inventory Tax Basis | Section 6.10(a) |
| Forward-Looking Statements | Section 11.02 |
| French Acceptance Notice | Section 2.02(i)(1) |
| French Assets | Section 2.02(i) |
| French Entity | Section 2.02(i) |
| French Offer Letter | Section 2.02(i)(1) |

-18-

French Purchase Price ....................................................... Section 2.02(i)(1)
Fundamental Representations ............................................. Section 10.01
General Assignment .......................................................... Section 2.02(a)
Guarantee ........................................................................ Section 7.13(a)
Inactive Employee ........................................................... Section 8.01(c)
Indemnified Party ............................................................ Section 10.05
Indemnifying Party .......................................................... Section 10.05
Indemnitees ..................................................................... Section 10.03
Initial Allocation ............................................................. Section 2.05(a)
Initial Allocation Schedule .............................................. Section 2.05(a)
Internal Restructuring Steps ............................................ Section 6.09(a)
Italian Consultation Process ............................................ Section 2.02(j)
Italian Entity ................................................................... Section 2.02(j)
Italian Target ................................................................... Section 2.02(j)
Lease Assignment and Assumption Agreement ................ Section 2.08(j)
Leased Real Property ....................................................... Annex 2.02(a)(i)
Licensed IP Contracts ..................................................... Section 3.10(b)
Master Manufacturing and Supply Agreement ................. Section 7.09
Material Commingled Contracts ....................................... Section 3.09(d)
Material Distribution Contract ......................................... Section 6.01(b)(xii)
Material Transferred Contracts ........................................ Section 3.09(b)
Non-U.S. Employment Terms ........................................... Section 8.01(j)
Notice of Disagreement ................................................... Section 2.04(d)
Notice of Objection .......................................................... Section 8.02(b)
Owned Real Property ....................................................... Annex 2.02(a)(i)
Patent Assignment ........................................................... Section 2.02(a)
Pre-Closing Accounts Payable ......................................... Annex 2.02(d)(i)
Pre-Closing Accounts Receivable ..................................... Annex 2.02(b)(i)
Pre-Closing Auto Claims .................................................. Section 7.04(c)
Pre-Closing Business Tax Returns .................................... Section 7.08(a)(i)
Pre-Closing Entity Tax Returns ........................................ Section 7.08(a)(i)
Pre-Closing Tax Returns .................................................. Section 7.08(a)(i)
Pre-Closing WC Claims ................................................... Section 7.04(b)
Price Adjustment Statement ............................................. Section 2.04(b)
Product Claims ................................................................ Annex 2.02(c)(iv)
Product Registration Transfer Time .................................. Section 2.02(g)
Proposed Allocation ........................................................ Section 2.05(b)
Proposed Initial Allocation .............................................. Section 2.05(a)
PTO ................................................................................. Section 8.01(h)
Public Official ................................................................. Section 3.19(b)
Purchase Price ................................................................. Section 2.03(d)
Purchase Price Adjustment Due Date ............................... Section 2.04(g)
Related Party ................................................................... Section 6.06(c)
Representatives ................................................................ Section 6.08(a)
Resolution Period ............................................................ Section 8.02(c)
Restricted Employee ........................................................ Section 7.11(a)

-19-

| | |
|---|---|
| Retention Bonuses | Section 8.01(s) |
| Retention Participant | Section 8.01(s) |
| Sanction Laws | Section 3.19(c) |
| Section 338(g) Election | Section 7.08(e)(i)(1) |
| Section 338(g) Transferred Companies | Section 7.08(e)(i)(1) |
| Seller | Preamble |
| Seller 401(k) Plans | Section 8.01(p) |
| Seller Field of Use | Section 7.01(b) |
| Seller Fundamental Representations | Section 10.01 |
| Seller Indemnitees | Section 10.03 |
| Seller Option | Section 8.01(r)(i) |
| Seller Ordinary Shares | Section 8.01(r)(i) |
| Seller Restricted Employee | Section 7.11(b) |
| Seller RSU Award | Section 8.01(r)(iii) |
| Seller's Actuary | Section 8.02(b) |
| Significant Distributors | Section 3.21(a) |
| Significant Suppliers | Section 3.21(b) |
| Sorting Service Agreement | Section 7.09 |
| Specified Internal Restructuring Steps | Section 6.09(a) |
| Specified Non-U.S. Jurisdiction | Section 8.01(j) |
| Swiss Asset Transfer | Section 6.09(c) |
| Trademark Assignment | Section 2.02(a) |
| Trademark License Agreement 1 | Section 7.09 |
| Trademark License Agreement 2 | Section 7.09 |
| Trademark License Agreements | Section 7.09 |
| Transfer Regulations | Section 8.01(o) |
| Transfer Time | Section 8.01(c) |
| Transferred Contracts | Annex 2.02(a)(xi) |
| Transferred Employee Liabilities | Annex 2.02(c)(vii) |
| Transferred IP | Annex 2.02(a)(viii) |
| Transferred IP Licenses | Annex 2.02(a)(viii) |
| Transferred IT | Annex 2.02(a)(x) |
| Transferred Real Property | Annex 2.02(a)(i) |
| Transferred Real Property Leases | Annex 2.02(a)(i) |
| Transferred Records | Annex 2.02(a)(vi) |
| Transition Services Agreement | Section 7.09 |
| U.S. Assets | Section 6.09(a) |
| U.S. Business Transfer | Section 6.09(a) |
| U.S. Inventory | Section 6.10(a) |
| Workers Compensation Policies | Section 7.04(b) |

SECTION 1.02. <u>Interpretation and Construction</u> . (a) Unless otherwise provided herein, all monetary values stated herein are expressed in United States currency and all references to "dollars" or "$" will be deemed references to the lawful money of the United States.

(b) Each accounting term set forth herein and not otherwise defined shall have the meaning accorded it under GAAP.

(c) Except as provided in Section 2.03(b) and Section 8.02(a), whenever conversion of values from any Foreign Currency for a particular date or period shall be required, such conversion shall be made using the rate provided by Bloomberg at 5:00 a.m. New York City time (the "Exchange Rate") three (3) business days prior to the applicable date or dates.

(d) The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. When a reference is made in this Agreement to a party or to a Section or Exhibit, such reference shall be to a party to, a Section of, or an Exhibit to, this Agreement, unless otherwise indicated. When a reference is made in this Agreement to a Schedule, such reference shall be to a Schedule to the Disclosure Letter, unless otherwise indicated. All terms defined in this Agreement shall have their defined meanings when used in any Exhibit to this Agreement or Schedule to the Disclosure Letter, as applicable, or any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein. Whenever used in this Agreement, "business day" shall mean any day, other than a Saturday or a Sunday or a day on which banking and savings and loan institutions are authorized or required by applicable Law to be closed in New York, New York or Dublin, Ireland. Whenever the words "include," "includes," "including" or "such as" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "or" when used in this Agreement is not exclusive. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." Whenever used in this Agreement, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders. Any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, supplemented or modified, including (i) (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and (ii) all attachments thereto and instruments incorporated therein. The words "asset" and "property" shall be construed to have the same meaning and effect. References to a Person are also to its permitted successors and assigns. In the event of any conflict between this Agreement and any Country Transfer Agreement, the terms of this Agreement shall control.

ARTICLE II

Closing

SECTION 2.01. Closing. The closing of the purchase and sale of the Transferred Assets and Transferred Equity Interests and the assumption of the Assumed Liabilities (the

-21-

" Closing ") shall take place at the offices of Wachtell, Lipton, Rosen & Katz in New York, New York, at 10:00 a.m., New York City time, on the later of (a) the second business day following the satisfaction (or, to the extent permitted by applicable Law, waiver) of the conditions set forth in Article V and (b) the first business day of the fiscal month of Seller following the fiscal month of Seller in which such satisfaction (or waiver) occurs (excluding in each case those conditions intended to be satisfied at the Closing but subject to their satisfaction or, to the extent permitted by applicable Law, waiver at such time) ( provided that the Closing shall not occur prior to July 29, 2017), or on such other date as the parties hereto may agree. The date on which the Closing occurs is referred to in this Agreement as the " Closing Date ." The Closing shall be deemed to occur and be effective at 12:01 A.M., local time, on the Closing Date. The parties hereto specifically acknowledge that time is of the essence because Seller's intention to exit the Business is or will become known to its employees, customers, suppliers and others having dealings with Seller. The parties hereto further agree to cooperate in good faith to determine whether the Closing Date may occur on the first day, rather than the first business day, of the relevant fiscal month of Seller.

SECTION 2.02. Transferred Assets and Transferred Equity Interests/Excluded Assets; Assumed/Excluded Liabilities .

(a) Transferred Assets and Transferred Equity Interests . Pursuant to the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will, and will cause the relevant Asset Selling Affiliates to, in accordance with Exhibit L (the " Closing Structure "), sell, convey, assign, and transfer to Buyer, and Buyer will purchase, acquire and accept, the Transferred Assets, free and clear of all Liens other than Permitted Liens. Accordingly, Seller will, or will cause the relevant Asset Selling Affiliates to, execute and deliver at the Closing a general assignment and bill of sale substantially in the form of Exhibit B (the " General Assignment "), a general patent assignment substantially in the form of Exhibit C (the " Patent Assignment ") and a general trademark assignment substantially in the form of Exhibit D (the " Trademark Assignment ") and at the Closing such other instruments of conveyance, assignment and transfer as Buyer reasonably requests (the form and substance of which shall be mutually agreed between the parties), in each case to convey to Buyer all of Seller's or each Asset Selling Affiliate's right, title and interest in and to the applicable Transferred Assets. In addition, pursuant to the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will, and will cause the relevant Stock Selling Affiliates to, in accordance with the Closing Structure, sell, convey, assign, and transfer to Buyer, and Buyer will purchase, acquire and accept, the Transferred Equity Interests (and will indirectly acquire and accept by means of such purchase acquisition and acceptance, the Transferred Equity Interests in any Transferred Company that is a subsidiary of another Transferred Company), free and clear of all Liens. Accordingly, Seller will, or will cause the relevant Stock Selling Affiliates to, deliver at the Closing stock certificates representing the Transferred Equity Interests, together with a stock power endorsed in blank, to the extent that such Transferred Equity Interests are in certificated form, and to the extent such Transferred Equity Interests are not in certificated form, other evidence of assignment.

(b) Excluded Assets . Anything to the contrary herein notwithstanding, Buyer is not purchasing, pursuant to this Agreement or any of the Transactions, Seller's (or any of its Affiliates') right, title or interest in any asset that is not a Transferred Asset or Transferred Equity Interest. Specifically, Seller's (and any of its Affiliates') right, title or interest in any Excluded Asset is not being conveyed to Buyer.

-22-

(c) <u>Assumed Liabilities</u> . At the Closing, Buyer shall assume the Assumed Liabilities and shall agree to satisfy and discharge when due the Assumed Liabilities. After the Closing, Buyer shall pay all Assumed Liabilities as and when such liabilities become due. Buyer will execute and deliver to Seller at the Closing an assumption agreement in the form of <u>Exhibit  E</u> (the " <u>Assumption Agreement</u> ") and such other agreements and instruments as Seller reasonably requests (the form and substance of which shall be mutually agreed between the parties), whereby Buyer agrees to assume and undertakes to pay, perform and discharge as and when due, the Assumed Liabilities. For the avoidance of doubt, at the Closing, by means of the acquisition (directly or indirectly) of the Transferred Equity Interests and not by means of a direct assumption of such liabilities by Buyer, Buyer shall be responsible for the liabilities of the Transferred Companies that would otherwise constitute Assumed Liabilities pursuant to <u>Annex 2.02(c)</u> (as more specifically set forth in <u>Section  6.07</u> ).

(d) <u>Excluded Liabilities</u> . Anything to the contrary herein notwithstanding, neither Buyer nor any of its Affiliates shall assume or be obligated to pay, perform or otherwise discharge, pursuant to this Agreement or any of the Transactions, any Excluded Liability. Seller and its Affiliates will remain liable to pay, perform and discharge when due, all Excluded Liabilities. For the avoidance of doubt, at the Closing, the acquisition (directly or indirectly) of the Transferred Equity Interests shall not result in the assumption by Buyer of the liabilities and obligations of the Transferred Companies that would otherwise constitute Excluded Liabilities pursuant to <u>Annex 2.02(d)</u> (as more specifically set forth in <u>Section  6.07</u> ).

(e) <u>Country Transfer Agreements</u> . To the extent required by applicable Law or as deemed necessary by either of the parties hereto, the transfer of each Country Unit will be effected pursuant to a short-form agreement or one or more instruments of transfer, such as a bill of sale, share transfer agreement, business transfer agreement, real estate transfer agreement or other asset assignment document, which agreement shall be prepared by Seller and shall be on terms mutually agreed between the parties hereto and consistent with and as close as reasonably possible to the applicable terms of this Agreement (each, a " <u>Country Transfer Agreement</u> "). The parties shall enter into the Country Transfer Agreements as soon as reasonably practicable after the date hereof and not later than the Closing.

(f) <u>Designation of Affiliates</u> . To the extent that any of the Transferred Assets or Transferred Equity Interests are under the control of any of Seller's Affiliates, Seller shall cause its Affiliates to promptly take such legal action as may be necessary to consummate the transfer to Buyer and its Affiliates of such Transferred Assets or Transferred Equity Interests under terms and conditions which are consistent with and subject to the terms of this Agreement. Prior to, and in any event at least thirty (30) days in advance of, the Closing, Buyer may designate, with the consent of Seller (which consent shall not be unreasonably withheld), one or more Affiliates to, at the Closing, (i) acquire all or part of the Transferred Assets or Transferred Equity Interests, (ii) assume all or part of the Assumed Liabilities or (iii) pay a designated portion of the Purchase Price pursuant to <u>Section  2.03</u> , in each case related to the applicable Country Unit, as the case may be, in which event all references herein to Buyer will be deemed to refer to such Affiliates, as appropriate; <u>provided</u> , <u>however</u> , that no such designation will in any event limit or affect the obligations of Buyer under this Agreement to the extent not performed by such Affiliates.

-23-

(g) <u>Transferred Assets Subject to Third-Party Consent</u> . With respect to each Product, the parties shall use reasonable best efforts to ensure that, effective as of the Closing or as soon as reasonably practicable thereafter, either (A) (1) the Product Registrations that constitute Transferred Assets shall have transferred to, or shall have been approved in writing by the applicable Governmental Entity for transfer to, Buyer or its designee or (2) Buyer shall have obtained a Product Registration (including any re-registrations) that enables Buyer or its designee to manufacture, distribute and market such Product in each applicable jurisdiction, or (B) Buyer or its designee otherwise shall have either (1) acceded to Seller's or its Affiliate's rights in respect of manufacturing, distributing and marketing such Products under such Product Registrations, including by Seller or an Affiliate of Seller designating Buyer or its designee as an authorized agent with respect to such Products, or (2) been designated as a manufacturing, sales or distribution agent with respect to the Products under such Product Registrations, in the case of this clause (B), pursuant to reasonable, lawful and customary arrangements to effectuate the foregoing (the time at which any of the foregoing occurs with respect to a Product Registration (or, if earlier, the expiration of such Product Registration in accordance with its terms), the " <u>Product Registration Transfer Time</u> "). If the Product Registration Transfer Time shall not have occurred on the Closing Date with respect to any such Product Registration, until such Product Registration Transfer Time with respect to such Product Registration, (X) the parties will continue to use reasonable best efforts to ensure that the Product Registration Transfer Time with respect to such Product occurs as soon as reasonably practicable after the Closing, (Y) Seller shall, and shall cause its subsidiaries to, consent to Buyer's and its Affiliates' use of such Product Registration for the continued operation of the Business with respect to such Product after the Closing, and (Z) if requested by Buyer, Seller shall, and shall cause its subsidiaries to, provide Buyer, to the fullest extent possible, pursuant to an arrangement reasonably satisfactory to Seller and Buyer, the exclusive net benefit of such Product Registration (including, to the extent not able to be conducted by Buyer and its Affiliates after the Closing as result of the failure of the Product Registration Transfer Time to occur, by Seller and its subsidiaries continuing to conduct the Business with respect to such Product in substantially the same manner and with substantially the same level of efforts and resources as conducted by Seller and its subsidiaries prior to the Closing) by passing through all revenues received by Seller and its subsidiaries with respect to the Products under such Product Registration from the Closing Date through such Product Registration Transfer Time, less only such amount of costs and expenses (including Taxes) as Seller and its Affiliates incur or become liable for in connection with any such arrangements with respect to such Products (other than any such costs and expenses that are duplicative of documented costs and expenses actually incurred by Buyer and its Affiliates in connection the conduct of the Business with respect to such Products). The parties agree they will cooperate to minimize the costs and expenses incurred in connection with the foregoing arrangements, including by using commercially reasonable efforts to avoid duplicative or incremental costs and expenses. Furthermore, the parties agree that Seller and its Affiliates shall be permitted to utilize their respective ordinary course transfer pricing in connection with the foregoing arrangements, including in connection with any sale of Products from Seller or its Affiliates to Buyer or its Affiliates. In the case of the occurrence of the Product Registration Transfer Time under clause (B) of the definition thereof with respect to any Product Registration, (x) unless the parties agree otherwise, the arrangements contemplated by such clause (B) with respect to a Product shall

-24-

terminate reasonably promptly upon the occurrence of any of the events contemplated by clause (A) of the definition of Product Registration Transfer Time and (y) unless Buyer requests otherwise, the parties will continue to use reasonable best efforts to ensure that one of the events contemplated by clause (A) of the definition of Product Registration Transfer Time occurs with respect to such Product Registration as soon as reasonably practicable after the Closing. In addition to the foregoing, to the extent that the sale, assignment, transfer, conveyance or delivery or attempted sale, assignment, transfer, conveyance or delivery to Buyer (or one of its Affiliates) of any Transferred Asset is prohibited by any applicable Law or would require any governmental or third-party authorizations, approvals (including Anti-Trust Approvals), consents or waivers and such authorizations, approvals, consents or waivers shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery thereof. From the date hereof until eighteen (18) months after the Closing Date, the parties shall use their respective reasonable best efforts to cooperate with each other to obtain promptly such authorizations, approvals, consents or waivers and to give any notices required for the transfer of such Transferred Asset and to obtain from third parties an approval or consent to establish a new contract with Buyer or its designated Affiliate with respect to the portion of any Commingled Contract related to the Business, pursuant to which Buyer or its designated Affiliate will have access to the rights and benefits of such Commingled Contract with respect to the Business on substantially the same terms and conditions provided to Seller and its Affiliates prior to the Closing, or to assign such portion to Buyer or its designated Affiliate; provided , however , that Seller shall not be required to pay any consideration (other than customary filing and application fees typically paid by a seller or transferee) or make any concession therefor. If such authorization, approval, consent or waiver is obtained, Seller shall promptly assign, transfer, convey or deliver any such Transferred Asset or, if applicable, that portion of any Commingled Contract, as the case may be, to Buyer or its designee pursuant to Section 2.02(f) at no additional cost. Pending the earlier of obtaining such authorization, approval, consent or waiver or the expiration of such eighteen-month (18 month) period, insofar as reasonably practicable and to the extent permitted by applicable Law, Seller shall hold such Transferred Assets for the benefit of Buyer and shall operate such Transferred Assets in a manner to place Buyer in a substantially similar position as if such Transferred Assets had been sold, conveyed, assigned and transferred. Buyer shall use its reasonable best efforts to cooperate with Seller in connection with any actions taken by Seller pursuant to this Section 2.02(g) . Buyer further agrees that, if Seller shall have complied with its obligations under this Agreement with respect to using reasonable best efforts to obtain such authorization, approval, consent or waiver, Seller shall not be in breach of this Agreement solely as a result of the failure to obtain any such authorization, approval, consent or waiver.

(h) Buyer ' s Recording and Similar Responsibilities . Notwithstanding the foregoing provisions of this Section 2.02 , it shall be Buyer's responsibility (i) to prepare the applicable country patent assignments and trademark assignments in respect of the Transferred IP and to record such assignments following execution thereof by Seller (or its applicable Affiliate), (ii) to apply for its own marketing authorizations for the Products to the relevant regulatory authorities where it is not within the power of Seller to cause, by giving notice to the applicable regulatory authority or otherwise, the transfer directly to Buyer of the existing marketing authorizations that are Transferred Assets and (iii) to bear the fees and other costs in accordance with Section 2.06(d) . Seller shall, and shall cause its Affiliates to, provide all reasonable assistance to Buyer in connection with the foregoing at Buyer's expense to the extent Seller or its Affiliates incurs third-party costs related thereto.

-25-

(i) Certain European Interests . The parties acknowledge that, pursuant to applicable Law, the relevant Employee Representatives of the entities set forth on Schedule 2.02(i)(A) to the Disclosure Letter (the " French Entity ") and Schedule 2.02(i)(B) to the Disclosure Letter (the " Dutch Entity ") will have to be informed and consulted in advance of any final decisions being taken by the French Entity and Dutch Entity (as applicable, the " Consultation Process ") with respect to the proposed purchase and sale of any Transferred Assets located in France (such proposed Transferred Assets, collectively, the " French Assets "), and the Netherlands (such proposed Transferred Assets, collectively, the " Dutch Assets "), respectively.

(1) Notwithstanding anything to the contrary contained in this Agreement, unless and until Seller has executed and delivered to Buyer the French Acceptance Notice (which shall not occur until the end of the Consultation Process in France, *i.e.* , until the applicable works council of the French Entity has rendered a clear opinion in writing or until the French Entity reasonably concludes that, as a matter of French Law, the applicable works council of the French Entity is deemed to have been consulted and to have rendered a negative opinion, in accordance with the provisions of French Law), (a) the provisions of this Article II shall not be effective with respect to the French Assets, (b) for the purpose of this Article II , the French Assets shall not be considered Transferred Assets, and (c) the Purchase Price shall be reduced by the French Purchase Price. On the terms and conditions set forth in the Offer Letter attached as Exhibit F-1 hereto (the " French Offer Letter "), including the price specified therein (the " French Purchase Price "), Buyer has irrevocably offered to acquire, or to cause its applicable Affiliates to acquire, the French Assets and to have the provisions of this Article II apply to such French Assets following the acceptance by Seller of Buyer's irrevocable offer as set out in the French Offer Letter (as may be amended by express agreement between the parties in the event that points arise during the Consultation Process, as set forth in the French Offer Letter). It is understood that in entering into this Agreement, Seller is not in any regard bound to accept Buyer's irrevocable offer as set out in the French Offer Letter. Upon delivery to Buyer of the executed French Acceptance Notice attached as Schedule 2 to the French Offer Letter (the " French Acceptance Notice "), this Article II shall be effective with respect to the French Assets and the French Assets shall be included in the Transferred Assets, as though, in each case, they had always been so included, and the Purchase Price shall no longer be reduced by the French Purchase Price. It is understood that the Purchase Price assumes delivery of the French Acceptance Notice and therefore already includes the French Purchase Price.

(2) Notwithstanding anything to the contrary contained in this Agreement, unless and until Seller has executed and delivered to Buyer the Dutch Acceptance Notice (which shall not occur until the end of the Consultation Process in the Netherlands, *i.e.* , until the applicable works council of the Dutch Entity has rendered an opinion in writing or until the Dutch Entity reasonably concludes that, as a matter of Dutch Law, the applicable works council of the Dutch Entity has sufficiently been able to render an opinion, in accordance with the provisions of Dutch Law), (a) the provisions of this Article II shall

-26-

not be effective with respect to the Dutch Assets, (b) for the purpose of this Article II, the Dutch Assets shall not be considered Transferred Assets, and (c) the Purchase Price shall be reduced by the Dutch Purchase Price. On the terms and conditions set forth in the Offer Letter attached as Exhibit F-2 hereto (the " Dutch Offer Letter "), including the price specified therein (the " Dutch Purchase Price "), Buyer has irrevocably offered to acquire, or to cause its applicable Affiliates to acquire, the Dutch Assets and to have the provisions of this Article II apply to such Dutch Assets following the acceptance by Seller of Buyer's irrevocable offer as set out in the Dutch Offer Letter (as may be amended by express agreement between the parties in the event that points arise during the Consultation Process, as set forth in the Dutch Offer Letter). It is understood that in entering into this Agreement, Seller is not in any regard bound to accept Buyer's irrevocable offer as set out in the Dutch Offer Letter. Upon delivery to Buyer of the executed Dutch Acceptance Notice attached as Schedule 2 to the Dutch Offer Letter (the " Dutch Acceptance Notice "), this Article II shall be effective with respect to the Dutch Assets and the Dutch Assets shall be included in the Transferred Assets, as though, in each case, they had always been so included, and the Purchase Price shall no longer be reduced by the Dutch Purchase Price. It is understood that the Purchase Price assumes delivery of the Dutch Acceptance Notice and therefore already includes the Dutch Purchase Price.

(j) Italian Interests . The parties acknowledge that, pursuant to applicable Law, the relevant Employee Representatives of the Selling Affiliate set forth on Schedule 2.02(j)(i) to the Disclosure Letter (the " Italian Entity ") will have to be informed and consulted in advance of any final decision being taken by the Italian Entity with respect to the contribution by the Italian Entity of the Transferred Assets owned by it, i.e. *conferimento di ramo d ' azienda* , into the entity set forth on Schedule 2.02(j)(ii) to the Disclosure Letter (the " Italian Target "), in accordance with the union consultation procedure before the applicable Italian Entity Employee Representative pursuant to Section 47 of Italian Law n. 428/1990 (the " Italian Consultation Process "). The parties acknowledge that the proposed purchase and sale of the Transferred Equity Interests of the Italian Target is conditional upon the completion of the Italian Consultation Process (which shall be deemed satisfied when Seller delivers written notice to Buyer that such Italian Consultation Process has been completed in accordance with applicable Italian Law). For the avoidance of doubt, if the Italian Consultation Process is not completed by the Closing, then the purchase and sale of the Transferred Equity Interests of the Italian Target shall be treated in the manner that other Transferred Assets are treated in Section 2.02(g) . Notwithstanding the foregoing, all items taken into account in the Purchase Price adjustment in accordance with Section 2.04 shall not be adjusted to reflect the exclusion of the assets of the Italian Target at the Closing but shall be reflected as if the transfer of the Italian Target shall have occurred at the Closing.

SECTION 2.03. Purchase Price . (a) Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall (or shall cause one or more of its Affiliates as Buyer may designate pursuant to Section 2.02(f) to) pay or cause to be paid to Seller (or one or more of its Affiliates as Seller may designate), in immediately available funds by wire transfer to one or more bank accounts designated in writing by Seller at least two (2) business days prior to the Closing Date, cash in U.S. dollars (subject to Section 2.03(b) ) in an amount exclusive of any Transfer Taxes equal to the Purchase Price.

-27-

(b) If requested by Seller, Buyer shall pay the portion of the Purchase Price applicable to the Country Units identified on Schedule 2.03(b) to the Disclosure Letter in the applicable Foreign Currency set forth on such Schedule. The conversion rate from U.S. dollars to the applicable Foreign Currency shall be the closing rate provided by Bloomberg at 5:00 a.m. New York City time three (3) business days prior to the Closing Date; provided , however , that if applicable Law in a Country Unit identified on Schedule 2.03(b) to the Disclosure Letter requires that the applicable portion of the Purchase Price be paid by a legal entity organized under the laws of such Country Unit, and Buyer reasonably requires more than two (2) business days to convert U.S. dollars into the applicable Foreign Currency and thereafter transfer such funds to one of its Affiliates so organized, then Buyer and Seller shall negotiate in good faith to agree on an alternative conversion mechanism that will allow Buyer to pay the applicable portion of the Purchase Price on the Closing Date in accordance with applicable Law. Schedule 2.03(b) to the Disclosure Letter sets forth Seller's good-faith estimate as of the date of this Agreement of the portion of the Purchase Price to be allocated to each Country Unit identified therein for payment in a Foreign Currency.

(c) At least three (3) business days prior to the anticipated Closing Date, Seller shall cause to be prepared and delivered to Buyer a statement setting forth Seller's good-faith estimate of the Cash Amount (such estimate, the " Estimated Cash Amount ").

(d) The " Purchase Price " shall be equal to the sum of (i) six billion fifty-nine million one hundred twenty-three thousand sixty-two dollars ($6,059,123,062) plus (ii) the Estimated Cash Amount, with such Purchase Price being increased or decreased as a result of (x) the inventory, and cash adjustments, if any, pursuant to Section 2.04 , and (y) the adjustment, if any, pursuant to Section 8.02(e) , and shall be allocated as described in Section 2.05 .

SECTION 2.04. Purchase Price Adjustment . (a) For the purposes of clarification only, Seller is retaining all accounts payable and current liabilities (subject to clause (i)(2) of Annex 2.02(d) ) and accounts receivable and current assets (other than Inventory and any Cash Amount) arising out of the operation and conduct of the Business before the Closing, and the only purchase price adjustment after the Closing with respect to changes in the working capital of the Business (but without prejudice to the adjustment in accordance with Section 8.02(e) ) will be the adjustments of the Inventory and the Cash Amount pursuant to this Section 2.04 .

(b) Within ninety (90) days after the Closing Date, Seller shall prepare and deliver to Buyer a statement (the " Price Adjustment Statement "), setting forth the book value of the Inventory, prepared in accordance with the Accounting Policies, transferred to Buyer as of immediately prior to the Closing (the " Closing Inventory ") and the Cash Amount. If the book value of the Closing Inventory is greater than the Inventory Target or less than the Inventory Target by the amounts specified in Section 2.04(f) below, the Purchase Price shall be adjusted as described in Section 2.04(f) below. If the Cash Amount is greater than the Estimated Cash Amount or less than the Estimated Cash Amount, the Purchase Price shall be adjusted as described in Section 2.04(f) below.

(c) In connection with the preparation of the Price Adjustment Statement, (i) Buyer shall (A) assist, and shall cause its Affiliates to assist, Seller, its accountants, advisors and other representatives in its preparation of the Price Adjustment Statement and (B) afford to

-28-

Seller, its accountants, advisors and other representatives, reasonable access during normal business hours to the personnel, properties, books and records of the Business to the extent relevant to the preparation of the Price Adjustment Statement (including taking and preparing physical counts of Inventory) and (ii) Seller shall, and shall cause its Affiliates to, consult with Buyer in good faith and provide Buyer, its accountants, advisors and other representatives with any reasonably requested information, data or back-up materials with respect to the calculation of the Closing Inventory and the Cash Amount. For purposes of this Section 2.04 , the book value of the Inventory will be determined in a manner consistent with the relevant accounting policies and methodologies used in the preparation of the Financial Information (including any applicable accounting reserves or adjustments) (the " Accounting Policies ").

(d) The Price Adjustment Statement shall become final and binding upon the parties on the forty-fifth (45th) day following receipt thereof by Buyer unless Buyer gives written notice of its disagreement (the " Notice of Disagreement ") to Seller prior to such date. The Notice of Disagreement shall specify in reasonable detail the nature and amount of any disagreement so asserted. If a timely Notice of Disagreement is received by Seller, then the Price Adjustment Statement (as revised in accordance with clause (x) or (y) below) shall become final and binding upon the parties on the earlier of (x) the date the parties hereto resolve any differences they have with respect to any matter specified in the Notice of Disagreement or (y) the date any matters in dispute are resolved by an accounting firm (in accordance with the procedure set forth in this Section 2.04 ) selected by Seller and Buyer or, if the parties are unable to agree, an independent accounting firm selected by Seller's and Buyer's independent accounting firms (such firm, the " Accounting Firm ").

(e) Buyer and Seller acknowledge and agree that the dispute resolution provisions set forth in Section 11.12 shall not apply to any dispute described in this Section 2.04 . During the thirty-(30) day period immediately following the delivery of the Notice of Disagreement, Seller and Buyer shall seek in good faith to resolve in writing any differences they may have with respect to any matter specified in the Notice of Disagreement. At the end of such thirty- (30) day period, Seller and Buyer shall submit for review and resolution by the Accounting Firm any and all matters which remain in dispute and which were included in the Notice of Disagreement, and the Accounting Firm shall make a final determination of the values set forth on the Price Adjustment Statement (and shall use such determination to prepare the final Price Adjustment Statement), which determination shall be binding on the parties; provided , however , the scope of such determination by the Accounting Firm shall be limited to: (i) those matters that remain in dispute and that were included in the Notice of Disagreement; (ii) whether the calculations of the Inventory and the Cash Amount were prepared in accordance with this Section 2.04 , specifically, in the case of the calculation of Inventory, whether the Accounting Policies were used; and (iii) whether there were mathematical errors in the Price Adjustment Statement, and the Accounting Firm is not authorized or permitted to make any other determination. Without limiting the generality of the foregoing, the Accounting Firm is not authorized or permitted to make any determination as to the accuracy of Section 3.06 or any other representation or warranty in this Agreement or as to compliance by Seller, Buyer or any of their respective Affiliates with any of the covenants in this Agreement (other than this Section 2.04 ). The Price Adjustment Statement shall become final and binding on Buyer and Seller on the date the Accounting Firm delivers the final Price Adjustment Statement to the parties. The fees and expenses of the Accounting Firm pursuant to this Section 2.04 shall be borne one-half each by Buyer and Seller.

-29-

(f) If the Price Adjustment Statement discloses that the book value of the Closing Inventory is one hundred five percent (105%) or more of the Inventory Target, then the amount by which the book value of the Closing Inventory exceeds the Inventory Target shall be added on a dollar-for-dollar basis to the Purchase Price. If the Price Adjustment Statement discloses that the book value of the Closing Inventory is ninety-five percent (95%) or less of the Inventory Target, then the Purchase Price shall be reduced on a dollar-for-dollar basis by the amount by which the book value of the Closing Inventory is less than the Inventory Target. If the Price Adjustment Statement discloses that the book value of the Closing Inventory is greater than ninety-five percent (95%), but less than one hundred five percent (105%), of the Inventory Target, then there shall be no adjustment to the Purchase Price in respect of the Closing Inventory. If the Price Adjustment Statement discloses that the Cash Amount exceeds the Estimated Cash Amount, then the amount of such excess shall be added on a dollar-for-dollar basis to the Purchase Price. If the Price Adjustment Statement discloses that the Cash Amount is less than the Estimated Cash Amount, then the Purchase Price shall be reduced on a dollar-for-dollar basis by the amount of such deficit.

(g) No payment pursuant to Section 2.04(f) need be made by either party until the date that is fifteen (15) business days after the determination of the final Price Adjustment Statement (the " Purchase Price Adjustment Due Date "); provided that, on or before the Purchase Price Adjustment Due Date, (i) Buyer (or one or more of its Affiliates as may be designated by Buyer) shall pay or cause to be paid to Seller (or one or more of the Selling Affiliates as may be designated by Seller), in immediately available funds by wire transfer to one or more bank accounts designated in writing by Seller at least two (2) business days prior to the Purchase Price Adjustment Due Date, cash in U.S. dollars in an amount equal to the positive Purchase Price adjustment under Section 2.04(f) , if any, or (ii) Seller (or one or more of its Affiliates as may be designated by Seller) shall pay or cause to be paid to Buyer (or one or more of its Affiliates as may be designated by Buyer), in immediately available funds by wire transfer to one or more bank accounts designated in writing by Buyer at least two (2) business days prior to the Purchase Price Adjustment Due Date, cash in U.S. dollars in an amount equal to the negative Purchase Price adjustment under Section 2.04(f) .

SECTION 2.05. Allocation of Purchase Price .

(a) Within thirty (30) calendar days after the date of this Agreement, Buyer shall deliver a reasonable draft of the allocation of the Purchase Price and Assumed Liabilities among the Transferred Assets and Transferred Equity Interests (and among the assets held by any Transferred Company disregarded as separate from its owner for U.S. federal income Tax purposes) in a manner that incorporates, reflects and is consistent with Exhibit M attached hereto (the " Allocation Method ") on a country-by-country basis (the " Initial Allocation ") to Seller (the " Proposed Initial Allocation "). Except as provided in this subparagraph (a) and subparagraph (c) of this Section 2.05 , at the close of business on the thirtieth (30th) calendar day after delivery of the Proposed Initial Allocation, the Proposed Initial Allocation shall become binding upon Buyer and Seller, shall be set forth on Schedule 2.05(a) to the Disclosure Letter (the " Initial Allocation Schedule "), and shall be the Initial Allocation. Seller shall raise any objection (so long as such

-30-

objection is reasonable) to the Proposed Initial Allocation in writing within thirty (30) calendar days of the delivery of the Proposed Initial Allocation. Buyer and Seller shall negotiate in good faith to resolve any differences within thirty (30) calendar days after delivery of Seller's objection. If Buyer and Seller reach written agreement amending the Proposed Initial Allocation within such thirty (30) calendar day period, the Proposed Initial Allocation, as so amended, shall become binding upon Buyer and Seller, shall be set forth in the Initial Allocation Schedule, and shall be the Initial Allocation.

(b) Within sixty (60) calendar days after the Closing Date, Buyer shall deliver a reasonable draft of the allocation of the Purchase Price and Assumed Liabilities among each of the Transferred Assets and Transferred Equity Interests (and among the assets held by any Transferred Company disregarded as separate from its owner for U.S. federal income Tax purposes) in a manner that incorporates, reflects and is consistent with the Allocation Method, the Initial Allocation, and Sections 1060 and 338 of the Code (the " Allocation ") to Seller (the " Proposed Allocation "). Except as provided in this subparagraph (b) and subparagraph (c) of this Section  2.05 , at the close of business on the thirtieth (30th) calendar day after delivery of the Proposed Allocation, the Proposed Allocation shall become binding upon Buyer and Seller, shall be set forth on Schedule 2.05(b) to the Disclosure Letter (the " Allocation Schedule "), and shall be the Allocation.

(c) Seller shall raise any objection (so long as such objection is reasonable) to the Proposed Allocation in writing within thirty (30) calendar days of the delivery of the Proposed Allocation. Buyer and Seller shall negotiate in good faith to resolve any differences within thirty (30) calendar days after delivery of Seller's objection. If Buyer and Seller reach written agreement amending the Proposed Allocation within such thirty (30) calendar day period, the Proposed Allocation, as so amended, shall become binding upon Buyer and Seller, shall be set forth in the Allocation Schedule, and shall be the Allocation.

(d) Buyer and Seller acknowledge and agree that the dispute resolution provisions set forth in Section  11.12 shall not apply to any dispute described in this Section  2.05 . If Buyer and Seller cannot agree on the Initial Allocation or the Allocation within thirty (30) calendar days after delivery of Seller's objection, then all remaining disputed items shall be submitted for resolution by an independent appraisal firm mutually selected by Buyer and Seller. Buyer and Seller shall each request that the independent appraisal firm make a final determination as to the disputed items, in a manner that is consistent with the Allocation Method, within thirty (30) calendar days after such submission. The Proposed Initial Allocation or the Proposed Allocation, as applicable, shall be amended in accordance with the findings of such independent appraisal firm, and the Proposed Initial Allocation or the Proposed Allocation, as applicable and as so amended, shall become binding upon Buyer and Seller, shall be set forth in the Initial Allocation Schedule or the Allocation Schedule, and shall be the Initial Allocation or the Allocation, as applicable. The fees, costs and expenses of the independent appraisal firm shall be borne equally by Buyer and Seller.

(e) The Allocation shall be amended to reflect any adjustments (including those described in Section  2.04 ) to the Purchase Price under this Agreement in a manner consistent with the Allocation Method. If, after all adjustments to the Allocation are made, the Allocation with respect to the Closing Inventory of any Selling Affiliate, when expressed in the relevant

-31-

local currency at the Exchange Rate used to determine the Closing Inventory, is different from the local currency net book value recorded on the statutory books for the Closing Inventory of such Selling Affiliate as of the Closing Date, then the Allocation with respect to the Closing Inventory of such Selling Affiliate shall be adjusted so that it is equal to such local currency net book value, and the parties will agree to a corresponding upward or downward adjustment (as appropriate) elsewhere in the Allocation, in a manner consistent with the Allocation Method.

(f) Each of Seller, Buyer and their respective Affiliates shall prepare and file its Tax Returns (including Internal Revenue Service Form 8594) on a basis consistent with the Allocation and, except as otherwise required by Law (as mutually agreed to by Buyer and Seller (and each party shall reasonably endeavor to reach such mutual agreement)), shall take no position inconsistent with the Allocation on any Tax Return or in any proceeding before any Taxing Authority or otherwise. If Seller and Buyer are unable to mutually agree that an item or action is required by applicable Law, such disagreement shall be referred to the Accounting Firm promptly for review and resolution (in accordance with the procedure set forth in Section 2.04 ). In the event that the Allocation is disputed by any Taxing Authority, the party receiving notice of the dispute shall promptly notify the other party hereto, and both Seller and Buyer agree to use their commercially reasonable efforts to defend such Allocation in any audit or similar proceeding.

(g) In the event that the Allocation has not become final pursuant to this Section 2.05 by the Closing:

(i) The allocated purchase prices included in the Proposed Allocation shall be used for the purpose of (A) including allocated purchase prices in the Country Transfer Agreements for each applicable Country Unit and (B) determining the amount of any payments made on the Closing Date to the applicable Selling Affiliate with respect to such Country Unit. The inclusion of such allocated purchase prices shall not be deemed to waive, amend or otherwise alter any of the rights or obligations of the parties set forth in this Section 2.05 and shall not be used for any purpose in resolving, or result in any prejudice with respect to, any dispute with respect to the Proposed Allocation or the Allocation.

(ii) To the extent that the amounts paid to any Selling Affiliate on the Closing Date are not equal to the portion of the Purchase Price allocated to such Selling Affiliate in the Allocation (with respect to any Selling Affiliate, the " Allocated Purchase Price "), the parties shall and shall cause their respective Affiliates to take all necessary actions to refund, repay and redistribute as promptly as reasonably practicable any amounts paid to any Selling Affiliate in excess of such Selling Affiliate's Allocated Purchase Price, such that, after giving effect to any such refunds, repayments and redistributions, the amounts received by each Selling Affiliate shall be equal to such Selling Affiliate's Allocated Purchase Price.

SECTION 2.06. Transfer Taxes; VAT .

(a) All Transfer Taxes arising from, or relating to, the Internal Restructuring Steps shall be borne and paid by Seller when due in compliance with applicable Transfer Tax Laws;

-32-

provided , however , that if Buyer is required by applicable Law to pay any such Transfer Taxes, then Buyer shall pay such Transfer Taxes, and Seller shall, subject to receipt of reasonably satisfactory evidence of Buyer's payment thereof, promptly reimburse Buyer for such Transfer Taxes, whether or not such Transfer Taxes were correctly or legally imposed by the applicable Governmental Entity.

(b) All other Transfer Taxes imposed on the transfer of the Transferred Equity Interests and the Transferred Assets to Buyer and assumption of the Assumed Liabilities by Buyer shall be borne and paid solely by Buyer when due in compliance with applicable Transfer Tax Laws; provided , however , that if Seller is required by applicable Law to pay any such Transfer Taxes, then Seller shall pay such Transfer Taxes, and Buyer shall, subject to receipt of reasonably satisfactory evidence of Seller's payment thereof, promptly reimburse Seller for such Transfer Taxes, whether or not such Transfer Taxes were correctly or legally imposed by the applicable Governmental Entity.

(c) The party responsible under applicable Law for filing the Tax Returns with respect to such Transfer Taxes shall prepare and timely file such Tax Returns and promptly provide a copy of such Tax Return to the other party. Seller and Buyer shall, and shall cause their respective Affiliates to, cooperate to timely prepare and file any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

(d) The amount of any payment for a supply of goods or for services or the value of any supply made or deemed to be made by Seller, any Affiliate of Seller or a Transferred Company pursuant to this Agreement or pursuant to any other agreement that is intended to effect the transfer of assets or Liabilities pursuant to this Agreement (including any assignment and bill of sale, assumption agreement, real estate deed, or other instrument of conveyance) shall be exclusive of any VAT properly chargeable on the supply, and, upon receipt of a valid invoice (or other valid and customary documentation, if any) in compliance with applicable Law and reasonably detailing the applicable VAT, the amount of such VAT shall be paid by Buyer or any Affiliate of Buyer or the recipient of such supply (in addition to any consideration for that supply), subject to the provisions of the relevant Country Transfer Agreement (for the avoidance of doubt, notwithstanding anything to the contrary in any Country Transfer Agreement, Buyer or its Affiliates shall be responsible for any such VAT). To the extent applicable, each Country Transfer Agreement shall make provision for matters relating to the VAT treatment of the business or assets transferred under that Country Transfer Agreement and cooperation in respect thereto including, without limitation, in connection with (i) the treatment of the transfer of the relevant business or assets as (x) a transfer of a going concern, including the transfer of a totality of assets or parts thereof, within the meaning of applicable VAT Laws, directives and regulations or (y) neither a supply of goods nor services for the purposes of applicable VAT Law, and (ii) the provision and maintenance of, and access to, relevant VAT records. The Parties shall (i) use commercially reasonable efforts in order to minimize any VAT burden and liquidity burden on the purchase and transfer of relevant business or assets pursuant to this Agreement and (ii) if and to the extent there is a reasonable basis for the position that the transfer qualifies as a VAT-free transfer ( i.e. , a transfer outside the scope of VAT, not subject to VAT, exempt from VAT or otherwise relieved from VAT) of a business or assets under applicable VAT Law, treat the purchase and transfer of relevant business or assets as such VAT-free transfer and in particular (i) prepare and file their Tax Returns, and (ii) issue their invoices, in compliance with such treatment.

(e) Subject to Section 2.06(d) , Seller shall indemnify and hold Buyer and its Affiliates harmless against any VAT Liabilities resulting from input VAT corrections pursuant to sec. 15a of the German VAT Act ( Umsatzsteuergesetz ) or similar provisions in other jurisdictions to the extent they relate to input VAT claimed by Seller or any of its Affiliates prior to or on the Closing Date, but only if the detrimental act giving rise to such VAT Liability resulting from input VAT corrections pursuant to sec. 15a of the German VAT Act occurred prior to or on the Closing Date.

-33-

SECTION 2.07. <u>Withholding Taxes</u> . Notwithstanding any provisions contained herein to the contrary, Buyer shall be permitted and entitled to deduct and withhold from any amount otherwise payable to any Person pursuant to this Agreement and any other Transaction Document such amounts as are required to be deducted and withheld under applicable Law. Any amounts so deducted and withheld shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made. Within fifteen (15) days of the expected Closing Date, Buyer shall deliver a schedule of expected withholding amounts to Seller. Furthermore, Buyer and Seller shall reasonably cooperate with each other to reduce the amount of withholding Taxes imposed on the payment of any amount to any Person pursuant to this Agreement and any other Transaction Document to the extent permitted by applicable Law, including by reasonably cooperating in order to execute and file any forms or certificates reasonably required to claim an available reduced rate of, or exemption from, withholding Taxes.

SECTION 2.08. <u>Delivery by Seller</u> . At the Closing, Seller will deliver or cause to be delivered to Buyer (unless delivered previously), the following:

(a) the officer's certificate referred to in <u>Section 5.01(c)</u> ;

(b) the secretary's certificate referred to in <u>Section 5.01(d)</u> ;

(c) duly executed counterparts of the Ancillary Agreements as contemplated by <u>Section 7.09</u> ;

(d) stock certificates representing the Transferred Equity Interests, together with a stock power endorsed in blank, to the extent such Transferred Equity Interests are in certificated form, and, to the extent such Transferred Equity Interests are not in certificated form, other evidence of assignment;

(e) unless otherwise requested by Buyer, resignation letters from the directors and officers of the Transferred Companies;

(f) duly executed counterparts of any Country Transfer Agreement;

(g) a duly executed General Assignment, Patent Assignment and Trademark Assignment as contemplated by <u>Section 2.02(a)</u> ;

(h) (x) with respect to Seller or any Selling Affiliate that is not a U.S. Person and is transferring Transferred Equity Interests of a Transferred Company treated as a U.S. corporation, a duly executed certificate substantially in the form of Exhibit J-1 , and (y) with respect to any Selling Affiliate that is a U.S. Person, a duly executed certificate of non-foreign status, substantially in the form of Exhibit J-2 ;

(i) with respect to the Owned Real Property set forth on Schedule 2.08(i) , a warranty deed, or comparable instrument of transfer and assignment, duly executed by each Affiliate of Seller named as a party thereto; and

(j) with respect to the Transferred Real Property Leases set forth on Schedule 2.08(j) , a lease assignment and assumption agreement for such lease, in substantially the form attached hereto as Exhibit K or in such other form as may be agreed by the parties (the " Lease Assignment and Assumption Agreement "), duly executed by each Affiliate of Seller named as a party thereto.

SECTION 2.09. Delivery by Buyer . At the Closing, Buyer will deliver or cause to be delivered to Seller or, as designated by Seller, one or more of Seller's Affiliates (unless previously delivered), the following:

(a) the Purchase Price in the manner set forth in Section 2.03 ;

(b) the officer's certificate referred to in Section 5.02(c) ;

(c) the secretary's certificate referred to in Section 5.02(d) ;

(d) duly executed counterparts of the Ancillary Agreements as contemplated by Section 7.09 ;

(e) duly executed counterparts of any Country Transfer Agreement;

(f) a duly executed Assumption Agreement as contemplated by Section 2.02(c) ;

(g) a counterpart of each Lease Assignment and Assumption Agreement, duly executed by each Affiliate of Buyer named as a party thereto; and

(h) cash payment equal to the amount set forth on Schedule 2.09(h) to the Disclosure Letter by wire transfer in immediately available funds to one or more bank accounts designated in writing by Seller at least two (2) business days prior to the Closing Date, which payment is to be made in respect of integration and other information technology costs and expenses incurred or to be incurred by Seller and its Affiliation in connection with the transactions contemplated hereby.

ARTICLE III

Representations and Warranties of Seller

Buyer acknowledges and agrees that the Transferred Assets are sold "as is, where is" and Buyer agrees to accept the Transferred Assets on the Closing Date in the condition they are in at the place they are located on such Closing Date based on its own inspection, examination and determination with respect to all matters, and without reliance upon any express or implied representations or warranties of any nature made by, on behalf of or imputed to Seller, other than the representations and warranties of Seller expressly set forth in this Agreement. BUYER AGREES THAT THE REPRESENTATIONS AND WARRANTIES GIVEN HEREIN BY SELLER ARE IN LIEU OF, AND BUYER HEREBY EXPRESSLY WAIVES ALL RIGHTS TO, ANY IMPLIED WARRANTIES THAT MAY OTHERWISE BE APPLICABLE BECAUSE OF THE PROVISIONS OF THE UNIFORM COMMERCIAL CODE OR ANY OTHER STATUTE, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Subject to the foregoing and except as set forth in the Disclosure Letter, Seller represents and warrants to Buyer as follows:

SECTION 3.01. Organization and Good Standing . (a) Each of Seller, the Selling Affiliates and the Transferred Companies is a legal entity duly organized, validly existing and in good standing (where such concept is recognized in the relevant jurisdiction) under the Laws of its jurisdiction of incorporation or formation, and has all requisite corporate power and authority to own or lease and operate its respective properties relating to the Business and to carry on the Business as now being operated and conducted. True and complete copies of the articles of incorporation and by-laws (or other charter documents) of the Transferred Companies have been made available in the Data Room.

(b) Schedule 1.01(f) to the Disclosure Letter sets forth the authorized capitalization of each of the Transferred Companies and the number of shares of each class of capital stock or other equity interests in each of the Transferred Companies, as such Schedule may be amended to reflect the Closing Structure and/or the Internal Restructuring Steps. There are no outstanding warrants, options, agreements, subscriptions, convertible or exchangeable securities or other Contracts pursuant to which any of the Transferred Companies is or may become obligated to issue, sell, purchase, return or redeem any shares of capital stock or other securities or other equity interests of any of the Transferred Companies, and no equity securities or other equity interests of any of the Transferred Companies are reserved for issuance for any purpose. Except as set forth on Schedule 3.01(b)(i) to the Disclosure Letter, none of the Transferred Companies has any subsidiaries and, except as set forth on Schedule 3.01(b)(ii) to the Disclosure Letter, none of the Transferred Companies owns any equity interests, limited liability company interests or capital stock in any other Person.

SECTION 3.02. Authority . Seller has full power and authority to execute and deliver this Agreement, the French Offer Letter and the Dutch Offer Letter and to carry out, or cause to be carried out, the transactions contemplated hereby and thereby. Seller and each of the Selling Affiliates have, or will have at the Closing, full power and authority to execute and

-36-

deliver each Transaction Document (other than this Agreement, the French Offer Letter and the Dutch Offer Letter) to which it is or will be a party and to carry out, or cause to be carried out, the transactions contemplated by each of the Transaction Documents (other than this Agreement, the French Offer Letter and the Dutch Offer Letter) to which it is or will be a party. This Agreement, the French Offer Letter and the Dutch Offer Letter have been duly authorized by all necessary action on the part of Seller and have been duly executed and delivered by Seller and constitute valid and legally binding obligations of Seller in accordance with their terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (b) the availability of injunctive relief and other equitable remedies. Each of the Transaction Documents (other than this Agreement, the French Offer Letter and the Dutch Offer Letter) has been duly authorized by all necessary action on the part of Seller and each Selling Affiliate and has been, or will be at the Closing, duly executed and delivered by Seller and each such Selling Affiliate and constitutes or will constitute a valid and legally binding obligation of Seller and each such Selling Affiliate in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (ii) the availability of injunctive relief and other equitable remedies.

SECTION 3.03. Title to Tangible Property and Transferred Equity Interests . (a) Except as otherwise set forth on Schedule 3.03(a) to the Disclosure Letter, or as otherwise disclosed in this Agreement, Seller, a Selling Affiliate or a Transferred Company has good and valid title to all the owned tangible Transferred Assets and valid rights to all the leased tangible Transferred Assets, and has the right to transfer or assign (or cause to be transferred or assigned), where applicable in accordance with the terms of this Agreement, such title to the owned tangible Transferred Assets and such rights to the leased tangible Transferred Assets, in each case, free and clear of any Liens other than Permitted Liens. This Section 3.03(a) does not relate to Transferred Real Property or interests in Transferred Real Property, such items being the subject of Section 3.05 .

(b) Seller, a Selling Affiliate or a Transferred Company has good and valid title to the Transferred Equity Interests and any certificates representing such Transferred Equity Interests, free and clear of any Liens and is the record and the beneficial owner of all shares of Transferred Equity Interests. The Transferred Equity Interests are (to the extent applicable) duly authorized, validly issued, fully paid and nonassessable.

SECTION 3.04. Assets of the Business . The Transferred Assets, together with (a) the Shared Services, (b) the services and licenses to be provided by the Selling Affiliates to Buyer and its Affiliates pursuant to the Ancillary Agreements and (c) the Excluded Assets identified in clauses (i)–(xiv) of Annex 2.02(b) , constitute all of the assets used in the Business as it is conducted as of the date of this Agreement. Except as set forth on Schedule 3.04 to the Disclosure Letter, the Transferred Assets, together with (i) the Shared Services, (ii) the services to be provided by the Selling Affiliates to Buyer and its Affiliates pursuant to the Ancillary Agreements and (iii) the Excluded Assets identified in clauses (i)–(iv), (vi), (vii) and (xiii) of Annex 2.02(b) , are sufficient in all material respects for the conduct of the Business as currently conducted.

-37-

SECTION 3.05. <u>Transferred Real Property</u> . (a) (i) Seller, a Selling Affiliate or a Transferred Company has good and valid title to the applicable Owned Real Property, free and clear of any Liens, other than Permitted Liens, (ii) Seller, a Selling Affiliate or a Transferred Company has a valid leasehold estate (as lessee) in all Leased Real Property as lessee or sublessee, in each case free and clear of all Liens, other than Permitted Liens, and (iii) <u>Schedule 3.05(a)</u> to the Disclosure Letter sets forth all leases, subleases, licenses, concessions or other agreements, written or oral, granting to any party or parties the right of use or occupancy of any portion of the Transferred Real Property (other than any landlord of Leased Real Property). None of the Owned Real Property is subject to any first refusal, purchase option, right to purchase or other similar right.

(b) Except as set forth on <u>Schedule 3.05(b)</u> to the Disclosure Letter and except as would not be material to the Business, (i) all improvements located on the Transferred Real Property have received all necessary approvals of Governmental Entities (including licenses and permits) required in connection with the use thereof being made as of the date of this Agreement, (ii) there are no judicial or administrative actions or proceedings pending or, to Seller's knowledge, threatened in writing under any condemnation, environmental, zoning, eminent domain, land-use or other Law applicable to the Transferred Real Property which, if adversely decided, would interfere with the present use in the Business of the Transferred Real Property and (iii) there are no outstanding unpaid assessment notices against any of the Transferred Real Property.

(c) The Transferred Companies do not own or lease any real property other than the Transferred Real Property.

(d) This <u>Section 3.05</u> does not relate to any environmental matters, such items being the subject of <u>Section 3.14</u> .

SECTION 3.06. <u>Financial Information; No Undisclosed Liabilities</u> . (a) The Financial Information provided to Buyer has been prepared from the books and records of Seller, has been prepared in accordance with GAAP, applied on a consistent basis throughout the periods covered thereby and fairly presents in all material respects the financial condition of the Business as of April 29, 2016 and the results of operations of the Business for the fiscal year ended on April 29, 2016, except that the Financial Information does not include footnotes and other presentation items required under GAAP. As of the date of this Agreement, to the knowledge of Seller, there are no facts or circumstances that would reasonably be expected to cause the financial statements specified in <u>Section 6.12</u> not to be delivered by the dates set forth in <u>Section 6.12</u> .

(b) There are no material liabilities included in the Assumed Liabilities, except (i) as included, reserved against or reflected in the Financial Information, (ii) as covered by the subject matter of the representations and warranties set forth in this <u>Article III</u> (other than this <u>Section 3.06</u> ), (iii) as set forth on <u>Schedule 3.06(b)</u> to the Disclosure Letter or (iv) for those arising in the ordinary course of business consistent with past practice since April 29, 2016.

SECTION 3.07. <u>Consents and Approvals; Absence of Violation or Conflicts</u> . Neither the execution and delivery of this Agreement or any of the other Transaction Documents

-38-

by Seller and the Selling Affiliates, nor the consummation by Seller and the Selling Affiliates of the Transactions nor compliance by Seller and the Selling Affiliates with any of the provisions hereof or thereof shall: (i) conflict with or result in any breach of any provisions of the respective certificate of incorporation, by-laws or similar organizational documents of Seller, the Transferred Companies or any of the Selling Affiliates; (ii) require any material consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, except (a) in connection with the Anti-Trust Filings and (b) any consent, approval, authorization or permit required to be obtained by Buyer or filing or notification required to be made by Buyer in order to take title to the Transferred Assets or otherwise operate the Business, which consent, approval, authorization or permit is standard in transactions of the type contemplated hereby; (iii) violate in any material respect any Law applicable to Seller, the Selling Affiliates, the Transferred Companies or the Transferred Assets; (iv) result in any material violation or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation, material modification or acceleration of any material obligation under any of the terms, conditions or provisions of any Material Transferred Contract or Material Distribution Contract or (v) result in the creation of any material Lien (other than Permitted Liens) upon any of the Transferred Assets, except, in the case of the foregoing clause (ii), where the failure to obtain any such consent, approval, authorization or permit, or to make such filing or notification, would not reasonably be expected, individually or in the aggregate, to adversely affect, in any material respect, the ability of Seller or any of the Selling Affiliates to perform their obligations under this Agreement or consummate the Transactions.

SECTION 3.08. Compliance with Laws; Licenses and Permits . (a) Seller's and its Affiliates' conduct of the Business and ownership and use of the Transferred Assets are, and since January 1, 2015, have been, in material compliance with all applicable Laws. Seller (or one of its Affiliates) has all material permits, approvals, registrations, licenses, grants, authorizations, exemptions, orders and consents with respect to the Business as it is now being conducted, each of which is valid and in full force and effect.

(b) This Section 3.08 does not relate to labor and employee matters, employee benefit matters or environmental matters, such items being the subject of Sections 3.12 , 3.13 and 3.14 , respectively. This Section 3.08 also does not relate to product registrations, product recalls or product defect matters or Taxes, such items being the subject of Section 3.17 and 3.18 , respectively.

SECTION 3.09. Transferred Contracts and Material Contracts . (a) Schedule 3.09(a) (i) to the Disclosure Letter sets forth all of the Material Transferred Contracts, Schedule 3.09(a)(ii) to the Disclosure Letter sets forth all of the Material Distribution Contracts and Schedule 3.09(a)(iii) to the Disclosure Letter sets forth all of the Material Commingled Contracts, in each case, as of the date of this Agreement.

(b) " Material Transferred Contracts " means (other than the Transferred IP Licenses and Collective Bargaining Agreements) each Transferred Contract:

(i) the performance of which is reasonably expected to involve annual payments on the part of Seller, any Selling Affiliate or any Transferred Company, or pursuant to which Seller, any Selling Affiliate or any Transferred Company reasonably expects to receive annual revenue in excess of three million dollars ($3,000,000) (excluding sales orders and purchase orders issued in the ordinary course of business);

-39-

(ii) with respect to a joint venture, partnership or other similar agreement;

(iii) which (A) limits or purports to limit the ability of Seller, any Selling Affiliate or any Transferred Company to compete in any line of business or with any Person or in any geographic area or during any period of time or (B) contains exclusivity obligations or restrictions binding on Seller, any Selling Affiliate or any Transferred Company or that would be binding on Buyer or any of its Affiliates (including the Transferred Companies) after the Closing, other than, in the case of each of clauses (A) and (B), customary exclusive distribution agreements for the Products entered into in the ordinary course of business consistent with past practice;

(iv) that contains any material indemnification rights or obligations, or credit support relating to such indemnification rights or obligations, other than any of such indemnification rights or obligations incurred in the ordinary course of business;

(v) that grants a Lien (other than a Permitted Lien) on any material Transferred Asset (other than a Lien that will be released as of the Closing Date);

(vi) that is a Transferred Real Property Lease;

(vii) that provides for the sale of any material Transferred Asset (other than sales of Inventory in the ordinary course of business) or the grant of any preferential rights (including most favored nation pricing provisions, a right of first offer or first refusal or any option) to purchase any material Transferred Asset, which Contract is valued at an amount in excess of seven hundred fifty thousand dollars ($750,000);

(viii) under which (A) any Person has directly or indirectly guaranteed any liabilities or obligations of Seller or any Selling Affiliate or (B) Seller or any Selling Affiliate has guaranteed any liabilities or obligations of any other Person;

(ix) that is (A) a settlement or similar Contract with any Governmental Entity or (B) an order or consent of any Governmental Entity to which Seller, any Selling Affiliate or any Transferred Company is subject, involving material performance by Seller, such Selling Affiliate or such Transferred Company after the date of this Agreement; or

(x) that provides for the manufacture of Products (or any part thereof) or the supply of raw materials or other components used in the manufacture of Products (or any part thereof), in each case excluding any sales orders and purchase orders in the ordinary course of business and any Contracts entered into in the ordinary course of business involving less than three million dollars ($3,000,000) of annual revenue, for Seller, any Selling Affiliate or any Transferred Company.

(c) Except as set forth on Schedule 3.09(c) to the Disclosure Letter, (i) subject to bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally, each Material Transferred Contract and Material Distribution

-40-

Contract is valid, binding and in full force and effect with respect to Seller, the relevant Selling Affiliate or the relevant Transferred Company and, to the knowledge of Seller, each other party thereto and (ii) none of Seller, the relevant Selling Affiliate or the relevant Transferred Company is, or, as of the date of this Agreement, has received written notice alleging that it is, in material default or breach under any Material Transferred Contract or Material Distribution Contract. To the knowledge of Seller, as of the date of this Agreement, none of the other parties to any Material Transferred Contract or Material Distribution Contract is in material default thereunder. Seller has made available to Buyer a true and complete copy of each Material Transferred Contract and Material Distribution Contract (including all material modifications and amendments thereto and waivers thereunder) or form of Material Transferred Contract and Material Distribution Contract.

(d) " Material Commingled Contracts " means each Commingled Contract the performance of which is reasonably expected to involve, in each case solely with respect to the Business, annual payments on the part of Seller, any Selling Affiliate or any Transferred Company, or pursuant to which Seller, any Selling Affiliate or any Transferred Company reasonably expects to receive annual revenue in excess of three million dollars ($3,000,000) (excluding sales orders and purchase orders issued in the ordinary course of business).

SECTION 3.10. Intellectual Property Rights . (a) Except as set forth on Schedule 3.10(a)(i) to the Disclosure Letter, Seller, a Transferred Company or a Selling Affiliate is the sole and exclusive owner of all right, title and interest in and to the Transferred IP. Except as set forth on Schedule 3.10(a)(ii) to the Disclosure Letter, the Transferred IP contains all of the Trademarks used exclusively in the conduct of the Business, and all of the Patents and other material IP Rights under which the Business operates as conducted by Seller immediately prior to the date of this Agreement. The Patents included in the Transferred IP include all unexpired patents and pending patent applications worldwide that cover the Products, but not including any Excluded IP Rights. The Transferred IP and the Transferred IP Licenses comprise all of the IP Rights of Seller or any of its Affiliates that are necessary to operate the Business in all material respects as currently conducted.

(b) Except with respect to non-exclusive licenses granted to third parties in the ordinary course of business to the extent not material to the Business, agreements with suppliers, distributors or customers entered into in the ordinary course of business or as otherwise contemplated by this Agreement, and except for "shrink wrap," "commercially available off the shelf software package" or "click through" licenses, Schedule 3.10(b) to the Disclosure Letter lists, as of the date of this Agreement, all of the Contracts: (i) pursuant to which Seller and its Affiliates obtained the right to use or practice rights under third-party IP Rights (excluding Copyright rights) that are used primarily in and are material to the conduct of the Business, (ii) by which Seller or any of its Affiliates has licensed or otherwise authorized a third party to use any Transferred IP, (iii) otherwise granting or restricting the right to use Transferred IP and (iv) transferring, assigning or indemnifying with respect to the Transferred IP, including, in each case, license agreements, settlement agreements and covenants not to sue (collectively, the " Licensed IP Contracts "). Subject to bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally, each Licensed IP Contract is valid, binding and in full force and effect with respect to Seller or the relevant Selling Affiliate and, to the knowledge of Seller, the other party thereto. Neither Seller nor the relevant Selling

-41-

Case: 2:19-cv-03347-EAS-EPD Doc #: 29-2 Filed: 11/06/20 Page: 635 of 963  PAGEID #: 2201

Affiliate is in material default under any Licensed IP Contract and to the knowledge of Seller, as of the date of this Agreement, none of the other parties to any Licensed IP Contract is in material default thereunder.

(c) Seller or its Affiliates have taken reasonable measures to protect the confidentiality of their respective trade secrets included in the Transferred IP. Seller or its Affiliates have used commercially reasonable efforts to maintain the secrecy of their respective confidential IP Rights currently used in the Business.

(d) Except as set forth on Schedule  3.10(d) to the Disclosure Letter, (i) to the knowledge of Seller, the Transferred Companies have not materially infringed on, and the operation of the Business as currently conducted does not materially infringe on, the IP Rights of any Person and (ii) there are no material adverse third-party actions or claims pending against Seller or any of its Affiliates by any Person in any court, arbitration or by or before any Governmental Entity, and since January 1, 2015, there have been no written third-party allegations, in any such case (A) to the effect that the operation or conduct of the Business constitutes a material infringement of the IP Rights of such Person or (B) challenging or seeking to deny or restrict in any material respect the rights of Seller or its Affiliates in the Transferred IP.

(e) Except as set forth on Schedule  3.10(e) to the Disclosure Letter, as of the date of this Agreement, there are no claims pending or, to the knowledge of Seller, threatened in writing by Seller or any of its Affiliates against any Person, nor has Seller or any of its Affiliates sent any written notice to any Person, regarding any actual or potential infringement, dilution, misappropriation or other unauthorized use in any material respect of any material Transferred IP.

(f) Except as set forth on Schedule 3.10(f) to the Disclosure Letter, Seller and its Affiliates have taken commercially reasonable measures to maintain the material Transferred IP under any applicable Law (including making and maintaining in full force and effect all necessary filings, registrations and issuances). To the knowledge of Seller, none of Seller, the Transferred Companies or the Selling Affiliates are using the material Transferred IP in a manner that would reasonably be expected to result in the cancellation or unenforceability of such Transferred IP (other than abandonments, expirations, cancellations and the like occurring in the ordinary course of business that are not material to the Business). The material Transferred IP is subsisting and, to the knowledge of Seller, valid and enforceable.

(g) No current or former employee, consultant or contractor of Seller or any of its Affiliates has any valid claim of ownership, in whole or in part, to the material Transferred IP or derivative works thereof, or has asserted in writing any such claim of ownership or right. All material Transferred IP that is owned (or purported to be owned) by Seller, any Transferred Company or any Selling Affiliate was (i) developed by employees of Seller, such Transferred Company or such Selling Affiliate within the scope of their employment; or (ii) developed by independent contractors who have irrevocably assigned the entire right, title, and interest in and to such material Transferred IP to Seller, a Transferred Company and/or a Selling Affiliate pursuant to written agreements.

-42-

SECTION 3.11. <u>Legal Proceedings</u> . (a) Except as set forth on <u>Schedule 3.11(a)</u> to the Disclosure Letter, (i) as of the date of this Agreement, there are no Business Claims pending or, to the knowledge of Seller, threatened in writing, against Seller or any of its Affiliates with respect to which liability is reasonably anticipated to exceed four hundred fifty thousand dollars ($450,000) and (ii) as of the Closing Date, there are no material Business Claims pending or, to the knowledge of Seller, threatened in writing, against Seller or any of its Affiliates.

(b) This <u>Section 3.11</u> does not relate to intellectual property matters, labor and employee matters, employee benefit matters or environmental matters, such items being the subject of <u>Sections 3.10</u> , <u>3.12</u> , <u>3.13</u> and <u>3.14</u> , respectively. This <u>Section 3.11</u> also does not relate to product registrations, product recalls or product defect matters, or Taxes, such items being the subject of <u>Sections 3.17</u> and <u>3.18</u> , respectively.

SECTION 3.12. <u>Labor and Employee Matters</u> . (a) <u>Schedule 3.12(a)</u> to the Disclosure Letter contains a complete and accurate list, as of the date of this Agreement, of each collective bargaining, works council or other material labor union contract or labor arrangement covering any Employee of the Business, excluding any national or industry contract or arrangement (the " <u>Collective Bargaining Agreements</u> "). True and complete copies of all Collective Bargaining Agreements have been made available in the Data Room. As of the date of this Agreement, no other union or labor organization is currently certified or recognized and, there are no ongoing, pending (for which Seller has received notice) or, to the knowledge of Seller, threatened strikes, material work stoppages, material requests for representation, material pickets or material walkouts that involve the labor or employment relations of Seller and its Affiliates with any Employee of the Business. As of the date of this Agreement, there is no material unfair labor practice, charge or complaint ongoing, pending (for which Seller has received notice), unresolved or, to the knowledge of Seller, threatened before any court, arbitrator, the National Labor Relations Board or any other Governmental Entity relating to any Employee of the Business.

(b) With respect to the Employees of the Business, each of Seller and its Affiliates is in material compliance with the terms of the Collective Bargaining Agreements and all applicable Laws pertaining to employment, employment practices and the employment of labor, including all such Laws relating to employment agreements, labor relations, employee Personal Information, equal employment opportunities, fair employment practices, prohibited discrimination or distinction, consultation and/or information, wages, hours, working time, safety and health and workers compensation.

SECTION 3.13. <u>Employee Plans</u> . (a) <u>Schedule 3.13(a)</u> to the Disclosure Letter lists, as of the date of this Agreement, each material Business Employee Benefit Plan (excluding any offer letter or employment agreement required by applicable Law or any Collective Bargaining Agreement) in which any Employee of the Business is entitled to participate or to which he or she is a party and each such Business Employee Benefit Plan that is an Assumed Benefit Plan sponsored by a Transferred Company is identified with an asterisk on <u>Schedule 3.13(a)</u> to the Disclosure Letter.

(b) Except as set forth in <u>Schedule 3.13(b)</u> to the Disclosure Letter, (i) with respect to each material Business Employee Benefit Plan, true and complete copies of all plan

-43-

documents (including all amendments and modifications thereof) or a summary of material terms thereof, or a form or sample of each material employment agreement (including an actual copy of any such agreement that contains material individualized terms, other than, for the avoidance of doubt, terms with respect to information covered by Section 8.01(b) or employee names or addresses) have been made available in the Data Room as of the date of this Agreement; provided that, if Buyer notifies Seller in writing that Buyer has reasonably determined that any such summary is not sufficient for Buyer to determine the material terms of any of the foregoing applicable Business Employee Benefit Plans, Seller shall use reasonable best efforts to provide to Buyer within twenty (20) days following the date Seller receives such notice a true and complete copy of the plan document or additional summaries such that Buyer can reasonably determine the material terms of such Business Employee Benefit Plan; (ii) with respect to each Assumed Benefit Plan sponsored by a Transferring Company, each writing constituting a part of such Assumed Benefit Plan, or, with respect to any such plan in a jurisdiction outside of the United States in which formal plan documents are not customary, a summary of the material terms of such plan, shall have been made available in the Data Room as of the date of this Agreement; (iii) with respect to any Assumed Benefit Plan that provides defined benefit pension or retiree medical benefits, a good faith estimate of the accumulated benefit obligation or accumulated postretirement benefit obligation of such Assumed Benefit Plan, as applicable, with respect to liabilities that, to the knowledge of Seller, may become obligations of Buyer and its Affiliates, shall have been delivered to Buyer as of the date of this Agreement; and (iv) with respect to any Assumed Benefit Plan described in the preceding clause (iii) that is funded, a good faith estimate of the value of the assets of such plan that, to the knowledge of Seller, may transfer to Buyer pursuant to Annex 2.02(a)(xii), shall have been delivered to Buyer as of the date of this Agreement.

(c) There does not now exist, nor do any circumstances exist that could reasonably be expected to result in, any Controlled Group Liability that could be a liability of Buyer and its Affiliates following the Closing in respect of any employee benefit plan maintained or contributed to by Seller and its Affiliates and that is not an Assumed Benefit Plan.

(d) Each Assumed Benefit Plan (and each related trust, insurance contract or fund) (i) has been maintained, contributed to, funded, operated and administered in all material respects in accordance with the terms of such Assumed Benefit Plan and in accordance in all material respects with ERISA, the Code and any other applicable Law, (ii) if intended to qualify for special Tax treatment, meets in all material respects all requirements for such treatment and (iii) if intended to be funded and/or book-reserved, is fully funded and/or book reserved, as appropriate, based upon reasonable actuarial assumptions and as required by applicable Law. There are no material pending or threatened claims (other than claims for benefits in the ordinary course), lawsuits or arbitrations that have been asserted in respect of Assumed Benefit Plans that could reasonably be expected to result in any material liability to any Governmental Entity, any participant in any Assumed Benefit Plan or any other party.

(e) Neither the execution of this Agreement nor the consummation of the Transactions (whether alone or together with any other events) will, subject to Buyer's compliance with its obligations under Section 8.01, result in or cause the accelerated vesting, funding or delivery of or increase the amount of any, payment or benefit to any Employee of the Business, in each case, except for arrangements relating to the exercise by an Employee of the

-44-

Business of any rights under applicable Law (including any right to object to a mandatory transfer of employment to Buyer or any of its Affiliates and any right to reject an offer of employment from Buyer or any of its Affiliates). No amount paid or payable (whether in the form of cash, property or other benefits) by Seller in connection with the Transactions hereby (whether alone or together with any other events) will be an "excess parachute payment" within the meaning of Section 280G of the Code.

SECTION 3.14. Environmental Matters .

(a) Seller and its Affiliates, with respect to the Business, (i) are and, since January 1, 2015, have been, in compliance in all material respects with Environmental Laws; (ii) have not received any written or, to the knowledge of Seller, oral communication from any Person alleging that Seller or any of its Affiliates is in material violation of or has any material liability arising under any Environmental Law, except to the extent the substance of any such communication has been materially resolved; (iii) have obtained, or have timely applied for, all material approvals and permits required under Environmental Laws to conduct the Business as conducted as of the date of this Agreement (" Environmental Permits "); (iv) are, and, since January 1, 2015, have been, in material compliance with all terms and conditions of such Environmental Permits; (v) to the knowledge of Seller, have not Released any Hazardous Materials at any Transferred Real Property that require material remediation under any Environmental Law; and (vi) are not subject to any pending or, to the knowledge of Seller, threatened, material Environmental Claim against Seller, its Affiliates or any Person whose liability Seller has retained or assumed either contractually or by operation of Law.

(b) To the knowledge of Seller, none of the following are present at any of the Transferred Real Property in a manner or to an extent that would result in a material liability under Environmental Law: (i) underground storage tanks containing, or landfills used for the disposal of, Hazardous Materials; (ii) wetlands that have been filled in by Seller; (iii) "toxic mold"; or (iv) asbestos-containing building materials.

(c) Seller has provided summaries, which are true and accurate in all material respects, of the most recent environmental, health and safety compliance audit findings that Seller has obtained or prepared prior to the date of this Agreement with respect to each of the Transferred Real Properties at which Seller or any of its Affiliates has conducted manufacturing activities, distribution activities or research and development activities.

(d) Notwithstanding any provision to the contrary, this Section 3.14 shall constitute the sole representations and warranties with respect to environmental matters.

SECTION 3.15. Absence of Certain Developments . Except as set forth on Schedule 3.15 to the Disclosure Letter, from April 29, 2016 to the date of this Agreement, (a) the Business has been operated in the ordinary course of business consistent with past practice in all material respects, (b) there have not been any effects, events, occurrences, circumstances or changes that, individually or in the aggregate, have resulted or would reasonably be expected to result in a Material Adverse Effect and (c) there has not been any action taken by Seller or its Affiliates that, if taken during the period from the date of this Agreement through the Closing Date without Buyer's consent, would constitute a breach of clauses (iv)-(ix), (xi), (xiii) and (xiv) (insofar as it relates to clauses (iv)-(ix), (xi) and (xiii)) of Section 6.01(b) .

-45-

SECTION 3.16. Brokerage Fees . Except for fees (or claims for fees) payable solely by Seller, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Transactions based on any arrangement or agreement made by or on behalf of Seller or any Selling Affiliate.

SECTION 3.17. Product Registrations; Recalls . (a) Schedule 3.17(a) to the Disclosure Letter sets forth, as of the date of this Agreement, a list of the Product Registrations, except for those approvals, clearances and authorizations that are not material to the Business.

(b) Seller has exclusive ownership, or has obtained beneficial use, of all material Product Registrations, and all such Product Registrations are and, to the extent freely transferrable by Seller, will be immediately after the Closing, valid and in full force and effect. No proceedings are (i) pending against Seller or, to the knowledge of Seller, against any third-party holding a Product Registration, or (ii) to the knowledge of Seller, threatened in writing to revoke, suspend, or modify in any material respect any Product Registration, other than in the case of clauses (i) and (ii) those that would not be material to the Business. To the knowledge of Seller, there is no false, misleading or unreliable data or information or material omission in any Product Registration.

(c) Since January 1, 2015, there has not been conducted or requested in writing, nor, to the knowledge of Seller, is there any current consideration by Seller or any Governmental Entity of, any material recall in respect of any Product, except as set forth on Schedule 3.17(c) to the Disclosure Letter.

(d) Except for ordinary course inquiries by Governmental Entities or as set forth on Schedule 3.17(d) to the Disclosure Letter, there are not presently pending, or, to the knowledge of Seller, threatened in writing, (i) any Product Claims as of the date of this Agreement, with respect to which liability is reasonably anticipated to exceed five hundred thousand dollars ($500,000) or (ii) as of the Closing Date, any material Product Claims. No Product is (i) adulterated within the meaning of 21 U.S.C. § 351, (ii) misbranded within the meaning of 21 U.S.C. § 352 or (iii) in violation of 21 U.S.C. §§ 360 or 360e, in each case as would be a material violation of applicable Law.

SECTION 3.18. Taxes .

(a) All material (i) Tax Returns that are required to be filed by or on behalf of each Transferred Company, and (ii) non-income Tax Returns arising out of, relating to, or in respect of the Transferred Assets, the Assumed Liabilities, and the Business, in each case, have been filed (taking into account any applicable extensions). All such Tax Returns were correct and complete in all material respects and were prepared and filed in material compliance with all applicable Laws.

(b) All material (i) Taxes of, or required to be paid by, each Transferred Company, and (ii) non-Income Taxes arising out of, relating to, or in respect of the Transferred Assets, the Assumed Liabilities, and the Business, in each case, have been paid, except for Taxes being contested in good faith through appropriate proceedings and for which adequate reserves have been established in the accounting books and records prior to the date hereof.

-46-

(c) There are no Liens for a material amount of Taxes upon any of the Transferred Assets or any other assets of the Business, except for Permitted Liens.

(d) No Transferred Company is the subject of a Tax audit, examination or other proceeding with respect to material Taxes, and no such audit, examination or other proceeding has been threatened in writing.

(e) There are no outstanding agreements or consents extending or waiving (or having the effect of extending or waiving) the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, material Taxes due from any Transferred Company for any taxable period and no request for any such waiver or extension is currently pending.

(f) Neither Seller nor any Asset Selling Affiliate has taken or agreed to take any action or is aware of any fact or circumstance that would prevent or impede, or could reasonably be expected to prevent or impede, the making of an election under Section 338(g) of the Code with respect to the Section 338(g) Transferred Companies.

(g) No Transferred Company (i) is a party to, bound by, or obligated under any Tax sharing, allocation or similar agreement or arrangement, (ii) is or was a member of any affiliated, consolidated, combined, unitary or other group for Tax purposes (other than any such group the common parent of which is Seller or any of its subsidiaries), (iii) has any material liability for Taxes of any Person (other than Seller or any of its subsidiaries) under Treasury Regulations Section 1.1502-6 (or any corresponding or similar provision of state, local or non-U.S. Tax Law), as transferee, successor or otherwise or (iv) is subject to any "closing agreement" within the meaning of Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. Tax Law), private letter ruling, or other written agreement with a Taxing Authority regarding Taxes or Tax matters.

(h) No Transferred Company has participated in a "listed transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(2) (or any corresponding or similar provision of state, local or non-U.S. Tax Law relating to the disclosure of Tax shelters or Tax avoidance schemes).

(i) All material Taxes which each Transferred Company is obligated to withhold from amounts owing to any employee, creditor, shareholder, related party, third party or other Person have been duly and timely withheld and paid over to the relevant Taxing Authority.

(j) No claim has been made by any Taxing Authority in a jurisdiction where any Transferred Company has not filed a Tax Return that it is or may be subject to Tax by such jurisdiction. No Transferred Company is or has been subject to Tax in any foreign jurisdiction other than its place of incorporation by virtue of having a permanent establishment or other place of business or taxable presence in that jurisdiction.

-47-

(k) Since December 31, 2013, no Transferred Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(l) No Transferred Company will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) that begins after the Closing Date as a result of (i) any change in method of accounting for a taxable period ending on or before the Closing Date, (ii) installment sale or open transaction disposition, intercompany transaction or intercompany account made or existing on or before the Closing Date, (iii) prepaid amount received on or prior to the Closing Date, (iv) "closing agreement" within the meaning of Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. Tax Law) executed on or before the Closing Date, (v) election pursuant to Section 108(i) of the Code (or any corresponding or similar provision of state, local or non-U.S. Tax Law), or (vi) to Seller's knowledge, intercompany transaction or excess loss account within the meaning of the regulations under Section 1502 of the Code. No Transferred Company will be required to reduce any Tax attribute under Treasury Regulations Section 1.1502-36 (or any corresponding or similar provision of state, local or non-U.S. Tax Law).

(m) No material net operating loss or other material Tax attribute of any Transferred Company is subject to a material limitation under Section 382 of the Code or any similar provision of applicable Tax Law.

(n) Each of the Transferred Companies is classified, and has at all times since the date of its formation been classified, as an association taxable as a corporation for U.S. federal, state and local income Tax purposes. Neither the Transferred Assets nor any assets owned by the Transferred Companies include any asset treated for federal income Tax purposes as an equity interest in any Person.

(o) None of the Non-U.S. Selling Affiliates are transferring U.S. real property interests as defined in Section 897(c) of the Code.

(p) Each of the Asset Selling Affiliates is duly registered as required for the purposes of VAT in its country of incorporation and an entrepreneur subject to VAT in its country of incorporation.

SECTION 3.19. Certain Compliance Matters . (a) Neither Seller nor any Affiliate, director, officer or employee, nor, to the knowledge of Seller, any distributor, agent, representative, sales intermediary or other third party acting on behalf of Seller or any of its Affiliates, in any way relating to the Business, the Transferred Companies or the Transferred Assets: (i) has taken any action in material violation of any applicable anticorruption Law, including the U.S. Foreign Corrupt Practices Act (" FCPA ") (15 U.S.C. § 78 dd-1 et seq. ) or (ii) has corruptly offered, paid, given, promised to pay or give or authorized the payment or gift of anything of value, directly or indirectly, to any "Public Official," as defined in Section 3.19(b) , for purposes of (A) influencing any act or decision of any Public Official in his official capacity; (B) inducing such Public Official to do or omit to do any act in violation of his

-48-

lawful duty; (C) securing any improper advantage; or (D) inducing such Public Official to use his or her influence with a government, Governmental Entity, or commercial enterprise owned or controlled by any government (including state-owned or state-controlled medical facilities), in order to assist the Business or any Person related in any way to the Business, the Transferred Companies or the Transferred Assets, in obtaining or retaining business or directing any business to any Person, in each case, as would be a material violation of applicable Law.

(b) For purposes of this Section 3.19 , " Public Official " means: (i) any officer, employee or representative of any regional, federal, state, provincial, county or municipal government or government department, agency, or other division; (ii) any officer, employee or representative of any commercial enterprise that is owned or controlled, or partially owned or controlled, by a government, including any state-owned or controlled medical facility; (iii) any officer, employee or representative of any public international organization, such as the African Union, the International Monetary Fund, the United Nations or the World Bank; (iv) any person acting in an official capacity for any government or government entity, enterprise, or organization identified above; and (v) any political party, party official or candidate for political office.

(c) None of Seller or any Selling Affiliate, nor, to the knowledge of Seller, any of their respective officers or directors, (i) appears on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury; (ii) is otherwise a party with whom, or has its principal place of business or the majority of its business operations (measured by revenues) located in a country in which, transactions are prohibited by (A) United States Executive Order 13224, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism (B) the United States Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, (C) the United States Trading with the Enemy Act of 1917, as amended, (D) the United States International Emergency Economic Powers Act of 1977, as amended or (E) the foreign asset control regulations of the United States Department of the Treasury (collectively, the " Sanction Laws "); (iii) has been convicted of or charged with a felony relating to money laundering; (iv) to the knowledge of Seller, is under investigation by any Governmental Entity for money laundering, or (v) to the knowledge of Seller, is subject to any pending or threatened (in writing) investigations or claims related to Sanction Laws.

(d) Seller and its Affiliates maintain auditing and monitoring processes and systems of internal controls as part of their healthcare compliance program that are reasonably adequate to ensure compliance by the Business with all Laws pertaining to the FCPA, anti-corruption, and healthcare fraud and abuse, including the anti-kickback provisions of the Medicare and Medicaid Law, 42 U.S.C. § 1320a-7b, as amended, the Federal Physician Self-Referral Act, 42 U.S.C. § 1395nn, as amended, the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, and the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, as amended.

(e) Seller and its Affiliates maintain compliance and operations processes and systems of internal controls as part of their compliance and logistics programs that are reasonably adequate to ensure compliance by the Business with all applicable International Trade Laws. Seller and the Selling Affiliates, with respect to the Business, are currently, and have been for the past two (2) years, in material compliance with International Trade Laws.

(f) To the extent related to the Business, to the knowledge of Seller, none of the current employees or suppliers of Seller or its Affiliates are debarred or suspended, or threatened in writing with debarment or suspension for the award of contract by any Governmental Entity or for participation in governmental healthcare programs such as Medicare or Medicaid.

SECTION 3.20. <u>Information Technology</u> . (a) Seller, the applicable Selling Affiliate or the applicable Transferred Company is the exclusive owner or is validly licensed or otherwise authorized to use the Transferred IT; and (b) since January 1, 2015, there have been no material security breaches or data loss pertaining to the Transferred IT.

SECTION 3.21. <u>Significant Distributors ; Significant Suppliers</u> . (a) <u>Schedule 3.21(a)</u> to the Disclosure Letter lists the names of each of the ten (10) most significant distributors of the Business (measured by dollar volume) for the twelve (12)-month period ended April 29, 2016 (the " <u>Significant Distributors</u> "). As of the date hereof, none of the Significant Distributors has terminated its relationship with Seller, the applicable Selling Affiliate or the applicable Transferred Company. As of the date hereof, none of Seller, any Selling Affiliate or any Transferred Company has received any written notice that any Significant Distributor has ceased or will cease to act as a distributor of the Business or that such Significant Distributor intends to terminate or materially modify existing Contracts with Seller, any Selling Affiliate or any Transferred Company.

(b) <u>Schedule 3.21(b)</u> to the Disclosure Letter lists the names of each of the ten (10) most significant suppliers of the Business (measured by dollar volume) for the twelve (12)-month period ended April 29, 2016 (the " <u>Significant Suppliers</u> "). As of the date hereof, none of the Significant Suppliers has terminated its relationship with Seller, the applicable Selling Affiliate or the applicable Transferred Company. As of the date hereof, none of Seller, any Selling Affiliate or any Transferred Company has received any written notice that any Significant Supplier has ceased or will cease to act as a supplier of the Business or that such Significant Supplier intends to terminate or materially modify existing Contracts with Seller, any Selling Affiliate or any Transferred Company.

## ARTICLE IV

<u>Representations and Warranties of Buyer</u>

Buyer represents and warrants to Seller as follows:

SECTION 4.01. <u>Buyer ' s Organization; Power; Execution</u> . Buyer and each Affiliate of Buyer that is a party to any Transaction Document are legal entities duly organized, validly existing and in good standing (where such concept is recognized in the relevant jurisdiction) under the Laws of their respective jurisdictions of incorporation or formation. Buyer has full power and authority to execute and deliver this Agreement, the French Offer Letter and the Dutch Offer Letter and to carry out, or cause to be carried out, the transactions contemplated hereby and thereby. Buyer and each Affiliate of Buyer that is a party to any

Transaction Document (other than this Agreement, the French Offer Letter and the Dutch Offer Letter) have, or will have at the Closing, full power and authority to execute and deliver each Transaction Document (other than this Agreement, the French Offer Letter and the Dutch Offer Letter) to which it is or will be a party and to carry out, or cause to be carried out, the transactions contemplated by each of the Transaction Documents (other than this Agreement, the French Offer Letter and the Dutch Offer Letter) to which it is or will be a party. This Agreement, the French Offer Letter and the Dutch Offer Letter have been duly authorized by all necessary action on the part of Buyer and have been duly executed and delivered by Buyer and constitute valid and legally binding obligations of Buyer in accordance with their terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (b) the availability of injunctive relief and other equitable remedies. Each of the Transaction Documents (other than this Agreement, the French Offer Letter and the Dutch Offer Letter) has been duly authorized by all necessary action on the part of Buyer and each Affiliate of Buyer that is a party to any Transaction Document (other than this Agreement, the French Offer Letter and the Dutch Offer Letter) and has been, or will be at the Closing, duly executed and delivered by Buyer and each such Affiliate of Buyer and constitutes or will constitute a valid and legally binding obligation of Buyer and each such Affiliate of Buyer in accordance with its terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (b) the availability of injunctive relief and other equitable remedies.

SECTION 4.02. <u>Consents and Approvals; Absence of Violation or Conflicts</u> . Neither the execution and delivery of this Agreement or any of the other Transaction Documents by Buyer and each Affiliate of Buyer that is a party to any Transaction Document, nor the consummation by Buyer and each Affiliate of Buyer that is a party to any Transaction Document of the Transactions nor compliance by Buyer and each Affiliate of Buyer that is a party to any Transaction Document with any of the provisions hereof or thereof, shall: (i) conflict with or result in any breach of any provisions of the respective certificate of incorporation, by-laws or similar organizational documents; (ii) require any material consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, except (a) in connection with the Anti-Trust Filings and (b) any consent, approval, authorization or permit required to be obtained by Seller or filing or notification required to be made by Seller in order to transfer title to the Transferred Assets or otherwise operate the Business, which consent, approval, authorization or permit is standard in transactions of the type contemplated hereby; (iii) violate in any material respect any Law applicable to Buyer or any Affiliate of Buyer that is a party to any Transaction Document; or (iv) require any material consent, approval, authorization, or permit under any contract, agreement or commitment between Buyer or any Affiliate of Buyer that is a party to any Transaction Document and a third party, except, in the case of the foregoing clause (ii), where the failure to obtain any such consent, approval, authorization or permit, or to make such filing or notification, would not reasonably be expected, individually or in the aggregate, to adversely affect, in any material respect, the ability of Buyer to perform its obligations under this Agreement or consummate the Transactions.

SECTION 4.03. <u>Litigation</u> . As of the date hereof, there are no actions, suits, proceedings, claims or investigations pending or, to the knowledge of Buyer, threatened in writing concerning Buyer or any of its Affiliates relating to the Transactions.

-51-

SECTION 4.04. <u>Sufficient Funds</u> . As of immediately prior to or substantially simultaneously with the Closing, Buyer will have sufficient funds to (a) satisfy all of Buyer's obligations under this Agreement, including the obligations under <u>Article II</u> , (b) pay any other amounts required to be paid by Buyer in connection with the consummation of the Transactions and (c) pay all related fees and expenses of Buyer.

SECTION 4.05. <u>Brokerage Fees</u> . Except for fees payable to Goldman, Sachs & Co. and Perella Weinberg Partners LP (which fees are payable by Buyer), there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Transactions based on any arrangement or agreement made by or on behalf of Buyer or any Affiliate thereof.

## ARTICLE V

### Conditions to Closing

SECTION 5.01. <u>Conditions Precedent to Buyer ' s Obligations on the Closing Date</u> . All of the obligations of Buyer hereunder are subject to fulfillment, prior to or at the Closing, of the following conditions (compliance with which or the occurrence of which may be waived, to the extent permitted by applicable Law, in whole or in part by Buyer in writing):

(a) The representations and warranties of Seller contained herein (other than the representations and warranties of Seller set forth in <u>Sections 3.01</u> (Organization and Good Standing), <u>3.02</u> (Authority), <u>3.03(b)</u> (Title to Transferred Equity Interests), <u>3.15(b)</u> (Absence of Certain Developments) and <u>3.16</u> (Brokerage Fees)) shall be true and correct (without giving effect to any references to "material," "materially," "Material Adverse Effect," "material adverse effect" or other similar materiality qualifications contained or incorporated in any such representation or warranty) on and as of the Closing Date (other than representations and warranties made as of a specified date, which shall be true and correct as of the date specified), except for such failures to be true and correct that do not, individually or in the aggregate, have a Material Adverse Effect. Each of the representations and warranties of Seller set forth in <u>Sections 3.01</u> (Organization and Good Standing), <u>3.02</u> (Authority), <u>3.03(b)</u> (Title to Transferred Equity Interests) and <u>3.16</u> (Brokerage Fees) shall be true and correct in all material respects on and as of the Closing Date (other than representations and warranties made as of a specified date, which shall be true and correct as of the date specified). The representation and warranty of Seller set forth in <u>Section 3.15(b)</u> (Absence of Certain Developments) shall be true and correct on and as of the Closing Date.

(b) Seller shall have performed and complied in all material respects with all the terms, provisions and conditions of this Agreement and the other Transaction Documents to be complied with and performed by Seller at or before the Closing.

(c) Seller shall have delivered to Buyer a certificate dated the Closing Date and executed by an authorized officer of Seller to the effect that each of the conditions specified in <u>Sections 5.01(a)</u> , <u>(b)</u> and <u>(g)</u> is satisfied in all respects.

-52-

(d) Seller shall have delivered to Buyer a certificate of a secretary or other authorized signatory of Seller enclosing a copy of (i) its certified Certificate of Incorporation, (ii) its Memorandum and Articles of Association and (iii) board of directors resolutions authorizing Seller to enter into this Agreement and the other Transaction Documents and to consummate the Transactions.

(e) No Law enacted, entered, promulgated, enforced or issued by any Governmental Entity or other legal restraint or prohibition preventing the consummation of any of the Transactions (each, a " Closing Legal Impediment ") shall be in effect.

(f) All Anti-Trust Approvals in the jurisdictions specified on Schedule 5.01(f) to the Disclosure Letter shall have been obtained.

(g) Since the date of this Agreement there has not been a Material Adverse Effect.

(h) Seller shall have signed and delivered, or caused one or more of its Affiliates, to sign and deliver the Ancillary Agreements contemplated under Section 7.09 .

(i) The actions set forth in Section 2.08 shall have been completed.

(j) The Closing Structure set forth on Exhibit L (as it may be amended in accordance with this Agreement) shall be in place.

SECTION 5.02. Conditions Precedent to Seller ' s Obligations on the Closing Date . All of the obligations of Seller hereunder are subject to the fulfillment, prior to or at the Closing, of the following conditions (compliance with which or the occurrence of which may be waived, to the extent permitted by applicable Law, in whole or in part by Seller in writing):

(a) The representations and warranties of Buyer contained herein (other than the Buyer Fundamental Representations) shall be true and correct (without giving effect to any references to "material", "materially" or other similar materiality qualifications contained or incorporated in any such representation or warranty) on and as of the Closing Date (other than representations and warranties made as of a specified date, which shall be true and correct as of the date specified), except for such failures to be true and correct that do not, individually or in the aggregate, have a material adverse effect on the ability of Buyer and its Affiliates to perform their obligations under this Agreement or to consummate the Transactions. Each of the representations and warranties of Buyer set forth in Sections 4.01 (Buyer's Organization; Power; Execution) and 4.05 (Brokerage Fees) (collectively, the " Buyer Fundamental Representations ") shall be true and correct in all material respects on and as of the Closing Date (other than representations and warranties made as of a specified date, which shall be true and correct as of the date specified).

(b) Buyer shall have performed and complied in all material respects with all the terms, provisions and conditions of this Agreement and the other Transaction Documents to be complied with and performed by Buyer at or before the Closing.

-53-

(c) Buyer shall have delivered to Seller a certificate dated the Closing Date and executed by an authorized officer of Buyer to the effect that each of the conditions specified above in Sections 5.02(a) and (b) is satisfied in all respects.

(d) Buyer shall have delivered to Seller a certificate of a secretary or other authorized signatory of Buyer enclosing a copy of (i) its certified certificate of incorporation, (ii) its by-laws and (iii) board of directors resolutions authorizing Buyer to enter into this Agreement and the other Transaction Documents and to consummate the Transactions, or the equivalent of the documents referred to in clauses (i), (ii) and (iii) above under applicable Law governing Buyer.

(e) No Closing Legal Impediment shall be in effect.

(f) All Anti-Trust Approvals in the jurisdictions specified on Schedule 5.01(f) to the Disclosure Letter shall have been obtained.

(g) Buyer shall have signed and delivered, or caused one or more of its Affiliates to sign and deliver, the Ancillary Agreements contemplated under Section 7.09 .

(h) The actions set forth in Section 2.09 shall have been completed.

## ARTICLE VI

### Certain Covenants

During the period from the date of this Agreement to the Closing Date:

SECTION 6.01. Conduct of Business . (a) Except as otherwise permitted by this Agreement or consented to by Buyer in writing, Seller agrees to (and to cause the Selling Affiliates and Transferred Companies to) use commercially reasonable efforts to run the Business in the ordinary course consistent with past practice and to:

(i) preserve the business relationships of the Business and keep available the services of its key employees and maintain its relations and goodwill with its key suppliers, customers, employees and others having business relationships with the Business;

(ii) maintain in effect all IP Rights included in the Transferred IP and material applications and registrations for Trademarks and Patents included in the Transferred IP (other than (A) as set forth on Schedule 3.10(f) to the Disclosure Letter and (B) abandonments, expirations, cancellations and the like occurring in the ordinary course of business that are not material, individually or in the aggregate, to the Business); and

(iii) maintain all material structures, equipment and other tangible personal property of the Business in their present repair, order and condition, except for depletion and wear and tear occurring in the ordinary course of business.

-54-

(b) Except as set forth in <u>Schedule 6.01(b)</u> to the Disclosure Letter, as required by applicable Law or as otherwise expressly required by the terms of this Agreement, Seller will not, and shall cause the Selling Affiliates and the Transferred Companies to not, without the prior written consent of Buyer (which consent shall not be unreasonably withheld) and to the extent primarily related to the Business or with respect to any Transferred Asset, any Transferred Company or any Assumed Liability (but excluding any Excluded Asset or Excluded Liability):

(i) (A) adopt, grant, extend, amend, vary, terminate or materially increase the rate or terms of any Business Employee Benefit Plan, bonus, insurance, pension or other employee benefit plan, payment or arrangement made to, for or with any employee who is expected to be an Employee of the Business, or (B) increase the compensation or employee benefits of any such individual, except, in each case, (1) as required by any applicable Law or any Collective Bargaining Agreement, (2) as contemplated in <u>Section 8.01</u>, (3) as may be initiated by Seller or one or more of Seller's Affiliates (other than the Transferred Companies) with respect to their employees generally in the applicable jurisdiction or geographic location (so long as the action is designed to apply uniformly to eligible Employees of the Business and a material number of eligible similarly situated other employees of Seller or its applicable Affiliate) and (4) arrangements that will not result in any liability under this Agreement or otherwise to Buyer or its Affiliates (including any retention or similar arrangements that will be paid solely by Seller);

(ii) enter into or materially amend any Collective Bargaining Agreement or other agreement with a labor union, works council or similar organization covering any Employee of the Business, except, in each case, (A) as required by any applicable Law or any Collective Bargaining Agreement as in effect on the date of this Agreement (or as modified as contemplated in this Agreement) or (B) where such agreement or amendment of any Collective Bargaining Agreement applies uniformly to a material number of eligible similarly situated employees of Seller or any of its Affiliates other than the Employees of the Business;

(iii) except as required by applicable Law, or as reasonably necessary to avoid a violation of applicable Law, transfer internally (including in response to a request for transfer by an employee), or otherwise alter the duties and responsibilities of, any employee of Seller and its Affiliates in a manner that would affect whether such employee is or is not classified as an Employee of the Business, other than, in the case of any Employee of the Business, such actions that are taken in order to fill a vacancy in the ordinary course of business consistent with past practice or upon a termination for cause or due to death or disability;

(iv) make any material change in any of its present financial accounting methods and practices of the Business or the Transferred Companies other than changes as may be initiated by Seller or one of its Affiliates with respect to Seller's businesses generally and other than as may be appropriate to conform to GAAP or applicable Law or that are consistent with the Accounting Policies;

-55-

(v) pledge, sell, lease, transfer, license, assign, encumber, dispose of or make subject to a Lien (other than any Permitted Liens) any Transferred Equity Interest or material Transferred Asset (other than Transferred IP, which is addressed in clause (vii) below) other than the sale of Inventory or obsolete, worn-out or excess equipment or assets in the ordinary course of business consistent with past practice;

(vi) waive or settle any claims or rights of value that relate primarily to the Business which claims or rights, individually or in the aggregate, are material to the Business;

(vii) transfer, assign or grant any license or sublicense of any material rights under or with respect to any material Transferred IP, other than non-exclusive licenses to customers, distributors and suppliers granted in the ordinary course of business consistent with past practice;

(viii) create or allow the Business to create, incur, assume or guarantee any indebtedness for borrowed money (other than any such indebtedness that will be discharged on or prior to the Closing);

(ix) make any acquisition of any assets or business that, individually or in the aggregate, would be material to the Business, other than acquisitions of Inventory, equipment or machinery in the ordinary course of business;

(x) fail to make capital expenditures necessary to operate the Business in the ordinary course of business consistent with past practice;

(xi) with respect to any Transferred Company and, except as would not affect Buyer or any of its Affiliates, with respect to the Transferred Assets and the Business, make, change or revoke any material Tax election, change any material Tax accounting method, file any material amended Tax Return, settle or compromise any audit or other proceeding relating to a material amount of Tax, enter into any "closing agreement" within the meaning of Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. Tax Law), apply for or request any Tax ruling, or surrender any right to claim a material Tax refund;

(xii) (A) terminate any Material Transferred Contract or any contract that provides for the distribution of Products pursuant to which Seller, any Selling Affiliate or any Transferred Company reasonably expects to receive annual revenue in excess of one million five hundred thousand dollars ($1,500,000) (a " Material Distribution Contract "), (B) amend any Material Transferred Contract that is a Transferred Real Property Lease or (C) enter into a new Contract that would be a Material Transferred Contract if entered into prior to the date hereof or a new Material Distribution Contract, in each case other than in the ordinary course of business consistent with past practice and except for renewals or terminations in accordance with the terms of any Material Transferred Contract or Material Distribution Contract, as applicable;

(xiii) modify in any material respect any payment terms with any customers or suppliers pursuant to any Material Transferred Contract or Material Distribution Contract, other than changes as may be initiated by Seller or one of its Affiliates with respect to the applicable Seller businesses generally; or

(xiv) agree, whether in writing or otherwise, to do any of the foregoing.

(c) Notwithstanding the foregoing, nothing in this Section 6.01 will prevent Seller or any of its Affiliates from taking any actions contemplated by Section 6.07 .

-56-

SECTION 6.02. <u>Certain Covenants Regarding the Transferred Companies</u> . Except as otherwise required by this Agreement, Seller agrees not to, and to cause each of the Transferred Companies not to issue or sell any capital stock or other equity interests or options, warrants, calls, subscriptions or equity rights to purchase any capital stock or other equity interests of such Transferred Company or any subsidiary of such Transferred Company or split, combine or subdivide the capital stock or other equity interests of such Transferred Company or any subsidiary of such Transferred Company in each case to a Person other than to Seller or a Stock Selling Affiliate; or authorize or effect any amendment to or otherwise change in any material respect the organizational documents of any Transferred Company or any subsidiary of such Transferred Company. The parties agree to reasonably cooperate with respect to the amount of cash and cash equivalents, if any, to be held by the non-U.S. Transferred Companies at the Closing.

SECTION 6.03. <u>Disclosure</u> . Seller shall give prompt notice to Buyer of (a) any notice received by Seller subsequent to the date of this Agreement and prior to the Closing Date of (or other communication relating to, or the occurrence of), any material default under any Material Transferred Contract or Material Distribution Contract, (b) any notice or other communication from any third party alleging that the consent of such third party is required in connection with the Transactions and (c) any effect, event, occurrence, circumstance or change that, to the knowledge of Seller, would constitute a breach of any representation or warranty or covenant of Seller contained in this Agreement that could reasonably be expected to cause any of the conditions set forth in <u>Section 5.01(a)</u> or <u>5.01(b)</u> not to be satisfied, it being understood and agreed, however, that if Seller fails to provide notice pursuant to this <u>Section 6.03</u> such failure to provide notice shall not constitute a breach of covenant for purposes of <u>Article V</u> or <u>Article X</u> .

SECTION 6.04. <u>Publicity</u> . No party to this Agreement shall originate any publicity, news release or other similar public announcement, written or oral, whether relating to this Agreement or any of the other Transaction Documents or the existence of any arrangement between the parties, without the prior written consent of the other party whether or not named in such publicity, news release or other similar public announcement, except (x) each party may issue a press release (or, if the parties agree, a joint press release) in connection with the execution and delivery of this Agreement and each party may, from time to time, refer to the Transactions in customary investor calls, investor meetings and other investor relations activities (including any such calls, meetings or activities specifically related to the Transactions), (y) either party may originate any such publicity, news release or other similar public announcement as may be required by Law (including the rules and regulations of the U.S. Securities and Exchange Commission), listing rules or any listing or trading agreement concerning its publicly traded securities and (z) to the extent the contents of such publicity, news release or other similar public announcement have previously been released publicly or are consistent in all material

-57-

respects with materials that have previously been released (without violation of this Section 6.04 ); provided that in such event under clauses (x) and (y), the party issuing same shall still be required to consult with the other party, whether or not named in such publicity, news release or other similar public announcement, a reasonable time prior to its release (to the extent practicable) to allow the other party to comment thereon and, after its release, shall provide the other party with a copy thereof. If Buyer, based on the advice of its counsel, determines that this Agreement, or any of the other Transaction Documents, must be publicly filed with a Governmental Entity (other than filings required to be made with the U.S. Securities and Exchange Commission), then Buyer, prior to making any such filing, shall provide Seller and its counsel with a redacted version of this Agreement (and any other Transaction Document) which it intends to file, and will give due consideration to any comments provided by Seller or its counsel.

SECTION 6.05. Commercially Reasonable Efforts; Regulatory Approvals; Access . Subject to any obligation imposed by Law, including all anti-trust and competition Laws:

(a) Subject to the terms and conditions set forth in this Agreement, including Section 2.02(g) , each of Seller and Buyer shall use its commercially reasonable efforts to (i) make the Anti-Trust Filings and any other filings required by applicable Law, (ii) obtain consents, approvals (including Anti-Trust Approvals), authorizations, qualifications and orders of Governmental Entities and other third parties and (iii) take other actions, in each case as is necessary to consummate the Transactions as soon as reasonably practical following the date of this Agreement; provided that Seller shall have no obligation to pay money (other than customary filing and application fees typically paid by a seller or transferee) or make any concessions to obtain such consents. In addition to the foregoing, Buyer agrees to provide such evidence as to financial capability, resources and creditworthiness as may be reasonably requested by any third party whose consent or approval is sought hereunder. Subject to appropriate confidentiality protections, each of the parties hereto will cooperate with and furnish to the other party such necessary information and assistance as such other party may reasonably request in connection with the foregoing.

(b) As soon as reasonably practicable after the date hereof, Seller and Buyer shall file the Anti-Trust Filings and any other filings required under any applicable Laws. With respect to filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Canadian Competition Act, and the German Act Against Restraints of Competition of 1958, as amended, Seller and Buyer shall make their respective filings no later than ten (10) business days following the date hereof (unless a later date is mutually agreed between the parties). Seller and Buyer shall provide to any Governmental Entity whose consent, authorization, order or approval is required in connection with the Transactions any additional information required under any applicable Laws or otherwise properly requested. The parties shall use their commercially reasonable efforts to obtain early termination of any applicable waiting period, to the extent required, from the applicable Governmental Entities. The parties also shall use their commercially reasonable efforts to cooperate by providing information reasonably requested by the other party in order to fulfill the foregoing obligations as promptly as reasonably practicable.

-58-

(c) Subject to applicable Law relating to the exchange of information, Buyer and Seller and their respective counsel shall (i) have the right to review in advance, and to the extent practicable each shall consult or, where required by applicable Law, cooperate with the other on, any filing made with, or written materials to be submitted to, any Governmental Entity in connection with the Transactions, (ii) promptly inform each other of any communication (or other correspondence or memoranda) received from, or given to, any Governmental Entity in connection with the Transactions, (iii) consult with the other party, and consider in good faith the views of the other party, prior to entering into any agreement with any Governmental Entity with respect to the Transactions and (iv) furnish each other with copies of all correspondence, filings and written communications between them or their subsidiaries or Affiliates, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to the Transactions. Buyer and Seller shall, to the extent practicable, provide each other and their respective counsel with advance notice of and the opportunity to participate in any in-person discussion or meeting with any Governmental Entity in respect of any filing, investigation or other inquiry in connection with the Transactions and to participate in the preparation for such discussion or meeting. Buyer and Seller also agree to keep the other fully informed about any anti-trust issues raised by any Governmental Entity.

(d) For purposes of this Section 6.05, to the extent necessary to obtain waiver or consent from any Governmental Entity required to satisfy the conditions set forth in Sections 5.01(f) or 5.02(f), as applicable, to obtain consents, approvals, authorizations, qualifications or orders of Governmental Entities or to avoid the entry of or have lifted, vacated or terminated any Closing Legal Impediment, Buyer shall, subject to the last sentence of this Section 6.05(d): (i) propose, negotiate, offer to commit and effect (and if such offer is accepted, commit to and effect), by consent decree, hold separate order or otherwise, and in connection with the consummation of the Transactions, the sale, divestiture or disposition (including by licensing any intellectual property rights) of any assets of Buyer or its subsidiaries or the Business; (ii) terminate or modify any existing relationships and contractual rights and obligations of Buyer or its subsidiaries or the Business; (iii) otherwise offer to take or offer to commit to take any action which it is capable of taking and, if the offer is accepted, take or commit to take such action, that limits its freedom of action with respect to, or its ability to retain, any of the assets of Buyer or its subsidiaries or the Business; and (iv) take promptly, in the event that any permanent or preliminary injunction or other order is entered or becomes reasonably foreseeable to be entered in any proceeding that would make consummation of the Transactions unlawful or that would prevent or delay consummation of the Transactions, any and all steps (including the posting of a bond or the taking of the steps contemplated by clauses (i) through (iii) of this subsection (d)) necessary to vacate, modify or suspend such injunction or order (each of the preceding clauses (i) through (iv), a " Divestiture Action "). Buyer shall use commercially reasonable efforts to take any such action or do any thing to satisfy the conditions in Sections 5.01(f) and 5.02(f) on or before the date that is the nine-month anniversary of the date hereof. Notwithstanding the foregoing or anything to the contrary contained in this Agreement, nothing in this Agreement shall

-59-

require Buyer or any of its Affiliates to propose, negotiate, offer to commit and effect, terminate, modify, offer to take or offer to commit to take, agree or take any Divestiture Action with respect to assets, businesses, product lines or operations of Buyer or any of its Affiliates, or the Business, or any combination thereof, that in the aggregate generated total revenues in excess of one hundred million dollars ($100,000,000) in the twelve (12) month period ending December 31, 2016.

(e) Seller shall give Buyer and its accountants, legal counsel and other representatives reasonable access, during normal business hours and without undue interruption of the Business throughout the period prior to the Closing, to all of the properties, books and records (other than records relating to Income Taxes and attorney-client privileged communications and, for the avoidance of doubt, other than where access to such information is prohibited by applicable Law) relating to the Business, and will furnish, at Buyer's expense, Buyer, its accountants, legal counsel and other representatives during such period all such information (other than records relating to Income Taxes and attorney-client privileged communications and, for the avoidance of doubt, other than where access to such information is prohibited by applicable Law) concerning the affairs of the Business as Buyer may reasonably request; provided that this Section 6.05(e) shall not entitle Buyer or its accountants, legal counsel or other representatives to contact any third party doing business with Seller or access the properties, books or records of any such third party, in each case without Seller's prior written consent (which consent shall not be unreasonably withheld). Buyer will hold in confidence all information so obtained in accordance with Section 7.12 . Nothing in this Agreement shall limit any of the parties' rights of discovery.

(f) From the date hereof until the Closing Date, Seller shall timely prepare, and promptly deliver to Buyer, with respect to the Business, a statement of sales, on a monthly basis, to be consistent with such financial information previously provided to Buyer by Seller.

(g) Seller shall, and shall cause the Selling Affiliates and the Transferred Companies to, use commercially reasonable efforts to make available to Buyer prior to the thirtieth (30th) day after the date hereof or as promptly as practicable thereafter each Material Distribution Contract.

SECTION 6.06. Financing . (a) Seller shall, and shall cause its Affiliates to, and shall use its commercially reasonable efforts to cause its and its Affiliates' respective officers, directors, employees, accountants, consultants, legal counsel, agents and other advisors and representatives to, provide commercially reasonable cooperation in connection with the arrangement by Buyer of bank financing and/or bond offerings for the purpose of financing the Transactions, the fees and expenses incurred in connection therewith and the other transactions contemplated hereby (the " Debt Financing ") as may be reasonably requested by Buyer; provided that, without limiting Section 6.12 , (i) such requested cooperation shall not unreasonably interfere with the ongoing operations of Seller and its Affiliates, (ii) Seller and its Affiliates shall not be required to provide any audited or unaudited "carve-out" financial statements of the Business and (iii) Seller and its Affiliates shall not be required to provide any updates to the Financial Information. Buyer shall, promptly upon request by Seller, reimburse Seller for all

-60-

out-of-pocket costs incurred by Seller or any of its Affiliates in connection with such cooperation. Buyer and its Affiliates shall, on a joint and several basis, indemnify and hold harmless Seller and its Affiliates from and against any Damages suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith. Seller shall have the right to consent to the use of its and its Affiliates' logos in connection with the Debt Financing (which consent shall not be unreasonably withheld).

(b) Notwithstanding anything to the contrary in this Section 6.06 , Buyer acknowledges and agrees that its obligation to consummate the Transactions on the terms and subject to the conditions set forth herein are not contingent on any debt or equity financing (including the Debt Financing) or the receipt of the proceeds therefrom.

(c) None of the Debt Financing Sources, in their capacities as such, will have any liability to Seller, any former, current or future stockholders, equity holders, controlling persons, directors, officers, employees, general or limited partners, members, managers, agents or Affiliates of Seller (in each case in their capacities as such), or any former, current or future direct or indirect stockholder, equity holder, controlling person, director, officer, employee, general or limited partner, member, manager, agent or Affiliate of any of the foregoing (in each case in their capacities as such) (each, a " Related Party "), relating to or arising out of this Agreement or the Debt Financing, whether at law, or equity, in contract, in tort or otherwise, and neither Seller nor any of its Related Parties will have any rights or claims against any of the Debt Financing Sources, in their capacities as such, hereunder or thereunder. For the avoidance of doubt, nothing in this Section 6.06(c) shall limit any obligations of the Debt Financing Sources to Buyer or its Affiliates.

SECTION 6.07. Transferred Companies Assets and Liabilities . Prior to the Closing, Seller shall take or cause to be taken, such action as is necessary or appropriate to transfer, assign or convey (i) any assets owned or held by the Transferred Companies other than those that would constitute Transferred Assets or (ii) any liabilities or obligations of the Transferred Companies other than those that would constitute Assumed Liabilities, in each case, to Seller or an Affiliate of Seller such that as of the Closing, (x) the assets owned or held by the Transferred Companies consist solely of assets that would otherwise constitute Transferred Assets pursuant to clauses (i)–(xvi) and (xviii) of Annex 2.02(a) and (y) the liabilities and obligations of the Transferred Companies consist solely of liabilities and obligations that would otherwise constitute Assumed Liabilities pursuant to clauses (i)–(x) of Annex 2.02(c) . Prior to or following the Closing, Buyer shall provide to Seller the necessary information and deliver such assignments, transfers, consents and other documents and instruments as may be reasonably required to permit Seller at its expense to effect and perfect the transfer of any registrations of Patents and Trademarks that constitute Excluded Assets but which are held by a Transferred Company. Notwithstanding anything in this Agreement to the contrary, prior to the Closing, Seller shall use commercially reasonable efforts to transfer, assign or convey any Pre-Closing Accounts Receivable that are owned or held by the Transferred Companies and any Pre-Closing Accounts Payable that are liabilities or obligations of the Transferred Companies, in each case, to Seller or an Affiliate of Seller prior to the Closing, and if Seller shall have complied with such obligation to use commercially reasonable efforts, Seller shall not be in breach of this Agreement solely as a result of the failure of any such transfer, assignment or conveyance to have been completed by Closing (it being understood that following the Closing any Pre-Closing Accounts

-61-

Receivable (including any cash received in respect thereof) shall in any event be treated as Excluded Assets and any Pre-Closing Accounts Payable shall in any event be treated as Excluded Liabilities).

SECTION 6.08. Exclusivity . (a) From the date of this Agreement until the earlier of the Closing Date or termination of this Agreement in accordance with its terms, Seller shall not, and shall cause its Affiliates, the Transferred Companies and its and their respective directors, officers or employees, or any attorney, accountant or other representative retained by any of them (collectively, " Representatives ") not to, directly or indirectly (i) solicit, initiate or knowingly encourage (including by way of furnishing non-public information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal that constitutes, or could reasonably be expected to lead to, any Alternative Proposal, (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or otherwise cooperate in any way with, or assist or participate in any effort or attempt by any Person with respect to, any Alternative Proposal or (iii) enter into or approve any agreement with respect to any Alternative Proposal. None of Seller, any of its Affiliates or any of the Transferred Companies shall release any third party from, or waive any provision of, any confidentiality agreement with respect to the Business to which it is a party and which was entered into with respect to any potential Alternative Proposal. Seller and its Affiliates shall, and shall cause their respective Representatives to, with respect to third parties with whom discussions or negotiations with respect to an Alternative Proposal have been terminated on or prior to the date of this Agreement, use its reasonable best efforts to obtain the return or destruction of, in accordance with the terms of the applicable confidentiality agreement, confidential information previously furnished by Seller or any of its Affiliates, or its or their Representatives, with respect to the Business.

(b) Seller will promptly notify Buyer orally (and then in writing within twenty-four (24) hours) after it or any of its Affiliates has received any proposal, inquiry, offer or request relating to or constituting, or that could reasonably be expected to lead to, an Alternative Proposal, any request for discussions or negotiations, or any request for information relating to the Business in connection with an Alternative Proposal or a potential Alternative Proposal or for access to the properties or books and records thereof of which Seller or any of its Affiliates is or becomes aware, or any amendments to the foregoing. Such notice to Buyer shall indicate the identity of the Person making such proposal and the terms and conditions of such proposal, if any. Seller shall also promptly provide Buyer with (i) a copy of any written notice or other written communication from any Person informing Seller or any of its Affiliates that it is considering making, or has made a proposal regarding, an Alternative Proposal, (ii) a copy of any Alternative Proposal (or any amendment thereof) received by Seller or any of its Affiliates and (iii) such other details of any such Alternative Proposal that Buyer may reasonably request. Thereafter, Seller shall promptly keep Buyer reasonably informed on a reasonably current basis of any material change to the terms of any such Alternative Proposal.

(c) " Alternative Proposal " means any inquiry, proposal or offer, or any expression of interest by any third party relating to Seller's or any of its Affiliates' willingness or ability to receive or discuss a proposal or offer, other than a proposal or offer by Buyer or any of its Affiliates, for any merger, amalgamation, consolidation, share exchange, recapitalization, liquidation, dissolution, acquisition or other business combination, in each case relating to twenty-five percent (25%) or more of the assets of the Business.

-62-

SECTION 6.09. Closing Structure .

(a) Anything in Section 6.01 or Section 6.02 to the contrary notwithstanding, Seller and its Affiliates may, prior to the Closing, take actions to implement the Closing Structure (such actions, the " Internal Restructuring Steps "), it being understood that that such actions shall not affect the parties' rights and obligations with respect to the Transferred Assets, Assumed Liabilities, Excluded Assets and Excluded Liabilities or the parties' indemnification and payment obligations hereunder. Seller has delivered to Buyer a statement on Schedule 6.09(a) to the Disclosure Letter setting forth the expected Internal Restructuring Steps as of the date hereof. Buyer shall have the right to review such statement setting forth the Internal Restructuring Steps (and any statement setting forth any modification to such Internal Restructuring Steps delivered pursuant to Section 6.09(c) ) and any additional information relating thereto that Buyer may reasonably request prior to the implementation of the applicable Internal Restructuring Steps. Buyer shall be entitled to submit written requests for modifications to such Internal Restructuring Steps to Seller no more than fifteen (15) days after the date hereof (or five (5) days after the date of delivery pursuant to Section 6.09(c) of any such statement setting forth any such modification to such Internal Restructuring Steps) to the extent such requests address the matters that would be reasonably expected to adversely affect Buyer or any of its Affiliates after the Closing (taking into account Seller's indemnification and payment obligations hereunder). Seller shall not unreasonably withhold consent to such requests; provided that, subject to Seller's compliance with Section 6.10(b) and the last sentence of Section 6.09(c) , with respect to requests for modifications to the Internal Restructuring Steps relating to (x) the Swiss Asset Transfer (as defined below) or (y) the transfer of Transferred Assets (1) by Selling Affiliates that are organized in the United States or (2) indirectly through the transfer of Transferred Companies that are organized in the United States (such Transferred Assets, the " U.S. Assets ," such transfer of U.S. Assets, the " U.S. Business Transfer " and such Internal Restructuring steps relating to the Swiss Asset Transfer or the U.S. Business Transfer, the " Specified Internal Restructuring Steps "), Seller shall not modify such Internal Restructuring Steps without Buyer's consent (which shall not be unreasonably withheld, conditioned or delayed) if such modification would reasonably be expected to materially adversely affect Buyer or its Affiliates (taking into account Seller's indemnification and payment obligations hereunder). Without limitation of the foregoing rights of Buyer, prior to their implementation, Buyer shall also have the right to review, and to submit written requests for modifications to Seller with respect to, any new organizational documents proposed to be adopted for the Transferred Companies, or amendments to be made to existing organizational documents of the Transferred Companies, any merger, demerger or similar filings (and amendments thereto) to be made by or with respect to any Transferred Companies with Governmental Entities, any agreements to which any Transferred Company will be a party (and amendments thereto) and any other documents (if any) Buyer may reasonably request, in each case that will implement the Internal Restructuring Steps if any such amendment, filing, document or agreement would be reasonably expected to adversely affect Buyer or any of its Affiliates after the Closing (taking into account Seller's indemnification and payment obligations hereunder). Seller shall not unreasonably withhold consent to such requests.

-63-

(b) In the event Seller applies for or requests any Tax ruling with respect to the Internal Restructuring Steps or any other transactions contemplated by this Agreement (to the extent any such Tax ruling would be reasonably expected to adversely affect Buyer or any of its Affiliates after the Closing), (i) Seller shall in good faith allow Buyer to make comments to Seller regarding the Tax ruling and any materials submitted to any Taxing Authority, and (ii) Buyer shall, at its own expense, have the right (but not the duty) to participate in the application or request for any Tax ruling ( provided that this clause (ii) shall not apply with respect to any Swiss Tax Ruling). Notwithstanding anything to the contrary herein, the right of Buyer to comment and participate pursuant to the preceding sentence shall not materially delay or otherwise materially impede Seller's submission of materials to any Taxing Authority or Seller's receipt of any such Tax ruling.

(c) Seller shall be entitled to modify the Closing Structure from time to time with the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed; provided , however , that subject to Seller's compliance with Section 6.10(b) and the last sentence of this Section 6.09(c) , Seller shall be entitled to modify the Closing Structure with respect to the U.S. Business Transfer and/or the Swiss Asset Transfer from time to time without Buyer's prior consent unless such modification would reasonably be expected to materially adversely affect Buyer or its Affiliates (taking into account Seller's indemnification and payment obligations hereunder). If any modification described in the previous sentence would reasonably be expected to result in a delay of the Product Registration Transfer Time with respect to any Product, Seller shall reasonably cooperate with Buyer to address any adverse consequences to Buyer as a result of such delay. In the event the Closing Structure is so modified, Schedule 1.01(f) shall be deemed to be automatically amended to reflect such modifications to the extent applicable. Seller shall be entitled to modify the Internal Restructuring Steps from time to time, provided that, to the extent any proposed modification to the Internal Restructuring Steps would be reasonably expected to adversely affect Buyer or any of its Affiliates after the Closing (taking into account Seller's indemnification and payment obligations hereunder), Seller's right to modify such steps shall be subject to the prior written consent of Buyer, which consent will not be unreasonably withheld, conditioned or delayed; further provided , however , that subject to Seller's compliance with Section 6.10(b) and the last sentence of this Section 6.09(c) , Seller shall be entitled to modify the Specified Internal Restructuring Steps from time to time without Buyer's prior consent unless such modification would be reasonably expected to materially adversely affect Buyer or its Affiliates (taking into account Seller's indemnification and payment obligations hereunder). To the extent Seller finally determines to make any such modification pursuant to the preceding sentence, Seller shall deliver a statement setting forth such modified Internal Restructuring Steps to Buyer as promptly as practicable following any such final decision to modify. In the event the Internal Restructuring Steps are so modified, Schedule 6.09(a) to the Disclosure Letter shall be deemed to be automatically amended to reflect such modifications to the extent applicable. Notwithstanding anything to the contrary in this Agreement, (i) the transfer of the Transferred Assets owned, as of the date hereof, by the Specified Entity shall be structured as a sale of the Transferred Assets by the Specified Entity or one of its Swiss Affiliates to Buyer or one of its non-Swiss Affiliates (such Transfer, the " Swiss Asset Transfer "), (ii) Seller shall, pursuant to the Internal Restructuring Steps, cause Innerdyne Holdings, Inc., and KPR U.S., Inc. to transfer cash equal to the amount of outstanding intercompany indebtedness owed to Covidien Finance International, GmbH in satisfaction of such indebtedness, and (iii) Seller shall, pursuant to the

-64-

Internal Restructuring Steps, cause KPR U.S., LLC to be treated as either (A) an entity disregarded as separate from its owner or (B) an association taxable as a corporation, in each case, for U.S. federal income Tax purposes effective at or prior to the Closing.

SECTION 6.10. Basis Calculations .

(a) As of the date hereof, the parties hereto agree that the U.S. Assets that are Inventory (the " U.S. Inventory ") have an estimated Tax basis equal to the Estimated Inventory Tax Basis and all the U.S. Assets have an estimated aggregate Tax basis equal to the Estimated Aggregate Tax Basis. Seller shall, and shall cause its Affiliates to, deliver to Buyer any documentation or information that is reasonably requested by Buyer in order to determine the aggregate Tax basis of the U.S. Inventory as of immediately prior to the Closing (the " Final Inventory Tax Basis ") and the aggregate Tax basis of all U.S. Assets as of immediately prior to the Closing (the " Final Aggregate Tax Basis "). Within thirty (30) days after the filing of the U.S. federal income Tax Return of Covidien LP for the taxable year in which Covidien LP completes the transfer of the U.S. Assets pursuant to the Internal Restructuring Steps, the parties shall mutually agree on a final determination of the Final Inventory Tax Basis and the Final Aggregate Tax Basis (and each party shall reasonably endeavor to reach such mutual agreement). If Buyer and Seller are unable to resolve any disagreement with respect to the Final Inventory Tax Basis or the Final Aggregate Tax Basis, such disagreement shall be referred to the Accounting Firm promptly for review and resolution (in accordance with the procedure set forth in Section 2.04 ). Within ninety (90) days after the date on which Covidien LP completes the transfer of the U.S. Assets pursuant to the Internal Restructuring Steps, Seller shall deliver to Buyer revised estimates of the Tax basis of the U.S. Inventory and the U.S. Assets.

(b) Seller shall pay over to Buyer, in immediately available funds by wire transfer to one or more bank accounts designated in writing by Buyer, cash in U.S. dollars in an amount equal to the greater of (i) the product of (x) the amount by which the Estimated Aggregate Tax Basis exceeds the Final Aggregate Tax Basis, multiplied by (y) the Buyer Tax Rate or (ii) the product of (x) the amount by which the Estimated Inventory Tax Basis exceeds the Final Inventory Tax Basis, multiplied by (y) the Buyer Tax Rate.

(c) To the extent that, (i) Seller or its Affiliates cause KPR U.S., LLC to assume any liabilities (including by contributing, or causing a contribution of, any assets to KPR U.S., LLC subject to any liabilities) and (ii) KPR U.S., LLC holds such liabilities as of the Closing, the Purchase Price shall be reduced by an amount equal to the excess of the amount such liabilities held by KPR U.S., LLC as of the Closing over $0.

SECTION 6.11. Certain Swiss Tax Matters .

(a) Subject to Section 6.11(b) , Seller shall use its reasonable best efforts to minimize the Swiss Tax Rate. To the extent Seller receives, prior to the Closing, a Swiss Tax Ruling, the Purchase Price shall be reduced by an amount equal to the Swiss Sale Amount, less the sum of (i) the Estimated Swiss Gain and (ii) (x) the Estimated Swiss Gain multiplied by the Swiss Tax Rate, further multiplied by (y) the Swiss Gross-Up.

-65-

(b) The Parties agree that if the Swiss Taxing Authorities deny or otherwise reject a request by Seller or its Affiliates for a Swiss Tax Ruling, neither Seller nor its Affiliates shall have any further obligation to seek a Swiss Tax Ruling. If, after the Closing but prior to the filing of its Swiss income Tax Return reflecting the gain from the Swiss Asset Transfer, Seller receives a Swiss Tax Ruling, Seller shall pay over to Buyer, the amount calculated in the last sentence of clause (a) above; provided , however , that if (x) such Swiss Tax Ruling has not been issued or received within seventy-five (75) days following the Closing, and (y) Seller determines that continued efforts to seek a Swiss Tax Ruling would be reasonably expected to have an adverse impact on Seller or its Affiliates, then Seller shall, in its reasonable discretion, be entitled to not seek such Swiss Tax Ruling (including, without limitation, by terminating or otherwise amending any pending request for such Swiss Tax Ruling).

(c) Seller shall provide Buyer with a reasonably detailed calculation of the amount of gain recognized on the Swiss Asset Transfer. If at the time Seller files its Swiss income Tax Return reflecting the gain from the Swiss Asset Transfer, such gain is determined to be greater than the Estimated Swiss Gain, Buyer shall pay to Seller an amount equal to (i) the excess of such gain over the Estimated Swiss Gain, multiplied by (ii) the Swiss Tax Rate, further multiplied by (iii) the Swiss Gross-Up. If the gain on the Swiss Asset Transfer is determined to be less than the Estimated Swiss Gain, Seller shall pay to Buyer an amount equal to (i) the excess of the Estimated Swiss Gain over such gain, multiplied by (ii) the Swiss Tax Rate, further multiplied by (iii) the Swiss Gross-Up. Any calculation of gain pursuant to this Section 6.11(c) shall be determined without reduction for and without reference to any Tax attributes of Seller or its Affiliates, other than the Swiss Tax Basis.

(d) Payments made pursuant to this Section 6.11 shall be in immediately available funds by wire transfer to one or more bank accounts designated in writing by the recipient of such payment.

SECTION 6.12. Certain Financial Statements . Seller shall use reasonable best efforts to deliver (at Seller's sole cost and expense) to Buyer (a) by May 15, 2017 audited financial statements of the Business for the fiscal year ended April 29, 2016 and (b) by July 1, 2017 reviewed but unaudited financial statements of the Business for the nine (9) fiscal months ended January 27, 2017; provided , that in the event that either of the financial statements described in the foregoing clauses (a) and (b) are not delivered to Buyer by the dates specified in the foregoing clauses (a) and (b), then, in each case, Seller will remain obligated to continue to use reasonable best efforts to deliver the financial statements to Buyer specified in the foregoing clauses (a) and (b).

## ARTICLE VII

### Post-Closing Covenants

During the period commencing after the Closing:

SECTION 7.01. Certain IP Matters . (a) Buyer covenants that, except as hereinafter set forth in the Trademark License Agreement 1, neither Buyer nor any of its Affiliates shall use in any manner the names "Medtronic" and/or "Covidien" or certain trade

-66-

dress associated with the Transferred Assets that includes such names and other marks. Buyer acknowledges and agrees that, except as set forth in the Trademark License Agreement 1, neither it nor any of its Affiliates is obtaining or receiving any rights to use in any manner any Trademarks or trade dress of Seller or any of its Affiliates other than the Trademarks included in the Transferred IP.

(b) Buyer hereby grants, and shall cause its Affiliates to grant, to Seller and its subsidiaries a non-exclusive, royalty free, fully paid-up, perpetual, irrevocable and worldwide license to use all Patents, Know-How and Copyrights included in the Transferred IP that was used by Seller or its Affiliates in connection with their businesses other than the Business prior to the Closing Date (" Seller Field of Use "), including the rights to make, have made, use, sell, have sold or offer for sale products and services in the Seller Field of Use.

(c) Seller hereby grants, and shall cause its Affiliates to grant, to Buyer and its subsidiaries a non-exclusive, royalty free, non-sublicenseable, fully paid-up, perpetual, irrevocable and worldwide license to use the Patents, Know-How and Copyrights included in the Excluded IP Rights which (i) are owned as of the Closing Date by Seller or any of its Affiliates, (ii) are used in the Business as of the Closing Date, (iii) would, absent the license granted in this Section 7.01(c) , be infringed by the making, using, offering for sale or selling the Products by Buyer or its subsidiaries and (iv) are not licensed to Buyer or its Affiliates pursuant to any of the Ancillary Agreements, such license solely to the extent necessary for the manufacture and sale of the Products by Buyer and its subsidiaries (" Buyer Field of Use "), including the rights to make, have made, use, sell, have sold or offer for sale Products in the Buyer Field of Use.

SECTION 7.02. IP Cooperation . For a period of up to two (2) years after the Closing Date, (i) Seller shall provide to Buyer, and Buyer shall provide to Seller, as applicable, the necessary information and deliver such assignments, transfers, consents and other documents and instruments as may be reasonably required to permit Buyer at its expense to effect and perfect the transfer of the registrations of the Patents and Trademarks included in the Transferred IP in accordance with Sections 2.02(a) , 2.02(d) and 2.02(h) and to permit Seller at its expense to effect and perfect the transfer of the registrations of any Patents and Trademarks that constitute Excluded Assets but which are held by a Transferred Company and (ii) Seller will reasonably cooperate with Buyer, and Buyer will reasonably cooperate with Seller, as applicable, in filing appropriate documents to cancel all "registered user" filings worldwide in connection with the foregoing. After such period, neither Seller nor Buyer shall have any further obligation hereunder.

SECTION 7.03. Access . Subject to customary confidentiality undertakings comparable to those included in the Confidentiality Agreements, (a) to the extent reasonably required for tax, accounting, regulatory, compliance, litigation or investigation purposes, or otherwise reasonably requested by Seller (other than in connection with a dispute, claim or litigation between Buyer and Seller or any of their respective Affiliates), Buyer will, during normal business hours (upon twenty-four (24) hours' written notice from Seller), (i) make available its relevant personnel as shall be reasonably necessary in connection with the foregoing and (ii) permit Seller and its duly authorized representatives access to all contracts, books, records (including employment records and personnel files of Transferred Employees) and other data relating to the Transferred Assets and Assumed Liabilities conveyed and assumed at the

-67-

Closing to the extent that such materials were delivered to Buyer, in each case except where such access is prohibited by applicable Law and (b) to the extent reasonably required for tax, accounting, regulatory, compliance, litigation or investigation purposes, or otherwise reasonably requested by Buyer (other than in connection with a dispute, claim or litigation between Buyer and Seller or any of their respective Affiliates), Seller will, during normal business hours (upon twenty-four (24) hours' written notice from Buyer), (i) make available its relevant personnel as shall be reasonably necessary in connection with the foregoing and (ii) permit Buyer and its duly authorized representatives access to all contracts, books, records and other data relating to the Excluded Assets and Excluded Liabilities retained at the Closing to the extent that such materials were retained by Seller and relate to the Business, except where such access is prohibited by applicable Law. Seller agrees that after the Closing, Buyer or its authorized representatives may, at Buyer's cost and expense, have access to and make copies of any books and records (including emails) (in each case, or redacted portions thereof) that have not been transferred to Buyer to the extent they relate to the Business, except where providing copies is prohibited by applicable Law. Seller and Buyer shall cooperate in a commercially reasonable manner in connection with the foregoing provisions of this Section 7.03 .

SECTION 7.04. Insurance .

(a) Except (1) with respect to insurance proceeds that constitute Transferred Assets pursuant to clause (xiv) of Annex 2.02(a) , or (2) as provided in Section 7.04(b) or Section 7.04(c) , the coverage under all insurance policies related to the Business and arranged or maintained by Seller or its Affiliates is only for the benefit of Seller and its Affiliates, and not for the benefit of Buyer or the Business. Except as set forth in Section 7.04(b) or Section 7.04(c) , as of the Closing Date, Buyer agrees to arrange for its own insurance policies (including self-insurance or similar arrangements funded directly or indirectly by Buyer or any of its Affiliates) with respect to the Business covering all periods following the Closing and, without prejudice to any right to indemnification pursuant to this Agreement or any other Transaction Document, agrees not to seek, through any means, to benefit from any of Seller's or its Affiliates' insurance policies which may provide coverage for claims relating in any way to the Business.

(b) Solely to the extent required for Buyer and its Affiliates to comply with applicable Law that requires Buyer and its Affiliates to maintain workers compensation insurance coverage for Transferred Employees for the period prior to the Closing, with respect to claims relating to acts, omissions, events or circumstances relating to Transferred Employees that occurred or existed prior to the Closing (" Pre-Closing WC Claims ") that are covered by Seller's or its Affiliates' workers compensation insurance policies relating to Transferred Employees (" Workers Compensation Policies "), Seller hereby authorizes Buyer, to the extent permitted by such Workers Compensation Policies, to report Pre-Closing WC Claims directly to the provider of such Workers Compensation Policies and shall use commercially reasonable efforts (at Buyer's expense), to the extent permitted by such Workers Compensation Policies, to assist Buyer's efforts to obtain the benefit of such insurance coverage with respect to such Pre-Closing WC Claims; provided that Buyer shall keep Seller reasonably informed of each claim and Buyer shall exclusively bear and shall promptly either directly pay (in lieu of Seller or its Affiliates having to first pay) or repay or reimburse Seller or its Affiliates for the amount of each claim and related costs or expenses (including increased premiums) and for the amount of any deductibles or self-insured retentions (including captive insurance amounts) associated with any such claims

-68-

under the Workers Compensation Policies and Buyer and its Affiliates shall be liable for any and all uninsured, uncovered, unavailable or uncollectible amounts of such payments; and provided further that Buyer and its Affiliates shall use commercially reasonable efforts (including prior to the Closing) to obtain, as soon as reasonably practicable, replacement insurance policies (including self-insurance) such that Buyer and its Affiliates are no longer legally required to have access to the Workers Compensation Policies. For the avoidance of doubt, nothing in this Agreement shall require Seller or its Affiliates to extend or purchase any insurance policy.

(c) Solely to the extent required for Buyer and its Affiliates to comply with applicable Law that requires Buyer and its Affiliates to maintain automobile liability insurance coverage for the Business or the Transferred Employees for the period prior to the Closing, with respect to claims relating to events or incidents relating to the Business or the Transferred Employees that occurred prior to the Closing (" Pre-Closing Auto Claims ") that are covered by Seller's or its Affiliates' automobile liability insurance policies relating to the Business or the Transferred Employees (" Auto Policies "), Seller hereby authorizes Buyer, to the extent permitted by such Auto Policies, to report Pre-Closing Auto Claims directly to the provider of such Auto Policies and shall use commercially reasonable efforts (at Buyer's expense), to the extent permitted by such Auto Policies, to assist Buyer's efforts to obtain the benefit of such insurance coverage with respect to such Pre-Closing Auto Claims; provided that Buyer shall keep Seller reasonably informed of each claim and Buyer shall exclusively bear and shall promptly either directly pay (in lieu of Seller or its Affiliates having to first pay) or repay or reimburse Seller or its Affiliates for the amount of each claim and related costs or expenses (including increased premiums) and for the amount of any deductibles or self-insured retentions (including captive insurance amounts) associated with any such claims under the Auto Policies and Buyer and its Affiliates shall be liable for any and all uninsured, uncovered, unavailable or uncollectible amounts of such payments; and provided further that Buyer and its Affiliates shall use commercially reasonable efforts (including prior to the Closing) to obtain, as soon as reasonably practicable, replacement insurance policies (including self-insurance) such that Buyer and its Affiliates are no longer legally required to have access to the Auto Policies. For the avoidance of doubt, nothing in this Agreement shall require Seller or its Affiliates to extend or purchase any insurance policy.

SECTION 7.05. Payments from Third Parties . In the event that, on or after the Closing Date, either party shall receive any payments or other funds due to the other pursuant to the terms of any of the Transaction Documents, then the party receiving such funds shall promptly forward such funds to the proper party. The parties acknowledge and agree there is no right of offset regarding such payments and a party may not withhold funds received from third parties for the account of the other party in the event there is a dispute regarding any other issue under any of the Transaction Documents.

SECTION 7.06. Assurances . From and after the Closing Date, if either Buyer or Seller becomes aware that any of the Transferred Assets has not been transferred to Buyer or that any of the Excluded Assets has been transferred to Buyer, it shall promptly notify the other and the parties hereto shall, as soon as reasonably practicable and, subject to Section 2.02(g) and Section 2.06 , ensure that such property is transferred, with any necessary prior third-party consent or approval, to:

(a) Buyer, in the case of any Transferred Asset which was not transferred at the Closing; or

(b) Seller, in the case of any Excluded Asset which was transferred at the Closing.

-69-

SECTION 7.07. Further Assurances . Subject to the terms and conditions of this Agreement, from and after the Closing Date, each party will execute and deliver, or cause its Affiliates to execute and deliver, all such documents and instruments and will take, or cause its Affiliates to take, all such further actions, in each case as may be reasonably necessary to consummate the transactions contemplated by this Agreement.

SECTION 7.08. Tax Matters .

(a) Preparation and Filing of Tax Returns; Payment of Taxes .

(i) Seller shall prepare and file all Tax Returns of the Transferred Companies or in respect of the Transferred Assets or the Business, in each case, that are due (including applicable extensions) before the Closing. Seller shall prepare all income Tax Returns of the Transferred Companies for all taxable periods ending on or before the Closing Date that are due after the Closing (" Pre-Closing Entity Tax Returns "). Seller shall prepare all Tax Returns (other than Tax Returns of the Transferred Companies) in respect of the Transferred Assets or the Business for all taxable periods ending on or before the Closing Date that are due after the Closing (" Pre-Closing Business Tax Returns " and, together with Pre-Closing Entity Tax Returns, " Pre-Closing Tax Returns "). Seller shall also prepare and file all Tax Returns for Transferred Companies that are required to be included in (or filed with) a Tax Return of an affiliated, consolidated, combined, unitary or aggregate group of which Seller or any of its Affiliates (other than a Transferred Company) is parent for Pre-Closing Tax Periods. With respect to any Pre-Closing Tax Return required to be prepared by Seller pursuant to this Section 7.08(a)(i) , (1) such Pre-Closing Tax Returns shall be prepared on a basis consistent with the past practices of the Transferred Companies or with respect to the Transferred Assets or the Business, respectively, unless a different position is required by Law and the parties mutually agree on the resolution of such issue (and each party shall reasonably endeavor to reach such mutual agreement), (2) Seller shall deliver to Buyer for its review and comment, at least thirty (30) days prior to the due date for the filing of such Pre-Closing Tax Return in the case of a separate income Tax Return of the Transferred Companies, and at least ten (10) days prior to the due date for the filing of such Pre-Closing Tax Return in the case of a separate non-income Tax Return of the Transferred Companies or in respect of the Transferred Assets or the Business (in each case taking into account any applicable extensions), a copy of such Tax Return, together with any additional information that Buyer may reasonably request, and (3) Seller shall consider in good faith any reasonable comments submitted by Buyer at least fifteen (15) days prior to the due date of such Pre-Closing Tax Return in the case of a separate income Tax Return of the Transferred Companies, and at least five (5) days prior to the due date for the filing of such Pre-Closing Tax Return in the case of a separate non-income Tax Return of the Transferred Companies or in respect of the Transferred Assets or the Business (in each case taking into account any applicable extensions). If applicable, Seller shall deliver a

-70-

revised Pre-Closing Tax Return to Buyer before the due date for the filing of such Pre-Closing Tax Return (taking into account any applicable extensions), and Buyer shall timely file or cause to be timely filed any Pre-Closing Tax Returns.

(ii) From and after the Closing, Buyer shall prepare and timely file, or cause to be prepared and timely filed, all other Tax Returns (other than those required to be prepared by Seller pursuant to Section 7.08(a)(i) ) required to be filed by the Transferred Companies, or in respect of the Transferred Assets or the Business, and any such Tax Returns of Transferred Companies for any Pre-Closing Tax Period or Straddle Period shall be prepared on a basis consistent with the past practices of the Transferred Companies as applicable, unless Buyer notifies Seller in writing that a different position is required by applicable Law, and the parties mutually agree on the resolution of such issue (and each party shall reasonably endeavor to reach such mutual agreement). With respect to any Tax Return required to be filed by Buyer for or including a Pre-Closing Tax Period, (1) Buyer shall deliver to Seller for its approval, at least thirty (30) days prior to the due date for the filing of such Tax Return in the case of an income Tax Return, and at least ten (10) days prior to the due date for the filing of such Tax Return in the case of a non-income Tax Return (in each case taking into account any applicable extensions), a statement setting forth the amount of Tax for which Seller is responsible pursuant to Section 7.08(c) (i) and a copy of such Tax Return, together with any additional information that Seller may reasonably request and (2) Buyer shall reflect on such Tax Return any reasonable comments, except to the extent such comments are inconsistent with past practice (unless the parties mutually agree that a position that is inconsistent with past practice is required by applicable Law, pursuant to this Section 7.08(a)(ii) ), submitted by Seller at least fifteen (15) days prior to the due date of such Tax Return in the case of an income Tax Return, and at least five (5) days prior to the due date for the filing of such Tax Return in the case of a non-income Tax Return (in each case taking into account any applicable extensions). Any Tax Return of a Transferred Company for a Tax period that would otherwise be a Straddle Period shall, to the extent permitted by applicable Law, be filed on the basis that the relevant Tax period ended as of the close of business on the Closing Date.

(iii) Unless otherwise required by Law (as mutually agreed to by Buyer and Seller (and each party shall reasonably endeavor to reach such mutual agreement)), neither Buyer nor any of its Affiliates (including any Transferred Company) shall file an amended Tax Return or agree to any waiver or extension of the statute of limitations relating to Taxes with respect to any Transferred Company, the Transferred Assets or the Business for a Pre-Closing Tax Period (or a Straddle Period), to the extent such amendment, waiver or extension would reasonably be expected to increase Seller's liability for Taxes under this Agreement, without the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned, or delayed.

(iv) All Taxes due and payable with respect to Tax Returns described in Section 7.08(a) will be paid by the filer, subject to reimbursement by the other party pursuant to Section 7.08(c) ; provided that, with respect to any Tax Return described in Section 7.08(a)(ii) for any Pre-Closing Tax Period or any Straddle Period and any Tax Return described in Section 7.08(a)(i) that is to be filed by Buyer, Seller shall pay any

-71-

Excluded Taxes or any Taxes that are Excluded Liabilities, in each case relating to such Tax Return, to Buyer no later than five (5) days prior to the due date for the filing of such Tax Return.

(v) If Seller and Buyer are unable to resolve any disagreement with respect to any Tax Return prepared by Seller pursuant to Section 7.08(a)(i) or prepared by Buyer pursuant to Section 7.08(a)(ii) , in each case, prior to the due date (taking into account any extension validly obtained) of such Tax Return, such Tax Return will be filed as proposed by Seller (in the case of a Tax Return prepared by Seller pursuant to Section 7.08(a)(i) ) or as proposed by Buyer (in the case of a Tax Return prepared by Buyer pursuant to Section 7.08(a)(ii) ), and any open issues shall be referred to the Accounting Firm promptly after the filing of such Tax Return for review and resolution (in accordance with the procedure set forth in Section 2.04 ). If Seller and Buyer are unable to mutually agree that an item or action is required by applicable Tax Law, such disagreement shall be referred to the Accounting Firm promptly for review and resolution (in accordance with the procedure set forth in Section 2.04 ). Any reimbursement or indemnification payment required under this Section 7.08 shall be adjusted to reflect the resolution of the Accounting Firm.

(b) Refunds .

(i) Refunds . Seller shall be entitled to retain, or receive prompt payment from Buyer or any of its subsidiaries or Affiliates (including the Transferred Companies) of, any refund (including any credit in lieu of a refund, which credit arises as a result of an overpayment and which otherwise would have been payable in cash by the relevant Taxing Authority at the election of the taxpayer) received or realized in cash with respect to Taxes attributable to any Transferred Company, the Transferred Assets or the Business for any Pre-Closing Tax Period (other than Transfer Taxes, but including any VAT for which Seller is responsible pursuant to Section 2.06(e) ), including any such amounts arising by reason of amended Tax Returns filed after the Closing Date, but only to the extent that (A) such refund (or credit) is not the result of an event that occurred after the Closing Date, and (B) such refund (or credit) is not attributable to, and does not result from, a carry back or other use of any item of loss, deduction, credit or other similar item arising in a Post-Closing Tax Period or, in the case of a refund (or credit) of Taxes for a Straddle Period, the use of any such item arising in a Post-Closing Tax Period. In connection with the foregoing, if Seller determines that any of the Transferred Companies is entitled to file or make a formal or informal claim for a refund (to which Seller would be entitled under the first sentence of this Section 7.08(b)(i) ) of Taxes (including by filing an amended Tax Return) with respect to a Pre-Closing Tax Period (other than Transfer Taxes or VAT, but including any VAT for which Seller is responsible pursuant to Section 2.06(e) ), Seller shall be entitled, at Seller's expense, to file or make, or to request that Buyer cause the applicable Transferred Company to file or make, such formal or informal claim for refund, and Seller shall be entitled to control the prosecution of such claim for refund, provided that Seller shall not take any action in connection therewith that would bind Buyer or any of its Affiliates (including any Transferred Company) for a Post-Closing Tax Period or otherwise adversely affect Buyer or any of its Affiliates (including any Transferred Company). Buyer will

-72-

cooperate, and cause the Transferred Companies to cooperate, with respect to such claim for refund, and will pay, or cause the relevant Transferred Company to pay, to Seller the amount (including interest received from any Taxing Authority) of any related refund (including any credit in lieu of a refund, which credit arises as a result of an overpayment and which otherwise would have been payable in cash by the relevant Taxing Authority at the election of the taxpayer) (to which Seller would be entitled under the first sentence of this Section 7.08(b)(i) ) received or realized in cash by Buyer or any Affiliate thereof (including any Transferred Company), net of any unreimbursed costs incurred by Buyer and its Affiliates in respect of such refund and reduced by the amount of any Taxes arising or that would arise as a result of the receipt of such refund or interest thereon, within five (5) days of receipt (or realization in cash) thereof. Buyer and the Transferred Companies shall be entitled to retain, or receive prompt payment from Seller with respect to, any other refund, credit, offset or other similar benefit received or realized with respect to Taxes attributable to any Transferred Company, the Transferred Assets or the Business. Notwithstanding any other provision, (x) Seller shall be entitled to any refund, credit or reimbursement for any Transfer Taxes arising from, or relating to, the Internal Restructuring Steps, and (y) Buyer shall be entitled to any refund, credit or reimbursement for any Transfer Taxes or VAT arising from, or relating to, any Transfer Taxes or VAT imposed on the transfer of the Transferred Equity Interests and the Transferred Assets to Buyer and assumption of the Assumed Liabilities by Buyer.

(ii) For the avoidance of doubt, any Tax basis, net operating loss, credit or other item that reduces Taxes paid or payable that may exist in any Transferred Company in a Post-Closing Tax Period or may be carried forward to a Post-Closing Tax Period shall be for the account of Buyer.

(c) Tax Indemnification .

(i) Seller shall indemnify, defend and hold Buyer and its Affiliates (including the Transferred Companies) harmless from and against all liability for Excluded Taxes; and

(ii) Buyer and its Affiliates (including the Transferred Companies) shall indemnify, defend and hold Seller and its Affiliates harmless from and against: (A) for any Post-Closing Tax Period (x) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) of the Transferred Companies and (y) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) with respect to the Transferred Assets or the Business, in the case of each of clauses (x) and (y), other than any such Tax liabilities that are Excluded Taxes, (B) all liability for Transfer Taxes for which Buyer is responsible pursuant to Section 2.06(a) , (C) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) attributable to a Buyer Tax Act, unless such Buyer Tax Act is effected with the written consent of Seller, (D) Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) attributable to any breach by Buyer or its Affiliates (including, after the Closing, any Transferred Company) of any covenant or other agreement hereunder, or (E) any Taxes (which shall include any costs and

-73-

expenses, including reasonable legal fees and expenses, attributable to such Taxes) imposed with respect to the excess of, if any, (x) any amount required to be included by Seller or any of its Affiliates in income under Section 951(a) of the Code with respect to a Transferred Company for the tax year of Seller or such Affiliate that includes the Closing Date, over (y) the amount that would have been required to be included by Seller or any of its Affiliates in income under Section 951(a) of the Code with respect to a Transferred Company for the tax year of Seller or such Affiliate that includes the Closing Date had the taxable year of such Transferred Company ended on the Closing Date;

(iii) In the case of any Straddle Period:

(1) The periodic Taxes of the Transferred Companies and Seller and Selling Affiliates that are not based on income or receipts (e.g., property Taxes) for the Pre-Closing Tax Period shall be computed based upon the ratio of the number of days in the Pre-Closing Tax Period and the number of days in the entire Tax period; and

(2) Taxes of the Transferred Companies and Seller and Selling Affiliates for the Pre-Closing Tax Period, other than Taxes described in Section 7.08(c)(iii)(1) above, shall be computed as if such Tax period ended as of the close of business on the Closing Date and, in the case of any Taxes of the Transferred Companies and Seller and Selling Affiliates attributable to the ownership of any equity interest in any partnership or other "flowthrough" entity, as if the Tax period of such partnership or other "flowthrough" entity ended as of the close of business on the Closing Date.

(iv) Any indemnity payment required to be made pursuant to this Section 7.08(c) shall be made within thirty (30) days after the indemnified party makes written demand upon the indemnifying party, but in no case earlier than five (5) business days prior to the date on which the relevant Taxes are required to be paid to the applicable Taxing Authority.

(v) Any indemnification payment made pursuant to this Section 7.08(c) shall be treated as an adjustment to the Purchase Price, for Tax purposes, unless otherwise required by applicable Tax Law. Each party shall notify the other party if it receives notice that any Taxing Authority proposes to treat any indemnification payment made pursuant to this Section 7.08(c) as other than an adjustment to the Purchase Price for Tax purposes, or if it otherwise determines that an indemnification payment under this Section 7.08(c) is required by applicable Tax Law to be treated as other than an adjustment to the Purchase Price for Tax purposes.

(d) Tax Contests .

(i) Buyer shall notify Seller within ten (10) business days of a Tax Proceeding for a Pre-Closing Tax Period with respect to a Transferred Company, provided that the failure to so notify Seller shall not affect Seller's indemnification obligation under Section 7.08(c) except to the extent of any material prejudice actually incurred by Seller.

-74-

(ii) With respect to any Tax Proceeding relating to (A) a Pre-Closing Tax Period with respect to a Transferred Company, the Transferred Assets or the Business (other than a Straddle Period or a Tax Proceeding with respect to any Transfer Taxes or VAT, but including any Tax Proceeding with respect to any VAT for which Seller is responsible pursuant to Section 2.06(e) ) or (B) a consolidated Tax Return of which Seller or any of its subsidiaries (other than a Transferred Company) is the common parent, Seller may choose in its sole discretion (at its expense) to control all Tax Proceedings and may make all decisions taken in connection with such Tax Proceeding (including selection of counsel), and, without limiting the foregoing, may, in its sole discretion, pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the applicable Tax liability and sue for a refund or contest the Tax at issue in such Tax Proceeding, provided that, to the extent such Tax Proceeding or the resolution or settlement thereof could have an impact on Buyer or any of its Affiliates (including the Transferred Companies) after the Closing Date, (x) Seller shall provide Buyer with a timely and reasonably detailed account of each phase of such Tax Proceeding and shall consult with Buyer before taking any significant action in connection with such Tax Proceeding and (y) Seller shall not settle, compromise or abandon any such Tax Proceeding without obtaining the prior written consent of Buyer, which consent shall not be unreasonably withheld.

(iii) With respect to any Tax Proceeding relating to a Straddle Period with respect to a Transferred Company, the Transferred Assets or the Business, Buyer may choose in its sole discretion (at its expense) to control all Tax Proceedings and may make all decisions taken in connection with such Tax Proceeding (including selection of counsel), and, without limiting the foregoing, may, in its sole discretion, pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the applicable Tax liability and sue for a refund or contest the Tax at issue in such Tax Proceeding, provided that, to the extent such Tax Proceeding or the resolution or settlement thereof could have an impact on Seller or any of its Affiliates with respect to the Pre-Closing Tax Period resulting in an increase of Seller's liability for Taxes pursuant to this Agreement, (x) Buyer shall provide Seller with a timely and reasonably detailed account of each phase of such Tax Proceeding and shall consult with Seller before taking any significant action in connection with such Tax Proceeding and (y) Buyer shall not settle, compromise or abandon any such Tax Proceeding without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld.

(iv) Except as otherwise provided in Section 7.08(d)(ii) and Section 7.08(d)(iii) , Buyer shall exclusively control all Tax Proceedings with respect to the Transferred Companies or otherwise relating to the Transferred Assets or the Business. Notwithstanding anything in Section 7.08(d)(ii) to the contrary, Buyer shall have the exclusive right to control any Tax Proceeding described in Section 7.08(d)(i) if Seller fails to, or notifies Buyer in writing that Seller elects not to, defend such Tax Proceeding.

(v) Buyer, the Transferred Companies and each of their respective Affiliates, on the one hand, and Seller and its respective Affiliates, on the other hand, shall cooperate in contesting any Tax Proceeding, which cooperation shall include the retention and, upon request, the provision to the requesting party of records and information which are reasonably relevant to such Tax Proceeding, and making employees available on a mutually convenient basis to provide additional information or explanation of any material provided hereunder or to testify at proceedings relating to such Tax Proceeding. Buyer and Seller shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Section 7.08(d) .

(e) Miscellaneous .

(i) Section 338(g) Elections .

(1) Notwithstanding anything herein to the contrary and to the extent permitted by applicable Law, Buyer may, in its sole discretion, make or cause to be made an election under Section 338(g) of the Code (a " Section 338(g) Election ") with respect to any Transferred Company set forth on Schedule 7.08(e)(i)(1) to the Disclosure Letter (the " Section 338(g) Transferred Companies "), and Buyer shall notify Seller promptly following the making of a Section 338(g) Election with respect to any Section 338(g) Transferred Company and shall deliver to Seller a copy of IRS Form 8023.

(2) With respect to any of the Transferred Companies that is characterized as a foreign corporation for U.S. federal income tax purposes and in respect of which a Section 338(g) Election has not been made pursuant to Section 7.08(e)(i)(1) , from the date of the Closing through the end of the taxable period of such entity that includes the Closing Date, Buyer shall not, and shall cause its Affiliates (including the Transferred Companies) not to, enter into any extraordinary transaction with respect to such Transferred Companies or otherwise take any action or enter into any transaction that would be considered under the Code to consummate the payment of an actual or deemed dividend by such Transferred Company, including pursuant to Section 304 of the Code, or that would otherwise result in a diminution of foreign Tax credits that, absent such transaction may be claimed by Seller or any of its Affiliates.

(ii) Each of Buyer and Seller shall, and shall cause their Affiliates to, provide to the other party to this Agreement such cooperation, documentation and information (including making its officers, directors, employees and agents available on a mutually convenient basis to provide an explanation of any documents or information provided) related to the Transferred Companies or the Transferred Assets as either of them may request that is reasonably necessary in (x) the preparation and filing of any Tax

-76-

Return, amended Tax Return, or claim for refund, (y) determining a liability for Taxes or an indemnity obligation under Section 7.08(c) or a right to refund of Taxes, or (z) conducting any Tax Proceeding. Such cooperation and information shall include providing necessary powers of attorney, copies of all relevant portions of relevant Tax Returns, together with all relevant portions of relevant accompanying schedules and relevant work papers, relevant documents relating to rulings or other determinations by Taxing Authorities and relevant records concerning the ownership and Tax basis of property and other information (including tax attributes such as earnings and profits and foreign tax credits), which any such party may possess. Each party to this Agreement shall retain all Tax Returns, schedules and work papers, and all material records and other documents relating to Tax matters, of the relevant entities for their respective Tax periods ending on or prior to the Closing Date until the later of (x) the expiration of the statute of limitations for the Tax periods to which the Tax Returns and other documents relate, or (y) seven (7) years following the due date (without extension) for such Tax Returns. Thereafter, the party holding such Tax Returns or other documents may dispose of them after offering the other party reasonable notice and opportunity to take possession of such Tax Returns and other documents at such other party's own expense. Notwithstanding anything herein to the contrary, Seller shall not be required to provide Buyer with a copy of, or otherwise disclose the contents of, any consolidated Tax Return and Buyer shall not be required to provide Seller with a copy of, or otherwise disclose the contents of, any consolidated Tax Return.

(iii) Notwithstanding anything herein to the contrary, indemnification for any and all Taxes, any claims with respect to Taxes, and the procedures with respect to claims for Taxes (in each case other than any Taxes referenced in, described in, or governed by Section 3.13 or Article VIII ) shall be governed exclusively by this Section 7.08 and Sections 2.06(a) , (b) , (d) and (e) and 10.01 and shall not be governed by the provisions of Ar ti c l e X (other than Section 10.01 ), and for the avoidance of doubt, none of Annexes 2.02(a) - (d) shall govern or apply to Tax assets or Tax liabilities.

(iv) Notwithstanding anything in this Agreement to the contrary and except as set forth on Schedule 7.08(e)(iv) to the Disclosure Letter, Seller shall terminate (or cause to be terminated) on or before the Closing Date all Tax sharing, allocation, indemnity or similar agreements or arrangements (other than this Agreement or any other Transaction Documents), if any, to which any of the Transferred Companies, on the one hand, and any Person (other than the Transferred Companies), on the other hand, are parties to, and neither Buyer nor any of the Transferred Companies or their respective Affiliates shall have any obligations thereunder after the Closing.

(f) Survival . The obligation to indemnify and hold harmless pursuant to Section 7.08(c) shall survive the consummation of the transactions contemplated hereby until sixty (60) days following the expiration of the applicable statute of limitations except for such claims for indemnification asserted prior to such date, which claims (and, if applicable, any representation or warranty the breach of which gives rise to such claim) shall survive until final resolution thereof.

-77-

SECTION 7.09. Ancillary Agreements . At the Closing, Buyer and Seller shall enter into, execute and deliver the Transition Services Agreement, substantially in the form attached as Exhibit G-1 (the " Transition Services Agreement "), the Master Manufacturing and Supply Agreement, substantially in the form attached as Exhibit H (the " Master Manufacturing and Supply Agreement "), the Trademark License Agreement (Buyer as Licensee), substantially in the form attached as Exhibit I-1 (the " Trademark License Agreement 1 "), the Trademark License Agreement (Seller as Licensee), substantially in the form attached as Exhibit I-2 (the " Trademark License Agreement 2 "), and the Sorting Service Agreement, substantially in the form attached as Exhibit N (the " Sorting Service Agreement "). Trademark License Agreement 1 and Trademark License Agreement 2 are collectively referred to as the " Trademark License Agreements ". Between the date hereof and the Closing, the parties shall negotiate in good faith to agree on the fees for the services to be provided pursuant to the Transition Services Agreement based on the principles set forth in Exhibit G-2 .

SECTION 7.10. Bulk Transfer Laws . Buyer hereby waives compliance by Seller and the Selling Affiliates with the provisions of any bulk sale or bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions. For the avoidance of doubt, the preceding sentence shall not limit the parties' obligations hereunder with respect to the conveyance of the Transferred Assets to Buyer.

SECTION 7.11. Non-Solicitation of Employees ; Non-Competition .

(a) For a period of one (1) year following the Closing Date, without the prior written consent of Buyer, none of Seller or any of its subsidiaries shall, directly or indirectly, solicit for employment, hire or employ any Transferred Employee, or any employee of the Business immediately prior to the Closing who has a title of Vice President or above (a " Restricted Employee "), in each case, except as required by applicable Law; provided that (i) Seller and its subsidiaries shall not be restricted from engaging in general or public solicitations or advertising (including using recruiting agencies) not targeted at any such Persons described above and (ii) this covenant shall not apply to any Transferred Employee who is terminated by Buyer. Buyer agrees that if Seller requests that Buyer waive the restrictions set forth in this Section 7.11(a) with respect to a Restricted Employee, Buyer shall consider such request in good faith.

(b) For a period of one (1) year following the Closing Date, without the prior written consent of Seller, none of Buyer or any of its subsidiaries shall, directly or indirectly, solicit for employment, hire or employ any employee of Seller or its Affiliates who is set forth on Schedule 7.11(b) (a " Seller Restricted Employee "), in each case, except as required by applicable Law; provided that (i) Buyer and its subsidiaries shall not be restricted from engaging in general or public solicitations or advertising (including using recruiting agencies) not targeted at any such Persons described above and (ii) this covenant shall not apply to any Seller Restricted Employee who is terminated by Seller. Seller agrees that if Buyer requests that Seller waive the restrictions set forth in this Section 7.11(b) with respect to a Seller Restricted Employee, Seller shall consider such request in good faith.

(c) For a period of two (2) years following the Closing Date, without the prior written consent of Buyer, Seller agrees not to, and not to permit any of its subsidiaries to, engage

-78-

anywhere in the world, or own an interest in any Person who engages anywhere in the world, in the manufacturing or sale of products that directly compete with the Products; provided , however , that nothing herein shall preclude Seller or any of its subsidiaries from:

(i) acquiring and, after such acquisition, owning an interest in any Person (or its successor) that is engaged in a business activity that would otherwise violate this Section 7.11(c) (a " Competing Business ") if such Competing Business generated less than twenty percent (20%) of such Person's consolidated annual revenues in the last completed fiscal year of such Person;

(ii) owning twenty percent (20%) or less of the outstanding securities of any Person who may be engaged in the Business;

(iii) acquiring and, after such acquisition, owning an interest in any Person (or its successor) that is engaged in a Competing Business if (A) such Competing Business generated twenty percent (20%) or more (but in no event greater than forty percent (40%)) of such Person's consolidated annual revenues in the last completed fiscal year of such Person and (B) Seller, within one (1) year after the consummation of such acquisition, discontinues, or enters into a definitive agreement to cause the divestiture of, a sufficient portion of the Competing Business of such Person such that the restrictions set forth in this Section 7.11(c) would not operate to restrict such ownership;

(iv) exercising its rights or performing or complying with its obligations under or as contemplated by this Agreement or any of the Transaction Documents; or

(v) entering into or participating in a joint venture, partnership or other strategic business relationship with any Person engaged in a Competing Business, if such joint venture, partnership or other strategic business relationship does not engage in the Competing Business.

(d) The parties acknowledge that the restrictions contained in this Section 7.11 are reasonable in scope and duration. The parties further acknowledge that the restrictions contained in this Section 7.11 are necessary to protect Buyer's significant investment in the Business, including its goodwill. It is the desire and intent of the parties that the provisions of this Section 7.11 be enforced to the fullest extent permissible under applicable Law. If any covenant in this Section 7.11 is found to be invalid, void or unenforceable in any situation in any jurisdiction by a final determination of a Governmental Entity of competent jurisdiction, the parties agree that: (i) such determination will not affect the validity or enforceability of (A) the offending term or provision in any other situation or in any other jurisdiction or (B) the remaining terms and provisions of this Section 7.11 in any situation in any jurisdiction; (ii) the offending term or provision will be reformed rather than voided and the Governmental Entity making such determination will have the power to reduce the scope, duration or geographical area of any invalid or unenforceable term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable provision, in order to render the restrictive covenants set forth in this Section 7.11 enforceable to the fullest extent permitted by applicable Law; and (iii) the restrictive covenants set forth in this Section 7.11 will be enforceable as so modified.

-79-

SECTION 7.12. Confidentiality .

(a) Each party acknowledges that the information being provided to it in connection with the Transaction and the other transactions contemplated hereby is subject to the terms of each of (1) that certain confidentiality agreement between Buyer and Seller, dated as of December 2, 2016 (the " Business Confidentiality Agreement "), and (2) that certain confidentiality agreement between Buyer and Seller, dated as of April 5, 2017 (together with the Business Confidentiality Agreement, the " Confidentiality Agreements "), the terms of which are incorporated herein by reference in their entirety and shall, subject to the following sentence, survive the Closing; provided that actions taken by the parties to the extent necessary in order to comply with their respective obligations under Section 6.05 hereunder shall not be deemed to be in violation of this Section 7.12 or of the Confidentiality Agreements; provided that the foregoing shall not affect Section 6.05(b) to the extent that Section 6.05(b) specifies that it is subject to this Section 7.12 or the Confidentiality Agreements. Effective upon, and only upon, the Closing, the Business Confidentiality Agreement shall terminate with respect to information relating solely to the Business, the Transferred Companies, the Transferred Assets and the Assumed Liabilities; provided , further , that Buyer acknowledges that its obligations of confidentiality and non-disclosure with respect to any and all other information provided to it by or on behalf of Seller, the Selling Affiliates, the Transferred Companies or any of their respective Affiliates or Representatives, concerning Seller or any of its Affiliates (other than solely with respect to the Business, the Transferred Companies, the Transferred Assets and the Assumed Liabilities) shall continue to remain subject to the terms and conditions of the Business Confidentiality Agreement (but subject to the term therein).

(b) For two (2) years after the Closing, unless Buyer has otherwise consented in writing, Seller agrees to, and shall cause its subsidiaries and shall instruct its Representatives to, retain in confidence, and not use, any and all confidential or proprietary information to the extent relating to the Business and the Transferred Assets (collectively, " Confidential Business Information "), and not disclose such Confidential Business Information to any other Person; provided that Confidential Business Information shall not include any information (i) which is or becomes generally available to the public other than as a result of disclosure in violation of this Section 7.12(b) , (ii) that Seller or any of its Affiliates receives after the Closing from a source that is not, to the knowledge of Seller, under any obligation of confidentiality with respect to such information, or (iii) that is independently developed by or on behalf of Seller or any of its Affiliates without reference to or use of such Confidential Business Information. In addition, the foregoing will not prohibit Seller or its Affiliates from disclosing Confidential Business Information which is required by applicable Law or order of a Governmental Entity or rule or policy of any securities exchange to be disclosed. The parties acknowledge and agree that (x) Seller and its Affiliates currently, and, subject to Section 7.11(c) , may continue following the Closing to, maintain and expand business and commercial relationships (whether as a customer, supplier or otherwise) with the same Persons, and engage in commercial relationships with such Persons and with Buyer and the other Transferred Companies, and, subject to Section 7.11(c) , may employ, or continue to employ, individuals who previously worked in or with the Business and possess knowledge and Know-How used in, relating to, or arising from the Business and (y)

-80-

nothing in this Section 7.12(b) shall prohibit or restrict the maintenance or expansion of any such relationships or employment of any such individuals. In addition, the foregoing shall not prohibit the use or disclosure of such Confidential Business Information to the extent reasonably necessary to comply with the terms of, or perform under, any of the Transaction Documents or any Transferred Contract or Commingled Contract that has not been assigned or transferred to Buyer or its Affiliates. Furthermore, the provisions of this Section 7.12(b) will not prohibit any use or disclosure in connection with the preparation and filing of financial statements with a Governmental Entity (including the U.S. Securities and Exchange Commission) or Tax Returns of Seller or its Affiliates or in connection with the enforcement of any right or remedy relating to this Agreement, the other Transaction Documents or the transactions contemplated hereby and thereby.

SECTION 7.13. Replacement of Guarantees .

(a) For purposes of this Agreement, " Guarantee " means any guarantee, letter of credit, surety bond (including any performance bond), credit support arrangement or other assurance of payment.

(b) Following the Closing, Buyer and Seller will reasonably cooperate with one another so that Buyer will obtain, or cause an Affiliate of Buyer to provide or obtain, replacement Guarantees with respect to each Guarantee issued by Seller or an Affiliate of Seller for the benefit of any Transferred Company or with respect to any Transferred Asset or Assumed Liability that was not replaced on or prior to the Closing Date (each, an " Existing Guarantee "). Buyer and Seller shall reasonably cooperate to obtain any necessary release of Seller and its Affiliates from such Existing Guarantees in form and substance reasonably satisfactory to Buyer and Seller.

SECTION 7.14. Other Covenants . Buyer agrees to perform or comply with the matters set forth on Schedule 7.14(a) to the Disclosure Letter. Each of Seller and Buyer shall, and shall cause each of its Affiliates to, comply with the applicable obligations set forth on Schedule 7.14(b) to the Disclosure Letter.

ARTICLE VIII

Employees

SECTION 8.01. Employee Benefits Matters . (a) From and after the date of this Agreement until the Closing Date, Buyer shall consult with Seller and obtain Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed) before distributing any communications to any Employee of the Business whether relating to employee benefits, post-Closing terms of employment or otherwise; provided that this sentence shall not apply to any (i) offer letters or other individual communications regarding post-Closing employment of Employees of the Business (including proposed terms of employment, compensation and employee benefits, or role and organizational structure) or (ii) individual conversations or communications regarding matters not covered by any of the Transaction Documents.

-81-

(b) To the extent permitted by applicable Law and as soon as practicable, but in no event later than five (5) business days after the date of this Agreement, Seller shall provide Buyer with a list on Schedule 8.01(b)(i) to the Disclosure Letter containing an identification number (with the corresponding names tying to these identification numbers to be provided concurrently to one person Buyer specifies), date of hire, position, location, and base salary, wage rate and bonus opportunity (and, in no event later than thirty (30) calendar days after the date of this Agreement, for sales employees, sales incentive targets, as well as actual sales incentive paid during the prior fiscal year), employee benefit plan participation, outstanding equity awards (including vesting schedule and exercise price, as applicable), expatriate status and any additional information that is necessary for Buyer to establish payroll systems or employee benefit plans as of the Transfer Time, as applicable, of each individual identified by Seller as expected to be an Employee of the Business, and Seller shall update such information periodically prior to the Closing Date to reflect new hires, leaves of absence and employment terminations and any other material changes thereto and provide copies of such updated lists and information to Buyer. In addition, Seller shall periodically update Schedule 1.01(b) to the Disclosure Letter to reflect (i) any new hires and employment terminations permitted pursuant to Section 6.01(b)(iii) , and (ii) any other employee of Seller and its Affiliates proposed by Seller to be an "Employee of the Business"; provided that, in the case of clause (ii), if Buyer objects to any such addition proposed to be made to such schedule by Seller, such addition shall be reviewed and agreed by the Vice President of Human Resources, MITG of Seller and the Senior Vice President, HR Bus Partner Medical of Buyer and if the Vice President of Human Resources, MITG of Seller and the Senior Vice President, HR Bus Partner Medical of Buyer cannot agree, then such addition shall not be included. With respect to those Transferred Companies set forth on Schedule 8.01(b)(ii) to the Disclosure Letter, Buyer and Seller will use commercially reasonable efforts to establish or ensure continuation of (as applicable) for each such Transferred Company payroll, human resources and employee benefit administration Contracts and processes, effective as of or prior to the Closing.

(c) Prior to the Closing, Seller shall, or shall cause its Affiliates to, take all actions necessary to transfer the employment of any individual who is employed by a Transferred Company and who is not an Employee of Business to Seller or any of its Affiliates (other than the Transferred Companies), as designated by Seller. In the event the employment of an Employee of the Business does not automatically transfer to Buyer or its Affiliates upon the occurrence of the Closing by operation of Law or pursuant to the transfer of the Transferred Equity Interests to Buyer, (i) Seller shall take, or cause its respective Affiliates to take, all actions required in accordance with applicable Law in respect of the transfer of employment of such Employees of the Business to Buyer or one of its Affiliates, and Seller shall encourage each Employee of the Business to accept any offers of employment pursuant to this Section 8.01(c) in its communications with such individuals; provided that, for the avoidance of doubt, nothing herein shall be interpreted as requiring Seller or any of its subsidiaries to provide any such Employee of the Business with any additional compensation or benefits or otherwise incur any material liability; and (ii) not less than ten (10) business days prior to the Closing, Buyer or one of its Affiliates will offer employment, effective at 12:01 a.m., local time, on the Closing Date (the " Transfer Time "), to such Employee of the Business in accordance with this Agreement. Offers pursuant to this Section 8.01(c) shall (A) be for a position commensurate with the skills and experience of such Employee of the Business and at a geographic work location within fifty (50) miles of the applicable Employee of the Business' primary work location immediately prior

-82-

to the Closing Date (or, to the extent applicable in jurisdictions other than the United States, within such lesser radius as is necessary to ensure severance is not due in connection with such relocation), and (B) otherwise comply in all respects with applicable Law (including with respect to compensation and benefits). With respect to any Employee of the Business to whom Buyer or one of its Affiliates is required to make an offer of employment pursuant to this Section 8.01(c) , and who, as of the Closing Date, is on approved leave of absence from work with Seller or its Affiliates (each, an " Inactive Employee "), Buyer shall offer employment to such individual on the earliest practicable date following the return of such individual to work with Seller and its Affiliates and otherwise on terms and conditions consistent with this Section 8.01 ; provided that such employee returns to work within one hundred eighty (180) days following the Closing Date or such later time as required by applicable Law or the terms of the applicable Collective Bargaining Agreement upon presenting themselves for duty to the Business. Seller shall promptly notify Buyer of the occurrence and end of any such leave of absence. In the case of any Inactive Employee who becomes a Transferred Employee following the Closing Date, all references in this Agreement to (1) the Closing Date shall be deemed to be references to the date on which such individual becomes a Transferred Employee and (2) the Transfer Time shall be deemed to be references to 12:01 a.m., local time, on the date that such individual becomes a Transferred Employee. In any jurisdiction where the employment of an Employee of the Business can transfer automatically to Buyer and its Affiliates upon the occurrence of the Closing by operation of Law or pursuant to the transfer (directly or indirectly) of the Transferred Equity Interests to Buyer, Buyer and Seller agree to take, or cause their respective Affiliates to take, all actions required under applicable Law and all other actions as are necessary or appropriate such that the employment of such Employee of the Business will transfer to Buyer or its Affiliates automatically as of the Transfer Time. Seller shall provide a list to Buyer of each Inactive Employee no later than ten (10) business days prior to the Closing and shall update such list as of the Closing.

(d) Buyer or its Affiliates shall bear all the liabilities, obligations and costs relating to, and shall indemnify and hold harmless Seller and the Selling Affiliates from and against, any claims made by any Employee of the Business for any statutory or common law severance or other separation benefits, any contractual or other severance or separation benefits and any other legally mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments pursuant to a Judgment of a court having jurisdiction over the parties) and for any other claim, cost, liability or obligation (whether related to compensation, benefits or otherwise), in each case, arising out of (i) Buyer's breach of its obligations under this Article VIII , including any failure of Buyer to provide to U.S. Transferred Employees the benefits described in Section 8.01(e) , (ii) Buyer making an offer to an Employee of the Business that does not meet the requirements of (A) Section 8.01(e) with respect to an Employee of the Business in the United States or (B) Section 8.01(j)(i) with respect to an Employee of the Business outside of the United States (whether or not located in a Specified Non-U.S. Jurisdiction), or (iii) any claims for severance or other separation benefits in connection with the involuntary termination of employment by Buyer or its Affiliates of any Transferred Employee after the Transfer Time. Seller or its Affiliates shall bear all the liabilities, obligations and costs relating to, and shall indemnify and hold harmless Buyer and its Affiliates from and against, any claims made by any Employee of the Business for any statutory or common law severance or other separation benefits, any contractual or other severance or separation benefits and any other legally mandated payment obligations (including any

-83-

compensation payable during a mandatory termination notice period and any payments pursuant to a Judgment of a court having jurisdiction over the parties) and for any other claim, cost, liability or obligation (whether related to compensation, benefits or otherwise), in each case, not arising out of Buyer's breach of its obligations under this Article VIII or under clause (ii) or (iii) above, including any such claim arising out of (A) the applicable Employee of the Business' refusal to accept an offer of employment made in compliance with this Article VIII from (or to commence employment with), or objection to the automatic transfer of employment to, Buyer or its Affiliates, and (B) any claims made by any Employee of the Business in China or other jurisdictions for any statutory severance or other separation benefits (including statutory economic compensation and statutory compensation payable in respect of accrued but not yet taken vacation days or other paid time off for the calendar year in which the Closing Date occurs) that arise as a result of any such employee who accepts an offer of employment from Buyer or any of its Affiliates making a request that such severance or other separation benefits be paid or provided by Seller or any of its subsidiaries. Buyer shall not encourage any Employee of the Business regarding a request described in the immediately preceding sentence, and in the event an Employee of the Business asks Buyer a question regarding such request, Buyer shall refer such Employee of the Business to an applicable representative of Seller with respect to such request.

(e) With respect to U.S. Transferred Employees, during the Benefits Continuation Period, Buyer or its Affiliates (i) shall provide to each Transferred Employee a total compensation opportunity and employee benefits that are no less favorable, in the aggregate, than those in effect for such Transferred Employee as of immediately prior to the Closing Date; provided that Buyer shall provide such Transferred Employee no less favorable base salary, wage rate and bonus opportunity, as applicable, than as set forth on Schedule 8.01(b)(i) to the Disclosure Letter (as so updated by Seller immediately prior to the Closing Date); and (ii) shall provide each Transferred Employee an office within a commute of no more than fifty (50) miles from his or her office as of immediately prior to the Closing Date; provided that, if a relocation beyond that distance is required and such Transferred Employee's employment terminates as a result of his or her desire not to accept such a relocation, such Transferred Employee shall receive the severance benefits at the level set forth in Section 8.01(f) . Notwithstanding the foregoing, nothing contemplated by this Agreement shall be construed as requiring either Buyer or any of its Affiliates to continue the employment of any U.S. Transferred Employee for any period after the Closing Date; provided that such employee shall receive the severance benefits set forth in Section 8.01(f) if terminated under the circumstances described therein. For avoidance of doubt, Buyer may satisfy its obligations under this Section 8.01(e) by providing cash payments or other benefits in lieu of equity compensation benefits.

(f) With respect to U.S. Transferred Employees, during the Benefits Continuation Period, in the event of a termination of any Transferred Employee's employment by Buyer or its Affiliates without cause (as reasonably determined by Buyer or its Affiliate), Buyer or its Affiliates shall provide severance benefits to such Transferred Employee that are no less favorable than those severance or termination benefits applicable to such Transferred Employee as set forth on Schedule 8.01(f) to the Disclosure Letter; provided that such severance benefits shall be provided only if the Transferred Employee executes (and does not revoke) a release of claims in favor of Seller, Buyer and their respective Affiliates in a form reasonably satisfactory to Buyer.

-84-

(g) With respect to U.S. Transferred Employees, effective from and after the Transfer Time, Buyer or its Affiliates shall (i) recognize, for all purposes (other than benefit accrual under a defined benefit pension plan) under all plans, programs and arrangements established or maintained by Buyer or its Affiliates for the benefit of the Transferred Employees (the " Buyer Plans "), service with Seller and the Selling Affiliates prior to the Transfer Time to the extent such service was recognized under the corresponding Business Employee Benefit Plan covering such Transferred Employees, including for purposes of eligibility, vesting and benefit levels and accruals, in each case, except (A) where it would result in a duplication of benefits or (B) with respect to newly established Buyer Plans that do not provide credit for past service to such similarly situated employees of Buyer and its Affiliates and in which at least a comparable number of similarly situated of employees of Buyer and its Affiliates (other than the Transferred Employees or newly hired employees) participate, (ii) waive any preexisting condition exclusion, actively-at-work requirement or waiting period under all employee health and other welfare benefit plans established or maintained by Buyer or its Affiliates for the benefit of the Transferred Employees, except to the extent such pre-existing condition, exclusion, requirement or waiting period would have applied to such individual under the corresponding Listed Plan, and (iii) provide full credit for any co-payments, deductibles or similar payments made or incurred prior to the Transfer Time for the plan year in which the Closing occurs.

(h) Seller shall pay to the Transferred Employees or reimburse Buyer for amounts Buyer or its subsidiaries pay to the Transferred Employees for all base salary, wages, commissions or other amounts (but not including any annual bonuses or incentives) in respect of services performed by each Employee of the Business for Seller or its Affiliates that are earned and accrued but unpaid as of the Transfer Time, as applicable, in each case, to be paid as soon as administratively practicable after the Transfer Time or as required by law, but in no event later than thirty (30) business days after the Transfer Time. To the extent required by applicable Law, Seller shall timely pay to the Transferred Employees all accrued but unpaid vacation, personal and sick time (" PTO ") for periods prior to the Transfer Time. If permitted by applicable Law (and, if only permitted by applicable Law with consent, Seller shall not be required to seek or obtain consent), Seller shall provide Buyer with a list of all accrued but unused PTO for each Transferred Employee and shall transfer to Buyer an amount sufficient to pay the costs of such PTO based on each such Transferred Employee's compensation at the Transfer Time, in each case, as soon as practicable following the Transfer Time. Buyer will cooperate in good faith with Transferred Employees with respect to PTO commitments purchased or reserved by such Transferred Employees prior to the applicable Transfer Time in respect of periods occurring subsequent to such applicable Transfer Time, it being understood that any such PTO commitments ultimately honored by Buyer shall count against the applicable Transferred Employee's paid time off accrued during his or her service with Buyer or be unpaid.

(i) Subject to Seller providing all reasonably necessary support and information in a timely manner, no later than the Closing Date, Buyer shall establish or cause to be established (or utilize existing Buyer Plans), at its own expense, all necessary retirement, pension, employee welfare and employee benefit plans for Transferred Employees, as applicable. Effective as of the Transfer Time, each Transferred Employee shall cease to be an employee of Seller or the applicable Affiliate and shall cease to participate in any Business Employee Benefit Plan (other than any Assumed Benefit Plan) as an active employee. Other than with respect to a government-sponsored benefit plan, (i) Seller shall be, or shall cause its Affiliates to be,

-85-

responsible for all (A) medical, vision, dental and prescription drug claims for expenses incurred by any Transferred Employee or his or her dependents, (B) claims for short-term and long-term disability income benefits incurred by any Transferred Employee, (C) claims for group life, travel and accident, and accidental death and dismemberment insurance benefits incurred by any Transferred Employee and (D) claims relating to COBRA coverage attributable to "qualifying events" with respect to any Transferred Employee and his or her beneficiaries and dependents, in each case, prior to or as of the Transfer Time and (ii) Buyer shall be, or shall cause its Affiliates to be, responsible for all (A) medical, vision, dental and prescription drug claims for expenses incurred by any Transferred Employee or his or her dependents, (B) claims for short-term and long-term disability income benefits incurred by any Transferred Employee, (C) claims for group life, travel and accident, and accidental death and dismemberment insurance benefits incurred by any Transferred Employee and (D) claims relating to COBRA coverage attributable to "qualifying events" with respect to any Transferred Employee and his or her beneficiaries and dependents, in each case, after the Transfer Time. Except in the event of any claim for workers compensation benefits, for purposes of this Agreement, the following claims and liabilities shall be deemed to be incurred as follows: (1) medical, vision, dental and/or prescription drug benefits (including hospital expenses), upon provision of the services, materials or supplies comprising any such benefits and (2) short and long-term disability, life, accidental death and dismemberment and business travel accident insurance benefits, upon the death, illness, injury or accident giving rise to such benefits. Seller and its Affiliates shall be responsible for all claims for workers compensation benefits that are incurred prior to the Transfer Time by any Transferred Employee. Buyer and its Affiliates shall be responsible for all claims for workers compensation benefits that are incurred on or after the Transfer Time by any Transferred Employee. A claim for workers compensation benefits shall be deemed to be incurred on the date the injury giving rise to the claim occurs.

(j) Notwithstanding any other provision of this Section 8.01 to the contrary, during the applicable Benefits Continuation Period (or such longer period required by applicable Law), Buyer or its Affiliates shall provide: (i) each Non-U.S. Transferred Employee (other than a Non-U.S. Employee located in a Specified Non-U.S. Jurisdiction) with (A) terms and conditions of employment (including seniority and other service credit) that, individually, are no less than as required by applicable Law, and in the aggregate, are no less favorable than those provided by Seller and its Affiliates immediately prior to the Transfer Time and (B) amounts (and, to the extent required by applicable Law, types) of compensation and benefits (including severance and equity compensation benefits) that, individually, are no less than as required by applicable Law and, in the aggregate, are no less favorable than those provided by Seller and its Affiliates immediately prior to the Transfer Time (clauses (A) and (B), collectively, the " Non-U.S. Employment Terms "); and (ii) each Non-U.S. Transferred Employee who is located in any jurisdiction set forth in Schedule 8.01(j) to the Disclosure Letter (each, a " Specified Non-U.S. Jurisdiction ") with, at Buyer's election, either (A) the applicable Non-U.S. Employment Terms or (B) as long as Buyer maintains each such Non-U.S. Transferred Employee's base compensation or wages and otherwise provides terms and conditions of employment (including seniority and other service credit) as required by applicable Law, such different standard of compensation opportunities and employee benefits as determined by Buyer; provided that, to the extent that such Non-U.S. Transferred Employee becomes entitled to severance benefits as a result of Buyer's election to not provide the Non-U.S. Employment Terms, Buyer shall be liable for the payment of all such severance benefits consistent with Sections 8.01(d)(ii) and

-86-

8.01(d)(iii) . For the avoidance of doubt, Buyer may satisfy its obligations pursuant to the preceding sentence by providing cash payments or other benefits in lieu of equity compensation benefits. Without limiting the generality of Section 8.01 or Buyer's obligations hereunder, with respect to Transferred Employees covered by Collective Bargaining Agreements, effective from and after the Transfer Time, Buyer or one of its Affiliates shall comply with applicable Law concerning Collective Bargaining Agreements in the context of this Agreement.

(k) Seller shall, and shall cause its Affiliates to, comply in all material respects with all appropriate requirements and procedures in connection with any information and consultation processes required by applicable Law in relation to the Transaction in those jurisdictions set forth on Schedule 8.01(k) to the Disclosure Letter (the " Consultation Processes ") and shall convene meetings of the appropriate Employee Representatives as soon as reasonably practicable with a view to obtaining expeditious delivery of any required works council or other Employee Representative opinions and completing the Consultation Processes. Seller shall keep Buyer regularly informed of the status of material matters relating to the Consultation Processes, including the delivery of the opinions of any Employee Representatives and furnishing Buyer promptly of copies of notices or details of any substantive material communications obtained by Seller, whether orally or in writing, as part of the Consultation Processes. Without limiting the generality of the foregoing, Seller undertakes to inform Buyer in writing as soon as possible (and in any event no later than two (2) business days) after any of the Consultation Processes has been completed. Buyer agrees to cooperate and use its commercially reasonable efforts to assist Seller in effecting the Consultation Processes, including providing such information (including information in respect of Buyer's employee benefit plans, if any) to, and attending such meetings with, the applicable Employee Representatives, in each case, as may be required by applicable Laws or practices or as may be reasonably requested by Seller or such Employee Representatives or their respective agents or advisors in connection with the Consultation Processes.

(l) If any Employee of the Business requires a work permit or employment pass or other legal or regulatory approval for his or her employment with Buyer or its Affiliates, Buyer shall, and shall cause its Affiliates to, use their commercially reasonable efforts to cause any such permit, pass or other approval to be obtained and in effect prior to the Transfer Time (and Seller shall, and shall cause its Affiliates to, use their commercially reasonable efforts to transfer any such permit, pass or other approval to Buyer, to the extent permitted by applicable Law and to cooperate with Buyer or its applicable Affiliate with respect to any ongoing approval processes). Notwithstanding the foregoing, to the extent permitted by applicable Law or any Collective Bargaining Agreement, in the event an applicable work permit for an Employee of the Business is not in place with Buyer or its Affiliate as of the Transfer Time, such Employee of the Business shall be treated as an Inactive Employee hereunder; provided , however , that Buyer shall, and shall cause its Affiliates to, continue to use their commercially reasonable efforts to obtain the applicable work permit; provided , further , that Seller shall not be obligated to provide for the services of such Employee of the Business to be made available to Buyer or any substitute for such services.

(m) To the extent (i) permitted by applicable Law and (ii) that doing so would not require the consent of any other Person, as soon as reasonably practicable following the Closing, Seller and its Affiliates shall use their commercially reasonable efforts to assign to Buyer and its

-87-

Affiliates any nondisclosure and confidentiality agreements, non-competition agreements or other restrictive covenant agreements applicable to any Transferred Employee to the extent that such agreements relate exclusively to the Business.

(n) As of the Transfer Time, Seller shall provide to Buyer and its Affiliates copies of all employment records for each Transferred Employee required to be provided to Buyer and its Affiliates under applicable Law or as necessary for Buyer to establish payroll systems or employee benefit plans as of the Transfer Time. After the Transfer Time, Seller shall maintain all other employment records pertaining to the Transferred Employees in accordance with its generally applicable data retention policies as in effect from time to time, and shall provide Buyer and its Affiliates access to such records as may be reasonably requested from time to time. Seller shall be permitted to retain copies of such employment records, except where prohibited by applicable Law. Buyer and its Affiliates shall ensure that all such records are used only in connection with the employment of such Transferred Employee or as otherwise permitted by applicable Law.

(o) To the extent applicable, the parties hereto acknowledge the application of the European Council Directive of March 12, 2001 (2001/23/EC) (the " Directive "), relating to the safeguarding of employees' rights in the event of transfers of undertakings, businesses or parts of businesses and any country legislation implementing the Directive and any other similar Law (collectively, the " Transfer Regulations "). The parties hereto acknowledge and agree that they shall, and shall cause their respective Affiliates to, comply with the Transfer Regulations to the extent applicable. Following the execution of this Agreement, Seller shall or shall cause its relevant Affiliate to notify the works council that represents its employees in Belgium of the Transaction prior to any public announcement being made by Seller about the Transaction, as required by applicable Law.

(p) Effective as of the Closing, Buyer shall establish participation by the U.S. Transferred Employees in Buyer's tax-qualified defined contribution plan or plans with a cash or deferred feature (the " Buyer 401(k) Plan ") for the benefit of each U.S. Transferred Employee who, as of immediately prior to the Closing, was eligible to participate in a tax-qualified defined contribution plan maintained by Seller or its Affiliates (collectively, the " Seller 401(k) Plans "). As soon as practicable after the Closing Date, the Seller 401(k) Plans shall, to the extent permitted by Section 401(k)(10) of the Code, make distributions available to Transferred Employees, and the Buyer 401(k) Plan shall accept any such qualified distribution (including loans) as a rollover contribution if so directed by the Transferred Employee; provided that the Transferred Employee has timely elected such rollover contribution. As of the Closing Date, with respect to the Seller 401(k) Plans, the U.S. Transferred Employees shall cease to participate in such Seller 401(k) Plans and shall be fully vested in their accounts under such plans, including all matching contributions under the 401(k) component, personal investment accounts and Seller core contribution component, and Seller shall make a pro rata contribution to the accounts of the U.S. Transferred Employees participating in the Seller core contribution component as of immediately prior to the Closing based on the number of days in the year commencing on May 1, 2017 and ending on the Closing Date.

(q) No later than forty-five (45) business days following the Closing, Seller or its applicable Affiliate shall pay (i) an annual bonus (prorated through the Closing Date and based

-88-

on the lesser of (A) the amount accrued with respect to such bonus and (B) the target amount to each Transferred Employee who is or would be eligible as of immediately prior to the Closing to receive an annual bonus under any Business Employee Benefit Plan pursuant to the terms thereof); and (ii) sales incentives or commissions (prorated through the Closing Date and based on actual performance through the Closing Date) to each Transferred Employee who participated in any Business Employee Benefit Plan that provides for sales incentives or commissions as of immediately prior to the Closing and who was eligible to earn sales incentives or commissions for the applicable performance period in which the Closing occurs.

(r) Prior to the Closing, Seller shall take all actions as are necessary to provide as follows:

(i) Each outstanding option (each, a " Seller Option ") to purchase ordinary shares, par value $0.0001 (" Seller Ordinary Shares "), other than any Integration Incentive Stock Option, that is held by a Transferred Employee as of immediately prior to the Closing shall, effective as of the Closing, become fully vested and exercisable and shall remain outstanding for the remainder of the term of such Seller Option.

(ii) Each outstanding Integration Incentive Stock Option held by a Transferred Employee as of immediately prior to the Closing shall remain outstanding and shall vest at the end of the performance period applicable to such Integration Incentive Stock Option to the extent the applicable performance criteria are satisfied.

(iii) Each outstanding restricted share unit award in respect of Seller Ordinary Shares (each, a " Seller RSU Award ") that is held by a Transferred Employee as of immediately prior to the Closing and vests solely based on continued service shall, as of the Closing, become fully vested and shall be settled by Seller in accordance with its terms.

(iv) Each outstanding Seller RSU Award that is held by a Transferred Employee as of immediately prior to the Closing and subject to performance-based vesting conditions shall remain outstanding, shall vest at the end of the performance period applicable to such Seller RSU Award to the extent the applicable performance criteria are satisfied and shall be settled by Seller in accordance with its terms.

(v) As of the Closing, each Employee of the Business who is eligible to receive a long-term cash retention bonus under Seller's Retention Bonus Plan shall become fully vested in his or her long-term cash retention bonus, which amount shall be paid by Seller or its applicable Affiliate in accordance with such plan.

(vi) No later than forty-five (45) business days following the Closing, Seller or its applicable Affiliate shall pay a bonus under Seller's Long-Term Performance Plan (prorated through the Closing Date and based on actual performance through the Closing Date, as determined by Seller) to each Transferred Employee who is or would be eligible to receive a bonus under such plan pursuant to the terms thereof.

(s) Schedule 8.01(s) to the Disclosure Letter sets forth certain retention bonuses (the " Retention Bonuses ") that may become payable on or following the Closing Date to

-89-

Employees of the Business identified on Schedule 8.01(s) to the Disclosure Letter who remain employed by Seller or any of its Affiliates immediately prior to the Closing (each, a " Retention Participant "). Following the Closing, Seller shall retain all liability under such Retention Bonuses and pay the Retention Bonuses in accordance with the terms and conditions thereof, treating, for all purposes, each Retention Participant's service with Buyer or any of its Affiliates after the Closing as service with Seller and its Affiliates. Buyer shall, and shall cause its Affiliates to, cooperate with Seller and its Affiliates in implementing this Section 8.01(s) .

(t) In the United States, pursuant to IRS Revenue Procedure 2004-53, Buyer and Seller and their respective Affiliates shall apply the "standard" method for purposes of employee payroll reporting with respect to any Employee of the Business.

(u) The provisions contained in this Agreement with respect to any Employee of the Business are included for the sole benefit of the respective parties hereto and shall not create any right in any other Person, including any Employee of the Business (or dependent or beneficiary of any of the foregoing). Nothing herein shall be deemed an amendment of any plan providing benefits to any Employee of the Business or of any other employee benefit plan.

SECTION 8.02. Pension Plan Adjustment .

(a) Within six (6) months following the Closing Date, Seller and Buyer shall determine the aggregate value of the underfunded pension liabilities as of the Closing Date under the Assumed Benefit Plans set forth on Schedule 8.02(a) to the Disclosure Letter (the absolute value of such underfunded liabilities, the " Aggregate Underfunded Amount "). The Aggregate Underfunded Amount shall be calculated on the same basis that was used to determine the estimate referred to in Section 3.13(b)(iii) and, if applicable, the conversion rate from the applicable Foreign Currency to U.S. dollars shall be the closing rate provided by Bloomberg at 5:00 a.m. New York City time on the Closing Date.

(b) As soon as administratively practicable following the Closing Date, Buyer's actuary (" Buyer ' s Actuary ") shall provide Seller's actuary (" Seller ' s Actuary ") with its determination of the Aggregate Underfunded Amount, together with a complete computer file and other relevant books and records containing all relevant information used by Buyer's Actuary or otherwise reasonably requested by Seller's Actuary and in the possession of Buyer as needed to calculate the Aggregate Underfunded Amount. The Aggregate Underfunded Amount provided by Buyer's Actuary pursuant to the immediately preceding sentence shall be the " Final Aggregate Underfunded Amount " and shall be final and binding upon the parties, unless prior to the close of business on the forty-fifth (45th) day following Seller's receipt of the information described in the first sentence of this Section 8.02(b) , Seller delivers to Buyer a written notice (a " Notice of Objection ") stating that Seller believes that Buyer's Actuary's calculation of the Aggregate Underfunded Amount contains factual or mathematical errors, fails to comply with applicable Law or otherwise fails to calculate the Aggregate Underfunded Amount on the same basis that was used to determine the estimate referred to in Section 3.13(b)(iii) , and states in reasonable detail the basis for such belief and Seller's Actuary's proposed determination of the Aggregate Underfunded Amount. In the event that Seller delivers a Notice of Objection, Seller shall provide to Buyer a complete computer file and other relevant books and records containing all relevant information used by Seller's Actuary or otherwise reasonably requested by Buyer's Actuary and in the possession of Seller as needed to evaluate the basis of Seller's Actuary's determination of the Aggregate Underfunded Amount.

-90-

(c) Should Seller timely provide a Notice of Objection, the parties shall use their reasonable best efforts to resolve promptly (but in any event within fifteen (15) days following Buyer's receipt of such Notice of Objection (such period, the " Resolution Period ")) any disagreements regarding the Aggregate Underfunded Amount and, if they so resolve the disagreements, the agreed Aggregate Underfunded Amount shall be the "Final Aggregate Underfunded Amount" and shall be final and binding upon the parties.

(d) In the event that the parties cannot resolve the disagreements during the Resolution Period, the Parties shall, within fifteen (15) days following the Resolution Period, jointly select and engage an independent third actuary with whom none of the parties has had a material relationship in the last two (2) years, who shall render its determination promptly (and in any event within thirty (30) days following its engagement) in accordance with the requirements of this Section 8.02 and whose determination shall be the "Final Aggregate Underfunded Amount" and shall be final and binding upon the parties. In no event (except for inaccuracy of the data provided) shall the Aggregate Underfunded Amount determined by the third actuary be more than the Aggregate Underfunded Amount claimed by Buyer's Actuary or less than the Aggregate Underfunded Amount determined by Seller's Actuary.

(e) If the Final Aggregate Underfunded Amount exceeds the amount set forth on Schedule 8.02(e) to the Disclosure Letter, Seller shall pay to Buyer an amount equal to such excess within five (5) business days following the determination of the Final Aggregate Underfunded Amount. If the Final Aggregate Underfunded Amount is less than the amount set forth on Schedule 8.02(e) to the Disclosure Letter, Buyer shall pay to Seller an amount equal to the excess of the amount set forth on Schedule 8.02(e) to the Disclosure Letter over the Final Aggregate Underfunded Amount within five (5) business days following the determination of the Final Aggregate Underfunded Amount.

(f) Each of the parties shall bear the fees, costs and expenses of their respective actuaries, and the fees, costs and expenses of the third actuary (if any) shall be borne one-half by Buyer and one-half by Seller.

ARTICLE IX

Termination

SECTION 9.01. Buyer Termination . This Agreement may be terminated by Buyer: (a) at any time prior to the Closing, if (i) Seller shall have failed to comply, in any material respect, with any of Seller's covenants or agreements contained in this Agreement or (ii) any one or more of the representations or warranties of Seller contained in this Agreement shall prove to have been inaccurate in any material respect when made and, in the case of clauses (i) and (ii), such failure or inaccuracy (A) would give rise, if occurring or continuing on the Closing Date, to the failure of a condition set forth in Section 5.01(a) or Section 5.01(b) , as applicable and (B) has not been or is incapable of being cured by Seller prior to the earlier of (1) the Outside Date and (2) the twentieth (20 th ) business day after Seller's receipt of written

-91-

notice thereof from Buyer; provided that such twentieth (20 th ) business day shall be extended (up to the Outside Date) so long as Seller is using its commercially reasonable efforts to cure any such breach; (b) at any time prior to the Closing, if any of the conditions precedent to the performance of Buyer's obligations at the Closing shall have become incapable of fulfillment by the Outside Date; or (c) if the Closing shall not have occurred on or before the Outside Date. Notwithstanding anything herein to the contrary, Buyer may only terminate this Agreement pursuant to the preceding clauses (a), (b) or (c) if at the time of termination Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

SECTION 9.02. Seller Termination . This Agreement may be terminated by Seller: (a) at any time prior to the Closing, if (i) Buyer shall have failed to comply, in any material respect, with any of Buyer's covenants or agreements contained in this Agreement or (ii) any one or more of the representations or warranties of Buyer contained in this Agreement shall prove to have been inaccurate in any material respect when made and, in the case of clauses (i) and (ii), such failure or inaccuracy (A) would give rise, if occurring or continuing on the Closing Date, to the failure of a condition set forth in Section 5.02(a) or Section 5.02(b) , as applicable, and (B) has not been or is incapable of being cured by Buyer prior to the earlier of (1) the Outside Date and (2) the twentieth (20 th ) business day after Buyer's receipt of written notice thereof from Seller; provided that such twentieth (20 th ) business day shall be extended (up to the Outside Date) so long as Buyer is using its commercially reasonable efforts to cure any such breach; (b) at any time prior to the Closing, if any of the conditions precedent to the performance of Seller's obligations at the Closing shall have become incapable of fulfillment by the Outside Date; or (c) if the Closing shall not have occurred on or before the Outside Date. Notwithstanding anything herein to the contrary, Seller may only terminate this Agreement pursuant to the preceding clauses (a), (b) or (c) if at the time of termination Seller is not in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

SECTION 9.03. Effect of Termination . If this Agreement is terminated pursuant to this Article IX , it will become void and of no further force and effect, with no liability on the part of any party to this Agreement (or any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents), except that the provisions of this Section 9.03 and Article XI will survive any termination of this Agreement; provided , however , that nothing herein shall relieve any party from liability for Damages incurred or suffered by any other party as a result of any fraud, willful misconduct or intentional breach of any covenant contained in this Agreement.

ARTICLE X

Indemnification

SECTION 10.01. Survival . All representations and warranties contained in this Agreement shall survive the Closing until the date that is eighteen (18) months from the Closing Date, and shall then expire and be of no force or effect; provided , however , that (a) the representations and warranties set forth in Section 3.18 (Taxes) shall survive the Closing until sixty (60) calendar days following the expiration of the applicable statute of limitations, (b) the

-92-

representations and warranties of Seller set forth in Section 3.10 (Intellectual Property Rights) shall survive the Closing until the date that is twenty-four (24) months from the Closing Date and (c) the representations and warranties of Seller set forth in Sections 3.01 (Organization and Good Standing), 3.02 (Authority), 3.03(b) (Title to Transferred Equity Interests) and 3.16 (Brokerage Fees) (collectively, the " Seller Fundamental Representations ") and the Buyer Fundamental Representations (together with the Seller Fundamental Representations, the " Fundamental Representations ") shall survive indefinitely. Any representation or warranty that is the subject of any Claim with respect to which notice is delivered by the Indemnified Party to the Indemnifying Party prior to the expiration of the applicable survival period set forth in this Section 10.01 shall survive with respect to such Claim until such Claim is fully and finally resolved. The covenants and agreements contained in this Agreement shall survive indefinitely.

SECTION 10.02. Indemnification by Seller . Subject to the provisions of this Article X , from and after the Closing Date, in addition to the indemnification set forth in Section 7.08(c) , Seller shall indemnify and hold harmless Buyer and its directors, officers, employees, Affiliates (including the Transferred Companies), agents and representatives (collectively, the " Buyer Indemnitees ") against and from any and all Damages which any Buyer Indemnitee may incur or suffer to the extent such Damages arise out of or result from (a) the breach of any representation or warranty made by Seller in this Agreement (other than the representations and warranties in clauses (iii) and (iv) of Section 3.13(b) ) as if made on the Closing Date, (b) any breach by Seller or any of its Affiliates of its covenants or agreements contained herein, (c) any of the Excluded Liabilities or (d) any liabilities as of immediately prior to the Closing arising out of the operation or conduct of the Business before the Closing that would be classified as current liabilities under GAAP on a balance sheet of the Business as of immediately prior to the Closing, calculated in a manner consistent with the Financial Information, to the extent such liabilities are of the type addressed in the balance sheet accounts entitled "Right of return" and "Accrued warranty expense" and relate to Products sold prior to the Closing. Notwithstanding that a claim for Damages may fall into multiple categories of this Section 10.02 , a Buyer Indemnitee may recover such Damages one time only.

SECTION 10.03. Indemnification by Buyer . Subject to the provisions of this Article X , from and after the Closing Date, in addition to the indemnification set forth in Section 6.06(a) , Section 7.08(c) and Section 8.01(d) , Buyer shall indemnify and hold harmless Seller against and from any and all Damages which Seller and any of its directors, officers, employees, Affiliates (other than the Transferred Companies), agents and representatives (collectively, the " Seller Indemnitees " and, together with the Buyer Indemnitees, the " Indemnitees ") may incur or suffer to the extent such Damages arise out of or result from (a) the breach of any representation or warranty made by Buyer in this Agreement as if made on the Closing Date, (b) any breach by Buyer or any of its Affiliates of its covenants or agreements contained herein or (c) without limiting the indemnification obligations of Seller pursuant to Section 10.02 , any of the Assumed Liabilities. Notwithstanding that a claim for Damages may fall into multiple categories of this Section 10.03 , a Seller Indemnitee may recover such Damages one time only.

-93-

SECTION 10.04. <u>Scope of Liability</u> . The rights of the Indemnitees to indemnification pursuant to the provisions of this <u>Article X</u> are subject to the following:

(a) Indemnification shall be available to the Buyer Indemnitees or the Seller Indemnitees under clause (a) of <u>Section  10.02</u> or clause (a) of <u>Section  10.03</u> (as applicable) with respect to breaches of representations or warranties only to the extent the aggregate amount of Damages otherwise due to the Buyer Indemnitees or the Seller Indemnitees, respectively, for all Claims under clause (a) of <u>Section  10.02</u> or clause (a) of <u>Section  10.03</u> (as applicable) exceeds sixty million dollars ($60,000,000) (the " <u>Deductible</u> ") and then indemnification shall be available to the Buyer Indemnitees or the Seller Indemnitees, respectively, for the amount of all payments due to the Buyer Indemnitees or the Seller Indemnitees, respectively, in excess of the Deductible, but only for all such Damages up to six hundred million dollars ($600,000,000); <u>provided</u> , <u>however</u> , that the limitations set forth in this <u>Section 10.04(a)</u> shall not apply to Damages in respect of claims for breach of any Fundamental Representation.

(b) None of the Buyer Indemnitees or the Seller Indemnitees shall be entitled to indemnification under clause (a) of <u>Section  10.02</u> or clause (a) of <u>Section  10.03</u> (as applicable) with respect to breaches of representations or warranties unless the Damages arising out of or resulting from such breach (or aggregated Damages arising out of or resulting from the same or similar facts, events or circumstances) are greater than three hundred thousand dollars ($300,000) (it being understood that any such Claims for amounts less than three hundred thousand dollars ($300,000) shall be ignored in determining whether the Deductible has been exceeded and thereafter); <u>provided</u> , <u>however</u> , that the limitations set forth in this <u>Section  10.04(b)</u> shall not apply to Damages in respect of claims for breach of any Fundamental Representation.

(c) The amount of Damages resulting from any inaccuracy or breach of the representations and warranties contained in this Agreement shall be determined without references to the terms "material," "materially," "Material Adverse Effect," "material adverse effect" or other similar qualifications as to materiality (including specific monetary thresholds) contained or incorporated in any such representation or warranty, but such qualifications, to the extent contained or incorporated in any such representation or warranty, shall apply for the purposes of determining whether any such inaccuracy or breach has occurred.

(d) The right of the Indemnitees to seek indemnification pursuant to this <u>Article  X</u> shall not be affected or deemed waived by reason of the fact that, based on any facts or circumstances known, or that should have been known, to Seller, Buyer or any other Indemnitee, including from any investigation made by or on behalf of such Indemnitee, the information provided in Seller's management presentation to Buyer, the Data Room or given in writing to such Indemnitee prior to the date of this Agreement (except, for the avoidance of doubt, any disclosure of any fact or item in any portion to the Disclosure Letter), such Indemnitee or any of its representatives knew or should have known that any representation or warranty is, was or might be inaccurate.

(e) Indemnification shall be available to the Buyer Indemnitees under clause (d) of <u>Section  10.02</u> only for such Damages up to thirty three million dollars ($33,000,000).

-94-

SECTION 10.05. <u>Claims</u> . Any Buyer Indemnitee or Seller Indemnitee claiming it may be entitled to indemnification under this <u>Article X</u> (the " <u>Indemnified Party</u> ") shall give prompt written notice to the other party (the " <u>Indemnifying Party</u> ") of each matter, action, cause of action, claim, demand, proceeding, assessment, fact or other circumstances upon which a claim for indemnification (a " <u>Claim</u> ") hereunder may be based. Such notice shall contain, with respect to each Claim and only to the extent known to such Indemnified Party, such facts and information as are then reasonably available, including the estimated amount of Damages and the specific basis for indemnification hereunder. Failure to give prompt notice of a Claim hereunder shall not affect the Indemnifying Party's obligations hereunder, except to the extent the Indemnifying Party is prejudiced by such failure.

SECTION 10.06. <u>Defense of Actions</u> . The Indemnified Party shall permit the Indemnifying Party, at the Indemnifying Party's option and expense, to assume the complete defense of any Claim by any third party within thirty (30) calendar days of receipt of notice of such Claim by the Indemnifying Party, with full authority to conduct such defense, through counsel reasonably acceptable to the Indemnified Party at the expense of the Indemnifying Party, and to settle or otherwise dispose of the same and the Indemnified Party will reasonably cooperate in such defense; <u>provided</u> that the Indemnifying Party will (a) permit the Indemnified Party to participate in such defense, settlement or disposal through counsel chosen by the Indemnified Party ( <u>provided</u> that the fees and expenses of such counsel shall be paid by such Indemnified Party) and (b) not, in defense of any such Claim, except with the prior written consent of the Indemnified Party, consent to the entry of any Judgment or enter into any settlement (i) which provides for any relief other than the payment of monetary damages, (ii) which does not include as an unconditional term thereof the giving by the third-party claimant to the Indemnified Party of a release from all liability in respect thereof and/or (iii) which includes any admission of wrongdoing or misconduct by the Indemnified Party. If the Indemnifying Party elects to assume the defense of any third-party Claim, the Indemnifying Party shall not enter into any settlement of such Claim for the payment of monetary damages unless (A) the Indemnified Party consents in writing to such settlement or (B) the Indemnifying Party confirms in writing to the Indemnified Party that the Indemnifying Party will be responsible for indemnifying the Indemnified Party for the Damages resulting from such Claim, to the extent provided in (and subject to the parameters of) this <u>Article X</u> . The Indemnifying Party shall not be entitled to assume the defense of any third-party Claim without the consent of the Indemnified Party if such third-party Claim (x) seeks an injunction or other equitable or non-monetary relief against the Indemnified Party (other than equitable or non-monetary relief that is incidental to monetary damages as the primary relief sought) and not also against the Indemnifying Party or (y) is related to or otherwise arises in connection with any criminal matter, in which case the Indemnified Party shall allow the Indemnifying Party a reasonable opportunity to participate in such defense with its own counsel and at its own expense. Notwithstanding an election by the Indemnifying Party to assume the defense of any third-party Claim, the Indemnified Party shall have the right to employ one separate co-counsel and to participate in the defense in such action or proceeding, and the Indemnifying Party shall bear the reasonable fees, costs and expenses of such separate counsel, if, based on advice from counsel, there exists any actual or potential conflict of interest between the Indemnified Party and the Indemnifying Party in connection with the defense of the third-party Claim. In any event, the Indemnified Party and the Indemnifying Party and their respective counsel shall cooperate in the defense of any third-party Claim subject to this <u>Article X</u> and keep each other informed of all significant

-95-

developments relating to any such third-party Claim, and provide copies of all relevant correspondence and documentation in each case relating thereto. In all circumstances, the Indemnified Party will not settle any Claim without the prior written consent of the Indemnifying Party, such consent not to be unreasonably withheld.

SECTION 10.07. Limitation, Exclusivity, No Duplicate Recovery . No Claim for indemnification for a breach of any representation or warranty shall be made or have any validity unless the Indemnified Party shall have given written notice of such Claim to the Indemnifying Party prior to the expiration of the applicable representation or warranty pursuant to Section 10.01 . This Article X , Section 6.06(a) , Section 7.08(c) and Section 8.01(d) provide the exclusive means by which a party may assert and remedy claims for monetary relief pursuant to this Agreement following the Closing Date, including any breach of any representation, warranty, covenant or agreement contained in this Agreement, and Section 11.12 provides the exclusive means by which a party may bring actions against the other party under this Agreement. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Indemnified Party be entitled to indemnification under this Article X with respect to any matter to the extent that such matter was reflected in the calculation of the adjustment to the Purchase Price, if any, pursuant to Section 2.04 . For the avoidance of doubt, the indemnification obligations of Buyer and Seller in respect of the allocation of Assumed Liabilities and Excluded Liabilities shall not govern the allocation of responsibility for liabilities between Buyer and Seller and their respective Affiliates in respect of any future commercial arrangements unrelated to this Agreement between the parties, such matters being addressed in the terms thereof.

SECTION 10.08. Calculation of Damages . Except as otherwise provided in this Article X , in any case where the Indemnified Party subsequently recovers from third parties any amount in respect of a matter with respect to which an Indemnifying Party has indemnified it pursuant to this Article X , such Indemnified Party shall promptly pay over to the Indemnifying Party the amount so recovered (after deducting therefrom the full amount of the expenses incurred by it in procuring such recovery), solely to avoid duplicative recovery for the same Damage, but not in excess of any amount previously so paid by the Indemnifying Party to or on behalf of the Indemnified Party in respect of such matter.

SECTION 10.09. Tax Treatment of Indemnity Payments . Any indemnity payment under this Agreement shall be treated as an adjustment to the Purchase Price for Tax purposes unless there is no reasonable basis for doing so under the applicable Tax Law.

SECTION 10.10. Claims Pursuant to Section 10.02(d) .

(a) For a period of one (1) year after the Closing Date, Buyer agrees to use commercially reasonable efforts to adhere to the returned goods policy set forth on Schedule 10.10 to the Disclosure Letter with respect to all Products of the Business returned from customers that were sold prior to the Closing.

(b) Indemnification shall be available to the Buyer Indemnitees under Section 10.02(d) for the period covering twelve (12) months from the Closing Date. Any such claim for indemnification with respect to which notice is delivered by Buyer to Seller prior to sixty (60) days following the end of Buyer's fiscal quarter in which such twelve (12) month period expires shall survive with respect to such claim until such claim is fully and finally resolved.

(c) Any claims for indemnification under Section 10.02(d) shall be submitted to Seller in writing no more than once per fiscal quarter of Buyer (collectively with all such claims for such fiscal quarter), together with supporting documentation evidencing that such claims for indemnification are in respect of Products sold prior to the Closing and any other documentation that Seller may reasonably request; provided , that notice of the claims for any given fiscal quarter may be delivered within sixty (60) days following the end of such fiscal quarter.

-96-

ARTICLE XI

Miscellaneous

SECTION 11.01. No Additional Representations . Buyer is relying, in addition to the representations, warranties, covenants and agreements set forth in this Agreement and the other Transaction Documents, on its own investigation, examination and valuation of the Business, including the Transferred Assets, in effecting the transactions covered by this Agreement and the other Transaction Documents. Buyer is purchasing the Transferred Assets based on the results of its inspections and investigations and the representations, warranties, covenants and agreements set forth in this Agreement and the other Transaction Documents, and not on any representation or warranty of Seller or any of its Affiliates not expressly set forth in this Agreement or any of the other Transaction Documents.

SECTION 11.02. Financial Information and Projections . In connection with Buyer's investigation of the Business, Buyer has received from Seller various forward-looking statements regarding the Business (including the estimates, assumptions, projections, forecasts and plans furnished to it) (the " Forward-Looking Statements "). Buyer acknowledges and agrees (i) there are uncertainties inherent in attempting to make the Forward-Looking Statements; (ii) Buyer is familiar with such uncertainties; and (iii) that Seller makes no representation or warranty with respect to any Forward-Looking Statement.

SECTION 11.03. To the Knowledge . "To the knowledge of Seller" or other references to the knowledge or awareness of Seller or its Affiliates means the actual knowledge of those individuals set forth on Schedule 11.03(a) to the Disclosure Letter. "To the knowledge of Buyer" or other references to the knowledge or awareness of Buyer or its Affiliates means the actual knowledge of those individuals set forth on Schedule 11.03(b) to the Disclosure Letter.

SECTION 11.04. Waivers . At any time and from time to time prior to the Closing, the parties hereto may by written agreement signed by both parties, (a) extend the time for, or waive in whole or in part, the performance of any obligation of any party hereto under this Agreement, (b) waive any inaccuracy in any representation, warranty or statement of any party hereto or (c) waive any condition or compliance with any covenant contained in this Agreement. The failure of a party hereto to require performance of any provision hereof at any time shall in no manner affect such party's right at a later time to enforce such provision. No waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

-97-

SECTION 11.05. <u>Modifications and Amendments</u> . This Agreement shall not be altered or otherwise amended except pursuant to an instrument in writing executed and delivered by each of the parties hereto. Notwithstanding the foregoing provisions of this <u>Section  11.05</u> , no amendment or modification to any of <u>Section  6.06(c)</u> , this sentence of this <u>Section  11.05</u> , the second proviso in <u>Section  11.06(a)</u> , <u>Section  11.12(a)</u> , <u>Section 11.12(b)</u> and/or <u>Section 11.12(c)</u> that is materially adverse to the Debt Financing Sources shall become effective without the prior written consent of the materially adversely affected Debt Financing Sources.

SECTION 11.06. <u>Assignability, Beneficiaries; Enforcement</u> . (a) This Agreement and the rights and obligations hereunder shall be binding upon and inure solely to the benefit of the parties hereto, their respective successors and permitted assigns, but this Agreement shall not be assignable by either party hereto without the express written consent of the other party hereto, which will not be unreasonably withheld; <u>provided</u> that, without such consent, either party may assign its rights and obligations hereunder (in whole but not in part) to an Affiliate at any time (but no such assignment shall relieve such assigning party of its obligations under this Agreement), or to a third party in connection with a sale or transfer (by means of a merger, stock sale or otherwise) of all or substantially all of such party's business. Other than as explicitly set forth herein, including in <u>Sections  10.02</u> and <u>10.03</u> , nothing contained herein is intended to confer upon any Person, other than the parties to this Agreement and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement; <u>provided</u> that the provisions of <u>Section 6.06(c)</u> , the second sentence of <u>Section  11.05</u> , this proviso of this <u>Section 11.06(a)</u> , <u>Section 11.12(a)</u> , <u>Section 11.12(b)</u> and <u>Section 11.12(c)</u> , in each case pertaining to the Debt Financing Sources, are intended to be for the benefit of, and shall be enforceable by, the Debt Financing Sources.

(b) The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at law if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement without proof of actual damages, this being in addition to any other remedy to which any party is entitled at law or in equity. Each party further agrees that (i) no other party hereto or any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section  11.06</u> , and each party hereto irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument and (ii) it will not oppose the granting of such remedy.

-98-

SECTION 11.07. <u>Notices</u> . Any notice, request, instruction or other communication to be given hereunder by either party to the other party shall be in writing and delivered personally, via email (which is confirmed), to the extent email addresses are provided below, or sent by postpaid registered or certified mail:

if to Seller, addressed to:

> Medtronic plc
> 710 Medtronic Parkway
> Minneapolis, MN 55432-5604
> Attn **:**   Christopher Cleary, Vice President – Corporate Development
>        DJ Sardella, Assoc. General Counsel – Corporate Development

with a copy (which shall not constitute notice) to:

> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, NY 10019
> Attn:   Adam O. Emmerich, Esq.
>      Benjamin M. Roth, Esq.
>      Victor Goldfeld, Esq.
> Email:   AOEmmerich@wlrk.com
>       BMRoth@wlrk.com
>       VGoldfeld@wlrk.com

if to Buyer, addressed to:

> Cardinal Health, Inc.
> 7000 Cardinal Place
> Dublin, OH 43017
> Attn:   Vice President, Mergers and Acquisitions
>      Chief Legal and Compliance Officer

with a copy (which shall not constitute notice) to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> 155 North Wacker Drive
> Chicago, IL 60606
> Attn:   Brian W. Duwe, Esq.
>      Richard C. Witzel, Jr., Esq.
> Email:   Brian.Duwe@skadden.com
>       Richard.Witzel@skadden.com

or to such other address for either party as such party shall hereafter designate by like notice.

SECTION 11.08. <u>Headings</u> . The Article and Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning and interpretation of this Agreement.

SECTION 11.09. <u>Counterparts</u> . This Agreement may be executed in two or more counterparts and such counterparts may be delivered in electronic format (including by fax or in portable document format (.pdf)), each of which shall be deemed to be an original and all of which shall be deemed to constitute the same Agreement.

-99-

SECTION 11.10. <u>Entire Agreement</u> . This Agreement, together with the Exhibits expressly contemplated hereby and attached hereto, the Disclosure Letter, the Transaction Documents, the Confidentiality Agreements and the other agreements and certificates delivered in connection herewith or therewith, contain the entire agreement between the parties with respect to the Transactions and supersedes all prior agreements or understandings between the parties. Other than the Confidentiality Agreements entered into between the parties, the Transaction Documents are intended to define the full extent of the legally enforceable undertakings and representations of the parties hereto, and no promise or representation, written or oral, which is not set forth in such agreements is intended by either party to be legally binding.

SECTION 11.11. <u>Payment of Expenses</u> . Except as otherwise set forth in this Agreement, all costs and expenses associated with this Agreement and the Transactions, including the fees of counsel and accountants, shall be borne by the party incurring such expenses.

SECTION 11.12. <u>Governing Law; Consent to Jurisdiction; Waivers</u> . (a) This Agreement shall be governed by the law of the State of New York without reference to the choice of law doctrine of such state that would result in the application of the law of any other State. All actions and proceedings (including any actions and proceedings against the Debt Financing Sources) arising out of or relating to this Agreement (or the Debt Financing) shall be heard and determined exclusively in the United States District Court for the Southern District of New York. The parties hereto hereby (i) submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York for the purpose of any action or proceeding (including any action or proceeding against the Debt Financing Sources) arising out of or relating to this Agreement or the Debt Financing brought by any party hereto and (ii) irrevocably waive, and agree not to assert by way of motion, defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named court, that its property is exempt or immune from attachment or execution, that the action or proceeding is brought in an inconvenient forum, that the venue of the action or proceeding is improper or that this Agreement, the Debt Financing or the Transactions may not be enforced in or by the above-named court.

(b) Notwithstanding anything herein to the contrary, the parties hereto acknowledge and irrevocably agree that any claim, suit, action or proceeding, whether in law or in equity, whether in contract or in tort or otherwise, against the Debt Financing Sources (in their capacities as such) arising out of, or relating to, the Transactions, the Debt Financing or the performance of services thereunder or related thereto shall, except as expressly provided otherwise in the definitive documentation pertaining to such Debt Financing, be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflicts of law rules of such State that would result in the application of the laws of any other State.

-100-

(c) IN CONNECTION WITH ANY DISPUTE HEREUNDER INCLUDING ANY DISPUTE THAT INVOLVES THE DEBT FINANCING SOURCES, EACH PARTY HERETO WAIVES ITS RIGHT TO TRIAL OF ANY ISSUE BY JURY.

(d) IN CONNECTION WITH ANY DISPUTE HEREUNDER, EACH PARTY HERETO WAIVES ANY CLAIM TO PUNITIVE, EXEMPLARY OR SPECULATIVE DAMAGES, OR ANY OTHER TYPE OF DAMAGES THAT ARE NOT REASONABLY FORESEEABLE, IN EACH CASE FROM THE OTHER PARTY HERETO (OR ANY AFFILIATE OF SUCH OTHER PARTY HERETO) (IT BEING UNDERSTOOD THAT THIS WAIVER DOES NOT COVER ANY RIGHT TO INDEMNITY FOR ANY DAMAGES PAYABLE TO THIRD PARTIES THAT MAY BE IMPOSED OR OTHERWISE INCURRED).

(e) IN CONNECTION WITH ANY DISPUTE HEREUNDER, EACH PARTY HERETO WAIVES ANY CLAIM FOR PREJUDGMENT INTEREST FROM THE OTHER.

SECTION 11.13. Fulfillment of Obligations . Any obligation of any party to any other party under this Agreement, which obligation is performed, satisfied or fulfilled by an Affiliate of such party, shall be deemed to have been performed, satisfied or fulfilled by such party.

SECTION 11.14. Severability . It is the desire and intent of the parties hereto that the provisions of this Agreement will be enforced to the fullest extent permissible under the Laws in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement will be determined to be invalid or unenforceable, such provision will be deemed amended to delete therefrom the portion thus determined to be invalid or unenforceable, such deletion to apply to the extent of such invalidity or unenforceability, without affecting in any way the remaining provisions hereof only with respect to the operation of such provision in the particular jurisdiction in which such determination is made.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-101-

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**CARDINAL HEALTH, INC.**

By: /s/ Donald M. Casey, Jr.
Name: Donald M. Casey, Jr.
Title: Chief Executive Officer - Medical Segment

[ *Buyer Signature Page to Stock and Asset Purchase Agreement* ]

**MEDTRONIC PLC**

By: /s/ Christopher Cleary
    Name: Christopher Cleary
    Title: Vice President - Corporate Development

[ *Seller Signature Page to Stock and Asset Purchase Agreement* ]

**Annex 2.02(a)**
**Transferred Assets**

The Transferred Assets consist of Seller's and any of its Affiliates' (other than, except with respect to clause (xvii) below, the Transferred Companies) right, title and interest in, to and under the following as they exist at the time of the Closing:

(i)     Real Property . (A) The real property and any buildings, improvements and fixtures thereon, as set forth on Schedule  2.02(a)(i)(A) to the Disclosure Letter, together with all improvements, fixtures and appurtenances thereto and rights in respect thereof to the extent owned by Seller or any of its Affiliates (the " Owned Real Property ") and (B) the real property listed on Schedule 2.02(a)(i)(B) to the Disclosure Letter to the extent leased by Seller or any of its Affiliates (such leases, the " Transferred Real Property Leases ", and such leased real property, the " Leased Real Property ," and together with the Owned Real Property, the " Transferred Real Property ");

(ii)    Inventory . All Inventory owned or held by Seller or any of its Affiliates at the time of the Closing;

(iii)   Equipment . The machinery, equipment (including any associated machine control systems and associated data acquisition hardware resident on the transferring equipment and including any dedicated software applications, but not including any shared computer systems on which the applications run), tools, furniture, fixtures and other tangible personal property (the " Equipment ") (but excluding (x) the Inventory and Transferred IT which are identified separately on this Annex  2.02(a) and (y) personal computers, which are to be retained by Seller and leased to Buyer pursuant to the Transition Services Agreement) that is (A) owned or leased by Seller or any of its Affiliates and (B) primarily related to or primarily used in the Business, whether located at the sites of Seller or any of its Affiliates, at a customer facility or the property of any vendor performing manufacturing, warehousing or other services for the Business, together with the interests of Seller or any of its Affiliates in respect of any rights of use or warranties relating thereto, other than, for the avoidance of doubt, the Equipment set forth on Schedule 2.02(a)(iii) of the Disclosure Letter; it being understood that, if either Buyer (or Seller) believes that any Equipment located at any Transferred Real Property that is owned or leased by Seller or any Affiliate of Seller is (or is not) a Transferred Asset pursuant to this clause (iii), Buyer or Seller may request that the determination of whether such Equipment is (or is not) a Transferred Asset pursuant to this clause (iii) be made by the Vice President, OpEx, Engineering Services & PMO of Seller and the President, Hospital Solutions & Global Supply Chain (Medical Segment) of Buyer;

(iv)    Goodwill . The goodwill generated by or associated with the Business;

(v)     Permits . All permits, licenses and authorizations, franchises, approvals, orders, registrations (but excluding the Product Registrations which are identified separately on this Annex 2.02(a) ), certificates, variances or similar rights granted to Seller or any of its Affiliates by a Governmental Entity primarily related to or primarily used in connection with the operation of to the Business prior to the Closing Date;

A-1

(vi)     Business Records . The following records, files, data and other materials, whether in hard copy or electronic form, to the extent primarily related to the Business and in the possession of Seller or any of its Affiliates: (1) vendor lists, (2) customer lists and customer service records, (3) a list of the distributors for the Products, (4) pricing lists for the Products, (5) testing and clinical data, market research reports, marketing plans and other marketing-related information and materials (including Personal Information), (6) subject to Section 7.01 , advertising, marketing data, marketing plans, sales and promotional materials, (7) quality control, vigilance and regulatory records, (8) ledgers and other business or financial records, and (9) Tax Returns (but only to the extent Tax Returns are related solely to the Transferred Companies or solely related to the Business or Transferred Assets) (collectively, the " Transferred Records "); provided that, to the extent practicable, Buyer shall be entitled to copies or extracts of any such materials relating to the Business that are not included in the Transferred Records;

(vii)    Product Registrations . All Product Registrations primarily related to the Business;

(viii)   Intellectual Property . (A) All IP Rights owned by Seller or any of its Affiliates primarily related to or primarily used in the Business or primarily related to the Legacy Products, other than any IP Rights included in the Excluded Assets, including (whether or not primarily related to or primarily used in the Business) (1) the Trademarks set forth on Schedule 2.02(a)(viii)(A)(1) to the Disclosure Letter and (2) the Patents set forth on Schedule 2.02(a)(viii)(A)(2) to the Disclosure Letter (collectively, the " Transferred IP ") and (B) (1) except for Contracts with suppliers, distributors or customers, all of the Contracts: (w) pursuant to which Seller and its Affiliates obtained the right to use or practice rights under third-party IP Rights (excluding Copyright rights) that are used primarily in the conduct of the Business or are primarily related to the Legacy Products, (x) by which Seller or any of its Affiliates has licensed or otherwise authorized a third party to use any Transferred IP, (y) otherwise granting or restricting the right to use Transferred IP and (z) transferring, assigning or indemnifying with respect to the Transferred IP, including, in each case, license agreements, settlement agreements and covenants not to sue, and (2) all other licenses, settlements or covenants not to sue relating primarily to Patents and Trademarks included in the Transferred IP (collectively, the " Transferred IP Licenses "), it being understood that, notwithstanding anything in this Agreement to the contrary, the representations and warranties of Seller in this Agreement shall be deemed not to be expanded in any way by the inclusion of references to Legacy Products in this clause (viii);

(ix)     Domain Names . The Internet domain names set forth on Schedule 2.02(a)(ix) to the Disclosure Letter;

(x)      IT Systems . All (A) object code and source code versions of software programs, scripts, web code, application interfaces and similar software tools, including development kits and support programs, and (B) stand-alone information technology hardware used to run such software and manage such data, in each case, owned or licensed by Seller or any of its Affiliates and dedicated exclusively to the Business (collectively, the " Transferred IT ");

A-2

(xi)     Contracts . All leases, licenses (other than Transferred Real Property Leases and Transferred IP Licenses which are identified separately on this Annex 2.02(a) ), bids, tenders, purchase orders, consulting agreements, supply agreements, distribution contracts, manufacturing contracts, maintenance contracts, agreements, commitments and other contracts, whether or not reduced to writing (collectively, " Contracts ") exclusively relating to the Business or any of the Transferred Assets, but specifically excluding the Excluded Contracts (collectively, the " Transferred Contracts ");

(xii)    Benefit Plans . All assets of or relating to (including all assets held in trust in any form) and any insurance, administration or other contracts relating to Assumed Benefit Plans to the extent such assets are required to transfer to Buyer and its Affiliates under applicable Law (including where transfer is required in order to apply the Transfer Regulations or to effect a mandatory transfer of employment under the Transfer Regulations, as applicable) or pursuant to the transfer (directly or indirectly) of the Transferred Equity Interests to Buyer or its Affiliates;

(xiii)   Corporate Organizational Records . With respect to each Transferred Company, the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance and existence of such Transferred Company;

(xiv)    Insurance Proceeds . All insurance proceeds actually received by Seller or any of its Affiliates prior to or after the Closing under any insurance policy written prior to the Closing in connection with (i) the damage or destruction of any of the Transferred Assets from and after the date hereof and prior to the Closing that is, or would have been but for such damage or destruction, included in the Transferred Assets or (ii) any Assumed Liability (other than, in the case of this clause (ii), where insurance proceeds are directly or indirectly funded by Seller or any of its Affiliates through self-insurance or other similar arrangement);

(xv)     Cash Amount; Cash Proceeds of Sales and Dispositions . (1) Cash and cash equivalents of the Transferred Companies to the extent included in the Cash Amount and (2) all net cash proceeds actually received by Seller or any of its Affiliates prior to or after the Closing in connection with any sales or other dispositions from and after the date hereof through the Closing of any asset that would have been included in the Transferred Assets but for such sale or disposition, other than with respect to sales of Inventory in the ordinary course of business consistent with past practice;

(xvi)    Claims; Settlement Proceeds . Any and all claims, causes of action, defenses and rights of offset or counterclaim, or settlement agreements (in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) arising out of the Transferred Contracts (other than any Pre-Closing Accounts Receivable) and all proceeds of any settlement from and after the date hereof through the Closing of any such claims, causes of action, defenses and rights of offset or counterclaim that would have been included in the Transferred Assets but for such settlement;

A-3

(xvii)  Transferred Company Assets . All assets of the Transferred Companies that would be Transferred Assets if the Transferred Companies were Asset Selling Affiliates (but specifically excluding any assets of the Transferred Companies that would be Excluded Assets), it being understood that the transfer (directly or indirectly) of the Transferred Equity Interests will constitute transfer of such assets; and

(xviii)  Other . All other assets, properties, Contracts and claims of every nature, tangible and intangible, primarily related to or primarily used in the Business, other than any asset of the type described in clauses (i) through (xiv) of Annex 2.02(b) .

A-4

**Annex 2.02(b)**
**Excluded Assets**

The Excluded Assets consist of any assets of Seller or any of its Affiliates that do not constitute Transferred Assets as described on Annex 2.02(a) to the Disclosure Letter, including the following:

(i)     Accounts Receivable/Other Current Assets . (1) All accounts receivable, notes receivable and similar rights to receive payments of Seller or any of its Affiliates existing on the Closing Date (" Pre-Closing Accounts Receivable "), (2) all other assets as of immediately prior to the Closing arising out of the operation or conduct of the Business before the Closing that would be classified as current assets under GAAP on a balance sheet of the Business as of immediately prior to the Closing, calculated in a manner consistent with the Financial Information;

(ii)    Cash and Cash Equivalents . All cash and cash equivalents and marketable securities and other investment assets, other than cash and cash equivalents in respect of clauses (xiv), (xv) and (xvi) of Annex 2.02(a) , held by Seller or any of its Affiliates on the Closing Date;

(iii)   Hedging or Other Currency Exchange Agreements . All rights to receive payments of Seller or any of its Affiliates pursuant to a hedging or other currency exchange agreement existing on the Closing Date;

(iv)    Benefit Plans . Except with respect to Assumed Benefit Plans, all the assets of and all the assets relating to and all rights under any employee compensation, benefit or welfare plan or any related contract between any Person and Seller or any of its Affiliates (including Business Employee Benefit Plans);

(v)     Certain Records . Any records and files not identified as Transferred Records, including (A) the personnel records maintained by Seller or any of its Affiliates, (B) Tax Returns (other than Tax Returns solely related to any Transferred Company), (C) records (including accounting records) relating to Taxes paid or payable by Seller or any of its Affiliates and all financial and Tax records relating to the Business that form part of Seller's or any of its Affiliates' general ledger or otherwise constitute accounting records, (D) records prepared in connection with the Transactions, including bids received from other Persons and analyses relating to the Business and (E) file copies of the Transferred Records retained by Seller, in each case whether generated before or after the Closing Date;

(vi)    Certain Contracts and Contract Rights . All rights of Seller and its Affiliates under (A) this Agreement and the Ancillary Agreements, (B) the Commingled Contracts (subject to Section 2.02(g) ), (C) those Contracts related to Shared Services, and (D) any contracts between Seller and any of its Affiliates or between Affiliates of Seller, whether arising before or after the Closing Date (collectively, the " Excluded Contracts ");

(vii)   Insurance . Other than insurance proceeds specified in clause (xiv) of Annex 2.02(a) , all current and prior insurance policies arranged or maintained by Seller or any of its

A-5

Affiliates and all rights of any nature with respect thereto, including all rights to insurance recoveries thereunder and to assert claims with respect to any such insurance recoveries, whether arising before or after the Closing Date;

(viii)   Corporate Organizational Records . Except with respect to the Transferred Companies, the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance and existence of Seller and each of its Affiliates as a corporation or other entity;

(ix)   Capital Stock . Other than the Transferred Equity Interests, all shares of capital stock of Seller's Affiliates;

(x)   Real Property . Each of the following: (A) any real property and any buildings, improvements and fixtures thereon, other than the Transferred Real Property; and (B) any leasehold interests, including any prepaid rent, security deposits and options to renew or purchase in connection therewith, of Seller or any of its Affiliates (other than the Transferred Real Property Leases);

(xi)   Intellectual Property . Except for Transferred IP and rights under the Transferred IP Licenses, all other IP Rights, including, for the avoidance of doubt, the IP Rights set forth on Schedule 2.02(b)(xi) (collectively, the " Excluded IP Rights ");

(xii)   Domain Names . All Internet domain names other than those set forth on Schedule 2.02(a)(ix) to the Disclosure Letter;

(xiii)   Excluded IT Systems . All property in the nature of databases, software programs, computer hardware, source code and object code owned or licensed by Seller or any of its Affiliates, in each case that is not otherwise included in the Transferred IT; and

(xiv)   Other Excluded Assets . The assets, properties, rights and claims set forth on Schedule 2.02(b)(xiv) to the Disclosure Letter.

A-6

**Annex 2.02(c)**
**Assumed Liabilities**

The Assumed Liabilities consist of any and all liabilities and obligations of Seller or any of its Affiliates, other than Tax Liabilities (Tax Liabilities being governed as provided in Section 7.08(c) ), to the extent arising from or relating to the Business or any Transferred Asset, in each case other than the Excluded Liabilities, including any of the following of such liabilities and obligations, other than Tax Liabilities (Tax Liabilities being governed as provided in Section 7.08(c) ), of Seller and its Affiliates:

(i)      Accounts Payable . All accrued receipts and accounts payable arising from or relating to the Business after the Closing;

(ii)     Transferred Contract Liabilities . All liabilities and obligations under the Transferred Contracts, whether arising before or after the Closing Date, but excluding those in respect of the Pre-Closing Accounts Payable;

(iii)    Asset Ownership . All liabilities and obligations to the extent arising from or relating to any Transferred Asset, or to the extent arising from or relating to the ownership by Buyer and its Affiliates of any Transferred Asset or associated with the realization of the benefits of any Transferred Asset, in each case arising on or after the Closing Date;

(iv)    Product Claims . Liabilities and obligations to the extent arising from or relating to lawsuits or other claims, regardless of when commenced or made and irrespective of the legal theory asserted, with respect to the design, manufacture, testing, advertising, marketing, distribution or sale of the Products, whether prior to or after the Closing, including all liabilities and obligations to the extent arising from or relating to (A) warranty obligations, (B) infringement, dilution, misappropriation or other violation of IP Rights, (C) alleged or actual hazard or defect in design, manufacture, materials or workmanship, including any failure to warn or alleged or actual breach of express or implied warranty or representation or (D) the return after the Closing of any Product sold prior to or after the Closing (collectively, " Product Claims "), in each case other than any Excluded Liability;

(v)     Environmental Liabilities . All liabilities and obligations to the extent arising from or relating to the Transferred Real Property, the Business or any Transferred Asset (or, in each case, the ownership or operation thereof) and arising under any Environmental Law, or with respect to any Environmental Claim or Hazardous Materials, in each case, whether arising before or after the Closing Date;

(vi)    Business Claims. Except as otherwise set forth in this Agreement and except for the matters specifically identified as Excluded Liabilities, all obligations and liabilities in respect of any criminal, civil or administrative suit, action or proceeding, pending or threatened, and claims, whether or not presently asserted, to the extent arising from or relating to the Business before or after the Closing Date (collectively, " Business Claims ");

A-7

(vii)   Employment Matters . Except as otherwise provided in Article VIII , all employment, labor, compensation, pension, employee welfare and employee benefits related liabilities, obligations, commitments, claims and losses relating to each (A) Transferred Employee (or any dependent or beneficiary of any Transferred Employee) that (1) arise as a result of an event or events that occur after the Transfer Time, (2) Buyer or its Affiliates have specifically agreed to assume pursuant to this Agreement or (3) transfer to Buyer or its Affiliates under applicable Law (including in connection with the application of the Transfer Regulations or the mandatory transfer of employment as contemplated by this Agreement, as applicable) or pursuant to the transfer of the Transferred Equity Interests to Buyer, (B) Employee of the Business (or any dependent or beneficiary of any such employee) who does not become a Transferred Employee as contemplated by this Agreement as a result of a breach by Buyer or any of its subsidiaries of applicable Law, any Collective Bargaining Agreement or this Agreement that arise as a result of such breach, and (C) Assumed Plan (such liabilities, obligations, commitments, claims and losses, the " Transferred Employee Liabilities ");

(viii)  Liabilities to Suppliers . Other than the Pre-Closing Accounts Payable, liabilities and obligations to suppliers or other third parties, such as licensors, for materials and services, to the extent arising from or relating to the Business, ordered in the ordinary course of business on or prior to the Closing Date, but scheduled to be delivered or provided after the Closing Date;

(ix)    Liabilities to Customers . Liabilities and obligations to customers under purchase orders for Products (and for which a related account receivable has not yet been recorded) that have not yet been shipped at the Closing Date; and

(x)     Liabilities of the Transferred Companies . All liabilities of the Transferred Companies to the extent arising from or related to the Business or any Transferred Asset (but specifically excluding any liabilities of the Transferred Companies that are Excluded Liabilities), it being understood that the transfer (directly or indirectly) of the Transferred Equity Interests will constitute assumption of such liabilities.

A-8

**Annex 2.02(d)**
**Excluded Liabilities**

The Excluded Liabilities consist of the following liabilities and obligations of Seller or any of its Affiliates, other than Tax Liabilities (Tax Liabilities being governed as provided in Section 7.08(c) ):

(i)     Accounts Payable/Other Current Liabilities . (1) All accrued receipts and accounts payable arising out of the operation or conduct of the Business before the Closing (the " Pre-Closing Accounts Payable "), and (2) all other liabilities as of immediately prior to the Closing arising out of the operation or conduct of the Business before the Closing that would be classified as current liabilities under GAAP on a balance sheet of the Business as of immediately prior to the Closing, calculated in a manner consistent with the Financial Information (other than any liabilities of the type addressed in the balance sheet accounts entitled "Right of return" and "Accrued warranty expense");

(ii)    Employment Matters . Except as otherwise provided in Article VIII , all employment, labor, compensation, pension, employee welfare and employee benefits related liabilities, obligations, commitments, claims and losses relating to (A) each employee of Seller and its Affiliates, including all former Employees of the Business (or any dependent or beneficiary of any such employee), other than the Transferred Employees and their dependents and beneficiaries or as described in clause (B) of the definition of Transferred Employee Liabilities, in each case, that arise out of an event or events that occur at any time, (B) each Transferred Employee (or any dependent or beneficiary of any Transferred Employee) that arise as a result of an event or events that occur prior to or as of the Transfer Time, except for any such liabilities, obligations, commitments, claims and losses described in clause (A)(2) or (3) of the definition of Transferred Employee Liabilities, (C) Business Employee Benefit Plans that are not Assumed Benefit Plans and (D) all Controlled Group Liabilities;

(iii)   Excluded Asset Liabilities . Each liability, obligation or commitment to the extent arising from or relating to any Excluded Asset or the distribution to, or ownership by, Seller or any of the Selling Affiliates of any Excluded Asset or associated with the realization of the benefits of any Excluded Asset, whether arising before or after the Closing Date;

(iv)    Liabilities of the Transferred Companies . All liabilities of the Transferred Companies, other than Tax Liabilities (Tax Liabilities being governed as provided in Section 7.08(c) ), (A) to the extent not arising from or related to the Business or the Transferred Assets or (B) that are otherwise Excluded Liabilities under clauses (i), (ii), (iii), (v) or (vi) of this Annex 2.02(d) ;

(v)     Indebtedness for Borrowed Money . All indebtedness for borrowed money of Seller and its Affiliates; and

(vi)    Other . (A) To the extent not otherwise specified in clauses (i)–(x) of Annex 2.02(c) , any liabilities of Seller and its Affiliates to the extent not arising from or related to the Business or the Transferred Assets; (B) any obligations of Seller or any of its Affiliates

A-9

pursuant to the terms of the Transaction Documents; (C) any liabilities or obligations set forth on Schedule 2.02(d)(vi) to the Disclosure Letter except to the extent arising from or related to a breach by Buyer or its Affiliates of Section 7.14 ; (D) any liabilities or obligations set forth on Schedule 2.02(d)(vii) to the Disclosure Letter; and (E) other liabilities or obligations of Seller or any Selling Affiliate that Seller designates as an Excluded Liability by a written notice delivered to Buyer prior to the Closing Date.

A-10

Exhibit 10.1

**EXECUTION VERSION**

**GOLDMAN SACHS BANK USA**
**GOLDMAN SACHS LENDING PARTNERS LLC**
200 West Street
New York, New York 10282-2198

**CONFIDENTIAL**

April 18, 2017

Cardinal Health, Inc.
7000 Cardinal Place
Dublin, OH 43017
Attention: Michael Kaufmann

**Project Fortis**
**Commitment Letter**

Ladies and Gentlemen:

Cardinal Health, Inc. (" *you* " or the " *Borrower* ") has advised Goldman Sachs Bank USA (" *GS Bank* ") and Goldman Sachs Lending Partners LLC (" *GSLP* " and, together with GS Bank, " *Goldman Sachs* ", the " *Commitment Parties* ", " *we* " or " *us* ") that you, directly or indirectly through one or more of your wholly-owned subsidiaries, intend to acquire (the " *Acquisition* ") certain assets and equity interests identified to us as "Fortis" (the " *Acquired Business* ") from Medtronic plc, an Irish public limited company (the " *Seller* ") and to consummate the other Transactions. In connection therewith, the Borrower intends to obtain a 364-day senior unsecured bridge term loan credit facility (the " *Bridge Facility* " *)* in an aggregate principal amount of up to $4.5 billion (as such amount may be reduced as set forth in the Term Sheet (as defined below)) and obtain an amendment to its Revolving Credit Agreement to increase the Maximum Consolidated Leverage Ratio financial covenant (the " *Revolver Amendment* "). The date of consummation of the Acquisition is referred to herein as the " *Closing Date* ". All capitalized terms used and not otherwise defined herein shall have the same meanings as specified therefor in the Term Sheet.

1. **Commitments.** In connection with the foregoing, (a) each of GS Bank and GSLP is pleased to advise you of its several (and not joint) commitment to provide $2,850,000,000 and $1,650,000,000, respectively, of the Bridge Facility (each in such capacity, an " *Initial Lender* "), (b) GS Bank is pleased to advise you of its willingness to act as the sole and exclusive administrative agent (in such capacity, the " *Administrative Agent* ") for the Bridge Facility and (c) GS Bank is pleased to advise you of its willingness, and you hereby engage GS Bank, to act as the sole and exclusive lead arranger and sole and exclusive bookrunning manager (in such capacity, the " *Lead Arranger* ") for the Bridge Facility, and in connection therewith to form a syndicate of lenders for the Bridge Facility (collectively, the " *Lenders* ") in consultation with you and subject to the provisions of this Commitment Letter, in each case upon and subject to the terms and conditions set forth in this letter and in Exhibits A and B hereto (collectively, the " *Term Sheet* " and, together with this letter agreement, the " *Commitment Letter* "). You further agree, subject to the last paragraph of Section 2 of this Commitment Letter, that no other titles will be awarded and no compensation (other than that expressly contemplated by this Commitment Letter and

the Fee Letter (as hereinafter defined)) will be paid in connection with the Bridge Facility unless you and we shall so agree, including as agreed prior to the date hereof in accordance with the Syndication Plan (as defined below).

2. **Syndication.** The Lead Arranger intends to commence syndication of the Bridge Facility promptly after your acceptance of the terms of this Commitment Letter and the Fee Letter (which syndication shall not reduce the commitment of the Initial Lenders hereunder, except as provided for in this Section 2 and Section 8). You agree to provide us with a period of at least 30 consecutive days following the date hereof and prior to the Closing Date to syndicate the Bridge Facility; *provided* that, for the avoidance of doubt, it is understood and agreed that (i) compliance with this sentence shall not be a condition precedent to the availability of the Bridge Facility on the Closing Date and (ii) you shall not be required to seek an extension of the Closing Date under the Acquisition Agreement, or take any action that would violate any provision of the Acquisition Agreement, to comply with this sentence. You agree to actively assist the Lead Arranger in achieving a Successful Syndication (as defined in the Fee Letter) until the earliest to occur of (a) the occurrence of a Successful Syndication and (b) the date that is 30 days following the Closing Date. Such assistance shall include (a) subject to the proviso in clause (b) below, your providing and causing your advisors to provide the Lead Arranger upon request with all customary information reasonably deemed necessary by the Lead Arranger to complete such syndication, (b) your assistance in the preparation of an information memorandum with respect to the Bridge Facility in form and substance customary for transactions of this type and otherwise reasonably satisfactory to the Lead Arranger (each, an " *Information Memorandum* ") (collectively with the Term Sheet and any additional summary of terms prepared for distribution to Lenders (as hereinafter defined), the " *Information Materials* "), it being understood and agreed that projections and/or financial statements with respect to the Acquired Business that are to be included in the Information Materials shall be as mutually agreed between you and us, (c) your using your commercially reasonable efforts to (i) ensure that the syndication efforts of the Lead Arranger benefit from your existing lending relationships and (ii) prior to the launch of the syndication, obtain a monitored Public Debt Rating for the Borrower from Moody's Investors Service, Inc. (" *Moody ' s* ") and Standard & Poor's, a division of S&P Global Inc. (" *S&P* "), that give effect to the Transactions and (d) making your officers and advisors available from time to time upon commercially reasonable notice to attend and make presentations at a reasonable number of meetings of prospective Lenders at times and places to be mutually agreed.

Notwithstanding anything to the contrary contained in this Commitment Letter or the Fee Letter or any other letter agreement or undertaking concerning the financing of the Acquisition, from and after the date of the execution and delivery of the Credit Documentation, the only consent that will be required to waive the conditions precedent to the initial funding of the Bridge Facility on the Closing Date is the consent of the Lenders holding a majority of the commitments outstanding at such time.

In order to facilitate an orderly and successful syndication of the Bridge Facility, you agree that until the earlier of the occurrence of a Successful Syndication and 30 days following the Closing Date (such earlier date, the " *Syndication Date* "), the Borrower will not issue, announce, offer, place or arrange debt securities or any syndicated credit facilities of the Borrower or its domestic subsidiaries (other than (i) the Senior Notes, (ii) any Excluded Debt ( *provided* that for purposes of this paragraph "Excluded Debt" shall not be deemed to include refinancings, replacements or extensions of the Revolving Credit Agreement or the Receivables Purchase Agreement) and (iii) any other financing reasonably agreed to by the Lead Arranger), in each case if such issuance, announcement, offering, placement or arrangement could reasonably be expected to materially impair the primary syndication of the Bridge Facility.

From the date of this Commitment Letter to and including the date that is 30 consecutive days after the date hereof (the " *Initial Syndication Period* "), decisions regarding the syndication of the Bridge Facility,

2

including determinations as to the timing of all offers to prospective Lenders, the selection of Lenders, the acceptance and final allocation of commitments, the awarding of any "agent" title or similar designation or role to any Lender and the amounts offered and the compensation provided to each Lender from the amounts to be paid to the Lead Arranger pursuant to the terms of this Commitment Letter and the Fee Letter, will be made jointly by Goldman Sachs and the Borrower and, except to the extent the Lead Arranger and the Borrower otherwise agree, in accordance with the syndication plan heretofore jointly developed by such parties (the " *Syndication Plan* "). Without limiting the foregoing, the Bridge Facility will be syndicated during the Initial Syndication Period only to Lenders identified in the Syndication Plan (and in the order set forth in the Syndication Plan) or otherwise agreed in writing prior to the date hereof (the " *Designated Lenders* "). Following the Initial Syndication Period, if and for so long as a Successful Syndication (as defined in the Fee Letter) has not been achieved, the Lead Arranger shall manage and control all aspects of the syndication of the Bridge Facility in consultation with you (including in the selection of Lenders); *provided* that the Bridge Facility shall not be syndicated to competitors of the Borrower and its subsidiaries specifically identified to the Lead Arranger in writing from time to time (collectively, the " *Disqualified Lenders* "). The commitments of Goldman Sachs hereunder with respect to the Bridge Facility will be reduced dollar-for-dollar by the amount of each commitment for the Bridge Facility received from a Permitted Assignee selected in accordance with this paragraph upon such Permitted Assignee becoming (i) a party to this Commitment Letter as an additional "Commitment Party" pursuant to a Joinder Agreement or (ii) a party to the Credit Documentation. For the purposes herein, " *Permitted Assignee* " shall mean each Designated Lender and any other Lender (other than a Disqualified Lender) approved by you in your reasonable discretion. In connection with any commitments received from Permitted Assignees selected in accordance with this paragraph, you agree, at the request of the Lead Arranger to enter into one or more customary joinder agreements (a " *Joinder Agreement* ") providing for such Permitted Assignees to become an additional "Commitment Party" under this Commitment Letter and extend commitments in respect of the Bridge Facility directly to you (it being agreed that the commitments of Goldman Sachs and such additional Commitment Parties will be several and not joint, and that such Joinder Agreements will contain such provisions relating to titles, the allocation of any reductions in the amount of the Bridge Facility and other matters relating to the relative rights of the Lead Arranger and such additional Commitment Parties as the Lead Arranger may reasonably request). It is understood that no Lender participating in the Bridge Facility will receive compensation from you in order to obtain its commitment, except on the terms contained herein and in the Term Sheet and the Fee Letter. Notwithstanding anything to the contrary provided herein, unless otherwise agreed in writing by you or pursuant to this paragraph or Section 8 of this Commitment Letter, no assignment in connection with the syndication described herein will reallocate, reduce or release the Initial Lenders' obligation to fund its entire commitments in the event any assignee of such Initial Lender shall fail to do so on the Closing Date.

3. **Information Requirements.** You hereby represent and warrant that all written information other than projections and other forward looking information and information of a general economic or industry nature (the " *Information* ") that has been or is hereafter made available to the Lead Arranger or any of the Lenders by you or on behalf of you by any of your representatives in connection with the Transactions (which representation and warranty shall be to the best of your knowledge to the extent it relates to the Acquired Business), taken as a whole, is and will be (as of the date made available) correct in all material respects and does not and will not (as of the date made available), taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements were or are made and (b) all financial projections concerning the Borrower, the Acquired Business and their subsidiaries that have been or are hereafter made available to the Lead Arranger or any of the Lenders by you or on behalf of you by any of your representatives (the " *Projections* ") have been or

3

will be prepared in good faith based upon assumptions believed by you to be reasonable at the time made (which representation and warranty shall be to the best of your knowledge to the extent it relates to the Acquired Business); it being understood that the Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, the Projections, by their nature, are inherently uncertain and no assurances are being given that the results reflected in the Projections will be achieved and actual results may differ from the Projections and such differences may be material. You agree that if at any time prior to the later of the Syndication Date and Closing Date, any of the representations in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement (or, in the case of the Acquired Business, use commercially reasonable efforts to supplement), or cause to be supplemented, the Information and Projections so that such representations contained in this paragraph remain correct in all material respects under those circumstances. In issuing this commitment and in arranging and syndicating the Bridge Facility, the Commitment Parties are and will be using and relying on the Information and Projections, if any, without independent verification thereof.

You acknowledge that (a) the Lead Arranger on your behalf will make available Information Materials to the proposed syndicate of Lenders by posting the Information Materials on IntraLinks or another similar electronic system and (b) certain prospective Lenders (such Lenders, " *Public Lenders* "; all other Lenders, " *Private Lenders* ") may have personnel that do not wish to receive material non-public information (within the meaning of the United States federal securities laws, " *MNPI* ") with respect to the Borrower, the Acquired Business, their respective affiliates or any other entity, or the respective securities thereof, and who may be engaged in investment and other market-related activities with respect to such entities' securities. If requested, you will assist us in preparing an additional version of the Information Materials not containing MNPI (the " *Public Information Materials* ") to be distributed to prospective Public Lenders.

Before distribution of any Information Materials (a) to prospective Private Lenders, you shall provide us with a customary letter authorizing the dissemination of the Information Materials and (b) to prospective Public Lenders, you shall provide us with a customary letter authorizing the dissemination of the Public Information Materials and confirming the absence of MNPI therefrom. In addition, at our request, you shall identify Public Information Materials by clearly and conspicuously marking the same as "PUBLIC".

You agree that the Lead Arranger on your behalf may distribute the following documents to all prospective Lenders, except to the extent you advise the Lead Arranger in writing (including by email) within a reasonable time prior to their intended distributions that such material should only be distributed to prospective Private Lenders and provided that you shall have been given a reasonable opportunity to review such documents: (a) administrative materials for prospective Lenders such as lender meeting invitations and funding and closing memoranda, (b) notifications of changes to the terms of the Bridge Facility and (c) other materials intended for prospective Lenders after the initial distribution of the Information Materials, including drafts and final versions of term sheets and definitive documents with respect to the Bridge Facility. If you advise us that any of the foregoing items should be distributed only to Private Lenders, then the Lead Arranger will not distribute such materials to Public Lenders.

4. **Fees and Indemnities.**

(a) You agree to pay the fees set forth in the separate fee letter, addressed to you and dated the date hereof, from GS Bank and GSLP (the " *Fee Letter* "). You also agree to reimburse the Commitment Parties from time to time on demand for (i) the reasonable and documented fees, disbursements and other charges of Davis Polk & Wardwell LLP, as counsel to the Lead Arranger and the Administrative Agent (which counsel shall provide you with an update of such amounts upon your

4

request from time to time), and (ii) all other reasonable and documented out-of-pocket fees and expenses of the Lead Arranger not to exceed $10,000 in the aggregate, in each case incurred in connection with the Bridge Facility.

(b) You also agree to indemnify and hold harmless the Commitment Party and each of its affiliates, successors and assigns and their respective officers, directors, employees, agents, advisors, controlling persons and other representatives (each, an " *Indemnified Party* ") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable and documented fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) the Transactions, this Commitment Letter, the Term Sheet, the Fee Letter or the Bridge Facility, or any use made or proposed to be made with the proceeds thereof, except, in each case, (a) to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party or any Related Person (as hereinafter defined) of such Indemnified Party, (b) to the extent resulting from any claim, litigation, investigation or proceeding (any of the foregoing, a " *Proceeding* ") that does not involve an act or omission of you or any of your affiliates and that is brought by an Indemnified Party solely against another Indemnified Party, other than claims against any Initial Lender or the Lead Arranger in its capacity in fulfilling its role as an agent or arranger under the Bridge Facility or (c) to the extent arising from a material breach by such Indemnified Party or any Related Person thereof of its obligations hereunder as found by a final, non-appealable judgment by a court of competent jurisdiction. In the case of any Proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such Proceeding is brought by you, your equity holders or creditors, the Seller, the Acquired Business or their subsidiaries, affiliates or equity holders or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the Transactions is consummated. For purposes hereof, a " *Related Person* " of an Indemnified Party means (a) any controlling person, controlled affiliate or subsidiary of such Indemnified Party, (b) the respective directors, officers or employees of such Indemnified Party or any of its subsidiaries, controlled affiliates or controlling persons and (c) the respective agents and advisors of such Indemnified Party or any of its subsidiaries, controlled affiliates or controlling persons.

(c) It is further agreed that the Commitment Parties shall be severally liable solely in respect of its commitments to the Bridge Facility, on a several, and not joint, basis with any other Lender. Notwithstanding any other provision of this Commitment Letter, (i) neither you nor any Indemnified Party shall be liable to any Indemnified Party or you, as the case may be, for any indirect, special, punitive or consequential damages in connection with your or its activities relating to or obligations pursuant to this Commitment Letter, the Term Sheet, the Fee Letter and the Bridge Facility; *provided* that this sentence shall not limit your indemnity obligations expressly provided in the immediately preceding paragraph (b) above; (ii) no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, other than for direct, actual damages resulting from the gross negligence or willful misconduct of such Indemnified Party as determined by a final, non-appealable judgment of a court of competent jurisdiction; and (iii) you shall not be responsible for the fees and expenses of more than one separate firm of attorneys for claims of the Indemnified Parties, taken as a whole, in each applicable jurisdiction (in addition to one separate firm of local attorneys in each jurisdiction and reasonably necessary specialty counsel (such as tax and regulatory)) and in the case of an actual or perceived conflict of interest, one additional counsel for the affected Indemnified Party in each appropriate jurisdiction. You shall not be liable for any settlement of any pending or threatened

5

Proceeding effected without your prior written consent (which consent shall not be unreasonably withheld); *provided* , *however* , that the foregoing indemnity will apply to any such settlement in the event that you were offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to assume such defense. You shall not, without the prior written consent of an Indemnified Party (which consent shall not be unreasonably withheld, delayed or conditioned), effect any settlement of any pending or threatened Proceeding against an Indemnified Party in respect of which indemnity could have been sought hereunder by such Indemnified Party unless (i) such settlement includes an unconditional release of such Indemnified Party from all liability or claims that are the subject matter of such Proceeding and (ii) does not include any statement as to any admission of fault, culpability or failure to act by or on behalf of an Indemnified Party. Each Indemnified Party will promptly notify you upon receipt of written notice of any claim or threat to institute a claim, *provided* that any failure by any Indemnified Party to give such notice shall not relieve you from the obligation to indemnify the Indemnified Parties unless such failure to provide such notice is prejudicial to your interests.

5. **Conditions to Financing.** The Initial Lenders' commitment hereunder, and each of our agreements to perform the services described herein, are subject only to the following conditions: (a)(x) except as set forth on the Disclosure Letter (as defined in the Acquisition Agreement), from April 29, 2016 to the date hereof there have not been any effects, events, occurrences, circumstances or changes that, individually or in the aggregate, have resulted or would reasonably be expected to result in an Acquired Business Material Adverse Effect and (y) since the date hereof, there has not been an Acquired Business Material Adverse Effect, (b) the execution and delivery of definitive documentation with respect to the Bridge Facility consistent with this Commitment Letter and the Fee Letter (the " *Credit Documentation* "), and (c) the satisfaction of other conditions set forth on Exhibit B.

For the purposes hereof, " *Acquired Business Material Adverse Effect* " means "Material Adverse Effect" as defined in the Acquisition Agreement.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Credit Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (a) the only representations relating to the Acquired Business, its subsidiaries and its businesses the accuracy of which shall be a condition to the availability of the Bridge Facility on the Closing Date shall be the representations made by or with respect to the Acquired Business and its subsidiaries in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have (or a subsidiary of yours has) the right to terminate your (or its) obligations under the Acquisition Agreement, or to decline to consummate the Acquisition pursuant to the Acquisition Agreement (as hereinafter defined), as a result of a breach of such representations in the Acquisition Agreement (the " *Acquisition Agreement Representations* "), (b) the only other representations the accuracy of which shall be a condition to availability of the Bridge Facility on the Closing Date shall be the Specified Representations (as hereinafter defined) and (c) the terms of the definitive documentation for the Bridge Facility shall be in a form such that the Bridge Facility is available on the Closing Date if the conditions set forth in clauses (a) through (c) of the first paragraph of this Section 5 of this Commitment Letter are satisfied. For purposes hereof, " *Specified Representations* " means the representations and warranties made by the Borrower in the Credit Documentation and set forth in the Term Sheet relating to corporate status, corporate power and authority to enter into the Credit Documentation, due authorization, execution, delivery and enforceability (subject to customary enforceability exceptions) of the Credit Documentation, no conflicts of the Bridge Facility with charter documents, the Revolving Credit Agreement or any debt instrument evidencing debt in an aggregate principal or committed (without duplication) amount outstanding of more than $100,000,000, Regulation U, the Investment Company Act, use of proceeds of the Bridge Facility not violating laws against sanctioned persons and foreign corrupt practices, and absence of payment and bankruptcy (as it related to the Borrower) events of default.

6

6. **Confidentiality and Other Obligations.** This Commitment Letter and the Fee Letter, and the contents hereof and thereof, are confidential and may not be disclosed by you in whole or in part to any person or entity without our prior written consent except (i) on a confidential basis to your accountants, attorneys and other professional advisors in connection with the Transactions and your officers, directors, employees and agents, (ii) pursuant to the order of any court or administrative agency in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process based on the reasonable advice of your legal counsel (in which case you agree to inform us promptly thereof to the extent not prohibited by law, rule or regulation), (iii) upon the request or demand of any regulatory authority having jurisdiction over you or any of your respective affiliates, (iv) in the case of the Commitment Letter and the contents hereof (but neither the Fee Letter nor the contents thereof) as you may determine is customary or reasonably advisable to comply with your obligations under securities and other applicable laws and regulations, including, without limitation, in connection with filings with the Securities and Exchange Commission, (v) to the extent requested by them, to Moody's, S&P and Fitch, Inc. (" *Fitch* ") on a confidential basis, (vi) the Term Sheet attached to this Commitment Letter to potential debt providers in coordination with us to obtain commitments to the Bridge Facility from such potential debt providers, (vii) to the extent that such information becomes publicly available other than by reason of disclosure in violation of this agreement by you, (viii) this Commitment Letter in any syndication or other marketing materials, prospectus or other offering memorandum, or any public or regulatory filing in each case relating to the Bridge Facility or the Senior Notes and (ix) the Commitment Letter and the Fee Letter (redacted in a customary manner reasonably satisfactory to us) on a confidential basis to the Seller, its officers, directors, employees and agents, accountants, attorneys and other professional advisors in connection with the Transactions. This paragraph shall terminate (as it relates to Commitment Letter but not as it relates to the Fee Letter) on the second anniversary of the date hereof.

The Commitment Parties shall use all confidential information provided to it by or on behalf of you hereunder solely for the purpose of providing the services which are the subject of this Commitment Letter and otherwise in connection with the Transactions and shall treat confidentially all such information; *provided* , *however* , that nothing herein shall prevent the Commitment Parties from disclosing any such information (i) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case the applicable Commitment Party agrees to inform you promptly thereof prior to such disclosure to the extent not prohibited by law, rule or regulation), (ii) upon the request or demand of any regulatory authority having jurisdiction over a Commitment Party or any of its affiliates, (iii) to the extent that such information becomes publicly available other than by reason of disclosure in violation of this agreement by a Commitment Party, (iv) to each Commitment Party's affiliates, employees, legal counsel, independent auditors and other experts or agents who need to know such information in connection with the Transactions and are informed of the confidential nature of such information, (v) for purposes of establishing a "due diligence" defense, (vi) to the extent that such information is received by a Commitment Party from a third party that is not to such Commitment Party's knowledge subject to confidentiality obligations to you, (vii) to the extent that such information is independently developed by a Commitment Party, (viii) to potential Lenders, participants or assignees who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph or as otherwise reasonably acceptable to you and the Commitment Parties, including as may be agreed in any confidential information memorandum or other marketing material), (ix) to the extent requested by them, to Moody's, S&P and Fitch on a confidential basis, and (x) to market data collectors, similar service providers to the lending industry, and service providers to Goldman Sachs and the Lenders in connection with the administration and management of the Bridge Facility; *provided* that such information is limited to the existence of this Commitment Letter and generic information about the Bridge Facility. This paragraph shall terminate on the second anniversary of the date hereof.

7

You acknowledge that the Commitment Parties or their respective affiliates may be providing financing or other services to parties whose interests may conflict with yours. Each Commitment Party agrees that it will not furnish confidential information obtained from you to any of its other customers and will treat confidential information relating to the Borrower, the Acquired Business and their respective affiliates with the same degree of care as it treats its own confidential information. Each Commitment Party further advises you that it will not make available to you confidential information that it has obtained or may obtain from any other customer. Subject to the preceding paragraph, you agree that in connection with the services and transactions contemplated hereby, each Commitment Party is permitted to access, use and share with any of its bank or non-bank affiliates, agents, advisors (legal or otherwise) or representatives any information concerning the Borrower, the Acquired Business or any of their respective affiliates that is provided to a Commitment Party by or on behalf of you or any of your representatives.

You acknowledge that, Goldman, Sachs & Co. has been retained by you (or one of your affiliates) as financial advisor (in such capacity, the " *Financial Advisor* ") in connection with the Acquisition. You agree to such retention, and further agree not to assert any claim you might allege based on any actual or potential conflicts of interest that might be asserted to arise or result from the engagement of the Financial Advisor, on the one hand, and our and our affiliates' relationships with you as described and referred to herein, on the other. Each additional Commitment Party that executes a Joinder Agreement or otherwise becomes party hereto after the date hereof acknowledges (i) the retention of Goldman, Sachs & Co. as the Financial Advisor and (ii) that such relationship does not create any fiduciary duties or fiduciary responsibilities to such additional Commitment Party on the part of Goldman Sachs or its affiliates.

In connection with all aspects of each transaction contemplated by this Commitment Letter, you acknowledge and agree, and acknowledge your affiliates' understanding, that: (i) the Bridge Facility and any related arranging or other services described in this Commitment Letter is an arm's-length commercial transaction between you and your affiliates, on the one hand, and the Commitment Parties, on the other hand, (ii) no Commitment Party has provided any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby, (iv) in connection with each transaction contemplated hereby and the process leading to such transaction, each Commitment Party has been, is, and will be acting solely as a principal and has not been, is not, and will not be acting as an advisor, agent or fiduciary, for you or any of your affiliates, stockholders, creditors or employees or any other party, (v) no Commitment Party has assumed and will not assume an advisory, agency or fiduciary responsibility in your or your affiliates' favor with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether a Commitment Party has advised or is currently advising you or your affiliates on other matters) and no Commitment Party has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth in this Commitment Letter and (vi) the Commitment Parties and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and no Commitment Party has any obligation to disclose any of such interests to you or your affiliates. To the fullest extent permitted by law, you hereby waive and release any claims that you may have against the Commitment Parties with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Commitment Letter.

As you know, Goldman Sachs (together with its affiliates, " **GS** ") is a full service financial institution engaged, either directly or through its affiliates, in a broad array of activities, including commercial and investment banking, financial advisory, market making and trading, investment management (both public and private investing), investment research, principal investment, financial planning, benefits counseling, risk management, hedging, financing, brokerage and other financial and non-financial activities and services globally. In the ordinary course of their various business activities, GS and funds or other entities in which GS invests or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of their customers. In addition, GS may at any time communicate independent recommendations and/or publish or express independent research views in respect of such assets, securities or instruments. Any of the aforementioned activities may involve or relate to assets, securities and/or instruments of you or the Acquired Business and/or other entities and persons which may (i) be involved in transactions arising from or relating to the arrangement contemplated by this Commitment Letter or (ii) have other relationships with you or your affiliates.

Each Commitment Party hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the " **U.S.A. Patriot Act** "), that it is required to obtain, verify and record information that identifies you, which information includes your name and address and other information, in accordance with the U.S.A. Patriot Act.

7. **Survival of Obligations.** The provisions of Sections 2, 3, 4, 6 and 8 shall remain in full force and effect regardless of whether any Credit Documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of the Commitment Parties hereunder, except that the provisions of paragraphs 2 and 3 shall not survive if the commitments and undertakings of the Commitment Parties are terminated prior to the effectiveness of the Bridge Facility; provided that (x) if the Credit Documentation becomes effective, the reimbursement, indemnification, choice of law, and waiver of jury trial provisions contained herein shall be superseded by the corresponding provisions of the Credit Documentation and (y) the syndication and information provisions shall terminate on the Syndication Date.

8. **Miscellaneous.** This Commitment Letter and the Fee Letter may be executed in multiple counterparts and by different parties hereto in separate counterparts, all of which, taken together, shall constitute an original. Delivery of an executed counterpart of a signature page to this Commitment Letter or the Fee Letter by telecopier, facsimile or other electronic transmission (e.g., a "pdf" or "tiff") shall be effective as delivery of a manually executed counterpart thereof. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Commitment Letter or the Fee Letter.

This Commitment Letter and the Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York. Each party hereto hereby irrevocably waives any and all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter, the Fee Letter, the Transactions and the other transactions contemplated hereby and thereby or the actions of the Commitment Parties in the negotiation, performance or enforcement hereof. Each party hereto hereby irrevocably and unconditionally submits to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City in respect of any suit, action or proceeding arising out of or relating to the provisions of this Commitment Letter or the Fee Letter and, with respect to any other suit, action or proceeding between the Borrower or any of its affiliates and an Indemnified Party arising out of or relating to the Transactions, and irrevocably agrees that all claims in respect of any such

9

suit, action or proceeding may be heard and determined in any such court. The parties hereto agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of process against you for any suit, action or proceeding relating to any such dispute. Each party hereto waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceedings brought in any such court, and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment.

This Commitment Letter, together with the Fee Letter, embodies the entire agreement and understanding among the parties hereto and your affiliates with respect to the Bridge Facility and supersedes all prior agreements and understandings relating to the subject matter hereof. No party has been authorized by the Commitment Parties to make any oral or written statements that are inconsistent with this Commitment Letter. Neither this Commitment Letter (including the attachments hereto) nor the Fee Letter may be amended or any term or provision hereof or thereof waived or modified except by an instrument in writing signed by you and us.

Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity) with respect to the subject matter contained herein, including an agreement to negotiate in good faith the Credit Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the funding of the Bridge Facility is subject to the conditions precedent set forth in Section 5 of this Commitment Letter and in Exhibit B hereto.

This Commitment Letter may not be assigned by you without our prior written consent (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and the Indemnified Parties). Each Initial Lender may assign all or a portion of its commitment hereunder to one or more Permitted Assignees; *provided* that no such assignment shall relieve such Initial Lender of its obligations hereunder, except to the extent such assignment is evidenced by (i) a Joinder Agreement or (ii) the Credit Documentation. In addition, all or any portion of the commitments hereunder may be assigned between GS Bank and GSLP (and such assignment shall relieve the assignor of its commitment hereunder to the extent of such assignment), and any reductions in the commitments of Goldman Sachs hereunder may be allocated between GS Bank and GSLP as they may decide in their sole discretion.

Any and all obligations of, and services to be provided by Goldman Sachs hereunder (including, without limitation, an Initial Lender's commitment) may be performed and any and all rights of Goldman Sachs hereunder may be exercised by or through any of its affiliates or branches and, in connection with such performance or exercise, Goldman Sachs may exchange with such affiliates or branches information concerning you and your affiliates that may be the subject of the transactions contemplated hereby and, to the extent so employed, such affiliates and branches shall be entitled to the benefits afforded to Goldman Sachs hereunder.

Please indicate your acceptance of the terms hereof and of the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter, and paying the fees specified in the Fee Letter to be payable upon acceptance of this Commitment Letter, by wire transfer of immediately available funds to the account specified by us, not later than 11:59 p.m. (New York City time) on April 18, 2017,

10

whereupon the undertakings of the parties with respect to the Bridge Facility shall become effective to the extent and in the manner provided hereby. This offer shall terminate with respect to the Bridge Facility if not so accepted by you at or prior to that time. Thereafter, all commitments and undertakings of the Commitment Party hereunder (or under the Credit Documentation, as applicable) will expire on the earliest of (a) the Outside Date (as defined in the Acquisition Agreement as in effect on the date hereof), (b) the closing of the Acquisition (after giving effect to the funding of the Bridge Facility on such date) or the execution of the Credit Documentation, (c) the date that the Acquisition Agreement expires in accordance with its terms or your or your applicable subsidiary's obligations to consummate the Acquisition under the Acquisition Agreement terminate in accordance with its terms or you inform us in writing that you have abandoned your pursuit of the Acquisition and (d) receipt by GS Bank of written notice from the Borrower of its election to terminate all commitments under the Bridge Facility in full.

[The remainder of this page intentionally left blank.]

11

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

GOLDMAN SACHS BANK USA

By: /s/ Robert Ehudin
    Name: Robert Ehudin
    Title: Authorized Signatory

GOLDMAN SACHS LENDING PARTNERS LLC

By: /s/ Robert Ehudin
    Name: Robert Ehudin
    Title: Authorized Signatory

[Project Fortis – Commitment Letter Signature Page]

Accepted and agreed to as of the date first written above:

CARDINAL HEALTH, INC.

By:  /s/ Michael Kaufmann

Name: Michael Kaufmann
Title: Chief Financial Officer

[Project Fortis – Commitment Letter Signature Page]

EXHIBIT A

**SUMMARY OF TERMS AND CONDITIONS**
**BRIDGE FACILITY**

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter to which this Exhibit A is attached.

| | |
|---|---|
| **Borrower:** | Cardinal Health, Inc., an Ohio corporation (the " ***Borrower*** "). |
| **Guarantors:** | None. |
| **Transactions:** | The Borrower intends to acquire (the " ***Acquisition*** ") assets and equity interests previously identified as "Fortis" (the " ***Acquired Business*** ") from Medtronic plc, an Irish public limited company (the " ***Seller*** "), pursuant to the Stock and Asset Purchase Agreement, dated as of April 18, 2017 (as amended in accordance with clause (i) of Exhibit B, the " ***Acquisition Agreement*** ") between the Borrower (or an Affiliate (as such term is defined in the Acquisition Agreement as in effect on the date hereof) of the Borrower to the extent the Borrower's rights and obligations under the Acquisition Agreement are assigned to such Affiliate prior to the Closing Date) and the Seller for an aggregate cash consideration set forth in the Acquisition Agreement as in effect on the date hereof (" ***Acquisition Consideration*** "). In connection with the Acquisition, the Borrower intends to (a) issue senior unsecured notes through a public offering or in a private placement (the " ***Senior Notes*** ") or borrow under a 364-day senior unsecured bridge term loan credit facility described below under the caption "Bridge Facility" and (b) pay the fees and expenses incurred in connection with the foregoing (including the Acquisition) (the " ***Transaction Costs*** "). The transactions described in this paragraph are collectively referred to herein as the " ***Transactions*** ". |
| **Administrative Agent:** | Goldman Sachs Bank USA (" ***GS Bank*** ") will act as sole and exclusive administrative agent for the Lenders (the " ***Administrative Agent*** "). |
| **Sole Lead Arranger and Sole Bookrunning Manager:** | GS Bank (in such capacity, the " ***Lead Arranger*** "). |
| **Lenders:** | GS Bank, Goldman Sachs Lending Partners LLC and other banks, financial institutions and institutional lenders selected in accordance with the terms of the Commitment Letter. |
| **Bridge Facility:** | A 364-day senior unsecured bridge term loan credit facility in an aggregate principal amount in U.S. dollars of up to $4.5 billion (the " ***Bridge Facility*** "). |

A-1

| | |
|---|---|
| **Purpose:** | The proceeds shall be used by the Borrower (i) to pay the Acquisition Consideration and (ii) to pay the Transaction Costs. |
| **Interest Rates and Fees:** | As set forth in Annex I hereto. |
| **Calculation of Interest and Fees:** | Other than calculations in respect of interest at the Base Rate (as defined on Annex I hereto) (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360-day year. |
| **Cost and Yield Protection:** | Substantially similar to the Amended and Restated Credit Agreement dated as of June 16, 2016 among the Borrower, JPMorgan Chase Bank, N.A. as administrative agent, and the other parties thereto (as in effect on the date hereof, the "*Revolving Credit Agreement*"). |
| | For purposes hereof, the term "substantially similar to the Revolving Credit Agreement" and words of similar import means substantially the same as the Revolving Credit Agreement as in effect on the date hereof with modifications (a) as are necessary to reflect the other terms specifically set forth in this Commitment Letter (including the nature of the Bridge Facility as a bridge facility) and the Fee Letter, (b) to reflect any changes in law or accounting standards since the date of the Revolving Credit Agreement and (c) to reflect the operational or administrative requirements of the Administrative Agent, as reasonably agreed by the Borrower. |
| **Maturity:** | The Bridge Facility will mature on the date that is 364 days after the Closing Date (the "*Maturity Date*"). |
| **Scheduled Amortization:** | None. |
| **Mandatory Prepayments and Commitment Reductions:** | On or prior to the Closing Date, the aggregate commitments in respect of the Bridge Facility under the Commitment Letter or under the Credit Documentation (as applicable) shall be permanently reduced, and after the Closing Date, the aggregate loans under the Bridge Facility shall be prepaid, in each case, dollar-for-dollar, by the following amounts, within one business day of receipt of such amount: |
| | (a) 100% of the Net Cash Proceeds (as defined below) actually received by the Borrower or any of its domestic subsidiaries after the Closing Date from all non-ordinary course asset sales or other dispositions of property by the Borrower and its domestic subsidiaries (including proceeds from the sale of stock of any domestic subsidiary of the Borrower), with exceptions for (i) the transfer or contribution of assets or equity interests among the Borrower and its subsidiaries, (ii) sales or other dispositions the Net Cash Proceeds of which individually (in any |

A-2

single transaction or series of related transactions) do not exceed $50,000,000 and (iii) other sales and dispositions the Net Cash Proceeds of which do not exceed $250,000,000 in the aggregate, in each case to the extent that such Net Cash Proceeds are not reinvested (or committed to be reinvested pursuant to a binding agreement) in the business of the Borrower or any of its subsidiaries within 9 months following receipt thereof;

(b) 100% of the Net Cash Proceeds actually received by the Borrower or any of its domestic subsidiaries after the date of the Commitment Letter from any incurrence of debt for borrowed money (including, without limitation, any Senior Notes) by the Borrower or any of its domestic subsidiaries, other than Excluded Debt. For purposes hereof, " *Excluded Debt* " shall mean (i) any intercompany debt of the Borrower or any of its subsidiaries, (ii) any debt of the Borrower or any of its subsidiaries incurred in the ordinary course under Revolving Credit Agreement or any other ordinary course borrowings under working capital, overdraft or other revolving or other debt facilities, (iii) debt facilities relating to customer loan programs, (iv) any commercial paper issued in the ordinary course of business, (v) any debt of the Borrower or any of its subsidiaries incurred in the ordinary course under the Fourth Amended and Restated Receivables Purchase Agreement dated as of November 1, 2013 among Cardinal Health Funding, LLC, Griffin Capital, LLC, The Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch, as the agent and the other parties thereto, as amended (the " *Receivables Purchase Agreement* "), (vi) factoring arrangements, capital leases, financial leases, hedging and cash management arrangements, repurchase agreements and reverse repurchase agreements, including the renewal, replacement, increase, extension or refinancing of each of the foregoing, (vii) ordinary course purchase money and equipment financings and similar obligations, including the renewal, replacement, increase, extension or refinancing of each of the foregoing, (viii) any debt assumed or acquired in connection with the Acquisition, (ix) other debt to be mutually agreed and (x) any debt incurred to refinance, replace, repay, redeem, or extend the foregoing (other than clause (viii) above) that does not increase the aggregate committed or principal amount thereof; provided that in the case of the Revolving Credit Agreement, the Receivables Purchase Agreement or any commercial paper issued in the ordinary course of business, such refinancing, replacement, repayment, redemption or extension is funded with substantially similar debt obligations; and

(c) 100% of the Net Cash Proceeds actually received by the Borrower from any issuance of equity or equity-linked securities (in a public offering or private placement) by the Borrower, other than (i) equity or equity-linked securities issued in connection with employee stock option plans or similar equity-based compensation or pension plans, (ii) equity or equity-linked securities issued in connection with the funding of an acquisition or the making of an investment by the Borrower or any of its subsidiaries (other than the Acquisition), (iii) upon vesting,

A-3

exercise, exchange or conversion of restricted stock units, performance stock units, options or other rights to acquire shares of common stock, (iv) to or by a subsidiary of Borrower to any other subsidiary of Borrower, and (v) other issuances of equity or equity-linked securities the Net Cash Proceeds of which do not exceed $100,000,000 in the aggregate.

" Net Cash Proceeds " shall mean:

(a) with respect to a sale or other disposition of any assets of the Borrower or any of its domestic subsidiaries, the excess, if any, of (i) the cash received in connection therewith (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) payments made to retire any debt that is secured by such asset and that is required to be repaid in connection with the sale thereof (other than loans under the Bridge Facility), (B) the reasonable expenses incurred by the Borrower or any of its subsidiaries in connection therewith, (C) taxes reasonably estimated to be payable in connection with such transaction, and (D) the amount of reserves established by the Borrower or any of its subsidiaries in good faith and pursuant to commercially reasonable practices for adjustment in respect of the sale price of such asset or assets in accordance with applicable generally accepted accounting principles, provided that if the amount of such reserves exceeds the amounts charged against such reserve, then such excess, upon the determination thereof, shall then constitute Net Cash Proceeds;

(b) with respect to the issuances, offerings of placements of debt obligations, the excess, if any, of (i) cash received by the Borrower or any of its domestic subsidiaries in connection with such issuance over (ii) the sum of (A) payments made to retire any debt that is required to be repaid in connection with such issuance (other than loans under the Bridge Facility), and (B) the underwriting discounts and commissions and other reasonable expenses incurred by the Borrower or any of its subsidiaries in connection with such issuance; and

(c) with respect to the issuances of equity or equity-linked securities, the excess, if any, of (i) cash received by the Borrower in connection with such issuance over (ii) the underwriting discounts and commissions and other reasonable expenses incurred by the Borrower or any of its subsidiaries in connection with such issuance.

In addition, the commitments shall terminate on the earliest of (x) the Outside Date (as defined in the Acquisition Agreement as in effect on the date hereof), (y) the closing of the Acquisition (after giving effect to the funding of the Bridge Facility on such date), and (z) the date that the Acquisition Agreement expires in accordance with its terms or the date that the Borrower's or the Borrower's applicable subsidiary's obligations to consummate the Acquisition under the Acquisition

A-4

Agreement are terminated in accordance with its terms or the Borrower informs the Administrative Agent in writing that it has abandoned its pursuit of the Acquisition.

The Borrower shall provide the Administrative Agent with prompt written notice of any mandatory prepayment or commitment reduction required by this section.

|                                                          |                                                                                                                                                                                                                                                                                                                                                                                                                       |
|----------------------------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **Optional Prepayments and Commitment Reductions:**      | The Bridge Facility may be prepaid at any time in whole or in part without premium or penalty, upon written notice, at the option of the Borrower, except that any prepayment of Eurodollar Rate advances other than at the end of the applicable interest periods therefor shall be made with reimbursement for any funding losses and redeployment costs of the Lenders resulting therefrom. The commitment under the Bridge Facility may be reduced permanently or terminated by the Borrower at any time without penalty. |
| **Conditions Precedent to Borrowing on the Closing Date:** | The borrowing under the Bridge Facility on the Closing Date will be subject solely to the conditions precedent set forth in Section 5 of the Commitment Letter and Exhibit B to the Commitment Letter. |
| **Representations and Warranties:**                      | Substantially similar to the Revolving Credit Agreement and limited to the following: (i) Existence and Standing; (ii) Authorization and Validity; (iii) No Conflict; Government Consent; Other Consents (provided that such representations with respect to conflicts with law, government consents and creation of liens in the definitive documentation for the Bridge Facility shall be subject to a material adverse effect standard); (iv) Financial Statements; (v) Material Adverse Change; (vi) Taxes; (vii) Litigation and Contingent Obligations; (viii) Subsidiaries; (ix) ERISA; (x) Accuracy of Information; (xi) Regulation U; (xii) Maintenance of Property; (xiii) Insurance; (xiv) Plan Assets; Prohibited Transactions; (xv) Environmental Matters; (xvi) Investment Company Act; (xvii) Default; (xviii) Compliance with Laws and (xiv) Anti-Corruption Laws and Sanctions. |
| **Covenants:**                                           | Substantially similar to the Revolving Credit Agreement and limited to the following: |

(a) *Affirmative Covenants:* (i) Financial Reporting; (ii) Use of Proceeds; Margin Stock; (iii) Notice of Default; (iv) Conduct of Business; Maintenance of Property, Books and Records; (v) Taxes; (vi) Insurance; (vii) Compliance with Laws; and (viii) Inspection.

A-5

(b) *Negative Covenants:* (i) Liens; (ii) Subsidiary Indebtedness and (iii) Contingent Obligations.

(c) *Financial Covenant:*

- Maximum Consolidated Leverage Ratio calculated in a manner substantially similar to the Revolving Credit Agreement, which will be amended pursuant to the Revolver Amendment to increase the Maximum Consolidated Leverage Ratio to 4.25 to 1.00 for a period of 12 months after the Closing Date, then stepping down to 3.75 to 1.00 for a period of 6 months thereafter, and then further stepping down to 3.25 to 1.00 thereafter; *provided* that if the Revolver Amendment is not effective on or before the Closing Date, the Maximum Consolidated Leverage Ratio shall be calculated in a manner substantially similar to the Revolving Credit Agreement as in effect on the Closing Date).

**Events of Default:** Substantially similar to the Revolving Credit Agreement and limited to the following: (i) inaccuracy of any representation or warranty in any material respect; (ii) nonpayment of principal interest, fee or other amounts; (iii) breach of notice of default or financial covenants; (iv) breach of terms or provisions of the Credit Documentation (with 30-day grace period after written notice from Administrative Agent); (v) cross-payment default and cross-acceleration; (vi) bankruptcy or insolvency defaults; (vii) monetary judgment defaults and material non-monetary judgment defaults; (viii) customary ERISA defaults; (ix) change of control; and (x) actual or asserted impairment of the Credit Documentation.

**Assignments and Participations:** Substantially similar to the Revolving Credit Agreement (subject, in the case of assignments prior to the Closing Date, to the provisions of the Commitment Letter (which for the avoidance of doubt shall apply to all Lenders), and provided that in no event will any assignment or participation be permitted to Disqualified Lenders). Notwithstanding the foregoing, to the extent that prior to the Closing Date commitments with respect to the Bridge Facility have been syndicated to a person that is not a Permitted Assignee as permitted by the Commitment Letter, the Initial Lenders may assign the corresponding Loans to such person following the funding of such Loans on the Closing Date without the consent of the Borrower.

**Waivers and Amendments:** Substantially similar to the Revolving Credit Agreement.

**Indemnification:** Substantially similar to the Revolving Credit Agreement, but having the scope and subject to qualifications and exceptions consistent with those provided in the Commitment Letter.

A-6

**Governing Law:**                                   New York.

**Expenses:**                                        Substantially similar to the Revolving Credit Agreement.

**Counsel to the Administrative Agent:**             Davis Polk & Wardwell LLP.

**Choice of Law; Consent to Jurisdiction;**
**Waiver Of Jury Trial:**                            Substantially similar to the Revolving Credit Agreement.

A-7

**ANNEX I
TO EXHIBIT A**

| | |
|---|---|
| **Interest Rates:** | The interest rates per annum applicable to the Bridge Facility will be, at the option of the Borrower (i) Eurocurrency Rate (calculated on a 360-day basis) *plus* the Applicable LIBOR Margin (as hereinafter defined) or (ii) the Base Rate (calculated on a 365/366-day basis) *plus* the Applicable Base Rate Margin (as hereinafter defined). |
| | The Borrower may select interest periods of one, two, three or six months (and, if agreed to by all relevant Lenders, twelve months) for Eurocurrency Rate advances. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly. |
| | " ***Eurocurrency Rate*** " and " ***Base Rate*** " will be defined substantially similar to the manner in which they are defined in the Revolving Credit Agreement and shall include a 0% floor in each case. |
| **Default Interest:** | During the continuance of an event of default, the Required Lenders may, at their option and by prior written notice to the Borrower, declare that each loan shall bear interest for the remainder of the applicable interest period at the rate otherwise applicable to such loan plus 2%; *provided* that such default interest rate shall apply automatically upon a bankruptcy or insolvency-related event of default. |

**Applicable LIBOR Margin:**

| Level Status | Level I Status | Level II Status | Level III Status | Level IV Status | Level V Status |
|---|---|---|---|---|---|
| Reference Rating S&P/ Moody's/ Fitch* | ≥ A/A2/A | A-/A3/A- | BBB+/Baa1/ BBB+ | BBB/Baa2/ BBB | ≤ BBB–/Baa3/ BBB- |
| Closing Date through 89 days following the Closing Date | 75.0 bps | 87.5 bps | 112.5 bps | 125.0 bps | 150.0 bps |
| 90th day following the Closing Date through 179th day following the Closing Date | 100.0 bps | 112.5 bps | 137.5 bps | 150.0 bps | 175.0 bps |
| 180th day following the Closing Date through 269th day following the Closing Date | 125.0 bps | 137.5 bps | 162.5 bps | 175.0 bps | 200.0 bps |
| From the 270th day following the Closing Date | 150.0 bps | 162.5 bps | 187.5 bps | 200.0 bps | 225.0 bps |

A-I-1

\* For the purpose hereof and the definition of "Applicable Ticking Fee Rate" below, the following terms have the following meanings, subject to the final three paragraphs of this section:

" *Fitch Rating* " means, at any time, the rating issued by Fitch and then in effect with respect to the Borrower's senior unsecured long-term debt securities without third-party credit enhancement.

" *Level I Status* " exists at any date if, on such date, the Borrower's Moody's Rating is A2 or better / the Borrower's S&P Rating is A or better / the Borrower's Fitch Rating is A or better.

" *Level II Status* " exists at any date if, on such date, the Borrower has not qualified for Level I Status / the Borrower's Moody's Rating is A3 or better / the Borrower's S&P Rating is A- or better / the Borrower's Fitch Rating is A- or better.

" *Level III Status* " exists at any date if, on such date, the Borrower has not qualified for Level I Status or Level II Status / the Borrower's Moody's Rating is Baa1 or better / the Borrower's S&P Rating is BBB+ or better / the Borrower's Fitch Rating is BBB+ or better.

" *Level IV Status* " exists at any date if, on such date, the Borrower has not qualified for Level I Status, Level II Status or Level III Status / the Borrower's Moody's Rating is Baa2 or better / the Borrower's S&P Rating is BBB or better / the Borrower's Fitch Rating is BBB or better.

" *Level V Status* " exists at any date if, on such date, the Borrower has not qualified for Level I Status, Level II Status, Level III Status or Level IV Status.

" *Moody's Rating* " means, at any time, the rating issued by Moody's and then in effect with respect to the Borrower's senior unsecured long-term debt securities without third-party credit enhancement.

" *Public Debt Rating* " means any of the Fitch Rating, the Moody's Rating and the S&P Rating, as applicable.

" *S&P Rating* " means, at any time, the rating issued by S&P, and then in effect with respect to the Borrower's senior unsecured long-term debt securities without third-party credit enhancement.

" *Status* " means Level I Status, Level II Status, Level III Status, Level IV Status, Level V Status or Level VI Status.

The Applicable LIBOR Margin shall be determined in accordance with the foregoing table based on the Borrower's Status as determined from its then-current Moody's, S&P and Fitch Ratings. The credit rating in effect on any date for the purposes of this Schedule is that in effect at the close of business on such date. If at any time the Borrower only has one (1) rating from either S&P, Moody's or Fitch, then such rating shall apply. If at any time the Borrower does not have a rating from at least one of S&P, Moody's or Fitch, Level V Status shall exist.

In the event that a split occurs between the three (3) ratings, then the following shall apply:

(a) if two (2) of the three (3) ratings established by or deemed to have been established by S&P, Moody's or Fitch fall within the same Level, but one (1) rating falls within a different Level, the Applicable LIBOR Margin shall be based upon the two (2) ratings that fall within the same Level; and

(b) if all three (3) ratings established by or deemed to have been established by S&P, Moody's or Fitch each fall within a different Level, the Applicable LIBOR Margin shall be based upon the middle rating of the three (3).

A-I-2

In the event that the Borrower has only two (2) ratings and a split occurs between these ratings, then the following shall apply:

(a) if the two (2) ratings established by or deemed to have been established by S&P, Moody's or Fitch differ by one Level, the Applicable LIBOR Margin shall be based upon the higher rating of the two (2); and

(b) if the two (2) ratings established by or deemed to have been established by S&P, Moody's or Fitch differ by more than one Level, the Applicable LIBOR Margin shall be based upon a rating that would be one Level higher (with Level I being the highest Level and Level V being the lowest level) than the lower rating.

| | |
|---|---|
| **Applicable Base Rate Margin** : | The greater of (i) 0% and (ii) the Applicable LIBOR Margin *minus* 1.0%. |
| **Duration Fees:** | The Borrower will pay a fee (the " ***Duration Fee*** "), for the ratable benefit of the Lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans under the Bridge Facility outstanding on the date which is 90 days after the Closing Date, due and payable in cash on such 90th day (or if such day is not a business day, the next business day); (ii) 0.75% of the aggregate principal amount of the loans under the Bridge Facility outstanding on the date which is 180 days after the Closing Date, due and payable in cash on such 180th day (or if such day is not a business day, the next business day); and (iii) 1.00% of the aggregate principal amount of the loans under the Bridge Facility outstanding on the date which is 270 days after the Closing Date, due and payable in cash on such 270th day (or if such day is not a business day, the next business day). |
| **Undrawn Fees:** | The Borrower will pay a fee (the " ***Ticking Fee*** "), for the ratable benefit of the Lenders, in an amount equal to a rate *per annum* equal to the Applicable Ticking Fee Rate as determined based on the Borrower's Status as in effect on the date of the Commitment Letter (the " ***Commitment Date*** ") *times* the actual daily undrawn portion of the commitments in respect of the Bridge Facility, calculated based on the number of days (if any) elapsed in a 360-day year, from and including the later of (x) the date of execution of the Credit Documentation and (y) the day that is 60 days after the date of execution of the Commitment Letter to but excluding the Fee Payment Date (as defined below), payable upon the earlier of (i) termination or expiration of the commitments under the Bridge Facility and (ii) the Closing Date (the " ***Fee Payment Date*** "). |

A-I-3

To the extent that, after the Commitment Date, the rating agencies update the Public Debt Ratings (pro forma for all or a portion of the Transactions) on or prior to the earlier of the termination of the commitments and the date that is three business days after the Closing Date (the date of such change in Public Debt Ratings, the " *Ratings Date* ") such that the Borrower's Status on the Ratings Date is lower than its Status on the Commitment Date, you agree that the Ticking Fee payable hereunder shall be adjusted to reflect such lower Status (as if such lower Status had been in effect on the Commitment Date) and to pay to the Administrative Agent for the account of each Lender on the later of the Fee Payment Date and the date that is three business days after the Ratings Date such additional amounts as may be necessary to reflect such incremental Ticking Fee that would have been payable had the Borrower's Status on the Ratings Date been in effect on the Commitment Date.

**Applicable Ticking Fee Rate** :

| Level Status | Level I Status | Level II Status | Level III Status | Level IV Status | Level V Status |
|---|---|---|---|---|---|
| Reference Rating S&P/ Moody's/ Fitch* | $\geq$ A/A2/A | A-/A3/A- | BBB+/Baa1/ BBB+ | BBB/Baa2/ BBB | $\leq$ BBB–/Baa3/ BBB- |
| Applicable Ticking Fee Rate | 7.0 bps | 8.0 bps | 10.0 bps | 12.5 bps | 20.0 bps |

A-I-4

**EXHIBIT B**

**CONDITIONS PRECEDENT TO CLOSING**

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter to which this Exhibit B is attached.

The initial borrowing under the Bridge Facility will be subject to the following additional conditions precedent:

(i) The Acquisition Agreement (including all schedules and exhibits thereto) shall be satisfactory to the Lead Arranger (it being understood that the Acquisition Agreement (including all schedules and exhibits thereto) delivered to the Lead Arranger on April 18, 2017 is satisfactory). The Acquisition shall be consummated substantially concurrently with the closing under the Bridge Facility in accordance with the Acquisition Agreement after giving effect to any modifications, amendments, consents or waivers thereto, other than those modifications, amendments, consents or waivers by you that are materially adverse to the Lenders or the Lead Arranger without the Lead Arranger's prior written consent, it being understood and agreed that (x) any decrease in the Acquisition Consideration by more than 15%, unless applied to reduce commitments with respect to the Bridge Facility on a dollar-for-dollar basis and (y) any modification to the definition of "Acquired Business Material Adverse Effect", in each case, shall be deemed to be materially adverse to the interests of the Lenders.

(ii) (x) The Lead Arranger shall have received for the Borrower (a) U.S. GAAP audited consolidated balance sheets and related statements of earnings, shareholders' equity and cash flows for the three most recent fiscal years ended at least 60 days prior to the Closing Date and (b) U.S. GAAP unaudited consolidated balance sheets and related statements of earnings and cash flows for each subsequent fiscal quarter ended at least 40 days before the Closing Date. The Lead Arranger hereby acknowledges receipt of the financial statements in the foregoing clause (a) for the fiscal years ended June 30, 2016, June 30, 2015 and June 30, 2014, and in the foregoing clause (b) for the fiscal quarters ended September 30, 2016 and December 31, 2016. The Borrower's filing of any required audited financial statements with respect to the Borrower on Form 10-K or required unaudited financial statements with respect to the Borrower on Form 10-Q, in each case, will satisfy the requirements under clauses (a) or (b), as applicable, of this paragraph.

(iii) (A) The Administrative Agent shall have received customary legal opinions, corporate organizational documents of the Borrower, a good standing certificate of the Borrower, resolutions of the appropriate governing body with respect to the Borrower, a customary closing certificate with respect to the Borrower and an appropriate borrowing notice and (B) the Acquisition Agreement Representations and the Specified Representations shall be true and correct in all material respects.

(iv) The Lead Arranger, the Administrative Agent and the Lenders shall have received all fees and expenses required to be paid on or prior to the Closing Date pursuant to the Fee Letter and invoiced to the Company at least three business days prior to the Closing Date.

B-1

(v) The Lead Arranger shall have received, at least three business days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act requested by the Lead Arranger at least ten business days prior to the Closing Date.

B-2

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

Media:    Ellen Barry                                          Investors:    Sally Curley
          (614) 553-3858                                                      (614) 757-7115
          ellen.barry@cardinalhealth.com                                     sally.curley@cardinalhealth.com

### Cardinal Health to Acquire Leading Patient Product Portfolio from Medtronic for $6.1 Billion

- *Increases Cardinal Health's product breadth in consumable medical products*

- *Creates additional geographic scale and scope and expands existing channel reach into the operating room and long-term care*

DUBLIN, Ohio, April 18, 2017 — Cardinal Health (NYSE:CAH) today announced that it has entered into a definitive agreement to acquire Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses for $6.1 billion in cash. The purchase price does not include cash tax benefits of at least $100 million. The acquisition is expected to be financed with a combination of $4.5 billion in new senior unsecured notes and existing cash. The transaction is expected to close in the first quarter of Cardinal Health's fiscal year 2018, subject to customary closing conditions, including regulatory clearances.

The Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses encompass 23 product categories across multiple market settings, including numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo, which are used in nearly every U.S. hospital. Total revenues for the businesses were $2.3 billion for the 12 months ending October 2016 with more than 70 percent of total sales in the U.S.

Cardinal Health expects the acquisition to be accretive to non-GAAP [1] diluted earnings per share from continuing operations by more than $0.21 per share in fiscal 2018, which includes approximately $100 million of inventory step-up costs during the first few quarters following closing. This is net of estimated incremental annual financing-related interest expense of up to $0.39, subject to change based on the company's ultimate bond pricing and tax rate. The company expects the acquisition to be accretive to non-GAAP diluted earnings per share by more than $0.55 per share in fiscal 2019, and increasingly accretive thereafter. By the end of fiscal 2020, the company assumes synergies will exceed $150 million annually.

"We are thrilled about today's announcement, as this well-established product line is complementary to our medical consumables business and fits naturally into our customer offering. For this reason, this product portfolio has been on our radar for many years," said George S. Barrett, Cardinal Health chairman and CEO. "We distribute some of these products today and have been collaborative partners with the leadership of this business. Given the current trends in healthcare, including aging demographics and a focus on post-acute care, this industry-leading portfolio will help us further expand our scope in the operating room, in long-term care facilities and in home healthcare, reaching customers across the entire continuum of care.

"We're also looking forward to welcoming the more than 10,000 employees across these businesses who share our dedication to serving customers and their patients by providing high-quality products and services."

Once the transaction is complete, the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses will become part of Cardinal Health's Medical segment, which is led by Don Casey, the segment's chief executive officer.

"Not only is this portfolio complementary to our existing suite of products, it enables us to build further scale on our established global platforms," said Casey. "We are familiar with the talented team who will be joining us and have worked closely with many of them in the past. We believe this will help us execute an efficient and seamless integration after the transaction closes. These leading products perfectly complement Cardinal Health's position in a value-based world, bringing additional reach and breadth that build on our existing strengths."

Cardinal Health plans to issue long-term debt to finance the transaction and has obtained a commitment letter from Goldman Sachs Bank USA and Goldman Sachs Lending Partners LLC to provide a $4.5 billion unsecured bridge loan.

Goldman, Sachs & Co. and Perella Weinberg Partners LP served as Cardinal Health's financial advisors on this transaction, and Skadden, Arps, Slate, Meagher & Flom LLP and Jones Day served as its legal advisors.

For more information on the acquisition, visit the Investor Relations page at ir.cardinalhealth.com.

Cardinal Health_Acquisition Fact Sheet - LINK

Cardinal Health_Transaction Slide Presentation - LINK

**Conference Call**

Please also reference an additional release issued today by Cardinal Health entitled, "Cardinal Health updates fiscal 2017 guidance; provides early outlook for future fiscal years."

Cardinal Health will host a webcast and a conference call today at 8:30 a.m. Eastern to discuss both of today's announcements. To access the call and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com. The call also can be accessed by dialing 913-312-1502, passcode #2495375. There is no pre-registration for the call; however, participants are advised to dial into the call at least 10 minutes prior to the start time.

Presentation slides and an audio replay will be archived on the website after the conclusion of the meeting. The audio replay will be available until Tuesday, April 25 at 12 p.m. Eastern at 719-457-0820, passcode #2495375.

**Non-GAAP financial measures (including footnote)**

Footnote (1) Expected accretion to non-GAAP diluted earnings per share from continuing operations reflects: (A) earnings from continuing operations, excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax, (B) divided by diluted weighted average shares outstanding.

Cardinal Health presents non-GAAP diluted earnings per share from continuing operations on a forward-looking basis. The most directly comparable forward-looking GAAP measure is diluted earnings per share from continuing operations. Cardinal Health is unable to provide a quantitative reconciliation of this forward-looking non-GAAP measure to the most directly comparable forward-looking GAAP measure, because Cardinal Health cannot reliably forecast LIFO charges/(credits), restructuring and employee severance, amortization and acquisition-related costs (which Cardinal Health expects to increase significantly as a result of the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses), impairments and (gain)/loss on disposal of assets and litigation (recoveries)/charges, net, which are difficult to predict and estimate. Please note that the unavailable reconciling items could significantly impact Cardinal Health's future financial results. These items could cause earnings per share and the accretion to earnings per share to differ materially from the company's non-GAAP expectations.

## About Cardinal Health

Cardinal Health Inc. is a global, integrated healthcare services and products company, providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. Backed by nearly 100 years of experience, with more than 40,000 employees in nearly 60 countries, Cardinal Health ranks among the top 25 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter and connect on LinkedIn at linkedin.com/company/cardinal-health .

## Cautions Concerning Forward-Looking Statements

This release contains forward-looking statements addressing Cardinal Health's plans to acquire Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses and other statements about future expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include: the ability to successfully complete the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the conditions of the credit markets and the company's ability to issue debt to fund the acquisition on acceptable terms; if the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses is completed, the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into Cardinal Health's operations, and the ability to achieve the expected synergies as well as accretion in earnings; competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and branded pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws, including proposals relating to a "border adjustment tax" or new import tariffs; changes in the distribution patterns or reimbursement rates for health care products and services; the

effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This release reflects management's views as of April 18, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**- 30 -**

Exhibit 99.2



**FOR IMMEDIATE RELEASE**

Media:    Ellen Barry                                    Investors:    Sally Curley
          (614) 553-3858                                               (614) 757-7115
          ellen.barry@cardinalhealth.com                               sally.curley@cardinalhealth.com

**Cardinal Health updates fiscal 2017 guidance;**
**Provides early outlook for future fiscal years**

DUBLIN, Ohio, April 18, 2017 — Cardinal Health (NYSE:CAH) today is updating its Non-GAAP [1] fiscal 2017 earnings per share (EPS) guidance and providing a preliminary view on fiscal 2018 and 2019. This is in conjunction with this morning's announcement of the planned acquisition of Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses.

Cardinal Health now believes that fiscal 2017 Non-GAAP EPS from continuing operations will be at the bottom of its previous guidance range of $5.35 to $5.50, with the EPS update attributable to expected fourth-quarter results. This takes into consideration generic deflation, which the company now expects to be in the low-double digits for the full fiscal year.

Using the updated fiscal 2017 guidance as a base, Cardinal Health's preliminary fiscal 2018 view is for Non-GAAP EPS to be flat to down mid-single digits.

The company's early fiscal 2018 outlook reflects the following:

- A significant increase in the Medical segment's profit, including the contributions from the acquisition announced today. This acquisition is expected to contribute at least $0.21 Non-GAAP EPS accretion in fiscal 2018, assuming a first-quarter fiscal 2018 close,

- Several company-specific discrete items that, in the aggregate, will have a negative impact on EPS of at least $0.50, approximately half of which is reflected in the Pharmaceutical segment decline mentioned below, and

- While the company expects generic deflation to moderate to mid-single digits in fiscal 2018, this deflation is still a headwind for the Pharmaceutical segment for the year. This, combined with the discrete items mentioned above, could result in an estimated Pharmaceutical segment profit decline in the high-single digits versus fiscal 2017.

In addition, fiscal 2019 Non-GAAP EPS is expected to grow at least high-single digits versus fiscal 2018.

The company expects to provide an update to its fiscal 2018 preliminary outlook at its fourth-quarter earnings call later this year.

**Conference Call**

Please also reference today's release entitled "Cardinal Health to Acquire Leading Patient Product Portfolio from Medtronic for $6.1 Billion."

Cardinal Health will host a webcast and a conference call today at 8:30 a.m. Eastern to discuss both of today's announcements. To access the call and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com. The call also can be accessed by dialing 913-312-1502, passcode #2495375. There is no pre-registration for the call; however, participants are advised to dial into the call at least 10 minutes prior to the start time.

**Cardinal Health**
**Page 2**

Presentation slides and an audio replay will be archived on the website after the conclusion of the meeting. The audio replay will be available until Tuesday, April 25 at 12 p.m. Eastern at 719-457-0820, passcode #2495375.

**Non-GAAP Financial Measures (including footnote)**

Footnote (1) Non-GAAP diluted earnings per share from continuing operations: (A) earnings from continuing operations, excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax, (B) divided by diluted weighted average shares outstanding. Cardinal Health presents Non-GAAP diluted earnings per share from continuing operations on a forward-looking basis. The most directly comparable forward-looking GAAP measure is diluted earnings per share from continuing operations. Cardinal Health is unable to provide a quantitative reconciliation of this forward-looking Non-GAAP measure to the most directly comparable forward-looking GAAP measure, because Cardinal Health cannot reliably forecast LIFO charges/(credits), restructuring and employee severance, amortization and acquisition-related costs (which Cardinal Health expects to increase significantly as a result of the acquisition of Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses), impairments and (gain)/loss on disposal of assets and litigation (recoveries)/charges, net, which are difficult to predict and estimate. Please note that the unavailable reconciling items could significantly impact Cardinal Health's future financial results. These items could cause EPS and the accretion to EPS to differ materially from the company's Non-GAAP expectations.

**About Cardinal Health**

Cardinal Health Inc. is a global, integrated healthcare services and products company, providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically-proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. Backed by nearly 100 years of experience, with more than 40,000 employees in nearly 60 countries, Cardinal Health ranks among the top 25 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter and connect on LinkedIn at linkedin.com/company/cardinal-health .

**Cautions Concerning Forward-Looking Statements**

This release contains forward-looking statements addressing Cardinal Health's plans to acquire Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses and other statements about future expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include: the ability to successfully complete the acquisition of the Patient Care, Deep Vein

**Cardinal Health**
**Page 3**

Thrombosis and Nutritional Insufficiency businesses on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the conditions of the credit markets and the company's ability to issue debt to fund the acquisition on acceptable terms; if the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses is completed, the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired business into Cardinal Health's operations, and the ability to achieve the expected synergies as well as accretion in earnings; competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and branded pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws, including proposals relating to a "border adjustment tax" or new import tariffs; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This release reflects management's views as of April 18, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**- 30 -**

# EXHIBIT 71

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**May 1, 2017**

**Date of Report**

**(Date of earliest event reported)**

# Cardinal Health, Inc.

(Exact name of registrant as specified in its charter)

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place, Dublin, Ohio 43017**

(Address of principal executive offices) (Zip Code)

**(614) 757-5000**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instructions A.2. below):

☐      Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐      Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐      Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d2(b))

☐      Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

## Item 2.02: Results of Operations and Financial Condition

On May 1, 2017 , Cardinal Health, Inc. (the "Company") issued a news release announcing its results for the quarter ended March 31, 2017 . A copy of the news release is included as Exhibit 99.1 to this report.

## Item 7.01: Regulation FD Disclosure

During a webcast scheduled to be held at 8:30 a.m. Eastern time on May 1, 2017 , the Company's Chairman and Chief Executive Officer and Chief Financial Officer will discuss the Company's results for the quarter ended March 31, 2017 and outlook for the fiscal year ending June 30, 2017 . The slide presentation for the webcast will be available on the Investors page at ir.cardinalhealth.com . An audio replay of the webcast also will be available on the Investors page at ir.cardinalhealth.com .

## Item 9.01: Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 99.1 | News release issued by the Company on May 1, 2017 announcing third-quarter results. |

2

# Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Cardinal Health, Inc.**

(Registrant)

Date: May 1, 2017　　　　　　　　　　By:　　/s/ Michael C. Kaufmann

Michael C. Kaufmann

Chief Financial Officer

3

# Exhibit Index

| Exhibit Number | Exhibit Description |
|---|---|
| 99.1 | News release issued by the Company on May 1, 2017 announcing third-quarter results. |

4

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

| | | | |
|---|---|---|---|
| Media: | Ellen Barry | Investors: | Lisa Capodici |
| | (614) 553-3858 | | (614) 757-5035 |
| | ellen.barry@cardinalhealth.com | | lisa.capodici@cardinalhealth.com |

# Cardinal Health Reports Third-quarter Results for Fiscal Year 2017

- **Revenue increased 4 percent to $31.8 billion**
- **GAAP [1] diluted earnings per share increased 3 percent to $1.20 , and non-GAAP diluted earnings per share increased 7 percent to $1.53**

**DUBLIN, Ohio, May 1, 2017** - Cardinal Health (NYSE: CAH) today reported third-quarter fiscal year 2017 revenues of $31.8 billion , an increase of 4 percent . The company also reported a decline in GAAP operating earnings of 8 percent to $605 million and in non-GAAP operating earnings of 4 percent to $759 million . GAAP diluted earnings per share (EPS) increased 3 percent to $1.20 , while non-GAAP diluted EPS increased 7 percent to $1.53 .

"The third quarter came in largely as we expected, in a dynamic market environment, as we noted a few weeks ago," said George S. Barrett, chairman and chief executive officer of Cardinal Health. "Many of our lines of business continue to perform well, particularly naviHealth, our medical/surgical consumables lines, and our Specialty Solutions group. We are also extremely excited about our recent announcement to acquire Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses. These product lines are natural extensions to the work that we're doing across the continuum of care from acute care, to surgery centers, to long-term care, into the retail setting and even to the consumer."

## Q3 FY17 summary

| | | Q3 FY17 | | Q3 FY16 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | 31.8 billion | $ | 30.7 billion | 4% |
| Operating earnings | $ | 605 million | $ | 656 million | (8)% |
| Non-GAAP operating earnings | $ | 759 million | $ | 788 million | (4)% |
| Net earnings attributable to Cardinal Health, Inc. | $ | 381 million | $ | 386 million | (1)% |
| Non-GAAP net earnings attributable to Cardinal Health, Inc. | $ | 485 million | $ | 472 million | 3% |
| Diluted EPS attributable to Cardinal Health, Inc. | $ | 1.20 | $ | 1.17 | 3% |
| Non-GAAP diluted EPS attributable to Cardinal Health, Inc. | $ | 1.53 | $ | 1.43 | 7% |

Diluted EPS for the quarter benefitted from a lower effective tax rate and fewer weighted average shares outstanding than the same quarter in the prior fiscal year.

## Segment results

### Pharmaceutical segment

Third-quarter revenue for the Pharmaceutical segment increased 3 percent to $28.4 billion due to performance from the Specialty business and growth from Pharmaceutical Distribution customers.

Segment profit for the quarter decreased 7 percent to $611 million . This decrease was driven by generic pharmaceutical pricing, the final quarterly impact of the loss of Safeway, and the company's ongoing investment in its pharmaceutical IT platform. These were partially offset by solid performance from Red Oak Sourcing.

| | | Q3 FY17 | | Q3 FY16 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | 28.4 billion | $ | 27.5 billion | 3% |
| Segment profit | $ | 611 million | $ | 660 million | (7)% |

### Medical segment

Third-quarter revenue for the Medical segment increased 9 percent to $3.4 billion driven by contributions from new and existing customers.

**Cardinal Health**
**Page 2**

Segment profit increased 16 percent to $148 million , reflecting solid performance from naviHealth, Cardinal Health Branded products (excluding Cordis) and distribution services. A decline in Cordis performance reflected increased SG&A expenses and the net favorable impact of two larger inventory adjustments in the year-over-year comparison.

|  | Q3 FY17 | Q3 FY16 | Y/Y |
|---|---|---|---|
| Revenue | $ 3.4 billion | $ 3.1 billion | 9% |
| Segment profit | $ 148 million | $ 128 million | 16% |

## Fiscal year 2017 outlook

As previously disclosed, the company does not provide GAAP EPS outlook, because it is unable to reliably forecast most of the items that are excluded from GAAP EPS to calculate non-GAAP EPS. These items could cause EPS to differ materially from non-GAAP EPS. See "Use of Non-GAAP Measures" following the attached schedules for additional explanation.

The company reaffirms its expectation that its fiscal 2017 non-GAAP EPS from continuing operations will be at the bottom of its previous guidance range of $5.35 to $5.50. Additional details about this outlook can be found in the company's press release issued April 18 .

## Additional third-quarter and recent highlights

- Announced intent to acquire Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses for $6.1 billion, enabling Cardinal Health to add an industry-leading portfolio of products, deepen its presence in the post-acute channel and increase its geographic scale

- Acquired rights to Navidea's Lymphoseek, a radiopharmaceutical diagnostic imaging agent

- Named on Fortune's 2017 " World's Most Admired Companies " list

- Recognized among the nation's best workplaces for female advancement as a Top Company for Executive Women by the National Association for Female Executives

## Webcast

Cardinal Health will host a webcast today at 8:30 a.m. Eastern to discuss third-quarter results. The webcast and corresponding slide presentation will be available on the Investor Relations page at ir.cardinalhealth.com . No access code is required.

Presentation slides and a webcast replay will be available on the Cardinal Health website at ir.cardinalhealth.com until April 30, 2018.

## Upcoming webcasted investor events

- Goldman Sachs 38 th Annual Global Healthcare Conference on June 14 at 10:40 a.m. Pacific in Rancho Palos Verdes, Calif.

## About Cardinal Health

Cardinal Health, Inc. is a global, integrated healthcare services and products company, providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. Backed by nearly 100 years of experience, with more than 40,000 employees in nearly 60 countries, Cardinal Health ranks among the top 25 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter and connect on LinkedIn at linkedin.com/company/cardinal-health .

[1.] GAAP refers to U.S. generally accepted accounting principles. This news release includes GAAP financial measures as well as non-GAAP financial measures, which are financial measures not calculated in accordance with GAAP.  See "Use of Non-GAAP Measures" following the attached schedules for definitions of the non-GAAP financial measures presented in this news release, and see the attached schedules for reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the Investor Relations page at ir.cardinalhealth.com . In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

## Cautions concerning forward-looking statements

This news release contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and

**Cardinal Health**
**Page 3**

expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the ability to successfully complete the acquisition of the Patient Recovery businesses from Medtronic on a timely basis, including obtaining required regulatory approvals and the satisfaction of other conditions; the conditions of the credit markets and our ability to issue debt to fund the acquisition on acceptable terms; if the acquisition of the Patient Recovery businesses is completed, the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; risks associated with the anticipated increase of indebtedness and potential limitations on our ability to use our cash for other purposes; our ability to successfully integrate and realize the benefits from our acquisition of Cordis; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including federal health care reform legislation; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This news release reflects management's views as of May 1, 2017 . Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**Schedule 1**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | | Third Quarter 2017 | | 2016 | % Change |
|---|---|---|---|---|---|
| Revenue | $ | 31,821 | $ | 30,662 | 4 % |
| Cost of products sold | | 30,093 | | 28,973 | 4 % |
| Gross margin | | 1,728 | | 1,689 | 2 % |
| | | | | | |
| **Operating expenses:** | | | | | |
| Distribution, selling, general and administrative expenses | | 960 | | 914 | 5 % |
| Restructuring and employee severance | | 15 | | 6 | N.M. |
| Amortization and other acquisition-related costs | | 128 | | 108 | N.M. |
| Impairments and loss on disposal of assets, net | | 2 | | — | N.M. |
| Litigation charges, net | | 18 | | 5 | N.M. |
| Operating earnings | | 605 | | 656 | (8)% |
| | | | | | |
| Other (income)/expense, net | | (5) | | — | N.M. |
| Interest expense, net | | 46 | | 44 | N.M. |
| Earnings before income taxes | | 564 | | 612 | (8)% |
| | | | | | |
| Provision for income taxes | | 182 | | 226 | (19)% |
| Net earnings | | 382 | | 386 | (1)% |
| | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | (1) | | — | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 381 | $ | 386 | (1)% |
| | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Basic | $ | 1.21 | $ | 1.18 | 3 % |
| Diluted | | 1.20 | | 1.17 | 3 % |
| | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | |
| Basic | | 316 | | 328 | |
| Diluted | | 318 | | 331 | |

**Schedule 2**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | | Year-to-Date 2017 | | 2016 | % Change |
|---|---|---|---|---|---|
| Revenue | $ | 97,010 | $ | 90,162 | 8 % |
| Cost of products sold | | 92,089 | | 85,285 | 8 % |
| Gross margin | | 4,921 | | 4,877 | 1 % |
| | | | | | |
| **Operating expenses:** | | | | | |
| Distribution, selling, general and administrative expenses | | 2,792 | | 2,678 | 4 % |
| Restructuring and employee severance | | 31 | | 19 | N.M. |
| Amortization and other acquisition-related costs | | 365 | | 327 | N.M. |
| Impairments and loss on disposal of assets, net | | 15 | | 17 | N.M. |
| Litigation (recoveries)/charges, net | | 37 | | (3) | N.M. |
| Operating earnings | | 1,681 | | 1,839 | (9)% |
| | | | | | |
| Other (income)/expense, net | | (2) | | 5 | N.M. |
| Interest expense, net | | 134 | | 134 | N.M. |
| Earnings before income taxes | | 1,549 | | 1,700 | (9)% |
| | | | | | |
| Provision for income taxes | | 533 | | 604 | (12)% |
| Net earnings | | 1,016 | | 1,096 | (7)% |
| | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | (2) | | (1) | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 1,014 | $ | 1,095 | (7)% |
| | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Basic | $ | 3.19 | $ | 3.33 | (4)% |
| Diluted | | 3.17 | | 3.30 | (4)% |
| | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | |
| Basic | | 318 | | 328 | |
| Diluted | | 320 | | 331 | |

<u>**Schedule 3**</u>

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets (Unaudited)**

| (in millions) | | March 31, 2017 | | June 30, 2016 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | **1,368** | $ | 2,356 |
| Trade receivables, net | | **7,505** | | 7,405 |
| Inventories, net | | **11,641** | | 10,615 |
| Prepaid expenses and other | | **1,769** | | 1,580 |
| Total current assets | | **22,283** | | 21,956 |
| | | | | |
| Property and equipment, net | | **1,849** | | 1,796 |
| Goodwill and other intangibles, net | | **9,287** | | 9,426 |
| Other assets | | **755** | | 944 |
| **Total assets** | $ | **34,174** | $ | 34,122 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | **17,535** | $ | 17,306 |
| Current portion of long-term obligations and other short-term borrowings | | **607** | | 587 |
| Other accrued liabilities | | **1,654** | | 1,808 |
| Total current liabilities | | **19,796** | | 19,701 |
| | | | | |
| Long-term obligations, less current portion | | **4,854** | | 4,952 |
| Deferred income taxes and other liabilities | | **2,742** | | 2,781 |
| | | | | |
| Redeemable noncontrolling interests | | **117** | | 117 |
| | | | | |
| Total Cardinal Health, Inc. shareholders' equity | | **6,646** | | 6,554 |
| Noncontrolling interests | | **19** | | 17 |
| Total shareholders' equity | | **6,665** | | 6,571 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | **34,174** | $ | 34,122 |

Schedule 4

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (Unaudited )**

| (in millions) | Third Quarter | | Year-to-Date | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| **Cash flows from operating activities:** | | | | |
| Net earnings | $ 382 | $ 386 | $ 1,016 | $ 1,096 |
| | | | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 186 | 159 | 525 | 465 |
| Impairments and loss on sale of other investments | 1 | — | 4 | — |
| Impairments and loss on disposal of assets, net | 3 | — | 15 | 17 |
| Share-based compensation | 26 | 26 | 73 | 82 |
| Provision for bad debts | 17 | 16 | 46 | 51 |
| Change in fair value of contingent consideration obligation | — | (2) | — | (16) |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | |
| Decrease/(increase) in trade receivables | 39 | (328) | (107) | (721) |
| Decrease/(increase) in inventories | 284 | 108 | (1,010) | (1,457) |
| Increase/(decrease) in accounts payable | (1,338) | 408 | 225 | 2,839 |
| Other accrued liabilities and operating items, net | 202 | 146 | (327) | (26) |
| Net cash provided by/(used in) operating activities | (198) | 919 | 460 | 2,330 |
| | | | | |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | (102) | (99) | (113) | (3,383) |
| Additions to property and equipment | (80) | (109) | (293) | (284) |
| Purchase of available-for-sale securities and other investments | (63) | (62) | (188) | (150) |
| Proceeds from sale of available-for-sale securities and other investments | 43 | 42 | 115 | 99 |
| Proceeds from maturities of available-for-sale securities | 10 | 18 | 49 | 37 |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | — | — | 1 | — |
| Net cash used in investing activities | (192) | (210) | (429) | (3,681) |
| | | | | |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | (3) | — | (3) | (23) |
| Net change in short-term borrowings | (8) | (5) | 25 | 34 |
| Net purchase of noncontrolling interests | — | (10) | (12) | (10) |
| Reduction of long-term obligations | — | (1) | (60) | (5) |
| Proceeds from interest rate swap terminations | — | — | 14 | — |
| Net tax proceeds/(withholdings) from share-based compensation | 20 | 4 | 20 | (3) |
| Excess tax benefits from share-based compensation | 5 | 1 | 37 | 33 |
| Dividends on common shares | (142) | (127) | (435) | (386) |
| Purchase of treasury shares | — | (300) | (600) | (300) |
| Net cash used in financing activities | (128) | (438) | (1,014) | (660) |
| | | | | |
| Effect of exchange rates changes on cash and equivalents | 5 | 3 | (5) | (7) |
| | | | | |
| Net increase/(decrease) in cash and equivalents | (513) | 274 | (988) | (2,018) |
| Cash and equivalents at beginning of period | 1,881 | 2,324 | 2,356 | 4,616 |
| **Cash and equivalents at end of period** | $ 1,368 | $ 2,598 | $ 1,368 | $ 2,598 |

**Schedule 5**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Third Quarter | | | (in millions) | Third Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **28,406** | $ 27,527 | Amount | $ | **3,418** | $ 3,138 |
| Growth rate | | **3 %** | 22% | Growth rate | | **9%** | 13% |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **611** | $ 660 | Amount | $ | **148** | $ 128 |
| Growth rate | | **(7)%** | 16% | Growth rate [1] | | **16%** | 26% |
| Segment profit margin | | **2.15 %** | 2.40% | Segment profit margin | | **4.34%** | 4.08% |

[1]. Segment profit for three months ended March 31, 2016 includes a $21 million unfavorable impact of Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit declined 1 percent and grew 47 percent for the three months ended March 31, 2017 and 2016, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the three months ended March 31, 2017 was $31,821 million , which included total segment revenue of $31,824 million and Corporate revenue of $(3) million . Total consolidated revenue for the three months ended March 31, 2016 was $30,662 million , which included total segment revenue of $30,665 million and Corporate revenue of $(3) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended March 31, 2017 were $605 million , which included total segment profit of $759 million and Corporate costs of $(154) million . Total consolidated operating earnings for the three months ended March 31, 2016 were $656 million , which included total segment profit of $788 million and Corporate costs of $(132) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Schedule 6**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | | Year-to-Date | | | (in millions) | | Year-to-Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | | **2017** | | 2016 | | | **2017** | | 2016 |
| **Pharmaceutical** | | | | | **Medical** | | | | |
| **Revenue** | | | | | **Revenue** | | | | |
| Amount | $ | **86,911** | $ | 80,954 | Amount | $ | **10,107** | $ | 9,220 |
| Growth rate | | **7 %** | | 22% | Growth rate | | **10%** | | 8% |
| **Segment profit** | | | | | **Segment profit** | | | | |
| Amount | $ | **1,682** | $ | 1,945 | Amount | $ | **435** | $ | 335 |
| Growth rate | | **(14)%** | | 25% | Growth rate [1] | | **30%** | | 1% |
| Segment profit margin | | **1.94 %** | | 2.40% | Segment profit margin | | **4.30%** | | 3.63% |

[1]  Segment profit for the six months ended March 31, 2016 includes the $43 million unfavorable impact of the Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit growth was 15 percent and 14 percent for the nine months ended March 31, 2017 and 2016, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the nine months ended March 31, 2017 was $97,010 million , which included total segment revenue of $97,018 million and Corporate revenue of $(8) million . Total consolidated revenue for the nine months ended March 31, 2016 was $90,162 million , which included total segment revenue of $90,174 million and Corporate revenue of $(12) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the nine months ended March 31, 2017 were $1,681 million , which included total segment profit of $2,117 million and Corporate costs of $(436) million . Total consolidated operating earnings for the nine months ended March 31, 2016 were $1,839 million , which included total segment profit of $2,280 million and Corporate costs of $(441) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Schedule 7**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation [1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2,3,4] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| **Third Quarter 2017** | | | | | | | | | | |
| GAAP | $ 1,728 | 2% | $ 605 | (8)% | $ 564 | $ 182 | $ 381 | (1)% | $ 1.20 | 3% |
| LIFO charges/(credits) | (9) | | (9) | | (9) | (4) | (5) | | (0.02) | |
| Restructuring and employee severance | — | | 15 | | 15 | 6 | 9 | | 0.03 | |
| Amortization and other acquisition-related costs | — | | 128 | | 128 | 41 | 87 | | 0.27 | |
| Impairments and (gain)/loss on disposal of assets | — | | 2 | | 2 | — | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | — | | 18 | | 18 | 7 | 11 | | 0.03 | |
| **Non-GAAP** | $ 1,719 | 1% | $ 759 | (4)% | $ 718 | $ 232 | $ 485 | 3 % | $ 1.53 | 7% |
| **Third Quarter 2016** | | | | | | | | | | |
| GAAP | $ 1,689 | 16% | $ 656 | 11 % | $ 612 | $ 226 | $ 386 | 6 % | $ 1.17 | 7% |
| LIFO charges/(credits) | 12 | | 12 | | 12 | 4 | 8 | | 0.02 | |
| Restructuring and employee severance | — | | 6 | | 6 | 2 | 4 | | 0.01 | |
| Amortization and other acquisition-related costs | — | | 108 | | 108 | 37 | 71 | | 0.21 | |
| Impairments and (gain)/loss on disposal of assets | — | | — | | — | — | — | | — | |
| Litigation (recoveries)/charges, net | — | | 5 | | 5 | 2 | 3 | | 0.01 | |
| **Non-GAAP** | $ 1,702 | 17% | $ 788 | 20 % | $ 744 | $ 272 | $ 472 | 19 % | $ 1.43 | 20% |

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| **Year-to-Date 2017** | | | | | | | | | | |
| GAAP | $ 4,921 | 1% | $ 1,681 | (9)% | $ 1,549 | $ 533 | $ 1,014 | (7)% | $ 3.17 | (4)% |
| LIFO charges/(credits) | — | | — | | — | — | — | | — | |
| Restructuring and employee severance | — | | 31 | | 31 | 12 | 19 | | 0.06 | |
| Amortization and other acquisition-related costs | — | | 365 | | 365 | 120 | 245 | | 0.76 | |
| Impairments and (gain)/loss on disposal of assets | — | | 15 | | 15 | 4 | 11 | | 0.03 | |
| Litigation (recoveries)/charges, net | — | | 37 | | 37 | 14 | 23 | | 0.07 | |
| **Non-GAAP** | $ 4,921 | —% | $ 2,129 | (5)% | $ 1,997 | $ 684 | $ 1,311 | (4)% | $ 4.10 | — % |
| **Year-to-Date 2016** | | | | | | | | | | |
| GAAP | $ 4,877 | 15% | $ 1,839 | 15 % | $ 1,700 | $ 604 | $ 1,095 | 19 % | $ 3.30 | 20 % |
| LIFO charges/(credits) | 51 | | 51 | | 51 | 20 | 31 | | 0.10 | |
| Restructuring and employee severance | — | | 19 | | 19 | 7 | 12 | | 0.04 | |
| Amortization and other acquisition-related costs | — | | 327 | | 327 | 115 | 212 | | 0.64 | |
| Impairments and (gain)/loss on disposal of assets | — | | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | — | | (3) | | (3) | (3) | — | | — | |
| **Non-GAAP** | $ 4,929 | 16% | $ 2,251 | 21 % | $ 2,112 | $ 751 | $ 1,361 | 20 % | $ 4.10 | 21 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules.

[2] attributable to Cardinal Health, Inc.

[3] GAAP diluted EPS for the three months ended March 31, 2017 compared to the prior year period was favorably impacted by $0.13 , which includes $0.08 due to change in the effective tax rate and $0.05 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate)))

divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

[4] Non-GAAP diluted EPS for the three months ended March 31, 2017 compared to the prior year period was favorably impacted by $0.16 , which includes $0.10 due to change in the effective tax rate and $0.06 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no losses on extinguishment of debt during the periods presented.

**Schedule 8**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | | Third Quarter | | |
|---|---|---|---|---|
| | | **2017** | | 2016 |
| **GAAP effective tax rate** | | **32.3%** | | 36.9% |
| | | | | |
| **Non-GAAP effective tax rate** | | | | |
| Earnings before income taxes | $ | **564** | $ | 612 |
| LIFO charges/(credits) | | **(9)** | | 12 |
| Restructuring and employee severance | | **15** | | 6 |
| Amortization and other acquisition-related costs | | **128** | | 108 |
| Impairments and loss on disposal of assets | | **2** | | — |
| Litigation (recoveries)/charges, net | | **18** | | 5 |
| Adjusted earnings before income taxes | $ | **718** | $ | 744 |
| | | | | |
| Provision for income taxes | $ | **182** | $ | 226 |
| LIFO charges/(benefits) tax benefit/(expense) | | **(4)** | | 4 |
| Restructuring and employee severance tax benefit | | **6** | | 2 |
| Amortization and other acquisition-related costs tax benefit | | **41** | | 37 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | | **7** | | 2 |
| Adjusted provision for income taxes | $ | **232** | $ | 272 |
| | | | | |
| **Non-GAAP effective tax rate** | | **32.3%** | | 36.6% |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This earnings release contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP").

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

**Exclusions from Non-GAAP Financial Measures**

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this earnings release for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics allows for a better comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business, which includes normal levels of reinvestment in the business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, amortizations of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs because they are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. They are also significantly impacted by the timing and size of acquisitions.

- Impairments and gains or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, and are inherently unpredictable in timing and amount. In the third quarter of fiscal 2017, consistent with the presentation of financial results by peer medical device companies, in litigation recoveries or charges, net we began to classify accrued losses and legal fees, net of expected recoveries, related to mass tort product liability claims, including claims for injuries allegedly caused by Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Such amounts would not have materially affected litigation recoveries or charges, net in prior periods, so have not been reclassified for those periods.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business operations and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the items listed above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Forward Looking Non-GAAP Measures**

In this earnings release, the Company presents its outlook for fiscal 2017 non-GAAP EPS. The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2017 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.14 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Definitions**

**Growth rate calculation** : Growth rates in this earnings release are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP effective tax rate** : (provision for income taxes adjusted for (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# EXHIBIT 72



# Q3 FY17 Cardinal Health, Inc. Earnings Conference Call

**May 1, 2017 8:30AM Eastern**

Operator:  Good day and welcome to the Cardinal Health Third Quarter Fiscal Year 2017 Earnings Conference Call. Today's conference is being recorded. At this time, I would like to turn the conference over to Sally Curley. Please go ahead, ma'am.

Sally Curley:  Thank you, Kyle, and welcome to this morning's call to discuss our third quarter fiscal 2017 earnings. With me today are Chairman and CEO, George Barrett, and CFO, Mike Kaufmann. George and Mike will have some prepared comments, and then we'll move into Q&A.

Before I turn the call over to George, since we will be making forward-looking statements, we need to remind you that the matters addressed in the statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied. Please refer to the SEC filings and the forward-looking statements slide provided at the beginning of the presentation found on the investor page of our website for a description of risks and uncertainties.

We will be ending today's conference call promptly at 9:45 AM. To more efficiently get through our question-and-answer queue, we are limiting each individual to one question with one follow-up. As always, the Investor Relations team will be available if you have additional questions.

Thank you and I'd now like to turn the call over to Cardinal Health Chairman and CEO, George Barrett. George?

George Barrett:  Thanks, Sally, and good morning to everyone joining us on today's call. We had a fairly full conversation with you just two weeks ago, so my commentary this morning will be relatively brief, and I'll let Mike walk you through the numbers.

The quarter came in largely as we expected. Our value proposition is resonating with our customers and our business partners, customer retention is high, and unit growth is solid. As I mentioned on our recent call, the performance in most of our lines of business is strong, and I'd like to highlight a few. Our specialty solutions group continues to grow at a good clip, well into the double digits. Or medical-surgical business has been performing very well, with help coming from new customers, the strength of our consumables portfolio, and the value of our supply chain services.

In addition, our naviHealth and post-acute activities are extremely attractive to a market going through significant changes, and are also growing at a pace faster than we had originally modeled. Most important, we are seeing that the value of our portfolio is fueling a more broad-based interest in Cardinal Health. With a provider system increasing in complexity, reconfiguring itself, and wrestling with new payment models, we feel confident that we can bring added efficiency, quality, and safety to virtually any system. And the value that we create in serving these providers increases our critical role in helping pharmaceutical, biotech, medical, and lab manufacturers bring their products to the patients they ultimately serve.

Having said this, we have highlighted these past months, and reinforced two weeks ago, the dynamics we've been experiencing around pharmaceutical pricing, particularly in generics, and the impact it has had on our pharmaceutical segment. There is little for me to add to my commentary from our call on April 18. In summary, we are experiencing pricing deflation in generics, some heightened reimbursement pressures, which affect our customers, and a scarcity of new generic launches in the near term. It's these factors, plus some company specific discrete items, which largely informed the fiscal 2017 and early 2018 outlook we provided.

One quick note about our Cordis business. We've said before that we expected our transition activities to cause some lumpiness in our Cordis numbers, which Mike will address. But overall, we were encouraged by our commercial momentum on a global basis. We've recently added some products to our bag, which will offer our customers even greater value. We are building a platform off of which we can offer additional products and services globally once we fully integrate the Patient Recovery business we plan to acquire from Medtronic.



I'd like to provide an additional comment specific to our recent conference call. We faced an interesting dilemma two weeks ago. We were extremely pleased to be able to bring our negotiations with Medtronic to the finish line. This is a business that has been on our radar for many years. At the same time, we began to see our early numbers for fiscal 18 roll-up. And while we always challenge ourselves to improve our numbers as we go through our planning process, we did not want to give you the good news about the acquisition without sharing the important facts that we were seeing in the current market. This has always been our approach with you. We are an organization that will take the necessary actions to improve and adapt to set ourselves up for the long-term.

Our people are competitive, focused, and committed to serving our customers and their patients. And a near-term disturbance in market conditions will not deter us from our obligation to be accountable for performance and our commitment to our customers. We will continue to invest in and drive those activities, which differentiate us in the marketplace as a creator of sustainable value.

It is with this in mind that I am even more excited about the acquisition of Medtronic's Patient Recovery business. As we said two weeks ago, these product lines are natural extensions to the work that we're doing across the continuum of care, from acute care, to surgery centers, to long-term care, into the retail setting, and even to the consumer. These are product areas and channels with which we have enormous experience.

I won't repeat all of the many reasons why we are thrilled about this transaction, but let me summarize by saying that the addition of these businesses increases our scale, our balance, and our relevance to all of our customers. These are products used every day in our global healthcare systems, and this acquisition will leverage all of the tools that we've built over the years to be the daily touchpoint to the providers of care and their patients.

I'd like to make one more observation about this acquisition. Some of you have asked whether this transaction represents a departure from our pharmaceutical distribution business, and the answer is no. As I mentioned earlier, we've had our eye on this business for a long time, and we believe that adding these product lines to our existing portfolio will provide additional value to our customers, and to you, our shareholders.

Let me be clear on this: Our pharmaceutical distribution business is an important and valuable part of an integrated portfolio. While market conditions can, from time to time, affect any business, we are confident in the value that our best-in-class distribution business provides today and into the future.

I'll finish by reiterating that our portfolio of product and service offerings is strong, valuable to our customers, and increasingly well balanced. And we are extremely positive about the opportunities in front of us.

And with that, I'll turn the call over to Mike, who'll walk you through the financials.

Michael Kaufmann:  Thanks, George, and thanks to everyone joining us on the call today. In my comments this morning, I'll first provide some context around our third quarter performance. Then, I'll review the expectations we detailed a couple of weeks ago for our full fiscal year. At this time, we don't have any updates to our FY18 or FY19 early thoughts we provided on April 18, so I won't say anything more, other than our leadership team has a strong sense of optimism and accountability. We are managing the company with discipline and for the long-term.

Please note that, with all of my comments, I'll begin with GAAP, and then provide the comparable non-GAAP figure. The slide presentation on our website should be a helpful guide throughout this discussion, as it includes our GAAP to non-GAAP reconciliation tables.

Starting on slide 4 with our consolidated company results, our third-quarter GAAP diluted EPS was $1.20 and non-GAAP diluted EPS was $1.53, an increase of 3% and 7%, respectively. Note that both the GAAP and non-GAAP diluted EPS for the quarter benefited from a lower effective tax rate and fewer outstanding shares as compared to the prior year. Total company revenues grew 4% versus the prior year to $31.8 billion.

Consolidated GAAP and non-GAAP gross margin dollars increased by 2% and 1%, respectively. GAAP gross margin rates were down 8 basis points for the quarter, while non-GAAP gross margin rates were down 15 basis points, primarily due to generic pharmaceutical pricing.

Consolidated company SG&A increased 5% from the prior year. Since we have lapped our significant acquisitions, the growth is mainly driven by the costs associated with our pharma IT system refresh, new medical segment business wins, and Cordis infrastructure expense, partially offset by assumptions around incentive compensation. As you would expect, we continue to be disciplined in our expense management. Both GAAP and non-GAAP operating earnings declined in the quarter versus the prior year by 8% and 4%, respectively.

Moving below the operating line, net interest and other expense was $41 million, a 7% decrease over the prior year. This decrease was driven by deferred compensation income, which has an equal offset in SG&A expense, so there is no net impact to EPS from this favorable variance. For the third quarter, the GAAP and non-GAAP effective tax rate was 32.3%, down 4.6 and 4.3 percentage points, respectively, versus the prior year. This improvement was due to a few favorable discrete items in the quarter.

Diluted weighted average shares outstanding were 318 million, 13 million fewer shares than the third quarter in the prior year. During the quarter, we did not repurchase any shares and, as of the end of the quarter, had $443 million remaining on our Board-authorized share repurchase program.

During the quarter, we had net operating cash outflows of $198 million. We ended the quarter with a cash balance, including short-term investments, of $1.6 billion, with $514 million held outside the United States. While we don't typically provide cash flow forecasts or guidance, we do expect to generate significant cash in the fourth quarter. Consequently, as we shared with you on April 18, about $1.6 billion of cash on hand will be used during the first quarter of FY18, when we expect to close the purchase of the Patient Recovery Business from Medtronic.

Next, I will cover segment performance, beginning with the pharmaceutical segment. Revenues grew 3% to $28.4 billion due to performance from the Specialty Solutions business and growth from Pharmaceutical Distribution customers. Segment profit for the quarter decreased 7% to $611 million. This decrease was driven by generic pharmaceutical pricing, the final quarterly impact of the loss of Safeway, and the investment in our pharmaceutical IT platform. This was partially offset by solid performance from Red Oak Sourcing.

During the third quarter, we began to see planned incremental expenses associated with the first few phases of our pharma IT refresh project. This multi-year project is on time and on budget. It will enable us to maintain the excellent service our customers have come to expect from Cardinal Health, provide us with the ability to expand in a cost-efficient manner, and better facilitate our ability to go-to-market as an integrated enterprise.

Finally, our pharma segment profit margin rate of 2.15% for the quarter was down 25 basis points versus the prior year, largely due to generic pharmaceutical pricing. A couple of other points to note on the quarter, our Specialty Solutions and China businesses saw double-digit bottom-line growth.

Now, I'll move to our medical segment results. Revenues for the quarter grew a robust 9% to $3.4 billion, driven by contributions from new and existing customers. Medical segment profit increased 16% to $148 million, reflecting solid performance from naviHealth, supply chain services, and Cardinal Health consumable products.

The quarter was unusual, in that we saw a decline in Cordis profit. This decline was mostly related to increased SG&A expenses to support our investment in an international infrastructure. This investment will benefit us as we integrate the Patient Recovery Business. The increased SG&A expense was partially offset by the net impact of the Cordis inventory adjustments.

Let me explain the third quarter inventory adjustments in more detail. First, this year benefitted from the absence of the inventory step-up, which we recorded in the prior year. This benefit was largely offset by an increase to an inventory reserve in the quarter --in the current year. This reserve is an estimate based on information often provided by third parties, including under-the-transition service agreements and from various service providers. During the period, we received more detailed information for this reserve and have adjusted it accordingly.

As both George and I have mentioned in the past, the exit from the transition service and manufacturing agreements could result in some lumpiness to the Cordis earnings, but we fully expect this to diminish as we move forward. We expect Cordis to return to growth in the fourth quarter and are working hard to ensure we have the right infrastructure for the long-term to support our customers and their patients. Segment profit margin rate increased 26 basis points to 4.34% due to the same factors I just mentioned on the segment profit dollars.

CardinalHealth
Essential to care™

Turning to slide number 7, you will see our consolidated GAAP and non-GAAP reconciliation for the quarter. The $0.33 variance to non-GAAP diluted EPS results was primarily driven by amortization and other acquisition-related costs.

I'll now update you on our assumptions for the fiscal year. We expect full year 2017 revenue growth to be in the mid-to-high single-digit percentages, which is a change from our previous outlook of high single-digit growth. One item of note, the actual closing date for the Medtronic transaction we announced on April 18 involves multiple parties, including regulators. Because of this and other factors, we need to quickly be ready to execute the best possible financing to secure attractive terms associated with the acquisition. This means that we could issue debt in the fourth quarter and, if we do, we would see up to $0.05 of financing costs, which is not included in our current fiscal 2017 EPS guidance. We will let you know when we access the debt markets and be transparent on the incremental costs.

To reiterate, as we shared with you on April 18, we expect our full year non-GAAP EPS to be at the bottom of our $5.35 to $5.50 range, and this served as the base for our fiscal 2018 early outlook.

Moving on to slide 10 of the presentation, the corporate assumptions around tax rate, shares, and capex will be at the low-end of the range, and acquisition-related intangible amortization will now be about $389 million, or $0.81 per share, which does not affect our non-GAAP earnings.

You can turn to slide 11 to see our pharma segment assumptions for the full fiscal year. We now expect mid-to-high single-digit percentage revenue growth for 2017, a change from our previous outlook of high single-digit growth. This is largely related to the loss of brand sales associated with the retail network changes at CVS Pharmacy, which they disclosed in late 2016. Additionally, we now expect full year pharma segment profit to decline low double digits versus the prior year.

Note, this tightening of the range is primarily due to the previously mentioned generic market pricing, which, while less deflationary than what we saw earlier this year, is still lower than we modeled for the second half of the year. All other pharma segment assumptions remain unchanged.

On slide 12, you can see there is only one change to our medical segment assumptions, which is we now expect a high single-digit percentage increase in revenue versus the prior year, up from our previous assumption of mid-to-high single-digit growth.

Let me close with this. I am confident we are well positioned and are working on the right things at the right pace for both the near term and long term. Thanks. And with that, operator, let's go to the questions.

Operator:  Thank you. We'll take our first question with Robert Jones from Goldman Sachs.

Robert Jones:  Great. Thanks for the questions. You guys guided generic deflation down low double digits for the year. I'm curious if maybe you could just talk a little bit about what you saw in the quarter relative to deflation, and then maybe how that plays into what you're expecting to see in the fourth quarter.

Michael Kaufmann:  Thanks for the question. As far as the deflation goes in the quarter, we're not going to specifically comment on quarter-by-quarter deflation rates, other than, as you know, we did update to be -- that deflation for the entire year we now expect to be in the low double digits. So, again, as I emphasized before, it's definitely lower than we had modeled in the second half, but it's improving.

Robert Jones:  Okay. Got it. And then, I guess, if we think about the moving pieces that drive the deflation metric, as you guys have it, next year thinking about it getting back into the mid-single digits, could you just talk about what factors will play into that improvement off of what you're expecting this year? Is it really just a comp issue, or do you have visibility into how that metric will actually improve in fiscal 2018?

**Michael Kaufmann:** Yes, thanks. A couple things. First of all, I think one of the biggest things to think about how it will improve next year is that you actually have to break down the individual items and take a look at where the various items are going. And as you do that, what we see in that is there's a very small subset of items that have deflated significantly this year, items you probably might be aware of over the last couple of years that launched that had limited competition, either because they were hard to make or there was raw material issues or those types of things, that were relatively high priced towards the beginning of the year, or higher priced in terms of generics go, and then they deflated significantly during the year.

And what we believe is that subset, that small subset of items which are very material, have really reached probably near the bottom of where they'll be. And so the impact of those items we don't see reoccurring next year, and that has a significant impact on the overall deflation rate for next year. And then when you combine that with all of the other efforts that we have in terms of pricing, sourcing, working with our customers on penetration and things like that, that's why we feel confident about where the overall deflation rate's headed.

**Robert Jones:** Great. Appreciate the comments.

**Operator:** We'll take our next question from Ross Muken with Evercore ISI.

**Ross Muken:** Good morning, guys. So on the Medical business, can you just expand a bit on sort of your experience so far in Cordis and how that's gone versus plan? And then, how the new Medtronic business, as that comes in, will both enhance your ex-U.S. strategy as well as your bundle in the U.S., and how you think maybe that could also further synergize your Cordis presence?

**George Barrett:** Ross, good morning. It's George. Thanks for the question. I'll start, and then Don Casey, our Medical segment CEO, is here with us, so I'll let Don weigh in a little bit. But, by and large, the thing that Mike just

described on Cordis has been the hardest part, which is basically ramping up the international infrastructure. Commercially, we're actually feeling very good about the way we're positioning, we're seeing some really interesting growth, particularly outside the U.S., and we're also seeing what we always like to see, which is some demand from our global operations for other services that Cardinal has to offer. And that's always been part of our thesis.

On the commercial side, some things that we see that are very optimistic. I think building up that infrastructure has been one that has taken a little more time than we expected, but we want to get it right. And, as we said, we're building a platform now, and maybe Don could talk a little bit about that.

Don Casey:  Yes, and two questions. The first is, how has Cordis impacted our bundle in the U.S., and it's been very positive. I mean, we get a tremendous amount of interest from people that are very familiar with what we would consider kind of our base Cardinal Health businesses, our base brands, which tend to be a little bit more commodity-oriented now that we're moving into something like Cordis, where we can deliver value. It, one, enhances our 360 Program, which we think is important, and that's had particular resonance among our strategic accounts.

Ex-U.S., we're very excited. Look, we built a platform, and George said it very well:  it's taken us a little longer, and we've been very careful to create something that we could build a significant foundation on. It's taken us, A, a little bit more time, and a little bit more money. But as we looked at the Patient Recovery business that we're getting from Medtronic, we think we're going to be able to slide that right on top of the foundation we've built. And that scale is going to be important in a couple ways.

First, it gives us a lot more critical mass, particularly in Asia and EMEA. We believe that critical mass will allow us to have a comprehensive bundle that will be very relevant to a lot of the acute care customers there. So, we're very optimistic that the foundation we built for Cordis is going to pay dividends as we bring the Patient Recovery business on top of that, when we're able to close the business, hopefully sometime in the first quarter.

**CardinalHealth**
*Essential to care™*

Ross Muken:  And can you just quickly update us on where you are with Kaiser, and how maybe your enhanced relationship there has helped you think through --obviously, they're a pretty dynamic organization --helped you think through what you could bring, from a distribution bundle perspective, to other potential key large IDNs in the U.S.?

George Barrett:  Yes, Ross, let me start, and then maybe Don will jump in. I want to be careful here, because I never want to speak for a customer. What I can say is, they are, as you mentioned, an incredibly interesting organization. We've built a business model that's really around creating value through efficiency and safety, the ability to standardize, the ability to drive cost, and the ability to actually support that through some of our clinical activities, particularly in post-acute.

And I think that overall portfolio is beginning to resonate with a lot of customers. And I think a very -- instead of speaking for Kaiser, use them as an example of a highly complex integrated system, I think we're able to create real alignment with their strategies of, how do they make sure that they're treating patients in the right way, in the right setting, at the right cost. And I think that's part of the alignment strategy for us. I don't know if you want to add to that, Don.

Don Casey:  Just briefly, George. It's been very interesting. The conversations were --that we were six months ago, we --let's make sure that we're able to get this business up and running. It's, again, as George said, a highly complex organization that represented a significant challenge for us. We've met that challenge. We're actually delivering better customer service than they've ever experienced, and now they've begun to sit there and say, these trucks are moving into our facilities, what else can you put into them? And it's really changed the complexion of the conversation to how is this a basic distribution agreement, to how does this become a strategic asset that we can look to become much more efficient as they look to expand their own operating horizons.

Ross Muken:  Great. Thanks, guys.

**CardinalHealth**
*Essential to care™*

Sally Curley:  Thanks, Ross. Operator, next question?

Operator:  We'll take our next question from Charles Rhyee with Cowen & Company.

Charles Rhyee:  Yes, thanks for taking the question. George, I wanted to go back on the generic pricing, and I think last quarter you talked about the sell-side margin for --sorry, the last call you talked about the sell-side margin pressure. And just wanted to get a sense on what you're seeing currently and whether what --the actions that you took in terms of revising the guidance down just a short while ago was really sort of maybe a trailing impact of now we've settled out or can you talk about the forward environment, how it looks to you? Thanks.

George Barrett:  Right. Thanks, Charles. As you know, this is a hard one to answer. As Mike said, there are things in our control and things that are not. We're doing the things in our control, as Mike said, around sourcing and pricing strategies, et cetera. How the market behaves is more out of our control. Here's what we've done as we modeled this. We try to take sort of exit rates, and we use those based on the real data and the best information we can get from sort of market conditions and the feel of what we're seeing in the market and that's basically how we model.

We talked, I think late in the year or early in the calendar year, about some shifting away from the very steep rates that we saw early in the fall. That did look a little better. As Mike said, it has been a bit better than it was last fall, but not I would say a full recovery, sort of the way I would say it. So we've tried to take that data we're seeing, use it real-time, use the experience that our teams have, and then just try to do some basic forward modeling. But always a little hard -- lot of moving parts here and it's always a little hard to get it perfect.

Charles Rhyee:  Then -- just a follow up then. Apart from what -- the things that are in your control, if you think about the competitive market for customers, can you talk about how that pricing -- is it fair to say that all your clients are

now -- been level-set to the sort of the new prevailing rates, including clients that may not have been up for renewal in the near term?

George Barrett:  Right. So let me start with the basics. Again, we've said this before. As you know, this is always a competitive market. I do think that from time-to-time, you see activities that seem a little bit more aggressive, and then those tend to stabilize. So, I can't speak for other companies. Everybody has their own renewal cycle. I would say we have limited exposure to major renewals. And most of what happens in the market moves across the system fairly quickly, so that's probably the best way to characterize it.

Charles Rhyee:  Okay. Thank you.

George Barrett:  Thanks, Charles.

Operator:  We'll take our next question from Michael Cherny with UBS.

Allen Lutz:  This is Allen in for Mike. Thanks for the question. On generic deflation, in some of the drug classes that have matured recently or undergone significant pricing pressure, are you guys seeing manufacturers rationalize production or exit markets entirely? And then, can you talk about how this compares to the past five years or so?

George Barrett:  Yes, so let me start. Again, trying to describe the manufacturers when there are this many is, as you can imagine, difficult. It's really each company has its own product line and its own strategy. I think we would expect on some kinds of products, where you wind up with many, many, many competitors, it's not unusual that

**Cardinal**Health
*Essential to care™*

companies will drop out. So if you wind up as a 12th launch --with a 12th launch in a product, it's not unusual that one or two players may say, look, we'd rather use our capacity directed in other areas.

So I don't know that I could characterize that we've seen a ton of this, but I do think as we think about the nature of the industry, we'll see that from time to time. And we fully expect on given products where there's very mature products with lots of competition that you might see companies come in and out of those markets.

Allen Lutz:  Got it. Thank you.

George Barrett:  Thanks.

Operator:  We'll take our next question from Ricky Goldwasser with Morgan Stanley.

Ricky Goldwasser:  Yes, hi. Good morning. So, the first question is about the discrete items. George, in your prepared remarks I think you talked about company specific discrete items, which largely impacted fiscal 2017 and headwinds in fiscal year 2018. So, can you just help us and give us more detail on what were these items in 2017? And were they included in guidance before or were they incorporated into kind of like the updated outlook that you provided us last week?

George Barrett:  Yes, Ricky, good morning. Let me turn it over to Mike actually, and this is really primarily references that we made a few weeks ago on 2018. But, Mike, if you want to...

Michael Kaufmann: Yes, thanks for the question, Ricky. As you can imagine, back on April 18, while we weren't completely closed with the quarter, we had very good line of sight into what the quarter was going to look like. So when I talked about those discrete items, I was taking into account what we expected to see for really the entire full year. So those were given with the knowledge of what was going in the third quarter, so there would be no update -- I'll go through the details, but there would be no update to those four discrete items just because of the actual results in the Q3 are what we see happening in Q4.

Those four items were, first and foremost, the largest was tax and reserve adjustments. And, as you can see, in this quarter this year we mentioned as one of the drivers for the quarter that tax was a positive for us versus the prior year. And we knew that when we gave you some insight a few weeks ago that that would be the largest. So of the greater than $0.50 of discrete items we expect to incur this year that we'll not incur next year, tax and some reserve adjustments that I've talked about was the biggest one.

The second bucket -- and the next three are all similar in size -- would be compensation. You heard me mention that today. So that will be an adjustment year-over-year. Investments in the business where we were very disciplined this year, particularly early on in the year as we knew how things were shaping up to be, very careful in that area and to manage our SG&A expense. And then in P-Mod, which is our Pharma Distribution IT refresh project, we know and have known that as we roll this out, that we're going to be incurring some incremental expenses over the next couple of years, particularly next year is a larger year for us in P-Mod expenses. And so those are the four that add up to the greater than $0.50, with the tax and reserve adjustments being the largest.

Ricky Goldwasser: Thank you. And then my follow-up is one on brand, one on generic. Mike, I think you talked about the impact to the revenue line from loss of brand sales associated with CVS. So just trying to understand if there is any pull-through also to the profit line. And then on the generic deflation level, your gross profit in the quarter still grew year-over-year. So at what level of generic deflation year-over-year gross profit starts to decline?

**CardinalHealth**
*Essential to care™*

Michael Kaufmann:  Yes, as far as the brand one related to the CVS piece, again, this was all contemplated in the guidance that we had. We had some insight into that, and is low-margin brand sales. And it doesn't really have any pull-through impact to us on generics as far as it goes to CVS. So we feel very comfortable that all of that sales decline is already modeled into our outlook for 2017, as well as our early thoughts on 2018.

As far as generic deflation goes, I'm not sure what more I can talk about on that other than, again, we see it getting better. We feel like we're positioned incredibly well with Red Oak Sourcing and our pricing teams, and it's definitely getting better. Not quite as good as we modeled, but definitely getting better.

Operator:  We'll take our next question from Lisa Gill with JPMorgan.

Lisa Gill:  Thanks very much. Good morning. George, when we spoke back two weeks ago, one of the things I think you highlighted on the drug distribution side was this idea of renegotiating some contracts specifically around penetration on the generic side. Is that something that's ongoing? You just made comments that you don't have any large renewals this year, but is that something that happens on an ongoing basis? And how should we think about how that will impact the business and the margins going forward?

George Barrett:  Lisa, let me let Mike jump in on this one.

Michael Kaufmann:  Yes, thanks, Lisa. A couple things on that. I think, we always have a portion of our contracts that are renewing every single year. And when we talk about renewals, we're really talking about those large renewals that are out there and to your point. So there's always independents that are renewing and other acute hospitals and stuff. And so we're constantly looking at our contracts and trying to make sure that they're fair to both the customer and to us.

And so where customers are looking for improved branded pricing or improved generic pricing, we're, of course, going to look at things like, okay, then you need to commit to higher percentage of your generics from us. You're going to need to buy more OTC, HBA products from us. You may need to accelerate your terms and pay faster. And so we constantly look, as we model, to make sure we're doing all the right things to pull the levers to be fair to both the customers to meet their needs in the marketplace as well as making sure that we protect our profitability.

George Barrett:  Yes, Lisa, I'd just add. We have a pretty comprehensive approach to thinking about the mix and the portfolio, and they are very tailored to the customer. And so I think our team does a pretty good job of really understanding the customer needs here.

Lisa Gill:  Is there a way to think about where penetration is today on generic purchasing and where it potentially could go? When we think about stabilization, my expectation would be, in that independent market, that there's less stabilization if you have, obviously, more places that you can buy product. So the more you can lock your customer in on the penetration side, the more stable it will become. So how do we think about where it is today and where it potentially could go as you think about all the other elements that Mike talked about in those conversations?

George Barrett:  Lisa, why don't I start just very broadly, generic penetration rate actually varies a fair amount across classes. We think classes tend to be pretty steady. So there are areas -- so, for example, a chain drug tends to be very high. Independent pharmacies have been growing significantly in recent years in their penetration rate. I would say the institutional area is still little bit lower in overall generic penetration rate. And so we're thinking about each of these areas and where there's opportunities.

The other thing that we've talked about in the past is that we still have in the system some purchasers of generic drugs that do a hybrid of buying directly and through a channel partner, and we see those as opportunities. We think we're an extremely efficient sourcer of products and our value proposition downstream is very broad and comprehensive. And so, for us, that's another lever that we think about all the time, which is how do we basically create the incentive and encourage all those players to source their generics through us.

Lisa Gill:  Okay. Great. Thank you.

Operator:  We'll take our next question from David Larsen with Leerink.

David Larsen:  Hi. Mike, what did you see for brand inflation this past quarter, and what are your expectations for brand inflation for fiscal 2018, please?

Michael Kaufmann:  Yes, so brand inflation, just a couple comments. As I mentioned earlier, I did say it was just a little bit less than where we expected it to be within the range of the 7% to 9% that we gave in the last quarter. And so it's still tracking within that range, but again, a little lower than we had originally modeled for the quarter in the second half. And that being said, it's a small driver for the second half of the year. And quite honestly, we have been at -- over 85% of our branded agreements are now non-contingent to inflation. I would expect that, if not by the end of FY18, definitely during the year, or by the end, we will be at closer to 90%, if not even slightly over 90% by the end of the year.

So I think what we're -- we're seeing a couple things. One, we're making ourselves less and less dependent upon it. And because it's already gone down from low double digits to more high single, I think the risk of it going significantly lower in the future, I think, is lower also. And so I don't see that as a big driver, one-way or the other,

CardinalHealth
*Essential to care™*

for 2018 and, honestly, even probably 2019 and those years going forward, unless there's dramatic changes in the environment.

David Larsen:  Okay. And then you said that generic deflation has improved. Can you give any more color around that, like when exactly did you sort of start seeing this improvement? Was it like in the March of 2017 timeframe? And then, we say things have improved, but we're now expecting sort of double-digit deflation for the full year. Can you put any numbers around – did it go from 11% to say 9% in March? Any more color would be really helpful. Thanks.

Michael Kaufmann:  Yes, a couple things. Remember, when we're talking about an entire year rate of low double digits, and it was significantly lower in the first half of the year, so, as you could imagine, what we'd expected it to improve a little bit more, to average out to low double digits for the year. And so, again, it is improving, and the low double digits is an average for the entire year. And you do remember, probably back on one of the other quarter calls, we said we started seeing it get better in the December quarter. There was a lot of noise in there for launches. And, as I said, we see it getting better in the second half, just not as good as we had modeled.

Operator:  We'll take our next question from Garen Sarafian with Citi Research.

Garen Sarafian:  Good morning, George and Mike. Just related to a prior question, so on branded manufacturer contracting, when trends had begun to moderate a few quarters back, there was the possibility to go back to have a candid two-way dialogue to make the contracts more of a win-win. So have you gone back to successfully update some of those contracts to reflect current trends with any sizable drug partners since then? If there's any sort of a metric you can provide as to what percent has been completed or not.

George Barrett:  Hi, Garen. It's George. I'll start, and then let Mike jump in. I think we're going to be careful about describing, in too much detail, any of our proprietary conversations with our manufacturer partners. But you should assume that we are pretty regularly in dialogue with all of our manufacturer partners, and we've worked closely together for years and when there's some shifting around, I think we work hard to make sure that we're getting compensated for the work that we do. And I think those conversations are productive. I don't know if you want to...

Michael Kaufmann:  The only thing I would add is, my whole comment around going from 85% to at least 90% is all around the success of those agreements, and we're already seeing that rate increase. So you can assume that we've been able to work through some of the conversations with some of the manufacturers, and are continuing to have very productive dialogue with other manufacturers, and that's what's leading to us being able to increase from over 85% to 90% timeframe.

Garen Sarafian:  No, that was useful. And then as a quick follow-up. Related to marketplace M&A, asking in sort of new generic terms, when one of your larger pharmacy clients that purchases both generics and brands from you acquires a substantial asset, set of stores, whatever you want to call it, how do those contracts evolve? Do they simply flow through the current contract typically, or are contracts typically set up where there's a mechanism that initiates a new contract conversation? Anything you could elaborate on there, in generic terms?

George Barrett:  Yes, Garen, and it's probably going to be disappointing, because it's hard for us to give specifics about these relationships, but it varies all across the board. There are sometimes where the -- built into the agreement is just an extension of what we're doing. Sometimes there's some discussion that has to take place, given a new portfolio and a new mix. So, each story is its own story, I would say. And again, for us to try to characterize this generally would be a mistake.

**CardinalHealth**
*Essential to care™*

Operator: And we'll take our next question from Robert Willoughby with Credit Suisse.

Robert Willoughby: Hey, George. On the naviHealth upside, what drove that, and how do you get paid for that? Why isn't it a bit more predictable? And then a quick one for Mike. Just, you mentioned a better fourth quarter cash flow experience. But why didn't the working capital accounts, inventories, receivables, payables trend as well as we'd hoped for in the third quarter? What was the setback there?

George Barrett: Bob, I'll take the first part of it, and turn it over to Mike. I think the naviHealth value proposition is so clearly aligned with what's happening in care. We have an aging population, so the post-acute area is a particular hot button. We know that there's a huge percentage of Medicare spend that occurs in the post-acute setting. So our ability to reduce costs, reduce readmission, reduce time of stay, those are powerful drivers, I think. And almost independent of any short-term policy issues, we know that that's valuable. And I think that's part of what's been steering the attention to naviHealth.

Part of the business model is very steady and predictable on a per-patient per-month basis. Some of it has to do with, what I'll say, gain sharing or savings programs. And so there's going to be some natural -- again, when you use the word lumpiness, it's of course a technical term of art here. But there is some natural bumpiness to this, because you have to -- basically you reconcile after a period of time on the share and on the savings that you've created. So some part of that model has that dynamic, but it is a really exciting part of our portfolio and we're thrilled to have it.

Michael Kaufmann: And as far as working capital goes, Bob, there's nothing fundamental that's changed in the net working capital. In other words, no big vendor term changes or customer mix changes or anything. It's more just the timing around some inventory builds related to some of the IT changes that we're doing and a few other projects that we have going on that we think we'll work through here in the fourth quarter and see significant cash flow in the fourth quarter. But no fundamental changes going on in the net working capital.

**Cardinal**Health
*Essential to care™*

Robert Willoughby:  George, is there a new business number or a backlog number, anything like that, for naviHealth we can point to?

George Barrett:  Bob, that's a great question. We've never provided that. It just hasn't been part of our public disclosures. All I can say is broadly, the demand for our work in naviHealth is substantial, and at times, I wish we could keep up with it. So we're working really hard to build out the capabilities to make sure that we can support the interest in that kind of, I'm going to say, predictive analytics to help drive patients to the right side of care and to manage them effectively.

Michael Kaufmann:  And again, even if there was, just because the agreements take time for the results to pop out, we might indicate what's in the pipeline, but it would still be hard to predict what the savings are until you actually work through the process with the customer.

Sally Curley:  Thanks, Bob. Kyle, next question?

Operator:  We'll take our next question from Eric Percher with Barclays.

Eric Percher:  Thank you. A question on the Patient Recovery business. Looking at the Medical business ((inaudible)) and they're running high-teens margins and what Medtronic has said about the impact ((inaudible)) those margins even expanded. When I back out, the inventory cost and look at the ((inaudible)) contribution. And so I know that acquisition cost...

**CardinalHealth**
*Essential to care™*

Sally Curley:  Actually, Eric, I'm sorry to interrupt to. You're breaking up a bit. If you're on a cell phone, we're getting kind of every other word.

Eric Percher:  Guys, well, let me put it simply. The Medical Patient Recovery businesses, is there an expectation for cost and transition services that's going to weigh on the margin relative to what we saw at Covidien?

George Barrett:  Thank you. Eric, good morning. Sorry, we just couldn't hear the first time around. Now we got you. So I think one of the things that has been a great learning on the Cordis thing is, particularly in the international operations, the work that we need to do to ensure that there's no disruption to the patients. So I think we've done that work, and as we did the business planning and the modeling for this acquisition, we took all the learnings from that international work that we did with Cordis, and it was applied into our model. So we feel very good about that.

The second thing I would just add is that on the international side, we are building out those capabilities to support Cordis. And so, as Don said, I think we'll start to see a framework that we can roll business onto internationally. I guess, the third point would be, proportionally, more of the Patient Recovery business is actually in the U.S., and that's riding on a system that we know and use every day with our consumables business. We will have some transition agreements on the Patient Recovery business, but I think we've modeled those very carefully. Mike, you want to add something to this?

Michael Kaufmann:  Yes, just a couple things. Related to the transition service agreements, transition manufacturing agreements, we actually have them going both ways. And so both companies are highly invested in each other's success here. So I think that will be an important thing as we work through those, and I think that's important. A couple other learnings is, on the Cordis piece, the U.S. piece has gone really well, in terms of infrastructure, has gone right according to plan. And remember that this Patient Recovery business is largely U.S., and so we feel really good about our back office capabilities in the U.S.

And as George mentioned, ex-U.S., we are definitely going to be able to leverage what we're doing with Cordis on the Patient Recovery business. And then just two other quick things is, I think we've done a very nice job in managing the R&D mix in terms of expenses and managing that. Don and team have been able to manage that well, really held onto sales momentum and actually created some. And just to wrap it up, from my point is that we did mention too, that the Cordis business would return to growth in Q4.

George Barrett: One thing I might want to add, just to make sure we're totally clear on this. So there are costs associated with the transition agreements, but I think what we're saying is we've built those in. So I don't want to suggest there's no cost. Transition agreements temporarily create some costs, but I think we've modeled those very effectively and we've taken all the learning from Cordis to make sure we're doing that very well outside the U.S.

Eric Percher: Thank you.

George Barrett: Thanks.

Operator: We'll take our next question from John Kreger with William Blair.

John Kreger: Hi. Thanks very much. George or Mike, the sell-side pricing pressure that you guys have talked about the last couple of quarters for generics, have you seen any of that bleed into either traditional brand or specialty?

Michael Kaufmann: No, I wouldn't think so. I would say that the repricing has been normal in the brand and specialty. It's hard. The only reason you heard a little bit of a hesitation is they're all kind of bid as one basket, right? And so if

**Cardinal**Health

*Essential to care™*

you just look at a customer who was buying brand from us in one year to the next, I wouldn't say there's been anything unusual at all from any erosion on that. That tends to be -- it flows right off of the WAC manufacturer price, whereas the generics is more of a market price that adjusts up and down on a daily basis. So they're very different markets, but no, nothing of concern in the brand or specialty market that I would call out.

John Kreger:  Great. That's helpful. And then a question for Don was in Medical. Once you complete the Medtronic asset purchase, does that sort of complete your sort of shopping list to build out a Cardinal brand, or are there other categories where you have a high level of interest in adding?

George Barrett:  Don, give a go and I'll jump in.

Don Casey:  Look, once we complete this, it's going to take us a little while to digest this business and really make sure we're optimizing this and Cordis, and that's going to take us a fair amount of time, talent, and treasure to get that done. Once we are finished that, we'll put our head up and see where we want to go. But right now, we feel very good about the fact that we've built a really strong group of products, of services, that are really putting together a pretty compelling offer that's winning in the marketplace. So we're going to focus on making sure we do a great job on integrating the Patient Recovery business, and then we'll go from there.

George Barrett:  Thanks, John.

John Kreger:  All right. Thank you.

**Cardinal**Health
*Essential to care™*

Operator:  We'll take our final question from Steven Valiquette with Bank of America Merrill Lynch.

Steven Valiquette:  Thanks. Good morning, George and Mike. So I do hate to beat the generic questions to death, but just a high-level question on the sequential flow of generic drug profits from the March quarter to the June quarter. Your phrase that generic pricing is worse than expected, but getting better is still, I think, throwing some of us off a little bit. I guess the question is, if we were to isolate just your generic drug profits for the upcoming June quarter versus the March quarter just reported, in your budgeting do you expect directionally that those generic profits would be down sequentially? Could they still be flattish sequentially, or could they even be up? Because you keep talking about the "generic pricing getting better." So maybe the sequential conversation might help us out a little bit. Thanks.

Michael Kaufmann:  That's hard to do. Let me see if I can help a little bit. Again, the low double digits is an annual rate, and so if you start with a higher double digits number in the first half of the year, you have to see second half has to be better, and again, we are seeing it better than the first half, but not quite as good as what we had expected. Again, if you just take a look at the curve is --what we're saying is better means it's less steep on the curve, and so the declines are less in the second half.

Now, we've always, historically, typically get deflation and we've just seen over the last few years some unique sets of items seeing significant inflation that have offset that. So I think it's hard to just look at the deflation as one single component. To me, the key is that curve being less steep, but at the same time, using Red Oak and our customer mix and our other initiatives to continue to drive down costing even more so that we can begin to either maintain or grow our margins. That to me is one of the keys that we're clearly working on.

Steven Valiquette:  Okay, and one quick follow-up. I think I heard a comment from you guys about the CVS revenues being a little bit softer and that prompted a little bit lower revenue outlook for the Pharma segment. But did that get worse as the March quarter progressed, the CVS revenues and prompted you to lower the revenue guidance

Page **26** of **27**

now from them or are you just sort of playing catch-up on some trends that have been in place since January? Thanks.

Michael Kaufmann:  Yes, that's really the news that CVS had given at late in calendar 2016 around some of the contract changes that they had. And so we saw that hit us early right in the quarter, and so we saw the impact in the March quarter, we projected it into our Q4 and through next year. So this all is contemplated in everything that we've given you in terms of brand sales and our impact on the revenue line and the bottom line, and so it is low-margin brand sales and so we don't see it having a significant impact to us. But again, everything that it does have and any impact is already contemplated in all of the 2017 and 2018 guidance that we've given to you guys.

Sally Curley:  Thanks, Steve. Kyle, is there anybody else?

Operator:  We have no further questions in queue. I would now like to turn the conference back over to George Barrett for any additional or closing remarks.

George Barrett:  Thanks, Kyle. Thanks all of you for joining us this morning. We look forward to speaking to all of you in the coming days and weeks. And with that, have a good day. We'll talk soon.

Operator:  This does conclude today's conference call. Thank you all for your participation and you may now disconnect.

# EXHIBIT 73

# Q3 FY2017

Cardinal Health, Inc. Earnings Investor/Analyst call
May 1, 2017



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic and branded pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; the ability to successfully complete the acquisition of the Patient Recovery businesses from Medtronic on a timely basis, including obtaining required regulatory approvals and the satisfaction of other conditions; the conditions of the credit markets and our ability to issue debt to fund the acquisition on acceptable terms; if the acquisition of the Patient Recovery businesses is completed, the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; risks associated with the anticipated increase of indebtedness and potential limitations on our ability to use our cash for other purposes; our ability to successfully integrate and realize the benefits from the acquisition of Cordis; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws, including proposals relating to a "border adjustment tax" or new import tariffs; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of May 1, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.  In addition, this presentation contains Non-GAAP financial measures.  Cardinal Health provides definitions and reconciliations of the differences between the Non-GAAP financial measures and their most directly comparable GAAP financial measures in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com. An audio replay of the webcast will be available at ir.cardinalhealth.com.

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q3 FY2017 results



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q3 FY17 financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | Q3 FY17 | Q3 FY16 | Q3 FY17 | Q3 FY16 |
| **Revenue** | **$31,821** | **$30,662** | N/A | N/A |
| *% change* | 4% increase YoY | 21% increase YoY | | |
| **Gross Margin** | **$1,728** | **$1,689** | **$1,719** | **$1,702** |
| *% change* | 2% increase YoY | 16% increase YoY | 1% increase YoY | 17% increase YoY |
| *Ratio to revenue* | 5.43% | 5.51% | 5.40% | 5.55% |
| **Operating Earnings** | **$605** | **$656** | **$759** | **$788** |
| *% change* | 8% decrease YoY | 11% increase YoY | 4% decrease YoY | 20% increase YoY |
| *Ratio to revenue* | 1.90% | 2.14% | 2.39% | 2.57% |
| **Net Earnings[1]** | **$381** | **$386** | **$485** | **$472** |
| *% change* | 1% decrease YoY | 6% increase YoY | 3% increase YoY | 19% increase YoY |
| *Ratio to revenue* | 1.20% | 1.26% | 1.52% | 1.54% |
| **Diluted EPS[1]** | **$1.20** | **$1.17** | **$1.53** | **$1.43** |
| *% change* | 3% increase YoY | 7% increase YoY | 7% increase YoY | 20% increase YoY |

[1]*Attributable to Cardinal Health, Inc.*
*Please see appendix for GAAP to Non-GAAP reconciliations.*

4    © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q3 FY17 Pharmaceutical segment business analysis

|  | Q3 FY17 ($M) | Q3 FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$28,406** | **$27,527** | **3%** |
| **Segment Profit** | **$611** | **$660** | **(7)%** |
| **Segment Profit Margin** | **2.15%** | **2.40%** | **-25 bps** |

## Highlights:

- **Revenue** for the Pharmaceutical segment increased 3 percent to $28.4 billion due to performance from the Specialty business and growth from Pharmaceutical Distribution customers.

- **Segment profit** for the quarter decreased 7 percent to $611 million. This decrease was driven by generic pharmaceutical pricing, the final quarterly impact of the loss of Safeway, and the company's ongoing investment in its pharmaceutical IT platform. These were partially offset by solid performance from Red Oak Sourcing.

- **Segment profit margin rate** decreased largely due to generic pharmaceutical pricing.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q3 FY17 Medical segment business analysis

| | Q3 FY17 ($M) | Q3 FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$3,418** | **$3,138** | **9%** |
| **Segment Profit** | **$148** | **$128** | **16%** |
| **Segment Profit Margin** | **4.34%** | **4.08%** | **+26 bps** |

## Highlights:

- **Revenue** for the Medical segment increased 9 percent to $3.4 billion driven by contributions from new and existing customers.

- **Segment profit** 16 percent to $148 million, reflecting solid performance from naviHealth, Cardinal Health Branded products (excluding Cordis) and distribution services. A decline in Cordis performance reflected increased SG&A expenses and the net favorable impact of two larger inventory adjustments in the year-over-year comparison.

- **Segment profit margin rate** increased due to the same factors mentioned above.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q3 FY17 GAAP to non-GAAP adjustments[1]

| | Q3 FY 2017 | | | | Q3 FY 2016 | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] |
| **GAAP** | **$1,728** | **$605** | **$381** | **$1.20** | **$1,689** | **$656** | **$386** | **$1.17** |
| LIFO charges/(credits) | (9) | (9) | (5) | (0.02) | 12 | 12 | 8 | 0.02 |
| Restructuring and employee severance | - | 15 | 9 | 0.03 | - | 6 | 4 | 0.01 |
| Amortization and other acquisition-related costs | - | 128 | 87 | 0.27 | - | 108 | 71 | 0.21 |
| Impairments and (gain)/loss on disposal of assets | - | 2 | 2 | 0.01 | - | - | - | - |
| Litigation (recoveries)/charges, net | - | 18 | 11 | 0.03 | - | 5 | 3 | 0.01 |
| **Non-GAAP** | **$1,719** | **$759** | **$485** | **$1.53** | **$1,702** | **$788** | **$472** | **$1.43** |
| | | | | | | | | |
| Amortization of acquisition-related intangible assets[3] | - | $96 | $67 | $0.21 | - | $88 | $57 | $0.17 |

[1]*Please see appendix for GAAP to Non-GAAP reconciliations.*
[2]*Attributable to Cardinal Health, Inc.*
[3]*Amortization of acquisition-related intangible assets is included in Amortization and other acquisition-related costs*

*The sum of the components may not equal the total due to rounding.*

7   © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY2017 Outlook

*The company presents its outlook for fiscal 2017 non-GAAP EPS and non-GAAP effective tax rate on the following pages.  As previously disclosed, the company does not provide a GAAP EPS or GAAP effective tax rate outlook because it is unable to reliably forecast many of the items that the company excludes from GAAP EPS and effective tax rate to calculate them. See "Forward-Looking non-GAAP Measures" following the attached schedules for additional information.*



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# FY17 financial expectations

|  | **FY2017 Outlook** | **FY2016 Actual** |
|---|---|---|
| **Revenue** | Mid-to-high single digit percentage growth vs. PY | $121.5B |
| **Non-GAAP Diluted EPS** | $5.35 to $5.50 | $5.24 |

*Red font indicates a change since previous guidance.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY17 corporate assumptions

|  | **FY2017 Outlook** | **FY2016 Actual** |
|---|---|---|
| **Non-GAAP effective tax rate** | 35% - 37%[1] | 36.0%[3] |
| **Diluted weighted average Shares outstanding** | 320M - 321M | 330M |
| **Interest and other, net** | $190M - $205M | $183M |
| **Capital expenditures** | $400M - $450M | $465M |
| **Acquisition-related intangible amortization** | ~$389M or ~$0.81[2] | $355M or $0.70 |

[1]*May fluctuate quarterly due to unique items affecting periods.*

[2]*Includes only acquisitions closed as of March 31, 2017.*

[3]*FY2016 GAAP ETR 37.1%, Please see appendix for GAAP to Non-GAAP reconciliations.*

*Red font indicates a change since previous guidance.*

10

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Pharmaceutical segment FY17(E)

- **Mid-to-high single digit percentage increase in revenue versus prior year**

- **Full-year segment profit down low-double digits versus prior year**

## Key assumptions

- Loss of the Safeway contract, which expired on March 31, 2016

- Generic drug price assumption of low-double digit deflation for full fiscal year

- Brand drug manufacturer price assumption of 7% to 9% inflation for full fiscal year

- Increased expense related to investment in information systems to support growth

- Incremental contribution from new generic launches, but Y-o-Y benefit significantly less

- Incremental contribution from Red Oak Sourcing, but Y-o-Y benefit significantly less

- Additional contributions from Metro Medical and Harvard Drug Group

- Double-digit revenue and profit growth from both Specialty and Cardinal Health China[1]

[1]*Cardinal Health China reports in both segments, but primarily contributes to the Pharmaceutical segment; growth is on a local currency basis*
*Red font indicates a change since previous guidance.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Medical segment FY17(E)

- **High-single digit percentage increase in revenue vs. prior year**

- **Double-digit segment profit growth vs. prior year**

### Key assumptions

- Cordis accretive by >$0.15 vs. prior year; net of transaction-related interest expense of $0.07-$0.08; increasingly accretive thereafter

- Above-market revenue growth in Cardinal Health at Home

- Double-digit profit growth from Cardinal Health Brand products

*Red font indicates a change since previous guidance.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# A balanced approach with capital

| Capital Deployment | | | |
|---|---|---|---|
| Capital Expenditures | Acquisitions[1] | Dividends | Share Repurchases |

| | Capital Expenditures | Acquisitions[1] | Dividends | Share Repurchases |
|---|---|---|---|---|
| FY12 - FY16 | $1.5B | $7.0B | $2.0B | $3.3B |
| YTD FY17 | $293M | $113M | $435M | $600M |

**Invested**

**$406M**

for sustainable growth[2]

**Returned**

**$1.0B**

to our shareholders[2]

[1]Acquisitions are net of divestitures.
[2]Nine months ended 3/31/2017

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health

*Essential to care™*

Appendix

# Q3 FY2017 trailing five quarters, GAAP to Non-GAAP reconciliation statements and supplemental financial information



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q3 FY2017 segment analysis

## Pharmaceutical segment

|  | Q3 FY16 | Q4 FY16 | Q1 FY17 | Q2 FY17 | Q3 FY17 |
|---|---|---|---|---|---|
| Revenue ($M) | 27,527 | 28,177 | 28,762 | 29,743 | 28,406 |
| Segment Profit ($M) | 660 | 542 | 534 | 537 | 611 |

## Medical segment

|  | Q3 FY16 | Q4 FY16 | Q1 FY17 | Q2 FY17 | Q3 FY17 |
|---|---|---|---|---|---|
| Revenue ($M) | 3,138 | 3,210 | 3,279 | 3,410 | 3,418 |
| Segment Profit ($M) | 128 | 122 | 127 | 159 | 148 |

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care™*

# Year-to-date financial summary[1]

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | YTD FY17 | YTD FY16 | YTD FY17 | YTD FY16 |
| **Revenue** | **$97,010** | **$90,162** | **N/A** | **N/A** |
| *% change* | 8% increase YoY | 20% increase YoY | | |
| **Gross Margin** | **$4,921** | **$4,877** | **$4,921** | **$4,929** |
| *% change* | 1% increase YoY | 15% increase YoY | 0% decrease YoY | 16% increase YoY |
| *Ratio to revenue* | 5.07% | 5.41% | 5.07% | 5.47% |
| **Operating Earnings** | **$1,681** | **$1,839** | **$2,129** | **$2,251** |
| *% change* | 9% decrease YoY | 15% increase YoY | 5% decrease YoY | 21% increase YoY |
| *Ratio to revenue* | 1.73% | 2.04% | 2.19% | 2.50% |
| **Net Earnings[2]** | **$1,014** | **$1,095** | **$1,311** | **$1,361** |
| *% change* | 7% decrease YoY | 19% increase YoY | 4% decrease YoY | 20% increase YoY |
| *Ratio to revenue* | 1.05% | 1.21% | 1.35% | 1.51% |
| **Diluted EPS[2]** | **$3.17** | **$3.30** | **$4.10** | **$4.10** |
| *% change* | 4% decrease YoY | 20% increase YoY | 0% decrease YoY | 21% increase YoY |

*[1] Nine months ended 3/31/2017*
*[2] Attributable to Cardinal Health, Inc.*
*Please see appendix for GAAP to Non-GAAP reconciliations.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2,3,4] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Third Quarter 2017** | | | | | |
| GAAP | $ 1,728 | 2 % | $ 605 | (8)% | $ 564 | $ 182 | $ 381 | (1)% | $ 1.20 | 3 % |
| LIFO charges/(credits) | (9) | | (9) | | (9) | (4) | (5) | | (0.02) | |
| Restructuring and employee severance | - | | 15 | | 15 | 6 | 9 | | 0.03 | |
| Amortization and other acquisition-related costs | - | | 128 | | 128 | 41 | 87 | | 0.27 | |
| Impairments and (gain)/loss on disposal of assets | - | | 2 | | 2 | - | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | - | | 18 | | 18 | 7 | 11 | | 0.03 | |
| Non-GAAP | $ 1,719 | 1 % | $ 759 | (4)% | $ 718 | $ 232 | $ 485 | 3 % | $ 1.53 | 7 % |
| | | | | | **Third Quarter 2016** | | | | | |
| GAAP | $ 1,689 | 16 % | $ 656 | 11 % | $ 612 | $ 226 | $ 386 | 6 % | $ 1.17 | 7 % |
| LIFO charges/(credits) | 12 | | 12 | | 12 | 4 | 8 | | 0.02 | |
| Restructuring and employee severance | - | | 6 | | 6 | 2 | 4 | | 0.01 | |
| Amortization and other acquisition-related costs | - | | 108 | | 108 | 37 | 71 | | 0.21 | |
| Impairments and (gain)/loss on disposal of assets | - | | - | | - | - | - | | - | |
| Litigation (recoveries)/charges, net | - | | 5 | | 5 | 2 | 3 | | 0.01 | |
| Non-GAAP | $ 1,702 | 17 % | $ 788 | 20 % | $ 744 | $ 272 | $ 472 | 19 % | $ 1.43 | 20 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2] Attributable to Cardinal Health, Inc.

[3] GAAP diluted EPS for the three months ended March 31, 2017 compared to the prior year period was favorably impacted by $0.13, which includes $0.08 due to change in the effective tax rate and $0.05 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

[4] Non-GAAP diluted EPS for the three months ended March 31, 2017 compared to the prior year period was favorably impacted by $0.16, which includes $0.10 due to change in the effective tax rate and $0.06 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.
We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Year-to-Date 2017 | | | | | |
| **GAAP** | $ 4,921 | 1 % $ | 1,681 | (9)% $ | 1,549 $ | 533 | $ 1,014 | (7)% $ | 3.17 | (4)% |
| LIFO charges/(credits) | - | | - | | - | - | - | | - | |
| Restructuring and employee severance | - | | 31 | | 31 | 12 | 19 | | 0.06 | |
| Amortization and other acquisition-related costs | - | | 365 | | 365 | 120 | 245 | | 0.76 | |
| Impairments and (gain)/loss on disposal of assets | - | | 15 | | 15 | 4 | 11 | | 0.03 | |
| Litigation (recoveries)/charges, net | - | | 37 | | 37 | 14 | 23 | | 0.07 | |
| **Non-GAAP** | $ 4,921 | - % $ | 2,129 | (5)% $ | 1,997 $ | 684 | $ 1,311 | (4)% $ | 4.10 | - % |
| | | | | | Year-to-Date 2016 | | | | | |
| GAAP | $ 4,877 | 15 % $ | 1,839 | 15 % $ | 1,700 $ | 604 | $ 1,095 | 19 % $ | 3.30 | 20 % |
| LIFO charges/(credits) | 51 | | 51 | | 51 | 20 | 31 | | 0.10 | |
| Restructuring and employee severance | - | | 19 | | 19 | 7 | 12 | | 0.04 | |
| Amortization and other acquisition-related costs | - | | 327 | | 327 | 115 | 212 | | 0.64 | |
| Impairments and (gain)/loss on disposal of assets | - | | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | - | | (3) | | (3) | (3) | - | | - | |
| Non-GAAP | $ 4,929 | 16 % $ | 2,251 | 21 % $ | 2,112 $ | 751 | $ 1,361 | 20 % $ | 4.10 | 21 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2] Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.
We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings[1] Before Income Taxes | Provision for Income Taxes | Net Earnings from Continuing Operations[2] | Net Earnings from Continuing Operations[2] Growth Rate | Diluted EPS[1,2] | Diluted EPS[1,2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | | Fiscal Year 2016 | | | |
| **GAAP** | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| LIFO charges/(credits) | - | | - | - | - | | - | |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | (69) | | (69) | (27) | (42) | | (0.13) | |
| **Non-GAAP** | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |

[1] From continuing operations

[2] Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**Total Company Business Analysis**

| (in millions) | Third Quarter | | | | Non-GAAP Third Quarter | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2017 | | 2016 | |
| **Revenue** | | | | | | | | |
| Amount | $ | 31,821 | $ | 30,662 | | | | |
| Growth rate | | 4 % | | 21 % | | | | |
| | | | | | | | | |
| **Gross margin** | | | | | | | | |
| Amount | $ | 1,728 | $ | 1,689 | $ | 1,719 | $ | 1,702 |
| Growth rate | | 2 % | | 16 % | | 1 % | | 17 % |
| | | | | | | | | |
| **Operating earnings** | | | | | | | | |
| Amount | $ | 605 | $ | 656 | $ | 759 | $ | 788 |
| Growth rate | | (8)% | | 11 % | | (4)% | | 20 % |
| | | | | | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | | | | | |
| Amount | $ | 381 | $ | 386 | $ | 485 | $ | 472 |
| Growth rate | | (1)% | | 6 % | | 3 % | | 19 % |
| | | | | | | | | |
| Return on equity | | 23.6 % | | 23.0 % | | 29.9 % | | 28.1 % |
| | | | | | | | | |
| Effective tax rate | | 32.3 % | | 36.9 % | | 32.3 % | | 36.6 % |
| | | | | | | | | |
| Debt to total capital | | 45 % | | 45 % | | | | |
| Net debt to capital | | | | | | 38 % | | 31 % |

| (in millions) | Year-to-Date | | | | Non-GAAP Year-to-Date | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2017 | | 2016 | |
| **Revenue** | | | | | | | | |
| Amount | $ | 97,010 | $ | 90,162 | | | | |
| Growth rate | | 8 % | | 20 % | | | | |
| | | | | | | | | |
| **Gross margin** | | | | | | | | |
| Amount | $ | 4,921 | $ | 4,877 | $ | 4,921 | $ | 4,929 |
| Growth rate | | 1 % | | 15 % | | - % | | 16 % |
| | | | | | | | | |
| **Operating earnings** | | | | | | | | |
| Amount | $ | 1,681 | $ | 1,839 | $ | 2,129 | $ | 2,251 |
| Growth rate | | (9)% | | 15 % | | (5)% | | 21 % |
| | | | | | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | | | | | |
| Amount | $ | 1,014 | $ | 1,095 | $ | 1,311 | $ | 1,361 |
| Growth rate | | (7)% | | 19 % | | (4)% | | 20 % |
| | | | | | | | | |
| Return on equity | | 20.8 % | | 22.3 % | | 26.9 % | | 27.7 % |
| | | | | | | | | |
| Effective tax rate | | 34.4 % | | 35.5 % | | 34.2 % | | 35.6 % |

Refer to the GAAP/Non-GAAP reconciliation for definitions and calculations supporting the Non-GAAP balances.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Third Quarter | | | (in millions) | Third Quarter | | |
| | 2017 | | 2016 | | 2017 | | 2016 |
|---|---|---|---|---|---|---|---|
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **28,406** | $ 27,527 | Amount | $ | **3,418** | $ 3,138 |
| Growth rate | | **3 %** | 22 % | Growth rate | | **9 %** | 13 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **611** | $ 660 | Amount | $ | **148** | $ 128 |
| Growth rate | | **(7)%** | 16 % | Growth rate[1] | | **16 %** | 26 % |
| Segment profit margin | | **2.15 %** | 2.40 % | Segment profit margin | | **4.34 %** | 4.08 % |

Segment profit for three months ended March 31, 2016 includes a $21 million unfavorable impact of Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit declined 1 percent and grew 47 percent for the three months ended March 31, 2017 and 2016, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the three months ended March 31, 2017 was $31,821 million, which included total segment revenue of $31,824 million and Corporate revenue of $(3) million. Total consolidated revenue for the three months ended March 31, 2016 was $30,662 million, which included total segment revenue of $30,665 million and Corporate revenue of $(3) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended March 31, 2017 were $605 million, which included total segment profit of $759 million and Corporate costs of $(154) million. Total consolidated operating earnings for the three months ended March 31, 2016 were $656 million, which included total segment profit of $788 million and Corporate costs of $(132) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Year-to-Date | | | (in millions) | Year-to-Date | | |
|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **86,911** | $ 80,954 | Amount | $ | **10,107** | $ 9,220 |
| Growth rate | | **7 %** | 22 % | Growth rate | | **10 %** | 8 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **1,682** | $ 1,945 | Amount | $ | **435** | $ 335 |
| Growth rate | | **(14)%** | 25 % | Growth rate[1] | | **30 %** | 1 % |
| Segment profit margin | | **1.94 %** | 2.40 % | Segment profit margin | | **4.30 %** | 3.63 % |

Segment profit for the six months ended March 31, 2016 includes the $43 million unfavorable impact of the Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit growth was 15 percent and 14 percent for the nine months ended March 31, 2017 and 2016, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the nine months ended March 31, 2017 was $97,010 million, which included total segment revenue of $97,018 million and Corporate revenue of $(8) million. Total consolidated revenue for the nine months ended March 31, 2016 was $90,162 million, which included total segment revenue of $90,174 million and Corporate revenue of $(12) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the nine months ended March 31, 2017 were $1,681 million, which included total segment profit of $2,117 million and Corporate costs of $(436) million. Total consolidated operating earnings for the nine months ended March 31, 2016 were $1,839 million, which included total segment profit of $2,280 million and Corporate costs of $(441) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Third Quarter 2017 | | 2016 |
|---|---|---|---|
| **GAAP return on equity** | **23.6 %** | | 23.0 % |
| | | | |
| **Non-GAAP return on equity** | | | |
| Net earnings attributable to Cardinal Health, Inc. | $ **381** | $ | 386 |
| LIFO charges/(credits), net of tax | **(5)** | | 8 |
| Restructuring and employee severance, net of tax | **9** | | 4 |
| Amortization and other acquisition-related costs, net of tax | **87** | | 71 |
| Impairments and loss on disposal of assets, net of tax | **2** | | - |
| Litigation charges, net, net of tax | **11** | | 3 |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $ **485** | $ | 472 |
| Annualized | $ **1,940** | $ | 1,889 |

| | Third Quarter 2017 | Second Quarter 2017 | Third Quarter 2016 | Second Quarter 2016 |
|---|---|---|---|---|
| Total Cardinal Health, Inc. shareholders' equity | $ **6,646** | $ **6,323** | $ 6,713 | $ 6,711 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $ **6,485** | | $ 6,712 | |
| **Non-GAAP return on equity** | **29.9 %** | | 28.1 % | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Year-to-Date | |
| --- | --- | --- |
| | 2017 | 2016 |
| **GAAP return on equity** | **20.8 %** | 22.3 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings from continuing operations attributable to Cardinal Health, Inc. | $  1,014 | $  1,095 |
| LIFO charges/(credits), net of tax | - | 31 |
| Restructuring and employee severance, net of tax | 19 | 12 |
| Amortization and other acquisition-related costs, net of tax | 245 | 212 |
| Impairments and (gain)/loss on disposal of assets, net of tax | 11 | 10 |
| Litigation (recoveries)/charges, net, net of tax | 23 | - |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $  1,311 | $  1,361 |
| Annualized | $  1,748 | $  1,815 |

| | Third Quarter 2017 | Second Quarter 2017 | First Quarter 2017 | Fourth Quarter 2016 | Third Quarter 2016 | Second Quarter 2016 | First Quarter 2016 | Fourth Quarter 2015 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Total Cardinal Health, Inc. shareholders' equity | $  6,646 | $  6,323 | $  6,512 | $  6,554 | $  6,713 | $  6,711 | $  6,505 | $  6,256 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $  6,509 | | | | $  6,546 | | | |
| **Non-GAAP return on equity** | **26.9 %** | | | | 27.7 % | | | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Third Quarter | | Year-to-Date | |
|---|---|---|---|---|
| | **2017** | 2016 | **2017** | 2016 |
| **GAAP effective tax rate** | **32.3 %** | 36.9 % | **34.4 %** | 35.5 % |
| | | | | |
| **Non-GAAP effective tax rate** | | | | |
| Earnings before income taxes | $ **564** | $ 612 | $ **1,549** | $ 1,700 |
| LIFO charges/(credits) | **(9)** | 12 | **-** | 51 |
| Restructuring and employee severance | **15** | 6 | **31** | 19 |
| Amortization and other acquisition-related costs | **128** | 108 | **365** | 327 |
| Impairments and loss on disposal of assets | **2** | - | **15** | 17 |
| Litigation (recoveries)/charges, net | **18** | 5 | **37** | (3) |
| Adjusted earnings before income taxes | $ **718** | $ 744 | $ **1,997** | $ 2,112 |
| | | | | |
| Provision for income taxes | $ **182** | $ 226 | $ **533** | $ 604 |
| LIFO charges/(credits) tax benefit/(expense) | **(4)** | 4 | **-** | 20 |
| Restructuring and employee severance tax benefit | **6** | 2 | **12** | 7 |
| Amortization and other acquisition-related costs tax benefit | **41** | 37 | **120** | 115 |
| Impairments and loss on disposal of assets tax benefit | **-** | - | **4** | 7 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | **7** | 2 | **14** | (3) |
| Adjusted provision for income taxes | $ **232** | $ 272 | $ **684** | $ 751 |
| | | | | |
| **Non-GAAP effective tax rate** | **32.3 %** | 36.6 % | **34.2 %** | 35.6 % |

| | Third Quarter | |
|---|---|---|
| | **2017** | 2016 |
| **Debt to total capital** | **45 %** | 45 % |
| | | |
| **Net debt to capital** | | |
| Current portion of long-term obligations and other short-term borrowings | $ **607** | $ 351 |
| Long-term obligations, less current portion | **4,854** | 5,195 |
| Debt | $ **5,461** | $ 5,546 |
| Cash and equivalents | **(1,368)** | (2,598) |
| Net debt | $ **4,093** | $ 2,948 |
| Total Cardinal Health, Inc. shareholders' equity | **6,646** | 6,713 |
| Capital | $ **10,739** | $ 9,661 |
| **Net debt to capital** | **38 %** | 31 % |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| | Fiscal Year |
|---|---|
| (in millions) | 2016 |
| **GAAP effective tax rate** | **37.1 %** |
| | |
| **Non-GAAP effective tax rate** | |
| Earnings before income taxes | $ 2,276 |
| Restructuring and employee severance | 25 |
| Amortization and other acquisition-related costs | 459 |
| Impairments and (gain)/loss on disposal of assets | 21 |
| Litigation (recoveries)/charges, net | (69) |
| Adjusted earnings before income taxes | $ 2,711 |
| | |
| Provision for income taxes | $ 845 |
| Restructuring and employee severance tax benefit | 9 |
| Amortization and other acquisition-related costs tax benefit | 143 |
| Impairments and (gain)/loss on disposal of assets tax benefit/(expense) | 6 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | (27) |
| Adjusted provision for income taxes | $ 976 |
| | |
| **Non-GAAP effective tax rate** | **36.0 %** |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

<u>Forward Looking non-GAAP Measures</u>

In this presentation, the Company presents its outlook for fiscal 2017 non-GAAP EPS and non-GAAP Effective Tax Rate (ETR).  The Company does not provide EPS or ETR outlook, which are the most directly comparable GAAP measures to non-GAAP EPS and non-GAAP ETR, respectively, because changes in the items that the Company excludes from GAAP EPS and GAAP ETR to calculate these measures can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on EPS or ETR outlook numbers.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2017 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.14 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total Cardinal Health, Inc. shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total Cardinal Health, Inc. shareholders' equity).

**Non-GAAP Diluted EPS attributable to Cardinal Health, Inc. or "Non-GAAP Diluted EPS" or "Non-GAAP Diluted Earnings Per Share"**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP Diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Effective Tax Rate**: (provision for income taxes adjusted for (1) LIFO charges/(credits)[1], (2) restructuring and employee severance[2], (3) amortization and other acquisition-related costs[3], (4) impairments and (gain)/loss on disposal of assets[4], (5) litigation (recoveries)/charges, net[5], and (6) loss on extinguishment of debt[6]) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP Gross Margin**: Gross margin excluding LIFO charges/(credits).

[1]The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market. These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[2]Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel), and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[3]Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs, and changes in the fair value of contingent consideration obligations.

[4]Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[5]Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[6]Charges related to the make-whole premium on the redemption of notes.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Non-GAAP Net Earnings attributable to Cardinal Health, Inc. or "Non-GAAP Net Earnings"**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Earnings from Continuing Operations:** earnings from continuing operations excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Operating Earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net.

**Non-GAAP Return on Equity**: (annualized current period net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax) divided by average Cardinal Health, Inc. shareholders' equity.

**Return on Equity**: annualized current period net earnings attributable to Cardinal Health, Inc. divided by average Cardinal Health, Inc. shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general, and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.

# EXHIBIT 74

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2017

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

**CardinalHealth**
*Essential to care™*

# Cardinal Health, Inc.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑                          Accelerated filer ☐

Non-accelerated filer ☐ (Do not check if a smaller reporting company)        Smaller reporting company ☐

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The number of the registrant's common shares, without par value, outstanding as of April 25, 2017, was the following: 315,882,555.

# Cardinal Health

**Q3 Fiscal 2017 Form 10-Q**

## Table of Contents

|  | Page |
|---|---|
| Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Explanation and Reconciliation of Non-GAAP Financial Measures | **13** |
| Quantitative and Qualitative Disclosures about Market Risk | **16** |
| Controls and Procedures | **16** |
| Legal Proceedings | **16** |
| Risk Factors | **17** |
| Unregistered Sales of Equity Securities and Use of Proceeds | **17** |
| Financial Statements and Supplementary Data | **18** |
| Exhibits | **32** |
| Form 10-Q Cross Reference Index | **33** |
| Signatures | **34** |

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a globally integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physicians' offices. We provide clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. We connect patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. We manage our business and report our financial results in two segments: Pharmaceutical and Medical. As used in this report, "we," "our," "us," and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise.

## Forward-Looking Statements

This Quarterly Report on Form 10-Q for the quarter ended March 31, 2017 (this "Form 10-Q") (including information incorporated by reference) includes "forward-looking statements" addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), but there are others in the document, which may be identified by the words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. The matters discussed in these forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from those made, projected or implied in the forward-looking statements. The most significant of these risks, uncertainties and other factors are described in "Risk Factors" in this Form 10-Q, in Exhibit 99.1 to this Form 10-Q, in "Risk Factors" of our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (our "2016 Form 10-K"), and in our other filings with the Securities and Exchange Commission ("SEC") since June 30, 2016. Forward-looking statements in this document speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

## Non-GAAP Financial Measures

In the "Overview of Consolidated Results" section of MD&A, we use financial measures that are derived from our consolidated financial data but are not presented in our condensed consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the SEC rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this Form 10-Q.

# Management's Discussion and Analysis of Financial Condition and Results of Operations

The discussion and analysis presented below is concerned with material changes in financial condition and results of operations between the periods specified in our condensed consolidated balance sheets at March 31, 2017 and June 30, 2016, and in our condensed consolidated statements of earnings for the three and nine months ended March 31, 2017 and 2016. All comparisons presented are with respect to the prior-year period, unless stated otherwise. This discussion and analysis should be read in conjunction with the MD&A included in our 2016 Form 10-K.

# Overview of Consolidated Results

## Revenue



**Revenue
(in billions)**

$30.7 — Q3 FY16
$31.8 — Q3 FY17
$90.2 — YTD FY16
$97.0 — YTD FY17

During the three months ended March 31, 2017, revenue increased 4 percent to $31.8 billion primarily due to sales growth from specialty pharmaceutical and pharmaceutical distribution customers. During the nine months ended March 31, 2017, revenue increased 8 percent to $97.0 billion primarily due to sales growth from pharmaceutical distribution customers.

## GAAP and Non-GAAP Operating Earnings



**GAAP
(in billions)**

$0.7 — Q3 FY16
$0.6 — Q3 FY17
$1.8 — YTD FY16
$1.7 — YTD FY17

**Non-GAAP
(in billions)**

$0.8 — Q3 FY16
$0.8 — Q3 FY17
$2.3 — YTD FY16
$2.1 — YTD FY17

| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | 2017 | 2016 | Change | 2017 | 2016 | Change |
| **GAAP operating earnings** | $ 605 | $ 656 | (8)% | $ 1,681 | $ 1,839 | (9)% |
| LIFO charges/(credits) | (9) | 12 | | — | 51 | |
| Restructuring and employee severance | 15 | 6 | | 31 | 19 | |
| Amortization and other acquisition-related costs | 128 | 108 | | 365 | 327 | |
| Impairments and (gain)/loss on disposal of assets | 2 | — | | 15 | 17 | |
| Litigation (recoveries)/charges, net | 18 | 5 | | 37 | (3) | |
| **Non-GAAP operating earnings** | $ 759 | $ 788 | (4)% | $ 2,129 | $ 2,251 | (5)% |

The sum of the components may not equal the total due to rounding.

The decreases in both GAAP and non-GAAP operating earnings for the three and nine months ended March 31, 2017 were primarily due to generic pharmaceutical customer pricing changes and the loss of a large pharmaceutical distribution customer beginning April 1, 2016. For the nine months ended March 31, 2017, reduced levels of branded pharmaceutical inflation also contributed to the decreases in GAAP and non-GAAP operating earnings. The decreases were partially offset by the benefits of Red Oak Sourcing within our generics program and growth from our Medical segment.

| MD&A | Overview |
|---|---|

## GAAP and Non-GAAP Diluted EPS



| ($ per share) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | 2017 | 2016 | Change | 2017 | 2016 | Change |
| **GAAP** [1] | $ **1.20** | $ 1.17 | **3%** | $ **3.17** | $ 3.30 | **(4)%** |
| LIFO charges/(credits) | **(0.02)** | 0.02 | | **—** | 0.10 | |
| Restructuring and employee severance | **0.03** | 0.01 | | **0.06** | 0.04 | |
| Amortization and other acquisition-related costs | **0.27** | 0.21 | | **0.76** | 0.64 | |
| Impairments and (gain)/loss on disposal of assets | **0.01** | — | | **0.03** | 0.03 | |
| Litigation (recoveries)/charges, net | **0.03** | 0.01 | | **0.07** | — | |
| **Non-GAAP** [1] | $ **1.53** | $ 1.43 | **7%** | $ **4.10** | $ 4.10 | **— %** |

The sum of the components may not equal the total due to rounding.

(1)     diluted earnings per share attributable to Cardinal Health, Inc. ("diluted EPS")

During the three months ended March 31, 2017, GAAP and non-GAAP diluted EPS increased primarily due to a lower effective tax rate and fewer outstanding shares as a result of share repurchases, partially offset by lower GAAP and non-GAAP operating earnings. During the nine months ended March 31, 2017 GAAP diluted EPS decreased and non-GAAP diluted EPS was flat compared to the prior-year period primarily due to lower GAAP and non-GAAP operating earnings, offset by fewer outstanding shares as a result of share repurchases and by a lower effective tax rate.

**MD&A** | **Overview**

## Cash and Equivalents

Our cash and equivalents balance was $1.4 billion at March 31, 2017 compared to $2.4 billion at June 30, 2016. The decrease in cash and equivalents during the nine months ended March 31, 2017 was driven by $600 million paid for share repurchases, $435 million paid for dividends and $293 million of capital expenditures, offset in part by $460 million net cash provided by operating activities. The $1.9 billion decrease in net cash provided by operating activities during the nine months ended March 31, 2017 compared to the prior-year period was primarily due to changes in working capital.

## Acquisition of Certain Medtronic Businesses

On April 18, 2017, we entered into an agreement with Medtronic plc ("Medtronic") to acquire its Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses for $6.1 billion in cash, subject to certain adjustments. These Medtronic businesses manufacture 23 medical product categories sold into multiple healthcare channels, and include numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition will further expand the Medical segment's portfolio of self-manufactured products. We plan to fund the acquisition through $4.5 billion in new long-term debt, the use of existing cash and expected operating cash flows through closing. Additionally, if needed, we may access our commercial paper program and credit facilities, further discussed in the "Liquidity and Capital Resources" section of MD&A. We also obtained a bank commitment to provide a $4.5 billion unsecured bridge loan. We expect to close the acquisition in the first quarter of our fiscal 2018, subject to customary closing conditions, including regulatory clearances.

## Trends

Within our Pharmaceutical segment, we now expect fiscal 2018 segment profit to be less than our expected fiscal 2017 segment profit due primarily to generic pharmaceutical customer pricing changes, which also are negatively impacting Pharmaceutical segment profit during fiscal 2017. However, as is generally the case, the frequency, timing, magnitude, and profit impact of pharmaceutical customer pricing changes and branded and generic pharmaceutical manufacturer pricing changes remain uncertain and their impact on Pharmaceutical segment profit and consolidated operating earnings in fiscal 2017 and fiscal 2018 could be more or less than we expect.

# Results of Operations

## Revenue



**Pharmaceutical Segment (in billions)**

| Q3 FY16 | Q3 FY17 | YTD FY16 | YTD FY17 |
|---------|---------|----------|----------|
| $27.5 | $28.4 | $81.0 | $86.9 |



**Medical Segment (in billions)**

| Q3 FY16 | Q3 FY17 | YTD FY16 | YTD FY17 |
|---------|---------|----------|----------|
| $3.1 | $3.4 | $9.2 | $10.1 |

| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | 2017 | 2016 | Change | 2017 | 2016 | Change |
| Pharmaceutical | $ 28,406 | $ 27,527 | 3% | $ 86,911 | $ 80,954 | 7% |
| Medical | 3,418 | 3,138 | 9% | 10,107 | 9,220 | 10% |
| Total segment revenue | 31,824 | 30,665 | 4% | 97,018 | 90,174 | 8% |
| Corporate | (3) | (3) | N.M. | (8) | (12) | N.M. |
| **Total revenue** | $ 31,821 | $ 30,662 | 4% | $ 97,010 | $ 90,162 | 8% |

### Pharmaceutical Segment

Pharmaceutical segment sales growth from specialty pharmaceutical customers and pharmaceutical distribution customers positively impacted revenue by $0.8 billion for the three months ended March 31, 2017.

Pharmaceutical segment revenue growth for the nine months ended March 31, 2017 was primarily due to $6.0 billion in sales growth from new and existing pharmaceutical distribution customers, including the on-boarding of a new mail order customer beginning in October 2015.

### Medical Segment

Medical segment revenue growth for the three months ended March 31, 2017 was primarily due to sales growth from new and existing customers.

Medical segment revenue growth for the nine months ended March 31, 2017 was primarily due to sales growth from new and existing customers and $212 million in contributions from acquisitions.

## Cost of Products Sold

Cost of products sold for the three and nine months ended March 31, 2017 increased $1.1 billion (4 percent) and $6.8 billion (8 percent) compared to the prior-year periods, respectively, as a result of the same factors affecting the changes in revenue and gross margin.

**MD&A** | Results of Operations

## Gross Margin





| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | **2017** | 2016 | Change | **2017** | 2016 | Change |
| Gross margin | **$    1,728** | $    1,689 | **2%** | **$    4,921** | $    4,877 | **1%** |

### Three Months Ended March 31, 2017

Gross margin increased $39 million during the three months ended March 31, 2017 compared to the prior-year period.

Sales growth from pharmaceutical distribution and specialty pharmaceutical customers, as well as from our Medical segment, positively impacted gross margin by $92 million. This was partially offset by the loss of a large pharmaceutical distribution customer beginning April 1, 2016.

Gross margin as a percent of revenue declined 8 basis points, primarily due to generic pharmaceutical customer pricing changes, partially offset by the benefits from Red Oak Sourcing within our generics program.

The increase in gross margin reflects a $21 million benefit from lower last-in first-out ("LIFO") charges. See Note 1 of the "Notes to Condensed Consolidated Financial Statements" for additional information on LIFO.

### Nine Months Ended March 31, 2017

Gross margin increased $44 million during the nine months ended March 31, 2017 compared to the prior-year period.

Pharmaceutical distribution sales growth and acquisitions in both segments increased gross margin by $221 million and $133 million, respectively. These were partially offset by the loss of a large pharmaceutical distribution customer beginning April 1, 2016.

Gross margin as a percent of revenue declined 34 basis points, primarily due to generic pharmaceutical customer pricing changes, partially offset by the benefits from Red Oak Sourcing within our generics program.

The increase in gross margin reflects a $51 million benefit from lower LIFO charges.

## Distribution, Selling, General and Administrative ("SG&A") Expenses

| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | **2017** | 2016 | Change | **2017** | 2016 | Change |
| SG&A expenses | **$    960** | $    914 | **5%** | **$    2,792** | $    2,678 | **4%** |

The increase in SG&A expenses during the three months ended March 31, 2017, compared to the prior-year period reflects costs related to a multi-year project to replace certain Pharmaceutical segment finance and operating information systems and an overall increase in new customer and product volume in our Medical segment, partially offset by reduced enterprise-wide incentive compensation. The increase in SG&A expenses during the nine months ended March 31, 2017 over the prior-year period was largely driven by acquisitions ($109 million).

| MD&A | Results of Operations |
|------|----------------------|

## Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 13 of the "Notes to Condensed Consolidated Financial Statements" for additional information on segment profit.



Pharmaceutical Segment Profit (in millions) — Q3 FY16 $660, Q3 FY17 $611, YTD FY16 $1,945, YTD FY17 $1,682

Medical Segment Profit (in millions) — Q3 FY16 $128, Q3 FY17 $148, YTD FY16 $335, YTD FY17 $435

| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | 2017 | 2016 | Change | 2017 | 2016 | Change |
| Pharmaceutical | $ 611 | $ 660 | (7)% | $ 1,682 | $ 1,945 | (14)% |
| Medical | 148 | 128 | 16 % | 435 | 335 | 30 % |
| Total segment profit | 759 | 788 | (4)% | 2,117 | 2,280 | (7)% |
| Corporate | (154) | (132) | (17)% | (436) | (441) | 1 % |
| Total consolidated operating earnings | $ 605 | $ 656 | (8)% | $ 1,681 | $ 1,839 | (9)% |

### Pharmaceutical Segment Profit

The decrease in Pharmaceutical segment profit during the three months ended March 31, 2017 was largely due to generic pharmaceutical customer pricing changes and the loss of a large pharmaceutical distribution customer beginning April 1, 2016, as well as incremental costs related to the project to replace certain Pharmaceutical segment finance and operating information systems. These were partially offset by the benefits of Red Oak Sourcing within our generics program.

The decrease in Pharmaceutical segment profit during the nine months ended March 31, 2017 was largely due to generic pharmaceutical customer pricing changes. The loss of a large pharmaceutical distribution customer beginning April 1, 2016 and reduced levels of branded pharmaceutical inflation also contributed to the decrease in Pharmaceutical segment profit. These were partially offset by the benefits of Red Oak Sourcing.

LIFO charges/(credits) are not allocated to segment profit as explained in Note 13 of the "Notes to Condensed Consolidated Financial Statements."

### Medical Segment Profit

The increase in Medical segment profit during the three months ended March 31, 2017 was primarily due to performance from naviHealth, Cardinal Health Brand products (excluding Cordis), and distribution services, offset by a decline in Cordis profit. The decline in Cordis profit reflects increased SG&A expenses and the net favorable effect of inventory adjustments, which includes the prior-year unfavorable impact on cost of products sold from the Cordis inventory fair value step up.

Contributions from Cardinal Health Brand products, including the benefit of the Cordis inventory fair value step up, as well as the positive impact of acquisitions, increased Medical segment profit during the nine months ended March 31, 2017.

### Corporate

The changes in Corporate during the three months ended March 31, 2017 were primarily due to higher amortization and other acquisition-related costs in the current year, offset by a $21 million benefit from lower LIFO charges.

The changes in Corporate during the nine months ended March 31, 2017 were primarily due a $51 million benefit from lower LIFO charges in the current year, partially offset by higher amortization and other acquisition-related costs.

## Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | Three Months Ended March 31, | | Nine Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | **2017** | 2016 | **2017** | 2016 |
| Restructuring and employee severance | $ **15** | $ 6 | $ **31** | $ 19 |
| Amortization and other acquisition-related costs | **128** | 108 | **365** | 327 |
| Impairments and (gain)/loss on disposal of assets, net | **2** | — | **15** | 17 |
| Litigation (recoveries)/charges, net | **18** | 5 | **37** | (3) |

**Amortization and Other Acquisition-Related Costs**
Amortization of acquisition-related intangible assets was $96 million and $88 million for the three months ended March 31, 2017 and 2016, respectively. Amortization of acquisition-related intangible assets was $291 million and $255 million for the nine months ended March 31, 2017 and 2016, respectively.

**Litigation (Recoveries)/Charges, Net**
Litigation (recoveries)/charges, net for the three months ended March 31, 2017 increased primarily due to Cordis-related IVC filter product liability claims. The increase for the nine months ended March 31, 2017 was primarily due to settlement of the State of West Virginia matter and, to a lesser extent, Cordis-related IVC filter product liability claims. See Note 7 of the "Notes to Condensed Consolidated Financial Statements" for additional information.

## Earnings Before Income Taxes

In addition to the items discussed above, earnings before income taxes were impacted by the following:

| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2017** | 2016 | Change | **2017** | 2016 | Change |
| Other (income)/expense, net | $ **(5)** | $ — | **N.M.** | $ **(2)** | $ 5 | **N.M.** |
| Interest expense, net | **46** | 44 | **N.M.** | **134** | 134 | **N.M.** |

## Provision for Income Taxes

During the three months ended March 31, 2017 and 2016, the effective tax rate was 32.3 percent and 36.9 percent, respectively. The effective tax rate for the three months ended March 31, 2017 was impacted by net favorable discrete items of $31 million. Net favorable discrete items were immaterial for the three months ended March 31, 2016.

During the nine months ended March 31, 2017 and 2016, the effective tax rate was 34.4 percent and 35.5 percent, respectively. The effective tax rate for the nine months ended March 31, 2017 and 2016, included net favorable discrete items of $45 million and $27 million, respectively.

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends and share repurchases. If we decide to engage in one or more acquisitions in addition to the acquisition of the Medtronic businesses described below, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $1.4 billion at March 31, 2017 compared to $2.4 billion at June 30, 2016. At March 31, 2017, our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

During the nine months ended March 31, 2017, we deployed $600 million on share repurchases, $435 million for cash dividends and $293 million for capital expenditures; net cash provided by operating activities was $460 million, driven primarily by net earnings, partially offset by changes in working capital. The $1.9 billion decrease in net cash provided by operating activities during the nine months ended March 31, 2017 compared to the prior-year period was primarily due to changes in working capital.

The cash and equivalents balance at March 31, 2017 included $514 million of cash held by subsidiaries outside of the United States.

Although the vast majority of cash is available for repatriation, bringing the cash into the United States could trigger U.S federal, state and local income tax obligations. Because the earnings are considered permanently reinvested, no U.S. tax provision has been accrued related to the repatriation of these earnings. It is not practicable to evaluate the amount of U.S. tax that might be payable on the remittance of such earnings.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $1.75 billion revolving credit facility and a $700 million committed receivables sales facility program. In November 2016, we renewed our committed receivables sales facility program through November 1, 2019. In December 2016, we increased our commercial paper program, which is backed by our revolving credit facility, from $1.5 billion to $1.75 billion. At March 31, 2017, we had no amounts outstanding under the revolving credit facility; however, availability was reduced by outstanding letters of credit of $14 million. We also had no amounts outstanding under the committed receivables sales facility program; however, availability was reduced by outstanding standby letters of credit of $46 million at March 31, 2017. Under our commercial paper program, we had a maximum amount outstanding of $855 million and an average daily amount outstanding of $208 million during the three months ended March 31, 2017.

Our revolving credit facility and committed receivables sales facility program require us to maintain a consolidated leverage ratio of no more than 3.25-to-1. As of March 31, 2017, we were in compliance with this financial covenant. In the event of a "material acquisition," such as the planned acquisition of the Medtronic businesses, we have the ability to temporarily increase the leverage ratio to 4.25-to-1. We expect to be in compliance with this financial covenant after issuing the new long-term debt discussed below.

### Funding for Acquisition of Certain Medtronic Businesses

On April 18, 2017, we entered into an agreement to acquire Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses for $6.1 billion in cash, subject to certain adjustments. We plan to fund the acquisition through $4.5 billion in new long-term debt, the use of existing cash and expected operating cash flows through closing. Additionally, if needed, we may access our commercial paper program and credit facilities, discussed above. On April 18, 2017, we obtained a commitment from a financial institution to provide us a 364-day senior unsecured bridge term loan facility in an aggregate principal amount of up to $4.5 billion (the "Bridge Facility"), the proceeds of which may be used for the payment of the acquisition purchase price. We plan to terminate the Bridge Facility commitment following the issuance of new long-term debt. Neither the closing of the Bridge Facility nor the receipt of any other financing is a condition to the closing of the acquisition.

### Available-for-Sale Securities

At March 31, 2017 and June 30, 2016, we held $197 million and $200 million, respectively of marketable securities, which are classified as available-for-sale.

## Capital Deployment

### Capital Expenditures

Capital expenditures during the nine months ended March 31, 2017 and 2016 were $293 million and $284 million, respectively.

### Dividends

On February 2, 2017, our Board of Directors approved a quarterly dividend of $0.4489 per share, or $1.80 per share on an annualized basis, which was paid on April 15, 2017 to shareholders of record on April 3, 2017.

### Share Repurchases

During the nine months ended March 31, 2017, we repurchased $600 million of our common shares. We funded the repurchases with available cash. At March 31, 2017, we had $443 million remaining under our existing share repurchase program.

### Acquisition of Certain Medtronic Businesses

Described above under "Funding for Acquisition of Certain Medtronic Businesses."

# Other Items

The MD&A in our 2016 Form 10-K addresses our contractual obligations, critical accounting policies and sensitive accounting estimates and off-balance sheet arrangements, as of and for the fiscal year ended June 30, 2016. Other than in connection with our proposed acquisition of the Medtronic businesses discussed above, there have been no subsequent material changes outside of the ordinary course of business to those items. See Note 15 of the "Notes to Condensed Consolidated Financial Statements" for additional information.

Explanation and Reconciliation of Non-GAAP Financial Measures

# Explanation and Reconciliation of Non-GAAP Financial Measures

The "Overview of Consolidated Results" section within MD&A in this Form 10-Q contains financial measures that are not calculated in accordance with GAAP.

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this Form 10-Q for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics allows for a better comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business, which includes normal levels of reinvestment in the business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, amortizations of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs because they are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. They are also significantly impacted by the timing and size of acquisitions.

- Impairments and gains or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, and are inherently unpredictable in timing and amount. In the third quarter of fiscal 2017, consistent with the presentation of financial results by peer medical device companies, in litigation recoveries or charges, net we began to classify accrued losses and legal fees, net of expected recoveries, related to mass tort product liability claims, including claims for injuries allegedly caused by Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Such amounts would not have materially affected litigation recoveries or charges, net in prior periods, so have not been reclassified for those periods.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business operations and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the items listed above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

# Definitions

**Growth rate calculation**: Growth rates in this Form 10-Q are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes**: earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

Case: 2:19-cv-03347-EAS-EPD Doc #: 29-2 Filed: 11/06/20 Page: 833 of 963 PAGEID #: 2399

Explanation and Reconciliation of Non-GAAP Financial Measures

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings | Net Earnings[1] Growth Rate | Diluted EPS[1] | Diluted EPS[1] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **Three Months Ended March 31, 2017** | | | | | | | | |
| **GAAP** | **$ 605** | **(8)%** | **$ 564** | **$ 182** | **$ 381** | **(1)%** | **$ 1.20** | **3 %** |
| LIFO charges/(credits) | (9) | | (9) | (4) | (5) | | (0.02) | |
| Restructuring and employee severance | 15 | | 15 | 6 | 9 | | 0.03 | |
| Amortization and other acquisition-related costs | 128 | | 128 | 41 | 87 | | 0.27 | |
| Impairments and loss on disposal of assets | 2 | | 2 | — | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | 18 | | 18 | 7 | 11 | | 0.03 | |
| **Non-GAAP** | **$ 759** | **(4)%** | **$ 718** | **$ 232** | **$ 485** | **3 %** | **$ 1.53** | **7 %** |
| **Three Months Ended March 31, 2016** | | | | | | | | |
| GAAP | $ 656 | 11 % | $ 612 | $ 226 | $ 386 | 6 % | $ 1.17 | 7 % |
| LIFO charges/(credits) | 12 | | 12 | 4 | 8 | | 0.02 | |
| Restructuring and employee severance | 6 | | 6 | 2 | 4 | | 0.01 | |
| Amortization and other acquisition-related costs | 108 | | 108 | 37 | 71 | | 0.21 | |
| Impairments and loss on disposal of assets | — | | — | — | — | | — | |
| Litigation (recoveries)/charges, net | 5 | | 5 | 2 | 3 | | 0.01 | |
| Non-GAAP | $ 788 | 20 % | $ 744 | $ 272 | $ 472 | 19 % | $ 1.43 | 20 % |
| **Nine Months Ended March 31, 2017** | | | | | | | | |
| **GAAP** | **$ 1,681** | **(9)%** | **$ 1,549** | **$ 533** | **$ 1,014** | **(7)%** | **$ 3.17** | **(4)%** |
| LIFO charges/(credits) | — | | — | — | — | | — | |
| Restructuring and employee severance | 31 | | 31 | 12 | 19 | | 0.06 | |
| Amortization and other acquisition-related costs | 365 | | 365 | 120 | 245 | | 0.76 | |
| Impairments and loss on disposal of assets | 15 | | 15 | 4 | 11 | | 0.03 | |
| Litigation (recoveries)/charges, net | 37 | | 37 | 14 | 23 | | 0.07 | |
| **Non-GAAP** | **$ 2,129** | **(5)%** | **$ 1,997** | **$ 684** | **$ 1,311** | **(4)%** | **$ 4.10** | **— %** |
| **Nine Months Ended March 31, 2016** | | | | | | | | |
| GAAP | $ 1,839 | 15 % | $ 1,700 | $ 604 | $ 1,095 | 19 % | $ 3.30 | 20 % |
| LIFO charges/(credits) | 51 | | 51 | 20 | 31 | | 0.10 | |
| Restructuring and employee severance | 19 | | 19 | 7 | 12 | | 0.04 | |
| Amortization and other acquisition-related costs | 327 | | 327 | 115 | 212 | | 0.64 | |
| Impairments and (gain)/loss on disposal of assets | 17 | | 17 | 7 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (3) | | (3) | (3) | — | | — | |
| Non-GAAP | $ 2,251 | 21 % | $ 2,112 | $ 751 | $ 1,361 | 20 % | $ 4.10 | 21 % |

[1]    attributable to Cardinal Health, Inc.
The sum of the components may not equal the total due to rounding.
We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

# Quantitative and Qualitative Disclosures About Market Risk

There have been no material changes in the quantitative and qualitative market risk disclosures included in our 2016 Form 10-K since the end of fiscal 2016 through March 31, 2017.

# Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2017. Based on this evaluation, our principal executive officer and principal financial officer have concluded that as of March 31, 2017, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

### Changes in Internal Control Over Financial Reporting

The Pharmaceutical segment is in a multi-year project to replace certain finance and operating information systems, which is affecting internal control over financial reporting. During the quarter ended March 31, 2017, we began transitioning selected processes to the new systems. If these new systems are not effectively implemented or fail to operate as intended, it could adversely affect our internal control over financial reporting.  Except for the changes made in connection with implementing the new systems described above, there were no changes in our internal control over financial reporting during the quarter ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

# Legal Proceedings

The legal proceedings described in Note 7 of the "Notes to Condensed Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

# Risk Factors

You should carefully consider the information in this Form 10-Q, including the risk factor below, and the risk factors discussed in "Risk Factors" and other risks discussed in our 2016 Form 10-K and our filings with the SEC since June 30, 2016. These risks could materially and adversely affect our results of operations, financial condition, liquidity and cash flows. Our business also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

**Our pending acquisition of certain Medtronic businesses subjects us to various risks and uncertainties.**

As discussed in the MD&A, on April 18, 2017, we entered into an agreement to acquire Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses for $6.1 billion in cash, subject to certain adjustments. The acquisition will further expand the Medical segment's portfolio of self-manufactured products. We plan to fund the acquisition through $4.5 billion in new long-term debt, the use of existing cash and expected operating cash flows through closing. Additionally, if needed, we may access our commercial paper program and credit facilities. Consummation of the pending acquisition is subject to various risks and uncertainties, including the following: the ability to successfully complete the acquisition on a timely basis, including receipt of required regulatory approvals and satisfaction of other closing conditions; and the conditions of the credit markets, which could affect our ability to issue debt to fund the acquisition on acceptable terms.

If we are successful in completing the acquisition, we will be subject to other risks, including the following: we may fail to realize the synergies and other benefits we expect from the acquisition; the use of a significant portion of our cash and the incurrence of substantial indebtedness in connection with the financing of the acquisition may have an adverse effect on our liquidity, limit our flexibility in responding to other business opportunities, and increase our vulnerability to adverse economic and industry conditions; we may fail to retain key personnel of the acquired businesses; future developments may impair the value of our purchased goodwill or intangible assets; we may face difficulties establishing, integrating or combining operations and systems; we may face challenges retaining the customers of the acquired businesses; we may encounter unforeseen internal control, regulatory or compliance issues; and we may face other additional risks relating to regulatory matters, legal proceedings, tax laws or positions, supply interruptions, commodity price volatility and global operations, including the effects of local economic environments and currency volatility.

# Unregistered Sales of Equity Securities and Use of Proceeds

**Issuer Purchases of Equity Securities**

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | | Total Number of Shares Purchased as Part of Publicly Announced Program (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Program (2) (in millions) | |
|---|---|---|---|---|---|---|
| January 2017 | 191 | $ | 74.13 | — | $ | 443 |
| February 2017 | 171 | | 80.09 | — | | 443 |
| March 2017 | 215 | | 81.53 | — | | 443 |
| **Total** | **577** | $ | **78.66** | — | $ | **443** |

(1) Reflects 191, 171 and 215 common shares purchased in January, February and March 2017, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2) On May 4, 2016, our Board of Directors approved a $1.0 billion share repurchase program that expires on December 31, 2019.

# Condensed Consolidated Statements of Earnings
## (Unaudited)

| (in millions, except per common share amounts) | Three Months Ended March 31, | | Nine Months Ended March 31, | |
|---|---|---|---|---|
| | **2017** | 2016 | **2017** | 2016 |
| Revenue | $ **31,821** | $ 30,662 | $ **97,010** | $ 90,162 |
| Cost of products sold | **30,093** | 28,973 | **92,089** | 85,285 |
| Gross margin | **1,728** | 1,689 | **4,921** | 4,877 |
| | | | | |
| **Operating expenses:** | | | | |
| Distribution, selling, general and administrative expenses | **960** | 914 | **2,792** | 2,678 |
| Restructuring and employee severance | **15** | 6 | **31** | 19 |
| Amortization and other acquisition-related costs | **128** | 108 | **365** | 327 |
| Impairments and loss on disposal of assets, net | **2** | — | **15** | 17 |
| Litigation (recoveries)/charges, net | **18** | 5 | **37** | (3) |
| Operating earnings | **605** | 656 | **1,681** | 1,839 |
| | | | | |
| Other (income)/expense, net | **(5)** | — | **(2)** | 5 |
| Interest expense, net | **46** | 44 | **134** | 134 |
| Earnings before income taxes | **564** | 612 | **1,549** | 1,700 |
| | | | | |
| Provision for income taxes | **182** | 226 | **533** | 604 |
| Net earnings | **382** | 386 | **1,016** | 1,096 |
| | | | | |
| Less: Net earnings attributable to noncontrolling interests | **(1)** | — | **(2)** | (1) |
| **Net earnings attributable to Cardinal Health, Inc.** | $ **381** | $ 386 | $ **1,014** | $ 1,095 |
| | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | |
| Basic | $ **1.21** | $ 1.18 | $ **3.19** | $ 3.33 |
| Diluted | **1.20** | 1.17 | **3.17** | 3.30 |
| | | | | |
| **Weighted-average number of common shares outstanding:** | | | | |
| Basic | **316** | 328 | **318** | 328 |
| Diluted | **318** | 331 | **320** | 331 |
| | | | | |
| Cash dividends declared per common share | $ **0.4489** | $ 0.3870 | $ **1.3467** | $ 1.1610 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Statements of Comprehensive Income

**(Unaudited)**

| (in millions) | Three Months Ended March 31, | | Nine Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | **2017** | 2016 | **2017** | 2016 |
| Net earnings | $ **382** | $ 386 | $ **1,016** | $ 1,096 |
| | | | | |
| **Other comprehensive loss:** | | | | |
| Foreign currency translation adjustments and other | **33** | 16 | **(47)** | (57) |
| Net unrealized gain/(loss) on derivative instruments, net of tax | **2** | (3) | **27** | (4) |
| Total other comprehensive income/(loss), net of tax | **35** | 13 | **(20)** | (61) |
| | | | | |
| Total comprehensive income | **417** | 399 | **996** | 1,035 |
| | | | | |
| Less: comprehensive income attributable to noncontrolling interests | **(1)** | — | **(2)** | (1) |
| Total comprehensive income attributable to Cardinal Health, Inc. | $ **416** | $ 399 | $ **994** | $ 1,034 |

See notes to condensed consolidated financial statements.

**Financial Statements**

# Condensed Consolidated Balance Sheets
## (Unaudited)

| (in millions) | | March 31, 2017 | | June 30, 2016 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,368 | $ | 2,356 |
| Trade receivables, net | | 7,505 | | 7,405 |
| Inventories, net | | 11,641 | | 10,615 |
| Prepaid expenses and other | | 1,769 | | 1,580 |
| Total current assets | | 22,283 | | 21,956 |
| | | | | |
| Property and equipment, net | | 1,849 | | 1,796 |
| Goodwill and other intangibles, net | | 9,287 | | 9,426 |
| Other assets | | 755 | | 944 |
| **Total assets** | $ | 34,174 | $ | 34,122 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 17,535 | $ | 17,306 |
| Current portion of long-term obligations and other short-term borrowings | | 607 | | 587 |
| Other accrued liabilities | | 1,654 | | 1,808 |
| Total current liabilities | | 19,796 | | 19,701 |
| | | | | |
| Long-term obligations, less current portion | | 4,854 | | 4,952 |
| Deferred income taxes and other liabilities | | 2,742 | | 2,781 |
| | | | | |
| Redeemable noncontrolling interests | | 117 | | 117 |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized—**500 thousand** shares, Issued—**none** | | — | | — |
| Common shares, without par value: | | | | |
| Authorized—**755 million** shares, Issued—**327 million** shares and 364 million shares at **March 31, 2017** and June 30, 2016, respectively | | 2,684 | | 3,010 |
| Retained earnings | | 4,842 | | 6,419 |
| Common Shares in treasury, at cost: **11 million** shares and 42 million shares at **March 31, 2017** and June 30 2016, respectively | | (744) | | (2,759) |
| Accumulated other comprehensive loss | | (136) | | (116) |
| **Total Cardinal Health, Inc. shareholders' equity** | | 6,646 | | 6,554 |
| Noncontrolling interests | | 19 | | 17 |
| **Total shareholders' equity** | | 6,665 | | 6,571 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 34,174 | $ | 34,122 |

See notes to condensed consolidated financial statements.

**Financial Statements**

# Condensed Consolidated Statements of Cash Flows
**(Unaudited)**

| (in millions) | Nine Months Ended March 31, | |
| --- | --- | --- |
| | **2017** | 2016 |
| **Cash flows from operating activities:** | | |
| Net earnings | $ **1,016** | $ 1,096 |
| | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | |
| Depreciation and amortization | **525** | 465 |
| Impairments and loss on sale of other investments | **4** | — |
| Impairments and loss on disposal of assets, net | **15** | 17 |
| Share-based compensation | **73** | 82 |
| Provision for bad debts | **46** | 51 |
| Change in fair value of contingent consideration obligation | **—** | (16) |
| Change in operating assets and liabilities, net of effects from acquisitions: | | |
| Increase in trade receivables | **(107)** | (721) |
| Increase in inventories | **(1,010)** | (1,457) |
| Increase in accounts payable | **225** | 2,839 |
| Other accrued liabilities and operating items, net | **(327)** | (26) |
| Net cash provided by operating activities | **460** | 2,330 |
| | | |
| **Cash flows from investing activities:** | | |
| Acquisition of subsidiaries, net of cash acquired | **(113)** | (3,383) |
| Additions to property and equipment | **(293)** | (284) |
| Purchase of available-for-sale securities and other investments | **(188)** | (150) |
| Proceeds from sale of available-for-sale securities and other investments | **115** | 99 |
| Proceeds from maturities of available-for-sale securities | **49** | 37 |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | **1** | — |
| Net cash used in investing activities | **(429)** | (3,681) |
| | | |
| **Cash flows from financing activities:** | | |
| Payment of contingent consideration obligation | **(3)** | (23) |
| Net change in short-term borrowings | **25** | 34 |
| Net purchase of noncontrolling interests | **(12)** | (10) |
| Reduction of long-term obligations | **(60)** | (5) |
| Proceeds from interest rate swap terminations | **14** | — |
| Net tax proceeds/(withholdings) from share-based compensation | **20** | (3) |
| Excess tax benefits from share-based compensation | **37** | 33 |
| Dividends on common shares | **(435)** | (386) |
| Purchase of treasury shares | **(600)** | (300) |
| Net cash used in financing activities | **(1,014)** | (660) |
| | | |
| Effect of exchange rates changes on cash and equivalents | **(5)** | (7) |
| | | |
| Net decrease in cash and equivalents | **(988)** | (2,018) |
| Cash and equivalents at beginning of period | **2,356** | 4,616 |
| **Cash and equivalents at end of period** | $ **1,368** | $ 2,598 |

See notes to condensed consolidated financial statements.

# Notes to Condensed Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

### Basis of Presentation

Our condensed consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. References to "we," "our," and similar pronouns in this Quarterly Report on Form 10-Q for the quarter ended March 31, 2017 (this "Form 10-Q") refer to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context requires otherwise.

Our condensed consolidated financial statements have been prepared in accordance with the U.S. Securities and Exchange Commission ("SEC") instructions to Quarterly Reports on Form 10-Q and include the information and disclosures required by accounting principles generally accepted in the United States ("GAAP") for interim financial reporting. The preparation of financial statements in conformity with GAAP requires us to make estimates and assumptions that affect amounts reported in the condensed consolidated financial statements and accompanying notes. Actual amounts may differ from these estimated amounts. In our opinion, all adjustments necessary for a fair presentation of the condensed consolidated financial statements have been included. Except as disclosed elsewhere in this Form 10-Q, all such adjustments are of a normal and recurring nature. In addition, financial results presented for this fiscal 2017 interim period are not necessarily indicative of the results that may be expected for the full fiscal year ending June 30, 2017. These condensed consolidated financial statements are unaudited and, accordingly, should be read in conjunction with the audited consolidated financial statements and related notes contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K").

### Inventories

A substantial portion of our inventories are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These inventories are included within the core pharmaceutical distribution facilities of our Pharmaceutical segment ("distribution facilities") and are primarily merchandise inventories. The LIFO method presumes that the most recent inventory purchases are the first items sold, so LIFO helps us better match current costs and revenue. We believe that the average cost method of inventory valuation provides a reasonable approximation of the current cost of replacing inventory within these distribution facilities. As such, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation.

Interim LIFO calculations are based on our estimates of the expected year-end inventory levels and costs, since the actual valuation of inventory under the LIFO method is computed at the end of the fiscal year based on the inventory levels, inventory mix and inventory cost inflation and deflation at that time. Based upon the year-to-date

balance and expectations for the remainder of the fiscal year, we recorded a LIFO credit of $9 million in the three months ended March 31, 2017, which brings our year-to-date LIFO charges to zero. We recorded LIFO charges of $12 million and $51 million for the three and nine months ended March 31, 2016, respectively. These LIFO charges and credits are included in cost of products sold in the condensed consolidated financial statements.

### Recent Financial Accounting Standards

In January 2017, the Financial Accounting Standards Board ("FASB") issued amended accounting guidance that simplifies the accounting for goodwill impairment by eliminating the step of measuring a goodwill impairment by estimating the implied fair value of goodwill. Instead, goodwill impairment will be measured as the amount by which the reporting unit's carrying value exceeds its fair value, limited to the carrying value of the goodwill. This guidance will be effective for us in the first quarter of fiscal 2021, with early adoption permitted. We are currently evaluating the timing of adoption. The impact of adoption is dependent on future events.

Also in January 2017, the FASB issued new accounting guidance that changes the definition of a business when evaluating whether a set of transferred assets and activities is considered a business. This guidance will be effective for us in the first quarter of fiscal 2019, with early adoption permitted. We are currently evaluating the timing of adoption. The impact of adoption is dependent on future events.

In November 2016, the FASB issued amended accounting guidance on the presentation of restricted cash and restricted cash equivalents in the statement of cash flows. The guidance requires an entity to include restricted cash and restricted cash equivalents with cash and cash equivalents when reconciling the beginning-of-period and end-of-period amounts shown on the statements of cash flows. This amendment will be effective for us in the first quarter of fiscal 2019, with early adoption permitted. We are currently evaluating the timing of adoption and the impact of this standard on our consolidated financial statements.

In October 2016, the FASB issued amended accounting guidance that requires an entity to recognize the income tax effect of intercompany sales and transfers of assets other than inventory at the time that the transfer occurs rather than when the asset is sold to a third party. This amendment will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In August 2016, the FASB issued accounting guidance which clarifies the classification of certain cash receipts and cash payments in the statement of cash flows, including those related to contingent consideration payments made after a business combination, distributions received from equity method investees, debt prepayment or debt extinguishment costs and proceeds from the settlement of insurance claims. This guidance will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In April 2015, the FASB issued amended accounting guidance that clarifies the circumstances under which a cloud computing customer

would account for the arrangement as a license of internal-use software. If it is determined that a software license does not exist in the arrangement, the customer would account for this arrangement as a service contract. We adopted this guidance in the first quarter of fiscal 2017. The adoption of this guidance did not have a material impact on our financial position or results of operations.

Also in April 2015, the FASB issued amended accounting guidance related to the presentation of debt issuance costs in the financial statements. This guidance requires an entity to present such costs in the balance sheet as a direct deduction from the related debt rather than as an asset. We adopted this guidance in the first quarter of fiscal 2017. Upon adoption of this guidance, debt issuance costs of $29 million were reclassified from other assets to long-term obligations, less current portion within the condensed consolidated balance sheet.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments, and assets recognized from costs incurred to obtain or fulfill a contract. The FASB also subsequently issued several amendments to the standard, including clarification on principal versus agent considerations, performance obligations and licensing, and certain scope improvements and practical expedients.

We have made progress on our evaluation of the amended guidance, including identification of revenue streams and customer contract reviews. Our revenue is primarily distribution revenue, which we recognize at a point in time when title transfers to customers and we have no further obligation to provide services related to such merchandise. Although we are continuing to assess the impact of the amended guidance, we generally anticipate that the timing of recognition of distribution revenue will be substantially unchanged under the amended guidance.

The amended guidance will be effective for us in the first quarter of fiscal 2019 and permits adoption under either the full retrospective approach (recognize effects of the amended guidance in each prior reporting period presented) or the modified retrospective approach (recognize the cumulative effect of adoption as an adjustment to retained earnings at the date of initial application). We are still evaluating our method of adoption.

## 2. Acquisitions

### Cordis

On October 2, 2015, we acquired the Cordis business from Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, for $1.9 billion using cash on hand and proceeds from our debt offering in June 2015. The acquisition of Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions with operations in more than 50 countries, expands our Medical segment's portfolio of self-manufactured products and its geographic scope. We

closed the Cordis acquisition in 20 principal countries on October 2, 2015, and acquired control of, as described in GAAP, and the rights to, the net economic benefit from the entire Cordis business in the remaining countries at that time.

Transaction and integration costs associated with the acquisition of Cordis were $16 million and $13 million during the three months ended March 31, 2017 and 2016, respectively, and $46 million and $54 million during the nine months ended March 31, 2017 and 2016, respectively, and are included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

### Fair Value of Assets Acquired and Liabilities Assumed

The allocation of the fair value of assets acquired and liabilities assumed for the acquisitions of Cordis, The Harvard Drug Group ("Harvard Drug"), and naviHealth Holdings, LLC ("naviHealth") were finalized during the nine months ended March 31, 2017, resulting in goodwill of $914 million, $634 million, and $322 million, respectively. There were no significant adjustments to the allocation of the fair value of assets acquired and liabilities assumed for the naviHealth and Harvard Drug acquisitions from those disclosed in our 2016 Form 10-K. During the nine months ended March 31, 2017, we recorded additional goodwill for Cordis of $53 million, net of tax, substantially all of which was to increase an accrual for assumed pre-acquisition product liability lawsuits. See Note 7 for further discussion of the product liability lawsuits.

## 3. Restructuring and Employee Severance

The following table summarizes restructuring and employee severance costs:

| (in millions) | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2017** | | 2016 | |
| Employee-related costs (1) | $ | 14 | $ | 6 |
| Facility exit and other costs (2) | | 1 | | — |
| **Total restructuring and employee severance** | $ | 15 | $ | 6 |

| (in millions) | Nine Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2017** | | 2016 | |
| Employee-related costs (1) | $ | 27 | $ | 11 |
| Facility exit and other costs (2) | | 4 | | 8 |
| **Total restructuring and employee severance** | $ | 31 | $ | 19 |

(1) Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2) Facility exit and other costs primarily consist of lease termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

**Notes to Financial Statements**

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | Facility Exit and Other Costs | Total |
|---|---|---|---|
| Balance at June 30, 2016 | $ 15 | $ 1 | $ 16 |
| Additions | 22 | 1 | 23 |
| Payments and other adjustments | (13) | (1) | (14) |
| **Balance at March 31, 2017** | **$ 24** | **$ 1** | **$ 25** |

## 4. Goodwill and Other Intangible Assets

### Goodwill
The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical | Medical | Total |
|---|---|---|---|
| Balance at June 30, 2016 | $ 2,919 | $ 4,248 | $ 7,167 |
| Goodwill acquired, net of purchase price adjustments | 21 | 36 | 57 |
| Foreign currency translation adjustments and other | (11) | (4) | (15) |
| **Balance at March 31, 2017** | **$ 2,929** | **$ 4,280** | **$ 7,209** |

### Other Intangible Assets
The following tables summarize other intangible assets by class at:

**March 31, 2017**

| (in millions) | Gross Intangible | Accumulated Amortization | Net Intangible | Weighted-Average Remaining Amortization Period (Years) |
|---|---|---|---|---|
| **Indefinite-life intangibles:** | | | | |
| IPR&D, trademarks and other | $ 71 | $ — | $ 71 | N/A |
| Total indefinite-life intangibles | 71 | — | 71 | N/A |
| **Definite-life intangibles:** | | | | |
| Customer relationships | 1,957 | 908 | 1,049 | 9 |
| Trademarks, trade names and patents | 507 | 181 | 326 | 14 |
| Developed technology and other | 905 | 273 | 632 | 9 |
| Total definite-life intangibles | 3,369 | 1,362 | 2,007 | 10 |
| **Total other intangible assets** | **$ 3,440** | **$ 1,362** | **$ 2,078** | **N/A** |

| | June 30, 2016 | | |
|---|---|---|---|
| (in millions) | Gross Intangible | Accumulated Amortization | Net Intangible |
| **Indefinite-life intangibles:** | | | |
| IPR&D, trademarks and other | $ 72 | $ — | $ 72 |
| Total indefinite-life intangibles | 72 | — | 72 |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,946 | 737 | 1,209 |
| Trademarks, trade names and patents | 508 | 140 | 368 |
| Developed technology and other | 808 | 198 | 610 |
| Total definite-life intangibles | 3,262 | 1,075 | 2,187 |
| **Total other intangible assets** | **$ 3,334** | **$ 1,075** | **$ 2,259** |

Total amortization of intangible assets was $96 million and $88 million for the three months ended March 31, 2017 and 2016, respectively, and $291 million and $255 million for the nine months ended March 31, 2017 and 2016, respectively. For acquisitions closed on or before March 31, 2017, estimated annual amortization of intangible assets for the remainder of fiscal 2017 through 2021 is as follows: $98 million, $363 million, $294 million, $264 million and $214 million.

## 5. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. We held the following investments in marketable securities at fair value at:

| (in millions) | March 31, 2017 | June 30, 2016 |
|---|---|---|
| **Current available-for-sale securities:** | | |
| Commercial paper | $ 2 | $ — |
| Treasury bills | 8 | 3 |
| International bonds | 2 | 2 |
| Corporate bonds | 70 | 58 |
| U.S. agency bonds | 5 | 6 |
| Asset-backed securities | 27 | 28 |
| International equity securities | 1 | 2 |
| U.S. agency mortgage-backed securities | 13 | 14 |
| Total current available-for-sale securities | 128 | 113 |
| **Long-term available-for-sale securities:** | | |
| Treasury bills | 14 | 10 |
| International bonds | 3 | 1 |
| Corporate bonds | 19 | 36 |
| U.S. agency bonds | — | 9 |
| Asset-backed securities | 16 | 17 |
| U.S. agency mortgage-backed securities | 17 | 14 |
| Total long-term available-for-sale securities | 69 | 87 |
| **Total available-for-sale securities** | **$ 197** | **$ 200** |

**Notes to Financial Statements**

Gross unrealized gains and losses on available-for-sale securities were immaterial at both March 31, 2017 and June 30, 2016. During the three and nine months ended March 31, 2017 and 2016, gross realized gains and losses on available-for-sale securities were immaterial and we did not recognize any other-than-temporary impairments. At March 31, 2017, the weighted-average effective maturity of our current and long-term marketable securities was approximately 6 months and 16 months, respectively.

## 6. Income Taxes

Fluctuations in our provision for income taxes as a percentage of pretax earnings ("effective tax rate") are due to changes in international and U.S. state effective tax rates resulting from our business mix and discrete items.

During the three months ended March 31, 2017 and 2016, the effective tax rate was 32.3 percent and 36.9 percent, respectively.

During the nine months ended March 31, 2017 and 2016, the effective tax rate was 34.4 percent and 35.5 percent, respectively.

At March 31, 2017 and June 30, 2016, we had $394 million and $527 million of unrecognized tax benefits, respectively. The March 31, 2017 and June 30, 2016, balances include $258 million and $355 million of unrecognized tax benefits, respectively, that if recognized, would have an impact on the effective tax rate.

At March 31, 2017 and June 30, 2016, we had $105 million and $145 million, respectively, accrued for the payment of interest and penalties related to unrecognized tax benefits, which we recognize in the provision for income taxes in the condensed consolidated statements of earnings. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the condensed consolidated balance sheets.

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is between zero and a net decrease of $45 million, exclusive of penalties and interest.

We file income tax returns in the U.S. federal jurisdiction, various U.S. state jurisdictions and various foreign jurisdictions. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2008 through the current fiscal year.

During the nine months ended March 31, 2017, the IRS closed audits of fiscal years 2006 and 2007, which is reflected in our condensed consolidated financial statements and in our evaluation of uncertain tax positions. The result of the settlement had an immaterial impact to our provision for income taxes. The IRS is currently conducting audits of fiscal years 2008 through 2014.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion.

The indemnification receivable was $140 million and $172 million at March 31, 2017 and June 30, 2016, respectively, and is included in other assets in the condensed consolidated balance sheets.

## 7. Commitments, Contingent Liabilities and Litigation

### Commitments

**Generic Sourcing Venture with CVS Health Corporation ("CVS Health")**

In July 2014, we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS Health for an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. Due to the achievement of predetermined milestones, we are required to make quarterly payments of $45.6 million to CVS Health for the remainder of the initial term.

### Legal Proceedings

We become involved from time to time in disputes, litigation and regulatory matters.

We may be named from time to time in *qui tam* actions initiated by private third parties. In such actions, the private parties purport to act on behalf of federal or state governments, allege that false claims have been submitted or have been caused to be submitted for payment by the government and may receive an award if their claims are successful. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own purporting to act on behalf of the government.

From time to time, we become aware through employees, internal audits or other parties of possible compliance matters that we investigate internally, such as complaints or concerns relating to accounting, internal accounting controls, financial reporting, auditing, or other ethical matters or relating to compliance with laws such as healthcare fraud and abuse, anti-corruption, or anti-bribery laws. In addition, from time to time, we receive subpoenas or requests for information from various government agencies relating to our business or to the business of a customer, supplier, or other industry participant. While we do not believe that the outcomes of any current internal investigation or third-party subpoena or request for information will be material to our financial statements, they could lead to the assertion of claims or the commencement of legal proceedings against us or result in sanctions.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators and product liability claims and lawsuits, including class actions. Even absent an identified regulatory or quality

**Notes to Financial Statements**

issue or product recall, we have become subject to product liability claims and lawsuits.

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for certain litigation and regulatory matters, including mass tort product liability claims, and income from favorable resolution of litigation in litigation (recoveries)/ charges, net in our condensed consolidated statements of earnings.

**State of West Virginia vs. Cardinal Health, Inc.**

In January 2017, we agreed, without admitting liability, to pay $20 million to the State of West Virginia to settle a lawsuit filed against us by the West Virginia Attorney General in June 2012. As previously disclosed, the West Virginia Attorney General had filed complaints in the Circuit Court of Boone County, West Virginia against a number of pharmaceutical wholesale distributors, including us, alleging, among other things, that the distributors had failed to maintain effective controls to guard against diversion of controlled substances in West Virginia, had failed to report suspicious orders of controlled substances in accordance with the West Virginia Uniform Controlled Substances Act, and were negligent in distributing controlled substances. During the nine months ended March 31, 2017, we settled the matter for $20 million.

**Other Controlled Substance Distribution Lawsuits**

As of April 28, 2017, 11 West Virginia counties and municipalities and the Cherokee Nation have filed lawsuits against pharmaceutical wholesale distributors, including us, and certain retail chains in various federal, state and other courts. The lawsuits make claims similar to those made in the State of West Virginia's lawsuit against us, which, as discussed above, we have resolved. Specifically, they allege violations of various statutes related to controlled substances and common law violations, and seek equitable relief and monetary damages. We are vigorously defending ourselves in these lawsuits. Since these lawsuits are at early stages, we are unable to predict the outcome of these lawsuits or estimate a range of reasonably possible losses.

**Product Liability Lawsuits**

As of April 28, 2017, we and our Cordis business have been named as defendants in 58 product liability lawsuits involving claims by approximately 500 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these lawsuits.

As of September 30, 2016, we had recorded an accrual of $79 million for losses and legal defense costs as an adjustment to pre-acquisition liabilities assumed in the Cordis acquisition. Refer to Note 2 for further information regarding this adjustment. We record additional accruals for losses and legal defense costs as litigation (recoveries)/charges, net in our condensed consolidated statements of earnings. At March 31, 2017, we had a total of $93 million, net of expected insurance recoveries, accrued for losses and legal defense costs.

## 8. Fair Value Measurements

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at:

| (in millions) | March 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 6 | $ — | $ — | $ 6 |
| Forward contracts (1) | — | 13 | — | 13 |
| Available-for-sale securities (2) | — | 197 | — | 197 |
| Other investments (3) | 111 | 3 | — | 114 |
| **Liabilities:** | | | | |
| Contingent Consideration (4) | — | — | (38) | (38) |

| (in millions) | June 30, 2016 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 516 | $ — | $ — | $ 516 |
| Forward contracts (1) | — | 19 | — | 19 |
| Available-for-sale securities (2) | — | 200 | — | 200 |
| Other investments (3) | 103 | — | — | 103 |
| **Liabilities:** | | | | |
| Contingent Consideration (4) | — | — | (19) | (19) |

(1)   The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the condensed consolidated balance sheets.

(2)   We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 5 for additional information regarding available-for-sale securities.

(3)   Level 1 other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices. Level 2 other investments are comprised of warrants for stock valued by utilizing observable inputs in a Black-Scholes model.

(4)   Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
| --- | --- |
| Balance at June 30, 2016 | $ 19 |
| Additions from acquisitions | 22 |
| Changes in fair value of contingent consideration (1) | — |
| Payment of contingent consideration | (3) |
| **Balance at March 31, 2017** | $ 38 |

(1)   Amount is included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

## 9. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to fair value through earnings at the end of each period. Our derivative and hedging programs are consistent with those described in the 2016 Form 10-K. The amount of ineffectiveness associated with these derivative instruments was immaterial for the three and nine months ended March 31, 2017 and 2016.

During the nine months ended March 31, 2017, we entered into forward interest rate swaps with a total notional amount of $200 million to hedge probable, but not firmly committed, future transactions associated with our debt.

During the nine months ended March 31, 2017 and 2016, we entered into pay-floating interest rate swaps with a total notional amounts of $100 million and $300 million, respectively. These swaps have been designated as fair value hedges of our fixed rate debt and are included in other assets in the condensed consolidated balance sheet.

During the nine months ended March 31, 2017, we terminated notional amounts of $200 million of pay-floating interest rate swaps. We received net settlement proceeds of $14 million related to the pay-floating interest rate swaps terminated during the nine months ended March 31, 2017 and the pay-floating interest rate swaps terminated in fiscal 2016, as previously disclosed in our 2016 Form 10-K. These swaps were previously designated as fair value hedges. There was no immediate impact to the condensed consolidated statements of earnings; however, the fair value adjustment to debt is being amortized over the life of the underlying debt as a reduction to interest expense, net in the condensed consolidated statements of earnings.

**Notes to Financial Statements**

## Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, accounts payable and other accrued liabilities at March 31, 2017 and June 30, 2016 approximate fair value due to their short-term maturities.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at:

| (in millions) | March 31, 2017 | June 30, 2016 |
|---|---|---|
| Estimated fair value | $ 5,628 | $ 5,780 |
| Carrying amount | 5,461 | 5,539 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

## 10. Redeemable Noncontrolling Interests

Redeemable noncontrolling interest represents the third parties' share of the net assets of naviHealth.  The third-party noncontrolling interest holders hold an option that allows them to sell their noncontrolling interests to us at any time after the two-year anniversary of the closing, or earlier if a trigger event occurs.  The terms of the agreement also provide us with the option to acquire any remaining noncontrolling interests at any time after the two-year anniversary of the closing, which is August 26, 2017. Our ownership interest in naviHealth was 82 percent at March 31, 2017.

The reconciliation of the changes in redeemable noncontrolling interests are as follows:

| (in millions) | Redeemable Noncontrolling Interest |
|---|---|
| Balance at June 30, 2016 | $ 117 |
| Net earnings attributable to redeemable noncontrolling interests | 3 |
| Net purchase of redeemable noncontrolling interests | (3) |
| Balance at March 31, 2017 | $ 117 |

## 11. Shareholders' Equity

During the nine months ended March 31, 2017, we repurchased 8.1 million common shares having an aggregate cost of $600 million. The average price paid per common share was $74.08.

During the nine months ended March 31, 2016, we repurchased 3.7 million common shares having an aggregate cost of $300 million. The average price paid per common share was $80.72.

We funded the repurchases with available cash.

During the nine months ended March 31, 2017, the Company retired 37 million common shares in treasury. The retirement of these shares had no impact on total shareholders' equity; however, it did impact certain individual components of shareholders' equity as follows: $2.5 billion decrease in common shares in treasury, $302 million decrease in common shares, and $2.2 billion decrease in retained earnings.

Other shares repurchased are held in treasury to be used for general corporate purposes.

## Accumulated Other Comprehensive Loss

The following table summarizes the changes in the balance of accumulated other comprehensive loss by component and in total:

| (in millions) | Foreign Currency Translation Adjustments | Unrealized Gain/(Loss) on Derivatives, net of tax | Accumulated Other Comprehensive Loss |
|---|---|---|---|
| Balance at June 30, 2016 | $ (123) | $ 7 | $ (116) |
| Other comprehensive income/(loss), before reclassifications | (47) | 24 | (23) |
| Amounts reclassified to earnings | — | 3 | 3 |
| Other comprehensive income/(loss), net of tax | (47) | 27 | (20) |
| Balance at March 31, 2017 | $ (170) | $ 34 | $ (136) |

Activity related to realized and unrealized gains and losses on available-for-sale securities, as described in Note 5, was immaterial during the nine months ended March 31, 2017.

## 12. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the number of common shares used to compute basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| (in millions) | Three Months Ended March 31, | |
|---|---|---|
| | 2017 | 2016 |
| Weighted-average common shares–basic | 316 | 328 |
| Effect of dilutive securities: | | |
| Employee stock options, restricted share units and performance share units | 2 | 3 |
| Weighted-average common shares–diluted | 318 | 331 |

| (in millions) | Nine Months Ended March 31, | |
|---|---|---|
| | 2017 | 2016 |
| Weighted-average common shares–basic | 318 | 328 |
| Effect of dilutive securities: | | |
| Employee stock options, restricted share units and performance share units | 2 | 3 |
| Weighted-average common shares–diluted | 320 | 331 |

The potentially dilutive employee stock options, restricted share units and performance share units that were antidilutive were 3 million and 2 million for the three months ended March 31, 2017 and 2016, respectively, and 3 million and 2 million for the nine months ended March 31, 2017 and 2016, respectively.

## 13. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The following table presents revenue for each reportable segment and Corporate:

|  | Three Months Ended March 31, | |
|---|---|---|
| (in millions) | 2017 | 2016 |
| Pharmaceutical | $ 28,406 | $ 27,527 |
| Medical | 3,418 | 3,138 |
| Total segment revenue | 31,824 | 30,665 |
| Corporate (1) | (3) | (3) |
| Total revenue | $ 31,821 | $ 30,662 |

|  | Nine Months Ended March 31, | |
|---|---|---|
| (in millions) | 2017 | 2016 |
| Pharmaceutical | $ 86,911 | $ 80,954 |
| Medical | 10,107 | 9,220 |
| Total segment revenue | 97,018 | 90,174 |
| Corporate (1) | (8) | (12) |
| Total revenue | $ 97,010 | $ 90,162 |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial and customer care shared services, human resources, information technology and legal and compliance. The results attributable to noncontrolling interests are recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided and other ratable allocation methodologies.

We do not allocate the following items to our segments: LIFO inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $2 million and $9 million for the three months ended March 31, 2017 and 2016, respectively, and $4 million and $20 million for the nine months ended March 31, 2017 and 2016, respectively.

The following table presents segment profit by reportable segment and Corporate:

|  | Three Months Ended March 31, | |
|---|---|---|
| (in millions) | 2017 | 2016 |
| Pharmaceutical | $ 611 | $ 660 |
| Medical | 148 | 128 |
| Total segment profit | 759 | 788 |
| Corporate | (154) | (132) |
| Total operating earnings | $ 605 | $ 656 |

|  | Nine Months Ended March 31, | |
|---|---|---|
| (in millions) | 2017 | 2016 |
| Pharmaceutical | $ 1,682 | $ 1,945 |
| Medical | 435 | 335 |
| Total segment profit | 2,117 | 2,280 |
| Corporate | (436) | (441) |
| Total operating earnings | $ 1,681 | $ 1,839 |

The following table presents total assets for each reportable segment and Corporate at:

|  | March 31, 2017 | June 30, 2016 |
|---|---|---|
| (in millions) | | |
| Pharmaceutical | $ 21,469 | $ 20,662 |
| Medical | 10,645 | 10,236 |
| Corporate | 2,060 | 3,224 |
| Total assets | $ 34,174 | $ 34,122 |

## 14. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees.

The following table provides total share-based compensation expense by type of award:

|  | Three Months Ended March 31, | |
|---|---|---|
| (in millions) | 2017 | 2016 |
| Restricted share unit expense | $ 18 | $ 18 |
| Employee stock option expense | 4 | 6 |
| Performance share unit expense | 3 | 2 |
| Total share-based compensation | $ 25 | $ 26 |

**Notes to Financial Statements**

| (in millions) | Nine Months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Restricted share unit expense | $ 53 | $ 53 |
| Employee stock option expense | 14 | 16 |
| Performance share unit expense | 6 | 13 |
| **Total share-based compensation** | $ 73 | $ 82 |

The total tax benefit related to share-based compensation was $9 million for both the three months ended March 31, 2017 and 2016, and $25 million and $28 million for the nine months ended March 31, 2017 and 2016, respectively.

## Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years. Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share |
| --- | --- | --- |
| Nonvested at June 30, 2016 | 2 | $ 71.73 |
| Granted | 1 | 82.37 |
| Vested | (1) | 68.81 |
| Canceled and forfeited | — | — |
| **Nonvested at March 31, 2017** | 2 | $ 76.96 |

At March 31, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested restricted share units not yet recognized was $95 million, which is expected to be recognized over a weighted-average period of two years.

## Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for periods ranging from seven to ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share |
| --- | --- | --- |
| Outstanding at June 30, 2016 | 7 | $ 54.09 |
| Granted | 1 | 83.11 |
| Exercised | (1) | 37.46 |
| Canceled and forfeited | — | — |
| **Outstanding at March 31, 2017** | 7 | $ 62.99 |
| **Exercisable at March 31, 2017** | 4 | $ 52.28 |

At March 31, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested stock options not yet recognized was $26 million, which is expected to be recognized over

a weighted-average period of 2 years. The following tables provide additional detail related to stock options:

| (in millions) | March 31, 2017 | June 30, 2016 |
| --- | --- | --- |
| Aggregate intrinsic value of outstanding options at period end | $ 130 | $ 181 |
| Aggregate intrinsic value of exercisable options at period end | 127 | 161 |

| (in years) | March 31, 2017 | June 30, 2016 |
| --- | --- | --- |
| Weighted-average remaining contractual life of outstanding options | 7 | 6 |
| Weighted-average remaining contractual life of exercisable options | 6 | 5 |

## Performance Share Units

Performance share units vest over a three-year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share |
| --- | --- | --- |
| Nonvested at June 30, 2016 | 0.8 | $ 63.96 |
| Granted | 0.2 | 83.19 |
| Vested (1) | (0.4) | 51.49 |
| Canceled and forfeited | — | — |
| **Nonvested at March 31, 2017** | 0.6 | $ 77.86 |

(1) Vested based on achievement of 139 percent of the target performance goal.

At March 31, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized was $17 million, which is expected to be recognized over a weighted-average period of two years.

## 15. Subsequent Events

On April 18, 2017, we entered into an agreement with Medtronic plc ("Medtronic") to acquire its Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses for $6.1 billion in cash, subject to certain adjustments. The Medtronic businesses manufacture 23 medical product categories sold into multiple healthcare channels, and include numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition will further expand the Medical segment's portfolio of self-manufactured products. We expect to close the acquisition in the first quarter of our fiscal 2018, subject to customary closing conditions, including regulatory clearances.

We plan to fund the acquisition through $4.5 billion in new long-term debt, the use of existing cash and expected operating cash flows

**Notes to Financial Statements**

through closing. Additionally, if needed, we may access our commercial paper program and credit facilities. On April 18, 2017, we obtained a commitment from a financial institution to provide us a 364-day senior unsecured bridge term loan facility in an aggregate principal amount of up to $4.5 billion (the "Bridge Facility"), the proceeds of which may be used for the payment of the acquisition purchase price. Neither the closing of the Bridge Facility nor the receipt of any other financing is a condition to the closing of the acquisition.

# Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 2.1 | Stock and Asset Purchase Agreement, dated April 18, 2017, by and between Cardinal Health, Inc. and Medtronic plc (incorporated by reference to Exhibit 2.1 to Cardinal Health's Current Report on Form 8-K filed on April 18, 2017, File No. 1-11373) |
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 10.1 | Commitment Letter, dated April 18, 2017, by and among Goldman Sachs Bank USA and Goldman Sachs Lending Partners LLC and Cardinal Health, Inc. (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on April 18, 2017, File No. 1-11373) |
| 10.2 | Amendment No. 1, dated as of May 1, 2017, to Amended and Restated Five-Year Credit Agreement as of June 16, 2016 |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of the Chief Executive Officer and the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.1 | Statement Regarding Forward-Looking Information |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

## Cardinal Health Website

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations and information about upcoming presentations and events is routinely posted and accessible at ir.cardinalhealth.com. In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

# Form 10-Q Cross Reference Index

| Item Number | | Page |
|---|---|---|
| **Part I. Financial Information** | | |
| Item 1 | Financial Statements | **18** |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Item 3 | Quantitative and Qualitative Disclosures about Market Risk | **16** |
| Item 4 | Controls and Procedures | **16** |
| | **Part II. Other Information** | |
| Item 1 | Legal Proceedings | **16** |
| Item 1A | Risk Factors | **17** |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | **17** |
| Item 3 | Defaults Upon Senior Securities | **N/A** |
| Item 4 | Mine Safety Disclosures | **N/A** |
| Item 5 | Other Information | **N/A** |
| Item 6 | Exhibits | **32** |
| | Signatures | **34** |

**N/A**    Not applicable

**Additional Information**

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Cardinal Health, Inc.

Date:  May 2, 2017

/s/  GEORGE S. BARRETT

**George S. Barrett**
**Chairman and Chief Executive Officer**

/s/  MICHAEL C. KAUFMANN

**Michael C. Kaufmann**
**Chief Financial Officer**

## AMENDMENT NO. 1 TO AMENDED AND RESTATED FIVE-YEAR CREDIT AGREEMENT

This Amendment (this "Amendment") is entered into as of May 1, 2017 by and among Cardinal Health, Inc., an Ohio corporation (the "Company"), JPMorgan Chase Bank, N. A., individually and as administrative agent (the "Administrative Agent"), and the other financial institutions signatory hereto.

## RECITALS

A.　　The Company, the Subsidiary Borrowers from time to time party thereto, the Administrative Agent and the Lenders are party to that certain Amended and Restated Five-Year Credit Agreement dated as of June 16, 2016 (the "Credit Agreement"). Unless otherwise specified herein, capitalized terms used in this Amendment shall have the meanings ascribed to them by the Credit Agreement.

B.　　The Company, the Administrative Agent and the undersigned Lenders wish to amend the Credit Agreement on the terms and conditions set forth below.

Now, therefore, in consideration of the mutual execution hereof and other good and valuable consideration, the parties hereto agree as follows:

　　1.　　Amendment to Credit Agreement.  Upon the "Effective Date" (as defined below), the Credit Agreement shall be amended as follows:

　　(a)　　The definition of "Consolidated Funded Indebtedness" in Section 1.1 of the Credit Agreement is hereby amended by inserting the following proviso at the end thereof, before the period: "; provided that Consolidated Funded Indebtedness shall be deemed to not include any Pre-Funded Acquisition Debt until the date the relevant Material Acquisition is consummated".

　　(b)　　The definition of "Consolidated Leverage Ratio" in Section 1.1 of the Agreement is hereby amended by adding the text marked with double-underlining as set forth below:

　　　　　　"Consolidated Leverage Ratio" means, as of any date of determination, the ratio of (a) the sum of (i) Consolidated Funded Indebtedness as of such date  plus (ii) without duplication, the outstanding principal amount of Securitization Obligations as of such date (provided that if such Securitization Obligations are accounted for as a sale of accounts receivable, chattel paper, general intangibles, or the like under GAAP, the outstanding principal amount of such Securitization Obligations shall be determined as the amount

which would have been considered outstanding at such date had such Securitization Obligations been accounted for as a borrowing at such date) *to* (b) Consolidated EBITDA for the period of the four fiscal quarters most recently ended, *provided* that, for such purpose, Consolidated EBITDA for any such period of four fiscal quarters shall be calculated giving *pro forma* effect to any Material Acquisition or any Material Disposition consummated during such period, as if such Material Acquisition or Material Disposition had occurred on the first day of such period. *Pro forma* calculations made pursuant to the proviso to the immediately preceding sentence shall be determined in good faith by an Authorized Officer of the Company.

(c)      Section 1.1 of the Credit Agreement is amended by adding the following definitions in the appropriate alphabetical order:

"Disposition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the disposition (by sale, transfer, license, lease or otherwise) of all or substantially all of the assets of a Person, or of any business or division of a Person, (b), the disposition of in excess of 50% of the equity interests of any Person, or otherwise causing any Person to cease being a subsidiary, or (c) a merger or consolidation or any other combination with another person (other than a Person that is a Subsidiary of the Borrowers) in which a Borrower or a Subsidiary of a Borrower is not the surviving entity.

"Material Disposition" means the Disposition by the Company or one of its Subsidiaries for aggregate cash consideration of $500,000,000 or more.

"Pre-Funded Acquisition Debt" means Indebtedness incurred for the purpose of financing a Material Acquisition, which Indebtedness is issued in advance of the date of consummation of such Material Acquisition, so long as the indenture or agreement governing such Indebtedness provides that such Indebtedness shall be repaid or redeemed within a specified period after the incurrence of such Indebtedness if such Material Acquisition is not consummated within such period.

2

(d)     Section 6.12 of the Credit Agreement is hereby amended by adding the text marked with double-underlining and deleting the struck-through text, in each case as set forth below:

6.12    Consolidated Leverage Ratio.

The Company shall not permit the Consolidated Leverage Ratio at any timeas of the last day of any fiscal quarter of the Company (each such date, a "Test Date") to be greater than 3.25 to 1.00 of the Company; provided that if a Material Acquisition is consummated, then, upon the written request of the Company given to the Administrative Agent within five (5) Business Days after such consummation (and including such details regarding such Material Acquisition as the Administrative Agent may reasonably request), (x) solely for the first four Test Dates occurring on or afterperiod commencing on the date such Material Acquisition is consummated (including the fiscal quarter in which such Material Acquisition occurs) and continuing until and including the last day of the fiscal quarter of the Company which is the fourth fiscal quarter ending on or after the date of such Material Acquisition, in lieu of the foregoing, the Company shall not permit the Consolidated Leverage Ratio on any such Test Dateat any time during such period to be greater than 4.253.75 to 1.00 and (y) solely for the fifth and sixth Test Dates occurring on or after the date such Material Acquisition is consummated, the Company shall not permit the Consolidated Leverage Ratio on any such Test Date to be greater than 3.75 to 1.00 (each such period specified in clauses (x) and (y), a "Leverage Holiday"); and provided, further, if the Company requests a Leverage Holiday, then the Company shall not be permitted to request a subsequent Leverage Holiday until at least one full fiscal quarter has transpired thereafter where no Leverage Holiday was in effect at any time during such fiscal quarter.

2.      Representations and Warranties of the Company.  The Company represents and warrants that as of the Effective Date:

(a)     The execution, delivery and performance by the Company of this Amendment have been duly authorized by all necessary corporate action and that this Amendment is a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or similar Laws affecting creditors' rights generally;

3

(b)     Each of the representations and warranties contained in the Credit Agreement (treating this Amendment as a Loan Document for purposes thereof) is true and correct in all material respects on and as of the Effective Date except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty was true and correct in all material respects on and as of such earlier date; and

(c)     No Default or Unmatured Default has occurred and is continuing, nor would a Default or Unmatured Default result from this Amendment.

3.     <u>Effective Date</u>.  This Amendment shall become effective upon the execution and delivery of this Amendment by the Company, the Administrative Agent and Lenders collectively constituting Required Lenders.

4.     <u>Reference to and Effect Upon the Credit Agreement; Other</u>.

(a)     Except as specifically amended above, the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.  This Amendment shall constitute a Loan Document.

(b)     The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Administrative Agent or any Lender under the Credit Agreement or any other Loan Document, nor constitute a waiver of any provision of the Credit Agreement or any other Loan Document, except as specifically set forth herein.  Upon the effectiveness of this Amendment, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of similar import shall mean and be a reference to the Credit Agreement as amended hereby and each reference in any other Loan Document to the Credit Agreement shall mean and be a reference to the Credit Agreement as amended hereby.

5.     <u>Costs and Expenses</u>.  The Borrower hereby affirms its obligation under Section 9.6 of the Credit Agreement to reimburse the Administrative Agent for all reasonable out-of-pocket expenses incurred by the Administrative Agent in connection with the preparation, negotiation, execution and delivery of this Amendment, including but not limited to the reasonable fees, charges and disbursements of attorneys for the Administrative Agent with respect thereto.

6.     <u>Governing Law</u>.  This Amendment shall be governed by, construed and enforced in accordance with the laws of the State of New York, including Section 5-1401 and Section 5-1402 of the general obligation law of the State of New York, without reference to any other conflicts of law principles thereof.

4

7.      Headings. Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purposes.

8.      Counterparts. This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original but all such counterparts shall constitute one and the same instrument. Delivery of an executed signature page of this Amendment by facsimile transmission or electronic mail shall be effective as delivery of manually executed counterpart hereof.

[Remainder of page is intentionally left blank.]

5

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date and year first above written.

CARDINAL HEALTH, INC., as the Company

By: /s/ Michael Kaufmann
Name: Michael Kaufmann
Title: Chief Financial Officer

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

JPMORGAN CHASE BANK, N.A,
individually and as Administrative Agent


By: /s/ Erik Barragan
Name: Erik Barragan
Title: Authorized Officer

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

Bank of America, N.A., as a Lender


By: /s/ Joseph L. Corah
Name: Joseph L. Corah
Title: Director

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

THE BANK OF TOKYO-MITSUBISHI UFJ,
LTD., as a Lender


By: /s/ Jaime Johnson
Name: Jaime Johnson
Title: Director

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

Barclays Bank PLC, as a Lender


By: /s/ Christopher Aitkin
Name: Christopher Aitkin
Title: Assistant Vice President

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

DEUTSCHE BANK AG NEW YORK
BRANCH, as a Lender


By: /s/ Ming K. Chu
Name: Ming K. Chu
Title: Director


By: /s/ Virginia Cosenza
Name: Virginia Cosenza
Title: Vice President

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

**GOLDMAN SACHS BANK USA**,
as a Lender


By: /s/ Robert Ehudin
Name: Robert Ehudin
Title: Authorized Signatory

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

HSBC BANK USA, as a Lender

By: /s/ Jason Fuqua
Name: Jason Fuqua
Title: Vice President

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

Morgan Stanley Bank N.A., as a Lender

By: /s/ Alice Lee
Name: Alice Lee
Title: Authorized Signatory

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as a Lender


By: /s/ Andrea S. Chen
Name: ANDREA S CHEN
Title: MANAGING DIRECTOR

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

U.S. Bank National Association, as a Lender


By: /s/ Joseph M. Schnorr
Name: Joseph M. Schnorr
Title: Senior Vice President

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

**CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, as a Lender

By: /s/ Gordon Yip
Name: Gordon Yip
Title: Director

By: /s/ Mark Koneval
Name: Mark Koneval
Title: Managing Director

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

**The Bank of Nova Scotia**, as a Lender


By: /s/ Michelle Phillips
Name: Michelle Phillips
Title: Execution Head & Director

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

THE HUNTINGTON NATIONAL BANK, as a Lender


By: /s/ Peter M Kakoules
Name: Peter M Kakoules
Title: Vice President

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

PNC Bank, National Association, as a Lender

By: /s/ Steven P. Shepard
Name: Steven P. Shepard
Title: Senior Vice President

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

Standard Chartered Bank, as a Lender


By: /s/ Daniel Mattern
Name: Daniel Mattern
Title: Associate Director
      Standard Chartered Bank

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

**SunTrust Bank**, as a Lender

By: /s/ Dave Felty
Name: Dave Felty
Title: Managing Director

[Signature Page to Amendment No. 1 to Amended and Restated Five-Year Credit Agreement]

Exhibit 12.1

## Computation of Ratio of Earnings to Fixed Charges

| (in millions, except ratios) | Fiscal Year Ended June 30, | | | | | Nine Months Ended March 31, 2017 |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | |
| Earnings from continuing operations before income taxes | $ 1,698.1 | $ 888.3 | $ 1,798.3 | $ 1,967.3 | $ 2,275.6 | $ 1,549.2 |
| **Plus fixed charges:** | | | | | | |
| Interest expense | 92.3 | 119.2 | 129.4 | 137.0 | 178.2 | 132.3 |
| Capitalized interest | 6.0 | 1.7 | 1.2 | 1.8 | 5.6 | 7.6 |
| Amortization of debt offering costs | 2.8 | 3.5 | 3.6 | 7.6 | 5.6 | 4.3 |
| Interest portion of rent expense | 7.8 | 8.3 | 9.8 | 9.6 | 11.5 | 9.9 |
| **Fixed charges** | 108.9 | 132.7 | 144.0 | 156.0 | 200.9 | 154.1 |
| Plus: amortization of capitalized interest | 3.2 | 3.4 | 2.9 | 2.4 | 2.5 | 2.5 |
| Less: capitalized interest | (6.0) | (1.7) | (1.2) | (1.8) | (5.6) | (7.6) |
| **Earnings** | $ 1,804.2 | $ 1,022.7 | $ 1,944.0 | $ 2,123.9 | $ 2,473.4 | $ 1,698.2 |
| **Ratio of earnings to fixed charges (1)** | 16.6 | 7.7 | 13.5 | 13.6 | 12.3 | 11.0 |

(1)   The ratio of earnings to fixed charges is computed by dividing fixed charges into earnings from continuing operations before income taxes plus fixed charges and capitalized interest. Fixed charges include interest expense, amortization of debt offering costs and the portion of rent expense that is deemed to be representative of the interest factor. Interest expense recorded on tax exposures has been recorded in income tax expense and has therefore been excluded from the calculation.

Exhibit 31.1

I, George S. Barrett, certify that:

1. I have reviewed this Form 10-Q of Cardinal Health, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 2, 2017

/s/ GEORGE S. BARRETT
———————————————————
George S. Barrett
Chairman and Chief Executive Officer

Exhibit 31.2

I, Michael C. Kaufmann, certify that:

1.  I have reviewed this Form 10-Q of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 2, 2017

/s/ MICHAEL C. KAUFMANN
Michael C. Kaufmann
Chief Financial Officer

Exhibit 32.5

**Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Each of George S. Barrett, Chairman and Chief Executive Officer of Cardinal Health, Inc. (the "Company"), and Michael C. Kaufmann, Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)     the Quarterly Report on Form 10-Q for the quarter ended March 31, 2017 containing the financial statements of the Company (the "Periodic Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 2, 2017

/s/ GEORGE S. BARRETT
George S. Barrett
Chairman and Chief Executive Officer

/s/ MICHAEL C. KAUFMANN
Michael C. Kaufmann
Chief Financial Officer

## Statement Regarding Forward-Looking Information

As used in this exhibit, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K"), our quarterly reports on Form 10-Q and our current reports on Form 8-K (along with any exhibits and amendments to such reports), as well as our news releases or any other written or oral statements made by or on behalf of us, may include, directly or by incorporation by reference, forward-looking statements that reflect our current view (as of the date the forward-looking statement is first made) about future events, prospects, projections or financial performance. The matters discussed in these forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied in or by such statements. These risks and uncertainties include:

- competitive pressures in the markets in which we operate, including pricing pressures;

- uncertainties relating to the pricing of generic pharmaceuticals;

- uncertainties relating to the timing, frequency and profitability of generic pharmaceutical launches;

- our ability to maintain the benefits of our generic pharmaceutical sourcing venture with CVS Health Corporation;

- with respect to our distribution agreements with branded pharmaceutical manufacturers, changes in the amount of service fees we receive or, in cases where part of our compensation under these agreements is branded pharmaceutical price appreciation, changes in the frequency or magnitude of such price appreciation;

- changes in the timing or frequency of the introduction of branded pharmaceuticals;

- uncertainties relating to the frequency or magnitude of branded pharmaceutical price appreciation;

- actions of regulatory bodies and other governmental authorities, including the U.S. Drug Enforcement Administration, certain agencies within the U.S. Department of Health and Human Services (including the U.S. Food and Drug Administration, Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights), the U.S. Nuclear Regulatory Commission, the U.S. Federal Trade Commission, the U.S. Customs and Border Protection, various state boards of pharmacy, state controlled substance agencies, state health departments, state insurance departments, state Medicaid departments or comparable regulatory bodies or governmental authorities or foreign equivalents that, in each case, could delay, limit or suspend product development, manufacturing, distribution, importation or sales or result in warning letters, recalls, seizures, injunctions or monetary sanctions;

- difficulties or delays in the development, production, manufacturing, sourcing and marketing of new or existing products and services, including difficulties or delays associated with obtaining requisite regulatory consents or approvals associated with those activities;

- risks arising from possible violations of healthcare fraud and abuse laws;

- costs or claims resulting from potential errors or defects in our manufacturing of medical devices or other products or in our compounding, repackaging, information systems or pharmacy management services that may injure persons or damage property or operations, including costs from remediation efforts or recalls and related product liability claims and lawsuits, including class actions;

- risks arising from possible violations of the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws and other similar anti-corruption laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws;

- risks arising from our collecting, handling and maintaining patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information;

- risks arising from certain of our businesses being Medicare-certified suppliers or participating in state Medicaid programs, which businesses are subject to accreditation and quality standards and other rules and regulations, including applicable billing, payment and record-keeping requirements;

- risks arising from certain of our businesses manufacturing pharmaceutical and medical products or repackaging pharmaceuticals that are purchased through federal or state healthcare programs, which businesses are subject to federal and state laws that establish eligibility for reimbursement by such programs;

- changes in laws or changes in the interpretation or application of laws or regulations, as well as possible failures to comply with applicable laws or regulations, including as a result of possible misinterpretations or misapplications;

- material reductions in purchases, non-renewal or early termination of contracts, or delinquencies or defaults by key customers;

- unfavorable changes to the terms of key customer or supplier relationships, or changes in customer mix;

- adverse changes in U.S. or foreign tax laws, including proposals relating to a U.S. "border adjustment tax" or import tariffs, or unfavorable challenges to our tax positions and payments to settle these challenges;

- uncertainties due to government healthcare reform, including possible modifications to, or repeal of, the Patient Protection and Affordable Care Act;

- changes in manufacturers' pricing, selling, inventory, distribution or supply policies or practices;

- changes in regulatory policies regarding pharmaceutical manufacturer product pricing practices;

- changes in hospital buying groups or hospital buying practices;

- changes in distribution or sourcing models for pharmaceutical and medical and surgical products, including an increase in direct and limited distribution;

- the risks of counterfeit products in the supply chain;

- changes to the prescription drug reimbursement formula and related reporting requirements for generic pharmaceuticals under Medicaid;

- increasing consolidation in the healthcare industry, which could give the resulting enterprises greater bargaining power and may increase pressure on prices for our products and services or result in the loss of customers;

- disruption or damage to, or failure of, our information systems, critical facilities, including our national logistics center, or distribution networks;

- risks to our business and information and controls systems in the event that the Pharmaceutical segment's multi-year systems replacement project or other business process improvements, infrastructure modernizations or initiatives to use third-party service providers for key systems and processes are not effectively implemented;

- any compromise of our information systems or of those of a third-party with whom we do business, including unauthorized access to or use or disclosure of sensitive information;

- the results, costs, effects or timing of any commercial disputes, government contract compliance matters, product liability claims or lawsuits, patent infringement claims, *qui tam* actions or other legal proceedings;

- possible losses relating to product liability claims regarding products for which we cannot obtain product liability insurance or for which such insurance is not adequate to cover our losses;

- our ability to maintain adequate intellectual property protections;

- the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition, and uncertainties relating to our ability to achieve the anticipated results from acquisitions;

- risks and uncertainties relating to the consummation of our pending acquisition of Medtronic plc's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses, including our ability to successfully complete the acquisition on a timely basis, including receipt of required regulatory approvals and satisfaction of other closing conditions, and the conditions of the credit markets, which could affect our ability to issue debt to fund the acquisition on acceptable terms;

- risks and uncertainties if the pending acquisition of Medtronic plc's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses is consummated, including the following: we may fail to realize the synergies and other benefits we expect from the acquisition; the use of a significant portion of our cash and the incurrence of substantial indebtedness in connection with the financing of the acquisition may have an adverse effect on our liquidity, limit our flexibility in responding to other business opportunities, and increase our vulnerability to adverse economic and industry conditions; we may fail to retain key personnel of the acquired businesses; future developments may impair the value of our purchased goodwill or intangible assets; we may face difficulties establishing, integrating or combining operations and systems; we may face challenges retaining the customers of the acquired businesses; we may encounter unforeseen internal control, regulatory or compliance issues; and we may face other additional risks relating to regulatory matters, legal proceedings, tax laws or positions, supply interruptions, commodity price volatility and global operations, including the effects of local economic environments and currency volatility;

- risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility;

- increased costs for commodities used in the Medical segment including various components, compounds, raw materials or energy such as oil-based resins, cotton, latex and other commodities;

- shortages in commodities, components, compounds, raw materials or energy used by our businesses, including supply disruptions of radioisotopes;

- the loss of, or default by, one or more key suppliers for which alternative suppliers may not be readily available;

- bankruptcy, insolvency or other credit failure of a customer or supplier that owes us a substantial amount;

- risks associated with global operations, including the effect of local economic environments, inflation, recession, currency volatility and global competition, in addition to risks associated with compliance with U.S. and international laws relating to global operations;

- risks associated with volatility and disruption to the global capital and credit markets, which may adversely affect our ability to access credit, our cost of credit and the financial soundness of our customers and suppliers;

- our ability to introduce and market new products and our ability to keep pace with advances in technology;

- the costs, effects, timing or success of restructuring programs or plans;

- significant charges to earnings if goodwill or intangible assets become impaired;

- uncertainties relating to general political, business, industry, regulatory and market conditions; and

- other factors described in the "Risk Factors" section of the 2016 Form 10-K.

The words "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions generally identify "forward-looking statements," which speak only as of the date the statements were made, and also include statements reflecting future results or guidance, statements of outlook and expense accruals. We undertake no obligation to update or revise any forward-looking statements, except to the extent required by applicable law.

# EXHIBIT 75

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**August 2, 2017**

**Date of Report**

**(Date of earliest event reported)**

# Cardinal Health, Inc.

(Exact name of registrant as specified in its charter)

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place, Dublin, Ohio 43017**

(Address of principal executive offices) (Zip Code)

**(614) 757-5000**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instructions A.2. below):

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

## Item 2.02: Results of Operations and Financial Condition

On August 2, 2017 , Cardinal Health, Inc. (the "Company") issued a news release announcing its results for the quarter and fiscal year ended June 30, 2017 . A copy of the news release is included as Exhibit 99.1 to this report.

## Item 7.01: Regulation FD Disclosure

During a webcast scheduled to be held at 8:30 a.m. Eastern time on August 2, 2017 , the Company's Chairman & Chief Executive Officer and Chief Financial Officer will discuss the Company's results for the fourth-quarter and fiscal year ended June 30, 2017 and outlook for the fiscal year ending June 30, 2018 . The slide presentation for the webcast will be available on the Investors page at ir.cardinalhealth.com . An audio replay of the webcast also will be available on the Investors page at ir.cardinalhealth.com .

## Item 9.01: Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 99.1 | News release issued by the Company on August 2, 2017 announcing fourth-quarter and fiscal year results. |

2

# Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Cardinal Health, Inc.**

(Registrant)

Date: August 2, 2017                    By:     /s/ Michael C. Kaufmann

Michael C. Kaufmann

Chief Financial Officer

3

## Exhibit Index

| Exhibit Number | Exhibit Description |
|---|---|
| 99.1 | News release issued by the Company on August 2, 2017 announcing fourth-quarter and fiscal year results. |

4

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

Media:   Ellen Barry                                      Investors:  Lisa Capodici

         (614) 553-3858                                               (614) 757-5035

         ellen.barry@cardinalhealth.com                               lisa.capodici@cardinalhealth.com

# Cardinal Health Reports Q4 and Fiscal 2017 Results, Provides 2018 Guidance

• **Fourth-quarter revenue increases 5 percent to $33 billion; full-year revenue increases 7 percent to a record $130 billion**
• **Fourth-quarter GAAP [1] diluted earnings per share decreases 16 percent to $0.86, and non-GAAP diluted earnings per share increases 15 percent to $1.31**
• **Full-year GAAP diluted earnings per share decreases 7 percent to $4.03, and non-GAAP diluted earnings per share increases 3 percent to $5.40**

**DUBLIN, Ohio, August 2, 2017** - Cardinal Health (NYSE: CAH) today reported fourth-quarter fiscal year 2017 revenues of $33 billion, an increase of 5 percent from the fourth quarter last year, and fiscal 2017 revenues of $130 billion, an increase of 7 percent from the same period last year. For the quarter, GAAP diluted earnings per share (EPS) decreased 16 percent to $0.86, while non-GAAP diluted EPS increased 15 percent to $1.31. GAAP diluted EPS for fiscal year 2017 decreased 7 percent to $4.03, and non-GAAP diluted EPS increased 3 percent to $5.40 .

"While these last 12 months were clearly a dynamic period in healthcare and certainly presented challenges for our fiscal 17, it was also a year in which we took important actions to strengthen our market positioning, grow our scale, add new, long-term drivers of growth, and improve the overall balance of our integrated portfolio," said George Barrett, chairman and CEO of Cardinal Health. "In spite of the challenges of the year, our team was able to deliver growth in non-GAAP EPS."

## Q4 and year-end FY17 summary

|  | | **Q4 FY17** | | Q4 FY16 | Y/Y | | **FY17** | | FY16 | Y/Y |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | **33.0 billion** | $ | 31.4 billion | 5% | $ | **130.0 billion** | $ | **121.5 billion** | 7% |
| Operating earnings | $ | **439 million** | $ | 620 million | (29)% | $ | **2,120 million** | $ | **2,459 million** | (14)% |
| Non-GAAP operating earnings | $ | **640 million** | $ | 643 million | (1)% | $ | **2,769 million** | $ | **2,895 million** | (4)% |
| Net earnings attributable to Cardinal Health, Inc. | $ | **274 million** | $ | 333 million | (18)% | $ | **1,288 million** | $ | **1,427 million** | (10)% |
| Non-GAAP net earnings attributable to Cardinal Health, Inc. | $ | **416 million** | $ | 372 million | 12% | $ | **1,727 million** | $ | **1,732 million** | — |
| Diluted EPS attributable to Cardinal Health, Inc. | $ | **0.86** | $ | 1.02 | (16)% | $ | **4.03** | $ | **4.32** | (7)% |
| Non-GAAP diluted EPS attributable to Cardinal Health, Inc. | $ | **1.31** | $ | 1.14 | 15% | $ | **5.40** | $ | **5.24** | 3% |

Diluted EPS for the quarter and year benefitted from a lower effective tax rate and fewer weighted average shares outstanding than the prior-year periods.

## Segment results

*Pharmaceutical segment*

Fourth-quarter revenue for the Pharmaceutical segment increased 5 percent to $29.6 billion due to growth from Pharmaceutical Distribution customers and strong performance from the Specialty Solutions business. Segment profit decreased 7 percent to $505 million. This decrease was driven by generic pharmaceutical pricing and the company's ongoing investment in its Pharmaceutical IT platform. These were partially offset by solid performance from Red Oak Sourcing.

Full-year revenue for the Pharmaceutical segment increased 7 percent to $116.5 billion due to growth from Pharmaceutical Distribution customers and strong performance from the Specialty Solutions business. Segment profit for the year decreased 12 percent to $2.2 billion driven by generic pharmaceutical pricing, and to a lesser extent, the impact of the loss of Safeway and reduced levels of branded manufacturer price appreciation. These were partially offset by solid performance from Red Oak Sourcing.

**Cardinal Health**
**Page 2**

| | Q4 FY17 | | Q4 FY16 | Y/Y | | FY17 | | FY16 | Y/Y |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | **29.6 billion** | $ 28.2 billion | 5% | $ | **116.5 billion** | $ 109.1 billion | 7% |
| Segment profit | $ | **505 million** | $ 542 million | (7)% | $ | **2.2 billion** | $ 2.5 billion | (12)% |

*Medical segment*

Revenue for the Medical segment increased 6 percent to $3.4 billion driven by contributions from new and existing customers. Segment profit increased 13 percent to $138 million reflecting solid performance from post-acute solutions, favorability from compensation-related items and growth in distribution services. These were partially offset by performance in Cardinal Health Branded products (including Cordis).

Full-year revenue for the Medical segment increased 9 percent to $13.5 billion due to contributions from new and existing customers and, to a lesser extent, acquisitions. Segment profit increased 25 percent to $572 million due to the contribution from post-acute solutions, Cardinal Health Branded products (including Cordis), favorability from compensation-related items and growth in distribution services.

| | Q4 FY17 | | Q4 FY16 | Y/Y | | FY17 | | FY16 | Y/Y |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | **3.4 billion** | $ 3.2 billion | 6% | $ | **13.5 billion** | $ 12.4 billion | 9% |
| Segment profit | $ | **138 million** | $ 122 million | 13% | $ | **572 million** | $ 457 million | 25% |

## Outlook

The company does not provide GAAP EPS outlook because it is unable to reliably forecast most of the items that are excluded from GAAP EPS to calculate non-GAAP EPS. These items could cause EPS to differ materially from non-GAAP EPS. See "Use of Non-GAAP Measures" following the attached schedules for additional explanation.

The company's fiscal year 2018 guidance range for non-GAAP diluted EPS from continuing operations is $4.85 to $5.10. This guidance now reflects incremental discrete items of $0.16 per share, identified since the early outlook announcement provided in April.

In a further comment on the year ahead, Barrett said: "As we indicated in our April early outlook, we expected our fiscal 2018 non-GAAP EPS to be down. Our perspective and operating expectations have not meaningfully changed. We are, however, taking some discrete actions, which will affect our EPS in FY18 and will improve our trajectory for 2019 and beyond. And we are targeting fiscal 2019 non-GAAP EPS of at least $5.60."

## FY17 and recent highlights

- Completed the acquisition of Medtronic's Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency business for $6.1 billion on July 29, 2017
- Acquired rights to Navidea's Lymphoseek, a radiopharmaceutical diagnostic imaging agent
- Convened the 27th annual Retail Business Conference, which provided one of the industry's largest lineups of continuing education courses, buying opportunities, and access to Cardinal Health solutions that help independent pharmacists diversify and improve their business
- Through the Cordis business, became the exclusive U.S. distributor of the Tryton Side Branch Stent, the first dedicated bifurcation device to receive regulatory approval in the U.S. to treat significant coronary bifurcation lesions
- Increased quarterly dividend by 3 percent to $0.4624 per share, or $1.85 on an annualized basis

## Awards and recognition

Over the past year, Cardinal Health was recognized for its leadership and commitment to diversity and sustainability, including:

- Named on the 2017 World's Most Admired Companies list by *Fortune*
- Recognized by the National Association for Female Executives as a Top 60 Company for Executive Women for the sixth consecutive year
- Included in Becker's Healthcare 150 Top Places to Work in Healthcare 2017 listing
- Named to the Human Rights Campaign (HRC) Best Places to Work for LGBT Equality for the fifth consecutive year based on ratings in HRC's 2017 Corporate Equality Index
- Included in the Dow Jones Sustainability North American Company Index for the eleventh consecutive year

## Webcast

Cardinal Health will host a webcast today at 8:30 a.m. Eastern to discuss fourth-quarter and year-end results. To access the webcast and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com . No access code is required.

Presentation slides and a webcast replay will be available on the Cardinal Health website at ir.cardinalhealth.com until Aug. 1, 2018.

**Cardinal Health**
**Page 3**

## Upcoming webcasted investor events

- Robert W. Baird's Global Healthcare Conference on Thursday, Sept. 7 at 9:05 a.m. Eastern in New York City
- Morgan Stanley 15th Annual Global Healthcare Conference on Monday, Sept. 11 at 8:45 a.m. Eastern in New York City

## About Cardinal Health

Cardinal Health, Inc. is a global, integrated healthcare services and products company, providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. Because Cardinal Health helps ensure pharmacists and the consumers they serve have access to medications they need while working to help prevent prescription drug diversion, the company and its education partners created Generation Rx , a national program to help prevent the misuse of prescription medications. Backed by nearly 100 years of experience, with approximately 50,000 employees in nearly 60 countries, Cardinal Health ranks #15 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter and connect on LinkedIn at linkedin.com/company/cardinal-health .

[1] GAAP refers to U.S. generally accepted accounting principles. This news release includes GAAP financial measures as well as non-GAAP financial measures, which are financial measures not calculated in accordance with GAAP. See "Use of Non-GAAP Measures" following the attached schedules for definitions of the non-GAAP financial measures presented in this news release, and see the attached schedules for reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the Investor Relations page at ir.cardinalhealth.com . In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

## Cautions concerning forward-looking statements

This news release contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with the recently completed acquisition of Medtronic's Patient Recovery Business, including the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws, including proposals relating to a "border adjustment tax" or new import tariffs; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any governmental or regulatory authority, including litigation relating to opioid distribution; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This news release reflects management's views as of August 2, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**Schedule 1**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | Fourth Quarter 2017 | | 2016 | % Change |
|---|---|---|---|---|
| Revenue | $ | 32,966 | $ 31,384 | 5 % |
| Cost of products sold | | 31,343 | 29,719 | 5 % |
| Gross margin | | 1,623 | 1,665 | (3)% |
| | | | | |
| **Operating expenses:** | | | | |
| Distribution, selling, general and administrative expenses | | 983 | 970 | 1 % |
| Restructuring and employee severance | | 24 | 6 | N.M. |
| Amortization and other acquisition-related costs | | 163 | 132 | N.M. |
| Impairments and loss on disposal of assets, net | | 3 | 3 | N.M. |
| Litigation (recoveries)/charges, net | | 11 | (66) | N.M. |
| Operating earnings | | 439 | 620 | (29)% |
| | | | | |
| Other (income)/expense, net | | (3) | — | N.M. |
| Interest expense, net | | 68 | 44 | 55 % |
| Earnings before income taxes | | 374 | 576 | (35)% |
| | | | | |
| Provision for income taxes | | 96 | 241 | (60)% |
| Net earnings | | 278 | 335 | (17)% |
| | | | | |
| Less: Net earnings attributable to noncontrolling interests | | (4) | (2) | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 274 | $ 333 | (18)% |
| | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | |
| Basic | $ | 0.87 | $ 1.03 | (16)% |
| Diluted | | 0.86 | 1.02 | (16)% |
| | | | | |
| **Weighted-average number of common shares outstanding:** | | | | |
| Basic | | 316 | 324 | |
| Diluted | | 318 | 327 | |

**Schedule 2**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | | Fiscal Year 2017 | | 2016 | % Change |
|---|---|---|---|---|---|
| Revenue | $ | 129,976 | $ | 121,546 | 7 % |
| Cost of products sold | | 123,432 | | 115,003 | 7 % |
| Gross margin | | 6,544 | | 6,543 | — % |
| | | | | | |
| **Operating expenses:** | | | | | |
| Distribution, selling, general and administrative expenses | | 3,775 | | 3,648 | 3 % |
| Restructuring and employee severance | | 56 | | 25 | N.M. |
| Amortization and other acquisition-related costs | | 527 | | 459 | N.M. |
| Impairments and loss on disposal of assets, net | | 18 | | 21 | N.M. |
| Litigation (recoveries)/charges, net | | 48 | | (69) | N.M. |
| Operating earnings | | 2,120 | | 2,459 | (14)% |
| | | | | | |
| Other (income)/expense, net | | (5) | | 5 | N.M. |
| Interest expense, net | | 201 | | 178 | 13 % |
| Earnings before income taxes | | 1,924 | | 2,276 | (15)% |
| | | | | | |
| Provision for income taxes | | 630 | | 845 | (25)% |
| Net earnings | | 1,294 | | 1,431 | (10)% |
| | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | (6) | | (4) | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 1,288 | $ | 1,427 | (10)% |
| | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Basic | $ | 4.06 | $ | 4.36 | (7)% |
| Diluted | | 4.03 | | 4.32 | (7)% |
| | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | |
| Basic | | 317 | | 327 | |
| Diluted | | 320 | | 330 | |

**Schedule 3**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets (Unaudited)**

| (in millions) | | June 30, 2017 | | June 30, 2016 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 6,879 | $ | 2,356 |
| Trade receivables, net | | 8,048 | | 7,405 |
| Inventories, net | | 11,301 | | 10,615 |
| Prepaid expenses and other | | 2,117 | | 1,580 |
| Total current assets | | 28,345 | | 21,956 |
| | | | | |
| Property and equipment, net | | 1,879 | | 1,796 |
| Goodwill and other intangibles, net | | 9,207 | | 9,426 |
| Other assets | | 681 | | 944 |
| **Total assets** | $ | 40,112 | $ | 34,122 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 17,906 | $ | 17,306 |
| Current portion of long-term obligations and other short-term borrowings | | 1,327 | | 587 |
| Other accrued liabilities | | 1,988 | | 1,808 |
| Total current liabilities | | 21,221 | | 19,701 |
| | | | | |
| Long-term obligations, less current portion | | 9,068 | | 4,952 |
| Deferred income taxes and other liabilities | | 2,877 | | 2,781 |
| | | | | |
| Redeemable noncontrolling interests | | 118 | | 117 |
| | | | | |
| Total Cardinal Health, Inc. shareholders' equity | | 6,808 | | 6,554 |
| Noncontrolling interests | | 20 | | 17 |
| Total shareholders' equity | | 6,828 | | 6,571 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 40,112 | $ | 34,122 |

**Schedule 4**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (Unaudited )**

| (in millions) | Fourth Quarter | | Fiscal Year | |
| --- | --- | --- | --- | --- |
| | **2017** | 2016 | **2017** | 2016 |
| | **(Unaudited)** | (Unaudited) | **(Unaudited)** | |
| **Cash flows from operating activities:** | | | | |
| Net earnings | $ **278** | $ 335 | $ **1,294** | $ 1,431 |
| | | | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | | |
| Depreciation and amortization | **192** | 176 | **717** | 641 |
| Gain on sale of other investments | **—** | — | **4** | — |
| Gain on disposal of assets, net | **3** | 4 | **18** | 21 |
| Share-based compensation | **23** | 29 | **96** | 111 |
| Provision for deferred income taxes | **291** | 87 | **291** | 87 |
| Provision for bad debts | **17** | 22 | **63** | 73 |
| Change in fair value of contingent consideration obligation | **(5)** | — | **(5)** | (16) |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | |
| Increase in trade receivables | **(558)** | (145) | **(665)** | (866) |
| Decrease/(increase) in inventories | **337** | 278 | **(673)** | (1,179) |
| Increase/(decrease) in accounts payable | **329** | (24) | **564** | 2,815 |
| Other accrued liabilities and operating items, net | **(183)** | (121) | **(520)** | (147) |
| Net cash provided by operating activities | **724** | 641 | **1,184** | 2,971 |
| | | | | |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | **(19)** | (231) | **(132)** | (3,614) |
| Additions to property and equipment | **(94)** | (181) | **(387)** | (465) |
| Purchase of available-for-sale securities and other investments | **(6)** | (50) | **(194)** | (200) |
| Proceeds from sale of available-for-sale securities and other investments | **113** | 37 | **228** | 136 |
| Proceeds from maturities of available-for-sale securities | **28** | 13 | **77** | 50 |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | **2** | 13 | **3** | 13 |
| Net cash provided by/(used in) investing activities | **24** | (399) | **(405)** | (4,080) |
| | | | | |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | **—** | (2) | **(3)** | (25) |
| Net change in short-term borrowings | **(22)** | (8) | **3** | 26 |
| Net purchase of noncontrolling interests | **—** | — | **(12)** | (10) |
| Reduction of long-term obligations | **(250)** | (1) | **(310)** | (6) |
| Proceeds from interest rate swap terminations | **—** | — | **14** | — |
| Proceeds from long-term obligations, net of issuance costs | **5,171** | — | **5,171** | — |
| Net tax proceeds/(withholdings) from share-based compensation | **6** | 9 | **26** | 6 |
| Excess tax benefits from share-based compensation | **(3)** | — | **34** | 33 |
| Dividends on common shares | **(142)** | (126) | **(577)** | (512) |
| Purchase of treasury shares | **—** | (351) | **(600)** | (651) |
| Net cash provided by/(used in) financing activities | **4,760** | (479) | **3,746** | (1,139) |
| | | | | |
| Effect of exchange rates changes on cash and equivalents | **3** | (5) | **(2)** | (12) |
| | | | | |
| Net increase/(decrease) in cash and equivalents | **5,511** | (242) | **4,523** | (2,260) |
| Cash and equivalents at beginning of period | **1,368** | 2,598 | **2,356** | 4,616 |
| **Cash and equivalents at end of period** | $ **6,879** | $ 2,356 | $ **6,879** | $ 2,356 |

**Schedule 5**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Fourth Quarter | | | (in millions) | Fourth Quarter | | |
|---|---|---|---|---|---|---|---|
| | | 2017 | 2016 | | | 2017 | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **29,552** | $ 28,177 | Amount | $ | **3,416** | $ 3,210 |
| Growth rate | | **5 %** | 14% | Growth rate | | **6%** | 12% |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **505** | $ 542 | Amount | $ | **138** | $ 122 |
| Growth rate | | **(7)%** | 1% | Growth rate | | **13%** | 19% |
| Segment profit margin | | **1.71 %** | 1.93% | Segment profit margin | | **4.03%** | 3.81% |

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the three months ended June 30, 2017 was $32,966 million , which included total segment revenue of $32,968 million and Corporate revenue of $(2) million . Total consolidated revenue for the three months ended June 30, 2016 was $31,384 million , which included total segment revenue of $31,387 million and Corporate revenue of $(3) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended June 30, 2017 were $439 million , which included total segment profit of $643 million and Corporate costs of $(204) million . Total consolidated operating earnings for the three months ended June 30, 2016 were $620 million , which included total segment profit of $664 million and Corporate costs of $(44) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments. The increase in corporate costs is primarily due to the change in ligation (recoveries)/charges, net driven by the lack of litigation recoveries from the prior period recurring in the current period and the prior year LIFO credits that did not recur in the current period.

**Schedule 6**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Fiscal Year | | | (in millions) | Fiscal Year | | |
|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **116,463** | $ 109,131 | Amount | $ | **13,524** | $ 12,430 |
| Growth rate | | **7 %** | 20% | Growth rate | | **9%** | 9% |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **2,187** | $ 2,488 | Amount | $ | **572** | $ 457 |
| Growth rate | | **(12)%** | 19% | Growth rate [1] | | **25%** | 6% |
| Segment profit margin | | **1.88 %** | 2.28% | Segment profit margin | | **4.23%** | 3.68% |

[1]    Segment profit for the fiscal year ended June 30, 2016 includes the $43 million unfavorable impact of the Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit growth was 14 percent and 15 percent for the fiscal years ended June 30, 2017 and 2016, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the fiscal year ended June 30, 2017 was $129,976 million , which included total segment revenue of $129,987 million and Corporate revenue of $(11) million . Total consolidated revenue for the fiscal year ended June 30, 2016 was $121,546 million , which included total segment revenue of $121,561 million and Corporate revenue of $(15) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the fiscal year ended June 30, 2017 were $2,120 million , which included total segment profit of $2,759 million and Corporate costs of $(639) million . Total consolidated operating earnings for the fiscal year ended June 30, 2016 were $2,459 million , which included total segment profit of $2,945 million and Corporate costs of $(486) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Schedule 7**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation [1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2,3,4] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Fourth Quarter 2017** | | | | | | |
| **GAAP** | $ 1,623 | (3)% | $ 439 | (29)% | $ 374 | $ 96 | $ 274 | (18)% | $ 0.86 | (16)% |
| Restructuring and employee severance | — | | 24 | | 24 | 9 | 15 | | 0.05 | |
| Amortization and other acquisition-related costs | — | | 163 | | 163 | 45 | 118 | | 0.37 | |
| Impairments and (gain)/loss on disposal of assets | — | | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | — | | 11 | | 11 | 4 | 7 | | 0.02 | |
| **Non-GAAP** | $ 1,623 | 1 % | $ 640 | (1)% | $ 575 | $ 155 | $ 416 | 12 % | $ 1.31 | 15 % |
| | | | | Fourth Quarter 2016 | | | | | | |
| GAAP | $ 1,665 | 14 % | $ 620 | 11 % | $ 576 | $ 241 | $ 333 | 14 % | $ 1.02 | 16 % |
| LIFO charges/(credits) | (51) | | (51) | | (51) | (20) | (31) | | (0.10) | |
| Restructuring and employee severance | — | | 6 | | 6 | 2 | 4 | | 0.01 | |
| Amortization and other acquisition-related costs | — | | 132 | | 132 | 28 | 104 | | 0.32 | |
| Impairments and (gain)/loss on disposal of assets | — | | 3 | | 3 | — | 3 | | 0.01 | |
| Litigation (recoveries)/charges, net | — | | (66) | | (66) | (25) | (41) | | (0.13) | |
| Non-GAAP | $ 1,614 | 11 % | $ 643 | 5 % | $ 599 | $ 226 | $ 372 | 12 % | $ 1.14 | 14 % |

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2,3,4] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Fiscal Year 2017** | | | | | | |
| **GAAP** | $ 6,544 | $ — | $ 2,120 | (14)% | $ 1,924 | $ 630 | $ 1,288 | (10)% | $ 4.03 | (7)% |
| Restructuring and employee severance | — | | 56 | | 56 | 20 | 36 | | 0.11 | |
| Amortization and other acquisition-related costs | — | | 527 | | 527 | 165 | 362 | | 1.13 | |
| Impairments and (gain)/loss on disposal of assets | — | | 18 | | 18 | 6 | 12 | | 0.04 | |
| Litigation (recoveries)/charges, net | — | | 48 | | 48 | 19 | 29 | | 0.09 | |
| **Non-GAAP** | $ 6,544 | —% | $ 2,769 | (4)% | $ 2,572 | $ 839 | $ 1,727 | — % | $ 5.40 | 3 % |
| | | | | Fiscal Year 2016 | | | | | | |
| GAAP | $ 6,543 | 15% | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| Restructuring and employee severance | — | | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | — | | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | — | | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | — | | (69) | | (69) | (27) | (42) | | (0.13) | |
| Non-GAAP | $ 6,543 | 15% | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules.

[2] attributable to Cardinal Health, Inc.

[3] GAAP diluted EPS for the three months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.21, which includes $0.19 due to change in the effective tax rate and $0.02 due to the change in weighted average shares outstanding. GAAP diluted EPS for the twelve months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.39, which includes $0.26 due to change in the effective tax rate and $0.13 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the

current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

[4] Non-GAAP diluted EPS for the three months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.22, which includes $0.19 due to change in the effective tax rate and $0.03 due to the change in weighted average shares outstanding. Non-GAAP diluted EPS for the twelve months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.44, which includes $0.27 due to change in the effective tax rate and $0.17 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no losses on extinguishment of debt during the periods presented.

**Schedule 8**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Fourth Quarter | | | | Fiscal Year | | | |
|---|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 | |
| **GAAP effective tax rate** | **25.8%** | | 41.8% | | **32.7%** | | 37.1% | |
| | | | | | | | | |
| **Non-GAAP effective tax rate** | | | | | | | | |
| Earnings before income taxes | $ | **374** | $ | 576 | $ | **1,924** | $ | 2,276 |
| LIFO charges/(credits) | | **—** | | (51) | | **—** | | — |
| Restructuring and employee severance | | **24** | | 6 | | **56** | | 25 |
| Amortization and other acquisition-related costs | | **163** | | 132 | | **527** | | 459 |
| Impairments and loss on disposal of assets | | **3** | | 3 | | **18** | | 21 |
| Litigation (recoveries)/charges, net | | **11** | | (66) | | **48** | | (69) |
| Adjusted earnings before income taxes | $ | **575** | $ | 599 | $ | **2,572** | $ | 2,711 |
| | | | | | | | | |
| Provision for income taxes | $ | **96** | $ | 241 | $ | **630** | $ | 845 |
| LIFO charges/(benefits) tax benefit/(expense) | | **—** | | (20) | | **—** | | — |
| Restructuring and employee severance tax benefit | | **9** | | 2 | | **20** | | 9 |
| Amortization and other acquisition-related costs tax benefit | | **45** | | 28 | | **165** | | 143 |
| Impairments and loss on disposal of assets tax benefit | | **1** | | — | | **6** | | 6 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | | **4** | | (25) | | **19** | | (27) |
| Adjusted provision for income taxes | $ | **155** | $ | 226 | $ | **839** | $ | 976 |
| | | | | | | | | |
| **Non-GAAP effective tax rate** | **27.0%** | | 37.6% | | **32.6%** | | 36.0% | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This earnings release contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP").

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

**Exclusions from Non-GAAP Financial Measures**

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this earnings release for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics allows for a better comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortizations of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs because they are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. They are also significantly impacted by the timing and size of acquisitions.

- Impairments and gains or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, and are inherently unpredictable in timing and amount. In the third quarter of fiscal 2017, consistent with the presentation of financial results by peer medical device companies, in litigation recoveries or charges, net we began to classify accrued losses and legal fees, net of expected recoveries, related to mass tort product liability claims, including claims for injuries allegedly caused by Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Such amounts would not have materially affected litigation recoveries or charges, net in prior periods, so have not been reclassified for those periods.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business operations and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the items listed above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Forward Looking Non-GAAP Measures**

In this earnings release, the Company presents its outlook for fiscal 2018 non-GAAP EPS. The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook. For fiscal 2018, the Company expects the acquisition of the Patient Recovery Business to significantly increase amortization and other acquisition-related costs.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2018 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Definitions**

**Growth rate calculation** : Growth rates in this earnings release are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP effective tax rate** : (provision for income taxes adjusted for (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# EXHIBIT 76



# Q4 FY17 Cardinal Health, Inc. Earnings Conference Call

**August 2, 2017 8:30AM Eastern**

Operator: Good day and welcome to the Cardinal Health Fourth Quarter Fiscal Year 2017 Earnings and Fiscal Year 2018 Guidance Conference Call. Today's conference is being recorded. At this time, I would like to turn the conference over to Sally Curley.

Sally Curley: Thank you, Antony, and welcome to this morning's call to discuss Cardinal Health's fourth quarter and year end fiscal 2017 earnings and fiscal 2018 guidance. With me today are Chairman and CEO George Barrett, CFO Mike Kaufmann, and VP Investor Relations Lisa Capodici. George and Mike will have some prepared comments and then we'll move into Q&A. Since we will be making forward-looking statements, we need to remind you that the matters addressed in the statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied. Please refer to the SEC filings and forward-looking statements slide at the beginning of the presentation, found on the investor page of our website, for description of risks and uncertainties. We will be ending today's conference call promptly at 9:45AM. To more efficiently get through our question and answer queue, we are limiting each individual to one question with one follow-up. As always, the IR team will be available if you have an additional questions.

There are a few items I want to highlight today. First, you may see a second posting of our 8-K filing today. The components were initially misclassified on the SEC website, so we're fixing that, but there is no change to the content. And second, we'll be presenting at the Robert W Baird Healthcare Conference on Thursday, 7th September at 9:05AM Eastern in New York, and at the Morgan Stanley 15th Annual Global Healthcare Conference on Monday, 11th September at 8:45AM Eastern in New York.

Before I turn the call over to George, as many of you know, September 18th will be my last day at Cardinal Health. It has been an honor to be a Cardinal Health Investor Relations officer and to serve you for nearly a decade. I'll continue to work closely with George, Mike, and Lisa to make this transition as seamless as possible.

CardinalHealth
Essential to care™

Lisa has more than 30 years of finance and IR experience and she and her team will serve the company well. So, after more than three decades as an IRO and spokesperson, more than 120 earnings calls, more than 400 sell-side events, several thousand investor meetings and millions of frequent flyer miles, I'm looking forward to parlaying all that experience into my new Savannah-based consulting business. I've made great friendships with many of you that I know will stand the test of time and I look forward to catching up with you over the coming weeks. Now onto the earnings call. George?

George Barrett: Thanks, Sally. Good morning and thank you for joining our year-end call. These past 12 months have been trying ones for those of us in healthcare. Our fiscal 2017 was a year of challenges, but also a year in which we took important actions to strengthen our market positioning, grow our scale, add new long-term drivers of growth and improve the overall balance of our integrated portfolio. These actions will have significant impact over the next two to five years. With this in mind, I'll devote most of my commentary to the year completed and the year in front of us, letting Mike provide details on Q4, which came in largely as we expected.

Before I begin, I'd like to make a quick comment about our guidance for fiscal 2018. Our perspective on the environment and our operating performance for FY18 has remained fairly consistent since we provided an early outlook back in April. We will, however, take actions this year, which have some impact on EPS for fiscal 2018, relative to that early outlook. We feel confident that this work will accelerate our growth rate trajectory in fiscal 2019 and beyond. Mike will cover these incremental items in his commentary.

While demand for the healthcare products and services we provide continues to grow, powered by demographic changes that will only accelerate in years ahead, a combination of market dynamics, policy uncertainty and economic forces made our FY17 among the most difficult years to model and predict. The impact of those dynamics was most pronounced in our pharma distribution business, where pricing was a material headwind that was mostly associated with generics. We have talked about this pricing phenomenon all year and spoke about it extensively in April. Along the way, however, we have also indicated that most of the Cardinal Health portfolio has been performing extremely well and we feel confident that we are well positioned for the long-term. Let me emphasise, I like our position in the markets in which we compete.

That said, let me give you some observations about our pharmaceutical distribution business. It remained an anchor tenant in our portfolio and very valuable to the broader healthcare system. Cardinal Health manages an intricate network, which includes complex contracting, global sourcing, extensive regulatory interfaces and a vital interconnection between manufacturers, providers and patients, giving us a leadership role in the safest and most secure pharmaceutical supply chain in the world. Ours is a business of enormous scale, innovation, and efficiency, both in terms of operations and return on capital. And perhaps most important, it provides a critical and valuable service to our thousands of retail, hospital and institutional pharmacy customers and their patients, as well as our pharmaceutical manufacturer partners.

Having said this, there's no doubt that pricing dynamics, most notably in generics, has been a challenge for our pharmaceutical distribution business, at a time where we were getting little benefit from new generic product launches. This dynamic weighed heavily on our numbers in FY17. To be clear, we are taking actions to address the changes in the market, including, one, employing advanced analytics and pricing strategies; two, reducing SG&A costs; and three, pursuing novel approaches to grow our consumer product offerings for our customers. We are taking these steps at a time where our service levels and line item fill rates are at historical highs, our customer retention numbers are outstanding and our PSAO network, the group of pharmacies for whom we negotiate network inclusion continues to grow, now serving over 5,600 members. We support this work with a suite of valuable services, including a growing medication management program, telepharmacy, inventory management and reimbursement support, all of which helps enable our customers to better compete and better serve their patients.

We have built a strong model in Red Oak Sourcing, our joint venture with CVS Health, and it continues to contribute nicely and is a source of strength for us, and our customers. Recently, we have designed a program to enable Cardinal Health and CVS Health to jointly source our OTC and consumer products. While this offers a considerably smaller opportunity than that associated with our generics program, we still believe that this scale will be beneficial to our customers and to us.

Our specialty solutions group generated outstanding growth this year, with annual sales now exceeding $12 billion. We have grown along all dimensions, expanding our therapeutic reach and growing both our acute

customer base and the number of clinicians and physician practices we serve. And we expect this trend to continue.

We have also grown our service offerings to our biopharma partners, helping manufacturers obtain global product approval, make informed strategy decisions and expand product reach. Our patient support hub improves patient access and adherence, helping to ensure that patients get the right medicine, in the right way, at the right time, and stay compliant with their treatment pathways.

So this was also a strong year for our nuclear business and we now serve more than 1 million patients each month. Of particular note, we are now the only Alpha radiopharmaceutical manufacturing facility in North America and have received Health Canada, EU and FDA market approval. The first commercial batch of Xofigo was manufactured in June and has already been used by patients.

Our medical segment showed excellent growth this year with contributions coming in broadly. Our medical surgical distribution unit had the strongest growth in recent years and we drove growth among critical business lines, including our surgical kitting, lab and medical services businesses. We also had excellent growth from our post-acute activities, which include naviHealth and Cardinal Health at Home.

Five years ago, our Cardinal Health brand product portfolio contained 4,800 product SKUs in 470 categories. Today, we have nearly 12,000 product SKUs, spanning 850 categories, to support customers who seek standardization and cost efficiencies in product categories where there is little clinical differentiation. As we integrate the newly acquired patient recovery business from Medtronic, this number grows to nearly 21,000 product SKUs, spanning more than 1,200 categories.

Now let me take a few minutes to provide an update on Cordis. We have always placed patient care as the top priority in our work. Very early on in the integration of this business, it was clear to us, and we shared with you, that given our priority and the number of interfaces with J&J that we would need to navigate, as we built out a global infrastructure to fully stand up the business, achieving our target synergies would take longer than originally modeled. We are creating a global platform. And the actions we've taken to build this infrastructure will prove particularly valuable as we integrate the 25% of the patient recovery business which operates outside of the U.S.



On the commercial side, we have made considerable progress over the year. We saw solid sales growth in Asia-Pacific, Latin America, and Europe. Our U.S. business, which had a slow start as we merged the organization with our AccessClosure business, is getting its sea legs and the progress has been encouraging. As we look to next year for Cordis, while much of the heavy lifting is behind us, it's still not complete. We are getting some commercial momentum and have signed distribution partnerships to expand our product portfolio, which now includes a coronary drug-eluting stent, a side branch stent to treat significant coronary bifurcation lesions, and balloon catheters.

Finally, turning to the patient recovery business, we are tremendously excited to have closed this transaction late last week. This is a product line that has been on our radar for many years. It is a product portfolio that fits naturally into work that we're doing across the continuum of care, in product categories and channels with which we have enormous expertise. The addition of the patient recovery business into our enterprise portfolio strengthens our ability to offer a broad line of products and services which are extremely important to our customer base, across multiple channels. There is much to be done to integrate this business and we are so pleased to welcome to the organization our new colleagues from around the world. A highly talented group of people who share our values and our commitment to quality.

Through it all, our people have remained passionate in their commitment to improve the efficiency, safety and quality of healthcare. Our organization has remained firmly focused on delivering value to our customers, keeping them in a competitive position so that they can best serve their patients. And we have maintained a clear perspective on the long-term, enduring value of our enterprise.

With these priorities front and center, we are taking a number of actions during the upcoming year to continue to drive efficiency, better align the organization, so that our customers can take full advantage of the comprehensive strength of our enterprise offerings; enhance the long-term positioning of our portfolio; improve the execution of our global products organization; and support our people.

I'd like to focus on one of those actions, our portfolio analysis. We are committed to creating value through an integrated portfolio across the enterprise, which we regularly review to ensure that, one, we are or can be capable of establishing a leadership position; and, two, the line of business is valuable to our customers and furthers our mission of helping to make healthcare more cost effective, safer, and high quality. With this discipline in mind, we

are evaluating certain aspects of that portfolio for alignment with those goals. As an outgrowth of this process, we are exploring strategic alternatives for our service and distribution business in China. Our China business has shown solid growth in the years since the acquisition of Yong Yu, and our Chinese colleagues have done excellent work in building out the portfolio. The China market clearly has outstanding potential for further growth. However, to take full advantage of this growth and to attain the market leadership we seek, it would take a level of investment that we believe could be more effectively deployed in other parts of our portfolio.

As I mentioned at the beginning of my commentary, very little has changed in our expectations for FY18 since we spoke to you in April. Underlying that early outlook was an assumption that our enterprise operating performance would grow. Four months later, that underlying assumption remains unchanged. We are running this business with the long game in mind. Our goal is to create enduring value for all of our stakeholders. We do intend to take some actions this year which we think are important to our future and which will position us to accelerate growth in FY19, but will negatively impact our EPS for FY18. As a result, we expect our fiscal 2018 non-GAAP EPS to be in the range of $4.85 to $5.10. Mike will cover this and walk you through the numbers to bridge our early outlook to today's guidance.

As we move beyond fiscal 18, we expect to see strong growth in 2019 and beyond. For historic perspective, some of you will remember that we made similar decisions during another challenging year in 2009 when we provided insights into how we saw the future. At that time, we said that we needed to make strategic decisions and key investments to provide reliably high performance. Since the spinoff of CareFusion, through the end of fiscal 17, we have delivered total shareholder return of 272%, including reinvested dividends. Our approach then was the same as it is now. Make the important moves today for a more financially secure future. We are well positioned to play a vital role in healthcare and its transformation, and we look at all our decisions and actions with our ability to create value for the long-term as a backdrop.

Let me finally address one more important topic. You should expect to see us take a more visible role in helping to address the national opioid epidemic. We intend to make a serious investment to support efforts to address the opiate crisis. Like others around the country, many of us at Cardinal Health have been touched personally by this public health crisis and all of us are deeply troubled by the devastating impact that drug addiction is having on our communities. We are, however, encouraged to see those communities come together with policy makers and

acknowledge that this is a multidimensional problem, one that cannot be addressed meaningfully by a single player or by stand-alone efforts. The search for blame is the enemy of the search for solutions. Addressing this national crisis requires open dialogue among all stakeholders, coordination and work on both the supply and the demand side.

Nine years ago, Cardinal Health Foundation launched its Generation Rx initiative to combat drug abuse and misuse and now we are building on that platform with a pilot program, targeting some of the hardest hit counties throughout Appalachia. Partnering with law enforcement, educators, and community groups, we will be working to promote education, prevention, product donations, and implement drug take-back strategies. With this work, we believe we can have a positive effect on some of the hardest hit neighborhoods. We look forward to telling you more about our plan in the coming months and we are engaging with partners across business, regulators and non-profits to have the greatest impact. This commitment is part of who we are at Cardinal Health. We know that solutions require planning and time and cooperation.

In spite of market challenges and policy uncertainty, our people managed to stay focused on one thing - serving their customers so that patients can receive the care, services and products they need. For that, I am most appreciative and I thank all of our very committed members of the Cardinal Health team around the world.

One final note before I turn the call over to Mike. As many of you know, Sally Curley, our SVP of IR and my partner for these nine years, has decided to join her husband in Savannah, Georgia, where they will plant stakes in the ground, set sail, one of her great joys, and set up her own consultancy. How Sally can pick her husband over Cardinal Health is a mystery to me, but we are excited for Sally and we will miss her daily presence. She has been recognized consistently over the years as one of the leading practitioners of her craft. Moving into FY18, we will benefit from the training that she has provided to her team and we will have her with us through the early fall, ensuring a smooth transition. And with that, thank you, Sally and I'll turn the call over to Mike.

Mike Kaufmann:   Thanks, George, and thanks to everyone joining us on the call. As George said, it has been a trying year, but also a year of significant accomplishments as the organization has taken a number of important steps. I will divide my comments into two primary areas. First, I plan to provide some greater specifics and clarity on our

numbers for the quarter and the year. Then, I will give you some additional color on our FY18 and provide a financial bridge from the early outlook we provided in April to our updated FY18 guidance.

The financial results that I provide this morning will all be on a non-GAAP basis, unless I specifically call them out as being GAAP. Slides seven and eleven of the presentation on our website include our GAAP to non-GAAP reconciliation tables for the fourth quarter and full year.

Let me start by discussing the financial performance for the quarter and full year as detailed on slides four and eight respectively. The quarter ended up largely where we guided when we spoke in April, except for our tax rate, which was lower than expected. Fourth quarter consolidated revenues increased 5% to $33 billion, while full-year revenues increased 7% to $130 billion. Fourth quarter non-GAAP gross margin dollars increased 1% and were flat for the full fiscal year. Gross margin rate decreased in the fourth quarter and full year by 22 and 35 basis points respectively. The drivers for these three items are best explained when I cover the segments in greater detail.

SG&A expenses increased for the quarter, largely because of our important investment in the IT system refresh in the pharma segment. Again, this major project, we refer internally as P-Mod, is designed to improve long-term customer service and interactions. So far, it has been on time and on budget and I feel very good about the success of future phases. For the year, SG&A expenses increased largely as a result of strategic acquisitions and the impact of the P-Mod project. This was partially offset by lower incentive compensation and disciplined management of expenses.

Non-GAAP operating earnings decreased 1% to $640 million for the fourth quarter and decreased 4% to $2.8 billion for the year. Moving below the operating line, for the fourth quarter, Net Interest and other expense was $65 million, which is roughly a $20 million increase over the prior year. This increase relates to the costs associated with our financing of the acquisition of the patient recovery business, which, as George mentioned, we were thrilled to close over this past weekend. The drivers for the full-year variance are consistent with those noted for the quarter.

Our non-GAAP effective tax rate was 27% for the fourth quarter. The tax rate was notably lower as we saw tax benefits from the realignment of foreign subsidiaries in anticipation of closing the patient recovery acquisition. In

addition, there were several other discrete tax benefits in the quarter, most of which will not repeat in fiscal 18. This resulted in a full year effective tax rate of 32.6%.

Our fourth quarter and full-year diluted weighted average shares outstanding were $318 million and $320 million, respectively. We did not execute any share repurchases during the fourth quarter. However, our fiscal 2017 total share repurchases were about $600 million, which, combined with our differentiated dividend payout, totals a robust $1.2 billion in cash returned to shareholders. We continue to have $443 million remaining on our board authorized share repurchase program. The impact of all of these items resulted in an increase in non-GAAP diluted EPS of 15% to $1.31 for the quarter and an increase of 3% to $5.40 for the full year.

Moving on to operating cash flow. We generated $724 million in the quarter, an improvement over the prior year. Operating cash flow was lower than we expected for the quarter because of nearly $400 million of vendor payments that were made early, due to some changes included in our Q4 P-Mod implementation. The impact of this will be resolved in Q1 of FY18. Our full year operating cash flow was $1.2 billion, of which we deployed $387 million in capital expenditures. Key areas, in which we invested, were around acquisition support and improvements to our existing infrastructure, including P-Mod.

Overall, we ended the year with cash, including short-term investments, of approximately $6.9 billion, of which $569 million were held outside the United States. This unusually high cash balance includes the proceeds of the $5.2 billion bond issuance in June. Remember that $4.5 billion was designated to fund the patient recovery acquisition, with the remaining amount mainly to fund the debt payments made in July. The $6.1 billion patient recovery acquisition completed this past week was funded by the $4.5 billion of the bond issuance, cash on hand and borrowings of $700 million under our existing credit arrangements.

Now let's move to the pharmaceutical segment performance for the fourth quarter and fiscal year. You can refer to slides five and nine. Pharma segment revenue in the fourth quarter grew 5% to $29.6 billion. For the year, revenue grew 7% to $116.5 billion. Both the quarter and full-year increases were driven by growth from pharmaceutical distribution customers and strong performance in the specialty solutions business. Segment profit for the fourth quarter decreased 7% to $505 million, primarily driven by generic pharmaceutical pricing as well as the ongoing investment in P-Mod. These were partially offset by solid performance from Red Oak Sourcing. Segment profit for the full year decreased 12% to $2.2 billion, due to generic pharmaceutical pricing and, to a



lesser extent, the loss of Safeway and lower branded manufacturer price appreciation. Again, the solid performance from Red Oak Sourcing provided some offset for these numbers.

For the fourth quarter and full year, our segment profit margin rate declined 22 and 40 basis points, respectively. These declines were largely due to generic pharmaceutical pricing, which we have discussed throughout the year. Consistent with recent comments, while this continues to be a headwind, the environment, while still competitive, seems to be stabilizing.

Now, let's move to slides six and ten to review the medical segment results for the quarter and the full year. Revenue for the quarter grew 6% to $3.4 billion, driven by contributions from new and existing customers. Revenue for the year grew 9% to $13.5 billion, driven by contributions from new and existing customers and, to a lesser extent, acquisitions. Fourth quarter segment profit increased 13% to $138 million, reflecting solid performance from post-acute solutions, favorability from compensation-related items and growth in distribution services. These were partially offset by performance in Cardinal Health branded products, including Cordis. Full-year segment profit increased 25% to $572 million, due to the contribution from post-acute solutions, Cardinal Health branded products, including Cordis, favorability from compensation-related items and growth in distribution services. Medical segment profit rate for the fourth quarter and full year increased 22 and 56 basis points. Both increases were driven by the same factors affecting the segment profit.

I know that George gave you some high-level thoughts on Cordis, so let me give you some further details. As you know, we've been working over the past 18 months to build out our global infrastructure for Cordis. The costs of this build out have been more than expected and have had a negative impact on SG&A and gross margin for the quarter and year. Specifically, the costs of moving manufacturing and standing up our back office services has been more expensive than we modeled, but I feel we have solid plans to address this in the first half of FY18. Mainly due to these increased costs, we did not achieve our fiscal 17 accretion target of $0.15.

In addition to the higher SG&A and manufacturing costs, mainly outside the US, there are two other factors that affected the accretion this fiscal year. First, we experienced lower-than-anticipated sales from partnership agreements. These agreements, while behind our original projections, are on a significant growth trajectory. And second, we incurred higher-than-planned write-offs for excess inventory. With the acquisition of the patient

recovery business, the investments that we've made in standing up our global business are important to best position the medial segment over the long-term.

Now onto the details of fiscal 18. My forward-looking comments will be focused on non-GAAP since we do not provide GAAP future guidance due to the difficulty in predicting items that we don't include in our non-GAAP EPS. Starting on slide thirteen, we expect mid-single digit percentage growth in our consolidated company revenues and expect our non-GAAP EPS to be in the range of $4.85 – $5.10.

Let me bridge this guidance to what we provided in our early outlook in April. First, we experienced some additional discrete items, mostly in taxes, that caused us to finish higher than we expected. This higher finish of about $0.06 when including the costs of issuing the debt for the patient recovery acquisition, impacts our FY18 growth rates. Also, we recently included three additional items in our FY18 guidance that total about $0.16 that we had not included in our April early outlook. First, we have identified some customer initiatives and actions we plan to take in fiscal 18 which will benefit us longer term. The majority of the items sit in the pharma segment and are why we lowered our segment profit assumption from high single-digit decline to low double-digit decline. Second, as George mentioned in his remarks, we intend to make a serious investment to support education, prevention and local communities in their efforts to address the opioid crisis. And finally, we are in the process of evaluating some tax planning that will be a headwind in fiscal 18, but will benefit us over the longer term. This is reflected in our full year tax rate.

So in summary, the bridge from our April 18th early outlook to our guidance of $4.85 – $5.10 consists of about a $0.06 higher finish, combined with about $0.16 of discrete items we believe will help us for the coming years. We are confident in our assumptions and have identified the key elements that will affect us in the coming year. This has been a thorough process and we are well positioned now to achieve these results in fiscal 2018 and beyond.

On slide fourteen, you will see five corporate assumptions for fiscal 2018. First, we expect a non-GAAP effective tax rate of 35 to 37%. As I've mentioned on prior calls, we only provide full-year guidance on tax rates as they have natural quarter-to-quarter fluctuations resulting from discrete items. Second, we are assuming diluted weighted average shares outstanding in the range of 319 to 320 million. This assumes share repurchases will offset dilution and will occur in the second half of the fiscal year. As a reminder, we plan to payoff notes of about $550 million in June of fiscal 18. This is part of our commitment to pay down $1.5 billion of debt during the next

CardinalHealth
*Essential to care™*

three years.  Third, we expect net interest and other expense to increase to $340 to $360 million, mainly due to debt issued for the patient recovery acquisition.  Fourth, we expect capital investment to be in the range of $500 to $540 million, which includes costs associated with the integration of our acquisitions and the important ongoing investment in P-Mod.   And finally, we assume amortization of approximately $370 million or $0.78, which includes all acquisitions closed as of June 30.  Again, this is excluded from non-GAAP and does not include amortization from the patient recovery business, which is expected to be significant.

Now let me drill down to the pharma segment assumptions you will see on slide fifteen.  Beginning with revenues, we expect a low to mid-single-digit percentage increase versus the prior year.  Please note that we expect first half growth to be significantly lower than the second half, due to the lapping of certain customer changes.  As I mentioned a few minutes ago, we expect pharma segment profit for the full year to be down low double digits versus the prior year.  Other key assumptions for pharma are, first, generic drug prices are modeled to deflate in the mid-single digits for the full fiscal year.  When we talk about generic market pricing, it is forward-looking and includes the impact on both the buy side and sell-side.

Next, we are modeling brand drug manufacturer price changes of 7 to 8% inflation for the full fiscal year.  Of note, as we exited fiscal 17, less than 10% of our brand margin is now contingent on inflation.  There will be incremental expense related to the continued investment in P-Mod to support growth.  Also there is an incremental contribution from new generic launches year over year, but the benefit will be significantly less.  Next, there will be incremental contribution from Red Oak Sourcing, but less on a year-over-year basis.  We expect double-digit growth in revenue and profit from the specialty solutions business.  And finally, our model assumes that we have a full year of contribution from Cardinal Health China.  As a reminder, China reports in both segments, but primarily contributes to our pharmaceutical segment.  For fiscal 18, the revenues for Cardinal Health China should exceed $4 billion.  As George mentioned, we are exploring strategic alternatives for this business.

Let's now move to expectations and assumptions for our medical segment for fiscal 18, which you can find on slide sixteen.  We expect revenues to increase in the high teens percentage range versus the prior year.  We also expect strong, double-digit segment profit growth.  Other key assumptions for medical include, first, the patient recovery acquisition is accretive by $0.21, integrates into the Cardinal Health brand business and has an

**CardinalHealth**
*Essential to care™*

inventory step-up in the first half of fiscal 18 of up to $100 million.  In addition, we expect solid growth from all of our other medical businesses and that the second half segment profit margin rate will exceed 6%. One large headwind will be the loss of a significant portion of the VA contract.  The full effect began in the fourth quarter of fiscal 17, as the transition to the new suppliers took much longer than expected.  Finally, we are not modeling a reinstatement of a medical device tax.

Another item of note is that in our first quarter of 2018, in accordance with GAAP accounting principles, we will adopt the new accounting treatment for the tax effect of share-based compensation.  We do not expect a significant impact on our EPS as a result of a discrete tax benefit or expense.

While we don't generally provide quarterly guidance, I do want to provide some color on what we are seeing for Q1.  First, we will see a tough comparison in the pharma segment, associated with generic pharmaceutical pricing in the first quarter.  Second, in the first half of fiscal 18, we expect to see the inventory step-up for the patient recovery business. Next, expenses related to P-Mod which will negatively impact both our first and second quarters of fiscal 18.  And finally, we will see considerably reduced contribution from the change in the VA contract.  As a result of these items, we are currently modeling roughly 20% of our full year, non-GAAP EPS in our first quarter.

Now, for FY19.  Given the actions we are taking this year, we are targeting non-GAAP EPS of at least $5.60.  As we exit FY19, we'll be a business that has multiple engines of growth, increasing balance across the portfolio and excellent alignment with healthcare trends.

Thanks for bearing with me through my rather long, prepared remarks.  And I'll now turn it over to the operator to start Q&A.

Operator:   Thank you.  Today's question and answer session will be conducted electronically.  If you would like to ask a question at this time, please press star one on your touchtone telephone.  If you are using a speakerphone, please turn your speaker function off to allow your signal to reach our equipment.  We ask that you please limit yourself to one question and one follow-up.  We'll take our first question from Charles Rhyee with Cowen.

**CardinalHealth**
*Essential to care™*

Charles Rhyee: Thanks for taking the question and, you know, for all the information there. Maybe, George or Mike, you talked about China a little bit earlier. Can you talk about sort of… How is that currently – is that currently still in the guidance as we're looking forward? And can you give a sense for the magnitude of the contribution it's giving the business, in case something happens? And then secondly, I think you mentioned in the medical business, you acquired, within Cordis, a drug-eluting stent. Is there any kind of approval processes you need to go through to market that in the U.S. or is that something currently just in Europe? Thanks.

Mike Kaufmann: Yeah, thanks for the question. As it relates to China, we are assuming a full year of contribution in China in our FY18. So it's assumed to be all the way through June 30th of this year. But then we are assuming, and when we say at least $5.60 of earnings in FY19. We are not including China in our FY19 guidance. Now this is probably a follow-up question. We are assuming there will be some redeployment of capital, but right now, in our at least $5.60, China would be slightly dilutive to us in our FY19 numbers.

And, George, you want to take over.

George Barrett: Yeah, sure. Hi, good morning, Charles. On the second part of your question, the drug-eluting stent was actually not part of the patient recovery business that we acquired, but actually done through partnership. If you remember, we talked about the fact that we'd be adding to the portfolio largely through opportunities to partner and that's what we've done here. So it's an approved product and not something that we acquired through the patient recovery business. And, by the way, to be clear, this is not for the U.S. market right now.

Mike Kaufmann: And if you listened on my comments, I made a comment that the partnership agreements were on a significant growth trajectory for FY18 and this would be one of the items that we expect to drive that growth for us in FY18.

Operator: Our next question comes from Michael Cherny with UBS.

CardinalHealth
*Essential to care™*

Michael Cherny:  Good morning, everyone.  Thank you for all of the color and, Sally, again, wishing you best of luck in the new role.  So just want to understand some of the additional customer actions.  As you think about the investments you're making, how many of these do you view as defensive, reactionary?  I know there's a lot that's positioning for the long-term health of the business.  But part of, I think, what I'm trying to understand and I think some other people are trying to understand is, are these going to be truly one time in nature in terms of strengthening the business now?  Or is there a need over time, especially in an increasingly competitive market, to continue to pursue these type of investments for the long-term health of the business?

George Barrett:  Michael, good morning.  It's George.  I'll take that and then Mike can jump in.  I think our perspective in dealing with our customers is always sort of, 'How do we grow opportunity?  How do we see the opportunity to partner more deeply with them and create growth over the long-term?'  So, while I can't go into details on these programs, that's sort of the underlying assumption.  As we mentioned earlier, of course, as you said, it is a competitive market, but our position with our customers is strong. There are things that we see that are opportunities to solidify those relationships and create new value.  And that's sort of what is the focus of our work.

Mike Kaufmann:  Yeah, and I wouldn't see these investments as something we have to make incrementally each year. This is something that, again, we have an option to make this year.  If we don't think we'll get the right returns out of those investments, we don't necessarily have to make those and that could provide some upside for us this year.  But we thought it was prudent to build these in, because we think there's some things that we'd like to do that we think are important for us to be able to, you know, solidify where we're headed in 19 and beyond.

Michael Cherny:  Great.  I'll turn it over to other people.  Thanks so much.

Mike Kaufmann:  Thanks, Michael.

**CardinalHealth**
*Essential to care™*

Operator: Our next question comes from Ricky Goldwasser with Morgan Stanley.

Ricky Goldwasser: Yeah, hi, good morning. So my first question is around your generic deflation assumptions, you know, in the mid-single digits. It sounds like you incorporate sell-side and buy side. So can you just give us a little bit more context in terms of what are you seeing in the market right now, and how do you think pricing will play out throughout the year? Because, to your point, you're giving us more forward-looking thoughts around pricing.

Mike Kaufmann: A couple of things. I'd say, first of all, as we've mentioned, we thought it was, you know, the curve was steepest during our first couple of quarters of our year and we started to see less steep of a decline in our second half. And, to us, that indicates that there's clearly been some stabilizing in the environment from what, you know, again, we're seeing as well as hearing from the teams. What that means is we would expect to have some tougher compares in our Q1 and Q2 this year. And then we would think the comparisons to the prior year would get better in the second half of the year. So that's the first thing I would say.

When we say we're including the buy side and sell-side, what we're basically saying is that, you know, when we get lower acquisition costs, sometimes that will translate into lower market pricing. And sometimes that's an opportunity for us to take a look at our margins, always keeping in mind our customers and making sure that they can compete in the marketplace and that they have the appropriate generic pricing that they need to have. And so ours is just basically an all-in of what we're seeing from the terms of our ultimate sell price downstream to the customers. So generally I would say that the good news is what we're seeing is it looks like the market is stabilizing and has over the last several months.

Ricky Goldwasser: So my follow-up, I have a follow-up on the medical segment, but also a clarification on what you just said. So, first, on the generic assumptions, it sounds like you are really thinking about it from a comp perspective in the second half of the year, so it would be great if you just can confirm that for me. And then, on the medical segment, you know, when you talked about the delay in sales coming from partnership agreements that are now kind of like starting to pick up, what was it about the relationship that led to that kind of like slow ramp-up? And

**CardinalHealth**
*Essential to care™*

any lessons that you learned that you think could help you to improve when you sign up these new type of customers?

Mike Kaufmann: Yeah, thanks. So, on the generics I would say that, again, all I'm saying is that since the curve was steeper in the first half of last year, we would expect the comps on generic deflation to be a little tougher in our first half than we would in the second half. And hopefully that answers that. As far as the partnership agreements, I'll mention it – and George may have a couple of quick comments in. Yeah, I think we've learned a couple of different things. I wouldn't say any real concerns. Just generally that sometimes just getting it down on paper and actually getting it signed and all the terms and conditions agreed to just takes a little bit longer than you think. And then sometimes, when you're working with the partners, the timing of which they think they'll get approvals, whether it be overseas or in the U.S., just takes a little longer than they expected. So it's really more about getting the 't's crossed, 'i's dotted and these approvals that just slowed it down. But nothing at all that makes us concerned that this isn't the right strategy, isn't going to be a significant portion of what we do. I think these partners see us as a great go-to-market partner, not only because of our distribution capabilities, but because of our commercialization capabilities with the significant sales activities that we have in place and excellent sales teams.

George Barrett: Yeah, Ricky, I actually don't have anything to add to that. I think that's exactly the right – right response.

Operator: Our next question comes from Ross Muken with Evercore ISI.

Ross Muken: Good morning, guys. So just digging back into the sort of 2019 color that you gave, I'm just trying to sort of, you know, back into the underlying profit growth. So you talked about a pretty decent step up in accretion from the Medtronic deal, so an incremental $0.34 in 2019. And obviously you've got some moving parts on the China piece. It seems like the underlying growth is somewhere in the 5 to 6% range. I guess, one, is that right in terms of profit? And, if so, is it really thinking about sort of the improved results in the second half and then kind of run

rating that into 19 in both of the underlying businesses?  Or are there sort of other assumptions in there to kind of be mindful of, as we kind of get into that picture?  Again, I realize you're not going to give a ton of color, but maybe just broad strokes of how you're thinking about that progression.

Mike Kaufmann:   Yeah, absolutely.  So I think obviously one of the things that we'll see is we really believe that the pharma distribution business will be stabilizing in FY19 as we continue to lap some of the headwinds that we've had, both in terms of some customer changes as well as generic market pricing.  We believe that we're going to continue to see really strong growth in our specialty business, which – its base continues to get larger and larger, so that strong growth becomes more and more meaningful.  We won't have any inventory step up for the patient recovery business, which, as I mentioned, you know, that we're targeting to be up to $100 million.  Plus we expect to see growth in that business as well as Cordis and other businesses.

We have some negative comp, you know, things that we mentioned, that were one-timers last year that affect this year, that we won't have that noise in the numbers.  Overall demand; we expect base overall demand to continue to grow.  We also expect some really nice growth, as we've seen this year, in our core med business in the post-acute and the distribution services area.  They've done a very nice job in med this year and we are excited about them in the future.  And then also there's some opportunities with capital deployment.  So I would say those are the broad strokes as to why we feel good about where we're headed in FY19.

Ross Muken:   And maybe this morning, one of your customers was acquired by KKR, but also there was involvement from Walgreens and Pharmerica.  I'm sure it's hard to comment, but I guess in those cases, can you just give us a sense for the profile of a customer like that, you know, the - sort of - materiality to the business and how you think about risk during these sort of transition periods?

George Barrett: Yeah, Ross, why don't I start?  First of all, obviously, we just saw the news this morning, so it is hard to say much other than that Pharmerica has been a customer and our agreement goes through June 2018.  You know, we've been in an industry that has seen the chess board move around a fair amount.  We will occasionally

**Cardinal**Health
*Essential to care™*

be on the right side of the movements, we'll occasionally be on the wrong side and that is true for all of us. I would say, in the big picture, this is not a material issue for us, but you certainly are seeing an industry that is going through some changes over these last couple of years and we'll probably see more now and again. But we feel like we have a very robust base at this point, strong positioning, and our customer stability is quite - quite high.

Operator: Our next question comes from Lisa Gill with JP Morgan.

Lisa Gill: Thanks very much and good morning. George, I was wondering if you were seeing any changes on the manufacturing side. So, you know, any of your contracts that maybe weren't under a fee-for-service relationship previously. Are you seeing any changing in any of the contracting right now on the manufacturing side?

George Barrett: Good morning, Lisa. So I'll do this carefully. Obviously, the conversations that we have with our manufacturer partners are proprietary and we're careful about that. I will say the industry is going through some interesting changes over these last couple of years. And so we're trying to make sure that, in our conversations with our branded partners, both sides are reflecting those changes. I think Mike sort of captured one of them, which I think is very significant, which is we're just going to see less and less that is in contingency, that is tied to something other than a fee base. So I think, directionally, we'll see more moving towards a standard fee base and I think Mike captured that and gave you a little bit of an economic sense of that. I would think that trend is going to continue. But by and large, I think – you know - conversations are productive. We are hopefully respected for the value we create and we have great respect for the partners that we work with on the manufacturing side.

Mike Kaufmann: Yeah, as I mentioned, we said in 17, a little less than 15% was contingent, but we exited at less than 10%, so we would expect our 18 to be less than 10% to be contingent. And we are continuing, as George said, to

have very productive conversations with some of the folks in that less than 10% bucket. So we'll see where that goes, but I feel very good that we're doing the right things to reduce our exposure there.

Lisa Gill:   And my follow-up question, Mike, would just be around the $0.16, where you talk about first seeing customer initiatives on the pharmaceutical segment. Can you just give me an example? I'm just trying to understand what kinds of things you're doing and then the investments that you're making around your customer segment?

Mike Kaufmann :  Yeah, that's hard to do. So I really can't do that. It's just we have some different discussions that we're doing with various customers that, again, if we think together with them, that leads to the right type of situation that we find to benefit us in 19 and beyond, we'll make those investments. And if we don't, then we won't make those and you will see some upside from us for the year related to not making those investments. So I can't really give you more – more detail than that.

Operator:  Our next question comes from Erin Wright with Credit Suisse.

Erin Wright:  Great, thanks. Can you speak to the strength in the specialty business that you've alluded to? And how should we think about the quarterly progression here and what's driving that business?

George Barrett: So let me start. I probably would say that I don't know that I can give you much about the quarterly progression as relates to specialty.   Again, I think beyond – Mike may just want to give further color on Q1 that he mentioned. But our specialty group has just been on a very strong pattern here. I think we've built out a lot of capability. We're clinically very strong. I think our analytics are very strong. And what we've been able to do, I think, is grow in both our ability to serve more therapeutic areas downstream and create more service offerings for our bio-pharmaceutical partners on the upstream. And obviously, we are also aligning with a trend that's happening in the pharmaceutical and biotech world, which is, more products that are being approved and are in

CardinalHealth
Essential to care™

development are specialty drugs. So I think we've been you know, seven or eight years ago, we made an important turn in the road to really double-down in this business and we've made a few acquisitions. We've done some great things organically to grow and we've built out some real capability. And we like to see ourselves as a thought leader in the space. So I think it's an encouraging sign, great direction and leadership is strong and we're thrilled with the team we've got there.

Mike Kaufmann: Yeah, I don't see anything lumpy or anything like that happening in specialty. I think it should be strong, steady growth throughout the year.

Erin Wright: Okay, great. And on potential redeployment of capital following a China exit, as you further diversify – kind of – your business, or have been in recent years, what other verticals have you contemplated? Whether it be in contract research services side or alternative species groups, such as animal health, anything like that. Thanks.

George Barrett: Yeah, why don't I take that, qualifying that as it relates to the redeployment of any capital that, coming from the China activities, that's one we can't comment on at this point. In terms of where we are strategically in the portfolio, there are areas that we think are very important, most of which we are now competing in and competing very effectively. So I wouldn't say that there is a marked hole in the portfolio. I like where we are on the pharmaceutical side. I think we touch all channels. I think we touch all of the manufacturing world and I think our reach is extensive. We said a couple of years ago that specialty needed to be bigger. It is. We said that generics needed to be bigger. It is. I think we're doing the things we need to do there.

On the medical side, I think our business, at this point, is really driven by the value that we can create for our customer base. And if you look at our customers, whether those are an IDN customer or a straight hospital customer or a clinic, our ability to provide a really broad basket of related services and products right now is pretty extensive. So we'll always look for opportunities to increase scale or competitive strength, but I wouldn't point you to a particular area of weakness right now. Again, another piece I'd add is that our post-acute work has been really interesting and I think we're quite strong there and we sort of took an early position in that space. So I

**Cardinal**Health

*Essential to care*™

wouldn't say there's an area to highlight as a weak area, but I think we're on the right paths there and I think the portfolio looks strong and highly connected.

Operator:   Our next question comes from Brian Tanquilut from Jefferies.

Brian Tanquilut:  Hey, good morning, guys.  Just a follow-up on generics, to Ricky's question earlier.  So you're assuming mid-single-digit deflation for the full fiscal year, but you also said that you think it's starting to stabilize.  So sparsing the details, are you basically expecting this to turn flat to positive once we anniversary the market disruptions or as we get to the back half of the year?

Mike Kaufmann:  No, I wouldn't say that we would see it going to flat or to the positive.  In fact, the history of generics wouldn't indicate that that's typically the case.  As we've said a few times, we've had a couple of years where we did have a net increase, net inflation in generics, but typically it is a net deflationary environment.  So we would assume it to stay in a deflationary environment, just not as extreme as we saw for the first part of this year.  And I think that's probably just the best way to summarize it.

Brian Tanquilut:  Got ya.  And then my follow-up, you mentioned something about investment in opioid measures.  If you don't mind just walking us through what you were thinking of doing there.  And then, as we've seen this in the press, obviously a lot of focus on you guys and your exposure there.  If you wouldn't mind giving us some color on what you think, you know, with all the investigations, your exposure is, given what you do for opioid drugs?

George Barrett:  Let me, um, let me do the second part first and then I'll come to the first part of your question.  Start with the basics.  We operate a very strong, robust, suspicious order monitoring system and process that not only meets our regulatory requirements, we believe it exceeds what is required of distributors.  We're doing our part to prevent the diversion of drugs.  I would also say though, it is important that everyone do their part in dealing with

CardinalHealth
Essential to care™

this issue.  You know, I said in my comments earlier that the search for blame is the enemy of the search for solutions.  It's something I say often in our organization, but it is especially true in a complex situation like this.  What we really need is for all of the stakeholders to work cooperatively and openly to address both sides of this issue.  And so I think that's important.  As it relates to legal cases, I would just say this, we are going to vigorously defend ourselves.   We believe that the lawsuits do not advance the hard work needed to solve the opioid abuse crisis.  And we are going to do the things that we think are important in the public good to help in a place where we've got some knowledge.  And so, we are doing this, and have been doing this, in education.

We've talked a lot about our Generation Rx initiative.  Some of you know about it.  We haven't been that visible in the public about it, but it is actually a really important program in helping to combat drug abuse and misuse.  We are working with law enforcement; we are working with educators.  We are working on product donations to help in a crisis.  We've got takeback strategies.  So what we are probably going to be doing, in terms of our focus, is working in the regions where the, we're really going to pilot this in regions where it's most acute.  And we feel that's very important.  So it's an action that we want to take.  It will build on the work that we've done.  And we think it's important and we're going to do it.

Operator:   Our next question comes from John Kreger with William Blair.

John Kreger:   Hi, thanks very much.  George, could you talk a little bit more about how you view the international opportunity?  It seems like, on the one hand, you're signaling that you're backing away from China, at least on the drug distribution side, but on the other hand, you're investing on the medical side with Cordis and Medtronic.  So how do you think about international as a growth opportunity going forward?

George Barrett: Hey, John.  Yeah, great question.  You absolutely drew a very valuable distinction, an important one for us, which is we're looking at – and I think I've always said this to you as we're looking internationally.  We look at the services part of our business with a different lens than we look at the product side.  Let me put it very plainly.  We have a big product business.  We want to sell those products in every market in the world.  Those tend to be

Page **23** of **30**

CardinalHealth
Essential to care™

opportunities where scale is advantageous to us. It drives manufacturing costs and there's sort of a virtuous cycle of having that scale.

Service businesses transport with greater challenges. It's harder to create value out of service businesses. We entered China because we saw a unique opportunity. We knew it was a business that was in a market that was growing. There was a roll up that was likely to occur and then we thought we could bring something to that market. And I think we have and our teams have done a great job there. They've really grown that business. But I think what we are seeing there is to have the kind of leadership that we seek is going to require a deployment of capital that can be more effectively deployed elsewhere. So I think it's just, for us, a question of how quickly and what does it take to achieve that leadership position? And so that's driving our decision in China. But I do think that distinction that you drew is an important one. We tend to look at product lines and product businesses a little bit differently than we do those – those service businesses.

John Kreger: Thank you. And then a follow-up for Mike. Can you just talk a bit more about investment areas in fiscal 18? It looks like CAPEX is slated to be up significantly, it looks like over 30%. What sort of investments are you planning on making in the coming year?

Mike Kaufmann: Yeah, as far as – you know – overall capital deployment, you're right. We would expect CAPEX to be, as we said, $500 to $540 million. We still plan to maintain our dividend policy of a 30 to 35% payout. And, as I mentioned, we also committed to pay down about $500 million of debt each year for the next three years. So those are three important things for us in terms of capital deployment. And, obviously, after that, as we always have, we'll continue to look at opportunistic repo and M&A that fits strategically with the business. Specifically as it relates to CAPEX, the biggest piece of that is going to be our P-Mod cost. We continue to make those investments over that multi-year project. And then there's some – also some dollars that were significant into some of the acquisitions. The patient recovery business will have some initial capital that we want to put into our plan for this year, as well as continuing to invest in some of our other recent acquisitions. So those are the biggest ones. And then we'll continue to invest, obviously, in all of our infrastructure, whether it be our buildings,

IT systems etc. and our other businesses that we continue to do across post-acute and specialty, etc. But those are a couple bigger carve-outs.

Operator: Our next question comes from Garen Sarafian with Citi Research.

Garen Sarafian: Good morning, everyone, and farewell, Sally, you'll be missed by many. Mike, sorry to come back to this, but in your prepared remarks on generic pricing, you stated that it remains competitive but seems to be stabilizing. Maybe we're mincing words here, but when can you declare victory, that it has indeed stabilized? I think to an earlier response, you implied it is lapsing with the quarters, but I want to see if there's something else that we're missing.

Mike Kaufmann: Yeah, I would just say this. I'm not sure that you can ever declare. I wish that I could say, 'On November 15th, we ought to be good to go,' but that's just not the way it works. I think it ebbs and flows, depending on various things going on in the market. And I think that when you have various launches that happen, multiple players etc. So I think it has always ebbed and flowed. That's been the case – I've been here 27 years now and I've seen it. I think what we try to say is that we're used to dealing with those normal ebbs and flows. What we saw late last year and the first half of this year was a little bit more extreme, because there was a lot of noise in the marketplace. And it seemed like those ebbs and flows were just a little bit more extreme. And what we're saying is it's not that it's stabilized in the sense of no competition, it's just that it's going back to what I would call more historical norms. George, I don't know if you want to add anything?

George Barrett: Yeah. It's an interesting question. Let me just frame it. And it's probably aligned with what Mike was just saying. You know, historically, you see deflation in generics. So, in a way, victory is just going back to typically our ability to model it very effectively. We actually have been able to model very effectively. This was the most challenging year for us in terms of being able to predict and model it. It just looked a little different than we had

CardinalHealth
Essential to care™

seen.  So in some ways, victory is actually just knowing that we're seeing patterns that are familiar and then we can model more effectively.  I think that's my version of victory on this one.

Garen Sarafian:   No, that's actually very helpful.  And then, just moving onto the medical side of the business, hospital utilization trends have been weak thus far in the quarter.  It doesn't look like it impacted you this quarter, but anything that you've observed and what are you assuming for fiscal 18? Thanks.

George Barrett: Yeah, Garen, yeah, from the data we're seeing, it's relatively flat utilization.  You know, I'd still, I think I've said this to a number of you, I do think that in a way that defies gravity.  We know that demographics are driving more people to need healthcare.  So I do think what we're seeing and what will continue this for a while is some choppiness associated with, you know, shifting benefit designs.  And, but ultimately, I think demographics will win out.  I mean, that's the reality.  Our business has been growing.  I do think our value proposition is resonating perhaps differently than it did three or four years ago.  And, as a result, we're positioned well with market leaders and I think our share position is good.  So I think we're not assuming a big increase in utilization in our upcoming year.  I think we'll continue to assume it's relatively steady as she goes.  No major changes.  Again, my view is that underlying that, there are some issues that are probably going to continue to grow over years.

Operator:  Our next question comes from David Larsen with Leerink Partners.

David Larsen:   Hi, let's assume you do sell the business in China.  Can you talk about any restrictions on what the cash might be?  Can you take it back into the U.S. and buy back stock?  Any thoughts around that would be helpful.  Thanks.

Mike Kaufmann:   Yeah, obviously that's something we are obviously thinking about and, as you can imagine, are doing the appropriate planning to do the right things to be able to have access to that cash.  So, at this point in time, you

know, I can't say a lot, other than we would not expect to be limited with at least a large portion of any net proceeds that we have.

David Larsen:   Okay, great.  And then for these $0.16 of discrete items, that's in addition to the $0.50 that you mentioned last quarter, is that correct?  And would any of that $0.16, are those like separate, discrete projects or would some of that potentially be, you know, perhaps pricing a bit more aggressively to win new business?  Thanks.

Mike Kaufmann:   Good question.  Really, they're two separate things.  When I was really talking about the discrete items that were greater than $0.50, I was really trying to call out things that caused FY18 to be down from FY17.  For instance, if you have a discrete tax item that doesn't repeat in 18 that you had in 17, then you obviously create a headwind.  Or if you have a reserve adjustment that was positive in 17 that isn't going to repeat in 18, then those are the types of things I was talking about.  So that greater than $0.50 obviously finished a little bit higher because taxes got a little bit better.  And that's why, you know, we finished a little higher, which created more headwind for 18.  So that was that bucket.

What I was specifically talking about on the $0.16 plus the $0.06, so a total of roughly $0.22, was where I was really trying to help you bridge our guidance that we gave of $4.85 – $5.10 back to the April early outlook, where we said that we would be down flattish to mid-single digits.  And so that $0.22 really helps you reconcile, you know, roughly midpoint to midpoint, if you look at it, of what happened.  Because since April, we went back and said, as we're establishing our budget, 'What else do we think's important to do?'  And so, first of all, not really part of the budget, we finished $0.06 higher.  But then we had the other $0.16, as I mentioned, as some customer investments that we decided to build in, that, again, if we do not do them, those will be potentially things that we would be able to give back this year in terms of over-performance.  But we think those are good investments that we're working through with various customers.  I will say those are not just being more aggressive in the marketplace.  That's not at all what those would refer to.  And then it's some tax planning that we're doing in order to put ourselves in the best position.  And then, as George mentioned, it's, significant investment into fighting this

**CardinalHealth**
*Essential to care™*

opioid epidemic that we're planning to do in 18 that we think is an important thing for us to do as a company and to step up.

Operator:   Our next question comes from Steven Valiquette with Bank of America Merrill Lynch.

Steven Valiquette:   Yeah, thanks.  Good morning, George and Mike.  And also, Sally, I enjoyed our interaction over the years.  And thanks for taking the question here.  Just quickly on brands.  We heard that one of your peers talk about some pressure in mid-calendar 17 from just recently converting more branded drug manufacturer contracts to fee-for-service.  So I was just curious if Cardinal made any changes around that in the past several months.  Is that playing a role in the near-term results and outlook?  And then I have a very quick, one-line follow-up question.

Mike Kaufmann:   Yeah, I would say that we can't get into a lot of specifics, but we have been working, as I said, with some of the suppliers that were in that contingent bucket, that had a portion of contingent.  And some of those suppliers we have reached new agreements with and other ones we're still working through with.  So that's why I said we went from around 15% to less than 10% now being contingent.  Was there a little bit of noise on some of that?  There's a little bit of that.  Nothing I would call significant in our 18 numbers, but, yeah, there was a little bit of trade-offs as we worked through with some of those manufacturers.  But we feel really good in general about where those came out and some of the other components of the deals that we were able to strike.

Steven Valiquette:   Okay, great.  And just quickly on Red Oak, you mentioned, I think, for FY18 maybe a little bit less contribution year over year.  I'm just curious, can you remind us just how much the annual payments were from Cardinal to CVS in fiscal 17 that just ended and then is that expected to change materially at all in FY18?

**CardinalHealth**
*Essential to care™*

Mike Kaufmann:   Yeah, the annual payments to CVS are $45.6 million a quarter and those payments are locked in for the rest of the deal, so there'll be no change in the impact of those payments in FY18 to FY17.  But, again, the value that we're seeing from Red Oak, net of those payments, continues to be very, very positive.

Just quickly, because we're running late on time, we're really going to have to make the next question our last one.  And then anybody else that didn't get a chance to get in, please we'll hopefully answer your questions, as we do one-on-one calls today or throughout the next several days if you need to get your questions answered.  So let's go to the last question.

Operator:   Our final question comes from Robert Jones with Goldman Sachs.

Robert Jones:   I appreciate you guys sneaking me in and I'll just limit it to one.  Looking at fiscal 19, the kind of early guidance you guys had given there, obviously pretty unprecedented for Cardinal to be providing, you know, guidance two years out when wrapping up the fiscal year.  So I guess just maybe, both George and Mike, just a little bit more on the thought process behind this.  I would think, you know, honestly, given how fluid the environment has been, that visibility would be still somewhat limited, especially that far out.  So how should we think about your confidence in the drivers behind fiscal 19, and maybe just the thought process behind, you know, kind of taking a step out and providing that to us today.

George Barrett:   Bob, thanks.  It's a fair question.  You know, I think it was important for us, as we looked at our business, we have been, over the past nine years, we have had moments where we've had to reset, invest, and drive for future plans.  I mentioned that during my prepared comments.  This is, sort of, one of these moments.  Part of this is the conditions of the market.  Part of it is the moves that we've made.  We felt, as we started looking out at the business, particularly having deployed some capital and some important moves, that it would be valuable for you to understand how we saw those and to sort of lay out our aspirations.  So I think it's partly a way of sort of framing how we see the business and the evolution of the portfolio.  You know, you've seen us make – announce a potential move here in China.  Over the last week, we've closed another transaction which we think strengthens

our business on the product side.  So we talked about it and felt that it would be helpful for us to frame that out for our investors to give you a little bit of a sense of our direction, our portfolio and our sense of optimism going forward.

All right, folks.  Thank you for staying with us.  I know it was a long call today.  I know there are one or two, maybe three or four of you, who did not get a chance to get questions in on the call.  We will make sure to be available to you during the day.  We look forward to getting a chance to talk with all of you.  Thank you all and we'll talk to you soon.

Operator:   That does conclude today's conference.  Thank you for your participation.

# EXHIBIT 77

Case: 2:19-cv-03347-EAS-EPD Doc #: 29-2 Filed: 11/06/20 Page: 934 of 963  PAGEID #: 2500

# Q4 FY2017

Cardinal Health, Inc. Earnings Investor/Analyst call
August 2, 2017



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with the recently completed acquisition of Medtronic's Patient Recovery Business, including the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws, including proposals relating to a "border adjustment tax" or new import tariffs; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any governmental or regulatory authority, including litigation relating to opioid distribution; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of August 2, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, this presentation contains Non-GAAP financial measures. Cardinal Health provides definitions and reconciliations of the differences between the Non-GAAP financial measurers and their most directly comparable GAAP financial measurers in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com. An audio replay of this webcast will be available at ir.cardinalhealth.com.

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
*Essential to care™*

# Q4 and FY2017 results



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q4 FY17 financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | Q4 FY17 | Q4 FY16 | Q4 FY17 | Q4 FY16 |
| **Revenue** | **$32,966** | **$31,384** | **N/A** | **N/A** |
| *% change* | *5% increase YoY* | *14% increase YoY* | | |
| **Gross Margin** | **$1,623** | **$1,665** | **$1,623** | **$1,614** |
| *% change* | *3% decrease YoY* | *14% increase YoY* | *1% increase YoY* | *11% increase YoY* |
| *Ratio to revenue* | *4.92%* | *5.31%* | *4.92%* | *5.14%* |
| **Operating Earnings** | **$439** | **$620** | **$640** | **$643** |
| *% change* | *29% decrease YoY* | *11% increase YoY* | *1% decrease YoY* | *5% increase YoY* |
| *Ratio to revenue* | *1.33%* | *1.98%* | *1.94%* | *2.05%* |
| **Net Earnings[1]** | **$274** | **$333** | **$416** | **$372** |
| *% change* | *18% decrease YoY* | *14% increase YoY* | *12% increase YoY* | *12% increase YoY* |
| *Ratio to revenue* | *0.83%* | *1.06%* | *1.26%* | *1.18%* |
| **Diluted EPS[1]** | **$0.86** | **$1.02** | **$1.31** | **$1.14** |
| *% change* | *16% decrease YoY* | *16% increase YoY* | *15% increase YoY* | *14% increase YoY* |

*[1]Attributable to Cardinal Health, Inc.*
*Please see appendix for GAAP to Non-GAAP reconciliations.*

4    © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q4 FY17 Pharmaceutical segment business analysis

|  | Q4 FY17 ($M) | Q4 FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$29,552** | **$28,177** | **5%** |
| **Segment Profit** | **$505** | **$542** | **(7)%** |
| **Segment Profit Margin** | **1.71%** | **1.93%** | **-22 bps** |

**Highlights:**

- **Revenue** for the Pharmaceutical segment increased 5 percent to $29.6 billion due to growth from Pharmaceutical Distribution customers and strong performance from the Specialty Solutions business.

- **Segment profit** for the quarter decreased 7 percent to $505 million. This decrease was driven by generic pharmaceutical pricing and the company's ongoing investment in its Pharmaceutical IT platform. These were partially offset by solid performance from Red Oak Sourcing.

- **Segment profit margin rate** decreased largely due to generic pharmaceutical pricing.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
*Essential to care™*

# Q4 FY17 Medical segment business analysis

| | Q4 FY17 ($M) | Q4 FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$3,416** | **$3,210** | **6%** |
| **Segment Profit** | **$138** | **$122** | **13%** |
| **Segment Profit Margin** | **4.03%** | **3.81%** | **+22 bps** |

## Highlights:

- **Revenue** for the Medical segment increased 6 percent to $3.4 billion driven by contributions from new and existing customers.

- **Segment profit** for the quarter increased 13 percent to $138 million reflecting solid performance from post-acute solutions, favorability from compensation-related items and growth in distribution services. These were partially offset by performance in Cardinal Health Branded products (including Cordis).

- **Segment profit margin rate** increased due to the same factors mentioned above.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q4 FY17 GAAP to non-GAAP adjustments[1]

| | Q4 FY 2017 | | | | Q4 FY 2016 | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] |
| **GAAP** | **$1,623** | **$439** | **$274** | **$0.86** | **$1,665** | **$620** | **$333** | **$1.02** |
| LIFO charges/(credits) | - | - | - | - | (51) | (51) | (31) | (0.10) |
| Restructuring and employee severance | - | 24 | 15 | 0.05 | - | 6 | 4 | 0.01 |
| Amortization and other acquisition-related costs | - | 163 | 118 | 0.37 | - | 132 | 104 | 0.32 |
| Impairments and (gain)/loss on disposal of assets | - | 3 | 2 | 0.01 | - | 3 | 3 | 0.01 |
| Litigation (recoveries)/charges, net | - | 11 | 7 | 0.02 | - | (66) | (41) | (0.13) |
| **Non-GAAP** | **$1,623** | **$640** | **$416** | **$1.31** | **$1,614** | **$643** | **$372** | **$1.14** |
| Amortization of acquisition-related intangible assets[3] | - | $101 | $74 | $0.23 | - | $99 | $68 | $0.21 |

[1]Please see appendix for GAAP to Non-GAAP reconciliations.
[2]Attributable to Cardinal Health, Inc.
[3]Amortization of acquisition-related intangible assets is included in Amortization and other acquisition-related costs.

The sum of the components may not equal the total due to rounding.

7    © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



**Cardinal**Health
*Essential to care™*

# FY17 financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | FY17 | FY16 | FY17 | FY16 |
| **Revenue** | **$129,976** | **$121,546** | **N/A** | **N/A** |
| *% change* | 7% increase YoY | 19% increase YoY | | |
| **Gross Margin** | **$6,544** | **$6,543** | **$6,544** | **$6,543** |
| *% change* | 0% increase YoY | 15% increase YoY | 0% increase YoY | 15% increase YoY |
| *Ratio to revenue* | 5.03% | 5.38% | 5.03% | 5.38% |
| **Operating Earnings** | **$2,120** | **$2,459** | **$2,769** | **$2,895** |
| *% change* | 14% decrease YoY | 14% increase YoY | 4% decrease YoY | 17% increase YoY |
| *Ratio to revenue* | 1.63% | 2.02% | 2.13% | 2.38% |
| **Net Earnings[1]** | **$1,288** | **$1,427** | **$1,727** | **$1,732** |
| *% change* | 10% decrease YoY | 18% increase YoY | 0% decrease YoY | 18% increase YoY |
| *Ratio to revenue* | 0.99% | 1.17% | 1.33% | 1.42% |
| **Diluted EPS[1]** | **$4.03** | **$4.32** | **$5.40** | **$5.24** |
| *% change* | 7% decrease YoY | 20% increase YoY | 3% increase YoY | 20% increase YoY |

*[1]Attributable to Cardinal Health, Inc.*
*Please see appendix for GAAP to Non-GAAP reconciliations.*



8    © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# FY17 Pharmaceutical segment business analysis

| | FY17 ($M) | FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$116,463** | **$109,131** | **7%** |
| **Segment Profit** | **$2,187** | **$2,488** | **(12)%** |
| **Segment Profit Margin** | **1.88%** | **2.28%** | **-40 bps** |

## Highlights:

- **Revenue** for the Pharmaceutical segment increased 7 percent to $116.5 billion due to growth from Pharmaceutical Distribution customers and strong performance from the Specialty Solutions business.

- **Segment profit** decreased 12 percent to $2.2 billion driven by generic pharmaceutical pricing, and to a lesser extent, the impact of the loss of Safeway and reduced levels of branded manufacturer price appreciation. These were partially offset by solid performance from Red Oak Sourcing.

- **Segment profit margin rate** decreased largely due to generic pharmaceutical pricing.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY17 Medical segment business analysis

|  | FY17 ($M) | FY16 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$13,524** | **$12,430** | **9%** |
| **Segment Profit** | **$572** | **$457** | **25%** |
| **Segment Profit Margin** | **4.23%** | **3.68%** | **+56 bps** |

## <u>Highlights:</u>

- **Revenue** for the Medical segment increased 9 percent to $13.5 billion due to contributions from new and existing customers and, to a lesser extent, acquisitions.

- **Segment profit** increased 25 percent to $572 million due to the contribution from post-acute solutions, Cardinal Health Branded products (including Cordis), favorability from compensation-related items and growth in distribution services.

- **Segment profit margin rate** increased due to the same factors mentioned above.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY17 GAAP to non-GAAP adjustments[1]

| | FY 2017 | | | | FY 2016 | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] |
| **GAAP** | **$6,544** | **$2,120** | **$1,288** | **$4.03** | **$6,543** | **$2,459** | **$1,427** | **$4.32** |
| Restructuring and employee severance | - | 56 | 36 | 0.11 | - | 25 | 16 | 0.05 |
| Amortization and other acquisition-related costs | - | 527 | 362 | 1.13 | - | 459 | 316 | 0.96 |
| Impairments and (gain)/loss on disposal of assets | - | 18 | 12 | 0.04 | - | 21 | 15 | 0.04 |
| Litigation (recoveries)/charges, net | - | 48 | 29 | 0.09 | - | (69) | (42) | (0.13) |
| **Non-GAAP** | **$6,544** | **$2,769** | **$1,727** | **$5.40** | **$6,543** | **$2,895** | **$1,732** | **$5.24** |
| | | | | | | | | |
| Amortization of acquisition-related intangible assets[3] | - | $392 | $272 | $0.85 | - | $355 | $233 | $0.70 |

[1]Please see appendix for GAAP to Non-GAAP reconciliations.
[2]Attributable to Cardinal Health, Inc.
[3]Amortization of acquisition-related intangible assets is included in Amortization and other acquisition-related costs.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY2018 Outlook

*The company presents its outlook for fiscal 2018 non-GAAP EPS and non-GAAP effective tax rate on the following pages. The company does not provide a GAAP EPS or GAAP effective tax rate outlook because it is unable to reliably forecast many of the items that the company excludes from GAAP EPS and effective tax rate to calculate them. See "Forward-Looking non-GAAP Measures" following the attached schedules for additional information.*



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# FY18 financial expectations

|  | **FY2018 Outlook** | **FY2017 Actual** |
|---|---|---|
| **Revenue** | Mid-single digit percentage growth vs. PY | $130.0B |
| **Non-GAAP Diluted EPS** | $4.85 to $5.10 | $5.40 |

*Note: Non-GAAP Diluted EPS for FY18 includes incremental discrete actions of $0.16 per share, the majority of which impacts our Pharmaceutical segment, identified since our April 18, 2017 early outlook*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY18 corporate assumptions

| | FY2018 Outlook | FY2017 Actual |
|---|---|---|
| **Non-GAAP effective tax rate** | 35% - 37%[1] | 32.6%[3] |
| **Diluted weighted average Shares outstanding** | 319M - 320M | 320M |
| **Interest and other, net** | $340M - $360M | $197M |
| **Capital expenditures** | $500M - $540M | $387M |
| **Acquisition-related intangible amortization** | ~$370M or ~$0.78[2] | $392M or ~$0.85 |

[1]May fluctuate quarterly due to unique items affecting periods.

[2]Includes only acquisitions closed as of June 30, 2017; does not include Patient Recovery Business, which is expected to have significant impact on acquisition-related intangible amortization.

[3]FY2017 GAAP ETR 32.7%, Please see appendix for GAAP to Non-GAAP reconciliations.

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
*Essential to care™*

# Pharmaceutical segment FY18(E)

- **Low- to mid-single digit percentage increase in revenue versus prior year**

- **Full-year segment profit down low-double digits versus prior year**

## Key assumptions

- Generic drug price assumption of mid-single digit deflation for full fiscal year

- Brand drug manufacturer price assumption of 7% to 8% inflation for full fiscal year

- Incremental expense increase related to investment in information systems to support growth

- Incremental contribution from new generic launches, but Y-o-Y benefit significantly less

- Incremental contribution from Red Oak Sourcing, but Y-o-Y benefit less

- Double-digit revenue and profit growth from our Specialty business

- Full-year contribution from Cardinal Health China[1]

[1]*Cardinal Health China reports in both segments, but primarily contributes to the Pharmaceutical segment*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Medical segment FY18(E)

- **High-teens percentage increase in revenue vs. prior year**

- **Strong double-digit segment profit growth vs. prior year**

## Key assumptions

- Patient Recovery Business acquisition completed in July 2017, accretive to FY18; integrated into Cardinal Health Branded products upon closing
  - Assumes up to $100M inventory step-up during first half of fiscal year

- Excluding Patient Recovery Business, solid growth from remaining Medical businesses

- Second-half segment profit margin rate exceeds 6%

- Significantly reduced portion of the Veteran Affairs contract; the full effect of which began in Q4FY17

- No reinstatement of a medical device tax

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# A balanced approach with capital

| Capital Deployment | | | |
|---|---|---|---|
| **Capital Expenditures** | **Acquisitions[1]** | **Dividends** | **Share Repurchases** |
| **FY12 - FY16** — $1.5B | $7.0B | $2.0B | $3.3B |
| **FY17** — $387M | $132M | $577M | $600M |

**Invested**

**$519M**

for sustainable growth[2]

**Returned**

**$1.2B**

to our shareholders[2]

[1]*Acquisitions are net of divestitures; does not include $6.1B deployed for the Patient Recovery Business which closed on July 29, 2017.*
[2]*Twelve months ended 6/30/2017*

17 © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care™*

Appendix

Q4 FY2017 trailing five quarters,
GAAP to Non-GAAP reconciliation statements
and supplemental financial information



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q4 FY2017 segment analysis

## Pharmaceutical segment

|  | Q4 FY16 | Q1 FY17 | Q2 FY17 | Q3 FY17 | Q4 FY17 |
|---|---|---|---|---|---|
| Revenue ($M) | 28,177 | 28,762 | 29,743 | 28,406 | 29,552 |
| Segment Profit ($M) | 542 | 534 | 537 | 611 | 505 |

## Medical segment

|  | Q4 FY16 | Q1 FY17 | Q2 FY17 | Q3 FY17 | Q4 FY17 |
|---|---|---|---|---|---|
| Revenue ($M) | 3,210 | 3,279 | 3,410 | 3,418 | 3,416 |
| Segment Profit ($M) | 122 | 127 | 159 | 148 | 138 |

19  © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care™*

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2,3,4] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Fourth Quarter 2017** | | | | | |
| **GAAP** | $ 1,623 | (3)% | $ 439 | (29)% | $ 374 | $ 96 | $ 274 | (18)% | $ 0.86 | (16)% |
| Restructuring and employee severance | - | | 24 | | 24 | 9 | 15 | | 0.05 | |
| Amortization and other acquisition-related costs | - | | 163 | | 163 | 45 | 118 | | 0.37 | |
| Impairments and (gain)/loss on disposal of assets | - | | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | - | | 11 | | 11 | 4 | 7 | | 0.02 | |
| **Non-GAAP** | $ 1,623 | 1 % | $ 640 | (1)% | $ 575 | $ 155 | $ 416 | 12 % | $ 1.31 | 15 % |
| | | | | | Fourth Quarter 2016 | | | | | |
| GAAP | $ 1,665 | 14 % | $ 620 | 11 % | $ 576 | $ 241 | $ 333 | 14 % | $ 1.02 | 16 % |
| LIFO charges/(credits) | (51) | | (51) | | (51) | (20) | (31) | | (0.10) | |
| Restructuring and employee severance | - | | 6 | | 6 | 2 | 4 | | 0.01 | |
| Amortization and other acquisition-related costs | - | | 132 | | 132 | 28 | 104 | | 0.32 | |
| Impairments and (gain)/loss on disposal of assets | - | | 3 | | 3 | - | 3 | | 0.01 | |
| Litigation (recoveries)/charges, net | - | | (66) | | (66) | (25) | (41) | | (0.13) | |
| Non-GAAP | $ 1,614 | 11 % | $ 643 | 5 % | $ 599 | $ 226 | $ 372 | 12 % | $ 1.14 | 14 % |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2]Attributable to Cardinal Health, Inc.

[3]GAAP diluted EPS for the three months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.21, which includes $0.19 due to change in the effective tax rate and $0.02 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

[4]Non-GAAP diluted EPS for the three months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.22, which includes $0.19 due to change in the effective tax rate and $0.03 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.
We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2,3,4] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Fiscal Year 2017 | | | | | |
| **GAAP** | $ 6,544 | - % | $ 2,120 | (14)% | $ 1,924 | $ 630 | $ 1,288 | (10)% | $ 4.03 | (7)% |
| Restructuring and employee severance | - | | 56 | | 56 | 20 | 36 | | 0.11 | |
| Amortization and other acquisition-related costs | - | | 527 | | 527 | 165 | 362 | | 1.13 | |
| Impairments and (gain)/loss on disposal of assets | - | | 18 | | 18 | 6 | 12 | | 0.04 | |
| Litigation (recoveries)/charges, net | - | | 48 | | 48 | 19 | 29 | | 0.09 | |
| **Non-GAAP** | $ 6,544 | - % | $ 2,769 | (4)% | $ 2,572 | $ 839 | $ 1,727 | (0)% | $ 5.40 | 3 % |
| | | | | | Fiscal Year 2016 | | | | | |
| GAAP | $ 6,543 | 15 % | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| Restructuring and employee severance | - | | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | - | | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | - | | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | - | | (69) | | (69) | (27) | (42) | | (0.13) | |
| Non-GAAP | $ 6,543 | 15 % | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules
[2]Attributable to Cardinal Health, Inc.
[3]GAAP diluted EPS for the twelve months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.39, which includes $0.26 due to change in the effective tax rate and $0.13 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate)) divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).
[4]Non-GAAP diluted EPS for the twelve months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.44, which includes $0.27 due to change in the effective tax rate and $0.17 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate)) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.
We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**
**Total Company Business Analysis**

| (in millions) | Fourth Quarter | | | | Non-GAAP Fourth Quarter | | | |
|---|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 | |
| **Revenue** | | | | | | | | |
| Amount | $ | **32,966** | $ | 31,384 | | | | |
| Growth rate | | **5 %** | | 14 % | | | | |
| | | | | | | | | |
| **Gross margin** | | | | | | | | |
| Amount | $ | **1,623** | $ | 1,665 | $ | **1,623** | $ | 1,614 |
| Growth rate | | **(3)%** | | 14 % | | **1 %** | | 11 % |
| | | | | | | | | |
| **Operating earnings** | | | | | | | | |
| Amount | $ | **439** | $ | 620 | $ | **640** | $ | 643 |
| Growth rate | | **(29)%** | | 11 % | | **(1)%** | | 5 % |
| | | | | | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | | | | | |
| Amount | $ | **274** | $ | 333 | $ | **416** | $ | 372 |
| Growth rate | | **(18)%** | | 14 % | | **12 %** | | 12 % |
| | | | | | | | | |
| Return on equity | | **16.3 %** | | 20.0 % | | **24.7 %** | | 22.4 % |
| | | | | | | | | |
| Effective tax rate | | **25.8 %** | | 41.8 % | | **27.0 %** | | 37.6 % |
| | | | | | | | | |
| Debt to total capital | | **60 %** | | 46 % | | | | |
| Net debt to capital | | | | | | **34 %** | | 33 % |

| (in millions) | Fiscal Year | | | | Non-GAAP Fiscal Year | | | |
|---|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 | |
| **Revenue** | | | | | | | | |
| Amount | $ | **129,976** | $ | 121,546 | | | | |
| Growth rate | | **7 %** | | 19 % | | | | |
| | | | | | | | | |
| **Gross margin** | | | | | | | | |
| Amount | $ | **6,544** | $ | 6,543 | $ | **6,544** | $ | 6,543 |
| Growth rate | | **- %** | | 15 % | | **- %** | | 15 % |
| | | | | | | | | |
| **Operating earnings** | | | | | | | | |
| Amount | $ | **2,120** | $ | 2,459 | $ | **2,769** | $ | 2,895 |
| Growth rate | | **(14)%** | | 14 % | | **(4)%** | | 17 % |
| | | | | | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | | | | | |
| Amount | $ | **1,288** | $ | 1,427 | $ | **1,727** | $ | 1,732 |
| Growth rate | | **(10)%** | | 18 % | | **(0)%** | | 18 % |
| | | | | | | | | |
| Return on equity | | **19.6 %** | | 21.9 % | | **26.3 %** | | 26.4 % |
| | | | | | | | | |
| Effective tax rate | | **32.7 %** | | 37.1 % | | **32.6 %** | | 36.0 % |

Refer to the GAAP/Non-GAAP reconciliation for definitions and calculations supporting the Non-GAAP balances.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Fourth Quarter | | | (in millions) | Fourth Quarter | | |
|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2017 | | 2016 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **29,552** | $ 28,177 | Amount | $ | **3,416** | $ 3,210 |
| Grow th rate | | **5 %** | 14 % | Grow th rate | | **6 %** | 12 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **505** | $ 542 | Amount | $ | **138** | $ 122 |
| Grow th rate | | **(7)%** | 1 % | Grow th rate | | **13 %** | 19 % |
| Segment profit margin | | **1.71 %** | 1.93 % | Segment profit margin | | **4.03 %** | 3.81 % |

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the three months ended June 30, 2017 w as $32,966 million, w hich included total segment revenue of $32,968 million and Corporate revenue of $(2) million. Total consolidated revenue for the three months ended June 30, 2016 w as $31,384 million, w hich included total segment revenue of $31,387 million and Corporate revenue of $(3) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended June 30, 2017 w ere $439 million, w hich included total segment profit of $643 million and Corporate costs of $(204) million. Total consolidated operating earnings for the three months ended June 30, 2016 w ere $620 million, w hich included total segment profit of $664 million and Corporate costs of $(44) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.
The increase in corporate costs is primarily due to the change in litigation (recoveries)/charges, net driven by the lack of litigation recoveries from the prior period recurring in the current period and prior year LIFO credits that did not recur in the current period.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Business Analysis**

| (in millions) | Fiscal Year 2017 | | 2016 | (in millions) | Fiscal Year 2017 | | 2016 |
|---|---|---|---|---|---|---|---|
| **Pharmaceutical** | | | | **Medical** | | | |
| | | | | | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **116,463** | $ 109,131 | Amount | $ | **13,524** | $ 12,430 |
| Growth rate | | **7 %** | 20 % | Growth rate | | **9 %** | 9 % |
| | | | | | | | |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **2,187** | $ 2,488 | Amount | $ | **572** | $ 457 |
| Growth rate | | **(12)%** | 19 % | Growth rate[1] | | **25 %** | 6 % |
| Segment profit margin | | **1.88 %** | 2.28 % | Segment profit margin | | **4.23 %** | 3.68 % |

[1]Segment profit for the fiscal year ended June 30, 2016 includes the $43 million unfavorable impact of the Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit growth was 14 percent and 15 percent for the fiscal years ended June 30, 2017 and 2016, respectively.

Refer to definitions for an explanation of calculations.

Total consolidated revenue for the fiscal year ended June 30, 2017 was $129,976 million, which included total segment revenue of $129,987 million and Corporate revenue of $(11) million. Total consolidated revenue for the fiscal year ended June 30, 2016 was $121,546 million, which included total segment revenue of $121,561 million and Corporate revenue of $(15) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the fiscal year ended June 30, 2017 were $2,120 million, which included total segment profit of $2,759 million and Corporate costs of $(639) million. Total consolidated operating earnings for the fiscal year ended June 30, 2016 were $2,459 million, which included total segment profit of $2,945 million and Corporate costs of $(486) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Fourth Quarter | | |
|---|---|---|---|
| | **2017** | | 2016 |
| **GAAP return on equity** | **16.3 %** | | 20.0 % |
| | | | |
| **Non-GAAP return on equity** | | | |
| Net earnings attributable to Cardinal Health, Inc. | $ **274** | $ | 333 |
| LIFO charges/(credits), net of tax | **-** | | (31) |
| Restructuring and employee severance, net of tax | **15** | | 4 |
| Amortization and other acquisition-related costs, net of tax | **118** | | 104 |
| Impairments and loss on disposal of assets, net of tax | **2** | | 3 |
| Litigation charges, net, net of tax | **7** | | (41) |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $ **416** | $ | 372 |
| Annualized | $ **1,664** | $ | 1,486 |

| | Fourth Quarter | Third Quarter | Fourth Quarter | Third Quarter |
|---|---|---|---|---|
| | **2017** | **2017** | 2016 | 2016 |
| Total Cardinal Health, Inc. shareholders' equity | $ **6,808** | $ **6,646** | $ 6,554 | $ 6,713 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $ **6,727** | | $ 6,634 | |
| **Non-GAAP return on equity** | **24.7 %** | | 22.4 % | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| | Fiscal Year | |
|---|---|---|
| (in millions) | **2017** | 2016 |
| **GAAP return on equity** | **19.6 %** | 21.9 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings from continuing operations attributable to Cardinal Health, Inc. | $ **1,288** | $ 1,427 |
| Restructuring and employee severance, net of tax | **36** | 16 |
| Amortization and other acquisition-related costs, net of tax | **362** | 316 |
| Impairments and (gain)/loss on disposal of assets, net of tax | **12** | 15 |
| Litigation (recoveries)/charges, net, net of tax | **29** | (42) |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $ **1,727** | $ 1,732 |

| | **Fourth Quarter 2017** | **Third Quarter 2017** | **Second Quarter 2017** | **First Quarter 2017** | Fourth Quarter 2016 | Third Quarter 2016 | Second Quarter 2016 | First Quarter 2015 |
|---|---|---|---|---|---|---|---|---|
| Total Cardinal Health, Inc. shareholders' equity | $ **6,808** | $ **6,646** | $ **6,323** | $ **6,512** | $ 6,554 | $ 6,713 | $ 6,712 | $ 6,505 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $ **6,569** | | | | $ 6,548 | | | |
| **Non-GAAP return on equity** | **26.3 %** | | | | 26.4 % | | | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
GAAP / Non-GAAP Reconciliation

| (in millions) | Fourth Quarter | | | | Fiscal Year | | | |
|---|---|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | **2017** | | 2016 | |
| **GAAP effective tax rate** | **25.8 %** | | 41.8 % | | **32.7 %** | | 37.1 % | |
| | | | | | | | | |
| **Non-GAAP effective tax rate** | | | | | | | | |
| Earnings before income taxes | $ | **374** | $ | 576 | $ | **1,924** | $ | 2,276 |
| LIFO charges/(credits) | | **-** | | (51) | | **-** | | - |
| Restructuring and employee severance | | **24** | | 6 | | **56** | | 25 |
| Amortization and other acquisition-related costs | | **163** | | 132 | | **527** | | 459 |
| Impairments and loss on disposal of assets | | **3** | | 3 | | **18** | | 21 |
| Litigation (recoveries)/charges, net | | **11** | | (66) | | **48** | | (69) |
| Loss on extinguishment of debt | | **-** | | - | | **-** | | - |
| Adjusted earnings before income taxes | $ | **575** | $ | 599 | $ | **2,572** | $ | 2,711 |
| | | | | | | | | |
| Provision for income taxes | $ | **96** | $ | 241 | $ | **630** | $ | 845 |
| LIFO charges/(credits) tax benefit/(expense) | | **-** | | (20) | | **-** | | - |
| Restructuring and employee severance tax benefit | | **9** | | 2 | | **20** | | 9 |
| Amortization and other acquisition-related costs tax benefit | | **45** | | 28 | | **165** | | 143 |
| Impairments and loss on disposal of assets tax benefit | | **1** | | - | | **6** | | 6 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | | **4** | | (25) | | **19** | | (27) |
| Adjusted provision for income taxes | $ | **155** | $ | 226 | $ | **839** | $ | 976 |
| | | | | | | | | |
| **Non-GAAP effective tax rate** | **27.0 %** | | 37.6 % | | **32.6 %** | | 36.0 % | |

| | Fourth Quarter | | | |
|---|---|---|---|---|
| | **2017** | | 2016 | |
| **Debt to total capital** | **60 %** | | 46 % | |
| | | | | |
| **Net debt to capital** | | | | |
| Current portion of long-term obligations and other short-term borrowings | $ | **1,327** | $ | 587 |
| Long-term obligations, less current portion | | **9,068** | | 4,952 |
| Debt | $ | **10,395** | $ | 5,539 |
| Cash and equivalents | | **(6,879)** | | (2,356) |
| Net debt | $ | **3,516** | $ | 3,183 |
| Total Cardinal Health, Inc. shareholders' equity | | **6,808** | | 6,554 |
| Capital | $ | **10,324** | $ | 9,737 |
| **Net debt to capital** | **34 %** | | 33 % | |

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

<u>Forward Looking non-GAAP Measures</u>

In this presentation, the Company presents its outlook for fiscal 2018 non-GAAP EPS.  The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook. For fiscal 2018, the Company expects the acquisition of the Patient Recovery Business to significantly increase amortization and other acquisition-related costs.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2018 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total Cardinal Health, Inc. shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total Cardinal Health, Inc. shareholders' equity).

**Non-GAAP Diluted EPS attributable to Cardinal Health, Inc. or "Non-GAAP Diluted EPS" or "Non-GAAP Diluted Earnings Per Share"**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP Diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Effective Tax Rate**: (provision for income taxes adjusted for (1) LIFO charges/(credits)[1], (2) restructuring and employee severance[2], (3) amortization and other acquisition-related costs[3], (4) impairments and (gain)/loss on disposal of assets[4], (5) litigation (recoveries)/charges, net[5], and (6) loss on extinguishment of debt[6]) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP Gross Margin**: Gross margin excluding LIFO charges/(credits).

[1]The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market. These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[2]Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel), and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[3]Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs, and changes in the fair value of contingent consideration obligations.

[4]Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[5]Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[6]Charges related to the make-whole premium on the redemption of notes.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Non-GAAP Net Earnings attributable to Cardinal Health, Inc. or "Non-GAAP Net Earnings"**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Earnings from Continuing Operations:** earnings from continuing operations excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Operating Earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5)  litigation (recoveries)/charges, net.

**Non-GAAP Return on Equity**: (annualized current period net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5)  litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax) divided by average Cardinal Health, Inc. shareholders' equity.

**Return on Equity**: annualized current period net earnings attributable to Cardinal Health, Inc. divided by average Cardinal Health, Inc. shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general, and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.