**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LOUISIANA SHERIFFS' PENSION & RELIEF FUND**, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> **CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C. KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON**, <br><br> Defendants. | **Case No. 2:19-cv-3347** <br><br> Judge Edmund A. Sargus <br> Chief Magistrate Judge Elizabeth A. Preston Deavers |

**DECLARATION OF DAVID S. BLOOMFIELD, JR., EXHIBITS (PART IV)**

# EXHIBITS 78-102

# EXHIBIT 78

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Barrett George S | CARDINAL HEALTH INC [ CAH ] | X Director    10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 08/08/2017 | X Officer (give title below)    Other (specify below) <br> Chairman and CEO |
| 7000 CARDINAL PLACE | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| (Street) <br> DUBLIN    OH    43017 | | X   Form filed by One Reporting Person <br>    Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/08/2017 | | A(1) | | 49,653 | A | $0 | 513,884 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Reflects performance share units that will settle on August 15, 2017.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact     08/09/2017

** Signature of Reporting Person      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 79

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

1. Name and Address of Reporting Person*
Casey Donald M Jr.

| (Last) | (First) | (Middle) |
|---|---|---|

7000 CARDINAL PLACE
(Street)

| DUBLIN | OH | 43017 |
|---|---|---|
| (City) | (State) | (Zip) |

2. Issuer Name **and** Ticker or Trading Symbol
CARDINAL HEALTH INC [ CAH ]

3. Date of Earliest Transaction (Month/Day/Year)
08/08/2017

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)
| | Director | | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) | | Other (specify below) |

CEO, Medical Segment

6. Individual or Joint/Group Filing (Check Applicable Line)
| X | Form filed by One Reporting Person |
| | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/08/2017 | | A(1) | | 13,034 | A | $0 | 143,235 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Reflects performance share units that will settle on August 15, 2017.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact          08/09/2017
** Signature of Reporting Person                      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 80

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 30, 2017

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

# Cardinal Health, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**
*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| *Title of class* | *Name of each exchange on which registered* |
|---|---|
| **Common shares (without par value)** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐   (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
| Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of voting stock held by non-affiliates or registrant on December 31, 2016, was the following: $22,624,332,824.

The number of the registrant's common shares, without par value, outstanding as of July 31, 2017, was the following: 316,453,664.

**Documents Incorporated by Reference:**

Portions of the registrant's Definitive Proxy Statement to be filed for its 2017 Annual Meeting of Shareholders are incorporated by reference into the sections of this Form 10-K addressing the requirements of Part III of Form 10-K.

# Cardinal Health
**Fiscal 2017 Form 10-K**

## Table of Contents

| | Page |
|---|---|
| Introduction | 2 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 3 |
| Explanation and Reconciliation of Non-GAAP Financial Measures | 18 |
| Selected Financial Data | 21 |
| Quantitative and Qualitative Disclosures about Market Risk | 22 |
| Business | 24 |
| Risk Factors | 30 |
| Properties | 34 |
| Legal Proceedings | 34 |
| Market for Registrant's Common Equity | 35 |
| Reports | 37 |
| Financial Statements and Supplementary Data | 40 |
| Directors, Executive Officers, and Corporate Governance | 70 |
| Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 71 |
| Exhibits | 72 |
| Form 10-K Cross Reference Index | 76 |
| Signatures | 77 |

# Introduction

**References to Cardinal Health and Fiscal Years**

As used in this report, "we," "our," "us," "Cardinal Health" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our fiscal year ends on June 30.  References to fiscal 2017, 2016, 2015, 2014 and 2013 and to FY17, FY16, FY15, FY14 and FY13 are to the fiscal years ended June 30, 2017, 2016, 2015, 2014 and 2013, respectively. Except as otherwise specified, information in this report is provided as of June 30, 2017.

**Non-GAAP Financial Measures**

In this report, including in the "Fiscal 2017 Overview" section of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), we use financial measures that are derived from consolidated financial data but are not presented in our financial statements that are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this report.

**Important Information Regarding Forward-Looking Statements**

This report (including information incorporated by reference) includes forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in MD&A, but there are others throughout this report, which may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. The most significant of these risks and uncertainties are described in "Risk Factors" in this report and in Exhibit 99.1 to the Form 10-K included in this report. Forward-looking statements in this report speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

**Available Information**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports are available free of charge on our website (www.cardinalhealth.com), under the "Investors — Financial Reporting — SEC Filings" caption, as soon as reasonably practicable after we electronically file them with, or furnish them to, the SEC. You may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website (www.sec.gov) where you can search for annual, quarterly and current reports, proxy and information statements, and other information regarding us and other public companies.

# Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A)

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a global, integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. We provide medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. We connect patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. We manage our business and report our financial results in two segments: Pharmaceutical and Medical.

## Pharmaceutical Segment

Our Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical, and over-the-counter healthcare and consumer products in the United States. This segment also provides services to pharmaceutical manufacturers and healthcare providers to support the development, marketing, and distribution of specialty pharmaceutical products; operates nuclear pharmacies and radiopharmaceutical manufacturing facilities; provides pharmacy management services to hospitals, as well as medication therapy management and patient outcomes services to hospitals, other healthcare providers and payers; and repackages generic pharmaceuticals and over-the-counter healthcare products. This segment also imports and distributes pharmaceuticals, over-the-counter healthcare and consumer products and provides specialty pharmacy and other services in China.

## Medical Segment

Our Medical segment manufactures, sources and distributes Cardinal Health branded medical, surgical and laboratory products, which are sold in the United States, Canada, Europe, Asia and other markets. In addition to distributing Cardinal Health branded products, this segment also distributes a broad range of national brand products and provides supply chain services and solutions to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China. This segment also distributes medical products to patients' homes and provides post-acute care management and transition services and software to hospitals, other healthcare providers and payers in the United States.

# Consolidated Results



| Revenue (in billions) | Operating Earnings (in billions) | Diluted EPS ($ per share) |

## Fiscal 2017 Overview

### Revenue

Revenue for fiscal 2017 was $130.0 billion, a 7 percent increase from the prior year, due primarily to sales growth from pharmaceutical distribution customers.

### GAAP and Non-GAAP Operating Earnings

| (in millions) | 2017 | 2016 | Change |
|---|---|---|---|
| **GAAP** | **$2,120** | $2,459 | **(14)%** |
| Restructuring and employee severance | 56 | 25 | |
| Amortization and other acquisition-related costs | 527 | 459 | |
| Impairments and (gain)/loss on disposal of assets | 18 | 21 | |
| Litigation (recoveries)/charges, net | 48 | (69) | |
| **Non-GAAP** | **$2,769** | $2,895 | **(4)%** |

The sum of the components may not equal the total due to rounding.

During fiscal 2017, GAAP operating earnings decreased 14 percent to $2.1 billion and non-GAAP operating earnings decreased 4 percent to $2.8 billion. The decreases in both GAAP and non-GAAP operating earnings were primarily due to generic pharmaceutical customer pricing changes and the previously disclosed loss of a large pharmaceutical distribution customer. The decreases were partially offset by the benefits of Red Oak Sourcing within our Pharmaceutical segment generics program and growth from our Medical segment. Changes in litigation (recoveries)/charges, net and amortization of acquisition-related intangible assets related to the acquisition of Cordis also contributed to the decrease in GAAP operating earnings during fiscal 2017.

### GAAP and Non-GAAP Diluted EPS

| ($ per share) | 2017 | 2016 | Change |
|---|---|---|---|
| **GAAP** | **$ 4.03** | $ 4.32 | **(7)%** |
| Restructuring and employee severance | 0.11 | 0.05 | |
| Amortization and other acquisition-related costs | 1.13 | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | 0.04 | 0.04 | |
| Litigation (recoveries)/charges, net | 0.09 | (0.13) | |
| **Non-GAAP** | **$ 5.40** | $ 5.24 | **3 %** |

The sum of the components may not equal the total due to rounding.

During fiscal 2017, GAAP diluted earnings per share from continuing operations attributable to Cardinal Health, Inc. ("diluted EPS") decreased 7 percent to $4.03 and non-GAAP diluted EPS increased 3 percent to $5.40. GAAP diluted EPS decreased due to lower GAAP operating earnings, partially offset by a lower effective tax rate and fewer shares outstanding as a result of share repurchases. Non-GAAP diluted EPS increased primarily due to a lower effective tax rate and fewer shares outstanding as a result of share repurchases, partially offset by lower non-GAAP operating earnings.

### Cash and Equivalents

Our cash and equivalents balance was $6.9 billion at June 30, 2017 compared to $2.4 billion at June 30, 2016. The increase in cash and equivalents during fiscal 2017 was driven by the proceeds from a $5.2 billion debt issuance and $1.2 billion provided by operating activities, partially offset by $600 million paid for share repurchases, $577 million paid in dividends, $387 million in capital expenditures and $310 million in debt repayments.

In July 2017, we used $6.1 billion to fund the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses from Medtronic plc, as discussed below, and used $403 million to redeem our 1.7% notes due 2018.

# Significant Developments in Fiscal 2017 and Trends

## Acquisition of Medtronic's Patient Recovery Business

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc ("Medtronic") for $6.1 billion in cash. The Patient Recovery Business manufactures 23 medical product categories sold into multiple healthcare channels, and includes numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition further expands the Medical segment's portfolio of self-manufactured products. We funded the acquisition through $4.5 billion in new long-term debt, the use of existing cash, and borrowings under our existing credit arrangements.

## Trends

Within our Pharmaceutical segment, we expect fiscal 2018 segment profit to be less than our fiscal 2017 segment profit due primarily to generic pharmaceutical customer pricing changes, which also negatively impacted Pharmaceutical segment profit during fiscal 2017. However, as is generally the case, the frequency, timing, magnitude, and profit impact of pharmaceutical customer pricing changes and branded and generic pharmaceutical manufacturer pricing changes remain uncertain and their impact on Pharmaceutical segment profit and consolidated operating earnings in fiscal 2018 could be more or less than we expect.

In fiscal 2018, we expect the acquisition of the Patient Recovery Business will significantly increase the Medical segment's revenue and segment profit. We also expect the acquisition will significantly increase amortization and acquisition-related costs in fiscal 2018 due to the size and complexity of the acquisition. We expect our interest expense, net to increase in fiscal 2018 primarily due to the debt issued to fund a portion of the purchase price of the acquisition of the Patient Recovery Business.

| MD&A | Results of Operations |
|------|----------------------|

# Results of Operations

## Revenue



**Pharmaceutical Segment (in billions)**

FY15: $91.1 | FY16: $109.1 | FY17: $116.5

**Medical Segment (in billions)**

FY15: $11.4 | FY16: $12.4 | FY17: $13.5

| (in millions) | Revenue | | | Change | |
|---|---|---|---|---|---|
| | **2017** | 2016 | 2015 | **2017** | 2016 |
| Pharmaceutical | **$ 116,463** | $109,131 | $ 91,116 | **7%** | 20% |
| Medical | **13,524** | 12,430 | 11,395 | **9%** | 9% |
| Total segment revenue | **129,987** | 121,561 | 102,511 | **7%** | 19% |
| Corporate | **(11)** | (15) | 20 | **N.M.** | N.M. |
| **Total revenue** | **$ 129,976** | $121,546 | $102,531 | **7%** | 19% |

### Fiscal 2017 Compared to Fiscal 2016

**Pharmaceutical Segment**
Fiscal 2017 Pharmaceutical segment revenue grew primarily due to sales growth from the addition of OptumRx and from other pharmaceutical distribution customers, including continued branded pharmaceutical price appreciation, all of which increased revenue by $7.0 billion.

**Medical Segment**
Fiscal 2017 Medical segment revenue grew primarily due to sales growth from new and existing customers and $212 million in contributions from acquisitions.

### Fiscal 2016 Compared to Fiscal 2015

**Pharmaceutical Segment**
Fiscal 2016 Pharmaceutical segment revenue grew primarily due to sales growth from the addition of OptumRx and from other pharmaceutical distribution customers, including continued branded pharmaceutical price appreciation, all of which increased revenue by $16.9 billion. Acquisitions also contributed $2.1 billion to revenue growth.

**Medical Segment**
Fiscal 2016 Medical segment revenue grew primarily due to acquisitions, net of divestitures, which contributed $645 million, and sales growth from existing businesses.

## Cost of Products Sold

Cost of products sold for fiscal 2017 and 2016 increased $8.4 billion (7 percent) and $18.2 billion (19 percent) compared to the prior-year periods, respectively, as a result of the same factors affecting the changes in revenue and gross margin.

| MD&A | Results of Operations |
|------|-----------------------|

# Gross Margin



**Gross Margin (in billions)**

FY15: $5.7 — FY16: $6.5 — FY17: $6.5



**Gross Margin Rate (Gross Margin as a Percent of Revenue)**

FY15: 5.57% — FY16: 5.38% — FY17: 5.03%

| (in millions) | Consolidated Gross Margin | | | Change | |
|---|---|---|---|---|---|
| | **2017** | 2016 | 2015 | **2017** | 2016 |
| Gross margin | **$ 6,544** | $ 6,543 | $ 5,712 | **N.M.** | 15% |

## Fiscal 2017 Compared to Fiscal 2016

Fiscal 2017 consolidated gross margin was essentially flat versus the prior-year period.

Consolidated gross margin for fiscal 2017 was positively impacted by sales growth from pharmaceutical distribution customers ($260 million) and acquisitions in both segments ($132 million) and was negatively impacted by the previously disclosed loss of a large pharmaceutical distribution customer.

Gross margin rate contracted during fiscal 2017, primarily due to generic pharmaceutical customer pricing changes, partially offset by the benefits from Red Oak Sourcing within our Pharmaceutical segment generics program.

## Fiscal 2016 Compared to Fiscal 2015

Fiscal 2016 consolidated gross margin increased $831 million (15 percent), and was favorably impacted by sales growth from pharmaceutical distribution customers ($510 million) and acquisitions, net of divestitures ($576 million).

Gross margin rate contracted during fiscal 2016, primarily due to changes in product mix driven by the on-boarding of a new mail order customer, OptumRx, starting in October 2015, and also due to the adverse impact of customer pricing changes. Our gross margin rate was favorably impacted by performance under our Pharmaceutical segment generics program. Our generics program had strong year-over-year performance from Red Oak Sourcing.

# Distribution, Selling, General and Administrative ("SG&A") Expenses

| (in millions) | SG&A Expenses | | | Change | |
|---|---|---|---|---|---|
| | **2017** | 2016 | 2015 | **2017** | 2016 |
| SG&A expenses | **$ 3,775** | $ 3,648 | $ 3,240 | **3%** | 13% |

## Fiscal 2017 Compared to Fiscal 2016

Fiscal 2017 SG&A expenses increased primarily due to acquisitions ($112 million) and costs related to a multi-year project to replace certain Pharmaceutical segment finance and operating information systems, partially offset by reduced enterprise-wide incentive compensation.

## Fiscal 2016 Compared to Fiscal 2015

Fiscal 2016 SG&A expenses increased primarily due to acquisitions, net of divestitures ($370 million).

# Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 15 of the "Notes to Consolidated Financial Statements" for additional information on segment profit.



| (in millions) | Segment Profit and Operating Earnings | | | Change | |
|---|---|---|---|---|---|
| | **2017** | 2016 | 2015 | **2017** | 2016 |
| Pharmaceutical | $ **2,187** | $ 2,488 | $ 2,094 | **(12)%** | 19% |
| Medical | **572** | 457 | 433 | **25 %** | 6% |
| Total segment profit | **2,759** | 2,945 | 2,527 | **(6)%** | 17% |
| Corporate | **(639)** | (486) | (366) | **31 %** | 33% |
| **Total consolidated operating earnings** | $ **2,120** | $ 2,459 | $ 2,161 | **(14)%** | 14% |

## Fiscal 2017 Compared to Fiscal 2016

### Pharmaceutical Segment Profit
Fiscal 2017 Pharmaceutical segment profit decreased largely due to generic pharmaceutical customer pricing changes. The previously disclosed loss of a large pharmaceutical distribution customer, the adverse impact of customer repricings and reduced levels of branded pharmaceutical price appreciation also contributed to the decrease in Pharmaceutical segment profit. These were partially offset by the benefits of Red Oak Sourcing within our generics program.

### Medical Segment Profit
Fiscal 2017 Medical segment profit increased due to strong performance from naviHealth, contributions from Cardinal Health branded products, reduced enterprise-wide incentive compensation, and contributions from distribution services. Cardinal Health branded products growth includes the prior year unfavorable impact on cost of products sold from the Cordis inventory fair value step up.

### Corporate
As discussed further in sections that follow, the principal drivers for the change in Corporate during fiscal 2017 were the change in litigation (recoveries)/charges, net and higher amortization and other acquisition-related costs.

## Fiscal 2016 Compared to Fiscal 2015

### Pharmaceutical Segment Profit
Fiscal 2016 Pharmaceutical segment profit increased due to sales growth from pharmaceutical distribution customers and performance under our generics program, partially offset by the adverse impact of customer pricing changes. Acquisitions also contributed to Pharmaceutical segment profit growth. Our generics program benefited from strong year-over-year performance from Red Oak Sourcing.

### Medical Segment Profit
Fiscal 2016 Medical segment profit increased due to the contribution from Cardinal Health branded products. Acquisitions, net of divestitures, which included the unfavorable impact on cost of products sold from the fair value step up of inventory acquired with Cordis, also contributed to segment profit growth. Fiscal 2016 Medical segment profit growth was partially offset by a decline in the results from our Canada business.

### Corporate
As discussed further in sections that follow, the principal driver for the change in Corporate in fiscal 2016 was increased amortization and other acquisition-related costs primarily related to the acquisitions of Cordis and Harvard Drug, partially offset by litigation recoveries.

# Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin, and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Restructuring and employee severance | $ 56 | $ 25 | $ 44 |
| Amortization and other acquisition-related costs | 527 | 459 | 281 |
| Impairments and (gain)/loss on disposal of assets, net | 18 | 21 | (19) |
| Litigation (recoveries)/charges, net | 48 | (69) | 5 |

**Amortization and Other Acquisition-Related Costs**

Amortization of acquisition-related intangible assets was $392 million, $355 million and $189 million for fiscal 2017, 2016 and 2015, respectively. The increase in amortization of acquisition-related intangible assets during fiscal 2017 and fiscal 2016 was largely due to the acquisition of Cordis. Transaction and integration costs associated with the Cordis acquisition were $61 million and $78 million during fiscal 2017 and 2016, respectively.

Transaction and integration costs associated with the acquisition of the Patient Recovery Business were $54 million during fiscal 2017.

**Litigation (Recoveries)/Charges, Net**

During fiscal 2017, we incurred litigation charges of $45 million due to accrued expenses relating to the Cordis-related IVC filter product liability claims and the settlement of the State of West Virginia matter. See Note 8 of the "Notes to Consolidated Financial Statements" for additional information.

During fiscal 2016 and 2015, we received and recognized income of $80 million and $71 million, respectively, from settlements of class action antitrust lawsuits in which we were a class member. During fiscal 2015, we incurred litigation charges of $68 million related to government investigations.

# Earnings From Continuing Operations Before Income Taxes

In addition to the items discussed above, earnings from continuing operations before income taxes was impacted by the following:

| (in millions) | Earnings from Continuing Operations Before Income Taxes | | | Change | |
|---|---|---|---|---|---|
| | 2017 | 2016 | 2015 | 2017 | 2016 |
| Other (income)/expense, net | $ (5) | $ 5 | $ (7) | N.M. | N.M. |
| Interest expense, net | 201 | 178 | 141 | 13% | 26 % |
| Loss on extinguishment of debt | — | — | 60 | N.M. | (100)% |

**Interest Expense, Net**

Fiscal 2017 interest expense increased primarily due to $5.2 billion of new long-term debt issued in June 2017, $4.5 billion of which was used to fund the acquisition of the Patient Recovery Business in July 2017. Fees relating to a commitment for an unsecured bridge term loan facility obtained in connection with the acquisition also contributed to the increase in interest expense. No amounts were drawn under the bridge loan facility and we terminated the commitment letter in June 2017.

Fiscal 2016 interest expense increased primarily as a result of the additional $1.5 billion of debt issued in June 2015 to fund the Harvard Drug and Cordis acquisitions.

**Loss on Extinguishment of Debt**

In fiscal 2015, we redeemed certain debt resulting in a loss on the extinguishment of debt of $60 million ($37 million, net of tax).

# Provision for Income Taxes

The provision for income taxes decreased in fiscal 2017 primarily due to a decrease in earnings from continuing operations and a 4.4 percentage point decrease in the effective tax rate as discussed below.

Generally, fluctuations in the effective tax rate are due to changes in the distribution of income among non-U.S. taxing jurisdictions with lower income tax rates and other reconciling items. A reconciliation of the provision based on the federal statutory income tax rate to our effective income tax rate from continuing operations is as follows (see Note 7 of the "Notes to Consolidated Financial Statements" for additional information):

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Provision at Federal statutory rate | **35.0%** | 35.0% | 35.0% |
| State and local income taxes, net of federal benefit | **1.0** | 1.5 | 4.1 |
| Foreign tax rate differential | **(0.2)** | (0.6) | (2.4) |
| Nondeductible/nontaxable items | **0.2** | 1.0 | 0.7 |
| Other | **(3.3)** | 0.2 | 1.0 |
| **Effective income tax rate** | **32.7%** | 37.1% | 38.4% |

## Fiscal 2017

The fiscal 2017 effective income tax rate was favorably impacted by the change in other items, which decreased 3.5 percentage points from fiscal 2016 primarily due to the realignment of foreign subsidiaries in anticipation of closing the acquisition of the Patient Recovery Business and also with deductions related to U.S. production activities. The state and local income tax rate decreased 0.5 percentage points primarily due to resolutions with state taxing authorities.

**Ongoing Audits**

The IRS is currently conducting audits of fiscal years 2008 through 2014.

## Fiscal 2016 and Fiscal 2015

The fiscal 2016 effective income tax rate was favorably impacted by the state and local income tax rate, which decreased 2.6 percentage points from fiscal 2015 due to resolutions with state taxing authorities and a shift in the distribution of income among jurisdictions. The foreign tax rate differential decreased 1.8 percentage points primarily due to the deferred tax benefits recognized in fiscal 2015.

The fiscal 2015 effective income tax rate was unfavorably impacted by the state and local income tax rate, which increased 1.9 percentage points due to the de-recognition of certain state tax benefits. The foreign tax rate differential also increased 1.2 percentage points primarily due to recognition of deferred tax benefits resulting from new tax legislation. In addition, the change in measurement of uncertain tax positions increased 1.3 percentage points primarily as a result of proposed assessment of additional tax.

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends, and share repurchases. If we decide to engage in one or more additional acquisitions, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $6.9 billion at June 30, 2017 compared to $2.4 billion at June 30, 2016. The increase in cash and equivalents during fiscal 2017 was driven by the proceeds from the $5.2 billion debt issuance and $1.2 billion provided by operating activities, partially offset by $600 million paid for share repurchases, $577 million paid in dividends, $387 million in capital expenditures and $310 million in debt repayments. The $1.8 billion decrease in net cash provided by operating activities was primarily due to an increase in working capital as a result of changes in timing of customer and vendor payments, some of which related to implementation of the new Pharmaceutical segment finance and operating information systems. At June 30, 2017, our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments. On July 29, 2017, we acquired the Patient Recovery Business for $6.1 billion in cash.

The cash and equivalents balance at June 30, 2017 included $569 million of cash held by subsidiaries outside of the United States. Although the vast majority of cash is available for repatriation, bringing the cash into the United States could trigger U.S federal, state and local income tax obligations. Because the earnings are considered permanently reinvested, no U.S. tax provision has been

accrued related to the repatriation of these earnings. It is not practicable to evaluate the amount of U.S. tax that might be payable on the remittance of such earnings.

The decrease in cash and equivalents during fiscal 2016 of $2.2 billion was driven by $3.6 billion deployed for acquisitions, $651 million paid for share repurchases, $512 million paid in dividends and $465 million in capital expenditures, partially offset by net cash provided by operating activities of $3.0 billion, which was positively impacted by increased net earnings and working capital improvements.

During fiscal 2015 we deployed $1.0 billion of cash on share repurchases, $503 million on acquisitions and $460 million on dividends. Net cash provided by operating activities of $2.5 billion benefited from a net working capital decrease in excess of $500 million as a result of the Walgreens contract expiration.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity at June 30, 2017 include a $1.75 billion revolving credit facility and a $700 million committed receivables sales facility program. We also have a $1.75 billion commercial paper program, backed by our revolving credit facility. At June 30, 2017, we had no amounts outstanding under our revolving credit facility or our committed receivables sales facility program. Under our commercial paper program, we had a maximum amount outstanding of $855 million and an average daily amount outstanding of $58 million during fiscal 2017.

Our revolving credit facility and committed receivables sales facility programs require us to maintain a consolidated leverage ratio of no more than 3.25-to-1 as of the last day of each quarter. As a result of the acquisition of the Patient Recovery Business, we temporarily

increased this ratio to 4.25-to-1. As of June 30, 2017, we were in compliance with these financial covenants.

### Long-Term Obligations

At June 30, 2017, we had total long-term obligations of $9.1 billion.

In June 2017, we sold $1 billion aggregate principal amount of 1.948% notes due 2019, $1.15 billion aggregate principal amount of 2.616% notes due 2022, $350 million aggregate principal amount of floating rate notes due 2022, $750 million aggregate principal amount of 3.079% notes due 2024, $1.35 billion aggregate principal amount of 3.410% notes due 2027 and $600 million aggregate principal amount of 4.368% notes due 2047. In addition to funding a portion of the purchase price of the acquisition of the Patient Recovery Business described below, in July 2017 we used a portion of the debt proceeds to redeem our $400 million 1.7% notes due 2018.

## Funding for Acquisition of Medtronic's Patient Recovery Business

On July 29, 2017, we acquired the Patient Recovery Business from Medtronic for $6.1 billion in cash. We funded the acquisition using $4.5 billion of the proceeds from long-term debt issued in June 2017, cash on hand, $400 million in commercial paper and $300 million borrowed under our receivables sales facility. The new long-term debt was issued in June 2017 primarily to fund a portion of the purchase price of this acquisition. We also had obtained a commitment letter in April 2017 from a financial institution for a $4.5 billion unsecured bridge term loan facility that could have been used to complete the acquisition. We incurred fees related to the facility, which are included in interest expense, net. No amounts were drawn under the bridge term loan facility and we terminated the commitment letter in June 2017.

## Available-for-Sale Securities

At June 30, 2017 and 2016, we held $65 million and $200 million, respectively, of marketable securities, which are classified as available-for-sale. In July 2017, we liquidated $65 million of our marketable securities.

## Risk Management

We use interest rate swaps, foreign currency contracts and commodity contracts to manage our exposure to cash flow variability. We also use interest rate swaps to protect the value of our debt and use foreign currency forward contracts to protect the value of our existing and forecasted foreign currency assets and liabilities. See the "Quantitative and Qualitative Disclosures About Market Risk" section as well as Note 1 and Note 11 of the "Notes to Consolidated Financial Statements" for information regarding the use of financial instruments and derivatives as well as foreign currency, interest rate and commodity exposures.

# Capital Deployment

## Capital Expenditures

Capital expenditures during fiscal 2017, 2016 and 2015 were $387 million, $465 million and $300 million, respectively.

We expect capital expenditures in fiscal 2018 to be between $500 million and $540 million primarily for information technology projects, growth projects in our core business and for integration of the acquisition of the Patient Recovery Business.

## Dividends

During fiscal 2017, we paid quarterly dividends totaling $1.80 per share, an increase of 16 percent from fiscal 2016.

On May 3, 2017, our Board of Directors approved a quarterly dividend of $0.4624 per share, or $1.85 per share on an annualized basis, which was paid on July 15, 2017 to shareholders of record on July 3, 2017.

## Share Repurchases

During fiscal 2017, we repurchased $600 million of our common shares. We funded the repurchases with available cash. At June 30, 2017, we had $443 million remaining under our existing $1.0 billion share repurchase program.

## Acquisition of Medtronic's Patient Recovery Business

Described above under "Funding for Acquisition of Medtronic's Patient Recovery Business."

## Long-Term Obligations Repayment Plans

We plan to reduce our long-term obligations by approximately $500 million in each of fiscal 2018, 2019 and 2020 by paying off long-term debt as it comes due.

# Contractual Obligations

At June 30, 2017, our contractual obligations, including estimated payments due by period, are as follows:

| (in millions) | 2018 | 2019 to 2020 | 2021 to 2022 | There-after | Total |
|---|---|---|---|---|---|
| Long-term debt and short-term borrowings (1) | $1,328 | $ 1,950 | $ 1,750 | $ 5,424 | $ 10,452 |
| Interest on long-term debt | 320 | 590 | 542 | 2,250 | 3,702 |
| Capital lease obligations (2) | 2 | 5 | 2 | 2 | 11 |
| Other liabilities (3) | 4 | — | — | — | 4 |
| Operating leases (4) | 110 | 171 | 100 | 107 | 488 |
| Purchase obligations and other payments (5) | 341 | 331 | 234 | 244 | 1,150 |
| Total contractual obligations (6) | $2,105 | $ 3,047 | $ 2,628 | $ 8,027 | $ 15,807 |

(1) Represents maturities of our long-term debt obligations and other short-term borrowings excluding capital lease obligations described below. See Note 6 of the "Notes to Consolidated Financial Statements" for further information.

(2) Represents maturities of our capital lease obligations included within long-term obligations in our consolidated balance sheets.

(3) Represents cash outflows by period for certain of our liabilities in which cash outflows could be reasonably estimated. Long-term liabilities, such as unrecognized tax benefits and deferred taxes, have been excluded from the table above because of the inherent uncertainty of the underlying tax positions or because of the inability to reasonably estimate the timing of any cash outflows. See Note 7 of the "Notes to Consolidated Financial Statements" for further discussion of income taxes. Additionally, the carrying value of redeemable noncontrolling interests are excluded from the table, as the ultimate amount and timing of any future cash payments related to the redemption amount are uncertain. See Note 1 and Note 12 of the "Notes to Consolidated Financial Statements" for additional information regarding redeemable noncontrolling interests.

(4) Represents minimum rental payments for operating leases having initial or remaining non-cancelable lease terms as described in Note 8 of the "Notes to Consolidated Financial Statements."

(5) A purchase obligation is defined as an agreement to purchase goods or services that is legally enforceable and specifies all significant terms, including fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and approximate timing of the transaction. The purchase obligation amounts disclosed above represent estimates of the minimum for which we are obligated and the time period in which cash outflows will occur. Purchase orders and authorizations to purchase that involve no firm commitment from either party are excluded from the above table. In addition, contracts that can be unilaterally canceled with no termination fee or with proper notice are excluded from our total purchase obligations except for the amount of the termination fee or the minimum amount of goods that must be purchased during the requisite notice period. Purchase obligations and other payments also includes quarterly payments of $45.6 million that we are required to pay CVS Health Corporation ("CVS"), in connection with the establishment of Red Oak Sourcing and will be in place for the remaining seven years of the agreement. See Note 8 of the "Notes to Consolidated Financial Statements" for additional information.

(6) Excludes obligations from acquisitions not closed as of June 30, 2017.

# Off-Balance Sheet Arrangements

We had no significant "off-balance sheet arrangements" at June 30, 2017, as that term is defined in the SEC rules.

# Recent Financial Accounting Standards

See Note 1 of the "Notes to Consolidated Financial Statements" for a discussion of recent financial accounting standards.

# Critical Accounting Policies and Sensitive Accounting Estimates

Critical accounting policies are those accounting policies that (i) can have a significant impact on our financial condition and results of operations and (ii) require the use of complex and subjective estimates based upon past experience and management's judgment. Other people applying reasonable judgment to the same facts and circumstances could develop different estimates. Because estimates are inherently uncertain, actual results may differ. In this section, we describe the significant policies applied in preparing our consolidated financial statements that management believes are the most dependent on estimates and assumptions. For further discussion of accounting policies for items within this section and of additional accounting policies, see Note 1 of the "Notes to Consolidated Financial Statements."

## Allowance for Doubtful Accounts

The allowance for doubtful accounts includes general and specific reserves. We determine our allowance for doubtful accounts by reviewing accounts receivable aging, industry trends, customer financial strength and credit standing, historical write-off trends and payment history. We regularly evaluate how changes in economic conditions may affect credit risks. See Note 1 of the "Notes to Consolidated Financial Statements" for further information on our policy for Receivables and Allowance for Doubtful Accounts.

A hypothetical 0.1 percent increase or decrease in the reserve as a percentage of trade receivables at June 30, 2017, would result in an increase or decrease in bad debt expense of $8 million. We believe the reserve maintained and expenses recorded in fiscal 2017 are appropriate. At this time, we are not aware of any analytical findings or customer issues that are likely to lead to a significant future increase in the allowance for doubtful accounts as a percentage of revenue.

The following table presents information regarding the allowance for doubtful accounts over the past three fiscal years:

| (in millions, except percentages) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Allowance for doubtful accounts | $ 137 | $ 135 | $ 135 |
| Reduction to allowance for customer deductions and write-offs | 58 | 74 | 66 |
| Charged to costs and expenses | 60 | 74 | 64 |
| Allowance as a percentage of customer receivables | 1.7% | 1.8% | 2.0% |
| Allowance as a percentage of revenue | 0.11% | 0.11% | 0.13% |

## Inventories

A substantial portion of our inventories (56 percent and 58 percent at June 30, 2017 and 2016, respectively) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These are primarily merchandise inventories at the core pharmaceutical distribution facilities within our Pharmaceutical segment ("distribution facilities"). The LIFO impact on the consolidated statements of earnings depends on pharmaceutical manufacturer price appreciation or deflation and our fiscal year-end inventory levels, which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end. Prices for branded pharmaceuticals generally tend to rise, resulting in an increase in cost of products sold, whereas prices for generic pharmaceuticals generally tend to decline, resulting in a decrease in cost of products sold. See Note 1 of the "Notes to Consolidated Financial Statements" for further information on our policy for Inventories.

Using LIFO, if there is a decrease in inventory levels that have experienced pharmaceutical price appreciation, the result generally will be a decrease in future cost of products sold as our older inventory is held at a lower cost. Conversely, if there is a decrease in inventory levels that have experienced a pharmaceutical price decline, the result generally will be an increase in future cost of products sold as our older inventory is held at a higher cost.

We believe that the average cost method of inventory valuation provides a reasonable approximation of the current cost of replacing inventory within these distribution facilities. As such, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation. If we had used the average cost method of inventory valuation for all inventory within the distribution facilities, the value of our inventories would not have changed in fiscal 2017 or 2016 because inventories valued at LIFO were $46 million and $9 million higher than the average cost value at June 30, 2017 and 2016, respectively. We do not record inventories in excess of replacement cost. As such, we did not record any changes in our LIFO reserve in fiscal 2017 and 2016.

Our remaining inventory that is not valued at the lower of LIFO or market is stated at the lower of cost, using the first-in, first-out method, or market. Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $76 million and $79 million at June 30, 2017 and 2016, respectively. We reserve for inventory obsolescence using estimates based on historical experience, historical and projected sales trends, specific categories of inventory, age of on-hand inventory and manufacturer return policies. If actual conditions are less favorable than our assumptions, additional inventory reserves may be required.

## Business Combinations

The assets acquired and liabilities assumed in a business combination, including identifiable intangible assets, are recorded at their estimated fair values as of the acquisition date. For further discussion of the Business Combinations accounting policy, see Note 1 of the "Notes to Consolidated Financial Statements."

Critical estimates and assumptions include: expected future cash flows for customer relationships, trademarks, trade names, patents, developed technology, in-process research and development ("IPR&D") and other identifiable intangible assets; discount rates that reflect the risk factors associated with future cash flows; and estimates of useful lives. See Note 2 of the "Notes to Consolidated Financial Statements" for additional information regarding our acquisitions.

## Goodwill and Other Intangible Assets

Purchased goodwill and intangible assets with indefinite lives are tested for impairment annually or when indicators of impairment exist. Goodwill impairment testing involves a comparison of the estimated fair value of reporting units to the respective carrying amount, which may be performed utilizing either a qualitative or quantitative assessment. A reporting unit is defined as an operating segment or one level below an operating segment (also known as a component).

We have two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. These operating segments are comprised of divisions (components), for which discrete financial information is available. Components are aggregated into reporting units for purposes of goodwill impairment testing to the extent that they share similar economic characteristics. Our reporting units are: Pharmaceutical operating segment (excluding our Nuclear Pharmacy Services division and Cardinal Health China - Pharmaceutical division); Nuclear Pharmacy Services division; Cardinal Health China - Pharmaceutical division; Medical operating segment (excluding our Cardinal Health at Home division and naviHealth division) ("Medical Unit"); Cardinal Health at Home division; and naviHealth division.

Goodwill impairment testing involves judgment, including the identification of reporting units and the estimation of the fair value of each reporting unit and, if necessary, the estimation of the implied fair value of goodwill. Our determination of estimated fair value of our reporting units is based on a combination of the income-based and market-based approaches. We use discount rates that are commensurate with the risks and uncertainty inherent in the respective reporting units and in our internally-developed forecasts. Under the market-based approach, we determine fair value by comparing our reporting units to similar businesses or guideline companies whose securities are actively traded in public markets.

Estimating the fair value of reporting units requires the use of estimates and significant judgments that are based on a number of factors including actual operating results. The use of alternate estimates and assumptions or changes in the industry or peer groups could materially affect the determination of fair value for each reporting unit and potentially result in goodwill impairment. If a reporting unit fails to achieve expected earnings or otherwise fails to meet current financial plans, or if there were changes to any other key assumptions used in the tests, the reporting unit could incur a goodwill impairment in a future period.

We performed annual impairment testing in fiscal 2017, 2016 and 2015 and concluded that there were no impairments of goodwill as the estimated fair value of each reporting unit exceeded its carrying value. For our annual impairment test in fiscal 2017, the fair value of our Medical Unit exceeded its carrying value of $6.8 billion by approximately 6 percent, which is lower than in past years due to recent performance of our Cordis acquisition.  For this test, we used a discount rate of 8.5 percent and a terminal growth rate of 2.0 percent. The goodwill balance for our Medical Unit is $2.6 billion. A decrease in future cash flows, an increase in the discount rate or a decrease in the terminal growth rate, among other things, could result in a goodwill impairment for the Medical Unit. If we were to alter our impairment testing in fiscal 2017 by increasing the discount rate by 1.0 percent, there would have been an impairment indicator for our Medical Unit and we would have performed Step 2 of the goodwill impairment test.  Similarly, changes in other key assumptions used in the test could result in an impairment indicator for our Medical Unit. For any of our other reporting units, there would not have been an impairment indicator for fiscal 2017 if we raised the discount rate by 1.0 percent.  Subsequent to June 30, 2017, we acquired the Patient Recovery Business as discussed in Note 18, which will be included in the Medical Unit going forward and is expected to significantly contribute to the profit of this unit.

Intangible assets with finite lives are amortized using a combination of straight-line and accelerated methods based on the expected cash flows from the asset over their estimated useful lives. We review intangible assets with finite lives for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable.

The impairment test for indefinite-lived intangibles other than goodwill (primarily IPR&D) requires comparing the fair value of the indefinite-lived intangible asset to the carrying value of the asset as of the impairment testing date.

We estimate the fair value of our indefinite-lived intangibles under the income approach using a discounted cash flow model. We use our internal forecasts to estimate future cash flows, which we believe are consistent with those of a market participant, and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for the indefinite-lived intangible including, among other factors, assumptions on regulatory approval for IPR&D.

Determining whether an impairment of indefinite-lived intangibles occurred requires estimating future undiscounted cash flows expected to be generated by the asset group. Actual results may differ materially from those used in our forecasts.

See Note 1 of "Notes to Consolidated Financial Statements" for additional information regarding goodwill and other intangible assets.

## Vendor Reserves

In the ordinary course of business, our vendors may dispute deductions taken against payments otherwise due to them or assert other disputes. These disputed transactions are researched and resolved based upon findings of the research performed. At any given time, there are outstanding items in various stages of research and resolution. In determining appropriate reserves for areas of exposure with our vendors, we assess historical experience and current outstanding claims. We have established various levels of reserves based on the type of claim and status of review. For further discussion on the Vendor Reserves, see Note 1 of "Notes to Consolidated Financial Statements."

Vendor reserves were $50 million and $62 million at June 30, 2017 and 2016, respectively. Approximately 77 percent of the vendor reserve at the end of fiscal 2017 pertained to the Pharmaceutical segment compared to 66 percent at the end of fiscal 2016. The reserve balance will fluctuate due to variations in outstanding claims from period-to-period, timing of resolutions and specific vendor issues.

The ultimate outcome of specific claims may be different than our original estimate and may require adjustment. We believe, however, that reserves recorded for such disputes are reasonable based upon current facts and circumstances.

## Loss Contingencies and Self-Insurance

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated.

Because these matters are inherently unpredictable and unfavorable developments or outcomes can occur, assessing contingencies is highly subjective and requires judgments about future events.

We also self-insure for employee healthcare, certain product liability matters, auto liability, property and workers' compensation and maintain insurance for individual losses exceeding certain limits when available.

Self-insurance accruals include an estimate for expected settlements on pending claims, defense costs, administrative fees, claims adjustment costs and an estimate for claims incurred but not reported.

For certain types of exposures, we develop the estimate of expected ultimate costs to settle each claim which is based on specific information related to each claim if available. Other estimates are based on an assessment of outstanding claims, historical analysis and current payment trends. For claims incurred but not reported, the liabilities are calculated and derived in accordance with generally accepted actuarial practices or using an estimated lag period.

We regularly review contingencies and self-insurance accruals to determine whether our accruals and related disclosures are adequate. The amount of loss may differ from these estimates. See Note 8 of the "Notes to Consolidated Financial Statements" for additional information regarding loss contingencies and product liability lawsuits.

## Provision for Income Taxes

Our income tax expense, deferred income tax assets and liabilities, and unrecognized tax benefits reflect management's assessment of estimated future taxes to be paid on items in the consolidated financial statements.

The following table presents information about our tax position at June 30:

| (in millions) | 2017 | 2016 |
|---|---|---|
| Total deferred income tax assets (1) | $  692 | $   567 |
| Valuation allowance for deferred income tax assets (2) | (237) | (93) |
| Net deferred income tax assets | 455 | 474 |
| Total deferred income tax liabilities | (2,331) | (2,130) |
| Net deferred income tax liability | $(1,876) | $(1,656) |

(1)　Total deferred income tax assets included $378 million and $193 million of loss and tax credit carryforwards at June 30, 2017 and 2016, respectively.

(2)　The valuation allowance primarily relates to federal, state and international loss carryforwards for which the ultimate realization of future benefits is uncertain.

Expiring loss and credit carryforwards and the required valuation allowances are adjusted quarterly. After applying the valuation allowances, we do not anticipate any limitations on our use of any of the other net deferred income tax assets described above.

We believe that our estimates for the valuation allowances against deferred tax assets and unrecognized tax benefits are appropriate based on current facts and circumstances. The amount we ultimately pay when matters are resolved may differ from the amounts accrued. For a further discussion on Provision for Income Taxes, see Note 1 of the "Notes to the Consolidated Financial Statements."

Tax benefits from uncertain tax positions are recognized when it is more likely than not that the position will be sustained upon examination of the technical merits of the position, including resolutions of any related appeals or litigation processes. The amount recognized is measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon settlement.

If any of our assumptions or estimates were to change, an increase or decrease in our effective income tax rate by 1 percent would have caused income tax expense to increase or decrease $19 million for fiscal 2017. See Note 7 of the "Notes to Consolidated Financial Statements" for additional information regarding unrecognized tax benefits.

## Share-Based Compensation

Employee share-based compensation is recognized in the consolidated statements of earnings based on the grant date fair value of the awards. The grant date market price of our common shares determines the fair value of restricted share units and performance share units. The fair value of stock options is determined using a lattice valuation model. We believe the lattice model provides reasonable estimates because it takes into account employee exercise patterns based on changes in our stock price and other variables and it provides for a range of input assumptions.

We analyze historical data to estimate option exercise behaviors and post-vesting forfeitures to be used within the lattice model. The expected life of the options granted, which represents the length of time in years that the options granted are expected to be outstanding,

is calculated from the option valuation model. Expected volatilities are based on implied volatility from traded options on our common shares and historical volatility over a period of time commensurate with the contractual term of the option grant (up to ten years).The forfeiture estimates are adjusted as circumstances change and ultimately reflect actual forfeitures when an award vests. Actual forfeitures in future reporting periods could be higher or lower than our current estimates. Compensation expense for nonvested performance share units depends on our periodic assessment of the probability of the targets being achieved and our estimate, which may vary over time, of the number of shares that ultimately will be issued. See Note 16 of the "Notes to Consolidated Financial Statements" for additional information regarding share-based compensation.

# Explanation and Reconciliation of Non-GAAP Financial Measures

This report, including the "Fiscal 2017 Overview" section within MD&A, contains financial measures that are not calculated in accordance with GAAP. In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this report for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics allows for a better comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion allows for better comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and their exclusion results in a metric that more meaningfully reflects the sustainability of our operating performance.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount. Beginning in the third quarter of fiscal 2017, consistent with the presentation of financial results by peer medical device companies, in litigation recoveries or charges, net we began to classify accrued losses and legal fees, net of expected recoveries, related to mass tort product liability claims, including claims for injuries allegedly caused by Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Such amounts would not have materially affected litigation recoveries or charges, net in prior periods, so have not been reclassified for those periods.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the items listed above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

# Definitions

**Growth rate calculation**: growth rates in this report are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes**: earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Explanation and Reconciliation of Non-GAAP Financial Measures**

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[1,2] | Net Earnings[1,2] Growth Rate | Diluted EPS[1,2] | Diluted EPS[1,2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | **Fiscal Year 2017** | | | | | |
| **GAAP** | $ 2,120 | (14)% | $ 1,924 | $ 630 | $ 1,288 | (10)% | $ 4.03 | (7)% |
| Restructuring and employee severance | 56 | | 56 | 20 | 36 | | 0.11 | |
| Amortization and other acquisition-related costs | 527 | | 527 | 165 | 362 | | 1.13 | |
| Impairments and loss on disposal of assets | 18 | | 18 | 6 | 12 | | 0.04 | |
| Litigation (recoveries)/charges, net | 48 | | 48 | 19 | 29 | | 0.09 | |
| **Non-GAAP** | $ 2,769 | (4)% | $ 2,572 | $ 839 | $ 1,727 | — % | $ 5.40 | 3 % |
| | | | Fiscal Year 2016 | | | | | |
| GAAP | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and loss on disposal of assets | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | (69) | | (69) | (27) | (42) | | (0.13) | |
| Non-GAAP | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |
| | | | Fiscal Year 2015 | | | | | |
| GAAP | $ 2,161 | 15 % | $ 1,967 | $ 755 | $ 1,212 | 4 % | $ 3.61 | 7 % |
| Restructuring and employee severance | 44 | | 44 | 15 | 29 | | 0.09 | |
| Amortization and other acquisition-related costs | 281 | | 281 | 100 | 181 | | 0.54 | |
| Impairments and (gain)/loss on disposal of assets | (19) | | (19) | (10) | (9) | | (0.03) | |
| Litigation (recoveries)/charges, net | 5 | | 5 | (14) | 19 | | 0.06 | |
| Loss on extinguishment of debt | — | | 60 | 23 | 37 | | 0.11 | |
| Non-GAAP | $ 2,472 | 16 % | $ 2,339 | $ 870 | $ 1,469 | 11 % | $ 4.38 | 14 % |
| | | | Fiscal Year 2014 | | | | | |
| GAAP | $ 1,885 | 89 % | $ 1,798 | $ 635 | $ 1,163 | 247 % | $ 3.37 | 247 % |
| Restructuring and employee severance | 31 | | 31 | 11 | 20 | | 0.06 | |
| Amortization and other acquisition-related costs | 223 | | 223 | 79 | 144 | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | 15 | | 15 | 5 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (21) | | (21) | (8) | (13) | | (0.04) | |
| Non-GAAP | $ 2,133 | 4 % | $ 2,047 | $ 722 | $ 1,324 | 3 % | $ 3.84 | 3 % |
| | | | Fiscal Year 2013 | | | | | |
| GAAP | $ 996 | (44)% | $ 888 | $ 553 | $ 335 | (69)% | $ 0.97 | (68)% |
| Restructuring and employee severance | 71 | | 71 | 27 | 44 | | 0.13 | |
| Amortization and other acquisition-related costs | 158 | | 158 | 52 | 106 | | 0.31 | |
| Impairments and (gain)/loss on disposal of assets | 859 | | 859 | 37 | 822 | | 2.39 | |
| Litigation (recoveries)/charges, net | (38) | | (38) | (15) | (23) | | (0.07) | |
| Non-GAAP | $ 2,046 | 10 % | $ 1,938 | $ 654 | $ 1,284 | 15 % | $ 3.73 | 16 % |

[1] from continuing operations

[2] attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

# Selected Financial Data

The consolidated financial data below includes all business combinations as of the date of acquisition that occurred during these periods. The following selected consolidated financial data should be read in conjunction with the consolidated financial statements and related notes and MD&A.

| (in millions, except per common share amounts) | 2017 | 2016 | 2015 | 2014 | 2013 (1) |
|---|---|---|---|---|---|
| **Earnings Data:** | | | | | |
| Revenue | $ 129,976 | $ 121,546 | $ 102,531 | $ 91,084 | $ 101,093 |
| | | | | | |
| Operating earnings | 2,120 | 2,459 | 2,161 | 1,885 | 996 |
| | | | | | |
| Earnings from continuing operations | 1,294 | 1,431 | 1,212 | 1,163 | 335 |
| Earnings/(loss) from discontinued operations, net of tax | — | — | 3 | 3 | (1) |
| Net earnings | 1,294 | 1,431 | 1,215 | 1,166 | 334 |
| Less: Net earnings attributable to noncontrolling interests | (6) | (4) | — | — | — |
| Net earnings attributable to Cardinal Health, Inc. | $ 1,288 | $ 1,427 | $ 1,215 | $ 1,166 | $ 334 |
| | | | | | |
| **Basic earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Continuing operations | $ 4.06 | $ 4.36 | $ 3.65 | $ 3.41 | $ 0.98 |
| Discontinued operations | — | — | 0.01 | 0.01 | — |
| Net basic earnings per common share attributable to Cardinal Health, Inc. | $ 4.06 | $ 4.36 | $ 3.66 | $ 3.42 | $ 0.98 |
| | | | | | |
| **Diluted earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Continuing operations | $ 4.03 | $ 4.32 | $ 3.61 | $ 3.37 | $ 0.97 |
| Discontinued operations | — | — | 0.01 | 0.01 | — |
| Net diluted earnings per common share attributable to Cardinal Health, Inc. | $ 4.03 | $ 4.32 | $ 3.62 | $ 3.38 | $ 0.97 |
| | | | | | |
| Cash dividends declared per common share | $ 1.8091 | $ 1.6099 | $ 1.4145 | $ 1.2500 | $ 1.0900 |
| | | | | | |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 40,112 | $ 34,122 | $ 30,142 | $ 26,033 | $ 25,819 |
| Long-term obligations, less current portion | 9,068 | 4,952 | 5,211 | 3,171 | 3,686 |
| Total Cardinal Health, Inc. shareholders' equity | 6,808 | 6,554 | 6,256 | 6,401 | 5,975 |

(1)   During fiscal 2013, we recognized a non-cash goodwill impairment charge of $829 million ($799 million, net of tax) related to our Nuclear Pharmacy Services division.

# Quantitative and Qualitative Disclosures About Market Risk

We are exposed to cash flow and earnings fluctuations as a result of certain market risks. These market risks primarily relate to foreign exchange, interest rate, and commodity price-related changes. We maintain a hedging program to manage volatility related to these market exposures which employs operational, economic, and derivative financial instruments in order to mitigate risk. See Note 1 and Note 11 of the "Notes to Consolidated Financial Statements" for further discussion regarding our use of derivative instruments.

## Foreign Exchange Rate Sensitivity

By the nature of our global operations, we are exposed to cash flow and earnings fluctuations resulting from foreign exchange rate variation. These exposures are transactional and translational in nature. Principal drivers of this foreign exchange exposure include the Canadian dollar, Euro, Thai baht, Mexican peso, Japanese yen, Chinese renminbi, Philippine peso, Singapore dollar, Russian ruble, and Australian dollar.

### Transactional Exposure

Transactional exposure arises from the purchase and sale of goods and services in currencies other than our functional currency or the functional currency of our subsidiaries. As part of our risk management program, at the end of each fiscal year we perform a sensitivity analysis on our forecasted transactional exposure for the upcoming fiscal year. These analyses include the estimated impact of our hedging program, which is designed to mitigate transactional exposure. Our forecasted transactional exposure at June 30, 2017 increased from the prior year primarily as a result of the increased transaction volume in foreign currencies due to the acquisition of Cordis, and we expect our transactional exposure to further increase in fiscal 2018 due to our acquisition of the Patient Recovery Business. At June 30, 2017 and 2016, we had hedged approximately 25 and 29 percent of transactional exposures, respectively.

The following table summarizes the analysis as it relates to transactional exposure and the impact of a hypothetical 10 percent fluctuation in foreign currency exchange rates, assuming rates collectively shift in the same direction and we are unable to change customer pricing in response to those shifts, for the upcoming fiscal year:

| (in millions) | June 30 | | | |
|---|---|---|---|---|
| | 2017 (1) | | 2016 | |
| Net hypothetical transactional exposure | $ | 638 | $ | 621 |
| | | | | |
| Sensitivity gain/loss | $ | 64 | $ | 62 |
| Estimated offsetting impact of hedges | | (16) | | (18) |
| **Hypothetical net gain/loss** | $ | 48 | $ | 44 |

(1)  This analysis excludes exposures that may be added as a result of acquisitions that have not yet closed as of June 30, 2017.

### Translational Exposure

We have exposure related to the translation of financial statements of our foreign operations into U.S. dollars, our functional currency. We perform a similar analysis to that previously described related to this translational exposure. Our forecasted translational exposure at June 30, 2017 was essentially flat compared to the prior period, however we expect our translational exposure to increase in fiscal 2018 due to our acquisition of the Patient Recovery Business. We have not typically hedged any of our translational exposure and no hedging impact was included in our analysis at June 30, 2017 and 2016.

The following table summarizes translational exposure and the impact of a hypothetical 10 percent strengthening or weakening in the U.S. dollar, assuming rates collectively shift in the same direction, for the upcoming fiscal year:

| (in millions) | June 30 | | | |
|---|---|---|---|---|
| | 2017 (1) | | 2016 | |
| Net hypothetical translational exposure | $ | 199 | $ | 201 |
| Sensitivity gain/loss | | 20 | | 20 |

(1)  This analysis excludes exposures that may be added as a result of acquisitions that have not yet closed as of June 30, 2017.

## Interest Rate Sensitivity

We are exposed to changes in interest rates primarily as a result of our borrowing and investing activities to maintain liquidity and fund operations. The nature and amount of our long-term and short-term debt can be expected to fluctuate as a result of business requirements, market conditions and other factors. Our policy is to manage exposures to interest rates using a mix of fixed and floating rate debt as deemed appropriate by management. We utilize interest rate swap instruments to mitigate our exposure to interest rate movements.

As part of our risk management program, we perform an annual sensitivity analysis on our forecasted exposure to interest rates for the upcoming fiscal year. This analysis assumes a hypothetical 50 basis point change in interest rates. At June 30, 2017 and 2016, the potential increase or decrease in annual interest expense under this analysis as a result of this hypothetical change was $16 million and $9 million, respectively.

We are also exposed to market risk from changes in interest rates related to our cash and cash equivalents, which includes marketable securities that are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. The fair value of our cash and cash equivalents is subject to change primarily as a result of changes in market interest rates and investment risk related to the issuers' credit worthiness. At both June 30, 2017 and 2016, a hypothetical increase or decrease of 50 basis points in interest rates would cause a potential increase or decrease of up to $1 million and $11 million, respectively, in the estimated fair value.

## Commodity Price Sensitivity

We are directly exposed to market price changes for certain commodities, including oil-based resins, nitrile, cotton, diesel fuel and latex. We typically purchase raw materials at either market prices or prices tied to a commodity index and some finished goods at prices based in part on a commodity price index. We also are indirectly exposed to fluctuations in certain commodity prices through the purchase of finished goods and various energy-related commodities, including natural gas and electricity, through our normal course of business where our contracts are not directly tied to a commodity index. As part of our risk management program, we perform sensitivity analysis on our forecasted commodity exposure for the upcoming fiscal year. Our forecasted commodity exposure at June 30, 2017 was essentially flat compared to the prior period, however we expect our commodity exposure to increase in fiscal 2018 due to our acquisition of the Patient Recovery Business. At June 30, 2017 and 2016, we had hedged a portion of these direct commodity exposures (see Note 11 of the "Notes to Consolidated Financial Statements" for further discussion).

The table below summarizes our analysis of these forecasted direct and indirect commodity exposures and the potential gain/loss given a hypothetical 10 percent fluctuation in commodity prices, assuming pricing collectively shifts in the same direction and we are unable to change customer pricing in response to those shifts, for the upcoming fiscal year:

| | June 30 | | |
|---|---|---|---|
| (in millions) | 2017 (1) | | 2016 |
| Hypothetical commodity exposure | $ | 411 | $ 417 |
| | | | |
| Sensitivity gain/loss | $ | 41 | $ 42 |
| Hypothetical offsetting impact of hedges | | (1) | (1) |
| **Hypothetical net gain/loss** | $ | 40 | $ 41 |

(1)  This analysis excludes exposures that may be added as a result of acquisitions that have not yet closed as of June 30, 2017.

We believe our total gross range of direct and indirect exposure to commodities, excluding exposure that may be added as a result of the acquisition of the Patient Recovery Business, is $400 million to $500 million for fiscal 2018.

# Business

## General

Cardinal Health, Inc. is a global, integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. We provide medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. We connect patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management.

## Pharmaceutical Segment

In the United States, our Pharmaceutical segment:

- distributes branded and generic pharmaceutical and over-the-counter healthcare and consumer products through its Pharmaceutical Distribution division to retailers (including chain and independent drug stores and pharmacy departments of supermarkets and mass merchandisers), hospitals and other healthcare providers. This division:

  - maintains prime vendor relationships that streamline the purchasing process resulting in greater efficiency and lower costs for our retail, hospital and other healthcare provider customers;

  - provides services to pharmaceutical manufacturers, including distribution, inventory management, data reporting, new product launch support and chargeback administration;

  - provides pharmacy management services to hospitals as well as medication therapy management and patient outcomes services to hospitals, other healthcare providers and payers, and operates pharmacies in community health centers; and

  - repackages generic pharmaceuticals and over-the-counter healthcare products;

- distributes specialty pharmaceutical products to hospitals and other healthcare providers; provides consulting, patient support and other services for specialty pharmaceutical products to pharmaceutical manufacturers and healthcare providers; and provides specialty pharmacy services through its Specialty Solutions division; and

- operates nuclear pharmacies and manufacturing facilities through its Nuclear Pharmacy Services division, which manufactures, prepares and delivers radiopharmaceuticals for use in nuclear imaging and other procedures in hospitals and physician offices. During fiscal 2017, this division also began operating a facility to contract manufacture a radiopharmaceutical treatment (Xofigo) and acquired the North American rights to Lymphoseek, a radiopharmaceutical diagnostic imaging agent.

In China, the Pharmaceutical segment distributes branded, generic and specialty pharmaceutical, over-the-counter healthcare and consumer products, provides logistics, marketing and other services and operates direct-to-patient specialty pharmacies through Cardinal Health China. In July 2017, we announced that we are exploring strategic alternatives for the Cardinal Health China pharmaceutical and medical distribution businesses. Our other medical product businesses in China, including Cordis and the Patient Recovery Business acquired from Medtronic, are not part of this exploration.

See Note 15 of the "Notes to Consolidated Financial Statements" for Pharmaceutical segment revenue, profit and assets for fiscal 2017, 2016 and 2015.

### Pharmaceutical Distribution

Our Pharmaceutical Distribution division's gross margin includes margin from our generic pharmaceutical program, from distribution services agreements with branded pharmaceutical manufacturers and from over-the-counter healthcare and consumer products. It also includes manufacturer cash discounts.

Margin from our generic pharmaceutical program includes price discounts and rebates from manufacturers and may include price appreciation on some products. Our earnings on generic pharmaceuticals are generally highest during the period immediately following the initial launch of a product, because generic pharmaceutical selling prices are generally highest during that period and tend to decline over time.

Margin from distribution services agreements with branded pharmaceutical manufacturers relates primarily to fees we receive for providing a range of distribution and related services to manufacturers and also, to a lesser extent, includes benefits from price appreciation on branded pharmaceutical products.

### Sourcing Venture With CVS Health Corporation

In July 2014, we established Red Oak Sourcing, a U.S.-based generic pharmaceutical sourcing venture with CVS with an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies.

### Specialty Pharmaceutical Products and Services

We refer to products and services offered by our Specialty Solutions division as "specialty pharmaceutical products and services." The Specialty Solutions division distributes oncology, rheumatology, urology, nephrology and other pharmaceutical products ("specialty pharmaceutical products") and human-derived plasma products to hospitals, dialysis clinics, physician offices and other healthcare providers; provides consulting, patient support, logistics, group purchasing and other services to pharmaceutical manufacturers and healthcare providers primarily supporting the development, marketing and distribution of specialty pharmaceutical products; and provides specialty pharmacy services. Our use of the

terminology "specialty pharmaceutical products and services" may not be comparable to the terminology used by other industry participants.

# Medical Segment

Our Medical segment manufactures and sources Cardinal Health branded medical, surgical and laboratory products, including cardiovascular and endovascular products; wound care products; single-use surgical drapes, gowns and apparel; exam and surgical gloves; and fluid suction and collection systems. We further expanded this segment's portfolio of manufactured products through the acquisition of the Patient Recovery Business from Medtronic in July 2017, which includes incontinence, wound care, enteral feeding, urology, operating room supply, electrode and needle, syringe and sharps disposal product lines. Our manufactured products are sold directly or through third-party distributors in the United States, Canada, Europe, Asia and other markets.

The Medical segment also distributes a broad range of national brand products and provides supply chain services and solutions to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China.

This segment also distributes medical products to patients' homes in the United States through our Cardinal Health at Home division and provides services and software to hospitals, other healthcare providers and payers to help manage the complex processes of patient discharge from an acute-care facility ("post-acute care") through naviHealth.

This segment also assembles and sells sterile and non-sterile procedure kits. It also provides supply chain services, including spend management, distribution management and inventory management services, to healthcare providers.

See Note 15 of the "Notes to Consolidated Financial Statements" for Medical segment revenue, profit and assets for fiscal 2017, 2016 and 2015.

# Acquisitions

We have acquired a number of businesses over the years that have enhanced our core strategic areas of self-manufactured medical products, generic pharmaceutical distribution and services, specialty pharmaceutical products and services, international and post-acute care. We expect to continue to pursue additional acquisitions in the future.

During the last five fiscal years, we completed the following three large acquisitions:

| Date | Company | Location | Lines of Business | Acquisition Price (in millions) |
|------|---------|----------|-------------------|----------------------------------|
| 10/15 | Cordis business of Johnson & Johnson | Fremont, CA | Cardiovascular and endovascular products | $1,944 |
| 07/15 | The Harvard Drug Group | Livonia, MI | Pharmaceutical product distribution | $1,115 |
| 03/13 | AssuraMed, Inc. | Twinsburg, OH | Medical product distribution to patients' homes | $2,070 |

We have also completed several smaller acquisitions during the last five fiscal years, including: in fiscal 2017, the acquisition of the North American rights to Lymphoseek, a radiopharmaceutical diagnostic imaging agent, from Navidea Biopharmaceuticals, Inc.; in fiscal 2016, the acquisition of an 82 percent ownership interest in naviHealth, a provider of post-acute care management services, and CuraSpan Health Group, Inc., a provider of discharge planning and care transition software; in fiscal 2015, the acquisitions of Tradex International, Inc., a supplier of disposable gloves, and Metro Medical Supply, Inc., a distributor of specialty pharmaceuticals and medical and surgical products; and in fiscal 2014, the acquisition of Access Closure, Inc., a manufacturer and distributor of extravascular closure devices.

As discussed above, on July 29, 2017, we acquired the Patient Recovery Business from Medtronic for $6.1 billion in cash.

**Business**

## Customers

Our largest customers, CVS and OptumRx, accounted for 23 percent and 11 percent of our fiscal 2017 revenue, respectively. In the aggregate, our five largest customers, including CVS and OptumRx, accounted for 50 percent of our fiscal 2017 revenue. Our pharmaceutical distribution agreements with CVS extend through June 2019.

We have agreements with group purchasing organizations ("GPOs") that act as agents to negotiate vendor contracts on behalf of their members. Our two largest GPO relationships in terms of member revenue are with Vizient Inc. and Premier, Inc. Sales to members of these two GPOs, under numerous contracts across all of our businesses, collectively accounted for 21 percent of our revenue in fiscal 2017.

## Suppliers

We rely on many different suppliers. Products obtained from our five largest suppliers accounted for an aggregate of 27 percent of our revenue during fiscal 2017, but no single supplier's products accounted for more than 7 percent of revenue.

## Competition

We operate in a highly competitive environment in the distribution of pharmaceuticals and related healthcare services. We also operate in a highly competitive environment in the development, manufacturing and distribution of medical and surgical products. We compete on many levels, including price, service offerings, support services, breadth of product lines and product quality and efficacy.

In the Pharmaceutical segment, we compete with wholesale distributors with national reach (including McKesson Corporation and AmerisourceBergen Corporation), regional wholesale distributors, self-warehousing chains, specialty distributors, third-party logistics companies, companies that provide specialty pharmaceutical services and nuclear pharmacies, among others. In addition, the Pharmaceutical segment has experienced competition from a number of organizations offering generic pharmaceuticals, including telemarketers. We also compete with manufacturers that sell their products directly.

In the Medical segment, our manufacturing and procedural kit businesses compete with diversified healthcare companies as well as companies that are more focused on specific product categories. We also compete with many different national medical product distributors, including Medline Industries, Inc. and Owens & Minor, Inc., regional medical product distributors, companies that distribute medical products to patients' homes and third-party logistics companies. In addition, we compete with manufacturers that sell their products directly.

## Employees

At June 30, 2017, we had approximately 28,000 employees in the United States and approximately 12,400 employees outside of the United States. In July 2017, we added approximately 3,500 employees in the United States and approximately 5,900 employees outside the United States through the acquisition of the Patient Recovery Business. Overall, we consider our employee relations to be good.

## Intellectual Property

We rely on a combination of trade secret, patent, copyright and trademark laws, nondisclosure and other contractual provisions, and technical measures to protect our products, services and intangible assets. We hold patents, and continue to pursue patent protection throughout the world, relating to the manufacture, operation and use of various medical and surgical products, to certain distribution and logistics systems, to the production and distribution of our nuclear pharmacy products and to other service offerings. We also operate under licenses for certain proprietary technologies, and in certain instances we license our technologies to third parties.

We believe that we have taken all necessary steps to protect our proprietary rights, but no assurance can be given that we will be able to successfully enforce or protect our rights in the event that they are infringed upon by a third party. While all of these proprietary rights are important to our operations, we do not consider any particular patent, trademark, license, franchise or concession to be material to our overall business.

# Regulatory Matters

Our business is highly regulated in the United States, at both the federal and state level, and in foreign countries. Depending upon the specific business, we may be subject to regulation by government entities including:

- the U.S. Drug Enforcement Administration (the "DEA");
- state controlled substance authorities and boards of pharmacy;
- certain agencies within the U.S. Department of Health and Human Services, including the U.S. Food and Drug Administration (the "FDA"), the Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights;
- state health departments, insurance departments, Medicaid departments or other comparable state agencies;
- the U.S. Nuclear Regulatory Commission (the "NRC");
- the U.S. Federal Trade Commission (the "FTC");
- U.S. Customs and Border Protection; and
- agencies comparable to those listed above in markets outside the United States.

These regulatory agencies have a variety of civil, administrative and criminal sanctions at their disposal for failure to comply with applicable legal or regulatory requirements. They can suspend our ability to manufacture and distribute products, initiate product recalls, seize products or impose criminal, civil and administrative sanctions.

## Distribution
The FDA, DEA and various state authorities regulate the marketing, purchase, storage and distribution of pharmaceutical and medical products under various federal and state statutes including the federal Prescription Drug Marketing Act of 1987, Drug Quality and Security Act of 2013 (the "DQSA"), and Controlled Substances Act (the "CSA"). The CSA governs the sale, packaging, storage and distribution of controlled substances. Wholesale distributors of controlled substances must hold valid DEA registrations and state-level licenses, meet various security and operating standards, and comply with the CSA.

## Manufacturing and Marketing
We sell our manufactured products in the United States, Canada, Europe, Asia and other markets. The FDA and other governmental agencies in the United States, as well as foreign governmental agencies, administer requirements that cover the design, testing, safety, effectiveness, manufacturing (including good manufacturing practices), quality systems, labeling, promotion and advertising (including restrictions on promoting or advertising a product other than for the product's cleared or approved uses), distribution, importation and post-market surveillance for most of our manufactured products. In addition, we need specific approval or clearance from, and registrations with, regulatory authorities before we can market and sell some products in the United States and certain other countries, including countries in the European Union ("EU").

In the United States, authorization to commercially market a medical device is generally received in one of two ways. The first, known as pre-market notification or the 510(k) process, requires us to demonstrate that a medical device is substantially equivalent to a legally marketed medical device. The second more rigorous process, known as pre-market approval ("PMA"), requires us to independently demonstrate that a medical device is safe and effective. Many of our Medical segment products are cleared through the 510(k) process and certain Cordis products must be approved through the PMA process.

In the EU, we are required to comply with applicable Medical Device Directives ("MDDs") and obtain CE Mark Certification in order to market medical devices. The EU regulatory bodies finalized a new Medical Device Regulation ("MDR") in 2017, which replaces the existing MDDs after a three-year transition period. Among other things, the MDR clarifies that private label distributors are deemed to be the manufacturer, which will increase our regulatory obligations in the EU with respect to private label products.

It can be costly and time-consuming to obtain regulatory approvals, clearances and registrations of medical devices, and they might not be granted on a timely basis, if at all. Even after we obtain approval or clearance to market a product or obtain product registrations, the product and our manufacturing processes are subject to continued regulatory oversight, including periodic inspection of manufacturing facilities by FDA and other regulatory authorities both in the United States and internationally.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action, which may include recalling the product, correcting the product at the customer location, revising product labeling and notifying customers.

## Nuclear Pharmacies and Related Businesses
Our nuclear pharmacies and radiopharmaceutical manufacturing facilities (including for Xofigo) require licenses or permits and must abide by regulations issued by the NRC, applicable state boards of pharmacy and the radiologic health agency or department of health of each state in which we operate, including pharmacy sterile compounding standards and practices. In addition, our radiopharmaceutical manufacturing facilities also must comply with FDA regulations, including good manufacturing practices.

## Product Tracing and Supply Chain Integrity
Title II of the DQSA, known as the Drug Supply Chain Security Act, establishes a phased-in national system for tracing pharmaceutical products through the pharmaceutical distribution supply chain to prevent the introduction of counterfeit, adulterated or mislabeled drugs. The first phase of implementation began in 2015, and upon full implementation in 2023, we and other supply chain stakeholders will participate in an electronic, interoperable, prescription drug tracing system. In addition, the FDA also has issued regulations requiring most medical device labeling to bear a unique device identifier. These regulations are being phased in through 2020. The

**Business**

MDR finalized in the EU in 2017 also introduces a new unique device identifier requirement with a three-year transition period.

## Government Healthcare Programs

We are subject to U.S. federal healthcare fraud and abuse laws. These laws generally prohibit persons from soliciting, offering, receiving or paying any compensation in order to induce someone to order, recommend or purchase products or services that are in any way paid for by Medicare, Medicaid or other federally-funded healthcare programs. They also prohibit submitting any fraudulent claim for payment by the federal government. There are similar state healthcare fraud and abuse laws that apply to Medicaid and other state-funded healthcare programs. Violations of these laws may result in criminal or civil penalties, as well as breach of contract claims and *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments).

Some businesses within each of our segments are Medicare-certified suppliers or participate in other federal and state healthcare programs, such as state Medicaid programs and the federal 340B drug pricing program. These businesses are subject to accreditation and quality standards and other rules and regulations, including applicable reporting, billing, payment and record-keeping requirements. Other businesses within each segment manufacture pharmaceutical or medical products or repackage pharmaceuticals that are purchased or reimbursed through, or are otherwise governed by, federal or state healthcare programs. Failure to comply with applicable eligibility requirements, standards and regulations could result in civil or criminal sanctions, including the loss of our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

Our U.S. federal and state government contracts are subject to specific procurement requirements. Failure to comply with applicable rules or regulations or with contractual or other requirements may result in monetary damages and criminal or civil penalties as well as termination of our government contracts or our suspension or debarment from government contract work.

## Health and Personal Information Practices

We collect, handle and maintain patient-identifiable health information. The U.S. Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as augmented by the Health Information Technology for Economic and Clinical Health Act, and state laws regulate the use and disclosure of patient-identifiable health information, including requiring specified privacy and security

measures. We also collect, handle and maintain other sensitive personal and financial information that is subject to U.S. federal and state laws protecting such information.

The processing and disclosure of personal information is also highly regulated in many other countries in which we operate. In Europe, for example, we are subject to the EU data protection regulations, including the current EU Directive on Data Protection, which requires member states to impose minimum restrictions on the collection, use and transfer of personal data. A new EU General Data Protection Regulation ("GDPR") that will become effective in 2018 and will apply uniformly across the EU includes, among other things, a requirement for prompt notice of data breaches to data subjects and supervisory authorities in certain circumstances and significant fines for non-compliance. The GDPR also requires companies processing personal data of individuals residing in the EU to comply with EU privacy and data protection rules.

## Antitrust Laws

The U.S. federal government, most U.S. states and many foreign countries have laws that prohibit certain types of conduct deemed to be anti-competitive. Violations of these laws can result in various sanctions, including criminal and civil penalties. Private plaintiffs also could bring civil lawsuits against us in the United States for alleged antitrust law violations, including claims for treble damages.

## Environmental, Health and Safety Laws

In the United States and other countries, we are subject to various federal, state and local environmental laws, as well as laws relating to safe working conditions and laboratory practices.

## Laws Relating to Foreign Trade and Operations

U.S. and foreign laws require us to abide by standards relating to the import and export of finished goods, raw materials and supplies and the handling of information. We also must comply with various export control and trade embargo laws, which may require licenses or other authorizations for transactions within some countries or with some counterparties.

Similarly, we are subject to U.S. and foreign laws concerning the conduct of our foreign operations, including the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws, the U.K. Bribery Act and other foreign anti-bribery laws. Among other things, these laws generally prohibit companies and their intermediaries from offering, promising or making payments to officials of foreign governments for the purpose of obtaining or retaining business.

## Other Information

Although our agreements with manufacturers sometimes require us to maintain inventory levels within specified ranges, our distribution businesses are generally not required by our customers to maintain particular inventory levels other than as needed to meet service level requirements. Certain supply contracts with U.S. government entities require us to maintain sufficient inventory to meet emergency demands, but we do not believe those requirements materially affect inventory levels.

Our customer return policies generally require that the product be physically returned, subject to restocking fees. We only allow customers to return products that can be added back to inventory and resold at full value, or that can be returned to vendors for credit.

We offer market payment terms to our customers.

## Revenue and Long-Lived Assets by Geographic Area

See Note 15 of the "Notes to Consolidated Financial Statements" for revenue and long-lived assets by geographic area.

# Risk Factors

The risks described below could materially and adversely affect our results of operations, financial condition, liquidity or cash flows. These are not the only risks we face. Our businesses also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

**We could suffer the adverse effects of competitive pressures.**

As described in greater detail in the "Business" section, we operate in markets that are highly competitive. Because of competition, our businesses face continued pricing pressure from our customers and suppliers. If we are unable to offset margin reductions caused by these pricing pressures through steps such as sourcing or cost control measures, additional service offerings and sales of higher margin products, our results of operations and financial condition could be adversely affected.

**Our Pharmaceutical segment's generic pharmaceutical program could be adversely affected by pricing changes and fewer product launches.**

Prices for generic pharmaceuticals generally decline over time. During fiscal 2017, generic pharmaceutical customer pricing changes negatively impacted Pharmaceutical segment profit and our consolidated operating earnings and are expected to have a similar negative effect in fiscal 2018. At times, some generic pharmaceuticals may experience price appreciation, which can positively affect our margins. The number of generic pharmaceuticals experiencing price appreciation or declines and the magnitude of pricing changes is uncertain in future fiscal years, and could adversely affect our margins.

The number of new generic pharmaceutical launches also varies from year to year, and the margin impact of these launches varies from product to product. Fewer product launches or launches that are less profitable than prior launches could adversely affect our margins.

Our generic pharmaceutical program has benefited from sourcing generic pharmaceuticals through our Red Oak Sourcing venture with CVS, which sources for both us and CVS. If the venture does not continue to be successful, our margins could be adversely affected.

**Our Pharmaceutical segment's margins under our distribution services agreements with branded pharmaceutical manufacturers are affected by service fees we receive from the manufacturers and prices established by the manufacturers.**

Our distribution services agreements with branded pharmaceutical manufacturers generally provide that we receive fees from the manufacturers to compensate us for the services we provide them. Under some agreements, branded pharmaceutical price appreciation also serves as part of our compensation. If our service fees are reduced or, in cases where our compensation is based in part on branded pharmaceutical price appreciation, if manufacturers determine not to increase prices or to implement only small increases, our margins could be adversely affected.

**Our business is subject to rigorous regulatory and licensing requirements.**

As described in greater detail in the "Business" section, our business is highly regulated in the United States, at both the federal and state level, and in foreign countries. If we fail to comply with regulatory requirements, or if allegations are made that we fail to comply, our results of operations and financial condition could be adversely affected.

To lawfully operate our businesses, we are required to obtain and hold permits, product registrations, licenses and other regulatory approvals from, and to comply with operating and security standards of, numerous governmental bodies. For example, as a wholesale distributor of controlled substances, we must hold valid DEA registrations and state-level licenses, meet various security and operating standards, and comply with the CSA. Failure to maintain or renew necessary permits, product registrations, licenses or approvals, or to comply with required standards, could have an adverse effect on our results of operations and financial condition.

Products that we manufacture, source, distribute or market must comply with regulatory requirements. Noncompliance or concerns over noncompliance may result in suspension of our ability to distribute, import or manufacture products, product bans, recalls or seizures, or criminal or civil sanctions, which, in turn, could result in product liability claims and lawsuits, including class actions. In addition, it can be costly and time-consuming to obtain regulatory approvals or product registrations to market a medical device, and such approvals or registrations might not be granted on a timely basis, if at all.

We are required to comply with laws relating to healthcare fraud and abuse. The requirements of these laws are complex and subject to varying interpretations, and it is possible that regulatory authorities could challenge our policies and practices. If we fail to comply with these laws, we could be subject to federal or state government investigations or *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments), which could result in civil or criminal sanctions, including the loss of licenses or the ability to participate in Medicare, Medicaid and other federal and state healthcare programs. Such sanctions and damages could adversely affect our results of operations and financial condition.

Some businesses within each of our segments are Medicare-certified suppliers or participate in other federal and state healthcare programs, such as state Medicaid program and the federal 340B drug pricing program. In addition, other businesses within each segment manufacture pharmaceutical or medical products or repackage pharmaceuticals that are purchased or reimbursed through, or are otherwise governed by, federal or state healthcare programs. Failure to comply with applicable eligibility requirements, standards and regulations could result in civil or criminal sanctions, including the loss of our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

Our government contracts are subject to specific procurement requirements. Failure to comply with applicable rules or regulations or with contractual or other requirements may result in monetary damages and criminal or civil penalties as well as termination of our government contracts or our suspension or debarment from government contract work.

We collect, handle and maintain patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information. Regulations currently in place continue to evolve, and new laws in this area could further restrict our ability to collect, handle and maintain personal or patient information, or could require us to incur additional compliance costs, either of which could have an adverse impact on our results of operations. Violations of federal, state or foreign laws concerning privacy and data protection could subject us to civil or criminal penalties, breach of contract claims, costs for remediation and harm to our reputation.

Our global operations are required to comply with the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws, the U.K. Bribery Act and similar anti-bribery laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws. If we fail to comply with any of these laws, we could suffer civil or criminal sanctions.

Our China operations are subject to national, regional and local regulations. The regulatory environment in China is evolving, and officials in the Chinese government exercise broad discretion in deciding how to interpret and apply regulations. It is possible that the Chinese government's current or future interpretation and application of existing or new regulations will negatively impact our China operations, result in regulatory investigations or lead to fines or penalties.

**CVS is a large customer that generates a significant amount of our revenue.**

Our sales and credit concentration is significant. CVS accounted for 23 percent of our fiscal 2017 revenue and 20 percent of our gross trade receivable balance at June 30, 2017. Our pharmaceutical distribution agreements with CVS extend through June 2019. If CVS does not renew our agreements with them, terminates the agreements due to an alleged default by us, defaults in payment or significantly reduces its purchases from us, our results of operations and financial condition could be adversely affected.

**We could be subject to adverse changes in the tax laws or challenges to our tax positions.**

We are a large multinational corporation with operations in the United States and many foreign countries. As a result, we are subject to the tax laws of many jurisdictions.

From time to time, legislative initiatives are proposed in the United States and other jurisdictions in which we operate that could adversely affect our tax positions, effective tax rate or tax payments. Examples of such initiatives include the repeal of the LIFO (last-in, first-out) method of inventory accounting for income tax purposes, a change in the current U.S. taxation treatment of income from foreign operations, new U.S. import tariffs or taxes, the establishment or

increase in taxation at the U.S. state level on the basis of gross revenues, recommendations of the base erosion and profit shifting project undertaken by the Organization for Economic Cooperation and Development and the European Commission's investigation into illegal state aid.

Tax laws are complex and subject to varying interpretations. Tax authorities have challenged some of our tax positions and it is possible that they will challenge others. These challenges may adversely affect our effective tax rate or tax payments.

**Changes to the U.S. healthcare environment may not be favorable to us.**

In recent years, the U.S. healthcare industry has undergone significant changes designed to increase access to medical care, improve safety and patient outcomes, contain costs and increase efficiencies. These changes include adoption of the Patient Protection and Affordable Care Act, a general decline in Medicare and Medicaid reimbursement levels, efforts by healthcare insurance companies to limit or reduce payments to pharmacies and providers, the basis for payments beginning to transition from a fee-for-service model to value-based payments and risk-sharing models, and the industry shifting away from traditional healthcare venues like hospitals and into clinics, physician offices and patients' homes.

We expect the U.S. healthcare industry to continue to change significantly in the future. Possible changes include repeal and replacement of major parts of the Patient Protection and Affordable Care Act, further reduction or limitations on governmental funding at the state or federal level, efforts by healthcare insurance companies to further limit payments for products and services or changes in legislation or regulations governing prescription pharmaceutical pricing, healthcare services or mandated benefits. These possible changes, and the uncertainty surrounding these possible changes, may cause healthcare industry participants to reduce the amount of products and services they purchase from us or the price they are willing to pay for our products and services, which could adversely affect us.

**Consolidation in the U.S. healthcare industry may negatively impact our results of operations.**

In recent years, U.S. healthcare industry participants, including distributors, manufacturers, healthcare providers, insurers and pharmacy chains, have consolidated or formed strategic alliances. Consolidations create larger enterprises with greater negotiating power, and also could result in the possible loss of a customer where the combined enterprise selects one distributor from two incumbents. If this consolidation trend continues, it could adversely affect our results of operations.

**Our business and operations depend on the proper functioning of information systems, critical facilities and distribution networks. Our business could be adversely affected if we experience a cyber-attack or other systems breach.**

We rely on our and third-party service providers' information systems for a wide variety of critical operations, including to obtain, rapidly process, analyze and manage data to:

- facilitate the purchase and distribution of inventory items from numerous distribution centers;

**Risk Factors**

- receive, process and ship orders on a timely basis;
- manage accurate billing and collections for thousands of customers;
- process payments to suppliers;
- facilitate manufacturing and assembly of medical products; and
- generate financial information.

Our business also depends on the proper functioning of our critical facilities, including our national logistics center, and our distribution networks. Our results of operations could be adversely affected if our or a service provider's information systems, critical facilities or distribution networks are disrupted (including disruption of access), are damaged or fail, whether due to physical disruptions, such as fire, natural disaster, pandemic or power outage, or due to cyber-security incidents, ransomware or other actions of third parties, including labor strikes, political unrest and terrorist attacks. Manufacturing disruptions also can occur due to regulatory action, production quality deviations, safety issues or raw material shortages or defects, or because a key product is manufactured at a single manufacturing facility with limited alternate facilities.

The Pharmaceutical segment is in a multi-year project to replace certain of its finance and operating information systems. If these new systems are not effectively implemented or they fail to operate as intended, it could adversely affect the Pharmaceutical segment's supply chain operations and our internal control over financial reporting. In addition, from time to time, other businesses perform business process improvements or infrastructure modernizations or use service providers for key systems and processes, such as receiving and processing customer orders, customer service and accounts payable. If any of these initiatives are not successfully or efficiently implemented or maintained, they could adversely affect our business and our internal control over financial reporting.

Our business relies on the secure transmission, storage and hosting of patient-identifiable health information, financial information and other sensitive information relating to our customers, company and workforce. We have programs in place to detect, contain and respond to information security incidents. However, because the techniques used to obtain unauthorized access, disable or degrade service or sabotage systems change frequently and may be difficult to detect for long periods of time, we may be unable to anticipate these techniques or to implement adequate preventative measures. In addition, hardware, software or applications developed internally or procured from third parties may contain defects in design or manufacture or other problems that could unexpectedly compromise information security. Unauthorized parties also may attempt to gain access to our or a service provider's systems or facilities through fraud, trickery or other forms of deception. Any compromise of our or a service provider's information systems, including unauthorized access to or use or disclosure of sensitive information, could adversely impact our operations, results of operations or our ability to satisfy legal requirements, including those related to patient-identifiable health information.

**We may become involved in legal proceedings that could adversely impact our cash flows or results of operations.**

Due to the nature of our business, which includes the distribution of controlled substances and the manufacture of medical products, we may from time to time become involved in disputes, litigation and regulatory matters. Litigation is inherently unpredictable and the unfavorable outcome of one or more of these legal proceedings could adversely affect our results of operations or financial condition.

For example, a number of governmental entities (including counties and municipalities) have filed lawsuits against pharmaceutical wholesale distributors (including us), pharmaceutical manufacturers and retail chains relating to the distribution of prescription opioid pain medications. Some states and other governmental entities have indicated they are considering filing similar lawsuits. We are vigorously defending ourselves in these lawsuits. The defense and resolution of these current and future lawsuits could adversely affect our results of operations and financial condition. See Note 8 of the "Notes to Consolidated Financial Statements" regarding these matters.

Some of the products that we distribute or manufacture have been and may in the future be alleged to cause personal injury, subjecting us to product liability claims. For example, we are a defendant in product liability lawsuits that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products and we have accrued an amount for losses and legal defense costs related to these lawsuits, which are discussed in Note 8 of the "Notes to Consolidated Financial Statements." Any settlement of or judgment for a product liability claim that is not covered by insurance and is in excess of any prior accruals could adversely affect our results of operations and financial condition.

We also operate in an industry characterized by extensive intellectual property litigation. Patent litigation can result in significant damage awards and injunctions that could prevent the manufacture and sale of affected products or force us to make royalty payments in order to continue selling the affected products.

**Acquisitions can have unanticipated results.**

An important element of our growth strategy has been to acquire other businesses that expand or complement our existing businesses. In fiscal 2017, we spent $132 million to acquire other businesses and in July 2017, we acquired the Patient Recovery Business from Medtronic for $6.1 billion. The acquisition of the Patient Recovery Business as well as other acquisitions involve the following risks: we may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition; our management's attention may be diverted to integration efforts; we may fail to retain key personnel of the acquired business; future developments may impair the value of our purchased goodwill or intangible assets; we may face difficulties or delays establishing, integrating or combining operations and systems; we may assume liabilities related to legal proceedings involving the acquired business; we may face challenges retaining the customers of the acquired business; or we may encounter unforeseen internal control, regulatory or compliance issues.

**We depend on certain suppliers to make their raw materials and products available to us and are subject to fluctuations in costs of raw materials and products.**

We depend on the availability of various components, compounds, raw materials and energy supplied by others for our operations. In some instances, for reasons of quality assurance, cost effectiveness, or availability, we procure certain components and raw materials from a sole supplier. Any of our supplier relationships could be interrupted due to events beyond our control, including natural disasters, or could be terminated. In addition, due to the stringent regulations and requirements of the FDA regarding the manufacture of our products, we may not be able to quickly establish additional or replacement sources for certain components or materials. A sustained supply reduction or interruption, and an inability to develop alternative sources for such supply, could have an adverse effect on our business.

Our manufacturing businesses use oil-based resins, pulp, cotton, latex and other commodities as raw materials in many products. Prices of oil and gas also affect our distribution and transportation costs. Prices of these commodities are volatile and can fluctuate significantly, causing our costs to produce and distribute our products to fluctuate. Due to competitive dynamics and contractual limitations, we may be unable to pass along cost increases through higher prices. If we cannot fully offset cost increases through other cost reductions, or recover these costs through price increases or surcharges, our results of operations could be adversely affected.

**Our results of operations may suffer upon the bankruptcy, insolvency, or other credit failure of a customer that has a substantial amount owed to us.**
Most of our customers buy products and services from us on credit, which is made available to customers based on our assessment of creditworthiness. The bankruptcy, insolvency or other credit failure of any customer that has a substantial amount owed to us could adversely affect our results of operations.

**Recent acquisitions have increased the extent of our exposure to the economic, political and currency risks of international operations.**
We conduct our operations in various regions of the world outside of the United States, including Europe and Asia. The scope and complexity of our international operations expanded with the acquisitions of Cordis and the Patient Recovery Business and we may continue to expand our operations outside the United States. Global developments can affect our business in many ways. Our global operations are affected by local economic environments, including inflation, recession and competition. In addition, we conduct our business in U.S. dollars and various functional currencies of our foreign subsidiaries. Changes in foreign currency exchange rates could adversely affect our financial results, which are reported in U.S. dollars. We may not be able to hedge to protect us against these exposures, and any hedges may not successfully mitigate these exposures. Political changes also can disrupt our global operations, as well as our customers and suppliers, in a particular location. Divergent or unfamiliar regulatory systems and labor markets also can increase the risks and burdens of operating in numerous countries.

**Our goodwill may become impaired, which would require us to record a significant charge to earnings in accordance with generally accepted accounting principles.**
U.S. GAAP requires us to test our goodwill for impairment on an annual basis, or more frequently if indicators for potential impairment exist. The testing required by GAAP involves estimates and judgments by management. Although we believe our assumptions and estimates are reasonable and appropriate, any changes in key assumptions, including a failure to meet business plans or other unanticipated events and circumstances such as a rise in interest rates, may affect the accuracy or validity of such estimates. We may be required to record a significant charge to earnings in our consolidated financial statements during the period in which any impairment of our goodwill is determined, which charge could adversely affect our results of operations. See "Critical Accounting Policies and Sensitive Accounting Estimates" in MD&A above for more information regarding goodwill impairment testing.

**Economic conditions may adversely affect demand for our products and services.**
Deterioration in general economic conditions in the United States and other countries in which we do business could adversely affect the amount of prescriptions filled and the number of medical procedures undertaken and, therefore, reduce purchases of our products and services, which could adversely affect our results of operations. In addition, deteriorating economic conditions may increase bankruptcies, insolvencies or other credit failures of customers or suppliers, which, if they have a substantial amount owed to us, also could adversely affect our results of operations.

# Properties

In the United States and Puerto Rico, at June 30, 2017, the Pharmaceutical segment operated 24 primary pharmaceutical distribution facilities and one national logistics center; six specialty distribution facilities; and more than 140 nuclear pharmacy and radiopharmaceutical manufacturing facilities. The Medical segment operated more than 70 medical-surgical distribution, assembly, manufacturing and other operating facilities in the United States and Puerto Rico. Our U.S. operating facilities are located in 45 states.

Outside the United States and Puerto Rico, at June 30, 2017, our Medical segment operated 20 facilities in Canada, the Dominican Republic, Malaysia, Malta, Mexico and Thailand that engage in manufacturing, distribution or research. In addition, our Pharmaceutical and Medical segments utilized various distribution and pharmacy facilities in China.

At June 30, 2017, we owned more than 70 operating facilities and leased more than 230 operating facilities around the world. Our principal executive offices are headquartered in an owned building located at 7000 Cardinal Place in Dublin, Ohio.

In connection with the acquisition of the Patient Recovery Business in July 2017, we acquired nine manufacturing facilities in the United States and eight manufacturing facilities outside the United States in Canada, Costa Rica, Germany, Ireland, Japan, Malaysia, Mexico and Thailand.

We consider our operating properties to be in satisfactory condition and adequate to meet our present needs. However, we regularly evaluate operating properties and may make further additions and improvements or consolidate locations as we seek opportunities to expand or enhance the efficiency of our business.

# Legal Proceedings

The legal proceedings described in Note 8 of the "Notes to Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

# Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

Our common shares are listed on the New York Stock Exchange under the symbol "CAH." The following table reflects the range of the reported high and low closing prices of our common shares as reported on the New York Stock Exchange Composite Tape and the per share dividends declared for the fiscal years ended June 30, 2017 and 2016 and paid quarterly. It also reflects the range of the reported high and low closing prices of our common shares from July 1, 2017 through the period ended on July 31, 2017 and the per share dividends declared from July 1, 2017 through the period ended on July 31, 2017:

| | High | | Low | | Dividends Declared |
|---|---|---|---|---|---|
| **Fiscal 2016** | | | | | |
| Quarter Ended: | | | | | |
| September 30, 2015 | $ | 87.02 | $ | 76.72 | $ 0.3870 |
| December 31, 2015 | | 90.85 | | 77.12 | 0.3870 |
| March 31, 2016 | | 89.68 | | 76.16 | 0.3870 |
| June 30, 2016 | | 87.20 | | 73.69 | 0.4489 |
| | | | | | |
| **Fiscal 2017** | | | | | |
| Quarter Ended: | | | | | |
| September 30, 2016 | $ | 84.92 | $ | 75.26 | $ 0.4489 |
| December 31, 2016 | | 76.71 | | 65.17 | 0.4489 |
| March 31, 2017 | | 83.80 | | 72.47 | 0.4489 |
| June 30, 2017 | | 82.71 | | 71.18 | 0.4624 |
| | | | | | |
| **Fiscal 2018** | $ | 78.69 | $ | 76.29 | $ — |

At July 31, 2017 there were approximately 8,239 shareholders of record of our common shares.

We anticipate that we will continue to pay quarterly cash dividends in the future. The payment and amount of future dividends remain, however, within the discretion of our Board of Directors and will depend upon our future earnings, financial condition, capital requirements and other factors.

### Issuer Purchases of Equity Securities

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Programs (2) (in millions) |
|---|---|---|---|---|
| April 2017 | 104 | $ 72.21 | — | $ 443 |
| May 2017 | 104 | 72.33 | — | 443 |
| June 2017 | 104 | 75.55 | — | 443 |
| **Total** | **312** | **$ 73.36** | **—** | **$ 443** |

(1)   Reflects 104, 104 and 104 common shares purchased in April, May and June 2017, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2)   On May 4, 2016, our Board of Directors approved a $1.0 billion share repurchase program that expires on December 31, 2019. During the three months ended June 30, 2017, we repurchased no common shares under this program. We have $443 million available under this program.

## Five Year Performance Graph

The following line graph compares the cumulative total return of our common shares with the cumulative total return of the Standard & Poor's Composite—500 Stock Index (the "S&P 500 Index") and the Standard & Poor's Composite—500 Healthcare Index (the "S&P 500 Healthcare Index"). The line graph assumes, in each case, an initial investment of $100 on June 30, 2012, based on the market prices at the end of each fiscal year through and including June 30, 2017, and reinvestment of dividends. The S&P 500 Index and S&P 500 Healthcare Index investments are weighted on the basis of market capitalization at the beginning of each period.



| | June 30 | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | **2017** |
| Cardinal Health, Inc. | $ 100.00 | $ 115.29 | $ 170.78 | $ 211.95 | $ 201.61 | **$ 206.15** |
| S&P 500 Index | 100.00 | 120.58 | 150.20 | 161.33 | 167.74 | **197.72** |
| S&P 500 Healthcare Index | 100.00 | 127.74 | 166.13 | 206.25 | 202.09 | **227.28** |

# Management Reports

## Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2017. Based on this evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were effective as of June 30, 2017 to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

## Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, controls deemed effective now may become inadequate in the future because of changes in conditions, or because compliance with policies or procedures has deteriorated or been circumvented.

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2017. In making this assessment, management used the criteria established in the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the "COSO criteria"). Based on management's assessment and the COSO criteria, management believes that our internal control over financial reporting was effective as of June 30, 2017.

Our independent registered public accounting firm, Ernst & Young LLP, has issued a report on our internal control over financial reporting. Ernst & Young LLP's report appears following this "Management Reports" section and expresses an unqualified opinion on the effectiveness of our internal control over financial reporting.

## Changes in Internal Control Over Financial Reporting

The Pharmaceutical segment is in a multi-year project to replace certain finance and operating information systems, which is affecting internal control over financial reporting. During the quarter ended June 30, 2017, we continued to transition selected processes to the new systems. If these new systems are not effectively implemented or fail to operate as intended, it could adversely affect our internal control over financial reporting. Except for the changes made in connection with implementing the new systems described above, there were no changes in our internal control over financial reporting during the quarter ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Reports**

# Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting

The Board of Directors and Shareholders of Cardinal Health, Inc.

We have audited Cardinal Health, Inc. and subsidiaries' internal control over financial reporting as of June 30, 2017, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). Cardinal Health, Inc. and subsidiaries' management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying "Management's Report on Internal Control Over Financial Reporting." Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Cardinal Health, Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of June 30, 2017, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Cardinal Health, Inc. and subsidiaries as of June 30, 2017 and 2016 and the related consolidated statements of earnings, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended June 30, 2017 of Cardinal Health, Inc. and subsidiaries and our report dated August 10, 2017 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Columbus, Ohio
August 10, 2017

# Report of Independent Registered Public Accounting Firm

The Board of Directors and Shareholders of Cardinal Health, Inc.

We have audited the accompanying consolidated balance sheets of Cardinal Health, Inc. and subsidiaries as of June 30, 2017 and 2016, and the related consolidated statements of earnings, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended June 30, 2017. Our audits also included the financial statement schedule listed in the Index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Cardinal Health, Inc. and subsidiaries at June 30, 2017 and 2016, and the consolidated results of their operations and their cash flows for each of the three years in the period ended June 30, 2017, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Cardinal Health, Inc. and subsidiaries' internal control over financial reporting as of June 30, 2017, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated August 10, 2017 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Columbus, Ohio

August 10, 2017

**Financial Statements**

# Financial Statements and Supplementary Data

|  | Page |
|---|---|
| Consolidated Financial Statements and Schedule: |  |
| Consolidated Statements of Earnings for the Fiscal Years Ended June 30, 2017, 2016 and 2015 | 41 |
| Consolidated Statements of Comprehensive Income for the Fiscal Years Ended June 30, 2017, 2016 and 2015 | 42 |
| Consolidated Balance Sheets at June 30, 2017 and 2016 | 43 |
| Consolidated Statements of Shareholders' Equity for the Fiscal Years Ended June  30, 2017, 2016 and 2015 | 44 |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2017, 2016 and 2015 | 45 |
| Notes to Consolidated Financial Statements | 46 |

# Consolidated Statements of Earnings

| (in millions, except per common share amounts) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Revenue | $ 129,976 | $ 121,546 | $ 102,531 |
| Cost of products sold | 123,432 | 115,003 | 96,819 |
| Gross margin | 6,544 | 6,543 | 5,712 |
| | | | |
| **Operating expenses:** | | | |
| Distribution, selling, general and administrative expenses | 3,775 | 3,648 | 3,240 |
| Restructuring and employee severance | 56 | 25 | 44 |
| Amortization and other acquisition-related costs | 527 | 459 | 281 |
| Impairments and (gain)/loss on disposal of assets, net | 18 | 21 | (19) |
| Litigation (recoveries)/charges, net | 48 | (69) | 5 |
| Operating earnings | 2,120 | 2,459 | 2,161 |
| | | | |
| Other (income)/expense, net | (5) | 5 | (7) |
| Interest expense, net | 201 | 178 | 141 |
| Loss on extinguishment of debt | — | — | 60 |
| Earnings from continuing operations before income taxes | 1,924 | 2,276 | 1,967 |
| | | | |
| Provision for income taxes | 630 | 845 | 755 |
| Earnings from continuing operations | 1,294 | 1,431 | 1,212 |
| | | | |
| Earnings from discontinued operations, net of tax | — | — | 3 |
| Net earnings | 1,294 | 1,431 | 1,215 |
| | | | |
| Less: Net earnings attributable to noncontrolling interests | (6) | (4) | — |
| **Net earnings attributable to Cardinal Health, Inc.** | $ 1,288 | $ 1,427 | $ 1,215 |
| | | | |
| **Basic earnings per common share attributable to Cardinal Health, Inc.:** | | | |
| Continuing operations | $ 4.06 | $ 4.36 | $ 3.65 |
| Discontinued operations | — | — | 0.01 |
| **Net basic earnings per common share attributable to Cardinal Health, Inc.** | $ 4.06 | $ 4.36 | $ 3.66 |
| | | | |
| **Diluted earnings per common share attributable to Cardinal Health, Inc.:** | | | |
| Continuing operations | $ 4.03 | $ 4.32 | $ 3.61 |
| Discontinued operations | — | — | 0.01 |
| **Net diluted earnings per common share attributable to Cardinal Health, Inc.** | $ 4.03 | $ 4.32 | $ 3.62 |
| | | | |
| **Weighted-average number of common shares outstanding:** | | | |
| Basic | 317 | 327 | 332 |
| Diluted | 320 | 330 | 335 |

The accompanying notes are an integral part of these consolidated statements.

41                                    Cardinal Health | Fiscal 2017 Form 10-K

**Financial Statements**

# Consolidated Statements of Comprehensive Income

| (in millions) | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Net earnings | $ | **1,294** | $ | 1,431 | $ | 1,215 |
| | | | | | | |
| **Other comprehensive income/(loss):** | | | | | | |
| Foreign currency translation adjustments and other | | **(25)** | | (82) | | (104) |
| Net unrealized gain/(loss) on derivative instruments, net of tax | | **16** | | (11) | | 11 |
| Total other comprehensive loss, net of tax | | **(9)** | | (93) | | (93) |
| | | | | | | |
| Total comprehensive income | | **1,285** | | 1,338 | | 1,122 |
| | | | | | | |
| Less: comprehensive income attributable to noncontrolling interests | | **(6)** | | (4) | | — |
| **Total comprehensive income attributable to Cardinal Health, Inc.** | $ | **1,279** | $ | 1,334 | $ | 1,122 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Balance Sheets

| (in millions) | | June 30 | | |
|---|---|---|---|---|
| | | **2017** | | 2016 |
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | **6,879** | $ | 2,356 |
| Trade receivables, net | | **8,048** | | 7,405 |
| Inventories, net | | **11,301** | | 10,615 |
| Prepaid expenses and other | | **2,117** | | 1,580 |
| Total current assets | | **28,345** | | 21,956 |
| | | | | |
| Property and equipment, net | | **1,879** | | 1,796 |
| Goodwill and other intangibles, net | | **9,207** | | 9,426 |
| Other assets | | **681** | | 944 |
| Total assets | $ | **40,112** | $ | 34,122 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | **17,906** | $ | 17,306 |
| Current portion of long-term obligations and other short-term borrowings | | **1,327** | | 587 |
| Other accrued liabilities | | **1,988** | | 1,808 |
| Total current liabilities | | **21,221** | | 19,701 |
| | | | | |
| Long-term obligations, less current portion | | **9,068** | | 4,952 |
| Deferred income taxes and other liabilities | | **2,877** | | 2,781 |
| | | | | |
| Redeemable noncontrolling interests | | **118** | | 117 |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized—**500 thousand** shares, Issued—**none** | | **—** | | — |
| Common shares, without par value: | | | | |
| Authorized—**755 million** shares, Issued—**327 million** shares and 364 million shares at **June 30, 2017** and 2016, respectively | | **2,697** | | 3,010 |
| Retained earnings | | **4,967** | | 6,419 |
| Common shares in treasury, at cost: **11 million** shares and 42 million shares at **June 30, 2017** and 2016, respectively | | **(731)** | | (2,759) |
| Accumulated other comprehensive loss | | **(125)** | | (116) |
| **Total Cardinal Health, Inc. shareholders' equity** | | **6,808** | | 6,554 |
| Noncontrolling interests | | **20** | | 17 |
| Total shareholders' equity | | **6,828** | | 6,571 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | **40,112** | $ | 34,122 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Statements of Shareholders' Equity

| (in millions) | Common Shares | | Retained Earnings | Treasury Shares | | Accumulated Other Comprehensive Income/(Loss) | Noncontrolling Interests | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares Issued | Amount | | Shares | Amount | | | |
| Balance at June 30, 2014 | 364 | $ 2,980 | $ 4,774 | (27) | $ (1,423) | $ 70 | $ — | $ 6,401 |
| Net earnings | | | 1,215 | | | | | 1,215 |
| Other comprehensive loss, net of tax | | | | | | (93) | | (93) |
| Employee stock plans activity, including tax impact of $52 million | — | 23 | | 4 | 214 | | | 237 |
| Treasury shares acquired | | | | (13) | (1,036) | | | (1,036) |
| Dividends declared | | | (471) | | | | | (471) |
| Other | | | 3 | | | | | 3 |
| Balance at June 30, 2015 | 364 | 3,003 | 5,521 | (36) | (2,245) | (23) | — | 6,256 |
| Net earnings | | | 1,427 | | | | 3 | 1,430 |
| Other comprehensive loss, net of tax | | | | | | (93) | | (93) |
| Purchase of noncontrolling interests | | | | | | | (7) | (7) |
| Employee stock plans activity, including tax benefit of $33 million | — | 7 | | 2 | 137 | | | 144 |
| Treasury shares acquired | | | | (8) | (651) | | | (651) |
| Dividends declared | | | (529) | | | | | (529) |
| Other | | | — | | | | 21 | 21 |
| Balance at June 30, 2016 | 364 | 3,010 | 6,419 | (42) | (2,759) | (116) | 17 | 6,571 |
| Net earnings | | | 1,288 | | | | 2 | 1,290 |
| Other comprehensive loss, net of tax | | | | | | (9) | | (9) |
| Purchase of noncontrolling interests | | | | | | | (1) | (1) |
| Employee stock plans activity, including tax benefit of $34 million | — | (11) | | 2 | 167 | | | 156 |
| Treasury shares acquired | | | | (8) | (600) | | | (600) |
| Dividends declared | | | (580) | | | | | (580) |
| Other | | | (1) | | | | 2 | 1 |
| Retirement of Treasury Shares | (37) | (302) | (2,159) | 37 | 2,461 | | | — |
| Balance at June 30, 2017 | 327 | $ 2,697 | $ 4,967 | (11) | $ (731) | $ (125) | $ 20 | $ 6,828 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Statements of Cash Flows

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net earnings | $ 1,294 | $ 1,431 | $ 1,215 |
| Earnings from discontinued operations, net of tax | — | — | (3) |
| Earnings from continuing operations | 1,294 | 1,431 | 1,212 |
| Adjustments to reconcile earnings from continuing operations to net cash provided by operating activities: | | | |
| Depreciation and amortization | 717 | 641 | 451 |
| Loss on extinguishment of debt | — | — | 60 |
| (Gain)/Loss on sale of other investments | 4 | — | (5) |
| Impairments and (gain)/loss on disposal of assets, net | 18 | 21 | (19) |
| Share-based compensation | 96 | 111 | 110 |
| Provision for deferred income taxes | 291 | 87 | 219 |
| Provision for bad debts | 63 | 73 | 52 |
| Change in fair value of contingent consideration obligation | (5) | (16) | 8 |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | |
| Increase in trade receivables | (665) | (866) | (870) |
| Increase in inventories | (673) | (1,179) | (779) |
| Increase in accounts payable | 564 | 2,815 | 1,948 |
| Other accrued liabilities and operating items, net | (520) | (147) | 153 |
| Net cash provided by operating activities | 1,184 | 2,971 | 2,540 |
| **Cash flows from investing activities:** | | | |
| Acquisition of subsidiaries, net of cash acquired | (132) | (3,614) | (503) |
| Additions to property and equipment | (387) | (465) | (300) |
| Purchase of available-for-sale securities and other investments | (194) | (200) | (342) |
| Proceeds from sale of available-for-sale securities and other investments | 228 | 136 | 206 |
| Proceeds from maturities of available-for-sale securities | 77 | 50 | 37 |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | 3 | 13 | 53 |
| Net cash used in investing activities | (405) | (4,080) | (849) |
| **Cash flows from financing activities:** | | | |
| Payment of contingent consideration obligation | (3) | (25) | (7) |
| Net change in short-term borrowings | 3 | 26 | (12) |
| Net purchase of noncontrolling interests | (12) | (10) | — |
| Reduction of long-term obligations | (310) | (6) | (1,221) |
| Proceeds from interest rate swap terminations | 14 | — | — |
| Proceeds from long-term obligations, net of issuance costs | 5,171 | — | 2,672 |
| Net tax proceeds/(withholding) from share-based compensation | 26 | 6 | 72 |
| Excess tax benefits from share-based compensation | 34 | 33 | 52 |
| Dividends on common shares | (577) | (512) | (460) |
| Purchase of treasury shares | (600) | (651) | (1,036) |
| Net cash provided by/(used in) financing activities | 3,746 | (1,139) | 60 |
| Effect of exchange rates changes on cash and equivalents | (2) | (12) | — |
| Net increase/(decrease) in cash and equivalents | 4,523 | (2,260) | 1,751 |
| Cash and equivalents at beginning of period | 2,356 | 4,616 | 2,865 |
| **Cash and equivalents at end of period** | $ 6,879 | $ 2,356 | $ 4,616 |
| **Supplemental Information:** | | | |
| Cash payments for interest | $ 200 | $ 174 | $ 150 |
| Cash payments for income taxes | 686 | 635 | 529 |

The accompanying notes are an integral part of these consolidated statements.

Cardinal Health | Fiscal 2017 Form 10-K

# Notes to Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

Cardinal Health, Inc. is a global, integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. The company provides medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. Cardinal Health, Inc. connects patients, providers, payers, pharmacists, and manufacturers for integrated care coordination and better patient management. References to "we", "our" and similar pronouns in these consolidated financial statements are to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context otherwise requires.

Our fiscal year ends on June 30. References to fiscal 2017, 2016 and 2015 in these consolidated financial statements are to the fiscal years ended June 30, 2017, 2016 and 2015, respectively.

### Basis of Presentation

Our consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. To conform to the current year presentation, certain prior year amounts have been reclassified. The results of businesses acquired or disposed of are included in the consolidated financial statements from the date of the acquisition or up to the date of disposal, respectively.

### Use of Estimates

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). The preparation of financial statements in accordance with GAAP requires us to make estimates, judgments and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates, judgments and assumptions are used in the accounting and disclosure related to, among other items, allowance for doubtful accounts, inventory valuation, business combinations, goodwill and other intangible asset impairment, vendor reserves, loss contingencies, self-insurance accruals, income taxes and share-based compensation. Actual amounts could ultimately differ from these estimated amounts.

### Cash Equivalents

We consider liquid investments purchased with an initial maturity of three months or less to be cash equivalents. The carrying value of cash equivalents approximates fair value.

### Receivables and Allowance for Doubtful Accounts

Trade receivables are presented net of an allowance for doubtful accounts of $137 million and $135 million at June 30, 2017 and 2016, respectively. An account is considered past due on the first day after its due date. In accordance with contract terms, we generally have the ability to charge customers service fees or higher prices if an account is considered past due. We regularly monitor past due accounts and establish appropriate reserves to cover potential losses, which are based primarily on historical collection rates and the credit worthiness of the customer. We write off any amounts deemed uncollectible against the established allowance for doubtful accounts.

We provide financing to various customers. Such financing arrangements range from 1 year to 5 years at interest rates that are generally subject to fluctuation. Interest income on these arrangements is recognized as it is earned. The financings may be collateralized, guaranteed by third parties or unsecured. Finance notes and related accrued interest were $171 million (current portion $53 million) and $145 million (current portion $31 million) at June 30, 2017 and 2016, respectively, and are included in other assets (current portion is included in prepaid expenses and other) in the consolidated balance sheets. Finance notes receivable allowance for doubtful accounts were $9 million and $19 million at June 30, 2017 and 2016, respectively. We estimate an allowance for these financing receivables based on historical collection rates and the credit worthiness of the customer. We write off any amounts deemed uncollectible against the established allowance for doubtful accounts.

### Concentrations of Credit Risk

We maintain cash depository accounts with major banks, and we invest in high quality, short-term liquid instruments, and in marketable securities. Our short-term liquid instruments mature within three months and we have not historically incurred any related losses. Investments in marketable debt securities consist of a portfolio of high-grade instruments. Such investments are made only in instruments issued by highly-rated institutions, whose financial condition we monitor.

Our trade receivables and finance notes and related accrued interest are exposed to a concentration of credit risk with customers in the retail and healthcare sectors. Credit risk can be affected by changes in reimbursement and other economic pressures impacting the healthcare industry. Such credit risk is limited due to supporting collateral and the diversity of the customer base, including its wide geographic dispersion. We perform regular credit evaluations of our customers' financial conditions and maintain reserves for losses through the established allowance for doubtful accounts. Historically, such losses have been within our expectations. Refer to the "Receivables and Allowance for Doubtful Accounts" section within this Note for additional information on the accounting treatment of reserves for allowance for doubtful accounts.

### Major Customers

CVS Health Corporation ("CVS") and OptumRx, which are primarily serviced through our Pharmaceutical segment, are our only customers that individually account for at least 10 percent of revenue and gross trade receivables.

The table below summarizes historical percent of revenue and gross trade receivables from CVS and OptumRx.

| | Percent of Revenue | | | Percent of Gross Trade Receivables at June 30 | |
|---|---|---|---|---|---|
| | **2017** | 2016 | 2015 | **2017** | 2016 |
| CVS | **23%** | 25% | 27% | **20%** | 22% |
| OptumRx | **11%** | 7% | 0% | **1%** | 1% |

Our pharmaceutical distribution contract with OptumRx began in fiscal 2016 and did not exceed 10 percent until fiscal 2017.

We have entered into agreements with group purchasing organizations ("GPOs") which act as purchasing agents that negotiate vendor contracts on behalf of their members. Vizient, Inc. and Premier, Inc. are our two largest GPO member relationships in terms of revenue. Sales to members of these two GPOs collectively accounted for 21 percent, 17 percent and 18 percent of revenue for fiscal 2017, 2016 and 2015, respectively. Our trade receivable balances are with individual members of the GPO, and therefore no significant concentration of credit risk exists with these types of arrangements.

## Inventories

A substantial portion of our inventories (56 percent and 58 percent at June 30, 2017 and 2016, respectively) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These inventories are included within the core pharmaceutical distribution facilities of our Pharmaceutical segment ("distribution facilities") and are primarily merchandise inventories. The LIFO method presumes that the most recent inventory purchases are the first items sold, so LIFO helps us better match current costs and revenue. We believe that the average cost method of inventory valuation provides a reasonable approximation of the current cost of replacing inventory within the distribution facilities. As such, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation.

If we had used the average cost method of inventory valuation for all inventory within the distribution facilities, the value of our inventories would not have changed in fiscal 2017 or 2016 because inventories valued at LIFO were $46 million and $9 million higher than the average cost value at June 30, 2017 and 2016, respectively. We do not record inventories in excess of replacement cost. As such, we did not record any changes in our LIFO reserve in fiscal 2017 and 2016.

Our remaining inventory that is not valued at the lower of LIFO or market is stated at the lower of cost, using the first-in, first-out method, or market. Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $76 million and $79 million at June 30, 2017 and 2016, respectively. We reserve for inventory obsolescence using estimates based on historical experience, historical and projected sales trends, specific categories of inventory and age of on-hand inventory.

## Cash Discounts

Manufacturer cash discounts are recorded as a component of inventory cost and recognized as a reduction of cost of products sold when the related inventory is sold.

## Property and Equipment

Property and equipment are carried at cost less accumulated depreciation. Property and equipment held for sale are recorded at the lower of cost or fair value less cost to sell. When certain events or changes in operating conditions occur, an impairment assessment may be performed on the recoverability of the carrying amounts.

Depreciation expense is computed using the straight-line method over the estimated useful lives of the assets, including capital lease assets which are depreciated over the terms of their respective leases. We generally use the following range of useful lives for our property and equipment categories: buildings and improvements— 3 to 39 years; machinery and equipment—3 to 20 years; and furniture and fixtures—3 to 7 years. We recorded depreciation expense of $314 million, $277 million and $254 million for fiscal 2017, 2016 and 2015, respectively.

The following table presents the components of property and equipment, net at June 30:

| (in millions) | 2017 | | 2016 | |
|---|---|---|---|---|
| Land, building and improvements | $ | **1,637** | $ | 1,735 |
| Machinery and equipment | | **2,860** | | 2,608 |
| Furniture and fixtures | | **130** | | 133 |
| Total property and equipment, at cost | | **4,627** | | 4,476 |
| Accumulated depreciation and amortization | | **(2,748)** | | (2,680) |
| **Property and equipment, net** | $ | **1,879** | $ | 1,796 |

Repairs and maintenance expenditures are expensed as incurred. Interest on long-term projects is capitalized using a rate that approximates the weighted-average interest rate on long-term obligations, which was 3 percent at June 30, 2017. The amount of capitalized interest was immaterial for all periods presented.

## Business Combinations

The assets acquired and liabilities assumed in a business combination, including identifiable intangible assets, are recorded at their estimated fair values as of the acquisition date. The excess of the purchase price over the estimated fair value of the identifiable net assets acquired is recorded as goodwill. We base the fair values of identifiable intangible assets on detailed valuations that require management to make significant judgments, estimates and assumptions. Critical estimates and assumptions include: expected future cash flows for customer relationships, trade names and other identifiable intangible assets; discount rates that reflect the risk factors associated with future cash flows; and estimates of useful lives. When an acquisition involves contingent consideration, we recognize a liability equal to the fair value of the contingent consideration obligation at the acquisition date. The estimate of fair value of a contingent consideration obligation requires subjective assumptions to be made regarding future business results, discount rates, discount periods and probabilities assigned to various potential business result scenarios. See Note 2 for additional information regarding our acquisitions.

## Goodwill and Other Intangible Assets

Purchased goodwill and intangible assets with indefinite lives are not amortized, but instead are tested for impairment annually or when indicators of impairment exist.

Goodwill impairment testing involves a comparison of the estimated fair value of reporting units to the respective carrying amount, which may be performed utilizing either a qualitative or quantitative assessment. A reporting unit is defined as an operating segment or one level below an operating segment (also known as a component). Goodwill impairment testing involves judgment, including the identification of reporting units and the estimation of the fair value of each reporting unit and, if necessary, the estimation of the implied fair value of goodwill.

We have two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. These operating segments are comprised of divisions (components), for which discrete financial information is available. Components are aggregated into reporting units for purposes of goodwill impairment testing to the extent that they share similar economic characteristics. Our reporting units are: Pharmaceutical operating segment (excluding our Nuclear Pharmacy Services division and Cardinal Health China - Pharmaceutical division); Nuclear Pharmacy Services division; Cardinal Health China - Pharmaceutical division; Medical operating segment (excluding our Cardinal Health at Home division and naviHealth division); Cardinal Health at Home division; and naviHealth division.

Fair value can be determined using market, income or cost-based approaches. Our determination of estimated fair value of the reporting units is based on a combination of the income-based and market-based approaches. Under the income-based approach, we use a discounted cash flow model in which cash flows anticipated over several future periods, plus a terminal value at the end of that time horizon, are discounted to their present value using an appropriate risk-adjusted rate of return. We use our internal forecasts to estimate future cash flows, which we believe are consistent with those of a market participant, and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for each reporting unit. Actual results may differ materially from those used in our forecasts. We use discount rates that are commensurate with the risks and uncertainty inherent in the respective reporting units and in our internally-developed forecasts. Discount rates used in our reporting unit valuations ranged from 8.5 percent to 12.5 percent. Under the market-based approach, we determine fair value by comparing our reporting units to similar businesses or guideline companies whose securities are actively traded in public markets. To further confirm fair value, we compare the aggregate fair value of our reporting units to our total market capitalization. Estimating the fair value of reporting units requires the use of estimates and significant judgments that are based on a number of factors including forecasted operating results. The use of alternate estimates and assumptions or changes in the industry or peer groups could materially affect the determination of fair value for each reporting unit and potentially result in goodwill impairment.

We performed annual impairment testing in fiscal 2017, 2016 and 2015 and concluded that there were no impairments of goodwill as the estimated fair value of each reporting unit exceeded its carrying value.

The impairment test for indefinite-lived intangibles other than goodwill (primarily in-process research and development ("IPR&D")) consists of a comparison of the fair value of the indefinite-lived intangible asset to the carrying value of the asset as of the impairment testing date. If the carrying amount of the indefinite-lived intangible exceeds its fair value, an impairment loss must be recognized in an amount equal to that excess. We estimate the fair value of our indefinite-lived intangibles under the income approach using a discounted cash flow model. We use our internal forecasts, which we believe are consistent with those of a market participant, to estimate future cash flows and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for the indefinite-lived intangible including, among other factors, assumptions on regulatory approval for IPR&D.

Intangible assets with finite lives, primarily customer relationships; trademarks, trade names and patents; and developed technology, are amortized using a combination of straight-line and accelerated methods based on the expected cash flows from the asset over their estimated useful lives. We review intangible assets with finite lives for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable. Determining whether an impairment loss occurred requires a comparison of the carrying amount to the sum of the future forecasted undiscounted cash flows expected to be generated by the asset group. Actual results may differ materially from those used in our forecasts.

## Investments

Investments in non-marketable equity securities are accounted for under either the cost or equity method of accounting and are included in other assets in the consolidated balance sheets. For investments in which we can exercise significant influence, we use the equity method of accounting. Our share of the earnings and losses was immaterial, both individually and in the aggregate, for all periods presented and is recorded in other income, net in the consolidated statements of the earnings. We monitor investments for other-than-temporary impairment by considering factors such as the operating performance of the investment and current economic and market conditions.

Marketable securities are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. Unrealized gains and losses on available-for-sale securities, net of applicable taxes, are included within shareholders' equity in accumulated other comprehensive income ("AOCI"). We monitor these securities for other-than-temporary impairment by considering factors such as the duration that, and the extent to which, the fair value is below cost, the operating performance and credit worthiness of the issuer of the securities and current economic and market conditions. See Note 5 for additional information regarding available-for-sale securities.

## Vendor Reserves

In the ordinary course of business, our vendors may dispute deductions taken against payments otherwise due to them or assert other disputes. These disputes are researched and resolved based upon the findings of the research performed. At any given time, there are outstanding items in various stages of research and resolution. In determining appropriate reserves for areas of exposure with our vendors, we assess historical experience and current outstanding claims. We have established various levels of reserves based on the type of claim and status of review. Though the claim types are relatively consistent, we periodically refine our methodology by updating the reserve estimate percentages to reflect actual historical experience. The ultimate outcome of certain claims may be different than our original estimate and may require an adjustment. All adjustments to vendor reserves are included in cost of products sold. In addition, the reserve balance will fluctuate due to variations of outstanding claims from period-to-period, timing of settlements and specific vendor issues, such as bankruptcies. Vendor reserves were $50 million and $62 million at June 30, 2017 and 2016, respectively, excluding third-party returns. See separate section within this Note for a description of third-party returns.

## Distribution Services Agreement and Other Vendor Fees

Our Pharmaceutical segment recognizes fees received from distribution services agreements and other fees received from vendors related to the purchase or distribution of the vendors' inventory when those fees have been earned and we are entitled to payment. Since the benefit provided to a vendor is related to the purchase and distribution of the vendor's inventory, we recognize the fees as a reduction in the carrying value of the inventory that generated the fees, and as such, a reduction of cost of products sold in our consolidated statements of earnings when the inventory is sold.

## Loss Contingencies and Self-Insurance

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. We also self-insure for employee healthcare, general liability, certain product liability matters, auto liability, property and workers' compensation. Self-insurance accruals include an estimate for expected settlements or pending claims, defense costs, administrative fees, claim adjustment costs and an estimate for claims incurred but not reported. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies and other liabilities is highly subjective and requires judgments about future events. We regularly review contingencies and our self-insurance accruals to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates. See Note 8 for additional information regarding loss contingencies and product liability lawsuits.

## Income Taxes

We account for income taxes using the asset and liability method. Deferred tax assets and liabilities are measured using enacted tax rates in the respective jurisdictions in which we operate. Deferred taxes are not provided on the unremitted earnings of subsidiaries outside of the United States when it is expected that these earnings are permanently reinvested.

Tax benefits from uncertain tax positions are recognized when it is more likely than not that the position will be sustained upon examination of the technical merits of the position, including resolutions of any related appeals or litigation processes. The amount recognized is measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon settlement. See Note 7 for additional information regarding income taxes.

## Other Accrued Liabilities

Other accrued liabilities represent various current obligations, including certain accrued operating expenses and taxes payable.

## Noncontrolling Interests and Redeemable Noncontrolling Interests

Noncontrolling interests represent the portion of net earnings, comprehensive income and net assets that is not attributable to Cardinal Health, Inc.

The redeemable noncontrolling interests relate to our ownership interest in naviHealth Holdings, LLC ("naviHealth"), which we acquired during fiscal 2016. The redeemable noncontrolling interests are redeemable at the option of the third-party noncontrolling interest holders at any time after the two-year anniversary of the closing, or earlier if a trigger event occurs. As such, the noncontrolling interests have been presented as redeemable noncontrolling interests in our consolidated balance sheets. The noncontrolling interests will be adjusted each period for net earnings and dividends attributable to the noncontrolling interests and changes in the noncontrolling ownership interests, if any. An additional adjustment to the carrying value of the noncontrolling interests may be required if the redemption value under the terms of the agreement exceeds the carrying value. Changes in the carrying value of the noncontrolling interests related to a change in the redemption value will be recorded through retained earnings and will not affect net earnings attributable to Cardinal Health, Inc. See Note 2 and Note 12 for additional information regarding redeemable noncontrolling interests.

## Share-Based Compensation

Share-based compensation provided to employees is recognized in the consolidated statements of earnings based on the grant date fair value of the awards. The fair value of stock options is determined on the grant date using a lattice valuation model. The fair value of restricted share units and performance share units is determined by the grant date market price of our common shares. The compensation expense associated with nonvested performance share units is dependent on our periodic assessment of the probability of the targets being achieved and our estimate, which may vary over time, of the number of shares that ultimately will be issued. The compensation expense recognized for share-based awards is net of estimated forfeitures and is recognized ratably over the service period of the awards. We classify share-based compensation expense in distribution, selling, general and administrative ("SG&A") expenses to correspond with the same line item as the majority of the cash compensation paid to employees. If awards are modified in connection with a restructuring activity, the incremental share-based

compensation expense is classified in restructuring and employee severance. See Note 16 for additional information regarding share-based compensation.

## Dividends

We paid cash dividends per common share of $1.80, $1.55 and $1.37 in fiscal 2017, 2016 and 2015, respectively.

## Revenue Recognition

We recognize revenue when persuasive evidence of an arrangement exists, product delivery has occurred or the services have been rendered, the price is fixed or determinable, and collectability is reasonably assured.

### Pharmaceutical Segment

The Pharmaceutical segment recognizes distribution revenue when title transfers to its customers and we have no further obligation to provide services related to such merchandise.

Revenue for deliveries that are directly shipped to customers from the manufacturer when we act as an intermediary in the ordering and delivery of products is recorded gross. This is in accordance with accounting standards addressing reporting revenue on a gross basis as a principal versus on a net basis as an agent. This revenue is recorded on a gross basis since we incur credit risk from the customer, bear the risk of loss for incomplete shipments and do not receive a separate fee or commission for the transaction and, as such, are the primary obligor. Revenue from these sales is recognized when title transfers to the customer and we have no further obligation to provide services related to such merchandise.

Radiopharmaceutical revenue is recognized upon delivery of the product to the customer and we have no further obligation to provide services related to such merchandise.

### Medical Segment

The Medical segment recognizes revenue when title transfers to its customers and we have no further obligation to provide services related to such products.

## Sales Returns and Allowances

Revenue is recorded net of sales returns and allowances. Our customer return policies generally require that the product be physically returned, subject to restocking fees, in a condition suitable to be added back to inventory and resold at full value, or returned to vendors for credit ("merchantable product"). Product returns are generally consistent throughout the year and typically are not specific to any particular product or customer.

We accrue for estimated sales returns and allowances at the time of sale based upon historical customer return trends, margin rates and processing costs. Our accrual for sales returns is reflected as a reduction of revenue and cost of products sold for the sales price and cost, respectively. At June 30, 2017 and 2016, the accrual for estimated sales returns and allowances was $347 million and $386 million, respectively, the impact of which is reflected in trade receivables, net and inventories, net in the consolidated balance sheets. Sales returns and allowances were $2.3 billion, $2.2 billion and $2.0 billion, for fiscal 2017, 2016 and 2015, respectively.

## Third-Party Returns

Since we generally do not accept non-merchantable product returns from our customers, many of our customers return non-merchantable pharmaceutical products to the manufacturer through third parties. Since our customers generally do not have a direct relationship with manufacturers, our vendors pass the value of such returns to us (usually in the form of an accounts payable deduction) for distribution to customers. We, in turn, pass the value received, less an administrative fee, to our customer. In certain instances, we pass the estimated value of the return to our customer prior to our receipt of the value from the vendor. Although we believe we have satisfactory protections, we could be subject to claims from customers or vendors if our administration of this overall process was deficient in some respect or our contractual terms with vendors are in conflict with our contractual terms with our customers. We have maintained reserves for some of these situations based on their nature and our historical experience with their resolution.

## Shipping and Handling

Shipping and handling costs are primarily included in SG&A expenses in our consolidated statements of earnings. Shipping and handling costs include all delivery expenses as well as all costs to prepare the product for shipment to the end customer. Shipping and handling costs were $496 million, $504 million and $454 million, for fiscal 2017, 2016 and 2015, respectively. Revenue received for shipping and handling was immaterial for all periods presented.

## Restructuring and Employee Severance

We consider restructuring activities to be programs by which we fundamentally change our operations, such as closing and consolidating facilities, changing the way we manufacture or distribute our products, moving manufacturing of a product to another location, changes in production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel) and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions). See Note 3 for additional information regarding our restructuring activities.

## Amortization and Other Acquisition-Related Costs

We classify certain costs incurred in connection with acquisitions as amortization and other acquisition-related costs in our consolidated statements of earnings. These costs consist of amortization of acquisition-related intangible assets, transaction costs, integration costs and changes in the fair value of contingent consideration obligations. Transaction costs are incurred during the initial evaluation of a potential acquisition and primarily relate to costs to analyze, negotiate and consummate the transaction as well as due diligence activities. Integration costs relate to activities required to combine the operations of an acquired enterprise into our operations and, in the case of the Cordis business, to stand-up the systems and processes needed to support its global footprint. We record changes in the fair value of contingent consideration obligations relating to acquisitions as income or expense in amortization and other acquisition-related costs. See Note 4 for additional information regarding amortization of acquisition-related intangible assets and

**Notes to Financial Statements**

Note 10 for additional information regarding contingent consideration.

## Translation of Foreign Currencies

Financial statements of our subsidiaries outside the United States are generally measured using the local currency as the functional currency. Adjustments to translate the assets and liabilities of these foreign subsidiaries into U.S. dollars are accumulated in shareholders' equity through AOCI utilizing period-end exchange rates. Revenues and expenses of these foreign subsidiaries are translated using average exchange rates during the year.

The foreign currency translation gains/(losses) included in AOCI at June 30, 2017 and 2016 are presented in Note 13. Foreign currency transaction gains and losses for the period are included in the consolidated statements of earnings in their respective financial statement line item.

## Interest Rate, Currency and Commodity Risk

All derivative instruments are recognized at fair value on the consolidated balance sheets and all changes in fair value are recognized in net earnings or shareholders' equity through AOCI, net of tax.

For contracts that qualify for hedge accounting treatment, the hedge contracts must be effective at reducing the risk associated with the exposure being hedged and must be designated as a hedge at the inception of the contract. Hedge effectiveness is assessed periodically. Any contract not designated as a hedge, or so designated but ineffective, is adjusted to fair value and recognized immediately in net earnings. If a fair value or cash flow hedge ceases to qualify for hedge accounting treatment, the contract continues to be carried on the balance sheet at fair value until settled and future adjustments to the contract's fair value are recognized immediately in net earnings. If a forecasted transaction is probable not to occur, amounts previously deferred in AOCI are recognized immediately in net earnings. See Note 11 for additional information regarding our derivative instruments, including the accounting treatment for instruments designated as fair value, cash flow and economic hedges.

## Fair Value Measurements

Fair value is defined as the price that would be received upon selling an asset or the price paid to transfer a liability on the measurement date. It focuses on the exit price in the principal or most advantageous market for the asset or liability in an orderly transaction between willing market participants. A three-tier fair value hierarchy is established as a basis for considering such assumptions and for inputs used in the valuation methodologies in measuring fair value. This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair values are:

Level 1 - Observable prices in active markets for identical assets and liabilities.

Level 2 - Observable inputs other than quoted prices in active markets for identical assets and liabilities.

Level 3 - Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets and liabilities.

See Note 10 for additional information regarding fair value measurements.

## Recent Financial Accounting Standards

In May 2017, the Financial Accounting Standards Board ("FASB") issued final guidance that clarifies when changes to the terms or conditions of a share-based payment award must be accounted for as modifications. Entities will apply the modification accounting guidance if the value, vesting conditions or classification of the award changes. This guidance will be effective for us in the first quarter of fiscal 2019 and the impact of this new guidance is dependent on future events.

In February 2017, the FASB clarified the guidance on how to account for the derecognition of nonfinancial assets (e.g., real estate, land, buildings, intangibles) and in-substance nonfinancial assets once an entity adopts the new revenue recognition guidance that is discussed in more detail in this section below. The guidance also defines what constitutes an in-substance nonfinancial asset. This guidance will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In January 2017, the FASB issued amended accounting guidance that simplifies the accounting for goodwill impairment by eliminating the step of measuring a goodwill impairment by estimating the implied fair value of goodwill. Instead, goodwill impairment will be measured as the amount by which the reporting unit's carrying value exceeds its fair value, limited to the carrying value of the goodwill. This guidance will be effective for us in the first quarter of fiscal 2021, with early adoption permitted. We are currently evaluating the timing of adoption. The impact of this new guidance is dependent on future events.

Also in January 2017, the FASB issued new accounting guidance that changes the definition of a business when evaluating whether a set of transferred assets and activities is considered a business. This guidance will be effective for us in the first quarter of fiscal 2019, with early adoption permitted. We are currently evaluating the timing of adoption. The impact of adoption is dependent on future events.

In November 2016, the FASB issued amended accounting guidance on the presentation of restricted cash and restricted cash equivalents in the statement of cash flows. The guidance requires an entity to include restricted cash and restricted cash equivalents with cash and cash equivalents when reconciling the beginning-of-period and end-of-period amounts shown on the statements of cash flows. This amendment will be effective for us in the first quarter of fiscal 2019, with early adoption permitted. We are currently evaluating the timing of adoption and the impact of this standard on our consolidated financial statements.

In October 2016, the FASB issued amended accounting guidance that requires an entity to recognize the income tax effect of intercompany sales and transfers of assets other than inventory at the time that the transfer occurs rather than when the asset is sold

to a third party. This amendment will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In August 2016, the FASB issued accounting guidance which clarifies the classification of certain cash receipts and cash payments in the statement of cash flows, including those related to contingent consideration payments made after a business combination, distributions received from equity method investees, debt prepayment or debt extinguishment costs and proceeds from the settlement of insurance claims. This guidance will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In June 2016, the FASB issued amended accounting guidance that will require entities to measure credit losses on trade and other receivables, held-to-maturity debt securities, loans and other instruments using an "expected credit loss" model that considers historical experience, current conditions and reasonable supportable forecasts. This guidance also requires that credit losses on available-for-sale debt securities with unrealized losses be recognized as allowances rather than as deductions in the amortized cost of the securities. This guidance will be effective for us in the first quarter of fiscal 2021. We are currently evaluating the impact of adoption on our consolidated financial statements.

In March 2016, the FASB issued amended accounting guidance that will change the accounting for certain aspects of share-based compensation to employees. The guidance requires all income tax effects of share-based awards to be recognized in the statement of earnings as awards vest or are settled. Additionally, the guidance increases the amount employers can withhold in shares to cover employee income taxes without requiring liability classification and allows a policy election for accounting for forfeitures. We anticipate the primary impact of the adoption will result in the recognition of excess tax benefits in the income statement on a prospective basis, rather than as a component of equity, and therefore we expect to recognize an immaterial discrete tax benefit or expense in income tax expense on our consolidated financial statements upon adoption in the first quarter of fiscal 2018. The inclusion of excess tax benefits and deficiencies as a component of our income tax expense will increase volatility within our provision for income taxes as the amount of excess tax benefits or deficiencies from share-based compensation awards depends on our stock price at the date the awards vest.

In February 2016, the FASB issued amended accounting guidance that requires lessees to recognize most leases on the balance sheet as a lease liability and corresponding right-of-use asset. This guidance will be effective for us in the first quarter of fiscal 2020, with early adoption permitted. We are currently evaluating the impact of the adoption on our consolidated financial statements.

In July 2015, the FASB issued amended accounting guidance that simplifies the current guidance surrounding the measurement of inventory. Under this amended guidance, inventory is measured at the lower of cost and net realizable value, which eliminates the need to determine replacement cost and evaluate whether the inventory is above or below net realizable value. Net realizable value is defined

as the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. The amended guidance does not apply to inventory measured under the LIFO method. We adopted this guidance in the fourth quarter of fiscal 2017. The adoption of this guidance did not impact our consolidated financial statements.

In April 2015, the FASB issued amended accounting guidance that clarifies the circumstances under which a cloud computing customer would account for the arrangement as a license of internal-use software. If it is determined that a software license does not exist in the arrangement, the customer would account for this arrangement as a service contract. We adopted this guidance in the first quarter of fiscal 2017. The adoption of this guidance did not have a material impact on our financial position or results of operations.

Also in April 2015, the FASB issued amended accounting guidance related to the presentation of debt issuance costs in the financial statements. This guidance requires an entity to present such costs in the balance sheet as a direct deduction from the related debt rather than as an asset. We adopted this guidance in the first quarter of fiscal 2017. Upon adoption of this guidance, debt issuance costs of $29 million were reclassified from other assets to long-term obligations, less current portion within the consolidated balance sheet.

In August 2014, the FASB issued amended accounting guidance related to uncertainties about an entity's ability to continue as a going concern. This guidance requires management to evaluate whether there is substantial doubt about a company's ability to continue as a going concern. We adopted this guidance in the fourth quarter of fiscal 2017. The adoption of this guidance did not impact our financial statement disclosures.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. The FASB also subsequently issued several amendments to the standard, including clarification on principal versus agent considerations, performance obligations and licensing, and certain scope improvements and practical expedients.

We continue to make progress on our evaluation of the amended guidance, including identification of revenue streams and customer contract reviews. Our revenue is primarily distribution revenue, which we recognize at a point in time when title transfers to customers and we have no further obligation to provide services related to such merchandise. Although we are continuing to assess the impact of the amended guidance, we generally anticipate that the timing of recognition of distribution revenue will be substantially unchanged under the amended guidance.

The amended guidance will be effective for us in the first quarter of fiscal 2019 and permits adoption under either the full retrospective

approach (recognize effects of the amended guidance in each prior reporting period presented) or the modified retrospective approach (recognize the cumulative effect of adoption as an adjustment to retained earnings at the date of initial application). We are still evaluating our method of adoption.

## 2. Acquisitions

While we have completed acquisitions impacting the Pharmaceutical segment during fiscal 2017, the pro forma results of operations and the results of operations for acquired businesses since the acquisition dates have not been separately disclosed because the effects were not significant compared to the consolidated financial statements, individually or in the aggregate. The cash paid for these acquisitions, net of cash acquired, was $132 million. During the three months ended June 30, 2017, we completed the largest of these acquisitions for a purchase price of approximately $80 million, which was paid in cash, and potential maximum contingent payments of $230 million. As of June 30, 2017, we recorded a $19 million contingent consideration obligation in connection with this acquisition.

### Cordis

On October 2, 2015, we acquired Cordis from Ethicon, Inc., a wholly-owned subsidiary of Johnson & Johnson, for $1.9 billion using cash on hand and proceeds from our debt offering in June 2015. The acquisition of Cordis, a global manufacturer and distributor of interventional cardiology devices and endovascular solutions with operations in more than 50 countries, expands our Medical segment's portfolio of self-manufactured products and its geographic scope. We closed the Cordis acquisition in 20 principal countries on October 2, 2015, and acquired control of, as described in GAAP, and the rights to, the net economic benefit from the entire Cordis business in the remaining countries at that time.

Transaction and integration costs associated with the acquisition of Cordis were $61 million and $78 million during fiscal 2017 and 2016, respectively, and are included in amortization and other acquisition-related costs in the consolidated statements of earnings.

### naviHealth

On August 26, 2015, we acquired a 71 percent ownership interest in naviHealth for $238 million, net of cash acquired of $53 million. We funded the acquisition with cash on hand. The acquisition of naviHealth, a leader in post-acute care management solutions, expands our ability to serve hospitals, other healthcare providers, and payers. We consolidate the results of naviHealth in our consolidated financial statements and report its consolidated results in our Medical segment. The terms of the agreement provide us with the option to acquire any remaining noncontrolling interests at any time after the two-year anniversary of the closing. The third-party noncontrolling interest holders also hold an option, which allows them to sell their noncontrolling interests to us at any time after the two-year anniversary of the closing, or earlier if a trigger event occurs. Refer to Note 12 for further information on the redeemable noncontrolling interests. We also completed acquisitions within naviHealth during fiscal 2016 for $242 million, which were paid in cash and increased our ownership interest to 82 percent.

### Harvard Drug

On July 2, 2015, we completed the acquisition of The Harvard Drug Group ("Harvard Drug") for $1.1 billion using cash on hand and proceeds from our debt offering in June 2015. The acquisition of Harvard Drug, a distributor of generic pharmaceuticals, over-the-counter healthcare and related products to retail, institutional, and alternate care customers, enhances our Pharmaceutical segment's generic pharmaceutical distribution and related services businesses. Harvard Drug also repackages generic pharmaceuticals and over-the-counter healthcare products.

### Fair Value of Assets Acquired and Liabilities Assumed

The allocation of the fair value of assets acquired and liabilities assumed for the acquisitions of Cordis, Harvard Drug and naviHealth were finalized during the fiscal year ended June 30, 2017.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed as of the acquisition dates for Cordis, naviHealth and Harvard Drug:

| (in millions) | Cordis | naviHealth | Harvard Drug |
|---|---|---|---|
| **Identifiable intangible assets:** | | | |
| Customer relationships (1) | $ 225 | $ 38 | $ 470 |
| Trade names (2) | 125 | 16 | 130 |
| Developed technology (3) | 395 | 61 | — |
| In-process research and development (4) | 55 | — | — |
| Total identifiable intangible assets acquired | 800 | 115 | 600 |
| | | | |
| Cash and equivalents | — | 53 | 44 |
| Trade receivables | — | 31 | 67 |
| Inventories | 205 | — | 49 |
| Prepaid expenses and other | 4 | 14 | 11 |
| Property and equipment | 97 | 5 | 16 |
| Other assets | 44 | 1 | — |
| Accounts payable | (82) | (2) | (47) |
| Other accrued liabilities | (85) | (95) | (37) |
| Deferred income taxes and other liabilities | (13) | (33) | (188) |
| Redeemable noncontrolling interests | — | (119) | — |
| Total identifiable net assets/ (liabilities) acquired | 970 | (30) | 515 |
| Goodwill | 914 | 321 | 634 |
| **Total net assets acquired** | **$ 1,884** | **$ 291** | **$ 1,149** |

(1) The weighted-average useful lives of customer relationships range from 4 to 13 years.

(2) The weighted-average useful lives of trade names range from 10 to 20 years.

(3) The weighted-average useful life of developed technology is 10 years.

(4) Acquired in-process research and development intangible assets have an indefinite life.

## 3. Restructuring and Employee Severance

The following tables summarize restructuring and employee severance costs:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Employee-related costs (1) | $ 51 | $ 15 | $ 34 |
| Facility exit and other costs (2) | 5 | 10 | 10 |
| **Total restructuring and employee severance** | $ 56 | $ 25 | $ 44 |

(1) Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2) Facility exit and other costs primarily consist of lease termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | Facility Exit and Other Costs | Total |
|---|---|---|---|
| Balance at June 30, 2015 | $ 22 | $ — | $ 22 |
| Additions | 17 | 2 | 19 |
| Payments and other adjustments | (24) | (1) | (25) |
| Balance at June 30, 2016 | 15 | 1 | 16 |
| Additions | 43 | 1 | 44 |
| Payments and other adjustments | (17) | (2) | (19) |
| **Balance at June 30, 2017** | $ 41 | $ — | $ 41 |

## 4. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical (1) | Medical | Total |
|---|---|---|---|
| Balance at June 30, 2015 | $ 2,199 | $ 2,871 | $ 5,070 |
| Goodwill acquired, net of purchase price adjustments | 738 | 1,382 | 2,120 |
| Foreign currency translation adjustments and other | (18) | (5) | (23) |
| Balance at June 30, 2016 | 2,919 | 4,248 | 7,167 |
| Goodwill acquired, net of purchase price adjustments | 29 | 35 | 64 |
| Foreign currency translation adjustments and other | (9) | (1) | (10) |
| **Balance at June 30, 2017** | $ 2,939 | $ 4,282 | $ 7,221 |

(1) At June 30, 2017 the accumulated goodwill impairment loss was $829 million.

The increase in the Pharmaceutical segment goodwill during fiscal 2017 is due to acquisitions. Goodwill recognized in connection with acquisitions primarily represents the expected benefits from synergies of integrating this business, the existing workforce of the acquired entity and the expected growth from new customers.

The increase in the Medical segment goodwill during fiscal 2017 is primarily due to the Cordis acquisition. During fiscal 2017, we

recorded additional goodwill for Cordis, substantially all of which was to increase an accrual for assumed pre-acquisition product liability lawsuits. The majority of the goodwill acquired in connection with the acquisition of Cordis is deductible for tax purposes. See Note 8 for further discussion of the product liability lawsuits.

See Note 2 for further discussion of these acquisitions.

### Other Intangible Assets

The following tables summarize other intangible assets by class at June 30:

| (in millions) | 2017 | | | |
|---|---|---|---|---|
| | Gross Intangible | Accumulated Amortization | Net Intangible | Weighted-Average Remaining Amortization Period (Years) |
| **Indefinite-life intangibles:** | | | | |
| IPR&D, trademarks and other | $ 61 | $ — | $ 61 | N/A |
| Total indefinite-life intangibles | 61 | — | 61 | N/A |
| **Definite-life intangibles:** | | | | |
| Customer relationships | 1,966 | 967 | 999 | 9 |
| Trademarks, trade names, and patents | 509 | 195 | 314 | 14 |
| Developed technology and other | 916 | 304 | 612 | 10 |
| Total definite-life intangibles | 3,391 | 1,466 | 1,925 | 10 |
| **Total other intangible assets** | $ 3,452 | $ 1,466 | $ 1,986 | N/A |

| (in millions) | 2016 | | |
|---|---|---|---|
| | Gross Intangible | Accumulated Amortization | Net Intangible |
| **Indefinite-life intangibles:** | | | |
| IPR&D, trademarks and other | $ 72 | $ — | $ 72 |
| Total indefinite-life intangibles | 72 | — | 72 |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,946 | 737 | 1,209 |
| Trademarks, trade names, and patents | 508 | 140 | 368 |
| Developed technology and other | 808 | 198 | 610 |
| Total definite-life intangibles | 3,262 | 1,075 | 2,187 |
| **Total other intangible assets** | $ 3,334 | $ 1,075 | $ 2,259 |

Total amortization of intangible assets was $395 million, $355 million and $191 million for fiscal 2017, 2016 and 2015, respectively. The estimated annual amortization for intangible assets, excluding intangible assets that may be added as a result of acquisitions that had not yet closed as of June 30, 2017, for fiscal 2018 through 2022 is as follows: $370 million, $301 million, $270 million, $219 million and $195 million.

## 5. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. We held the following investments in marketable securities at fair value at June 30:

| (in millions) | 2017 | 2016 |
|---|---|---|
| **Current available-for-sale securities:** | | |
| Commercial paper | $ — | $ — |
| Treasury bills | 25 | 3 |
| International bonds | 3 | 2 |
| Corporate bonds | 30 | 58 |
| U.S. agency bonds | 3 | 6 |
| Asset-backed securities | 3 | 28 |
| International equity securities | 1 | 2 |
| U.S. agency mortgage-backed securities | — | 14 |
| Total current available-for-sale securities | 65 | 113 |
| **Long-term available-for-sale securities:** | | |
| Treasury bills | — | 10 |
| International bonds | — | 1 |
| Corporate bonds | — | 36 |
| U.S. agency bonds | — | 9 |
| Asset-backed securities | — | 17 |
| U.S. agency mortgage-backed securities | — | 14 |
| Total long-term available-for-sale securities | — | 87 |
| **Total available-for-sale securities** | $ 65 | $ 200 |

Gross unrealized gains and losses were immaterial at both June 30, 2017 and 2016. During fiscal 2017, 2016 and 2015 gross realized gains and losses were immaterial and we did not recognize any other-than-temporary-impairments. At June 30, 2017, the weighted-average effective maturity of our current investments is approximately 7 months.

## 6. Long-Term Obligations and Other Short-Term Borrowings

The following table summarizes long-term obligations and other short-term borrowings at June 30:

| (in millions) (1) | 2017 | 2016 |
|---|---|---|
| 1.9% Notes due 2017 | $ — | $ 251 |
| 1.7% Notes due 2018 | 400 | 405 |
| 1.95% Notes due 2018 | 547 | 554 |
| 1.948% Notes due 2019 | 996 | — |
| 2.4% Notes due 2019 | 453 | 461 |
| 4.625% Notes due 2020 | 519 | 528 |
| 2.616% Notes due 2022 | 1,142 | — |
| 3.2% Notes due 2022 | 248 | 253 |
| Floating Rate Notes due 2022 | 347 | — |
| 3.2% Notes due 2023 | 544 | 549 |
| 3.079% Notes due 2024 | 744 | — |
| 3.5% Notes due 2024 | 396 | 398 |
| 3.75% Notes due 2025 | 481 | 505 |
| 3.410% Notes due 2027 | 1,340 | — |
| 4.6% Notes due 2043 | 346 | 349 |
| 4.5% Notes due 2044 | 341 | 345 |
| 4.9% Notes due 2045 | 445 | 450 |
| 4.368% Notes due 2047 | 594 | — |
| 7.8% Debentures due 2016 | — | 37 |
| 7.0% Debentures due 2026 | 124 | 124 |
| Other obligations | 388 | 330 |
| Total | 10,395 | 5,539 |
| Less: current portion of long-term obligations and other short-term borrowings | 1,327 | 587 |
| **Long-term obligations, less current portion** | $ 9,068 | $ 4,952 |

(1) Maturities are presented on a calendar year basis.

Maturities of existing long-term obligations and other short-term borrowings for fiscal 2018 through 2022 and thereafter are as follows: $1,327 million, $998 million, $454 million, $521 million, $1,738 million and $5,357 million.

### Long-Term Debt

All the notes represent unsecured obligations of Cardinal Health, Inc. and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. The 7.0% and 7.8% Debentures represent unsecured obligations of Allegiance Corporation (a wholly-owned subsidiary), which Cardinal Health, Inc. has guaranteed. None of these obligations are subject to a sinking fund and the Allegiance obligations are not redeemable prior to maturity. Interest is paid pursuant to the terms of the obligations. These notes are effectively subordinated to the liabilities of our subsidiaries, including trade payables of $17.9 billion.

In June 2017, we issued additional debt with the aggregate principal amount of $5.2 billion to fund a portion of the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc ("Medtronic"),

which closed on July 29, 2017, to redeem the 1.7% Notes due 2018 and for general corporate purposes. The notes issued in conjunction with the acquisition are 1.948% Notes due 2019, 2.616% Notes due 2022, 3.079% Notes due 2024, 3.410% Notes due 2027, 4.368% Notes due 2047, and floating rate Notes due 2022. The amount of the notes issued net of discounts, premiums, mark-to-market of any interest rate swaps and debt issuance costs was $5.2 billion. We also had obtained a commitment letter in April 2017 from a financial institution for a $4.5 billion unsecured bridge term loan facility that could have been used to complete the acquisition of the Patient Recovery Business. We incurred fees related to the facility, which are included in interest expense, net. No amounts were drawn under the bridge term loan facility and we terminated the commitment letter in June 2017.

In June 2015, we sold $550 million aggregate principal amount of 1.95% Notes that mature on June 15, 2018, $500 million aggregate principal amount of 3.75% Notes that mature on September 15, 2025, and $450 million aggregate principal amount of 4.9% Notes that mature on September 15, 2045. We used the net proceeds from the offering to pay part of the purchase price to acquire Harvard Drug on July 2, 2015 and Cordis on October 2, 2015, as discussed further in Note 2.

In November 2014, we sold $450 million aggregate principal amount of 2.4% Notes that mature on November 15, 2019, $400 million aggregate principal amount of 3.5% Notes that mature on November 15, 2024 and $350 million aggregate principal amount of 4.5% Notes that mature on November 15, 2044.

In December 2014, we redeemed certain outstanding notes at a redemption price equal to 100% of the principal amount and any accrued but unpaid interest, plus the applicable make-whole premium. As a result of the redemption, we incurred a loss on the extinguishment of debt of $60 million ($37 million, net of tax), which included a make-whole premium of $80 million, write-off of $2 million of unamortized debt issuance costs, and an offsetting $22 million fair value adjustment to the respective debt related to previously terminated interest rate swaps.

If we undergo a change of control, as defined in the notes, and if the notes receive specified ratings below investment grade by each of Standard & Poors Ratings Services, Moody's Investors Services and Fitch Ratings, any holder of the notes, excluding the debentures, can require with respect to the notes owned by such holder, or we can offer, to repurchase the notes at 101% of the principal amount plus accrued and unpaid interest.

## Other Financing Arrangements

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $1.75 billion revolving credit facility and a $700 million committed receivables sales facility program. In November 2016, we renewed our committed receivables sales facility program through Cardinal Health Funding, LLC ("CHF") through November 1, 2019. CHF was organized for the sole purpose of buying receivables and selling undivided interests in those receivables to third-party purchasers. Although consolidated with Cardinal Health, Inc. in accordance with GAAP, CHF is a separate legal entity from Cardinal Health, Inc. and from our subsidiary that sells receivables

to CHF. CHF is designed to be a special purpose, bankruptcy-remote entity whose assets are available solely to satisfy the claims of its creditors.

We also maintain a commercial paper program, backed by our revolving credit facility, which we increased in December 2015 from $1.5 billion to $1.75 billion. At June 30, 2017, we had no amounts outstanding under the revolving credit facility; however, availability was reduced by outstanding letters of credit of $20 million and $14 million at June 30, 2017 and 2016, respectively. We also had no amounts outstanding under the committed receivables sales facility program; however, availability was reduced by outstanding standby letters of credit of $46 million and $40 million at June 30, 2017 and 2016, respectively. Under our commercial paper program, we had a maximum amount outstanding of $855 million and an average daily amount outstanding of $58 million during the fiscal year ended June 30, 2017. We had no amount outstanding as of June 30, 2017.

Our revolving credit facility and committed receivables sales facility program require us to maintain a consolidated leverage ratio of no more than 3.25-to-1. As a result of the acquisition of the Patient Recovery Business, we temporarily increased this ratio to 4.25-to-1. As of June 30, 2017, we were in compliance with these financial covenants.

We also maintain other short-term credit facilities and an unsecured line of credit that allowed for borrowings up to $690 million and $699 million at June 30, 2017 and 2016, respectively. The $388 million and $330 million balance of other obligations at June 30, 2017 and 2016, respectively, consisted of short-term borrowings and capital leases.

## 7. Income Taxes

The following table summarizes earnings from continuing operations before income taxes:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| U.S. operations | $ 1,772 | $ 2,050 | $1,733 |
| Non-U.S. operations | 152 | 226 | 234 |
| **Earnings from continuing operations before income taxes** | $ 1,924 | $ 2,276 | $1,967 |

The following table summarizes the components of provision for income taxes from continuing operations:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| **Current:** | | | |
| Federal | $ 273 | $ 633 | $ 424 |
| State and local | 10 | 52 | 83 |
| Non-U.S. | 56 | 73 | 29 |
| Total current | $ 339 | $ 758 | $ 536 |
| **Deferred:** | | | |
| Federal | $ 258 | $ 96 | $ 196 |
| State and local | 37 | 12 | 24 |
| Non-U.S. | (4) | (21) | (1) |
| Total deferred | 291 | 87 | 219 |
| **Provision for income taxes** | $ 630 | $ 845 | $ 755 |

**Notes to Financial Statements**

The following table presents a reconciliation of the provision based on the federal statutory income tax rate to our effective income tax rate from continuing operations:

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Provision at federal statutory rate | 35.0% | 35.0% | 35.0% |
| State and local income taxes, net of federal benefit | 1.0 | 1.5 | 4.1 |
| Foreign tax rate differential | (0.2) | (0.6) | (2.4) |
| Nondeductible/nontaxable items | 0.2 | 1.0 | 0.7 |
| Other | (3.3) | 0.2 | 1.0 |
| Effective income tax rate | 32.7% | 37.1% | 38.4% |

At June 30, 2017, we had $700 million of undistributed earnings from non-U.S. subsidiaries that are intended to be permanently reinvested in non-U.S. operations. Because these earnings are considered permanently reinvested, no U.S. tax provision has been accrued related to the repatriation of these earnings. It is not practicable to estimate the amount of U.S. tax that might be payable on the eventual remittance of such earnings. This amount decreased from the prior year due to the realignment of foreign subsidiaries in anticipation of closing the acquisition of the Patient Recovery Business.

Deferred income taxes arise from temporary differences between financial reporting and tax reporting bases of assets and liabilities and operating loss and tax credit carryforwards for tax purposes. The following table presents the components of the deferred income tax assets and liabilities at June 30:

| (in millions) | 2017 | 2016 |
|---|---|---|
| **Deferred income tax assets:** | | |
| Receivable basis difference | $ 42 | $ 44 |
| Accrued liabilities | 125 | 133 |
| Share-based compensation | 53 | 56 |
| Loss and tax credit carryforwards | 378 | 193 |
| Deferred tax assets related to uncertain tax positions | 51 | 95 |
| Other | 43 | 46 |
| Total deferred income tax assets | 692 | 567 |
| Valuation allowance for deferred income tax assets | (237) | (93) |
| Net deferred income tax assets | $ 455 | $ 474 |
| | | |
| **Deferred income tax liabilities:** | | |
| Inventory basis differences | $ (1,578) | $ (1,351) |
| Property-related | (183) | (172) |
| Goodwill and other intangibles | (570) | (607) |
| Total deferred income tax liabilities | $ (2,331) | $ (2,130) |
| Net deferred income tax liability | $ (1,876) | $ (1,656) |

Deferred income tax assets and liabilities in the preceding table, after netting by taxing jurisdiction, are in the following captions in the consolidated balance sheets at June 30:

| (in millions) | 2017 | 2016 |
|---|---|---|
| Noncurrent deferred income tax asset (1) | 73 | 42 |
| Noncurrent deferred income tax liability (2) | (1,949) | (1,698) |
| Net deferred income tax liability | $ (1,876) | $ (1,656) |

(1) Included in other assets in the consolidated balance sheets.

(2) Included in deferred income taxes and other liabilities in the consolidated balance sheets.

At June 30, 2017 we had gross federal, state and international loss and credit carryforwards of $225 million, $1,406 million and $590 million, respectively, the tax effect of which is an aggregate deferred tax asset of $378 million. Substantially all of these carryforwards are available for at least three years. Approximately $223 million of the valuation allowance at June 30, 2017 applies to certain federal, state and international loss carryforwards that, in our opinion, are more likely than not to expire unutilized. However, to the extent that tax benefits related to these carryforwards are realized in the future, the reduction in the valuation allowance would reduce income tax expense. The increase in international loss carryforwards and valuation allowances are due to the realignment of foreign subsidiaries in anticipation of closing the acquisition of the Patient Recovery Business.

We had $417 million, $527 million and $542 million of unrecognized tax benefits at June 30, 2017, 2016 and 2015, respectively. The June 30, 2017, 2016 and 2015 balances include $268 million, $355 million and $357 million, respectively, of unrecognized tax benefits that, if recognized, would have an impact on the effective tax rate. The remaining unrecognized tax benefits relate to tax positions for which ultimate deductibility is highly certain but for which there is uncertainty as to the timing of such deductibility. Recognition of these tax benefits would not affect our effective tax rate. We include the full amount of unrecognized tax benefits in deferred income taxes and other liabilities in the consolidated balance sheets. The following table presents a reconciliation of the beginning and ending amounts of unrecognized tax benefits:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Balance at beginning of fiscal year | $ 527 | $ 542 | $ 510 |
| Additions for tax positions of the current year | 29 | 22 | 15 |
| Additions for tax positions of prior years | 23 | 42 | 69 |
| Reductions for tax positions of prior years | (8) | (48) | (42) |
| Settlements with tax authorities | (154) | (30) | (10) |
| Expiration of the statute of limitations | — | (1) | — |
| Balance at end of fiscal year | $ 417 | $ 527 | $ 542 |

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of

limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is a net decrease of $0 million to $45 million, exclusive of penalties and interest.

We recognize accrued interest and penalties related to unrecognized tax benefits in the provision for income taxes. At June 30, 2017, 2016 and 2015, we had $99 million, $145 million and $169 million, respectively, accrued for the payment of interest and penalties. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the consolidated balance sheets. During fiscal 2017 and 2015, we recognized $12 million and $24 million of expense for interest and penalties in income tax expense, respectively. During fiscal 2016, we recognized $9 million of benefit for interest and penalties in income tax expense.

We file income tax returns in the U.S. federal jurisdiction, various U.S. state and local jurisdictions, and various foreign jurisdictions. During the twelve months ended June 30, 2017, the IRS closed audits of fiscal years 2006 and 2007, which is reflected in our consolidated financial statements and in our evaluation of uncertain tax positions. The settlement had an immaterial impact to our provision for income taxes. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2008 through the current fiscal year.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $142 million and $172 million at June 30, 2017 and 2016, respectively, and is included in other assets in the consolidated balance sheets.

## 8. Commitments, Contingent Liabilities and Litigation

### Commitments

#### Operating Leases

The future minimum rental payments for operating leases having initial or remaining non-cancelable lease terms in excess of one year at June 30, 2017 for fiscal 2018 through 2022 and thereafter are as follows: $110 million, $94 million, $77 million, $59 million, $41 million and $107 million. Rental expense relating to operating leases was $159 million, $126 million and $104 million in fiscal 2017, 2016 and 2015, respectively. Sublease rental income was immaterial for all periods presented.

#### Generic Sourcing Venture With CVS Health Corporation

In July 2014, we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS for an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. Due to the achievement of predetermined milestones, we are required to make quarterly payments of $45.6 million to CVS for the remainder of the initial term.

### Legal Proceedings

We become involved from time to time in disputes, litigation and regulatory matters.

We may be named from time to time in *qui tam* actions initiated by private third parties. In such actions, the private parties purport to act on behalf of federal or state governments, allege that false claims have been submitted for payment by the government and may receive an award if their claims are successful. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own purporting to act on behalf of the government.

From time to time, we become aware through employees, internal audits or other parties of possible compliance matters that we investigate internally, such as complaints or concerns relating to accounting, internal accounting controls, financial reporting, auditing, or other ethical matters or relating to compliance with laws such as healthcare fraud and abuse, anti-corruption or anti-bribery laws. In addition, from time to time, we receive subpoenas or requests for information from various government agencies relating to our business or to the business of a customer, supplier or other industry participants. Internal investigations, subpoenas or requests for information could lead to the assertion of claims or the commencement of legal proceedings against us or result in sanctions.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators and product liability claims and lawsuits, including class actions. Even absent an identified regulatory or quality issue or product recall, we can become subject to product liability claims and lawsuits.

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for certain litigation and regulatory matters, including mass tort product liability claims, and income from favorable resolution of litigation in litigation (recoveries)/charges, net in our consolidated statements of earnings.

#### State of West Virginia vs. Cardinal Health, Inc.

In January 2017, we agreed, without admitting liability, to pay $20 million to the State of West Virginia to settle a lawsuit filed against us by the West Virginia Attorney General in June 2012. As previously

disclosed, the West Virginia Attorney General had filed complaints in the Circuit Court of Boone County, West Virginia against a number of pharmaceutical wholesale distributors, including us, alleging, among other things, that, between 2007 and 2012, the distributors had failed to maintain effective controls to guard against diversion of controlled substances in West Virginia and had failed to report suspicious orders of controlled substances in accordance with the West Virginia Uniform Controlled Substances Act.

### Opioid Lawsuits

As of August 8, 2017, 26 counties and municipalities in New York, Ohio, Oregon and West Virginia, as well as the Cherokee Nation, have filed lawsuits against pharmaceutical wholesale distributors (including us), pharmaceutical manufacturers and retail chains relating to the distribution of prescription opioid pain medications. The lawsuits, which have been filed in various federal, state and other courts, allege violations of controlled substance laws and various other statutes as well as common law claims, including negligence, public nuisance and unjust enrichment, and seek equitable relief and monetary damages. We are vigorously defending ourselves in these lawsuits. Since these lawsuits are at early stages, we are unable to predict the outcome of these lawsuits or estimate a range of reasonably possible losses.

### Product Liability Lawsuits

As of August 8, 2017, we are named as a defendant in 68 product liability lawsuits filed in Alameda County Superior Court in California involving claims by approximately 750 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Another 8 similar lawsuits involving claims by approximately 10 plaintiffs are pending in other jurisdictions. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these lawsuits.

In fiscal 2017, we recorded an accrual of $79 million ($53 million, net of tax) for estimated losses and legal defense costs as an adjustment to pre-acquisition liabilities assumed in the Cordis acquisition. We record additional accruals for losses and legal defense costs as litigation (recoveries)/charges, net in our consolidated statements of

earnings. At June 30, 2017, we had a total of $98 million, net of expected insurance recoveries, accrued for losses and legal defense costs related to the Cordis IVC filter lawsuits, which includes the $79 million accrual referenced above. While we have recorded accruals based on our assessment of these matters, because these lawsuits are at early stages, we are unable to estimate a range of reasonably possible losses in excess of this accrued amount.

### Antitrust Litigation Proceeds

We received and recognized income resulting from settlements of class action antitrust lawsuits, in which we were a class member, of $1 million, $80 million and $71 million during fiscal 2017, 2016 and 2015, respectively.

## 9. Guarantees

In the ordinary course of business, we agree to indemnify certain other parties under acquisition and disposition agreements, customer agreements, intellectual property licensing agreements, and other agreements. Such indemnification obligations vary in scope and, when defined, in duration. In many cases, a maximum obligation is not explicitly stated, and therefore the overall maximum amount of the liability under such indemnification obligations cannot be reasonably estimated. Where appropriate, such indemnification obligations are recorded as a liability. Historically, we have not, individually or in the aggregate, made payments under these indemnification obligations in any material amounts. In certain circumstances, we believe that existing insurance arrangements, subject to the general deduction and exclusion provisions, would cover portions of the liability that may arise from these indemnification obligations. In addition, we believe that the likelihood of a material liability being triggered under these indemnification obligations is not probable.

From time to time we enter into agreements that obligate us to make fixed payments upon the occurrence of certain events. Such obligations primarily relate to obligations arising under acquisition transactions, where we have agreed to make payments based upon the achievement of certain financial performance measures by the acquired business. Generally, the obligation is capped at an explicit amount. See Note 10 for detail regarding contingent consideration obligations.

**Notes to Financial Statements**

## 10. Fair Value Measurements

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at June 30:

| (in millions) | 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 739 | $ — | $ — | $ 739 |
| Forward contracts (1) | — | (21) | — | (21) |
| Available-for-sale securities (2) | — | 65 | — | 65 |
| Other investments (3) | 116 | — | — | 116 |
| **Liabilities:** | | | | |
| Contingent consideration (4) | — | — | (32) | (32) |

| (in millions) | 2016 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 516 | $ — | $ — | $ 516 |
| Forward contracts (1) | — | 19 | — | 19 |
| Available-for-sale securities (2) | — | 200 | — | 200 |
| Other investments (3) | 103 | — | — | 103 |
| **Liabilities:** | | | | |
| Contingent consideration (4) | — | — | (19) | (19) |

(1) The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the consolidated balance sheets.

(2) We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 5 for additional information regarding available-for-sale securities.

(3) Level 1 other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(4) Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods, and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
| --- | --- |
| Balance at June 30, 2015 | $ 53 |
| Additions from acquisitions | 7 |
| Changes in fair value of contingent consideration (1) | (16) |
| Payment of contingent consideration | (25) |
| Balance at June 30, 2016 | 19 |
| Additions from acquisitions | 21 |
| Changes in fair value of contingent consideration (1) | (5) |
| Payment of contingent consideration | (3) |
| **Balance at June 30, 2017** | $ 32 |

(1) Amount is included in amortization and other acquisition-related costs in the consolidated statements of earnings.

## 11. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk, and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to current fair value through earnings at the end of each period.

We are exposed to counterparty credit risk on all of our derivative instruments. Accordingly, we have established and maintain strict counterparty credit guidelines and only enter into derivative instruments with major financial institutions that are investment grade or better. We do not have significant exposure to any one counterparty and we believe the risk of loss is remote. Additionally, we do not require collateral under these agreements.

### Interest Rate Risk Management

We are exposed to the impact of interest rate changes. Our objective is to manage the impact of interest rate changes on cash flows and the market value of our borrowings. We utilize a mix of debt maturities along with both fixed-rate and variable-rate debt to manage changes in interest rates. In addition, we enter into interest rate swaps to further manage our exposure to interest rate variations related to our borrowings and to lower our overall borrowing costs.

### Currency Exchange Risk Management

We conduct business in several major international currencies and are subject to risks associated with changing foreign exchange rates. Our objective is to reduce earnings and cash flow volatility associated with foreign exchange rate changes to allow management to focus its attention on business operations. Accordingly, we enter into various contracts that change in value as foreign exchange rates change to protect the value of existing foreign currency assets and liabilities, commitments and anticipated foreign currency revenue and expenses.

## Commodity Price Risk Management

We are exposed to changes in the price of certain commodities. Our objective is to reduce earnings and cash flow volatility associated with forecasted purchases of these commodities to allow management to focus its attention on business operations. Accordingly, we enter into derivative contracts when possible to manage the price risk associated with certain forecasted purchases.

The following table summarizes the fair value of our assets and liabilities related to derivatives designated as hedging instruments and the respective line items in which they were recorded in the consolidated balance sheets at June 30:

| (in millions) | | 2017 | | 2016 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Foreign currency contracts (1) | $ | 3 | $ | 1 |
| Pay-floating interest rate swaps (2) | | — | | 33 |
| Pay-floating interest rate swaps (1) | | — | | 1 |
| Total assets | $ | 3 | $ | 35 |
| | | | | |
| **Liabilities:** | | | | |
| Foreign currency contracts (3) | $ | 2 | $ | 3 |
| Forward interest rate swaps (4) | | — | | 10 |
| Pay-floating interest rate swaps (3) | | 2 | | — |
| Pay-floating interest rate swaps (4) | | 19 | | — |
| Commodity contracts (3) | | 1 | | 2 |
| Commodity contracts (4) | | — | | 1 |
| Total liabilities | $ | 24 | $ | 16 |

(1)  Included in prepaid expenses and other in the consolidated balance sheets.
(2)  Included in other assets in the consolidated balance sheets.
(3)  Included in other accrued liabilities in the consolidated balance sheets.
(4)  Included in deferred income taxes and other liabilities in the consolidated balance sheets.

## Fair Value Hedges

We enter into pay-floating interest rate swaps to hedge the changes in the fair value of fixed-rate debt resulting from fluctuations in interest rates. These contracts are designated and qualify as fair value hedges. Accordingly, the gain or loss recorded on the pay-floating interest rate swaps is directly offset by the change in fair value of the underlying debt. Both the derivative instrument and the underlying debt are adjusted to market value at the end of each period with any resulting gain or loss recorded in interest expense, net in the consolidated statements of earnings.

During fiscal 2017 and 2016 we entered into pay-floating interest rate swaps with total notional amounts of $700 million and $600 million, respectively. These swaps have been designated as fair value hedges of our fixed rate debt and are included in deferred income taxes and other liabilities in the consolidated balance sheets.

During fiscal 2017 and 2016 we terminated notional amounts of $600 million and $250 million, respectively, of pay-floating interest rate swaps that were previously designated as fair value hedges. In June 2017, $250 million of pay-floating interest rate swaps matured.

The following tables summarize the outstanding interest rate swaps designated as fair value hedges at June 30:

| (in millions) | | 2017 | |
|---|---|---|---|
| | | **Notional Amount** | **Maturity Date** |
| Pay-floating interest rate swaps | $ | 1,813 | **Jun 2018** - **Sep 2025** |

| (in millions) | | 2016 | |
|---|---|---|---|
| | | Notional Amount | Maturity Date |
| Pay-floating interest rate swaps | $ | 1,963 | Jun 2017 - Sep 2025 |

The following table summarizes the gain/(loss) recognized in earnings for interest rate swaps designated as fair value hedges:

| (in millions) | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Pay-floating interest rate swaps (1) (2) | $ | 17 | $ | 23 | $ | 14 |
| Fixed-rate debt (1) | | (17) | | (23) | | (14) |

(1)  Included in interest expense, net in the consolidated statements of earnings.
(2)  Fiscal 2015 excludes $22 million fair value adjustment to the previously terminated interest rate swaps as a result of the December 2014 debt extinguishment as disclosed in Note 6.

There was no ineffectiveness associated with these derivative instruments for any periods presented.

## Cash Flow Hedges

We enter into derivative instruments to hedge our exposure to changes in cash flows attributable to interest rate, foreign currency and commodity price fluctuations associated with certain forecasted transactions. These derivative instruments are designated and qualify as cash flow hedges. Accordingly, the effective portion of the gain or loss on the derivative instrument is reported as a component of other comprehensive income and reclassified into earnings in the same line item associated with the forecasted transaction and in the same period during which the hedged transaction affects earnings. The ineffective portion of the gain or loss on the derivative instrument is recognized in earnings immediately.

During fiscal 2017 and 2016 we entered into forward interest rate swaps with a total notional amount of $700 million and $300 million, respectively, to hedge probable, but not firmly committed, future transactions associated with our debt.

Additionally, during fiscal 2017 we terminated $1.0 billion in forward interest rate swaps that were previously designated as cash-flow hedges. At June 30, 2017, we had no outstanding forward interest rate swaps.

We enter into foreign currency contracts to protect the value of anticipated foreign currency revenues and expenses. At June 30, 2017 and 2016, we held contracts to hedge probable, but not firmly committed, revenue and expenses. The principal currencies hedged are the Canadian dollar, Euro, Thai baht, Mexican peso and Chinese renminbi.

We enter into commodity contracts to manage the price risk associated with forecasted purchases of certain commodities used in our Medical segment.

**Notes to Financial Statements**

The following tables summarize the outstanding cash flow hedges at June 30:

| (in millions) | Notional Amount | Maturity Date | | |
|---|---|---|---|---|
| | | **2017** | | |
| Foreign currency contracts | 162 | Jul 2017 | - | Jun 2018 |
| Commodity contracts | 17 | Jul 2017 | - | Apr 2020 |

| (in millions) | Notional Amount | Maturity Date | | |
|---|---|---|---|---|
| | | 2016 | | |
| Forward interest rate swaps | $ 300 | Jun 2018 | - | Jun 2028 |
| Foreign currency contracts | 183 | Jul 2016 | - | Jun 2017 |
| Commodity contracts | 22 | Jul 2016 | - | Mar 2019 |

The following table summarizes the gain/(loss) included in AOCI for derivative instruments designated as cash flow hedges at June 30:

| (in millions) | 2017 | 2016 |
|---|---|---|
| Forward interest rate swaps | $ — | $ (10) |
| Commodity contracts | (1) | (3) |
| Foreign currency contracts | — | (4) |

The following table summarizes the gain/(loss) reclassified from AOCI into earnings for derivative instruments designated as cash flow hedges:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Foreign currency contracts (1) | $ (1) | $ 1 | $ 1 |
| Foreign currency contracts (2) | (1) | 5 | 4 |
| Foreign currency contracts (3) | 2 | (3) | (2) |
| Commodity contracts (3) | (3) | (5) | (1) |

(1) Included in revenue in the consolidated statements of earnings.

(2) Included in cost of products sold in the consolidated statements of earnings.

(3) Included in SG&A expenses in the consolidated statements of earnings.

The amount of ineffectiveness associated with these derivative instruments was immaterial for all periods presented.

## Economic (Non-Designated) Hedges

We enter into foreign currency contracts to manage our foreign exchange exposure related to intercompany financing transactions and other balance sheet items subject to revaluation that do not meet the requirements for hedge accounting treatment. Accordingly, these derivative instruments are adjusted to current market value at the end of each period through earnings. The gain or loss recorded on these instruments is substantially offset by the remeasurement adjustment on the foreign currency denominated asset or liability. The settlement of the derivative instrument and the remeasurement adjustment on the foreign currency denominated asset or liability are both recorded in other (income)/expense, net. The principal currencies managed through foreign currency contracts are the Canadian dollar, Euro, Thai baht, British pound and Chinese renminbi.

The following tables summarize the outstanding economic (non-designated) derivative instruments at June 30:

| (in millions) | Notional Amount | Maturity Date |
|---|---|---|
| | **2017** | |
| Foreign currency contracts | $ 558 | Jul 2017 |

| (in millions) | Notional Amount | Maturity Date |
|---|---|---|
| | 2016 | |
| Foreign currency contracts | $ 492 | Jul 2016 |

The following table summarizes the gain/(loss) recognized in earnings for economic (non-designated) derivative instruments:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Foreign currency contracts (1) | $ (5) | $ (17) | $ (45) |

(1) Included in other income, net in the consolidated statements of earnings.

## Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, net, accounts payable, and other accrued liabilities at June 30, 2017 and 2016 approximate fair value due to their short-term maturities.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at June 30:

| (in millions) | 2017 | 2016 |
|---|---|---|
| Estimated fair value | $ 10,713 | $ 5,780 |
| Carrying amount | 10,395 | 5,539 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

The following table is a summary of the fair value gain/(loss) of our derivative instruments based upon the estimated amount that we would receive (or pay), considering counter-party credit risk, to terminate the contracts at June 30:

| (in millions) | Notional Amount | Fair Value Gain/(Loss) | Notional Amount | Fair Value Gain/(Loss) |
|---|---|---|---|---|
| | **2017** | | 2016 | |
| Pay-floating interest rate swaps | $ 1,813 | $ (19) | $ 1,963 | $ 34 |
| Foreign currency contracts | 720 | 1 | 675 | (2) |
| Forward interest rate swaps | — | — | 300 | (10) |
| Commodity contracts | 17 | (1) | 22 | (3) |

## 12. Redeemable Noncontrolling Interests

In connection with the acquisition of a 71 percent ownership interest in naviHealth during fiscal 2016 as described in Note 2, we recognized redeemable noncontrolling interests with a fair value of $119 million at the acquisition date. Our ownership interest in naviHealth was 82 percent at both June 30, 2017 and 2016.

The reconciliation of the changes in redeemable noncontrolling interests are as follows:

| (in millions) | Redeemable Noncontrolling Interests |
|---|---|
| Balance at June 30, 2015 | $ — |
| Redeemable noncontrolling interests acquired | 119 |
| Net earnings attributable to redeemable noncontrolling interests | 1 |
| Net purchase of redeemable noncontrolling interests | (3) |
| Balance at June 30, 2016 | 117 |
| Net earnings attributable to redeemable noncontrolling interests | 4 |
| Net purchase of redeemable noncontrolling interests | (3) |
| **Balance at June 30, 2017** | **$ 118** |

## 13. Shareholders' Equity

At June 30, 2017 and 2016, authorized capital shares consisted of the following: 750 million Class A common shares, without par value; 5 million Class B common shares, without par value; and 500 thousand non-voting preferred shares, without par value. The Class A common shares and Class B common shares are collectively referred to below as "common shares". Holders of common shares are entitled to share equally in any dividends declared by the Board of Directors and to participate equally in all distributions of assets upon liquidation. Generally, the holders of Class A common shares are entitled to one vote per share, and the holders of Class B common shares are entitled to one-fifth of one vote per share on proposals presented to shareholders for vote. Under certain circumstances, the holders of Class B common shares are entitled to vote as a separate class. Only Class A common shares were outstanding at June 30, 2017 and 2016.

We repurchased $2.3 billion of our common shares, in the aggregate, through share repurchase programs during fiscal 2017, 2016 and 2015, as described below. We funded the repurchases with available cash. The common shares repurchased are held in treasury to be used for general corporate purposes.

During fiscal 2017, we repurchased 8.1 million common shares having an aggregate cost of $600 million. The average price paid per common share was $74.08.

During fiscal 2016, we repurchased 8.2 million common shares having an aggregate cost of $651 million. The average price paid per common share was $78.98.

During fiscal 2015, we repurchased 13.1 million common shares having an aggregate cost of $1.0 billion. The average price paid per common share was $79.02.

During fiscal 2017, we retired 37 million common shares in treasury. The retirement of these shares had no impact on total shareholders' equity; however, it did impact certain individual components of shareholders' equity as follows: $2.5 billion decrease in common shares in treasury, $302 million decrease in common shares, and $2.2 billion decrease in retained earnings.

### Accumulated Other Comprehensive Income/(Loss)

The following table summarizes the changes in the balance of accumulated other comprehensive income/(loss) by component and in total:

| (in millions) | Foreign Currency Translation Adjustments and other | Unrealized Gain/(Loss) on Derivatives, net of tax | Accumulated Other Comprehensive Income/(Loss) |
|---|---|---|---|
| Balance at June 30, 2015 | $ (41) | $ 18 | $ (23) |
| Other comprehensive income/(loss), net before reclassifications | (82) | (9) | (91) |
| Amounts reclassified to earnings | — | (2) | (2) |
| Total other comprehensive loss, net of tax of $6 million | (82) | (11) | (93) |
| Balance at June 30, 2016 | (123) | 7 | (116) |
| Other comprehensive income/(loss), before reclassifications | (25) | 19 | (6) |
| Amounts reclassified to earnings | — | (3) | (3) |
| Total comprehensive net loss of tax of $9 million attributable to Cardinal Health, Inc. | (25) | 16 | (9) |
| **Balance at June 30, 2017** | **$ (148)** | **$ 23** | **$ (125)** |

Activity related to realized and unrealized gains and losses on available-for-sale securities, as described in Note 5, was immaterial during fiscal 2017 and 2016.

## 14. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the computation of basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| (in millions, except per share amounts) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Earnings from continuing operations | $ 1,294 | $ 1,431 | $ 1,212 |
| Net earnings attributable to noncontrolling interest | (6) | (4) | — |
| Net earnings from continuing operations attributable to Cardinal Health, Inc. | 1,288 | 1,427 | 1,212 |
| Earnings from discontinued operations, net of tax | — | — | 3 |
| **Net earnings attributable to Cardinal Health, Inc.** | $ 1,288 | $ 1,427 | $ 1,215 |
| Weighted-average common shares–basic | 317 | 327 | 332 |
| **Effect of dilutive securities:** | | | |
| Employee stock options, restricted share units, and performance share units | 3 | 3 | 3 |
| **Weighted-average common shares–diluted** | 320 | 330 | 335 |
| **Basic earnings per common share attributable to Cardinal Health, Inc.:** | | | |
| Continuing operations | $ 4.06 | $ 4.36 | $ 3.65 |
| Discontinued operations | — | — | 0.01 |
| **Net basic earnings per common share attributable to Cardinal Health, Inc.** | $ 4.06 | $ 4.36 | $ 3.66 |
| **Diluted earnings per common share attributable to Cardinal Health, Inc.:** | | | |
| Continuing operations | $ 4.03 | $ 4.32 | $ 3.61 |
| Discontinued operations | — | — | 0.01 |
| **Net diluted earnings per common share attributable to Cardinal Health, Inc.** | $ 4.03 | $ 4.32 | $ 3.62 |

The potentially dilutive employee stock options, restricted share units and performance share units that were antidilutive for fiscal 2017, 2016 and 2015 were 3 million, 2 million and 1 million, respectively.

## 15. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical and over-the-counter healthcare and consumer products in the United States. This segment also provides services to pharmaceutical manufacturers and healthcare providers to support the development, marketing, and distribution of specialty pharmaceutical products; operates nuclear pharmacies and radiopharmaceutical manufacturing facilities; provides pharmacy management services to hospitals as well as medication therapy management and patient outcomes services to

hospitals, other healthcare providers and payers; and repackages generic pharmaceuticals and over-the-counter healthcare products. This segment also imports and distributes pharmaceuticals, over-the-counter healthcare and consumer products and provides specialty pharmacy and other services in China.

Our Medical segment manufactures, sources and distributes Cardinal Health branded medical, surgical and laboratory products, which are sold in the United States, Canada, Europe, Asia and other markets. In addition to distributing Cardinal Health branded products, this segment also distributes a broad range of national brand products and provides supply chain services and solutions to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China. This segment also distributes medical products to patients' homes and provides post-acute care management and transition services and software to hospitals, other healthcare providers and payers in the United States.

The following table presents revenue for each reportable segment and Corporate:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pharmaceutical | $116,463 | $109,131 | $ 91,116 |
| Medical | 13,524 | 12,430 | 11,395 |
| Total segment revenue | 129,987 | 121,561 | 102,511 |
| Corporate (1) | (11) | (15) | 20 |
| **Total revenue** | $129,976 | $121,546 | $102,531 |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general, and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial and customer care shared services, human resources, information technology, and legal and compliance. The results attributable to noncontrolling interests of consolidated entities are recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided, and other ratable allocation methodologies.

We do not allocate the following items to our segments: LIFO inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation, and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future

**Notes to Financial Statements**

returns. As approval decisions for such projects are dependent upon executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $17 million, $34 million and $26 million for fiscal 2017, 2016 and 2015, respectively.

The following tables present segment profit by reportable segment and Corporate:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pharmaceutical | $ 2,187 | $ 2,488 | $ 2,094 |
| Medical | 572 | 457 | 433 |
| Total segment profit | 2,759 | 2,945 | 2,527 |
| Corporate | (639) | (486) | (366) |
| Total operating earnings | $ 2,120 | $ 2,459 | $ 2,161 |

The following tables present depreciation and amortization and additions to property and equipment by reportable segment and Corporate:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pharmaceutical | $ 122 | $ 128 | $ 124 |
| Medical | 156 | 136 | 119 |
| Corporate | 439 | 377 | 208 |
| Total depreciation and amortization | $ 717 | $ 641 | $ 451 |

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pharmaceutical | $ 50 | $ 88 | $ 90 |
| Medical | 123 | 96 | 87 |
| Corporate | 214 | 281 | 123 |
| Total additions to property and equipment | $ 387 | $ 465 | $ 300 |

The following table presents total assets for each reportable segment and Corporate at June 30:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pharmaceutical | $ 21,848 | $ 20,662 | $ 17,385 |
| Medical | 10,688 | 10,236 | 7,095 |
| Corporate | 7,576 | 3,224 | 5,662 |
| Total assets | $ 40,112 | $ 34,122 | $ 30,142 |

The following tables present revenue and property and equipment, net by geographic area:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| United States | $ 125,006 | $ 116,864 | $ 98,435 |
| International | 4,970 | 4,682 | 4,096 |
| Total revenue | $ 129,976 | $ 121,546 | $ 102,531 |

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| United States | $ 1,623 | $ 1,558 | $ 1,327 |
| International | 256 | 238 | 179 |
| Property and equipment, net | $ 1,879 | $ 1,796 | $ 1,506 |

## 16. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees. At June 30, 2017, 23 million shares remain available for future grants under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan ("2011 LTIP"). Under the 2011 LTIP's fungible share counting provisions, stock options are counted against the plan as one share for every share issued; awards other than stock options are counted against the plan as two and one-half shares for every share issued. This means that only 9 million shares could be issued under awards other than stock options while 23 million shares could be issued under stock options. Shares are issued out of treasury shares when stock options are exercised and when restricted share units and performance share units vest.

The following table provides total share-based compensation expense by type of award:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Restricted share unit expense | $ 69 | $ 69 | $ 69 |
| Employee stock option expense | 19 | 21 | 21 |
| Performance share unit expense | 8 | 21 | 20 |
| Total share-based compensation expense from continuing operations | $ 96 | $ 111 | $ 110 |

The total tax benefit related to share-based compensation was $34 million, $38 million and $38 million for fiscal 2017, 2016 and 2015, respectively.

### Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years. Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|
| Nonvested at June 30, 2015 | 3 | $ 59.69 |
| Granted | 1 | 83.89 |
| Vested | (2) | 54.29 |
| Canceled and forfeited | — | — |
| Nonvested at June 30, 2016 | 2 | 71.73 |
| Granted | 1 | 82.34 |
| Vested | (1) | 69.23 |
| Canceled and forfeited | — | — |
| Nonvested at June 30, 2017 | 2 | $ 76.72 |

**Notes to Financial Statements**

The following table provides additional data related to restricted share unit activity:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Total compensation cost, net of estimated forfeitures, related to nonvested restricted share and share unit awards not yet recognized, pre-tax | $ 73 | $ 79 | $ 77 |
| Weighted-average period in years over which restricted share and share unit cost is expected to be recognized (in years) | 2 | 2 | 2 |
| Total fair value of shares vested during the year | $ 64 | $ 65 | $ 61 |

## Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for periods ranging from seven to ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share |
|---|---|---|
| Outstanding at June 30, 2015 | 8 | $ 46.50 |
| Granted | 1 | 84.11 |
| Exercised | (2) | 39.06 |
| Canceled and forfeited | — | — |
| Outstanding at June 30, 2016 | 7 | 54.09 |
| Granted | 1 | 83.09 |
| Exercised | (2) | 37.79 |
| Canceled and forfeited | — | — |
| **Outstanding at June 30, 2017** | **6** | **$ 63.44** |
| **Exercisable at June 30, 2017** | **4** | **$ 52.86** |

The following table provides additional detail related to stock options:

| (in millions, except per share amounts) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ 109 | $ 181 | $ 281 |
| Aggregate intrinsic value of exercisable options at period end | 106 | 161 | 193 |
| Aggregate intrinsic value of exercised options | 73 | 63 | 132 |
| Net proceeds from share-based compensation | 26 | 6 | 72 |
| Excess tax benefits from share based compensation | 34 | 33 | 52 |
| Total compensation cost, net of estimated forfeitures, related to unvested stock options not yet recognized, pre-tax | 22 | 22 | 23 |
| Total fair value of shares vested during the year | 19 | 20 | 20 |
| Weighted-average grant date fair value per stock option | 16.67 | 17.40 | 15.80 |

| (in years) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Weighted-average remaining contractual life of outstanding options | 7 | 6 | 6 |
| Weighted-average remaining contractual life of exercisable options | 6 | 5 | 5 |
| Weighted-average period over which stock option compensation cost is expected to be recognized | 2 | 2 | 2 |

Stock options are granted to our officers and certain employees. The fair values were estimated on the grant date using a lattice valuation model. We believe the lattice model provides reasonable estimates because it has the ability to take into account individual exercise patterns based on changes in our stock price and other variables, and it provides for a range of input assumptions, which are disclosed in the table below. The risk-free rate is based on the U.S. Treasury yield curve at the time of the grant. We analyzed historical data to estimate option exercise behaviors and employee terminations to be used within the lattice model. The expected life of the options granted was calculated from the option valuation model and represents the length of time in years that the options granted are expected to be outstanding. Expected volatilities are based on implied volatility from traded options on our common shares and historical volatility over a period of time commensurate with the contractual term of the option grant (up to ten years).

The following table provides the range of assumptions used to estimate the fair value of stock options:

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Risk-free interest rate | 1.4% - 2.0% | 1.5% - 1.9% | 1.8% - 2.1% |
| Expected volatility | 24% | 23% | 26% |
| Dividend yield | 2.2% - 2.5% | 1.8% - 2.0% | 1.7% - 1.9% |
| Expected life in years | 7 | 7 | 7 |

## Performance Share Units

Performance share units vest over a three-year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range

from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|
| Nonvested at June 30, 2015 | 0.9 | $ 50.31 |
| Granted | 0.3 | 84.26 |
| Vested (1) | (0.4) | 39.81 |
| Canceled and forfeited | — | — |
| Nonvested at June 30, 2016 | 0.8 | 63.96 |
| Granted | 0.2 | 83.19 |
| Vested (2) | (0.4) | 51.49 |
| Canceled and forfeited | — | — |
| **Nonvested at June 30, 2017** | **0.6** | **$ 77.83** |

(1)  Vested based on achievement of 133 percent of the target performance goal.

(2)  Vested based on achievement of 170 percent of the target performance goal.

The following table provides additional data related to performance share unit activity:

| (in millions) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Total compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized, pre-tax | $ 13 | $ 17 | $ 16 |
| Weighted-average period over which performance share unit cost is expected to be recognized (in years) | 2 | 2 | 2 |
| Total fair value of shares vested during the year | $ 19 | $ 16 | $ 8 |

## Employee Retirement Savings Plans

Substantially all of our domestic non-union employees are eligible to be enrolled in our company-sponsored contributory retirement savings plans, which include features under Section 401(k) of the Internal Revenue Code of 1986, and provide for matching and profit sharing contributions by us. Our contributions to the plans are determined by the Board of Directors subject to certain minimum requirements as specified in the plans. The total expense for our employee retirement savings plans was $49 million, $84 million and $91 million for fiscal 2017, 2016 and 2015, respectively.

## 17. Selected Quarterly Financial Data (Unaudited)

The following is selected quarterly financial data for fiscal 2017 and 2016. The sum of the quarters may not equal year-to-date due to rounding.

| (in millions, except per common share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **Fiscal 2017** | | | | |
| Revenue | $ 32,039 | $ 33,150 | $ 31,821 | $ 32,966 |
| Gross margin (1) | 1,590 | 1,602 | 1,728 | 1,623 |
| Distribution, selling, general and administrative expenses | 920 | 910 | 960 | 983 |
| Earnings from continuing operations | 310 | 324 | 382 | 278 |
| Earnings from discontinued operations, net of tax | — | — | — | — |
| Net earnings | 310 | 324 | 382 | 278 |
| Less: Net earnings attributable to noncontrolling interests | (1) | — | (1) | (4) |
| Net earnings attributable to Cardinal Health, Inc. | 309 | 324 | 381 | 274 |
| **Net earnings from continuing operations attributable to Cardinal Health, Inc. per common share:** | | | | |
| Basic | $ 0.97 | $ 1.02 | $ 1.21 | $ 0.87 |
| Diluted | 0.96 | 1.02 | 1.20 | 0.86 |

(1)  Gross margin is impacted by LIFO benefit/(charges) of $9 million and ($9) million in the second and third quarter, respectively. We did not have LIFO benefits/(charges) in the fourth quarter.

| (in millions, except per common share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Fiscal 2016 | | | | |
| Revenue | $ 28,055 | $ 31,445 | $ 30,662 | $ 31,384 |
| Gross margin (2) | 1,579 | 1,609 | 1,689 | 1,665 |
| Distribution, selling, general and administrative expenses | 842 | 922 | 914 | 970 |
| Earnings from continuing operations | 384 | 326 | 386 | 335 |
| Earnings from discontinued operations, net of tax | — | — | — | — |
| Net earnings | 384 | 326 | 386 | 335 |
| Less: Net earnings attributable to noncontrolling interests | (1) | — | — | (2) |
| Net earnings attributable to Cardinal Health, Inc. | 383 | 326 | 386 | 333 |
| Net earnings from continuing operations attributable to Cardinal Health, Inc. per common share: | | | | |
| Basic | $ 1.17 | $ 0.99 | $ 1.18 | $ 1.03 |
| Diluted | 1.15 | 0.98 | 1.17 | 1.02 |

(2)  Gross margin is impacted by LIFO benefit/(charges) of ($39) million, ($12) million and $51 million in the second, third and fourth quarter, respectively.

## 18. Subsequent Events

On July 29, 2017, we acquired the Patient Recovery Business from Medtronic for $6.1 billion in cash. We funded the acquisition using $4.5 billion in long-term debt issued in June 2017, cash on hand, $400 million in commercial paper and $300 million borrowed under our committed receivables sales facility program. The Patient Recovery Business manufactures 23 medical product categories sold into multiple healthcare channels, and includes numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition further expands the Medical segment's portfolio of self-manufactured products.

The information needed to perform a preliminary assessment of the fair value of assets acquired and liabilities assumed in the acquisition of the Patient Recovery Business was not available at the time these consolidated financial statements were prepared.

In July 2017, we redeemed our 1.7% notes due 2018 before maturity for $403 million, including a make-whole premium and accrued interest.

# Cardinal Health, Inc. and Subsidiaries

## Schedule II - Valuation and Qualifying Accounts [1]

| (in millions) | Balance at Beginning of Period | | Charged to Costs and Expenses (2) | | Charged to Other Accounts (3) | | Deductions (4) | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| **Fiscal 2017** | | | | | | | | | |
| Accounts receivable | $ | 135 | $ | 59 | $ | 1 | $ | (58) | $ 137 |
| Finance notes receivable | | 19 | | 3 | | — | | (13) | 9 |
| Sales returns and allowances | | 386 | | 2,285 | | — | | (2,324) | 347 |
| Other | | 1 | | — | | — | | — | 1 |
| | $ | 541 | $ | 2,347 | $ | 1 | $ | (2,395) | $ 494 |
| | | | | | | | | | |
| Fiscal 2016 | | | | | | | | | |
| Accounts receivable | $ | 135 | $ | 72 | $ | 2 | $ | (74) | $ 135 |
| Finance notes receivable | | 14 | | 6 | | — | | (1) | 19 |
| Sales returns and allowances | | 305 | | 2,207 | | — | | (2,126) | 386 |
| Other | | 1 | | — | | — | | — | 1 |
| | $ | 455 | $ | 2,285 | $ | 2 | $ | (2,201) | $ 541 |
| | | | | | | | | | |
| Fiscal 2015 | | | | | | | | | |
| Accounts receivable | $ | 137 | $ | 59 | $ | 5 | $ | (66) | $ 135 |
| Finance notes receivable | | 18 | | — | | — | | (4) | 14 |
| Sales returns and allowances | | 273 | | 1,988 | | — | | (1,956) | 305 |
| Other | | 1 | | — | | — | | — | 1 |
| | $ | 429 | $ | 2,047 | $ | 5 | $ | (2,026) | $ 455 |

(1)    Amounts included herein pertain to the continuing operations of the Company.

(2)    Fiscal 2017, 2016 and 2015 include $5 million, $5 million and $7 million, respectively, for reserves related to customer pricing disputes, excluded from provision for bad debts on the consolidated statements of cash flows and classified as a reduction in revenue in the consolidated statements of earnings.

(3)    Recoveries of amounts provided for or written off in prior years were $1 million, $2 million and $1 million for fiscal 2017, 2016 and 2015, respectively.

(4)    Write-off of uncollectible accounts or actual sales returns.

# Directors, Executive Officers and Corporate Governance

The following is a list of our executive officers:

| Name | Age | Position |
|------|-----|----------|
| George S. Barrett | 62 | Chairman and Chief Executive Officer |
| Michael C. Kaufmann | 54 | Chief Financial Officer |
| Donald M. Casey, Jr. | 57 | Chief Executive Officer, Medical segment |
| Jon L. Giacomin | 52 | Chief Executive Officer, Pharmaceutical segment |
| Michele A. M. Holcomb | 49 | Executive Vice President, Strategy and Corporate Development |
| Pamela O. Kimmet | 59 | Chief Human Resources Officer |
| Craig S. Morford | 58 | Chief Legal and Compliance Officer |
| Patricia B. Morrison | 58 | Executive Vice President, Customer Support Services and Chief Information Officer |

The business experience summaries provided below for our executive officers describe positions held during the last five years (unless otherwise indicated).

Mr. Barrett has served as Chairman and Chief Executive Officer since August 2009.

Mr. Kaufmann has served as Chief Financial Officer since November 2014. From August 2009 until November 2014, he served as Chief Executive Officer, Pharmaceutical segment.

Mr. Casey has served as Chief Executive Officer, Medical segment, since April 2012.

Mr. Giacomin has served as Chief Executive Officer, Pharmaceutical segment since November 2014. From January 2011 until November 2014, he served as President, U.S. Pharmaceutical Distribution.

Ms. Holcomb has served as Executive Vice President, Strategy and Corporate Development since January 2017. She joined us from Teva Pharmaceutical Industries Ltd., where she served as Senior Vice President, Strategy, Portfolio, Search, and Partnerships and Chief Operating Officer, Global R&D from October 2015 to December 2016, Senior Vice President, Chief Operating Officer, Global R&D from September 2012 to September 2015 and Vice President, Corporate Strategy and Operational Planning from April 2010 to September 2012.

Ms. Kimmet has served as Chief Human Resources Officer since June 2016. Prior to joining us, Ms. Kimmet served as Senior Vice President, Human Resources at Coca-Cola Enterprises, Inc. from October 2010 to June 2016.

Mr. Morford has served as Chief Legal and Compliance Officer since May 2009.

Ms. Morrison has served as Executive Vice President, Customer Support Services and Chief Information Officer since June 2011.

We have adopted *Standards of Business Conduct* that apply to all of our directors, officers and employees. The *Standards of Business Conduct* outline our corporate values and standards of integrity and behavior and are designed to protect and promote our reputation. The full text of the *Standards of Business Conduct* is posted on our website at www.cardinalhealth.com under "About Us — Corporate Citizenship — Ethics and Governance — Ethics and Compliance."

Any waiver of the *Standards of Business Conduct* for directors or executive officers must be approved by the Audit Committee. As required under SEC and New York Stock Exchange rules, we will disclose future amendments to our *Standards of Business Conduct* and waivers from the *Standards of Business Conduct* for our principal executive officer, principal financial officer, and principal accounting officer, or persons performing similar functions, and our other executive officers and directors on our website within four business days following the date of the amendment or waiver.

The other information called for by Item 10 of Form 10-K is incorporated by reference to our Definitive Proxy Statement (which will be filed with the SEC pursuant to Regulation 14A under the Exchange Act) relating to our 2017 Annual Meeting of Shareholders (our "2017 Proxy Statement") under the captions "Proposal 1—Election of Directors," "Share Ownership Information" and "Corporate Governance."

# Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The table below summarizes information relating to our equity compensation plans at June 30, 2017.

### Equity Compensation Plan Information

| Plan Category | Common Shares to be Issued Upon Exercise of Outstanding Options and Rights (#) | | Weighted Average Exercise Price of Outstanding Options ($) | | Common Shares Remaining Available for Future Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (#) | |
|---|---|---|---|---|---|---|
| | (a) | | (b) | | (c) | |
| Equity compensation plans approved by shareholders | 9,320,347 | (1) | $ 63.35 | (1) | 23,114,284 | (2) |
| Equity compensation plans not approved by shareholders | 4,203 | (3) | — | (3) | — | |
| Total at June 30, 2017 | 9,324,550 | | | | 23,114,284 | |

(1) In addition to stock options outstanding under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (the "2011 LTIP") and the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (the "2005 LTIP"), also includes 849,674 PSUs and 1,723,379 RSUs outstanding under the 2011 LTIP, 10,214 PSUs and 61,681 RSUs outstanding under the 2005 LTIP, and 167,471 RSUs outstanding under the 2007 Nonemployee Directors Equity Incentive Plan that are payable solely in common shares. PSUs and RSUs do not have an exercise price, and therefore were not included for purposes of computing the weighted-average exercise price. PSUs granted in fiscal 2015 are reported in this table at the actual amount that vested (133% of target). PSUs granted in fiscal 2016 and 2017 are reported in this table at the maximum payout level (200% of target) in accordance with SEC rules.

(2) Reflects common shares available under the 2011 LTIP in the form of stock options and other stock-based awards. Under the 2011 LTIP's fungible share counting provisions, stock options are counted against the plan as one share for every common share issued; awards other than stock options are counted against the plan as two and one-half shares for every common share issued. This means that only 9,245,714 shares could be issued under awards other than stock options while 23,114,284 shares could be issued under stock options.

(3) RSUs outstanding under the Cardinal Health, Inc. Amended and Restated Outside Directors Equity Incentive Plan that are payable solely in common shares. RSUs do not have an exercise price, and therefore were not included for purposes of computing the weighted-average exercise price.

The other information called for by Item 12 of Form 10-K is incorporated by reference to our 2017 Proxy Statement under the caption "Share Ownership Information."

**Exhibits**

# Exhibits, Financial Statement Schedules

(a)(1) The following financial statements are included in the "Financial Statements" section of this report:

|  | **Page** |
|---|---|
| Consolidated Financial Statements and Schedule: | **40** |
| Consolidated Statements of Earnings for the Fiscal Years Ended June 30, 2017, 2016 and 2015 | **41** |
| Consolidated Statements of Comprehensive Income for the Fiscal Years Ended June 30, 2017, 2016 and 2015 | **42** |
| Consolidated Balance Sheets at June 30, 2017 and 2016 | **43** |
| Consolidated Statements of Shareholders' Equity for the Fiscal Years Ended June 30, 2017, 2016 and 2015 | **44** |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2017, 2016 and 2015 | **45** |
| Notes to Consolidated Financial Statements | **46** |

(a)(2) The following Supplemental Schedule is included in this report:

|  | **Page** |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | **69** |

All other schedules not listed above have been omitted as not applicable or because the required information is included in the Consolidated Financial Statements or in the Notes thereto.

| **Exhibit Number** | **Exhibit Description** |
|---|---|
| 2..1.1 | Stock and Asset Purchase Agreement, dated March 1, 2015, between Ethicon, Inc. and Cardinal Health, Inc. (incorporated by reference to Exhibit 2.1 to Cardinal Health's Current Report on Form 8-K filed on May 28, 2015, File No. 1-11373) |
| 2.1.2 | Letter Agreement, dated May 29, 2015, between Ethicon, Inc. and Cardinal Health, Inc. relating to mechanics of agreeing to purchase price allocation (incorporated by reference to Exhibit 2.3 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2015, File No. 1-11373) |
| 2.1.3 | Amendment No. 1, dated as of October 2, 2015, to the Stock and Asset Purchase Agreement, dated as of March 1, 2015, between Ethicon, Inc. and Cardinal Health, Inc. (incorporated by reference to Exhibit 2.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2015, File No. 1-11373) |
| 2.1.4 | Letter Agreement, dated August 8, 2016, between Ethicon, Inc. and Cardinal Health, Inc. relating to pre-closing product registration transfer process for certain Day 2 Countries (incorporated by reference to Exhibit 2.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2016, File No. 1-11373) |
| 2.2.1 | Stock and Asset Purchase Agreement, dated April 18, 2017, between Cardinal Health, Inc. and Medtronic plc (incorporated by reference to Exhibit 2.1 to Cardinal Health's Current Report on Form 8-K filed on April 18, 2017, File No. 1-11373) |
| 2.2.2 | Amendment No. 1, dated as of July 28, 2017, to Stock and Asset Purchase Agreement, dated April 18, 2017, between Cardinal Health, Inc. and Medtronic plc |
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 4.1 | Specimen Certificate for Common Shares of Cardinal Health, Inc. (incorporated by reference to Exhibit 4.01 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2001, File No. 1-11373) |
| 4.2.1 | Indenture, dated as of June 2, 2008, between Cardinal Health, Inc. and The Bank of New York Trust Company, N.A. (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 2, 2008, File No. 1-11373) |
| 4.2.2 | Form of 4.625% Notes due 2020 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on December 14, 2010, File No. 1-11373) |
| 4.2.3 | Form of 1.900% Notes due 2017 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on May 21, 2012, File No. 1-11373) |
| 4.2.4 | Form of 3.200% Notes due 2022 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on May 21, 2012, File No. 1-11373) |
| 4.2.5 | Form of 1.700% Notes due 2018 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.2.6 | Form of 3.200% Notes due 2023 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.2.7 | Form of 4.600% Notes due 2043 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.2.8 | Form of 2.400% Notes due 2019 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |

**Exhibits**

| | |
|---|---|
| 4.2.9 | Form of 3.500% Notes due 2024 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |
| 4.2.10 | Form of 4.500% Notes due 2044 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |
| 4.2.11 | Form of 1.950% Notes due 2018 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |
| 4.2.12 | Form of 3.750% Notes due 2025 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |
| 4.2.13 | Form of 4.900% Notes due 2045 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |
| 4.2.14 | Form of 1.948% notes due 2019 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.15 | Form of 2.616% notes due 2022 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.16 | Form of Floating rate notes due 2022 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.17 | Form of 3.079% notes due 2024 (incorporated by reference to Exhibit 4.4 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.18 | Form of 3.410% notes due 2027 (incorporated by reference to Exhibit 4.5 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.19 | Form of 4.368% notes due 2047 (incorporated by reference to Exhibit 4.6 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.3 | Agreement to furnish to the Securities and Exchange Commission upon request a copy of instruments defining the rights of holders of certain long-term debt of Cardinal Health, Inc. and consolidated subsidiaries (incorporated by reference to Exhibit 4.07 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2005, File No. 1-11373) |
| 10.1.1 | Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.2 | First Amendment to Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.1.3 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.4 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.3 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)* |
| 10.1.5 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.4 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.1.6 | Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.7 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.1.7 | Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.8 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.1.8 | Form of Performance Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.9 | Form of Amendment to Stock Option and Restricted Share Units Agreements under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan, the Cardinal Health, Inc. 2005 Long-Term Incentive Plan and the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.1.9 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.2.1 | Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on November 7, 2016, File No. 1-11373)* |
| 10.2.2 | First Amendment to Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan* |
| 10.2.3 | Form of Nonqualified Stock Option Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan* |
| 10.2.4 | Form of Restricted Share Units Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan* |
| 10.2.5 | Form of Performance Share Units Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan* |
| 10.3.1 | Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373)* |
| 10.3.2 | First Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.3.3 | Second Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.3.4 | Third Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.4 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.3.5 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.3.6 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.11 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2010, File No. 1-11373)* |
| 10.4.1 | Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, File No. 1-11373)* |
| 10.4.2 | First Amendment to Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.2.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |

| | |
|---|---|
| 10.4.3 | Second Amendment to the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the Quarter ended December 31, 2011, File No. 1-11373)* |
| 10.4.4 | Form of Directors' Restricted Share Units Agreement under the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.5.7 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.5.1 | Cardinal Health Deferred Compensation Plan, as amended and restated effective January 1, 2016 (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2015, File No. 1-11373)* |
| 10.5.2 | First Amendment to the Cardinal Health Deferred Compensation Plan, as amended and restated effective as of January 1, 2016 (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373)* |
| 10.6 | Cardinal Health, Inc. Management Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Periodic Report on Form 8-K filed on November 10, 2014, File No. 1-11373)* |
| 10.7 | Cardinal Health, Inc. Policy Regarding Shareholder Approval of Severance Agreements (incorporated by reference to Exhibit 10.09 to Cardinal Health's Current Report on Form 8-K filed on August 7, 2006, File No. 1-11373)* |
| 10.8.1 | Employment Agreement, dated September 4, 2012, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on September 6, 2012, File No. 1-11373)* |
| 10.8.2 | Amendment, dated August 5, 2015, to Employment Agreement, dated September 4, 2012, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 6, 2015, File No. 1-11373)* |
| 10.8.3 | Aircraft Time Sharing Agreement, effective August 5, 2015, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 6, 2015, File No. 1-11373)* |
| 10.9 | Confidentiality and Business Protection Agreement, effective as of February 15, 2010, between Cardinal Health, Inc. and Michael C. Kaufmann (incorporated by reference to Exhibit 10.15 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2010, File No. 1-11373)* |
| 10.10 | Confidentiality and Business Protection Agreement, effective as of April 9, 2012, between Cardinal Health, Inc. and Donald M. Casey Jr. (incorporated by reference to Exhibit 10.14.1 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)* |
| 10.11 | Confidentiality and Business Protection Agreement, effective as of September 9, 2014, between Cardinal Health, Inc. and Jon L. Giacomin (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, File No. 1-11373)* |
| 10.12.1 | Form of Indemnification Agreement between Cardinal Health, Inc. and certain individual directors (incorporated by reference to Exhibit 10.38 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, File No. 1-11373) |
| 10.12.2 | Form of Indemnification Agreement between Cardinal Health, Inc. and certain individual executive officers (incorporated by reference to Exhibit 10.39 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, File No. 1-11373) |
| 10.13.1 | Issuing and Paying Agency Agreement, dated August 9, 2006, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.01 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.13.2 | First Amendment to Issuing and Paying Agency Agreement, dated February 28, 2007, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.01 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.13.3 | Second Amendment to Issuing and Paying Agency Agreement, effective as of December 1, 2016, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.13.4 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and J.P. Morgan Securities Inc. (incorporated by reference to Exhibit 10.02 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.13.5 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and J.P. Morgan Securities Inc. (incorporated by reference to Exhibit 10.02 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.13.6 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and J.P. Morgan Securities LLC (formerly known as J.P. Morgan Securities Inc.) (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.13.7 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and J.P. Morgan Securities LLC, effective as of December 1, 2016 (incorporated by reference to Exhibit 10.6 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.13.8 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Banc of America Securities LLC (incorporated by reference to Exhibit 10.03 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.13.9 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Banc of America Securities LLC (incorporated by reference to Exhibit 10.03 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.13.10 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, f/k/a Banc of America Securities LLC (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.13.11 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, effective as of December 1, 2016 (incorporated by reference to Exhibit 10.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.13.12 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.04 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.13.13 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.04 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.13.14 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Wells Fargo Securities, LLC, as successor in interest to Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.6 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.13.15 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Wells Fargo Securities, LLC, effective as of December 1, 2016 (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.13.16 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.05 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |

**Exhibits**

10.13.17 First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.05 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373)

10.13.18 Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.7 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373)

10.13.19 Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Goldman Sachs & Co., effective as of December 1, 2016 (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373)

10.13.20 Form of Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc. (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K filed on April 21, 2009, File No. 1-11373)

10.13.21 Form of First Amendment to Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc. (incorporated by reference to Exhibit 10.8 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373)

10.13.22 Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc., effective as of December 1, 2016 (incorporated by reference to Exhibit 10.7 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373)

10.14.1 Amended and Restated Five-Year Credit Agreement, dated as of June 16, 2016, among Cardinal Health, Inc., JPMorgan Chase Bank, N.A. as Administrative Agent, Joint Lead Arranger and Joint Book Manager, Bank of America, N.A. as Syndication Agent, The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Syndication Agent, Joint Lead Arranger and Joint Book Manager, Barclays Bank PLC, Deutsche Bank Securities Inc., Goldman Sachs Bank USA, HSBC Bank USA, National Association, Morgan Stanley Senior Funding, Inc. and Wells Fargo Bank, National Association, as Documentation Agents, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Joint Lead Arranger and Joint Book Manager (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on June 21, 2016, File No. 1-11373)

10.14.2 Amendment No. 1, dated as of May 1, 2017, to Amended and Restated Five-Year Credit Agreement as of June 16, 2016 (incorporated by reference to Exhibit 10.8 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2017, File No. 1-11373)

10.15 Commitment Letter, dated April 18, 2017, by and among Goldman Sachs Bank USA and Goldman Sachs Lending Partners LLC and Cardinal Health, Inc. (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on April 18, 2017, File No. 1-11373)

10.16.1 Tax Matters Agreement, dated as of August 31, 2009, by and between Cardinal Health, Inc. and CareFusion Corporation (incorporated by reference to Exhibit 10.3 to Cardinal Health's Current Report on Form 8-K filed on September 4, 2009, File No. 1-11373)

10.16.2 First Amendment to Tax Matters Agreement, dated as of May 28, 2012, by and between Cardinal Health, Inc. and CareFusion Corporation (incorporated by reference to Exhibit 10.20.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)

12.1 Computation of Ratio of Earnings to Fixed Charges

21.1 List of Subsidiaries of Cardinal Health, Inc.

23.1 Consent of Independent Registered Public Accounting Firm

31.1 Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2 Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1 Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

99.1 Statement Regarding Forward-Looking Information

101.INS XBRL Instance Document

101.SCH XBRL Taxonomy Extension Schema Document

101.CAL XBRL Taxonomy Extension Calculation Linkbase Document

101.DEF XBRL Taxonomy Definition Linkbase Document

101.LAB XBRL Taxonomy Extension Label Linkbase Document

101.PRE XBRL Taxonomy Extension Presentation Linkbase Document

* Management contract or compensatory plan or arrangement.

# Form 10-K Cross Reference Index

| Item | | Page(s) |
|---|---|---|
| | **Part 1** | |
| 1 | Business | 24 |
| 1A | Risk Factors | 30 |
| 1B | Unresolved Staff Comments | N/A |
| 2 | Properties | 34 |
| 3 | Legal Proceedings | 34 |
| 4 | Mine Safety Disclosures | N/A |
| | **Part II** | |
| 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 35 |
| 6 | Selected Financial Data | 21 |
| 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 3 |
| 7A | Quantitative and Qualitative Disclosures about Market Risk | 22 |
| 8 | Financial Statements and Supplementary Data | 40 |
| 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | N/A |
| 9A | Controls and Procedures | 37 |
| 9B | Other Information | N/A |
| | **Part III** | |
| 10 | Directors, Executive Officers and Corporate Governance | 70 |
| 11 | Executive Compensation | (a) |
| 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 71 |
| 13 | Certain Relationships and Related Transactions, and Director Independence | (b) |
| 14 | Principal Accounting Fees and Services | (c) |
| | **Part IV** | |
| 15 | Exhibits, Financial Statement Schedules | 72 |
| 16 | Form 10-K Summary | N/A |
| | Signatures | 77 |

**N/A**  Not applicable

**(a)**  The information called for by Item 11 of Form 10-K is incorporated by reference to our 2017 Proxy Statement under the captions "Compensation Discussion and Analysis," "Executive Compensation" and "Director Compensation."

**(b)**  The information called for by Item 13 of Form 10-K is incorporated by reference to our 2017 Proxy Statement under the caption "Corporate Governance."

**(c)**  The information called for by Item 14 of Form 10-K is incorporated by reference to our 2017 Proxy Statement under the caption "Audit Committee Report and Audit Matters."

**Additional Information**

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on August 10, 2017.

Cardinal Health, Inc.

By: /s/ GEORGE S. BARRETT
George S. Barrett
Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed below by the following persons on behalf of the registrant and in the capacities indicated on August 10, 2017.

| Name | Title |
|---|---|
| /s/ GEORGE S. BARRETT <br> **George S. Barrett** | Chairman and Chief Executive Officer and Director (principal executive officer) |
| /s/ MICHAEL C. KAUFMANN <br> **Michael C. Kaufmann** | Chief Financial Officer (principal financial officer) |
| /s/ STUART G. LAWS <br> **Stuart G. Laws** | Senior Vice President and Chief Accounting Officer (principal accounting officer) |
| /s/ DAVID J. ANDERSON <br> **David J. Anderson** | Director |
| /s/ COLLEEN F. ARNOLD <br> **Colleen F. Arnold** | Director |
| /s/ CARRIE S. COX <br> **Carrie S. Cox** | Director |
| /s/ CALVIN DARDEN <br> **Calvin Darden** | Director |
| /s/ BRUCE L. DOWNEY <br> **Bruce L. Downey** | Director |
| /s/ PATRICIA A. HEMINGWAY HALL <br> **Patricia A. Hemingway Hall** | Director |
| /s/ CLAYTON M. JONES <br> **Clayton M. Jones** | Director |
| /s/ GREGORY B. KENNY <br> **Gregory B. Kenny** | Director |
| /s/ NANCY KILLEFER <br> **Nancy Killefer** | Director |
| /s/ DAVID P. KING <br> **David P. King** | Director |

## AMENDMENT NO. 1

### TO

### STOCK AND ASSET PURCHASE AGREEMENT

This AMENDMENT NO. 1, dated as of July 28, 2017 (this "Amendment"), to the Stock and Asset Purchase Agreement, dated as of April 18, 2017 (the "Purchase Agreement"), is by and between Medtronic plc, an Irish public limited company ("Seller"), and Cardinal Health, Inc., an Ohio corporation ("Buyer").

WHEREAS, pursuant to and in accordance with Section 11.05 of the Purchase Agreement, the parties desire to amend certain provisions of the Purchase Agreement as set forth in this Amendment; and

WHEREAS, terms used herein and not defined shall have the meanings ascribed thereto in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual agreements set forth in the Purchase Agreement and this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree as follows:

### RECITALS

The second recital of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"WHEREAS, Seller desires to sell (or to cause to be sold), and Buyer desires to purchase or cause certain of its Affiliates to purchase (or otherwise acquire), certain assets, including the Transferred Equity Interests (as defined below), related to the Business as a going concern and Buyer is willing to assume or cause certain of its Affiliates to assume certain liabilities related to the Business, in each case upon the terms and subject to the conditions set forth herein."

### ARTICLE 1
### Purchase Agreement; Disclosure Letter; Other Matters

Section 1.01    Definitions.  Section 1.01(a) of the Purchase Agreement (Definitions) is hereby amended as follows:

(i)      The definition of the term "Ancillary Agreements" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Ancillary Agreements' means, other than this Agreement, the agreements and instruments, including any Country Transfer Agreements and any related instruments of transfer, the General Assignment, the Assumption Agreement,

the Patent Assignment, the Trademark Assignment, the U.S. Merger Agreement, the Transition Services Agreement, the Master Manufacturing and Supply Agreement, the Sorting Service Agreement, the Undisclosed Agency Agreement, the Escrow Agreement, the French Offer Letter, the Dutch Offer Letter, the Lease Assignment and Assumption Agreements and the Trademark License Agreements, executed and delivered in connection with the transactions contemplated by this Agreement."

(ii)     The definition of the term "Assumed Liabilities" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Assumed Liabilities' means the obligations and liabilities set forth or described on Annex 2.02(c), which expressly exclude the Excluded Liabilities."

(iii)     The definition of the term "Buyer Tax Act" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Buyer Tax Act' means the following: (A) at or after the Closing, any election made by Buyer or any of its Affiliates (including any Transferred Company) under any provision of the Code or non-U.S. Tax Law for any Pre-Closing Tax Period, which election is made at or after the Closing with respect to any Transferred Company, the Transferred Assets or the Business, but not (i) any such election that is set forth on a Tax Return required to be filed by Buyer under Section 7.08(a)(i) or Section 7.08(a)(ii) and which election is consistent with past practice, (ii) any such election that is expressly required by this Agreement, or (iii) any such election that is made with Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed), (B) any failure to comply with Item 2, 3 or 4 of Schedule 1.01(a) to the Disclosure Letter or any failure of the statement in Item 1 of Schedule 1.01(a) to the Disclosure Letter to be true, correct, and complete, and (C) any action taken by Buyer on the Closing Date after such Closing other than (i) in the ordinary course of business, (ii) as required or contemplated by this Agreement or applicable Law, or (iii) with Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed).  For the absence of doubt, none of the Section 338(g) Elections or any action undertaken by Seller and its Affiliates, prior to the Closing, pursuant to the Internal Restructuring Steps shall constitute a Buyer Tax Act."

(iv)     The definition of the term "Disclosure Letter" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Disclosure Letter' means the confidential disclosure letter delivered to Buyer by Seller prior to or simultaneously with entering into the Purchase Agreement, as amended by Amendment No. 1 to the Purchase Agreement, dated as of July 28, 2017."

(v)     The definition of the term "Employee of the Business" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Employee of the Business' means each employee of Seller or its Affiliates who is set forth on Schedule 1.01(b) to the Disclosure Letter (as such schedule may be updated in accordance with this Agreement), including each such employee who, as of the Closing Date (or, with respect to Deferred Employees, the applicable Deferred Closing Date) is on leave of absence (including medical leave, military leave, workers compensation leave and short-term or long-term disability or vacation)."

(vi)     The definition of the term "Inventory" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Inventory' means the inventory of all finished Products (including consignment stock) ("Finished Goods Inventory"), Product specific work in process and Product specific raw materials."

(vii)     The definition of the term "Legacy Product" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Legacy Product' means any product that is not a Product as of the Closing, but (a) is a prior product design, form, version or implementation (whether commercialized or not) of Seller, an Affiliate of Seller or a Transferred Company which product design, form, version or implementation (whether commercialized or not) was at any time prior to the Closing superseded by a Product design, form, version or implementation, (b) was within one of the product groups set forth on Exhibit A-1 and (c) in which product design, form, version or implementation by Seller, any of its Affiliates or any Transferred Company owns or has the valid right to use the IP Rights."

(viii)     The definition of the term "Permitted Liens" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Permitted Liens' means (a) mechanics', carriers', workmen's, repairmen's or other like Liens imposed by Law arising or incurred in the ordinary course of business, (b) Liens arising under purchase price conditional sales contracts or equipment leases with third parties entered into in the ordinary course of business consistent with past practice, (c) Liens for Taxes or other governmental charges that are not yet delinquent and may thereafter be paid without penalty, or that the taxpayer is contesting in good faith through appropriate proceedings and for which adequate reserves have been established in the accounting books and records prior to the date hereof, (d) restrictions under leases, subleases, licenses or occupancy agreements that constitute Transferred Assets, none of which materially interferes with the present use of the related real property, (e) easements, covenants, rights-of-

-3-

way and other similar restrictions of record, none of which materially interferes with the present use of the related real property, (f) zoning, building and other similar restrictions, none of which materially interferes with the present use of the related real property, (g) Liens created by or for the benefit of Buyer or its Affiliates, (h) Liens that are removed prior to the Closing or, with respect to Deferred Assets, the applicable Deferred Closing and (i) with respect to real property, other imperfections of title or encumbrances, if any, which do not materially interfere with the present use of such real property."

(ix)     The definition of the term "Transactions" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Transactions' mean, collectively, the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of the Transferred Assets and the Transferred Equity Interests (including pursuant to the U.S. Merger) and the assumption of the Assumed Liabilities."

(x)     The definition of the term "Transferred Employee" in Section 1.01(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"'Transferred Employee' means each Employee of the Business who, as of the Closing Date (or, with respect to Deferred Employees, the applicable Deferred Closing Date) (or, if applicable, such later date that such employee commences employment with Buyer or one of its Affiliates), becomes an employee of Buyer or one of its Affiliates whether by operation of Law, pursuant to the transfer (directly or indirectly) of the Transferred Equity Interests to Buyer or by acceptance of Buyer's or one of its Affiliate's offer of employment pursuant to Section 8.01."

(xi)     Section 1.01(a) of the Purchase Agreement is amended to include the following new definitions in the appropriate alphabetical positions:

"'Cardinal Merger Sub Common Stock' means common stock, par value $0 per share, of Cardinal Merger Sub."

"'Deferred Beneficiary' means Buyer or its applicable Affiliate designated in accordance with Section 2.02(f) that will be entitled to receive the relevant Deferred Assets and the relevant Deferred Liabilities at the applicable Deferred Closing."

"'Deferred Business' means the part of the Business in respect of which a Deferred Title Holder has Deferred Assets or Deferred Liabilities.  For the avoidance of doubt, the portion of the Business conducted by any of the Transferred Companies shall not be part of the Deferred Business in any country."

-4-

"'<u>Deferred Business Taxes</u>' means, with respect to any Deferred Asset, any Deferred Liability or any portion of the Deferred Business in each Deferred Closing Country, all Taxes (other than Excluded Deferred Taxes) in each case, incurred by the applicable Deferred Title Holder and/or its Affiliates in connection with (a) the operation (or ownership) of the Deferred Assets, Deferred Liabilities or any portion of the Deferred Business during the Deferred Period or (b) the receipt of goods or services in support and furtherance of the operation (or ownership) of the Deferred Assets, Deferred Liabilities, or Deferred Business during the Deferred Period."

"'<u>Deferred Inventory Closing Date</u>' means the date on which the Undisclosed Agency Agreement is terminated, pursuant to the terms thereof, with respect to the relevant Deferred Inventory or Distribution Services."

"'<u>Deferred Inventory Period</u>' means, with respect to the Deferred Inventory and the provision of Distribution Services, the period from the Closing until the applicable Deferred Inventory Closing Date."

"'<u>Deferred Inventory Taxes</u>' means, with respect to any Deferred Inventory or any Distribution Services, all Taxes (other than Excluded Deferred Taxes) in each case, incurred by Seller and/or its Affiliates in connection with (a) the ownership of the Deferred Inventory during the Deferred Inventory Period, or (b) the receipt of goods or services in support and furtherance of the ownership of the Deferred Inventory during the Deferred Inventory Period."

"'<u>Deferred Period</u>' means, with respect to the Deferred Business in each Deferred Closing Country, the period from the Closing until the applicable Deferred Closing."

"'<u>Deferred Taxes</u>' means, together, Deferred Business Taxes and Deferred Inventory Taxes."

"'<u>Deferred Title Holder</u>' means Seller or one or more of its Affiliates that has Deferred Assets or Deferred Liabilities during the applicable Deferred Period."

"'<u>Escrow Account</u>' means the segregated escrow trust account established pursuant to the Escrow Agreement to hold the Escrow Amount (or any replacement therefor contemplated by the last sentence of <u>Section 2.03(a)</u>)."

"'<u>Escrow Agent</u>' means U.S. Bank National Association (or any replacement therefor contemplated by the last sentence of <u>Section 2.03(a)</u>)."

"'<u>Estimated Swiss Tax Basis</u>' means the amount set forth in <u>Schedule 6.11(a)</u> to the Disclosure Letter."

-5-

"'Excluded Deferred Business Taxes' means (a) sales Taxes, VAT and other Taxes imposed on Seller or any of its Affiliates (including, for the avoidance of doubt, any Deferred Title Holder) to the extent Seller or any of its Affiliates (including, for the avoidance of doubt, any Deferred Title Holder) actually receives, in cash (or through a reduction of amounts otherwise payable), reimbursement or payment in respect of such Tax such that neither Seller nor any of its Affiliates (including, for the avoidance of doubt, any Deferred Title Holder) bears economic responsibility for such Tax, (b) Recoverable VAT, (c) Taxes (other than VAT) attributable to the NEB Return on Sales Amount owed to Seller or its Affiliates, and (d) except to the extent otherwise provided pursuant to any Ancillary Agreement, Taxes attributable to amounts owed to Seller or any of its Affiliates (including, for the avoidance of doubt, any Deferred Title Holder) under the Ancillary Agreements; provided, that for the avoidance of doubt, any Taxes allocated to any party pursuant to any Ancillary Agreement shall continue to be the responsibility of such party."

"'Excluded Deferred Inventory Taxes' means (a) sales Taxes, VAT and other Taxes imposed on Seller or any of its Affiliates to the extent Seller or any of its Affiliates actually receives, in cash (or through a reduction of amounts otherwise payable), reimbursement or payment in respect of such Tax such that neither Seller nor any of its Affiliates bears economic responsibility for such Tax, (b) Recoverable VAT, and (c) except to the extent otherwise provided pursuant to any Ancillary Agreement, Taxes attributable to amounts owed to Seller or any of its Affiliates under the Ancillary Agreements; provided that, for the avoidance of doubt, any Taxes allocated to any party pursuant to any Ancillary Agreement shall continue to be the responsibility of such party."

"'Excluded Deferred Taxes' means, together, Excluded Deferred Business Taxes and Excluded Deferred Inventory Taxes."

"'InnerDyne Common Stock' means common stock, par value $1.00 per share, of InnerDyne Holdings."

"'Integration Amount' means the amount set forth on Schedule 2.09(h) to the Disclosure Letter, which payment is, subject to the terms of this Agreement, to be made in respect of integration and other information technology costs and expenses incurred or to be incurred by Seller and its Affiliates in connection with the transactions contemplated hereby."

"'NEB Distribution Fee' means, for any given period during the Deferred Period: (a) the NEB Revenue Amount, *minus* (b) the NEB Return on Sales Amount, *minus* (c) the NEB Services Reimbursement Amount."

"'NEB Return on Sales Amount' means, for any given period during the Deferred Period, solely with respect to the Deferred Business in each

-6-

Deferred Closing Country, an amount equal to (i) the percentage set forth under the heading 'ROS%' on Annex A to the Disclosure Letter corresponding to the Deferred Closing Country set forth opposite such percentage on Annex A to the Disclosure Letter *multiplied by* (ii) the net sales (determined using the Accounting Policies) of the Deferred Business derived in such Deferred Closing Country during the Deferred Period."

"'NEB Revenue Amount' means, for any given period during the Deferred Period, solely with respect to the Deferred Business in each Deferred Closing Country, an amount equal to the net sales (determined using the Accounting Policies) of the Deferred Business ("Net Sales"), *minus* an amount equal to the applicable percentage of such net sales set forth in Annex C to the Disclosure Letter with respect to the region containing the Deferred Closing Country for which the applicable portion of such NEB Revenue Amount relates (such percentage, the "Bad Debt Rate")."

"'NEB Services Reimbursement Amount' means, for any given period during the Deferred Period, solely with respect to the Deferred Business in each Deferred Closing Country, an amount equal to the aggregate of (i) freight and duties expenses, (ii) sales force salary and commissions, (iii) ordinary course marketing expenses incurred consistent with past practice, (iv) any other expenses to the extent incurred at Buyer's or its Affiliates' direction and (v) Deferred Business Taxes, which in the case of clauses (i), (ii) and (iii) shall be determined by multiplying the Net Sales for such Deferred Closing Country by the percentage set forth under the heading 'Reimbursement % (OPC and DD)' on Annex A to the Disclosure Letter opposite such Deferred Closing Country; provided, that for the avoidance of doubt 'NEB Services Reimbursement Amount' shall not include (x) any general and administrative expenses and (y) solely to avoid any duplication of Buyer or its Affiliates paying for the same expense more than once, expenses that have otherwise been reimbursed to Seller or its Affiliates by Buyer or its Affiliates pursuant to any Ancillary Agreement."

"'Non-Commercial Employees' means the Employees of the Business set forth in Annex D to the Disclosure Letter."

"'Recoverable VAT' means any VAT to the extent Seller and/or any of its Affiliates (including, for the avoidance of doubt, any Deferred Title Holder) actually receives in cash (or through a reduction of Taxes otherwise payable) a refund, deduction, or credit of such VAT from the relevant Taxing Authority; provided, however, that, notwithstanding anything to the contrary herein, if and to the extent the relevant Taxing Authority subsequently disallows such refund, deduction, or credit, Buyer shall promptly pay to Seller or its Affiliates an amount equal to such disallowed refund, deduction, or credit, except where the disallowance of

-7-

such refund, deduction or credit results from the fraud, willful misconduct or intentional breach of this Agreement by Seller and/or any of its Affiliates."

"'Transferred Inventory' means all Inventory owned or held by Seller or any of its Affiliates at the time of the Closing."

Section 1.02    Interpretation and Construction.  Section 1.02 of the Purchase Agreement (Interpretation and Construction) is hereby amended as follows:

(i)    Section 1.02(c) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"Except as provided in Section 2.03(b) and Section 8.02(a), whenever conversion of values from any Foreign Currency for a particular date or period shall be required, such conversion shall be made using the rate provided by Bloomberg at 7:00 a.m. New York City time (the "Exchange Rate") three (3) business days prior to the applicable date or dates."

(ii)    Section 1.02(d) of the Purchase Agreement is hereby amended by adding the following to the end of the section:

"For purposes of Section 2.11, Section 7.08 and Article X, to the extent permitted by applicable Law and foreign currency regulations, if requested by either Seller or Buyer to the other party to make or receive payments through any of their respective Affiliates, the parties agree to cooperate in good faith with respect to such request, taking into account, among other matters, the costs or other burdens of complying with such request."

Section 1.03    Closing; Deferred Closings.  Article II of the Purchase Agreement (Closing; Deferred Closings) is hereby amended as follows:

(i)    Section 2.01 of the Purchase Agreement (Closing) is hereby amended and restated in its entirety as follows:

"The closing of the purchase and sale of the Transferred Assets and Transferred Equity Interests (including the U.S. Merger) and the assumption of the Assumed Liabilities (the "Closing") shall take place at the offices of Wachtell, Lipton, Rosen & Katz in New York, New York, at 10:00 a.m., New York City time, on the later of (a) the second business day following the satisfaction (or, to the extent permitted by applicable Law, waiver) of the conditions set forth in Article V and (b) the first calendar day of the first fiscal month of Seller immediately following the fiscal month of Seller in which such satisfaction (or waiver) occurs (excluding in each case those conditions intended to be satisfied at the Closing but subject to their satisfaction or, to the extent permitted by

-8-

applicable Law, waiver at such time) (provided that the Closing shall not occur prior to July 29, 2017), or on such other date as the parties hereto may agree.  The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."  The Closing shall be deemed to occur and be effective at 12:01 A.M., local time, on the Closing Date.  The parties hereto specifically acknowledge that time is of the essence because Seller's intention to exit the Business is or will become known to its employees, customers, suppliers and others having dealings with Seller."

(ii)     Section 2.02(a) of the Purchase Agreement (Transferred Assets and Transferred Equity Interests) is hereby amended and restated in its entirety as follows:

"Pursuant to the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will, and will cause the relevant Asset Selling Affiliates to, in accordance with Exhibit L (the "Closing Structure"), sell, convey, assign, and transfer to Buyer, and Buyer will purchase, acquire and accept, the Transferred Assets, free and clear of all Liens other than Permitted Liens.  Accordingly, Seller will, or will cause the relevant Asset Selling Affiliates to, execute and deliver at the Closing a general assignment and bill of sale substantially in the form of Exhibit B (the "General Assignment"), a general patent assignment substantially in the form of Exhibit C (the "Patent Assignment") and a general trademark assignment substantially in the form of Exhibit D (the "Trademark Assignment") and at the Closing such other instruments of conveyance, assignment and transfer as Buyer reasonably requests (the form and substance of which shall be mutually agreed between the parties), in each case to convey to Buyer all of Seller's and/or each Asset Selling Affiliate's right, title and interest in and to the applicable Transferred Assets.  In addition, pursuant to the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will, and will cause the relevant Stock Selling Affiliates to, in accordance with the Closing Structure, sell, convey, assign, and transfer to Buyer or Buyer's applicable Affiliates designated in accordance with Section 2.02(f), and Buyer or its applicable Affiliates designated in accordance with Section 2.02(f) will purchase, acquire and accept (including indirectly by means of the U.S. Merger), the Transferred Equity Interests (and will indirectly acquire and accept by means of such purchase acquisition and acceptance, the Transferred Equity Interests in any Transferred Company that is a subsidiary of another Transferred Company), free and clear of all Liens.  Accordingly, Seller will, or will cause the relevant Stock Selling Affiliates to, deliver at the Closing stock certificates representing the Transferred Equity Interests, together with a stock power endorsed in blank, to the extent that such Transferred Equity Interests are in certificated form, and to the extent such Transferred Equity Interests are not in certificated form, other evidence of assignment."

-9-

(iii)    Section 2.02(e) of the Purchase Agreement (Country Transfer Agreements) is hereby amended and restated in its entirety as follows:

"To the extent required by applicable Law or as deemed necessary by either of the parties hereto, the transfer of each Country Unit will be effected pursuant to a short-form agreement or one or more instruments of transfer, such as a bill of sale, share transfer agreement, business transfer agreement, real estate transfer agreement or other asset assignment document, which agreement shall be prepared by Seller and shall be on terms mutually agreed between the parties hereto and consistent with and as close as reasonably possible to the applicable terms of this Agreement (each, a "Country Transfer Agreement").  Unless otherwise agreed by Buyer and Seller, the parties shall enter into the Country Transfer Agreements as soon as reasonably practicable after the date hereof and not later than the Closing.  For the avoidance of doubt, Country Transfer Agreements with respect to each Deferred Closing Country will not be executed or delivered prior to or on the Closing Date, but shall instead be executed in connection with the applicable Deferred Closing."

(iv)    Section 2.02(f) of the Purchase Agreement (Designation of Affiliates) is hereby amended and restated in its entirety as follows:

"To the extent that any of the Transferred Assets or Transferred Equity Interests are under the control of any of Seller's Affiliates, Seller shall cause its Affiliates to promptly take such legal action as may be necessary to consummate the transfer to Buyer and its Affiliates of such Transferred Assets or Transferred Equity Interests under terms and conditions which are consistent with and subject to the terms of this Agreement.  Prior to, and in any event at least thirty (30) days in advance of, the Closing or the applicable Deferred Closing (as applicable), Buyer may designate, with the consent of Seller (which consent shall not be unreasonably withheld), one or more Affiliates to, at the Closing or the applicable Deferred Closing (as applicable), (i) acquire all or part of the Transferred Assets (or applicable Deferred Assets) or Transferred Equity Interests, (ii) assume all or part of the Assumed Liabilities (or applicable Deferred Liabilities) or (iii) pay the Deferred Closing Country Amount pursuant to Section 2.11 (h), in each case related to the applicable Country Unit, as the case may be, in which event all references herein to Buyer will be deemed to refer to such Affiliates, as appropriate; provided, however, that no such designation will in any event limit or affect the obligations of Buyer under this Agreement to the extent not performed by such Affiliates."

-10-

(v)     Section 2.02(g) of the Purchase Agreement (Transferred Assets Subject to Third-Party Consent) is hereby amended and restated in its entirety as follows:

"With respect to each Product, the parties shall use reasonable best efforts to ensure that, effective as of the Closing or the applicable Deferred Closing (as applicable), or as soon as reasonably practicable thereafter, either (A) (1) the Product Registrations that constitute Transferred Assets shall have transferred to, or shall have been approved in writing by the applicable Governmental Entity for transfer to, Buyer or its designee or (2) Buyer shall have obtained a Product Registration (including any re-registrations) that enables Buyer or its designee to manufacture, distribute and market such Product in each applicable jurisdiction, or (B) Buyer or its designee otherwise shall have either (1) acceded to Seller's or its Affiliate's rights in respect of manufacturing, distributing and marketing such Products under such Product Registrations, including by Seller or an Affiliate of Seller designating Buyer or its designee as an authorized agent with respect to such Products, or (2) been designated as a manufacturing, sales or distribution agent with respect to the Products under such Product Registrations, in the case of this clause (B), pursuant to reasonable, lawful and customary arrangements to effectuate the foregoing (the time at which any of the foregoing occurs with respect to a Product Registration (or, if earlier, the expiration of such Product Registration in accordance with its terms), the "Product Registration Transfer Time").  If the Product Registration Transfer Time shall not have occurred on the Closing Date or the applicable Deferred Closing Date (as applicable) with respect to any such Product Registration, until such Product Registration Transfer Time with respect to such Product Registration, (X) the parties will continue to use reasonable best efforts to ensure that the Product Registration Transfer Time with respect to such Product occurs as soon as reasonably practicable after the Closing or the applicable Deferred Closing Date (as applicable), (Y) Seller shall, and shall cause its subsidiaries to, consent to Buyer's and its Affiliates' use of such Product Registration for the continued operation of the Business with respect to such Product after the Closing or the applicable Deferred Closing Date (as applicable), and (Z) if requested by Buyer, Seller shall, and shall cause its subsidiaries to, provide Buyer, to the fullest extent possible, pursuant to an arrangement reasonably satisfactory to Seller and Buyer, the exclusive net benefit of such Product Registration (including, to the extent not able to be conducted by Buyer and its Affiliates after the Closing or the applicable Deferred Closing Date (as applicable) as result of the failure of the Product Registration Transfer Time to occur, by Seller and its subsidiaries continuing to conduct the Business with respect to such Product in substantially the same manner and with substantially the same level of efforts and resources as conducted by Seller and its subsidiaries prior to the Closing) by passing through all revenues received by Seller and its

-11-

subsidiaries with respect to the Products under such Product Registration from the Closing Date or the applicable Deferred Closing Date (as applicable) through such Product Registration Transfer Time, less only such amount of costs and expenses (including Taxes) as Seller and its Affiliates incur or become liable for in connection with any such arrangements with respect to such Products (other than any such costs and expenses that are duplicative of documented costs and expenses actually incurred by Buyer and its Affiliates in connection the conduct of the Business with respect to such Products).  The parties agree they will cooperate to minimize the costs and expenses incurred in connection with the foregoing arrangements, including by using commercially reasonable efforts to avoid duplicative or incremental costs and expenses. Furthermore, the parties agree that Seller and its Affiliates shall be permitted to utilize their respective ordinary course transfer pricing in connection with the foregoing arrangements, including in connection with any sale of Products from Seller or its Affiliates to Buyer or its Affiliates. In the case of the occurrence of the Product Registration Transfer Time under clause (B) of the definition thereof with respect to any Product Registration, (x) unless the parties agree otherwise, the arrangements contemplated by such clause (B) with respect to a Product shall terminate reasonably promptly upon the occurrence of any of the events contemplated by clause (A) of the definition of Product Registration Transfer Time and (y) unless Buyer requests otherwise, the parties will continue to use reasonable best efforts to ensure that one of the events contemplated by clause (A) of the definition of Product Registration Transfer Time occurs with respect to such Product Registration as soon as reasonably practicable after the Closing or the applicable Deferred Closing (as applicable).  In addition to the foregoing, to the extent that the sale, assignment, transfer, conveyance or delivery or attempted sale, assignment, transfer, conveyance or delivery to Buyer (or one of its Affiliates) of any Transferred Asset is prohibited by any applicable Law or would require any governmental or third-party authorizations, approvals (including Anti-Trust Approvals), consents or waivers and such authorizations, approvals, consents or waivers shall not have been obtained prior to the Closing or the applicable Deferred Closing (as applicable), this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery thereof.  From the date hereof until eighteen (18) months after the Closing Date, the parties shall use their respective reasonable best efforts to cooperate with each other to obtain promptly such authorizations, approvals, consents or waivers and to give any notices required for the transfer of such Transferred Asset and to obtain from third parties an approval or consent to establish a new contract with Buyer or its designated Affiliate with respect to the portion of any Commingled Contract related to the Business, pursuant to which Buyer or its designated Affiliate will have access to the rights and benefits of such

-12-

Commingled Contract with respect to the Business on substantially the same terms and conditions provided to Seller and its Affiliates prior to the Closing, or to assign such portion to Buyer or its designated Affiliate; provided, however, that Seller shall not be required to pay any consideration (other than customary filing and application fees typically paid by a seller or transferee) or make any concession therefor.  If such authorization, approval, consent or waiver is obtained, Seller shall promptly assign, transfer, convey or deliver any such Transferred Asset or, if applicable, that portion of any Commingled Contract, as the case may be, to Buyer or its designee pursuant to Section 2.02(f) at no additional cost.  Pending the earlier of obtaining such authorization, approval, consent or waiver or the expiration of such eighteen-month (18 month) period, insofar as reasonably practicable and to the extent permitted by applicable Law, Seller shall hold such Transferred Assets for the benefit of Buyer and shall operate such Transferred Assets in a manner to place Buyer in a substantially similar position as if such Transferred Assets had been sold, conveyed, assigned and transferred.  Buyer shall use its reasonable best efforts to cooperate with Seller in connection with any actions taken by Seller pursuant to this Section 2.02(g).  Buyer further agrees that, if Seller shall have complied with its obligations under this Agreement with respect to using reasonable best efforts to obtain such authorization, approval, consent or waiver, Seller shall not be in breach of this Agreement solely as a result of the failure to obtain any such authorization, approval, consent or waiver.  From the date hereof until eighteen (18) months after the Closing Date, the parties shall use their respective reasonable best efforts to cooperate with each other with respect to the portion of any Commingled Contracts set forth on Schedule 2.02(a)(xi) such that Seller or its designated Affiliate will have access to the rights and benefits of such Commingled Contract with respect to the portion of the Commingled Contract not related to the Business on substantially the same terms and conditions provided to Seller and its Affiliates prior to the Closing; provided, however, that Buyer shall not be required to pay any consideration (other than customary filing and application fees typically paid by a seller or transferee) or make any concession therefor.”

(vi)     Section 2.03(a) of the Purchase Agreement (Purchase Price; Purchase Price Escrow) is hereby amended and restated in its entirety as follows:

“On or prior to the last business day before the anticipated Closing Date, Seller, Buyer and the Escrow Agent shall execute and deliver the Escrow Agreement.  On the last business day before the anticipated Closing Date, subject to the terms and conditions of this Agreement, Buyer shall (or shall cause one or more of its Affiliates as Buyer may designate pursuant to Section 2.02(f) to) deposit in immediately available funds by wire transfer

-13-

to the Escrow Account cash in U.S. dollars in an amount exclusive of any Transfer Taxes equal to the Purchase Price plus the Integration Amount (such aggregate, the "Escrow Amount"). The Escrow Amount shall be held in the Escrow Account in accordance with the terms of this Agreement and the Escrow Agreement, and, in connection with the Closing, Buyer shall deliver to the Escrow Agent the Escrow Instructions to release and pay to Seller (or one or more of its Affiliates as Seller may designate) the Escrow Amount by wire transfer of immediately available funds on the next business day immediately following the Closing Date, and subject to the next two succeeding sentences, upon Buyer's delivery of the Escrow Instructions, Buyer shall have no other obligations hereunder in respect of payment of the Purchase Price. Buyer shall not, and shall cause its subsidiaries and representatives not to, take any action that would prevent, impede or delay the Escrow Agent from so delivering the Escrow Amount to Seller pursuant to the preceding sentence and the Escrow Agreement. If the Closing occurs, Buyer shall remain liable to Seller for the Escrow Amount if the Escrow Amount is not so received by Seller as a result of a breach of the preceding sentence. In the event that the Closing does not occur on such anticipated Closing Date, the parties shall enter into a replacement escrow agreement substantially in the form of the Escrow Agreement (or in a form the parties otherwise reasonably agree) (with references to the Escrow Agreement herein being deemed to be references to such replacement escrow agreement) with an escrow agent (who may be the Escrow Agent) and shall follow the steps set forth in the foregoing provisions of this Section 2.03(a), *mutatis mutandis*."

(vii)     Section 2.03(b) of the Purchase Agreement (Purchase Price; Purchase Price Escrow) is hereby amended and restated in its entirety as follows:

"The parties acknowledge that the portion of the Purchase Price allocable to the Country Unit specified on Schedule 2.03(b) to the Disclosure Letter as set forth in the Initial Allocation (the "Required Local Payment") will be paid by Buyer to Seller on the Closing Date in U.S. dollars. Within three (3) business days following the Closing Date, (i) Seller shall reimburse to Buyer, in U.S. dollars, the amount of such Required Local Payment and (ii) Buyer's local country Affiliate shall (and Buyer will cause such local country Affiliate to) pay Seller's local country Affiliate an amount, in local currency, equal to the local currency equivalent of such Required Local Payment (as determined using the Exchange Rate) by wire transfer of immediately available funds to the bank account designated by Seller on the date of this Agreement."

-14-

(viii)    Section 2.04(b) of the Purchase Agreement (Purchase Price Adjustment) is hereby amended and restated in its entirety as follows:

"Within ninety (90) days after the Closing Date, Seller shall prepare and deliver to Buyer a statement (the "Price Adjustment Statement"), setting forth the following amounts, in each case as of immediately prior to the Closing:  (i) the book value of the Inventory, prepared in accordance with the Accounting Policies (the "Closing Inventory") (it being understood that the Closing Inventory shall include the Inventory of the entire Business as of immediately prior to the Closing) and (ii) the Cash Amount. If the book value of the Closing Inventory is greater than the Inventory Target or less than the Inventory Target by the amounts specified in Section 2.04(f) below, the Purchase Price shall be adjusted as described in Section 2.04(f) below (all of which, for the avoidance of doubt, shall be determined assuming each Deferred Closing occurred at the Closing).  If the Cash Amount is greater than the Estimated Cash Amount or less than the Estimated Cash Amount, the Purchase Price shall be adjusted as described in Section 2.04(f) below (all of which, for the avoidance of doubt, shall be determined assuming each Deferred Closing occurred at the Closing)."

(ix)    Section 2.05(b) of the Purchase Agreement (Allocation of Purchase Price) is hereby amended and restated in its entirety as follows:

"Within sixty (60) calendar days after the Closing Date, Buyer shall deliver a reasonable draft of the allocation of the Purchase Price and Assumed Liabilities among each of the Transferred Assets and Transferred Equity Interests (and among the assets held by any Transferred Company disregarded as separate from its owner for U.S. federal income Tax purposes) in a manner that incorporates, reflects and is consistent with the Allocation Method, the Initial Allocation, and Sections 1060 and 338 of the Code (the "Allocation") to Seller (the "Proposed Allocation").  Except as provided in this subparagraph (b), subparagraph (c) and subparagraph (d) of this Section 2.05, at the close of business on the thirtieth (30th) calendar day after delivery of the Proposed Allocation, the Proposed Allocation shall become binding upon Buyer and Seller, shall be set forth on Schedule 2.05(b) to the Disclosure Letter (the "Allocation Schedule"), and shall be the Allocation."

(x)    Section 2.05(g) of the Purchase Agreement (Allocation of Purchase Price) is hereby amended and restated in its entirety as follows:

"In the event that the Initial Allocation has not become final pursuant to this Section 2.05 by the Closing, the allocated purchase prices included in the Proposed Initial Allocation shall be used for the purpose of (A) including allocated purchase prices in the Country Transfer Agreements

-15-

for each applicable Country Unit and (B) determining the amount of any payments made on the Closing Date to the applicable Selling Affiliate with respect to such Country Unit.  The inclusion of such allocated purchase prices shall not be deemed to waive, amend or otherwise alter any of the rights or obligations of the parties set forth in this Section 2.05 and shall not be used for any purpose in resolving, or result in any prejudice with respect to, any dispute with respect to the Proposed Initial Allocation or the Proposed Allocation."

(xi)     Section 2.05(h) of the Purchase Agreement (Allocation of Purchase Price) is hereby amended and restated in its entirety as follows:

"In the event that the Allocation has not become final pursuant to this Section 2.05 by the Closing, to the extent that the amounts paid to any Selling Affiliate on the Closing Date are not equal to the portion of the Purchase Price allocated to such Selling Affiliate in the Allocation (with respect to any Selling Affiliate, the "Allocated Purchase Price"), the parties shall and shall cause their respective Affiliates to take all necessary actions to refund, repay and redistribute as promptly as reasonably practicable any amounts paid to any Selling Affiliate in excess of such Selling Affiliate's Allocated Purchase Price, such that, after giving effect to any such refunds, repayments and redistributions, the amounts received by each Selling Affiliate shall be equal to such Selling Affiliate's Allocated Purchase Price."

(xii)     Section 2.05 of the Purchase Agreement (Allocation of Purchase Price) is hereby amended and supplemented by adding the following new Section 2.05(i), which provides as follows:

"With respect to any Deferred Closing Country, if, in connection with the applicable Deferred Closing, an allocation of the relevant portion of the Purchase Price among the assets and liabilities transferred in such Deferred Closing is required by applicable Law, and the Allocation has not become final pursuant to this Section 2.05 at the time of such Deferred Closing, the parties shall agree on an allocation of the relevant portion of the Purchase Price and Assumed Liabilities among the applicable Deferred Assets and Deferred Liabilities of the applicable Deferred Business (each, a "Suballocation").  Any such Suballocation shall be consistent with the Initial Allocation.  If Seller and Buyer are unable to mutually agree on any such Suballocation, such disagreement shall be referred to the Accounting Firm promptly for review and resolution (in accordance with the procedure set forth in Section 2.04)."

-16-

(xiii)   The reference to "Delivery by Seller" in Section 2.08 of the Purchase Agreement is hereby replaced with a reference to "Closing Deliveries by Seller," and the lead-in to Section 2.08 is hereby amended by adding the phrase "or prior to" between "At" and "the Closing."

(xiv)   Section 2.08(c) of the Purchase Agreement (Closing Deliveries by Seller) is hereby amended and restated in its entirety as follows:

> "duly executed counterparts of the Ancillary Agreements contemplated by Section 7.09;"

(xv)   Section 2.08(f) of the Purchase Agreement (Closing Deliveries by Seller) is hereby amended and restated in its entirety as follows:

> "duly executed counterparts of any Country Transfer Agreement (except for those Country Units subject to Section 2.11);"

(xvi)   Section 2.08 of the Purchase Agreement (Closing Deliveries by Seller) is hereby amended and supplemented by adding the following new Section 2.08(k), which provides as follows:

> "an irrevocable written authorization substantially in the form set forth as Exhibit Q hereto ("Merger Authorization") and a counterpart signature page to the Agreement and Plan of Merger substantially in the form set forth as Exhibit R hereto (the "U.S. Merger Agreement"), executed by InnerDyne Holdings."

(xvii)   The reference to "Delivery by Buyer" in Section 2.09 of the Purchase Agreement is hereby replaced with a reference to "Closing Deliveries by Buyer," and the lead-in to Section 2.09 is hereby amended by adding the phrase "or prior to" between "At" and "the Closing."

(xviii)   Section 2.09(a) of the Purchase Agreement (Closing Deliveries by Buyer) is hereby amended and restated in its entirety as follows:

> "a true and valid copy of the Escrow Instructions delivered to the Escrow Agent;"

(xix)   Section 2.09(d) of the Purchase Agreement (Closing Deliveries by Buyer) is hereby amended and restated in its entirety as follows:

> "duly executed counterparts of the Ancillary Agreements contemplated by Section 7.09;"

-17-

(xx)    Section 2.09(e) of the Purchase Agreement (Closing Deliveries by Buyer) is hereby amended and restated in its entirety as follows:

"duly executed counterparts of any Country Transfer Agreement (except for those Country Units subject to Section 2.11);"

(xxi)    Section 2.09(h) of the Purchase Agreement (Closing Deliveries by Buyer) is hereby amended and restated in its entirety as follows:

"a counterpart signature page to the U.S. Merger Agreement, executed by Cardinal Merger Sub."

(xxii)    The following text is hereby inserted at the end of Section 2.09 of the Purchase Agreement (Closing Deliveries by Buyer):

"In addition, at the Closing, consistent with Section 2.03(a), Buyer will deliver or cause to be delivered to the Escrow Agent (with a copy to Seller and its counsel) irrevocable written instructions in form and substance as set forth in the Escrow Agreement (the "Escrow Instructions")."

(xxiii)    Article II is hereby amended and supplemented by adding the following new Section 2.10 titled "U.S. Merger.", which provides as follows:

"(a)    Notwithstanding anything to the contrary in this Agreement, conveyance, assignment, transfer and delivery by Seller or its Affiliates, and acceptance by Buyer, of InnerDyne Holdings, Inc., a Delaware corporation ("InnerDyne Holdings"), shall be effected by the merger of Cardinal Health 527, Inc., a Delaware corporation and a wholly owned subsidiary of Buyer ("Cardinal Merger Sub"), with and into InnerDyne Holdings.  On the terms and subject to the conditions set forth in this Agreement and the U.S. Merger Agreement, and in accordance with the General Corporation Law of the State of Delaware (the "DGCL"), on the Closing Date, the parties shall cause Cardinal Merger Sub to be merged with and into InnerDyne Holdings (the "U.S. Merger"), as provided in this Section 2.10.  At the U.S. Merger Effective Time, the separate corporate existence of Cardinal Merger Sub shall cease, and InnerDyne Holdings shall continue as the surviving corporation in the U.S. Merger (the "U.S. Surviving Corporation").

(b)    On the last business day before the Closing Date, Buyer and Seller shall, pursuant to Section 103(c)(4) of the DGCL, through Buyer's counsel, deliver to (but not file with) the Secretary of State of the State of Delaware (the "Delaware Secretary") a certificate of merger in the form set forth as Exhibit S hereto (or otherwise as mutually agreed by Seller and Buyer), dated as of the Closing Date, relating to the U.S. Merger (the "U.S. Certificate of Merger") with instructions that the Delaware Secretary

-18-

not file the U.S. Certificate of Merger until written instructions (which may be by email) are received from Buyer or its counsel to make such filing.  Buyer hereby agrees that neither it nor any of its subsidiaries or representatives shall instruct or authorize the Delaware Secretary or any other Person to file or cause to be filed the U.S. Certificate of Merger unless and until the Merger Authorization is received from Seller at the Closing.

(c)      After receipt of the Merger Authorization from Seller, as soon as practicable after the Closing and on the Closing Date, Buyer shall send or cause to be sent an email to the Delaware Secretary authorizing the Delaware Secretary to file (or shall cause to be filed) the U.S. Certificate of Merger with an effective time of the Closing (the time the U.S. Merger becomes effective, the "U.S. Merger Effective Time").  Seller shall not, and shall cause its subsidiaries and representatives not to, take any action that would prevent, impede or delay the Delaware Secretary from filing the U.S. Certificate of Merger pursuant to the preceding sentence.

(d)      The U.S. Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL.

(e)      At the U.S. Merger Effective Time, by virtue of the U.S. Merger and without any action on the part of any holders of any shares of InnerDyne Common Stock or Cardinal Merger Sub Common Stock, (i) each share of InnerDyne Common Stock issued and outstanding immediately prior to the U.S. Merger Effective Time shall be cancelled for no consideration, shall cease to exist and shall no longer be outstanding and (ii) each share of Cardinal Merger Sub Common Stock issued and outstanding immediately prior to the U.S. Merger Effective Time shall be converted into one fully paid and nonassessable share of common stock, par value $0 per share, of the U.S. Surviving Corporation, and be owned by Buyer, and shall constitute the only outstanding shares of capital stock of the U.S. Surviving Corporation.

(f)      The certificate of incorporation and bylaws of InnerDyne Holdings, as in effect immediately prior to the U.S. Merger Effective Time, shall be, as of the U.S. Merger Effective Time, amended to be identical to that set forth as Exhibit A and Exhibit B, respectively, to the U.S. Merger Agreement and shall be the certificate of incorporation and bylaws, respectively, of the U.S. Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law.

(g)      The directors of Cardinal Merger Sub immediately prior to the U.S. Merger Effective Time shall be, as of the U.S. Merger Effective Time, the directors of the U.S. Surviving Corporation until the earlier of their resignation or removal or until their respective successors are duly elected and qualified, as the case may be, in accordance with the certificate of

-19-

incorporation and bylaws of the U.S. Surviving Corporation. The officers of Cardinal Merger Sub immediately prior to the U.S. Merger Effective Time shall be, as of the U.S. Merger Effective Time, the officers of the U.S. Surviving Corporation until the earlier of their resignation or removal or until their respective successors are duly elected or appointed and qualified, as the case may be, in accordance with the certificate of incorporation and bylaws of the U.S. Surviving Corporation."

(xxiv) Article II is hereby amended and supplemented by adding the following new Section 2.11 titled "Deferred Closings.", which provides as follows:

"(a)     Notwithstanding anything to the contrary contained in this Agreement (but subject to this Section 2.11(a)), (i) the conveyance, assignment, transfer and delivery by Seller or its Affiliates, and acceptance by Buyer or its Affiliates, of the Transferred Assets not owned by any Transferred Company located in the Country Units set forth on Annex B to the Disclosure Letter (the "Deferred Closing Countries") and owned or held by a Deferred Title Holder (the "Deferred Assets"), (ii) the transfer to Buyer or its Affiliates of the Employees of the Business who are employed in such Deferred Closing Countries (other than any Non-Commercial Employees) (the "Deferred Employees"), and (iii) the assumption (and obligation to satisfy and discharge when due) by Buyer of the Assumed Liabilities to the extent arising from or relating to the Business conducted in the Deferred Closing Countries or the applicable Deferred Assets or Deferred Employees (the "Deferred Liabilities"), in each case, shall not occur on the Closing Date. For purposes of Article X, however, Buyer shall be deemed to have assumed the Deferred Liabilities on the Closing Date; provided, that (A) the Seller Indemnitees shall not be entitled to indemnification pursuant to Article X for any Damages incurred or suffered by any Seller Indemnitees to the extent resulting from the Deferred Liabilities or the Deferred Business during the Deferred Period to the extent resulting from the fraud, willful misconduct or intentional breach of this Agreement by Seller or its subsidiaries during the Deferred Period, and (B) the Seller Indemnitees shall not be entitled to indemnification pursuant to Article X for any Damages incurred or suffered by any Seller Indemnitees as a result of a third-party Claim to the extent resulting from the Deferred Liabilities or the Deferred Business during the Deferred Period to the extent resulting from the gross negligence of Seller or its subsidiaries during the Deferred Period. For purposes of clarity, the transfer of Non-Commercial Employees shall not be deferred pursuant to this Section 2.11(a) and the Non-Commercial Employees shall transfer as of the Closing Date (or, if applicable, such later date that such employee commences employment with Buyer or one of its Affiliates) pursuant to Section 8.01(c) (provided, that offer letters with respect to such Non-Commercial Employees shall not be required to be issued at least 10 days prior to the Closing Date).

-20-

(b)     The conveyance, assignment, transfer, delivery and acceptance of the Deferred Assets, the transfer of Deferred Employees and the assumption of the Deferred Liabilities, with respect to a Deferred Closing Country (each such closing, a "Deferred Closing") shall take place at 10:00 a.m., New York City time, at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52 Street, New York, New York 10019, or such other time and location specified in the applicable Country Transfer Agreement for such Deferred Closing Country, on the second business day after the date on which Seller (or its Affiliates) no longer has to provide the "finance / accounting" function for such Deferred Closing Country pursuant to the Transition Services Agreement to Buyer (or its Affiliates) (each date on which a Deferred Closing takes place, a "Deferred Closing Date"); provided that, if there is a Closing Legal Impediment in effect with respect to such Deferred Closing, then such Deferred Closing shall occur on the second business day after the date on which such Closing Legal Impediment is no longer in effect and provided, further, that the Deferred Closing for any Deferred Closing Country may occur on an earlier date if agreed in writing by Buyer and Seller. If any earlier Deferred Closing occurs pursuant to the preceding sentence, Buyer and Seller agree to cause their Affiliates to amend the Undisclosed Agency Agreement to include the Country Unit(s) for which such earlier Deferred Closing occurred on terms to be mutually agreed but substantially consistent with those set forth in the Undisclosed Agency Agreement.

(c)     At each Deferred Closing, Seller and Buyer shall, or shall cause their respective Affiliates to, execute and deliver such documents and instruments, as may be reasonably necessary to transfer the Deferred Assets and Deferred Liabilities in such Deferred Closing Country to Buyer or its applicable Affiliate (designated in accordance with Section 2.02(f)), in each case consistent with the terms of this Agreement.

(d)     It is the intention of the Parties that Buyer shall be entitled to the "net economic benefit" relating to the applicable Deferred Business arising during the applicable Deferred Period, and in connection therewith, each Deferred Title Holder shall retain such title as it has to the Deferred Assets of the applicable Deferred Business and hold such Deferred Assets for the benefit and expense of the applicable Deferred Beneficiary during the applicable Deferred Period.  Solely to the extent related to the Deferred Business in a Deferred Closing Country, except as otherwise permitted by this Agreement or consented to by Buyer in writing (such consent not to be unreasonably withheld), (i) Seller agrees to (and to cause the applicable Deferred Title Holders to), (A) use commercially reasonable efforts to run the Deferred Business in the ordinary course consistent with past practice and in good faith and (B) comply with the covenants and agreements set forth in Section 6.01(b) (except Sections 6.01(b)(iv), 6.01(b)(viii), 6.01(b)(ix), 6.01(b)(x) and 6.01(b)(xi), and Section 6.01(b)(xiv) to the extent related to the

-21-

foregoing exclusions), in each case, until the Deferred Closing Date in such Deferred Closing Country, and (ii) Buyer agrees to grant Seller (and the Deferred Title Holders) a right to distribute the Products during the Deferred Period (the "Distribution Right").

(e)    Notwithstanding anything herein to the contrary, Seller's and its Affiliates' obligations to operate the Deferred Business is expressly conditioned on receipt of Products from applicable Affiliates of Buyer that applicable Affiliates of Seller need to operate the Deferred Business in compliance with this Agreement, and Seller and its Affiliates shall have no obligation to otherwise manufacture or procure any products.  Applicable Affiliates of Buyer may invoice applicable Affiliates of Seller for such Products; provided that neither Seller or any Affiliate of Seller shall have any obligation to settle any such invoices and that the only payments to be made to Buyer or its applicable Affiliates with respect to such Products (or the Deferred Business) are the payments of any NEB Distribution Fee as provided in Section 2.11(f).

(f)    Following each fiscal month of Seller covering any portion of the Deferred Period, Buyer shall prepare an invoice (using trial balances provided by or on behalf of Seller to Buyer pursuant to the Transition Services Agreement) with respect to the NEB Distribution Fee for such fiscal month and deliver such invoice to Seller (if such NEB Distribution Fee is positive, it will be paid by Seller or its Affiliates for their respective Distribution Right, as provided herein).  Seller or its applicable Affiliates shall settle such invoices with Buyer or its applicable Affiliates (in the applicable local currency in which the corresponding sales were made) in accordance with the country specific days sales outstanding (DSO) schedules of Seller set forth in Annex E to the Disclosure Letter (the "DSO Schedules") in full satisfaction of any open invoices relating to such sales; provided that if any invoice provides for a negative NEB Distribution Fee, Buyer shall pay to Seller or as directed by Seller the absolute value of such negative NEB Distribution Fee within 30 days of such invoice.  Any invoices prepared pursuant to this Section 2.11(f) shall comply with applicable VAT and Transfer Tax Laws.  For the avoidance of doubt, neither Seller nor any Affiliate of Seller shall have any obligation to pay for any unpaid accounts receivable.  Notwithstanding the foregoing, if the percentage of actual bad debt expense associated with the operation of the Deferred Business in any Deferred Closing Country in a particular fiscal month of Seller (calculated in a manner consistent with the Accounting Policies, including with respect to the allocation of any such debt as between the sales of Products of the Deferred Business and sales of products of Seller's other businesses) exceeds three (3) times the Bad Debt Rate applicable for such country, then Buyer agrees to pay or cause its applicable Affiliates to pay to Seller or its applicable Affiliates the amount by which such bad debt expense exceeds the product of (i) the Net Sales in such country in such fiscal

month *multiplied* by (ii) the Bad Debt Rate applicable for such country.  Upon payment to Seller or its applicable Affiliates of any amount required to be paid by Buyer pursuant to the previous sentence, Seller or its applicable Affiliates shall convey, assign, and transfer to Buyer all bad debts to which such payment relates, including the rights to receive, collect or enforce such bad debts (provided that the parties shall cooperate in good faith with respect to such collection or enforcement).

(g)     Subject to customary confidentiality undertakings comparable to those included in the Confidentiality Agreements, to the extent reasonably required to prepare or review any invoices required to be prepared or prepared pursuant to Section 2.11(f) or any calculation of the bad debt expense associated with the sales of Products of the Deferred Business to the extent Seller asserts such expense is payable, or to the extent such expense has been paid, pursuant to the second to last sentence of Section 2.11(f), Seller will, during normal business hours (upon at least two (2) business days' written notice from Buyer), (i) make available its relevant personnel as shall be reasonably necessary in connection with the foregoing and (ii) permit Buyer and its duly authorized representatives access to all contracts, books, records and other data relating to the Deferred Businesses and/or the calculation of any NEB Distribution Fee (or any calculation of the bad debt expense associated with the sales of Products of the Deferred Business to the extent Seller asserts such expense is payable, or to the extent such expense has been paid, pursuant to the second to last sentence of Section 2.11(f)) as shall be reasonably necessary in connection with the foregoing, except where such access is prohibited by applicable Law or Contract.

(h)     The parties acknowledge that the portion of the Purchase Price allocable to any Deferred Closing Country as set forth in the Initial Allocation (each, a "Deferred Closing Country Amount") will be paid by Buyer to Seller on the Closing Date in U.S. dollars.  On each Deferred Closing Date for each Deferred Closing Country in which a "local payment" is required by applicable Law to purchase the relevant Deferred Assets (as set forth on Schedule 2.11(h) to the Disclosure Letter), (i) Seller shall reimburse to Buyer, in U.S. dollars, the amount of such Deferred Closing Country Amount and (ii) the applicable Deferred Beneficiary shall (and Buyer shall cause such Deferred Beneficiary to) pay to the applicable Deferred Title Holder an amount, in local currency, equal to the local currency equivalent of such Deferred Closing Country Amount (as determined using the Exchange Rate) by wire transfer of immediately available funds to the bank account to be designated by the party that will be receiving such reimbursement or payment, as applicable.  Schedule 2.11(h) to the Disclosure Letter sets forth Seller's good-faith estimate as of the date of this Agreement of the portion of the Purchase Price to be allocated to each Deferred Country Unit identified therein for payment in a Foreign Currency."

-23-

(xxv)   Article II is hereby amended and supplemented by adding the following new Section 2.12 titled "Transferred Inventory.", which provides as follows:

"(a)      Notwithstanding anything to the contrary contained in this Agreement (but subject to the last two sentences of this Section 2.12(a)), except (i) for Transferred Inventory that constitutes Finished Goods Inventory not in excess of $50,000 U.S. dollars in the aggregate as of Closing held by Covidien Deutschland GmbH, (ii) for Transferred Inventory that constitutes Finished Goods Inventory owned by Covidien AG on behalf of or for the benefit of Especialidades Medicas Kenmex SA de CV and (iii) for Transferred Inventory that constitutes Finished Goods Inventory for which title is held by any of the Transferred Companies, the conveyance, assignment, transfer and delivery by Seller or its Affiliates, and acceptance by Buyer or its Affiliates, of legal title to Transferred Inventory that constitutes Finished Goods Inventory shall not occur on the Closing Date (the "Deferred Inventory").  For the avoidance of doubt, Deferred Inventory will include Transferred Inventory held by Medtronic Australasia Pty. Limited.  For purposes of Article X, however, Buyer shall be deemed to have assumed the Assumed Liabilities relating to or arising out of such Deferred Inventory on the Closing Date (without limiting clause (b) below).  This Section 2.12 shall not be applicable to the determination of Closing Inventory, and Closing Inventory shall be determined assuming this Section 2.12 was not applicable.

(b)      Seller and/or its Affiliates shall hold the Deferred Inventory for the benefit of, and at the expense and risk of loss to, Buyer and its Affiliates, and provide distribution services with respect to the Deferred Inventory on behalf of Buyer and/or its Affiliates pursuant to the terms of the Transition Services Agreement (such services, the "Distribution Services").  Subject to the express liability allocation provisions of the Transition Services Agreement with respect to Services to the extent relating to Deferred Inventory, Buyer and/or its Affiliates shall bear all risk of loss or damage to such Deferred Inventory, regardless of whether such Deferred Inventory is held by Seller or any of its Affiliates in the course of Seller and/or its Affiliates' provision of the Distribution Services; provided that neither Buyer nor any Affiliate thereof shall bear any risk of loss or similar liability for any loss or damage of any Deferred Inventory to the extent resulting from the fraud, willful misconduct or intentional breach of this Agreement by Seller or its Affiliates following the Closing.

(c)      Upon the conclusion of all Distribution Services in a Country Unit, Seller will, and will cause the relevant Asset Selling Affiliates to, sell, convey, assign, and transfer to Buyer or its designee all Deferred Inventory in the applicable Country Unit, free and clear of all Liens other than Permitted Liens."

-24-

Section 1.04   Representations and Warranties of Seller.  Article III of the Purchase Agreement (Representations and Warranties of Seller) is hereby amended as follows:

(i)      The first paragraph of Article III of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"Buyer acknowledges and agrees that the Transferred Assets are sold "as is, where is" and Buyer agrees to accept the Transferred Assets on the Closing Date or the applicable Deferred Closing Date (as applicable) in the condition they are in at the place they are located on such Closing Date or the applicable Deferred Closing Date (as applicable) based on its own inspection, examination and determination with respect to all matters, and without reliance upon any express or implied representations or warranties of any nature made by, on behalf of or imputed to Seller, other than the representations and warranties of Seller expressly set forth in this Agreement. BUYER AGREES THAT THE REPRESENTATIONS AND WARRANTIES GIVEN HEREIN BY SELLER ARE IN LIEU OF, AND BUYER HEREBY EXPRESSLY WAIVES ALL RIGHTS TO, ANY IMPLIED WARRANTIES THAT MAY OTHERWISE BE APPLICABLE BECAUSE OF THE PROVISIONS OF THE UNIFORM COMMERCIAL CODE OR ANY OTHER STATUTE, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE."

Section 1.05   Certain Covenants.  Article VI of the Purchase Agreement (Certain Covenants) is hereby amended as follows:

(i)      Section 6.05(e) of the Purchase Agreement (Commercially Reasonable Efforts; Regulatory Approvals; Access) is hereby amended and restated in its entirety as follows:

"Seller shall give Buyer and its accountants, legal counsel and other representatives reasonable access, during normal business hours and without undue interruption of the Business throughout the period prior to the Closing or, in the case of the Deferred Business, the applicable Deferred Closing (as applicable), to all of the properties, books and records (other than records relating to Income Taxes and attorney-client privileged communications and, for the avoidance of doubt, other than where access to such information is prohibited by applicable Law) relating to the Business, and will furnish, at Buyer's expense, Buyer, its accountants, legal counsel and other representatives during such period all such information (other than records relating to Income Taxes and attorney-client privileged communications and, for the avoidance of doubt, other than where access to such information is prohibited by applicable Law) concerning the affairs of the Business as Buyer may reasonably request; provided that this Section 6.05(e) shall not entitle Buyer or its accountants, legal counsel or other representatives to contact any third party doing business with Seller or access the properties, books or

-25-

records of any such third party, in each case without Seller's prior written consent (which consent shall not be unreasonably withheld).  Buyer will hold in confidence all information so obtained in accordance with Section 7.12.  Nothing in this Agreement shall limit any of the parties' rights of discovery."

(ii)     Section 6.07 of the Purchase Agreement (Transferred Companies Assets and Liabilities) is hereby amended and restated in its entirety as follows:

"Prior to the Closing, Seller shall take or cause to be taken, such action as is necessary or appropriate to transfer, assign or convey (i) any assets owned or held by the Transferred Companies other than those that would constitute Transferred Assets or (ii) any liabilities or obligations of the Transferred Companies other than those that would constitute Assumed Liabilities, in each case, to Seller or an Affiliate of Seller such that as of the Closing, (x) the assets owned or held by the Transferred Companies consist solely of assets that would otherwise constitute Transferred Assets pursuant to clauses (i)–(xvi) and (xviii) of Annex 2.02(a) and (y) the liabilities and obligations of the Transferred Companies consist solely of liabilities and obligations that would otherwise constitute Assumed Liabilities pursuant to clauses (i)–(x) of Annex 2.02(c).  Prior to or following the Closing, Buyer shall provide to Seller the necessary information and deliver such assignments, transfers, consents and other documents and instruments as may be reasonably required to permit Seller at its expense to effect and perfect the transfer of any registrations of Patents and Trademarks that constitute Excluded Assets but which are held by a Transferred Company.  Notwithstanding anything in this Agreement to the contrary (but without limiting Seller's and Buyer's obligations after the Closing under Article VII and Article X in respect of Pre-Closing Accounts Receivable and Pre-Closing Accounts Payable), Seller and its Affiliates shall not be required to transfer, assign or convey any Pre-Closing Accounts Receivable that are owned or held by any of the Transferred Companies or any Pre-Closing Accounts Payable that are liabilities or obligations of any of the Transferred Companies at or prior to the Closing (it being understood that following the Closing any Pre-Closing Accounts Receivable (including any cash received in respect thereof) shall in any event be treated as Excluded Assets and any Pre-Closing Accounts Payable shall in any event be treated as Excluded Liabilities).  Seller shall deliver or cause to be delivered to Buyer a schedule setting forth Pre-Closing Accounts Receivable and Pre-Closing Accounts Payable within thirty (30) days of the Closing Date.  Notwithstanding anything in this Agreement to the contrary, certain equipment that would constitute Excluded Assets may continue to be owned following the Closing by Kendall-Gammatron Limited and Covidien Manufacturing Solutions, S.A., and such equipment shall be subject to the provisions of the Master Manufacturing and Supply Agreement, including with respect to the transfer thereof to Seller or its applicable Affiliate as provided therein."

-26-

(iii)     The reference to "Innerdyne Holdings, Inc." in <u>Section 6.09(c)</u> of the Purchase Agreement (Closing Structure) is hereby replaced with a reference to "InnerDyne Holdings, Inc."

(iv)     <u>Section 6.11(a)</u> of the Purchase Agreement (Certain Swiss Tax Matters) is hereby amended and restated in its entirety as follows:

> "Subject to <u>Section 6.11(b)</u>, Seller shall use its reasonable best efforts to minimize the Swiss Tax Rate.  To the extent Seller receives, prior to the Closing, a Swiss Tax Ruling, the Purchase Price shall be reduced by an amount equal to the Swiss Sale Amount, less (i) the sum of (A) the Estimated Swiss Gain and (B) (x) the Estimated Swiss Gain multiplied by the Swiss Tax Rate, further multiplied by (y) the Swiss Gross-Up, less (ii) the Estimated Swiss Tax Basis."

Section 1.06   <u>Post-Closing Covenants</u>.  <u>Article VII</u> of the Purchase Agreement (Post-Closing Covenants) is hereby amended as follows:

(i)     <u>Section 7.01</u> of the Purchase Agreement (Certain IP Matters) is hereby amended and supplemented by adding a new <u>Section 7.01(d)</u>, which provides as follows:

> "Buyer hereby grants, and shall cause its Affiliates to grant, to Seller and its subsidiaries a non-exclusive, royalty free, fully paid-up, irrevocable and worldwide license under all of Buyer's and its Affiliates' IP Rights to the Transferred IP to (A) make, have made, import, use, offer to sell, sell, distribute and otherwise commercialize any Products and services, and (B) use, copy, distribute, disclose, display, sublicense and otherwise exploit in any manner any technology, Products and services, in each case to the extent necessary to own and operate the applicable Deferred Business in the applicable Deferred Closing Countries for Buyer's or its Affiliates' benefit.  If Buyer or any of its Affiliates incorporates any of Buyer or its Affiliates' other IP Rights into any of the Products or services being sold or provided by Seller or any of its Affiliates on Buyer's or any of its Affiliates' behalf in connection with the operation of the Deferred Business, Buyer grants (and shall cause its applicable Affiliates to grant) to Seller and its subsidiaries a non-exclusive, royalty free, fully paid-up, irrevocable, worldwide and non-sublicenseable (except to distributors of the Products) license under such other IP Rights to make, have made, import, use, offer to sell, sell, distribute and otherwise commercialize any such Products and services, and to own and operate the applicable Deferred Business, in each case to the extent necessary to provide services to Buyer or its Affiliates with respect to the applicable Deferred Business in the applicable Deferred Closing Countries for Buyer's or its Affiliates' benefit until the applicable Deferred Closing.  Buyer and Seller shall in good faith cooperate with the objective that all products and all materials using the Buyer and its Affiliates' IP Rights as described in this paragraph in the operation of the Deferred Business meet at least the same

-27-

high standards of quality, appearance, service and other standards that are observed immediately prior to the Closing Date by Seller and its Affiliates (or Buyer and its Affiliates with respect to Buyer's and its Affiliates' other IP Rights).  Seller's use of any Transferred IP or Buyer's and its Affiliates' other IP Rights and any goodwill generated thereby will inure to the benefit of Buyer and its Affiliates.  Seller's rights hereunder shall terminate immediately, fully and completely, upon the final Deferred Closing."

(ii)  Section 7.04 of the Purchase Agreement (Insurance) is hereby amended and restated in its entirety as follows:

"(a)  Except (1) with respect to insurance proceeds that constitute Transferred Assets pursuant to clause (xiv) of Annex 2.02(a), or (2) as provided in Section 7.04(b) or Section 7.04(c), the coverage under all insurance policies related to the Business and arranged or maintained by Seller or its Affiliates is only for the benefit of Seller and its Affiliates, and not for the benefit of Buyer or the Business.  Except as set forth in Section 7.04(b) or Section 7.04(c), as of the Closing Date (or, solely with respect to the Deferred Business, the applicable Deferred Closing Date), Buyer agrees to arrange for its own insurance policies (including self-insurance or similar arrangements funded directly or indirectly by Buyer or any of its Affiliates) with respect to the Business covering all periods following the Closing (or, solely with respect to the Deferred Business, the applicable Deferred Closing Date) and, without prejudice to any right to indemnification pursuant to this Agreement or any other Transaction Document, agrees not to seek, through any means, to benefit from any of Seller's or its Affiliates' insurance policies which may provide coverage for claims relating in any way to the Business.

(b)  Solely to the extent required for Buyer and its Affiliates to comply with applicable Law that requires Buyer and its Affiliates to maintain workers compensation insurance coverage for Transferred Employees for the period prior to the Closing (or with respect to the Deferred Employees, the applicable Deferred Closing), with respect to claims relating to acts, omissions, events or circumstances relating to Transferred Employees that occurred or existed prior to the Closing (or solely with respect to the Deferred Employees, the applicable Deferred Closing) ("Pre-Closing WC Claims") that are covered by Seller's or its Affiliates' workers compensation insurance policies relating to Transferred Employees (or the Deferred Employees, as applicable) ("Workers Compensation Policies"), Seller hereby authorizes Buyer, to the extent permitted by such Workers Compensation Policies, to report Pre-Closing WC Claims directly to the provider of such Workers Compensation Policies and shall use commercially reasonable efforts (at Buyer's expense), to the extent permitted by such Workers Compensation Policies, to assist Buyer's efforts to obtain the benefit of such insurance coverage with respect to such Pre-Closing WC Claims; provided that Buyer shall keep Seller reasonably informed of

-28-

each claim and Buyer shall exclusively bear and shall promptly either directly pay (in lieu of Seller or its Affiliates having to first pay) or repay or reimburse Seller or its Affiliates for the amount of each claim and related costs or expenses (including increased premiums) and for the amount of any deductibles or self-insured retentions (including captive insurance amounts) associated with any such claims under the Workers Compensation Policies and Buyer and its Affiliates shall be liable for any and all uninsured, uncovered, unavailable or uncollectible amounts of such payments; and provided further that Buyer and its Affiliates shall use commercially reasonable efforts (including prior to the Closing) to obtain, as soon as reasonably practicable, replacement insurance policies (including self-insurance) such that Buyer and its Affiliates are no longer legally required to have access to the Workers Compensation Policies.  For the avoidance of doubt, nothing in this Agreement shall require Seller or its Affiliates to extend or purchase any insurance policy.

(c)     Solely to the extent required for Buyer and its Affiliates to comply with applicable Law that requires Buyer and its Affiliates to maintain automobile liability insurance coverage for the Business or the Transferred Employees for the period prior to the Closing (or solely with respect to the Deferred Business or Deferred Employees, the applicable Deferred Closing), with respect to claims relating to events or incidents relating to the Business or the Transferred Employees that occurred prior to the Closing (or solely with respect to the Deferred Business or Deferred Employees, the applicable Deferred Closing) ("Pre-Closing Auto Claims") that are covered by Seller's or its Affiliates' automobile liability insurance policies relating to the Business or the Transferred Employees ("Auto Policies"), Seller hereby authorizes Buyer, to the extent permitted by such Auto Policies, to report Pre-Closing Auto Claims directly to the provider of such Auto Policies and shall use commercially reasonable efforts (at Buyer's expense), to the extent permitted by such Auto Policies, to assist Buyer's efforts to obtain the benefit of such insurance coverage with respect to such Pre-Closing Auto Claims; provided that Buyer shall keep Seller reasonably informed of each claim and Buyer shall exclusively bear and shall promptly either directly pay (in lieu of Seller or its Affiliates having to first pay) or repay or reimburse Seller or its Affiliates for the amount of each claim and related costs or expenses (including increased premiums) and for the amount of any deductibles or self-insured retentions (including captive insurance amounts) associated with any such claims under the Auto Policies and Buyer and its Affiliates shall be liable for any and all uninsured, uncovered, unavailable or uncollectible amounts of such payments; and provided further that Buyer and its Affiliates shall use commercially reasonable efforts (including prior to the Closing) to obtain, as soon as reasonably practicable, replacement insurance policies (including self-insurance) such that Buyer and its Affiliates are no longer legally required to have access to the Auto Policies.  For the avoidance of doubt, nothing in this

-29-

Agreement shall require Seller or its Affiliates to extend or purchase any insurance policy.

(d) Buyer or its Affiliates may from time to time during the Deferred Period arrange for its own insurance with respect to Deferred Assets pursuant to this Agreement. Seller and its Affiliates shall use commercially reasonable efforts, at Buyer's sole cost and expense, to assist Buyer's or its Affiliates' efforts to obtain the benefits of any such insurance with respect to claims relating to any loss or damage of any such Deferred Assets."

(iii) Section 7.06 of the Purchase Agreement (Assurances) is hereby amended and restated in its entirety as follows:

"From and after the Closing Date or the applicable Deferred Closing Date, as applicable, if either Buyer or Seller becomes aware that any of the Transferred Assets has not been transferred to Buyer or that any of the Excluded Assets has been transferred to Buyer, it shall promptly notify the other and the parties hereto shall, as soon as reasonably practicable and, subject to Section 2.02(g) and Section 2.06, ensure that such property is transferred, with any necessary prior third-party consent or approval, to:

(a) Buyer, in the case of any Transferred Asset which was not transferred at the Closing or the applicable Deferred Closing, as applicable; or

(b) Seller, in the case of any Excluded Asset which was transferred at the Closing or the applicable Deferred Closing, as applicable.

With respect to any Pre-Closing Accounts Receivable held by Buyer at Closing pursuant to Section 6.07, (A) Buyer and Seller shall cooperate in good faith to establish reasonable payment mechanics for Buyer to comply with this Section 7.06 upon its or its Affiliates' (including the Transferred Companies') receipt of cash received in respect of Pre-Closing Account Receivable and (B) Buyer's obligations under this Section 7.06 with respect to any Pre-Closing Accounts Receivable shall terminate one (1) year after the Closing Date."

(iv) Section 7.07 of the Purchase Agreement (Further Assurances) is hereby amended and restated in its entirety as follows:

"Subject to the terms and conditions of this Agreement, from and after the Closing Date or the Deferred Closing Date, as applicable, each party will execute and deliver, or cause its Affiliates to execute and deliver, all such documents and instruments and will take, or cause its Affiliates to take, all such further actions, in each case as may be reasonably necessary to consummate the transactions contemplated by this Agreement."

-30-

(v)     Section 7.08(a)(i) of the Purchase Agreement (Preparation and Filing of Tax Returns; Payment of Taxes) is hereby amended and restated in its entirety as follows:

"Seller shall prepare and file all Tax Returns of the Transferred Companies or in respect of the Transferred Assets or the Business, in each case, that are due (including applicable extensions) before the Closing.  Seller shall prepare (x) all income Tax Returns of the Transferred Companies for all taxable periods ending on or before the Closing Date that are due after the Closing ("Pre-Closing Entity Tax Returns"), (y) all income Tax Returns of the Seller or any of its subsidiaries and (z) all Tax Returns in respect of the Deferred Assets, the Deferred Liabilities, the Deferred Business, and the Deferred Inventory for all taxable periods (or portions thereof) beginning on or prior to (A) the applicable Deferred Closing Date (in the case of any Tax Return reflecting Deferred Business Taxes) or (B) the applicable Deferred Inventory Closing Date (in the case of any Tax Return reflecting Deferred Inventory Taxes) ("Deferred Period Tax Returns").  Seller shall prepare all Tax Returns (other than Tax Returns of the Transferred Companies) in respect of the Transferred Assets or the Business for all taxable periods ending on or before the Closing Date that are due after the Closing ("Pre-Closing Business Tax Returns" and, together with Pre-Closing Entity Tax Returns and Deferred Period Tax Returns, "Pre-Closing Tax Returns").  Seller shall also prepare and file all Tax Returns for Transferred Companies that are required to be included in (or filed with) a Tax Return of an affiliated, consolidated, combined, unitary or aggregate group of which Seller or any of its Affiliates (other than a Transferred Company) is parent for Pre-Closing Tax Periods.  With respect to any Pre-Closing Tax Return required to be prepared by Seller pursuant to this Section 7.08(a)(i), (1) such Pre-Closing Tax Returns shall be prepared on a basis consistent with the past practices of the Transferred Companies or with respect to the Transferred Assets or the Business, respectively, unless a different position is required by Law and the parties mutually agree on the resolution of such issue (and each party shall reasonably endeavor to reach such mutual agreement), (2) Seller shall deliver to Buyer for its review and comment, at least thirty (30) days prior to the due date for the filing of such Pre-Closing Tax Return in the case of a separate income Tax Return of the Transferred Companies, and at least ten (10) days prior to the due date for the filing of such Pre-Closing Tax Return in the case of a separate non-income Tax Return of the Transferred Companies or in respect of the Transferred Assets or the Business (in each case taking into account any applicable extensions), a copy of such Tax Return, together with any additional information that Buyer may reasonably request, and (3) Seller shall consider in good faith any reasonable comments submitted by Buyer at least fifteen (15) days prior to the due date of such Pre-Closing Tax Return in the case of a separate income Tax Return of the Transferred Companies, and at least five (5) days prior to the due date for the filing of such Pre-Closing Tax Return in the case of a separate non-income Tax Return of the Transferred Companies or

-31-

in respect of the Transferred Assets or the Business (in each case taking into account any applicable extensions).  If applicable, Seller shall deliver a revised Pre-Closing Tax Return to Buyer before the due date for the filing of such Pre-Closing Tax Return (taking into account any applicable extensions), and Buyer shall timely file or cause to be timely filed any Pre-Closing Tax Returns."

(vi)  Section 7.08(b)(i) of the Purchase Agreement (Refunds) is hereby amended and restated in its entirety as follows:

"Seller shall be entitled to retain, or receive prompt payment from Buyer or any of its subsidiaries or Affiliates (including the Transferred Companies) of, any refund (including any credit in lieu of a refund, which credit arises as a result of an overpayment and which otherwise would have been payable in cash by the relevant Taxing Authority at the election of the taxpayer) received or realized in cash with respect to (x) Taxes attributable to any Transferred Company, the Transferred Assets or the Business for any Pre-Closing Tax Period (other than Transfer Taxes, but including any VAT for which Seller is responsible pursuant to Section 2.06(e)) or (y) Excluded Deferred Taxes, including any such amounts arising by reason of amended Tax Returns filed after the Closing Date, but only to the extent that (A) such refund (or credit) is not the result of an event that occurred after the Closing Date (or after the applicable Deferred Closing Date, in the case of any such refund (or credit) in respect of Excluded Deferred Business Taxes, or after the applicable Deferred Inventory Closing Date, in the case of any such refund (or credit) in respect of Excluded Deferred Inventory Taxes), and (B) such refund (or credit) is not attributable to, and does not result from, a carry back or other use of any item of loss, deduction, credit or other similar item arising in a Post-Closing Tax Period (or in a taxable period beginning after the applicable Deferred Closing Date, in the case of any item arising with respect to Excluded Deferred Business Taxes, or in a taxable period beginning after the applicable Deferred Inventory Closing Date, in the case of any item arising with respect to Excluded Deferred Inventory Taxes) or, in the case of a refund (or credit) of Taxes for a Straddle Period, the use of any such item arising in a Post-Closing Tax Period (or in the case of a refund (or credit) of Excluded Deferred Business Taxes for a taxable period beginning on or prior to the applicable Deferred Closing Date and ending after the applicable Deferred Closing Date, the use of any such item arising in a taxable period beginning after the applicable Deferred Closing Date; or in the case of a refund (or credit) of Excluded Deferred Inventory Taxes for a taxable period beginning on or prior to the applicable Deferred Inventory Closing Date and ending after the applicable Deferred Inventory Closing Date, the use of any such item arising in a taxable period beginning after the applicable Deferred Inventory Closing Date).  In connection with the foregoing, if Seller determines that any of the Transferred Companies is entitled to file or make a formal or informal claim

-32-

for a refund (to which Seller would be entitled under the first sentence of this Section 7.08(b)(i)) of (x) Taxes (including by filing an amended Tax Return) with respect to a Pre-Closing Tax Period (other than Transfer Taxes or VAT, but including any VAT for which Seller is responsible pursuant to Section 2.06 (e)) or (y) Excluded Deferred Taxes, Seller shall be entitled, at Seller's expense, to file or make, or to request that Buyer cause the applicable Transferred Company to file or make, such formal or informal claim for refund, and Seller shall be entitled to control the prosecution of such claim for refund, provided that Seller shall not take any action in connection therewith that would bind Buyer or any of its Affiliates (including any Transferred Company) for a Post-Closing Tax Period (or a taxable period beginning after the applicable Deferred Closing Date, in the case of any refund (or credit) of Excluded Deferred Business Taxes, or a taxable period beginning after the applicable Deferred Inventory Closing Date, in the case of any refund (or credit) of Excluded Deferred Inventory Taxes) or otherwise adversely affect Buyer or any of its Affiliates (including any Transferred Company). Buyer will cooperate, and cause the Transferred Companies to cooperate, with respect to such claim for refund, and will pay, or cause the relevant Transferred Company to pay, to Seller the amount (including interest received from any Taxing Authority) of any related refund (including any credit in lieu of a refund, which credit arises as a result of an overpayment and which otherwise would have been payable in cash by the relevant Taxing Authority at the election of the taxpayer) (to which Seller would be entitled under the first sentence of this Section 7.08(b)(i)) received or realized in cash by Buyer or any Affiliate thereof (including any Transferred Company), net of any unreimbursed costs incurred by Buyer and its Affiliates in respect of such refund and reduced by the amount of any Taxes arising or that would arise as a result of the receipt of such refund or interest thereon, within five (5) days of receipt (or realization in cash) thereof. Buyer and the Transferred Companies shall be entitled to retain, or receive prompt payment from Seller with respect to, any other refund, credit, offset or other similar benefit received or realized with respect to Taxes attributable to any Transferred Company, the Transferred Assets or the Business (other than any such refund, credit, offset or other similar benefit received or realized with respect to Income Taxes of Seller or any of its subsidiaries, but only to the extent such Income Taxes were not Deferred Taxes borne by Buyer as part of the NEB Services Reimbursement Amount, under the Undisclosed Agency Agreement, or otherwise under this Agreement). Notwithstanding any other provision, (x) Seller shall be entitled to any refund, credit or reimbursement for any Transfer Taxes arising from, or relating to, the Internal Restructuring Steps, (y) Buyer shall be entitled to any refund, credit or reimbursement for any Transfer Taxes or VAT arising from, or relating to, any Transfer Taxes or VAT imposed on the transfer of the Transferred Equity Interests and the Transferred Assets to Buyer and assumption of the Assumed Liabilities by Buyer and (z) Buyer shall be entitled to any refund, credit or reimbursement for any Deferred Taxes borne

-33-

by Buyer."

(vii)     Section 7.08(c)(ii) of the Purchase Agreement (Tax Indemnification) is hereby amended and restated in its entirety as follows:

"Buyer and its Affiliates (including the Transferred Companies) shall indemnify, defend and hold Seller and its Affiliates harmless from and against: (A) for any Post-Closing Tax Period (x) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) of the Transferred Companies and (y) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) with respect to the Transferred Assets or the Business (including, for the avoidance of doubt, any Deferred Taxes), in the case of each of clauses (x) and (y), other than any such Tax liabilities that are Excluded Taxes or Excluded Deferred Taxes, (B) all liability for Transfer Taxes for which Buyer is responsible pursuant to Section 2.06(a), (C) all Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) attributable to a Buyer Tax Act, unless such Buyer Tax Act is effected with the written consent of Seller, (D) Tax liabilities (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Tax liabilities) attributable to any breach by Buyer or its Affiliates (including, after the Closing, any Transferred Company) of any covenant or other agreement hereunder, or (E) any Taxes (which shall include any costs and expenses, including reasonable legal fees and expenses, attributable to such Taxes) imposed with respect to the excess of, if any, (x) any amount required to be included by Seller or any of its Affiliates in income under Section 951(a) of the Code with respect to a Transferred Company for the tax year of Seller or such Affiliate that includes the Closing Date, over (y) the amount that would have been required to be included by Seller or any of its Affiliates in income under Section 951(a) of the Code with respect to a Transferred Company for the tax year of Seller or such Affiliate that includes the Closing Date had the taxable year of such Transferred Company ended on the Closing Date;"

(viii)     Section 7.08(d) of the Purchase Agreement (Tax Contests) is hereby amended and restated in its entirety as follows:

"(i)     Buyer shall notify Seller within ten (10) business days of a Tax Proceeding for a Pre-Closing Tax Period with respect to a Transferred Company, provided that the failure to so notify Seller shall not affect Seller's indemnification obligation under Section 7.08(c) except to the extent of any material prejudice actually incurred by Seller.

(ii)     With respect to any Tax Proceeding relating to (A) a Pre-Closing Tax Period with respect to a Transferred Company, the Transferred Assets or

-34-

the Business (other than a Straddle Period or a Tax Proceeding with respect to any Transfer Taxes or VAT, but including any Tax Proceeding with respect to any VAT for which Seller is responsible pursuant to Section 2.06(e)), (B) a consolidated Tax Return of which Seller or any of its subsidiaries (other than a Transferred Company) is the common parent, or (C) an Income Tax Return (other than a Deferred Period Tax Return) of Seller of any of its subsidiaries (other than a Transferred Company), Seller may choose in its sole discretion (at its expense) to control all Tax Proceedings and may make all decisions taken in connection with such Tax Proceeding (including selection of counsel), and, without limiting the foregoing, may, in its sole discretion, pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the applicable Tax liability and sue for a refund or contest the Tax at issue in such Tax Proceeding, provided that, to the extent such Tax Proceeding or the resolution or settlement thereof could have an impact on Buyer or any of its Affiliates (including the Transferred Companies) after the Closing Date, (x) Seller shall provide Buyer with a timely and reasonably detailed account of each phase of such Tax Proceeding and shall consult with Buyer before taking any significant action in connection with such Tax Proceeding and (y) Seller shall not settle, compromise or abandon any such Tax Proceeding without obtaining the prior written consent of Buyer, which consent shall not be unreasonably withheld.

(iii)     With respect to any Tax Proceeding relating to a Straddle Period with respect to a Transferred Company, the Transferred Assets or the Business, Buyer may choose in its sole discretion (at its expense) to control all Tax Proceedings and may make all decisions taken in connection with such Tax Proceeding (including selection of counsel), and, without limiting the foregoing, may, in its sole discretion, pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the applicable Tax liability and sue for a refund or contest the Tax at issue in such Tax Proceeding, provided that, to the extent such Tax Proceeding or the resolution or settlement thereof could have an impact on Seller or any of its Affiliates with respect to the Pre-Closing Tax Period resulting in an increase of Seller's liability for Taxes pursuant to this Agreement, (x) Buyer shall provide Seller with a timely and reasonably detailed account of each phase of such Tax Proceeding and shall consult with Seller before taking any significant action in connection with such Tax Proceeding and (y) Buyer shall not settle, compromise or abandon any such Tax Proceeding without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld.

(iv)    With respect to any Tax Proceeding relating to both (A) any Deferred Taxes and (B) any Excluded Taxes or Excluded Deferred Taxes (any such Tax Proceeding, a "Joint Tax Proceeding") (it being understood that a Tax Proceeding relating to a Tax Return that reflects both Deferred Taxes, on the one hand, and Excluded Taxes or Excluded Deferred Taxes, on the other hand, is a Joint Tax Proceeding), Seller may choose in its sole discretion to control all Joint Tax Proceedings and may make all decisions taken in connection with any such Joint Tax Proceeding (including selection of counsel), and, without limiting the foregoing, may, in its sole discretion, pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the applicable Tax liability and sue for a refund or contest the Tax at issue in such Joint Tax Proceeding, provided that, to the extent such Joint Tax Proceeding relates to Deferred Taxes, (v) Seller shall provide Buyer with a timely and reasonably detailed account of each phase of such Joint Tax Proceeding and shall consult with Buyer before taking any significant action in connection with such Joint Tax Proceeding, (w) Seller shall consult with Buyer and offer Buyer an opportunity to comment before submitting any written materials prepared or furnished in connection with such Joint Tax Proceeding, (x) Seller shall defend such Joint Tax Proceeding diligently and in good faith as if it were the only party in interest in connection with such Joint Tax Proceeding, (y) Buyer shall be entitled to participate (at its expense) in such Joint Tax Proceeding and, to the extent permitted by the relevant Taxing Authority, attend any meetings or conferences with the relevant Taxing Authority, and (z) Seller shall not settle, compromise or abandon any such Joint Tax Proceeding without obtaining the prior written consent of Buyer, which consent shall not be unreasonably withheld.  Buyer and Seller shall bear the expenses of conducting such Joint Tax Proceeding in proportion to the amount of Deferred Taxes, on the one hand, and Excluded Taxes and Excluded Deferred Taxes, on the other hand, at issue in such Joint Tax Proceeding.

(v)    Except as otherwise provided in Section 7.08(d)(iv), with respect to any Tax Proceeding relating to Deferred Taxes (such Tax Proceeding, a "Deferred Tax Proceeding"), Buyer may choose in its sole discretion (at its expense) to control all Deferred Tax Proceedings and may make all decisions taken in connection with any such Deferred Tax Proceeding (including selection of counsel), and, without limiting the foregoing, may, in its sole discretion, pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the applicable Tax liability and sue for a refund or contest the Tax at issue in such Deferred Tax Proceeding, provided that, to the extent any such Deferred Tax Proceeding relates to a taxable period (or portion thereof) beginning on or prior to (1) the applicable Deferred Closing Date (in the case of any Deferred Tax Proceeding with respect to

-36-

Deferred Business Taxes) or (2) the applicable Deferred Inventory Closing Date (in the case of any Deferred Tax Proceeding with respect to Deferred Inventory Taxes), (v) Buyer shall provide Seller with a timely and reasonably detailed account of each phase of such Deferred Tax Proceeding and shall consult with Seller before taking any significant action in connection with such Deferred Tax Proceeding, (w) Buyer shall consult with Seller and offer Seller an opportunity to comment before submitting any written materials prepared or furnished in connection with such Deferred Tax Proceeding, (x) Buyer shall defend such Deferred Tax Proceeding diligently and in good faith as if it were the only party in interest in connection with such Deferred Tax Proceeding, (y) Seller shall be entitled to participate (at its expense) in such Deferred Tax Proceeding and, to the extent permitted by the relevant Taxing Authority, attend any meetings or conferences with the relevant Taxing Authority, and (z) Buyer shall not settle, compromise or abandon any such Deferred Tax Proceeding without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld.

(vi)     Except as otherwise provided in Section 7.08(d)(ii), Section 7.08 (d)(iii), Section 7.08(d)(iv) and Section 7.08(d)(v), Buyer shall exclusively control all Tax Proceedings with respect to the Transferred Companies or otherwise relating to the Transferred Assets or the Business.  Notwithstanding anything in Section 7.08(d)(ii) and Section 7.08(d)(iv) to the contrary, Buyer shall have the exclusive right to control any Tax Proceeding described in Section 7.08(d)(i) if Seller fails to, or notifies Buyer in writing that Seller elects not to, defend such Tax Proceeding.

(vii)     Buyer, the Transferred Companies and each of their respective Affiliates, on the one hand, and Seller and its respective Affiliates, on the other hand, shall cooperate in contesting any Tax Proceeding, which cooperation shall include the retention and, upon request, the provision to the requesting party of records and information which are reasonably relevant to such Tax Proceeding, and making employees available on a mutually convenient basis to provide additional information or explanation of any material provided hereunder or to testify at proceedings relating to such Tax Proceeding.  Buyer and Seller shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Section 7.08(d).”

(ix)     Section 7.09 of the Purchase Agreement (Ancillary Agreements) is hereby amended and restated in its entirety as follows:

“At the Closing, Buyer and Seller shall enter into, execute and deliver the Transition Services Agreement, substantially in the form attached as Exhibit G-1 (the “Transition Services Agreement”), the Master Manufacturing and Supply Agreement, substantially in the form attached as Exhibit H (the

-37-

"Master Manufacturing and Supply Agreement"), the Trademark License Agreement (Buyer as Licensee), substantially in the form attached as Exhibit I-1 (the "Trademark License Agreement 1"), the Trademark License Agreement (Seller as Licensee), substantially in the form attached as Exhibit I-2 (the "Trademark License Agreement 2"), the Sorting Service Agreement, substantially in the form attached as Exhibit N (the "Sorting Service Agreement"), the Escrow Agreement, substantially in the form attached as Exhibit O (the "Escrow Agreement") and the Undisclosed Agency Agreement, substantially in the form attached as Exhibit P (the "Undisclosed Agency Agreement").  Trademark License Agreement 1 and Trademark License Agreement 2 are collectively referred to as the "Trademark License Agreements".  Between the date hereof and the Closing, the parties shall negotiate in good faith to agree on the fees for the services to be provided pursuant to the Transition Services Agreement based on the principles set forth in Exhibit G-2."

(x)      Section 7.11(c)(iv) of the Purchase Agreement (Non-Solicitation of Employees; Non-Competition) is hereby amended and restated in its entirety as follows:

"exercising its rights or performing or complying with its obligations under or as contemplated by this Agreement or any of the Transaction Documents, including the provision of the Distribution Services and the ownership and/or operation of the Deferred Business in accordance with this Agreement or any Ancillary Agreement; or"

(xi)      Section 7.12 of the Purchase Agreement (Confidentiality) is hereby amended and restated in its entirety as follows:

"(a)      Each party acknowledges that the information being provided to it in connection with the Transaction and the other transactions contemplated hereby is subject to the terms of each of (1) that certain confidentiality agreement between Buyer and Seller, dated as of December 2, 2016 (the "Business Confidentiality Agreement"), and (2) that certain confidentiality agreement between Buyer and Seller, dated as of April 5, 2017 (together with the Business Confidentiality Agreement, the "Confidentiality Agreements"), the terms of which are incorporated herein by reference in their entirety and shall, subject to the following sentence, survive the Closing; provided that actions taken by the parties to the extent necessary in order to comply with their respective obligations under Section 6.05 hereunder shall not be deemed to be in violation of this Section 7.12 or of the Confidentiality Agreements; provided that the foregoing shall not affect Section 6.05(b) to the extent that Section 6.05(b) specifies that it is subject to this Section 7.12 or the Confidentiality Agreements.  Effective upon, and only upon, the Closing, the Business Confidentiality Agreement shall terminate with respect to information relating solely to the Business, the Transferred Companies, the

-38-

Transferred Assets and the Assumed Liabilities (including, for avoidance of doubt, any Deferred Assets or Deferred Liabilities); provided, further, that Buyer acknowledges that its obligations of confidentiality and non-disclosure with respect to any and all other information provided to it by or on behalf of Seller, the Selling Affiliates, the Transferred Companies or any of their respective Affiliates or Representatives, concerning Seller or any of its Affiliates (other than solely with respect to the Business, the Transferred Companies, the Transferred Assets and the Assumed Liabilities, including, for avoidance of doubt, the Deferred Business, Deferred Assets and Deferred Liabilities) shall continue to remain subject to the terms and conditions of the Business Confidentiality Agreement (but subject to the term therein).

(b)     For two (2) years after the Closing, unless Buyer has otherwise consented in writing, Seller agrees to, and shall cause its subsidiaries and shall instruct its Representatives to, retain in confidence, and not use, any and all confidential or proprietary information to the extent relating to the Business and the Transferred Assets (collectively, "Confidential Business Information"), and not disclose such Confidential Business Information to any other Person; provided that Confidential Business Information shall not include any information (i) which is or becomes generally available to the public other than as a result of disclosure in violation of this Section 7.12(b), (ii) that Seller or any of its Affiliates receives after the Closing from a source that is not, to the knowledge of Seller, under any obligation of confidentiality with respect to such information, or (iii) that is independently developed by or on behalf of Seller or any of its Affiliates without reference to or use of such Confidential Business Information.  In addition, the foregoing will not prohibit Seller or its Affiliates from disclosing Confidential Business Information which is required by applicable Law or order of a Governmental Entity or rule or policy of any securities exchange to be disclosed.  The parties acknowledge and agree that (x) Seller and its Affiliates currently, and, subject to Section 7.11(c), may continue following the Closing to, maintain and expand business and commercial relationships (whether as a customer, supplier or otherwise) with the same Persons, and engage in commercial relationships with such Persons and with Buyer and the other Transferred Companies, and, subject to Section 7.11(c), may employ, or continue to employ, individuals who previously worked in or with the Business and possess knowledge and Know-How used in, relating to, or arising from the Business and (y) nothing in this Section 7.12(b) shall prohibit or restrict the maintenance or expansion of any such relationships or employment of any such individuals.  In addition, the foregoing shall not prohibit the use or disclosure of such Confidential Business Information to the extent reasonably necessary to comply with the terms of, or perform under, any of the Transaction Documents or any Transferred Contract or Commingled Contract that has not been assigned or transferred to Buyer or its Affiliates, or to provide the Distribution Services or operate Deferred Business in accordance

-39-

with this Agreement or any Ancillary Agreement.  Furthermore, the provisions of this Section 7.12(b) will not prohibit any use or disclosure in connection with the preparation and filing of financial statements with a Governmental Entity (including the U.S. Securities and Exchange Commission) or Tax Returns of Seller or its Affiliates or in connection with the enforcement of any right or remedy relating to this Agreement, the other Transaction Documents or the transactions contemplated hereby and thereby."

(xii)     Section 7.13(b) of the Purchase Agreement (Replacement of Guarantees) is hereby amended and restated in its entirety as follows:

"Following the Closing (or a Deferred Closing, as applicable), Buyer and Seller will reasonably cooperate with one another so that Buyer will obtain, or cause an Affiliate of Buyer to provide or obtain, replacement Guarantees with respect to each Guarantee issued by Seller or an Affiliate of Seller for the benefit of any Transferred Company or with respect to any Transferred Asset or Assumed Liability that was not replaced on or prior to the Closing Date (or a Deferred Closing Date, as applicable) (each, an "Existing Guarantee"). Buyer and Seller shall reasonably cooperate to obtain any necessary release of Seller and its Affiliates from such Existing Guarantees in form and substance reasonably satisfactory to Buyer and Seller."

Section 1.07     Employees.  Article VIII of the Purchase Agreement (Employees) is hereby amended as follows:

(i)     Section 8.01(a) of the Purchase Agreement (Employee Benefits Matters) is hereby amended and restated in its entirety as follows:

"From and after the date of this Agreement until the Closing Date or the applicable Deferred Closing Date, as applicable, Buyer shall consult with Seller and obtain Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed) before distributing any communications to any Employee of the Business whether relating to employee benefits, post-Closing or post the applicable Deferred Closing, as applicable, terms of employment or otherwise; provided that this sentence shall not apply to any (i) offer letters or other individual communications regarding post-Closing or post the applicable Deferred Closing, as applicable, employment of Employees of the Business (including proposed terms of employment, compensation and employee benefits, or role and organizational structure) or (ii) individual conversations or communications regarding matters not covered by any of the Transaction Documents."

-40-

(ii)    Section 8.01(b) of the Purchase Agreement (Employee Benefits Matters) is hereby amended and restated in its entirety as follows:

"To the extent permitted by applicable Law and as soon as practicable, but in no event later than five (5) business days after the date of this Agreement, Seller shall provide Buyer with a list on Schedule 8.01(b)(i) to the Disclosure Letter containing an identification number (with the corresponding names tying to these identification numbers to be provided concurrently to one person Buyer specifies), date of hire, position, location, and base salary, wage rate and bonus opportunity (and, in no event later than thirty (30) calendar days after the date of this Agreement, for sales employees, sales incentive targets, as well as actual sales incentive paid during the prior fiscal year), employee benefit plan participation, outstanding equity awards (including vesting schedule and exercise price, as applicable), expatriate status and any additional information that is necessary for Buyer to establish payroll systems or employee benefit plans as of the Transfer Time, as applicable, of each individual identified by Seller as expected to be an Employee of the Business, and Seller shall update such information periodically prior to the Closing Date (or the applicable Deferred Closing Date, as applicable, to the extent such employment actions are permitted by this Agreement, including the next succeeding sentence), to reflect new hires, leaves of absence and employment terminations and any other material changes thereto and provide copies of such updated lists and information to Buyer.  In addition, Seller shall periodically update Schedule 1.01(b) to the Disclosure Letter (including during the Deferred Period with respect to employees in a Deferred Closing Country) to reflect (i) any new hires and employment terminations permitted pursuant to Section 6.01(b)(iii), and (ii) any other employee of Seller and its Affiliates proposed by Seller to be an "Employee of the Business"; provided that, in the case of clause (ii), if Buyer objects to any such addition proposed to be made to such schedule by Seller, such addition shall be reviewed and agreed by the Vice President of Human Resources, MITG of Seller and the Senior Vice President, HR Bus Partner Medical of Buyer and if the Vice President of Human Resources, MITG of Seller and the Senior Vice President, HR Bus Partner Medical of Buyer cannot agree, then such addition shall not be included.  With respect to those Transferred Companies set forth on Schedule 8.01(b)(ii) to the Disclosure Letter, Buyer and Seller will use commercially reasonable efforts to establish or ensure continuation of (as applicable) for each such Transferred Company payroll, human resources and employee benefit administration Contracts and processes, effective as of or prior to the Closing.  On the Closing Date and the applicable Deferred Closing Date, Seller shall provide Buyer with an updated Schedule 8.01(b)(i) to the Disclosure Letter reflecting the applicable information as of such date."

-41-

(iii)     Section 8.01(c) of the Purchase Agreement (Employee Benefits Matters) is hereby amended and restated in its entirety as follows:

"Prior to the Closing or the applicable Deferred Closing, as applicable, Seller shall, or shall cause its Affiliates to, take all actions necessary to transfer the employment of any individual who is employed by a Transferred Company and who is not an Employee of Business to Seller or any of its Affiliates (other than the Transferred Companies), as designated by Seller.  In the event the employment of an Employee of the Business does not automatically transfer to Buyer or its Affiliates upon the occurrence of the Closing or the applicable Deferred Closing, as applicable, by operation of Law or pursuant to the transfer (directly or indirectly) of the Transferred Equity Interests to Buyer or its Affiliates, (i) Seller shall take, or cause its respective Affiliates to take, all actions required in accordance with applicable Law in respect of the transfer of employment of such Employees of the Business to Buyer or one of its Affiliates, and Seller shall encourage each Employee of the Business to accept any offers of employment pursuant to this Section 8.01(c) in its communications with such individuals; provided that, for the avoidance of doubt, nothing herein shall be interpreted as requiring Seller or any of its subsidiaries to provide any such Employee of the Business with any additional compensation or benefits or otherwise incur any material liability; and (ii) not less than ten (10) business days prior to the Closing or the applicable Deferred Closing, as applicable, Buyer or one of its Affiliates will offer employment, effective at 12:01 a.m., local time, on the Closing Date or the applicable Deferred Closing Date, as applicable (the "Transfer Time"), to such Employee of the Business in accordance with this Agreement.  Offers pursuant to this Section 8.01(c) shall (A) be for a position commensurate with the skills and experience of such Employee of the Business and at a geographic work location within fifty (50) miles of the applicable Employee of the Business' primary work location immediately prior to the Closing Date or the applicable Deferred Closing Date, as applicable (or, to the extent applicable in jurisdictions other than the United States, within such lesser radius as is necessary to ensure severance is not due in connection with such relocation), and (B) otherwise comply in all respects with applicable Law (including with respect to compensation and benefits).  With respect to any Employee of the Business to whom Buyer or one of its Affiliates is required to make an offer of employment pursuant to this Section 8.01(c), and who, as of the Closing Date or the applicable Deferred Closing Date, as applicable, is on approved leave of absence from work with Seller or its Affiliates (each, an "Inactive Employee"), Buyer shall offer employment to such individual on the earliest practicable date following the return of such individual to work with Seller and its Affiliates and otherwise on terms and conditions consistent with this Section 8.01; provided that such employee returns to work within one hundred eighty (180) days following the Closing Date or the applicable Deferred Closing Date, as applicable, or such later time as required by applicable Law

-42-

or the terms of the applicable Collective Bargaining Agreement upon presenting themselves for duty to the Business.  Seller shall promptly notify Buyer of the occurrence and end of any such leave of absence.  In the case of any Inactive Employee who becomes a Transferred Employee following the Closing Date or the applicable Deferred Closing Date, as applicable, all references in this Agreement to (1) the Closing Date or the applicable Deferred Closing Date, as applicable, shall be deemed to be references to the date on which such individual becomes a Transferred Employee and (2) the Transfer Time shall be deemed to be references to 12:01 a.m., local time, on the date that such individual becomes a Transferred Employee.  In any jurisdiction where the employment of an Employee of the Business can transfer automatically to Buyer and its Affiliates upon the occurrence of the Closing or Deferred Closing, as applicable, by operation of Law or pursuant to the transfer (directly or indirectly) of the Transferred Equity Interests to Buyer, Buyer and Seller agree to take, or cause their respective Affiliates to take, all actions required under applicable Law and all other actions as are necessary or appropriate such that the employment of such Employee of the Business will transfer to Buyer or its Affiliates automatically as of the Transfer Time.  Seller shall provide a list to Buyer of each Inactive Employee no later than ten (10) business days prior to the Closing or Deferred Closing Date, as applicable, and shall update such list as of the Closing or Deferred Closing Date, as applicable.  The Employee of the Business employed in France for whom the transfer of employment contemplated by this Section 8.01(c) is subject to the authorization of the *inspection du travail* shall transfer to Buyer or its Affiliates automatically on the day after such authorization is given.  If such authorization is not granted within four (4) months following the Closing Date, such Employee of the Business shall not become a Transferred Employee.  Seller shall use commercially reasonable efforts to obtain such authorization following the Closing and shall keep Buyer and its Affiliates informed of the status of such procedure.”

(iv)　　Section 8.01(d) of the Purchase Agreement (Employee Benefits Matters) is hereby amended and restated in its entirety as follows:

“Buyer or its Affiliates shall bear all the liabilities, obligations and costs relating to, and shall indemnify and hold harmless Seller and the Selling Affiliates from and against, any claims made by any Employee of the Business for any statutory or common law severance or other separation benefits, any contractual or other severance or separation benefits and any other legally mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments pursuant to a Judgment of a court having jurisdiction over the parties) and for any other claim, cost, liability or obligation (whether related to compensation, benefits or otherwise), in each case, arising out of (i) Buyer’s breach of its obligations under this Article VIII, including any failure of Buyer to provide

-43-

to U.S. Transferred Employees the benefits described in Section 8.01(e), (ii) Buyer making an offer to an Employee of the Business that does not meet the requirements of (A) Section 8.01(e) with respect to an Employee of the Business in the United States or (B) Section 8.01(j)(i) with respect to an Employee of the Business outside of the United States (whether or not located in a Specified Non-U.S. Jurisdiction), or (iii) any claims for severance or other separation benefits in connection with the involuntary termination of employment by Buyer or its Affiliates of any Transferred Employee after the Transfer Time.  Seller or its Affiliates shall bear all the liabilities, obligations and costs relating to, and shall indemnify and hold harmless Buyer and its Affiliates from and against, any claims made by any Employee of the Business for any statutory or common law severance or other separation benefits, any contractual or other severance or separation benefits and any other legally mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments pursuant to a Judgment of a court having jurisdiction over the parties) and for any other claim, cost, liability or obligation (whether related to compensation, benefits or otherwise), in each case, not arising out of Buyer's breach of its obligations under this Article VIII or under clause (ii) or (iii) above, including (A) any such claim arising out of the applicable Employee of the Business' refusal to accept an offer of employment made in compliance with this Article VIII from (or to commence employment with), or objection to the automatic transfer of employment to, Buyer or its Affiliates, and (B) any claims made by any Employee of the Business in China or other jurisdictions for any statutory severance or other separation benefits (including statutory economic compensation and statutory compensation payable in respect of accrued but not yet taken vacation days or other paid time off for the calendar year in which the Closing Date or the applicable Deferred Closing Date, as applicable, occurs) that arise as a result of any such employee who accepts an offer of employment from Buyer or any of its Affiliates making a request that such severance or other separation benefits be paid or provided by Seller or any of its subsidiaries.  Buyer shall not encourage any Employee of the Business regarding a request described in the immediately preceding sentence, and in the event an Employee of the Business asks Buyer a question regarding such request, Buyer shall refer such Employee of the Business to an applicable representative of Seller with respect to such request."

(v)     Section 8.01(i) of the Purchase Agreement (Employee Benefits Matters) is hereby amended and restated in its entirety as follows:

"Subject to Seller providing all reasonably necessary support and information in a timely manner, no later than the Closing Date or the applicable Deferred Closing Date, as applicable, Buyer shall establish or cause to be established (or utilize existing Buyer Plans), at its own expense, all necessary retirement, pension, employee welfare and employee benefit plans for Transferred

-44-

Employees, as applicable. Effective as of the Transfer Time, each Transferred Employee shall cease to be an employee of Seller or the applicable Affiliate and shall cease to participate in any Business Employee Benefit Plan (other than any Assumed Benefit Plan) as an active employee. Other than with respect to a government-sponsored benefit plan, (i) Seller shall be, or shall cause its Affiliates to be, responsible for all (A) medical, vision, dental and prescription drug claims for expenses incurred by any Transferred Employee or his or her dependents, (B) claims for short-term and long-term disability income benefits incurred by any Transferred Employee, (C) claims for group life, travel and accident, and accidental death and dismemberment insurance benefits incurred by any Transferred Employee and (D) claims relating to COBRA coverage attributable to "qualifying events" with respect to any Transferred Employee and his or her beneficiaries and dependents, in each case, prior to or as of the Transfer Time and (ii) Buyer shall be, or shall cause its Affiliates to be, responsible for all (A) medical, vision, dental and prescription drug claims for expenses incurred by any Transferred Employee or his or her dependents, (B) claims for short-term and long-term disability income benefits incurred by any Transferred Employee, (C) claims for group life, travel and accident, and accidental death and dismemberment insurance benefits incurred by any Transferred Employee and (D) claims relating to COBRA coverage attributable to 'qualifying events' with respect to any Transferred Employee and his or her beneficiaries and dependents, in each case, after the Transfer Time. Except in the event of any claim for workers compensation benefits, for purposes of this Agreement, the following claims and liabilities shall be deemed to be incurred as follows: (1) medical, vision, dental and/or prescription drug benefits (including hospital expenses), upon provision of the services, materials or supplies comprising any such benefits and (2) short and long-term disability, life, accidental death and dismemberment and business travel accident insurance benefits, upon the death, illness, injury or accident giving rise to such benefits. Seller and its Affiliates shall be responsible for all claims for workers compensation benefits that are incurred prior to the Transfer Time by any Transferred Employee. Buyer and its Affiliates shall be responsible for all claims for workers compensation benefits that are incurred on or after the Transfer Time by any Transferred Employee. A claim for workers compensation benefits shall be deemed to be incurred on the date the injury giving rise to the claim occurs."

(vi) Section 8.01(m) of the Purchase Agreement (Employee Benefits Matters) is hereby amended and restated in its entirety as follows:

"To the extent (i) permitted by applicable Law and (ii) that doing so would not require the consent of any other Person, as soon as reasonably practicable following the Closing or the applicable Deferred Closing Date, as applicable, Seller and its Affiliates shall use their commercially reasonable efforts to

-45-

assign to Buyer and its Affiliates any nondisclosure and confidentiality agreements, non-competition agreements or other restrictive covenant agreements applicable to any Transferred Employee to the extent that such agreements relate exclusively to the Business."

(vii)    Section 8.01(q) of the Purchase Agreement (Employee Benefits Matters) is hereby amended and restated in its entirety as follows:

"No later than forty-five (45) business days following the Closing or the applicable Deferred Closing Date, as applicable, Seller or its applicable Affiliate shall pay (i) an annual bonus (prorated through the Closing Date or the applicable Deferred Closing Date, as applicable, and based on the lesser of (A) the amount accrued with respect to such bonus and (B) the target amount to each Transferred Employee who is or would be eligible as of immediately prior to the Closing or the applicable Deferred Closing, as applicable, to receive an annual bonus under any Business Employee Benefit Plan pursuant to the terms thereof); and (ii) sales incentives or commissions (prorated through the Closing Date or the applicable Deferred Closing Date, as applicable, and based on actual performance through the Closing Date or the applicable Deferred Closing Date, as applicable) to each Transferred Employee who participated in any Business Employee Benefit Plan that provides for sales incentives or commissions as of immediately prior to the Closing or the applicable Deferred Closing, as applicable, and who was eligible to earn sales incentives or commissions for the applicable performance period in which the Closing or the applicable Deferred Closing, as applicable, occurs."

(viii)    Section 8.01(r) of the Purchase Agreement (Employee Benefits Matters) is hereby amended and restated in its entirety as follows:

"Prior to the Closing or the applicable Deferred Closing, as applicable, Seller shall take all actions as are necessary to provide as follows:

(i)      Each outstanding option (each, a "Seller Option") to purchase ordinary shares, par value $0.0001 ("Seller Ordinary Shares"), other than any Integration Incentive Stock Option, that is held by a Transferred Employee as of immediately prior to the Closing or the applicable Deferred Closing, as applicable, shall, effective as of the Closing or the applicable Deferred Closing, as applicable, become fully vested and exercisable and shall remain outstanding for the remainder of the term of such Seller Option.

(ii)      Each outstanding Integration Incentive Stock Option held by a Transferred Employee as of immediately prior to the Closing or the applicable Deferred Closing, as applicable, shall remain outstanding and shall vest at the end of the performance period applicable to such Integration Incentive Stock Option to the extent the applicable performance criteria are satisfied.

-46-

(iii)     Each outstanding restricted share unit award in respect of Seller Ordinary Shares (each, a "Seller RSU Award") that is held by a Transferred Employee as of immediately prior to the Closing or the applicable Deferred Closing, as applicable, and vests solely based on continued service shall, as of the Closing or the applicable Deferred Closing, as applicable, become fully vested and shall be settled by Seller in accordance with its terms.

(iv)     Each outstanding Seller RSU Award that is held by a Transferred Employee as of immediately prior to the Closing or the applicable Deferred Closing, as applicable, and subject to performance-based vesting conditions shall remain outstanding, shall vest at the end of the performance period applicable to such Seller RSU Award to the extent the applicable performance criteria are satisfied and shall be settled by Seller in accordance with its terms.

(v)     As of the Closing or the applicable Deferred Closing, as applicable, each Employee of the Business who is eligible to receive a long-term cash retention bonus under Seller's Retention Bonus Plan shall become fully vested in his or her long-term cash retention bonus, which amount shall be paid by Seller or its applicable Affiliate in accordance with such plan.

(vi)     No later than forty-five (45) business days following the Closing or the applicable Deferred Closing, as applicable, Seller or its applicable Affiliate shall pay a bonus under Seller's Long-Term Performance Plan (prorated through the Closing Date or the applicable Deferred Closing Date, as applicable, and based on actual performance through the Closing Date or the applicable Deferred Closing Date, as applicable, as determined by Seller) to each Transferred Employee who is or would be eligible to receive a bonus under such plan pursuant to the terms thereof."

(ix)     Section 8.01 of the Purchase Agreement (Employee Benefits Matters) is hereby amended and supplemented by adding a new Section 8.01(v), which provides:

"The parties agree to and covenant to perform the matters set forth in Schedule 8.01(v) of the Disclosure Letter."

(x)     Section 8.02(a) of the Purchase Agreement (Pension Plan Adjustment) is hereby amended and restated in its entirety as follows:

"Within six (6) months following the Closing Date, Seller and Buyer shall determine the aggregate value of the underfunded pension liabilities as of the Closing Date under the Assumed Benefit Plans set forth on Schedule 8.02(a) to the Disclosure Letter (the absolute value of such underfunded liabilities, the "Aggregate Underfunded Amount").  The Aggregate Underfunded Amount shall be calculated on the same basis that was used to determine the estimate referred to in Section 3.13(b)(iii) and, if applicable, the conversion rate from the applicable Foreign Currency to U.S. dollars shall be the closing rate

-47-

provided by Bloomberg at 7:00 a.m. New York City time on the Closing Date."

Section 1.08    Indemnification.  Section 10.03 of the Purchase Agreement (Indemnification by Buyer) is hereby amended and restated in its entirety as follows:

"Subject to the provisions of this Article X, from and after the Closing Date, in addition to the indemnification set forth in Section 6.06(a), Section 7.08(c) and Section 8.01(d), Buyer shall indemnify and hold harmless Seller against and from any and all Damages which Seller and any of its directors, officers, employees, Affiliates (other than the Transferred Companies), agents and representatives (collectively, the "Seller Indemnitees" and, together with the Buyer Indemnitees, the "Indemnitees") may incur or suffer to the extent such Damages arise out of or result from (a) the breach of any representation or warranty made by Buyer in this Agreement as if made on the Closing Date, (b) any breach by Buyer or any of its Affiliates of its covenants or agreements contained herein or (c) without limiting the indemnification obligations of Seller pursuant to Section 10.02, any of the Assumed Liabilities (including any Deferred Liabilities).  Notwithstanding that a claim for Damages may fall into multiple categories of this Section 10.03, a Seller Indemnitee may recover such Damages one time only."

Section 1.09    Miscellaneous.  The first sentence of Section 11.04 of the Purchase Agreement (Waivers) is amended by inserting the words "or after" between "prior to" and "the Closing."

Section 1.10    Transferred Assets.  Annex 2.02(a) of the Purchase Agreement (Transferred Assets) is hereby amended as follows:

(i)    The lead-in to Annex 2.02(a) is hereby amended by inserting at the end of the lead-in section the words "or, solely with respect to the applicable Deferred Business, the applicable Deferred Closing:"

(ii)    Annex 2.02(a)(ii) of the Purchase Agreement (Inventory) is hereby amended by inserting to the end of the section the words "or the applicable Deferred Closing, as applicable;"

(iii)    Annex 2.02(a)(v) of the Purchase Agreement (Permits) is hereby amended by inserting to the end of the section the words "or the applicable Deferred Closing Date, as applicable;"

(iv)    Annex 2.02(a)(xi) of the Purchase Agreement (Contracts) is hereby amended and restated in its entirety as follows:

"Contracts.  All leases, licenses (other than Transferred Real Property Leases and Transferred IP Licenses which are identified separately on this Annex

-48-

2.02(a)), bids, tenders, purchase orders, consulting agreements, supply agreements, distribution contracts, manufacturing contracts, maintenance contracts, agreements, commitments and other contracts, whether or not reduced to writing (collectively, "Contracts") exclusively relating to the Business or any of the Transferred Assets, and the Commingled Contracts set forth on Schedule 2.02(a)(xi) of the Disclosure Letter, but specifically excluding the Excluded Contracts (collectively, the "Transferred Contracts");"

(v)     Annex 2.02(a)(xiv) of the Purchase Agreement (Insurance Proceeds) is hereby amended and restated in its entirety as follows:

"Insurance Proceeds.  All insurance proceeds actually received by Seller or any of its Affiliates prior to or after the Closing under any insurance policy written prior to the Closing (or, solely with respect to Deferred Assets, the applicable Deferred Closing) in connection with (i) the damage or destruction of any of the Transferred Assets from and after the date hereof and prior to the Closing (or, solely with respect to Deferred Assets, the applicable Deferred Closing) that is, or would have been but for such damage or destruction, included in the Transferred Assets or (ii) any Assumed Liability (other than, in the case of this clause (ii), where insurance proceeds are directly or indirectly funded by Seller or any of its Affiliates through self-insurance or other similar arrangement);"

(vi)     Annex 2.02(a)(xv) of the Purchase Agreement (Cash Amount; Cash Proceeds of Sales and Dispositions) is hereby amended and restated in its entirety as follows:

"Cash Amount; Cash Proceeds of Sales and Dispositions.  (1) Cash and cash equivalents of the Transferred Companies to the extent included in the Cash Amount and (2) all net cash proceeds actually received by Seller or any of its Affiliates prior to or after the Closing in connection with any sales or other dispositions from and after the date hereof through the Closing (or, solely with respect to Deferred Assets, the applicable Deferred Closing) of any asset that would have been included in the Transferred Assets but for such sale or disposition, other than with respect to sales of Inventory in the ordinary course of business consistent with past practice;"

(vii)     Annex 2.02(a)(xvi) of the Purchase Agreement (Claims; Settlement Proceeds) is hereby amended and restated in its entirety as follows:

"Claims; Settlement Proceeds.  Any and all claims, causes of action, defenses and rights of offset or counterclaim, or settlement agreements (in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) arising out of the Transferred Contracts (other than any Pre-Closing Accounts Receivable) and all proceeds of any settlement from and after the date hereof through the Closing (or, solely with respect to

-49-

Deferred Assets, the applicable Deferred Closing) of any such claims, causes of action, defenses and rights of offset or counterclaim that would have been included in the Transferred Assets but for such settlement;"

Section 1.11    Excluded Assets.  Annex 2.02(b) of the Purchase Agreement (Excluded Assets) is hereby amended as follows:

(i)        Annex 2.02(b)(i) of the Purchase Agreement (Accounts Receivable/Other Current Assets) is hereby amended and restated in its entirety as follows:

"Accounts Receivable/Other Current Assets.  (1) All accounts receivable, notes receivable and similar rights to receive payments of Seller or any of its Affiliates existing on the Closing Date or the applicable Deferred Closing Date, as applicable ("Pre-Closing Accounts Receivable"), (2) all other assets as of immediately prior to the Closing or the applicable Deferred Closing, as applicable, arising out of the operation or conduct of the Business before the Closing or the applicable Deferred Closing, as applicable, that would be classified as current assets under GAAP on a balance sheet of the Business as of immediately prior to the Closing or the applicable Deferred Closing, as applicable, calculated in a manner consistent with the Financial Information;"

(ii)       Annex 2.02(b)(ii) of the Purchase Agreement (Cash and Cash Equivalents) is hereby amended and restated in its entirety as follows:

"Cash and Cash Equivalents.  All cash and cash equivalents and marketable securities and other investment assets, other than cash and cash equivalents in respect of clauses (xiv), (xv) and (xvi) of Annex 2.02(a), held by Seller or any of its Affiliates on the Closing Date or the applicable Deferred Closing Date, as applicable;"

(iii)      Annex 2.02(b)(iii) of the Purchase Agreement (Hedging or Other Currency Exchange Agreements) is hereby amended and restated in its entirety as follows:

"Hedging or Other Currency Exchange Agreements.  All rights to receive payments of Seller or any of its Affiliates pursuant to a hedging or other currency exchange agreement existing before, on or after the Closing Date;"

(iv)       Annex 2.02(b)(v) of the Purchase Agreement (Certain Records) is hereby amended and restated in its entirety as follows:

"Certain Records.  Any records and files not identified as Transferred Records, including (A) the personnel records maintained by Seller or any of its Affiliates, (B) Tax Returns (other than Tax Returns solely related to any Transferred Company), (C) records (including accounting records) relating to Taxes paid or payable by Seller or any of its Affiliates and all financial and Tax records relating to the Business that form part of Seller's or any of its

-50-

Affiliates' general ledger or otherwise constitute accounting records, (D) records prepared in connection with the Transactions, including bids received from other Persons and analyses relating to the Business and (E) file copies of the Transferred Records retained by Seller, in each case whether generated before, on or after the Closing Date;"

(v)    Annex 2.02(b)(vi) of the Purchase Agreement (Certain Contracts and Contract Rights) is hereby amended and restated in its entirety as follows:

"Certain Contracts and Contract Rights.  All rights of Seller and its Affiliates under (A) this Agreement and the Ancillary Agreements, (B) the Commingled Contracts (subject to Section 2.02(g)), except for those Commingled Contracts set forth on Schedule 2.02(a)(xi) of the Disclosure Letter, (C) those Contracts related to Shared Services, and (D) any contracts between Seller and any of its Affiliates or between Affiliates of Seller, whether arising before, on or after the Closing Date (collectively, the "Excluded Contracts");"

(vi)    Annex 2.02(b)(vii) of the Purchase Agreement (Insurance) is hereby amended and restated in its entirety as follows:

"Insurance.  Other than insurance proceeds specified in clause (xiv) of Annex 2.02(a), all current and prior insurance policies arranged or maintained by Seller or any of its Affiliates and all rights of any nature with respect thereto, including all rights to insurance recoveries thereunder and to assert claims with respect to any such insurance recoveries, whether arising before, on or after the Closing Date;"

Section 1.12    Assumed Liabilities.  Annex 2.02(c) of the Purchase Agreement (Assumed Liabilities) is hereby amended as follows:

(i)    The lead-in to Annex 2.02(c) is hereby amended by inserting the phrase "(including the Deferred Business and Deferred Assets but without duplication of any amounts included in the NEB Services Reimbursement Amount)" between "any Transferred Asset" and ", in each case other than the Excluded Liabilities".

(ii)    Annex 2.02(c)(ii) of the Purchase Agreement (Transferred Contract Liabilities) is hereby amended and restated in its entirety as follows:

"Transferred Contract Liabilities.  All liabilities and obligations under the Transferred Contracts, whether arising before, on or after the Closing Date, but excluding those in respect of the Pre-Closing Accounts Payable;"

(iii)    Annex 2.02(c)(iv) of the Purchase Agreement (Product Claims) is hereby amended and restated in its entirety as follows:

"Product Claims.  Liabilities and obligations to the extent arising from or

-51-

relating to lawsuits or other claims, regardless of when commenced or made and irrespective of the legal theory asserted,  with respect to the design, manufacture, testing, advertising, marketing, distribution or sale of the Products, whether prior to or after the Closing, including all liabilities and obligations to the extent arising from or relating to (A) warranty obligations, (B) infringement, dilution, misappropriation or other violation of IP Rights, (C) alleged or actual hazard or defect in design, manufacture, materials or workmanship, including any failure to warn or alleged or actual breach of express or implied warranty or representation or (D) the return after the Closing of any Product sold prior to, on or after the Closing (collectively, "Product Claims"), in each case other than any Excluded Liability;"

(iv)     Annex 2.02(c)(v) of the Purchase Agreement (Environmental Liabilities) is hereby amended and restated in its entirety as follows:

"Environmental Liabilities.  All liabilities and obligations to the extent arising from or relating to the Transferred Real Property, the Business or any Transferred Asset (or, in each case, the ownership or operation thereof) and arising under any Environmental Law, or with respect to any Environmental Claim or Hazardous Materials, in each case, whether arising before, on or after the Closing Date;"

(v)     Annex 2.02(c)(vi) of the Purchase Agreement (Business Claims) is hereby amended and restated in its entirety as follows:

"Business Claims.  Except as otherwise set forth in this Agreement and except for the matters specifically identified as Excluded Liabilities, all obligations and liabilities in respect of any criminal, civil or administrative suit, action or proceeding, pending or threatened, and claims, whether or not presently asserted, to the extent arising from or relating to the Business before, on or after the Closing Date (collectively, "Business Claims");"

Section 1.13   Excluded Liabilities.  Annex 2.02(d) of the Purchase Agreement (Excluded Liabilities) is hereby amended as follows:

(i)     Annex 2.02(d)(iii) of the Purchase Agreement (Excluded Asset Liabilities) is hereby amended and restated in its entirety as follows:

"Excluded Asset Liabilities.  Each liability, obligation or commitment to the extent arising from or relating to any Excluded Asset or the distribution to, or ownership by, Seller or any of the Selling Affiliates of any Excluded Asset or associated with the realization of the benefits of any Excluded Asset, whether arising before, on or after the Closing Date;"

Section 1.14    Disclosure Letter.  The Disclosure Letter is hereby amended as set forth on Exhibit A hereto.

Section 1.15    Exhibits.  The Exhibits of the Purchase Agreement are hereby amended as follows:

(i)       Exhibit 1 of the Purchase Agreement (Maximum Cash Amount of Transferred Companies) is hereby amended and restated in its entirety in the form set forth as Annex B attached hereto.

(ii)      Exhibit L of the Purchase Agreement (Closing Structure) is hereby amended and restated in its entirety in the form set forth as Annex C attached hereto.

(iii)     Exhibit M of the Purchase Agreement (Allocation Method) is hereby amended and restated in its entirety in the form set forth as Annex D attached hereto.

(iv)     The Purchase Agreement is hereby amended and supplemented by inserting a new Exhibit O titled "Form of Escrow Agreement" in the form set forth as Annex E attached hereto.

(v)      The Purchase Agreement is hereby amended and supplemented by inserting a new Exhibit P titled "Form of Undisclosed Agency Agreement" in the form set forth as Annex F attached hereto.

(vi)     The Purchase Agreement is hereby amended and supplemented by inserting a new Exhibit Q titled "Form of Merger Authorization" in the form set forth as Annex G attached hereto.

(vii)    The Purchase Agreement is hereby amended and supplemented by inserting a new Exhibit R titled "Form of U.S. Merger Agreement" in the form set forth as Annex H attached hereto.

(viii)   The Purchase Agreement is hereby amended and supplemented by inserting a new Exhibit S titled "Form of U.S. Certificate of Merger" in the form set forth as Annex I attached hereto.

**ARTICLE 2**
**General Provisions**

Section 2.01    Effect of Amendment.  This Amendment shall not constitute an amendment or waiver of any provision of the Purchase Agreement not expressly amended or waived herein and shall not be construed as an amendment, waiver or consent to any action that would require an amendment, waiver or consent except as expressly stated herein.  The Purchase Agreement, as amended by this Amendment, is and shall continue to be in full force and effect.

Section 2.02    Counterparts.  This Amendment may be executed in counterparts and such counterparts may be delivered in electronic format (including by fax or in portable

-53-

document format (.pdf)), each of which shall be deemed to be an original and all of which shall be deemed to constitute the same Amendment.

Section 2.03    Other Miscellaneous Terms.  The provisions of Article XI (Miscellaneous) of the Purchase Agreement shall apply *mutatis mutandis* to this Amendment, and to the Purchase Agreement, taken together as a single agreement, reflecting the terms as modified hereby.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, the parties have duly executed this Amendment as of the date first above written.

**CARDINAL HEALTH, INC.**

By: /s/ Donald M. Casey, Jr.
Name: Donald M. Casey, Jr.
Title: Chief Executive Officer - Medical Segment

**MEDTRONIC PLC**

By: /s/ Christopher Cleary
Name: Christopher Cleary
Title: Vice President - Corporate Development

Exhibit 10.22

**FIRST AMENDMENT TO THE**
**AMENDED CARDINAL HEALTH, INC. 2011 LONG-TERM INCENTIVE PLAN**

1.  Effective June 29, 2017, Section 2(ii) of the Plan is hereby deleted in its entirety and in replacement thereof shall be the following:

    ""**Retirement**" means, unless the Administrator determines otherwise, Termination of Employment (other than by death or Disability and other than in the event of Termination for Cause) of an Awardee from the Company and its Affiliates after attaining either (i) age 55 and at least 10 years of continuous service with the Company and its Affiliates or (ii) solely with respect to Awards granted on or after July 1, 2017, age 60 and at least five years of continuous service with the Company and its Affiliates, in each case including service with an Affiliate of the Company prior to the time that such Affiliate became an Affiliate of the Company."

2.  Effective August 8, 2017, Section 4(b)(x) of the Plan is hereby deleted in its entirety and in replacement thereof shall be the following:

    (x)     "to modify or amend each Award, including, but not limited to, providing for the continuation or acceleration of vesting and/or exercisability; provided, however, that any such modification or amendment is subject to (A) the minimum vesting provisions set forth in Sections 8(e), 11(a) and 12(a) of the Plan, and (B) the Plan amendment provisions set forth in Section 17 of the Plan;"

3.  Effective August 8, 2017, the first three sentences of Section 8(e) of the Plan are hereby deleted in their entirety and in replacement thereof shall be the following:

    (e)     "Options granted under the Plan will vest and/or be exercisable at such time and in such installments during the period prior to the expiration of the Option's term as determined by the Administrator, except that no Option may first become exercisable within one year from its Grant Date, other than (i) upon a Change of Control as specified in Section 16(b) of the Plan, (ii) upon the death or Disability of the Awardee, in each case as specified in the Option Agreement, or (iii) for up to a number of Shares subject to Options that, when added to the number of Shares subject to Stock Awards and Other Stock-Based Awards granted under the Plan that on or after August 8, 2017 vest within less than one year, does not in the aggregate exceed 5% of the total number of Shares provided in Section 3(a) of the Plan.  The Administrator has the right to make the timing of the ability to exercise any Option granted under the Plan subject to continued active employment, the passage of time, and/or such performance requirements as deemed appropriate by the Administrator.  At any time after the grant of an Option, the Administrator may reduce or eliminate any restrictions surrounding any Participant's right to exercise all or part of the Option, subject to the restrictions set forth above."

4.  Effective August 8, 2017, the following sentence is hereby inserted at the end of Section 11(a) of the Plan:

    "No condition that is based upon performance criteria and level of achievement versus such criteria shall be based on performance over a period of less than one year and no condition that is based solely upon continued employment or the passage of time shall provide for vesting in full of a Stock Award in less than one year from its Grant Date,

other than (i) upon a Change of Control as specified in Section 16(b) of the Plan, (ii) upon the death or Disability of the Awardee, in each case as specified in the Stock Award Agreement, or (iii) for up to a number of Shares subject to Stock Awards that, when added to the number of Shares subject to Options and Other Stock-Based Awards granted under the Plan that on or after August 8, 2017 vest within less than one year, does not in the aggregate exceed 5% of the total number of Shares provided in Section 3(a) of the Plan."

5. Effective August 8, 2017, the following sentence is hereby inserted at the end of Section 12(a) of the Plan:

"No condition that is based upon performance criteria and level of achievement versus such criteria shall be based on performance over a period of less than one year and no condition that is based solely upon continued employment or the passage of time shall provide for vesting in full of an Other Stock-Based Award in less than one year from its Grant Date, other than (i) upon a Change of Control as specified in Section 16(b) of the Plan, (ii) upon the death or Disability of the Awardee, in each case as specified in the Other Stock-Based Award Agreement, or (iii) for up to a number of Shares subject to Other Stock-Based Awards that, when added to the number of Shares subject to Options and Stock Awards granted under the Plan that on or after August 8, 2017 vest within less than one year, does not in the aggregate exceed 5% of the total number of Shares provided in Section 3(a) of the Plan."

6. Effective June 29, 2017, Section 13(d) of the Plan is hereby deleted in its entirety and in replacement thereof shall be the following:

"(d) *Termination of Employment*. The following provisions shall apply to Cash Awards upon Termination of Employment unless the Administrator determines otherwise.

(i) *Termination of Employment Due to Disability, Retirement or Death*. In the event that a Participant's Termination of Employment occurs by reason of Disability, Retirement or death before the date the Cash Award is paid for the applicable performance period, the Cash Award determined by the Administrator to be paid will be prorated based upon the length of time that the Participant was employed by the Company during the applicable performance period. In the case of a Participant's Disability, Termination of Employment will be deemed to occur as of the date that the Administrator determines was the date on which the definition of Disability was satisfied. The Cash Award will be paid at the same time payments are made to Participants who did not terminate employment during the applicable performance period and will be based on the level of financial, business or operational performance actually achieved, to the extent applicable to such Award. The right of the Participant to receive any payment under this Plan will pass to the Participant's estate in the event of the Participant's death.

(ii) *Certain Involuntary Terminations of Employment (Not Disability or Retirement Eligible)*. In the event that (A) a Participant's Termination

of Employment by the Company (other than as a Termination for Cause) occurs on or after the first day of the last one-fourth of the applicable performance period and before the date the Cash Award is paid for the applicable performance period, or (B) solely with respect to Cash Award opportunities granted on or after July 1, 2017, (1) Sections 13(d)(i) and 13(d)(ii)(A) of the Plan are not applicable, but the Participant has attained either (a) age 53 and at least eight years of continuous service with the Company and its Affiliates or (b) age 59 and at least four years of continuous service with the Company and its Affiliates, in each case including service with an Affiliate of the Company prior to the time that such Affiliate became an Affiliate of the Company, and (2) a Participant's Termination of Employment by the Company (other than as a Termination for Cause) occurs and no later than 45 days after the Termination of Employment, the Participant enters into a written separation agreement and general release of claims with the Company and its Affiliates (in such form as may reasonably be presented by the Company) (a "Separation Agreement") and the Participant does not timely revoke such Separation Agreement, in each case the Cash Award determined by the Administrator to be paid will be prorated based upon the length of time that the Participant was employed by the Company during the applicable performance period.  The Cash Award will be paid at the same time payments are made to Participants who did not terminate employment during or after completion of the applicable performance period and will be based on the level of financial, business or operational performance actually achieved, to the extent applicable to such Award.

(iii)      *Other Terminations of Employment*.  Except as set forth in Sections 13(d)(i) and (ii) above, in the event that a Participant's Termination of Employment occurs before the date the Cash Award is paid for the applicable performance period, all of the Participant's rights to any Cash Award for that performance period will be forfeited."

7.  Effective August 8, 2017, the following sentence is hereby inserted before the last sentence of Section 20 of the Plan:

"Further, the Administrator may, in its discretion, require that all or any portion of any Cash Award paid or payable after June 30, 2018 to a Participant who is or was an "executive officer" (as that term is defined under Rule 3b-7 under the Exchange Act) be repaid or forfeited to the Company upon a determination by the Administrator that the Participant engaged in a material violation of law or of the Company's Standards of Business Conduct during the performance or vesting period of the Cash Award and that this conduct caused material financial harm to the Company."

**CARDINAL HEALTH, INC.**
**NONQUALIFIED STOCK OPTION AGREEMENT**

This Nonqualified Stock Option Agreement (this "Agreement") is entered into in Franklin County, Ohio. On [date of grant] (the "Grant Date"), Cardinal Health, Inc., an Ohio corporation (the "Company"), has awarded to [employee name] ("Awardee"), a Nonqualified Stock Option (the "Option") to purchase [# of shares] common shares, without par value, of the Company (the "Shares") for an exercise price of [$X.XX] per share. The Option has been granted under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (the "Plan"), and will include and be subject to all provisions of the Plan, which are incorporated in this Agreement by reference, and will be subject to the provisions of this Agreement. Capitalized terms used in this Agreement which are not specifically defined will have the meanings ascribed to such terms in the Plan. [CLIFF ALTERNATIVE: This Option vests and becomes exercisable on the [        ] anniversary of the Grant Date (the "Vesting Date"), subject to the provisions of this Agreement, including those relating to Awardee's continued employment with the Company and its Affiliates (collectively, the "Cardinal Group").] [INSTALLMENT ALTERNATIVE: This Option vests and becomes exercisable in [        ] installments, which will be as nearly equal as possible, on the [        ] anniversaries of the Grant Date (each a "Vesting Date" with respect to the portion of the Option scheduled to vest on such date), subject in each case to the provisions of this Agreement, including those relating to Awardee's continued employment with the Company and its Affiliates (collectively, the "Cardinal Group").] This Option will expire on [date of expiration] (the "Grant Expiration Date").

1.    Method of Exercise and Payment of Price.

(a)    Method of Exercise. At any time when all or a portion of the Option is exercisable under the Plan and this Agreement, some or all of the exercisable portion of the Option may be exercised from time to time by written notice to the Company, or such other method of exercise as may be specified by the Company, including without limitation, exercise by electronic means on the web site of the Company's third-party equity plan administrator, which will:

(i)    state the number of whole Shares with respect to which the Option is being exercised; and

(ii)    if the Option is being exercised by anyone other than Awardee, if not already provided, be accompanied by proof satisfactory to counsel for the Company of the right of such person or persons to exercise the Option under the Plan and all applicable laws and regulations.

(b)    Payment of Price. The full exercise price for the portion of the Option being exercised shall be paid to the Company as provided below:

(i)    in cash;

(ii)    by check acceptable to the Company or wire transfer (denominated in U.S. Dollars);

(iii)    subject to any conditions or limitations established by the Administrator, other Shares owned by Awardee that have a Fair Market Value on the date of surrender equal to or greater than the aggregate exercise price of the Shares as to which said Option is exercised (it being agreed that the excess of the Fair Market Value over the aggregate exercise price will be refunded to Awardee, with any fractional Share being repaid in cash);

(iv)     if permitted by the Administrator, consideration received by the Company under a broker-assisted sale and remittance program acceptable to the Administrator;

(v)     if permitted by the Administrator, and subject to any conditions or limitations established by the Administrator, the Company's withholding Shares otherwise issuable upon exercise of the Option pursuant to a "net exercise" arrangement; or

(vi)     any combination of the foregoing methods of payment.

2.     Transferability.  The Option is transferable (a) at Awardee's death, by Awardee by will or pursuant to the laws of descent and distribution, and (b) by Awardee during Awardee's lifetime, without payment of consideration, to (i) the spouse, former spouse, parents, stepparents, grandparents, parents-in-law, siblings, siblings-in-law, children, stepchildren, children-in-law, grandchildren, nieces or nephews of Awardee, or any other persons sharing Awardee's household (other than tenants or employees) (collectively, "Family Members") or (ii) a trust, partnership or other entity controlled by Awardee or Awardee's Family Members and in which Awardee or Awardee's Family Members have 100% of the pecuniary interest; provided, however, that subsequent transfers of the transferred Option are prohibited, except (X) if the transferee is an individual, at the transferee's death by the transferee by will or pursuant to the laws of descent and distribution, and (Y) without payment of consideration to the individuals or entities listed in Paragraphs (b)(i) or (ii) above, with respect to the original Awardee. The Administrator may, in its discretion, permit transfers to other persons and entities as permitted by the Plan. Neither a transfer under a domestic relations order in settlement of marital property rights nor a transfer to an entity in which more than 50% of the voting interests are owned by Awardee or Family Members in exchange for an interest in that entity will be considered to be a transfer for consideration. Within 10 days of any transfer, Awardee shall notify the Company in writing of the transfer. Following transfer, the Option continues to be subject to the same terms and conditions as were applicable immediately prior to transfer and, except as otherwise provided in the Plan or this Agreement, references to the original Awardee are deemed to refer to the transferee. The events of a Termination of Employment of Awardee provided in Paragraph 3 continue to be applied with respect to the original Awardee, following which the Option is exercisable by the transferee only to the extent, and for the periods, specified in Paragraph 3. The Company has no obligation to notify any transferee of Awardee's Termination of Employment with the Cardinal Group for any reason. The conduct prohibited of Awardee in Paragraph 5 continues to be prohibited of Awardee following transfer to the same extent as immediately prior to transfer and the Option (or its economic value, as applicable) is subject to forfeiture by the transferee and recoupment from Awardee to the same extent as would have been the case of Awardee had the Option not been transferred. Awardee remains subject to the recoupment provisions of Paragraphs 5 and 15 of this Agreement and tax withholding provisions of Section 31 of the Plan following transfer of the Option.

3.     Termination of Employment.

(a)     Termination of Employment by Reason of Death or Disability.  If a Termination of Employment by reason of death or Disability occurs at least six months after the Grant Date, then any outstanding unvested portion of the Option vests upon and becomes exercisable in full from and after such Termination of Employment.  The Option may thereafter be exercised by Awardee, any transferee of Awardee, if applicable, or by the legal representative of the estate or by the legatee of Awardee under the will of Awardee from the date of such Termination of Employment until the Grant Expiration Date.

(b)     Termination of Employment by Reason of Retirement.  If a Termination of Employment by reason of Retirement occurs at least six months after the Grant Date, then a Ratable Portion of each

2

unvested installment of the outstanding Option immediately vests and becomes exercisable. Such "Ratable Portion," with respect to the applicable installment, is an amount equal to such installment of the Option scheduled to vest on a future Vesting Date multiplied by a fraction, the numerator of which is the number of days from the Grant Date through the date of the Termination of Employment, and the denominator of which is the number of days from the Grant Date through such Vesting Date. The Option, to the extent vested, may be exercised by Awardee (or any transferee, if applicable) until the Grant Expiration Date. If Awardee dies after Retirement, but before the Grant Expiration Date, the Option, to the extent vested, may be exercised by any transferee of the Option, if applicable, or by the legal representative of the estate or by the legatee of Awardee under the will of Awardee from and after such death until the Grant Expiration Date.[1]

(c) Involuntary Termination of Employment with Severance. If (i) Paragraph 3(b) is not applicable, but Awardee has attained either (A) age 53 and at least eight years of continuous service with the Cardinal Group, or (B) age 59 and at least four years of continuous service with the Cardinal Group, in each case including service with an Affiliate of the Company prior to the time that such Affiliate became an Affiliate of the Company, (ii) a Termination of Employment by the Cardinal Group (other than a Termination for Cause) occurs at least six months after the Grant Date, and (iii) no later than 45 days after the Termination of Employment, Awardee enters into a written separation agreement and general release of claims with the Cardinal Group (in such form as may reasonably be presented by the Cardinal Group) (a "Separation Agreement"), and Awardee does not timely revoke such Separation Agreement, then a Ratable Portion of each unvested installment of the outstanding Option immediately vests and becomes exercisable. The Option, to the extent vested, may be exercised by Awardee (or any transferee, if applicable) until the Grant Expiration Date. If Awardee dies after such Termination of Employment, but before the Grant Expiration Date, the Option, to the extent vested, may be exercised by any transferee of the Option, if applicable, or by the legal representative of the estate or by the legatee of Awardee under the will of Awardee from and after such death until the Grant Expiration Date.

(d) Change of Control. In the event of a Change of Control prior to the Participant's Termination of Employment, any outstanding unvested portion of the Option vests in full, except to the extent a Replacement Award is provided to the Participant in accordance with Section 16(b) of the Plan.

(e) Other Termination of Employment. Except as set forth in Paragraphs 3(a), (b), (c) and (d), if a Termination of Employment occurs, any unexercised portion of the Option that has not vested on such date of Termination of Employment is automatically forfeited. Unless a longer period is applicable as specified in Section 16(b)(iv) of the Plan or Paragraphs 3(a) through (c), Awardee (or any transferee, if applicable) has 90 days from the date of Termination of Employment or until the Grant Expiration Date, whichever period is shorter, to exercise any portion of the Option that is vested and exercisable on the date of Termination of Employment; provided, however, that if the Termination of Employment was a Termination for Cause, as determined by the Administrator, the Option may be immediately canceled by the Administrator (whether then held by Awardee or any transferee).

4. Restrictions on Exercise. The Option is subject to all restrictions in this Agreement and in the Plan. As a condition of any exercise of the Option, the Company may require Awardee or his or her transferee or successor to make any representation and warranty to comply with any applicable law or regulation or to confirm any factual matters (including Awardee's compliance with the terms of Paragraph

---

[1] This provision is an alternative that may not be included in every award agreement.

3

5 or any employment or severance agreement between the Cardinal Group and Awardee) reasonably requested by the Company.  The Option is not exercisable if such exercise would involve a violation of any Applicable Law.

5.     Special Forfeiture and Repayment Rules.  This Agreement contains special forfeiture and repayment rules intended to encourage conduct that protects the Cardinal Group's legitimate business assets and discourage conduct that threatens or harms those assets.  The Company does not intend to have the benefits of this Agreement reward or subsidize conduct detrimental to the Company, and therefore will require the forfeiture of the benefits offered under this Agreement and the repayment of gains obtained from this Agreement, according to the rules specified below.  Activities that trigger the forfeiture and repayment rules are divided into two categories: Misconduct and Competitor Conduct.

(a)     Misconduct.  During employment with the Cardinal Group and for three years after the Termination of Employment for any reason, Awardee agrees not to engage in Misconduct.  If Awardee engages in Misconduct during employment or within three years after the Termination of Employment for any reason, then

(i)     Awardee immediately forfeits the Option (or any part of the Option that has not been exercised) which automatically terminates, and

(ii)     Awardee shall, within 30 days following written notice from the Company, pay to the Company in cash an amount equal to (A) the gross gain to Awardee or any transferee from each and every exercise of the Option at any time within three years prior to the date the Misconduct first occurred less (B) $1.00.  The gross gain is calculated by subtracting the exercise price paid for the Shares from the Fair Market Value of the Shares on the exercise date.

As used in this Agreement, "**Misconduct**" means

(A)     disclosing or using any of the Cardinal Group's confidential information (as defined by the applicable Cardinal Group policies and agreements) without proper authorization from the Cardinal Group or in any capacity other than as necessary for the performance of Awardee's assigned duties for the Cardinal Group;

(B)     violation of the Standards of Business Conduct or any successor code of conduct or other applicable Cardinal Group policies, including but not limited to conduct which would constitute a breach of any representation or certificate of compliance signed by Awardee;

(C)     fraud, gross negligence or willful misconduct by Awardee, including but not limited to fraud, gross negligence or willful misconduct causing or contributing to a material error resulting in a restatement of the financial statements of any member of the Cardinal Group;

(D)     directly or indirectly soliciting or recruiting for employment or contract work on behalf of a person or entity other than a member of the Cardinal Group, any person who is an employee, representative, officer or director in the Cardinal Group or who held one or more of those positions at any time within the 12 months prior to Awardee's Termination of Employment;

(E)     directly or indirectly inducing, encouraging or causing an employee of the Cardinal Group to terminate his/her employment or a contract worker to terminate his/her contract with a member of the Cardinal Group;

4

(F)      any action by Awardee and/or his or her representatives that either does or could reasonably be expected to undermine, diminish or otherwise damage the relationship between the Cardinal Group and any of its customers, prospective customers, vendors, suppliers or employees known to Awardee; or

(G)      breaching any provision of any employment or severance agreement with a member of the Cardinal Group.

Nothing in this Agreement will prevent Awardee from testifying truthfully as required by law, prohibit or prevent Awardee from filing a charge with or participating, testifying or assisting in any investigation, hearing, whistleblower proceeding or other proceeding before any federal, state or local government agency (e.g., Equal Employment Opportunity Commission, National Labor Relations Board, Securities and Exchange Commission, etc.), or prevent Awardee from disclosing Cardinal Group's confidential information in confidence to a federal, state or local government official for the purpose of reporting or investigating a suspected violation of law.

(b)      Competitor Conduct.  If Awardee engages in Competitor Conduct during employment or within one year after the Termination of Employment for any reason, then

(i)      Awardee immediately forfeits the Option (or any part of the Option that has not been exercised) which automatically terminates, and

(ii)      Awardee shall, within 30 days following written notice from the Company, pay to the Company in cash an amount equal to (A) the gross gain to Awardee or any transferee from each and every exercise of the Option at any time since the earlier of one year prior to the date the Competitor Conduct first occurred and one year prior to the Termination of Employment, if applicable, less (B) $1.00.  The gross gain is calculated by subtracting the exercise price paid for the Shares from the Fair Market Value of the Shares on the exercise date.

As used in this Agreement, "**Competitor Conduct**" means accepting employment with, or directly or indirectly providing services to, a Competitor in the United States.  If Awardee has a Termination of Employment and Awardee's responsibilities to the Cardinal Group were limited to a specific territory or territories within or outside the United States during the 24 months prior to the Termination of Employment, then Competitor Conduct will be limited to that specific territory or territories.  A "Competitor" means any person or business that competes with the products or services provided by a member of the Cardinal Group for which Awardee had business responsibilities within 24 months prior to Termination of Employment or about which Awardee obtained confidential information (as defined by the applicable Cardinal Group policies or agreements).

(c)      General.

(i)      Nothing in this Paragraph 5 constitutes or is to be construed as a "noncompete" covenant or other restraint on employment or trade.  The provisions of this Paragraph 5 do not prevent, nor are they intended to prevent, Awardee from seeking or accepting employment or other work outside the Cardinal Group.  The execution of this Agreement is voluntary.  Awardee is free to choose to comply with the terms of this Agreement and receive the benefits offered or else reject this Agreement with no adverse consequences to Awardee's employment with the Cardinal Group.

5

(ii)     Awardee agrees to provide the Company with at least 10 days' written notice prior to accepting employment with or providing services to a Competitor prior to one year after Termination of Employment.

(iii)     Awardee acknowledges receiving sufficient consideration for the requirements of this Paragraph 5, including Awardee's receipt of the Option.  Awardee further acknowledges that the Company would not provide the Option to Awardee without Awardee's promise to abide by the terms of this Paragraph 5.  The parties also acknowledge that the provisions contained in this Paragraph 5 are ancillary to, or part of, an otherwise enforceable agreement at the time this Agreement is made.

(iv)     Awardee may be released from the obligations of this Paragraph 5 if and only if the Administrator determines, in writing and in the Administrator's sole discretion, that a release is in the best interests of the Company.

6.     Right of Set-Off.  By accepting the Option, Awardee consents to a deduction from, and set-off against, any amounts owed to Awardee that are not treated as "non-qualified deferred compensation" under Section 409A of the Code by any member of the Cardinal Group from time to time (including, but not limited to, amounts owed to Awardee as wages, severance payments or other fringe benefits) to the extent of the amounts owed to the Cardinal Group by Awardee under this Agreement.

7.     Withholding Tax.

(a)     Generally.  Awardee is liable and responsible for all taxes owed in connection with the exercise of the Option, regardless of any action the Company takes with respect to any tax withholding obligations that arise in connection with the Option.  The Company does not make any representation or undertaking regarding the tax treatment or the treatment of any tax withholding in connection with the exercise of the Option.  The Company does not commit and is under no obligation to structure the Option or the exercise of the Option to reduce or eliminate Awardee's tax liability.

(b)     Payment of Withholding Taxes.  Concurrently with the payment of the exercise price pursuant to Paragraph 1, Awardee is required to arrange for the satisfaction of the minimum amount of any domestic or foreign tax withholding obligation, whether national, federal, state or local, including any employment tax obligation (the "Tax Withholding Obligation") in a manner acceptable to the Company. Any manner provided for in Paragraph 1(b) is an acceptable manner to satisfy the Tax Withholding Obligation unless otherwise determined by the Administrator.

8.     Governing Law/Venue for Dispute Resolution/Costs and Legal Fees.  This Agreement is governed by the laws of the State of Ohio, without regard to principles of conflicts of law, except to the extent superseded by the laws of the United States of America.  **The parties agree and acknowledge that the laws of the State of Ohio bear a substantial relationship to the parties and/or this Agreement and that the Option and benefits granted in this Agreement would not be granted without the governance of this Agreement by the laws of the State of Ohio.  In addition, all legal actions or proceedings relating to this Agreement must be brought exclusively in state or federal courts located in Franklin County, Ohio and the parties executing this Agreement hereby consent to the personal jurisdiction of such courts.**  Awardee acknowledges that the covenants contained in Paragraph 5 are reasonable in nature, are fundamental for the protection of the Company's legitimate business and proprietary interests, and do not adversely affect Awardee's ability to earn a living.  In the event that it becomes necessary for the Company to institute legal proceedings under this Agreement, Awardee is responsible to the Company for all costs and reasonable legal fees incurred by the Company in

6

connection with the proceedings. Any provision of this Agreement which is determined by a court of competent jurisdiction to be invalid or unenforceable or to disqualify the Award under any Applicable Law should be construed or limited in a manner that is valid and enforceable and that comes closest to the business objectives intended by the provision, without invalidating or rendering unenforceable the remaining provisions of this Agreement.

9. <u>Defend Trade Secrets Act Notice</u>. Under the U.S. Defend Trade Secrets Act of 2016, Awardee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; (b) is made to Awardee's attorney in relation to a lawsuit for retaliation against Awardee for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

10. <u>Action by the Administrator</u>. The parties agree that the interpretation of this Agreement rests exclusively and completely within the sole discretion of the Administrator. The parties agree to be bound by the decisions of the Administrator with regard to the interpretation of this Agreement and with regard to any and all matters set forth in this Agreement. In fulfilling its responsibilities, the Administrator may rely upon documents, written statements of the parties, financial reports or other material as the Administrator deems appropriate. The parties agree that there is no right to be heard or to appear before the Administrator and that any decision of the Administrator relating to this Agreement, including without limitation whether particular conduct constitutes Misconduct or Competitor Conduct, is final and binding. The Administrator may delegate its functions under this Agreement to an officer of the Cardinal Group designated by the Administrator, to the extent permitted under the Plan.

11. <u>Prompt Acceptance of Agreement</u>. The Option grant evidenced by this Agreement will, at the discretion of the Administrator, be forfeited if this Agreement is not manually executed and returned to the Company, or electronically executed by Awardee by indicating Awardee's acceptance of this Agreement in accordance with the acceptance procedures set forth on the Company's third-party equity plan administrator's web site, within 90 days of the Grant Date.

12. <u>Electronic Delivery and Consent to Electronic Participation</u>. The Company may, in its sole discretion, decide to deliver any documents related to the Option grant under and participation in the Plan or future options that may be granted under the Plan by electronic means or to request Awardee's consent to participate in the Plan by electronic means. Awardee hereby consents to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company, including the acceptance of option grants and the execution of option agreements through electronic signature.

13. <u>Notices</u>. All notices, requests, consents and other communications required or provided under this Agreement to be delivered by Awardee to the Company will be in writing and will be deemed sufficient if delivered by hand, nationally recognized overnight courier, or certified or registered mail, return receipt requested, postage prepaid, and will be effective upon delivery to the Company at the address set forth below:

7

Cardinal Health, Inc.
7000 Cardinal Place
Dublin, Ohio 43017
Attention: Deputy General Counsel

All notices, requests, consents and other communications required or provided under this Agreement to be delivered by the Company to Awardee may be delivered by e-mail or in writing and will be deemed sufficient if delivered by e-mail, hand, facsimile, nationally recognized overnight courier, or certified or registered mail, return receipt requested, postage prepaid, and will be effective upon delivery to Awardee.

14. <u>Employment Agreement, Offer Letter or Other Arrangement</u>. To the extent a written employment agreement, offer letter or other arrangement ("Employment Arrangement") that was approved by the Human Resources and Compensation Committee or the Board of Directors or that was approved in writing by an officer of the Company pursuant to delegated authority of the Human Resources and Compensation Committee provides for greater benefits to Awardee with respect to (a) vesting of the Option on Termination of Employment by reason of specified events or (b) exercisability of the Option following Termination of Employment, than provided in this Agreement or in the Plan, then the terms of such Employment Arrangement with respect to vesting of the Option on Termination of Employment by reason of such specified events or exercisability of the Option following Termination of Employment supersede the terms of this Agreement to the extent permitted by the terms of the Plan.

15. <u>Recoupment</u>. This Agreement will be administered in compliance with Section 10D of the Exchange Act and any applicable rules or regulations promulgated by the Securities and Exchange Commission or any national securities exchange or national securities association on which the Shares may be traded. In its discretion, moreover, the Administrator may require repayment to the Company of all or any portion of this Award if the amount of the Award was calculated based upon the achievement of financial results that were subsequently the subject of a restatement of the Company's financial statements, Awardee engaged in misconduct that caused or contributed to the need for the restatement of the financial statements, and the amount payable to Awardee would have been lower than the amount actually paid to Awardee had the financial results been properly reported. This Paragraph 15 is not the Company's exclusive remedy with respect to such matters. Except as otherwise required by Applicable Law, this Paragraph 15 will not apply after a Change of Control.

16. <u>Amendments.</u> Any amendment to the Plan will be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto; provided, however, that no amendment will impair the rights of Awardee with respect to an outstanding Award unless agreed to by Awardee and the Company, which agreement must be in writing and signed by Awardee and the Company. Other than following a Change of Control, no such agreement is required if the Administrator determines in its sole discretion that such amendment either (a) is required or advisable in order for the Company, the Plan or the Option to satisfy any Applicable Law or to meet the requirements of any accounting standard or (b) is not reasonably likely to significantly diminish the benefits provided under the Option, or that any such diminishment has been adequately compensated, including pursuant to Section 16(c) of the Plan.

17. <u>Adjustments</u>. The number of Shares issuable subject to the Option and the other terms and conditions of the grant evidenced by this Agreement are subject to adjustment as provided in Section 16 of the Plan.

18. <u>No Right to Future Awards or Employment</u>. The grant of the Option under this Agreement to Awardee is a voluntary, discretionary award being made on a one-time basis and it does not

constitute a commitment to make any future awards.  The grant of the Option and any related payments made to Awardee will not be considered salary or other compensation for purposes of any severance pay or similar allowance, except as otherwise required by law.  Nothing contained in this Agreement confers upon Awardee any right with respect to continuance of employment or other service with the Company or any Affiliate, nor interferes in any way with any right the Company or any Affiliate would otherwise have to terminate Awardee's employment or other service at any time.

19.     Successors and Assigns.  Without limiting Paragraph 2, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, administrators, heirs, legal representatives and assigns of Awardee, and the successors and assigns of the Company.

CARDINAL HEALTH, INC.

By:     _____

Its:     _____

9

## ACCEPTANCE OF AGREEMENT

Awardee hereby: (a) acknowledges that he or she has received a copy of the Plan, a copy of the Company's most recent annual report to shareholders and other communications routinely distributed to the Company's shareholders, and a copy of the Plan Description pertaining to the Plan; (b) accepts this Agreement and the Option granted to him or her under this Agreement subject to all provisions of the Plan and this Agreement, including the provisions in the Agreement regarding "Special Forfeiture and Repayment Rules" set forth in Paragraph 5 and "Recoupment" set forth in Paragraph 15; (c) represents that he or she understands that the acceptance of this Agreement through an on-line or electronic system, if applicable, carries the same legal significance as if he or she manually signed the Agreement; and (d) agrees that no transfer of the Shares delivered in respect of the Option may be made unless the Shares have been duly registered under all applicable Federal and state securities laws pursuant to a then-effective registration which contemplates the proposed transfer or unless the Company has received a written opinion of, or satisfactory to, its legal counsel that the proposed transfer is exempt from such registration.

[_____

Awardee's Signature

_____

Date]

10

**CARDINAL HEALTH, INC.**
**RESTRICTED SHARE UNITS AGREEMENT**

This Restricted Share Units Agreement (this "Agreement") is entered into in Franklin County, Ohio. On [grant date] (the "Grant Date"), Cardinal Health, Inc., an Ohio corporation (the "Company"), has awarded to [employee name] ("Awardee") [# of shares] Stock Units (the "Restricted Share Units" or "Award"), representing an unfunded unsecured promise of the Company to deliver common shares, without par value, of the Company (the "Shares") to Awardee as set forth in this Agreement. The Restricted Share Units have been granted pursuant to the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (the "Plan"), and are subject to all provisions of the Plan, which are incorporated in this Agreement by reference, and are subject to the provisions of this Agreement. Capitalized terms used in this Agreement which are not specifically defined have the meanings ascribed to such terms in the Plan.

1.　　Vesting of Restricted Share Units.

(a)　　General. [CLIFF ALTERNATIVE: The Restricted Share Units vest on the [　　] anniversary of the Grant Date (the "Vesting Date"), subject to the provisions of this Agreement, including those relating to Awardee's continued employment with the Company and its Affiliates (collectively, the "Cardinal Group").] [INSTALLMENT ALTERNATIVE: The Restricted Share Units vest in [　　] installments, which will be as nearly equal as possible, on the [　　] anniversaries of the Grant Date (each a "Vesting Date" with respect to the portion of the Restricted Share Units scheduled to vest on such date), subject in each case to the provisions of this Agreement, including those relating to Awardee's continued employment with the Company and its Affiliates (collectively, the "Cardinal Group").]

(b)　　Change of Control. In the event of a Change of Control prior to a Termination of Employment, the Restricted Share Units (to the extent not previously vested or forfeited) vest in full, except to the extent that a Replacement Award is provided to Awardee in accordance with Section 16(b) of the Plan. Any Replacement Award must vest in full upon (i) a Termination for Good Reason by Awardee, (ii) a Termination of Employment by the Company or its successor in the Change of Control other than a Termination for Cause, or (iii) Awardee's death or Disability, in each case, occurring at or during the period of two years after the Change of Control. In addition, if a Replacement Award is provided, any Restricted Share Units that would vest in accordance with Paragraphs 3(b) or (c) in connection with Awardee's Retirement or Disability if Awardee's Termination of Employment occurred on the date of the Change of Control will for purposes of this Agreement vest at the time of the Change of Control.

2.　　Transferability. The Restricted Share Units are not transferable.

3.　　Termination of Employment.

(a)　　General. Except as set forth in Paragraphs 1(b) and 3(b), (c) and (d), if a Termination of Employment occurs, then any unvested Restricted Share Units are forfeited by Awardee immediately after such Termination of Employment.

(b)　　Death or Disability. If a Termination of Employment by reason of Awardee's death or Disability occurs at least 6 months after the Grant Date, then any outstanding unvested Restricted Share Units immediately vest in full and are not forfeited.

(c)　　Retirement. If a Termination of Employment by reason of Awardee's Retirement occurs at least 6 months after the Grant Date, then a Ratable Portion of each unvested installment of the

outstanding Restricted Share Units immediately vests and is not forfeited. Such "Ratable Portion," with respect to the applicable installment, is an amount equal to such installment of the Restricted Share Units scheduled to vest on a future Vesting Date multiplied by a fraction, the numerator of which is the number of days from the Grant Date through the date of the Termination of Employment, and the denominator of which is the number of days from the Grant Date through such Vesting Date.[1]

(d)     Involuntary Termination with Severance. If (i) Paragraph 3(c) is not applicable, but Awardee has attained either (A) age 53 and at least eight years of continuous service with the Cardinal Group or (B) age 59 and at least four years of continuous service with the Cardinal Group, in each case including service with an Affiliate of the Company prior to the time that such Affiliate became an Affiliate of the Company, (ii) a Termination of Employment by the Cardinal Group (other than a Termination for Cause) occurs at least 6 months after the Grant Date, and (iii) no later than 45 days after the Termination of Employment, Awardee enters into a written separation agreement and general release of claims with the Cardinal Group (in such form as may reasonably be presented by the Company) (a "Separation Agreement"), and Awardee does not timely revoke such Separation Agreement, then a Ratable Portion of each unvested installment of the outstanding Restricted Share Units immediately vests and is not forfeited.

4.     Special Forfeiture and Repayment Rules. This Agreement contains special forfeiture and repayment rules intended to encourage conduct that protects the Cardinal Group's legitimate business assets and discourage conduct that threatens or harms those assets. The Company does not intend to have the benefits of this Agreement reward or subsidize conduct detrimental to the Company, and therefore will require the forfeiture of the benefits offered under this Agreement and the repayment of gains obtained from this Agreement, according to the rules specified below. Activities that trigger the forfeiture and repayment rules are divided into two categories: Misconduct and Competitor Conduct.

(a)     Misconduct. During employment with the Cardinal Group and for three years after the Termination of Employment for any reason, Awardee agrees not to engage in Misconduct. If Awardee engages in Misconduct during employment or within three years after the Termination of Employment for any reason, then

(i)     Awardee immediately forfeits the Restricted Share Units that have not yet vested or that vested at any time within three years prior to the date the Misconduct first occurred and have not yet been paid pursuant to Paragraph 5, and those forfeited Restricted Share Units automatically terminate, and

(ii)     Awardee shall, within 30 days following written notice from the Company, pay to the Company in cash an amount equal to (A) the gross gain to Awardee resulting from the payment of Restricted Share Units pursuant to Paragraph 5 that had vested at any time within three years prior to the date the Misconduct first occurred less (B) $1.00. The gross gain is the Fair Market Value of the Shares represented by the Restricted Share Units on the date of receipt.

As used in this Agreement, "**Misconduct**" means

(A)     disclosing or using any of the Cardinal Group's confidential information (as defined by the applicable Cardinal Group policies and agreements) without proper authorization

---

[1] This provision is an alternative that may not be included in every award agreement.

2

from the Cardinal Group or in any capacity other than as necessary for the performance of Awardee's assigned duties for the Cardinal Group;

(B)     violation of the Standards of Business Conduct or any successor code of conduct or other applicable Cardinal Group policies, including but not limited to conduct which would constitute a breach of any representation or certificate of compliance signed by Awardee;

(C)     fraud, gross negligence or willful misconduct by Awardee, including but not limited to fraud, gross negligence or willful misconduct causing or contributing to a material error resulting in a restatement of the financial statements of any member of the Cardinal Group;

(D)     directly or indirectly soliciting or recruiting for employment or contract work on behalf of a person or entity other than a member of the Cardinal Group, any person who is an employee, representative, officer or director in the Cardinal Group or who held one or more of those positions at any time within the 12 months prior to Awardee's Termination of Employment;

(E)     directly or indirectly inducing, encouraging or causing an employee of the Cardinal Group to terminate his/her employment or a contract worker to terminate his/her contract with a member of the Cardinal Group;

(F)     any action by Awardee and/or his or her representatives that either does or could reasonably be expected to undermine, diminish or otherwise damage the relationship between the Cardinal Group and any of its customers, prospective customers, vendors, suppliers or employees known to Awardee; or

(G)     breaching any provision of any employment or severance agreement with a member of the Cardinal Group.

Nothing in this Agreement will prevent Awardee from testifying truthfully as required by law, prohibit or prevent Awardee from filing a charge with or participating, testifying or assisting in any investigation, hearing, whistleblower proceeding or other proceeding before any federal, state or local government agency (e.g., Equal Employment Opportunity Commission, National Labor Relations Board, Securities and Exchange Commission, etc.), or prevent Awardee from disclosing Cardinal Group's confidential information in confidence to a federal, state or local government official for the purpose of reporting or investigating a suspected violation of law.

(b)     Competitor Conduct.  If Awardee engages in Competitor Conduct during employment or within one year after the Termination of Employment for any reason, then

(i)     Awardee immediately forfeits the Restricted Share Units that have not yet vested or that vested at any time within one year prior to the date the Competitor Conduct first occurred and have not yet been paid pursuant to Paragraph 5, and those forfeited Restricted Share Units automatically terminate, and

(ii)     Awardee shall, within 30 days following written notice from the Company, pay to the Company in cash an amount equal to (A) the gross gain to Awardee resulting from the payment of Restricted Share Units pursuant to Paragraph 5 that had vested at any time since the

3

earlier of one year prior to the date the Competitor Conduct first occurred or one year prior to the Termination of Employment, if applicable, less (B) $1.00.  The gross gain is the Fair Market Value of the Shares represented by the Restricted Share Units on the date of receipt.

As used in this Agreement, "**Competitor Conduct**" means accepting employment with, or directly or indirectly providing services to, a Competitor in the United States.  If Awardee has a Termination of Employment and Awardee's responsibilities to the Cardinal Group were limited to a specific territory or territories within or outside the United States during the 24 months prior to the Termination of Employment, then Competitor Conduct will be limited to that specific territory or territories.  A "Competitor" means any person or business that competes with the products or services provided by a member of the Cardinal Group for which Awardee had business responsibilities within 24 months prior to Termination of Employment or about which Awardee obtained confidential information (as defined by the applicable Cardinal Group policies or agreements).

(c)　　　General.

(i)　　　Nothing in this Paragraph 4 constitutes or is to be construed as a "noncompete" covenant or other restraint on employment or trade.  The provisions of this Paragraph 4 do not prevent, nor are they intended to prevent, Awardee from seeking or accepting employment or other work outside the Cardinal Group.  The execution of this Agreement is voluntary.  Awardee is free to choose to comply with the terms of this Agreement and receive the benefits offered or else reject this Agreement with no adverse consequences to Awardee's employment with the Cardinal Group.

(ii)　　　Awardee agrees to provide the Company with at least 10 days' written notice prior to accepting employment with or providing services to a Competitor within one year after Termination of Employment.

(iii)　　　Awardee acknowledges receiving sufficient consideration for the requirements of this Paragraph 4, including Awardee's receipt of the Restricted Share Units.  Awardee further acknowledges that the Company would not provide the Restricted Share Units to Awardee without Awardee's promise to abide by the terms of this Paragraph 4.  The parties also acknowledge that the provisions contained in this Paragraph 4 are ancillary to, or part of, an otherwise enforceable agreement at the time this Agreement is made.

(iv)　　　Awardee may be released from the obligations of this Paragraph 4 if and only if the Administrator determines, in writing and in the Administrator's sole discretion, that a release is in the best interests of the Company.

5.　　　Payment.

(1)　　　General.  Subject to the provisions of Paragraph 4 and Paragraphs 5(b), (c), (d) and (e), Awardee is entitled to receive from the Company (without any payment by or on behalf of Awardee other than as described in Paragraph 9) the Shares represented by the vested Restricted Share Units on the Vesting Date.

(a)　　　Death.  To the extent that Restricted Share Units are vested on the date of Awardee's Termination of Employment due to death, Awardee is entitled to receive the corresponding Shares from the Company on the date of death.

4

(b)     Disability, Retirement and Other Separations from Service.  To the extent that Restricted Share Units are vested as the result of Disability, Retirement or otherwise on the date of Awardee's "separation from service" (determined in accordance with Section 409A of the Code), Awardee is entitled to receive the corresponding Shares from the Company on the date that is 60 days after Awardee's "separation from service"; provided, however, that if Awardee on the date of separation from service is a "specified employee" (certain employees of the Cardinal Group within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time), to the extent necessary to avoid the imposition of tax under Section 409A of the Code, Awardee is entitled to receive the corresponding Shares from the Company on the first day of the seventh month after the date of Awardee's separation from service or, if earlier, the date of Awardee's death.

(c)     Change of Control.  To the extent that Restricted Share Units are vested on the date of a Change of Control, Awardee is entitled to receive the corresponding Shares from the Company on the date of the Change of Control; provided, however, that if such Change of Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A)(v) of the Code and the regulations thereunder, and where Section 409A of the Code applies to such distribution as a deferral of compensation, Awardee is entitled to receive the corresponding Shares from the Company on the date that would have otherwise applied pursuant to Paragraphs 5(a), (b) or (c).

(d)     Elections to Defer Receipt.  Elections to defer receipt of the Shares beyond the date of payment provided in this Agreement may be permitted in the discretion of the Administrator pursuant to procedures established by the Administrator in compliance with the requirements of Section 409A of the Code.

6.     Dividend Equivalents.  Awardee is not entitled to receive cash dividends on the Restricted Share Units, but will receive a dividend equivalent payment from the Company in an amount equal to the dividends that would have been paid on each Share underlying the Restricted Share Units if it had been outstanding between the Grant Date and the payment date of any such Share (i.e., based on the record date for cash dividends).  Subject to an election to defer receipt as permitted under Paragraph 5(e), the Company shall pay dividend equivalent payments in cash as soon as reasonably practicable after the payment date of the Restricted Share Units to which such dividend equivalents relate.

7.     Right of Set-Off.  By accepting the Restricted Share Units, Awardee consents to a deduction from, and set-off against, any amounts owed to Awardee that are not treated as "non-qualified deferred compensation" under Section 409A of the Code by any member of the Cardinal Group from time to time (including, but not limited to, amounts owed to Awardee as wages, severance payments or other fringe benefits) to the extent of the amounts owed to the Cardinal Group by Awardee under this Agreement.

8.     No Shareholder Rights.  Awardee has no rights of a shareholder with respect to the Restricted Share Units, including no right to vote the Shares represented by the Restricted Share Units, until such Shares vest and are paid to Awardee.

9.     Withholding Tax.

(a)     Generally.  Awardee is liable and responsible for all taxes owed in connection with the Restricted Share Units (including taxes owed with respect to the cash payments described in Paragraph 6), regardless of any action the Company takes with respect to any tax withholding obligations that arise in connection with the Restricted Share Units.  The Company does not make any representation or undertaking regarding the tax treatment or the treatment of any tax withholding in connection with the

5

grant, vesting or payment of the Restricted Share Units or the subsequent sale of Shares issuable pursuant to the Restricted Share Units.  The Company does not commit and is under no obligation to structure the Restricted Share Units to reduce or eliminate Awardee's tax liability.

(b)      Payment of Withholding Taxes.  Prior to any event in connection with the Restricted Share Units (e.g., vesting or payment) that the Company determines may result in any domestic or foreign tax withholding amounts being paid by the Company, whether national, federal, state or local, including any employment tax obligation (the "Tax Withholding Obligation"), Awardee is required to arrange for the satisfaction of the minimum amount of such Tax Withholding Obligation in a manner acceptable to the Company.  Awardee's acceptance of this Agreement constitutes Awardee's instruction and authorization to the Company to withhold on Awardee's behalf the number of Shares from those Shares issuable to Awardee under this Award as the Company determines to be sufficient to satisfy the Tax Withholding Obligation.  In the case of any amounts withheld for taxes pursuant to this provision in the form of Shares, the amount withheld may not exceed the amount legally required, and withholding above the minimum withholding requirements shall be available only if and to the extent that the Administrator has authorized such.  The Company has the right to deduct from all cash payments paid pursuant to Paragraph 6 the amount of any taxes which the Company is required to withhold with respect to such payments.

10.      Governing Law/Venue for Dispute Resolution/Costs and Legal Fees.  This Agreement is governed by the laws of the State of Ohio, without regard to principles of conflicts of law, except to the extent superseded by the laws of the United States of America.  **The parties agree and acknowledge that the laws of the State of Ohio bear a substantial relationship to the parties and/or this Agreement and that the Restricted Share Units and benefits granted in this Agreement would not be granted without the governance of this Agreement by the laws of the State of Ohio.  In addition, all legal actions or proceedings relating to this Agreement must be brought exclusively in state or federal courts located in Franklin County, Ohio and the parties executing this Agreement hereby consent to the personal jurisdiction of such courts.**  Awardee acknowledges that the covenants contained in Paragraph 4 are reasonable in nature, are fundamental for the protection of the Company's legitimate business and proprietary interests, and do not adversely affect Awardee's ability to earn a living.  In the event that it becomes necessary for the Company to institute legal proceedings under this Agreement, Awardee is responsible to the Company for all costs and reasonable legal fees incurred by the Company in connection with the proceedings.  Any provision of this Agreement which is determined by a court of competent jurisdiction to be invalid or unenforceable or to disqualify the Award under any Applicable Law should be construed or limited in a manner that is valid and enforceable and that comes closest to the business objectives intended by the provision, without invalidating or rendering unenforceable the remaining provisions of this Agreement.

11.      Defend Trade Secrets Act Notice.  Under the U.S. Defend Trade Secrets Act of 2016, Awardee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; (b) is made to Awardee's attorney in relation to a lawsuit for retaliation against Awardee for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

12.      Action by the Administrator.  The parties agree that the interpretation of this Agreement rests exclusively and completely within the sole discretion of the Administrator.  The parties agree to be bound by the decisions of the Administrator with regard to the interpretation of this Agreement and with

regard to any and all matters set forth in this Agreement.  In fulfilling its responsibilities under this Agreement, the Administrator may rely upon documents, written statements of the parties, financial reports or other material as the Administrator deems appropriate.  The parties agree that there is no right to be heard or to appear before the Administrator and that any decision of the Administrator relating to this Agreement, including whether particular conduct constitutes Misconduct or Competitor Conduct, is final and binding.  The Administrator may delegate its functions under this Agreement to an officer of the Cardinal Group designated by the Administrator, to the extent permitted under the Plan.

13.     Prompt Acceptance of Agreement.  The Restricted Share Unit grant evidenced by this Agreement will, at the discretion of the Administrator, be forfeited if this Agreement is not manually executed and returned to the Company, or electronically executed by Awardee by indicating Awardee's acceptance of this Agreement in accordance with the acceptance procedures set forth on the Company's third-party equity plan administrator's web site, within 90 days of the Grant Date.

14.     Electronic Delivery and Consent to Electronic Participation.  The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Share Unit grant under and participation in the Plan or future Restricted Share Units that may be granted under the Plan by electronic means or to request Awardee's consent to participate in the Plan by electronic means.  Awardee hereby consents to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company, including the acceptance of restricted share unit grants and the execution of restricted share unit agreements through electronic signature.

15.     Notices.  All notices, requests, consents and other communications required or provided under this Agreement to be delivered by Awardee to the Company will be in writing and will be deemed sufficient if delivered by hand, nationally recognized overnight courier, or certified or registered mail, return receipt requested, postage prepaid, and will be effective upon delivery to the Company at the address set forth below:

> Cardinal Health, Inc.
> 7000 Cardinal Place
> Dublin, Ohio 43017
> Attention:  Deputy General Counsel

All notices, requests, consents and other communications required or provided under this Agreement to be delivered by the Company to Awardee may be delivered by e-mail or in writing and will be deemed sufficient if delivered by e-mail, hand, facsimile, nationally recognized overnight courier, or certified or registered mail, return receipt requested, postage prepaid, and will be effective upon delivery to Awardee.

16.     Employment Agreement, Offer Letter or Other Arrangement.  To the extent a written employment agreement, offer letter or other arrangement ("Employment Arrangement") that was approved by the Human Resources and Compensation Committee or the Board of Directors or that was approved in writing by an officer of the Company pursuant to delegated authority of the Human Resources and Compensation Committee provides for greater benefits to Awardee with respect to vesting of the Award on Termination of Employment by reason of specified events than provided in this Agreement or in the Plan, then the terms of such Employment Arrangement with respect to vesting of the Award on Termination of Employment by reason of such specified events supersede the terms of this Agreement to the extent permitted by the terms of the Plan.

7

17.     Recoupment.  This Agreement will be administered in compliance with Section 10D of the Exchange Act and any applicable rules or regulations promulgated by the Securities and Exchange Commission or any national securities exchange or national securities association on which the Shares may be traded.   In its discretion, moreover, the Administrator may require repayment to the Company of all or any portion of this Award if the amount of the Award was calculated based upon the achievement of financial results that were subsequently the subject of a restatement of the Company's financial statements, Awardee engaged in misconduct that caused or contributed to the need for the restatement of the financial statements, and the amount payable to Awardee would have been lower than the amount actually paid to Awardee had the financial results been properly reported.  This Paragraph 17 is not the Company's exclusive remedy with respect to such matters.  Except as otherwise required by Applicable Law, this Paragraph 17 will not apply after a Change of Control.

18.     Amendment.  Any amendment to the Plan is deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto; provided, however, that no amendment may impair the rights of Awardee with respect to an outstanding Restricted Share Unit unless agreed to by Awardee and the Company, which agreement must be in writing and signed by Awardee and the Company.  Other than following a Change of Control, no such agreement is required if the Administrator determines in its sole discretion that such amendment either (a) is required or advisable in order for the Company, the Plan or the Restricted Share Units to satisfy any Applicable Law or to meet the requirements of any accounting standard or (b) is not reasonably likely to significantly diminish the benefits provided under the Restricted Share Units, or that any such diminishment has been adequately compensated, including pursuant to Section 16(c) of the Plan.

19.     Adjustments.  The number of Shares issuable for each Restricted Share Unit and the other terms and conditions of the Award evidenced by this Agreement are subject to adjustment as provided in Section 16 of the Plan.

20.     Compliance with Section 409A of the Code.  To the extent applicable, it is intended that this Agreement comply with the provisions of Section 409A of the Code.  This Agreement shall be administered in a manner consistent with this intent, and any provision that would cause this Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force or effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of Awardee).

21.     No Right to Future Awards or Employment.  The grant of the Restricted Share Units under this Agreement to Awardee is a voluntary, discretionary award being made on a one-time basis and it does not constitute a commitment to make any future awards.  The grant of the Restricted Share Units and any payments made under this Agreement will not be considered salary or other compensation for purposes of any severance pay or similar allowance, except as otherwise required by law.  Nothing contained in this Agreement confers upon Awardee any right to be employed or remain employed by the Company or any of its Affiliates, nor limits or affects in any manner the right of the Company or any of its Affiliates to terminate the employment or adjust the compensation of Awardee.

22.    <u>Successors and Assigns</u>.  Without limiting Paragraph 2, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, administrators, heirs, legal representatives and assigns of Awardee, and the successors and assigns of the Company.

CARDINAL HEALTH, INC.

By: _____

Its: _____

9

<u>ACCEPTANCE OF AGREEMENT</u>

Awardee hereby: (a) acknowledges that he or she has received a copy of the Plan, a copy of the Company's most recent annual report to shareholders and other communications routinely distributed to the Company's shareholders, and a copy of the Plan Description pertaining to the Plan; (b) accepts this Agreement and the Restricted Share Units granted to him or her under this Agreement subject to all provisions of the Plan and this Agreement, including the provisions in the Agreement regarding "Special Forfeiture and Repayment Rules" set forth in Paragraph 4 and "Recoupment" set forth in Paragraph 17; (c)  represents that he or she understands that the acceptance of this Agreement through an on-line or electronic system, if applicable, carries the same legal significance as if he or she manually signed the Agreement; and (d) agrees that no transfer of the Shares delivered in respect of the Restricted Share Units may be made unless the Shares have been duly registered under all applicable Federal and state securities laws pursuant to a then-effective registration which contemplates the proposed transfer or unless the Company has received a written opinion of, or satisfactory to, its legal counsel that the proposed transfer is exempt from such registration.

[_____
Awardee's Signature

_____
Date]

10

**CARDINAL HEALTH, INC.**
**PERFORMANCE SHARE UNITS AGREEMENT**

This Performance Share Units Agreement (this "Agreement") is entered into in Franklin County, Ohio.  On [grant date] (the "Grant Date"), Cardinal Health, Inc., an Ohio corporation (the "Company"), has awarded to [employee name] ("Awardee") [target # of units] performance-based Stock Units (the "Performance Share Units" or "Award").  The Performance Share Units have been granted pursuant to the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (the "Plan"), and are subject to all provisions of the Plan, which are incorporated in this Agreement by reference, and are subject to the provisions of this Agreement.  Capitalized terms used in this Agreement which are not specifically defined have the meanings ascribed to them in the Plan.

1.        Vesting of Performance Share Units.  Subject to the provisions of this Agreement, zero to [maximum percentage] of the Performance Share Units vest when the Administrator certifies the payout level ("Payout Level") as a result of achievement of: (a) specific performance criteria (the "Performance Goals") for a performance period ("Performance Period") set forth in Exhibit A attached hereto; and (b) Qualifying Performance Criteria set by the Administrator for a Performance Period, if the Award is intended to satisfy the requirements for "performance-based compensation" under Section 162(m) of the Code.

2.        Transferability.  The Performance Share Units are not transferable.

3.        Termination of Employment.

(a)        General.  Except to the extent that vesting occurs pursuant to Paragraphs 3(b), (c), (d) or (e) or Paragraph 5, if a Termination of Employment occurs prior to the applicable payment date in Paragraph 6(a) (the "Payment Date") associated with a Performance Period, any Performance Share Units allocated to that Performance Period, whether vested or unvested, are forfeited by Awardee.

(b)        Death or Disability.  If a Termination of Employment by reason of Awardee's death or Disability occurs at least 6 months after the Grant Date, then the outstanding unvested Performance Share Units for a Performance Period will vest as if Awardee had remained employed through the Payment Date.

(c)        Retirement.  If a Termination of Employment by reason of Awardee's Retirement occurs at least 6 months after the Grant Date, then the outstanding unvested Performance Share Units for a Performance Period will vest in an amount equal to the number of Performance Share Units that would have vested if Awardee had remained employed through the Payment Date multiplied by a fraction, the numerator of which is the number of days in the Performance Period up to the date of such Termination of Employment, and the denominator of which is the total number of days in such Performance Period.[1]

(d)        Involuntary Termination with Severance.  If (i) neither Paragraph 3(c) nor Paragraph 3(e) is applicable, but Awardee has attained either (A) age 53 and at least eight years of continuous service with the Company and its Affiliates (collectively, the "Cardinal Group"), or (B) age 59 and at least four years of continuous service with the Cardinal Group, in each case including service with an Affiliate of the Company prior to the time that such Affiliate became an Affiliate of the Company, (ii) a Termination of Employment by the Cardinal Group (other than a Termination for Cause) occurs at least 6 months after

---

[1] This provision is an alternative that may not be included in every award agreement.

the Grant Date, and (iii) no later than 45 days after the Termination of Employment, Awardee enters into awritten separation agreement and general release with the Cardinal Group (in such form as may reasonably be presented by the Company) (a "Separation Agreement"), and Awardee does not timely revoke such Separation Agreement, then the outstanding unvested Performance Share Units for a Performance Period will vest in an amount equal to the number of Performance Share Units that would have vested if Awardee had remained employed through the Payment Date multiplied by a fraction, the numerator of which is the number of days in the Performance Period up to the date of such Termination of Employment, and the denominator of which is the total number of days in such Performance Period.

(e)      <u>Involuntary Termination After Completion of a Performance Period</u>.  If a Termination of Employment by the Cardinal Group (other than a Termination for Cause) occurs after the completion of a Performance Period but prior to the Payment Date, then the Performance Share Units for the applicable Performance Period will vest as if Awardee had remained employed through the Payment Date.

4.      <u>Special Forfeiture and Repayment Rules</u>.  This Agreement contains special forfeiture and repayment rules intended to encourage conduct that protects the Cardinal Group's legitimate business assets and discourage conduct that threatens or harms those assets.  The Company does not intend to have the benefits of this Agreement reward or subsidize conduct detrimental to the Company, and therefore will require the forfeiture of the benefits offered under this Agreement and the repayment of gains obtained from this Agreement, according to the rules specified below.  Activities that trigger the forfeiture and repayment rules are divided into two categories: Misconduct and Competitor Conduct.

(a)      <u>Misconduct</u>.  During employment with the Cardinal Group and for three years after the Termination of Employment for any reason, Awardee agrees not to engage in Misconduct.  If Awardee engages in Misconduct during employment or within three years after the Termination of Employment for any reason, then

(i)      Awardee immediately forfeits the Performance Share Units that have not yet vested or that vested at any time within three years prior to the date the Misconduct first occurred and have not yet been paid pursuant to Paragraph 6, and those forfeited Performance Share Units automatically terminate, and

(ii)      Awardee shall, within 30 days following written notice from the Company, pay to the Company in cash an amount equal to: (A) the gross gain to Awardee resulting from the payment of the Performance Share Units pursuant to Paragraph 6 that had vested at any time within three years prior to the date the Misconduct first occurred less (B) $1.00.  The gross gain is the Fair Market Value of the Shares represented by the Performance Share Units on the Payment Date.

As used in this Agreement, "**Misconduct**" means

(A)      disclosing or using any of the Cardinal Group's confidential information (as defined by the applicable Cardinal Group policies and agreements) without proper authorization from the Cardinal Group or in any capacity other than as necessary for the performance of Awardee's assigned duties for the Cardinal Group;

2

       (B)     violation of the Standards of Business Conduct or any successor code of conduct or other applicable Cardinal Group policies, including but not limited to conduct which would constitute a breach of any representation or certificate of compliance signed by Awardee;

       (C)     fraud, gross negligence or willful misconduct by Awardee, including but not limited to fraud, gross negligence or willful misconduct causing or contributing to a material error resulting in a restatement of the financial statements of any member of the Cardinal Group;

       (D)     directly or indirectly soliciting or recruiting for employment or contract work on behalf of a person or entity other than a member of the Cardinal Group, any person who is an employee, representative, officer or director in the Cardinal Group or who held one or more of those positions at any time within the 12 months prior to Awardee's Termination of Employment;

       (E)     directly or indirectly inducing, encouraging or causing an employee of the Cardinal Group to terminate his/her employment or a contract worker to terminate his/her contract with a member of the Cardinal Group;

       (F)     any action by Awardee and/or his or her representatives that either does or could reasonably be expected to undermine, diminish or otherwise damage the relationship between the Cardinal Group and any of its customers, prospective customers, vendors, suppliers or employees known to Awardee; or

       (G)     breaching any provision of any employment or severance agreement with a member of the Cardinal Group.

Nothing in this Agreement will prevent Awardee from testifying truthfully as required by law, prohibit or prevent Awardee from filing a charge with or participating, testifying or assisting in any investigation, hearing, whistleblower proceeding or other proceeding before any federal, state or local government agency (e.g., Equal Employment Opportunity Commission, National Labor Relations Board, Securities and Exchange Commission, etc.), or prevent Awardee from disclosing Cardinal Group's confidential information in confidence to a federal, state or local government official for the purpose of reporting or investigating a suspected violation of law.

       (b)     <u>Competitor Conduct</u>.  If Awardee engages in Competitor Conduct during employment or within one year after the Termination of Employment for any reason, then

       (i)     Awardee immediately forfeits the Performance Share Units that have not yet vested or that vested at any time within one year prior to the date the Competitor Conduct first occurred and have not yet been paid pursuant to Paragraph 6, and those forfeited Performance Share Units automatically terminate, and

       (ii)     Awardee shall, within 30 days following written notice from the Company, pay the Company an amount equal to: (A) the gross gain to Awardee resulting from the payment of Performance Share Units pursuant to Paragraph 6 that had vested at any time since the earlier of one year prior to the date the Competitor Conduct first occurred or one year prior to the Termination of Employment, if applicable, less (B) $1.00.  The gross gain is the Fair Market Value of the Shares represented by the Performance Share Units on the Payment Date.

As used in this Agreement, "**Competitor Conduct**" means accepting employment with, or directly or indirectly providing services to, a Competitor in the United States.  If Awardee has a Termination of

Employment and Awardee's responsibilities to the Cardinal Group were limited to a specific territory or territories within or outside the United States during the 24 months prior to the Termination of Employment, then Competitor Conduct is limited to that specific territory or territories. A "Competitor" means any person or business that competes with the products or services provided by a member of the Cardinal Group for which Awardee had business responsibilities within 24 months prior to Termination of Employment or about which Awardee obtained confidential information (as defined by the applicable Cardinal Group policies or agreements).

(c)     General.

(i)     Nothing in this Paragraph 4 constitutes or is to be construed as a "noncompete" covenant or other restraint on employment or trade. The provisions of this Paragraph 4 do not prevent, nor are they intended to prevent, Awardee from seeking or accepting employment or other work outside the Cardinal Group. The execution of this Agreement is voluntary. Awardee is free to choose to comply with the terms of this Agreement and receive the benefits offered or else reject this Agreement with no adverse consequences to Awardee's employment with the Cardinal Group.

(ii)     Awardee agrees to provide the Company with at least 10 days written notice prior to accepting employment with or providing services to a Competitor within one year after Termination of Employment.

(iii)     Awardee acknowledges receiving sufficient consideration for the requirements of this Paragraph 4, including Awardee's receipt of the Performance Share Units. Awardee further acknowledges that the Company would not provide the Performance Share Units to Awardee without Awardee's promise to abide by the terms of this Paragraph 4. The parties also acknowledge that the provisions contained in this Paragraph 4 are ancillary to, or part of, an otherwise enforceable agreement at the time this Agreement is made.

(iv)     Awardee may be released from the obligations of this Paragraph 4 if and only if the Administrator determines, in writing and in the Administrator's sole discretion, that a release is in the best interests of the Company.

5.     Change of Control.

(a)     Valuation. In the event of a Change of Control prior to a Payment Date, the Administrator, as constituted immediately before such Change of Control, shall determine and certify the Payout Level (the "Change of Control Payout Level") based on (i) actual performance through the most recent date prior to the Change of Control for which achievement of the Performance Goals can reasonably be determined; and (ii) the expected performance for the remainder of the Performance Period based on information reasonably available.

(b)     Vesting and Substitute Awards.

(i)     In the event of a Change of Control prior to a Payment Date, the percentage of the Performance Share Units determined in accordance with Exhibit A at the Change of Control Payout Level vests unless an award meeting the requirements of Paragraph 5(b)(ii) (a "Substitute Award") is provided to Awardee to replace or adjust the Award. If a Substitute Award is provided, any Performance Share Units that (A) except to the extent that clause (B) applies, would vest in accordance with Paragraphs 3(b) or (c) in connection with Awardee's Retirement or Disability if

4

Awardee's Termination of Employment occurred on the date of the Change of Control or (B) are eligible to vest in accordance with Paragraph 3(d) as a result of Awardee's Termination of Employment that actually occurs prior to the Change of Control, vest at the time of the Change of Control. No Substitute Award will be provided in the event of Awardee's Termination of Employment by reason of death, Disability, Retirement or the circumstances described in Paragraph 3(d) prior to a Change of Control.

(ii) An award meets the conditions of this Paragraph 5(b)(ii) (and hence qualifies as a Substitute Award) if, as determined by the Administrator as constituted immediately before the Change of Control, (A) it has a value at the time of grant or adjustment at least equal to the value of the Performance Share Units that would vest under Paragraph 5(b)(i) if there were no Substitute Award; (B) it is paid in publicly traded equity securities of the Company or its successor in the Change of Control or another entity that is affiliated with the Company or its successor following the Change of Control; (C) it is a restricted stock unit award with vesting and payment not conditioned on the achievement of any performance criteria or conditions; (D) it vests in full upon (1) a Termination for Good Reason by Awardee, (2) a Termination of Employment by the Company or its successor in the Change of Control other than a Termination for Cause, or (3) Awardee's death or Disability, in each case, occurring at or during the period of two years after the Change of Control; (E) if Awardee is subject to U.S. federal income tax under the Code, the tax consequences to Awardee under the Code of the Substitute Award are not less favorable to Awardee than the tax consequences of the Award; and (F) its other terms and conditions are not less favorable to Awardee than the terms and conditions of the Award (including the provisions that would apply in the event of a subsequent Change of Control). Without limiting the generality of the foregoing, the Substitute Award may take the form of a continuation of the Award if the modifications required by the preceding sentence are satisfied.

6.  <u>Payment</u>.

(a) <u>General</u>. The Company shall pay Performance Share Units in Shares. Subject to the provisions of Paragraph 4 and Paragraphs 6(b) and (c), Awardee is entitled to receive from the Company (without any payment on behalf of Awardee other than as described in Paragraph 10) one Share for each vested Performance Share Unit not later than the 60th day after the end of a Performance Period, except that if Awardee's Termination of Employment occurs due to death after the end of the Performance Period, Awardee is entitled to receive the corresponding Shares from the Company on the date of death.

(b) <u>Change of Control</u>. Notwithstanding Paragraph 6(a), to the extent that the performance and service vesting requirements have been satisfied for the Performance Share Units on the dates set forth below, payment with respect to the Performance Share Units will be made as follows:

(i) On the date of a Change of Control, Awardee is entitled to receive one Share for each vested Performance Share Unit, subject to any adjustments made pursuant to Section 16(a) of the Plan, from the Company; provided, however, that if such Change of Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A)(v) of the Code and the regulations thereunder, and where Section 409A of the Code applies to such distribution as a deferral of compensation, Awardee is entitled to receive the corresponding Shares from the Company on the date that would have otherwise applied pursuant to Paragraphs 6(a), 6(b)(ii) or 6 (b)(iii).

5

(ii)     If Awardee's separation from service occurs during the period of two years following a Change of Control (and such Change of Control constitutes a change of control event as defined in accordance with Section 409A(a)(2)(A)(v) of the Code and the regulations thereunder), Awardee is entitled to receive one Share for each vested Performance Share Unit from the Company on the date of Awardee's separation from service; provided, in such event that if Awardee on the date of separation from service is a "specified employee" (certain employees of the Cardinal Group within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time), Awardee is entitled to receive the corresponding Shares from the Company on the first day of the seventh month after the date of Awardee's separation from service or, if earlier, the date of Awardee's death.

(iii)     On the date of Awardee's Termination of Employment due to death following a Change of Control, Awardee is entitled to receive one Share for each vested Performance Share Unit from the Company on the date of death.

(c)     <u>Elections to Defer Receipt</u>.  Elections to defer receipt of the Shares beyond the Payment Date may be permitted in the discretion of the Administrator pursuant to procedures established by the Administrator in compliance with the requirements of Section 409A of the Code.

7.     <u>Dividend Equivalents</u>.  Awardee is not entitled to receive cash dividends on the Performance Share Units, but will receive a dividend equivalent payment from the Company in an amount equal to the dividends that would have been paid on each Share underlying the Performance Share Units if it had been outstanding between the Grant Date and the payment date of any such Share (i.e., based on the record date for cash dividends).  Subject to an election to defer receipt as permitted under Paragraph 6(c), the Company shall pay dividend equivalent payments in cash as soon as reasonably practicable after the payment date of (and to the same extent as) the Performance Share Units to which such dividend equivalents relate.

8.     <u>Right of Set-Off</u>.  By accepting the Performance Share Units, Awardee consents to a deduction from, and set-off against, any amounts owed to Awardee that are not treated as "non-qualified deferred compensation" under Section 409A of the Code by any member of the Cardinal Group from time to time (including, but not limited to, amounts owed to Awardee as wages, severance payments or other fringe benefits) to the extent of the amounts owed to the Cardinal Group by Awardee under this Agreement.

9.     <u>No Shareholder Rights</u>.  Awardee has no rights of a shareholder with respect to the Performance Share Units, including no right to vote any Shares represented by the Performance Share Units, until such Shares are paid to Awardee.

10.     <u>Withholding Tax</u>.

(a)     <u>Generally</u>.  Awardee is liable and responsible for all taxes owed in connection with the Performance Share Units (including taxes owed with respect to the cash payments described in Paragraph 7), regardless of any action the Company takes with respect to any tax withholding obligations that arise in connection with the Performance Share Units.  The Company does not make any representation or undertaking regarding the tax treatment or the treatment of any tax withholding in connection with the grant, vesting or payment of the Performance Share Units or the subsequent sale of Shares issuable pursuant to vested Performance Share Units.  The Company does not commit and is under no obligation to structure the Performance Share Units to reduce or eliminate Awardee's tax liability.

6

(b) <u>Payment of Withholding Taxes</u>.  Prior to any event in connection with the Performance Share Units (e.g., vesting or payment) that the Company determines may result in any domestic or foreign tax withholding amounts being paid by the Company, whether national, federal, state or local, including any employment tax obligation (the "Tax Withholding Obligation"), Awardee is required to arrange for the satisfaction of the minimum amount of such Tax Withholding Obligation in a manner acceptable to the Company.  Awardee's acceptance of this Agreement constitutes Awardee's instruction and authorization to the Company to withhold on Awardee's behalf the number of Shares from those Shares issuable to Awardee under this Award as the Company determines to be sufficient to satisfy the Tax Withholding Obligation.  In the case of any amounts withheld for taxes pursuant to this provision in the form of Shares, the amount withheld may not exceed the amount legally required, and withholding above the minimum withholding requirements shall be available only if and to the extent that the Administrator has authorized such.  The Company has the right to deduct from all cash payments paid pursuant to Paragraph 7 the amount of any taxes which the Company is required to withhold with respect to such payments.

11. <u>Governing Law/Venue for Dispute Resolution/Costs and Legal Fees</u>.  This Agreement is governed by the laws of the State of Ohio, without regard to principles of conflicts of law, except to the extent superseded by the laws of the United States of America.  **The parties agree and acknowledge that the laws of the State of Ohio bear a substantial relationship to the parties and/or this Agreement and that the Performance Share Units and benefits granted in this Agreement would not be granted without the governance of this Agreement by the laws of the State of Ohio.  In addition, all legal actions or proceedings relating to this Agreement must be brought exclusively in state or federal courts located in Franklin County, Ohio and the parties executing this Agreement hereby consent to the personal jurisdiction of such courts.**  Awardee acknowledges that the covenants contained in Paragraph 4 are reasonable in nature, are fundamental for the protection of the Company's legitimate business and proprietary interests, and do not adversely affect Awardee's ability to earn a living.  In the event that it becomes necessary for the Company to institute legal proceedings under this Agreement, Awardee is responsible to the Company for all costs and reasonable legal fees incurred by the Company in connection with the proceedings.  Any provision of this Agreement which is determined by a court of competent jurisdiction to be invalid or unenforceable or to disqualify the Award under any Applicable Law should be construed or limited in a manner that is valid and enforceable and that comes closest to the business objectives intended by the provision, without invalidating or rendering unenforceable the remaining provisions of this Agreement.

12. <u>Defend Trade Secrets Act Notice</u>.  Under the U.S. Defend Trade Secrets Act of 2016, Awardee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; (b) is made to Awardee's attorney in relation to a lawsuit for retaliation against Awardee for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

13. <u>Action by the Administrator</u>.  The parties agree that the interpretation of this Agreement rests exclusively and completely within the sole discretion of the Administrator.  The parties agree to be bound by the decisions of the Administrator with regard to the interpretation of this Agreement and with regard to any and all matters set forth in this Agreement.  In fulfilling its responsibilities under this Agreement, the Administrator may rely upon documents, written statements of the parties, financial reports or other material as the Administrator deems appropriate.  The parties agree that there is no right to be heard or to appear before the Administrator and that any decision of the Administrator relating to

7

this Agreement, including whether particular conduct constitutes Misconduct or Competitor Conduct, is final and binding.  The Administrator may delegate its functions under this Agreement to an officer of the Cardinal Group designated by the Administrator, to the extent permitted under the Plan.

14. <u>Prompt Acceptance of Agreement</u>.  The Performance Share Units grant evidenced by this Agreement will, at the discretion of the Administrator, be forfeited if this Agreement is not manually executed and returned to the Company, or electronically executed by Awardee by indicating Awardee's acceptance of this Agreement in accordance with the acceptance procedures set forth on the Company's third-party equity plan administrator's web site, within 90 days of the Grant Date.

15. <u>Electronic Delivery and Consent to Electronic Participation</u>.  The Company may, in its sole discretion, decide to deliver any documents related to the Performance Share Unit grant under and participation in the Plan or future Performance Share Units that may be granted under the Plan by electronic means or to request Awardee's consent to participate in the Plan by electronic means.  Awardee hereby consents to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company, including the acceptance of performance share unit grants and the execution of performance share unit agreements through electronic signature.

16. <u>Notices</u>.  All notices, requests, consents and other communications required or provided under this Agreement to be delivered by Awardee to the Company will be in writing and will be deemed sufficient if delivered by hand, nationally recognized overnight courier, or certified or registered mail, return receipt requested, postage prepaid, and will be effective upon delivery to the Company at the address set forth below:

> Cardinal Health, Inc.
> 7000 Cardinal Place
> Dublin, Ohio 43017
> Attention:  Deputy General Counsel

All notices, requests, consents and other communications required or provided under this Agreement to be delivered by the Company to Awardee may be delivered by e-mail or in writing and will be deemed sufficient if delivered by e-mail, hand, facsimile, nationally recognized overnight courier, or certified or registered mail, return receipt requested, postage prepaid, and will be effective upon delivery to Awardee.

17. <u>Employment Agreement, Offer Letter or Other Arrangement</u>.  To the extent a written employment agreement, offer letter or other arrangement ("Employment Arrangement") that was approved by the Human Resources and Compensation Committee or the Board of Directors or that was approved in writing by an officer of the Company pursuant to delegated authority of the Human Resources and Compensation Committee provides for greater benefits to Awardee with respect to vesting of the Award on Termination of Employment by reason of specified events than provided in this Agreement or in the Plan, then the terms of such Employment Arrangement with respect to vesting of the Award on Termination of Employment by reason of such specified events supersede the terms of this Agreement to the extent permitted by the terms of the Plan.

18. <u>Recoupment</u>.  This Agreement will be administered in compliance with Section 10D of the Exchange Act and any applicable rules or regulations promulgated by the Securities and Exchange Commission or any national securities exchange or national securities association on which the Shares may be traded.  In its discretion, moreover, the Administrator may require repayment to the Company of all or any portion of this Award if the amount of the Award was calculated based upon the achievement of

8

financial results that were subsequently the subject of a restatement of the Company's financial statements, Awardee engaged in misconduct that caused or contributed to the need for the restatement of the financial statements, and the amount payable to Awardee would have been lower than the amount actually paid to Awardee had the financial results been properly reported. This Paragraph 18 is not the Company's exclusive remedy with respect to such matters. Except as otherwise required by Applicable Law, this Paragraph 18 will not apply after a Change of Control.

19. Amendment. Any amendment to the Plan is deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto; provided, however, that no amendment may impair the rights of Awardee with respect to an outstanding Performance Share Unit unless agreed to by Awardee and the Company, which agreement must be in writing and signed by Awardee and the Company. Other than following a Change of Control, no such agreement is required if the Administrator determines in its sole discretion that such amendment either (a) is required or advisable in order for the Company, the Plan or the Performance Share Units to satisfy any Applicable Law or to meet the requirements of any accounting standard or (b) is not reasonably likely to significantly diminish the benefits provided under the Performance Share Units, or that any such diminishment has been adequately compensated, including pursuant to Section 16(c) of the Plan.

20. Adjustments. The number of Shares issuable for each Performance Share Unit and the other terms and conditions of the Award evidenced by this Agreement are subject to adjustment as provided in Section 16 of the Plan.

21. Compliance with Section 409A of the Code. To the extent applicable, it is intended that this Agreement comply with the provisions of Section 409A of the Code. This Agreement shall be administered in a manner consistent with this intent, and any provision that would cause this Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force or effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of Awardee).

22. No Right to Future Awards or Employment. The grant of the Performance Share Units under this Agreement to Awardee is a voluntary, discretionary award being made on a one-time basis and it does not constitute a commitment to make any future awards. The grant of the Performance Share Units and any payments made under this Agreement will not be considered salary or other compensation for purposes of any severance pay or similar allowance, except as otherwise required by law. Nothing contained in this Agreement confers upon Awardee any right to be employed or remain employed by the Company or any of its Affiliates, nor limits or affects in any manner the right of the Company or any of its Affiliates to terminate the employment or adjust the compensation of Awardee.

23. Successors and Assigns. Without limiting Paragraph 2, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, administrators, heirs, legal representatives and assigns of Awardee, and the successors and assigns of the Company.

CARDINAL HEALTH, INC.

By: _____

Its: _____

9

## ACCEPTANCE OF AGREEMENT

Awardee hereby: (a) acknowledges that he or she has received a copy of the Plan, a copy of the Company's most recent annual report to shareholders and other communications routinely distributed to the Company's shareholders, and a copy of the Plan Description pertaining to the Plan; (b) accepts this Agreement and the Performance Share Units granted to him or her under this Agreement subject to all provisions of the Plan and this Agreement, including the provisions in this Agreement regarding "Special Forfeiture and Repayment Rules" set forth in Paragraph 4 and "Recoupment" set forth in Paragraph 18; (c) represents that he or she understands that the acceptance of this Agreement through an on-line or electronic system, if applicable, carries the same legal significance as if he or she manually signed the Agreement; and (d) agrees that no transfer of the Shares delivered in respect of the Performance Share Units may be made unless the Shares have been duly registered under all applicable Federal and state securities laws pursuant to a then-effective registration which contemplates the proposed transfer or unless the Company has received a written opinion of, or satisfactory to, its legal counsel that the proposed transfer is exempt from such registration.

[_____
Awardee's Signature

_____
Date]

10

**CARDINAL HEALTH, INC.**

Statement of Performance Goals

A-1

Exhibit 12.1

## Computation of Ratio of Earnings to Fixed Charges

| (in millions, except ratios) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Earnings from continuing operations before income taxes | $ 888 | $ 1,798 | $ 1,967 | $ 2,276 | $ 1,924 |
| | | | | | |
| **Plus fixed charges:** | | | | | |
| Interest expense | 119 | 129 | 137 | 178 | 187 |
| Capitalized interest | 2 | 1 | 2 | 6 | 9 |
| Amortization of debt offering costs | 4 | 4 | 8 | 6 | 6 |
| Interest portion of rent expense | 8 | 10 | 10 | 12 | 14 |
| Fixed charges (1) | 133 | 144 | 156 | 201 | 217 |
| Plus: amortization of capitalized interest | 3 | 3 | 2 | 3 | 4 |
| Less: capitalized interest | (2) | (1) | (2) | (6) | (9) |
| Earnings (1) | $ 1,023 | $ 1,944 | $ 2,124 | $ 2,473 | $ 2,135 |
| | | | | | |
| **Ratio of earnings to fixed charges (1) (2)** | 8 | 14 | 14 | 12 | 10 |

(1) The sum of the components may not equal the total due to rounding.

(2) The ratio of earnings to fixed charges is computed by dividing fixed charges into earnings from continuing operations before income taxes plus fixed charges and capitalized interest. Fixed charges include interest expense, amortization of debt offering costs and the portion of rent expense that is deemed to be representative of the interest factor. Interest expense recorded on tax exposures has been recorded in income tax expense and has therefore been excluded from the calculation.

Exhibit 21.1

# Subsidiaries of the Registrant

Listed below are majority-owned subsidiaries of Cardinal Health, Inc. as of June 30, 2017.  Subsidiaries excluded from the list below would not, considered in the aggregate as a single subsidiary, constitute a "significant subsidiary" of Cardinal Health, Inc. as that term is defined in Rule 1-02(w) of SEC Regulation S-X.

| Subsidiary Name | State/Jurisdiction of Incorporation |
| --- | --- |
| Access Closure, Inc. | California |
| Allegiance Corporation | Delaware |
| AssuraMed, Inc. | Delaware |
| Cardinal Health 2, LLC | Nevada |
| Cardinal Health 3, LLC | Delaware |
| Cardinal Health 5, LLC | Delaware |
| Cardinal Health 6, Inc. | Nevada |
| Cardinal Health 7, LLC | Delaware |
| Cardinal Health 100, Inc. | Indiana |
| Cardinal Health 104 LP | Ohio |
| Cardinal Health 105, Inc. | Ohio |
| Cardinal Health 107, LLC | Ohio |
| Cardinal Health 108, LLC | Delaware |
| Cardinal Health 110, LLC | Delaware |
| Cardinal Health 112, LLC | Delaware |
| Cardinal Health 114, Inc. | Delaware |
| Cardinal Health 115, LLC | Ohio |
| Cardinal Health 116, LLC | Delaware |
| Cardinal Health 118, LLC | Delaware |
| Cardinal Health 119, LLC | Delaware |
| Cardinal Health 121, LLC | Delaware |
| Cardinal Health 122, LLC | Delaware |
| Cardinal Health 123, LLC | Delaware |
| Cardinal Health 124, LLC | Delaware |
| Cardinal Health 126, LLC | Delaware |
| Cardinal Health 127, Inc. | Kansas |
| Cardinal Health 200, LLC | Delaware |
| Cardinal Health 201, Inc. | Delaware |
| Cardinal Health 222 (Thailand) Ltd. | Thailand |
| Cardinal Health 247, Inc. | Colorado |
| Cardinal Health 249, LLC | Delaware |
| Cardinal Health 414, LLC | Delaware |
| Cardinal Health Australia 503 Pty. Ltd. | Australia |
| Cardinal Health Austria 504 GmbH | Austria |
| Cardinal Health Belgium 505 BVBA | Belgium |
| Cardinal Health Canada Inc. | Canada |
| Cardinal Health Colombia S.A.S. | Colombia |
| Cardinal Health D.R. 203 II Ltd. | Bermuda |
| Cardinal Health Denmark ApS | Denmark |
| Cardinal Health Finland Oy | Finland |
| Cardinal Health Foundation | Ohio |
| Cardinal Health France 506 SAS | France |
| Cardinal Health Funding, LLC | Nevada |

| Subsidiary Name | State/Jurisdiction of Incorporation |
| --- | --- |
| Cardinal Health Germany 507 GmbH | Germany |
| Cardinal Health (H.K.) Co. Ltd. | Hong Kong |
| Cardinal Health International Philippines, Inc. | Philippines |
| Cardinal Health IPS, LLC | Delaware |
| Cardinal Health Ireland 419 Designated Activity Company | Ireland |
| Cardinal Health Ireland 508 Limited | Ireland |
| Cardinal Health Italy 509 Srl | Italy |
| Cardinal Health Japan G.K. | Japan |
| Cardinal Health Korea Limited | Korea |
| Cardinal Health (L) Co., Ltd. | Malaysia |
| Cardinal Health Luxembourg 522 S.a.r.l. | Luxembourg |
| Cardinal Health Malaysia 211 Sdn. Bhd. | Malaysia |
| Cardinal Health Malta 212 Limited | Malta |
| Cardinal Health Managed Care Services, LLC | Delaware |
| Cardinal Health Medical Products India Private Limited | India |
| Cardinal Health Mexico 244 S. de R.L. de C.V. | Mexico |
| Cardinal Health Mexico 514 S. de R.L. de C.V. | Mexico |
| Cardinal Health Netherlands 502 B.V. | Netherlands |
| Cardinal Health Norway AS | Norway |
| Cardinal Health Pharmaceutical Contracting, LLC | Delaware |
| Cardinal Health Pharmacy Services, LLC | Delaware |
| Cardinal Health Poland Spółka z ograniczonąa odpowiedzialnośściąa | Poland |
| Cardinal Health Portugal 513 Unipessoal Lda. | Portugal |
| Cardinal Health P.R. 120, Inc. | Puerto Rico |
| Cardinal Health P.R. 218, Inc. | Puerto Rico |
| Cardinal Health P.R. 220, LLC | Puerto Rico |
| Cardinal Health Singapore 225 Pte. Ltd. | Singapore |
| Cardinal Health Spain 511 S.L. | Spain |
| Cardinal Health Specialty Pharmacy, LLC | Delaware |
| Cardinal Health Sweden 512 A.B. | Sweden |
| Cardinal Health Switzerland 515 GmbH | Switzerland |
| Cardinal Health Systems, Inc. | Ohio |
| Cardinal Health Technologies, LLC | Nevada |
| Cardinal Health Technologies Switzerland GmbH | Switzerland |
| Cardinal Health U.K. 432 Limited | United Kingdom |
| Cirpro de Delicias S.A. de C.V. | Mexico |
| Convertors de Mexico S.A. de C.V. | Mexico |
| Cordis Cashel Company Unlimited | Ireland |
| Cordis Corporation | Florida |
| Cordis (Shanghai) Medical Devices Co., Ltd. | China |
| Cornerstone Partners G.P.O., L.P. | Tennessee |
| Curaspan Health Group, Inc. | Delaware |

| Subsidiary Name | State/Jurisdiction of Incorporation |
|---|---|
| Dutch American Manufacturers II (D.A.M. II) B.V. | Netherlands |
| EPIC Insurance Company | Vermont |
| Griffin Capital, LLC | Nevada |
| Innovative Therapies, Inc. | Delaware |
| Instant Diagnostic Systems, Inc. | Alabama |
| Leader Drugstores, Inc. | Delaware |
| Marin Apothecaries | California |
| Medicine Shoppe International, Inc. | Delaware |
| NaviHealth, Inc. | Delaware |
| One Cloverleaf, LLC | Delaware |
| Pinnacle Intellectual Property Services, Inc. | Nevada |
| Pinnacle Intellectual Property Services-International, Inc. | Nevada |
| Post-Acute Care Center for Research, LLC | Delaware |
| Quiroproductos de Cuauhtemoc S. de R.L. de C.V. | Mexico |
| R Cubed, Inc. | Tennessee |
| RainTree GPO, LLC | Delaware |
| RGH Enterprises, Inc. | Ohio |
| RightCare Solutions, Inc. | Delaware |
| Rxealtime, Inc. | Nevada |
| Sonexus Health, LLC | Texas |
| The Harvard Drug Group, L.L.C. | Michigan |
| Tradex International, Inc. | Ohio |
| WaveMark, Inc. | Delaware |

Exhibit 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)    Registration Statement on Form S-3 No. 333-215935 of Cardinal Health, Inc.,

(2)    Registration Statements on Form S-4 No. 333-62938 and No. 333-74761 of Cardinal Health, Inc., and

(3)    Registration Statements on Form S-8 No. 33-42357, No. 33-64337, No. 333-72727, No. 333-90423, No. 333-91849, No. 333-38192, No. 333-38198, No. 333-56010, No. 333-129725, No. 333-149107, No. 333-155156, No. 333-163128, No. 333-164736, No. 333-177728, No. 333-183471, No. 333-206339, No. 333-206340, and No. 333-214412 of Cardinal Health, Inc.;

of our reports dated August 10, 2017, with respect to the consolidated financial statements and schedule of Cardinal Health, Inc. and subsidiaries and the effectiveness of internal control over financial reporting of Cardinal Health, Inc. and subsidiaries, included in this Annual Report (Form 10-K) of Cardinal Health, Inc. and subsidiaries for the year ended June 30, 2017.

 /s/ Ernst & Young LLP


Columbus, Ohio
August 10, 2017

Exhibit 31.1

I, George S. Barrett, certify that:

1.  I have reviewed this Form 10-K of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 10, 2017

/s/ GEORGE S. BARRETT
George S. Barrett
Chairman and Chief Executive Officer

Exhibit 31.2

I, Michael C. Kaufmann, certify that:

1.  I have reviewed this Form 10-K of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 10, 2017

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Financial Officer

Exhibit 32.1

**Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Each of George S. Barrett, Chairman and Chief Executive Officer of Cardinal Health, Inc. (the "Company"), and Michael C. Kaufmann, Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)     the Annual Report on Form 10-K for the fiscal year ended June 30, 2017 containing the financial statements of the Company (the "Periodic Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 10, 2017

/s/ GEORGE S. BARRETT
George S. Barrett
Chairman and Chief Executive Officer


/s/ MICHAEL C. KAUFMANN
Michael C. Kaufmann
Chief Financial Officer

Exhibit 99.1

## Statement Regarding Forward-Looking Information

As used in this exhibit, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 Form 10-K"), our quarterly reports on Form 10-Q and our current reports on Form 8-K (along with any exhibits and amendments to such reports), as well as our news releases or any other written or oral statements made by or on behalf of us, may include, directly or by incorporation by reference, forward-looking statements that reflect our current view (as of the date the forward-looking statement is first made) about future events, prospects, projections or financial performance. The matters discussed in these forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied in or by such statements. These risks and uncertainties include:

- competitive pressures in the markets in which we operate, including pricing pressures;

- uncertainties relating to the pricing of generic pharmaceuticals;

- uncertainties relating to the timing, frequency and profitability of generic pharmaceutical launches;

- our ability to maintain the benefits of our generic pharmaceutical sourcing venture with CVS Health Corporation;

- with respect to our distribution services agreements with branded pharmaceutical manufacturers, changes in the amount of service fees we receive or, in cases where part of our compensation under these agreements is based on branded pharmaceutical price appreciation, changes in the frequency or magnitude of such price appreciation;

- changes in the timing or frequency of the introduction of branded pharmaceuticals;

- actions of regulatory bodies and other governmental authorities, including the U.S. Drug Enforcement Administration, certain agencies within the U.S. Department of Health and Human Services (including the U.S. Food and Drug Administration, Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights), the U.S. Nuclear Regulatory Commission, the U.S. Federal Trade Commission, the U.S. Customs and Border Protection, various state boards of pharmacy, state controlled substance authorities, state health departments, state insurance departments, state Medicaid departments or comparable regulatory bodies or governmental authorities or foreign equivalents that, in each case, could delay, limit or suspend product development, manufacturing, distribution, importation or sales or result in warning letters, recalls, seizures, injunctions or monetary sanctions;

- difficulties or delays in the development, production, manufacturing, sourcing and marketing of new or existing products and services, including difficulties or delays associated with obtaining requisite regulatory consents or approvals associated with those activities;

- risks arising from possible violations of healthcare fraud and abuse laws;

- costs or claims resulting from potential errors or defects in our manufacturing of medical devices or other products or in our compounding, repackaging, information systems or pharmacy management services that may injure persons or damage property or operations, including costs from remediation efforts or recalls and related product liability claims and lawsuits, including class action lawsuits;

- risks arising from possible violations of the U.S. Foreign Corrupt Practices Act, Chinese anti-corruption laws and other similar anti-corruption laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws;

- risks arising from our collecting, handling and maintaining patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information;

- risks arising from certain of our businesses being Medicare-certified suppliers or participating in other federal and state healthcare programs, such as state Medicaid programs and the federal 340B drug pricing program, which businesses are subject to accreditation and quality standards and other rules and regulations, including applicable reporting, billing, payment and record-keeping requirements;

- risks arising from certain of our businesses manufacturing pharmaceutical and medical products or repackaging pharmaceuticals that are purchased or reimbursed through, or are otherwise governed by, federal or state healthcare programs, which businesses are subject to federal and state laws that establish eligibility for reimbursement by such programs and other applicable standards and regulations;

- changes in laws or changes in the interpretation or application of laws or regulations, as well as possible failures to comply with applicable laws or regulations, including as a result of possible misinterpretations or misapplications;

- material reductions in purchases, non-renewal or early termination of contracts, or delinquencies or defaults by key customers;

- unfavorable changes to the terms of key customer or supplier relationships, or changes in customer mix;

- adverse changes in U.S. or foreign tax laws, including proposals relating to new taxes or import tariffs, unfavorable challenges to our tax positions and payments to settle these challenges, or failure to permanently repeal the U.S. medical device tax;

- uncertainties due to government healthcare reform, including possible repeal or replacement of major parts of the Patient Protection and Affordable Care Act;

- reductions or limitations on governmental funding at the state or federal level or efforts by healthcare insurance companies to limit payments for products and services;

- changes in manufacturers' pricing, selling, inventory, distribution or supply policies or practices;

- changes in legislation or regulations governing prescription drug pricing, healthcare services or mandated benefits;

- changes in hospital buying groups or hospital buying practices;

- changes in distribution or sourcing models for pharmaceutical and medical and surgical products, including an increase in direct and limited distribution;

- the risks of counterfeit products in the supply chain;

- changes to the prescription drug reimbursement formula and related reporting requirements for generic pharmaceuticals under Medicaid;

- increasing consolidation in the healthcare industry, which could give the resulting enterprises greater bargaining power and may increase pressure on prices for our products and services or result in the loss of customers;

- disruption, damage or lack of access to, or failure of, our or our third-party service providers' information systems, our critical facilities, including our national logistics center, or our distribution networks;

- manufacturing disruptions, whether due to regulatory action, production quality deviations, safety issues or raw material shortages or defects, or because a key product is manufactured at a single manufacturing facility with limited alternate facilities;

- risks to our business and information and controls systems in the event that the Pharmaceutical segment's multi-year systems replacement project or other business process improvements, infrastructure modernizations or initiatives to use third-party service providers for key systems and processes are not effectively implemented;

- any compromise of our information systems or of those of a third-party service provider, including unauthorized access to or use or disclosure of sensitive information;

- the results, costs, effects or timing of any commercial disputes, government contract compliance matters, product liability claims or lawsuits, patent infringement claims, *qui tam* actions or other legal proceedings;

- possible losses relating to product liability claims regarding products for which we cannot obtain product liability insurance or for which such insurance is not adequate to cover our losses;

- our ability to maintain adequate intellectual property protections;

- risks and uncertainties relating to the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses from Medtronic plc (the "Patient Recovery Business"), including the following: we may fail to realize the synergies and other benefits we expect from the acquisition; we may fail to retain key personnel of the acquired businesses; future developments may impair the value of our purchased goodwill or intangible assets; we may face difficulties or delays establishing, integrating or combining operations and systems; we may face challenges retaining the customers of the acquired businesses; we may encounter unforeseen internal control, regulatory or compliance issues; and we may face other additional risks relating to regulatory matters, legal proceedings, tax laws or positions, supply interruptions, commodity price volatility and global operations, including the effects of local economic environments and currency volatility;

- risks relating to the use of a significant amount of cash, including borrowings under our existing credit arrangements, to fund the acquisition of the Patient Recovery Business, which is expected to result in increased short-term borrowings in the course of our operations during fiscal 2018;

- risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility;

- the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition, and uncertainties relating to our ability to achieve the anticipated results from acquisitions;

- increased costs for commodities used in the Medical segment including various components, compounds, raw materials or energy such as oil-based resins, pulp, cotton, latex and other commodities;

- shortages in commodities, components, compounds, raw materials or energy used by our businesses, including supply disruptions of radioisotopes;

- the loss of, or default by, one or more key suppliers for which alternative suppliers may not be readily available;

- bankruptcy, insolvency or other credit failure of a customer or supplier that owes us a substantial amount;

- risks associated with global operations, including the effect of local economic environments, inflation, recession, currency volatility and global competition, in addition to risks associated with compliance with U.S. and international laws relating to global operations;

- risks associated with our use of and reliance on the global capital and credit markets, including our ability to access credit and our cost of credit, which may adversely affect our ability to efficiently fund our operations or undertake certain expenditures;

- our ability to introduce and market new products and our ability to keep pace with advances in technology;

- the costs, effects, timing or success of restructuring programs or plans;

- significant charges to earnings if goodwill or intangible assets become impaired;

- uncertainties relating to general political, business, industry, regulatory and market conditions; and

- other factors described in the "Risk Factors" section of the 2017 Form 10-K.

The words "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions generally identify "forward-looking statements," which speak only as of the date the statements were made, and also include statements reflecting future results or guidance, statements of outlook and expense accruals. We undertake no obligation to update or revise any forward-looking statements, except to the extent required by applicable law.

# EXHIBIT 81

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Barrett George S | CARDINAL HEALTH INC [ CAH ] | X Director / 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below) / Other (specify below) |
| 7000 CARDINAL PLACE | 08/15/2017 | Chairman and CEO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| DUBLIN OH 43017 | | X Form filed by One Reporting Person |
| (City) (State) (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/15/2017 | | A[1] | | 47,669 | A | $0 | 561,553 | D | |
| Common Shares | 08/15/2017 | | F[2] | | 43,168 | D | $66.76[3] | 518,385 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $66.43 | 08/15/2017 | | A | | 233,673 | | [4] | 08/15/2027 | Common Shares | 233,673 | $0 | 233,673 | D | |

**Explanation of Responses:**

1. Grant of restricted share units ("RSUs") that vest in three equal annual installments beginning on August 15, 2018.
2. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 41,318 RSUs and 49,653 performance share units.
3. Reflects closing price on prior business day.
4. Stock option vests in three equal annual installments beginning on August 15, 2018.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact     08/17/2017
** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 82

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Casey Donald M Jr. | CARDINAL HEALTH INC [ CAH ] | Director __ 10% Owner __ |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 08/15/2017 | X Officer (give title below) __ Other (specify below) __ |
| 7000 CARDINAL PLACE | | CEO, Medical Segment |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| DUBLIN OH 43017 | | X Form filed by One Reporting Person |
| (City) (State) (Zip) | | __ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 08/15/2017 | | A(1) | | 14,301 | A | $0 | 157,536 | D | |
| Common Shares | 08/15/2017 | | F(2) | | 6,285 | D | $66.76(3) | 151,251 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $66.43 | 08/15/2017 | | A | | 70,102 | | (4) | 08/15/2027 | Common Shares | 70,102 | $0 | 70,102 | D | |

**Explanation of Responses:**

1. Grant of restricted share units ("RSUs") that vest in three equal annual installments beginning on August 15, 2018.
2. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 10,938 RSUs and 13,034 performance share units.
3. Reflects closing price on prior business day.
4. Stock option vests in three equal annual installments beginning on August 15, 2018.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact      08/17/2017

** Signature of Reporting Person      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 83

## Cardinal Health Inc at Morgan Stanley Healthcare Conference

New York Sep 11, 2017 (Thomson StreetEvents) -- Edited Transcript of Cardinal Health Inc presentation Monday, September 11, 2017 at 12:45:00pm GMT

CORPORATE PARTICIPANTS
 Lisa Capodici
 Michael C. Kaufmann, Cardinal Health, Inc. - CFO
CONFERENCE CALL PARTICIPANTS
 David Reed Risinger, Morgan Stanley, Research Division - MD in Equity Research and United States Pharmaceuticals Analyst
 Rivka Regina Goldwasser, Morgan Stanley, Research Division - MD

## PRESENTATION

**Rivka Regina Goldwasser**, Morgan Stanley, Research Division - MD

Good morning, everybody, and welcome to Morgan Stanley Global Healthcare Conference. I'm Ricky Goldwasser. I'm Morgan Stanley's health care services analyst. And it is my pleasure to introduce our first presenters for the day. To my left is my Mike Kaufmann, Cardinal CFO; and Lisa Capodici, Cardinal's new Head of IR. Before we start, I just want to remind you that for any disclosures, you should go to the Morgan Stanley website. And Lisa has some remarks as well.

**Lisa Capodici,**

Yes. Thank you very much, Ricky. During this presentation, we'll be making forward-looking statements. Our actual results could differ materially from those projected here today. For information about factors that could cause actual results to differ from today's projections, please refer to our SEC filings, which you can find on the Investors page of our website.

**Rivka Regina Goldwasser**, Morgan Stanley, Research Division - MD

Great. Thank you. So Mike, good morning,.

**Michael C. Kaufmann**, Cardinal Health, Inc. - CFO

Good morning. Thanks for having me. I appreciate it.

## QUESTIONS AND ANSWERS

**Answer – Rivka Regina Goldwasser:** Of course. Generic deflation has being really at the forefront of investor debate in recent months.

**Answer – Michael C. Kaufmann:** I hadn't noticed.

**Answer – Rivka Regina Goldwasser:** I think we're seeing both heightened focus from the FDA to clear up the pipelines, we're seeing the impact for the purchasing groups to lower market pricing. And it's all adding to the controversy. So first of all, what are you seeing currently in the marketplace if can you give us some perspective?

**Answer – Michael C. Kaufmann:** Yes. I think right now, it's early in our fiscal year, so can't really give a lot of updates since we're really just new. But I wouldn't say that we're seeing anything different than what we saw towards the back half of FY '17, which is that the steepness of the curve in terms of the amount of repricing that we're seeing, and specifically the generics, seems to have lessened than what we saw in the first half. So where in the first half, it was like a point-to-point like this, the curve is less steep. And so things seem to be getting more normalized to more of historical standards.

**Answer – Rivka Regina Goldwasser:** Okay. So when we think about that, we're hearing a lot of different messages in the marketplace, generic manufacturers seeing that they're more concerned talking about deflation at high single-digit, low-teens. Your comments now about kind of like more of a normalized trend, also your guidance of mid-single-digit growth seemed to suggest a more normal market trend. What do you think is driving that difference between kind of of like your perspective versus what we're all hearing from the manufacturers?

**Answer – Michael C. Kaufmann:** Yes, I'm really glad you asked that question because a lot of this just has to do with basic math if you think about it in the definition on how we're each defining it. So probably the best way to think about it is when Cardinal Health defines generic deflation, specifically our comment of mid-single digits, we're talking point-

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

to-point average selling price decrease. So if you think about it, if our average selling price on generics on June 30, '17, this just the past couple of months, was $100, if on June 30 of FY '18, it's $94, that's the 6% decline. That's what we're defining, that our average selling price point-to-point from June 30 to June 30 or July 1 to June 30 is going to go down mid-single digits, which in this example, I'd say would be 6%. So manufacturers, however, are talking about their overall sell price is going down, which is our cost. So if you think about it, for us to maintain margin dollar rates, since our costs are lower than our sell, we're going to have to take our cost down more than 6% in order to do that. So if my cost, to make the example simple, is $50 and my sell average is $100 and my cost average is $50 at the beginning of the year and I'm going down to $94 at the end of the year, I'm going to have to go down to $44 just to maintain margin dollars, so then what I would have to be down 12% on my manufacture cost. So if you actually think about, the 2 reconcile very well based on our definition and their definition. What I would be concerned about if I were all of you is that if I'm saying I'm going to be down 6% and they're saying they're going to be down 6%, that's actually a problem because that means that my margin dollars, if all other things being equal, have to be squeezed. And so that's really important to understand. We're talking about sell, they're talking about cost. And if the cost isn't going down more than sell, then you're going to see margin dollar compression, which is not what we're expecting this year.

**Answer – Rivka Regina Goldwasser:** So you're bringing an interesting question, right, because your guidance includes both the buy and the sell side. And the sell-side environment have been the key debate in this conference last year. With all the visibility and with all the sound bites that we are hearing from manufacturers about the pricing, what are you hearing from your customers? Are the customers coming back and saying, "Hey, we want more of that sell side," and that's something that could change that delta that you were talking about? So if you can maybe kind of like help us think about what you're seeing on that end.

**Answer – Michael C. Kaufmann:** Sure. Customers, it's never been different. I've been here 27 years, customers always ask for more and more of your margin. It's about being disciplined and being able to convince them that you have a lot of other services and offerings for them that are going to help them grow and maintain their business. And so I don't think that the pressure recently hasn't been any worse than that we've ever seen. And so our sales teams just has to do an excellent job of making sure that the customer understands that we're market-priced. And so a lot of this has to go back to what I had just said of market prices, what's really important, because Cardinal's pricing philosophy on generics is very much to be a market-priced -- at a market price. We are not looking to be a price leader. We don't believe we need to sell on price in order to win business. We believe that the quality of our pick, pack and ship and all the other services that we have enable us to sell at market. So if the market is reacting in such a way to stay, like as I said, continuing to improve then we will be. However, if the market decides to get aggressive again, then we are going to have to obviously match that. And that could lead to some further erosion or more than the mid-single digits that we're down. But I think the really important piece is not to get focused on that mid-single digits down. We could be better than that or worse than that. And that may or may not be a good guy or a bad guy, depending on what happens on the cost side. We don't really give any guidance on what our cost side is. We're just talking about sell because if I give you both and you're obviously going to know my margins, and that's more information than I would like to give. But we are, as you can imagine, as a percentage expecting cost to go down more. So if sell side gets a little bit more aggressive, then we may have to -- we're going to have to be more aggressive on cost. And if our cost doesn't go down as much as we're hoping, then we're going to have be less aggressive on the sell side. So it's really about balancing the 2 so that you don't have margin dollar erosion. And in fact, that you hope that you have margin dollar expansion.

**Answer – Rivka Regina Goldwasser:** And when we compare the 3 large distributors, you and McKesson and Amerisource, each of you have some distinct businesses and some different views of the market. You have [kind of] the Harvard group, the telemarketing assets, which give you an interesting sight -- point of sight into the independent market. Do you think it gives you a different perspective than others, gives you intelligence?

**Answer – Michael C. Kaufmann:** Yes, I do. I think that where it helps us, it's been -- over this past year, it's been both, I think, a good thing and a little bit of a bad thing in the sense that because Harvard, a big piece of Harvard is mostly generics, when there's extra pressure on generic sell margin, then we're going to disproportionately on that business feel extra pressure. And so some of that miss or so we've had this past year, the challenges we've had around generic deflation have been related partially to the Harvard business because it is always out there having to stay competitive. At the same time, it's probably the fastest indicator of what's going on in the market. And if we want to be able to price to market, whether that means lowering or raising prices, to know immediately within 24 hours or less what the price needs to be. Harvard's a great asset because we have telemarketers. They're on the phone all day long talking to folks. And so if today, they're selling lisinopril at $60 a bottle and they can sell as much as they can offer, and then tomorrow, they try to sell it at $60 and they can't sell a bottle, then they're going to know where the market has changed. And before the end of the day, somebody is going to be telling our costing team and our selling team, "Hey, it looks like lisinopril has moved from $60 a bottle to $50 a bottle, what are we going to do about it?" And then our costing teams and selling teams will make some quick decisions on whether or not there's a costing opportunity because we have more or whether there's a -- whether we need to lower price on our Pharmaceutical Distribution business besides just our telemarketing. So it does give us a very fast signal to what's going on in the market. The other thing that's good about -- on the good guy side for the Harvard business is that it's not just all generic telemarketing. It also is unit dose packaging and has the Rugby OTC line, too. And those are 2 areas that

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

have been performing better than we had expected them to perform while the generic piece has been a little bit behind because of the deflation. And so overall, Harvard is growing very nicely, but it's a little bit different mix than we expected.

**Answer – Rivka Regina Goldwasser:** Can we stop here and see if we have any question? We have one question from David Risinger.

---

**Analyst:** David Reed Risinger, Morgan Stanley, Research Division - MD in Equity Research and United States Pharmaceuticals Analyst

**Question – David Reed Risinger:** So I'm sure you've probably already gotten questions on this. And I don't know if you've commented. But Paul Bisaro, the CEO of Impax, has said that he's going to work on creating new channels to go around organizations like yours and buying groups that are squeezing the generic manufacturers. Could you just talk a little bit about that and what you think he might be referring to and how you'll respond?

**Answer – Michael C. Kaufmann:** Absolutely. Known Paul for a long time, a great guy, a smart guy, has done a lot of good things. And so I don't want to get too much in detail on it. But look, I understand anybody that's getting challenges has always got to be thinking about those things. And of course, Paul is thinking about those things. But a couple of things to keep in mind. The first thing I would tell you is if you talk to customers, customers generally, at least chain customers, hospital customers, they really don't like to buy outside of the distributor. It's a much more complicated process when they do that. They've got separate receiving that they have to do, separate ordering systems that they have to do. A lot of times the distributors will do things like bill by department for them within the hospitals and do different types of unique things for them in the whole order-to-cash standpoint as far as the way the payments are done. And that makes it very difficult for someone to want to buy outside of the distributor, manage their inventory and stuff, for instance. So I think that's the first hurdle that you have to go around. So I think customers would be expecting a much better price, not just price matching, if they're going to be able to buy it from somebody else direct. I think the second thing is contractually, I think all of the distributors, but at least I could speak for Cardinal, do an excellent job of contractually getting the customer to commit to what we need in order for the mix to work. And so if a customer wants a brand price of X, then they're going to have to buy a certain amount of generics. And just because they're somebody that can offer generics at a better price, they're going to be contractually committed to buy from us because we're subsidizing potentially a lower-than-market brand price. And so contractually, there's going to be a lot of difficulty for customers, particularly the larger customers, to go outside of their agreements with their distributors in order to actually buy direct. And then I think the next thing is a lot of those generic manufacturers are going to have to remember that while they might be successful potentially looking at some of these other distribution methods, they're still going to have a lot of business with the large buying consortiums, whether it be Red Oak Sourcing or one of the other ones. And so as we evaluate good partners and who we want to align with on the large portion, those that select to go around us periodically probably aren't going to be seen as quite the same level of partner that maybe the folks that are spending their time dedicated to going through this. So there is a risk/reward, maybe you get a little bit better price going around us, but then you could lose potentially a lot of volume that you were getting going through Red Oak Sourcing or some of the other buying cooperatives. So I do think it's something that folks will look at. But I don't think it's going to be material at the end of the day in terms of all the different reasons why I think the volume is going to continue to go through the large distributors. Absolutely.

**Answer – Rivka Regina Goldwasser:** There's another question here.

---

**Analyst:** Unidentified Analyst,

**Question – Unidentified Analyst:** Yes. In terms of these consortiums, obviously there have been -- every year, we seem to come up with a new consortium. What happens to pricing with consortiums that were formed maybe 2, 3 years ago? I assume there's a step-down when they first formed. Are they still going down subsequently? Or did they reach an equilibrium at some point? How do you look at that?

**Answer – Michael C. Kaufmann:** Yes. So a couple of things about that. I think one of the important things, and I'll just fit this in here because I think it's important, when we formed Red Oak, which was a little over 3 years ago now, we had a significant step-down in our overall cost through our partnership with CVS. And as you know, not only do we have our initial fixed payment, but if we performed at a certain level, we had additional payments. And we exceeded all the levels that we had, so we ended up having additional payments. So Red Oak was going incredibly well. One of the things we did before we even formed Red Oak to make sure that we maintained a lot of that profitability and then just give it away in a very thoughtful way was that we built a significant firewall between our costing side and our pricing side. So the team that communicates and works with Red Oak and gets all the data from Red Oak has a firewall and never shares cost with our pricing team. Our pricing team only sees the transfer costs, which is significantly marked up from our cost from Red Oak. So that way, when we tell them price to market, they're not getting influenced by the level of cost. And so if all of a sudden, market is $50 and we're acquiring at, let's say, $30 and we can take our cost down to $10, we don't let the pricing team know that because there's no reason for them to

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

know that. If the market stays at $50, they'd continue to price at $50. So I think one of the important things about the consortiums and as you get better costing is you need to be really diligent and smart about the way you organize so that it doesn't automatically just flow through in some way -- the customers in a way that hurt your overall margins and performance. So I think that's one thing. I think second of all, clearly we have said since the beginning that Red Oak has been a tailwind. It will be a tailwind again this year just like it has been in the past. But it will be a smaller tailwind than the year before to your point. So each year since you're coming off, you've lowered your cost, when you come down, even if you come down 10% or 15% every year, you're coming off of a smaller base. And so your actual dollar savings do get smaller on an annual basis. But every year, we would expect to continue to expect to get overall cost savings because there's new items that come to market, players leave and come into the market all the time. So there's always adjustments on items that we are always going after as a group.

**Answer – Rivka Regina Goldwasser:** And just to add on that question, when you think about Red Oak's relative position, obviously we have ClarusONE in the marketplace this year. WBAD now has a new partner in place. Does that include Red Oak's relative position and add to this kind of like pricing dynamics that you're talking about, anything that [Christian] alluded to?

**Answer – Michael C. Kaufmann:** Yes. It's really interesting. If I have -- if you think about it, I have 2 hats, right? I control both of these areas as a CFO. I control costing, I sit on the Red Oak board and own and manage the team that drives all costing improvements. And I also, through on the finance team, own the pricing team. And so if I have just my costing hat on, the formation of the ClarusONE, any of the activity around all that, always typically improves our pricing. Anytime that our competitors are getting pricing, it usually creates opportunities in the marketplace that Red Oak can go back and get better costing. Somebody that might have lost share somewhere else needs to get the share back, and so they'll work through us to do something. Or whatever other types of noise that's out there, Red Oak will take advantage of those opportunities. With decades and decades of generic buying experience that we have in Red Oak, they're going to take advantage of that. So that's always going to be a good guy for us generally when you see all those other activities. The key is whether or not what happens on the sell side. So if on the sell side, the competitors are getting better costing and then giving it all away, then that could create margin erosion. And the better that we're getting over here might be given away over here. If they're being disciplined about it and doing what they need to, to be appropriate with the customers but then not giving as much away, then that could create upside in the sense of where cost could come down and our selling prices can have that more normalized lowering of the market price versus aggressiveness. So it all really depends on the mix of the 2. So you can't really look at one exclusive of the other and know whether we're having a good year or a bad year unless you get some indication on both sides.

**Answer – Rivka Regina Goldwasser:** Okay. With no additional questions on generics and pharma distribution, let's shift focus to Medical segment. Medical segment is about 30% of your EBIT, making it the most diversified drug distributor. I think what investors are looking to understand is can the Medical segment strategy help shield you from the fundamentals of drug distribution? So can you walk us through the strategy for Medical segment as a starting point?

**Answer – Michael C. Kaufmann:** Sure, absolutely. I think for a lot of years, our Medical segment really felt like they were caught in between a strategy. They were a distribution -- we are a distribution company with a small product portfolio and we're more focused on the distribution. Several years ago, 5 or 6 years ago, we made a decision that, "Hey, look, like any distribution business, you're always going to constantly see pressure on your overall everyday distribution fees that you're able to get." So if you're at cost plus 3, you're going to have pressure to go to 2.5 and 2 and 1.5, et cetera. So there's always going to be pressure on that pure distribution fee. And our feeling was, "Hey, look, we know we're going to get that pressure, so let's position ourselves to be able to, while we're getting that pressure, be able to win in other areas with the customer." And the 2 big focus areas we had on is expanding our product portfolio by, first, internally building out that portfolio ourselves as well as through acquisitions, which we've done through AccessClosure, Cordis and now the Medtronic patient recovery business. But we've also expanded on our own by thousands of SKUs. And then the second thing as part of that strategy was building up our services businesses. So whether it be inventory management, freight management and other types of services that we can offer our medical surgical customers, that, that was going to be an important piece for us. So that as the pressure came on that core distribution business, we had some other things that we could say to the customer, "Okay, if you really want to go from plus 2 to plus 1.5, we can do that for you, but now you're going to have to buy 15%, 20%, x percent, certain numbers of dollars, however we want to express it, of our own products from us. In order for us to get the right mix to be able to get you where you want to be, you're going to have to commit to certain services to work with us in order for us to be able to have the overall type of P&L that we want." And so I think the strategy has been playing out nicely. Obviously, the Cordis piece did not go as well as we had expected it to be. We can talk about that as much as you want. But in general, it's still been a positive for us. And we expect it to grow this year. And so I think that's where we really believe the trick is that we've got these rails going to customers every single day. And now we can bring more and more product and more and more services to them. And then the last thing I think that we've done that has been helpful was we've put together a joint selling team that [call them] the strategic accounts, not only to sell med product distribution but also to sell some of the pharmaceutical and the pharmaceutical sales and services as one to large IDNs. So we see some really good growth in overall IDN accounts, large strategic accounts.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Answer – Rivka Regina Goldwasser:** So let's talk a little bit about the Cordis integration. As you mentioned, it's been taking longer than you initially expected, which kind of like raised the question about your relative positioning in that marketplace. So one, what have you learned throughout the process that you might not anticipated upfront? And what are you hearing from your customers?

**Answer – Michael C. Kaufmann:** Yes, I think one of the things to keep in mind around Cordis that has been a positive that we learned that we will continue to do with, for instance, the Medtronic acquisition, the patient recovery business, is, first of all, we stayed very, very focused on the customer. So while Cordis from a bottom line has not gone nearly as well as we expected it to be, and I'll go through that in a second why, from a top line, Cordis is performing very close to where we expected it to be. And that has been one of the absolute most important things for us because if you lose the sales, it's incredibly hard to get them back. And so while we're a little bit behind where we expected in some markets and ahead in other markets, overall, the overall sales volume of Cordis is about where we expected it to be. Where we really didn't perform nearly as well, I would it put it in 2 buckets. First of all, remember this is that this isn't a bucket that I would say is how I would compare our performance this past year. But it's important for you to know is that when we went to acquire the business in April or negotiated the price for the business in April, FX was at one spot. And remember, Cordis is 30% U.S. and 70% ex U.S. And when we actually closed on the business in October, FX had gone like that. And so we had a significant tens of millions of dollar erosion in the expected profits of the business between the point in time in which we negotiated the price to the point in time which we actually were able to close the deal. So that is: one, reconciling; and two, what I'll call business case. Now as far as reconciling to how we performed this year, obviously we took that into account because when we gave guidance, we had already knew that. It was really 3 things that struck us. One was SG&A was much more expensive than we expected. And that was mainly outside of the United States. And so we had very little infrastructure ex U.S. and we underestimated quite frankly on what it would cost for us to stand up the third-party logistics companies that we were working with, to stand up all of the infrastructure, to pay our sales reps, get them in the cars, et cetera, et cetera, et cetera. And so those cost of SG&A and around manufacturing and managing through the TSAs and having to operate 2 plants while we were moving our machinery from one plant to another, those costs were just more than we expected. The second thing is when we closed the deal, we expected and thought we would have a lot more visibility to inventory than we actually did. And so what happened is at the end of the year, we took a lot of inventory write-offs for obsolete inventory because we had inventory that was either on consignment or in our warehouses with our third-party logistics providers, so we didn't have a good insight to. And we ended up taking some significant write-offs on that. And so that was another area. We have been working for several months on putting in systems to be able to get after that. And so we will and we should have much better insights to inventory by the end of this calendar year. But that has been an area that snuck up on us. And then the last piece was the [bit] which I'd call partnership agreement. So when we acquired Cordis, several companies came to us and said, "Hey, with that type of a sales force, we really think our products match what's in your Cordis bag relatively well. And if you'll represent those products for us and sell those, we'll create royalty agreements with you, so you can collect fees and they'll do all the regulatory and all that." What we found is we overestimated how quickly those could get signed. And some of our partners weren't able to get approvals on the dates that we expected. So when we signed a deal expecting them to get approval in October and be selling in October, they weren't getting approved until March or April or the teams that will have it signed by October and the deal doesn't get signed in February, so we're late. And so those are the 3 things. So as you step back from those, we have a much better sense of those partnership agreements which -- what has been signed, how long it takes. And so we're being much more conservative in predicting those. The SG&A expenses, we have an aggressive plan to work on those. And lastly, on the inventory, we have some IT systems going in to help us there. So I think we have a really good game plan on all 3 of those. As far as it relates to Medtronic, which is really important to think about, is remember this, the patient recovery business is actually 70% U.S. and 30% ex U.S. The piece of Cordis in the U.S. went very well. It just flowed on our own rails, on our own warehouses and was pretty seamless. So 70% of the Medtronic business is already -- we're carrying well in excess of $100 million of sales a year that we do with that business. And so as you can imagine, we're very familiar with distributing and taking care of those products. And so we'll be able to run that through our rails on the U.S. And then ex U.S., a lot of the infrastructure that we've been putting on in Cordis will then be levered to help us with the Medtronic acquisition.

**Answer – Rivka Regina Goldwasser:** One question we're getting from investors is around a nontraditional competitor potentially in the med supply area. And that's Amazon. You hear a lot about Amazon on the drug side, but we're starting to get also questions about Amazon on the med supply area, given that they seem to be exploring opportunities across health care. And one venue that they're growing is really kind of like their enterprise business. So how do you think about Amazon as a potential competitor in the Medical segment? And what do you think could be the barriers to entry?

**Answer – Michael C. Kaufmann:** Yes, I think you can never discount Amazon. They've been incredibly successful and done a lot of unique things. And so we would never discount them. I would tell you though that our exposure in the Medical segment is different in the sense that we're not going to the smaller buyers, like the dental offices or the doctors' offices, with our med-surg supplies. As you know, we've sold that doctors' office supply business. And so our med supply business is generally all either to large surgery centers and to the acute -- large acute hospitals. And so what we're talking about is sending pallet loads of product, not individual boxes with a smile on them that are coming in with a single roll of table paper or gauze or some of those types of things. So we have customers that have -- that

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

are part of GPO contracts often. They're committed to buy through part of our agreement with the overall IDN. We're shipping in pallet loads with them. We're shipping things that are very heavy and probably not things Amazon will pursue, like water, saline solutions, things like that, bed pans, things that are bulky, not a lot of huge dollar margin on them. And obviously, as you can imagine, our contracts are not going to allow customers to cherrypick the more profitable things away from that if we're going to sell the other one. So I think due to the structure of our contracts, the size and volume that we're shipping versus the small parcel, I think what we do generally would not probably be something that would be all that attractive to an Amazon.

**Answer – Rivka Regina Goldwasser:** Okay. And last question on capital deployment. So obviously, you've been very acquisitive in recent years. Going forward, what are your capital deployment priorities, buybacks versus M&A? And then even more specifically, you talked about a shift in capital deployment focus from China to potential other areas. What are those other areas that you're interested in?

**Answer – Michael C. Kaufmann:** Yes. I think we're going to continue to be interested in any of the areas that are close to the core that we do, so medical products of any types, distributors, either in medical or pharma that might become available. If there's a smaller generic telemarketer that becomes available, there's going to be certain assets in the specialty space. So I think all of those core areas where we already have a lot of scale, if the right asset with the right price and right culture becomes available, we're going to take a look at those. The issue with China for us is that while it's been a business that has grown double digits for us on the top and bottom line every year, its margin rates have stayed much lower than we were hoping that they would be. They haven't really expanded as much as we were hoping they would. They are very similar to our U.S. Pharma distribution rates. And the overall capital commitment is still much more significant than in the U.S. So as we look at some of the regulatory changes in China, and even though we believe we could continue to grow double-digit top and bottom line, when we look at our other capital deployment opportunities in the areas that I just mentioned, it just seems like the capital that we have tied over, not only the capital that we have today but, even more importantly, in order to compete and stay in the -- and move from, say, top 8, 9, 10 to get into the top 5, which is where we believe you have to be, we'd have to spend billions of dollars of capital doing acquisitions over there. And so it's as much about the future capital avoidance that we have to be to stay competitive as it is about the current capital that we think it would be better to focus that on the U.S. So quickly, our priorities are going to be to continue to be the CapEx and stick with our differentiated dividend payout of 30% to 35%. And then after that, we've made some commitments on debt paydown of roughly about $500 million a year for 3 years. And then we'll balance between M&A and repo. We'll do enough repo to always offset dilution. And then after that, we're going to have to take a look at the balance between the 2.

**Answer – Rivka Regina Goldwasser:** Great. Thank you very much.

**Answer – Michael C. Kaufmann:** All right. Thanks.

StreetEvents transcripts content provided by Thomson Reuters

THOMSON REUTERS

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

# EXHIBIT 84

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Casey Donald M Jr. | CARDINAL HEALTH INC [ CAH ] | |

1. Name and Address of Reporting Person[*]: Casey Donald M Jr.
(Last) (First) (Middle)
7000 CARDINAL PLACE
(Street)
DUBLIN OH 43017
(City) (State) (Zip)

2. Issuer Name **and** Ticker or Trading Symbol: CARDINAL HEALTH INC [ CAH ]

3. Date of Earliest Transaction (Month/Day/Year): 09/15/2017

4. If Amendment, Date of Original Filed (Month/Day/Year):

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)
Director 10% Owner
X Officer (give title below) Other (specify below)
CEO, Medical Segment

6. Individual or Joint/Group Filing (Check Applicable Line)
X Form filed by One Reporting Person
Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Shares | 09/15/2017 | | F[(1)] | | 4,748 | D | $67.46[(2)] | 146,503 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Represents withholding of shares to satisfy tax withholding obligations of the reporting person in connection with the vesting of 10,006 restricted share units.

2. Reflects closing price on prior business day.

**Remarks:**

/s/ Elaine S. Natsis, Attorney-in-fact     09/18/2017
** Signature of Reporting Person     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 85

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**November 6, 2017**

**Date of Report**

**(Date of earliest event reported)**

# Cardinal Health, Inc.

(Exact name of registrant as specified in its charter)

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place, Dublin, Ohio 43017**

(Address of principal executive offices) (Zip Code)

**(614) 757-5000**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instructions A.2. below):

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

## Item 2.02: Results of Operations and Financial Condition

On November 6, 2017, Cardinal Health, Inc. (the "Company") issued a news release announcing its results for the quarter ended September 30, 2017 . A copy of the news release is included as Exhibit 99.1 to this report.

## Item 7.01: Regulation FD Disclosure

During a webcast scheduled to be held at 8:30 a.m. Eastern time on November 6, 2017, the Company's Chairman & Chief Executive Officer and Chief Financial Officer will discuss the Company's results for the quarter ended September 30, 2017 and outlook for the fiscal year ending June 30, 2018 . The slide presentation for the webcast will be available on the Investors page at ir.cardinalhealth.com . An audio replay of the webcast also will be available on the Investors page at ir.cardinalhealth.com .

## Item 9.01: Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Exhibit Description |
|---|---|
| 99.1 | News release issued by the Company on November 6, 2017 announcing quarter results. |

2

# Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Cardinal Health, Inc.**

(Registrant)

| | | |
|---|---|---|
| Date: November 6, 2017 | By: | /s/ Michael C. Kaufmann |
| | | Michael C. Kaufmann |
| | | Chief Financial Officer |

3

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

Media:    Ellen Barry                                    Investors:  Lisa Capodici

(614) 553-3858                                         (614) 757-5035

ellen.barry@cardinalhealth.com                        lisa.capodici@cardinalhealth.com

### Cardinal Health Reports First-quarter Results for Fiscal Year 2018

- **Revenue increases 2 percent to $32.6 billion**

- **GAAP [1] operating earnings decrease 51 percent to $262 million, and non-GAAP operating earnings decrease 9 percent to $610 million**

- **GAAP diluted earnings per share decrease 63 percent to $0.36, and non-GAAP diluted earnings per share decrease 12 percent to $1.09**

DUBLIN, Ohio, Nov. 6, 2017 - Cardinal Health (NYSE: CAH) today reported first-quarter fiscal year 2018 revenues of $32.6 billion, an increase of 2 percent. The company also reported a decline in GAAP operating earnings of 51 percent to $262 million and in non-GAAP operating earnings of 9 percent to $610 million. GAAP diluted earnings per share (EPS) decreased 63 percent to $0.36, while non-GAAP diluted EPS decreased 12 percent to $1.09.

"Fiscal year 2018 started largely as we expected and included strong performance from many of our business lines across the segments. With one quarter behind us, we remain comfortable with our full-year guidance. We're excited to have closed the Patient Recovery transaction during Q1 and are pleased to report the integration is going well," said George Barrett, chairman and CEO of Cardinal Health.

"I'd also like to thank our extraordinary colleagues who showed their commitment to serving both their communities and our customers in the midst of multiple recent natural disasters."

## Q1 FY18 summary

|  | Q1 FY18 | | Q1 FY17 | Y/Y |
|---|---|---|---|---|
| Revenue | $ | **32.6 billion** | $  32.0 billion | 2% |
| Operating earnings | $ | **262 million** | $  535 million | (51)% |
| Non-GAAP operating earnings | $ | **610 million** | $  669 million | (9)% |
| Net earnings attributable to Cardinal Health, Inc. | $ | **115 million** | $  309 million | (63)% |
| Non-GAAP net earnings attributable to Cardinal Health, Inc. | $ | **346 million** | $  399 million | (13)% |
| Diluted EPS attributable to Cardinal Health, Inc. | $ | **0.36** | $  0.96 | (63)% |
| Non-GAAP diluted EPS attributable to Cardinal Health, Inc. | $ | **1.09** | $  1.24 | (12)% |

During the quarter, the company entered into an agreement to regain direct distribution of self-manufactured surgeon gloves in certain international markets. Restructuring costs associated with this agreement, as well as increased amortization of acquisition-related intangible assets as a result of the Patient Recovery business acquisition, reduced GAAP operating earnings in the current period.

## Segment results

### *Pharmaceutical segment*

First-quarter revenue for the Pharmaceutical segment increased 1 percent to $28.9 billion due to sales growth from specialty and pharmaceutical distribution customers, which was partially offset by the previously announced May 2017 expiration of a large, mail-order customer contract.

Segment profit for the quarter decreased 13 percent to $467 million. This decrease was driven by generics program performance, which includes the negative impact of generic pharmaceutical pricing changes partially offset by the benefits from Red Oak Sourcing. The costs related to the company's ongoing investment in its Pharmaceutical IT platform also contributed to the decrease.

**Cardinal Health**
**Page 2**

| | | Q1 FY18 | | Q1 FY17 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | **28.9 billion** | $ | 28.8 billion | 1% |
| Segment profit | $ | **467 million** | $ | 534 million | (13)% |

***Medical segment***

First-quarter revenue for the Medical segment increased 14 percent to $3.7 billion primarily driven by contributions from acquisitions and, to a lesser extent, new and existing customers.

Segment profit for the quarter increased 1 percent to $129 million. This was primarily driven by contributions from acquisitions, which were mostly offset by the previously disclosed reduced contribution from a Veterans Affairs contract. Segment profit for the quarter includes the impact of the Patient Recovery business inventory fair value step-up. Excluding the $42 million step-up in the quarter, year-over-year Medical segment profit growth was 34 percent.

| | | Q1 FY18 | | Q1 FY17 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | **3.7 billion** | $ | 3.3 billion | 14% |
| Segment profit | $ | **129 million** | $ | 127 million | 1% |

## Fiscal year 2018 outlook

The company does not provide GAAP EPS outlook because it is unable to reliably forecast most of the items that are excluded from GAAP EPS to calculate non-GAAP EPS. These items could cause EPS to differ materially from non-GAAP EPS. See "Use of Non-GAAP Measures" following the attached schedules for additional explanation.

The company reaffirms its fiscal year 2018 guidance range for non-GAAP diluted EPS of $4.85 to $5.10.

## Additional first-quarter and recent highlights

• Closed acquisition of Medtronic's Patient Recovery business , which expands the Medical segment product offerings and includes well-established brands that fit naturally within the current medical products portfolio

• Entered into an agreement that regains rights to distribute self-manufactured surgeon gloves directly in certain international markets

• Announced a distribution agreement to make Cordis the exclusive distributor of Medinol coronary stents in the U.S.

• Launched ConnectSource™ , a new, cloud-based patient engagement platform from Cardinal Health Specialty Solutions to provide the biopharma industry with insights to make informed, data-driven decisions

• Launched new grant opportunities from the Cardinal Health Foundation's Generation Rx program to address the opioid epidemic, which target four highly-affected states

## Webcast

Cardinal Health will host a webcast today at 8:30 a.m. Eastern to discuss first-quarter results. To access the webcast and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com . No access code is required.

Presentation slides and a webcast replay will be available at ir.cardinalhealth.com until Nov. 5, 2018.

## Upcoming webcasted investor events

• Cardinal Health 2017 Annual Meeting of Shareholders on Nov. 8 at 8 a.m. Eastern

## About Cardinal Health

Cardinal Health, Inc. is a global, integrated healthcare services and products company, providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically proven medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. Because Cardinal Health helps ensure

**Cardinal Health**
**Page 3**

pharmacists and the consumers they serve have access to medications they need while working to help prevent prescription drug diversion, the company and its education partners created Generation Rx , a national program to help prevent the misuse of prescription medications. Backed by nearly 100 years of experience, with approximately 50,000 employees in nearly 60 countries, Cardinal Health ranks #15 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter and connect on LinkedIn at linkedin.com/ company/cardinal-health .

[1] GAAP refers to U.S. generally accepted accounting principles. This news release includes GAAP financial measures as well as non-GAAP financial measures, which are financial measures not calculated in accordance with GAAP. See "Use of Non-GAAP Measures" following the attached schedules for definitions of the non-GAAP financial measures presented in this news release, and see the attached schedules for reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the Investor Relations page at ir.cardinalhealth.com . In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

## Cautions Concerning Forward-Looking Statements

This news release contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with the recently completed acquisition of the Patient Recovery Business, including the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any governmental or regulatory authority, including litigation relating to opioid distribution; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This news release reflects management's views as of November 6, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**Schedule 1**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | First Quarter 2018 | | First Quarter 2017 | | % Change |
|---|---|---|---|---|---|
| Revenue | $ | 32,641 | $ | 32,039 | 2 % |
| Cost of products sold | | 30,969 | | 30,449 | 2 % |
| Gross margin | | 1,672 | | 1,590 | 5 % |
| | | | | | |
| **Operating expenses:** | | | | | |
| Distribution, selling, general and administrative expenses | | 1,062 | | 920 | 15 % |
| Restructuring and employee severance | | 132 | | 9 | N.M. |
| Amortization and other acquisition-related costs | | 183 | | 122 | N.M. |
| Impairments and (gain)/loss on disposal of assets, net | | 1 | | 3 | N.M. |
| Litigation (recoveries)/charges, net | | 32 | | 1 | N.M. |
| Operating earnings | | 262 | | 535 | (51)% |
| | | | | | |
| Other (income)/expense, net | | 2 | | (3) | N.M. |
| Interest expense, net | | 81 | | 44 | 86 % |
| Loss on extinguishment of debt | | 1 | | — | N.M. |
| Earnings before income taxes | | 178 | | 494 | (64)% |
| | | | | | |
| Provision for income taxes | | 61 | | 184 | (67)% |
| Net earnings | | 117 | | 310 | (62)% |
| | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | (2) | | (1) | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 115 | $ | 309 | (63)% |
| | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Basic | $ | 0.36 | $ | 0.97 | (63)% |
| Diluted | | 0.36 | | 0.96 | (63)% |
| | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | |
| Basic | | 316 | | 320 | |
| Diluted | | 318 | | 322 | |

**Schedule 2**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets (Unaudited)**

| (in millions) | | September 30, 2017 | | June 30, 2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,181 | $ | 6,879 |
| Trade receivables, net | | 8,382 | | 8,048 |
| Inventories, net | | 12,121 | | 11,301 |
| Prepaid expenses and other | | 2,041 | | 2,117 |
| Total current assets | | 23,725 | | 28,345 |
| | | | | |
| Property and equipment, net | | 2,651 | | 1,879 |
| Goodwill and other intangibles, net | | 14,926 | | 9,207 |
| Other assets | | 638 | | 681 |
| **Total assets** | $ | 41,940 | $ | 40,112 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 19,202 | $ | 17,906 |
| Current portion of long-term obligations and other short-term borrowings | | 935 | | 1,327 |
| Other accrued liabilities | | 2,270 | | 1,988 |
| Total current liabilities | | 22,407 | | 21,221 |
| | | | | |
| Long-term obligations, less current portion | | 9,068 | | 9,068 |
| Deferred income taxes and other liabilities | | 3,758 | | 2,877 |
| | | | | |
| Redeemable noncontrolling interests | | 12 | | 118 |
| | | | | |
| Total Cardinal Health, Inc. shareholders' equity | | 6,678 | | 6,808 |
| Noncontrolling interests | | 17 | | 20 |
| Total shareholders' equity | | 6,695 | | 6,828 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 41,940 | $ | 40,112 |

**Schedule 3**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (Unaudited )**

| (in millions) | First Quarter | |
|---|---|---|
| | **2018** | 2017 |
| **Cash flows from operating activities:** | | |
| Net earnings | $ **117** | $ 310 |
| | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | |
| Depreciation and amortization | **229** | 173 |
| Loss on extinguishment of debt | **1** | — |
| Impairments and loss on sale of other investments | **6** | — |
| Impairments and loss on disposal of assets, net | **1** | 3 |
| Share-based compensation | **17** | 23 |
| Provision for bad debts | **25** | 7 |
| Change in operating assets and liabilities, net of effects from acquisitions: | | |
| Increase in trade receivables | **(359)** | (306) |
| Increase in inventories | **(381)** | (298) |
| Increase in accounts payable | **1,296** | 279 |
| Other accrued liabilities and operating items, net | **229** | (87) |
| Net cash provided by operating activities | **1,181** | 104 |
| | | |
| **Cash flows from investing activities:** | | |
| Acquisition of subsidiaries, net of cash acquired | **(6,139)** | (9) |
| Additions to property and equipment | **(67)** | (100) |
| Purchase of available-for-sale securities and other investments | **(3)** | (52) |
| Proceeds from sale of available-for-sale securities and other investments | **64** | 34 |
| Proceeds from disposal of property and equipment | **1** | — |
| Proceeds from maturities of available-for-sale securities | **—** | 17 |
| Net cash used in investing activities | **(6,144)** | (110) |
| | | |
| **Cash flows from financing activities:** | | |
| Payment of contingent consideration obligation | **(15)** | — |
| Net change in short-term borrowings | **(6)** | 25 |
| Net purchase of noncontrolling interests | **(3)** | (10) |
| Reduction of long-term obligations | **(402)** | (1) |
| Proceeds from interest rate swap terminations | **—** | 14 |
| Net tax withholdings from share-based compensation | **(18)** | (9) |
| Excess tax benefits from share-based compensation | **—** | 30 |
| Dividends on common shares | **(150)** | (149) |
| Purchase of treasury shares | **(150)** | (250) |
| Net cash used in financing activities | **(744)** | (350) |
| | | |
| Effect of exchange rates changes on cash and equivalents | **9** | 1 |
| | | |
| Net decrease in cash and equivalents | **(5,698)** | (355) |
| Cash and equivalents at beginning of period | **6,879** | 2,356 |
| **Cash and equivalents at end of period** | $ **1,181** | $ 2,001 |

**Schedule 4**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Information**

| (in millions) | First Quarter | | | (in millions) | First Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2018** | | 2017 | | **2018** | | 2017 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **28,920** | $ 28,762 | Amount | $ | **3,724** | $ 3,279 |
| Growth rate | | **1 %** | 14 % | Growth rate | | **14%** | 12% |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **467** | $ 534 | Amount | $ | **129** | $ 127 |
| Growth rate | | **(13)%** | (19)% | Growth rate [1] | | **1%** | 26% |
| Segment profit margin | | **1.61 %** | 1.86 % | Segment profit margin | | **3.45%** | 3.87% |

[1] Segment profit includes a $42 million impact from the roll-out of the inventory fair value step up related to the Patient Recovery acquisition for the three months ended September 30, 2017. Excluding the impact of the inventory fair value step up, Medical segment profit would have increased 34% for the three months ended September 30, 2017.

**Supplemental Consolidated Information**

Total consolidated revenue for the three months ended September 30, 2017 was $32,641 million , which included total segment revenue of $32,644 million and Corporate revenue of $(3) million . Total consolidated revenue for the three months ended September 30, 2016 was $32,039 million , which included total segment revenue of $32,041 million and Corporate revenue of $(2) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended September 30, 2017 were $262 million , which included total segment profit of $596 million and Corporate costs of $(334) million . Total consolidated operating earnings for the three months ended September 30, 2016 were $535 million , which included total segment profit of $661 million and Corporate costs of $(126) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Schedule 5**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation [1]**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | | **First Quarter 2018** | | | |
| **GAAP** | $ 262 | (51)% | $ 178 | $ 61 | $ 115 | (63)% | $ 0.36 | (63)% |
| Restructuring and employee severance | 132 | | 132 | 47 | 85 | | 0.27 | |
| Amortization and other acquisition-related costs | 183 | | 183 | 58 | 125 | | 0.40 | |
| Impairments and (gain)/loss on disposal of assets | 1 | | 1 | — | 1 | | — | |
| Litigation (recoveries)/charges, net | 32 | | 32 | 13 | 19 | | 0.06 | |
| Loss on extinguishment of debt | — | | 1 | 1 | — | | — | |
| **Non-GAAP** | $ 610 | (9)% | $ 527 | $ 180 | $ 346 | (13)% | $ 1.09 | (12)% |
| | | | | | First Quarter 2017 | | | |
| GAAP | $ 535 | (14)% | $ 494 | $ 184 | $ 309 | (19)% | $ 0.96 | (17)% |
| Restructuring and employee severance | 9 | | 9 | 4 | 5 | | 0.02 | |
| Amortization and other acquisition-related costs | 122 | | 122 | 40 | 82 | | 0.25 | |
| Impairments and (gain)/loss on disposal of assets | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | 1 | | 1 | — | 1 | | — | |
| Non-GAAP | $ 669 | (9)% | $ 629 | $ 229 | $ 399 | (13)% | $ 1.24 | (10)% |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules.

[2] attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This earnings release contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP").

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, engage in financial and operational planning and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

**Exclusions from Non-GAAP Financial Measures**

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this earnings release for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics facilitates comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion facilitates comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and are inherently unpredictable in timing and amount, and in the case of impairments, are non-cash amounts, so their exclusion facilitates comparison of historical, current and forecasted financial results.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the items listed above is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Forward Looking Non-GAAP Measures**

In this earnings release, the Company presents its outlook for fiscal 2018 non-GAAP EPS. The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2018 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# EXHIBIT 86



# Q1 FY18 Cardinal Health, Inc. Earnings Conference Call

**November 6, 2017 8:30AM Eastern**

Operator:  Good day and welcome to 1Q FY2018 Cardinal Health, Inc. Earnings Conference Call.  Today's conference is being recorded.  At this time, I would like to turn the conference over to Lisa Capodici.  Please go ahead ma'am.

Lisa Capodici:  Thank you Lisa.  Good morning and welcome to Cardinal Health's first quarter fiscal 2018 earnings call.  I am joined today by George Barrett, Chairman and CEO; Mike Kaufmann, CFO; and Jorge Gomez, CFO of the medical segment.

During the call, we will be making forward-looking statements.  The matters addressed in the statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied.  Please refer to our SEC filings and the forward-looking statement slide at the beginning of our presentation for a description of risks and uncertainties.

Today's press releases and presentation are posted on the IR section of our website at ir.cardinalhealth.com. During the discussion today, we will reference non-GAAP financial measures.  Information about these measures and reconciliations to GAAP are included at the end of the slide presentation and press release.  We would like to remind you that we will webcast our 2017 annual meeting of shareholders this Wednesday, November 8 at 8:00 am Eastern Time.

During the Q&A portion of today's call please limit your questions to one with one follow-up so that we may give everyone in the queue a chance to ask a question.  As always, feel free to reach out to the IR team after this call with any additional questions.  Now I would like to turn the call over to our Chairman and CEO George Barrett.



George Barrett:  Thanks Lisa and good morning everyone.  Before we turn to the earnings let me offer a few words about the succession plan we announced today.  You all know Mike and I know you can appreciate why the board and I are so pleased that he will succeed me as our next CEO.

As our press release said, Mike will take on the CEO responsibilities in January and I will continue to serve as Executive Chairman through the annual meeting of shareholders a year from now in November of 2018.  At that time Greg Kenny, our independent lead director, will assume the role of Cardinal Health next Chairman.

Mike is a veteran of Cardinal Health having been with us for 27 years.  He knows our business inside and out.  In addition to serving as our CFO, Mike has held senior leadership positions at both the pharmaceutical and medical segments and has been instrumental in many of our key strategic initiatives.

As everyone here at Cardinal Health knows, Mike lives our mission and embodies our values.  He shares my view that it is a privilege and a responsibility to lead our company in service of our customers and their patients as well as the best interest of you our shareholders.  Mike has been a superb partner to me.  I am extremely excited for him and for us and I know that the transition will be seamless.

As Mike takes on his new role we are also delighted that Jorge Gomez, currently CFO of our medical segment, will succeed Mike as our next CFO.  Jorge was a natural choice for this position.  He has served as CFO of both of our segments as well as the company's treasurer and controller.  He brings a deep understanding of our business and global financial experience in his new role.  Mike and Jorge will make a great team and this is a natural evolution of the partnership they have already established.

While my role will shift in January, my ongoing commitment to Cardinal Health is deeply felt and unwavering.  I look forward to supporting Mike and our board after spending more time focusing on the public and health policy issues critical to Cardinal Health, our industry, and our communities.  With that, let's now turn to the performance of the quarter.

We're off to a solid start for our fiscal 2018.  We had expected that our first quarter numbers would be down year-over-year.  While that was the case, our business performed somewhat better than we had anticipated and we continue to see progress across most of our lines of business.  For the first quarter, we achieved revenues of $32.6 billion, non-GAAP earnings per share of $1.09, and generated a robust $1.2 billion in operating cash.

Our pharmaceutical segment performed largely as expected. Our pharma distribution business did extraordinary work for our customers particularly in light of the devastating natural disasters that have affected multiple communities around the country including Texas, Florida, California, and of course Puerto Rico. And I will return to this subject later in my comments.

As a reminder, our revenue comparison year-over-year was affected by the loss of a large mail order customer Prime Therapeutics which we have previously disclosed. At the end of our fiscal '17 we noted that the deflation rate on generics seemed to be stabilizing. We still hold that view noting that the rate of deflation is less today than we saw at this time last year. And Mike will touch on this more in his comments.

Our specialty solutions group continues its robust growth. We have grown to a stage of significant sale - scale deepening our value proposition as we continue to bring our new biopharma clients and acute care customers. As a result, we are seeing growth both in the downstream provider side and in the upstream biopharma services side. We believe we have a significant value proposition in the specialty space not only in retail and physician office settings but also for large acute care and IDN customers who are increasingly responsible for these critical medications.

Turning to our medical segment, the team had a solid start to the year. As expected, our numbers this quarter were adversely affected by the year-over-year comparison associated with the previously disclosed loss of a large portion of a VA contract. We do however continue to see good growth across many lines of business specifically our naviHealth, Cardinal Health at Home kitting and lab businesses performed particularly well and our strategic account work continues to grow as we become increasingly valuable to our partners.

The Cordis business performed as we expected this quarter. We continue to make progress building out our product portfolio most recently signing an agreement with Medinol where Cordis has exclusive distribution rights in the U.S. to their coronary stent portfolio including a drug eluting stent upon FDA approval. We are also distributing the Tryton Side Branch Stent to treat bifurcation lesions. This is the first dedicated bifurcation device to receive regulatory approval in the U.S.

Finally, and quite significantly, we closed the acquisition of the Patient Recovery business this quarter and our integration work is off to an excellent start. Our sales forces have been combined and realigned and product training across the group is going extremely well.

We are seeing great opportunities to create mutual value between the historical product lines and channels of Cardinal Health and these new product lines and channels that have come to us through this acquisition. We are thrilled to have our new colleagues on board, they've shown great enthusiasm as they have joined the Cardinal Health family.

It would be incomplete to have a conversation with you without addressing the drug abuse issue that is affecting this nation. Cardinal Health continues to take an active role in the dialogue and the hard work associated with helping to tackle this national crisis. As I have said before this is an issue that is large, it is complicated, and most important it is tragic and personal. I believe most of you know that we have spent nearly a decade continuously enhancing our best in class suspicious-order monitoring tools and analytics to keep pace with the ever-changing shape of this crisis.

But we have been doing much more than this. Because we know that professional training and prevention education is critically important in this area we have committed heavily to this. Over the last nine years we have been proactively educating pharmacists and students through our Generation Rx program which was created in conjunction with The Ohio State School of Pharmacy. To date, our Generation Rx materials have been used by more than 1 million people.

We have been working for many months on ways to expand the successful program to provide emerging physicians training, expanded drug take back programs, and in coordination with local law enforcement a Narcan distribution strategy for the emergency treatment of a known or suspected opioid overdose.

As a wholesale distributor, we do not manufacture, promote, market, or prescribe these drugs. We do however take very seriously our responsibilities to serve our healthcare system. Our anti-diversion systems and controls are substantial, they are well funded, and they are best in class. I am enormously proud of the work that our people do in their communities to help face down the challenges of the misuse and abuse of prescription medication.

I have never worked with an organization so mission driven which brings me to the recent natural disasters we have seen in various parts of the U.S. and Puerto Rico. We have more than 8,700 colleagues across Puerto Rico, the Dominican Republic, Florida, Texas, and California. They have been truly heroic in the work they have done and continue to do to assist in emergency relief efforts and to serve our customers and the healthcare needs of their patients particularly at a time when many of them are personally vulnerable or affected.

Our employees have also generously supported one another through our Cardinal Health Foundation Employee Assistance Fund to provide financial support to the Cardinal Health families affected by these storms.

Related to this, I would like to share a quick story with you. Last week the leader of our Puerto Rico organization shared with me that not only did we have an overwhelming percentage of our employees working within 24 hours after the hurricane hit, but that our people and our operations served as a key logistics provider in collaboration with HHS, the CDC, the local Department of Health, as well as several NGOs.

Given our capabilities and footprint, we were in a unique position to provide aid even on products and in areas we don't typically serve. The sense of community that permeates our colleagues on the island has been inspiring.

As one colleague said to me, "Cardinal Health values are not a plaque on a wall somewhere, they live right here in what we are doing every day to help each other and our customers here in Puerto Rico." It is difficult to find a way to adequately thank them for their extraordinary and heroic work. This is an untold story but this is the Cardinal Health that I see every day and of which I am so proud to be a part. With that I will turn the call over to Mike.

Mike Kaufmann: Thanks for the kind words George. I will also share a few brief comments before we get into the financial results for the quarter. Let me start by saying how excited I am to take on this new responsibility. I have been with Cardinal Health for 27 years and as you can imagine this company, our people, and our mission are very important to me. It's an extraordinary honor to be selected to succeed George as CEO and I am grateful for the trust and confidence that the board of directors is placing in me.

Given the close partnership George and I have had over the past 9 years, I look forward to what I know will be a smooth transition as I will continue to benefit from George's valuable perspective and ongoing contribution as Executive Chairman.

The strategic steps we have taken this year and over the past several years put us in a strong position for the future. I believe that we are well aligned with the trends in both the pharmaceutical and medical segments of the healthcare industry.

I don't expect to be making dramatic changes to what we have built and will certainly plan to take full advantage of the many opportunities that our robust portfolio has to offer. While there will always be challenges, I feel very good about how the company is competitively positioned and believe we are on the right track.

I also want to say how excited I am that Jorge Gomez will become our new CFO. We have worked closely together for many years and I am glad to have a partnership with Jorge similar to the one I have enjoyed with George. Jorge brings a depth of experience and I am thrilled he has accepted the role of CFO.

Finally, I just want to say that one of Cardinal Health's great strengths is the enormously talented and dedicated team of professionals we have in place. Together with our team I look forward to building on our strong foundation while always keeping in sight our ultimate goal of supporting our partners in the critical work they do each and every day serving patients and their families.

With that let me turn to the review of our financial performance for the first quarter. As always, the financial results that I provide this morning will be on a non-GAAP basis unless I specifically call them out as GAAP. Slide 7 of the presentation includes our GAAP to non-GAAP reconciliations for the first quarter.

Overall our first quarter fiscal 2018 results came in ahead of our plan. Operating income was somewhat ahead of expectations due mainly to the timing of certain expenses. Diluted EPS of $1.09 benefited from share count and the timing of a few discrete tax items. Revenues increased 2% year-over-year totaling $32.6 billion. Total company gross margin dollars were up 5% to $1.7 billion versus the same quarter in the prior year.

Given our recent acquisitions, most notably the Patient Recovery business, our consolidated SG&A increased 15% versus the prior year as expected. Consolidated operating earnings were $610 million, a 9% decline versus

the prior year. This was affected by the inventory step-up in the medical segment which I will cover in greater detail later on.

Moving below the operating line, net interest and other expense came in as expected at $83 million in the quarter. The increase versus the prior year was primarily driven by the interest on the debt issued to finance the Patient Recovery acquisition.

Our effective tax rate this quarter was 34.1%, a 2.3 percentage point decline versus the prior year. During the quarter, we did see a couple of small favorable discrete tax items. As we have stated in the past, the quarterly effective tax rate will have some variability. We still expect our full year tax rate to be unchanged from our plans.

Our first quarter diluted average shares outstanding were 318 million, about 4 million shares fewer than the first quarter of fiscal 2017. We had $150 million of share repurchases in the first quarter and we have about $300 million remaining on our board authorized share repurchase program.

Our operating cash flow for the quarter came in strong at $1.2 billion. If you recall, in our fourth quarter the operating cash flow reflected the impact of nearly $400 million of vendor payments that were made early due to some changes during the pharma IT refresh implementation. As expected, this impact was recaptured in the first quarter and contributed to our strong operating cash flow performance.

Given that we benefited from this and other timing items we still expect annual cash flow to be in line with our original expectations. Our cash balance at September 30, was $1.2 billion with roughly $600 million held outside the United States. The reduction from our fourth quarter cash balance reflects the funding of the Patient Recovery acquisition in July.

Now let's move to segment performance. Our pharmaceutical segment revenue increased 1% to $28.9 billion. This increase was due to sales growth from specialty and pharmaceutical distribution customers which was partially offset by the previously announced loss of a large mail order customer Prime Therapeutics which George mentioned in his comment.

Segment profit for the quarter decreased 13% to $467 million, in line with our expectations and what we shared on the fourth quarter call. This was driven by our generics program performance and the costs related to the

**CardinalHealth**
*Essential to care™*

ongoing investment in our pharma distribution IT refresh project. This project which we refer to internally as P-Mod is progressing well and is on time and on budget.

As an additional reminder, our generics program includes the benefit of Red Oak Sourcing as well as pharmaceutical pricing and volume changes. Let's now go to medical segment performance which came in largely as planned.

Revenues for the quarter grew 14% to $3.7 billion primarily driven by contributions from acquisitions and, to a lesser extent, new and existing customers. Medical segment profit increased 1% to $129 million during the quarter. This increase was primarily driven by the contribution from the Patient Recovery acquisition net of the inventory step-up. This was mostly offset by a reduced contribution from the previously announced loss of a large portion of a VA contract.

The Patient Recovery acquisition which closed on July 29 was successfully onboarded and performed operationally in line with our expectations. As I just noted, performance in the quarter included a $42 million inventory step-up. Excluding this, the medical segment profit growth would have been 34%.

While we have yet to finalize the inventory step-up calculations, our current estimate is that the remaining step-up to be recorded in Q2 will not exceed what we saw in the first quarter which is in line with our expectations.

With regards to Cardinal Health brands, the majority of our product lines performed as expected in the quarter. However, we did see some supply and commodity challenges primarily in our exam glove business.

Before moving to our fiscal year '18 outlook, you can turn to slide number 7 where you will see our consolidated GAAP to non-GAAP reconciliations for the quarter. The 73 cent variance was primarily driven by two factors. First, amortization and other acquisition related costs were 40 cents in the quarter. This includes all acquisitions closed as of September 30. Note that the year-over-year increase is a result of the Patient Recovery acquisition.

Historically we have utilized third party distribution partners to help get our products to market in countries where we haven't had a sales force and back office infrastructure. With the Patient Recovery and Cordis acquisitions, we now have a platform to distribute directly. Consequently, we deployed $125 million to regain direct distribution of our self-manufactured surgeon gloves in certain markets. This charge is reflected in the 27 cents in restructuring and employee severance.



Now let's talk briefly about total year financial assumptions on slides 9 and 10. First, we are reaffirming our full year non-GAAP EPS guidance range of $4.85 to $5.10. With respect to quarterly cadence we still expect the first and second half to be as we originally modeled. Consequently, the timing benefit in the first quarter should reverse in the second quarter.

Second, given the recent share repurchases I referenced earlier, we are revising our full-year share count projection to 318 to 319 million shares. And finally, we are updating the guidance for amortization and acquisition related intangibles to $560 million to include acquisitions that closed in our first quarter most notably Patient Recovery.

Our pharma segment assumptions on slide 11 remain on target and unchanged. However, let me give you a little more color on our generic and brand assumptions. Based on our first quarter generic deflation is trending as expected. Remember that our generic deflation calculation is a year-over-year point-to-point measurement of average selling price. We recognize that companies measure this differently. We continue to believe that we have appropriately risk adjusted our assumption for the year.

In addition, as it relates to brand inflation, while it is still early in the year we remain comfortable with our full year assumptions. Furthermore, if actual inflation falls below this assumption we expect it can be absorbed within our EPS guidance range given that over 90% of our contracts are now fee for service.

Our medical segment assumptions for fiscal 2018 can be found on slide 12 where we have no updates to report. We continue to feel we are well positioned especially with the recent onboarding of the Patient Recovery business. To close, with one quarter behind us we feel good about our overall positioning and our ability to execute throughout the remainder of the year. With that, I am going to turn the call back to George.


George Barrett: Thanks Mike. Before I turn to Q&A I would like to say a few words about Cardinal Health's unique value proposition in today's rapidly evolving healthcare landscape. Our healthcare supply chain capabilities are second to none. But being truly essential to care requires much more than that. We possess a unique set of skills and industry knowledge which when combined with our significant scale and a portfolio that spans the entire healthcare continuum, ideally positions us for continued leadership in the healthcare system.

For example, we provide a wide range of critical services negotiating on our customers' behalf to secure highly regulated drugs from around the world, working for them to secure inclusion in restricted networks, providing clinical pharmacy support and medication therapy management. We also provide population health tools to identify optimal pathways for post-acute care, medical product knowledge, and scale to allow medical providers to standardize their product selection and utilization and performance improvement services that reduce waste, improve efficiency, and increase patient safety.

These jobs require a deep understanding of the healthcare system, of hospitals, clinics, and pharmacies and an in-depth knowledge of an extremely complex regulatory framework. This expertise combined with our relationships and understanding of the intricacies of how healthcare is delivered has been honed by a team of thousands of professionals here at Cardinal Health over the past many decades.

Furthermore, we have built our portfolio with a conviction that our ability to provide solutions on both the medical and pharmaceutical delivery of care would be uniquely valuable to the system. This is why we remind you that while we are organized and report in segments, we often go to market as a broad suite of solutions across the enterprise. And this is why we are so confident that Cardinal Health will continue to grow while playing a vital role in healthcare.

Before we get to the Q&A I want to express my deepest thanks to all of you in the investment community for your support, confidence, and input over the years. I also want to thank our people 50,000 strong around the world for the amazing work they do every day living our mission as they serve our customers and their patients. I am honored and humbled by their dedication. With that let's now turn to Q&A. Operator?

Operator: Thank you. If you would like to ask a question at this time please press the star key followed by the digit 1 on your telephone. Please ensure that your mute function on your telephone is switched off to allow your signal to reach our equipment.

If you find that your question has already been answered you may remove yourself from the queue by pressing star 2. All participants are allowed to ask one question followed by one other question. Again, please press star

**Cardinal**Health

*Essential to care™*

1 to ask a question. We will now pause for just a moment to allow everyone to signal. Now, we will take our first question from Ms. Lisa Gill from J.P. Morgan. Please go ahead ma'am, your line is now open.

Mike Minchak: Thanks it's actually Mike Minchak in for Lisa this morning, just a couple of questions. With respect to the outlook I was just hoping you could talk about some of the key factors that could drive the fiscal '18 adjusted EPS either toward the upper or the lower end of the guidance range. And then just as a follow-on to that, last quarter you had previously discussed a target of at least $5.60 in adjusted EPS in fiscal '19. I just wanted to know if you had any comment on that at this point.

Mike Kaufmann: Yes, a couple of things. First of all as far as FY '19 goes that was just some early guidance that we gave and we are not planning on updating that at this time. As we get through our work early in our Q3 and Q4 and when more appropriate we will come out with some further guidance and thoughts around FY '19.

As far as opportunities and risks in our FY '18 guidance, I would start with the good news first thing is I don't see anything at this time that would be a huge mover in either direction but I do see some things that I would probably say fit into the category of opportunities, risks, and things that could maybe go either way.

As far as the opportunities, I would say share count is in the opportunity. Some of the over performance that we have seen in the pharma segment in Q1 and part of that being our specialty division, I could see that to continue throughout the year. And we're seeing some excellent performance in our post-acute solutions business and could continue to see that to possibly be an opportunity for the year.

As far as risks go I would say that our Cardinal brand products area has some risk and that is really what I mentioned in my script around the exam gloves. We are seeing some commodity and supply issues in that particular area so that could be a little bit of a risk to the year.

If our China exit happens sooner than we expected, as I mentioned we said we have it in for the full year. If that were to get done and approved and exited before the end of the year that could have a little downside risk. And then of course while we don't believe it from everything we're hearing, if the medical device tax were brought back that could be a negative.

**CardinalHealth**
*Essential to care™*

And then the things that I would say could go either way, effective tax rate, you know, was favorable in Q1. We expect to see puts and takes all year so we still feel comfortable about full year guidance but that could always go a little bit either direction.

The pharma pricing around, you know, generic ASP deflation, that could go, you know, could be a positive or maybe if it gets a little worse could be a negative. Timing and magnitude of the customer initiatives that I mentioned in the first quarter, those are with existing customers as I have stressed before. We continue to see good progress in those discussions but have not finalized anything there. And so depending on how that goes, that could be a little bit potential upside or maybe a little bit down.

And then finally the Patient Recovery performance. Again we feel really good about that but it's early. And so all of those things I would say could go either way but I want to stress none of them we see as significantly concerned that they would be a large driver one direction or the other.

Mike Minchak: Got it, I appreciate all the detail.

Mike Kaufmann: Absolutely. Next question?

Operator: And our next question is from Robert Jones from Goldman Sachs. Please go ahead sir, your line is now open.

Robert Jones: Great and my congrats to you Mike and Jorge on the new roles and, you know, George it has been obviously a pleasure working with you.

George Barrett: Thanks Bob.

Robert Jones: So just I wanted to go back to some things you guys talked about last quarter. You discussed 16 cents of investments related to customer initiatives and investments in tax and opioid prevention. But on the customer investments specifically I was wondering if you guys had an update on that opportunity, you know, both on the cost side and maybe when you could come to an agreement or be in a position to communicate around what that - what those investments were specifically related to.

Mike Kaufmann: Yes absolutely. So I would say the tax planning initiative is going as planned. The opioid one was one of the timing items that we were really talking about that we expected to be spending some of that in Q1 and we see that more as the expenses being spent in Q2 which is why we had a little bit of an upside in Q1 over our expectations.

But then specifically to your question around in customer investments, again those continue, discussions continue to go well. Nothing has been finalized there. We would expect that those discussions would probably have clarity by the end of our Q2.

And at that time at our next earnings release we think we ought to be able to give folks some clarity around whether or not there is some upside to this year if those don't happen or whether we have decided to expand upon those and do anything. But right now I am more anticipating that those will be about as planned or would provide some upside if they don't actually happen this year.

Robert Jones: Okay great and I guess just on the pharma segment, you know, margins came in better than at least we were expecting but there is obviously still a lot of debate in the market around generic pricing and, you know, some of the recent data points I would say from the generic manufacturers would probably point to a worsening environment. I know you guys have talked about this in the past but could you maybe just give us an update on what you saw with regards to generic pricing in the quarter both from a buy side and sell side perspective?

George Barrett: Yes Bob, good morning. Let me start and then I'll turn it to Mike. As we said in the comments, you know, if you compared where we are today to a year ago the rate of deflation is less dramatic. So we had seen some stabilizing of that rate as we came to the end of the fiscal year for us and I would say that has continued.

It is always difficult to comment on others' observations about price because as a manufacturer you've got your own portfolio which is actually unique to those products and as you know various of us who report publically actually use different methodologies. But, you know, ours has been consistent as Mike said on a point-to-point basis and so we feel fairly good about our forecast but maybe Mike you can jump in on that.

Mike Kaufmann: Yes the only thing I would add is as I have mentioned before both in my prepared remarks and before is our discussion of how we describe generic deflation is the point-to-point year-over-year related to average selling price. And everything that we see that we're forecasting for the current year still would say that our assumption of mid-single digits down would still be accurate.

And I have also said in the past the other important thing is, you know, not only how you see your selling price but also how you're doing on the costing side. And for us that is obviously mainly Red Oak and Red Oak continues to perform at or above our expectations.

So we feel good on both sides both from a selling standpoint and a costing standpoint which they both need to work out for you to get where you want to be and we feel good about both of those at this point in time.

Robert Jones: Great, thanks for all that, appreciate it.

Mike Kaufmann: Absolutely.

Operator: Thank you. Our next question is from Ricky Goldwasser from Morgan Stanley. Please go ahead, your line is now open.

**Liza Garcia:** Hi, this is actually Liza on for Ricky this morning, just a quick one. So we're fielding a lot of questions around Amazon. Can you maybe provide your thoughts on how you see Amazon in terms of maybe competition on the medical supply side and do you see an opportunity to work with Amazon if they were maybe to try and enter the drug supply chain?

**George Barrett:** Yes so Liza let me just sort of get broad issue for us. You know, as I have said in past calls we never dismiss any competitor or potential competitor. It's something we always take seriously. I think the thing that is worth noting if you think about the comments that we made during the course of the call today is the nature of what we actually do. And so we're sort of this critical interface between a highly regulated system of providers, manufacturers, and a regulatory system.

And so I think the heart of our competitive profile is really our ability to serve a healthcare system with a very complex and important suite of products and services that they need in order to be healthcare companies and providers. And I think that's at the heart of what we do. So it's very difficult to describe how we see that competitive landscape. We basically know what we do and what our value proposition is

As to working with them, you know, at this point we work very closely with our providers and manufacture partners. There is no particular plan right now to do anything distinctly with them but our primary goal and our focus is making sure that we add value for all of these customers with products and services that they very much need in order to do their work for patients.

**Liza Garcia:** Great, thank you so much.

**George Barrett:** You're welcome.

**Operator:** Thank you. Our next question is from Erin Wright from Credit Suisse. Please go ahead, your line is now open.

**Cardinal**Health
*Essential to care™*

Erin Wright: Great thanks. I'm curious kind of how you're maybe applying some of the lessons you learned from Cordis on the medical side of the business and what you can leverage or apply to the Medtronic Patient Protection business that you acquired. Can you kind of give us an update on the integration process and any sort of surprises in the initial days there? Thanks.

George Barrett: Good morning Erin. It's George, I'll start and then I'll turn it to Mike. You know, I think every integration is its own learning experience. And I think, you know, I think for us the Cordis integration required a lot of international work some of which we had people on the ground doing and in other places we had to build that out. We also had to do some work in that integration with a third party which is the partner that sold us the product line. So that requires a lot of interfaces, moving parts, and great disciplines. And I think we have over the course of the year honed that increasingly.

I think Don and his team have done a great job in the Patient Recovery business of planning well ahead, of thinking carefully about that integration, and of leveraging the work that we have already done particularly outside the U.S. So, you know, I think each one of these is an opportunity for growth and learning and I think Don and team have done that extremely well. We're off to a really good start. Mike I'll let you jump in there.

Mike Kaufmann: Yes I would say a couple of things. You know, part of the learnings from the Cordis acquisition that we applied to the Patient Recovery business is not only around the execution things that we knew that we had to put the right things in place but also about estimating what those costs would be.

And so as we gave our guidance and thoughts around Patient Recovery we took a lot of those learnings such as the amount of start-up costs it would take, the amount of SG&A that we would need to put into the business, to make sure that we were estimating those right so that we were giving, you know, the appropriate guidance around that business.

So I feel really good about what we put out there as our goals from a financial perspective for the Patient Recovery business but also on the learnings on the execution standpoint. So whether it be in the area of

**CardinalHealth**
*Essential to care™*

managing inventory or working through the SG&A cost structure or whether managing the TSAs with our partner in this case Medtronic, I think the team has - is working well on all of those.

Erin Wright:  Okay great and just a follow-up on P-Mod, just your efforts there. Do you think they're running ahead of plan or how should we be thinking about kind of the recurring nature of some of those incremental investments? Thanks.

Mike Kaufmann:  Yes as related to P-Mod I would say things are going really well.  We are on time and on budget on that project.  The pharma team is doing an excellent job of managing the cost, managing the scope, putting the right talented people on that project to deliver.  So it's going really well.

As far as the cadence for P-Mod goes, as we have mentioned before we expect it to be a headwind in our Q1 as we just said, we expect it to be a headwind in our Q2 just from a year-over-year expense standpoint with some of the implementations that we did last year going live.  It creates, you know, depreciation expense this year.  And then we expect it to become essentially neutral in our Q3 and our Q4.

Erin Wright:  Okay great thank you.

Mike Kaufmann:  Thank you for your questions.

Operator:  As a reminder, to ask a question at this time please press star 1.  Our next question is from Eric Coldwell from Baird.  Please go ahead sir, your line is now open.

**Cardinal**Health
*Essential to care™*

Eric Coldwell:  Hey thanks very much, two quick ones in medical.  The first one, to regain control of the exam gloves internationally you had obviously a sizable outflow.  Are there going to be other outflows for other product lines or how do you treat other product lines ex-U.S. in terms of regaining control of distribution?

Second of all, and this is for Mike, you know Mike I'm still - you and I have talked about this.  I'm still a little concerned about medical revenue for the year with the VA loss, the slow market, annualizing Kaiser, various challenges that have been brought up.  Can you just be more specific on what your interpretation of high teens revenue growth is, what that range is in your mind and just make sure we all understand how broad that range is?  That's it, thanks so much.

George Barrett:  Yes good morning Eric.  I'll start the first one and maybe Mike can take the second one.  We'll sort of tag team this.  The move that we made to regain the rights in Europe really was very specific to an old agreement that really was a reflection of the product line that we had some years ago.

And so these are a series of products for which we had no commercial operations ex-U.S. and so we depended on third party to do that.  And so now that we have operations in virtually all of these countries it was very logical for us to want to have the rights back to be able to commercialize our own products.

So it was specific to a set of products.  There is nothing else to be forthcoming as it relates to other products but we were able to close off just this sort of legacy agreement and glad that we're going to be able to commercialize our own products.

Mike Kaufmann:  Yes and that was really, you know, our surgeon gloves which is what we manufacture ourselves and have just an excellent reputation and outstanding, you know, quality and acceptance throughout both the U.S. and overseas was really the one product that we were selling significant amounts overseas.  Now obviously with the addition of Cordis and Patient Recovery and commercial operations overseas we plan to sell other products of ours that we feel really good about.  But that was really the only one that we had significant sales that we would create any type of, you know, restructuring charge like that.

As far as medical revenue goes, I really can't say more than the fact that we still feel good about the high teens revenue growth, percentage increase in revenue for this year. Our early looks at the Patient Recovery business, you know, while the first couple of weeks were a little variable after the first couple of weeks the business has looked very much as we expected for the year and the team is doing an excellent job. So to your point, while I mentioned the VA is a significant year-over-year headwind we still feel really good about our high teens guidance. Thanks, next question.

Operator: Thank you. Our next question is from Charles Rhyee from Cowen & Company. Please go ahead sir, your line is now open.

Charles Rhyee: Yes thanks and from myself also Mike congrats and George, a pleasure working with you. I had a question following up on Bob's question earlier. You know, when we think about the generic deflation and the comments we are hearing from manufacturers and then we also look at market data, when we as investors, when we're looking at this, you know, what do you think is a better guide to look at externally besides, you know, and obviously your comments on what you are seeing directly as we try to evaluate, you know, your comments and those of others.

Do you feel that the aggregate market data is reflective - is more broadly reflective or is there any limitations to that? You know, how should we kind of handicap, you know, the comments coming from different or the data sources that we can kind of get our hands on?

Mike Kaufmann: Thanks for the question. You know, this one is tough because really for anybody to really to understand the impact on our financials or probably any distributor's financials is really you have to understand both sides, both how you are affecting your sale price and your cost side. And for us to give exact numbers and guidance on both of those is probably not smart from a competitive standpoint. So we have always tried to give as you know our definition is really around the sell side of this.

CardinalHealth
*Essential to care™*

And so to me I think you have to look at both. I think you have to look at what we are saying from the standpoint of what we expect our sale price erosion to be and then you have to take a look at what the manufacturers are reporting because those are probably good indicators of what we're able to do on the costing side.

And that when you look at the difference between our sale price going down less than what we are able to get on the costing side as a percentage then that's probably the indicators that you see are positive moves. And that's what we're seeing this year, we're seeing a nice balance between what is happening on the sell side versus what is happening on our cost side. George would you like to add to that?

George Barrett: Yes Charles I guess you've been doing this a long time so you know the challenges of using public data and I think the way I have heard you describe it is what I think has to be done. You sort of have to triangulate between all the various inputs. There are a lot of moving parts on this. But we'll try to be transparent with you about what we see in our numbers and then to the extent that we can we'll give color on the tone of the market.

But I think you're right in pointing out that it's very difficult to get a perfect signal from public data. You have to work across multiple sources and triangulate. But we understand and we know, again we've been at this a long time as have you. It's always challenging to get precise numbers.

Charles Rhyee: Yes I appreciate that. And just to be clear, right, I mean Mike if I understand what you're saying is that when we think about manufacturer comments, you know, all things being equal, that's really your acquisition cost of drugs. As long as you are not, you know, it's not 100% pass through to your sell side margin we're actually earning money on this - on that deflationary comments. Is that fair?

Mike Kaufmann: That's right. and remember the cost is coming off of a lower base because your cost is lower than your sale so the percentage decline off of the sale is going to be from a dollar standpoint worth more than a percentage, the same percentage decline off of a cost and that's why you want to see a spread between the two between what you're saying on sale versus cost. And that's what we feel good about at this point in time.

**CardinalHealth**
*Essential to care™*

Charles Rhyee: Okay great, I'll leave it there. Thanks a lot.

Mike Kaufmann: Thanks Charles.

Operator: Thank you. And our next question is from Kevin Caliendo from Needham & Company. Please go ahead sir, your line is now open.

Kevin Caliendo: Thank you. And Mike congratulations, and George for someone who has known you since the Teva days, good luck and it has been a pleasure talking with you over all these years. Guys, any update on the 16 cents of EPS spend? I know you obviously kept your guidance the same so I'm assuming not. Is there any update on when we might get some more visibility on that?

Mike Kaufmann: Yes again, three components of that on the 16 cents. One was the spend on the opioid piece which I mentioned earlier is one of the timing things where we expected a chunk of that spend to happen in Q1 and we're really now more ramping it up in Q2. So we really saw no spend to speak of in Q1 and we expect it to happen in Q2. So we still expect the full year impact of that to be what we thought, it's just a timing move from Q1 to Q2.

As far as the tax initiatives we put in place, those are in place. Those are delivering what we expected and was built into our guidance for the year. And then as far as the customer initiatives, again we're continuing to have good discussions and these are again with existing customers which is important to know.

And, you know, it's still too early for me to call it on that but I would expect that we would have some clarity by the end of our Q2 that we would be able to communicate to folks on that. So no change in how those will impact our guidance for the year at this time.

Kevin Caliendo: Great. A quick question on Red Oak. There has been some sort of - some debate amongst investors and myself with regards. Given now that we have Webad and Claris 1 are all out there and the big three are purchasing a huge chunk of the generics in the marketplace, can Red Oak continue to grow? And if so, is it simply doing what they're doing now or would they expand into other products like OTC or other opportunities outside of the U.S.?

Mike Kaufmann: I think, you know, first of all I would just say our relationship with CVS continues to be incredibly strong and our interactions at the board level and working together have been incredibly positive.

So yes, we think Red Oak is an absolute asset not only in the generics side and something that we still feel will continue to deliver incremental value year-over-year as the years continue on it but also we will constantly look at that asset, both of us as two companies, and determined if there is other opportunities. So a little too early to say what those might be but it's absolutely on our mind to always think about what could we do to continue to, you know, create benefits for both Cardinal and CVS.

Kevin Caliendo: Great, thanks guys.

Mike Kaufmann: Absolutely.

Operator: And our next question is from Brian Tanquilut from Jefferies. Please go ahead sir, your line is now open.

Bryan Ross: Hi, good morning guys, this is Bryan Ross on for Brian Tanquilut. You know, I guess circling back to Amazon real quick, they have been in the more low end medical supply business for years and I guess more recently began getting into more complex regulated devices and supplies. I guess could you provide any color on, you know, if you have started to bump into them with any particular provider type or, you know, any particular product category?

And then I guess a follow-up to that is, you know, thinking more long term when you have a competitor that, you know, obviously largely competes on being the lowest cost provider, what are the strategies that Cardinal can pursue in order to, you know, maintain and grow their relationships with existing customers?

George Barrett: Good morning Brian it's George. I'll take this. So, you know, I described in my commentary a little bit about the work that we do. Let me start with actually answering the second - the first part of the question which was do we bump into them, have we seen them. And the answer is not really. Again we know that they have been talking about healthcare to some extent and obviously we follow that but in terms of practical impact, it's not something that we see on a daily basis.

I think the key for us is the value proposition. What do we actually do? And I described some of the activities in my commentary earlier but, you know, just sort of fill in the blanks on some of the things that we do. Red Oak, our ability to source global generics across the world probably at unprecedented scale, to understand that regulatory framework, to link our work in our specialty business with the connection between the pharmaceutical manufacturer, their innovation on the science side, and a very distinct customer need on the downstream side.

Work that we're doing in the continuum of care as we see these transitions of care and helping IDNs direct patients to the optimal site of care, our ability to aggregate demand across hospitals to provide scale and consumables at great efficiency, our work in terms of working across their networks. These are all very distinct healthcare capabilities and they really reside here at Cardinal. They have been residing here for decades and we just continue to build on those things.

So that's really at the heart of what we do. And I think that in some ways is the best protection and the best insurance as it relates to our value proposition and we're very excited about the work that we do in that regard.

Mike Kaufmann: The only thing I would add is even on the area where I think people think it is just pick, pack, and ship and where we would compete, just think about the things we do on that area besides all the value added that George has been talking about. Because we're talking about delivering in pallet loads, truck loads, large quantities, managing formularies, 24/7/365 emergency shipments. We're tied to their systems electronically to

path invoicing and help them bill per department and all those types of things as well as managing all the regulatory.

So even in what I think people think of the basic areas of pick, pack, and ship that the playing field may be level. We don't even think they're even level in those areas for what we do. And I would say that we are incredibly cost effective so I don't think the assumption that they would be more the lowest cost provider. When you look at the infrastructure we have in place every day to deliver to our customers I feel really good about our cost position also.

Bryan Ross: Great, thanks guys.

Mike Kaufmann: Thank you.

Lisa Capodici: Operator we have time for one more question.

Operator: Then our next question is from John Kreger from William Blair. Please go ahead sir, your line is now open.

John Kreger: Hi, thanks very much George and Mike, just a question about the medical business broadly. Can you maybe speak to the volume trends you're seeing across acute versus ambulatory versus home? How is that trending versus your expectations?

George Barrett: Yes John good morning. So I think we've said this before. It's a little bit difficult at times to get a good demand signal on utilization partly because what we're seeing is some shifting sites and also market-to-market variations. So we have customers who are gaining share and others that are losing.

In general the trend that we've seen is one that we should expect which is more care moving to ambulatory settings.  Having said that, we do have some of our IDN customers that are actually having pretty strong volume in their hospital settings and so it really varies from hospital to hospital.  But in general I would say we feel fairly good about what we're seeing on the demand side.

Now again we are probably gaining some share over these last two years and Don and team have done a good job of really providing that value proposition that seems to be encouraging some of our customers to want to grow more with Cardinal Health.

Mike Kaufmann:  Yes the only thing I would add and I think George said it right there is that just be a little helpful generally as George said in the acute space, it's very dependent on the customer but generally in the flattish area.  But we are seeing say low to mid-single digits in the ambulatory care space and in the home space where the care is shifting.  And the nice thing is that, you know, we're highly represented in all three of those spaces so as share does move between those three we're able to take advantage of that with our broad set of offerings.

John Kreger:  Great thank you and maybe just one quick follow-up relating to the Patient Recovery business.  So I think that was a business that was kind of flat to down a little bit and obviously you guys think you can grow it better as being part of your portfolio.  So, you know, are you willing to maybe quantify the step-up in growth that you think you can have on the asset and just how you intend to do that?  Thanks.

George Barrett:  Yes John, I won't quantify that for you.  That's not something we can do at this point and it's obviously very early.  I will say that the key for us is building that product line into now a very broad product line of products and services.  And so we think the opportunities create value between our historical product lines and channels and theirs is really palpable.

As an example, they are much stronger in long term care historically than we have been. That opens up doors for us and so we see those opportunities. And I think for us also we have product lines inside that business that will fold very naturally into sort of the economic model that we deliver and there are other products that are much more clinically attribute driven and our product teams know how to do that really well. So I think we're extremely excited about the fit into our portfolio and I think the ability to leverage our channels is really the opportunity here.

John Kreger: Great thank you.

George Barrett: You're welcome.

Operator: That will conclude today's questions and answer sessions. I would now like to turn the conference back over to Mr. George Barrett for any additional or closing remarks.

George Barrett: Look I know it has been a busy morning for all of you so thanks everyone for joining us this morning. We will look forward to talking with you as the day and the days unfold and have a good day.

# EXHIBIT 87

# Q1 FY2018

Cardinal Health, Inc. Earnings Investor/Analyst call
November 6, 2017



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with the recently completed acquisition of the Patient Recovery business, including the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to U.S. tax or trade laws; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any governmental or regulatory authority, including litigation relating to opioid distribution; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of November 6, 2017. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, this presentation contains Non-GAAP financial measures. Cardinal Health provides definitions and reconciliations of the differences between the Non-GAAP financial measurers and their most directly comparable GAAP financial measurers in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com. An audio replay of this webcast will be available at ir.cardinalhealth.com.

2  © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q1 FY18 results



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q1 FY18 financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | Q1 FY18 | Q1 FY17 | Q1 FY18 | Q1 FY17 |
| **Revenue** | **$32,641** | **$32,039** | N/A | N/A |
| *% change* | *2% increase YoY* | *14% increase YoY* | | |
| **Operating Earnings** | **$262** | **$535** | **$610** | **$669** |
| *% change* | *51% decrease YoY* | *14% decrease YoY* | *9% decrease YoY* | *9% decrease YoY* |
| *Ratio to revenue* | *0.80%* | *1.67%* | *1.87%* | *2.09%* |
| **Net Earnings[1]** | **$115** | **$309** | **$346** | **$399** |
| *% change* | *63% decrease YoY* | *19% decrease YoY* | *13% decrease YoY* | *13% decrease YoY* |
| *Ratio to revenue* | *0.35%* | *0.96%* | *1.06%* | *1.24%* |
| **Diluted EPS[1]** | **$0.36** | **$0.96** | **$1.09** | **$1.24** |
| *% change* | *63% decrease YoY* | *17% decrease YoY* | *12% decrease YoY* | *10% decrease YoY* |

*[1]Attributable to Cardinal Health, Inc.*

*Please see appendix for GAAP to Non-GAAP reconciliations.*

4    © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q1 FY18 Pharmaceutical segment business analysis

|  | Q1 FY18 ($M) | Q1 FY17 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$28,920** | **$28,762** | **1%** |
| **Segment Profit** | **$467** | **$534** | **(13)%** |
| **Segment Profit Margin** | **1.61%** | **1.86%** | **-24 bps** |

## Highlights:

- **Revenue** increase was due to sales growth from specialty and pharmaceutical distribution customers, which was partially offset by the previously announced May 2017 expiration of a large, mail-order customer contract.

- **Segment profit** decrease was driven by generics program performance, which includes the negative impact of generic pharmaceutical pricing changes partially offset by the benefits from Red Oak Sourcing. The costs related to the company's ongoing investment in its Pharmaceutical IT platform also contributed to the decrease.

*The sum of the components may not equal the total due to rounding.*

5 © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

CardinalHealth
*Essential to care™*

# Q1 FY18 Medical segment business analysis

| | Q1 FY18 ($M) | Q1 FY17 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$3,724** | **$3,279** | **14%** |
| **Segment Profit** | **$129** | **$127** | **1%** |
| **Segment Profit Margin** | **3.45%** | **3.87%** | **-42 bps** |

## Highlights:

- **Revenue** increase was primarily driven by contributions from acquisitions and, to a lesser extent, new and existing customers.

- **Segment profit** increase was primarily driven by contributions from acquisitions, which were mostly offset by the previously disclosed reduced contribution from a Veterans Affairs contract. Segment profit for the quarter includes the impact of the Patient Recovery business inventory fair value step-up. Excluding the $42 million step-up in the quarter, year-over-year Medical segment profit growth was 34 percent.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
*Essential to care™*

# Q1 FY18 GAAP to non-GAAP adjustments[1]

| | Q1 FY 2018 | | | Q1 FY 2017 | | |
|---|---|---|---|---|---|---|
| | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] |
| **GAAP** | **$262** | **$115** | **$0.36** | **$535** | **$309** | **$0.96** |
| Restructuring and employee severance | 132 | 85 | 0.27 | 9 | 5 | 0.02 |
| Amortization and other acquisition-related costs | 183 | 125 | 0.40 | 122 | 82 | 0.25 |
| Impairments and (gain)/loss on disposal of assets | 1 | 1 | - | 3 | 2 | 0.01 |
| Litigation (recoveries)/charges, net | 32 | 19 | 0.06 | 1 | 1 | - |
| **Non-GAAP** | **$610** | **$346** | **$1.09** | **$669** | **$399** | **$1.24** |
| Amortization of acquisition-related intangible assets[3] | $135 | $90 | $0.28 | $101 | $69 | $0.21 |

[1]Please see appendix for GAAP to Non-GAAP reconciliations.
[2]Attributable to Cardinal Health, Inc.
[3]Amortization of acquisition-related intangible assets is included in Amortization and other acquisition-related costs.

The sum of the components may not equal the total due to rounding.



7   © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# FY2018 Outlook

*The company presents its outlook for fiscal 2018 non-GAAP EPS and non-GAAP effective tax rate on the following pages.  The company does not provide a GAAP EPS or GAAP effective tax rate outlook because it is unable to reliably forecast many of the items that the company excludes from GAAP EPS and effective tax rate to calculate them. See "Forward-Looking non-GAAP Measures" following the attached schedules for additional information.*



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

Case: 2:19-cv-03347-EAS-EPD Doc #: 30 Filed: 11/06/20 Page: 249 of 695 PAGEID #: 2778

# FY18 financial expectations

|  | **FY2018 Outlook** | **FY2017 Actual** |
|---|---|---|
| **Revenue** | Mid-single digit percentage growth vs. PY | $130.0B |
| **Non-GAAP Diluted EPS** | $4.85 to $5.10 | $5.40 |

9    © Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY18 corporate assumptions

|  | **FY2018 Outlook** | **FY2017 Actual** |
|---|---|---|
| **Non-GAAP effective tax rate** | 35% - 37%[1] | 32.6%[3] |
| **Diluted weighted average Shares outstanding** | 318M - 319M | 320M |
| **Interest and other, net** | $340M - $360M | $197M |
| **Capital expenditures** | $500M - $540M | $387M |
| **Acquisition-related intangible amortization** | ~$560M or ~$1.17[2] | $392M or ~$0.85 |

[1]*May fluctuate quarterly due to unique items affecting periods.*

[2]*Includes only acquisitions closed as of September 30, 2017*

[3]*FY2017 GAAP ETR 32.7%, Please see appendix for GAAP to Non-GAAP reconciliations.*

*Red font indicates a change since 8/2/17.*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Pharmaceutical segment FY18(E)

- **Low- to mid-single digit percentage increase in revenue versus prior year**

- **Full-year segment profit down low-double digits versus prior year**

## Key assumptions

- Generic drug price assumption of mid-single digit deflation for full fiscal year

- Brand drug manufacturer price assumption of 7% to 8% inflation for full fiscal year

- Incremental expense increase related to investment in information systems to support growth

- Incremental contribution from new generic launches, but Y-o-Y benefit significantly less

- Incremental contribution from Red Oak Sourcing, but Y-o-Y benefit less

- Double-digit revenue and profit growth from our Specialty business

- Full-year contribution from Cardinal Health China[1]

[1]*Cardinal Health China reports in both segments, but primarily contributes to the Pharmaceutical segment*

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Medical segment FY18(E)

- **High-teens percentage increase in revenue versus prior year**

- **Strong double-digit segment profit growth versus prior year**

## Key assumptions

- Patient Recovery business acquisition completed in July 2017, accretive to FY18; integrated into Cardinal Health Branded products upon closing

- Excluding Patient Recovery business, solid growth from remaining Medical businesses

- Second-half segment profit margin rate exceeds 6%

- Significantly reduced portion of a Veterans Affairs contract, the full effect of which began in Q4FY17

- No reinstatement of a medical device tax



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

Appendix

Q1 FY18 trailing five quarters,
GAAP to Non-GAAP reconciliation statements
and supplemental financial information



© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q1 FY18 segment analysis

## Pharmaceutical segment

|  | Q1 FY17 | Q2 FY17 | Q3 FY17 | Q4 FY17 | Q1 FY18 |
|---|---|---|---|---|---|
| Revenue ($M) | 28,762 | 29,743 | 28,406 | 29,552 | 28,920 |
| Segment Profit ($M) | 534 | 537 | 611 | 505 | 467 |

## Medical segment

|  | Q1 FY17 | Q2 FY17 | Q3 FY17 | Q4 FY17 | Q1 FY18 |
|---|---|---|---|---|---|
| Revenue ($M) | 3,279 | 3,410 | 3,418 | 3,416 | 3,724 |
| Segment Profit ($M) | 127 | 159 | 148 | 138 | 129 |

© Copyright 2017, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care™*

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | **First Quarter 2018** | | | | |
| **GAAP** | $ 262 | (51)% | $ 178 | $ 61 | $ 115 | (63)% | $ 0.36 | (63)% |
| Restructuring and employee severance | 132 | | 132 | 47 | 85 | | 0.27 | |
| Amortization and other acquisition-related costs | 183 | | 183 | 58 | 125 | | 0.40 | |
| Impairments and (gain)/loss on disposal of assets | 1 | | 1 | - | 1 | | - | |
| Litigation (recoveries)/charges, net | 32 | | 32 | 13 | 19 | | 0.06 | |
| Loss on extinguishment of debt | - | | 1 | 1 | - | | - | |
| **Non-GAAP** | $ 610 | (9)% | $ 527 | $ 180 | $ 346 | (13)% | $ 1.09 | (12)% |
| | | | | First Quarter 2017 | | | | |
| GAAP | $ 535 | (14)% | $ 494 | $ 184 | $ 309 | (19)% | $ 0.96 | (17)% |
| Restructuring and employee severance | 9 | | 9 | 4 | 5 | | 0.02 | |
| Amortization and other acquisition-related costs | 122 | | 122 | 40 | 82 | | 0.25 | |
| Impairments and (gain)/loss on disposal of assets | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | 1 | | 1 | - | 1 | | - | |
| Non-GAAP | $ 669 | (9)% | $ 629 | $ 229 | $ 399 | (13)% | $ 1.24 | (10)% |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules
[2]Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.
We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the First Quarter 2017.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Fiscal Year 2017 | | | | | |
| **GAAP** | $ 6,544 | - % | $ 2,120 | (14)% | $ 1,924 | $ 630 | $ 1,288 | (10)% | $ 4.03 | (7)% |
| Restructuring and employee severance | - | | 56 | | 56 | 20 | 36 | | 0.11 | |
| Amortization and other acquisition-related costs | - | | 527 | | 527 | 165 | 362 | | 1.13 | |
| Impairments and (gain)/loss on disposal of assets | - | | 18 | | 18 | 6 | 12 | | 0.04 | |
| Litigation (recoveries)/charges, net | - | | 48 | | 48 | 19 | 29 | | 0.09 | |
| Loss on extinguishment of debt | - | | - | | - | - | - | | - | |
| **Non-GAAP** | $ 6,544 | - % | $ 2,769 | (4)% | $ 2,572 | $ 839 | $ 1,727 | - | $ 5.40 | 3 % |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules
[2]Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.
We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**
**Total Company Information**

| (in millions) | First Quarter | | | Non-GAAP First Quarter | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2018** | | 2017 | **2018** | | 2017 |
| **Revenue** | | | | | | |
| Amount | $ | **32,641** | $ 32,039 | | | |
| Growth rate | | **2 %** | 14 % | | | |
| | | | | | | |
| **Gross margin** | | | | | | |
| Amount | $ | **1,672** | $ 1,590 | $ **1,672** | $ | 1,590 |
| Growth rate | | **5 %** | 1 % | **5 %** | | 1 % |
| | | | | | | |
| **Operating earnings** | | | | | | |
| Amount | $ | **262** | $ 535 | $ **610** | $ | 669 |
| Growth rate | | **(51)%** | (14)% | **(9)%** | | (9)% |
| | | | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | | | |
| Amount | $ | **115** | $ 309 | $ **346** | $ | 399 |
| Growth rate | | **(63)%** | (19)% | **(13)%** | | (13)% |
| | | | | | | |
| Return on equity | | **6.8 %** | 19.0 % | **20.4 %** | | 24.4 % |
| | | | | | | |
| Effective tax rate | | **34.2 %** | 37.3 % | **34.1 %** | | 36.4 % |
| | | | | | | |
| Debt to total capital | | **60 %** | 46 % | | | |
| Net debt to capital | | | | **57 %** | | 35 % |

Refer to the GAAP/Non-GAAP reconciliation for definitions and calculations supporting the Non-GAAP balances.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Information**

| (in millions) | First Quarter | | | (in millions) | First Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2018** | | 2017 | | **2018** | | 2017 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **28,920** | $ 28,762 | Amount | $ | **3,724** | $ 3,279 |
| Growth rate | | **1 %** | 14 % | Growth rate | | **14 %** | 12 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **467** | $ 534 | Amount | $ | **129** | $ 127 |
| Growth rate | | **(13)%** | (19)% | Growth rate[1] | | **1 %** | 26 % |
| Segment profit margin | | **1.61 %** | 1.86 % | Segment profit margin | | **3.45 %** | 3.87 % |

[1] Segment profit includes a $42 million impact from the roll-out of the inventory fair value step up related to the Patient Recovery acquisition for the three months ended September 30, 2017. Excluding the impact of the inventory fair value step up, Medical segment profit would have increased 34% for the three months ended September 30, 2017.

**Supplemental Consolidated Information**

Total consolidated revenue for the three months ended September 30, 2017 was $32,641 million, which included total segment revenue of $32,644 million and Corporate revenue of $(3) million. Total consolidated revenue for the three months ended September 30, 2016 was $32,039 million, which included total segment revenue of $32,041 million and Corporate revenue of $(2) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended September 30, 2017 were $262 million, which included total segment profit of $596 million and Corporate costs of $(334) million. Total consolidated operating earnings for the three months ended September 30, 2016 were $535 million, which included total segment profit of $661 million and Corporate costs of $(126) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | First Quarter | |
| --- | --- | --- |
| | **2018** | 2017 |
| **GAAP return on equity** | **6.8 %** | 19.0 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings attributable to Cardinal Health, Inc. | $    **115** | $    309 |
| Restructuring and employee severance, net of tax | **85** | 5 |
| Amortization and other acquisition-related costs, net of tax | **125** | 82 |
| Impairments and loss on disposal of assets, net of tax | **1** | 2 |
| Litigation charges, net, net of tax | **19** | 1 |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $    **346** | $    399 |
| Annualized | $    **1,384** | $    1,596 |

| | First Quarter 2018 | Fourth Quarter 2017 | First Quarter 2017 | Fourth Quarter 2016 |
| --- | --- | --- | --- | --- |
| Total Cardinal Health, Inc. shareholders' equity | $    **6,678** | $    **6,828** | $    6,512 | $    6,554 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $    **6,762** | | $    6,533 | |
| **Non-GAAP return on equity** | **20.4 %** | | 24.4 % | |

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Fiscal Year | |
| --- | --- | --- |
| | **2017** | 2016 |
| **GAAP return on equity** | **19.6 %** | 21.9 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings from continuing operations attributable to Cardinal Health, Inc. | **$ 1,288** | $ 1,427 |
| Restructuring and employee severance, net of tax | **36** | 16 |
| Amortization and other acquisition-related costs, net of tax | **362** | 316 |
| Impairments and (gain)/loss on disposal of assets, net of tax | **12** | 15 |
| Litigation (recoveries)/charges, net, net of tax | **29** | (42) |
| Adjusted net earnings attributable to Cardinal Health, Inc. | **$ 1,727** | $ 1,732 |

| | **Fourth Quarter 2017** | **Third Quarter 2017** | **Second Quarter 2017** | **First Quarter 2017** | Fourth Quarter 2016 | Third Quarter 2016 | Second Quarter 2016 | First Quarter 2015 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Total Cardinal Health, Inc. shareholders' equity | **$ 6,808** | **$ 6,646** | **$ 6,323** | **$ 6,512** | $ 6,554 | $ 6,713 | $ 6,712 | $ 6,505 |
| Divided by average Cardinal Health, Inc. shareholders' equity | **$ 6,569** | | | | $ 6,548 | | | |
| **Non-GAAP return on equity** | **26.3 %** | | | | 26.4 % | | | |

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
GAAP/Non-GAAP Reconciliation

|  | First Quarter | |
| --- | --- | --- |
| (in millions) | **2018** | 2017 |
| **GAAP effective tax rate** | **34.2 %** | 37.3 % |
|  |  |  |
| **Non-GAAP effective tax rate** |  |  |
| Earnings/(loss) before income taxes | **$      178** | $      494 |
| Restructuring and employee severance | **132** | 9 |
| Amortization and other acquisition-related costs | **183** | 122 |
| Impairments and loss on disposal of assets | **1** | 3 |
| Litigation (recoveries)/charges, net | **32** | 1 |
| Loss on extinguishment of debt | **1** | - |
| Adjusted earnings before income taxes | **$      527** | $      629 |
|  |  |  |
| Provision for income taxes | **$      61** | $      184 |
| Restructuring and employee severance tax benefit | **47** | 4 |
| Amortization and other acquisition-related costs tax benefit | **58** | 40 |
| Impairments and loss on disposal of assets tax benefit | **-** | 1 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | **13** | - |
| Loss on extinguishment of debt tax benefit | **1** | - |
| Adjusted provision for income taxes | **$      180** | $      229 |
|  |  |  |
| **Non-GAAP effective tax rate** | **34.1 %** | 36.4 % |

|  | First Quarter | |
| --- | --- | --- |
|  | **2018** | 2017 |
| **Debt to total capital** | **60 %** | 46 % |
|  |  |  |
| **Net debt to capital** |  |  |
| Current portion of long-term obligations and other short-term borrowings | **$      935** | $      616 |
| Long-term obligations, less current portion | **9,068** | 4,916 |
| Debt | **$      10,003** | $      5,532 |
| Cash and equivalents | **(1,181)** | (2,001) |
| Net debt | **$      8,822** | $      3,531 |
| Total Cardinal Health, Inc. shareholders' equity | **6,678** | 6,512 |
| Capital | **$      15,500** | $      10,043 |
| **Net debt to capital** | **57 %** | 35 % |

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | | Fiscal Year 2017 |
|---|---|---|
| **GAAP effective tax rate** | | **32.7 %** |
| | | |
| **Non-GAAP effective tax rate** | | |
| Earnings before income taxes | $ | 1,924 |
| LIFO charges/(credits) | | - |
| Restructuring and employee severance | | 56 |
| Amortization and other acquisition-related costs | | 527 |
| Impairments and loss on disposal of assets | | 18 |
| Litigation (recoveries)/charges, net | | 48 |
| Adjusted earnings before income taxes | $ | 2,572 |
| | | |
| Provision for income taxes | $ | 630 |
| LIFO charges/(credits) tax benefit/(expense) | | - |
| Restructuring and employee severance tax benefit | | 20 |
| Amortization and other acquisition-related costs tax benefit | | 165 |
| Impairments and loss on disposal of assets tax benefit | | 6 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | | 19 |
| Adjusted provision for income taxes | $ | 839 |
| | | |
| **Non-GAAP effective tax rate** | | **32.6 %** |

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

<u>Forward Looking non-GAAP Measures</u>

In this presentation, the Company presents its outlook for fiscal 2018 non-GAAP EPS and non-GAAP ETR.  The Company does not provide EPS or ETR outlook, which are the most directly comparable GAAP measure to non-GAAP EPS and non-GAAP ETR, respectively, because changes in the items that the Company excludes from these non-GAAP measures can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS or ETR outlook.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2018 EPS and ETR. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

**Cardinal Health, Inc. and Subsidiaries**

### Definitions

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total Cardinal Health, Inc. shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total Cardinal Health, Inc. shareholders' equity).

**Non-GAAP Diluted EPS attributable to Cardinal Health, Inc. or "Non-GAAP Diluted EPS" or "Non-GAAP Diluted Earnings Per Share"**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP Diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Effective Tax Rate**: (provision for income taxes adjusted for (1) LIFO charges/(credits)[1], (2) restructuring and employee severance[2], (3) amortization and other acquisition-related costs[3], (4) impairments and (gain)/loss on disposal of assets[4], (5) litigation (recoveries)/charges, net[5], and (6) loss on extinguishment of debt[6]) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP Gross Margin**: Gross margin excluding LIFO charges/(credits).

[1] The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market. These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[2] Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel), and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[3] Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs, and changes in the fair value of contingent consideration obligations.

[4] Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[5] Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[6] Charges related to the make-whole premium on the redemption of notes.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Non-GAAP Net Earnings attributable to Cardinal Health, Inc. or "Non-GAAP Net Earnings"**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Earnings from Continuing Operations:** earnings from continuing operations excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP Operating Earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net.

**Non-GAAP Return on Equity**: (annualized current period net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax) divided by average Cardinal Health, Inc. shareholders' equity.

**Return on Equity**: annualized current period net earnings attributable to Cardinal Health, Inc. divided by average Cardinal Health, Inc. shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general, and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.

# EXHIBIT 88

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2017

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

# Cardinal Health, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**

*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The number of the registrant's common shares, without par value, outstanding as of October 31, 2017, was the following: 314,603,641

# Cardinal Health
**Q1 Fiscal 2018 Form 10-Q**

## Table of Contents

|  | Page |
|---|---|
| Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Explanation and Reconciliation of Non-GAAP Financial Measures | **13** |
| Quantitative and Qualitative Disclosures about Market Risk | **16** |
| Controls and Procedures | **16** |
| Legal Proceedings | **16** |
| Risk Factors | **17** |
| Unregistered Sales of Equity Securities and Use of Proceeds | **17** |
| Financial Statements and Supplementary Data | **18** |
| Exhibits | **30** |
| Form 10-Q Cross Reference Index | **31** |
| Signatures | **32** |

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a global, integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. We provide medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. We connect patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. We manage our business and report our financial results in two segments: Pharmaceutical and Medical. As used in this report, "we," "our," "us," and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our fiscal year ends on June 30. References to fiscal 2018 and fiscal 2017 and to FY18 and FY17 are to the fiscal years ending or ended June 30, 2018 and June 30, 2017, respectively.

## Forward-Looking Statements

This Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (this "Form 10-Q") (including information incorporated by reference) includes "forward-looking statements" addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), but there are others in this Form 10-Q, which may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those made, projected or implied. The most significant of these risks and uncertainties are described in Exhibit 99.1 to this Form 10-Q and in "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (our "2017 Form 10-K"). Forward-looking statements in this Form 10-Q speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

## Non-GAAP Financial Measures

In the "Overview of Consolidated Results" section of MD&A, we use financial measures that are derived from our consolidated financial data but are not presented in our condensed consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this Form 10-Q.

**MD&A** | **Overview**

# Management's Discussion and Analysis of Financial Condition and Results of Operations

The discussion and analysis presented below is concerned with material changes in financial condition and results of operations between the periods specified in our condensed consolidated balance sheets at September 30, 2017 and June 30, 2017, and in our condensed consolidated statements of earnings for the three months ended September 30, 2017 and 2016. All comparisons presented are with respect to the prior-year period, unless stated otherwise. This discussion and analysis should be read in conjunction with the MD&A included in our 2017 Form 10-K.

# Overview of Consolidated Results

## Revenue



**Revenue**
**(in billions)**

Revenue for the three months ended September 30, 2017 increased 2 percent to $32.6 billion due to sales growth from specialty and pharmaceutical distribution customers, which was partially offset by the previously announced May 2017 expiration of a large pharmaceutical distribution mail order customer contract. Medical segment acquisitions also contributed to the increase in revenue during the three months ended September 30, 2017.

## GAAP and Non-GAAP Operating Earnings



**GAAP**
**(in millions)**

**Non-GAAP**
**(in millions)**

| (in millions) | Three Months Ended September 30, | | |
| --- | --- | --- | --- |
| | **2017** | 2016 | **Change** |
| **GAAP** | $ **262** | $ 535 | **(51)%** |
| Restructuring and employee severance | **132** | 9 | |
| Amortization and other acquisition-related costs | **183** | 122 | |
| Impairments and (gain)/loss on disposal of assets | **1** | 3 | |
| Litigation (recoveries)/charges, net | **32** | 1 | |
| **Non-GAAP** | $ **610** | $ 669 | **(9)%** |

The sum of the components may not equal the total due to rounding.

During the three months ended September 30, 2017, GAAP operating earnings decreased 51 percent to $262 million and non-GAAP operating earnings decreased 9 percent to $610 million. The decrease in GAAP operating earnings was primarily due to contract termination restructuring costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model, increased amortization of acquisition-related intangible assets as a result of the Patient Recovery Business acquisition, and litigation charges. Our Pharmaceutical segment generics program performance, which includes the negative impact of generic pharmaceutical customer pricing changes offset by the benefits of Red Oak Sourcing, also contributed to the decrease in GAAP and non-GAAP operating earnings during the three months ended September 30, 2017.

## GAAP and Non-GAAP Diluted EPS



| GAAP ($ per share) | | | | Non-GAAP ($ per share) | | |
| --- | --- | --- | --- | --- | --- | --- |
| $0.96 | | $0.36 | | $1.24 | | $1.09 |
| Q1 FY17 | | Q1 FY18 | | Q1 FY17 | | Q1 FY18 |

| | Three Months Ended September 30, | | |
| --- | --- | --- | --- |
| ($ per share) | **2017** | 2016 | **Change** |
| **GAAP** | **$ 0.36** | $ 0.96 | **(63)%** |
| Restructuring and employee severance | 0.27 | 0.02 | |
| Amortization and other acquisition-related costs | 0.40 | 0.25 | |
| Impairments and (gain)/loss on disposal of assets | — | 0.01 | |
| Litigation (recoveries)/charges, net | 0.06 | — | |
| **Non-GAAP** | **$ 1.09** | $ 1.24 | **(12)%** |

The sum of the components may not equal the total due to rounding.

During the three months ended September 30, 2017, GAAP diluted earnings per share attributable to Cardinal Health, Inc. ("diluted EPS") decreased 63 percent to $0.36 per share and non-GAAP diluted EPS decreased 12 percent to $1.09 per share. GAAP and non-GAAP diluted EPS decreased primarily due to the factors impacting GAAP and non-GAAP operating earnings and partly due to an increase in interest expense. The decrease in GAAP and non-GAAP diluted EPS was partially offset by a lower effective tax rate.

## Cash and Equivalents

Our cash and equivalents balance was $1.2 billion at September 30, 2017 compared to $6.9 billion at June 30, 2017. The decrease in cash and equivalents during the three months ended September 30, 2017 was driven by $6.1 billion paid for acquisitions, net of cash acquired, $403 million to redeem our 1.7% notes due 2018, $150 million paid for share repurchases and $150 million paid in dividends, offset in part by net cash provided by operating activities of $1.2 billion.

# Significant Developments in Fiscal 2018 and Trends

## Acquisitions

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc for $6.1 billion in cash. The Patient Recovery Business manufactures 23 categories of medical products that are sold into multiple healthcare channels, and includes numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition further expands the Medical segment's portfolio of self-manufactured products. We funded the acquisition through $4.5 billion in new long-term debt, the use of existing cash, and borrowings under our existing credit arrangements.

## Trends

Within our Pharmaceutical segment, we expect fiscal 2018 segment profit to be less than our fiscal 2017 segment profit due primarily to generic pharmaceutical customer pricing changes. However, as is generally the case, the frequency, timing, magnitude, and profit impact of pharmaceutical customer pricing changes and branded and generic pharmaceutical manufacturer pricing changes remain uncertain and their impact on Pharmaceutical segment profit and consolidated operating earnings in fiscal 2018 could be more or less than we expect.

The acquisition of the Patient Recovery Business increased Medical segment revenue and profit during the three months ended September 30, 2017. Since the acquisition, which closed on July 29, 2017, only contributed to results for two months and also reflects an unfavorable impact from a fair value inventory step up, we expect the acquisition to increase Medical segment profit more significantly during the remainder of fiscal 2018 than it did during the three months ended September 30, 2017. During the three months ended September 30, 2017, the acquisition also increased amortization and other acquisition-related costs due to the size and complexity of the acquisition, and we expect increased amortization and other acquisition-related costs during the remainder of fiscal 2018.

During the three months ended September 30, 2017, the debt issued in June 2017 to fund a portion of the purchase price of the Patient Recovery Business acquisition increased our interest expense and we expect increased interest expense during the remainder of fiscal 2018.

We are exploring strategic alternatives for our China products and services distribution business. If we agree to sell the business, it is possible that we could recognize an impairment or loss.

# Results of Operations

## Revenue



| (in millions) | Three Months Ended September 30, | | |
| --- | --- | --- | --- |
| | **2017** | 2016 | **Change** |
| Pharmaceutical | **$ 28,920** | $ 28,762 | **1%** |
| Medical | **3,724** | 3,279 | **14%** |
| Total segment revenue | **32,644** | 32,041 | **2%** |
| Corporate | **(3)** | (2) | **N.M.** |
| **Total revenue** | **$ 32,641** | $ 32,039 | **2%** |

### Pharmaceutical Segment

Pharmaceutical segment revenue increased slightly during the three months ended September 30, 2017 due to sales growth from specialty and pharmaceutical distribution customers, which was partially offset by the previously announced May 2017 expiration of a large pharmaceutical distribution mail order customer contract.

### Medical Segment

Medical segment revenue growth for the three months ended September 30, 2017 was primarily due to contributions from acquisitions of $333 million, including the Patient Recovery Business.

## Cost of Products Sold

Cost of products sold increased to $31.0 billion (2 percent) compared to the prior-year period, as a result of the same factors affecting the change in revenue and gross margin.

**MD&A**      Results of Operations

## Gross Margin



| Gross Margin (in billions) | Gross Margin Rate (Gross Margin as a Percent of Revenue) |
|---|---|
| $1.6 (Q1 FY17)    $1.7 (Q1 FY18) | 4.96% (Q1 FY17)    5.12% (Q1 FY18) |

| (in millions) | Three Months Ended September 30, | | |
|---|---|---|---|
| | **2017** | 2016 | **Change** |
| Gross margin | **$ 1,672** | $ 1,590 | **5%** |

Gross margin during the three months ended September 30, 2017 increased $82 million (5 percent) versus the prior-year period. Acquisitions, including the Patient Recovery Business, increased gross margin by $97 million.

Gross margin rate grew 16 basis points during the three months ended September 30, 2017 due to acquisitions, including the Patient Recovery Business, and Pharmaceutical segment generics program performance. Gross margin rate was negatively impacted by changes in pharmaceutical distribution product mix.

## Distribution, Selling, General, and Administrative ("SG&A") Expenses

| (in millions) | Three Months Ended September 30, | | |
|---|---|---|---|
| | **2017** | 2016 | **Change** |
| SG&A expenses | **$ 1,062** | $ 920 | **15%** |

The increase in SG&A expenses during the three months ended September 30, 2017 was due to acquisitions ($92 million), including the Patient Recovery Business, and the costs related to a multi-year project to replace certain Pharmaceutical segment finance and operating information systems.

**MD&A**    **Results of Operations**

# Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 14 of the "Notes to Condensed Consolidated Financial Statements" for additional information on segment profit.



| Pharmaceutical Segment Profit (in millions) | | Medical Segment Profit (in millions) | | Consolidated Operating Earnings (in millions) | |
|---|---|---|---|---|---|
| $534 | $467 | $127 | $129 | $535 | $262 |
| Q1 FY17 | Q1 FY18 | Q1 FY17 | Q1 FY18 | Q1 FY17 | Q1 FY18 |

| (in millions) | Three Months Ended September 30, | | |
|---|---|---|---|
| | **2017** | 2016 | **Change** |
| Pharmaceutical | $ **467** | $ 534 | **(13)%** |
| Medical | **129** | 127 | **1 %** |
| Total segment profit | **596** | 661 | **(10)%** |
| Corporate | **(334)** | (126) | **165 %** |
| **Total consolidated operating earnings** | $ **262** | $ 535 | **(51)%** |

## Pharmaceutical Segment Profit

The decrease in Pharmaceutical segment profit during the three months ended September 30, 2017 was primarily due to our generic program performance, which includes the negative impact of generic pharmaceutical customer pricing changes offset by the benefits of Red Oak Sourcing. The costs related to a multi-year project to replace certain Pharmaceutical segment finance and operating information systems also contributed to the decrease in Pharmaceutical Segment profit during the three months ended September 30, 2017.

## Medical Segment Profit

Medical segment profit grew slightly during the three months ended September 30, 2017. Acquisitions, which included the unfavorable cost of products sold impact from the fair value step up of inventory acquired with the Patient Recovery business, contributed to segment profit growth. The increase was mostly offset by the previously announced loss of a portion of a large distribution customer contract.

## Corporate

As discussed further in sections that follow, the change in Corporate during the three months ended September 30, 2017 was due to contract termination restructuring costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model, amortization and other acquisition-related costs due to the Patient Recovery Business acquisition, and litigation charges.

**MD&A**  **Results of Operations**

## Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin, and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | Three Months Ended September 30, | |
| --- | --- | --- |
| | **2017** | 2016 |
| Restructuring and employee severance | **$ 132** | $ 9 |
| Amortization and other acquisition-related costs | **183** | 122 |
| Impairments and (gain)/loss on disposal of assets, net | **1** | 3 |
| Litigation (recoveries)/charges, net | **32** | 1 |

**Restructuring and Employee Severance**
The increase in restructuring and employee severance during the three months ended September 30, 2017 was primarily due to $125 million in contract termination costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model.

**Amortization and Other Acquisition-Related Costs**
Amortization of acquisition-related intangible assets was $135 million and $101 million for the three months ended September 30, 2017 and 2016, respectively. The increase in amortization of acquisition-related

intangible assets during the three months ended September 30, 2017 was largely due to the Patient Recovery Business acquisition. Transaction and integration costs associated with the Patient Recovery Business acquisition were $37 million for the three months ended September 30, 2017.

**Litigation (Recoveries)/Charges, Net**
The increase in litigation charges during the three months ended September 30, 2017 was due to an increase in estimated losses and legal defense costs associated with inferior vena cava (IVC) filter product liability claims.

## Earnings Before Income Taxes

In addition to the items discussed above, earnings before income taxes was impacted by the following:

| (in millions) | Three Months Ended September 30, | | |
| --- | --- | --- | --- |
| | **2017** | 2016 | Change |
| Other (income)/expense, net | **$ 2** | $ (3) | **N.M.** |
| Interest expense, net | **81** | 44 | **84%** |
| Loss on extinguishment of debt | **1** | — | **N.M.** |

**Interest Expense, Net**
Interest expense increased during the three months ended September 30, 2017 primarily due to $5.2 billion of new long-term debt issued in June 2017, $4.5 billion of which was used to fund the acquisition of the Patient Recovery Business in July 2017.

## Provision for Income Taxes

During the three months ended September 30, 2017 and 2016, the effective tax rate was 34.2 percent and 37.3 percent, respectively. The decrease in the effective tax rate was due to the impact of discrete items.

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends, and share repurchases. If we were to decide to engage in one or more additional acquisitions, depending on the size and timing of such transactions, we might need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $1.2 billion at September 30, 2017 compared to $6.9 billion at June 30, 2017. At September 30, 2017, our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

During the three months ended September 30, 2017, we deployed $6.1 billion for acquisitions, net of cash acquired, $403 million to redeem our 1.7% notes due 2018, $150 million for share repurchases and $150 million for cash dividends; net cash provided by operating activities was $1.2 billion, driven by the timing of certain vendor payments and other changes in working capital.

The cash and equivalents balance at September 30, 2017 included $576 million of cash held by subsidiaries outside of the United States.

Although the vast majority of this cash is available for repatriation, bringing the cash into the United States could trigger U.S federal, state and local income tax obligations. Because the earnings are considered permanently reinvested, no U.S. tax provision has been accrued related to the repatriation of these earnings. It is not practicable to evaluate the amount of U.S. tax that might be payable on the remittance of such earnings.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $2.0 billion revolving credit facility and a $1.0 billion committed receivables sales facility program. We also have a commercial paper program of up to $2.0 billion, backed by the revolving credit facility. In August 2017, we increased our revolving credit facility from $1.75 billion to $2.0 billion and in September 2017, we completed a corresponding increase to our commercial paper program from $1.75 billion to $2.0 billion. In August 2017, we also increased our committed receivables sales facility program from $700 million to $1.0 billion.

At September 30, 2017, we had no amounts outstanding under the revolving credit facility or the committed receivables sales facility program. During the three months ended September 30, 2017, we had maximum amounts outstanding under our committed receivables program and commercial paper program of $1.3 billion and an average daily amount outstanding of $405 million.

Our revolving credit facility and committed receivables sales facility program require us to maintain, as of the end of any calendar quarter,

a consolidated leverage ratio of no more than 4.25-to-1, which will be reduced over eighteen months back to 3.25-to-1. The ratio temporarily increased as result of our acquisition of the Patient Recovery Business. As of September 30, 2017, we were in compliance with this financial covenant.

### Long-Term Obligations

During the three months ended September 30, 2017, we redeemed our 1.7% notes due 2018 for $403 million. At September 30, 2017, we had total long-term obligations of $10.0 billion. We plan to reduce our long-term obligations by approximately $500 million each year during fiscal 2018, 2019 and 2020 by paying off long-term obligations.

### Funding for Acquisition of Patient Recovery Business

On July 29, 2017, we acquired the Patient Recovery Business from Medtronic plc for $6.1 billion in cash. We funded the acquisition through $4.5 billion in new long-term debt issued in June 2017, the use of existing cash and borrowings under existing credit arrangements.

## Capital Deployment

### Capital Expenditures

Capital expenditures during the three months ended September 30, 2017 and 2016 were $67 million and $100 million, respectively.

### Dividends

On August 9, 2017, our Board of Directors approved a quarterly dividend of $0.4624 per share, or $1.85 per share on an annualized basis, payable on October 15, 2017 to shareholders of record on October 2, 2017.

### Share Repurchases

During the three months ended September 30, 2017, we repurchased $150 million of our common shares. We funded the repurchases with available cash and short-term borrowings. At September 30, 2017, we had $293 million remaining under our existing share repurchase program.

### Acquisition of Patient Recovery Business

Described above under "Funding for Acquisition of Patient Recovery Business."

# Other Items

The MD&A in our 2017 Form 10-K addresses our contractual obligations, critical accounting policies and sensitive accounting estimates, and off-balance sheet arrangements, as of and for the fiscal year ended June 30, 2017. There have been no subsequent material changes outside of the ordinary course of business to those items.

# Explanation and Reconciliation of Non-GAAP Financial Measures

The "Overview of Consolidated Results" section within MD&A in this Form 10-Q contains financial measures that are not calculated in accordance with GAAP.

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, engage in financial and operational planning and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this report for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics facilitates comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion facilitates comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and are inherently unpredictable in timing and amount, and in the case of impairments, are non-cash amounts, so their exclusion facilitates comparison of historical, current and forecasted financial results.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

The tax effect for each of the items listed above is generally determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

Explanation and Reconciliation of Non-GAAP Financial Measures

# Definitions

**Growth rate calculation**: growth rates in this Form 10-Q are determined by dividing the difference between current-period results and prior-period results by prior-period results.

**Non-GAAP operating earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes**: earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, each net of tax.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[1] | Net Earnings[1] Growth Rate | Diluted EPS[1] | Diluted EPS[1] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | **First Quarter Fiscal 2018** | | | | | |
| **GAAP** | $ 262 | (51)% | $ 178 | $ 61 | $ 115 | (63)% | $ 0.36 | (63)% |
| Restructuring and employee severance | 132 | | 132 | 47 | 85 | | 0.27 | |
| Amortization and other acquisition-related costs | 183 | | 183 | 58 | 125 | | 0.40 | |
| Impairments and (gain)/loss on disposal of assets | 1 | | 1 | — | 1 | | — | |
| Litigation (recoveries)/charges, net | 32 | | 32 | 13 | 19 | | 0.06 | |
| Loss on extinguishment of debt | — | | 1 | 1 | — | | — | |
| **Non-GAAP** | $ 610 | (9)% | $ 527 | $ 180 | $ 346 | (13)% | $ 1.09 | (12)% |
| | | | **First Quarter Fiscal 2017** | | | | | |
| GAAP | $ 535 | (14)% | $ 494 | $ 184 | $ 309 | (19)% | $ 0.96 | (17)% |
| Restructuring and employee severance | 9 | | 9 | 4 | 5 | | 0.02 | |
| Amortization and other acquisition-related costs | 122 | | 122 | 40 | 82 | | 0.25 | |
| Impairments and (gain)/loss on disposal of assets | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | 1 | | 1 | — | 1 | | — | |
| Non-GAAP | $ 669 | (9)% | $ 629 | $ 229 | $ 399 | (13)% | $ 1.24 | (10)% |

[1] attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.

We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

There were no LIFO charges/(credits) during the periods presented.

# Quantitative and Qualitative Disclosures About Market Risk

As previously disclosed in our 2017 Form 10-K, as a result of the completion of the acquisition of the Patient Recovery Business, our exposure to market price changes for certain commodities as well as to both translational and transactional foreign exchange rate fluctuations has increased since the end of fiscal 2017. At the time of filing this Form 10-Q, we have not completed our analysis to quantify these impacts.

# Controls and Procedures

## Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2017. Based on this evaluation, our principal executive officer and principal financial officer have concluded that as of September 30, 2017, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

## Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

# Legal Proceedings

The legal proceedings described in Note 8 of the "Notes to Condensed Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

# Risk Factors

You should carefully consider the information in this Form 10-Q and the risk factors discussed in "Risk Factors" and other risks discussed in our 2017 Form 10-K and our filings with the SEC since June 30, 2017. These risks could materially and adversely affect our results of operations, financial condition, liquidity, and cash flows. Our business also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

# Unregistered Sales of Equity Securities and Use of Proceeds

**Issuer Purchases of Equity Securities**

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Program (2) (in millions) |
|---|---|---|---|---|
| July 2017 | 183 | $ 77.88 | — | $ 443 |
| August 2017 | 776,376 | 66.79 | 776,254 | 426 |
| September 2017 | 1,433,328 | 68.50 | 1,432,736 | 293 |
| **Total** | **2,209,887** | **$ 67.90** | **2,208,990** | **$ 293** |

(1)   Reflects 183, 122 and 592 common shares purchased in July, August and September 2017, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2)   On May 4, 2016, our Board of Directors approved a $1.0 billion share repurchase program that expires on December 31, 2019. During the three months ended September 30, 2017, we repurchased 2.2 million common shares under this program. After these repurchases, we have $293 million available under this program.

# Condensed Consolidated Statements of Earnings

**(Unaudited)**

| | | Three Months Ended September 30, | | |
|---|---|---|---|---|
| (in millions, except per common share amounts) | | 2017 | | 2016 |
| Revenue | $ | 32,641 | $ | 32,039 |
| Cost of products sold | | 30,969 | | 30,449 |
| Gross margin | | 1,672 | | 1,590 |
| | | | | |
| **Operating expenses:** | | | | |
| Distribution, selling, general and administrative expenses | | 1,062 | | 920 |
| Restructuring and employee severance | | 132 | | 9 |
| Amortization and other acquisition-related costs | | 183 | | 122 |
| Impairments and (gain)/loss on disposal of assets, net | | 1 | | 3 |
| Litigation (recoveries)/charges, net | | 32 | | 1 |
| Operating earnings | | 262 | | 535 |
| | | | | |
| Other (income)/expense, net | | 2 | | (3) |
| Interest expense, net | | 81 | | 44 |
| Loss on extinguishment of debt | | 1 | | — |
| Earnings before income taxes | | 178 | | 494 |
| | | | | |
| Provision for income taxes | | 61 | | 184 |
| Net earnings | | 117 | | 310 |
| Less: Net earnings attributable to noncontrolling interests | | (2) | | (1) |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 115 | $ | 309 |
| | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | |
| Basic | $ | 0.36 | $ | 0.97 |
| Diluted | | 0.36 | | 0.96 |
| | | | | |
| **Weighted-average number of common shares outstanding:** | | | | |
| Basic | | 316 | | 320 |
| Diluted | | 318 | | 322 |
| | | | | |
| Cash dividends declared per common share | $ | 0.4624 | $ | 0.4489 |

See notes to condensed consolidated financial statements.

**Financial Statements**

# Condensed Consolidated Statements of Comprehensive Income
**(Unaudited)**

| (in millions) | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | **2017** | | 2016 | |
| Net earnings | $ | **117** | $ | 310 |
| | | | | |
| **Other comprehensive income:** | | | | |
| Foreign currency translation adjustments and other | | **40** | | (1) |
| Net unrealized gain/(loss) on derivative instruments, net of tax | | **(1)** | | 1 |
| Total other comprehensive income, net of tax | | **39** | | — |
| | | | | |
| Total comprehensive income | | **156** | | 310 |
| | | | | |
| Less: comprehensive income attributable to noncontrolling interests | | **(2)** | | (1) |
| **Total comprehensive income attributable to Cardinal Health, Inc.** | $ | **154** | $ | 309 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Balance Sheets
**(Unaudited)**

| (in millions) | | September 30, 2017 | | June 30, 2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,181 | $ | 6,879 |
| Trade receivables, net | | 8,382 | | 8,048 |
| Inventories, net | | 12,121 | | 11,301 |
| Prepaid expenses and other | | 2,041 | | 2,117 |
| Total current assets | | 23,725 | | 28,345 |
| | | | | |
| Property and equipment, net | | 2,651 | | 1,879 |
| Goodwill and other intangibles, net | | 14,926 | | 9,207 |
| Other assets | | 638 | | 681 |
| **Total assets** | $ | 41,940 | $ | 40,112 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 19,202 | $ | 17,906 |
| Current portion of long-term obligations and other short-term borrowings | | 935 | | 1,327 |
| Other accrued liabilities | | 2,270 | | 1,988 |
| Total current liabilities | | 22,407 | | 21,221 |
| | | | | |
| Long-term obligations, less current portion | | 9,068 | | 9,068 |
| Deferred income taxes and other liabilities | | 3,758 | | 2,877 |
| | | | | |
| Redeemable noncontrolling interests | | 12 | | 118 |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized—**500 thousand** shares, Issued—**none** | | — | | — |
| Common shares, without par value: | | | | |
| Authorized—**755 million** shares, Issued—**327 million** shares and 327 million shares at **September 30, 2017** and June 30, 2017, respectively | | 2,674 | | 2,697 |
| Retained earnings | | 4,943 | | 4,967 |
| Common shares in treasury, at cost: **12 million** shares and 11 million shares at **September 30, 2017** and June 30, 2017, respectively | | (853) | | (731) |
| Accumulated other comprehensive loss | | (86) | | (125) |
| **Total Cardinal Health, Inc. shareholders' equity** | | 6,678 | | 6,808 |
| Noncontrolling interests | | 17 | | 20 |
| **Total shareholders' equity** | | 6,695 | | 6,828 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 41,940 | $ | 40,112 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Statements of Cash Flows

**(Unaudited)**

| | | Three Months Ended September 30, | | |
|---|---|---|---|---|
| (in millions) | | 2017 | | 2016 |
| **Cash flows from operating activities:** | | | | |
| Net earnings | $ | 117 | $ | 310 |
| | | | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | | |
| Depreciation and amortization | | 229 | | 173 |
| Loss on extinguishment of debt | | 1 | | — |
| Impairments and loss on sale of other investments | | 6 | | — |
| Impairments and loss on disposal of assets, net | | 1 | | 3 |
| Share-based compensation | | 17 | | 23 |
| Provision for bad debts | | 25 | | 7 |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | |
| Increase in trade receivables | | (359) | | (306) |
| Increase in inventories | | (381) | | (298) |
| Increase in accounts payable | | 1,296 | | 279 |
| Other accrued liabilities and operating items, net | | 229 | | (87) |
| Net cash provided by operating activities | | 1,181 | | 104 |
| | | | | |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | | (6,139) | | (9) |
| Additions to property and equipment | | (67) | | (100) |
| Purchase of available-for-sale securities and other investments | | (3) | | (52) |
| Proceeds from sale of available-for-sale securities and other investments | | 64 | | 34 |
| Proceeds from disposal of property and equipment | | 1 | | — |
| Proceeds from maturities of available-for-sale securities | | — | | 17 |
| Net cash used in investing activities | | (6,144) | | (110) |
| | | | | |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | | (15) | | — |
| Net change in short-term borrowings | | (6) | | 25 |
| Purchase of noncontrolling interests | | (3) | | (10) |
| Reduction of long-term obligations | | (402) | | (1) |
| Proceeds from interest rate swap terminations | | — | | 14 |
| Net tax withholdings from share-based compensation | | (18) | | (9) |
| Excess tax benefits from share-based compensation | | — | | 30 |
| Dividends on common shares | | (150) | | (149) |
| Purchase of treasury shares | | (150) | | (250) |
| Net cash used in financing activities | | (744) | | (350) |
| | | | | |
| Effect of exchange rates changes on cash and equivalents | | 9 | | 1 |
| | | | | |
| Net decrease in cash and equivalents | | (5,698) | | (355) |
| Cash and equivalents at beginning of period | | 6,879 | | 2,356 |
| **Cash and equivalents at end of period** | $ | 1,181 | $ | 2,001 |

See notes to condensed consolidated financial statements.

# Notes to Condensed Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

### Basis of Presentation

Our condensed consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. References to "we," "our," and similar pronouns in this Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (this "Form 10-Q") refer to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context requires otherwise.

Our fiscal year ends on June 30. References to fiscal 2018 and 2017 in these condensed consolidated financial statements are to the fiscal years ending or ended June 30, 2018 and June 30, 2017, respectively.

Our condensed consolidated financial statements have been prepared in accordance with the U.S. Securities and Exchange Commission ("SEC") instructions to Quarterly Reports on Form 10-Q and include the information and disclosures required by accounting principles generally accepted in the United States ("GAAP") for interim financial reporting. The preparation of financial statements in conformity with GAAP requires us to make estimates and assumptions that affect amounts reported in the condensed consolidated financial statements and accompanying notes. Actual amounts may differ from these estimated amounts. In our opinion, all adjustments necessary for a fair presentation of the condensed consolidated financial statements have been included. Except as disclosed elsewhere in this Form 10-Q, all such adjustments are of a normal and recurring nature. In addition, financial results presented for this fiscal 2018 interim period are not necessarily indicative of the results that may be expected for the full fiscal year ending June 30, 2018. These condensed consolidated financial statements are unaudited and, accordingly, should be read in conjunction with the audited consolidated financial statements and related notes contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 Form 10-K").

### Recent Financial Accounting Standards

In August 2017, the Financial Accounting Standards Board (the "FASB") issued accounting guidance which is intended to improve and simplify accounting rules around hedge accounting. The guidance will be effective for us in the first quarter of fiscal 2020 and early adoption is permitted. We are currently evaluating the impact of this standard on our condensed consolidated financial statements.

In March 2016, the FASB issued amended accounting guidance that changed the accounting for certain aspects of share-based compensation to employees. The guidance requires all income tax effects of share-based awards to be recognized in the statement of earnings as awards vest or are settled. Additionally, the guidance increases the amount employers can withhold in shares to cover employee income taxes without requiring liability classification and

allows a policy election for accounting for forfeitures. The primary impact of adoption resulted in the recognition of excess tax benefits in the statement of earnings on a prospective basis, rather than as a component of equity. The impact on the presentation in the condensed consolidated statement of cash flows is also prospective. We adopted this guidance in the first quarter of fiscal 2018. The impact of adoption on the provision for income taxes on our condensed consolidated statement of earnings was immaterial. The inclusion of excess tax benefits and deficiencies as a component of our income tax expense will increase volatility within our provision for income taxes as the amount of excess tax benefits or deficiencies from share-based compensation awards depends on our stock price at the date the awards vest.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. The FASB also subsequently issued several amendments to the standard, including clarification on principal versus agent considerations, performance obligations and licensing, and certain scope improvements and practical expedients.

We continue to make progress on our evaluation of the amended revenue recognition guidance, including identification of revenue streams and customer contract reviews. Our revenue is primarily distribution revenue, which we recognize at a point in time when title transfers to customers and we have no further obligation to provide services related to such merchandise. Although we are continuing to assess the impact of the amended guidance, we generally anticipate that the timing of recognition of distribution revenue will be substantially unchanged under the amended guidance.

## 2. Acquisitions

### Patient Recovery Business

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc for $6.1 billion in cash. The Patient Recovery Business manufactures 23 categories of medical products sold into multiple healthcare channels, and includes numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition further expands the Medical segment's portfolio of self-manufactured products. We closed the Patient Recovery Business acquisition in 28 principal countries on July 29, 2017, and acquired control of, as described in GAAP, and the rights to, the net economic benefit from the entire Patient Recovery Business in the remaining countries at the closing. We are in the process of transitioning legal ownership in the remaining non-

principal countries, which we expect to complete by the end of calendar 2018. The results for the entire Patient Recovery Business in all countries are included in the condensed consolidated financial statements beginning July 29, 2017. We funded the acquisition through $4.5 billion in new long-term debt, the use of existing cash and borrowings under our existing credit arrangements.

Transaction and integration costs associated with the acquisition of the Patient Recovery business were $37 million during the three months ended September 30, 2017, and are included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

### Fair Value of Assets Acquired and Liabilities Assumed

The allocation of the purchase price for the acquisition of the Patient Recovery Business is not yet finalized and is subject to adjustment as we complete the valuation analysis for this acquisition. The purchase price is subject to adjustment based on working capital requirements as set forth in the acquisition agreement.

The valuation of identifiable intangible assets utilizes significant unobservable inputs and thus represents a Level 3 nonrecurring fair value measurement. The estimated fair value of the identifiable intangible assets was determined using income-based approaches, which includes market participant expectations of the cash flows that an asset could generate over its economic life, discounted back to present value using an appropriate rate of return. The weighted-average discount rate used to arrive at the present value of the identifiable intangible assets was 8.2 percent, and considers the inherent risk of each intangible asset relative to the internal rate of return and weighted-average cost of capital.

The following table summarizes the estimated fair value of the assets acquired and liabilities assumed as of the acquisition date for the Patient Recovery Business:

| (in millions) | Patient Recovery Business |
|---|---|
| **Identifiable intangible assets:** | |
| Customer relationships (1) | $ 1,712 |
| Trade names (2) | 186 |
| Developed technology and other (3) | 732 |
| Total identifiable intangible assets acquired | 2,630 |
| | |
| Cash and equivalents | 24 |
| Inventories | 434 |
| Prepaid expenses and other | 106 |
| Property and equipment, net | 807 |
| Other accrued liabilities | (153) |
| Deferred income taxes and other liabilities | (873) |
| Total identifiable net assets acquired/(liabilities) assumed | 2,975 |
| Goodwill | 3,103 |
| **Total net assets acquired** | **$ 6,078** |

(1)   The range of useful lives for customer relationships is 10 to 18 years.

(2)   The useful life of trade names is 15 years.

(3)   The useful life of developed technology is 15 years.

## 3. Restructuring and Employee Severance

The following table summarizes restructuring and employee severance costs:

| | Three months ended September 30, | | | |
|---|---|---|---|---|
| (in millions) | **2017** | | 2016 | |
| Employee-related costs (1) | $ | **4** | $ | 7 |
| Facility exit and other costs (2) | | **128** | | 2 |
| **Total restructuring and employee severance** | $ | **132** | $ | 9 |

(1)   Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2)   Facility exit and other costs primarily consist of product distribution and lease contract termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

In September 2017, we entered into an agreement to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model. The expected costs with this restructuring include $125 million, on a pre-tax basis, in contract termination costs. These costs are reflected in facility exit and other costs in the condensed consolidated statements of earnings during the three months ended September 30, 2017. The contract termination costs are expected to be paid before the end of fiscal 2018.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | | Facility Exit and Other Costs | Total | |
|---|---|---|---|---|---|
| Balance at June 30, 2017 | $ | 41 | $ — | $ | 41 |
| Additions | | 2 | 127 | | 129 |
| Payments and other adjustments | | (9) | — | | (9) |
| **Balance at September 30, 2017** | $ | **34** | $ 127 | $ | **161** |

## 4. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical | Medical | Total | |
|---|---|---|---|---|
| Balance at June 30, 2017 | $ 2,939 | $ 4,282 | $ | **7,221** |
| Goodwill acquired, net of purchase price adjustments | 1 | 3,156 | | **3,157** |
| Foreign currency translation adjustments and other | 11 | 30 | | **41** |
| **Balance at September 30, 2017** | $ 2,951 | $ 7,468 | $ | **10,419** |

The increase in the Medical segment goodwill is primarily due to the Patient Recovery Business acquisition. Goodwill recognized in connection with the Patient Recovery Business acquisition primarily represents the expected benefits from certain synergies of integrating the business, the existing workforce of the acquired entity, and the expected growth from new customers.

## Other Intangible Assets

The following tables summarize other intangible assets by class at:

**September 30, 2017**

| (in millions) | Gross Intangible | Accumulated Amortization | Net Intangible | Weighted-Average Remaining Amortization Period (Years) |
|---|---|---|---|---|
| **Indefinite-life intangibles:** | | | | |
| IPR&D, trademarks and other | $ 61 | $ — | $ 61 | N/A |
| Total indefinite-life intangibles | 61 | — | 61 | N/A |
| | | | | |
| **Definite-life intangibles:** | | | | |
| Customer relationships | 3,705 | 1,046 | 2,659 | 13 |
| Trademarks, trade names, and patents | 697 | 212 | 485 | 13 |
| Developed technology and other | 1,648 | 346 | 1,302 | 12 |
| Total definite-life intangibles | 6,050 | 1,604 | 4,446 | 13 |
| **Total other intangible assets** | $ 6,111 | $ 1,604 | $ 4,507 | N/A |

| | June 30, 2017 | | |
|---|---|---|---|
| (in millions) | Gross Intangible | Accumulated Amortization | Net Intangible |
| **Indefinite-life intangibles:** | | | |
| IPR&D, trademarks and other | $ 61 | $ — | $ 61 |
| Total indefinite-life intangibles | 61 | — | 61 |
| | | | |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,966 | 967 | 999 |
| Trademarks, trade names, and patents | 509 | 195 | 314 |
| Developed technology and other | 916 | 304 | 612 |
| Total definite-life intangibles | 3,391 | 1,466 | 1,925 |
| **Total other intangible assets** | $ 3,452 | $ 1,466 | $ 1,986 |

The increase in definite-life intangibles is primarily due to the Patient Recovery Business acquisition. Total amortization of intangible assets was $135 million and $101 million for the three months ended September 30, 2017 and 2016, respectively. Estimated annual amortization of intangible assets for the remainder of fiscal 2018 through 2022 is as follows: $444 million, $563 million, $531 million, $458 million, and $421 million.

## 5. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. We held the following investments in marketable securities at fair value at:

| (in millions) | September 30, 2017 | June 30, 2017 |
|---|---|---|
| Treasury bills | $ — | $ 25 |
| International bonds | — | 3 |
| Corporate bonds | — | 30 |
| U.S. agency bonds | — | 3 |
| Asset-backed securities | — | 3 |
| International equity securities | — | 1 |
| **Total available-for-sale securities** | $ — | $ 65 |

In July 2017, we liquidated our marketable securities. There were no unrealized gains or loss at September 30, 2017, and gross unrealized gains and losses were immaterial at June 30, 2017. During the three months ended September 30, 2017 and 2016, gross realized gains and losses were immaterial and we did not recognize any other-than-temporary impairments.

## 6. Long-Term Obligations and Other Short-Term Borrowings

### Long-Term Debt

At September 30, 2017 and June 30, 2017, we had total long term obligations, including the current portion, of $10.0 billion and $10.4 billion, respectively. All the notes represent unsecured obligations of Cardinal Health, Inc. and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. Interest is paid pursuant to the terms of the obligations. These notes are effectively subordinated to the liabilities of our subsidiaries, including trade payables of $19.2 billion.

In June 2017, we issued additional debt with the aggregate principal amount of $5.2 billion to fund a portion of the acquisition of the Patient Recovery Business, to redeem the $400 million 1.7% Notes due 2018 and for general corporate purposes. In July 2017, we redeemed the $400 million 1.7% Notes due 2018. The notes issued in June 2017 were 1.948% Notes due 2019, 2.616% Notes due 2022, 3.079% Notes due 2024, 3.410% Notes due 2027, 4.368% Notes due 2047, and floating rate Notes due 2022.

### Other Financing Arrangements

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $2.0 billion revolving credit facility and a $1.0 billion committed receivables sales facility program. At September 30, 2017, we had no amounts outstanding under the revolving credit facility or the committed receivables sales facility program.

In November 2016, we renewed our committed receivables sales facility program through Cardinal Health Funding, LLC ("CHF") through November 1, 2019. CHF was organized for the sole purpose of buying receivables and selling undivided interests in those receivables to third-party purchasers. Although consolidated with

**Notes to Financial Statements**

Cardinal Health, Inc. in accordance with GAAP, CHF is a separate legal entity from Cardinal Health, Inc. and from our subsidiary that sells receivables to CHF. CHF is designed to be a special purpose, bankruptcy-remote entity whose assets are available solely to satisfy the claims of its creditors.

## 7. Income Taxes

Fluctuations in our provision for income taxes as a percentage of pretax earnings ("effective tax rate") are due to changes in international and U.S. state effective tax rates resulting from our business mix and discrete items.

During the three months ended September 30, 2017 and 2016, the effective tax rate was 34.2 percent and 37.3 percent, respectively. The decrease in the effective tax rate was due to the impact of discrete items.

At September 30, 2017 and June 30, 2017, we had $410 million and $417 million of unrecognized tax benefits, respectively. The September 30, 2017 and June 30, 2017 balances include $266 million and $268 million of unrecognized tax benefits, respectively, that if recognized, would have an impact on the effective tax rate.

At September 30, 2017 and June 30, 2017, we had $97 million and $99 million, respectively, accrued for the payment of interest and penalties related to unrecognized tax benefits, which we recognize in the provision for income taxes in the condensed consolidated statements of earnings. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the condensed consolidated balance sheets.

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is between zero and a net decrease of $35 million, exclusive of penalties and interest.

We file income tax returns in the U.S. federal jurisdiction, various U.S. state jurisdictions, and various foreign jurisdictions. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2008 through the current fiscal year.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $144 million and $142 million at September 30, 2017 and June 30, 2017, respectively, and is included in other assets in the condensed consolidated balance sheets.

## 8. Commitments, Contingent Liabilities and Litigation

### Commitments

**Generic Sourcing Venture with CVS Health Corporation ("CVS Health")**

In July 2014, we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS Health for an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. Due to the achievement of predetermined milestones, we are required to make quarterly payments of $45.6 million to CVS Health for the remainder of the initial term.

### Legal Proceedings

We become involved from time to time in disputes, litigation, and regulatory matters.

We may be named from time to time in *qui tam* actions initiated by private third parties. In such actions, the private parties purport to act on behalf of federal or state governments, allege that false claims have been submitted for payment by the government and may receive an award if their claims are successful. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own purporting to act on behalf of the government.

From time to time, we become aware through employees, internal audits or other parties of possible compliance matters, such as complaints or concerns relating to accounting, internal accounting controls, financial reporting, auditing, or other ethical matters or relating to compliance with laws such as healthcare fraud and abuse, anti-corruption or anti-bribery laws. When we become aware of such possible compliance matters, we investigate internally and take appropriate corrective action. In addition, from time to time, we receive subpoenas or requests for information from various federal or state agencies relating to our business or to the business of a customer, supplier or other industry participants. Internal investigations, subpoenas or requests for information could lead to the assertion of claims or the commencement of legal proceedings against us or result in sanctions.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a potential quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators and product liability claims and lawsuits, including class actions. Even absent an identified regulatory or quality issue or product recall, we can become subject to product liability claims and lawsuits.

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred

**Notes to Financial Statements**

and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for certain litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges, net in our condensed consolidated statements of earnings.

**Opioid Lawsuits**

As of October 30, 2017, 98 counties and municipalities, one state attorney general and one tribal entity have filed lawsuits against pharmaceutical wholesale distributors (including us) relating to the distribution of prescription opioid pain medications. Many of the lawsuits also include pharmaceutical manufacturers and retail chains. We are also a defendant in a purported class action lawsuit brought on behalf of unions and other health and welfare funds that paid for certain opioid prescriptions on behalf of their members. These lawsuits, which have been filed in various federal, state and other courts, allege violations of controlled substance laws and various other statutes as well as common law claims, including negligence, public nuisance and unjust enrichment, and seek equitable relief and monetary damages. We are vigorously defending ourselves in these lawsuits. Since these lawsuits are in early stages, we are unable to predict their outcome or estimate a range of reasonably possible losses.

In September 2017, we, along with other distributors, received a request for information related to an investigation being conducted by a group of approximately 40 U.S. state attorneys general. We also have received civil investigative demands, subpoenas or requests for information from several individual state attorneys general offices. These investigations are focused on the distribution of opioid medication. We are currently evaluating and responding to their requests.

**Product Liability Lawsuits**

As of October 30, 2017, we are named as a defendant in 90 product liability lawsuits filed in Alameda County Superior Court in California involving claims by approximately 1,030 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Another 15 similar lawsuits involving claims by approximately 25 plaintiffs are pending in other jurisdictions. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these lawsuits.

At September 30, 2017, we had a total of $129 million, net of expected insurance recoveries, accrued for losses and legal defense costs related to the Cordis IVC filter lawsuits. While we have recorded accruals based on our assessment of these matters, because these lawsuits are in early stages, we are unable to estimate a range of reasonably possible losses in excess of this accrued amount.

## 9. Fair Value Measurements

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at:

| (in millions) | September 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 1,162 | $ — | $ — | $ 1,162 |
| Available-for-sale securities (2) | — | — | — | — |
| Other investments (3) | 116 | — | — | 116 |
| **Liabilities:** | | | | |
| Forward contracts (1) | — | (21) | — | (21) |
| Contingent consideration (4) | — | — | (23) | (23) |

| (in millions) | June 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 739 | $ — | $ — | $ 739 |
| Available-for-sale securities (2) | — | 65 | — | 65 |
| Other investments (3) | 116 | — | — | 116 |
| **Liabilities:** | | | | |
| Forward contracts (1) | — | (21) | — | (21) |
| Contingent consideration (4) | — | — | (32) | (32) |

(1) The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the condensed consolidated balance sheets.

(2) We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 5 for additional information regarding available-for-sale securities.

(3) The other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(4) Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods, and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
|---|---|
| Balance at June 30, 2017 | $ 32 |
| Additions from acquisitions | 5 |
| Changes in fair value of contingent consideration (1) | — |
| Payment of contingent consideration | (15) |
| **Balance at September 30, 2017** | **$ 23** |

The sum of the components may not equal the total due to rounding.

(1) Amount is included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

## 10. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk, and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to fair value through earnings at the end of each period. Our derivative and hedging programs are consistent with those described in the 2017 Form 10-K. The amount of ineffectiveness associated with these derivative instruments was immaterial for the three months ended September 30, 2017 and 2016.

### Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, accounts payable, and other accrued liabilities at September 30, 2017 and June 30, 2017 approximate fair value due to their short-term maturities.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at:

| (in millions) | September 30, 2017 | June 30, 2017 |
|---|---|---|
| Estimated fair value | $ 10,333 | $ 10,713 |
| Carrying amount | 10,003 | 10,395 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

## 11. Redeemable Noncontrolling Interests

In connection with the acquisition of a 71 percent ownership interest in naviHealth during fiscal 2016, we recognized redeemable noncontrolling interest with a fair value of $119 million at the acquisition date.

The noncontrolling interests are redeemable at the option of the third-party noncontrolling interests holders at any time after the two-year anniversary of the closing. During the three months ended September 30, 2017, certain third-party noncontrolling interest holders notified us of their intent to exercise their put right on the noncontrolling interest representing 16 percent of naviHealth with a carrying value of $103 million and a redemption value of $109 million.

Upon notification of the intent to exercise the put, the carrying value of the 16 percent of naviHealth became mandatorily redeemable and was reclassified to other accrued liabilities in the condensed consolidated balance sheet.

The reconciliation of the changes in redeemable noncontrolling interests are as follows:

| (in millions) | Redeemable Noncontrolling Interest |
|---|---|
| Balance at June 30, 2017 | $ 118 |
| Net earnings attributable to redeemable noncontrolling interests | 1 |
| Net purchase of redeemable noncontrolling interests | (103) |
| Adjustment of redeemable noncontrolling interests to redemption value | (5) |
| **Balance at September 30, 2017** | **$ 12** |

In October 2017, we settled the $103 million mandatorily redeemable liability with cash, which resulted in our ownership interest in naviHealth increasing to 98 percent.

## 12. Shareholders' Equity

During the three months ended September 30, 2017, we repurchased 2.2 million common shares having an aggregate cost of $150 million. The average price paid per common share was $67.92. We funded the repurchases with available cash and short-term borrowings.

During the three months ended September 30, 2016, we repurchased 3.1 million common shares having an aggregate cost of $250 million. The average price paid per common share was $81.37. We funded the repurchases with available cash

The common shares repurchased are held in treasury to be used for general corporate purposes.

### Accumulated Other Comprehensive Loss

The following table summarizes the changes in the balance of accumulated other comprehensive loss by component and in total:

| (in millions) | Foreign Currency Translation Adjustments | Unrealized Gain/(Loss) on Derivatives, net of tax | Accumulated Other Comprehensive Loss |
|---|---|---|---|
| Balance at June 30, 2017 | $ (148) | $ 23 | $ (125) |
| Other comprehensive income/(loss), before reclassifications | 40 | (1) | 39 |
| Amounts reclassified to earnings | — | — | — |
| Other comprehensive income/(loss), net of tax | 40 | (1) | 39 |
| **Balance at September 30, 2017** | **$ (108)** | **$ 22** | **$ (86)** |

Activity related to realized gains and losses on available-for-sale securities, as described in Note 5, was immaterial during the three months ended September 30, 2017. There were no unrealized gains and losses on available-for-sale securities at September 30, 2017.

## 13. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the number of common shares used to compute basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| (in millions) | Three Months Ended September 30, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Weighted-average common shares–basic | 316 | 320 |
| **Effect of dilutive securities:** | | |
| Employee stock options, restricted share units, and performance share units | 2 | 2 |
| **Weighted-average common shares–diluted** | 318 | 322 |

The potentially dilutive employee stock options, restricted share units, and performance share units that were antidilutive for the three months ended September 30, 2017 and 2016 were 5 million and 3 million, respectively.

## 14. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The following table presents revenue for each reportable segment and Corporate:

| (in millions) | Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2016 | |
| Pharmaceutical | $ | 28,920 | $ | 28,762 |
| Medical | | 3,724 | | 3,279 |
| Total segment revenue | | 32,644 | | 32,041 |
| Corporate (1) | | (3) | | (2) |
| **Total revenue** | $ | 32,641 | $ | 32,039 |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial, and customer care shared services, human resources, information technology, and legal and compliance. The results attributable to noncontrolling interests are

recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided and other ratable allocation methodologies.

We do not allocate the following items to our segments: last-in first-out, or ("LIFO"), inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation, and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $5 million and $1 million for the three months ended September 30, 2017 and 2016, respectively.

The following table presents segment profit by reportable segment and Corporate:

| (in millions) | Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2016 | |
| Pharmaceutical | $ | 467 | $ | 534 |
| Medical | | 129 | | 127 |
| Total segment profit | | 596 | | 661 |
| Corporate | | (334) | | (126) |
| **Total operating earnings** | $ | 262 | $ | 535 |

The following table presents total assets for each reportable segment and Corporate at:

| (in millions) | September 30, 2017 | | June 30, 2017 | |
| --- | --- | --- | --- | --- |
| Pharmaceutical | $ | 22,220 | $ | 21,848 |
| Medical | | 18,055 | | 10,688 |
| Corporate | | 1,665 | | 7,576 |
| **Total assets** | $ | 41,940 | $ | 40,112 |

## 15. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees.

The following table provides total share-based compensation expense by type of award:

| (in millions) | Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2016 | |
| Restricted share unit expense | $ | 18 | $ | 17 |
| Employee stock option expense | | 5 | | 5 |
| Performance share unit expense | | (6) | | 1 |
| **Total share-based compensation** | $ | 17 | $ | 23 |

**Notes to Financial Statements**

The total tax benefit related to share-based compensation was $6 million and $8 million for the three months ended September 30, 2017 and 2016, respectively. As of July 1, 2017, under ASU 2016-09, excess tax benefits, which are immaterial for the three months ended September 30, 2017, are prospectively recognized within the provision for income taxes on our condensed consolidated statements of earnings and prospectively recognized as operating activity on our condensed consolidated statement of cash flows.

## Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years. Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share | |
|---|---|---|---|
| Nonvested at June 30, 2017 | 2 | $ | 76.72 |
| Granted | 1 | | 66.44 |
| Vested | (1) | | 79.53 |
| Canceled and forfeited | — | | — |
| **Nonvested at September 30, 2017** | **2** | **$** | **71.60** |

At September 30, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested restricted share units not yet recognized was $117 million, which is expected to be recognized over a weighted-average period of two years.

## Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share | |
|---|---|---|---|
| Outstanding at June 30, 2017 | 6 | $ | 63.44 |
| Granted | 2 | | 66.44 |
| Exercised | — | | — |
| Canceled and forfeited | — | | — |
| **Outstanding at September 30, 2017** | **8** | **$** | **64.30** |
| **Exercisable at September 30, 2017** | **5** | **$** | **59.19** |

At September 30, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested stock options not yet recognized was $35 million, which is expected to be recognized over a weighted-average period of two years.

The following tables provide additional detail related to stock options:

| (in millions) | September 30, 2017 | | June 30, 2017 |
|---|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ 65 | $ | 109 |
| Aggregate intrinsic value of exercisable options at period end | 65 | | 106 |

| (in years) | September 30, 2017 | June 30, 2017 |
|---|---|---|
| Weighted-average remaining contractual life of outstanding options | 7 | 7 |
| Weighted-average remaining contractual life of exercisable options | 6 | 6 |

## Performance Share Units

Performance share units vest over a three-year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share | |
|---|---|---|---|
| Nonvested at June 30, 2017 | 0.6 | $ | 77.83 |
| Granted | 0.2 | | 66.43 |
| Vested (1) | (0.2) | | 71.57 |
| Canceled and forfeited | — | | — |
| **Nonvested at September 30, 2017** | **0.6** | **$** | **75.39** |

(1) Vested based on achievement of 133 percent of the target performance goal.

At September 30, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized was $18 million, which is expected to be recognized over a weighted-average period of two years if the performance goals are achieved.

# Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 2.1 | Amendment No. 1, dated as of July 28, 2017, to Stock and Asset Purchase Agreement, dated April 18, 2017, between Cardinal Health, Inc. and Medtronic plc (incorporated by reference to Exhibit 2.2.2 to Cardinal Health's Annual Report on Form 10-K for the year ended June 30, 3017, File No. 1-11373) |
| 2.2 | Amendment No. 2, dated as of October 2, 2017, to Stock and Asset Purchase Agreement, dated as of March 2, 2015, by and between Ethicon, Inc. and Cardinal Health, Inc. |
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 10.1.1 | First Amendment to Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.2 to Cardinal Health's Annual Report on Form 10-K for the year ended June 30, 3017, File No. 1-11373) |
| 10.1.2 | Form of Nonqualified Stock Option Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.3 to Cardinal Health's Annual Report on Form 10-K for the year ended June 30, 3017, File No. 1-11373) |
| 10.1.3 | Form of Restricted Share Units Agreement under the Amended Cardinal Health 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.4 to Cardinal Health's Annual Report on Form 10-K for the year ended June 30, 3017, File No. 1-11373) |
| 10.1.4 | Form of Performance Share Units Agreement under the Amended Cardinal Health 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.5 to Cardinal Health's Annual Report on Form 10-K for the year ended June 30, 3017, File No. 1-11373) |
| 10.2 | Third Amendment to Issuing and Paying Agency Agreement, dated September 15, 2017, by and between Cardinal Health, Inc., and the Bank of New York Mellon |
| 10.3 | Amendment No. 2 to Amended and Restated Five-Year Credit Agreement, dated as of August 26, 2017, by and between Cardinal Health, Inc. and JPMorgan Chase Bank, N.A., individually and as administrative agent |
| 10.4.1 | Fourth Amended and Restated Receivables Purchase Agreement, dated as of November 1, 2013, among Cardinal Health Funding, LLC, as Seller, Griffin Capital, LLC, as Servicer, the Conduits party thereto, the Financial Institutions Party thereto, the Managing Agents party thereto, and LC Banks party thereto and the Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch, as the Agent (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, File No. 1-11373) |
| 10.4.2 | First Amendment and Joinder, dated as of November 3, 2014, to the Fourth Amended and Restated Receivables Purchase Agreement, dated as of November 1, 2013 (incorporated by reference to Exhibit 10.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, File No. 1-11373) |
| 10.4.3 | Second Amendment, dated as of November 14, 2016, to the Fourth Amended and Restated Receivables Purchase Agreement, dated as of November 1, 2013 |
| 10.4.4 | Third Amendment, dated as of August 30, 2017, to the Fourth Amended and Receivables Purchase Agreement, dated as of November 1, 2013 (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 31, 2017, File No. 1-11373) |
| 10.5.1 | Seventh Amended and Restated Performance Guaranty, dated as of November 14, 2016, executed by Cardinal Health, Inc. in favor of Cardinal Health Funding, LLC |
| 10.5.2 | Amendment No. 1, dated May 1, 2017, to Seventh Amended and Restated Performance Guaranty, dated as of November 14, 2016 |
| 12.1 | Computation of Earnings to Fixed Charges |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of the Chief Executive Officer and the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.1 | Statement Regarding Forward-Looking Information |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

## Cardinal Health Website

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible at ir.cardinalhealth.com. In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

# Form 10-Q Cross Reference Index

| Item<br>Number | | Page |
|---|---|---|
| | **Part I. Financial Information** | |
| Item 1 | Financial Statements | **18** |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Item 3 | Quantitative and Qualitative Disclosures about Market Risk | **16** |
| Item 4 | Controls and Procedures | **16** |
| | **Part II. Other Information** | |
| Item 1 | Legal Proceedings | **16** |
| Item 1A | Risk Factors | **17** |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | **17** |
| Item 3 | Defaults Upon Senior Securities | **N/A** |
| Item 4 | Mine Safety Disclosures | **N/A** |
| Item 5 | Other Information | **N/A** |
| Item 6 | Exhibits | **30** |
| | Signatures | **32** |

**N/A**    Not applicable

**Additional Information**

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Cardinal Health, Inc.

Date:  November 7, 2017

/s/   GEORGE S. BARRETT

**George S. Barrett**

**Chairman and Chief Executive Officer**

/s/   MICHAEL C. KAUFMANN

**Michael C. Kaufmann**

**Chief Financial Officer**

# EXHIBIT 89

**Cardinal Health Inc at JPMorgan Healthcare Conference**

San Francisco Jan 12, 2018 (Thomson StreetEvents) -- Edited Transcript of Cardinal Health Inc presentation Monday, January 8, 2018 at 7:00:00pm GMT

CORPORATE PARTICIPANTS
    Jorge M. Gomez, Cardinal Health, Inc. - CFO
    Michael C. Kaufmann, Cardinal Health, Inc. - CEO & Director
CONFERENCE CALL PARTICIPANTS
    Lisa Christine Gill, JP Morgan Chase & Co, Research Division - Senior Publishing Analyst

## PRESENTATION

**Lisa Christine Gill**, JP Morgan Chase & Co, Research Division - Senior Publishing Analyst

Good morning. My name is Lisa Gill. And I'm the health care, technology and distribution analyst with JPMorgan. It is with great pleasure today that I introduce CEO Mike Kaufmann from Cardinal Health. This will be Mike's first presentation as the new CEO. Also with us today is Jorge Gomez as well as George Barrett, who will join us in the Georgian Room for the breakout. So with that, let me turn over to Mike.

**Michael C. Kaufmann**, Cardinal Health, Inc. - CEO & Director

Thanks, Lisa.

Good morning, everyone. Before I begin, I want to note that my comments are subject to forward-looking statements, which are outlined and discussed on our Investor Relations website.

During the discussion today, we will reference non-GAAP financial measures. Information about these measures and reconciliations to GAAP are included at the end of the slide presentation, which will be posted on our Investor Relations website.

While I just became CEO actually last week, I have worked with the company for -- thank you. I have worked with the company for 27 years. I've served in roles in charge of all sales and marketing, in charge of global procurement and most recently as CFO. I've also had the pleasure to work with George Barrett for the entire 10 years that George has been at Cardinal Health. And in fact, George and I have known each other for a long time prior to that because while George worked at Teva, he and I had a chance to work together. And so given that George and I have known each other for close to 20 years, I can tell you that the transition for the last couple months has been going well, and I would see no reason that it wouldn't continue to go well as we have a very close and long-term relationship.

I also want to say how excited I am to have Jorge Gomez as the new CFO of Cardinal Health. Jorge has served in 3 very critical roles within Cardinal Health. He served as its Treasurer initially. He also served as CFO of the Pharmaceutical segment when I was the CEO of that segment. And he also most recently has served as CFO of the Medical segment. So he brings a wealth of experience in key roles on the financial side to Cardinal Health. So I'm excited to have him.

Also joining us today is Greg Kenny, our lead Director. So Greg is here today and will be joining us for many of our investor 101s throughout the rest of the day.

For those of you who may not be as familiar with Cardinal Health, let me just flip these, Cardinal is a company of considerable scale and breadth. Our revenues for our fiscal year ended FY '17 were $130 billion. We are currently operating in 60 different countries, and we employ over 50,000 employees worldwide. Additionally, we touch about 85% of hospitals and 24,000 pharmacies on a daily basis. We have over 30 manufacturing plants and have decades of manufacturing experience. We acquired 17 additional plants to the 15 that we had with the Patient Recovery acquisition. And so we have great scale in both manufacturing as well as global supply chain. Through this scale, we either source through our sourcing offices or through our direct manufacturing over 400,000 unique products that we use to serve customers throughout the continuum of care. And finally, we serve over 2 million patients in the home, and we also serve over 10,000 clinics and physicians' offices across the health care system with both our Cardinal Health at Home business and our specialty business.

Our decisions to participate in these areas as well as many of the other areas I haven't talked about in Cardinal are all informed around the drug trends or the various health care trends that we see. This is just a list of some of those trends that we use to determine both our strategic priorities and where we want to be and where we want to go as a company. I'm not going to speak to all of these, but I will talk about 4 of them that I think have informed a lot of our recent moves and why we feel really good about our business going forward.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

First of all, the global demand for health care is not letting up. It is going to continue to grow. And we believe this is a significant tailwind for us and, obviously, for many of you in this room with your businesses. We see growth -- significant growth in the U.S., Asia and in Europe, all of where we're participating at this point in time. So we don't see that letting up. A good example or stat is that there's a belief that folks greater than 65 years old will double by the year 2060. So I think that's the first tailwind that we see. The second thing I would talk about is the power of generics and also the importance of breakthrough pharmaceuticals. While these seem incredibly different, where you have low-cost generics on this side and the innovation in very more expensive products on the other side, having both of them work together is incredibly important to funding an overall system. And it's important as a company in distribution to be able to be a significant player in both. As far as generics go, there'll be probably -- or close to 90% of prescriptions will be generic over the next coming years. And so being able to acquire pharmaceutical generic products at the lowest possible cost at the highest service levels is incredibly important for us as a company. And so our joint venture with CVS called Red Oak Sourcing has been going very well and continues to operate and we think positions us very well on the generics side. As it goes to specialty drugs, our specialty business, which in this past year, FY '17, finished at greater than $12 billion in sales, has significant presence in both downstream to providers as well as upstream to manufacturers. This is a business with significant scale and is continuing to grow double digits both bottom line and top line. If you take that $12 billion of volume with over $20 billion of specialty drugs that we do through our pharmaceutical distribution business, we have significant scale in the specialty space.

Another important trend is around the care shifting to more efficient settings. This is one of those trends that for us has informed a lot of our recent acquisitions, particularly over the last 5 years. If you think about it, we moved into buying AssuraMed, which is now called Cardinal Health at Home, recently, and that is about 4 to 5 years ago, and that is a business that, as I mentioned earlier, is providing about 50,000 products to patients in the home and about 2 million patients. So that is an area that we're seeing significant growth and importance going forward. And this business is not a business that's just about shipping product to home. Yes, that's an important piece of it. But what's really the secret sauce of this business is the relationships that we have with the discharge planners, the patients and the payers. Because the real trick here is being able to match the patient up and be able to work through on the reimbursement issues and make sure the right product at the right price is getting to the customer in their home and making sure they're getting it when they need it. So that's one area that this trend has informed for us.

Most recently, about 1.5 years ago or so, you saw us acquire naviHealth. This is a business that works in the postacute space. And this is a business that works with both payers and providers to reduce the ultimate cost of care once they leave the hospital setting. And this is an important business that we continue to see significant growth and opportunity going forward to partner not only with our provider customers but also with our payer customers.

And finally in this space, we also acquired MTMOutcomes -- or OutcomesMTM, and this is providing medication therapy management. And so we employ hundreds of pharmacists that are able to work with our pharmacy customers to be able to provide medication therapy management services to patients while they're at home.

And the last trend that I would say that's incredibly important that's been informing a lot of what we're doing is what I'll call just partnerships and the importance of those. I think many of us in this room know that in this current environment, to be able to be efficient from a capital perspective, to be able to truly broaden what you can do as a company, partnerships are incredibly important. And so you see that across our spectrum. So first of all, many of our customers are our largest competitors. Many of our suppliers can also be competitors of ours. And so it's really important for us to be able to work together with partners like that, and it's something we've been doing for a really long time, that I think we're very good at because people know that we want to be transparent and good and fair to work with. And we'll continue to do that and work with these companies.

The second area has been, for instance, our CVS partnership on Red Oak Sourcing. This has been one of the most important and valuable partnerships that we've had and continues to deepen our relationship with CVS and we have great relationships. And this partnership has worked incredibly well, and the performance under the team at Red Oak has been incredible.

And lastly in the area of partnerships with our more recent acquisition of Cordis. This is a way that we are growing our overall product portfolio, is by forming partnerships. A good example is the partnership we just signed with Medinol to bring a drug-eluting stent into our United States bag and also ex U.S. to be able to service customers that want a greater offering on our cardiology offering through Cordis. And so partnerships are incredibly important across our entire portfolio of companies.

So now let me step back and give you a little bit more recent financial information.

For our fiscal year FY '17, as I mentioned, we did about $130 billion in revenue. We had $2.7 billion of non-GAAP operating earnings, and we had earnings per share of $5.40.

Now if you look more recently at our most recent quarter, which ended September 30, 2017, we had revenues of $32.6 billion, we had non-GAAP operating segment -- profit of $610 million and then we also had non-GAAP diluted

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

EPS of $1.09. During the first quarter, we also generated $1.2 billion in cash flow. And at the end of the quarter, we had an extremely flexible and solid balance sheet that will enable us to go forward.

Going into a little more detail.

While we go to market as one company, we do report in 2 distinct segments. First of all, we have our Pharmaceutical segment, which is led by Jon Giacomin. Jon and his team this past year had revenues of $116 billion and had segment profit of $2.2 billion. Our Medical segment, which is led by Donald Casey, had revenues of $13.5 billion and had a segment profit of $572 million. One thing I will make of note is that for our fiscal year '17, the Medical segment was about 20% of our overall segment profit. Our expectations going forward in fiscal '18 is that will be more like 30% or greater going forward with the recent acquisition of our Patient Recovery business.

So let me go into a little bit more detail on our Patient Recovery business.

This is a business that we purchased from Medtronic for $6.1 billion. It closed on July 29, 2017, so we had about 2 months of activity in our first quarter of '17.

We brought with it 23 product categories that are highly complementary to the suite of products that we already had at Cardinal. As I mentioned earlier, it also added 17 high-quality global manufacturing plants that when combined with the 15 plants that we had, we now have over 30 global manufacturing plants worldwide.

We committed that we would deliver at least $0.21 of non-GAAP EPS for fiscal '18; and that our current belief is that we will deliver greater than $0.55 of non-GAAP accretion in our FY '19 numbers; and that by the time we exit FY '20, we will be at a run rate of over $150 million of both sales and cost synergies.

So let me give you just a little bit more detail on some of the product lines in case you're not familiar with them. These are the names of some of the key brands that came along with the acquisition. As you can see, I will not go through all of these on here, but these are very well-known brands. They range from products such as bandages and dressings to enteral feeding pumps. Some of these brands like the Curity brand is well known for both wound care. And if you take a look at the Kangaroo brand, this is particularly important in the enteral feeding space. And finally, the Kendall line, which is also very well known in both electrodes as well as in compression products.

These are very important products, and an important piece of this is the sales training, of working our sales teams together. And so over the last several months, we've been bringing the sales teams together, doing the training, learning the best from the best and going forward. And things are going very well so far on the integration of this business.

As I mentioned, we report externally in 2 segments, the Medical and the Pharmaceutical segment. However, that's not the way we go to market. We go to market every single day as one company. When we look at a customer, whether they're an acute care hospital, a mail order pharmacy, a retail independent or retail chain, we look at the breadth of all of Cardinal to determine what offerings we can bring to that customer. And so each customer is looked at as a unique opportunity to bring all that we have at Cardinal to them. So for customers, we can offer unique solutions in the areas of logistics, business, patient and product solutions.

Now while this is kind of a large and kind of feels like it's at 10,000 feet here, let me wrap up with a slide that talks about specifically some of the things that we do to wrap ourselves around customers and how we believe we're unique.

So this is an example of an actual existing customer of ours. It's a large medical center. It's one of the largest not-for-profit health care centers in the United States. They have revenues of over $4 billion a year and are made up of 10-plus hospitals as well as retail pharmacies and clinics. And we touch them in so many ways. First of all, we are their med-surg distributor. And so through the med-surg distribution business, we are delivering 5 days a week to this hospital in semi truckloads to them, on pallets of product to them, to service all of their key medical-surgical needs. And by being there every day as their med-surg provider, that also has in place then the rails for us to then effectively service them with our own Cardinal Health-branded products. And so here, we offer a large array of our products, both the new Patient Recovery as well as existing lines of Cardinal products, to them on a daily basis so they can get high-quality products at a lower cost and take advantage of the fact that we're already going there 5 days a week.

On top of Cardinal-branded products and med-surg distribution, we're also doing custom kitting for them on a daily basis. So we provide custom kits for the various physicians that they can use in the hospital to help them be particularly efficient in the operating room and many other spots of the hospital.

We also provide inventory management services. So using our WaveMark RFID technology, for instance, in the cath lab and in the OR, we are RFID-tagging expensive medical products so that they can be scanned when they're used to be able to manage inventory, reduce obsolescence and make sure that products are getting billed.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

On top of that, we have a business that we call OptiFreight. So imagine, as a hospital of this scale, you have a lot of freight that's incoming from other suppliers that they're buying directly from, as well as product that's going out from the hospital to other locations. They need someone to help manage these freight costs and reduce those costs for them. We do that through this offering, and this is one of our largest service offerings that we offer, particularly into the acute space, and we do that with them on a daily basis.

We also provide with them third-party logistic services. So one of the things that this hospital does, and this is not just unique to them, they will have certain high-cost, expensive medical-surgical products. They will buy them and have them shipped to our distribution center, where we will maintain these products, break them down into a low unit of measure for them. They will order, and we will be able to ship those to the hospital on a daily basis. What this does for them is it helps them take advantage to manage their formulary and reduce their cost so that they can, again, do the lowest cost that they can to provide service.

We also -- besides medical-surgical distribution, we provide all of the pharmaceutical distribution to this customer. So we are delivering pharmaceuticals 5 or 6 days a week on a daily basis into the various locations within this hospital and this IDN. Because we're going every day with pharmaceutical distribution, one of the things that we ended up doing last couple of years is help them take advantage of the significant scale we have in generic purchasing on the solid oral products. And so they buy their solid oral generics through us on our source program, and then their injectable products, which they would get through their GPO contract, we service them daily by loading their GPO contracts. So they take advantage -- have taken advantage of the great costing that you're able to get from their GPO partner on the injectables and the great costing that we're able to provide on the sourcing side on solid oral products.

We also are their specialty provider. So we are providing consigned inventory services not only into the main hospital but also into the various clinics that they serve.

We provide the nuclear pharmacy services for them. So on a daily basis, we are compounding patient-specific radiopharmaceutical doses for them and delivering them to the hospital so they can take and administer them to the patients and take this risky and costly service out of the hospital and put it on us where we have that expertise.

And lastly, we also provide consulting services for them. This is -- and we do this in many areas on a lot of different projects. For instance, we have worked with them on a SKU rationalization product -- project. We have also worked with them in the areas of data to help clean up their data. And things like SKU rationalization and cleaning up their data can really improve their area -- many different areas. It improves their ability to order more effectively. It improves their ability to bill more effectively. It reduces inventory obsolescence. And so we're able to touch a lot of the hospital through our consulting services, various programs that we have.

So as you can see, we have many, many touch points to our customers. And this is just one example. We have many customers that we have the same or more services, and obviously there's others we have less services to. But we as a company have a strong breadth that we can wrap our arms around a customer and provide a lot of services that they need.

So in closing, I really believe that the strategic steps that we've taken over the last several years has really put us in a strong position as a company. I believe that we are well aligned with the trends in health care. And I as the new CEO don't expect to make dramatic changes. But as anybody with a dynamic environment, there will always be changes that will be needed to be made. But I feel really good that we're competitively positioned incredibly well for the future.

So thank you, and I look forward to having myself and Jorge in the breakout session to answer your questions. Lisa? Thanks.

## QUESTIONS AND ANSWERS

**Analyst:** Lisa Christine Gill, JP Morgan Chase & Co, Research Division - Senior Publishing Analyst

**Question – Lisa Christine Gill:** (technical difficulty)

**Answer – Jorge M. Gomez:** A June filer, we will have the first half of our fiscal year based on the old statutory rates of 35% for corporate taxes. For the second half of the year, that will drop to 21%. So you should keep that in mind. The second thing is those provisions that I mentioned before that will be a negative for us, they actually don't kick in until July 1, which is the beginning of our fiscal year '19. So that's another timing consideration that you should keep in mind. Net-net, all of this, as I said before, should be positive. And you should expect to see our blended ETR for '18 non-GAAP to be in the neighborhood of about 30%. So that's what we're expecting for fiscal year '18.

It is important to keep in mind that because these calculations are very complex, the SEC has given relief to companies in the form of a 1-year measurement period over which we will have the opportunity to refine the estimates and make sure that we have all the right calculations. And that will happen over the next year or so. So when we file

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

our 10-Q for Q2, we will give you color and specifics in terms of where we are with those estimates, which ones are more final and which ones are still in progress.

We will be very transparent about all of those things. The last thing that I'd like to mention is from a cash flow perspective and capital allocation perspective, obviously, we are very excited about the positive impact from -- these changes. There will be some pretty large noncash accounting adjustments that'll happen in Q2. I think most of you have heard about the impact on the remeasurement of deferred tax assets and liabilities. We also will have to make some accruals pertaining to the impact from the mandatory -- the tax on the mandatory repatriation of all U.S -- or international earnings. Those 2 items will hit Q2 and by extension, the rest of the fiscal year, they will be -- the remeasurement of the deferred tax asset and liability is going to be much larger than the negative impact and that's going to be positive for us. The repatriation of earnings, the tax on that repatriation of earnings is going to be negative for us but of a much smaller scale. So we expect in Q2 to have actually a significant benefit on our P&L related to these accounting adjustments, which as I said before, for the most part will be noncash.

But from a cash flow perspective, when you think about the ongoing rate, the non-GAAP ETR annual rate, that is going to have most of the P&L benefit that comes with that change will translate into cash. So obviously, we are very excited about that because that enhances our ability to reinvest in the business. We remain very committed to our balanced capital allocation process or practice that we have followed for many years. We'll continue to reinvest in the business to ensure that we have sustainable growth. We have a differentiated dividend that is very important to us, and we will always look at strategic M&A opportunities and we'll return to -- cash to shareholders in the form of share buybacks opportunistically and we will not sit on idle cash, our practice has been very clear around that. Obviously, we will be -- we were given very specific information and we'll be transparent as to how we allocate capital going forward. But that's how we're thinking about this. Overall, really excited about the impact that tax reform has on us.

**Answer – Michael C. Kaufmann:** Just one quick thing. I just want to help everybody. So as Jorge said, so if you take into consideration, as he mentioned, the very onetime large entry we'll have when we release Q2, then the ongoing impact, if you set all those aside for a minute because they clearly are going to affect our FY '18 guidance, but if you're setting those aside, right, he said there's -- we're still comfortable with the guidance that we had placed before. And we'll come back out with new, specific guidance with the impact of tax when appropriate here when we announce the quarter. But again, setting those aside, we would still expect the guidance that we stated before, that we're comfortable with it.

**Question – Lisa Christine Gill:** Yes, generally, at this conference, we get some indication as to where drug price inflation is trending for the branded manufacturers here at the early part of the year. Can you tell us what your experience has been thus far on that side, one? And then two, reports back a month or so ago about Teva getting out of manufacturing certain products because of how low the cost is. Can you talk about how that impacts your business? I think some view that, that could be a positive. Others view that, that could be negative from a competitive standpoint.

**Answer – Michael C. Kaufmann:** Yes, absolutely. So first of all, as it goes to brand price increase activity, it's still very early in the month. But as you know, our Q3 and particularly the month of January is one of the largest months in terms of price increase activity. We said this year that we expect it -- that to be somewhere in the neighborhood of 7% to 8% inflation. And we would still say, based on what we've seen, we still feel comfortable with the range that we had provided earlier on at being in that 7% to 8% range. I will say this, though, that's really important. Remember now, over 90% of our branded fees now are no longer contingent to inflation. And so it's important to know that while that rate is still somewhat important to us, it's not as important as it has been in the past because most of our agreements are pure fee-for-service agreements, and whether the inflation is 2% or 20%, we're still going to earn the same fee. As far as the comments related to Teva in looking at their portfolio, I think in general, pharma companies on the generic side have been doing that for years. Is Teva maybe looking a little more aggressively than in the past? And they have, at least from what we're hearing from them, yes. But I feel really comfortable that with our Red Oak Sourcing entity and what that team is doing with their knowledge of where Teva and where all these other companies are both vertically integrated, with -- which drugs are important to them, sitting down with great relationships with them to work through these situations, I don't see any reason why we can't take -- we can't work through this in a way that will be both productive for the manufacturers as well as for us as a buyer.

**Question – Lisa Christine Gill:** Questions? You obviously just gave an update around '18, that you anticipate it will be the same outside of tax. But can you maybe just drill down a little bit around what trends you're seeing on each side of your business, right? So you've made a couple of acquisitions on the Medical side of your business. Jorge has come from the Medical side of the business. Can you maybe just talk to us about have things met your expectations on that side of the business? What are you seeing in the hospital environment? I think there's an overall concern around utilization right now for hospitals as well as hospitals buying other services because of the compounded pressure that's put on them today.

**Answer – Michael C. Kaufmann:** Right, great. Yes, it's a little bit hard because we're in between earnings right now, so I have to be careful there -- careful. But just a couple of things to keep in mind, really referring back to Q1. Obviously, the Patient Recovery business acquisition was an important acquisition for us. And as I mentioned in the

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

previous session as well as in the past, that acquisition is going well so far. We have not only were able to close in on July 29 and work together effectively with Medtronic to transition the business, but we've also been able to get the sales teams together and begin joint training and working through the sales force to make sure that we all have the right reps selling the right products and taking advantage of our scale and breadth to make sure we're delivering that. And as I mentioned in the first quarter, we saw -- the early sales trends were at or above where we expected those to be from the Patient Recovery business. And so things seem to be going well with that one. As you've -- as we've said in the past, our Cordis business has been a business that was struggling last year. We went through a lot of the reasons behind that related to some of the -- underestimating some of the SG&A cost that we would incur ex U.S., some issues around inventory obsolescence and the little bit slower-than-anticipated pickup on those partnership agreements. As I said in the first quarter, we are making progress in all of those areas. And in the first quarter, the Cordis business performed about as we expected in that quarter, and we'll give you more color as appropriate when we get to the end of the second quarter. So overall, when you look across the rest of our Medical segment, whether it be our services businesses, for instance our naviHealth, the OptiFreight business and some of our other services businesses, those are going very well. Our Cardinal Health-branded products continues to go well. And our overall ability to win and retain business in med-surg distribution, I feel very good about. On the Pharma side, the specialty business, again we said at the beginning that we felt that we would grow double digits this year. I mentioned that we felt that way back in Q1, being on track, that we'd be able to grow top and bottom line double digits there. And our nuclear business is doing well. And the biggest driver probably on our pharma distribution business is branded inflation, which I've talked about, and generic deflation, which we said would be in the mid-single-digits deflation. And what we saw in the first quarter was that, that was tracking about where we expected it to.

**Question – Lisa Christine Gill:** Okay. One of the things you talked about in your drug distribution business is making investments in some of your customers when you gave guidance for '18. When we got to last quarter, it didn't appear that you made some of the investments but rather maybe pushed some things out. Can you talk about, one, how to think about what those investments are? And two, do you feel like you still need to make them as we move throughout fiscal '18?

**Answer – Michael C. Kaufmann:** Yes. Yes, that scenario, I would tell you, I -- we -- the way we basically budget or expected those investments to occur was more -- was in the second half. And so as you remember, we said we had about $0.16 of activity, and some of it was related to opioids and some other activities. And then a piece of that was related to these customer investments. We expect those customer investments, if we make those, will be in the second half of the year. And we are still working through some negotiations and discussions with the customers that we're referring to, and so that has not been finalized yet. I'm still hopeful that maybe by the time we announce our Q2 earnings, we'll be able to have some discussion around that. But as I said is, I feel strong about our business whether or not we make them. These are kind of some unique opportunities to work together in a different way with a couple of customers. If we do, do them, we will be transparent about when they occurred and what those costs will be. And if we don't do them, then that would be some upside to our original guidance that we gave because then, we won't incur those costs that we built into our plan.

**Question – Lisa Christine Gill:** I think when people hear the word investment, they think price. So when you talk about unique type of relationships, I know you don't want to give away too much from a proprietary standpoint as I'm sure some of your competitors are in the audience today, but how do we think about what we're talking about here? I mean, are we talking about programs? Are we talking with different types of contracting?

**Answer – Michael C. Kaufmann:** Yes. Yes, I know it's tough and -- because of the fact that it's (inaudible). I will say this. It is with existing customers. So this isn't going out and creating some war chest to take prices down or something in the marketplace. That's not what we're doing. This is about making investments with current customers to be able to take our relationships to a more potential strategic level to do some additional things together. Could there be some price components of that? Absolutely. But there are other components to that to just deepen our relationship with some customers to be able to do some things going forward over the long term that we think could be beneficial for us.

**Question – Lisa Christine Gill:** One of the other things -- Mike and I had a conversation on our way walking today, and I said, "How are you doing on negotiating things around specialty and having pricing for branded, generics, specialty with your customers?" And Mike said, "Well, my competitors have had to work through that, and we haven't had to work through that because we were shifting towards that a number of years ago." So maybe if you can just walk people through where you are on the different pricing that you have in the marketplace and as we think about specialty especially as specialty is one of the bigger growth areas.

**Answer – Michael C. Kaufmann:** Absolutely. I think that our entire industry recognizes the importance of trying to make sure that you price products appropriately so that if you have products that have lower margins on them, potentially higher cost structures, that you're charging differentiated for those in order to be fairly compensated for what we do. And so that is something that we saw years ago. And I think you probably heard us talk a little bit less about it because this is something that we've had in place for a long period of time. It has a -- I don't know of any customer that we have now that I wouldn't say that we aren't protected in a shift of mix on specialty (inaudible). Sometimes, that protection comes in the fact that you price specialty different than regular brand. Sometimes, it

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

comes in the fact that we have what we call mix protection in our agreements so that if the mix were, say, 60% regular brand and 40% specialty, that if that mix were to change to a higher mix of specialty, then the overall cost of goods would change. And so we've always found ways, either through differentiated pricing on the products or through what we call mix protection, to be able to make sure that as we sign longer-term deals, that the change in mix with those customers doesn't put the deal upside down and put us in a tough position with that customer.

---

**Analyst:** Unidentified Analyst,

**Question – Unidentified Analyst:** I've been noticing more cities and counties have been naming Cardinal Health (inaudible) in the opioid lawsuits. Do you guys have any contingency planning -- what a settlement would be like? Like what's the time line for this stuff?

**Answer – Michael C. Kaufmann:** Yes, the time line is really hard to talk about as -- what I can talk about is a few things. You're right, we continue to see more and more cities and counties look to the distributors and the manufacturers in these suits. What I can say is this, is that we've had a program in place for a long time. For instance, we had a program that we've been doing for over 10 years, what we call Generation Rx, where we have trained and been to PTA meetings and many other meetings throughout the country over the years, working with both our customers and our sales reps, educating folks around opioid abuse and importance of understanding, recognizing the signs and what to do. I feel really good about our programs. We really focused on knowing our customers in detail, whether that's visiting the customers, looking at the analytics of what they're buying from us as well as working with our sales reps and others to both educate and understand our customers. So when I look at our analytic skills that we have in place to be able to understand what customers' buying patterns are and do the best that we possibly can, I feel really good that we are world class and second to none when it comes to be able to do that. And I feel like this is something we've been committed to doing the right thing for an incredibly long time. Does that mean with all this going on that down the line there might be some type of settlement? Possibly. It's something we'll have to take a look at in the future. Do we feel that we've done all the right things? Do I feel that we're in an incredibly good position? I do. And so this isn't something where we're just going to -- we feel like we've got to settle because we haven't done anything right. In fact, we feel we've done things incredibly well and have reached out to all the right folks over the years. But down the line, potentially -- if it's a more potentially efficient way to go, there might be a settlement, but that's probably going to be a long time off, and it's really hard for me to quantify at this point in time.

---

**Analyst:** Lisa Christine Gill, JP Morgan Chase & Co, Research Division - Senior Publishing Analyst

**Question – Lisa Christine Gill:** Mike, one of the things that we've talked about the last couple of years has been the competition on the independent side, right? And so 2 years ago, McKesson came out and talked about the competition that we saw there and changes in the marketplace, and we started to see what we believe to be stabilization. Can you really -- can you characterize where the market is today, number one, from a competitive standpoint on the independent side? And two, what are some of the opportunities you see in the independent market today? That's still the biggest driver from a profitable standpoint, right, if I remember correctly?

**Answer – Michael C. Kaufmann:** Yes, yes. So a couple of things there. I think, first of all, if I step back and I talk about the way we define generic deflation that we said would be down mid-single digits, for us the way we define generic deflation is how our average selling price is changing. So it doesn't make our definition right or wrong, but know that our competitors may define that differently. They may use a mix of both acquisition cost and sale or whatever. So it's important to understand. But for us, it's -- our definition is pure, what is our average selling price doing with our independent -- with our overall generic portfolio, which, again, a lot of it is to retail independents. And so probably the best indication around stabilization is the fact that that's tracking about where we expected it to be. We said it would be down mid-single digits. We expected that to be down mid-single digits, which means to me pricing is tracking about where we expect it to be. And so I feel good about where we're at, at this point in time. Just as importantly to that, though, is it's a combination. So if I just tell you that I'm down mid-single digits on my average selling price, that's nice, and that's an important piece of data. But if I don't talk about my cost side, then I could be misleading in the sense that if cost isn't going down as much as we expected, that could still mean a margin squeeze or vice versa, that average selling price could be going down a little bit more. But if my acquisition cost is going down faster, I could still be at or expanding my margins. And I would tell you that Red Oak, which is where we really evaluate our cost side, is performing at or better than we expected to. So sale price is performing where we expected and costing is performing about or better than we expected. So right now, we feel really good about where we're performing related to the generic marketplace. As far as continuing to work with our retail independent customers, we are constantly looking at new programs, some of the ones that we continue to expand is our medication therapy management business, OutcomesMTM that we bought. This is a business that a lot of its customer base is chains and retail independents, and we're continuing to grow that business with them. We are working with our independent customers to put more and more on our Cardinal inventory management program. So we're constantly expanding the base of customers on that. We've been working together with CVS in the private label space to improve our costing and breadth of our line in the private label space, and so that our -- the breadth and cost of our Cardinal Health private

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

label is broader and better. And so we can offer that to our retail independents. So there's a host of other service that we're continuing to grow with our retail independents.

---

**Analyst:** Unidentified Analyst,

**Question – Unidentified Analyst:** You said on a clinical call that you would distribute biosimilars.

**Answer – Michael C. Kaufmann:** Yes. Right now, we do distribute biosimilars...

**Question – Unidentified Analyst:** Through specialty.

**Answer – Michael C. Kaufmann:** Through both -- well, actually, both through our specialty and through our normal pharmaceutical distribution business. So depending on the manufacturer and which channel they've chosen to go through. So if they're exclusive and they only want to go through specialty distribution, our specialty distribution business has been able to compete very effectively to get access to all of those and be able to distribute directly into the clinics and the various -ologists, whether it's rheumatologists, oncologists, et cetera. If the manufacturer has chosen to go through normal pharmaceutical distribution versus specialty so that it's offered 5 days a week to the hospital's retail, we also have access to all the biosimilars. And so as far as access and selling, not a problem. I think the unique thing on biosimilars that's going to be important is right now for us, it acts more like a branded drug. So our margins are very similar to what we would make on branded drugs at this point in time. If someday some of the biosimilars become auto-substitutable and act more like generics, then those would be negotiated and go through our Red Oak Sourcing entity. And I think then we'll be able to improve our margins on them at that point in time. But that's probably several years off before we see that. Yes, thank you.

**Question – Unidentified Analyst:** Question on taxes. Order of magnitude, can you quantify the 2 offsets you called out to the tax reform benefit?

**Answer – Jorge M. Gomez:** Yes, we are not in a position to quantify those onetimers at this point. But as I said before, we will have a clear understanding of those numbers when we have our Q2 earnings call. What I -- I'm going to repeat what I said before, which is, those are going to be large numbers for us and, for the most part, is going to be a positive impact to earnings, to our P&L, in Q2 and the rest of the year.

**Question – Unidentified Analyst:** I mean, the ongoing one starting in July. You called (inaudible).

**Answer – Michael C. Kaufmann:** Oh, okay.

**Answer – Jorge M. Gomez:** Oh, the ongoing? I would say the negative items will be much smaller than the benefit that we'll get from the drop in the statutory tax rate.

**Question – Unidentified Analyst:** Can you speak to the 2.3% device tax?

**Answer – Jorge M. Gomez:** Sure. So at this point, as we -- as you know, we don't have any med device tax in our guidance for this year. We thought -- we are following what's going on with all the legislative action. And based on what I'm hearing from a lot of people, including AdvaMed, I think there is a chance, there is a possibility that the med device tax will be repealed in the next weeks or months. And so we'll -- we keep monitoring the situation, and we'll see what happens in the next few weeks.

---

**Analyst:** Lisa Christine Gill, JP Morgan Chase & Co, Research Division - Senior Publishing Analyst

**Question – Lisa Christine Gill:** Yes. Over the last couple of years, your M&A strategy has really centered around -- on the medical supply side. Now that you're stepping into the CEO role, you talked on the stage not a lot of changes. But how do you view that strategy from your seat versus the previous CEO and his strategy around medical supply? It'll be 30% of your business. Is that an area you want to continue to grow? Or is this something that you're going to focus in other areas?

**Answer – Michael C. Kaufmann:** Yes, it's a great question. I would say I think the strategy has been right on. I think that we recognized several years ago that trying to stay as just a med-surg distributor without a really strong breadth in products was not going to be the place that you wanted to be. Customers were demanding us to ask more, and we knew that pure everyday distribution would be more and more commoditized and that we would need to take advantage of those rails and that cost structure to be able to deliver more value, which is what we've been able to do through that. So I would say this. I would not expect us to do anything in the product space on med for probably at least 12 to 18 months, not because I don't think it's the right strategy -- absolutely, it's the right strategy -- but because we think it's really important now we step back and focus on the execution of the Patient Recovery business. It was one of the largest acquisitions that we've ever done, and we want to make sure that it goes right. So right now, the folks that would be needed to work on a new acquisition are the ones we really need to be focused on executing the

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

ones that we've done, both managing the Patient Recovery business as well as continue to do right things on Cordis. So I don't see us doing anything on the short term over on the product side. But over the long term, I would say that, that scenario, we were going to continue to explore and look for ways to continue to take advantage of not only our breadth but also the rails that we're going on, the sales forces that we'll have in place. So I would continue to expect us to see expansion there.

**Question – Lisa Christine Gill:** Is there certain product areas you don't have today that you would envision being part of Cardinal going forward?

**Answer – Michael C. Kaufmann:** We're constantly reevaluating that. I wouldn't say there's anything specifically that sticks out that we'd want to talk about publicly, but we -- our team does a really good job of constantly looking at various areas. I think we want to stay in the area of those products that are from commodity to kind of middle of the road. We -- I don't see us going to the high, high physician preference items where you need to have representatives that are literally calling on the doctors. And if the doc and that representative don't have it -- we want, with that central supply group, is having say on that product choice is where we're going to be because of our relationships there, and we think that's the right model for us with our infrastructure.

**Question – Lisa Christine Gill:** (inaudible) you had a question?

---

**Analyst:** Unidentified Analyst,

**Question – Unidentified Analyst:** Yes, Mike, can you talk about what percentage of revs or operating kind of (inaudible) business is much more commoditized (inaudible) competition from like an Amazon (inaudible)? How to get to (inaudible)?

**Answer – Michael C. Kaufmann:** Yes. Yes, it's a great question. I won't be able to give you specifics, but I will tell you this, is if you took our entire Medical segment profit and you started thinking about what's in there, first of all there's a large portion now of our Medical segment profit that is ex U.S. And so that is something, I think, very different from the competitors that people often talk about, that worry about that might do some disintermediation to us. So you can take that out. Then, as I mentioned, we have a significant scale in services businesses. And what I mean by services business is freight management, naviHealth and postacute, et cetera, et cetera. We have a significant amount of our earnings in our services business, again, that I think are very unique and not quite the same level of being disintermediated at least by the type of competition that you're mentioning. Then you take a look at our physician preference items. When I say physician or higher physician preference, surgeon gloves, drapes, or gowns, these are products that people don't just order. You may think, well, drapes and gowns are drapes and gowns. It's actually not. I mean, anytime when we switch, we have to spend time and test them and work with the facilities. So these are surgeon gloves. Surgeons are very specific about them. Our Cordis products and several of our other products are much more preferred than I think folks understand. And you begin to pull that out, and you will find that it is a very small portion of our Medical segment, which is actually pure, commoditized national brand or the lower-end commodity Cardinal Health-branded products. And the last thing I would say on those to wrap this up is it's not only a small portion -- but while it's a small portion, a couple things to keep in mind is first of all, we're not shipping eaches to our customers. So when we ship gloves, we tend to ship a pallet of gloves. And so that's the first thing, is that it is semi trucks and pallets, not eaches and boxes, which is a very different type of delivery. It's 5 days a week into the hospital. We have mix requirements. So if a customer wants to buy a certain national brand from us, they're going to have to buy a certain Cardinal brand from us. So to be able to pick and choose is not something that the customer is able to do without potentially experiencing some cost increases. And lastly, when you look at the scale of all we do and how much we buy, if you were able to take a look at the everyday selling price that we're selling out and look at competitors out there, the price we're selling at today is significantly, I mean significantly lower than anything else out there. And so the amount of scale that we have to buy those commodity products is significant, and it would be hard for someone to ever come close to any of the pricing that we would otherwise have.

---

**Analyst:** Lisa Christine Gill, JP Morgan Chase & Co, Research Division - Senior Publishing Analyst

**Question – Lisa Christine Gill:** Okay. Thanks very much, everybody. We're out of time. Thank you. All right, good luck.

---

StreetEvents transcripts content provided by Thomson Reuters

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

# EXHIBIT 90

# Cardinal Health
## 36th Annual JP Morgan Healthcare Conference

Mike Kaufmann
Chief Executive Officer

*Monday, January 8, 2018*



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with the recently completed acquisition of the Patient Recovery business, including the ability to retain the acquired businesses' customer and employees, the ability to successfully integrate the acquired business into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties with respect to the recently enacted Tax Cuts and Jobs Act, including the ability to realize the benefits of, and mitigate the risks from the Act; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of any investigation or action by any regulatory authority, including litigation related to opioid distribution. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of January 8, 2018. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, this presentation contains Non-GAAP financial measures. Cardinal Health provides definitions and reconciliations of the differences between the Non-GAAP financial measures and their most directly comparable GAAP financial measures in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com.



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**For those tasked with navigating the complexities of healthcare…**

Cardinal Health brings **scaled solutions** that **help our customers thrive** in a changing world.

# Essential facts about Cardinal Health
*A global, integrated healthcare products & services company*

**$130 billion**
revenues in FY17

We operate in
**60**
countries

Approximately
**50,000**
employees worldwide

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.


**Cardinal**Health
*Essential to care™*

# Essential facts about Cardinal Health

*A global, integrated healthcare products & services company*













© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# Healthcare Trends



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# FY17 financial summary

| | |
|---|---|
| **Revenue ($M)** | **$129,976** |
| **non-GAAP Operating Earnings[1] ($M)** | **$2,769** |
| **non-GAAP Diluted EPS[2]** | **$5.40** |

[1]*FY17 GAAP operating earnings $2,120M*
[2]*Attributable to Cardinal Health, Inc. FY17 GAAP diluted EPS $4.03*
*Please see appendix for GAAP to Non-GAAP reconciliations.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth

*Essential to care™*

# Q1FY18 financial summary

| | |
|---|---|
| **Revenue ($M)** | **$32,641** |
| **non-GAAP Operating Earnings[1] ($M)** | **$610** |
| **non-GAAP Diluted EPS[2]** | **$1.09** |

[1]*Q1FY18 GAAP operating earnings $262M*
[2]*Attributable to Cardinal Health, Inc. Q1FY18 GAAP diluted EPS $0.36*
*Please see appendix for GAAP to Non-GAAP reconciliations.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Two financial reporting segments…

## *Pharmaceutical*



## *Medical*



| FY17 revenues of $116B | FY17 revenues of $13.5B |
|---|---|
| FY17 segment profit of $2.2B | FY17 segment profit of $572M |



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# Acquisition of Medtronic's Patient Recovery Business

| | |
|---|---|
| **Purchase price** | **$6.1B** |
| **Closed** | **July 2017** |
| **Product Categories** | **23** |
| **Manufacturing facilities** | **17** |
| **FY18 non-GAAP Diluted EPS[1] Impact** | **>$0.21 [2]** |
| **FY19 non-GAAP Diluted EPS[1] Impact** | **>$0.55 [2]** |
| **Annual Operational synergies exiting FY20** | **>$150M [2]** |

[1]Attributable to Cardinal Health, Inc.
[2]Expected financial impact provided on April 18, 2017.
Please see appendix for GAAP to Non-GAAP definitions.

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



*Essential to care™*

# Patient Recovery Business Product Lines

| Brand | Products |
|---|---|
| Argyle™ | Open suction, cardiothoracic drainage, catheters |
| Curity™ | Bandages, dressings, underpads, adult briefs, protective underwear |
| Devon™ | Foam positioners, delivery kits, OR essentials |
| Dover™ | Urology, collection systems |
| KANGAROO | Enteral feeding pumps, sets, tubes and access devices |
| Kendall™ | Compression devices, anti-embolism stockings, disposable lead wires |
| Monoject™ | Sharps disposal containers, hypodermic needles, prefilled syringes |

**CardinalHealth**
*Essential to care™*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# Cardinal Health goes to market with enterprise-wide capabilities in four areas



**Logistics**
Solutions

Enable a more efficient way of bringing healthcare to market



**Business**
Solutions

Optimize the process and performance of healthcare



**Patient**
Solutions

Connect clinicians and patients for smarter population management, better patient wellness



**Product**
Solutions

Provide a comprehensive healthcare product offering

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Robust solutions for an existing customer

- One of the largest not-for-profit healthcare providers

- $4B+ in revenues

- 10+ hospitals, long-term care facilities, physician offices, retail clinics and pharmacies, and rehabilitation centers



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

CardinalHealth
*Essential to care™*

# Cardinal Health
## 36th Annual JP Morgan Healthcare Conference

Mike Kaufmann
Chief Executive Officer

*Monday, January 8, 2018*



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

**Cardinal Health, Inc. and Subsidiaries**

**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | **Fiscal Year 2017** | | | | |
| **GAAP** | $ 2,120 | (14)% | $ 1,924 | $ 630 | $ 1,288 | (10)% | $ 4.03 | (7)% |
| Restructuring and employee severance | 56 | | 56 | 20 | 36 | | 0.11 | |
| Amortization and other acquisition-related costs | 527 | | 527 | 165 | 362 | | 1.13 | |
| Impairments and (gain)/loss on disposal of assets | 18 | | 18 | 6 | 12 | | 0.04 | |
| Litigation (recoveries)/charges, net | 48 | | 48 | 19 | 29 | | 0.09 | |
| Loss on extinguishment of debt | - | | - | - | - | | - | |
| **Non-GAAP** | $ 2,769 | (4)% | $ 2,572 | $ 839 | $ 1,727 | (0)% | $ 5.40 | 3 % |
| | | | | Fiscal Year 2016 | | | | |
| GAAP | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| LIFO charges/(credits) | - | | - | - | - | | - | |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | (69) | | (69) | (27) | (42) | | (0.13) | |
| Non-GAAP | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2]Attributable to Cardinal Health, Inc.

[3]GAAP diluted EPS for the twelve months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.39, which includes $0.26 due to change in the effective tax rate and $0.13 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate)) divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

[4]Non-GAAP diluted EPS for the twelve months ended June 30, 2017 compared to the prior period was favorably impacted by $0.44, which includes $0.27 due to change in the effective tax rate and $0.17 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.
We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the periods presented.



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | **First Quarter 2018** | | | | |
| **GAAP** | $ 262 | (51)% | $ 178 | $ 61 | $ 115 | (63)% | $ 0.36 | (63)% |
| Restructuring and employee severance | 132 | | 132 | 47 | 85 | | 0.27 | |
| Amortization and other acquisition-related costs | 183 | | 183 | 58 | 125 | | 0.40 | |
| Impairments and (gain)/loss on disposal of assets | 1 | | 1 | - | 1 | | - | |
| Litigation (recoveries)/charges, net | 32 | | 32 | 13 | 19 | | 0.06 | |
| Loss on extinguishment of debt | - | | 1 | 1 | - | | - | |
| **Non-GAAP** | $ 610 | (9)% | $ 527 | $ 180 | $ 346 | (13)% | $ 1.09 | (12)% |
| | | | | First Quarter 2017 | | | | |
| GAAP | $ 535 | (14)% | $ 494 | $ 184 | $ 309 | (19)% | $ 0.96 | (17)% |
| Restructuring and employee severance | 9 | | 9 | 4 | 5 | | 0.02 | |
| Amortization and other acquisition-related costs | 122 | | 122 | 40 | 82 | | 0.25 | |
| Impairments and (gain)/loss on disposal of assets | 3 | | 3 | 1 | 2 | | 0.01 | |
| Litigation (recoveries)/charges, net | 1 | | 1 | - | 1 | | - | |
| Non-GAAP | $ 669 | (9)% | $ 629 | $ 229 | $ 399 | (13)% | $ 1.24 | (10)% |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules
[2]Attributable to Cardinal Health, Inc.

The sum of the components may not equal the total due to rounding.
We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the First Quarter 2017.

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



**Cardinal Health, Inc. and Subsidiaries**

<u>Forward Looking non-GAAP Measures</u>

In this presentation, the Company presents forward-looking non-GAAP EPS and may present forward-looking non-GAAP ETR metrics.  The Company does not provide EPS or ETR outlook, which are the most directly comparable GAAP measure to non-GAAP EPS and non-GAAP ETR, respectively, because changes in the items that the Company excludes from these non-GAAP measures can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS or ETR outlook.

The timing and amount of any of the excluded items could significantly impact the actual EPS and ETR metrics. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013.

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total Cardinal Health, Inc. shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total Cardinal Health, Inc. shareholders' equity).

**Non-GAAP Diluted EPS attributable to Cardinal Health, Inc. or "Non-GAAP Diluted EPS" or "Non-GAAP Diluted Earnings Per Share"**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP Diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Effective Tax Rate**: (provision for income taxes adjusted for (1) LIFO charges/(credits)[1], (2) restructuring and employee severance[2], (3) amortization and other acquisition-related costs[3], (4) impairments and (gain)/loss on disposal of assets[4], (5)  litigation (recoveries)/charges, net[5], and (6) loss on extinguishment of debt[6]) divided by (earnings before income taxes adjusted for the same six items).

**Non-GAAP Gross Margin**: Gross margin excluding LIFO charges/(credits).

[1]The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market.  These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[2]Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel), and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[3]Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs, and changes in the fair value of contingent consideration obligations.

[4]Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[5]Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[6]Charges related to the make-whole premium on the redemption of notes.



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# EXHIBIT 91

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): February 7, 2018**

# Cardinal Health, Inc.

(Exact name of registrant as specified in its charter)

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place, Dublin, Ohio 43017**

(Address of principal executive offices) (Zip Code)

**(614) 757-5000**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instructions A.2. below):

☐      Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐      Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐      Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d2(b))

☐      Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

## Item 2.02: Results of Operations and Financial Condition

On February 8, 2018 , Cardinal Health, Inc. (the "Company") issued a news release announcing its results for the quarter ended December 31, 2017 . A copy of the news release is included as Exhibit 99.1 to this report.

## Item 5.02: Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers

On February 7, 2018, the Board of Directors (the "Board") of the Company elected Akhil Johri to the Board, effective immediately, to serve until the 2018 annual meeting of shareholders and until his successor is elected and qualified.  Mr. Johri was appointed to serve on the Audit Committee of the Board.  Mr. Johri is Executive Vice President and Chief Financial Officer of United Technologies Corporation.  Mr. Johri will participate in the standard director compensation arrangements described in the Company's proxy statement for its 2017 annual meeting of shareholders.  The Board has determined that Mr. Johri is independent under the standards of the New York Stock Exchange and the Company's Corporate Governance Guidelines.

## Item 7.01: Regulation FD Disclosure

During a webcast scheduled to be held at 8:30 a.m. Eastern time on February 8, 2018 , the Company's Chief Executive Officer and Chief Financial Officer will discuss the Company's results for the quarter ended December 31, 2017 and outlook for the fiscal year ending June 30, 2018 . The slide presentation for the webcast will be available on the Investors page at ir.cardinalhealth.com . An audio replay of the webcast also will be available on the Investors page at ir.cardinalhealth.com .

## Item 9.01: Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 99.1 | News release issued by the Company on February 8, 2018 announcing second-quarter results. |

2

# Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Cardinal Health, Inc.**

(Registrant)

Date: February 8, 2018          By:     /s/ Jorge M. Gomez

Jorge M. Gomez

Chief Financial Officer

3

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

Media:   Ellen Barry                        Investors:  Lisa Capodici

            (614) 553-3858                            (614) 757-5035

            ellen.barry@cardinalhealth.com            lisa.capodici@cardinalhealth.com

## Cardinal Health Reports Second-quarter Results for Fiscal Year 2018

- **Revenue increases 6 percent to $35.2 billion.**
- **GAAP [1] operating earnings declines 26 percent to $399 million, and GAAP diluted earnings per share (EPS) increases 226 percent to $3.33. Among other items, GAAP EPS includes $2.83 of transitional tax benefits.**
- **Non-GAAP operating earnings increases 4 percent to $730 million, and non-GAAP EPS increases 13 percent to $1.51. Excluding a $0.20 benefit from tax reform, non-GAAP EPS is $1.31.**
- **Company raises FY18 outlook to reflect the benefits of U.S. tax reform.**
- **Board of directors approves new $1 billion share repurchase authorization.**

**DUBLIN, Ohio, Feb. 8, 2018** - Cardinal Health (NYSE: CAH) today reported second-quarter fiscal year 2018 revenue of $35.2 billion, an increase of 6 percent. The company also reported a decline in GAAP operating earnings of 26 percent to $399 million and an increase in GAAP diluted earnings per share (EPS) of 226 percent to $3.33. GAAP EPS included, among other items, $2.83 of transitional tax benefits related to the enactment of U.S. tax reform discussed below. Non-GAAP operating earnings increased 4 percent to $730 million, while non-GAAP EPS increased 13 percent to $1.51. Excluding a $0.20 benefit from a lower tax rate applied to year-to-date non-GAAP pre-tax earnings due to U.S. tax reform, non-GAAP EPS for the quarter was $1.31, a 2 percent decrease from non-GAAP EPS in the prior-year quarter.

"Overall, we are very pleased with the quarter," said Mike Kaufmann, CEO of Cardinal Health. "Our Pharmaceutical Distribution business performed better than expected, and we continue to see strong growth in Specialty Solutions. In the Medical segment, the integration of the Patient Recovery business is progressing as planned, and we are excited by the opportunities in that business. In addition, we remain encouraged by how well our value proposition is resonating with customers.

"As we look to the remainder of the year," Kaufmann continued, "we anticipate our overall operating performance to be as expected."

## Q2 FY18 summary

| | | Q2 FY18 | | Q2 FY17 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | **35.2 billion** | $ | 33.1 billion | 6% |
| Operating earnings | $ | **399 million** | $ | 542 million | (26)% |
| Non-GAAP operating earnings | $ | **730 million** | $ | 701 million | 4% |
| Net earnings attributable to Cardinal Health, Inc. | $ | **1.1 billion** | $ | 324 million | 225% |
| Non-GAAP net earnings attributable to Cardinal Health, Inc. | $ | **478 million** | $ | 427 million | 12% |
| Diluted EPS attributable to Cardinal Health, Inc. | $ | **3.33** | $ | 1.02 | 226% |
| Non-GAAP diluted EPS attributable to Cardinal Health, Inc. | $ | **1.51** | $ | 1.34 | 13% |

## U.S. tax reform

The enactment of the U.S. Tax Cuts and Jobs Act ("U.S. tax reform") has two primary components impacting Cardinal Health's financial results. First, there is a tax benefit included in earnings that reflects the impact of applying a lower federal tax rate to U.S. earnings. Given the company's June 30 fiscal year end, the lower tax rate will be phased in across fiscal years 2018 and 2019, resulting in a U.S. statutory federal rate of approximately 28 percent for fiscal year 2018. For the quarter ended Dec. 31, 2017, the application of this lower tax rate to fiscal year-to-date U.S. earnings resulted in a benefit of $0.20 per share. Any impact on the tax benefit from future changes in the estimated effective tax rate will be reflected in the applicable period of the change in estimate.

**Cardinal Health**
**Page 2**

Second, as part of U.S. tax reform, the company recorded transitional tax benefits totaling $2.83 per share. These benefits reflected the re-measurement of Cardinal Health's net U.S. deferred tax liabilities and assets at the lower federal rate of 21 percent, partially offset by the required U.S. repatriation tax on undistributed foreign earnings. As these tax reform benefits are estimated, the company may record adjustments to these amounts during the next 12 months. These transitional tax benefits are excluded from the company's reported non-GAAP earnings.

**Fiscal year 2018 outlook**

The company does not provide GAAP EPS outlook because it is unable to reliably forecast most of the items that are excluded from GAAP EPS to calculate non-GAAP EPS. These items could cause EPS to differ materially from non-GAAP EPS. See "Use of Non-GAAP Measures" following the attached schedules for additional explanation.

The company is raising its outlook for fiscal 2018 non-GAAP EPS to $5.25-$5.50, to reflect $0.40 per share of benefit from the lower federal rate due to U.S. tax reform.

## Segment results

### Pharmaceutical segment
Second-quarter revenue for the Pharmaceutical segment increased 5 percent to $31.1 billion due to sales growth from pharmaceutical and specialty distribution customers, which was partially offset by the previously announced expiration of a large, mail-order customer contract.

Segment profit for the quarter decreased 4 percent to $514 million, which was driven by costs related to the company's ongoing investment in its Pharmaceutical IT platform, as well as the company's generics program performance. These were partially offset by strong performance in the Specialty Solutions business.

|  | | Q2 FY18 | | Q2 FY17 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | 31.1 billion | $ | 29.7 billion | 5% |
| Segment profit | $ | 514 million | $ | 537 million | (4)% |

### Medical segment
Second-quarter revenue for the Medical segment increased 19 percent to $4 billion, which was driven by contributions from the acquisition of the Patient Recovery business and, to a lesser extent, new and existing customers.

Segment profit increased 38 percent to $220 million, driven by contributions from the acquisition of the Patient Recovery business, which were partially offset by performance in Cardinal Health Branded products, including Cordis. Segment profit for the quarter included the impact of the Patient Recovery business inventory fair value step-up expense. Excluding the $22 million step-up in the quarter, year-over-year Medical segment profit growth was 52 percent.

|  | | Q2 FY18 | | Q2 FY17 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | 4.0 billion | $ | 3.4 billion | 19% |
| Segment profit | $ | 220 million | $ | 159 million | 38% |

## Additional second-quarter and recent highlights

- The Cardinal Health board of directors approved a new authorization to repurchase up to $1 billion of Cardinal Health common shares, which will expire on Dec. 31, 2020. With this new authorization, Cardinal Health is now authorized to repurchase up to $1.3 billion of its common shares.

- The company closed its divestiture of its Cardinal Health China distribution business on Feb. 1 with net proceeds of approximately $800 million.

- Cordis and Medinol announced U.S. Food and Drug Administration approval of the EluNIR™ drug-eluting stent for the treatment of patients with narrowing or blockages to their coronary arteries. The companies also announced treatment of the first patients in the United States with the device following its approval.

- The company launched the Opioid Action Program , aimed at helping communities in four of the nation's hardest-hit states combat the opioid epidemic. The pilot program will deliver much needed front-line assistance to help prevent opioid abuse and support first responders in Ohio, Kentucky, Tennessee and West Virginia.

**Cardinal Health**
**Page 3**

## Webcast

Cardinal Health will host a webcast today at 8:30 a.m. Eastern to discuss second-quarter results. To access the webcast and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com . No access code is required.

Presentation slides and a webcast replay will be available on the Cardinal Health website at ir.cardinalhealth.com until Feb. 7, 2019.

## Upcoming webcasted investor events

- Leerink Partners 7th Annual Global Healthcare Conference on Feb. 15 at 9 a.m. in New York City

- 2018 RBC Capital Markets Global Healthcare Conference on Feb. 21 at 8:30 a.m. in New York City

- Cowen 38th Annual Health Care Conference on March 12 at 11:20 a.m. in Boston

- Barclays Global Healthcare Conference on March 13 at 9 a.m. in Miami

## About Cardinal Health

Cardinal Health, Inc. is a global, integrated healthcare services and products company, providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically proven medical products, pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. To help combat prescription drug abuse, the company and its education partners created Generation Rx, a national drug education and awareness program. Backed by nearly 100 years of experience, with approximately 50,000 employees in nearly 60 countries, Cardinal Health ranks #15 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter, @cardinalhealthwings on Facebook and connect on LinkedIn at linkedin.com/ company/cardinal-health .

[1] GAAP refers to U.S. generally accepted accounting principles. This news release includes GAAP financial measures as well as non-GAAP financial measures, which are financial measures not calculated in accordance with GAAP. See "Use of Non-GAAP Measures" following the attached schedules for definitions of the non-GAAP financial measures presented in this news release, and see the attached schedules for reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the Investor Relations page at ir.cardinalhealth.com . In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

## Cautions Concerning Forward-Looking Statements

This news release contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with the recently completed acquisition of the Patient Recovery Business, including the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to the recently enacted Tax Cuts and Jobs Act, including the ability to realize the benefits of, and manage the potential impact from certain provisions of the Act; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of ongoing investigations and of any action by any governmental or regulatory authority, including litigation or reputational harm arising from the distribution of opioids; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This news release reflects management's views as of Feb. 8, 2018. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**Schedule 1**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | | Second Quarter 2018 | | 2017 | % Change |
|---|---|---|---|---|---|
| Revenue | $ | 35,186 | $ | 33,150 | 6 % |
| Cost of products sold | | 33,325 | | 31,548 | 6 % |
| Gross margin | | 1,861 | | 1,602 | 16 % |
| | | | | | |
| **Operating expenses:** | | | | | |
| Distribution, selling, general and administrative expenses | | 1,131 | | 910 | 24 % |
| Restructuring and employee severance | | 21 | | 7 | N.M. |
| Amortization and other acquisition-related costs | | 184 | | 115 | N.M. |
| Impairments and (gain)/loss on disposal of assets, net | | 68 | | 9 | N.M. |
| Litigation (recoveries)/charges, net | | 58 | | 19 | N.M. |
| Operating earnings | | 399 | | 542 | (26)% |
| | | | | | |
| Other (income)/expense, net | | (5) | | 7 | N.M. |
| Interest expense, net | | 87 | | 44 | 96 % |
| Earnings before income taxes | | 317 | | 491 | (35)% |
| | | | | | |
| Provision for/(benefit from) income taxes | | (736) | | 167 | (541)% |
| Net earnings | | 1,053 | | 324 | 225 % |
| | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | — | | — | N.M. |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 1,053 | $ | 324 | 225 % |
| | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Basic | $ | 3.35 | $ | 1.02 | 228 % |
| Diluted | | 3.33 | | 1.02 | 226 % |
| | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | |
| Basic | | 315 | | 318 | |
| Diluted | | 316 | | 319 | |

**Schedule 2**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | | Year-to-Date 2018 | | 2017 | % Change |
|---|---|---|---|---|---|
| Revenue | $ | 67,827 | $ | 65,189 | 4 % |
| Cost of products sold | | 64,294 | | 61,997 | 4 % |
|    Gross margin | | 3,533 | | 3,192 | 11 % |
| | | | | | |
| **Operating expenses:** | | | | | |
| Distribution, selling, general and administrative expenses | | 2,193 | | 1,831 | 20 % |
| Restructuring and employee severance | | 153 | | 16 | N.M. |
| Amortization and other acquisition-related costs | | 368 | | 237 | N.M. |
| Impairments and (gain)/loss on disposal of assets, net | | 68 | | 12 | N.M. |
| Litigation (recoveries)/charges, net | | 90 | | 20 | N.M. |
|    Operating earnings | | 661 | | 1,076 | (39)% |
| | | | | | |
| Other (income)/expense, net | | (4) | | 3 | N.M. |
| Interest expense, net | | 168 | | 88 | 91 % |
| Loss on extinguishment of debt | | 2 | | — | N.M. |
|    Earnings before income taxes | | 495 | | 985 | (50)% |
| | | | | | |
| Provision for/(benefit from) income taxes | | (675) | | 351 | (292)% |
|    Net earnings | | 1,170 | | 634 | 85 % |
| | | | | | |
| Less: Net earnings attributable to noncontrolling interest | | (2) | | (1) | N.M. |
|   **Net earnings attributable to Cardinal Health, Inc.** | $ | 1,168 | $ | 633 | 85 % |
| | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Basic | $ | 3.70 | $ | 1.99 | 86 % |
| Diluted | | 3.68 | | 1.97 | 87 % |
| | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | |
| Basic | | 315 | | 319 | |
| Diluted | | 317 | | 321 | |

**Schedule 3**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets (Unaudited)**

| (in millions) | | December 31, 2017 | | June 30, 2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,249 | $ | 6,879 |
| Trade receivables, net | | 7,664 | | 8,048 |
| Inventories, net | | 12,087 | | 11,301 |
| Prepaid expenses and other | | 1,972 | | 2,117 |
| Assets held for sale | | 2,216 | | — |
| Total current assets | | 25,188 | | 28,345 |
| | | | | |
| Property and equipment, net | | 2,547 | | 1,879 |
| Goodwill and other intangibles, net | | 14,366 | | 9,207 |
| Other assets | | 804 | | 681 |
| **Total assets** | $ | 42,905 | $ | 40,112 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 19,194 | $ | 17,906 |
| Current portion of long-term obligations and other short-term borrowings | | 702 | | 1,327 |
| Other accrued liabilities | | 1,890 | | 1,988 |
| Liabilities related to assets held for sale | | 1,339 | | — |
| Total current liabilities | | 23,125 | | 21,221 |
| | | | | |
| Long-term obligations, less current portion | | 9,057 | | 9,068 |
| Deferred income taxes and other liabilities | | 3,091 | | 2,877 |
| | | | | |
| Redeemable noncontrolling interests | | 13 | | 118 |
| | | | | |
| Total Cardinal Health, Inc. shareholders' equity | | 7,599 | | 6,808 |
| Noncontrolling interests | | 20 | | 20 |
| Total shareholders' equity | | 7,619 | | 6,828 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 42,905 | $ | 40,112 |

**Schedule 4**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (Unaudited )**

| (in millions) | Second Quarter 2018 | Second Quarter 2017 | Year-to-Date 2018 | Year-to-Date 2017 |
|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | |
| Net earnings | $ 1,053 | $ 324 | $ 1,170 | $ 634 |
| | | | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 291 | 166 | 520 | 339 |
| Loss on extinguishment of debt | — | — | 2 | — |
| Impairments and loss on sale of other investments | — | 3 | 6 | 3 |
| Impairments and loss on disposal of assets, net | 67 | 9 | 68 | 12 |
| Share-based compensation | 23 | 24 | 40 | 47 |
| Provision for bad debts | 24 | 22 | 49 | 29 |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | | |
| Decrease/(increase) in trade receivables | (258) | 160 | (617) | (146) |
| Increase in inventories | (614) | (996) | (995) | (1,294) |
| Increase in accounts payable | 811 | 1,284 | 2,107 | 1,563 |
| Other accrued liabilities and operating items, net | (1,118) | (442) | (890) | (529) |
| Net cash provided by operating activities | 279 | 554 | 1,460 | 658 |
| | | | | |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | (2) | (2) | (6,141) | (11) |
| Additions to property and equipment | (101) | (113) | (168) | (213) |
| Purchase of available-for-sale securities and other investments | (3) | (73) | (6) | (125) |
| Proceeds from sale of available-for-sale securities and other investments | 1 | 38 | 65 | 72 |
| Proceeds from maturities of available-for-sale securities | — | 22 | — | 39 |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | — | 1 | 1 | 1 |
| Net cash used in investing activities | (105) | (127) | (6,249) | (237) |
| | | | | |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | (2) | — | (17) | — |
| Net change in short-term borrowings | 161 | 8 | 155 | 33 |
| Purchase of noncontrolling interests | (103) | (2) | (106) | (12) |
| Proceeds from long-term obligations, net of issuance costs | 3 | — | 3 | — |
| Reduction of long-term obligations | (1) | (59) | (403) | (60) |
| Proceeds from interest rate swap terminations | — | — | — | 14 |
| Net tax proceeds/(withholdings) from share-based compensation | 2 | 9 | (16) | — |
| Excess tax benefits from share-based compensation | — | 2 | — | 32 |
| Dividends on common shares | (146) | (144) | (296) | (293) |
| Purchase of treasury shares | — | (350) | (150) | (600) |
| Net cash used in financing activities | (86) | (536) | (830) | (886) |
| | | | | |
| Effect of exchange rates changes on cash and equivalents | (2) | (11) | 7 | (10) |
| Cash reclassified to assets held for sale | (18) | — | (18) | — |
| | | | | |
| Net increase/(decrease) in cash and equivalents | 68 | (120) | (5,630) | (475) |
| Cash and equivalents at beginning of period | 1,181 | 2,001 | 6,879 | 2,356 |
| **Cash and equivalents at end of period** | $ 1,249 | $ 1,881 | $ 1,249 | $ 1,881 |

**Schedule 5**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Information**

| (in millions) | Second Quarter | | | (in millions) | Second Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2018** | 2017 | | | **2018** | 2017 | |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **31,146** | $ 29,743 | Amount | $ | **4,044** | $ 3,410 |
| Growth rate | | **5 %** | 5 % | Growth rate | | **19%** | 8% |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **514** | $ 537 | Amount | $ | **220** | $ 159 |
| Growth rate | | **(4)%** | (14)% | Growth rate [1] | | **38%** | 50% |
| Segment profit margin | | **1.65 %** | 1.81 % | Segment profit margin | | **5.43%** | 4.68% |

[1] Segment profit includes a $22 million impact from the roll-out of the inventory fair value step up related to the Patient Recovery acquisition for the three months ended December 31, 2017. Excluding the impact of the inventory fair value step up, Medical segment profit would have increased 52% for the three months ended December 31, 2017.

**Supplemental Consolidated Information**

Total consolidated revenue for the three months ended December 31, 2017 was $35,186 million , which included total segment revenue of $35,190 million and Corporate revenue of $(4) million . Total consolidated revenue for the three months ended December 31, 2016 was $33,150 million , which included total segment revenue of $33,153 million and Corporate revenue of $(3) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended December 31, 2017 were $399 million , which included total segment profit of $734 million and Corporate costs of $(335) million . Total consolidated operating earnings for the three months ended December 31, 2016 were $542 million , which included total segment profit of $696 million and Corporate costs of $(154) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Schedule 6**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Information**

| (in millions) | Year-to-Date | | | (in millions) | Year-to-Date | | |
|---|---|---|---|---|---|---|---|
| | **2018** | | 2017 | | **2018** | | 2017 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **60,066** | $ 58,505 | Amount | $ | **7,768** | $ 6,690 |
| Growth rate | | **3 %** | 10 % | Growth rate | | **16%** | 10% |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **981** | $ 1,071 | Amount | $ | **348** | $ 286 |
| Growth rate | | **(8)%** | (17)% | Growth rate [1] | | **22%** | 39% |
| Segment profit margin | | **1.63 %** | 1.83 % | Segment profit margin | | **4.48%** | 4.28% |

[1] Segment profit includes a $64 million impact from the roll-out of the inventory fair value step up related to the Patient Recovery acquisition for the six months ended December 31, 2017. Excluding the impact of the inventory fair value step up, Medical segment profit would have increased 44% for the six months ended December 31, 2017.

**Supplemental Consolidated Information**

Total consolidated revenue for the six months ended December 31, 2017 was $67,827 million , which included total segment revenue of $67,834 million and Corporate revenue of $(7) million . Total consolidated revenue for the six months ended December 31, 2016 was $65,189 million , which included total segment revenue of $65,195 million and Corporate revenue of $(6) million . Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the six months ended December 31, 2017 were $661 million , which included total segment profit of $1,329 million and Corporate costs of $(668) million . Total consolidated operating earnings for the six months ended December 31, 2016 were $1,076 million , which included total segment profit of $1,357 million and Corporate costs of $(281) million . Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Schedule 7**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation [1]**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for/ (Benefit from) Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Diluted EPS [2] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **Second Quarter 2018** | | | | | | | | |
| **GAAP** | $ 399 | (26)% | $ 317 | $ (736) | $ 1,053 | 225 % | $ 3.33 | 226% |
| Restructuring and employee severance | 21 | | 21 | (2) | 23 | | 0.07 | |
| Amortization and other acquisition-related costs | 184 | | 184 | 41 | 143 | | 0.46 | |
| Impairments and (gain)/loss on disposal of assets, net | 68 | | 68 | (43) | 111 | | 0.35 | |
| Litigation (recoveries)/charges, net | 58 | | 58 | 17 | 41 | | 0.13 | |
| Transitional tax benefit, net [3] | — | | — | 894 | (894) | | (2.83) | |
| **Non-GAAP** | $ 730 | 4 % | $ 648 | $ 171 | $ 478 | 12 % | $ 1.51 [4] | 13% |
| **Second Quarter 2017** | | | | | | | | |
| GAAP | $ 542 | (4)% | $ 491 | $ 167 | $ 324 | — % | $ 1.02 | 4% |
| LIFO charges/(credits) | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | 7 | | 7 | 2 | 5 | | 0.01 | |
| Amortization and other acquisition-related costs | 115 | | 115 | 39 | 76 | | 0.24 | |
| Impairments and (gain)/loss on disposal of assets, net | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | 19 | | 19 | 7 | 12 | | 0.04 | |
| Non-GAAP | $ 701 | (4)% | $ 650 | $ 222 | $ 427 | (1)% | $ 1.34 | 3% |
| **Year-to-Date 2018** | | | | | | | | |
| **GAAP** | $ 661 | (39)% | $ 495 | $ (675) | $ 1,168 | 85 % | $ 3.68 | 87 % |
| Restructuring and employee severance | 153 | | 153 | 45 | 108 | | 0.34 | |
| Amortization and other acquisition-related costs | 368 | | 368 | 98 | 270 | | 0.85 | |
| Impairments and (gain)/loss on disposal of assets, net | 68 | | 68 | (43) | 111 | | 0.35 | |
| Litigation (recoveries)/charges, net | 90 | | 90 | 30 | 60 | | 0.19 | |
| Loss on extinguishment of debt | — | | 2 | 1 | 1 | | — | |
| Transitional tax benefit, net [3] | — | | — | 894 | (894) | | (2.82) | |
| **Non-GAAP** | $ 1,340 | (2)% | $ 1,175 | $ 350 | $ 823 | — % | $ 2.60 [4] | 1 % |
| **Year-to-Date 2017** | | | | | | | | |
| GAAP | $ 1,076 | (9)% | $ 985 | $ 351 | $ 633 | (11)% | $ 1.97 | (8)% |
| LIFO charges/(credits) | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | 16 | | 16 | 6 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | 237 | | 237 | 79 | 158 | | 0.49 | |
| Impairments and (gain)/loss on disposal of assets, net | 12 | | 12 | 4 | 8 | | 0.02 | |
| Litigation (recoveries)/charges, net | 20 | | 20 | 8 | 12 | | 0.04 | |
| Non-GAAP | $ 1,370 | (6)% | $ 1,279 | $ 452 | $ 826 | (7)% | $ 2.57 | (4)% |

[1] For more information on these measures, refer to the Use of Non-GAAP Measures and Definitions schedules.

[2] attributable to Cardinal Health, Inc.

[3] Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.

[4] Non-GAAP EPS for the three and six months ended December 31, 2017 includes a $0.20 benefit from applying a lower federal tax rate to our year-to-date U.S. pre-tax non-GAAP earnings. Excluding this benefit, non-GAAP EPS would have been $1.31 and $2.40 for the three and six months ended December 31, 2017, respectively.

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This earnings release contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP").

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

**Exclusions from Non-GAAP Financial Measures**

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this earnings release for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics facilitates comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion facilitates comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and are inherently unpredictable in timing and amount, and in the case of impairments, are non-cash amounts, so their exclusion facilitates comparison of historical, current and forecasted financial results.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

- Transitional tax benefit, net related to the Tax Cuts and Jobs Act is excluded because it results from the one-time impact during the one-year measurement period of a very significant change in the U.S. federal corporate tax rate and, due to the significant size of the benefit, obscures analysis of trends and financial performance. The transitional tax benefit includes the estimate for the re-measurement of deferred tax assets and liabilities due to the reduction of the U.S. federal corporate income tax rate and the repatriation tax on undistributed foreign earnings, both of which are subject to adjustment during an up to 12 month measurement period.

The tax effect for each of the items listed above, other than the transitional tax benefit item, is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Forward Looking Non-GAAP Measures**

In this earnings release, the Company presents its outlook for fiscal 2018 non-GAAP EPS. The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2018 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013. During the second quarter of fiscal 2018, the excluded items have increased the Company's EPS by $1.82, which includes a $2.83 transitional tax benefit related to the Tax Cuts and Jobs Act.

**Definitions**

**Growth rate calculation:** growth rates in this earnings release are determined by dividing the difference between current-period results and prior-period results by prior-period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP effective tax rate** : (provision for income taxes adjusted for (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, and (7) transitional tax benefit, net) divided by (earnings before income taxes adjusted for the first six items).

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, each net of tax, and (7) transitional tax benefit, net.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# EXHIBIT 92



# Q2 FY18 Cardinal Health, Inc. Earnings Conference Call

**February 8, 2018 8:30AM Eastern**

Operator:  Good day, and welcome to the Cardinal Health, Inc. Second Quarter Fiscal Year 2018 Earnings conference call. Today's conference is being recorded.  At this time, I would like to turn the conference over to Lisa Capodici. Please go ahead.

Lisa Capodici:  Thank you, Nicole.  Good morning, and welcome to Cardinal Health's second quarter fiscal 2018 earnings call.  I am joined today by our CEO, Mike Kaufmann; and Chief Financial Officer, Jorge Gomez.

During the call, we will be making forward-looking statements.  The matters addressed in these statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied.  Please refer to our SEC filings and the forward-looking statement slide at the beginning of our presentation for a description of risks and uncertainties.

Today's press release and presentation are posted on the IR section of our website at ir.cardinalhealth.com. During the discussion today, we will reference non-GAAP financial measures.  Information about these measures and reconciliations to GAAP are included at the end of the slide presentation and press release.

During the Q&A portion of today's call, please limit your questions to one with one follow-up, so that we may give everyone in the queue chance to ask a question.  As always, the IR team will be available after this call, so feel free to reach out to us with any additional questions.

Now, I'd like to turn the call over to our CEO, Mike Kaufmann.

Mike Kaufmann:  Thank you, Lisa, and good morning, everyone.  We appreciate you joining us today as we report on Cardinal Health's performance for the second quarter.  I'll begin with an overview of the results and then touch on



our outlook for the balance of the year.  Then, Jorge will provide further details in his remarks.  Having worked with Jorge for many years, I couldn't be happier to have him as my partner and our CFO.

Before we turn to the quarter, though, I'd like to take a moment to thank George Barrett.  As you know, I took on the CEO role on January 1.  We have had an incredibly smooth transition, and we look forward to George's continued guidance and contributions as Executive Chairman.  Also, I am excited that Jon Giacomin has assumed leadership of our Medical segment, and we're thrilled to have him in this new role.

Jon is a veteran of Cardinal Health with a proven track record as an operator.  His knowledge of our customers, enterprise strategy and focus on execution will be invaluable in his new capacity.  I'd also like to thank Don Casey for his contributions to Cardinal Health and we all wish him well in his new endeavor.

Let's now turn to the quarter.  Overall, we are very pleased with the results.  Performance across the vast majority of the business was at or above plan, and this translated into the numbers, with 6% revenue growth and non-GAAP earnings per share, excluding the benefit of tax reform, of $1.31, ahead of our expectations.

Among the highlights this quarter was the pharmaceutical segment performance, where results were better than expected.  And in the medical segment, the Patient Recovery, At Home, and naviHealth businesses all performed well.  On the flip side, we have some work to do in a couple of discrete areas, specifically in exam gloves and at Cordis, and we are on it.

Turning first to the pharmaceutical segment, revenue was up 5%, driven by better-than-expected results in pharmaceutical distribution and continued strong performance in the specialty and nuclear businesses.  Generic market pricing continues to trend as expected and Red Oak has continued to perform very well, delivering better-than-planned results on the cost side.

I continue to be impressed with the talent, strategies and execution of the Red Oak Sourcing team and appreciate their partnership.  On the brand side, I am pleased to report that based on both Q2 results and increases we saw in January, brand inflation remains in-line with our expectations.

And finally in specialty, with another strong quarter, this business remains on track to deliver double-digit top and bottom-line growth for the year.  So in sum, I'm very pleased with the results of the pharmaceutical segment.



In the medical segment, we also delivered solid performance across most of the business. Revenue was up 19% for the quarter, driven primarily by the benefits of the patient recovery acquisition. In addition, we saw growth in our new and existing customers reflecting the appeal of our differentiated offer. In fact, we achieved sales growth in all product categories except exam gloves.

This was our first full quarter with the patient recovery business having closed the transaction last Summer. We are thrilled with the job our new associates around the world are doing. The integration is on track and we are excited about the long-term potential of this business.

As I noted, we also saw excellent results from Services, Cardinal Health at Home and naviHealth. In fact, all of these businesses were up double digits for the quarter, driven by growing demand and solid execution.

While most of the medical segment performed well, we did see some challenges in exam gloves where, as we previously discussed, commodity pricing and supply disruptions have created headwinds. We're actively exploring avenues to minimize this impact in the future. Also, at Cordis, the good news is we continue to generate top-line growth.

However, profitability has been softer than we expected, reflecting higher than anticipated cost as Jorge will address. As a result, we now anticipate Cordis results to be lower than previously expected for the balance of the year.

Let me assure you that Jon Giacomin and Pat Holt, the new leader of Cordis, are already on this and working with the team to improve the performance and produce the kind of results we believe Cordis is capable of. As you know, this is a higher-margin business for us, and once we address the current challenges, we expect to see meaningful leverage as we grow sales.

I would also note that we are excited about the recent FDA approval of our partner Medinol's innovative drug-eluting stent for the treatment of patients with narrowing or blockages to their coronary arteries. In January, the first commercial cases using the stent in the United States were implanted successfully.

As Medinol's distribution partner, Cordis can now provide this novel stent and delivery system as part of our interventional vascular portfolio for customers. This is a significant addition to the portfolio and Cordis remains

committed to bringing new technologies like this to the market to provide even more treatment options for clinicians and their patients.

Let's turn now to our outlook. For the full fiscal year, we are raising our non-GAAP EPS outlook by 40 cents to $5.25 to $5.50 to reflect the benefits of U.S. tax reform. While the following items net to zero, this revised outlook includes better-than-expected performance in the pharmaceutical segment, lower expectations for the medical segment due to Cordis and exam gloves and a 5 cent impact from the sale of our China distribution business, which was completed on February 1. Jorge will cover the details of all of this in a few minutes.

Having grown the China business over the past seven years, the timing was right for this transaction. To be a market leader in China and get the type of returns we expected, we recognize that significant scale was required.

Shanghai Pharma brings the strength and scale necessary to position that business to better meet the needs of patients throughout China. We appreciate all of the good work that was done by our talented team in China to build this business, which is now poised for further growth.

As we announced, the gross proceeds from the transaction are $1.2 billion and the net proceeds are approximately $800 million. We will be evaluating the use of the proceeds as well as the benefits from tax reform as part of our overall capital allocation strategy. We remain very committed to the balance capital allocation process that we have followed for many years.

Of course, we'll continue to invest in the business to ensure that we have sustainable growth and we will continue to carefully manage our short and long-term debt obligations. At the same time, we have a differentiated dividend that is very important to us and we always look at strategic M&A opportunities.

In addition, we have a track record of utilizing share repurchases to return cash to shareholders at appropriate times. Toward that end, as you saw in our press release issued this morning, our Board of Directors has approved a new $1 billion share repurchase program.

In summary, it was a strong quarter, and as I look ahead, I am very excited about the outlook for our company. With the breadth and balance of our portfolio, Cardinal Health is well positioned for the future. We have an excellent foundation on which to build. We are a valued partner to our customers across the healthcare

CardinalHealth
*Essential to care™*

continuum.  And as our strategies have taken hold, we are poised to capitalize on the trends taking place in the global healthcare environment from the aging population to the continued shift of care to more efficient settings.

As an organization, we are focused on continuing to innovate to improve the delivery and efficiency of healthcare.  As always, our talented team of nearly 50,000 colleagues around the world are the core of our success and what truly differentiates Cardinal Health.  It is an honor to represent them as CEO.

I thank them for their hard work this past quarter and their continued commitment to our company.  Let me now turn it over to Jorge.


Jorge Gomez:  Thanks, Mike.  I'm delighted to begin this role and to join my first earnings call as CFO.  Now before I share about our performance, I'd like to give just a few thoughts.  As I enter my second month in this role, I could not be more excited about the opportunities ahead of us.  I look forward to partnering with Mike, our leadership team, our board and our investors to drive sustainable growth for Cardinal Health.

Now, let me review in detail our strong financial performance in the second quarter of fiscal 2018.  The financial results that I provide this morning will be on a non-GAAP basis, unless I specifically call them out as GAAP.  Slide 7 of the presentation includes our GAAP to non-GAAP adjustments for the second quarter.

As Mike said before, we are pleased with the second quarter results.  Based on the performance year-to-date, we feel confident about Cardinal's outlook for the year.  Starting with EPS, diluted EPS for Q2 was $1.51, a 13% increase versus the prior year.  This includes a reduction of the federal tax rate, resulting from the recent U.S. tax reform.  I will discuss this in detail in a few moments.

Revenue increased 6% versus last year, totaling $35.2 billion.  Total company gross margin dollars were up 16% to $1.9 billion versus the same quarter in the prior year.  Consolidated SG&A increased 24% versus last year in line with our expectations.  This increase was driven primarily by our recent acquisitions, most notably the patient recovery business.

Consolidated operating earnings were $730 million, which represent 4% growth versus the prior year.  Moving below the operating line, net interest and other expense was about $81 million in the quarter.  The increase versus the prior year was driven by the interest on the debt issued to finance the patient recovery acquisition.

Our effective tax rate this quarter was 26.2%, an 8 percentage point improvement versus the prior year, mainly driven by the recent tax reform. Second quarter diluted average shares outstanding were approximately 316 million, about 3.5 million fewer shares than the second quarter of fiscal 2017.

Yesterday, as Mike mentioned, our board approved a new $1 billion share repurchase program, and now we have about $1.3 billion available for share repurchase. Operating cash flow for the quarter came in at about $300 million, in line with our expectations. During the first six months of the fiscal year, we generated approximately $1.5 billion in operating cash flow.

Our cash balance as of December 31 was $1.2 billion with about $500 million held outside the U.S. Now, let's move to segment performance. The pharmaceutical segment delivered revenue growth of 5% in Q2. Revenues were $31.1 billion in the quarter. Sales growth was driven by both pharmaceutical and specialty distribution customers. This segment revenue increase was partially offset by the contract expiration of a large mail order customer, Prime Therapeutics in May of 2017.

While exceeding our expectations, segment profit for the quarter decreased 4% to $514 million. This decrease was driven by costs related to the ongoing investment in our pharmaceutical IT platform as well the net performance of our generics program. We anticipated these headwinds and they were partially offset by strong performance in the specialty business.

Once again, the specialty team delivered strong top and bottom-line growth in the quarter. The pharma IT project continues to progress well and is on budget. Excluding these costs in the quarter, the pharma segment profit would have been flat.

As Mike said, generic market pricing and brand inflation performed in line with our expectations this quarter. Based on this, and what we saw in January, we continue to be confident in our full-year assumption. As a reminder, our generics program includes the impact from average selling price, volume changes, and the benefits of Red Oak Sourcing.

Now, let's go to the results up in medical segment. Revenue for the quarter grew 19% to just over $4 billion, primarily driven by the patient recovery acquisition and, to a lesser extent, new and existing customers. I'm happy to share that this is the first time this segment revenue exceeded $4 billion in a single quarter.

**CardinalHealth**
*Essential to care*™

Medical segment profit increased 38% to $220 million during Q2. This increase was driven by contributions from the patient recovery business, which was partially offset by the performance of Cardinal Health Branded products, including Cordis. Please note segment profit for the quarter includes a $22 million inventory fair value step-up expense related to the patient recovery business.

Excluding this expense, medical segment profit growth versus last year was 52%. I remain close to the integration of patient recovery. I am very happy to report that while still early, this business is performing on plan. Our teams are working very well to ensure a successful on-boarding.

Also, I'd like to call out that Cardinal Health at-Home distribution services and naviHealth all performed very well and were all up double digits in earnings for the quarter. Now, I'd like to mention a few challenges we continue to address. As Mike mentioned, our exam gloves business has continued to see supply disruptions and commodity challenges similar to what we noted on our first quarter call.

Our sourcing and commercial teams are pursuing several projects to minimize the impact from these dynamics. With respect to Cordis, let me provide some additional details around the ongoing performance and overall trajectory of this business. Overall, we are encouraged that in each of the last two quarters, Cordis revenue grew driven by our business outside the U.S. And we are excited to see the acceleration of our product partnership agreements.

As you may recall, these partnerships have grown more slowly than expected. However, we are now seeing improved momentum in both product breadth and financial performance. Notably, as Mike said, we are excited that our partner, Medinol, received FDA approval to launch a new drug-eluting stent in the U.S. market through Cordis distribution.

This is a key addition to our portfolio. While we continue to make progress on the commercial front, the overall earnings performance of Cordis was impacted by inefficiencies in the global supply chain and elevated SG&A outside the U.S. The team is fully focused on these issues and we have implemented robust remediation plans to address both inventory and SG&A challenges. We recognize it will take a little time to work through these items but we are moving expeditiously. The Cordis business remains a top priority for me and for the organization. We

have great leaders in that business who have support from the entire enterprise to put this business on a capital-efficient growth trajectory.

Transitioning back to our Q2 performance, on slide 7, you will see our consolidated GAAP to non-GAAP adjustments for the quarter. A $1.82 variance to non-GAAP diluted EPS was primarily driven by the transitional tax benefit of $2.83 offset by amortization and other acquisition-related costs, impairments, and litigation.

I'd now like to move to the topic of tax reform. I will quickly outline the impact of the U.S. Tax Cuts and Jobs Act on our second quarter and full fiscal year. While we have completed our initial analysis of the tax reform impact, keep in mind that these amounts are provisional and we may require adjustments in future periods.

I think it is helpful to show you the performance for the quarter and the full year with and without the benefit of tax reform. If you look at slide 9, in the first column, we have provided a walk from our second quarter reported non-GAAP EPS of $1.51 to our non-GAAP EPS excluding the impact of tax reform of $1.31.

The 20 cents reflects the benefit of the lower blended federal tax rate applied to our year-to-date U.S. pre-tax income. As a company with a June 30 fiscal year-end, we have a blended U.S. statutory sales tax rate of approximately 28% for fiscal 2018.

Now, let's talk about the total year EPS assumptions in the second column. Our new non-GAAP EPS guidance range is $5.25 to $5.50. The walk to our original full year guidance includes a full-year benefit of 40 cents resulting from tax reform. This reflects the benefit of applying the lower blended sales tax rate of 28% to our full fiscal year forecasted U.S. pre-tax income. Our non-GAAP EPS guidance range excluding the impact of tax reform remains $4.85 to $5.10.

As I noted earlier, there is a benefit of $2.83 resulting from tax reform, which is excluded from our non-GAAP figures. This is the estimated net benefit from both the re-measurement of our deferred tax assets and liabilities, partially offset by the one-time transition tax on accumulated earnings in foreign subsidiaries.

I think it is important to note that there are certain provisions of the new tax law that do not become effective for us until the beginning of our fiscal 2019. Provisions that could be a headwind for us include the elimination or repeal of certain U.S. deductions and the addition of new international provisions. Despite these headwinds, we expect our non-GAAP ETR for fiscal 2019 to be lower than fiscal 2018.



Moving on to slide 10, you can see there are no changes to our fiscal 2018 revenue assumption and we have included the updated non-GAAP EPS guidance range. Now, turning to slide 11, for our full-year corporate assumptions, you will see that we have made three changes. First, given the recent tax reform, we are updating our non-GAAP ETR to a range of 29% to 31%.

This is consistent with what I shared at the J.P. Morgan Healthcare Conference in January. Second, we are revising our full-year share count projection down slightly to a range of 316 million to 317 million shares. And finally, we are updating our acquisition-related intangible amortization to $576 million or $1.16 per share. This is excluded from our non-GAAP EPS.

Our pharma segment assumptions are on the slide 12. We have one change to these assumptions. As you may have seen, we completed the sale of our distribution business in China on February 1 earlier than anticipated. As a result, we estimate a 5 cent per share negative impact to our fiscal 2018 non-GAAP EPS.

As Mike mentioned, we can absorb this in our current guidance. Also as a reminder, the China distribution business reported in both of our segments by contributing more to the pharma segment. Our medical segment assumptions for fiscal 2018 can be found on the slide 13 where we have one update to report. Given the challenges with Cordis and exam gloves that I discussed earlier, we expect the medical segment profit, excluding patient recovery, to be flat to down for this year.

One thing that I'd like to note is that on January 22, the medical device tax was suspended for two years in line with our fiscal 2018 expectations and existing guidance. From a capital allocation perspective, we are continuously looking at the most optimal deployment of capital.

We will review cash benefits from tax reform and the proceeds from the China divestiture through the lens of optimizing sustainable and capital-efficient growth. We are committed to deploying capital in a balanced way through organic growth and differentiated dividend, value-creating M&A and share buybacks.

In closing, we are pleased with our Q2 performance and excited about Cardinal's overall position. We're confident in our ability to execute throughout the remainder of the year. With that, I'd like to open the line and invite your questions.

CardinalHealth

*Essential to care™*

Operator:  Thank you.  Ladies and gentlemen if you would like to ask a question today please press star and then 1 on your touch-tone keypad.  If you happen to be on a speakerphone, please pick up your handset or do press the mute function so the signal can reach our equipment.

In the interest of time please limit yourself to one question and one follow up question.  Again, that is star 1 if you'd like to ask a question.  We'll be taking our first question from Eric Percher from Nephron Research.

Clayton Meyers:  Hi.  Good morning.  This is actually Clayton Meyers on for Eric Percher.  It's just – a good quarter on the pharmaceutical segment.  I just wanted a few questions on that business.  Particularly, it sounds to me if I'm reading correctly that you performed better than expected on the buy-side via Red Oak.

And then particularly I'm just wondering as you think about the generic market, if there is a difference in pricing between different generic categories most notably in oral solids and injectables, and maybe that's what we're seeing some noise from the manufacturers over the last couple of months.  Thanks.

Mike Kaufmann:  Hi, Clayton, thanks a lot for the questions.  Yes.  Right, I think we had a very good quarter in the pharmaceutical segment, it absolutely exceeded our expectations, and as we mentioned, a lot of it had to do with Red Oak in its performance on the cost side.  As I mentioned, the generic deflation is trending basically about where we expected it to be.

As far as your question on solid orals and injectables, yes, the majority of our generics that we sell and when we talk about our higher margin source program are our solid orals.  Most of the injectable generics that we sell are through the GPO non-source programs, which are a lower-margin business for us.

So there could be a little bit difference of why you might hear some different messages from pharma manufacturers.  But we feel very good about where the pharma segment is, particularly as I mentioned, pharma distribution, but also specialty and nuclear continued to perform well for us.

Clayton Meyers:  Great.  Thanks.  That's very helpful.

**CardinalHealth**
*Essential to care™*

Mike Kaufmann:  Great.  Thanks, Clayton.  Next question.

Operator:  The next question comes from Ross Muken with Evercore.

Ross Muken:  Good morning, guys.  So I'm just trying to dig in a bit on the medical side to just sort of understand some of the underlying.  The color was helpful.  But we've got a euro that's better that should help a number of the businesses and it looked like the inventory step-up was probably a little bit less than what you originally guided, and so those should've been I think a bit of a net benefit.

And so as we're thinking about the headwind, you know, Cordis, you called out but there, you've got a product launch and it seems like that's a pretty good product launch, and that's helpful.  So where really is the magnitude, the delta I guess in the traditional business coming from?  I'm just trying to tease out some of the parts.

Mike Kaufmann:  Yes.  Thanks, Ross, for the question.  A couple different pieces.  The first thing I want to really emphasize, and I'll let Jorge go through some of the details of the moving part, is the overall medical segment is doing very well.  That when you take apart the business and take a look at how our post-acute businesses are doing, the at-home and the naviHealth businesses, our services businesses, our product lines, they all are doing really well.  So we feel good overall about the segment.  But I'll have Jorge talk a little bit about the challenges and see if we can give you maybe just a little bit more color.

Jorge Gomez:  Yes.  Ross, as we said before, in addition to Cordis, exam gloves is a headwind for us right now.  It's been for a quarter or so now and the challenges will continue for a little while.  One thing for you to remember also with respect to the core business is that the loss of VA that we had last year.  We are still dealing with that headwind.

Beyond that, as Mike said, the other businesses, and I indicated that on my prepared remarks, are doing really well.  Your comment about FX, FX is not a headwind for us right now.  As you said, it's probably a little bit of a net

benefit.  But remember that we have long exposures from a sales perspective but we also buy a lot of products and materials in foreign currency and so that offsets some of the benefit from FX.

Ross Muken:  That's helpful.  And maybe just a quick clarification on the tax rate.  So in the deck, the ETR, you kind of quoted as 29 to 31, and then in the press release we had 28.  I'm just trying to understand the difference between the delineation of those two definitions and then really understand kind of what the trajectory is into '19.  Because I recall at J.P. you talked about a number of more in the mid-20s.

Jorge Gomez:  That's a good question.  The 28%, that is the federal corporate tax rate.  So that's a clean rate.  The 29% to 30% is the effective tax rate, which includes not only the federal corporate tax rate but also all our taxes like state tax and things like that.  So there's a little bit more to it on the effective tax rate.  So that's the difference between those two.

With respect to the second question about '19, and I indicated that on my prepared remarks as well, we are experiencing a step-down this year is blended given the difference between the first half and the second half of the year.  But we also expect a further step-down in '19 as we experienced a whole benefit for the full year of the 28% -- 21% tax rate.

Remember, there's also some provisions that kick in in 2019 that will offset some of the further step-down in 2019.  But net-net, you should expect to see our ETR in '19 to be lower than in '18.

Mike Kaufmann:  Thanks, Ross.

Operator:  We'll take our next question from George Hill with RBC Capital Markets.

CardinalHealth

*Essential to care™*

Stephen Hagan:  Hi.  It's Stephen Hagan on for George Hill.  So just kind of a housekeeping item on the inventory step-up costs.  With the lower impact this quarter, what's the expectation now for the full-year impact?

Jorge Gomez:  So Stephen, this quarter, in Q2, was the last time that we had the step-up expense.  So going forward, we won't have that effect anymore.

Stephen Hagan:  Okay.  And then on the pharma segment, what kind of drove the strength this quarter?  Was there any pull-forward of future benefit, or was it really mostly the specialty and the other things you pointed out?

Mike Kaufmann:  It was really just better than expected results on our generic programs in pharmaceutical distribution and then strength in both our specialty businesses and our nuclear businesses.

Operator:  And our next question comes from Lisa Gill with JPMorgan.

Michael Minchak:  Thanks and good morning.  It's Mike Minchak in for Lisa.  I guess first question, in the past, you had talked about 16 cents of investments related to customer initiatives and spending related to opioids.  Just wondering if you had any update in terms of that commentary and sort of how much of that ramped in the second quarter and what's the expectation for the full year?

Mike Kaufmann:  Yes.  Sure.  So a couple of pieces.  As it relates to the opioids, we started to see some spending in Q2, but it was actually very minor.  We took a little bit longer to get that ramped up than we expected.  We still expect to spend the full amount that we said we would.  So you saw a little bit of a timing benefit in Q2 on not spending it, then you'll see more of a catch-up full spend in Q's 3 and 4.  And we actually are starting to see that spend already in January and February.  So we feel good now that we're on track to see the spending go the way we

expected it to now for the rest of the year. As far as the customer investments, I still feel like, as you can imagine, we did – they're still included in our outlook for the second half of the year.

So we still are having ongoing conversations with the customers. And as I've mentioned before, I reiterate these are existing customers and these are some strategic initiatives that we're working through with them. And while I was hoping that we might have those finalized by now, I would still – I still feel like we will sometime this quarter.

Michael Minchak: Great. And then as a follow-up, can you talk about utilization and volume trends in the medical segment across both the acute ambulatory and home segments and sort of how we should think about the strong flu season is impacting the results and expectations for the year in both the pharma and medical segments?

Jorge Gomez: Yes. With respect to utilization, that is always a difficult, I guess, metric to track and because it depends on manufacturers. And so for us, the way we think about it is we look at our customer base and how they are doing. And what I can tell you is that our businesses are performing well in terms of sales.

The majority of our customers are growing and they – as you see more consolidation in the medical space, there will always be some winners and some losers. And so utilization for us is a function of that. We see a good growth in our key accounts in the medical front and that's reflected on our revenue growth performance so far.

With respect to the flu season, in December, we saw some activity, and we believe in January, it's picking up a little bit. From a financial standpoint for us, in Q2, flu was not really a driver but we know that over the last few weeks, it's picking up.

Operator: And our next question comes from Ricky Goldwasser with Morgan Stanley.

Liza Garcia: Hi, guys. This is Liza on actually for Ricky. Just a clarification on the tax rate for this quarter. Can you maybe dive into – is this a lower federal tax rate assumed for the December quarter in the 20 cents and also why the 20 cents is outsized relative to the expectations for the next two quarters?

Jorge Gomez:  Yes.  That's a good question.  The way it works is the ETR is a projection for the full year.  So the projected ETR is in the 21% to 31% range.  So if you pick the midpoint, the first half of the year is adjusted in a way that it's kind of a catch-up entry so that the average for all of the quarters' results in a 30% rate.

The first quarter rate was kind of a typical rate of 36%.  And so the entry in Q2 is to average the two quarters such that the average for the entire year is a 30% range that we're talking about.  So it's a mathematical adjustment to average the rate for the entire year.

Liza Garcia:  Okay.  Thank you.  I guess I know you've touched on kind of a lower tax rate going into fiscal 2019, but I guess how should we think about that relative to the $5.60 that's been called out?

Mike Kaufmann:  Yes.  Remember the $5.60 was an early outlook that we gave a while back and we have a lot of moving parts that we're going to be taking a look at.  We still feel it's early to really talk about FY19.  Clearly, tax rate will be one of the movers that we'll take a look at as we put together our guidance for next year.  We're going to continue to take a look at our patient recovery business and how it's doing.  So far, it's tracking as we expected it to be, but it's only been a few months, so we're going to want to get a little bit more time under our belt there.

Obviously, the continued impact of the exam gloves, how Cordis is going to ramp up for us next year.  And then, we'll take a look at generic programs and the net impact of customer wins and losses.  Those are some of the things that we want to still play out for a few more months and another quarter or two.

And then as we have in the past, in August, we'll come out with our guidance for '19.  Next question.

Operator:  Our next question comes from David Larsen with Leerink.

David Larsen:  Hi.  Can you talk a bit about margin expectations for the medical division?  I know that we had talked about with, I think, 5.75% margin long-term at one point.  Any thoughts on that? Thanks.

Jorge Gomez:  Yes.  Thanks, Dave.  Yeah.  If you look at the margin rate for this quarter, which was about 5.4%, that rate includes actually the inventory step-up expense related to Patient Recovery.  So if you adjust for that expense that is not going to happen on the second half of the year.  We are very close to the 6% margin rate expectation that we have for the second half of this year.

So we feel good about being on a path to get into those margin rates for medical that we discussed before.

David Larsen:  Okay.  That's great.  And then just any thoughts on commentary from Washington around drug pricing reform, any thoughts on what the administration might do or not and how that could impact the business?  Thanks.

Mike Kaufmann:  Yes, and thanks a lot for the question, Dave.  And just a couple of things about that.  When I think about price reform and its impact on us, I'd kind of break it down into generics and branded drugs.  And from a generic perspective, I think we can all agree that it tends to be the vast majority of those items are deflating and that they're roughly 90% of prescriptions in the U.S. are generics.  And so from a cost effectiveness for the entire healthcare system, generics continue to be very, very cost effective for the system.

So it's hard for me to imagine something in the area of generics that would be materially in the terms of the drug pricing area based on just the overall economics and the trends we're seeing in generics.  As far as it goes to the branded side, as we've seen both in our guidance and others is that we're now only expecting to see somewhere in the neighborhood of 7% to 8% inflation from branded drugs.

So the branded manufacturers themselves have cut back significantly on the amount of inflation or price increases that they've had.  We continue to see that.  And then as you're translate that into how it impacts us, as we mentioned in the past, we expect to be, and from everything we're seeing right now will be more than 90% of our branded margins are going to be non-contingent to inflation.

So if you put that around, less than 10% of our branded margins are contingent to inflation, which again is down to 7% to 8%.  So for us, as Cardinal, I think that this is an area that we feel good that we ought to be able to manage through very effectively however it goes in Washington.

Operator: And our next question comes from Charles Rhyee with Cowen.

Charles Rhyee: Yes. Thanks for taking the questions. A lot have been asked but just maybe going back to, on Red Oak. Can you talk about sort of longer-term, when you think about the contribution here, obviously, we're talking about sort of a lower contribution year-over-year expected this year versus last. But as you kind of look at over the next couple of years, we do have some more launches coming.

Can you think about – can you give us a sense on how maybe as we think about 2019, how that contribution could vary as we go forward? Thanks.

Mike Kaufmann: Yes. We're continuing to feel really good about Red Oak. It's not just about the fact that our scale and our ability to source, but that team is just – first of all, it's a great group of folks. They're very strategic. They're constantly thinking about new ways to approach and work with our manufacturing partners, thinking about the pipeline of launches.

So I feel really confident in their ability to continue to give us year-over-year benefit. As I said, it might be a little bit less going forward year-over-year as we continue to work through the items. But anytime we see launches and stuff, I fully expect that Red Oak will put us in the best position possible to compete in the marketplace and have the best cost position.

So continue to feel really good about all the work that they're doing and the benefits that will continue to drive going forward.

Charles Rhyee: Is it fair then as when we just look at the calendar of launches, is that a good proxy then just to think about sort of the incremental change in benefit from Red Oak or do you think we should think about Red Oak continuing to perform maybe better than what the market would look like?

**CardinalHealth**
*Essential to care™*

Mike Kaufmann: Yes. It's a great question. There is so many things that go into it. So clearly, the launches are an important piece of it, but each launch is so different. Depending on whether it's a 2-player or a 5-player, whatever number market, the type of drug, how hard it is to make, the timing of the various launches, when other players come out on current drugs that might be 2 or 3-player markets, they get continued competition. So it's hard to really pick any one item and predict it.

And so as we get closer to giving '19 guidance, we'll give you some more color around the benefits that we expect from Red Oak. But whatever the environment is, I expect that we'll be in the best position to compete with just the team we have there. Next question.

Operator: And as a reminder, if you'd like you ask a question please press star 1 at this time. We will move on to Robert Jones from Goldman Sachs.

Robert Jones: Great. Thanks for the questions. Yes, so just I know you've kind of answered this a couple of different ways. I just wanted to go back to make sure I understood the back half of the year. Big beat in the quarter even if I adjust out the benefit for tax from both the quarter and the guidance, and yet it looks like you're really not raising the back half at all.

So I guess the question really is, are you anticipating some areas getting worse? Is there something you have visibility into the back half? I know you mentioned China but that's not all that significant in the grand scheme of what you did in the quarter and then you're not really raising the guidance outside of tax.

Mike Kaufmann: Thanks. I appreciate the question. So let me just give you a few thoughts on that. First, for me right now it just feels a little bit early to be raising guidance. I mentioned there are some small timing type of things that we'll be absorbing like the opioids that I mentioned that had less spend in Q2 and we'll have some more spend in Q3. As Jorge mentioned, we expected Cordis profits to ramp up in our original projections, and those aren't ramping up as quite as well as we would have liked them to. And then also the exam gloves have been somewhat of a challenge and we're still working through our various solutions there. And then as you just

mentioned, we have the 5 cents from China. So you have all those, and then as a positive, as we've said, we feel really good about where the pharma segment's at and that we do continue to expect it to be better than expected.

But at this time, when we take all those puts and takes and put them together, we just feel the right thing to do is just to at this point in time maintain our guidance adjusted for the impact of tax reform.

Robert Jones: Okay. Got it. And I guess just one quick follow-up on medical. And I feel like you do get this question at least the last few quarters, but your largest peer there focused on the acute space continues to struggle quite a bit. And one of the main areas they talk a lot about is a very challenging end-market, yet that doesn't seem to be the case even if we kind of parse out Medtronic and Cordis around what the messages that you're sharing on that core business.

So is there anything, any light you can shed on this for us as far as market share shifts, maybe just a different type of customer mix, because it really has become quite divergent between the message from your core medical business and your largest peer?

Mike Kaufmann: Yes. Thanks for the question on that, too. I appreciate that. I don't want to comment on competitors' actual results. But I will say a few things. First of all, I think there has been some supply disruptions in the market for sure. But those items for us, from a profitability standpoint, have not been that significant of a driver in our Q2.

And while we still see that there'll probably be some supply disruptions in three and four, we also don't expect that to be much of a negative driver for going forward for us. Now, we truly understand how difficult this is on our end-customers, and we know that it is making their lives tough and we are working incredibly hard every day to get after supply and make sure that we are on top of those things.

But as far as the profit driver, it's not big. I think the big difference for us is that we made a decision years ago that we were going to change our value proposition. And that while distribution would always be part of our core and something important for us that we really needed to have a product strategy. And that was going to differentiate us that we could take advantage of those rails going to those customers every single day and that we would be able to then drive our product mix and improve our overall profit.

**Cardinal**Health
*Essential to care™*

So I think the real difference here is our value proposition. And we've seen that play out in some of the recent wins over the last year or so. So I think it's really that is the difference on our value prop.

Operator: Our next question comes from Erin Wright with Credit Suisse.

Erin Wright: Hi. Thanks. A quick follow-up on the customer initiatives you mentioned in the previous quarters as well as earlier on the call. I guess given we still don't have so much clarity there, would these expenses get pushed out into fiscal 2019? And can you just give us some greater color on what these initiatives entail? Thanks.

Mike Kaufmann: Thanks. No. We don't expect them to get pushed into '19. The amount that we had set aside and had given some early color on, we still would expect to happen in the second half of our fiscal '18. And as far as more color, I can continue to really only say that it is with existing customers.

It's something that we're working on with them that both sides would really be important long-term valuable opportunities for us. And other than those two things, I really can't speak more about it.

Erin Wright: Okay. Thanks. And on medical, can you speak to some of the broader drivers across international markets? Where did you see sort of pockets of growth on a geographic basis? And I think you briefly mentioned this but what's truly embedded in your guidance as it relates to the foreign exchange impact? Thanks.

Jorge Gomez: Hi Erin, this is Jorge. I'm going to take that question. I would break down the international markets between Cordis and patient recovery. I think for patient recovery, what I would say is right now it's early to tell. We are on track with our deal model with respect to sales expectations in the international markets.

With Cordis, it's a lot easier to see the performance in those markets. And I can tell you that the Cordis business is doing very well in Asia Pacific. We've seen tremendous growth in markets like China. We've seen a good

turnaround of trends in other markets like Japan and we see some growth in places like Korea and Australia-New Zealand.  For EMEA, we also see, in certain buckets, a fair amount of growth.

The assumptions that we have with respect to FX in the forecast, we alluded to that before.  FX is a little bit of a tailwind for us and that's what we have included in for the balance of the year, but it's not a significant driver.

Operator:  And our next question comes from Brian Tanquilut with Jefferies.

Bryan Ross:  Hey.  This is Bryan Ross on for Brian Tanquilut.  Just a quick one on the generic deflation front.  I know you've kept the mid-single digit assumption unchanged for the fiscal year.  But, I guess, are you seeing anything materially different trend-wise on the buy-side and the sell-side as we've moved into 2018?

And then kind of where do you envision that's going as we get into the back half of the fiscal year in comparison to the first half?  Is it still in that mid-single digit range or was the first half slightly more deflationary?  And then are there any material contracts, or RFPs, coming up on the sell-side for 2018?

Mike Kaufmann:  Yes.  Great.  Remember, our calculation for generic deflation is a point-to-point calculation.  So we basically look at the end of last year and to the end of this year, and we still expect, at that point, to see mid-single digits as our ultimate deflation number.  And so we still feel good about that estimate and are trending there as far as we look at our continued trends.

The piece, as I mentioned before, that's doing slightly better which is helping us is on the cost side.  So, deflation is tracking about where expect, cost is tracking a little bit better, and that's driving some upside for us in pharmaceutical distribution.  And as I mentioned, specialty and nuclear continue to perform better than we expected.

As far as RFPs go, we don't actually really have any large account RFPs that we're renewing in our fiscal '18 and those that are out there that are large, actually don't renew until the end of our fiscal '19.

Bryan Ross:  Got it.  Thank you.

Operator:  Our next question comes from Eric Coldwell with Baird.

Eric Coldwell:  Hey, guys.  I tried to back out when all of my topics were covered.  So thanks very much.  I'm good here.

Mike Kaufmann:  All right.  Thanks, Eric.

Operator:  And we have time for one final question with John Kreger with William Blair.

Courtney Owens:  Hi.  This is Courtney Owens on for John Kreger.  Just a quick question.  So can you provide us with just a little bit of an update on naviHealth?  I heard you guys say that it performed pretty well during the quarter, but just would like an update kind of on what your expectations for that portion of the business going forward, and kind of what's been like the recent client uptake on that service.  Thanks.

Mike Kaufmann:  Yes.  Thanks for the question.  The business – we really are excited about the business itself.  It's got a really good team.  I think they're on trend.  We're continuing to see both providers and payers looking for help in the post-acute space and we think we have a unique model that combines both software and analytics with clinicians to be able to really provide a top-notch service to those customers.

So we continue to feel good about that business.  We're making continued investments in that business, because we do see it as a business that we see growing going forward.  But other than that I just, again, feel really good about it and feel good about the team.

Courtney Owens:  Awesome.  Thank you.

**Cardinal**Health

*Essential to care™*

Mike Kaufmann:  Thank you.

Lisa Capodici:  Operator, I think that was the last call?

Operator:  Yes, it was.  I'd like to turn the conference back over to Mike Kaufmann for any closing remarks.

Mike Kaufmann:  Well, again, I want to thank all of you for joining us today.  I know you are having a busy day.  We really appreciate the questions and we look forward to talking again soon.  Have a good morning.

Operator:  And once again, ladies and gentlemen, that does conclude today's conference.  We appreciate your participation today.

# EXHIBIT 93

# Q2 FY2018

Cardinal Health, Inc. Earnings Investor/Analyst call
February 8, 2018



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with the recently completed acquisition of the Patient Recovery Business, including the ability to retain the acquired businesses' customers and employees, the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the terms of or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to the recently enacted Tax Cuts and Jobs Act, including the ability to realize the benefits of, and manage the potential impact from certain provisions of the Act; changes in the distribution patterns or reimbursement rates for health care products and services; the effects of ongoing investigations and of any action by any governmental or regulatory authority, including litigation or reputational harm arising from the distribution of opioids; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of Feb. 8, 2018. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, this presentation contains Non-GAAP financial measures. Cardinal Health provides definitions and reconciliations of the differences between Non-GAAP financial measures and their most directly comparable GAAP financial measures in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com.

2   © Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q2 FY18 results



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q2 FY18 financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | Q2 FY18 | Q2 FY17 | Q2 FY18 | Q2 FY17 |
| **Revenue**<br>*% change* | **$35,186**<br>*6% increase YoY* | **$33,150**<br>*5% increase YoY* | **N/A** | **N/A** |
| **Operating Earnings**<br>*% change*<br>*Ratio to revenue* | **$399**<br>*26% decrease YoY*<br>*1.13%* | **$542**<br>*4% decrease YoY*<br>*1.63%* | **$730**<br>*4% increase YoY*<br>*2.07%* | **$701**<br>*4% decrease YoY*<br>*2.11%* |
| **Net Earnings[1]**<br>*% change*<br>*Ratio to revenue* | **$1,053**<br>*225% increase YoY*<br>*3.00%* | **$324**<br>*0% decrease YoY*<br>*0.98%* | **$478**<br>*12% increase YoY*<br>*1.36%* | **$427**<br>*1% decrease YoY*<br>*1.29%* |
| **Diluted EPS[1]**<br>*% change* | **$3.33[2,3]**<br>*226% increase YoY* | **$1.02**<br>*4% increase YoY* | **$1.51[3]**<br>*13% increase YoY* | **$1.34**<br>*3% increase YoY* |

[1]*Attributable to Cardinal Health, Inc.*

[2] *Reflects the $2.83 net benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.*

[3]*Includes a tax benefit of $0.20 per share from applying a lower federal tax rate to our year-to-date U.S. pretax non-GAAP earnings.  Any impact on the tax benefit from future changes in the estimated effective tax rate will be reflected in the applicable period of the change in estimate.*

*Please see appendix for GAAP to Non-GAAP reconciliations.*



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# Q2 FY18 Pharmaceutical segment business analysis

|  | Q2 FY18 ($M) | Q2 FY17 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$31,146** | **$29,743** | **5%** |
| **Segment Profit** | **$514** | **$537** | **(4)%** |
| **Segment Profit Margin** | **1.65%** | **1.81%** | **-16 bps** |

## Highlights:

- **Revenue** increase was due to sales growth from pharmaceutical and specialty distribution customers, which was partially offset by the previously announced expiration of a large, mail-order customer contract.

- **Segment profit** decrease was driven by costs related to the company's ongoing investment in its Pharmaceutical IT platform, as well as the company's generics program performance. These were partially offset by strong performance in its Specialty Solutions business.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
*Essential to care™*

# Q2 FY18 Medical segment business analysis

|  | Q2 FY18 ($M) | Q2 FY17 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$4,044** | **$3,410** | **19%** |
| **Segment Profit** | **$220** | **$159** | **38%** |
| **Segment Profit Margin** | **5.43%** | **4.68%** | **+76 bps** |

## Highlights:

- **Revenue** increase was driven by contributions from the acquisition of the Patient Recovery business and, to a lesser extent, new and existing customers.

- **Segment profit** increase was driven by contributions from the acquisition of the Patient Recovery business, which were partially offset by performance in Cardinal Health Branded products, including Cordis. Segment profit for the quarter includes the impact of the Patient Recovery business inventory fair value step-up expense. Excluding the $22 million step-up in the quarter, year-over-year Medical segment profit growth was 52 percent.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**CardinalHealth**

*Essential to care™*

# Q2 FY18 GAAP to non-GAAP adjustments[1]

| | Q2 FY 2018 | | | | Q2 FY 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] |
| **GAAP** | **$1,861** | **$399** | **$1,053** | **$3.33** | **$1,602** | **$542** | **$324** | **$1.02** |
| LIFO charges/(credits) | - | - | - | - | 9 | 9 | 5 | 0.02 |
| Restructuring and employee severance | - | 21 | 23 | 0.07 | - | 7 | 5 | 0.01 |
| Amortization and other acquisition-related costs | - | 184 | 143 | 0.46 | - | 115 | 76 | 0.24 |
| Impairments and (gain)/loss on disposal of assets | - | 68 | 111 | 0.35 | - | 9 | 6 | 0.02 |
| Litigation (recoveries)/charges, net | - | 58 | 41 | 0.13 | - | 19 | 12 | 0.04 |
| Transitional tax benefit[3] | - | - | (894) | (2.83) | | | | |
| **Non-GAAP** | **$1,861** | **$730** | **$478** | **$1.51** | **$1,611** | **$701** | **$427** | **$1.34** |
| | | | | | | | | |
| Amortization of acquisition-related intangible assets[4] | - | $150 | $115 | $0.37 | - | $95 | $63 | $0.20 |

[1]Please see appendix for GAAP to Non-GAAP reconciliations.
[2]Attributable to Cardinal Health, Inc.
[3] Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.
[4]Amortization of acquisition-related intangible assets is included in Amortization and other acquisition-related costs.

The sum of the components may not equal the total due to rounding.

7    © Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY2018 Outlook

*The company presents its outlook for fiscal 2018 non-GAAP EPS and non-GAAP effective tax rate on the following pages.  The company does not provide a GAAP EPS or GAAP effective tax rate outlook because it is unable to reliably forecast many of the items that the company excludes from GAAP EPS and effective tax rate to calculate them. See "Forward-Looking non-GAAP Measures" following the attached schedules for additional information.*



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Non-GAAP EPS impact of tax reform

|  | Q2 FY18 | FY18 |
|---|---|---|
| **Non-GAAP EPS** | **$1.51** | **$5.25 - $5.50** |
| Less: Tax benefit from change in U.S. federal rate[1] | **$0.20** | **$0.40** |
| **Non-GAAP EPS excluding the impact of tax reform** | **$1.31** | **$4.85 - $5.10** |

[1] Reflects the benefit from applying a lower federal tax rate to our U.S. pretax non-GAAP earnings.. Any impact on the tax benefit from future changes in the estimated effective tax rate will be reflected in the applicable period of the change in estimate.



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

# FY18 financial expectations

|  | **FY2018 Outlook** | **FY2017 Actual** |
|---|---|---|
| **Revenue** | Mid-single digit percentage growth vs. PY | $130.0B |
| **Non-GAAP EPS** | $5.25 to $5.50 | $5.40 |

*Red font indicates a change since 11/6/17.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY18 corporate assumptions

| | FY2018 Outlook | FY2017 Actual |
|---|---|---|
| **Non-GAAP effective tax rate** | 29% - 31%[1] | 32.6%[3] |
| **Diluted weighted average Shares outstanding** | 316M - 317M | 320M |
| **Interest and other, net** | $340M - $360M | $197M |
| **Capital expenditures** | $500M - $540M | $387M |
| **Acquisition-related intangible amortization** | $576M or ~$1.16[2] | $392M or ~$0.85 |

[1]*May fluctuate quarterly due to unique items affecting periods.*

[2]*Includes only acquisitions/divestures closed as of December 31, 2017.*

[3]*FY2017 GAAP ETR 32.7%, Please see appendix for GAAP to Non-GAAP reconciliations.*

*Red font indicates a change since 11/6/17.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Pharmaceutical segment FY18(E)

- **Low- to mid-single digit percentage increase in revenue versus prior year**
- **Full-year segment profit down low-double digits versus prior year**

## Key assumptions

- Generic drug price assumption of mid-single digit deflation for full fiscal year

- Brand drug manufacturer price assumption of 7% to 8% inflation for full fiscal year

- Incremental expense increase related to investment in information systems to support growth

- Incremental contribution from new generic launches, but Y-o-Y benefit significantly less

- Incremental contribution from Red Oak Sourcing, but Y-o-Y benefit less

- Double-digit revenue and profit growth from our Specialty business

- Reduced contribution ($0.05 per share) from early closing of Cardinal Health China divestiture[1]

[1]*Closed February 1, 2018. Cardinal Health China reports in both segments, but primarily contributes to the Pharmaceutical segment.*

*Red font indicates a change since 11/6/17.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Medical segment FY18(E)

- **High-teens percentage increase in revenue versus prior year**

- **Strong double-digit segment profit growth versus prior year**

## Key assumptions

- Patient Recovery business acquisition completed in July 2017, accretive to FY18; integrated into Cardinal Health Branded products upon closing

- Excluding Patient Recovery, medical segment flat to down, driven by Cordis and exam gloves

- Second-half segment profit margin rate exceeds 6%

- Significantly reduced portion of a Veterans Affairs contract, the full effect of which began in Q4FY17

- No reinstatement of a medical device tax

*Red font indicates a change since 11/6/17.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



Appendix

Q2 FY18 trailing five quarters,
GAAP to Non-GAAP reconciliation statements
and supplemental financial information



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q2 FY18 segment analysis

## Pharmaceutical segment

|                        | Q2 FY17 | Q3 FY17 | Q4 FY17 | Q1 FY18 | Q2 FY18 |
|------------------------|---------|---------|---------|---------|---------|
| Revenue ($M)           | 29,743  | 28,406  | 29,552  | 28,920  | 31,146  |
| Segment Profit ($M)    | 537     | 611     | 505     | 467     | 514     |

## Medical segment

|                        | Q2 FY17 | Q3 FY17 | Q4 FY17 | Q1 FY18 | Q2 FY18 |
|------------------------|---------|---------|---------|---------|---------|
| Revenue ($M)           | 3,410   | 3,418   | 3,416   | 3,724   | 4,044   |
| Segment Profit ($M)    | 159     | 148     | 138     | 129     | 220     |

15 © Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

CardinalHealth
Essential to care™

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for/ (Benefit from) Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Second Quarter 2018 | | | | | |
| GAAP | $ 1,861 | 16 % | $ 399 | (26)% | $ 317 | $ (736) | $ 1,053 | 225 % | $ 3.33 | 226 % |
| Restructuring and employee severance | - | | 21 | | 21 | (2) | 23 | | 0.07 | |
| Amortization and other acquisition-related costs | - | | 184 | | 184 | 41 | 143 | | 0.46 | |
| Impairments and (gain)/loss on disposal of assets, net | - | | 68 | | 68 | (43) | 111 | | 0.35 | |
| Litigation (recoveries)/charges, net | - | | 58 | | 58 | 17 | 41 | | 0.13 | |
| Transitional tax benefit, net[3] | - | | - | | - | 894 | (894) | | (2.83) | |
| Non-GAAP | $ 1,861 | 15 % | $ 730 | 4 % | $ 648 | $ 171 | $ 478 | 12 % | $ 1.51[4] | 13 % |
| | | | | | Second Quarter 2017 | | | | | |
| GAAP | $ 1,602 | (0)% | $ 542 | (4)% | $ 491 | $ 167 | $ 324 | 0 % | $ 1.02 | 4 % |
| LIFO charges/(credits) | 9 | | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | - | | 7 | | 7 | 2 | 5 | | 0.01 | |
| Amortization and other acquisition-related costs | - | | 115 | | 115 | 39 | 76 | | 0.24 | |
| Impairments and (gain)/loss on disposal of assets | - | | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | - | | 19 | | 19 | 7 | 12 | | 0.04 | |
| Non-GAAP | $ 1,611 | (2)% | $ 701 | (4)% | $ 650 | $ 222 | $ 427 | (1)% | $ 1.34 | 3 % |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2]Attributable to Cardinal Health, Inc.

[3]Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.

[4]Non-GAAP EPS for the three and six months ended December 31, 2017 includes a $0.20 benefit from applying a lower federal tax rate to our year-to-date U.S. pre-tax non-GAAP earnings. Excluding this benefit, non-GAAP EPS would have been $1.31 and $2.40 for the three and six months ended December 31, 2017, respectively.

The sum of the components may not equal the total due to rounding.
We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation[1]**

| | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for/ (Benefit from) Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Year-to-Date 2018 | | | | | |
| GAAP | $ 3,533 | 11 % | $ 661 | (39)% | $ 495 | $ (675) | $ 1,168 | 85 % | $ 3.68 | 87 % |
| Restructuring and employee severance | - | | 153 | | 153 | 45 | 108 | | 0.34 | |
| Amortization and other acquisition-related costs | - | | 368 | | 368 | 98 | 270 | | 0.85 | |
| Impairments and (gain)/loss on disposal of assets | - | | 68 | | 68 | (43) | 111 | | 0.35 | |
| Litigation (recoveries)/charges, net | - | | 90 | | 90 | 30 | 60 | | 0.19 | |
| Loss on extinguishment of debt | - | | - | | 2 | 1 | 1 | | - | |
| Transitional tax benefit, net[3] | - | | - | | - | 894 | (894) | | (2.82) | |
| Non-GAAP | $ 3,533 | 10 % | $ 1,340 | (2)% | $ 1,175 | $ 350 | $ 823 | (0)% | $ 2.60[4] | 1 % |
| | | | | | Year-to-Date 2017 | | | | | |
| GAAP | $ 3,192 | 0 % | $ 1,076 | (9)% | $ 985 | $ 351 | $ 633 | (11)% | $ 1.97 | (8)% |
| LIFO charges/(credits) | 9 | | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | - | | 16 | | 16 | 6 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | - | | 237 | | 237 | 79 | 158 | | 0.49 | |
| Impairments and (gain)/loss on disposal of assets | - | | 12 | | 12 | 4 | 8 | | 0.02 | |
| Litigation (recoveries)/charges, net | - | | 20 | | 20 | 8 | 12 | | 0.04 | |
| Non-GAAP | $ 3,201 | (1)% | $ 1,370 | (6)% | $ 1,279 | $ 452 | $ 826 | (7)% | $ 2.57 | (4)% |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2]Attributable to Cardinal Health, Inc.

[3]Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.

[4]Non-GAAP EPS for the three and six months ended December 31, 2017 includes a $0.20 benefit from applying a lower federal tax rate to our year-to-date U.S. pre-tax non-GAAP earnings. Excluding this benefit, non-GAAP EPS would have been $1.31 and $2.40 for the three and six months ended December 31, 2017, respectively.

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**Total Company Information**

| (in millions) | | Second Quarter 2018 | | 2017 | | Non-GAAP Second Quarter 2018 | | 2017 |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| Amount | $ | 35,186 | $ | 33,150 | | | | |
| Grow th rate | | 6 % | | 5 % | | | | |
| | | | | | | | | |
| **Gross margin** | | | | | | | | |
| Amount | $ | 1,861 | $ | 1,602 | $ | 1,861 | $ | 1,611 |
| Grow th rate | | 16 % | | (0)% | | 15 % | | (2)% |
| | | | | | | | | |
| **Operating earnings** | | | | | | | | |
| Amount | $ | 399 | $ | 542 | $ | 730 | $ | 701 |
| Grow th rate | | (26)% | | (4)% | | 4 % | | (4)% |
| | | | | | | | | |
| **Net earnings attributable to Cardinal Health, Inc.** | | | | | | | | |
| Amount | $ | 1,053 | $ | 324 | $ | 478 | $ | 427 |
| Grow th rate | | 225 % | | 0 % | | 12 % | | (1)% |
| | | | | | | | | |
| Return on equity | | 58.9 % | | 20.2 % | | 26.7 % | | 26.6 % |
| | | | | | | | | |
| Effective tax rate | | (231.9)% | | 34.0 % | | 26.2 % | | 34.2 % |
| | | | | | | | | |
| Debt to total capital | | 56 % | | 46 % | | | | |
| Net debt to capital | | | | | | 53 % | | 36 % |

Refer to the GAAP/Non-GAAP reconciliation for definitions and calculations supporting the Non-GAAP balances.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Information**

| (in millions) | Second Quarter | | | (in millions) | Second Quarter | | |
|---|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2018 | | 2017 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **31,146** | $ 29,743 | Amount | $ | **4,044** | $ 3,410 |
| Grow th rate | | **5 %** | 5 % | Grow th rate | | **19 %** | 8 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **514** | $ 537 | Amount | $ | **220** | $ 159 |
| Grow th rate | | **(4)%** | (14)% | Grow th rate[1] | | **38 %** | 50 % |
| Segment profit margin | | **1.65 %** | 1.81 % | Segment profit margin | | **5.43 %** | 4.68 % |

[1] Segment profit includes a $22 million impact from the roll-out of the inventory fair value step up related to the Patient Recovery acquisition for the three months ended December 31, 2017. Excluding the impact of the inventory fair value step up, Medical segment profit w ould have increased 52% for the three months ended December 31, 2017.

**Supplemental Consolidated Information**

Total consolidated revenue for the three months ended December 31, 2017 w as $35,186 million, w hich included total segment revenue of $35,190 million and Corporate revenue of $(4) million. Total consolidated revenue for the three months ended December 31, 2016 w as $33,150 million, w hich included total segment revenue of $33,153 million and Corporate revenue of $(3) million. Corporate revenue consists primarily of elimination of inter-segment revenue and other revenue not allocated to the segments.

Total consolidated operating earnings for the three months ended December 31, 2017 w ere $399 million, w hich included total segment profit of $734 million and Corporate costs of $(335) million. Total consolidated operating earnings for the three months ended December 31, 2016 w ere $542 million, w hich included total segment profit of $696 million and Corporate costs of $(154) million. Corporate includes, among other things, LIFO charges/(credits), restructuring and employee severance, amortization and other acquisition-related costs, impairments and (gain)/loss on disposal of assets, litigation (recoveries)/charges, net and certain investment spending that are not allocated to the segments.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Second Quarter | |
|---|---|---|
| | **2018** | 2017 |
| **GAAP return on equity** | **58.9 %** | 20.2 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings attributable to Cardinal Health, Inc. | $ **1,053** | $ 324 |
| LIFO charges/(credits), net of tax | **-** | 5 |
| Restructuring and employee severance, net of tax | **23** | 5 |
| Amortization and other acquisition-related costs, net of tax | **143** | 76 |
| Impairments and loss on disposal of assets, net of tax | **111** | 6 |
| Litigation charges, net, net of tax | **41** | 12 |
| Loss on extinguishment of debt, net of tax | **-** | - |
| Transitional tax benefit, net | **(894)** | - |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $ **478** | $ 427 |
| Annualized | $ **1,913** | $ 1,710 |

| | Second Quarter 2018 | First Quarter 2018 | Second Quarter 2017 | First Quarter 2017 |
|---|---|---|---|---|
| Total Cardinal Health, Inc. shareholders' equity | $ **7,599** | $ **6,695** | $ 6,323 | $ 6,512 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $ **7,157** | | $ 6,418 | |
| **Non-GAAP return on equity** | **26.7 %** | | 26.6 % | |

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Year-to-Date | |
|---|---|---|
| | **2018** | 2017 |
| **GAAP return on equity** | **33.1 %** | 19.6 % |
| | | |
| **Non-GAAP return on equity** | | |
| Net earnings from continuing operations attributable to Cardinal Health, Inc. | $ **1,168** | $ 633 |
| LIFO charges/(credits), net of tax | **-** | 5 |
| Restructuring and employee severance, net of tax | **108** | 10 |
| Amortization and other acquisition-related costs, net of tax | **270** | 158 |
| Impairments and (gain)/loss on disposal of assets, net of tax | **111** | 8 |
| Litigation (recoveries)/charges, net, net of tax | **60** | 12 |
| Loss on extinguishment of debt, net of tax | **1** | - |
| Transitional tax benefit | **(894)** | - |
| Adjusted net earnings attributable to Cardinal Health, Inc. | $ **823** | $ 826 |
| Annualized | $ **1,647** | $ 1,652 |

| | Second Quarter 2018 | First Quarter 2018 | Fourth Quarter 2017 | Second Quarter 2017 | First Quarter 2017 | Fourth Quarter 2016 |
|---|---|---|---|---|---|---|
| Total Cardinal Health, Inc. shareholders' equity | $ **7,599** | $ **6,695** | $ **7,619** | $ 6,323 | $ 6,512 | $ 6,323 |
| Divided by average Cardinal Health, Inc. shareholders' equity | $ **7,047** | | | $ 6,463 | | |
| **Non-GAAP return on equity** | **23.4 %** | | | 25.6 % | | |

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Second Quarter | | | | | Fiscal Year | |
|---|---|---|---|---|---|---|---|
| | **2018** | | 2017 | | | 2017 | |
| **GAAP effective tax rate** | **(231.9)%** | | 34.0 % | | | 32.7 % | |
| | | | | | | | |
| **Non-GAAP effective tax rate** | | | | | | | |
| Earnings before income taxes | $ | **317** | $ | 491 | $ | | 1,924 |
| LIFO charges/(credits) | | **-** | | 9 | | | - |
| Restructuring and employee severance | | **21** | | 7 | | | 56 |
| Amortization and other acquisition-related costs | | **184** | | 115 | | | 527 |
| Impairments and loss on disposal of assets | | **68** | | 9 | | | 18 |
| Litigation (recoveries)/charges, net | | **58** | | 19 | | | 48 |
| Transitional tax benefit, net | | **-** | | - | | | - |
| Adjusted earnings before income taxes | $ | **648** | $ | 650 | $ | | 2,572 |
| | | | | | | | |
| Provision for income taxes | $ | **(736)** | $ | 167 | $ | | 630 |
| LIFO charges/(credits) tax benefit/(expense) | | **-** | | 4 | | | - |
| Restructuring and employee severance tax benefit/(expense) | | **(2)** | | 2 | | | 20 |
| Amortization and other acquisition-related costs tax benefit/(expense) | | **41** | | 39 | | | 165 |
| Impairments and loss on disposal of assets tax benefit/(expense) | | **(43)** | | 3 | | | 6 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | | **17** | | 7 | | | 19 |
| Transitional tax benefit, net | | **894** | | - | | | - |
| Adjusted provision for income taxes | $ | **171** | $ | 222 | $ | | 839 |
| | | | | | | | |
| **Non-GAAP effective tax rate** | **26.2 %** | | 34.2 % | | | 32.6 % | |

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

<u>Forward Looking non-GAAP Measures</u>

In this presentation, the Company presents its outlook for fiscal 2018 non-GAAP EPS and non-GAAP Effective Tax Rate (ETR).  The Company does not provide EPS or ETR outlook, which are the most directly comparable GAAP measures to non-GAAP EPS and non-GAAP ETR, respectively, because changes in the items that the Company excludes from GAAP EPS and GAAP ETR to calculate these measures can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on EPS or ETR outlook numbers.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2018 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013. During the second quarter of fiscal 2018, the excluded items have increased the Company's EPS by $1.82, which includes a $2.83 transitional tax benefit related to the Tax Cuts and Jobs Act.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total Cardinal Health, Inc. shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total Cardinal Health, Inc. shareholders' equity).

**Non-GAAP Diluted EPS attributable to Cardinal Health, Inc. or "Non-GAAP Diluted EPS" or "Non-GAAP Diluted Earnings Per Share"**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP Diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Effective Tax Rate**: (provision for income taxes adjusted for (1) LIFO charges/(credits)[1], (2) restructuring and employee severance[2], (3) amortization and other acquisition-related costs[3], (4) impairments and (gain)/loss on disposal of assets[4], (5)  litigation (recoveries)/charges, net[5], and (6) loss on extinguishment of debt[6] and (7) transitional tax benefit[7]) divided by (earnings before income taxes adjusted for the first six items).

**Non-GAAP Gross Margin**: Gross margin excluding LIFO charges/(credits).

[1] The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market.  These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[2] Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel), and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[3] Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs, and changes in the fair value of contingent consideration obligations.

[4] Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[5] Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[6] Charges related to the make-whole premium on the redemption of notes.

[7] Estimate for the re-measurement of deferred tax assets and liabilities due to the reduction of the U.S. federal corporate income tax rate and the repatriation tax on undistributed foreign earnings.

**Cardinal Health, Inc. and Subsidiaries**

**<u>Definitions</u>**

**Non-GAAP Net Earnings attributable to Cardinal Health, Inc. or "Non-GAAP Net Earnings"**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, and (7) transitional tax benefit, each net of tax.

**Non-GAAP Operating Earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net.

**Non-GAAP Return on Equity**: (annualized current period net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, and (7) transitional tax benefit, each net of tax) divided by average Cardinal Health, Inc. shareholders' equity.

**Return on Equity**: annualized current period net earnings attributable to Cardinal Health, Inc. divided by average Cardinal Health, Inc. shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general, and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.

# EXHIBIT 94

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended December 31, 2017

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

**CardinalHealth**
*Essential to care™*

# Cardinal Health, Inc.

*(Exact name of registrant as specified in its charter)*

| **Ohio** | **31-0958666** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**

*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑            Accelerated filer ☐

Non-accelerated filer ☐ (Do not check if a smaller reporting company)     Smaller reporting company ☐

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The number of the registrant's common shares, without par value, outstanding as of January 31, 2018, was the following: 314,706,914.

# Cardinal Health
**Q2 Fiscal 2018 Form 10-Q**

## Table of Contents

|  | Page |
|---|---|
| Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Explanation and Reconciliation of Non-GAAP Financial Measures | **13** |
| Quantitative and Qualitative Disclosures about Market Risk | **16** |
| Controls and Procedures | **16** |
| Legal Proceedings | **16** |
| Risk Factors | **16** |
| Unregistered Sales of Equity Securities and Use of Proceeds | **16** |
| Financial Statements and Supplementary Data | **17** |
| Exhibits | **32** |
| Form 10-Q Cross Reference Index | **33** |
| Signatures | **34** |

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a globally integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. We provide medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. We connect patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. We manage our business and report our financial results in two segments: Pharmaceutical and Medical. As used in this report, "we," "our," "us," and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our fiscal year ends on June 30. References to fiscal 2018 and fiscal 2017 and to FY18 and FY17 are to the fiscal years ending or ended June 30, 2018 and June 30, 2017, respectively.

## Forward-Looking Statements

This Quarterly Report on Form 10-Q for the quarter ended December 31, 2017 (this "Form 10-Q") (including information incorporated by reference) includes "forward-looking statements" addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), but there are others in this Form 10-Q, which may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those made, projected or implied. The most significant of these risks and uncertainties are described in Exhibit 99.1 to this Form 10-Q and in "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (our "2017 Form 10-K"). Forward-looking statements in this Form 10-Q speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

## Non-GAAP Financial Measures

In the "Overview of Consolidated Results" section of MD&A, we use financial measures that are derived from our consolidated financial data but are not presented in our condensed consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this Form 10-Q.

# Management's Discussion and Analysis of Financial Condition and Results of Operations

The discussion and analysis presented below is concerned with material changes in financial condition and results of operations between the periods specified in our condensed consolidated balance sheets at December 31, 2017 and June 30, 2017, and in our condensed consolidated statements of earnings for the three and six months ended December 31, 2017 and 2016. All comparisons presented are with respect to the prior-year period, unless stated otherwise. This discussion and analysis should be read in conjunction with the MD&A included in our 2017 Form 10-K.

## Overview of Consolidated Results

### Revenue

**Revenue**
**(in billions)**



| | | | |
|---|---|---|---|
| $33.1 | $35.2 | $65.2 | $67.8 |
| Q2 FY17 | Q2 FY18 | YTD FY17 | YTD FY18 |

During the three and six months ended December 31, 2017, revenue increased 6 percent to $35.2 billion and 4 percent to $67.8 billion, respectively, primarily due to sales growth from pharmaceutical distribution and specialty pharmaceutical customers, partially offset by the previously announced May 2017 expiration of a large pharmaceutical distribution mail order customer contract. Medical segment acquisitions also contributed to the increase in revenue during the three and six months ended December 31, 2017.

## GAAP and Non-GAAP Operating Earnings



**GAAP**
(in billions)

**Non-GAAP**
(in billions)

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2017** | 2016 | Change | **2017** | 2016 | Change |
| **GAAP operating earnings** | $ **399** | $ 542 | (26)% | $ **661** | $ 1,076 | (39)% |
| LIFO charges/(credits) | **—** | 9 | | **—** | 9 | |
| Restructuring and employee severance | **21** | 7 | | **153** | 16 | |
| Amortization and other acquisition-related costs | **184** | 115 | | **368** | 237 | |
| Impairments and (gain)/loss on disposal of assets | **68** | 9 | | **68** | 12 | |
| Litigation (recoveries)/charges, net | **58** | 19 | | **90** | 20 | |
| **Non-GAAP operating earnings** | $ 730 | $ 701 | 4 % | $ 1,340 | $ 1,370 | (2)% |

The sum of the components may not equal the total due to rounding.

The decrease in GAAP operating earnings during the three months ended December 31, 2017 was primarily due to increased amortization of acquisition-related intangible assets as a result of the Patient Recovery Business acquisition; the write-down of the net assets held for sale from the divestiture of our China distribution business; litigation charges associated with inferior vena cava (IVC) filter product liability claims; performance from Cardinal Health Brand products; costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems; and Pharmaceutical segment generics program performance, which includes the negative impact of generic pharmaceutical customer pricing changes offset by the benefits of Red Oak Sourcing. These factors were partially offset by the segment profit contribution from acquisitions, including the Patient Recovery Business acquisition. In addition to the factors affecting GAAP earnings for the three months described above, the decrease in GAAP operating earnings during the six months ended December 31, 2017 includes contract termination restructuring costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model.

The increase in non-GAAP operating earnings during the three months ended December 31, 2017 was primarily due to contributions from acquisitions, including the Patient Recovery Business acquisition. These factors were largely offset by performance from Cardinal Health Brand products, costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems and Pharmaceutical segment generics program performance.

The decrease in non-GAAP operating earnings during the six months ended December 31, 2017 was primarily due to our Pharmaceutical segment generics program performance, costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems and performance from Cardinal Health Brand products. The decreases were partially offset by contributions from acquisitions, including the Patient Recovery Business acquisition.

## GAAP and Non-GAAP Diluted EPS



| | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| ($ per share) | **2017** | 2016 | Change | **2017** | 2016 | Change |
| **GAAP** [1] | **$ 3.33** | $ 1.02 | **226%** | **$ 3.68** | $ 1.97 | **87%** |
| LIFO charges/(credits) | **—** | 0.02 | | **—** | 0.02 | |
| Restructuring and employee severance | **0.07** | 0.01 | | **0.34** | 0.03 | |
| Amortization and other acquisition-related costs | **0.46** | 0.24 | | **0.85** | 0.49 | |
| Impairments and (gain)/loss on disposal of assets | **0.35** | 0.02 | | **0.35** | 0.02 | |
| Litigation (recoveries)/charges, net | **0.13** | 0.04 | | **0.19** | 0.04 | |
| Transitional tax benefit, net | **(2.83)** | — | | **(2.82)** | — | |
| **Non-GAAP** [1] | **$ 1.51** | $ 1.34 | **13%** | **$ 2.60** | $ 2.57 | **1%** |

The sum of the components may not equal the total due to rounding.

(1)      diluted earnings per share attributable to Cardinal Health, Inc. ("diluted EPS")

During the three and six months ended December 31, 2017, GAAP diluted EPS increased primarily due to the net benefit from enactment of the U.S. Tax Cuts and Jobs Act ("Tax Act"), partially offset by the net impact of the factors impacting GAAP operating earnings and an increase in interest expense.

During the three months ended December 31, 2017, non-GAAP diluted EPS increased primarily due to the benefit of applying a lower U.S. federal statutory tax rate to U.S. pre-tax non-GAAP earnings as a result of the Tax Act and the net benefit of the factors impacting non-GAAP operating earnings, partially offset by an increase in interest expense.

During the six months ended December 31, 2017, non-GAAP diluted EPS increased primarily due to the benefit of applying a lower U.S. federal statutory tax rate to U.S. pre-tax non-GAAP earnings as a result of the Tax Act, largely offset by an increase in interest expense and the factors impacting non-GAAP operating earnings.

## Cash and Equivalents

Our cash and equivalents balance was $1.2 billion at December 31, 2017 compared to $6.9 billion at June 30, 2017. The decrease in cash and equivalents during the six months ended December 31, 2017 was due to $6.1 billion paid for acquisitions, $403 million to redeem our 1.7% notes due 2018 and $296 million paid in dividends, offset in part by net cash provided by operating activities of $1.5 billion.

# Significant Developments in Fiscal 2018 and Trends

## Acquisitions and Divestitures

### Patient Recovery Business Acquisition

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc for $6.1 billion in cash. The Patient Recovery Business manufactures 23 categories of medical products that are sold into multiple healthcare channels, and include numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition further expanded the Medical segment's portfolio of self-manufactured products.

### China Distribution Business Divestiture

On November 14, 2017, we announced that we signed a definitive agreement to sell our pharmaceutical and medical products distribution business in China ("China distribution business") to Shanghai Pharmaceuticals Holding Co., Ltd. The divestiture does not include Cardinal Health's remaining businesses in China, including Cordis and its recently acquired Patient Recovery Business.

The transaction closed on February 1, 2018 with gross proceeds of $1.2 billion. The net proceeds are approximately $800 million after adjusting for third party indebtedness, taxes, and other transaction expenses and adjustments. In connection with the sale, during the three months ended December 31, 2017, we recognized a $67 million write-down of the net assets held for sale. The write-down is non-deductible for tax purposes. We also recognized estimated tax expense of $57 million related to the transaction.

## Trends

### Pharmaceutical Segment

Within our Pharmaceutical segment, we continue to expect fiscal 2018 segment profit to be less than our fiscal 2017 segment profit due primarily to generic pharmaceutical customer pricing changes. However, as is generally the case, the frequency, timing, magnitude, and profit impact of pharmaceutical customer pricing changes and branded and generic pharmaceutical manufacturer pricing changes remain uncertain and their impact on Pharmaceutical segment profit and consolidated operating earnings in fiscal 2018 could be more or less than we expect.

### Patient Recovery Business Acquisition

The acquisition of the Patient Recovery Business increased Medical segment revenue and profit during the three and six months ended December 31, 2017. We expect the acquisition to increase Medical segment profit more during the remainder of fiscal 2018 than it did during the six months ended December 31, 2017.

### Tax Cuts and Jobs Act

The Tax Act was enacted on December 22, 2017. The Tax Act, among other things, reduces the U.S. federal corporate tax rate from 35 percent to 21 percent and requires companies to pay a one-time tax to repatriate, for U.S. purposes, earnings of certain foreign subsidiaries that were previously deferred for tax purposes. In addition, beginning July 1, 2018 for us, it limits certain deductions and creates new taxes on certain foreign sourced earnings. The rate change is effective at the beginning of calendar year 2018 and, as a result, we have a blended U.S. federal statutory tax rate of 28.1 percent for our fiscal year 2018. The application of the lower federal tax rate to our year-to-date U.S. pre-tax earnings resulted in a tax benefit during the three months ended December 31, 2017. Additionally, we recognized a $894 million net transitional tax benefit comprised of the remeasurement of our U.S. deferred tax assets and liabilities at the lower tax rate partially offset by the provisional expense for the repatriation tax.

We are still completing our accounting for the tax effects of the Tax Act because all of the necessary information is not currently available, prepared, or analyzed. As such, the amounts we have recorded are provisional estimates and, as permitted by the SEC, we will continue to assess the impact of enactment of the Tax Act and we may record additional provisional amounts or adjustments to provisional amounts during the remainder of fiscal 2018 and in the first half of fiscal 2019.

**MD&A**　　　　　　　　　　**Results of Operations**

# Results of Operations

## Revenue



**Pharmaceutical Segment (in billions)**

$29.7 — Q2 FY17
$31.1 — Q2 FY18
$58.5 — YTD FY17
$60.1 — YTD FY18



**Medical Segment (in billions)**

$3.4 — Q2 FY17
$4.0 — Q2 FY18
$6.7 — YTD FY17
$7.8 — YTD FY18

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2017 | 2016 | Change | 2017 | 2016 | Change |
| Pharmaceutical | $ 31,146 | $ 29,743 | 5% | $ 60,066 | $ 58,505 | 3% |
| Medical | 4,044 | 3,410 | 19% | 7,768 | 6,690 | 16% |
| Total segment revenue | 35,190 | 33,153 | 6% | 67,834 | 65,195 | 4% |
| Corporate | (4) | (3) | 33% | (7) | (6) | 17% |
| **Total revenue** | $ 35,186 | $ 33,150 | 6% | $ 67,827 | $ 65,189 | 4% |

### Pharmaceutical Segment

Pharmaceutical segment revenue growth for the three and six months ended December 31, 2017 was primarily due to $2.5 billion and $3.5 billion, respectively, of sales growth from pharmaceutical distribution and specialty pharmaceutical customers, partially offset by the previously announced May 2017 expiration of a large pharmaceutical distribution mail order customer contract.

### Medical Segment

Medical segment revenue growth for the three and six months ended December 31, 2017 was primarily due to $545 million and $877 million, respectively, of contributions from acquisitions, including the Patient Recovery Business acquisition, and sales growth from new and existing customers.

# Cost of Products Sold

Cost of products sold for the three and six months ended December 31, 2017 increased $1.8 billion (6 percent) and $2.3 billion (4 percent) compared to the prior-year periods, respectively, as a result of the same factors affecting the changes in revenue and gross margin.

## Gross Margin



**Gross Margin (in billions)**

| Q2 FY17 | Q2 FY18 | YTD FY17 | YTD FY18 |
|---------|---------|----------|----------|
| $1.6 | $1.9 | $3.2 | $3.5 |



**Gross Margin Rate (Gross Margin as a Percent of Revenue)**

| Q2 FY17 | Q2 FY18 | YTD FY17 | YTD FY18 |
|---------|---------|----------|----------|
| 4.83% | 5.29% | 4.90% | 5.21% |

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2017** | 2016 | Change | **2017** | 2016 | Change |
| Gross margin | $ **1,861** | $ 1,602 | **16%** | $ **3,533** | $ 3,192 | **11%** |

Gross margin during the three and six months ended December 31, 2017 increased $259 million and $341 million, respectively, compared to the prior-year period primarily due to acquisitions ($235 million and $336 million, respectively), including the Patient Recovery Business acquisition.

Gross margin rate grew 46 and 31 basis points during the three and six months ended December 31, 2017, respectively, due to acquisitions, including the Patient Recovery Business acquisition, partially offset by the negative impact of changes in pharmaceutical distribution product mix.

## Distribution, Selling, General and Administrative ("SG&A") Expenses

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2017** | 2016 | Change | **2017** | 2016 | Change |
| SG&A expenses | $ **1,131** | $ 910 | **24%** | $ **2,193** | $ 1,831 | **20%** |

The increase in SG&A expenses during the three and six months ended December 31, 2017 was due to acquisitions ($135 million and $225 million, respectively), including the Patient Recovery Business acquisition, and costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems.

| MD&A | Results of Operations |
|---|---|

## Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 15 of the "Notes to Condensed Consolidated Financial Statements" for additional information on segment profit.



**Pharmaceutical Segment Profit (in millions)**

| Q2 FY17 | Q2 FY18 | YTD FY17 | YTD FY18 |
|---|---|---|---|
| $537 | $514 | $1,071 | $981 |

**Medical Segment Profit (in millions)**

| Q2 FY17 | Q2 FY18 | YTD FY17 | YTD FY18 |
|---|---|---|---|
| $159 | $220 | $286 | $348 |

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2017** | 2016 | Change | **2017** | 2016 | Change |
| Pharmaceutical | $ **514** | $ 537 | **(4)%** | $ **981** | $ 1,071 | **(8)%** |
| Medical | **220** | 159 | **38 %** | **348** | 286 | **22 %** |
| Total segment profit | **734** | 696 | **5 %** | **1,329** | 1,357 | **(2)%** |
| Corporate | **(335)** | (154) | **118 %** | **(668)** | (281) | **138 %** |
| **Total consolidated operating earnings** | $ **399** | $ 542 | **(26)%** | $ **661** | $ 1,076 | **(39)%** |

### Pharmaceutical Segment Profit

The decrease in Pharmaceutical segment profit during the three months ended December 31, 2017 was primarily due to costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems and our generic program performance, which includes the negative impact of generic pharmaceutical customer pricing changes partially offset by the benefits of Red Oak Sourcing. Performance from our specialty pharmaceutical products distribution and services business positively impacted Pharmaceutical segment profit.

The decrease in Pharmaceutical segment profit during the six months ended December 31, 2017 was primarily due to our generic program performance and costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems. Performance from our specialty pharmaceutical products distribution and services business positively impacted Pharmaceutical segment profit.

### Medical Segment Profit

The increases in Medical segment profit during the three and six months ended December 31, 2017 were primarily due to acquisitions, which included the unfavorable cost of products sold impact from the fair value step up of inventory acquired with the Patient Recovery Business acquisition. The increases were partially offset by performance from Cardinal Health Brand products.

### Corporate

The changes in Corporate during the three and six months ended December 31, 2017 were due to the factors discussed in the Other Components of Consolidated Operating Earnings section that follows.

**MD&A**  **Results of Operations**

## Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | Three Months Ended December 31, | | Six Months Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| Restructuring and employee severance | $ 21 | $ 7 | $ 153 | $ 16 |
| Amortization and other acquisition-related costs | 184 | 115 | 368 | 237 |
| Impairments and (gain)/loss on disposal of assets, net | 68 | 9 | 68 | 12 |
| Litigation (recoveries)/charges, net | 58 | 19 | 90 | 20 |

### Restructuring and Employee Severance
The increase in restructuring and employee severance during the six months ended December 31, 2017 was primarily due to $125 million in contract termination costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model.

### Amortization and Other Acquisition-Related Costs
Amortization of acquisition-related intangible assets was $150 million and $95 million for the three months ended December 31, 2017 and 2016, respectively, and $285 million and $196 million for the six months ended December 31, 2017 and 2016, respectively. The increases in amortization of acquisition-related intangible assets during the three and six months ended December 31, 2017 were largely due to the Patient Recovery Business acquisition.

Transaction and integration costs associated with the Patient Recovery Business acquisition were $24 million and $61 million for the three and six months ended December 31, 2017, respectively.

### Impairments and (gain)/loss on disposal of assets, net
During the three and six months ended December 31, 2017 we recognized a $67 million write-down of the assets held for sale from the divestiture of our China distribution business.

### Litigation (Recoveries)/Charges, Net
The increases in litigation charges during the three and six months ended December 31, 2017 were due to an increase in estimated losses and legal defense costs associated with inferior vena cava (IVC) filter product liability claims.

## Earnings Before Income Taxes

In addition to the items discussed above, earnings before income taxes were impacted by the following:

| (in millions) | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2017 | 2016 | Change | 2017 | 2016 | Change |
| Other (income)/expense, net | $ (5) | $ 7 | N.M. | $ (4) | $ 3 | N.M. |
| Interest expense, net | $ 87 | $ 44 | 96% | $ 168 | $ 88 | 91% |
| Loss on extinguishment of debt | $ — | $ — | N.M. | $ 2 | $ — | N.M. |

### Interest expense, net
The increases in interest expense during the three and six months ended December 31, 2017 was primarily due to increased debt issued in June 2017 to fund a portion of the purchase price of the Patient Recovery Business acquisition.

## Provision for/(Benefit from) Income Taxes

During the three months ended December 31, 2017 and 2016, the effective tax rate was (231.9) percent and 34.0 percent, respectively. During the six months ended December 31, 2017 and 2016, the effective tax rate was (136.6) percent and 35.6 percent, respectively. The change in the effective tax rate for the three and six months ended December 31, 2017 compared to the prior periods is due to the net benefit from enactment of the Tax Act.

The net benefit from the Tax Act during the three and six months ended December 31, 2017 includes a provisional net tax benefit of $935 million related to the remeasurement of our deferred tax assets and

liabilities to the new federal statutory rate, the benefit from the impact of applying a lower federal tax rate to our year-to-date U.S. pre-tax earnings and a provisional tax expense of $41 million for the one-time repatriation tax applied to our undistributed foreign earnings.

Our effective tax rate also includes $57 million of tax expense recognized in connection with the sale of our China distribution business.

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends and share repurchases. If we decide to engage in one or more acquisitions, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $1.2 billion at December 31, 2017 compared to $6.9 billion at June 30, 2017. At December 31, 2017, our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

During the six months ended December 31, 2017, we deployed $6.1 billion for acquisitions, net of cash acquired, $403 million to redeem our 1.7% notes due 2018, $296 million for cash dividends, $168 million for capital expenditures and $150 million on share repurchases; net cash provided by operating activities was $1.5 billion, driven primarily by net earnings. Additionally, we had $151 million outstanding under our commercial paper program as of December 31, 2017. The $802 million increase in net cash provided by operating activities during the six months ended December 31, 2017 compared to the prior-year period was primarily due to changes in working capital.

The cash and equivalents balance at December 31, 2017 included $538 million of cash held by subsidiaries outside of the United States.

As a result of the Tax Act, we have recognized a provisional amount of $41 million for the one-time U.S. repatriation tax on undistributed earnings of foreign subsidiaries. Though these foreign earnings have been deemed to be repatriated from a U.S. federal tax perspective, we have not yet completed our assessment of the Tax Act on our plans to reinvest foreign earnings and as such have not changed our prior conclusion that the earnings are indefinitely reinvested. As such, no non-U.S. taxes were recorded at December 31, 2017. If we decide to repatriate these earnings in the future, we may be subject to certain non-U.S. taxes at that time. See Note 8 of the "Notes to Condensed Consolidated Financial Statements" for additional information on the Tax Act.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $2.0 billion commercial paper program, which is backed by a $2.0 billion revolving credit facility, and a $1.0 billion committed receivables sales facility program.

At December 31, 2017, we had $151 million outstanding under our commercial paper program and no amounts outstanding under the revolving credit facility or the committed receivables sales facility program. During the six months ended December 31, 2017, we had maximum amounts outstanding under our commercial paper and

committed receivables programs of $1.3 billion and an average daily amount outstanding of $381 million.

Our revolving credit facility and committed receivables sales facility programs require us to maintain, as of the end of any calendar quarter, a consolidated leverage ratio of no more than 4.25-to-1, which will reduce to 3.25-to-1 in March 2019. The ratio temporarily increased as result of our acquisition of the Patient Recovery Business. As of December 31, 2017, we were in compliance with this financial covenant.

## Capital Deployment

### Capital Expenditures

Capital expenditures during the six months ended December 31, 2017 and 2016 were $168 million and $213 million, respectively.

### Dividends

On November 8, 2017, our Board of Directors approved a quarterly dividend of $0.4624 per share, or $1.85 per share on an annualized basis, which was paid on January 15, 2018 to shareholders of record on January 2, 2018.

### Share Repurchases

During the six months ended December 31, 2017, we repurchased $150 million of our common shares. We funded the repurchases with available cash and short term borrowings. At December 31, 2017, we had $293 million remaining under our existing share repurchase program. On February 7, 2018, our Board of Directors approved a new $1.0 billion share repurchase program that expires on December 31, 2020.

### Funding for Acquisition of Patient Recovery Business

On July 29, 2017, we acquired the Patient Recovery Business from Medtronic plc for $6.1 billion in cash. We funded the acquisition through $4.5 billion in new long-term debt issued in June 2017, the use of existing cash and borrowings under existing credit arrangements.

### China Distribution Business Divestiture

On February 1, 2018, we completed the divestiture of our China distribution business to Shanghai Pharmaceuticals Holding Co., Ltd. for gross proceeds of $1.2 billion. The net proceeds are approximately $800 million after adjusting for third-party indebtedness, taxes, and other transaction expenses and adjustments.

# Other Items

The MD&A in our 2017 Form 10-K addresses our contractual obligations, critical accounting policies and sensitive accounting estimates and off-balance sheet arrangements, as of and for the fiscal year ended June 30, 2017. There have been no subsequent material changes outside of the ordinary course of business to those items, except for critical accounting policies and sensitive accounting estimates related to the assets held for sale classification of the China distribution business and the accounting effects resulting from the Tax Act as discussed further in Note 4 and Note 8, respectively, of the "Notes to Condensed Consolidated Financial Statements."

Explanation and Reconciliation of Non-GAAP Financial Measures

# Explanation and Reconciliation of Non-GAAP Financial Measures

The "Overview of Consolidated Results" section within MD&A in this Form 10-Q contains financial measures that are not calculated in accordance with GAAP.

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this Form 10-Q for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics facilitates comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion facilitates comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and are inherently unpredictable in timing and amount, and in the case of impairments, are non-cash amounts, so their exclusion facilitates comparison of historical, current and forecasted financial results.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

- Transitional tax benefit, net related to the Tax Cuts and Jobs Act is excluded because it results from the one-time impact during the one-year measurement period of a very significant change in the U.S. federal corporate tax rate and, due to the significant size of the benefit, obscures analysis of trends and financial performance. The transitional tax benefit includes the estimate for the re-measurement of deferred tax assets and liabilities due to the reduction of the U.S. federal corporate income tax rate and the repatriation tax on undistributed foreign earnings, both of which are subject to adjustment during an up to 12 month measurement period.

The tax effect for each of the items listed above, other than the transitional tax benefit item, is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

# Definitions

**Growth rate calculation:** growth rates in this Form 10-Q are determined by dividing the difference between current-period results and prior-period results by prior-period results.

**Non-GAAP operating earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes**: earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, each net of tax, and (7) transitional tax benefit, net.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

Explanation and Reconciliation of Non-GAAP Financial Measures

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Provision for/(Benefit from) Income Taxes | Net Earnings[1] | Net Earnings[1] Growth Rate | Diluted EPS[1] | Diluted EPS[1] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| | | | **Three Months Ended December 31, 2017** | | | | | |
| **GAAP** | $ 399 | (26)% | $ 317 | $ (736) | $ 1,053 | 225 % | $ 3.33 | 226 % |
| Restructuring and employee severance | 21 | | 21 | (2) | 23 | | 0.07 | |
| Amortization and other acquisition-related costs | 184 | | 184 | 41 | 143 | | 0.46 | |
| Impairments and loss on disposal of assets | 68 | | 68 | (43) | 111 | | 0.35 | |
| Litigation (recoveries)/charges, net | 58 | | 58 | 17 | 41 | | 0.13 | |
| Transitional tax benefit, net[2] | — | | — | 894 | (894) | | (2.83) | |
| **Non-GAAP** | $ 730 | 4 % | $ 648 | $ 171 | $ 478 | 12 % | $ 1.51 | 13 % |
| | | | Three Months Ended December 31, 2016 | | | | | |
| GAAP | $ 542 | (4)% | $ 491 | $ 167 | $ 324 | — % | $ 1.02 | 4 % |
| LIFO charges/(credits) | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | 7 | | 7 | 2 | 5 | | 0.01 | |
| Amortization and other acquisition-related costs | 115 | | 115 | 39 | 76 | | 0.24 | |
| Impairments and loss on disposal of assets | 9 | | 9 | 3 | 6 | | 0.02 | |
| Litigation (recoveries)/charges, net | 19 | | 19 | 7 | 12 | | 0.04 | |
| Non-GAAP | $ 701 | (4)% | $ 650 | $ 222 | $ 427 | (1)% | $ 1.34 | 3 % |
| | | | **Six Months Ended December 31, 2017** | | | | | |
| **GAAP** | $ 661 | (39)% | $ 495 | $ (675) | $ 1,168 | 85 % | $ 3.68 | 87 % |
| Restructuring and employee severance | 153 | | 153 | 45 | 108 | | 0.34 | |
| Amortization and other acquisition-related costs | 368 | | 368 | 98 | 270 | | 0.85 | |
| Impairments and loss on disposal of assets | 68 | | 68 | (43) | 111 | | 0.35 | |
| Litigation (recoveries)/charges, net | 90 | | 90 | 30 | 60 | | 0.19 | |
| Loss on extinguishment of debt | — | | 2 | 1 | 1 | | — | |
| Transitional tax benefit, net[2] | — | | — | 894 | (894) | | (2.82) | |
| **Non-GAAP** | $ 1,340 | (2)% | $ 1,175 | $ 350 | $ 823 | — % | $ 2.60 | 1 % |
| | | | Six Months Ended December 31, 2016 | | | | | |
| GAAP | $ 1,076 | (9)% | $ 985 | $ 351 | $ 633 | (11)% | $ 1.97 | (8)% |
| LIFO charges/(credits) | 9 | | 9 | 4 | 5 | | 0.02 | |
| Restructuring and employee severance | 16 | | 16 | 6 | 10 | | 0.03 | |
| Amortization and other acquisition-related costs | 237 | | 237 | 79 | 158 | | 0.49 | |
| Impairments and (gain)/loss on disposal of assets | 12 | | 12 | 4 | 8 | | 0.02 | |
| Litigation (recoveries)/charges, net | 20 | | 20 | 8 | 12 | | 0.04 | |
| Non-GAAP | $ 1,370 | (6)% | $ 1,279 | $ 452 | $ 826 | (7)% | $ 2.57 | (4)% |

[1]  attributable to Cardinal Health, Inc.

[2]  Reflects the estimated net transitional benefit from the remeasurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries.  We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods. See Note 8 of the "Notes to Condensed Consolidated Financial Statements" for more information on the Tax Act.

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

# Quantitative and Qualitative Disclosures About Market Risk

As previously disclosed in our 2017 Form 10-K, as a result of the completion of the acquisition of the Patient Recovery Business, our exposure to both translational and transactional foreign exchange rate fluctuations has increased since the end of fiscal 2017. At the time of filing this Form 10-Q, we have not completed our analysis to quantify these impacts. Our direct exposure to market price changes for commodities has increased by approximately $108 million as a result of the completion of the acquisition of the Patient Recovery Business.

# Controls and Procedures

## Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of December 31, 2017. Based on this evaluation, our principal executive officer and principal financial officer have concluded that as of December 31, 2017, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

## Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

# Legal Proceedings

The legal proceedings described in Note 9 of the "Notes to Condensed Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

# Risk Factors

You should carefully consider the information in this Form 10-Q and the risk factors discussed in "Risk Factors" and other risks discussed in our 2017 Form 10-K and our filings with the SEC since June 30, 2017. These risks could materially and adversely affect our results of operations, financial condition, liquidity and cash flows. Our business also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

# Unregistered Sales of Equity Securities and Use of Proceeds

## Issuer Purchases of Equity Securities

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | | Total Number of Shares Purchased as Part of Publicly Announced Program (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Program (2) (in millions) | |
|---|---|---|---|---|---|---|
| October 2017 | 144 | $ | 66.06 | — | $ | 293 |
| November 2017 | 148 | | 59.38 | — | | 293 |
| December 2017 | 177 | | 61.50 | — | | 293 |
| **Total** | **469** | $ | **62.23** | **—** | $ | **293** |

(1)  Reflects 144, 148 and 177 common shares purchased in October, November and December 2017, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2)  On May 4, 2016, our Board of Directors approved a $1.0 billion share repurchase program that expires on December 31, 2019. On February 7, 2018, our Board of Directors approved a new $1.0 billion share repurchase program that expires on December 31, 2020.

# Condensed Consolidated Statements of Earnings
## (Unaudited)

| (in millions, except per common share amounts) | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | **2017** | 2016 | **2017** | 2016 |
| Revenue | $ **35,186** | $ 33,150 | $ **67,827** | $ 65,189 |
| Cost of products sold | **33,325** | 31,548 | **64,294** | 61,997 |
| Gross margin | **1,861** | 1,602 | **3,533** | 3,192 |
| | | | | |
| **Operating expenses:** | | | | |
| Distribution, selling, general and administrative expenses | **1,131** | 910 | **2,193** | 1,831 |
| Restructuring and employee severance | **21** | 7 | **153** | 16 |
| Amortization and other acquisition-related costs | **184** | 115 | **368** | 237 |
| Impairments and loss on disposal of assets, net | **68** | 9 | **68** | 12 |
| Litigation (recoveries)/charges, net | **58** | 19 | **90** | 20 |
| Operating earnings | **399** | 542 | **661** | 1,076 |
| | | | | |
| Other (income)/expense, net | **(5)** | 7 | **(4)** | 3 |
| Interest expense, net | **87** | 44 | **168** | 88 |
| Loss on extinguishment of debt | **—** | — | **2** | — |
| Earnings before income taxes | **317** | 491 | **495** | 985 |
| | | | | |
| Provision for/(benefit from) income taxes | **(736)** | 167 | **(675)** | 351 |
| Net earnings | **1,053** | 324 | **1,170** | 634 |
| | | | | |
| Less: Net earnings attributable to noncontrolling interests | **—** | — | **(2)** | (1) |
| Net earnings attributable to Cardinal Health, Inc. | $ **1,053** | $ 324 | $ **1,168** | $ 633 |
| | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | |
| Basic | $ **3.35** | $ 1.02 | $ **3.70** | $ 1.99 |
| Diluted | **3.33** | 1.02 | **3.68** | 1.97 |
| | | | | |
| **Weighted-average number of common shares outstanding:** | | | | |
| Basic | **315** | 318 | **315** | 319 |
| Diluted | **316** | 319 | **317** | 321 |
| | | | | |
| Cash dividends declared per common share | $ **0.4624** | $ 0.4489 | $ **0.9248** | $ 0.8978 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Statements of Comprehensive Income

**(Unaudited)**

| (in millions) | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | **2017** | 2016 | **2017** | 2016 |
| Net earnings | $ **1,053** | $ 324 | $ **1,170** | $ 634 |
| **Other comprehensive income/(loss):** | | | | |
| Foreign currency translation adjustments and other | **(9)** | (78) | **31** | (80) |
| Net unrealized gain/(loss) on derivative instruments, net of tax | **—** | 24 | **(1)** | 26 |
| Total other comprehensive income/(loss), net of tax | **(9)** | (54) | **30** | (54) |
| Total comprehensive income | **1,044** | 270 | **1,200** | 580 |
| Less: comprehensive income attributable to noncontrolling interests | **—** | — | **(2)** | (1) |
| **Total comprehensive income attributable to Cardinal Health, Inc.** | $ **1,044** | $ 270 | $ **1,198** | $ 579 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Balance Sheets
## (Unaudited)

| (in millions) | | December 31, 2017 | | June 30, 2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,249 | $ | 6,879 |
| Trade receivables, net | | 7,664 | | 8,048 |
| Inventories, net | | 12,087 | | 11,301 |
| Prepaid expenses and other | | 1,972 | | 2,117 |
| Assets held for sale | | 2,216 | | — |
| Total current assets | | 25,188 | | 28,345 |
| | | | | |
| Property and equipment, net | | 2,547 | | 1,879 |
| Goodwill and other intangibles, net | | 14,366 | | 9,207 |
| Other assets | | 804 | | 681 |
| Total assets | $ | 42,905 | $ | 40,112 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 19,194 | $ | 17,906 |
| Current portion of long-term obligations and other short-term borrowings | | 702 | | 1,327 |
| Other accrued liabilities | | 1,890 | | 1,988 |
| Liabilities related to assets held for sale | | 1,339 | | — |
| Total current liabilities | | 23,125 | | 21,221 |
| | | | | |
| Long-term obligations, less current portion | | 9,057 | | 9,068 |
| Deferred income taxes and other liabilities | | 3,091 | | 2,877 |
| | | | | |
| Redeemable noncontrolling interests | | 13 | | 118 |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized—**500 thousand** shares, Issued—**none** | | — | | — |
| Common shares, without par value: | | | | |
| Authorized—**755 million** shares, Issued—327 million shares at **December 31, 2017** and June 30, 2017, respectively | | 2,694 | | 2,697 |
| Retained earnings | | 5,848 | | 4,967 |
| Common shares in treasury, at cost: **12 million** shares and 11 million shares at **December 31, 2017** and June 30, 2017, respectively | | (848) | | (731) |
| Accumulated other comprehensive loss | | (95) | | (125) |
| **Total Cardinal Health, Inc. shareholders' equity** | | 7,599 | | 6,808 |
| Noncontrolling interests | | 20 | | 20 |
| **Total shareholders' equity** | | 7,619 | | 6,828 |
| Total liabilities, redeemable noncontrolling interests and shareholders' equity | $ | 42,905 | $ | 40,112 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Statements of Cash Flows

**(Unaudited)**

| | Six Months Ended December 31, | |
| --- | --- | --- |
| (in millions) | 2017 | 2016 |
| **Cash flows from operating activities:** | | |
| Net earnings | $ 1,170 | $ 634 |
| | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | |
| Depreciation and amortization | 520 | 339 |
| Loss on extinguishment of debt | 2 | — |
| Impairments and loss on sale of other investments | 6 | 3 |
| Impairments and loss on disposal of assets, net | 68 | 12 |
| Share-based compensation | 40 | 47 |
| Provision for bad debts | 49 | 29 |
| Change in operating assets and liabilities, net of effects from acquisitions: | | |
| Increase in trade receivables | (617) | (146) |
| Increase in inventories | (995) | (1,294) |
| Increase in accounts payable | 2,107 | 1,563 |
| Other accrued liabilities and operating items, net | (890) | (529) |
| Net cash provided by operating activities | 1,460 | 658 |
| | | |
| **Cash flows from investing activities:** | | |
| Acquisition of subsidiaries, net of cash acquired | (6,141) | (11) |
| Additions to property and equipment | (168) | (213) |
| Purchase of available-for-sale securities and other investments | (6) | (125) |
| Proceeds from sale of available-for-sale securities and other investments | 65 | 72 |
| Proceeds from maturities of available-for-sale securities | — | 39 |
| Proceeds from divestitures and disposal of property and equipment and held for sale assets | 1 | 1 |
| Net cash used in investing activities | (6,249) | (237) |
| | | |
| **Cash flows from financing activities:** | | |
| Payment of contingent consideration obligation | (17) | — |
| Net change in short-term borrowings | 155 | 33 |
| Purchase of noncontrolling interests | (106) | (12) |
| Proceeds from long-term obligations, net of issuance costs | 3 | — |
| Reduction of long-term obligations | (403) | (60) |
| Proceeds from interest rate swap terminations | — | 14 |
| Net tax proceeds/(withholdings) from share-based compensation | (16) | — |
| Excess tax benefits from share-based compensation | — | 32 |
| Dividends on common shares | (296) | (293) |
| Purchase of treasury shares | (150) | (600) |
| Net cash used in financing activities | (830) | (886) |
| | | |
| Effect of exchange rates changes on cash and equivalents | 7 | (10) |
| Cash reclassified to assets held for sale | (18) | — |
| | | |
| Net decrease in cash and equivalents | (5,630) | (475) |
| Cash and equivalents at beginning of period | 6,879 | 2,356 |
| **Cash and equivalents at end of period** | $ 1,249 | $ 1,881 |

See notes to condensed consolidated financial statements.

# Notes to Condensed Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

### Basis of Presentation

Our condensed consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. References to "we," "our," and similar pronouns in this Quarterly Report on Form 10-Q for the quarter ended December 31, 2017 (this "Form 10-Q") refer to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context requires otherwise.

Our fiscal year ends on June 30. References to fiscal 2018 and 2017 in these condensed consolidated financial statements are to the fiscal years ending or ended June 30, 2018 and June 30, 2017, respectively.

Our condensed consolidated financial statements have been prepared in accordance with the U.S. Securities and Exchange Commission ("SEC") instructions to Quarterly Reports on Form 10-Q and include the information and disclosures required by accounting principles generally accepted in the United States ("GAAP") for interim financial reporting. The preparation of financial statements in conformity with GAAP requires us to make estimates and assumptions that affect amounts reported in the condensed consolidated financial statements and accompanying notes. Actual amounts may differ from these estimated amounts. In our opinion, all adjustments necessary for a fair presentation of the condensed consolidated financial statements have been included. Except as disclosed elsewhere in this Form 10-Q, all such adjustments are of a normal and recurring nature. In addition, financial results presented for this fiscal 2018 interim period are not necessarily indicative of the results that may be expected for the full fiscal year ending June 30, 2018. These condensed consolidated financial statements are unaudited and, accordingly, should be read in conjunction with the audited consolidated financial statements and related notes contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 Form 10-K").

### Recent Financial Accounting Standards

In August 2017, the Financial Accounting Standards Board (the "FASB") issued accounting guidance which is intended to improve and simplify accounting rules around hedge accounting. The guidance will be effective for us in the first quarter of fiscal 2020 and early adoption is permitted. We are currently evaluating the impact of this standard on our consolidated financial statements.

In January 2017, the FASB issued amended accounting guidance that simplifies the accounting for goodwill impairment by eliminating the step of measuring a goodwill impairment by estimating the implied fair value of goodwill. Instead, goodwill impairment will be measured as the amount by which the reporting unit's carrying value exceeds its fair value, limited to the carrying value of goodwill. We adopted this guidance in the second quarter of fiscal 2018. The adoption did

not have an impact on our condensed consolidated financial statements.

In March 2016, the FASB issued amended accounting guidance that changed the accounting for certain aspects of share-based compensation to employees. The guidance requires all income tax effects of share-based awards to be recognized in the statement of earnings as awards vest or are settled. Additionally, the guidance increases the amount employers can withhold in shares to cover employee income taxes without requiring liability classification and allows a policy election for accounting for forfeitures. The primary impact of adoption is the recognition of excess tax benefits in the statement of earnings on a prospective basis, rather than as a component of equity. The impact on the presentation in the condensed consolidated statement of cash flows is also prospective. We adopted this guidance in the first quarter of fiscal 2018. The impact of adoption on the provision for/(benefit from) income taxes on our condensed consolidated statement of earnings was immaterial. The inclusion of excess tax benefits and deficiencies as a component of our income tax expense will increase volatility within our provision for/(benefit from) income taxes as the amount of excess tax benefits or deficiencies from share-based compensation awards depends on our stock price at the date the awards vest or settle.

In February 2016, the FASB issued amended accounting guidance that requires lessees to recognize most leases on the balance sheet as a lease liability and corresponding right-of-use asset. The guidance also requires disclosures that meet the objective of enabling financial statement users to assess the amount, timing, and uncertainty of cash flows arising from leases. This guidance will be effective for us in the first quarter of fiscal 2020, with early adoption permitted. We are currently evaluating the impact of this standard on our consolidated financial statements and the options for adoption.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition which is effective for us in the first quarter of fiscal 2019. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. The FASB also subsequently issued several amendments to the standard, including clarification on principal versus agent considerations, performance obligations and licensing, and certain scope improvements and practical expedients.

We continue to make progress on our evaluation of the amended revenue recognition guidance. Our revenue is primarily distribution revenue, which we recognize at a point in time when title transfers to customers and we have no further obligation to provide services related to such merchandise. Although we are continuing to assess the impact of the amended guidance, we generally anticipate that the timing of recognition of distribution revenue will be substantially

unchanged under the amended guidance and we do not expect the adoption of the amended accounting guidance to have a material impact on our consolidated financial statements. During the remainder of fiscal 2018 we will quantify the impact of adoption, if any, and implement any required changes to processes to meet the new accounting, reporting and disclosure requirements and will update our internal controls and policies accordingly. Additionally, we are continuing to evaluate our method of adoption.

## 2. Acquisitions

### Patient Recovery Business

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc for $6.1 billion in cash. The Patient Recovery Business manufactures 23 categories of medical products sold into multiple healthcare channels, and includes numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition further expanded the Medical segment's portfolio of self-manufactured products. We closed the Patient Recovery Business acquisition in 28 principal countries on July 29, 2017, and acquired control of, for GAAP purposes, and the rights to, the net economic benefit from the entire Patient Recovery Business in the remaining countries at the closing. We are in the process of transitioning legal ownership in the remaining non-principal countries, which we expect to complete by the end of calendar 2018. The results for the entire Patient Recovery Business in all countries are included in the condensed consolidated financial statements beginning July 29, 2017. We funded the acquisition through $4.5 billion in new long-term debt, existing cash and borrowings under our existing credit arrangements.

Transaction and integration costs associated with the acquisition of the Patient Recovery business were $24 million and $61 million during the three and six months ended December 31, 2017, respectively, and are included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

### Fair Value of Assets Acquired and Liabilities Assumed

The allocation of the purchase price for the acquisition of the Patient Recovery Business is not yet finalized and is subject to adjustment as we complete the valuation analysis for this acquisition.

The valuation of identifiable intangible assets utilizes significant unobservable inputs and thus represents a Level 3 nonrecurring fair value measurement. The estimated fair value of the identifiable intangible assets was determined using income-based approaches, which includes market participant expectations of the cash flows that an asset could generate over its economic life, discounted back to present value using an appropriate rate of return. The weighted-average discount rate used to arrive at the present value of the identifiable intangible assets was 8.2 percent, and considers the inherent risk of each intangible asset relative to the internal rate of return and weighted-average cost of capital.

The following table summarizes the estimated fair value of the assets acquired and liabilities assumed as of the acquisition date for the Patient Recovery Business:

| (in millions) | | Patient Recovery Business |
|---|---|---|
| **Identifiable intangible assets:** | | |
| Customer relationships (1) | $ | 1,733 |
| Trade names (2) | | 187 |
| Developed technology and other (3) | | 732 |
| Total identifiable intangible assets acquired | | 2,652 |
| | | |
| Cash and equivalents | | 22 |
| Inventories | | 426 |
| Prepaid expenses and other | | 249 |
| Property and equipment, net | | 752 |
| Other accrued liabilities | | (307) |
| Deferred income taxes and other liabilities | | (851) |
| Total identifiable net assets acquired/(liabilities assumed) | | 2,943 |
| Goodwill | | 3,137 |
| **Total net assets acquired** | $ | **6,080** |

(1)     The range of useful lives for customer relationships is 10 to 18 years.

(2)     The useful life of trade names is 15 years.

(3)     The useful life of developed technology is 15 years.

## 3. Restructuring and Employee Severance

The following table summarizes restructuring and employee severance costs:

| | Three Months Ended December 31, | | | |
|---|---|---|---|---|
| (in millions) | 2017 | | 2016 | |
| Employee-related costs (1) | $ | 15 | $ | 6 |
| Facility exit and other costs (2) | | 6 | | 1 |
| **Total restructuring and employee severance** | $ | 21 | $ | 7 |

| | Six Months Ended December 31, | | | |
|---|---|---|---|---|
| (in millions) | 2017 | | 2016 | |
| Employee-related costs (1) | $ | 19 | $ | 13 |
| Facility exit and other costs (2) | | 134 | | 3 |
| **Total restructuring and employee severance** | $ | 153 | $ | 16 |

(1)     Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2)     Facility exit and other costs primarily consist of product distribution and lease contract termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

In September 2017, we entered into an agreement to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model. The expected costs with this restructuring include $125 million, on a pre-tax basis, in contract termination costs.

These costs are reflected in facility exit and other costs in the condensed consolidated statement of earnings during the six months ended December 31, 2017. We paid $65 million of the contract termination fee during the three months ended December 31, 2017 and the remaining $60 million during January 2018.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | Facility Exit and Other Costs | Total |
|---|---|---|---|
| Balance at June 30, 2017 | $ 41 | $ — | $ 41 |
| Additions | 11 | 130 | 141 |
| Payments and other adjustments | (16) | (66) | (82) |
| **Balance at December 31, 2017** | **$ 36** | **$ 64** | **$ 100** |

## 4. Assets Held for Sale

We classify assets and liabilities (the "disposal group") as held for sale when management commits to a plan to sell the disposal group in its present condition and at a price that is reasonable in relation to its current fair value. We also consider whether an active program to locate a buyer has been initiated and if it is probable that the sale will occur within one year without significant changes to the plan to sell. Upon classification of the disposal group as held for sale, we test the assets for impairment and cease related depreciation and amortization.

In November 2017, we signed a definitive agreement with Shanghai Pharmaceuticals Holding Co., Ltd. to sell our pharmaceutical and medical products distribution business in China ("China distribution business") for gross proceeds of $1.2 billion. The transaction closed on February 1, 2018 for net proceeds of approximately $800 million after adjusting for third party indebtedness, taxes, and other transaction expenses and adjustments.

During the three months ended December 31, 2017, we met the criteria for the related assets and liabilities of the China distribution business to be classified as held for sale. We determined that the sale of the China distribution business does not meet the criteria to be classified as discontinued operations. The China distribution business primarily operates within our Pharmaceutical segment, with a smaller portion operating within our Medical segment.

At December 31, 2017, the book value of the disposal group exceeded its fair value less cost to sell. Accordingly, we recognized a $67 million write-down on the disposal group in impairments and loss on disposal of assets in our condensed consolidated statement of earnings. This write-down includes a $2 million gain related to currency translation adjustments in accumulated other comprehensive income. The write-down is non-deductible for tax purposes. We also recognized provisional tax expense of $57 million related to the transaction. See Note 8 for additional information regarding income taxes.

The following table presents information related to the assets and liabilities that were classified as held for sale at December 31, 2017 in the condensed consolidated balance sheets:

| (in millions) | December 31, 2017 |
|---|---|
| Trade Receivables, net | $ 952 |
| Inventories, net | 622 |
| Goodwill and other intangibles, net | 448 |
| Other assets | 261 |
| Impairment of assets held for sale | (67) |
| **Total assets held for sale** | **2,216** |
| Accounts Payable | 818 |
| Current portion of long-term obligations and other short term borrowings | 397 |
| Other liabilities | 124 |
| **Total liabilities related to assets held for sale** | **$ 1,339** |

## 5. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical | Medical | Total |
|---|---|---|---|
| Balance at June 30, 2017 | $ 2,939 | $ 4,282 | $ 7,221 |
| Goodwill acquired, net of purchase price adjustments | 1 | 3,187 | 3,188 |
| Foreign currency translation adjustments and other | 14 | 9 | 23 |
| Reclassified to assets held for sale | (333) | (54) | (387) |
| **Balance at December 31, 2017** | **$ 2,621** | **$ 7,424** | **$ 10,045** |

The increase in the Medical segment goodwill is primarily due to the Patient Recovery Business acquisition. Goodwill recognized in connection with the Patient Recovery Business acquisition primarily represents the expected benefits from certain synergies of integrating the business, the existing workforce of the acquired entity, and the expected growth from new customers.

During the three months ended December 31, 2017, goodwill of $387 million was reclassified to assets held for sale in connection with the sale of our China distribution business, discussed further in Note 4.

## Other Intangible Assets

The following tables summarize other intangible assets by class at:

**December 31, 2017**

| (in millions) | Gross Intangible | | Accumulated Amortization | | Net Intangible | | Weighted-Average Remaining Amortization Period (Years) |
|---|---|---|---|---|---|---|---|
| **Indefinite-life intangibles:** | | | | | | | |
| IPR&D, trademarks and other | $ | 62 | $ | — | $ | 62 | N/A |
| Total indefinite-life intangibles | | 62 | | — | | 62 | N/A |
| | | | | | | | |
| **Definite-life intangibles:** | | | | | | | |
| Customer relationships | | 3,614 | | 1,074 | | 2,540 | 13 |
| Trademarks, trade names and patents | | 686 | | 224 | | 462 | 14 |
| Developed technology and other | | 1,648 | | 391 | | 1,257 | 12 |
| Total definite-life intangibles | | 5,948 | | 1,689 | | 4,259 | 13 |
| **Total other intangible assets** | $ | 6,010 | $ | 1,689 | $ | 4,321 | N/A |

| | June 30, 2017 | | | | | |
|---|---|---|---|---|---|---|
| (in millions) | Gross Intangible | | Accumulated Amortization | | Net Intangible | |
| **Indefinite-life intangibles:** | | | | | | |
| IPR&D, trademarks and other | $ | 61 | $ | — | $ | 61 |
| Total indefinite-life intangibles | | 61 | | — | | 61 |
| | | | | | | |
| **Definite-life intangibles:** | | | | | | |
| Customer relationships | | 1,966 | | 967 | | 999 |
| Trademarks, trade names and patents | | 509 | | 195 | | 314 |
| Developed technology and other | | 916 | | 304 | | 612 |
| Total definite-life intangibles | | 3,391 | | 1,466 | | 1,925 |
| **Total other intangible assets** | $ | 3,452 | $ | 1,466 | $ | 1,986 |

The increase in definite-life intangibles is primarily due to the Patient Recovery Business acquisition. Total amortization of intangible assets was $152 million and $95 million for the three months ended December 31, 2017 and 2016, respectively, and $287 million and $196 million for the six months ended December 31, 2017 and 2016, respectively. For acquisitions closed on or before December 31, 2017, estimated annual amortization of intangible assets for the remainder of fiscal 2018 through 2022 is as follows: $289 million, $553 million, $522 million, $450 million and $417 million.

During the three months ended December 31, 2017, other intangible assets of $61 million were transferred to assets held for sale in connection with the sale of our China distribution business, discussed further in Note 4.

## 6. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. We held the following investments in marketable securities at fair value at:

| (in millions) | December 31, 2017 | | June 30, 2017 | |
|---|---|---|---|---|
| **Current available-for-sale securities:** | | | | |
| Treasury bills | $ | — | $ | 25 |
| International bonds | | — | | 3 |
| Corporate bonds | | — | | 30 |
| U.S. agency bonds | | — | | 3 |
| Asset-backed securities | | — | | 3 |
| International equity securities | | — | | 1 |
| **Total available-for-sale securities** | $ | — | $ | 65 |

In July 2017, we liquidated our marketable securities. There were no unrealized gains or loss at December 31, 2017, and gross unrealized gains and losses were immaterial at June 30, 2017. During the six months ended December 31, 2017 and 2016, gross realized gains and losses were immaterial and we did not recognize any other-than-temporary impairments.

## 7. Long-Term Obligations and Other Short-Term Borrowings

### Long-Term Debt

At December 31, 2017 and June 30, 2017, we had total long term obligations, including the current portion and other short-term borrowings, of $9.8 billion and $10.4 billion, respectively. All the notes represent unsecured obligations of Cardinal Health, Inc. and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. Interest is paid pursuant to the terms of the obligations. These notes are effectively subordinated to the liabilities of our subsidiaries, including trade payables of $19.2 billion.

In June 2017, we issued additional debt with the aggregate principal amount of $5.2 billion to fund a portion of the acquisition of the Patient Recovery Business, to redeem the $400 million 1.7% Notes due 2018 and for general corporate purposes. The notes issued in June 2017 were 1.948% Notes due 2019, 2.616% Notes due 2022, 3.079% Notes due 2024, 3.410% Notes due 2027, 4.368% Notes due 2047, and floating rate Notes due 2022.

### Other Financing Arrangements

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $2.0 billion commercial paper program, which is backed by a $2.0 billion revolving credit facility and a $1.0 billion committed receivables sales facility program. At December 31, 2017, we had $151 million outstanding under the commercial paper program and no amounts outstanding under the revolving credit facility and committed receivables sales facility program.

In November 2016, we renewed our committed receivables sales facility program through Cardinal Health Funding, LLC ("CHF") through November 1, 2019. CHF was organized for the sole purpose of buying receivables and selling undivided interests in those receivables to third-party purchasers. Although consolidated with Cardinal Health, Inc. in accordance with GAAP, CHF is a separate legal entity from Cardinal Health, Inc. and from our subsidiary that sells receivables to CHF. CHF is designed to be a special purpose, bankruptcy-remote entity whose assets are available solely to satisfy the claims of its creditors.

## 8. Income Taxes

Fluctuations in our provision for/(benefit from) income taxes as a percentage of pretax earnings ("effective tax rate") are generally due to changes in international and U.S. state effective tax rates resulting from our business mix and discrete items. In our second quarter ending December 31, 2017 new U.S. tax legislation, as discussed further below, was the primary driver of fluctuations.

### U.S. Tax Cuts and Jobs Act

On December 22, 2017, the United States enacted the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act makes broad and complex changes to the U.S. tax code that affect our fiscal year 2018 financial results in two primary ways. First, effective as of January 1, 2018, the Tax Act reduces the U.S. federal corporate tax rate from 35 percent to 21 percent. Second, it requires companies to pay a one-time U.S. repatriation tax on certain undistributed earnings of foreign subsidiaries. Because our fiscal year ends in June, we have a blended U.S. Federal statutory tax rate for fiscal 2018 of 28.1 percent under the Tax Act. The Tax Act also establishes new tax provisions that will affect us beginning July 1, 2018 including, (1) eliminating the U.S. manufacturing deduction; (2) establishing new limitations on deductible interest expense and certain executive compensation; (3) eliminating the corporate alternative minimum tax; (4) creating the base erosion anti-abuse tax; (5) creating a new provision designed to tax global intangible low-tax income ("GILTI"); (6) generally eliminating U.S. federal income taxes on dividends from foreign subsidiaries; and (7) changing rules related to uses and limitations of net operating loss carryforwards created in tax years beginning after December 31, 2017.

Regarding the new GILTI tax rules, we are allowed to make an accounting policy election to either (1) treat taxes due on future GILTI exclusions in U.S. taxable income as a current period expense when incurred or (2) reflect such portion of the future GILTI exclusions in U.S. taxable income that relate to existing basis differences in our measurement of deferred taxes. Our analysis of the new GILTI rules and how they may impact us is incomplete. Accordingly, we have not made a policy election regarding the treatment of the GILTI tax.

Also on December 22, 2017, the SEC issued Staff Accounting Bulletin 118 (SAB 118) allowing companies to use provisional estimates to record the effects of the Tax Act. SAB 118 also provides a measurement period (not to exceed one year from the date of enactment) to complete the accounting for the impacts of the Tax Act.

We are still completing our accounting for the tax effects of the Tax Act because all the necessary information is not currently available, prepared, or analyzed. As permitted by SAB 118, we have made reasonable estimates of the effects of the Tax Act on our financial results. As we complete our analysis of the accounting for the tax effects of enactment of the Tax Act, we may record additional provisional amounts or adjustments to provisional amounts as discrete items in future periods.

### Remeasurement of Deferred Tax Assets and Liabilities

As a result of the enactment of a lower tax rate, we remeasured our U.S. deferred tax assets and liabilities based on the rates at which they are expected to reverse in the future. While we are still analyzing certain aspects of the Tax Act and refining our calculations, we have recorded a provisional net benefit of $935 million in the three months ended December 31, 2017 related to this required remeasurement. The provisional estimate is based on currently available information related to deferred tax assets and liabilities which is subject to change as additional information becomes available, prepared, and analyzed.

### Repatriation Tax on Undistributed Foreign Earnings

In connection with the required one-time U.S. repatriation tax on undistributed earnings of foreign subsidiaries, we recorded a provisional tax expense of $41 million in the three months ended December 31, 2017. The Tax Act permits the payment of this tax over an eight-year period beginning in fiscal 2019. Though these foreign earnings have been deemed to be repatriated from a U.S. federal tax perspective, we have not yet completed our assessment of the Tax Act on our plans to reinvest foreign earnings and as such have not changed our prior conclusion that the earnings are indefinitely reinvested. The repatriation tax is based on currently available information and technical guidance related to the new tax law. The provisional estimate will be updated when additional information related to undistributed foreign earnings, foreign taxes and foreign cash and equivalents becomes available, prepared and analyzed.

### Effective Tax Rate

During the three months ended December 31, 2017 and 2016, the effective tax rate was (231.9) percent and 34.0 percent, respectively. During the six months ended December 31, 2017 and 2016, the effective tax rate was (136.6) percent and 35.6 percent, respectively. The change in the effective tax rate for the three and six months ended December 31, 2017 compared to the prior periods is due to the net benefit from enactment of the Tax Act.

The net benefit from the Tax Act during the three and six months ended December 31, 2017 includes the aforementioned provisional net tax benefit of $935 million related to the remeasurement of our deferred tax assets and liabilities to the new federal statutory rate, the benefit from the impact of applying a lower federal tax rate to year-to-date U.S. pre-tax earnings and the provisional tax expense of $41 million based on the one-time repatriation tax applied to our undistributed foreign earnings.

Our effective tax rate also includes $57 million of tax expense recognized in connection with the sale of our China distribution business.

### Unrecognized Tax Benefits

At December 31, 2017 and June 30, 2017, we had $520 million and $417 million of unrecognized tax benefits, respectively. The

December 31, 2017 and June 30, 2017, balances include $277 million and $268 million of unrecognized tax benefits, respectively, that if recognized, would have an impact on the effective tax rate.

At December 31, 2017 and June 30, 2017, we had $125 million and $99 million, respectively, accrued for the payment of interest and penalties related to unrecognized tax benefits, which we recognize in the provision for/(benefit from) income taxes in the condensed consolidated statements of earnings. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the condensed consolidated balance sheets.

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is between zero and a net decrease of $30 million, exclusive of penalties and interest.

### Other Tax Matters

We file income tax returns in the U.S. federal jurisdiction, various U.S. state jurisdictions and various foreign jurisdictions. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2008 through the current fiscal year.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $146 million and $142 million at December 31, 2017 and June 30, 2017, respectively, and is included in other assets in the condensed consolidated balance sheets.

As a result of the acquisition of the Patient Recovery Business from Medtronic plc, we have an indemnification receivable of $136 million recognized as of December 31, 2017. Under the purchase agreement, Medtronic plc is obligated to indemnify us for certain tax exposures and transaction taxes related to periods prior to our acquisition of the Patient Recovery Business. In January 2018, Medtronic plc paid $85 million of this amount to us which we placed on deposit with the IRS.

## 9. Commitments, Contingent Liabilities and Litigation

### Commitments

**Generic Sourcing Venture with CVS Health Corporation ("CVS Health")**

In July 2014, we established Red Oak Sourcing, LLC ("Red Oak Sourcing"), a U.S.-based generic pharmaceutical sourcing venture with CVS Health for an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies. Due to the achievement of predetermined milestones, we are required to make quarterly payments of $45.6 million to CVS Health for the remainder of the initial term.

### Legal Proceedings

We become involved from time to time in disputes, litigation, and regulatory matters.

We may be named from time to time in *qui tam* actions initiated by private third parties. In such actions, the private parties purport to act on behalf of federal or state governments, allege that false claims have been submitted for payment by the government and may receive an award if their claims are successful. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own purporting to act on behalf of the government.

From time to time, we become aware through employees, internal audits or other parties of possible compliance matters, such as complaints or concerns relating to accounting, internal accounting controls, financial reporting, auditing, or other ethical matters or relating to compliance with laws such as healthcare fraud and abuse, anti-corruption or anti-bribery laws. When we become aware of such possible compliance matters, we investigate internally and take appropriate corrective action. In addition, from time to time, we receive subpoenas or requests for information from various federal or state agencies relating to our business or to the business of a customer, supplier or other industry participants. Internal investigations, subpoenas or requests for information could lead to the assertion of claims or the commencement of legal proceedings against us or result in sanctions.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a potential quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators and product liability claims and lawsuits, including class actions. Even absent an identified regulatory or quality issue or product recall, we can become subject to product liability claims and lawsuits.

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for certain litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges in our condensed consolidated statements of earnings.

### Opioid Lawsuits

Pharmaceutical wholesale distributors, including us, have been named as defendants in a number of lawsuits relating to the distribution of prescription opioid pain medications. These lawsuits, which have been filed in various federal, state and other courts, allege violations of controlled substance laws and various other statutes as

well as common law claims, including negligence, public nuisance and unjust enrichment, and seek equitable relief and monetary damages. Many of these lawsuits also name pharmaceutical manufacturers, retail chains and other entities as defendants.

As of February 2, 2018, we are named as a defendant in 343 lawsuits in 36 jurisdictions. The plaintiffs in these lawsuits include 317 counties, municipalities and other entities; two state attorneys general; and 23 union and other health and welfare funds and hospital systems and other health care providers. Of these lawsuits, ten are purported class actions. In December 2017, all federal lawsuits (298 as of February 2, 2018) were ordered to be transferred for consolidated pre-trial proceedings in a Multi-District Litigation proceeding in the United States District Court for the Northern District of Ohio. We are vigorously defending ourselves in these lawsuits. Since these lawsuits are in early stages, we are unable to predict their outcome or estimate a range of reasonably possible losses.

In addition to the two state attorneys general who have sued us, we, along with other distributors, have, since September 2017, received requests related to an investigation being conducted by a group of 39 U.S. state attorneys general relating to the distribution of opioid medication. This investigation is part of a broader investigation of pharmaceutical manufacturers and distributors. We also have received civil investigative demands, subpoenas or requests for information from nine individual state attorneys general offices. We are cooperating with these investigations.

**Product Liability Lawsuits**

As of February 2, 2018, we are named as a defendant in 112 product liability lawsuits filed in Alameda County Superior Court in California involving claims by approximately 1,362 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Another 17 lawsuits involving similar claims by approximately 28 plaintiffs are pending in other jurisdictions. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these lawsuits.

At December 31, 2017, we had a total of $184 million, net of expected insurance recoveries, accrued for losses and legal defense costs related to the Cordis IVC filter lawsuits. While we have recorded accruals based on our assessment of these matters, because these lawsuits are in early stages, we are unable to estimate a range of reasonably possible losses in excess of this accrued amount.

## 10. Fair Value Measurements

**Assets and (liabilities) measured on a recurring basis**

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at:

| (in millions) | December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ — | $ — | $ — | $ — |
| Available-for-sale securities (2) | — | — | — | — |
| Other investments (3) | 122 | — | — | 122 |
| **Liabilities:** | | | | |
| Forward contracts (1) | — | (33) | — | (33) |
| Contingent consideration (4) | — | — | (21) | (21) |

| (in millions) | June 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 739 | $ — | $ — | $ 739 |
| Available-for-sale securities (2) | — | 65 | — | 65 |
| Other investments (3) | 116 | — | — | 116 |
| **Liabilities:** | | | | |
| Forward contracts (1) | — | (21) | — | (21) |
| Contingent consideration (4) | — | — | (32) | (32) |

(1)   The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the condensed consolidated balance sheets.

(2)   We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 6 for additional information regarding available-for-sale securities.

(3)   The other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(4)   Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods, and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

**Notes to Financial Statements**

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
|---|---|
| Balance at June 30, 2017 | $ 32 |
| Additions from acquisitions | 5 |
| Changes in fair value of contingent consideration (1) | — |
| Payment of contingent consideration | (17) |
| **Balance at December 31, 2017** | **$ 21** |

The sum of the components may not equal the total due to rounding.

(1)    Amount is included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

**Assets and (liabilities) measured on a nonrecurring basis**

Assets and liabilities held for sale of $2.2 billion and $1.3 billion, respectively, at December 31, 2017 are related to the sale of our China distribution business that closed on February 1, 2018. There were no assets or liabilities held for sale at June 30, 2017. These estimated fair values utilized Level 3 unobservable inputs based on expected sales proceeds following a competitive bidding process. See Note 4 for additional information regarding assets and liabilities held for sale.

## 11. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to fair value through earnings at the end of each period. Our derivative and hedging programs are consistent with those described in the 2017 Form 10-K. The amount of ineffectiveness associated with these derivative instruments was immaterial for the three and six months ended December 31, 2017 and 2016.

During the six months ended December 31, 2017 and 2016, we entered into pay-floating interest rate swaps with a total notional amounts of $350 million and $100 million, respectively. These swaps have been designated as fair value hedges of our fixed rate debt and are included in other assets in the condensed consolidated balance sheet.

During the six months ended December 31, 2016, we entered into forward interest rate swaps with a total notional amount of $200 million to hedge probable, but not firmly committed, future transactions associated with our debt.

**Fair Value of Financial Instruments**

The carrying amounts of cash and equivalents, trade receivables, accounts payable and other accrued liabilities at December 31, 2017 and June 30, 2017 approximate fair value due to their short-term maturities.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at:

| (in millions) | December 31, 2017 | June 30, 2017 |
|---|---|---|
| Estimated fair value | $ 9,801 | $ 10,713 |
| Carrying amount | 9,759 | 10,395 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

## 12. Redeemable Noncontrolling Interests

In connection with the acquisition of a 71 percent ownership interest in naviHealth during fiscal 2016, we recognized redeemable noncontrolling interest with a fair value of $119 million at the acquisition date.

During the six months ended December 31, 2017, certain third-party noncontrolling interest holders exercised their put right on the noncontrolling interest representing 16 percent of naviHealth with a redemption value of $103 million and a carrying value of $109 million, which we settled in cash. As a result of this settlement, our ownership in naviHealth increased to 98 percent.

The following table summarizes activity in redeemable noncontrolling interests:

| (in millions) | Redeemable Noncontrolling Interest |
|---|---|
| Balance at June 30, 2017 | $ 118 |
| Net earnings attributable to redeemable noncontrolling interests | 2 |
| Net purchase of redeemable noncontrolling interests | (103) |
| Adjustment of redeemable noncontrolling interests to redemption value | (4) |
| **Balance at December 31, 2017** | **$ 13** |

## 13. Shareholders' Equity

During the six months ended December 31, 2017, we repurchased 2.2 million common shares having an aggregate cost of $150 million. The average price paid per common share was $67.92. We funded the repurchases with available cash and short-term borrowings.

During the six months ended December 31, 2016, we repurchased 8.1 million common shares having an aggregate cost of $600 million. The average price paid per common share was $74.08. We funded the repurchases with available cash.

The common shares repurchased are held in treasury to be used for general corporate purposes.

During the six months ended December 31, 2016, we retired 37 million common shares in treasury. The retirement of these shares had no impact on total shareholders' equity; however, it did impact certain individual components of shareholders' equity as follows: $2.5

billion decrease in common shares in treasury, $302 million decrease in common shares, and $2.2 billion decrease in retained earnings.

## Accumulated Other Comprehensive Loss

The following table summarizes the changes in the balance of accumulated other comprehensive loss by component and in total:

| (in millions) | Foreign Currency Translation Adjustments | Unrealized Gain/(Loss) on Derivatives, net of tax | Accumulated Other Comprehensive Loss |
|---|---|---|---|
| Balance at June 30, 2017 | $ (148) | $ 23 | $ (125) |
| Other comprehensive income/(loss), before reclassifications | 31 | (1) | 30 |
| Amounts reclassified to earnings | — | — | — |
| Other comprehensive income/(loss), net of tax | 31 | (1) | 30 |
| Balance at December 31, 2017 | $ (117) | $ 22 | $ (95) |

Activity related to realized and unrealized gains and losses on available-for-sale securities, as described in Note 6, was immaterial during the six months ended December 31, 2017.

## 14. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the number of common shares used to compute basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| (in millions) | Three Months Ended December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Weighted-average common shares–basic | 315 | 318 |
| **Effect of dilutive securities:** | | |
| Employee stock options, restricted share units and performance share units | 1 | 1 |
| Weighted-average common shares–diluted | 316 | 319 |

| (in millions) | Six Months Ended December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Weighted-average common shares–basic | 315 | 319 |
| **Effect of dilutive securities:** | | |
| Employee stock options, restricted share units and performance share units | 2 | 2 |
| Weighted-average common shares–diluted | 317 | 321 |

The potentially dilutive employee stock options, restricted share units and performance share units that were antidilutive were 7 million and 4 million for the three months ended December 31, 2017 and 2016, respectively, and 6 million and 3 million for the six months ended December 31, 2017 and 2016, respectively.

## 15. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The following table presents revenue for each reportable segment and Corporate:

| (in millions) | Three Months Ended December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Pharmaceutical | $ 31,146 | $ 29,743 |
| Medical | 4,044 | 3,410 |
| Total segment revenue | 35,190 | 33,153 |
| Corporate (1) | (4) | (3) |
| Total revenue | $ 35,186 | $ 33,150 |

| (in millions) | Six Months Ended December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Pharmaceutical | $ 60,066 | $ 58,505 |
| Medical | 7,768 | 6,690 |
| Total segment revenue | 67,834 | 65,195 |
| Corporate (1) | (7) | (6) |
| Total revenue | $ 67,827 | $ 65,189 |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial and customer care shared services, human resources, information technology and legal and compliance. The results attributable to noncontrolling interests are recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided and other ratable allocation methodologies.

We do not allocate the following items to our segments: last-in first-out, or ("LIFO"), inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for/(benefit from) income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We

encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $6 million and $1 million for the three months ended December 31, 2017 and 2016, respectively, and $11 million and $2 million for the six months ended December 31, 2017 and 2016, respectively.

The following table presents segment profit by reportable segment and Corporate:

| (in millions) | Three Months Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2017** | | 2016 | |
| Pharmaceutical | $ | **514** | $ | 537 |
| Medical | | **220** | | 159 |
| Total segment profit | | **734** | | 696 |
| Corporate | | **(335)** | | (154) |
| **Total operating earnings** | $ | **399** | $ | 542 |

| (in millions) | Six Months Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2017** | | 2016 | |
| Pharmaceutical | $ | **981** | $ | 1,071 |
| Medical | | **348** | | 286 |
| Total segment profit | | **1,329** | | 1,357 |
| Corporate | | **(668)** | | (281) |
| **Total operating earnings** | $ | **661** | $ | 1,076 |

The following table presents total assets for each reportable segment and Corporate at:

| (in millions) | December 31, 2017 | | June 30, 2017 | |
| --- | --- | --- | --- | --- |
| Pharmaceutical | $ | **23,014** | $ | 21,848 |
| Medical | | **17,993** | | 10,688 |
| Corporate | | **1,898** | | 7,576 |
| **Total assets** | $ | **42,905** | $ | 40,112 |

## 16. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees.

The following table provides total share-based compensation expense by type of award:

| (in millions) | Three Months Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2017** | | 2016 | |
| Restricted share unit expense | $ | **16** | $ | 17 |
| Employee stock option expense | | **5** | | 5 |
| Performance share unit expense | | **2** | | 2 |
| **Total share-based compensation** | $ | **23** | $ | 24 |

| (in millions) | Six Months Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2017** | | 2016 | |
| Restricted share unit expense | $ | **34** | $ | 34 |
| Employee stock option expense | | **10** | | 10 |
| Performance share unit expense | | **(4)** | | 3 |
| **Total share-based compensation** | $ | **40** | $ | 47 |

The total tax benefit related to share-based compensation was $5 million and $8 million for the three months ended December 31, 2017 and 2016, respectively, and $11 million and $16 million for the six months ended December 31, 2017 and 2016, respectively.

### Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years. Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share | |
| --- | --- | --- | --- |
| Nonvested at June 30, 2017 | 2 | $ | 76.72 |
| Granted | 1 | | 66.10 |
| Vested | (1) | | 79.80 |
| Canceled and forfeited | — | | — |
| **Nonvested at December 31, 2017** | **2** | **$** | **67.92** |

At December 31, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested restricted share units not yet recognized was $107 million, which is expected to be recognized over a weighted-average period of two years.

### Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share | |
| --- | --- | --- | --- |
| Outstanding at June 30, 2017 | 6 | $ | 63.44 |
| Granted | 2 | | 66.44 |
| Exercised | — | | — |
| Canceled and forfeited | — | | — |
| **Outstanding at December 31, 2017** | **8** | **$** | **64.28** |
| **Exercisable at December 31, 2017** | **5** | **$** | **59.14** |

At December 31, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested stock options not yet recognized was $31 million, which is expected to be recognized over

a weighted-average period of two years. The following tables provide additional detail related to stock options:

| (in millions) | December 31, 2017 | | June 30, 2017 |
|---|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ | 47 | $ 109 |
| Aggregate intrinsic value of exercisable options at period end | | 47 | 106 |

| (in years) | December 31, 2017 | June 30, 2017 |
|---|---|---|
| Weighted-average remaining contractual life of outstanding options | 7 | 7 |
| Weighted-average remaining contractual life of exercisable options | 6 | 6 |

## Performance Share Units

Performance share units vest over a three-year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share | |
|---|---|---|---|
| Nonvested at June 30, 2017 | 0.6 | $ | 77.83 |
| Granted | 0.2 | | 66.43 |
| Vested (1) | (0.2) | | 71.57 |
| Canceled and forfeited | — | | — |
| **Nonvested at December 31, 2017** | **0.6** | **$** | **75.14** |

(1)  Vested based on achievement of 133 percent of the target performance goal.

At December 31, 2017, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized was $16 million, which is expected to be recognized over a weighted-average period of two years if targets are achieved.

## 17. Subsequent Events

On February 1, 2018, we closed on the sale of our China distribution business to Shanghai Pharmaceuticals Holding Co., Ltd. for gross proceeds of $1.2 billion and net proceeds of approximately $800 million. The information needed to calculate the loss on sale was not available at the time these condensed consolidated financial statements were prepared. We estimated the loss as of December 31, 2017 to be $67 million, which we recognized as a write-down on the disposal group in impairments and loss on disposal of assets in our condensed consolidated statement of earnings.

On January 3, 2018, we paid the remaining $60 million of the contract termination fee related to the agreement to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model.

# Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 2.1 | Amendment No. 2, dated as of October 2, 2017, to Stock and Asset Purchase Agreement, dated as of March 2, 2015, by and between Ethicon, Inc. and Cardinal Health, Inc. (incorporated by reference to Exhibit 2.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, File No. 1-11373) |
| 2.2 | Letter Agreement, dated November 21, 2017, by and between Cardinal Health, Inc. and Medtronic plc |
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 10.1 | Form of Directors' Restricted Share Units Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan |
| 10.2 | Second Amendment, effective as of January 1, 2018, to the Cardinal Health Deferred Compensation Plan, as amended and restated effective as of January 1, 2016 |
| 10.3 | Letter Agreement, dated November 5, 2017, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on November 6, 2017, File No. 1-11373) |
| 10.4 | Confidentiality and Business Protection Agreement, effective as of November 6, 2017, between Cardinal Health, Inc. and Jorge M. Gomez |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of the Chief Executive Officer and the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.1 | Statement Regarding Forward-Looking Information |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

## Cardinal Health Website

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations and information about upcoming presentations and events is routinely posted and accessible at ir.cardinalhealth.com. In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

# Form 10-Q Cross Reference Index

| Item Number | | Page |
|---|---|---|
| **Part I. Financial Information** | | |
| Item 1 | Financial Statements | **17** |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Item 3 | Quantitative and Qualitative Disclosures about Market Risk | **16** |
| Item 4 | Controls and Procedures | **16** |
| **Part II. Other Information** | | |
| Item 1 | Legal Proceedings | **16** |
| Item 1A | Risk Factors | **16** |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | **16** |
| Item 3 | Defaults Upon Senior Securities | **N/A** |
| Item 4 | Mine Safety Disclosures | **N/A** |
| Item 5 | Other Information | **N/A** |
| Item 6 | Exhibits | **32** |
| | Signatures | **34** |

**N/A**     Not applicable

**Additional Information**

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Cardinal Health, Inc.

Date:   February 8, 2018

/s/   MICHAEL C. KAUFMANN

**Michael C. Kaufmann**
**Chief Executive Officer**

/s/   JORGE M. GOMEZ

**Jorge M. Gomez**
**Chief Financial Officer**

Exhibit 2.2

Cardinal Health, Inc.
7000 Cardinal Place
Dublin, OH 43017

November 21, 2017

Medtronic plc
710 Medtronic Parkway
Minneapolis, MN 55432

Ladies and Gentlemen:

Reference is made to the Stock and Asset Purchase Agreement, dated as of April 18, 2017 and amended as of July 28, 2017 (as it may be amended, supplemented or modified from time to time, the "Purchase Agreement"), by and between Medtronic plc ("Seller") and Cardinal Health, Inc. ("Buyer"). Capitalized terms used but not otherwise defined in this letter agreement (the "Letter Agreement") shall have the meanings given to such terms in the Purchase Agreement.

In consideration of the mutual agreements, provisions and covenants contained in this Letter Agreement and the Purchase Agreement, the parties hereto agree as follows:

1.     Price Adjustment Statement Delivery Extension.  Pursuant to Section 11.04 of the Purchase Agreement, Seller and Buyer hereby agree that, without limiting any rights or remedies that may be available to Buyer or Seller under or by reason of the Purchase Agreement, the ninety (90) day period after the Closing Date during which Seller must prepare and deliver to Buyer the Price Adjustment Statement pursuant to Section 2.04(b) of the Purchase Agreement is extended to November 19, 2017. Buyer acknowledges that Seller delivered the Price Adjustment Statement on November 19, 2017.

2.     Proposed Allocation Negotiation Extension.  Pursuant to Section 11.04 of the Purchase Agreement, Seller and Buyer hereby agree that the thirty (30) calendar day period during which Seller and Buyer must negotiate in good faith to resolve Seller's objections to the Proposed Allocation pursuant to Sections 2.05(c) of the Purchase Agreement is extended to, and will expire at midnight central time on, December 19, 2017.

3.     Modifications and Amendments.  This Letter Agreement shall not be altered or otherwise amended except pursuant to an instrument in writing executed and delivered by each of the parties hereto.

4.     Miscellaneous.  The provisions of Sections 11.04 (*Waivers*), 11.06 (*Assignability, Beneficiaries; Enforcement*), 11.07 (*Notices*), 11.08 (*Headings*), 11.09 (*Counterparts*), 11.12 (*Governing Law; Consent to Jurisdiction; Waivers*) and 11.14 (*Severability*) of the Purchase Agreement apply to this Letter Agreement, *mutatis mutandis*.

[*Signature Page Follows*]

Very truly yours,

CARDINAL HEALTH, INC.

By: /s/ Jorge M. Gomez
Name: Jorge M. Gomez
Title: Chief Financial Officer -
Medical Segment

Accepted and agreed:

MEDTRONIC PLC

By: /s/ Philip Albert
Name: Philip Albert
Title: VP, Corporate Taxes

[*Signature Page to Proposed Allocation Negotiation Extension Side Letter*]

Exhibit 10.1

## CARDINAL HEALTH, INC.
## DIRECTORS' RESTRICTED SHARE UNITS AGREEMENT

This Restricted Share Units Agreement (this "Agreement") is entered into in Franklin County, Ohio.  On [date of grant] (the "Grant Date"), Cardinal Health, Inc., an Ohio corporation (the "Company"), has awarded to [Director name] ("Awardee"), [# of Shares] Stock Units (the "Restricted Share Units" or "Award"), representing an unfunded unsecured promise of the Company to deliver common shares, without par value, of the Company (the "Shares") to Awardee as set forth in this Agreement.  The Restricted Share Units have been granted pursuant to the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (the "Plan"), and are subject to all provisions of the Plan, which are incorporated in this Agreement by reference, and are subject to the provisions of this Agreement.  Capitalized terms used in this Agreement which are not specifically defined have the meanings ascribed to such terms in the Plan.

1.      Vesting of Restricted Share Units.  The Restricted Share Units vest on the first anniversary of the Grant Date, except that if the [year] Annual Meeting of Shareholders is prior to the first anniversary of the Grant Date, then the Restricted Share Units will vest on the date of the [year] Annual Meeting of Shareholders (in either event, the "Vesting Date"), subject to the provisions of this Agreement, including those relating to Awardee's continued service on the Board.  In the event of a Change of Control, the Restricted Share Units (to the extent not previously vested or forfeited) vest in full, except to the extent that (a) Awardee is asked to continue to serve on the Board or to serve as a member of the board of directors (or similar governing body) of the Company's successor in the Change of Control or another entity that is affiliated with the Company or its successor following the Change of Control; and (b) a Replacement Award is offered to Awardee in accordance with Section 16(b) of the Plan.

2.      Transferability.  The Restricted Share Units are not transferable.

3.      Termination of Service on the Board.  If Awardee ceases to be a member of the Board prior to the vesting of the Restricted Share Units for any reason other than Awardee's death, all of the then unvested Restricted Share Units shall be forfeited by Awardee immediately after Awardee ceases to be a member of the Board.  If Awardee ceases to be a member of the Board prior to the vesting or forfeiture of the Restricted Share Units by reason of Awardee's death, then such Restricted Share Units vest in full and are not forfeited.

4.      Special Forfeiture and Repayment Rules.  This Agreement contains special forfeiture and repayment rules intended to encourage conduct that protects the legitimate business assets of the Company and its Affiliates (collectively, the "Cardinal Group") and discourage conduct that threatens or harms those assets.  The Company does not intend to have the benefits of this Agreement reward or subsidize conduct detrimental to the Company, and therefore will require the forfeiture of the benefits offered under this Agreement and the repayment of gains obtained from this Agreement, according to the rules specified below.  Activities that trigger the forfeiture and repayment rules are divided into two categories: Misconduct and Competitor Conduct.

(a)      Misconduct.  During service on the Board and for three years after Awardee's termination of service on the Board for any reason, Awardee agrees not to engage in Misconduct.  If Awardee engages in Misconduct during service on the Board or within three years after Awardee's termination of service on the Board for any reason, then

(i)      Awardee immediately forfeits the Restricted Share Units that have not yet vested or that vested at any time within three years prior to the date the Misconduct first occurred and have not yet been paid pursuant to Paragraph 5, and those forfeited Restricted Share Units automatically terminate, and

(ii)      Awardee shall, within 30 days following written notice from the Company, pay to the Company in cash an amount equal to (A) the gross gain to Awardee resulting from the payment of Restricted Share Units pursuant to Paragraph 5 that had vested at any time within three years prior to the date the Misconduct first occurred less (B) $1.00.  The gross gain is the Fair Market Value of the Shares represented by the Restricted Share Units on the date of receipt.

As used in this Agreement, "**Misconduct**" means

       (A)    disclosing or using any of the Cardinal Group's confidential information (as defined by the applicable Cardinal Group policies and agreements) without proper authorization from the Cardinal Group or in any capacity other than as necessary for the performance of Awardee's duties as a Director of the Company;

       (B)    violation of the Standards of Business Conduct or any successor code of conduct or other applicable Cardinal Group policies, including but not limited to conduct which would constitute a breach of any representation or certificate of compliance signed by Awardee;

       (C)    fraud, gross negligence or willful misconduct by Awardee, including but not limited to fraud, gross negligence or willful misconduct causing or contributing to a material error resulting in a restatement of the financial statements of any member of the Cardinal Group;

       (D)    directly or indirectly soliciting or recruiting for employment or contract work on behalf of a person or entity other than a member of the Cardinal Group, any person who is an employee, representative, officer or director in the Cardinal Group or who held one or more of those positions at any time within the 12 months prior to Awardee's termination of service on the Board;

       (E)    directly or indirectly inducing, encouraging or causing an employee of the Cardinal Group to terminate his/her employment or a contract worker to terminate his/her contract with a member of the Cardinal Group;

       (F)    any action by Awardee and/or his or her representatives that either does or could reasonably be expected to undermine, diminish or otherwise damage the relationship between the Cardinal Group and any of its customers, prospective customers, vendors, suppliers or employees known to Awardee; or

       (G)    breaching any provision of any agreement with a member of the Cardinal Group.

Nothing in this Agreement will prevent Awardee from testifying truthfully as required by law, prohibit or prevent Awardee from filing a charge with or participating, testifying or assisting in any investigation, hearing, whistleblower proceeding or other proceeding before any federal, state or local government agency (e.g., Equal Employment Opportunity Commission, National Labor Relations Board, Securities and Exchange Commission, etc.), or prevent Awardee from disclosing Cardinal Group's confidential information in confidence to a federal, state or local government official for the purpose of reporting or investigating a suspected violation of law.

       (b)    <u>Competitor Conduct</u>.  If Awardee engages in Competitor Conduct during service on the Board or within one year after Awardee's termination of service on the Board for any reason, then

       (i)    Awardee immediately forfeits the Restricted Share Units that have not yet vested or that vested at any time within one year prior to the date the Competitor Conduct first occurred and have not yet been paid pursuant to Paragraph 5, and those forfeited Restricted Share Units automatically terminate, and

       (ii)    Awardee shall, within 30 days following written notice from the Company, pay to the Company in cash an amount equal to (A) the gross gain to Awardee resulting from the payment of Restricted Share Units pursuant to Paragraph 5 that had vested at any time since the earlier of one year prior to the date the Competitor Conduct first occurred or one year prior to Awardee's termination of service on the Board, if applicable, less (B) $1.00.  The gross gain is the Fair Market Value of the Shares represented by the Restricted Share Units on the date of receipt.

As used in this Agreement, "**Competitor Conduct**" means accepting employment with, or directly or indirectly providing services to, a Competitor in the United States.  A "Competitor" means any person or business that competes with the products or services provided by a member of the Cardinal Group or about which Awardee obtained confidential information (as defined by the applicable Cardinal Group policies or agreements).  For purposes of this Agreement, the nature and extent of Awardee's activities, if any, disclosed to and reviewed by the Audit or Nominating and Governance Committees of the Board (each, a "Specified Committee") prior to the date of Awardee's termination of service on the Board will not be deemed to be Competitor Conduct unless specified to the contrary by the Specified Committee in a written notice given to Awardee within 90 days after the Specified Committee is notified in writing of such activities.

     (c)     General.

        (i)     Nothing in this Paragraph 4 constitutes or is to be construed as a "noncompete" covenant or other restraint on employment or trade.  The execution of this Agreement is voluntary.  Awardee is free to choose to comply with the terms of this Agreement and receive the benefits offered or else reject this Agreement with no adverse consequences to Awardee's service on the Board.

        (ii)     Awardee agrees to provide the Company with at least 10 days written notice prior to accepting employment with or providing services to a Competitor within one year after Awardee's termination of service on the Board.

        (iii)     Awardee acknowledges receiving sufficient consideration for the requirements of this Paragraph 4, including Awardee's receipt of the Restricted Share Units.  Awardee further acknowledges that the Company would not provide the Restricted Share Units to Awardee without Awardee's promise to abide by the terms of this Paragraph 4.  The parties also acknowledge that the provisions contained in this Paragraph 4 are ancillary to, or part of, an otherwise enforceable agreement at the time this Agreement is made.

        (iv)     Awardee may be released from the obligations of this Paragraph 4 if and only if the Administrator determines, in writing and in the Administrator's sole discretion, that a release is in the best interests of the Company.

     5.     Payment.

     (a)     General.  Subject to the provisions of Paragraph 4 and Paragraphs 5(b), (c) and (d) below, Awardee is entitled to receive from the Company (without any payment by or on behalf of Awardee) the Shares represented by the vested Restricted Share Units on the Vesting Date.

     (b)     Death.  To the extent that Restricted Share Units are vested on the date of Awardee's death, Awardee is entitled to receive the corresponding Shares from the Company on the date of death.

     (c)     Change of Control.  To the extent that Restricted Share Units are vested on the date of a Change of Control, Awardee is entitled to receive the corresponding Shares from the Company on the date of the Change of Control; provided, however, that if such Change of Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A)(v) of the Code and the regulations thereunder, and where Section 409A of the Code applies to such distribution as a deferral of compensation, Awardee is entitled to receive the corresponding Shares from the Company on the date that would have otherwise applied pursuant to Paragraphs 5(a) or (b).

     (d)     Elections to Defer Receipt.  Elections to defer receipt of the Shares beyond the date of payment provided in this Agreement may be permitted in the discretion of the Administrator pursuant to procedures established by the Administrator in compliance with the requirements of Section 409A of the Code.

6.        Dividend Equivalents.  Awardee is not entitled to receive cash dividends on the Restricted Share Units, but will receive a dividend equivalent payment from the Company in an amount equal to the dividends that would have been paid on each Share underlying the Restricted Share Units if it had been outstanding between the Grant Date and the payment date of any such Share (i.e., based on the record date for cash dividends).  Subject to an election to defer receipt as permitted under Paragraph 5(d), the Company shall pay dividend equivalent payments in cash as soon as reasonably practicable after the payment date of the Restricted Share Units to which such dividend equivalents relate.

7.        Right of Set-Off.  By accepting the Restricted Share Units, Awardee consents to a deduction from, and set-off against, any amounts owed to Awardee that are not treated as "non-qualified deferred compensation" under Section 409A of the Code by any member of the Cardinal Group from time to time (including, but not limited to, amounts owed to Awardee as Director annual retainer fees, meeting fees or other fringe benefits) to the extent of the amounts owed to the Company by Awardee under this Agreement.

8.        No Shareholder Rights.  Awardee has no rights of a shareholder with respect to the Restricted Share Units, including no right to vote the Shares represented by the Restricted Share Units until such Shares vest and are paid to Awardee.

9.        Governing Law/Venue for Dispute Resolution/Costs and Legal Fees.  This Agreement is governed by the laws of the State of Ohio, without regard to principles of conflicts of law, except to the extent superseded by the laws of the United States of America.  **The parties agree and acknowledge that the laws of the State of Ohio bear a substantial relationship to the parties and/or this Agreement and that the Restricted Share Units and benefits granted in this Agreement would not be granted without the governance of this Agreement by the laws of the State of Ohio.  In addition, all legal actions or proceedings relating to this Agreement must be brought exclusively in state or federal courts located in Franklin County, Ohio and the parties executing this Agreement hereby consent to the personal jurisdiction of such courts.**  Awardee acknowledges that the covenants contained in Paragraph 4 are reasonable in nature, are fundamental for the protection of the Company's legitimate business and proprietary interests, and do not adversely affect Awardee's ability to earn a living.  In the event that it becomes necessary for the Company to institute legal proceedings under this Agreement, Awardee is responsible to the Company for all costs and reasonable legal fees incurred by the Company in connection with the proceedings.  Any provision of this Agreement which is determined by a court of competent jurisdiction to be invalid or unenforceable or to disqualify the Award under any Applicable Law should be construed or limited in a manner that is valid and enforceable and that comes closest to the business objectives intended by the provision, without invalidating or rendering unenforceable the remaining provisions of this Agreement.

10.      Defend Trade Secrets Act Notice.  Under the federal Defend Trade Secrets Act of 2016, Awardee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Awardee's attorney in relation to a lawsuit for retaliation against Awardee for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

11.      Action by the Administrator.  The parties agree that the interpretation of this Agreement rests exclusively and completely within the sole discretion of the Administrator.  The parties agree to be bound by the decisions of the Administrator with regard to the interpretation of this Agreement and with regard to any and all matters set forth in this Agreement.  In fulfilling its responsibilities hereunder, the Administrator may rely upon documents, written statements of the parties, financial reports or other material as the Administrator deems appropriate.  The parties agree that there is no right to be heard or to appear before the Administrator and that any decision of the Administrator relating to this Agreement, including whether particular conduct constitutes Misconduct or Competitor Conduct, is final and binding.

12.     Electronic Delivery and Consent to Electronic Participation.  The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Share Unit grant under and participation in the Plan or future Restricted Share Units that may be granted under the Plan by electronic means or to request Awardee's consent to participate in the Plan by electronic means.  Awardee hereby consents to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company, including the acceptance of restricted share unit grants and the execution of restricted share unit agreements through electronic signature.

13.     Notices.  All notices, requests, consents and other communications required or provided under this Agreement to be delivered by Awardee to the Company will be in writing and will be deemed sufficient if delivered by hand, nationally recognized overnight courier, or certified or registered mail, return receipt requested, postage prepaid, and will be effective upon delivery to the Company at the address set forth below:

> Cardinal Health, Inc.
> 7000 Cardinal Place
> Dublin, Ohio 43017
> Attention:  Deputy General Counsel

All notices, requests, consents and other communications required or provided under this Agreement to be delivered by the Company to Awardee may be delivered by e-mail or in writing and will be deemed sufficient if delivered by e-mail, hand, facsimile, nationally recognized overnight courier, or certified or registered mail, return receipt requested, postage prepaid, and will be effective upon delivery to Awardee.

14.     Amendment.  Any amendment to the Plan is deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto; provided, however, that no amendment may impair the rights of Awardee with respect to an outstanding Restricted Share Unit unless agreed to by Awardee and the Company, which agreement must be in writing and signed by Awardee and the Company.  Other than following a Change of Control, no such agreement is required if the Administrator determines in its sole discretion that such amendment either (a) is required or advisable in order for the Company, the Plan or the Restricted Share Units to satisfy any Applicable Law or to meet the requirements of any accounting standard or (b) is not reasonably likely to significantly diminish the benefits provided under the Restricted Share Units, or that any such diminishment has been adequately compensated, including pursuant to Section 16(c) of the Plan.

15.     Adjustments.  The number of Shares issuable for each Restricted Share Unit and the other terms and conditions of the Award evidenced by this Agreement are subject to adjustment as provided in Section 16 of the Plan.

16.     Compliance with Section 409A of the Code.  To the extent applicable, it is intended that this Agreement comply with the provisions of Section 409A of the Code.  This Agreement shall be administered in a manner consistent with this intent, and any provision that would cause this Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force or effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of Awardee).

17.     No Right to Future Awards or Board Membership.  The grant of the Restricted Share Units under this Agreement to Awardee is a voluntary, discretionary award being made on a one-time basis and it does not constitute a commitment to make any future awards.  Nothing contained in this Agreement shall confer upon Awardee any right to continued service as a member of the Board.

18.     Successors and Assigns.  Without limiting Paragraph 2, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, administrators, heirs, legal representatives and assigns of Awardee, and the successors and assigns of the Company.

CARDINAL HEALTH, INC.


By: _____

Its: _____

<u>ACCEPTANCE OF AGREEMENT</u>

Awardee hereby:  (a) acknowledges that he or she has received a copy of the Plan, a copy of the Company's most recent annual report to shareholders and other communications routinely distributed to the Company's shareholders, and a copy of the Plan Description pertaining to the Plan; (b) accepts this Agreement and the Restricted Share Units granted to him or her under this Agreement subject to all provisions of the Plan and this Agreement, including the provisions in the Agreement regarding "Special Forfeiture and Repayment Rules" set forth in Paragraph 4; (c) represents that he or she understands that the acceptance of this Agreement through an on-line or electronic system, if applicable, carries the same legal significance as if he or she manually signed the Agreement; and (d) agrees that no transfer of the Shares delivered in respect of the Restricted Share Units may be made unless the Shares have been duly registered under all applicable Federal and state securities laws pursuant to a then-effective registration which contemplates the proposed transfer or unless the Company has received a written opinion of, or satisfactory to, its legal counsel that the proposed transfer is exempt from such registration.

_____
Awardee's Signature


_____
Date

Exhibit 10.2

**SECOND AMENDMENT**
**TO THE**
**CARDINAL HEALTH DEFERRED COMPENSATION PLAN**
(As amended and restated January 1, 2016)

**Background Information**

A.    Cardinal Health, Inc. ("Cardinal Health") previously adopted and currently maintains the Cardinal Health Deferred Compensation Plan (the "Plan") for the benefit of a select group of management and highly compensated employees of Cardinal Health and its subsidiaries and affiliates.

B.    The Cardinal Health, Inc. Benefits Policy Committee (the "BPC") oversees the administration of the Plan and, pursuant to Section 7.1 of the Plan, is authorized to approve certain amendments to the Plan in accordance with authority delegated by the Human Resources and Compensation Committee of the Board of Directors of Cardinal Health.

C.    The BPC desires to amend the Plan to modify plan governance processes and amendment authority and make other technical and conforming changes.  The aforementioned changes fall within the BPC's delegated authority.

D.    Section 7.1 of the Plan permits the amendment of the Plan at any time.

**Amendment of the Plan**

The Plan is hereby amended as set forth below, effective as of January 1, 2018.

1.    Section 1.1(b) of the Plan is hereby amended in its entirety to read as follows:

  "(b)    Administrative Committee.  The Financial Benefit Plans Committee of the Company."

2.    The first sentence of Section 1.1(l) of the Plan is hereby amended to read as follows:

  "Any employee of an Employer who is (i) an employee who is a Reporting Person or (ii) (A) among a select group of management or highly compensated employees (within the meaning of Sections 201(2), 301(a)(3) and 401(a) of ERISA), and (B) designated by the Company as eligible to make Compensation deferral contributions under Article II of the Plan in accordance with eligibility criteria established from time to time by the Administrative Committee, the Committee or the Board."

3.    Section 1.1(t) of the Plan is hereby amended in its entirety to read as follows:

  "(t)    [Reserved.]"

4.    The last sentence of Section 1.1(aa) of the Plan is hereby amended to read as follows:

  "The Administrative Committee may require the Participant to submit to periodic medical examinations at the Participant's expense to confirm the existence and continuation of a Total Disability."

5.    The fifth sentence of Section 3.3 of the Plan is hereby amended to read as follows:

"Contributions made to Participant Accounts under this Section may be subject to additional requirements as established from time to time by the Administrative Committee, such as a requirement to be employed on the last day of the year for which such contribution is made."

6.    A new Section 6.1A is hereby added to the Plan to read as follows:

"6.1A    Administrative Committee Meetings and Membership.  The Administrative Committee shall be comprised of the following members:  (1) Senior Vice President of the Company overseeing Benefits; (2) An individual designated by the Chief Human Resources Officer ("CHRO") of the Company; (3) Treasurer of the Company; and (4) An individual designated by the Chief Financial Officer ("CFO") of the Company.  Each Member of the Administrative Committee shall serve without the need of a formal appointment or resignation, so long as she or he holds the position, or is designated in writing as the stated designee of the CHRO or CFO.  The designee of the CFO shall chair the Administrative Committee.

The Administrative Committee shall meet quarterly as determined by the Administrative Committee and at such other times as necessary to perform its duties.  A majority of the members of the Administrative Committee constitutes a quorum.  The Administrative Committee may act by a majority vote at a meeting or by a writing approved by a majority of its members without a meeting.  The Administrative Committee may adopt such rules and procedures as are necessary or appropriate, as determined in the Administrative Committee's discretion, to carry out its responsibilities with respect to the Plan."

6.    Section 6.2 of the Plan is hereby amended in its entirety to read as follows:

"6.2    Administrative Committee.  The Administrative Committee shall have full power, authority and discretion to control and manage the operation and administration of the Plan.  The discretionary authority of the Administrative Committee shall include, but not be limited to, the following:

A.    To determine all questions relating to the rights and status of Eligible Employees and Participants, the value of a Participant's Account, and the nonforfeitable percentage of each Participant's Account;

B.    To adopt rules and procedures necessary for the proper and efficient administration of the Plan, provided the rules and procedures are not inconsistent with the terms of this Plan;

C.    To construe, interpret and enforce the terms of the Plan and the rules and regulations it adopts, including the discretionary authority to interpret the Plan documents, documents related to the Plan's operation, and findings of fact;

D.    To review and render decisions respecting claims (including appeals of denied claims) in accordance with the Plan's claims procedures;

E.    To furnish an Employer with information that the Employer may require for tax or other purposes;

F.    To engage such legal, accounting, recordkeeping, clerical, investment and/or administrative services that it may deem necessary or appropriate for the proper administration or operation of the Plan;

G.   To engage the services of agents whom it may deem advisable to assist it with the performance of its duties;

H.   To delegate responsibility (including the responsibilities described in this Section 6.2) to others, including, but not limited to benefits staff of the Company and third parties engaged to provide services to the Plan;

I.   To keep such records, books of account, data and other documents as may be necessary for the proper administration of the Plan;

J.   To prepare and distribute to Participants and Beneficiaries information concerning the Plan and their rights under the Plan;

K.   To determine the times and places for holding meetings of the Administrative Committee and the notice to be given of such meetings; and

L.   To do all things necessary or appropriate to operate and administer the Plan in accordance with its provisions and in compliance with applicable provisions of law.

Without limiting the powers set forth herein, the Administrative Committee shall have the power to change or waive any requirements of the Plan to conform with Code Section 409A or other applicable law or to meet special circumstances not anticipated or covered in the Plan.

When making a determination or calculation, the Administrative Committee shall be entitled to rely upon all valuations, certificates and reports furnished by any funding agent or service provider, upon all certificates and reports made by an accountant, upon all opinions given by any legal counsel selected or approved by the Administrative Committee, and upon any information furnished by a Participant or Beneficiary (including the legal counsel or other representative thereof), an Employer, or the Trustee.  The members of the Administrative Committee, the Committee, and the Company and its officers and directors shall, except as otherwise provided by law, be fully protected in respect of any action taken or suffered by them in good faith in reliance upon any such valuations, certificates, reports, opinions, advice, or other information.

Benefits under the Plan shall be paid only if the Administrative Committee (or its delegate) decides in its discretion that the applicant is entitled to such benefits under the Plan."

7.   Section 7.1 of the Plan is hereby amended in its entirety to read as follows:

"7.1   Amendment.  The Company may amend the Plan at any time and in any respect through a written resolution adopted or approved by the Board, or by:

A.   the Administrative Committee, with respect to any amendment that: (i) is required to comply with a change in applicable law, or (ii) when aggregated with any other amendment or amendments approved on the same date, is reasonably expected to have an annual financial impact on the Company of $5 million or less;

B.   the CHRO of the Company, with respect to any amendment that, when aggregated with any other amendment or amendments approved on the same date, is reasonably expected to have an annual financial impact on the Company of $20 million or less; and

       C.      the Chief Executive Officer of the Company.

However, no amendment shall operate retroactively so as to affect adversely any rights to which a Participant may be entitled under the provisions of the Plan as in effect prior to such action."

8.     All other provisions of the Plan shall remain in full force and effect.

**CARDINAL HEALTH, INC.**
**BENEFITS POLICY COMMITTEE**

By: /s/ Pamela O. Kimmet_____

Its: Chief HR Officer_____

Date: November 27, 2017_____

Exhibit 10.4

## Confidentiality and Business Protection Agreement

This Confidentiality and Business Protection Agreement ("Agreement") is hereby entered into by and between Jorge M. Gomez ("Executive") and Cardinal Health, Inc., an Ohio Corporation (the "Company") effective as of November 6, 2017.

It is hereby agreed as follows:

1.     <u>Consideration and Acknowledgements</u>.   The parties acknowledge that the provisions and covenants contained in this Agreement are ancillary and material to, and in consideration of, the promotion of Executive to Chief Financial Officer and that the limitations contained herein are reasonable in geographic and temporal scope and do not impose a greater restriction or restraint than is necessary to protect the goodwill and other legitimate business interests of the Company.  The parties also acknowledge and agree that the provisions of this Agreement do not adversely affect Executive's ability to earn a living in any capacity that does not violate the covenants contained herein.  The parties further acknowledge and agree that the provisions of Section 9(a) below are accurate and necessary because (i) this Agreement is entered into in the State of Ohio, (ii) Ohio has a substantial relationship to the parties and to this transaction, (iii) Ohio is the headquarters state of the Company, which has operations worldwide and has a compelling interest in having its employees treated uniformly, (iv) the use of Ohio law provides certainty to the parties in any covenant litigation in the United States, and (v) enforcement of the provisions of this Agreement would not violate any fundamental public policy of Ohio or any other jurisdiction.

2.     <u>Confidential Information</u>.  Executive shall hold in a fiduciary capacity for the benefit of the Company and all of its subsidiaries, partnerships, joint ventures, limited liability companies and other affiliates (collectively, the "Cardinal Group"), all secret or confidential information, knowledge or data relating to the Cardinal Group and its businesses (including, without limitation, any proprietary and not publicly available information concerning any processes, methods, trade secrets, research, secret data, costs, names of users or purchasers of their respective products or services, business methods, operating procedures or programs or methods of promotion and sale) that Executive has obtained or obtains during Executive's employment by the Cardinal Group and that is not public knowledge (other than as a result of Executive's violation of this Agreement) ("Confidential Information").  For the purposes of this Agreement, information shall not be deemed to be publicly available merely because it is embraced by general disclosures or because individual features or combinations thereof are publicly available.  Executive shall not communicate, divulge or disseminate Confidential Information at any time during or after Executive's employment with the Cardinal Group, except with prior written consent of the applicable Cardinal Group company, or as otherwise required by law or legal process.  All records, files, memoranda, reports, customer lists, drawings, plans, documents and the like that Executive uses, prepares or comes into contact with during the course of Executive's employment shall remain the sole property of the Company or the Cardinal Group company, as applicable, and shall be turned over to the applicable Cardinal Group company upon termination of Executive's employment.

3.     <u>Non-Recruitment of Cardinal Group Employees, etc</u>.  Executive shall not, at any time during the Restricted Period (as defined below), without the prior written consent of the Company, engage in the following conduct (a "Solicitation"): (i) directly or indirectly, including via social media or professional networking services, solicit, recruit or employ (whether as an employee, officer, director, agent, consultant or independent contractor) any person who is or was at any time during the previous twelve months an employee, representative, officer or director of the Cardinal Group; or (ii) take any action to encourage or induce any employee, representative, officer or director of the Cardinal Group to cease his or her relationship with the Cardinal Group for any reason.  A "Solicitation" does not include any recruitment of employees within or for the Cardinal Group.  The "Restricted Period" means the period of Executive's employment with the Cardinal Group and the additional period ending twenty-four months after Executive's date of termination of employment or date of retirement, as applicable.  The Restricted

Period shall be extended and its expiration tolled by the time period in which Executive is in breach of any covenant in this Agreement to ensure that Executive does not benefit from any breach and that the Company receives the full benefit of two years protection from unfair competition on which it has relied in entering into this Agreement.

4.  No Competition -- Solicitation of Business.  During the Restricted Period, Executive shall not (either directly or indirectly or as an officer, agent, employee, partner, consultant or director of any other company, partnership or entity) solicit, service or accept on behalf of any competitor of the Cardinal Group the business of (i) any customer of the Cardinal Group during the time of Executive's employment or at date of termination of employment, or (ii) any potential customer of the Cardinal Group which Executive knew to be an identified, prospective purchaser of products or services of the Cardinal Group.

5.  No Competition -- Employment by Competitor.  During the Restricted Period, Executive shall not invest in (other than in a publicly traded company with a maximum investment of no more than 1% of outstanding shares), counsel, advise or be otherwise engaged or employed by any entity or enterprise that is in competition with the business conducted by any member of the Cardinal Group (other than a business that is not a significant business to the Cardinal Group as a whole or to the entity or enterprise as a whole).

6.  No Disparagement.

(a)  Executive and the Company shall at all times refrain from taking actions or making statements, written or oral, that (i) denigrate, disparage or defame the goodwill or reputation of Executive or the Cardinal Group, as the case may be, or any of its trustees, officers, security holders, partners, agents or former or current employees and directors, or (ii) are intended to, or may be reasonably expected to, adversely affect the morale of the employees of the Cardinal Group.  Executive further agrees not to make any negative statements to third parties relating to Executive's employment or any aspect of the businesses of the Cardinal Group and not to make any statements to third parties about the circumstances of the termination of Executive's employment or about the Cardinal Group or its trustees, directors, officers, security holders, partners, agents or former or current employees and directors, except as may be required by a court or governmental body.

(b)  Executive further agrees that, following termination of employment for any reason, Executive shall assist and cooperate with the Company with regard to any matter or project in which Executive was involved during Executive's employment with the Company, including but not limited to any litigation that may be pending or may arise after such termination of employment.  Further, Executive agrees to notify the Company at the earliest opportunity of any contact that is made by any third parties concerning any such matter or project.  The Company shall not unreasonably request such cooperation of Executive and shall cooperate with Executive in scheduling any assistance by Executive, taking into account Executive's business and personal affairs, and shall compensate Executive for any lost wages or expenses associated with such cooperation and assistance.

7.  Inventions.  All plans, discoveries and improvements, whether patentable or unpatentable, made or devised by Executive, whether alone or jointly with others, from the date of Executive's initial employment by the Company and continuing until the end of any period during which Executive is employed by the Cardinal Group, relating or pertaining in any way to Executive's employment with or the business of the Cardinal Group, shall be promptly disclosed in writing to the Company's Chief Legal and Compliance Officer and are hereby transferred to and shall redound to the benefit of the Company, and shall become and remain its sole and exclusive property.  Executive agrees to execute any assignment to the Company or its nominee, of Executive's entire right, title and interest in and to any such discoveries and improvements and to execute any other instruments and documents requisite or desirable in applying for and obtaining patents, trademarks or copyrights, at the expense of the Company, with respect thereto in the United States and in all foreign countries, that may be required by

the Company.  Executive further agrees at all times to cooperate to the extent and in the manner required by the Company in the prosecution or defense of any patent or copyright claims or any litigation or other proceeding involving any trade secrets, processes, discoveries or improvements covered by this Agreement, but all necessary expenses thereof shall be paid by the Company.

8.      Acknowledgement and Enforcement.  Executive acknowledges and agrees that: (a) the purpose of the foregoing covenants, including without limitation the noncompetition covenants of Sections 4 and 5, is to protect the goodwill, trade secrets and other Confidential Information of the Company; (b) because of the nature of the business in which the Cardinal Group is engaged and because of the nature of the Confidential Information to which Executive has access, the Company would suffer irreparable harm and it would be impractical and excessively difficult to determine the actual damages of the Cardinal Group in the event Executive breached any of the covenants of this Agreement; and (c) remedies at law (such as monetary damages) for any breach of Executive's obligations under this Agreement would be inadequate.  Executive therefore agrees and consents that if Executive commits any breach of a covenant under this Agreement or threatens to commit any such breach, the Company shall have the right (in addition to, and not in lieu of, any other right or remedy that may be available to it) to temporary and permanent injunctive relief from a court of competent jurisdiction, without posting any bond or other security and without the necessity of proof of actual damage.  If any of the covenants contained in this Agreement are finally held by a court to be invalid, illegal or unenforceable (whether in whole or in part), such covenant shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining covenants shall not be affected thereby; provided, however, that if any of such covenants is finally held by a court to be invalid, illegal or unenforceable because it exceeds the maximum scope or duration determined to be acceptable to permit such provision to be enforceable, such covenant will be deemed to be modified to the minimum extent necessary to modify such scope or duration in order to make such provision enforceable hereunder.

9.      Defend Trade Secrets Act Notice. Under the U.S. Defend Trade Secrets Act of 2016, Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; (b) is made to Executive's attorney in relation to a lawsuit for retaliation against Executive for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

10.     Miscellaneous.

(a)      This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without reference to principles of conflict of laws.  If, under any such law, any portion of this Agreement is at any time deemed to be in conflict with any applicable statute, rule, regulation or ordinance, such portion shall be deemed to be modified or altered to conform thereto.  The parties hereto irrevocably agree to submit to the jurisdiction and venue of the courts of the State of Ohio in any action or proceeding brought with respect to or in connection with this Agreement.  The captions of this Agreement are not part of the provisions hereof and shall have no force or effect.  This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.  This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives.  This Agreement is the product of negotiation and shall not be construed strictly for or against any party.

(b)      All notices and other communications under this Agreement shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Executive:        At the most recent address on file for Executive at the Company

If to the Company:     Cardinal Health, Inc.
7000 Cardinal Place
Dublin, Ohio 43017
Attention: Chief Legal and Compliance Officer

or to such other address as either party shall have furnished to the other in writing in accordance herewith.  Notice and communications shall be effective when actually received by the addressee.

(c)       The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.  If any provision of this Agreement shall be held invalid or unenforceable in part, the remaining portion of such provision, together with all other provisions of this Agreement, shall remain valid and enforceable and continue in full force and effect to the fullest extent consistent with the law.

(d)       Executive's or the Company's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right Executive or the Company may have hereunder, shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name and on its behalf, all as of the day and year first above written.


/s/ Jorge M. Gomez
Jorge M. Gomez
Execution Date: 11/16/2017


CARDINAL HEALTH, INC.

/s/ Pamela O. Kimmet
By: Pamela O. Kimmet
Its: Chief Human Resources Officer
Execution Date: 11/16/2017

Exhibit 12.1

# Computation of Ratio of Earnings to Fixed Charges

| (in millions, except ratios) | 2014 | 2015 | 2016 | 2017 | Six months ended December 31, 2017 |
|---|---|---|---|---|---|
| Earnings before income taxes | $ 1,798 | $ 1,967 | $ 2,276 | $ 1,924 | $ 495 |
| | | | | | |
| **Plus fixed charges:** | | | | | |
| Interest expense | 129 | 137 | 178 | 187 | 168 |
| Capitalized interest | 1 | 2 | 6 | 9 | 2 |
| Amortization of debt offering costs | 4 | 8 | 6 | 6 | 5 |
| Interest portion of rent expense | 10 | 10 | 12 | 14 | 8 |
| **Fixed charges (1)** | 144 | 156 | 201 | 217 | 183 |
| Plus: amortization of capitalized interest | 3 | 2 | 3 | 4 | 2 |
| Less: capitalized interest | (1) | (2) | (6) | (9) | (2) |
| **Earnings (1)** | $ 1,944 | $ 2,124 | $ 2,473 | $ 2,135 | $ 678 |
| | | | | | |
| **Ratio of earnings to fixed charges (1) (2)** | 14 | 14 | 12 | 10 | 4 |

(1)  The sum of the components may not equal the total due to rounding.
(2)  The ratio of earnings to fixed charges is computed by dividing fixed charges into earnings from continuing operations before income taxes plus fixed charges and capitalized interest. Fixed charges include interest expense, amortization of debt offering costs and the portion of rent expense that is deemed to be representative of the interest factor. Interest expense recorded on tax exposures has been recorded in income tax expense and has therefore been excluded from the calculation.

Exhibit 31.1

I, Michael C. Kaufmann, certify that:

1.  I have reviewed this Form 10-Q of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 8, 2018

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Executive Officer

Exhibit 31.2

I, Jorge M. Gomez, certify that:

1. I have reviewed this Form 10-Q of Cardinal Health, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 8, 2018

/s/ JORGE M. GOMEZ
Jorge M. Gomez
Chief Financial Officer

Exhibit 32.1

**Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Each of Michael C. Kaufmann, Chief Executive Officer of Cardinal Health, Inc. (the "Company"), and Jorge M. Gomez, Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)      the Quarterly Report on Form 10-Q for the quarter ended December 31, 2017 containing the financial statements of the Company (the "Periodic Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)      the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 8, 2018

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Executive Officer

/s/ JORGE M. GOMEZ

Jorge M. Gomez
Chief Financial Officer

## Statement Regarding Forward-Looking Information

As used in this exhibit, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 Form 10-K"), our quarterly reports on Form 10-Q and our current reports on Form 8-K (along with any exhibits and amendments to such reports), as well as our news releases or any other written or oral statements made by or on behalf of us, may include, directly or by incorporation by reference, forward-looking statements that reflect our current view (as of the date the forward-looking statement is first made) about future events, prospects, projections or financial performance. The matters discussed in these forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied in or by such statements. These risks and uncertainties include:

- competitive pressures in the markets in which we operate, including pricing pressures;

- uncertainties relating to the pricing of generic pharmaceuticals;

- uncertainties relating to the timing, frequency and profitability of generic pharmaceutical launches;

- our ability to maintain the benefits of our generic pharmaceutical sourcing venture with CVS Health Corporation;

- with respect to our distribution services agreements with branded pharmaceutical manufacturers, changes in the amount of service fees we receive or, in cases where part of our compensation under these agreements is based on branded pharmaceutical price appreciation, changes in the frequency or magnitude of such price appreciation;

- changes in the timing or frequency of the introduction of branded pharmaceuticals;

- actions of regulatory bodies and other governmental authorities, including the U.S. Drug Enforcement Administration, certain agencies within the U.S. Department of Health and Human Services (including the U.S. Food and Drug Administration, Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights), the U.S. Nuclear Regulatory Commission, the U.S. Federal Trade Commission, the U.S. Customs and Border Protection, various state boards of pharmacy, state controlled substance authorities, state health departments, state insurance departments, state Medicaid departments or comparable regulatory bodies or governmental authorities or foreign equivalents that, in each case, could delay, limit or suspend product development, manufacturing, distribution, importation or sales or result in warning letters, recalls, seizures, injunctions or monetary sanctions;

- any compromise of our information systems or of those of a third-party service provider, including unauthorized access to or use or disclosure of company or customer information, and ancillary risks associated with our ability to effectively manage any issues arising from any such compromise;

- possible losses, damage to reputation and other effects that may arise from the defense and resolution of the lawsuits and investigations in which we have been named relating to the distribution of prescription opioid pain medication;

- risks and uncertainties relating to the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses from Medtronic plc (the "Patient Recovery Business"), including the ability to retain the acquired business' customers and employees; the ability to successfully integrate the acquired business into our operations; the ability to achieve the expected synergies and accretion in earnings; unforeseen internal control, regulatory or compliance issues; and additional risks relating to regulatory matters, legal proceedings, tax laws or positions or foreign exchange rate volatility;

- difficulties or delays in the development, production, manufacturing, sourcing and marketing of new or existing products and services, including difficulties or delays associated with obtaining requisite regulatory consents or approvals associated with those activities;

- risks arising from possible violations of healthcare fraud and abuse laws;

- costs or claims resulting from potential errors or defects in our manufacturing of medical devices or other products or in our compounding, repackaging, information systems or pharmacy management services that may injure persons or damage property or operations, including costs from remediation efforts or recalls and related product liability claims and lawsuits, including class action lawsuits;

- risks arising from possible violations of the U.S. Foreign Corrupt Practices Act and other similar anti-corruption laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws;

- risks arising from our collecting, handling and maintaining patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information;

- risks arising from certain of our businesses being Medicare-certified suppliers or participating in other federal and state healthcare programs, such as state Medicaid programs and the federal 340B drug pricing program, which businesses are subject to accreditation and quality standards and other rules and regulations, including applicable reporting, billing, payment and record-keeping requirements;

- risks arising from certain of our businesses manufacturing pharmaceutical and medical products or repackaging pharmaceuticals that are purchased or reimbursed through, or are otherwise governed by, federal or state healthcare programs, which businesses are subject to federal and state laws that establish eligibility for reimbursement by such programs and other applicable standards and regulations;

- changes in laws or changes in the interpretation or application of laws or regulations, as well as possible failures to comply with applicable laws or regulations, including as a result of possible misinterpretations or misapplications;

- material reductions in purchases, non-renewal or early termination of contracts, or delinquencies or defaults by key customers;

- unfavorable changes to the terms of key customer or supplier relationships, or changes in customer mix;

- risks arising from changes in U.S. or foreign tax laws, including our ability to effectively implement and account for the recently enacted Tax Cuts and Jobs Act, unfavorable challenges to our tax positions and payments to settle these challenges, or failure to permanently repeal the U.S. medical device tax;

- uncertainties due to government healthcare reform, including possible repeal or replacement of major parts of the Patient Protection and Affordable Care Act;

- reductions or limitations on governmental funding at the state or federal level or efforts by healthcare insurance companies to limit payments for products and services;

- changes in manufacturers' pricing, selling, inventory, distribution or supply policies or practices;

- changes in legislation or regulations governing prescription drug pricing, healthcare services or mandated benefits;

- changes in hospital buying groups or hospital buying practices;

- changes in distribution or sourcing models for pharmaceutical and medical and surgical products, including an increase in direct and limited distribution;

- the risks of counterfeit products in the supply chain;

- changes to the prescription drug reimbursement formula and related reporting requirements for generic pharmaceuticals under Medicaid;

- increasing consolidation in the healthcare industry, which could give the resulting enterprises greater bargaining power and may increase pressure on prices for our products and services or result in the loss of customers;

- disruption, damage or lack of access to, or failure of, our or our third-party service providers' information systems, our critical facilities, including our national logistics center, or our distribution networks;

- manufacturing disruptions, whether due to regulatory action, production quality deviations, safety issues or raw material shortages or defects, or because a key product is manufactured at a single manufacturing facility with limited alternate facilities;

- risks to our business and information and controls systems in the event that the Pharmaceutical segment's multi-year systems replacement project or other business process improvements, infrastructure modernizations or initiatives to use third-party service providers for key systems and processes are not effectively implemented;

- the results, costs, effects or timing of any commercial disputes, government contract compliance matters, product liability claims or lawsuits, patent infringement claims, *qui tam* actions or other legal proceedings;

- possible losses relating to product liability lawsuits and claims regarding products for which we cannot obtain product liability insurance or for which such insurance may not be adequate to cover our losses, including the product liability lawsuits we are currently defending relating to alleged personal injuries associated with the use of Cordis inferior vena cava filter products;

- our ability to maintain adequate intellectual property protections;

- the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition, and uncertainties relating to our ability to achieve the anticipated results from acquisitions;

- increased costs for commodities and other materials used in the Medical segment manufacturing, including various components, compounds, raw materials or energy such as oil-based resins, pulp, cotton, latex and other commodities;

- shortages in commodities, components, compounds, raw materials or energy used by our businesses, including supply disruptions of radioisotopes;

- the loss of, or default by, one or more key suppliers for which alternative suppliers may not be readily available;

- bankruptcy, insolvency or other credit failure of a customer or supplier that owes us a substantial amount;

- risks associated with global operations, including the effect of local economic environments, inflation, recession, currency volatility and global competition, in addition to risks associated with compliance with U.S. and international laws relating to global operations;

- risks associated with our use of and reliance on the global capital and credit markets, including our ability to access credit and our cost of credit, which may adversely affect our ability to efficiently fund our operations or undertake certain expenditures;

- our ability to introduce and market new products and our ability to keep pace with advances in technology;

- the costs, effects, timing or success of restructuring programs or plans;

- significant charges to earnings if goodwill or intangible assets become impaired;

- uncertainties relating to general political, business, industry, regulatory and market conditions; and

- other factors described in the "Risk Factors" section of the 2017 Form 10-K.

The words "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions generally identify "forward-looking statements," which speak only as of the date the statements were made, and also include statements reflecting

future results or guidance, statements of outlook and expense accruals. We undertake no obligation to update or revise any forward-looking statements, except to the extent required by applicable law.

# EXHIBIT 95

THOMSON REUTERS

# FINAL TRANSCRIPT

Cardinal Health Inc at Leerink Partners Global Healthcare Conference

EVENT DATE/TIME: 02/15/2018 09:00 AM GMT

THOMSON REUTERS | Contact Us

©2018 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

1

## 02/15/2018 09:00 AM GMT, Cardinal Health Inc at Leerink Partners Global Healthcare Conference

### CORPORATE PARTICIPANTS

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*
**Kevin Moran**

### CONFERENCE CALL PARTICIPANTS

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

### PRESENTATION

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

All right. I'm Dave Larsen, the health care, IT and distribution analyst here at Leerink Partners. We're delighted to have Cardinal Health. Joining us, we have Jorge Gomez, Cardinal's CFO; and Kevin Moran, Manager of Investor Relations. So Jorge and Kevin, thank you very much for joining us. Really appreciate it.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Good morning.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Kevin, I think you have a couple of comments you can start with.

**Kevin Moran**

I do. Just real quick. Thanks, Dave. During the presentation, we will be making forward-looking statements. Our actual results could differ materially from those projected here today. For information about these factors that could cause actual results to differ from today's projections, please refer to our SEC filings, which you can find on our investor page on our website. Thanks.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Great. Thanks very much. So, Jorge, thanks for joining us. Really appreciate it.

### QUESTIONS AND ANSWERS

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Why don't we start off with a topic that's been in the news recently? There was obviously an article on the Wall Street Journal about Amazon getting in the medical supply business. Just any general thoughts there would be very helpful. Has Amazon met with any of your customers? And if so, to what extent has Amazon potentially bid on business? Are you seeing them in the market?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Good morning, Dave. Good morning, everybody. Thanks for the invite. Pleasure to be here. First thing, I -- in general, what I would tell you is that we are not seeing any presence right now in the marketplace by Amazon. We don't run into them. We know that they have had a number of conversations with some of our customers, but there's nothing that we are seeing right now that is tangible in terms of any participation in the spaces where we compete today. They have had -- through their platforms, have had some presence in terms of distributing and selling some medical supplies. They've been doing this for a long time, but not in terms of going directly to our customers. So that's all I can say in terms of the facts that we can see in the marketplace. With respect to the things that we do and why we feel comfortable about our competitive position, I think what we do as a company, especially in the Medical segment, we have a pretty comprehensive set of products and services that goes well beyond distribution. Historically, until probably a few years ago, the Medical business for Cardinal was primarily a distribution business of -- distribution of national brands. That has changed quite a bit in the last few years. We've gone through a pretty significant transformation in terms of our offering. And today, we have a very broad portfolio of products and services, starting with the backbone distribution business that is now complemented by a very strong, very robust products franchise. And within that products franchise, we have all sorts of medical products going from all the way from the low-end type of commodity type of products to Class 2 and Class 3 medical devices. So we bring our customers a pretty broad basket of products. In addition to that, we have other parts of the business, like we had a lot of distribution services. OptiFreight is a great business that we have. We are pretty embedded

THOMSON REUTERS | Contact Us

©2018 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



with our customers, managing -- helping them manage their internal logistics. We have businesses like at -Home, where we actually provide a pretty sophisticated service, bringing together manufacturers, payers and bringing the product to patients at home. And we also have a business like naviHealth that focuses on post-acute services, helping providers and helping insurance companies -- payers manage populations once they leave the acute setting. So as you can tell from that list of offerings, we are an integrated health care company. And in order to be able to deliver all of these products and services, you need to have certain capabilities from a regulatory standpoint, from a clinical standpoint, legal. There's a lot of things that go into what we do that are a lot more than just distributing products.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. So it sounds like the depth of the services that Cardinal provides to your IDN customers is very vast. You have a very extensive list of vendors and suppliers that you work with. And basically, you have a pretty deep competitive moat built around the business and it will be tough for anybody, including Amazon, to penetrate that moat is what I'm hearing.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

We are seeing customers in this space become more integrated, more sophisticated. And this set of portfolio of products and services that we bring is -- that we bring to the marketplace is resonating with that -- with this larger, more sophisticated IDNs. And as a result of that, our business is actually growing.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

And how long were you in the Medical division for, Jorge?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

I was there for about 2.5 years.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay, all right. So when you approached these hospital IDNs, it's -- I mean, can you describe the sales process? I mean, it sounds to me like it's more of a strategic relationship and a consultative sale as opposed to simply selling products.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Yes. I think one of the key aspects of our go-to-market strategy is customer intimacy. We have -- the go-to-market approach starts with an enterprise perspective. So we have a group of executive -- sales executives that have relationships with our customers at the highest possible level, and we try to approach them with our integrated portfolio. We have -- we report in 2 segments. But when we go to our customers, we don't go as one segment or the other. We don't go as Pharma or Medical. We go as Cardinal Health, and we try to bring all of these things together. And I think that there is a -- as IDNs get bigger and bigger, they are approaching their purchasing, their sourcing in that way -- in a more integrated way.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

How are your prices relative to what you've seen on Amazon's website?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

I guess people can go on and check what prices they offer. What we hear from our customers in multiple situations is that our prices are much better than what other competitors offer, in particular Amazon. If you go to the website and some of the things they offer, it appears we have much better price. I'm not surprised with those comments -- or by those comments because we have that tremendous scale. So our medical supply business, our medical device business, we are very large. If you take, for example, the low-end type of products, gloves or drapes and gowns, we are as big as almost anybody in that space, either through our own manufacturing facilities or our sourcing capabilities, and we are able to bring very competitive pricing to our customers. And I think the best testament to that is the fact that, that business for us, over the last couple of years, has gained a lot of ground and we have won a number of significant customers.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. So as far as you know, Amazon has not reached out to any of your customers. Is that what I'm hearing?

©2018 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## 02/15/2018 09:00 AM GMT, Cardinal Health Inc at Leerink Partners Global Healthcare Conference

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

What we know, based on conversations with our customers, is that they have had some conversations, but that's the extent of my acknowledge. What I said -- aired here before is that in terms of presence in the marketplace, in terms of running into them in RFPs or other competitive situations, we haven't seen that.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay, all right. That's great. And the Medical business has actually been, I think, doing pretty well. When are we going to get through this inventory step-up charge? And we had been talking about -- or you had been guiding to a 6% operating margin for the back half of fiscal '18. Maybe can you just talk a bit about that, please?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Yes. The inventory step-up you're referring to is part of the acquisition of Patient Recovery. When you kind of onboard the balance sheet of the company you acquire, you have to mark-to-market the assets of the company you acquire. As a result of that, you -- in our case, we had to step up the value of the inventory that came with the acquisition. That resulted in a charge, in an expense that happened in our Q1 and Q2, so the first 2 quarters of this acquisition, and we already took that charge and is done. We won't have that expense going forward. So in Q3, when we report our Q3, there won't be anything related to the step-up of the inventory. With respect to margins in the second half of the year, if you take a look at the numbers that we just released with our Q2 numbers, the margin for the Medical segment was about 5.4%. I think it was 5.43%. And that number, to your point, included the impact from this inventory expense -- inventory step-up expense. If you're going -- which is kind of a onetime event. If you are going to remove that expense, the profit margin for the segment would be in the 6% ZIP Code, approximately 6%. So that tells me -- that gives us comfort that we're going to -- the second half of the year, we will be around that 6% margin that we guided to.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

So you're very much on track with your long-term plan for the Medical division.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

We are on track with respect to achieving that gross margin -- that profit margin in the second half of this year, yes.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. And then with the Patient Recovery business, I think we've been talking about $0.55 for fiscal 2019, and then I think $0.21 in 2018 -- yes.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

$0.21, yes. So we just closed this transaction a few months ago. The early signals that we're seeing, the -- how the business is tracking today is very much in line with our plan. The business fundamentals are healthy. The integration is going well. Still early, but everything is on track at this point. So we have no reason to believe at this point that the $0.21 accretion in '18 or the $0.55 accretion in '19 is at risk at this point.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Okay. And there were some challenges, though, like in the exam glove business, and then also like how is Cordis doing. Maybe you can address those 2 items.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Yes. I see those 2 items as temporary in nature. The -- let me start with exam gloves. Exam gloves is a market dynamic. It's not a Cardinal-specific challenge. It is -- what's happening is several months ago, a new set of environmental regulations were enacted in China. As a result of that, a number of manufacturing plants were shut down because they didn't meet those new regulations. That has constrained supply. And as a result of that, prices of exam gloves in that market have gone up, and China is a major source of exam gloves. It's going to take some time for the market to adjust to that disruption in supply. We are looking at a number of alternatives to address that challenge, including things like finding alternative sources in other geographies. We are, in some cases, trying to modify some -- to tweak some specs on those gloves so we can produce those gloves in other places at a lower cost. And when possible, we try to raise prices, particularly in spaces where we have -- where we will have long-term contracts. There are places where we have certain channels where we have long-term

THOMSON REUTERS | Contact Us

©2018 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



contracts. And so until those contracts expire, we're not in a position to change prices. But there are multiple projects, multiple initiatives along those lines to address that. With respect to Cordis, it's a recent acquisition. We closed that transaction about just over 2 years ago. Global business. Now, it was our first attempt to build a global business in the last, I guess, 7 years. We used to be a global company until we spin off CareFusion about 7 years ago, 8 years ago. And when we acquired Cordis, we decided to go again globally, and that business is about 2/3 outside the U.S., 1/3 in the U.S. And frankly, one of the things that we encounter with that acquisition was that we underestimated the cost of growing globally, and that has been probably the biggest challenge. The business is actually -- from a demand perspective, from a commercial standpoint, the business is doing well. We've been growing. The top line has been growing in the mid-single digits, which is good in the cardiology space, cardiovascular, endovascular. The performance of our OUS operations is really good. So top line is we feel good about it. We have cost issues. We have supply chain issues in terms of building infrastructure, but we're making progress. And as we invest in technology and improve certain processes, we believe that a lot of those headwinds that we have now will be more manageable, and we will put Cordis back into a growth trajectory.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. So it sounds like the Medical division overall is performing fairly well. 6% operating margins, on track for the back half of the year. Temporary challenges with the gloves and Cordis but will recover likely in another quarter or 2.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

It is hard to put a specific time frame. It's going to take probably a little while. But we -- quarter after quarter, we keep making progress in that.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. Let's talk about Washington. So Trump put forth his budget proposal this week. Let's talk about a couple of these different ideas and what impact, if any, they might have on your business. So first of all, if Part B went into Part D or if Part B rates declined like ASP plus 6% to ASP plus 3%, what impact would that have on your business, if any? And during the sequester that occurred recently, whether it was a 2% ding on the ASP rates, what impact did that have on your business?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

It is very early to tell exactly how this idea, this proposal are going to actually translate into specific legislation or rules in the marketplace. What we have experienced in the past with this type of dynamics in Washington is that the impact -- the direct impact to us is not very clear and is not necessarily negative. And we've seen this during the Obamacare years and in the recent years when there has been some regression to certain policies. What we do for our customers, our mission as a company in terms of making health care more efficient -- more cost-efficient, is actually very much aligned with the cost pressures that we have that we can see in the industry. Specifically related to drug prices, a big -- a very important part of our business is the generics business, and generics continues to be a very effective way of addressing challenges in health care. And that's one thing that we do really well. There is a high, high penetration of generics scripts in the country that will continue, and so we don't think that, that part of the market is going to be negatively impacted by some of these proposals. On the branded side, I think inflation in branded pharmaceuticals has trended somewhat down in the last several quarters, probably a couple of -- maybe a year or so. For us -- so that's one thing. But for us, if you remember, the way we are compensated from a branded pharmaceutical perspective, 90 -- more than 90% of our income comes from fee-for-service. So we are not exposed in a significant way to brand inflation anymore. We have -- under 10% of our branded pharmaceutical income comes from continued inflation. So under 10% could be impacted by a significant shift in branded prices, but more than 90% of our business is fee-for-service. So the exposure is very low there.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. When the sequester went into effect, AmerisourceBergen, one of your competitors, actually had an unfavorable impact on earnings. Not -- it wasn't that material but, I mean, they did call it out on their earnings calls. I think their specialty business is maybe a bit larger than Cardinal's. Did you see any unfavorable impact on your specialty business or earnings from specialty when the sequester went into effect a couple years ago?

THOMSON REUTERS | Contact Us

©2018 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## 02/15/2018 09:00 AM GMT, Cardinal Health Inc at Leerink Partners Global Healthcare Conference

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Our specialty business today and for the last few quarters, and we said this last week, is going really well, is growing top line and bottom line double digits in not only from a distribution perspective, but we have a great set of services wrapped around distribution. So right now, that business is a good driver of growth for us.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay, all right. And then how about 403(b) Medicaid best price rebates from the PBMs going right to the members at the point of sale? Do any one of those keep you up at night?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Not right now. Again, we need to wait and see exactly how those regulations will play out. But at this point, it would be speculative for us to make any comments on that.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. And then let's talk about buy side generic deflation. Your Pharma operating margins were actually very good this past quarter. I mean, maybe you can mention the 1 or 2 things that drove that. And then what are your thoughts on, I guess, buy and sell side generic deflation?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Yes. I will wrap all that up in the concept of generics program. So when we think about generics, we always talk about generics programs. And within our generics programs, there are like 3 main levers, if you will, 3 main components. And those are units -- unit growth, you have pricing and then you have our sourcing cost. What we experienced in Q2 -- and to your point about the performance of the Pharma business in Q2, what we experienced was unit growth and deflation. For us, deflation is ASP deflation, so average selling price deflation. When we look at those 2 components of generics programs, they came in, in line with our expectations. And the sourcing cost, the third element of our generics programs, actually performed better than what we had modeled, than what we had planned. And as a result, we had some margin expansion in the quarter, which resulted in the overperformance to our expectations in the quarter. We feel good about how that business is performing. When we talk about our guidance for this year, we refer to the fact that as we look at the second half of the year, we believe that some of this overperformance relative to our expectations in Q2 will carry forward in the second half of the year. So that's how we're thinking about it.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

So you're maintaining price on the sell side. And on the buy side, things are a little bit better than expected?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Pricing on the sell side is playing out, is happening as we modeled in our plan. So it's in line with our expectations. We continue to see deflation from an ASP perspective, but it is in line with what we thought was going to happen this year.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. And then there's going to be some incremental investments into the Pharma business in the back half of the year. Maybe you can touch on those. Like what are -- what exactly are those client investments, the $0.16 of client investments? And then maybe touch on opioids.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Yes. So the $0.16 includes more -- not only customer investments or customer initiatives. We said about half of that amount was related to specific customer initiatives. I don't have any update. We talked about this last week during the earnings call. We continue to work with a number of existing customers on a few ideas that could result in some interesting projects for the future, and it's something that we are actively working on. And the timing of that is we hope to have some more clear news to share with the market as soon as possible. We have modeled that in the second half of the year, so about half of that $0.16 or $0.08 is related to those customer initiatives. The remaining $0.08 is comprised of -- comprises a couple of other things, including opioid programs and some structuring initiatives that we actually completed in the first half of this year. So of that remaining $0.08, we already spent some of that in the first half. But opioid programs are ramping up. We are working on a number of initiatives to help the country with this difficult situation around opioids, and we will be spending all of that money, all of those -- whatever piece of that $0.08 is in the second half of this year. So we are on track to complete those investments.

THOMSON REUTERS | Contact Us

©2018 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## 02/15/2018 09:00 AM GMT, Cardinal Health Inc at Leerink Partners Global Healthcare Conference

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay. So for opioids that are prescribed or delivered to doc offices and clinics that are your clients, are all of those transactions reported to the DEA?

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

No. There's a very sophisticated system, a monitoring system, that tracks all of the deliveries of controlled substances. So we are -- we have systems and people and algorithms, a number of things that go into monitoring the overall activity. Depending on some thresholds and some guidelines that we have that we have developed internally and in conjunction with regulatory bodies, we have flags and triggers that under certain circumstances, certain volumes, certain patterns, then we'd report certain activity. But it's not everything.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

It's not everything, okay. I think we're through our allotted time. So thank you very much, Jorge and Kevin, for joining us. Really appreciate it.

**Kevin Moran**

Thanks.

**Jorge M. Gomez** *Cardinal Health, Inc. - CFO*

Thanks so much, Dave. Thanks, everyone.

**David M. Larsen** *Leerink Partners LLC, Research Division - MD, Healthcare Information Technology and Distribution*

Okay, all right.

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Briefs are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT BRIEFS REFLECTS THOMSON REUTERS'S SUBJECTIVE CONDENSED PARAPHRASE OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT BRIEF. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2018 Thomson Reuters. All Rights Reserved.


©2018 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

# EXHIBIT 96

**Cardinal Health Inc at Barclays Global Healthcare Conference**

Miami Mar 13, 2018 (Thomson StreetEvents) -- Edited Transcript of Cardinal Health Inc presentation Tuesday, March 13, 2018 at 1:00:00pm GMT

CORPORATE PARTICIPANTS
  Jorge M. Gomez, Cardinal Health, Inc. - CFO
  Kevin Moran
CONFERENCE CALL PARTICIPANTS
  Steven J. James Valiquette, Barclays Bank PLC, Research Division - Research Analyst

**PRESENTATION**

**Steven J. James Valiquette**, Barclays Bank PLC, Research Division - Research Analyst

Okay, great. Welcome to the Barclays Health Care Conference. I'm Stephen Valiquette, the health care services analyst. Next company is Cardinal Health. To my right is Jorge Gomez, the company's CFO. And this will be a fireside chat. But also up here is Kevin Moran from Investor Relations, who has the ever-exciting task of reading the forward-looking statements for legal reasons. So Kevin, over to you for a minute.

**Kevin Moran,**

Thanks, Steve. During this presentation, we will be making forward-looking statements. Our actual results could differ materially from those projected here today. For information about factors that could cause actual results to differ from today's projections, please refer to our SEC filings, which you can find on the Investor page of our website. Thanks, Steve.

**QUESTIONS AND ANSWERS**

**Analyst:** Steven J. James Valiquette, Barclays Bank PLC, Research Division - Research Analyst

**Question – Steven J. James Valiquette:** Okay, great. All right. So perhaps, we'll kick things off on the Pharmaceutical Distribution side of the business. And seems like over the past several months, there has been now a handful of generic manufacturers who have talked about some product rationalization, particularly in the U.S. market in particular, to try to stem some of the tide of generic deflation. So I guess I'm just curious to get your updated thoughts on the progress of this and whether this is really changing things on the pricing from your perspective.

**Answer – Jorge M. Gomez:** Good morning, Steve. The dynamic in the generics market over the last, say, couple of quarters, several months, I think is -- has been constructive from my perspective. We've seen more stability with respect to pricing downstream with our customers. As it relates to manufacturers' activities and changes in supply capacity and things like that, I haven't seen a major shift, to be honest. It is typical in this type of commodity-type of industries to always have some shifts in volumes, in production, in capacity. And depending on the economics of specific items, specific drugs, there is always the appetite and the desire, in some cases, to add capacity, to shut down certain lines. And so we've seen some of that probably a little bit more than the typical dynamic, but I haven't seen a major, major change in that respect. However, as I said, from our perspective, Q2, for example, was a good indicator of more stability. Our selling price was in line with what we had modeled for that period. And then on the sourcing side, we -- actually, our Red Oak Sourcing operations performed ahead of plan. So net-net for us, it was a good quarter, and while we continue to see some of that, of the same dynamic, as we go into the second half of this year.

**Question – Steven J. James Valiquette:** Okay. Now seems like investors always want every management company or every management team to have a magical crystal ball around the outlook for generic pricing over the course of a couple of years and what it means for margins for your business. I know it's tough to really accurately address those types of questions, but as we do think about the overall generic component of your pharma distribution business, we talk about where pricing trends are, but also the generic pipeline. Just curious how you think about, at least, just maybe, perhaps, the margin profile within drug distribution in the next couple of years, whether we can maybe sustain margins or do you see chances for expansion. Or maybe just sort of big picture, how that might trend over the next few years, the way you see things right now.

**Answer – Jorge M. Gomez:** Yes. And you're right. That is very hard to predict in a linear way. We all would like to have models that were very predictable, very linear. In reality, I guess, business that works in a more unpredictable way within certain ranges. So when we think about the next several quarters, next few years, we range a pretty broad set of potential outcomes, and based on different trajectories for ASP, for sourcing cost. And we think that if you look at the fundamentals of the industry, the fundamentals of the economy overall, when you project GDP growth inflation,

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

prescription growth, unit growth, I think there's a number of combinations that are actually conducive to growing the business; to sustain margins; and depending, again, how we perform from a sourcing perspective, how downstream pricing works. And overall, we feel like despite some short-term dislocations, if you will, with respect to certain pricing dynamics, this is a great industry. It's a great industry that is supported by the overall growth in the economy, by very strong macroeconomic trends around, again as I said before, GDP growth, the growth of the population, the aging of the population, expansion of coverage and things like that. So we try to focus on the things that we control. We believe the overall environment is good for us, the things that we control in terms of having good pricing discipline. We spend a lot of time, we invest a lot of money in technology to ensure that we have great analytical capabilities to understand pricing dynamics with our customers really well. We have tremendous capabilities with Red Oak. We continue to be really, really happy with the performance of that group. They have great talent and great technology, great analytical capabilities to understand the manufacturing -- generics manufacturing space really well and build good relationships with manufacturers. The work that we do there is not just about lowering cost. Obviously, we want to have a very efficient sourcing operation, but they build great relationships with manufacturers so that these manufacturers remain viable and healthy. And then beyond that, as a company, we pay a lot of attention to our overall efficiencies, cost. We mentioned before this investment we're making in IT for the medical sector -- I'm sorry, for the pharma segment, what we call PMod. Those investments are intended to make us more, more efficient. So when you add up all those things, we see in our projections the ability to potentially sustain margins. And in some cases, there are levers that we are trying to use that could actually help us expand margins outside the pure PD business. We have other parts within the pharmaceutical segment, like the Specialty business and Nuclear, that can also help us keep gross margin dollars, increase gross margin dollars and have a reasonable financial trajectory for the next couple of years.

**Question – Steven J. James Valiquette:** Okay. So just briefly touched on the Pharma Distribution technology or IT refresh. Could you just remind the audience again how long this is expected to be ongoing? And then also, what are the savings that you have projected that the program might yield over time?

**Answer – Jorge M. Gomez:** Well, what we're doing with PMod is a comprehensive overhaul of our IT infrastructure for this Pharmaceutical segment. The key objective, the ultimate objective, with this upgrade of systems is to improve the customer experience. One of the things that when we think about competition and how we remain relevant and very competitive into the future, one of the things that is very important is to make the customer experience as smooth as possible, remove any type of friction. And so with PMod, we are improving our ordering systems. We are improving the ability to interact with our customers from a customer service perspective. Our pricing capabilities, pricing analytics are also being upgraded as a result of this investment. And the last thing is cleaning the data, ensuring that we have a master data foundation that is very much in sync with our customers. And again, with the intention of making that interaction as smooth as possible, right? We believe that is a lot more than just the infrastructure. We believe that this is a competitive advantage. It's something that is going to keep us relevant into the future. The savings, we haven't talked specifically about hard numbers on that. But there are -- there's a significant benefit that comes from having a better experience for the customer. We believe that's going to drive higher penetration with certain markets. And then on the cost side, for sure, we are being able to automate a few parts of our business, and that allows us to redeploy resources into more value-added aspects of the business.

**Question – Steven J. James Valiquette:** Okay. Now another area where Cardinal, and actually the whole drug distribution industry, is also trying to improve some visibility on the overall business is in kind of reworking some of the customer contracting in charging by drug class, whether it's brand versus generics versus specialty drugs. I think there was some attempt to do that with manufacturers, too. But maybe you want to just talk about kind of where we are on the progress of that with customers first. And also if you can talk about there is any traction with manufacturers as well, kind of how that's going. But I think more of this was geared towards customers, from what I recall. But...

**Answer – Jorge M. Gomez:** Yes. I guess from a downstream perspective with customers, we are not making any major changes right now. The -- we have had a pretty consistent practice for the last several years, particular since the time when major specialty products came to market. When the hep C drugs came up to market about 3.5 years ago, 4 years ago, we -- at that point, we actually went through a major shift, if you will, in the way we contracted with our customers, and that practice has remained. And what we've done since then is our contracts are a function of the overall mix. And so when we go to our pharmaceutical customers, we go with generics, branded product, specialty products and services. And so we -- the way we price this contract is completely a function of that mix. And we have grids that are very, very clear that allow customers to access certain products at certain price if they have certain volume, if they hit certain volume thresholds for us. You're hear -- we are hearing a lot that this is now becoming more and more prevalent in the industry. This is something that, for us, is not new. This is something that we've been doing for a while. I think, to your point about contracts with manufacturers, the way that space work for us is a little bit different. I don't think we are using those type of major -- the negotiations there are. They have the -- always the element of mix because some products require a different type of handling and the activity cost is the cost per unit could be different depending on the activity that is required. But I think those contracts are a lot simpler than the contracts that we have with customers.

**Question – Steven J. James Valiquette:** Okay. This next question goes back from a couple of quarters ago, but the management talked about some customer investments. And I think some investors may have taken that as a code for maybe some price concessions with various customers. I guess, really, the question around that is where do we stand

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

right now on the sell-side pricing? Obviously, if you go back about a year to 1.5 years ago, there was all kinds of attention on pricing with independent retail customers. But let's just talk about the overall sell-side pricing environment right now in terms of stability and kind of where things stand right now.

**Answer – Jorge M. Gomez:** So let me start by the last part of your question in terms of sell-side pricing stability. I alluded to that earlier in my remarks. We're seeing a much stabler environment right now than what we saw, say, 6 months ago, 12 months ago. I think that is true across the board, not only with retail independents, but also with our larger customers. I think the dynamic from a pricing perspective is going back to what we saw a few years ago in terms of more -- a lot more stability. With respect to the customer investment that we have talk about for the last couple of quarters, that is -- again, it's with existing customers. I would not describe them as just a renegotiation of pricing. Pricing could be one lever, but what we're trying to do with the key customers, existing customers, is we're trying to expand the relationship. As you can see in the marketplace, there's a lot of M&A activity, a lot of changes taking place in the marketplace, and we want to make sure that as a company, we remain the right partner for these customers as they evolve. So as an example, in the past, with CVS, we had a great relationship with them. They -- now they went from retail of PBM, and now they are adding an insurance company. I mean, those type of customers, we like to be aligned with those type of customers and have an offering that is going to be able to keep up with the evolution of those customers. So these investments that we are talking about, they are along those lines. It's making sure that we service our customers and we meet all of their needs. And that could involve a number of things, including contract terms, including price and including capital, including services offerings. It could involve a lot of things. And we believe that this is going to be very good for us going forward. We keep making progress on it. I talked about this last night, and I told you, we were closer than where we were last time when we talked, and I feel the same way today. We keep making progress on that. And at this point, my expectation is that those new agreements will take place this year.

**Question – Steven J. James Valiquette:** Okay, great. Last question on the Pharmaceutical side before we flip over to the Medical side. The company's specialty drug distribution business has been growing pretty well over the past couple of years. If you go back maybe 3, 4 years ago, there was definitely a perception that maybe your peers had pretty large market share and Cardinal was kind of in more of a nascent stage. But it seems like you gained a lot of ground. Just curious if -- well really, what are the main drivers that really -- that have allowed Cardinal to gain so much share in the Specialty area? Is it just based on physician relationships? Is it just tied to a wave of new drugs? Maybe just touch on some of the dynamics that have allowed you to grow so strongly and, it seems like, gain some market share.

**Answer – Jorge M. Gomez:** Yes. I think in the Specialty business, it's very important to have an offering that goes well beyond distribution capabilities. So our volume clearly has grown a lot over the last several years. We've grown in the double digits top line, double digits bottom line. One key enabler of that type of growth is services that you wrap around your distribution volume. There's a lot of activity going on in Specialty, as you all know. That market is growing really fast. And the needs from a lot of the customers range -- cover a lot of ground, including things from very simple services around 3PL to more complex services around access to reimbursement for patients and everything in between. We have assembled a great set of assets and services around Specialty that are very appealing to customers, biotech companies, small pharma companies. And even large pharma companies are outsourcing a lot of their internal processes around the Specialty products. So when you put all that packaged together, that is a very compelling proposition for our customers. And that is probably, I'd say, the main reason for the growth that we have experienced. It is those services, those value-added activities that we bring along with distribution that has been the key enabler for us.

**Question – Steven J. James Valiquette:** Okay, great. All right. So let's shift gears over to the Medical side. Obviously, Cardinal's done some pretty good-sized acquisitions over the past couple of years, adding on more manufacturing capabilities, which I think is, for me, from my point of view, is definitely the right strategy and probably going to be a winning strategy. At the same time, a couple of speed bumps along the way. I think you guys have been pretty open and forthcoming about some of these temporary issues that you're facing within the Cordis franchise right now. Maybe just spend a minute or so on kind of what you're doing to remedy some of those issues and, more importantly, maybe just the timing of when we think we'll get Cordis back on track and operating at the level that you want it to be.

**Answer – Jorge M. Gomez:** Yes. Just to reemphasize something you said. The Medical segment has gone through a major transformation over the last 5 years, going from being a pure medical supply distribution business to what it is today, which encompasses a lot of products and services. So we remain, we continue to be a very strong medical, MedSurg distributor, but we have added a pretty substantial medical products franchise and then we have complemented that with very strong services businesses, like at-Home, naviHealth, OptiFreight. And so that is a major transformation that takes some time. Part of that transformation has been accomplished through organic growth and then the addition of pretty significant businesses like Cordis and Patient Recovery. Those businesses came with a lot of international operations. In the case of Cordis, when we acquired Cordis, that business was -- still is 2/3 outside the U.S. from a revenue perspective and 1/3 in the U.S. Building infrastructure to support that business outside the U.S. is something that, to be totally honest, was -- we underestimated some of the costs and complexity to build that infrastructure. We are just 3 years removed from the closing of Cordis, and we cover a lot of ground. We have faced,

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

as you said, a lot of challenges along the way. But we feel like we are going into a phase of a lot more stability. To give you examples, when -- Cordis was what is called a carve-out acquisition, where basically, we acquired the products. The salespeople came with the acquisition outside the U.S., but no infrastructure came. And we prepared for that, we planned for that. But again, it's -- it has cost us more money and it's taken a little bit longer. We have gone live with a pretty significant IT platform that is going to enable us to have better visibility into the supply chain. One of the key challenges we faced in the last couple of years, we've talked about this a couple of times, is write-offs of inventory because we didn't have enough visibility in all the overseas markets with respect to levels. And so we faced some challenges with expiration of product, and we had to write off some certain volumes. Now we have visibility to that and things are going to start getting better. They are starting to get better. From a commercial standpoint, Cordis is actually going very well. It's a business that, under our ownership, has grown at a 2% or 3% level overall with much higher growth rates outside the U.S. That is a business that, prior to Cardinal's ownership, was actually declining in several markets. But we knew that we could provide a lot of more focus and bring together their products, the Cordis products, with the medical products that we had before and make our bag a lot more interesting for our customers, and that is happening. So we're very excited about the fact that from a go-to-market perspective, things are going better overall. We -- the other thing that is actually contributing to the success of the -- on the commercial front with Cordis is the launch of a new drug-eluting stent in the U.S. That was one of the big challenges commercially. We had a big hole in the bag in the U.S. We didn't have a DES. Now we have a DES. So when I go through the challenges that we faced, feel good about the commercial aspect. With the addition of the drug-eluting stent, we have a good portfolio. From an operational standpoint outside the U.S., we've now built most of the infrastructure that we need. We are fine-tuning that infrastructure. We have some fixed costs outside the U.S. that now, with the addition of Patient Recovery, is going to -- we're going to be able to spread that cost over a much bigger basket of products. That should help us with productivity and overall SG&A. So that's how we're tackling all of the challenges. And I feel like as we go into '19, we are going to see that business go -- getting back to the growth trajectory that we want, especially on a capital-efficient basis. Because it is growing today, but the growth, the top line growth, is not translating to the bottom line.

**Question – Steven J. James Valiquette:** Okay. So you mentioned Cordis, 1/3 in the U.S., 2/3 outside the U.S. For the Patient Recovery business you just acquired, do you have the same statistic for them?

**Answer – Jorge M. Gomez:** Yes, but it's very different. So first of all, Patient Recovery is a much bigger business. About 1/4 of the Patient Recovery business is outside the U.S. So -- and 3/4 in the U.S. So from an integration perspective, that makes that integration a lot more manageable because integrating the business in the U.S. is a lot simpler. In fact, with the integration of Cordis, when we integrated Cordis in the U.S., it was pretty seamless. We didn't have any major challenges there. So with Patient Recovery, that was one important thing. We knew it was going to be the majority of that business in the U.S. For the o-U. S. piece, now we have a lot of experience. We learned a lot of lessons from Cordis. And so as we exit the TSAs that we have with Medtronic, because for the first 12 months, you operate under TSAs. And then in the second year, it's when you actually go live with your own systems, and that's when it becomes more challenging. Now we're going to have 3 years of experience with Cordis, we're going to have some basic infrastructure built. And so that should make that transition of Patient Recovery into our operations a lot smoother than what happened with Cordis.

**Question – Steven J. James Valiquette:** Okay. Final, real quick question. Obviously, some headlines in the press around Amazon doing pilots with hospitals. Just curious whether you're seeing Amazon as a competitive threat. Is it something that's happening right now? Is it somewhere way down the road? I mean, what are your thoughts around that topic? Because I'm sure investors bring that up to you.

**Answer – Jorge M. Gomez:** Yes. A few times. Not very often, but a few times. Obviously a great company. We have a lot of respect for Amazon. We have a lot of respect for all of our competitors. Part of what we do as a business to remain viable and competitive is to always pay attention to potential disruptors for our business model. And as such, we focus on 3 major things that, we believe, if we get right, we should be fine. First is capabilities, second is scale and third is the breadth of our portfolio. When you think about capabilities, a lot of times, people talk about our distribution model is going to be disrupted. We are a lot more than a distribution company. We're a health care company that brings a lot of capabilities together around regulatory, around clinical knowledge, around legal aspects in health care. Our customer service operations are very, very massive and very integrated with our customers. Technology integration for ordering systems, those are capabilities that are extremely important, and we -- that keep us really close to our customers, understanding their needs, understanding how we can help them on a daily basis. It's not a business where we just ship a box to them. It's a business where there's a lot of work before that. We ship the product. We help them with the internal operations. We guide them through a lot of regulatory issues and clinical issues and so forth. And that is a pretty comprehensive set of services. From a scale perspective, we -- in our categories, all the categories that we sell, we have massive scale. And we buy as good as anybody in the industry. We have a large manufacturing footprint. Right now, we have over 30 plants up all over the globe at a good level of scale. So our customers tell us this all the time, our pricing relative to other potential disruptors is actually very, very good. And we know that because of the scale that we have. And finally, when you think about the exposure of the corporation to a company like Amazon and others from a breadth of portfolio perspective, not only we have distribution products, services, but we also have a pretty substantial business outside the U.S. now. With Cordis and

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

Patient Recovery, surgeon glove outside the U.S., all of our business outside the U.S. is with our own products, where we have much greater margins. And then from a growth perspective, which is very important, a lot of these geographies where we have presence outside the U.S. are growing faster than the overall U.S. health care system. So for all those reasons, we feel good about our competitive position. We have not run into Amazon in any -- with any of our customers. We -- they've been selling products online on a cash basis for a long time, but we haven't run into them. And we know that they have meetings and exploratory conversations with our customers. And we remain close to all of our customers, but we don't see any short-term potential disruption there.

**Question – Steven J. James Valiquette:** Okay, great. With that, I think we're out of time. So thanks, Jorge and Kevin. And we'll continue the discussion here in a breakout session down in [Poinciana 3]. Thank you.

**Answer – Jorge M. Gomez:** Very good. Thank you.

StreetEvents transcripts content provided by Thomson Reuters

THOMSON REUTERS

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

# EXHIBIT 97

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): May 3, 2018**

# Cardinal Health, Inc.

(Exact name of registrant as specified in its charter)

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place, Dublin, Ohio 43017**

(Address of principal executive offices) (Zip Code)

**(614) 757-5000**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instructions A.2. below):

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

## Item 2.02: Results of Operations and Financial Condition

On May 3, 2018 , Cardinal Health, Inc. (the "Company") issued a news release announcing its results for the quarter ended March 31, 2018 . A copy of the news release is included as Exhibit 99.1 to this report.

## Item 7.01: Regulation FD Disclosure

During a webcast scheduled to be held at 8:30 a.m. Eastern time on May 3, 2018 , the Company's Chief Executive Officer and Chief Financial Officer will discuss the Company's results for the quarter ended March 31, 2018 and outlook for the fiscal year ending June 30, 2018 . The slide presentation for the webcast will be available on the Investors page at ir.cardinalhealth.com . An audio replay of the webcast also will be available on the Investors page at ir.cardinalhealth.com .

## Item 9.01: Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Exhibit Description |
| --- | --- |
| 99.1 | News release issued by the Company on May 3, 2018 announcing third-quarter results. |

2

# Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Cardinal Health, Inc.**

(Registrant)

Date: May 3, 2018        By:    /s/ Jorge M. Gomez

                                        Jorge M. Gomez

                                        Chief Financial Officer

3

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

Media:  Ellen Barry                                    Investors: Lisa Capodici

(614) 553-3858                                    (614) 757-5035

ellen.barry@cardinalhealth.com                    lisa.capodici@cardinalhealth.com

# Cardinal Health Reports Third-quarter Results for Fiscal Year 2018

- **Revenue increased 6 percent to $33.6 billion.**
- **GAAP [1] operating earnings declined 10 percent to $546 million, and GAAP diluted earnings per share (EPS) decreased 33 percent to $0.81.**
- **Non-GAAP [1] operating earnings increased 3 percent to $781 million, and non-GAAP EPS decreased 9 percent to $1.39.**
- **Company updates fiscal year 2018 outlook.**

**DUBLIN, Ohio, May 3, 2018** - Cardinal Health (NYSE: CAH) today reported third-quarter fiscal year 2018 revenue of $33.6 billion, an increase of 6 percent. The company also reported a decline in GAAP operating earnings of 10 percent to $546 million and a decrease in GAAP diluted earnings per share (EPS) of 33 percent to $0.81. Non-GAAP operating earnings increased 3 percent to $781 million, while non-GAAP diluted EPS decreased 9 percent to $1.39.

"Our non-GAAP operating earnings came in largely as expected this quarter. However, our non-GAAP EPS was adversely affected by a significant negative change in our effective tax rate primarily associated with our Cordis business," said Mike Kaufmann, Chief Executive Officer of Cardinal Health. "Our team is moving aggressively to address our operational and supply chain issues at Cordis. Under the leadership of our new Medical Segment CEO, Jon Giacomin, we are implementing a series of initiatives to improve those operations and drive greater efficiencies. While these initiatives will take some time, we remain confident in the potential of this business and the value it provides to cardiovascular patients."

Mr. Kaufmann continued, "We have an exceptional portfolio of assets, a tremendously talented and dedicated organization, and a critical position in the delivery of global healthcare. We look forward to building on this incredibly strong foundation to drive future performance and increase value for our shareholders."

## Q3 FY18 summary

|  | | Q3 FY18 | | Q3 FY17 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | **33.6 billion** | $ | 31.8 billion | 6% |
| Operating earnings | $ | **546 million** | $ | 605 million | (10)% |
| Non-GAAP operating earnings | $ | **781 million** | $ | 759 million | 3% |
| Net earnings attributable to Cardinal Health, Inc. | $ | **255 million** | $ | 381 million | (33)% |
| Non-GAAP net earnings attributable to Cardinal Health, Inc. | $ | **437 million** | $ | 485 million | (10)% |
| Diluted EPS attributable to Cardinal Health, Inc. | $ | **0.81** | $ | 1.20 | (33)% |
| Non-GAAP diluted EPS attributable to Cardinal Health, Inc. | $ | **1.39** | $ | 1.53 | (9)% |

**Tax rate**

During the three months ended March 31, 2018 and 2017, GAAP effective tax rates were 45.1 percent and 32.3 percent, respectively, and non-GAAP effective tax rates were 37.5 percent and 32.3 percent, respectively.

This quarter's higher effective tax rates are attributable to unfavorable discrete items and a significant negative impact from the reduction in Cordis income. Both unfavorable items were partially offset by the lower U.S. federal income tax rate due to the U.S. Tax Cuts and Jobs Act.

Additionally, the effective tax rates in the third quarter of fiscal year 2017 were positively affected by discrete items.

**Cardinal Health**
**Page 2**

**Outlook**

The company does not provide GAAP EPS outlook because it is unable to reliably forecast most of the items that are excluded from GAAP EPS to calculate non-GAAP EPS. These items could cause EPS to differ materially from non-GAAP EPS. See "Use of Non-GAAP Measures" following the attached schedules for additional explanation.

The company revised its outlook for fiscal 2018 non-GAAP EPS to $4.85-$4.95 from $5.25-$5.50. This new guidance reflects the company's updated view on the performance of Cordis and its negative effect on the tax rate . The company will offer commentary for fiscal year 2019 during its earnings call today and expects to provide specific guidance when it reports year-end results in August.

## Segment results

### Pharmaceutical segment

Third-quarter revenue for the Pharmaceutical segment increased 5 percent to $29.7 billion due to sales growth from pharmaceutical and specialty distribution customers. This was partially offset by the previously announced expiration of a large, mail-order customer contract and the divestiture of the company's China distribution business.

Segment profit decreased by 3 percent to $596 million which reflects a modest, negative impact from the company's generic program performance.

|  | | Q3 FY18 | | Q3 FY17 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | 29.7 billion | $ | 28.4 billion | 5% |
| Segment profit | $ | 596 million | $ | 611 million | (3)% |

### Medical segment

Third-quarter revenue for the Medical segment increased 15 percent to $3.9 billion, which was driven primarily by the acquisition of the Patient Recovery business.

Segment profit increased 34 percent to $199 million, driven by contributions from acquisitions. This was partially offset by performance in Cordis and, to a lesser extent, other Cardinal Health Branded products.

|  | | Q3 FY18 | | Q3 FY17 | Y/Y |
|---|---|---|---|---|---|
| Revenue | $ | 3.9 billion | $ | 3.4 billion | 15% |
| Segment profit | $ | 199 million | $ | 148 million | 34% |

## Additional third-quarter and recent highlights

- The company announced that it has extended and expanded its relationship with Optum through a contract that now extends through the end of the company's fiscal year 2024.

- As part of its  Opioid Action Program , Cardinal Health donated more than 16,000 prepaid prescription medication disposal envelopes to the National Community Pharmacists Association Foundation for distribution to NCPA member pharmacies free of charge.

- The company began donations of more than 80,000 doses of Narcan®, (naloxone HCI) Nasal Spray 4mg, to community organizations who will distribute the life-saving overdose-reversal medication to first responders and law enforcement across Ohio, Kentucky, Tennessee and West Virginia.

- Cardinal Health was recognized as being among the nation's best workplaces for female advancement as a  Top Company for Executive Women  by the National Association for Female Executives.

## Webcast

Cardinal Health will host a webcast today at 8:30 a.m. Eastern to discuss third-quarter results. To access the webcast and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com . No access code is required.

Presentation slides and a webcast replay will be available on the Cardinal Health website at ir.cardinalhealth.com until May 2, 2019.

**Cardinal Health**
**Page 3**

## About Cardinal Health

Cardinal Health, Inc. is a global, integrated healthcare services and products company, providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically proven medical products, pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. Cardinal Health connects patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. To help combat prescription drug abuse, the company and its education partners created Generation Rx, a national drug education and awareness program. Backed by nearly 100 years of experience, with approximately 50,000 employees in nearly 60 countries, Cardinal Health ranks #15 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter, @cardinalhealthwings on Facebook and connect on LinkedIn at linkedin.com/ company/cardinal-health .

[1]  GAAP refers to U.S. generally accepted accounting principles. This news release includes GAAP financial measures as well as non-GAAP financial measures, which are financial measures not calculated in accordance with GAAP. See "Use of Non-GAAP Measures" following the attached schedules for definitions of the non-GAAP financial measures presented in this news release, and see the attached schedules for reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the Investor Relations page at ir.cardinalhealth.com . In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

## Cautions Concerning Forward-Looking Statements

This news release contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with our ability to improve the performance of our Cordis business; risks associated with the acquisition of the Patient Recovery Business, including the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the pricing or other terms of, or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to the recently enacted Tax Cuts and Jobs Act; changes in the distribution patterns or reimbursement rates for health care products and services; risks associated with the distribution of opioids, including ongoing investigations and lawsuits by certain governmental and regulatory authorities, the potential financial impact of enacted and proposed taxes or other assessments on the sale of opioids, and potential reputational or operational harm; and changes in foreign currency rates and the cost of commodities such as oil based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This news release reflects management's views as of May 3, 2018. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**Schedule 1**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | Third Quarter | | | Year-to-Date | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2018 | 2017 | % Change | 2018 | 2017 | % Change |
| Revenue | $ 33,633 | $ 31,821 | 6 % | $ 101,460 | $ 97,010 | 5 % |
| Cost of products sold | 31,720 | 30,093 | 5 % | 96,014 | 92,089 | 4 % |
| Gross margin | 1,913 | 1,728 | 11 % | 5,446 | 4,921 | 11 % |
| | | | | | | |
| **Operating expenses:** | | | | | | |
| Distribution, selling, general and administrative expenses | 1,132 | 960 | 18 % | 3,325 | 2,792 | 19 % |
| Restructuring and employee severance | 2 | 15 | N.M. | 155 | 31 | N.M. |
| Amortization and other acquisition-related costs | 175 | 128 | N.M. | 543 | 365 | N.M. |
| Impairments and (gain)/loss on disposal of assets, net | (6) | 2 | N.M. | 62 | 15 | N.M. |
| Litigation (recoveries)/charges, net | 64 | 18 | N.M. | 155 | 37 | N.M. |
| Operating earnings | 546 | 605 | (10)% | 1,206 | 1,681 | (28)% |
| | | | | | | |
| Other (income)/expense, net | (2) | (5) | N.M. | (6) | (2) | N.M. |
| Interest expense, net | 84 | 46 | 83 % | 251 | 134 | 87 % |
| Loss on extinguishment of debt | — | — | N.M. | 2 | — | N.M. |
| Earnings before income taxes | 464 | 564 | (18)% | 959 | 1,549 | (38)% |
| | | | | | | |
| Provision for/(benefit from) income taxes | 209 | 182 | 15 % | (466) | 533 | N.M. |
| Net earnings | 255 | 382 | (33)% | 1,425 | 1,016 | 40 % |
| | | | | | | |
| Less: Net earnings attributable to noncontrolling interests | — | (1) | N.M. | (3) | (2) | N.M. |
| Net earnings attributable to Cardinal Health, Inc. | $ 255 | $ 381 | (33)% | $ 1,422 | $ 1,014 | 40 % |
| | | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | | |
| Basic | $ 0.81 | $ 1.21 | (33)% | $ 4.52 | $ 3.19 | 42 % |
| Diluted | 0.81 | 1.20 | (33)% | 4.50 | 3.17 | 42 % |
| | | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | | |
| Basic | 313 | 316 | | 314 | 318 | |
| Diluted | 315 | 318 | | 316 | 320 | |

**Schedule 2**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets (Unaudited)**

| (in millions) | | March 31, 2018 | | June 30, 2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 2,175 | $ | 6,879 |
| Trade receivables, net | | 7,671 | | 8,048 |
| Inventories, net | | 11,962 | | 11,301 |
| Prepaid expenses and other | | 1,705 | | 2,117 |
| Total current assets | | 23,513 | | 28,345 |
| | | | | |
| Property and equipment, net | | 2,521 | | 1,879 |
| Goodwill and other intangibles, net | | 14,299 | | 9,207 |
| Other assets | | 698 | | 681 |
| **Total assets** | $ | 41,031 | $ | 40,112 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 18,741 | $ | 17,906 |
| Current portion of long-term obligations and other short-term borrowings | | 551 | | 1,327 |
| Other accrued liabilities | | 2,135 | | 1,988 |
| Total current liabilities | | 21,427 | | 21,221 |
| | | | | |
| Long-term obligations, less current portion | | 9,027 | | 9,068 |
| Deferred income taxes and other liabilities | | 3,027 | | 2,877 |
| | | | | |
| Redeemable noncontrolling interests | | 12 | | 118 |
| | | | | |
| Total Cardinal Health, Inc. shareholders' equity | | 7,537 | | 6,808 |
| Noncontrolling interests | | 1 | | 20 |
| Total shareholders' equity | | 7,538 | | 6,828 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 41,031 | $ | 40,112 |

**Schedule 3**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (Unaudited )**

| (in millions) | Third Quarter 2018 | Third Quarter 2017 | Year-to-Date 2018 | Year-to-Date 2017 |
|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | |
| Net earnings | $ 255 | $ 382 | $ 1,425 | $ 1,016 |
| | | | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 259 | 186 | 779 | 525 |
| Loss on extinguishment of debt | — | — | 2 | — |
| Impairments and loss on sale of other investments | — | 1 | 6 | 4 |
| Impairments and loss on disposal of assets, net | (6) | 3 | 62 | 15 |
| Share-based compensation | 24 | 26 | 64 | 73 |
| Provision for bad debts | 27 | 17 | 76 | 46 |
| Change in fair value of contingent consideration obligation | (2) | — | (2) | — |
| Change in operating assets and liabilities, net of effects from acquisitions and divestitures: | | | | |
| Decrease/(increase) in trade receivables | (15) | 39 | (632) | (107) |
| Increase/(decrease) in inventories | 130 | 284 | (865) | (1,010) |
| Increase/(decrease) in accounts payable | (472) | (1,338) | 1,635 | 225 |
| Other accrued liabilities and operating items, net | 554 | 202 | (336) | (327) |
| Net cash provided by operating activities | 754 | (198) | 2,214 | 460 |
| | | | | |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | (1) | (102) | (6,142) | (113) |
| Additions to property and equipment | (78) | (80) | (246) | (293) |
| Purchase of available-for-sale securities and other investments | (1) | (63) | (7) | (188) |
| Proceeds from sale of available-for-sale securities and other investments | — | 43 | 65 | 115 |
| Proceeds from maturities of available-for-sale securities | — | 10 | — | 49 |
| Proceeds from divestitures, net of cash sold, and disposal of property and equipment | 861 | — | 862 | 1 |
| Net cash provided by/(used in) investing activities | 781 | (192) | (5,468) | (429) |
| | | | | |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | (5) | (3) | (22) | (3) |
| Net change in short-term borrowings | (205) | (8) | (50) | 25 |
| Purchase of noncontrolling interests | — | — | (106) | (12) |
| Proceeds from long-term obligations, net of issuance costs | — | — | 3 | — |
| Reduction of long-term obligations | — | — | (403) | (60) |
| Proceeds from interest rate swap terminations | — | — | — | 14 |
| Net tax proceeds/(withholdings) from share-based compensation | 13 | 20 | (3) | 20 |
| Excess tax benefits from share-based compensation | — | 5 | — | 37 |
| Dividends on common shares | (140) | (142) | (436) | (435) |
| Purchase of treasury shares | (300) | — | (450) | (600) |
| Net cash used in financing activities | (637) | (128) | (1,467) | (1,014) |
| | | | | |
| Effect of exchange rates changes on cash and equivalents | 10 | 5 | 17 | (5) |
| Change in cash held for sale | 18 | — | — | — |
| | | | | |
| Net increase/(decrease) in cash and equivalents | 926 | (513) | (4,704) | (988) |
| Cash and equivalents at beginning of period | 1,249 | 1,881 | 6,879 | 2,356 |
| **Cash and equivalents at end of period** | $ 2,175 | $ 1,368 | $ 2,175 | $ 1,368 |

**Schedule 4**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Information**

**Third Quarter**

| (in millions) | | 2018 | | 2017 |
|---|---|---|---|---|
| **Pharmaceutical** | | | | |
| | | | | |
| **Revenue** | | | | |
| Amount | $ | **29,720** | $ | 28,406 |
| Growth rate | | **5 %** | | 3 % |
| | | | | |
| **Segment profit** | | | | |
| Amount | $ | **596** | $ | 611 |
| Growth rate | | **(3)%** | | (7)% |
| Segment profit margin | | **2.00 %** | | 2.15 % |

| (in millions) | | 2018 | | 2017 |
|---|---|---|---|---|
| **Medical** | | | | |
| | | | | |
| **Revenue** | | | | |
| Amount | $ | **3,916** | $ | 3,418 |
| Growth rate | | **15%** | | 9% |
| | | | | |
| **Segment profit** | | | | |
| Amount | $ | **199** | $ | 148 |
| Growth rate | | **34%** | | 16% |
| Segment profit margin | | **5.09%** | | 4.34% |

**Year-to-Date**

| (in millions) | | 2018 | | 2017 |
|---|---|---|---|---|
| **Pharmaceutical** | | | | |
| | | | | |
| **Revenue** | | | | |
| Amount | $ | **89,786** | $ | 86,911 |
| Growth rate | | **3 %** | | 7 % |
| | | | | |
| **Segment profit** | | | | |
| Amount | $ | **1,576** | $ | 1,682 |
| Growth rate | | **(6)%** | | (14)% |
| Segment profit margin | | **1.76 %** | | 1.94 % |

| (in millions) | | 2018 | | 2017 |
|---|---|---|---|---|
| **Medical** | | | | |
| | | | | |
| **Revenue** | | | | |
| Amount | $ | **11,684** | $ | 10,107 |
| Growth rate | | **16%** | | 10% |
| | | | | |
| **Segment profit** | | | | |
| Amount | $ | **548** | $ | 435 |
| Growth rate [1] | | 26% | | 30% |
| Segment profit margin | | **4.69%** | | 4.30% |

[1] Segment profit includes a $64 million impact from the roll-out of the inventory fair value step up related to the Patient Recovery acquisition for the nine months ended March 31, 2018. Excluding the impact of the inventory fair value step up, Medical segment profit would have increased 41% for the nine months ended March 31, 2018.

**Schedule 5**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation [1]**

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Income Taxes | Net Earnings [2] | Net Earnings [2] Growth Rate | Effective Tax Rate | Diluted EPS [2] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| **Third Quarter 2018** | | | | | | | | | |
| **GAAP** | $ 546 | (10)% | $ 464 | $ 209 | $ 255 | (33)% | 45.1% | $ 0.81 | (33)% |
| Restructuring and employee severance | 2 | | 2 | (17) | 19 | | | 0.06 | |
| Amortization and other acquisition-related costs | 175 | | 175 | 44 | 131 | | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets, net | (6) | | (6) | (14) | 8 | | | 0.02 | |
| Litigation (recoveries)/charges, net | 64 | | 64 | 21 | 43 | | | 0.14 | |
| Transitional tax benefit, net [3] | — | | — | 17 | (17) | | | (0.06) | |
| **Non-GAAP** | $ 781 | 3 % | $ 700 | $ 262 | $ 437 | (10)% | 37.5% | $ 1.39 [4] | (9)% |
| **Third Quarter 2017** | | | | | | | | | |
| GAAP | $ 605 | (8)% | $ 564 | $ 182 | $ 381 | (1)% | 32.3% | $ 1.20 | 3 % |
| LIFO charges/(credits) | (9) | | (9) | (4) | (5) | | | (0.02) | |
| Restructuring and employee severance | 15 | | 15 | 6 | 9 | | | 0.03 | |
| Amortization and other acquisition-related costs | 128 | | 128 | 41 | 87 | | | 0.27 | |
| Impairments and (gain)/loss on disposal of assets, net | 2 | | 2 | — | 2 | | | 0.01 | |
| Litigation (recoveries)/charges, net | 18 | | 18 | 7 | 11 | | | 0.03 | |
| Non-GAAP | $ 759 | (4)% | $ 718 | $ 232 | $ 485 | 3 % | 32.3% | $ 1.53 | 7 % |
| **Year-to-Date 2018** | | | | | | | | | |
| **GAAP** | $ 1,206 | (28)% | $ 959 | $ (466) | $ 1,422 | 40 % | (48.6)% | $ 4.50 | 42 % |
| Restructuring and employee severance | 155 | | 155 | 29 | 126 | | | 0.40 | |
| Amortization and other acquisition-related costs | 543 | | 543 | 143 | 400 | | | 1.27 | |
| Impairments and (gain)/loss on disposal of assets, net | 62 | | 62 | (57) | 119 | | | 0.38 | |
| Litigation (recoveries)/charges, net | 155 | | 155 | 51 | 104 | | | 0.33 | |
| Loss on extinguishment of debt | — | | 2 | 1 | 1 | | | — | |
| Transitional tax benefit, net [3] | — | | — | 911 | (911) | | | (2.88) | |
| **Non-GAAP** | $ 2,121 | — % | $ 1,875 | $ 612 | $ 1,261 | (4)% | 32.6 % | $ 3.99 [4] | (3)% |
| **Year-to-Date 2017** | | | | | | | | | |
| GAAP | $ 1,681 | (9)% | $ 1,549 | $ 533 | $ 1,014 | (7)% | 34.4 % | $ 3.17 | (4)% |
| LIFO charges/(credits) | — | | — | — | — | | | — | |
| Restructuring and employee severance | 31 | | 31 | 12 | 19 | | | 0.06 | |
| Amortization and other acquisition-related costs | 365 | | 365 | 120 | 245 | | | 0.76 | |
| Impairments and (gain)/loss on disposal of assets, net | 15 | | 15 | 4 | 11 | | | 0.03 | |
| Litigation (recoveries)/charges, net | 37 | | 37 | 14 | 23 | | | 0.07 | |
| Non-GAAP | $ 2,129 | (5)% | $ 1,997 | $ 684 | $ 1,311 | (4)% | 34.2 % | $ 4.10 | — % |

[1] For more information on these measures, refer to the Use of Non-GAAP Measures and Definitions schedules.

[2] attributable to Cardinal Health, Inc.

[3] Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries.  We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.

[4] Non-GAAP EPS for the three and nine months ended March 31, 2018 includes a $0.13 and $0.33 benefit from applying a lower federal tax rate to our year-to-date U.S. pre-tax non-GAAP earnings. Excluding this benefit, non-GAAP EPS would have been $1.26 and $3.66 for the three and nine months ended March 31, 2018, respectively.

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This earnings release contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP").

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

**Exclusions from Non-GAAP Financial Measures**

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this earnings release for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics facilitates comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion facilitates comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and are inherently unpredictable in timing and amount, and in the case of impairments, are non-cash amounts, so their exclusion facilitates comparison of historical, current and forecasted financial results.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

- Transitional tax benefit, net related to the Tax Cuts and Jobs Act is excluded because it results from the one-time impact during the one-year measurement period of a very significant change in the U.S. federal corporate tax rate and, due to the significant size of the benefit, obscures analysis of trends and financial performance. The transitional tax benefit includes the initial estimate and measurement period adjustments for the re-measurement of deferred tax assets and liabilities due to the reduction of the U.S. federal corporate income tax rate and the repatriation tax on undistributed foreign earnings, both of which are subject to adjustment during an up to 12 month measurement period.

The tax effect for each of the items listed above, other than the transitional tax benefit item, is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Forward Looking Non-GAAP Measures**

In this earnings release, the Company presents its outlook for fiscal 2018 non-GAAP EPS.  The Company does not provide EPS outlook, which is the most directly comparable GAAP measure to non-GAAP EPS, because changes in the items that the Company excludes from EPS to calculate non-GAAP EPS, described above, can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on an EPS outlook.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2018 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013. For the nine months ending March 31, 2018, the excluded items have increased the Company's EPS by $0.51, which includes a $2.88 net transitional tax benefit related to the Tax Cuts and Jobs Act.

**Definitions**

**Growth rate calculation:** growth rates in this earnings release are determined by dividing the difference between current-period results and prior-period results by prior-period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP effective tax rate** : (provision for income taxes adjusted for (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, and (7) transitional tax benefit, net) divided by (earnings before income taxes adjusted for the first six items).

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, each net of tax, and (7) transitional tax benefit, net.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# EXHIBIT 98



# Q3 FY18 Cardinal Health, Inc. Earnings Conference Call

**May 3, 2018 8:30AM Eastern**

Operator:  Good day and welcome to the Cardinal Health Third Quarter Fiscal Year 2018 Earnings conference call. Today's conference is being recorded. At this time, I'd like to turn it over to Ms. Lisa Capodici. Please go ahead madam.

Lisa Capodici:  Thank you Irena. Good morning and welcome to Cardinal Health's Third Quarter Fiscal 2018 Earnings call. I am joined today by our CEO, Mike Kaufmann and Chief Financial Officer, Jorge Gomez. During the call, we will be making forward-looking statements. The matters addressed in the statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected or implied. Please refer to our SEC filings and the forward-looking statement slide at the beginning of our presentation for a description of risks and uncertainties.

Today's press release and presentation are posted on the IR section on our website at ir.cardinalhealth.com. During the discussion today, we will reference non-GAAP financial measures. Information about these measures and reconciliation to GAAP are included at the end of the slide presentation and press release. During the Q&A portion of today's call please limit your questions to one so that we may give everyone in the queue a chance to ask a question. As always, the IR team will be available after this call so feel free to reach out to us with any additional questions.

Mike will provide an overview of our third quarter performance and discuss some strategic actions we have underway as we plan for fiscal 2019 and beyond. Then, Jorge will provide some additional financial detail and color. And with that I'd like to turn the call over to Mike.



Mike Kaufmann: Thanks Lisa and good morning everyone. I'm glad you could join us. Let me start by saying we recognize that today's results did not meet your expectations or ours. The biggest variable driving these results was some unanticipated disappointing performance from our Cordis business which masked an otherwise better than expected quarter. The quarter's performance not only reduced our non-GAAP operating earnings but more significantly, it created a higher non-GAAP effective tax rate. But for the Cordis tax issues alone, non-GAAP EPS would have been $1.52.

We will walk you through the details. As you'll see on an operating earnings basis, overall results came in largely as expected. In fact, the majority of the business, with Cordis being the notable exception, performed in-line with or above plan highlighted by better than expected results in the pharma segment. Let me start with some overall results then move to segment details. Then I'll give you a broader perspective on our priorities and our plans to optimize our performance going forward and positively impact the trajectory of our business.

Revenue for the third quarter reached $33.6 billion -- up 6% from last year and non-GAAP operating earnings grew 3%. Non-GAAP EPS decreased by 9% to $1.39 for the quarter versus last years $1.53. While Jorge will go into more details, a higher than expected non-GAAP effective tax rate resulted in a 19 cent negative impact to non-GAAP EPS, 13 cents of this was related to the current and forecasted results of Cordis.

Operating cash flow was strong. It exceeded $750 million for the quarter. In addition, we received approximately $850 million in net proceeds from the February 1 divestiture of our China distribution business. In the pharma segment, revenue for the quarter increased nearly 5% to $29.7 billion driven primarily by growth in business with existing customers offset in part by the previously announced loss of our contract with Prime Therapeutics. Segment profit for the quarter was down but less than anticipated, so we were pleased with this performance. Contributing to the results, we saw strong performance from Red Oak, however, it was not enough to offset generic deflation. A strong flu season contributed some upside and brand inflation has tracked generally in-line with our expectations.

Of note this quarter was the renewal of our contract with Optum. We are very pleased that we extended and expanded this important relationship. And our contract now extends through the end of our fiscal year 2024. Optum has been a customer of ours since August 2015 when we signed our first multiyear agreement. We look forward to deepening our relationship with them and pursuing new ways to partner and collaborate. Beyond

**CardinalHealth**
*Essential to care™*

Optum, we are excited to have signed some additional new business and completed key renewals with a number of smaller existing customers.

Before I turn to specialty, I want to mention the efforts by the entire industry to combat the abuse of prescription opioid pain medication. As you know we launched our Opioid Action Program last fall. And this quarter, we began distributing Narcan free of charge to more than 40 organizations who are providing the product of first responders and law enforcement. Just last weekend, more than 150 Cardinal Health employees volunteered with our friends at Kroger to staff 105 takeback events in 26 states. And we are continuing to provide grants and support for education and advocacy to prevent misuse and abuse. All of us at Cardinal Health are committed to being at the table. We are continuing to focus significant time and effort to help alleviate this public health crisis that has touched many of us in our communities. On the specialty side, this business continues to exceed our expectations. It delivered double-digit top and bottom line gains reflecting growth with both new and existing customers. Nuclear while not a large contributor also performed well, so overall pharma performance was better than expected.

Turning now to the medical segment, for the quarter the medical segment posted revenue growth of 15% while segment profit increased 34% versus the prior year. Growth was driven by the Patient Recovery acquisition partially offset by the continued challenges at Cordis. We are very pleased that the Patient Recovery business continues on track and we are making good progress on the integration. We are executing on our plan and hitting important milestones as we prepare to transition this business off of the TSAs. Our team is laser focused. And we understand the importance of getting this right. There is a lot of hard work being put in by our integration team and we appreciate their diligence. At Cordis, while we are making progress there is still much work to be done for this business to meet our expectations. We are pleased that year-to-date performance has shown growth on the top line and we are seeing progress in international markets including China where sales are up double digits.

In addition, our introduction of a drug-eluting stent to the offering is going well and the pipeline looks promising. However, as we've noted in previous quarters operating cost and inventory reserves continue to be challenges - both came in even higher than expected this quarter and continue to weigh on profitability. We are moving aggressively to stabilize this business. Jon Giacomin has taken on this challenge in his new capacity of the Medical Segment CEO and he and Pat Holt, Cordis' new leader, have spent the last few months digging into the

business. Together with the Cordis team they are executing on a series of initiatives to improve performance and drive profitability. However, this will take time.

We must not lose sales momentum and we need several tools in place to enable significant progress. For example, the recent launch of our new global supply chain platform will be critical in providing the team with better inventory visibility. It will also provide better insights into demand so we can more effectively and profitably manage this business. In addition to the launch of our supply chain platform, work is underway to help us do four things.

First, we are implementing new process and technology improvements that will better manage our Cordis-consigned inventory. Next, we will refocus the product portfolio to enhance efficiency and profitability. Additionally, we continue to look at ways to reduce the cost structure. And finally, we will enhance our capabilities around demand planning to better ensure we have the right inventory in the right markets to capitalize on sales opportunities and reduce inventory reserves. We expect that Cordis will be on a path to profitable growth by the end of FY19 and remain confident that the business can be a significant tribute – a significant contributor over the longer term.

On a positive note, while the year over year contributions to segment profit growth was relatively smaller, we continue to see strong demand and execution at our At Home, naviHealth and Medical Services businesses. So overall while we continue to work through a couple of challenges, the medical segment had success in many areas and we are confident in it's potential to continue to deliver a differentiated value proposition to customers and contribute as a long term driver of high-margin growth.

Turning now to our outlook, as you've seen from our press release we are forecasting a more modest fourth quarter and Jorge will walk you through the specifics of how we are thinking about the quarter and full year. As we look ahead, we are now anticipating FY19 will be more challenging than previously expected. Well we will still have the tailwinds of Patient Recovery and Red Oak and subsequent U.S. tax reform, we now see significant headwinds including Cordis performance, customer repricings, the loss of PharMerica and continued generic deflation.

CardinalHealth
*Essential to care™*

Taking into account both the headwinds and the tailwinds, the company should see some modest growth in non-GAAP EPS in FY19 based on the updated FY18 guidance of $4.85 to $4.95. On our August earnings call, we will provide specific FY19 guidance and more detail as we usually do at year end.

Within this context, as we think about the future - FY19 but also longer term - our team is taking a hard and fresh look across the business to determine what the right steps are to drive long term growth for the benefit of our shareholders and other stakeholders. Over the past four months since Jorge and I took on our new roles, our management team has been carefully assessing both where we are and the potential opportunities that we have to best position Cardinal Health in what we know is a rapidly evolving industry landscape.

We know we have terrific opportunities to continue to capitalize on the strengths of our model, the complexity of the supply chain and the stickiness of our customer relationships. While we are in the earliest stages of our work, what I can say is that we are taking a comprehensive and objective look across the business with a view towards better leveraging our unique and broad portfolio of assets to drive profitable future growth.

Among our priorities, we are focused on three key things. Number one, our business mix. We know that we need to have the right composition and balance in our portfolio to fully capitalize on industry tailwinds and opportunities for growth. In addition, we are actively looking at select portions of our business that are poised for outsized growth and focused on scaling our performance in them. We are carefully considering the right investments to achieve both of these objectives.

Number two, our cost structure. Execution is essential to sustainable performance. We are taking a fundamental and in-depth look at the best opportunities to drive efficiency and lower our manufacturing and SG&A cost to improve our ability to compete. Finally, number three, our capital deployment strategy. We are examining how to best utilize our strong financial profile and capital to drive value for our shareholders and other constituents. We are carefully considering how we balance our various short and long term needs.

The entire team is highly energized to advance and implement the right strategy for the future of Cardinal Health. We have an exceptional portfolio of assets, a tremendously talented and dedicated organization and a critical position in the delivery of global healthcare. We look forward to building on this incredibly strong foundation to drive future performance and increase value for our shareholders. We look forward to updating you on our plans

as we update them and develop them further. With that, let me turn it over to Jorge to discuss more detail on the financials.

Jorge Gomez:  Thank you Mike. Good morning. As Mike said, we are focused on execution. And we are actively working through our near-term challenges to deliver the results that we all expect. We will achieve this objective by enhancing efficiencies, reducing complexity and cost in a systematic way and ultimately generating sustained growth and delivering value. Today, I will cover three key topics. First, I will review our results for the quarter and give some additional detail by segment. Second, I'll share some thoughts on our outlook for the total year. Finally, I will provide some thoughts on our next steps to build a path for growth.

The financial results that I provide this morning will be on a non-GAAP basis unless I specifically call them out as GAAP. Slide 7 of the presentation includes our GAAP to non-GAAP adjustments for the third quarter. Operating earnings was in-line with our expectations this quarter but fell short at the EPS line driven by a substantially higher tax rate. Beginning with total company results diluted EPS for Q3 was $1.39 -- a 9% decrease versus the prior year. This decline was driven by a substantially higher tax rate which I will explain shortly. Revenue increased 6% versus last year totaling $33.6 billion. Total company gross margin dollars were up 11% to $1.9 billion versus the same quarter in the prior year.

Consolidated SG&A increased 18% versus last year in-line with our expectations. This increase was primarily driven by recent acquisitions including Patient Recovery. Consolidated operating earnings was $781 million which represents 3% growth versus the prior year. Moving below the operating line, net interest and other expense was about $81 million in the quarter. The increase versus the prior year was primarily driven by the interest on the debt issued to finance the Patient Recovery acquisition.

Our Q3 effective tax rate was 37.5%, a five-percentage point increase versus the prior year and about seven percentage points more than what we expected for the quarter. Two primary factors account for this unfavorable variance. First, in the third quarter of fiscal 17, we had several favorable discrete tax items which drove last year's Q3 effective tax rate to an unusually low 32%. Second, in Q3 this year, Cordis performance drove an unexpected reduction to pre-tax income in certain geographies.



This required a year-to-date true up of approximately 13 cents per share relative to our Q2 expectations. Additionally, we booked provision-to-return adjustments of 6 cents that contributed to a higher than anticipated increase in the Q3 effective tax rate. These unfavorable tax adjustments reduced the benefits from U.S. tax reform this year and we now expect our fiscal 18 effective tax rate to be between 32% and 34%.

Third quarter diluted average shares outstanding were approximately 350 million about 2.7 million fewer shares than the third quarter of fiscal 17. During the quarter, we completed share repurchases for a total of $300 million bringing our total fiscal year-to-date repurchases to $450 million. We have about $1 billion remaining under our board approved share repurchase plan. Operating cash flow was very strong for the quarter. It came in ahead of our expectations at $754 million. During the first nine months of the fiscal year, we generated approximately $2.2 billion in operating cash flow. Our cash balance as of March 31, was $2.2 billion with about $600 million held outside the U.S.

I'll now transition to segment performance which you can find starting on slide 5. The pharmaceutical segment delivered strong revenue growth of nearly 5% in Q3. Revenues were $29.7 billion in the quarter. Sales growth was driven by both pharmaceutical and specialty distribution customers, and was partially offset by the previously announced expiration of the Prime Therapeutics contract and the divestiture of the China distribution business.

Segment profit for the quarter decreased 2.5% to $596 million. This reflects the most negative impact from our generics program performance even taking into account the strong flu season. This favorability from the flu season will not continue into Q4. Segment profit for Q3 also reflects a positive contribution from the Specialty Solutions business. As a reminder, the early completion of the China distribution business divestiture on February 1 is reflected in Q3 results and will more significantly impact Q4.

Now, I'll turn to the results of the medical segment on slide 6. Revenue for this segment grew 15% in the quarter to $3.9 billion primarily driven by the Patient Recovery acquisition. Medical segment profit increased 34% to $199 million during Q3. This increase was driven by contributions from Patient Recovery and was offset by lower than then anticipated performance primarily in Cordis, and to a lesser extent, other Cardinal Health Branded products.

Patient Recovery continues to perform in line with our expectations. As Mike said, our teams are making good progress in preparation for the TSA exits that begin this summer. Other areas of the medical segment performed

well in the quarter. We saw a nice growth in Cardinal Health at Home, Lab and services. Also, our strategic accounts were up for the quarter.

As we discussed on our last call, we continue to face challenges in the medical segment mostly with Cordis. We are working through the headwinds in the Cordis business. We've seen revenue growth year-to-date, primarily driven by our business outside the U.S. particularly in China where we saw double-digit revenue growth. On the operations front, we're actively working to position Cordis on a path toward growth. We have implemented several supply chain work streams to enhance our global demand planning capabilities and consignment processes.

As part of this initiative, we implemented new ERP functionality which allowed us in Q3 to identify inventory positions in certain geographies that require higher inventory reserves. This new functionality gives us greater market visibility and will help us continue to use complexity in our global supply chain. The weaker than expected Cordis performance and higher inventory reserves, are major contributors to a higher than anticipated tax rate for the current quarter and full year. Though we are actively deploying operational improvement efforts, it will take time to yield the results we expect.

Now, I will transition to GAAP to non-GAAP adjustments for the quarter which you can find on slide 7. The 58-cent variance to non-GAAP diluted EPS was primarily driven by amortization and our acquisition-related costs. Next, I'd like to discuss our guidance for this year found on slide 9. Based on Q3 results and expectations for the fourth quarter, we have revised our full year guidance to a range of $4.85 to $4.95 from a previous range of $5.25 to $5.50. This revision is primarily driven by Cordis operating performance and its corresponding impact to the tax rate that I mentioned earlier.

For our full year corporate assumptions found on slide 10, you will see that we have several changes. First, based on my earlier commentary on the tax rate we now expect the full year tax rate to be between 32% and 34%. We are reviewing options to address the Cordis-related tax rate increase that we are seeing in the second half and mitigate this negative impact in the future. We have revised our diluted shares outstanding to a range of 315 to 316 million shares. We expect our interest and our expense to be between $330 and $350 million. We also expect our capital expenditures to be between $400 and $430 million. Lastly, we are updating our acquisition related intangible amortization to $575 million.

Our pharma segment assumptions are on slide 11, where we have three changes. We now expect our full year segment profit to be down to a range of high-single to low-double digits. This is an improvement from our previous assumption of down low-double digits. Also, we now expect to see mid-to-high single digit deflation in generic drug prices and better than expected incremental contribution from Red Oak Sourcing. While generic deflation is slightly higher than our original expectations, we've seen moderation in deflation versus last year and sequentially. Keep in mind our generic deflation assumption is a point-to-point calculation from June to June.

Our medical segment assumptions are on slide 12 where we have two updates. First, we now expect medical segment profit to be down high teens for the year, excluding Patient Recovery. This reduction reflects business dynamics that I discussed earlier, specifically related to the challenges we continue to address in the Cordis business, and to a lesser extent, in other Cardinal Health Branded products including exam gloves. Second, we will not achieve the 6% margin rate in the second half of fiscal 18, again primarily due to Cordis performance. Now, let me share a few additional thoughts that I think can be useful to help you understand the remainder of the year.

As you know, we had about 8 cents in our second half for customer initiatives. As Mike mentioned, we extended and expanded our relationship with Optum which represents about half of our planned customer initiatives for fiscal 18. In addition, we discussed on our Q2 call that the China distribution business divestiture will be a loss of 5 cents for the full year, mostly in pharma. Also, we anticipate that the operational challenges with Cordis will continue through Q4 and fiscal 19.

In closing, we're focused on creating a path toward growth in fiscal 19 and we are committed to developing and implementing a strategy that will position Cardinal Health for long-term success. To that end, as Mike mentioned earlier, we are proceeding with a detailed operational review, which will include growth and efficiency initiatives as well as portfolio optimization and capital allocation. We will share more about this in August. With that I'd like to open the line and invite your questions.

Lisa Capodici:  Operator?

**Operator:** Thank you. If you'd like to ask a question, at this time, please signal by pressing star 1 on your telephone keypad. Again, please press star 1 to ask a question and please limit your questions to one and one follow-up. We'll take our first question from Ross Muken in Evercore. Please go ahead.

**Ross Muken:** Hi. Good morning guys, obviously, a lot on the update. Can you just help us, you know, in terms of interpreting kind of what we should learn from 4Q in that 4Q guide about 2019? I know you probably don't want to go too much detail on '19 but, you know, Mike you sort of laid out some of the headwinds or incremental headwinds the business is facing, but obviously, some of those are occurring in the quarter and then some things may not continue in the future and obviously a huge swing factor is the tax rate. So, can you just help us understand sort of in that 4Q run rate kind of as we lift off relative to what you've talked about at least qualitatively kind of what's already captured, what's not captured, what are the other things we should be considering and then anything you can give us on the tax rate would be helpful.

**Mike Kaufmann:** Hey thanks for the question Ross, a lot of pieces there. And as you said at the beginning we're going to really be limited here because we really want to take some time and continue our analysis and update folks at the time of our year-end, you know, guidance and at that time. So right now, all I can say is, as you kind of talked about them as you can imagine we see some tailwinds from things like tax reform in Red Oak but the – some of the other items that you mentioned around repricings and other pieces are going to be some headwinds for us. So right now the, what we can provide you is and we just again want to be helpful at this time is that we would expect to see modest growth off of the $4.85 to $4.95 guidance that we gave you. And we plan to come back with a lot more detail and thoughts around that in August.

**Ross Muken:** And maybe just Mike just I realize just maybe on the tax rate because that is so sensitive, can you help us understand a bit better kind of what's, what are the key drivers we have to look for that's causing that to be above what one would expect an effective rate to be in kind of the new tax reform environment and then what the path is

back to a more normalized rate longer-term because I'm assuming a north of 30 rate is probably not where the business ends up, you know, on a very long-term basis?

Jorge Gomez:  Ross, this is Jorge. I'll take that question. You know, with respect to the issue that we're facing, you know, in simple terms the downturn in the quarter's performance results created certain losses in certain jurisdictions where we cannot take the benefit of those operating losses from a tax perspective. Obviously, we are reviewing multiple options available to address the, to your question the going forward impact and we expect to be in a position to take action within the next few months. I think overall the impact from U.S. tax reform will continue to benefit us and we expect to see a decline or a tax break going forward. The exact impact from the dynamic that we have going on right now is something that we will be, we are evaluating and we address, we are finding options to address that long-term.

Mike Kaufmann:  And if you remember last time on the call we also mentioned that with U.S. tax reform, the positives of it because we're June 30 year-end we had the six months' worth of that. But as we mentioned before we wouldn't be able to see those benefits double in our FY19 because some of the other components of the Tax Reform Act that have a negative impact on us don't actually kick in until our FY19 and that we said we would still be evaluating those and we're still at that point because there's still some clarity being given on those items and so we're still working through those. Again, we said that U.S. tax reform would still be a net positive for us in '19 but because some of those negative items don't kick in until July 1 we're still evaluating those too.

Lisa Capodici:  Operator next question.

Operator:  Next question is from Glen Santangelo with Deutsche Bank.



Glen Santangelo: Yes thanks and good morning. Mike I just wanted to follow-up on some of the comments that you made with respect to the new management and sort of working with the board to take a comprehensive look across the businesses of, and I know you probably don't want to go into too much detail there but I'm trying to get a better sense, are you assessing whether you think that you need to add more pieces to try to make what you have work a little bit better or are you trying to more signal that maybe you need to do a full-blown evaluation of all, everything you do have and maybe start considering shedding some pieces? So, any additional elaboration there would be helpful.

Mike Kaufmann: Yes thank you, actually don't see it is either one of those. First of all I think, you know, the change in management for us where we really feel lucky that we were able to take Jon Giacomin who has a tremendous track record as our leader on our pharmaceutical segment and someone I've worked with a long time and actually has a lot of knowledge of the medical business based on some of his prior history within Cardinal or outside of Cardinal and within Cardinal. So, Jon has been moved over to the CEO of the segment and he'll bring a very disciplined and focused approach to what all we're doing there. And then we changed out the leader of the Cordis business with someone who was actually running our Asia Pac business within Cordis which was doing incredibly well. And he's a very seasoned leader, knowledgeable to the business, has a good track record with the business and is a guy that we have a lot of faith in. So as far as leadership changes we've made those two initially and we'll continue to add some talent in the medical segment in some areas that we think could be beneficial.

We actually feel really good about our portfolio in medical. What we're disappointed on is really just our execution in a few areas, again particularly and primarily related to Cordis. So, I don't really see an absolute need to add pieces. I think in the future we still completely believe in the strategy of having a product business on top of a distribution business. And after we get a chance to absorb the Patient Recovery acquisition and the, get the Cordis business back on a growth trajectory we'll continue to look at more pieces but I don't think we need to have those. And at this point time we're always going to be evaluating our entire portfolio but there is nothing sticking out to me that there's something that we need to shed in order to be able to operate effectively going forward.

Glen Santangelo:  Okay thanks for that. And maybe just one quick follow-up on generic pricing. I mean it felt like through the winter months maybe we were starting to see some of that generic price deflation abate somewhat. Now you're kind of signaling maybe it's getting a little bit worse. And so, could you maybe just give us a sense for maybe what we saw through the winter months and what we're seeing now and do you expect that this is going to translate into any additional sell side pricing pressure? And I guess I'm kind of curious also why do you guys disclose so much about generic pricing? Aren't you just signaling to your customers that they should be asking for greater discounts?

Mike Kaufmann:  Yes I think, you know, look we always have to balance what we try to disclose to be helpful to you guys is well as what's a competitive situation. But what we're really saying is we're not at all saying that we think it's deteriorating. In fact, what we're seeing is that it is moderating from last year and sequentially from the last quarter. So, all we're saying is that originally when we looked at our point to point number we expect it to finish in the mid-single digits down from point to point. And as we look at it we think it might be slightly worse than that from that point to point but still better sequentially and versus the prior year. And so, we continue to see it moderate. So, we aren't seeing, and I wouldn't characterize it as seeing it more aggressive necessary pricing in the market. We just didn't, it's just not moderating as much as we originally thought it might. Next question please.

Operator:  Next question from Michael Cherny with Bank of America Merrill Lynch.

Michael Cherny:  Good morning team and thanks for all the color so far. I just wanted to follow-up on the customer repricing commentary you had relative to '19. You mentioned the Optum expansion, some of the customer initiatives. As you think about heading into '19 and the moving pieces of your business is Optum the only pressure you see relative to customer repricing or how do you think about the rest of the business in terms of what could pressure into '19, you know, broadly speaking? I don't know if you can give an exact number but just maybe have some qualitative comments about how you see that shaking out over the next year?

Mike Kaufmann: Yes obviously, we can't go into any customer details but I'll try to be helpful here. Optum is clearly one of them and Optum is one of our largest customers and we're excited to renew and expand our relationship with them. We also have repriced some of our other customers during this year, and so we actually as you can imagine from our budget process role in the impact year over year for that. And as we look out at our contract expirations over the next 12 to 18 months we also take a look at those to understand the timing of when some of those customers may reprice and build all of that in. So, that's what we take into account to do that and we do expect that to be something that we have a larger maybe portion than normal to do next year and that's why those customer repricings are significant for us.

Michael Cherny: Got it. I'll jump back into the queue. Thanks.

Mike Kaufmann: Thanks Michael.

Lisa Capodici: Operator?

Operator: Next question from Robert Jones with Goldman Sachs

Robert Jones: Great. Hey thanks for the question. Yes Mike just want to get a little bit of a better understanding of the size and scope of the Cordis issue., You know, obviously there's been several revisions along the way around the business. You guys have given a lot of commentary this morning on it but if I just look at the performance in medical in the quarter I'm curious if Cordis is actually profitable today as we look at 3Q? And then you talked about getting back to profitable growth by the end of fiscal 19. I'm just wondering if you could share some more specificity around what steps you need to take in order to get the business back to profitable growth by the end of next fiscal year?



Mike Kaufmann:  Yes thanks, a couple things. First of all, I would say inventory reserves are one of the biggest issues were having. As we came off the TSAs and have been working through this our ability to be able to understand all of the demand signals, roll those demand signals up, turn those into manufacturing plans and then correspondingly having visibility to both the consigned inventory as well as our own inventory across our network on Cordis particularly outside the U.S. -- it's obviously much easier for us in the U.S. -- but outside the U.S. has been much more difficult than we expected it to be.

As we said in prior quarters we said we would be rolling out some IT projects and solutions. We rolled one of those out in this past quarter which started giving us more visibility to our inventory and as you might expect as we roll that out that visibility pointed out to us that we had some inventory that needed to be reserved against due to excess amounts in certain parts of the world.

So, that drove some inventory write-offs that we had and we're going to be rolling out some further detail IT systems to give us more clarity. And so, we believe that we're going to be working through some challenges in getting our inventory at the right levels in the right spots in order to – and that's probably going to create - has and probably will create some inventory reserve challenges. Second of all, when you don't have as good of demand signals it's hard to run your manufacturing plants as efficiently as you would like to. And so, that's been a challenge for us on our cost side. And so, as we get better visibility into that we'll be able to do the types of things we need to do in our manufacturing plants to reduce cost.

And lastly setting up the ex-U.S. or OUS cost structure related to the commercial organization and the other pieces has been more costly than we anticipated. And we so far have been erring to doing everything we need to do to support our sales team so we don't have any impact on our topline. And that has caused us to have more expenses than we expected to, again particularly outside the U.S. were 70% of Cordis' business are. So, those are the big things that are causing it. And as you can imagine we have work plans on each one of those to get after those in order to get us back on track for profitable growth at the end of '19.

**Robert Jones:** Now I appreciate all that Mike. And then just one quick follow-up on your repricing comments as a headwind to '19 I'm just wondering is that kind of normal course of business as you, you know, re-up important customers like Optum or is that something incremental to what you've been seeing in the market?

**Mike Kaufmann:** Yes, I would say it's more normal course of business. You know, we operate in a very competitive environment and while we have great relationships with our customers, you know, they're always looking for us to be able to provide some additional value to them but this is nothing where we're seeing necessarily different pricing in the market or competitive nature than we have in the past. We just have a large share of repricings ahead of us in '19 that we're going to need to work through. Next question please?

**Operator:** Next question from Charles Rhyee with Cowen.

**Charles Rhyee:** Yes, hey guys, thanks for taking the questions. Mike, you know, sorry to stay on the medical topic here but, you know, last quarter you guys actually posted a really good result in medical and, you know, if we backed up the inventory step up charge it would have been even better. You know, can you give a sort of a contrast and compare like, you know, what changed, you know, really in the last three months that – because it seemed like, you know, last quarter things were actually going in the right direction. Maybe you can give us a sense on, you know, what reversed so much from last quarter to this one?

**Mike Kaufmann:** Yes, it's really Cordis is by far the biggest component of it. It is again some - we rolled out that inventory system during late in the quarter. And as we rolled up and took a look at our inventory really for the first time to be able to see it a lot more clearly across the globe it created a large inventory write-off in the quarter that was a significant hit to our operating earnings in medical. Exam gloves also continues to be a challenge in the quarter.

But that was the biggest one with the Cordis write-off. Then as part of your work what you have to do is you then have to relook at your forecast for Cordis. And what happens is when you take a look at the inventory write-offs

we've had the performance of the business as I mentioned, the various components and you forecast where you're going to be for the year as Jorge gave some color on it changed where we believe our income was going to be in various jurisdictions and that caused us to have to go back and restate what we expect the tax impact would be on Cordis. I know that's below the line but that was what drove the tax component that also had the impact on EPS that we mentioned.

Charles Rhyee:  I see so just to be clear here what you're saying is that, you know, if you had this inventory system in place a quarter earlier we might have seen some of this – these effects earlier than now?

Mike Kaufmann:  Oh absolutely. Had we had it in place we probably would have seen some write-off at that time but it's again hard to know. You do the best you can with the visibility you had. It rolled off. But when the system rolled on we got better visibility, we were able to assess in a better way what our inventory situation needed to be from reserves.

Charles Rhyee:  Okay great. Thank you.

Mike Kaufmann:  Next question please.

Operator:  Comes from Ricky Goldwasser with Morgan Stanley.

Ricky Goldwasser:  Yes hi, good morning. You know, I have a couple of questions on the drug distribution side. So, you talk about better results in distribution. And I know that you highlighted specialty in Red Oak. But it seems there are some conflicting remarks. So, if you think about Red Oak you talked about the fact that it was a headwind to operating income in the quarter. And then you also said that performance from Red Oak then is not enough to

CardinalHealth
Essential to care™

offset deflation. So, can you give a little bit kind of a context? Is it that just price deflation from manufacturers is picking up and you are not able to garner the same pricing power over them through the purchasing consortium? And then secondly, what does that mean to sell side pricing? Does this mean that we are seeing more price concessions that you need to give to your independent customers?

Mike Kaufmann: So thanks for the question Ricky. I'm not sure how – as far as the comment around Red Oak being a headwind. Red Oak was absolutely not a headwind at all. Red Oak has been and continues to be a tailwind for us. And we feel actually absolutely great about Red Oak. We think they continue to perform better than anyone in the market.

We like our model. We like where we're going. We like our talent -- no issues at all with Red Oak, continues to be a tailwind. What I was trying to indicate was that the generic deflation within the quarter was more than the over performance of Red Oak. And so just to tie that piece out and so in total what we're saying that we're not seeing anything really different in the marketplace from pricing pressures from our customers or from competitors. So, we don't see the environment being different than we had been expecting it to be other then we just looked at where we actually thought we'd finish at June 30.

And when we were looking at that we thought that we might not be, you know, we said we'd be down mid-single digits and we think we might be somewhere between mid-single and high-single digits, but again still better sequentially and better than last year on where generic deflation is. So, my summary would be Red Oak's still a tailwind, generic deflation is moderating. It's just that Red Oak is not enough itself in order to offset what we saw for generic deflation in the quarter.

Ricky Goldwasser: Okay. And if we step back and we think about what do you think the sustainable growth rate is for the drug distribution business?

Mike Kaufmann: Yes at this point in time, you know, we'll take a look at that and give some more color when we, with our '18 guidance. We still have a lot of work that we're - or I'm sorry '19 guidance. We still have a lot of work to do to

**Cardinal**Health

*Essential to care™*

understand all the various components of both of the pharma and medical segment. And we'll do that and give more color in August.

Lisa Capodici:  Operator next question.

Operator:  It comes from Lisa Gill with JP Morgan.

Lisa Gill:  Thanks very much and good morning. Mike just I want to come back to Cordis just one last time strategically. So, when we think about Cordis and the asset that it is can you help me to understand why it's important to the portfolio when we think about cross sell? I know there's a lot of sales outside the U.S. Is this your anchor to build out your medical supply business outside the U.S.? I just really want to understand – I understand the commitment that you're making to, you know, try to rebuild this business and everything that it's going to take on your side but I just want to understand the strategic rationale for doing so.

Mike Kaufmann:  No thanks, good question and I appreciate it Lisa. I think you hit it pretty well there in the fact that when we first bought Cordis again we think that it fits within our ability to bundle and work with our customers to bring a total package of products that our value proposition can help them have equal or better products at lower cost. So, we think it fits well within our overall product offering, the customers in the U.S. And then externally it really helped us got a, get a base of being able to grow and sell our products outside the United States. By being 70% of its volume outside the U.S., what that did is cost us to be able to and begin to build an ex-US infrastructure. Granted that building of that infrastructure has been more expensive than we thought. It hasn't gone as well as we thought so we're clearly disappointed and absolutely we'll own up to that.

But we learned a lot from doing that and, you know, we were able to set up third-party logistics companies, set up HR processes and all those things. And we've been using that in order to put on top of that the Patient Recovery business that is outside the United States. And so, we're able to leverage off of that as well as some other moves

that we've made to take back some of our other products outside the U.S. that we were going to others to be able to sell that so we can offer a lot more robust product offering outside of the United States. So, I think that's a good piece of our strategy and why we still feel that's a good fit for us.

Lisa Gill:  And so as you evaluate that I mean so it's been a couple of years since you bought Cordis almost a year for Patient Recovery. What's your timeline where you say yes this is - obviously, I mean if we see the numbers turn around then it's a yes, it's working. But do you also have a timeline of you know what maybe this isn't this strategy that makes sense for us. Maybe we should stay, you know, more so in the U.S. and think about maybe divesting things rather than investing in them? I, you know, I think that's the big question for a lot of us is just to understand your process how you're thinking about this and what the timeline is for those types of evaluations.

Mike Kaufmann:  Yes, fair question. You know, that's – it's hard to put a specific timeline on that. It's something that we are clearly doing. I think there's various degrees too. There's also being outside the U.S. in 60 countries. Are you outside the U.S. in 30 or 40 countries? So, I don't think it's necessarily all in of whether you want to be outside of the U.S. are not. It would be hard for me to imagine at this point in time not wanting to be outside the U.S. with our significant breadth of products many of which in our Patient Recovery business as well as Cordis we think can compete effectively outside the United States.

But whether or not we need to have the breadth of 60 or 70 countries or not that's something we are absolutely looking at at this point in time right now and whether each and every country is where we need to be. So, we're going to continue to evaluate that portfolio but feel that we have some really great products that we think can help people outside the United States as well as in the United States. Next question.

Lisa Capodici:  Operator?

Operator:  Erin Wright with Credit Suisse.



Erin Wright:  Great thanks. I guess beyond Cordis, can you give us an update on the Medtronic kind of integration process here? And can you speak to maybe some of the other businesses as well within the segment and naviHealth for instance and the prospects there? And then I'm curious how core is the exam glove business to your Cordis business overall? Thanks.

Mike Kaufmann:  Great. So, a couple things there, just the last piece, the exam glove business would not be tied at all to the Cordis piece. That is just a large volume commodity type of a product that I think every distributor has to have access to and have a private label offering on in order to have a low-cost alternative for it. So, I just think that's one of those staple products that everybody needs to have to be a product company and distribution company. And it's just that with the limits on availability for the product and some commodity challenges it's creating some headwind right now as I've mentioned in the past because we have a lot of downstream fixed contracts that we're working through.

As far as Patient Recovery the Medtronic acquisition of the Patient Recovery business that continues to go well. We continue to hit our milestones. One of the things that we've done and that Jon was able to do with his leadership is he was able to tap back into the pharma side and bring over some excellent talent from the pharma side to help join the team on medical. And so, Jon has done a nice job of taking a look at where we could use some various folks, bring some people over that are experts in areas like inventory management, data management -- things like that to help the team. And of course, we operate as one Cardinal Health and so the pharma team's happy to contribute whatever resources we can in order to get it right.

So far that acquisition is going well. We begin to roll off of some of the TSAs in our mid to late summer. And that will be a kind of a new big checkpoint for us to make sure that goes well. But so far, we still are feeling like we're on track and hitting the milestones that we have.

As far as the other businesses that you may have mentioned we're seeing really strong demand for naviHealth and our at Home business and particularly are two that we feel really good about. We continue to see the trend of care moving more towards the home. Both of those businesses compete in that space and both are we believe best in class in that space. And so, we're seeing a lot of demand not only for just core every day services that

**CardinalHealth**
*Essential to care™*

they offer but for folks that want to partner with them in various unique ways in order to drive volume. So, we feel really good about both of those businesses as well as our portfolio of medical services businesses, freight management and others that we have that we're also seeing very nice performance from.

Lisa Capodici: Operator?

Erin Wright: Right and then could I just ask a quick one on the CAPEX? Does it step down and for the year I guess should we expect a meaningful step up capital expenditures in fiscal 19? Thanks.

Mike Kaufmann: You know, at this point in time that's something that as Jorge and I look at all of our cap, all of our, you know, spends of capital that CAPEX we're always going to want to make sure that we're investing appropriately in the business but at the same time being very careful because we know what that creates in the future. And so, this was more of just us over the last 60 days or so evaluating what was out there and also reprioritizing some of our focus and bandwidth on other projects that just then we didn't need to spend some of the capital that we had previously anticipated to spend. Next question.

Erin Wright: Okay great thank you.

Operator: Next question is from David Larsen with Leerink.

David Larsen: Hi. Can you talk a bit about the inventory management system that the Medtronic Patient Recovery business is on? Like what is your level of visibility into those products and, you know, are we at risk of seeing a similar situation with that business line similar to what we're seeing with Cordis now? Thanks.



Mike Kaufmann:  Yes first of all the – a couple things. The Patient Recovery business remember is more 75% in the U.S., much smaller volumes outside the U.S. So, that's the first thing to know. And it's actually, you know, just coming into our warehouses as part of our everyday offering. And so, from an inventory visibility standpoint very little concern on Patient Recovery. Second thing related to Patient Recovery and our other medical products they're not consigned inventory type of items. And so, that creates a different level of inventory visibility challenges that we don't have in Patient Recovery.

As far as Cordis goes I would say that, you know, we still have additional levels of inventory visibility that we would like to see but we are going to – we feel a lot better where we are today as you could imagine by having the visibility that we got. The biggest area of challenge that we have is not so much in our own systems to seeing inventory visibility, it's in our consigned inventory. And so, that's really where we have to take it to the next level is around the consigned inventory to get better visibility there to make sure we don't have any additional write-off concerns in that part.

One other thing I would say too is that back to the Patient Recovery in general those don't – those products don't have expiration dates where the Cordis products do have expiration dates. And that's what's creating some of the inventory challenges. It's not just that you have over inventory potentially but if you have some that are expiring you're going to need to reserve those.

David Larsen:  Okay and that's helpful thank you. And then for the 16 cents of client investments that you've been planning on and opioids for fiscal 18 have those occurred yet or not? Will they occur in 4Q or will they push into fiscal 19? And then are those recurring in nature, like will we see those continue indefinitely? Thanks.

Jorge Gomez:  Dave I'll take that question. So, for – as we indicated before in the second half of fiscal 18 we accounted for about 8 cents related to customer investment. And with the Optum repricing, with the Optum extension we have utilized probably half of that, most of it in Q4. We continue to look at other opportunities to expand relationships in other – with other customers. And as it relates to how we should think about that going forward I

think Mike alluded to our expectations going forward especially in '19 as it relates to the normal cycle of renewals of certain customers in '19.

Mike Kaufmann: And as far as the rest of the 16 cents the other 8 cents, the tax component we talked about that part has basically been spent. And then the piece of Opioid as we said would be moved back into our second half, so we saw some spend in Q3 and would expect the rest of the spend to happen in Q4. So really the vast majority of the 16 cents did get spent – will get spent this year other than a portion of the customer initiatives.

Lisa Capodici: Operator?

Operator: Next question from John Kreger with William Blair.

Courtney Owens: Hi. This is Courtney Owens on for John Kerger. So I noticed, I know that you just called out kind of like some of the differences from like an inventory perspective between Patient Recovery and Cordis. But just kind of outside of that we're just trying to see like kind of what's significantly different about the Patient Recovery business in the sense that like what have you learned since your integration of Cordis to kind of avoid some of the issues that you're seeing with Cordis right now as it relates to the Patient Recovery business. Thanks.

Mike Kaufmann: Yes, a couple things. Again, back to the inventory, this nature of having inventory with expiration dates. The fact that it's consigned inventory in Cordis versus not consigned in Patient Recovery. I think the – we clearly underestimated the needs and requirements of being able to have inventory visibility at a deeper level than we anticipate or understood that we would have through that process. So, while that's a learning for us in Cordis it's not a big deal as we said for Patient Recovery because it's not as much U.S. and it doesn't have – or it's not as much outside the U.S. and it doesn't have expiration dates. So, after learning I would say that's not one that's a hugely valuable one to us for Patient Recovery.

Page **24** of **30**

I think the areas where we really had some learnings was around estimating what our cost structure would be. You know, when we came out with Cordis early in our quarters and recently have been saying that we underestimated what our cost would be to stand up the ex-U.S. infrastructure and to work through all of that. And we knew that going in the Patient Recovery which we've now had since, you know, end of July of this past year. And so, when we estimated our costs we were much more realistic about setting those up and understanding what it would be to do that. So, I think that's probably the biggest one is understanding what it would take to do it. The good news too is by already having established relationships with third-party logistics companies setting up some of the infrastructure again outside of the U.S. we were able to leverage that same infrastructure. And so, some of the learnings around how to contract and what we need from those service providers also was helpful.

Courtney Owens:  Got it, thank you.

Lisa Capodici:  Operator next question.

Operator:  Next question from George Hill with RBC.

George Hill:  Hey, good morning guys and thanks for taking the questions. First, it's kind of a housekeeping question for Jorge. With the Optum renewal is there a prior period adjustment kind of for like retroactive it impacts Q4 that artificially weighs on results?

Jorge Gomez:  No. No there is no retroactive adjustment there. We just signed the agreement and it, you know, the accounting and the economic impact is all perspective.



George Hill: Okay. And then like I guess I'm going to hit Cordis one more time. If you kind of bucket the three challenges, one I'll call operational, two I'll call competitive, three I'll call kind of end market challenges as we looked out to '19, I guess can you kind of rank order the challenges? It sounds like most of them are operational which you guys should be able to fix. I guess I would just ask you to address the other two because we've talked a lot about the inventory systems. I guess talk about the market and talk about competitive as it relates to the outlook for that business?

Mike Kaufmann: Yes it's, you know, obviously is a competitive marketplace – but we feel good about our ability to compete in the marketplace. And then one of the things that we're doing that I think is helping our competitiveness in the marketplace besides some of the great work Jon and team are doing around the commercial structure, our ability to bundle with other products, our ability in training with our sales reps is also by adding to the portfolio. So, we have more in the bag.

And as I mentioned our addition of the drug-eluting stent has been an important component of our commercial competitive ability to compete going forward. And we feel really good about the quality and the acceptance of that stent and expect that to be something that we would see growing going forward. And we're actively working with other players out there to look at other products that we can add to our bag in a very capital efficient way by partnering with folks to bring them in. So, I like our competitive positioning and, you know, part of where that's indicative is that this is a business that historically had not grown in a long, long time. And so far, year-to-date we are seeing growth year over year in our topline.

So, where I get encouraged is we're seeing a top line that is while we still think there's opportunities to grow more and do some things we're seeing it actually grow year over year which is different than history. We're seeing a bag that's expanding. We just haven't been able to turn it through to a drop through to the bottom line because of the inventory reserves and the operational issues that we have. So, for me clearly it's the operational issues that are the biggest concern. And I think we have the right folks and the right plans in place. It's going to take some time because we don't want to do anything rash in order to – that would, you know, hurt our momentum on the top line but the team is very focused with detailed work plans, metrics and timelines to get after getting this business back on track.

George Hill:  Okay. And if I could just maybe sneak in a third one real quick for Jorge? Jorge just kind of what volume levels do we need to see in generics given the – the depreciation that we're seeing in generics? What kind of volume growth do we need to see to grow EBIT in that segment? Thanks.

Jorge Gomez:  Well, you know, that is a level of detail that we, you know, we normally don't get into. And as you – as we have discussed a number of times there is a lot of variables that come together to generate growth when you think about ASP units, Red Oak. So, we look at the totality of those variables when we try to estimate the growth. So, there is multiple combinations of all those variables that result in your growth or decline.

Mike Kaufmann:  Next question please.

Operator:  Comes from Brian Tanquilut with Jeffries.

Brian Tanquilut:  Hey morning guys, just a quick question, as we think about generic pricing and your qualitative comments about FY19 EPS I mean what are your views on, you know, or thoughts and where that trends or what assumption are you making as you've made those comments on EPS growth? And also, how would you characterize generic inflation expectations today versus 2016 calendar?

Mike Kaufmann:  Yes, I'll take a stab at that. I think a couple things. We're not ready to give any specifics around '19 at this time and where we would expect it to be. You know, right now we would assume it would be continue to see deflation but at what level it's still something we're evaluating. Again, what I can emphasize is that what we've seen versus last year and what we've seen sequentially we have seen generic deflation moderating. But as Jorge said not only within generics do you have to understand all the various components but when you're repricing and thinking through deals with customers you have all of the components to take into account which would be branded mix, generic mix, specialty mix and all of those as we reprice.

**CardinalHealth**
*Essential to care™*

And so, I think one of the things that we need to do and we are continuing to do is assess the overall on all the buckets within our customer go to market strategies and pricing in order to manage our profitability appropriately going forward and drive growth.

Brian Tanquilut: Hey Mike just a follow-up to that, as we think about your repricing's are you seeing any ability to increase compliance, rate requirements or what kind of leverage do you have in these contract negotiations with your price?

Mike Kaufmann: Yes it really depends on the customer. As you know some customers are already buying 100% of their product from us and so it's obviously been hard to take that up above that. But we do have other customers that aren't buying all the generics from us. And as you can imagine anytime we go to work with a customer we look at all of the components that they could buy from us including consumer health, brand and generics and look to partner with them so that if they would like to see a price decrease what can they give us in terms of additional volume that might help offset some of the impact that we feel? So, we continue to see that as an opportunity for us to penetrate not only in generics but in other areas like consumer health. We'll continue to push on that. And I would say in typically in most contracts on renewals we do tend to see improved penetration of generics. And oftentimes private label and other products.

Lisa Capodici: Operator next question.

Operator: Comes from Eric Percher with Nephron Research.

Eric Percher: Thank you. I may stay on generics because I have a feeling the stocks will react to the commentary today. I want to make sure I understand. There was a comment that there is a negative impact from the generic program performance. I know later you said that your expectation was for substantial improvement. You didn't quite see

that but you did see improvement this year. I know you also said that Red Oak was strong. So, I just want to come back to that simple comment about negative impact from generic program performance and was that just relative to your expectation for the year?

Mike Kaufmann:  Yes that was relative to our expectation for the year that when we put together what we are seeing in generic deflation which as you said was, you know, moderating but not moderating quite as much as we expected Red Oak's over performance then in all the combination of wins, losses, penetration, etc generic launches when we put that all together the net impact of that is that our generic programs was net negative but again still better than we expected it to be.

Lisa Capodici:  Operator we have time for one more question.

Operator:  Our last question comes from Steven Valiquette with Barclays.

Steven Valiquette:  Hi, thanks. Good morning Mike and Jorge. My line dropped earlier so thanks for fitting me back in here. Just on the topic around the FY18 guidance around generic price deflation, obviously, your guidance is sell side based if we do focus on the buy side generic pricing for a moment. Is there any update on the whole discussion around the generic manufacturer portfolio rationalization and whether that's creating any changes in the pricing trend so far in calendar 2018? Thanks.

Mike Kaufmann:  Yes, I wouldn't say that we've seen any material impact yet from that. We have as you can imagine the Red Oak team leads all of those discussions for us, and again, glad we have such a talented group up there to be able to do that for us. They constantly are working with manufacturers and we want to work with manufacturers. And we understand some may need or want to, you know, discontinue certain lines.

We work with them on the timing and at the same time knowing that we're focused on getting the best everyday cost possible we'll look for other folks to maybe put them back into those products if we need to in order to make sure we're maintaining the cost. So, at this point in time I would say we're not really seeing any material impact. And going forward I feel like with Red Oak both its talent and its game plan we feel like we're positioned well to compete in an environment and be – and still be effective at getting after cost even as manufacturers look at reducing their overall product lines.

Steven Valiquette:  Okay. So, it sounds like if deflation is moderating. That's not really the driver of it. It's basically other factors within the overall generic portfolio?

Mike Kaufmann:  I think from us it's the deflation component again goes back to the sell side so that's more based on the competitive environment. As far as Red Oak being able to get after cost and find better cost for us it's not seems so far impacting their ability to go continue to lower and drive lower cost for us. Thanks for the question.

All right so I just want to thank everybody for taking the time to get on the call today. I know we gave you a lot of information today to digest. We hope you found it helpful and Jorge and I and the IR team look forward to talking to many of you today and over the next coming days. Take care everybody.

Operator:  Thank you. And this will conclude today's conference call. Thank you for your participation. Ladies and gentlemen, you may now disconnect.

# EXHIBIT 99

# Q3 FY18

Cardinal Health, Inc. Earnings Investor/Analyst call
May 3, 2018



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Forward-looking statements and GAAP reconciliation

**Cautions Concerning Forward-Looking Statements**

This presentation contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of pharmaceutical price appreciation or deflation and the timing of and benefit from generic pharmaceutical introductions; the ability to maintain the benefits from the generic sourcing venture with CVS Health; risks associated with our ability to improve the performance of our Cordis business; risks associated with the acquisition of the Patient Recovery Business, including the ability to successfully integrate the acquired businesses into our operations and the ability to achieve the expected synergies as well as accretion in earnings; the risk of non-renewal or a default under one or more key customer or supplier arrangements or changes to the pricing or other terms of, or level of purchases under those arrangements; uncertainties due to government health care reform including proposals to modify or repeal the Affordable Care Act; uncertainties with respect to the recently enacted Tax Cuts and Jobs Act; changes in the distribution patterns or reimbursement rates for health care products and services; risks associated with the distribution of opioids, including ongoing investigations and lawsuits by certain governmental and regulatory authorities, the potential financial impact of enacted and proposed taxes or other assessments on the sale of opioids, and potential reputational or operational harm; and changes in foreign currency rates and the cost of commodities such as oil based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This presentation reflects management's views as of May 3, 2018. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement. In addition, this presentation contains Non-GAAP financial measures. Cardinal Health provides definitions of and reconciliations of Non-GAAP financial measures and their most directly comparable GAAP financial measures in the Financial Appendix at the end of this presentation and at ir.cardinalhealth.com

2  © Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q3 FY18 results



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q3 FY18 financial summary

| | GAAP Basis ($M) | | Non-GAAP Basis ($M) | |
|---|---|---|---|---|
| | Q3 FY18 | Q3 FY17 | Q3 FY18 | Q3 FY17 |
| **Revenue**<br>*% change* | **$33,633**<br>*6% increase YoY* | **$31,821**<br>*4% increase YoY* | **N/A** | **N/A** |
| **Operating Earnings**<br>*% change*<br>*Ratio to revenue* | **$546**<br>*10% decrease YoY*<br>*1.62%* | **$605**<br>*8% decrease YoY*<br>*1.90%* | **$781**<br>*3% increase YoY*<br>*2.32%* | **$759**<br>*4% decrease YoY*<br>*2.39%* |
| **Net Earnings[1]**<br>*% change*<br>*Ratio to revenue* | **$255**<br>*33% decrease YoY*<br>*0.76%* | **$381**<br>*1% decrease YoY*<br>*1.20%* | **$437**<br>*10% decrease YoY*<br>*1.30%* | **$485**<br>*3% increase YoY*<br>*1.52%* |
| **Diluted EPS[1]**<br>*% change* | **$0.81**<br>*33% decrease YoY* | **$1.20**<br>*3% increase YoY* | **$1.39**<br>*9% decrease YoY* | **$1.53**<br>*7% increase YoY* |

[1]*Attributable to Cardinal Health, Inc.*

*Please see appendix for GAAP to Non-GAAP reconciliations.*

4    © Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.


CardinalHealth
*Essential to care™*

# Q3 FY18 Pharmaceutical segment business analysis

|  | Q3 FY18 ($M) | Q3 FY17 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | $29,720 | $28,406 | 5% |
| **Segment Profit** | $596 | $611 | (3)% |
| **Segment Profit Margin** | 2.00% | 2.15% | -15 bps |

## Highlights:

- **Revenue** increase due to sales growth from pharmaceutical and specialty distribution customers. This was partially offset by the previously announced expiration of a large, mail-order customer contract and the divestiture of the company's China distribution business.

- **Segment profit** decrease which reflects a modest negative impact from the company's generic program performance.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q3 FY18 Medical segment business analysis

|  | Q3 FY18 ($M) | Q3 FY17 ($M) | YoY Change |
|---|---|---|---|
| **Revenue** | **$3,916** | **$3,418** | **15%** |
| **Segment Profit** | **$199** | **$148** | **34%** |
| **Segment Profit Margin** | **5.09%** | **4.34%** | **+75 bps** |

## Highlights:

- **Revenue** increase was driven primarily by the acquisition of the Patient Recovery business.

- **Segment profit** increase primarily driven by contributions from acquisitions. This was partially offset by performance in Cordis and, to a lesser extent, other Cardinal Health Branded products.

*The sum of the components may not equal the total due to rounding.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Q3 FY18 GAAP to non-GAAP adjustments[1]

| | Q3 FY18 | | | | Q3 FY17 | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] | Gross Margin ($M) | Operating Earnings ($M) | Net Earnings[2] ($M) | Diluted EPS[2] |
| **GAAP** | **$1,913** | **$546** | **$255** | **$0.81** | **$1,728** | **$605** | **$381** | **$1.20** |
| LIFO charges/(credits) | - | - | - | - | (9) | (9) | (5) | (0.02) |
| Restructuring and employee severance | - | 2 | 19 | 0.06 | - | 15 | 9 | 0.03 |
| Amortization and other acquisition-related costs | - | 175 | 131 | 0.42 | - | 128 | 87 | 0.27 |
| Impairments and (gain)/loss on disposal of assets | - | (6) | 8 | 0.02 | - | 2 | 2 | 0.01 |
| Litigation (recoveries)/charges, net | - | 64 | 43 | 0.14 | - | 18 | 11 | 0.03 |
| Transitional tax benefit[3] | - | - | (17) | (0.06) | | | | |
| **Non-GAAP** | **$1,913** | **$781** | **$437** | **$1.39** | **$1,719** | **$759** | **$485** | **$1.53** |
| | | | | | | | | |
| Amortization of acquisition-related intangible assets[4] | - | $149 | $110 | $0.35 | - | $96 | $67 | $0.21 |

[1]Please see appendix for GAAP to Non-GAAP reconciliations.
[2]Attributable to Cardinal Health, Inc.
[3] Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.
[4]Amortization of acquisition-related intangible assets is included in Amortization and other acquisition-related costs.

The sum of the components may not equal the total due to rounding.

7    © Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



CardinalHealth
*Essential to care™*

# FY18 Outlook

*The company presents its outlook for fiscal 2018 non-GAAP EPS and non-GAAP effective tax rate on the following pages.  The company does not provide a GAAP EPS or GAAP effective tax rate outlook because it is unable to reliably forecast many of the items that the company excludes from GAAP EPS and effective tax rate to calculate them. See "Forward-Looking non-GAAP Measures" following the attached schedules for additional information.*



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# FY18 financial expectations

|  | FY18 Outlook | FY17 Actual |
|---|---|---|
| **Revenue** | Mid-single digit percentage growth vs. PY | $130.0B |
| **Non-GAAP EPS** | $4.85 to $4.95 | $5.40 |

*Red font indicates a change since 2/8/18.*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# FY18 corporate assumptions

| | FY18 Outlook | FY17 Actual |
|---|---|---|
| **Non-GAAP effective tax rate** | 32% - 34%[1] | 32.6%[3] |
| **Diluted weighted average Shares outstanding** | 315M - 316M | 320M |
| **Interest and other, net** | $330M - $350M | $197M |
| **Capital expenditures** | $400M - $430M | $387M |
| **Acquisition-related intangible amortization[2]** | $575M | $392M |

[1]*May fluctuate quarterly due to unique items affecting periods.*

[2]*Includes only acquisitions/divestures closed as of March 31, 2018.*

[3]*FY2017 GAAP ETR 32.7%, Please see appendix for GAAP to Non-GAAP reconciliations.*

*Red font indicates a change since February 8, 2018*

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Pharmaceutical segment FY18(E)

- **Low- to mid-single digit percentage increase in revenue versus prior year**

- **Full-year segment profit down high-single to low-double digits versus prior year**

## Key assumptions

- Generic drug price assumption of mid-to-high single digit deflation for full fiscal year

- Brand drug manufacturer price assumption of 7% to 8% inflation for full fiscal year

- Incremental expense increase related to investment in information systems to support growth

- Incremental contribution from new generic launches, but Y-o-Y benefit significantly less

- Better than expected incremental contribution from Red Oak Sourcing, essentially flat Y-o-Y

- Double-digit revenue and profit growth from our Specialty business

- Reduced contribution ($0.05 per share) from early closing of the China distribution business divestiture[1]

[1]Closed February 1, 2018. Cardinal Health China reports in both segments, but primarily contributes to the Pharmaceutical segment.

Red font indicates a change since February 8, 2018

© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



# Medical segment FY18(E)

- **High-teens percentage increase in revenue versus prior year**
- **Strong double-digit segment profit growth versus prior year**

## Key assumptions

- Patient Recovery business acquisition completed in July 2017, accretive to FY18; integrated into Cardinal Health Branded products upon closing

- Excluding Patient Recovery, Medical segment profit down high teens, driven primarily by Cordis

- Second-half segment profit margin rate will not reach 6% primarily due to Cordis performance

- Significantly reduced portion of a Veterans Affairs contract, the full effect of which began in Q4FY17

- No reinstatement of a medical device tax

*Red font indicates a change since February 8, 2018*

12    © Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.



Appendix

Q3 FY18 trailing five quarters,
GAAP to Non-GAAP reconciliation statements
and supplemental financial information



© Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved

# Q3 FY18 segment analysis

## Pharmaceutical segment

|  | Q3 FY17 | Q4 FY17 | Q1 FY18 | Q2 FY18 | Q3 FY18 |
|---|---|---|---|---|---|
| Revenue ($M) | 28,406 | 29,552 | 28,920 | 31,146 | 29,720 |
| Segment Profit ($M) | 611 | 505 | 467 | 514 | 596 |

## Medical segment

|  | Q3 FY17 | Q4 FY17 | Q1 FY18 | Q2 FY18 | Q3 FY18 |
|---|---|---|---|---|---|
| Revenue ($M) | 3,418 | 3,416 | 3,724 | 4,044 | 3,916 |
| Segment Profit ($M) | 148 | 138 | 129 | 220 | 199 |

14   © Copyright 2018, Cardinal Health, Inc. or one of its subsidiaries. All rights reserved.

**Cardinal**Health
*Essential to care™*

**Cardinal Health, Inc. and Subsidiaries**

**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Effective Tax Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Third Quarter 2018** | | | | | | | | | | | |
| **GAAP** | $ 1,913 | 11 % | $ 546 | (10)% | $ 464 | $ 209 | $ 255 | (33)% | 45.1 % | $ 0.81 | (33)% |
| Restructuring and employee severance | - | | 2 | | 2 | (17) | 19 | | | 0.06 | |
| Amortization and other acquisition-related costs | - | | 175 | | 175 | 44 | 131 | | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets, net | - | | (6) | | (6) | (14) | 8 | | | 0.02 | |
| Litigation (recoveries)/charges, net | - | | 64 | | 64 | 21 | 43 | | | 0.14 | |
| Transitional tax benefit, net[3] | - | | - | | - | 17 | (17) | | | (0.06) | |
| **Non-GAAP** | $ 1,913 | 11 % | $ 781 | 3 % | $ 700 | $ 262 | $ 437 | (10)% | 37.5 % | $ 1.39[4,5] | (9)% |
| **Third Quarter 2017** | | | | | | | | | | | |
| GAAP | $ 1,728 | 2 % | $ 605 | (8)% | $ 564 | $ 182 | $ 381 | (1)% | 32.3 % | $ 1.20 | 3 % |
| LIFO charges/(credits) | (9) | | (9) | | (9) | (4) | (5) | | | (0.02) | |
| Restructuring and employee severance | - | | 15 | | 15 | 6 | 9 | | | 0.03 | |
| Amortization and other acquisition-related costs | - | | 128 | | 128 | 41 | 87 | | | 0.27 | |
| Impairments and (gain)/loss on disposal of assets, net | - | | 2 | | 2 | - | 2 | | | 0.01 | |
| Litigation (recoveries)/charges, net | - | | 18 | | 18 | 7 | 11 | | | 0.03 | |
| Non-GAAP | $ 1,719 | 1 % | $ 759 | (4)% | $ 718 | $ 232 | $ 485 | 3 % | 32.3 % | $ 1.53 | 7 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2] attributable to Cardinal Health, Inc.

[3] Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.

[4] Non-GAAP EPS for the three and nine months ended March 31, 2018 includes a $0.13 and $0.33 benefit from applying a lower federal tax rate to our year-to-date U.S. pre-tax non-GAAP earnings. Excluding this benefit, non-GAAP EPS would have been $1.26 and $3.66 for the three and nine months ended March 31, 2018, respectively.

[5] Non-GAAP EPS for the three months ended March 31, 2018 includes a $0.13 negative impact on provision for income taxes from the reduction in Cordis projected income and jurisdictional mix. Excluding this provision, non-GAAP EPS would have been $1.52 for the three months ended March 31, 2018.

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

Cardinal Health, Inc. and Subsidiaries

GAAP / Non-GAAP Reconciliation[1]

| | Gross Margin | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Income Taxes | Net Earnings[2] | Net Earnings[2] Growth Rate | Effective Tax Rate | Diluted EPS[2] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Year-to-Date 2018 | | | | | | |
| GAAP | $ 5,446 | 11 % | $ 1,206 | (28)% | $ 959 | $ (466) | $ 1,422 | 40 % | (48.6)% | $ 4.50 | 42 % |
| LIFO charges/(credits) | - | | - | | - | - | - | | | - | |
| Restructuring and employee severance | - | | 155 | | 155 | 29 | 126 | | | 0.40 | |
| Amortization and other acquisition-related costs | - | | 543 | | 543 | 143 | 400 | | | 1.27 | |
| Impairments and (gain)/loss on disposal of assets, net | - | | 62 | | 62 | (57) | 119 | | | 0.38 | |
| Litigation (recoveries)/charges, net | - | | 155 | | 155 | 51 | 104 | | | 0.33 | |
| Loss on extinguishment of debt | - | | - | | 2 | 1 | 1 | | | - | |
| Transitional tax benefit, net[3] | - | | - | | - | 911 | (911) | | | (2.88) | |
| Non-GAAP | $ 5,446 | 11 % | $ 2,121 | (0)% | $ 1,875 | $ 612 | $ 1,261 | (4)% | 32.6 % | $ 3.99[4] | (3)% |
| | | | | | Year-to-Date 2017 | | | | | | |
| GAAP | $ 4,921 | 1 % | $ 1,681 | (9)% | $ 1,549 | $ 533 | $ 1,014 | (7)% | 34.4 % | $ 3.17 | (4)% |
| LIFO charges/(credits) | - | | - | | - | - | - | | | - | |
| Restructuring and employee severance | - | | 31 | | 31 | 12 | 19 | | | 0.06 | |
| Amortization and other acquisition-related costs | - | | 365 | | 365 | 120 | 245 | | | 0.76 | |
| Impairments and (gain)/loss on disposal of assets, net | - | | 15 | | 15 | 4 | 11 | | | 0.03 | |
| Litigation (recoveries)/charges, net | - | | 37 | | 37 | 14 | 23 | | | 0.07 | |
| Non-GAAP | $ 4,921 | (0)% | $ 2,129 | (5)% | $ 1,997 | $ 684 | $ 1,311 | (4)% | 34.2 % | $ 4.10 | 0 % |

[1]For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2]attributable to Cardinal Health, Inc.

[3]Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.

[4]Non-GAAP EPS for the three and nine months ended March 31, 2018 includes a $0.13 and $0.33 benefit from applying a lower federal tax rate to our year-to-date U.S. pre-tax non-GAAP earnings. Excluding this benefit, non-GAAP EPS would have been $1.26 and $3.66 for the three and nine months ended March 31, 2018, respectively.

[5]Non-GAAP EPS for the three months ended March 31, 2018 includes a $0.13 negative impact on provision for income taxes from the reduction in Cordis projected income and jurisdictional mix. Excluding this provision, non-GAAP EPS would have been $1.52 for the three months ended March 31, 2018.

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**
**Segment Information**

| (in millions) | Third Quarter | | | (in millions) | Third Quarter | | |
|---|---|---|---|---|---|---|---|
| | **2018** | | 2017 | | **2018** | | 2017 |
| **Pharmaceutical** | | | | **Medical** | | | |
| **Revenue** | | | | **Revenue** | | | |
| Amount | $ | **29,720** | $ 28,406 | Amount | $ | **3,916** | $ 3,418 |
| Growth rate | | **5 %** | 3 % | Growth rate | | **15 %** | 9 % |
| **Segment profit** | | | | **Segment profit** | | | |
| Amount | $ | **596** | $ 611 | Amount | $ | **199** | $ 148 |
| Growth rate | | **(3)%** | (7)% | Growth rate | | **34 %** | 16 % |
| Segment profit margin | | **2.00 %** | 2.15 % | Segment profit margin | | **5.09 %** | 4.34 % |

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation**

| (in millions) | Third Quarter 2018 | | Third Quarter 2017 | | Year-to-Date 2018 | | Year-to-Date 2017 | | Fiscal Year 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **GAAP effective tax rate** | | 45.1 % | | 32.3 % | | (48.6)% | | 34.4 % | | 32.7 % |
| | | | | | | | | | | |
| **Non-GAAP effective tax rate** | | | | | | | | | | |
| Earnings before income taxes | $ | 464 | $ | 564 | $ | 959 | $ | 1,549 | $ | 1,924 |
| LIFO charges/(credits) | | - | | (9) | | - | | - | | - |
| Restructuring and employee severance | | 2 | | 15 | | 155 | | 31 | | 56 |
| Amortization and other acquisition-related costs | | 175 | | 128 | | 543 | | 365 | | 527 |
| Impairments and loss on disposal of assets | | (6) | | 2 | | 62 | | 15 | | 18 |
| Litigation (recoveries)/charges, net | | 64 | | 18 | | 155 | | 37 | | 48 |
| Transitional tax benefit, net | | - | | - | | | | | | - |
| Adjusted earnings before income taxes | $ | 700 | $ | 718 | $ | 1,875 | $ | 1,997 | $ | 2,572 |
| | | | | | | | | | | |
| Provision for income taxes | $ | 209 | $ | 182 | $ | (466) | $ | 533 | $ | 630 |
| LIFO charges/(credits) tax benefit/(expense) | | - | | (4) | | - | | - | | - |
| Restructuring and employee severance tax benefit/(expense) | | (17) | | 6 | | 29 | | 12 | | 20 |
| Amortization and other acquisition-related costs tax benefit/(expense) | | 44 | | 41 | | 143 | | 120 | | 165 |
| Impairments and loss on disposal of assets tax benefit/(expense) | | (14) | | - | | (57) | | 4 | | 6 |
| Litigation (recoveries)/charges, net tax benefit/(expense) | | 21 | | 7 | | 51 | | 14 | | 19 |
| Transitional tax benefit, net | | 17 | | - | | 911 | | - | | - |
| Adjusted provision for income taxes | $ | 262 | $ | 232 | $ | 612 | $ | 684 | $ | 839 |
| | | | | | | | | | | |
| **Non-GAAP effective tax rate** | | 37.5 % | | 32.3 % | | 32.6 % | | 34.2 % | | 32.6 % |

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Cardinal Health, Inc. and Subsidiaries**

**GAAP / Non-GAAP Reconciliation[1]**

| (in millions, except per common share amounts) | Gross Margin | | Gross Margin Growth Rate | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | | Provision for Income Taxes | Net Earnings[2] | | Net Earnings[2] Growth Rate | Diluted EPS[2,3,4] | Diluted EPS[2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Fiscal Year 2017 | | | | | | | |
| GAAP | $ | 6,544 | - % | 2,120 | (14)% | $ 1,924 | $ | 630 | $ | 1,288 | (10)% | $ 4.03 | (7)% |
| Restructuring and employee severance | | - | · | 56 | | 56 | | 20 | | 36 | | 0.11 | |
| Amortization and other acquisition-related costs | | - | | 527 | | 527 | | 165 | | 362 | | 1.13 | |
| Impairments and (gain)/loss on disposal of assets | | - | | 18 | | 18 | | 6 | | 12 | | 0.04 | |
| Litigation (recoveries)/charges, net | | - | | 48 | | 48 | | 19 | | 29 | | 0.09 | |
| Non-GAAP | $ | 6,544 | - % | 2,769 | (4)% | $ 2,572 | $ | 839 | $ | 1,727 | (0)% | $ 5.40 | 3 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Financial Measures and Definitions schedules

[2] attributable to Cardinal Health, Inc.

[3] GAAP diluted EPS for the three months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.21, which includes $0.19 due to change in the effective tax rate and $0.02 due to the change in weighted average shares outstanding. GAAP diluted EPS for the twelve months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.39, which includes $0.26 due to change in the effective tax rate and $0.13 due to the change in weighted average shares outstanding. The change in GAAP diluted EPS due to the effective tax rate is calculated as ((GAAP Earnings before Income Taxes for the current period times (one minus the current period GAAP Effective Tax Rate)) minus (GAAP Earnings before Income Taxes for the current period times (one minus the prior period GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in GAAP diluted EPS due to the weighted average shares outstanding is calculated as (GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

[4] Non-GAAP diluted EPS for the three months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.22, which includes $0.19 due to change in the effective tax rate and $0.03 due to the change in weighted average shares outstanding. Non-GAAP diluted EPS for the twelve months ended June 30, 2017 compared to the prior year period was favorably impacted by $0.44, which includes $0.27 due to change in the effective tax rate and $0.17 due to the change in weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the effective tax rate is calculated as ((Non-GAAP Earnings before Income Taxes for the current period times (one minus the current period Non-GAAP Effective Tax Rate)) minus (Non-GAAP Earnings before Income Tax for the current period times (one minus the prior period Non-GAAP Effective Tax Rate))) divided by the current period weighted average shares outstanding. The change in Non-GAAP diluted EPS due to the weighted average shares outstanding is calculated as (Non-GAAP Net Earnings for the current period divided by the current period weighted average shares outstanding) minus (Non-GAAP Net Earnings for the current period divided by the prior period weighted average shares outstanding).

The sum of the components may not equal the total due to rounding.
We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.
There were no losses on extinguishment of debt during the periods presented.

**Cardinal Health, Inc. and Subsidiaries**

<u>Forward Looking non-GAAP Measures</u>

In this presentation, the Company presents its outlook for fiscal 2018 non-GAAP EPS and non-GAAP Effective Tax Rate (ETR).  The Company does not provide EPS or ETR outlook, which are the most directly comparable GAAP measures to non-GAAP EPS and non-GAAP ETR, respectively, because changes in the items that the Company excludes from GAAP EPS and GAAP ETR to calculate these measures can be dependent on future events that are less capable of being controlled or reliably predicted by management and are not part of the Company's routine operating activities. Additionally, due to their unpredictability, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on EPS or ETR outlook numbers.

The timing and amount of any of the excluded items could significantly impact the Company's fiscal 2018 EPS. Over the past five fiscal years, the excluded items have lowered the Company's EPS from $0.47 to $2.76, which includes a goodwill impairment charge of $2.32 per share related to our Nuclear Pharmacy Services division that we recognized in fiscal 2013. For the nine months ending March 31, 2018, the excluded items have increased the Company's EPS by $0.51, which includes a $2.88 net transitional tax benefit related to the Tax Cuts and Jobs Act.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Debt**: long-term obligations plus short-term borrowings.

**Debt to Total Capital**: debt divided by (debt plus total Cardinal Health, Inc. shareholders' equity).

**Interest and Other, net**: other (income)/expense, net plus interest expense, net.

**Net Debt**: a Non-GAAP measure defined as debt minus (cash and equivalents).

**Net Debt to Capital**: a Non-GAAP measure defined as net debt divided by (net debt plus total Cardinal Health, Inc. shareholders' equity).

**Non-GAAP Diluted EPS attributable to Cardinal Health, Inc. or "Non-GAAP Diluted EPS" or "Non-GAAP Diluted Earnings Per Share"**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Non-GAAP Diluted EPS from continuing operations**: non-GAAP earnings from continuing operations divided by diluted weighted-average shares outstanding.

**Non-GAAP Effective Tax Rate**: (provision for income taxes adjusted for (1) LIFO charges/(credits)[1], (2) restructuring and employee severance[2], (3) amortization and other acquisition-related costs[3], (4) impairments and (gain)/loss on disposal of assets[4], (5) litigation (recoveries)/charges, net[5], and (6) loss on extinguishment of debt[6] and (7) transitional tax benefit[7]) divided by (earnings before income taxes adjusted for the first six items).

**Non-GAAP Gross Margin**: Gross margin excluding LIFO charges/(credits).

[1]The inventories of the Company's core pharmaceutical distribution facilities in the Pharmaceutical segment are valued at the lower of cost, using the LIFO method, or market. These charges or credits are included in cost of products sold, and represent changes in the Company's LIFO inventory reserve.

[2]Programs by which the Company fundamentally changes its operations such as closing and consolidating facilities, moving manufacturing of a product to another location, production or business process sourcing, employee severance (including rationalizing headcount or other significant changes in personnel), and realigning operations (including realignment of the management structure of a business unit in response to changing market conditions).

[3]Costs that consist primarily of amortization of acquisition-related intangible assets, transaction costs, integration costs, and changes in the fair value of contingent consideration obligations.

[4]Asset impairments and (gains)/losses from the disposal of assets not eligible to be classified as discontinued operations are classified within impairments and (gain)/loss on disposal of assets within the condensed consolidated statements of earnings.

[5]Loss contingencies related to litigation and regulatory matters and income from favorable resolution of legal matters.

[6]Charges related to the make-whole premium on the redemption of notes.

[7]Estimate for the re-measurement of deferred tax assets and liabilities due to the reduction of the U.S. federal corporate income tax rate and the repatriation tax on undistributed foreign earnings.

**Cardinal Health, Inc. and Subsidiaries**

**Definitions**

**Non-GAAP Net Earnings attributable to Cardinal Health, Inc. or "Non-GAAP Net Earnings"**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, and (7) transitional tax benefit, each net of tax.

**Non-GAAP Operating Earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5)  litigation (recoveries)/charges, net.

**Non-GAAP Return on Equity**: (annualized current period net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5)  litigation (recoveries)/charges, net, and (6) loss on extinguishment of debt, and (7) transitional tax benefit, each net of tax) divided by average Cardinal Health, Inc. shareholders' equity.

**Return on Equity**: annualized current period net earnings attributable to Cardinal Health, Inc. divided by average Cardinal Health, Inc. shareholders' equity.

**Segment Profit**: segment revenue minus (segment cost of products sold and segment distribution, selling, general, and administrative expenses).

**Segment Profit Margin**: segment profit divided by segment revenue.

# EXHIBIT 100

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2018

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

**CardinalHealth**
*Essential to care™*

# Cardinal Health, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**

*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The number of the registrant's common shares, without par value, outstanding as of April 30, 2018, was the following: 310,685,049.

# Cardinal Health
**Q3 Fiscal 2018 Form 10-Q**

## Table of Contents

| | Page |
|---|---|
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 2 |
| Explanation and Reconciliation of Non-GAAP Financial Measures | 14 |
| Quantitative and Qualitative Disclosures about Market Risk | 17 |
| Controls and Procedures | 17 |
| Legal Proceedings | 17 |
| Risk Factors | 17 |
| Unregistered Sales of Equity Securities and Use of Proceeds | 18 |
| Financial Statements and Supplementary Data | 19 |
| Exhibits | 34 |
| Form 10-Q Cross Reference Index | 35 |
| Signatures | 36 |

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a globally integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. We provide medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. We connect patients, providers, payers, pharmacists and manufacturers for integrated care coordination and better patient management. We manage our business and report our financial results in two segments: Pharmaceutical and Medical. As used in this report, "we," "our," "us," and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our fiscal year ends on June 30. References to fiscal 2018 and fiscal 2017 are to the fiscal years ending or ended June 30, 2018 and June 30, 2017, respectively.

## Forward-Looking Statements

This Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (this "Form 10-Q") (including information incorporated by reference) includes "forward-looking statements" addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), but there are others in this Form 10-Q, which may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results, trends or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those made, projected or implied. The most significant of these risks and uncertainties are described in Exhibit 99.1 to this Form 10-Q and in "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (our "2017 Form 10-K"). Forward-looking statements in this Form 10-Q speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

## Non-GAAP Financial Measures

In the "Overview of Consolidated Results" section of MD&A, we use financial measures that are derived from our consolidated financial data but are not presented in our condensed consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this Form 10-Q.

**MD&A** | **Overview**

# Management's Discussion and Analysis of Financial Condition and Results of Operations

The discussion and analysis presented below is concerned with material changes in financial condition and results of operations between the periods specified in our condensed consolidated balance sheets at March 31, 2018 and June 30, 2017, and in our condensed consolidated statements of earnings for the three and nine months ended March 31, 2018 and 2017. All comparisons presented are with respect to the prior-year period, unless stated otherwise. This discussion and analysis should be read in conjunction with the MD&A included in our 2017 Form 10-K.

## Overview of Consolidated Results

### Revenue



**Revenue**
**(in billions)**

| | | | |
|---|---|---|---|
| $31.8 | $33.6 | $97.0 | $101.5 |
| Q3 FY17 | Q3 FY18 | YTD FY17 | YTD FY18 |

During the three and nine months ended March 31, 2018, revenue increased 6 percent to $33.6 billion and 5 percent to $101.5 billion, respectively, primarily due to sales growth from pharmaceutical distribution and specialty pharmaceutical customers, partially offset by the previously announced May 2017 expiration of a large pharmaceutical distribution mail order customer contract. The Patient Recovery Business acquisition also contributed to the increase in revenue during the three and nine months ended March 31, 2018.

| MD&A | Overview |
|------|----------|

## GAAP and Non-GAAP Operating Earnings



|  | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| (in millions) | **2018** | 2017 | Change | **2018** | 2017 | Change |
| **GAAP operating earnings** | $ **546** | $ 605 | (10)% | $ **1,206** | $ 1,681 | (28)% |
| LIFO charges/(credits) | **-** | (9) | | **-** | - | |
| Restructuring and employee severance | **2** | 15 | | **155** | 31 | |
| Amortization and other acquisition-related costs | **175** | 128 | | **543** | 365 | |
| Impairments and (gain)/loss on disposal of assets | **(6)** | 2 | | **62** | 15 | |
| Litigation (recoveries)/charges, net | **64** | 18 | | **155** | 37 | |
| **Non-GAAP operating earnings** | $ 781 | $ 759 | 3% | $ 2,121 | $ 2,129 | -% |

The sum of the components may not equal the total due to rounding.

The decrease in GAAP operating earnings during the three months ended March 31, 2018 was primarily due to increased amortization of acquisition-related intangible assets as a result of the Patient Recovery Business acquisition; litigation charges associated with inferior vena cava (IVC) filter product liability claims; performance from Cardinal Health Brand products; and a modest, negative impact from our Pharmaceutical segment generic program. These factors were partially offset by contributions from the Patient Recovery Business acquisition.

The decrease in GAAP operating earnings during the nine months ended March 31, 2018 was primarily due to increased amortization of acquisition-related intangible assets as a result of the Patient Recovery Business acquisition; contract termination restructuring costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model; litigation charges associated with inferior vena cava (IVC) filter product liability claims; a modest, negative impact from our Pharmaceutical segment generic program; performance from Cardinal Health Brand products; the loss on sale from the divestiture of our China distribution business; and the costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems. These factors were partially offset by contributions from the Patient Recovery Business acquisition.

The increase in non-GAAP operating earnings during the three months ended March 31, 2018 was primarily due to contributions from the Patient Recovery Business acquisition, partially offset by performance from Cardinal Health Brand products, primarily Cordis performance, and a modest, negative impact from our Pharmaceutical segment generic program.

The decrease in non-GAAP operating earnings during the nine months ended March 31, 2018 was primarily due to performance from our Pharmaceutical segment generics program, performance from Cardinal Health Brand products and costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems. These were largely offset by contributions from the Patient Recovery Business acquisition.

| **MD&A** | **Overview** |

## GAAP and Non-GAAP Diluted EPS



| ($ per share) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | **2018** | 2017 | **Change** | **2018** | 2017 | **Change** |
| **GAAP** [1] | **$ 0.81** | $ 1.20 | **(33)%** | **$ 4.50** | $ 3.17 | **42%** |
| LIFO charges/(credits) | **-** | (0.02) | | **-** | - | |
| Restructuring and employee severance | **0.06** | 0.03 | | **0.40** | 0.06 | |
| Amortization and other acquisition-related costs | **0.42** | 0.27 | | **1.27** | 0.76 | |
| Impairments and (gain)/loss on disposal of assets | **0.02** | 0.01 | | **0.38** | 0.03 | |
| Litigation (recoveries)/charges, net | **0.14** | 0.03 | | **0.33** | 0.07 | |
| Transitional tax benefit, net | **(0.06)** | - | | **(2.88)** | - | |
| **Non-GAAP** [1] | **$ 1.39** | $ 1.53 | **(9)%** | **$ 3.99** | $ 4.10 | **(3)%** |

The sum of the components may not equal the total due to rounding.

(1)  diluted earnings per share attributable to Cardinal Health, Inc. ("diluted EPS")

During the three months ended March 31, 2018, GAAP diluted EPS decreased primarily due to a higher effective tax rate and an increase in interest expense. The higher effective tax rate is due to a change in discrete items, a reduction in projected Cordis income and its impact on jurisdictional mix encompassing U.S. and international operations, partially offset by the net benefit from enactment of the U.S. Tax Cuts and Jobs Act ("Tax Act").

During the nine months ended March 31, 2018, GAAP diluted EPS increased primarily due to the net benefit from enactment of the Tax Act, which includes a provisional net benefit of $952 million related to the remeasurement of our deferred tax assets and liabilities to the new federal statutory rate, as well as the benefit from applying a lower federal tax rate to our year-to-date U.S. pre-tax earnings and a provisional tax expense of $41 million for a one-time repatriation tax applied to undistributed foreign earnings. This net tax benefit was partially offset by an increase in interest expense.

During the three months ended March 31, 2018, non-GAAP diluted EPS decreased primarily due to a higher non-GAAP effective tax rate and an increase in interest expense, partially offset by the net benefit of the factors impacting non-GAAP operating earnings.

During the nine months ended March 31, 2018, non-GAAP diluted EPS decreased primarily due to an increase in interest expense, partially offset by the benefit of applying a lower U.S. federal statutory tax rate to U.S. pre-tax non-GAAP earnings as a result of the Tax Act.

## Cash and Equivalents

Our cash and equivalents balance was $2.2 billion at March 31, 2018 compared to $6.9 billion at June 30, 2017. The decrease in cash and equivalents during the nine months ended March 31, 2018 was due to $6.1 billion paid for acquisitions, $436 million paid in dividends, $450 million paid for share repurchases and $403 million paid to redeem our 1.7% notes due 2018. These were offset in part by net cash of $2.2 billion provided by operating activities and $861 million of net cash proceeds from the sale of our China distribution business.

| MD&A | Overview |
|------|----------|

# Significant Developments in Fiscal 2018 and Trends

## Acquisitions and Divestitures

### Patient Recovery Business Acquisition

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc for $6.1 billion in cash. The Patient Recovery Business manufactures 23 categories of medical products that are sold into multiple healthcare channels, and includes numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition further expanded the Medical segment's portfolio of self-manufactured products.

### China Distribution Business Divestiture

During the three months ended March 31, 2018, we completed the divestiture of our pharmaceutical and medical products distribution business in China (the "China distribution business") to Shanghai Pharmaceuticals Holding Co., Ltd. for gross proceeds of $1.2 billion. The net proceeds were $861 million after adjusting for third party indebtedness and preliminary transaction adjustments. The net proceeds are not reflective of tax obligations due in connection with the sale, for which we have recorded a liability of $57 million. In connection with the divestiture, we recognized a net loss of $60 million, which is comprised of the $67 million disposal group write-down which was recognized during the three months ended December 31, 2017 when we entered into the definitive agreement to sell the business, offset by a $7 million gain recognized during the three months ended March 31, 2018 resulting from fluctuations in working capital and foreign currency exchange rates.

## Trends

### Segment Performance for the Remainder of Fiscal 2018 and for Fiscal 2019

Within our Medical segment Cordis business, we expect continued operating cost and inventory challenges to negatively impact segment profit for the remainder of fiscal 2018.

Within our Pharmaceutical segment, we expect customer pricing changes to negatively impact segment profit for the remainder of fiscal 2018 and for fiscal 2019. We also expect fiscal 2019 to be negatively impacted by the previously-announced loss of a large pharmaceutical distribution customer. As is generally the case, the frequency, timing, magnitude, and profit impact of customer pricing changes, branded and generic pharmaceutical manufacturer pricing changes and customer wins and losses are uncertain and their impact on segment profit for the remainder of fiscal 2018 and for fiscal 2019 could be more or less than we expect.

### Tax Cuts and Jobs Act

The Tax Act was enacted in December 2017. The Tax Act, among other things, reduced the U.S. federal corporate tax rate from 35 percent to 21 percent and requires companies to pay a one-time tax to repatriate, for U.S. purposes, earnings of certain foreign subsidiaries that were previously deferred for tax purposes. In addition, beginning in our fiscal year 2019, it limits certain deductions and creates new taxes on certain foreign sourced earnings. The rate change was effective at the beginning of calendar year 2018 and, as a result, we have a blended U.S. federal statutory tax rate of 28.1 percent for our fiscal year 2018. The application of the lower federal tax rate to our year-to-date U.S. pre-tax earnings resulted in a tax benefit during the nine months ended March 31, 2018. We expect the lower federal statutory rate to have a significant positive impact on earnings per share in our fiscal year 2019. Additionally, we recognized a $911 million provisional net transitional tax benefit during the nine months ended March 31, 2018, comprised of the remeasurement of our U.S. deferred tax assets and liabilities at the lower tax rate partially offset by the expense for the repatriation tax.

We are still completing our accounting for the tax effects of the Tax Act because all of the necessary information is not currently available, prepared, or analyzed. As such, the amounts we have recorded are provisional estimates and, as permitted by the SEC, we will continue to assess the impact of enactment of the Tax Act and we may record additional provisional amounts or adjustments to provisional amounts during the remainder of fiscal 2018 and in the first half of fiscal 2019.

| MD&A | Results of Operations |
|---|---|

# Results of Operations

## Revenue





| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | Change | 2018 | 2017 | Change |
| Pharmaceutical | $ 29,720 | $ 28,406 | 5% | $ 89,786 | $ 86,911 | 3% |
| Medical | 3,916 | 3,418 | 15% | 11,684 | 10,107 | 16% |
| Total segment revenue | 33,636 | 31,824 | 6% | 101,470 | 97,018 | 5% |
| Corporate | (3) | (3) | -% | (10) | (8) | 25% |
| Total revenue | $ 33,633 | $ 31,821 | 6% | $ 101,460 | $ 97,010 | 5% |

### Pharmaceutical Segment

Pharmaceutical segment revenue growth was primarily due to sales growth from pharmaceutical distribution and specialty pharmaceutical customers, which together increased revenue by $2.6 billion and $6.1 billion during the three and nine months ended March 31, 2018, respectively. The increases were partially offset by the previously announced May 2017 expiration of a large pharmaceutical distribution mail order customer contract and the February 2018 divestiture of our China distribution business.

### Medical Segment

Medical segment revenue growth for the three months ended March 31, 2018 was primarily due to $526 million of contributions from acquisitions, which primarily includes the Patient Recovery Business acquisition.

Medical segment revenue growth for the nine months ended March 31, 2018 was primarily due to $1.4 billion of contributions from acquisitions, which primarily includes the Patient Recovery Business acquisition, and sales growth from new and existing customers.

## Cost of Products Sold

Cost of products sold for the three and nine months ended March 31, 2018 increased $1.6 billion (5 percent) and $3.9 billion (4 percent) compared to the prior-year periods, respectively, as a result of the same factors affecting the changes in revenue and gross margin.

| MD&A | Results of Operations |
|------|----------------------|

## Gross Margin



Gross Margin (in billions)



Gross Margin Rate (Gross Margin as a Percent of Revenue)

| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | Change | 2018 | 2017 | Change |
| Gross margin | $ 1,913 | $ 1,728 | 11% | $ 5,446 | $ 4,921 | 11% |

Gross margin during the three and nine months ended March 31, 2018 increased $185 million and $525 million, respectively, compared to the prior-year periods primarily due to acquisitions ($232 million and $568 million, respectively), which primarily includes the Patient Recovery Business acquisition.

Gross margin rate grew 26 and 30 basis points during the three and nine months ended March 31, 2018, respectively, due to acquisitions, which primarily includes the Patient Recovery Business acquisition, partially offset by the negative impact of changes in pharmaceutical distribution product mix.

## Distribution, Selling, General and Administrative ("SG&A") Expenses

| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | Change | 2018 | 2017 | Change |
| SG&A expenses | $ 1,132 | $ 960 | 18% | $ 3,325 | $ 2,792 | 19% |

The increase in SG&A expenses during the three and nine months ended March 31, 2018 was largely due to acquisitions ($142 million and $367 million, respectively), which primarily includes the Patient Recovery Business acquisition. The increase in SG&A expenses during the nine months ended March 31, 2018 also includes costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems.

| MD&A | Results of Operations |
|------|----------------------|

## Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 15 of the "Notes to Condensed Consolidated Financial Statements" for additional information on segment profit.



Pharmaceutical Segment Profit (in millions)

Q3 FY17 $611  Q3 FY18 $596  YTD FY17 $1,682  YTD FY18 $1,576



Medical Segment Profit (in millions)

Q3 FY17 $148  Q3 FY18 $199  YTD FY17 $435  YTD FY18 $548

|  | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| (in millions) | 2018 | 2017 | Change | 2018 | 2017 | Change |
| Pharmaceutical | $ 596 | $ 611 | (3)% | $ 1,576 | $ 1,682 | (6)% |
| Medical | 199 | 148 | 34% | 548 | 435 | 26% |
| Total segment profit | 795 | 759 | 5% | 2,124 | 2,117 | -% |
| Corporate | (249) | (154) | 62% | (918) | (436) | 111% |
| Total consolidated operating earnings | $ 546 | $ 605 | (10)% | $ 1,206 | $ 1,681 | (28)% |

### Pharmaceutical Segment Profit

Pharmaceutical segment profit during the three months ended March 31, 2018 was adversely impacted by our generic program performance, which includes the negative impact of generic pharmaceutical customer pricing changes partially offset by the benefits of Red Oak Sourcing. Performance from our specialty pharmaceutical products distribution and services business positively impacted Pharmaceutical segment profit.

The decrease in Pharmaceutical segment profit during the nine months ended March 31, 2018 was primarily due to our generic program performance and the costs related to our multi-year project to replace certain Pharmaceutical segment finance and operating information systems. Performance from our specialty pharmaceutical products distribution and services business positively impacted Pharmaceutical segment profit.

### Medical Segment Profit

The increase in Medical segment profit during the three months ended March 31, 2018 was due to acquisitions, which primarily includes the Patient Recovery Business acquisition. The increase was partially offset by performance from the Cordis business, and to a lesser extent, performance from other Cardinal Health Brand products.

The increase in Medical segment profit during the nine months ended March 31, 2018 was primarily due to acquisitions, which included the unfavorable cost of products sold impact from the fair value step up of inventory acquired with the Patient Recovery Business acquisition. The increase was partially offset by performance from the Cordis business, and to a lesser extent, performance from other Cardinal Health Brand products.

The performance from the Cordis business for both periods primarily reflects operating costs and inventory reserves.

### Corporate

The changes in Corporate during the three and nine months ended March 31, 2018 were due to the factors discussed in the Other Components of Consolidated Operating Earnings section that follows.

| MD&A | Results of Operations |
|------|----------------------|

## Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | Three Months Ended March 31, | | Nine Months Ended March 31, | |
|---|---|---|---|---|
| | **2018** | 2017 | **2018** | 2017 |
| Restructuring and employee severance | $ **2** | $ 15 | $ **155** | $ 31 |
| Amortization and other acquisition-related costs | **175** | 128 | **543** | 365 |
| Impairments and (gain)/loss on disposal of assets, net | **(6)** | 2 | **62** | 15 |
| Litigation (recoveries)/charges, net | **64** | 18 | **155** | 37 |

**Restructuring and Employee Severance**

The increase in restructuring and employee severance during the nine months ended March 31, 2018 was primarily due to $125 million in contract termination costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model.

**Amortization and Other Acquisition-Related Costs**

Amortization of acquisition-related intangible assets was $149 million and $96 million for the three months ended March 31, 2018 and 2017, respectively, and $434 million and $291 million for the nine months ended March 31, 2018 and 2017, respectively. The increases in amortization of acquisition-related intangible assets during the three and nine months ended March 31, 2018 were largely due to the Patient Recovery Business acquisition.

Transaction and integration costs associated with the Patient Recovery Business acquisition were $25 million and $85 million for the three and nine months ended March 31, 2018, respectively.

**Impairments and (gain)/loss on disposal of assets, net**

During the nine months ended March 31, 2018 we recognized a net loss of $60 million related to the divestiture of our China distribution business. This loss is comprised of the $67 million disposal group write-down which was recognized during the three months ended December 31, 2017 when we entered into the definitive agreement to sell the business, offset by a $7 million gain recognized during the three months ended March 31, 2018 resulting from fluctuations in working capital and foreign currency exchange rates.

**Litigation (Recoveries)/Charges, Net**

The increases in litigation charges during the three and nine months ended March 31, 2018 were due to an increase in estimated losses and legal defense costs associated with inferior vena cava (IVC) filter product liability claims.

## Earnings Before Income Taxes

In addition to the items discussed above, earnings before income taxes were impacted by the following:

| (in millions) | Three Months Ended March 31, | | | Nine Months Ended March 31, | | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | Change | 2018 | 2017 | Change |
| Other (income)/expense, net | $ (2) | $ (5) | N.M. | $ (6) | $ (2) | N.M. |
| Interest expense, net | $ 84 | $ 46 | 83% | $ 251 | $ 134 | 87% |
| Loss on extinguishment of debt | $ - | $ - | N.M. | $ 2 | $ - | N.M. |

**Interest expense, net**

The increases in interest expense during the three and nine months ended March 31, 2018 were primarily due to new debt issued in June 2017 to fund a portion of the purchase price of the Patient Recovery Business acquisition.

| MD&A | Results of Operations |
|------|----------------------|

## Provision for/(Benefit from) Income Taxes

During the three months ended March 31, 2018 and 2017, the effective tax rate was 45.1 percent and 32.3 percent, respectively. The effective tax rate for the three months ended March 31, 2018 was negatively impacted by a reduction in projected Cordis income and its impact on jurisdictional mix encompassing U.S. and international operations, as well as net unfavorable discrete items of $18 million, partially offset by the favorable impact of the lower U.S. federal income tax rate from enactment of the Tax Act. The effective tax rate for the three months ended March 31, 2017 was impacted by net favorable discrete items of $31 million.

During the nine months ended March 31, 2018 and 2017, the effective tax rate was (48.6) percent and 34.4 percent, respectively. The effective tax rate for the nine months ended March 31, 2018 was favorably impacted by the provisional net benefit from enactment of the Tax Act.

The provisional net benefit from the Tax Act during the three and nine months ended March 31, 2018 includes a provisional net tax benefit of $18 million and $952 million, respectively, related to the remeasurement of our deferred tax assets and liabilities to the new federal statutory rate, the benefit from the impact of applying a lower federal tax rate to our year-to-date U.S. pre-tax earnings and a provisional tax expense of $41 million for the one-time repatriation tax applied to our undistributed foreign earnings.

Our effective tax rate for the nine months ended March 31, 2018 also includes $57 million of tax expense recognized during the three months ended December 31, 2017 in connection with the sale of our China distribution business.

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends and share repurchases. If we decide to engage in one or more acquisitions, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $2.2 billion at March 31, 2018 compared to $6.9 billion at June 30, 2017. At March 31, 2018, our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

During the nine months ended March 31, 2018, we deployed $6.1 billion for acquisitions, net of cash acquired, $450 million on share repurchases, $436 million for dividends, $403 million to redeem our 1.7% notes due 2018 and $246 million for capital expenditures. This was partially offset by net cash of $2.2 billion provided by operating activities and the $861 million of net proceeds from the divestiture of the China distribution business. The $1.8 billion increase in net cash provided by operating activities during the nine months ended March 31, 2018 compared to $460 million in the prior-year period was primarily due to changes in working capital.

The cash and equivalents balance at March 31, 2018 includes $614 million of cash held by subsidiaries outside of the United States.

Though our foreign earnings as of December 31, 2017 have been deemed to be repatriated from a U.S. federal tax perspective, we have not yet completed our assessment of the Tax Act on our plans to reinvest foreign earnings and as such have not changed our prior conclusion that the earnings are indefinitely reinvested. As such, no non-U.S. taxes were recorded at March 31, 2018. If we decide to repatriate these earnings in the future, we may be subject to certain non-U.S. taxes at that time. See Note 8 of the "Notes to Condensed Consolidated Financial Statements" for additional information on the Tax Act.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $2.0 billion commercial paper program, which is backed by a $2.0 billion revolving credit facility, and a $1.0 billion committed receivables sales facility program.

At March 31, 2018, we had no amounts outstanding under the commercial paper program, revolving credit facility or the committed receivables sales facility program. During the nine months ended March 31, 2018, we had maximum amounts outstanding under our

commercial paper and committed receivables programs of $1.7 billion and an average daily amount outstanding of $363 million.

Our revolving credit facility and committed receivables sales facility programs require us to maintain, as of the end of any calendar quarter, a consolidated leverage ratio of no more than 4.25-to-1, which will reduce to 3.25-to-1 in March 2019. The ratio temporarily increased as a result of our acquisition of the Patient Recovery Business. As of March 31, 2018, we were in compliance with this financial covenant.

## Capital Deployment

### Capital Expenditures

Capital expenditures during the nine months ended March 31, 2018 and 2017 were $246 million and $293 million, respectively.

### Dividends

On February 7, 2018, our Board of Directors approved a quarterly dividend of $0.4624 per share, or $1.85 per share on an annualized basis, which was paid on April 15, 2018 to shareholders of record on April 2, 2018.

### Share Repurchases

During the three months ended March 31, 2018, we repurchased $300 million of our common shares pursuant to an accelerated share repurchase ("ASR") program, which was completed in March 2018. See Note 13 of the "Notes to condensed consolidated financial statements" for additional information. During the nine months ended March 31, 2018, we repurchased $450 million of our common shares. We funded the repurchases with available cash and short term borrowings.

On February 7, 2018, our Board of Directors approved a new $1.0 billion share repurchase program that expires on December 31, 2020. At March 31, 2018, we had $993 million remaining under that program.

### Funding for Acquisition of Patient Recovery Business

On July 29, 2017, we acquired the Patient Recovery Business from Medtronic plc for $6.1 billion in cash. We funded the acquisition through $4.5 billion in new long-term debt issued in June 2017, the use of existing cash and borrowings under existing credit arrangements.

### China Distribution Business Divestiture

On February 1, 2018, we completed the divestiture of our China distribution business to Shanghai Pharmaceuticals Holding Co., Ltd. for gross proceeds of $1.2 billion. The net proceeds were $861 million after adjusting for third-party indebtedness and preliminary transaction adjustments. The net proceeds are not reflective of tax obligations due in connection with the sale, for which we have recorded a liability of $57 million. The purchase price is subject to adjustment based on working capital requirements as set forth in the definitive agreement.

# Other Items

The MD&A in our 2017 Form 10-K addresses our contractual obligations and off-balance sheet arrangements, as of and for the fiscal year ended June 30, 2017. There have been no subsequent material changes outside of the ordinary course of business to those items.

# Critical Accounting Policies and Sensitive Accounting Estimates

The discussion and analysis presented below is concerned with material changes in critical accounting policies and sensitive accounting estimates between the periods specified in our condensed consolidated balance sheets at March 31, 2018 and June 30, 2017. This discussion and analysis should be read in conjunction with the Critical Accounting Policies and Sensitive Accounting Estimates included in our 2017 Form 10-K. There have been no changes to our critical accounting policies and sensitive accounting estimates, except related to Goodwill detailed below and the accounting effects resulting from the Tax Act as discussed further in Note 8, respectively, of the "Notes to Condensed Consolidated Financial Statements."

Critical accounting policies are those accounting policies that (i) can have a significant impact on our financial condition and results of operations and (ii) require the use of complex and subjective estimates based upon past experience and management's judgment. Other people applying reasonable judgment to the same facts and circumstances could develop different estimates. Because estimates are inherently uncertain, actual results may differ. In this section, we describe the significant policies applied in preparing our consolidated financial statements that management believes are the most dependent on estimates and assumptions for goodwill impairment testing.

## Goodwill

In January 2017, the Financial Accounting Standards Board issued amended accounting guidance that simplifies the accounting for goodwill impairment by eliminating the step of measuring a goodwill impairment by estimating the implied fair value of goodwill. Instead, goodwill impairment will be measured as the amount by which the reporting unit's carrying value exceeds its fair value, limited to the carrying value of goodwill. We adopted this guidance in the second quarter of fiscal 2018. For further discussion of accounting policies, see Critical Accounting Policies and Sensitive Accounting Estimates and Note 1 of the "Notes to Consolidated Financial Statements" contained in our 2017 Form 10-K.

Purchased goodwill is tested for impairment at least annually. Qualitative factors are first assessed to determine if it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If it is determined that it is more likely than not that the fair value does not exceed the carrying amount, then a quantitative test is performed. The quantitative goodwill impairment test involves a comparison of the estimated fair value of the reporting unit to the respective carrying amount.

Goodwill impairment testing involves judgment, including the identification of reporting units, qualitative evaluation of events and circumstances to determine if it is more likely than not that an impairment exists, and, if necessary, the estimation of the fair value of the applicable reporting unit. Our qualitative evaluation considers the weight of evidence and significance of all identified events and circumstances and most relevant drivers of fair value, both positive and negative, in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount.

**Medical Unit Goodwill Qualitative Assessment**

The divisions of our Medical operating segment, excluding our Cardinal Health at Home and naviHealth divisions, form a single reporting unit ("Medical Unit"). In connection with classification of the China distribution business as assets held for sale in the second quarter of fiscal 2018, we performed a quantitative assessment for goodwill impairment of our Medical Unit and determined that the fair value exceeded its carrying value by approximately 8 percent, and therefore no impairment was recognized. The goodwill balance for our Medical Unit was $5.7 billion at March 31, 2018.

Due to indications of lower than expected fiscal 2018 profit for the Medical Unit, particularly within our Cordis business, we performed a qualitative assessment for goodwill impairment of our Medical Unit as of March 31, 2018. A qualitative goodwill impairment assessment is an inherently judgmental process that depends on the critical evaluation of various factors that may individually or in the aggregate indicate that it is more likely than not that the fair value of a reporting unit is less than its carrying value. Our qualitative assessment considered factors, both positive and negative, that differ from the analysis that we conducted in the second quarter of fiscal 2018, including, as a positive factor, lower U.S. Federal taxes from the enactment of the Tax Act, and as a negative factor, the decrease in expected profits. In weighing the totality of the positive and negative factors, and considering the result of corroborating quantitative sensitivity analyses, we concluded that it is not more likely than not that the fair value of the Medical Unit is less than its carrying amount and therefore a quantitative assessment is not required.

# Explanation and Reconciliation of Non-GAAP Financial Measures

The "Overview of Consolidated Results" section within MD&A in this Form 10-Q contains financial measures that are not calculated in accordance with GAAP.

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this Form 10-Q for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges from non-GAAP metrics facilitates comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they relate to programs in which we fundamentally change our operations and because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion facilitates comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and are inherently unpredictable in timing and amount, and in the case of impairments, are non-cash amounts, so their exclusion facilitates comparison of historical, current and forecasted financial results.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt financing transactions.

- Transitional tax benefit, net related to the Tax Cuts and Jobs Act is excluded because it results from the one-time impact during the one-year measurement period of a very significant change in the U.S. federal corporate tax rate and, due to the significant size of the benefit, obscures analysis of trends and financial performance. The transitional tax benefit includes the initial estimate and measurement period adjustments for the re-measurement of deferred tax assets and liabilities due to the reduction of the U.S. federal corporate income tax rate and the repatriation tax on undistributed foreign earnings, both of which are subject to adjustment during an up to 12 month measurement period.

The tax effect for each of the items listed above, other than the transitional tax benefit item, is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Explanation and Reconciliation of Non-GAAP Financial Measures**

## Definitions

**Growth rate calculation:** growth rates in this Form 10-Q are determined by dividing the difference between current-period results and prior-period results by prior-period results.

**Non-GAAP operating earnings**: operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes**: earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP net earnings attributable to Cardinal Health, Inc.**: net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, each net of tax, and (7) transitional tax benefit, net.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.**: non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Explanation and Reconciliation of Non-GAAP Financial Measures**

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings Before Income Taxes | Income Taxes | Net Earnings[1] | Net Earnings[1] Growth Rate | Effective Tax Rate | Diluted EPS[1] | Diluted EPS[1] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | **Three Months Ended March 31, 2018** | | | | | | |
| **GAAP** | $ 546 | (10)% | $ 464 | $ 209 | $ 255 | (33)% | 45.1% | $ 0.81 | (33)% |
| Restructuring and employee severance | 2 | | 2 | (17) | 19 | | | 0.06 | |
| Amortization and other acquisition-related costs | 175 | | 175 | 44 | 131 | | | 0.42 | |
| Impairments and loss on disposal of assets | (6) | | (6) | (14) | 8 | | | 0.02 | |
| Litigation (recoveries)/charges, net | 64 | | 64 | 21 | 43 | | | 0.14 | |
| Transitional tax benefit, net[2] | - | | - | 17 | (17) | | | (0.06) | |
| **Non-GAAP** | $ 781 | 3% | $ 700 | $ 262 | $ 437 | (10)% | 37.5% | $ 1.39 | (9)% |
| | | | **Three Months Ended March 31, 2017** | | | | | | |
| GAAP | $ 605 | (8)% | $ 564 | $ 182 | $ 381 | (1)% | 32.3% | $ 1.20 | 3% |
| LIFO charges/(credits) | (9) | | (9) | (4) | (5) | | | (0.02) | |
| Restructuring and employee severance | 15 | | 15 | 6 | 9 | | | 0.03 | |
| Amortization and other acquisition-related costs | 128 | | 128 | 41 | 87 | | | 0.27 | |
| Impairments and loss on disposal of assets | 2 | | 2 | - | 2 | | | 0.01 | |
| Litigation (recoveries)/charges, net | 18 | | 18 | 7 | 11 | | | 0.03 | |
| Non-GAAP | $ 759 | (4)% | $ 718 | $ 232 | $ 485 | 3% | 32.3% | $ 1.53 | 7% |
| | | | **Nine Months Ended March 31, 2018** | | | | | | |
| **GAAP** | $ 1,206 | (28)% | $ 959 | $ (466) | $ 1,422 | 40% | (48.6)% | $ 4.50 | 42% |
| Restructuring and employee severance | 155 | | 155 | 29 | 126 | | | 0.40 | |
| Amortization and other acquisition-related costs | 543 | | 543 | 143 | 400 | | | 1.27 | |
| Impairments and loss on disposal of assets | 62 | | 62 | (57) | 119 | | | 0.38 | |
| Litigation (recoveries)/charges, net | 155 | | 155 | 51 | 104 | | | 0.33 | |
| Loss on extinguishment of debt | - | | 2 | 1 | 1 | | | - | |
| Transitional tax benefit, net[2] | - | | - | 911 | (911) | | | (2.88) | |
| **Non-GAAP** | $ 2,121 | -% | $ 1,875 | $ 612 | $ 1,261 | (4)% | 32.6% | $ 3.99 | (3)% |
| | | | **Nine Months Ended March 31, 2017** | | | | | | |
| GAAP | $ 1,681 | (9)% | $ 1,549 | $ 533 | $ 1,014 | (7)% | 34.4% | $ 3.17 | (4)% |
| LIFO charges/(credits) | - | | - | - | - | | | - | |
| Restructuring and employee severance | 31 | | 31 | 12 | 19 | | | 0.06 | |
| Amortization and other acquisition-related costs | 365 | | 365 | 120 | 245 | | | 0.76 | |
| Impairments and (gain)/loss on disposal of assets | 15 | | 15 | 4 | 11 | | | 0.03 | |
| Litigation (recoveries)/charges, net | 37 | | 37 | 14 | 23 | | | 0.07 | |
| Non-GAAP | $ 2,129 | (5)% | $ 1,997 | $ 684 | $ 1,311 | (4)% | 34.2% | $ 4.10 | -% |

[1] attributable to Cardinal Health, Inc.

[2] Reflects the estimated net transitional benefit from the remeasurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods. See Note 8 of the "Notes to Condensed Consolidated Financial Statements" for more information on the Tax Act.

e sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

**Other**

# Quantitative and Qualitative Disclosures About Market Risk

As previously disclosed in our 2017 Form 10-K, as a result of the completion of the acquisition of the Patient Recovery Business, our exposure to market price changes for commodities and to both translational and transactional foreign exchange rate fluctuations has increased since the end of fiscal 2017.

As previously disclosed, our annual direct exposure to market price changes for commodities has increased by approximately $100 million as a result of the completion of the acquisition of the Patient Recovery Business. At the time of filing this Form 10-Q, we have not completed our analysis to quantify the increase to our foreign exchange transactional exposure. As a result of the Patient Recovery Business acquisition and the divestiture of the China distribution

business, our income statement translational exposure has increased by approximately $100 million.

In addition, our total foreign exchange exposure related to intercompany financing transactions and certain other balance sheet items subject to revaluation that do not meet the requirements for hedge accounting treatment is now approximately $580 million. We use foreign currency economic (non-designated) hedge contracts to offset the remeasurement impact of this exposure.

For further discussion of our programs to manage interest rate risk, currency exchange risk and commodity price risk, see Note 11 of the "Notes to Consolidated Financial Statements" contained in our 2017 Form 10-K.

# Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2018. Based on this evaluation, our principal executive officer and principal financial officer have concluded that as of March 31, 2018, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

### Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

# Legal Proceedings

The legal proceedings described in Note 9 of the "Notes to Condensed Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

# Risk Factors

You should carefully consider the information in this Form 10-Q, including the risk factor below, and the risk factors discussed in "Risk Factors" and other risks discussed in our 2017 Form 10-K and our filings with the SEC since June 30, 2017. These risks could materially and adversely affect our results of operations, financial condition, liquidity and cash flows. Our business also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

**The public health crisis involving the abuse of prescription opioid pain medication could negatively affect our business.**

Our Pharmaceutical segment distributes prescription opioid pain medications. In recent years, the abuse of prescription opioid pain medication has received heightened public attention. These developments heighten a number of risks that we face and may present new risks that could adversely affect our operations or financial condition.

A significant number of counties, municipalities and other plaintiffs including state attorneys general have filed lawsuits against pharmaceutical manufacturers, pharmaceutical wholesale distributors (including us) and retail chains relating to the manufacturing, marketing and distribution of prescription opioid pain

medications. In addition, we are currently being investigated by a number of other states for the same activities and may be named as a defendant in additional lawsuits in the future. We are vigorously defending ourselves in these lawsuits. The defense and resolution of current and future lawsuits could adversely affect our results of operations and financial condition or have adverse reputational or operational effects on our business. See Note 9 of the "Notes to Condensed Consolidated Financial Statements" regarding these matters.

Other legislative, regulatory or industry measures to address the misuse of prescription opioid medications could affect our business in ways that we may not be able to predict. For example, in April 2018, the State of New York created an aggregate $100 million annual

**Other**

assessment on all manufacturers and distributors licensed to sell or distribute opioids in New York. The initial payment is due on January 1, 2019 for opioids sold or distributed during calendar year 2017. We are not currently able to estimate the portion of this assessment that will be assessed against us for calendar years 2017 or 2018. In addition, other states are considering legislation that could require us to pay taxes on the distribution of opioid medications in those states. These proposed bills vary in the tax amounts and the means of calculation. Liabilities for taxes or assessments under any such laws will have an adverse impact on our results of operations, unless

we are able to mitigate them through operational changes or commercial arrangements where permitted.

Unfavorable publicity regarding the use or misuse of opioid prescription pain medications and the role of wholesale distributors in the supply chain of such prescription medications, as well as the continued proliferation of the opioid lawsuits, investigations, regulations and legislative actions discussed above could adversely affect our reputation or results of operations.

# Unregistered Sales of Equity Securities and Use of Proceeds

### Issuer Purchases of Equity Securities

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share (2) | Total Number of Shares Purchased as Part of Publicly Announced Program (3) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Program (3) (in millions) |
|---|---|---|---|---|
| January 2018 | 225 | $ 73.40 | - | $ 293 |
| February 2018 | 3,564,234 | 67.34 | 3,564,004 | 1,053 |
| March 2018 | 767,766 | 78.17 | 767,538 | 993 |
| **Total** | **4,332,225** | **$ 69.26** | **4,331,542** | **$ 993** |

(1) Reflects 225, 230 and 228 common shares purchased in January, February and March 2018, respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2) In the third quarter of fiscal 2018, we purchased $300 million of our common shares under an accelerated share repurchase ("ASR") program, which began on February 14, 2018 and was completed on March 21, 2018. We repurchased 4.3 million shares under the ASR at an average price paid per share of $69.26. See Note 13 of the "Notes to Condensed Consolidated Financial Statements" for additional information.

(3) On May 4, 2016, our Board of Directors approved a $1.0 billion share repurchase program that was completed in March 2018. On February 7, 2018, our Board of Directors approved a new $1.0 billion share repurchase program that expires on December 31, 2020.

**Financial Statements**

# Condensed Consolidated Statements of Earnings

**(Unaudited)**

| (in millions, except per common share amounts) | Three Months Ended March 31, 2018 | | Three Months Ended March 31, 2017 | | Nine Months Ended March 31, 2018 | | Nine Months Ended March 31, 2017 | |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 33,633 | $ | 31,821 | $ | 101,460 | $ | 97,010 |
| Cost of products sold | | 31,720 | | 30,093 | | 96,014 | | 92,089 |
| Gross margin | | 1,913 | | 1,728 | | 5,446 | | 4,921 |
| | | | | | | | | |
| **Operating expenses:** | | | | | | | | |
| Distribution, selling, general and administrative expenses | | 1,132 | | 960 | | 3,325 | | 2,792 |
| Restructuring and employee severance | | 2 | | 15 | | 155 | | 31 |
| Amortization and other acquisition-related costs | | 175 | | 128 | | 543 | | 365 |
| Impairments and (gain)/loss on disposal of assets, net | | (6) | | 2 | | 62 | | 15 |
| Litigation (recoveries)/charges, net | | 64 | | 18 | | 155 | | 37 |
| Operating earnings | | 546 | | 605 | | 1,206 | | 1,681 |
| | | | | | | | | |
| Other (income)/expense, net | | (2) | | (5) | | (6) | | (2) |
| Interest expense, net | | 84 | | 46 | | 251 | | 134 |
| Loss on extinguishment of debt | | - | | - | | 2 | | - |
| Earnings before income taxes | | 464 | | 564 | | 959 | | 1,549 |
| | | | | | | | | |
| Provision for/(benefit from) income taxes | | 209 | | 182 | | (466) | | 533 |
| Net earnings | | 255 | | 382 | | 1,425 | | 1,016 |
| | | | | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | - | | (1) | | (3) | | (2) |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 255 | $ | 381 | $ | 1,422 | $ | 1,014 |
| | | | | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | | | | |
| Basic | $ | 0.81 | $ | 1.21 | $ | 4.52 | $ | 3.19 |
| Diluted | | 0.81 | | 1.20 | | 4.50 | | 3.17 |
| | | | | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | | | | |
| Basic | | 313 | | 316 | | 314 | | 318 |
| Diluted | | 315 | | 318 | | 316 | | 320 |
| | | | | | | | | |
| Cash dividends declared per common share | $ | 0.4624 | $ | 0.4489 | $ | 1.3872 | $ | 1.3467 |

See notes to condensed consolidated financial statements.

**Financial Statements**

# Condensed Consolidated Statements of Comprehensive Income
**(Unaudited)**

| (in millions) | Three Months Ended March 31, | | Nine Months Ended March 31, | |
|---|---|---|---|---|
| | **2018** | 2017 | **2018** | 2017 |
| Net earnings | $ **255** | $ 382 | $ **1,425** | $ 1,016 |
| | | | | |
| **Other comprehensive income/(loss):** | | | | |
| Foreign currency translation adjustments and other | **110** | 33 | **141** | (47) |
| Amounts reclassified to earnings | **(23)** | - | **(23)** | - |
| Net unrealized gain/(loss) on derivative instruments, net of tax | **3** | 2 | **2** | 27 |
| Total other comprehensive income/(loss), net of tax | **90** | 35 | **120** | (20) |
| | | | | |
| Total comprehensive income | **345** | 417 | **1,545** | 996 |
| | | | | |
| Less: comprehensive income attributable to noncontrolling interests | **-** | (1) | **(3)** | (2) |
| **Total comprehensive income attributable to Cardinal Health, Inc.** | $ **345** | $ 416 | $ **1,542** | $ 994 |

See notes to condensed consolidated financial statements.

**Financial Statements**

# Condensed Consolidated Balance Sheets

**(Unaudited)**

| (in millions) | | March 31, 2018 | | June 30, 2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 2,175 | $ | 6,879 |
| Trade receivables, net | | 7,671 | | 8,048 |
| Inventories, net | | 11,962 | | 11,301 |
| Prepaid expenses and other | | 1,705 | | 2,117 |
| Total current assets | | 23,513 | | 28,345 |
| | | | | |
| Property and equipment, net | | 2,521 | | 1,879 |
| Goodwill and other intangibles, net | | 14,299 | | 9,207 |
| Other assets | | 698 | | 681 |
| **Total assets** | $ | 41,031 | $ | 40,112 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 18,741 | $ | 17,906 |
| Current portion of long-term obligations and other short-term borrowings | | 551 | | 1,327 |
| Other accrued liabilities | | 2,135 | | 1,988 |
| Total current liabilities | | 21,427 | | 21,221 |
| | | | | |
| Long-term obligations, less current portion | | 9,027 | | 9,068 |
| Deferred income taxes and other liabilities | | 3,027 | | 2,877 |
| | | | | |
| Redeemable noncontrolling interests | | 12 | | 118 |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized-**500 thousand** shares, Issued-**none** | | - | | - |
| Common shares, without par value: | | | | |
| Authorized-**755 million** shares, Issued-327 million shares at **March 31, 2018** and June 30, 2017, respectively | | 2,710 | | 2,697 |
| Retained earnings | | 5,958 | | 4,967 |
| Common shares in treasury, at cost: **16 million** shares and 11 million shares at **March 31, 2018** and June 30, 2017, respectively | | (1,126) | | (731) |
| Accumulated other comprehensive loss | | (5) | | (125) |
| **Total Cardinal Health, Inc. shareholders' equity** | | 7,537 | | 6,808 |
| Noncontrolling interests | | 1 | | 20 |
| **Total shareholders' equity** | | 7,538 | | 6,828 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 41,031 | $ | 40,112 |

See notes to condensed consolidated financial statements.

# Condensed Consolidated Statements of Cash Flows
**(Unaudited)**

| | Nine Months Ended March 31, | |
| --- | --- | --- |
| (in millions) | **2018** | 2017 |
| **Cash flows from operating activities:** | | |
| Net earnings | $ 1,425 | $ 1,016 |
| | | |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | |
| Depreciation and amortization | 779 | 525 |
| Loss on extinguishment of debt | 2 | - |
| Impairments and loss on sale of other investments | 6 | 4 |
| Impairments and loss on disposal of assets, net | 62 | 15 |
| Share-based compensation | 64 | 73 |
| Provision for bad debts | 76 | 46 |
| Change in fair value of contingent consideration obligation | (2) | - |
| Change in operating assets and liabilities, net of effects from acquisitions and divestitures: | | |
| Increase in trade receivables | (632) | (107) |
| Increase in inventories | (865) | (1,010) |
| Increase in accounts payable | 1,635 | 225 |
| Other accrued liabilities and operating items, net | (336) | (327) |
| Net cash provided by operating activities | 2,214 | 460 |
| | | |
| **Cash flows from investing activities:** | | |
| Acquisition of subsidiaries, net of cash acquired | (6,142) | (113) |
| Additions to property and equipment | (246) | (293) |
| Purchase of available-for-sale securities and other investments | (7) | (188) |
| Proceeds from sale of available-for-sale securities and other investments | 65 | 115 |
| Proceeds from maturities of available-for-sale securities | - | 49 |
| Proceeds from divestitures, net of cash sold, and disposal of property and equipment | 862 | 1 |
| Net cash used in investing activities | (5,468) | (429) |
| | | |
| **Cash flows from financing activities:** | | |
| Payment of contingent consideration obligation | (22) | (3) |
| Net change in short-term borrowings | (50) | 25 |
| Purchase of noncontrolling interests | (106) | (12) |
| Proceeds from long-term obligations, net of issuance costs | 3 | - |
| Reduction of long-term obligations | (403) | (60) |
| Proceeds from interest rate swap terminations | - | 14 |
| Net tax proceeds/(withholdings) from share-based compensation | (3) | 20 |
| Excess tax benefits from share-based compensation | - | 37 |
| Dividends on common shares | (436) | (435) |
| Purchase of treasury shares | (450) | (600) |
| Net cash used in financing activities | (1,467) | (1,014) |
| | | |
| Effect of exchange rates changes on cash and equivalents | 17 | (5) |
| | | |
| Net decrease in cash and equivalents | (4,704) | (988) |
| Cash and equivalents at beginning of period | 6,879 | 2,356 |
| **Cash and equivalents at end of period** | $ 2,175 | $ 1,368 |

See notes to condensed consolidated financial statements.

# Notes to Condensed Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

### Basis of Presentation

Our condensed consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. References to "we," "our," and similar pronouns in this Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (this "Form 10-Q") refer to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context requires otherwise.

Our fiscal year ends on June 30. References to fiscal 2018 and 2017 in these condensed consolidated financial statements are to the fiscal years ending or ended June 30, 2018 and June 30, 2017, respectively.

Our condensed consolidated financial statements have been prepared in accordance with the U.S. Securities and Exchange Commission ("SEC") instructions to Quarterly Reports on Form 10-Q and include the information and disclosures required by accounting principles generally accepted in the United States ("GAAP") for interim financial reporting. The preparation of financial statements in conformity with GAAP requires us to make estimates and assumptions that affect amounts reported in the condensed consolidated financial statements and accompanying notes. Actual amounts may differ from these estimated amounts. In our opinion, all adjustments necessary for a fair presentation of the condensed consolidated financial statements have been included. Except as disclosed elsewhere in this Form 10-Q, all such adjustments are of a normal and recurring nature. In addition, financial results presented for this fiscal 2018 interim period are not necessarily indicative of the results that may be expected for the full fiscal year ending June 30, 2018. These condensed consolidated financial statements are unaudited and, accordingly, should be read in conjunction with the audited consolidated financial statements and related notes contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 Form 10-K").

### Recent Financial Accounting Standards

In March 2018, the Financial Accounting Standards Board (the "FASB") issued amended accounting guidance to codify guidance pursuant to SEC staff accounting bulletin 118 ("SAB 118"), which was issued in connection with the Tax Cuts and Jobs Act (the "Tax Act") of December 2017. The guidance allows companies to use provisional estimates to record the effects of the Tax Act and also provides a measurement period (not to exceed one year from the date of enactment) to complete the accounting for the impacts of the Tax Act. We adopted this guidance in the second quarter of fiscal 2018 when it was initially issued as SAB 118. We are still completing our accounting for the tax effects of the Tax Act because all the necessary information is not currently available, prepared, or analyzed. As such, we have made reasonable estimates of the effects of the Tax Act on our financial results. As we complete our analysis

of the accounting for the tax effects of enactment of the Tax Act, we may record additional provisional amounts or adjustments to provisional amounts as discrete items in future periods. See Note 8 for additional information regarding income taxes.

In August 2017, the FASB issued accounting guidance which is intended to improve and simplify accounting rules around hedge accounting. The guidance will be effective for us in the first quarter of fiscal 2020 and early adoption is permitted. We are currently evaluating the impact of this standard on our consolidated financial statements.

In January 2017, the FASB issued amended accounting guidance that simplifies the accounting for goodwill impairment by eliminating the step of measuring a goodwill impairment by estimating the implied fair value of goodwill. Instead, goodwill impairment will be measured as the amount by which the reporting unit's carrying value exceeds its fair value, limited to the carrying value of goodwill. We adopted this guidance in the second quarter of fiscal 2018. The adoption did not have an impact on our condensed consolidated financial statements.

In March 2016, the FASB issued amended accounting guidance that changed the accounting for certain aspects of share-based compensation to employees. The guidance requires all income tax effects of share-based awards to be recognized in the statement of earnings as awards vest or are settled. Additionally, the guidance increases the amount employers can withhold in shares to cover employee income taxes without requiring liability classification and allows a policy election for accounting for forfeitures. The primary impact of adoption is the recognition of excess tax benefits in the statement of earnings on a prospective basis, rather than as a component of equity. The impact on the presentation in the condensed consolidated statement of cash flows is also prospective. We adopted this guidance in the first quarter of fiscal 2018. The impact of adoption on the provision for/(benefit from) income taxes on our condensed consolidated statement of earnings was immaterial. The inclusion of excess tax benefits and deficiencies as a component of our income tax expense will increase volatility within our provision for/(benefit from) income taxes as the amount of excess tax benefits or deficiencies from share-based compensation awards depends on our stock price at the date the awards vest or settle.

In February 2016, the FASB issued amended accounting guidance that requires lessees to recognize most leases on the balance sheet as a lease liability and corresponding right-of-use asset. The guidance also requires disclosures that meet the objective of enabling financial statement users to assess the amount, timing, and uncertainty of cash flows arising from leases. This guidance will be effective for us in the first quarter of fiscal 2020, with early adoption permitted. The majority of our lease spend relates to certain real estate with the remaining lease spend primarily related to equipment. We are continuing to evaluate the impact of this standard on our consolidated financial statements and the methods of adoption.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition which is effective for us in the first quarter of

**Notes to Financial Statements**

fiscal 2019. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. The FASB also subsequently issued several amendments to the standard, including clarification on principal versus agent considerations, performance obligations and licensing, and certain scope improvements and practical expedients.

During fiscal 2018 we have made significant progress on our evaluation and assessment of the amended revenue recognition guidance. Our revenue is primarily distribution revenue, which we recognize at a point in time when title transfers to customers and we have no further obligation to provide services related to such merchandise. Although our preliminary assessment is subject to change prior to our adoption of the amended guidance in the first quarter of fiscal 2019, we generally anticipate that the timing of recognition of distribution revenue will be substantially unchanged under the amended guidance and we do not expect the adoption of the amended accounting guidance to have a material impact on our consolidated financial statements.

During the remainder of fiscal 2018 we will implement any additional required changes to processes to meet the new accounting, reporting and disclosure requirements, conclude the update of our internal controls and policies, and finalize our method of adoption.

## 2. Acquisitions

### Patient Recovery Business

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc for $6.1 billion in cash. The Patient Recovery Business manufactures 23 categories of medical products sold into multiple healthcare channels, and includes numerous industry-leading brands, such as Curity, Kendall, Dover, Argyle and Kangaroo. The acquisition further expanded the Medical segment's portfolio of self-manufactured products. We closed the Patient Recovery Business acquisition in 28 principal countries on July 29, 2017, and acquired control of, for GAAP purposes, and the rights to the net economic benefit from the entire Patient Recovery Business in the remaining countries at the closing. We are in the process of transitioning legal ownership in the remaining non-principal countries, which we expect to complete by the end of calendar 2018. The results for the entire Patient Recovery Business in all countries are included in the condensed consolidated financial statements beginning July 29, 2017. We funded the acquisition through $4.5 billion in new long-term debt, existing cash and borrowings under our existing credit arrangements.

Transaction and integration costs associated with the acquisition of the Patient Recovery business were $25 million and $85 million during the three and nine months ended March 31, 2018,

respectively, and are included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

**Fair Value of Assets Acquired and Liabilities Assumed**

The allocation of the purchase price for the acquisition of the Patient Recovery Business is not yet finalized and is subject to adjustment as we complete the valuation analysis for this acquisition.

The valuation of identifiable intangible assets utilizes significant unobservable inputs and thus represents a Level 3 nonrecurring fair value measurement. The estimated fair value of the identifiable intangible assets was determined using income-based approaches, which includes market participant expectations of the cash flows that an asset could generate over its economic life, discounted back to present value using an appropriate rate of return. The weighted-average discount rate used to arrive at the present value of the identifiable intangible assets was 8.2 percent, and considers the inherent risk of each intangible asset relative to the internal rate of return and weighted-average cost of capital.

The following table summarizes the estimated fair value of the assets acquired and liabilities assumed as of the acquisition date for the Patient Recovery Business:

| (in millions) | Patient Recovery Business |
|---|---:|
| **Identifiable intangible assets:** | |
| Customer relationships (1) | $ 1,733 |
| Trade names (2) | 187 |
| Developed technology and other (3) | 732 |
| Total identifiable intangible assets acquired | 2,652 |
| | |
| Cash and equivalents | 22 |
| Inventories | 426 |
| Prepaid expenses and other | 252 |
| Property and equipment, net | 756 |
| Other accrued liabilities | (307) |
| Deferred income taxes and other liabilities | (865) |
| Total identifiable net assets acquired/(liabilities assumed) | 2,936 |
| Goodwill | 3,144 |
| **Total net assets acquired** | $ 6,080 |

(1)  The range of useful lives for customer relationships is 10 to 18 years.

(2)  The useful life of trade names is 15 years.

(3)  The useful life of developed technology is 15 years.

**Notes to Financial Statements**

## 3. Restructuring and Employee Severance

The following table summarizes restructuring and employee severance costs:

| (in millions) | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2018** | | 2017 | |
| Employee-related costs (1) | $ | **(1)** | $ | 14 |
| Facility exit and other costs (2) | | **3** | | 1 |
| **Total restructuring and employee severance** | $ | **2** | $ | 15 |

| (in millions) | Nine Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2018** | | 2017 | |
| Employee-related costs (1) | $ | **18** | $ | 27 |
| Facility exit and other costs (2) | | **137** | | 4 |
| **Total restructuring and employee severance** | $ | **155** | $ | 31 |

(1) Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated, duplicate payroll costs during transition periods and changes to related estimates.

(2) Facility exit and other costs primarily consist of product distribution and lease contract termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

In September 2017, we entered into an agreement to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model. The costs with this restructuring include $125 million, on a pre-tax basis, in contract termination costs.

These costs are reflected in facility exit and other costs in the condensed consolidated statement of earnings during the nine months ended March 31, 2018. We paid $65 million of the contract termination fee during November 2017 and we paid the remaining $60 million of the contract termination fee in January 2018.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | | Facility Exit and Other Costs | | Total | |
|---|---|---|---|---|---|---|
| Balance at June 30, 2017 | $ | 41 | $ | - | $ | 41 |
| Additions | | 8 | | 131 | | 139 |
| Payments and other adjustments | | (31) | | (127) | | (158) |
| **Balance at March 31, 2018** | $ | 18 | $ | 4 | $ | 22 |

## 4. Divestitures

In November 2017, we signed a definitive agreement with Shanghai Pharmaceuticals Holding Co., Ltd. to sell our pharmaceutical and medical products distribution business in China ("China distribution business") for gross proceeds of $1.2 billion. The transaction closed on February 1, 2018 for net proceeds of $861 million after adjusting for third party indebtedness and preliminary transaction adjustments. The net proceeds are not reflective of tax obligations due in connection with the sale, for which we have recorded a liability of $57

million. The purchase price is subject to adjustment based on working capital requirements as set forth in the definitive agreement, which would impact the loss related to this divestiture.

We determined that the sale of the China distribution business does not meet the criteria to be classified as discontinued operations. The China distribution business primarily operated within our Pharmaceutical segment, and a smaller portion operated within our Medical segment.

During the nine months ended March 31, 2018, we recognized a net loss of $60 million related to this divestiture. This loss is comprised of the $67 million disposal group write-down recognized during the six months ended December 31, 2017, offset by a $7 million gain recognized during the three months ended March 31, 2018 resulting from fluctuations in working capital, debt and foreign currency from December 31, 2017 to the date of close.

## 5. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical | | Medical | | Total | |
|---|---|---|---|---|---|---|
| Balance at June 30, 2017 | $ | 2,939 | $ | 4,282 | $ | 7,221 |
| Goodwill acquired, net of purchase price adjustments | | 1 | | 3,194 | | 3,195 |
| Foreign currency translation adjustments and other | | 28 | | 55 | | 83 |
| Goodwill divested with the sale of our China distribution business | | (347) | | (54) | | (401) |
| **Balance at March 31, 2018** | $ | 2,621 | $ | 7,477 | $ | 10,098 |

The increase in the Medical segment goodwill is primarily due to the Patient Recovery Business acquisition. Goodwill recognized in connection with the Patient Recovery Business acquisition primarily represents the expected benefits from certain synergies of integrating the business, the existing workforce of the acquired entity, and the expected growth from new customers.

During the nine months ended March 31, 2018, goodwill was reduced by $401 million in connection with the sale of our China distribution business, discussed further in Note 4.

**Notes to Financial Statements**

## Other Intangible Assets

The following tables summarize other intangible assets by class at:

| (in millions) | March 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Gross Intangible | Accumulated Amortization | Net Intangible | Weighted-Average Remaining Amortization Period (Years) |
| **Indefinite-life intangibles:** | | | | |
| IPR&D, trademarks and other | $ 62 | $ - | $ 62 | N/A |
| Total indefinite-life intangibles | 62 | - | 62 | N/A |
| | | | | |
| **Definite-life intangibles:** | | | | |
| Customer relationships | 3,625 | 1,162 | 2,463 | 15 |
| Trademarks, trade names and patents | 684 | 237 | 447 | 15 |
| Developed technology and other | 1,669 | 440 | 1,229 | 12 |
| Total definite-life intangibles | 5,978 | 1,839 | 4,139 | 14 |
| **Total other intangible assets** | $ 6,040 | $ 1,839 | $ 4,201 | N/A |

| (in millions) | June 30, 2017 | | |
| --- | --- | --- | --- |
| | Gross Intangible | Accumulated Amortization | Net Intangible |
| **Indefinite-life intangibles:** | | | |
| IPR&D, trademarks and other | $ 61 | $ - | $ 61 |
| Total indefinite-life intangibles | 61 | - | 61 |
| | | | |
| **Definite-life intangibles:** | | | |
| Customer relationships | 1,966 | 967 | 999 |
| Trademarks, trade names and patents | 509 | 195 | 314 |
| Developed technology and other | 916 | 304 | 612 |
| Total definite-life intangibles | 3,391 | 1,466 | 1,925 |
| **Total other intangible assets** | $ 3,452 | $ 1,466 | $ 1,986 |

The increase in definite-life intangibles is primarily due to the Patient Recovery Business acquisition. Total amortization of intangible assets was $148 million and $96 million for the three months ended March 31, 2018 and 2017, respectively, and $435 million and $291 million for the nine months ended March 31, 2018 and 2017, respectively. For acquisitions closed on or before March 31, 2018, estimated annual amortization of intangible assets for the remainder of fiscal 2018 through 2022 is as follows: $139 million, $554 million, $523 million, $451 million and $418 million.

During the nine months ended March 31, 2018, other intangible assets were reduced by $62 million in connection with the sale of our China distribution business, discussed further in Note 4.

## 6. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. We held the following investments in marketable securities at fair value at:

| (in millions) | March 31, 2018 | June 30, 2017 |
| --- | --- | --- |
| **Current available-for-sale securities:** | | |
| Treasury bills | $ - | $ 25 |
| International bonds | - | 3 |
| Corporate bonds | - | 30 |
| U.S. agency bonds | - | 3 |
| Asset-backed securities | - | 3 |
| International equity securities | - | 1 |
| **Total available-for-sale securities** | $ - | $ 65 |

In July 2017, we liquidated our marketable securities. There were no unrealized gains or losses at March 31, 2018, and gross unrealized gains and losses were immaterial at June 30, 2017. During the nine months ended March 31, 2018 and 2017, gross realized gains and losses were immaterial and we did not recognize any other-than-temporary impairments.

## 7. Long-Term Obligations and Other Short-Term Borrowings

### Long-Term Debt

At March 31, 2018 and June 30, 2017, we had total long term obligations, including the current portion and other short-term borrowings, of $9.6 billion and $10.4 billion, respectively. All the notes represent unsecured obligations of Cardinal Health, Inc. and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. Interest is paid pursuant to the terms of the obligations. These notes are effectively subordinated to the liabilities of our subsidiaries, including trade payables of $18.7 billion.

In June 2017, we issued additional debt with the aggregate principal amount of $5.2 billion to fund a portion of the acquisition of the Patient Recovery Business, to redeem the $400 million 1.7% Notes due 2018 and for general corporate purposes. The notes issued in June 2017 were 1.948% Notes due 2019, 2.616% Notes due 2022, 3.079% Notes due 2024, 3.410% Notes due 2027, 4.368% Notes due 2047, and floating rate Notes due 2022.

### Other Financing Arrangements

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $2.0 billion commercial paper program, which is backed by a $2.0 billion revolving credit facility and a $1.0 billion committed receivables sales facility program. At March 31, 2018, we had nothing outstanding under the commercial paper program and no amounts outstanding under the revolving credit facility and committed receivables sales facility program.

In November 2016, we renewed our committed receivables sales facility program through Cardinal Health Funding, LLC ("CHF") through November 1, 2019. CHF was organized for the sole purpose

---

of buying receivables and selling undivided interests in those receivables to third-party purchasers. Although consolidated with Cardinal Health, Inc. in accordance with GAAP, CHF is a separate legal entity from Cardinal Health, Inc. and from our subsidiary that sells receivables to CHF. CHF is designed to be a special purpose, bankruptcy-remote entity whose assets are available solely to satisfy the claims of its creditors.

## 8. Income Taxes

Fluctuations in our provision for/(benefit from) income taxes as a percentage of pretax earnings ("effective tax rate") are generally due to changes in international and U.S. state effective tax rates resulting from our business mix and discrete items.

**U.S. Tax Cuts and Jobs Act**
On December 22, 2017, the United States enacted the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act makes broad and complex changes to the U.S. tax code that affect our fiscal year 2018 financial results in two primary ways. First, effective as of January 1, 2018, the Tax Act reduces the U.S. federal corporate tax rate from 35 percent to 21 percent. Second, it requires companies to pay a one-time U.S. repatriation tax on certain undistributed earnings of foreign subsidiaries. Because our fiscal year ends in June, we have a blended U.S. Federal statutory tax rate for fiscal 2018 of 28.1 percent under the Tax Act. The Tax Act also establishes new tax provisions that will affect us beginning July 1, 2018 including, (1) eliminating the U.S. manufacturing deduction; (2) establishing new limitations on deductible interest expense and certain executive compensation; (3) eliminating the corporate alternative minimum tax; (4) creating the base erosion anti-abuse tax; (5) creating a new provision designed to tax global intangible low-tax income ("GILTI"); (6) generally eliminating U.S. federal income taxes on dividends from foreign subsidiaries; and (7) changing rules related to uses and limitations of net operating loss carryforwards created in tax years beginning after December 31, 2017.

Regarding the new GILTI tax rules, we are allowed to make an accounting policy election to either (1) treat taxes due on future GILTI exclusions in U.S. taxable income as a current period expense when incurred or (2) reflect such portion of the future GILTI exclusions in U.S. taxable income that relate to existing basis differences in our measurement of deferred taxes. Our analysis of the new GILTI rules and how they may impact us is incomplete. Accordingly, we have not made a policy election regarding the treatment of the GILTI tax.

**Remeasurement of Deferred Tax Assets and Liabilities**
As a result of the enactment of a lower tax rate, we remeasured our U.S. deferred tax assets and liabilities based on the rates at which they are expected to reverse in the future. While we are still analyzing certain aspects of the Tax Act and refining our calculations, we have recorded a measurement period adjustment to our provisional net benefit of $18 million in the three months ended March 31, 2018, for a total provisional net benefit of $952 million in the nine months ended March 31, 2018, related to this required remeasurement. The provisional estimate is based on currently available information related to deferred tax assets and liabilities which is subject to change

as additional information becomes available, prepared, and analyzed.

**Repatriation Tax on Undistributed Foreign Earnings**
In connection with the required one-time U.S. repatriation tax on undistributed earnings of foreign subsidiaries, we recorded no additional adjustment during the three months ended March 31, 2018 to the provisional tax expense of $41 million for the nine months ended March 31, 2018. The Tax Act permits the payment of this tax over an eight-year period beginning in fiscal 2019. Though these foreign earnings have been deemed to be repatriated from a U.S. federal tax perspective, we have not yet completed our assessment of the Tax Act on our plans to reinvest foreign earnings and as such have not changed our prior conclusion that the earnings are indefinitely reinvested. The repatriation tax is based on currently available information and technical guidance related to the new tax law. The provisional estimate will be updated when additional information related to undistributed foreign earnings, foreign taxes and foreign cash and equivalents becomes available, prepared and analyzed.

**Effective Tax Rate**
During the three months ended March 31, 2018 and 2017, the effective tax rate was 45.1 percent and 32.3 percent, respectively. The effective tax rate for the three months ended March 31, 2018 was negatively impacted by a reduction in projected Cordis income and its impact on jurisdictional mix encompassing U.S. and international operations, as well as net unfavorable discrete items of $18 million, partially offset by the favorable impact of the lower U.S. federal income tax rate from enactment of the Tax Act. The effective tax rate for the three months ended March 31, 2017 was impacted by net favorable discrete items of $31 million.

During the nine months ended March 31, 2018 and 2017, the effective tax rate was (48.6) percent and 34.4 percent, respectively. The effective tax rate for the nine months ended March 31, 2018 was favorably impacted by the provisional net benefit from enactment of the Tax Act.

The provisional net benefit from the Tax Act during the three and nine months ended March 31, 2018 includes the aforementioned remeasurement of our deferred tax assets and liabilities to the new federal statutory rate provisional measurement period adjustment of $18 million and net tax benefit of $952 million, respectively, the benefit from the impact of applying a lower federal tax rate to year-to-date U.S. pre-tax earnings and $41 million provisional tax expense for the one-time repatriation tax applied to our undistributed foreign earnings.

Our effective tax rate for the nine months ended March 31, 2018 also includes $57 million of tax expense recognized during the three months ended December 31, 2017 in connection with the sale of our China distribution business.

**Unrecognized Tax Benefits**
At March 31, 2018 and June 30, 2017, we had $426 million and $417 million of unrecognized tax benefits, respectively. The March 31, 2018 and June 30, 2017 balances include $264 million and $268 million of unrecognized tax benefits, respectively, that if recognized, would have an impact on the effective tax rate.

---

At March 31, 2018 and June 30, 2017, we had $106 million and $99 million, respectively, accrued for the payment of interest and penalties related to unrecognized tax benefits, which we recognize in the provision for/(benefit from) income taxes in the condensed consolidated statements of earnings. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the condensed consolidated balance sheets.

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is between zero and a net decrease of $35 million, exclusive of penalties and interest.

**Other Tax Matters**
We file income tax returns in the U.S. federal jurisdiction, various U.S. state jurisdictions and various foreign jurisdictions. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2008 through the current fiscal year.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $148 million and $142 million at March 31, 2018 and June 30, 2017, respectively, and is included in other assets in the condensed consolidated balance sheets.

As a result of the acquisition of the Patient Recovery Business, Medtronic plc is obligated to indemnify us for certain tax exposures and transaction taxes related to periods prior to the acquisition under the purchase agreement. The indemnification receivable was $34 million at March 31, 2018.

## 9. Commitments, Contingent Liabilities and Litigation

### Commitments
**Generic Sourcing Venture with CVS Health Corporation ("CVS Health")**
Red Oak Sourcing, LLC ("Red Oak Sourcing") is a U.S.-based generic pharmaceutical sourcing venture with CVS Health for an initial term through June 2024. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of its participants. Due to the achievement of predetermined milestones, we are required to make quarterly payments of $45.6 million to CVS Health for the initial term.

### Legal Proceedings
We become involved from time to time in disputes, litigation, and regulatory matters.

We may be named from time to time in *qui tam* actions initiated by private third parties. In such actions, the private parties purport to act on behalf of federal or state governments, allege that false claims have been submitted for payment by the government and may receive an award if their claims are successful. After a private party has filed a *qui tam* action, the government must investigate the private party's

claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own purporting to act on behalf of the government.

From time to time, we become aware through employees, internal audits or other parties of possible compliance matters, such as complaints or concerns relating to accounting, internal accounting controls, financial reporting, auditing, or other ethical matters or relating to compliance with laws such as healthcare fraud and abuse, anti-corruption or anti-bribery laws. When we become aware of such possible compliance matters, we investigate internally and take appropriate corrective action. In addition, from time to time, we receive subpoenas or requests for information from various federal or state agencies relating to our business or to the business of a customer, supplier or other industry participants. Internal investigations, subpoenas or requests for information could lead to the assertion of claims or the commencement of legal proceedings against us or result in sanctions.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a potential quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators and product liability claims and lawsuits, including class actions. Even absent an identified regulatory or quality issue or product recall, we can become subject to product liability claims and lawsuits.

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for certain litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges in our condensed consolidated statements of earnings.

**Opioid Lawsuits**
Pharmaceutical wholesale distributors, including us, have been named as defendants in hundreds of lawsuits relating to the distribution of prescription opioid pain medications. These lawsuits have been filed in various federal, state, and other courts by a variety of plaintiffs, which are primarily counties, municipalities and political subdivisions from 46 states. Plaintiffs also include four state attorneys general, unions and other health and welfare funds, hospital systems and other healthcare providers. Of these lawsuits, 21 are purported class actions. The lawsuits seek equitable relief and monetary damages based on a variety of legal theories including various common law claims, such as negligence, public nuisance, unjust

**Notes to Financial Statements**

enrichment as well as violations of controlled substance laws and various other statutes. Many also name pharmaceutical manufacturers, retail pharmacy chains and other entities as defendants.

The vast majority of these lawsuits have been filed in U.S. federal court and have been transferred for consolidated pre-trial proceedings in a Multi-District Litigation proceeding in the United States District Court for the Northern District of Ohio. In April 2018, the court, among other things, ordered that motions to dismiss in a number of these lawsuits be briefed from June through August 2018 and that three lawsuits proceed to trial in March 2019 depending on the court's ruling on those motions. As part of these proceedings, we have been discussing with various parties and other stakeholders, including state attorneys general, possible prospective non-monetary injunctive relief and other solutions that we and others in the healthcare system either have already undertaken or may undertake in the future to help alleviate the national opioid epidemic.

We are vigorously defending ourselves in all of these opioid lawsuits. Since all of the above-referenced lawsuits are in early stages, we are unable to predict their outcome or estimate a range of reasonably possible losses.

In addition, 39 state attorneys general have formed a multi-state task force to investigate the manufacturing, distribution, dispensing and prescribing practices of opioid medications. We have received requests related to this multi-state investigation, as well as civil investigative demands, subpoenas or requests for information from these and other state attorneys general offices. We are cooperating with the offices conducting these investigations.

**Product Liability Lawsuits**

As of May 1, 2018, we are named as a defendant in 137 product liability lawsuits filed in Alameda County Superior Court in California involving claims by approximately 1,607 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Another 16 lawsuits involving similar claims by approximately 17 plaintiffs are pending in other jurisdictions. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these lawsuits.

At March 31, 2018, we had a total of $247 million, net of expected insurance recoveries, accrued for losses and legal defense costs related to the Cordis IVC filter lawsuits. While we have recorded accruals based on our assessment of these matters, because these lawsuits are in early stages, we are unable to estimate a range of reasonably possible losses in excess of this accrued amount.

## 10. Fair Value Measurements

**Assets and (liabilities) measured on a recurring basis**

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at:

| (in millions) | March 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 548 | $ - | $ - | $ 548 |
| Available-for-sale securities (1) | - | - | - | - |
| Other investments (2) | 115 | - | - | 115 |
| **Liabilities:** | | | | |
| Forward contracts (3) | - | (58) | - | (58) |
| Contingent consideration (4) | - | - | (14) | (14) |

| (in millions) | June 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 739 | $ - | $ - | $ 739 |
| Available-for-sale securities (1) | - | 65 | - | 65 |
| Other investments (2) | 116 | - | - | 116 |
| **Liabilities:** | | | | |
| Forward contracts (3) | - | (21) | - | (21) |
| Contingent consideration (4) | - | - | (32) | (32) |

(1) We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the condensed consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 6 for additional information regarding available-for-sale securities.

(2) The other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(3) The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the condensed consolidated balance sheets.

(4) Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods, and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

**Notes to Financial Statements**

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | | Contingent Consideration Obligation |
|---|---|---|
| Balance at June 30, 2017 | $ | 32 |
| Additions from acquisitions | | 5 |
| Changes in fair value of contingent consideration (1) | | (2) |
| Payment of contingent consideration | | (22) |
| Balance at March 31, 2018 | $ | 14 |

e sum of the components may not equal the total due to rounding.

(1) Amount is included in amortization and other acquisition-related costs in the condensed consolidated statements of earnings.

## 11. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to fair value through earnings at the end of each period. Our derivative and hedging programs are consistent with those described in the 2017 Form 10-K. The amount of ineffectiveness associated with these derivative instruments was immaterial for the three and nine months ended March 31, 2018 and 2017.

During the nine months ended March 31, 2018 and 2017, we entered into pay-floating interest rate swaps with total notional amounts of $650 million and $100 million, respectively. These swaps have been designated as fair value hedges of our fixed rate debt and are included in other assets in the condensed consolidated balance sheet.

During the nine months ended March 31, 2017, we entered into forward interest rate swaps with a total notional amount of $200 million to hedge probable, but not firmly committed, future transactions associated with our debt.

### Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, accounts payable and other accrued liabilities at March 31, 2018 and June 30, 2017 approximate fair value due to their short-term maturities.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at:

| (in millions) | | March 31, 2018 | | June 30, 2017 |
|---|---|---|---|---|
| Estimated fair value | $ | 9,576 | $ | 10,713 |
| Carrying amount | | 9,578 | | 10,395 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices

for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

## 12. Redeemable Noncontrolling Interests

In connection with the acquisition of a 71 percent ownership interest in naviHealth during fiscal 2016, we recognized redeemable noncontrolling interest with a fair value of $119 million at the acquisition date.

In August 2017, certain third-party noncontrolling interest holders exercised their put right on the noncontrolling interest representing 16 percent of naviHealth with a redemption value of $103 million and a carrying value of $109 million. We settled the put in September and our ownership in naviHealth increased to 98 percent.

The following table summarizes activity in redeemable noncontrolling interests:

| (in millions) | | Redeemable Noncontrolling Interest |
|---|---|---|
| Balance at June 30, 2017 | $ | 118 |
| Net earnings attributable to redeemable noncontrolling interests | | 2 |
| Net purchase of redeemable noncontrolling interests | | (103) |
| Adjustment of redeemable noncontrolling interests to redemption value | | (5) |
| Balance at March 31, 2018 | $ | 12 |

## 13. Shareholders' Equity

During the nine months ended March 31, 2018, we repurchased 6.5 million common shares having an aggregate cost of $450 million. The average price paid per share was $68.81. We funded the repurchases with available cash and short-term borrowings. These repurchases include $300 million purchased under an accelerated share repurchase ("ASR") program, which began on February 14, 2018 and was completed on March 21, 2018. We repurchased 4.3 million shares under the ASR at an average price paid per share of $69.26.

During the nine months ended March 31, 2017, we repurchased 8.1 million common shares having an aggregate cost of $600 million. The average price paid per common share was $74.08. We funded the repurchases with available cash.

The common shares repurchased are held in treasury to be used for general corporate purposes.

During the nine months ended March 31, 2017, we retired 37 million common shares in treasury. The retirement of these shares had no impact on total shareholders' equity; however, it did impact certain individual components of shareholders' equity as follows: $2.5 billion decrease in common shares in treasury, $302 million decrease in common shares, and $2.2 billion decrease in retained earnings.

## Accumulated Other Comprehensive Loss

The following table summarizes the changes in the balance of accumulated other comprehensive loss by component and in total:

| (in millions) | Foreign Currency Translation Adjustments | | Unrealized Gain/(Loss) on Derivatives, net of tax | | Accumulated Other Comprehensive Loss | |
|---|---|---|---|---|---|---|
| Balance at June 30, 2017 | $ | (148) | $ | 23 | $ | (125) |
| Other comprehensive income/(loss), before reclassifications | | 141 | | 2 | | 143 |
| Amounts reclassified to earnings | | (23) | | - | | (23) |
| Other comprehensive income/(loss), net of tax | | 118 | | 2 | | 120 |
| Balance at March 31, 2018 | $ | (30) | $ | 25 | $ | (5) |

Activity related to realized and unrealized gains and losses on available-for-sale securities, as described in Note 6, was immaterial during the nine months ended March 31, 2018.

## 14. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the number of common shares used to compute basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| | Three Months Ended March 31, | |
|---|---|---|
| (in millions) | 2018 | 2017 |
| Weighted-average common shares-basic | 313 | 316 |
| **Effect of dilutive securities:** | | |
| Employee stock options, restricted share units and performance share units | 2 | 2 |
| Weighted-average common shares-diluted | 315 | 318 |

| | Nine Months Ended March 31, | |
|---|---|---|
| (in millions) | 2018 | 2017 |
| Weighted-average common shares-basic | 314 | 318 |
| **Effect of dilutive securities:** | | |
| Employee stock options, restricted share units and performance share units | 2 | 2 |
| Weighted-average common shares-diluted | 316 | 320 |

The potentially dilutive employee stock options, restricted share units and performance share units that were antidilutive were 5 million and 3 million for the three months ended March 31, 2018 and 2017, respectively, and 5 million and 3 million for the nine months ended March 31, 2018 and 2017, respectively.

## 15. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The following table presents revenue for each reportable segment and Corporate:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| (in millions) | 2018 | | 2017 | |
| Pharmaceutical | $ | 29,720 | $ | 28,406 |
| Medical | | 3,916 | | 3,418 |
| Total segment revenue | | 33,636 | | 31,824 |
| Corporate (1) | | (3) | | (3) |
| **Total revenue** | $ | 33,633 | $ | 31,821 |

| | Nine Months Ended March 31, | | | |
|---|---|---|---|---|
| (in millions) | 2018 | | 2017 | |
| Pharmaceutical | $ | 89,786 | $ | 86,911 |
| Medical | | 11,684 | | 10,107 |
| Total segment revenue | | 101,470 | | 97,018 |
| Corporate (1) | | (10) | | (8) |
| **Total revenue** | $ | 101,460 | $ | 97,010 |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate management, corporate finance, financial and customer care shared services, human resources, information technology and legal and compliance. The results attributable to noncontrolling interests are recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided and other ratable allocation methodologies.

We do not allocate the following items to our segments: last-in first-out, or ("LIFO"), inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income, net; interest expense, net; loss on extinguishment of debt; and provision for/(benefit from) income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We

encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $7 million and $2 million for the three months ended March 31, 2018 and 2017, respectively, and $17 million and $4 million for the nine months ended March 31, 2018 and 2017, respectively.

The following table presents segment profit by reportable segment and Corporate:

| (in millions) | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | **2018** | | 2017 |
| Pharmaceutical | $ | **596** | $ 611 |
| Medical | | **199** | 148 |
| Total segment profit | | **795** | 759 |
| Corporate | | **(249)** | (154) |
| **Total operating earnings** | $ | **546** | $ 605 |

| (in millions) | Nine Months Ended March 31, | | |
| --- | --- | --- | --- |
| | **2018** | | 2017 |
| Pharmaceutical | $ | **1,576** | $ 1,682 |
| Medical | | **548** | 435 |
| Total segment profit | | **2,124** | 2,117 |
| Corporate | | **(918)** | (436) |
| **Total operating earnings** | $ | **1,206** | $ 1,681 |

The following table presents total assets for each reportable segment and Corporate at:

| (in millions) | March 31, 2018 | | June 30, 2017 |
| --- | --- | --- | --- |
| Pharmaceutical | $ | **20,573** | $ 21,848 |
| Medical | | **17,746** | 10,688 |
| Corporate | | **2,712** | 7,576 |
| **Total assets** | $ | **41,031** | $ 40,112 |

## 16. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees.

The following table provides total share-based compensation expense by type of award:

| (in millions) | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | **2018** | | 2017 |
| Restricted share unit expense | $ | **20** | $ 18 |
| Employee stock option expense | | **7** | 4 |
| Performance share unit expense | | **(4)** | 3 |
| **Total share-based compensation** | $ | **24** | $ 25 |

⸱ sum of the components may not equal the total due to rounding.

| (in millions) | Nine Months Ended March 31, | | |
| --- | --- | --- | --- |
| | **2018** | | 2017 |
| Restricted share unit expense | $ | **56** | $ 53 |
| Employee stock option expense | | **17** | 14 |
| Performance share unit expense | | **(9)** | 6 |
| **Total share-based compensation** | $ | **64** | $ 73 |

The total tax benefit related to share-based compensation was $8 million and $9 million for the three months ended March 31, 2018 and 2017, respectively, and $20 million and $25 million for the nine months ended March 31, 2018 and 2017, respectively.

### Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years. Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share | |
| --- | --- | --- | --- |
| Nonvested at June 30, 2017 | 2 | $ | 76.72 |
| Granted | 1 | | 66.13 |
| Vested | (1) | | 79.23 |
| Canceled and forfeited | - | | - |
| **Nonvested at March 31, 2018** | **2** | $ | **71.97** |

At March 31, 2018, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested restricted share units not yet recognized was $73 million, which is expected to be recognized over a weighted-average period of two years.

### Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share | |
| --- | --- | --- | --- |
| Outstanding at June 30, 2017 | 6 | $ | 63.44 |
| Granted | 2 | | 66.44 |
| Exercised | (1) | | 43.08 |
| Canceled and forfeited | - | | - |
| **Outstanding at March 31, 2018** | **7** | $ | **64.82** |
| **Exercisable at March 31, 2018** | **5** | $ | **59.55** |

At March 31, 2018, the total pre-tax compensation cost, net of estimated forfeitures, related to nonvested stock options not yet recognized was $26 million, which is expected to be recognized over

**Notes to Financial Statements**

a weighted-average period of two years. The following tables provide additional detail related to stock options:

| (in millions) | March 31, 2018 | | June 30, 2017 |
|---|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ 46 | $ | 109 |
| Aggregate intrinsic value of exercisable options at period end | 46 | | 106 |

| (in years) | March 31, 2018 | June 30, 2017 |
|---|---|---|
| Weighted-average remaining contractual life of outstanding options | 7 | 7 |
| Weighted-average remaining contractual life of exercisable options | 6 | 6 |

### Performance Share Units

Performance share units vest over a three-year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|---|
| Nonvested at June 30, 2017 | 0.6 | $ | 77.83 |
| Granted | 0.2 | | 66.43 |
| Vested (1) | (0.2) | | 71.57 |
| Canceled and forfeited | (0.2) | | - |
| **Nonvested at March 31, 2018** | **0.4** | **$** | **66.14** |

(1) Vested based on achievement of 133 percent of the target performance goal.

At March 31, 2018, the total pre-tax compensation cost, net of

estimated forfeitures, related to nonvested performance share units not yet recognized was $9 million, which is expected to be recognized over a weighted-average period of two years if targets are achieved.

## 17. Subsequent Events

In April 2018, the State of New York passed a budget which included the Opioid Stewardship Act (the "OSA"). The OSA created an aggregate $100 million annual assessment on all manufacturers and distributors licensed to sell or distribute opioids in New York. Each licensed manufacturer and distributor will be required to pay a portion of the assessment based on its ratable share, as determined by the state, of the total morphine milligram equivalents sold or distributed in New York during the applicable calendar year. The initial payment is due on January 1, 2019 for opioids sold or distributed during calendar year 2017.

We accrue for contingencies if it is probable that a liability has been incurred and the amount can be reasonably estimated. At this time, we are unable to estimate amounts which we will owe under the OSA for calendar year 2017 or 2018 because the information necessary to determine our share of the assessment is not yet available.

# Exhibits

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 10.1 | Second Amendment, effective as of January 1, 2018, to the Cardinal Health Deferred Compensation Plan, as amended and restated effective as of January 1, 2016 (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2017, File No. 1-11373) |
| 10.2 | Aircraft Time Sharing Agreement, effective as of February 8, 2018, by and between Cardinal Health, Inc. and Michael C. Kaufmann |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of the Chief Executive Officer and the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.1 | Statement Regarding Forward-Looking Information |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

## Cardinal Health Website

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations and information about upcoming presentations and events is routinely posted and accessible at ir.cardinalhealth.com. In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

**Form 10-Q Cross Reference Index**

# Form 10-Q Cross Reference Index

| Item Number | | Page |
|---|---|---|
| **Part I. Financial Information** | | |
| Item 1 | Financial Statements | **19** |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | **2** |
| Item 3 | Quantitative and Qualitative Disclosures about Market Risk | **17** |
| Item 4 | Controls and Procedures | **17** |
| **Part II. Other Information** | | |
| Item 1 | Legal Proceedings | **17** |
| Item 1A | Risk Factors | **17** |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | **18** |
| Item 3 | Defaults Upon Senior Securities | **N/A** |
| Item 4 | Mine Safety Disclosures | **N/A** |
| Item 5 | Other Information | **N/A** |
| Item 6 | Exhibits | **34** |
| | Signatures | **36** |

**N/A**     Not applicable

**Additional Information**

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Cardinal Health, Inc.

Date:     May 9, 2018

/s/ MICHAEL C. KAUFMANN

**Michael C. Kaufmann**
**Chief Executive Officer**

/s/ JORGE M. GOMEZ

**Jorge M. Gomez**
**Chief Financial Officer**

# EXHIBIT 101

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): August 6, 2018**

# Cardinal Health, Inc.

(Exact name of registrant as specified in its charter)

| **Ohio** | **1-11373** | **31-0958666** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**7000 Cardinal Place, Dublin, Ohio 43017**

(Address of principal executive offices) (Zip Code)

**(614) 757-5000**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instructions A.2. below):

☐  Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company  ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

## Item 2.02: Results of Operations and Financial Condition

On August 6, 2018 , Cardinal Health, Inc. (the "Company") issued a news release announcing its results for the quarter and fiscal year ended June 30, 2018 . A copy of the news release is included as Exhibit 99.1 to this report.

## Item 7.01: Regulation FD Disclosure

During a webcast scheduled to be held at 8:30 a.m. Eastern time on August 6, 2018 , the Company's Chief Executive Officer and Chief Financial Officer will discuss the Company's results for the quarter and fiscal year ended June 30, 2018 and outlook for the fiscal year ending June 30, 2019 . The slide presentation for the webcast will be available on the Investors page at ir.cardinalhealth.com . An audio replay of the webcast also will be available on the Investors page at ir.cardinalhealth.com .

## Item 9.01: Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Exhibit Description |
|---|---|
| 99.1 | News release issued by the Company on August 6, 2018 announcing fourth-quarter and year-end results. |

2

# Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Cardinal Health, Inc.**

(Registrant)

Date: August 6, 2018

By:  /s/ Jorge M. Gomez

Jorge M. Gomez

Chief Financial Officer

3

Exhibit 99.1



**FOR IMMEDIATE RELEASE**

Media:  Ellen Barry                                    Investors:  Lisa Capodici

(614) 553-3858                                                 (614) 757-5035

ellen.barry@cardinalhealth.com                                lisa.capodici@cardinalhealth.com

## Cardinal Health Reports Fourth-quarter and Year-end Results for Fiscal Year 2018

- **Fourth-quarter revenue increased 7 percent to $35 billion; full-year revenue increased 5 percent to $137 billion**

- **Full-year GAAP [1] operating earnings were $126 million and non-GAAP operating earnings were $2.6 billion. GAAP operating earnings included a Medical segment non-cash, goodwill impairment of $1.4 billion**

- **Full-year GAAP diluted earnings per share were $0.81, and non-GAAP diluted earnings per share were $5.00**

**DUBLIN, Ohio, August 6, 2018** - Cardinal Health (NYSE: CAH) today reported fourth-quarter fiscal year 2018 revenues of $35 billion, an increase of 7 percent from the fourth quarter last year, and fiscal year 2018 revenues of $137 billion, an increase of 5 percent from fiscal 2017.

Fourth-quarter GAAP operating earnings were a loss of $1.1 billion due to a Medical segment non-cash, goodwill impairment of $1.4 billion, which was primarily due to the performance of the Cordis business. Non-GAAP operating earnings were $465 million for the quarter. The company reported GAAP operating earnings of $126 million for fiscal year 2018 and non-GAAP operating earnings of $2.6 billion.

For the quarter, GAAP diluted earnings per share (EPS) were a loss of $3.76, while non-GAAP diluted EPS were $1.01. GAAP diluted EPS for fiscal year 2018 were $0.81, and non-GAAP diluted EPS were $5.00.

"Fiscal '18 was a challenging year, but we are making significant progress by taking decisive actions to drive growth, reduce costs and enhance profitability," said Mike Kaufmann, CEO of Cardinal Health. "We are on track, and Cardinal Health's best-in-class products and services continue to distinguish us with our customers and their patients."

## Q4 and year-end FY18 summary

| | | Q4 FY18 | | Q4 FY17 | Y/Y | | FY18 | | FY17 | Y/Y |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 35 billion | $ | 33 billion | 7 % | $ | 137 billion | $ | 130 billion | 5 % |
| Operating earnings/(loss) | $ | (1.1 billion) | $ | 439 million | N.M. | $ | 126 million | $ | 2.1 billion | (94)% |
| Non-GAAP operating earnings | $ | 465 million | $ | 640 million | (27)% | $ | 2.6 billion | $ | 2.8 billion | (7)% |
| Net earnings/(loss) attributable to Cardinal Health, Inc. | $ | (1.2 billion) | $ | 274 million | N.M. | $ | 256 million | $ | 1.3 billion | (80)% |
| Non-GAAP net earnings/(loss) attributable to Cardinal Health, Inc. | $ | 315 million | $ | 416 million | (24)% | $ | 1.6 billion | $ | 1.7 billion | (9)% |
| Diluted EPS attributable to Cardinal Health, Inc. | $ | (3.76) | $ | 0.86 | N.M. | $ | 0.81 | $ | 4.03 | (80)% |
| Non-GAAP diluted EPS attributable to Cardinal Health, Inc. | $ | 1.01 | $ | 1.31 | (23)% | $ | 5.00 | $ | 5.40 | (7)% |

**Tax rates**

During the fourth quarter of 2018 and 2017, GAAP effective tax rates were 1.8 percent and 25.8 percent, respectively. During fiscal years 2018 and 2017, GAAP effective tax rates were 213.8 percent and 32.7 percent, respectively. The fiscal year 2018 effective tax rates were adversely affected by the non-deductible Medical segment goodwill impairment. This unfavorable impact was partially offset in both the fourth quarter and fiscal year 2018 by net discrete tax benefits. Also, as previously disclosed, the fiscal year 2018 GAAP effective tax rate benefitted from transitional tax benefits of $2.97 per share due to the enactment of the U.S. Tax Cuts and Jobs Act ("U.S. tax reform") and a lower U.S. federal income tax rate.

**Cardinal Health**
**Page 2**

During the fourth quarter of 2018 and 2017, the non-GAAP effective tax rates were 11.8 percent and 27.0 percent respectively. During fiscal years 2018 and 2017, the non-GAAP effective tax rates were 29.3 percent and 32.6 percent. The non-GAAP effective tax rates for the fourth quarter and fiscal year 2018 benefitted from net favorable discrete items and the lower U.S. federal income tax rate due to U.S. tax reform.

## Segment results

### *Pharmaceutical segment*

Fourth-quarter revenue for the Pharmaceutical segment increased 6 percent to $31 billion due to sales growth from Pharmaceutical and Specialty Distribution customers. This was partially offset by the divestiture of the company's China distribution business and expiration of a large, mail-order customer contract, both of which were previously announced.

Segment profit for the quarter decreased 18 percent to $416 million primarily due to the negative impact from the company's generic program performance.

| | | Q4 FY18 | | Q4 FY17 | Y/Y | | FY18 | | FY17 | Y/Y |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | **31 billion** | $ | 30 billion | 6 % | $ | **121 billion** | $ | 116 billion | 4 % |
| Segment profit | $ | **416 million** | $ | 505 million | (18)% | $ | **2 billion** | $ | 2 billion | (9)% |

### *Medical segment*

Fourth-quarter revenue for the Medical segment increased 14 percent to $4 billion, which was driven primarily by the acquisition of the Patient Recovery business.

Medical segment profit decreased by 17 percent, or $24 million, to $114 million in the fourth quarter driven by the performance of Cardinal Health Branded products, primarily Cordis, and compensation-related items. This was mostly offset by contributions from acquisitions.

| | | Q4 FY18 | | Q4 FY17 | Y/Y | | FY18 | | FY17 | Y/Y |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | **3.9 billion** | $ | 3 billion | 14 % | $ | **16 billion** | $ | 14 billion | 15% |
| Segment profit | $ | **114 million** | $ | 138 million | (17)% | $ | **662 million** | $ | 572 million | 16% |

### Outlook

The company does not provide GAAP EPS outlook because it is unable to reliably forecast most of the items that are excluded from GAAP EPS to calculate non-GAAP EPS. These items could cause EPS to differ materially from non-GAAP EPS. See "Use of Non-GAAP Measures" following the attached schedules for additional explanation.

The company's fiscal year 2019 guidance range for non-GAAP diluted EPS from continuing operations is $4.90 to $5.15.

### Recent highlights

- Closed on partnership with Clayton, Dubilier & Rice to accelerate the growth of naviHealth , a market leader in post-acute care management. Cardinal Health retains approximately a 45 percent interest in naviHealth and, at closing, received net cash proceeds of $736 million and expects to record a pre-tax gain of more than $500 million in the first quarter of FY19.

- The company exited its transition services agreements (TSA) with Medtronic for North America, Latin America and the Global Supply Chain during the last week of July and is on track for TSA exits in other regions in late calendar year 2018 and early 2019.

- Awarded more than $3 million in grants to more than 70 nonprofit organizations to support local efforts to combat the opioid epidemic across Ohio, West Virginia, Kentucky and Tennessee. The grants were made through the Cardinal Health Foundation's Generation Rx program and are funded by Cardinal Health's Opioid Action Program.

### FY18 awards and recognition highlights

- Named as one of 2018 World's Most Admired Companies by Fortune for the fourth consecutive year

- Earned distinction as a 2018 " Top 70 Companies for Executive Women " by the National Association for Female Executives for the seventh consecutive year

**Cardinal Health**
**Page 3**

- Recognized by Becker's Healthcare as one of the 150 Top Places to Work in Healthcare in 2018 for the fifth consecutive year

- Named to the Human Rights Campaign (HRC) Best Places to Work for LGBT Equality for the tenth consecutive year based on ratings in HRC's 2018 Corporate Equality Index

## Webcast

Cardinal Health will host a webcast today at 8:30 a.m. Eastern to discuss fourth-quarter and year-end results. To access the webcast and corresponding slide presentation, go to the Investor Relations page at ir.cardinalhealth.com . No access code is required.

Presentation slides and a webcast replay will be available on the Cardinal Health website at ir.cardinalhealth.com until August 5, 2019.

## Upcoming webcasted investor events

- Morgan Stanley 16 th Annual Global Healthcare Conference on Friday, Sept. 14 at 8:45 a.m. Eastern in New York City

## About Cardinal Health

Cardinal Health, Inc. is a global, integrated healthcare services and products company, providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. The company provides clinically proven medical products, pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home. To help combat prescription drug abuse, the company and its education partners created Generation Rx, a national drug education and awareness program. Backed by nearly 100 years of experience, with approximately 50,000 employees in nearly 60 countries, Cardinal Health ranks #14 on the *Fortune* 500. For more information, visit cardinalhealth.com , follow @CardinalHealth on Twitter, @cardinalhealthwings on Facebook and connect on LinkedIn at linkedin.com/ company/cardinal-health .

[1] GAAP refers to U.S. generally accepted accounting principles. This news release includes GAAP financial measures as well as non-GAAP financial measures, which are financial measures not calculated in accordance with GAAP. See "Use of Non-GAAP Measures" following the attached schedules for definitions of the non-GAAP financial measures presented in this news release and see the attached schedules for reconciliations of the differences between the non-GAAP financial measures and their most directly comparable GAAP financial measures.

Cardinal Health uses its website as a channel of distribution for material company information. Important information, including news releases, financial information, earnings and analyst presentations, and information about upcoming presentations and events is routinely posted and accessible on the Investor Relations page at ir.cardinalhealth.com . In addition, the website allows investors and other interested persons to sign up automatically to receive e-mail alerts when the company posts news releases, SEC filings and certain other information on its website.

## Cautions Concerning Forward-Looking Statements

This news release contains forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. These statements may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include competitive pressures in Cardinal Health's various lines of business; the amount or rate of generic deflation and our ability to offset generic deflation and maintain other financial and strategic benefits through our generic sourcing venture with CVS Health; our ability to manage uncertainties associated with the pricing of branded pharmaceuticals, including decreased branded inflation and possible branded price reductions; risks associated with our ability to stabilize the performance of our Cordis business; risks associated with the acquisition of the Patient Recovery business, including the ability to successfully integrate the acquired businesses and the ability to achieve the expected synergies and accretion in earnings; the risk of non-renewal under our contracts with CVS Health or one or more other key customer or supplier arrangements or changes to the pricing or other terms of or level of purchases under those arrangements; uncertainties due to government health care reform including federal health care reform legislation or administrative action; uncertainties with respect to the recently enacted Tax Cuts and Jobs Act; changes in the distribution patterns or reimbursement rates for health care products and services; risks associated with the distribution of opioids, including ongoing investigations and lawsuits by certain governmental and regulatory authorities, the potential financial impact of enacted and possible taxes or other assessments on the sale of opioids, and potential reputational or operational harm; and changes in foreign currency rates and the cost of commodities such as oil-based resins, cotton, latex and diesel fuel. Cardinal Health is subject to additional risks and uncertainties described in Cardinal Health's Form 10-K, Form 10-Q and Form 8-K reports and exhibits to those reports. This news release reflects management's views as of Aug. 6, 2018. Except to the extent required by applicable law, Cardinal Health undertakes no obligation to update or revise any forward-looking statement.

**Schedule 1**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Earnings (Unaudited)**

| (in millions, except per common share amounts) | Fourth Quarter | | | Fiscal Year | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2018** | 2017 | **% Change** | **2018** | 2017 | **% Change** |
| Revenue | **$ 35,349** | $ 32,966 | 7% | **$ 136,809** | $ 129,976 | 5 % |
| Cost of products sold | **33,614** | 31,343 | 7% | **129,628** | 123,432 | 5 % |
| Gross margin | **1,735** | 1,623 | 7% | **7,181** | 6,544 | 10 % |
| | | | | | | |
| **Operating expenses:** | | | | | | |
| Distribution, selling, general and administrative expenses | **1,270** | 983 | 29% | **4,596** | 3,775 | 22 % |
| Restructuring and employee severance | **22** | 24 | N.M. | **176** | 56 | N.M. |
| Amortization and other acquisition-related costs | **165** | 163 | N.M. | **707** | 527 | N.M. |
| Impairments and (gain)/loss on disposal of assets, net [1] | **1,354** | 3 | N.M. | **1,417** | 18 | N.M. |
| Litigation (recoveries)/charges, net | **4** | 11 | N.M. | **159** | 48 | N.M. |
| Operating earnings/(loss) | **(1,080)** | 439 | N.M. | **126** | 2,120 | (94)% |
| | | | | | | |
| Other (income)/expense, net | **29** | (3) | N.M. | **23** | (5) | N.M. |
| Interest expense, net | **78** | 68 | 15% | **329** | 201 | 64 % |
| Loss on extinguishment of debt | **—** | — | N.M. | **2** | — | N.M. |
| Earnings/(loss) before income taxes | **(1,187)** | 374 | N.M. | **(228)** | 1,924 | N.M. |
| | | | | | | |
| Provision for/(benefit from) income taxes | **(21)** | 96 | N.M. | **(487)** | 630 | N.M. |
| Net earnings/(loss) | **(1,166)** | 278 | N.M. | **259** | 1,294 | (80)% |
| | | | | | | |
| Less: Net earnings attributable to noncontrolling interests | **—** | (4) | N.M. | **(3)** | (6) | N.M. |
| Net earnings/(loss) attributable to Cardinal Health, Inc. | **$ (1,166)** | $ 274 | N.M. | **$ 256** | $ 1,288 | (80)% |
| | | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.:** | | | | | | |
| Basic | **$ (3.76)** | $ 0.87 | N.M. | **$ 0.82** | $ 4.06 | (80)% |
| Diluted | **(3.76)** [2] | 0.86 | N.M. | **0.81** | 4.03 | (80)% |
| | | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | | |
| Basic | **310** | 316 | | **313** | 317 | |
| Diluted | **310** [2] | 318 | | **315** | 320 | |

[1] In conjunction with the preparation of our consolidated financial statements for fiscal year 2018, we recently completed our annual goodwill impairment test, which we perform annually in the fourth quarter. As part of this annual test, we concluded that a portion of our Medical segment goodwill was impaired, resulting in a non-cash impairment charge of $1.4 billion during the fourth quarter of fiscal 2018. This impairment charge does not impact our liquidity, cash flows from operations, or compliance with debt covenants.

[2] Due to the net loss during the fourth quarter of fiscal 2018, dilutive potential common shares have not been included in the denominator of the dilutive per share computation due to their antidilutive effect.

**Schedule 2**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets (Unaudited)**

| (in millions) | | June 30, 2018 | | June 30, 2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,763 | $ | 6,879 |
| Trade receivables, net | | 7,800 | | 8,048 |
| Inventories, net | | 12,308 | | 11,301 |
| Prepaid expenses and other | | 1,926 | | 2,117 |
| Assets held for sale | | 756 | | — |
| Total current assets | | 24,553 | | 28,345 |
| | | | | |
| Property and equipment, net | | 2,487 | | 1,879 |
| Goodwill and other intangibles, net | | 12,229 | | 9,207 |
| Other assets | | 682 | | 681 |
| **Total assets** | $ | 39,951 | $ | 40,112 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 19,677 | $ | 17,906 |
| Current portion of long-term obligations and other short-term borrowings | | 1,001 | | 1,327 |
| Other accrued liabilities | | 2,002 | | 1,988 |
| Liabilities related to assets held for sale | | 213 | | — |
| Total current liabilities | | 22,893 | | 21,221 |
| | | | | |
| Long-term obligations, less current portion | | 8,012 | | 9,068 |
| Deferred income taxes and other liabilities | | 2,975 | | 2,877 |
| | | | | |
| Redeemable noncontrolling interests | | 12 | | 118 |
| | | | | |
| Total Cardinal Health, Inc. shareholders' equity | | 6,059 | | 6,808 |
| Noncontrolling interests | | — | | 20 |
| Total shareholders' equity | | 6,059 | | 6,828 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 39,951 | $ | 40,112 |

**Schedule 3**

**Cardinal Health, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (Unaudited )**

| (in millions) | Fourth Quarter | | Fiscal Year | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| **Cash flows from operating activities:** | | | | |
| Net earnings/(loss) | $ (1,166) | $ 278 | $ 259 | $ 1,294 |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 253 | 192 | 1,032 | 717 |
| Loss on extinguishment of debt | — | — | 2 | — |
| Impairments and loss on sale of other investments | — | — | 6 | 4 |
| Impairments and loss on disposal of assets, net | 1,354 | 3 | 1,417 | 18 |
| Share-based compensation | 21 | 23 | 85 | 96 |
| Provision for deferred income taxes | (1,012) | 291 | (1,012) | 291 |
| Provision for bad debts | 35 | 17 | 111 | 63 |
| Change in fair value of contingent consideration obligation | — | (5) | (2) | (5) |
| Change in operating assets and liabilities, net of effects from acquisitions and divestitures: | | | | |
| Increase in trade receivables | (239) | (558) | (871) | (665) |
| (Increase)/decrease in inventories | (346) | 337 | (1,211) | (673) |
| Increase in accounts payable | 939 | 329 | 2,574 | 564 |
| Other accrued liabilities and operating items, net | 715 | (183) | 378 | (520) |
| Net cash provided by operating activities | 554 | 724 | 2,768 | 1,184 |
| **Cash flows from investing activities:** | | | | |
| Acquisition of subsidiaries, net of cash acquired | — | (19) | (6,142) | (132) |
| Additions to property and equipment | (138) | (94) | (384) | (387) |
| Purchase of available-for-sale securities and other investments | (2) | (6) | (9) | (194) |
| Proceeds from sale of available-for-sale securities and other investments | — | 113 | 65 | 228 |
| Proceeds from maturities of available-for-sale securities | — | 28 | — | 77 |
| Proceeds from divestitures, net of cash sold, and disposal of property and equipment | — | 2 | 862 | 3 |
| Net cash provided by/(used in) investing activities | (140) | 24 | (5,608) | (405) |
| **Cash flows from financing activities:** | | | | |
| Payment of contingent consideration obligation | (13) | — | (35) | (3) |
| Net change in short-term borrowings | — | (22) | (50) | 3 |
| Purchase of noncontrolling interests | — | — | (106) | (12) |
| Reduction of long-term obligations | (551) | (250) | (954) | (310) |
| Proceeds from interest rate swap terminations | — | — | — | 14 |
| Proceeds from long-term obligations, net of issuance costs | — | 5,171 | 3 | 5,171 |
| Net tax proceeds/(withholdings) from share-based compensation | — | 6 | (3) | 26 |
| Excess tax benefits from share-based compensation | — | (3) | — | 34 |
| Dividends on common shares | (145) | (142) | (581) | (577) |
| Purchase of treasury shares | (100) | — | (550) | (600) |
| Net cash provided by/(used in) financing activities | (809) | 4,760 | (2,276) | 3,746 |
| Effect of exchange rates changes on cash and equivalents | (13) | 3 | 4 | (2) |
| Cash reclassified to assets held for sale | (4) | — | (4) | — |
| Net increase/(decrease) in cash and equivalents | (412) | 5,511 | (5,116) | 4,523 |
| Cash and equivalents at beginning of period | 2,175 | 1,368 | 6,879 | 2,356 |
| **Cash and equivalents at end of period** | $ 1,763 | $ 6,879 | $ 1,763 | $ 6,879 |

**Schedule 4**

**Cardinal Health, Inc. and Subsidiaries**
**Segment Information**

### Fourth Quarter

| (in millions) | | 2018 | | 2017 | (in millions) | | 2018 | | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| **Pharmaceutical** | | | | | **Medical** | | | | |
| | | | | | | | | | |
| **Revenue** | | | | | **Revenue** | | | | |
| Amount | $ | **31,455** | $ | 29,552 | Amount | $ | **3,898** | $ | 3,416 |
| Growth rate | | **6 %** | | 5 % | Growth rate | | **14 %** | | 6% |
| | | | | | | | | | |
| **Segment profit** | | | | | **Segment profit** | | | | |
| Amount | $ | **416** | $ | 505 | Amount | $ | **114** | $ | 138 |
| Growth rate | | **(18)%** | | (7)% | Growth rate | | **(17)%** | | 13% |
| Segment profit margin | | **1.32 %** | | 1.71 % | Segment profit margin | | **2.92 %** | | 4.03% |

### Fiscal Year

| (in millions) | | 2018 | | 2017 | (in millions) | | 2018 | | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| **Pharmaceutical** | | | | | **Medical** | | | | |
| | | | | | | | | | |
| **Revenue** | | | | | **Revenue** | | | | |
| Amount | $ | **121,241** | $ | 116,463 | Amount | $ | **15,581** | $ | 13,524 |
| Growth rate | | **4 %** | | 7 % | Growth rate | | **15%** | | 9% |
| | | | | | | | | | |
| **Segment profit** | | | | | **Segment profit** | | | | |
| Amount | $ | **1,992** | $ | 2,187 | Amount | $ | **662** | $ | 572 |
| Growth rate | | **(9)%** | | (12)% | Growth rate | | **16%** [1] | | 25% [2] |
| Segment profit margin | | **1.64 %** | | 1.88 % | Segment profit margin | | **4.25%** | | 4.23% |

[1] Segment profit includes a $64 million impact from the roll-out of the inventory fair value step up related to the Patient Recovery acquisition for fiscal year 2018. Excluding the impact of the inventory fair value step up, Medical segment profit would have increased 27% for fiscal year 2018.

[2] Segment profit for fiscal year 2016 includes the $43 million unfavorable impact of the Cordis-related inventory fair value step-up. Excluding this step-up, year-over-year Medical segment profit growth was 14 percent for fiscal year 2017.

**Schedule 5**

**Cardinal Health, Inc. and Subsidiaries**
**GAAP / Non-GAAP Reconciliation [1]**

| (in millions, except per common share amounts) | Operating Earnings/(Loss) | Operating Earnings Growth Rate | Earnings/(Loss) Before Income Taxes | Provision for/(Benefit from) Income Taxes | Net Earnings/(Loss) [2] | Net Earnings [2] Growth Rate | Effective Tax Rate | Diluted EPS [2,6] | Diluted EPS [2] Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Fourth Quarter 2018** | | | | | |
| **GAAP** | $ (1,080) | N.M. | $ (1,187) | $ (21) | $ (1,166) | N.M. | 1.8% | $ (3.76) | N.M. |
| Restructuring and employee severance | 22 | | 22 | (3) | 25 | | | 0.08 | |
| Amortization and other acquisition-related costs | 165 | | 165 | 33 | 132 | | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets, net [5] | 1,354 | | 1,354 | 13 | 1,341 | | | 4.30 | |
| Litigation (recoveries)/charges, net | 4 | | 4 | (4) | 8 | | | 0.02 | |
| Transitional tax benefit, net [3] | — | | — | 25 | (25) | | | (0.08) | |
| **Non-GAAP** | $ 465 | (27)% | $ 358 | $ 43 | $ 315 | (24)% | 11.8% | $ 1.01 [4] | (23)% |
| | | | | Fourth Quarter 2017 | | | | | |
| GAAP | $ 439 | (29)% | $ 374 | $ 96 | $ 274 | (18)% | 25.8% | $ 0.86 | (16)% |
| Restructuring and employee severance | 24 | | 24 | 9 | 15 | | | 0.05 | |
| Amortization and other acquisition-related costs | 163 | | 163 | 45 | 118 | | | 0.37 | |
| Impairments and (gain)/loss on disposal of assets, net | 3 | | 3 | 1 | 2 | | | 0.01 | |
| Litigation (recoveries)/charges, net | 11 | | 11 | 4 | 7 | | | 0.02 | |
| Non-GAAP | $ 640 | (1)% | $ 575 | $ 155 | $ 416 | 12 % | 27.0% | $ 1.31 | 15 % |
| | | | | **Fiscal Year 2018** | | | | | |
| **GAAP** | $ 126 | (94)% | $ (228) | $ (487) | $ 259 | (80)% | 213.8% | $ 0.81 | (80)% |
| Restructuring and employee severance | 176 | | 176 | 25 | 151 | | | 0.48 | |
| Amortization and other acquisition-related costs | 707 | | 707 | 176 | 531 | | | 1.69 | |
| Impairments and (gain)/loss on disposal of assets, net [5] | 1,417 | | 1,417 | (44) | 1,461 | | | 4.64 | |
| Litigation (recoveries)/charges, net | 159 | | 159 | 48 | 111 | | | 0.35 | |
| Loss on extinguishment of debt | — | | 2 | 1 | 1 | | | — | |
| Transitional tax benefit, net [3] | — | | — | 936 | (936) | | | (2.97) | |
| **Non-GAAP** | $ 2,585 | (7)% | $ 2,233 | $ 655 | $ 1,578 | (9)% | 29.3% | $ 5.00 [4] | (7)% |
| | | | | Fiscal Year 2017 | | | | | |
| GAAP | $ 2,120 | (14)% | $ 1,924 | $ 630 | $ 1,288 | (10)% | 32.7% | $ 4.03 | (7)% |
| Restructuring and employee severance | 56 | | 56 | 20 | 36 | | | 0.11 | |
| Amortization and other acquisition-related costs | 527 | | 527 | 165 | 362 | | | 1.13 | |
| Impairments and (gain)/loss on disposal of assets, net | 18 | | 18 | 6 | 12 | | | 0.04 | |
| Litigation (recoveries)/charges, net | 48 | | 48 | 19 | 29 | | | 0.09 | |
| Non-GAAP | $ 2,769 | (4)% | $ 2,572 | $ 839 | $ 1,727 | — % | 32.6% | $ 5.40 | 3 % |

[1] For more information on these measures, refer to the Use of Non-GAAP Measures and Definitions schedules.

[2] attributable to Cardinal Health, Inc.

[3] Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries. We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.

[4] Non-GAAP EPS for fourth quarter and fiscal year 2018 includes a $0.07 and $0.43 benefit from applying a lower federal tax rate to our year-to-date U.S. pre-tax non-GAAP earnings. Excluding this benefit, non-GAAP EPS would have been $0.94 and $4.57 for fourth quarter and fiscal year 2018, respectively.

[5] Fourth quarter and fiscal year 2018 include a goodwill impairment charge of $1.4 billion related to our Medical segment.

[6] Fourth quarter fiscal 2018 GAAP diluted loss per share is calculated using a weighted average of 310 million common shares and excludes dilutive securities from the denominator due to their anti-dilutive effects resulting from our GAAP net loss for the quarter. Fourth quarter fiscal 2018 non-GAAP diluted EPS and the EPS impact from the GAAP to non-GAAP per share reconciling

items are calculated using a weighted average of 312 million common shares, which includes potentially dilutive securities. The inclusion of approximately 2 million dilutive shares in the GAAP to non-GAAP per share reconciling items has a $0.02 impact on our non-GAAP EPS calculation.

The sum of the components may not equal the total due to rounding.

We generally apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

---

**Cardinal Health, Inc. and Subsidiaries**

**Use of Non-GAAP Measures**

This earnings release contains financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP").

In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

**Exclusions from Non-GAAP Financial Measures**

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this earnings release for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges and credits from non-GAAP metrics facilitates comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs , which include transaction costs, integration costs, and changes in the fair value of contingent consideration obligations, are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion facilitates comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and are inherently unpredictable in timing and amount, and in the case of impairments, are non-cash amounts, so their exclusion facilitates comparison of historical, current and forecasted financial results.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt extinguishment transactions.

- Transitional tax benefit, net related to the Tax Cuts and Jobs Act is excluded because it results from the one-time impact during the one-year measurement period of a very significant change in the U.S. federal corporate tax rate and, due to the significant size of the benefit, obscures analysis of trends and financial performance. The transitional tax benefit includes the initial estimate and measurement period adjustments for the re-measurement of deferred tax assets and liabilities due to the reduction of the U.S. federal corporate income tax rate and the repatriation tax on undistributed foreign earnings, both of which are subject to adjustment during an up to 12 month measurement period.

The tax effect for each of the items listed above, other than the transitional tax benefit item, is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Forward Looking Non-GAAP Measures**

In this document, the Company presents certain forward-looking non-GAAP metrics. The Company does not provide outlook on a GAAP basis because changes in the items that the Company excludes from GAAP to calculate the comparable non-GAAP measure can be dependent on future events that are less capable of being controlled or reliability predicted by management and are not part of the Company's routine operating activities. Additionally, management does not forecast many of the excluded items for internal use and therefore cannot create or rely on outlook done on a GAAP basis.

The timing and amount of any of the items excluded from GAAP to calculate non-GAAP could significantly impact the Company's fiscal 2019 GAAP results. Over the past five years, the excluded items have lowered the Company's EPS from $0.47 to $4.19, which includes a goodwill impairment charge of $4.36 per share related to our Medical segment that we recognized in fiscal 2018.

**Definitions**

**Growth rate calculation:** growth rates in this earnings release are determined by dividing the difference between current-period results and prior-period results by prior-period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP effective tax rate** : (provision for income taxes adjusted for (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, and (7) transitional tax benefit, (net) divided by (earnings before income taxes adjusted for the first six items).

**Non-GAAP net earnings attributable to Cardinal Health, Inc.** : net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, each net of tax, and (7) transitional tax benefit, net.

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

# EXHIBIT 102

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549
## Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 30, 2018

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 1-11373

# Cardinal Health, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ohio** | **31-0958666** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **7000 Cardinal Place, Dublin, Ohio** | **43017** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(614) 757-5000**

*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

| *Title of each class* | *Name of each exchange on which registered* |
|---|---|
| **Common shares (without par value)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the Form 10-K or any amendment to the Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
| Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The aggregate market value of voting stock held by non-affiliates or registrant on December 31, 2017 , was the following: $19,248,647,885 .

The number of the registrant's common shares, without par value, outstanding as of July 31, 2018 , was the following: 308,828,810 .

**Documents Incorporated by Reference:**

Portions of the registrant's Definitive Proxy Statement to be filed for its 2018 Annual Meeting of Shareholders are incorporated by reference into the sections of this Form 10-K addressing the requirements of Part III of Form 10-K.

# Cardinal Health
**Fiscal 2018 Form 10-K**

## Table of Contents

|  | Page |
|---|---|
| Introduction | 2 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 3 |
| Explanation and Reconciliation of Non-GAAP Financial Measures | 19 |
| Selected Financial Data | 22 |
| Quantitative and Qualitative Disclosures about Market Risk | 23 |
| Business | 25 |
| Risk Factors | 31 |
| Properties | 36 |
| Legal Proceedings | 36 |
| Market for Registrant's Common Equity | 37 |
| Reports | 39 |
| Financial Statements and Supplementary Data | 42 |
| Directors, Executive Officers, and Corporate Governance | 73 |
| Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 74 |
| Exhibits | 75 |
| Form 10-K Cross Reference Index | 79 |
| Signatures | 80 |

Introduction

# Introduction

**References to Cardinal Health and Fiscal Years**

As used in this report, "we," "our," "us," "Cardinal Health" and similar pronouns refer to Cardinal Health, Inc. and its majority-owned subsidiaries, unless the context requires otherwise. Our fiscal year ends on June 30.  References to fiscal 2019 , 2018 , 2017 , 2016 , 2015 and 2014 and to the fiscal years ended June 30, 2019 , 2018 , 2017 , 2016 , 2015 and 2014 , respectively. Except as otherwise specified, information in this report is provided as of June 30, 2018 .

**Non-GAAP Financial Measures**

In this report, including in the "Fiscal 2018 Overview" section of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), we use financial measures that are derived from consolidated financial data but are not presented in our financial statements that are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). These measures are considered "non-GAAP financial measures" under the Securities and Exchange Commission ("SEC") rules. The reasons we use these non-GAAP financial measures and the reconciliations to their most directly comparable GAAP financial measures are included in the "Explanation and Reconciliation of Non-GAAP Financial Measures" section following MD&A in this report.

**Important Information Regarding Forward-Looking Statements**

This report (including information incorporated by reference) includes forward-looking statements addressing expectations, prospects, estimates and other matters that are dependent upon future events or developments. Many forward-looking statements appear in MD&A, but there are others throughout this report, which may be identified by words such as "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions, and include statements reflecting future results or guidance, statements of outlook and expense accruals. These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. The most significant of these risks and uncertainties are described in "Risk Factors" in this report and in Exhibit 99.1 to the Form 10-K included in this report. Forward-looking statements in this report speak only as of the date of this document. Except to the extent required by applicable law, we undertake no obligation to update or revise any forward-looking statement.

**Available Information**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports are available free of charge on our website (www.cardinalhealth.com), under the "Investors — Financial Reporting — SEC Filings" caption, as soon as reasonably practicable after we electronically file them with, or furnish them to, the SEC. You may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website (www.sec.gov) where you can search for annual, quarterly and current reports, proxy and information statements, and other information regarding us and other public companies.

# Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A)

## About Cardinal Health

Cardinal Health, Inc. is an Ohio corporation formed in 1979 and is a global, integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. We provide medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. We manage our business and report our financial results in two segments: Pharmaceutical and Medical.

## Pharmaceutical Segment

Our Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical, and over-the-counter healthcare and consumer products in the United States. This segment also provides services to pharmaceutical manufacturers and healthcare providers to support the development, marketing, and distribution of specialty pharmaceutical products; operates nuclear pharmacies and radiopharmaceutical manufacturing facilities; provides pharmacy management services to hospitals, as well as medication therapy management and patient outcomes services to hospitals, other healthcare providers and payers; and repackages generic pharmaceuticals and over-the-counter healthcare products.

## Medical Segment

Our Medical segment manufactures, sources and distributes Cardinal Health branded medical, surgical and laboratory products, which are sold in the United States, Canada, Europe, Asia and other markets. In addition to distributing Cardinal Health branded products, this segment also distributes a broad range of national brand products and provides supply chain services and solutions to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States and Canada. This segment also distributes medical products to patients' homes in the United States through our Cardinal Health at Home division.

| MD&A | Results of Operations |
|------|----------------------|

# Consolidated Results



## Fiscal 2018 Overview

**Revenue**

Revenue for fiscal 2018 was $136.8 billion , a 5 percent increase from the prior year, due primarily to sales growth from pharmaceutical distribution and specialty pharmaceutical customers. The Patient Recovery Business acquisition also contributed to the increase in revenue in fiscal 2018.

**GAAP and Non-GAAP Operating Earnings**

| (in millions) | | **2018** | | 2017 | Change |
|---|---|---|---|---|---|
| **GAAP** | $ | **126** | $ | 2,120 | **(94)%** |
| Restructuring and employee severance | | **176** | | 56 | |
| Amortization and other acquisition-related costs | | **707** | | 527 | |
| Impairments and (gain)/loss on disposal of assets | | **1,417** | | 18 | |
| Litigation (recoveries)/charges, net | | **159** | | 48 | |
| **Non-GAAP** | $ | **2,585** | $ | 2,769 | **(7)%** |

The sum of the components may not equal the total due to rounding.

During fiscal 2018 , GAAP operating earnings decreased 94 percent to $126 million and non-GAAP operating earnings decreased 7 percent to $2.6 billion .

The decrease in GAAP operating earnings was primarily due to a non-cash goodwill impairment charge related to our Medical segment; increased amortization of acquisition-related intangible assets as a result of the Patient Recovery Business acquisition; contract termination restructuring costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model; performance from Cardinal Health Brand products, primarily Cordis; performance from our Pharmaceutical segment generics program;  litigation charges associated with inferior vena cava (IVC) filter product liability claims; and the adverse impact of pharmaceutical customer contract renewals. These factors were partially offset by contributions from the Patient Recovery Business acquisition.

The decrease in non-GAAP operating earnings was primarily due to performance from Cardinal Health Brand products, primarily Cordis; performance from our Pharmaceutical segment generics program; and the adverse impact of pharmaceutical customer contract renewals. These factors were partially offset by contributions from the Patient Recovery Business acquisition.

| MD&A | Results of Operations |
|------|------------------------|

**GAAP and Non-GAAP Diluted EPS**

| ($ per share) | | 2018 | | 2017 | Change |
|---|---|---|---|---|---|
| **GAAP** | $ | **0.81** | $ | 4.03 | **(80)%** |
| Restructuring and employee severance | | **0.48** | | 0.11 | |
| Amortization and other acquisition-related costs | | **1.69** | | 1.13 | |
| Impairments and (gain)/loss on disposal of assets | | **4.64** | | 0.04 | |
| Litigation (recoveries)/charges, net | | **0.35** | | 0.09 | |
| Transitional tax benefit, net | | **(2.97)** | $ | — | |
| Non-GAAP | $ | **5.00** | $ | 5.40 | **(7)%** |

The sum of the components may not equal the total due to rounding.

During fiscal 2018 , GAAP diluted earnings per share attributable to Cardinal Health, Inc. ("diluted EPS") decreased 80 percent to $0.81 and non-GAAP diluted EPS decreased 7 percent to $5.00 .

Fiscal 2018 GAAP diluted EPS decreased primarily due to the factors impacting GAAP operating earnings and increased interest expense. These were partially offset by the net benefit from the U.S. Tax Cuts and Jobs Act ("Tax Act"), which includes a provisional transitional tax benefit of $936 million as well as the benefit from applying a lower federal tax rate to our U.S. pre-tax earnings.

Fiscal 2018 non-GAAP diluted EPS decreased primarily due to the factors impacting non-GAAP operating earnings and an increase in interest expense, partially offset by the benefit of applying a lower U.S. federal statutory tax rate under the Tax Act to U.S. pre-tax non-GAAP earnings.

**Cash and Equivalents**

Our cash and equivalents balance was $1.8 billion at June 30, 2018 compared to $6.9 billion at June 30, 2017 . The decrease in cash and equivalents during fiscal 2018 was due to $6.1 billion paid for acquisitions,  $954 million paid for debt repayments, $581 million  paid in dividends,  $550 million  paid for share repurchases and $384 million paid for capital expenditures. These cash decreases were offset in part by $2.8 billion of net cash provided by operating activities and  $861 million of cash proceeds from the sale of our China distribution business.

| MD&A | Results of Operations |
|---|---|

# Significant Developments in Fiscal 2018 and Trends

## Acquisitions and Divestitures

**Patient Recovery Business Acquisition**

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc for $6.1 billion in cash. The acquisition further expanded the Medical segment's portfolio of Cardinal Health Brand products.

**China Distribution Business Divestiture**

During fiscal 2018 we completed the divestiture of our pharmaceutical and medical products distribution business in China (the "China distribution business") to Shanghai Pharmaceuticals Holding Co., Ltd. for proceeds of $861 million (after adjusting for third party indebtedness and preliminary transaction adjustments). The proceeds are not reflective of tax obligations due in connection with the sale, for which we have recorded a liability of $59 million . We recognized a pre-tax loss of $41 million related to this divestiture.

**naviHealth Divestiture**

In June 2018, we signed a securities purchase agreement and a contribution and rollover agreement with investor entities controlled by Clayton, Dubilier & Rice ("CD&R") to sell our ownership interest in naviHealth for proceeds of $736 million (after adjusting for certain fees and expenses) and a 44% equity interest in a partnership that owns naviHealth. We also have certain call rights to reacquire naviHealth. We do not expect a cash tax impact from this transaction because the capital gain will be offset by capital loss carry-forwards . The transaction closed on August 1, 2018. We expect to record a pre-tax gain of more than $500 million in the first quarter of fiscal 2019.

## Trends

Within our Pharmaceutical segment, we expect fiscal 2019 segment profit to be less than our fiscal 2018 segment profit due to the adverse impact of customer contract renewals, generics program performance, and the previously announced loss of a large pharmaceutical distribution customer. Our generics program performance includes the negative impact of generic pharmaceutical customer pricing changes partially offset by the benefits of Red Oak Sourcing. As is generally the case, the frequency, timing, magnitude and profit impact of pharmaceutical customer pricing changes and branded and generic pharmaceutical manufacturer pricing changes remain uncertain and their impact on Pharmaceutical segment profit and consolidated operating earnings in fiscal 2019 could be more or less than we expect.

The acquisition of the Patient Recovery Business increased Medical segment revenue and profit during fiscal 2018. We expect the acquisition to increase Medical segment profit further during fiscal 2019 due to the one additional month of results and the fiscal 2018 negative impact of the inventory fair value step up.  We also expect the acquisition will increase amortization and acquisition-related costs in fiscal 2019 due to the size and complexity of the acquisition.

The performance of our Cordis business within our Medical segment declined significantly due to inventory challenges and increased operating costs in fiscal 2018. We expect Cordis performance to stabilize in fiscal 2019.

In early fiscal 2019, we implemented certain enterprise-wide cost-saving measures, which we expect to reduce our future operating expenses.

**Tax Cuts and Jobs Act**

The Tax Act was enacted in December 2017. The Tax Act, among other things, reduced the U.S. federal corporate tax rate from 35 percent to 21 percent and required companies to pay a one-time tax to repatriate, for U.S. purposes, earnings of certain foreign subsidiaries that were previously deferred for tax purposes. The rate change was effective at the beginning of calendar year 2018 and the application of the lower federal tax rate to our U.S. pre-tax earnings resulted in a significant favorable impact to our tax provision in fiscal 2018. Additionally, we recognized a $936 million provisional net transitional tax benefit during fiscal 2018, consisting of the remeasurement of our U.S. deferred tax assets and liabilities at the lower tax rate partially offset by the expense for the repatriation tax. We expect the lower federal statutory rate to be more beneficial in fiscal 2019 than in 2018; however, beginning in fiscal 2019, the Tax Act limits certain deductions and creates new taxes on certain foreign sourced earnings, which will offset some of the additional benefit.

We are still completing our accounting for the tax effects of the Tax Act because all of the necessary information is not currently available, prepared, or analyzed. As such, the amounts we have recorded are provisional estimates and, as permitted by the SEC, we will continue to assess the impact of enactment of the Tax Act and we may record additional provisional amounts or adjustments to provisional amounts during the first half of fiscal 2019.

| MD&A | Results of Operations |
|---|---|

# Results of Operations

## Revenue



| | | | Revenue | | Change | |
|---|---|---|---|---|---|---|
| (in millions) | | **2018** | 2017 | 2016 | **2018** | 2017 |
| Pharmaceutical | $ | **121,241** | $116,463 | $109,131 | **4%** | 7% |
| Medical | | **15,581** | 13,524 | 12,430 | **15%** | 9% |
| Total segment revenue | | **136,822** | 129,987 | 121,561 | **5%** | 7% |
| Corporate | | **(13)** | (11) | (15) | **N.M.** | N.M. |
| **Total revenue** | $ | **136,809** | $129,976 | $121,546 | **5%** | 7% |

### Fiscal 2018 Compared to Fiscal 2017

**Pharmaceutical Segment**
Fiscal 2018 Pharmaceutical segment revenue grew primarily due to sales growth from pharmaceutical distribution and specialty pharmaceutical customers, which together increased revenue by $9.4 billion. The increases were partially offset by the previously announced May 2017 expiration of a large pharmaceutical distribution mail order customer contract and the February 2018 divestiture of our China distribution business.

**Medical Segment**
Fiscal 2018 Medical segment revenue grew mainly due to $1.9 billion of contributions from acquisitions, which primarily consists of the Patient Recovery Business acquisition.

### Fiscal 2017 Compared to Fiscal 2016

**Pharmaceutical Segment**
Fiscal 2017 Pharmaceutical segment revenue grew primarily due to sales growth from the addition of OptumRx and from other pharmaceutical distribution customers, including branded pharmaceutical price appreciation, all of which increased revenue by $7.0 billion.

**Medical Segment**
Fiscal 2017 Medical segment revenue grew primarily due to sales growth from new and existing customers and $212 million in contributions from acquisitions.

## Cost of Products Sold

Cost of products sold f or fiscal 2018 and 2017 increased $6.2 billion ( 5 percent ) and $8.4 billion ( 7 percent ) compared to the prior-year periods, respectively, as a result of the same factors affecting the changes in revenue and gross margin.

| MD&A | Results of Operations |
|---|---|

# Gross Margin







| | Consolidated Gross Margin | | | Change | |
|---|---|---|---|---|---|
| (in millions) | **2018** | 2017 | 2016 | **2018** | 2017 |
| Gross margin | **$ 7,181** | $ 6,544 | $ 6,543 | **10%** | —% |

## Fiscal 2018 Compared to Fiscal 2017

Fiscal 2018 consolidated gross margin increased $637 million ( 10 percent ) and was favorably impacted by acquisitions ($809 million), which primarily consists of the Patient Recovery Business acquisition.

Gross margin rate grew during fiscal 2018 , mainly due to acquisitions, which primarily consists of the Patient Recovery Business acquisition. Gross margin rate growth was partially offset by the negative impact of changes in pharmaceutical distribution product mix and performance in our Cordis business due to inventory challenges and increased manufacturing costs.

## Fiscal 2017 Compared to Fiscal 2016

Fiscal 2017 consolidated gross margin was essentially flat versus the prior-year period.

Consolidated gross margin for fiscal 2017 was positively impacted by sales growth from pharmaceutical distribution customers ($260 million) and acquisitions in both segments ($132 million) and was negatively impacted by the previously disclosed loss of a large pharmaceutical distribution customer.

Gross margin rate contracted during fiscal 2017 , primarily due to generic pharmaceutical customer pricing changes, partially offset by the benefits from Red Oak Sourcing within our Pharmaceutical segment generics program.

# Distribution, Selling, General and Administrative ("SG&A") Expenses

| | SG&A Expenses | | | Change | |
|---|---|---|---|---|---|
| (in millions) | **2018** | 2017 | 2016 | **2018** | 2017 |
| SG&A expenses | **$ 4,596** | $ 3,775 | $ 3,648 | **22%** | 3% |

## Fiscal 2018 Compared to Fiscal 2017

Fiscal 2018 SG&A expenses increased mainly due to acquisitions ($524 million), which primarily consists of the Patient Recovery Business acquisition, and enterprise-wide compensation related items.

## Fiscal 2017 Compared to Fiscal 2016

Fiscal 2017 SG&A expenses increased primarily due to acquisitions ($112 million) and costs related to a multi-year project to replace certain Pharmaceutical segment finance and operating information systems, partially offset by reduced enterprise-wide incentive compensation.

| MD&A | Results of Operations |
|---|---|

# Segment Profit

We evaluate segment performance based on segment profit, among other measures. See Note 16 of the "Notes to Consolidated Financial Statements" for additional information on segment profit.



| (in millions) | Segment Profit and Operating Earnings | | | Change | |
|---|---|---|---|---|---|
| | **2018** | 2017 | 2016 | **2018** | 2017 |
| Pharmaceutical | $  **1,992** | $  2,187 | $  2,488 | **(9)%** | (12)% |
| Medical | **662** | 572 | 457 | **16 %** | 25 % |
| Total segment profit | **2,654** | 2,759 | 2,945 | **(4)%** | (6)% |
| Corporate | **(2,528)** | (639) | (486) | **296 %** | 31 % |
| **Total consolidated operating earnings** | $  **126** | $  2,120 | $  2,459 | **(94)%** | (14)% |

## Fiscal 2018 Compared to Fiscal 2017

**Pharmaceutical Segment Profit**
Fiscal 2018 Pharmaceutical segment profit decreased largely due to our generics program performance and the adverse impact of customer contract renewals. Our generics program performance includes the negative impact of generic pharmaceutical customer pricing changes partially offset by the benefits of Red Oak Sourcing. Performance from our specialty pharmaceutical products distribution and services business positively impacted Pharmaceutical segment profit.

**Medical Segment Profit**
Fiscal 2018 Medical segment profit increased largely due to acquisitions, inclusive of the unfavorable cost of products sold impact from the fair value step up of inventory acquired with the Patient Recovery Business acquisition. The increase was partially offset by performance from the Cordis business, and to a lesser extent, performance from other Cardinal Health Brand products. The performance from the Cordis business primarily reflects inventory challenges and increased operating costs.

**Corporate**
The changes in Corporate during fiscal 2018 are due to the factors discussed in the Other Components of Consolidated Operating Earnings section that follows.

## Fiscal 2017 Compared to Fiscal 2016

**Pharmaceutical Segment Profit**
Fiscal 2017 Pharmaceutical segment profit decreased largely due to our generic program performance. The previously disclosed loss of a large pharmaceutical distribution customer, the adverse impact of customer contract renewals and reduced levels of branded pharmaceutical price appreciation also contributed to the decrease in Pharmaceutical segment profit.

**Medical Segment Profit**
Fiscal 2017 Medical segment profit increased due to strong performance from naviHealth, contributions from Cardinal Health branded products, reduced enterprise-wide incentive compensation, and contributions from distribution services. Cardinal Health branded products growth includes the prior year unfavorable impact on cost of products sold from the Cordis inventory fair value step up.

**Corporate**
The changes in Corporate during fiscal 2017 are due to the factors discussed in the Other Components of Consolidated Operating Earnings section that follows.

| MD&A | Results of Operations |
|---|---|

# Other Components of Consolidated Operating Earnings

In addition to revenue, gross margin, and SG&A expenses discussed previously, consolidated operating earnings were impacted by the following:

| (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Restructuring and employee severance | $ 176 | $ | 56 | $ | 25 |
| Amortization and other acquisition-related costs | 707 | | 527 | | 459 |
| Impairments and (gain)/loss on disposal of assets, net | 1,417 | | 18 | | 21 |
| Litigation (recoveries)/charges, net | 159 | | 48 | | (69) |

**Restructuring and Employee Severance**
The increase in restructuring and employee severance during fiscal 2018 was primarily due to $125 million in contract termination costs to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model.

**Amortization and Other Acquisition-Related Costs**
Amortization of acquisition-related intangible assets was $574 million, $395 million and $355 million for fiscal 2018 , 2017 and 2016 , respectively. The increase in amortization of acquisition-related intangible assets during fiscal 2018 was largely due to the Patient Recovery Business acquisition.

Transaction and integration costs associated with the acquisition of the Patient Recovery Business were $109 million and $54 million during fiscal 2018 and 2017, respectively.

**Impairments and (gain)/loss on disposal of assets, net**
During the fourth quarter of fiscal 2018, we recognized a $1.4 billion non-cash goodwill impairment charge related to our Medical segment, as discussed further in Note 5 of the "Notes to Consolidated Financial Statements." There was no tax benefit related to this goodwill impairment charge.

**Litigation (Recoveries)/Charges, Net**
The increases in litigation charges during fiscal 2018 and 2017 were due to an increase in estimated losses and legal defense costs associated with inferior vena cava (IVC) filter product liability claims.

During fiscal 2016 , we received and recognized income of $80 million from settlements of class action antitrust lawsuits in which we were a class member.

# Earnings/(loss) Before Income Taxes

In addition to the items discussed above, earnings/(loss) before income taxes was impacted by the following:

| (in millions) | Earnings/(loss) Before Income Taxes | | | Change | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2018 | 2017 |
| Other (income)/expense, net | $ 23 | $ (5) | $ 5 | N.M. | N.M. |
| Interest expense, net | 329 | 201 | 178 | 64% | 13% |
| Loss on extinguishment of debt | 2 | — | — | N.M. | N.M. |

**Interest Expense, Net**
Fiscal 2018 interest expense increased primarily due to new debt issued in June 2017 to fund a portion of the purchase price of the Patient Recovery Business acquisition.

| MD&A | Results of Operations |

# Provision for Income Taxes

Generally, fluctuations in the effective tax rate are due to changes in the distribution of income among taxing jurisdictions with differing income tax rates and other reconciling items.

The fluctuations in the effective tax rate from fiscal 2017 to fiscal 2018 are primarily due to net benefits from the enactment of the Tax Act, the impact of nondeductible goodwill impairment charges, an increase in valuation allowances and a benefit from a capital loss due to international legal entity reorganization. The significant increase in valuation allowances were related to capital losses, credit carryforwards and net operating loss carryforwards in U.S. federal, U.S. state and international jurisdictions that will not likely be realized. A reconciliation of the provision based on the federal statutory income tax rate to our effective income tax rate from continuing operations is as follows (see Note 8 of the "Notes to Consolidated Financial Statements" for additional information):

| | 2018 (1) | 2017 (2) | 2016 (2) |
|---|---|---|---|
| Provision at Federal statutory rate | 28.1 % | 35.0 % | 35.0 % |
| State and local income taxes, net of federal benefit | (16.0) | 1.0 | 1.5 |
| Foreign tax rate differential | (48.4) | (7.3) | (0.6) |
| Nondeductible/nontaxable items | (10.2) | 0.2 | 1.0 |
| Goodwill impairment | (124.7) | — | — |
| Tax Act | 410.9 | — | — |
| Capital loss | 71.4 | — | — |
| Change in valuation allowances | (76.9) | 7.7 | 0.1 |
| Foreign tax credits | 27.3 | (1.6) | (0.1) |
| China tax | (25.8) | — | — |
| Other | (21.9) | (2.3) | 0.2 |
| **Effective income tax rate** | **213.8 %** | 32.7 % | 37.1 % |

(1)    The effective income tax rate for fiscal 2018 represents an income tax benefit tax rate.

(2)    The effective income tax rates for fiscal 2017 and 2016 represents income tax expense tax rates.

## Fiscal 2018

The fiscal 2018 effective income tax rate was impacted by various items including benefits from the enactment of the Tax Act, the impact of nondeductible goodwill impairment charges, changes in valuation allowances and a benefit from a capital loss due to an international legal entity reorganization.

The net benefit from the Tax Act for fiscal 2018 includes a provisional net tax benefit of $977 million related to the remeasurement of our deferred tax assets and liabilities to the new federal statutory rate, the benefit from the impact of applying a lower federal tax rate to our year-to-date U.S. pre-tax earnings and a provisional tax expense of $41 million for the one-time repatriation tax applied to our undistributed foreign earnings.

Our effective tax rate for fiscal 2018 also includes $59 million of tax expense recognized in connection with the sale of our China distribution business.

**Ongoing Audits**

The IRS is currently conducting audits of fiscal years 2008 through 2014.

## Fiscal 2017 and Fiscal 2016

The fiscal 2017 effective income tax rate was favorably impacted by the realignment of foreign subsidiaries in anticipation of closing the acquisition of the Patient Recovery Business and also from deductions related to U.S. production activities. The state and local income tax rate decreased primarily due to resolutions with state taxing authorities.

The fiscal 2016 effective income tax rate was favorably impacted by the state and local income tax rate, which decreased due to resolutions with state taxing authorities and a shift in the distribution of income among jurisdictions. The foreign tax rate differential decreased primarily due to the deferred tax benefits recognized in fiscal 2015.

# Liquidity and Capital Resources

We currently believe that, based on available capital resources (cash on hand and committed credit facilities) and projected operating cash flow, we have adequate capital resources to fund working capital needs; currently anticipated capital expenditures; currently anticipated business growth and expansion; contractual obligations; tax payments; and current and projected debt service requirements, dividends, and share repurchases. If we decide to engage in one or more additional acquisitions, depending on the size and timing of such transactions, we may need to access capital markets for additional financing.

## Cash and Equivalents

Our cash and equivalents balance was $1.8 billion at June 30, 2018 compared to $6.9 billion at June 30, 2017 . The decrease in cash and equivalents during fiscal 2018 was due to $6.1 billion deployed for acquisitions during the year, $954 million used for debt repayments, $581 million paid in dividends, $550 million paid for share repurchases and $384 million paid for capital expenditures, offset in part by $2.8 billion net cash provided by operating activities and $861 million of proceeds from the divestiture of the China distribution business. N et cash provided by operating activities increased by $1.6 billion from fiscal 2017 primarily due to working capital changes in part as a result of timing of customer and vendor payments related to the new Pharmaceutical segment finance and operating information systems. At June 30, 2018 , our cash and equivalents were held in cash depository accounts with major banks or invested in high quality, short-term liquid investments.

In August 2018, we completed the sale of our interest in naviHealth to CD&R and received proceeds of $736 million (after adjusting for certain fees and expenses) and a 44% equity interest in a partnership that owns naviHealth.

The increase in cash and equivalents during fiscal 2017 of $4.5 billion was due to proceeds from a $5.2 billion debt issuance and $1.2 billion provided by operating activities, partially offset by $600 million paid for share repurchases, $577 million paid in dividends, $387 million paid in capital expenditures and $310 million in debt repayments. The $1.8 billion decrease in net cash provided by operating activities in fiscal 2017 was primarily due to an increase in working capital as a result of changes in timing of customer and vendor payments, some of which related to implementation of the new Pharmaceutical segment finance and operating information systems.

The decrease in cash and equivalents during fiscal 2016 of $2.2 billion was due to $3.6 billion deployed for acquisitions, $651 million paid for share repurchases, $512 million paid in dividends and $465 million paid in capital expenditures, partially offset by net cash provided by operating activities of $3.0 billion , which was positively impacted by increased net earnings and working capital improvements.

The cash and equivalents balance at June 30, 2018 included $557 million of cash held by subsidiaries outside of the United States. Though our foreign earnings as of December 31, 2017 have been deemed to be repatriated from a U.S. federal tax perspective, we have not yet completed our assessment of the Tax Act on our plans to reinvest foreign earnings and as such have not changed our prior conclusion that the earnings are indefinitely reinvested. As such, no non-U.S. taxes related to repatriation were recorded at June 30, 2018 . If we decide to repatriate these earnings in the future, we may be subject to certain non-U.S. taxes at that time. See Note 8 of the "Notes to Consolidated Financial Statements" for additional information on the Tax Act.

Changes in working capital, which impact operating cash flow, can vary significantly depending on factors such as the timing of customer payments, inventory purchases and payments to vendors in the regular course of business, as well as fluctuating working capital needs driven by customer and product mix.

## Other Financing Arrangements and Financial Instruments

### Credit Facilities and Commercial Paper

In addition to cash and equivalents and operating cash flow, other sources of liquidity at June 30, 2018 include a $2.0 billion commercial paper program, backed by a $2.0 billion revolving credit facility. We also have a $1.0 billion committed receivables sales facility program. At June 30, 2018 , we had no amounts outstanding under our revolving credit facility or our committed receivables sales facility program. Under our commercial paper and committed receivables programs, we had maximum amounts outstanding of $1.7 billion and an average daily amount outstanding of $277 million during fiscal 2018. Our revolving credit facility and committed receivables sales facility programs require us to maintain, as of the end of any calendar quarter, a consolidated leverage ratio of no more than 4.25-to-1 , which will reduce to 3.25-to-1 in March 2019. As of June 30, 2018 , we were in compliance with this financial covenant.

**MD&A** | **Liquidity and Capital Resources**

## Long-Term Obligations

In June 2018, we repaid our $550 million 1.95% Notes due 2018 in full at maturity. At June 30, 2018 , we had total long-term obligations of $8.0 billion . In fiscal 2018 we sold our China distribution business, including its debt which was $378 million as of June 30, 2017. See Note 4 of the "Notes to Consolidated Financial Statements" for further discussion of this divestiture.

In June 2017, we sold $1 billion aggregate principal amount of 1.948% notes due 2019, $1.15 billion aggregate principal amount of 2.616% notes due 2022, $350 million aggregate principal amount of floating rate notes due 2022, $750 million aggregate principal amount of 3.079% notes due 2024, $1.35 billion aggregate principal amount of 3.410% notes due 2027 and $600 million aggregate principal amount of 4.368% notes due 2047. In addition to funding a portion of the purchase price of the acquisition of the Patient Recovery Business described below, in July 2017 we used a portion of the debt proceeds to redeem our $400 million 1.7% notes due 2018.

## Funding for Acquisition of Medtronic's Patient Recovery Business

On July 29, 2017 , we acquired the Patient Recovery Business from Medtronic for $6.1 billion in cash. We funded the acquisition through $4.5 billion in new long-term debt issued in June 2017, the use of existing cash and borrowings under existing credit arrangements.

## Risk Management

We use interest rate swaps, foreign currency contracts and commodity contracts to manage our exposure to cash flow variability. We also use interest rate swaps to protect the value of our debt and use foreign currency forward contracts to protect the value of our existing and forecasted foreign currency assets and liabilities. See the "Quantitative and Qualitative Disclosures About Market Risk" section as well as Note 1 and Note 12 of the "Notes to Consolidated Financial Statements" for information regarding the use of financial instruments and derivatives as well as foreign currency, interest rate and commodity exposures.

# Capital Deployment

## Capital Expenditures

Capital expenditures during fiscal 2018 , 2017 and 2016 were $384 million , $387 million and $465 million , respectively.

We expect capital expenditures in fiscal 2019 to be between $360 million and $390 million primarily for information technology projects, growth projects in our core business and for integration of the acquisition of the Patient Recovery Business.

## Dividends

During fiscal 2018 , we paid quarterly dividends totaling $1.85 per share, an increase of 3 percent from fiscal 2017 .

On May 9, 2018, our Board of Directors approved a quarterly dividend of $0.4763 per share, or $1.91 per share on an annualized basis, which was paid on July 15, 2018 to shareholders of record on July 2, 2018.

On August 8, 2018, our Board of Directors approved a quarterly dividend of $0.4763 per share, or $1.91 per share on an annualized basis, which will be paid on October 15, 2018 to shareholders of record on October 1, 2018.

## Share Repurchases

During fiscal 2018 , we repurchased $550 million of our common shares. We funded the repurchases with available cash and short-term borrowing. At June 30, 2018 , we had $893 million r emaining under our existing $1.0 billion share repurchase program.

On August 16, 2018 we entered into an accelerated share repurchase program ("ASR") to purchase shares of our common stock for an aggregate purchase price of $ 600 million and received an initial delivery of 9.5 million shares of common stock using a reference price of $ 50.45 . The program is expected to conclude in the second quarter of fiscal 2019.

During fiscal 2017, we repurchased $600 million of our common shares. We funded the repurchases with available cash.

## Acquisition of Medtronic's Patient Recovery Business

Described above under "Funding for Acquisition of Medtronic's Patient Recovery Business."

| MD&A | Other |
|---|---|

# Contractual Obligations

At June 30, 2018 , our contractual obligations, including estimated payments due by period, are as follows:

| (in millions) | 2019 | | 2020 to 2021 | | 2022 to 2023 | | There-after | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Long-term debt and short-term borrowings (1) | $ | 999 | $ | 964 | $ | 2,259 | $ | 4,783 | $ | 9,005 |
| Interest on long-term debt | | 303 | | 531 | | 420 | | 2,068 | | 3,322 |
| Capital lease obligations (2) | | 2 | | 4 | | 2 | | — | | 8 |
| Operating leases (3) | | 113 | | 174 | | 99 | | 103 | | 489 |
| Purchase obligations and other payments (4) | | 534 | | 501 | | 382 | | 196 | | 1,613 |
| **Total contractual obligations (5)** | $ | **1,951** | $ | **2,174** | $ | **3,162** | $ | **7,150** | $ | **14,437** |

(1) Represents maturities of our long-term debt obligations and other short-term borrowings excluding capital lease obligations described below. See Note 7 of the "Notes to Consolidated Financial Statements" for further information.

(2) Represents maturities of our capital lease obligations included within long-term obligations in our consolidated balance sheets.

(3) Represents minimum rental payments for operating leases having initial or remaining non-cancelable lease terms as described in Note 9 of the "Notes to Consolidated Financial Statements."

(4) A purchase obligation is defined as an agreement to purchase goods or services that is legally enforceable and specifies all significant terms, including fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and approximate timing of the transaction. The purchase obligation amounts disclosed above represent estimates of the minimum for which we are obligated and the time period in which cash outflows will occur. Purchase orders and authorizations to purchase that involve no firm commitment from either party are excluded from the above table. In addition, contracts that can be unilaterally canceled with no termination fee or with proper notice are excluded from our total purchase obligations except for the amount of the termination fee or the minimum amount of goods that must be purchased during the requisite notice period. Purchase obligations and other payments also includes quarterly payments of $45.6 million that we are required to pay CVS Health Corporation ("CVS") in connection with Red Oak Sourcing and will be in place for the remaining six years of the agreement. See Note 9 of the "Notes to Consolidated Financial Statements" for additional information.

(5) Long-term liabilities, such as unrecognized tax benefits, deferred taxes and other tax liabilities, have been excluded from the above table due to the inherent uncertainty of the underlying tax positions or because of the inability to reasonably estimate the timing of any cash outflows. See Note 8 of the "Notes to Consolidated Financial Statements" for further discussion of income taxes.

# Off-Balance Sheet Arrangements

We had no significant "off-balance sheet arrangements" at June 30, 2018 , as that term is defined in the SEC rules.

# Recent Financial Accounting Standards

See Note 1 of the "Notes to Consolidated Financial Statements" for a discussion of recent financial accounting standards.

# Critical Accounting Policies and Sensitive Accounting Estimates

Critical accounting policies are those accounting policies that (i) can have a significant impact on our financial condition and results of operations and (ii) require the use of complex and subjective estimates based upon past experience and management's judgment. Other people applying reasonable judgment to the same facts and circumstances could develop different estimates. Because estimates are inherently uncertain, actual results may differ. In this section, we describe the significant policies applied in preparing our consolidated financial statements that management believes are the most dependent on estimates and assumptions. For further discussion of accounting policies for items within this section and of additional accounting policies, see Note 1 of the "Notes to Consolidated Financial Statements."

## Allowance for Doubtful Accounts

The allowance for doubtful accounts includes general and specific reserves. We determine our allowance for doubtful accounts by reviewing accounts receivable aging, industry trends, customer financial strength and credit standing, historical write-off trends and payment history. We regularly evaluate how changes in economic conditions may affect credit risks. See Note 1 of the "Notes to Consolidated Financial Statements" for further information on our policy for Receivables and Allowance for Doubtful Accounts.

A hypothetical 0.1 percent increase or decrease in the reserve as a percentage of trade receivables at June 30, 2018 , would result in an increase or decrease in bad debt expense of $8 million . We believe the reserve maintained and expenses recorded in fiscal 2018 are appropriate.

At this time, we are not aware of any analytical findings or customer issues that are likely to lead to a significant future increase in the allowance for doubtful accounts as a percentage of revenue. The following table presents information regarding the allowance for doubtful accounts over the past three fiscal years:

| (in millions, except percentages) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Allowance for doubtful accounts at beginning of period | $ 137 | $ | 135 | $ | 135 |
| Charged to costs and expenses | 114 | | 60 | | 74 |
| Reduction to allowance for customer deductions and write-offs | (111) | | (58) | | (74) |
| Allowance for doubtful accounts at end of period | $ 139 | $ | 137 | $ | 135 |
| Allowance as a percentage of customer receivables | 1.8% | | 1.7% | | 1.8% |
| Allowance as a percentage of revenue | 0.10% | | 0.11% | | 0.11% |

The sum of the components may not equal the total due to rounding.

## Inventories

A substantial portion of our inventories ( 56 percent at both June 30, 2018 and 2017 ) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These are primarily merchandise inventories at the core pharmaceutical distribution facilities within our Pharmaceutical segment ("distribution facilities"). The LIFO impact on the consolidated statements of earnings depends on pharmaceutical manufacturer price appreciation or deflation and our fiscal year-end inventory levels, which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end. Historically, prices for branded pharmaceuticals have generally tended to rise, resulting in an increase in cost of products sold, whereas prices for generic pharmaceuticals generally tend to decline, resulting in a decrease in cost of products sold. See Note 1 of the "Notes to Consolidated Financial Statements" for further information on our policy for Inventories.

Using LIFO, if there is a decrease in inventory levels that have experienced pharmaceutical price appreciation, the result generally will be a decrease in future cost of products sold as our older inventory is held at a lower cost. Conversely, if there is a decrease in inventory levels that have experienced a pharmaceutical price decline, the result generally will be an increase in future cost of products sold as our older inventory is held at a higher cost.

We believe that the average cost method of inventory valuation provides a reasonable approximation of the current cost of replacing inventory within these distribution facilities. As such, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation. If we had used the average cost method of inventory valuation for all inventory within the distribution facilities, the value of our inventories would not have changed in fiscal 2018 or 2017 because inventories valued at LIFO were $92 million and $46 million higher than the average cost value at June 30, 2018 and 2017 , respectively. We do not record inventories in excess of replacement cost. As such, we did not record a LIFO reserve in fiscal 2018 and 2017 .

Our remaining inventory that is not valued at the lower of LIFO or market is stated at the lower of cost, using the first-in, first-out method, or market. Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $147 million and $76 million at June 30, 2018 and 2017 , respectively. The increase in the reserves for excess and obsolete inventory during fiscal 2018 was driven by increased inventory reserves within our Medical segment Cordis business and the Patient Recovery acquisition.

| MD&A | Critical Accounting Policies and Sensitive Accounting Estimates |

We reserve for inventory obsolescence using estimates based on historical experience, historical and projected sales trends, specific categories of inventory, age and expiration dates of on-hand inventory and manufacturer return policies. If actual conditions are less favorable than our assumptions, additional inventory reserves may be required.

## Business Combinations

The assets acquired and liabilities assumed in a business combination, including identifiable intangible assets, are recorded at their estimated fair values as of the acquisition date. For further discussion of the Business Combinations accounting policy, see Note 1 of the "Notes to Consolidated Financial Statements."

Critical estimates and assumptions include: expected future cash flows for customer relationships, trademarks, trade names, patents, developed technology, in-process research and development ("IPR&D") and other identifiable intangible assets; discount rates that reflect the risk factors associated with future cash flows; and estimates of useful lives. See Note 2 of the "Notes to Consolidated Financial Statements" for additional information regarding our acquisitions.

## Goodwill and Other Indefinite-Lived Intangible Assets

Purchased goodwill and intangible assets with indefinite lives are tested for impairment annually or when indicators of impairment exist. Goodwill impairment testing involves a comparison of the estimated fair value of reporting units to the respective carrying amount, which may be performed utilizing either a qualitative or quantitative assessment. Qualitative factors are first assessed to determine if it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If it is determined that it is more likely than not that the fair value does not exceed the carrying amount, then a quantitative test is performed. The quantitative goodwill impairment test involves a comparison of the estimated fair value of the reporting unit to the respective carrying amount. A reporting unit is defined as an operating segment or one level below an operating segment (also known as a component).

We have two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. These operating segments are comprised of divisions (which are components), for which discrete financial information is available. Components are aggregated into reporting units for purposes of goodwill impairment testing to the extent that they share similar economic characteristics. Our reporting units are: Pharmaceutical operating segment (excluding our Nuclear Pharmacy Services division); Nuclear Pharmacy Services division; Medical operating segment (excluding our Cardinal Health at Home division and naviHealth division) ("Medical Unit"); Cardinal Health at Home division; and naviHealth division.

Goodwill impairment testing involves judgment, including the identification of repo rting units, qualitative evaluation of events and circumstances to determine if it is more likely than not that an impairment exists, and, if necessary, the estimation of the fair value of the applicable reporting unit. Our qualitative evaluation considers the weight of evidence and significance of all identified events and circumstances and most relevant drivers of fair value, both positive and negative, in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount.

Our determination of estimated fair value of our reporting units is based on a combination of the income-based and market-based approaches (using discount rates ranging from 8.5 percent to 13.5 percent ) . We use discount rates that are commensurate with the risks and uncertainty inherent in the respective reporting units and in our internally-developed forecasts. Under the market-based approach, we determine fair value by comparing our reporting units to similar businesses or guideline companies whose securities are actively traded in public markets. We also use the guideline transaction method to determine fair value based on pricing multiples derived from the sale of companies that are similar to our reporting units.

Estimating the fair value of reporting units requires the use of estimates and significant judgments that are based on a number of factors including actual operating results. The use of alternate estimates and assumptions or changes in the industry or peer groups could materially affect the determination of fair value for each reporting unit and potentially result in goodwill impairment. If a reporting unit fails to achieve expected earnings or otherwise fails to meet current financial plans, or if there were changes to any other key assumptions used in the tests, the reporting unit could incur a goodwill impairment in a future period.

We performed annual impairment testing in fiscal 2018, 2017 and 2016 and, with the exception of our Medical Unit in fiscal 2018, concluded that there were no impairments of goodwill as the estimated fair value of each reporting unit exceeded its carrying value. As discussed further in Note 5 of the "Notes to Consolidated Financial Statements," during the fourth quarter of fiscal 2018 we recognized a $1.4 billion goodwill impairment charge related to our Medical Unit, which is included in impairments and loss on disposal of assets in our consolidated statements of earnings. The impairment was primarily driven by inventory and cost challenges within our Cordis business which furthered in the fourth quarter of fiscal 2018. There was no tax benefit related to the goodwill impairment charge. If the fair value of the Medical Unit were to decline below its carrying value in subsequent periods, additional impairment would be recognized in those periods. For any of our other reporting units, there would not have been an impairment for fiscal 2018 if we raised the discount rate by 1 percent.

| MD&A | Critical Accounting Policies and Sensitive Accounting Estimates |
|---|---|

The impairment test for indefinite-lived intangibles other than goodwill (primarily IPR&D) involves first assessing qualitative factors to determine if it is more likely than not that the fair value of the indefinite-lived intangible asset is less than its carrying amount. If so, then a quantitative test is performed to compare the estimated fair value of the indefinite-lived intangible asset to the respective asset's carrying amount. Our qualitative evaluation requires the use of estimates and significant judgments and considers the weight of evidence and

significance of all identified events and circumstances and most relevant drivers of fair value, both positive and negative, in determining whether it is more likely than not that the fair value of the indefinite-lived intangible asset is less than its carrying amount.

See Note 1 of "Notes to Consolidated Financial Statements" for additional information regarding goodwill and other intangible assets.

## Vendor Reserves

In the ordinary course of business, our vendors may dispute deductions taken against payments otherwise due to them or assert other disputes. These disputed transactions are researched and resolved based upon findings of the research performed. At any given time, there are outstanding items in various stages of research and resolution. In determining appropriate reserves for areas of exposure with our vendors, we assess historical experience and current outstanding claims. We have established various levels of reserves based on the type of claim and status of review. For further discussion on the Vendor Reserves, see Note 1 of "Notes to Consolidated Financial Statements."

Vendor reserves were $45 million and $50 million at June 30, 2018 and 2017 , respectively. Approximately 69 percent of the vendor reserve at the end of fiscal 2018 pertained to the Pharmaceutical segment compared to 77 percent at the end of fiscal 2017 . The reserve balance will fluctuate due to variations in outstanding claims from period-to-period, timing of resolutions and specific vendor issues.

The ultimate outcome of specific claims may be different than our original estimate and may require adjustment. We believe, however, that reserves recorded for such disputes are reasonable based upon current facts and circumstances.

## Loss Contingencies and Self-Insurance

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or outcomes can occur, assessing contingencies is highly subjective and requires judgments about future events.

We also self-insure for employee healthcare, certain product liability matters, auto liability, property and workers' compensation and maintain insurance for individual losses exceeding certain limits when available.

Self-insurance accruals include an estimate for expected settlements on pending claims, defense costs, administrative fees, claims adjustment costs and an estimate for claims incurred but not reported. For certain types of exposures, we develop the estimate of expected ultimate costs to settle each claim based on specific information

related to each claim if available. Other estimates are based on an assessment of outstanding claims, historical analysis and current payment trends. For claims incurred but not reported, the liabilities are calculated and derived in accordance with generally accepted actuarial practices or using an estimated lag period.

We regularly review contingencies and self-insurance accruals to determine whether our accruals and related disclosures are adequate. Examples of such contingencies include the New York Opioid Stewardship Act, various lawsuits related to the distribution of prescription opioid pain medications and the Cordis IVC filter lawsuits. The amount of loss may differ from these estimates. See Note 9 of the "Notes to Consolidated Financial Statements" for additional information regarding loss contingencies and product liability lawsuits.

# Provision for Income Taxes

We account for income taxes using the asset and liability method. Deferred tax assets and liabilities are measured using enacted tax rates in the respective jurisdictions in which we operate. Our income tax expense, deferred income tax assets and liabilities, and unrecognized tax benefits reflect management's assessment of estimated future taxes to be paid on items in the consolidated financial statements.

The following table presents information about our tax position at June 30:

| (in millions) | 2018 | | 2017 | |
|---|---|---|---|---|
| Total deferred income tax assets (1) | $ | 848 | $ | 692 |
| Valuation allowance for deferred income tax assets (2) | | (412) | | (237) |
| Net deferred income tax assets | | 436 | | 455 |
| Total deferred income tax liabilities | | (2,213) | | (2,331) |
| Net deferred income tax liability | $ | (1,777) | $ | (1,876) |

(1)　Total deferred income tax assets included $526 million and $378 million of loss and tax credit carryforwards at June 30, 2018 and 2017 , respectively.

(2)　The valuation allowance primarily relates to federal, state and international loss and credit carryforwards for which the ultimate realization of future benefits is uncertain.

Expiring or unusable loss and credit carryforwards and the required valuation allowances are adjusted quarterly when it is more likely than not that at least a portion of the respective deferred tax assets will not be realized. After applying the valuation allowances, we do not anticipate any limitations on our use of any of the other net deferred income tax assets described above. Tax benefits from uncertain tax positions are recognized when it is more likely than not that the position will be sustained upon examination of the technical

merits of the position, including resolutions of any related appeals or litigation. The amount recognized is measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon settlement.

Our assumptions and estimates around uncertain tax positions require significant judgment; the actual amount of tax benefit related to uncertain tax positions may differ from these estimates. See Note 8 of the "Notes to Consolidated Financial Statements" for additional information regarding unrecognized tax benefits.

We believe that our estimates for the valuation allowances against deferred tax assets and unrecognized tax benefits are appropriate based on current facts and circumstances. The amount we ultimately pay when matters are resolved may differ from the amounts accrued. Changes in our current estimates due to unanticipated market conditions, tax law changes or other factors could have a material effect on our ability to utilize deferred tax assets. For a further discussion on Provision for Income Taxes, see Note 8 of the "Notes to the Consolidated Financial Statements."

The calculation of our tax liabilities includes estimates for uncertainties in the application of broad and complex changes to the U.S. tax code as per the Tax Cuts and Jobs Act ("the Tax Act") as enacted by the United States government on December 22, 2017. Although we are still completing our accounting for the tax effects of the Tax Act, we have made reasonable estimates and recorded provisional amounts based on management judgment and our current understanding of the Tax Act which is subject to further interpretation by the Internal Revenue Service ("IRS"). See Note 8 of the "Notes to Consolidated Financial Statements" for additional information regarding the Tax Act.

# Share-Based Compensation

Employee share-based compensation is recognized in the consolidated statements of earnings based on the grant date fair value of the awards. The grant date market price of our common shares determines the fair value of restricted share units and performance share units. The fair value of stock options is determined using a lattice valuation model. We believe the lattice model provides reasonable estimates because it takes into account employee exercise patterns based on changes in our stock price and other variables and it provides for a range of input assumptions.

We analyze historical data to estimate option exercise behaviors and post-vesting forfeitures. The expected life of the options granted, which represents the length of time in years that the options granted are expected to be outstanding, is calculated from the option valuation model. Expected volatilities are based on implied volatility

from traded options on our common shares and historical volatility over a period of time commensurate with the contractual term of the option grant (up to ten years).

Forfeiture estimates for all types of awards are adjusted as circumstances change and ultimately reflect actual forfeitures when an award vests. Actual forfeitures in future reporting periods could be higher or lower than our current estimates.

Compensation expense for nonvested performance share units depends on our periodic assessment of the probability of the targets being achieved and our estimate, which may vary over time, of the number of shares that ultimately will be issued. See Note 17 of the "Notes to Consolidated Financial Statements" for additional information regarding share-based compensation.

# Explanation and Reconciliation of Non-GAAP Financial Measures

This report, including the "Fiscal 2018 Overview" section within MD&A, contains financial measures that are not calculated in accordance with GAAP. In addition to analyzing our business based on financial information prepared in accordance with GAAP, we use these non-GAAP financial measures internally to evaluate our performance, evaluate the balance sheet, engage in financial and operational planning, and determine incentive compensation because we believe that these measures provide additional perspective on and, in some circumstances are more closely correlated to, the performance of our underlying, ongoing business. We provide these non-GAAP financial measures to investors as supplemental metrics to assist readers in assessing the effects of items and events on our financial and operating results on a year-over-year basis and in comparing our performance to that of our competitors. However, the non-GAAP financial measures that we use may be calculated differently from, and therefore may not be comparable to, similarly titled measures used by other companies. The non-GAAP financial measures disclosed by us should not be considered a substitute for, or superior to, financial measures calculated in accordance with GAAP, and the financial results calculated in accordance with GAAP and reconciliations to those financial statements set forth below should be carefully evaluated.

## Exclusions from Non-GAAP Financial Measures

Management believes it is useful to exclude the following items from the non-GAAP measures presented in this report for its own and for investors' assessment of the business for the reasons identified below:

- LIFO charges and credits are excluded because the factors that drive last-in first-out ("LIFO") inventory charges or credits, such as pharmaceutical manufacturer price appreciation or deflation and year-end inventory levels (which can be meaningfully influenced by customer buying behavior immediately preceding our fiscal year-end), are largely out of our control and cannot be accurately predicted. The exclusion of LIFO charges and credits from non-GAAP metrics facilitates comparison of our current financial results to our historical financial results and to our peer group companies' financial results.

- Restructuring and employee severance costs are excluded because they are not part of the ongoing operations of our underlying business.

- Amortization and other acquisition-related costs , which include transaction costs, integration costs, and changes in the fair value of contingent consideration obligations, are excluded primarily for consistency with the presentation of the financial results of our peer group companies. Additionally, costs for amortization of acquisition-related intangible assets are non-cash amounts, which are variable in amount and frequency and are significantly impacted by the timing and size of acquisitions, so their exclusion facilitates comparison of historical, current and forecasted financial results. We also exclude other acquisition-related costs, which are directly related to an acquisition but do not meet the criteria to be recognized on the acquired entity's initial balance sheet as part of the purchase price allocation. These costs are also significantly impacted by the timing, complexity and size of acquisitions.

- Impairments and gain or loss on disposal of assets are excluded because they do not occur in or reflect the ordinary course of our ongoing business operations and are inherently unpredictable in timing and amount, and in the case of impairments, are non-cash amounts, so their exclusion facilitates comparison of historical, current and forecasted financial results.

- Litigation recoveries or charges, net are excluded because they often relate to events that may have occurred in prior or multiple periods, do not occur in or reflect the ordinary course of our business and are inherently unpredictable in timing and amount.

- Loss on extinguishment of debt is excluded because it does not typically occur in the normal course of business and may obscure analysis of trends and financial performance. Additionally, the amount and frequency of this type of charge is not consistent and is significantly impacted by the timing and size of debt extinguishment transactions.

- Transitional tax benefit, net related to the Tax Cuts and Jobs Act is excluded because it results from the one-time impact during the one-year measurement period of a very significant change in the U.S. federal corporate tax rate and, due to the significant size of the benefit, obscures analysis of trends and financial performance. The transitional tax benefit includes the initial estimate and measurement period adjustments for the re-measurement of deferred tax assets and liabilities due to the reduction of the U.S. federal corporate income tax rate and the repatriation tax on undistributed foreign earnings, both of which are subject to adjustment during an up to 12 month measurement period.

The tax effect for each of the items listed above, other than the transitional tax benefit item, is determined using the tax rate and other tax attributes applicable to the item and the jurisdiction(s) in which the item is recorded. The gross, tax and net impact of each item are presented with our GAAP to non-GAAP reconciliations.

**Explanation and Reconciliation of Non-GAAP Financial Measures**

# Definitions

**Growth rate calculation** : growth rates in this report are determined by dividing the difference between current period results and prior period results by prior period results.

**Non-GAAP operating earnings** : operating earnings excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets and (5) litigation (recoveries)/charges, net.

**Non-GAAP earnings before income taxes** : earnings before income taxes excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net and (6) loss on extinguishment of debt.

**Non-GAAP Net Earnings attributable to Cardinal Health, Inc.:** net earnings attributable to Cardinal Health, Inc. excluding (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, each net of tax, and (7) transitional tax benefit related to the Tax Cuts and Jobs Act.

**Non-GAAP effective tax rate** : (provision for income taxes adjusted for (1) LIFO charges/(credits), (2) restructuring and employee severance, (3) amortization and other acquisition-related costs, (4) impairments and (gain)/loss on disposal of assets, (5) litigation (recoveries)/charges, net, (6) loss on extinguishment of debt, and (7) transitional tax benefit, (net) divided by (earnings before income taxes adjusted for the first six items).

**Non-GAAP diluted EPS attributable to Cardinal Health, Inc.** : non-GAAP net earnings attributable to Cardinal Health, Inc. divided by diluted weighted-average shares outstanding.

**Explanation and Reconciliation of Non-GAAP Financial Measures**

# GAAP to Non-GAAP Reconciliations

| (in millions, except per common share amounts) | Operating Earnings | Operating Earnings Growth Rate | Earnings/(Loss) Before Income Taxes | Provision for Income Taxes | Net Earnings [1,2] | Net Earnings/(Loss) [1,2] Growth Rate | Diluted EPS [1,2] | Diluted EPS [1,2] Growth Rate |
|---|---|---|---|---|---|---|---|---|
| **Fiscal Year 2018** | | | | | | | | |
| GAAP | $ 126 | (94)% | $ (228) | $ (487) | $ 259 | (80)% | $ 0.81 | (80)% |
| Restructuring and employee severance | 176 | | 176 | 25 | 151 | | 0.48 | |
| Amortization and other acquisition-related costs | 707 | | 707 | 176 | 531 | | 1.69 | |
| Impairments and loss on disposal of assets [4] | 1,417 | | 1,417 | (44) | 1,461 | | 4.64 | |
| Litigation (recoveries)/charges, net | 159 | | 159 | 48 | 111 | | 0.35 | |
| Loss on extinguishment of debt | — | | 2 | 1 | 1 | | — | |
| Transitional tax benefit, net [3] | — | | — | 936 | (936) | | (2.97) | |
| **Non-GAAP** | **$ 2,585** | **(7)%** | **$ 2,233** | **$ 655** | **$ 1,578** | **(9)%** | **$ 5.00** | **(7)%** |
| Fiscal Year 2017 | | | | | | | | |
| GAAP | $ 2,120 | (14)% | $ 1,924 | $ 630 | $ 1,288 | (10)% | $ 4.03 | (7)% |
| Restructuring and employee severance | 56 | | 56 | 20 | 36 | | 0.11 | |
| Amortization and other acquisition-related costs | 527 | | 527 | 165 | 362 | | 1.13 | |
| Impairments and loss on disposal of assets | 18 | | 18 | 6 | 12 | | 0.04 | |
| Litigation (recoveries)/charges, net | 48 | | 48 | 19 | 29 | | 0.09 | |
| Non-GAAP | $ 2,769 | (4)% | $ 2,572 | $ 839 | $ 1,727 | — % | $ 5.40 | 3 % |
| Fiscal Year 2016 | | | | | | | | |
| GAAP | $ 2,459 | 14 % | $ 2,276 | $ 845 | $ 1,427 | 18 % | $ 4.32 | 20 % |
| Restructuring and employee severance | 25 | | 25 | 9 | 16 | | 0.05 | |
| Amortization and other acquisition-related costs | 459 | | 459 | 143 | 316 | | 0.96 | |
| Impairments and (gain)/loss on disposal of assets | 21 | | 21 | 6 | 15 | | 0.04 | |
| Litigation (recoveries)/charges, net | (69) | | (69) | (27) | (42) | | (0.13) | |
| Non-GAAP | $ 2,895 | 17 % | $ 2,711 | $ 976 | $ 1,732 | 18 % | $ 5.24 | 20 % |
| Fiscal Year 2015 | | | | | | | | |
| GAAP | $ 2,161 | 15 % | $ 1,967 | $ 755 | $ 1,212 | 4 % | $ 3.61 | 7 % |
| Restructuring and employee severance | 44 | | 44 | 15 | 29 | | 0.09 | |
| Amortization and other acquisition-related costs | 281 | | 281 | 100 | 181 | | 0.54 | |
| Impairments and (gain)/loss on disposal of assets | (19) | | (19) | (10) | (9) | | (0.03) | |
| Litigation (recoveries)/charges, net | 5 | | 5 | (14) | 19 | | 0.06 | |
| Loss on extinguishment of debt | — | | 60 | 23 | 37 | | 0.11 | |
| Non-GAAP | $ 2,472 | 16 % | $ 2,339 | $ 870 | $ 1,469 | 11 % | $ 4.38 | 14 % |
| Fiscal Year 2014 | | | | | | | | |
| GAAP | $ 1,885 | 89 % | $ 1,798 | $ 635 | $ 1,163 | 247 % | $ 3.37 | 247 % |
| Restructuring and employee severance | 31 | | 31 | 11 | 20 | | 0.06 | |
| Amortization and other acquisition-related costs | 223 | | 223 | 79 | 144 | | 0.42 | |
| Impairments and (gain)/loss on disposal of assets | 15 | | 15 | 5 | 10 | | 0.03 | |
| Litigation (recoveries)/charges, net | (21) | | (21) | (8) | (13) | | (0.04) | |
| Non-GAAP | $ 2,133 | 4 % | $ 2,047 | $ 722 | $ 1,324 | 3 % | $ 3.84 | 3 % |

[1]  from continuing operations
[2]  attributable to Cardinal Health, Inc.
[3]  Reflects the estimated net transitional benefit from the re-measurement of our deferred tax assets and liabilities partially offset by the repatriation tax on cash and earnings of foreign subsidiaries.  We have not yet completed our analysis of the impact of the Tax Act and, as such, these amounts are provisional estimates and we may record additional provisional amounts or adjustments to the provisional amounts in future periods.
[4]  Fiscal year 2018 includes a goodwill impairment charge of $1.4 billion related to our Medical segment. There was no tax benefit related to this goodwill impairment charge.

The sum of the components may not equal the total due to rounding.
We apply varying tax rates depending on the item's nature and tax jurisdiction where it is incurred.

Selected Financial Data

# Selected Financial Data

The consolidated financial data below includes all business combinations as of the date of acquisition that occurred during these periods. The following selected consolidated financial data should be read in conjunction with the consolidated financial statements and related notes and MD&A.

| (in millions, except per common share amounts) | 2018 [1,2] | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| **Earnings Data:** | | | | | |
| Revenue | $ 136,809 | $ 129,976 | $ 121,546 | $ 102,531 | $ 91,084 |
| Operating earnings | 126 | 2,120 | 2,459 | 2,161 | 1,885 |
| Earnings from continuing operations | 259 | 1,294 | 1,431 | 1,212 | 1,163 |
| Earnings/(loss) from discontinued operations, net of tax | — | — | — | 3 | 3 |
| Net earnings | 259 | 1,294 | 1,431 | 1,215 | 1,166 |
| Less: Net earnings attributable to noncontrolling interests | (3) | (6) | (4) | — | — |
| **Net earnings attributable to Cardinal Health, Inc.** | $ 256 | $ 1,288 | $ 1,427 | $ 1,215 | $ 1,166 |
| **Basic earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Continuing operations | $ 0.82 | $ 4.06 | $ 4.36 | $ 3.65 | $ 3.41 |
| Discontinued operations | — | — | — | 0.01 | 0.01 |
| **Net basic earnings per common share attributable to Cardinal Health, Inc.** | $ 0.82 | $ 4.06 | $ 4.36 | $ 3.66 | $ 3.42 |
| **Diluted earnings per common share attributable to Cardinal Health, Inc.:** | | | | | |
| Continuing operations | $ 0.81 | $ 4.03 | $ 4.32 | $ 3.61 | $ 3.37 |
| Discontinued operations | — | — | — | 0.01 | 0.01 |
| **Net diluted earnings per common share attributable to Cardinal Health, Inc.** | $ 0.81 | $ 4.03 | $ 4.32 | $ 3.62 | $ 3.38 |
| Cash dividends declared per common share | $ 1.8635 | $ 1.8091 | $ 1.6099 | $ 1.4145 | $ 1.2500 |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 39,951 | $ 40,112 | $ 34,122 | $ 30,142 | $ 26,033 |
| Long-term obligations, less current portion | 8,012 | 9,068 | 4,952 | 5,211 | 3,171 |
| Total Cardinal Health, Inc. shareholders' equity | 6,059 | 6,808 | 6,554 | 6,256 | 6,401 |

[1] During the fourth quarter of fiscal 2018, we recognized a non-cash goodwill impairment charge of $1.4 billion related to our Medical segment. There was no tax benefit related to this goodwill impairment charge.

[2] During fiscal 2018, the United States enacted the Tax Cuts and Jobs Act. See Note 8 for more information.

# Quantitative and Qualitative Disclosures About Market Risk

We are exposed to cash flow and earnings fluctuations as a result of certain market risks. These market risks primarily relate to foreign exchange, interest rate, and commodity price-related changes. We maintain a hedging program to manage volatility related to some of these market exposures which employs operational, economic, and derivative financial instruments in order to mitigate risk. See Note 1 and Note 12 of the "Notes to Consolidated Financial Statements" for further discussion regarding our use of derivative instruments.

## Foreign Exchange Rate Sensitivity

By the nature of our global operations, we are exposed to cash flow and earnings fluctuations resulting from foreign exchange rate variation. These exposures are transactional and translational in nature. The following foreign currencies represent the principal drivers of our foreign exchange exposure: Canadian dollar, Euro, Thai baht, Mexican peso and Chinese renminbi.

We apply a Value-At-Risk ("VAR") methodology to our transactional and translational exposures. The VAR model is a risk estimation tool and is not intended to represent actual losses in fair value that could be incurred.

### Transactional Exposure

Transactional exposure arises from the purchase and sale of goods and services in currencies other than our functional currency or the functional currency of our subsidiaries. At the end of each fiscal year we perform sensitivity analyses on our forecasted transactional exposure for the upcoming fiscal year. These analyses include the estimated impact of our hedging program, which is designed to

mitigate transactional exposure. Applying a VAR methodology to our transactional exposure and including the impact of our hedging program, the potential maximum loss in earnings for the upcoming fiscal year is estimated to be $26 million, which is based on a one-year horizon and a 95 percent confidence level. Under the same methodology, at June 30, 2017, our potential maximum loss in earnings for the upcoming fiscal year was estimated to be $19 million.

### Translational Exposure

We have exposure related to the translation of financial statements of our foreign operations into U.S. dollars, our functional currency. Applying a VAR methodology to our translational exposure, the potential maximum loss in earnings for the upcoming fiscal year is estimated to be $9 million, which is based on a one-year horizon and a 95 percent confidence level. Under the same methodology, at June 30, 2017, our potential maximum loss in earnings for the upcoming fiscal year was estimated to be $14 million.

## Interest Rate Sensitivity

We are exposed to changes in interest rates primarily as a result of our borrowing and investing activities to maintain liquidity and fund operations. The nature and amount of our long-term and short-term debt can be expected to fluctuate as a result of business requirements, market conditions and other factors. Our policy is to manage exposures to interest rates using a mix of fixed and floating rate debt as deemed appropriate by management. We utilize interest rate swap instruments to mitigate our exposure to interest rate movements.

As part of our risk management program, we perform an annual sensitivity analysis on our forecasted exposure to interest rates for the upcoming fiscal year. This analysis assumes a hypothetical 50 basis point change in interest rates. At June 30, 2018 and 2017 , the potential increase or decrease in annual interest expense under this

analysis as a result of this hypothetical change was $15 million and $16 million, respectively.

We are also exposed to market risk from changes in interest rates related to our cash and cash equivalents, which includes marketable securities that are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. The fair value of our cash and cash equivalents is subject to change primarily as a result of changes in market interest rates and investment risk related to the issuers' credit worthiness. At June 30, 2018 , a hypothetical increase or decrease of 50 basis points in interest rates would result in no change in the estimated fair value. At June 30, 2017 , a hypothetical increase or decrease of 50 basis points in interest rates would result in a potential increase or decrease of $1 million in the estimated fair value.

# Commodity Price Sensitivity

We are directly exposed to market price changes for certain commodities, including oil-based resins, nitrile, cotton, diesel fuel and latex. We typically purchase raw materials at either market prices or prices tied to a commodity index and some finished goods at prices based in part on a commodity price index.

As part of our risk management program, we perform sensitivity analysis on our forecasted direct commodity exposure for the upcoming fiscal year. Our forecasted direct commodity exposure at June 30, 2018 increased approximately $190 million from June 30, 2017 primarily due to the acquisition of the Patient Recovery Business. At June 30, 2018 and 2017 , we had hedged a portion of these direct commodity exposures (see Note 12 of the "Notes to Consolidated Financial Statements" for further discussion).

Our forecasted direct commodity exposures for the upcoming fiscal years were $424 million and $234 million at June 30, 2018 and 2017, respectively. The potential gain/loss given a hypothetical 10 percent fluctuation in commodity prices, assuming pricing collectively shifts in the same direction and we are unable to change customer pricing in response to those shifts, for the upcoming fiscal year were $42 million and $23 million at June 30, 2018 and 2017, respectively. The hypothetical offsetting impact of hedges in both periods was minimal. In prior years, we forecasted both direct and indirect exposure to commodity pricing changes. Beginning in fiscal 2018, we began only estimating direct exposure because it is the primary way that we view and manage commodity risk. Under the prior methodology, our exposure in fiscal 2017 for the next fiscal year was estimated to be $411 million and the potential gain/loss was $41 million.

# Business

## General

Cardinal Health, Inc. is a global integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. We provide medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency from hospital to home.

## Pharmaceutical Segment

In the United States, our Pharmaceutical segment:

- distributes branded and generic pharmaceutical and over-the-counter healthcare and consumer products through its Pharmaceutical Distribution division to retailers (including chain and independent drug stores and pharmacy departments of supermarkets and mass merchandisers), hospitals and other healthcare providers. This division:

  - maintains prime vendor relationships that streamline the purchasing process resulting in greater efficiency and lower costs for our retail, hospital and other healthcare provider customers;

  - provides services to pharmaceutical manufacturers, including distribution, inventory management, data reporting, new product launch support and chargeback administration;

  - provides pharmacy management services to hospitals as well as medication therapy management and patient outcomes services to hospitals, other healthcare providers and payers, and operates pharmacies in community health centers; and

  - repackages generic pharmaceuticals and over-the-counter healthcare products;

- through its Specialty Solutions division, distributes specialty pharmaceutical products to hospitals and other healthcare providers and provides consulting, patient support and other services for specialty pharmaceutical products to pharmaceutical manufacturers and healthcare providers; and

- operates nuclear pharmacies and manufacturing facilities through its Nuclear Pharmacy Services division, which manufactures, prepares and delivers radiopharmaceuticals for use in nuclear imaging and other procedures in hospitals and physician offices. This division also contract manufactures a radiopharmaceutical treatment (Xofigo) and holds the North American rights to manufacture and distribute Lymphoseek, a radiopharmaceutical diagnostic imaging agent.

See Note 16 of the "Notes to Consolidated Financial Statements" for Pharmaceutical segment revenue, profit and assets for fiscal 2018 , 2017 and 2016 .

### Pharmaceutical Distribution

Our Pharmaceutical Distribution division's gross margin includes margin from our generic pharmaceutical program, from distribution services agreements with branded pharmaceutical manufacturers and from over-the-counter healthcare and consumer products. It also includes manufacturer cash discounts.

Margin from our generic pharmaceutical program includes price discounts and rebates from manufacturers and may in some instances include price appreciation. Our earnings on generic pharmaceuticals are generally highest during the period immediately following the initial launch of a product, because generic pharmaceutical selling prices are generally highest during that period and tend to decline over time.

Margin from distribution services agreements with branded pharmaceutical manufacturers is derived primarily from compensation we receive for providing a range of distribution and related services to manufacturers. Our compensation typically is a percentage of the wholesale acquisition cost that is set by manufacturers. In addition, under a limited number of agreements, branded pharmaceutical price appreciation, which is determined by the manufacturers, also serves as part of our compensation.

### Sourcing Venture With CVS Health Corporation

In July 2014, we established Red Oak Sourcing, a U.S.-based generic pharmaceutical sourcing venture with CVS with an initial term of 10 years. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of both companies.

### Specialty Pharmaceutical Products and Services

We refer to products and services offered by our Specialty Solutions division as "specialty pharmaceutical products and services." The Specialty Solutions division distributes oncology, rheumatology, urology, nephrology and other pharmaceutical products ("specialty pharmaceutical products") and human-derived plasma products to hospitals, dialysis clinics, physician offices and other healthcare providers; provides consulting, patient support, logistics, group purchasing and other services to pharmaceutical manufacturers and healthcare providers primarily supporting the development, marketing and distribution of specialty pharmaceutical products; and provides specialty pharmacy services. Our use of the terminology "specialty pharmaceutical products and services" may not be comparable to the terminology used by other industry participants.

# Medical Segment

Our Medical segment manufactures and sources Cardinal Health branded medical, surgical and laboratory products, including cardiovascular and endovascular products; wound care products; single-use surgical drapes, gowns and apparel; exam and surgical gloves; and fluid suction and collection systems. We further expanded this segment's portfolio of Cardinal Health Brand products through the acquisition of the Patient Recovery Business from Medtronic in July 2017, which includes incontinence, wound care, enteral feeding, urology, operating room supply, electrode and needle, syringe and sharps disposal product lines. Our Cardinal Health Brand products are sold directly or through third-party distributors in the United States, Canada, Europe, Asia and other markets.

The Medical segment also distributes a broad range of national brand products and provides supply chain services and solutions to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States and Canada.

This segment also distributes medical products to patients' homes in the United States through our Cardinal Health at Home division.

This segment also assembles and sells sterile and non-sterile procedure kits. It also provides supply chain services, including spend management, distribution management and inventory management services, to healthcare providers.

**naviHealth Partnership**

In August 2018, we entered into a partnership with CD&R through which we own 44% of the ownership interests in the naviHealth business. naviHealth partners with health plans, hospital systems, physician groups and other healthcare providers to manage post-acute care through value-based programs.

See Note 16 of the "Notes to Consolidated Financial Statements" for Medical segment revenue, profit and assets for fiscal 2018 , 2017 and 2016 .

# Acquisitions and Divestitures

## Acquisitions

We have acquired a number of businesses over the years that have enhanced our core strategic areas of Cardinal Health Brand medical products, generic pharmaceutical distribution and services, specialty pharmaceutical products and services, international and post-acute care. We expect to continue to pursue additional acquisitions in the future.

During the last five fiscal years, we completed the following three large acquisitions:

| Date | Company | Location | Lines of Business | Acquisition Price (in billions) |
|------|---------|----------|-------------------|--------------------------------|
| 07/17 | Patient Recovery Business of Medtronic, plc | Mansfield, MA | Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency | $6.1 |
| 10/15 | Cordis business of Johnson & Johnson | Fremont, CA | Cardiovascular and endovascular products | $1.9 |
| 07/15 | The Harvard Drug Group | Livonia, MI | Pharmaceutical product distribution | $1.1 |

We have also completed several smaller acquisitions during the last five fiscal years, including: in fiscal 2017, the acquisition of the North

American rights to Lymphoseek, a radiopharmaceutical diagnostic imaging agent, from Navidea Biopharmaceuticals, Inc.; in fiscal 2015, the acquisitions of Tradex International, Inc., a supplier of disposable gloves, and Metro Medical Supply, Inc., a distributor of specialty pharmaceuticals and medical and surgical products; and in fiscal 2014, the acquisition of Access Closure, Inc., a manufacturer and distributor of extravascular closure devices.

## Divestitures

Over the past year, we have also completed several divestitures, including, in February 2018, selling our pharmaceutical and medical products distribution business in China to Shanghai Pharmaceuticals Holding Co., Ltd. for proceeds of $861 million (after adjusting for third party indebtedness and preliminary transaction adjustments).

Additionally, in August 2018, we completed the sale of our ownership interest in naviHealth, Inc. to investor entities controlled by CD&R for proceeds of $736 million (after adjusting for certain fees and expenses) and a 44% equity interest in a partnership that owns the naviHealth business.

We had acquired our ownership interest in naviHealth through a series of transactions, beginning in fiscal 2016, when we acquired a 71% ownership interest. As of the end of fiscal 2018, we owned 98% of the interests in naviHealth.

**Business**

## Customers

Our largest customers, CVS and OptumRx accounted for 25 percent and 11 percent of our fiscal 2018 revenue, respectively. In the aggregate, our five largest customers, including CVS and OptumRx, accounted for 47 percent of our fiscal 2018 revenue. Our pharmaceutical distribution agreements with CVS extend through June 2019.

We have agreements with group purchasing organizations ("GPOs") that act as agents to negotiate vendor contracts on behalf of their members. Our two largest GPO relationships in terms of member revenue are with Vizient, Inc. and Premier, Inc. Sales to members of these two GPOs, under numerous contracts across all of our businesses, collectively accounted for 22 percent of our revenue in fiscal 2018 .

## Suppliers

We rely on many different suppliers. Products obtained from our five largest suppliers accounted for an aggregate of 29 percent of our revenue during fiscal 2018 , but no single supplier's products accounted for more than 8 percent of revenue.

## Competition

We operate in a highly competitive environment in the distribution of pharmaceuticals and consumer healthcare products. We also operate in a highly competitive environment in the development, manufacturing and distribution of medical devices and surgical products. We compete on many levels, including price, service offerings, support services, breadth of product lines and product quality and efficacy.

In the Pharmaceutical segment, we compete with wholesale distributors with national reach, including McKesson Corporation and AmerisourceBergen Corporation, regional wholesale distributors, self-warehousing chains, specialty distributors, third-party logistics companies, companies that provide specialty pharmaceutical

services and nuclear pharmacies, among others. In addition, the Pharmaceutical segment has experienced competition from a number of organizations offering generic pharmaceuticals, including telemarketers. We also compete with manufacturers that sell their products directly.

In the Medical segment, we compete with many diversified healthcare companies and national medical product distributors, such as Medline Industries, Inc., Owens & Minor, Inc. and Becton, Dickinson and Company, as well as regional medical product distributors and companies that are focused on specific product categories. We also compete with companies that distribute medical products to patients' homes and third-party logistics companies.

## Employees

At June 30, 2018 , we had approximately 32,300 employees in the United States and approximately 17,900 employees outside of the United States.

## Intellectual Property

We rely on a combination of trade secret, patent, copyright and trademark laws, nondisclosure and other contractual provisions, and technical measures to protect our products, services and intangible assets. We hold patents, and continue to pursue patent protection throughout the world, relating to the manufacture, operation and use of various medical and surgical products, to certain distribution and logistics systems, to the production and distribution of our nuclear pharmacy products and to other service offerings. We also operate under licenses for certain proprietary technologies, and in certain instances we license our technologies to third parties.

We believe that we have taken all necessary steps to protect our proprietary rights, but no assurance can be given that we will be able to successfully enforce or protect our rights in the event that they are infringed upon by a third party. While all of these proprietary rights are important to our operations, we do not consider any particular patent, trademark, license, franchise or concession to be material to our overall business.

**Business**

# Regulatory Matters

Our business is highly regulated in the United States, at both the federal and state level, and in foreign countries. Depending upon the specific business, we may be subject to regulation by government entities including:

- the U.S. Drug Enforcement Administration (the "DEA");

- certain agencies within the U.S. Department of Health and Human Services, including the U.S. Food and Drug Administration (the "FDA"), the Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights;

- state health departments, insurance departments, Medicaid departments or other comparable state agencies;

- state boards of pharmacy and other controlled substance authorities;

- the U.S. Nuclear Regulatory Commission (the "NRC");

- the U.S. Federal Trade Commission (the "FTC");

- U.S. Customs and Border Protection; and

- agencies comparable to those listed above in markets outside the United States.

These regulatory agencies have a variety of civil, administrative and criminal sanctions at their disposal for failure to comply with applicable legal or regulatory requirements. They can suspend our ability to manufacture and distribute products, initiate product recalls, seize products or impose criminal, civil and administrative sanctions.

## Distribution

State Boards of Pharmacy, FDA, DEA and various other state authorities regulate the marketing, purchase, storage and distribution of pharmaceutical and medical products under various federal and state statutes including the federal Prescription Drug Marketing Act of 1987, Drug Quality and Security Act of 2013 (the "DQSA"), and Controlled Substances Act (the "CSA"). The CSA governs the sale, packaging, storage and distribution of controlled substances. Wholesale distributors of controlled substances must hold valid DEA registrations and state-level licenses, meet various security and operating standards, and comply with the CSA. They must also comply with state requirements relating to controlled substances that differ from state to state.

## Manufacturing and Marketing

We sell our manufactured products in the United States, Canada, Europe, Asia and other markets. The FDA and other governmental agencies in the United States, as well as foreign governmental agencies, administer requirements that cover the design, testing, safety, effectiveness, manufacturing (including good manufacturing practices), quality systems, labeling, promotion and advertising (including restrictions on promoting or advertising a product other than for the product's cleared or approved uses), distribution, importation and post-market surveillance for most of our manufactured products. In addition, we need specific approval or clearance from, and registrations with, regulatory authorities before

we can market and sell some products in the United States and certain other countries, including countries in the European Union ("EU").

In the United States, authorization to commercially market a medical device is generally received in one of two ways. The first, known as pre-market notification or the 510(k) process, requires us to demonstrate that a medical device is substantially equivalent to a legally marketed medical device. The second more rigorous process, known as pre-market approval ("PMA"), requires us to independently demonstrate that a medical device is safe and effective. Many of our Medical segment products are cleared through the 510(k) process and certain Cordis products must be approved through the PMA process.

In the EU, we are required to comply with applicable Medical Device Directives ("MDDs") and obtain CE Mark Certification in order to market medical devices. The EU regulatory bodies finalized a new Medical Device Regulation ("MDR") in 2017, which replaces the existing MDDs after a three-year transition period. Among other things, the MDR clarifies that private label distributors are deemed to be the manufacturer, which will increase our regulatory obligations in the EU with respect to private label products.

It can be costly and time-consuming to obtain regulatory approvals, clearances and registrations of medical devices, and they might not be granted on a timely basis, if at all. Even after we obtain approval or clearance to market a product or obtain product registrations, the product and our manufacturing processes are subject to continued regulatory oversight, including periodic inspection of manufacturing facilities by FDA and other regulatory authorities both in the United States and internationally.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements or published standards. When we or a regulatory agency identify a quality or regulatory issue, we investigate and take appropriate corrective action, which may include recalling the product, correcting the product at the customer location, revising product labeling and notifying customers.

## Health and Personal Information Practices

We collect, handle and maintain patient-identifiable health information. The U.S. Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as augmented by the Health Information Technology for Economic and Clinical Health Act, and state laws regulate the use and disclosure of patient-identifiable health information, including requiring specified privacy and security measures. We also collect, handle and maintain other sensitive personal and financial information that is subject to U.S. federal and state laws protecting such information.

The processing and disclosure of personal information is also highly regulated in many other countries in which we operate. In Europe, for example, we are subject to the EU data protection regulations, including the current EU Directive on Data Protection, which requires member states to impose minimum restrictions on the collection, use

**Business**

and transfer of personal data. The EU General Data Protection Regulation ("GDPR") includes, among other things, a requirement for prompt notice of data breaches to data subjects and supervisory authorities in certain circumstances and significant fines for non-compliance. The GDPR also requires companies processing personal data of individuals residing in the EU to comply with EU privacy and data protection rules.

## Nuclear Pharmacies and Related Businesses

Our nuclear pharmacies and radiopharmaceutical manufacturing facilities (including for Xofigo) require licenses or permits and must abide by regulations issued by the NRC, applicable state boards of pharmacy and the radiologic health agency or department of health of each state in which we operate, including pharmacy sterile compounding standards and practices. In addition, our radiopharmaceutical manufacturing facilities also must comply with FDA regulations, including good manufacturing practices.

## Product Tracing and Supply Chain Integrity

Title II of the DQSA, known as the Drug Supply Chain Security Act or "Track and Trace," establishes a phased-in national system for tracing pharmaceutical products through the pharmaceutical distribution supply chain to prevent the introduction of counterfeit, adulterated or mislabeled drugs. The first phase of implementation began in 2015, and upon full implementation in 2023, we and other supply chain stakeholders will participate in an electronic, interoperable, prescription drug tracing system. In addition, the FDA also has issued regulations requiring most medical device labeling to bear a unique device identifier. These regulations are being phased in through 2020. The MDR finalized in the EU in 2017 also introduces a new unique device identifier requirement with a three-year transition period.

## Government Healthcare Programs

We are subject to U.S. federal healthcare fraud and abuse laws. These laws generally prohibit persons from soliciting, offering, receiving or paying any compensation in order to induce someone to order, recommend or purchase products or services that are in any way paid for by Medicare, Medicaid or other federally-funded healthcare programs. They also prohibit submitting any fraudulent claim for payment by the federal government. There are similar state healthcare fraud and abuse laws that apply to Medicaid and other state-funded healthcare programs. Violations of these laws may result in criminal or civil penalties, as well as breach of contract claims and *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments).

Some businesses within each of our segments are Medicare-certified suppliers or participate in other federal and state healthcare

programs, such as state Medicaid programs and the federal 340B drug pricing program. These businesses are subject to accreditation and quality standards and other rules and regulations, including applicable reporting, billing, payment and record-keeping requirements. Other businesses within each segment manufacture pharmaceutical or medical products or repackage pharmaceuticals that are purchased or reimbursed through, or are otherwise governed by, federal or state healthcare programs. Failure to comply with applicable eligibility requirements, standards and regulations could result in civil or criminal sanctions, including the loss of our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

Our U.S. federal and state government contracts are subject to specific procurement requirements. Failure to comply with applicable rules or regulations or with contractual or other requirements may result in monetary damages and criminal or civil penalties as well as termination of our government contracts or our suspension or debarment from government contract work.

## Antitrust Laws

The U.S. federal government, most U.S. states and many foreign countries have laws that prohibit certain types of conduct deemed to be anti-competitive. Violations of these laws can result in various sanctions, including criminal and civil penalties. Private plaintiffs also could bring civil lawsuits against us in the United States for alleged antitrust law violations, including claims for treble damages.

## Environmental, Health and Safety Laws

In the United States and other countries, we are subject to various federal, state and local environmental laws, as well as laws relating to safe working conditions and laboratory practices.

## Laws Relating to Foreign Trade and Operations

U.S. and foreign laws require us to abide by standards relating to the import and export of finished goods, raw materials and supplies and the handling of information. We also must comply with various export control and trade embargo laws, which may require licenses or other authorizations for transactions within some countries or with some counterparties.

Similarly, we are subject to U.S. and foreign laws concerning the conduct of our foreign operations, including the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act and other foreign anti-bribery laws. Among other things, these laws generally prohibit companies and their intermediaries from offering, promising or making payments to officials of foreign governments for the purpose of obtaining or retaining business.

**Business**

## Other Information

Although our agreements with manufacturers sometimes require us to maintain inventory levels within specified ranges, our distribution businesses are generally not required by our customers to maintain particular inventory levels other than as needed to meet service level requirements. Certain supply contracts with U.S. government entities require us to maintain sufficient inventory to meet emergency demands, but we do not believe those requirements materially affect inventory levels.

Our customer return policies generally require that the product be physically returned, subject to restocking fees. We only allow customers to return products that can be added back to inventory and resold at full value, or that can be returned to vendors for credit.

We offer market payment terms to our customers.

## Revenue and Long-Lived Assets by Geographic Area

See Note 16 of the "Notes to Consolidated Financial Statements" for revenue and long-lived assets by geographic area.

# Risk Factors

The risks described below could materially and adversely affect our results of operations, financial condition, liquidity or cash flows. These are not the only risks we face. Our businesses also could be affected by risks that we are not presently aware of or that we currently consider immaterial to our operations.

**We could continue to suffer the adverse effects of competitive pressures.**

As described in greater detail in the "Business" section, we operate in markets that are highly competitive and dynamic. In addition, competitive pressures in our pharmaceutical and medical distribution may be increased by new business models, new entrants, new regulations, or changes in consumer demand. Our businesses face continued pricing pressure from these factors, which adversely affects our margins. If we are unable to offset margin reductions caused by these pricing pressures through steps such as sourcing or cost control measures, additional service offerings and sales of higher margin products, our results of operations could continue to be adversely affected.

**Our Pharmaceutical segment's generic pharmaceutical program may continue to be adversely affected by pricing changes and fewer product launches.**

The performance of our Pharmaceutical segment's generic pharmaceutical program declined in fiscal 2018 and 2017 and is expected to decline in fiscal 2019. The decline has been due to generic pharmaceutical customer pricing deflation and less benefit from new generic pharmaceutical launches, which have more than offset the benefits from sourcing generic pharmaceuticals through our Red Oak Sourcing venture with CVS. If we continue to be unable to offset this decline, our Pharmaceutical segment profit and consolidated operating earnings will continue to be adversely affected.

The extent and magnitude of generic pharmaceutical pricing changes is uncertain in future fiscal years and may vary from what we anticipate. Similarly, the number of new generic pharmaceutical launches also varies from year to year, and the margin impact of these launches varies from product to product. Finally, the benefit from Red Oak Sourcing could be less than we anticipate.

**CVS is a large customer that generates a significant amount of our revenue.**

Our sales and credit concentration is significant. CVS accounted for 25 percent of our fiscal 2018 revenue and 22 percent of our gross trade receivable balance at June 30, 2018. Our pharmaceutical distribution agreements with CVS expire in June 2019. If CVS does not renew our agreements, renews our agreements at a reduced price or significantly reduces its purchases from us, our results of operations and financial condition could be adversely affected.

**Changes in manufacturer approaches to pricing branded pharmaceutical products could have an adverse effect on our Pharmaceutical segment's margins.**

Our compensation under contractual arrangements with manufacturers for the purchase of branded pharmaceutical products is set as a percentage of the wholesale acquisition cost set by the manufacturer. Sales prices of branded pharmaceutical products to

our customers generally are a percentage discount from wholesale acquisition cost.

In recent years, pharmaceutical manufacturers have generally increased the wholesale acquisition cost of their branded pharmaceuticals each year. In May 2018, the U.S. government announced plans to, among other things, adopt policies to encourage manufacturers to limit increases in (or reduce) wholesale acquisition cost. If manufacturers change their historical approach to setting and increasing wholesale acquisition cost and we are unable to negotiate alternative ways to be compensated by manufacturers or customers for the value of our services, our Pharmaceutical segment profit and consolidated operating earnings could be adversely affected.

**Our Pharmaceutical segment's margins under a limited number of our distribution services agreements with branded pharmaceutical manufacturers are affected by prices established by the manufacturers.**

Our distribution services agreements with branded pharmaceutical manufacturers generally provide that we receive fees from the manufacturers to compensate us for services we provide them. Under a limited number of agreements, branded pharmaceutical price appreciation, which is determined by the manufacturers currently also serves as a part of our compensation. If manufacturers decide not to increase prices or to implement only small increases and we are unable to negotiate alternative ways to be compensated by manufacturers or customers for the value of our services, our margins could be adversely affected.

**Our business is subject to rigorous regulatory and licensing requirements.**

As described in greater detail in the "Business" section, our business is highly regulated in the United States, at both the federal and state level, and in foreign countries. If we fail to comply with regulatory requirements, or if allegations are made that we fail to comply, our results of operations and financial condition could be adversely affected.

To lawfully operate our businesses, we are required to obtain and hold permits, product registrations, licenses and other regulatory approvals from, and to comply with operating and security standards of, numerous governmental bodies. For example, as a wholesale distributor of controlled substances, we must hold valid DEA registrations and state-level licenses, meet various security and operating standards, and comply with the CSA. Failure to maintain or renew necessary permits, product registrations, licenses or approvals, or to comply with required standards, could have an adverse effect on our results of operations and financial condition.

Products that we manufacture, source, distribute or market must comply with regulatory requirements. Noncompliance or concerns over noncompliance may result in suspension of our ability to distribute, import or manufacture products, product bans, recalls or seizures, or criminal or civil sanctions, which, in turn, could result in product liability claims and lawsuits, including class actions. In addition, it can be costly and time-consuming to obtain regulatory approvals or product registrations to market a medical device, and

**Risk Factors**

such approvals or registrations might not be granted on a timely basis, if at all.

We collect, handle and maintain patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information. Regulations currently in place continue to evolve, and new laws in this area could further restrict our ability to collect, handle and maintain personal or patient information, or could require us to incur additional compliance costs, either of which could have an adverse impact on our results of operations. Violations of federal, state or foreign laws concerning privacy and data protection could subject us to civil or criminal penalties, breach of contract claims, costs for remediation and harm to our reputation.

We are required to comply with laws relating to healthcare fraud and abuse. The requirements of these laws are complex and subject to varying interpretations, and it is possible that regulatory authorities could challenge our policies and practices. If we fail to comply with these laws, we could be subject to federal or state government investigations or *qui tam* actions (false claims cases initiated by private parties purporting to act on behalf of federal or state governments), which could result in civil or criminal sanctions, including the loss of licenses or the ability to participate in Medicare, Medicaid and other federal and state healthcare programs. Such sanctions and damages could adversely affect our results of operations and financial condition.

Some businesses within each of our segments are Medicare-certified suppliers or participate in other federal and state healthcare programs, such as state Medicaid program and the federal 340B drug pricing program. In addition, other businesses within each segment manufacture pharmaceutical or medical products or repackage pharmaceuticals that are purchased or reimbursed through, or are otherwise governed by, federal or state healthcare programs. Failure to comply with applicable eligibility requirements, standards and regulations could result in civil or criminal sanctions, including the loss of our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

Our government contracts are subject to specific procurement requirements. Failure to comply with applicable rules or regulations or with contractual or other requirements may result in monetary damages and criminal or civil penalties as well as termination of our government contracts or our suspension or debarment from government contract work.

Our global operations are required to comply with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act and similar anti-bribery laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws. If we fail to comply with any of these laws, we could suffer civil or criminal sanctions.

**We could be subject to adverse changes in the tax laws or challenges to our tax positions.**
We are a large multinational corporation with operations in the United States and many foreign countries. As a result, we are subject to the tax laws of many jurisdictions.

The Tax Act was enacted in December 2017. The Tax Act, among other things, reduced the U.S. federal corporate tax rate from 35 percent to 21 percent and required companies to pay a one-time tax to repatriate, for U.S. purposes, earnings of certain foreign subsidiaries that were previously deferred for tax purposes. In addition, beginning in our fiscal year 2019, the Tax Act limits certain deductions and creates new taxes on certain foreign sourced earnings. While we generally expect the impact of the Tax Act to be positive, it is possible that the limitation of certain deductions and the creation of new taxes could be more detrimental to us than anticipated.

From time to time, initiatives are proposed in the United States and other jurisdictions in which we operate that could adversely affect our tax positions, effective tax rate or tax payments. Specific initiatives that may impact us include the repeal of the LIFO (last-in, first-out) method of inventory accounting for income tax purposes, the establishment or increase in taxation at the U.S. state level on the basis of gross revenues, recommendations of the base erosion and profit shifting project undertaken by the Organization for Economic Cooperation and Development and the European Commission's investigation into illegal state aid.

Tax laws are complex and subject to varying interpretations. Tax authorities have challenged some of our tax positions and it is possible that they will challenge others. These challenges may adversely affect our effective tax rate or tax payments.

**Changes to the U.S. healthcare environment may not be favorable to us.**
In recent years, the U.S. healthcare industry has undergone significant changes designed to increase access to medical care, improve safety and patient outcomes, contain costs and increase efficiencies. These changes include adoption of the Patient Protection and Affordable Care Act, a general decline in Medicare and Medicaid reimbursement levels, efforts by healthcare insurance companies to limit or reduce payments to pharmacies and providers, the basis for payments beginning to transition from a fee-for-service model to value-based payments and risk-sharing models, and the industry shifting away from traditional healthcare venues like hospitals and into clinics, physician offices and patients' homes.

We expect the U.S. healthcare industry to continue to change significantly in the future. Possible changes include repeal and replacement of major parts of the Patient Protection and Affordable Care Act, further reduction or limitations on governmental funding at the state or federal level, efforts by healthcare insurance companies to further limit payments for products and services or changes in legislation or regulations governing prescription pharmaceutical pricing, healthcare services or mandated benefits. These possible changes, and the uncertainty surrounding these possible changes, may cause healthcare industry participants to reduce the amount of products and services they purchase from us or the price they are willing to pay for our products and services, which could adversely affect us.

**Risk Factors**

**Our business and operations depend on the proper functioning of information systems, critical facilities and distribution networks. Our business could be adversely affected if we experience a cyber-attack or other systems breach.**

We rely on our and third-party service providers' information systems for a wide variety of critical operations, including to obtain, rapidly process, analyze and manage data to:

- facilitate the purchase and distribution of inventory items from numerous distribution centers;
- receive, process and ship orders on a timely basis;
- manage accurate billing and collections for thousands of customers;
- process payments to suppliers;
- facilitate manufacturing and assembly of medical products; and
- generate financial information.

Our business also depends on the proper functioning of our critical facilities, including our national logistics center, and our distribution networks. Our results of operations could be adversely affected if our or a service provider's information systems, critical facilities or distribution networks are disrupted (including disruption of access), are damaged or fail, whether due to physical disruptions, such as fire, natural disaster, pandemic or power outage, or due to cyber-security incidents, ransomware or other actions of third parties, including labor strikes, political unrest and terrorist attacks. Manufacturing disruptions also can occur due to regulatory action, production quality deviations, safety issues or raw material shortages or defects, or because a key product is manufactured at a single manufacturing facility with limited alternate facilities.

From time to time, our businesses perform business process improvements or infrastructure modernizations or use service providers for key systems and processes, such as receiving and processing customer orders, customer service and accounts payable. If any of these initiatives are not successfully or efficiently implemented or maintained, they could adversely affect our business and our internal control over financial reporting.

Our business relies on the secure transmission, storage and hosting of patient-identifiable health information, financial information and other sensitive information relating to our customers, company and workforce. We have programs in place to detect, contain and respond to information security incidents. However, because the techniques used to obtain unauthorized access, disable or degrade service or sabotage systems change frequently and may be difficult to detect for long periods of time, we may be unable to anticipate these techniques or to implement adequate preventative measures. In addition, hardware, software or applications developed internally or procured from third parties may contain defects in design or manufacture or other problems that could unexpectedly compromise information security. Unauthorized parties also may attempt to gain access to our or a service provider's systems or facilities through fraud, trickery or other forms of deception. Any compromise of our or a service provider's information systems, including unauthorized access to or use or disclosure of sensitive information, could adversely impact our operations, results of operations or our ability

to satisfy legal requirements, including those related to patient-identifiable health information and the new EU general data protection regulation (GDPR).

**Consolidation in the U.S. healthcare industry may negatively impact our results of operations.**

In recent years, U.S. healthcare industry participants, including distributors, manufacturers, healthcare providers, insurers and pharmacy chains, have consolidated or formed strategic alliances. Consolidations create larger enterprises with greater negotiating power, and also could result in the possible loss of a customer where the combined enterprise selects one distributor from two incumbents. If this consolidation trend continues, it could adversely affect our results of operations.

**We may become involved in legal proceedings that could adversely impact our cash flows or results of operations.**

Due to the nature of our business, which includes the distribution of controlled substances and the manufacture of medical products, we may from time to time become involved in disputes, litigation and regulatory matters. Litigation is inherently unpredictable and the unfavorable outcome of one or more of these legal proceedings could adversely affect our results of operations or financial condition.

For example, we are subject to a number of lawsuits and investigations related to the national health crisis involving the abuse of opioid pain medication as described below in the Risk Factor titled "The public health crisis involving the abuse of prescription opioid pain medication could negatively affect our business" and in Note 9 to the "Notes to Consolidated Financial Statements."

Additionally, some of the products that we distribute or manufacture have been and may in the future be alleged to cause personal injury, subjecting us to product liability claims. For example, we are a defendant in product liability lawsuits that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. We have accrued an amount for losses and legal defense costs related to these lawsuits, which are discussed in Note 9 of the "Notes to Consolidated Financial Statements." Any settlement of or judgment for a product liability claim that is not covered by insurance and is in excess of any prior accruals could adversely affect our results of operations and financial condition.

We also operate in an industry characterized by extensive intellectual property litigation. Patent litigation can result in significant damage awards and injunctions that could prevent the manufacture and sale of affected products or force us to make royalty payments in order to continue selling the affected products.

**The public health crisis involving the abuse of prescription opioid pain medication could negatively affect our business.**

Our Pharmaceutical segment distributes prescription opioid pain medications. In recent years, the abuse of prescription opioid pain medication has received heightened public attention. These developments heighten a number of risks that we face and may present new risks that could adversely affect our operations or financial condition.

**Risk Factors**

A significant number of counties, municipalities and other plaintiffs, including a number of state attorneys general, have filed lawsuits against pharmaceutical manufacturers, pharmaceutical wholesale distributors (including us), retail chains and others relating to the manufacturing, marketing or distribution of prescription opioid pain medications. In addition, we are currently being investigated by about 40 other states for the same activities and may be named as a defendant in additional lawsuits in the future. We are vigorously defending ourselves in these lawsuits. The defense and resolution of current and future lawsuits could adversely affect our results of operations and financial condition or have adverse reputational or operational effects on our business. See Note 9 of the "Notes to the Consolidated Financial Statements" for more information regarding these matters.

Other legislative, regulatory or industry measures related to the public health crisis could affect our business in ways that we may not be able to predict. For example, in April 2018, the State of New York created an aggregate $100 million annual assessment on all manufacturers and distributors licensed to sell or distribute opioids in New York. In addition, legislation has been proposed in some states that, if enacted, could require distributors to pay taxes on the distribution of opioid medications in those states. These proposed bills vary in the tax amounts and the means of calculation. Liabilities for taxes or assessments under any such laws could have an adverse impact on our results of operations unless we are able to mitigate them through operational changes or commercial arrangements where permitted.

Unfavorable publicity regarding the abuse or misuse of prescription opioid pain medications and the role of wholesale distributors in the supply chain of such prescription medications, as well as the continued proliferation of the opioid lawsuits, investigations, regulations and legislative actions discussed above could adversely affect our reputation and results of operations.

**Our ability to manage and complete acquisitions and divestitures could impact our strategic objectives and financial condition.**
An important element of our growth strategy has been to acquire other businesses that expand or complement our existing businesses. In fiscal 2018, we spent $6.1 billion to acquire other businesses including, in July 2017, the acquisition of the Patient Recovery Business from Medtronic for $6.1 billion and divested our China distribution business as well as our majority interest in naviHealth.

The acquisition of the Patient Recovery Business as well as other acquisitions involve the following risks: we may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition; our management's attention may be diverted to integration efforts; we may fail to retain key personnel of the acquired business; future developments may impair the value of our purchased goodwill or intangible assets; we may face difficulties or delays establishing, integrating or combining operations and systems; we may assume liabilities related to legal proceedings involving the acquired business; we may face challenges retaining the customers

of the acquired business; or we may encounter unforeseen internal control, regulatory or compliance issues.

When we decide to sell assets or a business, we may encounter difficulty finding buyers or alternative exit strategies, which could delay the achievement of our strategic objectives. We could also experience greater dis-synergies than expected and the impact of the divestiture on our results of operations could be greater than anticipated.

**We depend on certain suppliers to make their raw materials and products available to us and are subject to fluctuations in costs of raw materials and products.**
We depend on the availability of various components, compounds, raw materials and energy supplied by others for our operations. In some instances, for reasons of quality assurance, cost effectiveness, or availability, we procure certain components and raw materials from a sole supplier. Any of our supplier relationships could be interrupted due to events beyond our control, including natural disasters, or could be terminated. In addition, due to the stringent regulations and requirements of the FDA regarding the manufacture of our products, we may not be able to quickly establish additional or replacement sources for certain components or materials. A sustained supply reduction or interruption, and an inability to develop alternative sources for such supply, could have an adverse effect on our business.

Our manufacturing businesses use oil-based resins, pulp, cotton, latex and other commodities as raw materials in many products. Prices of oil and gas also affect our distribution and transportation costs. Prices of these commodities are volatile and can fluctuate significantly, causing our costs to produce and distribute our products to fluctuate. Due to competitive dynamics and contractual limitations, we may be unable to pass along cost increases through higher prices. If we cannot fully offset cost increases through other cost reductions, or recover these costs through price increases or surcharges, our results of operations could be adversely affected.

**Our results of operations may suffer upon the bankruptcy, insolvency, or other credit failure of a customer that has a substantial amount owed to us.**
Most of our customers buy products and services from us on credit, which is made available to customers based on our assessment of creditworthiness. The bankruptcy, insolvency or other credit failure of any customer that has a substantial amount owed to us could adversely affect our results of operations.

**As a result of our international operations, we have exposure to economic, political and currency risks, including changes in tariffs.**
We conduct our operations in various regions of the world outside of the United States, including Europe, Asia and Latin America. Global developments can affect our business in many ways. Our global operations are affected by local economic environments, including inflation, recession and competition. Additionally, divergent or unfamiliar regulatory systems and labor markets also can increase the risks and burdens of operating in numerous countries.

Changes or uncertainty in U.S. or foreign policy, including any changes or uncertainty with respect to U.S. or international trade

policies or tariffs, also can disrupt our global operations, as well as our customers and suppliers, in a particular location and may require us to spend more money to source certain products or materials that we purchase.

In addition, we conduct our business in U.S. dollars and various functional currencies of our foreign subsidiaries. Changes in foreign currency exchange rates could adversely affect our financial results, which are reported in U.S. dollars. We may not be able to hedge to protect us against these exposures, and any hedges may not successfully mitigate these exposures.

**Our goodwill may be further impaired, which would require us to record a significant charge to earnings in accordance with generally accepted accounting principles.**

U.S. GAAP requires us to test our goodwill for impairment on an annual basis, or more frequently if indicators for potential impairment exist. This year, as a result of the required annual test, we have

recorded a $1.4 billion impairment to goodwill within our Medical segment. The testing required by GAAP involves estimates and judgments by management. Although we believe our assumptions and estimates are reasonable and appropriate, any changes in key assumptions, including a failure to meet business plans or other unanticipated events and circumstances such as a rise in interest rates, may affect the accuracy or validity of such estimates. In addition to the impairment to goodwill in our Medical segment, it is possible that we may record significant charges related to other business units or we may record additional charges in our Medical segment, which charge or charges could adversely affect our results of operations. See "Critical Accounting Policies and Sensitive Accounting Estimates" in MD&A above for more information regarding goodwill impairment testing.

**Properties and Legal Proceedings**

# Properties

In the United States and Puerto Rico, at June 30, 2018 , the Pharmaceutical segment operated 24 primary pharmaceutical distribution facilities and one national logistics center; seven specialty distribution facilities; and more than 140 nuclear pharmacy and radiopharmaceutical manufacturing facilities. The Medical segment operated more than 70 medical-surgical distribution, assembly, manufacturing and other operating facilities in the United States and Puerto Rico. Our U.S. operating facilities are located in 45 states.

Outside the United States and Puerto Rico, at June 30, 2018 , our Medical segment operated 25 facilities in Canada, Costa Rica, the Dominican Republic, Germany, Ireland, Japan, Malaysia, Malta, Mexico and Thailand that engage in manufacturing, distribution or research.

At June 30, 2018 , we owned more than 75 operating facilities and leased more than 200 operating facilities around the world. Our principal executive offices are headquartered in an owned building located at 7000 Cardinal Place in Dublin, Ohio.

We consider our operating properties to be in satisfactory condition and adequate to meet our present needs. However, we regularly evaluate operating properties and may make further additions and improvements or consolidate locations as we seek opportunities to expand or enhance the efficiency of our business.

# Legal Proceedings

The legal proceedings described in Note 9 of the "Notes to Consolidated Financial Statements" are incorporated in this "Legal Proceedings" section by reference.

# Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

Our common shares are listed on the New York Stock Exchange under the symbol "CAH." The following table reflects the range of the reported high and low closing prices of our common shares as reported on the New York Stock Exchange Composite Tape and the per share dividends declared for the fiscal years ended June 30, 2018 and 2017 and paid quarterly. It also reflects the range of the reported high and low closing prices of our common shares from July 1, 2018 through the period ended on July 31, 2018 and the per share dividends declared from July 1, 2018 through the period ended on July 31, 2018:

|  | High | Low | Dividends Declared |
|---|---|---|---|
| **Fiscal 2017** |  |  |  |
| Quarter Ended: |  |  |  |
| September 30, 2016 | $ 84.92 | $ 75.26 | $ 0.4489 |
| December 31, 2016 | 76.71 | 65.17 | 0.4489 |
| March 31, 2017 | 83.80 | 72.47 | 0.4489 |
| June 30, 2017 | 82.71 | 71.18 | 0.4624 |
|  |  |  |  |
| **Fiscal 2018** |  |  |  |
| Quarter Ended: |  |  |  |
| September 30, 2017 | $ 78.69 | $ 64.36 | $ 0.4624 |
| December 31, 2017 | 68.24 | 55.00 | 0.4624 |
| March 31, 2018 | 75.23 | 61.22 | 0.4624 |
| June 30, 2018 | 65.82 | 48.83 | 0.4763 |
|  |  |  |  |
| **Fiscal 2019** | $ 50.80 | $ 48.80 | $ — |

At July 31, 2018 there were approximately 7,817 shareholders of record of our common shares.

We anticipate that we will continue to pay quarterly cash dividends in the future. The payment and amount of future dividends remain, however, within the discretion of our Board of Directors and will depend upon our future earnings, financial condition, capital requirements and other factors.

## Issuer Purchases of Equity Securities

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs (2) | Approximate Dollar Value of Shares That May Yet be Purchased Under the Programs (2) (in millions) |
|---|---|---|---|---|
| April 2018 | 292 | $ 63.07 | — | $ 993 |
| May 2018 | 449,113 | 52.22 | 448,675 | 970 |
| June 2018 | 1,433,537 | 53.41 | 1,433,244 | 893 |
| **Total** | **1,882,942** | **$ 53.13** | **1,881,919** | **$ 893** |

(1) Reflects 292 , 438 and 293 common shares purchased in April, May and June 2018 , respectively, through a rabbi trust as investments of participants in our Deferred Compensation Plan.

(2) On February 7, 2018 our Board of Directors approved a $1.0 billion share repurchase program that expires on December 31, 2020. During the three months ended June 30, 2018 , we repurchased two million common shares under this program at June 30, 2018. We have $893 million available under this program. On August 16, 2018 we entered into an ASR program to purchase shares of our common stock for an aggregate purchase price of $ 600 million and received an initial delivery of  9.5 million  shares of common stock using a reference price of $ 50.45 . The program is expected to conclude in the second quarter of fiscal 2019.

**Market for Registrant's Common Equity**

## Five Year Performance Graph

The following line graph compares the cumulative total return of our common shares with the cumulative total return of the Standard & Poor's Composite—500 Stock Index (the "S&P 500 Index") and the Standard & Poor's Composite—500 Healthcare Index (the "S&P 500 Healthcare Index"). The line graph assumes, in each case, an initial investment of $100 on June 30, 2013, based on the market prices at the end of each fiscal year through and including June 30, 2018 , and reinvestment of dividends. The S&P 500 Index and S&P 500 Healthcare Index investments are weighted on the basis of market capitalization at the beginning of each period.



| | June 30 | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | **2018** |
| Cardinal Health, Inc. | $ 100.00 | $ 148.12 | $ 183.83 | $ 174.87 | $ 178.80 | $ **115.63** |
| S&P 500 Index | 100.00 | 124.60 | 133.84 | 139.17 | 164.06 | **187.62** |
| S&P 500 Healthcare Index | 100.00 | 130.09 | 161.53 | 158.26 | 177.99 | **190.64** |

# Management Reports

## Evaluation of Disclosure Controls and Procedures

We evaluated, with the participation of our principal executive officer and principal financial officer, the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2018 . Based on this evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were effective as of June 30, 2018 to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

## Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, controls deemed effective now may become inadequate in the future because of changes in conditions, or because compliance with policies or procedures has deteriorated or been circumvented.

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2018 . In making this assessment, management used the criteria established in the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the "COSO criteria"). Based on management's assessment and the COSO criteria, management believes that our internal control over financial reporting was effective as of June 30, 2018 .

Our independent registered public accounting firm, Ernst & Young LLP, has issued a report on our internal control over financial reporting. Ernst & Young LLP's report appears following this "Management Reports" section and expresses an unqualified opinion on the effectiveness of our internal control over financial reporting.

On July 29, 2017, we completed the acquisition of the Patient Recovery business. As permitted by guidelines established by the SEC, management excluded the Patient Recovery business from the scope of its assessment of the effectiveness of internal control over financial reporting as of June 30, 2018. The Patient Recovery business constituted 17% and 11% of our total and net assets, respectively, as of June 30, 2018 and approximately 2% of our revenue for the fiscal year then ended.

## Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Reports

# Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting

The Shareholders and the Board of Directors of Cardinal Health, Inc.

## Opinion on Internal Control over Financial Reporting

We have audited Cardinal Health, Inc. and subsidiaries' internal control over financial reporting as of June 30, 2018, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Cardinal Health, Inc. and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of June 30, 2018, based on the COSO criteria.

As indicated in the accompanying "Management's Report on Internal Control Over Financial Reporting," management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of the Patient Recovery Business, which is included in the 2018 consolidated financial statements of the Company and constituted 17% and 11% of total and net assets, respectively; as of June 30, 2018 and 2% of revenues for the year then ended. Our audit of internal control over financial reporting of the Company also did not include an evaluation of the internal control over financial reporting of the Patient Recovery Business.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Cardinal Health, Inc. and subsidiaries as of June 30, 2018 and 2017 and the related consolidated statements of earnings, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended June 30, 2018, and the related notes and financial statement schedule listed in the Index at Item 15(a)(2) and our report dated August 22, 2018 expressed an unqualified opinion thereon.

## Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying "Management's Report on Internal Control Over Financial Reporting." Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

## Definition and Limitations of Internal Control Over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Grandview Heights, Ohio

August 22, 2018

Cardinal Health | Fiscal 2018 Form 10-K                                    **40**

**Reports**

# Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Cardinal Health, Inc.

## Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Cardinal Health, Inc. and subsidiaries (the Company) as of June 30, 2018 and 2017, the related consolidated statements of earnings, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended June 30, 2018, and the related notes and the financial statement schedule listed in the Index at Item 15(a)(2) (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at June 30, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended June 30, 2018, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of June 30, 2018, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated August 22, 2018 expressed an unqualified opinion thereon.

## Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2002.

Grandview Heights, Ohio

August 22, 2018

**41**     Cardinal Health | Fiscal 2018 Form 10-K

**Financial Statements**

# Financial Statements and Supplementary Data

|  | **Page** |
|---|---|
| Consolidated Financial Statements and Schedule: | |

| | Page |
|---|---|
| Consolidated Statements of Earnings for the Fiscal Years Ended June 30, 2018, 2017 and 2016 | 43 |
| Consolidated Statements of Comprehensive Income for the Fiscal Years Ended June 30, 2018, 2017 and 2016 | 44 |
| Consolidated Balance Sheets at June 30, 2018 and 2017 | 45 |
| Consolidated Statements of Shareholders' Equity for the Fiscal Years Ended June 30, 2018, 2017, and 2016 | 46 |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2018, 2017 and 2016 | 47 |
| Notes to Consolidated Financial Statements | 48 |

**Financial Statements**

# Consolidated Statements of Earnings

| (in millions, except per common share amounts) | | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|---|
| Revenue | $ | 136,809 | $ | 129,976 | $ | 121,546 |
| Cost of products sold | | 129,628 | | 123,432 | | 115,003 |
| Gross margin | | 7,181 | | 6,544 | | 6,543 |
| | | | | | | |
| **Operating expenses:** | | | | | | |
| Distribution, selling, general and administrative expenses | | 4,596 | | 3,775 | | 3,648 |
| Restructuring and employee severance | | 176 | | 56 | | 25 |
| Amortization and other acquisition-related costs | | 707 | | 527 | | 459 |
| Impairments and (gain)/loss on disposal of assets, net | | 1,417 | | 18 | | 21 |
| Litigation (recoveries)/charges, net | | 159 | | 48 | | (69) |
| Operating earnings | | 126 | | 2,120 | | 2,459 |
| | | | | | | |
| Other (income)/expense, net | | 23 | | (5) | | 5 |
| Interest expense, net | | 329 | | 201 | | 178 |
| Loss on extinguishment of debt | | 2 | | — | | — |
| Earnings/(loss) before income taxes | | (228) | | 1,924 | | 2,276 |
| | | | | | | |
| Provision for/(benefit from) income taxes | | (487) | | 630 | | 845 |
| Net earnings | | 259 | | 1,294 | | 1,431 |
| | | | | | | |
| Less: Net earnings attributable to noncontrolling interests | | (3) | | (6) | | (4) |
| **Net earnings attributable to Cardinal Health, Inc.** | $ | 256 | $ | 1,288 | $ | 1,427 |
| | | | | | | |
| **Earnings per common share attributable to Cardinal Health, Inc.** | | | | | | |
| Basic | $ | 0.82 | $ | 4.06 | $ | 4.36 |
| Diluted | | 0.81 | | 4.03 | | 4.32 |
| | | | | | | |
| **Weighted-average number of common shares outstanding:** | | | | | | |
| Basic | | 313 | | 317 | | 327 |
| Diluted | | 315 | | 320 | | 330 |

The accompanying notes are an integral part of these consolidated statements.

**Financial Statements**

# Consolidated Statements of Comprehensive Income

| (in millions) | | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|---|
| Net earnings | $ | 259 | $ | 1,294 | $ | 1,431 |
| | | | | | | |
| **Other comprehensive income/(loss):** | | | | | | |
| Foreign currency translation adjustments and other | | 58 | | (25) | | (82) |
| Amounts reclassified to earnings | | (23) | | — | | — |
| Net unrealized gain/(loss) on derivative instruments, net of tax | | (2) | | 16 | | (11) |
| Total other comprehensive income/(loss), net of tax | | 33 | | (9) | | (93) |
| | | | | | | |
| Total comprehensive income | | 292 | | 1,285 | | 1,338 |
| | | | | | | |
| Less: comprehensive income attributable to noncontrolling interests | | (3) | | (6) | | (4) |
| **Total comprehensive income attributable to Cardinal Health, Inc.** | $ | 289 | $ | 1,279 | $ | 1,334 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Balance Sheets

| (in millions) | | June 30 2018 | | 2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and equivalents | $ | 1,763 | $ | 6,879 |
| Trade receivables, net | | 7,800 | | 8,048 |
| Inventories, net | | 12,308 | | 11,301 |
| Prepaid expenses and other | | 1,926 | | 2,117 |
| Assets held for sale | | 756 | | — |
| Total current assets | | 24,553 | | 28,345 |
| | | | | |
| Property and equipment, net | | 2,487 | | 1,879 |
| Goodwill and other intangibles, net | | 12,229 | | 9,207 |
| Other assets | | 682 | | 681 |
| **Total assets** | $ | 39,951 | $ | 40,112 |
| | | | | |
| **Liabilities, Redeemable Noncontrolling Interests and Shareholders' Equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 19,677 | $ | 17,906 |
| Current portion of long-term obligations and other short-term borrowings | | 1,001 | | 1,327 |
| Other accrued liabilities | | 2,002 | $ | 1,988 |
| Liabilities related to assets held for sale | | 213 | | — |
| Total current liabilities | | 22,893 | | 21,221 |
| | | | | |
| Long-term obligations, less current portion | | 8,012 | | 9,068 |
| Deferred income taxes and other liabilities | | 2,975 | | 2,877 |
| | | | | |
| Redeemable noncontrolling interests | | 12 | | 118 |
| | | | | |
| **Shareholders' equity:** | | | | |
| Preferred shares, without par value: | | | | |
| Authorized— **500 thousand** shares, Issued— **none** | | — | | — |
| Common shares, without par value: | | | | |
| Authorized— **755 million** shares, Issued— **327 million** shares at **June 30, 2018** and June 30, 2017, respectively | | 2,730 | | 2,697 |
| Retained earnings | | 4,645 | | 4,967 |
| Common shares in treasury, at cost: **18 million** shares and 11 million shares at **June 30, 2018** and June 30, 2017, respectively | | (1,224) | | (731) |
| Accumulated other comprehensive loss | | (92) | | (125) |
| **Total Cardinal Health, Inc. shareholders' equity** | | 6,059 | | 6,808 |
| Noncontrolling interests | | — | | 20 |
| **Total shareholders' equity** | | 6,059 | | 6,828 |
| **Total liabilities, redeemable noncontrolling interests and shareholders' equity** | $ | 39,951 | $ | 40,112 |

The accompanying notes are an integral part of these consolidated statements.

# Consolidated Statements of Shareholders' Equity

| (in millions) | Common Shares | | Retained Earnings | Treasury Shares | | Accumulated Other Comprehensive Income/(Loss) | Noncontrolling Interests | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares Issued | Amount | | Shares | Amount | | | |
| Balance at June 30, 2015 | 364 | $ 3,003 | $ 5,521 | (36) | $ (2,245) | $ (23) | $ — | $ 6,256 |
| Net earnings | | | 1,427 | | | | 3 | 1,430 |
| Other comprehensive loss, net of tax | | | | | | (93) | | (93) |
| Purchase of noncontrolling interests | | | | | | | (7) | (7) |
| Employee stock plans activity, including tax benefit of $33 million | — | 7 | | 2 | 137 | | | 144 |
| Treasury shares acquired | | | | (8) | (651) | | | (651) |
| Dividends declared | | | (529) | | | | | (529) |
| Other | | | | | | | 21 | 21 |
| Balance at June 30, 2016 | 364 | 3,010 | 6,419 | (42) | (2,759) | (116) | 17 | 6,571 |
| Net earnings | | | 1,288 | | | | 2 | 1,290 |
| Other comprehensive loss, net of tax | | | | | | (9) | | (9) |
| Purchase of noncontrolling interests | | | | | | | (1) | (1) |
| Employee stock plans activity, including tax benefit of $34 million | — | (11) | | 2 | 167 | | | 156 |
| Treasury shares acquired | | | | (8) | (600) | | | (600) |
| Dividends declared | | | (580) | | | | | (580) |
| Other | | | (1) | | | | 2 | 1 |
| Retirement of Treasury Shares | (37) | (302) | (2,159) | 37 | 2,461 | | | — |
| Balance at June 30, 2017 | 327 | 2,697 | 4,967 | (11) | (731) | (125) | 20 | 6,828 |
| Net earnings | | | 256 | | | | (1) | 255 |
| Other comprehensive loss, net of tax | | | | | | 33 | | 33 |
| Purchase and divestiture of noncontrolling interests | | | | | | | (19) | (19) |
| Employee stock plans activity, including tax benefit of $10 million | — | 33 | | 1 | 57 | | | 90 |
| Treasury shares acquired | | | | (8) | (550) | | | (550) |
| Dividends declared | | | (584) | | | | | (584) |
| Other | | | 6 | | | | | 6 |
| Balance at June 30, 2018 | 327 | $ 2,730 | $ 4,645 | (18) | $ (1,224) | $ (92) | $ — | $ 6,059 |

The accompanying notes are an integral part of these consolidated statements.

**Financial Statements**

# Consolidated Statements of Cash Flows

| (in millions) | | **2018** | | 2017 | | 2016 |
|---|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | | |
| Net earnings | $ | **259** | $ | 1,294 | $ | 1,431 |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | | | | |
| Depreciation and amortization | | **1,032** | | 717 | | 641 |
| Loss on extinguishment of debt | | **2** | | — | | — |
| Impairments and loss on sale of other investments | | **6** | | 4 | | — |
| Impairments and loss on disposal of assets, net | | **1,417** | | 18 | | 21 |
| Share-based compensation | | **85** | | 96 | | 111 |
| Provision for/(benefit from) deferred income taxes | | **(1,012)** | | 291 | | 87 |
| Provision for bad debts | | **111** | | 63 | | 73 |
| Change in fair value of contingent consideration obligation | | **(2)** | | (5) | | (16) |
| Change in operating assets and liabilities, net of effects from acquisitions and divestitures: | | | | | | |
| Increase in trade receivables | | **(871)** | | (665) | | (866) |
| Increase in inventories | | **(1,211)** | | (673) | | (1,179) |
| Increase in accounts payable | | **2,574** | | 564 | | 2,815 |
| Other accrued liabilities and operating items, net | | **378** | | (520) | | (147) |
| Net cash provided by operating activities | | **2,768** | | 1,184 | | 2,971 |
| **Cash flows from investing activities:** | | | | | | |
| Acquisition of subsidiaries, net of cash acquired | | **(6,142)** | | (132) | | (3,614) |
| Additions to property and equipment | | **(384)** | | (387) | | (465) |
| Purchase of available-for-sale securities and other investments | | **(9)** | | (194) | | (200) |
| Proceeds from sale of available-for-sale securities and other investments | | **65** | | 228 | | 136 |
| Proceeds from maturities of available-for-sale securities | | **—** | | 77 | | 50 |
| Proceeds from divestitures, net of cash sold, and disposal of property and equipment | | **862** | | 3 | | 13 |
| Net cash used in investing activities | | **(5,608)** | | (405) | | (4,080) |
| **Cash flows from financing activities:** | | | | | | |
| Payment of contingent consideration obligation | | **(35)** | | (3) | | (25) |
| Net change in short-term borrowings | | **(50)** | | 3 | | 26 |
| Purchase of noncontrolling interests | | **(106)** | | (12) | | (10) |
| Reduction of long-term obligations | | **(954)** | | (310) | | (6) |
| Proceeds from interest rate swap terminations | | **—** | | 14 | | — |
| Proceeds from long-term obligations, net of issuance costs | | **3** | | 5,171 | | — |
| Net tax proceeds/(withholding) from share-based compensation | | **(3)** | | 26 | | 6 |
| Excess tax benefits from share-based compensation | | **—** | | 34 | | 33 |
| Dividends on common shares | | **(581)** | | (577) | | (512) |
| Purchase of treasury shares | | **(550)** | | (600) | | (651) |
| Net cash provided by/(used in) financing activities | | **(2,276)** | | 3,746 | | (1,139) |
| Effect of exchange rates changes on cash and equivalents | | **4** | | (2) | | (12) |
| Cash reclassified to assets held for sale | | **(4)** | | — | | — |
| Net increase/(decrease) in cash and equivalents | | **(5,116)** | | 4,523 | | (2,260) |
| Cash and equivalents at beginning of period | | **6,879** | | 2,356 | | 4,616 |
| **Cash and equivalents at end of period** | $ | **1,763** | $ | 6,879 | $ | 2,356 |
| **Supplemental Information:** | | | | | | |
| Cash payments for interest | $ | **320** | $ | 200 | $ | 174 |
| Cash payments for income taxes | | **425** | | 686 | | 635 |

The accompanying notes are an integral part of these consolidated statements.

# Notes to Consolidated Financial Statements

## 1. Basis of Presentation and Summary of Significant Accounting Policies

Cardinal Health, Inc. is a globally integrated healthcare services and products company providing customized solutions for hospitals, healthcare systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices. The company provides medical products and pharmaceuticals and cost-effective solutions that enhance supply chain efficiency. References to "we", "our" and similar pronouns in these consolidated financial statements are to Cardinal Health, Inc. and its majority-owned or controlled subsidiaries unless the context otherwise requires.

Our fiscal year ends on June 30. References to fiscal 2018 , 2017 and 2016 in these consolidated financial statements are to the fiscal years ended June 30, 2018 , 2017 and 2016 , respectively.

### Basis of Presentation

Our consolidated financial statements include the accounts of all majority-owned or controlled subsidiaries, and all significant intercompany transactions and amounts have been eliminated. To conform to the current year presentation, certain prior year amounts have been reclassified. The results of businesses acquired or disposed of are included in the consolidated financial statements from the date of the acquisition or up to the date of disposal, respectively.

### Use of Estimates

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). The preparation of financial statements in accordance with GAAP requires us to make estimates, judgments and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates, judgments and assumptions are used in the accounting and disclosure related to, among other items, allowance for doubtful accounts, inventory valuation and reserves, business combinations, goodwill and other intangible asset impairment, vendor reserves, loss contingencies, self-insurance accruals, income taxes and share-based compensation. Actual amounts could ultimately differ from these estimated amounts.

### Cash Equivalents

We consider liquid investments purchased with an initial maturity of three months or less to be cash equivalents. The carrying value of cash equivalents approximates fair value.

### Receivables and Allowance for Doubtful Accounts

Trade receivables are presented net of an allowance for doubtful accounts of $139 million and $137 million at June 30, 2018 and 2017 , respectively. An account is considered past due on the first day after its due date. In accordance with contract terms, we generally have the ability to charge customers service fees or higher prices if an account is considered past due. We regularly monitor past due accounts and establish appropriate reserves to cover potential losses, which are based primarily on historical collection rates and the credit worthiness of the customer. We write off any amounts deemed uncollectible against the established allowance for doubtful accounts.

We provide financing to various customers. Such financing arrangements range from 1 year to 5 years at interest rates that are generally subject to fluctuation. Interest income on these arrangements is recognized as it is earned. The financings may be collateralized, guaranteed by third parties or unsecured. Finance notes, net and related accrued interest were $136 million (current portion $26 million ) and $171 million (current portion $53 million ) at June 30, 2018 and 2017 , respectively, and are included in other assets (current portion is included in prepaid expenses and other) in the consolidated balance sheets. Finance notes receivable allowance for doubtful accounts were $7 million and $9 million at June 30, 2018 and 2017 , respectively. We estimate an allowance for these financing receivables based on historical collection rates and the credit worthiness of the customer. We write off any amounts deemed uncollectible against the established allowance for doubtful accounts.

### Concentrations of Credit Risk

We maintain cash depository accounts with major banks, and we invest in high quality, short-term liquid instruments, and in marketable securities. Our short-term liquid instruments mature within three months and we have not historically incurred any related losses. Investments in marketable debt securities consist of a portfolio of high-grade instruments. Such investments are made only in instruments issued by highly-rated institutions, whose financial condition we monitor. We had none of these investments at June 30, 2018.

Our trade receivables and finance notes and related accrued interest are exposed to a concentration of credit risk with certain large customers and with customers in the retail and healthcare sectors. Credit risk can be affected by changes in reimbursement and other economic pressures impacting the healthcare industry. With respect to customers in the retail and healthcare sectors, such credit risk is limited due to supporting collateral and the diversity of the customer base, including its wide geographic dispersion. We perform regular credit evaluations of our customers' financial conditions and maintain reserves for losses through the established allowance for doubtful accounts. Historically, such losses have been within our expectations. Refer to the "Receivables and Allowance for Doubtful Accounts" section within this Note for additional information on the accounting treatment of reserves for allowance for doubtful accounts.

### Major Customers

CVS Health Corporation ("CVS") and OptumRx, are our only customers that individually account for at least 10 percent of revenue and gross trade receivables. These customers are primarily serviced through our Pharmaceutical segment.

**Notes to Financial Statements**

The following table summarizes historical percent of revenue and gross trade receivables from CVS and OptumRx:

| | Percent of Revenue | | | Percent of Gross Trade Receivables at June 30 | |
|---|---|---|---|---|---|
| | **2018** | 2017 | 2016 | **2018** | 2017 |
| CVS | **25%** | 23% | 25% | **22%** | 20% |
| OptumRx | **11%** | 11% | 7% | **4%** | 1% |

Our pharmaceutical distribution contract with OptumRx began in fiscal 2016 and did not exceed 10 percent until fiscal 2017.

We have entered into agreements with group purchasing organizations ("GPOs") which act as purchasing agents that negotiate vendor contracts on behalf of their members. Vizient, Inc. and Premier, Inc. are our two largest GPO member relationships in terms of revenue. Sales to members of these two GPOs collectively accounted for 22 percent , 21 percent and 17 percent of revenue for fiscal 2018 , 2017 and 2016 , respectively. Our trade receivable balances are with individual members of the GPO, and therefore no significant concentration of credit risk exists with these types of arrangements.

## Inventories

A substantial portion of our inventories ( 56 percent at both June 30, 2018 and 2017 ) are valued at the lower of cost, using the last-in, first-out ("LIFO") method, or market. These inventories are included within the core pharmaceutical distribution facilities of our Pharmaceutical segment ("distribution facilities") and are primarily merchandise inventories. The LIFO method presumes that the most recent inventory purchases are the first items sold, so LIFO helps us better match current costs and revenue. We believe that the average cost method of inventory valuation provides a reasonable approximation of the current cost of replacing inventory within the distribution facilities. As such, the LIFO reserve is the difference between (a) inventory at the lower of LIFO cost or market and (b) inventory at replacement cost determined using the average cost method of inventory valuation.

If we had used the average cost method of inventory valuation for all inventory within the distribution facilities, the value of our inventories would not have changed in fiscal 2018 or 2017 because inventories valued at LIFO were $92 million and $46 million higher than the average cost value at June 30, 2018 and 2017 , respectively. We do not record inventories in excess of replacement cost. As such, we did not record any changes in our LIFO reserve in fiscal 2018 and 2017 .

Our remaining inventory that is not valued at the lower of LIFO or market is stated at the lower of cost, using the first-in, first-out method, or net realizable value. Net realizable value is defined as the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. Inventories presented in the consolidated balance sheets are net of reserves for excess and obsolete inventory which were $147 million and $76 million at June 30, 2018 and 2017 , respectively. The increase in the reserves for excess and obsolete inventory during fiscal 2018 was driven by increased Cordis inventory

reserves and the Patient Recovery acquisition. We reserve for inventory obsolescence using estimates based on historical experience, historical and projected sales trends, specific categories of inventory and age of on-hand inventory.

## Cash Discounts

Manufacturer cash discounts are recorded as a component of inventory cost and recognized as a reduction of cost of products sold as inventory is sold.

## Property and Equipment

Property and equipment are carried at cost less accumulated depreciation. Property and equipment held for sale are recorded at the lower of cost or fair value less cost to sell. When certain events or changes in operating conditions occur, an impairment assessment may be performed on the recoverability of the carrying amounts.

Depreciation expense is computed using the straight-line method over the estimated useful lives of the assets, including capital lease assets which are depreciated over the terms of their respective leases. We generally use the following range of useful lives for our property and equipment categories: buildings and improvements— 3 to 39 years ; machinery and equipment— 3 to 20 years ; and furniture and fixtures— 3 to 7 years . We recorded depreciation and amortization expense of $446 million , $314 million and $277 million for fiscal 2018 , 2017 and 2016 , respectively.

The following table presents the components of property and equipment, net at June 30:

| (in millions) | 2018 | | 2017 | |
|---|---|---|---|---|
| Land, building and improvements | $ | **2,115** | $ | 1,637 |
| Machinery and equipment | | **3,006** | | 2,860 |
| Furniture and fixtures | | **139** | | 130 |
| Total property and equipment, at cost | | **5,260** | | 4,627 |
| Accumulated depreciation and amortization | | **(2,773)** | | (2,748) |
| **Property and equipment, net** | $ | **2,487** | $ | 1,879 |

Repairs and maintenance expenditures are expensed as incurred. Interest on long-term projects is capitalized using a rate that approximates the weighted-average interest rate on long-term obligations, which was 4 percent at June 30, 2018 . The amount of capitalized interest was immaterial for all periods presented.

## Business Combinations

The assets acquired and liabilities assumed in a business combination, including identifiable intangible assets, are recorded at their estimated fair values as of the acquisition date. The excess of the purchase price over the estimated fair value of the identifiable net assets acquired is recorded as goodwill. We base the fair values of identifiable intangible assets on detailed valuations that require management to make significant judgments, estimates and assumptions. Critical estimates and assumptions include: expected future cash flows for customer relationships, trade names and other identifiable intangible assets; discount rates that reflect the risk factors associated with future cash flows; and estimates of useful lives. When an acquisition involves contingent consideration, we recognize a liability equal to the fair value of the contingent consideration obligation at the acquisition date. The estimate of fair

value of a contingent consideration obligation requires subjective assumptions to be made regarding future business results, discount rates, discount periods and probabilities assigned to various potential business result scenarios. See Note 2 for additional information regarding our acquisitions.

## Goodwill and Other Intangible Assets

Purchased goodwill and intangible assets with indefinite lives are not amortized, but instead are tested for impairment annually or when indicators of impairment exist.

Purchased goodwill is tested for impairment at least annually. Qualitative factors are first assessed to determine if it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If it is determined that it is more likely than not that the fair value does not exceed the carrying amount, then a quantitative test is performed. The quantitative goodwill impairment test involves a comparison of the estimated fair value of the reporting unit to the respective carrying amount.

Goodwill impairment testing involves judgment, including the identification of reporting units, qualitative evaluation of events and circumstances to determine if it is more likely than not that an impairment exists, and, if necessary, the estimation of the fair value of the applicable reporting unit. Our qualitative evaluation considers the weight of evidence and significance of all identified events and circumstances and most relevant drivers of fair value, both positive and negative, in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount.

We have two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. These operating segments are comprised of divisions (components), for which discrete financial information is available. Components are aggregated into reporting units for purposes of goodwill impairment testing to the extent that they share similar economic characteristics. Our reporting units are: Pharmaceutical operating segment (excluding our Nuclear Pharmacy Services division); Nuclear Pharmacy Services division; Medical operating segment (excluding our Cardinal Health at Home division and naviHealth division) ("Medical Unit"); Cardinal Health at Home division; and naviHealth division.

Fair value can be determined using market, income or cost-based approaches. Our determination of estimated fair value of the reporting units is based on a combination of the income-based and market-based approaches. Under the income-based approach, we use a discounted cash flow model in which cash flows anticipated over several future periods, plus a terminal value at the end of that time horizon, are discounted to their present value using an appropriate risk-adjusted rate of return. We use our internal forecasts to estimate future cash flows, which we believe are consistent with those of a market participant, and include an estimate of long-term growth rates based on our most recent views of the long-term outlook for each reporting unit. Actual results may differ materially from those used in our forecasts. We use discount rates that are commensurate with the risks and uncertainty inherent in the respective reporting units and in our internally-developed forecasts. Discount rates used in our reporting unit valuations ranged from 8.5 percent to 13.5 percent .

Under the market-based approach, we determine fair value by comparing our reporting units to similar businesses or guideline companies whose securities are actively traded in public markets. We also use the guideline transaction method to determine fair value based on pricing multiples derived from the sale of companies that are similar to our reporting units. To further confirm fair value, we compare the aggregate fair value of our reporting units to our total market capitalization. Estimating the fair value of reporting units requires the use of estimates and significant judgments that are based on a number of factors including forecasted operating results. The use of alternate estimates and assumptions or changes in the industry or peer groups could materially affect the determination of fair value for each reporting unit and potentially result in goodwill impairment.

We performed annual impairment testing in fiscal 2018 , 2017 and 2016 and with the exception of our Medical Unit in fiscal 2018, concluded that there were no impairments of goodwill as the estimated fair value of each reporting unit exceeded its carrying value. As discussed further in Note 5 of the "Notes to Consolidated Financial Statements," during the fourth quarter of fiscal 2018 we recognized a $1.4 billion goodwill impairment charge related to our Medical Unit, which is included in impairments and loss on disposal of assets in our consolidated statements of earnings. There was no tax benefit related to this goodwill impairment charge.

The impairment test for indefinite-lived intangibles other than goodwill (primarily IPR&D) involves first assessing qualitative factors to determine if it is more likely than not that the fair value of the indefinite-lived intangible asset is less than its carrying amount. If so, then a quantitative test is performed to compare the estimated fair value of the indefinite-lived intangible asset to the respective asset's carrying amount. Our qualitative evaluation requires the use of estimates and significant judgments and considers the weight of evidence and significance of all identified events and circumstances and most relevant drivers of fair value, both positive and negative, in determining whether it is more likely than not that the fair value of the indefinite-lived intangible asset is less than its carrying amount.

Intangible assets with finite lives, primarily customer relationships; trademarks, trade names and patents; and developed technology, are amortized using a combination of straight-line and accelerated methods based on the expected cash flows from the asset over their estimated useful lives. We review intangible assets with finite lives for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable. Determining whether an impairment loss occurred requires a comparison of the carrying amount to the sum of the future forecasted undiscounted cash flows expected to be generated by the asset group. Actual results may differ materially from those used in our forecasts.

## Assets Held for Sale

We classify assets and liabilities (the "disposal group") as held for sale when management commits to a plan to sell the disposal group in its present condition and at a price that is reasonable in relation to its current fair value. We also consider whether an active program to locate a buyer has been initiated and if it is probable that the sale will

Cardinal Health | Fiscal 2018 Form 10-K                    50

occur within one year without significant changes to the plan to sell. Upon classification of the disposal group as held for sale, we test the assets for impairment and cease related depreciation and amortization.

## Investments

Investments in non-marketable equity securities are accounted for under either the cost or equity method of accounting and are included in other assets in the consolidated balance sheets. For investments in which we can exercise significant influence, we use the equity method of accounting. Our share of the earnings and losses was immaterial, both individually and in the aggregate, for all periods presented and is recorded in other income, net in the consolidated statements of earnings. We closely monitor our investments for other-than-temporary impairment by considering factors such as the operating performance of the investment and current economic and market conditions.

Marketable securities are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. Unrealized gains and losses on available-for-sale securities, net of applicable taxes, are included within shareholders' equity in accumulated other comprehensive income ("AOCI"). We monitor these securities for other-than-temporary impairment by considering factors such as the duration that, and the extent to which, the fair value is below cost, the operating performance and credit worthiness of the issuer of the securities and current economic and market conditions. See Note 6 for additional information regarding available-for-sale securities.

## Vendor Reserves

In the ordinary course of business, our vendors may dispute deductions taken against payments otherwise due to them or assert other disputes. These disputes are researched and resolved based upon the findings of the research performed. At any given time, there are outstanding items in various stages of research and resolution. In determining appropriate reserves for areas of exposure with our vendors, we assess historical experience and current outstanding claims. We have established various levels of reserves based on the type of claim and status of review. Though the claim types are relatively consistent, we periodically refine our methodology by updating the reserve estimate percentages to reflect actual historical experience. The ultimate outcome of certain claims may be different than our original estimate and may require an adjustment. Adjustments to vendor reserves are included in cost of products sold. In addition, the reserve balance will fluctuate due to variations of outstanding claims from period-to-period, timing of settlements and specific vendor issues, such as bankruptcies. Vendor reserves were $45 million and $50 million at June 30, 2018 and 2017 , respectively, excluding third-party returns. See Third-Party Returns section within this Note for a description of third-party returns.

## Distribution Services Agreement and Other Vendor Fees

Our Pharmaceutical segment recognizes fees received from distribution services agreements and other fees received from vendors related to the purchase or distribution of the vendors' inventory when those fees have been earned and we are entitled to

payment. Since the benefit provided to a vendor is related to the purchase and distribution of the vendor's inventory, we recognize the fees as a reduction in the carrying value of the inventory that generated the fees, and as such, a reduction of cost of products sold in our consolidated statements of earnings when the inventory is sold.

## Loss Contingencies and Self-Insurance

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. We also self-insure for employee healthcare, general liability, certain product liability matters, auto liability, property and workers' compensation. Self-insurance accruals include an estimate for expected settlements or pending claims, defense costs, administrative fees, claim adjustment costs and an estimate for claims incurred but not reported. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies and other liabilities is highly subjective and requires judgments about future events. We regularly review contingencies and our self-insurance accruals to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates. We recognize these estimated loss contingencies, income from favorable resolution of litigation and certain defense costs in litigation (recoveries)/charges in our consolidated statements of earnings. See Note 9 for additional information regarding loss contingencies and product liability lawsuits.

## Income Taxes

We account for income taxes using the asset and liability method. Deferred tax assets and liabilities are measured using enacted tax rates in the respective jurisdictions in which we operate . We assess the realizability of deferred tax assets on a quarterly basis and provide a valuation allowance for deferred tax assets when it is more likely than not that at least a portion of the deferred tax assets will not be realized. The realizability of deferred tax assets depends on our ability to generate sufficient taxable income within the carryback or carryforward periods provided for in the tax law for each applicable tax jurisdiction and also considers all available positive and negative evidence.

Deferred taxes for non-U.S. liabilities are not provided on the unremitted earnings of subsidiaries outside of the United States when it is expected that these earnings are indefinitely reinvested.

Tax benefits from uncertain tax positions are recognized when it is more likely than not that the position will be sustained upon examination of the technical merits of the position, including resolutions of any related appeals or litigation processes. The amount recognized is measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon settlement. See Note 8 for additional information regarding income taxes.

## Other Accrued Liabilities

Other accrued liabilities represent various current obligations, including certain accrued operating expenses and taxes payable.

**Notes to Financial Statements**

## Noncontrolling Interests and Redeemable Noncontrolling Interests

Noncontrolling interests represent the portion of net earnings, comprehensive income and net assets that is not attributable to Cardinal Health, Inc.

The redeemable noncontrolling interests relate to our ownership interest in naviHealth Holdings, LLC ("naviHealth"), which we acquired during fiscal 2016. The redeemable noncontrolling interests are redeemable at the option of the third-party noncontrolling interest holders at any time after the two-year anniversary of the closing, or earlier if a trigger event occurs. As such, the noncontrolling interests have been presented as redeemable noncontrolling interests in our consolidated balance sheets. The noncontrolling interests will be adjusted each period for net earnings and dividends attributable to the noncontrolling interests and changes in the noncontrolling ownership interests, if any. An additional adjustment to the carrying value of the noncontrolling interests may be required if the redemption value under the terms of the agreement exceeds the carrying value. Changes in the carrying value of the noncontrolling interests related to a change in the redemption value will be recorded through retained earnings and will not affect net earnings attributable to Cardinal Health, Inc. See Note 13 for additional information regarding redeemable noncontrolling interests.

In June 2018, we signed a securities purchase agreement and a contribution and rollover agreement with investor entities controlled by Clayton, Dubilier & Rice ("CD&R") to sell our ownership interest in naviHealth. For more information on this divestiture see Note 4 .

## Share-Based Compensation

Share-based compensation provided to employees is recognized in the consolidated statements of earnings based on the grant date fair value of the awards. The fair value of stock options is determined on the grant date using a lattice valuation model. The fair value of restricted share units and performance share units is determined by the grant date market price of our common shares. The compensation expense associated with nonvested performance share units is dependent on our periodic assessment of the probability of the targets being achieved and our estimate, which may vary over time, of the number of shares that ultimately will be issued. The compensation expense recognized for share-based awards is net of estimated forfeitures and is recognized ratably over the service period of the awards. All income tax effects of share-based awards are recognized in the statement of earnings as awards vest or are settled. We classify share-based compensation expense in distribution, selling, general and administrative ("SG&A") expenses to correspond with the same line item as the majority of the cash compensation paid to employees. If awards are modified in connection with a restructuring activity, the incremental share-based compensation expense is classified in restructuring and employee severance. See Note 17 for additional information regarding share-based compensation.

## Dividends

We paid cash dividends per common share of $1.85 , $1.80 and $1.55 in fiscal 2018 , 2017 and 2016 , respectively.

## Revenue Recognition

We recognize revenue when persuasive evidence of an arrangement exists, product delivery has occurred or the services have been rendered, the price is fixed or determinable, and collectability is reasonably assured.

### Pharmaceutical Segment

The Pharmaceutical segment recognizes distribution revenue when title transfers to its customers and we have no further obligation to provide services related to such merchandise.

Revenue for deliveries that are directly shipped to customers from the manufacturer when we act as an intermediary in the ordering and delivery of products is recorded gross. This is in accordance with accounting standards addressing reporting revenue on a gross basis as a principal versus on a net basis as an agent. This revenue is recorded on a gross basis since we incur credit risk from the customer, are primarily responsible for fulfillment, bear the risk of loss for incomplete shipments and do not receive a separate fee or commission for the transaction and, as such, are the primary obligor. Revenue from these sales is recognized when title transfers to the customer and we have no further obligation to provide services related to such merchandise.

Radiopharmaceutical revenue is recognized upon delivery of the product to the customer and we have no further obligation to provide services related to such merchandise.

### Medical Segment

The Medical segment recognizes revenue when title transfers to its customers and we have no further obligation to provide services related to such products.

## Sales Returns and Allowances

Revenue is recorded net of sales returns and allowances. Our customer return policies generally require that the product be physically returned, subject to restocking fees, in a condition suitable to be added back to inventory and resold at full value, or returned to vendors for credit ("merchantable product"). Product returns are generally consistent throughout the year and typically are not specific to any particular product or customer.

We accrue for estimated sales returns and allowances at the time of sale based upon historical customer return trends, margin rates and processing costs. Our accrual for sales returns is reflected as a reduction of revenue and cost of products sold for the sales price and cost, respectively. At June 30, 2018 and 2017 , the accrual for estimated sales returns and allowances was $479 million and $347 million , respectively, the impact of which is reflected in trade receivables, net and inventories, net in the consolidated balance sheets. Sales returns and allowances were $2.4 billion , $2.3 billion and $2.2 billion , for fiscal 2018 , 2017 and 2016 , respectively.

## Third-Party Returns

We generally do not accept non-merchantable pharmaceutical product returns from our customers, so many of our customers return non-merchantable pharmaceutical products to the manufacturer through third parties. Since our customers generally do not have a direct relationship with manufacturers, our vendors pass the value of such returns to us (usually in the form of an accounts payable

**Notes to Financial Statements**

deduction) for distribution to customers. We, in turn, pass the value received, less an administrative fee, to our customer. In certain instances, we pass the estimated value of the return to our customer prior to our receipt of the value from the vendor. Although we believe we have satisfactory protections, we could be subject to claims from customers or vendors if our administration of this overall process was deficient in some respect or our contractual terms with vendors are in conflict with our contractual terms with our customers. We have maintained reserves for some of these situations based on their nature and our historical experience with their resolution.

### Shipping and Handling

Shipping and handling costs are primarily included in SG&A expenses in our consolidated statements of earnings. Shipping and handling costs include all delivery expenses as well as all costs to prepare the product for shipment to the end customer. Shipping and handling costs were $543 million , $496 million and $504 million , for fiscal 2018 , 2017 and 2016 , respectively. Revenue received for shipping and handling was immaterial for all periods presented.

### Restructuring and Employee Severance

Restructuring activities are programs that are not part of the ongoing operations of our underlying business, such as closing and consolidating facilities, changing the way we manufacture or distribute our products, moving manufacturing of a product to another location, changes in production or business process outsourcing or insourcing, employee severance (including rationalizing headcount or other significant changes in personnel) and realigning operations (including realignment of the management structure in response to changing market conditions). See Note 3 for additional information regarding our restructuring activities.

### Amortization and Other Acquisition-Related Costs

We classify certain costs incurred in connection with acquisitions as amortization and other acquisition-related costs in our consolidated statements of earnings. These costs consist of amortization of acquisition-related intangible assets, transaction costs, integration costs and changes in the fair value of contingent consideration obligations. Transaction costs are incurred during the initial evaluation of a potential acquisition and primarily relate to costs to analyze, negotiate and consummate the transaction as well as due diligence activities. Integration costs relate to activities required to combine the operations of an acquired enterprise into our operations and, in the case of the Cordis and Patient Recovery businesses, to stand-up the systems and processes needed to support an expanded geographic footprint. We record changes in the fair value of contingent consideration obligations relating to acquisitions as income or expense in amortization and other acquisition-related costs. See Note 5 for additional information regarding amortization of acquisition-related intangible assets and Note 11 for additional information regarding contingent consideration.

### Translation of Foreign Currencies

Financial statements of our subsidiaries outside the United States are generally measured using the local currency as the functional currency. Adjustments to translate the assets and liabilities of these foreign subsidiaries into U.S. dollars are accumulated in

shareholders' equity through AOCI utilizing period-end exchange rates. Revenues and expenses of these foreign subsidiaries are translated using average exchange rates during the year.

The foreign currency translation gains/(losses) included in AOCI at June 30, 2018 and 2017 are presented in Note 14 . Foreign currency transaction gains and losses for the period are included in the consolidated statements of earnings in the respective financial statement line item.

### Interest Rate, Currency and Commodity Risk

All derivative instruments are recognized at fair value on the consolidated balance sheets and all changes in fair value are recognized in net earnings or shareholders' equity through AOCI, net of tax.

For contracts that qualify for hedge accounting treatment, the hedge contracts must be effective at reducing the risk associated with the exposure being hedged and must be designated as a hedge at the inception of the contract. Hedge effectiveness is assessed periodically. Any contract not designated as a hedge, or so designated but ineffective, is adjusted to fair value and recognized immediately in net earnings. If a fair value or cash flow hedge ceases to qualify for hedge accounting treatment, the contract continues to be carried on the balance sheet at fair value until settled and future adjustments to the contract's fair value are recognized immediately in net earnings. If a forecasted transaction is probable not to occur, amounts previously deferred in AOCI are recognized immediately in net earnings. See Note 12 for additional information regarding our derivative instruments, including the accounting treatment for instruments designated as fair value, cash flow and economic hedges.

### Fair Value Measurements

Fair value is defined as the price that would be received upon selling an asset or the price paid to transfer a liability on the measurement date. It focuses on the exit price in the principal or most advantageous market for the asset or liability in an orderly transaction between willing market participants. A three-tier fair value hierarchy is established as a basis for considering such assumptions and for inputs used in the valuation methodologies in measuring fair value. This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair values are:

Level 1 - Observable prices in active markets for identical assets and liabilities.

Level 2 - Observable inputs other than quoted prices in active markets for identical assets and liabilities.

Level 3 - Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets and liabilities.

See Note 11 for additional information regarding fair value measurements.

### Recent Financial Accounting Standards

In March 2018, the Financial Accounting Standards Board (the "FASB") issued amended accounting guidance to codify guidance

**Notes to Financial Statements**

pursuant to SEC staff accounting bulletin 118 ("SAB 118"), which was issued in connection with the Tax Cuts and Jobs Act (the "Tax Act") of December 2017. The guidance allows companies to use provisional estimates to record the effects of the Tax Act and also provides a measurement period (not to exceed one year from the date of enactment) to complete the accounting for the impacts of the Tax Act. We adopted this guidance in the second quarter of fiscal 2018 when it was initially issued as SAB 118. We are still completing our accounting for the tax effects of the Tax Act because all the necessary information is not currently available, prepared, or analyzed. As such, we have made reasonable estimates of the effects of the Tax Act on our financial results. As we complete our analysis of the accounting for the tax effects of enactment of the Tax Act, we may record additional provisional amounts or adjustments to provisional amounts as discrete items in future periods. See Note 8 for additional information regarding income taxes.

In August 2017, the FASB issued accounting guidance which is intended to improve and simplify accounting rules around hedge accounting. The guidance will be effective for us in the first quarter of fiscal 2020 and early adoption is permitted. While we are currently evaluating the timing of adoption, we do not expect the impact of this standard to have a material impact on our consolidated financial statements.

In March 2016, the FASB issued amended accounting guidance that changed the accounting for certain aspects of share-based compensation to employees. The guidance requires all income tax effects of share-based awards to be recognized in the statement of earnings as awards vest or are settled. Additionally, the guidance increases the amount employers can withhold in shares to cover employee income taxes without requiring liability classification and allows a policy election for accounting for forfeitures. The primary impact of adoption is the recognition of excess tax benefits in the statement of earnings on a prospective basis, rather than as a component of equity. The impact on the presentation in the consolidated statement of cash flows is also prospective. We adopted this guidance in the first quarter of fiscal 2018. The impact of adoption on the provision for/(benefit from) income taxes on our consolidated statement of earnings was immaterial. The inclusion of excess tax benefits and deficiencies as a component of our income tax expense will increase volatility within our provision for/(benefit from) income taxes as the amount of excess tax benefits or deficiencies from share- based compensation awards depends on our stock price at the date the awards vest or settle.

In February 2016, the FASB issued amended accounting guidance that requires lessees to recognize most leases on the balance sheet as a lease liability and corresponding right-of-use asset. The guidance also requires disclosures that meet the objective of enabling financial statement users to assess the amount, timing, and uncertainty of cash flows arising from leases. This guidance will be effective for us in the first quarter of fiscal 2020 and we expect to elect the practical expedient which will allow us to not apply the amended lease accounting guidance to comparative periods that will be presented. The majority of our lease spend relates to certain real estate with the remaining lease spend primarily related to equipment.

We are continuing to evaluate the impact of this standard on our consolidated financial statements and the methods of adoption.

In May 2014, the FASB issued amended accounting guidance related to revenue recognition which is effective for us in the first quarter of fiscal 2019. This guidance is based on the principle that revenue is recognized in an amount that reflects the consideration to which an entity expects to be entitled in exchange for the transfer of goods or services to customers. The guidance also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. The FASB also subsequently issued several amendments to the standard, including clarification on principal versus agent considerations, performance obligations and licensing, and certain scope improvements and practical expedients.

During fiscal 2018 we finalized our evaluation and assessment of the amended revenue recognition guidance. Our revenue is primarily distribution revenue, which we recognize at a point in time when title transfers to customers and we have no further obligation to provide services related to such merchandise. The timing of recognition of our distribution revenue will be unchanged under the amended guidance. The adoption of the amended accounting guidance will not have a material impact on our consolidated financial statements.

In May 2017, the FASB issued final guidance that clarifies when changes to the terms or conditions of a share-based payment award must be accounted for as modifications. Entities will apply the modification accounting guidance if the value, vesting conditions or classification of the award changes. This guidance will be effective for us in the first quarter of fiscal 2019 and the impact of this new guidance is dependent on future events.

In February 2017, the FASB clarified the guidance on how to account for the derecognition of nonfinancial assets (e.g., real estate, land, buildings, intangibles) and in-substance nonfinancial assets once an entity adopts the new revenue recognition guidance that is discussed in more detail above. The guidance also defines what constitutes an in-substance nonfinancial asset. This guidance will be effective for us in the first quarter of fiscal 2019. We anticipate the adoption of this guidance will not impact our consolidated financial statements.

In January 2017, the FASB issued amended accounting guidance that simplifies the accounting for goodwill impairment by eliminating the step of measuring a goodwill impairment by estimating the implied fair value of goodwill. Instead, goodwill impairment will be measured as the amount by which the reporting unit's carrying value exceeds its fair value, limited to the carrying value of the goodwill. We adopted this guidance in the second quarter of fiscal 2018. During the fourth quarter of fiscal 2018, we measured the Medical Unit's impairment at the amount by which the reporting unit's carrying value exceeded its fair value, resulting in an impairment charge of $1.4 billion . Refer to Note 5 for further discussion.

Also in January 2017, the FASB issued new accounting guidance that changes the definition of a business when evaluating whether a set of transferred assets and activities is considered a business. This

**Notes to Financial Statements**

guidance will be effective for us in the first quarter of fiscal 2019. The impact of adoption is dependent on future events.

In October 2016, the FASB issued amended accounting guidance that requires an entity to recognize the income tax effect of intercompany sales and transfers of assets other than inventory at the time that the transfer occurs rather than when the asset is sold to a third party. This amendment will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In August 2016, the FASB issued accounting guidance which clarifies the classification of certain cash receipts and cash payments in the statement of cash flows, including those related to contingent consideration payments made after a business combination, distributions received from equity method investees, debt prepayment or debt extinguishment costs and proceeds from the settlement of insurance claims. This guidance will be effective for us in the first quarter of fiscal 2019. We are currently evaluating the impact of this standard on our consolidated financial statements.

In June 2016, the FASB issued amended accounting guidance that will require entities to measure credit losses on trade and other receivables, held-to-maturity debt securities, loans and other instruments using an "expected credit loss" model that considers historical experience, current conditions and reasonable supportable forecasts. This guidance also requires that credit losses on available-for-sale debt securities with unrealized losses be recognized as allowances rather than as deductions in the amortized cost of the securities. This guidance will be effective for us in the first quarter of fiscal 2021. We are currently evaluating the impact of adoption on our consolidated financial statements.

## 2. Acquisitions

D uring fiscal 2018 , we completed several acquisitions, the most significant of which is the Patient Recovery Business described in more detail below. T he pro forma results of operations and the results of operations for acquired businesses since the acquisition dates have not been separately disclosed because the effects were not significant compared to the consolidated financial statements, individually or in the aggregate.

### Patient Recovery Business

On July 29, 2017, we acquired the Patient Care, Deep Vein Thrombosis, and Nutritional Insufficiency businesses (the "Patient Recovery Business") from Medtronic plc for $6.1 billion in cash. The Patient Recovery Business manufactures 23 categories of medical products sold into multiple healthcare channels. The acquisition further expanded the Medical segment's portfolio of self-manufactured products. We closed the Patient Recovery Business acquisition in 28 principal countries on July 29, 2017, and acquired control of, for GAAP purposes, and the rights to the net economic benefit from the entire Patient Recovery Business in the remaining countries at the closing. We are in the process of transitioning legal ownership in the remaining non-principal countries, which we expect to complete in early calendar 2019.

The results for the entire Patient Recovery Business in all countries are included in the consolidated financial statements beginning July 29, 2017. We funded the acquisition through $4.5 billion in long-term debt, existing cash and borrowings under our existing credit arrangements.

Transaction and integration costs associated with the acquisition of the Patient Recovery business were $109 million during the fiscal year ended June 30, 2018 and are included in amortization and other acquisition-related costs in the consolidated statements of earnings.

### Fair Value of Assets Acquired and Liabilities Assumed

The allocation of the purchase price for the acquisition of the Patient Recovery Business is not yet finalized and is subject to adjustment as we complete the valuation analysis for this acquisition.

The valuation of identifiable intangible assets utilizes significant unobservable inputs and thus represents a Level 3 nonrecurring fair value measurement. The estimated fair value of the identifiable intangible assets was determined using income-based approaches, which includes market participant expectations of the cash flows that an asset could generate over its economic life, discounted back to present value using an appropriate rate of return. The weighted- average discount rate used to arrive at the present value of the identifiable intangible assets was 8.0 percent, and considers the inherent risk of each intangible asset relative to the internal rate of return and weighted-average cost of capital.

The following table summarizes the estimated fair value of the assets acquired and liabilities assumed as of the acquisition date for the Patient Recovery Business:

| (in millions) | | Patient Recovery Business |
|---|---|---|
| **Identifiable intangible assets:** | | |
| Customer relationships (1) | $ | 1,733 |
| Trade names (2) | | 187 |
| Developed technology and other (3) | | 732 |
| Total identifiable intangible assets acquired | | 2,652 |
| | | |
| Cash and equivalents | | 22 |
| Inventories | | 425 |
| Prepaid expenses and other | | 252 |
| Property and equipment, net | | 741 |
| Other accrued liabilities | | (322) |
| Deferred income taxes and other liabilities | | (982) |
| Total identifiable net assets acquired/(liabilities assumed) | | 2,788 |
| Goodwill | | 3,292 |
| **Total net assets acquired** | $ | **6,080** |

(1) The range of useful lives for customer relationships is 10 to 18 years.

(2) The useful life of trade names is 15 years.

(3) The useful life of developed technology is 15 years.

**Notes to Financial Statements**

## 3. Restructuring and Employee Severance

The following tables summarize restructuring and employee severance costs:

| (in millions) | 2018 | | 2017 | | 2016 | |
|---|---|---|---|---|---|---|
| Employee-related costs (1) | $ | 34 | $ | 51 | $ | 15 |
| Facility exit and other costs (2) | | 142 | | 5 | | 10 |
| **Total restructuring and employee severance** | $ | 176 | $ | 56 | $ | 25 |

(1)  Employee-related costs primarily consist of termination benefits provided to employees who have been involuntarily terminated and duplicate payroll costs during transition periods.

(2)  Facility exit and other costs primarily consist of product distribution and lease contract termination costs, accelerated depreciation, equipment relocation costs, project consulting fees and costs associated with restructuring our delivery of information technology infrastructure services.

In September 2017, we entered into an agreement to transition the distribution of our Medical segment's surgeon gloves in certain international markets from a third-party distribution arrangement to a direct distribution model. The costs with this restructuring include $125 million , on a pre-tax basis, of contract termination costs which have been paid and are reflected in facility exit and other costs in the consolidated statement of earnings during the fiscal year ended 2018.

The following table summarizes activity related to liabilities associated with restructuring and employee severance:

| (in millions) | Employee-Related Costs | | Facility Exit and Other Costs | | Total | |
|---|---|---|---|---|---|---|
| Balance at June 30, 2016 | $ | 15 | $ | 1 | $ | 16 |
| Additions | | 43 | | 1 | | 44 |
| Payments and other adjustments | | (17) | | (2) | | (19) |
| Balance at June 30, 2017 | | 41 | | — | | 41 |
| Additions | | 19 | | 131 | | 150 |
| Payments and other adjustments | | (36) | | (127) | | (163) |
| **Balance at June 30, 2018** | $ | 24 | $ | 4 | $ | 28 |

## 4. Divestitures and Assets Held for Sale

### China Divestiture

In February 2018, we sold our pharmaceutical and medical products distribution business in China ("China distribution business") for proceeds of $861 million (after adjusting for third party indebtedness and preliminary transaction adjustments) to Shanghai Pharmaceuticals Holding Co., Ltd. The proceeds are not reflective of tax obligations due in connection with the sale, for which we have recorded a liability of $59 million . The purchase price is subject to adjustment based on working capital requirements as set forth in the definitive agreement, which would impact the loss related to this divestiture.

We determined that the sale of the China distribution business does not meet the criteria to be classified as discontinued operations. The China distribution business primarily operated within our Pharmaceutical segment, and a smaller portion operated within our Medical segment.

During the fiscal year ended 2018, we recognized a pre-tax loss of $41 million related to this divestiture.

### naviHealth Assets Held for Sale

In June 2018, we entered into a Securities Purchase Agreement and related Contribution and Rollover Agreement with investor entities controlled by CD&R. Pursuant to those agreements, on August 1, 2018, we sold our 98% ownership interest in naviHealth Holdings, LLC in exchange for proceeds of $736 million (after adjusting for certain fees and expenses) and a 44% equity interest in a partnership that owns 100% of the equity interest of naviHealth. We also have certain call rights to reacquire naviHealth.

Upon signing the agreement, we met the criteria for the related assets and liabilities of naviHealth to be classified as held for sale. At June 30, 2018, we determined that the fair value less cost to sell exceeded the book value of the disposal group and there were no other indicators of asset impairment. We recognized a provisional tax benefit of $12 million related to the transaction during the three months ended June 30, 2018. See Note 8 for additional information regarding income taxes. We determined that the sale of naviHealth does not meet the criteria to be classified as discontinued operations. The naviHealth business operated within our Medical segment.

The following table presents information related to the assets and liabilities that were classified as held for sale at June 30, 2018 in the consolidated balance sheets:

| (in millions) | June 30, 2018 | |
|---|---|---|
| Trade Receivables, net | $ | 74 |
| Goodwill and other intangibles, net | | 642 |
| Other assets | | 40 |
| **Total assets held for sale** | $ | 756 |
| Deferred revenue | | 35 |
| Deferred income taxes | | 38 |
| Other liabilities | | 140 |
| **Total liabilities related to assets held for sale** | $ | 213 |

Notes to Financial Statements

## 5. Goodwill and Other Intangible Assets

### Goodwill

The following table summarizes the changes in the carrying amount of goodwill by segment and in total:

| (in millions) | Pharmaceutical (1) | | Medical (2) | | Total | |
|---|---|---|---|---|---|---|
| Balance at June 30, 2016 | $ | 2,919 | $ | 4,248 | $ | 7,167 |
| Goodwill acquired, net of purchase price adjustments | | 29 | | 35 | | 64 |
| Foreign currency translation adjustments and other | | (9) | | (1) | | (10) |
| Balance at June 30, 2017 | | 2,939 | | 4,282 | | 7,221 |
| Goodwill acquired, net of purchase price adjustments | | 1 | | 3,342 | | 3,343 |
| Foreign currency translation adjustments and other | | 28 | | 6 | | 34 |
| Goodwill divested with the sale of our China distribution business | | (347) | | (54) | | (401) |
| naviHealth goodwill reclassified to assets held for sale | | — | | (509) | | (509) |
| Impairment | | — | | (1,372) | | (1,372) |
| **Balance at June 30, 2018** | $ | **2,621** | $ | **5,695** | $ | **8,316** |

(1)  At June 30, 2018 and 2017, the Pharmaceutical segment accumulated goodwill impairment loss was $829 million .

(2)  At June 30, 2018 , the Medical segment accumulated goodwill impairment loss was $1.4 billion . The Medical segment had no accumulated goodwill impairment loss at June 30, 2017.

The increase in the Medical segment goodwill during fiscal 2018 is primarily due to the Patient Recovery Business acquisition. Goodwill recognized in connection with the Patient Recovery Business acquisition primarily represents the expected benefits from certain synergies of integrating the business, the existing workforce of the acquired entity, and the expected growth from new customers. See Note 2 for further discussion of this acquisition.

In conjunction with the preparation of our consolidated financial statements for fiscal 2018, we recently completed our annual quantitative goodwill impairment test, which we perform annually in the fourth quarter. This quantitative test resulted in a $1.4 billion goodwill impairment charge related to our Medical Unit, which is included in impairments and loss on disposal of assets in our consolidated statements of earnings. The impairment was primarily driven by inventory and cost challenges within our Cordis business which furthered in the fourth quarter of fiscal 2018. This impairment charge does not impact our liquidity, cash flows from operations, or compliance with debt covenants. There was no tax benefit related to the goodwill impairment charge. The goodwill balance for our Medical Unit, after recognizing the impairment, was $4.3 billion at June 30, 2018.

Using a combination of income and market-based approaches (using a discount rate of  8.5 percent ), the carrying amount exceeded the fair value and resulted in an impairment of $1.4 billion  for the Medical unit. Our fair value estimates utilize significant unobservable inputs and thus represent Level 3 fair value measurements.

During fiscal 2018, goodwill was also reduced by $401 million and $509 million in connection with the sale of our China distribution

business and reclassification of naviHealth's assets and liabilities to held for sale, respectively.

See Note 4 for further discussion of this divestiture and assets held for sale.

### Other Intangible Assets

The following tables summarize other intangible assets by class at June 30:

| | 2018 | | | | | | |
|---|---|---|---|---|---|---|---|
| (in millions) | Gross Intangible | | Accumulated Amortization | | Net Intangible | | Weighted-Average Remaining Amortization Period (Years) |
| **Indefinite-life intangibles:** | | | | | | | |
| IPR&D, trademarks and other | $ | 62 | $ | — | $ | 62 | N/A |
| Total indefinite-life intangibles | | 62 | | — | | 62 | N/A |
| **Definite-life intangibles:** | | | | | | | |
| Customer relationships | | 3,513 | | 1,191 | | 2,322 | 15 |
| Trademarks, trade names and patents | | 667 | | 246 | | 421 | 15 |
| Developed technology and other | | 1,562 | | 454 | | 1,108 | 12 |
| Total definite-life intangibles | | 5,742 | | 1,891 | | 3,851 | 14 |
| **Total other intangible assets** | $ | **5,804** | $ | **1,891** | $ | **3,913** | N/A |

| | 2017 | | | | | |
|---|---|---|---|---|---|---|
| (in millions) | Gross Intangible | | Accumulated Amortization | | Net Intangible | |
| **Indefinite-life intangibles:** | | | | | | |
| IPR&D, trademarks and other | $ | 61 | $ | — | $ | 61 |
| Total indefinite-life intangibles | | 61 | | — | | 61 |
| **Definite-life intangibles:** | | | | | | |
| Customer relationships | | 1,966 | | 967 | | 999 |
| Trademarks, trade names and patents | | 509 | | 195 | | 314 |
| Developed technology and other | | 916 | | 304 | | 612 |
| Total definite-life intangibles | | 3,391 | | 1,466 | | 1,925 |
| **Total other intangible assets** | $ | **3,452** | $ | **1,466** | $ | **1,986** |

Total amortization of intangible assets was $574 million , $395 million and $355 million for fiscal 2018 , 2017 and 2016 , respectively. The estimated annual amortization for intangible assets for fiscal 2019 through 2023 is as follows: $529 million , $501 million , $430 million , $398 million and $348 million .

During fiscal 2018, other intangible assets were reduced by $62 million and $133 million in connection with the sale of our China distribution business and reclassification of naviHealth's assets and liabilities to held for sale, respectively.

**Notes to Financial Statements**

See Note 4 for further discussions of this divestiture and assets held for sale.

## 6. Available-for-Sale Securities

We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. We held the following investments in marketable securities at fair value at June 30:

| (in millions) | 2018 | 2017 |
|---|---|---|
| **Current available-for-sale securities:** | | |
| Treasury bills | — | 25 |
| International bonds | — | 3 |
| Corporate bonds | — | 30 |
| U.S. agency bonds | — | 3 |
| Asset-backed securities | — | 3 |
| International equity securities | — | 1 |
| **Total available-for-sale securities** | $  — | $  65 |

In July 2017, we liquidated our marketable securities. There were no unrealized gains or losses at June 30, 2018 and unrealized gains and losses were immaterial at June 30, 2017 . During fiscal 2018 , 2017 and 2016 , gross realized gains and losses were immaterial and we did not recognize any other-than-temporary-impairments.

## 7. Long-Term Obligations and Other Short-Term Borrowings

The following table summarizes long-term obligations and other short-term borrowings at June 30:

| (in millions) (1) | 2018 | 2017 |
|---|---|---|
| 1.7% Notes due 2018 | $  — | $  400 |
| 1.95% Notes due 2018 | — | 547 |
| 1.948% Notes due 2019 | 998 | 996 |
| 2.4% Notes due 2019 | 448 | 453 |
| 4.625% Notes due 2020 | 514 | 519 |
| 2.616% Notes due 2022 | 1,143 | 1,142 |
| 3.2% Notes due 2022 | 243 | 248 |
| Floating Rate Notes due 2022 | 348 | 347 |
| 3.2% Notes due 2023 | 525 | 544 |
| 3.079% Notes due 2024 | 742 | 744 |
| 3.5% Notes due 2024 | 390 | 396 |
| 3.75% Notes due 2025 | 460 | 481 |
| 3.41% Notes due 2027 | 1,340 | 1,340 |
| 4.6% Notes due 2043 | 346 | 346 |
| 4.5% Notes due 2044 | 342 | 341 |
| 4.9% Notes due 2045 | 445 | 445 |
| 4.368% Notes due 2047 | 594 | 594 |
| 7.0% Debentures due 2026 | 124 | 124 |
| Other obligations | 11 | 388 |
| Total | 9,013 | 10,395 |
| Less: current portion of long-term obligations and other short-term borrowings | 1,001 | 1,327 |
| **Long-term obligations, less current portion** | $  8,012 | $  9,068 |

(1) Maturities are presented on a calendar year basis.

Maturities of existing long-term obligations and other short-term borrowings for fiscal 2019 through 2023 and thereafter are as follows: $1.0 billion , $452 million , $516 million , $1.7 billion , $526 million and $4.8 billion .

## Long-Term Debt

All the notes represent unsecured obligations of Cardinal Health, Inc. and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. The 7.0% Debentures represent unsecured obligations of Allegiance Corporation (a wholly-owned subsidiary), which Cardinal Health, Inc. has guaranteed. None of these obligations are subject to a sinking fund and the Allegiance obligations are not redeemable prior to maturity. Interest is paid pursuant to the terms of the obligations. These notes are effectively subordinated to the liabilities of our subsidiaries, including trade payables of $19.7 billion .

In June 2018, we repaid the full principal of the 1.95% Notes due 2018 at maturity for $550 million . In July 2017, we redeemed the 1.7% Notes due 2018 early in full with a portion of the proceeds from the June 2017 issuance for $400 million .

In June 2017, we issued additional debt with the aggregate principal amount of $5.2 billion to fund a portion of the acquisition of the Patient Recovery Business from Medtronic, which closed on July 29, 2017 , to redeem the 1.7% Notes due 2018 and for general corporate purposes. The notes issued in conjunction with the acquisition are 1.948% Notes due 2019, 2.616% Notes due 2022, 3.079% Notes due 2024, 3.41% Notes due 2027, 4.368% Notes due 2047, and floating rate Notes due 2022. The amount of the notes issued net of discounts, premiums, mark-to-market of any interest rate swaps and debt issuance costs was $5.2 billion .

If we undergo a change of control, as defined in the notes, and if the notes receive specified ratings below investment grade by each of Standard & Poors Ratings Services, Moody's Investors Services and Fitch Ratings, any holder of the notes, excluding the debentures, can require with respect to the notes owned by such holder, or we can offer, to repurchase the notes at 101% of the principal amount plus accrued and unpaid interest.

## Other Financing Arrangements

In addition to cash and equivalents and operating cash flow, other sources of liquidity include a $2.0 billion revolving credit facility and a $1.0 billion committed receivables sales facility program, which we increased in August 2017 from $1.75 billion to $2.0 billion . In November 2016, we renewed our committed receivables sales facility program through Cardinal Health Funding, LLC ("CHF") through November 1, 2019. CHF was organized for the sole purpose of buying receivables and selling undivided interests in those receivables to third-party purchasers. Although consolidated with Cardinal Health, Inc. in accordance with GAAP, CHF is a separate legal entity from Cardinal Health, Inc. and from our subsidiary that sells receivables to CHF. CHF is designed to be a special purpose, bankruptcy-remote entity whose assets are available solely to satisfy the claims of its creditors.

We also maintain a $2.0 billion commercial paper program backed by a $2.0 billion revolving credit facility. At June 30, 2018 , we had no amounts outstanding under the revolving credit facility; however, availability was reduced by outstanding letters of credit of $24 million and $20 million at June 30, 2018 and 2017 , respectively. We also had no amounts outstanding under the committed receivables sales facility program; however, availability was reduced by outstanding

standby letters of credit of $34 million and $46 million at June 30, 2018 and 2017 , respectively. Under our commercial paper and committed receivables programs, we had a maximum amount outstanding of $1.7 billion and an average daily amount outstanding of $277 million during fiscal 2018 . We had no amounts outstanding under the commercial paper program as of June 30, 2018 .

Our revolving credit facility and committed receivables sales facility program require us to maintain, as of the end of any calendar quarter, a consolidated leverage ratio of no more than 4.25 -to-1, which will reduce to 3.25-to-1 in March 2019. As of June 30, 2018 , we were in compliance with these financial covenants.

We also maintain other short-term credit facilities and an unsecured line of credit that allowed for borrowings up to $8 million and $690 million at June 30, 2018 and 2017 , respectively. The $11 million and $388 million balance of other obligations at June 30, 2018 and 2017 , respectively, consisted of short-term borrowings and capital leases.

In fiscal 2018 we sold our China distribution business, including its debt which was $378 million as of June 30, 2017. See Note 4 for further discussion of this divestiture.

## 8. Income Taxes

### Earnings/(loss) before Income Taxes and Provision for Income Taxes

The following table summarizes earnings/(loss) before income taxes:

| (in millions) | 2018 | 2017 | 2016 |
|---|---|---|---|
| U.S. operations | $ 391 | $ 1,772 | $ 2,050 |
| Non-U.S. operations | (619) | 152 | 226 |
| **Earnings/(loss) before income taxes** | $ (228) | $ 1,924 | $ 2,276 |

The following table summarizes the components of provision for/(benefit from) income taxes:

| (in millions) | 2018 | 2017 | 2016 |
|---|---|---|---|
| **Current:** | | | |
| Federal | $ 341 | $ 273 | $ 633 |
| State and local | 41 | 10 | 52 |
| Non-U.S. | 143 | 56 | 73 |
| Total current | $ 525 | $ 339 | $ 758 |
| **Deferred:** | | | |
| Federal | $ (1,003) | $ 258 | $ 96 |
| State and local | 16 | 37 | 12 |
| Non-U.S. | (25) | (4) | (21) |
| Total deferred | (1,012) | 291 | 87 |
| **Provision for/(benefit from) income taxes** | $ (487) | $ 630 | $ 845 |

**Notes to Financial Statements**

**Effective Tax Rate**

The following table presents a reconciliation of the provision based on the federal statutory income tax rate to our effective income tax rate:

| | 2018 (1) | 2017 (2) | 2016 (2) |
|---|---|---|---|
| Provision at Federal statutory rate | 28.1 % | 35.0 % | 35.0 % |
| State and local income taxes, net of federal benefit | (16.0) | 1.0 | 1.5 |
| Foreign tax rate differential | (48.4) | (7.3) | (0.6) |
| Nondeductible/nontaxable items | (10.2) | 0.2 | 1.0 |
| Goodwill impairment | (124.7) | — | — |
| Tax Act | 410.9 | — | — |
| Capital loss | 71.4 | — | — |
| Change in valuation allowances | (76.9) | 7.7 | 0.1 |
| Foreign tax credits | 27.3 | (1.6) | (0.1) |
| China tax related to divestiture | (25.8) | — | — |
| Other | (21.9) | (2.3) | 0.2 |
| **Effective income tax rate** | **213.8 %** | 32.7 % | 37.1 % |

(1)  The effective income tax rate for fiscal 2018 represents an income tax benefit tax rate.

(2)  The effective income tax rates for fiscal 2017 and 2016 represents income tax expense tax rates.

The income tax benefit rate in fiscal 2018 was 213.8% compared to income tax expense rates of 32.7% in fiscal 2017 and 37.1% in fiscal 2016. Fluctuations in the effective tax rates are primarily due to net benefits from the enactment of the Tax Act, the impact of nondeductible goodwill impairment charges, and a benefit from a capital loss due to international legal entity reorganization. There were also changes in valuation allowances related to capital losses, credit carryforwards and net operating loss carryforwards in U.S. federal, U.S. state and international jurisdictions.

On December 22, 2017, the United States enacted the Tax Act. The Tax Act makes broad and complex changes to the U.S. tax code that affect our fiscal year 2018 financial results in two primary ways. First, effective as of January 1, 2018, the Tax Act reduces the U.S. federal corporate tax rate from 35 percent to 21 percent. Second, it requires companies to pay a one-time U.S. repatriation tax on certain undistributed earnings of foreign subsidiaries. Because our fiscal year ends in June, we have a blended U.S. Federal statutory tax rate for fiscal 2018 of 28.1 percent under the Tax Act. The Tax Act also establishes new tax provisions that will affect us beginning July 1, 2018 including, (1) eliminating the U.S. manufacturing deduction; (2) establishing new limitations on deductible interest expense and certain executive compensation; (3) eliminating the corporate alternative minimum tax; (4) creating the base erosion anti-abuse tax; (5) creating a new provision designed to tax global intangible low-tax income ("GILTI"); (6) generally eliminating U.S. federal income taxes on dividends from foreign subsidiaries; and (7) changing rules related to uses and limitations of net operating loss carryforwards created in tax years beginning after December 31, 2017.

Regarding the new GILTI tax rules, we are allowed to make an accounting policy election to either (1) treat taxes due on future GILTI

exclusions in U.S. taxable income as a current period expense when incurred or (2) reflect such portion of the future GILTI exclusions in U.S. taxable income that relate to existing basis differences in our measurement of deferred taxes. Our analysis of the new GILTI rules and how they may impact us is incomplete. Accordingly, we have not made a policy election regarding the treatment of the GILTI tax.

As a result of the enactment of a lower tax rate, we remeasured our U.S. deferred tax assets and liabilities based on the rates at which they are expected to reverse in the future. While we are still analyzing certain aspects of the Tax Act and refining our calculations, we have recorded a provisional net benefit of $977 million related to this required remeasurement. The provisional estimate is based on currently available information related to deferred tax assets and liabilities which is subject to change as additional information becomes available, prepared, and analyzed.

At June 30, 2018 , we had $110 million of undistributed earnings from non-U.S. subsidiaries. In connection with the required one-time U.S. repatriation tax on undistributed earnings of foreign subsidiaries, we recorded a provisional tax expense of $41 million which may change when our calculation is complete. The Tax Act permits the payment of this tax in eight installments over an eight-year period beginning in fiscal 2019. Though these foreign earnings have been deemed to be repatriated from a U.S. federal tax perspective, we have not yet completed our assessment of the Tax Act on our plans to reinvest foreign earnings and as such have not changed our prior conclusion that the earnings are indefinitely reinvested. The repatriation tax is based on currently available information and technical guidance related to the new tax law. The provisional estimate will be updated when additional information related to undistributed foreign earnings, foreign taxes and foreign cash and equivalents becomes available, prepared and analyzed.

Our effective tax rate was unfavorably impacted by goodwill impairment charges related to our Medical operating segment for the portion attributable to nondeductible goodwill for income tax purposes.

On June 28, 2018, we executed an international legal entity reorganization. This transaction resulted in a US capital loss and a tax benefit of $163 million . Due to the uncertainty of the future utilization of the capital loss, we recorded a valuation allowance of $72 million on the carryforward.

We had other changes in valuation allowances related to federal credits and various international and state net operating losses that we believe are more likely than not to expire unutilized.

**Deferred Income Taxes**

Deferred income taxes arise from temporary differences between financial reporting and tax reporting bases of assets and liabilities and operating loss and tax credit carryforwards for tax purposes.

The following table presents the components of the deferred income tax assets and liabilities at June 30:

## Notes to Financial Statements

| (in millions) | | 2018 | | 2017 |
|---|---|---|---|---|
| **Deferred income tax assets:** | | | | |
| Receivable basis difference | $ | 41 | $ | 42 |
| Accrued liabilities | | 110 | | 125 |
| Share-based compensation | | 40 | | 53 |
| Loss and tax credit carryforwards | | 526 | | 378 |
| Deferred tax assets related to uncertain tax positions | | 30 | | 51 |
| Other | | 101 | | 43 |
| Total deferred income tax assets | | 848 | | 692 |
| Valuation allowance for deferred income tax assets | | (412) | | (237) |
| **Net deferred income tax assets** | $ | 436 | $ | 455 |
| | | | | |
| **Deferred income tax liabilities:** | | | | |
| Inventory basis differences | $ | (1,103) | $ | (1,578) |
| Property-related | | (176) | | (183) |
| Goodwill and other intangibles | | (934) | | (570) |
| **Total deferred income tax liabilities** | $ | (2,213) | $ | (2,331) |
| **Net deferred income tax liability** | $ | (1,777) | $ | (1,876) |

Deferred income tax assets and liabilities in the preceding table, after netting by taxing jurisdiction, are in the following captions in the consolidated balance sheets at June 30:

| (in millions) | | 2018 | | 2017 |
|---|---|---|---|---|
| Noncurrent deferred income tax asset (1) | | 37 | | 73 |
| Noncurrent deferred income tax liability (2) | | (1,814) | | (1,949) |
| **Net deferred income tax liability** | $ | (1,777) | $ | (1,876) |

(1)	Included in other assets in the consolidated balance sheets.

(2)	Included in deferred income taxes and other liabilities in the consolidated balance sheets.

At June 30, 2018 we had gross federal, state and international loss and credit carryforwards of $794 million , $2.0 billion and $1.1 billion , respectively, the tax effect of which is an aggregate deferred tax asset of $526 million . Substantially all of these carryforwards are available for at least three years. Approximately $379 million of the valuation allowance at June 30, 2018 applies to certain federal, state and international loss carryforwards that, in our opinion, are more likely than not to expire unutilized. However, to the extent that tax benefits related to these carryforwards are realized in the future, the reduction in the valuation allowance would reduce income tax expense.

### Unrecognized Tax Benefits

We had $423 million , $417 million and $527 million of unrecognized tax benefits at June 30, 2018 , 2017 and 2016 , respectively. The June 30, 2018 , 2017 and 2016 balances include $262 million , $268 million and $355 million , respectively, of unrecognized tax benefits that, if recognized, would have an impact on the effective tax rate. The remaining unrecognized tax benefits relate to tax positions for which ultimate deductibility is highly certain but for which there is uncertainty as to the timing of such deductibility. Recognition of these tax benefits would not affect our effective tax rate. We include the full amount of unrecognized tax benefits in deferred income taxes and other liabilities in the consolidated balance sheets. The following table

presents a reconciliation of the beginning and ending amounts of unrecognized tax benefits:

| (in millions) | | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|---|
| Balance at beginning of fiscal year | $ | 417 | $ | 527 | $ | 542 |
| Additions for tax positions of the current year | | 15 | | 29 | | 22 |
| Additions for tax positions of prior years (1) | | 141 | | 23 | | 42 |
| Reductions for tax positions of prior years | | (40) | | (8) | | (48) |
| Settlements with tax authorities (1) | | (99) | | (154) | | (30) |
| Expiration of the statute of limitations (1) | | (11) | | — | | (1) |
| **Balance at end of fiscal year** | $ | 423 | $ | 417 | $ | 527 |

(1)	Included in additions for tax positions of prior years is $110 million related to exposures acquired as part of the Patient Recovery Business for which we are indemnified. Settlements of $81 million related to the Patient Recovery Business as well as $11 million of statute expirations.

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is a net decrease of $0 million to $35 million , exclusive of penalties and interest.

We recognize accrued interest and penalties related to unrecognized tax benefits in the provision for income taxes. At June 30, 2018 , 2017 and 2016 , we had $110 million , $99 million and $145 million , respectively, accrued for the payment of interest and penalties. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the consolidated balance sheets. During fiscal 2018 and 2017, we recognized $8 million and $12 million of expense for interest and penalties in income tax expense, respectively. During fiscal 2016 , we recognized $9 million of benefit for interest and penalties in income tax expense.

### Other Tax Matters

We file income tax returns in the U.S. federal jurisdiction, various U.S. state and local jurisdictions, and various foreign jurisdictions. With few exceptions, we are subject to audit by taxing authorities for fiscal years 2008 through the current fiscal year.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), which has been acquired by Becton, Dickinson and Company. Under the tax matters agreement, CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $151 million and $142 million at June 30, 2018 and 2017 , respectively, and is included in other assets in the consolidated balance sheets.

As a result of the acquisition of the Patient Recovery Business, Medtronic plc is obligated to indemnify us for certain tax exposures and transaction taxes related to periods prior to the acquisition under the purchase agreement. The indemnification receivable was $21 million at June 30, 2018 and is included in Other assets in the consolidated balance sheet.

## 9. Commitments, Contingent Liabilities and Litigation

### Commitments

#### Operating Leases

The future minimum rental payments for operating leases having initial or remaining non-cancelable lease terms in excess of one year at June 30, 2018 for fiscal 2019 through 2023 and thereafter are as follows: $113 million , $97 million , $77 million , $58 million , $41 million and $103 million . Rental expense relating to operating leases was $172 million , $159 million and $126 million in fiscal 2018 , 2017 and 2016 , respectively. Sublease rental income was immaterial for all periods presented.

#### Generic Sourcing Venture With CVS Health Corporation

Red Oak Sourcing, LLC ("Red Oak Sourcing") is a U.S.-based generic pharmaceutical sourcing venture with CVS Health for an initial term through June 2024. Red Oak Sourcing negotiates generic pharmaceutical supply contracts on behalf of its participants. Due to the achievement of predetermined milestones, we are required to make quarterly payments of $45.6 million to CVS Health for the initial term.

### Contingencies

#### New York Opioid Stewardship Act

In April 2018, the State of New York passed a budget which included the Opioid Stewardship Act (the "OSA"). The OSA created an aggregate $100 million annual assessment on all manufacturers and distributors licensed to sell or distribute opioids in New York. Each licensed manufacturer and distributor will be required to pay a portion of the assessment based on its ratable share, as determined by the state, of the total morphine milligram equivalents sold or distributed in New York during the applicable calendar year. The initial payment is due on January 1, 2019 for opioids sold or distributed during calendar year 2017.

We accrue for contingencies if it is probable that a liability has been incurred and the amount can be reasonably estimated. At this time, we believe that it is probable that we owe an amount under the OSA for calendar years 2017 and 2018, but we are unable to estimate the amount because of uncertainties with respect to the implementation of the assessment and because the information necessary to determine our share of the assessment is not yet available.

### Legal Proceedings

We become involved from time to time in disputes, litigation and regulatory matters.

We may be named from time to time in *qui tam* actions initiated by private third parties. In such actions, the private parties purport to act on behalf of federal or state governments, allege that false claims have been submitted for payment by the government and may receive an award if their claims are successful. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in and take control over the litigation. These actions may remain under seal while the government makes this determination. If the government declines to intervene, the private party may nonetheless continue to pursue the litigation on his or her own purporting to act on behalf of the government .

From time to time, we become aware through employees, internal audits or other parties of possible compliance matters, such as complaints or concerns relating to accounting, internal accounting controls, financial reporting, auditing, or other ethical matters or relating to compliance with laws such as healthcare fraud and abuse, anti-corruption or anti-bribery laws. When we become aware of such possible compliance matters, we investigate internally and take appropriate corrective action. In addition, from time to time, we receive subpoenas or requests for information from various federal or state agencies relating to our business or to the business of a customer, supplier or other industry participants. Internal investigations, subpoenas or requests for information could lead to the assertion of claims or the commencement of legal proceedings against us or result in sanctions.

From time to time, we may determine that products we manufacture or market do not meet our specifications, regulatory requirements, or published standards. When we or a regulatory agency identify a potential quality or regulatory issue, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales, action by regulators and product liability claims and lawsuits, including class actions. Even absent an identified regulatory or quality issue or product recall, we can become subject to product liability claims and lawsuits.

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for certain litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges in our consolidated statements of earnings.

#### Opioid Lawsuits

Pharmaceutical wholesale distributors, including us, have been named as defendants in over 1,000 lawsuits relating to the distribution of prescription opioid pain medications. These lawsuits have been filed in various federal, state, and other courts by a variety of plaintiffs, which are primarily counties, municipalities and political subdivisions from 48 states. Plaintiffs also include state attorneys general, unions and other health and welfare funds, hospital systems and other healthcare providers. Of these lawsuits, 32 are purported class actions. The lawsuits seek equitable relief and monetary damages based on a variety of legal theories including various common law claims, such as negligence, public nuisance, unjust enrichment as well as violations of controlled substance laws and various other

**Notes to Financial Statements**

statutes. Many also name pharmaceutical manufacturers, retail pharmacy chains and other entities as defendants.

The vast majority of these lawsuits have been filed in U.S. federal court and have been transferred for consolidated pre-trial proceedings in a Multi-District Litigation proceeding in the United States District Court for the Northern District of Ohio. The court, among other things, ordered that three lawsuits proceed to trial in 2019 depending on the outcome of pre-trial motions. As a part of these proceedings, distributors have engaged in preliminary discussions with various parties, including state attorneys general, regarding possible resolution structures.

In addition, 39 state attorneys general have formed a multi-state task force to investigate the manufacturing, distribution, dispensing and prescribing practices of opioid medications. We have received requests related to this multi-state investigation, as well as civil investigative demands, subpoenas or requests for information from these and other state attorneys general offices. We are cooperating with the offices conducting these investigations.

We are vigorously defending ourselves in all of these opioid matters. Since all of the above-referenced lawsuits and investigations are in early stages, we are unable to predict their outcome or estimate a range of reasonably possible losses.

**Product Liability Lawsuits**

As of August 20, 2018, we are named as a defendant in 174 product liability lawsuits filed in Alameda County Superior Court in California involving claims by approximately 1,918 plaintiffs that allege personal injuries associated with the use of Cordis OptEase and TrapEase inferior vena cava (IVC) filter products. Another 20 lawsuits involving similar claims by approximately 21 plaintiffs are pending in other jurisdictions. These lawsuits seek a variety of remedies, including unspecified monetary damages. We are vigorously defending ourselves in these lawsuits.

At June 30, 2018, we had a total of $259 million , net of expected insurance recoveries, accrued for losses and legal defense costs related to the Cordis IVC filter lawsuits. While we have recorded accruals based on our assessment of these matters, because these lawsuits are in early stages, we are unable to estimate a range of reasonably possible losses in excess of this accrued amount.

## 10. Guarantees

In the ordinary course of business, we agree to indemnify certain other parties under acquisition and disposition agreements, customer agreements, intellectual property licensing agreements, and other agreements. Such indemnification obligations vary in scope and, when defined, in duration. In many cases, a maximum obligation is not explicitly stated, and therefore the overall maximum amount of the liability under such indemnification obligations cannot be reasonably estimated. Where appropriate, such indemnification obligations are recorded as a liability. Historically, we have not, individually or in the aggregate, made payments under these indemnification obligations in any material amounts. In certain circumstances, we believe that existing insurance arrangements, subject to the general deduction and exclusion provisions, would cover portions of the liability that may arise from these indemnification

obligations. In addition, we believe that the likelihood of a material liability being triggered under these indemnification obligations is not probable.

From time to time we enter into agreements that obligate us to make fixed payments upon the occurrence of certain events. Such obligations primarily relate to obligations arising under acquisition transactions, where we have agreed to make payments based upon the achievement of certain financial performance measures by the acquired business. Generally, the obligation is capped at an explicit amount. See Note 11 for detail regarding contingent consideration obligations.

## 11. Fair Value Measurements

The following tables present the fair values for assets and (liabilities) measured on a recurring basis at June 30:

| (in millions) | 2018 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 200 | $ — | $ — | $ 200 |
| Other investments (2) | 117 | — | — | 117 |
| **Liabilities:** | | | | |
| Contingent consideration (3) | — | — | (1) | (1) |
| Forward contracts (4) | — | (76) | — | (76) |

| (in millions) | 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 739 | $ — | $ — | $ 739 |
| Available-for-sale securities (1) | — | 65 | — | 65 |
| Other investments (2) | 116 | — | — | 116 |
| **Liabilities:** | | | | |
| Contingent consideration (3) | — | — | (32) | (32) |
| Forward contracts (4) | — | (21) | — | (21) |

(1) We invest in marketable securities, which are classified as available-for-sale and are carried at fair value in the consolidated balance sheets. Observable Level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit risk are used to determine the fair value. See Note 6 for additional information regarding available-for-sale securities.

(2) Level 1 other investments balance includes investments in mutual funds, which are used to offset fluctuations in deferred compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

(3) Contingent consideration represents the obligations incurred in connection with acquisitions. We do not deem the fair value of the contingent consideration obligations under any single acquisition to be significant. The estimate of fair value of the contingent consideration obligations requires subjective assumptions to be made regarding future business results, discount rates, discount periods, and probabilities assigned to various potential business result scenarios and was determined using probability assessments with respect to the likelihood of reaching various targets or of achieving certain milestones. The fair value measurement is based on significant inputs unobservable in the market and thus represents a Level 3 measurement. Changes in current expectations of progress could change the probability of achieving the targets within the measurement periods and result in an increase or decrease in the fair value of the contingent consideration obligation.

**Notes to Financial Statements**

(4)  The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable Level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the consolidated balance sheets.

The following table presents those liabilities measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (in millions) | Contingent Consideration Obligation |
|---|---|
| Balance at June 30, 2016 | $ 19 |
| Additions from acquisitions | 21 |
| Changes in fair value of contingent consideration (1) | (5) |
| Payment of contingent consideration | (3) |
| Balance at June 30, 2017 | 32 |
| Additions from acquisitions | 5 |
| Changes in fair value of contingent consideration (1) | (2) |
| Payment of contingent consideration | (35) |
| **Balance at June 30, 2018** | **$ 1** |

The sum of the components may not equal the total due to rounding.

(1)  Amount is included in amortization and other acquisition-related costs in the consolidated statements of earnings.

## 12. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk, and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to current fair value through earnings at the end of each period.

We are exposed to counterparty credit risk on all of our derivative instruments. Accordingly, we have established and maintain strict counterparty credit guidelines and only enter into derivative instruments with major financial institutions that are investment grade or better. We do not have significant exposure to any one counterparty and we believe the risk of loss is remote. Additionally, we do not require collateral under these agreements.

### Interest Rate Risk Management

We are exposed to the impact of interest rate changes. Our objective is to manage the impact of interest rate changes on cash flows and the market value of our borrowings. We utilize a mix of debt maturities along with both fixed-rate and variable-rate debt to manage changes in interest rates. In addition, we enter into interest rate swaps to further manage our exposure to interest rate variations related to our borrowings and to lower our overall borrowing costs.

### Currency Exchange Risk Management

We conduct business in several major international currencies and are subject to risks associated with changing foreign exchange rates. Our objective is to reduce earnings and cash flow volatility associated with foreign exchange rate changes to allow management to focus its attention on business operations. Accordingly, we enter into various contracts that change in value as foreign exchange rates change to protect the value of existing foreign currency assets and liabilities, commitments and anticipated foreign currency revenue and expenses.

### Commodity Price Risk Management

We are exposed to changes in the price of certain commodities. Our objective is to reduce earnings and cash flow volatility associated with forecasted purchases of these commodities to allow management to focus its attention on business operations. Accordingly, we enter into derivative contracts when possible to manage the price risk associated with certain forecasted purchases.

The following table summarizes the fair value of our assets and liabilities related to derivatives designated as hedging instruments and the respective line items in which they were recorded in the consolidated balance sheets at June 30:

| (in millions) | 2018 | | 2017 | |
|---|---|---|---|---|
| **Assets:** | | | | |
| Foreign currency contracts (1) | $ | 3 | $ | 3 |
| Commodity contracts (1) | | 2 | | — |
| **Total assets** | $ | 5 | $ | 3 |
| | | | | |
| **Liabilities:** | | | | |
| Foreign currency contracts (3) | $ | 3 | $ | 2 |
| Pay-floating interest rate swaps (2) | | 78 | | 19 |
| Pay-floating interest rate swaps (3) | $ | — | $ | 2 |
| Commodity contracts (3) | | — | | 1 |
| **Total liabilities** | $ | 81 | $ | 24 |

(1) Included in prepaid expenses and other in the consolidated balance sheets.
(2)  Included in deferred income taxes and other liabilities in the consolidated balance sheets.
(3)  Included in other accrued liabilities in the consolidated balance sheets.

### Fair Value Hedges

We enter into pay-floating interest rate swaps to hedge the changes in the fair value of fixed-rate debt resulting from fluctuations in interest rates. These contracts are designated and qualify as fair value hedges. Accordingly, the gain or loss recorded on the pay-floating interest rate swaps is directly offset by the change in fair value of the underlying debt. Both the derivative instrument and the underlying debt are adjusted to market value at the end of each period with any resulting gain or loss recorded in interest expense, net in the consolidated statements of earnings.

During fiscal 2018 and 2017 we entered into pay-floating interest rate swaps with total notional amounts of $1.1 billion and $700 million , respectively. These swaps have been designated as fair value hedges of our fixed rate debt and are included in deferred income taxes and other liabilities in the consolidated balance sheets.

Cardinal Health | Fiscal 2018 Form 10-K                    **64**

**Notes to Financial Statements**

During fiscal 2017 we terminated notional amounts of $600 million of pay-floating interest rate swaps that were previously designated as fair value hedges. During fiscal 2018 and 2017 , $550 million and $250 million , respectively, of pay-floating interest rate swaps matured.

The following tables summarize the outstanding interest rate swaps designated as fair value hedges at June 30:

| (in millions) | 2018 | | |
| --- | --- | --- | --- |
| | Notional Amount | Maturity Date | |
| Pay-floating interest rate swaps | $ 2,313 | Nov 2019 | - Sep 2025 |

| (in millions) | 2017 | |
| --- | --- | --- |
| | Notional Amount | Maturity Date |
| Pay-floating interest rate swaps | $ 1,813 | Jun 2018 - Sep 2025 |

The following table summarizes the gain/(loss) recognized in earnings for interest rate swaps designated as fair value hedges:

| (in millions) | 2018 | 2017 | 2016 |
| --- | --- | --- | --- |
| Pay-floating interest rate swaps (1) | $ 11 | $ 17 | $ 23 |
| Fixed-rate debt (1) | (11) | (17) | (23) |

(1) Included in interest expense, net in the consolidated statements of earnings.

There was no ineffectiveness associated with these derivative instruments for any periods presented.

## Cash Flow Hedges

We enter into derivative instruments to hedge our exposure to changes in cash flows attributable to interest rate, foreign currency and commodity price fluctuations associated with certain forecasted transactions. These derivative instruments are designated and qualify as cash flow hedges. Accordingly, the effective portion of the gain or loss on the derivative instrument is reported as a component of other comprehensive income and reclassified into earnings in the same line item associated with the forecasted transaction and in the same period during which the hedged transaction affects earnings. The ineffective portion of the gain or loss on the derivative instrument is recognized in earnings immediately.

During fiscal 2017 we entered into forward interest rate swaps with a total notional amount of $700 million to hedge probable, but not firmly committed, future transactions associated with our debt.

During fiscal 2017 we terminated $1.0 billion in forward interest rate swaps that were previously designated as cash-flow hedges.

We enter into foreign currency contracts to protect the value of anticipated foreign currency revenues and expenses. At June 30, 2018 and 2017 , we held contracts to hedge probable, but not firmly committed, revenue and expenses. The principal currencies hedged are the Canadian dollar, Thai baht, Euro, and Mexican peso.

We enter into commodity contracts to manage the price risk associated with forecasted purchases of certain commodities used in our Medical segment.

The following tables summarize the outstanding cash flow hedges at June 30:

| (in millions) | 2018 | | |
| --- | --- | --- | --- |
| | Notional Amount | Maturity Date | |
| Foreign currency contracts | $ 124 | Jul 2018 | - Jun 2019 |
| Commodity contracts | 12 | Jul 2018 | - Oct 2020 |

| (in millions) | 2017 | | |
| --- | --- | --- | --- |
| | Notional Amount | Maturity Date | |
| Foreign currency contracts | $ 162 | Jul 2017 | - Jun 2018 |
| Commodity contracts | 17 | Jul 2017 | - Apr 2020 |

The following table summarizes the gain/(loss) included in AOCI for derivative instruments designated as cash flow hedges at June 30:

| (in millions) | 2018 | 2017 |
| --- | --- | --- |
| Commodity contracts | 2 | (1) |
| Foreign currency contracts | (2) | — |

The following table summarizes the gain/(loss) reclassified from AOCI into earnings for derivative instruments designated as cash flow hedges:

| (in millions) | 2018 | 2017 | 2016 |
| --- | --- | --- | --- |
| Foreign currency contracts (1) | $ 1 | $ (1) | $ 1 |
| Foreign currency contracts (2) | — | (1) | 5 |
| Foreign currency contracts (3) | (2) | 2 | (3) |
| Commodity contracts (3) | — | (3) | (5) |

(1) Included in revenue in the consolidated statements of earnings.

(2) Included in cost of products sold in the consolidated statements of earnings.

(3) Included in SG&A expenses in the consolidated statements of earnings.

The amount of ineffectiveness associated with these derivative instruments was immaterial for all periods presented.

## Economic (Non-Designated) Hedges

We enter into foreign currency contracts to manage our foreign exchange exposure related to sales transactions, intercompany financing transactions and other balance sheet items subject to revaluation that do not meet the requirements for hedge accounting treatment. Accordingly, these derivative instruments are adjusted to current market value at the end of each period through earnings. The gain or loss recorded on these instruments is substantially offset by the remeasurement adjustment on the foreign currency denominated asset or liability. The settlement of the derivative instrument and the remeasurement adjustment on the foreign currency denominated asset or liability are both recorded in other (income)/expense, net. The principal currencies managed through foreign currency contracts are the Euro, Canadian dollar, British pound, Japanese yen, and Chinese renminbi.

The following tables summarize the outstanding economic (non-designated) derivative instruments at June 30:

| (in millions) | 2018 | | |
| --- | --- | --- | --- |
| | Notional Amount | Maturity Date | |
| Foreign currency contracts | $ 550 | Jul 2018 | - Jun 2019 |

**Notes to Financial Statements**

| (in millions) | 2017 | |
|---|---|---|
| | Notional Amount | Maturity Date |
| Foreign currency contracts | $ 558 | Jul 2017 |

The following table summarizes the gain/(loss) recognized in earnings for economic (non-designated) derivative instruments:

| (in millions) | **2018** | 2017 | 2016 |
|---|---|---|---|
| Foreign currency contracts (1) | **$ (5)** | $ (5) | $ (17) |

(1) Included in other income, net in the consolidated statements of earnings.

## Fair Value of Financial Instruments

The carrying amounts of cash and equivalents, trade receivables, net, accounts payable, and other accrued liabilities at June 30, 2018 and 2017 approximate fair value due to their short-term maturities.

The following table summarizes the estimated fair value of our long-term obligations and other short-term borrowings compared to the respective carrying amounts at June 30:

| (in millions) | **2018** | 2017 |
|---|---|---|
| Estimated fair value | **$ 8,852** | $ 10,713 |
| Carrying amount | **9,013** | 10,395 |

The fair value of our long-term obligations and other short-term borrowings is estimated based on either the quoted market prices for the same or similar issues or other inputs derived from available market information, which represents a Level 2 measurement.

The following table is a summary of the fair value gain/(loss) of our derivative instruments based upon the estimated amount that we would receive (or pay), considering counter-party credit risk, to terminate the contracts at June 30:

| (in millions) | **2018** | | 2017 | |
|---|---|---|---|---|
| | **Notional Amount** | **Fair Value Gain/(Loss)** | Notional Amount | Fair Value Gain/(Loss) |
| Pay-floating interest rate swaps | **$ 2,313** | **$ (78)** | $ 1,813 | $ (19) |
| Foreign currency contracts | **674** | **—** | 720 | 1 |
| Commodity contracts | **12** | **—** | 17 | (1) |

## 13. Redeemable Noncontrolling Interests

In connection with the acquisition of a 71 percent ownership interest in naviHealth during fiscal 2016 , we recognized redeemable noncontrolling interests with a fair value of $119 million at the acquisition date.

In August 2017, certain third-party noncontrolling interest holders exercised their put right on the noncontrolling interest representing 16 percent of naviHealth with a redemption value of $ 103 million and a carrying value of $ 109 million . We settled the put in September 2017 and our ownership in naviHealth increased to 98 percent , up from 82 percent at June 30, 2017 and 2016.

In June 2018, we entered into a Securities Purchase Agreement and related Contribution and Rollover Agreement to sell our 98 percent ownership interest in naviHealth, which closed on August 1, 2018. See Note 4 and Note 19 for more information.

The reconciliation of the changes in redeemable noncontrolling interests are as follows:

| (in millions) | Redeemable Noncontrolling Interests |
|---|---|
| Balance at June 30, 2016 | $ 117 |
| Net earnings attributable to redeemable noncontrolling interests | 4 |
| Net purchase of redeemable noncontrolling interests | (3) |
| Balance at June 30, 2017 | 118 |
| Net earnings attributable to redeemable noncontrolling interest | 2 |
| Net purchase of redeemable noncontrolling interests | (103) |
| Adjustment of redeemable noncontrolling interests to redemption value | (5) |
| **Balance at June 30, 2018** | **$ 12** |

## 14. Shareholders' Equity

At June 30, 2018 and 2017 , authorized capital shares consisted of the following: 750 million Class A common shares, without par value; 5 million Class B common shares, without par value; and 500 thousand non-voting preferred shares, without par value. The Class A common shares and Class B common shares are collectively referred to below as "common shares". Holders of common shares are entitled to share equally in any dividends declared by the Board of Directors and to participate equally in all distributions of assets upon liquidation. Generally, the holders of Class A common shares are entitled to one vote per share, and the holders of Class B common shares are entitled to one-fifth of one vote per share on proposals presented to shareholders for vote. Under certain circumstances, the holders of Class B common shares are entitled to vote as a separate class. Only Class A common shares were outstanding at June 30, 2018 and 2017 .

We repurchased $1.8 billion of our common shares, in the aggregate, through share repurchase programs during fiscal 2018 , 2017 and 2016 , as described below. We funded the repurchases with available cash and short term borrowings. The common shares repurchased are held in treasury to be used for general corporate purposes.

During fiscal 2018 , we repurchased 8.4 million common shares having an aggregate cost of $550 million . The average price paid per common share was $65.30 . These repurchases include $300 million purchased under an accelerated share repurchase ("ASR") program, which began on February 14, 2018 and was completed on March 21, 2018. We repurchased 4.3 million shares under the ASR at an average price paid per share of $69.26 .

During fiscal 2017 , we repurchased 8.1 million common shares having an aggregate cost of $600 million . The average price paid per common share was $74.08 .

During fiscal 2016 , we repurchased 8.2 million common shares having an aggregate cost of $651 million . The average price paid per common share was $78.98 .

During fiscal 2017 , we retired 37 million common shares in treasury. The retirement of these shares had no impact on total shareholders' equity; however, it did impact certain individual components of

## Notes to Financial Statements

shareholders' equity as follows: $2.5 billion decrease in common shares in treasury, $302 million decrease in common shares, and $2.2 billion decrease in retained earnings.

### Accumulated Other Comprehensive Income/(Loss)

The following table summarizes the changes in the balance of accumulated other comprehensive income/(loss) by component and in total:

| (in millions) | Foreign Currency Translation Adjustments and other | Unrealized Gain/(Loss) on Derivatives, net of tax | Accumulated Other Comprehensive Income/(Loss) |
|---|---|---|---|
| Balance at June 30, 2016 | $ (123) | $ 7 | $ (116) |
| Other comprehensive income/(loss), net before reclassifications | (25) | 19 | (6) |
| Amounts reclassified to earnings | — | (3) | (3) |
| Total other comprehensive loss attributable to Cardinal Health, Inc., net of tax of $9 million | (25) | 16 | (9) |
| Balance at June 30, 2017 | (148) | 23 | (125) |
| Other comprehensive income/(loss), before reclassifications | 58 | — | 58 |
| Amounts reclassified to earnings | (23) | (2) | (25) |
| Total comprehensive income/(loss) attributable to Cardinal Health, Inc., net of tax of $1 million | 35 | (2) | 33 |
| Balance at June 30, 2018 | $ (113) | $ 21 | $ (92) |

Activity related to realized and unrealized gains and losses on available-for-sale securities, as described in Note 6 , was immaterial during fiscal 2018 and 2017 .

## 15. Earnings Per Share Attributable to Cardinal Health, Inc.

The following table reconciles the computation of basic and diluted earnings per share attributable to Cardinal Health, Inc.:

| (in millions, except per share amounts) | 2018 | 2017 | 2016 |
|---|---|---|---|
| Net earnings | $ 259 | $ 1,294 | $ 1,431 |
| Net earnings attributable to noncontrolling interest | (3) | (6) | (4) |
| Net earnings attributable to Cardinal Health, Inc. | $ 256 | $ 1,288 | $ 1,427 |
| Weighted-average common shares–basic | 313 | 317 | 327 |
| Effect of dilutive securities: | | | |
| Employee stock options, restricted share units, and performance share units | 2 | 3 | 3 |
| Weighted-average common shares–diluted | 315 | 320 | 330 |
| Basic earnings per common share attributable to Cardinal Health, Inc.: | $ 0.82 | $ 4.06 | $ 4.36 |
| Diluted earnings per common share attributable to Cardinal Health, Inc.: | 0.81 | 4.03 | 4.32 |

The potentially dilutive employee stock options, restricted share units and performance share units that were antidilutive for fiscal 2018 , 2017 and 2016 were 6 million , 3 million and 2 million , respectively.

## 16. Segment Information

Our operations are principally managed on a products and services basis and are comprised of two operating segments, which are the same as our reportable segments: Pharmaceutical and Medical. The factors for determining the reportable segments include the manner in which management evaluates performance for purposes of allocating resources and assessing performance combined with the nature of the individual business activities.

The Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical and over-the-counter healthcare and consumer products in the United States. This segment also provides services to pharmaceutical manufacturers and healthcare providers to support the development, marketing, and distribution of specialty pharmaceutical products; operates nuclear pharmacies and radiopharmaceutical manufacturing facilities; provides pharmacy management services to hospitals as well as medication therapy management and patient outcomes services to hospitals, other healthcare providers and payers; and repackages generic pharmaceuticals and over-the-counter healthcare products.

Our Medical segment manufactures, sources and distributes Cardinal Health branded medical, surgical and laboratory products, which are sold in the United States, Canada, Europe, Asia and other markets. We further expanded this segment's portfolio of manufactured products through the acquisition of the Patient Recovery Business from Medtronic in July 2017, which includes incontinence, wound care, enteral feeding, urology, operating room supply, electrode and needle, syringe and sharps disposal product lines. In addition to distributing Cardinal Health branded products, this segment also distributes a broad range of national brand products and provides supply chain services and solutions to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States and Canada .

The following table presents revenue for each reportable segment and Corporate:

| (in millions) | 2018 | 2017 | 2016 |
|---|---|---|---|
| Pharmaceutical | $ 121,241 | $ 116,463 | $ 109,131 |
| Medical | 15,581 | 13,524 | 12,430 |
| Total segment revenue | 136,822 | 129,987 | 121,561 |
| Corporate (1) | (13) | (11) | (15) |
| Total revenue | $ 136,809 | $ 129,976 | $ 121,546 |

(1) Corporate revenue consists of the elimination of inter-segment revenue and other revenue not allocated to the segments.

We evaluate segment performance based on segment profit, among other measures. Segment profit is segment revenue, less segment cost of products sold, less segment distribution, selling, general, and administrative ("SG&A") expenses. Segment SG&A expenses include share-based compensation expense as well as allocated corporate expenses for shared functions, including corporate

**Notes to Financial Statements**

management, corporate finance, financial and customer care shared services, human resources, information technology, and legal and compliance. The results attributable to noncontrolling interests of consolidated entities are recorded within segment profit. Corporate expenses are allocated to the segments based on headcount, level of benefit provided, and other ratable allocation methodologies.

We do not allocate the following items to our segments: LIFO inventory charges/(credits); restructuring and employee severance; amortization and other acquisition-related costs; impairments and (gain)/loss on disposal of assets; litigation (recoveries)/charges, net; other income/expense, net; interest expense, net; loss on extinguishment of debt; and provision for/(benefit from) income taxes.

In addition, certain investment spending, certain portions of enterprise-wide incentive compensation, and other spending are not allocated to the segments. Investment spending generally includes the first-year spend for certain projects that require incremental investments in the form of additional operating expenses. We encourage our segments and corporate functions to identify investment projects that will promote innovation and provide future returns. As approval decisions for such projects are dependent upon executive management, the expenses for such projects are often retained at Corporate. Investment spending within Corporate was $43 million , $17 million and $34 million for fiscal 2018 , 2017 and 2016 , respectively.

The following tables present segment profit by reportable segment and Corporate:

| (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Pharmaceutical | $ | 1,992 | $ | 2,187 | $ | 2,488 |
| Medical | | 662 | | 572 | | 457 |
| Total segment profit | | 2,654 | | 2,759 | | 2,945 |
| Corporate | | (2,528) | | (639) | | (486) |
| Total operating earnings | $ | 126 | $ | 2,120 | $ | 2,459 |

The following tables present depreciation and amortization and additions to property and equipment by reportable segment and Corporate:

| (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Pharmaceutical | $ | 156 | $ | 122 | $ | 128 |
| Medical | | 278 | | 156 | | 136 |
| Corporate | | 598 | | 439 | | 377 |
| Total depreciation and amortization | $ | 1,032 | $ | 717 | $ | 641 |

| (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Pharmaceutical | $ | 58 | $ | 50 | $ | 88 |
| Medical | | 127 | | 123 | | 96 |
| Corporate | | 199 | | 214 | | 281 |
| Total additions to property and equipment | $ | 384 | $ | 387 | $ | 465 |

The following table presents total assets for each reportable segment and Corporate at June 30:

| (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Pharmaceutical | $ | 21,421 | $ | 21,848 | $ | 20,662 |
| Medical | | 16,066 | | 10,688 | | 10,236 |
| Corporate | | 2,464 | | 7,576 | | 3,224 |
| Total assets | $ | 39,951 | $ | 40,112 | $ | 34,122 |

The following tables present revenue and property and equipment, net by geographic area:

| (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| United States | $ | 132,526 | $ | 125,006 | $ | 116,864 |
| International | | 4,283 | | 4,970 | | 4,682 |
| Total revenue | $ | 136,809 | $ | 129,976 | $ | 121,546 |

| (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| United States | $ | 1,950 | $ | 1,623 | $ | 1,558 |
| International | | 537 | | 256 | | 238 |
| Property and equipment, net | $ | 2,487 | $ | 1,879 | $ | 1,796 |

## 17. Share-Based Compensation

We maintain stock incentive plans (collectively, the "Plans") for the benefit of certain of our officers, directors and employees. At June 30, 2018 , 19 million shares remain available for future grants under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan ("2011 LTIP"). Under the 2011 LTIP's fungible share counting provisions, stock options are counted against the plan as one share for every share issued ; awards other than stock options are counted against the plan as two and one-half shares for every share issued . This means that only 8 million shares could be issued under awards other than stock options while 19 million shares could be issued under stock options. Shares are issued out of treasury shares when stock options are exercised and when restricted share units and performance share units vest.

The following table provides total share-based compensation expense by type of award:

| (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Restricted share unit expense | $ | 73 | $ | 69 | $ | 69 |
| Employee stock option expense | | 22 | | 19 | | 21 |
| Performance share unit expense | | (10) | | 8 | | 21 |
| Total share-based compensation expense | $ | 85 | $ | 96 | $ | 111 |

The total tax benefit related to share-based compensation was $23 million , $34 million and $38 million for fiscal 2018 , 2017 and 2016 , respectively.

### Restricted Share Units

Restricted share units granted under the Plans generally vest in equal annual installments over three years . Restricted share units accrue cash dividend equivalents that are payable upon vesting of the awards.

**Notes to Financial Statements**

The following table summarizes all transactions related to restricted share units under the Plans:

| (in millions, except per share amounts) | Restricted Share Units | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|
| Nonvested at June 30, 2016 | 2 | $ 71.73 |
| Granted | 1 | 82.34 |
| Vested | (1) | 69.23 |
| Canceled and forfeited | — | — |
| Nonvested at June 30, 2017 | 2 | 76.72 |
| Granted | 1 | 65.97 |
| Vested | (1) | 78.92 |
| Canceled and forfeited | — | — |
| **Nonvested at June 30, 2018** | **2** | **$ 71.58** |

The following table provides additional data related to restricted share unit activity:

| (in millions) | 2018 | 2017 | 2016 |
|---|---|---|---|
| Total compensation cost, net of estimated forfeitures, related to nonvested restricted share and share unit awards not yet recognized, pre-tax | $ 78 | $ 73 | $ 79 |
| Weighted-average period in years over which restricted share and share unit cost is expected to be recognized (in years) | 2 | 2 | 2 |
| Total fair value of shares vested during the year | $ 65 | $ 64 | $ 65 |

## Stock Options

Employee stock options granted under the Plans generally vest in equal annual installments over three years and are exercisable for a period up to ten years from the grant date. All stock options are exercisable at a price equal to the market value of the common shares underlying the option on the grant date.

The following table summarizes all stock option transactions under the Plans:

| (in millions, except per share amounts) | Stock Options | Weighted-Average Exercise Price per Common Share |
|---|---|---|
| Outstanding at June 30, 2016 | 7 | $ 54.09 |
| Granted | 1 | 83.09 |
| Exercised | (2) | 37.79 |
| Canceled and forfeited | — | — |
| Outstanding at June 30, 2017 | 6 | 63.44 |
| Granted | 2 | 66.39 |
| Exercised | (1) | 43.12 |
| Canceled and forfeited | — | — |
| **Outstanding at June 30, 2018** | **7** | **$ 64.50** |
| **Exercisable at June 30, 2018** | **5** | **$ 59.60** |

The following table provides additional detail related to stock options:

| (in millions, except per share amounts) | 2018 | 2017 | 2016 |
|---|---|---|---|
| Aggregate intrinsic value of outstanding options at period end | $ 13 | $ 109 | $ 181 |
| Aggregate intrinsic value of exercisable options at period end | 13 | 106 | 161 |
| Aggregate intrinsic value of exercised options | 14 | 73 | 63 |
| Net proceeds/(withholding) from share-based compensation | (3) | 26 | 6 |
| Excess tax benefits from share based compensation | 10 | 34 | 33 |
| Total compensation cost, net of estimated forfeitures, related to unvested stock options not yet recognized, pre-tax | 17 | 22 | 22 |
| Total fair value of shares vested during the year | 19 | 19 | 20 |
| Weighted-average grant date fair value per stock option | 13.50 | 16.67 | 17.40 |

| (in years) | 2018 | 2017 | 2016 |
|---|---|---|---|
| Weighted-average remaining contractual life of outstanding options | 7 | 7 | 6 |
| Weighted-average remaining contractual life of exercisable options | 5 | 6 | 5 |
| Weighted-average period over which stock option compensation cost is expected to be recognized | 2 | 2 | 2 |

Stock options are granted to our officers and certain employees. The fair values were estimated on the grant date using a lattice valuation model. We believe the lattice model provides reasonable estimates because it has the ability to take into account individual exercise patterns based on changes in our stock price and other variables, and it provides for a range of input assumptions, which are disclosed in the table below. The risk-free rate is based on the U.S. Treasury yield curve at the time of the grant. We analyzed historical data to estimate option exercise behaviors and employee terminations to be used within the lattice model. The expected life of the options granted was calculated from the option valuation model and represents the length of time in years that the options granted are expected to be outstanding. Expected volatilities are based on implied volatility from traded options on our common shares and historical volatility over a period of time commensurate with the contractual term of the option grant (up to ten years ).

The following table provides the range of assumptions used to estimate the fair value of stock options:

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| Risk-free interest rate | 2.1% | 1.4% - 2.0% | 1.5% - 1.9% |
| Expected volatility | 25% | 24% | 23% |
| Dividend yield | 2.7% - 2.8% | 2.2% - 2.5% | 1.8% - 2.0% |
| Expected life in years | 7 | 7 | 7 |

**Notes to Financial Statements**

## Performance Share Units

Performance share units vest over a three -year performance period based on achievement of specific performance goals. Based on the extent to which the targets are achieved, vested shares may range from zero to 200 percent of the target award amount. Performance share units accrue cash dividend equivalents that are payable upon vesting of the awards.

The following table summarizes all transactions related to performance share units under the Plans (based on target award amounts):

| (in millions, except per share amounts) | Performance Share Units | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|
| Nonvested at June 30, 2016 | 0.8 | $ 63.96 |
| Granted | 0.2 | 83.19 |
| Vested (1) | (0.4) | 51.49 |
| Canceled and forfeited | — | — |
| Nonvested at June 30, 2017 | 0.6 | 77.83 |
| Granted | 0.2 | 66.43 |
| Vested (2) | (0.2) | 71.57 |
| Canceled and forfeited | (0.2) | — |
| **Nonvested at June 30, 2018** | **0.4** | **$ 66.13** |

(1) Vested at 170 percent of the target performance share units granted.

(2) Vested at 133 percent of the target performance share units granted.

The following table provides additional data related to performance share unit activity:

| (in millions) | 2018 | 2017 | 2016 |
|---|---|---|---|
| Total compensation cost, net of estimated forfeitures, related to nonvested performance share units not yet recognized, pre-tax | $ 1 | $ 13 | $ 17 |
| Weighted-average period over which performance share unit cost is expected to be recognized (in years) | 2 | 2 | 2 |
| Total fair value of shares vested during the year | $ 14 | $ 19 | $ 16 |

## Employee Retirement Savings Plans

Substantially all of our domestic non-union employees are eligible to be enrolled in our company-sponsored contributory retirement savings plans, which include features under Section 401(k) of the Internal Revenue Code of 1986, and provide for matching and profit sharing contributions by us. Our contributions to the plans are determined by the Board of Directors subject to certain minimum requirements as specified in the plans. The total expense for our employee retirement savings plans was $129 million , $49 million and $84 million for fiscal 2018 , 2017 and 2016 , respectively.

## 18. Selected Quarterly Financial Data (Unaudited)

The following is selected quarterly financial data for fiscal 2018 and 2017 . The sum of the quarters may not equal year-to-date due to rounding.

| (in millions, except per common share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **Fiscal 2018** | | | | |
| Revenue | $ 32,641 | $ 35,186 | $ 33,633 | $ 35,349 |
| Gross margin (1) | 1,672 | 1,861 | 1,913 | 1,735 |
| Distribution, selling, general and administrative expenses | 1,062 | 1,131 | 1,132 | 1,270 |
| Net earnings/(loss) (2) | 117 | 1,053 | 255 | (1,166) |
| Less: Net earnings attributable to noncontrolling interests | (2) | — | — | — |
| Net earnings/(loss) attributable to Cardinal Health, Inc. | 115 | 1,053 | 255 | (1,166) |
| **Net earnings/(loss) attributable to Cardinal Health, Inc. per common share:** | | | | |
| Basic | $ 0.36 | $ 3.35 | $ 0.81 | $ (3.76) |
| Diluted (3) | 0.36 | 3.33 | 0.81 | (3.76) |

(1) Gross margin was not impacted by LIFO benefit/(charges) in fiscal 2018.

(2) During the fourth quarter of fiscal 2018, we recognized a goodwill impairment charge of $ 1.4 billion related to our Medical segment. There was no tax benefit related to this goodwill impairment charge.

(3) Due to the net loss during the fourth quarter of fiscal 2018, dilutive potential common shares have not been included in the denominator of the dilutive per share computation due to their antidilutive effect.

| (in millions, except per common share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Fiscal 2017 | | | | |
| Revenue | $ 32,039 | $ 33,150 | $ 31,821 | $ 32,966 |
| Gross margin (4) | 1,590 | 1,602 | 1,728 | 1,623 |
| Distribution, selling, general and administrative expenses | 920 | 910 | 960 | 983 |
| Net earnings | 310 | 324 | 382 | 278 |
| Less: Net earnings attributable to noncontrolling interests | (1) | — | (1) | (4) |
| Net earnings attributable to Cardinal Health, Inc. | 309 | 324 | 381 | 274 |
| Net earnings attributable to Cardinal Health, Inc. per common share: | | | | |
| Basic | $ 0.97 | $ 1.02 | $ 1.21 | $ 0.87 |
| Diluted | 0.96 | 1.02 | 1.20 | 0.86 |

(4) Gross margin is impacted by LIFO benefit/(charges) of $ 9 million and $(9) million in the second and third quarter, respectively. We did not have LIFO benefits/(charges) in the fourth quarter.

## 19. Subsequent Events

In June 2018, we entered into a Securities Purchase Agreement and related Contribution and Rollover Agreement with investor entities controlled by CD&R. Pursuant to those agreements, on August 1, 2018, we sold our 98% ownership interest in naviHealth in exchange for proceeds of $736 million (after adjusting for certain fees and expenses) and a 44% equity interest in a partnership that owns 100% of the equity interest of naviHealth. We also have certain call rights to reacquire naviHealth.

On August 16, 2018 we entered into an ASR program to purchase shares of our common stock for an aggregate purchase price of $ 600 million and received an initial delivery of  9.5 million  shares of common stock using a reference price of $ 50.45 . The program is expected to conclude in the second quarter of fiscal 2019.

**Schedule II** — Valuation and Qualifying Accoun ts

# Cardinal Health, Inc. and Subsidiaries
## Schedule II - Valuation and Qualifying Accounts [1]

| (in millions) | Balance at Beginning of Period | | Charged to Costs and Expenses (1) | | Charged to Other Accounts (2) | | Deductions (3) | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| **Fiscal 2018** | | | | | | | | | |
| Accounts receivable | $ | 137 | $ | 113 | $ | 1 | $ | (111) | $ | 139 |
| Finance notes receivable | | 9 | | (2) | | — | | — | | 7 |
| Sales returns and allowances | | 347 | | 2,402 | | — | | (2,270) | | 479 |
| Other | | 1 | | — | | — | | — | | 1 |
| | $ | 494 | $ | 2,513 | $ | 1 | $ | (2,381) | $ | 626 |
| | | | | | | | | | | |
| Fiscal 2017 | | | | | | | | | |
| Accounts receivable | $ | 135 | $ | 59 | $ | 1 | $ | (58) | $ | 137 |
| Finance notes receivable | | 19 | | 3 | | — | | (13) | | 9 |
| Sales returns and allowances | | 386 | | 2,285 | | — | | (2,324) | | 347 |
| Other | | 1 | | — | | — | | — | | 1 |
| | $ | 541 | $ | 2,347 | $ | 1 | $ | (2,395) | $ | 494 |
| | | | | | | | | | | |
| Fiscal 2016 | | | | | | | | | |
| Accounts receivable | $ | 135 | $ | 72 | $ | 2 | $ | (74) | $ | 135 |
| Finance notes receivable | | 14 | | 6 | | — | | (1) | | 19 |
| Sales returns and allowances | | 305 | | 2,207 | | — | | (2,126) | | 386 |
| Other | | 1 | | — | | — | | — | | 1 |
| | $ | 455 | $ | 2,285 | $ | 2 | $ | (2,201) | $ | 541 |

(1)   Fiscal 2018 , 2017 and 2016 include $3 million , $5 million and $5 million , respectively, for reserves related to customer pricing disputes, excluded from provision for bad debts on the consolidated statements of cash flows and classified as a reduction in revenue in the consolidated statements of earnings.

(2)   Recoveries of amounts provided for or written off in prior years were $1 million , $1 million and $2 million for fiscal 2018 , 2017 and 2016 , respectively.

(3)   Write-off of uncollectible accounts or actual sales returns.

 The sum of the components may not equal the total due to rounding.

# Directors, Executive Officers and Corporate Governance

The following is a list of our executive officers:

| Name | Age | Position |
|------|-----|----------|
| George S. Barrett | 63 | Executive Chairman of the Board |
| Michael C. Kaufmann | 55 | Chief Executive Officer |
| Jorge M. Gomez | 50 | Chief Financial Officer |
| Jon L. Giacomin | 53 | Chief Executive Officer, Medical segment |
| Michele A. M. Holcomb | 50 | Executive Vice President, Strategy and Corporate Development |
| Pamela O. Kimmet | 60 | Chief Human Resources Officer |
| Craig S. Morford | 59 | Chief Legal and Compliance Officer |
| Patricia B. Morrison | 59 | Executive Vice President, Customer Support Services and Chief Information Officer |

The business experience summaries provided below for our executive officers describe positions held during the last five years (unless otherwise indicated).

Mr. Barrett has served as Executive Chairman of the Board since January 2018. Prior to that, he served as Chairman and Chief Executive Officer from August 2009. He will retire in November 2018.

Mr. Kaufmann has served as Chief Executive Officer since January 2018. From November 2014 through December 2017, he served as Chief Financial Officer. From August 2009 until November 2014, he served as Chief Executive Officer, Pharmaceutical segment.

Mr. Gomez has served as Chief Financial Officer since January 2018. From June 2015 through December 2017, he served as Senior Vice President and CFO, Medical Segment. From February 2012 until June 2015, he was Senior Vice President and CFO, Pharmaceutical segment.

Mr. Giacomin has served as Chief Executive Officer, Medical segment since February 2018. From November 2014 to February 2018, he served as Chief Executive Officer, Pharmaceutical segment. From January 2011 until November 2014, he served as President, U.S. Pharmaceutical Distribution.

Ms. Holcomb has served as Executive Vice President, Strategy and Corporate Development since January 2017. She joined us from Teva Pharmaceutical Industries Ltd., where she served as Senior Vice President, Strategy, Portfolio, Search, and Partnerships and Chief Operating Officer, Global R&D from October 2015 to December 2016 and Senior Vice President, Chief Operating Officer, Global R&D from September 2012 to September 2015.

Ms. Kimmet has served as Chief Human Resources Officer since June 2016. Prior to joining us, Ms. Kimmet served as Senior Vice President, Human Resources at Coca-Cola Enterprises, Inc. from October 2010 to June 2016.

Mr. Morford has served as Chief Legal and Compliance Officer since May 2009.

Ms. Morrison has served as Executive Vice President, Customer Support Services and Chief Information Officer since June 2011. She will retire on September 1, 2018.

We have adopted *Standards of Business Conduct* that apply to all of our directors, officers and employees. The *Standards of Business Conduct* outline our corporate values and standards of integrity and behavior and are designed to protect and promote our reputation. The full text of the *Standards of Business Conduct* is posted on our website at www.cardinalhealth.com under "About Us — Corporate Citizenship — Ethics and Governance — Ethics and Compliance."

Any waiver of the *Standards of Business Conduct* for directors or executive officers must be approved by the Audit Committee. As required under SEC and New York Stock Exchange rules, we will disclose future amendments to our *Standards of Business Conduct* and waivers from the *Standards of Business Conduct* for our principal executive officer, principal financial officer, and principal accounting officer, or persons performing similar functions, and our other executive officers and directors on our website within four business days following the date of the amendment or waiver.

The other information called for by Item 10 of Form 10-K is incorporated by reference to our Definitive Proxy Statement (which will be filed with the SEC pursuant to Regulation 14A under the Exchange Act) relating to our 2018 Annual Meeting of Shareholders (our "2018 Proxy Statement") under the captions "Corporate Governance" and "Share Ownership Information."

# Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The table below summarizes information relating to our equity compensation plans at June 30, 2018.

**Equity Compensation Plan Information**

| Plan Category | Common Shares to be Issued Upon Exercise of Outstanding Options and Rights (#) | | Weighted Average Exercise Price of Outstanding Options ($) | | Common Shares Remaining Available for Future Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (#) | |
|---|---|---|---|---|---|---|
| | (a) | | (b) | | (c) | |
| Equity compensation plans approved by shareholders | 10,320,017 | (1) | $ 64.50 | (1) | 19,305,951 | (2) |
| Equity compensation plans not approved by shareholders | 4,203 | (3) | — | (3) | — | |
| Total at June 30, 2018 | 10,324,220 | | | | 19,305,951 | |

(1)    In addition to stock options outstanding under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (the "2011 LTIP") and the Cardinal Health, Inc. 2005 Long-Term Incentive Plan (the "2005 LTIP"), also includes 827,766 PSUs and 2,165,340 RSUs outstanding under the 2011 LTIP, 10,241 PSUs and 61,861 RSUs outstanding under the 2005 LTIP, and 165,024 RSUs outstanding under the 2007 Nonemployee Directors Equity Incentive Plan that are payable solely in common shares. PSUs and RSUs do not have an exercise price, and therefore were not included for purposes of computing the weighted-average exercise price. PSUs granted in fiscal 2015 are not reported in this table because they expired without any shares vesting. PSUs granted in fiscal 2016 and 2017 are reported in this table at the maximum payout level (200% of target) in accordance with SEC rules.

(2)    Reflects common shares available under the 2011 LTIP in the form of stock options and other stock-based awards. Under the 2011 LTIP's fungible share counting provisions, stock options are counted against the plan as one share for every common share issued; awards other than stock options are counted against the plan as two and one-half shares for every common share issued. This means that only 7,722,380 shares could be issued under awards other than stock options while 19,305,951 shares could be issued under stock options.

(3)    RSUs outstanding under the Cardinal Health, Inc. Amended and Restated Outside Directors Equity Incentive Plan that are payable solely in common shares. RSUs do not have an exercise price, and therefore were not included for purposes of computing the weighted-average exercise price.

The other information called for by Item 12 of Form 10-K is incorporated by reference to our 2018 Proxy Statement under the caption "Share Ownership Information."

**Exhibits**

# Exhibits, Financial Statement Schedules

(a)(1) The following financial statements are included in the "Financial Statements" section of this report:

|  | Page |
|---|---|
| Consolidated Financial Statements and Schedule: | **42** |
| Consolidated Statements of Earnings for the Fiscal Years Ended June 30, 2018, 2017 and 2016 | **43** |
| Consolidated Statements of Comprehensive Income for the Fiscal Years Ended June 30, 2018, 2017 and 2016 | **44** |
| Consolidated Balance Sheets at June 30, 2018 and 2017 | **45** |
| Consolidated Statements of Shareholders' Equity for the Fiscal Years Ended June 30, 2018, 2017 and 2016 | **46** |
| Consolidated Statements of Cash Flows for the Fiscal Years Ended June 30, 2018, 2017 and 2016 | **47** |
| Notes to Consolidated Financial Statements | **48** |

(a)(2) The following Supplemental Schedule is included in this report:

|  | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | **72** |

All other schedules not listed above have been omitted as not applicable or because the required information is included in the Consolidated Financial Statements or in the Notes thereto.

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1.1 | Stock and Asset Purchase Agreement, dated April 18, 2017, between Cardinal Health, Inc. and Medtronic plc (incorporated by reference to Exhibit 2.1 to Cardinal Health's Current Report on Form 8-K filed on April 18, 2017, File No. 1-11373) |
| 2.1.2 | Amendment No. 1, dated as of July 28, 2017, to Stock and Asset Purchase Agreement, dated April 18, 2017, between Cardinal Health, Inc. and Medtronic plc (incorporated by reference to Exhibit 2.2.2 to Cardinal Health's Annual Report on Form 10-K for the year ended June 30, 2017, File No. 1-11373) |
| 2.1.3 | Letter Agreement, dated November 21, 2017, by and between Cardinal Health, Inc. and Medtronic, plc (incorporated by reference to Exhibit 2.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2017, File No. 1-11373) |
| 3.1 | Amended and Restated Articles of Incorporation of Cardinal Health, Inc., as amended (incorporated by reference to Exhibit 3.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373) |
| 3.2 | Cardinal Health, Inc. Restated Code of Regulations (incorporated by reference to Exhibit 3.2 to Cardinal Health's Current Report on Form 8-K filed on June 30, 2016, File No. 1-11373) |
| 4.1 | Specimen Certificate for Common Shares of Cardinal Health, Inc. (incorporated by reference to Exhibit 4.01 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2001, File No. 1-11373) |
| 4.2.1 | Indenture, dated as of June 2, 2008, between Cardinal Health, Inc. and The Bank of New York Trust Company, N.A. (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 2, 2008, File No. 1-11373) |
| 4.2.2 | Form of 4.625% Notes due 2020 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on December 14, 2010, File No. 1-11373) |
| 4.2.3 | Form of 3.200% Notes due 2022 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on May 21, 2012, File No. 1-11373) |
| 4.2.4 | Form of 1.700% Notes due 2018 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.2.5 | Form of 3.200% Notes due 2023 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.2.6 | Form of 4.600% Notes due 2043 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on February 22, 2013, File No. 1-11373) |
| 4.2.7 | Form of 2.400% Notes due 2019 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |
| 4.2.8 | Form of 3.500% Notes due 2024 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |
| 4.2.9 | Form of 4.500% Notes due 2044 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on November 19, 2014, File No. 1-11373) |
| 4.2.10 | Form of 1.950% Notes due 2018 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |
| 4.2.11 | Form of 3.750% Notes due 2025 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |

**Exhibits**

| | |
|---|---|
| 4.2.12 | Form of 4.900% Notes due 2045 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on June 23, 2015, File No. 1-11373) |
| 4.2.13 | Form of 1.948% notes due 2019 (incorporated by reference to Exhibit 4.1 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.14 | Form of 2.616% notes due 2022 (incorporated by reference to Exhibit 4.2 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.15 | Form of Floating rate notes due 2022 (incorporated by reference to Exhibit 4.3 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.16 | Form of 3.079% notes due 2024 (incorporated by reference to Exhibit 4.4 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.17 | Form of 3.410% notes due 2027 (incorporated by reference to Exhibit 4.5 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.2.18 | Form of 4.368% notes due 2047 (incorporated by reference to Exhibit 4.6 to Cardinal Health's Current Report on Form 8-K filed on June 12, 2017, File No. 1-11373) |
| 4.3 | Agreement to furnish to the Securities and Exchange Commission upon request a copy of instruments defining the rights of holders of certain long-term debt of Cardinal Health, Inc. and consolidated subsidiaries (incorporated by reference to Exhibit 4.07 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2005, File No. 1-11373) |
| 10.1.1 | Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.2 | First Amendment to Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.1.3 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.4 | Form of Nonqualified Stock Option Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.3 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)* |
| 10.1.5 | Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.7 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.1.6 | Form of Restricted Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.8 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.1.7 | Form of Performance Share Units Agreement under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Current Report on Form 8-K/A filed on November 4, 2011, File No. 1-11373)* |
| 10.1.8 | Form of Amendment to Stock Option and Restricted Share Units Agreements under the Cardinal Health, Inc. 2011 Long-Term Incentive Plan, the Cardinal Health, Inc. 2005 Long-Term Incentive Plan and the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.1.9 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, File No. 1-11373)* |
| 10.2.1 | Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on November 7, 2016, File No. 1-11373)* |
| 10.2.2 | First Amendment to Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year end June 30, 2017, File No. 1-11373)* |
| 10.2.3 | Form of Nonqualified Stock Option Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.3 to Cardinal Health's Annual Report on Form 10-K for the fiscal year end June 30, 2017, File No. 1-11373)* |
| 10.2.4 | Form of Restricted Share Units Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.4 to Cardinal Health's Annual Report on Form 10-K for the fiscal year end June 30, 2017, File No. 1-11373)* |
| 10.2.5 | Form of Performance Share Units Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.5 to Cardinal Health's Annual Report on Form 10-K for the fiscal year end June 30, 2017, File No. 1-11373)* |
| 10.2.6 | Form of Directors Restricted Share Units Agreement under the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2017, File No. 1-11373) |
| 10.3.1 | Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, File No. 1-11373)* |
| 10.3.2 | First Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.3.3 | Second Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.3.4 | Third Amendment to Cardinal Health, Inc. 2005 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.2.4 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2014)* |
| 10.4.1 | Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, File No. 1-11373)* |
| 10.4.2 | First Amendment to Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.2.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, File No. 1-11373)* |
| 10.4.3 | Second Amendment to the Cardinal Health, Inc. 2007 Nonemployee Directors Equity Incentive Plan (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the Quarter ended December 31, 2011, File No. 1-11373)* |
| 10.5.1 | Cardinal Health Deferred Compensation Plan, as amended and restated effective January 1, 2016 (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2015, File No. 1-11373)* |
| 10.5.2 | First Amendment to the Cardinal Health Deferred Compensation Plan, as amended and restated effective as of January 1, 2016 (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373)* |
| 10.5.3 | Second Amendment, effective as of January 1, 2018, to the Cardinal Health Deferred Compensation Plan, as amended and restated effective as of January 1, 2016 (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2017, File No. 1-11373) |

**Exhibits**

| | |
|---|---|
| 10.6 | Cardinal Health, Inc. Policy Regarding Shareholder Approval of Severance Agreements (incorporated by reference to Exhibit 10.09 to Cardinal Health's Current Report on Form 8-K filed on August 7, 2006, File No. 1-11373)* |
| 10.7.1 | Employment Agreement, dated September 4, 2012, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on September 6, 2012, File No. 1-11373)* |
| 10.7.2 | Amendment, dated August 5, 2015, to Employment Agreement, dated September 4, 2012, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 6, 2015, File No. 1-11373)* |
| 10.7.3 | Aircraft Time Sharing Agreement, effective August 5, 2015, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K filed on August 6, 2015, File No. 1-11373)* |
| 10.7.4 | Letter Agreement, dated November 5, 2017, between Cardinal Health, Inc. and George S. Barrett (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on November 6, 2017, File No. 1-11373) |
| 10.8.1 | Confidentiality and Business Protection Agreement, effective as of February 15, 2010, between Cardinal Health, Inc. and Michael C. Kaufmann (incorporated by reference to Exhibit 10.15 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2010, File No. 1-11373)* |
| 10.8.2 | Aircraft Time Sharing Agreement, effective as of February 8, 2018, by and between Cardinal Health, Inc. and Michael C. Kaufmann (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018, File No. 1-11373) |
| 10.9 | Confidentiality and Business Protection Agreement, effective as of April 9, 2012, between Cardinal Health, Inc. and Donald M. Casey Jr. (incorporated by reference to Exhibit 10.14.1 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373)* |
| 10.10 | Confidentiality and Business Protection Agreement, effective as of September 9, 2014, between Cardinal Health, Inc. and Jon L. Giacomin (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, File No. 1-11373)* |
| 10.11 | Confidentiality and Business Protection Agreement, effective as of November 6, 2017, between Cardinal Health, Inc. and Jorge M. Gomez (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2017 , File No. 1-11373) |
| 10.12.1 | Confidentiality and Business Protection Agreement, effective as of June 28, 2018, between Cardinal Health, Inc. and Patricia B. Morrison |
| 10.12.2 | Letter Agreement, dated July 17, 2018, between Cardinal Health, Inc. and Patricia B. Morrison |
| 10.13.1 | Form of Indemnification Agreement between Cardinal Health, Inc. and certain individual directors (incorporated by reference to Exhibit 10.38 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, File No. 1-11373) |
| 10.13.2 | Form of Indemnification Agreement between Cardinal Health, Inc. and certain individual executive officers (incorporated by reference to Exhibit 10.39 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, File No. 1-11373) |
| 10.14.1 | Issuing and Paying Agency Agreement, dated August 9, 2006, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.01 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.14.2 | First Amendment to Issuing and Paying Agency Agreement, dated February 28, 2007, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.01 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.14.3 | Second Amendment to Issuing and Paying Agency Agreement, effective as of December 1, 2016, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.14.4 | Third Amendment to Issuing and Paying Agency Agreement, dated September 15, 2017, between Cardinal Health, Inc. and The Bank of New York (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, File No. 1-11373) |
| 10.14.5 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and J.P. Morgan Securities Inc. (incorporated by reference to Exhibit 10.02 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.14.6 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and J.P. Morgan Securities Inc. (incorporated by reference to Exhibit 10.02 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.14.7 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and J.P. Morgan Securities LLC (formerly known as J.P. Morgan Securities Inc.) (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.8 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and J.P. Morgan Securities LLC, effective as of December 1, 2016 (incorporated by reference to Exhibit 10.6 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.14.9 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Banc of America Securities LLC (incorporated by reference to Exhibit 10.03 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.14.10 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Banc of America Securities LLC (incorporated by reference to Exhibit 10.03 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.14.11 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, f/k/a Banc of America Securities LLC (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.12 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, effective as of December 1, 2016 (incorporated by reference to Exhibit 10.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.14.13 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.04 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |
| 10.14.14 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.04 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.14.15 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Wells Fargo Securities, LLC, as successor in interest to Wachovia Capital Markets, LLC (incorporated by reference to Exhibit 10.6 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.16 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Wells Fargo Securities, LLC, effective as of December 1, 2016 (incorporated by reference to Exhibit 10.5 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.14.17 | Commercial Paper Dealer Agreement, dated August 9, 2006, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.05 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, File No. 1-11373) |

Cardinal Health | Fiscal 2018 Form 10-K

**Exhibits**

| | |
|---|---|
| 10.14.18 | First Amendment to Commercial Paper Dealer Agreement, dated February 28, 2007, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.05 to Cardinal Health's Current Report on Form 8-K filed on March 6, 2007, File No. 1-11373) |
| 10.14.19 | Second Amendment to Commercial Paper Dealer Agreement, effective as of December 31, 2012, between Cardinal Health, Inc. and Goldman, Sachs & Co. (incorporated by reference to Exhibit 10.7 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.20 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and Goldman Sachs & Co., effective as of December 1, 2016 (incorporated by reference to Exhibit 10.4 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.14.21 | Form of Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc. (incorporated by reference to Exhibit 10.2 to Cardinal Health's Current Report on Form 8-K filed on April 21, 2009, File No. 1-11373) |
| 10.14.22 | Form of First Amendment to Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc. (incorporated by reference to Exhibit 10.8 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2012, File No. 1-11373) |
| 10.14.23 | Commercial Paper Dealer Agreement between Cardinal Health, Inc. and SunTrust Robinson Humphrey, Inc., effective as of December 1, 2016 (incorporated by reference to Exhibit 10.7 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended December 31, 2016, File No. 1-11373) |
| 10.15.1 | Amended and Restated Five-Year Credit Agreement, dated as of June 16, 2016, among Cardinal Health, Inc., JPMorgan Chase Bank, N.A. as Administrative Agent, Joint Lead Arranger and Joint Book Manager, Bank of America, N.A. as Syndication Agent, The Bank of Tokyo-Mitsubishi UFJ, Ltd., as Syndication Agent, Joint Lead Arranger and Joint Book Manager, Barclays Bank PLC, Deutsche Bank Securities Inc., Goldman Sachs Bank USA, HSBC Bank USA, National Association, Morgan Stanley Senior Funding, Inc. and Wells Fargo Bank, National Association, as Documentation Agents, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Joint Lead Arranger and Joint Book Manager (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on June 21, 2016, File No. 1-11373) |
| 10.15.2 | Amendment No. 1, dated as of May 1, 2017, to Amended and Restated Five-Year Credit Agreement as of June 16, 2016 (incorporated by reference to Exhibit 10.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended March 31, 2017, File No. 1-11373) |
| 10.15.3 | Amendment No. 2 to Amended and Restated Five-Year Credit Agreement, dated as of August 26, 2017, by and between Cardinal Health, Inc. and JPMorgan Chase Bank, N.A., individually and as administrative agent (incorporated by reference to Exhibit 10.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, File No. 1-11373) |
| 10.16.1 | Fourth Amended and Restated Receivables Purchase Agreement, dated as of November 1, 2013, among Cardinal Health Funding, LLC, as Seller, Griffin Capital, LLC, as Servicer, the Conduits party thereto, the Financial Institutions Party thereto, the Managing Agents party thereto, and LC Banks party thereto and the Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch, as the Agent (incorporated by reference to Exhibit 10.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, File No. 1-11373) |
| 10.16.2 | First Amendment and Joinder, dated as of November 3, 2014, to the Fourth Amended and Restated Receivables Purchase Agreement, dated as of November 1, 2013 (incorporated by reference to Exhibit 10.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, File No. 1-11373) |
| 10.16.3 | Second Amendment, dated as of November 14, 2016, to the Fourth Amended and Restated Receivables Purchase Agreement, dated as of November 1, 2013 (incorporated by reference to Exhibit 10.4.3 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, File No. 1-11373) |
| 10.16.4 | Third Amendment, dated as of August 30, 2017, to the Fourth Amended and Receivables Purchase Agreement, dated as of November 1, 2013 (incorporated by reference to Exhibit 10.1 to Cardinal Health's Current Report on Form 8-K filed on August 31, 2017, File No. 1-11373) |
| 10.17.1 | Seventh Amended and Restated Performance Guaranty, dated as of November 14, 2016, executed by Cardinal Health, Inc. in favor of Cardinal Health Funding, LLC (incorporated by reference to Exhibit 10.5.1 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, File No. 1-11373) |
| 10.17.2 | Amendment No. 1 to Seventh Amended and Restated Performance Guaranty, dated as of November 14, 2016 (incorporated by reference to Exhibit 10.5.2 to Cardinal Health's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, File No. 1-11373 |
| 10.18.1 | Tax Matters Agreement, dated as of August 31, 2009, by and between Cardinal Health, Inc. and CareFusion Corporation (incorporated by reference to Exhibit 10.3 to Cardinal Health's Current Report on Form 8-K filed on September 4, 2009, File No. 1-11373) |
| 10.18.2 | First Amendment to Tax Matters Agreement, dated as of May 28, 2012, by and between Cardinal Health, Inc. and CareFusion Corporation (incorporated by reference to Exhibit 10.20.2 to Cardinal Health's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, File No. 1-11373) |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges |
| 21.1 | List of Subsidiaries of Cardinal Health, Inc. |
| 23.1 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.1 | Statement Regarding Forward-Looking Information |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

\* Management contract or compensatory plan or arrangement.

# Form 10-K Cross Reference Index

| Item | | Page(s) |
|---|---|---|
| | **Part 1** | |
| 1 | Business | **25** |
| 1A | Risk Factors | **31** |
| 1B | Unresolved Staff Comments | **N/A** |
| 2 | Properties | **36** |
| 3 | Legal Proceedings | **36** |
| 4 | Mine Safety Disclosures | **N/A** |
| | **Part II** | |
| 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | **37** |
| 6 | Selected Financial Data | **22** |
| 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | **3** |
| 7A | Quantitative and Qualitative Disclosures about Market Risk | **23** |
| 8 | Financial Statements and Supplementary Data | **42** |
| 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | **N/A** |
| 9A | Controls and Procedures | **39** |
| 9B | Other Information | **N/A** |
| | **Part III** | |
| 10 | Directors, Executive Officers and Corporate Governance | **73** |
| 11 | Executive Compensation | **(a)** |
| 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | **74** |
| 13 | Certain Relationships and Related Transactions, and Director Independence | **(b)** |
| 14 | Principal Accounting Fees and Services | **(c)** |
| | **Part IV** | |
| 15 | Exhibits, Financial Statement Schedules | **75** |
| 16 | Form 10-K Summary | **N/A** |
| | Signatures | **80** |

**N/A** Not applicable

**(a)** The information called for by Item 11 of Form 10-K is incorporated by reference to our 2018 Proxy Statement under the captions "Corporate Governance" and "Executive Compensation."

**(b)** The information called for by Item 13 of Form 10-K is incorporated by reference to our 2018 Proxy Statement under the caption "Corporate Governance."

**(c)** The information called for by Item 14 of Form 10-K is incorporated by reference to our 2018 Proxy Statement under the caption "Audit Committee Matters."

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on August 22, 2018 .

Cardinal Health, Inc.

By:   /s/   MICHAEL C. KAUFMANN
      **MICHAEL C. KAUFMANN**
      **Chief Executive Officer**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed below by the following persons on behalf of the registrant and in the capacities indicated on August 22, 2018 .

| **Name** | **Title** |
|---|---|
| /s/   MICHAEL C. KAUFMANN<br>**Michael C. Kaufmann** | Chief Executive Officer and Director (principal executive officer) |
| /s/   JORGE M. GOMEZ<br>**Jorge M. Gomez** | Chief Financial Officer (principal financial officer) |
| /s/   STUART G. LAWS<br>**Stuart G. Laws** | Senior Vice President and Chief Accounting Officer (principal accounting officer) |
| /s/   GEORGE S. BARRETT<br>**George S. Barrett** | Executive Chairman of the Board |
| /s/ DAVID J. ANDERSON<br>**David J. Anderson** | Director |
| /s/   COLLEEN F. ARNOLD<br>**Colleen F. Arnold** | Director |
| /s/   CARRIE S. COX<br>**Carrie S. Cox** | Director |
| /s/   CALVIN DARDEN<br>**Calvin Darden** | Director |
| /s/   BRUCE L. DOWNEY<br>**Bruce L. Downey** | Director |
| /s/   PATRICIA A. HEMINGWAY HALL<br>**Patricia A. Hemingway Hall** | Director |
| /s/ AKHIL JOHRI<br>**Akhil Johri** | Director |
| /s/   CLAYTON M. JONES<br>**Clayton M. Jones** | Director |
| /s/   GREGORY B. KENNY<br>**Gregory B. Kenny** | Director |
| /s/   NANCY KILLEFER<br>**Nancy Killefer** | Director |
| /s/   DAVID P. KING<br>**David P. King** | Director |

Exhibit 10.12.1

**Confidentiality and Business Protection Agreement**

This Confidentiality and Business Protection Agreement ("Agreement") is hereby entered into by and between Patrice B. Morrison ("Executive") and Cardinal Health, Inc., an Ohio Corporation (the "Company"), effective as of June 28, 2018.

It is hereby agreed as follows:

1.      Consideration and Acknowledgements . The parties acknowledge that the provisions and covenants contained in this Agreement are ancillary and material to, and in consideration of, retirements benefits being negotiated between the parties and that the limitations contained herein are reasonable in geographic and temporal scope and do not impose a greater restriction or restraint than is necessary to protect the goodwill and other legitimate business interests of the Company. The parties also acknowledge and agree that the provisions of this Agreement do not adversely affect Executive's ability to earn a living in any capacity that does not violate the covenants contained herein. The parties further acknowledge and agree that the provisions of Section 9(a) below are accurate and necessary because (i) this Agreement is entered into in the State of Ohio, (ii) Ohio has a substantial relationship to the parties and to this transaction, (iii) Ohio is the headquarters state of the Company, which has operations worldwide and has a compelling interest in having its employees treated uniformly, (iv) the use of Ohio law provides certainty to the parties in any covenant litigation in the United States, and (v) enforcement of the provisions of this Agreement would not violate any fundamental public policy of Ohio or any other jurisdiction.

2.      Confidential Information . Executive shall hold in a fiduciary capacity for the benefit of the Company and all of its subsidiaries, partnerships, joint ventures, limited liability companies and other affiliates (collectively, the "Cardinal Group"), all secret or confidential information, knowledge or data relating to the Cardinal Group and its businesses (including, without limitation, any proprietary and not publicly available information concerning any processes, methods, trade secrets, research, secret data, costs, names of users or purchasers of their respective products or services, business methods, operating procedures or programs or methods of promotion and sale) that Executive has obtained or obtains during Executive's employment by the Cardinal Group and that is not public knowledge (other than as a result of Executive's violation of this Agreement) ("Confidential Information"). For the purposes of this Agreement, information shall not be deemed to be publicly available merely because it is embraced by general disclosures or because individual features or combinations thereof are publicly available. Executive shall not communicate, divulge or disseminate Confidential Information at any time during or after Executive's employment with the Cardinal Group, except with prior written consent of the applicable Cardinal Group company, or as otherwise required by law or legal process. All records, files, memoranda, reports, customer lists, drawings, plans, documents and the like that Executive uses, prepares or comes into contact with during the course of Executive's employment shall remain the sole property of the Company or the Cardinal Group company, as applicable, and shall be turned over to the applicable Cardinal Group company upon termination of Executive's employment.

3.      Non-Recruitment of Cardinal Group Employees, etc . Executive shall not, at any time during the Restricted Period (as defined below), without the prior written consent of the Company, engage in the following conduct (a "Solicitation"): (i) directly or indirectly, including via social media or professional networking services, solicit, recruit or employ (whether as an employee, officer, director, agent, consultant or independent contractor) any person who is or was at any time during the previous twelve months an employee, representative, officer or director of the Cardinal Group; or (ii) take any action to encourage or induce any employee, representative,

officer or director of the Cardinal Group to cease his or her relationship with the Cardinal Group for any reason. A "Solicitation" does not include any recruitment of employees within or for the Cardinal Group. The "Restricted Period" means the period from the date of this Agreement until twenty-four months after Executive's retirement date. The Restricted Period shall be extended and its expiration tolled by the time period in which Executive is in breach of any covenant in this Agreement to ensure that Executive does not benefit from any breach and that the Company receives the full benefit of two years protection from unfair competition on which it has relied in entering into this Agreement.

4.          No Competition -- Solicitation of Business . During the Restricted Period, Executive shall not (either directly or indirectly or as an officer, agent, employee, partner, consultant or director of any other company, partnership or entity) solicit, service or accept on behalf of any competitor of the Cardinal Group the business of (i) any customer of the Cardinal Group during the time of Executive's employment or at date of termination of employment, or (ii) any potential customer of the Cardinal Group which Executive knew to be an identified, prospective purchaser of products or services of the Cardinal Group.

5.          No Competition -- Employment by Competitor . During the Restricted Period, Executive shall not invest in (other than in a publicly traded company with a maximum investment of no more than 1% of outstanding shares), counsel, advise or be otherwise engaged or employed by any entity or enterprise that is in competition with the business conducted by any member of the Cardinal Group (other than a business that is not a significant business to the Cardinal Group as a whole or to the entity or enterprise as a whole).

6.          No Disparagement .

(a)       Executive and the Company shall at all times refrain from taking actions or making statements, written or oral, that (i) denigrate, disparage or defame the goodwill or reputation of Executive or the Cardinal Group, as the case may be, or any of its trustees, officers, security holders, partners, agents or former or current employees and directors, or (ii) are intended to, or may be reasonably expected to, adversely affect the morale of the employees of the Cardinal Group. Executive further agrees not to make any negative statements to third parties relating to Executive's employment or any aspect of the businesses of the Cardinal Group and not to make any statements to third parties about the circumstances of the termination of Executive's employment or about the Cardinal Group or its trustees, directors, officers, security holders, partners, agents or former or current employees and directors, except as may be required by a court or governmental body.

(b)       Executive further agrees that, following termination of employment for any reason, Executive shall assist and cooperate with the Company with regard to any matter or project in which Executive was involved during Executive's employment with the Company, including but not limited to any litigation that may be pending or may arise after such termination of employment. Further, Executive agrees to notify the Company at the earliest opportunity of any contact that is made by any third parties concerning any such matter or project. The Company shall not unreasonably request such cooperation of Executive and shall cooperate with Executive in scheduling any assistance by Executive, taking into account Executive's business and personal affairs, and shall compensate Executive for any lost wages or expenses associated with such cooperation and assistance.

7.          Inventions . All plans, discoveries and improvements, whether patentable or unpatentable, made or devised by Executive, whether alone or jointly with others, from the date of Executive's initial employment by the Company and continuing until the end of any period during which Executive is employed by the Cardinal Group, relating or pertaining in any way to

2

Executive's employment with or the business of the Cardinal Group, shall be promptly disclosed in writing to the Company's Chief Legal and Compliance Officer and are hereby transferred to and shall redound to the benefit of the Company, and shall become and remain its sole and exclusive property. Executive agrees to execute any assignment to the Company or its nominee, of Executive's entire right, title and interest in and to any such discoveries and improvements and to execute any other instruments and documents requisite or desirable in applying for and obtaining patents, trademarks or copyrights, at the expense of the Company, with respect thereto in the United States and in all foreign countries, that may be required by the Company. Executive further agrees at all times to cooperate to the extent and in the manner required by the Company in the prosecution or defense of any patent or copyright claims or any litigation or other proceeding involving any trade secrets, processes, discoveries or improvements covered by this Agreement, but all necessary expenses thereof shall be paid by the Company.

8. Acknowledgement and Enforcement . Executive acknowledges and agrees that: (a) the purpose of the foregoing covenants, including without limitation the noncompetition covenants of Sections 4 and 5, is to protect the goodwill, trade secrets and other Confidential Information of the Company; (b) because of the nature of the business in which the Cardinal Group is engaged and because of the nature of the Confidential Information to which Executive has access, the Company would suffer irreparable harm and it would be impractical and excessively difficult to determine the actual damages of the Cardinal Group in the event Executive breached any of the covenants of this Agreement; and (c) remedies at law (such as monetary damages) for any breach of Executive's obligations under this Agreement would be inadequate. Executive therefore agrees and consents that if Executive commits any breach of a covenant under this Agreement or threatens to commit any such breach, the Company shall have the right (in addition to, and not in lieu of, any other right or remedy that may be available to it) to temporary and permanent injunctive relief from a court of competent jurisdiction, without posting any bond or other security and without the necessity of proof of actual damage. If any of the covenants contained in this Agreement are finally held by a court to be invalid, illegal or unenforceable (whether in whole or in part), such covenant shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining covenants shall not be affected thereby; provided , however , that if any of such covenants is finally held by a court to be invalid, illegal or unenforceable because it exceeds the maximum scope or duration determined to be acceptable to permit such provision to be enforceable, such covenant will be deemed to be modified to the minimum extent necessary to modify such scope or duration in order to make such provision enforceable hereunder.

9. Miscellaneous .

(a) This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without reference to principles of conflict of laws. If, under any such law, any portion of this Agreement is at any time deemed to be in conflict with any applicable statute, rule, regulation or ordinance, such portion shall be deemed to be modified or altered to conform thereto. The parties hereto irrevocably agree to submit to the jurisdiction and venue of the courts of the State of Ohio in any action or proceeding brought with respect to or in connection with this Agreement. The captions of this Agreement are not part of the provisions hereof and shall have no force or effect. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives. This Agreement is the product of negotiation and shall not be construed strictly for or against any party.

3

(b)      All notices and other communications under this Agreement shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

|  |  |
|---|---|
| If to Executive: | At the most recent address on file for Executive at the Company |
| If to the Company: | Cardinal Health, Inc. |
|  | 7000 Cardinal Place |
|  | Dublin, OH |
|  | Attn: Chief Legal and Compliance Officer |

or to such other address as either party shall have furnished to the other in writing in accordance herewith. Notice and communications shall be effective when actually received by the addressee.

(c)      The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. If any provision of this Agreement shall be held invalid or unenforceable in part, the remaining portion of such provision, together with all other provisions of this Agreement, shall remain valid and enforceable and continue in full force and effect to the fullest extent consistent with the law.

(d)      Executive's or the Company's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right Executive or the Company may have hereunder, shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

4

IN WITNESS WHEREOF, Executive has hereunto set Executive's hand and the Company has caused these presents to be executed in its name and on its behalf, all as of the day and year first above written.

/s/ Patricia B. Morrison
Patricia B. Morrison
Execution Date: 6-28-18

CARDINAL HEALTH, INC.

/s/ Pamela O. Kimmet
By: Pamela O. Kimmet
Its: Chief Human Resources Officer
Execution Date: 6-28-18

5

Exhibit 10.12.2

[Cardinal Health Letterhead]

July 17, 2018

Ms. Patricia B. Morrison
## #### #### #####
####### ######## #####

Dear Patty:

The purpose of this letter (referred to as this "Agreement") is to confirm the agreement between Cardinal Health, Inc. and its subsidiaries ("the Company") and you concerning your retirement from the Company and the retirement benefits to be provided to you in consideration of your many years of service and significant contributions to the Company.

**Retirement Date**
You will retire and cease to be an officer and employee of the Company on August 31, 2018 ("Retirement Date"). You agree to provide a letter of resignation to this effect for our corporate records.

**Long-term incentive awards**
You will be deemed to have "retired" for purposes of your long-term incentive awards. As a result, subject to the terms of the Amended Cardinal Health, Inc. 2011 Long-Term Incentive Plan and the applicable award agreements, (i) a ratable portion of each unvested installment of your outstanding stock options will immediately vest and become exercisable upon your Retirement Date, and options, to the extent vested, may be exercised until their grant expiration term, (ii) a ratable portion of each unvested installment of your outstanding restricted share units will immediately vest upon your Retirement Date, and (ii) following the end of the applicable performance period, a ratable portion of your unvested performance share units, which would have vested if you had remained employed through the payment date, will vest.

In accordance with the Company's standard procedures, for receipt of this retirement treatment, you hereby release the Company and all of its affiliates and related entities, predecessors, successors and assigns (whether to all or any part of such entities' businesses), and all of such entities' officers, directors, agents, representatives, attorneys, and employees (current and former) and their employee benefit plans and programs and their administrators and fiduciaries from any and all claims and causes of action that may exist, whether known or unknown, as of the date of your execution of this Agreement, with the exception of any other claims that cannot be waived by law.

**Successors**
You, and anyone who succeeds to your rights and responsibilities, are bound by this Agreement, and this Agreement will accrue to the benefit of and may be enforced by the Company and its successors and assigns.

**Severability**
You agree that the validity or unenforceability of any part of this Agreement shall not affect the validity or enforceability of any remaining provisions.

**Governing Law**
You agree that all questions concerning the intention, validity or meaning of this Agreement shall be construed and resolved according to the laws of the State of Ohio. You also designate the federal and state courts in

Franklin County, Ohio as the courts of competent jurisdiction and venue for any actions or proceedings related to this Agreement, and hereby irrevocably consent to such designation, jurisdiction and venue.

By signing below, you agree to and accept all of the terms in this Agreement.

Sincerely,

CARDINAL HEALTH, INC.

/s/ Pamela O. Kimmet

Pamela O. Kimmet
Chief Human Resources Officer


Agreed to:


/s/ Patricia B. Morrison         July 20, 2018
Patricia B. Morrison            Date

**Exhibit 12.1**

## Computation of Ratio of Earnings to Fixed Charges

| (in millions, except ratios) | | 2014 | | 2015 | | 2016 | | 2017 | | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Earnings/(loss) from continuing operations before income taxes | $ | 1,798 | $ | 1,967 | $ | 2,276 | $ | 1,924 | $ | (228) |
| | | | | | | | | | | |
| **Plus fixed charges:** | | | | | | | | | | |
| Interest expense | | 129 | | 137 | | 178 | | 187 | | **328** |
| Capitalized interest | | 1 | | 2 | | 6 | | 9 | | **4** |
| Amortization of debt offering costs | | 4 | | 8 | | 6 | | 6 | | **11** |
| Interest portion of rent expense | | 10 | | 10 | | 12 | | 14 | | **16** |
| **Fixed charges (1)** | | 144 | | 156 | | 201 | | 217 | | **359** |
| Plus: amortization of capitalized interest | | 3 | | 2 | | 3 | | 4 | | **4** |
| Less: capitalized interest | | (1) | | (2) | | (6) | | (9) | | **(4)** |
| **Earnings (1)** | $ | 1,944 | $ | 2,124 | $ | 2,473 | $ | 2,135 | $ | **131** |
| | | | | | | | | | | |
| **Ratio of earnings to fixed charges (1) (2)** | | 13.5 | | 13.6 | | 12.3 | | 9.9 | | **0.4** |

(1)  The sum of the components may not equal the total due to rounding.

(2)  The ratio of earnings to fixed charges is computed by dividing fixed charges into earnings/(loss) from continuing operations before income taxes plus fixed charges and amortization of capitalized interest less capitalized interest. Fixed charges include interest expense, amortization of debt offering costs and the portion of rent expense that is deemed to be representative of the interest factor. Interest expense recorded on tax exposures has been recorded in income tax expense and has therefore been excluded from the calculation.

Exhibit 21.1

## Subsidiaries of the Registrant

Listed below are majority-owned subsidiaries of Cardinal Health, Inc. as of June 30, 2018 . Subsidiaries excluded from the list below would not, considered in the aggregate as a single subsidiary, constitute a "significant subsidiary" of Cardinal Health, Inc. as that term is defined in Rule 1-02(w) of SEC Regulation S-X.

| Subsidiary Name | State/Jurisdiction of Incorporation | Subsidiary Name | State/Jurisdiction of Incorporation |
|---|---|---|---|
| A+ Secure Packaging, LLC | Tennessee | Cardinal Health France 506 SAS | France |
| Access Closure, Inc. | California | Cardinal Health Funding, LLC | Nevada |
| Aero-Med, Ltd. | Connecticut | Cardinal Health Germany 507 GmbH | Germany |
| Allegiance Corporation | Delaware | Cardinal Health Germany Manufacturing GmbH | Germany |
| AssuraMed, Inc. | Delaware | Cardinal Health International Philippines, Inc. | Philippines |
| Bellwether Oncology Alliance, Inc. | Tennessee | Cardinal Health IPS, LLC | Delaware |
| Cardinal Health 2, LLC | Nevada | Cardinal Health Ireland 419 Designated Activity Company | Ireland |
| Cardinal Health 3, LLC | Delaware | Cardinal Health Ireland 508 Limited | Ireland |
| Cardinal Health 5, LLC | Delaware | Cardinal Health Ireland Unlimited Company | Ireland |
| Cardinal Health 6, Inc. | Nevada | Cardinal Health Italy 509 Srl | Italy |
| Cardinal Health 7, LLC | Delaware | Cardinal Health Japan G.K. | Japan |
| Cardinal Health 100, Inc. | Indiana | Cardinal Health Korea Limited | Korea |
| Cardinal Health 104 LP | Ohio | Cardinal Health Malaysia 211 Sdn. Bhd. | Malaysia |
| Cardinal Health 105, Inc. | Ohio | Cardinal Health Malta 212 Limited | Malta |
| Cardinal Health 107, LLC | Ohio | Cardinal Health Managed Care Services, LLC | Delaware |
| Cardinal Health 108, LLC | Delaware | Cardinal Health Medical Products India Private Limited | India |
| Cardinal Health 110, LLC | Delaware | Cardinal Health Mexico 244 S. de R.L. de C.V. | Mexico |
| Cardinal Health 112, LLC | Delaware | Cardinal Health Mexico 514 S. de R.L. de C.V. | Mexico |
| Cardinal Health 113, LLC | Wisconsin | Cardinal Health Middle East FZ-LLC | United Arab Emirates |
| Cardinal Health 114, Inc. | Delaware | Cardinal Health Netherlands 502 B.V. | Netherlands |
| Cardinal Health 115, LLC | Ohio | Cardinal Health Norway AS | Norway |
| Cardinal Health 116, LLC | Delaware | Cardinal Health Pharmaceutical Contracting, LLC | Delaware |
| Cardinal Health 118, LLC | Delaware | Cardinal Health Pharmacy Services, LLC | Delaware |
| Cardinal Health 119, LLC | Delaware | Cardinal Health Poland Spółka z ograniczonąa odpowiedzialnośscią | Poland |
| Cardinal Health 121, LLC | Delaware | Cardinal Health Portugal 513 Unipessoal Lda. | Portugal |
| Cardinal Health 122, LLC | Delaware | Cardinal Health P.R. 120, Inc. | Puerto Rico |
| Cardinal Health 123, LLC | Delaware | Cardinal Health P.R. 218, Inc. | Puerto Rico |
| Cardinal Health 124, LLC | Delaware | Cardinal Health P.R. 220, LLC | Puerto Rico |
| Cardinal Health 126, LLC | Delaware | Cardinal Health Singapore 225 Pte. Ltd. | Singapore |
| Cardinal Health 127, Inc. | Kansas | Cardinal Health Spain 511 S.L. | Spain |
| Cardinal Health 200, LLC | Delaware | Cardinal Health Specialty Pharmacy, LLC | Delaware |
| Cardinal Health 201, Inc. | Delaware | Cardinal Health Sweden 512 A.B. | Sweden |
| Cardinal Health 222 (Thailand) Ltd. | Thailand | Cardinal Health Switzerland 515 GmbH | Switzerland |
| Cardinal Health 247, Inc. | Colorado | Cardinal Health Systems, Inc. | Ohio |
| Cardinal Health 249, LLC | Delaware | Cardinal Health Technologies, LLC | Nevada |
| Cardinal Health 414, LLC | Delaware | Cardinal Health Technologies Switzerland GmbH | Switzerland |
| Cardinal Health Australia 503 Pty. Ltd. | Australia | Cardinal Health U.K. 432 Limited | United Kingdom |
| Cardinal Health Austria 504 GmbH | Austria | Cardinal Health Medical Equipment Consulting (Shanghai) Co., Ltd. | China |
| Cardinal Health Belgium 505 BVBA | Belgium | Cirpro de Delicias S.A. de C.V. | Mexico |
| Cardinal Health Canada Inc. | Canada | Convertors de Mexico S.A. de C.V. | Mexico |
| Cardinal Health Canada Holdings Cooperative U.A. | Netherlands | Cordis Cashel Company Unlimited | Ireland |
| Cardinal Health Colombia S.A.S. | Colombia | Cordis Corporation | Florida |
| Cardinal Health do Brasil Ltd. | Brazil | Cordis (Shanghai) Medical Devices Co., Ltd. | China |
| Cardinal Health D.R. 203 II Ltd. | Bermuda | Cornerstone Partners G.P.O., L.P. | Tennessee |
| Cardinal Health Denmark ApS | Denmark | | |
| Cardinal Health Finland Oy | Finland | | |
| Cardinal Health Foundation | Ohio | | |

| Subsidiary Name | State/Jurisdiction of Incorporation |
|---|---|
| Covidien Ireland Limited | Ireland |
| Covidien Manufacturing Solutions, S.A. | Costa Rica |
| Curaspan Health Group, Inc. | Delaware |
| EPIC Insurance Company | Vermont |
| Especialidades Medicas Kenmex S.A. de C.V. | Mexico |
| Griffin Capital, LLC | Nevada |
| Innovative Therapies, Inc. | Delaware |
| Instant Diagnostic Systems, Inc. | Alabama |
| Kendall Patient Recovery BVBA | Belgiuum |
| Kendall-Gammatron Limited | Thailand |
| KPR Australia Pty. Ltd. | Australia |
| KPR Italia S.r.l. | Italy |
| KPR Switzerland Sales Gmbh | Switzerland |
| KPR U.S., LLC | Delaware |
| Leader Drugstores, Inc. | Delaware |
| Limited Liability Company "Cardinal Health Russia" | Russian Federation |
| Marin Apothecaries | California |
| Medicine Shoppe International, Inc. | Delaware |
| Mediquip Sdn. Bhd. | Malaysia |
| NaviHealth, Inc. | Delaware |
| Nippon Covidien Ltd. | Japan |
| One Cloverleaf, LLC | Delaware |
| Outcomes Incorporated | Iowa |
| Pinnacle Intellectual Property Services, Inc. | Nevada |
| Pinnacle Intellectual Property Services-International, Inc. | Nevada |
| Post-Acute Care Center for Research, LLC | Delaware |
| Quiroproductos de Cuauhtemoc S. de R.L. de C.V. | Mexico |
| R Cubed, Inc. | Tennessee |
| RainTree GPO, LLC | Delaware |
| Renal Purchasing Group, LLC | Tennessee |
| RGH Enterprises, Inc. | Ohio |
| RightCare Solutions, Inc. | Delaware |
| Rxealtime, Inc. | Nevada |
| Sonexus Health, LLC | Texas |
| TelePharm, LLC | Iowa |
| The Harvard Drug Group, L.L.C. | Michigan |
| Tradex International, Inc. | Ohio |
| UroMed, Inc. | Georgia |
| WaveMark, Inc. | Delaware |

**Exhibit 23.1**

## Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

(1)  Registration Statement on Form S-3 No. 333-215935 of Cardinal Health, Inc.,

(2)  Registration Statements on Form S-4 No. 333-62938 and No. 333-74761 of Cardinal Health, Inc., and

(3)  Registration Statements on Form S-8 No. 33-42357, No. 333-90423, No. 333-38192, No. 333-38198, No. 333-56010, No. 333-129725, No. 333-149107, No. 333-155156, No. 333-163128, No. 333-164736, No. 333-177728, No. 333-183471, No. 333-206339, No. 333-206340, No. 333-214412 and No. 333-219892 of Cardinal Health, Inc.;

of our reports dated August 22, 2018 , with respect to the consolidated financial statements and schedule of Cardinal Health, Inc. and subsidiaries and the effectiveness of internal control over financial reporting of Cardinal Health, Inc. and subsidiaries, included in this Annual Report (Form 10-K) of Cardinal Health, Inc. and subsidiaries for the year ended June 30, 2018 .

/s/ Ernst & Young LLP

Grandview Heights, Ohio

August 22, 2018

**Exhibit 31.1**

I, Michael C. Kaufmann , certify that:

1.  I have reviewed this Form 10-K of Cardinal Health, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 22, 2018

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Executive Officer

**Exhibit 31.2**

I, Jorge M. Gomez , certify that:

1. I have reviewed this Form 10-K of Cardinal Health, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 22, 2018

/s/ J ORGE M. G OMEZ

Jorge M. Gomez
Chief Financial Officer

**Exhibit 32.1**

**Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Each of Michael C. Kaufmann, Chief Executive Officer of Cardinal Health, Inc. (the "Company"), and Jorge M. Gomez, Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)     the Annual Report on Form 10-K for the fiscal year ended June 30, 2018 containing the financial statements of the Company (the "Periodic Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 22, 2018

/s/ MICHAEL C. KAUFMANN

Michael C. Kaufmann
Chief Executive Officer

/s/ JORGE M. GOMEZ

Jorge M. Gomez
Chief Financial Officer

Exhibit 99.1

## Statement Regarding Forward-Looking Information

As used in this exhibit, "we," "our," "us" and similar pronouns refer to Cardinal Health, Inc. and its subsidiaries, unless the context requires otherwise. Our filings with the Securities and Exchange Commission, including this Annual Report on Form 10-K for the fiscal year ended June 30, 2018 (the "2018 Form 10-K"), our quarterly reports on Form 10-Q and our current reports on Form 8-K (along with any exhibits and amendments to such reports), as well as our news releases or any other written or oral statements made by or on behalf of us, including materials posted on our website, may include, directly or by incorporation by reference, forward-looking statements that reflect our current view (as of the date the forward-looking statement is first made) about future events, prospects, projections or financial performance. The matters discussed in these forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied in or by such statements. These risks and uncertainties include:

- competitive pressures in the markets in which we operate, including pricing pressures;

- uncertainties relating to the pricing of generic pharmaceuticals;

- uncertainties relating to the timing, frequency and profitability of generic pharmaceutical launches;

- our ability to maintain the benefits of our generic pharmaceutical sourcing venture with CVS Health Corporation;

- with respect to our distribution services agreements with branded pharmaceutical manufacturers, changes in the amount of service fees we receive or, in cases where part of our compensation under these agreements is based on branded pharmaceutical price appreciation, changes in the frequency or magnitude of such price appreciation;

- changes in manufacturer approaches to pricing branded pharmaceutical products and risks related to our compensation under contractual arrangements with manufacturers being set as a percentage of the wholesale acquisition cost of branded pharmaceuticals;

- changes in the timing or frequency of the introduction of branded pharmaceuticals;

- our high sales concentration with certain key customers, including CVS Health Corporation and OptumRx;

- actions of regulatory bodies and other governmental authorities, including the U.S. Drug Enforcement Administration, certain agencies within the U.S. Department of Health and Human Services (including the U.S. Food and Drug Administration, Centers for Medicare and Medicaid Services, the Office of Inspector General and the Office for Civil Rights), the U.S. Nuclear Regulatory Commission, the U.S. Federal Trade Commission, the U.S. Customs and Border Protection, various state boards of pharmacy, state controlled substance authorities, state health departments, state insurance departments, state Medicaid departments or comparable regulatory bodies or governmental authorities or foreign equivalents that, in each case, could delay, limit or suspend product development, manufacturing, distribution, importation or sales or result in warning letters, recalls, seizures, injunctions or monetary sanctions;

- any compromise of our information systems or of those of a third-party service provider, including unauthorized access to or use or disclosure of company or customer information, and ancillary risks associated with our ability to effectively manage any issues arising from any such compromise;

- possible losses that may arise or expenses that we may incur from the resolution and defense of the lawsuits and investigations in which we have been named relating to the distribution of prescription opioid pain medication;

- potential damage to our reputation, adverse operational impacts or other effects that may result from the national opioid epidemic and the allegations that have been made about our role in such epidemic;

- potential adverse impact to our financial results resulting from enacted and proposed state taxes or other assessments on the sale and distribution of opioid medications;

- risks and uncertainties relating to the acquisition of the Patient Care, Deep Vein Thrombosis and Nutritional Insufficiency businesses from Medtronic plc (the "Patient Recovery Business"), including the ability to retain the acquired business' customers and employees; the ability to successfully integrate the acquired business into our operations; the ability to achieve the expected synergies and accretion in earnings; unforeseen internal control, regulatory or compliance issues; and additional risks relating to regulatory matters, legal proceedings, tax laws or positions or foreign exchange rate volatility;

- uncertainties related to our ability to manage inventory and cost challenges within the Cordis business and to stop the decline in Cordis' performance;

- difficulties or delays in the development, production, manufacturing, sourcing and marketing of new or existing products and services, including difficulties or delays associated with obtaining requisite regulatory consents or approvals associated with those activities;

- manufacturing disruptions, whether due to regulatory action, production quality deviations, safety issues or raw material shortages or defects, or because a key product is manufactured at a single manufacturing facility with limited alternate facilities;

- risks arising from possible violations of healthcare fraud and abuse laws;

- costs or claims resulting from potential errors or defects in our manufacturing of medical devices or other products or in our compounding, repackaging, information systems or pharmacy management services that may injure persons or damage property or operations, including costs from remediation efforts or recalls and related product liability claims and lawsuits, including class action lawsuits;

- risks arising from possible violations of the U.S. Foreign Corrupt Practices Act and other similar anti-corruption laws in other jurisdictions and U.S. and foreign export control, trade embargo and customs laws;

- risks arising from our collecting, handling and maintaining patient-identifiable health information and other sensitive personal and financial information, which are subject to federal, state and foreign laws that regulate the use and disclosure of such information;

- risks arising from certain of our businesses being Medicare-certified suppliers or participating in other federal and state healthcare programs, such as state Medicaid programs and the federal 340B drug pricing program, which businesses are subject to accreditation and quality standards and other rules and regulations, including applicable reporting, billing, payment and record-keeping requirements;

- risks arising from certain of our businesses manufacturing pharmaceutical and medical products or repackaging pharmaceuticals that are purchased or reimbursed through, or are otherwise governed by, federal or state healthcare programs, which businesses are subject to federal and state laws that establish eligibility for reimbursement by such programs and other applicable standards and regulations;

- changes in laws or changes in the interpretation or application of laws or regulations, as well as possible failures to comply with applicable laws or regulations, including as a result of possible misinterpretations or misapplications;

- material reductions in purchases, pricing changes, non-renewal, early termination, or delinquencies or defaults under contracts with key customers;

- unfavorable changes to the terms of key customer or supplier relationships, or changes in customer mix;

- risks arising from changes in U.S. or foreign tax laws, including our ability to effectively implement and account for the recently enacted Tax Cuts and Jobs Act and unfavorable challenges to our tax positions and payments to settle these challenges;

- uncertainties due to government healthcare reform, including possible repeal or replacement of major parts of the Patient Protection and Affordable Care Act;

- reductions or limitations on governmental funding at the state or federal level or efforts by healthcare insurance companies to limit payments for products and services;

- changes in manufacturers' pricing, selling, inventory, distribution or supply policies or practices;

- changes in legislation or regulations governing prescription drug pricing, healthcare services or mandated benefits;

- changes in hospital buying groups or hospital buying practices;

- changes in distribution or sourcing models for pharmaceutical and medical and surgical products, including an increase in direct and limited distribution;

- the risks of counterfeit products in the supply chain;

- changes to the prescription drug reimbursement formula and related reporting requirements for generic pharmaceuticals under Medicaid;

- increasing consolidation in the healthcare industry, which could give the resulting enterprises greater bargaining power and may increase pressure on prices for our products and services or result in the loss of customers;

- disruption, damage or lack of access to, or failure of, our or our third-party service providers' information systems, our critical facilities, including our national logistics center, or our distribution networks;

- risks to our business and information and controls systems in the event that business process improvements, infrastructure modernizations or initiatives to use third-party service providers for key systems and processes are not effectively implemented;

- the results, costs, effects or timing of any commercial disputes, government contract compliance matters, patent infringement claims, *qui tam* actions, government investigations or other legal proceedings;

- possible losses relating to product liability lawsuits and claims regarding products for which we cannot obtain product liability insurance or for which such insurance may not be adequate to cover our losses, including the product liability lawsuits we are currently defending relating to alleged personal injuries associated with the use of Cordis inferior vena cava filter products;

- our ability to maintain adequate intellectual property protections;

- the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition, and uncertainties relating to our ability to achieve the anticipated results from acquisitions;

- our ability to manage and complete divestitures or other strategic business combination transactions, including our ability to find buyers or other strategic exit opportunities and risks associated with the possibility that we could experience greater dis-synergies than anticipated or otherwise fail to achieve our strategic objectives;

- increased costs for commodities and other materials used in the Medical segment manufacturing, including various components, compounds, raw materials or energy such as oil-based resins, pulp, cotton, latex and other commodities;

- shortages in commodities, components, compounds, raw materials or energy used by our businesses, including supply disruptions of radioisotopes;

- the loss of, or default by, one or more key suppliers for which alternative suppliers may not be readily available;

- bankruptcy, insolvency or other credit failure of a customer or supplier that owes us a substantial amount;

- risks associated with global operations, including the effect of local economic environments, inflation, recession, currency volatility and global competition, in addition to risks associated with compliance with U.S. and international laws relating to global operations including currently proposed tariffs;

- risks associated with our use of and reliance on the global capital and credit markets, including our ability to access credit and our cost of credit, which may adversely affect our ability to efficiently fund our operations or undertake certain expenditures;

- our ability to introduce and market new products and our ability to keep pace with advances in technology;

- the costs, effects, timing or success of restructuring programs or plans;

- significant charges to earnings if goodwill or intangible assets become impaired;

- uncertainties relating to general political, business, industry, regulatory and market conditions; and

- other factors described in the "Risk Factors" section of the 2018 Form 10-K.

The words "expect," "anticipate," "intend," "plan," "believe," "will," "should," "could," "would," "project," "continue," "likely," and similar expressions generally identify "forward-looking statements," which speak only as of the date the statements were made, and also include statements reflecting future results or guidance, statements of outlook and expense accruals. We undertake no obligation to update or revise any forward-looking statements, except to the extent required by applicable law.