UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:19-cv-03347 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | Chief Judge Edmund A. Sargus, Jr. |
| | ) | Magistrate Judge Elizabeth A. Preston Deavers |
| vs. | ) | |
| | ) | |
| CARDINAL HEALTH, INC., et al., | ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED AMENDED COMPLAINT

4826-8526-9204.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     SUMMARY OF FACTUAL ALLEGATIONS.............................................................4

III.    ARGUMENT.................................................................................................................9

        A.      Legal Standard for Motion to Dismiss....................................................................9

In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts consider a complaint "in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-26 (2007); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382-83 (6th Cir. 2016). In general, a complaint "does not need detailed factual allegations," but only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 556.

        B.      The Complaint Pleads Materially False and Misleading Statements.......10

Defendants do not dispute that the Complaint adequately pleads their misrepresentations and the reasons why each statement is alleged to be false and misleading; instead, they only challenge the materiality of their statements as grounds for dismissal. The question of materiality, however, may only be decided as a matter of law only if the "'alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality,'" which is not the case here. *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 747 (S.D. Ohio 2006). Since Defendants chose to speak repeatedly about the financial contribution of Cordis, the progress of its integration and that Cordis would benefit from Cardinal's inventory management technology and supply chain expertise, they had a duty to disclose the full truth, which they did not. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001).

                1.      Defendants' Statements that Cordis Was Benefiting from
                        Cardinal's Inventory Management Technology and Supply Chain
                        Expertise Were Materially Misleading (¶¶32-33, 37, 41-45, 58)..............12

Defendants' materiality argument ignores the "context in which a statement is made is essential in determining whether a statements is puffery." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1006-07 (S.D. Ohio 2008). When considering Defendants' statements in the context of the well-pled facts alleged in the Complaint (including that these statements ran directly counter to the facts establishing that Cordis had debilitating inventory issues that were negatively impacting Cardinal throughout the Class Period), they were material to investors and are therefore actionable.

**Page**

2. Defendants' Statements About the Cordis Integration Were Materially Misleading (¶¶43, 46-47, 49-52, 54, 56-57, 59, 61)................17

Defendants' statements about the Cordis integration were also material for the same reasons. Courts have found that statements like the ones Defendants made are materially misleading and not puffery when contradicted by concealed true facts. *See, e.g.*, *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008); *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-cv-04883-BLF, 2018 WL 1411129, at *12, *18 (N.D. Cal. Mar. 21, 2018).

3. Defendants' Statements About Cordis's Impact on Cardinal's Financial Results Were Materially Misleading (¶¶60, 68-69, 73).............18

Defendants challenge three statements they made in February, August and September 2017 as inactionable, claiming they are "accurate statements of historical results." But these statements are actionable half-truths. The fact that a statement contains some accurate financial results is not a dispositive defense to a half-truth. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).

4. The PSLRA Safe Harbor Does Not Apply to Defendants' Statements ...........................................................................................20

The majority of statements Defendants challenge are not forward-looking; they are statements of present or historical fact not protected by the safe harbor. *Huffy Corp.*, 577 F. Supp. 2d at 1014-15. Defendants' accretive earnings and synergies statements are not protected by the safe harbor because they are not accompanied by sufficient cautionary language. *Helwig*, 251 F.3d at 559. Defendants are also not entitled to safe harbor protection because the Complaint alleges sufficient facts to demonstrate that any statements Defendants deem forward-looking were made "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1)(B).

5. Cardinal's Financial Statements Were False and Misleading (¶¶92-103) ................................................................................................25

Defendants' materiality arguments with regard to Cardinal's false and misleading financial statements provide no basis for dismissal because courts have repeatedly rejected Defendants' quantitative arguments. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016). Here, the Complaint alleges both quantitative and qualitative factors that weigh in favor of materiality and must be considered. Also Plaintiff is not required to quantify the financial-statement impact of the improper accounting at the pleading stage. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 416 (S.D.N.Y. 2020).

C. Plaintiff Pleads a Strong Inference of Scienter ......................................................28

Plaintiff has stated with particularity facts which holistically raise a strong inference of scienter that is at least as compelling as any opposing inference. 15 U.S.C. §78u-4(b)(2);

**Page**

*Tellabs*, 551 U.S. at 322-26; *Frank v. Dana Corp.*, 646 F.3d 954, 958-59 (6th Cir. 2011) ("*Dana II*"); *Helwig*, 251 F.3d at 552; *Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2016 WL 8199124, at *30-*31 (S.D. Ohio Jan. 21, 2016); *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1106-07 (S.D. Ohio 2007).

1. Defendants' Own Statements, Their Roles with Respect to Cordis and the Significance of Cordis to Cardinal's Core Business Support the Inference that Defendants Knew "the Most Current Factual Information" About Cordis, but Disregarded It When Speaking to Investors ................................................................31

The Individual Defendants' own representations throughout the Class Period, their functions and history with Cordis and the overall significance of Cordis to Cardinal's core business raise a strong inference that Defendants knew the "most current factual information" about Cordis's integration and inventory issues but persistently disregarded it before speaking to the investment community. ¶¶45-46, 49-52, 57-58, 61, 67, 73, 76, 81-83, 105-108; *Helwig*, 251 F.3d at 252; *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004), *abrogated on other grounds by Dana II*, 646 F.3d at 961; *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at *20 (M.D. Tenn. Dec. 18, 2017); *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-01112, 2019 WL 6168254, at *22 (M.D. Tenn. Nov. 19, 2019); *Ross*, 501 F. Supp. 2d at 1117; *Kyrstek v. Ruby Tuesday, Inc.*, No. 3:14-cv-01119, 2016 WL 1274447, at *9 (M.D. Tenn. March 31, 2016).

2. Defendants' Incomplete Disclosures About Cordis Do Not Negate Scienter but Are *Probative* of It ..................................................36

Defendants' statements alleged at ¶¶55, 59, 69, 73, 77, 80 and 82 were all misleading partial disclosures, as Plaintiff alleges at ¶¶67, 71, 73 and 83. While Defendants vaguely referred to unquantified, higher than planned inventory write-offs and costs at Cordis, they falsely assured investors that they had installed systems that would better track inventory, they now had inventory visibility and Cordis's performance issues were limited to the prior year. ¶¶55, 59, 69, 73, 77, 80, 82. Defendants also continued to conceal that they were unable to accurately track Cordis's inventory due to deficient inventory tracking systems, Cordis was carrying $200-$300 million in excess, obsolete, expired, missing and unaccounted for inventory, and in the summer of 2017, Cordis's international inventory tracking system had completely shut down and remained so for the next year, so that Defendants had no visibility into Cordis's global inventories during that time. ¶¶67, 71, 73, 83. Defendants' partial disclosures create "a compelling inference that [they] made a conscious decision to not disclose" the whole truth about Cordis's inventory. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020). ¶¶89-90.

3. The Closeness in Time of Defendants' March 13, 2018 Misrepresentations and Their May 2, 2018 Revelation of the Truth Is Probative of Scienter ............................................................39

The short seven week period between Defendants' March 13, 2018 misrepresentations that they had visibility into Cordis's inventories and Cordis's

- iii -

Page

performance issues were behind it, and their inconsistent May 3, 2018 disclosures that they still lacked inventory visibility at Cordis, had been unable to forecast demand for Cordis products, were taking higher than planned Codis inventory write-offs and that all of these issues caused a huge earnings miss, supports the inference that Defendants acted knowingly or, at a minimum, recklessly.  ¶¶82, 84-88; *Helwig*, 251 F.3d at 552; *Dana II*, 646 F.3d at 960; *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018); *Fidel v. Farley*, No. Civ.A.1:00-CV-48-M, 2001 WL 36126923 (W.D. Ky. June 27, 2001).

4.      The Magnitude of the Impact of Cordis's Concealed Inventory
Issues on Cardinal's Business Is Probative of Scienter ............................41

The magnitude of Cardinal's goodwill write down ($1.4 billion), year-over-year profit decline (94%) and inventory reserve increase (from $76 million to $147 million), all driven by inventory and cost challenges at Cordis, is relevant to and supports an inference of scienter.  *Dana II*, 646 F.3d at 960.  *See also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001); *Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 846 (E.D. Mo. 2019); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y.  2019).  Defendants' reliance on *Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004) to argue that magnitude is not probative of scienter is unavailing because *Fidel* predates *Dana II*, *Tellabs* and *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).

5.      Defendants' $113 Million in Insider Trading Supports an Inference
of Scienter ................................................................................................43

Insider trading at suspicious times or in unusual amounts is indicative of scienter. *Helwig*, 251 F.3d at 552.  Defendant Barrett's and Casey's Class Period sales for combined proceeds of over $113 million were unusual in amount compared to their sales in the three years preceding the Class Period, and were made at suspicious times such as one week after Cardinal's FY 2016 earnings call in which Defendants touted the Cordis acquisition, and while Barrett repeatedly made positive statements about Cordis.  ¶¶42, 49-51, 54-56, 58-59, 113, 112-113.  Insider sales like these support an inference of scienter.  *Big Lots*, 2016 WL 8199124, at *33; *Ross*, 501 F. Supp. 2d at 1117; *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (N.D. Ohio 2004).  Defendants' contention that Barrett's and Casey's purported "purchases" of Cardinal stock during the Class Period negate scienter must be rejected, as neither defendant actually purchased shares on the open market or paid market prices for their stock, but acquired shares through option grants or exercises.  *See, e.g.*, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999).  The fact that not all Individual Defendants traded during the Class Period is not dispositive of scienter. *See, e.g.*, *Tellabs*, 551 U.S. at 325.

6.      Defendants' Compensation and Executive Departures Support an
Inference of Scienter ................................................................................47

The "self-interested motivation of defendants in the form of saving their salaries or jobs" is probative of scienter.  *Helwig*, 251 F.3d at 552.  Defendants' misrepresentations allowed Barrett, Kaufmann and Casey to collect more than $65.8 million in salary and

**Page**

bonuses from 2015-2017 because their compensation was tied to the performance of Cardinal's Medical Segment, which included Cordis, and their misstatements about Cordis allowed them to meet or exceed their target annual incentive awards.. ¶¶115-128; *Cardinal Health*, 426 F. Supp. 2d at 737-38.  Wilson's, Casey's and Barrett's successive departures from August 2017 to February 2018, just as the fraud began to emerge in August 2017, further support an inference of scienter. *See, e.g., Big Lots*, 2016 WL 8199124, at *34.

7.	Plaintiff Pleads a Strong Inference that Defendants Kaufmann, Gomez and Barrett Knew or Recklessly Disregarded that Cardinal's Public Financial Statements Were False ...................................49

The fact that Kaufmann, Gomez and Barrett signed SOX certifications is relevant to and probative of scienter.  ¶¶105-108; *Dana II*, 646 F.3d at 961 (false Sarbanes-Oxley certifications were relevant to holistic view of scienter allegations); *accord Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 WL 1335803, *56 (M.D. Tenn. Mar. 31, 2011; *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007).  Kaufmann's and Gomez's roles as CFOs of Cardinal and its Medical Segment, which included Cordis, required them to have detailed knowledge about Cardinal's public financial statements, goodwill, inventory levels and inventory reserves, and the calculation of Cardinal's reported earnings.  All of these facts viewed collectively with all other scienter allegations plead a strong inference that defendants Kaufmann, Gomez and Barrett knew, or were reckless in not knowing, that Cardinal's financial statements were not prepared in accordance with GAAP because Cardinal failed to take timely charges against earnings to write-off losses for excess, obsolete, expired and missing inventory. ¶¶92-103. *Kyrstek*, 2016 WL 1274447, at *9.

D.	Plaintiff Has Adequately Pled Loss Causation .......................................................50

Defendants only challenge to loss causation in connection with Cardinal's false and misleading financial statements fails because: 1) the Complaint satisfies the Sixth Circuit requirement for loss causation by pleading facts sufficient to show "'the causal connection that the plaintiff has in mind.'" *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)), *cert. denied*, __ U.S. __, 139 S. Ct. 310 (2018); and 2) pleading loss causation does not require an admission by Defendants of accounting rule violations or a restatement of Cardinal's financial statements. *Ross*, 501 F. Supp. 2d at 1117, 1119.

E.	Plaintiff's Sections 20(a) and 20A Claims Are Adequately Alleged ....................53

Because Defendants have failed to establish sufficient grounds to support dismissal of the Section 10(b) claims against them, their argument for dismissal of the 20(a) and 20A claims must also be rejected.  *See* Ross, 501 F. Supp. 2d at 1119.

IV.	CONCLUSION……………………………………………………………………………………………………..53

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)..............................................................................15

*Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*,
334 F. Supp. 2d 985 (S.D. Ohio 2004) ...............................................................48

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002).................................................................................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................10

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................10

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)................................................................19

*Christine Asia Co. Ltd. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ...........................................................................15

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ..............................................................2, 11, 14, 15

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)..................................................................27

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ............................................................10, 22, 30, 39

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 347 (2005)), *cert. denied*, __ U.S. __, 139 S. Ct. 310 (2018)..............................4, 51

*Feiner v. SS & C Techs.*,
11 F. Supp. 2d 204 (D. Conn. 1998)....................................................................28

*Fidel v. AK Steel Holding Corp.*,
No. C-1-00-320, 2002 WL 31545952 (S.D. Ohio Sept. 19, 2002).............................11, 21, 43

*Fidel v. Farley*,
392 F.3d 220 (6th Cir. 2004) ..............................................................................43

4826-8526-9204.v1

**Page**

*Fidel v. Farley*,
   No. Civ.A.1:00-CV-48-M, 2001 WL 36126923 (W.D. Ky. June 27, 2001),
   *aff'd*, 392 F.3d 220 (6th Cir. 2004) ................................................................................40, 41

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ...........................................................................................42, 43

*Frank v. Dana Corp.*,
   547 F.3d 564 (6th Cir. 2008) ......................................................................................11, 29, 30

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) ....................................................................................... *passim*

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000).....................................................................................................12

*Gauquie v. Albany Molecular Rsch., Inc.*,
   No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016).........................31

*Grae v. Corr. Corp. of Am.*,
   No. 3:16-cv-2267, 2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) ..........................15, 31, 32

*Gruhn v. Tween Brands, Inc.*,
   No. 2:07-cv-852, 2009 WL 1542795 (S.D. Ohio June 2, 2009)..............................................47

*Halford v. AtriCure, Inc.*,
   No. 1:08cv867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) ..............................................18

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ....................................................................................... *passim*

*I.B.E.W. v. Ltd. Brands, Inc.*,
   788 F. Supp. 2d 609 (S.D. Ohio 2011) ..............................................................................24, 27

*In re 3Com Sec. Litig.*,
   761 F. Supp. 1411 (N.D. Cal. 1990) .......................................................................................28

*In re Akorn, Inc. Sec. Litig.*,
   240 F. Supp. 3d 802 (N.D. Ill. 2017) .......................................................................................18

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011).................................................................................28, 42

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................................26

4826-8526-9204.v1

**Page**

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015)................................................................25, 27

