## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**LOUISIANA SHERIFFS' PENSION &
RELIEF FUND, Individually and on
Behalf of All Others Similarly Situated,**
                **Plaintiff,**

      **v.**

**CARDINAL HEALTH, INC.,** *et al.*,

      **Defendants.**

**Case No. 2:19-cv-3347
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers**

### OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss the Consolidated Amended Complaint.  (ECF No. 31.)  Plaintiff has filed a response in opposition (ECF No. 32) and Defendants have replied (ECF No. 36).  Plaintiff also filed a Motion to Strike Exhibits Submitted with Defendants' Motion to Dismiss (ECF No. 33), to which Defendants responded in opposition (ECF No. 37), and Plaintiff replied (ECF No. 38).  For the following reasons, the Court **DENIES** Defendants' Motion to Dismiss and **DENIES AS MOOT** Plaintiff's Motion to Strike.

### I.

Plaintiff Louisiana Sheriffs' Pension & Relief Fund brings this securities class action on behalf of all purchasers of Cardinal Health common stock for the period March 2, 2015 and May 2, 2018, inclusive (the "Class Period"), alleging violations of §§ 10(b), 20(a) and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.  (Am. Compl. ¶ 1, ECF No. 28.) Plaintiff named as defendants Cardinal Health, Inc., ("Cardinal"), and

George S. Barrett, Donald M. Casey, Jr., Michael C. Kaufmann, Jorge M. Gomez, and David J. Wilson who are current and former senior executives (collectively "Defendants").

## A.    Amended Complaint

Cardinal is a global distributor of drugs and medical devices that is based in Dublin, Ohio.  (Am. Compl. ¶ 19, ECF No. 28.)  Plaintiff alleges that, during the Class Period, Defendants made material misrepresentations and omissions regarding Cardinal's acquisition and integration of Cordis Corporation ("Cordis").  Cordis is a manufacturer and global supplier of cardiovascular and endovascular devices which Cardinal purchased from Johnson & Johnson in 2015 for $1.9 billion.  (*Id.* ¶¶ 2, 20.)

The Cordis acquisition is alleged to have been a key part of Cardinal's business strategy to bolster stagnated margins in its medical device segment and to offset declining revenues in Cardinal's pharmaceutical business.  (*Id.* ¶¶ 19–24.)  This acquisition is alleged to have been the largest in Cardinal's 40-year history.  (*Id.* ¶ 23.)  One of Cardinal's top executives, Don Casey, was a former Johnson & Johnson executive who oversaw the global cardiovascular group.  Plaintiff alleges that Mr. Casey assured analysts and investors that Defendants had a deep understanding of the business throughout the acquisition period.  (*Id.*)

Defendants allegedly misled investors by repeatedly assuring the market that they were transforming Cordis' business with Cardinal's inventory management technology and supply chain expertise, which would result in significant operating efficiencies and earnings accretion for investors.  Plaintiff alleges that Defendants claimed that Cardinal and Cordis were able to offer reliable, trackable inventory and logistics and deep analytic capabilities, and that Cardinal was implementing its radio-frequency identification ("RFID") technology at Cordis to eliminate

or reduce expired and lost inventory and lower managed inventory levels.  (*Id*. ¶¶ 32–33, 37, 41–45, 58.)

Defendants also allegedly told investors that they expected the Cordis acquisition to be more than $0.20 per share accretive in fiscal year ("FY") 2017, the first full year after the acquisition, and that Cardinal would achieve at least $100 million in annual synergies by the end of FY 2018, all as a result of their purported transformation of Cordis.  (*Id*. ¶¶ 31-32, 34, 36, 41, 43, 48, 53, 55, 65.)  The Amended Complaint throughout alleges that Defendants continually assured investors that Cardinal's integration of Cordis was on track, on plan and going very well, that Cordis' business was performing very well and as expected, and that Cordis was generating top-line revenue growth.  (*Id.* ¶¶ 43, 46–47, 49–52, 54, 56– 57, 59– 61, 75– 77, 80– 82.)

Plaintiff alleges that Defendants' statements about Cardinal's Cordis acquisition, integration, and inventory were false and misleading.  Plaintiff specifies that from the time the Cordis acquisition was announced, and throughout the Class Period, Defendants allegedly concealed debilitating inventory management and tracking problems plaguing Cordis, failed to disclose that Cordis was carrying $200 to $300 million in excess, obsolete, expired, missing and unaccounted-for inventory in its warehouses in El Paso, Colombia, Brazil, Mississippi, Belgium and Japan, which was not being reflected in Cardinal's earnings throughout the Class Period.  (*Id*. ¶ 67(a)(ii).)  Plaintiff further alleges that Cardinal was incurring significant cost overruns in setting up a global supply chain for Cordis, and that Cordis' most popular products were on back order and therefore could not be sold when needed.  (*Id*. ¶ 67.)  Plaintiff avers that Cordis products had short shelf lives of one to two years, causing the excess inventory to expire before it could be utilized.  (*Id*. ¶¶ 67, 71, 83.)

Plaintiff additionally alleges that Defendants' inability to track inventory was further exacerbated when, in July of 2017, Cordis' iTrak inventory management system completely shut down by the amount of Cordis' inventory outside the United States. (*Id.* ¶¶ 71, 83(a)). As a result, Defendants had no visibility of Cordis worldwide inventories from July 2017 and continuing for the next year. *Id.* Internally at Cardinal, Plaintiff avers, this was called the "Dark Period" or the "Blackout Period." (*Id.*)

The Amended Complaint continues, alleging that on "May 3, 2018, Cardinal shocked investors and analysts by announcing before the markets opened that Cardinal's GAAP [Generally Accepted Accounting Principles] diluted EPS [Earnings Per Share] for 3Q [third quarter] FY 2018 *decreased* 33% to $0.81 because of *higher than expected Cordis inventory reserves* and that the Cordis business was a disaster and would not see profitable growth until the end of FY 2019." (*Id.* ¶ 5.) "On the news that Cordis' inventory and sales issues negatively affected Cardinal's earnings, Cardinal's stock price fell over 21% on May 3 on huge trading volume of 15,594,300 shares – by far the biggest trading day since the beginning of the Class Period." (*Id.* ¶ 89.)

