# EXHIBIT 36

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br> Plaintiff,<br><br>vs.<br><br>FEDERAL HOME LOAN MORTGAGE CORPORATION a/k/a FREDDIE MAC, et al.,<br><br>Defendants. | Case No. 4:08-cv-00160-BYP |

REPORT ON MARKET EFFICIENCY

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

June 7, 2017

## TABLE OF CONTENTS

I.  SCOPE OF PROJECT AND REPORT ...................................................................1

II.  CREDENTIALS ................................................................................................2

III.  CONCLUSIONS.................................................................................................5

IV.  FACTUAL BACKGROUND ..............................................................................6

    A.  About the Company ...................................................................................6

    B.  Relevant Procedural History ......................................................................7

V.  EFFICIENT MARKET DEFINED......................................................................9

    A.  The Cammer Factors.................................................................................12

    B.  The Krogman Factors ...............................................................................14

VI.  EFFICIENCY OF THE MARKET FOR FREDDIE MAC COMMON STOCK .............15

    A.  Trading Volume ........................................................................................15

    B.  Analyst Coverage and Other Avenues of Information Dissemination .................16

        1.  Analyst Coverage...........................................................................16

        2.  Institutional Ownership and Buy-Side Analysis........................................18

        3.  News Coverage ...............................................................................18

    C.  Market Makers and Listing on the New York Stock Exchange ...........................19

    D.  S-3 Registration Eligibility .....................................................................21

    E.  Krogman Factors ......................................................................................24

        1.  Market Capitalization.....................................................................24

        2.  Float .............................................................................................25

        3.  Bid-Ask Spread..............................................................................25

VII.  EMPIRICAL EVIDENCE OF MARKET EFFICIENCY FOR FREDDIE MAC
     COMMON STOCK ............................................................................................27

    A.  Event Study Test of Market Efficiency ...........................................................28

        1.  A Caveat About Non-Significant Stock Price Movements........................29

        2.  Selection of Allegation-Related Event.......................................................31

        3.  Selection of Collective Events: WSJ/NYT News Event Dates .................33

        4.  Isolating the Impact of Company-Specific Information ...........................34

        5.  t-Test ............................................................................................37

        6.  Allegation-Related Event Study Results.....................................................37

    B.  Collective Empirical Test Conducted on all WSJ/NYT News Event Dates..........38

        1.  Z-Test Analysis of Frequency of Significant Event Returns....................39

VIII.  MARKET EFFICIENCY SUMMARY ..................................................................................40

IX.  PER SHARE DAMAGE METHODOLOGY ...........................................................................41

    A.  Section 10(b) Per Share Damage Methodology.......................................................42

X.  LIMITING FACTORS AND OTHER ASSUMPTIONS...................................................45

XI.  APPENDIX: LOGARITHMIC RETURNS ........................................................................46

## I.  SCOPE OF PROJECT AND REPORT

1.  In my declaration dated 16 December 2016 (the "December Declaration), I concluded that in the years subsequent to the Expert Report of Dr. Greg Hallman, dated 16 August 2012 (the "Hallman Report"), substantial developments have occurred in the legal, academic, and practitioner's arenas concerning what needs to be proved regarding market efficiency, including what tests are therefore appropriate, and how damages could be computed on a consistent basis for all proposed class members.

2.  Subsequently, I was asked by Markovits, Stock & DeMarco, LLC and Strauss Troy Co., LPA, Co-Lead Counsel for the Plaintiff, to determine whether the common stock of The Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") traded in an efficient market during the period from 1 August 2006 through 20 November 2007 (the "Class Period").

3.  In addition, I was asked to opine on whether damages in this matter can be computed using a common class-wide methodology for all Class members in connection with their claims under Section 10(b) of the Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, "Section 10(b)").

