**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **LOUISIANA SHERIFFS' PENSION & RELIEF FUND**, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>**CARDINAL HEALTH, INC.**, et al.,<br><br>Defendants. | **Case No. 2:19-cv-3347**<br><br>Judge Edmund A. Sargus<br><br>Magistrate Judge Elizabeth A. Preston Deavers<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

                    **Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................3

ARGUMENT..............................................................................................................................9

To establish its entitlement to class certification, a plaintiff must prove that it will adequately represent the interests of the class, that its claims or defenses are typical of the class, and that questions of law or fact common to the class predominate over questions affecting only individual class members. *See* Fed. R. Civ. P. 23(a)(3), (4), (b)(3); *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Plaintiff fails to establish these elements of Rule 23.

I.       PLAINTIFF FAILS TO SATISFY RULE 23(A) BECAUSE IT IS NOT AN ADEQUATE CLASS REPRESENTATIVE AND DOES NOT HAVE TYPICAL CLAIMS..................................................................................................11

       A.     Plaintiff has not proven that it controls this litigation and will adequately monitor class counsel.......................................................... 11

Adequacy requires that class representatives, not class counsel, direct and control the litigation and is undermined where the litigation is a lawyer- and not client-driven suit. *See In re AEP ERISA Litig.*, No. 2:03-cv-67, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008) (Marbley, J.); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 144-50 (N.D. Tex. 2014). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Plaintiff has failed to demonstrate that it controls the litigation and will adequately monitor class counsel and therefore has failed to prove that it is an adequate class representative.

       B.     Plaintiff is inadequate and atypical because it cannot prove that it suffered the same injury as the rest of the proposed class. ................................ 17

Adequacy and typicality are defeated where a class representative does not suffer the same injury as class members or is subject to unique defenses, including where the class representative benefitted from the alleged fraud. *See In re Groupo Televisa Sec. Litig.*, 2020 WL 3050550, at *7-8 (S.D.N.Y. June 8, 2020); *Bentley* v. *Honeywell Int'l, Inc.*, 223 F.R.D. 471, 484 (S.D. Ohio 2004) (Marbley, J.). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This creates unique defenses against Plaintiff related to

damages and standing that will distract from prosecution of this action. As a result, Plaintiff has failed to prove adequacy and typicality.

C.     Plaintiff's purchases of Cardinal Health stock ████████████████ ██████████████ subject it to unique defenses.................................................................. 23

██████████████████████████████████
███████████████████. ███████████ make Plaintiff inadequate and atypical because they call into question Plaintiff's credibility and subject it to a unique defense of non-reliance on the alleged fraudulent statements. *See George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013).

II.     PLAINTIFF DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(B)(3). .....................................................................24

A.     Plaintiff has not proven that damages can be measured on a classwide basis consistent with its theories of liability........................................ 25

1.     Dr. Feinstein's vague damages methodology is "no model at all" and therefore fails to satisfy *Comcast*. ....................................... 25

To establish predominance under Rule 23(b)(3), a plaintiff must establish through evidentiary proof that damages can be measured on a classwide basis consistent with Plaintiff's theories of liability. *See Comcast Corp.* v. *Behrend*, 569 U.S. 27, 31-34 (2013). Plaintiff's expert Dr. Steven P. Feinstein's vague assertions that unspecified "valuation tools" and "empirical analyses" can be used to measure damages on a classwide basis are insufficient to meet Plaintiff's burden to prove predominance.

2.     Dr. Feinstein has not demonstrated a reliable method for establishing whether the alleged misstatements created artificial inflation. .................................................................. 30

As Defendants' expert Dr. Kenneth M. Lehn explains in his Rebuttal Report, Dr. Feinstein will not be able to apply an event study analysis at the time of the alleged misstatements to demonstrate that those statements caused artificial inflation to enter Cardinal Health's stock price. As a result, Dr. Feinstein will need to rely on the stock price declines following the two alleged corrective disclosures, which, due to the many complicating factors in this case, will not provide a reliable estimate for artificial inflation at earlier points in the Class Period.

3.     Dr. Feinstein's damages methodology fails to measure damages attributable only to the alleged wrongdoing. .................................... 31

"[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35. Plaintiff's damages methodology does not address how it will disentangle the effects of multiple factors unrelated to the alleged fraud that affected Cardinal Health's stock price, including, among other things, the impact of information unrelated to the alleged misrepresentations, the impact of changing

information about Cordis and the relative value of Cordis to Cardinal Health during the lengthy Class Period, and the impact of known risks concerning the Cordis acquisition.  Accordingly, Plaintiff has failed to establish that its methodology will measure only those damages associated with the alleged wrongdoing as required under *Comcast*.

4.      Dr. Feinstein's opinion is unreliable because ████████ ████████████████████████████████████████ .............................................. 35

Dr. Feinstein's opinion and testimony regarding his proposed damages methodology is not credible because ████████████████████████████████████ ███████████ . *See In re Davol, Inc. / C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, Nos. 2:18-mc-2846 (EAS), 2:18-cv-01320 (EAS), 2021 WL 5881775, at *2-4 (S.D. Ohio Dec. 13, 2021).

B.      The continual disclosures of new information about Cordis and changing circumstances during the lengthy Class Period create individualized issues that defeat predominance......................................... 36

The disclosures of new information related to Cordis throughout the over three-year Class Period create a situation where class members who purchased Cardinal Health stock at different times will face different issues of materiality, falsity, and scienter that defeat predominance. *See J. H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 998 (7th Cir. 1980); *Gelman* v. *Westinghouse Elec. Corp.*, 73 F.R.D. 60, 66-67 (W.D. Pa. 1976).

CONCLUSION...................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska* v. *Suburban Propane Gas Corp.*,
123 F.3d 1317 (9th Cir. 1997) ...................................................................................22

*Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000).................................................................................11, 21

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)...................................................................................................36

*Bentley* v. *Honeywell Int'l, Inc.*,
223 F.R.D. 471 (S.D. Ohio 2004) ..............................................................................11

*Berger* v. *Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) ...............................................................................12, 14

*Berwecky* v. *Bear, Stearns & Co., Inc.*,
197 F.R.D. 65 (S.D.N.Y. 2000) .................................................................................23

*Bovee* v. *Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003).............................................................................11

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)........................................................................................... *passim*

*Doshi* v. *Gen. Cable*,
2017 WL 5178673 (E.D. Ky. Nov. 7, 2017).............................................................21

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005)...................................................................................................31

*E. Tex. Motor Freight Sys., Inc.* v. *Rodriguez*,
431 U.S. 395 (1977)........................................................................................ 17, 19-20

*Finkelstein* v. *Liberty Digit., Inc.*,
2005 WL 1074364 (Del. Ch. 2005) ...........................................................................28

*Ft. Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................... *passim*

*Gelman* v. *Westinghouse Elec. Corp.*,
73 F.R.D. 60 (W.D. Pa. 1976) ...................................................................................38

iv

*George* v. *China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...................................................................23, 24

*Gordon* v. *Sonar Cap. Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015)...........................................................................11, 20

*Greenspan* v. *Brassler*,
  78 F.R.D. 130 (S.D.N.Y. 1978) ........................................................................................12

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).......................................................................................................1, 9

*Hubbard* v. *BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) .........................................................................................33

*In re AEP ERISA Litig.*,
  No. 2:03-cv-67 (ALM), 2008 WL 4210352 (S.D. Ohio Sept. 8, 2008) ...................................11

*In re Bausch & Lomb Inc. Sec. Litig.*,
  244 F.R.D. 169 (W.D.N.Y. 2007)..................................................................................17, 20

*In re Bos. Sci. Corp. ERISA Litig.*,
  254 F.R.D. 24 (D. Mass. 2008)........................................................................................21

*In re Bridgestone Inv. Corp. Ltd.*,
  2019 WL 1455334 (N.D. Cal. Apr. 2, 2019) ............................................................ 20-21, 22

*In re Cardinal Health, Inc. Sec. Litig.*,
  226 F.R.D. 298 (S.D. Ohio 2005).............................................................................17, 21, 24

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014)..................................................................................27, 29

*In re Davol, Inc. / C.R. Bard, Inc., Polypropylene Hernia Mesh*
  *Prods. Liab. Litig.*,
  Nos. 2:18-mc-2846 (EAS), 2:18-cv-01320 (EAS),
  2021 WL 5881775 (S.D. Ohio Dec. 13, 2021) ..................................................................36

