## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **LOUISIANA SHERIFFS' PENSION & RELIEF FUND**, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>**CARDINAL HEALTH, INC.**, et al.,<br><br>Defendants. | Case No. **2:19-cv-3347**<br><br>Judge Edmund A. Sargus<br><br>Magistrate Judge Elizabeth A. Preston Deavers<br><br>**ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Notice – On June 3, 2022, Defendants filed a version of this brief under seal and another version publicly. (ECF #84, PageID# 5316; ECF #85, PageID# 5365.) Under this Court's May 20, 2022 Order (ECF #81, PageID# 4029), because neither Plaintiff nor any Third Parties made any "Submission," as that term is defined in the May 20, 2022 Order, Defendants are publicly re-filing their Memo Contra and exhibits. The Court's May 20, 2022 Order indicates that "the re-filed Memo Contra and exhibits will be deemed to have been timely filed on June 3, 2022."

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ..................................................................................................3

ARGUMENT.......................................................................................................9

To establish its entitlement to class certification, a plaintiff must prove that it will adequately represent the interests of the class, that its claims or defenses are typical of the class, and that questions of law or fact common to the class predominate over questions affecting only individual class members. *See* Fed. R. Civ. P. 23(a)(3), (4), (b)(3); *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Plaintiff fails to establish these elements of Rule 23.

I.   PLAINTIFF FAILS TO SATISFY RULE 23(A) BECAUSE IT IS NOT AN ADEQUATE CLASS REPRESENTATIVE AND DOES NOT HAVE TYPICAL CLAIMS........................................................................11

    A.   Plaintiff has not proven that it controls this litigation and will adequately monitor class counsel........................................... 11

Adequacy requires that class representatives, not class counsel, direct and control the litigation and is undermined where the litigation is a lawyer- and not client-driven suit. *See In re AEP ERISA Litig.*, No. 2:03-cv-67, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008) (Marbley, J.); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 144-50 (N.D. Tex. 2014). Plaintiff brought this suit because it was suggested by Robbins Geller pursuant to an effectively exclusive and free securities-monitoring service that Robbins Geller provides to Plaintiff, Robbins Geller has agreed to indemnify Plaintiff for its conduct in this litigation, and Plaintiff's representative at deposition was unaware of basic facts alleged in the Complaint or about the litigation and admitted that all of its knowledge about this case comes from Robbins Geller. Plaintiff has failed to demonstrate that it controls the litigation and will adequately monitor class counsel and therefore has failed to prove that it is an adequate class representative.

    B.   Plaintiff is inadequate and atypical because it cannot prove that it suffered the same injury as the rest of the proposed class. ................................. 17

Adequacy and typicality are defeated where a class representative does not suffer the same injury as class members or is subject to unique defenses, including where the class representative benefitted from the alleged fraud. *See In re Groupo Televisa Sec. Litig.*, 2020 WL 3050550, at *7-8 (S.D.N.Y. June 8, 2020); *Bentley* v. *Honeywell Int'l, Inc.*, 223 F.R.D. 471, 484 (S.D. Ohio 2004) (Marbley, J.). Plaintiff's representative testified that Plaintiff may have benefited from declines in Cardinal Health's stock price due to Plaintiff's large investments in hedge funds and other funds that may have shorted or traded options on Cardinal Health stock. As a result, Plaintiff is not certain, and may be unable to determine, whether Plaintiff suffered any economic loss from the fraud alleged in this case. This creates unique defenses against Plaintiff related to

damages and standing that will distract from prosecution of this action. As a result, Plaintiff has failed to prove adequacy and typicality.

C.     Plaintiff's purchases of Cardinal Health stock following the alleged corrective disclosures and after the end of the Class Period subject it to unique defenses...........................................................................23

Plaintiff purchased Cardinal Health stock after both alleged corrective disclosures and after it became involved in this litigation. These post-disclosure purchases make Plaintiff inadequate and atypical because they call into question Plaintiff's credibility and subject it to a unique defense of non-reliance on the alleged fraudulent statements. *See George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at \*6 (S.D.N.Y. July 3, 2013).

II.     PLAINTIFF DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(B)(3). ............................................................24

A.     Plaintiff has not proven that damages can be measured on a classwide basis consistent with its theories of liability........................................25

1.     Dr. Feinstein's vague damages methodology is "no model at all" and therefore fails to satisfy *Comcast*. ........................................25

To establish predominance under Rule 23(b)(3), a plaintiff must establish through evidentiary proof that damages can be measured on a classwide basis consistent with Plaintiff's theories of liability. *See Comcast Corp.* v. *Behrend*, 569 U.S. 27, 31-34 (2013). Plaintiff's expert Dr. Steven P. Feinstein's vague assertions that unspecified "valuation tools" and "empirical analyses" can be used to measure damages on a classwide basis are insufficient to meet Plaintiff's burden to prove predominance.

2.     Dr. Feinstein has not demonstrated a reliable method for establishing whether the alleged misstatements created artificial inflation. ........................................................................30

As Defendants' expert Dr. Kenneth M. Lehn explains in his Rebuttal Report, Dr. Feinstein will not be able to apply an event study analysis at the time of the alleged misstatements to demonstrate that those statements caused artificial inflation to enter Cardinal Health's stock price. As a result, Dr. Feinstein will need to rely on the stock price declines following the two alleged corrective disclosures, which, due to the many complicating factors in this case, will not provide a reliable estimate for artificial inflation at earlier points in the Class Period.

3.     Dr. Feinstein's damages methodology fails to measure damages attributable only to the alleged wrongdoing. ....................................31

"[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35. Plaintiff's damages methodology does not address how it will disentangle the effects of multiple factors unrelated to the alleged fraud that affected Cardinal Health's stock price, including, among other things, the impact of information unrelated to the alleged misrepresentations, the impact of changing

information about Cordis and the relative value of Cordis to Cardinal Health during the lengthy Class Period, and the impact of known risks concerning the Cordis acquisition.  Accordingly, Plaintiff has failed to establish that its methodology will measure only those damages associated with the alleged wrongdoing as required under *Comcast*.

4.      Dr. Feinstein's opinion is unreliable because he is financially beholden to Plaintiff's counsel Robbins Geller. ............................................. 35

Dr. Feinstein's opinion and testimony regarding his proposed damages methodology is not credible because Robbins Geller is his largest client and accounts for a material portion of his personal income.  *See In re Davol, Inc. / C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, Nos. 2:18-mc-2846 (EAS), 2:18-cv-01320 (EAS), 2021 WL 5881775, at *2-4 (S.D. Ohio Dec. 13, 2021).

B.      The continual disclosures of new information about Cordis and changing circumstances during the lengthy Class Period create individualized issues that defeat predominance.................................................... 36

The disclosures of new information related to Cordis throughout the over three-year Class Period create a situation where class members who purchased Cardinal Health stock at different times will face different issues of materiality, falsity, and scienter that defeat predominance.  *See J. H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 998 (7th Cir. 1980); *Gelman* v. *Westinghouse Elec. Corp.*, 73 F.R.D. 60, 66-67 (W.D. Pa. 1976).

CONCLUSION...............................................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska* v. *Suburban Propane Gas Corp.*,
123 F.3d 1317 (9th Cir. 1997) ......................................................................22

*Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)......................................................................11, 21

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)......................................................................36

*Bentley* v. *Honeywell Int'l, Inc.*,
223 F.R.D. 471 (S.D. Ohio 2004) ......................................................................11

*Berger* v. *Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) ......................................................................12, 14

*Berwecky* v. *Bear, Stearns & Co., Inc.*,
197 F.R.D. 65 (S.D.N.Y. 2000) ......................................................................23

*Bovee* v. *Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003)......................................................................11

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)...................................................................... *passim*

*Doshi* v. *Gen. Cable*,
2017 WL 5178673 (E.D. Ky. Nov. 7, 2017)......................................................................21

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005)......................................................................31

*E. Tex. Motor Freight Sys., Inc.* v. *Rodriguez*,
431 U.S. 395 (1977)...................................................................... 17, 19-20

*Finkelstein* v. *Liberty Digit., Inc.*,
2005 WL 1074364 (Del. Ch. 2005) ......................................................................28

*Ft. Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ...................................................................... *passim*

*Gelman* v. *Westinghouse Elec. Corp.*,
73 F.R.D. 60 (W.D. Pa. 1976) ......................................................................38

*George* v. *China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...................................................................23, 24

*Gordon* v. *Sonar Cap. Mgmt. LLC*,
92 F. Supp. 3d 193 (S.D.N.Y. 2015)...........................................................................11, 20

*Greenspan* v. *Brassler*,
78 F.R.D. 130 (S.D.N.Y. 1978) .......................................................................................12

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)......................................................................................................1, 9

*Hubbard* v. *BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) .........................................................................................33

*In re AEP ERISA Litig.*,
No. 2:03-cv-67 (ALM), 2008 WL 4210352 (S.D. Ohio Sept. 8, 2008) ..................................11

*In re Bausch & Lomb Inc. Sec. Litig.*,
244 F.R.D. 169 (W.D.N.Y. 2007).................................................................................17, 20

*In re Bos. Sci. Corp. ERISA Litig.*,
254 F.R.D. 24 (D. Mass. 2008)........................................................................................21

*In re Bridgestone Inv. Corp. Ltd.*,
2019 WL 1455334 (N.D. Cal. Apr. 2, 2019) ............................................................. 20-21, 22

*In re Cardinal Health, Inc. Sec. Litig.*,
226 F.R.D. 298 (S.D. Ohio 2005)............................................................................17, 21, 24

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014)................................................................................27, 29

*In re Davol, Inc. / C.R. Bard, Inc., Polypropylene Hernia Mesh*
*Prods. Liab. Litig.*,
Nos. 2:18-mc-2846 (EAS), 2:18-cv-01320 (EAS),
2021 WL 5881775 (S.D. Ohio Dec. 13, 2021) ......................................................................36

*In re Gen. Elec. Sec. Litig.*,
2009 WL 2259502 (S.D.N.Y. July 29, 2009) .......................................................................13

*In re Groupo Televisa Sec. Litig.*,
2020 WL 3050550 (S.D.N.Y. June 8, 2020) ...................................................................17, 19

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014)..............................................................................13, 14, 16

*In re Quarterdeck Off. Sys., Inc. Sec. Litig.*,
  1993 WL 623310 (C.D. Cal. Sept. 30, 1993) ...........................................................21

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) .................................................................................25

*In re Valence Tech. Sec. Litig.*,
  1996 WL 119468 (N.D. Cal. Mar. 14, 1996)...........................................................23

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
  722 F.3d 838 (6th Cir. 2013) ...................................................................................10

*Iron Workers Loc. No. 25 Pension Fund* v. *Credit-Based Asset Servicing &*
  *Securitization, LLC*,
  616 F. Supp. 2d 461 (S.D.N.Y. 2009).......................................................................16

*J. H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*,
  628 F.2d 998 (7th Cir. 1980) .......................................................................... 22, 36-37

*J.B.D.L. Corp.* v. *Wyeth-Ayerst Labs., Inc.*,
  225 F.R.D. 208 (S.D. Ohio 2003) ............................................................................11

*Jaffe Pension Plan* v. *Household Int'l, Inc.*,
  756 F. Supp. 2d 928 (N.D. Ill. 2010) .......................................................................20

*Katz* v. *Comdisco, Inc.*,
  117 F.R.D. 403 (N.D. Ill. 1987)...............................................................................21

