# EXHIBIT 1

CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LOUISIANA SHERIFFS' PENSION & RELIEF FUND**, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>**CARDINAL HEALTH, INC.**, et al.,<br><br>Defendants. | **Case No. 2:19-cv-3347**<br><br>Judge Edmund A. Sargus<br><br>Magistrate Judge Elizabeth A. Preston Deavers |

**EXPERT REBUTTAL REPORT OF KENNETH M. LEHN**

**June 3, 2022**

CONFIDENTIAL

# Table of Contents

I.    Qualifications.................................................................................................................3

II.   Assignment and Summary of Conclusions...................................................................4

III.  Background....................................................................................................................5

     A.   Plaintiff's Allegations.........................................................................................5

     B.   Feinstein Report and Proposed Damages Methodology.....................................6

     C.   Company Background..........................................................................................8

     D.   Estimating "Out-of-Pocket" Damages...............................................................14

IV.  Professor Feinstein Has Not Demonstrated That Alleged Class-Wide Damages Can Be Calculated Subject to a Common and Reliable Methodology Consistent With Plaintiff's Claims. .......................................................................................................................19

     A.   Professor Feinstein does not articulate how he will measure artificial inflation for "out-of-pocket" damages calculation and tie it to the alleged misrepresentations. Without such an articulation, it is impossible to determine whether his purported methodology is consistent with Plaintiff's claims...................20

     B.   Professor Feinstein's proposed methodology does not allow him to reliably establish that any alleged affirmative misstatements caused Cardinal Health's stock price to be artificially inflated. ..........................................................21

     C.   Professor Feinstein's proposed methodology does not establish that he can reliably disaggregate the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates such that he can estimate how much artificial inflation allegedly was caused by each individual alleged misrepresentation..................................................................................................32

     D.   Professor Feinstein's proposed methodology does not establish that he will be able to reliably estimate how much of the residual decline in Cardinal Health's stock price on the alleged corrective disclosure dates can be tied to the alleged misrepresentations. ..............................................................................33

         1.   Professor Feinstein's proposed methodology does not provide a reliable measure of the value of information that could have been disclosed earlier in the proposed Class Period.......................................................... 33

         2.   Professor Feinstein's proposed methodology does not establish that he will be able to reliably account for information revealed by the alleged corrective disclosures that could not have been known earlier during the proposed Class Period........................................................... 34

     E.   Professor Feinstein's proposed methodology does not describe how he will parse the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates to account for the materialization of known versus unknown risks....................................................................................................37

     F.   Professor Feinstein's proposed methodology does not describe how he will reliably account for the information disclosed on the alleged corrective

**CONFIDENTIAL**

disclosure dates and match it to information that could have and should have been disclosed at the beginning of the proposed Class Period. ...................................45

G.   Professor Feinstein's proposed methodology does not describe how he will reliably parse the effects of the alleged affirmative misstatements and corrective disclosures from the corresponding effects of confounding information. ...........................................................................................................46

H.   Professor Feinstein asserts that "standard valuation tools" could be used to calculate damages, but he does not provide specific details about how any of the purported tools could be used to reliably estimate damages. ...............................56

**CONFIDENTIAL**

### I.      Qualifications

1.      I am Professor Emeritus of Finance in the Joseph M. Katz Graduate School of Business at the University of Pittsburgh. From 1999-2020, I held the Samuel A. McCullough Chair in Finance at the University. During my academic career I taught undergraduate and graduate level courses in finance, including courses on corporate finance, mergers and acquisitions, corporate restructuring, corporate governance, and business valuation. I also was an affiliated professor in the school of law at the University of Pittsburgh from 1997 to 2020. I have published more than 50 scholarly papers, including many on mergers and acquisitions. I have served on the editorial boards of several scholarly journals and am a founding editor of the *Journal of Corporate Finance*.

2.      Before joining the faculty at the University of Pittsburgh, I was chief economist of the Securities and Exchange Commission ("SEC") from 1987 to 1991 and deputy chief economist at the SEC from 1984 to 1985. During my tenure at the SEC, I worked on various policy issues related to mergers and acquisitions. Since leaving the SEC, I have been retained by counsel for parties in litigation to opine on, among other issues, valuation, loss causation, and damages.

3.      I received a B.A. in economics from Waynesburg College in 1975, an M.A. in economics from Miami University in 1976, and a Ph.D. in economics from Washington University in 1981.

4.      My curriculum vitae, which lists my publications and testimony, is attached hereto as **Appendix A**.

5.      I have been assisted by Compass Lexecon's professional staff. **Appendix B** lists materials that I have relied upon in forming my opinions in this matter. My analyses and opinions are based solely on the work performed by me and those under my direction. I am being

**CONFIDENTIAL**

compensated for my work on this matter at a rate of $1,250 per hour. I also expect to receive compensation from Compass Lexecon for my work on this matter. None of my compensation is contingent on my opinions or the outcome of this case.

## II.    Assignment and Summary of Conclusions

6.    I have been retained by counsel for Defendants to evaluate whether Plaintiff's expert Professor Steven P. Feinstein has proposed a damages methodology that can be applied on a class-wide basis to reliably measure damages in a manner that is consistent with Plaintiff's theories of liability in this case. Based on my review and analysis, as well as my expertise and experience, I have concluded that Professor Feinstein has not proposed such a methodology for the following reasons:

- The methodology proposed by Professor Feinstein does not explain how he will reliably measure artificial inflation and tie it to specific alleged misrepresentations. As a result, if the Court finds that only some of the alleged misrepresentations are actionable, then Professor Feinstein has not provided a reliable methodology to estimate damages.

- Professor Feinstein's proposed methodology does not explain how he will reliably establish that the alleged affirmative misstatements caused Cardinal Health's stock price to be artificially inflated, nor does it describe how he will calculate the amount of any such inflation on each day of the Class Period. Contrary to his claim that he can rely on the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates to construct an inflation ribbon, he has not set forth a methodology that describes how he will use these residual declines to reliably measure the amount of inflation throughout the more than three-year Class Period.

- Professor Feinstein's proposed methodology, as he describes it, is not capable of estimating the changing value of information related to Cordis during the Class Period. Moreover, Professor Feinstein's proposed methodology does not establish that he will be able to account for information revealed by the alleged corrective disclosures that could not have been known earlier during the Class Period. Thus, he fails to establish how his proposed methodology can reliably measure the fluctuating stock price impact of the alleged misrepresentations or Plaintiff's allegations that Defendants' knowledge concerning Cordis changed during the course of the Class Period.

- Professor Feinstein's proposed methodology does not explain how he will reliably parse the effect of the materialization of known versus unknown risks on Cardinal Health's stock price on the alleged corrective disclosure dates.

4

**CONFIDENTIAL**

- Professor Feinstein's proposed methodology does not explain how he will reliably parse the effects of the alleged misrepresentations and/or corrective disclosures on Cardinal Health's stock price from the corresponding effects of confounding information.

- Professor Feinstein asserts that "standard valuation tools" could be used to calculate damages despite any complexities presented by this case, but he does not provide details about how the purported tools could be used to reliably estimate damages in a manner consistent with Plaintiff's claims or even which of the purported tools would be applied.

I elaborate on and provide the bases for my opinions in the remainder of this report.

## III. Background

### A. Plaintiff's Allegations

7.     Plaintiff 1199 SEIU Health Care Employees Pension Fund ("Plaintiff") filed this lawsuit on behalf of all purchasers of Cardinal Health, Inc. ("Cardinal Health" or the "Company") common stock during the period of March 2, 2015 through May 2, 2018 ("Class Period") against Cardinal Health and certain of its current and former executives (collectively, "Defendants") for violations of §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934.[1] Plaintiff alleges that, throughout the Class Period, Defendants "misrepresented that they conducted adequate due diligence of Cordis, and that Cardinal was able to implement, and was implementing, its supply chain expertise and inventory management solutions worldwide at Cordis, which would drive sales growth and reduce any of Cordis's expired and lost products, and lower Cordis's managed inventory levels."[2] Plaintiff also alleges that "Defendants … misrepresented that the Cordis integration was on track and that Cordis was performing well and as expected."[3] Plaintiff claims that Defendants' statements were "materially false and misleading because … Cordis's inventory controls and demand forecasting capabilities were materially

---

[1] Louisiana Sheriff's Pension & Relief Fund v. Cardinal Health, Inc., et al. Consolidated Amended Complaint for Violations of the Federal Securities Laws, September 8, 2020 ("Complaint"), at 1.

[2] Complaint, ¶ 2.

[3] Complaint, ¶ 2.

5

**CONFIDENTIAL**

deficient before the acquisition and for two and a half years afterward and Defendants knew these facts all along."[4]

8. Plaintiff claims that, on August 2, 2017, the alleged truth was partially revealed when "Cardinal reported weak earnings for its 4Q and FY 2017 and lowered its earnings guidance for fiscal year 2018 due to lost sales and cost issues including 'higher-than-planned write-offs for excess' inventory at Cordis."[5] Plaintiff further claims that, on May 3, 2018, Defendants announced "lower-than-expected earnings for Cardinal's third quarter fiscal year 2018 due to the poor performance of its Cordis business and an increase in inventory reserves" and the "Company also reduced expected earnings for FY 2018 and told investors that Cordis would not be profitable until the end of FY 2019."[6]

### B.    Feinstein Report and Proposed Damages Methodology

9. On March 25, 2022, Plaintiff submitted a report by Professor Steven P. Feinstein as an exhibit to Plaintiff's Motion for Class Certification.[7] In that report, Professor Feinstein concludes that "Section 10(b) and Section 20A damages in this matter can each be computed for all Class members using a common methodology for each respective cause of action that is consistent with Plaintiff's theory of liability."[8]

10. To calculate Section 10(b) damages, Professor Feinstein proposes to use what he describes as "the out-of-pocket damage methodology,"[9] wherein "damages are measured as the

---

[4] Complaint, ¶ 3.

[5] Complaint, ¶ 133.

[6] Complaint, ¶ 134.

[7] Lead Plaintiff's Motion for Class Certification, March 25, 2022 and Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA, March 24, 2022 ("Feinstein Report").

[8] Feinstein Report, ¶ 19.

[9] Feinstein Report, ¶ 141.

**CONFIDENTIAL**

difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale."[10] He further states that "[a]rtificial inflation is the difference between the observed market price of a security and what that price would have been but for the misrepresentations and omissions."[11] Professor Feinstein concludes that "[e]conomic analyses, including valuation and empirical event study analysis, can be used to estimate the relationship between specific statements or sets of statements and the subsequent effect on prices, in the case of affirmative statements, omissions, and/or corrective disclosures. As such, class-wide damages in response to the specific misrepresentations and omissions ultimately established by the Plaintiff can be calculated in a straightforward manner common to all Class members."[12]

11. More specifically, Professor Feinstein states that he will use "valuation tools, which would include event study analysis, and potentially other empirical analyses … to establish if the disclosures correcting the alleged misrepresentations and omissions, caused the price of Cardinal stock to fall."[13] He further claims that he will construct "an inflation ribbon … indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Cardinal stock on each day during the Class Period…[which] is often constructed by working chronologically backwards from the final corrective disclosure that eliminates all remaining artificial inflation from the stock price, back to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by

---

[10] Feinstein Report, ¶ 142.

[11] Feinstein Report, ¶ 142.

[12] Feinstein Report, ¶ 143.

[13] Feinstein Report, ¶ 147.i.

7

CONFIDENTIAL

the amount of inflation that dissipated. The corrective disclosure that finally eliminates all remaining artificial inflation may occur after the end of the Class Period." [brackets added][14]

12.    Professor Feinstein was deposed in this matter on May 5, 2022.[15]

### C.    Company Background

13.    Cardinal Health is a "healthcare services and products company that … help[s] pharmacies, hospitals, and other healthcare providers focus on patient care while reducing costs, enhancing efficiency and improving quality."[16] The Company consists of two segments, including (i) a pharmaceutical segment, which distributes "branded and generic pharmaceutical, specialty pharmaceutical, over-the-counter healthcare and consumer products in the United States,"[17] and (ii) a medical segment, which "distributes a broad range of medical, surgical and laboratory products and provides services to hospitals, ambulatory surgery centers, clinical laboratories and other healthcare providers in the United States, Canada and China…," as well as medical products "to patients in the home in the United States."[18]

14.    On March 2, 2015, Cardinal Health announced plans to acquire Johnson & Johnson's Cordis business for $1.9 billion in cash.[19] Cordis was "a [global] manufacturer and distributor of interventional cardiology devices and endovascular solutions … with operations in

---

[14] Feinstein Report, ¶ 147.ii.

[15] Deposition Transcript of Steven P, Feinstein, May 5, 2022, ("Feinstein Dep. Tr.").

[16] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 8.

[17] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 8.

[18] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 8.

[19] "Cardinal Health To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash," *Cardinal Health, Inc., Press Release*, March 2, 2015.

CONFIDENTIAL

more than 50 countries." [brackets added][20] The acquisition of Cordis was completed on October 4, 2015.[21]

15.     For the fiscal year ended June 30, 2015, Cardinal Health reported total revenue of $102.5 billion and total segment profit of $2.5 billion.[22] The pharmaceutical segment had $91.1 billion in revenue, accounting for 89% of the Company's total revenue, and $2.1 billion in segment profit, accounting for 84% of the Company's total segment profit.[23] The medical segment had $11.4 billion in revenue and $433 million in segment profit.[24] At the time of the acquisition announcement, Cordis's annual revenue in 2014 was approximately $780 million, which amounted to only 0.76% of Cardinal Health's total revenue of $102.5 billion.[25, 26] Following the close of the acquisition, Cordis became part of the Company's medical segment.[27]

16.     As evident from the above, Cordis accounted for a small percentage of the Company's overall revenue and earnings as of the announcement of the acquisition. Investors reacted to the acquisition announcement accordingly. For example, after market close on Friday, February 20, 2015,[28] news about a potential acquisition of Cordis by Cardinal Health leaked to the media. Cardinal Health's residual return on the next trading day, Monday, February 23, 2015,

---

[20] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 10.

[21] "Cardinal Health Completes Acquisition of Cordis," *Cardinal Health, Inc., Press Release*, October 4, 2015.

[22] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 11 and 13.

[23] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 11 and 13.

[24] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 11 and 13.

[25] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 9.

[26] Cardinal Health's purchase price for Cordis of $1.9 billion was 6.6% of Cardinal Health's $29.6 billion market capitalization "Cardinal Health To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash," *Cardinal Health, Inc., Press Release*, March 2, 2015; Cardinal market capitalization per CRSP.

[27] "Cardinal Health Completes Acquisition Of Cordis," *Cardinal Health, Inc., Press Release*, October 4, 2015.

[28] "J&J Said to Be in Talks on Sale of Cordis, With Cardinal Leading," *Bloomberg*, February 20, 2015.

**CONFIDENTIAL**

was 0.93% and not statistically significant.[29] Furthermore, Cardinal Health's residual return on March 2, 2015,[30] the first trading day following the announcement of Cardinal Health's acquisition of Cordis, was 1.01% and not statistically significant.[31] These results are inconsistent with a conclusion that the news regarding the Cordis acquisition released on these dates caused a change in Cardinal Health's stock price.[32]

17. Importantly, the significance of Cordis to Cardinal Health changed throughout the Class Period. Because the prospects of Cordis and Cardinal Health's other businesses changed over time (*see Infra* ¶¶ 18-22), Cordis's value to Cardinal Health would also fluctuate given the relative performance of Cordis compared with Cardinal Health's other businesses.[33] As a result, the effect of Cordis-related disclosures on Cardinal Health's stock price likely would have changed over time. Notably, the effect of a Cordis-related disclosure on Cardinal Health's stock price at the end of the Class Period could be higher or lower than it would have been earlier during the Class Period. Accordingly, the effect of an alleged misstatement or omission about Cordis on Cardinal Health's stock price, and therefore the artificial inflation associated

---

[29] The "residual return" equals Cardinal Health's actual stock price return minus its predicted return based on an event study of Cardinal Health stock. In this report, the referenced residual returns and *t*-statistics are from Feinstein Report Exhibit-8, which reports Professor Feinstein's event study results, except for February 23, 2015. For that date, I applied Professor Feinstein's event study methodology and found that the residual return is 0.93% with a *t*-statistic of 1.03.

[30] "Cardinal Health To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash," *Cardinal Health Inc., Press Release*, March 2, 2015.

[31] *See* Feinstein Report Exhibit-8.

[32] Furthermore, Plaintiff's investment advisor, Columbia Management Investment Advisers, testified that "Cordis acquisition was too small to really have an effect on Cardinal Health's valuation." *See* Deposition Transcript of Nicholas Smith (Columbia Management Investment Advisers), May 26, 2022 ("Smith Dep. Tr.") 148:4-7.

[33] For example, following the Cordis acquisition, Cardinal Health engaged in other acquisitions and analysts considered news about Cordis when analyzing the expected performance of those other acquisitions. Nephron commented: "We expect Medtronic will be more accretive than guided but have taken a cautious view given that Cordis fell short. Cordis failed to meet the initial accretion target owing to greater than expected SG&A and inventory write-offs." *See* "Initiating Coverage at Hold, Price Target of $65 (10% upside)," *Nephron*, December 1, 2017, at 1 (CAH-SDOH2.19-cv-3347-00386623).

**CONFIDENTIAL**

with any such statement, also likely would have been different at different times during the Class Period, even if the content of the alleged misstatement or omission did not change.

18.     In addition, the performance of other Cardinal Health business units declined substantially during the Class Period, which further complicates an analysis of artificial inflation and damages. During the first six quarters of the Class Period, Cardinal Health reported strong earnings with increases in operating profits for both the pharmaceutical and medical segments. However, on October 31, 2016, Cardinal Health reported a 19% decline in the Q1 2017 operating profit of its pharmaceutical segment, primarily driven "by generic pharmaceutical pricing, reduced levels of branded inflation and the loss of Safeway…" as a customer.[34] On the same date, Cardinal Health reduced its FY 2017 EPS guidance from $5.48-$5.73 to $5.40-$5.60, which was the first time the Company had lowered EPS guidance since the start of the Class Period.[35]

19.     Throughout the rest of the Class Period, the Company continued to report problems with its pharmaceutical segment. For example, on February 7, 2017, Cardinal Health reported a 14% decline in Q2 2017 operating profit for the pharmaceutical segment, which it attributed to generic pharmaceutical pricing as well as the loss of Safeway as a customer.[36] It

---

[34] "Q1 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, October 31, 2016, at 3; Cardinal Form 10-Q, September 30, 2016, at 7.

[35] "Cardinal Health Reports First-quarter Results for Fiscal Year 2017," *Cardinal Health Inc., Press Release,* October 31, 2016, at 2; "Cardinal Health Reports Fiscal 2015 Third-quarter Results," *Cardinal Health, Inc., Press Release,* April 30, 2015; "Cardinal Health Reports Strong Q4 and Record Fiscal Year-End Non-GAAP Operating Earnings Results," *Cardinal Health, Inc., Press Release,* July 30, 2015; "Cardinal Health Reports Strong First-Quarter Results for Fiscal 2016," *Cardinal Health, Inc., Press Release*, November 2, 2015; "Cardinal Health Reports Second-Quarter Results for Fiscal 2016," *Cardinal Health, Inc., Press Release*, February 1, 2016; "Cardinal Health Reports Strong Third-Quarter Results for Fiscal Year 2016," *Cardinal Health, Inc., Press Release*, April 28, 2016; "Cardinal Health Reports Q4 and Fiscal 2016 Results, Provides Fiscal 2017 Outlook," *Cardinal Health, Inc., Press Release*, August 2, 2016.

[36] "Q2 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 7, 2017, at 2; Cardinal Form 10-Q, December 31, 2016, at 7.

11

**CONFIDENTIAL**

also reduced its FY17 EPS guidance, this time from a prior range of $5.40-$5.60 to $5.35-$5.50.[37] On May 1, 2017, Cardinal Health also reported a 7% decline in its pharmaceutical profits driven by "generic pharmaceutical pricing, the final quarterly impact of the loss of Safeway, and the investment in [its] pharmaceutical IT platform." [brackets added][38]

20.     On August 2, 2017, Cardinal Health's then CEO, George S. Barrett, reported during an earnings call that the "past 12 months have been trying ones for those of us in healthcare" and that a "combination of market dynamics, policy uncertainty and economic forces made our FY'17 among the most difficult years to model and predict. The impact of those dynamics was most pronounced in our pharma distribution business, where pricing was a material headwind that was mostly associated with generics."[39] The company also reduced its FY 2018 EPS guidance from $5.35-$5.50 to $4.85-$5.10.[40] In Q1 2018, Cardinal Health lost another large pharmaceutical customer, Prime Therapeutics, and it reported the loss of a large portion of a Veterans Affairs contract in its medical segment.[41] Its Q1 2018 pharmaceutical segment profits declined by 13%, driven again by the performance of its generics program and costs related to its ongoing investment in the Company's pharmaceutical distribution IT project.[42]

21.     During the same period, Cardinal Health made multiple disclosures concerning difficulties related to the Cordis acquisition. For example, in Q2 2016 the Company indicated

---

[37] "Q2 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 7, 2017, at 3.

[38] "Q3 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, May 1, 2017, at 5.

[39] "Q4 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2017, at 2.

[40] "Q4 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2017, at 6. On May 1, 2017, Cardinal Health reiterated its FY18 EPS guidance of $5.35-$5.50. *See* "Q3 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, May 1, 2017, at 7.

[41] "Q1 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 6, 2017, at 3.

[42] "Q1 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 6, 2017, at 7.

**CONFIDENTIAL**

that the Cordis acquisition was increasing its exposure to foreign exchange ("FX") risk and that it was difficult to assess the impact of this additional exposure on its future performance.[43] In Q3 2016, Cardinal Health announced that the "foreign exchange impact … was greater than we had originally modeled."[44] On August 2, 2016, Cardinal Health reduced the expected accretion from the Cordis acquisition from greater than $0.20 per share to $0.15 per share[45] "largely due to currency impacts as well as some increased SG&A investments compared to our original business case."[46] It also announced that "some of the synergies originally associated with this complex acquisition will take longer to achieve than … originally modeled."[47] On May 1, 2017, Cardinal Health announced that it "saw a decline in Cordis profit … [which] was mostly related to increased SG&A expenses to support … investment in an international infrastructure." [brackets added][48] On August 2, 2017, Cardinal Health announced it had not achieved its expected accretion of $0.15 per share from the Cordis acquisition because of increased costs associated with "moving manufacturing and standing up … back office services…."[49] On

---

[43] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 1, 2016, at 11 ("And so, clearly with Cordis, we are getting some additional exposure with FX, with 70% of that business being overseas. But to be able to actually get into any detail about how that FX will be impacting our business exactly, it's really difficult to do that.").

[44] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* April 28, 2016, at 10.

[45] Cardinal Health described the accretion estimates as "greater than $0.20 in non-GAAP diluted earnings per share from continuing operations; increasingly accretive thereafter" and "adding more than $0.15 to FY17 versus the prior year" *See* "Cardinal Health To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash," *Cardinal Health, Inc.*, *Press Release,* March 2, 2015; "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2016, at 15. I use "$0.20 per share" and "$0.15 per share" as a shorthand for these estimates in this report.

[46] "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2016, at 15.

[47] "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2016, at 15.

[48] "Q3 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* May 1, 2017, at 6.

[49] "Q4 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2017, at 10.

13

**CONFIDENTIAL**

February 8, 2018, Cardinal Health announced that Cordis results were anticipated "to be lower than previously expected for the balance of the year."[50]

22.     The Company's pharmaceutical profits continued to decline during Q2 2018 as it reported a 4% decrease in operating earnings due to the continuing poor performance of its generics program and its ongoing investment in its IT platform.[51] On May 3, 2018, Cardinal Health reported a quarterly earnings miss and reduced guidance for FY 2018 reflecting weaker than expected operating performance and higher than expected inventory reserves at Cordis, both of which contributed to a higher than anticipated effective tax rate.[52] **Exhibit 1** includes a list of additional major Company announcements.

### D.     Estimating "Out-of-Pocket" Damages

23.     When applied in a Section 10(b) case, calculation of "out-of-pocket" damages requires the application of a damages methodology that will measure the artificial inflation that allegedly entered into the relevant security price, which would not have occurred but for the alleged misstatements and omissions (i.e., "alleged misrepresentations").[53] As a result, a reliable methodology for estimating "out-of-pocket" damages must be able to isolate the alleged artificial inflation caused by the alleged misrepresentations and distinguish it from other factors that affected the security price throughout the proposed class period, such as non-company-specific

---

[50] "Q2 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 8, 2018, at 3.

[51] "Q2 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 8, 2018, at 6.

[52] "Q3 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* May 3, 2018, at 8.

[53] *See, e.g.*, D. Fischel, 1982, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38, 1-20 at n. 25 ("Isolating the effect of the alleged misconduct on the firm's stock price is required by the out-of-pocket measure of damages, the traditional method for computing damages in open market trading cases under rule 10b-5, which limits recovery to the difference between the price paid or received, and the 'real' value of the security at the time of the purchase/sale.").

**CONFIDENTIAL**

economic factors and other confounding information. If a damages methodology is not able to do this, it is not capable of reliably calculating damages on a class-wide basis.

24.     If plaintiffs allege that the defendants made affirmative misstatements, then a reliable damages methodology must determine whether the alleged misstatements caused artificial inflation. Typically, event study analysis is used to test whether there was a statistically significant increase in the relevant security price on the date that the alleged affirmative misstatement was made.[54] If there is a statistically significant increase in the security price on this date, and no confounding information was released concurrently, then the analysis may provide a reliable basis to conclude that the alleged misstatement caused the security price to be artificially inflated.[55] If there was not a statistically significant increase in the security price on this date, and if no confounding information was released concurrently, then the analysis may provide a reliable basis to conclude that the alleged misstatement did not cause the security price to be artificially inflated.

25.     In matters involving alleged omissions, one cannot assess whether the alleged omissions caused artificial inflation by conducting event study analysis of the security price on the dates of the alleged omissions. Instead, to assess the effect of the alleged omissions on the security price, event study analysis is conducted on the dates on which the truth about these alleged omissions was revealed (the "corrective disclosures"). If there is a statistically significant decline in the security price on some or all of the dates of the alleged corrective disclosures, and no confounding information was released concurrently, then there may be a reliable basis to

---

[54] I describe the event study methodology in **Appendix C**.

[55] "Confounding information" refers to information unrelated to a plaintiffs' claim that is disclosed concurrently with the alleged corrective disclosures and/or alleged misstatements that could cause the company's stock price to move.

**CONFIDENTIAL**

conclude that the alleged omissions artificially inflated the relevant security price. If there are no statistically significant declines in the security price on some or all of the dates of the alleged corrective disclosures, and no confounding information was released concurrently, then the analysis provides no reliable basis to conclude that the alleged omissions caused the security price to be inflated.

26.     Importantly, an event study finding that an alleged corrective disclosure is associated with a statistically significant decline in the security price does not by itself demonstrate that the alleged misrepresentations created artificial inflation in the security price. Nor does it quantify the amount of any such inflation that may have existed. Additional work must be done before there is a reliable basis to conclude that the alleged misrepresentations caused the security price to be artificially inflated and to calculate the amount of any such inflation.

27.     For example, additional work must be done to establish that the stock price declines on the alleged corrective disclosure dates reliably measure the value of information that was known and therefore *could* have been disclosed earlier in the class period, according to plaintiffs' theory. If the information released on the alleged corrective disclosure dates is not information that defendants possessed at the start of the class period, then a reliable damages methodology must tie the stock price declines on the alleged corrective disclosure dates to dates on which the relevant information was known to the defendants. Otherwise, the damages methodology will overestimate the amount of artificial inflation at earlier points in the class period.

28.     Additional work also must be done to establish that the stock price declines on the alleged corrective disclosure dates reliably measure the amount by which the security price was

16

**CONFIDENTIAL**

artificially inflated earlier in the class period. The amount of a stock price decline following an alleged corrective disclosure is unlikely to be a reliable estimate of the amount of artificial inflation present earlier in the class period (particularly during a long class period like the one proposed here) if the value of information about the subject of the disclosure changed over time. For example, if the alleged corrective disclosures pertain to an acquisition that the subject company made several years ago, and if the acquired company became more significant to the subject company as the class period progressed, then the stock price declines on the alleged corrective disclosure dates are likely to overstate the amount by which the subject company's stock price was artificially inflated at earlier points in the class period. A reliable damages methodology would need to specify how it would account for this, i.e., how it would disaggregate the stock price declines on the alleged corrective disclosure dates to measure artificial inflation on earlier dates when the acquired company was less important to the subject company.

29.    Additional work also must be done to identify and exclude the impact of confounding information. On days when both an alleged corrective disclosure and confounding information are released, an event study by itself will be unable to parse the effects of the two disclosures on the subject company's stock price. A reliable damages methodology would need to specify how it would parse confounding information from the alleged corrective disclosure.

30.    Finally, it often is the case that stock price declines on alleged corrective disclosure dates reflect materializations of risk, including risks that were known to market participants before realization as well as risks that allegedly were not disclosed to market participants. A reliable damages methodology necessarily must distinguish between how much of the security price declines on the alleged corrective disclosure dates reflect the materialization

17

**CONFIDENTIAL**

of risks that were known to market participants versus unknown risks. This is especially relevant in this matter, given that it is widely recognized that expected synergies in mergers and acquisitions are highly risky.[56] Hence, a reliable damages methodology in this matter must be capable of parsing the effects that the materialization of risks known to the market had on Cardinal Health's stock price from the corresponding effects of the materialization of unknown risks.

---

[56] *See, e.g.,* M. Sirower, 1997, *The Synergy Trap,* Free Press, at 3 and 10 ("Few, if any, corporate resource decisions can change the value of a company as quickly or dramatically as a major acquisition. Yet the change is usually for the worse. Shareholders of acquiring firms routinely lose money right on announcement of acquisitions. They rarely recover their losses. … For most acquisitions, achieving significant synergy is not likely. When it does occur, it usually falls far short of the required performance improvements priced into the acquisition premium."). *See also* M. Hitt, J. Harrison, and R. Ireland, 2001, *Mergers and Acquisitions: A Guide to Creating Value for Stakeholders*, Oxford University Press, at 5 ("Acquisitions Often Fail: Despite their popularity and importance among large and small firms alike, many acquisitions do not produce the financial benefits expected or desired for the acquiring firm… The point is that there clearly are risks involved in mergers and acquisitions.") and 55 ("Counting on the creation of synergies, especially in terms of the sharing of skills associated with slightly different distribution channels, Kimberly-Clark executives believed that the strategic decision to acquire Scott Paper Co. for $9.4 billion was appropriate. However, the expected synergies are proving elusive.").

This is also consistent with deposition testimony by Plaintiff's investment managers. *See, e.g.*, Deposition Transcript of Stephanie McGirr (Boston Partners), April 26, 2022 ("McGirr Dep. Tr."), 149:12-149:23 ("Q. What are potential challenges that a company may face in integrating an acquisition? A. There can be -- there can be lots of issues. They can range from your kind of business supply chain issues, production, quality control, you know, cultural integration. It depends on what the acquiring business is and what the acquired business is. So I think the challenges would be ranked on a case-by-case basis…."); Deposition Transcript of Jeff Agne (Rothschild), May 12, 2022 ("Agne Dep. Tr."), 127:14-17 ("Q. So is it fair to say that you generally see acquisitions as a good thing? … THE WITNESS: It's a case-by-case basis."; 139:14-17 "Q. So you understand that there's a risk that the company may not ultimately achieve the full accretion estimate, correct? A. Yeah. Q. And that a 20 cent accretion estimate in this case was not a guarantee, correct? A. Based on my experience if I was reading this, I would not think anything in here was a hundred percent risk free, any estimates."); Deposition Transcript of Bhaskaran Swaminathan (LSV Asset Management), April 28, 2022, 150:21-151:14 ("Q Well, what sort of -- what sort of risks are associated with acquisitions? A Well, the risks, at least from the literature… they talk about post-acquisition integration, for example. Two companies – two different cultures are coming together… things don't work out."); Smith Dep. Tr., 157:1-158:2; 222:15-18 ("Did you understand that the Cordis acquisition involved risks? … THE WITNESS: Yes. … Q Did you understand that there was a risk that Cardinal Health would not achieve its accretion and synergies estimates? A Yes."; "Did I understand that there was a risk to a 15 cent accretion number and potentially not getting there? Yes, I knew there was some risk that they might not get there.").

