# EXHIBIT 6

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION

-------------------------------------------

LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and On Behalf of All Others Similarly Situated,
Plaintiffs

v.

CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C. KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON
Defendants

No. 2:19-cv-03347

-------------------------------------------

VIDEO DEPOSITION OF
Stephanie McGirr
April 26, 2022
Boston, Massachusetts
Lead: Alexandra P. Sadinsky, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING 1-800-825-3341

Page 2

APPEARANCES:

ROBBINS GELLER RUDMAN & DOWD LLP
By Jennifer Caringal, Esquire
Marco Janoski, Esquire
655 West Broadway
San Diego, CA 92101
619.231.1058
jcaringal@rgrdlaw.com
mjanoski@rgrdlaw.com
Counsel for the Plaintiffs

WACHTELL LIPTON ROSEN & KATZ
By Alexandra P. Sadinsky, Esquire
Elizabeth N. Brandt, Esquire
51 West 52nd Street
New York, NY 10019
212.403.1000
apsadinsky@wlrk.com
enbrandt@wlrk.com
Counsel for the Defendants

Page 3

APPEARANCES:  (Continued)

ALSO PRESENT:
William Butterly, In-House Counsel, Boston Partners

Megan Rossi (Via Zoom)

Christopher Kinnon (Via Zoom)

Nicole Kim, Cardinal Health (Via Zoom)

Jackson Martin, Wachtell Lipton Paralegal

JANE ROSE REPORTING
74 Fifth Avenue
New York, New York 10011
1-800-825-3341
Janet McHugh, Court Reporter
Adam Cerro, Videographer

Page 4

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| STEPHANIE MCGIRR | | | |
| By Ms. Sadinsky | 6 | | 426 |
| By Mr. Janoski | | 399 | |
| Exhibit Index | | 429 | |
| Court Reporter Certificate | | | 440 |
| Errata | | 441 | |

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 5

PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are on the record. This is the videographer Adam Cerro, with Jane Rose Reporting. Today's date is April 26, 2022 and the time is 8:10 a.m.

We are here in One Beacon Street, 30th Floor, Boston, Massachusetts, to take the video deposition of Stephanie McGirr in the matter of Louisiana Sheriffs' Pension and Relief Fund v. Cardinal Health, Inc.

Would counsel please introduce themselves for the record?

MS. SADINSKY: Alexandra Sadinsky from Wachtell, Lipton, Rosen & Katz, for the defendants.

MS. BRANDT: Elizabeth Brandt, Wachtell, Lipton, Rosen & Katz, for the defendants.

MR. MARTIN: Jackson Martin, Wachtell, Lipton, Rosen & Katz, for the defendants.

MR. BUTTERLY: Bill Butterly, Boston Partners, for Boston Partners.

MR. JANOSKI: Marco Janoski from Robbins, Geller, Rudman & Dowd, on behalf of the

Page 6

lead plaintiff, 1199SEIU Health Care Employees Pension Fund, and the proposed class to Cardinal Health Investors.

MS. CARINGAL: Jennifer Caringal from Robbins, Geller, Rudman & Dowd, on behalf of lead plaintiffs.

THE VIDEOGRAPHER: Could counsel on the phone introduce themselves?

MS. KIM: Sorry about that. I couldn't find the mute button.

Nicole Kim on behalf of Cardinal Health.

THE VIDEOGRAPHER: Thank you. Would the court reporter, Janet McHugh, please swear in the witness?

STEPHANIE MCGIRR, having been duly sworn, after presenting identification in the form of a driver's license, deposes and says as follows:

DIRECT EXAMINATION

BY MS. SADINSKY:

Q. Hi, Ms. McGirr. My name is Alexandra Sadinsky, and I want to start by just covering some parameters for today.

Page 7

So it's my job to ask you questions. It's your job to answer them the best you can. If you don't understand a question, please tell me so I can try and rephrase or explain the question.

Please give audible, verbal responses to the questions. The court reporter and the transcript cannot reflect if you're merely nodding your head.

Remember that you are testifying on behalf of Boston Partners. There may be times when I'm asking for your personal knowledge as an employee of Boston Partners. If you're ever unsure whether I'm asking you a question personally or as Boston Partners' representative, just let me know, and I'll be happy to clarify.

If you need to take a break, just let me know. We can take a break anytime, as long as there's not a question pending.

Your lawyer or plaintiff's lawyer may object to certain of my questions for purposes of the record, but unless your lawyer, Mr. Butterly, instructs you not to answer, you should fully and completely answer the question.

So with that background, let's jump in. Do

Page 8

you understand you're under oath?

A. I do.

Q. Is there anything that would prevent you from giving complete and accurate testimony today?

A. No.

Q. Have you been deposed before?

A. Yes.

Q. How many times?

A. Once.

Q. What was the case about?

A. I don't remember.

MR. BUTTERLY: Same thing.

Q. Same thing. When was it?

A. I don't remember with accuracy. Say five to -- three to five years ago.

Q. And it was while you were an employee of Boston Partners?

A. Yes.

Q. And it was about your, you know, work analyzing securities as an employee of Boston Partners?

A. Yes.

Q. Have you ever testified in court

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 9

before?

A.  No.

Q.  What did you do to prepare for this deposition?

A.  Supplied the documents.

Q.  How did you do that?

A.  Via Bill and determining where the documents were located.

Q.  How did you determine that?

A.  My memory.

Q.  Did you pull emails?  Did you go through your files?

A.  I did not personally.

Q.  Did you give information for someone else to do that?

A.  Yes.

Q.  What information did you give?

A.  The location of the documents.

Q.  And what was the location of the document that you gave?

A.  In file drawers located at One Beacon Street.

Q.  Okay.  So you're talking about hard copy documents?

Page 10

A.  Yes.

Q.  Did you do anything else to prepare for your deposition?

A.  No.

Q.  Did you meet with anyone in advance of today's deposition?

A.  No.

Q.  Did you speak to anyone from 1199SEIU Health Care Employees Pension Fund?

A.  No.

Q.  Okay if, for the rest of today, I refer to them as "SEIU"?

A.  Yes.

Q.  Have you met with any lawyers from Robbins Geller?

A.  No.

Q.  Did you look at any documents as you were thinking about today?

A.  No.

Q.  Do you know whether anyone is paying for Boston Partners' costs associated with this deposition?

A.  No.

Q.  Can you describe your educational

Page 11

background?

A.  I have a bachelor's degree from Colgate University with a major in English.

Q.  When did you graduate?

A.  In 2000.

Q.  Do you have any other degrees?

A.  No.

Q.  Do you have any certifications?

A.  No.

Q.  Do you have any securities-related licenses?

A.  No.

Q.  Do you need securities-related licenses to practice as an analyst at Boston Partners?

A.  No.

Q.  Why not?

A.  It's not a requirement.

Q.  Please walk me through your post-college employment history.

A.  I graduated in 2000.  I started work at Arthur Andersen in August of 2000.  I was in an operations role at Arthur Andersen, and then left that company in April of 2002, began work at Boston Partners in June of 2002.  I've held

Page 12

various roles at Boston Partners in the last 20 years, with my current position being large cap value portfolio manager.

Q.  Can you walk me through all of your positions at Boston Partners?

A.  Yes.  So beginning in 2002, I was an operations associate, research associate, working with both the fundamental and quantitative teams at Boston Partners.

I was in that role for two years, and then became an associate fundamental analyst working under a more senior fundamental analyst for about three years.

Q.  2004 to 2007?

A.  Yes.  Gaining experience with the fundamental research philosophy at Boston Partners during that time.

Then I assumed my own coverage in the 2007, 2008 time frame, covering various industries.

Q.  Which ones?

A.  I covered consumer staples, and consumer staples was the first one, along with business services.

And then, in 2010, the coverage changed.  I

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 13

was covering healthcare services, property and casualty insurance, as well as retail apparel and restaurants, beginning at that time. And maintained coverage of health care services and property and casualty insurance until 2018.

Q. When did you stop doing retail apparel?

A. I think that was about 2015?

Q. Then you said you did health care services and property and casualty insurance until 2018. When in 2018?

A. September of 2018.

Q. And is that when you moved to your current role?

A. That's correct.

Q. And so you're a portfolio manager now?

A. Correct.

Q. And you were an analyst before?

A. Correct.

Q. What are the differences in those roles?

A. There are analysts who go into greater depth about specific companies. That's the responsibility of the analyst, is to do -- have a more specific industry knowledge.

Page 14

The portfolio manager has the industry knowledge, but is looking at it across a larger universe of stocks, specifically, the universe that applies to the product that is being managed. So for large cap, it is based on the market cap of the stocks.

That's how -- that's how it's divided up, as well as a geographic difference. So for large cap value, it's a domestic portfolio, predominantly.

Q. When you were covering health care services, were you covering companies that were in several different strategies?

A. Yes.

Q. And would you provide information to the -- would you provide different information on the same company to portfolio managers for the different strategies? For example, would you provide different information on Cardinal Health to the large cap strategy portfolio manager? If Cardinal Health was in the large cap strategy, then you would provide to Steve Pollack, the mid cap value portfolio manager if Cardinal Health is in the mid cap value strategy?

Page 15

A. No. The information for any given stock was the same.

Q. Does the analyst know more about a particular security than the portfolio manager?

A. Usually.

Q. Between 2015 and 2018, you were covering -- you were an analyst covering health care services; right?

A. Correct.

Q. I'm going to focus on that time period today. If there's ever anything, you know, relevant about your current role, please let me know if you're ever unsure about the time period I'm referencing.

A. Mm-hmm.

Q. Just let me know, but you can assume, unless I say something different, that I'm referring to your role between 2015 and 2018.

A. Mm-hmm.

Q. During the time period of 2015 and 2018, who did you report to?

A. I reported to the director of research.

Q. Who is that?

A. That is Todd Knightly.

Page 16

Q. Did you report to anyone else?

A. As well as the portfolio managers at Boston Partners.

Q. Which ones?

A. The large cap value portfolio managers, the mid cap, the all cap, the global, and for a period of time, the emerging markets.

Q. Who is the large cap portfolio managers?

A. Mark Donovan and David Pyle.

Q. Can you spell David Pyle's last name?

A. P-Y-L-E.

Q. Okay. Mid cap?

A. Is Steve Pollack.

Q. All cap?

A. Is Duilio Ramallo.

Q. Can you say that again?

A. Duilio Ramallo.

Q. Global?

A. Is Chris Hart.

Q. Emerging markets?

A. Was Paul Korngiebel.

Q. Paul?

A. Korngiebel.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 17

Q.   And you covered Cardinal Health; right?

A.   Correct.

Q.   Which of those strategies was Cardinal Health in?

A.   I do not remember.

MS. SADINSKY:  So I want to mark as an exhibit -- it was from Bill Supple's deposition. It was Exhibit, I believe, 10.  And I don't know if we have an extra copy of that.  It was the second mid cap value presentation.

MR. BUTTERLY:  I have mine in my office.  I'll go get it.

MS. SADINSKY:  I have a copy.

MR. JANOSKI:  That would be Exhibit 2.

MS. SADINSKY:  We just need one copy right now.  I'm going to ask one question.

MR. BUTTERLY:  Never mind then.

BY MS. SADINSKY:

Q.   While they're getting that, during 2015 and 2018, did anyone report to you?

A.   Jessica Ballis was an associate reporting in to me.

Q.   For what period?

A.   I'd say 2015.  And it could have been

Page 18

less than that.  Less than the full year, but for a portion of 2015.

Q.   Why was she reporting to you during that year?

A.   She was an associate analyst, so she was gaining experience, and I was also on maternity leave for a portion of 2015.

Q.   When did she start working at Boston Partners?

A.   I do not remember.

Q.   So when she was reporting to you, would she write a report on Cardinal Health and you would review it and give her feedback before it was distributed more broadly?

A.   It's possible.

Q.   Well, how would you describe your oversight responsibilities?

A.   She would do analysis.  We would discuss it, and she would put out research, a research recommendation on the work.  Whether she did it specifically for Cardinal Health is what I cannot remember.

Q.   Okay.

MS. SADINSKY:  So I'm going to mark as

Page 19

Exhibit 1, a mid cap value equity deck dated April 29, 2015.  The Bates number ends in -00003300 to -00003322.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00003300 through -3322 marked Exhibit 12.)

MR. BUTTERLY:  Counsel, I'd just like to state for the record I think you marked this as Exhibit 2 yesterday, just so we have consistency in numbering.

MS. SADINSKY:  I just want to -- can we just start over today?  It's going to be too difficult.

MR. JANOSKI:  I mean, it's your exhibit.  I think it will get more confusing as we go along.

MS. SADINSKY:  If you're going to remind me, because I'm going to use many exhibits again and I just don't remember.

MR. JANOSKI:  I mean, you finished yesterday at 11.  So if you're marking new exhibits, I think it would be easier for the record if you start at 12 and -- versus previously marked.

Page 20

MS. SADINSKY:  Okay.  This was Exhibit 2 yesterday.

BY MS. SADINSKY:

Q.   If you could, turn to the slide number 21, which is at the end.

A.   Okay.

Q.   And the top of that page is labeled "Mid Cap Value Strategy"; correct?  It's describing the portfolio?

A.   It is.

Q.   And on the left-hand column, there's a column labeled "Health Care."

Do you see that?

A.   I do.

Q.   And Cardinal Health is listed there; correct?

A.   Correct.

Q.   Does that refresh your recollection that Cardinal Health was in the mid cap value strategy?

A.   Yes.

MS. SADINSKY:  Okay.  You can put that to the side.

Q.   So we were talking about your oversight

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 21

responsibilities with respect to Ms. Ballis; correct?

A. Yes.

Q. And so she would do research on a particular company and you would talk about the research that she did, and then that would get distributed more broadly; correct?

A. Yes.

Q. And you -- she reported to you during 2015; correct?

A. Correct.

Q. And why did she stop reporting to you?

A. She assumed her own coverage, so she went from associate analyst to a full analyst.

Q. How long does it take to go from associate analyst to full analyst?

A. It can range. On average, about two years.

Q. Cardinal Health is one of the companies you covered between 2015 and 2018; right?

A. Correct.

Q. Is Cardinal Health currently in the large cap value strategy?

A. I don't believe so.

Page 22

Q. When did you start covering Cardinal Health?

A. In 2010.

Q. When did you stop covering Cardinal Health?

A. In 2018.

Q. When did Boston Partners first add Cardinal Health to any of its strategies?

A. I don't remember.

Q. Why did you start covering Cardinal Health in 2010?

A. I was assigned health care services as an industry.

Q. Was Boston Partners -- was Cardinal Health within -- strike that.

Was Cardinal Health in any of Boston Partners' strategies at the time you started covering it?

A. I don't know.

Q. Were you assigned to cover Cardinal Health to determine whether to add it to any of Boston Partners' strategies?

A. Yes.

Q. What did that involve?

Page 23

A. It would involve researching the company, based on Boston Partners' investment philosophy. So looking at the valuation of the company, looking at the business fundamentals, and looking at the underlying business momentum to see if it fit -- if it warranted inclusion in the portfolio.

Q. So once you looked at all of those things, you would make a recommendation whether or not to add it to Boston Partners' -- one of Boston Partners' portfolios?

A. We would write up our conclusions and determine if it was worth including, if it was a hold, or if it was a sell. So buy, hold or sell recommendation.

Q. So I want to focus on the time when you were specifically recommending whether to add it to one of your strategies. So would you still make a buy, sell, or hold recommendation or would you make a recommendation whether to actually add it to a portfolio?

A. We would, as an analyst, we would make a buy, sell, or hold recommendation and then it is the portfolio manager's decision whether or

Page 24

not to include it in the portfolio.

Q. Do you have any discussions with the portfolio manager whether -- about whether to include it in the portfolio?

A. We do. There's frequently a discussion, follow-up questions. So the analyst would provide a writeup for the recommendation. And the portfolio manager could come back and ask additional questions.

Q. Does the portfolio manager tell you if they're ultimately going to add it to the portfolio or not?

A. Sometimes. It's not necessary for them to let us know ahead of time.

Q. When you, you know, did your initial analysis of Cardinal Health, do you recall whether it was added to the portfolio right away?

A. I don't remember.

Q. Do you recall whether you made a recommendation to add it to the portfolio right away?

A. I don't remember.

Q. Do you recall who you would have made the recommendation to at that time?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 25

A.   It would have been made to any applicable portfolio manager that could buy the stock.

Q.   Do you recall whether anyone else would have worked on that research with you?

A.   It very likely could have been Jessica.

Q.   How long has Jessica been with Boston Partners?

A.   I don't remember.

Q.   Did Jessica switch roles at some point? So why was she an associate analyst in 2015 if she would have worked on this initial research with you in 2010?

A.   I'm sorry.  It was not in 2010.  She was not here in 2010.  I don't remember when she arrived at Boston Partners.  It was sometime before 2015.

Q.   Okay.  So I just want to make sure I'm following.  You started covering Cardinal Health in 2010; correct?

A.   Correct.

Q.   Okay.  So you would have made a recommendation whether to add it to any strategy at that point in time; correct?

Page 26

A.   It's possible.  If it was -- if Cardinal Health was a stock that was being -- was on an agenda for me to review.  I don't remember if I did specific analysis on Cardinal Health in 2010.

Q.   Who sets the agenda of securities for you to review?

A.   It's a mix of the analyst, the portfolio managers and the director of research.

Q.   Do you conduct research on companies that are not in Boston Partners' portfolio?

A.   We do.

Q.   Why?

A.   We look at stocks that are not in the portfolio to determine if they should be included in the portfolio.

Q.   At some point, did you make a recommendation that Cardinal Health should be included in the portfolio?

A.   I don't remember.

Q.   Okay.  Who covers Cardinal Health now?

A.   Andy Hatem.

Q.   Who is Andy Hatem?

A.   He is an analyst at Boston Partners.

Page 27

Q.   How long has he been with Boston Partners?

A.   I believe since 2017.

Q.   How did you transition the responsibilities to cover Cardinal Health from yourself to Mr. Hatem?

A.   When I became a large cap, a portfolio manager, he took over coverage responsibilities of health care services.

Q.   Did you train him?

A.   I did not train him.

Q.   Did Mr. Hatem have experience covering health care companies in prior jobs or prior roles at Boston Partners?

A.   He did.

Q.   What was that experience?

A.   He was a health care services analyst at a prior firm.

Q.   Which firm?

A.   Adage.

Q.   Do you recall whether he covered Cardinal Health while he was a health care services analyst at Adage?

A.   I don't know for sure if he covered

Page 28

health care services.  I expect that would be under his.

Q.   Do you recall discussing Cardinal Health with Mr. Hatem ever?

A.   I do not.

Q.   You do not, as in you never did, or you don't recall?

A.   I don't recall.

Q.   What other health care companies did you cover between 2015 and 2018?

A.   I would have covered any health care services companies.

Q.   Did anyone else cover health care services companies between 2015 and 2018?

A.   Jessica would have helped, for a period of time, covering health care services.

Q.   Anyone else?

A.   I don't think so.

Q.   We're going to look at a document later today, authored by someone named Brian Boyden. Who is that?

A.   Brian Boyden, okay.  So he was an analyst at Boston Partners.

Q.   And --

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 29

A.   While I was on maternity leave, he may have helped on health care services.

Q.   Did you cover Johnson & Johnson during 2015 to 2018?

A.   No.  I did not cover pharmaceutical companies.

Q.   Okay.  So who covered pharmaceutical companies?

A.   Currently, that's Andy Hatem.  For a period of time, that was Brian Boyden.

Q.   You said Andy Hatem joined the firm in 2017; correct?

A.   Correct.

Q.   So before 2017, Brian Boyden covered pharmaceutical companies?

A.   I believe so.  Yes.

Q.   And Cardinal Health is a health care company and not a pharmaceutical company?

A.   Cardinal Health is a health care services company, not a pharmaceutical company.

Q.   What does it mean to cover a company?

A.   You're responsible for the analysis and research.

Q.   Okay.  So we -- so you agree that

Page 30

Cardinal Health is part of Boston Partners' mid cap strategy; correct?

A.   I do.  Yes.

Q.   And was the mid cap strategy based on a model portfolio?

A.   In what way?

Q.   You would decide, Boston Partners would decide, you know, what securities to add to the mid cap strategy, and then all of Boston Partners' clients that chose the mid cap strategy would, you know, Boston Partners would invest that client's money in the securities in that strategy in the same proportion that they were in that strategy?

A.   Yes.  I expect there may be clients within mid cap that have exceptions.  I don't know for sure.

Q.   What kind of exceptions?

A.   They could have restrictions on what could be held, the amounts, the different weights in which an industry, a security could be held.  Those specifics, I'm not privy to.  For the most part, I think it's a model portfolio.

Q.   So putting those restrictions to the

Page 31

side, if a client picks the mid cap strategy, it would have the same holdings as any other client that picks that strategy unless these clients have restrictions?

A.   Correct.

Q.   And anytime Boston Partners bought or sold securities within that strategy, it would do so for each of the clients that picked that strategy, absent there being any restrictions?

A.   Correct.

Q.   And do you know when Boston Partners first began investing in Cardinal Health on behalf of its clients?

A.   I don't remember.

Q.   Okay.

MS. SADINSKY:  Let's mark -- it was Tab 6 yesterday.  I don't know which exhibit number that is.  Exhibit 5?

MR. BUTTERLY:  I'll grab mine from yesterday.  I'll be right back.

MS. SADINSKY:  We have extra copies.

MR. BUTTERLY:  That's okay.

MS. SADINSKY:  Tab 6, ending in Bates No. -00007661.  It's Tab 6 in the binder.  You

Page 32

don't need to stamp these.

I'd really just like to start over today.  Let's mark the first one we did as 1.  It's too confusing.  So let's mark this as Exhibit 2.

MR. JANOSKI:  Again, I'm not going to tell you how to do it.  You don't think it just makes sense to continue from 12 onward?

MS. SADINSKY:  I'd rather not.  I'm sorry.  I just -- I'm getting confused.

MR. JANOSKI:  It will make it difficult to distinguish between those exhibits later on.

MS. SADINSKY:  I'm using some of the same ones as yesterday.  I don't remember if they were marked.  I just don't want to.

MS. CARINGAL:  No, he's not referring to using the same exhibit numbers as yesterday.  He's talking about starting at Exhibit 12 so that we do continuous --

MS. SADINSKY:  Oh, remarking?

MR. JANOSKI:  Yeah.

MS. CARINGAL:  Yeah.

MS. SADINSKY:  That's fine.  Okay.

MS. CARINGAL:  It will make things a

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 33

lot easier down the road.

MR. JANOSKI: Yeah, you don't have to refer --

MS. SADINSKY: So what are we starting at?

MR. JANOSKI: 12.

MS. SADINSKY: So what was the first one I showed her?

MR. JANOSKI: So the first one was previously marked.

MS. SADINSKY: So if I want to mark the first one new today.

MS. CARINGAL: 12.

MR. JANOSKI: 12.

MS. SADINSKY: So this first one we did is going to be Exhibit 12. This is going to be Exhibit 13. I'm sorry.

MS. CARINGAL: Perfect. Thank you.

(Native Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00007661 marked Exhibit 13.)

BY MS. SADINSKY:

Q. All right. Exhibit 13 ending in Bates No. -00007661. This is a document your lawyers

Page 34

provided listing Boston Partners' trades in Cardinal Health on behalf of any of its clients.

Do you have any reason to believe that this is not a complete trading record of Boston Partners' trades into or out of Cardinal Health on behalf of its clients?

A. No.

Q. Okay. If you turn to the first page of this very long document. Can you tell me the first date in the first row?

A. September 3, 2014.

Q. So this shows that Boston Partners first invested in Cardinal Health on behalf of its clients in September 2014; correct?

A. It shows an investment in 2014. I don't think I can determine from this if it's the first investment.

Q. So this is a document your lawyers provided listing all trades into or out of Cardinal Health on behalf of any of Boston Partners' clients.

So if there was a trade in Cardinal Health on behalf of any client before 2014, it would --

A. The date would have started before

Page 35

2014. Yes.

Q. That's at least how I understand it.

A. Okay.

Q. So based on this document, would you agree that Boston Partners started investing in Cardinal Health in 2014?

A. Yes.

Q. Do you have any idea why you would have covered Cardinal Health for four years before it was added to any of Boston Partners' strategies?

A. It would have been determined that it didn't fit the investment philosophy.

Q. Do you have any idea who made that determination?

A. That would be Steve Pollack.

Q. Do you know why he made that determination?

A. It would be on the recommendation of the analyst, Steve's own investment judgment. Those are the reasons.

Q. Do you recall making a recommendation not to invest in Cardinal Health between 2010 and 2014?

A. I don't.

Page 36

Q. Do you remember having concerns about Cardinal Health between 2010 and 2014?

A. I don't.

Q. Do you remember having concerns about companies in the health care sector between 2010 and 2014?

A. I don't.

Q. Has Cardinal Health ever been a part of any other Boston Partners strategy?

A. I don't remember.

Q. Has it ever been a part of the large cap strategy?

A. I don't remember.

Q. Has Boston Partners ever shorted Cardinal Health?

A. I don't remember.

Q. Has Boston Partners ever held a derivative position in Cardinal Health?

A. I don't remember.

Q. Who would have that information?

A. That would be probably in the same trade blotters or holdings reports.

Q. And who would be able to testify about that information?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 37

Let me ask again differently. Who would be the most knowledgeable person at Boston Partners about whether Boston Partners has ever shorted Cardinal Health, taken a derivative position in Cardinal Health?

A. In terms of -- I would have handled the shorting along with other portfolio managers in the firm. The reason I don't remember is just because I don't remember the history of the positions going back that far.

Q. Have you ever shorted any company in the mid cap value strategy?

A. Not for mid cap, no.

Q. If Cardinal Health was only ever in the mid cap strategy, would you have ever shorted it?

A. No.

Q. Have you ever held a derivative -- or I don't even know how you say that -- purchased a derivative position, held a derivative position?

A. I don't think mid cap holds derivatives.

Q. Any other indirect position in mid cap.

A. I don't think so.

Q. What about investments in hedge funds?

Page 38

A. There is a research hedge fund at Boston Partners that, in a -- as well as other hedge funds that will go short positions at Boston Partners.

Whether it was held as a short, I do not remember.

Q. Does the mid cap strategy invest in that research hedge fund?

A. No.

Q. What's that research hedge fund called?

A. The Research Fund.

Q. Has the mid cap strategy invested in any mutual funds?

A. No.

Q. Any funds at all?

A. Not that I know of.

Q. Does the mid cap strategy only invest in individual securities?

A. I believe so.

Q. Does the mid cap strategy only invest in common stock of companies?

A. Yes.

Q. Never preferred stock?

A. I don't believe so.

Page 39

Q. Why not?

A. I don't think that's part of its mandate.

Q. Why not?

A. I don't know.

Q. No specific reason for that?

A. Not that I'm aware of.

Q. So at the time that Boston Partners started investing in Cardinal Health, which this document shows as September of 2014, the people that would have determined it was a suitable investment for Boston Partners' clients would have been yourself and Steve Pollack; correct?

A. Correct.

Q. Anyone else?

A. Not that I can remember.

Q. Would anyone else have been involved in the decision to add Cardinal Health to the mid cap strategy?

A. The ultimate decision is with the portfolio manager. Again, there was a period of time since 2014 where others, whether it was Jessica or Brian, I can't remember, would have contributed some analysis to health care

Page 40

services.

Q. And earlier you mentioned that you reported to Todd Knightly as well.

Was he involved in the decision to add Cardinal Health to any of the strategies?

A. It's unlikely.

Q. Why?

A. His responsibility isn't to add stocks to any portfolio.

Q. And earlier I think you mentioned that there's quantitative analysis and fundamental analysis of securities.

Did you do both quantitative and fundamental analysis of Cardinal Health?

A. At the time I was a fundamental analyst, we used the quantitative screens as a tool to narrow the universe, the universe of coverage to determine where we should spend our time doing the fundamental analysis.

Q. So there's actual work done by a human in fundamental analysis but not for quantitative analysis; is that correct?

A. We have a quantitative team that determines what factors should be included within

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 41

the quantitative analysis. So there are humans on that side of the business, but the quantitative screens are not -- are basically pieces of papers and numbers that we review as fundamental analysis.

Q. There's not a human in the quantitative group that -- strike that.

There's not a human in the quantitative group that is assigned to a specific company; correct?

A. Correct.

Q. They create the, you know, formulas, models, whatever you call it?

A. Yes.

Q. Is that -- is the quantitative model based on, you know, data that the company has published or disclosed?

A. Which company?

Q. Any companies?

A. Yes. It takes filings from companies' reports, uses that information as one factor, you know, contributing factors into the screens.

Q. Is the data used in quantitative analysis, is that typically historical company

Page 42

data or is it forecasts the company puts out?

A. It's predominantly historical financial data. There is a component that includes estimates and those, by nature, are forward looking.

Q. What is that component? Can you describe it?

A. It's -- we refer to it as estimate revisions. So it is based on sell-side analyst estimates of future earnings.

Q. This is part of quantitative analysis?

A. That's correct.

Q. You said sell-side analyst estimates. So is that third-party analysts?

A. Correct.

Q. And which third-party analysts do you look at?

A. It's a consortium of numbers. It's more than one.

Q. And how far in the future -- strike that.

How far in the future are -- if we're talking about future earnings, how far in the future are we talking about?

Page 43

A. I believe it goes out as far as 24 months. It could be less. So I'm not certain on that number.

Q. Two years or less?

A. I believe so.

Q. And that's based on the forecast the company -- that's based on the forecast that third-party analysts publish; correct?

A. Correct.

Q. And not the forecast the company publishes; correct?

A. Not -- no. It's not a company-issued guidance.

Q. What's the reason for that?

A. There's -- I don't know.

Q. Is it your view that companies may be more bullish when they issue guidance than a third-party independent analyst would be?

MR. JANOSKI: Objection. Calls for speculation.

MS. SADINSKY: You can answer.

MR. BUTTERLY: You can answer.

A. I don't know if that's a true statement.

Page 44

Q. When you -- well, why would -- strike that.

When a company issues its guidance, would you typically assume that there's 100 percent chance that the company will meet that guidance?

A. No.

MR. JANOSKI: Objection. Assumes facts.

Q. Would you incorporate some discount to that guidance into your own model or analysis?

A. It's scenario dependent.

Q. Okay. So have you ever met with anyone from SEIU?

A. I don't know.

Q. Have you heard of someone named Lorraine Monchak?

A. It doesn't sound familiar.

Q. Dilay Altiner?

A. I don't know.

Q. I forget this person's first name. Mr. Andreal (phonetic)?

A. I don't know.

Q. You don't recall ever meeting with anyone from SEIU?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 45

A.   I don't recall.

Q.   So you -- during 2015 to 2018, you did not make the decision -- you were not the ultimate decision maker as to whether to buy other sell stock for SEIU; correct?

A.   Not within the mid cap value strategy.

Q.   Were you the decision maker as to whether to buy or sell stock at all between 2015 and 2018?

A.   Within mid cap?  Or for a different product?

Q.   For any, any product?

A.   I was for the research product, the research hedge fund.

Q.   Okay.  So you were the portfolio manager for the research hedge fund?

A.   I maintained, yes, within the industries that were under my coverage.

Q.   Was Cardinal Health within that?

A.   Correct.  Yes.

Q.   Cardinal Health was in the Research Fund?

A.   It was under my coverage.  I don't know if it was in the Research Fund.

Page 46

Q.   Describe the Research Fund again.  I'm sorry.

A.   So the Research Fund was -- is a product that was managed by senior analysts and it was an opportunity for the senior analysts to make and execute buy decisions to manage a long portfolio as well as a short portfolio for the industries under their coverage.

Q.   So there were multiple people making decisions as to whether to buy or sell securities within that portfolio?

A.   That's correct.

Q.   And so was that Research Fund -- do clients invest in that Research Fund portfolio or is that Research Fund portfolio part of another Boston Partners strategy?

A.   It does have external -- it has independent external investments.

Q.   So clients invest directly in it?

A.   Yes.

Q.   Is it also part of other strategies, Boston Partners strategies.

A.   Meaning do other products invest in the Research Fund?

Page 47

Q.   Yes.  For example, would the large cap strategy invest in the Research Fund?

A.   No.

Q.   Would any Boston Partners strategy?

A.   No.

Q.   How many securities are in the Research Fund?

A.   I don't know.

Q.   And you don't know whether Cardinal Health is in the Research Fund; correct?

A.   Not -- no.  I don't have a good memory of whether or not it was included.

Q.   And you don't know whether SEIU invested in the Research Fund; correct?

A.   I don't know if they were a client of the Research Fund.

Q.   Okay.  Does Boston Partners ever ask its clients permission before trading in a particular security if that security is not on the restriction -- restricted list?

A.   I don't believe so.

Q.   Why?

A.   The -- I don't think it's a requirement that the -- the purpose of the investments within

Page 48

the portfolio, the Boston Partners products, is to give the portfolio managers the autonomy to invest as they see appropriate.

Q.   So the portfolio manager has complete discretion over, you know, buying and selling for a particular client as long as that discretion is exercised within the bounds of any contracts or agreements?

A.   Correct.

Q.   Does Boston Partners ever discuss a potential trade with its clients before doing so?

A.   No.

Q.   Are clients ever involved in a decision as to whether to buy or sell a security?

A.   Not unless it's held on a restricted list.

Q.   To your knowledge, has SEIU ever given any instruction on what trades Boston Partners should make unless, you know, there was something in the restriction list?

A.   I don't know.

Q.   Have you ever discussed Cardinal Health with anyone at SEIU?

A.   I don't know.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 49

Q.   How are trades executed once a buy or sell decision is made?

A.   That is determined by the traders.  I don't think -- maybe I don't understand your question fully.

Q.   So say you recommend to Mr. Pollack, let's go buy Cardinal Health.  Mr. Pollack says, I agree, let's buy it.  How does that buy happen?

A.   The portfolio manager is responsible for determining the weight of a position in the portfolio, if there is a limit in terms of what price they're willing to pay.

So the discussions on the specifics of a trade are between the portfolio manager and the trading room.

Q.   Is the trading room comprised of Boston Partners employees?

A.   It is.

Q.   Are traders assigned to specific securities?

A.   No.

Q.   So if Mr. Pollack decides he wants to make Cardinal Health 25 percent of the portfolio and he wants to pay $20 per share, and no more,

Page 50

he would just go to any trader in the trading group and say that?

A.   It gets sent through -- there's transparency within the trading room.  So the trade request goes through a system.  I believe it's visible to everyone in the trading room.  But those -- whatever criteria the portfolio manager would place upon a trade would happen with everyone's knowledge.

Q.   So say Mr. Pollack decides he wants to sell Cardinal Health at $20 per share and he goes and he gives that instruction to the trader.  By the time they turn around to go execute that trade, it's $15 per share.  What happens?

MR. JANOSKI:  Objection.  Calls for speculation.

A.   It would be a discussion between the trader and the portfolio manager.

Q.   And how does a trader find buyers and sellers?

A.   I don't know.

Q.   Have you ever been involved in trading?

A.   No.

Q.   When you were covering Cardinal Health,

Page 51

did you prepare formal reports of Cardinal Health?

A.   Yes.

Q.   How often?

A.   I don't know.

Q.   Does it sound right if I tell you I have seen formal reports that you prepared after each earnings call?

A.   That makes sense.  Yes.  So if it's held in the portfolio, there's at least a quarterly report that's produced that provides updates on the position and the recommendation.

Q.   And what if it's not held?

A.   Then there's less frequent updates provided.

Q.   When you say "at least a quarterly report," what more could there be?

A.   There could be interquarter updates.

Q.   What form would those be in?

A.   Meaning what would the analyst produce or what kind of updates would they be?

Q.   What kind of updates would they be?

A.   They could be presentations at conferences.  They could be press releases.

Page 52

There could be industry updates based on competitors.  And I'm sure there's other examples, but that's a few.

Q.   And so would the analyst prepare another formal report?

A.   It could be.  More likely, it would be an informal report.  So perhaps an email update, commentary at the research meeting, dependent on -- yeah.  Dependent on what --

Q.   What's a research meeting?

A.   The research meeting is a meeting held by the investment team as well as anybody else who would like to join in at Boston Partners.  It's held twice a week and it provides the analysts and portfolio managers a format to discuss stocks that are being reviewed, industry updates and position, any questions on positions in portfolios.

Q.   Who is involved in that meeting?

A.   It's the analysts, portfolio managers, as well as, really, any other professional at Boston Partners who has an interest in participating.

Q.   How many people are usually involved?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 53

A. It varies. It would be the analyst team, as well as the portfolio managers, which could be upwards of 20 people.

Q. How long are the meetings?

A. It varies.

Q. Are the meetings, you know, a full day or are they a couple of hours?

A. They are not a full day. So it could be 20 minutes. It could be over an hour.

Q. Okay. So between, let's say 20 --

A. Half an hour, an hour.

Q. Half hour to an hour. Okay. And describe that meeting. Does each analyst go around and give an update on their security? Does each portfolio manager give an update on the portfolio?

A. So the analysts will go around and provide an update to the portfolio management team on the stocks that they're researching. It will be -- if there's a stock with a buy recommendation, it could be a formal presentation to the entire team. If it's an update on a holding, it will be just the comments in regard to the update. And then it could be stocks that

Page 54

have been reviewed during that period of time and the explanation for why it's not a buy recommendation.

Q. What if there's a sell recommendation?

A. That would also be provided at that meeting.

Q. Would that be a formal presentation?

A. No.

Q. So if you make a buy recommendation, there would be a formal presentation. If you make a hold recommendation or a sell recommendation, you would just give some comments?

A. That's correct.

Q. Why would there be a formal presentation for a buy recommendation and not a sell recommendation?

A. The -- it's likely that the buy recommendation would provide additional information as the analyst is getting the portfolio manager team familiar with a stock that hadn't been held previously. If a stock is held and it's a sell recommendation, the presumption is there's already familiarity with the business

Page 55

and the stock itself.

Q. Does a buy recommendation also mean let's increase our position in this security?

A. It can.

Q. So it's not necessarily let's add this security to our portfolio. It's also let's increase our position?

A. That's correct.

Q. And that would mean let's increase the weightings of the security in the portfolio?

A. That's correct.

Q. Are buy recommendations -- strike that. Once a security is already in a portfolio, is it rare to make a buy recommendation? In other words, is it rare to increase your position in that security?

A. No.

Q. Why not?

A. It depends on what the initial weighting is when the security is bought in the portfolio.

Q. Okay. So you received -- so when you prepare the formal reports after each quarterly earnings call, who receives those reports?