*In re Cardinal Health Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ........................................................... *passim*

*In re Checkers Sec. Litig.*,
   858 F. Supp. 1168 (M.D. Fla. 1994).........................................................................28

*In re Duke Energy Corp. Sec. Litig.*,
   282 F. Supp. 2d 158 (S.D.N.Y. 2003).......................................................................27

*In re Enron Corp.*,
   No. H-01-3624, 2003 WL 2418157 (S.D. Tex. Apr. 24, 2003)...............................46

*In re Envision Healthcare Corp. Sec. Litig.*,
   No. 3:17-cv-01112, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019).........................23, 24, 32

*In re Extreme Networks, Inc. Sec. Litig.*,
   No. 15-cv-04883-BLF, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)....................18

*In re Fed.-Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich. 2001)....................................................................18

*In re FirstEnergy Corp. Sec. Litig.*,
   316 F. Supp. 2d 581 (N.D. Ohio 2004).................................................................11, 44

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005).......................................................................28

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ...................................................................................18

*In re Hertz Glob. Holdings, Inc.*,
   905 F.3d 106 (3d Cir. 2018)......................................................................................46

*In re Huffy Corp. Sec. Litig.*,
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ..............................................13, 14, 17, 20

*In re Jiffy Lube Sec. Litig.*,
   772 F. Supp. 258 (D. Md. 1991)...............................................................................28

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ..............................................................................45

- viii -

**Page**

*In re Proquest Sec. Litig.*,
   527 F. Supp. 2d 728 (E.D. Mich. 2007)...................................................................................49

*In re PTC Therapeutics, Inc. Sec. Litig.*,
   No. 16-1124 (KM) (MAH), 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ...............................31

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
   124 F. Supp. 2d 527 (S.D. Ohio 2000) ...................................................................................46

*In re Sofamor Danek Grp.*,
   123 F.3d 394 (6th Cir. 1997) ..................................................................................................20

*In re Telxon Corp. Sec. Litig.*,
   133 F. Supp. 2d 1010 (N.D. Ohio 2000).................................................................................11

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ................................................................................................46

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003).....................................................................................46

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016).................................................................................................25, 27

*Ind. State Dist. Council v. Omnicare, Inc.*,
   583 F.3d 935 (6th Cir. 2009) ..................................................................................................52

*Kyrstek v. Ruby Tuesday, Inc.*,
   No. 3:14-cv-01119, 2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016)........................34, 37, 50

*Litwin v. Blackstone Grp. L.P.*,
   634 F.3d 706 (2d Cir. 2011)...............................................................................................25, 27

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)............................................................................................................10, 43

*Nicholas v. Poughkeepsie Sav. Bank/FSB*,
   No. 90 CIV. 1607 (RWS), 1990 WL 145154 (S.D.N.Y. Sept. 27, 1990)................................28

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
   877 F.3d 695 (6th Cir. 2017) ...................................................................................4, 50, 51

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).....................................................................................................35

4826-8526-9204.v1

**Page**

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) ......................................................................9, 10, 52

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)...................................................12, 33, 35, 42

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)....................................................................................19, 52

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ..............................................................................32

*Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)..................................................................26

*Ret. Sys. v. Psychiatric Sols., Inc.*,
    No. 3:09-00882, 2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) .........................49

*Roberti v. OSI Sys., Inc.*,
    No. CV 13-9174-MWF, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)..................31

*Ross v. Abercrombie & Fitch Co.*,
    501 F. Supp. 2d 1102 (S.D. Ohio 2007) ........................................................ *passim*

*Rubin v. Schottenstein, Zox & Dunn*,
    143 F.3d 263 (6th Cir. 1998) ..............................................................................37

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................................35

*S.E.C. v. Mozilo*,
    No. CV 09-3994-JFW, 2010 WL 3656068 (C.D. Cal. Sept. 16, 2010).......37, 38, 39

*Sanchez v. Centene Corp.*,
    407 F. Supp. 3d 831 (E.D. Mo. 2019).......................................................37, 39, 42

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020)..........................................................................37, 39

*Silverman v. Motorola, Inc.*,
    No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008)................................18

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)................................................................................23

- x -

**Page**

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)................................................................................................ *passim*

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
  No. 09-12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)...................................19, 20, 21

*Willis v. Big Lots, Inc.*,
  2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) .......................................................21, 29, 45, 49

*Winslow v. BancorpSouth, Inc.*,
  No. 3:10-00463, 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ..........................................24

*Zwick Partners, LP v. Quorum Health Corp.*,
  No. 3:16-cv-2475, 2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) .......................................36

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78j(b).............................................................................................................4, 10, 20, 53
  §78t(a) ..............................................................................................................................4, 53
  §78t-1 ...............................................................................................................................4, 53
  §78u-4 .................................................................................................... *passim*
  §78u-4(B)(1) .........................................................................................................................10
  §78u-4(B)(2) .........................................................................................................................10
  §78u-4(b)(2) .........................................................................................................................28
  §78u-5(c)...............................................................................................................................22
  §78u-5(c)(1)(B).....................................................................................................................24

Federal Rules of Civil Procedure
  Rule 9(b) .............................................................................................4, 10, 11, 28
  Rule 12(b)(6)...........................................................................................................................9

17 C.F.R.
  §210.4–01(a)(1) ...................................................................................................................25
  §240.10b-5 ............................................................................................................... *passim*

4826-8526-9204.v1

## I.   INTRODUCTION

This securities fraud case arises out of Defendants' material misrepresentations and omissions regarding Cardinal's acquisition and integration of Cordis Corporation.  Cordis is a manufacturer and global seller of cardiovascular and endovascular devices which Cardinal purchased from Johnson & Johnson ("J&J") in 2015 for $1.9 billion.  ¶¶2, 20.[1]  The Cordis acquisition was a key part of Cardinal's business strategy to shore up stagnated margins in its Medical segment and to offset declining revenues in Cardinal's Pharmaceutical business.  ¶¶19-24.  While this was the largest acquisition in Cardinal's 40-year history, the fact that one of Cardinal's top executives, defendant Don Casey, was a former J&J executive who oversaw the global cardiovascular group, assured analysts and investors that Defendants had a deep understanding of the business.  ¶23.

But investors were deceived from the start.  From the time the Cordis acquisition was announced, and throughout the Class Period, Defendants concealed debilitating inventory management and tracking problems plaguing Cordis, failed to disclose that Cordis was carrying $200-$300 million in excess, obsolete, expired, missing and unaccounted-for inventory (which was not being reflected in Cardinal's earnings throughout the Class Period), and covered up the facts that Cardinal was incurring significant cost overruns in setting up a global supply chain for Cordis and Cordis's most popular products were back-ordered and therefore could not be sold when needed.  ¶67.  Defendants also concealed that by summer 2017, these problems had grown increasingly worse as Defendants lost all visibility into Cordis's inventory in regions around the world because its then-existing inventory management system had completely shut down.  ¶¶71, 83.  Internally at Cardinal, this was called the "Dark Period" or the "Blackout Period."  *Id*.  And while Defendants

---

[1]   Paragraph references ("¶__" and "¶¶__") are to the Consolidated Amended Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF No. 28).  Unless otherwise defined, all capitalized terms have the same meanings as defined in Plaintiff's Complaint.  All citations are omitted and emphasis is added throughout unless otherwise noted.

4826-8526-9204.v1

were concealing these facts from investors, they collected close to $180 million in insider stock sales and incentive based compensation.  ¶¶112-128.

Defendants argue that Plaintiff has not adequately alleged: (1) the *materiality* of Defendants' statements and omissions; (2) scienter; and (3) loss causation with regard to Cardinal's false and misleading financial statements (conceding loss causation is appropriately pled for all other misstatements and omissions).  Motion to Dismiss the Consolidated Amended Complaint for and Memorandum of Law in Support (ECF No. 31) (the "MTD").  Defendants' arguments for dismissal fail.

*First*, Defendants' contention that all of their statements are immaterial "puffery" is undercut by their decision to speak repeatedly on investor conference calls and in press releases, news articles and SEC filings about the Cordis acquisition, its financial performance, the progress of its integration and how Cordis would benefit from Cardinal's inventory management technology. Cordis was a massive acquisition and its success was central to turning around Cardinal's Medical Segment and boosting the Company's declining margins and revenue.  ¶¶19-24.  Indeed, when the truth about Cordis's widespread problems began to emerge, Cardinal's stock price suffered massive declines – 8% on August 2, 2017 and 21% on May 3, 2018 alone.  ¶¶68-70, 84-89.  These stock price drops, which removed billions of dollars from Cardinal's market capitalization, belie any claim of immateriality.  Moreover, even for close calls (which this was not), materiality is a "fact intensive question," on which Defendants cannot prevail.  *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) ("As for materiality whether or not a statement is material turns on 'a fact-intensive test.'").  Defendants' claim that their statements are protected by the Private Securities Litigation Reform Act of 1995's ("PSLRA") safe harbor (*essentially another materiality argument*) must also be rejected because the challenged statements are misrepresentations of current or historic fact that fall outside the limited application of the safe

- 2 -

harbor and Defendants' boilerplate risk disclosures fall short of the "meaningful cautionary language" required for safe harbor protection. Similarly, Defendants' materiality arguments with regard to Cardinal's false and misleading financial statements fall short because courts have repeatedly rejected Defendants' limited quantitative and quantifying arguments.

*Second*, Defendants have failed to articulate a single plausible opposing inference of scienter that would detract from Plaintiff's allegations of fraud. Instead, Defendants make a meritless claim that their purported Class Period disclosures about Cordis "negate" scienter. But during the Class Period Defendants failed to disclose anything about Cordis's hundreds of millions of dollars in excess, obsolete, expired and missing inventory, Cordis's deficient inventory tracking systems, Defendants' inability to forecast demand for Cordis products, or any of the other material, adverse facts alleged in the Complaint. *See* ¶¶67, 71, 83. Moreover, the Complaint particularizes numerous allegations that the Sixth Circuit and this Court have found highly probative of scienter, including Defendants' disregard of the most current factual information about Cordis before making statements to investors, unusual and massive insider trading, key executive departures, the magnitude of Cardinal's post-Class Period write down of almost all of Cordis's value, the importance of Cordis to Cardinal's business strategy, and Defendants' self-interest in boosting and keeping their performance-based compensation. Viewed holistically, as they must be, these well-pled allegations create a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-26 (2007).

*Third*, Defendants challenge loss causation, but only with regard to Cardinal's false and misleading financial statements. But Defendants' argument is based on the incorrect claim that pleading loss causation requires an admission by Defendants of accounting rule violations or a restatement of Cardinal's financial statements. That argument has been repeatedly rejected by this Court and others in the Circuit. A plaintiff alleging securities fraud need only provide a defendant

"'with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)), *cert. denied*, __ U.S. __, 139 S. Ct. 310 (2018). Plaintiff has done far more than that by: (1) specifically linking the August 2, 2017 and May 3, 2018 disclosures of Cardinal's lower-than-expected earnings due to Cordis's inventory write-offs, increased costs and lower sales to Defendants' prior misleading statements and omissions, including Cardinal's financial statements (¶¶131-137); (2) pleading that class members purchased Cardinal stock at artificially inflated prices as a result of Defendants' materially misleading misstatements and omissions (¶¶131-132); and (3) pleading that class members were damaged when the truth about Cordis and its impact on Cardinal's financial results was revealed, resulting in significant stock price declines as the artificial inflation left the stock. *Id.*

Last, Defendants also move to dismiss Plaintiff's §§20(a) and 20A claims based on the sole argument that the Complaint does not adequately allege a §10(b) claim. Defendants are incorrect and the Court should sustain both claims.

Plaintiff's Complaint satisfies the pleading requirements of the Exchange Act, the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure, and Defendants' Motion should be denied.

## II.     SUMMARY OF FACTUAL ALLEGATIONS

This securities class action is brought on behalf of all purchasers of Cardinal common stock during the March 2, 2015 through May 2, 2018 Class Period, against Cardinal and five of its current and former senior executives for violations of §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

Defendants made false and misleading statements about Cardinal's Cordis acquisition, integration and inventory. Defendants misled investors by repeatedly assuring the market that they

- 4 -

4826-8526-9204.v1

were transforming Cordis's business with Cardinal's inventory management technology and supply chain expertise, which would result in significant operating efficiencies and earnings accretion for investors.  Defendants said that Cardinal and Cordis were able to offer reliable, trackable inventory and logistics and deep analytic capabilities, and that Cardinal was implementing its RFID technology at Cordis to eliminate or reduce expired and lost inventory and lower managed inventory levels.  *See* ¶¶32-33, 37, 41-45, 58.  Defendants also told investors that they expected the Cordis acquisition to be more than $0.20 per share accretive in FY 2017, the first full year after the acquisition, and that Cardinal would achieve at least $100 million in annual synergies by the end of FY 2018, all as a result of their purported transformation of Cordis.  ¶¶31-32, 34, 36, 41, 43, 48, 53, 55, 65. Defendants also continually assured investors that Cardinal's integration of Cordis was on track, on plan and going very well, Cordis's business was performing very well and as expected, and Cordis was generating top-line revenue growth.  ¶¶43, 46-47, 49-52, 54, 56-57, 59-61, 75-77, 80-82.

On August 2, 2016, when Cardinal announced its 4Q and FY 2016 results, Defendants lowered Cordis's expected FY 2017 accretion from $0.20 to $0.15 in non-GAAP diluted earnings per share.  ¶55.  But Defendants blamed the lowered figure on foreign exchange costs and increased expenditures, and emphasized that Cordis's business was "going really well" and they still "expect[ed] great performance from Cordis."  ¶¶54-55.  Similarly, between August 2016 and February 2017, Defendants continued to maintain that Cordis's business was "going really well," "continues to perform well," and "continues to meet our performance expectations and make real and measurable progress." ¶¶57, 59.  And they publicly claimed that the Medical Segment's profits were increasing remarkably due to contributions from the Cordis business.  ¶60.

In May and August 2017, Cardinal reported lower-than-expected Cordis performance for 3Q and 4Q FY 2017, which Defendants blamed on increased buildout costs and unquantified Cordis inventory write-offs.  ¶¶65, 68-69.  Defendants did not give investors details about the amount or

- 5 -

nature of the inventory write-offs, other than to say that the August increased reserve related to "excess inventory" at Cordis. ¶69. But Defendants continued to insist through 2Q 2018 that Cordis's slower performance and inventory issues were isolated to 2Q 2017 and were under control, Cordis was still performing well and as expected, and was on a growth trajectory. ¶¶73-77, 79-82. Defendants assured investors during that time that they had implemented "robust" remediation plans to address Cordis's inventory issues. ¶80.