Plaintiff avers that, before this stock fall in May 2018, Defendant David Wilson, Cordis' Worldwide President, left abruptly in August 2017; three months later, in November 2017, Cardinal announced that defendant George Barrett would resign as Chief Executive Officer ("CEO") effective January 2018; and in early February 2018, defendant Don Casey, CEO of Cardinal's Medical Segment and the chief advocate of the Cordis acquisition, left abruptly. (*Id.* ¶¶ 14, 72, 78, 111.) Plaintiff alleges "[t]wo of these insiders *sold over 1.3 million shares* of Cardinal stock at artificially inflated prices, reaping *over $113 million in proceeds* before leaving the Company." (*Id.* ¶ 4.)

Plaintiff continues, alleging that "after the Class Period in August 2018, Cardinal announced a $1.4 billion non-cash goodwill impairment charge, primarily driven by 'inventory and cost challenges within [the] Cordis business.'" (*Id*. ¶ 91, Ex. 102, Aug. 22, 2018 Form 10-K at 16.) Plaintiff further alleges that, "the $1.4 billion write down negatively impacted Cardinal's FY 2018 operating profits, which declined 94% from $2.12 billion (2017) to $126 million (2018). (*Id*. ¶¶ 91, 129.) Plaintiff summarizes that Cardinal's $1.4 billion non-cash goodwill write-down erased 100% of the goodwill recorded for the Cordis acquisition, representing nearly 74% of the $1.9 billion purchase price that Cardinal paid to acquire Cordis on October 4, 2015. (*Id*. ¶ 129.) Plaintiff concludes that the $1.4 billion write off in less than three years is explained in the allegations in the Amended Complaint as deception of the investors from the start in violation of the federal securities laws.

**B.    Claims for Relief**

There are three claims for relief asserted in the Amended Complaint on behalf of a class of investors. In the first, Plaintiff alleges that Defendants violated § 10(b) of the Securities Exchange Act and SEC Rule 10b-5, by making false and misleading statements about the acquisition, integration, and performance of Cordis and issued false public financial statements for Cardinal during the Class Period—March 2, 2015 to May 2, 2018. (Am. Compl. ¶¶ 149–53, ECF No. 28.) In the second claim, Plaintiff alleges that the individual defendants are persons who controlled Cardinal under § 20(a) of the Securities Exchange Act, and therefore are secondarily liable for Cardinal's alleged violations of § 10(b) and Rule 10b-5. (*Id*. ¶¶ 154–157.) The third claim is brought against Defendant Barrett under § 20A of the 1934 Act because he allegedly violated the Securities Exchange Act by selling Cardinal stock during the Class Period while in possession of material, non-public information about the company. (*Id*. ¶¶ 158–67.)

## II.

Defendants have moved for dismissal of all three causes of action for failure to state a claim upon which relief can be granted. (Defs' Mot. to Dismiss ("Defs.' Mot."), ECF No. 31.) That motion is ripe for review. (ECF Nos. 32, 26.)

### A.     Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Furthermore, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it][is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 677–79 (quoting *Twombly*, 550 U.S. at 55) (internal quotations omitted). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016) (quoting *Twombly*, 550 U.S. at 556). When considering a motion to dismiss under Rule 12(b)(6), a court "considers the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

**B.** **Heightened Pleading Requirements for Private Securities Fraud Claims**

Security fraud actions brought pursuant to the Securities and Exchange Act are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *Id.* Under Rule 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting" the fraud. Fed. R. Civ. P. 9(b). This means that a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 826 (E.D. Ky. 2019) (citing *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018)).

Moreover, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional pleading requirements. *Id.* A plaintiff must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading" and, finally, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384 (citing 15 U.S.C. § 78u–4(b)(1)(B), (b)(2)(A)).

### III.

Defendants argue that they are entitled to dismissal of all claims in the Amended Complaint because Plaintiff does not adequately plead securities fraud under either (A) § 10(b) if the Securities Exchange Act, or (B) § 20(a) and § 20A of the Securities Exchange Act. (Am. Compl. ¶ 13, ECF No. 28.)

**A.** **Claims Under § 10(b) and Rule 10b-5**

Section 10(b) of the Securities Exchange Act "makes it unlawful for any person to 'use or employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (citing 15 U.S.C. § 78j(b)). SEC Rule 10b-5 implements § 10(b), specifying it as unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (citing 17 C.F.R. § 240.10b-5(b)).

To succeed on a claim under § 10(b) of the Securities Exchange Act and SEC Rule 10b-5, Plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 37–38 (quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Defendants only challenge the pleading adequacy of the first, second, and sixth elements—materiality, scienter, and loss causation. (Defs.' Mot. at 14.) Specifically, they argue that the Amended Complaint: (1) does not sufficiently allege that "the statements by the company or its executives regarding Cordis, or the company's financial statements, contained any material misrepresentations or omissions"; (2) does "not come close to pleading with particularity that the company or any of its executives acted with scienter"; and (3) does not "adequately allege loss causation . . . in connection with the company's alleged issuance of false financial statements" (*Id.*) The Court addresses each of these in turn.

### 1.   Material Misrepresentations or Omissions

To prevail on a § 10(b) and Rule 10b-5 claim, a plaintiff must show that the alleged statements "were *misleading* as to a *material* fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Id.* Whether a statement or omission is material depends on "the significance the reasonable investor would place on the withheld or misrepresented information." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir. 2001), *abrogated on other grounds by Tellabs*, 551 U.S. 308, (citing *Basic*, 485 U.S. at 238)).

An omission is material if there is a "substantial likelihood that the" false statement "or disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32 (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Materiality is an "inherently fact-specific" inquiry. *Basic*, 485 U.S. at 236. As such, a court may only determine that a statement or omission is not material as a matter of law "if the alleged misrepresentations or omissions are so obviously unimportant to a" reasonable investor "that reasonable minds cannot differ on the question of materiality." *In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 747 (S.D. Ohio 2006) (citing, *inter alia*, citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 n. 11 (3d Cir. 1992)).