4.  Toward these ends, I analyzed the market for Freddie Mac common stock, the price behavior of the stock, and the factors that are generally accepted to be indicative of market efficiency. I examined Company press releases, conference call transcripts, equity analyst reports, news articles, regulatory filings, daily prices of the common stock, trading volume, the performance of the overall stock market, the performance of Freddie Mac's peer group, the Hallman Report, the Expert Report of Mukesh Bajaj dated 14 December 2012 (the

1

Case: 4:08-cv-00160-BYP Doc #: 372-3 Filed: 06/12/17 236 of 159 PageID #: 18513

"Bajaj Report"), as well as other pertinent data and documents. I also read the Third Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") dated 28 March 2012, and considered the allegations therein. Exhibit-1 lists the documents I considered in preparing this report and arriving at the opinions expressed herein.

5. This report presents my methodology, findings, and conclusions.

6. I reserve the right to amend, refine, or modify my opinion and report, including in the event any additional information or analysis becomes available.

## II.   CREDENTIALS

7. I am an Associate Professor of Finance at Babson College, and the founder and president of Crowninshield Financial Research, Inc., a financial economics consulting firm.

8. I hold a Ph.D. in Economics from Yale University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College. I also hold the Chartered Financial Analyst ("CFA") designation, granted by the CFA Institute.

9. At Babson College, I have taught undergraduate and MBA level courses in Capital Markets, Investments, Equity Analysis, Fixed Income Analysis, Financial Management, Risk Management, Quantitative Methods, and Security Valuation. I have also taught executive courses on investments and corporate financial management for numerous corporations. Other courses I have taught are listed in my curriculum vitae, which is attached as Exhibit-2.

10. At Babson College, I have held the Chair in Applied Investments and served as the Director of the Stephen D. Cutler Investment Management Center, a research and education center dedicated to the study and teaching of investments and capital markets.

Case: 4:08-cv-00160-BYP Doc #: 372-3 Filed: 06/12/17 29 of 159 PageID #: 18516

11. Prior to my joining the faculty at Babson College, I taught finance at Boston University. Previously, I was an Economist at the Federal Reserve Bank of Atlanta where my primary responsibilities were to monitor financial markets, analyze proposed regulation, and advise the Bank President in preparation for his participation in meetings of the Federal Open Market Committee – the government body responsible for monetary policy in the United States.

12. I have published in the field of finance. My finance articles have appeared in the *Atlanta Federal Reserve Bank Economic Review*, *Derivatives Quarterly*, *Derivatives Weekly*, *The Engineering Economist*, *The Journal of Risk*, *The American Bankruptcy Institute Journal*, *The Journal of Financial Planning*, *The Journal of Forensic Economics*, *Managerial Finance*, *Risk Management*, and *Primus*. I am the author of Finance and Accounting for Project Management, published by the American Management Association. I wrote two chapters in the book *The Portable MBA in Finance and Accounting* – one on corporate financial planning and the other on risk management. I have presented research at the annual conventions of the American Finance Association, the Academy of Financial Services, the Multinational Finance Society, the Financial Management Association, the Taxpayers Against Fraud Education Fund Conference, and the International Conference on Applied Business Research. Co-authored papers of mine have been presented at the Eastern Finance Association meetings and the Midwestern Finance Association meetings. A list of all the publications I authored in the previous ten years can be found in my curriculum vitae, which is attached as Exhibit-2.

13. I have been selected to review papers for numerous finance journals and conferences, and I have reviewed finance textbook manuscripts for Prentice-Hall, Elsevier, Blackwell, and

3

Case: 4:08-cv-00160-BYP Doc #: 372-3 Filed: 06/12/17 50 of 159 PageID #: 18517

Southwestern Publishing. I have been quoted on matters relating to finance and investments in *The Wall Street Journal*, *The Washington Post*, *The New York Times*, *The Financial Times*, *The Boston Globe*, and *Bloomberg News*, and my research relating to financial analysis and valuation has been discussed in *The Wall Street Journal*, *Bond Buyer*, and *Grant's Municipal Bond Observer*.

14. I am a member of the American Finance Association, the Financial Management Association, the North American Case Research Association, the National Association of Forensic Economics, the CFA Institute, and the CFA Society Boston, where I have served as a member of the education committee and ethics subcommittee. I served on the Fixed Income Specialization Examination Committee of the CFA Institute.