*In re Gen. Elec. Sec. Litig.*,
  2009 WL 2259502 (S.D.N.Y. July 29, 2009) ......................................................................13

*In re Groupo Televisa Sec. Litig.*,
  2020 WL 3050550 (S.D.N.Y. June 8, 2020) ...................................................................17, 19

*In re Kosmos Energy Ltd. Sec. Litig.*,
  299 F.R.D. 133 (N.D. Tex. 2014) ...............................................................................13, 14, 16

*In re Quarterdeck Off. Sys., Inc. Sec. Litig.*,
  1993 WL 623310 (C.D. Cal. Sept. 30, 1993) ........................................................21

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ..............................................................................25

*In re Valence Tech. Sec. Litig.*,
  1996 WL 119468 (N.D. Cal. Mar. 14, 1996)..........................................................23

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
  722 F.3d 838 (6th Cir. 2013) ................................................................................10

*Iron Workers Loc. No. 25 Pension Fund* v. *Credit-Based Asset Servicing &
  Securitization, LLC*,
  616 F. Supp. 2d 461 (S.D.N.Y. 2009).....................................................................16

*J. H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*,
  628 F.2d 998 (7th Cir. 1980) ...................................................................... 22, 36-37

*J.B.D.L. Corp.* v. *Wyeth-Ayerst Labs., Inc.*,
  225 F.R.D. 208 (S.D. Ohio 2003) ..........................................................................11

*Jaffe Pension Plan* v. *Household Int'l, Inc.*,
  756 F. Supp. 2d 928 (N.D. Ill. 2010) .....................................................................20

*Katz* v. *Comdisco, Inc.*,
  117 F.R.D. 403 (N.D. Ill. 1987)..............................................................................21

*Kelley* v. *Mid-Am. Racing Stables, Inc.*,
  139 F.R.D. 405 (W.D. Okla. 1990).........................................................................15

*Loritz* v. *Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015)...................................................27, 28

*Ludlow* v. *BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) .................................................................................34

*Makor Issues & Rts., Ltd.* v. *Tellabs, Inc.*,
  256 F.R.D. 586 (N.D. Ill. 2009)..............................................................................21

*Matrixx Initiatives, Inc.* v. *Siracusano*,
  563 U.S. 27 (2011)..................................................................................................36

*Minpeco, S.A.* v. *Conticommodity Servs., Inc.*,
  676 F. Supp. 486 (S.D.N.Y. 1987) .........................................................................20

*Morris* v. *Wachovia Sec., Inc.*,
  223 F.R.D. 284 (E.D. Va. 2004) .............................................................................37

*Ogden* v. *AmeriCredit Corp.*,
  225 F.R.D. 529 (N.D. Tex. 2005) ...................................................................14, 15

*Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
  No. 4:08-cv-0160-BYP,
  2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................................27, 28, 29

*Rikos* v. *Procter & Gamble Co.*,
  799 F.3d 497 (6th Cir. 2015) ....................................................................................10

*Rocco* v. *Nam Tai Elecs., Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ..............................................................................23

*Rolex Emps. Ret. Tr.* v. *Mentor Graphics Corp.*,
  136 F.R.D. 658 (D. Or. 1991) ...................................................................................23

*Ross* v. *Abercrombie & Fitch Co.*,
  501 F. Supp. 2d 1102 (S.D. Ohio 2007) ..................................................................10

*Schledwitz* v. *United States*,
  169 F.3d 1003 (6th Cir. 1999) ..................................................................................36

*Senter* v. *Gen. Motors Corp.*,
  532 F.2d 511 (6th Cir. 1976) ..............................................................................11, 17

*Shiring* v. *Tier Techs., Inc.*,
  244 F.R.D. 307 (E.D. Va. 2007) ....................................................................... 15, 21-22

*Sicav* v. *Wang*,
  2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ............................................................27

*Smith* v. *Fahnestock & Co., Inc.*,
  2002 WL 334511 (S.D.N.Y. Mar. 1, 2002) .............................................................20

*Wal-Mart Stores, Inc.* v. *Dukes*,
  564 U.S. 338 (2011) .......................................................................................9, 10, 24

*Weisman* v. *Darneille*,
  78 F.R.D. 669 (S.D.N.Y. 1978) ...............................................................................17

*Welling* v. *Alexy*,
  155 F.R.D. 654 (N.D. Cal. 1994) ....................................................................... 11-12

*Zandman* v. *Joseph*,
  102 F.R.D. 924 (N.D. Ind. 1984) .............................................................................37

**Statutes and Rules**

15 U.S.C. § 78u-4 ...........................................................................................................................14

Fed. R. Civ. P. 23............................................................................................................ *passim*

## PRELIMINARY STATEMENT

The Supreme Court has made clear:  "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23."  *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Plaintiff offers no such proof here.  Instead, its motion papers offer only superficial discussion of the elements of that Rule without affirmatively proving compliance.  Plaintiff's approach is insufficient under Supreme Court and Sixth Circuit precedent, which requires that the Court conduct a "rigorous analysis" and find that Plaintiff has "affirmatively demonstrat[ed] its compliance" with Rule 23 requirements before certifying a class.  *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013).

Plaintiff has failed to meet its burden on multiple requirements:

*First*, Plaintiff has failed to prove that it controls this litigation and will adequately monitor class counsel.  The Private Securities Litigation Reform Act ("PSLRA") mandates that class representatives, not lawyers, control the litigation.  But here, Plaintiff's counsel is in control.  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  Plaintiff has failed to prove that it is more than "the key to the courthouse door," and therefore Plaintiff has failed to prove adequacy.

*Second*, Plaintiff is inadequate and atypical because it cannot prove that it suffered any economic loss from the alleged wrongdoing.  ████████████████████████████████

1



render it atypical and inadequate, and subject it to unique defenses that will significantly distract from prosecution of this action to the detriment of the proposed class.

*Third*, despite alleging that two "corrective disclosures" revealed that Cardinal Health had made misstatements about Cordis, █████████████████████████████ ████████████████████████████████████████ ██████████████████████. ████████████████████ make Plaintiff inadequate and atypical because they call into question Plaintiff's credibility and subject it to a unique defense of non-reliance on the alleged fraudulent statements.

*Fourth*, Plaintiff has failed to show that damages can be measured on a classwide basis consistent with Plaintiff's theories of liability and therefore has failed to prove predominance under Rule 23(b)(3). The methodology described by Plaintiff's expert, Dr. Steven P. Feinstein, is inscrutably vague and addresses none of the unique complexities to calculating damages in this case. *See* Ex. 1, Expert Rebuttal Rep. of Kenneth M. Lehn.[1] As a result, Plaintiff has failed to

---

[1] References to numbered exhibits in the form "Ex. __" are to the Exhibits to the Declaration of David S. Bloomfield, Jr., Esq. in Support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Class Certification, ECF No. 83, PageID # 5040-43. References to lettered exhibits are to the Exhibits to the Declaration of Spencer A. Burkholz in Support of Lead Plaintiff's Motion for Class Certification, ECF No. 72-2, PageID # 3628-31 ("Burkholz Decl.").

show that Dr. Feinstein's proposed methodology will measure only damages caused by the alleged wrongdoing, as required by *Comcast*. ██████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████.

*Finally*, the continual disclosures of new information related to Cordis throughout the more-than-three-year proposed class period create a situation where class members who purchased at different times will face different issues of materiality, falsity, and scienter that also defeat predominance.

Each of these flaws is an independent basis to deny Plaintiff's motion.  For all of these reasons, the Court should find that Plaintiff has failed to carry its burden to prove compliance with Rule 23 and deny class certification.

**BACKGROUND**

Cardinal Health is a healthcare services and products company that manages its business in two segments:  Pharmaceutical and Medical.  Ex. 2, June 30, 2015 Form 10-K at 3023.  The Pharmaceutical segment distributes medicines and provides other products and services to pharmacies, hospitals, and other healthcare providers.  *Id.* at 3043.  The Medical segment distributes medical, surgical, and laboratory products and provides services to hospitals, surgery centers, and laboratories, among others.  *Id.* at 3044.  During the company's fiscal years 2015 to 2018, the Pharmaceutical segment accounted for 89-90% of Cardinal Health's revenues and between 75-84% of its operating earnings, with the Medical segment accounting for the rest.[2]

---

[2] *See* Ex. A, Feinstein Rep. ¶¶ 21-22.