*Kelley* v. *Mid-Am. Racing Stables, Inc.*,
  139 F.R.D. 405 (W.D. Okla. 1990)...........................................................................15

*Loritz* v. *Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015)......................................................27, 28

*Ludlow* v. *BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ...................................................................................34

*Makor Issues & Rts., Ltd.* v. *Tellabs, Inc.*,
  256 F.R.D. 586 (N.D. Ill. 2009)...............................................................................21

*Matrixx Initiatives, Inc.* v. *Siracusano*,
  563 U.S. 27 (2011)....................................................................................................36

*Minpeco, S.A.* v. *Conticommodity Servs., Inc.*,
  676 F. Supp. 486 (S.D.N.Y. 1987) ...........................................................................20

*Morris* v. *Wachovia Sec., Inc.*,
  223 F.R.D. 284 (E.D. Va. 2004)...............................................................................37

*Ogden* v. *AmeriCredit Corp.*,
     225 F.R.D. 529 (N.D. Tex. 2005) .................................................................14, 15

*Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
     No. 4:08-cv-0160-BYP,
     2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ..........................................27, 28, 29

*Rikos* v. *Procter & Gamble Co.*,
     799 F.3d 497 (6th Cir. 2015) ..............................................................................10

*Rocco* v. *Nam Tai Elecs., Inc.*,
     245 F.R.D. 131 (S.D.N.Y. 2007) .........................................................................23

*Rolex Emps. Ret. Tr.* v. *Mentor Graphics Corp.*,
     136 F.R.D. 658 (D. Or. 1991) .............................................................................23

*Ross* v. *Abercrombie & Fitch Co.*,
     501 F. Supp. 2d 1102 (S.D. Ohio 2007) ..............................................................10

*Schledwitz* v. *United States*,
     169 F.3d 1003 (6th Cir. 1999) .............................................................................36

*Senter* v. *Gen. Motors Corp.*,
     532 F.2d 511 (6th Cir. 1976) .........................................................................11, 17

*Shiring* v. *Tier Techs., Inc.*,
     244 F.R.D. 307 (E.D. Va. 2007) ................................................................ 15, 21-22

*Sicav* v. *Wang*,
     2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) .........................................................27

*Smith* v. *Fahnestock & Co., Inc.*,
     2002 WL 334511 (S.D.N.Y. Mar. 1, 2002) ..........................................................20

*Wal-Mart Stores, Inc.* v. *Dukes*,
     564 U.S. 338 (2011)..............................................................................9, 10, 24

*Weisman* v. *Darneille*,
     78 F.R.D. 669 (S.D.N.Y. 1978) ...........................................................................17

*Welling* v. *Alexy*,
     155 F.R.D. 654 (N.D. Cal. 1994)................................................................ 11-12

*Zandman* v. *Joseph*,
     102 F.R.D. 924 (N.D. Ind. 1984).........................................................................37

vii

**Statutes and Rules**

15 U.S.C. § 78u-4 ..................................................................................................................14

Fed. R. Civ. P. 23 .................................................................................................... *passim*

## PRELIMINARY STATEMENT

The Supreme Court has made clear:  "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23."  *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Plaintiff offers no such proof here.  Instead, its motion papers offer only superficial discussion of the elements of that Rule without affirmatively proving compliance.  Plaintiff's approach is insufficient under Supreme Court and Sixth Circuit precedent, which requires that the Court conduct a "rigorous analysis" and find that Plaintiff has "affirmatively demonstrat[ed] its compliance" with Rule 23 requirements before certifying a class.  *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013).

Plaintiff has failed to meet its burden on multiple requirements:

*First*, Plaintiff has failed to prove that it controls this litigation and will adequately monitor class counsel.  The Private Securities Litigation Reform Act ("PSLRA") mandates that class representatives, not lawyers, control the litigation.  But here, Plaintiff's counsel is in control.  Plaintiff's deposition revealed that it brought this lawsuit only because it was suggested by Robbins Geller pursuant to a portfolio monitoring agreement.  Plaintiff then engaged Robbins Geller without considering any other law firms—just as it has retained Robbins Geller in three other federal securities actions since 2019.  With this litigation now underway, Plaintiff's representative at deposition did not know basic facts alleged in the Complaint or about the litigation, and testified that all of Plaintiff's knowledge comes from Robbins Geller.  Plaintiff has failed to prove that it is more than "the key to the courthouse door," and therefore Plaintiff has failed to prove adequacy.

*Second*, Plaintiff is inadequate and atypical because it cannot prove that it suffered any economic loss from the alleged wrongdoing.  Through the course of Plaintiff's deposition, it

1

became clear that Plaintiff invested as much as $1 billion in hedge funds, plus additional investments in other types of funds, that may have shorted or traded in options on Cardinal Health stock during the class period—and therefore Plaintiff may have *profited* through those investments from declines in Cardinal Health's stock price. Confronted with Plaintiff's massive investments in such funds, Plaintiff's representative conceded that *he cannot be certain that Plaintiff suffered any economic harm* from the fraud alleged in this case. Plaintiff's billion-dollar investments in such funds render it atypical and inadequate, and subject it to unique defenses that will significantly distract from prosecution of this action to the detriment of the proposed class.

*Third*, despite alleging that two "corrective disclosures" revealed that Cardinal Health had made misstatements about Cordis, Plaintiff continued to purchase Cardinal Health stock after the alleged fraud was allegedly revealed, and even purchased Cardinal Health stock after filing its complaint in this case. These post-disclosure purchases make Plaintiff inadequate and atypical because they call into question Plaintiff's credibility and subject it to a unique defense of non-reliance on the alleged fraudulent statements.

*Fourth*, Plaintiff has failed to show that damages can be measured on a classwide basis consistent with Plaintiff's theories of liability and therefore has failed to prove predominance under Rule 23(b)(3). The methodology described by Plaintiff's expert, Dr. Steven P. Feinstein, is inscrutably vague and addresses none of the unique complexities to calculating damages in this case. *See* Ex. 1, Expert Rebuttal Rep. of Kenneth M. Lehn.[1] As a result, Plaintiff has failed to

---

[1] References to numbered exhibits in the form "Ex. __" are to the Exhibits to the Declaration of David S. Bloomfield, Jr., Esq. in Support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Class Certification, ECF No. 83, PageID # 5040-43. References to lettered exhibits are to the Exhibits to the Declaration of Spencer A. Burkholz in Support of Lead Plaintiff's Motion for Class Certification, ECF No. 72-2, PageID # 3628-31 ("Burkholz Decl.").

2

show that Dr. Feinstein's proposed methodology will measure only damages caused by the alleged wrongdoing, as required by *Comcast*. Moreover, it was revealed at deposition that Dr. Feinstein's company (of which he is the sole owner) earns "*in the neighborhood of 50 percent*" of its fees from Robbins Geller, which is Dr. Feinstein's largest client and a material source of his personal income, making Dr. Feinstein's vague assurances that he could somehow calculate damages by an unspecified method entirely non-credible.

*Finally*, the continual disclosures of new information related to Cordis throughout the more-than-three-year proposed class period create a situation where class members who purchased at different times will face different issues of materiality, falsity, and scienter that also defeat predominance.

Each of these flaws is an independent basis to deny Plaintiff's motion. For all of these reasons, the Court should find that Plaintiff has failed to carry its burden to prove compliance with Rule 23 and deny class certification.

## BACKGROUND

Cardinal Health is a healthcare services and products company that manages its business in two segments: Pharmaceutical and Medical. Ex. 2, June 30, 2015 Form 10-K at 3023. The Pharmaceutical segment distributes medicines and provides other products and services to pharmacies, hospitals, and other healthcare providers. *Id.* at 3043. The Medical segment distributes medical, surgical, and laboratory products and provides services to hospitals, surgery centers, and laboratories, among others. *Id.* at 3044. During the company's fiscal years 2015 to 2018, the Pharmaceutical segment accounted for 89-90% of Cardinal Health's revenues and between 75-84% of its operating earnings, with the Medical segment accounting for the rest.[2]

---

[2] *See* Ex. A, Feinstein Rep. ¶¶ 21-22.

On March 2, 2015, Cardinal Health announced that it planned to acquire Cordis, a manufacturer of cardiology and endovascular devices, from Johnson & Johnson. Ex. 3, Mar. 2, 2015 Press Release at 4564. Prior to the acquisition, Cordis had annual revenues of approximately $780 million, which was less than 1% of Cardinal Health's total revenues, with 70% of its sales outside the U.S. *Id.*[3] The acquisition closed on October 4, 2015, and Cordis became part of Cardinal Health's Medical segment. Ex. 4, Oct. 4, 2015 Press Release at 4590-91; Ex. 2, June 30, 2015 Form 10-K at 3025.

From the time the Cordis acquisition was announced, Cardinal Health disclosed that the transaction presented risks, including with respect to "the ability to retain customers and employees," "to successfully integrate the acquired business into Cardinal Health's operations," and "to achieve the expected synergies as well as accretion in earnings." Ex. 3, Mar. 2, 2015 Press Release at 4566.[4] Over the next three years, Cardinal Health also made multiple disclosures concerning challenges encountered as it worked to integrate Cordis. For example:

---

[3] *See also* Ex. 1, Lehn Rep. ¶ 15.

[4] *See also, e.g.*, Ex. 2, June 30, 2015 Form 10-K at 3051 (noting, among other risks, that "we may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition"); Ex. 4, Oct. 4, 2015 Press Release at 4592; Ex. 5, June 30, 2016 Form 10-K at 3339-40; *see also* Ex. 1, Lehn Rep. ¶ 66, Lehn Rep. Ex. 3.

As discussed in the Expert Rebuttal Report of Kenneth M. Lehn, securities analysts and Plaintiff's investment managers recognized that the Cordis acquisition presented risks. *See* Ex. 1, Lehn Rep. ¶¶ 67-68, Lehn Rep. Ex. 4; *see also* Ex. 6 (McGirr Dep.) at 174:1-12 ("Q. So you were aware, at this time, that there were integration risks in – integration risks with the Cordis acquisition? A. There's – yes. There's integration risks with acquisitions. Q. And those integration risks may mean that, you know, it's not certain that the acquisition will be accretive? A. That's correct."); *see also id.* at 200:1-202:3; Ex. 7 (Smith Depo.) at 156:1-3, 157:24-158:2, 263:9-264:23; Ex. 8 (Agne Dep.) at 139:14-141:18, 145:15-147:24, 173:3-8, 180:25-184:21; Ex. 9 (Swaminathan Dep.) at 150:21-151:14.