18

**CONFIDENTIAL**

**IV.     Professor Feinstein Has Not Demonstrated That Alleged Class-Wide Damages Can Be Calculated Subject to a Common and Reliable Methodology Consistent With Plaintiff's Claims.**

31.     Professor Feinstein asserts that his proposed methodology "allows the calculation of individual and class-wide damages stemming from various alleged misrepresentations and omissions, and therefore will accommodate alternative potential determinations of liability."[57] He further claims that "an inflation ribbon would be constructed, using generally accepted empirical analysis and valuation tools, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Cardinal stock on each day during the Class Period, if any."[58] Other than this broad and superficial description, Professor Feinstein provides no details as to how, specifically, given the complex issues in this matter, residual declines in Cardinal Health's stock price following the alleged corrective disclosures can be used to (i) measure purported artificial inflation in Cardinal Health's stock during the Class Period, (ii) adjust this purported artificial inflation on each day of the Class Period, and (iii) tie this purported artificial inflation to individual alleged misrepresentations. Although Professor Feinstein generically asserts that a list of "valuation tools" can be applied to address any issues "complicating" the calculation of damages, he does not describe what complicating issues may be present in this case or provide any explanation regarding how any specific valuation tool could be applied to address such issues.[59] As a result, Professor Feinstein has not provided a methodology that will provide a reliable estimate of class-wide damages that are attributable to Plaintiff's claims. The bases for my opinion follow.

---

[57] Feinstein Report, ¶ 143.

[58] Feinstein Report, ¶ 147.ii.

[59] Feinstein Report, ¶¶ 144 and 146.

19

**CONFIDENTIAL**

**A.  Professor Feinstein does not articulate how he will measure artificial inflation for "out-of-pocket" damages calculation and tie it to the alleged misrepresentations. Without such an articulation, it is impossible to determine whether his purported methodology is consistent with Plaintiff's claims.**

32.    Professor Feinstein's proposed methodology requires him to estimate the amount of artificial inflation present in Cardinal Health's stock price on each day during the proposed Class Period.[60] However, his proposed methodology does not establish how he will reliably tie his estimate of artificial inflation to specific alleged misrepresentations. Furthermore, Professor Feinstein does not specify whether in his view the Plaintiff is claiming (i) that Cardinal Health made affirmative misstatements that caused Cardinal Health's stock price to increase, (ii) that Cardinal Health made omissions (including the concealment of a risk) that maintained or increased alleged artificial inflation, or (iii) a combination of both. The first type of claim requires a damages methodology that reliably determines whether the alleged affirmative misstatements created artificial inflation and the evolution of that inflation going forward in time to the end of the Class Period. By comparison, the second type of claim requires a damages methodology that reliably determines whether the alleged corrective disclosures can measure the dissipation of artificial inflation in the stock and the evolution of that inflation going backward in time to the start of the Class Period. Professor Feinstein's proposed methodology does not distinguish between the nature of these different types of misrepresentations despite the fact that each requires a different methodology to accurately estimate damages.

---

[60] During his deposition, Professor Feinstein acknowledged that a calculation of daily inflation would be required. *See* Feinstein Dep. Tr. 101:18-102:4.

**CONFIDENTIAL**

> **B.    Professor Feinstein's proposed methodology does not allow him to reliably establish that any alleged affirmative misstatements caused Cardinal Health's stock price to be artificially inflated.**

33.    Professor Feinstein's proposed methodology does not allow him to reliably estimate the amount of artificial inflation that allegedly entered Cardinal Health's stock price during the proposed Class Period.

34.    As a starting point, to demonstrate that artificial inflation entered Cardinal Health's stock price during the proposed Class Period, it is necessary to examine whether the alleged affirmative misstatements caused statistically significant increases in Cardinal Health's stock price on the dates when they were made. Professor Feinstein's event study analysis of Cardinal Health's stock price does not establish this. As a result, Professor Feinstein will have to rely on the residual declines following the two alleged corrective disclosures to estimate the amount of alleged inflation at earlier points in the Class Period. For the reasons described below, Professor Feinstein has not described a methodology where he can use those residual declines to reliably calculate damages throughout the Class Period.

35.    During the Class Period, Plaintiff alleges there were 37 dates[61] on which Cardinal Health made alleged misrepresentation, either alleged affirmative misstatements and/or alleged omissions. Professor Feinstein's event study analysis finds that the residual returns on the Company's stock price are *not* positive and statistically significant on 32 of these dates. *See* **Exhibit 2.** On the five dates associated with statistically significant residual increases in Cardinal

---

[61] There are 37 unique trading dates on which the alleged misstatements identified in the Complaint were made. However, Plaintiff claims that multiple misstatements were made on some of the dates, including February 7, 2017 and February 8, 2018, when some of the alleged misstatements were made after market close. In these cases, I examine Cardinal Health's stock price reaction on the trading dates on which the alleged misstatements were made and the next trading dates. In addition to the 37 dates, Plaintiff claims that an article published by Endovascular Today in October 2015 contained false and misleading statements. I am unable to identify the precise date on which this article was published.

21

**CONFIDENTIAL**

Health's stock price, which are August 2, 2016; October 31, 2016; February 7, 2017; January 8, 2018; and February 8, 2018 (*See* **Exhibit 2**), the alleged misstatements included information that had been disclosed previously.

36. If the market for Cardinal Health's stock was efficient during the Class Period, as Professor Feinstein claims it was,[62] then there is no reliable basis to conclude that the repetition of previously disclosed information affected Cardinal Health's stock price. Moreover, Cardinal Health announced positive non-fraud-related information on these five dates. Professor Feinstein has not analyzed the information disclosed on these dates, let alone established, how his proposed methodology would account for confounding information released at the same time as the alleged misstatements.[63] Hence, there is no reliable basis to conclude that the alleged misstatements artificially inflated Cardinal Health's stock price on these dates. I discuss each of the five dates in turn.

*August 2, 2016*

37. Plaintiff claims that multiple alleged misstatements were made on August 2, 2016, including that (i) Cordis was hitting integration and performance benchmarks,[64] (ii) Cordis was doing "really well" and key employees and management were in place,[65] and (iii) notwithstanding the revised FY17 Cordis accretion outlook (from $0.20 to $0.15 per share), the Company "was still expecting 'double-digit segment … growth and margin.'"[66] Defendants had

---

[62] Feinstein Report, ¶ 17 ("Cardinal stock traded in an efficient market over the course of the Class Period.").

[63] Feinstein Dep. Tr. 132:18-25 ("Q Sitting here today, do you know whether confounding information was released at the same time as any of the alleged misrepresentation in this case? … THE WITNESS: Well, I haven't evaluated whether it was material, whether there was any material confounding information.").

[64] Complaint, ¶ 54.

[65] Complaint, ¶ 54.

[66] Complaint, ¶ 55.

22

**CONFIDENTIAL**

made each of these alleged misstatements prior to August 2, 2016.

38.     For example, Cardinal Health previously made similar statements about the progress of Cordis's integration and performance benchmarks on October 4, 2015,[67] January 12, 2016,[68] February 1, 2016,[69] April 28, 2016,[70] and June 15, 2016.[71]

39.     Additionally, the Company previously made statements that key employees and management were in place on October 4, 2015,[72] February 1, 2016,[73] and April 28, 2016.[74]

40.     Cardinal Health also made previous statements that the medical segment expected to perform well on February 1, 2016[75] and June 17, 2016.[76]

---

[67] "Cardinal Health Completes Acquisition Of Cordis," *Cardinal Health, Inc.*, *Press Release*, October 4, 2015 ("Integration teams have been engaged since the acquisition announcement in March 2015, and the integration process is off to a successful start.").

[68] "Cardinal Health, Inc. NYSE:CAH Company Conference Presentation," *S&P Global Market Intelligence*, January 12, 2016 ("the integration has gone well. ... [and is] off to a good start").

[69] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health*, *Inc.*, February 1, 2016 ("The integration of Cordis has gone well and is on target.").

[70] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* April 28, 2016 ("the onboarding of Cordis continues to progress well.").

[71] "Cardinal Health Inc at William Blair Growth Stock Conference," *Thomson StreetEvents*, June 15, 2016 ("operationally the integration is going extremely well. … we are actually about where we modeled it with again some swings in foreign exchange. But otherwise Cordis is off to a strong start … and I think right now we are off to a good start in the integration.").

[72] "Cardinal Health Completes Acquisition Of Cordis," *Cardinal Health, Inc.*, *Press Release*, October 4, 2015 ("other executives are in place across all functions and regions.").

[73] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health*, *Inc.*, February 1, 2016 ("Cordis is off to a good start, with all key personnel in place, and day-to-day operations up and running.").

[74] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* April 28, 2016 ("We have filled the key roles [at Cordis] with excellent talent and are focused on execution.") [brackets added].

[75] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health*, *Inc.*, February 1, 2016 ("in general, we feel good progress along many of the lines in the Medical segment…. with the addition of Cordis and some other good activities, Medical also had a good top line growth.").

[76] "Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc.*, June 17, 2016 ("[W]e are going to meet what we said and the guidance where we are, we are still pretty comfortable with where that is.").

23

**CONFIDENTIAL**

41.    Moreover, on August 2, 2016, Cardinal Health announced Q4 2016 and FY2016 earnings.[77] Professor Feinstein testified that it is reasonable that there would be confounding information on earnings announcement dates.[78] He is correct. For example, on August 2, 2016, Cardinal Health announced that (i) the pharmaceutical segment's "revenue was up 20% versus fiscal 2015" and its operating profit increased 19% to $2.5 billion; (ii) it had "successfully completed the integration of the Harvard Drug team, building on [its] first rate generics offering;" and (iii) specialty solutions "delivered an outstanding fiscal 2016" where it "exceeded the $8 billion revenue target" and "successfully completed the integration of Metro Medical."[79]

*October 31, 2016*

42.    Plaintiff claims that multiple alleged misstatements were made on October 31, 2016, including that (i) the team had done "a tremendous job leading the integration, thoughtfully phasing in new systems and processes" (ii) the "integration of Cordis has proved to be an excellent example of how we can bring together best practices across borders,"[80] and (iii) Cordis "continues to meet our performance expectations" and that "Cordis continues to perform well."[81] Each of these alleged misstatements were made by Defendants prior to October 31, 2016.

43.    For example, Cardinal Health previously made similar statements about the

---

[77] "Cardinal Health Reports Q4 and Fiscal 2016 Results, Provides Fiscal 2017 Outlook," *Cardinal Health, Inc.*, August 2, 2016.

[78] Feinstein Dep. Tr. 127:4-11("I've described why it's reasonable that there would be confounding information, that these corrective disclosures were made on earnings announcements dates, dates when the company communicated with the marketplace. And so there was a lot of information disclosed….").

[79] "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2016.

[80] Complaint, ¶ 56.

[81] Complaint, ¶ 57.

24

**CONFIDENTIAL**

integration of Cordis on October 4, 2015,[82] January 12, 2016,[83] February 1, 2016,[84] April 28, 2016,[85] and June 15, 2016.[86]

44.     Similarly, Cardinal Health previously made statements that Cordis continued to meet performance expectations on February 1, 2016[87] and June 17, 2016.[88]

45.     Moreover, on October 31, 2016, Cardinal Health announced Q1 2017 earnings.[89] Also, on October 31, 2016, Cardinal Health announced that (i) it onboarded Kaiser Permanente as a medical segment customer; (ii) its specialty solutions group is "again showing strong double-digit growth;" and (iii) Cardinal Health is seeing "growth in some important markets, including Europe."[90]

*February 7, 2017*

46.     Plaintiff claims the Defendants made alleged misstatements about the medical segment on February 7, 2017, including that "Cardinal reported positive news for the Medical

---

[82] "Cardinal Health Completes Acquisition Of Cordis," *Cardinal Health, Inc.*, *Press Release*, October 4, 2015 ("Integration teams have been engaged since the acquisition announcement in March 2015, and the integration process is off to a successful start.").

[83] "Cardinal Health, Inc. NYSE:CAH Company Conference Presentation," *S&P Global Market Intelligence*, January 12, 2016 ("the integration has gone well. … [and is] off to a good start.").

[84] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health*, *Inc*., February 1, 2016 ("The integration of Cordis has gone well and is on target.").

[85] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* April 28, 2016 ("the onboarding of Cordis continues to progress well.").

[86] "Cardinal Health Inc at William Blair Growth Stock Conference," *Thomson StreetEvents*, June 15, 2016 ("operationally the integration is going extremely well.").

[87] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health*, *Inc*., February 1, 2016 ("Cordis is off to a good start, with all key personnel in place, and day-to-day operations up and running.").

[88] "Cardinal Health, Inc. Dublin Day," *Cardinal Health*, *Inc*., June 17, 2016 ("[W]e are going to meet what we said and the guidance where we are, we are still pretty comfortable with where that is. … I will tell you we are pretty comfortable that Cordis is performing about where we thought it would be.").

[89] "Cardinal Health Reports First-quarter Results for Fiscal Year 2017," *PR Newswire,* October 31, 2016.

[90] "Q1 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* October 31, 2016.

**CONFIDENTIAL**

Segment, partly due to Cordis"[91] and "[o]ur Cordis acquisition is largely on plan…. "[92] However, Cardinal Health had previously made similar positive statements about the medical segment and the performance of Cordis, for example, on April 28, 2016,[93] and June 15, 2016.[94]

47.      Moreover, on February 7, 2017, Cardinal Health announced Q2 2017 earnings.[95] Also, on February 7, 2017, Cardinal Health announced that (i) "pharmaceutical segment performed a bit better than we had expected this quarter;" (ii) "second-quarter fiscal results were slightly better than expected with GAAP diluted EPS at $1.02 and non-GAAP diluted EPS at $1.34, a 4% and 3% increase respectively… both the GAAP and non-GAAP diluted EPS for the quarter benefitted from a lower effective tax rate;" and (iii) the specialty business performed better than expected "driven by growth in the acute space and Metro Medical on the provider facing side and growth in [Cardinal's] 3PL and regulatory science service offerings on the biopharma side." [brackets added].[96]

*January 8, 2018*

48.      Plaintiff claims that, on January 8, 2018, Defendants made alleged misstatements including that "Cordis's struggles were last year's news, and Defendants were making progress in 'some issues around inventory obsolescence'" and "the Cordis business performed about as

---

[91] Complaint, ¶ 60.

[92] Complaint, ¶ 61.

[93] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, April 28, 2016 ("Medical segment profit grew 26% to $128 million. This was driven by the net contributions from acquisitions as well as Cardinal Health brand products. As you may recall, this quarter, like Q2, includes the Cordis inventory fair value step-up, which was $21 million in each quarter. Let me give you a little more color on Cordis. First, the onboarding of Cordis continues to progress well. We have filled the key roles with excellent talent and are focused on execution.").

[94] "Cardinal Health Inc at William Blair Growth Stock Conference," *Thomson StreetEvents*, June 15, 2016 ("operationally the integration is going extremely well.").

[95] "Cardinal Health Reports Second-quarter Results for Fiscal Year 2017," *PR Newswire,* February 7, 2017.

[96] "Q2 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 7, 2017.

**CONFIDENTIAL**

we expected [in the first quarter]." [brackets added][97] Cardinal Health previously made similar statements, for example on September 11, 2017[98] and November 6, 2017.[99]

49.     Moreover, on January 8, 2018, Cardinal Health presented at the 36th Annual J.P. Morgan Healthcare Conference.[100] During the conference, Cardinal Health disclosed multiple pieces of information, including a lower company effective tax rate as a result of legislation surrounding tax rate reform.[101] Consequently, some analysts increased their price targets and earnings estimates due in part to the disclosure of this news.[102]

*February 8, 2018*

50.     Plaintiff claims that, on February 8, 2018, Defendants made alleged misstatements including that "at Cordis, the good news is we continue to generate top line growth"[103] and "we have implemented robust remediation plans"[104] to address issues at Cordis.

---

[97] Complaint, ¶ 77.

[98] "Cardinal Health Inc at Morgan Stanley Healthcare Conference," *Thomson StreetEvents*, September 11, 2017 ("The second thing is when we closed the deal, we expected and thought we would have a lot more visibility to inventory than we actually did. … We have been working for several months on putting in systems to be able to get after that. And so we will and we should have much better insights to inventory by the end of this calendar year. But that has been an area that snuck up on us.").

[99] "Q1 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 6, 2017 ("The Cordis business performed as we expected this quarter.").

[100] "Cardinal Health Inc at JPMorgan Healthcare Conference," *Thomson StreetEvents*, January 8, 2018.

[101] *See* "Cardinal Health, Inc. NYSE:CAH Company Conference Presentation," *S&P Capital IQ*, January 8, 2018, at 9, 14 ("Overall, really excited about the impact that tax reform has on us" and that Cardinal Health is "not in a position to quantify those onetimers at this point. But as I said before, we will have a clear understanding of those numbers when we have our Q2 earnings call. What I – I'm going to repeat what I said before, which is, those are going to be large numbers for us and, for the most part, is going to be a positive impact to earnings, to our P&L, in Q2 and the rest of the year.").

[102] *See, e.g.*, "Adjusting Estimates for Revised Tax Rate," *William Blair*, January 11, 2018, at 1 (WB000240) ("We are updating our Cardinal Health model to reflect an expected improvement to the company's effective tax rate following recent passage of U.S. tax reform legislation and management commentary at this week's JPMorgan Healthcare Conference. … As a result, we are lowering our fiscal 2018 effective tax rate to 29.4% from 35.6%. We are also lowering our effective tax rate in the out years to 25% from 36% previously. We are increasing our fiscal 2018 EPS estimate by $0.48, to $5.46, and our fiscal 2019 EPS target by $0.91, to $6.51.").

[103] Complaint, ¶ 80.

[104] Complaint, ¶ 80.

**CONFIDENTIAL**

Cardinal Health had previously made similar statements, for example on February 1, 2016,[105] April 28, 2016,[106] and November 6, 2017.[107]

51.     Moreover, on February 8, 2018, Cardinal Health announced Q2 2018 earnings.[108] Also, on February 8, 2018, Cardinal Health announced that (i) the pharmaceutical segment performed better than expected; (ii) the specialty business had another strong quarter; and (iii) revenues in the medical segment were up, primarily driven by "the benefits of the patient recovery acquisition."[109]

52.     Further support for my conclusion that there is not a reliable basis to conclude that the alleged affirmative misstatements caused Cardinal Health's stock price to be artificially inflated is found in analyst commentary on the five dates associated with statistically significant residual increases in Cardinal Health's stock price. On each of these dates, analysts reported on multiple pieces of positive news regarding Cardinal Health's pharmaceutical and medical (excluding Cordis) segments. For example:

---

[105] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 1, 2016, at 29 ("Our revenue overall, was an overall revenue guidance increase. But as you can see, obviously, the pharma segment has performed well. But with the addition of Cordis and some other good activities; medical also had a good top line growth.").

[106] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, April 28, 2016, at 10 ("In our Medical segment, we saw the same sort of uplift across the breadth of our businesses. Revenues grew 13% to $3.1 billion driven by contribution from acquisitions, net of divestitures, as well as growth from all of our existing businesses…. Cordis continues to progress well.").

[107] "Q1 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 6, 2017, at 16 ("the Cordis integration required a lot of international work some of which we had people on the ground doing and in other places we had to build that out. We also had to do some work in that integration with a third party which is the partner that sold us the product line. So that requires a lot of interfaces, moving parts, and great disciplines. And I think we have over the course of the year honed that increasingly.").

[108] "Cardinal Health Reports Second-quarter Results for Fiscal Year 2018," *Cardinal Health, Inc., Press Release,* February 8, 2018.

[109] "Q2 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 8, 2018, at 2-3.

28

**CONFIDENTIAL**

(i) On August 2, 2016, <u>Barclays</u> reported that "CAH reported 4QFY16 adjusted EPS from continuing operations of $1.14 … well above our estimate"[110] and "Cardinal pulled forward $350mn of share repurchase into 4Q16 and made an additional $250mn in repurchases in early July, providing a greater than expected boost to 1QFY17 and full year EPS. … Specialty exceeded Cardinal's $8bn revenue target. … Red Oak will continue to provide incremental benefits (albeit lower than FY16)"[111]; <u>William Blair</u> reported that "We viewed the fiscal fourth quarter as largely in line, with modest outperformance in the Pharma segment and a small shortfall in the Medical segment relative to our model—a pattern we have seen often from Cardinal. … Cardinal delivered another very strong performance in the Pharma segment despite a roll-off of Safeway and slowing generic growth. The segment's 14% revenue growth was 60 basis points better than our target and margins were 8 basis points better as well. The segment's earnings were up 19% for the full year - roughly doubling the pace of spending growth on pharmaceuticals for the second year in a row. ... For fiscal 2018, we continue to model 4% revenue growth in Pharma, and now estimate 8% income growth compared to 6% previously."[112]

(ii) On October 31, 2016, <u>Barclays</u> reported that "Pharmaceutical segment revenue increased 14% y/y to $28.8bn, ahead of our $27.5bn estimate. Growth was driven by net new and existing customers as well as double digit growth in Cardinal's specialty solutions business."[113]; <u>UBS</u> reported that "CAH's FY1Q results came in as a moderate positive surprise given industry-wide concerns following MCK's results last week. While the company noted it is seeing pricing pressure across generics within its independent segment, the magnitude appears more modest, while there did not appear to be further headwinds arising."[114]; and <u>William Blair</u> reported that "The pharmaceutical segment modestly outperformed our expectations, with revenues $115 million above our target and operating income $4 million above (although down 19% from the prior year)."[115]

(iii) On February 7, 2017, <u>Baird</u> reported that "Specialty: 'High rate of growth' continues driven by performance with both providers and manufacturers. Oncology, rheumatology, nephrology remain strong categories in the provider market. Facing the

[110] "4QFY16 Initial Impressions: Initial Guidance in Line w/Expectations (if Below Consensus)," *Barclays*, August 2, 2016, at 1 (BARC_00000398).

[111] "4QFY16 Initial FY17 Outlook Presents Room for Upside," *Barclays*, August 3, 2016, at 1 and 3 (BARC_00000406).

[112] "Post-Call Model Adjustments; Fiscal 2017 Below Expectations but Longer-Term Drivers Intact," *William Blair*, August 2, 2016, at 1 (WB000007).

[113] "1QFY17 Review: Price Competition Hurricane Downgraded to Tropical Storm," *Barclays*, November 1, 2016, at 4 (BARC_00000481).

[114] "What You May Have Missed: 'Less bad' good enough today, but industry pressures remain," *UBS*, October 31, 2016, at 1 (UBS0000004).

[115] "First Look at Fiscal First-Quarter Results; Results Exceed Estimates; Guidance Cut Not as Big as Feared," *William Blair*, October 31, 2016, at 1 (WB000260).

29

**CONFIDENTIAL**

manufacturer, hub services, 3PL, and scientific and regulatory affairs are all seeing nice growth."[116]; and Cowen reported that "Our positive outlook is primarily based on the strength of the U.S. drug distribution market which should continue to benefit from the generic wave at least through the next couple of years. … The Medical segment could become a significant contributor to operating profit driven by business mix (faster revenue growth at AssuraMed) and product mix (higher margins at AssuraMed and from preferred products). Longer-term, we see continued growth in specialty and China as meaningful contributors to earnings growth as we look beyond five years."[117]

(iv) On January 8, 2018, analysts focused on Cardinal Health's tax rate following passage of recent legislation, with Credit Suisse explaining that "CAH offered incremental tax reform disclosure, calling for a blended effective tax rate of -30% in FY2018 (vs. our current 36%)" and that it "[r]eiterate[s] outperform: With respect to the drug pricing environment, it [CAH] noted more predictable generic drug pricing, consistent with our recent analysis indicating a stabilizing generic deflation environment."[118]

(v) On February 8, 2018, Leerink commented that "Following the F2Q:18 earnings call this morning, we are incrementally more positive on the stock. Brand and generic pricing trends appear to have stabilized and we believe that generic buy-side rates are coming in slightly better than CAH's expectations. Pharma beat our operating income estimate, and the division's operating profit would have been flat y/y except for IT investments."[119]

53.    In sum, Professor Feinstein's proposed methodology does not describe how he will be able to establish that the alleged misstatements caused Cardinal Health's stock price to increase on the dates that the statements were made. As described above, Professor Feinstein will not be able to rely on an event study to conclude that alleged misstatements caused Cardinal Health's stock price to increase on any of the 32 dates for which there was no positive, statistically significant residual return. On the 5 of 37 dates where there was a positive,

---

[116] "Business Balance Paying Off, Still Difficult to Get Excited," *Baird*, February 7, 2017, at 1 (CAH-SDOH2.19-cv-3347-00391735).

[117] "Does CAH F2Q17 Signal We've Passed The Inflection For Distributors?" *Cowen*, February 7, 2017, at 2 (CAH-SDOH2.19-cv-3347-00391747).

[118] "Incremental disclosure on tax reform," *Credit Suisse,* January 8, 2018, at 1 (CSSU_00000344).

[119] "Pharma and Medical Improving, though more Investment Needed in F2H18," *Leerink,* February 8, 2018, at 1 (CAH-SDOH2.19-cv-3347-00394751).

**CONFIDENTIAL**

statistically significant residual return, the alleged misstatements included previously disclosed information and confounding information was concurrently released. Professor Feinstein has not specified what, if any, valuation tool he would apply to reliably measure the specific amount of price increase in Cardinal Health's stock caused by the alleged misstatements at the time those alleged misstatements were made.

54.     Hence, in order to establish that the alleged misrepresentations caused artificial inflation, and in order to identify the amount of any such inflation, Professor Feinstein will have to rely on the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates, August 2, 2017 (over two years after the Class Period began) and May 2, 2018 (over three years after the Class Period began).[120] However, because of various complexities in this matter (discussed further below), Professor Feinstein cannot simply use these residual declines in Cardinal Health's stock price to estimate artificial inflation throughout the Class Period without doing considerably more work. His proposed methodology does not address how he will conduct this additional work or how his methodology will be able to address the complexities presented in this matter. As a result, Professor Feinstein has failed to establish that his proposed methodology will be able to provide the Court with a reliable estimate of damages.

---

[120] Professor Feinstein acknowledged that his methodology would focus on the declines following the alleged corrective disclosures. Feinstein Dep. Tr. 131:8-10 ("looking at how the stock price changed around the time of each of the alleged misrepresentation" … "[i]s not the most reliable way….") and 131:20-22 ("You see the stock price movement when the mix of information in the marketplace changes, and that would happen later, upon disclosure.").

**CONFIDENTIAL**

**C.    Professor Feinstein's proposed methodology does not establish that he can reliably disaggregate the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates such that he can estimate how much artificial inflation allegedly was caused by each individual alleged misrepresentation.**

55.    Plaintiff alleges that the Defendants made misrepresentations on 37 dates, and on most of those dates Plaintiff alleges that the Defendants made multiple alleged misstatements.[121] Professor Feinstein's proposed methodology does not describe how he will reliably estimate the amount of artificial inflation that was caused by each individual alleged misrepresentation. As a result, if the Court finds that some of the alleged misrepresentations are not actionable, then Professor Feinstein's proposed methodology leaves the Court with no reliable basis to estimate the amount of alleged inflation caused by the remaining, actionable, alleged misrepresentations.

56.    In addition, given that Plaintiff alleges multiple misrepresentations on many dates throughout the Class Period, without a methodology that can reliably estimate the alleged inflation associated with individual alleged misrepresentations, Professor Feinstein will be unable to reliably estimate artificial inflation on each day during the proposed Class Period. This problem with Professor Feinstein's proposed methodology is exacerbated by the fact that the amount of alleged artificial inflation associated with any specific alleged misrepresentations was likely changing during the proposed Class Period, as other alleged misstatements and corrective disclosures took place and as other company-specific information was released. This is especially problematic in this case given the length of the proposed Class Period (i.e., over three years), the number of alleged misstatements and corrective disclosures, and the large amount of information released during the proposed Class Period. Professor Feinstein does not establish

---

[121] Professor Feinstein testified that he was aware that the Complaint identifies more than one misrepresentation on multiple dates. *See* Feinstein Dep. Tr. 181:23-182:2.

CONFIDENTIAL

that his proposed methodology will be able to account for these factors and reliably estimate alleged artificial inflation throughout the proposed Class Period.

57. Professor Feinstein's proposed methodology is based principally on the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates. Specifically, he states that the "inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure that eliminates all remaining artificial inflation from the stock price, back to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated. The corrective disclosure that finally eliminates all remaining artificial inflation may occur after the end of the Class Period." [122] However, Professor Feinstein does not describe how this backcasting methodology is applicable to Plaintiff's specific claims in this case. I describe in Sections D and E below why his proposed backcasting methodology does not provide a reliable estimate of alleged artificial inflation in this matter.

> **D. Professor Feinstein's proposed methodology does not establish that he will be able to reliably estimate how much of the residual decline in Cardinal Health's stock price on the alleged corrective disclosure dates can be tied to the alleged misrepresentations.**
>
> > 1. Professor Feinstein's proposed methodology does not provide a reliable measure of the value of information that could have been disclosed earlier in the proposed Class Period.

58. Professor Feinstein acknowledged in his deposition that the effect of a piece of information on a company's stock price could be different depending on whether the information

---

[122] Feinstein Report, ¶ 147.ii.

**CONFIDENTIAL**

is disclosed earlier versus later in the proposed Class Period.[123] However, his proposed methodology, does not describe how he plans to address this issue.

59.     Professor Feinstein's failure to address this issue is particularly problematic in this case. Given that Cardinal Health's business condition and overall economic circumstances changed during the proposed Class Period, investors would likely have processed the same piece of information differently earlier in the proposed Class Period as opposed to later in the Class Period. As a result, a given piece of information is likely to have a different valuation impact at different times during the Class Period. As described in Section III.C., the value of disclosures and alleged misstatements related to the Cordis acquisition likely changed throughout the proposed Class Period, given that the significance of Cordis to Cardinal and to investors changed during the Class Period.[124] Professor Feinstein does not explain how his proposed methodology could be applied to address this issue. Hence, his proposed methodology does not establish that he will be able to reliably estimate damages in this case.[125]

> 2.     Professor Feinstein's proposed methodology does not establish that he will be able to reliably account for information revealed by the alleged corrective disclosures that could not have been known earlier during the proposed Class Period.

60.     If the information revealed by an alleged corrective disclosure includes information that Defendants did not know or could not have reasonably known earlier in the proposed Class Period, then the residual declines in Cardinal Health's stock price on the alleged

---

[123] Feinstein Dep. Tr. 235:6-11; 238:23-239:2.

[124] Professor Feinstein in his deposition testified that it was important to understand the significance of Cordis to investors over the Class Period. *See* Feinstein Dep. Tr. 143:14-144:17.

[125] While Professor Feinstein testified that he will run "tests" to "see if valuation metrics have different impacts at different point in time" and that these tests would be "valuation multiples," Professor Feinstein's proposed methodology remains vague and does not address the specific facts and circumstances of this case. *See* Feinstein Dep. Tr. 237:1-238:10.

34

**CONFIDENTIAL**

corrective disclosure dates will overstate the amount by which Cardinal Health's stock price was artificially inflated during the Class Period. Although Professor Feinstein acknowledges that artificial inflation caused by an alleged misrepresentation can only be carried back to the date on which the alleged misstatement occurred (that is, the date on which the information was known and improperly concealed or misrepresented),[126] his proposed methodology does not describe how he will reliably account for this.

61.     In this matter, Plaintiff claims that Defendants' knowledge about the issues affecting Cordis changed during the proposed Class Period. As the Complaint describes, some of the allegedly misrepresented information was known by the Defendants only for a portion of the Class Period. For example, the Complaint alleges that in the period *after* the Cordis acquisition, "Defendants discovered hundreds of millions of dollars in Cordis consignment and warehouse inventory."[127] In October 2015, Defendants "inherited iTrak … which prevented Cardinal from accurately tracking … inventory…. Cardinal was forced to hire staff to conduct manual counts of Cordis consigned inventory… *The process took at least one year, until late 2016 or early 2017*... Cardinal *discovered during these manual counts* that J&J held large amounts of expired Cordis consignment inventory…. " [emphasis added][128] Around January 2016, Cardinal planned to open a "Global Replenishment Center," by April 2017, which was delayed and was not opened until October 2017.[129] "*Following the acquisition*, North American Territory Sales Managers ('TSMs') were given one quarter to manually reconcile lists of Cordis consigned inventory that

---

[126] Feinstein Dep. Tr. 150:3-7 ("They – you can certainly carry [inflation] back to when the misrepresentation was made. … You could not carry [inflation] back to before there were any misrepresentations and omissions, I would think.") [brackets added].

[127] Complaint, ¶ 67 (a) (ii).

[128] Complaint, ¶ 67 (a) (ii) (3).

[129] Complaint, ¶ 67 (a) (ii) (4).

**CONFIDENTIAL**

had not been managed by J&J, an initiative that took place sometime between October 2015 and March 2016. ... Sales Managers *discovered during that time* that Cordis's consignment inventory with short shelf lives of one to two years had either been sitting unused and expired or about to expire ...." [emphasis added][130] In addition, "[t]he Dark Period commenced in or about the summer of 2017 when Cordis's iTrak inventory management system, which was used in almost all Cordis's ex-US operations, completely shut-down," which "exacerbated" alleged inventory problems at Cordis.[131]

62.     None of this information could have been disclosed by the Defendants before they had knowledge of it. As a result, to the extent that the alleged corrective disclosures revealed this allegedly concealed or misrepresented information, the residual decline in Cardinal Health's stock price following those corrective disclosures will overstate the amount of artificial inflation present at earlier points in the proposed Class Period. To reliably estimate damages, it would be necessary to identify the amount of artificial inflation associated with specific alleged misrepresentations or omissions and apply that inflation only during those portions of the Class Period during which Defendants were aware of the allegedly hidden information. Professor Feinstein fails to establish how his proposed methodology will reliably address this issue.