Page 56

A. It goes out to all of the investment personnel.

Q. How many investment personnel are there at Boston Partners?

A. I don't know for sure.

Q. About?

A. 75.

Q. Okay.

A. On the distribution list for investment personnel. It's a very large distribution list.

Q. Okay. And that includes portfolio managers?

A. It does.

Q. That includes analysts?

A. It does.

Q. Does it include clients?

A. No.

Q. When you prepare the interquarter -- interquarter updates, so, you know, either an informal email report or a commentary, so an informal email report, would that go to the same people?

A. Very likely, yes.

Q. Is there anyone else you provided

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 57

information on Cardinal Health to, other than portfolio managers and analysts at Boston Partners?

A. No.

Q. Do you recall ever providing information on Cardinal Health to SEIU?

A. No.

Q. And you received reports on other companies of Boston Partners; correct?

A. Can you clarify?

Q. So you were on the investment personnel distribution list. So any report any analyst sent, you received?

A. Correct.

Q. And so you received reports on companies in the pharmaceutical industry; correct?

A. Correct.

Q. And you received reports on Johnson & Johnson; correct?

A. Most likely, yes.

Q. And so you said earlier that Ms. Ballis also worked on Cardinal Health; correct?

A. I may have been mistaken in that. I'm

Page 58

trying to remember back to 2015 when I was on maternity leave and your question about Brian's responsibilities.

Brian may have covered health care services during my absence. I don't know if Jessica worked on it with him.

Q. Okay. She did. And I'll show you some reports later.

A. Okay. Okay.

MR. JANOSKI: Objection to just your statement of facts.

MS. SADINSKY: Okay.

Q. What was the purpose of the reports you prepared?

A. It was to provide the analysis to the investment team.

Q. To the portfolio managers?

A. To the portfolio managers.

Q. To decide whether to buy or spell the stock?

A. Correct.

Q. Were the reports that you prepared based on a model?

A. Meaning a financial model?

Page 59

Q. Yes.

A. That was a -- that would be a contributing element of the analysis. Yes.

Q. Do you have a name for that model? I'm going to refer to this financial model throughout. I just want to know --

A. I would call it the Cardinal Health model.

Q. Okay. We'll call it the Cardinal Health model.

And you said that's one of the factors. What are the other factors?

A. So it's -- you look at the projections for income and earnings and free cash flow. We're also looking at the competitiveness of the industry. We look at the quality of management, how management uses, disburses the free cash flow that the company earns.

So all of that are part of the investment approach as we look at the three circles; the valuation, the fundamentals, and momentum.

Q. So when you say you look at the projections, so you said, I think, three things. You look at the projections of income, earnings

Page 60

and free cash flow, the competitiveness of the industry and the quality of management and their use of free cash flow.

Are all three of those things incorporated into the Cardinal Health model?

A. Those are not an exhaustive list of what we're looking at. Those are examples of what we look at.

In some cases, yes, the use of free cash flow is included in the model. It's -- you know, there's an implied -- it's a -- you know, you look at the competitiveness of the industry. That would appear -- it's hard to put that in explicitly into a financial model. But as you make assumptions about growth, et cetera, that would be a factor.

Q. So is it fair to say, when you're conducting your analysis of Cardinal Health, all of the things that you look at are incorporated into your financial model either as an actual number or as a way that it impacts some of the assumptions that are going into your determination of particular numbers?

MR. JANOSKI: Objection. Vague.

LA Sheriff's Pension                     FINAL                        April 26, 2022
v. Cardinal Health Inc.              CONFIDENTIAL                    Stephanie McGirr

Page 61

A.   That's reasonable.
Q.   Sorry.  Can you repeat your answer?
A.   I think that's reasonable.
Q.   Okay.  So throughout the rest of the day, I'm just going to refer to it as your model.
A.   Okay.
Q.   And when I'm referring to it as your model, I'm kind of referring to this wholesale analysis and the financial numbers that you use.
And so do you keep copies of this model?
A.   Yes.  It's saved.
Q.   Is it a spreadsheet?
A.   Yes.
Q.   Is it like a living spreadsheet, you continuously update it.  It's one document?
A.   Yes.
Q.   There's not like a spreadsheet each time you update it?
A.   No.
Q.   How often do you update the model?
A.   It would most likely be quarterly, if it was a held position.
Q.   Do you update the model -- do you ever do interquarter updates to the financial model?

Page 62

A.   If it was -- if there was an event that caused us to update, that meant that something in the model was stale, we very possibly could.
Q.   Okay.  Is the model based on a DCF analysis?
A.   No.
Q.   Is it based on a comparable companies analysis?
A.   No.
Q.   Is it -- what is the model based on?
A.   So for the most part, the models that I would put together would be an income statement, and then you're using that to determine a free cash flow estimate.
So we would look at historical financials, make an assumption for growth, both on a revenue, sales line, gross margin, operating income, to derive an earnings estimate.  And then looking at, you know, an assumption for shares outstanding to determine an earnings per share number.  Also, looking at, you know, capital investments and using that to come up with a free cash flow estimate.
Q.   The purpose of your model is to

Page 63

determine a free cash flow estimate?
A.   Free cash flow and earnings.  Yes.
Q.   How would you describe free cash flow?
A.   Free cash flow is the cash generated from the operations of the business, after the necessary investments in the business.  And many times, it's discretionary, you know, cash available for management to determine how they want to spend it.
Q.   So that would include, you know, how much cash the company has to do an acquisition?
A.   Among other things, yes.
Q.   And you said that your model -- so your model is used -- your model is used to determine free cash flow estimates and earnings estimates; correct?
A.   Yes.
Q.   So earnings estimates, how far out?
A.   Usually, one to two years.
Q.   Closer to one or closer to two?
A.   Both.  We -- 12 to 24 months out.
Q.   What is -- why don't you look more than 24 months out?
A.   It's difficult to have precision about

Page 64

what happens in the future.
Q.   Why is it difficult to have precision about what happens in the future?
A.   The future is unknowable.
Q.   The future is unpredictable?
A.   Yes.
Q.   So if the company, you know, issues, you know, guidance for three years out, it's not something that's generally incorporated into your model?
A.   Yes.
Q.   So if a company says, we're going to purchase this other company and in three years from now, we're going to have $100 million in synergies, that's not something that you would incorporate into your model at that time?
MR. JANOSKI:  Objection.  Calls for speculation.
A.   We could analyze the stock value in different ways.  So we could take that synergy number as a baseline and then make some assumptions on the likelihood of achieving that.
Q.   Okay.  And you would incorporate some of that into your model?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 65

A. We could. Yes.

Q. Possibly?

A. Yeah.

Q. Okay. So we determined that your model is used to determine free cash flow and earnings estimates. The earnings estimates are generally based on 12 to 24 months out; correct?

A. Correct.

Q. And how many years of historical earnings is it generally based on?

A. I would say it depends on the company. Three to five years.

Q. Okay. Where do you get information about a company?

A. We'll pull information from several sources. It can be SEC filings. It can be meetings with management, conferences, industry information, sell-side research.

Q. Meetings with management. How often do you have meetings with management?

A. It varies. Yeah. It varies depending on -- there's no set timeline for meetings with management.

Q. What types of meetings do you have?

Page 66

For example, do you have meetings after an earnings call? Do you have meetings at an industry conference? Does management of a company come here and meet with you?

A. It can be all of those.

Q. Okay. And how is that arranged?

A. Sometimes it's through a sell-side firm that is handling the corporate access for a company. Sometimes it can be the investor relations department at the company itself.

So, for the most part, it's those two. It's either through a sell-side research firm or the investment relations.

Q. And you had meetings with Cardinal Health management; correct?

A. I believe so. Yes.

Q. Meetings with Mike Kaufmann?

A. Yes.

Q. Meetings with George Barrett?

A. Yes.

Q. Meetings with Jorge Gomez?

A. That's not as familiar, but probably if he was on the management team.

Q. How often would you have meetings with

Page 67

Cardinal Health?

A. I don't remember.

Q. At least once a year?

A. Possibly.

Q. Would you generally have calls with a member of management after an earnings call?

A. That sounds familiar.

Q. Did you listen to earnings calls?

A. Yes.

Q. Did you listen -- did you attend industry conferences where Cardinal Health was presenting?

A. Yes.

Q. Did you attend the Cardinal Health-specific presentation at an industry conference?

A. Likely, yes.

Q. Did you read Cardinal Health press releases?

A. Yes.

Q. Did you go to Cardinal Health's offices in -- where are they, Dublin, Dublin, Ohio?

A. No.

Q. Did you get information about Cardinal

Page 68

Health from your colleagues?

A. Yes.

Q. Who?

A. Likely Jessica or Brian.

Q. Anyone else?

A. No.

Q. Through what channels did you get that information?

A. I don't remember. I don't remember.

Q. Would you, you know, call Brian or would Brian call you and say, hey, did you see this news about Cardinal Health?

A. Yeah. It could have been phone calls. It could have been email discussions. I just don't know.

Q. Okay. Could it have been in-person?

A. It certainly could have been.

Q. Is Brian in this office?

A. Yes.

Q. Do you get information from third-party analysts?

A. Yes.

Q. Which ones?

A. I don't remember.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 69

Q. JPMorgan?
A. Yes.
Q. Bard?
A. Yes.
Q. Cohen?
A. Yes.
Q. Goldman?
A. Yup.
Q. Bank of America?
A. Yup.
Q. Any others that you pay particular attention to?
A. Regarding Cardinal specifically or -- there's other health care services providers. I mean, Lerix One was a research firm that's respected in the area. I don't remember specifically whose research was consumed at the time regarding Cardinal Health.
Q. But Lerix was one of the firms?
A. Likely, they're on the list.
Q. And you had conversations with someone named Dave Larson.
A. I know Dave Larson. I can't remember a specific conversation with him.

Page 70

Q. Did you get information from news reports?
A. Probably.
Q. Which news sources?
A. It would have been the Bloomberg FactSet that mostly, the press releases that were supplied from Cardinal Health.
Q. So, generally, Bloomberg FactSet press releases that were supplied by Cardinal Health.
What about New York Times, Wall Street Journal, Business Insider?
A. It could have been. I don't remember.
Q. Did you get information from trade magazines?
A. Unlikely.
Q. Endovascular Today?
A. No.
Q. Clinica MedTech?
A. No.
Q. Have you lettered of those?
A. No.
Q. Do investors care about what's said in those, from your experience?
MR. JANOSKI: Objection.

Page 71

A. I don't know.
MR. JANOSKI: Calls for speculation.
Q. Have you ever considered anything in a trade magazine such as Endovascular Today or Clinica MedTech in analyzing any company ever?
A. Not that I remember.
Q. And how many companies have you analyzed at -- as you've been an analyst?
A. Hundreds.
Q. Hundreds of companies.
Have you ever considered information from any trade magazine in analyzing a company?
A. I don't know.
Q. Has -- have you ever heard anyone say that they made an investment decision based on something that was said in Endovascular Today?
A. I don't know.
Q. Have you ever heard of Endovascular Today?
A. It doesn't sound familiar.
Q. Have you ever heard of Clinica MedTech?
A. It doesn't sound familiar.
Q. So sitting here today, have you ever heard anyone say that they made an investment

Page 72

decision based on something that was said in Endovascular Today or Clinica MedTech?
A. I don't think so.
Q. Do you get information from Boston Partners' clients?
A. No.
Q. Have you ever gotten information from SEIU?
A. No.
Q. Do you review information about other companies for your model of Cardinal?
A. Meaning competitors?
Q. Competitors -- yeah. Sure. Or any companies at all?
A. We will use industry-wide knowledge as -- as just part of the buildup of the model. If a competitor is experiencing some sort of headwind or benefit, we could use that to -- as part of our analysis, thinking that Cardinal would share the same -- would have similar exposure.
Q. What would be the competitors of Cardinal that you would look at?
A. McKesson and AmerisourceBergen.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 73

Q.   Any others?

A.   Those are the two predominant.

Q.   Would you look at pharmaceutical companies as well in thinking about Cardinal?

A.   We could.  We could look at some of the pricing dynamics within pharmaceutical companies.

Q.   What does that mean?

A.   So are the pharmaceutical companies raising or lowering the prices of their drugs? And that would -- there would be a difference between branded drugs and generic drugs as well.

Q.   And how did that affect your model, prices going up?

A.   Prices going up would have a positive impact on the revenue or sales assumptions within the model.  And then depending on what class of drug, it would have an impact on what the margin is for the business.

Q.   How important to you were -- was drug pricing in assessing Cardinal Health?

A.   It was fairly important.

Q.   Fairly important.  How would you define that?

A.   There's -- so the distribution model of

Page 74

Cardinal was a passthrough.  So they would -- if drug prices were going up, that would be a benefit to sales.

If there were more generics coming out, that was less positive to sales, but more positive to profits and margin.

Q.   But when you say "fairly important," was this, you know -- how significant was changes in pricing to your analysis of Cardinal Health?

MR. JANOSKI:  Objection.  Vague.

A.   It was a contributing factor in the analysis.

Q.   What would you say were the biggest -- what would you say were the three most significant factors in assessing Cardinal Health?

MR. JANOSKI:  Objection.  Calls for speculation.  Lacks foundation.

A.   It's hard to remember with specificity, going back that far.  So, you know, again, kind of -- it's hard for me to give you an answer on what the top three are.

Q.   Let me ask you this:  Would you say generic pricing was one of the top three things you looked at in assessing -- I said generic

Page 75

pricing.  I meant pharmaceutical pricing.

A.   Pharmaceutical pricing was a factor, and it's -- the reason I have a hard time remembering is there was -- how important was that, was pharmaceutical pricing at that time compared to the number of generics coming to market, was very important for the distributors for a period of time.  I can't remember when that was.

So that's why I have a difficult time answering this question, because at different times over my coverage period, there would be different issues --

Q.   I see.

A.   -- that carried a greater importance.

Q.   So at some points in time, pharmaceutical pricing was more important in your analysis than at other points in time?

A.   That's fair.

Q.   And that's because, as the industry changes, you know, the elements of your analysis, the importance of the elements of your analysis change as well?

A.   Yes.

Page 76

Q.   Was your analysis of Cardinal Health and other health care companies different around or in election years?

A.   It could be.

Q.   Why?

A.   There would be -- at different periods of time, there would be sensitivity to government regulations, and what was any given company's exposure to potential changes in regulation.

Q.   So the risk of investing in a health care company may be different in an election year because you don't know, you know, who is going to be the president?

A.   It could be.

Q.   And so as you get closer to the election, and -- or after the election, when you know who was elected, it's more predictable -- strike that.

It's easier to predict what is going to happen with a stock in certain ways?

MR. JANOSKI:  Objection.  Assumes facts.

Q.   It's easier to -- there's less regulatory unknowns?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 77

MR. JANOSKI:  Same objection.

A.  Potentially.

Q.  Do you remember, you know, considering political risk in your analysis or model of Cardinal Health in 2016?

A.  It's possible.

Q.  Okay.

MS. SADINSKY:  Next, as Tab 13, I want to mark -- or as Exhibit 13, I want to mark Tab 37.

COURT REPORTER:  That's Exhibit 14.

MS. SADINSKY:  Exhibit 14.  I'm sorry. And this ends in Bates No. -175012 to -175015.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00175012 through -5014 marked Exhibit 14.)

BY MS. SADINSKY:

Q.  And this is one of the formal reports of Cardinal Health that you prepared; correct?

A.  Yes.

Q.  And this report is based on your model; correct?

A.  Yes.

Q.  And this is sent to investment

Page 78

personnel Boston.

Do you see that?

A.  I do.

Q.  And that has the portfolio managers and analysts that we discussed before on it?

A.  Yes.

Q.  And that would include Steve Pollack?

A.  Yes.

Q.  And Andy Hatem, once he joined the firm?

A.  Correct.

Q.  And Jessica Ballis, when she was at the firm?

A.  Yes.

Q.  And the subject is "CAH(71) (Cardinal Health) HOLD TP = 77 (SOP)."

Do you see that?

A.  I do.

Q.  What does "hold" mean?

A.  Hold means it's a hold recommendation. It's neither a buy or a sell.

Q.  So you were recommending to continue maintaining Boston Partners' investment in Cardinal Health?

Page 79

A.  If it was held, yes.

Q.  Okay.  And we determined earlier that Boston Partners started investing in Cardinal Health in 2014; correct?

A.  Yes.

Q.  So it was held at this time; correct?

A.  I don't know.

MR. JANOSKI:  Objection.  Counsel, I'll just state for the record that your document requests started in September 2014.  So I'm going to object to both this and the entire previous line of questioning as assuming facts, because I don't think there's foundation that the first event was in September of 2014.  But you can go ahead.

MS. SADINSKY:  My document request is in September of 2014 and that document showed the first investment was September 2014.

So what's the issue?

MR. JANOSKI:  I'm saying I don't think there's been foundation laid that the very first investment started in 2014.

MS. SADINSKY:  Okay.

MR. JANOSKI:  That's my objection.  You

Page 80

can keep asking questions.

MS. SADINSKY:  Sure.  Okay.

BY MS. SADINSKY:

Q.  So we looked at the transaction history that your counsel provided of all of Boston Partners' trades in Cardinal Health and the first one listed was September 2014.

Do you remember that?

A.  I see what's on this page.  Yes.  On that trading history.

Q.  Okay.  So that's what I'm referring to when I say Boston Partners started investing in Cardinal Health in 2014.

So at this point in time, Cardinal Health was invested in -- or Boston Partners was invested in Cardinal Health and you're recommending hold.  So you're recommending maintaining Boston Partners' holdings in Cardinal Health on behalf of its clients; correct?

A.  If it was held in 2017, yes.

Q.  Okay.  And what's the criteria for rating a stock buy, sell, hold?

A.  So it, again, is looking at the intersection of the valuation.  So the price of

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 81

the stock compared to what we think the stock is worth, the business fundamentals and whether they're getting better or worse, and then the momentum of the business.

So we look at the three of those. And if one of those is missing or if the other two aren't strong enough to offset one of those three factors, we would rate the stock a hold.

Q. If one is missing and the other two don't offset that, you would rate the stock a hold?

A. Correct.

Q. And so if all three factors are present, you would rate it a buy?

A. Yes.

Q. And if all three factors are not present, you would rate it a sell?

A. Correct.

Q. Would you rate it a sell if two factors were missing?

A. It -- it's a stock-by-stock basis.

Q. Okay. But if one factor was missing and the other two were present, you wouldn't rate it a sell?

Page 82

A. It's possible. Yeah.

Q. What type of event would cause you to change your recommendation?

A. It could be an improvement in momentum, fundamentals, or evaluation. You know, we're looking for, at times, a catalyst for change.

So if we look at a stock, a company, an industry, and can identify an event that would improve the outlook, that could cause us to change our opinion.

It also could be the share price of a stock. If it becomes inexpensive enough that some of the concerns are already reflected in the valuation, and we see an opportunity for a business to get better, that would cause us to change the rating.

Q. Just so -- just because a company announces, you know, bad news and the stock price plummets --

A. Mm-hmm.

Q. -- that wouldn't necessarily cause you to change your recommendation to sell?

A. It wouldn't necessarily. No.

Q. Why?

A. Because the bad news could be reflected

Page 83

in the stock.

Q. And so if a company's stock price plummets and the bad news is reflected, if you're recommending to sell, it's -- it could be based on something else, for example, the reason of the news makes you question how the company is going to do in other areas?

A. Mm-hmm.

MR. JANOSKI: Objection. Calls for speculation.

Q. In the subject line, the next thing is "TP."

What does that stand for?

A. That stands for target price.

Q. And how is the target price set?

A. The target price is set by the analyst, who makes a judgment call, based on the three circles, and what the fair value of the stock is.

Q. It's based on the model?

A. It can be, yeah. That's a component.

Q. The target price is a component of the model?

A. The model is a component in setting the target price.

Page 84

Q. What are the other components?

A. So there's an estimate of what earnings will be, earnings or free cash flow, in most scenarios. And then what multiple should be put on those earnings or free cash flow.

Q. So when we're talking about earnings and free cash flow, that's from the model; right?

A. Correct.

Q. The model plus a multiple?

A. Mm-hmm.

Q. It's the target price?

A. In most cases, yes.

Q. How is the multiple determined?

A. The multiple is determined by the analyst. It is a more qualitative estimate, based on what the fundamentals are, you know, the growth rate of the business, kind of the quality of the business, are elements used to set the multiple.

Q. Are industry challenges part of the assessment or part of what is used to set the multiple?

A. Yeah.

MR. JANOSKI: Objection. Vague.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 85

A.  The industry, the health of the industry would be a factor.

Q.  You said that much more articulate than I did.

Health of industry, growth rate, quality of business.  Anything else?

A.  There's lots of other elements to be considered and it depends on the stock and I think the issues that are topical at the time.

Q.  Okay.  So 77 here refers to a $77 target price?

A.  That's correct.

Q.  And that's less than the market price here?

A.  That's more than the market price.  The market price would be 71, is reflected by the 71 in the first set of parentheses.  After the CAH.  And the target price is 77.

Q.  So if you look at the table, the first line --

A.  Oh, okay.

Q.  So what --

A.  Yes, I see what you're talking about.

Q.  Is there an error?

Page 86

A.  There could be an inconsistency.

Q.  Okay.  What do you think is right?  The table --

A.  I don't know what's right.

Q.  Okay.

A.  I think what can happen is this table gets populated at the premarket price.  And that could have been the case in this situation.

Q.  Is this table populated based on the model?

A.  Some -- some places are based on the model.  Some are just automatically generated.

Q.  What's automatically generated?

A.  It's going to be difficult to say with specifics in this case, just because my memory -- I don't remember.

Most of the numbers within the table would be automatically generated.  At times, the BPAM estimate EPS could be adjusted by the analyst.  Most else within this -- and then the business description would be generated on the last page.

Q.  Yeah.  Okay.  So let's stick with just this table here first.

A.  Okay.

Page 87

Q.  So this table is based on the numbers the company reports, the model, and any adjustments made by the analyst?

A.  Correct.

Q.  And so the top of this table says "market price."  That's generated based on company information; correct?

A.  That's generated based on where the stock is trading, yeah, in the market.

Q.  And so 52-week range, again, this is based on where the stock is trading in the market?

A.  Yes.

Q.  Target price and target rationale are set by the analyst?

A.  Correct.

Q.  The numbers in this first part of the table starting with the Column USD, and let's end with the Column EPS?

A.  Mm-hmm.

Q.  Let's exclude the Column BPM EST EPS.

A.  Mm-hmm.

Q.  All of those numbers are based on companies -- numbers that the company generates;

Page 88

correct?

A.  That are published.  Yes.

Q.  Published numbers?

A.  Yeah.

Q.  By the company?

A.  Or analysts, sell-side analysts that are being pulled from various screens.

Q.  So the numbers in -- from USD, mm to EPS in this table are based on numbers that Cardinal Health published or numbers that sell-side analysts published --

A.  Yes.

Q.  -- correct?

A.  Yes.

Q.  And BPAM est EPS is --

A.  Boston --

Q.  Is Boston Partners?

A.  Analysts, yes.

Q.  And what does that stand for?

A.  It's Boston Partners asset management estimated earnings per share.

Q.  And so here Cardinal Health estimated earnings per share for June 2018, which is fiscal 2018, as $5.25.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 89

Do you see that?
A. I do.
Q. And Boston Partners estimated it as 4.88; right?
A. Correct.
Q. So they estimate it as less than Cardinal Health; correct?
A. Yes.
Q. Next, part of the table is "Assets through total capital."
Does that come from Cardinal Health and sell-side analysts or does that come from Boston Partners' analysts?
A. That likely comes from SEC filings.
Q. By Cardinal Health?
A. Yeah.
Q. What is OROA?
A. Operating return on operating assets.
Q. What is ROE?
A. Return on equity.
Q. Who sets those numbers?
A. Those are calculations.
Q. By who?
A. By the quantitative team.

Page 90

Q. At Boston Partners?
A. I believe so. Yes.
Q. Based on whatever qualitative or quantitative formula they have?
A. Correct.
Q. Based on the company's reported numbers.
A. Yes.
Q. Under that you have "enterprise value, valuation" -- strike that.
Under that you have "enterprise value."
Who sets those numbers?
A. That's just a market-based number. It's where the -- it's pulled from the --
Q. The company?
A. -- the company, like screens and databases.
Q. Okay. It's not your estimate of what it should be?
A. No.
Q. Debt plus MI. What's MI?
A. Minority interest.
Q. What is EV?
A. Enterprise value.

Page 91

Q. Who sets those numbers?
A. Those are, again, calculations.
Q. Valuation. Who sets the numbers under here, P/B, P/FY1, P/FCF EV/EBITDA?
A. Those will come from a database just based on where the stock is trading.
Q. Per share, who sets these numbers?
A. Again, where the stock is trading and then the database of sell-side estimates.
Q. What does comp mean?
A. That's a composite score.
Q. What does that mean?
A. That's the quantitative ranking. So that is a composite of how the screens rank valuation, fundamentals and momentum.
Q. A higher score is better, a lower score is worse?
A. A lower score is better.
Q. What is the lowest score?
A. 1.
Q. And sorry, that's a quantitative ranking of the three fundamentals?
A. Of the three circles, being valuation, fundamentals and momentum.

Page 92

Q. That's composite score; right?
A. Composite. Yes.
Q. Composite?
A. Yes.
Q. And at this time, the composite score was good, based on a quantitative analysis?
A. Yes.
Q. What's fail?
A. That's a likelihood of failure, which is, again, a quantitative ranking.
Q. Sorry. I just want to go back to composite score.
So the lowest score is 1. What's the highest?
A. 10.
Q. So fail is likelihood of failure, also based on a quantitative analysis?
A. Correct.
Q. Of the three circles?
A. Yes.
Q. And is a lower score better?
A. Yes.
Q. What's the range?
A. I believe it's 1 through 5. 1 through

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 93

5, but I'd have to go back and confirm that.

Q. So at this time, Cardinal was likely to fail -- very, very likely to fail based on a quantitative analysis?

MR. JANOSKI: Objection.

A. It did not have a good score.

MR. JANOSKI: Assumes facts.

Q. I'm sorry. So you said fail stands for likelihood of failure based on a quantitative analysis; correct?

A. Yes.

Q. And you said that a lower score is better; correct?

A. Correct.

Q. You said the range is 1 to 5; correct?

A. I can't remember. I don't know specifically if it's 1 through 5 or 1 through 10. Just I can't remember.

Q. If it was 1 through 5, then this is the highest score for the likelihood of failure that Boston Partners would have; correct?

MR. JANOSKI: Objection. Calls for speculation.

A. It's not a good score.

Page 94

Q. It's not a --

A. It's not a good score.

Q. And do you see a lot of 5s?

A. I can't -- I don't have a good frame of reference for that.

Q. Have you given a lot of 5s?

A. The failure score is not an element that is -- it's not a ranking that carries as much weight as the composite score does.

Q. Why?

A. I don't have a good answer for that.

Q. What's the difference between the composite score and the failure score? How do you think about them differently?

A. The composite score is given more focus. And I don't have a good answer for -- to kind of parse out the differences between the composite or failure. I think that would be a question for the quantitative team.

Q. Okay. The reason I'm trying to understand is we're talking about a quantitative ranking based on the three circles for each. And based on what is on this report, the composite score has the best ranking it could and the

Page 95

failure score has the worst ranking it could.

So I'm wondering how those actually --

A. I don't have --

MR. JANOSKI: Objection. Assumes facts.

A. I don't have a good answer, and I would say, again, just given -- not having the familiarity with the failure score on the quantitative side, it either is a mediocre score or it's a bad score. I can't give you some specificity on that.

Q. Are these scores important to you?

A. The composite score is given, yes, it's important.

Q. What is BSI?

A. That's a bad stock indicator.

Q. What does that mean?

A. It's pretty -- it's, you know, is it a good stock or a bad stock. So it's another quantitative --

Q. Quantitative?

A. -- ranking tool.

Q. Is that important to you?

A. It's not as important as the composite

Page 96

score.

Q. Is it something, though, that you consider?

A. I have not -- at times, it is. But it's not given -- again, it's not given as much weight as the composite score.

Q. What is the range for BSI?

A. I don't know.

Q. What is ERV?

A. Is estimate revisions.

Q. Sorry. For BSI, is a lower score, again, better than a higher score?

A. I have not -- that's a better question for the quantitative team. I can't answer.

Q. ERV is estimate revisions. Is this important to you?

A. It is.

Q. What does this mean?

A. It's the number of estimates that are increasing compared to the number of estimates that are decreasing.

Q. So a higher score would be better than a lower score?

A. A lower score is better.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 97

Q. Why?

A. That's how it's formulated. It's just a calculation.

Q. So the number doesn't reflect the actual number of estimates increasing versus the number decreasing?

A. It's a calculation.

Q. Okay. Do you know the range of scores?

A. It's 1 through 100.

Q. So 1 is the best score, 100 is the worst score?

A. Correct.

Q. So ERV and composite are the most important?

A. (Witness nodded.)

Q. What is insider zone?

A. That would be the insider ownership.

Q. So executives, the shares --

A. Correct.

Q. -- that executives own?

Okay. At the top of this table, it says "Target rationale, SOP."

What does SOP stand for?

A. Sum of the parts?

Page 98

Q. What does that mean?

A. It means it's looking at the different parts of the business, valuing them separately and then putting them together to come up with a price for the whole.

Q. Why is your target rationale "sum of the parts"? What does that mean?

A. It's -- I'd have to read through to -- this note to remember what the rationale for using sum of the parts was. But at the time, it seemed appropriate to look at the different parts of the business and value them separately.

Q. What are other ways to express the target rationale?

A. As an analyst?

Q. Yes.

A. To value a business, we could put a price-to-earnings multiple on the business. We could look at the book value of a business. We could look at the free cash flow yield. Those are some other examples.

Q. And those would be expressed differently in the target rationale section of this?

Page 99

A. Correct.

Q. Okay. And so the subject line has the name of the company, the market price, your recommendation, the target price, and the target rationale?

A. Correct.

Q. And that's because those are, you know, the key components that portfolio managers look at in determining whether to buy or sell stock?

A. Yes.

Q. Okay. Then you have -- oh, so in this box here, you have columns for 6/15, 6/16, 6/17, 6/18.

Do you see that?

A. I do.

Q. That refers to fiscal year 2015, fiscal year 2016, fiscal year 2017 and fiscal year 2018?

A. Correct.

Q. This report is dated August 2, 2017; correct?

A. Correct.

Q. So is it correct that the information you provide is based on the prior two years, the current year, and the next year?

Page 100

A. So the table is reflecting only one year out in this case. Because it's looking -- they had just finished their fiscal year 2017. So it has that information and then the next 12 months.

Q. But your model reflects the next 24 months?

A. Likely, yes.

Q. How would I know whether or not your model reflects the next 24 months?

A. It would likely be in the text of the note.

Q. In what section?

A. So in this case, it looks as if it's going forward 12 months in terms of under the valuation portion on the third page.

Q. On the page with the Bates No. -5014 at the end?

A. That's correct.

Q. V says "V5 TP equals 77 sum of parts."

Where are you seeing it only goes forward 12 months?

A. It implies 16 times fiscal year '18 estimates. So that would be 12 months ahead

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 101

from -- or ten months ahead, if this came out in August.  But it's based on that fiscal year 2018.

Q.   So in August 2017, your analysis of Cardinal looked ten months ahead?

A.   Yes.

Q.   And your model reflected forecast ten months ahead?

A.   Yes.

Q.   No further than that; correct?

A.   Correct.

Q.   Does the composite -- composite?

A.   That's how I say it, but yeah.

Q.   Does the composite factor factor in your recommendation to buy, sell, hold?

A.   Can you -- does it factor into my opinion of whether --

Q.   Yes.

A.   Yes.  It can.

Q.   And the bad stock indicator?

A.   Not so much.

Q.   And the estimate revisions, ERV?

A.   Yes.

Q.   And the fail indicator?

A.   Not as much.

Page 102

Q.   Okay.  So the composite and the ERV; correct?

A.   Correct.

MR. BUTTERLY:  Can you stop just for one second?

MS. SADINSKY:  Sure.  Let's go off the record.

THE VIDEOGRAPHER:  The time is 9:46 a.m.  We're off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 9:54 a.m.  We're on the record.

BY MS. SADINSKY:

Q.   Ms. McGirr, was there something that you wanted to clarify about your testimony regarding the fail and composite?

A.   There is.  So the failure score is 1 through 10, with 1 being the most favorable.

Q.   1 is most favorable, 10 is least?

A.   Correct.

Q.   And then a composite score is also 1 through 10?

A.   That's correct.

Q.   And 1 is most favorable, 10 is least?

Page 103

A.   Yes.

Q.   And BSI is also 1 through 10?

A.   I don't have a clarification on that one.

Q.   Okay.  Okay.  Sticking on this chart, the next section is the conclusions section.

Is this a summary of what your buy, sell, hold recommendation is based on?

A.   Yes.

Q.   And would you say the information in the conclusion section is the most important information reflected in your model?

A.   It's a summary of -- yeah, what the -- yeah, of what the model is putting out.

Q.   Is the information listed in the conclusion section listed in order of importance?

A.   Not necessarily.

Q.   Okay.  For example, the last sentence in here refers to Cardinal's decision to increase its investment spend, and the sentence before is a sentence about the pricing environment having stabilized.

Would the pricing environment having stabilized been more important to you than

Page 104

Cardinal's decision to increase its investment spend?

A.   Not necessarily.

Q.   Okay.  After that, if you go to the next page, the one marked ending in -175013, there's a section titled "MO."

What does MO stand for?

A.   That stands for momentum.

Q.   And what does 72 mean?

A.   That is the quantitative score.

Q.   And what is the range of scores?

A.   1 through 100.

Q.   And is a lower score better?

A.   Correct.  Yes.

Q.   And so is -- and 100 is the worst?

A.   Yes.

Q.   And is 72 a good score or a bad score?

A.   It's a poor score.

Q.   Poor score.  And under -- oh, and how do you decide what information to include in the momentum section?

A.   That's the analyst's judgment.

Q.   And so this is the information that you consider in considering whether the company has

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 105

momentum?

A. Yes.

Q. Is there other information that you consider?

A. I'm sure there is. It depends on the stock and the business being evaluated.

Q. But the information listed here is the most important information you consider in determining whether a company has momentum?

A. For Cardinal, yes.

Q. And under that, there's a table. Do you see that?

A. I do.

Q. And the table has columns for the third quarter of 2016 through the fourth quarter of 2017. Do you see that?

A. I do.

Q. Are the numbers here based on the actual reported results reported by Cardinal?

A. Yes.

Q. Are any of the numbers based on forecasts?

A. No.

Page 106

Q. Are any of the numbers different from what the company reported?

A. I don't believe so.

Q. After the table, there's a section called "Catalyst." Do you see that?

A. I do.

Q. And you started talking about catalyst before, but can you briefly describe what it means to be a catalyst?

A. A catalyst in this case is looking for a positive event that would drive better than expected earnings and free cash flow, or would allow the business to sustain the rate of growth that it's had so far.

Q. So is the catalyst's focus on the company's free cash flow and growth rate?

A. Those are two main catalysts, events that would impact earnings growth and free cash flow.

Q. And so the items listed in catalyst are positive things?

A. In this case, yes.

Q. Are there ever negative things?

Page 107

A. There can be.

Q. Why?

A. Because there will be negative events that impact a company.

Q. So a catalyst can be both positive or negative things that impact a company?

A. Yeah.

Q. It's like -- would it be the key things that you would be thinking about in whether the company would grow or not grow in the future?

A. That's fair.

Q. Under that, you have a section -- actually, sticking on catalyst, is M&A a catalyst?

A. It can be.

Q. How do you think about M&A in assessing a company's value?

A. Well, it depends if it's the target or if it's the acquirer.

If it's a business that is acquiring another asset, we are evaluating the merits of the acquisition compared to other ways the company can spend its cash. So is the return on that investment better than buying back shares, paying

Page 108

down debt, you know, issuing a dividend to shareholders.

Q. Do you -- how do you think about -- so strike that.

Let's stick with the standpoint of the acquirer.

A. Mm-hmm.

Q. How do you think about the ability for the company to integrate an acquisition? Does that factor into your analysis?

A. It does.

Q. Does that factor into the catalyst portion?

A. It can.

Q. What other sections?

A. It could be a fundamental. You know, is it going to change the growth rate of the business? Is it going to change the return profile? Will it change the historic allocation of cash? Does it add debt to the business, which could increase a risk profile?

These are some of the elements considered.

Q. And you said this can be a fundamental. Is that what you said?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 109

A.  It can be, yeah.

Q.  And so it could be a catalyst.  Can it fall within MO, momentum?

A.  Yes.  So I think it's -- sometimes, it's not so clearcut; right?  So it's not going to fall into just a single section.  An acquisition can impact a business in many ways.

Q.  Okay.  And that's reflected in your model?

A.  Yeah.

Q.  If a company announces that it's going to acquire another company and it says, we expect, you know, accretion of X dollars in five years --

A.  Mm-hmm.

Q.  -- would you incorporate that expected accretion at the time the acquisition is announced, at the time the acquisition closes, at the time you understand the integration is going well?  When would that actually factor into your analysis?

MR. JANOSKI:  Objection.  Compound. Calls for speculation.

A.  It's going to be dependent.  And it

Page 110

certainly could vary based on the business that's being analyzed.

Q.  Okay.  We'll look at some specifics in a bit.

Then there's a section titled "F."

Do you see that?

A.  I do.

Q.  What does that mean?

A.  That stands for fundamentals.

Q.  And what is 5?

A.  That is the quantitative score for the fundamentals.

Q.  What's the range of scores?

A.  1 through 100.

Q.  And is 5 a good score or a bad score?

A.  That's a good score.

Q.  Is the best score 1, worst score 100?

A.  Yes.

Q.  Is there any inconsistency in the fact that the momentum is a poor score and the fundamentals is a good score here?

A.  Not necessarily.

Q.  Why not?

A.  The fundamental score changes less

Page 111

frequently.

Q.  Why?

A.  Because the fundamentals of a business generally change less frequently.  They will -- the -- it would be best to get the quantitative team to give the specifics of the formula.

But the return profile -- the events that are being measured and the factors that are being weighed and considered within the fundamentals score are longer term looking than they are within the momentum factor.

Q.  But nothing in your analysis of Cardinal Health on August 2, 2017, was based on anything more than ten months out; correct?