In truth, Defendants' statements about the integration of Cordis, its performance and its inventory were materially false and misleading because Cordis had been plagued by debilitating inventory crises worldwide even before the acquisition and continuing for the first two and a half years afterward. ¶¶67, 71, 83. Prior to Cardinal's acquisition of Cordis, J&J had failed to integrate inventory control and supply chain systems for Cordis, so J&J could not accurately forecast demand for Cordis products and, therefore, manufactured and accumulated excess inventory. ¶67(a)(ii)(1)-(5). Because Cordis products had short shelf lives of one to two years, it was not long before the excess product inventory expired. *Id.*

From October 2015 through at least May 2018, Defendants were unable to accurately track Cordis consignment and warehouse inventory around the world because they had inherited deficient and incompatible inventory control and supply systems from J&J and failed to implement more effective systems. *Id.* Beginning from late 2015, Defendants discovered that J&J had been carrying at least $200 million to $300 million in excess, obsolete, and missing or unaccounted-for inventory in its warehouses, including in El Paso, Colombia, Brazil, Mississippi, Belgium and Japan. ¶67(a)(ii). Compounding Cordis's inventory control deficiencies, when Cardinal acquired Cordis it did not have an existing supply chain, customer service system or distribution capabilities outside the United States. ¶67(c)(i)-(ii). Creating a supply chain and customer service infrastructure for Cordis

- 6 -

in 50-plus countries was an enormous undertaking for which Cardinal was not prepared, in part because of its haste to complete the deal.  *Id*.

The inability to track inventory was further exacerbated when, around July 2017, Cordis's iTrak inventory management system completely shut down due to being stressed by the amount of Cordis's inventory outside the United States.  ¶¶71, 83(a).  As a result, Defendants had no visibility of Cordis worldwide inventories from July 2017 and continuing for the next year.  *Id*.  Defendants and others referred to the crisis internally as the "Dark Period" or the "Blackout Period."  *Id*.

Cordis's inventory control and supply chain deficiencies created another performance hurdle which Defendants were unable to remedy for years after the acquisition: Cordis's most popular products were constantly back-ordered in the EMEA and North American regions, leading to an increasing loss of customers and sales following the acquisition.  ¶67(b)(i)-(iii).  Cordis also lost sales and customers around the world after the acquisition because Cardinal failed to train its own sales representatives to sell Cordis's products, which were much more complicated and difficult to understand than Cardinal's traditional products.  ¶67(d)(i)-(iii); *see also* ¶83(b)(i)-(ii).

For all of these reasons, Cardinal's acquisition and integration of Cordis was disastrous and never on track during the Class Period.  ¶¶67, 71, 83.  Cordis was not performing well or as expected and its inventory issues were debilitating, never under control and never remediated, which was in turn draining Cardinal's business.  ¶67(a)(iii).  As a result, three of the highest ranking individual Defendants abruptly resigned their positions in succession from August 2017 to February 2018 while the undisclosed Cordis disaster unfolded (but was kept hidden from investors).  ¶¶72, 78, 111. Defendant David Wilson, Cordis's Worldwide President, left abruptly in August 2017.  ¶72.  Three months later, on November 6, 2017, Cardinal announced that defendant George Barrett would resign as CEO effective January 2018.  ¶111.  Then, in early February 2018, defendant Don Casey, CEO of

- 7 -

Cardinal's Medical Segment and the chief advocate of the Cordis acquisition, abruptly left. ¶¶14, 78.

Barrett and Casey did not leave without benefitting from Cardinal's artificially inflated stock prices created by their own misrepresentations about Cordis. These insiders sold over 1.4 million shares of Cardinal Health at artificially inflated prices between $70.40 and $86.44, reaping almost $114 million in insider trading proceeds during the Class Period. ¶¶112-114. Defendant Barrett alone pocketed almost $109 million in just eight trading days, selling his stock for up to $86.44 per share, and Casey dumped over 59,000 shares in two consecutive days while Cardinal's stock price was above $83 per share, for proceeds of almost $5 million. *Id*.

Then, on May 3, 2018, just three months after Casey left, Cardinal shocked investors and analysts by announcing before the markets opened that Cardinal's Generally Accepted Accounting Principles ("GAAP") diluted EPS for 3Q 2018 decreased 33% to $0.81 because Cordis's inventory reserves had been "even higher than expected this quarter." *See* ¶¶5, 84-90, 131-137. Cardinal admitted that day that it lacked demand planning capabilities to "have the right inventory in the right markets to capitalize on sales opportunities and reduce inventory reserves." ¶86. Cardinal's management also acknowledged that the Company had only recently launched a new global supply chain platform necessary for inventory visibility and insights into demand, and that the Company was only, in May 2018, implementing process and technology improvements to better manage Cordis consigned inventory. ¶¶86-87. Specifically, Cardinal implemented in 3Q 2018 – two and a half years after it acquired Cordis – an ERP functionality which allowed Cardinal to identify inventory positions in certain geographies that required higher inventory reserves. It was also admitted that Cardinal did not expect Cordis to begin to see profitable growth until the end of FY 2019. *Id*.

- 8 -

In response to these disclosures of the truth about Cordis and its impact on Cardinal's earnings, Cardinal's stock price fell 21.4% on May 3, 2018 to $50.79 on huge trading volume of 15,594,300 shares – by far the biggest trading day since the beginning of the Class Period. ¶¶89, 136. Then, in August 2018, one quarter after the end of the Class Period, Cardinal announced that it would have to take a $1.4 billion non-cash goodwill impairment charge, primarily driven by "inventory and cost challenges within [the] Cordis business." ¶91. Cardinal's $1.4 billion "non-cash" goodwill write-down erased 100% of the goodwill recorded for the Cordis acquisition, representing nearly 74% of the $1.9 billion purchase price that Cardinal paid to acquire Cordis on October 4, 2015. ¶129. Cardinal paid $1.9 billion to acquire Cordis in October 2015, but had to write off $1.4 billion of the purchase price in non-cash goodwill related to Cordis less than three years later. *Id.* Moreover, the $1.4 billion write down negatively impacted Cardinal's FY 2018 operating profits, which declined 94% from $2.12 billion (2017) to $126 million (2018). ¶¶91, 129. Cardinal also announced in August 2018 that it was doubling its inventory reserve from year-end FY 2017, from $76 million to $147 million, and that the vast majority of the increase was driven by its Cordis business. *Id.* Cardinal's August 2018 news confirmed the prior two corrective disclosures and that Defendants had misrepresented the success and benefits of the acquisition throughout the Class Period and that the Cordis acquisition was a failure which decimated Cardinal's profitability.

## III. ARGUMENT

### A. Legal Standard for Motion to Dismiss

In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts consider a complaint "in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs*, 551 U.S. at 322-23; *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382-83 (6th Cir. 2016). In general, a complaint "does not need detailed factual allegations," but only "enough facts to state a claim to

- 9 -

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 556.

Under §10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 383-84 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)); *accord Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018). Defendants only contest three of these elements: (1) whether Plaintiff has alleged material misrepresentations and omissions; (2) scienter; and (3) loss causation (only with respect to Plaintiff's allegations that Cardinal's financial statements were false and misleading).

A securities fraud claim must also satisfy Rule 9(b) and the PSLRA. *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 383. Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Similarly, the PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §§78u-4(B)(1)-(2).

As discussed below, Plaintiff's Complaint meets all pleading requirements and adequately alleges each element of Plaintiff's claim. Defendants' motion should be denied in its entirety.

**B.      The Complaint Pleads Materially False and Misleading Statements**

Under Rule 10b-5, "any untrue statement of a material fact" is actionable, including failure "to state a material fact necessary in order to make the statements made, in light of the circumstances

- 10 -

under which they were made, not misleading." 17 C.F.R. §240.10b-5. "Our securities laws . . . 'require an actor to "provide complete and non-misleading information with respect to the subjects on which he undertakes to speak."'" *Bridgestone*, 399 F.3d at 670; *see also Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, 2002 WL 31545952, at *18 (S.D. Ohio Sept. 19, 2002) (same); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004) (same). Because Defendants chose to speak repeatedly about the financial contribution of Cordis, the progress of its integration and that Cordis would benefit from Cardinal's inventory management technology and supply chain expertise, they had a duty to disclose the full truth: Defendants actually lacked visibility into Cordis's inventories because of deficient or inoperable inventory management systems; Cordis was carrying hundreds of millions of dollars in excess, obsolete, expired, missing and unaccounted-for inventory; Cordis's sales were declining due to a complete lack of inventory controls and demand forecast capability; and Cardinal was incurring significant increased costs and was not prepared to set up a global supply chain for Cordis, which Cordis lacked because it was only a portfolio of inventory, intellectual property and a sales force; and all of this was draining Cardinal's business. ¶¶67, 71, 83. Defendants materially misled investors by failing to disclose these facts at any time during the Class Period even as they repeatedly spoke about Cordis and its inventories. As the Sixth Circuit has recognized, "a company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001).

Importantly, Defendants do not dispute that the Complaint adequately pleads their misrepresentations and the reasons why each statement is alleged to be false and misleading.[2]

---

[2] To adequately plead falsity under Rule 9(b) and the PSLRA, a plaintiff must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (*Dana I*) ("At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied."); *see also In re Telxon*

- 11 -

Rather, Defendants argue that their statements were not *materially* misleading.  MTD at 14-21.  But questions of materiality may be decided as a matter of law only if the "'alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.'"  *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 747 (S.D. Ohio 2006).  That is not the case here.  "Indeed, materiality is a fact-intensive inquiry more appropriate for summary judgment or trial, and courts are loath to dismiss a securities fraud complaint on materiality grounds unless the omitted material is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Particularly in light of the fact-intensive nature of any materiality analysis, Defendants' materiality arguments are meritless and do not support dismissal of Plaintiff's Complaint.

> 1.  **Defendants' Statements that Cordis Was Benefiting from Cardinal's Inventory Management Technology and Supply Chain Expertise Were Materially Misleading (¶¶32-33, 37, 41-45, 58)**

Defendants argue that *all* of their Class Period representations about the benefits of combining Cardinal's inventory management and supply chain expertise with Cordis's portfolio, were immaterial "puffery."  MTD at 15.  But Defendants only address three statements from the first six months of the 38-month Class Period to make this argument.  *Id*. at 15-20 (challenging

---

*Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1025 (N.D. Ohio 2000) (pleading falsity requires "'the who, what, when, where, and how:  the first paragraph of any newspaper story'").  For each statement made, the Complaint identifies the content of the statement, which defendant spoke (or omitted material information), and when and where the statements were made.  ¶¶31-65, 68-82. The Complaint also sets forth why each statement was false and misleading, including the material information Defendants omitted.  *See* ¶¶67, 71, 83, 92-103.

statements alleged at ¶¶37, 41 and 43, made in March and October 2015).[3]  Much like Defendants'

Class Period misrepresentations, their argument presents only a small part of the whole story.

Throughout the Class Period – continuing until March 2018 – Defendants told investors that

Cardinal would use, and was using, its inventory management technology (RFID/CIMS) and supply

chain expertise to drive operational efficiencies and reduce costs associated with Cordis inventory.

¶¶32-33, 37, 41-45, 58.  As set forth below, Plaintiff pleads in detail why these statements were

material to investors, and Defendants' argument that three of the statements in 2015 were immaterial

puffery must be rejected.[4]

As an initial matter, courts in the Sixth Circuit are cautious when addressing arguments that

statements are so-called puffery.  *See, e.g.*, *Cardinal Health,* 426 F. Supp. 2d at 749 n.70

("[f]ollowing the devastating corporate scandals occurring in the past decade, most courts now

consider statements of corporate optimism with more hesitation" and should "proceed cautiously

when examining [d]efendants' assertions that their enthusiastic statements . . . were 'puffery' as

---

[3]    In footnote 5 of their MTD, Defendants argue that the April 10, 2015 statement in ¶41 of the Complaint is not properly attributed to defendant Casey.  But the quote in ¶41 is from an article published in Clinica Medtech Intelligence, titled "INTERVIEW: The bigger value picture behind Cardinal's Health's Cordis buy," which was based on an interview given by defendant Casey.  This statement was one many following Cardinal's announcement of its plans to purchase Cordis where Defendants "led investors to believe that once the Cordis acquisition closed, Cardinal would be able to use its supply chain expertise and its sophisticated inventory management systems to efficiently manage Cordis inventory, which in turn would provide value to the Company in the form of profitable sales, lower inventory related costs, and increased earnings," and is therefore actionable. *See* ¶40.

[4]    The puffery section of Defendants' Motion also cites ¶¶34, 36, 41, 43, 53 and 65 of the Complaint, which contain their statements that Cordis would be accretive to Cardinal's earnings by FY 2017 and bring annual synergies of at least $100 million by end of FY 2018.  MTD at 15. Defendants, however, do not specially address why the accretive and synergies statements in these paragraphs are allegedly puffery.  Thus, while its it is not clear whether Defendants are challenging them, these statements cannot be dismissed as puffery for the same reason discussed in III.B.1-2. Also, these statements were not "so vague, so general, or so loosely optimistic that a reasonable investor would find [them] unimportant to the total mix of information."  *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1006 (S.D. Ohio 2008).

- 13 -

opposed to reckless or fraudulent misstatements."); *Huffy*, 577 F. Supp. 2d at 1006 (the court agreed that "it should proceed cautiously when addressing Defendants' assertion that certain statements are not actionable, because they were puffery"). Accordingly, the "context in which a statement is made is essential in determining whether a statements is puffery." *Id.* at 1007; *Bridgestone*, 399 F.3d at 671-72 ("'What might be innocuous "'puffery'" or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.'").

In arguing their statements were puffery, Defendants incorrectly present them as though made in isolation and ignore the context in which they were made. On almost every investor conference call from the beginning of the Class Period to early February 2017, Defendants spoke about how Cordis would benefit from Cardinal's inventory management technology and supply chain expertise, and how that would translate into cost synergies and earnings accretion for Cardinal, all in the context of discussing the acquisition and integration of Cordis. ¶¶32-33, 37, 41-45, 58. These statements were made repeatedly to reassure investors about the success of the acquisition and integration, which was of utmost importance to investors because Cardinal's entry into manufacturing interventional cardiovascular products represented a significant departure from the low-tech and low-margin medical supplies Cardinal had traditionally sold. ¶29. Unlike Cardinal's other products, Cordis's heart stints and catheters had strict expiration dates that had to be closely monitored for quality and regulatory standards. ¶¶30, 67(a). Moreover, since the acquisition greatly expanded Cardinal's geographic footprint, and Cordis lacked international supply chain and distribution capabilities since it was a J&J portfolio consisting of only intellectual property, inventory and a sales force, managing Cordis's consigned and warehouse inventory posed significant operational challenges for Cardinal. ¶¶30, 67(c). Thus, Cardinal's implementation of an effective

4826-8526-9204.v1

inventory management system and supply chain was critical to the success of the integration and Cardinal's accretive expectations for Cordis, and was particularly important to investors.