Importantly, § 10(b) and Rule 10b-5 do not "create an affirmative duty to disclose any and all material information." *Matrixx Initiatives*, 563 U.S. at 44. An affirmative duty to disclose may arise when a company has made "an inaccurate, incomplete or misleading prior disclosure." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (citing *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n. 10 (3d Cir. 2004)). Otherwise,

9

disclosure is required only when necessary "to make . . . statements made, in light of the circumstances under which they were made, not misleading." *Id.* (citing 17 C.F.R. § 240.10b-5(b))

Defendants argue that the statements in Amended Complaint are immaterial as a matter of law for three reasons: (a) most of the statements are "vague, soft, puffing statements" or "generalized statements of optimism that are not capable of objective verification," (b) most of the statements are forward-looking that fall within the PSLRA's safe harbor, and (c) statements disclosing the past financial performance of Cardinal and Cordis are not materially misleading because the "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." (Defs.' Mot. at 15, 17, 19, ECF No. 31.)

### a.    Vague, Soft, Puffing Statements

In considering materiality in securities regulation, the Sixth Circuit has distinguished "hard" information and "soft" information. *Id.* (citing *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 (6th Cir. 1997)). "Hard information" is "typically historical information or other factual information that is objectively verifiable." *Id.* Hard information, publicly disclosed, is actionable if it is misleading and material. *Id.* In contrast, "soft information"—sometimes called "puffery"—includes "predictions and matters of opinions" not capable of objective verification. *Id.* (citing *Sofamor Danek Grp.*, 123 F.3d at 401). "[V]ague, soft, puffing statements or obvious hyperbole upon which a reasonably investor would not rely" are immaterial as a matter of law. *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (citation omitted). The "context in which a statement is made is essential in determining whether a statement is puffery." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1007 (S.D. Ohio 2008); *see also City of*

*Monroe*, 399 F.3d at 672 (quoting *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.")).

In *In re Ford Motor Co. Securities Litigation*, the Sixth Circuit explained that puffery is the "kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."  381 F.3d 563, 570–71 (6th Cir. 2004).  In that case the defendant Ford made the following statements:

> 1) "[A]t Ford quality comes first."; 2) "We aim to be the quality leader"; 3) "Ford has its best quality ever"; 4) Ford is "taking across-the-board actions to improve ... [its] quality."; 5) Ford has made "quality a top priority"; 6) "Ford is a worldwide leader in automotive safety"; 7) Ford has made "quality a top priority"; 8) Ford is "designing safety into . . . [its] cars and trucks" because it wants its "customers to feel safe and secure in their vehicles at all times"; 9) Ford "want[s] to make customers' lives ... safer"; 10) Ford has "dedicated . . . [itself] to finding even better ways of delivering ... safer vehicles to [the] consumer"; 11) Ford "want[s] to be clear leaders in corporate citizenship"; 12) Ford's "greatest asset is the trust and confidence . . . [it] has earned from . . . [its] customers"; 13) Ford "is going to lead in corporate social responsibility."

*Id*. at 570 (alterations in original).  These statements, the court said, were "mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information."  *Id*.

In the case *sub judice*, Defendants argue that "most, if not all, of the statements the complaint alleges to be false or misleading are immaterial" because the statements are puffery. (*Def. Mot.* at 15, ECF No. 31) (citing Am. Compl. ¶¶ 33, 37–38, 41–47, 49–54, 56–59, 61, 65, 73–74, 76–77, 80–82, ECF No. 28).  These statements, however, do not fall within the "certain

kind" of statements the Sixth Circuit find constitutes mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information. By way of example, the following paragraphs are the types of statements Defendant maintain constitute puffery.

- March 2, 2015, during the conference call, a defendant told investors that Cordis will "leverage [Cardinal's] highly efficient delivery model and investments we have made in RFID technology by virtue of our WaveMark acquisition." He explained that "this shared platform connects manufacturers and providers with supply chain visibility and analytics" and "reduc[es] expired and lost products, lowering managed inventory levels and decreasing holding costs." He concluded, "[a]ll this adds up to significant potential operating efficiencies . . . [and Cordis would] benefit from our efficient shared distribution system to drive significant supply chain savings." (Am. Compl. ¶ 33.)

- March 3, 2015, a defendant stated at a conference:

  We think there is a different way to bring value to the market around those products. It's not just a product and account of those products. It's the way that they are managed in the cath lab, it's how much inventory you are carrying, it's whether or not, you can tag them to prevent leakage or loss of a product, prevent a product from expiring.

  So they are all kinds of supply chain tools built around . . . this that could change the paradigm, and it's actually largely what we see. . . . So we see this as a growth opportunity actually in this area. . . . For us, we see a great opportunity and then combining it with our supply chain expertise. (¶ 37.)

- April 10, 2015, article: "By leveraging its RFID-enabled supply chain capabilities, [Cardinal] believes it can continue to see growth and get more mileage from mature, but well-respected products such [as] those offered by Cordis." On an April 30, 2015 Cardinal earnings conference call for 3Q 2015, Kaufmann confirmed "in FY 2015, the first full year post-close, we expect the transaction to be greater than $0.20 accretive and increasingly accretive thereafter. We still expect operational synergies of at least $100 million annually by the time we exit FY18." (¶ 41.)

- October 31, 2016, conference: "The integration of Cordis has proved to be an excellent example of how we can bring together best practices across borders. We have seen over this past year, that taking the time to do things right is essential to best serve our customers. We have also seen growth in some important markets including Europe, where we believe that taking an integrated cohesive approach to our customers will position us for measurable growth over the long term. (¶ 56.)

- On September 11, 2017, conference call: [F]rom a top line, Cordis is performing very close to where we expected it to be. And that has been one of the absolute most important things for us because if you lose the sales, it's incredibly hard to get them back. And so while we're a little bit behind where we expected in some markets and ahead in other markets, overall, the overall sales volume of Cordis is about where we expected it to be. (¶ 74.)