15. The CFA designation is the premier credential for financial analysts worldwide. In order to receive this credential, applicants must pass a series of three exams covering such topics as economics, equity analysis, financial valuation, business analysis, quantitative methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards. For over ten years I taught in the Boston University CFA Review Program and the CFA Society Boston Review Program – two of the leading review programs that prepared candidates for the CFA exams. In both of these programs I taught candidates at the most advanced level.

16. In addition to my teaching, research, CFA, and academic community responsibilities, I practice extensively as a financial consultant. Past clients include the United States Securities and Exchange Commission, the Internal Revenue Service, the Attorney General of the State of Illinois, and the National Association of Securities Dealers. As a financial consultant, I have conducted analyses and presented opinions related to markets, valuation,

Case: 4:08-cv-00160-BYP Doc #: 372-3 Filed: 06/12/17 31 of 159 PageID #: 18518

and damages in over 70 cases. Testimony that I have provided since my December Declaration is identified in Exhibit-3.

17. I am the sole owner of the consulting firm Crowninshield Financial Research, which receives compensation for the work performed by me and the analysts who assist me on this case. My firm is being compensated at a rate of $825 per hour for my work. My compensation is neither contingent on my findings nor on the outcome of this matter.

### III. CONCLUSIONS

18. Freddie Mac common stock traded in an efficient market over the course of the Class Period. Freddie Mac common stock satisfied the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1273 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), which, consistent with financial economic principles, empirical research, and even Dr. Bajaj's recent testimony, indicate market efficiency. *See* Expert Report of Mukesh Bajaj, Ph.D., dated 11 October 2016 (the "Bajaj Allergan Report"), ¶14.

19. Event study analysis demonstrates that there was a cause and effect relationship between the release of new, Company-specific information and movements in Freddie Mac's stock price during the Class Period. Freddie Mac's stock price responded in a statistically significant fashion to new Company-specific information, which not only indicates market efficiency, but provides direct demonstrative evidence of market efficiency.

20. Based on the foregoing, I conclude that Freddie Mac common stock traded in an efficient market over the course of the Class Period.

21. Damages in this matter can be computed for all Class Members using a common methodology that is consistent with the Plaintiff's allegations of liability.

it was not eligible for S-3 registration on account of its exemption from Exchange Act reporting requirements, the Company did regularly provide quarterly and annual financial reports to investors and therefore possessed the same characteristics (size and reporting) that underlie why S-3 registration eligibility indicates market efficiency.

146. Freddie Mac common stock satisfied the empirical *Cammer* factor, which provides direct demonstrative evidence of market efficiency.

147. The empirical tests proved that there was a cause and effect relationship between new, important Company-specific information, and movements in the price of Freddie Mac stock.

148. Given these facts, I conclude that Freddie Mac common stock traded in an efficient market over the course of the Class Period.

## IX. PER SHARE DAMAGE METHODOLOGY

149. Plaintiff's counsel asked me to opine on whether damages could be measured for each Class member under Section 10(b) of the Exchange Act using a common methodology for all Class members.

150. It should be noted that I have not conducted a loss causation analysis at this time and reserve the right to address such issues at the appropriate stage. The loss causation analysis that will be necessary to actually calculate damages in the current case requires the full development of the record.

151. Nonetheless, the methodology discussed herein allows the calculation of individual and class-wide damages stemming from various alleged misrepresentations and omissions, and therefore will accommodate alternative potential determinations of liability. Economic analysis (including valuation and empirical event study analysis) can be used to estimate

the relationship between specific statements or sets of statements and the subsequent effect on prices, in the case of affirmative statements, omissions, and/or corrective disclosures or risk materialization. As such, class-wide damages in response to the specific misrepresentations and omissions ultimately established by the Plaintiff can be calculated in a straightforward manner common to all Class members. Out-of-pocket damages can be measured as the difference between the amount of share price inflation at purchase and the amount of inflation in the share price at sale, taking into account formulaic prescriptions in relevant case law (e.g., *Dura*) and statutes. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