On March 2, 2015, Cardinal Health announced that it planned to acquire Cordis, a manufacturer of cardiology and endovascular devices, from Johnson & Johnson. Ex. 3, Mar. 2, 2015 Press Release at 4564. Prior to the acquisition, Cordis had annual revenues of approximately $780 million, which was less than 1% of Cardinal Health's total revenues, with 70% of its sales outside the U.S. *Id.*[3] The acquisition closed on October 4, 2015, and Cordis became part of Cardinal Health's Medical segment. Ex. 4, Oct. 4, 2015 Press Release at 4590-91; Ex. 2, June 30, 2015 Form 10-K at 3025.

From the time the Cordis acquisition was announced, Cardinal Health disclosed that the transaction presented risks, including with respect to "the ability to retain customers and employees," "to successfully integrate the acquired business into Cardinal Health's operations," and "to achieve the expected synergies as well as accretion in earnings." Ex. 3, Mar. 2, 2015 Press Release at 4566.[4] Over the next three years, Cardinal Health also made multiple disclosures concerning challenges encountered as it worked to integrate Cordis. For example:

---

[3] *See also* Ex. 1, Lehn Rep. ¶ 15.

[4] *See also, e.g.,* Ex. 2, June 30, 2015 Form 10-K at 3051 (noting, among other risks, that "we may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition"); Ex. 4, Oct. 4, 2015 Press Release at 4592; Ex. 5, June 30, 2016 Form 10-K at 3339-40; *see also* Ex. 1, Lehn Rep. ¶ 66, Lehn Rep. Ex. 3.

As discussed in the Expert Rebuttal Report of Kenneth M. Lehn,

*See* Ex. 1, Lehn Rep. ¶¶ 67-68, Lehn Rep. Ex. 4; *see also*



4

- On August 2, 2016, Cardinal Health disclosed that it was lowering the estimated FY2017 accretion from the Cordis acquisition from more than $0.20 to more than $0.15 per share "due to currency impacts as well as some increased SG&A investments compared to our original business case" and explained that "some of the synergies originally associated with this complex acquisition will take longer to achieve than we originally modeled." Ex. 10, Aug. 2, 2016 Tr. at 5038.



- On May 1, 2017, Cardinal Health reported "a decline in Cordis profit" that was "mostly related to increased SG&A expenses to support our investment in an international infrastructure," and "an increase to an inventory reserve," and explained that there could be "some lumpiness to the Cordis earnings." Ex. 11, May 1, 2017 Tr. at 5245.



- On August 2, 2017, Cardinal Health reported that Cordis did not achieve its reduced accretion target of $0.15 due to increased SG&A and manufacturing costs. Ex. 12, Aug. 2, 2017 Tr. at 5320. The company also reported lower-than-anticipated sales from partnership agreements and write-offs for excess Cordis inventory. *Id.*

[8] Securities analysts also noted that "Cardinal's guidance underscores the challenges in integrating the Cordis business."[9]

- On February 8, 2018, Cardinal Health reported that earnings at Cordis were impacted by supply-chain issues and elevated expenses, that Cordis results were anticipated "to be lower than previously expected for the balance of the year," and

---

[5] *See* 

[6] *See*

[7] *See* .

[8] *See* .

[9] Ex. 13, Aug. 3, 2017 Morgan Stanley Rep. at 3396.

that "it will take a little time to work through these items." Ex. 14, Feb. 8, 2018 Tr. at 5441, 5445. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████ [10]

- On May 3, 2018, Cardinal Health reported that third quarter earnings were affected by "a significant negative change in our effective tax rate" related to performance at Cordis and lowered its 2018 earnings outlook. Ex. 15, May 3, 2018 Press Release at 5484-85. Cardinal Health explained that the results reflected "unanticipated disappointing performance from our Cordis business" and that "as we've noted in previous quarters operating cost and inventory reserves continue to be challenges – both came in even higher than expected this quarter and continue to weigh on profitability." Ex. 16, May 3, 2018 Tr. at 5495-96. ██████████████████████████████████████████
███████████████████████████████████.[11]

During the proposed class period of March 2, 2015 to May 2, 2018 (the "Class Period"), there were also issues affecting Cardinal Health's financial performance unrelated to Cordis. Cardinal Health disclosed such issues throughout the Class Period, including on the two corrective disclosure dates alleged by Plaintiff.[12] For example:

- On August 2, 2017 (the first alleged corrective disclosure date), Cardinal Health disclosed a decline in profit for the Pharmaceutical segment due to "generic pharmaceutical pricing," "ongoing investment in its Pharmaceutical IT platform," "the loss of Safeway and reduced levels of branded manufacturer price appreciation." Ex. 17, Aug. 2, 2017 Press Release at 5297. ████████████████
███████████████████████████████████ [13]

---

[10] *See also* ██████████████████████████████████████████████
██████

[11] *See* ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████

[12] *See* Ex. 1, Lehn Rep. ¶¶ 76-80, 82-83.

[13] *See* Ex. 1, Lehn Rep. ¶ 82; *see also* ███████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

6

- On May 3, 2018 (the second alleged corrective disclosure date), Cardinal Health disclosed that Pharmaceutical segment performance was negatively impacted by "the previously announced expiration of a large, mail-order customer contract," "the divestiture of the company's China distribution business," and "generic program performance." Ex. 15, May 3, 2018 Press Release at 5485. ████ ████████████████████████████ that there were a "multitude of factors impacting Cardinal Health's outlook" and stock price at this time. Ex. 19, May 3, 2018 Bank of Am. Rep. at 5094.[14]

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████.[15]

More than a year after the second alleged corrective disclosure, on August 1, 2019, a purported Cardinal Health shareholder (other than Plaintiff) filed a complaint alleging that Cardinal Health and its executives had violated federal securities laws in connection with statements about Cordis.[16] Plaintiff subsequently became involved in the litigation ████████

████████████████████████████████████████

_____

████████████████████████████████████████

[14] *See also* Ex. 1, Lehn Rep. ¶ 83; ████████████████████.

[15] *See* ████████████████████████████████████

████████████████████████████████████████

[16] ECF No. 1, PageID #1-34.



█████████████████████████████████ .[17] ████████████████████████████████████

████████████████████████████████████ .[18]  After filing a motion for

appointment as lead plaintiff on September 30, 2019, which was granted on June 19, 2020,

Plaintiff filed its complaint in this case on September 8, 2020 (the "Complaint" or "Compl.").[19]

Since 2019, Plaintiff has sought lead plaintiff status in three other federal securities actions,

where it has also engaged Robbins Geller as counsel.[20]

    The Complaint alleges that Defendants made false and misleading statements and

omissions regarding the acquisition, integration, and performance of Cordis.  Compl. ¶¶ 67, 71,

83.  During the Class Period, Plaintiff transacted in Cardinal Health stock ███████████████

████████████████████████████████████████████████████████████████████████████

████ .[21] ████████████████████████████████████████████████████████████████

████ .[22] ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████ .[23] ████████████████████████████████████████████████████████████████

---

[17] ████████████████████████████████████████ .

[18] ████████████ .

[19] Mot. for Appointment as Lead Pl., ECF No. 13, PageID # 213-15; Op. & Order, ECF No. 22, PageID # 390-405; Compl., ECF No. 28, PageID # 420-89.

[20] ████████████████████████████████████████████████████████████████████ ████████████████████ *see also* Ex. B, Mar. 10, 2022 Pl.'s Resps. & Objs. to Defs.' First Set of Interrogs. at 10.

[21] ██████████████████████████████████████████████ . Representatives of four of Plaintiff's investment managers have been deposed in this Action (Boston Partners Global Investors, Inc., LSV Asset Management, Rothschild Asset Management, Inc., and Columbia Management Investment Advisers, LLC).

[22] ████████████ .

[23] ████████████████████████████████████████████████████████████████████ .