4

- On August 2, 2016, Cardinal Health disclosed that it was lowering the estimated FY2017 accretion from the Cordis acquisition from more than $0.20 to more than $0.15 per share "due to currency impacts as well as some increased SG&A investments compared to our original business case" and explained that "some of the synergies originally associated with this complex acquisition will take longer to achieve than we originally modeled." Ex. 10, Aug. 2, 2016 Tr. at 5038. Plaintiff's investment managers testified that they recognized that there were risks to Cardinal Health's ability to achieve the estimated accretion and synergies from Cordis.[5]

- On May 1, 2017, Cardinal Health reported "a decline in Cordis profit" that was "mostly related to increased SG&A expenses to support our investment in an international infrastructure," and "an increase to an inventory reserve," and explained that there could be "some lumpiness to the Cordis earnings." Ex. 11, May 1, 2017 Tr. at 5245. Plaintiff's investment managers testified that they recognized at this time that there were challenges affecting Cordis's performance that might impact Cardinal Health's ability to achieve its accretion and synergies targets.[6]

- On August 2, 2017, Cardinal Health reported that Cordis did not achieve its reduced accretion target of $0.15 due to increased SG&A and manufacturing costs. Ex. 12, Aug. 2, 2017 Tr. at 5320. The company also reported lower-than-anticipated sales from partnership agreements and write-offs for excess Cordis inventory. *Id.* Plaintiff's investment managers testified that cost and inventory challenges had been disclosed previously,[7] and that repeated disclosures about issues at Cordis raised concerns about whether the Cordis integration would be successful.[8] Securities analysts also noted that "Cardinal's guidance underscores the challenges in integrating the Cordis business."[9]

- On February 8, 2018, Cardinal Health reported that earnings at Cordis were impacted by supply-chain issues and elevated expenses, that Cordis results were anticipated "to be lower than previously expected for the balance of the year," and

---

[5] *See* Ex. 6 (McGirr Dep.) at 219:13-21, 245:16-247:20; Ex. 7 (Smith Dep.) at 217:4-21, 224:19-225:2.

[6] *See* Ex. 6 (McGirr Dep.) at 277:22-279:2 (explaining that Cordis challenges disclosed at this time created risks "[i]n terms of Cordis being able to achieve the targets that management had set out"); Ex. 7 (Smith Dep.) at 313:9-13 ("Q. . . . So you were aware that there were problems with the Cordis business that could impact Cordis's performance going forward in May 2017, correct? A.  Yes.").

[7] *See* Ex. 6 (McGirr Dep.) at 297:11-298:17, 299:19-300:10; 302:3-9; Ex. 7 (Smith Dep.) at 327:13-328:10.

[8] *See* Ex. 6 (McGirr Dep.) at 303:3-304:14; 309:2-310:9.

[9] Ex. 13, Aug. 3, 2017 Morgan Stanley Rep. at 3396.

that "it will take a little time to work through these items." Ex. 14, Feb. 8, 2018 Tr. at 5441, 5445. Plaintiff's investment managers testified that, by this time, "it [was] widely known in the market that the integration [of Cordis] was not going as planned" and "there was a risk that the company's remediation plans might not be successful." Ex. 6 (McGirr Dep.) at 346:1-14, 352:23-354:15.[10]

- On May 3, 2018, Cardinal Health reported that third quarter earnings were affected by "a significant negative change in our effective tax rate" related to performance at Cordis and lowered its 2018 earnings outlook. Ex. 15, May 3, 2018 Press Release at 5484-85. Cardinal Health explained that the results reflected "unanticipated disappointing performance from our Cordis business" and that "as we've noted in previous quarters operating cost and inventory reserves continue to be challenges – both came in even higher than expected this quarter and continue to weigh on profitability." Ex. 16, May 3, 2018 Tr. at 5495-96. As one of Plaintiff's investment managers testified, many of these issues had been discussed in previous disclosures.[11]

During the proposed class period of March 2, 2015 to May 2, 2018 (the "Class Period"), there were also issues affecting Cardinal Health's financial performance unrelated to Cordis. Cardinal Health disclosed such issues throughout the Class Period, including on the two corrective disclosure dates alleged by Plaintiff.[12] For example:

- On August 2, 2017 (the first alleged corrective disclosure date), Cardinal Health disclosed a decline in profit for the Pharmaceutical segment due to "generic pharmaceutical pricing," "ongoing investment in its Pharmaceutical IT platform," "the loss of Safeway and reduced levels of branded manufacturer price appreciation." Ex. 17, Aug. 2, 2017 Press Release at 5297. Securities analysts and investors recognized that these issues unrelated to Cordis were impacting Cardinal Health's performance.[13]

---

[10] *See also* Ex. 6 (McGirr Dep.) at 347:4-12, 350:11-351:24; Ex. 7 (Smith Dep.) at 348:17-349:19.

[11] *See* Ex. 6 (McGirr Dep.) at 366:14-20 ("Q. All of the issues I just discussed, supply chain issues, SG&A issues, infrastructure issues, manufacturing issues, TSA issues, issues with partnership agreements and issues with inventory writeoffs, you knew about all those challenges before this day; right? A. Yes.").

[12] *See* Ex. 1, Lehn Rep. ¶¶ 76-80, 82-83.

[13] *See* Ex. 1, Lehn Rep. ¶ 82; *see also* Ex. 6 (McGirr Dep.) at 321:8-323:18; Ex. 18, Columbia Mgmt. Inv., Q. Inv. Comment. as of Sept. 30, 2017 at 6385 ("Generic drug pricing deflation as well as company spending initiatives hurt the growth outlook, resulting in investor disappointment."); Ex. 7 (Smith Dep.) at 336:22-337:2 ("Q. So you agree that generics pricing

- On May 3, 2018 (the second alleged corrective disclosure date), Cardinal Health disclosed that Pharmaceutical segment performance was negatively impacted by "the previously announced expiration of a large, mail-order customer contract," "the divestiture of the company's China distribution business," and "generic program performance." Ex. 15, May 3, 2018 Press Release at 5485. It was recognized by market participants that there were a "multitude of factors impacting Cardinal Health's outlook" and stock price at this time. Ex. 19, May 3, 2018 Bank of Am. Rep. at 5094.[14]

Plaintiff's investment managers testified that issues affecting Cardinal Health's larger Pharmaceutical segment—in particular, challenges with respect to the pricing of generic drugs—were more important to them in assessing Cardinal Health's financials than Cordis given the relatively small size of Cordis compared to Cardinal Health's overall business.[15]

More than a year after the second alleged corrective disclosure, on August 1, 2019, a purported Cardinal Health shareholder (other than Plaintiff) filed a complaint alleging that Cardinal Health and its executives had violated federal securities laws in connection with statements about Cordis.[16] Plaintiff subsequently became involved in the litigation after Robbins Geller suggested that Plaintiff bring a lawsuit pursuant to a portfolio monitoring agreement

---

was probably one of the biggest reasons driving Cardinal Health stock price decline at this time? . . . THE WITNESS: My opinion is that generic pricing was the main contributing factor."); *id.* at 321:19-323:14.

[14] *See also* Ex. 1, Lehn Rep. ¶ 83; Ex. 6 (McGirr Dep.) at 372:2-373:21.

[15] *See* Ex. 6 (McGirr Dep.) at 161:12-162:3, 179:17-180:14, 238:19-240:24, 259:2-261:9, 307:14-308:4 ("Cordis specifically carried less weight than other segments of the business . . . given the size of the business"), 316:13-318:18 ("Q. So it's fair to say that the challenges of the pharmaceutical business are more important to you than the challenges with the Cordis business at this time? A. Yes."), 328:19-329:13, 360:19-361:2; Ex. 8 (Agne Dep.) at 186:10-187:10 (explaining that Plaintiff's investment manager determined that there were better investment opportunities than Cardinal Health because "on the drug distribution side of the business, you know, this wave of sort of new generic drugs that had come to the market from – call it 2012 to 2015 had started to wane a little bit"); Ex. 7 (Smith Dep.) at 62:1-5 ("Q. . . . is it fair to say that the pharmaceutical segment was generally more important to you in assessing Cardinal Health's . . . valuation? A. Yes."), 203:4-204:5.

[16] ECF No. 1, PageID #1-34.

between Plaintiff and Robbins Geller.[17] Plaintiff engaged Robbins Geller to represent it in this case without interviewing or considering any other firms.[18] After filing a motion for appointment as lead plaintiff on September 30, 2019, which was granted on June 19, 2020, Plaintiff filed its complaint in this case on September 8, 2020 (the "Complaint" or "Compl.").[19] Since 2019, Plaintiff has sought lead plaintiff status in three other federal securities actions, where it has also engaged Robbins Geller as counsel.[20]

The Complaint alleges that Defendants made false and misleading statements and omissions regarding the acquisition, integration, and performance of Cordis. Compl. ¶¶ 67, 71, 83. During the Class Period, Plaintiff transacted in Cardinal Health stock through several third-party investment managers, which were delegated authority to make investments on Plaintiff's behalf.[21] Plaintiff also invested up to roughly $1 billion in hedge funds during the Class Period.[22] Plaintiff testified that those hedge funds and other third-party funds in which Plaintiff invested possibly engaged in short sales or options transactions with respect to Cardinal Health stock.[23] Plaintiff further testified that it does not know whether it profited from declines in

---

[17] Ex. 20 (Ristorucci Dep.) at 112:22-115:7, 118:1-13.

[18] *Id*. at 134:7-13.

[19] Mot. for Appointment as Lead Pl., ECF No. 13, PageID # 213-15; Op. & Order, ECF No. 22, PageID # 390-405; Compl., ECF No. 28, PageID # 420-89.

[20] Ex. 20 (Ristorucci Dep.) at 315:19-22, 318:1-319:6. Plaintiff's motion for appointment as lead plaintiff was denied in one action, granted in another, and a decision on lead plaintiff is pending in the third. *Id.*; *see also* Ex. B, Mar. 10, 2022 Pl.'s Resps. & Objs. to Defs.' First Set of Interrogs. at 10.

[21] Ex. 20 (Ristorucci Dep.) at 80:16-20, 82:5-16, 333:24-335:6. Representatives of four of Plaintiff's investment managers have been deposed in this Action (Boston Partners Global Investors, Inc., LSV Asset Management, Rothschild Asset Management, Inc., and Columbia Management Investment Advisers, LLC).

[22] *Id.* at 239:8-16.

[23] *Id.* at 220:5-8, 221:14-21, 245:12-25, 265:8-24, 274:14-275:23, 282:12-283:9, 291:21-292:5.

Cardinal Health's stock price due to its significant investments in these hedge funds and other funds, and therefore cannot be certain that it suffered any economic loss due to the misstatements alleged in the Complaint.[24]

Defendants filed a motion to dismiss on November 6, 2020, which the Court denied.[25] Plaintiff has now filed a motion for class certification seeking to certify a class of purchasers of Cardinal Health stock during the proposed Class Period, for appointment of itself as class representative, and for appointment of Robbins Geller as class counsel.[26]

## ARGUMENT

As the Supreme Court has emphasized, class-action treatment is the "exception," not the "rule," and Rule 23 "does not set forth a mere pleading standard." *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011)). A plaintiff seeking class certification has the burden of establishing that class certification is appropriate under Rule 23. *See Wal-Mart Stores*, 564 U.S. at 350. Accordingly, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

To satisfy Rule 23(a), a plaintiff must demonstrate that "the representative parties will fairly and adequately protect the interests of the class" and that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3), (4). Where, as here, the plaintiff seeks certification under Rule 23(b)(3), the Court

---

[24] *Id.* at 296:8-297:3 ("I'm not able to make that calculation."), 297:15-302:21, 303:16-304:14.

[25] Defs.' Mot. to Dismiss, ECF No. 31, PageID # 3225-64; Op. & Order, ECF No. 39, PageID # 3400-30.