63.     Similarly, the record in this case may establish that certain information revealed on the alleged corrective disclosure dates was not known by the Defendants prior to these dates. For example, on May 3, 2018, Cardinal Health reported an earnings per share ("EPS") miss reflecting inventory write-downs at Cordis and a significant negative change in Cardinal Health's effective tax rate primarily associated with Cordis. Cardinal Health explained that "we rolled out

---

[130] Complaint, ¶ 67 (a) (ii) (5).

[131] Complaint, ¶ 71.

CONFIDENTIAL

that inventory system during *late in the quarter*. And as we rolled up and took a look at our inventory really for the first time to be able to see it a lot more clearly across the globe it created a large inventory write-off in the quarter that was a significant hit to our operating earnings in medical" [emphasis added].[132] If the record establishes that the information related to the inventory write-down could not have been disclosed earlier and could not have been known or knowable as of the start of the proposed Class Period, it would not be appropriate to carry the artificial inflation associated with the alleged concealment of that information back to the beginning of the Class Period. Doing so would overstate the amount of artificial inflation during portions of the Class Period when Defendants did not know the allegedly concealed information. Professor Feinstein does not establish how his methodology would reliably address this issue.

    **E.    Professor Feinstein's proposed methodology does not describe how he will parse the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates to account for the materialization of known versus unknown risks.**

64.    Professor Feinstein's proposed methodology does not describe how he will parse the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates to account for the materialization of known versus unknown risks. Insofar that the alleged corrective disclosures represent materializations of known risks (in whole or in part), it is not appropriate for Professor Feinstein to use the entire residual decline in Cardinal Health's stock price on the alleged corrective disclosure dates as estimates of artificial inflation. This issue is especially relevant in this matter, as it is well understood that accretion and synergies associated with acquisitions are uncertain and a known risk.[133]

---

[132] "Q3 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* May 3, 2018, at 16.

[133] Consistent with this, Professor Feinstein testified that sophisticated investors and analysts know that mergers and acquisitions often are not successful. *See* Feinstein Dep. Tr. 211:14-19 ("Q. In your view, do investors understand that mergers and acquisitions often are not successful? … THE WITNESS: Yeah, I think they – I think investors – well, I think sophisticated investors and analysts do know that …").

**CONFIDENTIAL**

65.     The risk associated with integrating acquisitions and achieving expected synergies is well-documented in the academic literature, which suggests that synergies often are not realized. For example, one textbook explains: "Few, if any, corporate resource decisions can change the value of a company as quickly or dramatically as a major acquisition. Yet the change is usually for the worse. Shareholders of acquiring firms routinely lose money right on announcement of acquisitions. They rarely recover their losses. … For most acquisitions, achieving significant synergy is not likely. When it does occur, it usually falls far short of the required performance improvements priced into the acquisition premium."[134]

66.     Throughout the proposed Class Period, Cardinal Health disclosed that the projected synergies from the Cordis acquisition were risky. For example:[135]

- On March 2, 2015, Cardinal Health disclosed these risks in its acquisition announcement: "These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include the ability to successfully complete the Acquisition on a timely basis, including receipt of required regulatory approvals; the occurrence of any event, change or other circumstance that could give rise to the termination of the Offer Letter or the Purchase Agreement (once executed); the outcome of any legal proceedings that may be instituted against the parties and others related to the Acquisition; the satisfaction of certain conditions to the completion of the Acquisition; or the conditions of the credit markets and an ability to issue debt on acceptable terms."[136]

- On March 2, 2015, Michael Kaufmann, CFO of Cardinal Health, stated: "Obviously, we can't give you the exact uptake of the synergies as we go along…,"[137] when asked about the timeline of the projected synergies and accretion.

- On October 4, 2015, Cardinal Health disclosed these risks when it announced the completion of the Cordis acquisition: "These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected,

---

[134] *Supra* n. 56.

[135] For additional disclosures, *see* **Exhibit 3**.

[136] Cardinal Health, Inc. Form 8-K, March 2, 2015, at 3.

[137] "Cardinal Health Inc To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash M&A Call," *Cardinal Health, Inc., M&A Conference Call*, March 2, 2015.

**CONFIDENTIAL**

anticipated or implied. These risks and uncertainties include: the ability to retain customers and employees of Cordis and to successfully integrate the Cordis into Cardinal Health's operations, and the ability to achieve the expected synergies as well as accretion in earnings."[138]

- On February 1, 2016, Mr. Barrett stated: "Finally, a few words on Cordis - as you know, we closed the acquisition of Cordis on October 2, 2015. This is not a simple integration process…"[139]

- On April 28, 2016, Mr. Kaufmann stated: "As we work through the transaction there are a few mechanics such as the timing of exiting our transition service agreements with J&J, the closing of Day 2 countries and the ramping up and down of certain expenses that could result in variability between quarters. As you can imagine, all of these moving parts can lead to Cordis results that may not be linear for a few more quarters. Specifically, some of these caused margin rates to be somewhat elevated in the third quarter versus how they may look over the next few quarters."[140]

- June 17, 2016: Don Casey: "So where are we on Cordis today? ... And as you begin to look at the help we are getting from J&J, it has been significant as we begin to carve out what we say are day one versus day two countries. In some countries it takes a little longer to get product registrations and what not and we will use J&J there for a little longer. But we are in the process now the day we closed, we brought a lot of business right into us, US and China and other places... Some of -- Mike and I get to spend a lot of time together anyway but we get to spend even more time because the accounting issues obviously as you look at the inventory step-up as well as Johnson & Johnson runs a slightly different calendar than we do, so there is some lumpiness that goes along with when day one countries show up or day two countries show up and we think we are a couple quarters away from having that totally ironed out."[141]

- September 11, 2017: Michael Kaufman: "It was really 3 things that struck us. One was SG&A was much more expensive than we expected. …The second thing is when we closed the deal, we expected and thought we would have a lot more visibility to inventory than we actually did. And so what happened is at the end of the year, we took a lot of inventory write-offs for obsolete inventory because we had inventory that was either on consignment or in our warehouses with our third-party logistics providers, so we didn't have a good insight to. And we ended up taking some significant writeoffs on that. And so that was another area. We have been working for several months on putting in systems to be able to get after that. And so we will and we should have much better insights to inventory by the end of this calendar year. But that has been an area that snuck up on us."[142]

---

[138] "Cardinal Health Completes Acquisition of Cordis," *Cardinal Health, Inc. Press Release*, October 4, 2015.

[139] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 1, 2016, at 4.

[140] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* April 28, 2016, at 10-11.

[141] "Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc.,* June 17, 2016, at 23.

[142] "Cardinal Health Inc at Morgan Stanley Healthcare Conference," *Thomson StreetEvents*, September 11, 2017.

**CONFIDENTIAL**

- February 8, 2018: "Jorge Gomez: ...While we continue to make progress on the commercial front, the overall earnings performance of Cordis was impacted by inefficiencies in the global supply chain and elevated SG&A outside the U.S. The team is fully focused on these issues and we have implemented robust remediation plans to address both inventory and SG&A challenges. We recognize it will take a little time to work through these items but we are moving expeditiously."[143]

67.     Furthermore, analysts were clearly aware of these risks. For example:[144]

- On March 2, 2015, <u>Leerink</u> stated: "It is unclear what portion of these synergies are included in the F2017 net EPS accretion guidance of ~$0.20, although we believe large acquisitions typically take ~3 years to fully integrate and optimize, and we believe there is likely less than $50M of synergies contemplated as part of the F2017 guidance."[145]

- On May 6, 2015, <u>Argus</u> stated: "Cardinal faces operational and integration risks as it folds in acquired companies. The announced acquisition of Cordis, which will expand the company's portfolio of medical devices, will also bring a higher level of regulatory risk, as these products are regulated by FDA."[146]

- On July 30, 2015, <u>Leerink</u> stated: "Acquisition Integration Could Be a Risk. Cardinal Health has performed a fair number of acquisitions over the past several years, and may continue to be an acquirer in the future. If the company fails to integrate any of these acquisitions onto its platform or if there are any information technology, personnel, or structural issues with the integration process, then the company's earnings could be at risk."[147]

- On March 15, 2016, <u>Credit Suisse</u> stated: "Skeptics abound on the deal, with many concerned over management's ability to hold the business together, particularly overseas where CAH has minimal presence. We note history offers few success stories for CAH as it relates to its manufacturing endeavors added through acquisitions, but Cordis adds a lower-end technology focus with efficiencies around manufacturing."[148]

- On August 2, 2017, <u>Cowen</u> stated: "There are a number of company-specific risks associated with our PT [price target], including: (1) CAH's ability to turnaround the

---

[143] "Q2 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 8, 2018, at 7.

[144] For additional analyst report statements, *see* **Exhibit 4**.

[145] "Cordis a Good Long-Term Asset in Line with CAH's IDN Strategy," *Leerink*, March 2, 2015, at 1 (CAH-SDOH2.19-cv-3347-00006231).

[146] "Analyst's Notes," *Argus*, May 6, 2015, at 2 (ARGUS0000001).

[147] "CAH Well Positioned Heading into F2016 and F2017," *Leerink*, July 30, 2015, at 3, 7 (CAH-SDOH2.19-cv-3347-00388394).

[148] "Small Steps, Big Returns," *Credit Suisse*, March 15, 2016, at 5 (CSSU_00000292).

**CONFIDENTIAL**

Medical segment, (2) integration risk related to Cordis and Harvard Drug Group, and (3) management's ability to deploy capital effectively." [brackets added][149]

- On August 3, 2017, <u>Morgan Stanley</u> stated: "Cardinal's guidance underscores the challenges in integrating the Cordis business, management optimism regarding the pricing environment, and reliance on capital deployment for growth."[150]

- On February 8, 2018, <u>J.P. Morgan</u> stated: "We also point to a potential challenging environment for the company's Medical business as it relates to hospital utilization and the ongoing integration of the Cordis and Patient Recovery businesses."[151]

- On February 8, 2018, <u>Credit Suisse</u> stated: "Risks to our $83 target price and Outperform rating for Cardinal Health are the potential integration challenges from the company's recent acquisitions of the Medtronic assets, Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs and branded inflation."[152]

- On February 26, 2018, <u>Merrill Lynch</u> stated: "Lessons learned from Cordis shouldn't reoccur, but integration risk does remain. The Cordis integration was more expensive than Cardinal originally predicted due in part to greater internal expenses to take over the operations from J&J. This was likely due to the complexity of the entire Cordis portfolio, as it was almost a collection of numerous businesses vs. one standalone asset. Additionally, the go-to-market strategy for the Cordis products was different from the traditional CAH portfolio given that Cordis is an implantable device vs. the more traditional supplies that CAH has sold. This forced CAH to address a different touch point at the customer vs. the typical supplies manager or head of procurement. While none of these challenges are insurmountable, they all did contribute to a slower-than-expected integration and synergy capture." [153]

- On April 11, 2018, <u>J.P. Morgan</u> stated: "We also point to a potential challenging environment for the company's Medical business as it relates to hospital utilization and the ongoing integration of the Cordis and Patient Recovery businesses."[154]

- On April 27, 2018, <u>Nephron</u> stated: "CAH has had difficulty integrating the Cordis acquisition as international SG&A investments have proved to be greater than

---

[149] "CAH Reports Soft Operating F4Q17, 2018 Guidance," *Cowen*, August 2, 2017, at 13 (CAH-SDOH2.19-cv-3347-00393164).

[150] "CAH: Model and Price Target Updates," *Morgan Stanley*, August 3, 2017, at 1 (MS_CARDINAL_003396).

[151] "Follow-Up on F2Q18," *J.P. Morgan*, February 8, 2018, at 4 (CAH-SDOH2.19-cv-3347-00394618).

[152] "2Q18 EPS ahead; Raising estimates," *Credit Suisse*, February 8, 2018, at 5 (CSSU_00000405).

[153] "Growth wings still seem clipped; Reinstate with Underperform rating," *Bank of America Merrill Lynch*, February 26, 2018, at 20 (CAH-SDOH2.19-cv-3347-00394568).

[154] "Cardinal Health Week Day 3: Specialty Solutions," *J.P. Morgan*, April 11, 2018, at 8 (CAH-SDOH2.19-cv-3347-00387176).

**CONFIDENTIAL**

expected and in 2QFY18 supply chain pressures for exam gloves resulted in another headwind to the business."[155]

68.     Plaintiff's own investment managers also testified that they recognized that the Cordis acquisition and integration carried associated risks. For example:

- Boston Partners, Stephanie McGirr: "Q. And they would be the same types of risks we discussed before, you know, potential challenges to the integration such as business supply challenges, production challenges, quality control challenges and cultural and integration challenges? ... A. Those would have been some. Q. And those could have affected the likelihood that Cordis would enhance the growth and profit profile of the medical unit? … A. Yes."[156]

- Rothschild, Jeff Agne: "Q And that a 20 cent accretion estimate in this case was not a guarantee, correct? A Based on my experience if I was reading this, I would not think anything in here was a hundred percent risk free, any estimates. Q So why might Cardinal Health not achieve the full accretion estimate? A It could be because the integration goes sloppy. It could be because pricing in the industry craters. It could be because competition comes out that has better products. It could be the estimate was just wildly too high by management. It could be a whole host of reasons."[157]

- Columbia Management, Nicholas Smith: "Q And did you agree that the Cordis acquisition had risks and uncertainties? A Yes.";[158] "Q Did you understand that there was a risk that Cardinal Health would not achieve its accretion and synergies estimates? A Yes.";[159] "Q So some of the potential risks associated with Cordis acquisition were realized, right? … THE WITNESS: Yes."[160]

69.     In sum, it is inappropriate for Professor Feinstein to use the entire residual decline in Cardinal Health's stock price on the alleged corrective disclosure dates as an estimate of artificial inflation on all earlier dates during the proposed Class Period. If Professor Feinstein claims that "but for" the alleged misrepresentations, the market would have assumed that there was a higher probability that Cardinal Health would face problems associated with the Cordis

---

[155] "CAH 3QFY18: What to Watch For," *Nephron*, April 27, 2018, at 1 (CAH-SDOH2.19-cv-3347-00387296).

[156] McGirr Dep. Tr. 159:9-22.

[157] Agne Dep. Tr. 139:18-140:5.

[158] Smith Dep. Tr. 156:1-3.

[159] Smith Dep. Tr. 157:24-158:2.

[160] Smith Dep. Tr. 276:15-18.

42

**CONFIDENTIAL**

acquisition, he must (i) quantify by how much this probability would have increased in the "but for" world, and (ii) estimate by how much this increased probability would have affected Cardinal Health's stock price. Professor Feinstein has not described a methodology that is capable of doing this.

70.     Furthermore, market participants continuously assess the increases or decreases in the probability of an event occurring in their analyses of companies. For example, when Cardinal Health announced at the beginning of the proposed Class Period that it would achieve greater than $0.20 accretion and $100 million in synergies associated with the Cordis acquisition,[161] investors may have assumed, hypothetically, that there was a 20% probability that Cardinal Health would actually achieve these targets. One year later, when Cardinal Health announced that it was on target to achieve the synergies, investors may have assumed that the probability of Cardinal Health actually achieving these targets had increased and now exceeded 20%. Conversely, the probability of an event occurring can decrease with time. For example, when Cardinal Health continued to disclose problems associated with the Cordis integration, investors may have assumed that the probability of Cardinal Health actually achieving these targets had decreased and now fell below 20%.[162] These changes in the probability of an event occurring would cause the alleged artificial inflation in Cardinal Health stock to change (i.e., either increase or decrease) during the proposed Class Period, which Professor Feinstein's proposed methodology does not account for.

71.     This is consistent with what Plaintiff's investment managers did in this case. For

---

[161] "Cardinal Health Inc To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash M&A Call," *Cardinal Health, Inc., M&A Conference Call*, March 2, 2015.

[162] *See* **Exhibit 3.**

**CONFIDENTIAL**

example, Boston Partners' Stephanie McGirr testified that they "analyze the stock value in different ways. [They] … take that synergy number as a baseline and then make some assumptions on the likelihood of achieving that." [brackets added][163] Ms. McGirr also testified that disclosures about Cordis increased risks "[i]n terms of Cordis being able to achieve the targets that management had set out" for accretion and synergies.[164]

72.     The stock price reaction when a risk is realized reflects a 100% certainty that the risk would actually occur and therefore may overstate the amount of artificial inflation in a security price caused by the concealment or understatement of a risk. The appropriate measure of artificial inflation with respect to the concealment or understatement of a risk would be the difference between the security price given the disclosed level of risk and what the security price would have been if the actual level of risk had been disclosed.

73.     Professor Feinstein's approach of using the residual declines in Cardinal Health's stock price on the alleged corrective disclosure dates to measure alleged artificial inflation implicitly assumes that market participants had assumed there was a 100% probability that the projected synergies from the Cordis acquisition would be realized, which is an unreasonable assumption for the aforementioned reasons. Professor Feinstein acknowledged in his deposition that publicly disclosed information concerning the level of risk associated with the Cordis acquisition would be reflected in the price of Cardinal Health stock.[165] As a result, the residual decline following the alleged corrective disclosures likely overstates the amount of artificial inflation present at earlier points in the proposed Class Period. However, Professor Feinstein

---

[163] McGirr Dep. Tr. 64:19-22.

[164] McGirr Dep. Tr. 277:22-279:2.

[165] Feinstein Dep. Tr. 73:9-75:5; 78:1-79:5.

44

does not explain how his proposed methodology would address these issues in calculating artificial inflation throughout the Class Period. As a result, Professor Feinstein has failed to establish that his proposed methodology is capable of providing a reliable estimate of alleged artificial inflation and, hence, damages.

**F.    Professor Feinstein's proposed methodology does not describe how he will reliably account for the information disclosed on the alleged corrective disclosure dates and match it to information that could have and should have been disclosed at the beginning of the proposed Class Period.**

74.    Professor Feinstein testified that "if the corrective disclosure is substantially different or discloses different information from what the alleged misrepresentations and omissions were about, then additional analysis needs to be done in order to relate the drop at the end to the inflation earlier."[166] However, Professor Feinstein's proposed methodology does not describe how he will reliably account for the mismatch between the alleged misrepresentations as articulated in the Complaint and the alleged corrective disclosures. For example, one of Plaintiff's claims centers around Cardinal Health's statement that the Cordis acquisition was expected to be accretive to non-GAAP diluted EPS by at least $0.20 in fiscal year 2017.[167] Plaintiff claims that the truth about this alleged misstatement was disclosed on August 2, 2017, which purportedly removed artificial inflation from Cardinal Health's stock price on that date.[168] But one year earlier, on August 2, 2016, Cardinal Health had already lowered its accretion target from $0.20 to $0.15.[169] Thus, on the August 2, 2017 corrective disclosure date, Cardinal Health had disclosed that Cordis missed its accretion target of $0.15 per share provided on August 2,

---

[166] Feinstein Dep. Tr. 215:2-7.

[167] Complaint, ¶¶ 2 and 31.

[168] Complaint, ¶¶ 68-69 and 133.

[169] "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2016, at 15.

**CONFIDENTIAL**

2016, not as of the start of the proposed Class Period when Cardinal Health disclosed an EPS accretion target $0.20 per share. Therefore, the alleged corrective disclosures cannot be corrective of any alleged misstatement prior to August 2, 2016. Furthermore, I did not find any evidence that analysts tied the miss of the $0.15 per share accretion target to any alleged misstatement on August 2, 2016. As explained above, one can only use the residual price decline on the alleged corrective disclosure date to estimate inflation if one can establish that an equivalent disclosure could have been made earlier. Given the above, Professor Feinstein has failed to establish how his proposed methodology is capable of accounting for the mismatch between what was disclosed on the alleged corrective disclosure date (i.e., $0.15 per share miss) and the alleged misrepresentation.

> **G.** **Professor Feinstein's proposed methodology does not describe how he will reliably parse the effects of the alleged affirmative misstatements and corrective disclosures from the corresponding effects of confounding information.**

75.     Professor Feinstein's proposed methodology does not show how he will isolate the confounding effects on Cardinal Health's stock price of non-fraudulent information that was released concurrently on the dates of the alleged affirmative misstatements and/or corrective disclosures. Professor Feinstein appears to state that his proposed methodology can deal with "specific issues complicating the quantification of artificial inflation" by using "standard tools of valuation."[170] However, he does not describe what "standard tools of valuation" he would actually apply, or how any such tools can reliably address the different pieces of confounding information that were released by Cardinal Health throughout the proposed Class Period. This issue is especially problematic in this case, given the relatively small size of Cordis as compared

---

[170] Feinstein Report, ¶ 144.

46

**CONFIDENTIAL**

to Cardinal Health's consolidated operations, the length of the proposed Class Period, and the large volume of company-specific information unrelated to Plaintiff's claims released during the course of the proposed Class Period.

76. Plaintiff alleges that there are 37 dates[171] on which Cardinal Health made false and misleading statements, which could have created artificial inflation that entered Cardinal Health's stock price during the proposed Class Period. As explained in Section IV.A., there were only five statistically significant positive dates that potentially could be viewed as causing artificial inflation and on all five of those dates the alleged misrepresentations included information that was stale. In addition, on the same dates, Cardinal Health disclosed multiple pieces of information that were distinct from the news about Cordis.[172] As an example, I discuss below the information, including the confounding information, disclosed by Cardinal Health on August 2, 2016, one of the five dates on which there was a statistically significant residual increase in Cardinal Health's stock price.[173]

77. On August 2, 2016, Plaintiff claims that "Barrett praised the Cordis team, telling investors that 'Don Casey and his team did a tremendous job closing the Cordis acquisition on

---

[171] *Supra* n. 61.

[172] Professor Feinstein acknowledged in his testimony that confounding information was released on the alleged misrepresentation dates. *See* Feinstein Dep. Tr. 132:23-133:11 ("I haven't evaluated whether … there was any material confounding information … I mean, the initial misrepresentations and omissions and then the subsequent ones, yeah, they were most likely accompanied at some points in time by information that was not about the Cordis acquisition or integration. I think it's pretty clear that if we look at every one of the alleged misrepresentations and omissions, at least some of them would have been accompanied by other information announced on the same day.").

[173] Professor Feinstein testified that it would be reasonable to expect confounding information on earnings announcement dates. *See* Feinstein Dep. Tr. 127:4-11. Four of the five alleged misstatement dates (August 2, 2016, October 31, 2016, February 7, 2017, and February 8, 2018) with a statistically significant residual increase in Cardinal Health's stock were on earnings announcement dates. On the fifth date (January 8, 2018), Cardinal Health spoke at a conference. During that time, the Company disclosed multiple pieces of information, including positive news due to the change in tax laws. Following this disclosure, some analysts increased their EPS target as a result of this information. *See, e.g.*, "Adjusting Estimates for Revised Tax Rate," *William Blair*, January 11, 2018, at 1 (WB000240).

**CONFIDENTIAL**

time and managing the integration into Cardinal Health … and we hit our integration and performance benchmarks.' Kaufmann also raved about the progress of the integration, stating, 'First of all, I just want to make sure, we feel really excited about Cordis. We think things are going really well. We've got all of the key employees, management teams, sales folks in place, things are going incredibly well.'"[174] As discussed in Section IV.A, the allegedly misrepresented information on this date included stale information. On the same date, Cardinal Health also announced that (i) the pharmaceutical segment's "revenue was up 20% versus fiscal 2015" and its operating profit increased 19% to $2.5 billion; (ii) Cardinal also "successfully completed the integration of the Harvard Drug team, building on [its] first rate generics offering;" (iii) specialty solutions "delivered an outstanding fiscal 2016" where it "exceeded the $8 billion revenue target" and "successfully completed the integration of Metro Medical."[175] Analyst commentary on these disclosures focused on the information that was distinct from the alleged misrepresentation. For example, William Blair reported: "We maintain our Outperform rating on Cardinal given strong execution in the Pharma segment, an expectation that Red Oak's sourcing capabilities and further generic penetration can more than offset deflationary headwinds, and a reasonable valuation."[176]

78. Of note, on the same date, Cardinal Health also reported a reduction in the expected FY17 accretion from the Cordis acquisition from greater than $0.20 per share to $0.15 per share. Plaintiff does not allege that this disclosure was corrective. There is no evidence that analysts reacted negatively to the disclosure, as the market would have expected that the

---

[174] Complaint, ¶ 54.

[175] "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2016, at 3-4.

[176] "Post-Call Model Adjustments; Fiscal 2017 Below Expectations but Longer-Term Drivers Intact," *William Blair*, August 2, 2016, at 3 (WB000007).

**CONFIDENTIAL**

integration of any acquisition involves risks. In fact, on this date, William Blair stated that the disclosure was "underscoring the complexity" of the integration process: "Cordis synergy goals, however, were cut to 15 cents in accretion from 20 cents, underscoring the complexity of this integration process (standing up from J&J across multiple countries where Cardinal has not typically operated in the past)."[177]

79.     The remaining 32 dates on which Plaintiff claims Cardinal Health made false and misleading statements also contained confounding information. For example, 13 dates were either earnings announcements dates or dates when Cardinal Health filed its Forms 10-Q and 10-K, which included disclosure of information unrelated to Cordis. Then, on an additional 15 dates, Cardinal Health held or participated in investor conferences. *See* **Exhibit 2.** Thus, on these dates, one would expect that Cardinal Health would have disclosed multiple pieces of information, including information unrelated to Cordis.[178] For example, on May 1, 2017 Cardinal Health announced 3Q 2017 earnings. During the earnings call, Barrett stated that "specialty solutions group continues to grow at a good clip, well into the double digits;" that he is "excited about the acquisition of Medtronic's Patient Recovery business;" that "performance in most of our lines of business is strong;" and that "naviHealth and post-acute activities are extremely attractive to a market going through significant changes, and are also growing at a pace faster than we had originally modeled."[179] In another example, on June 17, 2016, Cardinal Health held

---

[177] "Post-Call Model Adjustments; Fiscal 2017 Below Expectations but Longer-Term Drivers Intact," *William Blair*, August 2, 2016, at 2 (WB000007) ("Cordis synergy goals, however, were cut to 15 cents in accretion from 20 cents, underscoring the complexity of this integration process (standing up from J&J across multiple countries where Cardinal has not typically operated in the past).").

[178] Consistent with this, Professor Feinstein testified that it is reasonable that there would be confounding information on earnings announcement dates. *See* Feinstein Dep. Tr. 127:4-11.

[179] "Q3 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, May 1, 2017, at 2-3.

49

**CONFIDENTIAL**

its annual Dublin Day investor call. Executives at the Company stated that "[p]harmaceutical segment has been performing very well;" that "[s]pecialty is an area where we are seeing some very nice growth;" and that they are "very pleased with the relationship that we have with CVS and the Red Oak sourcing joint venture. It's creating a lot of value…"[180]

80.     With respect to the two dates of the alleged corrective disclosures, Professor Feinstein testified that "it's reasonable that there would be confounding information" on those dates, as the alleged corrective disclosures "were made on earnings announcement dates … so there was a lot of information disclosed."[181] Consistent with this, analysts focused on multiple pieces of information that Cardinal Health disclosed on both of the two alleged corrective disclosure dates.

81.     Importantly, an event study would not be able by itself to establish what portion of the residual price decline on the alleged corrective disclosure date was caused by the correction of the alleged misstatements as opposed to other confounding information released at the same time.[182] However, unless a damages methodology is able to identify and exclude the effects of confounding information, such a damages methodology would not be able to reliably calculate damages. To the contrary, to the extent that a damages methodology does not adequately address confounding information, that methodology would likely overestimate or potentially underestimate damages. Professor Feinstein's proposed methodology does not describe how he will parse the effects of the alleged corrective disclosures on Cardinal Health's residual stock price from the corresponding effects of confounding non-fraudulent inflation that

---

[180] "Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc*., June 17, 2016, at 41 and 43.

[181] Feinstein Dep. Tr. 127:4-10.

[182] Feinstein Dep. Tr. 98:1-8.

**CONFIDENTIAL**

was released concurrently.[183] Therefore, Professor Feinstein's proposed methodology does not provide a method to reliably calculate damages that are attributable to the wrongdoing alleged in this case.

82.     On August 2, 2017, the date of the first alleged corrective disclosure, Plaintiff claims that although profit in the medical segment increased by 13%, it was offset by "performance in Cardinal Branded products (including Cordis)" and that "Cardinal did not achieve its FY 2017 accretion target for Cordis of $0.15 due to sales, inventory, and related cost issues."[184] On the same date, Cardinal Health also announced negative information about its pharmaceutical segment.[185] In particular, Cardinal Health announced that its pharmaceutical segment's Q4 2017 profit decreased by 7% "primarily driven by generic pharmaceutical pricing as well as the ongoing investment in P-Mod" and full year profit decreased 12% "due to generic pharmaceutical pricing and, to a lesser extent, the loss of Safeway [as a customer] and lower branded manufacturer price appreciation." [brackets added][186] Cardinal Health also reduced its FY 2018 non-GAAP diluted EPS guidance to $4.85-$5.10, primarily due to incremental investment initiatives across its businesses (e.g., technology and client service investments).[187]

---

[183] Professor Feinstein claimed that there has never "been a time when it was just absolutely impossible" for him to disaggregate confounding information. Feinstein Dep. Tr. 167:16-17. While this may be true based on Professor Feinstein's experience, there is no reliable basis that such a statement can be applied generally to every case without performing any analysis. The issue of parsing confounding information from the alleged corrective disclosures is even more difficult in this particular case because of the complexities presented in this case, as discussed elsewhere in this report.

[184] Complaint, ¶¶ 68-69.

[185] Professor Feinstein in his deposition stated that disclosures about the performance of the pharmaceutical business might contain confounding information. *See* Feinstein Dep. Tr. 135:19-136:1.

[186] "Q4 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2017, at 9-10.

[187] "Q4 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2017, at 8-9 and 11.

**CONFIDENTIAL**

Although they discussed the information about Cordis, analysts also focused on information that

is distinct from the alleged corrective disclosures. For example:

- Baird: "The supply chain environment remains choppy...this isn't the only headwind" and "[l]ike peers, the near-term outlook for pharmaceutical distribution is challenging."[188]

- BofA: Trimmed their FY2018 and 2019 EPS due to expense trends, medical contract change, and the removal of the CAH China business from the 2019 guidance.[189]

- Cowen: "[W]e are cautious on CAH, as well as all distributors, as we see challenges in the Pharma segment. Challenges include the pricing pressure from generics as well as the diminishing contributions from generic introductions as the generic wave comes to an end."[190]

- Credit Suisse: "CAH's shares languished today on a surprising cut to FY18 EPS guidance (-$0.27 vs. consensus) primarily on incremental investment initiatives across its businesses, further defining FY18 as a transition year, in our view" and "Reiterate Outperform …  Risks to our call includes unfavorable drug pricing trends and difficulty integrating acquisitions."[191]

- JP Morgan: "Our FY18 adjusted EPS estimate moves to $4.97, which is essentially at the midpoint of the $4.85-$5.10 guidance range, and down from our prior estimate of $5.23. Our new FY18 estimate assumes total adjusted operating profit growth of ~2% y/y, comprised of a ~10% decline in Pharma adjusted operating profit (the company guided to a low double digit decline) and ~51% adjusted operating profit growth in Medical (the company guided to double-digit profit growth)."[192]

- Leerink: "Bottom Line: Following the F4Q17 earnings call this morning, we are more cautious on the stock. While management highlighted that generic pricing pressure is starting to alleviate, the guided y/ y decline in Pharma's operating income in F2018 suggests that the market is still highly competitive. While much of the margin pressure next year will come from internal discreet items, such as technology and client service investments, we believe that CAH may be pricing aggressively in some cases to win or retain business. Furthermore, CAH highlighted that the expected accretion from Cordis is taking longer than expected to realize. While the Patient Recovery business should contribute meaningfully to earnings, expectations remain high in our view. We

---

[188] "Paddling Furiously Upstream," *Baird*, August 2, 2017, at 1-2 (CAH-SDOH2.19-cv-3347-00393126).

[189] "Plenty of moving pieces for FY18," *Bank of America Merrill Lynch*, August 2, 2017, at 1 (CAH-SDOH2.19-cv-3347-00393138).

[190] "CAH Reports Soft Operating F4Q17, 2018 Guidance," *Cowen*, August 2, 2017, at 2 (CAH-SDOH2.19-cv-3347-00393164).

[191] "Diagnosing 4Q post call; Moderating estimates," *Credit Suisse*, August 2, 2017, at 1 (CSSU_00000384).

[192] "Follow-Up on F4Q Results and Initial FY18 Guidance," *J.P. Morgan*, August 3, 2017, at 2 (CAH-SDOH2.19-cv-3347-00393213).