A.  Forward-looking.  That's correct.

Q.  Okay.  Then -- and how do you decide what to include in the fundamentals section?

A.  It's judgment and just what's valued by the firm, what elements are valued by the firm.

Q.  Then there's a section titled "V." What does that stand for?

A.  That stands for valuation.

Q.  And the score here is 5.

A.  Yes.

Page 112

Q.  What's the range of scores?

A.  It's 1 through 100.

Q.  And 5 -- and 1 is the best, 100 is the worst?

A.  Yes.

Q.  And 5 is a good score?

A.  Yeah.

Q.  And it says "Sum of the parts."  That's your target price rationale; correct?

A.  Correct.

Q.  And that means that you should be looking at each part of the business separately; right?

A.  Correct.

Q.  And Cardinal Health has two segments, a pharmaceutical segment and a medical segment?

A.  Yes.

Q.  And you're saying look at the pharmaceutical segment and the medical segment differently?

A.  Yes.

Q.  Are you saying look at other parts of the business separately, too?

A.  Not at this time.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 113

Q. Okay. So this -- so sum of parts means look at pharmaceutical and medical segments separately?

A. Yes.

Q. When it says here "Implies 16 XFF FY 18e," we said earlier that refers to this is based on earnings, earning projections for fiscal 2018?

A. Correct.

Q. Okay. Other than these formal quarterly routers, informal emails you may send, interquarter emails to your colleagues, and the research meetings that you have twice a week, is there any other way that you would share your view on Cardinal with your colleagues?

A. There could be in-person or phone call discussions.

Q. Do those happen often?

A. They do.

Q. And do you have those with Mr. Pollack?

A. Yes. I did, yes.

Q. And did you have them with anyone else?

A. I'm sure.

Q. Other portfolio managers?

Page 114

A. Likely.

Q. Other analysts?

A. Possibly.

Q. Okay.

MS. SADINSKY: Let's next mark as Exhibit 15 -- and let's do Exhibit 15 and 16 at the same time, Exhibit 15, Tab 7. Exhibit 16, Tab 8.

(Native Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00007661 marked Exhibit 15.)

(Document bearing "SEIUHEALTH" marked Exhibit 16.)

MS. SADINSKY: So as Exhibit 15, we're going to mark a Bates -- a document ending in Bates No. -7661.

And as Exhibit 16, we are going to mark a document that we created which I will explain in a moment.

BY MS. SADINSKY:

Q. Exhibit 15 is a document your lawyers provided of Boston Partners' trades in Cardinal Health on behalf of SEIU.

A. Mm-hmm.

Page 115

Q. Do you have any reason to believe this is not a complete trading record of Boston Partners' trades into or out of Cardinal Health on behalf of SEIU?

A. No.

Q. This is pretty hard to read for me.

A. Yeah.

Q. So the next exhibit, Exhibit 16, is a version of this chart. We made the font bigger and removed the columns that seem irrelevant to us, based -- the columns based on trading and whatnot. You're free to flip back through the charts if you want to confirm the numbers.

MR. JANOSKI: Counsel, I'm going to put an objection as inauthentic document. I trust that you didn't alter anything, but just to preserve.

MS. SADINSKY: Sure.

BY MS. SADINSKY:

Q. And so the columns are trade date. That's the date that the trade in Cardinal Health was executed; correct?

A. Yes.

Q. The price is the price at which the

Page 116

shares were bought or sold at; correct?

A. Correct.

Q. The par or shares is the number of shares that were bought or sold; correct?

A. Correct.

Q. I excluded the column that says "B" or "S" accidentally. And you can look back if you want. But I'll represent to you that positive numbers mean purchases of shares. Negative numbers in that column means sales of shares.

A. Okay.

Q. Trade-based amount is the amount of money that was spent or received which makes sense, I think, because if it's a positive number of shares, you would spend money. If it's a negative number of shares, if it's a sale of shares, you would make money; correct?

A. Correct.

Q. We're going to refer to this chart periodically throughout the rest of the deposition.

MS. SADINSKY: Next, I would like to mark as Exhibit 16, Tab 53.

THE COURT REPORTER: That's 17.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 117

MR. MARTIN: 17.

MS. SADINSKY: Sorry.

MS. BRANDT: So Tab 53?

MS. SADINSKY: Yes. Exhibit 17. Tab 53.

(Trade Chart marked Exhibit 17.)

MS. SADINSKY: That's the one that you printed, Jackson, on Sunday night.

BY MS. SADINSKY:

Q. Exhibit 17. This is a compilation of Cardinal Health stock prices compiled from Bloomberg for each day during the alleged class period, which is March -- in the litigation, which is March 2, 2015 through May 3, 2018.

I'll represent to you that this is compiled from Bloomberg. And we're going to refer to this periodically throughout the rest of the deposition, so you can just put that to the side.

MR. JANOSKI: Counsel, I'll just make the same objection on authenticity grounds. Just because we don't know where this is from. We reserve the objection on that.

MS. SADINSKY: Sure.

That says Tab 9. I'm going to mark

Page 118

Tab 9 as Exhibit 18.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00154198 and -4199 marked Exhibit 18.)

MS. SADINSKY: And I'm going to turn to some specific events relating to Cardinal Health now.

BY MS. SADINSKY:

Q. So in February of 2015, a rumor leaked to the market that Cardinal Health was a potential buyer for Cordis.

Do you see that?

A. I do.

Q. Have you seen this article before?

A. I don't remember.

Q. Do you recall hearing, in February of 2015, about Cardinal Health's potential acquisition of the Cordis business from Johnson & Johnson?

A. It's possible.

Q. All right.

MS. SADINSKY: All right. Let's mark as Exhibit 19, Tab 10.

(Document Bates-stamped

Page 119

BP_CAH-SDOH2_19-cv-2491-00154491 through -4514 marked Exhibit 19.)

MR. JANOSKI: Did I miss one? Is that 18?

MS. SADINSKY: That one was Exhibit 18. So this is Exhibit 19. And it's Bates No. -00154491 to -00154513.

THE WITNESS: Thank you.

BY MS. SADINSKY:

Q. And this is JPMorgan's trading desk commentary. And it says that it was sent to you. Do you see that?

A. I do. I would just note that I was on maternity leave during this period of time. So it's -- it was sent to me, but it's very possible I didn't read it.

Q. Okay. If you go to Page 10, the one ending in Bates No. -54500.

A. Yes.

Q. The third line on that page. It says, "J&J is in talks to sell its Cordis business and Cardinal Health is said to be among the leading suitor."

A. Yes.

Page 120

Q. Do you see that?

A. I do.

Q. Okay. So you may have heard, in February of 2015, about Cardinal Health's potential acquisition from the Cordis business?

A. Yes.

Q. It's possible?

A. It's possible.

Q. And did you have a view at this time as to whether the acquisition would be a good idea for Cardinal?

A. I don't remember.

Q. Would -- if you heard a rumor about Cardinal Health potentially acquiring another business, would that be something that you would consider and analyze prior to Cardinal Health officially announcing the acquisition?

A. Yes.

MR. JANOSKI: Objection. Calls for speculation.

A. And likely, yes, I would go through.

Q. How so?

A. How would I analyze it?

Q. Mm-hmm.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 121

A.  We would look at it to say does it -- you know, are there financial synergies?  What does it do to make the acquirer -- what does any acquisition do to make the acquirer better?  Does it diversify the business positively?  Does it give it a faster growth platform, a more positive, a more profitable earnings stream?

We'd look at the cost to acquire.  Does it change -- you know, how does it change the balance sheet of the acquirer?

Those are some examples.

Q.  Do you recall ever assessing Cardinal Health's acquisition of the Cordis business?

A.  I don't remember.

Q.  Do you recall ever discussing Cardinal Health's acquisition of the Cordis business with Ms. Ballis?

A.  I don't specifically.

Q.  Do you believe, as a representative of Boston Partners, that Ms. Ballis would have assessed Cardinal Health's acquisition of the Cordis business in her role as an analyst covering Cardinal Health?

A.  It's likely.

Page 122

Q.  Do you know whether Ms. Ballis had a view as to whether the acquisition was a good idea for Cardinal Health?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  I don't know.

Q.  Would you assess whether or when Ms. Ballis -- as a representative of Boston Partners, do you believe that Ms. Ballis would have assessed whether the acquisition would be accretive to Cardinal?

A.  It would be reasonable for her to do that analysis.

Q.  And would that be reflected in her report?

A.  Most likely.

Q.  And if it was not reflected in her report, does that mean that it was not something she considered important in analyzing Cardinal Health?

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.

A.  I don't know.

Q.  If a company that you are covering is

Page 123

acquiring another company and you are going to assess potential accretion and synergies, is there any reason that you personally would not include that assessment in your report of the company?

MR. JANOSKI:  Same objections and incomplete hypothetical.

A.  It's possible if it was a small acquisition and there were not many details provided.

Q.  If it was a small acquisition?  And why?  Why would that be?

A.  If it was a small acquisition, it wouldn't be significant enough to change the estimates of the acquiring company.

Q.  When would an acquisition be small enough not to change the estimates of an acquiring company?

A.  If --

MR. JANOSKI:  Same objection.  Calls for speculation.

A.  If the -- if it met the metrics of being small enough, the acquiring company didn't have to provide disclosures.

Page 124

Q.  If the acquiring company disclosed an acquisition, would it -- does that automatically mean it would be not small enough?

MR. JANOSKI:  Same objections and vague.

A.  There are times where an acquiring company can announce an acquisition, but they don't have to provide the financial metrics behind it, because it's a small enough portion of the existing business that they don't have to provide the details, the financial details.

Q.  What financial details are you referring to?

A.  It could be the projected accretion.  It could be the revenue contribution.  A lot of -- some of those financial specifics of the acquiring business that don't have to be disclosed.

Q.  So if Ms. Ballis did any work to try and estimate accretion or synergies from the Cordis business at this time, where would we find written records of that work?

A.  From Boston Partners?

Q.  Correct.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 125

A. It would likely be in the email files for the target price database, the vision database that's held at Boston Partners that has the history of notes and target prices.

Q. That's the financial model? Is that different from your financial model?

A. The financial model would be on a computer in just Excel, most likely. The published information would be in the vision database.

Q. Did -- at the time Cardinal -- at the time of the rumor of the acquisition of the Cordis business, did you know anything about how the Cordis business had performed for Johnson & Johnson?

A. I don't remember.

Q. Do you recall ever doing any work on the business's prior performance?

A. I don't recall.

Q. Would that be something that you would ordinarily do?

A. It's unlikely if it's a business that was in -- owned by a company that was not within my industry coverage. I would not have, prior to

Page 126

the acquisition, have done work on another analyst coverage.

Q. I see. Would you have talked to the analyst -- so Johnson & Johnson was covered by Brian Boyden?

A. Correct.

Q. Would you have talked to Brian to understand his views on Cordis?

A. At the time the acquisition was announced?

Q. Yes.

A. It's possible. Unlikely I had that conversation, as I believe I was on maternity leave when the disclosure, you know, the potential acquisition was announced.

Q. And Jessica would have had that conversation, if any existed?

MR. JANOSKI: Objection. Calls for speculation. Lacks foundation.

A. I don't know.

Q. Would there have been anyone, other than Jessica, that could have had that conversation?

A. It could have been a portfolio manager.

Page 127

MS. SADINSKY: Okay. Let's mark as Tab 11, Exhibit 20.

(Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00004564 through -4566 marked Exhibit 20.)

BY MS. SADINSKY:

Q. When were you on maternity leave? What dates?

A. My daughter was born January 7th, and I came back sometime in April, I believe.

Q. January 7, 2015, to April 2015?

A. Correct.

Q. And did you do any work while you were on maternity leave?

A. I did some work while I was on maternity leave.

Q. Can you describe the type of work that you did while you were on maternity leave?

A. According to my memory, I remember looking into some managed care companies at the request of a portfolio manager while I was on maternity leave.

Q. Did you do any work on Cardinal Health?

A. I don't remember.

Page 128

Q. Did you do work on any companies in the health care industry?

A. The managed care companies I referred to, I would have.

Q. What is that? What companies?

A. So I believe Cigna was one of them and it may have been Anthem and UnitedHealth as well.

Q. And you don't remember whether you did any work on Cardinal?

A. Correct.

Q. So I'm going to ask you some questions about this time period. And when I ask them, I'm asking -- to the extent you don't have personal knowledge, I'm going to ask you in your capacity as a representative of Boston Partners.

A. Okay.

Q. So I just marked Exhibit 20, a press release that Cardinal Health issued announcing its plans to acquire Cordis, the Bates number and -- this is a public document, but we also produced it in this litigation, so I used the produced version. Bates number ends in -00004564 to -00004566.

Do you see that this is a press release

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 129

announcing that Cardinal Health plans to acquire Cordis?
A. I do.
Q. Do you recall hearing about this potential acquisition at the time?
A. I don't remember.
Q. Would this have been something the analyst covering Cardinal Health at the time would have tracked?
A. Yes.
Q. And would the analyst -- would a Boston Partners -- would the Boston Partners analyst covering Cardinal Health at this time, you know, do an analysis to develop a view as to whether the acquisition was a good idea or a bad idea for Cardinal Health?
MR. JANOSKI: Objection. Vague. Lacks foundation.
A. Likely.
Q. Would the analyst have conveyed to portfolio managers and other Boston Partners personnel whether they were enthusiastic about the acquisition?
MR. JANOSKI: Same objections.

Page 130

A. The analysts likely would have provided their view on the acquisition.
Q. Do you recall Ms. Ballis ever sharing her view on the acquisition of Cordis?
A. I don't remember.
Q. Do you recall ever being enthusiastic about the acquisition of Cordis?
MR. JANOSKI: Objection. Vague.
A. I don't remember.
Q. Do you recall ever having concerns about the acquisition of Cordis?
A. I don't remember.
Q. It says here, in the first paragraph, "Cardinal Health today announced plans to acquire Johnson & Johnson's Cordis business for 1.944 billion in cash, or approximately 1.594 billion net the present value of tax benefits."
Do you see that?
A. I do.
Q. Would -- did you have a view as to the price Cardinal Health was paying to acquire Cordis?
A. I don't remember.
Q. Do you know whether Ms. Ballis had a

Page 131

view?
A. I do not know.
Q. As a representative of Boston Partners, would the analyst develop a view on the price Cardinal Health is paying for an acquisition?
A. Yes.
Q. And that would be incorporated into the analyst's financial model for Cardinal Health?
A. Yes.
Q. In what ways?
A. It would -- the debt would have -- and the cost to service the debt would likely be incorporated in the model. And then any other adjustments in terms of Cardinal's ability to buy back shares would be reflected in the share count outstanding.
Q. Okay. In the second-to-last paragraph, where it starts with "we are extremely excited about...Cordis."
A. Mm-hmm.
Q. It then says, "This is a significant step forward in our cardiovascular strategy. Cordis brings with it a long and proud legacy of cardiovascular innovation. This move highlights

Page 132

our commitment to address a major pain point in healthcare systems through innovative new approaches to the management of physician preference items."
Do you see that?
A. I do.
Q. We'll go through some of the analyst reports that you and Ms. Ballis authored, discussing Cardinal Health's physician preference item strategy in a little bit.
What are physician preference items?
A. I believe those are items that the physicians get to dictate for purchase by a hospital system or a health care system that might be outside of like the normal scope of what the hospital purchases.
Q. Do you -- what did you understand Cardinal's physician preference item strategy to be?
A. I don't remember.
Q. Did you understand it to be something that -- do you recall hearing about it?
A. I don't.
Q. In the -- at this time, in 2015, did

LA Sheriff's Pension                          FINAL                          April 26, 2022
v. Cardinal Health Inc.                   CONFIDENTIAL                      Stephanie McGirr

Page 133

your analysis of Cardinal Health focus on the medical segment?

A. I don't remember. It did. I had the sum of the parts, so there was some evaluation, but I -- during my coverage of Cardinal. But at this specific time in 2015, I don't remember.

Q. Do you remember there being a point in time where your analysis did not focus on the medical segment?

A. I don't remember.

Q. Okay. Same page. The second paragraph says, "Assuming this timing, Cardinal Health expects fiscal 2017 accretion in non-GAAP diluted earnings per share from continuing operations of greater than 20 cents per share, which includes the cost of an incremental 7 to 8 cents per share of interest expense associated with financing the transaction. The company expects the acquisition to be increasingly accretive thereafter and assumes that synergies will exceed 100 million annually by the end of fiscal 2018."

Do you see that?

A. I do.

Q. Let's start with the 20-cent accretion

Page 134

estimate. Cardinal Health said it expected to achieve 20-cent accretion by the end of fiscal 2017; right?

A. Yes.

Q. And this was in March of 2015; correct?

A. Correct.

Q. So Cardinal Health stated that it expected to achieve that accretion more than two years after this announcement; correct?

A. Correct.

Q. And at the time of the announcement, would the accretion estimate be something that a Boston Partners analyst would focus on?

A. It's possible. But, again, it seems further out into the future than average.

Q. The -- you said "further out in the future than average."

A. I'm sorry. It's possible. Yes, two years out, it could have been included within the forecast.

MS. SADINSKY: Let's mark Exhibit 21, Tab 12. We're going to go back to Exhibit 22. Tab 12 is -- ends in Bates No. -2 -- sorry -- ends in Bates No. -00152082 to -152084.

Page 135

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00152082 through -2084 marked Exhibit 21.)

THE WITNESS: Thank you.

BY MS. SADINSKY:

Q. This is an analyst report on Cardinal Health dated April 30, 2015.

Do you see that?

A. I do.

Q. And if you go to the page, the second page ending in Bates No. -2083.

A. Yes.

Q. Does this reflect how far out the model for Cardinal Health is based on at this time?

A. Yes.

Q. And how far out is that?

A. So she's looking 12 months, calendar year '16, and this is -- she's looking 18 months.

Q. 18 months. So how far does that go?

A. She's looking more than 18 months. She's looking like 20 months.

Q. To what month is she looking to?

A. She's looking to December of 2016.

Q. Okay. So she's looking to December of

Page 136

2016?

A. Yes.

Q. So let's put that to the side. This is dated April 2015; correct?

A. Correct.

Q. Okay. Let's go back to Exhibit 20.

A. Mm-hmm.

Q. So this -- so the announcement was in March 2015; correct?

A. Mm-hmm. Correct.

Q. So -- and they expected accretion by the end of fiscal 2017; correct?

A. Correct.

Q. And that is when?

A. June of 2017.

Q. So that would not be reflected in the model; correct?

A. No. That's incorrect.

Q. That's incorrect?

A. Because this is calendar year 2016.

Q. Yes.

A. So this would have included half of fiscal 2017.

Q. Okay.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 137

A. So if it's 20 cents for the full year, fiscal 2017, some portion of that likely would have been factored into a calendar year 2016 estimate.

Q. So some portion of the accretion estimate would be factored into the assessment, but not all of it?

A. Likely, yes.

Q. Okay. Sticking with Exhibit 20, which is the press release --

A. Okay.

Q. -- did you -- would an analyst understand that there was 100 percent chance that Cardinal Health would achieve the 20-cent accretion estimate?

MR. JANOSKI: Objection. Assumes facts. Calls for speculation.

A. That's unlikely.

Q. Would you assume that Cardinal Health would achieve the 20-cent accretion estimate?

A. It's possible.

MR. JANOSKI: Same objections.

Q. But unlikely?

A. It's a case-by-case basis.

Page 138

Q. Would an analyst understand that there was a possibility that a company would not ultimately achieve the full amount of its accretion estimate?

MR. JANOSKI: Same objections.

A. Yes.

Q. And what would the -- would an analyst factor in -- strike that.

So we said, at this point in time, the first half of fiscal 2017 would be included in the analyst model because the analyst model was based on a calendar year; correct?

A. Correct.

Q. So let's just assume, for purposes of this discussion, 50 percent.

A. Okay.

Q. Would an analyst factor in the same, then, 10 percent estimate into its own model?

MR. JANOSKI: Objection. Assumes facts. Calls for speculation.

A. I don't know. The -- yeah. I don't know.

Q. Would it be reasonable to factor in a company's -- the full amount of a company's

Page 139

estimate into your own estimate of Cardinal Health?

MR. JANOSKI: Same objections.

A. It's possible.

Q. What would be the reasons that that would be reasonable?

A. To -- the reasons it would be reasonable to include the full amount?

Q. Yes.

A. It's possible to include the full amount as a placeholder, where it's likely the company management has greater insight into the contribution of a new business than an outsider has.

If the management team has proven ability to execute on prior acquisitions, and to achieve synergy numbers, an analyst would be inclined to give full credit for an integration, you know, the integration number that's provided.

It's also -- those are two reasons.

Q. Based on your experience covering Cardinal Health, would you have factored in the same accretion estimate into your own model? So would you have understood that Cardinal Health

Page 140

Management has a proven ability to execute on prior acquisitions and achieve synergy numbers and, therefore, incorporate the same estimate into your own?

MR. JANOSKI: Objection. Compound. Lacks foundation. Calls for speculation.

A. It's possible. It's possible.

Q. Was it your view that Cardinal Health had a proven ability to execute on acquisitions?

A. I don't remember.

Q. Okay. Now, let's look at the $100 million synergies estimate.

Cardinal Health said they expected to achieve $100 million in synergies by the end of fiscal 2018; right?

A. Yes.

Q. And we just looked at Ms. Ballis's model, which went up to December 2016; correct?

A. We looked at her target price that went up to 2016. Yes.

Q. Okay. So would the $100 million in synergies estimate have factored into her model at this time?

A. It could have.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 141

Q. In what ways?

A. A portion of it could have been reflected in her estimates for the calendar year 2016.

Q. Okay. Even though it was to be realized three years out?

A. Yes.

Q. Why?

A. It's possible that the synergies are realized in -- kind of sequentially. So it's not all realized on a singular date, that some of those benefits could be realized earlier on in the integration process.

Q. How would you determine whether or not those benefits could be realized sooner than the final date?

A. Probably through benchmarks set by the management team.

Q. So if the management team did -- if there were no benchmarks set by the management team, it would not have factored into your estimate?

A. It would have been more difficult to determine how to forecast those synergies.

Page 142

Q. And because of that difficulty, would it be unlikely that a Boston Partners analyst would incorporate them into their own estimate, target price?

A. I think not until some had been realized or pulled out. Yes.

Q. Okay. Can you read through this announcement and see if there's any -- and tell me if there's any incremental, you know, benchmarks for either accretion or synergies?

A. So it says, in the second paragraph that "Cardinal Health expects fiscal 2017 accretion in non-GAAP earnings per share from continuing operations of greater than 20 cents per share, which includes the cost of an incremental 7 to 8 cents per share interest expense associated with financing the transaction."

So that's the first contribution from the acquisition.

Q. So just to be clear, accretion and synergies are different; right? It said it expects 20 cents accretion by fiscal 2017 and 100 million synergies by fiscal 2018; correct?

Page 143

A. That's correct.

Q. Okay.

A. And then it goes on to say, "The company expects the acquisition to be increasingly accretive thereafter and assumes that synergies will exceed 100 million annually by the end of fiscal 2018."

So it does not provide any interim benchmarks in realizing the synergies prior to the 2018 fiscal year end.

Q. And does it provide any interim benchmarks for realizing accretion prior to fiscal year 2017?

A. No. It does not.

Q. And, therefore, it would be unlikely that an analyst would include the $100 million synergy estimate into its forecast at this time?

MR. JANOSKI: Objection. Calls for speculation. Lacks foundation.

A. I don't know.

Q. It would be difficult to do, for an analyst to do so?

A. Yes.

Q. Would -- in your experience as an

Page 144

investment analyst, would you understand that there would be an 100 percent chance that Cardinal Health would achieve the full 100 million in synergies?

MR. JANOSKI: Objection. Assumes facts.

A. Can you repeat the question?

MR. JANOSKI: Lacks foundation.

Q. Sure. Would -- so you weren't covering Cardinal because you were on maternity leave at this time.

So, as a representative of Boston Partners or in your experience as an investment analyst, would it be reasonable to assume that there was 100 percent chance that Cardinal Health would achieve the full amount of the $100 million synergy estimate?

MR. JANOSKI: Objection.

A. It's possible.

MR. JANOSKI: Calls for speculation. Calls for speculation is the objection.

A. Again, if management had a history of achieving synergy targets and prior acquisitions, that synergy number could be included in a

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 145

forecast.

Q. And you don't remember whether or not Cardinal had a history of hitting synergy estimates?

A. I don't remember.

Q. Do you recall whether Cardinal had a history of having challenging M&A?

MR. JANOSKI: Objection. Assumes facts.

A. I don't remember at this time if it had a history.

Q. Do you remember whether at any point in time you believed Cardinal Health had a difficult history with M&A?

A. I do remember there being some difficulties with M&A at Cardinal Health.

Q. And did that ever affect your model of Cardinal?

A. It may have.

Q. Did that ever affect your recommendation to buy, sell or hold Cardinal?

A. I believe so.

Q. And why would it?

A. It would -- if a company has poor

Page 146

execution, it would impact the quality of the fundamentals of the business. It would also impact the momentum of the business. And as an analyst at Boston Partners, having two of the three factors that we evaluate for a holding or a buy, that would be -- those would be negatives.

So if the company was missing on earnings because of challenges related to an acquisition, and if that was impacting their growth expectations and their profitability, those would be -- those would be negatives.

Q. So a company's difficulty in integrating an acquisition could affect your view on how the company would perform as a whole going forward?

A. Yes.

Q. When do you recall -- so I think you testified before that -- I said, did it affect your recommendation -- I said -- sorry -- "do you remember at any point in time you believe Cardinal Health had a difficult history with M&A?"

You said, "I do remember there being some difficulties with M&A."

Page 147

I said, "Did that ever affect your model?"

You said, "It may have."

I said, "Did it ever affect your recommendation to buy, sell, hold?"

You said, "I believe so."

Do you remember that?

A. I do.

Q. Do you remember when that happened?

A. I don't.

Q. Do you remember -- at the time the acquisition was announced, do you remember any discussion about what was needed to do to successfully integrate Cordis?

A. I don't remember.

Q. In your experience as an investment analyst, would that be something -- or strike that.

In your experience -- in your capacity as a Boston Partners representative, would that be something that analysts and portfolio managers would discuss?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

A. Would they discuss an acquisition?

Page 148

Q. And -- yes. Would they discuss an acquisition?

A. Most Likely.

Q. Would they discuss what was needed for a successful integration of an acquisition?

A. Possibly.

Q. Would they discuss how that would affect the analyst's modeling of Cardinal?

A. Possibly.

Q. At this time, do you recall -- at this time, did you have an understanding of any challenges that Cardinal may face in integrating Cordis?

MR. JANOSKI: Vague as to time.

A. I don't remember.

Q. At the time of the acquisition, did you have an understanding that there may be challenges relating to setting up global operations for Cordis?

A. I don't remember.

MR. JANOSKI: Objection. Assumes facts.

Q. At this time, did you have an understanding as to whether there would be

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 149

challenges related to foreign exchange?

MR. JANOSKI:  Same objections.

A.  I don't remember.

Q.  Challenges related to expanding Cardinal Health's product portfolio?

MR. JANOSKI:  Same objections.

A.  I don't remember.

Q.  Did the Cordis acquisition expand Cardinal Health's product portfolio?

A.  It sounds -- based on the press release, yes.

Q.  What are potential challenges to a company's acquisition -- strike that.

What are potential challenges that a company may face in integrating an acquisition?

A.  There can be -- there can be lots of issues.  They can range from your kind of business supply chain issues, production, quality control, you know, cultural integration.

It depends on what the acquiring business is and what the acquired business is.  So I think the challenges would be ranked on a case-by-case basis.

Q.  So there can be challenges with

Page 150

business supply chain production, quality control and cultural integration; correct?

A.  Amongst others, yes.

Q.  And those challenges would be something that you would consider in assessing the likelihood of a successful integration?

A.  Yes.

Q.  Okay.  Let's go back to Tab -- Exhibit 21, which is the April report.

You were back from maternity leave at this time; correct?

A.  I believe so.

Q.  And this report -- this is a report authored by Jessica Ballis; correct?

A.  Correct.

Q.  It's sent to you; correct?

A.  Correct.

Q.  Why is it sent to you and not the investment personnel distribution list?

A.  I don't remember.

Q.  Was it sent to you to review before it's sent to the investment personnel distribution list?

A.  It's possible.

Page 151

Q.  Do you think that's something -- do you think it's something that you would have reviewed at this time?

A.  It's possible, yes.

Q.  Is this something that you would have edited?

A.  I may have.

Q.  In 2015 -- sorry.

So I want to -- on the first page, ending in -2082, the first sub-bullet, second sentence. "Lackluster results for the medical business are expected to continue for the new couple quarters and detracted from the strength of the pharmaceutical segment, closing of the Cordis acquisition will enhance the growth and profit profile of the medical unit, but results will likely" -- "will not likely be as compelling as those of the pharmaceutical business."

Do you see that?

A.  I do.

Q.  If you go to Page 2, ending in -2083, under the section, starting with V --

A.  Yes.

Q.  -- it says, "Cardinal Health trades at

Page 152

XYZ.  Though a slight discount to distribution peers, which seems appropriate given softness of its medical segment."

Do you see that?

A.  I do.

Q.  And in 2015, what was your understanding of the medical segment's contribution to Cardinal Health?

A.  I don't remember.

Q.  Based on reviewing this report now, what was -- what would -- how would you view the medical segment's contribution to Cardinal Health in 2015?

A.  Based on the note, the medical segment seems less significant than the pharmaceutical segment.

Q.  What does less significant mean to you?

A.  It seems that the main driver of the business and its valuation would be the pharmaceutical segment, with the medical segment being more of a negative business when it -- in regards to the valuation and performance relative to peers.

Q.  And how would that affect your view of

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 153

acquisitions within the medical segment?

A. It's difficult for me to say.

Q. Sitting here today, if you read this report today, and this was dated today, and you were to assess the Cordis acquisition which was announced today --

A. Mm-hmm.

Q. -- how would this assess your view, or how would this be incorporated into your analysis of that acquisition?

MR. JANOSKI: Objection. Calls for speculation.

A. The Cordis acquisition is framed -- I believe it's framed as a positive for the medical segment within Cardinal.

Q. Yup. So it says here on the first page, first sub-bullet, "Closing of the Cordis acquisition will enhance the growth and profit profile of the medical unit, but results will likely not be as compelling as those of the pharmaceutical business."

Do you see that?

A. I do. Yup.

Q. So the closing of the Cordis business

Page 154

will be a positive; correct?

A. That's what it says. Yes.

Q. Would you expect it to be as positive as the company expects?

A. I --

MR. JANOSKI: Objection. Vague. Calls for speculation.

A. I don't know.

Q. Okay. Would the -- if an acquisition was in a business unit that had had poor results in the past, would that impact how you were viewing that acquisition?

MR. JANOSKI: Same objections.

A. It's difficult to say.

Q. Why?

A. Because the new -- the business being acquired being run by the same management team that had been running an underperforming business. You know, so is the management team changing with this acquisition? Is the management team responsible for the underperformance of a poorly performing segment, or is it some other singular issue that can be quickly resolved?

Page 155

So it's difficult to tell if the acquisition is going to make everything better.

Q. Do you know who Don Casey is?

A. It's not a familiar name to me.

Q. He was the CEO of the medical segment at the time of the Cordis acquisition. Actually, I'm not going to represent that, because I'm not positive; is that right?

MS. BRANDT: At the time, yes.

MS. SADINSKY: I will represent that.

Q. You don't know who he is?

A. It's not familiar to me.

Q. So if the management team -- if the -- strike that.

If the CEO of the medical segment --

A. Mm-hmm.

Q. -- was the same -- would be the same CEO at the time -- when the acquisition closed, that may affect your analysis?

A. It could.

MR. JANOSKI: Objection. Vague. Calls for speculation.

MR. BUTTERLY: Alex, this was on your press release, by the way, top of the page. If

Page 156

it makes it easier.

MS. SADINSKY: Oh, thank you.

BY MS. SADINSKY:

Q. If you go back to Exhibit 20, top of Page 2, the page ending in Bates No. -4565. It says, "Once a transaction is complete, the business will report to Don Casey, Cardinal Health's Medical Segment chief executive officer and a medical device industry veteran."

Do you see that?

A. I do.

Q. So does this -- so this indicates that the CEO of Cardinal Health at this time -- the CEO of the medical segment of Cardinal Health at this time would remain in place --

A. Yes.

Q. -- after the acquisition; correct?

A. Yes.

Q. So there would be no reason to believe that a management change at the CEO level of the segment in which Cordis is being added to would play into your analysis; correct?

A. Correct.

Q. Or it would play into your analysis in

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 157

the sense that you may not credit the full amount of the estimate because there's no offsetting management change at the CEO level of the medical segment?

MR. JANOSKI: Objection. Vague.

MS. SADINSKY: That was very confusing.

MR. JANOSKI: Calls for speculation.

BY MS. SADINSKY:

Q. You said before that when you're thinking about an acquisition within a business unit that has had poor performance in the past, you may not necessarily discount the performance of that business unit if there are some other changes that make it likely that that acquisition will perform well, such as management changes --

MR. JANOSKI: Objection.

Q. -- so the management that was responsible for poor performance in the past will no longer be in place once the acquisition closes. That's not exactly what -- that's not exactly what you said yet, but is that an accurate summary?

MR. JANOSKI: Objection. Compound. And objection to the extent that it misstates the

Page 158

witness's testimony.

A. The quality of management is a factor that we consider in terms of the quality of a business. And if there's a management change, that can be a positive catalyst or a negative catalyst, depending on how that management is regarded.

In the case of Cardinal, I don't have a memory of how Don Casey ran the medical business, but with the leadership not changing, you know, management -- that would not be a positive catalyst for the acquisition of Cordis.

Q. Got it. It says here, "The Cordis acquisition will enhance the growth and profit profile of the medical unit."

Do you see that?

A. I do.

Q. Did Boston Partners analyze or model the ways in which it would enhance the growth and profit profile?

A. I don't know.

Q. Would they -- would Ms. Ballis have written this in her report if she didn't?

A. Probably not. No.

Page 159

Q. Do you know what -- were there any risks to the thesis that Cordis "will enhance the growth and profit profile of the medical unit"?

A. Do I know what the risks were of the contribution to the medical unit? I don't remember.

Q. Would there have been risks?

A. Probably.

Q. And they would be the same types of risks we discussed before, you know, potential challenges to the integration such as business supply challenges, production challenges, quality control challenges and cultural and integration challenges?

MR. JANOSKI: Objection. Calls for speculation.

A. Those would have been some.

Q. And those could have affected the likelihood that Cordis would enhance the growth and profit profile of the medical unit?

MR. JANOSKI: Same objection.

A. Yes.

Q. And those challenges would likely be reflected in an analyst's analysis of Cordis's

Page 160

contribution to the growth of the medical unit?

A. Yes.

MR. JANOSKI: Objection. Calls for speculation. Lacks foundation.

Q. So we looked at this before, where it says, "Results will likely not be as compelling as those pharmaceutical business." And then the second page noting the softness of the medical segment.

What challenges were facing the medical business at this time?

A. I don't remember.

Q. What challenges has the medical business faced in the past?

A. I don't remember specifically.

Q. Do you remember ever having concerns about the medical segment?

A. Yes.

Q. What were those concerns?

A. I believe, but please confirm my memory, that Cardinal had acquired a business and didn't have good inventory accounting. And there was a high degree of spoilage with some of the product that was acquired.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 161

Q. That's the Cordis business.
And how did that affect your view of the medical segment?
A. It reflected poorly on the medical segment.
Q. Do you remember having concerns or views about the medical segment prior to the challenges announced with the Cordis business?
A. I don't remember.
Q. So you may have?
A. I may have.
Q. At this time, in 2015, do you remember what was more important to you in assessing Cardinal Health's financials, the performance of the pharmaceutical segment or the performance of the medical segment?
A. I believe it was the pharmaceutical segment.
Q. Why?
A. Because it was a bigger portion of their business.
Q. Did that change over time?
A. The size of the pharmaceutical segment?
Q. Did the fact that the pharmaceutical

Page 162

segment was more important to you in assessing Cardinal Health's financials change over time?
A. I don't believe so.
Q. Okay.
MS. SADINSKY: Okay. Next Exhibit, Exhibit 22, I want to mark Tab 13. Can I have Tab 13?
MS. BRANDT: Yes.
MS. SADINSKY: 22; right?
COURT REPORTER: Yes.
MR. JANOSKI: Yes.
MS. SADINSKY: So Exhibit 22 will be 153545 to 153547.
(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00153545 through -3547 marked Exhibit 22.)
BY MS. SADINSKY:
Q. This is an analyst report from July 14, 2015; correct?
A. Yes.
Q. Do you see your name listed at the top of this report?
A. I do.
Q. Did you receive this report?

Page 163

A. Yes.
Q. And this report is written by Brian Boyden; correct?
A. Correct.
Q. And this is an analyst report about Johnson & Johnson; correct?
A. Yes.
Q. And if you go to Page 3, ending in -53547, can you read me the first bullet on that page?
A. The "F(8): Strong. JNJ is the largest and most diversified health care company in the world with a focus on markets where it can be number one or number two by share. Any business for J&J is not top two or cannot grow to this level as a divestiture candidate. The sale of Ortho-Clinical Diagnostics in '14 and Cordis in '15 are examples."
Q. You can stop there.
MR. JANOSKI: I'll object to just the reading of the -- this email into the record as hearsay.
Q. Okay. Who is Brian Boyden?
A. He is an analyst at Boston Partners.

Page 164

Q. And he's a health care analyst?
A. He was a health care analyst. A pharmaceutical analyst, yes.
Q. So would you have read a report like this?
A. Yes.
Q. And would you have read this bullet that refers to Cordis?
A. Yes.
Q. Okay. And did you understand, at this time, how Cordis had performed for Johnson & Johnson?
A. Yes.
Q. And how did it perform?
A. Poorly.
Q. And did you understand why Johnson & Johnson sold Cordis?
A. Yes.
Q. And why did it do that?
A. Because it was not a top two business in the markets where it operated.
Q. So it was not a top performer for Johnson & Johnson.
A. It didn't have large market share

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 165

within the markets it operated.

Q. Did Cordis's performance for Johnson & Johnson affect your view of whether the acquisition of Cordis was a good idea for Cardinal Health?

A. I don't remember.

Q. Is it something that you would have thought about?

A. Possibly.

Q. Sitting here today, do you think it is likely something you would have thought about?

MR. JANOSKI: Objection. Lacks foundation.

A. It's possible.

Q. Sitting here today, is this something you think was -- that you would have factored into your model?

A. I don't know.

Q. Is this something that you would have discussed with Mr. Boyden further?

A. It's possible. J&J is a different business than Cardinal, and it's not only -- the size of Johnson & Johnson is very different than the size of Cardinal. And that could have been,

Page 166

you know, a factor that was considered in why Cordis may have been good for Cardinal but didn't -- wasn't good for Johnson & Johnson.