In this context, it would have been material to reasonable investors to know that Defendants were unable to accurately track how much of Cordis's consigned and warehouse inventory existed, how much of it was excess and obsolete or about to expire, how much of it was missing or unaccounted-for, and where it was located around the world. ¶67. Given the central importance of inventory management to the Cordis business, it was also material to investors to know that Cordis was actually carrying $200-$300 million in excess, obsolete, expired, missing and unaccounted-for inventory in 2015-2017, that Cardinal had been forced to manually count consignment inventory in North America and EMEA, and that Cardinal could not demand forecast for Cordis products. *Id.* Instead, investors were misled about Cordis and kept in the dark about all of these adverse facts plaguing it. *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at *15 (M.D. Tenn. Dec. 18, 2017) ("A reasonable juror could conclude that CoreCivic's statements, in context, were false or misleading because they ran directly counter to a wealth of available evidence establishing that its operations had pervasively failed to live up to the quality standards of the BOP.").

Not only is Defendants' materiality argument undercut by the fact that they repeatedly talked to inventors about the Cordis acquisition, its inventory management and integration, materiality is also demonstrated by the significant stock declines – more than 8% and 21%, respectively – that followed the disclosures on August 2, 2017 and May 3, 2018 related to Cordis inventory write-downs, higher costs to set up Cordis's supply chain and lost sales due to inventory problems. ¶¶68-69, 84-88, 133-134. *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) ("And, of course, the materiality of the alleged misrepresentations is self-evident when we look at the market's negative reaction – to the tune of a nine-percent drop in stock price in three days . . . ."); *see also Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) ("The

- 15 -

importance of this information to investors is illustrated by the fact that, when it was revealed four months subsequent to the IPO, Alibaba's stock dropped 13% in two days . . . .").

Defendants also selectively cite ¶¶37, 41 and 43 of the Complaint to argue their statements in March and October 2015 are immaterial as a matter of law because they are just "about the effect of combining Cardinal Health and Cordis's offerings to customers." MTD at 16. But this ignores that Defendants' statements were about the positive impact Cardinal's RFID technology would have, and was having, directly on Cordis's *own* inventory. *See, e.g.*, ¶¶33, 42, 45, 58. For instance, when the Cordis acquisition was initially announced on March 2, 2015, Casey touted that Cardinal's RFID technology as a ***shared platform*** that connects manufacturers like Cordis and health care providers "with supply chain visibility and analytics" and "reduc[es] expired and lost products, lowering managed inventory levels and decreasing holding costs." ¶33. And on May 13, 2015, defendant Kaufmann told investors that with Cardinal's RFID technology applied to Cordis, "***we're*** going to be able to take a waste out of the system, reduce obsolescence, reduce inventory." ¶42. Similarly, during Cardinal's November 19, 2015 Investor and Analyst Day conference, Casey told investors that attaching RFID technology to Cordis's products was "going to change the game from ***our*** ability to manage lost products, dated products, it's going to provide the analytics people need to begin to understand how ***we*** can do a much better job of managing inventory." ¶45. And at Cardinal's December 16, 2016 annual investor conference, defendant Barrett also talked to investors specifically about the value of Cardinal's inventory management program in managing the cost associated with consignment inventory, which was a significant part of Cordis's global inventory. ¶58.

These statements led inventors to believe that Cardinal's RFID technology would not only benefit its customers, it was also providing Defendants with inventory visibility and accuracy, controlling inventory costs and keeping track of Cordis's significant global consigned inventory.

- 16 -

But in truth, the inventory tracking technology that Defendants said the Company would use to improve Cordis's performance was never implemented. ¶67(a). Taken in the context they were made, these statements were materially misleading.

### 2. Defendants' Statements About the Cordis Integration Were Materially Misleading (¶¶43, 46-47, 49-52, 54, 56-57, 59, 61)

Throughout the Class Period Defendants also spoke to investors about the Cordis integration, repeatedly assuring them that "the integration process is off to a successful start" (¶43); "the integration has gone well" (¶46); "integration of Cordis has gone well and is on target" (¶47); "[w]e're off to a very good start . . . things are going as expected" (49); "integration of Cordis remains on track" (¶50); "the onboarding of Cordis continues to progress well" (¶50); "operationally the integration is going extremely well" (¶51); "we hit our integration and performance benchmarks . . . things are going incredibly well" (¶54); "Cordis . . . continues to meet our performance expectations and make real and measurable progress" (¶57); and "[o]ur Cordis acquisition is largely on plan" (¶61).

These statements were materially misleading, because they concealed the debilitating inventory management and tracking problems Defendants were experiencing, the fact that Cordis was carrying $200-$300 million in excess, obsolete, expired, missing and unaccounted-for inventory which was not being reflected in Cardinal's earnings, the cost overruns in setting up a global supply chain for Cordis and the fact that Defendants were not prepared for that enormous undertaking globally, and the fact that Cordis's most popular products were back-ordered and not available for sale for months. ¶¶67, 71, 83. These concealed facts directly belied Defendants' assertions that the integration was "going extremely well," "incredibly well," "off to a successful start" and "on track." *Huffy*, 577 F. Supp. 2d at 1015 (rejecting defendants' puffery claim because statements "were made at a time that the Defendants knew that Gen-X was mired in problems associated with . . . its accounts receivable, accounts payable and inventory, yet Huffy lauded the acquisition of that

- 17 -

entity"). Indeed, courts have found that statements such as these are materially misleading and not puffery when contradicted by concealed true facts. *See, e.g.*, *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (finding statement that a company was "on track" to meet its integration goals was materially misleading in light of plaintiff's allegations that serious problems hindered the integration); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (holding that statements referring to the launch of new products as "on track," are not puffery and would be material if in fact defendants knew that those products were not on track); *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-cv-04883-BLF, 2018 WL 1411129, at *12, *18 (N.D. Cal. Mar. 21, 2018) (statements that integration was "on track" found to be actionable).[5]

### 3. Defendants' Statements About Cordis's Impact on Cardinal's Financial Results Were Materially Misleading (¶¶60, 68-69, 73)

Defendants also challenge three statements they made in February, August and September 2017 (¶¶60, 68-69, 73[6]), as inactionable, claiming they are "accurate statements of historical results."

---

[5] Defendants' reliance on *In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) does not support their position. MTD at 17. In *Fed.-Mogul Corp.*, the court found defendants' statement immaterial because they were merely statements relating to the Company's overall business strategy of acquiring complementary companies. 166 F. Supp. 2d at 562-63. In contrast, Defendants' statements here were specifically about the progress of the Cordis integration and were admittedly verifiable. *See, e.g.*, ¶54 ("we hit our . . . integration benchmarks"); ¶57 ("Cordis . . . continues to . . . make real and measurable progress"); *Halford v. AtriCure, Inc.*, No. 1:08cv867, 2010 WL 8973625, at *11 (S.D. Ohio Mar. 29, 2010) (finding that statements that provide factual information which is "objectively verifiable" are not puffery). For the same reasons, Defendants' reliance on *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) is not persuasive as Defendants' statements about the Cordis integration were objectively verifiable.

[6] Defendants include ¶61 in their argument that accurate statements of historical results are not actionable. MTD at 19. But the statements in ¶61 relate to the progress of the Cordis integration ("[o]ur Cordis acquisition is largely on plan" and "Cordis is performing well, particularly in Europe and Latin America"). As discussed above in III.B.2, statements about the Cordis integration were materially misleading. Defendants also include ¶¶70-72 in their argument about purported accurate historical results. MTD at 19. But those paragraphs do not contain any alleged misstatements. Rather, they describe the stock price decline following the August 2, 2017 partial disclosure (¶70),

- 18 -

4826-8526-9204.v1

MTD at 19. But the fact that a statement contains some accurate financial results is **not** a dispositive defense to a half-truth. As the Supreme Court held in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.*

Defendants' August 2, 2017 statements regarding Cordis and Cardinal's financial results were partial corrective disclosures but remained materially misleading. ¶¶68-69. Defendants failed to disclose the full truth about Cordis's inventory issues when they vaguely disclosed unquantified "higher than planned write-offs" for Cordis inventory in 4Q 2017, giving investors a false impression about the state of Cordis's inventory. ¶¶69, 71. The Complaint alleges that at the time the August 2017 statements were made, Defendants had lost all visibility into Cordis's inventory in regions around the world because Cordis's iTrak inventory management system had completely shut down. ¶¶71, 83(a). The crisis was known internally at Cardinal as the "Dark Period" or "Blackout Period," and continued into the summer of 2018. *Id.* Defendants' loss of visibility into Cordis's inventory was exacerbating the already existing problems of high backorders for Cordis's most popular products, Defendants' inability to forecast and meet demand for Cordis's products, and the accumulation of excess, obsolete, expired, missing and unaccounted-for inventories of Cordis products. *Id.* When Defendants elected to speak on August 2, 2017, they had the duty to speak fully and truthfully about Cordis's inventory. They failed that duty and therefore their statements are actionable. *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 709 (E.D. Mich. 2010) ("where corporate officers choose to speak they are obligated to disclose the truth and to make any additional disclosures necessary to avoid making both present and prior statements misleading"); *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, No. 09-12830, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21,

the reasons why the August 2, 2017 statements were false and misleading (¶71) and the fact that Cordis's top executives, defendant Wilson, resigned amidst the inventory crisis (¶72).

- 19 -

2010) ("Plaintiffs are right that once Defendants did make statements, they were obligated to share complete information.").

The statements in ¶¶60 and 73 were materially misleading for the same reasons. In February 2017, Defendants told investors that growth in Cardinal's Medical Segment was due to the Cordis acquisition, stating that 2Q 2017 "profit increased 50 percent to $159 million due to the contribution from Cardinal Health Brand products, which includes Cordis." ¶60. Then in September 2017, in conjunction with more facts about the Cordis inventory write-offs being disclosed, defendant Kaufmann assured investors that Cordis has "still been a positive for us. And we expect it to grow this year." ¶73. But in both February and September 2017, Defendants again failed to disclose the known inventory problems plaguing Cordis. And in September 2017, Defendants continued to conceal the "Dark Period" which was exacerbating those problems. The omission of these material facts rendered Defendants' statements in ¶¶60, 68-69 and 73 materially misleading under §10(b). *See Huffy Corp.*, 577 F. Supp. 2d at 1004-05, 1007 (finding that statements attributing sales growth to recent acquisition were actionable).[7]

### 4. The PSLRA Safe Harbor Does Not Apply to Defendants' Statements

Defendants generally argue that ***all*** of their Class Period statements are forward-looking statements protected by PSLRA's safe harbor. *See* MTD at 17-18. But Defendants only specifically address their statements that the Cordis acquisition would be accretive to Cardinal's non-GAAP diluted earnings per share by the end of Cardinal's 2017 fiscal year (*Id*. at 17 (challenging ¶¶31-34, 36, 41, 48, 55)), while sweepingly challenging every other statement as just "general expectations or

---

[7]   Defendants' reliance on *In re Sofamor Danek Grp.*, 123 F.3d 394, 401-02 (6th Cir. 1997) is not persuasive. MTD at 19. In that case, the defendants stayed silent as to the alleged product defects and likely regulatory problems, so no duty to disclose was triggered. Accordingly the court held there was no actionable omission. In contrast, Defendants here chose to speak about Cordis's inventory and the systems it was implementing. Having elected to speak on the subject, Defendants had a duty to speak truthfully and completely.

outlook for Cordis," without any substantive explanation as to why they are even forward-looking or why the safe harbor applies. *Id*. at 18. None of Defendants' statements fall within the safe harbor protection because: (1) the statements Defendants generally label as concerning "expectation or outlook" were not forward-looking; (2) Defendants' cautionary language was neither meaningful or adequate; and (3) Defendants had knowledge that those statements were materially misleading and omitted material information when they made them.

**The statements Defendants generally label as concerning "expectation or outlook" were not forward-looking**. The statements Defendants cite on page 18 of their Motion are not forward-looking because they were "statements of present or historic fact." *Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *12 (S.D. Ohio Jan. 21, 2016). For example, Defendants' claim every statement they made about the Cordis integration was forward-looking. *See* MTD at 18 (challenging ¶¶43, 46-47, 49-52, 54, 56-57, 59, 61). But this ignores that these statements were specific statements of past or current facts that purported to convey to investors the existing state of Cordis's integration: "the integration process *is off to* a successful start" (¶43); "the integration *has* gone well" (¶46); "integration of Cordis *has* gone well and *is* on target" (¶47); "[w]e're *off to* a very good start . . . things *are going* as expected" (49); "integration of Cordis *remains on track*" (¶50); "the onboarding of Cordis *continues to progress* well" (¶50); "operationally the integration *is going* extremely well" (¶51); "we *hit* our integration and performance benchmarks . . . things *are* going incredibly well" (¶54); "Cordis . . . *continues to meet* our performance expectations and *make* real and measurable progress" (¶57); and "[o]ur Cordis acquisition *is* largely on plan" (¶61). *See also* ¶¶37, 41-42, 45, 58, 60, 63, 65, 68-69 (statements of past or current fact). "Because the statement[s] plainly relate to past or current, rather than future, performance, the statement[s] cannot be considered forward-looking." *Fidel*, 2002 WL 31545952, at *19.

- 21 -

**Defendants' cautionary language was neither meaningful nor adequate**.  Under the PSLRA safe harbor, a forward-looking statement is not actionable if: (1) the statement is identified as forward-looking *and* is accompanied by meaningful cautionary language; *or* (2) the plaintiff has failed to plead or prove that the statement was made with "actual knowledge" that it was false and misleading.  *See* 15 U.S.C. §78u-5(c); *see also Esperion*, 905 F.3d at 983.  Having failed to satisfy either prong, Defendants cannot avail themselves of the protections of the safe harbor for any statement they deem forward-looking, including their statements about earnings accretion and synergies related to the Cordis acquisition.

The cautionary language Defendants point to in Cardinal's March 2, 2015 press release, regarding the expected accretion and synergies from the Cordis acquisition, is not "meaningful" because it was nothing more than a general warning to investors that "results [could] differ materially from those projected anticipated or implied."  Declaration of David S. Bloomfield, Jr. in Support of Defendants' Motion to Dismiss ("Bloomfield Decl."), Ex 5 (ECF No. 29 at 147 of 428).  To be meaningful, the cautionary language "'must be *substantive* and *tailored* to the specific future projections, estimates or opinions . . . which the plaintiffs challenge.'"  *Helwig*, 251 F.3d at 559.  The required substantive and tailored warnings must be "based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."  *See Cardinal Health*, 426 F. Supp. 2d at 749.

To be substantive and tailored here, Defendants' March 2, 2015 cautionary language would have had to include that Cordis: (1) had inadequate inventory controls and no properly functioning inventory management system in place when the acquisition was announced; (2) was unable to accurately track consigned and warehouse inventory or forecast demand; and (3) Cordis was experiencing debilitating problems with product backorders and was manufacturing excess products, which were subject to strict expiration dates.  ¶67(a)-(b).  Defendants' cautionary language thereafter

- 22 -

4826-8526-9204.v1

would have had to continue to warn of these risks and that Cordis was carrying at least $200-$300 million in excess, obsolete and expired inventory and that by summer 2017 Defendants had lost all visibility into Cordis's ex-U.S. inventories. ¶¶67(a), 71, 83(a). But it did not. The inadequacy of Defendants' cautionary language is demonstrated by the fact that, when investors learned the truth about the negative impact Cordis was having on Cardinal's earnings, they were surprised and disappointed by Defendants' "lack of visibility, lack of good inventory controls, and lack of understanding of the full required investment [for Cordis]." ¶90(b).