In contrast to the statements made in the *In re Ford Motor Co. Securities Litigation* case, the above statements made by Defendants, and those not specifically quoted, are not the "kind of rosy affirmation commonly heard from corporate managers" that are "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." 381 F.3d at 570–71. On the investor conference calls and in publications from the beginning of the Class Period to early February 2017, Plaintiff's allegations show that Defendants spoke about how Cordis would benefit from Cardinal's inventory management technology and supply chain expertise, and how that would translate into cost synergies and earnings accretion for Cardinal, all in the context of discussing the acquisition and integration of Cordis. (Am. Compl. ¶¶ 32–33, 33, 37, 41– 45, 58, ECF No. 28.)

Additionally, in context, which "is essential in determining whether a statement is puffery," the statements appear to be made to reassure investors about the success of the acquisition and integration of Cordis, which was of importance to investors because Cardinal's entry into manufacturing interventional cardiovascular products represented a significant departure from the low-tech and low-margin medical supplies Cardinal had traditionally sold. *Huffy*, 577 F. Supp. 2d at 1007. Unlike Cardinal's other products, Cordis' heart stints and catheters had strict expiration dates that had to be closely monitored for quality and regulatory standards. (*Id.* ¶¶ 30, 67(a).) Moreover, the acquisition greatly expanded Cardinal's geographic footprint; Cordis lacked international supply chain and distribution capabilities as it was a

13

Johnson & Johnson portfolio consisting of only intellectual property, inventory and a sales force. Plaintiff alleges that managing Cordis' consigned and warehouse inventory posed significant operational challenges for Cardinal. (*Id*. ¶¶ 30, 67(c).) Thus, Cardinal's implementation of an effective inventory management system and supply chain was important to the total mix of information available regarding the success of the integration and Cardinal's accretive expectations for Cordis.

In this context, it would have been material to reasonable investors to know that Defendants were unable to accurately track how much of Cordis' consigned and warehouse inventory actually existed, how much of it was excess and obsolete or about to expire, how much of it was missing or unaccounted-for, and where it was located around the world. (*Id*. ¶ 67.) Given the central importance of inventory management to the Cordis business, it was also material to investors to know that Cordis was actually carrying $200 to $300 million in excess, obsolete, expired, missing and unaccounted-for inventory in 2015 through 2017, that Cardinal had been forced to manually count consignment inventory in North America, Europe, the Middle East and Asia, and that Cardinal could not forecast demand for Cordis products. (*Id*.) Instead, Plaintiff alleges that the investors were misled about Cordis and kept in the dark as to these adverse factors. The Court finds that the statements at issue here do not constitute puffery and instead were capable of verification. That is, they are "assertion[s] of a relationship between data and a conclusion, one that a finder of fact could test against record evidence." *See City of Monroe Employees Ret. System v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005).

**b.    Safe Harbor**

The PSLRA carves a safe harbor for forward-looking statements by executive officers that were "accompanied by meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the forward-looking statement" *or* were "immaterial."  15 U.S.C. § 78u–5(c)(1)(A); *see also* 15 U.S.C. § 78u–5(i)(1) (defining "forward-looking statement"); *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018). Defendants focus only on the first portion of the safe harbor provision – that the statements were forward looking and were accompanied by meaningful cautionary language.

Defendants divide the allegedly forward looking statements into two groups:  (i) their statements from March 2015 to August 2016 "regarding the earnings accretion and synergies it expected to achieve from the Cordis acquisition," and, (ii) their statements made about "general expectations or outlook" for Cordis in filings or conference calls made throughout the Class Period.  (Defs.' Mot. at 17–19.)

### i.  Statements in 2015 and 2016 about earnings accretion and synergies

After announcing the Cordis acquisition in March 2015, Defendants made the following statements about the "accretion" and "synergies" it expected Cordis to achieve in fiscal years 2017 and 2018:

- **March 2, 2015.** Cardinal Health's form 8-K announced the Cordis acquisition and stated that "Fiscal 2017, first full post-close year, accretion [from Cordis] is expected to be greater than $0.20 in non-GAAP diluted earnings per share from continuing operations; increasingly accretive thereafter."  (Am. Compl. ¶ 31.)

- **March 2, 2015.**  Defendants presented slides to investors regarding the Cordis acquisition which stated that the acquisition was expected to be "significantly accretive to [Cardinal's] Medical Segment margin Rates," expected to be "greater than $0.20 in non-GAAP EPS accretion in FY 17" and "increasingly accretive thereafter," with "[a]nnual synergies of at least $100M expected exiting FY18." (*Id.* ¶ 32.)

  Defendants Barrett and Kauffman reiterated that Defendants expected "the transaction to be greater than $0.20 accretive in fiscal 2017, which is the first full year post close, and we expect this to be increasingly accretive thereafter. . . . We expect operational synergies of at least $100 million annually to be realized by the time we exit our fiscal 2018."  (*Id.* ¶ 34.)

15

- **March 3, 2015.** Defendant Barrett attended an investor health care conference and repeated that the "economics of [the Cordis] deal are extremely attractive. We expect it to be more than $0.20 accretive in fiscal FY17. We expect by the end of 2018 to achieve about $100 million or more of synergies. And we think this is really important driver for us." (*Id.* ¶ 36.)

- **April 30, 2015.** Defendant Kauffman repeated the $.020 accretion and $100 million "operational synergies" expectations regarding Cordis on a conference call for 3Q 2015. (*Id.* ¶ 41.)

- **February 1, 2016.** On an earnings conference call for 2Q 2016, Defendant Kauffman reported that "in FY17 we still expect the transaction to be greater than $0.20 accretive, and increasingly accretive thereafter. We are also working towards achieving the $100 million of annual synergies as we exit our FY18." (*Id.* ¶ 48.)

- **August 2, 2016.** Defendant Kauffman stated on a conference call for 4Q 2016 that Cardinal lowered Cordis' expected fiscal year 2017 accretion in non-GAAP diluted earnings from $0.20 to $0.15 per share, "largely due to currency impacts, as well as some increased SG&A investments compared to our original business case." Defendant Kaufmann also told investors that the Company was still expecting "double-digit segment . . . growth and margin . . . expansion" from the Medical Segment due to "expect[ed] great performance from Cordis." (*Id.* ¶ 55.)