### A. Section 10(b) Per Share Damage Methodology

152. Assuming a Plaintiff's verdict on the allegations of fraud, Section 10(b) per share damages, respectively for each investor, can be measured as follows:

    i. First, valuation tools, which would include event study analysis such as that described herein, and potentially other empirical analyses if necessary, would be used to establish that the disclosure(s), correcting the alleged misrepresentations and omissions, caused the price of Freddie Mac common stock to fall. This analysis, after controlling for potentially non-fraud-related information, would establish that the alleged misrepresentations and omissions had caused the stock price to be artificially inflated, and that the corrective disclosure(s) caused the inflation to dissipate, in turn causing investor losses. This analysis would apply on a class-wide basis.

    ii. Second, an inflation ribbon would be constructed for the stock, using generally accepted empirical analysis and valuation tools, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of the Freddie Mac common stock on each day of the Class Period. An inflation ribbon is a time series of the difference

between a stock's actual price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure from the outset of the Class Period. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools and models. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated. The full array of generally accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for stock prices under the assumption of prior full disclosure. This analysis would also apply on a class-wide basis.

iii. Third, the measure of per share damages generally applied in 10(b)-5 cases is the reduction in the inflation ribbon over an investor's holding period (the economic/inflation loss) that was caused by corrective disclosures. That is, for each Class member, per share damages would be calculated as the difference between the inflation on the date the shares were purchased and the inflation on the date those same shares were subsequently sold, excluding any inflation dissipation caused by factors other than corrective disclosure. Per share damages are also limited, however, to be no greater than the decline in share price over the holding period, which is the investment loss actually sustained. Pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (15 U.S.C. § 78u-4(e)), for any shares sold during the 90-day period after the end of the Class Period, per share damages would be calculated as the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss), or the decline in the share price (the investment loss), where the terminal stock price is deemed to be the average price from the final corrective disclosure date to the sale date. Also pursuant to the PSLRA, for

Case: 4:08-cv-00160-BYP Doc #: 372-3 Filed: 06/12/17 7 of 153. PageID #: 18557

any shares held 90 days or more beyond the final corrective disclosure, damages would equal the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the stock price (the investment loss), where the terminal stock price is deemed to be the average price over the 90 days following the final corrective disclosure. The calculation of each Class member's damages would be a mechanical arithmetical exercise, conducted the same way for all Class members, applying the results of the Class-wide analyses described above to each Class member's trading data.

153. Consequently, each Class member's damages under Section 10(b) can be computed in the same way, common to all Class members, using readily available daily pricing information, in accordance with widely used and generally accepted methodologies and the PSLRA.

154. I have not yet been asked to calculate damages for any of the claims alleged on behalf of the Class, and such calculations will likely depend, in part, on the completion of discovery. However, the methodology described above is generally accepted and widely used for calculating damages under Section 10(b) consistently on a class-wide basis in securities class actions.

155. The damages methodology will take into account all relevant valuation factors, and do so correctly. If varying investment risk is an issue, the full set of generally accepted and widely used valuation tools will measure the valuation impact of risk, just as investors and analysts routinely take this factor in account in real time. The damages expert will have the added benefit of the event study results, and can observe how much the Freddie Mac common stock price actually changed when the corrective disclosure event occurred.

156. However, I am aware that the full record of facts needs to be developed before one can impose a restriction on the but-for valuation component of the damages analysis, according to the allegations.

157. Further, a fundamental principle of financial economics is that in an efficient market, investors are not systematically wrong. This principle facilitates estimation of the prices the stock would have traded at had investors been properly and fully informed about what the Plaintiff alleges was misrepresented or concealed, which in turn is the basis of the construction of the inflation ribbon. This detail, however, as well as the inflation ribbon itself, will be provided in a report on loss causation and damages, at the appropriately later stage.

## X.     LIMITING FACTORS AND OTHER ASSUMPTIONS

158. This report is furnished solely for the purpose of court proceedings in the above referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.

Steven P. Feinstein, Ph.D., CFA