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████.[24]

Defendants filed a motion to dismiss on November 6, 2020, which the Court denied.[25] Plaintiff has now filed a motion for class certification seeking to certify a class of purchasers of Cardinal Health stock during the proposed Class Period, for appointment of itself as class representative, and for appointment of Robbins Geller as class counsel.[26]

## ARGUMENT

As the Supreme Court has emphasized, class-action treatment is the "exception," not the "rule," and Rule 23 "does not set forth a mere pleading standard." *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011)). A plaintiff seeking class certification has the burden of establishing that class certification is appropriate under Rule 23. *See Wal-Mart Stores*, 564 U.S. at 350. Accordingly, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

To satisfy Rule 23(a), a plaintiff must demonstrate that "the representative parties will fairly and adequately protect the interests of the class" and that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3), (4). Where, as here, the plaintiff seeks certification under Rule 23(b)(3), the Court

---

[24] █████████████████████████████████████████████████████████.

[25] Defs.' Mot. to Dismiss, ECF No. 31, PageID # 3225-64; Op. & Order, ECF No. 39, PageID # 3400-30.

[26] Lead Pl.'s Mot. for Class Certification, ECF No. 72, PageID # 3594-98.

must also find that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

The Court may certify a class only if, after "rigorous analysis," it finds that the plaintiff has "affirmatively demonstrat[ed] [its] compliance" with these requirements. *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350); *see also Rikos* v. *Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015) ("'Class certification is appropriate if the [district] court finds, after conducting a 'rigorous analysis,' that the requirements of Rule 23 have been met.'"). This analysis "frequently" overlaps with the merits of the plaintiff's underlying claims because class determination "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33-34 (quoting *Wal-Mart*, 564 U.S. at 351); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851-52 (6th Cir. 2013) (court properly considered "extensive" record in ruling on class certification). And in conducting its "rigorous analysis," a court may, and should, weigh the persuasiveness of expert testimony, because "the submissions of [the plaintiff's] expert constitute a significant part of the evidence supporting [the plaintiff's] certification motion." *Ft. Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 128 (S.D.N.Y. 2014); *see also Wal-Mart*, 564 U.S. at 354-55 (disregarding expert opinion that was "worlds away" from establishing Rule 23 requirements). Here, Plaintiff has failed to meet its burden to demonstrate that the requirements of Rule 23 are satisfied, and class certification should be denied.[27]

---

[27] Plaintiff seeks certification of a class to pursue claims under §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934. Mem. in Supp. of Lead Pl.'s Mot. for Class Certification, ECF No. 72-2, PageID # 3606. As Plaintiff acknowledges, the §§ 20(a) and 20A claims are "derivative" of the § 10(b) claim, *id.* at PageID # 3617 n.6, and are predicated on liability for a violation of § 10(b). *See Ross* v. *Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1120 (S.D. Ohio 2007). For the reasons set forth herein, Plaintiff has failed to prove that it satisfies Rule 23 with respect to any of its claims.

10

I.     **PLAINTIFF FAILS TO SATISFY RULE 23(A) BECAUSE IT IS NOT AN ADEQUATE CLASS REPRESENTATIVE AND DOES NOT HAVE TYPICAL CLAIMS.**

To establish adequacy, Plaintiff must show that it "will vigorously prosecute the interests of the class through qualified counsel" and that it has "common interests with unnamed members of the class." *Senter* v. *Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir. 1976).  Adequacy is "essential to due process because a final judgment in a class action is binding on all class members." *Bovee* v. *Coopers & Lybrand*, 216 F.R.D. 596, 612 (S.D. Ohio 2003) (Sargus, J.).

With respect to typicality, a court must deny class certification "'where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation,'" *Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000), because "'absent class members will suffer if their representative is preoccupied with defenses unique to it.'"  *Bentley* v. *Honeywell Int'l, Inc.*, 223 F.R.D. 471, 484 (S.D. Ohio 2004) (Marbley, J.).  A unique defense need not be one that will necessarily "prevail"; it need only be "meritorious enough to require the plaintiff to devote considerable time to rebut" it.  *Gordon* v. *Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) (internal quotation marks omitted).

   A.  **Plaintiff has not proven that it controls this litigation and will adequately monitor class counsel.**

A plaintiff who is "merely a pawn of the class lawyers" is inadequate to serve as a class representative.  *In re AEP ERISA Litig.*, No. 2:03-cv-67, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008) (Marbley, J.); *see also J.B.D.L. Corp.* v. *Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 216 (S.D. Ohio 2003) (Beckwith, J.) (a class representative must "demonstrate a willingness and ability to play an active role in and control the litigation and to protect the absent class members").  A class representative plays "the necessary role of 'check[ing] the otherwise

11

unfettered discretion of counsel in prosecuting the suit.'" *Welling* v. *Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994).[28] Adequacy is especially important in securities cases because the PSLRA mandates that "class representatives, and not lawyers, must direct and control the litigation" and "raises the standard adequacy threshold." *Berger* v. *Compaq Comput. Corp.*, 257 F.3d 475, 481, 483 (5th Cir. 2001). Here, Plaintiff is not an adequate class representative because it is acting as a "pawn" of its counsel, Robbins Geller.



---

[28] *See also Greenspan* v. *Brassler*, 78 F.R.D. 130, 133 (S.D.N.Y. 1978) ("'An attorney who prosecutes a class action with unfettered discretion becomes, in fact, the representative of the class. This is an unacceptable situation because of the possible conflicts of interest involved.'").



; *see* Ex. B, Mar. 10, 2022 Pl.'s Resps. & Objs. to Defs.'

First Set of Interrogs. at 10.

---

[29] *See also In re Gen. Elec. Sec. Litig.*, 2009 WL 2259502, at *6 n.4 (S.D.N.Y. July 29, 2009) (noting that the "conflict of interest is more significant if a monitoring firm is guaranteed to bring the potential lawsuit").

[30]



undermines Plaintiff's ability to adequately represent the interests of class members in this case. *See In re Kosmos*, 299 F.R.D. at 145, 149 (explaining that potential class representatives that are "'simply lending their names to a suit'" that is a "lawyer and not a client-driven suit" may be found inadequate).[31]

Indeed, the record shows that Plaintiff will not fairly and adequately represent class interests because it has abdicated control and direction of this case to Robbins Geller. The PSLRA requires that the class representative have an understanding of the case beyond "derivative knowledge acquired solely from counsel," *Berger*, 257 F.3d at 483 n.18, ███████

---

[31] *See also, e.g., Ogden* v. *AmeriCredit Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005) (that plaintiff "initiated her relationship with her attorneys in response to a solicitation by them" and "ha[d] not contacted or spoken with any other attorneys regarding her claims" weighed against adequacy).

[32] *See* 15 U.S.C. § 78u-4(c)(1)-(2) (stating that "upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure" and "[i]f the court makes a finding . . . that a party or attorney violated any requirement of [Rule 11(b)] as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney").



Courts have rejected proposed class representatives where, ▮▮▮▮ the "vast majority" of their knowledge is "derived from counsel."  *See Ogden*, 225 F.R.D. at 533-35 (plaintiff was inadequate where her "deposition testimony indicates that there are many instances in which she has little or no knowledge outside of that given to her by her attorneys").[33]

---

[33] *See also Shiring* v. *Tier Techs., Inc.*, 244 F.R.D. 307, 315-16 (E.D. Va. 2007) (explaining that "the knowledge and control requirement is satisfied only where plaintiff demonstrates that he understands the action in which he is involved, and, notably that this 'understanding [is] not . . . limited to derivative knowledge acquired solely from counsel'"); *Kelley* v. *Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 409 (W.D. Okla. 1990) (denying class certification where "what the plaintiffs know appears to come entirely from their counsel").

██████████████████████████████████ [34]

In addition, although it is *Plaintiff's burden* to prove that it is an adequate class representative, the sole piece of evidence submitted by Plaintiff in support of its adequacy is a sworn statement by Plaintiff's *counsel* that "contains little more than formulaic, boiler-plate assertions over two pages of substantive text" that "provides naught by which to assess [Plaintiff's] credibility" or its "knowledge about the underlying facts of the case" because "*any* potential class representative in *any* securities case could make almost identical assertions" of adequacy. *In re Kosmos*, 299 F.R.D. at 146; *see* Burkholz Decl. ¶¶ 3-5, ECF No. 72-2, PageID # 3629-30. The court in *In re Kosmos* found that a similar submission "carrie[d] little weight" and "fail[ed] to demonstrate adequacy." 299 F.R.D. at 146-47. But unlike in that case, where a board member of the plaintiff submitted the statement, in this case Robbins Geller executed the statement ████████████████████████████████████ ████████████. And while Robbins Geller's statement claims that Robbins Geller provides written quarterly "updates" and has sent filings to Plaintiff for review, Plaintiff has not provided evidence that it has had substantive input into decisions concerning the conduct of the litigation ████████████████████████████████████████████ or is acting as more than a rubber stamp for Robbins Geller's prosecution of the action.