[26] Lead Pl.'s Mot. for Class Certification, ECF No. 72, PageID # 3594-98.

must also find that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

The Court may certify a class only if, after "rigorous analysis," it finds that the plaintiff has "affirmatively demonstrat[ed] [its] compliance" with these requirements. *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350); *see also Rikos* v. *Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015) ("'Class certification is appropriate if the [district] court finds, after conducting a 'rigorous analysis,' that the requirements of Rule 23 have been met.'"). This analysis "frequently" overlaps with the merits of the plaintiff's underlying claims because class determination "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33-34 (quoting *Wal-Mart*, 564 U.S. at 351); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851-52 (6th Cir. 2013) (court properly considered "extensive" record in ruling on class certification). And in conducting its "rigorous analysis," a court may, and should, weigh the persuasiveness of expert testimony, because "the submissions of [the plaintiff's] expert constitute a significant part of the evidence supporting [the plaintiff's] certification motion." *Ft. Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 128 (S.D.N.Y. 2014); *see also Wal-Mart*, 564 U.S. at 354-55 (disregarding expert opinion that was "worlds away" from establishing Rule 23 requirements). Here, Plaintiff has failed to meet its burden to demonstrate that the requirements of Rule 23 are satisfied, and class certification should be denied.[27]

---

[27] Plaintiff seeks certification of a class to pursue claims under §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934. Mem. in Supp. of Lead Pl.'s Mot. for Class Certification, ECF No. 72-2, PageID # 3606. As Plaintiff acknowledges, the §§ 20(a) and 20A claims are "derivative" of the § 10(b) claim, *id.* at PageID # 3617 n.6, and are predicated on liability for a violation of § 10(b). *See Ross* v. *Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1120 (S.D. Ohio 2007). For the reasons set forth herein, Plaintiff has failed to prove that it satisfies Rule 23 with respect to any of its claims.

10

**I.     PLAINTIFF FAILS TO SATISFY RULE 23(A) BECAUSE IT IS NOT AN ADEQUATE CLASS REPRESENTATIVE AND DOES NOT HAVE TYPICAL CLAIMS.**

To establish adequacy, Plaintiff must show that it "will vigorously prosecute the interests of the class through qualified counsel" and that it has "common interests with unnamed members of the class." *Senter* v. *Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir. 1976). Adequacy is "essential to due process because a final judgment in a class action is binding on all class members." *Bovee* v. *Coopers & Lybrand*, 216 F.R.D. 596, 612 (S.D. Ohio 2003) (Sargus, J.).

With respect to typicality, a court must deny class certification "'where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation,'" *Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000), because "'absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Bentley* v. *Honeywell Int'l, Inc.*, 223 F.R.D. 471, 484 (S.D. Ohio 2004) (Marbley, J.). A unique defense need not be one that will necessarily "prevail"; it need only be "meritorious enough to require the plaintiff to devote considerable time to rebut" it. *Gordon* v. *Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) (internal quotation marks omitted).

### A. Plaintiff has not proven that it controls this litigation and will adequately monitor class counsel.

A plaintiff who is "merely a pawn of the class lawyers" is inadequate to serve as a class representative. *In re AEP ERISA Litig.*, No. 2:03-cv-67, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008) (Marbley, J.); *see also J.B.D.L. Corp.* v. *Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 216 (S.D. Ohio 2003) (Beckwith, J.) (a class representative must "demonstrate a willingness and ability to play an active role in and control the litigation and to protect the absent class members"). A class representative plays "the necessary role of 'check[ing] the otherwise

unfettered discretion of counsel in prosecuting the suit.'" *Welling* v. *Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994).[28]  Adequacy is especially important in securities cases because the PSLRA mandates that "class representatives, and not lawyers, must direct and control the litigation" and "raises the standard adequacy threshold." *Berger* v. *Compaq Comput. Corp.*, 257 F.3d 475, 481, 483 (5th Cir. 2001).  Here, Plaintiff is not an adequate class representative because it is acting as a "pawn" of its counsel, Robbins Geller.

Plaintiff brought this lawsuit only because it was brought to Plaintiff's attention by Robbins Geller.  Ex. 20 (Ristorucci Dep.) at 118:1-13.  During 2017 and 2018, following the alleged corrective disclosures that allegedly revealed the fraud related to Cordis, Plaintiff never formed the view that Cardinal Health had made any misleading statements regarding Cordis and never sought to engage any counsel to bring litigation against Cardinal Health.  *Id.* at 105:25-108:6, 118:1-13.  Plaintiff chose to participate in this litigation in September 2019—over a year after the final alleged corrective disclosure—and only because the lawsuit was suggested by Robbins Geller.  *Id.* at 118:1-13.  Robbins Geller raised the claim as part of a portfolio monitoring arrangement it entered with Plaintiff in April 2019.  *Id.* at 111:16-115:7, 157:21-158:2; *see also* Ex. 21, Apr. 1, 2019 Engagement Agreement for Portfolio Monitoring at 0004.  Under this arrangement, Plaintiff provides Robbins Geller with regular updates regarding its transactions in publicly traded securities, and Robbins Geller suggests lawsuits that Plaintiff might bring—at no charge to Plaintiff.  Ex. 20 (Ristorucci Dep.) at 153:18-155:12, 163:18-164:20, 168:11-169:2; Ex. 21, Apr. 1, 2019 Engagement Agreement for Portfolio Monitoring ¶¶ 2, 6-7.  Thus, any time that Robbins Geller learns of a potential securities class action lawsuit

---

[28] *See also Greenspan* v. *Brassler*, 78 F.R.D. 130, 133 (S.D.N.Y. 1978) ("'An attorney who prosecutes a class action with unfettered discretion becomes, in fact, the representative of the class.  This is an unacceptable situation because of the possible conflicts of interest involved.'").

it might bring on a contingent fee basis, it can simply review Plaintiff's transaction data to see if it can suggest that Plaintiff pursue the claim.

Courts have criticized "[t]his type of free securities monitoring service that Robbins Geller provides," especially where, like here, the portfolio monitoring agreement is effectively exclusive. *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 149 (N.D. Tex. 2014) ("[T]he fact that Robbins Geller is the Plan's sole securities monitoring service and has, in turn, filed this suit and is now seeking appointment as Class Counsel, may not [be] dispositive on the issue of whether the Plan would be an adequate Class Representative, but it strongly suggests that this is a lawyer and not a client-driven suit.").[29] Although Plaintiff has monitoring agreements with two other firms, only Robbins Geller focuses on alerting it to potential federal securities fraud claims in the U.S., while the other firms focus on other types of matters. Ex. 20 (Ristorucci Dep.) at 158:3-162:20.[30] And every time that Plaintiff has filed a lawsuit on a claim brought to its attention by Robbins Geller—including this case—it has *always* engaged Robbins Geller, and did not even consider or interview any other firms for this case. *Id.* at 134:7-13, 156:16-24.

Indeed, since 2019, Plaintiff has sought lead plaintiff status in three other federal securities litigations—and in each case Plaintiff hired Robbins Geller. *Id.* at 314:6-16, 315:19-22, 317:1-5, 318:1-17; 318:23-319:6; *see* Ex. B, Mar. 10, 2022 Pl.'s Resps. & Objs. to Defs.' First Set of Interrogs. at 10. Thus, including this case, Robbins Geller is representing Plaintiff in connection with four pending securities litigations, in two of which it has been granted lead

---

[29] *See also In re Gen. Elec. Sec. Litig.*, 2009 WL 2259502, at *6 n.4 (S.D.N.Y. July 29, 2009) (noting that the "conflict of interest is more significant if a monitoring firm is guaranteed to bring the potential lawsuit").

[30] As Plaintiff explained, the law firm Labaton Sucharow focuses on alerting Plaintiff to potential securities fraud claims outside of the U.S. and the law firm Scott + Scott primarily monitors Plaintiff's portfolio for potential recoveries from class action settlements. Ex. 20 (Ristorucci Dep.) at 158:3-162:20.

plaintiff status and in one case its lead plaintiff application is pending. Ex. 20 (Ristorucci Dep.) at 315:19-22, 318:1-17, 318:23-319:6. This effectively exclusive and close affiliation with Robbins Geller undermines Plaintiff's ability to adequately represent the interests of class members in this case. *See In re Kosmos*, 299 F.R.D. at 145, 149 (explaining that potential class representatives that are "'simply lending their names to a suit'" that is a "lawyer and not a client-driven suit" may be found inadequate).[31]

Pursuant to its retention agreement, Robbins Geller has further agreed to indemnify Plaintiff for any claims or sanctions related to this litigation—including even in the event that the Court were to assess sanctions against Plaintiff for the conduct of this litigation, which the Court is required by the PSLRA to consider at the conclusion of the action.[32] Ex. 20 (Ristorucci Dep.) at 169:14-170:4; *see also* Ex. 22, Sep. 6, 2019 Retention Agreement ¶ 9. The fact that Plaintiff has effectively insulated itself from the consequences of Robbins Geller's actions in litigating the case underscores that Robbins Geller is the real party in interest directing this litigation.

Indeed, the record shows that Plaintiff will not fairly and adequately represent class interests because it has abdicated control and direction of this case to Robbins Geller. The PSLRA requires that the class representative have an understanding of the case beyond "derivative knowledge acquired solely from counsel," *Berger*, 257 F.3d at 483 n.18, but Plaintiff

---

[31] *See also, e.g.*, *Ogden* v. *AmeriCredit Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005) (that plaintiff "initiated her relationship with her attorneys in response to a solicitation by them" and "ha[d] not contacted or spoken with any other attorneys regarding her claims" weighed against adequacy).

[32] *See* 15 U.S.C. § 78u-4(c)(1)-(2) (stating that "upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure" and "[i]f the court makes a finding . . . that a party or attorney violated any requirement of [Rule 11(b)] as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney").

admitted that *all* of its knowledge of the allegations in the Complaint—including the factual bases of the allegations—comes from Robbins Geller. *See* Ex. 20 (Ristorucci Dep.) at 146:9-148:10, 340:15-342:22. Plaintiff's representative further admitted that he did not "read the research underlying" the allegations and could not explain the factual bases for them. *Id.* at 340:15-342:22. Moreover, he could not identify a single one of the individual Defendants or provide any examples of alleged misstatements by the Defendants, and he was unaware that an insider trading claim had been filed against one Defendant. *Id.* at 205:1-9, 208:1-211:25. Courts have rejected proposed class representatives where, like here, the "vast majority" of their knowledge is "derived from counsel." *See Ogden*, 225 F.R.D. at 533-35 (plaintiff was inadequate where her "deposition testimony indicates that there are many instances in which she has little or no knowledge outside of that given to her by her attorneys").[33]

Plaintiff's representative also did not know who had been retained to act as its local counsel in this action. He instead testified that "we rely on the judgment of Robbins Geller to make determinations about who's appropriate counsel," and Robbins Geller directly retained local counsel. Ex. 20 (Ristorucci Dep.) at 132:2-134:3. Plaintiff described the same circumstances for its expert witness: Robbins Geller did not ask for Plaintiff's approval to retain Dr. Feinstein, did not discuss Dr. Feinstein with Plaintiff before he was retained, and did not disclose to Plaintiff that Dr. Feinstein's company (of which Dr. Feinstein is the sole owner) earns "in the neighborhood of 50 percent" of it fees from Robbins Geller. *Id.* at 326:1-327:20;

---

[33] *See also Shiring* v. *Tier Techs., Inc.*, 244 F.R.D. 307, 315-16 (E.D. Va. 2007) (explaining that "the knowledge and control requirement is satisfied only where plaintiff demonstrates that he understands the action in which he is involved and, notably that this 'understanding [is] not . . . limited to derivative knowledge acquired solely from counsel'"); *Kelley* v. *Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 409 (W.D. Okla. 1990) (denying class certification where "what the plaintiffs know appears to come entirely from their counsel").