**CONFIDENTIAL**

lower our forward estimates, and our PT to $70 (from $75), and we maintain our MP rating."[193]

- Raymond James: "Weak outlook driven by continued pharma pressure."[194]

- Needham: "The company admitted it has taken longer to achieve the synergy targets it originally set out, especially outside the US. This is a little troubling, as a big part of the MDT Patient Recovery Business accretion is achieving $150M in synergies. Plus, 25% of the MDT business is outside the US, where CAH is behind its own schedule on Cordis. We'd rather see them do it right, then rush to hit some financial target that, quite frankly, the company is not going to get paid for in the short-term relative to its stock price. But, as we said earlier, the Medical business growth, both top line and margin and as a percentage of company earnings, is a thesis many investors were willing to support, so from here, the integration progress will be watched extra closely moving forward."[195]

- Morgan Stanley: "Cardinal's guidance underscores the challenges in integrating the Cordis business, management optimism regarding the pricing environment, and reliance on capital deployment for growth. We lower our target to $73; Reiterate EW."[196]

83.     On May 3, 2018, the date of the final alleged corrective disclosure, Plaintiff claims "Cardinal's 3Q FY 2018 EPS declined significantly and it was reducing Cardinal's FY 2018 and earnings due to problems with the Cordis business, including inventory and sales."[197] During the earnings call "Kaufmann revealed that Cordis's inventory reserves had been 'even higher than expected this quarter' and impacted Cardinal's profitability."[198] On the same date, Cardinal Health also announced that it was "anticipating FY19 will be more challenging than previously expected … we now see significant headwinds including … customer repricings, the

---

[193] "CAH Investing for the Long-Haul; PT to $70," *Leerink*, August 2, 2017, at 1 (CAH-SDOH2.19-cv-3347-00393222).

[194] "Weak Outlook Driven by Continued Pharma Pressure," *Raymond James*, August 2, 2017, at 1 (CAH-SDOH2.19-cv-3347-00398954).

[195] "F4Q17: Another Setback to Numbers and Sentiment," *Needham*, August 3, 2017, at 2 (CAH-SDOH2.19-cv-3347-00393245).

[196] "CAH: Model and Price Target Updates," *Morgan Stanley*, August 3, 2017, at 1 (MS_CARDINAL_003396).

[197] Complaint, ¶ 84.

[198] Complaint, ¶ 85.

53

**CONFIDENTIAL**

loss of PharMerica and continued generic deflation."[199] It also stated that its pharmaceutical segment's operating profit decreased by 2.5%, reflecting "the most negative impact from [Cardinal Health's] generic program." [brackets added][200] Although analysts reacted negatively to the news about Cordis, they also referred to other factors. For example:

- Barclays: "…[V]arious factors impacting the outlook. 1) Cordis (within Medical) will continue to take some time to re-orient, with a path back to profitability in the business by the end of FY19; 2) Large drug customer re-pricings are expected over the next 12-18 months (we believe large retail drug chain renewals could be key), which will likely hurt margins; 3) The loss of PharMerica as a customer; 4) Continued generic deflation, which was just revised to a slightly worse trend for the rest of FY18 (suggests weak trends likely continuing into FY19)."[201]

- Credit Suisse: "Expectations were undoubtedly low, but the latest report was worse than feared, with a meaningfully lower outlook for its Medical segment, incremental to associated tax headwinds, exposing prolonged profit challenges with its diversification strategy. … While we remain positively disposed on the stock, our patience is challenged to some degree by the latest shortfall. Risks are drug pricing and acquisitions miscues."[202]

- Jefferies: "[U]nderscore our Hold rationale on the stock: challenges in its medical segment, as well as its exposure to a competitive med supplies business are offsetting its stabilizing, if not improved, core business. On generics, the issue seems more CAH-specific (and not a re-emergence of steep, industry-wide deflation) as mgmt appears to have been overly optimistic with their guidance assumptions on this factor. … With mgmt conceding that issues faced by the Cordis segment will take a while to fix and that segment profitability won't re-emerge until next year, we do not see NT catalysts to reverse pressure on CAH's earnings power. Combining this with other pressures faced by its medical segment (issues with gloves, rising competition) makes it difficult for CAH shares to see positive momentum in the coming months. …the guidance cut related to generic pricing is because the improvement in generic deflation is tracking below seemingly overly optimistic assumptions baked into guidance."[203]

---

[199] "Q3 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health*, *Inc*., May 3, 2018, at 4.

[200] "Q3 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health*, *Inc*., May 3, 2018, at 7; Cardinal Health Q3 2019 10-Q, at 8.

[201] "Post-call: revised FY19 EPS view suggests $5.60 highly unlikely now," *Barclays*, May 3, 2018, at 1 (CAH-SDOH2.19-cv-3347-00386127).

[202] "3Q EPS miss on Cordis conundrum; Guide cut," *Credit Suisse*, May 3, 2018, at 1 (CAH-SDOH2.19-cv-3347-00395116).

[203] "Company-Specific Issues To Keep This Cardinal From Flying NT," *Jefferies*, May 4, 2018, at 1 (CAH-SDOH2.19-cv-3347-00386221).

**CONFIDENTIAL**

- Evercore: "There is no way to sugar coat this Q and there isn't really a silver lining here either unfortunately. The challenges at Cordis are disappointing and the tax rate is somewhat confounding, but there are also other headwinds impacting 2019. The loss of PMC, continued HSD deflation, other customer repricing all lead to modest growth despite a likely tax tailwind (magnitude matters). Our updated forecast has a core profit decline in Pharma, while Medical shows modest expansion due to synergy capture and inventory / Cordis relief (too aggressive?). We think a realistic range for 2019 is likely $4.90-5.20 and hope the rest of the sell side heeds management's caution."[204]

- RBC: "CAH reported a F3Q-18 EPS miss on an inventory write-down in its Cordis business and related tax expense and revised its 2018 guidance downward. The company also outlined several headwinds making us more pessimistic on F2019 growth."[205]

- BofA: "The multitude of factors impacting Cardinal Health's outlook are creating an ongoing negative feedback loop for the stock that is hard to break. The quarter itself was not too bad when you back out the tax spike related to Cordis."[206]

84.     In short, multiple pieces of confounding information about Cardinal Health were released on the dates of the alleged affirmative misstatements and/or corrective disclosures, which highlights a major problem with Professor Feinstein's proposed methodology. As discussed above, when there is confounding information, event study analysis, by itself, typically is unable to separate the price movement attributable to the disclosure from that of the confounding information.[207] Separately, Professor Feinstein does not explain how any of the "valuation tools" listed in his report can be used to isolate the effects of confounding information.

---

[204] "Striking a Tough 'Chord'," *Evercore ISI*, May 3, 2018, at 1 (CAH-SDOH2.19-cv-3347-00006221).

[205] "Titanic, and We Don't Mean the Movie: Weak F3Q and Outlook Sink CAH Shares," *RBC Capital Markets*, May 3, 2018, at 1 (CAH-SDOH2.19-cv-3347-00395316).

[206] "Well that escalated quickly (FY19 guidance ramp): What You May Have Missed," *Bank of America Merrill Lynch*, May 3, 2018, at 1 (CAH-SDOH2.19-cv-3347-00395094).

[207] Professor Feinstein testified that the event study by itself cannot "disaggregate non-fraud-related confounding information." *See* Feinstein Dep. Tr. 98:1-8.

**CONFIDENTIAL**

    **H.    Professor Feinstein asserts that "standard valuation tools" could be used to calculate damages, but he does not provide specific details about how any of the purported tools could be used to reliably estimate damages.**

85.    Professor Feinstein asserts that "[t]o the extent there may be specific issues complicating the quantification of artificial inflation encountered in the execution of the out-of-pocket damage methodology due to potentially unique facts and circumstances of this case, the standard tools of valuation analysis can be applied as needed."[208] He further provides a partial list[209] of what these "valuation tools" are: "valuation multiple models, such as those based on earnings, earnings before interest, tax, depreciation and amortization (EBITDA), revenue, book value, and cash flow; discounted cash flow (DCF) models; scenario analysis, and the literature regarding valuation effects of factors such as reputation, quality of accounting, mergers, acquisitions, and impairments."[210] Setting aside that this description is vague, Professor Feinstein fails to articulate *how* any of these "valuation tools" can be applied to specific facts and circumstances in this case or even, conceptually, what facts and circumstances might call for any of these tools. He also states in his deposition testimony that he has not determined whether he would use any of these "valuation tools" in this case other than an event study.[211]

86.    Separately, Professor Feinstein does not account for the subjectivity that goes into using these "valuation tools." For example, the selection of comparable companies, discount rate, and other variables can produce vastly different results. Professor Feinstein does not provide any explanation of how he could apply these tools to produce reliable estimates of artificial inflation

---

[208] Feinstein Report, ¶ 144.

[209] Professor Feinstein testified in his deposition that the list of valuation tools in his report paragraph 146 is non-exhaustive. *See* Feinstein Dep. Tr. 103:3-104:20.

[210] Feinstein Report, ¶ 146.

[211] Feinstein Dep. Tr. 90:8-92:23; 95:1-4; 96:4-7.

**CONFIDENTIAL**

that are tied to the circumstances of this case. A discounted cash flow analysis, for example, would require developing reliable estimates of future cash flows and a discount rate, but Professor Feinstein does not explain in what situations he would expect to apply a discounted cash flow analysis or how he would be able to develop reliable estimates of these inputs in the context of those situations. Apart from his generic assertions that these tools could be applied, Professor Feinstein provides no basis to establish that any of the listed tools could be applied to calculate damages in a manner consistent with Plaintiff's claims in this case.

87.     Professor Feinstein also fails to acknowledge the difficulty of applying these "valuation tools" to the complexities identified in this case, including (i) a long proposed Class Period during which a large amount of company-specific information, including information about Cordis, was disclosed, (ii) the changing value of information about Cordis during the course of the proposed Class Period, (iii) 37 alleged misstatement dates with many containing multiple alleged misstatements, (iv) Plaintiff's allegations that Defendants' knowledge concerning alleged inventory issues at Cordis changed during the course of the proposed Class Period, (v) two corrective disclosure dates that both took place over two years after the Class Period began (and would be relied upon to estimate artificial inflation from alleged misrepresentation made years earlier in different circumstances), and (vi) the presence of confounding information on the alleged misstatement dates and on the alleged corrective disclosure dates. Thus, Professor Feinstein's vague reference to these various potential "valuation tools" fails to articulate, let alone establish, any methodology for measuring damages consistent with Plaintiff's claims.

**CONFIDENTIAL**

Kenneth M. Lehn
June 3, 2022

**CONFIDENTIAL**

# APPENDIX A

**June 2022**

**Kenneth Lehn**
**Curriculum Vitae**

Katz Graduate School of Business
University of Pittsburgh
278-B Mervis Hall
Pittsburgh, Pa. 15260
phone: (412) 648-2034
fax:    (412) 624-2875
e-mail: lehn@katz.pitt.edu

**Education**

Ph.D., Washington University, 1981 (Economics)
M.A., Miami University, 1976 (Economics).
B.A., Waynesburg College, 1975 (Economics).

**Employment**

Professor Emeritus of Finance, September 2020-present.

Samuel A. McCullough Professor of Finance, 1999-2020 and Professor of Finance, 1991-1999, Katz Graduate School of Business, University of Pittsburgh.

Affiliated Professor of Law, School of Law, University of Pittsburgh, September 1997-present.

Senior Consultant, Compass Lexecon, 2009-present.

Director, Center for Research on Contracts and the Structure of Enterprise, University of Pittsburgh, 1991-2001.

Chief Economist, U.S. Securities and Exchange Commission, June 1987-July 1991.

Adjunct Professor of Law, Georgetown University, 1990-1991.

Assistant Professor of Business and Public Policy, School of Business Administration, Washington University, 1981-1987.

A-1

**CONFIDENTIAL**

Research Associate, Center for the Study of American Business, Washington University, 1986-1987.

Visiting Assistant Professor of Economics, University of California, Los Angeles, 1986.
Deputy Chief Economist, U.S. Securities and Exchange Commission, 1984-1985.

Instructor of Economics, Miami University, 1976-1977.

**Courses Taught**

Corporate Finance (MBA)
Applied Corporate Finance (MBA)
Valuation (MBA)
Creating Value through Restructuring (MBA)
Organization of Securities Markets (Undergraduate)
Business and Public Policy (Undergraduate, MBA, Executive)
Corporate Governance (Doctoral)
Finance for Lawyers (Law)

**Teaching Awards**

MBA Teacher of the Year (Pittsburgh), nine times.
MBA Teacher of the Year (Washington U.), 1987.
Undergraduate Teacher of the Year (Washington U.), 1981.

**Publications**

**Books**

*Modernizing U.S. securities regulation: economic and legal perspectives*, ed. with Robert W. Kamphuis, Jr., Homewood, Ill.: Business-One Irwin, 1993.

**Published Papers**

"Corporate governance and corporate agility," *Journal of Corporate Finance*, February 2021.

"Financing investment spikes in the years surrounding World War I," with Leonce Bargeron and David Denis, *Journal of Financial Economics*, November 2018, 215-236.

"Corporate governance, agility, and survival," *International Journal of Economics and Business*, February 2018, 65-72.

A-2

**CONFIDENTIAL**

"Limited liability and share transferability: an analysis of California firms, 1920-1940," with Leonce Bargeron, *Journal of Corporate Finance*. June 2017, 451-468.

"Employee-management trust and M&A activity," with Leonce Bargeron and Jared Smith, *Journal of Corporate Finance*, December 2015, 389-406.

"Disagreement and the informativeness of stock returns: the case of acquisition announcements," with Leonce L. Bargeron, Sara B. Moeller, and Frederik P. Schlingemann, *Journal of Corporate Finance*, April 2014, 155-172.

"Financing the business firm," with Leonce Bargeron in *The Oxford Handbook in Managerial Economics*, edited by William Shughart and Christopher Thomas, Oxford University Press, 2013.

"Sarbanes-Oxley and corporate risk-taking," with Leonce Bargeron and Chad Zutter, *Journal of Accounting and Economics*, February 2010, 34-52.

"Determinants of the size and structure of corporate boards: 1935-2000," with Sukesh Patro and Mengxin Zhao, *Financial Management*, Winter 2009, 747-780. Received Pearson/Prentice-Hall Award for second best paper published in *Financial Management* during 2008-2010.

"The subprime crisis and systemic risk: evidence from U.S. securities markets," with Leonce Bargeron and Mehmet Yalin, *Globalization and Systemic Risk*, edited by Douglas D. Evanoff, David S. Hoelscher, and George G. Kaufman, World Scientific Publishing, 2009, 299-312.

"The CISG: perspectives from an economist," *The CISG and the business lawyer*, edited by Ronald Brand, Harry Flechtner, and Mark Walter, Oxford University Press, 2007, 261-265.

"Governance indexes and valuation: which causes which?," with Sukesh Patro and Mengxin Zhao, *Journal of Corporate Finance* 13 (December 2007), 907-928.

"The rise of the private equity market," with Thomas Boulton and Steven Segal, *New financial instruments and institutions: opportunities and policy challenges*, edited by Yasuyuki Fuchita and Robert Litan, Brookings Institution Press, 2007, 141-161.

"CEO turnover after acquisitions: are bad bidders fired?," with Mengxin Zhao, *Journal of Finance* (August 2006), 1759-1811. Reprinted in *Mergers and acquisitions*, ed. by J. Harold Mulherin, Edward Elgar Publishing, 2012.

"Corporate governance in the deregulated telecommunications industry," *Telecommunications Policy* (May-June 2002), 225-242.

A-3

**CONFIDENTIAL**

"Growth opportunities and corporate debt policy: the case of the U.S. defense industry, 1980-1995," with Vidhan Goyal and Stanko Racic, *Journal of Financial Economics* (April 2002), 35-59.

"Decentralization, incentives, and value creation: the case of JLG Industries," with Heidi E. Treml, *Journal of Applied Corporate Finance* (Fall 2000), 60-70. Reprinted in Donald H. Chew and Stuart L. Gillan, *Corporate governance at the crossroads*, McGraw-Hill Irwin, 2005.
"Workforce integration and the dissipation of value in mergers: the case of USAir's acquisition of Piedmont Aviation," with Stacey Kole, *Mergers and productivity*, edited by Steven Kaplan, National Bureau of Economic Research, University of Chicago Press, 2000, 239-279.

"Comment on 'Financial regulatory structure and the resolution of conflicting goals' by Larry D. wall and Robert A. Eisenbeis," *Journal of Financial Services Research,* (September/December 1999), 247-248.

"Some observations on Henry Manne's contributions to financial economics," *Case Western Law Review*, (Winter 1999), 263-268.

"Deregulation and the adaptation of governance structures: the case of the U.S. airline industry," with Stacey Kole, *Journal of Financial Economics* (April 1999), 79-118. Won Second Jensen Prize for Corporate Finance and Organizations in 1999 *JFE* Best Paper Contest. Reprinted in J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"The causes and consequences of accounting fraud," with Mason Gerety, *Managerial and Decision Economics* (November-December 1997), 587-599.

"Antitrust franchise relocation in professional sports: an economic analysis of the *Raiders* case," with Michael Sykuta, *Antitrust Bulletin* (Fall 1997), 541-564.

"EVA, accounting profits, and CEO turnover," with Anil Makhija, *Journal of Applied Corporate Finance*, (Summer 1997), 90-97.

"Investor behavior in mass privatization: the case of the Czech voucher scheme," with Archana Hingorani and Anil Makhija, *Journal of Financial Economics* (1997), 349-396. Reprinted in Diane Denis and John McConnell, *Governance: an international perspective*, Edward Elgar Publishing Ltd., forthcoming 2005.

"Deregulation, the evolution of governance structure, and survival," with Stacey Kole, *American Economic Review Papers and Proceedings* (May 1997), 421-425.

"EVA and MVA as performance measures and signals for strategic change," with Anil Makhija, *Strategy and Leadership* (May/June 1996), 34-38.

A-4

**CONFIDENTIAL**

"The effect of entry in the local telephone market on the equity values of the Regional Bell Operating Companies," with Kevin Green, *Managerial and Decision Economics*, (July--August 1995), 469-477

"The SEC's Market 2000 Report," with Corinne Bronfman and Robert A. Schwartz, 19 *Journal of Corporation Law*, 3 (Spring 1994), 523-551.  Modified versions are published in *Financial Review* (published by Ministry of Finance in Japan), Summer 1994, and "U.S. Securities Markets Regulation: Regulatory Structure," in Benn Steil, ed., *International financial market regulation*, (New York: John Wiley and Sons), 1994, 37-74.

"The market for marketplaces: reflections on the SEC's Market 2000 Report," in Robert A. Schwartz, editor, *Global equity markets: technological, competitive and regulatory challenges*, Irwin Professional, 1994.

"Regulation of going private transactions," with Jeffry Davis in *Modernizing U.S. securities regulation: economic and legal perspectives*, Kenneth Lehn and Robert W. Kamphuis, Jr., eds., Homewood, Ill.: Business-One Irwin, 1993.

"Information asymmetries, Rule 13e-3, and premiums in going private transactions," with Jeffry Davis, 70 *Washington University Law Quarterly*, (l992), 587-6ll.

"Contractual resolution of bondholder-stockholder conflicts in leveraged buyouts," with Annette Poulsen, *Journal of Law and Economics*, (October l99l), 645-674.  Reprinted in Roberta Romano, *Foundations of corporate law*, Oxford University Press, 1993.

"Institutional ownership of equity: effects on stock market liquidity and corporate long-term investments," with Jonathan Jones and J. Harold Mulherin, in Arnold W. Sametz, ed., *Institutional investors: challenges and responsibilities*, (Homewood, Ill.: Dow-Jones Irwin), 1991, 115-127.

"The case for indexing," in *The effect of index investment policies on corporate governance*, 1991 Annual Colloquium on Corporate Law and Social Policy, University of Toledo Law School, 1991.

"Comment on 'Globalization of financial markets' by Clifford W. Smith, Jr.," in 34 *Carnegie-Rochester Conference Series on Public Policy* (Spring 1991), 97-103.

"Securities regulation during the Reagan Administration: corporate takeovers and the 1987 stock market crash," with Jeffry Davis, in Anandi P. Sahu and Ronald L. Tracy, eds., *The economic legacy of the Reagan years: euphoria or chaos?*, (New York: Praeger Publishers), 1991, 129-140.

**CONFIDENTIAL**

"Comment on 'The record of LBO performance' by William Long and David Ravenscraft," in Arnold W. Sametz, ed., *The battle for corporate control*, (Homewood, Ill.: Dow-Jones Irwin), 1991, 547-553.

"The choice between dual class recapitalizations and going private transactions," with Jeffry Netter and Annette Poulsen, 27 *Journal of Financial Economics*, (October 1990), 557-580. Reprinted in J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"Do bad bidders become good targets?," with Mark L. Mitchell, 98 *Journal of Political Economy* (April 1990), 372-398; reprinted, with some modifications, in 3 *Journal of Applied Corporate Finance* (Summer 1990), 60-69; Donald H. Chew, Jr., ed., *The new corporate finance: where theory meets practice*, New York: McGraw-Hill, 1993, 52-61; Michael J. Brennan, ed., *Empirical corporate finance*, Edward Elgar, 2000; and J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"The economics of event risk: the case of bondholders in leveraged buyouts," with Annette Poulsen, 15 *Journal of Corporation Law* (Winter 1990), 199-217.

 "The view from the SEC," in *Proceedings of the 1989 Annual Conference of the Garn Institute of Finance*, University of Utah, 1990, 167-170.

"Public policy towards corporate restructuring," 25 *Business Economics* (April 1990), 26-31.

"Commentary on 'An economic analysis of the Brady Report' by David Haddock," in Gerald P. Dwyer, Jr. and Rik W. Hafer, eds., *The stock market: bubbles, volatility, and chaos*, (Boston, Mass.: Kluwer Academic Publishers), 1990, 197-201.

"View from Washington on leveraged buyouts," in Edward I. Altman, ed., *The high yield debt market*, (Homewood, Ill.: Dow-Jones Irwin), 1990, 154-160.

"Free cash flow and stockholder gains in going private transactions," with Annette Poulsen, 44 *Journal of Finance* (July 1989), 771-787.

"Comment on 'The danger of regulatory overreaction to the October 1987 crash' by Lawrence Harris," 7 *Cornell Law Review* (July 1989), 948-952.

"Leveraged buyouts: wealth created or wealth redistributed?" with Annette Poulsen, in Murray L. Weidenbaum and Kenneth Chilton, eds., *Public policy towards corporate takeovers* (New Brunswick, N.J.: Transaction Publishers), 1988, 46-62.

A-6

**CONFIDENTIAL**

"Majority-minority relationships -- an economic perspective," 13 *Canada-U.S. Law Journal* (1988), 135-141.

"The economics of leveraged takeovers," with David Blackwell and Wayne Marr, 65 *Washington University Law Quarterly* (1987), 163-191.

"The structure of corporate ownership: causes and consequences," with Harold Demsetz, 93 *Journal of Political Economy* (December 1985), 1155-1177.

"Information asymmetries in baseball's free agent market," *Economic Inquiry* (January 1984), 37-44; reprinted in Brian Goff and Robert D. Tollison, eds., *Sportometrics*, Texas A&M University Press, 1990, 253-261.

"Property rights, risk-sharing, and player disability in major league baseball," 25 *Journal of Law and Economics* (October 1982), 343-356; reprinted in Brian Goff and Robert D. Tollison, eds., *Sportometrics*, Texas A&M University Press, 1990, 35-58.

**Other Articles**

"Private insecurities," *The Wall Street Journal*, February 15, 2006.

"How to clean up after corporate scandals," *The Pittsburgh Post-Gazette*, October 6, 2002.

"Soaring labor costs may ground airline merger," *The Wall Street Journal*, May 25, 2000, A26.

"Some observations on the Shad-Johnson accord and SEC-CFTC jurisdiction disputes," in Charles W. Smithson, *Managing financial risk: a guide to derivative products, financial engineering, and value maximization*, McGraw-Hill, 1998.

"Hostile takeovers: some empirical observations," *Corporations, Securities and Antitrust News* (Fall 1996), 1, 10-11.

"The lessons of Marriott," *The Wall Street Journal*, March 11, 1993.

"A Coase for rejoicing," *The Wall Street Journal*, October 17, 1991.

"Agency evaluates bust-up takeovers," with Mark Mitchell, *National Law Journal* (November 6, 1989), S1, S3-S4; reprinted in the *New York Law Journal* (December 4, 1989).

"Market correction of bad acquisitions," with Mark Mitchell, 3 *Institutional Investor: Global Capital Markets Forum* (April 1989), 53.

**CONFIDENTIAL**

"Are takeovers hostile to economic performance?," with John Pound and Gregg Jarrell, *Regulation* (September-October 1986).

"Takeovers don't crimp long-term planning," with Gregg Jarrell, *The Wall Street Journal*, May 1, 1985.

**Policy Reports**

"Institutional ownership, tender offers, and long-term investments," with Gregg Jarrell and Wayne Marr, Office of the Chief Economist, U.S. Securities and Exchange Commission, April 19, 1985.

"Noninvestment grade debt as a source of tender offer financing," Office of the Chief Economist, U.S. Securities and Exchange Commission, 1986.

"The post-offering price performance of closed-end funds," with Kathleen Weiss and David Malmquist, Office of Economic Analysis, U.S. Securities and Exchange Commission, 1989.

"Estimating the value of federal deposit insurance," with William C. Dale, Jeffry L. Davis, David Malmquist, and Hank McMillan, Office of Economic Analysis, U.S. Securities and Exchange Commission, 1991.

Letter to Jonathan Katz, Secretary, U.S. Securities and Exchange Commission, on Regulation of Credit Rating Agencies, December 5, 1994.

Testimony concerning disclosure of accounting policies for derivatives and disclosures of quantitative and qualitative information about market risk inherent in market risk sensitive instruments, Subcommittee on Securities, U.S. Senate Committee on Banking, Housing and Urban Affairs, 105th Congress, 1st Session, March 4, 1997.

**Consulting**

Retained by counsel for various firms and government agencies, including Akin Gump; Arnold & Porter; Arthur Cox; Australian Taxation Office; Baker Botts; Barber & Bartz; Bartlit Beck; Bass, Berry & Sims; Bryan Cave; Buchanan Ingersoll; Cadwalader, Wickersham & Taft; Clifford Chance; Cooley; Cornell & Gollub; Covington & Burling; Cravath, Swaine and Moore; Crowell & Moring; Davis Graham & Stubbs; Davis Polk & Wardwell; Dechert; DLA Piper; Dorsey & Whitney; Gibson, Dunn, & Crutcher; Fried, Frank, Harris, Shriver & Jacobson; Fulbright & Jaworski; Heller Ehrman; Hogan & Hartson;  Howrey, Hughes Hubbard & Reed; Irell & Manella; Jenner & Block; Jones Day; Keker & Van Nest; King & Spalding; Kirkland & Ellis; K&L Gates; Kramer Levin Naftalis & Frankel; Latham & Watkins; Lowenstein Sandler;

A-8

**CONFIDENTIAL**

Mayer Brown; McDermott, Will, & Emery; McGuireWoods; Milbank, Tweed, Hadley & McCoy; Morgan, Lewis, & Bockius; Morris, Nichols Arsht & Tunnel; Morrison & Foerster; Nossaman; O'Melveny & Myers; Orrick; Paul, Weiss, & Rifkind; Pepper Hamilton; Perkins Coie; Pillsbury Winthrop Shaw & Pitman; Pisanelli Bice; Potter Anderson Corroon; Proskauer & Rose; Quarles & Brady; Quinn Emanuel; Reed Smith; Richards, Layton & Finger; Segal McCambridge Singer & Mahoney; Shearman & Sterling; Sheppard Mullin Richter; Shook, Hardy & Bacon; Sidley; Simpson Thacher, & Bartlett; Skadden, Arps, Slate, Meagher, & Flom; Steptoe & Johnson; Sullivan & Cromwell; U.S. Securities and Exchange Commission; U.S. Department of Justice; Wachtell, Lipton, Rosen & Katz; Weil Gotshal; Williams & Connolly; Willkie Farr & Gallagher; WilmerHale; Wilson Sonsini; and Winston & Strawn.

Retained as Independent Distribution Consultant for Pilgrim Baxter & Associates, Federated Investors, Hartford Financial, Wachovia Corp. and GAMCO.


**Expert Witness Testimony**

In the Matter of the Companies Law (2018 Revision) and in the Matter of FGL Holdings, Grand Court of the Cayman Islands, Financial Services Division, Cause No. FSD 184 of 2020 (RPJ), trial testimony, Georgetown, Grand Cayman Island, May 27, 30, and 31, 2022 and June 1, 2022.

HBK Master Fund L.P. and HBK Merger Strategies Master Fund L.P. v. Pivotal Software, Inc., Delaware Court of Chancery C.A. No. 2020-0165-KSJM; and In Re: Pivotal Software, Inc. Stockholders' Litigation, Delaware Court of Chancery C.A. No. 2020-0440-KSJM, deposition testimony (via Zoom), Pittsburgh, PA, April 19, 2022.

Nantahala Capital Partners II Limited Partnership, on behalf of itself and all other similarly situated stockholders of QAD Inc., v. QAD Inc., Pamela M. Lopker, Anton Chilton, Scott J. Adelson, Kathleen M. Crusco, Peter R. Van Cuylenberg, Thoma Bravo, LLC, Thoma Bravo, LP, Project Quick Ultimate Parent, LP, Project Quick Parent, LLC, and Project Quick Merger Sub Inc., Delaware Court of Chancery, C.A. No. 2021-0573-PAF, deposition testimony (via Zoom), Pittsburgh, PA, September 24, 2021.

Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated against Abbvie Inc., Richard A. Gonzalez and William J. Chase, U.S. District Court, Northern District of Illinois, Case No. 1:18-cv-06790, deposition testimony (via Zoom), Pittsburgh, Pa., August 26, 2021.

Melvyn Klein v. H.I.G. Capital, LLC, et al., Delaware Court of Chancery, C.A. No. 2017-0862-AGB, deposition testimony (via Zoom), New York, N.Y., July 30, 2021.

A-9

**CONFIDENTIAL**

In re EQT Corporation Securities Litigation, U.S. District Court, Western District of Pennsylvania, Master File No. 2:19-cv-00754-MPK, deposition testimony (via Zoom), Pittsburgh, Pa., July 26, 2021.

Budicak, Inc., Blue Marlin Arbitrage, LLC, and Prime Trading, LLC, individually and on behalf of others similarly situated v. Lansing Trade Group, LLC, Cascade Commodity Consulting, LLC, and John Does Nos. 6-10, U.S. District Court, District of Kansas, Case No. 2:19-cv-02449, deposition (via Zoom), Pittsburgh, Pa., June 21, 2021.

Anthem, Inc. against Express Scripts, Inc., U.S. District Court, Southern District of New York, Civil Action No. 16 Civ. 2048, deposition (via Zoom), Pittsburgh, Pa., April 16, 2021.

Peggy Roif Rotstain, et al., on behalf of themselves and all others similarly situated, and The Official Stanford Investors Committee v. Trustmark National Bank, HSBC Bank PLC, The Toronto-Dominion Bank, Independent Bank F/K/A Bank of Houston, SG Private Banking (Suisse) S.A., and Blaise Friedli, U.S. District Court, Northern District of Texas, Dallas Division, Case No. 3:09-CV-02384-N-BQ, deposition testimony (via Zoom), Pittsburgh, Pa., February 4, 2021.

Simon Property Group, Inc. and Simon Property Group, L.P. vs. Taubman Centers, Inc. and Taubman Realty Group, Inc., State of Michigan, Circuit Court for the 6th Judicial Circuit, Oakland County, 2020-181675.CB, deposition testimony (via vTestify), Pittsburgh, Pa., October 30, 2020.

Robert Conklin, Thomas Edlund, Darren Kinney, and Joshua Rhodes, all individually and for their respective individual account damages on behalf of the DST Systems, Inc. 401 (k) Profit Sharing Plan, v. DST Systems, American Arbitration Association, AA Case Nos.: 01-19-0001-8717, 01-19-0001-8736, 01-19-0001-964, and 01-19-0001-9375, respectively, arbitration testimony (via Zoom), Pittsburgh, Pa., September 18, 2020. Additional testimony, both live and taped (via Zoom), provided in related arbitration hearings on the following dates: September 24, 2020, October 2, 2020, October 9, 2020, October 16, 2020, October 23, 2020, October 29, 2020, November 5, 2020, November 12, 2020, November 20, 2020, December 4, 2020, December 11, 2020, December 18, 2020, January 8, 2021, January 14, 2021, January 21, 2021, January 28, 2021, February 4, 2021, February 11, 2021, February 18, 2021, February 26, 2021, March 4, 2021, March 12, 2021, March 18, 2021, March 25, 2021, April 1, 2021, April 8, 2021, April 15, 2021, April 22, 2021, April 29, 2021, May 6, 2021, May 13, 2021, May 20, 2021, May 27, 2021, June 10, 2021, June 18, 2021, June 24, 2021, July 1, 2021, July 15, 2021, July 22, 2021, July 29, 2021, August 5, 2021, August 12, 2021, August 19, 2021, August 26, 2021, September 2, 2021, and September 16, 2021.