Q. So it's possible that you would have discussed this with Mr. Boyden to understand further why Cordis, you know, had performed poorly for Johnson & Johnson?

MR. JANOSKI: Objection. Lacks foundation.

A. It's possible.

Q. And is it possible that what Mr. Boyden had said about Cordis's poor performance for Johnson & Johnson would have affected your assessment of the likelihood that Cardinal Health would achieve the 20-cent accretion estimate disclosed at the time the deal was announced?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

A. Yeah. I think I just need to clarify. It's -- the Cordis performance does not explicitly say it was poor for Johnson & Johnson. But that it didn't get to the market share position that Johnson & Johnson wanted it to.

Q. Okay. Is that something -- sitting

Page 167

here today, is that something that would have affected your assessment of the likelihood that Cardinal Health would achieve the 20-cent accretion estimate announced at the time the deal was announced?

MR. JANOSKI: Same objections.

A. I don't know.

Q. Is it possible?

A. It's possible.

Q. And is it possible that you would have reduced any accretion estimate incorporated into your model for Cordis at this time?

MR. JANOSKI: Objection. Lacks foundation.

Q. I'm simply asking whether it's possible.

A. It's possible.

Q. Is it possible that this would have affected your assessment of the likelihood that Cardinal Health would achieve the $100 million synergies estimate disclosed at the time the deal was announced?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

Page 168

A. It's possible.

Q. And is it possible that you would have decreased any estimate built into your model for Cordis based on this?

MR. JANOSKI: Same objections.

A. It's possible.

MS. SADINSKY: Next, I am going to mark as Tab -- Tab 14 as Exhibit 23.

How is everyone doing?

MR. BUTTERLY: Doing great.

COURT REPORTER: Okay.

MS. SADINSKY: Tab 14 is Bates No. -154300 to -154302.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-001154300 through -4302 marked Exhibit 23.)

BY MS. SADINSKY:

Q. This report is dated July 30 -- Jessica Ballis' report is dated July 30, 2015.

Do you see that?

A. I do.

Q. And it was sent to investment personnel Boston.

Do you see that?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 169

A. I do.

Q. You're included in that distribution list; correct?

A. Yes.

Q. And later you forward this to someone named Ann Carroll.

Do you see that?

A. I do.

Q. Who is Ann Carroll?

A. She is -- she was responsible for inputting target prices into the database. She's an employee at Boston Partners.

Q. Okay. So you received this report; correct?

A. Correct.

Q. And you read it; correct?

A. Yes.

Q. If you go to Page 2 ending in Bates No. -4301, the last sub-bullet on this page, under "Fundamentals", it's about the acquisition of Cordis. It says, "Acquisition of Cordis from Johnson & Johnson announced March 15th with an expected close date toward the end of CY15."

What's CY?

Page 170

A. Calendar year.

Q. Calendar year '15. "Cordis plays the -- "plays in the cardiology product space and generates 780 million of revenues in calendar year '14 with 70 percent of sales coming from international markets. Deal is expected to generate slight dilution in fiscal 2016, but greater than 20 cents of annual EPS accretion beginning in fiscals '20 or '17, which includes an incremental 7 to 8 cents of interest expense. Deal is expected to be increasingly accretive from there with expected synergies of 100 million annually by the end of fiscal '18."

Do you see that?

A. I do.

Q. After that, "Because Cordis should expand Cardinal Health's global scale and its growth in physician preference items, margins should see a lift. However, lower growth rates of the medical distribution business versus pharmaceutical distribution business has weighed on investor sentiment."

Do you see that?

A. I do.

Page 171

Q. This -- the language I just read, beginning with "because Cordis should expand," ending with "has weighed on investor sentiment."

A. Yes.

Q. This report, the same language is also included in the reports that you authored on November 2, 2015, April 28, 2016, and August 2, 2016. And we're going to go through some of those in a bit.

A. Okay.

Q. So I'll hold off on marking them for now, but I'll represent to you that the same language is included.

At the bottom of the page, under "V," it says here again, "Though a discount to distribution peers which seems appropriate given recent softness of its medical segment."

Do you see that?

A. I do.

Q. Where it says "because Cordis should expand Cardinal Health's global sale and its growth in physician preference items," is that referring to Cardinal Health's physician preference item strategy?

Page 172

A. I believe so.

Q. Do you remember whether that strategy was important -- strike that.

Do you remember whether you considered that strategy in developing and maintaining your model of Cardinal Health?

A. I don't remember.

Q. It says here, "Margins should see a lift."

Do you see that?

A. I do.

Q. Did anyone at Boston Partners model the extent to which Cordis might increase Cardinal Health's margins?

A. I don't remember.

Q. Would Ms. Ballis -- and you write this in your own reports if -- if no one had actually analyzed the extent to which Cordis would increase Cardinal Health's margins?

A. Probably not.

Q. Do you recall what the results of the analysis of how Cordis would increase Cardinal Health's margins?

MR. JANOSKI: Objection. Assumes

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 173

facts.  Lacks foundation.

A.  I don't.

MS. SADINSKY:  And just confusing.

A.  I don't remember.

Q.  Okay.  It says, "Margins should see a lift."

What does that mean?

A.  That the operating profitability, the operating profit margin should increase from the contribution of Cordis.

Q.  Why does it say "should" and not "will"?

A.  Because it's uncertain.

Q.  So this is saying it's not certain that margins will see a lift?

A.  Yes.  It's unknowable.

Q.  Are there risks to the proposition that margins would increase?

A.  Yes.

Q.  What are those risks?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  Again, I think there's the integration risks that we had discussed before.

Page 174

Q.  So you were aware, at this time, that there were integration risks in -- integration risks with the Cordis acquisition?

A.  There's -- yes.  There's integration risks with acquisitions.

Q.  And those integration risks may mean that, you know, it's not certain that the acquisition will be accretive?

A.  That's correct.

Q.  And it's not certain that there will be synergies?

A.  That's correct.

Q.  In the same language we're talking about, the second sentence, "Lower growth rate of the medical distribution business versus pharmaceutical distribution has weighed on investor sentiment."

What does that mean?

A.  There's -- the growth of the medical business was slower than the pharmaceutical business.  So given Cardinal's mix of business relative to peers, investors were less inclined to give Cardinal the same multiple, the same valuation as they were peers.

Page 175

Q.  For -- for results or forecasts or projections relating to its medical segment?

A.  They were less willing to give the stock price the same valuation they gave peers because of Cardinal's business mix.

Q.  So because the medical distribution business had not grown at the same rate as Cardinal Health's peers, Cardinal Health --

A.  Cardinal -- yes, because Cardinal did not -- Cardinal, on a consolidated basis, was not growing at the same rate of peers because it held the medical business, Cardinal's stock was given a lower valuation.

Q.  So the medical business resulted in a discount to Cardinal Health's stock price?

A.  I believe so.  Yes.  According to this note.

Q.  So Cardinal -- so investors thought that Cardinal Health was less valuable because of its medical segment business?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  I believe so.

Q.  How would that have affected your view

Page 176

of the Cordis acquisition?

A.  I can't say with certainty.  I don't think the stock price of Cardinal impacted the view of the Cordis acquisition necessarily.

The Cordis acquisition would have been analyzed on its own, separate from the stock price.  But then when valuing and recommending -- deciding on how to recommend Cardinal, the share price as well as the Cordis acquisition, potential integration, what it meant for the medical segment, all would have been considered.

Q.  And because the -- because investors had applied a discount to Cardinal Health's stock price as a result of the lower growth rate of the medical distribution business, is it likely that you would have also applied a discount when you were modeling Cordis's contribution to Cardinal Health?

MR. JANOSKI:  Objection.  Assumes facts.

A.  I don't think so.

Q.  Why?

A.  I think we would look at what's the -- we would look at the medical segment and

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 177

determine, is this -- what is the value for the medical segment?  That's on a standalone basis, and then relative.

The value of Cardinal would incorporate the value of the pharmaceutical segment, as we determined, and then the value of the medical segment.  So if the medical segment deserved a lower valuation multiple, that would be stated here in this valuation segment.  And what we were doing was explaining to the readers why Cardinal, as a whole, was trading at a discount to other distribution peers.

Q.  I see.  So the lower growth rate of the medical distribution business may not have affected your view of Cordis?

A.  Correct.

Q.  Would the Cordis business -- would you expect the Cordis business to increase the company's stock price?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  Per this note, it seemed that Cordis could be a positive for the medical segment, because it could accelerate some of its -- some

Page 178

of the growth there.

Q.  But when you say it has weighed on investor sentiment, what does that mean?

A.  It means the sentiment was more negative in the medical segment.  So it was -- compared to how the pharmaceutical segment was performing and was viewed by the Street, the medical segment was a negative and weighing on Cardinal as a whole, the Cardinal stock as a whole.

Q.  But you're talking about Cordis in this paragraph; correct?

A.  I don't believe so.  I think this is before Cordis.  It says, "Because Cordis should expand Cardinal's global scale and its business versus pharmaceutical and it's" -- hold on.  I'm sorry.  I got it confused.

"Because Cordis should expand Cardinal's global scale and its growth in physician preference items, margins should see a lift," with the implication of that's going forward. "However, lower growth rate of the medical distribution business versus pharmaceutical distribution has weighed on investor sentiment,"

Page 179

up until this point."

Q.  So the "however" there does not modify the prior sentence?  So Cordis should increase Cardinal's margins, however, not really so sure, because of investor sentiment about the medical segment?

A.  My interpretation --

MR. JANOSKI:  Objection.  Vague.

A.  My interpretation of these sentences is that the medical distribution has been underperforming relative to the pharmaceutical distribution.  And there's the potential that the Cordis acquisition will improve the performance of the medical segment.

Q.  Okay.  Did you believe that it would?

A.  I can't remember.

Q.  Okay.  Did you put less weight on the medical segment in assessing Cardinal Health's financials for this reason?

A.  Yes.  And it's just a smaller component of the business.  So when looking at Cardinal's financials, the performance of the pharmaceutical business just had a greater impact.

Q.  Okay.  So you put less weight on the

Page 180

medical segment because it was a smaller component, and because its lower growth rate had weighed on investor sentiment?

MR. JANOSKI:  Objection.  Misstates testimony.

A.  Yeah.  It's somewhat two different things.

So the medical segment was a smaller portion of earnings.  So by nature of that, it would have less weight when calculating the earnings of Cardinal.  It was given a lower earnings multiple because of the growth in performance of that business, compared to the pharmaceutical business.

Q.  Do you remember that earnings multiple changing?

A.  I don't remember.

Q.  You don't remember if it did or --

A.  I don't remember if it did.

Q.  Okay.  If this same language -- actually, why don't we just mark them.

MS. SADINSKY:  I'm going to mark as Tab 20 -- Tab 16, Beth, will be Exhibit 24.  Tab 22 will be Exhibit 25, and Tab 26 will be

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 181

Exhibit 26.  So 16, 22 and 26.

This is Exhibit 23 -- oh, 24.

(Document Bates-stamped BP_CAH-SDOH52_19-cv-2491-00150019 through -0022 marked Exhibit 24.)

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00155392 through -5215 marked Exhibit 25.)

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00175017 through -5215 marked Exhibit 26.)

MS. SADINSKY:  Tab 16, Bates No. -150019 to -150022.

Tab 22 is Exhibit 25, Bates No. -155392 to -155395.

Tab 26 is Exhibit 26, -155212 to -155215.

THE WITNESS:  Thank you.

BY MS. SADINSKY:

Q.  Can you confirm that you wrote each of these?

A.  Yes.

Q.  Can you tell me the dates of each of these?

Page 182

A.  So it starts November 2, 2015.  Then there's a note from April 28, 2016.  And then a note from August 2, 2016.

Q.  Okay.  Let's start -- let's go to the August 2, 2016.

A.  Okay.

Q.  Page 3 ending in -55214.

A.  Yes.

Q.  Do you see the language in the last paragraph there, "Because Cordis should expand Cardinal Health's global scale and its growth in physician preference items, margins should see a lift.  However, lower growth rate of the medical distribution business versus pharmaceutical distribution has weighed on investor sentiment."

A.  I'm sorry.  We're on 5394.  Yes.  Okay. I see it.  I got it.

Q.  Wait.  I don't think I'm on 5394.  I'm on the August 2, 2016 one, Exhibit 26.

A.  August 2.  I'm on the wrong one.  Okay.

Q.  So the third page.

A.  Yes.

Q.  55214.

A.  Yes.

Page 183

Q.  Do you see that language there?

A.  I do.

Q.  So this is now more than a year after the report that we had just looked at from July 2015.

A.  Yes.

Q.  So the medical business was still not doing well?

A.  The medical business still had a lower growth rate compared to the pharmaceutical business.

Q.  And so a year after -- so how would that have affected your view of Cordis?

A.  I think the Cordis -- I don't know if it necessarily changed the view of Cordis.  It sounds like the Cordis expectations remained the same with expanding the global scale and improving margins.

Q.  Would the fact that the lower growth rate of the medical segment was still something that weighed on investor sentiment at this time something that would have factored into your analysis of Cordis?

MR. JANOSKI:  Objection.  Assumes

Page 184

facts.  Lacks foundation.

A.  I don't think the Cordis -- I don't -- I think just given, in this case, in August of 2016, Cardinal had owned Cordis for maybe a quarter, it would not have impacted the medical business much at this point.

Q.  So -- and I'll show you a document that shows this in a few minutes.

A.  Okay.

Q.  The Cordis acquisition closed in October of 2015.

A.  Okay.

Q.  So this is August 2016.  So --

A.  Okay.

Q.  -- it's been, what?

A.  It's three quarters.

Q.  So would that change your view?

MR. JANOSKI:  Same objections.  Assumes facts and lacks foundation.

A.  I don't remember.  I think the -- it sounds like the expectations for Cordis's contribution were unchanged.  But the medical segment continued to grow slower than the pharmaceutical segment did.

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 185

Q.  Okay.  If this language is not included in reports after that --

A.  Yeah.

Q.  -- what does that mean?

A.  I don't know.

Q.  If the language that, "Because Cordis should expand global scale and its growth in physician preference items, margins should see a lift" --

A.  Yes.

Q.  -- if that's not included, does that mean that the performance expectations for Cordis have changed?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  It could.

MS. SADINSKY:  Let's mark the next exhibit, 27, Tab 33.  Tab 33, we'll mark as Exhibit 27, Bates No. -175017 to -175020.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00175017 through -5020 marked Exhibit 27.)

BY MS. SADINSKY:

Q.  This is a report you wrote dated

Page 186

March 1, 2017; correct?

A.  Yes.

Q.  Can you look through this report and tell me if the language about Cordis's margins is anywhere in here?

A.  I don't see language regarding Cordis's margins in here.

Q.  What does that mean to you?

A.  I don't have a conclusion on that.

Q.  Why?

A.  Why no conclusion?  I don't know what the significance of it not being in here is -- is related to.

Q.  Is it possible that your view on Cordis's contribution to Cardinal Health's margins changed?

A.  It's possible.

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.

Q.  Is it likely?

A.  I don't know.

MR. JANOSKI:  Same objections.

Q.  If the Cordis acquisition closed in October 2015, and I can show you a document

Page 187

where -- I'm just going to represent it to you -- is it still a relatively new acquisition as of May 2017?

A.  I don't think so.

Q.  Okay.

A.  Yeah.

Q.  If there's language in a document from you after this, calling it a relatively new asset, would that surprise you?

A.  It may not.

Q.  Would you have removed the language about margins if you -- if you were sure they would be achieved?

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.

A.  It's possible.

Q.  Do you remember earlier, we established that when Cardinal announced the acquisition, it said it expected accretion of 20 cents by the end of fiscal 2017?

A.  I do.

Q.  And the end of fiscal 2017 is when?

A.  Is June of 2017.

Q.  And that's a month after you issued

Page 188

this report; correct?

A.  That's right.

Q.  Is it surprising that you wouldn't say anything about whether or not Cardinal would achieve that accretion in this report, when the expectation was that it would be achieved a month from now?

MR. JANOSKI:  Objection.  Is calls for speculation.  Assumes facts.

A.  I don't know.

Q.  Does that signal anything to you about whether or not you incorporated that accretion into your report?

MR. JANOSKI:  Same objections.

A.  I don't know for sure.

MR. BUTTERLY:  May I talk to my client one second?

MS. SADINSKY:  Let's go off the record.

THE VIDEOGRAPHER:  The time is 11:28 a.m.  We're off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 11:36 a.m.  We're on the record.

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 189

BY MS. SADINSKY:

Q.  So let's go back to Exhibit 23.  So do you see in the subject line here, Jessica Ballis, she recommends holding Cardinal on July 30, 2015, and on August 24, 2015, the subject line says, "Buy"?

A.  I do.

Q.  And that's a change from the third quarter of 2015 through fiscal 2015?

A.  I'm sorry.  Can you repeat that?

Q.  August 24, would that have incorporated the fourth quarter of 2015?

A.  Probably.  I don't know when the report date was, but it may have.

Q.  Do you have any idea why the change?

A.  I don't.  Not from looking at this.

Well, one guess is the price.  The stock price went down.  But that's just a guess.

Q.  So the stock price went down -- the stock -- Cardinal Health's actual stock price went down, which changed your recommendation to buy more Cardinal because it was cheaper?

A.  It's possible.

Q.  When it says -- what's the target

Page 190

rationale here?  What do these numbers mean?

A.  So it's 16 times fiscal year end, '17 estimates.

Q.  What does that mean, 16 times the estimate?

A.  So it's 16 multiple put on the earnings estimate for the year end 2017.

Q.  The earnings estimate of Cardinal?

A.  Correct.

Q.  And what was Cardinal's multiple at this time?  Does the table reflect that?

THE VIDEOGRAPHER:  Counsel, do you have your mic on?

MS. SADINSKY:  Oh, sorry.

A.  The table does not reflect the two thousand -- does it reflect?  I don't believe it reflects the 2017 estimates.

Q.  But --

A.  It's a multiple.

Q.  Wait.  I'm sorry.  The 16 times multiple is developed by Boston Partners; right?

A.  That's correct.

Q.  And the fiscal year end 2017 earnings estimates are the ones issued by Cardinal Health;

Page 191

correct?

A.  Those would be the Boston Partners' earnings estimates.

Q.  Okay.  And if you look at the table in Jessica Ballis' email, the Boston Partners' earnings estimates are the same as Cardinal Health's?

A.  Those are -- the estimates that are published on this table, there's a consensus estimate, which is the average of all of the published sell-side estimates.  And then there's a Boston Partners' estimate.  So those two estimates are the same.

Q.  Those are the same.  And do we know what Cardinal Health's estimate was?

A.  What their guidance was at the time?  Not from this table.

Q.  Okay.  And where would that be reflected in your report?

A.  It could be under "Momentum," if it states what guidance was.  So it says on that next bullet point, the top one on 54301, "Estimates of 4.93 for 6/16 may increase slightly as management raised the bottom of its fiscal

Page 192

year '16 guidance range by 10 cents to 4.85 to 5.05."

So that's for fiscal year '16.

Q.  Okay.  And so Boston Partners' estimate was somewhere in the middle of that?

A.  Correct.

Q.  And the 16 times multiple, what does that mean?

A.  That's a judgment saying the value of the stock is worth 16 times that earnings estimate.

Q.  Okay.  I want to go now to Exhibit 16, which was SEIU's sales and purchases in Cardinal.  One of the first ones we looked at, I think.

A.  Okay.  Yup.

Q.  Yes.  Exhibit 16.

If you go to the fifth row down, August 5th -- so Jessica Ballis' report was July 30, 2015; correct?  And that was Exhibit 23.

A.  Okay.  Correct.

Q.  And you might want to just put that one on the top because I'm going to have you compare them.

A.  Okay.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 193

Q. And she recommended hold; right?

A. Correct.

Q. And then on August 5, five days later, Boston Partners sold Cardinal Health shares; right?

A. Correct.

Q. Did you have any conversations with Mr. Pollack about whether he should sell Cardinal Health stock at this time?

A. I don't remember.

Q. Do you know what the rationale was behind selling Cardinal Health stock at this time?

A. I don't know.

Q. Is it common for Mr. Pollack to sell Cardinal Health stock when an analyst recommends holding the stock?

A. Yes. It's possible.

Q. And then if you look at your report on August 24, you recommended buying Cardinal Health stock; right?

A. Yes.

Q. And on August 24, you did, in fact, buy Cardinal Health stock; right?

Page 194

A. I don't buy on August 24th.

Q. 8/24/2015, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 -- the 9th through 12th rows? Remember we determined if there's a positive number in the par shares column, that's a purchase?

MR. JANOSKI: And then, Counsel, I think you misspoke earlier. I think you said there was a sale on August 5th. This would reflect a purchase on August 5th.

MS. SADINSKY: I'm sorry. I mixed up my rows.

Q. Sorry. On August 5th, you purchased shares after Ms. Ballis recommended holding; right?

A. Correct.

Q. And do you know why?

A. I don't know why.

Q. And on August 24, you recommended buying shares; right?

A. Yes.

Q. And you -- and Boston Partners did, in fact, buy shares; right?

A. Yes.

Page 195

Q. Do you know why?

A. I don't remember.

Q. You know what? I'm confusing myself. I'm sorry.

Jessica Ballis' report is dated July 30, 2015; correct?

A. That's right.

Q. On July 31, the next day, Boston Partners sold shares; correct?

A. Yes.

Q. Okay. Do you know why they sold shares after Ms. Ballis recommended to hold them?

A. I don't know.

Q. And it's common or it happens that Mr. Pollack will buy or sell shares even when an analyst recommends holding them?

A. Yes.

Q. And when an analyst recommends buying shares, as you did on August 24th, it's -- is it common for Mr. Pollack to then go and buy shares?

A. Yes.

Q. Because it's uncommon for you to recommend to buy a stock? It's rare you change your recommendation from hold to buy?

Page 196

A. It's notable --

MR. JANOSKI: Objection. Vague.

Q. It's notable.

A. -- when a recommendation changes.

Q. It doesn't happen that often?

A. It can. It can happen. I mean, it certainly does happen, those recommendations.

Q. And at this time, both on July 31st and August 24th, when Boston Partners' transaction in Cardinal Health stock on behalf of SEIU, had transacted in Cardinal Health stock on behalf of all of Boston Partners' clients in the mid cap strategy; correct?

A. I don't know.

Q. It would have; right?

A. Not necessarily.

Q. Why not?

A. There could have been cash flows within a particular strategy or within a particular account.

Q. So unless SEIU invested more money with Boston Partners, assuming that did not happen.

A. Or withdrew.

Q. Or withdrew.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 197

A. Yeah.

Q. Assuming no cash flows, if Boston Partners' transaction in Cardinal Health securities on this date on behalf of SEIU, it would have on behalf of all of the clients in the mid cap strategy, absent any restrictions?

A. Most likely, yes.

Q. Okay.

MS. SADINSKY: Next Exhibit 28, I'm going to mark Tab 51. Tab 51 is a public document. I don't know why this is marked confidential by Cardinal. It shouldn't have been. Bates Nos. -472611 to -472701.

(Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00472611 through -2701marked Exhibit 28.)

BY MS. SADINSKY:

Q. This is Cardinal Health's 10-K for fiscal year 2015; is that right?

A. Yes.

Q. And do you review Cardinal Health's financial statements -- or do you review Cardinal Health's 10-Ks as part of your analysis of Cardinal Health?

Page 198

A. I do.

Q. And so would you have reviewed this 10-K?

A. It's possible.

Q. And this was published on August 13th, 2015. This is back -- this is when you were back from maternity leave; correct?

A. Yes. Yeah.

Q. So it's likely that you would have reviewed it?

A. Yeah.

Q. Okay. Let's go to page numbered 36. The Bates number ends in -2647.

On the left-hand column, do you see the section labeled "Acquisitions Can Have Unanticipated Results"?

A. Yes.

Q. Can you read that to me?

A. "An important element of our growth strategy has been to acquire other businesses that expand or complement our existing businesses. In fiscal 2015 we spent 503 million to acquire other businesses and we acquired Harvard Drug in July 2015 for 1.1 billion and

Page 199

entered into an agreement to acquire Cordis for 1.9 billion. Acquisitions involve risks. We may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition; future developments may impair the value of our purchased goodwill or intangible assets or we may encounter unforeseen accounting, internal control, regulatory or compliance issues. Once completed, the Cordis acquisition will subject us to additional risks relating to regulatory matters, legal proceedings, tax laws or positions and, as discussed later in this section, global operations."

MR. JANOSKI: I'm just going to object to the reading of this into the record as hearsay.

Q. Do you recall ever seeing this?

A. I don't.

Q. But this would be something that you would review as part of your review of companies?

A. It's possible, yes.

Q. Do you agree that acquisitions can have unanticipated results?

A. Yes.

Page 200

Q. Do you agree that acquisitions involve risks?

A. Yes.

Q. Do you agree that that risk may be overpaying for a business?

A. Yes.

Q. Do you agree that a risk may be failing to realize the synergies that you expect from an acquisition?

A. Yes.

Q. Do you agree that a risk may be failing to realize the other benefits that a company expects from an acquisition?

A. Yes.

Q. Do you agree that those risks may include future developments that may impair the value of purchased goodwill or intangible assets in connection with an acquisition?

A. Yeah.

Q. Do you agree those risks may include unforeseen accounting, internal control, regulatory or compliance issues?

A. Yes.

Q. Do you agree those risks may include

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 201

legal proceedings?

A. Yes.

Q. And issues with tax laws?

A. Yes.

Q. Do you agree that -- did you understand that the Cordis acquisition involved risks?

A. Yes.

Q. And those risks included all of the risks that we just discussed?

A. Yes.

MR. JANOSKI: I'm going to object to this line of questioning as assuming facts and calling for speculation.

Q. And you understood those risks?

A. Yes.

Q. In your experience as an investment analyst, would it be your opinion that investors understand that acquisitions have risks?

A. Yes.

MR. JANOSKI: Objection. Calls for speculation.

Q. And in your experience as an investment analyst, would it be your opinion that investors understood that the Cordis acquisition had risks?

Page 202

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

A. Yes.

Q. Okay. Next -- you can put that one to the side. I don't know if I marked this or not yet.

MS. SADINSKY: Okay. So tab -- next, I'm going to mark Tab 17, 17 and 18, Beth. 17 will be Exhibit 29. 18 will be Exhibit 30. And we can do 19, too, Exhibit 31.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00150089 and -0090 marked Exhibit 29.)

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00161225 and -1226 marked Exhibit 30.)

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00155472 through -5474 marked Exhibit 31.)

MS. SADINSKY: Okay. Exhibit 29, 150089 to 150090.

Exhibit 30, 161225 to 226.

And Exhibit 31, 155472 to 155474.

Page 203

BY MS. SADINSKY:

Q. Let's start with Exhibit 29. Exhibit 29 is an email -- you're copied on the email that is Exhibit 29; right?

A. That's correct.

Q. And this email is dated October 26, 2015?

A. Correct.

Q. And this email is about scheduling meetings with companies at JPMorgan's health care conference?

A. Correct.

Q. Did you attend JPMorgan's health care conference in 2016?

A. I don't believe so.

Q. Did Ms. Ballis attend JPMorgan's health care conference in 2016?

A. I think so.

Q. Did she attend the presentation by Cardinal Health?

A. I don't know for sure.

Q. Is that something she likely would have attended?

MR. JANOSKI: Objection. Calls for

Page 204

speculation.

MS. SADINSKY: That's fine. I'll just show you she did.

Q. Let's go to Exhibit 30. This is an email exchange between you and Ms. Ballis; correct?

A. Yes.

Q. And it's dated January 12, 2016; correct?

A. Correct.

Q. If you go to Page 2, ending in Bates No. -1226.

A. Yes.

Q. Jessica Ballis emails you, "Cardinal Health maintaining fiscal year '16 guidance despite generic inflation moderating more than expected, branded inflation as initially expected and Cordis integration on plan."

A. Yes.

Q. Did Ms. Ballis email you after JPMorgan's conference?

A. Yes. This looks like it was after JPMorgan's conference.

Q. If you go back to Exhibit 29, it shows

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 205

the dates of JPMorgan's conference.

A. Yes.

Q. Under Greg's email.

A. Yeah.

Q. So she emailed you after the conference and presumably then after she attended Cardinal Health's presentation at the conference?

A. Yes.

Q. Does that sound right?

A. Yes.

Q. Do you normally attend health care conferences?

A. I do.

Q. Have you attended JPMorgan's health care conferences in the past?

A. I have.

Q. Have you attended Cardinal Health's presentation at that?

A. I believe so.

Q. How many people generally attend those presentations?

A. A lot.

Q. What is a lot?

A. Like over 100.

Page 206

Q. Do you ever ask questions at those conferences?

A. Sometimes.

Q. Do you have to submit them in advance?

A. It depends on the format of the question -- of the way the conference is being held. So, no, not always.

Q. Do you recall whether you ever asked a question at a Cardinal Health conference?

A. Not in -- during some of the one-on-one meetings with Cardinal Health.

Q. But not at a --

A. Not in the large --

Q. Industry conference?

A. -- conference room setting.

Q. So Ms. Ballis emails you, and part of her email says that "Cordis integration is on plan."

Do you see that?

A. I do.

Q. Do you recall receiving this email?

A. I don't.

Q. The -- let's now turn to Exhibit 31. Exhibit 31 is an analyst report prepared by

Page 207

Jessica Ballis, dated February 1, 2016.

Do you see that?

A. I do.

Q. And did you receive this report?

A. Yes.

Q. And if you look at the first sub-bullet on Page 1, the very end of that bullet, the last sentence, "Additional commentary included that China business continues to grow at double digit rates despite the economic slowdown and integrations of Cordis, Harvard Drug and Metro Medical are on track."

Do you see that?

A. I do.

Q. So on both of these days, January 12, when Ms. Ballis emailed you, and February 1, when she issued this report, she reported that the integration of Cordis was on plan and on track; correct?

A. Yes.

Q. What do the phrases "on plan" and "on track" mean to you?

A. It implies that the integrations are progressing as expected.

Page 208

Q. And did you ask any questions about how the integration was on plan or on track?

A. I don't remember.

Q. Would you have?

A. It's possible. If it was on track, it didn't seem like it rose to be an issue to question.

Q. Did you ever ask any questions about what was needed to successfully integrate Cordis?

A. I don't know.

Q. Sitting here today, can you remember ever asking any questions about what was needed to successfully integrate Cordis?

A. Yes. I just don't remember the timing of it.

Q. And who would you have asked those questions to?

A. I think it was Mike Kaufmann.

Q. And do you remember what he said to you?

A. I don't remember.

Q. Do you remember being more confident that the integration would go as planned or less confident after -- the integration would go as

LA Sheriff's Pension        FINAL        April 26, 2022
v. Cardinal Health Inc.        CONFIDENTIAL        Stephanie McGirr

Page 209

planned after talking to him?

MR. JANOSKI: Objection. Vague.

A. Again, I can't remember when the conversation took place. But I don't remember being particularly confident.

Q. Would -- do you remember that something Mr. Kaufmann said to you about the integration would have changed how you were viewing the risk of the Cordis integration at that time?

MR. JANOSKI: Objection. Assumes facts.

A. I don't think it was what was being communicated. I think the comfort level was due to execution issues that had arisen.

Q. Okay. And so the risks associated with Cordis were changing?

A. It seems as if --

MR. JANOSKI: Objection. Assumes facts. Go ahead.

A. That the risk wasn't changing? The risks were becoming realized.

Q. Okay.

A. So just like a -- yeah, a little change, nuance, but yeah.

Page 210

Q. Okay. So the risks were becoming realized, meaning you were realizing that the acquisition of Cordis would not grow margins and --

MR. JANOSKI: Objection. Assumes facts. Calls for speculation.

A. The Cordis business was becoming a detractor from Cardinal.

Q. Got it.

So, at this time, in January and February of 2016, Ms. Ballis tells you the integration is on track.

Did you ask any questions about what was needed to achieve the 20-cent accretion estimate?

A. I don't remember.

Q. Any questions about what was needed to achieve the 100 million synergies estimate?

A. I don't remember.

Q. Would statements such as the integration was on plan or on track have factored into your model of Cardinal Health?

A. Yes.

Q. In what ways?

A. It would have provided credibility that

Page 211

the targets Cardinal had provided were likely to be realized.

Q. Would it give you -- would it affect your assessment of the likelihood that Cardinal Health would achieve the 20-cent accretion estimate?

A. Yes.

Q. Would it affect your assessment of the likelihood that Cardinal Health would achieve the 100 million synergies estimate?

A. Yes.

Q. Because both of those, you would have more comfort that Cardinal Health would achieve those than less?

A. Yes. There was no reason to doubt them if the integrations were on track.

Q. So if someone tells you the integration is on track, you have more comfort at that time that Cardinal Health would achieve the accretion estimate than you had at the time Cardinal Health initially announced the accretion estimate before the acquisition closed?

A. Yeah.

Q. And how come statements such as the

Page 212

integration was on plan or on track didn't change the recommendation to -- from hold?

A. I can't say definitively. It looks like there was a value -- a valuation component, and then, in total, the estimates for the consolidated company were decreasing because of issues within the pharmaceutical segment.

Q. Would statements such as the integration is on plan or on track, you know, lead you to buy more Cardinal Health stock, in general?

A. Not on its own.

Q. Because it's just not that significant?

A. Correct.

Q. At the end of this paragraph, on the first page, it references other recent acquisitions; right?

A. Yes.

Q. Which ones?

A. It refers to the Harvard Drug and Metro Medical acquisitions.

Q. Then if you go to Page 2 of this report ending in -55473, the last sub-bullet under "Fundamentals," the first line there says,

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 213

"Cardinal Health has increased its acquisition activity lately"; right?

A.   Yes.

Q.   And it discusses Cordis; right?

A.   Correct.

Q.   Then at the end of that paragraph -- then in the middle of that paragraph, it discusses Harvard Drug; right?

A.   It discusses Harvard Drug, yes.

Q.   At the end of that paragraph, it discusses NaviHealth?

A.   Correct.

Q.   NaviHealth?

A.   Yes.

Q.   So Cardinal Health had -- had acquired other companies around this time; correct?

A.   Correct.

Q.   Did those other acquisitions have any implications for the performance of Cordis?

A.   I don't know.

Q.   Did you consider, at the time, whether undertaking multiple acquisitions could increase the risks associated with the integration of Cordis?

Page 214

A.   It's possible.

Q.   It's possible that you considered that they increased the risk?

A.   Yes.

Q.   It wouldn't decrease the risk; right?

A.   Unlikely, no.

Q.   So if Cardinal Health announced that it was going to acquire Cordis in March 2015 --

A.   Mm-hmm.

Q.   -- and that was the only acquisition it was undergoing at the time --

A.   Mm-hmm.

Q.   -- and then it announced additional acquisitions that may change the risk profile related to the integration of Cordis?

MR. JANOSKI:  Objection.  Calls for speculation.

A.   It's possible.

Q.   Okay.

MS. SADINSKY:  Okay.  Next, let's mark Tabs 20, 21 -- Tabs 20 and 21 as Exhibits 32 and Exhibit 33.

(Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455353 through

Page 215

-5357 marked Exhibit 32.)

(Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455358 through -5360 marked Exhibit 33.)

MS. SADINSKY:  And then I'm also, after we go through these two, I'm going to have you look again at Exhibit 25, if you want to pull that up.

THE WITNESS:  Okay.

MS. SADINSKY:  So Exhibit 32, 455353 to 455357.

THE WITNESS:  Thank you.

MS. SADINSKY:  Exhibit 33 is 455358 to 455360.

BY MS. SADINSKY:

Q.   So Exhibit 32 is a roadshow scheduled for Cardinal Health; correct?

A.   Yes.

Q.   What's a roadshow?

A.   It's when management goes out on the road and meets with different, in this case, investor groups.

Q.   And what is a non-deal roadshow?

A.   It means they're going -- it's

Page 216

informational, rather than trying to issue equity or affect income.

Q.   Okay.  If you go to Page 4, which ends in Bates No. -455356, and you look at the 12:15 to 1:15 group lunch.

A.   Yes.

Q.   Do you see your name listed there?

A.   I do.

Q.   Did you have lunch with -- sorry.  If you go to Page 2 of this document, ending in -455354.

A.   Yes.

Q.   Who does it list as the roadshow participants?

A.   It shows George Barrett, who is the CEO of Cardinal Health, and then Sally Curley, who is the senior vice president of investor relations.

Q.   Okay.  So did you have lunch with George Barrett and Sally Curley on February 9, 2016?

A.   I believe so.

Q.   Do you remember that lunch?

A.   I don't.

Q.   Do you remember -- do you know these

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 217

people listed here as the attendees at the lunch?

A.   Some of them, yes.

Q.   So you don't remember what you discussed at this lunch, though?

A.   Not specifically.  No.

Q.   Okay.  Let's go to Exhibit 33. So these are Cardinal Health's internal notes from the lunch?

A.   Yes.

Q.   These were produced from Cardinal Health's files?

A.   Okay.

MR. JANOSKI:  I'm just going to object to the authenticity.  I don't think a foundation has been laid that this is what they are.  But go ahead.

BY MS. SADINSKY:

Q.   Okay.  If you go to the second page ending in -455359.

A.   Yes.

Q.   The first question there.  Question: "Cordis, OUS."

What is OUS?  Outside the United States?

A.   That's possible.

Page 218

Q.   Did you ask this question?

A.   I don't remember.

Q.   Do you know who asked this question?

A.   I don't know.

Q.   The response, which I believe comes from George Barrett, says, "Came in about as expected, even with FX challenges.  So feel good about it.  Operating assumption was do no harm."

Do you see that?

A.   I do.

Q.   What are FX challenges?

A.   Foreign exchange.

Q.   Do you remember discussing challenges with foreign exchange?

A.   I don't remember.

Q.   Do you remember foreign exchange challenges with Cardinal Health at any point in time?

A.   Not specifically, no.

Q.   Okay.  If you now look at Exhibit 25, which we marked earlier, which is your April 2016 report --

A.   Yes.

Q.   -- and you go to Page 2, ending in

Page 219

-55393.

A.   Mm-hmm.

Q.   If you go to the first sub-bullet under momentum.

A.   Mm-hmm.

Q.   It says, "A contract loss, higher tax rate, higher corporate expenses and lower drug inflation and less FX favorability drove the reduction."

What does that mean?