For the same reasons, the cautionary language Defendants' chain cite on page 18 of their Motion is also inadequate as it consists of the same boilerplate text. A "'boilerplate litany of generally applicable risk factors' does not qualify as 'meaningful.'" *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-01112, 2019 WL 6168254, at *15 (M.D. Tenn. Nov. 19, 2019). Indeed, Defendants repeated almost identical cautionary statements throughout the Class Period, dispelling any notion that such purported warnings were meaningful. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("The consistency of the defendants' language over time despite the new information they received . . . belies any contention that the cautionary language was "'tailored to the specific future projection.'"); *Helwig*, 251 F.3d at 559 (statements not meaningful or cautionary where "the warning signs flared, Vencor's precautions grew more cursory and abstract" and that "[s]ubstantially similar language" appeared in defendant's filings over the course of several years). Indeed, Cardinal's cautionary language remained the same even as the Cordis inventory problems intensified, including during the "Dark Period" or "Blackout Period" that commenced in the summer of 2017. ¶71. *Envision,* 2019 WL 6168254, at *16 (cautionary language "is only meaningful to the extent that [the risks warned of] have not already occurred").

**Defendants had knowledge that those statements were materially misleading and omitted material information when made**. Defendants are also not entitled to safe harbor

- 23 -

protection because the Complaint alleges more than sufficient facts to demonstrate that any statements Defendants deem forward-looking were made "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1)(B); *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *18 (M.D. Tenn. Apr. 26, 2011) ("even where the safe harbor is triggered, it does not protect statements made with actual knowledge of the falsity"). There can be no reasonable dispute that based on the facts alleged here, Defendants were aware of, but failed to disclose, Cordis's inventory problems, thereby misleading investors about Cardinal's prospects for success. *See supra* §III.C. Similar to this case, in *Envision*, defendants argued that their projection of the company's growth and expected synergies from a merger was forward-looking and protected under the PSLRA. 2019 WL 6168254, at *15. The plaintiffs, however, alleged that defendants were aware, but failed to disclose, that the company's declining revenues would impact its ability to achieve the predicted growth and that the predicted growth was based on unstainable conditions. *Id.* Accordingly, the court determined "that the meaningfulness of the cautionary statement cannot be determined without a determination of the facts – *i.e.*, whether *Envision* was already experiencing changes in payor mix or third-party reimbursement rates at the time it made the statement. The Court cannot make such a factual determination on a motion to dismiss." *Id.* at *16.[8] Thus, whether Defendants statements were protected by the safe harbor – including the meaningfulness of the cautionary language and Defendants knowledge of the facts undermining their statements – is appropriately a factual determination best left for a jury and not decided on a motion to dismiss.

---

[8] The Court in *Envision* also discussed what makes a cautionary statement meaningful, stating: "'If a company were to warn of the potential deterioration of one line of business, when in fact it was established that that line of business had already deteriorated, then . . . its cautionary language would be inadequate to meet the safe harbor standard. By analogy, the safe harbor would not protect from liability a person "who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."'" *Id.* at *16. Given the facts alleged in the Complaint here, Defendants' cautionary language was not meaningful.

For these reasons, Defendants' efforts to invoke safe harbor protection for their statements fail.

### 5. Cardinal's Financial Statements Were False and Misleading (¶¶92-103)

Plaintiff alleges that Cardinal's financial statements were false and misleading because, in violation of GAAP, Cardinal improperly failed to take timely charges against earnings to write-off losses for excess, obsolete, expired and missing Cordis inventory in its publicly filed financial statements, which caused Cardinal's publicly reported earnings to be artificially inflated.  ¶¶67(e), 83(c), 92-103.  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) ("'[f]inancial statements . . . which are not prepared in accordance with [GAAP are] presum[ptively] . . . misleading or inaccurate'") (quoting 17 C.F.R. §210.4–01(a)(1)) (alterations in original). Defendants only challenge the materiality of these allegations, claiming that Cordis's annual revenues were only a small part of Cardinal's total revenue and that the Complaint does not quantify by how much Defendants' GAAP violations inflated Cardinal's earnings or allege that Defendants' restated Cardinal's financial results.  MTD at 20-21.  These arguments fail.

First, courts have repeatedly rejected Defendants' limited quantitative argument with regard to materiality.  *SAIC*, 818 F.3d at 96 ("We reject [defendants] materiality argument, which asks us to consider quantitative factors only in the narrowest light in determining the financial impact of losing the CityTime project due to the fraud, and to otherwise ignore qualitative factors."); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 737 (S.D.N.Y. 2015) ("courts cannot rely solely on the quantitative impact of a misstatement, but must consider quantitative factors in conjunction with qualitative factors"); *Litwin v. Blackstone Grp. L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) ("Even where a misstatement or omission may be quantitatively small compared to a registrant's firm-wide financial results, its significance to a particularly important segment of a registrant's business tends to show its materiality.").

- 25 -

Here, the Complaint alleges both quantitative and qualitative factors that must be considered in assessing materiality. First, Defendants' sole focus on Cordis's revenue contribution to Cardinal ignores that Cardinal's GAAP diluted EPS for 3Q 2018 decreased *33%* because of the problems "primarily associated with our Cordis business." ¶84. Second, Defendants spoke repeatedly about Cordis to investors during the Class Period, reporting on its integration, its financial contribution to Cardinal's Medical Segment and that it would be accretive to Cardinal's non-GAAP earnings by more than $0.20 by FY 2017, with annual synergies of at least $100 million by FY 2018. ¶¶31-34, 36-37, 41-61, 65, 68-69, 73-77, 79-82. In that context, the truth about Cordis's inventory and the fact that Cardinal's financial results were inflated because the inventory had not been written off would have been material to investors. *In re BHP Billiton Ltd. Sec. Litig*., 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) ("when the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors").

Third, the Cordis acquisition was critical to shore up Cardinal's declining margins and revenues. ¶¶20-24. Indeed, analysts following Cardinal consistently reported on Cordis's growth and financial contribution to Cardinal's Medical Segment, which would have been dramatically reduced if Defendants had properly accounted for Cordis's inventory. *See* ¶¶35, 39, 62. And also, the fact that analysts were disappointed when on May 3, 2018 Cardinal disclosed that its earnings for 3Q 2018 decreased *33%* because of higher-than-expected Cordis inventory reserves, and Cardinal's stock price declined *21%* in response, are additional factors that support the materiality of Cardinal's reported inflated earnings. ¶¶84, 89. *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368-69 (S.D.N.Y. 2012) ("[T]hat analysts were clearly surprised and disappointed after [defendants] misstatements were corrected, and that the share price declined by almost 10% after the announcement" is a qualitative factor to be considered for materiality.).

4826-8526-9204.v1

Defendants' reliance on *I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609 (S.D. Ohio 2011) does not support Defendants' limited quantitative analysis. In *Ltd. Brands*, this Court looked at **both** qualitative and quantitative factors in assessing the materiality of plaintiff's allegations that defendants mislead investors about the development and implementation of a new software system. *Id*. at 636. This Court found that defendants' statements about the software system were not material because of quantitative reasons, but also because, unlike here, the complaint failed to allege the importance of the software system to the company's business and when the truth about the software system was allegedly disclosed Limited's stock price decline was no greater that Limited's competitors. *Id*. Not only does the Complaint here sufficiently allege facts supporting the materiality of Cordis to Cardinal's financial performance, it also alleges that while Cardinal's stock price dropped 8% and 21% on August 2, 2017 and May 3, 2018, respectively, in response to Defendants' disclosures, the S&P 500 Index and the S&P 500 Health Index (the indexes against which Cardinal compared its stock performance), barely moved. [9] ¶¶133, 136; *see id*. (finding that statements related to software system were not material because "several of Limited's competitors in the retail segment also suffered sharp declines in their stock during that same short period").

Second, Plaintiff is not required to quantify the financial-statement impact of the improper accounting at the pleading stage. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 416 (S.D.N.Y. 2020) ("Plaintiffs are entitled to discovery as to the scope

---

[9]    Defendants' reliance on the 2003 opinion in *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003) is likewise not instructive. As cited above, the Second Circuit has issued several opinions since 2003 that have repeatedly rejected a quantitative-factor-only test for materiality (*see SAIC*, 818 F.3d 85; *BioScrip*, 95 F. Supp. 3d 711, *Litwin*, 634 F.3d 706). *See also Basic Inc. v. Levinson*, 485 U.S. 224, 236 & n.14 (1988) ("A bright-line rule indeed is easier to follow than a standard that requires the exercise of judgment in the light of all the circumstances. But ease of application alone is not an excuse for ignoring the purposes of the Securities Acts and Congress' policy decisions. Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive.").

- 27 -

of this financial misconduct. Indeed, at this stage of litigation, Plaintiffs are not obligated to quantify each alleged GAAP violation. Even under the heightened standard of Rule 9(b), this would pose an almost insurmountable burden on plaintiffs before discovery."); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 519 (S.D.N.Y. 2011) (rejecting argument "that to plead materiality, it is necessary to quantify the overstatements").[10]

Third, the fact that Defendants did not restate Cardinal's financial results or admit to GAAP violations, is not dispositive. "To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *see also Feiner v. SS & C Techs.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998) ("the fact that [the company] has not elected to restate or reverse its earnings or revenue figures . . . does not indicate, much less prove, the accuracy of those figures"). As such, Defendants' arguments that their statements about Cardinal's inflated earning would not be material to investors, must be rejected.

### C. Plaintiff Pleads a Strong Inference of Scienter

The PSLRA requires a plaintiff to "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'" in making misrepresentations. *Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011) ("*Dana II*") (citing 15 U.S.C. §78u-4(b)(2)). "[A] plaintiff need only allege that defendant's behavior was reckless" in misrepresenting present or

---

[10] *See also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 467 (S.D.N.Y. 2005) (holding that plaintiff need not "precisely quantify the amount by which financial statements were overstated"); *Nicholas v. Poughkeepsie Sav. Bank/FSB*, No. 90 CIV. 1607 (RWS), 1990 WL 145154, at *5 (S.D.N.Y. Sept. 27, 1990) (plaintiff need not quantify amount by which reserves were overstated). *See also In re Checkers Sec. Litig.*, 858 F. Supp. 1168, 1175-76 (M.D. Fla. 1994) (unquantified improper revenue recognition satisfied Rule 9(b)); *In re Jiffy Lube Sec. Litig.*, 772 F. Supp. 258, 265 (D. Md. 1991) (unnecessary to plead amount by which defendant allegedly overstated income); *In re 3Com Sec. Litig.*, 761 F. Supp. 1411, 1415 (N.D. Cal. 1990) (same).

- 28 -

historical facts. *Big Lots*, 2016 WL 8199124, at \*30-\*31. "'Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care,"'" and "'"akin to conscious disregard."'" *Dana II*, 646 F.3d at 959.

In evaluating the sufficiency of scienter allegations, the Supreme Court has directed courts to "accept all factual allegations in the complaint as true," view the allegations "holistically" and consider whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322-26. "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the requisite standard." *Id*. at 310. "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Dana I*, 547 F. 3d at 571. In other words, *Tellabs* "'awards the draw to the plaintiff.'" *Id*.

The Sixth Circuit analyzes scienter "with reference to nine non-exhaustive factors" identified in *Helwig*, 251 F.3d at 552, that are probative of scienter, consistent with *Tellabs*:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

- 29 -

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.[11]

*Esperion*, 905 F.3d at 979 (citing *Helwig*, 251 F.3d at 552). In analyzing scienter, courts are not limited to the *Helwig* factors, but may consider other facts probative of defendants' recklessness. *See, e.g.*, *Dana II*, 646 F.3d at 960-61 (considering factors in addition to *Helwig* factors, including a senior executive's retirement and false Sarbanes-Oxley certifications, in finding that allegations holistically supported an inference of scienter).

Defendants impermissibly scrutinize certain allegations in isolation, such as their own insider sales and compensation, to argue that each, standing alone, does not support an inference of scienter. MTD at 25-28. However, all facts probative of scienter must be considered collectively in assessing whether the Complaint raises a strong inference. *Dana I*, 547 F. 3d at 571. Plaintiff pleads the following facts, including four of the *Helwig* factors, which collectively raise a strong inference of knowing or reckless misconduct on the part of each defendant:

- Defendants' disregard of the most current factual information about Cordis before making statements to investors;

- insider trading by defendants Barrett and Casey in unusual amounts totaling ***almost $114 million*** and at suspicious times;

- key executive departures of Defendants who were directly responsible for the Cordis acquisition and integration, and who spoke positively about it to investors: Wilson, Cordis's president, in August 2017; Barrett, Cardinal's CEO, in January 2018; and Casey, CEO of Cardinal's Medical Segment who led the integration of Cordis, in February 2018;

- closeness in time of Defendants' final Class Period misrepresentations about Cordis on March 8, 2018 and their May 3, 2018 disclosures of inconsistent information which shocked investors;

- the magnitude of the post-Class Period impact from Cardinal's acquisition of Cordis and the inventory and other problems Defendants concealed from investors: Cardinal

---

[11] *Helwig*'s "'most plausible' standard . . . is no longer good law." *Dana I*, 547 F.3d at 571. The approach mandated by *Tellabs* is more lenient than the heightened pleading standard previously imposed under *Helwig*. *Dana I*, 547 F.3d at 571.

wrote down $1.4 billion in goodwill and tangible assets – ***74% of the price it paid for Cordis –*** causing a 94% decline in operating profits, and ***doubled its year-over-year inventory reserves*** from $76 million to $147 million;

- the importance of Cordis to Cardinal's core business; and

- the self-interested motivations of Defendants to protect their performance-based compensation.

The inference these facts and circumstances raise is at least as plausible as any non-culpable inference suggested by Defendants. *Tellabs*, 551 U.S. at 323-24.

> **1. Defendants' Own Statements, Their Roles with Respect to Cordis and the Significance of Cordis to Cardinal's Core Business Support the Inference that Defendants Knew "the Most Current Factual Information" About Cordis, but Disregarded It When Speaking to Investors**

A defendant's "disregard of the most current factual information before making statements" is probative of scienter. *Helwig*, 251 F.3d at 552. The Individual Defendants' own representations, their functions and history with Cordis and the overall significance of Cordis to Cardinal's core business support the inference that Defendants knew the "most current factual information" about Cordis, but persistently disregarded it before speaking.