Plaintiff argues that even if these statements are forward-looking within the meaning of the PSLRA, they do not fall within the safe harbor protection because the cautionary language used by Defendants was not "meaningful." (Pl.'s Resp. at 22–24.) This Court agrees.

To qualify as "meaningful," a cautionary statement must "convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business." *In re Humana, Inc. Sec. Litig.*, No. CIVA 308CV-00162-JHM, 2009 WL 1767193, at *12 (W.D. Ky. June 23, 2009) (quoting *Helwig*, 251 F.3d at 558–59) (internal quotations omitted). Boilerplate warnings are not sufficient. *Id.*; *but see In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 739 (W.D. Ky. 2004) ("Simply because language is repeated does not classify it as 'boilerplate.'"). "'[C]autionary statements must be substantive and tailored

16

to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge." *Id*. (citing *Helwig*, 251 F.3d at 559). However, the "PSLRA does not require companies to warn of 'the particular factor that ultimately causes the forward-looking statement not to come true' in order to receive protection under the safe harbor provision." *Id*. (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). When an investor "has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Helwig*, 251 F.3d at 559 (citing *Harris*, 182 F.3d at 807).

The cautionary statements Defendants posit are meaningful provide that the Cordis acquisition is "subject to risks and uncertainties that could cause actual results to differ materially from those projected[.]" (Bloomfield Decl., Ex 5, ECF No. 29.) The Form 8-K was accompanied by a press release that also listed as one of several future uncertainties as the ability to "integrate the acquired business into Cardinal's operations, if the acquisition is completed; [and] the ability to achieve the expected synergies as well as accretion in earnings[.]" (*Id.*)

The oral statements alleged at ¶¶ 34, 36, 41, 48, and 55 discussing Cordis' expected future accretion and synergies were also accompanied by cautionary language. At the conference call on March 2, a Cardinal executive warned that Defendants would be making "forward-looking statements" that "are subject to risks and uncertainties that could cause actual results to differ materially"; the executive referred listeners "to [Cardinal's] SEC filings and the forward-looking statements slides at the beginning of presentation found on the Investor page of the Cardinal website. (*Id.*, Ex. 6.) The April 30 conference call contained the same cautionary statement and referred listeners the "forward-looking statements slide" of the presentation. That slide listed several specific future uncertainties, including "the ability to successfully complete

the acquisition of Cordis on a timely basis and if completed to achieve the anticipated results from the Cordis acquisition[.]" (*Id.*, Ex. 15.) Defendants made similar cautionary statements at the beginning of the February 1, 2016 and August 2, 2016 conference calls.

The cautionary language Defendants highlight regarding the expected accretion and synergies from the Cordis acquisition was a general warning to investors that results could differ materially from those projected anticipated or implied. To be meaningful, the cautionary language "'must be *substantive* and *tailored* to the specific future projections, estimates or opinions . . . which the plaintiffs challenge.'" *Helwig*, 251 F.3d at 559. For example, in *In re Humana, Inc. Securities Litigation*, the court found the following "cautionary statements are not vague or blanket disclaimers, but instead are substantive, extensive, and tailored to the future-looking statements they reference.":

> Our business depends significantly on effective information systems and the integrity and timeliness of the data we use to run our business. . . . As a result of our past and on-going acquisition activities, we have acquired additional information systems. We have been taking steps to reduce the number of systems we operate, have upgraded and expanded our information systems capabilities, and are gradually migrating existing business to fewer systems. Our information systems require an ongoing commitment of significant resources to maintain, protect and enhance existing systems and develop new systems to keep pace with continuing changes in information processing technology, evolving industry and regulatory standards, and changing customer preferences. If the information we rely upon to run our business was found to be inaccurate or unreliable or if we fail to maintain effectively our information systems and data integrity, *we could have operational disruptions, have problems in determining medical cost estimates and establishing appropriate pricing, have customer and physician and other health care provider disputes, have regulatory or other legal problems, have increases in operating expenses, lose existing customers, have difficulty attracting new customers, or suffer other adverse consequences.*

> (Humana 2007 Form 10–K at 18; Humana 2006 Form 10–K at 18.); *see also id.* at 19 ("Failure to adequately protect and maintain the integrity of our information systems and data may result in a material adverse effect on our financial positions, results in operations and cash flows.")

Humana's cautionary language also *warned explicitly* that its expected earnings were susceptible to risks associated not only with inaccuracies in Humana's data and information systems, but also in the design and pricing of its products. Humana specifically warned investors that failure by the Company to "design and price our products properly and competitively" could cause its profitability to decline. (Humana Form 10–Q (October 29, 2007) at 26.) *See also* Humana 2006 Form 10–K at 17 ("[I]f we lose accounts with favorable medical cost experience while retaining or increasing membership in accounts with unfavorable medical cost experience, our business and results of operations could be materially adversely affected.")

Similarly, Humana also *informed* investors of the manner in which it calculated future benefit and medical claims, *the numerous risks associated* with its estimation of the costs of the claims and other expenses, and the potential impact of these items on the profitability of the company. (Humana 2007 Form 10–K at 16) ("We estimate the costs of our future benefit claims and other expenses using actuarial methods and assumptions based upon claim payment patterns, medical inflation, historical developments, including claim inventory levels and claim receipt patterns, and other relevant factors."); *see also* Humana 2006 Form 10–K at 16). Humana *expressly identified numerous factors* that could potentially "cause actual health care costs to exceed what was estimated and used to set [Humana's] premiums," including "increased use of medical facilities and services, including prescription drugs; . . . our membership mix; variances in actual versus estimated levels of cost associated with new products, benefits or lines of business, product changes or benefit level changes." *Id.*

The cautionary language used *gave investors particular information* about the effect that utilization of inaccurate benefit claims information and the effect that possible variances in actual verses estimated levels of cost associated with new products, benefits or benefit level changes could have on Humana's financial health. Humana's cautionary statements provided investors company and industry specific-risks and described their impact on Humana's financial results. This cautionary language warned of risks similar to those that ultimately led Humana to revise its earnings guidance downward on March 12, 2008.