The arrangement between Plaintiff and Robbins Geller fuels the "abusive lawyer-driven litigation" that the PSLRA aims to eradicate. *See Iron Workers Loc. No. 25 Pension Fund* v. *Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 465 (S.D.N.Y. 2009).

---

[34] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

16

But "[t]he class is entitled to a representative who is more than 'a key to the courthouse door dispensable once entry has been effected.'"  *Weisman* v. *Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978).  Accordingly, the Court should deny class certification on the basis that Plaintiff is an inadequate class representative.

### B. Plaintiff is inadequate and atypical because it cannot prove that it suffered the same injury as the rest of the proposed class.

To demonstrate adequacy, Plaintiff must prove that it "'possess[es] the same interest and suffer[ed] the same injury'" as members of the proposed class.  *E. Tex. Motor Freight Sys., Inc.* v. *Rodriguez*, 431 U.S. 395, 403 (1977); *see also Senter*, 532 F.2d at 525 ("The representative must have common interests with unnamed members of the class.").  A plaintiff that benefits from an alleged fraud has not suffered any injury, much less one common to the class.  In *In re Groupo Televisa Securities Litigation*, for example, the plaintiff was found atypical and class certification was denied because the plaintiff benefited from its interest in a hedge fund that held short positions in the defendant company's stock, and thus "[a]s an economic reality, the price drop which injured the other class members enriched [the plaintiff]."  2020 WL 3050550, at *7-8 (S.D.N.Y. June 8, 2020).  *See also In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005) (Marbley, J.) (denying lead plaintiff status to investors that "will be subject to the unique defense that [they] experienced a net gain at the Class Period's end and, thus, were not damaged by the fraud"); *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007) (collecting cases) (denying lead plaintiff status to an investor that purchased common stock but gained from sales of the defendant's corporate bonds since such gains "may 'subject it to unique defenses that render such plaintiff incapable of adequately representing the class'").

Plaintiff seeks to represent a class of purchasers that allegedly suffered losses when Cardinal Health's stock price declined following two alleged corrective disclosures. Compl. ¶¶ 131-37, 143. ██████████████████████████



██████████████. *See* Ex. 24.[36] ██████████

██████████. *See id.*[37] ██████████

18



██████ the $2.1 million in Plaintiff's claimed losses on Cardinal Health stock. *See* Pl.'s Mem. of Law in Supp. of Mot. for Appointment as Lead Pl., ECF No. 13-1, PageID # 225; Pl.'s Certification, ECF No. 13-4, PageID # 240-43. ████████████████████

████████ *See E. Tex. Motor Freight Sys., Inc.*, 431 U.S. at 403-04 (vacating class certification

_____

[38] ████████████████████████████████████████████████████████████. But as the court in *In re Groupo Televisa* explained, whether Plaintiff benefited by holding legal title or by holding an interest in a fund makes no difference: "[t]he point is not about title to chattels; it is about whether one whose net worth is increased by a drop in market price is a proper representative of a class of those whose net worth was diminished by it." 2020 WL 3050550, at *7.

19

where "[plaintiffs] could have suffered no injury as a result of the alleged discriminatory practices, and they were, therefore simply not eligible to represent a class of persons who did allegedly suffer injury"); *see also Jaffe Pension Plan* v. *Household Int'l, Inc.*, 756 F. Supp. 2d 928, 935 (N.D. Ill. 2010) (collecting cases for the proposition that Rule 10b-5 damages are limited to actual damages, which "require that plaintiffs' losses be netted against their profits attributable to the same fraud").[39]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████.

*See, e.g.*, *Smith* v. *Fahnestock & Co., Inc.*, 2002 WL 334511, at *3 (S.D.N.Y. Mar. 1, 2002) (damages for a plaintiff who claimed her broker misled her into making unsuitable investments in six stocks were offset by profits from all "similarly unsuitable" investments that she was coerced to enter); *In re Bausch & Lomb*, 244 F.R.D. at 173-74 (netting gains and losses from stocks and bonds); *Minpeco, S.A.* v. *Conticommodity Servs., Inc.*, 676 F. Supp. 486, 490 (S.D.N.Y. 1987) (losses from short positions in silver futures offset by gains on physical silver holdings).

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████. *See In re*

*Bridgestone Inv. Corp. Ltd.*, 2019 WL 1455334, at *2 (N.D. Cal. Apr. 2, 2019) (proposed lead

---

[39] *See also, e.g.*, *Gordon*, 92 F. Supp. 3d at 201-02 ("'As a general rule, plaintiffs cannot claim damages where the same fraud alleged to be the cause of a loss also permitted a countervailing gain. In other words, where both a plaintiff's losses and gains derived from a single causal event, the losses it sustains are netted against all of that plaintiff's gains.'").

20

plaintiff had problems of adequacy and atypicality because its "total loss was uncertain and could not be readily ascertained"); *In re Cardinal Health*, 226 F.R.D. at 308 ("proving damages and typicality w[ould] be the bête noir" of two plaintiffs that had net gains during the class period); *Baffa*, 222 F.3d at 59 (a plaintiff "'subject to unique defenses which threaten to become the focus of the litigation'" is atypical).

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Makor Issues & Rts., Ltd.* v. *Tellabs, Inc.*, 256 F.R.D. 586, 599-600 (N.D. Ill. 2009) (finding proposed class representative atypical and inadequate where representative was subject to lack of standing defense); *see also In re Quarterdeck Off. Sys., Inc. Sec. Litig.*, 1993 WL 623310, at \*3 (C.D. Cal. Sept. 30, 1993) (denying class certification where "lack of standing would be a unique defense which would absorb a considerable amount of plaintiffs' time and divert attention from the other claims"); *Doshi* v. *Gen. Cable*, 2017 WL 5178673, at \*4 (E.D. Ky. Nov. 7, 2017) (rejecting lead plaintiff candidate that would be "subject to a standing defense").[40]

Notably, the Court need not actually find that Plaintiff lacks standing to determine that Plaintiff is inadequate and atypical, but rather only that the defense is "'likely to consume a significant portion of the litigant's time and energy and . . . there is a danger that preoccupation with defenses unique to the representative[ ] will cause absent class members to suffer.'" *Makor Issues & Rts.*, 256 F.R.D. at 600; *see also, e.g.*, *Shiring*, 244 F.R.D. at 314 ("'[I]t does not matter

---

[40] *See also, e.g.*, *Katz* v. *Comdisco, Inc.*, 117 F.R.D. 403, 407 (N.D. Ill. 1987) ("One such unique defense that precludes a plaintiff from representing a class is lack of standing."); *In re Bos. Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 30 (D. Mass. 2008) (denying class certification where lead plaintiffs "could only have benefitted from an overvaluation of [Defendant's] stock," and as such, "failed to demonstrate individual injury [and] standing").

whether a unique defense ultimately will prove meritorious,' instead, the presence of an arguable defense is sufficient to find atypicality."). "The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J. H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980); *see also, e.g.*, *Alaska* v. *Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997) (upholding denial of class certification because named plaintiffs were "subject to unique defenses which could skew the focus of the litigation").



Plaintiff's alleged $2.1 million in losses "w[ill] be vigorously contested by Defendants"

, thus raising "significant problems with [Plaintiff's] adequacy or typicality." *In re Bridgestone*, 2019 WL 1455334, at *2. Plaintiff is inadequate and atypical because (1) it has not shown that it suffered the same injury as the class it seeks to represent, and (2) ████ subject Plaintiff to unique defenses

22

regarding damages and lack of standing that will significantly distract from prosecution of the action to the detriment of the class.

### C. Plaintiff's purchases of Cardinal Health stock ███████████ ██████████████████████████████ subject it to unique defenses.