*see* Ex. 23 (Feinstein Dep.) at 44:22-45:2.[34]

In addition, although it is *Plaintiff's burden* to prove that it is an adequate class representative, the sole piece of evidence submitted by Plaintiff in support of its adequacy is a sworn statement by Plaintiff's *counsel* that "contains little more than formulaic, boiler-plate assertions over two pages of substantive text" that "provides naught by which to assess [Plaintiff's] credibility" or its "knowledge about the underlying facts of the case" because "*any* potential class representative in *any* securities case could make almost identical assertions" of adequacy.  *In re Kosmos*, 299 F.R.D. at 146; *see* Burkholz Decl. ¶¶ 3-5, ECF No. 72-2, PageID # 3629-30.  The court in *In re Kosmos* found that a similar submission "carrie[d] little weight" and "fail[ed] to demonstrate adequacy."  299 F.R.D. at 146-47.  But unlike in that case, where a board member of the plaintiff submitted the statement, in this case Robbins Geller executed the statement and apparently never asked Plaintiff to do so.  Ex. 20 (Ristorucci Dep.) at 197:3-199:3.  And while Robbins Geller's statement claims that Robbins Geller provides written quarterly "updates" and has sent filings to Plaintiff for review, Plaintiff has not provided evidence that it has had substantive input into decisions concerning the conduct of the litigation (such as the content of the Complaint or retention of local counsel and an expert witness) or is acting as more than a rubber stamp for Robbins Geller's prosecution of the action.

The arrangement between Plaintiff and Robbins Geller fuels the "abusive lawyer-driven litigation" that the PSLRA aims to eradicate.  *See Iron Workers Loc. No. 25 Pension Fund* v. *Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 465 (S.D.N.Y. 2009).

---

[34] Although Plaintiff acknowledged that an expert witness should be able to give an independent opinion, when asked if Dr. Feinstein's material financial relationship with Robbins Geller raised any concerns, Plaintiff said that it "makes [him] think for a minute," but ultimately explained that Plaintiff deferred to Robbins Geller's judgment on this matter.  Ex. 20 (Ristorucci Dep.) at 324:20-325:18, 328:1-330:3.

16

But "[t]he class is entitled to a representative who is more than 'a key to the courthouse door dispensable once entry has been effected.'" *Weisman* v. *Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978). Accordingly, the Court should deny class certification on the basis that Plaintiff is an inadequate class representative.

### B. Plaintiff is inadequate and atypical because it cannot prove that it suffered the same injury as the rest of the proposed class.

To demonstrate adequacy, Plaintiff must prove that it "'possess[es] the same interest and suffer[ed] the same injury'" as members of the proposed class. *E. Tex. Motor Freight Sys., Inc*. v. *Rodriguez*, 431 U.S. 395, 403 (1977); *see also Senter*, 532 F.2d at 525 ("The representative must have common interests with unnamed members of the class."). A plaintiff that benefits from an alleged fraud has not suffered any injury, much less one common to the class. In *In re Groupo Televisa Securities Litigation*, for example, the plaintiff was found atypical and class certification was denied because the plaintiff benefited from its interest in a hedge fund that held short positions in the defendant company's stock, and thus "[a]s an economic reality, the price drop which injured the other class members enriched [the plaintiff]." 2020 WL 3050550, at *7-8 (S.D.N.Y. June 8, 2020). *See also In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005) (Marbley, J.) (denying lead plaintiff status to investors that "will be subject to the unique defense that [they] experienced a net gain at the Class Period's end and, thus, were not damaged by the fraud"); *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007) (collecting cases) (denying lead plaintiff status to an investor that purchased common stock but gained from sales of the defendant's corporate bonds since such gains "may 'subject it to unique defenses that render such plaintiff incapable of adequately representing the class'").

17

Plaintiff seeks to represent a class of purchasers that allegedly suffered losses when Cardinal Health's stock price declined following two alleged corrective disclosures. Compl. ¶¶ 131-37, 143.  But Plaintiff cannot prove that it suffered any economic injury because it does not know—and potentially cannot determine—its total economic exposure to Cardinal Health securities during the Class Period.  During that time, Plaintiff invested between 9.5% and 15.5% of its up to $11.5 billion in assets under management in multiple hedge funds. Ex. 20 (Ristorucci Dep.) at 238:6-21, 239:8-16.[35]  Plaintiff testified that these hedge funds, as well as other third-party funds in which it invested such as exchange traded funds, possibly shorted Cardinal Health stock or engaged in options transactions concerning Cardinal Health stock.  *Id.* at 220:5-8, 245:9-25, 265:8-24, 274:14-275:23, 282:12-283:9, 291:21-292:5.  Plaintiff further testified that it does not know, and does not possess information from which it could determine, the magnitude of any such transactions or whether Plaintiff gained an economic benefit from such transactions.  *Id.* at 219:14-18, 223:4-20.

Plaintiff's investment records from January 2018 alone show more than $500 million invested in hedge funds and other funds that could have shorted Cardinal Health stock or engaged in Cardinal Health options transactions.  *See* Ex. 24.[36]  These same records show gains on these investments as of January 2018 of more than $80 million.  *See id.*[37]  These amounts

---

[35] *See* Ex. 20 (Ristorucci Dep.) at 239:8-13 ("Q.  Okay.  And so between 2015 and 2018, you would expect that over 1 billion of SEIU's assets would have been invested in hedge funds? A.  I don't know if I'd say over.  If you told me it was a billion, I wouldn't say – I wouldn't be surprised.").

[36] Plaintiff produced records from Northern Trust, the institution that served as custodian of Plaintiff's investments.  Ex. 20 (Ristorucci Dep.) at 164:22-165:1.  Exhibit 24 summarizes information from a Northern Trust report dated January 31, 2018 and related testimony of Plaintiff's representative at deposition concerning Plaintiff's investments in various funds that could have shorted or engaged in options trades on Cardinal Health stock.

[37] The Northern Trust reports as of October 31, 2017 and May 31, 2018 also show investments through which Plaintiff may have shorted or transacted in options in Cardinal Health stock.

dwarf the $2.1 million in Plaintiff's claimed losses on Cardinal Health stock. *See* Pl.'s Mem. of Law in Supp. of Mot. for Appointment as Lead Pl., ECF No. 13-1, PageID # 225; Pl.'s Certification, ECF No. 13-4, PageID # 240-43. Given these numbers, Plaintiff admitted at deposition that it could not rule out the possibility that it *benefitted* from the alleged fraud through short positions or option trades in Cardinal Health stock through those investments. Ex. 20 (Ristorucci Dep.) at 297:15-302:21 ("I cannot rule it out.").[38]

Indeed, because short positions or certain options transactions in Cardinal Health stock would have derived gains as the stock price declined, Plaintiff admitted that *it was not certain that it actually suffered economic loss* from the decline in Cardinal Health stock during the Class Period. *Id.* at 296:8-297:3; 303:16-304:14. As Plaintiff's representative admitted: "*I'm not able to make that calculation.*" *Id.* at 296:8-297:3. In other words, Plaintiff cannot tell whether it suffered *any* injury based on the allegations in the Complaint, let alone demonstrate that it suffered the same injury as the proposed class—and therefore Plaintiff cannot prove its adequacy. *See E. Tex. Motor Freight Sys., Inc.*, 431 U.S. at 403-04 (vacating class certification

---

*See, e.g.*, Ex. 30, Excerpt from Oct. 2017 N. Tr. Rep. (showing investments in various hedge funds, exchange traded funds, and other funds as of October 31, 2017); Ex. 31, Excerpt from May 2018 N. Tr. Rep. (showing investments in various hedge funds, exchange traded funds, and other funds as of May 31, 2018).

[38] Plaintiff's counsel has claimed that any transactions in third-party funds are irrelevant because Plaintiff only owned an interest in those funds instead of holding title to the securities traded in the funds. *See, e.g.*, Ex. 20 (Ristorucci Dep.) at 294:3-6, 295:24-296:6. But as the court in *In re Groupo Televisa* explained, whether Plaintiff benefited by holding legal title or by holding an interest in a fund makes no difference: "[t]he point is not about title to chattels; it is about whether one whose net worth is increased by a drop in market price is a proper representative of a class of those whose net worth was diminished by it." 2020 WL 3050550, at *7. Plaintiff's representative also admitted that Plaintiff has an economic interest in the holdings of those funds: "So any – any asset, including a short position where our investment – well, where the investment vehicle in which we have an interest gains a profit – our – our there's an overall positive impact on the pension fund." Ex. 20 (Ristorucci Dep.) at 244:18-245:7; *see also id.* at 243:7-244:17.

19

where "[plaintiffs] could have suffered no injury as a result of the alleged discriminatory practices, and they were, therefore simply not eligible to represent a class of persons who did allegedly suffer injury"); *see also Jaffe Pension Plan* v. *Household Int'l, Inc.*, 756 F. Supp. 2d 928, 935 (N.D. Ill. 2010) (collecting cases for the proposition that Rule 10b-5 damages are limited to actual damages, which "require that plaintiffs' losses be netted against their profits attributable to the same fraud").[39]

Nor does it matter that Plaintiff's profits would have been earned on ownership interests in hedge funds or other funds while its alleged losses were from investments in Cardinal Health stock, as courts net profits and losses caused from the same fraud across different assets. *See, e.g.*, *Smith* v. *Fahnestock & Co., Inc.*, 2002 WL 334511, at *3 (S.D.N.Y. Mar. 1, 2002) (damages for a plaintiff who claimed her broker misled her into making unsuitable investments in six stocks were offset by profits from all "similarly unsuitable" investments that she was coerced to enter); *In re Bausch & Lomb*, 244 F.R.D. at 173-74 (netting gains and losses from stocks and bonds); *Minpeco, S.A.* v. *Conticommodity Servs., Inc.*, 676 F. Supp. 486, 490 (S.D.N.Y. 1987) (losses from short positions in silver futures offset by gains on physical silver holdings).

The "questionability" of Plaintiff's economic losses also renders it atypical because determining Plaintiff's actual financial interest—if doing so is even possible—would be a painstaking process that will consume significant time and attention in this litigation. *See In re Bridgestone Inv. Corp. Ltd.*, 2019 WL 1455334, at *2 (N.D. Cal. Apr. 2, 2019) (proposed lead

---

[39] *See also, e.g.*, *Gordon*, 92 F. Supp. 3d at 201-02 ("'As a general rule, plaintiffs cannot claim damages where the same fraud alleged to be the cause of a loss also permitted a countervailing gain. In other words, where both a plaintiff's losses and gains derived from a single causal event, the losses it sustains are netted against all of that plaintiff's gains.'").

plaintiff had problems of adequacy and atypicality because its "total loss was uncertain and could not be readily ascertained"); *In re Cardinal Health*, 226 F.R.D. at 308 ("proving damages and typicality w[ould] be the bête noir" of two plaintiffs that had net gains during the class period); *Baffa*, 222 F.3d at 59 (a plaintiff "'subject to unique defenses which threaten to become the focus of the litigation'" is atypical).