Carrie Scheufele, Jeffrey Scheufele, and Nicholas Oram, individually and on behalf of all others similarly situated vs. Tableau Software, Inc., Christian Chabot and Thomas Walker, U.S. District

A-10

**CONFIDENTIAL**

Court, Southern District of New York, Civil No. 1:17-cv-05753-JGK, deposition testimony (via Zoom), Pittsburgh, Pa., July 30, 2020.

Peggy Leineke v. DST Systems, Inc. et al., Joint Submission for Arbitration dated August 6, 2018, American Arbitration Association, deposition testimony (via Zoom), New York, N.Y., June 30, 2020.

Adam S. Levy on behalf of himself and all others similarly situated v. Thomas Gutierrez, Richard Gaynor, Raja Bal, J. Michael Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman Sachs & Co., Canaccord Genuity Inc., and Apple Inc., U.S. District Court, District of New Hampshire, No. 1:14-cv-00443-JL, deposition testimony, New York, N.Y., September 9, 2019.

Channel Medsystems, Inc. v. Boston Scientific Corporation and NXT Merger Corporation, Delaware Court of Chancery, C.A. No. 2018-0673-AGB, trial testimony, Wilmington, Del., April 18, 2019.

Channel Medsystems, Inc. v. Boston Scientific Corporation and NXT Merger Corporation, Delaware Court of Chancery, C.A. No. 2018-0673-AGB, deposition testimony, New York, N.Y., March 29, 2019.

Oklahoma Law Enforcement Retirement System, Individually and On Behalf of all Others Similarly Situated v. Adeptus Health, Inc., et al., U.S. District Court. Eastern District of Texas, Sherman Division, Civil Action No. 4:17-CV-00449, deposition testimony, New York, N.Y., March 12, 2019.

Adam S. Levy on behalf of himself and all others similarly situated v. Thomas Gutierrez, Richard Gaynor, Raja Bal, J. Michael Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman Sachs & Co., Canaccord Genuity Inc., and Apple Inc., U.S. District Court, District of New Hampshire, No. 1:14-cv-00443-JL, deposition testimony, New York, N.Y., February 1, 2019.

The Mangrove Partners Master Fund, LTD., v. Calamos Asset Management, Inc., Delaware Court of Chancery, 2017-0139, deposition testimony, New York, N,Y., December 21, 2018.

The Colonial Bancgroup, Inc. and Kevin O'Halloran v. PriceWaterhoueCoopers, LLP and Crowe Horvath, LL, U.S. District Court, Middle District of Alabama, Northern Division, Case No. 2:11-cv-00746-WKW; and Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. PriceWaterhouseCoopers, LLP and Crowe Horvath, LLP, U.S. District Court, Middle

A-11

**CONFIDENTIAL**

District of Alabama, Northern Division, Case No. 2:12-cv-00957-WKW; trial testimony, March 22, 2018.

Wynn Resorts, Limited vs. Kazuo Okada, Aruze USA, and Universal Entertainment Corp., District Court, Clark County, Nevada, Case No. A-12-656710 – B, Dept. No. XI, deposition testimony, Las Vegas, Nevada, January 19, 2018.

Guardian Protection Services, Inc. f/k/a Armstrong-Guardian, Inc. v. Emil Parent and Lawrence Cersosimo as Trustees of the 1993 Irrevocable Trust for Russell L. Cersosimo, and Russell L. Cersosimo, as Trustee of the 2008 Irrevocable Trust for Russell L. Cersosimo, Court of Common Pleas of Allegheny County, Pennsylvania, Civil Division, No. GD-16-021536, Code: 020 – In Equity, hearing testimony, Pittsburgh, Pa., March 24, 2017.

In re: Declaration of Trust, dated December 21, 1964, FBO Carol Lynn Farmer, Superior Court of California, County of Orange, Central Justice Center, Case No. 30-2015-00784792-PR-TR-CJC, deposition testimony, Costa Mesa, Cal., November 8, 2016.

The Colonial Bancgroup, Inc. and Kevin O'Halloran v. PriceWaterhouseCoopers, LLP and Crowe Horwath, LLP, U.S. District Court, Middle District of Alabama, Northern Division, Case No. 2:11-cv-00746-WKW; and Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. PriceWaterhouseCoopers, LLP and Crowe Horwath, LLP, U.S. District Court, Middle District of Alabama, Northern Division, Case No. 2:12-cv-00957-WKW; deposition testimony, New York, N.Y., October 4, 2016.

Chrome Systems, Inc. v. Autodata Solutions, Inc., et al., JAMS Reference No. 1340012931, arbitration testimony, Chicago, Ill., September 16, 2016.

Chrome Systems, Inc. v. Autodata Solutions, Inc., et al., JAMS Reference No. 1340012931, deposition testimony, New York, N.Y., September 7, 2016.

Move, Inc., et al. vs. Zillow, Inc., et al., Superior Court of the State of Washington for King County, No. 14-2-07669-0 SEA, deposition testimony, Philadelphia, Pa., April 18, 2016.

St. Denis J. Villere & Company, et al. v. Epiq Systems International, et al., Circuit Court of Jackson County, Missouri at Kansas City, Case No. 1516-CV26509, deposition testimony, New York, N.Y., March 28, 2016.

Chrome Systems, Inc. v. Autodata Solutions, Inc., et al., Court of Chancery of the State of Delaware, C.A. No 11808-VCG, deposition testimony, New York, N.Y., February 24, 2016.

Assured Guaranty (UK) LTD vs. J.P. Morgan Investment Management, Inc., Index 603755/2008 and Ambac Assurance UK Limited vs. J.P. Morgan Investment Management, Inc., Index

A-12

**CONFIDENTIAL**

650259/2009, Supreme Court of the State of New York, County of New York, deposition testimony, New York, N.Y., January 8, 2016.

Frank J. Fosbre, Jr., et al., vs. Las Vegas Sands Corp., et al., U.S. District Court, District of Nevada, Case No. 2:10-cv-00765-APG-GWF (Consolidated), deposition testimony, Chicago, Ill., December 21, 2015.

Assured Guaranty (UK) LTD vs. J.P. Morgan Investment Management, Inc., Index 603755/2008 and Ambac Assurance UK Limited vs. J.P. Morgan Investment Management, Inc., Index 650259/2009, Supreme Court of the State of New York, County of New York, deposition testimony, New York, N.Y., November 24, 2015.

Richard Thorpe, et al., v. Walter Investment Management Corp., et al., U.S. District Court, Southern District of Florida, Case No.: 14-cv-20880-UU, deposition testimony, New York, N.Y., November 11, 2015.

Peggy Roif Rotstain, et al. and the Official Stanford Investors Committee against Trustmark National Bank, et al., U.S. District Court, Northern District of Texas, Dallas Division, Case No. 3:09-CV-02384-N, deposition testimony, New York, N.Y., October 14, 2015.

In Re HP Securities Litigation, U.S. District Court, Northern District of California, San Francisco Division, Master File No. c-12-5980-CRB, deposition testimony, New York, N.Y., January 19, 2015.

Mary K. Jones, et al. v. Pfizer, Inc., et al., U.S. District Court, Southern District of New York, No. 10-cv-3864 (AKH), deposition testimony, New York, NY, October 2014.

In Re: Activision Blizzard, Inc. Stockholder Litigation, Court of Chancery of the State of Delaware, Consolidated C.A. No. 8885-VCL, deposition testimony, New York, NY, October 2014.

Sue Ann Hamm, In Re the Marriage of, v. Harold Hamm, District Court Of Oklahoma County, State Of Oklahoma, FD-2012-2048, trial testimony, Oklahoma City, OK, September 2014.

In Re: Adelphia Communications Corporation Securities and Derivative Litigation, relating to Island Partners, et al. v. Deloitte & Touche LLP, U.S. District Court, Southern District of New York, 05-CV-2770, deposition testimony, Philadelphia, PA, September 2014.

In Re: Lehman Brothers Securities and Erisa Litigation, U.S. District Court, Southern District of New York, 09-MD-2017 (LAK), deposition testimony, New York, N.Y., June 2014.

A-13

**CONFIDENTIAL**

Sue Ann Hamm, In Re the Marriage of, v. Harold Hamm, District Court Of Oklahoma County, State Of Oklahoma, FD-2012-2048, deposition testimony, Oklahoma City, OK, June 2014. Sandalwood Debt Fund A, Sandalwood Debt Fund B, and Hudson Investment Partners v. BDO USA LLP and BDO Seidman LLP, Superior Court of New Jersey, Law Division, Essex County, Docket No. L-9016-11, deposition testimony, Short Hills, N.J., April 2014.

Bettina M. Whyte, as Trustee of the Semgroup Litigation Trust, vs. PriceWaterhouseCoopers, LLP, District Court In and For Tulsa County, State of Oklahoma, Case No. CJ-2010-04042, Daubert hearing, Tulsa, OK, January 2014.

Louis Pagnotti, Inc., et al. vs. Deloitte and Touche, LLP, Court of Common Pleas of Luzerne County, 104-CV-04967-JMF, deposition testimony, New York, N.Y., October 2013.

Securities and Exchange Commission vs. Life Partners, Inc., et al., United States District Court for the Western District of Texas, Austin Division, 1-12-CV-00033-JRN, deposition testimony, New York, N.Y., August 2013.

Bettina M. Whyte, as Trustee of the Semgroup Litigation Trust, vs. PriceWaterhouseCoopers, LLP, District Court In and For Tulsa County, State of Oklahoma, CJ-2010-04042, deposition testimony, July 2013.

Raymond M. Pfeil, et al. v. State Street Bank & Trust Company, United States District Court Eastern District Of Michigan, Southern Division, 2:09-CV-12229-DPH-VMM, deposition testimony, New York, N.Y., March 2013.

CMMF, LLC v. J. P. Morgan Investment Management, Inc. and Ted C. Ufferfilge, Supreme Court Of The State Of New York, County Of New York, 09-601924, trial testimony, New York, N.Y., January 2013.

CMMF, LLC v. J. P. Morgan Investment Management, Inc. and Ted C. Ufferfilge, Supreme Court Of The State Of New York, County Of New York, 09-601924, deposition testimony, New York, N.Y., September 2012.

In Re Refco Securities Litigation, United States District Court Southern District of New York, 07-MD-1902 (GEL), deposition testimony, New York, N.Y., September 2012.

Securities and Exchange Commission v. Michael W. Perry and A. Scott Keys, United States District Court Central District Of California, 11-1309-R (JCx), deposition testimony, Washington, D.C., May 2012.

A-14

**CONFIDENTIAL**

Lissa Rohlik vs. I-Flow Corporation, United States District Court, Eastern District of North Carolina (Southern Division), 7:10-CV-00173-FL, deposition testimony, Pittsburgh, Pa., May 2012.

City of Livonia Employees' Retirement System, et al. vs. Wyeth et al., United States District Court Southern District Of New York, 07-CV-10329-RJS, deposition testimony, New York, N.Y., February 2012.

In Re Delphi Financial Group Shareholder Litigation, Court of Chancery of the State of Delaware, 7144-VCG, deposition testimony, Wilmington, Delaware, February 2012.

Alaska Electrical Pension Fund et al. v. Pharmacia Corporation et al., United States District Court, District of New Jersey, 03-1519 (AET), deposition testimony, New York, N.Y., October 2011.

Securities and Exchange Commission v. Rajnish Das and Stormy Dean, United States District Court for The District Of Nebraska, 8:10-CV-00102, deposition testimony, Denver, Col., July 2011.

Securities and Exchange Commission v. Lisa Berry, United States District Court, Northern District of California, San Jose Division, C07-04431 RMW, deposition testimony, San Francisco, Ca., May 2011.

Joel Krieger, et al., v. Wesco Financial Corporation, et al, Court of Chancery of the State of Delaware, 6176-VCL, deposition testimony, New York, N.Y., April 2011.

Eric Silverman, et al.,v. Motorola, Inc., et al., United States District Court for the Northern District of Illinois, Eastern Division, 07-C-04507, deposition testimony, Washington, D.C., January 2011.

NACCO Industries Inc., et al. v. Applica Inc., et al., United States District Court Northern District of Ohio, CA-2541-VCL, deposition testimony, New York, N.Y., December 2010.

In Re Le-Nature's Inc. Commercial Litigation, United States Judicial Panel on Multidistrict Litigation, MDL 2021, arbitration testimony, Pittsburgh, Pa., December 2010.

Securities and Exchange Commission v. Raj Sabhlok and Michael Pattison, United States District Court, Northern District of California, San Francisco Division, C-08-4238 EMC, trial testimony, San Francisco, Ca., September 2010.

**CONFIDENTIAL**

Securities and Exchange Commission v. Angelo Mozilo, David Sambol and Eric Sieracki, United States District Court, Central District of California, CV09-03394 JFW (MANx), deposition testimony, Chicago, Ill., July 2010.

In Re Le-Nature's Inc. Commercial Litigation, United States Judicial Panel on Multidistrict Litigation, MDL 2021deposition testimony, New York, N.Y., June 2010.

In Re John Q. Hammons Hotels Inc. Shareholder Litigation, Court of Chancery of the State of Delaware, 758-CC, trial testimony, Georgetown, Del., June 2010.

In Re John Q. Hammons Hotels Inc. Shareholder Litigation, Court of Chancery of the State of Delaware, 758-CC, deposition testimony, New York, N.Y., April 2010.

Securities and Exchange Commission v. Raj Sabhlok and Michael Pattison, United States District Court, Northern District of California, San Francisco Division, C-08-4238 EMC, deposition testimony, San Francisco, Ca., December 2009.

LDK Solar Securities Litigation, U.S. District Court, Northern District of California, C-07-05182-WHA, deposition testimony, San Francisco, Ca., December 2009.

Makor Issues & Rights Ltd. v. Tellabs, U.S. District Court, Northern District of Illinois, No. 04-1683, deposition testimony, Chicago, Ill., October 2009.

David Rogers et al. v. Baxter International, Inc., et al., United States District Court, Northern District Of Illinois, Eastern Division, 06-3241, deposition testimony, Chicago, Ill., September 2009.

Mainstay High Yield Corporate Bond Fund v. Heartland Partners et al., United States District Court Eastern District of Michigan, 07-10542, deposition testimony, New York, N.Y., September 2009.

In Re Metropolitan Securities Litigation, United States District Court, Eastern District of Washington, CV-04-25-FVS, deposition testimony, New York, N.Y., September 2009.

27001 Partnership, et al. v. BT Securities Corporation, et al., Circuit Court Of The State Of Alabama, In And For The County Of Jefferson, CV-04-7487-JLB, deposition testimony, New York, N.Y., August 2009.

Securities and Exchange Commission v. Biovail Corporation et al., United States District Court, Southern District of New York, CIV-02979 (LAK), deposition testimony, New York, N.Y., July 2009.

A-16

**CONFIDENTIAL**

Eric Silverman, et al.,v. Motorola, Inc., et al., United States District Court for the Northern District of Illinois, Eastern Division, 07-C-04507, deposition testimony, Washington, D.C., June 2009.

Brieger, et al. v. Tellabs, Inc. et al., United States District Court, Northern District of Illinois, Eastern Division, 06-C-1882, trial testimony, Chicago, Ill., May 2009.

DVI Inc. Securities Litigation, United States District Court, Eastern District of Pennsylvania, 03-CV-5336, deposition testimony, Philadelphia, Pa., February 2009.

Brieger, et al. v. Tellabs, Inc. et al., United States District Court, Northern District of Illinois, Eastern Division, 06-C-1882, deposition testimony, Chicago, Ill., January 2009.

Kingsway Financial Services, Inc., et al. v. PriceWaterhouseCoopers, et al., United States District Court, Southern District of New York, 03-C-5560 RMB (HBP), deposition testimony, New York, N.Y., January 2009.

In re: Dollar General Corporation Securities Litigation, Sixth Circuit Court for Davidson County, Tennessee, Master Docket No. 07MD1 (Consolidated Action), deposition testimony, New York, N.Y., October 2008.

In re: Dollar General Corporation Securities Litigation, Sixth Circuit Court for Davidson County, Tennessee, Master Docket No. 07MD1 (Consolidated Action), deposition testimony, New York, N.Y., September 2008.

In re: Delphi Corporation Securities, Derivative & ERISA Litigation, United States District Court, Eastern District of Michigan, Southern Division, MDL No. 1725 05-CV-70882-DT, deposition testimony, Chicago, Ill., May 1, 2008.

In re: Xcelera.com, Inc. Securities Litigation, United States District Court, District of Massachusetts, Daubert hearing to exclude testimony of Scott Hakala, Boston, Mass., April 2008.

In re: Vivendi Universal, S.A. Securities Litigation, United States District Court, Southern District of New York, No. 02 Civ. 5571 (RJH/HBP), deposition testimony, New York, N.Y., April 18, 2008.

In re: HealthSouth Corporation Securities Litigation, United States District Court, Northern Alabama, Southern Division, Master File No. CV-03-BE-1500-S, In re: HealthSouth Corporation Stockholder Litigation, Consolidated Case No. CV-03-BE-1501-S, In re: HealthSouth Corporation Bondholder Litigation, deposition testimony, New York, N.Y., April 14, 2008.

**CONFIDENTIAL**

In re: Apollo Group, Inc. Securities Litigation, United States District Court, District of Arizona, 2-04-cv-2147-JAT, trial testimony, Phoenix, Ariz., January 2008.

In re: Schering-Plough Corporation Securities Litigation, United States District Court, District of New Jersey, Master File No. 01-CV-0829 (KSH/MP), deposition testimony, Roseland, N.J., September 14, 2007.

In re: Xcelera.com, Inc. Securities Litigation, United States District Court, District of Massachusetts, Civil Action No. 00-CV-11649-RWZ, deposition testimony, Boston, Mass., August 2007.

In re: Omnicom Group, Inc. Securities Litigation, United States District Court, Southern District of New York, No. 02-CV-4483 (RCC), deposition testimony, New York, N.Y., May 4, 2007.

Janet Baker et al. v. Dexia S.A. and Dexia Bank Belgium, United States District Court, District of Massachusetts, deposition testimony, Pittsburgh, Pa., April 2007.

Ohio Public Employees' Retirement System, et al. vs. Richard D. Parsons, R.E. "Ted Turner," et al., Franklin County Common Pleas Court, Columbus, Ohio, Case No. 03CVH07-7932, United States District Court, Southern District of New York, In re AOL Time Warner, Inc. Securities and ERISA Litigation, MDL Docket No. 1500 (SWK), The Consolidated Opt-Out Action, Master File No. 06 Civ. 0695 (SWK), deposition testimony, New York, N.Y., March 30, 2007.

In re: Cardinal Health, Inc. Securities Litigation, United States District Court, Southern District of Ohio, Eastern Division, No. C2-04-00575 (ALM), mediation testimony, Dallas, Tex., March 2007.

In re: Apollo Group, Inc. Securities Litigation, United States District Court, District of Arizona, 2-04-cv-2147-JAT, deposition testimony, Pittsburgh, PA, February 7, 2007.

In re: Sprint Corporation Shareholders Litigation, District Court of Johnson County, Kansas Civil Court department, Case No. 04 CV 01714, deposition testimony, New York, N.Y., January 15, 2007.

In re: Curtis v. Northern Life Insurance Company, King County Superior Court, State of Washington, No. 01-2-18578-1 SEA, deposition testimony, Pittsburgh, Pa., July 2006.

Howard Yue vs. New Focus, Inc., et al. and New Focus, Inc. vs. Howard Yue, Superior Court of California, County of Santa Clara, Case No. CV808031, deposition testimony, Palo Alto, Ca., June 29, 2005.

A-18

**CONFIDENTIAL**

Daniel McCabe, Russell E. McCabe, and David Motovidlak v. Ernst & Young, LLP, et al., United States District Court, District of New Jersey, No. Civ. 01-5747 (WHW), deposition testimony, New York, N.Y., April 2005.

Securities and Exchange Commission v. David C. Guenthner and Jay M. Samuelson, United States District Court, District of Nebraska, No. 8:02CV10, deposition testimony, Omaha, Neb., April 2005.

Fyffes PLC and DCC PLC, S&L Investments Limited, James Flavin, and Lotus Green Limited, The High Court, Dublin, Ireland, Case No. 1183P/2002, trial testimony, Dublin, Ireland, February 22, 2005.

Oracle Corporation and Pepper Acquisition Corp.  v. Peoplesoft, et al., Delaware Chancery Court, New Castle County, Civil Action No. 20377, trial testimony, Wilmington, Del., October 7, 2004.

Oracle Corporation and Pepper Acquisition Corp. v. v. Peoplesoft, et al., Delaware Chancery Court, New Castle County, Civil Action No. 20377, deposition testimony, Wilmington, Del., September 24, 2004.

Sensormatic Electronics Corporation vs. First National Bank of Pennsylvania, Winner & Bagnara, Inc., and James E. Winner, Jr., United States District Court, Western District of Pennsylvania, Civil Action No. 99-756, deposition testimony, Sharon, Pa., June 2, 2004.

Securities and Exchange Commission v. Michael J. Rivers and Thomas E. Hall, United States District Court, District of Minnesota, 02-4213-JRT/FLN, trial testimony, Minneapolis, Minn., May 2004.

Corporacion Durango, S.A. de C.V., as assignee of Durango Paper Company v. HG Estate, LLC and St. Mary's Railroad Corporation, United States District Court, Southern District of New York, No. 02 CIV 10059 (CSH), arbitration testimony, New York, N.Y., April 2004.

In re: AT&T Corp. Securities Litigation, United States District Court, District of New Jersey, MDL No. 1399 Consolidated CA No. 01-1883, deposition testimony, Pittsburgh, Pa., March 10, 2004.

Austern Trust Dated 7/11/94, Barry Austern and Susan L. Austern Trustees, derivatively on behalf of DPL, Inc. vs. Peter H. Forster, Court of Common Pleas of Hamilton County, Ohio, deposition testimony, Cincinnati, Ohio, September 24, 2003.

MCI/Worldcom bankruptcy, deposition testimony, New York, N.Y., September 2003.

A-19

**CONFIDENTIAL**

Securities and Exchange Commission v. Robert J. Prevett, et al., United States District Court, Northern District of California, Civil Action No. C-01-21069-PVT, trial testimony, San Jose, Ca., July 2003.

Internal Revenue Service v. Estate of Josephine Thompson, United States Tax Court, Docket No. 4939-02, trial testimony, New York, N.Y., June 2003.

In re: Telecorp PCS Incorporated Shareholders Litigation, Delaware Chancery Court, New Castle County, CA No. 19260-NC, deposition testimony, New York, N.Y., April 4, 2003.

Securities and Exchange Commission v. Jack Lau, et al., United States District Court, Northern District of California, Civil Action No. C-01-21067-PVT, trial testimony, San Jose, Ca., March 2003.

Sylvia Allen, as personal representative of the estate of James Allen vs. R.J. Reynolds Tobacco Company and Philip Morris Incorporated, United States District Court, Southern District of Florida, No. 01-4319-CIV-KING/O'Sullivan, deposition testimony, Miami, Fl., December 6, 2002.

Zoffanies Pty Limited v. Commissioner of Taxation (Australia), tribunal testimony, Sydney, Australia, August 2002.

United States v. Robert Prevett, United States District Court, Northern District of California, trial testimony, San Jose, Ca., November 2002.

United States v. Frank Dubone, et al., United States District Court, Western District of Pa., trial testimony, May 2002.

United States vs. Atul Bhagat, United States District Court, Northern District of California, trial testimony, San Jose, Ca., March 2002.

Consolidated Edison, Inc. against Northeast Utilities, Inc., Civil Action No.: 01-CIV1893 (JGK) (HP), deposition testimony, New York, N.Y., February 28, 2002.

Robert K. Bell, et al., v. Fore Systems, et al., United States District Court, Western District of Pennsylvania, Civil Action No. 97-1265, deposition testimony, Pittsburgh, Pa., June 2001.

Beder, et al. v. Cleveland Browns, Inc., et al., Court of Common Pleas of Ohio, Cuyahoga County, No. CV-297862, deposition testimony, Cleveland, Ohio, January 2001.

Kohler Company v. Sogen International Fund, Inc., Sheboygan County Circuit Court, Wisconsin, deposition testimony, Milwaukee, Wisc., October 1999.

A-20

**CONFIDENTIAL**

The Common Fund for Nonprofit Organizations v. KPMG Peat Marwick LLP, et al., United States District Court, Southern District of New York, No. 96 CIV 0255 (MGC), deposition testimony, Washington, D.C., January 1999.

Securities and Exchange Commission v. Jacob Y. Terner, et al., United States District Court, Central District of California, Civil Action No. 97-4812 GHK (JGx), trial testimony, Los Angeles, Ca., July 1998.

Securities and Exchange Commission v. Jacob Y. Terner, et al., United States District Court, Central District of California, Civil Action No. 97-4812 GHK (JGx), deposition testimony, Los Angeles, Ca., June 1998.

Securities and Exchange Commission v. Harold Fitzgerald Lenfest and Marguerite Lenfest, United States District Court, Eastern District of Pennsylvania, Civil Action No. 95-CV-7597 JCH, deposition testimony, Philadelphia, Pa., February 1998.

United States v. Mark Aronds, United States District Court, Eastern District of Michigan, trial testimony, Detroit, Mich., December 1997.

Retirement System of Alabama, et al., v. James River, et al., Circuit Court of the State of Alabama, deposition testimony, Richmond, Va., March 1997.

Securities and Exchange Commission v. Shahryar Soroosh, United States District Court, Northern District of California, No. C-96-3933-VRW, trial testimony, San Francisco, Ca., February 1997.

Securities and Exchange Commission v. Shahryar Soroosh, United States District Court, Northern District of California, No. C-96-3933-VRW, deposition testimony, January 1997.

Securities and Exchange Commission vs. Michael P. Angelos and G. Gregory Russell, United States District Court, District of Maryland, Civil Action No. B-96-834, deposition testimony, Baltimore, Md., November 22, 1996.

Securities and Exchange Commission vs. S. Jay Goldinger, Bert R. Cohen, Andrew E. Gerald, Harvey M. Rosen, and Ronald A. Weinstein, United States District Court, Central District of California, No. 91-3445-JWI (GHXx), deposition testimony, Los Angeles, Ca., February 22, 1995.

H Enterprises International v. General Electric Capital Corporation, et al., United States District Court, District of Minnesota, Fourth Division, CIV No. 4-91-679, deposition testimony, Minneapolis, Minn., 1994.

A-21

**CONFIDENTIAL**

Exxon Valdez Oil Spill Litigation, deposition testimony, Anchorage, Ak., 1993.

The Procter & Gamble Company v. Mafco Holdings, Inc., et al., American Arbitration Association Commercial Tribunal, arbitration testimony, New York, N.Y., November 1992.

Carter Hawley Hale bankruptcy, deposition testimony, Los Angeles, Ca., 1991.

**Board and Committee Memberships**

Economist Intelligence Unit, Advisory Board, 2015–2016.
NASD ATC Advisory Committee, 2006-2007.
Shadow Financial Regulatory Committee, 2003-2007.
Allegheny Institute, 2005-2014.
Aristech Receivables, 1998-2001.
Weirton Receivables, 1993-2001.
Borden Receivables, 1994-1996.
Carbide/Graphite Group Receivables, 1993-1996.
Economic Advisory Board, The Nasdaq Stock Market, 1996-1998.
Academic Advisory Council, Turnaround Management Association, 2000–present.
Advisory Board, Mobot Inc., 2000.

**Journal and Other Refereeing**

*American Economic Review*, *Economic Inquiry*, *Economic Journal*, *Financial Management*, *Harvard Business School Press*, *Irwin Publishing*, *Journal of Accounting, Auditing and Finance*, *Journal of Business*, *Journal of Comparative Economics*, *Journal of Corporate Finance*, *Journal of Economics and Management Strategy*, *Journal of Finance*, *Journal of Financial Economics*, *Journal of Financial and Quantitative Analysis*, *Journal of Law and Economics*, *Journal of Law, Economics, and Organization*, *Journal of Managerial Accounting Research*, *Journal of Political Economy*, *Management and Decision Economics*, *National Research Council Canada*, *National Science Foundation*, *Quarterly Journal of Economics*, *Rand Journal of Economics*, *The Accounting Review*, *The Financial Review*, *University of Chicago Press*.

**University Service**

Committee on Business School Centers (chair), 2011-2012.
Dean Search Committee for Katz School of Business, 2005-2006.
Promotion and Tenure Committee, Katz Graduate School of Business, 2004-2006, 2008-2010, 2019-2020.
Distinguished Faculty Committee, 2003-2005.

A-22

**CONFIDENTIAL**

Executive Committee, Katz Graduate School of Business, 1994-1995 (co-chair); 1998-2001 (co-chair, 2000); 2008-2011; 2013-2015.
Appeals Panel for Grievance over Denial of Tenure (chair), 1999.
Steering Committee for University's Reaccreditation with Middle States Association, 1999.
Promotion and Tenure Committee, Katz Graduate School of Business, 1999-2001.
Dean Search Committee for Katz Graduate School of Business, 1995.
Internal Review Committee for Economics Department (chair), 1994.
Faculty Appointment Committee, Katz Graduate School of Business, 1993-1994.
MBA Curriculum Committee, Katz Graduate School of Business, 1993.
Retirement Subcommittee, 1992-1993.
Doctoral Policy Committee, Katz Graduate School of Business, 1991-1993; 2003-2005.

**Other Professional Service**

Founding Editor, *Journal of Corporate Finance*, 1992-2001.
Associate Editor, Investment Management and Financial Innovations, 2004-2006.
Associate Editor, *Journal of Financial Research*, 1999-2005.
Associate Editor, *The Financial Review*, 1998-2003.
Associate Editor, *Asia-Pacific Journal of Accounting & Economics*, 2000-2003.
Associate Editor, *International Journal of the Economics of Business Economics*, 1994-2000.
Associate Editor, *Pacific-Basin Finance Journal*, 1992-1996.
Editorial Board, *Investment Management and Financial Innovations*, 2004-2006.
Advisory Board, *Financial Economics Network*, 1994-2020.
Advisory Board, *Journal of Financial Abstracts*, 1994-2020.
Advisory Board, *Corporate, Securities, and Finance Law Abstracts*, 1996-2020.
Advisory Board, *The Financier*, 1994-2003.
Advisory Board, *The Arbitrageur*, 1998-2003.
Program Committee, 1992, 1993 Pacific Basin Conferences.
Program Committee, 1992 Western Finance Association Meetings.
Program Committee, 1992, 1996, 2007 Financial Management Association Meetings.

**Seminar and Conference Presentations**

AEI-Brookings Joint Center for Regulatory Studies, Allegheny County Bankruptcy Symposium, American Appraisal Association, American Economic Association, American Enterprise Institute, American Finance Association, American Management Association, American Society of Appraisers, Arizona State University, Baruch College, Boston College, California Polytechnic University, Canadian Law and Economics Association, Clemson University, Columbia University, U.S. Department of Justice, DePaul University, Drexel University, Duquesne University, European Financial Management Association Conference, Federal Reserve Bank of Atlanta, Federal Reserve Bank of Chicago, Federal Reserve Bank of New York, Federal Reserve Bank of San Francisco, George Mason University, Georgetown University, Georgia Institute of

A-23

**CONFIDENTIAL**

Technology, Harvard University, Hofstra University, Indiana University, Kent State University, Massachusetts Institute of Technology, Michigan State University, National Bureau of Economic Research, Networks Financial Institute, North Carolina State University, Northeastern University, Northwestern University, Oberlin College, Ohio State University, Ohio University, Paris Financial Management Conference, Pennsylvania State University, Professional Liability and Underwriting Society, Purdue University, Queens University, Southern Methodist University, Texas A&M University, Tulane University, U.S. Chamber of Commerce, U.S. Department of Justice, U.S. Federal Trade Commission, U.S. Securities and Exchange Commission University of California (Los Angeles), University of California (Santa Barbara), University of Chicago, University of Delaware, University of Florida, University of Illinois, University of Kansas, University of Maryland, University of Michigan, University of Missouri, University of Missouri (St. Louis), University of North Carolina, University of Notre Dame, University of Oregon, University of Pennsylvania, University of Rhode Island, University of Rochester, University of South Carolina, University of Southern California, University of Texas, University of Texas (Dallas), University of Utah, University of Virginia, Washington University (St. Louis), World Finance Conference.