A.   Those items you listed were reasons for the reduction in guidance.

Q.   So were you aware, in 2016, that foreign exchange challenges were creating challenges for Cardinal Health?

A.   Yes.

Q.   And were you aware that they were creating challenges for the Cordis business?

MR. JANOSKI:  Objection.  Lacks foundation.

A.   It's possible.  Yes.

Q.   Let me ask you this:  Did -- other than the Cordis business, did Cardinal Health -- were you aware of where Cardinal Health -- strike

Page 220

that.

Did Cardinal Health operate outside the United States -- did the pharmaceutical segment operate outside the United States?

A.   I don't remember.

Q.   Okay.  So in 2016, you are aware that there were foreign exchange challenges that were impacting Cardinal's results; correct?

A.   Yes.

Q.   And did you have a view on how long those foreign exchange challenges would last?

A.   I don't remember.

Q.   Would that have been something that you would have analyzed?

A.   It's possible.  It's possible.  But I think -- that's -- yeah.

Q.   Is it something that you would have factored into your model?

A.   Yes.

Q.   Is this something that would have impacted how you were thinking about Cordis, given that, you know, it operated primarily outside of the United States?

MR. JANOSKI:  Objection.  Calls for

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 221

speculation.

A.   It's possible.

Q.   Would the foreign exchange challenges have affected your assessment of Cardinal Health's ability to achieve the 20-cent accretion estimate it announced at the time of the acquisition --

MR. JANOSKI:  Same objection.

Q.   -- a year earlier?

A.   It's possible.

Q.   Is it likely?

MR. JANOSKI:  Same objection.

A.   I don't know.

Q.   Would foreign exchange challenges make it -- make a company more profitable or less profitable?

A.   A challenge, by definition, would seem to make a company less profitable.

The hesitation in answering is because forecasting foreign exchange moves is not a specialty.  So we, as a firm, frequently look at foreign exchange as kind of transient and not a factor that certainly is within the company's control.  But wanting to understand where the

Page 222

exposure is, because it could complicate -- you know, it could create some volatility in estimates and numbers, earnings that come through.

Q.   Okay.  And at this time, less FX favorability resulted in Cardinal reducing its estimates; right?

A.   That's correct.

Q.   Does that mean that those estimates -- that FX favorability was impacting Cardinal's ability to meet its forecast?

A.   That's correct.

Q.   And would those same challenges or -- sorry -- would that same, you know, thought process that if you can't meet your earnings because of FX favorability for the company generally, would that same, you know, thought process apply to a company that was primarily based outside of the United States?

MR. JANOSKI: Objection.  Vague.

A.   It could.

Q.   Would the FX challenges have affected your assessment of the likelihood that Cardinal Health would achieve the 100 million synergies

Page 223

estimate?

MR. JANOSKI:  Objection.  Calls for speculation.

A.   It could.

Q.   It could.  So if you go to Page 1 of this report.

A.   Yes.

Q.   The column "year over year grow" under "sales" for fiscal 2016 on the table --

A.   Yes.

Q.   -- that's 18.9; right?

A.   That's correct.

Q.   Does that -- what does that mean?

A.   That means the sales growth rate over the prior year was 18.9 percent.

Q.   Is that a high growth rate?

A.   Yes.

Q.   Do you know whether that had anything to do with Cordis?

A.   It probably did.

Q.   It did?

A.   Yeah.

Q.   And so would that have changed your assessment of the likelihood that Cardinal Health

Page 224

would achieve its accretion or synergies estimates?

MR. JANOSKI:  Objection.  Calls for speculation.

A.   It's hard to say.

Q.   Okay.  The fail -- the composite number here?

A.   Yes.

Q.   Is 2?

A.   Yup.

Q.   What does that mean?

A.   So, again, that's a quantitative score.  We rank the universe of stocks between 1 and 10, with 1 being the best and 10 being the worst.

Q.   And what does 2 signal to you?

A.   That's an attractive score.

Q.   That's an attractive score?

A.   Yes.

Q.   What about the fail score?

A.   That's a 3.  So, again, that's a quantitative ranking between 1 and 10.  And a failure of 3 is good.

Q.   Okay.

A.   Yeah.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 225

Q.  Did these signal anything to you about Cordis?

A.  Not specifically, no.

MS. SADINSKY:  Next, I want to mark as Exhibit 34 -- oh, sorry, Tab 23.

I'm also going to do Tab 24 and 25. Let's just do them all at the same.

Exhibit 34 is Tab 23.  Exhibit 35 is Tab 24.  Exhibit 36 is Tab 25.

Exhibit 34 is a Cardinal Health earnings call transcript.  Public document, but I just include the Bates stamp number, 390661 to 390693.

Exhibit 35 -- that's Exhibit 36.

Exhibit 35 is a document Bates-numbered 147878 to 147879.  And Exhibit 36, number 455365 to 455366.

(Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00390661 through -0693 marked Exhibit 34.)

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00147878 and -4789 marked Exhibit 35.)

(Document Bates-stamped

Page 226

BP_CAH-SDOH2.19-cv-3347-00455365 and -5366 marked Exhibit 36.)

BY MS. SADINSKY:

Q.  Let's start with Exhibit 34, which is the earnings conference call transcript.

A.  Mm-hmm.

Q.  So on August 2, 2016, Cardinal Health announced its 2016 results.

Do you see that?

A.  I do.

Q.  Do you -- and you testified earlier that you generally listen to earnings calls; right?

A.  Correct.

Q.  And you were covering Cardinal Health in August 2016; right?

A.  Correct.

Q.  So you would have listened to this call?

A.  Yeah.

Q.  If we go to Page 15, 0675, the paragraph starting with "first" --

A.  Yes.

Q.  -- can you read the first two sentences

Page 227

for me?

A.  "First, we continue to expect great performance from Cordis, with that acquisition adding more than 15 cents to fiscal '17 versus the prior year, net of transaction-related interest expense of 7 to 8 cents.  This is a lower accretion figure than we originally provided, largely due to currency impacts as well as some increased SG&A investments compared to our original base case."

MR. JANOSKI:  I'm going to object to the reading into the record as hearsay.

Q.  If you go back to Page 1, this earnings call was at 8 a.m.; right?

A.  Correct.

Q.  So that's before the markets open?

A.  Yes.

Q.  So back to Page 15, the portion that you just read.

So in August 2016, Cardinal Health decreased its accretion estimate from 20 cents to 15 cents; right?

A.  Correct.

Q.  Was this a surprise?

Page 228

A.  I don't remember.  I don't remember.

Q.  If you had been told earlier this year that the integration was on plan, on track, would this have been a surprise to you?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  It's possible.

Q.  Did you believe, before this, that Cardinal would have achieved that 20 cents accretion estimate?

A.  Yes.

Q.  You believed that there was 100 percent chance that Cardinal would have achieved the 20-cent accretion estimate before this?

A.  It was likely.

Q.  Why?

A.  Given the statements that it was on track and it didn't seem as if they were adjusting -- they hadn't adjusted the accretion numbers that I can remember due to foreign exchange.

Q.  Okay.  So at the time the acquisition was announced -- and I just want to recap and make sure I'm understanding what you've said so

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 229

far.

At the time the acquisition was announced, before it closed, it's not necessarily true that you would have factored in or that you would have been 100 percent certain that Cardinal would achieve the accretion and synergies estimates.

MR. JANOSKI: Objection. Vague.

Q. At some point in time, when you start hearing that the integration is on plan, it's on track, you likely would have incorporated those accretion estimates and thought there was 100 percent chance of that, or maybe you would have thought that when FX challenges were presented, and it didn't decrease it.

Can you just kind of walk me through how you were thinking about it, how it changed, developed?

MR. JANOSKI: Objection. Compound. Vague. Assumes facts. Calls for a narrative.

A. So based on the documents that we've discussed so far today, the synergy and accretion targets were established at the time that the acquisition was announced, and the updates provided by management at interim periods, after

Page 230

the announcement, seemed to imply or directly stated that the accretion and synergy targets had not changed.

And then, at the time of the fiscal '16 conference call, the synergy targets were reduced due to foreign exchange.

Q. And so how would that have -- how did those, you know, different events get incorporated into your analysis? And what I'm really trying to understand is, would the amount of accretion that you factored into your own analysis change over this time period?

A. Yeah. It's unlikely it would have changed as the guidance was saying the integrations were on track. There was no reason that I can see to adjust down the assumptions --

Q. Right.

A. -- of what these acquisitions were going to deliver until the announcement with the fiscal year '16 earnings call. If there was a statement in between, that's not reflected here, that's possible. But I don't see anything other than this.

Q. And let me ask you this: Did -- and so

Page 231

the question I asked was, you know, how this factored into your model, you know, how you factored the accretion into your model.

A. Yes.

Q. Before the statements the company made about the integration being on plan, on track --

A. Mm-hmm.

Q. -- did those statements change the accretion factored into your own model?

A. It's unlikely.

Q. Why? At the time the acquisition was announced, you would have incorporated 100 -- you would have assumed 100 percent of the company's accretion estimate into your own analysis?

A. It's possible. Yeah. I don't know if there was a haircut, saying, okay, we'll give them 80 percent credit or if we just say, okay, we'll put the 100 percent in, you'll put the full value of the 20 cents, and then the 100 million.

It's possible we did that, but also considering it was two years into the future, at the time the acquisition was announced, I don't believe we were valuing Cardinal Health stock on

Page 232

that number. So then, as the updates were provided and we were -- every single quarter it became closer to the realization of those synergies and the integration was on track, per guidance, that number would have been most likely included in totality.

Q. I see. So between the time the acquisition was announced in March 2015, and this time in August 2016 --

A. Yes.

Q. -- you would have incorporated different accretion figures into your model because the time in which that accretion would be realized was getting shorter; correct?

A. Yes.

Q. Because management had made positive statements about the progress of the integration; correct?

A. Correct.

Q. Okay. Okay. So looking at Page 15, we understand -- or we see that Cardinal lowered its accretion figure; right?

A. Yes.

Q. Did this signal to you that the risks

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 233

associated with the Cordis acquisition were changing?

A.  It seems like it.  Yes.

Q.  And did you understand, at this time, that there were challenges with the Cordis business?

A.  I don't think so.

Q.  Why not?

A.  Because the challenges -- the reason for the reduction was cited as foreign exchange. And then -- which wouldn't be -- that's not a company-specific issue.

Q.  Mm-hmm.

A.  And then the SG&A, the increased SG&A investments are a company-specific issue.  So that could be a risk factor.

I just can't remember, from reading this, what they were specifically.

Q.  Okay.  So reading this now, you understand that there were challenges with SG&A investments?

A.  That was a portion, a reason for some of the reduction.  Yes.

Q.  And those challenges were different

Page 234

than what was in the original deal model; correct?

A.  Apparently.  Yes.

Q.  And you understood that the SG&A investments posed a risk to Cardinal Health's ability to achieve its accretion estimate?

A.  Yes.

MR. JANOSKI:  Objection.  Calls for speculation.

Q.  And that's why it lowered its accretion estimate from 20 cents to 15 cents; right?

A.  Yes.

Q.  And would you have believed, at this time, that Cardinal Health was guaranteeing 100 percent that it would achieve 15-cent accretion estimate?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  I think -- so they were targeting a 15-cent accretion estimate.  I don't know if that's a guaranty.  But that was their target. That was the guidance that they had put forth.

Q.  Okay.  And would you incorporate the same guidance into your own model?

Page 235

A.  It's possible.

Q.  Okay.  And did you ask any questions about why SG&A expenses were higher?

A.  I don't remember.

Q.  Do you remember if this concerned you?

A.  I don't remember.

Q.  Do you understand that there was a risk that SG&A expenses may continue to be higher than the business case going forward?

MR. JANOSKI:  Objection.  Assumes facts.

A.  I don't remember.

Q.  Does -- did -- I don't know who's speaking here, if this is Mr. Kaufmann.

Does Mr. Kaufmann say, when he's talking about the SG&A investments, that they're all set now, they're not going to continue increasing?

A.  I don't know.

Q.  Do you -- go ahead and read it and let us know.

MR. JANOSKI:  Objection.  The document speaks for itself.

A.  I don't think, from that paragraph, that there's a guaranty that they won't increase

Page 236

again.

Q.  So you understood that it's possible that there may be SG&A expenses that are higher than the original business case going forward?

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.

A.  Yes.

Q.  And that -- and you understood that may pose a risk to the integration of the Cordis business or the success of the Cordis business?

MR. JANOSKI:  Same objection.

A.  Sure.

Q.  Okay.  Okay.  Let's go to Exhibit 35. I'm sorry.  Actually, on Exhibit 34, the date of this is August 2, 2016; right?

A.  Yes.

Q.  Okay.  Exhibit 35.  This is an email. If you look at Megan Case's email to you on July 20th, about halfway down the page?

A.  Yes.

Q.  It says, "This is an invitation to schedule a follow-up call with a member of Cardinal Health senior management with our upcoming Q4 earnings conference call on

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 237

August 2."
Do you see that?
A.  I do.
Q.  So if you keep going up the page, Megan then confirms that you're going to have a follow-up call with Mike Kaufmann.
Do you see that?
A.  I do.
Q.  So did you have a call with Mike Kaufmann following the earnings call?
A.  I believe so.
Q.  These calls that you have, are they one-on-one calls?
A.  This was, yes.
Q.  How long do they last?
A.  This was 15 minutes?
Q.  Is it just you and Mike Kaufmann?
A.  I believe there's somebody from investor relations.
Q.  And do you ask questions?
A.  Yes.
Q.  Does Mike Kaufmann -- so, okay.  So you ask questions.  Let's now turn to Exhibit 36.
Exhibit 36, I don't know if you're on the

Page 238

right one.  Yeah.  So these are Cardinal Health's notes from your call with Mr. Kaufmann.
A.  Yes.
Q.  And I'd like you to read through it, the whole thing, a page and a half.  Let me know when you're done.
A.  Okay.
Q.  There's nothing in here about the reduced accretion estimate for Cordis; right?
A.  I don't see that.
Q.  Why didn't you ask any questions about Cordis lowering its accretion estimate?
A.  I don't know.
Q.  Is it because it wasn't important to you?
MR. JANOSKI:  Objection.  Assumes facts.  Calls for speculation.
A.  I don't know.
Q.  Did you put less weight on Cordis in assessing Cardinal Health's financials and other aspects of Cardinal's business?
MR. JANOSKI:  Same objections.
A.  Yes.
Q.  Why?

Page 239

A.  Because it's a smaller portion of their business.
Q.  Any other reasons?
A.  I don't remember.
Q.  Were there other factors about Cardinal Health's business that were more significant to you than Cordis in assessing Cardinal Health's financial performance?
A.  Yes.
Q.  What were they?
A.  It looked as if it was contract losses that was impacting the earnings expectations.
Q.  So, at this time, contract losses were what were -- strike that.
At this time, what was driving Cardinal Health's financial performance, the pharmaceutical segment or the medical segment?
A.  It's both.  But the bigger driver is the pharmaceutical segment.
Q.  Okay.  And so before you had testified, and I'm paraphrasing, that you put less weight on Cordis -- let me just not -- let me not paraphrase.
Did you put less weight on Cordis in

Page 240

assessing Cardinal Health's financials and other aspects of the business?  You said yes.
I said why?
And you said, because it's a smaller portion of the business.
Do you remember that?
A.  I do.
Q.  Do you understand or did you understand that investors put less weight on Cordis in assessing Cardinal Health's financials than other aspects of the Cardinal Health's business?
MR. JANOSKI:  Objection.  Calls for speculation.
A.  Yeah, I can't speak for all other investors.
Q.  In your experience as -- in your experience as an investment analyst, do you think it's fair to say that investors have put less weight on Cordis than on other aspects of Cardinal Health's business in assessing Cardinal Health's financials?
MR. JANOSKI:  Same objection.
A.  Most of their errings came from the non-Cordis business, so yes.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 241

Q. Do you remember a time when that changed?

A. I don't remember.

Q. So when we looked at the earnings call on August 2, 2016, we established that that happened before the markets opened; right?

A. Yes.

Q. So I want to go back to exhibit -- the Bloomberg stock prices, which was Exhibit 17.

A. Yup.

Q. Are you there?

A. Yes.

Q. So if you go to Page 11, and if you go to rows -- so if the call happened before the market opened, you would compare the closing price on the day before with the opening price on the day of; right?

A. Yup.

Q. So the closing price on August 1st was -- what was it? I'm having trouble seeing. 68.82, am I reading that right?

A. 68.89.

Q. 68.89. And opened at 69.41?

A. Correct.

Page 242

Q. So the stock price went up; right?

A. The stock price went up.

Q. Do you know why?

A. I don't know why.

Q. Is it weird that it went up when, or is it unusual that it went up when Cardinal Health lowered its accretion forecast for Cordis?

A. In isolation, yes.

Q. Can you expand on that?

A. Yes. If -- the stock price of Cardinal went up. If it was a day where the entire market was going up, Cardinal may have gone along -- may have gone up with it. I don't remember what the market's performance was for that day.

Q. But is it unusual that a company lowering its accretion estimate by 25 percent would not have a negative effect on the company's stock price?

MR. JANOSKI: Objection. Calls for speculation. Double negative.

A. I don't know. I can't -- I don't know.

Q. Okay. If we pull back up Exhibit 26, this was the analyst report that you wrote on August 2, 2016. So --

Page 243

A. Yes.

Q. -- on the day of this earnings call. If we go to the third page, ending in -55214 --

A. Yes.

Q. -- you have this paragraph, the last paragraph, that Cardinal Health has increased its acquisition activity --

A. Yes.

Q. -- and then you're -- the third sentence notes the reduction in the accretion estimate. Do you see that?

A. I do.

Q. And if you go back to Page 1 of this report --

A. Yes.

Q. -- you recommended to hold Cardinal Health stock; right?

A. Yes.

Q. So why did you recommend holding Cardinal Health stock in light -- when there was this reduction in the accretion estimate for Cordis?

A. That's one element to consider in the

Page 244

recommendation. Looking through this note, it seemed as if the valuation was reasonable, considering the earnings growth the consolidated company was expected to generate.

Q. Can you explain what that means? What are you looking at when you say that?

A. I'm looking at the conclusion paragraph.

Q. Mm-hmm.

A. Where it says, "Valuation is reasonable at a modest discount to historical multiples and supported by a 7 percent free cash flow yield. Low double digit earnings growth, CAGR, appear sustainable, driven by mixed benefits from medical segment and higher volumes through JV with CVS."

Q. What is CAGR?

A. It's consolidated annual growth rate.

Q. If you go to -- sorry. Okay. Sorry. I think I cut you off. What were you saying?

A. So you asked why I would recommend a hold --

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 245

Q. Yes.

A. -- if there was a reduction in the Cordis accretion.

Q. Yup.

A. And the Cordis accretion is just one element to be considered in the conclusion, in the recommendation of the stock. And then just reading through the conclusion paragraph, that explains the rationale for the hold rating.

Q. And so there were -- you recommended to hold Cardinal Health stock because of reasons unrelated to -- so strike that.

You recommended to hold Cardinal Health stock despite the reduction in accretion?

A. That's correct.

Q. Did the reduction in accretion factor into your model of Cardinal Health at all?

A. I expect it did.

MR. JANOSKI: Objection.

A. I expect it did.

Q. Did the reduction change your -- impact how you were thinking about Cordis?

A. Probably.

Q. Did it impact how you were thinking

Page 246

about the risks associated with Cordis?

A. Probably.

Q. Did you understand, at this time, that there was a possibility that Cardinal Health would not achieve the 15-cent accretion estimate?

MR. JANOSKI: Objection. Calls for speculation.

A. It's possible.

Q. It's always a possibility; right?

A. Yes.

Q. What did you understand were the risks that could affect Cardinal Health's ability to achieve that estimate?

A. At this time, aside from the other risks that we've discussed about any given integration, the foreign exchange headwinds, and then the increased SG&A investments were cited.

Q. Would there be other risks, too?

A. Yes.

Q. Decisions by management regarding how the integration would be implemented?

A. It's possible.

Q. Difficulties in retaining customers after the acquisition?

Page 247

A. It's possible. Yes.

Q. Difficulties in retaining employees after the acquisition?

A. Yes.

Q. Difficulties in integrating international operations?

A. Yup.

Q. Difficulties in establishing supply chains and distribution capabilities?

A. Yes.

Q. Difficulties posed by the size of Cordis's international business?

A. Yes.

Q. Anything else?

A. There's -- either there could be questions in terms of the accuracy of what is being purchased. There can be, you know, geopolitical events. There can be, you know, lots of risks. There can be a long list of risks.

Q. What are geopolitical events?

A. It can be a war. It can be a change in administration, you know, regulatory changes.

Q. And so these risks, all of these risks

Page 248

are constantly changing; right?

A. Correct.

Q. And that assesses how you view the likelihood of success of the Cordis integration?

A. Yes.

Q. Did -- okay. So, at this time, we established that Cardinal Health reduced its accretion estimate from 20 cents to 15 cents; right?

A. Yes.

Q. It doesn't say anything about its synergies estimate; right?

A. I don't believe so.

Q. Did the reduction in the accretion estimate affect your assessment of the likelihood that Cardinal Health would achieve the synergies?

A. I don't remember.

Q. Would it have?

MR. JANOSKI: Objection. Calls for speculation.

A. It's possible.

Q. Sitting here today, do you think it's likely that it would have changed your assessment of the likelihood that Cardinal Health would

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 249

achieve those synergies?

MR. JANOSKI:  Same objection.

A.  It's hard to say with certainty.  I've got the benefit of hindsight at this point.  So I'm trying -- that clouds it.

Q.  Sitting here today, would the reduction in accretion change your view about synergies at all?

MR. JANOSKI:  Same objection.

A.  Can you repeat that, please?

Q.  Yeah.  Would a reduction in an accretion estimate make you think about the synergies estimate differently in any way?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  It's possible.

Q.  Okay.

MS. SADINSKY:  How is everyone doing?

MR. JANOSKI:  I would just ask that we determine whether or not you have a 2 p.m cutoff or not.

MS. SADINSKY:  Yeah.

MR. JANOSKI:  Because we do want to ask 30 or 40 minutes of questions at some point.

Page 250

MS. SADINSKY:  Let's go off the record.

THE VIDEOGRAPHER:  The time is 12:43 p.m.  We're off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 12:53 p.m.  We're on the record.

MS. SADINSKY:  I am going to mark three exhibits, 37, 38, 39.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00155130 through -5133 marked Exhibit 37.)

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00160069 through -0072 marked Exhibit 38.)

(Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455339 through -5352 marked Exhibit 39.)

MS. SADINSKY:  Okay.  Exhibit 37 is an analyst report you wrote, Bates No. -155130 to -155133.  Exhibit 38 is an email, Bates No. -160069 to -160072.  And Exhibit 39, Bates No. -00455339 to -00455352.

BY MS. SADINSKY:

Q.  So let's start with Exhibit 37.  This

Page 251

is an analyst report that you wrote; correct?

A.  Yes.

Q.  It's dated November 1, 2016; correct?

A.  Yes.

Q.  So this is after the end of Cardinal's Q1 -- first quarter 2017?

A.  Correct.

Q.  And you're recommending to hold Cardinal Health stock; right?

A.  Yes.

Q.  If you go to Page 2, 5131, if you go to the third bullet under "Momentum" --

A.  Yes.

Q.  -- it says, "Medical segment increased 12 percent to 3.3 billion due to new client wins, volume growth and acquisition.  (Cardinal Health laps Cordis acquisition this quarter)."

Do you see that?

A.  I do.

Q.  What does the phrase "Cardinal Health laps Cordis acquisition this quarter" mean?

A.  So the Cordis acquisition would annualize this quarter.  So a period of above normal growth would no longer be repeated because

Page 252

the growth, just from having Cordis as part of their business, would start to get lapped.  So it would be dependent on Cordis's organic growth after that point in time.

Q.  So there may be more growth in the first year of the business than there would be in the second year of the business?

A.  On a reported basis, yes.  So Cordis's growth could be consistent year over year.  But the way it's going to be reflected in Cardinal's financials is going to be greater the first year, because the entirety of the Cordis financials weren't included in the prior years.

Does that make sense?

Q.  No.

A.  So say Cordis had 20 million in revenue.  Cardinal had 100 million.  The first year of Cordis, it's going to show 20 percent growth.  So it's going to go from 100 million to 120 million.

The second year, you're not going to have that bolus of growth because Cordis's organic growth is all that's going to be counted.  So it may be you go from 100 million to 120 million,

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 253

but then to 122 million the following year.  So that outsized growth rate will not be repeated, because it's only dependent on Cordis's underlying growth.

Q.   How does that affect your model?

A.   It doesn't necessarily affect the model.  It's just the reporting, the numbers that get reported will drop down in terms of a percentage growth.

Q.   Okay.  If you look at the chart on Page 1, 5130, you have numbers for fiscal year 2018 here; right?

A.   Yes.

Q.   And if you go to the V -- the -- what is it, valuation section, on the third page?

A.   Yes.

Q.   What time period is this based on?

A.   It's looking at fiscal year '17.

Q.   So why do you have numbers for fiscal year '18?

A.   For reference.  I don't have a good -- I think that's a reference number.  So I was saying these are the expectations for 2018 and this is what Cardinal could earn.  But the value

Page 254

of the stock is being based off of the 2017 numbers.

Q.   Okay.  So your evaluation doesn't include 2018 numbers at this time?

A.   Correct.

Q.   Okay.  Let's go to Exhibit 38.  This is an email exchange.  And you're on it.

Do you see that?

A.   I do.

Q.   It's between you and Heather Finn.

Do you see that?

A.   I do.

Q.   And she's organizing a meeting with Cardinal Health; right?

A.   Correct.

Q.   And who from Cardinal Health?

A.   It's Michael Kaufmann, Lisa Capodici, Garen Sarafian and Heather Finn.  I'm sorry.  Heather Finn and Garen are from Citi.  So just Lisa and Michael from Cardinal.

Q.   Did you have a meeting with Mike Kaufmann and Lisa Capodici as part of Citi's non-deal roadshow in December 2016?

A.   I believe so.

Page 255

Q.   On December 24, 2016?

A.   Yes.

Q.   Who else was there?

A.   It looks as if it was Garen from City and then Heather from City.

Q.   And then you, Mike and Lisa?

A.   I believe so.

Q.   No one else?

A.   Not that I can tell from this.

Q.   Do you remember how long the meeting was?

A.   Usually, they're an hour.

Q.   An hour.  And you asked questions during this meeting?

A.   Yes.

Q.   Do you remember what you discussed?

A.   Yes.

Q.   What --

A.   Well, based on this transcript.

Q.   Okay.  So --

A.   Sorry.  On 39.  I don't --

Q.   Stay on 38 right now.

A.   No.

Q.   Do you remember what you discussed?

Page 256

A.   No.

Q.   If you go to Page 4 ending in -0072.

A.   Yes.

Q.   The section under the medical segment -- sorry.  Actually, if you go to Page 1 of this.

The potential topics and questions, did you write these?

A.   No.

Q.   These were written by Garen at City; correct?

A.   Correct.

Q.   She sent to you a list of potential questions to discuss with Mike and -- Mike Kaufmann?

A.   Yes.

Q.   Okay.  If we go to Page 4 now, 0072.  The first question under "Medical Segment," "Can you discuss your outlook for your medical segment?  How do you expect contributions from Cordis, global purchasing, the NaviHealth addition and distribution growth to trend going forward?"

Do you see that?

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 257

A.  I do.
Q.  Did you ask this question?
A.  I don't remember.
Q.  What is global purchasing?
A.  I believe that that's purchasing pharmaceuticals from global manufacturers.
Q.  Why is that under the medical segment?
A.  I don't know.
Q.  What about NaviHealth, NaviHealth?
A.  I can't remember.
Q.  Is that a medical segment business?
A.  It looks like it.
Q.  Okay.  Now let's go to the notes, Exhibit 39.  And these are Cardinal Health's notes from this meeting.
And SM here, does that refer to you?
A.  I believe so.
MR. JANOSKI:  Counsel, I would just object to this document as -- on authenticity grounds.  I don't think any foundation has been laid as to what it is, but you can go ahead.
Q.  Does this look like -- if you just quickly skim through this, does this look like an accurate recitation of the meeting that you had

Page 258

with Mike Kaufmann in December 2016?
A.  It looks like it's -- it could be a transcript from that meeting.
Q.  Okay.  And SM here, does that refer to you?
A.  I believe so.
Q.  MK, who does that refer to?
A.  I expect that's Mike Kaufmann.
Q.  Can we go to Page 8?  And that is the one ending in -5346.
And so -- I apologize.  This is a compilation, I guess, of notes from multiple people.  So I think the notes from you end on the Page 55342.
Does that make sense to you?
A.  Yes.
MR. JANOSKI:  Objection to the statement of facts.
Q.  Do you see anything in here about -- so I'd like you to read -- actually, I'll just direct you to the Page 55341.  And I'd like you to read -- actually, why don't you just read the entirety of the notes.  It's just easier, the four pages.  Let me know when you're done.

Page 259

A.  Okay.  I'm finished.
Q.  So these are notes from a December 2016 meeting with Mike Kaufmann; correct?
A.  Correct.
Q.  And we just established that, in August 2016, Cardinal decreased its accretion from Cordis from 20 cents to 15 cents; right?
A.  Correct.
Q.  Did you see -- did you ask any questions about that accretion reduction in your meeting with Mike Kaufmann?
A.  No.
Q.  Does that surprise you?
A.  No.
Q.  Why?
A.  Because there were other issues that we were discussing at this time.
Q.  Other issues that were more important to you in assessing Cardinal Health's financials?
MR. JANOSKI:  Objection.  Assumes facts.
A.  Yes.
Q.  Which issues were those?
A.  It was the pricing of generics.

Page 260

Q.  And that affects the pharmaceutical segment?
A.  Correct.
Q.  In what ways?
A.  Significantly.  They -- there were questions about pricing and the competitive nature of the industry as a whole at this period of time.  And that -- that warranted a good amount of time during the meeting.
Q.  And those questions about generics would have affected, you know, how you were thinking about Cardinal Health's value?
A.  Correct.
Q.  And in your experience as an investment analyst, would those issues have affected how investors were thinking about Cardinal Health's value?
MR. JANOSKI:  Objection.  Calls for speculation.
A.  I believe so.
Q.  Generic pricing was important to the market?
MR. JANOSKI:  Same objection.
A.  Yes.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 261

Q.   And at this time, the issues with Cordis, the reduction in its accretion estimate, was not as important to you as the generic pricing issues; correct?

A.   Correct.

Q.   Because the Cordis issues did not have as much of an effect on Cardinal's financials as the generic pricing issues would have; correct?

A.   Correct.

MR. JANOSKI:  Objection.  Assumes facts.

A.   Correct.

Q.   Did you ask any questions about the increased SG&A expenses that Cardinal Health announced during its August 2nd, 2016 earnings call?

A.   No.

Q.   The only reference to Cordis that I see is on the page marked 55341.  Is that what you see, too?

A.   I do.

Q.   And what did you ask about Cordis.  Or let me rephrase, because I think these notes are shorthand.

Page 262

What was the discussion about Cordis?

A.   I believe it was the margin contribution.

Q.   And what were you told?

A.   I don't -- I can't read some of the shorthand.  They're sourcing business to get the best price.  I think it's for private label products.  And our sales team tries to sell to customers to lower their cost and improve our margins.

So they're trying to expand the suite of products that they sell into their customers.

Q.   Were you told that Cordis was certain to increase Cardinal Health's margins?

A.   No.

Q.   Did you ask any questions about how Cordis specifically would increase the margins?

A.   No.

Q.   Did the conversation that you had with Mike Kaufmann about margins in the medical business affect your assessment of the likelihood that Cordis would achieve the 15-cent accretion estimate?

A.   No.

Page 263

Q.   Why not?

A.   It wasn't discussed.

Q.   Okay.  At this time, would your -- would the risks related to the Cordis acquisition go up, go down, stay the same?

A.   I don't know.

Q.   Okay.

MS. SADINSKY:  Next, I want to mark Tabs 30 and 31, which is Exhibit -- which is going to be Exhibit 40 and Exhibit 41.

BY MS. SADINSKY:

Q.   Actually, if you could just pull back up Exhibit 39 or in general.  In December 2016, were the risks associated with the Cordis acquisition different than they were when the Cordis acquisition was announced in March?

A.   I don't remember.

Q.   Were there risks relating to closing the acquisition anymore?

A.   No.

Q.   So they would have been different; right?

A.   I think the potential risks, again, were fairly consistent.  The risks for any

Page 264

acquisition are out as a possibility.  So I don't think the possibility of realizing those risks, you know, any additional risk had necessarily changed.  They had realized some headwinds in the form of the higher SG&A spend and the foreign exchange.

Q.   So realizing risks, that changes -- does that change -- so maybe risk is not the right word.

So when you are realizing risk, does it change the likelihood of hitting accretion and synergies estimates?

MR. JANOSKI:  Objection.  Calls for speculation.

Q.   If you realize more risk, does it make it less likely?

A.   They had -- Cardinal was facing headwinds in the form of foreign exchange and the SG&A.  So their ability to achieve that original target was unlikely.

Q.   So it changed --

A.   Yeah.

Q.   -- from the time the original target was announced?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 265

A.   Correct.

MS. SADINSKY:  So we're marking Tab 30 as Exhibit 40 and Tab 31 as Exhibit 41.

(Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455285 through -5295 marked Exhibit 40.)

(Document Bates-stamped CAH-SDOH2.19-cv-2247-00005824 through -5829 marked Exhibit 41.)

MS. SADINSKY:  We'll mark them, and then I'll start talking.

BY MS. SADINSKY:

Q.   Starting with Exhibit 40, this is a schedule of the 2017 JPMorgan health care conference.  In the middle, on Tuesday, January 10th, do you see your name?

A.   I do.

Q.   Did you attend a meeting with Cardinal Health as part of the 2017 health care conference on January 10, 2017?

A.   I believe so.

Q.   And what is a three-on-one?

A.   It means there's three investment firms meeting with the company.

Page 266

Q.   And do you have a lot of three-on-one meetings with Cardinal Health?

A.   It's possible.

Q.   Okay.  And do you know the people from Capital Research and Management Company, Columbia Threadneedle listed here?

A.   I know some of them.

Q.   Who do you know?

A.   I remember Harlan Sonderling.

Q.   And he also covered Cardinal Health?

A.   Yes.

Q.   Did you work with him?

A.   No.

Q.   Did you ever share your views on Cardinal Health with him?

A.   I don't believe so.

Q.   Is that something that you would normally do?

A.   I don't usually.

Q.   And who did you meet with at this conference?

A.   It was -- it looks like George Barrett, Lisa Capodici, Sally Curley, Mike Kaufmann, and Holly Fisher.

Page 267

Q.   So just because names are circled doesn't mean those are the only names you met with?

A.   I don't know the difference.  I don't remember who I met with.  I'm assuming those were the people.  The people listed are the ones who were present.

Q.   And your meeting was at 8:30 a.m.; right?

A.   Yes.

Q.   How long was it?

A.   Half an hour.

Q.   And do you remember what was discussed?

A.   No.

Q.   And this was a month after you had met with Mike Kaufmann; correct?

A.   Yes.

Q.   Do you remember asking any questions at this meeting?

A.   I don't.

Q.   Is it common to meet with Cardinal Health Management two months in a row?

A.   It's possible.

Q.   Does it happen often?

Page 268

A.   No.  I think it's just a coincidence.

Q.   Okay.  Let's go to Exhibit 41.  This is a transcript of the conference.

And so you attended this conference.  I think we established that; right?

A.   Yes.

Q.   And so the analyst here, where it says analyst, it's possible that this could be you asking a question; right?

A.   It's unlikely.

Q.   Why?

A.   I don't usually ask questions in this setting.

Q.   If we go to Page 5, which ends in -5628, which is very small, if you go about midway down the page, "Question:  Unidentified audience member:  Can you give us a little bit of an update on Cordis?"

Do you see that?

A.   I do.

Q.   Do you know who asked that?

A.   I don't.

Q.   Would it have been one of the people on the three-on-one meeting?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 269

A. I don't know.

Q. But it wouldn't have been you?

A. No.

Q. Okay. And Barrett says, "The question is about Cordis and how it's going. And is it going sort of according to model? It's going really well. It's a big complex business. Global business as you know. So there were some startup costs, particularly in some markets where we didn't have existing infrastructure, sort of order to cash and we had to do some TSA agreements with J&J," Johnson & Johnson, right?

A. Mm-hmm.

Q. "And then we are moving, transitioning those off. So other than those going a little more slowly than we modeled and really going more slowly because we chose to go more slowly to make sure we got them right because we didn't want to do anything that could disrupt patient care, it's actually going well. What we did announce at the beginning of the year, because of that, our accretion that we expected was a little bit slower than the original model, but it really was just about the costs associated with these

Page 270

transition agreements, but market-wise we're doing really well. Each market is a little different than we modeled, but net over net, it's roughly as we modeled it, so it's going pretty well."

Do you recall Barrett discussing integration of Cordis at this conference?

A. I don't.

Q. Did you understand that there were challenges with the Cordis business at this time?

A. I believe so.

Q. Did you understand there were challenges with setting up a global infrastructure?

A. I don't remember.

Q. So where it says "so there were some startup costs, particularly in some markets where we didn't have an existing infrastructure," does that refresh your recollection that there were challenges with setting up a global infrastructure?

MR. JANOSKI: Objection. Lacks foundation.

A. It's possible. Yes.

Page 271

Q. Does it refresh your recollection?

A. I don't remember. I don't -- I wasn't -- I don't know if I was at this presentation. But it's in writing. So I believe it.

Q. Okay. If you were there, you were told that there were challenges in setting up a global infrastructure?

A. Yes.

Q. Did you understand there were challenges associated with TSA agreements with Johnson & Johnson?

A. I don't know what those are.

Q. Transition services agreements. Have you heard that before?

A. Okay. Yes.

Q. Did you understand there were challenges associated with transition services agreements with Johnson & Johnson?

MR. JANOSKI: Objection. Assumes facts.

A. From reading this.

Q. And if you were there, you would have been told that?

Page 272

A. Yes.

Q. Did you understand there were challenges with realizing the accretion estimates built into the deal model?

MR. JANOSKI: Objection. Assumes facts.

A. Yes. From this transcript.

Q. And if you were there, you would have been told that?

A. Yes.

Q. Did you understand these challenges affected Cordis's performance?

A. Yes.

Q. Did you understand that they created a risk for the future performance of Cordis?

MR. JANOSKI: Objection. Assumes facts. Calls for speculation.