The most direct evidence that Defendants knew (or recklessly disregarded) Cordis's integration and inventory woes is their own statements throughout the Class Period. *See Corr. Corp.*, 2017 WL 6442145, at *20 (a defendant's "own public statements" about allegedly misrepresented matters "go a long way toward" pleading their knowledge regarding undisclosed facts about the same matters).[12] Throughout the Class Period, defendants Barrett, Kaufmann, Gomez

---

[12] *See also Gauquie v. Albany Molecular Rsch., Inc.*, No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about [an] issue demonstrates defendants' sensitivity to it."); *Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF (VBKx), 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("an inference of scienter can be established by the fact that the Defendants touched on [a] specific issue . . . in their public statements"); *In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124 (KM) (MAH), 2017 WL 3705801, at *17 n.28 (D.N.J. Aug. 28, 2017) ("Through their public statements, [defendants]

- 31 -

and Casey spoke repeatedly to investors about Cordis's operations, integration, inventory and inventory management systems (albeit neither accurately nor fully). *E.g.*, ¶¶45-46, 49-52, 57-58, 61, 73, 76, 81-82, 105-108. Defendants' specific statements about Cordis strongly infer that they *knew* the undisclosed adverse facts about the integration and inventory issues with Cordis. ¶¶67, 71, 83; *Corr. Corp.*, 2017 WL 6442145, at *20.

Barrett, Kaufmann and Gomez also signed Sarbanes-Oxley certifications in which they attested that they had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting, which included inventory levels and reserves, to ensure that material information relating to the Company was made known to them. ¶¶105-108; *Dana II*, 646 F.3d at 961 (Sarbanes-Oxley certifications were relevant to scienter analysis).

Defendants Casey and Wilson also necessarily had intimate knowledge about Cordis by their very roles and functions with respect to the acquired business. Casey was a former J&J employee who had gained familiarity with Cordis while at J&J, and who was responsible for leading its integration into Cardinal's operations. ¶109. Wilson was also a former J&J employee who worked at Cordis for 11 years and was hired by Cardinal to lead the Cordis business after the acquisition. ¶110. *See, e.g.*, *Envision*, 2019 WL 6168254, at *22 (it was reasonable to presume that Chairman and CFO of defendant company were aware of subsidiary's out-of-network billing and that it was an undisclosed growth driver because of their high-level positions and because out-of-network billing accounted for 20% of subsidiary's collections).

Further bolstering Defendants' own statements and roles, courts may presume that high-level executives are aware of matters critical to core management and central to the business's operations. *Envision*, 2019 WL 6168254, at *21-*22 (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688

---

demonstrated personal knowledge of the ACT DMD results and PTC's conversations with the [agency].").

(6th Cir. 2004) ("[H]igh-level executives can be presumed to be aware of matters central to their business's operation . . . ."), *abrogated on other grounds by Dana II*, 646 F.3d at 961. *See also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) ("Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue."). The overall significance of the Cordis acquisition and the need for it to be successfully integrated into Cardinal's business permits the inference that Defendants, all high-level Cardinal and Cordis executives, knew about Cordis's inventory and integration problems. Cardinal acquired Cordis in 2015 for $1.9 billion – the Company's largest ever acquisition up to that time – to boost the stagnating profitability of Cardinal's Medical Segment, broaden the Medical Segment portfolio to higher margin products like heart stints and catheters and expand the Segment globally. ¶¶19-20, 30-31. As Defendants declared when they announced the Cordis acquisition, the deal "[c]reat[ed] immediate global scale and scope." ¶31. Moreover, the heart stints and catheters central to the purpose of acquiring Cordis have strict product expiration dates, which must be closely monitored to comply with regulatory and quality standards, unlike Cardinal's legacy Medical Segment products such as operating gowns and surgical gloves. ¶30. Accordingly, Cardinal's implementation of effective inventory control systems and control of inventory levels at Cordis was key to the success of the Cordis acquisition and integration. ¶30.

All of these facts permit the inference that each Defendant knew the following undisclosed, adverse information, which was true and current throughout the Class Period:

- • Cardinal was unable to accurately track Cordis's inventory, including how much of it was excess, obsolete, about to expire or missing, for at least two and a half years after the acquisition because of Cordis's deficient inventory controls and tracking systems. Defendants did not implement an inventory management system that provided reliable visibility into Cordis's international inventories until the spring of 2018. (¶¶67(a), 83(a), 85-88).

- 33 -

- During the first two and a half years after the acquisition, Cordis was carrying at least $200 to $300 million in excess, obsolete, missing and unaccounted-for warehouse inventory (¶67(a)(ii)(2)).

- Cardinal was unable to track consignment inventory in Cordis's North American and EMEA regions due to the failure of Cordis's iTrak inventory management system, which forced Cardinal to try to manually track Cordis consignment inventory in those regions for a year after the acquisition (¶67(a)(ii)).

- Cordis's most popular products were constantly back-ordered and not available for delivery for months throughout the Class Period in EMEA and North America due to the inability to track and analyze Cordis's inventory (¶¶67(b), 83(a),(b)).

- Cardinal was unable to forecast demand for Cordis products, causing Casey and Wilson to manufacture excessive amounts of Cordis products, which had short, one to two year shelf lives (¶¶67(c), 83(a)).

- Cordis was losing employees, customers and sales throughout the Class Period because of backorders and inadequate numbers of sales representatives (¶¶67(d), 83(b)).

- Daily sales reports showed that Cordis sales were materially below plan for almost all territories in North America (¶67(d)).

- Compounding all of these adverse circumstances, Cordis's iTrak inventory management system ***completely shut down*** outside the U.S. in or about summer 2017, so that Cardinal lost all visibility into Cordis' international inventories. The crisis was known internally as the "Dark Period" or "Blackout Period" and continued into the summer of 2018. ¶71.

Plaintiff's detailed allegations of the most current factual information about Cordis and why it is reasonable to infer that Defendants knew but disregarded it while making positive statements to investors is not only evidence of falsity and materiality but, standing alone, raises a strong inference of knowing misconduct. *See, e.g.*, *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) ("In the Court's view, a strong inference of scienter is shown through Plaintiffs' allegations that Defendants knew about Abercrombie's declining gross margins and storewide markdowns throughout the class period, yet failed to disclose the information."); *Kyrstek v. Ruby Tuesday, Inc.*, No. 3:14-cv-01119, 2016 WL 1274447, at *9 (M.D. Tenn. Mar. 31, 2016) (Where defendants "allegedly disclosed helpful information about Lime Fresh's growth potential while

- 34 -

withholding negative information about Lime Fresh's performance," the complaint presented "a cogent inference that Defendants acted with the requisite scienter. . . . Common sense dictates that disclosing the good while withholding the bad, especially when the bad is so readily known, suggests deliberate concealment.").

Moreover, if Defendants did not know these facts, they were reckless in persistently speaking about Cordis's inventories, integration and its anticipated impact on Cardinal's performance. *See S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (when a defendant speaks but does not have actual knowledge about a subject, "it would be at least actionably reckless to reassure the public about these matters at all").[13]  As one analyst summed up after the May 3, 2018 revelations that ended the Class Period, "the current issue with Cordis . . . stems from inventory reserves as a result of greater visibility into inventory from the newly implemented inventory management system." ¶90(c).  In other words, Defendants had insufficient visibility prior to spring of 2018 to be able to speak accurately about Cordis's inventories and its anticipated impact on Cardinal's performance.

---

[13]  Defendants' argument that plaintiff "must" plead documents or sources to meet the PSLRA pleading standard is meritless.  MTD at 24.  Defendants rely on *dicta* in a footnote in *Helwig* which does **not** hold plaintiffs are **required** to plead documents or sources, but simply includes in a parenthetical that a complaint "can" meet the PSLRA pleading standard with documents or sources. 251 F.3d at 557 n.4.  In fact, in the case cited in *Helwig*'s *dicta* footnote, *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), the Second Circuit held that:

> [W]e find no requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources, and we see no reason to impose such a requirement . . . .  Imposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them.

*Novak*, 216 F.3d at 304.  Nor did the Second Circuit hold that plaintiffs must plead documents if they do not plead sources.  *Id.  See also Lexmark*, 367 F. Supp. 3d at 38 ("[T]his Court is aware of no authority requiring confidential witness allegations.").

### 2. Defendants' Incomplete Disclosures About Cordis Do Not Negate Scienter but Are *Probative* of It

Defendants' argument that their Class Period disclosures about Cordis "negate" scienter is meritless. MTD at 22-24.[14] First, Defendants' statements in August 2016 and January 2017 about the costs of the Cordis integration and reduced expectations for earnings accretion disclosed ***nothing*** about Cordis's hundreds of millions of dollars in excess, obsolete, expired and missing inventory, Cordis's deficient inventory tracking systems and Defendants' resulting inability to accurately track Cordis's inventory and demand forecast for Cordis products, or that Cordis's most popular products were back-ordered and unavailable for months in North America and EMEA. *Id.* at 23; ¶¶55, 59. The argument that Plaintiff's claims should be dismissed because Defendants made a "disclosure" that revealed none of the ***concealed***, adverse material information is a non-sequitur.

Second, defendant Kaufmann's August 2, 2017 statement that Cardinal missed its FY 2017 accretion target for Cordis due to three factors, the third being "higher than planned write-offs" for excess inventory at Cordis, was, as Plaintiff alleges, a partial disclosure. ¶¶69, 71. The key word is ***partial***. Kaufmann's effort to gloss over an unquantified excess inventory write-off continued to conceal, among other things, that Defendants had discovered at least $200-$300 million in excess and obsolete, expired and missing Cordis inventory, three to four times Cardinal's inventory reserves of $76 million and $79 million in 2017 and 2016, respectively. ¶¶67(a)(ii)(2), 91, 99. The August 2, 2017 statement also failed to disclose Defendants' inability since 2015 to accurately track Cordis's warehouse and consignment inventory due to deficient inventory tracking and management systems and the onset of the "Dark Period" which exacerbated Defendants' lack of inventory visibility, as well as Cardinal's inability to demand forecast for Cordis products, which further compounded the

---

[14] Defendants' argument about Class Period disclosures is really a truth-on-the-market defense, which "is intensely fact-specific . . . [and] not appropriate for the Court to consider . . . on . . . Motions to Dismiss." *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018).

4826-8526-9204.v1

excess inventory levels. ¶¶67, 71. Defendants' failure to disclose any of this relevant information when telling investors about unquantified write-offs of excess Cordis inventory "'created a material omission,' providing evidence of a strong inference of fraudulent intent." *Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 846 (E.D. Mo. 2019). "A company must 'provide complete and non-misleading information' when it chooses to speak." *Kyrstek*, 2016 WL 1274447, at *5 (quoting *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998)). "'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,'" *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020), and only disclosing a portion of the truth does not diminish a strong inference of scienter.

Here, Defendants did not tell the whole truth about Cordis's inventory on August 2, 2017. Defendants' incomplete disclosure "create[s] a compelling inference that Defendants made a conscious decision to not disclose" the whole truth as it related to Cordis's excess inventory and its root causes. *Id*. at 215 (defendant "had to know that revealing the full extent of [a major tenant's] performance problems would have been troubling news to its investors"). *See also Sanchez*, 407 F. Supp. 3d at 846 (defendants' choice to discuss "'concerns'" regarding company's reserves "could be found to be misleading because they omitted material information"); *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx), 2010 WL 3656068, at *19 (C.D. Cal. Sept. 16, 2010) (defendant's incomplete disclosures did not negate an inference of scienter as a matter of law).

Finally, defendants make a broad-brushed argument that they "continued to inform" the investment community that buildout costs and inventory write-offs contributed to lower-than-expected profitability for Cordis from September 2017 to March 2018, citing to their statements at ¶¶73, 77, 80 and 82. MTD at 23. A simple review of Defendants' actual statements, however, illustrates why each one was misleading, as Plaintiff alleges. ¶¶73, 83. On September 11, 2017, defendant Kaufmann again spoke about the unquantified inventory write-offs announced a month

earlier, admitting "we didn't have a good insight" in August 2017.  ¶73.  However, Kaufmann then assured investors that Cardinal was installing IT systems at that time to better track inventory, and that Cordis has "still been a positive for us.  And we expect it to grow this year."  *Id*.  Then, in January 2018, Kaufmann told investors that Cordis "was struggling *last year*" because of "*some issues* around inventory obsolescence," but that Defendants "are making progress in all those areas." ¶77.  In February and March 2018, Kaufmann and Gomez continued to refer vaguely to unquantified "write-offs of inventory" at Cordis, and said that Cordis results would be lower than anticipated because of higher than anticipated costs.  ¶¶80-82.  At the same times, however, Kaufmann and Gomez assured investors that they had "implemented robust remediation plans" to address inventory "challenges," and that "[n]ow we have visibility to that and things [] are starting to get better.  From a commercial standpoint, *Cordis is actually going very well*. . . .  [A]s we go into '19, we are going to see that business [] getting back to the growth trajectory that we want, especially on a capital-efficient basis."  ¶¶80-82.

As Plaintiff alleges, all of these statements were false and misleading because Kaufmann and Gomez continued to conceal from September 2017 through March 2018 that Defendants still lacked visibility into Cordis's international inventories due to deficient tracking systems which Defendants had not yet remediated or replaced; Defendants had known about the problems with Cordis's excess inventory and inventory visibility since March 2015, which were still ongoing due to the 2017-2018 Dark Period and deficient inventory tracking; Cordis had been carrying $200-$300 million in excess, obsolete, expired, missing and unaccounted for inventory; and Cordis's products were back-ordered and unavailable for months in EMEA and North America.  ¶¶67, 71, 83.  It was also not true that Cardinal now had better insight into Cordis's inventories as Defendants said in March 2018, because Defendants admitted in May 2018 that they had lacked visibility, which resulted in Defendants' doubling of Cardinal's inventory reserve from FY 2017 to FY 2018.  ¶¶84-88, 91.  Defendants'

4826-8526-9204.v1

misleadingly incomplete and false statements between September 2017 and March 2018 do not negate scienter, but are probative of it. *Setzer*, 968 F.3d at 215; *Sanchez*, 407 F. Supp. 3d at 846; *Mozilo*, 2010 WL 3656068, at *19.

Indeed, the investment community's reaction to the May 3, 2018 revelations belies Defendants' argument that their August 2017 to March 2018 statements negate scienter. ¶¶89-90. Cardinal investors' shock as to the disclosure was reflected in the Company's stock price, which fell over 21% on May 3, 2018 on huge trading volume of 15,594,300. ¶89. Analysts also treated the May 3, 2018 revelations as new and negative news. As one analyst summed up: "[W]ith the acquisition having closed in October 2015, we are disappointed by the lack of visibility, lack of good inventory controls, and lack of understanding of the full required investment." ¶90(b). Another analyst described the May 3, 2018 revelations, as "Titanic, and We Don't Mean The Movie." ¶90(a).[15]

### 3. The Closeness in Time of Defendants' March 13, 2018 Misrepresentations and Their May 2, 2018 Revelation of the Truth Is Probative of Scienter

The "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" is probative of scienter. *Helwig*, 251 F.3d at 552; *accord Dana II*, 646 F.3d at 960 (temporal proximity of positive and corrective statements is probative). Here, just seven weeks passed between Defendants' last Class Period misrepresentation about Cordis and their inconsistent disclosures that shocked the investment community and caused Cardinal's stock price to plummet. ¶¶82, 84-88. This short period further supports the inference that Defendants acted knowingly or, at a minimum, recklessly. *Esperion*, 905 F.3d at 981 (six-week gap

---

[15] Defendants cite to one analyst's comment to suggest they were "open and forthcoming." MTD at 23. But even if appropriately considered on a motion to dismiss (*see* Opposition to Request for Judicial Notice, filed concurrently), the comment was made in March 2018, two months ***before*** the May 3, 2018 disclosures that finally revealed the full impact the Cordis integration and inventory problems were having on Cardinal's business and performance. ¶82.