*In re Humana, Inc. Securities Litig.*, CIVA 308CV-00162-JHM, 2009 WL 1767193, at *13–14

(W.D. Ky. June 23, 2009) (emphasis added). As can be seen by this quote, unlike Cardinal's

language, Humana's cautionary language was substantive, extensive, and tailored to the future-

looking statements.

Here, Plaintiff persuasively argues that:

> To be substantive and tailored here, Defendants' March 2, 2015 cautionary language would have had to include that Cordis: (1) had inadequate inventory controls and no properly functioning inventory management system in place when the acquisition was announced; (2) was unable to accurately track consigned and warehouse inventory or forecast demand; and (3) Cordis was experiencing debilitating problems with product backorders and was manufacturing excess products, which were subject to strict expiration dates. ¶67(a)-(b). Defendants' cautionary language thereafter would have had to continue to warn of these risks and that Cordis was carrying at least $200-$300 million in excess, obsolete and expired inventory and that by summer 2017 Defendants had lost all visibility into Cordis' ex-U.S. inventories. ¶¶67(a), 71, 83(a).  But it did not.
>
> The inadequacy of Defendants' cautionary language is demonstrated by the fact that, when investors learned the truth about the negative impact Cordis was having on Cardinal's earnings, they were surprised and disappointed by Defendants' "lack of visibility, lack of good inventory controls, and lack of understanding of the full required investment [for Cordis]." ¶90(b).

(Pl. Mem. in Opp. at 22–23.)

While it is unnecessary for the Court to determine what a meaningful cautionary statement would be in the context of the Cordis acquisition, what Defendants offer as cautionary statements do not convey substantive information about factors that realistically could cause the results to differ materially from those projected in the forward-looking statements.  Accordingly, these proposed forward-looking statements do not qualify for protection of the PSLRA's safe harbor.

### ii.      Statements about general expectations or outlook

Defendants also argue that all statements made throughout the Class Period "regarding general expectations or outlook for Cordis in filings and on investor or analyst conference calls" qualify for the PSLRA safe harbor.  (Defs.' Mot. at 18) (citing Am. Compl. ¶¶ 32–34, 36-38, 41–43, 45–52, 54–61, 63, 65, 68–69, 73–77, 79, 80–82, ECF No. 28).)  Plaintiff responds that these statements were not forward-looking and were instead "statements of present or historic fact[,]"

20

making them ineligible for the PSLRA safe harbor. (Pl.'s Resp. at 21 (citing *Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2016 WL 8199124, at *12 (S.D. Ohio Jan. 21, 2016).) This Court agrees.

A statement is not considered "forward-looking" under the PSLRA safe harbor if it relates to "past or current, rather than future, performance[.]" *Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, 2002 WL 31545952, at *19 (S.D. Ohio Sept. 19, 2002); *see also Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 678 (6th Cir. 2003) (A "statement of present or historical fact . . . is not subject to the safe harbor provision of the PSLRA."). However, what might seem like a statement of present or historical fact qualifies as a forward-looking statement if it is a "statement of the assumptions underlying or relating to any" forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(D).

The "critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made." *Dougherty v. Esperion Therapeutics*, Inc., 905 F.3d 971, 983 (6th Cir. 2018). "If so, then the statement is not forward-looking"—even if the statement pertains to a future event. *Id.* (citing *Julianello v. K-V Pharmaceutical Co.*, 791 F.3d 915, 921 (8th Cir. 2015)). As the court in *Dougherty* explained, "take for instance a man's statement to his friend, 'My girlfriend has agreed to marry me.' That is not a forward-looking statement. Rather, it is a backward-looking statement concerning a future event." *Id.*

Applying the foregoing standards, the challenged statements about the "general expectations or outlook for Cordis" are statements of present or historical fact that could be verified at the time they were made, and thus are not forward-looking:

- **January 12, 2016**. Defendant Kaufmann told investors on a J.P. Morgan conference call that "I just wanted to let you know right now everything's going as planned on Cordis . . . for right now, I just want you to know from everything we

21

see things are going as planned and as expected."  Defendant Barrettt confirmed that "the integration has gone well."  (Am. Compl. ¶ 46.)

- **February 1, 2016**.  On a conference call with investors and analysts, Defendant Barrett stated that the "integration of Cordis has gone well and is on target." Defendant Kaufmann stated that "Cordis is off to a good start, with all key personnel in place, and day-to-day operations up and running."  (*Id.* ¶ 47.)

- **February 10, 2016**.  Defendant Barrett spoke at an analyst conference and stated in response to a question about Cordis: "We're off to a very good start. As we said at the end of our second quarter, things are going as expected." (*Id.* ¶ 49.)

- **March 7, 2016**. Defendant Barrett stated at an investor conference: "Again, for us the Cordis acquisition, which is very early on and going well thus far"; and "Cordis is off to a very good start, and nothing I've seen makes me less enthusiastic about this part of the strategy." (*Id.*)

- **April 28, 2016**. Defendant Barrett spoke on an earnings conference call that the Cordis integration "remains on track." Defendant Kauffmann stated: "the onboarding of Cordis continues to progress well. We have filled the key roles with excellent talent and are focused on execution"; and "I think it's really important to know that the underlying Cordis business is doing really well—done an excellent job of staffing up, both from management and the sales teams." (*Id.* ¶ 50.)

- **June 15, 2016**. Defendant Barrett remarked that "operationally the [Cordis] integration is going extremely well. Market share is going well, we have retained the talent we want, we have attracted additional talent on a global basis, we are actually about where we modeled it . . . ." (*Id.* ¶ 51.)

- **August 2, 2016**. Defendant Barrett stated on an earning conference call that Defendant Casey "and his team did a tremendous job closing the Cordis acquisition on time and managing the integration into Cardinal Health . . . and we hit our integration and performance benchmarks." Defendant Kaufmann stated, "We think things are going really well. We've got all of the key employees, management teams, sales folks in place, things are going incredibly well." (*Id.* ¶ 54.)