"'[A] person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative.'" *Rocco* v. *Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007); *Berwecky* v. *Bear, Stearns & Co., Inc.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000) (holding that class representatives were subject to "unique defenses" where they purchased shares "after the allegations of fraudulent behavior [ ] became public knowledge").[41]



. Indeed, Plaintiff purchased over 10,000 shares of Cardinal Health stock in the six days after the August 2, 2017 alleged corrective disclosure, and a total of over 29,000 shares between August 2, 2017 and May 3, 2018, the date of the second alleged corrective disclosure. *See* Pl.'s Certification, ECF No. 13-4, PageID # 242-43. ████████

_____

[41] *See also Rolex Emps. Ret. Tr.* v. *Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (denying class certification because lead plaintiff continued to trade in the stock after learning of the alleged fraud, including six months after the end of the class period); *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *6-7 (S.D.N.Y. July 3, 2013) (denying class certification where "all three named plaintiffs continued to make purchases of the securities at issue following the alleged 'truthful' disclosure"); *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, at *6 (N.D. Cal. Mar. 14, 1996) (finding that plaintiffs who had purchased stock after corrective disclosure were atypical).



This trading activity "undermines any causal nexus between the Defendants' alleged misrepresentation[s] and the resulting injury." *In re Cardinal Health*, 226 F.R.D. at 310; *see also China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 ("Such post-disclosure purchases can both defeat typicality and adequacy as well as rebut the presumption that plaintiff relied on the alleged misrepresentations or the integrity of the market in making his or her purchases."). It also calls into question Plaintiff's credibility in asserting the claims of fraud alleged in the Complaint, ██████████████████████████████████████████████.

## II.  PLAINTIFF DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(B)(3).

The only subdivision of Rule 23(b) that Plaintiff claims to have satisfied is Rule 23(b)(3), *see* Pl. Br. at 2,[43] which requires proof that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). As the Supreme Court has observed, "Rule 23(b)(3) [is] 'an adventuresome innovation,'" and its "predominance criterion is even more demanding than Rule 23(a)."

---

[42] *See also* ███████████████████████████████████████████████████████████.

[43] Mem. in Supp. of Lead Pl.'s Mot. for Class Certification, ECF No. 72-2, PageID # 3599-627.

*Comcast*, 569 U.S. at 34 (quoting *Wal-Mart*, 564 U.S. at 362). Before any grant of class certification, the Court has a "duty to take a 'close look' at whether common questions predominate over individual ones" and whether the plaintiff has met the "demanding" criterion of Rule 23(b)(3). *Id.*

### A. Plaintiff has not proven that damages can be measured on a classwide basis consistent with its theories of liability.

To satisfy predominance, a plaintiff must establish by "evidentiary proof" that its alleged damages are "capable of measurement on a classwide basis" by a methodology that is consistent with the plaintiff's theories of liability. *Comcast*, 569 U.S. at 33-34. In *Comcast*, the Supreme Court stressed that the damages methodology "must measure *only* those damages" attributable to the plaintiff's theory of liability and not "damages that are not the result of the wrong." *Id.* at 35, 37 (emphasis added). It is also critical that the damages model not be "speculative" or "arbitrary" because this would "reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 35-36. Put simply, "[n]o damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013). Here, the vague damages methodology proffered by Dr. Feinstein falls "far short of establishing that damages are capable of measurement on a classwide basis," and class certification may be denied on that basis alone. *See Comcast*, 569 U.S. at 34.

### 1. Dr. Feinstein's vague damages methodology is "no model at all" and therefore fails to satisfy *Comcast*.

Dr. Feinstein's proposed damages "methodology" is briefly described in a few paragraphs in his report. Ex. A, Feinstein Rep. ¶¶ 147(i)-(vii). The methodology consists of the generic assertion that Dr. Feinstein would apply "valuation tools," which would "include event study analysis" and "potentially other empirical analyses"—which are not specified or described—to examine if the alleged corrective disclosures caused Cardinal Health's stock price

to fall. *Id.* ¶ 147(i). He would then construct "an inflation ribbon," again using "empirical analysis and valuation tools"—again not specified or described. *Id.* ¶ 147(ii). And while Dr. Feinstein states that "[t]he inflation ribbon is often constructed by working chronologically backwards," he does not specify whether he would actually apply the "working backwards" approach here or some other unidentified method. *Id.*

Dr. Feinstein at no point explains what unspecified "valuation tools" and "empirical analyses" he would *actually use* to calculate damages, or *how* any such valuation tools would be applied. He vaguely assures that "to the extent that there may be specific issues complicating the quantification of artificial inflation," then "tools of valuation analysis can be applied," but he never identifies what such complicating issues may be or what "tools" may be required to address them. *Id.* ¶ 144.



Dr. Feinstein's vague references to "valuation tools" and "empirical analyses" fail to provide evidence from which the Court can conclude that his proposed methodology will "measure *only* those damages attributable" to plaintiff's theory of liability as required by

*Comcast*. 569 U.S. at 35 (emphasis added). To the contrary, these are the type of vague assurances that damages will somehow be calculated later that courts have rejected. *See Loritz* v. *Exide Techs.*, 2015 WL 6790247, at \*22 (C.D. Cal. July 21, 2015) (finding that plaintiffs' description of "general techniques for computing damages in securities fraud cases" that "fails to tie these theories to the facts of this case or to each other" insufficient under *Comcast*).[44]

Indeed, the Northern District of Ohio rejected substantially the same damages model—also proffered by Dr. Feinstein—as "general and vague" and "no damages model at all" in *Ohio Public Employees Retirement System* v. *Federal Home Loan Mortgage Corp.*, No. 4:08-cv-0160, 2018 WL 3861840, at \*19-20 (N.D. Ohio Aug. 14, 2018) ("*Freddie Mac*") (Pearson, J.). As he does here, Dr. Feinstein in *Freddie Mac* vaguely claimed that he would rely on "valuation tools" to calculate "out-of-pocket" damages. *Id.* at \*19. The Court denied class certification, explaining that "[w]hen a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts (as did Dr. Feinstein) that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified." *Id.* (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014)).



," there are no meaningful differences. ▮ *compare* Ex. 36, Excerpt of Feinstein Rep. ¶ 152, *Freddie Mac*, No. 4:08-cv-00160-BYP (N.D. Ohio June 12,

---

[44] *See also, e.g.*, *Ft. Worth Emps.' Ret. Fund*, 301 F.R.D. at 141-42 (declining to certify damages class because plaintiffs' expert merely "mention[ed] three methods" and failed to provide the court with "assurance beyond [the expert's] say-so" that "there [was] a damages model that [would] permit the calculation of damages on a classwide basis"); *Sicav* v. *Wang*, 2015 WL 268855, at \*6 (S.D.N.Y. Jan. 21, 2015) (declining to certify class where plaintiffs failed to show, "concretely, how [they] propose[d] to reliably establish damages").

2017), ECF No. 372-3 *with* Ex. A, Feinstein Rep. ¶ 147.  The only additional detail that

Dr. Feinstein provides about how he would apply his methodology is a list of the names of

possible "valuation tools" that he might apply.  Ex. A, Feinstein Rep. ¶ 146. ▮▮▮▮



[45, 46]

  Dr. Feinstein's methodology is even more deficient here than it was in *Freddie Mac*

given the unique complexities to calculating potential damages in this case.  A vague damages

model is "particularly problematic" where:

> (1) there are multiple alleged misrepresentations, (2) corrective information was
> allegedly disclosed at multiple times, (3) corrective information regarding the
> different alleged misrepresentations was allegedly disclosed on the same day, and
> (4) some of the allegedly concealed facts arose or were made known to the
> company (and thus for the first time could have been disclosed) during the class
> period.

*Loritz*, 2015 WL 6790247, at *22.

---

[45] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[46] Dr. Feinstein also fails to acknowledge that many of the "valuation tools" he references rely on subjective assumptions and never explains how such tools reliably could be applied in this case. *See* Ex. 1, Lehn Rep. ¶¶ 86-87.  Discounted cash flow analysis, for example, requires estimates of future cash flows and a discount rate. *Id.* ¶ 86.  Dr. Feinstein does not explain what this tool might be used for or how he would identify appropriate assumptions, and his track record does not reassure. *See Finkelstein* v. *Liberty Digit., Inc.*, 2005 WL 1074364, at *14-15 (Del. Ch. 2005) ("The problems with [Dr. Feinstein's] DCF analysis are so pervasive and numerous that it is impossible to describe all of them"; "Feinstein's assumptions bear no relationship to reality"; "For these and other reasons too numerous to set forth, I find Feinstein's DCF valuation to be unreliable and to provide no rational insight into [the company's] value"; "Feinstein performed a variety of other aggressive valuations, none of which is reliable.").