Plaintiff's uncertainty that it suffered any economic loss further subjects Plaintiff to the "unique defense" of lack of standing because Plaintiff may have "experienced a net profit during the Class Period" and thus "did not suffer injury from the alleged fraud." *Makor Issues & Rts., Ltd.* v. *Tellabs, Inc.*, 256 F.R.D. 586, 599-600 (N.D. Ill. 2009) (finding proposed class representative atypical and inadequate where representative was subject to lack of standing defense); *see also In re Quarterdeck Off. Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *3 (C.D. Cal. Sept. 30, 1993) (denying class certification where "lack of standing would be a unique defense which would absorb a considerable amount of plaintiffs' time and divert attention from the other claims"); *Doshi* v. *Gen. Cable*, 2017 WL 5178673, at *4 (E.D. Ky. Nov. 7, 2017) (rejecting lead plaintiff candidate that would be "subject to a standing defense").[40]

Notably, the Court need not actually find that Plaintiff lacks standing to determine that Plaintiff is inadequate and atypical, but rather only that the defense is "'likely to consume a significant portion of the litigant's time and energy and . . . there is a danger that preoccupation with defenses unique to the representative[ ] will cause absent class members to suffer.'" *Makor Issues & Rts.*, 256 F.R.D. at 600; *see also, e.g.*, *Shiring*, 244 F.R.D. at 314 ("'[I]t does not matter

---

[40] *See also, e.g.*, *Katz* v. *Comdisco, Inc.*, 117 F.R.D. 403, 407 (N.D. Ill. 1987) ("One such unique defense that precludes a plaintiff from representing a class is lack of standing."); *In re Bos. Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 30 (D. Mass. 2008) (denying class certification where lead plaintiffs "could only have benefitted from an overvaluation of [Defendant's] stock," and as such, "failed to demonstrate individual injury [and] standing").

whether a unique defense ultimately will prove meritorious,' instead, the presence of an arguable defense is sufficient to find atypicality."). "The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J. H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980); *see also, e.g.*, *Alaska* v. *Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997) (upholding denial of class certification because named plaintiffs were "subject to unique defenses which could skew the focus of the litigation").

Here, determining Plaintiff's economic exposure to Cardinal Health stock will require significant time and energy. As Plaintiff explained, it does not have any visibility into the underlying transactions undertaken by the hedge funds and other funds in which it invested. Ex. 20 (Ristorucci Dep.) at 219:14-18, 223:4-20, 265:25-269:24, 275:24-276:8, 283:11-286:13, 292:8-293:16. In some cases, these funds even invested in other funds, which makes the problem of determining Plaintiff's economic exposure to Cardinal Health stock even more complex. *Id.* at 284:6-23. As Plaintiff explained, it may not be possible to obtain information about the securities transactions in all the funds in which Plaintiff invested, and will likely require seeking information from each of the individual funds throughout the Class Period. *Id.* at 241:21-242:16 ("It's possible in some cases, yes, but in some cases, maybe not.").

Plaintiff's alleged $2.1 million in losses "w[ill] be vigorously contested by Defendants" in light of Plaintiff's large investments in hedge funds and other funds that possibly shorted or traded options in Cardinal Health stock, thus raising "significant problems with [Plaintiff's] adequacy or typicality." *In re Bridgestone*, 2019 WL 1455334, at *2. Given those investments, Plaintiff is inadequate and atypical because (1) it has not shown that it suffered the same injury as the class it seeks to represent, and (2) these investments subject Plaintiff to unique defenses

22

regarding damages and lack of standing that will significantly distract from prosecution of the action to the detriment of the class.

### C. Plaintiff's purchases of Cardinal Health stock following the alleged corrective disclosures and after the end of the Class Period subject it to unique defenses.

"'[A] person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative.'" *Rocco* v. *Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007); *Berwecky* v. *Bear, Stearns & Co., Inc.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000) (holding that class representatives were subject to "unique defenses" where they purchased shares "after the allegations of fraudulent behavior [ ] became public knowledge").[41]

Here, Plaintiff allowed its investment managers to continue purchasing Cardinal Health stock after the alleged corrective disclosures and after Plaintiff joined this litigation. Ex. 20 (Ristorucci Dep.) at 83:7-16. Indeed, Plaintiff purchased over 10,000 shares of Cardinal Health stock in the six days after the August 2, 2017 alleged corrective disclosure, and a total of over 29,000 shares between August 2, 2017 and May 3, 2018, the date of the second alleged corrective disclosure. *See* Pl.'s Certification, ECF No. 13-4, PageID # 242-43. Plaintiff also purchased Cardinal Health stock after the second corrective disclosure and even after this litigation commenced. *See, e.g.*, Ex. 32, Rhumbline Trading Ledger (showing purchases of 90 shares from July 2018 to September 2018); Ex. 33, State Street Trading Ledger (showing

---

[41] *See also Rolex Emps. Ret. Tr.* v. *Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (denying class certification because lead plaintiff continued to trade in the stock after learning of the alleged fraud, including six months after the end of the class period); *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *6-7 (S.D.N.Y. July 3, 2013) (denying class certification where "all three named plaintiffs continued to make purchases of the securities at issue following the alleged 'truthful' disclosure"); *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, at *6 (N.D. Cal. Mar. 14, 1996) (finding that plaintiffs who had purchased stock after corrective disclosure were atypical).

purchase of 200 shares on May 16, 2018); Ex. 34, Boston Partners Trading Ledger (showing purchase of 148 shares on May 15, 2018). One investment manager purchased 6,900 shares of Cardinal Health on behalf of Plaintiff in December 2020 (two months after Plaintiff filed its Complaint), and continued to hold those shares at least as of December 2021. Ex. 35, LSV Trading Ledger. Plaintiff never told any of its investment managers to divest or to stop purchasing Cardinal Health stock because of any alleged fraud by Cardinal Health. Ex. 20 (Ristorucci Dep.) at 83:7-16, 313:14-18.[42]

This trading activity "undermines any causal nexus between the Defendants' alleged misrepresentation[s] and the resulting injury." *In re Cardinal Health*, 226 F.R.D. at 310; *see also China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 ("Such post-disclosure purchases can both defeat typicality and adequacy as well as rebut the presumption that plaintiff relied on the alleged misrepresentations or the integrity of the market in making his or her purchases."). It also calls into question Plaintiff's credibility in asserting the claims of fraud alleged in the Complaint, given that Plaintiff continued to invest in the company after bringing its suit.

## II.   PLAINTIFF DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(B)(3).

The only subdivision of Rule 23(b) that Plaintiff claims to have satisfied is Rule 23(b)(3), *see* Pl. Br. at 2,[43] which requires proof that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). As the Supreme Court has observed, "Rule 23(b)(3) [is] 'an adventuresome innovation,'" and its "predominance criterion is even more demanding than Rule 23(a)."

---

[42] *See also* Ex. 6 (McGirr Dep.) at 377:13-18; Ex. 7 (Smith Dep.) at 345:8-13; Ex. 8 (Agne Dep.) at 225:2-24; Ex. 9 (Swaminathan Dep.) at 241:18-242:7, 243:12-25.

[43] Mem. in Supp. of Lead Pl.'s Mot. for Class Certification, ECF No. 72-2, PageID # 3599-627.

*Comcast*, 569 U.S. at 34 (quoting *Wal-Mart*, 564 U.S. at 362). Before any grant of class certification, the Court has a "duty to take a 'close look' at whether common questions predominate over individual ones" and whether the plaintiff has met the "demanding" criterion of Rule 23(b)(3). *Id.*

### A. Plaintiff has not proven that damages can be measured on a classwide basis consistent with its theories of liability.

To satisfy predominance, a plaintiff must establish by "evidentiary proof" that its alleged damages are "capable of measurement on a classwide basis" by a methodology that is consistent with the plaintiff's theories of liability. *Comcast*, 569 U.S. at 33-34. In *Comcast*, the Supreme Court stressed that the damages methodology "must measure *only* those damages" attributable to the plaintiff's theory of liability and not "damages that are not the result of the wrong." *Id.* at 35, 37 (emphasis added). It is also critical that the damages model not be "speculative" or "arbitrary" because this would "reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 35-36. Put simply, "[n]o damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013). Here, the vague damages methodology proffered by Dr. Feinstein falls "far short of establishing that damages are capable of measurement on a classwide basis," and class certification may be denied on that basis alone. *See Comcast*, 569 U.S. at 34.

### 1. Dr. Feinstein's vague damages methodology is "no model at all" and therefore fails to satisfy *Comcast*.

Dr. Feinstein's proposed damages "methodology" is briefly described in a few paragraphs in his report. Ex. A, Feinstein Rep. ¶¶ 147(i)-(vii). The methodology consists of the generic assertion that Dr. Feinstein would apply "valuation tools," which would "include event study analysis" and "potentially other empirical analyses"—which are not specified or described—to examine if the alleged corrective disclosures caused Cardinal Health's stock price

25

to fall. *Id.* ¶ 147(i). He would then construct "an inflation ribbon," again using "empirical analysis and valuation tools"—again not specified or described. *Id.* ¶ 147(ii). And while Dr. Feinstein states that "[t]he inflation ribbon is often constructed by working chronologically backwards," he does not specify whether he would actually apply the "working backwards" approach here or some other unidentified method. *Id.*

Dr. Feinstein at no point explains what unspecified "valuation tools" and "empirical analyses" he would *actually use* to calculate damages, or *how* any such valuation tools would be applied. He vaguely assures that "to the extent that there may be specific issues complicating the quantification of artificial inflation," then "tools of valuation analysis can be applied," but he never identifies what such complicating issues may be or what "tools" may be required to address them. *Id.* ¶ 144. To the contrary, Dr. Feinstein admitted during his deposition that, apart from an event study, he *does not know* what "valuation tools" might be applied in this case, or even if any "valuation tools" would be necessary at all:

> Q. . . . My question is: Have you determined yet whether circumstances will require the application of any valuation tools, apart from an event study, with respect to the first step in your proposed damages methodology?
>
> A. No. No. I mean, it's possible that no valuation tools will be necessary, or it's also possible that the full toolkit of valuation tools will be brought to – will be necessary. So I haven't made that determination yet. . . .
>
> Q. So at this point in time, you don't know what tools you'll actually end up taking out of your toolbox in this case, correct?
>
> A. I think that's fair to say.

Ex. 23 (Feinstein Dep.) at 90:18-91:4, 95:1-4.

Dr. Feinstein's vague references to "valuation tools" and "empirical analyses" fail to provide evidence from which the Court can conclude that his proposed methodology will "measure *only* those damages attributable" to plaintiff's theory of liability as required by

*Comcast*.  569 U.S. at 35 (emphasis added).  To the contrary, these are the type of vague assurances that damages will somehow be calculated later that courts have rejected.  *See Loritz* v. *Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (finding that plaintiffs' description of "general techniques for computing damages in securities fraud cases" that "fails to tie these theories to the facts of this case or to each other" insufficient under *Comcast*).[44]

Indeed, the Northern District of Ohio rejected substantially the same damages model—also proffered by Dr. Feinstein—as "general and vague" and "no damages model at all" in *Ohio Public Employees Retirement System* v. *Federal Home Loan Mortgage Corp.*, No. 4:08-cv-0160, 2018 WL 3861840, at *19-20 (N.D. Ohio Aug. 14, 2018) ("*Freddie Mac*") (Pearson, J.).  As he does here, Dr. Feinstein in *Freddie Mac* vaguely claimed that he would rely on "valuation tools" to calculate "out-of-pocket" damages.  *Id.* at *19.  The Court denied class certification, explaining that "[w]hen a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts (as did Dr. Feinstein) that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified."  *Id*. (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014)).