CONFIDENTIAL

# APPENDIX B

## Materials Relied Upon

**Court Documents**

Louisiana Sheriff's Pension & Relief Fund v. Cardinal Health, Inc., et al. Consolidated Amended Complaint for Violations of the Federal Securities Laws, September 8, 2020

Lead Plaintiff's Motion for Class Certification, March 25, 2022

Opinion and Order, Louisiana Sheriff's Pension & Relief Fund v. Cardinal Health, Inc., et al., September 27, 2021

**Expert Report**

Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA, March 24, 2022 and Exhibits

**Depositions**

Deposition Transcript of Stephanie McGirr (Boston Partners), April 26, 2022

Deposition Transcript of Bhaskaran Swaminathan (LSV Asset Management), April 28, 2022

Deposition Transcript of Steven P. Feinstein, May 5, 2022

Deposition Transcript of Jeff Agne (Rothschild), May 12, 2022

Deposition Transcript of Nicholas Smith (Columbia Management Investment Advisers), May 26, 2022

**SEC Documents**

Cardinal Health, Inc. Form 8-K, March 2, 2015

Cardinal Health, Inc., Form 10-Q, March 31, 2015

Cardinal Health, Inc., Form 8-K, June 5, 2015

Cardinal Health, Inc. Form 10-K, June 30, 2015

Cardinal Health, Inc., Annual Report, June 30, 2015

Cardinal Health, Inc., Form 10-Q, September 30, 2015

Cardinal Health, Inc., Form 10-Q, December 31, 2015

Cardinal Health, Inc., Form 10-Q, March 31, 2016

Cardinal Health, Inc., Form 10-K, June 30, 2016

Cardinal Health, Inc., Form 10-Q, September 30, 2016

Cardinal Health, Inc., Form 10-Q, December 31, 2016

**CONFIDENTIAL**

Cardinal Health, Inc., Form 10-Q, March 31, 2017

Cardinal Health, Inc., Form 10-K, June 30, 2017

Cardinal Health, Inc., Form 10-Q, September 30, 2017

Cardinal Health, Inc., Form 10-Q, December 31, 2017

Cardinal Health, Inc., Form 8-K, January 17, 2018

Cardinal Health, Inc., Form 10-Q, March 31, 2019


**Academic Literature**

Campbell, J.Y., A.W. Lo, & A.C. MacKinlay, *The Econometrics of Financial Markets*, (Princeton University Press, 1997)

Fischel, D., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *The Business Lawyer* (1982)

Hitt, M., J. Harrison, and R. Ireland, 2001, *Mergers and Acquisitions: A Guide to Creating Value for Stakeholders*, Oxford University Press

MacKinlay, A.C., "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997)

Mendenhall, W. ., J.E. Reinmuth & R.J. Beaver, *Statistics for Management and Economics* (Duxbury Press, 1993)

Schwert, G.W., "Using Financial Data to Measure Effects of Regulation," 24 *Journal of Law and Economics* (1981)

Sirower, M., *The Synergy Trap,* Free Press (1997)


**Analyst Reports**

"Accretion Is Nice but Strategic Direction & Rationale Still Up for Some Debate," *Credit Suisse*, March 2, 2015 (CSSU_00000047)

"Just Take a Statin: Cardinal Fails to Bypass Cordis Deal," *Deutsche Bank*, March 2, 2015, (DBSI000222)

"CAH transforms Medical unit w/ Cordis deal: DD ROIC (accretion > 35c w/ synergy)," *Evercore*, March 2, 2015 (CAH-SDOH2.19-cv-3347-00006358)

"Cordis a Good Long-Term Asset in Line with CAH's IDN Strategy," *Leerink*, March 2, 2015 (CAH-SDOH2.19-cv-3347-00006231)

"Analyst's Notes," *Argus*, May 6, 2015 (ARGUS0000001)

"CAH Well Positioned Heading into F2016 and F2017," *Leerink*, July 30, 2015 (CAH-SDOH2.19-cv-3347-00388394)

"First Look at Fiscal Second-Quarter Results; Another Solid Quarter as Top-Line Guidance Suggests Continued Strength," *William Blair*, February 1, 2016 (WB000229)

**CONFIDENTIAL**

"Analyst's Notes," *Argus*, March 10, 2016 (ARGUS0000013)

"Small Steps, Big Returns," *Credit Suisse*, March 15, 2016 (CSSU_00000292)

"European Vacation: Notes from Cardinal Mgmt Meetings," *Deutsche Bank*, March 31, 2016, (DBSI000279)

"Is Minor's Kaiser Loss, Cardinal's Major Win?" *Morgan Stanley*, April 20, 2016 (MS_CARDINAL_001388)

"Our Read and Read-Through for ABC and MCK," *Barclays*, April 28, 2016 (BARC_00000327)

"Expectations Reset; 20% y/y EPS Growth is very Good," *Leerink*, April 28, 2016 (CAH-SDOH2.19-cv-3347-00389345)

"Earnings Reset – More Headwinds On The Horizon," *Morgan Stanley*, May 3, 2016 (CAH-SDOH2.19-cv-3347-00395165)

"Leveraging the global Cordis footprint," *Credit Suisse*, May 12, 2016 (CSSU_00000229)

"Analyst's Notes," *Argus*, May 16, 2016 (ARGUS0000017)

"What we are looking for at 'Dublin Day'," *RBC Capital Markets*, June 13, 2016 (RBCCM00000144)

"Dublin Day Deliberations," *Morgan Stanley*, June 15, 2016 (MS_CARDINAL_001547)

"Dublin Down on Value Based Care," *Morgan Stanley*, June 20, 2016 (MS_CARDINAL_001650)

"Long-term positioning remains favorable for addressing changing health care market," *RBC Capital Markets*, June 20, 2016 (RBCCM00000153)

"4QFY16 Preview: A Focus on FY17," *Barclays*, July 25, 2016 (BARC_00000385)

"4QFY16 Initial Impressions: Initial Guidance in Line w/Expectations (if Below Consensus)," *Barclays*, August 2, 2016 (BARC_00000398)

"4Q16 EPS tops consensus, FY17 view passes muster," *Credit Suisse*, August 2, 2016 (CAH-SDOH2.19-cv-3347-00390233)

"Post-Call Model Adjustments; Fiscal 2017 Below Expectations but Longer-Term Drivers Intact," *William Blair*, August 2, 2016 (WB000007)

"4QFY16 Initial FY17 Outlook Presents Room for Upside," *Barclays*, August 3, 2016 (BARC_00000406)

"Putting the special in specialty pharmacy," *Credit Suisse*, September 16, 2016 (CSSU_00000281)

"Lowering EPS on TRICARE news," *Credit Suisse*, October 3, 2016 (CSSU_00000212)

"Analyst's Notes," *Argus*, October 14, 2016 (ARGUS0000021)

"Not Armageddon, but Still a Deep Impact in Pharmaceutical Segment," *Baird*, October 31, 2016 (CAH-SDOH2.19-cv-3347-00390759)

"What You May Have Missed: 'Less bad' good enough today, but industry pressures remain," *UBS*, October 31, 2016 (UBS0000004)

**CONFIDENTIAL**

"First Look at Fiscal First-Quarter Results; Results Exceed Estimates; Guidance Cut Not as Big as Feared," *William Blair*, October 31, 2016 (WB000260)

"1QFY17 Review: Price Competition Hurricane Downgraded to Tropical Storm," *Barclays*, November 1, 2016 (BARC_00000481)

"Taking heart in cardiovascular strategy," *Credit Suisse*, November 3, 2016 (CSSU_00000235)

"Analyst's Notes," *Argus*, November 8, 2016 (ARGUS0000025)

"On the Road with Cardinal Health," *Barclays*, November 14, 2016 (BARC_00000495)

"Business Balance Paying Off, Still Difficult to Get Excited," *Baird*, February 7, 2017 (CAH-SDOH2.19-cv-3347-00391735)

"Does CAH F2Q17 Signal We've Passed The Inflection For Distributors?" *Cowen*, February 7, 2017 (CAH-SDOH2.19-cv-3347-00391747)

"Solid F2Q:17, Generic Buy-Side Pricing Stabilizing; PT to $81," Leerink, February 7, 2017 (CAH-SDOH2.19-cv-3347-00006290)

"Analyst's Notes," *Argus*, March 21, 2017 (ARGUS0000029)

"3QFY17 Review: CAH Meets the Lowered Bar," *Barclays*, May 1, 2017 (BARC_00000642)

"Volumes and Pricing Pressures Continue – Reducing Estimates," *Leerink*, May 1, 2017 (CAH-SDOH2.19-cv-3347-00006297)

"First Look at Fiscal Third-Quarter Results; $0.05 Beat From Tax Benefit, Outlook Largely Unchanged From Prerelease," *William Blair*, May 1, 2017 (CAH-SDOH2.19-cv-3347-00387618)

"Paddling Furiously Upstream," *Baird*, August 2, 2017 (CAH-SDOH2.19-cv-3347-00393126)

"Plenty of moving pieces for FY18," *Bank of America Merrill Lynch*, August 2, 2017 (CAH-SDOH2.19-cv-3347-00393138)

"CAH Reports Soft Operating F4Q17, 2018 Guidance," *Cowen*, August 2, 2017 (CAH-SDOH2.19-cv-3347-00393164)

"Diagnosing 4Q post call; Moderating estimates," *Credit Suisse*, August 2, 2017 (CSSU_00000384)

"CAH Investing for the Long-Haul; PT to $70," *Leerink*, August 2, 2017 (CAH-SDOH2.19-cv-3347-00393222)

"Weak Outlook Driven by Continued Pharma Pressure," *Raymond James*, August 2, 2017 (CAH-SDOH2.19-cv-3347-00398954)

"Follow-Up on F4Q Results and Initial FY18 Guidance," *J.P. Morgan*, August 3, 2017 (CAH-SDOH2.19-cv-3347-00393213)

"CAH: Model and Price Target Updates," *Morgan Stanley*, August 3, 2017 (MS_CARDINAL_003396)

"F4Q17: Another Setback to Numbers and Sentiment," *Needham*, August 3, 2017 (CAH-SDOH2.19-cv-3347-00393245)

"Model Update," *J.P. Morgan*, November 7, 2017 (CAH-SDOH2.19-cv-3347-00393790)

**CONFIDENTIAL**

"Initiating Coverage at Hold, Price Target of $65 (10% upside)," *Nephron*, December 1, 2017 (CAH-SDOH2.19-cv-3347-00386623)

"Re-Positioning for the New Year to Reduce Hospital Exposure," *J.P. Morgan*, December 19, 2017 (JPMS_00006744)

"Incremental Disclosure on Tax Reform," *Credit Suisse*, January 8, 2018 (CSSU_00000344)

"Adjusting Estimates for Revised Tax Rate," *William Blair*, January 11, 2018 (WB000240)

"2Q18 EPS ahead; Raising estimates," *Credit Suisse*, February 8, 2018 (CSSU_00000405)

"Follow-Up on F2Q18," *J.P. Morgan*, February 8, 2018 (CAH-SDOH2.19-cv-3347-00394618)

"Pharma and Medical Improving, though more Investment Needed in F2H18," *Leerink,* February 8, 2018 (CAH-SDOH2.19-cv-3347-00394751)

"Model Maintenance; Adjusting Estimates, Reflecting US Tax Reform, Consistent with Conference Call Commentary," *Credit Suisse*, February 9, 2018 (CSSU_00000435)

"Model Update: FY18 Looks Conservative With Improved Fundamentals In Pharma," *Cowen*, February 14, 2018 (CAH-SDOH2.19-cv-3347-00394707)

"Growth Wings Still Seem Clipped; Reinstate with Underperform Rating," *Bank of America Merrill Lynch*, February 26, 2018 (CAH-SDOH2.19-cv-3347-00394568)

"Management Meeting Takeaways From Cowen Health Care Conference," *Cowen*, March 12, 2018 (CAH-SDOH2.19-cv-3347-00394603)

"Analyst's Notes," *Argus*, April 2, 2018 (ARGUS0000045)

"Cardinal Health Week Day 3: Specialty Solutions," *J.P. Morgan*, April 11, 2018 (CAH-SDOH2.19-cv-3347-00387176)

"Cardinal Health Week Day 4: The Medical Segment," *J.P. Morgan*, April 12, 2018 (CAH-SDOH2.19-cv-3347-00387189)

"Cardinal Health Week Day 5: Takeaways from the Conference Call," *J.P. Morgan*, April 13, 2018 (CAH-SDOH2.19-cv-3347-00387205)

"CAH 3QFY18: What to Watch For," *Nephron*, April 27, 2018 (CAH-SDOH2.19-cv-3347-00387296)

"Post-call: revised FY19 EPS view suggests $5.60 highly unlikely now," *Barclays*, May 3, 2018 (CAH-SDOH2.19-cv-3347-00386127)

"Well that escalated quickly (FY19 guidance ramp): What You May Have Missed," *Bank of America Merrill Lynch*, May 3, 2018 (CAH-SDOH2.19-cv-3347-00395094)

"3Q EPS miss on Cordis conundrum; Guide cut," *Credit Suisse*, May 3, 2018 (CAH-SDOH2.19-cv-3347-00395116)

"Striking a Tough 'Chord'," *Evercore ISI*, May 3, 2018 (CAH-SDOH2.19-cv-3347-00006221)

"Titanic, and We Don't Mean the Movie: Weak F3Q and Outlook Sink CAH Shares," *RBC Capital Markets*, May 3, 2018 (CAH-SDOH2.19-cv-3347-00395316)

B-5

**CONFIDENTIAL**

"Company-Specific Issues To Keep This Cardinal From Flying NT," *Jefferies*, May 4, 2018 (CAH-SDOH2.19-cv-3347-00386221)


**Investor Conference Call Transcripts**

"Cardinal Health Inc To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash M&A Call," *Cardinal Health, Inc., M&A Conference Call*, March 2, 2015

"Healthcare is changing …We're changing healthcare," *Cowen and Company 35th Annual Health Care Conference*, March 3, 2015

"Cardinal Health Inc at Barclays Healthcare Conference," *Thomson StreetEvents,* March 10, 2015

"Healthcare is changing …We're changing healthcare," *Bank of America Merrill Lynch 2015 Health Care Conference*, May 13, 2015

"Cardinal Health, Inc. Investor and Analyst Meeting November 19, 2015," *Cardinal Health, Inc., Investor and Analyst Meeting*, November 19, 2015

"Healthcare is changing …We're changing healthcare," *J.P. Morgan Healthcare Conference*, January 12, 2016

"Cardinal Health, Inc. NYSE:CAH Company Conference Presentation," *S&P Global Market Intelligence*, January 12, 2016

"CAH – Cardinal Health Inc at Leerink Partners Global Healthcare Conference," *Thomson Reuters StreetEvents,* February 10, 2016

"CAH – Cardinal Health Inc at Raymond James Institutional Investors Conference," *Thomson Reuters StreetEvents,* March 7, 2016

"Cardinal Health Inc at William Blair Growth Stock Conference," *Thomson StreetEvents*, June 15, 2016

"Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc.*, June 17, 2016

"Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc.,* December 16, 2016

"Cardinal Health Inc at JPMorgan Healthcare Conference- Q&A," 35th Annual *JPMorgan Healthcare Conference*, January 10, 2017

"Healthcare is changing …We're changing healthcare," *35th Annual J.P. Morgan Healthcare Conference*, January 10, 2017

"Cardinal Health Inc at Morgan Stanley Healthcare Conference," *Thomson StreetEvents*, September 11, 2017

"Cardinal Health, Inc. NYSE:CAH Company Conference Presentation," *S&P Capital IQ*, January 8, 2018

"Cardinal Health Inc at JPMorgan Healthcare Conference," *Thomson StreetEvents*, January 8, 2018

"Cardinal Health Inc at Leerink Partners Global Healthcare Conference," *Leerink Partners Global Healthcare Conference*, February 15, 2018

**CONFIDENTIAL**

"Cardinal Health Inc. at Barclays Global Healthcare Conference," *Thomson StreetEvents,* March 13, 2018

## Earnings Conference Call Transcripts

"Cardinal Health Inc To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash M&A Call," *Cardinal Health, Inc., M&A Conference Call*, March 2, 2015

"Q3 FY15 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, April 30, 2015

"Q4 FY15 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, July 30, 2015

"Q1 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 2, 2015

"Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 1, 2016

"Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* April 28, 2016

"Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2016

"Q1 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* October 31, 2016

"Q2 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 7, 2017

"Q3 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* May 1, 2017

"Q4 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2017

"Q1 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 6, 2017

"Q2 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 8, 2018

"Q3 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health*, *Inc.*, May 3, 2018

## Earnings Presentations

"Q3 FY2017 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health*, *Inc.*, May 1, 2017

"Q4 FY2017 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health*, *Inc.*, August 2, 2017

"Q1 FY2018 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health, Inc.*, November 6, 2017

"Q2 FY2018 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health, Inc.*, February 8, 2018

"Q3 FY18 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health*, *Inc.*, May 3, 2018

**CONFIDENTIAL**

**News Articles and Press Releases**

"J&J Said To Be In Talks To Sell Cordis Unit; Cardinal Health Said To Be Leading Suitor For J&J's Cordis," *Bloomberg*, February 20, 2015

"Cardinal Health to Acquire Cordis, a Worldwide Leader in Cardiac and Endovascular Medical Products for $1.944 Billion in Cash," *Cardinal Health, Inc., Press Release*, March 2, 2015

"Interview: The bigger value behind Cardinal Health's Cordis buy," *Clinica Medtech Intelligence,* April 10, 2015

"Cardinal Health acquires Nashville specialty pharma distributor," *BizJournals.com*, April 28, 2015

"Cardinal Health Reports Fiscal 2015 Third-quarter Results," *Cardinal Health, Inc., Press Release,* April 30, 2015

"Cardinal Health To Acquire The Harvard Drug Group For $1.115 Billion," *Cardinal Health, Inc., Press Release*, June 5, 2015

"Cardinal Health Acquires OutcomesMTM," *Cardinal Health, Inc., Press Release*, July 16, 2015

"Cardinal Health Reports Strong Q4 and Record Fiscal Year-End Non-GAAP Operating Earnings Results," *Cardinal Health, Inc., Press Release*, July 30, 2015

"Cardinal Health's move to acquire naviHealth highlights demand for post acute care coordination," *MedCity News*, August 26, 2015

"Cardinal Health Completes Acquisition Of Cordis," *Cardinal Health, Inc.*, *Press Release*, October 4, 2015

"Cardinal Health Reports Strong First-Quarter Results for Fiscal 2016," *Cardinal Health, Inc., Press Release*, November 2, 2015

"Cardinal Health Reports Second-Quarter Results for Fiscal 2016," *Cardinal Health, Inc.,* February 1, 2016

"Another Significant Specialty Deal: Cardinal Health Buys Raintree Oncology," *Drug Channels*, March 11, 2016

"DEALS: FocalPoint Advises FDSI Logistics in its acquisition by Cardinal Health," *FocalPoint*, April 27, 2016

"Cardinal Health Reports Strong Third-Quarter Results for Fiscal Year 2016," *Cardinal Health, Inc.*, *Press Release*, April 28, 2016

"Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc., Press Release*, June 17, 2016

"Cardinal Health Reports Q4 and Fiscal 2016 Results, Provides Fiscal 2017 Outlook," *Cardinal Health, Inc.*, *Press Release*, August 2, 2016

"Cardinal Health buys Iowa telepharmacy startup," *Des Moines Register*, August 26, 2016

"Cardinal Health Expands in Asia," *Cardinal Health, Inc., Press Release,* October 5, 2016

"Cardinal Health Reports First-quarter Results for Fiscal Year 2017," *Cardinal Health Inc., Press Release,* October 31, 2016

"Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc., Press Release,* December 16, 2016

**CONFIDENTIAL**

"Cardinal Health Reports Second-quarter Results for Fiscal Year 2017," *Cardinal Health Inc., Press Release,* February 7, 2017

"Cardinal Health Announces New Strategic Agreements at CIT 2017 to Expand Cordis' Cardiology Product Offerings in China," *Cardinal Health Inc., Press Release*, March 31, 2017

"Cardinal Health to Acquire Leading Patient Product Portfolio from Medtronic for $6.1 Billion," *Cardinal Health, Inc., Press Release*, April 18, 2017

"Cardinal Health updates fiscal 2017 guidance; Provides early outlook for future fiscal years," *Cardinal Health, Inc., Press Release,* April 18, 2017

"Cardinal Health Reports Third-quarter Results for Fiscal Year 2017," *Cardinal Health, Inc., Press Release*, May 1, 2017

"Cardinal Health Reports Q4 and Fiscal 2017 Results, Provides 2018 Guidance," *Cardinal Health, Inc., Press Release*, August 2, 2017

"Cardinal Health Reports First-quarter Results for Fiscal Year 2018," *Cardinal Health, Inc., Press Release*, November 6, 2017

"Cardinal Health Signs Definitive Agreement to Sell its China Business to Shanghai Pharma," *Cardinal Health Inc., Press Release*, November 14, 2017

"Cardinal Health Announces Closing of Cardinal Health China Distribution Business Divestiture to Shanghai Pharma," *Cardinal Health Inc., Press Release*, February 1, 2018

"Cardinal Health Reports Second-quarter Results for Fiscal Year 2018," *Cardinal Health, Inc., Press Release*, February 8, 2018

**Data**

US Stock and Index Databases ©2022 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business

CONFIDENTIAL

# APPENDIX C
## Event Study

1.      Event study analysis is a method commonly used in financial economics to estimate the relation between releases of new information and changes in a company's security price.[1] Event study analysis controls for the relation between a company's stock returns and the corresponding returns on market and/or industry indices on the relevant event dates. This is typically done by using regression analysis to estimate the historical relation between a company's stock returns and the corresponding returns on the market and/or industry indices. Parameters from the regression model are used along with the actual performance of the market and/or industry indices on the day in question to estimate an expected or "explained" return. The expected return is then subtracted from the actual return to estimate a "residual return" on the relevant event date.

2.      Conventional event study analysis tests the "null hypothesis" that the residual return on the event date is zero against the alternative hypothesis that the residual return is different from zero.[2] Put differently, the analysis tests the null hypothesis that the event at hand had no impact on the relevant company's stock price against the alternative hypothesis that the event at hand is associated with a change in the company's stock price. If the null hypothesis cannot be rejected at conventional levels of significance, then the residual return is not considered to be statistically significant, *i.e.*, it is not considered to be significantly different from

---

[1] *See*, *e.g.*, A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997), 13-39.

[2] *See*, *e.g.*, J.Y. Campbell, A.W. Lo, and A.C. MacKinlay, *The Econometrics of Financial Markets*, (Princeton University Press, 1997), at 160-66; A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997), 13-39; G.W. Schwert, "Using Financial Data to Measure Effects of Regulation," 24 *Journal of Law and Economics* (1981), 121-57; D. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *The Business Lawyer* (1982), 1-20, at 19.

**CONFIDENTIAL**

zero. Under these circumstances, one cannot conclude that the event at hand had an impact on the relevant company's stock price.

3. The statistical significance of residual returns is assessed by calculating a standardized measure of the size of the residual return known as a "*t*-statistic." A *t*-statistic with an absolute value of 1.96 or greater denotes statistical significance at the five percent level (a conventional level at which such assessments are made) in a "two-tailed" test of statistical significance.[3] In a two-tailed test, the null hypothesis is that the residual return is zero, and the alternative hypothesis is that the residual return is different from zero (*i.e.*, either positive or negative).

---

[3] *See*, *e.g.*, W. Mendenhall, J.E. Reinmuth & R.J. Beaver, *Statistics for Management and Economics* (Duxbury Press, 1993), at 346-47.

**CONFIDENTIAL**

# EXHIBIT 1
## Timeline of Selected Cardinal Health Company Announcements

1. March 2, 2015: Cardinal announced its plans to acquire Cordis for $1.944 billion in cash. Cardinal "expects fiscal year 2017 accretion in non-GAAP diluted earnings per share… [of] $0.20 per share, which includes the cost of an incremental $0.07-$0.08 per share of interest expense associated with financing the transaction. The company expects… and assumes that synergies will exceed $100 million annually by the end of fiscal 2018."[1]

2. April 28, 2015: Cardinal acquired specialty pharmaceutical distributor Metro Medical Supply Inc.[2]

3. April 30, 2015: Cardinal announced strong third quarter 2015 results, driven by its Pharmaceutical segment. In the Pharmaceutical segment, it completed the acquisition of a specialty distribution business: Metro Medical, which Cardinal expected to generate more than $5 billion in revenue in 2015. Red Oak Sourcing, a joint venture with CVS Health, continued to perform well contributing to strong performance of the Pharmaceutical segment. Medical segment profit was down 8% due to price erosion in legacy branded med/surg distribution business and challenges in the Canadian market.[3]

4. June 5, 2015: Cardinal announced its "plans to acquire The Harvard Drug Group…, a distributor of generic pharmaceuticals, over-the-counter medications and related products to retail, institutional and alternate care customers… for $1.115 billion using existing cash and new debt…. Cardinal Health expects accretion in non-GAAP diluted earnings per share (EPS) from continuing operations of greater than $0.15 per share in fiscal 2016, net of the $0.03 to $0.04 per share of interest expense for the related debt financing. Cardinal Health expects accretion in non-GAAP diluted EPS of more than $0.20 in fiscal 2017 and for accretion to be increasingly greater thereafter."[4]

5. July 16, 2015: Cardinal acquired OutcomesMTM, a company that delivers personalized Medication Therapy Management.[5]

6. July 30, 2015: Cardinal announced record earnings for FY2015, driven by its Pharmaceutical segment. Year-over-year Medical segment was "essentially flat." During Q4 2015, Cardinal entered into an agreement to acquire Harvard Drug, which it hoped would strengthen its capabilities in generics and add scale to Red Oak JV with CVS. Other notable mentions during this quarter were payment models that are changing from Medicare, shifting to value-based models. CMS announced its "first mandatory targets

---

[1] "Cardinal Health To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash," *Cardinal Health Inc., Press Release*, March 2, 2015.

[2] "Cardinal Health acquires Nashville specialty drug distributor," *BizJournals.com*, April 28, 2015.

[3] "Q3 FY15 Cardinal Health, Inc.  Earnings Conference Call," *Cardinal Health, Inc.*, April 30, 2015, at 2, 3 and 4.

[4] "Cardinal Health To Acquire The Harvard Drug Group For $1.115 Billion," *Cardinal Health Inc., Press Release*, June 5, 2015.

[5] "Cardinal Health Acquires OutcomesMTM," *Cardinal Health Inc., Press Release*, July 16, 2015.

**CONFIDENTIAL**

for bundled payments." Cardinal believes that with its acquisitions such as Cordis, AccessClosure, Innovative Therapies, and Emerge, they are well positioned to serve these bundles. The Company stated, "[T]he Medical segment will have a challenging first [2016] quarter," driven by the "wind-down of a post-spin CareFusion contract in Canada." Cardinal "anticipate[d] outgrowing the market in Cardinal Health at Home" and continued to believe that China "represent[ed] a significant opportunity."[6]

7. October 4, 2015: Cardinal completed acquisition of Cordis.[7]

8. November 2, 2015: Cardinal reported strong Q1 2016 earnings, driven by its Pharmaceutical segment. The Company stated, "[M]edical segment profit[s] declined 11% versus the prior year." In August, Cardinal took a majority stake at naviHealth, which will report to Medical segment. The U.S. healthcare system continues to experience changes.[8]

9. February 1, 2016: Cardinal reported strong Q2 2016 earnings, driven by its Pharmaceutical segment. Pharmaceutical segment profit increased 16%. Medical segment profit declined 8%. But for the Cordis-related $21 million inventory step-up, taken in Q1 2016, Medical segment profit would have shown an increase of 10% over prior year. China continues to grow at double-digit rates.[9]

10. February 1, 2016: Cardinal Health indicated that with the Cordis acquisition it was getting additional exposure to foreign exchange ("FX") risk and that it was difficult for it to assess the impact of the FX risk.[10]

11. March 11, 2016: Cardinal acquires RainTree Oncology Services.[11]

12. April 27, 2016: Cardinal acquires FDSI Logistics, LLC for an undisclosed purchase price.[12]

13. April 28, 2016: Cardinal reported strong Q3 2016 earnings, both segments performed well. Pharmaceutical segment profit increased 16% and Medical segment profit increased 26%, including a negative impact of Cordis related inventory value step-up of $21

---

[6] "Q4 FY15 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, July 30, 2015, at 3, 4, 8, 9 and 16.

[7] "Cardinal Health Completes Acquisition Of Cordis," *Cardinal Health, Inc., Press Release,* October 4, 2015.

[8] "Q1 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 2, 2015, at 3-6.

[9] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 1, 2016, at 2, 4 and 8.

[10] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 1, 2016, at 11.

[11] "Another Significant Specialty Deal: Cardinal Health Buys Raintree Oncology," *Drug Channels*, March 11, 2016.

[12] "DEALS: FocalPoint Advises FDSI Logistics in its acquisition by Cardinal Health," *FocalPoint*, April 27, 2016.

**CONFIDENTIAL**

million quarterly for Q2 2016. ("As you may recall, this quarter, like Q2, includes the Cordis inventory fair value step-up, which was $21 million in each quarter.")[13]

14. April 28, 2016: Cardinal announced that "foreign exchange impact … was greater than … originally modeled."[14]

15. August 2, 2016: Cardinal reported strong Q4 2016 and FY2016 earnings, both segments performed well. Pharmaceutical segment profit increased 19% compared to prior year. Medical segment profit increased 6%. Highlights included successful completion of integration of Metro Medical into Specialty Solutions group within the Pharmaceutical segment; strengthened generics program through Red Oak Sourcing (partnership with CVS). Near-term generics environment presents challenges.[15]

16. August 2, 2016: Cardinal lowered its accretion from the Cordis acquisition from $0.20 to $0.15 per share due to currency impacts and increased SG&A investments. Cardinal also announced that some of the synergies associated with the Cordis acquisition will take longer to achieve than originally modeled.[16]

17. August 25, 2016: "Cardinal purchased a 71 percent stake in naviHealth for $290 million … which will be integrated into its Medical segment."[17]

18. August 26, 2016: Cardinal acquired TelePharm, LLC.[18]

19. October 5, 2016: Cardinal expands its offering of "powder-free gloves, disposable drapes, and gowns to Hong Kong."[19]

20. October 31, 2016: Generics price erosion and competitive intensity increased and caused the Company to lower FY2017 EPS guidance to $5.40-$5.60 from $5.48-$5.73. Pharmaceutical segment profit declined 19% "primarily driven by generic pharmaceutical pricing, reduced levels of branded inflation and the loss of Safeway." Medical segment profit was up 26% compared to prior year. The Company stated that "Cardinal Health branded products continue[d] to be a driver of growth for the segment." Cardinal also onboarded a large complex customer during this quarter.[20]

---

[13] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, April 28, 2016, at 10.

[14] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* April 28, 2016 at 10.

[15] "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2016, at 3-5.

[16] "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2016, at 15.

[17] "Cardinal Health's move to acquire naviHealth highlights demand for post acute care coordination," *MedCity News*, August 26, 2015.

[18] "Cardinal Health buys Iowa telepharmacy startup," *Des Moines Register*, August 26, 2016.

[19] "Cardinal Health Expands in Asia," *Cardinal Health, Inc., Press Release,* October 5, 2016.

[20] "Q1 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, October 31, 2016, at 2-4.

**CONFIDENTIAL**

21. February 7, 2017: Pharmaceutical profit declined 14% vs. prior year, "entirely the result of generic pharmaceutical pricing and the loss of Safeway." Lowered EPS FY '17 guidance range from $5.40-$5.60 to $5.35-$5.50. Medical segment profit increased 50% vs. prior year, including "the $21 million unfavorable impact of the Cordis-related inventory fair value step-up in the second quarter of fiscal year 2016."[21]

22. March 31, 2017: "Cardinal … announced two new strategic agreements that will enable Cordis… to rapidly expand its cardiology product offering in China."[22]

23. April 18, 2017: Cardinal "announced that it has entered into a definitive agreement to acquire Medtronic's Patient Care, Deep Vein Thrombosis and Natural Insufficiency businesses for $6.1 billion in cash…. The transaction is expected to close in the first quarter of Cardinal's 2018 fiscal year."[23]

24. April 18, 2017: Cardinal updated its FY'17 EPS guidance to be at the bottom of the previous guidance range of $5.35 to $5.50, which "takes into consideration generic deflation…. Cardinal Health's preliminary fiscal 2018 view is for Non-GAAP EPS to be flat to down mid-single digits…. [FY'19] Non-GAAP EPS is expected to grow at least high-single digits [vs]. fiscal [year] 2018."[24]

25. May 1, 2017: Pharmaceutical segment profit decreased 7%, "driven by generic pharmaceutical pricing, the final quarterly impact of the loss of Safeway, and the [C]ompany's ongoing investment in its [pharma] IT platform." Medical segment reported solid performance (excluding Cordis). "A decline in Cordis performance reflected increased SG&A expenses and the net favorable impact of two larger inventory adjustments."[25]

26. May 1, 2017: Cardinal announced a decline in Cordis profit that "was mostly related to increased SG&A expenses to support investment in an international infrastructure."[26]

27. August 2, 2017: Pharmaceutical segment profit decreased 7%, "driven by generic pharmaceutical pricing and the [C]ompany's ongoing investment in its [pharma] IT

---

[21] "Q2 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* February 7, 2017, at 2 and 8-9.

[22] "Cardinal Health Announces New Strategic Agreements at CIT 2017 to Expand Cordis' Cardiology Product Offerings in China," *Cardinal Health Inc., Press Release*, March 31, 2017.

[23] "Cardinal Health to Acquire Leading Patient Product Portfolio from Medtronic for $6.1 Billion," *Cardinal Health Inc., Press Release*, April 18, 2017.

[24] "Cardinal Health updates fiscal 2017 guidance; Provides early outlook for future fiscal years," *Cardinal Health Inc., Press Release,* April 18, 2017.

[25] "Q3 FY2017 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health*, *Inc.*, May 1, 2017, at 5-6.