A. Yes.

Q. What does the phrase it's "going sort of according to model" mean to you?

A. It sounds like it's not going exactly as planned.

Q. So it's going differently than what was in the original business case?

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 273

A. Potentially, yes.

Q. What does the phrase "it's roughly as we modeled it" mean to you?

A. It's not exactly as we modeled it.

Q. So it's going differently than the original business case?

A. Yes.

Q. So the Cordis business was not going to model in some ways at this time; correct?

A. Yes.

Q. And in January 2017, George Barrett told investors that the Cordis business was not going to plan in some ways; correct?

MR. JANOSKI: Objection. Misstates the document.

A. It seems that way.

Q. Did you --

A. Well, in some ways.

Q. Okay. In some ways.

Did you factor this into your own model of Cardinal Health?

A. I don't remember.

Q. Given what was said here, sitting here today, would this have impacted how you were

Page 274

thinking about Cordis?

A. It may have.

Q. Would -- sitting here today, would this have affected your assessment of the likelihood that Cardinal Health would achieve the 15-cent accretion estimate?

MR. JANOSKI: Objection. Calls for speculation.

A. It may have.

Q. And what about the likelihood that Cardinal Health would achieve the 100 million in synergies?

MR. JANOSKI: Same objection.

A. It may have.

Q. So it's possible that discussions of challenges with the Cordis business in January 2017 may have made it less likely, in your mind, that Cardinal Health would achieve its accretion and synergies estimates?

MR. JANOSKI: Same objection.

A. It's possible.

MS. SADINSKY: Okay. Now, I'm going to -- let's just mark a bunch together. Tabs 32, 33, 34. And so we are on Exhibit 42 -- oh,

Page 275

sorry.

So Tab 32, we're going to mark Exhibit 42. Tab 33, we've already marked as Exhibit 27. And Tab 34, we'll mark as Exhibit 43. So if you want to find your Exhibit 27, we're going to look at that in a minute.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00147222 through -7224 marked Exhibit 42.)

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00156289 through -6326 marked Exhibit 43.)

BY MS. SADINSKY:

Q. Okay. So Exhibit 42 is a public document, but Bates No. -147222 to -147224. And this is a Cardinal Health's press release announcing its third quarter of 2017 results; right?

A. Yes.

Q. And this was on May 1, 2017; correct?

A. Correct.

Q. Did you ever see this?

A. I believe so.

Page 276

Q. And you -- do you recall seeing this?

A. I don't recall seeing it.

Q. But it's something that you would have reviewed as part of your analysis of Cardinal Health?

A. I think so. Yes.

Q. Okay. If we go to Page 2, 7223, under the section header "Medical Segment."

A. Mm-hmm.

Q. If we go to the second paragraph there, the second sentence, "A decline in Cordis performance reflected increased SG&A expenses and the net favorable impact of two larger inventory adjustments in the year-over-year comparison."

Do you see that?

A. I do.

Q. Do you recall learning around this time that increased SG&A expenses had impacted Cordis's performance?

A. Vaguely.

Q. And we saw that you had learned about this previously as well; right?

A. Yes.

Q. I think that was in August of 2016;

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 277

right?

A.  Mm-hmm.

Q.  Okay.  If we go now to Exhibit 27.

A.  Yup.

Q.  So this is the analyst report that you wrote that same day; correct?

A.  Correct.

Q.  And you recommended to hold Cardinal Health stock; correct?

A.  Yes.

Q.  Go to Page 25018.  Under "Momentum," the fourth bullet, "Medical segment profits increased 16 percent.  Cardinal Health continues to make infrastructure investments which weight on SG&A levels for the quarter.  This is focused on international markets where Cardinal Health sees growth opportunities and can scale the business.  Double digit growth for 2018 seems reasonable, driven by the integration of MDT."
     What is MDT?

A.  It was a business for Medtronic.

Q.  So, at this time, you understood there were challenges related to the Cordis business; right?

Page 278

A.  Yes.

Q.  You understood there were SG&A challenges; right?

A.  Yes.

Q.  Did you understand what was causing those challenges?

A.  I don't remember.

Q.  Infrastructure investments?

A.  Yup.

Q.  Did you understand --

     MR. JANOSKI:  Objection.  Lacks foundation.  Go ahead.

Q.  Did you understand those challenges were affecting Cordis's performance?

A.  Yes.

Q.  Did you understand that those challenges created risk for the future performance of Cordis?

A.  Yes.

     MR. JANOSKI:  Objection.  Calls for speculation.

Q.  And how did it create risk?

A.  In terms of Cordis being able to achieve the targets that management had set out.

Page 279

Q.  The accretion and synergies targets?

A.  Correct.

Q.  And did the -- so this is May '17, and the first time -- and we looked at a document from August 2016 about SG&A expenses.

A.  Okay.

Q.  Do you remember that?

A.  Yes.

Q.  Does the fact that Cardinal was talking about SG&A expenses, challenges with SG&A expenses for, you know, three quarters of a year signal anything to you?

     MR. JANOSKI:  Objection.  Assumes facts.

A.  That the issue was taking time to resolve.

Q.  And it was not going away immediately?

A.  Correct.

Q.  And it could continue in the future?

A.  It's possible.

Q.  Do you know why Cardinal Health was making infrastructure investments?

A.  I don't remember.

Q.  And so MDT, you said, was --

Page 280

A.  Medtronic.

Q.  And Cardinal Health acquired one of Medtronic's businesses?

A.  I believe so.

Q.  Did you have any concern that the acquisition of Medtronic could impact Cardinal Health's ability to successfully integrate Cordis?

A.  I don't remember.

Q.  Would you have any concern that Cardinal would have trouble handling the integration of multiple acquisitions at once?

A.  It's possible.

Q.  Did you have a view on the Medtronic acquisition, whether it was a good thing or a bad thing for Cardinal?

A.  I don't remember.

Q.  Was the decline in Cordis's performance at this time something that you focused on?

A.  I don't remember.

Q.  Sitting here today, do you think it's something that you would have focused on?

A.  It's possible.

Q.  Were these issues, these SG&A issues, a

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 281

surprise to you in May 2017?

A. I don't remember.

Q. You had already learned that there were SG&A issues --

A. Yes. So no.

Q. -- before, right?

Did you ask any questions about the SG&A expenses referred to here?

A. I don't remember.

Q. Do you recall ever asking questions about SG&A --

A. I do.

Q. -- expenses? You do.

And when was that?

A. I don't remember the timing.

Q. Okay.

A. But I think it was, again, on a call with Mike Kaufmann, when we discussed some of the inventory issues and the spoilage that I had mentioned earlier.

Q. Okay. So you discussed inventory issues and SG&A expenses on the same call.

A. I believe so.

Q. And that was a call with Mike Kaufmann.

Page 282

A. I believe so.

Q. After an earnings release?

A. I think it was likely one of those follow-up calls.

Q. Okay. But probably not one of the ones we've already gone through?

A. It doesn't look like it. Yeah.

Q. Did you factor in the SG&A challenges into your own model of Cardinal Health?

A. It's possible.

Q. On the earnings release, they also referenced two larger inventory adjustments.

Did you ask any questions about those?

A. It's possible.

Q. Were you surprised by those?

A. I believe so.

Q. Why?

A. Because the management at Cardinal was also surprised that -- with the inventory adjustment issues that had to be taken. And, generally, if something -- an issue that specific and kind of granular is surprising a management team, it's likely to surprise an outside observer as well.

Page 283

Q. So, Cardinal Health's executive management didn't know about the inventory issues before they --

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

Q. To the extent -- to -- in your -- as far as you know?

MR. JANOSKI: Same objections.

A. In that it wasn't disclosed ahead of time, and that the inventory issues appeared several quarters after the acquisition.

Q. Okay. So in May 2017, Cardinal Health disclosed information about inventory adjustments; right?

A. Yes.

Q. Okay. So you learned about inventory adjustments in May 2017; correct?

A. Yes.

Q. And those inventory adjustments, did you factor them into your own model of Cardinal?

A. Probably.

Q. Probably? Okay.

And would those inventory adjustments have affected your assessment of the likelihood that

Page 284

Cardinal would achieve the accretion and synergies targets?

A. It's possible.

Q. Is it likely?

A. It's possible. I think the -- I don't know the basis of what the -- I don't know what the expectations were for that segment going into this quarter and how that weighed.

So it's -- it may have already taken kind of like the expectation reset may have already taken place.

Q. So did you change your estimates for Cordis each quarter?

A. Probably not for Cordis specifically. Probably for the segment as a whole.

Q. And that would include any changes --

A. It would.

Q. -- for Cordis?

And you regularly reviewed and revised, you know, how you were thinking and modeling the medical segment, including Cordis?

A. Most likely, yes.

Q. Based on changing the risk profile and, you know, information that the company was

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 285

disclosing?

A.  Yes.

Q.  Let's go to Exhibit 43.  This is a Bard analyst report.  You said that you -- one of -- Bard was one of the analysts that, you know, you follow; right?

A.  Mm-hmm.  Yes.

Q.  This was sent to Steve Pollack.  Do you see that?

A.  I do.

Q.  So I don't know if you received one or not.  But Bard was one of the analysts that you did cover; right?  Or that you did follow; right?

A.  Yes.

Q.  So if you go to Page 10, which ends with 6298, or if we go to 9, 6297 to 6298, you have an article from Bard on Cardinal Health.  You see that; right?

A.  I do.  Yup.

Q.  If you go to the second page of that article, 6298 -- so is this article something you've seen before?

A.  I don't remember.

Q.  Is it something you may have reviewed?

Page 286

A.  It's possible.  Yes.

Q.  Is it something that you likely would have reviewed?

A.  Yes.

Q.  Is Bard one of the analysts you give, you know, you pay more attention to in your analysis?

A.  I would read through them.  I can't remember specifically for Cardinal.  But it's possible.

Q.  Okay.  On 6298, the fourth bullet says, "Medical segment.  Cordis choppiness was the primary culprit of down side versus our model.  Medical EBIT missed us by 11 percent and unexpectedly declined QQ."  Do you see that?

A.  I do.

Q.  And, again, this is based on the May 1, 2017 earnings release; right?

A.  This is --

Q.  If you look at the first page of the document, the email is dated May 2, 2017.

A.  Okay.  Yes.

Q.  When you read the phrase "Cordis

Page 287

choppiness," what does that mean to you?

A.  It means that performance in Cordis was not up to expectations.

Q.  What was choppy about Cordis?

MR. JANOSKI:  Objection.  Lacks foundation.

A.  It looks as if that contributed to a miss.  The document says higher SG&A investments and an inventory reserve.

Q.  So putting the document to the side, do you remember -- do you understand -- strike that.  Putting the document to the side, in May 2017, did you understand that there were problems with the Cordis business?

A.  Yes.

Q.  And did the choppiness or the problems with the Cordis business refer to problems with the integration?

A.  Yes.

Q.  And so, in May 2017, you understood there were problems with the Cordis integration?

A.  Yes.

Q.  It wasn't going exactly according to the deal model; right?

Page 288

A.  Correct.

Q.  It was going worse than originally expected; right?

A.  Correct.

Q.  It was less likely that Cardinal Health would achieve the accretion and synergies estimates that it -- that it set forth at the time of the acquisition; right?

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.

A.  It appeared that way.

Q.  Okay.  And did you agree -- did the problems with the integration impact Cordis's performance?

A.  Yes.

Q.  Okay.  And you agree that these problems impacted Cordis's performance?

A.  Yes.

Q.  And did you have any concern at this time, in May 2017, that these problems with Cordis would continue?

A.  I don't remember specifically.  But it's possible.

Q.  And would you have factored in that

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 289

possibility into your own deal model?
    A.  Yes.
    Q.  Okay.  So on May 1, 2017, Cardinal Health discussed these issues with the Cordis business; right?
    A.  Yes.
    Q.  If you go now to Exhibit 16, which is SEIU's purchases -- SEIU's transactions in Cardinal, made by Boston Partners, if you go to the second page, towards the bottom, you see a purchase of shares on May 3, 2017?
    Do you see that?
    A.  I do.
    Q.  Did you have any conversations with Mr. Pollack about whether he should buy Cardinal Health stock at this time?
    A.  I don't remember.
    Q.  Do you know why Mr. Pollack decided to buy Cardinal Health stock at this time?
    A.  I do not know.
    Q.  Do you know whether he bought Cardinal Health stock on behalf of other clients at this time?
    A.  I don't know.

Page 290

    Q.  Would he have bought Cardinal Health stock on behalf of other clients at this time if the reason for the purchase here was not inflow of cash or outflow of cash?
        MR. JANOSKI:  Objection.  Calls for speculation.
    A.  It's possible.  Yeah.  Most likely.
    Q.  Would there be any other reason?
    A.  Not that I can think of.
    Q.  Did you ever have any discussions with anyone from SEIU about whether Boston Partners should purchase Cardinal Health stock?
    A.  I don't believe so.
    Q.  And did SEIU direct this purchase of stock?
    A.  I don't believe so.
    Q.  Would they ever have a reason to do so?
    A.  No.
    Q.  Okay.
        MS. SADINSKY:  What are we on?  Next, let's mark as Tabs 35 and 36 -- actually, yeah.  35, 36, 38.  I'm just going to give you a bunch.  35, 36, 38, and 39.  I'm just going to start reading the Bates numbers in.

Page 291

        Tab 35, Bates numbers 147165 to 147168.  And that is Exhibit?
        COURT REPORTER:  44.
        MS. SADINSKY:  Exhibit 44.
        (Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00147165 through -7168 marked Exhibit 44.)
        MS. SADINSKY:  Exhibit 45 is 393446 to 393475.
        (Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00393446 through -3475 marked Exhibit 45.)
        MS. SADINSKY:  Exhibit 46 is 147644 to 147646.
        (Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00147644 through -7646 marked Exhibit 46.)
        MS. SADINSKY:  And Exhibit 47 is 156122 to 156228.
        (Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00156122 through -6228 marked Exhibit 47.)
BY MS. SADINSKY:
    Q.  So let's start with Exhibit 44.  On

Page 292

August 2, 2017, Cardinal Health announced its fiscal 2017 results; right?
    A.  Yes.
    Q.  And its earnings call that day -- oh, if you go to Exhibit 45, Exhibit 45 is the earnings call from that day; right?
    A.  Yes.
    Q.  And the time shows that the earnings call is at 8:30?
    A.  Correct.
    Q.  That's before the markets opened?
    A.  Correct.
    Q.  And you would have read the earnings announcement and listened to the earnings call; correct?
    A.  Yes.
    Q.  And did you -- do you remember this earnings release?
    A.  I don't remember.
    Q.  Okay.  Let's start with the press release.  If you go to Page 2, which ends in the Bates No. -7166 --
    A.  Mm-hmm.
    Q.  -- under pharmaceutical segment --

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 293

A.  Yup.

Q.  -- and I am going to start with the second sentence under pharmaceutical segment. "Segment profit decreased 7 percent to 505 million.  This decrease was driven by generic pharmaceutical pricing and the company's ongoing investment in its pharmaceutical IT platform."

And the next paragraph -- sorry.  Second sentence of the next paragraph.  "Segment profit for the year decreased 12 percent to 2.2 billion, driven by generic pharmaceutical pricing, and to a lesser extent, the impact of the loss of Safeway and reduced levels of branded manufacturer price appreciation."

Do you see that?

A.  I do.

Q.  Did you understand that there were challenges with the pharmaceutical segment in August 2017?

A.  Yes.

Q.  What were those challenges?

A.  There was generic pricing issues. There is a contract loss and lower price inflation within branded drugs.

Page 294

Q.  Okay.  And there was also challenges related to ongoing investment in IT?

A.  Yes.

Q.  Okay.  So you under -- you said you understood there were challenges with generic price marketing; right?

A.  Yes.

Q.  Did you understand those challenges were affecting Cardinal Health's financial performance?

A.  Yes.

Q.  And you understood there were challenges related to ongoing investment in IT; right?

A.  Correct.

Q.  Did you understand those challenges were affecting Cardinal's financial performance?

A.  Yes.

Q.  You understood there were challenges related to a customer.  That's Safeway?

A.  Correct.

Q.  And did you understand those were affecting Cardinal's financial performance?

A.  Yes.

Page 295

Q.  And you understood there were challenges with branded manufacturer price appreciation?

A.  Yes.

Q.  What does that mean?  You called it something else before.

A.  Inflation was less than expected.

Q.  Okay.  And that was impacting Cardinal Health's financial performance?

A.  Yes.

Q.  Did you have any view on whether or not these issues would continue?

A.  Probably.

Q.  And did you factor in these challenges into your own model of Cardinal Health stock?

A.  I expect so.

Q.  And did these challenges change your estimates or assessment of Cardinal Health in any way?

A.  I don't remember.  Probably.

Q.  Okay.  Now, let's go to the transcript, which is Exhibit 45.  Let's go to Pages 10 to 11, 3455 to 56.  And I am going -- and let me know when you're there.

Page 296

A.  Okay.

Q.  I am going to focus on the last two paragraphs of this page.  And who's talking?  I believe -- okay.  This is Mike Kaufmann.  If you go to Page 7, 3452, you can see that?

A.  Okay.

Q.  I just want to be clear about who's talking.

Okay.  So, on 3455, "I know that George gave you some high level thoughts on Cordis, so let me give you some further details.  As you know, we've been working over the past 18 months to build out our global infrastructure for Cordis. The cost of this buildout has been more than expected and have had a negative impact on SG&A and gross margin for the quarter and year. Specifically, the cost of moving manufacturing and standing up our back office services has been more expensive than we modeled, but I feel we have solid plans to address this in the first half of fiscal year 2018.  Mainly due to these increased costs, we did not achieve our fiscal '17 accretion target of 15 cents.  In addition to the higher SG&A and manufacturing costs, mainly

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 297

outside the United States, there are two other factors that affected the accretion this fiscal year.  First, we experienced lower than anticipated sales from partnership agreements.  These agreements, while behind our original projections, are on a significant growth trajectory.  And, second, we incurred higher than planned writeoffs for excess inventory."

Do you see that?

A.  I do.

Q.  Were you surprised that Cardinal Health did not meet the 15-cent accretion estimate?

A.  I don't remember.

Q.  Did you know about some of the challenges listed here before this date?

A.  Yes.

Q.  You knew about the SG&A costs; right?

A.  Correct.

Q.  And you knew about the inventory issues; right?

A.  Yes.

Q.  And you learned about that in May of 2017; right?

A.  I believe so.  Yes.

Page 298

Q.  At least in May 2017; right?

A.  Yeah.

MR. JANOSKI:  Objection.  Assumes facts.

Q.  You testified earlier you looked at the May 2017 earnings release and confirmed that there was information about inventory and SG&A in that release; correct?

A.  Yes.

Q.  So you already knew that there were challenges with building out a global infrastructure in August 2017; correct?

A.  Yes.

Q.  And you understood before this that those challenges were affecting Cordis's performance; right?

A.  Yeah.

Q.  Did you have any concern that those challenges would continue in the future?

A.  I don't remember.

Q.  Did anything in here tell you that those challenges were completely resolved?

A.  No.

Q.  And I think this is the first time

Page 299

we've seen a disclosure about challenges with sales from partnership agreements; right?

A.  I believe so.

Q.  Were you surprised by the disclosure about sales from partnership agreements?

A.  I don't remember.

Q.  Did you understand that sales with partnership agreements were affecting Cordis's performance?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  Based on this, yes.

Q.  Okay.  Did you have any concern that those challenges would continue in the future?

A.  I don't remember.

Q.  Sitting here today, would you have any concern about that?

A.  It seems reasonable.  Yes.

Q.  Okay.  And you understood, at this time, that there were challenges with inventory writeoffs; right?

A.  Yes.

Q.  And you already knew, before this, there were challenges -- that there were

Page 300

inventory challenges related to Cordis; right?

A.  Yes.

Q.  So -- and you understood that the inventory challenges were affecting Cordis's performance; right?

A.  Yes.

Q.  And you already knew before this that the inventory challenges were affecting Cordis's performance; right?

A.  Yes.

Q.  Did you have any concerns that the inventory challenges would continue in the future?

A.  I don't remember.

Q.  Okay.  If you look after "we experienced lower than anticipated sales and partnership agreements," the next sentence is, "These agreements, while behind our original projections, are in a significant growth trajectory."

Do you see that?

A.  I do.

Q.  Do you see a similar sentence after the sentence about inventory?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 301

A. Yes.

Q. What is it?

A. It says, "And, second, we incurred higher than planned writeoffs for excess inventory."

Q. But -- so after the sentence on partnership agreements, there's a sentence that say, "These agreements, while behind our original projections, are on a significant growth trajectory."

A. Correct.

Q. Does that mean that they were making headway on improving the partnership agreements?

MR. JANOSKI: Objection. Calls for speculation.

A. The implication is.

Q. Do you see a sentence like that or anything similar after the sentence about inventory?

A. I don't see something similar.

Q. And would the implication, therefore, be that they haven't made significant headway on improving those?

MR. JANOSKI: Objection. Lacks

Page 302

foundation. Calls for speculation.

A. I don't know.

Q. Okay. So many of the challenges with the Cordis business disclosed at this time were previously disclosed; correct?

MR. JANOSKI: Objection. Vague as to challenges. Lacks foundation.

A. Yes. Several of them have been referred to previously.

Q. Okay. So did this announcement affect your assessment of Cordis's likely performance going forward?

A. I don't remember specifically.

Q. Okay. Did this announcement affect your assessment of the risk associated with the Cordis integration?

A. It's possible.

Q. Is -- would it have -- strike that.

Would it affect your assessment of the risks even if you knew about these challenges before this date?

MR. JANOSKI: Objection. Calls for speculation.

A. It impacted my assessment of the

Page 303

execution. I don't know if it impacted the risks.

Q. Okay. Did the fact that these, you know, challenges, issues that were disclosed about Cordis, you know, were continuing for several months mean anything to you?

A. It is -- yeah. It was that the management was having a difficult time resolving the issues.

Q. The longer it takes to resolve an issue, does that make it less likely it will be resolved?

A. It depends. Yeah, that depends.

Q. That's not a good question.

The longer an issue lasts, does it make it less likely the company will achieve the accretion and synergies estimates announced at the time the deal was announced -- at the time the deal was announced?

MR. JANOSKI: Objection. Calls for speculation. Incomplete hypothetical.

A. It's possible.

Q. Is it likely?

MR. JANOSKI: Same objections.

Page 304

A. If they've already missed their target date, then yeah. Yes.

Q. And if challenges exist for a while and the company keeps disclosing more and more challenges?

A. It's concerning.

MR. JANOSKI: Same objections.

Q. What did you say?

A. I said it's concerning.

Q. It's concerning because it makes it less likely the -- that the Cordis, you know, integration will ever be successful?

MR. JANOSKI: Same objections.

A. It's -- yes.

Q. Okay. Okay. Next, I want to go to an exhibit we already marked earlier that was the sum of the parts one, Exhibit 14, your August 2, 2017 analyst report. It was one of the first documents we looked at today.

A. Okay.

Q. So we looked at this earlier; right?

A. Yes.

Q. And you wrote this report; right?

A. Yes.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 305

Q.   This is your report of Cardinal Health on August 2, 2017; right?

A.   Correct.

Q.   And that's the same day that Cardinal announced its 2017 results; right?

A.   Correct.

Q.   And the pharmaceutical challenges and Cordis challenges that we just went over?

A.   Correct.

Q.   Okay.  At the bottom of Page 1, 5012, it says, "Cardinal Health's decision to increase investment spend will weigh on 2018 profits and prevents visibility into underlying growth trends until 2H 2018."

Do you see that?

A.   I do.

Q.   What is 2H?

A.   Second half.

Q.   And this is referring to the IT investments or what is this referring to?

A.   It's not specific.  I think it could be total investment spend, whether it's the infrastructure IT.

Q.   Okay.  So it could refer to both

Page 306

medical and pharmaceutical?

A.   Correct.

Q.   Okay.  If you go to Page 2, 5013, the third bullet under "Momentum."

A.   Yes.

Q.   "Investment focus on opioid addiction prevention, specific customer initiatives to increase value and tax planning preparations that will drive estimated tax rate," yada, yada, yada.

Next bullet, "The decrease in profits year over year was primarily due to lower gross margin within distribution due to lower generic selling prices.  Cardinal Health also increased its IT investments during the year which increased SG&A, further pressuring operating income."

Do you see that?

A.   I do.

Q.   I want you to read through this report, the whole report.  You can -- well, read through the whole report and let me know when you're done.

A.   Okay.

Q.   Is Cordis mentioned in this report?

A.   No.

Page 307

Q.   Why not?

A.   I don't know.

Q.   Is it because you put less weight on Cordis in assessing Cardinal Health's financials than other aspects of the Cardinal Health's business?

MR. JANOSKI:  Objection.  Calls for speculation.

A.   It's possible.

Q.   Is it possible or did you put less weight on Cordis in assessing Cardinal Health's financials?

MR. JANOSKI:  Same objection.

A.   Cordis specifically carried less weight than other segments of the business.

Q.   And that's because --

A.   Just given the size of the business.

Q.   Okay.  And Cordis was less significant to you than other parts of the Cardinal Health's business when you were reaching your assessment of Cardinal Health's target price?

A.   That's correct.

Q.   And did you understand that investors also put less weight on Cordis in assessing

Page 308

Cardinal Health's financials?

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.

A.   I believe so.

Q.   And did the Cordis challenges that were disclosed on this day factor into your model of Cardinal Health at all?

A.   I don't remember.

Q.   Would they -- would you expect them to be featured in your report if they did?

MR. JANOSKI:  Objection.  Calls for speculation.

A.   I think so.  I think the Cordis challenges were among, amongst several issues that Cardinal was dealing with at the time.

Q.   Okay.  Did you mention in this report anywhere that Cardinal had missed its accretion target for Cordis, the 15-cent target?

A.   I don't believe so.

Q.   Did the Cordis challenges impact how you were thinking about Cordis?

A.   Most likely.

Q.   Did you have a view at this time as to whether Cordis would ever be accretive?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 309

A.  I don't remember.

Q.  Do you remember ever having a view that Cordis would never be accretive?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  I believe so.

Q.  You do remember having a view.  I'm not asking you to speculate.

I'm asking if you remember having a view.

A.  I remember having a view.

Q.  And was that -- did you develop that view after you learned of inventory problems?

A.  Yes.

MR. JANOSKI:  Objection.  Vague as to "inventory problems."

Q.  And we discussed inventory adjustments being disclosed in May 2017; correct?

A.  Correct.

Q.  So did your -- did the Cordis challenges discussed in August 2017 affect your assessment of whether or not Cardinal Health would be able to achieve the $100 million synergy estimate announced at the time the deal was disclosed?

Page 310

A.  I believe so.

Q.  Did -- did your assessment of whether Cardinal Health would be able to achieve the $100 million synergy estimate change between the time the deal was announced and this time in August 2017?

A.  I don't remember specifically.

Q.  Do you think it did?

A.  Probably.

Q.  Do you think it did multiple times?

A.  Probably.

Q.  When you -- when you heard this earnings announcement and listened to this earnings call and heard about these issues with Cordis, that it missed the accretion target and the SG&A challenges and the inventory writeoffs and partnership agreements, did you conclude that Cardinal Health or its executives had committed securities fraud?

MR. JANOSKI:  Objection.  Compound. Lacks foundation.  Calls for a legal conclusion.

A.  I don't remember thinking that.

Q.  Would you -- so if you go to the first page of your report, your recommendation is to

Page 311

hold Cardinal Health stock; right?

A.  That's correct.

Q.  Would you recommend to hold stock in a company that you thought was committing securities fraud?

A.  No.

Q.  No.  Okay.

And sitting here today, have you ever believed that Cardinal Health committed securities fraud?

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for a legal conclusion.

A.  No.

Q.  Have you ever believed that Mike Kaufmann committed securities fraud?

MR. JANOSKI:  Same objections.

A.  No.

Q.  George Barrett?

MR. JANOSKI:  Same objections.

A.  No.

Q.  Jorge Gomez?

MR. JANOSKI:  Same objection.

A.  No.

Q.  Don Casey?

Page 312

A.  No.

MR. JANOSKI:  Same objection.

Q.  David Wilson?

MR. JANOSKI:  Same objection.

A.  No.

Q.  Have you ever believed that Cardinal Health was a dishonest company?

MR. JANOSKI:  Same objection.

A.  No.

Q.  Did you believe, in August 2017, that Cardinal Health had lied to investors about the integration of Cordis?

MR. JANOSKI:  Lacks foundation. Objection.  Lacks foundation.

A.  It's possible.

Q.  Why?

A.  The negative information came out over such an extended period of time, it raised questions on how management was choosing to communicate the issues with investors.

Q.  Did you ever ask any questions about it?

A.  I don't remember.

Q.  Did you have any reason to believe that

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 313

management was not disclosing issues as it found out about them?

A. In --

MR. JANOSKI: Objection. Lacks foundation. Double negative.

A. In hindsight, yes.

Q. Why?

A. Because the issues were -- it was the same issues over several quarters in a row. So it seemed as if management just didn't have a handle on what was happening. But didn't say that to investors.

Q. So as it was -- if management is disclosing issues with the Cordis business --

A. Mm-hmm.

Q. -- that, in your view, is insufficient?

A. They were disclosing issues. But it seemed as if there -- it wasn't issues in totality. So they were disclosing issues and then new issues would come up and then new issues would come up.

So either they didn't know the extent to which the troubles -- how pervasive they were, or they just chose not to communicate them.

Page 314

Q. Do you have any reason to believe that they knew about problems and chose not to communicate about those problems?

A. No.

MR. JANOSKI: Objection. Lacks foundation.

Q. So you have no reason -- so you said there's two options. Either they didn't know the extent of the problems -- they didn't know the extent to which the troubles, how pervasive they were, and the second option was, or they just chose not to communicate them.

You have no reason to believe that Cardinal Health and its executives just didn't know the extent of the problems? Sitting here -- let me rephrase it. That was confusing.

The first option is they just didn't know the extent of these problems. You have no reason to believe that's not true; right?

A. Correct.

Q. Did you tell anyone at Boston Partners at any time that you believed Cardinal Health or its executives had committed securities fraud?

MR. JANOSKI: Objection. Lacks

Page 315

foundation. Calls for a legal conclusion.

A. No.

Q. Would you recommend holding stock in a company you thought was committing securities fraud?

A. No.

Q. As a fiduciary of your clients' money, would you ever recommend holding stock on behalf your clients when you thought that company was committing securities fraud?

A. No.

Q. Did you discuss this August 2017 announcement with anyone from Boston Partners?

A. I don't remember.

Q. Okay. Let's go to Exhibit 46. And so do you have that one?

A. I probably do in the pile.

Q. This is August 1, 2017.

A. Got it. Yes.

Q. So this is an email. It's scheduling a call between you and Mike Kaufmann, following this earnings call.

Do you see that?

A. I do.

Page 316

Q. Did you have a call with Mike Kaufmann following the earnings call?

A. I believe so.

Q. Was it a one-on-one call?

A. I believe so.

Q. Do you know how long it was?

A. 15 minutes.

Q. Did you ask any questions?

A. I expect so.

Q. Do you know what you asked questions about?

A. I don't.

Q. Did you ask any questions about the challenges with the pharmaceutical business?

A. I don't remember. But probably.

Q. Probably? I think you said the biggest headwind was generic pricing in your report.

Would you have asked questions about generic pricing?

A. Probably.

Q. Would that have been the focus of your conversation with Mike Kaufmann?

A. Most likely.

Q. And why is that?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 317

A. Because it's the biggest segment of their business.

Q. So generic pricing issues were most important to you at this time in assessing Cardinal Health's financials?

A. I believe so.

Q. Did you ask any questions about Cordis missing its accretion estimate?

A. I don't remember.

Q. Do you think you would have?

A. Probably not.

Q. Why is that?

A. Because in those 15 minutes, I was most likely discussing the 75 percent of the business that is the pharmaceutical distribution segment.

Q. So you would be focused on the portion of the business that's most important to you in assessing Cardinal Health's financials; correct?

A. Most likely.

Q. And that's not Cordis; right?

A. Correct.

Q. Did you ask any questions about Cordis's infrastructure challenges?

A. I don't remember.

Page 318

Q. Any questions about Cordis's partnership agreement challenges?

A. I don't remember.

Q. Any questions about Cordis's inventory writeoffs?

A. I don't remember.

Q. And the reason that you wouldn't have asked questions about that -- and the reason you probably would not have asked questions about that is because you would have been focused on the challenges with the pharmaceutical business announced at this time?

A. Correct.

Q. So it's fair to say that the challenges of the pharmaceutical business are more important to you than the challenges with the Cordis business at this time?

A. Yes.

Q. Okay. Let's go to Exhibit 47, which is another Bard morning meeting report.

A. Okay.

Q. And do you recall seeing this report?

A. I don't.

Q. But you read Bard reports; right?

Page 319

A. At times, yes.

Q. Okay. Let's go to Page 18, Bates No. -6139. And this is a report by Bard on Cardinal Health; correct?

A. Yes.

Q. And this is after Cardinal Health announced its results on August 2, 2017; right?

A. Yes.

Q. And the first paragraph, second -- well, the first two sentences, "The supply chain environment remains choppy and Cardinal Health appears comfortable taking proactive decisions to defend share. While this isn't the only headwind, incremental 'customer initiatives and actions' appear to be the primary explanation for the fiscal year '18 guide down."

Do you see that?

A. I do.

Q. So Bard reported that customer initiatives and actions were the primary explanation for the poor results that quarter; right?

A. Yes.

Q. And what do you understand that to

Page 320

mean?

A. It's not immediately clear to me what that means. I'm assuming it's some customer-specific contracting issues.

Q. Is it about Cordis?

A. It doesn't appear to be.

Q. Okay. I want to go back to the Bloomberg stock prices, which was Exhibit 17.

A. Yup.

Q. So we have to look at -- so we said the earnings call was before markets open; right?

A. Correct.

Q. So let's go to Page 5.

A. I'll have to find it. Okay.

Q. Okay. Page 5, August 1, 2017, the stock price closed at 66.17.

Do you see that?

A. On August 1, it closed at 66.17; correct.

Q. What did it open at on August 2?

A. $60.80.

Q. So it dropped; right?

A. Correct.

Q. Do you have a view as to why?

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 321

A. I expect because of the earnings release.

Q. Do you agree that the market was concerned about issues with generics pricing?

MR. JANOSKI: Objection. Calls for speculation.

A. I believe so.

Q. Do you agree the market was concerned about ongoing investment in IT within the pharmaceutical segment?

MR. JANOSKI: Same objection.

A. It's possible.

Q. Would you agree that the market -- right now, I'm just asking for your opinion.

A. Yeah. I think -- I think it would be a secondary concern.

Q. What would be the primary concern?

A. The generic pricing environment.

Q. So you think the stock price -- the decrease in the stock price was primarily driven by the challenges announced with respect to generics pricing?

A. That's my memory.

Q. And the market may have had secondary

Page 322

concerns about the ongoing investment in IT?

A. And everything else.

Q. Technology and client services.

A. All of the other unexpected headwinds that Cardinal disclosed.

Q. That would all be incorporated into the stock price?

A. Yes.

Q. Like loss of Safeway?

A. I expect so. Yes.

Q. And reduced levels of brand and manufacturer price appreciation?

A. Yes.

Q. So the primary reason for the stock price decrease was generics pricing?

MR. JANOSKI: Objection. Calls for --

Q. In your view?

MR. JANOSKI: Calls for speculation.

A. I think so. And I think -- but it all gets pulled into -- yes.

Q. And Cordis was one of the secondary reasons?

A. I expect so. Yes.

Q. Would you expect the issues, the

Page 323

other -- the pharmaceutical -- okay. Strike that.

So generics pricing was the most important reason from your point of view?

A. Yes.

Q. Would you expect the other challenges with the pharmaceutical segment, ongoing investment in IT, technology and client services investments, loss of Safeway, reduced levels of brand and manufacturer price appreciation, would you expect those to have a more significant impact on Cardinal Health's stock price than Cordis?

MR. JANOSKI: Objection. Calls for speculation. Assumes facts.

A. Yes.

Q. You would?

A. Yes.

MS. SADINSKY: Okay. What are we on now?

Let's mark Tab 40. Then after this, I'm going to do 41 and 42.

THE WITNESS: Do you think we can do a break within like five or ten minutes?

Page 324

MS. SADINSKY: Do you want to do it now?

THE WITNESS: Whenever, if that's okay.

MS. SADINSKY: Do you want to go through one more document and then do it?

THE WITNESS: Yeah. That's fine.

MS. SADINSKY: So Exhibit 48 -- Exhibit 48.

(Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00180856 through -0859 marked Exhibit 48.)

MS. SADINSKY: 00180856 to 858.

BY MS. SADINSKY:

Q. This is your report on Cardinal Health from -- and you wrote an email after. So the initial report is from November 8, 2017; correct?

A. Correct.

Q. And you recommended to hold Cardinal Health stock; correct?

A. Correct.

Q. And if you go to Page 2, 0857, top of page, under the conclusion, the first sentence says, "Discounted valuation is appropriate as it reflects looming threat and uncertain form of

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 325

potential Amazon entry into pharma or medical distribution market."

Do you see that?

A. I do.

Q. And back on Page 1, on November 15, you changed your recommendation to buy. You said, "Cardinal Health stock is discounting significant disruption from potential Amazon entry into the supply chain."

Do you see that?

A. I do.

Q. What did you mean by "Cardinal Health is discounting significant disruption from potential Amazon entry into the supply chain"?

A. The price of the stock came down enough, far enough that it already seems to be reflecting whatever disruption, so market share gains that Amazon could achieve by entering into the distribution industry.

Q. So you believe the price of Cardinal Health stock was not accurately reflecting the risk of the Amazon entry, meaning the stock had decreased more than you thought made sense?

A. That's correct.

Page 326

Q. And you think investors overreacted so the price went down more than it should have?

MR. JANOSKI: Objection. Calls for speculation.

A. Yes.

Q. And that presented a buying opportunity?

A. Correct.

Q. Because in the market, Cardinal Health was trading for less than you believed it was actually worth?

A. Correct.

Q. So the stock price is not always a fair indicator of a company's value; correct?

MR. JANOSKI: Objection. Calls for speculation.

A. Correct.

Q. And did you believe that Amazon's entry into the marketplace would have a negative impact on the medical segment?

A. It was possible.

Q. Why?

A. Anytime a business would lose market share or there's an additional competitor that

Page 327

would be a negative.

Q. Okay. And what about the Cordis acquisition?

A. I think that was less relevant.

Q. Why?

A. I can't remember why. It wasn't -- one, it wasn't in the U.S., predominantly.

Q. Okay.

A. And I think it was just the -- the products that Cordis dealt with weren't -- were more advanced than what Amazon would be getting into.