4826-8526-9204.v1

between inconsistent statements weighed in plaintiffs' favor); *Fidel v. Farley*, No. Civ.A.1:00-CV-48-M, 2001 WL 36126923, at *7 (W.D. Ky. June 27, 2001) (45 days between defendants' claims of success and their revelation of $60 million in write-offs for overvalued and non-existent inventory, "[w]hen viewed in light of the totality of the circumstances, . . . suggests the pattern of deception urged by the Plaintiffs"), *aff'd*, 392 F.3d 220 (6th Cir. 2004).

On March 13, 2018, defendant Gomez told investors at a Barclays Global Healthcare Conference (¶82):

> We have faced, as you said, a lot of challenges along the way.  But *we feel like we are going into a phase of a lot more stability. . . .  We have gone live with a pretty significant IT platform that is going to enable us to have better visibility into the supply chain*.  One of the key challenges we faced in the last couple of years, we've talked about this a couple of times, is write-offs of inventory because we didn't have enough visibility in all the overseas markets with respect to levels.  And so we faced some challenges with expiration of product, and we had to write off some certain volumes.  *Now we have visibility to that and things are going to start getting better.  They are starting to get better.  From a commercial standpoint, Cordis is actually going very well. . . .  So we're very excited about the fact that from a go-to-market perspective, things are going better overall. . . .*  I feel like *as we go into '19, we are going to see that business go – getting back to the growth trajectory that we want, especially on a capital-efficient basis*.

Just seven weeks later, on May 3, 2018, Cardinal announced that its 3Q 2018 GAAP diluted EPS decreased 33% to $0.81, and non-GAAP diluted EPS decreased 9% to $1.39 because of "a significant negative change in our effective tax rate primarily associated with our Cordis business." ¶84.  Cardinal's outlook for FY 2018 non-GAAP EPS was accordingly reduced from $5.25-$5.50 down to $4.85 to $4.95, "reflect[ing] the company's updated view on the performance of Cordis and its negative effect on the tax rate."  ¶84.

The higher tax rate negatively impacting Cardinal's earnings was only the tip of the iceberg.  Defendants' ongoing lack of visibility into Cordis's inventories, and their failure to implement inventory management systems for two and a half years, had been a root cause of Cordis's negative performance and the consequent tax rate increase.  On the May 3, 2018 earnings call, defendant

- 40 -

Kaufmann revealed that Cordis's "higher than expected" inventory reserves impacted Cardinal's profitability. ¶85. He also admitted that Cardinal had lacked demand planning capabilities to "have the right inventory in the right markets to capitalize on sales opportunities and reduce inventory reserves." ¶86. Kaufmann also conceded that Cardinal was only now, two and a half years after the acquisition, "implementing new process and technology improvements that will better manage our Cordis consigned inventory." *Id.* Defendant Gomez further admitted that Cardinal had only recently "implemented several supply chain work streams to enhance our global demand planning capabilities and consignment process." ¶87. Specifically, in 3Q FY 2018 – two and a half years after it acquired Cordis – Cardinal finally implemented an ERP functionality which allowed it to identify inventory positions in certain geographies that require higher inventory reserves. *Id.* And it was disclosed that the operational challenges with Cordis would continue through 4Q 2018 and FY 2019 – contrary to Gomez's statement only seven weeks earlier that Cordis would be back on a growth trajectory going into 2019. ¶84.

Plaintiff's allegations of the proximity of Defendants' March 2018 assurances and May 2018 contrary revelations thus support a strong inference of scienter. *Helwig*, 251 F.3d at 552.

### 4. The Magnitude of the Impact of Cordis's Concealed Inventory Issues on Cardinal's Business Is Probative of Scienter

The magnitude of the impact of misrepresented or concealed facts is relevant to a court's holistic analysis of scienter. *Dana II*, 646 F.3d at 960 (considering "[m]agnitude of false statements" in analyzing scienter). Three months after the Class Period ended, when Cardinal reported FY 2018 results in August 2018, the Company announced a $1.4 billion write down of goodwill and tangible assets "driven by inventory and cost challenges within [the] Cordis business." ¶¶91, 129. Cardinal's $1.4 billion "non-cash" goodwill write-down ***erased 100% of the goodwill recorded for the Cordis acquisition, representing nearly 74% of the $1.9 billion purchase price that Cardinal paid to acquire Cordis*** on October 4, 2015. In other words, Cardinal paid $1.9 billion to acquire Cordis in

- 41 -

October 2015, but wrote off $1.4 billion of the purchase price in non-cash goodwill related to Cordis less than three years later. Moreover, the $1.4 billion write down negatively impacted Cardinal's FY 2018 operating profits, *which declined 94%* from $2.12 billion (2017) to $126 million (2018). ¶¶91, 129.

Cardinal also quantified its inventory reserve related to Cordis for the first time in August 2018. As a result of the problems Defendants knew about, but failed to disclose during the Class Period, Cardinal conceded in August 2018 that its inventory reserves had to be nearly *doubled* from $76 million for FY 2017 to $147 million for FY 2018. The vast majority of this massive increase in inventory reserve was driven by the Cordis business. *Id*.

The sheer size of Cardinal's goodwill write down, decline in operating profits and increase in inventory reserves, driven by inventory and cost challenges at Cordis, is relevant to and supports an inference of scienter. *Dana II*, 646 F.3d at 960 (company's reduction of tax-deferred assets by $918 million, and reduction of net income by $44 million were relevant to the court's scienter analysis, and supported a strong inference of scienter when viewed holistically with other factors probative of scienter). Indeed, the staggering negative impact of Cordis on Cardinal's FY 2018 results "suggests more than a careless mistake or trivial miscalculation by [Cardinal] and its executives." *Lexmark*, 367 F. Supp. 3d at 38 (enormous amounts at stake coupled with detailed allegations of fraud create a strong inference that defendants were "'reckless in not knowing'" that their public statements "'materially misrepresented [the company's] financial state'") (citing *Bear Stearns*, 763 F. Supp. 2d at 517). Cardinal's revelations of Cordis's impact on Cardinal's business, which Defendants failed to disclose or misleadingly and incompletely disclosed throughout the Class Period, "contribute to the belief that Defendants were aware of the undisclosed [problems] yet intentionally did not disclose the information." *Sanchez*, 407 F. Supp. 3d at 846 (almost $400 million in undisclosed liabilities contributed to strong inference of recklessness). *See also Fla. State Bd. of Admin. v. Green*

*Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (the "sheer size of the $390 million write-down adds to the inference that the defendants must have been aware the problem was brewing").

Defendants argue that the magnitude of the write-off does not support scienter because inventory problems at Cordis "were not the sole cause" of the goodwill impairment. MTD at 28. But Cardinal's August 22, 2018 Form 10-K, which Defendants rely on, expressly states that the $1.4 billion goodwill impairment "was primarily driven by inventory and cost challenges within [the] Cordis business which furthered in the fourth quarter of fiscal 2018." *Id.*; Bloomfield Decl., Ex. 102 (ECF No. 30 at 652 of 695). Defendants' argument that the charge was also related to "cost challenges," not strictly inventory, fails to negate the inference that Defendants had been materially misrepresenting Cordis's financial state and its impact on Cardinal. In any event, the amount of the charge that was related to inventory versus cost challenges is a factual issue that does not support dismissal of Plaintiff's claims.

Defendants' claim that, as a matter of law, the magnitude of a write-off cannot support an inference of scienter is equally infirm. MTD at 28. Defendants rely on *Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004). *Id.* However, *Fidel* predates *Dana II*, in which the Sixth Circuit established a "holistic approach to reviewing scienter pleadings" in accordance with Supreme Court precedent that post-dates *Fidel*. *Dana II*, 646 F.3d at 961. *See Tellabs*, 551 U.S. 308 and *Matrixx*, 563 U.S. 27. Thus, in accordance with *Tellabs*, *Matrixx* and *Dana II*, the magnitude of Cardinal's $1.4 billion write-off, along with the other factors probative of scienter, is relevant to the court's holistic analysis. *Dana II*, 646 F.3d at 960-61. The write-off, as well as the doubling of the inventory reserve and negative impact on Cardinal's EPS, all support a strong inference of scienter.

### 5. Defendants' $113 Million in Insider Trading Supports an Inference of Scienter

In the Sixth Circuit, "insider trading at a suspicious time or in an unusual amount" is indicative of scienter. *Helwig*, 251 F.3d at 552. Here, defendants Barrett and Casey together ***sold***

- 43 -

*over 1.3 million shares* of Cardinal stock between May 2015 and February 2017, reaping *over $113 million in proceeds*. ¶¶112-113.

Barrett's and Casey's sales during the Class Period were both suspicious in timing and unusual in amount. ¶¶112-114. Barrett sold 600,000 shares of Cardinal stock for over $50 million in proceeds in the first five months after Cardinal announced the acquisition of Cordis, then sold the remaining 740,000 shares through February 2017 for an additional $59 million—all at the same time as he was repeatedly making positive statements about the acquisition and Cordis. ¶¶34, 36-38, 41-42, 49-51, 54, 56, 58-59, 113. As a result of those false statements, Cardinal's stock price was artificially inflated by Defendants' fraud and Barrett sold his stock for up to $87.73 per share – $36.93 more per share than Cardinal stock traded for after the May 3, 2018 disclosure. ¶¶112, 136. Moreover, the number of shares Barrett sold between May 2015 and February 2017 was *71% higher* than the number of shares he sold in the *three years preceding* the Class Period. ¶¶113-114. Casey also sold when Cardinal's stock price was artificially inflated above $83 per share. Casey sold 59,000 shares for insider trading proceeds of almost $5 million on August 9 and August 10, 2016, the same days Barrett made $19 million in stock sales. *Id*. The timing and amount of Casey's stock sales were also unusual. He dumped his stock only one week after Cardinal's 4Q and FY 2016 earnings conference call – in which Defendants touted the Cordis acquisition – and Casey had not sold any Cardinal stock in the years before the Class Period. ¶¶54-55, 113-114.

Insider sales of these magnitudes support an inference of scienter. *See Abercrombie*, 501 F. Supp. 2d at 1117 ($130 million in insider sales by two defendants, made shortly after positive sales numbers were announced, "further substantiate[d] a strong inference of scienter"); *FirstEnergy*, 316 F. Supp. 2d at 599 ("[I]nsider sales made when a company's stock price is near an all time high are probative of scienter."). Moreover, the stark contrast in Barrett's and Casey's Class Period sales as compared to the three years immediately preceding the Class Period supports an inference of

- 44 -

scienter. *See, e.g.*, *Big Lots*, 2016 WL 8199124, at \*33 (defendant's class period sales of stock in amounts disproportionate to pre-class period years were suspicious and probative of scienter).

Defendants impermissibly rely on information compiled from Barrett's and Casey's Form 4s to argue that these Defendants' purported purchases of Cardinal stock during the Class Period negate scienter. MTD at 25-26, n.6. The Form 4s are materials outside the Amended Complaint to which Plaintiff has objected, and are not properly considered on a motion to dismiss. *See* Plaintiff's Motion to Strike Exhibits Submitted with Defendants' Motion to Dismiss, filed concurrently herewith. The argument should be rejected outright on that basis alone. *Id*.

However, even if Defendants were permitted to rely on extraneous evidence at the pleading stage, the Form 4s illustrate that neither Barrett nor Casey actually purchased Cardinal shares on the open market or paid market prices for their stock during the Class Period. Casey acquired additional rights to shares through costless option grants, and Barrett's only acquisitions were through option grants or the exercise of options at prices far below market price pursuant to a 10b5-1 plan. *See* Exhibits cited at MTD 26 n.6. Such acquisitions do not defeat an inference of scienter because Defendants did not make open market purchases, and the value of whatever these defendants acquired is not certain. *See, e.g.*, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("[T]his Court cannot evaluate the true value of the options exercised by the Individual Defendants. They may have exercised options to buy at a very low price per share," so that the subsequent sale of shares would be "valuable to the defendants."). *See also Big Lots*, 2016 WL 8199124, at \*33 (scienter not defeated even where stock holdings of individual defendants allegedly increased).

Defendants also point to a supposedly "unusually long" Class Period here of 38 months in an effort to negate scienter. MTD at 26. But the length of the Class Period is only a function of the efforts Defendants took to obfuscate the known problems with the Cordis acquisition. To allow

- 45 -

4826-8526-9204.v1

Defendants to avoid liability for their false statements and omissions by repeatedly delaying disclosure of the truth is counter to the very purpose of the federal securities laws.[16] Courts regularly hold that an inference of scienter is supported even in the face of Class Periods just as long as or longer than here. *See, e.g.*, *Cardinal Health*, 426 F. Supp. 2d at 734 ($740,000 in insider sales over nearly four-year class period gave rise to a strong inference of scienter); *In re Enron Corp.*, No. H-01-3624, 2003 WL 2418157, at *1 (S.D. Tex. Apr. 24, 2003) (three-year class period); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 397 (S.D.N.Y. 2003) (three-year class period). Moreover, in establishing the unusual amount and timing of Barrett's and Casey's insider trading, Plaintiff compared it to the transactions (or lack thereof) three years before the Class Period, the same period of time as the Class Period.  ¶¶113-114.

Defendants also urge the Court to ignore Barrett's insider trading because almost half of the sales occurred before the close of the Cordis acquisition and all of his sales occurred before the corrective disclosures.  MTD at 26.  But the relevant inquiry is the proximity in time of the sales to the false statements and not to the corrective disclosures.  *See, e.g.*, *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 541 (S.D. Ohio 2000) (insider sales support strong inference of scienter when made close in time to the alleged misrepresentation, even though sales were made "long before the end of the class period").  What is relevant is whether the sales were timed to take

---

[16]  Barrett's and Casey's insider sales here are distinct from the sales alleged in cases relied upon by Defendants.  In *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002), the only basis for a class period of 63 weeks was to "sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period." *Id.* at 1092.  And the insider trading in *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106 (3d Cir. 2018) does not even compare to the trading by Barrett and Casey here.  In *Hertz*, two of the individual defendants collectively netted $7.1 million from their sales, as opposed to Barrett's and Casey's profits of over $113 million. *Id.* at 119.  Moreover, the *Hertz* defendants' trading profits exceeded their annual salaries by only $1 million. *Id.*  Here, Barrett's insider trading profits totaling almost $109 million *dwarfed* his annual salary of $1.32 million for each year from 2017-2018, on both an annual or collective basis.  ¶¶112, 116.  Likewise, Casey's 2016 insider sales of almost $5 million far exceeded his 2016 salary of $671,311. *Id.*

advantage of the alleged artificial inflation caused by the fraud, and this is exactly what Barrett and Casey did here.  Moreover, the amount of Cardinal stock sold is itself unusual, which is enough to raise an inference of scienter.  *Helwig*, 251 F.3d at 552 ("insider trading at a suspicious time *or* in an unusual amount" is probative of scienter).