All of these statements about Cardinal's integration efforts being "on track" and "as planned" and "as expected" convey that the *current* state of the integration efforts had progressed to a point that made it reasonably likely for Cardinal to complete the integration process by a certain time. *See Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (treating language about the company being "on track" as "statements of present fact that

could be considered material"). *In re Akorn, Inc. Securities Litig.*, 240 F. Supp. 3d 802, 817

(N.D. Ill. 2017) (same?).  Further, the veracity of these statements could have been determined at

the time they were made: "integration of Cordis has gone well and is on target," that Cardinal has

"all key personnel in place, and day-to-day operations up and running," it has in place "the key

roles with excellent talent," "an excellent job of staffing up, both from management and the sales

teams," "we hit our integration and performance benchmarks."  Consequently, these statements

fall outside of the safe harbor of the PSLRA.

### c.  Accurate statements of historical results

Defendants challenge statements they made in February, August and September 2017,

that they contend are not actionable as a matter of law.  Specifically, Defendants assert:

> The complaint also alleges that statements by the company and executives
> disclosing the past performance of Cardinal Health and of Cordis on quarterly
> earnings calls, and the reasons for that past performance, contained material
> omissions. *See, e.g.*, Am. Compl. ¶¶ 60-61, 68-73.  According to the complaint,
> such statements were materially incomplete because they were unaccompanied by
> disclosures of alleged inventory problems that could hamper Cordis' performance
> in the future. *See, e.g., id.* ¶¶ 67, 71, 73, 83.)

(Defs' Mot. at 19, ECF No. 31.)

Defendants contend:

> As a matter of law, such allegations are inadequate to plead a material omission.
> As the Sixth Circuit has explained: "It is clear that a violation of federal securities
> law cannot be premised upon a company's disclosure of accurate historical data.
> The disclosure of accurate historical data does not become misleading even if less
> favorable results might be predictable by the company in the future." *In re Sofamor
> Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997). Thus, the Sixth Circuit
> held that the Ford company's disclosure of historically accurate sales data for a
> product was not rendered materially misleading by the omission of an
> accompanying disclosure that the product was defective and that "the eventual
> public revelation of the defect would affect adversely Ford's financial status." *Ford*,
> 381 F.3d at 570 (citing *Sofamor*, 123 F.3d at 401 n.3).

*Id*.  Defendants' arguments are not well taken.

This is not a situation, as Defendants argue, where there was a disclosure of accurate historical data that Plaintiff alleges became misleading because less favorable results might be predictable by the company in the future or an eventual public revelation that would adversely effect Cardinal's financial status.  (Defs' Mot. at 19) (quoted above).  Instead, as the Sixth Circuit explained, if a company chooses to volunteer information its "disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts . . . to the extent that the volunteered disclosure was misleading . . . ."  *City of Monroe Employees Ret. System v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) (internal quotations omitted).  The court noted that "[o]ur securities laws therefore 'require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'"  *Id*. (citations omitted).  The *Bridgestone Corporation* court concluded:

> The question thus is not whether a [defendant's] silence can give rise to liability, but whether liability may flow from his decision to speak . . . concerning material details . . . , without revealing certain additional known facts necessary to make his statements not misleading. This question is answered by the text of [SEC] Rule 10b–5(b) itself: it is unlawful for any person to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."

*Id*.  (citing, *inter alia*, 17 C.F.R. § 240.10b–5(b)).

With these standards in mind, the Court finds that the allegations at issue are not as a matter of law inadequate to plead a material omission.

### d.    Conclusion of Material Misrepresentation

Examining Defendants' statements in the context in which they were made, and as alleged by Plaintiff, reasonable minds could infer that the statements made about the Cordis integration were materially misleading because Defendants failed to disclose "known facts necessary to make" the "statements not misleading."  *City of Monroe*, 399 F.3d at 670 (citation

24

omitted). Thus, the Court concludes that the alleged misrepresentations or omissions are not so obviously unimportant to a reasonable investor "that reasonable minds cannot differ on the question of materiality." *In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d at 747. Consequently, Plaintiff has sufficiently pleaded that the statements by Cardinal or its executives regarding Cordis, or the company's financial statements, contained material misrepresentations or omissions.

### 2. Scienter

The PSLRA requires a plaintiff to "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'" in making isrepresentations. *Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011) (quoting 15 U.S.C. §78u-4(b)(2)). In a securities fraud case, "scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (citations and internal quotations omitted). "Recklessness is defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care'"—"akin to conscious disregard." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (internal quotations and citation omitted).

The Supreme Court has established a three-part test to determine whether a plaintiff's scienter allegations are sufficiently pleaded. *Tellabs*, 551 U.S. at 322–24.

"First, all of the plaintiff's factual allegations must be accepted as true.

Second, the complaint and other sources normally considered by a court when ruling on a 12(b)(6) motion must be considered in their entirety, including documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

> Third, the court must take into account plausible opposing inferences when determining whether there is a strong inference of scienter. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."

*Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (citing *Tellabs*, 551 U.S. at 322–25) (internal quotations and citations omitted).  The Sixth Circuit applies this test with reference to nine non-exhaustive "*Helwig* factors":

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473 (6th Cir. 2014) (citing *Helwig*, 251 F.3d at 552).  The ultimate question is whether the allegations, viewed holistically and not piecemeal, give rise to the "inference of scienter and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  "Whether [Plaintiff] can ultimately prove [its] allegations and establish scienter is an altogether different question."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49 (2011).