All of those complications and more are present here. Plaintiff alleges misrepresentations on 37 specific dates over a class period spanning more than three years—more than two times the length of the class period in *Freddie Mac*—with many dates containing multiple alleged misrepresentations. *See* Compl. ¶ 1 (class period of 38 months); *Freddie Mac*, 2018 WL 3861840, at *1, *13 (class period of just under 17 months with 23 alleged misrepresentation dates). Plaintiff also alleges two corrective disclosures nine months apart and that the first corrective disclosure contained additional misrepresentations. *See* Compl. ¶¶ 68-89, 133-37. Throughout the lengthy Class Period there was also a large volume of "confounding" information released—that is, information affecting Cardinal Health that was unrelated to the alleged misstatements—as well as multiple disclosures about risks and problems related to Cordis. *See* Ex. 1, Lehn Rep. ¶¶ 66, 76-83, Lehn Rep. Exs. 1, 3. Plaintiff further alleges that Defendants only discovered certain information about Cordis in the years after the acquisition, which could not have been disclosed earlier. *Id.* ¶¶ 61-63. Dr. Feinstein makes no attempt to grapple with any of these or other complicating issues. But, as explained in detail by Dr. Lehn and summarized below, a damages methodology that does not address these complications cannot reliably measure only those damages associated with the alleged wrongdoing—it will instead over- or potentially even undercompensate the class—and therefore is insufficient under *Comcast*. *See generally id.* ¶¶ 31, 60-63, 75-84.

Dr. Feinstein's vague assurances about using unknown "valuation tools" to address any "complicating" factors amount to simply, "Trust me." But that is far from sufficient to carry Plaintiff's burden. *See, e.g.*, *In re ConAgra Foods*, 302 F.R.D. at 552, 577-79 (denying class certification where "[a]lthough the methodologies [the plaintiff's expert] describes may very well be capable of calculating damages in this action, [he] has made no showing that this is the

29

case"). Because Plaintiff has failed to provide the Court with "assurance beyond [the expert's] say-so," Plaintiff has failed to satisfy Rule 23(b)(3). *Ft. Worth Emps.' Ret. Fund*, 301 F.R.D. at 141-42.

### 2. Dr. Feinstein has not demonstrated a reliable method for establishing whether the alleged misstatements created artificial inflation.

As explained in Dr. Lehn's rebuttal report, Dr. Feinstein will not be able to rely on an event study analysis at the time of the alleged misstatements to demonstrate that those statements caused artificial inflation in Cardinal Health's stock price. Ex. 1, Lehn Rep. ¶ 34. Dr. Feinstein's own event study analysis shows that there were no statistically significant price increases on 32 of the 37 dates on which Plaintiff alleges misstatements. Ex. A, Feinstein Rep. at 152-67 (Exhibit 8); *see* Ex. 1, Lehn Rep. ¶ 35, Lehn Rep. Ex. 2. And on the five alleged misstatement dates where Dr. Feinstein found statistically significant and positive stock price returns, Cardinal Health disclosed information that had already been disclosed previously, and there was confounding information released, and thus there is no reliable basis to conclude that the alleged misrepresentations affected the stock price. Ex. 1, Lehn Rep. ¶¶ 35-53, Lehn Rep. Ex. 2.

What these findings mean is that it will be much more challenging to reliably estimate any artificial inflation caused by the alleged misstatements in this case. As Dr. Lehn explains, Dr. Feinstein will need to rely on the stock price declines following the two alleged corrective disclosures to estimate inflation throughout the Class Period. *Id.* ¶¶ 34, 54. But given the many complicating factors in this case, discussed in detail by Dr. Lehn and summarized below, the residual declines following the alleged corrective disclosures will not provide a reliable estimate for alleged artificial inflation at earlier points in the Class Period. *Id.* ¶¶ 31, 54, 57-84. Dr. Feinstein never explains how his proposed damages methodology will address these issues

30

and therefore fails to demonstrate that his methodology will measure damages in a manner consistent with Plaintiff's theories of liability.[47]

### 3. Dr. Feinstein's damages methodology fails to measure damages attributable only to the alleged wrongdoing.

Under *Comcast*, "a model purporting to serve as evidence of damages in [a] class action must measure *only* those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  569 U.S. at 35 (emphasis added); *see also Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 343, 345 (2005) (courts must evaluate "the tangle of factors affecting [stock] price," because securities laws protect only "against those economic losses that misrepresentations actually cause" and do not provide "broad insurance against market losses").  Here, there are multiple complicating factors that must be addressed in order to reliably measure any damages attributable only to Plaintiff's claims.  Dr. Feinstein does not explain how his methodology would be applied to address these issues, and therefore Plaintiff has failed to carry its burden.

Impact of confounding information.  Dr. Feinstein does not explain how his methodology will disentangle the effects of the large volume of confounding information released during the Class Period and on the alleged corrective disclosure dates.  For example, on August 2, 2017, the date of the first alleged corrective disclosure, Cardinal Health announced, among other things, that Pharmaceutical segment profits decreased due to generic pricing headwinds, the loss of a significant customer contract, and an investment in IT systems—all unrelated to Cordis.

---

[47] Indeed, not only does Dr. Feinstein fail to address this issue, he also does not discuss how he would adjust his methodology to estimate the impact of alleged affirmative misstatements versus omissions, or statements that were a combination of both, which require different methods of analysis.  *See* Ex. 1, Lehn Rep. ¶ 32.

*See* Ex. 1, Lehn Rep. ¶ 82. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. *See id.*[48] There was

also confounding information released on the date of the second alleged corrective disclosure

(May 3, 2018), as well as on the dates of the alleged misstatements. *See id.* ¶¶ 41, 45, 47, 49, 51,

76-79, 83.

The problem of confounding information is particularly significant in this case given that

Cordis was only a small portion of Cardinal Health's business. *Id.* ¶¶ 15, 75. As a result,

Cardinal Health made many disclosures about other aspects of its business, and disclosures about

the much larger Pharmaceutical segment likely had a significant impact on the stock price.[49]

*See id.* ¶¶ 75-84, Lehn Rep. Ex. 1. ████████████████████████

████████████████████████████████. *See id.* ¶ 81; Ex. 23 (Feinstein

Dep.) at 98:1-8.[50] But other than vague allusions to other unspecified "valuation tools,"



Dr. Feinstein does not explain how his methodology will account for confounding information. *See* Ex. A, Feinstein Rep. ¶ 147(i).

Impact of changing information about Cordis. Plaintiff alleges that the Defendants discovered information about issues at Cordis in the years following the acquisition. *See* Ex. 1, Lehn Rep. ¶¶ 61-63. Therefore, the stock price decline on the alleged corrective disclosure dates likely "reflected the market's reaction to facts that could not possibly have been disclosed" during earlier points in the Class Period. *Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 728 n.27 (11th Cir. 2012). To the extent the residual stock price decline following a corrective disclosure reflected the market's reaction to information that was not known during the entire Class Period, the stock price decline will overestimate the amount of artificial inflation at earlier points in the Class Period, and thus overestimate potential damages. *See* Ex. 1, Lehn Rep. ¶ 60. Dr. Feinstein offers no explanation regarding how his methodology will address this issue.

Impact of known versus unknown risks. Dr. Feinstein does not explain how his methodology will parse the price impact of known versus allegedly undisclosed risks. As Dr. Lehn explains, it is widely recognized that acquisitions have risks and expected synergies are often not achieved, *id.* ¶ 65, and ███████████████████████████████ ███████████████████████████████████████████ ████████████. Cardinal Health also disclosed information throughout the Class Period concerning risks and challenges associated with Cordis. *See* Ex. 1, Lehn Rep. ¶ 66, Lehn Rep. Ex. 3. ███████████████████████████████████████████ *Id.* ¶¶ 67-68.[51]

---

[51] *See, e.g.,* █████████████████████████████████████ ███████████████████████████████████████████

To the extent that the alleged corrective disclosures represented the materializations of known risks concerning the Cordis acquisition (in whole or in part), it would not be appropriate to use the entire residual decline in Cardinal Health's stock price to estimate artificial inflation. *Id.* ¶¶ 64, 69; *see also Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 689-90 (5th Cir. 2015).  This is because the stock price decline following the materialization of a risk reflects the 100% certainty that the risk would occur.  As a result, a damages methodology that uses the residual decline following the corrective disclosures to estimate artificial inflation earlier in the Class Period will likely overestimate damages.  Ex. 1, Lehn Rep. ¶ 73.  Moreover, investors' perception of the risk associated with the Cordis acquisition was also likely changing during the lengthy Class Period, which would affect the valuation impact of alleged misrepresentations.  *Id.* ¶¶ 70-71. Dr. Feinstein's methodology does not address any of these issues.