Dr. Feinstein conceded that his damages model in this case "is the same" as in *Freddie Mac*.  Ex. 23 (Feinstein Dep.) at 193:17-23.  While he also claimed that his methodology here "is articulated with more specificity," there are no meaningful differences.  *Id.*; *compare* Ex. 36, Excerpt of Feinstein Rep. ¶ 152, *Freddie Mac*, No. 4:08-cv-00160-BYP (N.D. Ohio June 12,

---

[44] *See also, e.g.*, *Ft. Worth Emps.' Ret. Fund*, 301 F.R.D. at 141-42 (declining to certify damages class because plaintiffs' expert merely "mention[ed] three methods" and failed to provide the court with "assurance beyond [the expert's] say-so" that "there [was] a damages model that [would] permit the calculation of damages on a classwide basis"); *Sicav* v. *Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (declining to certify class where plaintiffs failed to show, "concretely, how [they] propose[d] to reliably establish damages").

2017), ECF No. 372-3 *with* Ex. A, Feinstein Rep. ¶ 147.  The only additional detail that Dr. Feinstein provides about how he would apply his methodology is a list of the names of possible "valuation tools" that he might apply.  Ex. A, Feinstein Rep. ¶ 146.  But Dr. Feinstein still does not specify—and, indeed, he does not know—which of those valuation tools would be applied in this case, how or why they would be applied, or if any of them would be applied at all.  And he further testified that the list in his report is merely exemplary, and there are in fact *other unspecified tools* that may be required to apply his methodology that are not even referenced.[45, 46]

Dr. Feinstein's methodology is even more deficient here than it was in *Freddie Mac* given the unique complexities to calculating potential damages in this case.  A vague damages model is "particularly problematic" where:

> (1) there are multiple alleged misrepresentations, (2) corrective information was allegedly disclosed at multiple times, (3) corrective information regarding the different alleged misrepresentations was allegedly disclosed on the same day, and (4) some of the allegedly concealed facts arose or were made known to the company (and thus for the first time could have been disclosed) during the class period.

*Loritz*, 2015 WL 6790247, at *22.

---

[45] Ex. 23 (Feinstein Tr.) at 103:3-18 ("Well, the quote said 'the full array,' and [paragraph] 146 is the most commonly used tools.  [Paragraph] 146 specifically says this list is among the commonly used tools.  So there could be additional tools.").

[46] Dr. Feinstein also fails to acknowledge that many of the "valuation tools" he references rely on subjective assumptions and never explains how such tools reliably could be applied in this case. *See* Ex. 1, Lehn Rep. ¶¶ 86-87.  Discounted cash flow analysis, for example, requires estimates of future cash flows and a discount rate.  *Id.* ¶ 86.  Dr. Feinstein does not explain what this tool might be used for or how he would identify appropriate assumptions, and his track record does not reassure.  *See Finkelstein* v. *Liberty Digit., Inc.*, 2005 WL 1074364, at *14-15 (Del. Ch. 2005) ("The problems with [Dr. Feinstein's] DCF analysis are so pervasive and numerous that it is impossible to describe all of them"; "Feinstein's assumptions bear no relationship to reality"; "For these and other reasons too numerous to set forth, I find Feinstein's DCF valuation to be unreliable and to provide no rational insight into [the company's] value"; "Feinstein performed a variety of other aggressive valuations, none of which is reliable.").

All of those complications and more are present here. Plaintiff alleges misrepresentations on 37 specific dates over a class period spanning more than three years—more than two times the length of the class period in *Freddie Mac*—with many dates containing multiple alleged misrepresentations. *See* Compl. ¶ 1 (class period of 38 months); *Freddie Mac*, 2018 WL 3861840, at *1, *13 (class period of just under 17 months with 23 alleged misrepresentation dates). Plaintiff also alleges two corrective disclosures nine months apart and that the first corrective disclosure contained additional misrepresentations. *See* Compl. ¶¶ 68-89, 133-37. Throughout the lengthy Class Period there was also a large volume of "confounding" information released—that is, information affecting Cardinal Health that was unrelated to the alleged misstatements—as well as multiple disclosures about risks and problems related to Cordis. *See* Ex. 1, Lehn Rep. ¶¶ 66, 76-83, Lehn Rep. Exs. 1, 3. Plaintiff further alleges that Defendants only discovered certain information about Cordis in the years after the acquisition, which could not have been disclosed earlier. *Id.* ¶¶ 61-63. Dr. Feinstein makes no attempt to grapple with any of these or other complicating issues. But, as explained in detail by Dr. Lehn and summarized below, a damages methodology that does not address these complications cannot reliably measure only those damages associated with the alleged wrongdoing—it will instead over- or potentially even undercompensate the class—and therefore is insufficient under *Comcast. See generally id.* ¶¶ 31, 60-63, 75-84.

Dr. Feinstein's vague assurances about using unknown "valuation tools" to address any "complicating" factors amount to simply, "Trust me." But that is far from sufficient to carry Plaintiff's burden. *See, e.g.*, *In re ConAgra Foods*, 302 F.R.D. at 552, 577-79 (denying class certification where "[a]lthough the methodologies [the plaintiff's expert] describes may very well be capable of calculating damages in this action, [he] has made no showing that this is the

29

case").  Because Plaintiff has failed to provide the Court with "assurance beyond [the expert's] say-so," Plaintiff has failed to satisfy Rule 23(b)(3).  *Ft. Worth Emps.' Ret. Fund*, 301 F.R.D. at 141-42.

### 2. Dr. Feinstein has not demonstrated a reliable method for establishing whether the alleged misstatements created artificial inflation.

As explained in Dr. Lehn's rebuttal report, Dr. Feinstein will not be able to rely on an event study analysis at the time of the alleged misstatements to demonstrate that those statements caused artificial inflation in Cardinal Health's stock price.  Ex. 1, Lehn Rep. ¶ 34. Dr. Feinstein's own event study analysis shows that there were no statistically significant price increases on 32 of the 37 dates on which Plaintiff alleges misstatements.  Ex. A, Feinstein Rep. at 152-67 (Exhibit 8); *see* Ex. 1, Lehn Rep. ¶ 35, Lehn Rep. Ex. 2.  And on the five alleged misstatement dates where Dr. Feinstein found statistically significant and positive stock price returns, Cardinal Health disclosed information that had already been disclosed previously, and there was confounding information released, and thus there is no reliable basis to conclude that the alleged misrepresentations affected the stock price.  Ex. 1, Lehn Rep. ¶¶ 35-53, Lehn Rep. Ex. 2.

What these findings mean is that it will be much more challenging to reliably estimate any artificial inflation caused by the alleged misstatements in this case.  As Dr. Lehn explains, Dr. Feinstein will need to rely on the stock price declines following the two alleged corrective disclosures to estimate inflation throughout the Class Period.  *Id.* ¶¶ 34, 54.  But given the many complicating factors in this case, discussed in detail by Dr. Lehn and summarized below, the residual declines following the alleged corrective disclosures will not provide a reliable estimate for alleged artificial inflation at earlier points in the Class Period.  *Id.* ¶¶ 31, 54, 57-84. Dr. Feinstein never explains how his proposed damages methodology will address these issues

30

and therefore fails to demonstrate that his methodology will measure damages in a manner consistent with Plaintiff's theories of liability.[47]

### 3. Dr. Feinstein's damages methodology fails to measure damages attributable only to the alleged wrongdoing.

Under *Comcast*, "a model purporting to serve as evidence of damages in [a] class action must measure *only* those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." 569 U.S. at 35 (emphasis added); *see also Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 343, 345 (2005) (courts must evaluate "the tangle of factors affecting [stock] price," because securities laws protect only "against those economic losses that misrepresentations actually cause" and do not provide "broad insurance against market losses"). Here, there are multiple complicating factors that must be addressed in order to reliably measure any damages attributable only to Plaintiff's claims. Dr. Feinstein does not explain how his methodology would be applied to address these issues, and therefore Plaintiff has failed to carry its burden.

Impact of confounding information. Dr. Feinstein does not explain how his methodology will disentangle the effects of the large volume of confounding information released during the Class Period and on the alleged corrective disclosure dates. For example, on August 2, 2017, the date of the first alleged corrective disclosure, Cardinal Health announced, among other things, that Pharmaceutical segment profits decreased due to generic pricing headwinds, the loss of a significant customer contract, and an investment in IT systems—all unrelated to Cordis.

---

[47] Indeed, not only does Dr. Feinstein fail to address this issue, he also does not discuss how he would adjust his methodology to estimate the impact of alleged affirmative misstatements versus omissions, or statements that were a combination of both, which require different methods of analysis. *See* Ex. 1, Lehn Rep. ¶ 32.

*See* Ex. 1, Lehn Rep. ¶ 82. Securities analysts expressed concerns about the Pharmaceutical segment, and Plaintiff's own investment manager was more concerned about the Pharmaceutical segment in discussions with Cardinal Health management on the same day. *See id.*[48] There was also confounding information released on the date of the second alleged corrective disclosure (May 3, 2018), as well as on the dates of the alleged misstatements. *See id.* ¶¶ 41, 45, 47, 49, 51, 76-79, 83.

The problem of confounding information is particularly significant in this case given that Cordis was only a small portion of Cardinal Health's business. *Id.* ¶¶ 15, 75. As a result, Cardinal Health made many disclosures about other aspects of its business, and disclosures about the much larger Pharmaceutical segment likely had a significant impact on the stock price.[49] *See id.* ¶¶ 75-84, Lehn Rep. Ex. 1. Drs. Lehn and Feinstein agree that an event study analysis is insufficient to address the effects of confounding information. *See id.* ¶ 81; Ex. 23 (Feinstein Dep.) at 98:1-8.[50] But other than vague allusions to other unspecified "valuation tools,"

---

[48] Ex. 6 (McGirr Dep.) at 316:1-318:18; *see also* Ex. 7 (Smith Dep.) at 336:22-337:6 (stating that "generic pricing was the main contributing factor" affecting the stock price of Cardinal Health in August 2017).

[49] For example, Plaintiff's investment manager testified that "when looking at Cardinal's financials, the performance of the pharmaceutical business just had a greater impact" because the Medical segment is "just a smaller component of the business." Ex. 6 (McGirr Dep.) at 179:17-23. *See also, e.g., id.* at 161:12-162:3, 259:2-261:12, 307:14-308:4; Ex. 7 (Smith Dep.) at 96:22-97:7, 182:24-183:7 ("Cordis and the medical piece would have been so small, I probably would not have dug very far into it. I would have spent more time on the drug distribution pharmaceutical side."), 191:22-192:3 ("The medical segment is much smaller than the pharmaceutical segment. So even good performance there would not be enough to overcome bad performance on the pharmaceutical side.").

[50] "Q. Can the event study, by itself, control for potentially non-fraud-related information? A. Okay. If – you're asking there, does the t-test by itself – the statistical t-test, does it account for non – does it disaggregate non-fraud related confounding information. No, the t-test itself will not disaggregate the non-fraud related confounding information." Ex. 23 (Feinstein Dep.) at 98:1-8.

32

Dr. Feinstein does not explain how his methodology will account for confounding information. *See* Ex. A, Feinstein Rep. ¶ 147(i).

<u>Impact of changing information about Cordis</u>. Plaintiff alleges that the Defendants discovered information about issues at Cordis in the years following the acquisition. *See* Ex. 1, Lehn Rep. ¶¶ 61-63. Therefore, the stock price decline on the alleged corrective disclosure dates likely "reflected the market's reaction to facts that could not possibly have been disclosed" during earlier points in the Class Period. *Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 728 n.27 (11th Cir. 2012). To the extent the residual stock price decline following a corrective disclosure reflected the market's reaction to information that was not known during the entire Class Period, the stock price decline will overestimate the amount of artificial inflation at earlier points in the Class Period, and thus overestimate potential damages. *See* Ex. 1, Lehn Rep. ¶ 60. Dr. Feinstein offers no explanation regarding how his methodology will address this issue.