[26] "Q3 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* May 1, 2017, at 6.

E-4

**CONFIDENTIAL**

platform." Medical segment profit increased 13%, "partially offset by performance in Cardinal Health Branded products (including Cordis)."[27]

28. August 2, 2017: Cardinal announced that it did not achieve its Cordis accretion target of $0.15 due to factors including increased costs associated with moving manufacturing and standing up back office services.[28]

29. November 6, 2017: Pharmaceutical profit decreased 13% "driven by generics program performance [and] costs related to ongoing investment in pharma IT platform." Medical segment profit increased 1% "driven by contributions from acquisitions, which were mostly offset by the previously disclosed reduced contribution from a [VA] contract. Segment profit for the quarter includes the impact of the Patient Recovery business inventory fair value step-up" of $42 million.[29]

30. November 14, 2017: Cardinal announced "that it has signed a definitive agreement to sell its Cardinal Health China business to Shanghai Pharmaceuticals Holding Co., Ltd. [] for $1.2 billion. The transaction is expected to close by the end of [Cardinal's] fiscal year."[30]

31. February 1, 2018: Cardinal "announced the closing of its divestiture of its Cardinal Health China business to Shanghai Pharmaceuticals."[31]

32. February 8, 2018: Pharmaceutical profit decreased 4% driven by generics program performance and costs related to ongoing investment in pharma IT platform. Medical Segment profit increased 38%, "driven by contributions from the acquisition of the Patient Recovery business, which were partially offset by performance in Cardinal Health Branded products, including Cordis. Segment profit for the quarter includes the impact of the Patient Recovery business inventory fair value step-up expense" of $22 million.[32]

33. May 3, 2018: Pharmaceutical profit decreased 3%, "reflect[ing] a modest negative impact from the [C]ompany's generic program performance." Medical segment profit increased 34%, "was partially offset by performance in Cordis."[33]

---

[27] "Q4 FY2017 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health*, *Inc.*, August 2, 2017, at 5-6.

[28] "Q4 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.,* August 2, 2017, at 10.

[29] "Q1 FY2018 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health*, *Inc.*, November 6, 2017, at 5-6.

[30] "Cardinal Health Signs Definitive Agreement to Sell its China Business to Shanghai Pharma," *Cardinal Health Inc., Press Release*, November 14, 2017.

[31] "Cardinal Health Announces Closing of Cardinal Health China Distribution Business Divestiture to Shanghai Pharma," *Cardinal Health Inc., Press Release*, February 1, 2018.

[32] "Q2 FY2018 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health*, *Inc.*, February 8, 2018, at 5-6.

[33] "Q3 FY18 Cardinal Health, Inc. Earnings Investor/Analyst call," *Cardinal Health*, *Inc.*, May 3, 2018, at 5-6.

**CONFIDENTIAL**
**EXHIBIT 2**
**Cardinal Health, Inc.**
**Stock Price Reaction to the Alleged False and Misleading Statements**

| | Announcement Date | Announcement Time | Stock Price Reaction Date | Event | Price | Price$_{t-1}$ | Actual Return | Residual Return | Residual $ Decline | $t$-Statistic | Pos Sig? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | 03/02/15 | 7:30 AM | 03/02/15 | Cardinal announced that it had made a binding offer to purchase the Cordis business of J&J for $1.9 billion. (Cardinal Health, Inc., Press Release) | $89.52 | $87.99 | 1.72% | 1.01% | $0.89 | 1.10 | |
| | | 8:30 AM | | Cardinal Health M&A Conference Call. (Cardinal Health, Inc., M&A Conference Call) | | | | | | | |
| [2] | 03/03/15 | 10:40 AM | 03/03/15 | Cardinal presented at Cowen Investor Health Care Conference. (Cowen and Company 35th Annual Health Care Conference) | $88.43 | $89.52 | -1.23% | -0.55% | -$0.49 | -0.61 | |
| [3] | 03/10/15 | 7:30 AM | 03/10/15 | Cardinal presented at a Barclays Healthcare Conference. (Thomson StreetEvents) | $86.94 | $87.98 | -1.19% | -0.14% | -$0.12 | -0.15 | |
| [4] | 04/10/15 | | 04/10/15 | *Clinica Medtech Intelligence* article. | $90.52 | $89.89 | 0.70% | -0.02% | -$0.02 | -0.03 | |
| [5] | 04/30/15 | 7:00 AM | 04/30/15 | 3Q 2015 Earnings Press Release. (Cardinal Health, Inc., Press Release) | $84.34 | $88.90 | -5.27% | -4.14% | -$3.68 | -4.76 | |
| | | 8:30 AM | | 3Q 2015 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |
| [6] | 05/13/15 | 11:00 AM | 05/13/15 | Cardinal presented at the Bank of America Merrill Lynch Health Care Conference. (Bank of America Merrill Lynch 2015 Health Care Conference) | $86.48 | $86.16 | 0.37% | 0.33% | $0.28 | 0.44 | |
| [7] | 10/04/15 | 7:00 PM | 10/05/15 | Cardinal issued a press release announcing the completion of the Cordis acquisition. (Cardinal Health, Inc., Press Release) | $79.55 | $78.62 | 1.18% | 0.69% | $0.54 | 0.91 | |
| [8] | 11/19/15 | 8:30 AM | 11/19/15 | Cardinal hosted an Investor and Analyst Day. (Cardinal Health, Inc., Investor and Analyst Meeting) | $87.36 | $88.60 | -1.41% | -0.25% | -$0.22 | -0.33 | |
| [9] | 01/12/16 | 12:30 PM | 01/12/16 | Cardinal executives spoke during a J.P. Morgan conference call. (J.P. Morgan Healthcare Conference) | $79.89 | $79.27 | 0.78% | -0.19% | -$0.15 | -0.23 | |
| [10] | 02/01/16 | 7:00 AM | 02/01/16 | 2Q 2016 Earnings Press Release. (Cardinal Health, Inc., Press Release) | $79.80 | $81.37 | -1.95% | -2.01% | -$1.64 | -2.43 | |
| | | 8:30 AM | | 2Q 2016 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |
| [11] | 02/02/16 | 4:07 PM | 02/03/16 | Cardinal filed Form 10-Q for 2Q 2016. (sec.gov) | $77.33 | $77.73 | -0.52% | -1.06% | -$0.82 | -1.28 | |

E-6

**CONFIDENTIAL**
**EXHIBIT 2**
**Cardinal Health, Inc.**
**Stock Price Reaction to the Alleged False and Misleading Statements**

| | Announcement Date | Announcement Time | Stock Price Reaction Date | Event | Price | Price$_{t-1}$ | Actual Return | Residual Return | Residual $ Decline | $t$-Statistic | Pos Sig? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [12] | 02/10/16 | 8:50 AM | 02/10/16 | Cardinal presented at a Leerink Partners Global Healthcare Conference. (Thomson Reuters StreetEvents) | $78.22 | $76.65 | 2.03% | 1.26% | $0.97 | 1.53 | |
| [13] | 03/07/16 | 9:15 AM | 03/07/16 | Cardinal presented at a Raymond James Institutional Investor Conference. (Thomson Reuters StreetEvents) | $84.15 | $83.51 | 0.76% | 0.07% | $0.06 | 0.08 | |
| [14] | 04/28/16 | 7:00 AM | 04/28/16 | 3Q 2016 Earnings Press Release (Cardinal Health, Inc., Press Release) | $78.51 | $86.54 | -9.74% | -9.27% | -$8.02 | -10.97 | |
| | | 8:30 AM | | 3Q 2016 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |
| [15] | 05/03/16 | 4:27 PM | 05/04/16 | Cardinal filed Form 10-Q for 3Q 2016. (sec.gov) | $77.51 | $79.24 | -2.21% | -1.39% | -$1.10 | -1.63 | |
| [16] | 06/15/16 | 9:00 AM | 06/15/16 | Cardinal presented at the William Blair Growth Stock Conference. (Thomson StreetEvents) | $76.68 | $77.93 | -1.62% | -1.03% | -$0.80 | -1.18 | |
| [17] | 06/17/16 | 10:00 AM | 06/17/16 | Cardinal Dublin Day Conference Call. (Cardinal Health, Inc.) | $75.51 | $76.54 | -1.35% | -0.37% | -$0.28 | -0.42 | |
| [18] | 08/02/16 | 7:00 AM | 08/02/16 | 4Q 2016 and FY 2016 Earnings Press Release. (Cardinal Health, Inc., Press Release) | $84.92 | $82.41 | 3.00% | 3.41% | $2.81 | 3.94 | *** |
| | | 8:00 AM | | 4Q 2016 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |
| [19] | 08/12/16 | 6:51 AM | 08/12/16 | Cardinal filed Form 10-K for FY 2016. (sec.gov) | $83.60 | $83.61 | -0.01% | 0.15% | $0.13 | 0.18 | |
| [20] | 10/31/16 | 7:00 AM | 10/31/16 | 1Q 2017 Earnings Press Release. (Cardinal Health, Inc., Press Release ) | $68.69 | $67.50 | 1.75% | 2.43% | $1.64 | 2.49 | *** |
| | | 8:30 AM | | Cardinal Health, Inc. 1Q 2017 Earnings Call. (Cardinal Health, Inc) | | | | | | | |
| [21] | 11/02/16 | 4:23 PM | 11/03/16 | Cardinal filed Form 10-Q for 1Q 2017. (sec.gov) | $65.38 | $68.66 | -4.90% | -3.75% | -$2.57 | -3.74 | |
| [22] | 12/16/16 | 10:00 AM | 12/16/16 | Cardinal Dublin Dublin Day Conference Call. (Cardinal Health, Inc.) | $73.76 | $73.00 | 1.04% | 0.90% | $0.66 | 0.84 | |
| [23] | 01/09/17 | 7:00 PM | 01/10/17 | Cardinal presented at the J.P. Morgan Healthcare Conference. (35th Annual J.P. Morgan Healthcare Conference) | $75.22 | $74.76 | 0.61% | 0.26% | $0.19 | 0.24 | |
| [24] | 02/07/17 | 7:00 AM | 02/07/17 | 2Q 2017 Earnings Press Release. (Cardinal Health, Inc., Press Release) | $77.76 | $75.97 | 2.33% | 2.29% | $1.74 | 2.17 | *** |
| | | 8:30 AM | | 2Q 2017 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |

**CONFIDENTIAL**
**EXHIBIT 2**
**Cardinal Health, Inc.**
**Stock Price Reaction to the Alleged False and Misleading Statements**

| | Announcement Date | Announcement Time | Stock Price Reaction Date | Event | Price | Price$_{t-1}$ | Actual Return | Residual Return | Residual $ Decline | $t$-Statistic | Pos Sig? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02/07/17 | 4:21 PM | 02/08/17 | Cardinal filed Form 10-Q for 2Q 2017. (sec.gov) | $77.81 | $77.76 | 0.06% | 0.27% | $0.21 | 0.26 | |
| [25] | 04/18/17 | 6:56 AM | 04/18/17 | Cardinal issued a press release announcing that its fiscal 2017 non-GAAP EPS would be at the bottom of guidance and that its 2018 outlook would be below expectations. (Cardinal Health, Inc., Press Release) | $72.39 | $81.83 | -12.26% | -11.12% | -$9.10 | -10.67 | |
| [26] | 05/01/17 | 7:00 AM | 05/01/17 | 3Q 2017 Earnings Press Release. (Cardinal Health, Inc., Press Release) | $72.19 | $72.59 | -0.55% | -0.65% | -$0.47 | -0.52 | |
| | | 8:30 AM | | 3Q 2017 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |
| [27] | 05/02/17 | 4:07 PM | 05/03/17 | Cardinal filed Form 10-Q for 3Q 2017. (sec.gov) | $72.54 | $72.99 | -0.62% | -0.02% | -$0.01 | -0.02 | |
| [28] | 08/02/17 | 7:00 AM | 08/02/17 | 4Q 2017 and FY 2017 Earnings Press Release. (Cardinal Health, Inc., Press Release) | $70.99 | $77.33 | -8.55% | -8.35% | -$6.46 | -6.72 | |
| | | 8:30 AM | | 4Q 2017 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |
| [29] | 08/10/17 | 5:26 PM | 08/11/17 | Cardinal filed Form 10-K for FY 2017. (sec.gov) | $66.98 | $67.31 | -0.49% | -0.81% | -$0.55 | -0.65 | |
| [30] | 09/11/17 | 8:45 AM | 09/11/17 | Cardinal presented at the Morgan Stanley Healthcare Conference. (Thomson StreetEvents) | $69.73 | $68.36 | 1.98% | 1.07% | $0.73 | 0.84 | |
| [31] | 11/06/17 | 6:45 AM | 11/06/17 | 1Q 2018 Earnings Press Release. (Cardinal Health, Inc., Press Release) | $60.25 | $61.38 | -1.86% | -1.36% | -$0.83 | -1.16 | |
| | | 8:30 AM | | Cardinal Health, Inc. 1Q 2018 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |
| [32] | 11/07/17 | 4:22 PM | 11/08/17 | Cardinal filed Form 10-Q for 1Q 2018. (sec.gov) | $60.99 | $60.27 | 1.19% | 1.00% | $0.60 | 0.86 | |
| [33] | 01/08/18 | 2:00 PM | 01/08/18 | Cardinal presented at the J.P. Morgan Healthcare Conference. (Cardinal Health, Inc.) | $65.22 | $63.22 | 3.11% | 3.78% | $2.39 | 2.99 | *** |
| [34] | 01/17/18 | 7:37 AM | 01/17/18 | Cardinal filed an 8-K announcing that Don Casey had left Cardinal. (sec.gov) | $72.65 | $72.58 | 0.10% | -1.06% | -$0.77 | -0.82 | |
| [35] | 02/08/18 | 7:00 AM | 02/08/18 | 2Q 2018 Earnings Press Release. (Cardinal Health, Inc., Press Release) | $66.63 | $65.14 | 2.26% | 6.70% | $4.36 | 5.10 | *** |
| | | 8:30 AM | | Cardinal Health, Inc. 2Q 2018 Earnings Call. (Cardinal Health, Inc.) | | | | | | | |
| | 02/08/18 | 4:36 PM | 02/09/18 | Cardinal filed Form 10-Q for 2Q 2018. (sec.gov) | $66.72 | $66.63 | 0.13% | -1.49% | -$0.99 | -1.13 | |

E-8

**CONFIDENTIAL**
**EXHIBIT 2**
**Cardinal Health, Inc.**
**Stock Price Reaction to the Alleged False and Misleading Statements**

| | Announcement Date | Announcement Time | Stock Price Reaction Date | Event | Price | Price$_{t-1}$ | Actual Return | Residual Return | Residual $ Decline | $t$-Statistic | Pos Sig? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [36] | 02/15/18 | 4:00 AM | 02/15/18 | Cardinal presented at the Leerink Partners Global Healthcare Conference. (Leerink Partners Global Healthcare Conference) | $68.10 | $67.34 | 1.12% | -0.13% | -$0.09 | -0.10 | |
| [37] | 03/13/18 | 8:00 AM | 03/13/18 | Cardinal presented at the Barclays Global Healthcare Conference. (Thomson StreetEvents) | $72.27 | $72.36 | -0.12% | -0.22% | -$0.16 | -0.16 | |

Notes:

A time stamp for the April 10, 2015 *Clinica Medtech Intelligence* article is unavailable.  The residual return on the following trading day, April 13, 2015, is negative and not statistically significant.

In October 2015, *Endovascular Today* published an interview with Cordis's then-President David Wilson but the but the precise date of publication is unavailable.

Sources:

Feinstein Report Exhibit 8; Consolidated Amended Complaint;  PR Newswire;  Thomson Reuters;  cardinalhealth.com; sec.gov;  US Stock and Index Databases ©2022 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business; Bloomberg, L.P.

**CONFIDENTIAL**

# EXHIBIT 3
## Cardinal Disclosed that the Cordis Acquisition Had Risks

1. March 2, 2015: "These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include: the ability to successfully complete the acquisition of Cordis on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the ability to retain customers and employees of the acquired business and to successfully integrate the acquired business into Cardinal Health's operations, if the acquisition is completed; the ability to achieve the expected synergies as well as accretion in earnings, if the acquisition is completed; the occurrence of any event, change or other circumstance that could give rise to the termination of the binding offer or the purchase agreement (once executed); the conditions of the credit markets and an ability to issue debt on acceptable terms…."[1]

2. March 2, 2015: "These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include: the ability to successfully complete the acquisition of Cordis on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the ability to retain customers and employees of the acquired business and to successfully integrate the acquired business into Cardinal Health's operations, if the acquisition is completed; the ability to achieve the expected synergies as well as accretion in earnings, if the acquisition is completed; the occurrence of any event, change or other circumstance that could give rise to the termination of the binding offer or the purchase agreement (once executed); the conditions of the credit markets and an ability to issue debt on acceptable terms; or the outcome of any legal proceedings that may be instituted against the parties and others related to the planned acquisition."[2]

3. March 2, 2015: "Michael Kaufmann: ...Obviously, we can't give you the exact uptake of the synergies as we go along, but we do expect synergies of $100 million in FY18, and there are both revenue and cost synergies in the model at this point in time."[3]

4. March 3, 2015: "These risks and uncertainties include...the ability to successfully complete the Cordis acquisition on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions…."[4]

5. March 31, 2015: "These risks and uncertainties include … risks and uncertainties relating to our planned acquisition of Cordis, including the ability to successfully complete the

---

[1] Cardinal Health, Inc. Form 8-K, March 2, 2015, Exhibit 99.1, at 3.

[2] "Cardinal Health To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash," *Cardinal Health, Inc., Press Release*, March 2, 2015.

[3] "Cardinal Health Inc To Acquire Cordis, A Worldwide Leader In Cardiac And Endovascular Medical Products For $1.944 Billion In Cash M&A Call," *Cardinal Health, Inc. M&A Conference Call*, March 2, 2015.

[4] "Healthcare is changing …We're changing healthcare," *Cowen and Company 35th Annual Health Care Conference*, March 3, 2015, at 2.

E-10

**CONFIDENTIAL**

acquisition on a timely basis, and, if completed, the ability to achieve the expected synergies and positive impact to operating results...."[5]

6.  April 30, 2015: "These risks and uncertainties include...the ability to successfully complete the acquisition of Cordis on a timely basis and if completed to achieve the anticipated results from the Cordis acquisition...."[6]

7.  May 13, 2015: "These risks and uncertainties include ... the ability to successfully complete the Cordis acquisition on a timely basis and if completed, to achieve the anticipated results from the Cordis acquisition[7]

8.  June 5, 2015: "These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied. These risks and uncertainties include: the ability to successfully complete the acquisitions of The Harvard Drug Group and Cordis on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the ability to retain customers and employees of the acquired businesses and to successfully integrate the acquired businesses into Cardinal Health's operations, if the acquisitions are completed; the ability to achieve the expected synergies as well as accretion in earnings...."[8]

9.  June 30, 2015: "We expect [the Cordis] acquisition to significantly reduce GAAP operating earnings and earnings before income taxes and discontinued operations in fiscal 2016, largely due to the expected impact of amortization and other acquisition-related costs."

    "These risks and uncertainties include ... the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition; … risks and uncertainties relating to our pending acquisition of Cordis, including, if completed, the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition will subject us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility...."[9]

10. June 30, 2015: "We expect [the Cordis] acquisition to significantly reduce GAAP operating earnings and earnings before income taxes and discontinued operations in fiscal 2016, largely due to the expected impact of amortization and other acquisition-related costs."[10]

---

[5] Cardinal Health, Inc. Form 10-Q, March 31, 2015, Exhibit 99.1, at 1.

[6] "Cardinal Health Reports Fiscal 2015 Third-Quarter Results," *Cardinal Health, Inc., Press Release*, April 30, 2015.

[7] "Healthcare is changing …We're changing healthcare," *Bank of America Merrill Lynch 2015 Health Care Conference*, May 13, 2015, at 2.

[8] Cardinal Health, Inc. Form 8-K, June 5, 2015, Exhibit 99.1, at 3.

[9] Cardinal Health, Inc. Form 10-K, June 30, 2015, at 10 and Exhibit 99.1, at 1.

[10] Cardinal Health, Inc. Annual Report, June 30, 2015, at 10.

**CONFIDENTIAL**

11. July 30, 2015: "These risks and uncertainties include...the ability to successfully complete the acquisition of Cordis and if completed to achieve the anticipated results from the Cordis acquisition…."[11]

12. September 30, 2015: "We expect [the Cordis] acquisition to have a significant negative impact on GAAP operating earnings and earnings before income taxes throughout the remainder of fiscal 2016, largely due to the expected impact of amortization and other acquisition-related costs and the roll out of the inventory fair value step up."

"These risks and uncertainties include … risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition will subject us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility…."[12]

13. October 4, 2015: "These risks and uncertainties include: the ability to retain customers and employees of Cordis and to successfully integrate the Cordis into Cardinal Health's operations, and the ability to achieve the expected synergies as well as accretion in earnings."[13]

14. November 2, 2015: Michael Kaufmann: "We will continue to update you on the Cordis inventory fair value step-up. And, while we don't yet have complete visibility, we feel very comfortable that this step-up will not exceed our original assumptions."

"Ross Muken: ...And then you've obviously closed on Cordis, can you talk just a little bit about sort of how the organization is responding to you bringing them in house? I'm assuming there's probably some good enthusiasm as you obviously, you know, will take a little bit of a different bend on that business."

"George Barrett: Sure. Let me get started again with the caveat, this is very, very new. We literally just closed this business a few weeks ago."

Michael Kaufmann: "And as I mentioned in my opening remarks, while we don't have perfect visibility to every component right now of the inventory, we do have enough visibility to tell you that the impact of the inventory step-up that we had originally said would be 13 to 15 cents, we still expect that to be the number and we do not expect any variance to the upside or it to be more expensive than 13 to 15 than we did before."[14]

---

[11] "Cardinal Health Reports Strong Q4 And Record Fiscal Year-End Non-GAAP Operating Earnings Results", *Cardinal Health, Inc., Press Release*, July 30, 2015.

[12] Cardinal Health, Inc. Form 10-Q, September 30, 2015, at 2 and Exhibit 99.1, at 1.

[13] "Cardinal Health Completes Acquisition Of Cordis," *Cardinal Health Inc., Press Release,* October 4, 2015.

[14] " Q1 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 2, 2015, at 5, 8 and 12-13.

**CONFIDENTIAL**

15. November 2, 2015: "These risks and uncertainties include … the ability to achieve and maintain the benefits from the acquisitions of Cordis and The Harvard Drug Group…."[15]

16. November 19, 2015: "These risks and uncertainties include … the ability to achieve and maintain the benefits from our acquisitions of Cordis and The Harvard Drug Group…."[16]

17. December 31, 2015: "The decrease in Medical segment profit during the three and six months ended December 31, 2015 compared to the prior-year periods was primarily due to the negative impact of acquisitions and divestitures, which included the unfavorable cost of products sold impact from the fair value step up of inventory acquired with Cordis."

    "These risks and uncertainties include … risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition will subject us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility…."[17]

18. January 12, 2016: "These risks and uncertainties include ... the ability to achieve and maintain the benefits from our acquisitions of Cordis and The Harvard Drug Group…."[18]

19. February 1, 2016: "George Barrett: ...Finally, a few words on Cordis - as you know, we closed the acquisition of Cordis on October 2, 2015. This is not a simple integration process…."

    Michael Kaufmann: "And so, clearly with Cordis, we are getting some additional exposure with FX, with 70% of that business being overseas. But to be able to actually get into any detail about how that FX will be impacting our business exactly, it's really difficult to do that."

    "[Y]ou know, right now we see FX as a little bit of a headwind in the second half of the year. But it - other than that, it's - I really can't give you more details." [19]

20. February 1, 2016: "These risks and uncertainties include … the ability to continue to achieve and maintain the benefits from the generic sourcing venture with CVS Health and from the acquisitions of Cordis and The Harvard Drug Group…."[20]

---

[15] "Cardinal Health Reports Strong First-Quarter Results For Fiscal 2016," *Cardinal Health, Inc., Press Release*, November 2, 2015.

[16] "Cardinal Health, Inc. Investor and Analyst Meeting," *Cardinal Health, Inc. Investor and Analyst Meeting*, November 19, 2015, at 4.

[17] Cardinal Health, Inc. Form 10-Q, December 31, 2015, at 7 and Exhibit 99.1, at 1.

[18] "Healthcare is changing …We're changing healthcare," *J.P. Morgan Healthcare Conference*, January 12, 2016, at 2.

[19] "Q2 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 1, 2016, at 2, 4 and 11-12.

[20] "Cardinal Health Reports Second-Quarter Results For Fiscal 2016," *Cardinal Health, Inc., Press Release*, February 1, 2016.

**CONFIDENTIAL**

21. March 31, 2016: "The increase in Medical segment profit during the three and nine months ended March 31, 2016 compared to the prior-year periods was primarily due to the impact of acquisitions, net of divestitures, which included the unfavorable impact on cost of products sold from the fair value step up of inventory acquired with Cordis."

    "These risks and uncertainties include … risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition will subject us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility…."[21]

22. April 28, 2016: Michael Kaufmann: "As I mentioned last quarter, the expected favorability of the lower inventory step up was a wash with the foreign exchange impact that was greater than we had originally modeled. As we work through the transaction there are a few mechanics such as the timing of exiting our transition service agreements with J&J, the closing of Day 2 countries and the ramping up and down of certain expenses that could result in variability between quarters. As you can imagine, all of these moving parts can lead to Cordis results that may not be linear for a few more quarters…. Specifically, some of these caused margin rates to be somewhat elevated in the third quarter versus how they may look over the next few quarters."

    Michael Kaufmann: "As we mentioned in FY 18, as we exit FY 18 we expect to be at $100 million of synergies on Cordis. So we're still expecting that as we exit FY 18. But there'll be a lot of noise as we're standing up. At the same time we're still long and then we roll off those Transition Service Agreements into what we think are going to be better cost situations for us."[22]

23. April 28, 2016: "These risks and uncertainties include … the ability to continue to achieve and maintain the benefits from the generic sourcing venture with CVS Health and from the acquisitions of Cordis and The Harvard Drug Group…."[23]

24. June 17, 2016: "Don Casey: ...So where are we on Cordis today? ...And as you begin to look at the help we are getting from J&J, it has been significant as we begin to carve out what we say are day one versus day two countries. In some countries it takes a little longer to get product registrations and what not and we will use J&J there for a little longer. But we are in the process now the day we closed, we brought a lot of business right into us, US and China and other places.... Some of -- Mike and I get to spend a lot of time together anyway but we get to spend even more time because the accounting issues obviously as you look at the inventory step-up as well as Johnson & Johnson runs a slightly different calendar than we do, so there is some lumpiness that goes along with when day one countries show up or day two countries show up and we think we are a

---

[21] Cardinal Health, Inc. Form 10-Q, March 31, 2016, at 8 and Exhibit 99.1, at 1.

[22] "Q3 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, April 28, 2016, at 7, 10-11 and 29.

[23] "Cardinal Health Reports Strong Third-Quarter Results For Fiscal Year 2016," *Cardinal Health, Inc., Press Release*, April 28, 2016.

E-14

CONFIDENTIAL

couple quarters away from having that totally ironed out.... And the last point I would make is incredibly proud [sic] of not only the Cordis organization under the leadership of David Wilson, but the Cardinal organization showed tremendous agility and flexibility because as we were saying, one day we inherited a business in a country we've probably not even traveled to and now we are operating something. So the combination of Cordis and Cardinal hasn't been seamless."

"Don Casey: ...The day one countries we said we would like to target to get them off within a year. Then there's day two countries like Brazil is a noteworthy day two country. You just can't switch the product registrations all that quickly. So it's not that we are not ready to do it, it's just there are regulatory filings that take time."

"Don Casey:  "So the only thing that has changed in Cordis I would tell you is where FX falls and in some cases that was a bigger move than we thought. But the underlying business in some cases has been a little bit stronger than we thought. So again, FX is a challenge." [24]

25. June 30, 2016: "Acquisitions, net of divestitures, which included the unfavorable impact on cost of products sold from the fair value step up of inventory acquired with Cordis, also contributed to segment profit growth."

"These risks and uncertainties include ... the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition and uncertainties relating to our ability to achieve the anticipated results from acquisitions; risks and uncertainties relating to the acquisition of Cordis, including, if completed, the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition will subject us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility."[25]

26. August 2, 2016: Michael Kaufmann: "As I mentioned last quarter, we expected variability in the margin rate between quarters as we are still working through a few intricate mechanics related to the transition service and manufacturing agreements that we have with J&J. This variability is caused by such factors as the timing of exits, the ramping up and down of certain expenses and the impact of foreign exchange."

"First, we continue to expect great performance from Cordis with that acquisition adding more than 15 cents to fiscal '17 versus the prior year, net of transaction-related interest expense of 7 to 8 cents. This is a lower accretion figure than we originally provided, largely due to currency impacts as well as some increased SG&A investments compared to our original business case. Our commitment to serving this global customer base without disruption is our highest priority, and therefore some of the synergies originally

---

[24] "Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc.*, June 17, 2016, at 21, 23-24 and 33-34.

[25] Cardinal Health, Inc. Form 10-K, June 30, 2016, at 13 and Exhibit 99.1, at 1-2.

CONFIDENTIAL

associated with this complex acquisition will take longer to achieve than we originally modeled."[26]

27. August 2, 2016: "These risks and uncertainties include … our ability to successfully integrate and realize the benefits from our acquisition of Cordis…."[27]

28. September 30, 2016: "These risks and uncertainties include ... risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility."[28]

29. October 31, 2016:  Michael Kaufmann: "As we mentioned last quarter, our integration team is on track to have our operations fully stood up and exit the TSA agreements by the end of this fiscal year, while our transition manufacturing agreements will extend for a couple of years. Until we exit these TSAs, they can create some variability in our segment profit rate."

"John Kreger: One other one on the medical front, can you give us a sense about what your organic revenue growth was in the quarter now with your year lap in Cordis. We were thinking about 6%. Is that about right?"

Michael Kaufmann: "I can't give you the exact number but I would definitely tell you that we were positive growth in the medical segment without Cordis. We don't still expect Cordis to deliver $0.15 for FY17 and so if you were to back Cordis out you would still see nice growth, healthy growth in the medical segment."[29]

30. October 31, 2016: "These risks and uncertainties include … the ability to successfully integrate and realize the benefits from the acquisition of Cordis…."[30]

31. December 16, 2016: "These risks and uncertainties include ... the ability to successfully integrate and realize the benefits from the acquisition of Cordis…."[31]

32. December 31, 2016: "The increase in Medical segment profit during the three months ended December 31, 2016 was primarily due to contributions from Cardinal Health Brand products, which includes the beneficial comparison from the $21 million, prior-

[26] "Q4 FY16 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2016, at 8, 11, 15 and 22.

[27] "Cardinal Health Reports Q4 And Fiscal 2016 Results, Provides Fiscal 2017 Outlook," *Cardinal Health, Inc., Press Release*, August 2, 2016.

[28] Cardinal Health, Inc. Form 10-Q, September 30, 2016, Exhibit 99.1, at 1-2.

[29] "Q1 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, October 31, 2016, at 7 and 31.

[30] "Cardinal Health Reports First-quarter Results for Fiscal Year 2017," *Cardinal Health, Inc., Press Release*, October 31, 2016.

[31] "Cardinal Health, Inc. Dublin Day," *Cardinal Health, Inc.,* December 16, 2016, at 2.

**CONFIDENTIAL**

year unfavorable impact on cost of products sold from the Cordis inventory fair value step up."

"These risks and uncertainties include...risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility."[32]

33. January 10, 2017: "George Barrett: The question is about Cordis and how it's going, and is it going sort of according to model. It's going really well. It's a big complex business, global business, as you know. So there was some startup costs, particularly in some markets where we didn't have an existing infrastructure sort of order to cash and we had to do some TSA agreements with J&J, and then are moving -- transitioning those off. So other than those going a little more slowly than we modeled, and really going more slowly because we chose to go more slowly to make sure we got them right because we didn't want to do anything that could disrupt patient care, it's actually going well."

"What we did announce at the beginning of the year, because of that, our accretion that we expected was a little bit slower than the original model, but it really was just about the costs associated with these transition agreements." [33]

34. January 10, 2017: "These risks and uncertainties include ... the ability to successfully integrate and realize the benefits from the acquisition of Cordis…."[34]

35. February 7, 2017: "These risks and uncertainties include … the ability to successfully integrate and realize the benefits from the acquisition of Cordis…."[35]

36. March 31, 2017: "The decline in Cordis profit reflects increased SG&A expenses and the net favorable effect of inventory adjustments, which includes the prior-year unfavorable impact on cost of products sold from the Cordis inventory fair value step up."

"These risks and uncertainties include...risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility…."[36]

37. May 1, 2017: "Michael Kaufmann: ...The quarter was unusual, in that we saw a decline in Cordis profit. This decline was mostly related to increased SG&A expenses to support

---

[32] Cardinal Health, Inc. Form 10-Q, December 31, 2016, at 7 and Exhibit 99.1, at 1-2.