Q. Okay. Can you quickly skim the written portion of this report?

A. Okay.

Q. Is Cordis mentioned?

A. It is not mentioned.

Q. On the last earnings call we just looked at, Cardinal Health disclosed that Cordis missed its accretion target and was negatively impacted by challenges related to SG&A, partnership agreements and inventory writeoffs; right?

A. Correct.

Page 328

Q. Did you do any analysis of Cordis in light of that prior disclosure?

A. I don't remember.

Q. Did you ask any questions about Cordis in light of that prior disclosure?

A. I don't remember.

Q. If you did analysis of Cordis in light of that prior disclosure, would it have been reflected in your report?

A. It likely would have been reflected in the earnings estimates.

Q. And would it likely have been reflected in the, you know, descriptions that you included?

A. It's possible.

Q. Is it likely or not likely?

A. I don't think it was -- it just wasn't -- didn't seem significant enough to warrant a specific mention.

Q. So it's your view that the Cordis issues disclosed in August 2017 weren't significant enough to mention?

A. I believe so. Yes.

Q. And that's because you put less weight on Cordis in assessing Cardinal Health's

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 329

financials; right?

A. Correct.

Q. And the pharmaceutical segment was more important to you in assessing Cardinal Health's financials; right?

A. Correct.

Q. And you understood that investors cared more about the pharmaceutical segment in assessing Cardinal Health's financials, too; right?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

A. I believe so.

Q. Okay. By the way, the report here, this table --

A. Yeah.

Q. -- on Page 1, it looks like a little different now.

A. Yeah.

Q. Why?

A. There was just a formatting change.

Q. Okay.

A. I can't remember exactly what the genesis of it was, but at some point along the

Page 330

line, this table just got updated.

Q. But the model didn't change; right?

A. The process didn't change. No. It's just the way that this table got generated.

MS. SADINSKY: Okay. Let's go off the record.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: The time is 2:14 p.m. We're off the record.

(A recess was taken.)

(Native Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455439 marked Exhibit 49.)

(Document Bates-stamped CAHSDOH2.19-cv-3347-00005636 through -5644 marked Exhibit 50.)

(Document Bates-stamped CAHSDOH2_19-cv-2491-00159287 through -9289 marked Exhibit 51.)

(Document Bates-stamped CAHSDOH2.19-cv-3347-00395010 through -5032 marked Exhibit 52.)

(Document Bates-stamped CAHSDOH2_19-cv-2491-00008938 through -8940

Page 331

marked Exhibit 53.)

THE VIDEOGRAPHER: The time is 2:24 p.m. We're on the record.

BY MS. SADINSKY:

Q. Okay. So the last thing we were talking about was Amazon's entry into the marketplace and how that affected your analysis of Cardinal Health. Remember that?

A. Yes.

Q. That was November 2017. Remember that?

A. Yes.

Q. Before that, we had discussed Cardinal Health's August 2017 disclosure where it had missed the Cordis accretion estimate and announced some challenges about the pharmaceutical segment and Cordis. Remember that?

A. Yes.

Q. Okay. Now, I would like to go to Exhibit 49. And this is kind of small. If you go to the page after the blue sheet, the first page after the blue sheet.

A. Okay.

Q. The first row there -- this is a

Page 332

document from Cardinal Health's files.

MS. SADINSKY: Do you want to object?

MR. JANOSKI: No.

Q. This is a document from Cardinal Health's files listing attendees at the JPMorgan conference during the portion of the meeting with Cardinal Health.

Do you see that?

A. I do.

Q. And do you see your name listed?

A. I do.

Q. And who were the internal participants?

A. Jacqueline Blatt, Jake Drerup, Kevin Moran, Lisa Capodici and Mike Kaufmann.

Q. And do you remember this meeting?

A. I don't remember this meeting.

Q. And do you remember any -- do you know who any of these people are, other than Mike Kaufmann in the internal participant section?

A. I remember Lisa Capodici.

Q. So the other people there, you know, would have attended, but not --

A. I don't remember them. No.

Q. Okay. So you attended the JPMorgan

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 333

health care conference in January of 2018; correct?

A.  I believe so.  Yes.

Q.  And you attended the presentation by Cardinal Health; correct?

A.  Correct.

Q.  And would that presentation also have had 100 or more attendees?  I think you described the last health care conference like that.

A.  The main -- the main presentation would have, yes.

Q.  Is there breakout rooms?

A.  That's -- yes.  And that's what is listed here, most likely, on this page.

Q.  And how many people would be there?

A.  There could be one to as many as -- this looks like a couple dozen.

Q.  Okay.  So the people listed here are the people that attended the breakout session?

A.  I'm not sure what this represents, actually.  This is a large list of people.

Q.  Okay.  Well, put this segment to the side.

A.  Okay.

Page 334

Q.  You attended the JPMorgan health care conference in January of 2018.  You attended the presentation by Cardinal Health?

A.  I believe so.

Q.  And the breakout session with Cardinal Health -- put that to the side.  Don't even look at it.

How many people do you think would be there, about?

A.  A couple dozen.

Q.  Would you have asked questions?

A.  Unlikely.

Q.  Why?

A.  I usually wait to ask them in a smaller setting.

Q.  Okay.  Do you recall discussing Cordis?

A.  I don't remember.

Q.  Okay.  Let's now go to Exhibit 50. Exhibit 50, -5636 to -- oh, geez, -5644, I think. And let's go to Page 6, which ends in -5641. Actually, let's go to Page 5, which ends in -5640, so you can see.

A.  Okay.

Q.  So there's a question by Lisa Christine

Page 335

Gill.

Q.  Who is that?

A.  She's the analyst from JPMorgan who covered Cardinal Health.

Q.  Okay.  And she asks the question to Mike Kaufmann; right?

A.  Mm-hmm.

Q.  And she asks about -- so -- okay.  In the middle of her -- the paragraph with Lisa Christine Gill it says, "So you've made a couple acquisitions on the medical side of your business?  Jorge has come from the medical side of the business.  Can you talk to us about things that have met your expectations on that side of the business?"

Do you see where she says that?

A.  I do.

Q.  And so there were multiple acquisitions on the medical side of the business that Cardinal had recently made; right?

A.  Yes.

Q.  And she's asking for an update on the expectations from the medical segment from those acquisitions; right?

Page 336

A.  Yes.

Q.  Okay.  So -- and Mike Kaufmann, in his response, you see the bottom of the page he's referring to the patient recovery business acquisition; right?

A.  Yes.

Q.  And that's one of the recent acquisitions Cardinal had made in its medical unit; right?

A.  It looks like it.  Yes.

Q.  Okay.  And then on the next page, I'm going one, two, three, four, five -- like six lines down, and it's towards like the end of the line where it starts "as you've" -- "as we've said in the past."

Do you see where I am?

A.  Yes.

Q.  "As we've said in the past, our Cordis business has been a business that was struggling last year.  We went through a lot of the reasons behind that related to some of the -- underestimating some of the SG&A costs that we would incur XUS, some issues around inventory obsolescence and a little bit slower than

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 337

anticipated pickup on those partnership agreements.  As I said in the first quarter, we are making progress in all of those areas, and in the first quarter the business" -- "the Cordis business has performed about as we expected in that quarter and we'll give you more color as appropriate when we get to the end of the second quarter."

Do you remember these remarks?

A.  I don't remember.

Q.  But you believe you attended this presentation?

A.  Yes.

Q.  And so, in January 2018, you understood there were challenges with the Cordis business; right?

A.  Yes.

Q.  And you were aware that the Cordis business had been struggling, I think you said, over the last year.  Cordis business has been a business that was struggling last year; right?

A.  Yes.

Q.  A year is 12 months; right?

A.  Yes.

Page 338

Q.  So you understood that there were challenges with the Cordis business before at least January 2017; correct?

A.  Yes.

Q.  Okay.  So you understood there were challenges with building a global infrastructure before this; right?

A.  Yes.

Q.  Understood there were changes with sales from partnership agreements?

A.  Yes.

Q.  Understood there were challenges with inventory writeoffs?

A.  Yes.

Q.  Understood that all of those challenges were affecting Cordis's performance?

A.  Yes.

Q.  You understood before this time that the inventory challenges were affecting Cordis's performance; right?

A.  Yes.

Q.  And what do you understand the phrase "we are making progress" to mean?

A.  That they are improving in rectifying

Page 339

some of the issues that they had.

Q.  Did you understand that to mean that they had been entirely resolved?

A.  No.

Q.  Did you understand, at this time, that there was a risk that the challenges with the Cordis business might continue?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  Possibly.

Q.  Because you understood, at this time, that the issues had not been entirely resolved; right?

A.  Yes.

MR. JANOSKI:  Objection.  Lacks foundation.

Q.  And so if there's an issue you're trying to resolve, but not -- but have not yet done so, there may be a risk you may never be able to do so; correct?

A.  Correct.

Q.  Did you understand that the challenges with the Cordis business might impact Cordis's performance in the future?

Page 340

A.  Yes.

Q.  And did you understand that there's a risk that some of the challenges could get worse instead of better?

A.  Yes.

Q.  Did you ask any questions about the progress of addressing the Cordis challenges?

A.  I don't remember.

Q.  Do you remember asking any questions at this conference?

A.  No.

Q.  So you would not have asked any questions about the progress of fixing the Cordis challenges; right?

A.  Correct.

Q.  Did you understand what progress had been made?

A.  No.

Q.  Did any -- did you ask any questions about what was needed to improve the Cordis business?

A.  I don't believe so.

Q.  Did you factor in the statements at the conference into your own model of Cardinal

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 341

Health?

A. It's possible.

Q. And would your model have -- strike that.

And if you did so, it would change, you know, your view of the likelihood that Cordis would be accretive, that it would -- that Cardinal Health would ultimately be able to achieve the synergies estimate announced three years ago?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

A. I'm sorry. Can you repeat that?

Q. Yeah. So as you, you know, hear about challenges and you incorporate it into your model --

A. Mm-hmm.

Q. -- does that change -- the model -- sorry.

At the time the acquisition is announced, Cardinal Health discloses expected synergies and accretion.

We've been over this; right?

A. Yeah.

Page 342

Q. So when you find out about challenges with the Cordis business and you incorporated that into your model --

A. Mm-hmm.

Q. -- does it change your assessment of the likelihood that Cardinal Health will achieve whatever accretion and synergies estimates --

A. Yeah.

Q. -- it has disclosed?

Given what was said here, would these statements have impacted how you were thinking about Cordis?

A. Yes.

Q. And did statements such as "we are making progress," would that affect your assessment of the likelihood that the Cordis acquisition would ever be accretive?

MR. JANOSKI: Objection. Calls for speculation.

A. It's possible.

Q. Would it make it more likely or less likely?

A. It would make it more likely that it's going to get resolved.

Page 343

Q. Okay. So the risk that the Cordis acquisition would not be successful had gone down between the August 2017 disclosure and today?

A. Yes.

Q. Okay. Exhibit 51. And this is a document Bates-numbered 00159287 to 159289.

You are not on this document. But I want to ask you some questions about it.

A. Okay.

Q. Andy Hatem is another health care analyst at Boston Partners; right?

A. That's correct.

Q. And he currently covers Cardinal Health stock; right?

A. That's correct.

Q. And he joined Boston Partners in 2017; correct?

A. That's correct.

Q. And did he cover Cardinal Health at that time?

A. At?

Q. When he joined.

A. No.

Q. Did he join -- did he cover Cardinal

Page 344

Health in January of 2018?

A. No.

Q. Was he involved in your assessment of Cardinal Health in 2018?

A. I don't believe so.

Q. Would you have discussed Cardinal Health with Mr. Hatem in 2018?

A. It's possible.

Q. And he covered Cardinal Health for other -- for his prior employer; right?

A. That's correct.

Q. So would you share your views on Cardinal Health with each other?

A. Probably.

Q. That would make sense; right?

A. Yeah.

Q. So this is an email exchange between Robert Jones and Andy Hatem.

Who is Robert Jones?

A. He is a portfolio manager at Boston Partners. Oh, no. This is a different person. I don't know. This is a salesperson.

MR. BUTTERLY: Yeah.

Q. Bob Jones?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 345

MR. BUTTERLY:  We had one.

A.  We have one.  Kind of who doesn't?  But we have -- yeah.  Sorry.  So this person looks like it may have been an analyst at Goldman Sachs.

Q.  Do you know him?

A.  I think so.  I think I've met him.

Q.  And so if you look at the email from Bob Jones to Andy Hatem, after he talks about Amazon, where it starts with "x-ray," do you see that?

A.  I do.

Q.  "X-ray still scares me.  Don Casey's track record on integration was spotty with Cordis.  Per the company's own admission didn't go according to plan at Cardinal."

Do you see that?

A.  I do.

Q.  When you read the phrase "integration was spotty with Cordis," what does that mean to you?

A.  It means it did not go according to plan.

Q.  And you were aware -- sorry.

Page 346

Did you know that the integration of Cordis was spotty or was not going according to plan?

A.  At the time?

Q.  Yes.

A.  Yes.

Q.  And you agree -- did you agree that the integration was not going according to plan at this time?

A.  Yes.

Q.  Was it widely known in the market that the integration was not going as planned?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  I believe so.

Q.  Did you discuss the fact that the integration was not going as planned at this time?

A.  With Andy?

Q.  Yes.

A.  I don't remember.

Q.  Did you discuss it with anyone at Boston Partners?

A.  Probably.

Q.  Other people at Boston Partners also

Page 347

knew that the integration wasn't going as planned at this time?

A.  Probably.

Q.  And third-party analysts knew that the integration wasn't going as planned at this time; right?

A.  Yes.

Q.  And were you aware of inventory challenges at this time?

MR. JANOSKI:  Vague as to "inventory challenges."

A.  I believe so.  Yes.

Q.  And if you -- so you knew at this time that the integration was spotty or there were problems with the integration.

Would that have affected your assessment of the likelihood that the Cordis acquisition would ever be accretive to Cardinal Health?

MR. JANOSKI:  Objection.  Calls for speculation.

A.  I don't know.

Q.  Would it make it more likely or less likely that the acquisition would result in accretion to Cardinal Health?

Page 348

A.  Less likely.

Q.  And you knew that there were problems with the integration at this time.

Did that affect your assessment of the likelihood that Cardinal Health would achieve its $100 million synergy estimate announced at the time of the acquisition?

A.  It's possible.

Q.  Did it make it more likely or less likely that Cardinal Health would achieve it?

A.  Less likely.

Q.  Okay.  Let's go to Exhibit 52.

A.  Okay.

Q.  On February 8, Cardinal announced its second quarter 2018 results.

Do you see that?

A.  I do.

Q.  And I didn't say the Bates number.  395010 to 395032.

And this call was at 8:30 a.m.; right?

A.  Correct.

Q.  Before the market opened; right?

A.  Yup.

Q.  Let's go to Page 7.  The Bates

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 349

No. -5016. And I want to see who's talking. Actually go to Page 5, 5014. This shows that Jorge Gomez is talking.

Do you see that?

A. I do.

Q. Go back to Page 7. I'm going to focus on the bottom paragraph. "While we continue to make progress on the commercial front, the overall earnings performance of Cordis was impacted by inefficiencies in the global supply chain and elevated SG&A outside the United States. The team is fully focused on these issues and we have implemented robust remediation plans to address both inventory and SG&A challenges. We recognize it will take a little time to work through these items, but we are moving expeditiously."

Do you see that?

A. I do.

Q. Do you recall this earnings announcement?

A. I don't. Not specifically.

Q. Or this earnings call.

Would you have listened to it?

Page 350

A. It's possible.

Q. Is it likely?

A. It is.

Q. You were covering Cardinal Health at this time.

A. I was covering -- whether I listened to it live or read the transcript, but yes.

Q. You would have either reviewed the transcript or listened to the earnings call?

A. Yes.

Q. Did you understand there were challenges with Cordis in February 2018?

A. Yes.

Q. Did you understand there were challenges concerning inefficiencies in the global supply chain?

A. Yes.

Q. Did you understand that there were challenges relating to SG&A?

A. Yes.

Q. Did you understand there were inventory challenges?

A. Yes.

Q. Did you understand that the challenges

Page 351

were affecting Cordis's performance?

A. Yes.

Q. Did any of these challenges come as a surprise to you?

A. I don't believe so.

Q. Because they were previously disclosed; right?

A. Yes.

MR. JANOSKI: Objection. Assumes facts.

Q. So you knew that there were inefficiencies in the global supply chain before this; right?

A. Correct.

Q. And you knew there were SG&A challenges before this; right?

A. Yes.

Q. And you knew there were inventory challenges before this in February 2018; right?

A. Yes.

Q. And you knew that all these challenges were affecting Cordis's performance before February 2018; right?

A. Yes.

Page 352

Q. Did you have any view on what was causing all of these challenges?

A. I don't believe so.

Q. Did you ask any questions about the inventory or SG&A challenges discussed here?

A. I don't remember.

Q. Did you factor in these inventory or SG&A challenges into your own model of Cardinal?

A. I believe so.

Q. And did you update your model for the Cordis business at this time?

A. It's possible.

Q. Gomez says, "We have implemented robust remediation plans and we recognize it will take a little time to work through these items."

Do you see that?

A. What page is this on?

Q. Page 7 still. "The team is fully focused on these issues, and we have implemented robust remediation plans. We recognize it will take a little time to work through these items."

A. Yes. I see that.

Q. Did you understand that the company was taking measures to try and address Cordis's

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 353

challenges?

A. Yes.

Q. Did you understand it would take some time for the company to address those challenges?

A. Yes.

MR. JANOSKI: Objection. Lacks foundation.

Q. Did you understand that there was a risk that the company's remediation plans might not be successful?

MR. JANOSKI: Same objection.

A. Yes.

Q. Did you understand there was a risk that the challenges would persist and continue to affect Cordis's performance going forward?

A. Yes.

MR. JANOSKI: Same objection.

Q. Did you understand there was a risk that it might take longer than expected to resolve the challenges?

A. Yes.

Q. And did you understand there was a risk that the challenges could get worse before they got better?

Page 354

A. Yes.

Q. And because you understood these risks, that is why you updated your model?

A. Yes.

Q. And you updated your model to reflect less confidence in the Cordis acquisition; correct?

A. Partially. Yes.

Q. What does that mean?

A. That was a contributing factor in the reduced estimates.

Q. Okay. So you reduced whatever estimates were incorporated into your model for Cordis at this time?

A. I believe so.

Q. Okay. Let's go to your report, Exhibit 53. And Bates No. -8938 to -8940.

This is a report you wrote on February 8, 2018; right?

A. It is.

Q. And this is after that earnings call; right?

A. Correct.

Q. And on this day, you recommended to buy

Page 355

Cardinal Health stock.

Do you see that?

A. I do.

Q. And then on Page 2, if you go to the second bullet -- and I think this is the MO section; right?

A. It is.

Q. The momentum section. At the end of the second bullet, the bullet about MedSurge revenues, you say, "Further improvement should occur during the 2H."

What's that again?

A. Second half.

Q. "Second half and year end 2019 as exam glove issue is resolved and relatively new Cordis asset grows revenue to leverage expense base."

Do you see that?

A. I do.

Q. You updated your recommendation to buy at this time; right?

A. Yes.

Q. Why did you recommend buying Cardinal Health stock when there were all these issues with Cordis?

Page 356

A. Because, at the time, I thought the valuation was attractive and there was going to be double-digit earnings growth.

Q. And earlier we talked about your analysis that Cardinal Health stock price was undervalued in light of concerns about Amazon's entry into the market.

Do you remember that?

A. I do.

Q. Did you think that Cardinal Health's stock price was still undervalued at this time because of Amazon's entry into the marketplace?

A. It was still undervalued. Yes.

Q. And is that part of the reason you updated your recommendation to buy?

A. Yes.

Q. Okay. In the bullet that we just looked at, you called Cordis a "relatively new asset."

What does that mean?

A. It means it's a new asset compared to the history of Cardinal Health.

Q. So Cordis was unlike other -- other -- Cordis was -- the Cordis asset brought something

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 357

new and different to Cardinal Health than it had before; right?

A. Correct.

Q. It expanded its global presence; right?

A. Yes.

Q. It expanded its product portfolio; right?

A. Yes.

Q. And so the fact that Cordis, you know, brought all of these new aspects of the business to Cardinal Health meant that it was still too early to assess how it would do? I'm just trying to understand, you know.

A. Yes.

Q. This is -- they announce the acquisition in March 2015. So this is almost three years after that.

A. That's right.

Q. So how was it a relatively new asset? Can you just flesh that out to me?

A. Yes. I think looking -- compared to when Cardinal Health itself was established, that Cordis was relatively new compared to the main pharmaceutical distribution business.

Page 358

Q. Did you mean that there's a lot of unknowns about Cordis?

A. I don't think so.

Q. No? Okay. So you just meant it's relatively new in terms of how long the company has existed?

A. Yes.

Q. Or how long the medical segment has existed?

A. Either.

Q. You also said here, "And relatively new Cordis asset 'grows revenue to leverage expense base.'"

What does that mean?

A. So, at this point in time, I think Cordis was showing little revenue. But it was still supporting the costs associated with the asset. So if the business could show sales improvement, that would rapidly improve profitability on a fixed expense base.

Q. Okay. So -- so you were saying here that, you know, if Cordis improves its performance, this may be a good asset after all?

A. It would help the profitability of the

Page 359

company.

Q. Okay. I'm going to -- I'm just going to give you the next tabs. I'm going to pull them and ask more questions, but since we're kind of in a rush.

Okay. Did the company's statements about Cordis's inventory and SG&A challenges on this day impact how you were thinking about Cordis?

A. I don't remember.

Q. Would they have?

A. It's possible. Yes.

Q. Because I think you said you updated your model; right?

A. I did say that.

Q. But the updates on your model just weren't significant enough to dissuade you from updating your recommendation to a buy?

A. Well, so -- I'm sorry. Say that one more time.

Q. So you said you changed your model.

A. I did.

Q. And to reflect, I guess, lower confidence in Cordis.

But the updates to the model didn't dissuade

Page 360

you from updating your recommendation to buy on this date; correct?

A. It did not. And I was just going through to see what was written in terms of earnings estimates. So it looks as if earnings estimates actually increased, but due to a lower tax rate. No.

Q. So you updated your model to reflect less confidence in Cordis, but it ultimately didn't impact your recommendation because Cordis is less important to you than other parts of Cardinal's business in assessing Cardinal's financials; correct?

MR. JANOSKI: Objection. Lacks foundation.

A. The -- any changes related to the Cordis business were overwhelmed by changes in other parts of the business.

Q. Other parts of the business were more important to you in assessing Cardinal Health's financials, in assessing whether or not to buy or sell Cardinal Health's stock?

MR. JANOSKI: Vague as to time.

Q. At this time?

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 361

A. Yeah. Other parts of the business had a more significant impact than Cordis did.

Q. Okay. So now let's go to the SEIU purchases, so Exhibit 16. And let's go to Page 3. And if you look at -- what's the date we were just on? February 8, okay.

If you look at February 9th, you know, through May 1st, Boston Partners bought stock on several occasions; correct?

A. Correct.

Q. Did you have any conversations with Mr. Pollack about whether he should buy Cardinal Health stock at this time?

A. Not that I remember.

Q. Do you know why he decided to buy Cardinal Health stock at this time?

A. I don't.

Q. Did he agree with you that Cardinal Health stock price was depressed because investors were overly concerned about Amazon's entry into the marketplace?

MR. JANOSKI: Objection. Calls for speculation. Lacks foundation.

A. I don't know for sure.

Page 362

Q. Did you ever have any conversations with him about that?

A. We did.

Q. And what did he say?

A. I don't remember.

Q. Did he agree with you?

MR. JANOSKI: Objection. Lacks foundation.

A. It sounds like he was buying the stock. He was buying --

Q. So he agreed with you?

A. Yeah.

Q. And putting aside the cash inflow, outflow and restrictions issue --

A. Mm-hmm.

Q. -- every time Mr. Pollack purchased Cardinal Health stock on behalf of SEIU, between February 9th and May 1st, it was doing so for the other Boston Partners' clients in the mid cap portfolio?

A. I would expect so.

Q. You don't have any reason to believe that anyone at Boston Partners would have discussed these purchases with SEIU?

Page 363

A. Correct.

Q. And you don't have any reason to believe that SEIU had any input into these transactions?

A. Correct.

Q. And no reason to believe that SEIU directed the purchases; correct?

A. Correct.

MS. SADINSKY: Okay. I'm nearing the end. And I am going to mark -- which exhibit are we on?

MR. MARTIN: 54.

MS. SADINSKY: Here is Exhibit 54.

(Document Bates-stamped CAHSDOH2_19-cv-2491-00018674 through -8677 marked Exhibit 54.)

(Document Bates-stamped CAHSDOH2_19-cv-2491-00007767 and -7768 marked Exhibit 55.)

(Document Bates-stamped CAHSDOH2_19-cv-2491-00018710 through -8712 marked Exhibit 56.)

(Document Bates-stamped CAHSDOH2_19-cv-2491-00019159 and -9160

Page 364

marked Exhibit 57.)

(Document Bates-stamped CAHSDOH2_19-cv-2491-00010308 through -0310 marked Exhibit 58.)

BY MS. SADINSKY:

Q. Okay. I just marked as Exhibit 54 a document 18674 to 18677. This is Cardinal Health's earnings release on May 3, 2018; right?

A. Yes.

Q. And Page 1, in the middle of the page, it says, "Our non-GAAP operating earnings came in largely as expected this quarter. However, our non-GAAP EPS was adversely affected by a significant negative change in our effective tax rate primarily associated with our Cordis business."

Do you see that?

A. I do.

Q. Did you review this earnings release at the time?

A. Yes.

Q. Was this a surprise?

A. I don't remember. Probably.

Q. Okay. Did you factor in the earnings

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 365

miss into your own model of Cardinal?
  A.  Probably.
  Q.  Did this change your estimates or assessment of Cardinal?
  A.  Probably.
  Q.  What was your understanding of the reasons why Cordis adversely affected the company's effective tax rate?
  MR. JANOSKI:  Objection.  Lacks foundation.
  A.  I don't know why Cordis impacted the tax rate.
  Q.  Did you ask any questions?
  A.  I don't remember.
  Q.  Was it related to any of the Cordis challenges discussed previously?
  A.  I don't know.
  Q.  Do you know if it was related to the supply chain issues?
  A.  I don't know.
  Q.  Do you know if it was related to the SG&A issues?
  A.  I don't know.
  Q.  Was it related to the infrastructure

Page 366

issues?
  A.  I don't know.
  Q.  Do you -- was it related to the manufacturing issues?
  A.  I don't know.
  Q.  The TSA issues?
  A.  I don't know.
  Q.  The issues of partnership agreements?
  A.  I don't know.
  Q.  The inventory issues?
  A.  I don't know.
  Q.  Why didn't you ever ask about it?
  A.  I may have asked.  I don't remember.
  Q.  All of the issues I just discussed, supply chain issues, SG&A issues, infrastructure issues, manufacturing issues, TSA issues, issues with partnership agreements and issues with inventory writeoffs, you knew about all those challenges before this day; right?
  A.  Yes.
  MR. JANOSKI:  Objection.  Vague as to "each of these issues."
  Q.  And you don't know how any of those particular challenges contributed to this result;

Page 367

correct?
  A.  I don't know specifically.  No.
  Q.  And it's possible that none of these challenges did; right?
  MR. JANOSKI:  Objection.  Calls for speculation.
  A.  It's possible.
  Q.  And given what was said here, this impacted how you were thinking about the Cordis acquisition?
  A.  Probably.
  Q.  And it affected your assessment that Cordis would ever be accretive?
  A.  It's possible.
  Q.  And it affected your assessment of the likelihood that Cardinal would ever achieve synergies?
  A.  It's possible.
  Q.  If you go to Page 2, 8675, middle of the page under "Pharmaceutical."
  A.  Yes.
  Q.  "The third quarter revenue for the pharmaceutical segment increased 5 percent to 29.7 billion due to sales growth from

Page 368

pharmaceutical and specialty distribution customers.  This was partially offset by the previously announced expiration of a large mail order customer contract and the divestiture of the company's China distribution business.  Segment profit decreased by 3 percent to 596 million which reflects a modest negative impact from the company's generic program performance."
  Do you see that?
  A.  I do.
  Q.  Do you agree that, on March 3, 2018, the company announced challenges with the pharmaceutical segment?
  A.  Yes.
  Q.  What were those challenges?
  A.  It was the expiration of a mail order customer contract, divestiture of the company's China distribution business and then generic program performance.
  Q.  And would you agree that those challenges impacted Cardinal Health's results?
  A.  Yes.
  Q.  And it impacted Cardinal Health's stock

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 369

price?
    A.  Yes.
    Q.  And you would have factored these challenges with the pharmaceutical business into your own model of Cardinal Health?
    A.  Yes.
    Q.  And these pharmaceutical challenges would change your own estimates or assessment of Cardinal Health?
    A.  Yes.
    Q.  Okay.  Let's go to Exhibit 55.  And this is 00007767 to 7768.  You -- this is a Bank of America research report that you received on May 3, 2018; right?
    A.  Yes.
    Q.  And I want you to look at the first full paragraph on the first page of this report, the one that says "perfect storm of pressures."
    Do you see that?
    A.  Yes, I do.
    Q.  "Perfect storm of pressures drive expected fiscal year '19 shortfall.  The multitude of factors impacting Cardinal Health's outlook are creating an ongoing negative feedback

Page 370

loop for the stock that is hard to break."
    Do you see that?
    A.  I do.
    Q.  Do you recall receiving this report?
    A.  I don't.
    Q.  Is this something that you would have reviewed at the time?
    A.  Yes.
    Q.  What do you understand "multitude of factors" to mean?
    A.  More than one.
    Q.  Do you understand that to mean not just Cordis, but other issues, too?
    A.  Yes.
    Q.  And issues with the pharmaceutical segment?
    A.  Yes.
    Q.  So issues with the pharmaceutical segment were impacting the company's stock price at this time?
    A.  Yes.
        MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.
    Q.  And this was widely known among the

Page 371

investment analyst community?
        MR. JANOSKI:  Objection.  Calls for speculation.
    A.  Yes.
    Q.  And what do you understand the analyst here to be referring to when they say "an ongoing negative feedback loop for the stock"?
    A.  There is repeated bad news coming from the company in terms of guidance and results.  And that's going to make it difficult -- it hasn't stopped.
        (Discussion off the record.)
    Q.  And those ongoing negative results were related to both pharmaceutical segment and the medical segment?
    A.  Yes.
    Q.  Do you agree with this assessment?
    A.  Yes.
    Q.  It also says, the title here, "Perfect Storm of Pressures Drive Expected Fiscal Year '19 Shortfall."
    What does that mean?
    A.  I don't know for sure.  But it implies the earnings in fiscal year 2019 will be lower

Page 372

than expected.
    Q.  Okay.  Let's go to the Cardinal Health stock prices, which is Exhibit 17.  And if you go to Page 1, just the top two rows there, it shows, on May 2nd, the price closed at 56.54, and on May 3, the price opened at 47.12.
    A.  Sorry.
    Q.  Page 1.
    A.  Yup.
    Q.  Is that accurate?
    A.  That's correct.
    Q.  So the stock price fell; right?
    A.  Yes, it did.
    Q.  After the earnings announcement.  Okay.  Do you know why?
        MR. JANOSKI:  Objection.  Calls for speculation.
    A.  The earnings release.
    Q.  Would you agree the market was concerned about Cordis?
    A.  Yes.
    Q.  Would you agree the market was concerned about the loss of a large customer?
    A.  Yes.

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 373

Q. Would you agree the market was concerned about the divestiture of the China distribution business?

MR. JANOSKI: Objection. Calls for speculation.

A. Somewhat.

Q. Would you agree the market was concerned about continued generics deflation?

MR. JANOSKI: Same objection.

A. Yes.

Q. Would you agree that -- sorry.

Were there other factors that contributed to the price decline?

A. I think those were the main ones.

Q. So all of those factors contributed to the price decline?

A. Yes.

Q. Not just one factor?

A. Correct.

Q. A combination of all?

A. Yes.

Q. Okay. Exhibit 56, please, 18710 to 18712.

This is an analyst report that you wrote;

Page 374

correct?

A. That's right.

Q. And it's dated May 10, 2018; correct?

A. Correct.

Q. So it's after this May 3, 2018 disclosure; correct?

A. Correct.

Q. And you recommend to hold Cardinal Health stock; right?

A. Yes.

Q. Why?

A. Given the valuation.

Q. Why didn't the challenges with Cordis lead you to change your recommendation?

A. I thought it was already reflected in the price of the stock.

Q. And the Cordis -- but -- okay.

It was already reflected in the price of the stock?

A. Correct.

Q. And -- but did you think that the Cordis challenges would continue?

A. It was possible.

Q. And why didn't that change you to

Page 375

cause -- why didn't that change you -- why didn't that cause you to change your recommendation?

A. Because it may have already been reflected and kind of written off, if you will, where it wasn't expected to get better. So it's already reflected in estimates.

Q. Okay. At this point in time, did you still put less weight on Cordis than other parts of the business in assessing Cardinal Health's financials?

A. Specifically?

Q. Specifically.

A. Yeah.

Q. And did you -- do you still understand, at this time, that investors also put less weight on Cordis specifically in assessing Cardinal Health's financials?

A. It's possible.

Q. So you recommended holding Cardinal Health's stock at this time; right?

A. Mm-hmm.

Q. As a fiduciary, would you recommend holding stock in a company that you believed committed securities fraud?

Page 376

A. No.

Q. And as a fiduciary, would you recommend holding stock in a company where you believe the executives committed securities fraud?

A. No.

Q. So when you learned of the earnings announcement and this tax rate issue in May 2018, did you conclude that Cardinal Health or its executives had committed securities fraud?

MR. JANOSKI: Objection. Lacks foundation. Calls for a legal conclusion.

A. No.

Q. Did you conclude that Cardinal Health or its executives had previously made material misrepresentations about the Cordis acquisition?

MR. JANOSKI: Same objections.

A. I don't believe so.

Q. And I think you said this, but just to make sure the record is clear. Would you recommend that Boston Partners continue to hold Cardinal Health stock if you believed Cardinal Health or its executives had committed securities fraud?

A. No.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 377

Q.   Did you hear anyone else at Boston Partners express the view that Cardinal Health or its executives had committed securities fraud?

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for a legal conclusion.

A.   No.

Q.   Did you or anyone else at Boston Partners discuss the May 3, 2018, announcement with SEIU?

A.   I don't believe so.

Q.   Did you?

A.   No.

Q.   Did anyone at SEIU express the view that Cardinal Health or its executives had committed securities fraud?

MR. JANOSKI:  Objection.  Calls for a legal conclusion.  Lacks foundation.

A.   No.

Q.   Okay.  If we go to SEIU sales again, which is Exhibit 16, if you look at the last -- the last page, where it says "May 3rd"?

A.   Yeah.

Q.   Boston Partners sold Cardinal Health stock on May 3rd; right?

Page 378

A.   Yes.

Q.   And that was the day of the announcement; right?

A.   Right.

Q.   Did you have any conversations with Mr. Pollack about whether he should sell Cardinal Health stock?

A.   I don't remember.

Q.   Do you know why he sold Cardinal Health stock?

A.   My guess it was the earnings release.

Q.   And you recommended he hold the stock; right?

A.   I did.

Q.   Do you know whether Mr. Pollack discussed his decision or discussed whether to sell Cardinal Health stock with SEIU?

A.   I don't know.

Q.   Would it surprise you if he did?

A.   Yes.

Q.   It was not common for him to do so?

A.   I don't believe so.

Q.   Do you have any reason to believe that SEIU had input into this decision to sell?

Page 379

A.   No.

Q.   Any reason to believe that SEIU directed it?

A.   No.

Q.   Okay.  Same page.  If you go to May 15th.  That's a week and a half later.

A.   Yeah.

Q.   Boston Partners bought Cardinal Health stock on behalf of SEIU.  Do you see that?

A.   I do.

Q.   Did you have any conversations with Mr. Pollack about whether he should buy Cardinal Health stock?

A.   I don't know.

Q.   Do you know why he decided to buy?

A.   I don't know.

Q.   Maybe potentially related to Amazon?

MR. JANOSKI:  Objection.  Calls for speculation.

A.   I don't know.

Q.   You don't remember at all?

A.   I don't remember.

Q.   Do you know whether -- putting aside

Page 380

the cash flow, inflow, outflow thing, Boston Partners would have also bought Cardinal Health stock on behalf of its other clients in the mid cap portfolio at this time; correct?

A.   Yes.

Q.   And Boston Partners would not have purchased stock for its clients if it believed that the company whose stock it was purchasing committed securities fraud?

A.   Correct.

Q.   And Boston Partners would not purchase stock for its clients if it believed the stock of -- believed the executives of that company committed securities fraud; right?

A.   Correct.

Q.   You have a fiduciary obligation not to invest in dishonest companies; correct?

A.   Correct.

Q.   Did you discuss this purchase with anyone at SEIU?

A.   No.

Q.   Did you have any reason to believe SEIU had input into this decision?

A.   No.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 381

Q.   Okay.  Earlier we discussed other --
and I'm almost done, I promise.
Earlier we discussed other recent
acquisitions of Cardinal.
Do you remember that?
A.   Yes.
Q.   Medtronic?
A.   Yup.
Q.   Harvard Drug?
A.   Yes.
Q.   Metro Medical?
A.   Yes.
Q.   NaviHealth?
A.   Yes.
Q.   Did the Cordis challenges disclosed on
May 3, 2018 affect your view of whether Cardinal
Health would be able to successfully integrate
those acquisitions?
A.   It's possible.
Q.   What do you mean by that?
A.   If this same management team has had
troubles integrating one acquisition, it speaks
to a track record potentially of being able to
integrate additional acquisitions.