Finally, the fact that not all of the Individual Defendants engaged in insider trading during the Class Period is not dispositive of whether Plaintiff has pleaded a strong inference of scienter.[17] *See, e.g.*, *Tellabs*, 551 U.S. at 325 (absence of personal financial gain not dispositive of scienter).

> **6.      Defendants' Compensation and Executive Departures Support the Strong Inference of Scienter**

The "self-interested motivation of defendants in the form of saving their salaries or jobs" provides additional support for Plaintiff's scienter allegations.  *Helwig*, 251 F.3d at 552; ¶¶115-128. Defendants argue that the inference of scienter based on their compensation is "negated" because "they were releasing negative information about [Cordis] throughout the Class Period."  MTD at 25. But however Defendants may wish to characterize it now, they were not disclosing the truth about Cordis during the Class Period.  *See* §C.2.  As alleged, Defendants' false statements and material omissions not only kept Cardinal's stock price artificially inflated, it allowed the Individual Defendants to collect more than $65.8 million in salary and bonuses from 2015-2017 (Barrett collected almost $38 million, Kaufmann over $15 million and Casey over $12.8 million).  ¶¶115-128.  This compensation was directly tied to the performance of Cardinal's Medical Segment, which included Cordis, and as a result of their material misstatements about the Cordis integration, the Individual Defendants either met or exceeded their target annual incentives awards.  ¶115.

---

[17]   Defendants' reliance on *Gruhn v. Tween Brands, Inc.*, No. 2:07-cv-852, 2009 WL 1542795, at *8 (S.D. Ohio June 2, 2009) is misplaced.  MTD at 27.  The *Gruhn* court determined there was insufficient support for an inference of scienter based on the collective allegations by plaintiffs, who failed to provide context surrounding the timing of the sales for the one individual defendant alleged to have engaged in insider trading.

- 47 -

For example, in 2015, Barrett received 146%, or $2,510,508, of his target annual incentive, Kaufmann received 153%, or $1,053,260, of his target annual incentive and Casey received 95%, or $618,118, of his target annual incentive.  ¶118.  Barrett, Kaufmann and Casey were also awarded long-term incentive grants that were in excess of 2015 targets, with Barrett receiving $9,300,000 off of an $8,000,000 target, Kaufmann receiving $5,380,000 off of a $2,100,000 target, and Casey receiving $3,810,000 off of a $2,100,000 target. ¶120.  Plaintiffs detail similar compensation awards that the Individual Defendants received in 2016 that were also based on the purportedly successful integration of Cordis.  ¶¶122-125.

Defendants were motivated to keep Cardinal Health's stock price high and did in fact profit from their compensation packages.  ¶¶115-128.  These specific facts tying the Individual Defendants' compensation to the performance of Cordis support an inference of scienter.  *See Cardinal Health*, 426 F. Supp. 2d at 737-38 ("By presenting specific facts tying the Individual Defendants' compensation to company performance, Plaintiffs do more than just present 'bare allegations.'  Further . . . other courts have held that the magnitude of a defendant's compensation package, together with other factors, may provide a heightened showing of motive to commit fraud.").

Defendants also urge the Court to disregard the suspicious departures of three of Cardinals' top executives – Wilson, Casey and Barrett – in assessing the inference of scienter because the resignations occurred before the May 3, 2018 disclosure that ends the Class Period.  MTD at 27. Defendants conveniently ignore that these executives lost or left their positions as the truth about Cordis's inventory was beginning to emerge.[18]  For example, Wilson, who served as Cordis's

---

[18]  For this reason, *Albert Fadem Tr. v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1014 (S.D. Ohio 2004) is inapposite.  Plaintiffs in *Am. Elec. Power Co.* did not provide any plausible explanation for the timing of the resignations, merely alleging that one executive defendant resigned during the class period and another resigned after the class period, with no tie to the allegations in the case.  *Id.*

- 48 -

president, resigned shortly after Defendants' first partial disclosure alleged on August 2, 2017. ¶111.

Three months later, on November 6, 2017, it was announced that Barrett, then-CEO of Cardinal,

would resign on January 1, 2018. *Id.* Casey's resignation as CEO of Cardinal Health's Medical

Segment followed shortly afterward in February 2018. *Id.* The temporal proximity of Wilson's,

Casey's and Barrett's departures to when the fraud began to emerge supports an inference of

scienter. *See, e.g.*, *Big Lots*, 2016 WL 8199124, at *34 (timing of executives' resignations in wake

of disclosures "noteworthy" and supported strong inference of scienter based on totality of the

circumstances).[19]

<div align="center">

**7.      Plaintiff Pleads a Strong Inference that Defendants Kaufmann, Gomez and Barrett Knew or Recklessly Disregarded that Cardinal's Public Financial Statements Were False**

</div>

As discussed in §C.1, defendants Kaufmann, Gomez and Barrett signed SOX certifications in

which they attested that they had designed and tested the effectiveness of disclosure controls and

internal controls over financial reporting – which included inventory levels and reserves – to ensure

that material information relating to the Company was made known to them. ¶¶105-108; *Dana II*,

646 F.3d at 961 (false Sarbanes-Oxley certifications were relevant to holistic view of scienter

allegations); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 WL

1335803, at *56 (M.D. Tenn. Mar. 31, 2011) ("The Sarbanes-Oxley certifications signed by Jacobs

and Polson establishes their awareness of PSI's rising malpractice expenses and declining staffing

levels and budgets as well as the increasing costs of the regulatory investigations at Riveredge."); *In*

*re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("SOX certifications give rise to

---

[19]    Citing no authority, Defendants highlight the promotions of Kaufmann and Gomez to assert that Wilson, Casey and Barrett did not leave, or were not pushed out, due to undisclosed problems at Cordis. MTD at 27. Setting aside that this is a factual argument inappropriate on a motion to dismiss, that Kaufmann and Gomez were promoted is irrelevant or, at a minimum, unpersuasive, in light of the fact that the majority of the Individual Defendants had to leave Cardinal and their departures were suspicious in timing.

<div align="center">- 49 -</div>

an inference of [defendants'] scienter").  Kaufmann, moreover, served as Cardinal's CFO from November 2014 to December 2017, while Gomez served as CFO of Cardinal's Medical Segment from July 2015 through 2017, then as Cardinal's CFO from January 2018 to August 2019.  ¶¶15-16. Kaufmann and Gomez were required by their very roles as Cardinal's top financial officers to have detailed knowledge about Cardinal's public financial statements, significant line items in the financial statements such as goodwill, inventory levels and inventory reserves, and the calculation of Cardinal's reported earnings.

All of these facts coupled with the host of other scienter allegations discussed *infra* plead a strong inference that defendants Kaufmann, Gomez and Barrett knew, or were reckless in not knowing, that Cardinal's quarterly and year-end financial statements were not prepared in accordance with GAAP because Cardinal failed to take timely charges against earnings to write-off losses for excess, obsolete, expired and missing inventory.  ¶¶92-103.  *Kyrstek*, 2016 WL 1274447, at *9 (alleged GAAP reporting violation "compounds Defendants' already-suspicious decision to disclose only positive puffery").  It follows that a strong inference is raised that these defendants also knew that by not taking necessary inventory write-offs, Cardinal artificially and materially inflated its consolidated operating earnings, earnings before income taxes, net earnings and earnings per share, and Medical Segment profit, in its Forms 10-K and 10-Q filed in 2016 and 2017.  ¶¶101-103.

In light of the great weight of facts alleged that are probative of scienter, Plaintiff has raised a strong inference of scienter that is more plausible than any opposing inference suggested by Defendants.  *Tellabs*, 551 U.S. at 323-24.

### D.    Plaintiff Has Adequately Pled Loss Causation

To successfully plead loss causation, a plaintiff need only "'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'"  *Cmty. Health*, 877

- 50 -

F.3d at 695 (quoting *Dura Pharms.*, 544 U.S. at 347). This ordinary pleading rule is "'not meant to impose a great burden upon a plaintiff.'" *Id.* The Complaint exceeds this standard.

Plaintiff has clearly satisfied the Sixth Circuit's required causal connection between Defendants' misleading statements and omissions inflating Cardinal's stock price and the stock price declines when negative material information related to the statements and omissions was disclosed. *See* ¶¶131-137. Specifically, the Complaint pleads that: (1) Defendants misled investors by concealing Cordis's debilitating inventory management and tracking problems, that Cordis was carrying millions in excess, obsolete and expired inventory, not reflected in Cardinal's publicly reported earnings, the cost overruns to set up a global supply chain, and the fact that sales were being impacted by persistent back-order issues (¶¶67, 71, 83, 92-103); (2) Defendants' materially misleading statements and omissions caused Cardinal's stock price to trade at artificially inflated levels (¶131); (3) Plaintiff and the Class purchased Cardinal stock at these inflated prices (*id.*); (4) on August 2, 2017, when Cardinal reported weak earnings for its 4Q and FY 2017 and lowered earnings guidance for FY 2018 due to lost sales and cost issues at Cordis, including "higher-than-planned write-offs for excess inventory," Cardinal's' stock price dropped 8% (¶¶68-69, 133); (5) on May 3, 2018, when Cardinal announced lower-than-expected earnings for 3Q 2018 due to Cordis's poor performance, which included an inventory reserve increase, and that as a result the Company was reducing expected earnings for 2018 and that Cordis would not be profitable until the end of 2019, Cardinal's stock price dropped over 21% on unusually high trading volume (¶¶84-88, 134-136); and (6) as a direct result, Plaintiff and the Class suffered damages (¶137). Nothing more is required. *See Ross*, 501 F. Supp. 2d at 1119; *Cardinal Health*, 426 F. Supp. 2d at 760.

In fact, Defendants concede these allegations are sufficient with respect to all of Plaintiff's claims except those regarding Cardinal's false and misleading financial statements. MTD at 21-22. With respect to that subset of statements, Defendants argue that loss causation cannot be properly

- 51 -

4826-8526-9204.v1

alleged because Defendants never admitted to violating GAAP. *Id.* But this Court, and others, have rejected this same argument, as a corrective disclosure need not admit fraud or detail a fraud's particulars. *See, e.g.*, *Ross*, 501 F. Supp. 2d at 1117, 1119 (where "Plaintiffs makes specific claims as to Defendants' alleged misrepresentations and a purported link to Plaintiffs' claimed loss" there is no need to allege the drop "was caused by a correction, admission, disclosure of misrepresentation or restatement by Defendants"); *Cardinal Health*, 426 F. Supp. 2d at 760 ("where the Plaintiffs allege that the subject of the misrepresentations and omissions caused their losses, they need not specify 'corrective disclosures' causing the decline in stock value"). As the Sixth Circuit has stated: "We are mindful of the dangerous incentive that is created when the success of any loss causation argument is made contingent upon a defendant's acknowledgment that it misled investors." *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 385.

Here, among other omissions, the Complaint alleges that Cardinal improperly failed to take timely charges against earnings to write-off losses for excess, obsolete, expired and missing Cordis inventory in its publicly filed financial statements, causing Cardinal to report inflated earnings during the Class Period, which kept the Company's stock price artificially inflated. ¶¶67(e), 83(c), 92-103, 131. The Complaint further alleges that when the truth emerged in the form of Cardinal's report of lower-than-expected earnings and reduced earnings guidance on August 2, 2017 and May 3, 2018 due to Cordis's inventory write-offs, increased inventory reserves and costs and lower sales, Cardinal's stock price significantly declined. ¶¶131-137. These allegations are more than sufficient to plead the required "causal connection" between Cardinal's false and misleading financial statements and Plaintiff's economic loss.[20]

---

[20] Defendants reliance on *Ind. State Dist. Council v. Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009) for their limited loss causation argument fails. In *Omnicare*, the plaintiff predicated loss causation on a fragment of a sentence buried in a release authored by someone other than the defendant that did not even address the allegedly misrepresented facts. *Id.* at 944. Unlike *Omnicare*, and as discussed above, the Complaint here specifically pleads how the disclosures on August 2,

- 52 -

**E.     Plaintiff's Sections 20(a) and 20A Claims Are Adequately Alleged**

Because Defendants have failed to establish sufficient grounds to support dismissal of the

Section 10(b) claims against them, their argument for dismissal of the §§20(a) and 20A claims must

also be rejected. *See Ross*, 501 F. Supp. 2d at 1119.

**IV.     CONCLUSION**

For the reasons stated above, the Court should deny defendants' motion in its entirety.

DATED:  December 21, 2020                     Respectfully submitted,

                                              MURRAY MURPHY MOUL + BASIL LLP


                                                    s/ JOSEPH F. MURRAY
                                              JOSEPH F. MURRAY (0063373)
                                              1114 Dublin Road
                                              Columbus, OH  43215
                                              Telephone:  614/488-0400
                                              614/488-0401 (fax)
                                              murray@mmmb.com

                                              Local Counsel for Lead Plaintiff

---

2017 and May 3, 2018 that Cardinal's earning, and earning guidance, had declined due to Cordis's inventory write-offs and increased reserves, caused the Company's stock price to drop 8% and 21%, respectively.  ¶¶133-134, 136.  Based on these allegations, the Complaint sufficiently alleges loss causation with regard to Cardinal's false and misleading financial statements.

- 53 -

4826-8526-9204.v1

- 54 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
HENRY ROSEN
LAURIE L. LARGENT
JENNIFER N. CARINGAL
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
henryr@rgrdlaw.com
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
jcaringal@rgrdlaw.com

Lead Counsel for Lead Plaintiff

4826-8526-9204.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 21, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<div style="margin-left:50%">

s/ JOSEPH F. MURRAY
JOSEPH F. MURRAY

JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)

E-mail:  murray@mmmb.com

</div>

4826-8526-9204.v1

## Mailing Information for a Case 2:19-cv-03347-EAS-EPD Louisiana Sheriffs Pension & Relief Fund v. Cardinal Health, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Laura M Andracchio**
  landracchio@rgrdlaw.com

- **David S Bloomfield , Jr**
  dbloomfield@porterwright.com,mruyf@porterwright.com,rtrafford@porterwright.com,CLShike@wlrk.com,APSadinsky@wlrk.com,wdsavitt@WLRK.com

- **Spencer Burkholz**
  SpenceB@rgrdlaw.com

- **Jennifer Caringal**
  JCaringal@rgrdlaw.com

- **Laurie Largent**
  llargent@rgrdlaw.com,cbarrett@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Todd Aaron Long**
  tlong@mcneeslaw.com,kfoster@mcneeslaw.com,talattorney@gmail.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,murray@ecf.courtdrive.com

- **Darren J Robbins**
  tedp@rgrdlaw.com

- **Henry Rosen**
  henryr@rgrdlaw.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)