Defendants argue that Plaintiff's allegations fail to give rise to a strong inference of scienter as required by the PSLRA.  In response, Plaintiff contends that Defendants scrutinize certain allegations such as their own insider sales and compensation, to argue that each, standing alone, does not support an inference of scienter.  Plaintiff maintains that, all facts probative of scienter, however, must be considered collectively in assessing whether the Complaint raises a strong inference, and here that consideration provides a strong inference of knowing or reckless misconduct on the part of each defendant.  (Pl's Mem. in Opp. at 30) (citing *Dana I*, 547 F. 3d at 571).  Plaintiff submits that the following facts, including four of the *Helwig* factors, collectively raise a strong inference of knowing or reckless misconduct on the part of each defendant:

- insider trading by defendants Barrett and Casey in unusual amounts totaling ***almost $114 million*** and at suspicious times;

- key executive departures of Defendants who were directly responsible for the Cordis acquisition and integration, and who spoke positively about it to investors: Wilson, Cordis' president, in August 2017; Barrett, Cardinal's CEO, in January 2018; and Casey, CEO of Cardinal's Medical Segment who led the integration of Cordis, in February 2018;

- closeness in time of Defendants' final Class Period misrepresentations about Cordis on March 8, 2018 and their May 3, 2018 disclosures of inconsistent information which shocked investors;

- the magnitude of the post-Class Period impact from Cardinal's acquisition of Cordis and the inventory and other problems Defendants concealed from investors: Cardinal wrote down $1.4 billion in goodwill and tangible assets – ***74% of the price it paid for Cordis*** – causing a 94% decline in operating profits, and ***doubled its year-over-year inventory reserves*** from $76 million to $147 million;

- the importance of Cordis to Cardinal's core business; and

- the self-interested motivations of Defendants to protect their performance-based compensation.

(Pl. Mem. in Opp. at 30–31.)  This Court agrees.

Throughout their motion and reply brief, Defendants present law that supports their conclusions from inferences drawn in their favor from the facts and circumstances alleged.  For example, Defendants contend:  "The fact that the negative statements were made throughout the Class Period suggests an inference of honest and frank behavior on the part of Defendants, as opposed to an intent to commit fraud and a scheme to inflate the stock price."  (Reply at 12, ECF No. 36.)  However, in evaluating the sufficiency of scienter allegations, the Supreme Court has directed courts to "accept all factual allegations in the complaint as true," view the allegations "holistically" and consider whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322–26.  "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the requisite standard." *Id*. at 310. "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Dana I*, 547 F. 3d at 571.  In other words, *Tellabs* "'awards the draw to the plaintiff.'" *Id*.

In the instant action, it is alleged that Defendants continued to represent that the Cordis acquisition and integration of inventory oversight with Cardinal's systems was on track and going well when internal reports showed that Cardinal knew that there were hundreds of millions of dollars in obsolete inventory and there was an internal "dark period" where Defendants could not track any Cordis inventory for approximately a year.  Plaintiff's allegations sufficiently show that Defendants were aware of this.  Viewed holistically, Plaintiff's allegations give rise to the strong inference of scienter required by *Tellabs*.  That is, there is a strong inference of scienter

that may be drawn from these facts and circumstances that is at least as plausible as any non-culpable inference suggested by Defendants.

### 3.    Loss Causation

"In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  At the pleading stage, "a plaintiff need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'"  *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, (2005)); *see also In re Cardinal Health Inc. Securities Litigation*, 426 F. Supp. 2d 688, 758 (S.D. Ohio 2006) (stating "[e]ssentially, a plaintiff needs to allege a drop in stock price; establish a causal connection; and connect the alleged fraud with the ultimate disclosure and loss").  Plaintiff has met that burden.

Plaintiff alleged a causal connection between Defendants' alleged misleading statements and omissions inflating Cardinal's stock price and the stock price declines when negative material information related to the statements and omissions was disclosed.  (Am. Compl. ¶¶ 131–137, ECF No. 28.)  Specifically, the Amended Complaint contains the following allegations:  (a) Defendants misled investors by concealing Cordis' debilitating inventory management and tracking problems, that Cordis was carrying millions in excess, obsolete and expired inventory not reflected in Cardinal's publicly reported earnings, the cost overruns to set up a global supply chain, and the fact that sales were being impacted by persistent back-order issues (*Id*. ¶¶ 67, 71, 83, 92–103); (b) Defendants' materially misleading statements and omissions caused Cardinal's stock price to trade at artificially inflated levels (*Id*. ¶ 131); (c)

Plaintiff and the Class purchased Cardinal stock at these inflated prices (*id*.); (d) on August 2, 2017, when Cardinal reported weak earnings for its 4Q and FY 2017 and lowered earnings guidance for FY 2018 due to lost sales and cost issues at Cordis, including "higher-than-planned write-offs for excess inventory," Cardinal's' stock price dropped 8% (*Id*. ¶¶ 68–69, 133); (e) on May 3, 2018, when Cardinal announced lower-than-expected earnings for 3Q 2018 due to Cordis' poor performance, which included an inventory reserve increase, and that as a result the Company was reducing expected earnings for 2018 and that Cordis would not be profitable until the end of 2019, Cardinal's stock price dropped over 21% on unusually high trading volume (*Id*. ¶¶ 84–88, 134–136); and (f) as a direct result, Plaintiff and the Class suffered damages (*Id*. ¶ 137).

These allegations are more than sufficient to plead the required "causal connection" between Cardinal's allegedly false and misleading financial statements and Plaintiff's economic loss.

**B**      **Claims Under §§ 20(a) and 20A**

Plaintiff's claims brought under § 10(b) and Rule 10b-5 of the Securities Exchange Act require a predicate violation. *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1120 (S.D. Ohio 2007); *PR Diamonds, Inc.* v. *Chandler*, 364 F.3d 671, 696 (6th Cir. 2004). Because the Court has not dismissed Plaintiff's claims under § 10(b) and Rule 10b–5, the Defendants' motion to dismiss the § 20(a) claim is not well taken.

## IV.

Plaintiff also filed a Motion to Strike Exhibits Submitted with Defendants' Motion to Dismiss, which is fully briefed. (ECF Nos. 33, 37, 38.) The Court, however, need not make a determination of this issue because even when considering the exhibits as part of the pleadings

and accepting them as the support Defendants intended them to be, Defendants' Motion to Dismiss was denied. Therefore, the Court finds that Plaintiff's Motion has been rendered moot. (ECF No. 33.)

**V.**

For the reasons stated above, the Court **DENIES** Defendants' Motion to Dismiss (ECF No. 31) and **DENIES AS MOOT** Plaintiff's Motion to Strike Exhibits (ECF No. 33). This case remains open on this Court's docket.

**IT IS SO ORDERED.**

9/27/2021                                                      s/Edmund A. Sargus, Jr.
DATE                                                          EDMUND A. SARGUS, JR.
                                                             UNITED STATES DISTRICT JUDGE