Impact of changing value of information.  The value of any disclosures about Cordis also likely changed during the course of the over-three-year Class Period.  *See id.* ¶¶ 58-59. For example, Cardinal Health made other acquisitions after the Cordis transaction, and announced the larger $6.1 billion acquisition of Medtronic's Patient Recovery business in April 2017.[52]  As a result, ██████████████████████

████████████████████████████████████████████

███████████████████████.  Ex. 1, Lehn Rep. ¶¶ 17, 59.  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

---

[52] Ex. 37, Apr. 18, 2017 Form 8-K at 3910.

Impact of mismatched disclosures. Dr. Feinstein does not explain how he will account for mismatches between the contents of the alleged misrepresentations and corrective disclosures. For example, Plaintiff alleges that Defendants misrepresented that the Cordis acquisition would be accretive by $0.20 in fiscal 2017. *See, e.g.*, Compl. ¶¶ 31-32, 43, 48, 53. However, on August 2, 2016, Cardinal Health lowered the expected accretion to $0.15. Ex. 10, Aug. 2, 2016 Tr. at 5038. The alleged corrective disclosure on August 2, 2017, which announced that Cordis missed the $0.15 accretion target, therefore could not have corrected any misstatement prior to August 2, 2016. Ex. 1, Lehn Rep. ¶ 74. As a result, the stock price decline following that corrective disclosure is not a reliable estimate of alleged inflation present prior to August 2, 2016. *Id.* Dr. Feinstein does not explain how his methodology will address this issue.

Impact of individual misrepresentations. It is possible that some of the alleged misrepresentations may be found inactionable at summary judgment or trial. A damages model that measures damages attributable only to the alleged wrongdoing would need to isolate the valuation impact of only those alleged misstatements that remain in the case. In addition, without a methodology that can reliably estimate the alleged inflation associated with individual misstatements, Dr. Feinstein will be unable to reliably estimate artificial inflation on each day of the Class Period. *Id.* ¶ 56. Dr. Feinstein's methodology does not address these issues.

**4. Dr. Feinstein's opinion is unreliable because** ████████████████ ██████████████████████.

A plaintiff cannot satisfy its burden to establish predominance simply by proffering an expert witness' "say-so." *Ft. Worth Emps.' Ret. Fund*, 301 F.R.D. at 142. But here the proffered "say-so" carries even less weight—████████████████████████████ ██████████.

35



"Bias is always relevant in assessing a witness's credibility." *Schledwitz* v. *United States*, 169 F.3d 1003, 1015 (6th Cir. 1999). A witness's bias or interest may be inferred from "'all facts and circumstances which, when tested by human experience tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only.'" *In re Davol, Inc / C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, Nos. 2:18-mc-2846 (EAS), 2:18-cv-01320 (EAS), 2021 WL 5881775, at *2 (S.D. Ohio Dec. 13, 2021).

## B. The continual disclosures of new information about Cordis and changing circumstances during the lengthy Class Period create individualized issues that defeat predominance.

The materiality of any alleged misstatement turns on the "total mix of information made available." *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988)). When there are continual disclosures of information over a lengthy class period, an investor who purchased early in the class period "would face a different question of proof on the materiality issue" than a later purchaser "after a great deal more

36

information concerning [the subject of the disclosures] was available." *J. H. Cohn & Co.*, 628 F.2d at 998.[53]  Here, the Class Period covers over three years.  During that time, Cardinal Health regularly disclosed information about challenges and risks at Cordis, including when it disclosed a reduced accretion estimate on August 2, 2016, when it disclosed increased SG&A expenses and an increase in an inventory reserve on May 1, 2017, and in the first alleged corrective disclosure on August 2, 2017, among other continuing disclosures.  *See* Ex. 1, Lehn Rep. ¶¶ 21, 66, Lehn Rep. Ex. 3; *see also supra* pp. 4-6.  As a result, investors who purchased Cardinal Health stock later in the Class Period had more information available about issues at Cordis than those who purchased shortly after the acquisition was announced.  This creates "different question[s] of proof on the materiality issue" for class members who purchased at different times that defeat predominance.  *J. H. Cohn & Co.*, 628 F.2d at 998; *see also Zandman* v. *Joseph*, 102 F.R.D. 924, 928 (N.D. Ind. 1984) (denying class certification where plaintiffs alleged at least 22 disclosures over 27-month class period because "the questions at issue in plaintiffs' 10b–5 claims—falsity, materiality and scienter—would vary significantly at every stage in the alleged class period.").

Likewise, Plaintiff alleges that Defendants' knowledge about issues as well as the circumstances at Cordis were changing during the Class Period.  *See, e.g.*, Compl. ¶¶ 67(a)(ii)(2)-(4), 71; Ex. 1, Lehn Rep. ¶ 61.  As a result, proof of scienter and falsity will also necessarily vary for purchasers at different times during the Class Period.  *See J. H. Cohn & Co.*, 628 F.2d at 998 ("a purchaser early in the period would face different proof concerning the defendants' willfulness or recklessness in issuing or omitting to issue material information than a

---

[53] *See also Morris* v. *Wachovia Sec., Inc.*, 223 F.R.D. 284, 300-01 (E.D. Va. 2004) (denying class certification because "materiality will involve a piecemeal and individualized assessment of the import of any given disclosure to each member of the purported subclass").

purchaser later in the period"); *Zandman*, 102 F.R.D. at 928-29 (denying class certification where circumstances related to the alleged misrepresentations were changing over the course of the class period). These individualized issues of materiality, scienter, and falsity are not subject to classwide proof, and therefore predominance is not met. *See Gelman* v. *Westinghouse Elec. Corp.*, 73 F.R.D. 60, 67 (W.D. Pa. 1976) (denying class certification where company's circumstances and defendants' knowledge changed over time because "the extent of the company's duty to disclose, the materiality of the alleged nondisclosures and even the various defendants' intent or 'scienter' will require substantially individualized determinations").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for class certification. Because of the issues involved, Defendants believe that oral argument would be helpful and therefore request that the Court hold oral argument on the motion for class certification.

June 3, 2022

/s/ Robert W. Trafford by
<u>David S. Bloomfield, Jr.</u>
Robert W. Trafford (0024447)
Trial Attorney
David S. Bloomfield, Jr. (0068158)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2800
Columbus, OH  43215
Tel.:  (614) 227-2000
Fax:  (614) 227-2100
Email:  rtrafford@porterwright.com
          dbloomfield@porterwright.com

William Savitt (*pro hac vice*)
Lauren M. Kofke (*pro hac vice*)
Alexandra P. Sadinsky (*pro hac vice*)
Elizabeth N. Brandt (*pro hac vice*)
Danika L. Kritter (*pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
Tel:  (212) 403-1000
Fax:  (212) 403-2000
Email:  wdsavitt@wlrk.com
          lmkofke@wlrk.com
          apsadinsky@wlrk.com
          enbrandt@wlrk.com
          dlkritter@wlrk.com

Edward J. Jacobs
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY  10111
Tel:  (212) 589-4674
Fax:  (212) 589-4201
Email:  ejacobs@bakerlaw.com

*Attorneys for Defendants*

39

**CERTIFICATE OF SERVICE**

I certify that on this 3rd day of June, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Of Counsel:

ROBBINS GELLER RUDMAN
 & DOWD LLP
Spencer A. Burkholz (admitted PHV)
Laurie L. Largent (admitted PHV)
Jennifer N. Caringal (admitted PHV)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
jcaringal@rgrdlaw.com


*Lead Counsel for Lead Plaintiff*

JOSEPH F. MURRAY
MURRAY MURPHY MOUL + BASIL LLP
1114 Dublin Road
Columbus, OH 43215
E-mail: murray@mmmb.com

*Attorneys for Plaintiffs*


/s/ David S. Bloomfield, Jr.
David S. Bloomfield, Jr. (0068158)

40