<u>Impact of known versus unknown risks</u>. Dr. Feinstein does not explain how his methodology will parse the price impact of known versus allegedly undisclosed risks. As Dr. Lehn explains, it is widely recognized that acquisitions have risks and expected synergies are often not achieved, *id.* ¶ 65, and Dr. Feinstein acknowledged that sophisticated investors and analysts would have understood that acquisitions often are not successful, Ex. 23 (Feinstein Dep.) at 211:14-21. Cardinal Health also disclosed information throughout the Class Period concerning risks and challenges associated with Cordis. *See* Ex. 1, Lehn Rep. ¶ 66, Lehn Rep. Ex. 3. Securities analysts, as well as Plaintiff's investment managers, were aware of these risks. *Id.* ¶¶ 67-68.[51]

---

[51] *See, e.g.*, Ex. 6 (McGirr Dep.) at 149:14-150:3, 159:1-160:2, 174:1-12, 200:1-202:3; Ex. 7 (Smith Dep.) at 1561:1-3; 157:24-158:2, 263:9-264:23; Ex. 8 (Agne Dep.) at 139:14-141:12, 145:15-147:24, 173:3-8, 180:25-184:21; Ex. 9 (Swaminathan Dep.) at 150:21-151:14.

To the extent that the alleged corrective disclosures represented the materializations of known risks concerning the Cordis acquisition (in whole or in part), it would not be appropriate to use the entire residual decline in Cardinal Health's stock price to estimate artificial inflation. *Id.* ¶¶ 64, 69; *see also Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 689-90 (5th Cir. 2015).  This is because the stock price decline following the materialization of a risk reflects the 100% certainty that the risk would occur.  As a result, a damages methodology that uses the residual decline following the corrective disclosures to estimate artificial inflation earlier in the Class Period will likely overestimate damages.  Ex. 1, Lehn Rep. ¶ 73.  Moreover, investors' perception of the risk associated with the Cordis acquisition was also likely changing during the lengthy Class Period, which would affect the valuation impact of alleged misrepresentations.  *Id.* ¶¶ 70-71.  Dr. Feinstein's methodology does not address any of these issues.

Impact of changing value of information.  The value of any disclosures about Cordis also likely changed during the course of the over-three-year Class Period.  *See id.* ¶¶ 58-59.  For example, Cardinal Health made other acquisitions after the Cordis transaction, and announced the larger $6.1 billion acquisition of Medtronic's Patient Recovery business in April 2017.[52]  As a result, securities analysts and investors began to interpret information about Cordis as indicating potential problems with those other acquisitions, thus changing the likely valuation impact of information about Cordis.  Ex. 1, Lehn Rep. ¶¶ 17, 59.  Dr. Feinstein admitted that a given piece of information could have a different valuation impact at different times in the Class Period, but his methodology fails to address how it would adjust artificial inflation to account for the changing value of information.  Ex. 23 (Feinstein Dep.) at 235:6-236:24.

---

[52] Ex. 37, Apr. 18, 2017 Form 8-K at 3910.

34

Impact of mismatched disclosures.  Dr. Feinstein does not explain how he will account for mismatches between the contents of the alleged misrepresentations and corrective disclosures.  For example, Plaintiff alleges that Defendants misrepresented that the Cordis acquisition would be accretive by $0.20 in fiscal 2017.  *See, e.g.*, Compl. ¶¶ 31-32, 43, 48, 53.  However, on August 2, 2016, Cardinal Health lowered the expected accretion to $0.15.  Ex. 10, Aug. 2, 2016 Tr. at 5038.  The alleged corrective disclosure on August 2, 2017, which announced that Cordis missed the $0.15 accretion target, therefore could not have corrected any misstatement prior to August 2, 2016.  Ex. 1, Lehn Rep. ¶ 74.  As a result, the stock price decline following that corrective disclosure is not a reliable estimate of alleged inflation present prior to August 2, 2016.  *Id.*  Dr. Feinstein does not explain how his methodology will address this issue.

Impact of individual misrepresentations.  It is possible that some of the alleged misrepresentations may be found inactionable at summary judgment or trial.  A damages model that measures damages attributable only to the alleged wrongdoing would need to isolate the valuation impact of only those alleged misstatements that remain in the case.  In addition, without a methodology that can reliably estimate the alleged inflation associated with individual misstatements, Dr. Feinstein will be unable to reliably estimate artificial inflation on each day of the Class Period.  *Id.* ¶ 56.  Dr. Feinstein's methodology does not address these issues.

### 4. Dr. Feinstein's opinion is unreliable because he is financially beholden to Plaintiff's counsel Robbins Geller.

A plaintiff cannot satisfy its burden to establish predominance simply by proffering an expert witness' "say-so."  *Ft. Worth Emps.' Ret. Fund*, 301 F.R.D. at 142.  But here the proffered "say-so" carries even less weight—because Dr. Feinstein is personally financially beholden to Robbins Geller.

35

Dr. Feinstein is the founder and sole owner of Crowninshield Financial Research—the firm being compensated by Robbins Geller for expert services in this case.  Ex. 23 (Feinstein Dep.) at 23:10-16; Ex. A, Feinstein Rep. ¶¶ 6, 16.  In each of the last four years, Dr. Feinstein earned between two-thirds to 90 percent of his income from Crowninshield.  Ex. 23 (Feinstein Dep.) at 27:18-28:8.  And Robbins Geller is by far Dr. Feinstein's biggest client:  *in 21 of the 33 cases* where Dr. Feinstein provided testimony in the last four years, he was hired by Robbins Geller.  *Id.* at 33:7-43:10, 44:4-12.  Indeed, Dr. Feinstein estimated that over the past four years, "*in the neighborhood of 50 percent*" of Crowninshield's fees came from Robbins Geller.  *Id.* at 44:22-45:2.

"Bias is always relevant in assessing a witness's credibility."  *Schledwitz* v. *United States*, 169 F.3d 1003, 1015 (6th Cir. 1999).  A witness's bias or interest may be inferred from "'all facts and circumstances which, when tested by human experience tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only.'"  *In re Davol, Inc / C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, Nos. 2:18-mc-2846 (EAS), 2:18-cv-01320 (EAS), 2021 WL 5881775, at *2 (S.D. Ohio Dec. 13, 2021).  Dr. Feinstein has a powerful economic incentive to remain in favor with his largest client, Robbins Geller, and his opinion as an expert witness is therefore not credible.

### B. The continual disclosures of new information about Cordis and changing circumstances during the lengthy Class Period create individualized issues that defeat predominance.

The materiality of any alleged misstatement turns on the "total mix of information made available."  *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988)).  When there are continual disclosures of information over a lengthy class period, an investor who purchased early in the class period "would face a different question of proof on the materiality issue" than a later purchaser "after a great deal more

36

information concerning [the subject of the disclosures] was available." *J. H. Cohn & Co.*, 628 F.2d at 998.[53]  Here, the Class Period covers over three years.  During that time, Cardinal Health regularly disclosed information about challenges and risks at Cordis, including when it disclosed a reduced accretion estimate on August 2, 2016, when it disclosed increased SG&A expenses and an increase in an inventory reserve on May 1, 2017, and in the first alleged corrective disclosure on August 2, 2017, among other continuing disclosures.  *See* Ex. 1, Lehn Rep. ¶¶ 21, 66, Lehn Rep. Ex. 3; *see also supra* pp. 4-6.  As a result, investors who purchased Cardinal Health stock later in the Class Period had more information available about issues at Cordis than those who purchased shortly after the acquisition was announced.  This creates "different question[s] of proof on the materiality issue" for class members who purchased at different times that defeat predominance.  *J. H. Cohn & Co.*, 628 F.2d at 998; *see also Zandman* v. *Joseph*, 102 F.R.D. 924, 928 (N.D. Ind. 1984) (denying class certification where plaintiffs alleged at least 22 disclosures over 27-month class period because "the questions at issue in plaintiffs' 10b–5 claims—falsity, materiality and scienter—would vary significantly at every stage in the alleged class period.").

Likewise, Plaintiff alleges that Defendants' knowledge about issues as well as the circumstances at Cordis were changing during the Class Period.  *See, e.g.*, Compl. ¶¶ 67(a)(ii)(2)-(4), 71; Ex. 1, Lehn Rep. ¶ 61.  As a result, proof of scienter and falsity will also necessarily vary for purchasers at different times during the Class Period.  *See J. H. Cohn & Co.*, 628 F.2d at 998 ("a purchaser early in the period would face different proof concerning the defendants' willfulness or recklessness in issuing or omitting to issue material information than a

---

[53] *See also Morris* v. *Wachovia Sec., Inc.*, 223 F.R.D. 284, 300-01 (E.D. Va. 2004) (denying class certification because "materiality will involve a piecemeal and individualized assessment of the import of any given disclosure to each member of the purported subclass").

purchaser later in the period"); *Zandman*, 102 F.R.D. at 928-29 (denying class certification where circumstances related to the alleged misrepresentations were changing over the course of the class period).  These individualized issues of materiality, scienter, and falsity are not subject to classwide proof, and therefore predominance is not met.  *See Gelman* v. *Westinghouse Elec. Corp.*, 73 F.R.D. 60, 67 (W.D. Pa. 1976) (denying class certification where company's circumstances and defendants' knowledge changed over time because "the extent of the company's duty to disclose, the materiality of the alleged nondisclosures and even the various defendants' intent or 'scienter' will require substantially individualized determinations").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for class certification. Because of the issues involved, Defendants believe that oral argument would be helpful and therefore request that the Court hold oral argument on the motion for class certification.

June 3, 2022

/s/ Robert W. Trafford by
David S. Bloomfield, Jr.
Robert W. Trafford (0024447)
Trial Attorney
David S. Bloomfield, Jr. (0068158)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2800
Columbus, OH  43215
Tel.:  (614) 227-2000
Fax:  (614) 227-2100
Email:  rtrafford@porterwright.com
        dbloomfield@porterwright.com

William Savitt (*pro hac vice*)
Lauren M. Kofke (*pro hac vice*)
Alexandra P. Sadinsky (*pro hac vice*)
Elizabeth N. Brandt (*pro hac vice*)
Danika L. Kritter (*pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
Tel:  (212) 403-1000
Fax:  (212) 403-2000
Email:  wdsavitt@wlrk.com
        lmkofke@wlrk.com
        apsadinsky@wlrk.com
        enbrandt@wlrk.com
        dlkritter@wlrk.com

Edward J. Jacobs
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY  10111
Tel:  (212) 589-4674
Fax:  (212) 589-4201
Email:  ejacobs@bakerlaw.com

*Attorneys for Defendants*

39

## CERTIFICATE OF SERVICE

I certify that on this 28th day of June, 2022, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following:

Of Counsel:

ROBBINS GELLER RUDMAN
 & DOWD LLP
Spencer A. Burkholz (admitted PHV)
Laurie L. Largent (admitted PHV)
Jennifer N. Caringal (admitted PHV)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
jcaringal@rgrdlaw.com


*Lead Counsel for Lead Plaintiff*

JOSEPH F. MURRAY
MURRAY MURPHY MOUL + BASIL LLP
1114 Dublin Road
Columbus, OH  43215
E-mail:  murray@mmmb.com

*Attorneys for Plaintiffs*

                    /s/ David S. Bloomfield, Jr.
                    David S. Bloomfield, Jr. (0068158)

40