[33] "Cardinal Health Inc at JPMorgan Healthcare Conference- Q&A," *Thomson StreetEvents*, January 10, 2017.

[34] "Healthcare is changing …We're changing healthcare," *35th Annual J.P. Morgan Healthcare Conference*, January 10, 2017, at 2.

[35] "Cardinal Health Reports Second-quarter Results for Fiscal Year 2017," *Cardinal Health, Inc., Press Release*, February 7, 2017.

[36] Cardinal Health, Inc. Form 10-Q, March 31, 2017, at 8 and Exhibit 99.1, at 1-2.

**CONFIDENTIAL**

our investment in an international infrastructure. This investment will benefit us as we integrate the Patient Recovery Business ... As both George and I have mentioned in the past, the exit from the transition service and manufacturing agreements could result in some lumpiness to the Cordis earnings, but we fully expect this to diminish as we move forward."[37]

38. June 30, 2017: "Changes in litigation (recoveries)/charges, net and amortization of acquisition-related intangible assets related to the acquisition of Cordis also contributed to the decrease in GAAP operating earnings during fiscal 2017."

"These risks and uncertainties include...risks and uncertainties relating to the acquisition of Cordis, including the ability to achieve the expected synergies and positive impact to operating results and the additional risks the Cordis acquisition subjects us to relating to regulatory matters, legal proceedings, tax laws or positions and global operations, including the effects of local economic environments and currency volatility; … the costs, difficulties and uncertainties related to the integration of acquired businesses, including liabilities relating to the operations or activities of such businesses prior to their acquisition, and uncertainties relating to our ability to achieve the anticipated results from acquisitions…."[38]

39. August 2, 2017: "George Barrett: Now let me take a few minutes to provide an update on Cordis. …Our U.S. business, which had a slow start as we merged the organization with our AccessClosure business, is getting its sea legs and the progress has been encouraging. As we look to next year for Cordis, while much of the heavy lifting is behind us, it's still not complete."

Michael Kaufmann: "I know that George gave you some high-level thoughts on Cordis, so let me give you some further details. As you know, we've been working over the past 18 months to build out our global infrastructure for Cordis. The costs of this build out have been more than expected and have had a negative impact on SG&A and gross margin for the quarter and year. Specifically, the costs of moving manufacturing and standing up our back office services has been more expensive than we modeled, but I feel we have solid plans to address this in the first half of FY18. Mainly due to these increased costs, we did not achieve our fiscal 17 accretion target of $0.15."

"In addition to the higher SG&A and manufacturing costs, mainly outside the US, there are two other factors that affected the accretion this fiscal year. First, we experienced lower-than-anticipated sales from partnership agreements. These agreements, while behind our original projections, are on a significant growth trajectory. And second, we incurred higher-than-planned write-offs for excess inventory. With the acquisition of the patient recovery business, the investments that we've made in standing up our global business are important to best position the medial segment over the long-term." [39]

---

[37] "Q3 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, May 1, 2017, at 4 and 6.

[38] Cardinal Health, Inc. Form 10-K, June 30, 2017, at 4 and Exhibit 99.1, at 1-2.

[39] "Q4 FY17 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, August 2, 2017, at 2, 5, 10-11.

CONFIDENTIAL

40. September 11, 2017: "Michael Kaufmann: ...So while Cordis from a bottom line has not gone nearly as well as we expected it to be, and I'll go through that in a second why, from a top line, Cordis is performing very close to where we expected it to be. And that has been one of the absolute most important things for us because if you lose the sales, it's incredibly hard to get them back. And so while we're a little bit behind where we expected in some markets and ahead in other markets, overall, the overall sales volume of Cordis is about where we expected it to be. Where we really didn't perform nearly as well, I would it put it in 2 buckets. First of all, remember this is that this isn't a bucket that I would say is how I would compare our performance this past year. But it's important for you to know is that when we went to acquire the business in April or negotiated the price for the business in April, FX was at one spot. And remember, Cordis is 30% U.S. and 70% ex U.S. And when we actually closed on the business in October, FX had gone like that. And so we had a significant tens of millions of dollar erosion in the expected profits of the business between the point in time in which we negotiated the price to the point in time which we actually were able to close the deal. So that is: one, reconciling; and two, what I'll call business case. Now as far as reconciling to how we performed this year, obviously we took that into account because when we gave guidance, we had already knew that. It was really 3 things that struck us. One was SG&A was much more expensive than we expected. And that was mainly outside of the United States. And so we had very little infrastructure ex U.S. and we underestimated quite frankly on what it would cost for us to stand up the third-party logistics companies that we were working with, to stand up all of the infrastructure, to pay our sales reps, get them in the cars, et cetera, et cetera, et cetera. And so those cost of SG&A and around manufacturing and managing through the TSAs and having to operate 2 plants while we were moving our machinery from one plant to another, those costs were just more than we expected. The second thing is when we closed the deal, we expected and thought we would have a lot more visibility to inventory than we actually did. And so what happened is at the end of the year, we took a lot of inventory write-offs for obsolete inventory because we had inventory that was either on consignment or in our warehouses with our third-party logistics providers, so we didn't have a good insight to. And we ended up taking some significant writeoffs on that. And so that was another area. We have been working for several months on putting in systems to be able to get after that. And so we will and we should have much better insights to inventory by the end of this calendar year. But that has been an area that snuck up on us. And then the last piece was the [bit] which I'd call partnership agreement. So when we acquired Cordis, several companies came to us and said, "Hey, with that type of a sales force, we really think our products match what's in your Cordis bag relatively well. And if you'll represent those products for us and sell those, we'll create royalty agreements with you, so you can collect fees and they'll do all the regulatory and all that." What we found is we overestimated how quickly those could get signed. And some of our partners weren't able to get approvals on the dates that we expected. So when we signed a deal expecting them to get approval in October and be selling in October, they weren't getting approved until March or April or the teams that will have it signed by October and the deal doesn't get signed in February, so we're late. And so those are the 3 things. So as you step back from those, we have a

E-19

**CONFIDENTIAL**

much better sense of those partnership agreements which -- what has been signed, how long it takes."[40]

41. November 6, 2017: "George Barrett: ...You know, I think every integration is its own learning experience. And I think, you know, I think for us the Cordis integration required a lot of international work some of which we had people on the ground doing and in other places we had to build that out. We also had to do some work in that integration with a third party which is the partner that sold us the product line. So that requires a lot of interfaces, moving parts, and great disciplines. And I think we have over the course of the year honed that increasingly."[41]

42. February 8, 2018: "Jorge Gomez: ...While we continue to make progress on the commercial front, the overall earnings performance of Cordis was impacted by inefficiencies in the global supply chain and elevated SG&A outside the U.S. The team is fully focused on these issues and we have implemented robust remediation plans to address both inventory and SG&A challenges. We recognize it will take a little time to work through these items but we are moving expeditiously."

Michael Kaufmann: "As Jorge mentioned, we expected Cordis profits to ramp up in our original projections, and those aren't ramping up as quite as well as we would have liked them to."[42]

43. February 15, 2018: "Jorge Gomez: ...With respect to Cordis, it's a recent acquisition. We closed that transaction about just over 2 years ago... Now, it was our first attempt to build a global business in the last, I guess, 7 years. We used to be a global company until we [spun] off CareFusion about 7 years ago, 8 years ago. And when we acquired Cordis, we decided to go again globally, and that business is about 2/3 outside the U.S., 1/3 in the U.S. And frankly, one of the things that we encounter[ed] with that acquisition was that we underestimated the cost of growing globally, and that has been probably the biggest challenge."[43]

44. March 13, 2018: "Steven J. James Valiquette: I think you guys have been pretty open and forthcoming about some of these temporary issues that you're facing within the Cordis franchise right now. Maybe just spend a minute or so on kind of what you're doing to remedy some of those issues and, more importantly, maybe just the timing of when we think we'll get Cordis back on track and operating at the level that you want it to be."

"Jorge M. Gomez: And so that is a major transformation that takes some time. Part of that transformation has been accomplished through organic growth and then the addition of pretty significant businesses like Cordis and Patient Recovery. Those businesses came

---

[40] "Cardinal Health Inc at Morgan Stanley Healthcare Conference," *Thomson StreetEvents*, September 11, 2017.

[41] "Q1 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, November 6, 2017, at 16.

[42] "Q2 FY18 Cardinal Health, Inc. Earnings Conference Call," *Cardinal Health, Inc.*, February 8, 2018, at 5, 7, 11 and 18.

[43] "Cardinal Health Inc at Leerink Partners Global Healthcare Conference," *Leerink Partners Global Healthcare Conference*, February 15, 2018, at 4-5.

E-20

**CONFIDENTIAL**

with a lot of international operations. In the case of Cordis, when we acquired Cordis, that business was -- still is 2/3 outside the U.S. from a revenue perspective and 1/3 in the U.S. Building infrastructure to support that business outside the U.S. is something that, to be totally honest, was -- we underestimated some of the costs and complexity to build that infrastructure. We are just 3 years removed from the closing of Cordis, and we cover a lot of ground."

"But we feel like we are going into a phase of a lot more stability. To give you examples, when -- Cordis was what is called a carve-out acquisition, where basically, we acquired the products. The salespeople came with the acquisition outside the U.S., but no infrastructure came. And we prepared for that, we planned for that. But again, it's -- it has cost us more money and it's taken a little bit longer. We have gone live with a pretty significant IT platform that is going to enable us to have better visibility into the supply chain. One of the key challenges we faced in the last couple of years, we've talked about this a couple of times, is write-offs of inventory because we didn't have enough visibility in all the overseas markets with respect to levels. And so we faced some challenges with expiration of product, and we had to write off some certain volumes."[44]

---

[44] "Cardinal Health Inc at Barclays Global Healthcare Conference," *Thomson StreetEvents*, March 13, 2018 at 3-4.

E-21

**CONFIDENTIAL**

# EXHIBIT 4
## Analysts Were Aware of Risks Associated with the Cordis Acquisition

1. March 2, 2015: "This morning CAH announced it was buying Cordis from J&J for $1.944B in cash, or approximately $1.594B net of future tax benefits. … While the accretion is nice, investors are questioning the strategic rationale for getting in this business given its relatively anemic growth profile. … We do not expect CAH's share price to receive the full benefit of the accretion, as it will take time to see if CAH can accelerate the growth of this business as it evolves its go-to-market strategy."[1]

2. March 2, 2015: "The cost synergies generally strike us as reasonable but we do question the long-term ramifications of eliminating meaningful elements of the research spend on the Cordis growth trajectory. The topline synergies are somewhat less obvious, but to the extent that CAH can increase Cordis market share vs. other cardiovascular/endovascular competitors through CAH's acute medical-surgical distribution footprint, it could be an interesting long-term opportunity."[2]

3. March 2, 2015: "In conclusion, while [the Cordis] transaction is not without obvious risks and does mark a change in CAH's overall business mix/business model we believe the financial attractiveness outweighs this fact and the familiarity of management helps to ensure proper execution."[3]

4. March 2, 2015: "While the [Cordis] deal is accretive and the price is not unreasonable, we take a mixed view of the deal as it adds risk to Med/Surg execution and could slow growth."[4]

5. March 2, 2015: "It is unclear what portion of these synergies [from the Cordis acquisition] are included in the F2017 net EPS accretion guidance of ~$0.20, although we believe large acquisitions typically take ~3 years to fully integrate and optimize, and we believe there is likely less than $50M of synergies contemplated as part of the F2017 guidance."[5]

6. May 6, 2015: "RISKS: Cardinal faces operational and integration risks as it folds in acquired companies. The announced acquisition of Cordis, which will expand the

---

[1] "Accretion Is Nice but Strategic Direction & Rationale Still Up for Some Debate," *Credit Suisse*, March 2, 2015, at 1 (CSSU_00000047).

[2] "Accretion Is Nice but Strategic Direction & Rationale Still Up for Some Debate," *Credit Suisse*, March 2, 2015, at 2 (CSSU_00000047).

[3] "CAH transforms Medical unit w/ Cordis deal: DD ROIC (accretion > 35c w/ synergy)," *Evercore*, March 2, 2015, at 1 (CAH-SDOH2.19-cv-3347-00006358).

[4] "Just Take a Statin: Cardinal Fails to Bypass Cordis Deal," *Deutsche Bank*, March 2, 2015, at 1 (DBSI000222).

[5] "Cordis a Good Long-Term Asset in Line with CAH's IDN Strategy," *Leerink*, March 2, 2015, at 1 (CAH-SDOH2.19-cv-3347-00006231).

**CONFIDENTIAL**

company's portfolio of medical devices, will also bring a higher level of regulatory risk, as these products are regulated by FDA."[6]

7. July 30, 2015 "Acquisition Integration Could Be a Risk. Cardinal Health has performed a fair number of acquisitions over the past several years, and may continue to be an acquirer in the future. If the company fails to integrate any of these acquisitions onto its platform or if there are any information technology, personnel, or structural issues with the integration process, then the company's earnings could be at risk."[7]

8. February 1, 2016: "Margin of 3.36% missed our expectation by 40 basis points as the Cordis inventory step-up did not appear to be offset by improvements in other areas as we had expected. We look for additional color on the growth of the various components of this segment, which have become increasingly difficult to parse out."[8]

9. March 10, 2016: "RISKS: Cardinal faces operational risks as it integrates acquired companies. The acquisition of Cordis, which will expand the company's portfolio of medical devices, will also bring a higher level of regulatory risk, as these products are regulated by FDA."[9]

10. March 15, 2016: "Skeptics abound on the deal, with many concerned over management's ability to hold the business together, particularly overseas where CAH has minimal presence. We note history offers few success stories for CAH as it relates to its manufacturing endeavors added through acquisitions, but Cordis adds a lower-end technology focus with efficiencies around manufacturing."[10]

11. March 15, 2016: "Acquisition Integration Challenges: CAH has acquired a number of businesses in both the Pharmaceutical segment and the Medical segment over the past 12-18 months. We would highlight the company announced the acquisitions of Cordis in January of 2015, Metro Medical in April of 2015, the Harvard Drug Group in June 2015, and naviHealth in August 2015. While we believe each of the acquisitions fits nicely into the strategies of the respective segments, there is always a risk in integrating new businesses that have been acquired."[11]

12. March 31, 2016: "While Cordis appears to be a solid growth opportunity for Cardinal, FX may prove a challenging headwind shorter-term, as the company remains largely

---

[6] "Analyst's Notes," *Argus*, May 6, 2015, at 2 (ARGUS0000001).

[7] "CAH Well Positioned Heading into F2016 and F2017," *Leerink*, July 30, 2015, at 3, 7 (CAH-SDOH2.19-cv-3347-00388394).

[8] "First Look at Fiscal Second-Quarter Results; Another Solid Quarter as Top-Line Guidance Suggests Continued Strength," *William Blair*, February 1, 2016, at 1 (WB000229).

[9] "Analyst's Notes," *Argus*, March 10, 2016, at 2 (ARGUS0000013).

[10] "Small Steps, Big Returns," *Credit Suisse*, March 15, 2016, at 5 (CSSU_00000292).

[11] "Small Steps, Big Returns," *Credit Suisse*, March 15, 2016, at 9 (CSSU_00000292).

unhedged on currency exposure, which appears to be a relatively new phenomenon in the drug distribution space."[12]

13. April 10, 2016: "Risks to our price target include slowing branded price inflation, the absence of generic inflation, loss of large customers, and failure to integrate Cordis."[13]

14. April 28, 2016: "Medical margin will fluctuate with Cordis integration activity…"[14]

15. April 28, 2016: "Acquisition Integration Could Be a Risk. Cardinal Health has performed a fair number of acquisitions over the past several years, and may continue to be an acquirer in the future. If the company fails to integrate any of these acquisitions onto its platform or if there are any information technology, personnel, or structural issues with the integration process, then the company's earnings could be at risk."[15]

16. May 3, 2016: "Cordis performance has lagged since Cardinal bought the asset from JNJ in 2015 with an acceleration this quarter impacted by inventory management issues related to visibility on reserves for consigned inventory."[16]

17. May 12, 2016: "Risks to our $97 PT and Outperform rating for Cardinal Health include the potential integration challenges from the company's recent acquisitions of Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs."[17]

18. May 16, 2016: "RISKS: Cardinal faces operational risks as it integrates acquired companies. The acquisition of Cordis, which has expanded the company's portfolio of medical devices, also brings a higher level of regulatory risk, as these products are regulated by FDA."[18]

19. June 13, 2016: "Cordis integration. Management indicated on the March quarter call that the Cordis integration was going well, but that profit performance could be a bit lumpy based on FX and other volume trends internationally. With another quarter nearly complete, the potential for additional commentary on this important business — particularly with the announcement of additional focus on the stent market — could be market moving for the stock."[19]

---

[12] "European Vacation: Notes from Cardinal Mgmt Meetings," *Deutsche Bank*, March 31, 2016, at 3 (DBSI000279).

[13] "Is Minor's Kaiser Loss, Cardinal's Major Win?," *Morgan Stanley*, April 20, 2016, at 1 (MS_CARDINAL_001388).

[14] "Our Read and Read-Through for ABC and MCK," *Barclays*, April 28, 2016, at 1 (BARC_00000327).

[15] "Expectations Reset; 20% y/y EPS Growth is very Good," *Leerink*, April 28, 2016, at 3 (CAH-SDOH2.19-cv-3347-00389345).

[16] "Earnings Reset – More Headwinds On The Horizon," *Morgan Stanley*, May 3, 2016, at 1 (CAH-SDOH2.19-cv-3347-00395165).

[17] "Leveraging the global Cordis footprint," *Credit Suisse*, May 12, 2016, at 4 (CSSU_00000229).

[18] "Analyst's Notes," *Argus*, May 16, 2016, at 2 (ARGUS0000017).

[19] "What we are looking for at 'Dublin Day'," *RBC Capital Markets*, June 13, 2016, at 1 (RBCCM00000144).

**CONFIDENTIAL**

20. June 13, 2016: "Impediments to our price target and rating include but are not limited too [sic]: …Integration of recent acquisitions does not yield forecast synergies."[20]

21. June 15, 2016: "Key swing factors, in addition to the headwinds that management previously outlined, include the performance of Cordis in its first full year, capital deployment, and branded price inflation. Our assumptions include the low end of Cordis guidance, share repurchases of $500 million, and branded price inflation 50 to 300 bps lower relative to 2016."[21]

22. June 15, 2016: "Valuation Methodology & Risks … Risks to our price target include failure to integrate Cordis, a negative pricing environment for branded and generic pharmaceuticals, and loss of large customers."[22]

23. June 20, 2016: "Valuation Methodology & Risks … Risks to our price target include failure to integrate Cordis, a negative pricing environment for branded and generic pharmaceuticals, and loss of large customers."[23]

24. June 20, 2016: "Impediments to our price target and rating include but are not limited to: …Integration of recent acquisitions does not yield forecast synergies."[24]

25. July 25, 2016: "We foresee continued strength in the Pharma segment but near-term Medical segment results could be lumpy as Cordis integration is completed."[25]

26. August 2, 2016: "Risks to our $97 PT and Outperform rating for Cardinal Health include the potential integration challenges from the company's recent acquisitions of Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs."[26]

27. August 2, 2016: "Cordis synergy goals, however, were cut to 15 cents in accretion from 20 cents, underscoring the complexity of this integration process (standing up from J&J across multiple countries where Cardinal has not typically operated in the past)…. Given the slower Cordis synergy capture schedule, we are also lowering our income growth target to 19% from 34% previously."[27]

---

[20] "What we are looking for at 'Dublin Day'," *RBC Capital Markets*, June 13, 2016, at 4 (RBCCM00000144).

[21] "Dublin Day Deliberations," *Morgan Stanley*, June 15, 2016, at 1 (MS_CARDINAL_001547).

[22] "Dublin Day Deliberations," *Morgan Stanley*, June 15, 2016, at 5 (MS_CARDINAL_001547).

[23] "Dublin Down on Value Based Care," *Morgan Stanley*, June 20, 2016, at 3 (MS_CARDINAL_001650).

[24] "Long-term positioning remains favorable for addressing changing health care market," *RBC Capital Markets*, June 20, 2016, at 4 (RBCCM00000153).

[25] "4QFY16 Preview: A Focus on FY17," *Barclays*, July 25, 2016, at 4 (BARC_00000385).

[26] "4Q16 EPS tops consensus, FY17 view passes muster," *Credit Suisse*, August 2, 2016, at 5 (CAH-SDOH2.19-cv-3347-00390233).

[27] "Post-Call Model Adjustments; Fiscal 2017 Below Expectations but Longer-Term Drivers Intact," *William Blair*, August 2, 2016, at 2 (WB000007).

**CONFIDENTIAL**

28. September 16, 2016: "Risks to our $97 PT and Outperform rating for Cardinal Health include the potential integration challenges from the company's recent acquisitions of Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs."[28]

29. October 3, 2016: "Risks to our $95 PT and Outperform rating for Cardinal Health include the potential integration challenges from the company's recent acquisitions of Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs."[29]

30. October 14, 2016: "RISKS: Cardinal faces operational risks as it integrates acquired companies. The acquisition of Cordis, which has expanded the company's portfolio of medical devices, also brings a higher level of regulatory risk, as these products are regulated by FDA."[30]

31. October 31, 2016: "With underlying Medical results stabilizing and Cordis and the branded product strategy now ramping, we like risk/reward for this aspect of the story, especially considering skepticism already embedded in CAH achieving intermediate-term goals."[31]

32. November 3, 2016: "Risks to our $85 PT and Outperform rating for Cardinal Health include the potential integration challenges from the company's recent acquisitions of Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs and branded inflation."[32]

33. November 8, 2016: "RISKS: Cardinal faces operational risks as it integrates acquired companies. The acquisition of Cordis, which has expanded the company's portfolio of medical devices, also brings a higher level of regulatory risk, as these products are regulated by FDA and health agencies in overseas markets."[33]

34. November 14, 2016: "The FY17 earnings ramp is steep: Factors impacting the FY17 quarterly progression include Kaiser transition expenses falling in 1Q, lapping $42mn in inventory expense in 2Q/3Q, delayed roll off of Cordis transition services agreement now expected in 3Q/4Q, and expense reduction activity falling at the corporate (not segment) level."[34]

35. February 7, 2017: "Acquisition Integration Could Be a Risk. Cardinal Health has performed a fair number of acquisitions over the past several years, and may continue to

---

[28] "Putting the special in specialty pharmacy," *Credit Suisse*, September 16, 2016, at 3 (CSSU_00000281).

[29] "Lowering EPS on TRICARE news," *Credit Suisse*, October 3, 2016, at 4 (CSSU_00000212).

[30] "Analyst's Notes," *Argus*, October 14, 2016, at 3 (ARGUS0000021).

[31] "Not Armageddon, but Still a Deep Impact in Pharmaceutical Segment," *Baird*, October 31, 2016, at 2 (CAH-SDOH2.19-cv-3347-00390759).

[32] "Taking heart in cardiovascular strategy," *Credit Suisse*, November 3, 2016, at 4 (CSSU_00000235).

[33] "Analyst's Notes," *Argus*, November 8, 2016, at 2-3 (ARGUS0000025).

[34] "On the Road with Cardinal Health," *Barclays*, November 14, 2016, at 1 (BARC_00000495).

**CONFIDENTIAL**

be an acquirer in the future. If the company fails to integrate any of these acquisitions onto its platform or if there are any information technology, personnel, or structural issues with the integration process, then the company's earnings could be at risk."[35]

36. March 21, 2017: "RISKS: Cardinal faces operational risks as it integrates acquired companies. The acquisition of Cordis, which has expanded the company's portfolio of medical devices, also brings a higher level of regulatory risk, as these products are regulated by the FDA and health agencies in overseas markets."[36]

37. May 1, 2017: "[W]hile expected volatility in Cordis related transition costs (particularly in international investments) led to higher SG&A and a lower than expected profit contribution."[37]

38. May 1, 2017: "We suspect that there will be significant integration costs and adjustments that may need to be made for Medtronics in F2018E, which would be consistent with Cordis' recent activity."[38]

39. May 1, 2017: "We believe the key topic on today's call will revolve around any updates to the competitive pricing environment for generics, and some apparent weakness in the previously acquired Cordis business within the medical segment." [39]

40. August 2, 2017: "There are a number of company-specific risks associated with our PT, including: (1) CAH's ability to turnaround the Medical segment, (2) integration risk related to Cordis and Harvard Drug Group, and (3) management's ability to deploy capital effectively."[40]

41. August 3, 2017: "Cardinal's guidance underscores the challenges in integrating the Cordis business, management optimism regarding the pricing environment, and reliance on capital deployment for growth."[41]

42. August 3, 2017: "The Medical business grew by 6% in the quarter, basically in line with our expectations, but margins were weak, some 40bps below our expectations at 4.0%. Some of this could be part of the IT spend, but management specifically called out the integration of Cordis as a culprit. The company admitted it has taken longer to achieve the synergy targets it originally set out, especially outside the US. … But, as we said

[35] "Solid F2Q:17, Generic Buy-Side Pricing Stabilizing; PT to $81," *Leerink*, February 7, 2017, at 3 (CAH-SDOH2.19-cv-3347-00006290).

[36] "Analyst's Notes," *Argus*, March 21, 2017, at 2 (ARGUS0000029).

[37] "3QFY17 Review: CAH Meets the Lowered Bar," *Barclays*, May 1, 2017, at 3 (BARC_00000642).

[38] "Volumes and Pricing Pressures Continue – Reducing Estimates," *Leerink*, May 1, 2017, at 1 (CAH-SDOH2.19-cv-3347-00006297).

[39] "First Look at Fiscal Third-Quarter Results; $0.05 Beat From Tax Benefit, Outlook Largely Unchanged From Prerelease," *William Blair*, May 1, 2017, at 1 (CAH-SDOH2.19-cv-334 7-00387618).

[40] "CAH Reports Soft Operating F4Q17, 2018 Guidance," *Cowen*, August 2, 2017, at 13 (CAH-SDOH2.19-cv-3347-00393164).

[41] "CAH: Model and Price Target Updates," *Morgan Stanley*, August 3, 2017, at 1 (MS_CARDINAL_003396).

**CONFIDENTIAL**

earlier, the Medical business growth, both top line and margin and as a percentage of company earnings, is a thesis many investors were willing to support, so from here, the integration progress will be watched extra closely moving forward."[42]

43. November 7, 2017: "Risks to our thesis include integration risk from recent acquisitions...."[43]

44. December 19, 2017: "Looking laterally, we point to CAH's acquisition of Cordis in 2015 as an example of a large acquisition with integration challenges."[44]

45. January 8, 2018: "Risks to our $81 target price and Outperform rating for Cardinal Health are the potential integration challenges from the company's recent acquisitions of the Medtronic assets, Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs and branded inflation."[45]

46. February 8, 2018: "Risks to our $83 target price and Outperform rating for Cardinal Health are the potential integration challenges from the company's recent acquisitions of the Medtronic assets, Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs and branded inflation."[46]

47. February 8, 2018: "We also point to a potential challenging environment for the company's Medical business as it relates to hospital utilization and the ongoing integration of the Cordis and Patient Recovery businesses."[47]

48. February 9, 2018: "Risks to our $83 target price and Outperform rating for Cardinal Health are the potential integration challenges from the company's recent acquisitions of the Medtronic assets, Cordis, the Harvard Drug Group, and naviHealth, as well as lower profit contributions from generic drugs and branded inflation."[48]

49. February 14, 2018: "There are a number of company-specific risks associated with our PT, including: (1) CAH's ability to turnaround the Medical segment, (2) integration risk related to Cordis and Harvard Drug Group, and (3) management's ability to deploy capital effectively."[49]

50. February 26, 2018: "The Cordis deal was somewhat of a departure from the company's existing preferred products portfolio, bringing CAH a clinical device rather than the

---

[42] "F4Q17: Another Setback to Numbers and Sentiment," *Needham*, August 3, 2017, at 2 (CAH-SDOH2.19-cv-3347-00393245).

[43] "Model Update," *J.P. Morgan*, November 7, 2017, at 2 (CAH-SDOH2.19-cv-3347-00393790).

[44] "Re-Positioning for the New Year to Reduce Hospital Exposure," *J.P. Morgan*, December 19, 2017, at 1 (JPMS_00006744).

[45] "Incremental Disclosure on Tax Reform," *Credit Suisse*, January 8, 2018, at 4 (CSSU_00000344).

[46] "2Q18 EPS ahead; Raising estimates," *Credit Suisse*, February 8, 2018, at 5 (CSSU_00000405).

[47] "Follow-Up on F2Q18," *J.P. Morgan*, February 8, 2018, at 4 (CAH-SDOH2.19-cv-3347-00394618).

[48] "Model Maintenance; Adjusting Estimates, Reflecting US Tax Reform, Consistent with Conference Call Commentary," *Credit Suisse*, February 9, 2018, at 4 (CSSU_00000435).

[49] "Model Update: FY18 Looks Conservative With Improved Fundamentals In Pharma," *Cowen*, February 14, 2018, at 12 (CAH-SDOH2.19-cv-3347-00394707).

**CONFIDENTIAL**

traditional supplies it sold. Additionally, the decentralized nature of the Cordis assets created integration hurdles that slowed the recognition of profit contribution."[50]

51. February 26, 2018: "Lessons learned from Cordis shouldn't reoccur, but integration risk does remain. The Cordis integration was more expensive than Cardinal originally predicted due in part to greater internal expenses to take over the operations from J&J. This was likely due to the complexity of the entire Cordis portfolio, as it was almost a collection of numerous businesses vs. one standalone asset. Additionally, the go-to-market strategy for the Cordis products was different from the traditional CAH portfolio given that Cordis is an implantable device vs. the more traditional supplies that CAH has sold. This forced CAH to address a different touch point at the customer vs. the typical supplies manager or head of procurement. While none of these challenges are insurmountable, they all did contribute to a slower-than-expected integration and synergy capture." [51]

52. March 12, 2018: "There are a number of company-specific risks associated with our PT, including: (1) CAH's ability to turnaround the Medical segment, (2) integration risk related to Cordis and Harvard Drug Group, and (3) management's ability to deploy capital effectively."[52]

53. April 2, 2018: "RISKS: Cardinal faces operational risks as it integrates acquired companies. The acquisition of Cordis, which has expanded the company's portfolio of medical devices, brings another level of regulatory risk, as these products are regulated by the FDA and overseas health agencies."[53]

54. April 11, 2018: "We also point to a potential challenging environment for the company's Medical business as it relates to hospital utilization and the ongoing integration of the Cordis and Patient Recovery businesses."[54]

55. April 12, 2018: "Management has previously noted that while it is encouraged with the top line momentum, achieving target synergies would take longer than originally modeled, with the company noting that profitability has been negatively impacted by higher than anticipated costs to build out the global infrastructure (moving manufacturing and standing up the back office services). The higher costs related to Cordis is expected to be a headwind in FY18. … We also point to a potential challenging environment for

---

[50] "Growth Wings Still Seem Clipped; Reinstate with Underperform Rating," *Bank of America Merrill Lynch*, February 26, 2018, at 5 (CAH-SDOH2.19-cv-3347-00394568).

[51] "Growth Wings Still Seem Clipped; Reinstate with Underperform Rating," *Bank of America Merrill Lynch*, February 26, 2018, at 20 (CAH-SDOH2.19-cv-3347-00394568).

[52] "Management Meeting Takeaways From Cowen Health Care Conference," *Cowen*, March 12, 2018, at 3 (CAH-SDOH2.19-cv-3347-00394603).

[53] "Analyst's Notes," *Argus*, April 2, 2018, at 3 (ARGUS0000045).

[54] "Cardinal Health Week Day 3: Specialty Solutions," *J.P. Morgan*, April 11, 2018, at 8 (CAH-SDOH2.19-cv-3347-00387176).

**CONFIDENTIAL**

the company's Medical business as it relates to hospital utilization and the ongoing integration of the Cordis and Patient Recovery businesses." [55]

56. April 13, 2018: "Management noted that Cordis performance has been a mixed bag. They are excited about how the sales team is driving growth, and have added important new components to the bag. However, on the back office side, they have had some challenges with respect to their ability to effectively manage inventory and also with the OUS cost structure, as they had underestimated how costly it would be to stand up that organization. … We also point to a potential challenging environment for the company's Medical business as it relates to hospital utilization and the ongoing integration of the Cordis and Patient Recovery businesses." [56]

57. April 27, 2018: "CAH has had difficulty integrating the Cordis acquisition as international SG&A investments have proved to be greater than expected and in 2QFY18 supply chain pressures for exam gloves resulted in another headwind to the business." [57]

---

[55] "Cardinal Health Week Day 4: The Medical Segment," *J.P. Morgan*, April 12, 2018, at 9-10 (CAH-SDOH2.19-cv-3347-00387189).

[56] "Cardinal Health Week Day 5: Takeaways from the Conference Call," *J.P. Morgan*, April 13, 2018, at 2, 4 (CAH-SDOH2.19-cv-3347-00387205).

[57] "CAH 3QFY18: What to Watch For," *Nephron*, April 27, 2018, at 1 (CAH-SDOH2.19-cv-3347-00387296).

E-30