Page 382

Q.   Do you remember having concerns about
Cardinal Health's ability to integrate its
acquisition -- other acquisitions at this time?
A.   I can't remember at that time.
Q.   Do you remember ever having concerns
about Cardinal Health's ability to integrate its
recent acquisitions?
A.   Yes.
Q.   Do you remember how those concerns came
about?
A.   I think it was going through these
series of announcements from management that
highlighted the challenges they were having
integrating the acquisitions.
Q.   So if you look at the same document,
the sales of Cardinal Health stock -- I forget
what exhibit this is.  I can't remember.
Exhibit 16 -- it shows that Boston Partners, you
know, sold its Cardinal Health stock in
June 2018.
You see that; right?
A.   I do.
Q.   Is it possible that Boston Partners
closed out of its position in Cardinal Health

Page 383

because -- because it believed that -- because of
concerns about Cardinal Health's ability to
integrate its other recent acquisitions?
MR. JANOSKI:  Objection.  Calls for
speculation.
A.   It's possible.
Q.   Did you ever have a conversation with
anyone about that?
A.   I don't remember.
Q.   Would it -- would that be something
that you would talk about?
A.   Yes.  It's possible.
Q.   Would you discuss a decision to close
out of your position in a company with
Mr. Pollack?
A.   It's possible.
Q.   Is it likely?
A.   It depends.
Q.   Do you remember when Boston Partners
closed out of its position in Cardinal?
A.   I don't.
Q.   Do you remember that Boston Partners
did close out of its position in Cardinal?
A.   I don't.

Page 384

Q.   Let's go to Exhibit 57.
MR. JANOSKI:  Counsel, is this going to
be your last exhibit?  If we're going to take a
break, I'm going to need some time.
MS. SADINSKY:  I have one more.  Just
one, I promise.
Q.   What is this?  What is this report?
A.   56?  What are we looking at?
Q.   57.
A.   This is the new and closed positions
report for SEIU Health Care.
Q.   What is -- this is a report of?
A.   Holdings for the SEIU Health Care
account that were opened or closed in the second
quarter of 2018.
Q.   Do you help prepare this report?
A.   I do not.
Q.   Who prepares this report?
A.   I don't know.
Q.   Do you have input into this?
A.   I do not.
Q.   If Cardinal Health is listed on here --
actually, let's go to Page 2, ending in -19160.
A.   Yeah.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 385

Q. Do you see Cardinal Health listed there?

A. Yes.

Q. And it says, "Trade date, 6/29/2018."

A. I do.

Q. And it says, "Sold position, as disappointing results from its medical products/distribution segment puts into question its recent acquisitions in this division."

Do you see that?

A. I do.

Q. Does this refresh your recollection that Boston Partners closed out its position in Cardinal Health because of concerns about Cardinal Health's ability to integrate recent acquisitions?

A. It does.

Q. What does the phrase "recent acquisitions" mean to you?

A. Acquisitions in recent history. So in the last few years.

Q. Does it mean two or more acquisitions?

A. It's -- yes.

Q. So it's not just Cordis, but Cordis and

Page 386

something else?

A. I believe so.

Q. Do you remember having concerns about the Medtronic acquisition?

A. I don't remember.

Q. What does the phrase "puts into question" mean to you?

A. Its ability to show a positive return.

Q. So -- so it puts into question the likelihood of positive performance from those acquisitions?

A. Yes.

Q. So this is about whether the acquisitions would perform and generate positive returns to the company in the future; correct?

MR. JANOSKI: Objection. Lacks foundation.

A. I believe so.

Q. Nothing here references securities fraud; right?

A. No.

Q. Boston Partners did not close out of its position due to any belief that Cardinal Health or its executives committed securities

Page 387

fraud; right?

A. I don't believe so.

Q. You don't believe so?

A. No.

Q. "Yes" or "no"?

A. No.

Q. Did anyone at Boston Partners have any discussion with SEIU about whether Boston Partners should close out of the Cardinal position?

A. I don't know.

Q. Would it surprise you if they did?

A. Yes.

Q. Do you know whether SEIU ever told anyone at Boston Partners that Cardinal Health or its executives committed securities fraud?

A. I don't know.

Q. Do you know whether SEIU would have directed Boston Partners to close out of its position in Cardinal Health?

A. I don't think so.

Q. Okay. Last exhibit. Exhibit 58.

Okay. This is an analyst report written by Andy Hatem and dated October 1, 2018; correct?

Page 388

A. Yes.

Q. And you received this; correct?

A. Correct.

Q. And he recommends to hold Cardinal Health stock; right?

A. That's correct.

Q. Why would he recommend to hold Cardinal Health stock after Boston Partners had closed out of its positions in Cardinal Health?

A. He's looking at a valuation level. Hold is also a euphemism for "pass." Like there's no -- you don't buy it. It's not worth selling, because we don't hold it. We're not going to short it.

So hold is kind of like -- can also be don't do anything with this stock if you don't hold it already.

Q. Do you continue to evaluate companies after you close out of your position in them?

A. We can. Yes.

Q. Do you continue to evaluate Cardinal Health today?

A. Not specifically. No.

Q. Why?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 389

A. It's not my role right now.

Q. Sorry. Let me rephrase.

Does someone at Boston Partners continue to evaluate Cardinal Health today?

A. Yes.

Q. And do you receive reports on Cardinal Health today?

A. If the research is being done on it, yes.

Q. And do you know if there's still quarterly reports done?

A. I don't think there are.

Q. So it would be a less -- it would be like a periodic analysis. I think earlier you said, if you have a position in a company, there's a quarterly analysis -- a quarterly report, and if not, there's a less frequent report, but still some analysis?

A. That's correct.

Q. Let's go to Pages 2 to 3, 10309 to 10310, and I want to focus on the bullet, the last bullet, "Poor M&A track record."

Do you see that?

A. I do.

Page 390

Q. "Poor M&A track record. Cardinal's last seven deals cost 13.5 billion with ROI that has been poor."

What is ROI?

A. Return on investment.

Q. Skipping ahead. "Going back, they spent 470 million on Yong Yu, a Chinese distributor, in attempt to enter the market despite the government saying they only wanted Chinese drug distributors to own the market."

Do you see that?

A. I do.

Q. So Cardinal Health's acquisition of Yong Yu did not go well?

A. No.

Q. Do you remember that?

A. I don't specifically.

Q. Have you heard of Yong Yu?

A. They -- there's a reference to the Chinese distribution business earlier.

Q. And so you knew that Cardinal Health's acquisition of a Chinese distribution business had not gone as planned?

A. Yes.

Page 391

Q. Skipping ahead. "In December 10th, they paid 1.3 billion for Kinray, a move that bolstered distribution to New York-based independent pharmacies. The deal was a good one, but there's few drug distribution assets left to buy. In February '13 they spent 2.1 billion to buy AssuraMed, which delivers medical products to the home. Deal looks expensive and it's unclear how much it has grown."

Do you recall Cardinal Health buying AssuraMed?

A. Not specifically.

Q. Do you know what AssuraMed is?

A. Yes.

Q. Do you remember some concerns about the price of the acquisition?

A. I don't remember.

Q. Then it says, "1.2 billion buy of Harvard Drug Group in 2015 brought a good asset. Yet, was pricey, given it was one of the last assets remaining."

Do you see that?

A. I do.

Q. And we saw Harvard Drug referenced in

Page 392

your reports as well; right?

A. Correct.

Q. And did you also believe that, you know, Cardinal Health overpaid for Harvard Drug?

A. I don't remember.

Q. Do you remember ever discussing that?

A. I don't remember.

Q. Okay. "In December '15, they bought a stake in NaviHealth."

Do you see that?

A. I do.

Q. "It was expensive, likely in an area they do not know and they sold it."

Do you see that?

A. I do.

Q. Do you recall when Cardinal Health purchased NaviHealth?

A. I don't.

Q. We saw that in your reports from earlier; right?

A. Yes.

Q. Then they sold it; right?

A. Correct.

Q. And then they purchased Cordis. We

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 393

discussed that.

So, finally, "Their 2 billion buy of Cordis and 6.1 billion buy of Medtronic have gone poorly."

Do you see that?

A. I do.

Q. Medtronic is one of their other recent acquisitions; right?

A. Correct.

Q. In the medical business; right?

A. Yes.

Q. And then, at the end, it says, "M&A is not its strength here."

Do you see that?

A. I do.

Q. This report discusses concerns about Cardinal Health's M&A track record and integrations or acquisitions that have gone poorly.

Do you see that?

A. I do.

Q. It references Yong Yu, Kinray, AssuraMed, Harvard Drug, NaviHealth, Cordis and Medtronic; right?

Page 394

A. Correct.

Q. Recognizing that this report was written months later, I think this is October 2018, were these same concerns about Cardinal Health's M&A track record and ability to integrate acquisitions also present in May 2018?

MR. JANOSKI: Objection. Lacks foundation.

Q. "Yes" or "no"?

A. I'm sorry. Repeat the last part.

Q. Were the same concerns about Cardinal Health's M&A track record also present in May 2018?

MR. JANOSKI: Again, objection. Lacks foundation.

A. Yes.

Q. And those concerns, you know, played a part in Boston Partners' decision to close out of its position in Cardinal?

A. I believe so.

Q. And were you concerned about Cardinal Health's ability to execute on its recent acquisitions in May 2018?

A. Yes.

Page 395

Q. And in your experience as an investment analyst, would you believe that other investors were also concerned about Cardinal Health's ability to execute on its recent acquisitions in May 2018?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

A. It's possible.

Q. Do you think it was likely or not likely?

A. Likely.

MR. JANOSKI: Same objection.

Q. And that contributed to Boston Partners' decision to close out of Cardinal Health; right?

A. Yeah. Just to clarify, it may have been held in other products, but it was why mid cap sold out of the strategy or sold out of the position.

Q. Okay. Boston Partners currently does not hold Cardinal Health shares; right?

A. I don't know if it's held in any strategy.

Q. Is it held in the large cap strategy?

Page 396

A. I don't believe so. No.

Q. Do you know if it's held in the mid cap strategy?

A. I don't know.

Q. I'll represent to you, or we can look at transaction history if you want, that there's nothing in there to indicate that it's currently held today.

Would Boston Partners ever add Cardinal Health back?

A. It's possible. Yes.

Q. And that's why they continue to follow it?

A. Yes.

Q. And would they have continued -- okay. Three quick questions, and then I'll be done.

When is the first time you became aware of this litigation?

A. A month ago.

Q. In connection with this deposition?

A. Correct.

Q. Have you ever reviewed the Amended Complaint?

A. No.

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 397

Q. Have you ever spoken about the allegations in the Amended Complaint?

A. No.

Q. Have you ever seen the Amended Complaint?

A. No.

Q. Has anyone ever given you the Amended Complaint?

A. No.

Q. Have you ever performed any analysis of the allegations relating to the complaint in this lawsuit?

A. No.

Q. Are you aware of anyone else at Boston Partners who has done so?

A. No.

Q. Have you ever discussed the lawsuit with anyone prior to learning that you were being deposed?

A. No.

Q. Has there ever been a point in time where you believe that Cardinal Health or its executives committed securities fraud?

A. No.

Page 398

Q. Has there ever been a point in time where you believe that Cardinal Health or its executives were dishonest?

A. No.

Q. And as a fiduciary, would you have recommended holding Cardinal Health stock in May 2018 or buying Cardinal Health stock in August 2017 if you believed Cardinal Health or its executives committed securities fraud?

A. No.

Q. The truth is you don't believe that Cardinal Health or its executives ever committed securities fraud?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation, and for a legal conclusion.

A. Yes.

MS. SADINSKY: Thank you.

THE WITNESS: Thank you.

MS. SADINSKY: We can go off the record.

THE VIDEOGRAPHER: The time is 3:20 p.m. We're off the record.

(A recess was taken.)

Page 399

THE VIDEOGRAPHER: The time is 3:27 p.m. We're on the record.

CROSS-EXAMINATION

BY MR. JANOSKI:

Q. Good afternoon, Ms. McGirr. Again, I'm Janoski. I'm here on behalf of 1199SEIU and the other Cardinal Health investors.

I have a few questions. I'd like to just follow up on some issues that defense counsel went into, but I'll try to be quick and get us out of here.

First, in the time that you and Boston Partners researched and transacted in Cardinal Health securities, did you ever come into possession of material nonpublic information about the company?

A. I don't believe so.

Q. Okay. Is it fair to say that Boston Partners' research was based on material that was in the public domain?

A. Yes.

Q. And I believe you said this earlier, I don't want to mischaracterize your testimony, I think you said that all of the inputs into the

Page 400

Cardinal model would have been based on publicly available information?

A. Yes.

Q. Okay. You never had access to Cardinal Health's emails or internal documents; right?

A. Correct.

Q. All right. Throughout the day, you were also asked about various calls and meetings you had with Cardinal Health management.

Do you remember those questions, generally?

A. Yes.

Q. And would any material nonpublic information have been discussed at those meetings?

A. No.

Q. That's because of Reg FD; right?

A. Correct.

Q. Can you just explain what Reg FD is generally?

A. If a management team -- if an investor is in possession of material nonpublic information, the investment -- anybody possessing that information is not allowed to trade the stock, and it needs to get disclosed to counsel.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 401

Q. So it's fair to say that management would have been prohibited from discussing that type of nonpublic information with you at these meetings; right?

A. Correct.

Q. And at various times throughout the day, you were also shown different documents related to Cardinal Health's public statements regarding the performance, integration, and status of Cordis.

Do you recall those generally?

A. I do.

Q. And is it fair to say that, sitting here today, you don't have any basis to know, one way or the other, whether the company's public statements were true or not?

A. That's correct.

Q. Okay. Because you didn't have access to the data that they had when they were making those statements; right?

A. That's correct.

Q. You just relied on what they said to the market; essentially; right?

A. Yes.

Page 402

Q. And given the information asymmetry that exists in the marketplace, analysts like yourself and others in the market generally have to take a company at their word; right?

MS. SADINSKY: Objection. Speculation.

A. Yes.

MS. SADINSKY: Vague.

Q. So you don't know whether Cardinal and its executives were making timely or false disclosures about the status of the Cordis integration; right?

A. That's correct.

Q. And various times today, defense counsel asked you about various risks that the company was facing with respect to the Cordis integration.

Do you remember that?

A. I do.

Q. Okay. Some of those risks include increased SG&A; right?

A. Yeah.

Q. The FX exposure; right?

A. Correct.

Q. Okay. But, again, none of those risks

Page 403

really account for the fact of whether the company is making timely and fulsome disclosures; right?

A. That's correct.

Q. And, again, I'm not trying to put words in your mouth, but I believe that you said that it was possible that Cardinal had lied to investors. You just didn't know?

MS. SADINSKY: Objection. Misstatements the record. Misstates the testimony.

MR. JANOSKI: And if it helps, could the court reporter read back Page 305, Lines 4 through 9, if you have access to it?

THE COURT REPORTER: Okay. You're going to have to tell me again.

Q. Well, do you recall the testimony that you gave where you said because of the ongoing disclosures and issues going with the Cordis integration, you believed that either the management didn't know the extent of the problems or they chose not to communicate them?

A. Yes, I do.

Q. Okay. And you don't know which one of

Page 404

those it was; right?

A. That's correct.

Q. Now, throughout the day, you were also shown various sell-side analyst reports discussing Cardinal Health; right?

A. Yes.

Q. And part of your job would be to receive and review these sell-side analyst reports for Cardinal and the other companies you covered; right?

A. Yes.

MR. JANOSKI: Okay. I'm going to mark as Plaintiff's Exhibit 1, and for the record, when I say "BP Bates Number," I'm referring to the Bates prefix of BP_CAH-SDOH2_19-cv-2491, and because that's a mouthful, I will say Plaintiff's Exhibit 1 --

THE WITNESS: Thank you.

MR. JANOSKI: -- has a Bates range of BP Bates -00153050 through -052.

(Document Bates-stamped CAHSDOH2_19-cv-2491-00153050 through -3052 marked Exhibit P1.)

MS. SADINSKY: Thanks.

LA Sheriff's Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
April 26, 2022
Stephanie McGirr

Page 405

BY MR. JANOSKI:

Q. So Plaintiff's Exhibit 1 is an analyst report that you received via email on March 2nd, 2015; correct?

A. That's correct.

Q. And this is the type of email that you would receive and review in the ordinary course of business; right?

A. Correct.

Q. And do you recall, generally, we spoke earlier in the day, that in March of 2015, Cardinal announced that it would be acquiring Cordis from Johnson & Johnson?

A. Yes.

Q. And at least this analyst right here viewed the deal as a significant positive; right?

A. Yes.

Q. And I think this analyst cites the 20 cents of accretion to earnings per share that was discussed earlier today as well?

A. Yes.

Q. And it's true that, at this point in time, Boston Partners viewed the deal as a positive; right?

Page 406

MS. SADINSKY: Objection.

A. This -- you know, I have to go back and look. Again, I was on maternity leave during this, in March of 2015.

Q. Why don't we go to --

A. It feels like a long time ago.

Q. I know. I understand. It's hard to do all this from memory.

If you could just pull Defendant's Exhibit 21, which is BP Bates 001 --

A. Yes.

Q. -- 52082 --

A. Got it.

Q. -- through 084.

A. Yes.

Q. And, again, this is an internal analyst note that you received from Jessica Ballis; right?

A. That's correct.

Q. And these type of internal analyst notes are documents that were authored and maintained in the ordinary course of business of Boston Partners; right?

A. Yes.

Page 407

Q. And if you go to the first bullet point under conclusion down there, it's written here that, "The closing of the Cordis acquisition will enhance the growth and profit profile of the medical unit"; correct?

A. That's correct.

Q. Okay. That would be a positive --

A. Yes.

Q. -- for the company generally; right?

And do you recall, just throughout the day, there were several -- there was discussion about various statements that the company made about the Cordis integration being on track or on plan or turning around?

Do you remember that generally?

A. I do.

Q. And I believe you said that those statements factored into your model of Cardinal Health; right?

A. Yes.

Q. And that would be because the company's ability to integrate an acquisition would bear on its future earning results; right?

A. Yes.

Page 408

Q. And, again, as you sit here today, you have no way to know, one way or the other, whether the company's statements were truthful or fulsome at that point in time; right?

A. Yes.

(Document Bates-stamped CAHSDOH2_19-cv-2491-00160399 through -0400 marked Exhibit P2.)

MR. JANOSKI: I'm going to mark as Plaintiff's Exhibit 2 document bearing BP Bates 00160399 through 400.

Q. Plaintiff's Exhibit 2 is an analyst report emailed to you on August 2, 2016; correct?

A. That's correct.

Q. Okay. And, again, this is the type of email that you would receive and review in the ordinary course of business?

A. Correct.

Q. And these type of sell-side analyst reports were relevant to your investment thesis of Cardinal Health?

A. Yes.

Q. Okay. And, again, if you look at the -- under the key points, it looks look --

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 409

well, first, at the top, it looks like this analyst report is summarizing Cardinal Health's August 2, 2016 conference call; right?

A. Yes.

Q. And do you recall, earlier in the day, that was the conference call where certain headwinds with SG&A expense were disclosed?

A. Yes.

Q. Okay. But under the key points here, this analyst is relaying the message that the Cordis integration appears on track; right?

A. Yes.

Q. And if you look a couple of sentences down, he also relays that, "Given the strong performance of the medical segment, we believe investor skepticism regarding Cordis has eased somewhat."

Do you see that?

A. Yes.

Q. Is it fair to say that those type of statements from Cardinal management, that the integration was on track or on plan, served to ease investor sentiment, generally, about any concerns about Cordis?

Page 410

A. Yes.

THE VIDEOGRAPHER: Counsel, your microphone fell off.

MR. JANOSKI: I'm going to be marking Plaintiff's Exhibit 3.

(Document Bates-stamped CAHSDOH2_19-cv-2491-00008544 through -8545 marked Exhibit P3.)

BY MR. JANOSKI:

Q. Plaintiff's Exhibit 3 bears a Bates range of BP Bates 00008544 through 8545.

THE WITNESS: Thank you.

MS. SADINSKY: Thank you.

BY MR. JANOSKI:

Q. And Plaintiff's Exhibit 3 is an analyst report that was emailed to you on March 12, 2018; correct?

A. Yes.

Q. And, again, this is a type of analyst report that you would receive and review in the ordinary course of business?

A. Correct.

Q. And this type of analyst report would be relevant to your investment thesis in Cardinal

Page 411

Health?

A. Yes.

Q. Okay. And it looks like this particular account analyst report is describing statements from Cardinal management at a Cohen health care conference?

A. That's correct.

Q. And, again, at this point in March of 2018, I think defense counsel had already discussed with you that there were several disclosures made in the market about the Cordis headwinds; right?

A. Yes.

Q. At this point in time, Cordis had already announced increased SG&A expense.

Do you remember that.

A. I do.

Q. Some of the FX issues?

A. Yes.

Q. And some inventory issues as well?

A. That's correct.

Q. Okay. But at least at this point in time, in March of 2018, this analyst is relaying a positive sentiment from management; right?

Page 412

A. Yes.

Q. Okay. And at least in the third sentence here, that they are relaying the message that the turnaround in Cordis seems on track; right?

A. Correct.

Q. And if you look at the second page of this analyst report, Bates ending 545, it has a whole heading talking about the turnaround in Cordis appearing on track; right?

A. That's correct.

Q. And this is only two months before Cardinal Health announced the big earnings miss caused by Cordis issues; right?

MS. SADINSKY: Objection.

A. That's correct.

Q. Do you recall that you had gone through some documents that, in May of 2018, the company announced major earnings revisions?

A. It announced, yes, with Cordis being a component of that.

Q. Yes.

A. Yes.

Q. Okay. And do you generally recall the

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 413

market reaction to that news?  You were shown one analyst report.  But do you remember the general market sentiment to that news?

A.  I do.  I believe we saw the price decline --

Q.  Yeah.

A.  -- cited as well, yes.

Q.  Okay.  And, again, I think you saw one analyst report that attributed it to a variety of factors.

But do you recall other analysts pitting the blame more on Cordis than the others?

A.  I don't.

Q.  Okay.

MR. JANOSKI:  I'm going to be marking Plaintiff's Exhibit 4 and 5.

(Document Bates-stamped CAHSDOH2_19-cv-2491-00158492 through -8497 marked Exhibit P4.)

(Document Bates-stamped CAHSDOH2_19-cv-2491-00007662 through -7749 marked Exhibit P5.)

MR. JANOSKI:  So for the record, Plaintiff's Exhibit 4 has BP Bates range of

Page 414

00158492 through 496.  And Plaintiff's Exhibit 5 has BP Bates range of 00007796 -- I'm sorry.  I read that wrong.  Bates range of 00007662 through -749.

Q.  Turning first to Plaintiff's Exhibit 5. This is an analyst report that was emailed from RW Baird to Todd Hawthorne on May 3, 2018; correct?

A.  Yes.

Q.  Who is Todd Hawthorne?

A.  He was a portfolio manager at Boston Partners at that time.

Q.  Okay.  He had a similar job to what you did?

A.  He ran a different product, but it was the same -- yes.

Q.  And you would receive these RW Baird analyst reports as well; right?

A.  Yes.

Q.  And if you look at Plaintiff's Exhibit 5, which is the larger email, that's these RW Baird analyst reports getting emailed to you the following day?

A.  That's correct.  Yup.

Page 415

Q.  And if you look at the tab on Plaintiff's Exhibit 5, which is Bates ending 681, that shows the same analyst report there, right, that you received?

A.  That's correct.  Yup.

Q.  So you can use either one, whichever is easier to use.  I'm going to use Exhibit 4 just because it's smaller.

A.  Okay.

Q.  And more manageable.  But this is an analyst reaction to that March 2018 earnings announcement that Cardinal discussed; right?

A.  Yes.

Q.  And this particular analyst is highlighting Cordis as being the main driver of the disappointing results, is it not?

A.  Yes.

Q.  It's -- it looks like this analyst lowered their price target as well?

A.  Yes.  That's correct.

Q.  It had previously had a price target of $80, but following this news, it lowered it to 57; right?

A.  That's right.

Page 416

Q.  And I guess the title of this is called "Time to Cut the Cord."  That's generally a reference to Cordis; correct?

A.  Correct.

Q.  And the kind of ongoing issues that have been plaguing the company; right?

A.  Yes.

Q.  And if you look at that, under the medical bullet point, the first bullet point there --

A.  Yes.

Q.  -- says that "CAH consistently overestimates medical margin and performance." Do you see that?

A.  I do.

Q.  Do you agree with that statement, based on your time covering the company?

A.  They -- yes.  They had overestimated within the medical segment.

Q.  Okay.  The next sentence describes Cordis as an unmitigated disaster. Do you see that?

A.  I do.

Q.  Did you share that sentiment?

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 417

A.  It did not go well.

Q.  Now, here -- why don't we look at another one as well.

I'm handing you what's being marked at Plaintiff's Exhibit 6.

(Document Bates-stamped CAHSDOH2_19-cv-2491-00007796 and -7797 marked Exhibit P6.)

BY MR. JANOSKI:

Q.  For the record, Plaintiff's Exhibit 6 bears Bates range BP Bates 00007796 through 797.

And this is an analyst report from Raymond James that you received on May 3, 2018; right?

A.  Yes.

Q.  And, again, this is an email that you would have received and reviewed in the ordinary course of business?

A.  Yes.

Q.  And it would have helped form the basis of your investment thesis in Cardinal?

A.  Yes.

Q.  And this particular analyst is, again, calling out Cordis as the main driver of the disappointment; right?

Page 418

A.  Yes.

Q.  It's titled "Cordis Drives Disappointment"; right?

A.  It is.

Q.  And if you look at the last bulleted section on fiscal year '18 EPS guidance.

Do you see that?

A.  I do.

Q.  Do you see where it says, "The main driver called out was performance of Cordis"?

A.  I do.

Q.  And, again, defense counsel showed you one analyst report that famed -- that blamed a variety of factors for this particular earnings miss; right?

A.  That's correct.

Q.  But at least with these last two analyst reports, these analysts appear to be singling out Cordis as the primary driver for the May 2018 earnings disappointment?

A.  That's correct.

Q.  And isn't it true that Boston Partners also attributed that poor performance of Cardinal Health primarily to Cordis?

Page 419

MS. SADINSKY:  Objection.

A.  No.  Not necessarily.

(Document Bates-stamped CAHSDOH2_19-cv-2491-00155828 through -5829 marked Exhibit P7.)

BY MR. JANOSKI:

Q.  I'm handing you what's been marked as Plaintiff's Exhibit 7.

A.  Okay.

Q.  For the record, Plaintiff's Exhibit 7 bears Bates range of BP Bates 00155828 through 829.

Now, this is an email string where you sent and received email messages.  The topmost email being of July 17, 2018; right?

A.  That's correct.

Q.  And these are emails that you would have sent and received in the ordinary course of business; right?

A.  Correct.

Q.  If you look at the, I guess the origination email, the very first email string in time from Steve Pollack, do you see that at the bottom of Page 1?

Page 420

A.  I do.  Mm-hmm.

Q.  Again, Steve Pollack, could you remind me what his position was at this point in time?

A.  He's the mid cap portfolio manager.

Q.  So he was the one ultimately responsible for the buy/sell decisions?

A.  That's correct.

Q.  And he's describing this quarter, I guess Q2 of 2018, as being a challenging quarter; right?

A.  Yes.

Q.  And it looks like he's emailing all the analysts covering different industries to give a brief explanation for the stock selection drag.

A.  That's correct.

Q.  Right?  And it looks like, for you, he assigns drug distributers and insurance stocks; right?

A.  That's correct.

Q.  And the first item you highlight for the poor Q2 2018 performance was the weak Cardinal Health results on excess inventory in MedSurge segment; right?

A.  That's right.

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 421

Q. And when he follows up and asks, you clarify that that MedSurge segment was Cordis; right?

A. That's correct.

Q. So you individually identified Cordis as the main drag on the Cardinal Health stock for Q2 2018?

MS. SADINSKY: Objection.

A. Yes.

Q. Okay. Right. And that -- you identified that as one of the primary drags overall in the portfolio for this quarter as well?

A. That's correct.

Q. Right?

MR. BUTTERLY: Are you sure that's correct?

THE WITNESS: Which?

MR. BUTTERLY: I'm not sure. Go ahead.

MR. JANOSKI: We'll see one right here.

(Document Bates-stamped CAHSDOH2_19-cv-2491-00003105 through -3114 marked Exhibit P8.)

BY MR. JANOSKI:

Page 422

Q. I'm handing you what's Plaintiff's Exhibit 8.

A. Thank you.

Q. For the record, Plaintiff's Exhibit 8 bears Bates range BP00003105 through 3114.

Now, this is a report that would have been prepared for lead plaintiff 1199 for the second quarter of 2018; right?

A. Correct.

Q. Have you seen these type of reports before?

A. I have.

Q. Okay. And this is something that Boston Partners would generate in the ordinary course of business; right?

A. Correct.

Q. If you go to Bates ending 109, Cardinal Health here is identified as one of the top five largest detractors for the second quarter of 2018; right?

A. That's correct.

Q. And in the previous email, you had specifically identified Cordis as being the primary reason for Cardinal's underperformance;

Page 423

right?

MS. SADINSKY: Objection.

A. Cordis was identified as being the primary reason for underperformance within the MedSurge business; the MedSurge business underperformance being the main drawdown within Cardinal Health.

Q. So I guess if I just clarify your answer, so the MedSurge was the main driver of the underperformance, and within that, it was Cordis that was the main drag within there?

A. That's correct.

Q. And if you look -- can turn to Bates ending 112, it looks like, at this point in time, at least at some point between April 1, 2018 and June 3, 2018, Boston Partners had exited the position in Cardinal Health?

A. That's correct.

Q. And that's consistent with the trade run we saw earlier; right?

A. That's right.

Q. Okay. And if you could just pull up Defendant's Exhibit 57.

A. Yes.

Page 424

Q. Which, for the record, is BP Bates 00019159 through 160. Again, can you just explain what this report is meant to show?

A. This shows the positions within the SEIU portfolio that were opened or closed within the second quarter of 2018.

Q. Okay. And Boston Partners regularly generates these kind of reports for its clients to show new and closed positions?

A. Correct.

Q. And it's something that Boston Partners generates in the ordinary course of business?

A. Yes.

Q. Okay. And if you look on the second page, Bates ending 60, defense counsel asked you about this line showing the closing of the position of Cardinal Health; right?

A. Yes.

Q. Okay. And the reason given for selling the position was the disappointing results for its medical products distribution segment; right?

A. That's correct.

Q. And, again, based on that last email, you identified Cordis as being the primary drag

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 425

in the medical segment?

A. That's right.

Q. Now, in making investment decisions to buy or sell Cardinal Health stock, market price is always a relevant factor; right?

A. Correct.

Q. It's an input to the entire valuation; right?

A. Yes.

Q. Okay. And has Boston Partners ever invested in a stock when you knew that the stock price was inflated by fraud?

A. I don't believe so.

Q. And Boston Partners has never invested in a stock when they knew the stock price was inflated by false or misleading statements; right?

A. Correct.

Q. Now, throughout the day, defense counsel asked you a variety of questions about whether you or others at Boston Partners ever believed that Cardinal had committed securities fraud.

Do you recall those line of questions?

Page 426

A. I do.

Q. All right. Do you know what the legal elements of a securities fraud claim are under the Securities Exchange Act of 1934?

A. I don't know the specifics.

Q. Okay. And you don't know what information was available to Cardinal management at the time they were making their public statements; right?

A. That's correct.

Q. So is it fair to say that you have no basis, one way or the other, to determine whether securities fraud was committed?

A. True.

MR. JANOSKI: I have no further questions. Thank you for your time.

THE WITNESS: Thank you.

MR. JANOSKI: Unless she has something.

MS. SADINSKY: Yeah. Just one quick question.

REDIRECT EXAMINATION

BY MS. SADINSKY:

Q. Do you generally assume that people comply with the law?

Page 427

A. I do.

Q. Is it fair to say you don't know, either way, whether or not the executives were complying with the law? Is it fair to say that you don't know, either way, whether or not the executives were telling the truth?

A. That's true.

Q. The executives have a legal obligation to tell the truth?

A. I believe so.

Q. So is it fair to say --

MR. JANOSKI: Objection. Calls for a legal conclusion.

Q. -- you don't know whether they were lying or not?

A. That's true.

Q. That's fair to say?

A. Yes.

Q. That you -- so you would assume that they're telling the truth?

A. Correct.

Q. And you would not assume they're lying?

A. That's correct.

MS. SADINSKY: That's all. Thank you.

Page 428

THE WITNESS: Thank you.

THE VIDEOGRAPHER: This concludes today's video deposition of Stephanie McGirr. The time is 3:54 p.m. We're off the record.

(Deposition concluded at 3:54 p.m.)

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 429

E X H I B I T S
Number        Description        Page

Exhibit 12  Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-00003300
      through -3322            19

Exhibit 13 Native Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00007661            33

Exhibit 14 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-00175012
      through -5014            77

Exhibit 15 Native Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00007661            114

Exhibit 16 Document bearing "SEIUHEALTH"  114

Exhibit 17 Trade Chart            117

      - Continued -

Page 430

E X H I B I T S
Number        Description        Page

Exhibit 18 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00154198 and -4199            118

Exhibit 19 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00154491 through -4514            119

Exhibit 20 Document Bates-stamped
      BP_CAH-SDOH2.19-cv-3347-
      00004564 through -4566            127

Exhibit 21 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00152082 through -2084            135

Exhibit 22 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00153545 through -3547            162

      - Continued -

Page 431

E X H I B I T S
Number        Description        Page

Exhibit 23 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      001154300 through -4302        168

Exhibit 24 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00150019 through -0022        181

Exhibit 25 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00155392 through -5215        181

Exhibit 26 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-
      00175017 through -5215        181

Exhibit 27 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-00175017
      through -5020            185

      - Continued -

Page 432

E X H I B I T S
Number        Description        Page

Exhibit 28 Document Bates-stamped
      BP_CAH-SDOH2.19-cv-3347-00472611
      through -2701            197

Exhibit 29 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-00150089
      and -0090            202

Exhibit 30 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-00161225
      and -1226            202

Exhibit 31 Document Bates-stamped
      BP_CAH-SDOH2_19-cv-2491-00155472
      through -5474            202

Exhibit 32 Document Bates-stamped
      BP_CAH-SDOH2.19-cv-3347-00455353
      through -5357            215

      - Continued -

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 433

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 33 | Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455358 through -5360 | 215 |
| Exhibit 34 | Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00390661 through -0693 | 225 |
| Exhibit 35 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00147878 and -4789 | 225 |
| Exhibit 36 | Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455365 and -5366 | 226 |
| Exhibit 37 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00155130 through -5133 | 250 |

- Continued -

Page 434

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 38 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00160069 through -0072 | 250 |
| Exhibit 39 | Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455339 through -5352 | 250 |
| Exhibit 40 | Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455285 through -5295 | 265 |
| Exhibit 41 | Document Bates-stamped CAH-SDOH2.19-cv-2247-00005824 through -5829 | 265 |
| Exhibit 42 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00147222 through -7224 | 275 |

- Continued -

Page 435

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 43 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00156289 through -6326 | 275 |
| Exhibit 44 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00147165 through -7168 | 291 |
| Exhibit 45 | Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00393446 through -3475 | 291 |
| Exhibit 46 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00147644 through -7646 | 291 |
| Exhibit 47 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00156122 through -6228 | 291 |

- Continued -

Page 436

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 48 | Document Bates-stamped BP_CAH-SDOH2_19-cv-2491-00180856 through -0859 | 324 |
| Exhibit 49 | Native Document Bates-stamped BP_CAH-SDOH2.19-cv-3347-00455439 | 330 |
| Exhibit 50 | Document Bates-stamped CAHSDOH2.19-cv-3347-00005636 through -5644 | 330 |
| Exhibit 51 | Document Bates-stamped CAHSDOH2_19-cv-2491-00159287 through -9289 | 330 |
| Exhibit 52 | Document Bates-stamped CAHSDOH2.19-cv-3347-00395010 through -5032 | 330 |

- Continued -

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 437

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 53 | Document Bates-stamped CAHSDOH2_19-cv-2491-00008938 through -8940 | 331 |
| Exhibit 54 | Document Bates-stamped CAHSDOH2_19-cv-2491-00018674 through -8677 | 363 |
| Exhibit 55 | Document Bates-stamped CAHSDOH2_19-cv-2491-00007767 and -7768 | 363 |
| Exhibit 56 | Document Bates-stamped CAHSDOH2_19-cv-2491-00018710 through -8712 | 363 |
| Exhibit 57 | Document Bates-stamped CAHSDOH2_19-cv-2491-00019159 and -9160 | 364 |

- Continued -

Page 438

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 58 | Document Bates-stamped CAHSDOH2_19-cv-2491-00010308 through -0310 | 364 |
| Exhibit P1 | Document Bates-stamped CAHSDOH2_19-cv-2491-00153050 through -3052 | 404 |
| Exhibit P2 | Document Bates-stamped CAHSDOH2_19-cv-2491-00160399 through -0400 | 408 |
| Exhibit P3 | Document Bates-stamped CAHSDOH2_19-cv-2491-00008544 through -8545 | 410 |
| Exhibit P4 | Document Bates-stamped CAHSDOH2_19-cv-2491-00158492 through -8497 | 413 |

- Continued -

Page 439

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit P5 | Document Bates-stamped CAHSDOH2_19-cv-2491-00007662 through -7749 | 413 |
| Exhibit P6 | Document Bates-stamped CAHSDOH2_19-cv-2491-00007796 and -7797 | 417 |
| Exhibit P7 | Document Bates-stamped CAHSDOH2_19-cv-2491-00155828 through -5829 | 419 |
| Exhibit P8 | Document Bates-stamped CAHSDOH2_19-cv-2491-00003105 through -3114 | 421 |

Page 440

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, Janet M. McHugh, a Registered Merit Reporter and a Notary Public within and for the Commonwealth of Massachusetts do hereby certify:

THAT STEPHANIE MCGIRR, the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability; that before completion of the deposition review of the transcript was not requested.

I further certify that I am not related to any parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of April, 2022.

_____
JANET M. MCHUGH
Notary Public
My Commission Expires:
July 16, 2028

LA Sheriff's Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

April 26, 2022
Stephanie McGirr

Page 441

INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel
that notary public signature is required.

Please return a copy of the signed errata within
30 days of receipt, unless otherwise agreed upon
by counsel.  Once we receive one signed errata, we
will distribute an electronic copy to all parties.

RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:
   FAX: 1-800-825-9055
   EMAIL: janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
PO Box 542
Luck, WI  54853

Page 443

PAGE   LINE   CHANGE        REASON
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____
____ / _____ / _____ / _____

Page 442

ACKNOWLEDGMENT OF THE DEPONENT


     I, Stephanie McGirr, do hereby certify that
I have read the foregoing pages and that the same
is a correct transcription of the answers given
by me to the questions therein propounded, except
for the corrections or changes in form or substance,
if any, noted in the attached Errata Sheet.


_____  _____
(DATE)   STEPHANIE MCGIRR



Signed and subscribed to before me this
_____ day of _____, 2022.

_____
    Notary Public

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com