# EXHIBIT 7

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION

-----------------------------------------

LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated,
    Plaintiffs

  v.

CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON,
    Defendants

Case No. 2:19-CVL-03347

----------------------------------------

REMOTE VIDEO DEPOSITION OF
Nicholas Smith, Individually and as Corporate Designee of Columbia Management Investment Advisers
May 26, 2022
Lead: Alexandra P. Sadinsky, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY
JANE ROSE REPORTING 1-800-825-3341

**Page 3**

A P P E A R A N C E S   C O N T I N U E D

ATTORNEYS ALSO ON BEHALF OF DEFENDANTS

    Bide B. Akande, Esquire
    Porter Wright Morris & Arthur LLP
    321 North Clark Street
    Suite 400
    Chicago, Illinois 60654
    (312) 756-8500

  -AND-

    Lindsey M. Woods, Esquire
    Porter Wright Morris & Arthur LLP
    41 South High Street
    Suites 2800 - 3200
    Columbus, Ohio 43215
    (614) 227-2000

**Page 2**

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF

    J. Marco Janoski Gray, Esquire
    Laurie L. Largent, Esquire
    Jennifer N. Caringal, Esquire
    Megan A. Rossi, Esquire
    Robbins Geller Rudman & Dowd LLP
    655 West Broadway
    Suite 1900
    San Diego, California 92101
    (619) 239-3247

ATTORNEYS FOR DEFENDANTS

    Alexandra P. Sadinsky, Esquire
    Wachtell Lipton Rosen & Katz
    51 West 52nd Street
    New York, New York 10019
    (212) 403-1000

**Page 4**

A P P E A R A N C E S   C O N T I N U E D

ATTORNEYS FOR COLUMBIA MANAGEMENT INVESTMENT ADVISERS LLC & THE DEPONENT

    Michael W. DeWitt, Esquire
    DeWitt Law, LLC
    4200 Regent Street
    Suite 200
    Columbus, Ohio 43219
    (614) 683-2683

ALSO PRESENT:

    Max Obmascik, Paralegal
      Wachtell Lipton Rosen & Katz

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    Joan V. Cain, Court Reporter
    Marvin Oltman, Videographer

Page 5

## TABLE OF CONTENTS

Witness:
Nicholas Smith

Examination

By Ms. Sadinsky...........................Page 8

Reporter Certificate.......................Page 360

Notice to Read and Sign....................Page 362

Index of Exhibits..........................Page 364

Page 7

Morris & Arthur for the defendants.

MR. JANOSKI: If that's it for your side, this is Marco Janoski from Robbins Geller on behalf of lead plaintiff and the proposed class. I'm joined here in the room, but off camera, by Laurie Largent, Jen Caringal, and Megan Rossi.

MR. DeWITT: Okay. Michael DeWitt on behalf of the deponent CMI and Mr. Smith. DeWitt Law. Sorry.

THE COURT REPORTER: Good morning. My name is Joan Cain. I am a court reporter and a Notary Public in the Commonwealth of Virginia. I am the deposition officer for today's deposition.

All parties in today's deposition are appearing remotely to comply with the guidance of the Centers for Disease Control in response to the COVID-19 pandemic occurring in our country at this time. I have collected everyone's appearances off the record, and they will appear on the appearance page of the transcript.

Before we proceed, I will ask counsel for today's deposition to stipulate on the record that this deposition officer may swear in the deponent, even though I am not in the physical presence of the deponent, and that there is no objection to that at

Page 6

PROCEEDINGS

- - -

12:03 p.m. EDT
May 26, 2022

- - -

THE VIDEOGRAPHER: Here begins Media No. 1, Volume 1 in the deposition of Nick Smith in the matter of Louisiana Sheriffs' Pension & Relief Fund versus Cardinal Health, Incorporated.

Today's date is May 26th, 2022. The time is now 12:04 p.m. Eastern Time.

My name is Marvin Oltman, the legal video specialist. The court reporter is Joan Cain. We are both with Jane Rose Reporting, New York, New York.

Will counsel please identify themselves and state who they represent, beginning with the party noticing this proceeding, and please remember to speak slowly for the court reporter today. Thank you.

MS. SADINSKY: Alexandra Sadinsky from Wachtell Lipton for the defendants.

MS. WOODS: Lindsey Woods from Porter Wright Morris & Arthur for the defendants.

MR. AKANDE: Bide Akande from Porter Wright

Page 8

this time, nor will there be an objection to it at a future date.

Let's start with the noticing attorney, please.

MS. SADINSKY: We so stipulate.

MR. JANOSKI: So stipulated by plaintiffs.

MR. DeWITT: Stipulated by deponent.

NICHOLAS SMITH, having been duly sworn under penalties of perjury by the Notary Public, was examined and did testify as follows:

THE COURT REPORTER: Thank you. Please begin.

MS. SADINSKY: Thank you.

EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MS. SADINSKY:

Q Hi, Mr. Smith.

MS. SADINSKY: Before we begin, I want to state on the record the challenges we faced with getting a timely, complete production from Columbia. We served a document subpoena on February 1st, 2022. Columbia produced documents within a month of the subpoena. After review, there were several notable deficiencies which were addressed in discussions with Columbia and its counsel.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 9

On April 11th, 2022, Columbia agreed to supplement its production. Defendants specifically requested Nick Smith's emails, as he was to be the deponent, and yet at that point no search had been conducted of his emails.

On May 11th, defendants received 15 of Mr. Smith's reports. We then had additional discussions with Columbia and its counsel and identified additional missing documents. We were told that our requests were too broad and brought back too many hits, and agreed to significantly narrow the scope on May 13 so that we could receive documents and complete this deposition in advance of our June 3rd briefing deadline.

Then a series of delays from Columbia extended the document production from which was initially suggested to May 16th to eventually May 25th. Last night at 5:15 p.m. Eastern Standard Time [sic], the night before the deposition, Columbia produced approximately 3500 documents from Columbia personnel, including the deponent, a senior analyst who covered Cardinal Health, Nick Smith, who Columbia itself identified as a person with the most knowledge of the topics covered in the subpoena.

These emails and reports specifically

Page 10

discussed Cardinal Health's performance and the Cordis acquisition and were squarely within the time frame at issue. Production also included records of meetings with key Cardinal Health executives during the relevant time period which were previously undisclosed.

Documents produced last night should have been produced way earlier. Documents were responsive to our subpoena and a number of them addressed the issues in this case as we discussed with Columbia and its counsel on numerous occasions.

We are proceeding with this deposition, given time constraints, but reserve our right to reopen this deposition on Tuesday, May 31st, to the extent we identify further documents we would like to question the deponent about.

So --

MR. DeWITT: Hang on now, Alex, I'm just going to disagree on the record. That's all I want to say. Disagree on the record.

MR. JANOSKI: For the record, plaintiffs would object to any reopening of this deposition on May 31st as well.

MS. SADINSKY: Okay. We reserve our rights to reopen the deposition.

Page 11

BY MS. SADINSKY:

Q So, Mr. Smith, let's cover some parameters for today. It's my job to ask you questions, and it's your job to answer them as best as you can. If you don't understand a question, please tell me so I can try to rephrase or explain. Please give audible, verbal responses to the questions. A transcript cannot reflect if you're merely nodding your head.

Remember that you are testifying on behalf of Columbia Management Investment Advisers. There will be times when I'm also asking for your personal knowledge or experience as an employee of Columbia. If you are ever unsure whether I am asking you a question personally or as Columbia's representative, please ask me, and I'll be happy to clarify.

If you need to take a break, please let me know. We can take a break any time as long as there's not a question pending. Your lawyer or plaintiffs' lawyer may object to certain of my questions for purposes of the record. But unless your lawyer instructs you not to answer, you should fully and completely answer the question.

Do you understand that you are testifying under oath today just as you would be testifying

Page 12

under oath at a trial?

A Yes.

Q Is there anything that would prevent you from testifying truthfully today?

A No.

Q Is there any reason, medical or otherwise, why you can't testify completely and accurately today?

A No.

Q Is anyone present with you at your deposition today?

A No.

Q Do you understand that while we're on the record, you must put away and not look at electronic devices not being used for this deposition?

A Yes.

Q Do you understand while we're on the record there shall be no other programs displaying images on your screen other than the program being used to conduct the deposition and show deposition exhibits?

A Yes.

Q Do you currently have any other programs open on your computer?

A I do. I have a few that I will close right now.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

---

Page 13

Q   And please turn off email, silence your phone, turn off text messages, things like that, while we're on the record, please.

And do you understand that while we're on the record, you will not communicate with anyone except as reflected on the record?

A   Yes.

Q   Is everything turned off now?

A   Yes.

Q   Have you been deposed before?

A   No.

Q   Have you testified in court before?

A   No.

Q   Do you understand that you have been designated as a witness to testify on behalf of Columbia with regard to certain topics identified by the parties in advance of the deposition?

A   Yes.

MS. SADINSKY:  Max, let's mark as Exhibit 1 Tab 2.

- - -

(Columbia Exhibit 1 was marked for identification.)

- - -

BY MS. SADINSKY:

---

Page 14

Q   So when we mark exhibits today, Max is going to put them in the chat.  If people would like to open them and look at them themselves, he'll also put them on the screen for you.

So I've just marked as Exhibit 1 a subpoena for deposition of Mr. Smith.

Mr. Smith, do you recognize this document?

A   I do not.  This is my first time seeing it.

Q   Okay.

MS. SADINSKY:  Max, let's turn to page 7. So let's zoom in to the bottom there, Topics for Examination.  Let's zoom in so it's easier for Mr. Smith to see.

BY MS. SADINSKY:

Q   So, Mr. Smith, you were designated as a witness to testify about all of these topics.  So why don't you read them to yourself.  Let us know when we can scroll down.

A   I am aware of these.  I have seen these topics presented to me.

Q   Okay.  And are you prepared to testify today about all of the topics listed?

A   To the best of my knowledge.

MS. SADINSKY:  Okay.  Let's put down this document.

---

Page 15

BY MS. SADINSKY:

Q   What did you do to prepare for this deposition?

A   I have reread my initial notes that were provided to you, and attempted to refresh my memory of the deals at question.

Q   Did you meet with anyone?

A   Other than our counsel, no.

Q   So you met with Mr. DeWitt?

A   Yes.

Q   How many times did you meet?

A   I believe we spoke twice.

Q   By phone?

A   Via computer.

Q   Via computer as in video?  Email?

A   Video.

Q   How long did you meet for?

A   I don't recall.  Not that long.

Q   Other than reading your notes, did you do anything else to prepare?

A   No.

Q   Did you meet with any lawyers from Robbins Geller?

A   No.

Q   Have you ever spoken to any lawyers from

---

Page 16

Robbins Geller?

A   No.

Q   Are the only documents you looked at your notes?

A   Yes.

Q   To the best of your knowledge, were all of the notes you looked at produced?

A   Yes.

Q   Do you know whether anyone is paying for Columbia's costs, including costs associated with Mr. DeWitt's representation of you associated with this deposition?

A   I do not know.

Q   Okay.  Can you describe your educational background?

A   I was an undergraduate of Harvard University with a degree in chemistry and then a graduate of what is now called the Booth School of Business at University of Chicago.

Q   When did you graduate?

A   I graduated undergraduate in 2000 and business school with an M.B.A. in 2005.

Q   Do you have any other degrees?

A   I have a -- it's not a degree, no.  I just have professional designations.

---

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 17

Q   What are your professional designations?
A   I have the CFA designation.
Q   When did you get that?
A   I believe I received it in 2005, but would have to verify.
Q   Any other certifications or securities-related licenses?
A   Not at this time.
Q   Did you ever have any?
A   Yes.
Q   What were they?
A   Series 7 and Series 63.
Q   What were they?
A   Series 7 and Series 63.
Q   And when did you have those?
A   I would have received those in 2000, when I began my first job at Merrill Lynch.
Q   Please walk me through your post college employment history.  So it sounds like Merrill Lynch was your first job.
A   Yes.
Q   Okay.  And how long were you there?  What was your position?
A   Three years.  I was an investment banking analyst.

Page 18

Q   And then did you go to business school after that?
A   Yes.
Q   And then what did you do after business school?
A   I took a job with U.S. Trust working with the Value and Restructuring Mutual Fund, which is to this day, the same job that I've had.  We've had different corporate owners, but my job has been basically the same.
Q   So U.S. Trust became Columbia?
A   U.S. Trust was sold by Charles Schwab to Bank of America.  Bank of America merged the mutual funds into their Columbia division.  I and my team went with that division, and Columbia was then subsequently sold to Ameriprise Financial, and, again, my team went with that subsidiary, and I am now with Columbia Threadneedle.
Q   Okay.  Can you walk me through your various jobs and roles at Columbia?
A   I am a portfolio manager on the Columbia Contrarian Core product and any associated sub-accounts or institutional accounts.
Q   Repeat the second part again.
A   And any associated sub-accounts or

Page 19

institutional accounts.
Q   What does that mean?
A   We managed basically the same product for the mutual fund as well as any institutional clients that wish to have their own separate accounts.
Q   Have you always been a portfolio manager?
A   I began actively managing as a portfolio manager in about 2007.  Prior to that, I would have been primarily an analyst within the team.
Q   Okay.  And so just so I'm understanding the organizational structure, analysts report to portfolio managers?
A   Themes can have their own analyst that is separate from the research analyst pool.
Q   Okay.  So were you a research analyst, or were you an analyst for a team?
A   Analyst for a team.
Q   What team?
A   When I started in 2005, it was the value and restructuring product, and in 2012, value and restructuring was merged into Contrarian Core, and since then I've been a full-time portfolio manager with Contrarian Core.
Q   Okay.  Who do you report to?
A   Guy Pope is my direct report.

Page 20

Q   Do you report to anyone else?
A   Not directly, no.
Q   And what is Guy Pope's job title?
A   He would be the senior portfolio manager for the Contrarian Core Fund.
Q   Senior portfolio manager and the Contrarian Core Fund, is that what you said?
A   Yes, Contrarian Core Fund.
Q   And who does Mr. Pope report to?
A   I don't know directly, as we've had organizational changes over the years.  Melda Mergen comes to mind as the main person that would be above him in the organizational charts.
Q   And who is that?
A   She is our head of equities.
Q   Head of equities.
Who reports to you?
A   No one.
Q   Did anyone report to you between 2015 and 2018?
A   No.
Q   So you're a portfolio manager.  Mr. Pope is a senior portfolio manager?
A   Yes.  It's sometimes hard to distinguish because they give us all the same title, but

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 21

Mr. Pope is the head of the team.

Q   Okay. How many other portfolio managers are in the Contrarian Core Fund?

A   We are four people total.

Q   Who is it?

A   It would be Michael Welter, Harvey Liu, Guy Pope, and myself.

Q   Were there any others between 2015 and 2018?

A   No.

Q   Do you have any analysts on the team now?

A   No.

Q   Did you have any between 2015 and 2018?

A   No.

Q   So it's always been four people since 2015?

A   Since 2012 actually.

Q   2012.

How do your job responsibilities differ from Mr. Pope's?

A   Mr. Pope is in charge of the overall portfolio composition. I am specifically in charge of about one quarter of the names in the portfolio.

Q   And are you in charge of buying and selling divisions for that order of the portfolio?

A   I am not.

Page 22

Q   So --

A   The buy and sell decisions would be held by Mr. Pope.

Q   So you make a recommendation to Mr. Pope, and Mr. Pope decides whether to buy or sell or hold stock?

A   That's correct.

Q   Are you involved in decision-making after you make the recommendation?

A   We have active discussions, but the ultimate decision-making authority would lie with Mr. Pope.

Q   Cardinal Health was part of the Contrarian Core Strategy, right?

A   Correct. We owned Cardinal Health within the strategy.

Q   And going forward, is it okay if I just refer to it as the Contrarian strategy?

A   Sure.

Q   And when did you -- when did the Contrarian strategy hold Cardinal Health stock?

A   I do not recall the exact dates.

Q   If -- when did the Contrarian strategy stop holding Cardinal Health stock?

A   I do not recall the exact date without

Page 23

notes in front of me.

Q   Does the Contrarian strategy still hold Cardinal Health stock?

A   We do not hold Cardinal Health stock today.

Q   Have you held Cardinal Health stock within the last year?

A   I do not believe so, no.

Q   Did you hold Cardinal Health stock when you started with the Contrarian strategy in 2012?

A   I do not recall.

Q   So we'll look today at some reports that various people wrote on Cardinal, including Harlan Sonderling, Jeffrey Cicirelli -- I don't know if I'm pronouncing that right, but -- so what were these people's roles?

A   Harlan Sonderling was a research analyst in charge of the healthcare space. He would not have been running a portfolio directly, or he may have been actually. I don't -- I don't know. But his job was to speak with all of the portfolio managers throughout the firm and give them his opinions on healthcare stocks.

Q   Okay. And Jeffrey Cicirelli -- am I saying that right?

A   I do not recognize that name.

Page 24

Q   Okay. And so was Cardinal Health in strategies other than the Contrarian strategy?

A   It is likely, but I don't know.

Q   Is the only person you received research on Cardinal Health from Mr. Sonderling?

A   Are you asking for internal?

Q   Internal, yes.

A   Internally, yes.

Q   And so Mr. Sonderling is no longer at Columbia, correct?

A   Yes.

Q   When did he leave?

A   I don't know.

Q   Is anyone --

A   I don't recall the date.

Q   Is anyone covering Cardinal Health now?

A   I don't know. We've had -- to elaborate, we've had new cover -- new analysts come in, and I do not know if they have picked up the coverage on that name as of right now.

Q   Do you still receive research on Cardinal Health from Columbia employees?

A   No.

Q   Okay. Can you describe the Contrarian strategy for me?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 25

A    Our goal is to outperform the Russell 1000 Index.  We have a screen that looks for names trading in the bottom one-third of their 52-week trading range.  We use that screen for our buy ideas.  We also can actively trade around names that are already in the portfolio, increasing or decreasing the weights depending on our view of our price targets for those names, and we will sell names when we feel that they are relatively overvalued to other opportunities that we are finding.

Q    Is the Contrarian strategy based on a model portfolio?

A    No.

Q    So if a client picks the Contrarian strategy, is it going to have the same holdings as any other client that picked the Contrarian strategy?

A    Yes.

Q    So in that sense, is it based on a model portfolio?

A    No.  We manage all the accounts identically.  We put in all the trades at the same time.

Q    Okay.  So maybe there's just some confusion

Page 26

on the term "model portfolio."

The Contrarian strategy, any client that invests in the Contrarian strategy or picks the Contrarian strategy will have the same securities in their portfolio as any other client that picked the Contrarian strategy, correct?

A    That is correct.

Q    And any time Columbia buys or sells securities within the Contrarian strategy, it would do so for all of the clients that picked that strategy?

A    Yes.  There are two exceptions to this line of questioning, which is we have separate wrap accounts that trade once a week or, in my case, I have some legacy accounts from the U.S. Trust period that also trade once a week.  But when we do those once-a-week trades, they true-up those accounts to match the rest of the accounts that we manage.

Q    So those accounts would still have the same securities as --

A    Yes.

Q    And do you know the plaintiff in this case, 1199SEIU Health Care Employees Pension Fund?

A    I have heard the name, but I did not have personal contact with them.

Page 27

Q    I may refer to them a few times throughout this deposition, so I'm just going to refer to them as SEIU.  Okay?

A    Okay.

MS. SADINSKY:  Okay.  As Exhibit 2, Max, let's mark Tab 3.

- - -

(Columbia Exhibit 2 was marked for identification.)

- - -

BY MS. SADINSKY:

Q    So Exhibit 2 is a document that your lawyers provided with the file name "Transactions Ledger," and it lists Columbia's trades in Cardinal Health on behalf of any of its clients from March -- any of its clients?  Yes -- any of its clients from March 2015 to March 2018.

And have you seen this before?

A    I have not seen this before.

Q    So we asked for -- or Columbia said they provided trading records.  If you look at the top here: "All Transactions Ledger, Trade Date 3/1/2015 - 5/31, 2018."

Would you agree that this is a complete trading record of Columbia's trades into and out of

Page 28

Cardinal Health stock on behalf of its clients between March 1, 2015 to May 31st, 2018?

A    I cannot testify to that.  I did not provide this document.

Q    Do you have any reason to believe that it is not a complete trading history if your lawyers provided it?

A    I have no reason to believe it would not be a complete trading history.

MS. SADINSKY:  Okay.  I want to zoom in on the type column, Max.  That's column 4.

BY MS. SADINSKY:

Q    Okay.  So, in Type, you have three things here.

MS. SADINSKY:  Scroll down a little.

BY MS. SADINSKY:

Q    You have BY, DI, and then you have SL. Those are the only three things.

What do those stand for?

A    I would be guessing, but BY looks like it would be buy, SL looks like it would be sell, and I do not recognize the DI designation on this chart.

Q    If you had to guess what DI is, what would it be?

A    I won't guess.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 29

MR. DeWITT: Calls for speculation.

BY MS. SADINSKY:

Q Your -- your lawyers produced this and you're a representative of Columbia, and we need to know what the document that your -- that your company produced means. So if --

A I did not produce it. I cannot speak to the designation there.

MS. SADINSKY: Mr. DeWitt, if you would like to follow up and let us know what the designations on this document mean, that would be helpful. Thanks.

MR. DeWITT: I will do that.

BY MS. SADINSKY:

Q So if you look at the first entry here --

MS. SADINSKY: Let's zoom out, Max.

BY MS. SADINSKY:

Q -- the first entry on the left-hand --

MS. SADINSKY: If you zoom in to the date.

BY MS. SADINSKY:

Q -- the Trade Date column is June 26th, 2015.

Do you see that?

A Yes.

Q Do you know if the first time Columbia ever

Page 30

invested in Cardinal Health was on June 16th, 2015?

A I do not.

Q Do you know whether -- do you recall whether Columbia was invested in Cardinal Health prior to June 2015?

A Can you clarify, please? You're using the word "Columbia" as opposed to Contrarian.

Q Do you -- yes.

Do you know whether the Contrarian strategy was invested in Cardinal between -- before June 2015?

A I do not recall when the Contrarian strategy first invested in Cardinal.

MS. SADINSKY: Let's go down to the last page, Max.

BY MS. SADINSKY:

Q If you'd go to the last page, the last entry, it shows the last transaction involving Cardinal was on December 14th, 2017.

Do you see that?

A Yes.

Q Is that when the Contrarian strategy stopped investing in Cardinal?

A Again, I do not recall when the Contrarian strategy finally exited the position, and I did not

Page 31

produce this document. So I cannot confirm that that would have been the final date.

Q Sitting here today, do you recall whether the Contrarian strategy was invested in Cardinal within the last three to four years?

A I definitely recall not owning it in the last one to two years. I do not recall in the three- to four-year range.

MS. SADINSKY: And, Mr. DeWitt, if you could confirm whether or not this is a complete trading history, and also confirm whether Columbia traded in Cardinal Health after this time period, that would be helpful.

THE WITNESS: Again, Columbia versus Contrarian.

BY MS. SADINSKY:

Q The Contrarian -- though this transaction ledger is -- is purporting to give all trades in Cardinal that Columbia made, not Contrarian.

A Then I can't speak to this at all.

Q Okay. What is the significance --

MS. SADINSKY: We can put this chart down, Max.

BY MS. SADINSKY:

Q What is the significance of having Cardinal

Page 32

as part of the Contrarian strategy?

A Our goal is to pick stocks that will help us outperform our index.

Q Well, let me put it a different way. Does -- when you put Cardinal Health in the Contrarian strategy, does that mean that Columbia clients invested in the Contrarian strategy invest in Cardinal Health?

THE WITNESS: I -- yes.

BY MS. SADINSKY:

Q And so that means once Columbia -- once Cardinal was part of the Contrarian strategy, Columbia would buy Cardinal Health for any client that was invested in the Contrarian strategy, correct?

A Yes.

Q And do you know why Columbia invested in Cardinal Health -- why the Contrarian strategy invested in Cardinal Health?

A Specifically, to your second part of the question, why the Contrarian strategy invested in Cardinal Health, it was because we believed Cardinal Health would outperform our index and help our returns for our clients.

Q And Mr. Pope determined that Cardinal

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 33

Health was a suitable investment for Columbia's clients within the Contrarian strategy?

A   It would have been a combination of Mr. Pope and the other portfolio managers, including myself.

Q   And do you remember any conversations around that?

A   Yes.  I had conversations with Mr. Pope on many, many occasions regarding Cardinal Health.

Q   Do you remember conversations around adding Cardinal Health to the Contrarian strategy for the first time?

A   I -- my recollection is limited by the amount of time that has passed, but I do recall having conversations and why we wanted to buy -- potentially buy Cardinal Health at that time.

Q   What do you recall about those conversations?

A   I recall evaluating Cardinal Health versus its peers and other stocks throughout the universe of stocks that we look at and thinking that there was potential upside to the name.

Q   Do you remember -- and who determined to remove Cardinal Health from Columbia's Contrarian strategy?  Was that also Mr. Pope?

Page 34

A   It would have ultimately been Mr. Pope's decision.

Q   And were you also involved in those conversations?

A   Yes.

Q   And do you remember anything about them?

A   You can refer to my notes.

Q   We will, but do you remember anything about them?

A   Not beyond what was put into my notes.

Q   So we'll look at documents, but as part of the deposition, I want to just understand what you know and what you remember rather than just testifying about the document that we already have produced.

So could you just explain to me what you remember?  I mean, if it's based on your notes and you refreshed your recollection that way, that's fine.  I just want to understand exactly what you remember sitting here today.

A   Cardinal had underperformed for several years, and by underperform, specifically, they had not hit their guidance targets for earnings.

Q   And do you remember why?

A   I'm going off the recollection of what is

Page 35

already in my notes.  They had -- they have a very large drug distribution business.  That was 80 percent of the earnings, and a lot of that earnings growth or decline can be tied to when generic drugs are introduced into the market, and there was a two-year lull in new generic introductions that had been causing them to miss the earnings estimates for several quarters.

Q   So your recollection is that the reason Columbia -- strike that.

So the reason -- the reason the Contrarian strategy stopped investing in Cardinal Health was because of underperformance related to issues affecting the pharmaceutical segment, correct?

A   No.  We look at all stocks as generalists and compare them to all other stocks in our universe.  So that would have been one factor out of many.

Q   Understood.

So -- but sitting here today and based on your recollection, the reason for Cardinal Health's underperformance was generally related to issues related to the pharmaceutical drug distribution business, like, generic pricing issues, correct?

A   Yes.

Page 36

MR. JANOSKI:  Objection.  Vague as to time period.

BY MS. SADINSKY:

Q   Sorry.  Can you repeat your answer?

A   I'll defer to my counsel's statement there, if you could clarify the question.

Q   That wasn't your counsel.  That was Robbins -- that was plaintiff's counsel.

A   Okay.

Q   And I'm sorry.  We can't use any objections to change your testimony.  So --

A   Okay.

Q   -- can you please repeat your answer?

A   The answer is yes.  I -- I recollect that the stock had underperformed because of the drug distribution part of the business having margins compressing.

Q   And so we established earlier that 1199SEIU Health Care Employees Pension trust was one of Columbia's clients, correct?

A   I believe so.  I have not -- I can't confirm that based on your verbal conversation about it since I -- I don't actually see the accounts directly.  But I have seen that account, that name, in the past.

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 37

Q   Okay.  Do you know whether or not 1199SEIU or SEIU is still a client of Columbia?

A   I do not know if it is still a client of Columbia.

Q   Did you ever meet with anyone from SEIU?

A   Not that I recall.

Q   Did you generally meet with clients that were invested in the Contrarian strategy?

A   On many occasions, and I've met with many different clients over the years.

Q   And what types of meetings would you have?  What would be the purpose of meetings?

A   They would either be introductory meetings, where they wanted to learn about our product and potentially invest, or they were update meetings, where they wanted to hear from us as to our performance and our thoughts on the space and whether they wanted to continue investing with us.

Q   Okay.  Can you describe the steps for a securities transaction in the Contrarian portfolio so -- and maybe I can just flesh that out a little.

Does, you know, an analyst make a -- so would Mr. Sonderling make a recommendation to you about Cardinal and then you would make a recommendation to Mr. Pope and then Mr. Pope would

Page 38

ultimately decide whether to buy or sell?  How does it work?

A   That's a very vague question because there are lots -- that could be an hour-long answer.  I'll keep it short.

The four of us on the team are generalists, and we source ideas from hundreds of different possible ways, including ourselves, our internal analysts, external analysts, reading voraciously.

Q   Before a buy or sell decision is made, would you have a conversation with any of the clients that are invested in the Contrarian strategy?  Would you go to SEIU, for example, and say, "Hey, can we buy this stock?"

A   No.

Q   Would you ever do that?

A   No.

Q   Why not?

A   I believe that we are not allowed to solicit client input.  We are held to a standard that we alone have discretion on the investments we make.

Q   Do you know whether SEIU ever instructed Columbia or anyone on the Contrarian strategy to sell Cardinal Health stock?

Page 39

A   I wouldn't know that.

Q   Do you remember ever discussing with anyone from SEIU any trades that -- that Columbia made in the Contrarian strategy before they were made?

A   No.

Q   Do you remember ever discussing Cardinal Health with anyone at SEIU?

A   No.

Q   Has the SEIU portfolio with -- actually, strike that.

Has the Contrarian strategy ever taken a short position in any security?

A   No.

Q   Why not?

A   We're a long-only fund.

Q   Has the Contrarian strategy ever held put options on any security?

A   No.

Q   Does the Contrarian fund ever invest in any securities other than common stock?

A   It depends -- I don't know because, the definition of common stock -- I don't know how foreign securities would be treated that are traded as ADRs; however, I believe that to be correct.

Q   So either common stock and potentially

Page 40

ADRs, but probably only common stock, correct?

A   I believe ADRs would qualify as common stock as well.

Q   Okay.  Did the Contrarian strategy ever take a position that was intended to hedge potential losses on investments in Cardinal Health stock?

A   No.

Q   What about losses on investments in -- in stocks within the healthcare sector generally?

A   Can you clarify the question?  Are you asking if we ever hedged?

Q   Yes.

A   No.

Q   Did the Contrarian strategy ever invest in mutual funds?

A   No.

Q   Any third-party funds?

A   No.

Q   Any indirectly held positions in a security?

A   I don't know what you mean by that question.

Q   So -- so, for example, I'm referring to third-party funds and, you know, if there's any other sort of thing that could have an indirectly

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 41

held position. I'm not an expert in this stuff, so I don't know if any of those actually exist.

A   I'm not sure that -- I'm not sure how to answer that question.

Q   So you're not aware of any indirectly held position in Cardinal Health stock. The only investment in Cardinal Health stock that you're aware of through the Contrarian strategy was the Contrarian's own investment in Cardinal Health stock, correct?

A   Correct.

Q   Okay. So when Cardinal Health was part of the Contrarian strategy, you prepared formal reports on Cardinal Health, correct?

A   That is incorrect. They are not formal reports.

Q   Okay. How would -- how would you describe them?

A   They are my personal notes on Cardinal Health as a portfolio manager covering the name.

Q   How often did you prepare those reports?

A   It was at my discretion, but almost always on the quarterly earnings calls, I would update and create a new report. Not always, but often, and, occasionally, I would create interim reports if

Page 42

there was significant news or if we had a significant meeting with management teams or if I did many -- not many -- if I did analyst calls that I felt justified updating the notes.

Q   And who received those reports?

A   As I said, they were for me personally, and then on the quarterly earnings calls, I would send out my notes to the rest of my team, so the three members -- the other three members of my team would have received them.

Q   And that's Mr. Pope, Mr. Liu, and then I think you said one other?

A   Mr. Welter.

Q   Mr. Welter.

Did any Columbia analysts receive those notes?

A   I would not have sent them unless it was a one-off, where we were perhaps discussing the names, and I wanted to show them something that I had written down.

Q   So Mr. Sonderling generally wouldn't have seen the --

A   No.

Q   -- seen the reports?

Did Columbia's clients ever receive your

Page 43

reports?

A   No, not as a general rule. It's possible reports may have been shared over the years as examples to our clients of our internal research. I do not recall my Cardinal notes ever being shared in that way.

Q   Okay. So did anyone else, other than the three other members of your team and the occasional, you know, sharing of reports with analysts, did anyone else ever receive those reports?

A   The only other person who would have seen those reports would have been either Rich McCloskey or -- I do not recall who came before him, but there's a person who has a role where they -- they basically speak to our clients on our behalf and represent the fund, and so we would occasionally share reports with them so that they had some knowledge of the positions. They were not -- they are not a portfolio manager, though.

Q   Okay. What's Mr. McCloskey's position or title?

A   I don't know his title. He represents the fund to our clients, more of a sales role.

Q   Got it.

So other people prepared reports on

Page 44

Cardinal Health too, right? Mr. Sonderling prepared reports?

A   Yes, Mr. Sonderling would have prepared reports on Cardinal.

Q   When Mr. Sonderling was preparing reports, were you involved in the preparation? Would you review the reports before they were sent around or anything like that?

A   No.

Q   Was your report based on Mr. Sonderling's report?

A   No.

Q   So would you and Mr. Sonderling both independently cover Cardinal Health?

A   Yes.

Q   What was the purpose of that?

A   Again, Mr. Sonderling is responsible for providing his opinions to the entire firm. My role is specific to Contrarian Core.

Q   And so how would the ways that you think about Cardinal Health differ?

A   I'm a generalist. He is a sector specialist. So I'm comparing Cardinal Health and the potential upside to thousands of stocks as opposed to Harlan, who was comparing it to the names

Page 45

that he covered.

Q   Is it fair to say that Mr. Sonderling may be more informed about Cardinal Health's stock than you would be?

A   I certainly hope he would have been.

Q   Okay.  I was trying to ask the question in a non-offensive way.

What are the purpose of your reports?

A   Again, they were for me internally to express and write down my opinions as well as force myself to increase my knowledge of the names that we hold in our portfolio and stay on top of news and the earnings and the forecasts.

Q   Was the purpose of the reports to also share your knowledge and opinion of Cardinal Health with Mr. Pope, who was ultimately responsible for making decisions as to whether to buy and sell Cardinal Health stock?

A   Yes.

Q   Were your reports based on a model?

A   No.

Q   Did you do internal valuations of Cardinal Health stock?

A   I did not have internal valuations beyond what you see in the notes.

Page 46

Q   So we're going to look at some of these reports, and there's a section called "Valuation." So what was that based off?

A   That's my internal notes on how I was valuing Cardinal Health.

Q   And how did you -- so when you say how you were valuing Cardinal Health, what does that mean? How did you decide how to value Cardinal Health without some sort of model?

A   I sometimes create internal models for my stocks.  In the case of Cardinal Health, I would have reviewed Harlan's models, his valuation.  I would have reviewed sell-side models and sell-side valuations.

Q   So --

A   I would have also --

Q   Sorry.

A   I would have also compared the valuation to all the other stocks in our universe.

Q   Okay.  I just want to break that down a bit.  Sell-side models and valuations, you mean by third-party analysts?

A   Yes.

Q   And other stocks within our universe, how would you compare the valuations?  What does that

Page 47

mean?

A   That's my job, is to value stocks, value companies.

Q   Yeah, I understand that.  But how would you compare Microsoft's valuation with Cardinal Health's valuation?

A   I might not, or I might look at them on a free cash flow basis, or I might look at them on a multiple of earnings, or I might decide that's not the correct metric.  If you review my notes, you'll see at least two or three of them refer to a sum-of-the-parts valuation.

Q   What does that mean?

A   That's where I looked at the value of the medical business and the value of the drug distribution business separately.  Cardinal had spoken about potentially spinning off the medical. I don't know if that was ever mentioned in their press releases, but they had a history of spinning off smaller divisions, and so it made sense that once they had done several M&A deals in the medical space, that they would consider spinning it off.  So I felt that I needed to look at it that way.

Q   Okay.  So different valuation techniques or however you would define it would be a

Page 48

sum-of-the-parts, a free cash flow valuation, multiple of earnings.  Anything else?

A   Comparison to peers.

Q   Comparison to peers. Anything else?

A   Not for Cardinal.

Q   Okay.  Comparison to peers would be other, like, drug distribution businesses or other healthcare businesses --

A   Yes.

Q   -- like McKesson, ABC?

A   I apologize.  I don't know what names you just said.  I didn't hear them.

Q   McKesson, ABC, AmerisourceBergen.

A   Yes.

Q   Okay.  So you said you sometimes would prepare some internal models for some stocks, but you don't think you did that for Cardinal. Did I get that right?

A   I did not.  I would have provided it as part of what you've received, if I had done that.

Q   Do you ever do a DCF analysis?

A   Not a formal one for Cardinal.  You would have -- I would have used a free cash flow multiple.

Q   What does that mean?

Page 49

A   That means the multiple of the free cash flow number.

Q   And why would you use a free cash flow multiple for Cardinal as opposed to a DCF analysis?

A   They're very similar, ultimately.

Q   Why would you use the free cash flow multiple, though?

A   It's much faster and easier as a shorthand.

Q   So you said you sometimes did a comparable -- or a comparison to peers analysis, correct?

A   Yes.

Q   And you said some of the peers would be McKesson and AmerisourceBergen, correct?

A   Yes.

Q   And how did you determine whether Cardinal should be valued at a premium or a discount to those companies?

A   I would have looked at the growth rates of the various companies.  We would have evaluated the management, and I would have come up with a thesis on which stock I thought it would perform and how it would perform.

Q   Okay.  Okay.  Earlier we talked about where you got information about Cardinal for your reports,

Page 50

and you said sell-side models or valuations.  You said you would look at Harlan's valuations, you said you would look at other stocks in the Contrarian portfolio.  I'm going to ask about some other potential sources.  I just want you to let me know if you got information from these sources or not.

So did you get information from Cardinal Health directly?

A   Yes.  I used Cardinal Health's earnings reports, earnings transcripts, and subsequent or post-earnings conversations with Cardinal Health's management team or IR.

Q   Did you look at financial statements?

A   Yes.

Q   Did you look at press releases?

A   Yes.

Q   Did you look at -- like, so we talked about earnings call transcripts.  Did you also look at industry conference transcripts?

A   Yes.

Q   Did -- you had post-earnings conversations with management or the IR team, correct?

A   Yes.

Q   How often?  Every earnings call?

A   You would have to look at my notes.  My

Page 51

notes would have included dates and notes related to those conversations.

Q   Generally, after every earnings call?

A   Generally, we try to have a subsequent follow-up call after every earnings call.

Q   And anyone else from Columbia involved in those calls?

A   Yes.  Often they are available firmwide.  Occasionally, my team might reach out directly and do a call just for my team on a name that we own.

Q   So if they're available firmwide, who else would generally join?

A   Any PM that wanted to.

Q   Who -- who do you remember joining Cardinal Health's post-earnings calls with you?

A   I don't recall.

Q   You don't recall one other person ever joining?

A   Harlan would have been the main one, if he set up the meeting.  The other PMs can come in and out of those meetings, and I don't recall specific names.

Q   Were you generally the person asking questions?

A   If I set up the meeting, then my -- I or

Page 52

other members of my team would have asked the questions.  If Harlan or someone else at Columbia had set up the meeting, then they would have led the meeting, and I or members of my team might have jumped in with one or two questions along the way.

Q   Would Mr. Pope join those calls ever?

A   Frequently.

Q   Okay.  So Harlan generally was on them, Mr. Pope was generally on them, and then there were other people that could have joined as well?

A   Yes.

Q   Did you get information from Cardinal at road shows?

A   Yes.

Q   How often?

A   I don't recall.

Q   Do you attend -- did you attend a lot of Cardinal road shows?

A   I don't understand the question.  I did -- road shows is not how I would describe them.

Q   How would you describe them?  What are you thinking of?

A   I -- I would have seen Cardinal at sell-side conferences.

Q   Do you attend a lot of sell-side

Page 53

conferences?

A   Prior to COVID, I did, yes.

Q   Did you attend a lot of sell-side conferences where Cardinal was there?

A   Almost certainly, at least one time a year I would have been at a sell-side conference where Cardinal was also in attendance.

Q   So you said that you also get information for your Cardinal analysis from sell-side models and valuations.

So what organizations or what sell-side analysts do you generally rely on?

A   I can't answer that question easily because sell-side analysts switch firms frequently --

Q   Okay.

A   -- and also come into and exit the space frequently.  So I would ask you to please look at my notes to see which sell-side analysts I may have spoken with, to the extent that I took notes on those conversations and wrote them down.

Beyond that, I do not recall who I spoke with that many years ago.

Q   I'm not necessarily asking who you spoke with.  So you receive a bunch of, you know, sell-side analyst reports, and you may read them and

Page 54

incorporate some of that into your model, so your notes are not going to give me a hundred percent of the information I want.  I want to know how you were thinking when you prepared those reports.

So were there some specific people that you read their reports and you thought, "Okay, this is a person that I trust their judgment.  Let me rely on this more than others"?

A   The answer is yes.  I read -- I'm going to qualify the answer.  I read all the sell-side reports that I can, given my time constraints, and there are some reports and some analysts that are simply better than others, and I preferentially try to read them when I -- when I can.

Q   Is there a name or two that you can give me of people that you think are generally very good?

A   Not from this time period that I can recall.

Q   Did you read sell-side analyst reports from Baird?

A   B-A-I-R-D?

Q   Yes.

A   Most likely, but I don't recall exactly.

Q   Cowen?

A   Again, likely, but I can't recall exactly.

Page 55

Q   JPM?  Goldman?

A   Yes to almost all the large firms that Columbia has a research relationship with.

Q   So you said you can't remember anyone from the time frame of 2015 to 2018.  Who would you say are some of the stronger analysts that -- that you look to now or prioritize their reports now?

A   I don't have one on Columbia -- sorry. Strike that.

I don't have an analyst that I look to on Cardinal, McKesson, and Amerisource as of right now, an outside analyst.

Q   Did you get information from news reports?

A   Yes.

Q   Like, Bloomberg?  New York Times?  Wall Street Journal?

A   Yes.

Q   Any others?

A   Any potential news source would have been something I would have tried to read.

Q   How about trade magazines?

A   What specifically are you referring to?

Q   Endovascular Today.

A   No.  Almost never.

Q   Clinica MedTech?

Page 56

A   No.

Q   Did you get information on Cardinal Health from Columbia clients ever?

A   No.

Q   Out of all the sources of information that you look at, what would you give the most weight to in updating your valuation of Cardinal?

A   The earnings release and our subsequent conversations with the management team.

Q   And then what would you give the least to -- least weight to?

A   News articles written by third-party reporters.

Q   And then somewhere in between there would be sell-side analyst reports?

A   Internal reports if I have -- if they're available.  Sell-side reports from analysts that I like and trust.

Q   Okay.  And so you updated your report generally after every earnings calls and then sometimes there were interim updates if there was something particularly important or you had a meeting with Cardinal Health management or something like that, right?

A   Yes.

Page 57

MS. SADINSKY: Okay. Let's mark as Exhibit 3 Tab 5.

- - -

(Columbia Exhibit 3 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Is that showing on the screen for you, Mr. Smith?

A   Yes.

Q   Is this one of the reports on Cardinal that you prepared?

A   Yes.

MS. SADINSKY: Maybe we can zoom in a little and get rid of the extra margins.

BY MS. SADINSKY:

Q   This is -- so Exhibit 3 is a report that Columbia produced from your files with the file name 4.30.2015 Cardinal Health, so April 30th, 2015 and the other people that received this report would have been the other three members of your team, correct?

A   Yes.

Q   The top of the report, under Cardinal Health, says: "CAH Price $85 MV $28.2 bn" and "EV

Page 58

$29.8 bn."

Do you see that?

A   I do.

Q   Does that refer to Cardinal Health's stock price, market value, and enterprise value?

A   That is correct. I will qualify that I was not always perfect at updating that when I would create a new report. So, occasionally, they may not match what the actual stock price was at the time that I date stamped or marked the date on the file.

Q   Okay. Are these numbers based on Cardinal's actual reported results, or are they based on, you know, sell-side analysts' valuation of what it should be?

A   Can you clarify? Are you talking about the numbers in the rest of the document?

Q   No. The numbers in this row here: The price, market value, and enterprise value?

A   I would have pulled those numbers from FactSet.

Q   Okay. And which of these three numbers, the stock price, the market value, or the enterprise value was most important to you in assessing Cardinal Health's financial performance?

A   None of them have any correlation to the

Page 59

financial performance specifically. They're simply statements of the valuation of the company.

Q   Okay. So these generally were of equal importance to you?

A   I'm not understanding the question. I'm sorry.

Q   When you assess a company's value, do you typically look at the stock price? Do you typically look at the market value? Do you typically look at the enterprise value?

A   Okay. The stock price would have been the number that I was most interested in to compare to my valuation, but the stock price and the market value are the same thing, as I'm sure you know.

Q   Yeah.

Okay. Then there's a section here titled "Background."

Do you see that?

A   Yes.

Q   Can you explain what type of information you would typically include in the Background section of these reports?

A   It differs by company. Every company I choose to put what I deem relevant so that when I look at it, I immediately know exactly what

Page 60

differentiates one company from another.

In this case, I believe I am referring to the quarterly sales and the quarterly profits and margins, but these are averages. This is not specific to any quarter, and this is meant to just give me a general sizing of the two segments that represent the company Cardinal Health.

Q   We'll look at other reports later that don't include this Background section. Why is that? Is this because this was probably one of the early reports you did on Cardinal?

A   That's correct. When I -- when I start on a company that I'm not as familiar with, I like to refresh myself every time I go and update my numbers. As I become more familiar, I will sometimes remove information that is in my head.

Q   Okay. So fair to say that, you know, April -- this report was April 30th, 2015. So fair to say this is probably around the beginning of the time you started, you know, preparing reports on Cardinal?

A   I believe I have reports that probably go several years earlier, but they would not have been formal write-ups or -- sorry. I shouldn't use the word "formal."

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 61

They would not have been in-depth write-ups for me, personally. They may have been me meeting the company at a conference, jotting down some notes, and simply putting them in a file just so I have them for later in the event that Cardinal ends up on our screen.

Q   Okay. So is it fair to say that this is one of the reports that you prepared early in the time in which Cardinal became part of the Contrarian strategy?

A   Yes.

Q   Okay. So fair to say Cardinal became part of the Contrarian strategy sometime in 2015? Again, this report is dated April 30th, 2015.

A   I believe that to be accurate.

Q   Okay.

MS. SADINSKY:  So if you zoom -- let's make this Background section bigger -- oh, it cuts off the screen. Never mind. You can zoom out.

BY MS. SADINSKY:

Q   If you read the Background section, it shows that the sales and profits -- profits from the medical segment were a fraction of the sales from the profits of the pharmaceutical segment, right?

A   About 12 percent, yes.

Page 62

Q   And would you -- is it fair to say that the pharmaceutical segment was generally more important to you in assessing Cardinal Health's, you know, valuation?

A   Yes.

Q   In your experience as an investment analyst, would you say that investors and other analysts typically view the pharmaceutical segment's performance as more important in assessing Cardinal Health's financials and valuation?

MR. JANOSKI:  Objection. Lacks foundation. Calls for speculation.

BY MS. SADINSKY:

Q   You can answer.

A   I -- I was going to say the same thing actually. You're asking me to speculate on what other people think. I can only speak to what I think and what my team thought, and so I and my team felt that the pharmaceutical drug distribution business was by far the most important element in valuing Cardinal in 2015.

Q   Okay. And you spoke -- you had conversations with other sell-side analysts and read other sell-side analyst reports, correct?

A   Correct.

Page 63

Q   And based on your experience as an investment analyst of -- I don't know -- 20 years almost and reading those reports, would you say that investors and other analysts were typically more focused on the pharmaceutical segment in assessing Cardinal Health's valuation and financials?

A   Yes.

MR. JANOSKI:  Same objection. Lacks foundation. Calls for speculation.

BY MS. SADINSKY:

Q   You said yes, correct?

A   Yes. The reports that I read generally emphasized the drug distribution business in their valuations.

Q   This section also highlights a recent acquisition, AssuraMed.

Do you see that?

A   I do.

Q   Why did you highlight the AssuraMed acquisition in the Background section?

A   It must have been a recent acquisition that the company was talking about, and so I felt that I just wanted to include it so that I would know what they were talking about when I read the reports or spoke with the company.

Page 64

Q   How do you generally think about M&A in assessing a company's value?

A   That's an overly broad question.

Q   Yeah, I knew you were going to say that.

At what point would you incorporate expected profits from an acquisition into your own valuation or -- or analysis of a company?

A   Primarily when the company tells me how they -- how they are planning on incorporating those profits and where they would come from; or, secondarily, based on sell-side or internal analyst reports that are incorporating that information in the absence of company information.

Q   Would you ever -- or do you generally incorporate expected profits before the acquisition actually closes?

A   Yes, I will include expected profits post a deal being announced but before the deal closes if the company has provided the information on how the deal is expected to impact their profits and, hence, future valuations, or I will incorporate it based on analyst models or judgments about the potential valuation impact.

Q   And how does your analysis incorporate or how do you think about potential integration

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 65

challenges? So if the company discloses expected profits or -- or anything like that, you know, would you consider the fact that there may, you know, be obstacles to achieving those? There may be challenges in the integration of the acquisition?

A   I am hopefully skeptical, but I do also expect management teams to have taken that into account before they provide the numbers, and so it would depend on my analysis of the management team itself and their historical track record.

Q   Okay. Okay. Then there's a section titled "Q2 thoughts."

Do you see that?

A   Yes.

Q   And how do you decide what information to include in this section?

A   Again, it differs by every company that I cover. I try to highlight what I feel are the most important elements of the earnings call in terms of helping me -- again, this is an internal note -- helping me judge whether the company is on track with the thesis that I had when we invested.

Q   Okay. So fair to say the information exhibit excluded in the Q2 thoughts section is generally what you believed to be the most important

Page 66

information from that -- that earnings call?

A   Most of the time, yes.

Q   Then there's a section --

MS. SADINSKY: Let's scroll down a little bit.

BY MS. SADINSKY:

Q   -- titled "Valuation."

And can you explain what types of information would go in this section?

A   So this would include, referencing back to your earlier question, any or all valuation methods that I feel are relevant or important to trying to get to a price target for the company.

Q   So this would include, like, the sell-side models, Harlan's model, et cetera? You would look at all of that to come to your valuation?

A   Yes. This is an internal note to me and that I will also share with my team. So this will incorporate everything that I have read and try to condense it down to, essentially, a single number.

Q   Okay. So the first two sentences here: "All the drug distribution companies have seen multiple expansion in the past two years, and now trade at 20x 2015 estimates. This gives me some pause, since we are now entirely reliant on EPS

Page 67

growth rates to drive results."

Can you just break that down for me? You know, you say the expansion the drug distribution industry gives you, quote, some pause. What does that mean?

A   I was believing that the valuations had gone up a little too quickly and that the stocks were no longer looking cheap.

Q   When you say valuations had gone up too quickly, what does that mean? Like, sell-side analyst valuations?

A   No. The stock price.

Q   And did you think that the stock price had gone up quickly and that was warranted or not warranted?

A   At the time, the drug distribution companies were benefiting from generic drug inflation, and if you continue reading my valuation, you'll see that I say: "So I trust the 12% EPS growth rates for the next two years..." that was based on the best available information from speaking to internal and external analysts and people in the industry.

And so if you'd go down to the What to do section, you'll see that I felt the stocks were near

Page 68

fair value. Again, that's an arbitrary and discretionary number and a valuation-subjective evaluation. But my subjective opinion was that the stocks had gone up correctly because earnings growth had gone up as a result of the generic inflation, but I now felt they were at fair value, and so you'll see I actually had suggested trimming slightly our position in the stock already.

Q   What does fair value mean in this context?

A   It's a completely subjective number of what I think the company is worth.

Q   Okay. Sticking in the Valuation section still, you refer to -- and you just mentioned this. You refer to: "...the 12% EPS growth rates for the next two years."

Do you see that?

A   Yes.

Q   So is your valuation generally based on forecasts two years out?

A   Sometimes. Not always.

Q   Is it sometimes more? Sometimes less?

A   It will differ by every company we cover.

Q   What about Cardinal Health?

A   At this point in time, per my notes, you can see I felt that two years was the correct number

Page 69

to look at.

Q   Did that change over time?

A   I would have to go through each and every one of the reports we provided you to see what I wrote, but it -- it can change over time.

Q   Is it two years from the date of this report? two calendar years? two fiscal years?

A   It would have been two years from the date of this report.

Q   Okay.  In the What to do section, you say you're:  "...okay holding the stock at our current position."

So that means you're recommending, or you're saying to yourself that you should hold Cardinal not by more -- not sell any at this point in time?

A   Both yes and no.  You have to read the entire section to get a true sense of my opinion.

Q   Okay.  I'm going to talk about the trimming thing too.

A   Okay.

Q   I just want to understand what it means to hold.

A   Yes.  That would mean do not add or sell based on the current size of our position in the

Page 70

portfolio.

But when I write:  "I am okay holding the stock..." and I do this for many of my companies, it means I don't have a strong opinion, one way or the other, to either buy more or sell.

Q   Okay.  How often -- when -- when do you -- what would cause you to change your recommendation to buy?

A   The valuation to my price target.  Whatever the stock price is versus my price target.

Q   Do you -- have you -- with respect to Cardinal Health, did you -- well, actually, strike that.

In general, you know, are you someone that makes a recommendation to buy frequently or not frequently?

A   It's entirely dependent on market conditions.

Q   Where you say:  "...the stock is near fair value and could see a multiple pullback," so fair value you said is just a subjective way that you describe the stock.

What does "see a multiple pullback" -- what does that mean?

A   So under the Valuation section, you'll see

Page 71

that I said that the drug distribution companies now trade at 20 times 2015 estimates --

Q   Mm-hmm.

A   -- a multiple pullback would be instead of trading at 20 times they would trade at less than 20 times.

Q   And that would decrease the stock price?

A   Yes.

Q   And if the stock price decreases, that doesn't necessarily mean that you'll recommend selling it, correct?

A   If the stock price decreases and nothing else changes, often that would result in me being more interested in potentially buying.

Q   Because the stock would be cheaper --

A   Correct.

Q   -- and you would believe the market was undervaluing it?

A   Potentially.

Q   Okay.  And then it says you may: "...suggest trimming as we get newer ideas in the Fund, taking the position down to maybe 80 bps over time."

What is 80 bps?

A   80 basis points, so 0.8 percent.

Page 72

Q   Of the Contrarian portfolio?

A   Yes.

Q   And what does it mean to "get newer ideas in the Fund"?

A   It's referencing back to my earlier answer. We are looking for stocks trading the bottom third of their 52-week trading range, and new ideas in the fund would be ideas that we are finding off of that list that we feel have good upside potential.

Q   How often is the -- how often are the portfolio managers in the Contrarian strategy looking for newer ideas?

A   We are always looking for new ideas.

Q   Then if you scroll down, there's the section "Main points."

What type of information would you typically include in this section?

A   This would be more of the financial information off of an earnings call.  So, typically, revenue growth, margins, EBITDA, EPS, and any other information I feel is relevant for this specific company or their specific industry.

Q   Is it fair to say all the information in the Main points section is reflected in your valuation?

Page 73

A    Ultimately, all the information in the Main points section will show up in my price target.
Q    In your price target.
Where is your price target?
A    I believe if you scroll up --
Q    Yeah.
A    -- you will see it in the very last sentence of the Valuation.
Q    Got it.
Okay.  Then there's a section at the bottom and the next page titled "Notes."
MS. SADINSKY:  Let's go up a little, Max.  This first paragraph here.
BY MS. SADINSKY:
Q    And what type of information would you typically include in this section?
A    This would be less the financial information and more the relevant information happening in the -- to the company specifically or the industry overall that I wanted to make sure I'm aware of.
Q    Is this information reflected in your valuation, in your price target?
A    Ultimately, yes.
Q    Okay.  So your price target here was 100,

Page 74

which is higher than Cardinal Health's price, correct?
A    I believe I had two price targets on there.
MS. SADINSKY:  Scroll back up.
BY MS. SADINSKY:
Q    Yeah.  I think it -- it's hard to see because of the stamping.  I think it says:  2015 target of 87, 2016 target of a hundred.
A    That is correct.  And that was using the multiple and the earnings per share growth rate, as well as all the information to decide that the stock should reflect that growth one year out.
Q    So -- one year out.  Okay.
And is there anywhere on this chart that -- that compares this to, you know, Cardinal's own guidance?
A    Could you scroll down to Main points, please.
I'm not seeing it on this sheet.  Scroll down to the Notes, please.
So you'll see under Notes:  "Med Devices:  Long term goal of 5.5% of profits."
That would have been guidance provided by Cardinal, indicating that they thought they could get the operating margins in the medical devices

Page 75

segment to 5.5 percent in the long term.
Q    Right.  But is there anything to compare the target $87 price for 2015 to anything Cardinal announced?  Like, how do I know if that -- if you're valuing it at more, at a premium or at a discount?
A    Cardinal does not provide price targets for their stock.  No company does.
Q    Right.
But if you are -- if you want to think about the price target in relation to Cardinal Health's guidance, is there any way to, you know, figure out how you're -- how you're thinking about it relative to Cardinal based on this report?
A    No.  The price target is my internal number of what I think it's worth.  I don't share that with anyone except myself and my team.
Q    Okay.  All right.  Let's go to the second page.
There's a section titled "Call with CFO, Mike Kaufmann."  You said earlier that you would generally speak with members of Cardinal Health management after an earnings call.  Not necessarily every single one, but you did have post-earnings call calls with Cardinal Health management, correct?
A    Yes.

Page 76

Q    And how long were those calls, generally?
A    They could be as short as 15 minutes or as long as an hour, even an hour and a half depending on the availability of the management team or the investor relations person.
Q    And when you had those calls with management, did you make it a priority to discuss the most important issues to your valuation of Cardinal?
A    I certainly tried to.
Q    And so the notes here would reflect, you know, the questions that you or other people at Columbia asked and the responses that, you know, Mr. Kaufmann or someone else gave in response?
A    Yes.
MS. SADINSKY:  We can put this document down.
BY MS. SADINSKY:
Q    Other than these formal reports -- not formal.
Other than these reports that you prepared for yourself and sometimes sent to other members of your team, how else did you share your views on Cardinal Health with your colleagues?
A    Usually, it would be done verbally.

Page 77

Q   Over the phone?  In in-person meetings?  On Zoom?

A   This -- well, this was 2015.  It would have been over the phone or in person.

Q   How often did you have verbal conversations with your colleagues about Cardinal?

A   I can't answer that.  I speak with my colleagues almost every day on different topics or stocks, and I simply don't recollect how often Cardinal would have come up seven years ago.

Q   But did you generally have, like, standing meetings to go over stocks within your quarter of the portfolio?

A   We did not have standing meetings.  I would have almost always had a conversation post the earnings call and as an additional comment on my emailed-out report simply because we are looking at hundreds of names as a team, and most of us don't have time to read everything with 100 percent all the way through.  And so I will attempt, in the verbal communication, to highlight the two or three things I deem most important.

Q   How many companies' stock or securities do you cover right now?

A   So each of us covers about one quarter of

Page 78

the fund.

Q   Yeah.  How many securities is in your quarter?

A   It would be between 15 and 20 on average.

Q   So you cover approximately 15 to 20 companies?

A   Those are just the companies in the fund or owned in our portfolio.

Q   Okay.  And then you cover companies outside the fund as well, but, typically, it's maybe a little less involved?

A   It's a much less involved process, but we all monitor and maintain lists of companies that we would like to ultimately either own or keep an eye on and that can number in the, you know, dozens to hundreds depending on where the stock market is valued and how the stocks have been trading at any point in time.

Q   Okay.  And then other than, you know, meetings with -- with the other members of your team and, you know, sending these reports to the other members of your team, did you have meetings with anyone else at Columbia about Cardinal, for example, Mr. Sonderling?

A   I would have spoken with Mr. Sonderling

Page 79

about the names in his coverage usually quarterly.

Q   Quarterly.
And then you would also receive his reports?

A   Yes.

Q   Okay.  So I'm going to go on to a new document.

MS. SADINSKY:  Does anyone need a break?  All set?

Okay.  Let's mark as -- what exhibit are we on?

MR. OBMASCIK:  Exhibit 4.

MS. SADINSKY:  Okay.  Let's mark as Exhibit 4 Tab 6.

- - -

(Columbia Exhibit 4 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Can you see the document on the screen?

A   Yes.

Q   Okay.  Is this one of the reports that Mr. Sonderling prepared?

A   It appears to be.

Q   It has the same date as the report you

Page 80

prepared that we just looked at, right?  April 30th, 2015.

A   Yes.

Q   Okay.  Exhibit 4 is an April 30th, 2015 report Columbia produced written by Mr. Sonderling.
And any portfolio manager or all portfolio managers at Columbia would have received this report?

A   I believe so.

Q   And you have here a table in the middle of the page.  Is this report based on a model?

A   That is not a question I can answer.  I did not prepare this report.

Q   You did not what?

A   I didn't prepare this report.  I do not know where Harlan got that table from or how he created it.

Q   So you don't know whether Mr. Sonderling had a model for Cardinal Health?  You never --

A   I assume he had a model, but I -- I never -- I mean, I -- I would be speculating.

Q   Did you ever discuss Mr. Sonderling's model of Cardinal Health with Mr. Sonderling?

A   Yes.

MR. JANOSKI:  Objection.  Assumes facts.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 81

BY MS. SADINSKY:

Q   And you received Mr. Sonderling's reports, correct?

A   Yes.

Q   And these reports, and we'll look at a bunch of them today, they typically include this table, correct?

A   Yes.

Q   And did you ever look at this table before?

A   Yes, I've looked at this table.

Q   And do you know what this table means?

A   For the most part, yes.

Q   And do you know where the information in this table comes from?

A   No.

Q   Did you ever --

A   I do not know where Harlan pulled the information that he put in this table from.  I can only assume or speculate.

Q   Did you ever -- did you ever ask Mr. Harlan any -- or Harlan any questions about the inputs that were in this table?

A   Rarely.  I would have focused on the rating, and I would have focused on the Comments below, and I rarely looked at the analyst tables

Page 82

because I do most of my own work.

Q   Okay.  What does the rating mean?

A   The rating is a directional indicator of whether Harlan thought the stock was a buy, modest buy, hold, modest sell, or strong sell.

Q   Okay.  And what is the -- what is the rating system?  One through five?  One through ten?

A   One through five.  A two would be a modest buy.

Q   And one would be a buy?

A   Correct.

Q   Two would be modest buy?  Three would be hold?  Four would be modest sell?  Five would be sell?

A   Yes.

Q   And then current price is Cardinal Health's current stock price as of this date?

A   Again, I had a different number there in mind, so I do not know where Harlan got his number from.

Q   Okay.

A   And I would have to pull up the historical price data to see which one of us had the correct number there, but I never looked at anything past the rating usually.

Page 83

Q   Okay.  So you typically focussed on the rating?

A   I would typically look at the rating and then go straight into the Comments.  The Comments were the most valuable to me.

Q   Okay.  So the Comments section, is it fair to say this is a summary of what the rating is based on?

A   Yes.

Q   And the information in the Comments section is the most important information, you know, reflected in how Mr. Sonderling is viewing Cardinal Health's performance and future performance.

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.

THE WITNESS:  I would be speculating.

BY MS. SADINSKY:

Q   Okay.  Mr. --

A   But that is the implication.

Q   Okay.  And I'm just going to remind you that your testimony shouldn't be repeating the objections of the lawyers on this call.  It should be your true and honest answer.  It is important to understand that since you are under oath.

Is the information in the Comments section

Page 84

listed in order of importance, to the best of your knowledge.

A   That I do not know.

MR. JANOSKI:  Again, he did not author this document.  Calls for speculation.

BY MS. SADINSKY:

Q   And the language in bold at the top of -- or at the top of the Comments, is that, you know, the top highlights?

MR. JANOSKI:  Same objections.

THE WITNESS:  When I received these reports, I assumed that the information in bold was what the analyst wanted me to focus on first.

BY MS. SADINSKY:

Q   Okay.  And then other than --

MS. SADINSKY:  We can put this down.

BY MS. SADINSKY:

Q   Other than these types of reports that Mr. Sonderling prepared, did he share his views of Cardinal with you in any other way?

A   He might have over the phone if we spoke about it.

Q   Emails?

A   Potentially.

Q   Would he come to Contrarian team meetings?

LA Sheriffs' Pension          FINAL          May 26, 2022
v. Cardinal Health Inc.                       Nicholas Smith

Page 85

A    No.  We would occasionally hold meetings with him to go over his entire coverage.

MS. SADINSKY:  Okay.  What exhibit are we on now?  Exhibit 5?

Let's mark Tab 7.

- - -

(Columbia Exhibit 5 was marked for identification.)

- - -

BY MS. SADINSKY:

Q    Earlier you said you didn't know who Jeffrey Cicirelli was, correct?

A    I did not recognize the name when you said it before.  Could you -- I might have to look at the report.

Yeah, I still don't -- I don't know who Jeffrey Cicirelli is.  I'm reading your report, and it says he's an investment grade credit.  I almost never speak with the credit people unless it directly relates to one of my stocks, and in this case, I would not have -- I would not have deemed it relevant.

Q    Okay.  Okay.  Can you expand on that a bit more?  Kind of just break it down to me what the credit people do.  When would it be relevant?  When

Page 86

would it not be relevant?

A    Credit people do debt or debt securities.

Q    So if a company announces an acquisition, would they do some analysis of the price paid, the debt that the company is incurring to do the acquisition?  Things like that?

A    I assume so, but I -- again, I'd be -- you're asking me to speculate about their job.  I don't do their job.

Q    I'm asking you to tell me when you consider the information from the credit team relevant.  Would it be relevant at that time to you or not?

A    It would depend on market conditions.  If we were in a market environment like 2008 where companies were having trouble refinancing their debt and could potentially face bankruptcy, then I would frequently speak with the credit side.  In 2015 that would not have been an issue.

Q    So between 2015 and 2018, would you have considered reports from the credit team to be not relevant to your own analysis?

A    That is correct.

Q    Do you recall ever considering reports from the credit team between 2015 and 2018?

A    I don't recall looking at credit reports,

Page 87

and the answer for Cardinal specifically is, no, I did not.

Q    You did not.

Is that what you said, you did not?

A    I did not look at credit reports for Cardinal.

MS. SADINSKY:  All right.  We can put this down, Max.

BY MS. SADINSKY:

Q    Did anyone else at Columbia produce any sort of reports on Cardinal that you're aware of, other than you; Mr. Sonderling; Mr. Cicirelli, even though you don't know who that is?  Anyone else?

A    Not that I'm aware of.

MS. SADINSKY:  Let's mark as -- actually, we can wait on that.

BY MS. SADINSKY:

Q    Okay.  So I want to turn to some specific events relating to Cardinal.  Are you sure no one wants a break?  Because this next section's going to go for a while.

MR. JANOSKI:  Why don't we take a quick break.

MS. SADINSKY:  Okay.  What time is it?

Let's go off the record.

Page 88

THE VIDEOGRAPHER:  We are now going off the record at 1:46 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're now going back on the record at 1:55 p.m.

MS. SADINSKY:  Okay.  Let's mark as Exhibit 6 Tab 8.

- - -

(Columbia Exhibit 6 was marked for identification.)

- - -

BY MS. SADINSKY:

Q    And so now I'm going to focus on some specific events relating to Cardinal Health.

Exhibit 6, which Max will put up in a second, is an article from Bloomberg, dated February 20th, 2015 entitled "J&J Said to Be in Talks on Sale of Cordis, with Cardinal Leading."

Have you seen this before?

A    I do not recall.

Q    Did you typically read Bloomberg articles?

A    I typically read Bloomberg articles, but I read hundreds of articles a day.

Q    Was Johnson & Johnson one of the companies that you tracked?

Page 89

A    Yes.

Q    Did you track Johnson & Johnson in 2015?

A    Most likely.

Q    Do you recall hearing in February 2015 about Cardinal Health's potential acquisition of the Cordis business from Johnson & Johnson?

A    I don't recall what I heard on those specific dates. It's -- it's most likely I was aware of this -- or a version of this article from a different news source.

Q    Okay. Do you recall at the time you first heard about the potential acquisition of Cordis whether you had a view as to whether the acquisition was a good idea for Cardinal?

A    I did not have a view when I first heard about the acquisition.

Q    Did you ever -- did you have any concerns about Cardinal Health's potential acquisition of Cordis?

A    I did not know enough about Cordis to hold a view when I first heard about it.

Q    Did you know anything about Cordis as a result of you tracking Johnson & Johnson?

A    Not really.

Q    Did you know who Cordis was?

Page 90

A    I did not have familiarity with Cordis at the time.

Q    Okay. Would a rumor of a potential acquisition have been something that -- would a -- strike that.

Would a rumor of a potential acquisition by a company you were covering have been something that you would have factored into your valuation before the acquisition was announced?

A    Unlikely.

Q    Why?

A    A lot of rumors occur on Wall Street.

Q    So you would not have, you know, factored in an acquisition until the company itself actually announces it; is that fair to say?

A    That would most often be the case, yes.

Q    And you would not have done any work to estimate, you know, potential accretion or synergies from an acquisition before it was actually announced?

A    No.

Q    And, no, as in you would not have done it?

A    I would not have done it. There might have been sell-side reports that did that work for me, and I might have read them.

Page 91

Q    But it's not something that you would have factored into your own valuation at the time, considering there's lots of rumors and you don't know what is true and what is not?

A    That is correct. I would have given it a very low weighting in my valuation, if any.

Q    Okay. Did you -- so you said you didn't have much familiarity with Cordis at this time, correct?

A    Correct.

Q    And you didn't know how Cordis had performed for Johnson & Johnson while it was still part of Johnson & Johnson?

A    I did not know. That is correct.

Q    Did you ever hear anything about poor performance of Cordis for Johnson & Johnson?

A    I believe I had indirectly heard that Johnson & Johnson was looking to sell Cordis because Cordis was not meeting their internal targets.

Q    Would that --

A    I do not recall where I heard that from.

Q    Okay. Would that have impacted how you were thinking about Cardinal Health's acquisition of Cordis?

A    Not necessarily. They're different

Page 92

businesses, and a larger company like J&J selling a slower-growth business can still be a good thing for the acquirer if the acquirer is able to -- is a more natural -- I should say a more natural owner of that asset and --

THE COURT REPORTER: I'm sorry. I missed the last few words of the witness's statement.

MS. SADINSKY: I believe the witness said a more natural acquirer or --

THE WITNESS: And more natural owner of a slower-growth asset and assuming they paid the right price for it.

BY MS. SADINSKY:

Q    Are you aware of any trade decisions that the Contrarian strategy made based on this information?

A    Specifically, you are referring to the article I'm looking at?

Q    Yes.

A    I am not aware.

Q    Well, I'm referring to the rumor generally.

A    I am not aware of any trades related to that.

Q    Okay.

MS. SADINSKY: Let's mark as Exhibit 7 Tab

LA Sheriffs' Pension          FINAL          May 26, 2022
v. Cardinal Health Inc.          Nicholas Smith

Page 93

9.

- - -

(Columbia Exhibit 7 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Did you prepare this report?

A   Yes.

Q   Exhibit 7 is a report Columbia produced from your files with the file name "February 23rd, 2015 Cardinal Health."

If you'd go under main points --

MS. SADINSKY:  If you could scroll down, Max, and zoom in a bit.

BY MS. SADINSKY:

Q   -- the eighth bullet there says:  "Medical going through transition:  Having to adjust for new payment realities, new profit pools."

Do you see that?

A   Yes.

Q   What does that mean?

A   It has been so long that I do not recall the specifics at all.

Q   What does going through a transition mean?

A   In my notes, that would usually mean that

Page 94

the management team is either trying to reposition the business or that there's some external factor that they're dealing with that is causing earnings to temporarily be lower than they should be.

Q   If you'd go to "Call with CFO Mike Kaufmann," which is the second page, and you look at the second sub-bullet there, it says:  "Medical focus is on private label and physician" -- preference [sic] -- "items.  Introducing items at a higher rate, distribution is very important but need to focus on cost effective substitutes.  Have done acquisitions and will continue to do that in less commoditized products."

Do you see that?

A   Yes.

Q   And the last bullet in that section says: "Margins in Med:  5.75% FY17 goal requires some acquisitions, up from 4%, so up 40%.  Driven by private label growth.  Services will drive this."

Do you see that?

A   Yes.

Q   So on those two bullets, what -- what does private label and physician preference items mean? Is that part of the medical transition?

A   So I will often copy the words that

Page 95

management teams tell me about their industry into my notes.  I am not an expert on this industry.  I am a generalist.  So my testimony here is going to be potentially wrong if I try to clarify what those terms mean to a specialist.

My understanding of the term "private label" is that Cardinal made or sourced their own devices and would sell them under the Cardinal brand or some brand that Cardinal owned, hence the word "private label," to the hospitals or end users.

Q   And so are they changing that -- was your understanding, based on this, that they were changing their focus from private label growth to, you know, other -- something different?

A   No.  My understanding was that Cardinal was attempting to increase the amount of private label devices and items they could sell through their medical division.

Q   Okay.  And then this last bullet that we looked at, or both of these bullets actually, focus on the fact that the medical segment has done some acquisitions and will continue to do acquisitions, right?

A   Yes.  What's the question?

Q   Yes.

Page 96

And do you understand that part of the -- or did you understand that part of the medical business's transition, is that what you're referring to as this growth by acquisition?

A   Not necessarily, no.

Q   What do you mean?

A   The -- the transition may have had to do with their reimbursements or margins at the time.  I cannot recall exactly.

Q   Do you remember if you had a view on the transition of the medical segment?

A   I believed that it would get better and improve from where it was.  It was not performing well at the time.

Q   So you thought this transition was a prudent strategy?

A   I'm not clear on what the word "transition" means in that capacity.  I did believe that acquisitions could help the medical segment reach a critical mass and help them get the margins to the long-term goal over time.

Q   Did the transitioning of the medical segment referred to in this report factor into your valuation of Cardinal?

A   Not significantly at this point in time.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 97

Q   Why not?

A   It was too small.

Q   And at this point in time, fair to say the pharmaceutical segment was more important to you in assessing Cardinal Health's valuation than other parts of Cardinal Health's business?

A   That is correct.

Q   And based on your experience as an investment analyst who reads sell-side reports, is it your -- is it fair to say that you believed other investors and analysts were also focused on the pharmaceutical segment when they were coming up with their own valuation of Cardinal around this time?

MR. JANOSKI:  Objection.  Lacks foundation. Calls for speculation.

THE WITNESS:  The reports that I read derived most of the valuation from how the drug distribution business was performing.

MS. SADINSKY:  Okay.  What exhibit are we on?

MR. OBMASCIK:  Exhibit 8.

MS. SADINSKY:  So let's mark as Exhibit 8 Tab 10, and Exhibit 8 is a March 2nd, 2015 press release from Cardinal Health announcing its plans to acquire Cordis.

Page 98

- - -

(Columbia Exhibit 8 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Max is going to put that up on the screen.
You said that you would review press releases by the companies you covered, correct?

A   Yes, I would have read this press release.

Q   You would have read this one?

A   Yes.

Q   And do you recall learning in March 2015 that Cardinal Health had announced its plans to acquire Cordis?

A   I don't recall exactly what I learned on that date, but given that this press release came out on that date, I would have read this press release from Cardinal.

Q   Okay.  Did you have a view at this time as to whether the acquisition of Cordis was a good idea for Cardinal Health?

A   I did not have a strong view positive or negative.  I would have focused on the third bullet point, where they discuss the accretion to non-GAAP diluted earnings.

Page 99

Q   Okay.  And we'll look at that in a moment, but do you recall whether you were enthusiastic about the acquisition?

A   I don't recall.

Q   But you said you didn't have a strong view on it one way or another?

A   Yes.

Q   So fair to say you were probably not enthusiastic?

A   I --

MR. JANOSKI:  Objection.  Misstates testimony.

THE WITNESS:  I didn't have a strong opinion one way or the other.  I had to first understand and evaluate how it would impact the valuation.

BY MS. SADINSKY:

Q   Do you recall whether you had any concerns about the acquisition?

A   I didn't know enough at that time to have formed an opinion on the day of the press release.

Q   Okay.  In the first paragraph here, it says that: Cardinal Health is purchasing Cordis for 1.9 billion.
Do you see that in the first paragraph

Page 100

where it says: "Dublin"?

A   Yes.

Q   Did you have a view as to the price Cardinal Health was paying to acquire Cordis?

A   Not on the day of the acquisition.

Q   Did you have a view as to the price Cardinal was paying to acquire Cordis, you know, around this time?

A   I did not.

Q   Did you ever think around this time that Cardinal Health was paying too much?

A   I did not.  I -- I don't -- I didn't know enough about Cordis, and so I would not have had an opinion on the valuation that was being paid by Cardinal at this time.

Q   Would you have done anything to analyze the price being paid at this time?

A   I would have read analyst reports and spoken to people with more knowledge than I.

Q   Who would you have spoken to?

A   Potentially, Harlan.  Potentially other sell-side analysts, and I do not recall any of those conversations anymore.

Q   Okay.  Let's go to the last paragraph -- or the second-to-last paragraph on this page.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 101

MS. SADINSKY: Max, maybe we can make it a little bit bigger. Get rid of those extra margins.

BY MS. SADINSKY:

Q   It says here -- the paragraph beginning: "We are extremely excited..." it says here: "This is a significant step forward in our cardiovascular strategy. Cordis brings with it a long and proud legacy of cardiovascular innovation. This move highlights our commitment to address a major pain point in healthcare systems through innovative new approaches to the management of physician preference items."

Do you see that?

A   Yes.

Q   And the physician preference items was something that was referenced in your February report that we just looked at, right?

A   Yes.

Q   And -- and were you aware that Cordis was part of Cardinal Health's PPI strategy, physician preference item strategy?

MR. JANOSKI: Objection. Lacks foundation.

THE WITNESS: I was not actually.

BY MS. SADINSKY:

Q   Have you ever heard of the PPI strategy?

Page 102

A   Only from the management of Cardinal when they were discussing it, and I could not give a good definition of it anymore.

Q   Do you know if there were other acquisitions that were part of the PPI strategy?

A   I do not off the top of my head, no.

Q   Do you remember anything that management said to you about the PPI strategy?

A   Other than what's in my notes, I do not recall anymore.

Q   And at the time of the announcement, did you have a view on whether the PPI strategy was a good thing?

A   I did not.

Q   Did you have a view on whether Cordis would contribute to Cardinal Health -- or a view to the extent to which Cordis would contribute to Cardinal Health?

A   I did not.

Q   Okay. Let's go -- scroll up a bit to the second full paragraph on this page, and this relates to the same bullet that you'd mentioned before, the paragraph beginning: "Assuming this timing..."

Do you see where I am?

A   Yes.

Page 103

Q   So the first sentence there: "Cardinal Health expects fiscal 2017 accretion in non-GAAP diluted earnings per share...from continuing operations of greater than $0.20 per share..."

Do you see that?

A   Yes.

Q   So Cardinal said it expected to achieve 20 cents accretion by the end of fiscal 2017, right?

A   Yes.

Q   And that's more than two years after this announcement, right? This announcement's March 2nd, 2015.

A   More than two years. I don't believe your math is correct. This says fiscal 2017, and I believe Cardinal's fiscal year-end -- I don't have my screens in front of me, but I believe their fiscal year-end is in the middle of the year.

Q   Their fiscal year-end is June 30th, so June 30th, 2017, is that more or less than two years after March 2nd, 2015?

A   You're -- you're correct.

Q   And was this accretion estimate something that you focused on?

A   But where you're not correct is the fiscal 2017 year starts in June of 2016 already; does it

Page 104

not?

Q   So fiscal year starts -- ends June 30th, so fiscal year 2018 would have began July 1st, 2017, right?

A   Twenty -- fiscal 2018 I believe would have started July 1st, 2017, yes.

Q   Yes. So fiscal year 2017 ends on June 30th, 2017?

A   Ends, correct. Yes.

Q   And this is talking about accretion by the end of fiscal 2017, correct?

A   It doesn't say by the end. It says: "Expects fiscal 2017 accretion of greater than 20 cents per share." So I assume that would be within fiscal year 2017. Is that not how it --

Q   No. You're right. It says "end for synergies." So apologies.

Okay. Did you -- so you said the accretion estimate was something you would have focused on, correct?

A   Correct.

Q   And did you understand that there was 100 percent chance that Cardinal Health would achieve the 20 cents accretion estimate?

MR. JANOSKI: Objection. Lacks foundation.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 105

Calls for speculation.

THE WITNESS: Sorry. Repeat the question.

BY MS. SADINSKY:

Q   Did you understand that there was a hundred percent chance that Cardinal Health would achieve the 20 cent accretion estimate in fiscal year 2017?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

THE WITNESS: Sorry. I need you to repeat it one more time very slowly. I'm missing one or two of the words early in your question that I think are key to how I answer it.

BY MS. SADINSKY:

Q   Did you understand that there was an -- a hundred percent chance --

A   That there wasn't? Was not?

Q   There was. That there was.

A   Did I understand that there was --

Q   -- a 100 percent chance that Cardinal Health would achieve the 20 cents accretion estimate in fiscal year 2017?

MR. JANOSKI: Same objection. Lacks foundation. Calls for speculation.

THE WITNESS: Did I understand that there was a 100 percent chance that Cardinal would achieve

Page 106

20 cents EPS accretion in fiscal 2017?

Is that a correct --

BY MS. SADINSKY:

Q   Yes. That's my question.

A   No, I did not assume a 100 percent chance.

Q   In your experience as an investment analyst, do you believe that other analysts and investors would understand there was a 100 percent chance that Cardinal Health would achieve 20 cents accretion by fiscal year 2017?

MR. JANOSKI: Same objection. Lacks foundation. Calls for speculation.

THE WITNESS: I was already going to answer you're asking me to speculate on other people.

My experience and my team's experience has been that guidance numbers are a company's best guess at the time of the announcement and not -- or -- and are subject to change if there are other influencing factors as time goes on.

BY MS. SADINSKY:

Q   So in your experience as an investment analyst, you -- you would believe there was -- or you would understand there was not a hundred percent chance that the company would achieve its best estimate?

Page 107

MR. JANOSKI: Same objections.

THE WITNESS: I would not assume 100 percent. I will add a caveat. When a company does a deal, they tend to guide conservatively.

BY MS. SADINSKY:

Q   Okay. What would be the reasons that Cardinal Health might not achieve the full 100 percent amount of the 20 cent accretion estimate?

MR. DeWITT: Objection.

THE WITNESS: That is not something I can answer.

MR. JANOSKI: Join in objection.

BY MS. SADINSKY:

Q   In your -- why can't --

A   It's far too broad a question.

Q   Would you have factored in the same 20 cent estimate into your own valuation of Cardinal?

A   Yes. Companies tend to guide conservatively when they announce M&A, and I would have written in that I expect them to do 20 cents and the synergies that are in the last line of that paragraph. I would have expected that to be something they could accomplish.

Q   And earlier we looked at your model is typically based on two years, right?

Page 108

A   That is -- that was a single point in time and a single note that we looked at. So I would not generalize that.

Q   Do you recall if you ever did a valuation that was of Cardinal that was based on more than two years of -- of growth?

A   I believe in my later notes, I'm actually only looking one year out for some of the valuation that I came up with.

Q   Okay. So fair to say your valuation is typically based on two years out or less?

A   That is not correct either. It depends on the company and it depends on the industry.

Q   For Cardinal Health.

A   For Cardinal Health at this point in time, I was looking about two years out. That is correct.

Q   And so an accretion estimate and a synergies estimate, if you look at the same paragraph, it says: "Synergies would be by the end of fiscal year 2018."

How would the fact that you were looking about two years out impact how you were thinking about these accretion and synergies estimates?

A   I'm not clear on what the question is.

Q   So if synergies were -- they say 100

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 109

million in synergies by the end of 2018 -- by the end of fiscal 2018. That's more than two years out, right?

A   Yes.

Q   So would you have incorporated a synergies estimate that's more than two years out if your valuation is based on two years out?

A   I would not have included the synergies in a number or price target because I do not believe I had a price target for fiscal year 2018 at this point in time, but I probably would have referenced the 100 million in synergies in my notes somewhere so that I would incorporate it in the future.

Q   Okay. So fair to say that the 100 million in synergies may be reflected in your notes, but were not reflected in your price target at this time in March 2015?

A   That is likely correct.

Q   So the 100 million synergies estimate, you understood as well that there was not -- or that -- did you understand as well that there was -- strike that.

Did you understand that there was a hundred percent chance that Cardinal Health would achieve the 100 million in synergies by the end of fiscal

Page 110

year 2018?

MR. JANOSKI: Objection. Lacks foundation. Calls for speculation.

THE WITNESS: Similar to my prior response, I never assume a hundred percent. Things are always subject to change. Again, I would have assumed that Cardinal would have guided conservatively. Most management teams do when they announce synergy numbers in an M&A deal.

BY MS. SADINSKY:

Q   And this would not have been in your price target at this time, correct?

A   Not yet, no.

Q   At the time of the announcement, was there any discussion or analysis at Columbia of what Cardinal Health would need to do to successfully integrate Cordis?

A   It's possible I had a conversation along those lines, but I do not recall it.

Q   If you did have a conversation, who would you have had that conversation with?

A   Most likely with Harlan.

Q   Did you have -- did you or anyone else at Columbia have an understanding of any challenges that Cardinal may face in seeking to integrate

Page 111

Cordis?

A   No.

Q   Would you have understood that there may be challenge -- or would you have understood that there were potential challenges in integrating an acquisition?

MR. JANOSKI: Objection. Calls for speculation.

THE WITNESS: There are always challenges integrating an acquisition. I would have assumed Cardinal would have already figured those out or been in process of solving them.

BY MS. SADINSKY:

Q   You would have assumed that all of the potential challenges that could arise in integrating an acquisition a company would know at the time it announces an acquisition?

A   I would have assumed that they would have a decent understanding of what they are buying, that they would have done their due diligence, and that they would have figured out or mapped out potential areas of concern and started to address them, yes.

Q   And if a company disclosed potential challenges that may lead to it not hitting its accretion or synergies estimate, that's something

Page 112

that you would have read and been aware of?

A   The question makes no sense to me.

Q   Well, we'll actually look at the disclosure, so let's just wait on that.

But at this time, did you or anyone else at Columbia understand how Cordis had performed for Johnson & Johnson?

I know we said no at the time of the rumor, but at the time of the actual acquisition, did you have any understanding of how Cordis had performed for Johnson & Johnson?

A   I personally did not. Other Columbia portfolio managers who have owned or followed Johnson & Johnson may have had a better sense of that.

Q   Would you have discussed that with them?

A   Not necessarily, no.

Q   Do you recall if you ever did?

A   I do not recall.

Q   Okay. Let's mark as Exhibit 9 Tab 11.

- - -

(Columbia Exhibit 9 was marked for identification.)

- - -

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 113

Q   Exhibit 9 is a January 29th, 2015 report from Mr. Sonderling titled "Cardinal Health reports strong 2Q fiscal year June 2015 earnings; retain 2; CEO call at 200 p.m."
    Have you seen this before?
A   I don't recall, but most likely.
Q   And this is before Cardinal Health announced the Cordis acquisition, right?  It's in January 2015.
A   Yes.
Q   If you'd go to page 2, page 2 is -- looks like a -- the notes that Harlan sent after he had a call with George Barrett.
    Do you see it says:  "Cardinal Health CEO George Barrett earnings call-back"?
A   Yes.
Q   Okay.  In the first bullet there --
    MS. SADINSKY:  Maybe, Max, we can zoom in a little to get rid of the extra space.
BY MS. SADINSKY:
Q   The end of that first bullet says: "Replaced Medical Canada leader and CFO.  [HS: That's moving decisively.]"
    HS is Harlan's notes, right?
A   They appear to be.

Page 114

Q   "Team will drive more through the channel, more private label, follow steps that have worked in US.  Canada is not fated to be lower [sic].  [HS: Don Casey, Head of Medical, is good.]  Hospital and health systems want Cardinal's overall offering."
    Do you see that?
A   I do.  I believe the word was "loser," not "lower."
Q   Oh, sorry.
    And so with respect to the management changes in medical, so replacing the medical Canada leader and medical CFO, Mr. Sonderling writes: "That's moving decisively."
    What does that mean?
    MR. JANOSKI:  Objection.  Calls for speculation.
    THE WITNESS:  I'm speculating that Harlan meant that Cardinal was taking action to improve the business finally.
BY MS. SADINSKY:
Q   Did -- did Harlan have concerns about the medical segment leadership at this time?
    MR. JANOSKI:  Same objection.
    THE WITNESS:  I cannot answer that because I did not have -- I don't recall having a

Page 115

conversation with him about the Canadian leadership.
BY MS. SADINSKY:
Q   What about medical segment leadership generally?  It refers to medical Canada leader and also just the CFO.
A   I do not recall speaking with him about medical leadership.  I do recall speaking with him about the medical segment and that its performance was simply not that good for several reasons --
Q   What reason?
A   The main reason that I believe is in my notes, if you want to reference them, had to do with the reimbursement.
Q   What is the reimbursement?  What does that mean?
A   I don't recall anymore.  I'm speculating on my own notes if I try to answer that.  I believe it had to do with the prices that Cardinal was receiving for their devices.
Q   Did you have any concerns about medical segment leadership around this time?
A   Not with the leadership specifically, no.
Q   He says here that:  "Don Casey...is good."
    Do you see that?
A   Yes.

Page 116

Q   What does that mean?
A   I did not know Don Casey.  That is Harlan's opinion.
    THE COURT REPORTER:  I didn't catch the objection.
    MR. JANOSKI:  Objection.  Calls for speculation was the objection.
BY MS. SADINSKY:
Q   You didn't know anything about Don Casey?
A   Again, I'm a generalist.  I don't know the specific people frequently within the industry.  So I did not know who Don Casey was, and this is Harlan's opinion in here.
Q   Okay.  And it says:  "Hospital and health systems want Cardinal's overall offering."
    What do you understand that to mean?
A   I understand it to be Harlan's opinion that hospital and health systems are fine with -- and willing to buy Cardinal's products.
Q   The second-to-last bullet there, it says: "Home health cited as big potential (HS:  I agree.)"
    What is home health here?  Is this referring to the AssuraMed acquisition?
A   I would speculate that that's what he's referring to.

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 117

Q   And how did that acquisition impact how Columbia was thinking about the Cordis acquisition?
A   I cannot speak to Columbia. I can only speak to my own notes and my own valuation, and I have in my own notes -- I believe I cited home health as a growth opportunity for Cardinal, but I did not really include it in my valuation ever. It was --
Q   And --
A   -- too small.
Q   And you keep saying you can't speak for Columbia. I want to remind you that you have been designated by Columbia as the corporate witness.
A   Yes, but I don't invest for all of Columbia. I only invest within the Contrarian fund, and you're not asking me to -- you keep on using the word "Columbia" generically.
Q   Okay. Did the -- how did the AssuraMed impact how the Contrarian fund is thinking about the Cordis acquisition?
MR. JANOSKI: Objection. Lacks foundation.
BY MS. SADINSKY:
Q   You can answer.
A   I said not at all. I didn't really view either of them in -- I'm not answering that

Page 118

correctly.
The way you asked the question, the answer would be it did not.
MS. SADINSKY: Okay. Let's mark as -- actually, I think we already looked at this. Let's go back to Tab 6, which was Exhibit 4.
Let's go back to Exhibit 4.
BY MS. SADINSKY:
Q   And we looked at this report earlier. This is Mr. Sonderling's April 30th, 2015 report, and let's zoom into the Comments section.
The top paragraph, the bolded paragraph, says: "Medical revenue rose 4%, but operating company fell 8% on weak Canada and a new item 'reduced contribution from national brand distribution,' which now needs explaining."
The next paragraph: "Medical increasingly appears like McKesson's comparably sized Technology segment, the 15% of total operating income segment that regularly detracts from outstanding Distribution segment performance." The difference is -- "The difference is that MCK is shrinking Technology, while Cardinal is spending big money to acquire and build out this segment. Now, we have to learn what 'reduced contribution from national brand

Page 119

distribution' means. I wish I could focus instead on the good things happening in Distribution."
Do you see that?
A   Yes.
Q   When Mr. Sonderling says Cardinal Health is spending "big money" to build out the medical segment, how was Cardinal Health building out the medical segment?
MR. JANOSKI: Objection. Calls for speculation.
THE WITNESS: Yeah, I don't know what he's referring to there.
BY MS. SADINSKY:
Q   This is after the Cordis acquisition, right?
A   Then he's most likely referring to the Cordis acquisition.
Q   And what does, quote, big money mean to you?
A   That's Harlan's use of words. I -- I don't know what he meant specifically, other than to speculate, and I won't.
Q   I'm asking when you read this report or when you read this report now, what do you understand "spending big money to...build out the

Page 120

medical segment" to mean. That is not speculating. I am asking what you understand that to mean.
MR. JANOSKI: Objection. I would say badgering the witness and vague as to "big money."
BY MS. SADINSKY:
Q   Big money is a quote from the document.
Mr. Smith, what do you understand, quote, big money, end quote, to mean when you read it here?
MR. JANOSKI: Objection. He didn't author this document. Calls for speculation.
BY MS. SADINSKY:
Q   Go ahead.
A   I interpret this paragraph to mean that Cardinal is now spending money to grow their medical segment. I do not have an opinion on Harlan's use of the words big money. Harlan -- I -- it's not my words, and I don't have an opinion on it.
Q   When you read this paragraph, do you understand Harlan to be happy about the money that Cardinal Health was spending to build out the medical segment or not happy? When you read and made --
A   I interpreted it as a negative.
Q   As a negative.
And why?

Page 121

MR. JANOSKI: And I'm going to lodge an objection again as speculative. Vague as to "happy."

THE WITNESS: Negative because the medical performance has been -- had been quite weak as compared to the distribution business.

BY MS. SADINSKY:

Q And did you understand that Harlan or others at Columbia may have had concerns with the decision to grow the medical segment as a result of its prior weak performance?

MR. JANOSKI: Objection. Calls for speculation.

THE WITNESS: I don't recall the nature of the opinions expressed when I spoke to Harlan about this segment, bluntly. I don't recall.

BY MS. SADINSKY:

Q Did you ever have concerns about the money Cardinal was spending to build out its medical segment around this time?

A I was a -- I was on the more favorable side because I had seen Cardinal build and divest nonstrategic subsidiaries in the past. I believe they had done -- and I cannot recall the name or the timing. I believe they had done a divestiture years

Page 122

earlier, and I was not adverse to them increasing the medical size and then potentially turning that into a spin-off or otherwise monetizing it for shareholders.

Q And did you and Harlan ever discuss your views on this and whether they differed?

A I -- again, I don't recall the exact conversations I had with Harlan on this.

Q At the bottom of this page, if we go to the bullets there, the second bullet says: "Cardinal made no share repurchase due to the pending Cordis acquisition."

How do you think about share repurchases in assessing Cardinal's valuation?

A Share repurchases at Cardinal had historically been running around 3 percent a year in 2015, and I included them in my earnings per share growth rate as a result, and so it would have led me to give Cardinal a slightly higher price target if I had assumed or could assume that they would continue at a strong pace.

Q Okay. I just want to make sure I'm understanding.

So if a company is going to continue share -- or Cardinal Health was going to continue

Page 123

share repurchases, you may give Cardinal Health a slightly higher price target, correct?

A Based on the earnings per share growth being slightly higher, yes.

Q And so if Cardinal Health was going to stop doing share repurchases, you would have a slightly lower price target than you would have if they were going to continue doing share repurchases, right?

A No, not necessarily. Doing an acquisition that has accretion also grows the earnings per share number.

Q Okay. So would the share -- would the fact that Cardinal couldn't do any share repurchases right now and would expect accretion in two years, how does -- how does that interplay?

A Is that --

Q I'm not asking -- I'm not asking that question well, but do you understand what I'm trying to get at? It's no share repurchases in the near immediate term and accretion in the future, so how does that affect how you're thinking about the price target for Cardinal Health?

MR. JANOSKI: Objection. Compound. Vague.

THE WITNESS: I would have included both aspects of your question in my analysis and my

Page 124

valuation.

BY MS. SADINSKY:

Q Okay. So your valuation could, you know, be slightly higher because of the accretion estimate and also slightly lower because of the share repurchases. So in some sense, it could -- not necessarily cancel each other out, but it'll -- it'll be adjusted for both?

MR. JANOSKI: Objection. Compound.

THE WITNESS: I would have factored in share repurchases or lack of -- thereof and the accretion from the deal in my final analysis. I disagree with the way you asked the question. You're including too much.

BY MS. SADINSKY:

Q Okay. So let me say it this way.

Lack of share repurchases would be a negative when it comes to your valuation and --

A Potential. A potential negative.

Q A potential negative when it comes to your valuation. That's correct, right?

A It depends on the circumstances of why, and it's very case specific. But in Cardinal's case, I wasn't -- I was originally including share repurchases in my earnings growth number.

Page 125

Q   Okay.  So you were originally including share repurchases in your earnings growth number.  So lack of share repurchases or stopping share repurchases would be a potential negative, correct?
A   Not necessarily.  Again --
Q   I'm saying it wouldn't be -- just to be clear, I'm not saying it wouldn't be offset by anything, and I'm going to get there.  I'm just trying to break it down.  Just give us --
A   I can't let you do that, because there could be a million reasons why a company would stop doing a share repurchase; some negative, some positive.
MR. JANOSKI:  I'm sorry, Mr. Smith.  I'm just going to object and ask that counsel please let the witness finish his answer before cutting him off.
Go ahead, Mr. Smith.  Continue.
THE WITNESS:  Yeah, the way you're phrasing it to me is putting words in my mouth that are not correct.  It may or may not be a negative when share repurchases go away.  I was originally -- all I'm saying, and the only thing I will stand to here is I was originally including the 3 percent share repurchases year over year in my EPS growth

Page 126

estimate.
The fact that they went away for this deal, I will not say was a positive or a negative as it specifically relates to the share repurchases.  You have to factor in everything.
BY MS. SADINSKY:
Q   Okay.  Let me try it this way.
You were originally including 3 percent share repurchases, which was a -- which impacted your price target upwards?
A   It was one factor in my price target.
Q   And it was one factor in your price target that moved the price target up, right?
A   Not necessarily.
Q   Share repurchases included in your price target bring it down, that one factor?  I understand there's a bunch of factors.
A   That one factor would have brought the earnings per share growth up, that is correct.
Q   And you're not including that factor anymore, not including 3 percent share repurchases in your model when Cardinal Health is not doing them, correct?
A   Not for the time frame under which they said they would stop them.

Page 127

Q   Okay.  In this second paragraph here, Mr. Sonderling says:  "I wish I could focus instead on the good things happening in Distribution."
So at this time, I think you previously testified that the pharmaceutical segment was more important to you in coming up with your valuation of Cardinal than other aspects of Cardinal's business, correct?
A   Yes.
Q   And did you understand that Harlan felt the same way?
MR. JANOSKI:  Objection.  Calls for speculation.
THE WITNESS:  It would have been a proportionally much -- yes, I did.
BY MS. SADINSKY:
Q   And this report, if you look at the bottom, mentions another recent acquisition, right?  Metro Medical?  That's in the first bullet.
A   Yes.
Q   Did you ever think about whether Cardinal Health doing multiple acquisitions at the same time could have implications for Cordis?
A   No.
Q   Do you think that it's possible that doing

Page 128

multiple acquisitions at the same time could increase the integration risk of an acquisition?
A   Metro Medical is a distribution business.  It should not have had any impact on the Cordis integration.
Q   Okay.  What if -- well, we'll look at it in a moment.  That's fine.
MS. SADINSKY:  Let's mark -- what's our next exhibit?
MR. OBMASCIK:  Exhibit 10.
MS. SADINSKY:  -- Exhibit 10, Tab 12.
- - -
(Columbia Exhibit 10 was marked for identification.)
- - -
BY MS. SADINSKY:
Q   Did you prepare this report?
A   Yes.
Q   It's a report produced from your files with the file name "April 30th, 2015 Cardinal Health."
Under the What to do section, you say:  "I am ok holding the stock at our current position, but also feel the stock is facing a tougher 2016.  We have two more good quarters before I worry about the comps:  Red Oak performance in Pharma, and Cordis

Page 129

dilution in Medical.  I would suggest trimming as we get newer ideas in the Fund, taking the position down to maybe 80 bps over time."

Q    Do you see that?

A    Yes.

Q    What does "...worry about the comps" mean?

A    The -- in this case, how they would grow earnings year over year.

Q    And what does "...Cordis dilution in Medical" mean?

A    2016 fiscal year, I believe, they had announced would be slightly dilutive.

Q    And so how does that impact the comps?

A    Well, Cordis is contributing negatively to earnings in 2016.  So that would make the year-over-year earnings growth go down.

Q    And how did that impact how you were thinking about Cordis?

A    I wasn't thinking about Cordis specifically at all.

Q    How did --

A    I was thinking about Cardinal overall.

Q    Okay.  How did that impact how you were thinking about Cardinal?

A    I was clearly telling us, as it says right

Page 130

here, I suggested trimming the position because I felt that the stock might not perform as well as we wanted it to.

Q    And the stock might not perform as well as you wanted it to in part because of Cordis, correct?

A    In part.  I think Red Oak performance was a larger piece of this analysis, though.

Q    Because performance in the pharmaceutical segment generally had a greater impact on Cardinal Health's performance than other aspects of Cardinal Health's business; is that right?

A    Yes, and Red Oak specifically had driven significant gains in the -- in the overall business for several years -- or for at least the prior year.

Q    Okay.  Under "Main points" --

MS. SADINSKY:  If you could scroll down.

BY MS. SADINSKY:

Q    -- I don't know -- the fourth to last bullet highlights:  "Medical going through transition:  New payment realities, adding Cordis."

Again, you don't know what this means?

A    It -- to me in my notes at the time, and I don't recall the specifics, it's been too long, but I was -- I would -- I would have written that to mean that medical should improve from here as they

Page 131

get through the -- as they get through the -- essentially, the bad stuff that had been happening in the prior year.

Q    Okay.  So you thought that the medical business was going to improve at this time?

A    Yes.

Q    And if you go to "Q3 thoughts," which is at the top of the page, you say:  "Topline growth of 18% was strong, helped by acquisitions, with Pharma great and Medical struggling.  Overall Cardinal Health moved guidance to top of EPS range for 2015.  Red Oak JV is driving Pharma results, two more quarters of positive here.  Medical has two more bad quarters, but Cordis getting added should help in 2017 and will hide weakness in 2016."

And then if we go down to the Notes section, the first bullet:  "Medical remains difficult, margins down.  Cordis will change the business."

So in both of these sections you speak positively about Cordis helping the business in 2017, right?

A    Yes.

Q    And how would Cordis, quote, change the business and, quote, help in 2017?

Page 132

A    Help in 2017 directly refers to the accretion.

Q    And change the business?

A    Refers to larger scale.

Q    What does that mean?

A    Cordis -- my understanding of Cordis is that it had a -- it was a distribution business as well as combined with the devices, and, as such, would give Cardinal more scale and, therefore, hopefully, better growth.

Q    Did anyone at Columbia analyze or model the extent to which Cordis might increase Cardinal's margins or change Cardinal's business?

A    I am not aware.

Q    Were there risks to the thesis that Cordis would, quote, help in 2017 and, quote, change the business?

MR. JANOSKI:  Objection.  Vague as to "risks."

THE WITNESS:  I'm not aware of risks that I was thinking about back then.

BY MS. SADINSKY:

Q    Okay.  So you don't --

A    I don't recall.  I don't recall risks that I was thinking about back then.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 133

Q   Okay.  So you believe there was a hundred percent chance that Cordis would change the business and help in 2017 at the time you wrote this?

MR. JANOSKI:  Objection.  Lacks foundation.  Calls for speculation.

THE WITNESS:  I do not recall when I typed these notes in specifically because I would often update my quarterly notes even several weeks after, but I would not change the date or the title of the report.  So I could have added these notes after April 30th, which is -- it's possible that I'd had some conversations at this point that had made me more positive, but I, again, do not recall exactly how I formed that opinion back then.

BY MS. SADINSKY:

Q   My question was:  Did you believe there was a hundred percent chance at whatever time you updated these notes that Cordis would a hundred percent -- there was a hundred percent chance that Cordis would, quote, change the business, and a hundred percent chance that Cordis would, quote, help in 2017?

A   I would --

MR. JANOSKI:  Same objections.

THE WITNESS:  I had a very strong belief

Page 134

that it would help in 2017.

BY MS. SADINSKY:

Q   Okay.  Is it harder to predict help and benefits in the future?

A   What do you mean?

Q   So this report is from April 2015, and you're talking about helping in 2017.  Is that harder to, you know, be sure whether or not something will actually help in 2017, given the time lapse?

MR. JANOSKI:  Objection.  Vague.  Calls for speculation.

THE WITNESS:  It is -- yes.

MS. SADINSKY:  Okay.  Next Tab 14 -- Tab 14.

- - -

(Columbia Exhibit 11 was marked for identification.)

- - -

MS. SADINSKY:  And we're on Exhibit 11.  I'm marking as Exhibit 11 a June 19, 2015 report from Mr. Cicirelli titled "Cardinal Health Moving BBB+/R2/Marketperform to New Issue (3.75% '25)."

BY MS. SADINSKY:

Q   Do you see that?

Page 135

A   Yes.

Q   And have you seen this report before?

A   No.

Q   And this report is specifically about Cardinal, right?

A   I haven't seen this report before.  It appears to be.

Q   And would you have received this report before?

A   I wouldn't have read it even if I did.

Q   So how does -- what does the -- so the credit team does work and -- who looks at those?

A   The credit team does credit.  They do debt.  I'm equities.

Q   So what is the point of that work?  Is it incorporated --

A   It's for them.  It's for their team.

Q   What does their team do with it?  What does their team do?  Invest in bonds?  Is that what they do?  I just -- I want to know how the credit team fits into Columbia's organizational structure.

A   Columbia has bond funds.  The credit team -- I don't know where Jeffrey falls within the structure, but he would have either worked directly on the team or as a research analyst for other

Page 136

teams, other debt and credit teams.

Q   But so the credit teams are separate from equity teams?

A   They manage money separately from equities, yes.  They're totally different investment types.

Q   So the credit team manages money too?

A   Very likely, yes.  I don't know of Jeffrey's specific role.

Q   So the credit team doesn't exist at Columbia to, you know, provide information to the equity teams, right?

A   They can if we ask them for information.

Q   But that's not --

A   We may end up on the same calls together even.

Q   But that's not their sole purpose.  They have their own investing?

A   Debt is completely different from equity.

Q   Okay.  And so you have a debt team?

A   Yes.

Q   Okay.

A   But I can't -- I'm not high enough in the corporate structure to speak to the debt team and how it's structured.  I don't know.

Q   Okay.  And as a reminder, you're here on

LA Sheriffs' Pension                     FINAL                     May 26, 2022
v. Cardinal Health Inc.                                            Nicholas Smith

Page 137

behalf of Columbia.  You're not here on behalf of the Contrarian strategy.  You're designated as a witness for Columbia.  The fact that you don't --

A   Yes, but I can't answer questions I don't know answers to.

Q   And you had an obligation to be educated on these things in advance of this deposition as a 30(b)(6) witness and we'd be happy to --

MR. JANOSKI:  Counsel, can you state the topic this would be relevant to that's in the notice?

MS. SADINSKY:  On -- this is an article on the price being paid for the Cordis acquisition.

MR. JANOSKI:  On debt securities, not the actual securities at issue here.  So I don't understand why you're badgering the witness about not being prepared for something that's outside the scope of this --

MS. SADINSKY:  Mr. Janoski, this is an article that's talking about how the price that Cardinal Health is paying to acquire Cordis is affecting it's balance sheet.  A company's balance sheet is directly relevant to the financial performance and condition of the company.

MR. JANOSKI:  And you can ask him questions

Page 138

about it but if he's not prepared to answer something he doesn't have personal knowledge of, it's outside the scope of the deposition, I don't understand why you're badgering him.

MS. SADINSKY:  Maybe you can let ask my questions, Mr. Janoski, and we can argue about this off the record.

MR. JANOSKI:  We can, but I would object to that as --

MS. SADINSKY:  Your -- your objection is noted.

MR. DeWITT:  I'm going to note an objection too.  I won't go into any more reasons, but I'm going to note an objection.

MS. SADINSKY:  Okay.  Let's mark -- what are we on?  Exhibit 12? -- tab 15.

- - -

(Columbia Exhibit 12 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Did you prepare this report?

A   Yes.

Q   Exhibit 12 is a report Columbia produced in your files with the file name:  July 30th, 2015

Page 139

Cardinal Health.

If we go to page 2 -- or sorry.

If we go to the bottom of page 1, do you see where it says:  "Call with John Ransom"?

A   Yes.

Q   And John Ransom is a sell-side analyst with Raymond James?

A   He would have been at the time, yes.

Q   Let's go to page 2.

And I want to look at the second bullet on page 2.  "CAH ranks #3 in his mind, has only 8% specialty, which is the main growth driver.  Thinks recent deals are just so so.  Cordis may devalue brands, need a stent which they are still missing, under constant margin pressure.  Bought generic distributor so not seeing upside there."

Do you see that?

A   Yes.

Q   Do you remember this call with John Ransom at Raymond James?

A   I do not remember this call at all.  I wrote it in my notes so I wouldn't have to try to remember it.

Q   So we're going to look at more of your notes, and you very rarely include summaries of

Page 140

calls with analysts, so when would you decide to include a summary of a call with an analyst in your -- in your report?

A   This was still early as I was learning about the company, so I tend to include analyst calls early on as I'm learning about a company and trying to gain a broader base of knowledge.

Q   And there's two analyst calls in this document, one with John Ransom and then one with Bob Willoughby.  Would these have been the only two analyst calls you had?

A   No.

Q   And why would you choose to include these two and not others?

A   It's arbitrary.  I don't know.

Q   Would it be because the information you learned on these two calls was more important to you in your valuation of Cardinal than others?

A   No.

Q   So you may have summaries of other calls somewhere else?

A   These may have just been the first two calls.  I don't know.  I don't recall.

Q   Is John Ransom someone that you thought of highly?

JANE ROSE REPORTING                    National Court-Reporting Coverage
1-800-825-3341                         janerose@janerosereporting.com

Page 141

A   No.

Q   No?

A   I didn't rank him higher or lower than any other analyst on the street at the time.

Q   Well, we talked about earlier that there were some analysts that you would read their stuff more and you've ranked them higher than others, right?

A   That is correct.  He's probably in my notes because he was the first analyst I managed to get ahold of to discuss this and started taking notes. Once I talk to other analysts who might be repeating information that I've now written down or learned, I usually don't include them in my notes anymore.

Q   Okay.  And then what about Bob Willoughby, how would you rank -- who is Bob Willoughby?

A   He is the Merrill Lynch analyst.

Q   And how would he -- how would you think of him?

A   My recollection of Bob Willoughby is that I spoke with him a little more often than some of the other analysts back then, but, again, I -- I actually don't recall where he would have ranked in my mind versus others.

Q   Why would you --

Page 142

A   There weren't -- there weren't a lot -- there are occasionally analysts that are standouts. I didn't have any standout analyst in this space that I would point to at this time.

Q   Okay.  And you said you'd talked to him somewhat more often than others.  How did -- how did you end up connecting with people?  And I'm just trying to understand, you know, how it works, how you work with sell-side analysts, how often you talk to certain people, how that comes about just so I can tailor my questions appropriately.

A   Analysts publish reports.  Often, they will be in my email, and I will reach out to them if I wanted to follow-up, conversations.

Q   So you'll generally reach out to the analysts, not the other way around?

A   90 percent of the time, I'm reaching out. 10 percent of the time, they're asking to do a call with me.

Q   Okay.  Okay.  So let's look at that bullet from your call with John Ransom.  So in your notes from your call, you say: "Cordis may devalue brands, need a stent which they still are missing, under constant margin pressure.  Bought generic distributor so not seeing upside there."

Page 143

Is this Mr. Ransom's analysis or yours?

A   That's Mr. Ransom's analysis.

Q   Did you ask any questions about that?

A   Well, that's why it's in there.  Because I was asking him questions.

Q   Okay.  What did he say?  What do you remember about that?

A   What's right there in that paragraph is what I remember.  That's what I wrote down.

Q   Did you agree with what he was saying?

A   This would not have been notes indicating my agreement or disagreement.  This is merely me gathering information and opinions before I form my own opinion.

Q   Okay.  And what do you understand when you wrote here, "Cordis may devalue brands"?  What do you understand that to mean?

A   At the time, I understood that to mean that he didn't like the Cordis deal.

Q   And because it would devalue brands?  What does that mean?

A   I don't recall what that meant at the time.

Q   Do you recall whether other sell-side analysts didn't like the Cordis deal at this time?

A   I recall other analysts not liking the

Page 144

deal.  I do not recall who they were or are.

Q   Do you remember why they didn't like the deal at this time?

A   They did not like the Cordis business was my recollection.

Q   What about the Cordis business?

A   Specifically, I believe it was the growth rates of the business and the margins.

Q   So analysts had concerns about the growth rates of the Cordis business and the margins of the Cordis business before Cardinal Health bought it. So the growth rates of margins at Johnson & Johnson?

MR. JANOSKI:  Objection.  Assumes facts. Calls for speculation.

THE WITNESS:  Yeah, again, I was -- I'm not a specialist on the space.  That is my recollection of what analysts were talking about when I spoke with them about the business.

BY MS. SADINSKY:

Q   Yeah, I'm not asking for you to give me a fact.  I'm asking what people told you, what you heard, what you understood at this time.

So --

A   That was my recollection.

Q   And how did that factor -- how did, you

Page 145

know, what those negative thoughts or negative opinions about Cordis that some sell-side analysts had, how did that factor into your own analysis of Cardinal Health?

A As I wrote in my notes, I -- and as I said earlier, a low-growth business, low-margin business is not always a bad acquisition. If it's purchased at the right price, if it can be integrated with an existing business, if you can get synergies, you can sometimes end up with a better overall business, and my thoughts at this point in time in 2015 were that the medical segment could actually improve post Cordis.

Q Do -- what was the other -- what were the other businesses within the medical segment that you thought Cordis could integrate with and get synergies from?

A I -- I was not enough of a specialist to know.

Q But you understood that the medical business was in a period of transition, right?

A Yes, and I was trusting management's publicly -- public statements.

Q And when you say -- or when it says here: Need a stent which they're still missing, what does

Page 146

that mean?

A I wrote that down because he said it, but I did not follow up to delve into exactly what he specifically meant.

Q Do you understand that to mean that Cordis didn't have all the products it needed at this time?

A Yes.

MR. JANOSKI: Objection. Calls for speculation.

BY MS. SADINSKY:

Q So you understood this to mean Cordis didn't have all the products it needed at this time to operate successfully is what he was telling you?

A No. I understood this to mean that Cordis might have to introduce some additional products to have a full product line.

Q To what?

A Have a full product line.

Q And how would that impact -- and was there risk that Cordis would not be able to get those products? Why would you raise it?

Okay. They might need to get another product to have a full product line? What's the significance of that?

A Yeah, I don't recall. The -- the -- I

Page 147

don't recall. My interpretation of his comment was that Cordis needed to add some additional products that they might not have in their product lineup at that time.

Q Okay. And then it says: "Bought generic distributor so not seeing upside there."

What's -- what is that referring to? What's a generic distributor? Is that Cordis?

A I don't recall. My best recollection is maybe that was the Harvard acquisition.

Q Okay. Okay. Now let's look at the Bob Willoughby call notes. The top -- where am I?

Sorry. Okay. The first sub-bullet: "Cordis rolling through which will help medical look good. We forget that it is a distribution business servicing hospitals. And they can always spin it. Plus too small to really move the needle. May add COV assets, et cetera, over time."

Do you see that?

A Yes.

Q This is Mr. Willoughby's analysis, right?

A Yes.

Q He says Cordis is, quote, too small to really move the needle. What does that mean? What do you understand that to mean?

Page 148

A I understand that to mean that the distribution business is the predominant business when it comes to valuing this company.

Q So you understood this to mean that the Cordis acquisition was too small to really have an effect on Cardinal Health's valuation?

A Yes.

MR. JANOSKI: Objection. Lacks foundation.

BY MS. SADINSKY:

Q You said yes, right?

A Yes.

Q And "May add COV assets, et cetera, over time," what does that mean?

A That would be Covidien.

Q And: "We forget that it is a distribution business serving hospitals. And they can always spin it."

What does that mean?

A You have two questions there. Do you want to ask them separately?

Q What do both sentences mean?

A I do not have enough --

MR. JANOSKI: Objection.

THE WITNESS: -- expertise to analyze what a distribution business servicing hospitals is. My

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 149

interpretation was that they had direct sales relationships with hospitals.

"And they can always spin it" was a reference to Cardinal being able to spin off to shareholders the medical business in the future, assuming it was large enough to stand on its own.

BY MS. SADINSKY:

Q   So let's focus on the first sentence: "We forget that it's a distribution business servicing hospitals." You said, "My interpretation was they had direct sales relationships with hospitals."

Why would Bob Willoughby -- what does it mean when he says, "We forget that"? Does that mean this is a negative thing? How do you -- what do you understand --

A   I don't know. I actually don't know.

MR. JANOSKI: Objection. Calls for speculation.

THE WITNESS: Those were his words, and I didn't follow up.

BY MS. SADINSKY:

Q   Did you ask any questions?

A   Probably, but if it's not in my notes, I don't remember anymore.

Q   But if it's in your notes, it's something

Page 150

that was part of the conversation that was important, or is this a full transcript of entire conversation?

A   This is not a full transcript of the entire conversation.

Q   Okay. So you don't have --

A   This is also not necessarily things that I only deemed important. I frequently -- again, these are my personal notes. So I write down whatever I feel like writing down.

Q   Okay. So your testimony is you have no understanding of what we forget that -- what that means there, right?

A   I do not know what that was referring to specifically.

Q   And you have no understanding, sitting here today, of what that could mean, right?

A   Those were Bob Willoughby's words. I don't -- yeah, I don't know what that -- what he was referring to.

Q   Okay. And did you think the Cordis acquisition was more or less risky after speaking with Mr. Ransom and Mr. Willoughby?

MR. JANOSKI: Objection. Vague as to "risky."

Page 151

BY MS. SADINSKY:

Q   You can answer. Unless your own counsel instructs you not to answer, you have to answer each question.

A   Yeah. I'm thinking how to answer that question.

Q   I could rephrase if you'd like.

A   That would be helpful.

Q   Okay. Given what Mr. Ransom and Mr. Willoughby said here, would this affect your assessment of the likelihood that Cardinal Health would achieve the 20 cent accretion estimate disclosed at the time the deal was announced?

A   This was information gathering for me, and it is -- and it would influence my ultimate opinion of the Cordis deal and what it would contribute to Cardinal.

Q   So would it make it -- so it would influence it. Would it make it -- you think it was more or less likely -- do you think Cardinal was more or less likely to achieve that 20 cent accretion estimate in light of this?

MR. JANOSKI: Objection. Calls for speculation.

THE WITNESS: At the time, per my notes, I

Page 152

believed that Cardinal would achieve the 20 cents accretion in 2017.

BY MS. SADINSKY:

Q   But you said it would affect your assessment, right?

A   Yes. That my assessment was that Cardinal would achieve the 20 cents after I spoke with all these people.

Q   Okay. So the comments that Mr. Willoughby and Mr. Ransom gave about Cordis being too small to move the business and devaluing brands would make it more likely that -- that Cardinal would achieve the accretion estimate?

MR. JANOSKI: Objection. Compound.

THE WITNESS: No, I didn't say that.

MR. JANOSKI: Incomplete as to notes and asked and answered.

THE WITNESS: Yeah, I didn't say that. I simply told you that after speaking with both of these gentlemen and many other people, I still felt that Cardinal could achieve the 20 cents accretion in 2017 that they had --

BY MS. SADINSKY:

Q   Okay.

A   -- in their press release.

Page 153

Q   Okay.  I thought my question was limited to these two, but your answer included a bunch of other analysts too, which is fine.

Okay.  Let's --

MS. SADINSKY:  What exhibit are we on?

MR. OBMASCIK:  Exhibit 13.

MS. SADINSKY:  Let's mark Tab 16 as Exhibit 13.

- - -

(Columbia Exhibit 13 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Exhibit 13 is Cardinal Health's 10-K for fiscal year 2015, filed on August 13th, 2015.

And you reviewed a company's financial statements, SEC filings, as part of your coverage of a company, right?

A   I apologize.  I need to see what you're showing me here.

I did not read this 10-K.

Q   Okay.  I'm going to show you a disclosure in it that's also in the acquisition announcement.  We'll just look at that instead.  Hold on.  Let me just make sure.

Page 154

MS. SADINSKY:  All right.  Let's go back to the acquisition announcement.  It was Exhibit 8.  No, that's not Exhibit 8.  The acquisition announcement is the March 2nd press release -- sorry.  It's Tab 10.

Okay.  And let's go to page 3.

BY MS. SADINSKY:

Q   We looked at this before, the acquisition press release.  We looked at the cautions concerning forward-looking --

MS. SADINSKY:  Scroll down more and zoom in.  Yeah.

BY MS. SADINSKY:

Q   Okay.  So I'm going to go to the middle of this paragraph:  "These risks and uncertainties include."

Do you see where I am?

A   Yes.

Q   "These risks and uncertainties include: The ability to successfully complete the acquisition of Cordis on a timely basis, including receipt of required regulatory approvals and satisfaction of other conditions; the ability to retain customers and employees of the acquired business and to successfully integrate the acquired business into

Page 155

Cardinal Health's operations, if the acquisition is completed; the ability to achieve the expected synergies as well as accretion in earnings, if the acquisition is completed; the occurrence of any event, change or other circumstance that could give rise to the termination of the binding offer or the purchase agreement (once executed);" yada, yada, yada.

Do you see that?

A   Yes.

Q   So Cardinal Health disclosed very --

MR. JANOSKI:  Sorry -- one second.  Objection into the reading of the record and the objection as to also as incomplete with the yada, yada, yada.

MS. SADINSKY:  I'm just reading it because it's hard to see on the screen.  I thought I was helping everyone.  But if people don't want me to read it into the record, I'm happy not to and we can all read it to ourselves.

BY MS. SADINSKY:

Q   So do you see here the disclosure of potential risks and uncertainties related to the Cordis acquisition, Mr. Smith?

A   Yes.

Page 156

Q   And did you agree that the Cordis acquisition had risks and uncertainties?

A   Yes.

Q   And did you agree -- and did you understand that the Cordis acquisition had risks and uncertainties?

MR. JANOSKI:  Asked and answered.

THE WITNESS:  I thought you asked that.

BY MS. SADINSKY:

Q   I can ask questions as many time as I want.  This is my deposition and you're instructed to answer the question.

A   Okay.  Yes.

MR. DeWITT:  I would point out I'm not objecting to any of these things.  So he -- if she asks you a question, you need to answer it.  I realize you keep getting interrupted -- your answers keep getting interrupted by these objections, but just answer the questions to the best of your ability, the questions that Ms. Sadinsky is asking.  If you don't understand them, just ask her to repeat it.

MS. SADINSKY:  Thank you, Mr. DeWitt.

BY MS. SADINSKY:

Q   So I don't remember my question now.  I

Page 157

think I said:  Did you understand that the Cordis acquisition involved risks?

MR. JANOSKI:  Asked and answered.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   And did you understand what those risks were?

A   No.

Q   Did you understand that there were challenges relating to the ability to retain customers and employees of the acquired business?

A   No.

Q   Would you -- do you believe that that would be a risk or no?

MR. JANOSKI:  Asked and answered.

THE WITNESS:  I believe this to be standard language that's included in almost every deal.

BY MS. SADINSKY:

Q   This language here is included in every single deal?

A   Similar language is included in almost every deal.  I do not have an opinion on any specific risk.

Q   Did you understand that there was a risk that Cardinal Health would not achieve its accretion

Page 158

and synergies estimates?

A   Yes.

MR. JANOSKI:  Objection.  Lacks foundation.

BY MS. SADINSKY:

Q   In general, what kind of risks do companies undertaking acquisitions face?

A   I can't answer that.  It's too broad a question.

Q   In your -- you're an investment professional.  You analyze acquisition -- companies' acquisitions.  You cover 15 to 20 companies.  You're telling me that you've never considered what risk a company takes in undertaking an acquisition.  Is that your testimony?

MR. JANOSKI:  Objection.  Vague. Badgering.

THE WITNESS:  I consider all the risks that the company takes.  I would point you to the top of this press release where the company has given accretion information, and I assume that the company's management team has incorporated all of these risks that you read down here into their analysis of the deal and have factored those into those numbers.  They are condensing all these risks for an outsider, such as myself, who's not actively

Page 159

involved in the deal into an accretion number.

BY MS. SADINSKY:

Q   Well, I understand.  But one of the risks here is the inability to meet the accretion and synergies estimate, and I just want to -- I just want to know what kinds of risks do companies undertaking acquisitions face, in general, based on your investment experience.  I understand that they're factored into something or another, but just what are the types of risks that a company faces in undertaking an acquisition?

A   There are literally too many to even begin to list them.

Q   Can you give me three examples?

A   Retaining employees, earn exchange, macroenvironment.

Q   Setting up operations?

A   I don't know what that means.

Q   So Cardinal -- so Cordis operated and -- 70 percent of its operations were outside the United States, right?

A   Okay.

MR. JANOSKI:  Objection.  Lacks foundation.

MS. SADINSKY:  Okay.  Let's go to page 1 of --

Page 160

THE COURT REPORTER:  I'm sorry.  I didn't hear the answer.

THE WITNESS:  I said okay.  I --

BY MS. SADINSKY:

Q   Let's go to page 1 of the press release and let's go to the third paragraph, where it says: "Headquartered in Fremont..." in the middle of that paragraph, it's talking about Cordis:  "While the U.S. is the largest single market, 70 percent of total sales come from outside the U.S.  Cordis' international presence includes operations in more than 50 countries..."

Do you see that?

A   Yes.

Q   Did Cardinal Health generally operate outside the United States before this?

A   It was my understanding that most of their business with the drug distribution side would have been within the United States.

Q   So would there have been a risk related to setting up global operations?

A   Potentially.

Q   That's a potential risk as well, correct?

A   Yes.  I -- yes.

Q   Okay.

Page 161

MS. SADINSKY: What exhibit are we on?

MR. OBMASCIK: Exhibit 14.

MS. SADINSKY: Does anyone need a break? No? Okay.

Let's mark as Exhibit 14 Tab 17.

- - -

(Columbia Exhibit 14 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Exhibit 14 is a November 2nd, 2015 report from Mr. Sonderling titled "Cardinal Health reports huge 1QfyJune2016 earnings and raises annual guidance by full upside; retain 2."

Have you seen this report before?

A   I do not recall. I assume I probably did see it when it was first published.

Q   Under the Comments section, it says: "Cardinal Health had massive Distribution income, much of it organic, and the segment is now 87% of total operating income with rising margin! This shatters the 20-25% Medical mix range I have forecast pre-Cordis. One can say of Medical, it could have been worse, let's see how Cordis integrates. I have to revise my range of price

Page 162

targets. Please join the call with CEO Mike Kaufmann at 140 p.m. EST. I will attend the November 19 analyst meeting."

Do you see that?

A   Yes.

Q   So Mr. Sonderling is recommending Columbia retain its Cardinal position -- you said two was modest buy?

A   That would have been the -- yes.

Q   So he's recommending Cardinal's a modest buy after, quote, massive distribution income growth, correct?

A   I cannot speculate. He did not change his rating here from the prior report that you showed, but he was still indicating that he was favorable to the company based on that rating.

Q   Okay. When he says here: "One can say of Medical, it could have been worse," does that indicate to you -- do you understand that to mean medical did well? "Let's buy more Cardinal stock"?

MR. JANOSKI: Objection. Calls for speculation.

THE WITNESS: I understand that to mean that medical could have been worse, but had numbers that were better than he thought they would be.

Page 163

BY MS. SADINSKY:

Q   So would you understand his comments here where he's talking about massive distribution growth to mean the pharmaceutical segment did really well this quarter?

A   Yes.

Q   I'm not asking you a trick question.

And Mr. Sonderling says pharma is 87% of Cardinal's total income with a rising margin, correct?

A   Yes.

Q   And Mr. Sonderling also says pharma's performance, quote, shatters medical's, right?

A   Yes.

Q   What does that mean?

MR. JANOSKI: Objection. Calls for speculation.

BY MS. SADINSKY:

Q   What do you --

THE COURT REPORTER: One at a time.

THE WITNESS: You're asking me to interpret Harlan, and if you knew Harlan, you wouldn't ask me to interpret Harlan.

BY MS. SADINSKY:

Q   What do you understand that to mean?

Page 164

A   That means that he had assumed that the medical contribution to the company's earnings would be in the 20 to 25 percent of operating income range.

Q   He had assumed that previously?

MR. JANOSKI: Objection. Calls for speculation.

THE WITNESS: Yeah, you are asking me to speculate. That is the assumption based on how I read that, that he had medical being a higher percent of the operating income than what it came in at.

BY MS. SADINSKY:

Q   Okay. And so the pharmaceutical segment now at 87 percent means the pharmaceutical segment was a greater percentage of Cardinal Health's overall --

A   Yeah.

Q   -- business than previously forecasted?

A   Than Harlan had expected based on the way he wrote this.

Q   And did Harlan put less -- did you understand that Harlan put less weight on the medical segment in assessing Cardinal Health's financials in the pharmaceutical segment?

Page 165

MR. JANOSKI: Objection. Calls for speculation.

THE WITNESS: Yeah, my under- -- I really can't answer that actually. The -- I was -- yeah, I can't answer that, and Harlan -- Harlan would have his own model with his own analysis. The two rating in here would have almost certainly been predicated more on the distribution part of the business.

BY MS. SADINSKY:

Q Okay. And at this time, was the pharmaceutical segment still more important to you in assessing Cardinal Health's financials and other parts of Cardinal Health's business?

A Yes.

Q And then he says here: "One can say of Medical, it could have been worse, let's see how Cordis integrates."

Do you see that?

A Yes.

Q Did you ever have any discussions with Mr. Sonderling about what Cardinal Health would need to do to successfully integrate Cordis?

A I don't recall any specifics of any conversations that specifically talked about Cordis in that way.

Page 166

Q Okay. Did you ever -- do you recall any conversations you had about what was needed to integrate Cordis with anyone?

A Not specifics on what was needed, no.

Q Do you recall having conversations with anyone who had concerns about Cardinal Health's ability to integrate Cordis at this time?

A I don't recall if I had conversations about their ability to integrate Cordis. I definitely had conversations, as you saw in my notes, about Cordis itself and the quality of that business.

Q And Mr. Sonderling indicates there's going to be a call with Mr. Kaufmann later that day that he's going to attend.

Do you see that?

A Yes.

Q And -- and what date is this? This is November 2nd, 2015. Do you know if you attended that call?

A I do not recall, and it may or may not be in my notes. I don't always take notes on every single management meeting. If I don't hear anything new, for example, I will not -- usually, I will not incorporate it into my notes.

MS. SADINSKY: Okay. Let's go off the

Page 167

record.

THE VIDEOGRAPHER: We are now going off the record at 3:27 p.m.

(Whereupon, at 3:27 p.m., the proceedings in the above-entitled matter were recessed, to reconvene at 4:00 p.m., this same day.)

Page 168

AFTERNOON SESSION
(4:00 p.m.)

THE VIDEOGRAPHER: We are now going on the record at 4 o'clock -- 4 p.m. Excuse me.

MS. SADINSKY: Thank you.

So just before we begin, I just want to put on the record that the counsel for the parties have conferred, and any objection to form or just any statement of objection preserves all objections.

Okay. As our next exhibit, let's mark Tab 19. This will be Exhibit 15.

- - -

(Columbia Exhibit 15 was marked for identification.)

- - -

CONTINUED EXAMINATION BY COUNSEL FOR DEFENDANTS

BY MS. SADINSKY:

Q And this is a document titled "Morning Meeting Recap," and it's written by Christopher Vandergrift.

Have you seen this before?

A All of these get sent to me in email, but I only read them if I've missed the morning meeting.

Q Okay. If you've missed the -- what did you say?

Page 169

A   If I've missed the morning meeting, then I will read them.

Q   What's the morning meeting?

A   We have a firmwide meeting for portfolio managers and research analysts every day at 8:30 Eastern.

Q   Okay.  And who's Christopher Vandergrift?

A   He would be an equity research analyst.

Q   Okay.  And does he cover certain companies or -- what does he do?

A   He covers certain financial technology names.

Q   Okay.  And at the -- if you'd go to page 2, at the bottom of the page under "Comments," there --

MS. SADINSKY:  Scroll down a little bit more.

BY MS. SADINSKY:

Q   -- it says -- it has something from Harlan Sonderling.

Do you see that?

A   Yes.

Q   And it says:  "JPMorgan Healthcare conference," and the last bullet there says:  "I have meetings today," and at the end it says:  I have meetings today with all three drug

Page 170

distributors, McKesson, Cardinal and ABC.

Do you see that?

A   Yes.

Q   And McKesson has the No. 1, Cardinal has No. 2, and ABC has No. 4.

Do you know what those mean?

A   Those would be the ratings.

Q   And one is the best and five is the worst?

A   Yes.

Q   So McKesson was rated the best of these three, and ABC was rated the worst?

A   In Harlan's mind, yes.

Q   Were there different ratings that Columbia had?

A   No.  Harlan was the only one rating these companies.

Q   All right.  So Columbia's ratings for Cardinal Health were two, McKesson was one, and ABC was four, correct?

A   I don't know if Harlan's ratings count as -- I'm making air quotes -- as Columbia's ratings.  Our analysts ratings were one, two, and four.

MR. JANOSKI:  And I want to check.  Are you getting my audio?  I didn't see an objection to form

Page 171

on the -- on the realtime.

THE COURT REPORTER:  I didn't hear you.

MR. JANOSKI:  Okay.  I'll try to speak up a little bit more.  Sorry.

BY MS. SADINSKY:

Q   Okay.  So Mr. Sonderling attended the JPMorgan conference.  The date of this is January 12th.

So Mr. Sonderling attended the JPMorgan conference on January 12th, 2016, right?

A   According to this, yes.

Q   And did anyone else at Columbia attend the JPMorgan conference?

A   I don't know the answer to that.

Q   Did you attend?

A   I don't remember.  I'd have to check my calendar.

Q   Did -- and Mr. Sonderling met with Cardinal Health, right?

A   According to this, he was planning to meet with them.

Q   Okay.  Do you know if he did?

A   I don't.

Q   And did he attend the presentation -- do you know if he attended the presentation by Cardinal

Page 172

Health at the conference?

A   I don't.

Q   Would you have expected him to attend the presentation by Cardinal Health at the conference?

A   If it did not conflict with any other meetings or presentations, then he should have.

Q   Okay.  And in the section of this report on McKesson, he notes, and this is the last bullet on this page, and it goes on to the next page:  "Peer Cardinal Health affirmed $5.15 to $5.35 guide and will take opposite tact on generic inflation citing it's not a major factor; however, Cardinal Health and ABC will be in the doghouse as their guidance looks aggressive."

Do you see that?

A   Yes.

Q   Was Columbia concerned about generic inflation issues around this time with respect to drug distributors?

A   Yes.

Q   Why?

A   And, again, you used the word "Columbia." I can only speak to what you see here with Harlan and my own opinion.  The firm doesn't hold opinions as a firm.  We hold them as individuals.

Page 173

Generic inflation had been going up for many years, and that was actually benefiting drug distributors' earnings, and the concern was that it could reverse and therefore cause the drug distribution business to be less profitable.

Q   And when you say "drug distribution business," that's referring to the pharmaceutical segment, correct?

A   Yes.

Q   And how did these concerns around generic inflation -- generic inflation impact how you were assessing Cardinal Health's valuation?

A   It was my primary concern at the time.

Q   And it was a concern that would result in a lower valuation?

A   If they had to reduce earnings, then, yes.

Q   So fair to say around this time concerns about the pharmaceutical segment were affecting how you were thinking about Cardinal Health's valuation?

A   I don't know if I had substantial concerns in January of 2016. Again, I would have to reference my notes that -- that you have, but there definitely is a point in time where I did become more concerned about generic deflation being a problem as opposed to generic inflation.

Page 174

Q   And then when it says here: "Cardinal Health's guidance looks aggressive," what -- how -- how did Columbia under- -- what did Columbia understand by that statement?

A   Aggressive would mean that their earnings guidance appears high and may have to come down.

Q   And when it says: "Cardinal and ABC will be in the doghouse," what did Columbia understand that to mean?

A   I understood -- I can't speak for Columbia generally.

I understood that to mean that McKesson had already indicated generic inflation was decreasing and becoming more deflationary, which would be a negative, but that Cardinal and AmerisourceBergen had not yet said that publicly.

Q   So would there be a concern at this time -- would there be a potential concern at this time that Cardinal Health's guidance was potentially unreliable?

MR. JANOSKI:  Object to form.

THE WITNESS:  I think you should look at the word "aggressive" -- "potentially aggressive" and may have to come down.  Please recall that you are specifically looking at a paragraph under the

Page 175

McKesson heading.  So this was Harlan's notes from a McKesson meeting and may or may not reflect his actual opinion.

BY MS. SADINSKY:

Q   Understood.  I'm asking what your opinion was.

A   My opinion is that this was information that I appreciated seeing, and I had to start incorporating it into my analysis.

Q   And when you read that the guidance looks aggressive, do you understand that to mean the guidance may be unreliable?

MR. JANOSKI:  Object to form.

THE WITNESS:  I understood this to be McKesson's potential opinion via Harlan and that I needed to probably speak with Cardinal directly to get their opinion.

BY MS. SADINSKY:

Q   And did you do that?

A   I don't recall.

MS. SADINSKY:  And let's mark as Exhibit 16 Tab 20.

- - -

(Columbia Exhibit 16 was marked for identification.)

Page 176

- - -

BY MS. SADINSKY:

Q   Tab 20 is the transcript from the January 12th, 2016 JPMorgan conference that Mr. Sonderling said he was going to attend.

We just saw that, right?

If we'd go to page 2 of the transcript -- is it two?  Yeah.

Two under Mike Kaufmann --

MS. SADINSKY:  And let's try and zoom in a little bit, Max.

BY MS. SADINSKY:

Q   And let's see.  The -- the third paragraph in Mike Kaufmann stating -- statements, where it says: "And there's really three topics."

Do you see that?

A   Yes.

Q   So he says: "First of all, Cordis. I wanted to...give you an update.  We're only 12 days into the month and wrapping up the quarter, but I just wanted to let you know right now everything's going as planned on Cordis.  A couple weeks from now when we have our second quarter release, we will give you some more detailed information" -- about -- "how the inventory step-up looks, and overall how

Page 177

things are going in Cordis. But for right now, I just want you to know from everything we see things are going as planned and as expected."

Q Do you see that?

A Yes.

Q What do you understand the phrase "going as planned and as expected to mean"?

A I interpret it that the guidance they provided originally is still accurate and can be relied on.

Q And do you know if Mr. Sonderling asked any questions about how Cordis was on the plan?

MR. JANOSKI: Object to form.

THE WITNESS: I don't, and I don't even know if he was at this meeting for sure.

BY MS. SADINSKY:

Q Okay. And do you recall hearing around this time that the Cordis integration was on plan?

A I would have most likely looked at this transcript and at least skimmed it, and I would have interpreted this to say that the Cordis integration was on plan.

Q Okay. And would statements such as, "The integration is on plan," have factored into your analysis of Cardinal?

Page 178

A Yes.

Q And would they --

A Go ahead.

THE COURT REPORTER: I missed what you said, the witness.

THE WITNESS: Yes, was my answer.

BY MS. SADINSKY:

Q And would statements such as, "The integration was on plan," have impacted how you were thinking about Cordis?

A Yes.

Q And would this make it more likely that Cardinal would achieve the 20 cent accretion estimate disclosed at the time the deal was announced?

A Yes.

Q And would this make it more likely that Cardinal would achieve the 100 million synergies estimate disclosed at the time the deal was announced?

A Yes.

MS. SADINSKY: Let's next mark --
Exhibit 17?

MR. OBMASCIK: Exhibit 17.

MS. SADINSKY: Tab 22.

Page 179

- - -

(Columbia Exhibit 17 was marked for identification.)

- - -

BY MS. SADINSKY:

Q Did you prepare this report?

A Yes.

Q Exhibit 17 is a report Columbia produced from your files with the file name "February 1st, 2016 Cardinal Health Q2."

If we go down to the Notes section at the bottom of the page --

MS. SADINSKY: And zoom into that first bullet there. Yeah, first bullet.

BY MS. SADINSKY:

Q -- it says: "Called out FX and generic inflation as needing to improve to hit high end of EPS targets. But also seemed relatively blasé about them in terms of negative impact, so I don't really want to change my numbers based on this."

Do you see that?

A Yes.

Q Were you aware that currency -- FX or currency challenges were creating operational challenges for the Cordis business in early 2016?

Page 180

A I was not aware it was affecting the Cordis business specifically. I was aware it was affecting -- well, I retract that. I may or -- I can't remember. I cannot recall if I was aware that it affected Cordis specifically, but I was aware it was affecting Cardinal overall.

Q Okay. And FX challenges would affect, you know, businesses outside the United States, right?

A Yes.

Q And we saw that 70 percent of Cordis's business was outside the United States, right?

A Yes.

Q So would FX/currency challenges affect the Cordis business?

A Yes.

Q And were you aware of that?

A I'm not sure how aware I was at the time of how much of the Cordis business was actually outside the U.S.

Q Were you aware of other parts of Cardinal's business that were outside the United States?

A Yes.

Q What? What were those?

A They had a Chinese business distributing drugs I believe.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 181

Q   Any other businesses?

A   That was the main one.

Q   So the Chinese business and the Cordis businesses were the two businesses outside the United States primarily?

A   That's your statement.  I believe that to be accurate, but I cannot recall if I was fully aware of that at the time.

Q   Did you have a view at this time on how long the currency impacts would last?

A   I did not.

Q   Did you do anything to analyze that?

A   Yes.  Nothing specific, but foreign exchange tends to impact all of our companies, and so I and my team would have looked at foreign exchange potential impacts across our entire universe and coverage.

Q   And what did you mean by, when you wrote here:  "Seemed relatively blasé about them in terms of negative impact, so I don't really want to change my numbers based on" -- that.

Who seemed relatively --

A   Cardinal -- Cardinal would guide with a range, an earnings range, and so, per my first sentence, they do not appear to potentially hit the

Page 182

high end of that range, but I would normally incorporate the midpoint of that range in my valuation and in the numbers I would include in my notes.  So I didn't feel like I needed to move to the bottom end of that range at this time.

Q   Okay.  So you normally incorporate the middle of the range into your own valuation; is that right?

A   Yes.

Q   And would you have factored in these currency impacts into your own valuation of -- I'll say Cardinal, but how you were think -- well, did you factor in these currency impacts into your own valuation of Cardinal?

A   Not -- not really.  It was not a large enough impact to play a significant role in the valuation at the time.

Q   Okay.  Would the currency impacts have affected your assessment of the likelihood that Cardinal would achieve the 20 cent accretion estimate disclosed at the time the deal was announced?

A   Can you repeat the question.

Q   Would the currency challenges affect your assessment of the likelihood that Cardinal Health

Page 183

would achieve the 20 cent accretion estimate for Cordis disclosed at the time the deal was announced?

A   Most likely, but, again, it was so -- Cordis and the medical piece would have been so small, I probably would not have dug very far into it.  I would have spent more time on the drug distribution pharmaceutical side.

Q   Okay.  But you said most likely, and I just want to make sure I'm clear and understanding.  If it affected your assessment, would it make it less likely that Cardinal Health would achieve the 20 cent accretion estimate disclosed at the time the deal was announced, or would it make it more likely that Cardinal Health would achieve the 20 cent accretion?

A   It would make it less likely to achieve the 20 cent accretion.  The offset in my mind would have been that I believe managements tend to guide conservatively when they announce deals, and going back to your transcript comments, I didn't, at this point, see anything to cause me to reduce that.

Q   Okay.  So it did affect --

A   The 20 cent accretion number.

Q   So it did affect your assessment of the likelihood, but not in a very significant way.  Is

Page 184

that your testimony?

A   It affected my assessment, but I believed management had enough offsets to still get there.

Q   Okay.  Did the currency challenges affect your assessment of the likelihood that Cardinal Health would achieve the 100 million synergies estimate for Cordis disclosed at the time the deal was announced?

A   No.

Q   Why not?

A   I didn't really think about it.

Q   Okay.  Were you -- and you testified a moment ago that you were aware that generic deflation was also creating challenges for the pharmaceutical segment around this time, correct?

A   I don't know the exact date.  My notes are the best reference point for when I started to incorporate that into my thinking.

Q   Okay.  And your notes reference generic inflation here, correct?

MR. JANOSKI:  Object to form.

THE WITNESS:  That is correct.

BY MS. SADINSKY:

Q   So you are aware that generic inflation was creating challenges for the pharmaceutical segment

Page 185

around this time, correct?

A   I was aware that they were beginning to be a potential risk.

Q   All right.

A   You can see the way I wrote it:  "generic inflation."  I'm still using the word "inflation."  So it was still positive.

Q   Okay.  So you were aware that they were beginning to be a potential risk at this time, correct?

A   Yes.

Q   And did you have a view on how long generic inflation would be a potential risk at -- around this time?

A   The generic inflation is actually beneficial.  It's generic deflation that is concerning.

And, no, I didn't have a view on the timeline.  I had guesses and estimates, but that's standard.

MS. SADINSKY:  Okay.  As Exhibit 18, let's mark Tab 24.

- - -

(Columbia Exhibit 18 was marked for identification.)

Page 186

- - -

BY MS. SADINSKY:

Q   Exhibit 18 is an April 28th, 2016 report from Mr. Sonderling titled:  "Cardinal Health guides to lower 4QJune16 eps due to generic deflation; 4Q will rise 12%, less than full year 20%; better Medical earnings; retain 2."

Have you seen this before?

A   Again, I don't recall, but most likely I saw it via my email.

Q   Okay.  In the Comments, the bold section, it says:  "Cardinal's 4Q guidance is lower due to 'slightly deflationary' generics."

Do you see that?

A   Yes.

Q   And then in the middle of the page it says -- where are we? -- the bottom of the big paragraph there, the second paragraph, it says:  "Some of the generic disinflation/deflation is likely due to manufacturer self-regulation in light of the political environment."

Do you see that?

A   Yes.

Q   And then if you look at the first sub-bullet at the end there, it says:  "Medical

Page 187

segment revenue and margin recovery, and capital deployment in repurchase and acquisitions and repurchases are not enough to offset this."

Do you see that?

A   Yes.

Q   So he discusses lower guidance from Cardinal in the first paragraph, and that lower guidance is related specifically to challenges affecting the pharmaceutical segment, correct?

A   Yes.

Q   And he says:  "Some of the generic disinflation/deflation is likely due to manufacturer self-regulation in light of the political environment."

What does that mean?

MR. JANOSKI:  Object to form.

THE WITNESS:  I am speculating he is referring to Martin Shkreli and the dramatic price increases that some generic drugs had seen when they got concentrated into a very small manufacturing base that was wholly controlled by one or two companies.

BY MS. SADINSKY:

Q   That was wholly controlled by -- I think you cut out at the end.

Page 188

A   By one company.  One or two companies.

Q   And what companies are those?

A   I don't know.  You would have to look at the news reports at the time.

Q   Were you aware that there were growing political risks associated with investing in healthcare companies around this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  I don't believe that statement is accurate.  That's a very broad statement, to include all healthcare companies.

BY MS. SADINSKY:

Q   Okay.  Were you aware that there were growing political risks associated with investing in Cardinal Health around this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  No, I don't believe that statement is referring to Cardinal Health.  I told you I believe that is specifically referring to generic manufacturers.

BY MS. SADINSKY:

Q   So why is -- why would a statement like -- why would a statement like that be included in a report about Cardinal Health?  Does it have any impact on Cardinal Health?

LA Sheriffs' Pension          FINAL          May 26, 2022
v. Cardinal Health Inc.                                             Nicholas Smith

Page 189

A    If the generic manufacturers have to reduce prices, then, yes, that is disinflationary or deflationary as opposed to inflationary, and Cardinal Health's margins tend to go up in an inflationary environment.

Q    Okay.  So were the political -- was the political environment related to manufacturers at this time creating growing risks for investing in Cardinal Health?

A    Yes.

Q    Were pharmaceutical pricing issues affecting the performance of Cardinal Health around this time?

A    Repeat the question.

Q    Were pharmaceutical pricing issues affecting the performance of Cardinal Health around this time?

A    Can you clarify what you mean by the performance of Cardinal Health?  Do you mean the stock price or the operational financials?

Q    The -- the stock price, the financial performance of Cardinal Health.

A    I don't recall if it was both being affected.  It was definitely affecting the operational performance a little bit.

Page 190

Q    And would that affect the financial performance?

A    That would ultimately affect the stock price.

Q    Okay.  So were pharmaceutical pricing issues affecting Cardinal Health's stock price around this time?

A    I would have to go back and look.  I don't recall.

Q    And it says here that Cardinal lowered its guidance due to slightly deflationary generics, right?

A    Yes.

Q    So does that indicate to you that generic deflation was affecting the performance of Cardinal Health stock around this time?

A    I believe it would, but I would have to check the actual stock price performance to confirm.

Q    And did those generic pricing issues factor into your analysis of Cardinal Health around this time?

A    I believe they did.

Q    Were you more cautious about investing in Cardinal Health in light of the pharmaceutical pricing issues that existed around this time?

Page 191

A    I would have to check my notes.

Q    Sitting here today, do you think that you would have been more cautious about investing in Cardinal Health in light of the pharmaceutical pricing issues that existed around this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  I would have to check my notes, because it would depend on the stock price.

BY MS. SADINSKY:

Q    Can you explain what you mean?

A    As I spoke with you earlier, if the stock price goes down but my earnings estimates or other factors remain higher, the stock is relatively cheaper.  So even if the earnings estimates were coming down, if the stock had gone down more, I might become more positive.

Q    I see.

And this report also says that "medical segment revenue and margin recovery, and capital deployment in repurchase and acquisitions are not enough to offset this."

Why wouldn't the medical segment's revenue and margin recovery be enough to offset this at this time?

A    The medical segment is much smaller than

Page 192

the pharmaceutical segment.  So even good performance there would not be enough to overcome bad performance in the pharmaceutical side.

Q    And at this time in April 2016, was the pharmaceutical segment still more important to you in assessing Cardinal Health's financial -- Cardinal Health's valuation than other aspects of Cardinal Health's business?

A    Yes.

Q    And in your experience as an investment professional, would you expect that the pharmaceutical segment's performance would be more important to other investors and securities analysts in assessing the value of Cardinal Health around this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  Base -- based on the reports that I was reading from other analysts, yes.

BY MS. SADINSKY:

Q    Okay.  If we go to page 2, the first bullet there, at the end, it says:  "The Cordis integration is on track."

Do you see that?

A    Yes.

Q    What do you understand the phrase "on

Page 193

track" to mean?

A   It's matching the numbers provided in the guidance.

Q   And would statements such as, "The Cordis integration was on track," have factored into how you were thinking -- factored into your valuation of Cardinal Health?

A   It would be one element of the valuation, yes.

Q   And would statements like, "The integration was on track," have impacted how you were thinking about Cordis?

A   Yes.

Q   And given what was said here about the integration being on track, would this have affected your assessment of the likelihood that Cardinal would achieve the 20 cent accretion estimate disclosed at the time the deal was announced?

A   Yes.

Q   In a positive way, right?

A   I would assume that they were still on track to hit the accretion guidance that they gave.

Q   And given what was said here, would a statement such as the integration on -- is on track have affected your assessment of the likelihood that

Page 194

Cardinal would achieve the 100 million synergies estimate disclosed at the time the deal was announced?

A   Yes.

Q   In a positive way, correct?

A   It would have reiterated that they should hit it.

MS. SADINSKY:  Okay.  And now let's mark as Exhibit 19, Tab 25.

- - -

(Columbia Exhibit 19 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Did you prepare this report?

A   Yes.

Q   Exhibit 19 is a report Columbia produced from your files with the file name "April 28th, 2016 Cardinal Health Q3."

This is the same date as Mr. Sonderling's report, correct?

A   Yes.  Again, my notes may have had some updates post that call.

Q   In general, if you and Mr. Sonderling publish or write a report on Cardinal on the same

Page 195

day, would you read Mr. Sonderling's report before you wrote yours?

A   Not necessarily.  I often try to write my reports in realtime from the company reports if I have time to do it, but occasionally we have three, four, or even five companies reporting on the same day, in which case, I may be delayed, and I may end up reading the analyst publications before I get to do my own.

Q   And if you wrote your report before Mr. Sonderling's, would you -- you would read his after still -- correct, you read his reports generally, right?

A   I would try to.

Q   And would you ever go back and change something in your own report in light of his?

A   Yes.  If I felt I'd gotten something wrong or misinterpreted it.

Q   If you'd go down -- or if you'd go to the Main points section, the fourth -- let me see where I am.  I'm sorry.

Yeah, the fourth bullet that starts with "2017 fiscal year."

Do you see that?

A   Yes.

Page 196

Q   You say you estimate $5.80, and analysts are closer to $6.00.

Do you see that?

A   Yes.

Q   And then you say, the third sentence there, "2017 guide:  Medical growth from Cordis and Home business."

Do you see that?

A   Yes.

Q   And if you'd go to the sixth bullet where it starts with "medical" --

A   Yes.

Q   -- it says:  "Revenue up 13 percent. Operating income 26 percent.  Seeing margin expansion."

Do you see that?

A   Yes.

Q   Okay.  So your -- your valuation of Cardinal was less than analysts, right?

A   No.  That was the earnings estimate post the call.  Analysts estimates were $6, but those are backward looking, and once the analysts were publish -- would publish their new earnings estimates post this call, and it takes a few days for that to happen, I expected their numbers to

LA Sheriffs' Pension            FINAL            May 26, 2022
v. Cardinal Health Inc.                                       Nicholas Smith

Page 197

match mine or come closer to it.

Q   Was your estimate $5.80 or the company's?

A   That's my estimate.

Q   Okay.  So yours was after the call and analysts estimates were from before the call, right?

A   Correct.

Q   Okay.  And you write that medical is seeing margin expansion.

What does that mean?

A   That means their margins are expanding, going up.

Q   Does that mean that the medical segment is becoming a larger part of Cardinal's business?

A   In this quarter, it would have become a larger part of the earnings, yes.

Q   And would that have affected how you were thinking about Cordis?

A   Yes.

Q   And did anyone at Columbia analyze or model the extent to which Cordis was contributing to the medical segment's growth at this time?

A   Not that I'm aware of.

Q   Did you?

A   Not independently, no.

Q   And what do you mean when you say "not

Page 198

independently"?

A   I did not model Cordis specifically.  I would have only done Cardinal overall.

Q   And if you'd go to the Notes section, the last bullet here, it says:  "Q4 guided down due to branded inflation, loss of Safeway contract, higher tax rate, corporate costs, and failure of FX and generic inflation to rebound."

Do you see that?

A   Yes.

Q   So you note here that currency and generic challenges -- generic -- should I just say deflation?  Does that make it clearer?  Generic deflation?  Let's just say generic deflation because I think that's what you have said multiple times, is what you really mean when you refer to this challenge with generic inflation.

Does that sound okay to you?

A   I believe the generic market was still positive year over year at this point in time, and, hence, it was still inflationary.

Q   Okay.

A   It's going to become deflationary when we get to later notes.

Q   Okay.  But you note that the challenges

Page 199

related to currency and generic inflation have failed to rebound.

What does that mean?

A   It means that foreign exchange prices did not revert back to where they had been, and it also means that generic inflation did not go back higher. It kept on getting lower.

Q   So it's still inflationary, but the amount of inflation is going down?

A   Yes.

Q   Okay.  And so at this time, you had already -- you already knew that there were currency challenges that were affecting Cardinal Health, right?

A   Yes, some.

Q   And -- sorry?

A   Yes is the answer.

Q   And -- and did you have a view at this time as to how long those currency challenges would last?

A   No.

Q   And currency challenges impact businesses outside of the United States, right?

A   Yes.

Q   And that includes Cordis, right?

A   Yes.

Page 200

Q   And given what was said here with this -- about currency challenges, would this have impacted how you were thinking about Cordis?

A   It would have impacted how I thought about the medical segment overall at this point.

Q   Why is that?

A   Because I no longer distinguish between Cordis and the medical segment.

Q   And why would it have impacted how you were thinking about the medical segment?

A   Because Cordis was now part of the medical segment and it wasn't being broken out separately.

Q   Okay.  So this would have impacted how you were thinking about the medical segment, which includes Cordis, correct?

A   Yes.

Q   And did the FX challenges that were continuing at this time affect your assessment of the likelihood that Cardinal would achieve the 20 cents accretion estimate disclosed at the time the deal was announced?

A   Sorry.  Repeat the question.

Q   Did the FX challenges that continued to exist at this time affect your assessment of the likelihood that Cardinal Health would achieve the 20

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 201

cent accretion estimate disclosed at the time the deal was announced?

A    No.  In fact, my confidence was higher because the medical segment outperformed this quarter.

Q    So the -- you had higher confidence in Cordis at this time as opposed to the time when the acquisition was announced?

A    I had higher confidence in the medical segment hitting their numbers at this time.  I was no longer breaking Cordis out separately, and that is going to be true going forward.

Q    Okay.  So you had higher confidence in the medical segment, which expected to get 20 cents accretion from Cordis at this time than you had in the medical segment, which also expected to get 20 cents accretion at the time the deal was announced in March 2015; is that accurate?

A    I apologize.  I'm getting a little tired, and could you repeat that question.

Q    Let's just read it back.

Okay.  So you had higher confidence in the medical segment, and the medical segment expected to get 20 cents accretion from Cordis by fiscal year 2017.  So you had higher confidence in the medical

Page 202

segment at this time than you had in the medical segment in March 2015 at the time the Cordis deal was announced, correct?

MR. JANOSKI:  Object to form.

THE WITNESS:  I had higher confidence that the medical segment would achieve the results that they were supposed to get with Cordis integrated.

BY MS. SADINSKY:

Q    Okay.  And did you have higher confidence that the medical segment would achieve the results -- the synergies results that Cardinal Health disclosed at the time the deal was announced with Cordis integrated?

A    Yes.

Q    And you were aware at this time of challenges related to generic inflation, correct?

A    Yes.

Q    And those challenges affected the pharmaceutical segment, correct?

A    Yes.

Q    And at this time, did you have a view as to how long those generic inflation challenges would last?

A    No.

Q    And would you have factored in generic

Page 203

inflation challenges into your own valuation of Cardinal?

A    Yes.

Q    What was more important to you in assessing Cardinal Health's financial performance, the FX challenges or the generic inflation challenges?

A    The generic inflation challenges.

Q    Why?

A    It has a much bigger impact on the overall earnings of the company.

Q    Because the generic inflation challenges affect the pharmaceutical segment, which is a larger part of Cardinal Health's business?

A    Yes.

Q    And the pharmaceutical segment was still more important to you in assessing Cardinal Health's financials and other aspects of Cardinal Health's business at this time?

A    Yes.

Q    And did you -- do you understand, in your investment experience, that the generic inflation challenges affecting the pharmaceutical segment were more important to other investors and sell-side analysts in assessing Cardinal Health's business than issues affecting only the medical segment?

Page 204

MR. JANOSKI:  Object to form.

THE WITNESS:  Again, based on the reports that I read from many analysts, that was overall correct, but I cannot speculate as to how everyone was thinking about the company.

MS. SADINSKY:  Let's mark Tab 51 as Exhibit 20.

- - -

(Columbia Exhibit 20 was marked for identification.)

- - -

BY MS. SADINSKY:

Q    So this document that I'm about to mark, I don't have a Bates stamped version of it yet because this is one of the documents that Columbia produced last night.  So we can swap it out later with a Bates stamped version.  But I just used an internal control number.  So I just want to put that on the record.

Tab 51 is a document titled:  "Columbia Midcap Growth Fund," that Columbia produced to us last night.  What is Columbia Midcap Growth Fund?

A    I don't know.  I'm not a portfolio manager on it.

Q    You don't know what it is?

LA Sheriffs' Pension                              FINAL                              May 26, 2022
v. Cardinal Health Inc.                                                             Nicholas Smith

Page 205

A   It's one of our mutual funds, but I don't know anything about it specifically.
Q   When you say: "It's one of our mutual funds," what does that mean?  Is it like the Contrarian fund, just a different fund?
A   I believe so.
Q   And who's involved in that fund?
A   I don't know.  You'd have to pull up the documents and show me who the PMs are.
Q   I don't think the PMs are listed in here. This was produced as a responsive document by your counsel.
    So let's turn to the seventh page -- or the sixth page.
    So at the bottom of the sixth page --
    MS. SADINSKY:  More.  More.  Go all the way down to the bottom of this page.  There's going to be a header for Cardinal Health.  No.  I think you went too far.  Keep going up.  Sorry.  Up.
    Yeah, there we go.
BY MS. SADINSKY:
Q   Do you see that?
A   I see it.
Q   And information from Cardinal Health in the mid-cap growth fund, is it your understanding that

Page 206

the mid-cap growth fund has portfolio managers and then also gets information from research analysts just like the Contrarian fund does?
A   That is my understanding.
Q   Okay.  And this is a section about Cardinal Health.  Do you see that?
A   Yes.
Q   And so was Cardinal Health part of the mid-cap growth fund?
A   I do not know.
Q   Okay.  On the bottom of the next page, it says, under the header "Comment on Medical Device Segment" -- do you see that?
A   Yes.
Q   It says:  "Cardinal Health is making a serious push in Medical Devices.  1st step was acquiring Cordis in 2015 for $2 billion; they will do more.  Cardinal believes that devices could be distributed just like drugs.  However, there is a significant service level associated with medical devices (i.e., reps in OR suites)."
A   That's OR.
Q   What?
A   That is an abbreviation, OR.
Q   What does that mean?

Page 207

A   I don't know.  I'm not a specialist, but I would speculate it means operating room.
Q   Operating room.  Oh, well, that's helpful because I just read it as the word "or."
    Okay.  Next page.  "Further, Cardinal will be challenged as they're entering a market that is dominated by very large players with a largely insignificant offering (Cordis).  King Concern -- longer term, Cardinal's views may prove accurate, but it will take a long time for this to play out (& Street clearly is skeptical)."
    Do you see that?
A   Yes.
Q   You don't know who wrote this, right?
A   I do not.
Q   Okay.  So do you generally agree with the statements in this report?
A   I have no opinion on the statements in this report because I had nothing to do with writing them, and they're a totally different fund.  My opinion is related to my user opinions.
Q   Okay.  Just because it's related to a different fund doesn't mean you can't agree or disagree with them.  So let's go through them.
    So it says:  "Cardinal believes that

Page 208

devices could be distributed just like drugs. However, there is a significant service level associated with medical devices."
    Is that true, or is that not true?
    MR. JANOSKI:  Object to form.
    THE WITNESS:  I don't know.  I didn't write this report, and the person writing it may have taken some liberties with the way they generalized the business.  So I don't actually know if that is true or not.
BY MS. SADINSKY:
Q   Did you ever hear anything about service levels affecting the medical device segment?  Do you know anything about that?
A   I was not aware of it.
Q   Ever have any conversations about that with sell-side analysts or anyone?
A   No.
Q   And then on the next page, where it says: "Cardinal will be challenged as they are entering a market that is dominated by very large players..."
    What do -- what do you understand that to mean?  Who --
    MR. JANOSKI:  Object to form.
BY MS. SADINSKY:

Page 209

Q Who are the other players in the market that Cordis is in?

A I do -- do not know. I spent more of the time on the pharmaceutical side --

THE COURT REPORTER: I'm sorry. I missed the last few words after pharmaceutical side.

MS. SADINSKY: Analyzing that business, I think.

BY MS. SADINSKY:

Q Did you understand that Cordis -- there were -- Cordis had competitors?

A Yes.

Q Did you ever consider how Cordis, you know, ranked amongst its competitors?

A I did not do a deep dive into exactly where Cordis ranked versus its competitors.

Q Did you ever have a discussion with anyone about how Cordis lined up against its competitors?

A Not directly, no.

Q What do you mean, directly?

A I never had a conversation about Cordis lined up against their competitors as a -- as a stand-alone business.

Q Did you ever have any conversations about Cordis's competitors with anyone with respect to --

Page 210

A No --

Q -- your thinking about Cordis?

A No.

Q And then it says here: "...with a largely insignificant offering (Cordis)..."

What do you understand that to mean?

A That's an opinion of whoever wrote this.

Q What do you understand that to mean?

MR. JANOSKI: Object to form.

THE WITNESS: I understand it's their -- the opinion of the person who wrote this.

BY MS. SADINSKY:

Q What do you understand the words to mean? I get that it's an opinion. I'm asking what you understand the words to mean.

MR. JANOSKI: Object to form.

THE WITNESS: The words appear to mean that Cordis does not have a very good product selection.

BY MS. SADINSKY:

Q What did you know about Cordis's product selection at this time?

A I merely knew the two areas that they tended to be fairly large in.

Q Did you ever have any conversations with anyone about Cordis's products offering?

Page 211

A Not specifically, no. Not about Cordis.

Q You have --

A We talked about the medical segment as a -- as a segment -- as a combined segment. I did not have conversations about Cordis in and of themselves.

Q But you had a conversation with John Ransom about Cordis's product offering, right?

A It was -- it was mentioned by him, and I wrote it down in my notes, but I didn't do a deep dive into their product offering.

Q And in the notes we looked at earlier, John Ransom told you that Cordis was in need of a new stent which they currently did not have; isn't that correct?

A That was the notes that I had written down from my conversation with him, yes.

Q So I'll ask you again: Did you or did you not ever have conversations with anyone about Cordis's products offering?

A I'm unclear on the question because I did not have in-depth conversations about Cordis's product offering. I had very generic, high-level conversations about the products that Cordis sold and how they would integrate into the medical device

Page 212

segment overall.

Q Did you ever have any conversations, whether in-depth or not, about where someone raised concerns about Cordis's product offerings?

A I don't recall.

Q You had that conversation with John Ransom, right?

A But I didn't recall that conversation. That's why I wrote it down in my notes.

Q And we looked at those notes, right?

A Yes.

Q And in those notes, it reflected that John Ransom raised concerns about Cordis's not having a particular stent at that time; is that -- isn't that correct?

A That's one specific product, not the overall offering.

Q Okay. Did you ever have conversations with anyone about Cordis -- Cordis products where someone raised concerns about a Cordis product or products?

A No.

Q John Ransom didn't raise a concern to you about Cordis not having a particular product?

A He did, but your question was concerns about their products that they had, and nobody

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 213

raised a concern to me about products that they actually had.

Q   Okay.  Did you ever have a conversation with anyone where they raised a concern about products Cordis did not have that they thought Cordis needed?

A   Yes, in my notes that you referenced.

Q   So you had a conversation with someone about Cordis's product portfolio or lack of one, correct?

A   Yes.

Q   Okay.  And so John Ransom's concern about Cordis not having a product that it needed is consistent with the statement here about the insignificant offering of Cordis; is that correct?

A   I disagree.

Q   Why?

A   I disagree.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   Why?

A   You're comparing apples and oranges.

Q   Tell me how.

A   Insignificant offering refers to products that Cordis currently has.  You're asking me to

Page 214

compare it to products Cordis doesn't have.  I can't do that.

Q   Well, insignificant offering, wouldn't that mean it's missing products?  That's why it's insignificant?

MR. JANOSKI:  Object to form.

THE WITNESS:  I don't know.  I didn't write this opinion.  I have no idea what the author of this statement meant by it.

BY MS. SADINSKY:

Q   Okay.  That's fair.

But you were aware that -- that some people had concerns about some products that were not in Cordis's portfolio, correct?

A   I was aware, apparently, and I didn't recollect this until I reviewed my notes, that they might have needed a stent product to help round out their portfolio, but that's all I was aware of.

MS. SADINSKY:  Which Tab are we on?

MR. OBMASCIK:  Exhibit 21.

MS. SADINSKY:  As Exhibit 21, let's mark Tab 26.

- - -

(Columbia Exhibit 21 was marked for identification.)

Page 215

- - -

MS. SADINSKY:  You said Exhibit 21, right?

MR. OBMASCIK:  Correct.

BY MS. SADINSKY:

Q   Exhibit 21 is a transcript of Cardinal Health's fourth quarter 2016 earnings call on August 2nd, 2016.  It's -- the transcript, would you have either listened to the earnings call or read the transcript?

A   Yes.

Q   At the top of the page it says 8 a.m. eastern.  Do you see that?

A   Yes.

Q   This call happened before the markets opened, right?

A   Yes.

Q   Let's go to page 15.  In the middle of the page -- actually, let's go to -- I just want to show you who's speaking.

Okay.  If we go to page 8, it shows Mike Kaufmann there.

Do you see that?

A   Okay.  Yes.

Q   I want to go to page 15.  I just wanted to show you it's going to be Mike Kaufmann speaking.

Page 216

In the middle of the page there, you see the paragraph starting with: "First"?

A   Yes.

Q   "First, we continue to expect great performance from Cordis with that acquisition adding more than 15 cents to fiscal '17 versus the prior year, net of transaction-related interest expense of 7 to 8 cents.  This is a lower accretion figure than we originally provided, largely due to currently impacts as well as some increased SG&A investments compared to our original business case."

Do you see that?

A   Yes.

Q   At this time in August 2016, Cardinal decreased its accretion estimate from 20 cents to 15 cents, correct?

A   It appears that is correct.

Q   Was it something that you focused on?

A   Yes.

Q   Why?

A   Well, they reduced the accretion number.  I would have taken that into account in my valuation.

Q   Was this a surprise?

A   Yes.

Q   Did you believe before this that Cardinal

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 217

would be able to achieve the 20 cent accretion estimate by the end of fiscal 2017?

A   Yes.

Q   And now did you understand that there were challenges with the Cordis business at this time?

A   Yes.

Q   You understood there were challenges with currency impacts?

A   Yes.

Q   You understood there were challenges with SG&A investments?

A   Yes.

Q   Did you understand that the currency impacts posed a risk to Cardinal Health's ability to achieve the expected accretion from the acquisition?

A   Yes.

Q   Did you understand that higher-than-expected SG&A investments posed a risk to Cardinal Health's ability to achieve the expected accretion from the acquisition?

A   Yes.

Q   Did you understand why the SG&A investments were higher?

A   No.

Q   Were you concerned that the SG&A

Page 218

investments were higher?

A   Not particularly.

Q   Why not?

A   The segment was, I believe, still outperforming at this time.

Q   Did you understand there was a risk that SG&A expenses may continue to be higher than originally -- sorry.  Strike that.

So it says: "...increased SG&A investments compared to our original business case."  I'm going to use the same language.

Did you understand there was a risk that SG&A investments may continue to be higher than the original business case going forward?

MR. JANOSKI:  Object to form.

THE WITNESS:  I was not actually paying any attention to the SG&A investments for the most part. I was looking at the FX.  I incorporated that into my notes, I believe.  The SG&A investments, if you continue reading this, appear to be related to keeping service levels high, which is something I would have agreed with the company on doing, and so I would not have paid them very much attention.

BY MS. SADINSKY:

Q   Okay.

Page 219

A   Also, the FX is called out as the largest impact on the accretion number coming down.  So I would have focused on that and almost solely on that.

Q   Okay.  So you would have been -- you would have been aware of FX -- you would have been aware of both challenges, but focused almost primarily on FX challenges, correct?

A   Yes.

MS. SADINSKY:  And now let's mark as Exhibit 22, Tab 27.

- - -

(Columbia Exhibit 22 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Did you prepare this report?

A   Yes.

Q   Exhibit 22 is a report Columbia produced from your files with the file name "August 2nd, 2016 Cardinal Health Q4."  So this report came out or you wrote this report either the same day Cardinal lowered its accretion estimate or in a couple days thereafter, right?

A   Yes, and I appear to have updated this

Page 220

report along the way.

Q   Okay.  And if we look at the -- where are we? -- What to do section, and it says: "My estimate of EPS growth makes me comfortable with the valuation.  I am fine with holding at this level given the guidance and upside into 2018."

Do you see that?

A   Yes.

Q   And Cordis had reduced its expected accretion from 20 cents to 15 cents around this time, right?

A   Yes.

Q   Did that reduction factor into your valuation of Cardinal Health at all?

A   Yes, it would have factored into the ultimate EPS number that I used.

Q   But it didn't change your recommendation as to whether to continue to hold Cardinal Health stock, right?  It didn't lead you to say "we should sell," right?

A   Based on where the stock price was, I apparently was fine holding at that level.

Q   And so -- so you said the Cordis challenges would have impacted how you were thinking about Cordis, but not enough to change your recommendation

Page 221

with respect to Cardinal Health, right?

A   Again, I was no longer thinking about Cordis specifically.  My thinking would have been medical segment and the pharmaceutical segment.

Q   Okay.  So did the -- the Cordis challenges disclosed on this date impact how you were thinking about the medical segment, but not enough to change your recommendation as to buying -- or as to sell Cardinal Health stock, correct?

MR. JANOSKI:  Object to form.

THE WITNESS:  That is correct.  I was looking, and that statement on the what to do specifically is referring to the 2018 EPS estimate, which was a best guess at the time of how Cardinal as a company as a whole would produce earnings.

BY MS. SADINSKY:

Q   Okay.  And so we looked at the 15 cent estimate.  Did you understand that there was a hundred percent chance that Cardinal would achieve 15 cents in accretion by the end -- or by fiscal year 2017?

MR. JANOSKI:  Object to form.

THE WITNESS:  No.

BY MS. SADINSKY:

Q   Did you understand that there was a risk

Page 222

that Cardinal Health would not achieve the full 15 cent accretion by fiscal year 2017?

A   No.

Q   So you understood -- so it was -- so it's not a hundred percent certain that Cardinal would achieve 15 cents accretion, and it was also -- there was also no risk that Cardinal Health wouldn't?

MR. JANOSKI:  Object to form.

THE WITNESS:  I -- sorry.  I'm getting a little confused by the way you're phrasing these questions.  Nothing in our industry is a hundred percent.  So the way you're asking it is forcing me into a box that doesn't make any sense for me to answer that way.

Did I understand that there was risk to a 15 cent accretion number and potentially not getting there?  Yes, I knew there was some risk that they might not get there.

BY MS. SADINSKY:

Q   Okay.  And was -- was foreign exchange a risk that could affect Cardinal Health's ability to achieve the accretion estimate?

MR. JANOSKI:  Object to form.

THE WITNESS:  It would have been one risk factor.

Page 223

BY MS. SADINSKY:

Q   And higher-than-expected SG&A investments was another risk that could affect Cardinal Health's ability to achieve that accretion estimate?

A   Yes.  I did not include that.  I assumed that management would be able to overcome that part.

Q   And were decisions by management regarding how the integration was implemented, could that be a potential risk that could affect Cardinal Health's ability to achieve the accretion estimate?

A   It could be.  It did not factor into my analysis.

Q   Okay.  Could difficulties in retaining customers and employees be risks that could affect Cardinal Health's ability to achieve the accretion estimate?

A   Yes.

Q   Could difficulties in integrating international operations be a risk that could affect Cardinal Health's ability to achieve its accretion estimate?

A   Yes.

Q   And could difficulties posed by the size of Cordis's international business as compared to its U.S. business be a risk that could affect Cardinal

Page 224

Health's ability to achieve its accretion estimate?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   Did the reduction in the accretion estimate affect your assessment of the likelihood that Cardinal Health would achieve the 100 million in synergies that it estimated at the time the deal was announced?

A   No.  It -- the SG&A delayed it, though.

Q   What does that mean?

A   The increase in SG&A cost would have delayed the timeline under which I would have expected the 100 million in synergies to be achieved.

Q   Okay.  So let me ask it this way.

Did the reduction in the accretion estimate -- or strike that.

Did the SG&A investments affect your assessment of the likelihood that Cardinal Health would achieve the 100 million synergies estimate by the end of fiscal year 2018?

A   Yes.

Q   It was unlikely that it would achieve the 100 million synergies estimate by the end of fiscal

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 225

year 2018, correct?

A It was less likely.

Q Less likely.

Okay. Let me go back to this.

MS. SADINSKY: All right. Next, let's mark Tab 28 as -- where are we? Exhibit 23?

- - -

(Columbia Exhibit 23 was marked for identification.)

- - -

BY MS. SADINSKY:

Q Tab 28 -- or sorry. Exhibit 23 is an August 24, 2016 report from Mr. Sonderling titled "Cardinal Health fiscal year June 2017 guidance sufficient, despite tough next quarters; retain 2; CEO Barrett call."

Would you have read this?

A Again, it would have been in my email, and I may or may not have gone through it thoroughly.

Q And this is a report from Mr. Sonderling from after Cardinal lowered its accretion estimate for Cordis, correct?

A Based on the date stamp, yes.

Q I want you to read through this report. There's only one bullet on the next page. You can

Page 226

tell Max when to scroll down for you. You don't need to read the table if you don't want to, and then I want to ask you some questions.

A Okay. Do you want to scroll down so I can read the next page or not?

MS. SADINSKY: There's just one bullet. Just scroll down.

THE WITNESS: Okay.

BY MS. SADINSKY:

Q Is the reduced accretion estimate for Cordis mentioned in here?

A I did not see it.

Q Why don't you think the reduced accretion estimate for Cordis would be reflected in Mr. Sonderling's analysis to Cardinal Health at this time?

MR. JANOSKI: Object to form.

THE WITNESS: I believe Harlan, who was doing similar to what I was doing and incorporating it into the medical segment, so the line under -- I think it's bullet three under the first paragraph, where he says: "Medical rose 19% partly due to the Cordis acquisition," reflects the Cordis acquisition within medical. I cannot speculate as to why he did or did not break out the earnings accretion.

Page 227

BY MS. SADINSKY:

Q But the medical rose 19 percent, that would be based on earnings to date -- right? -- not forecasts for the future?

A Yes.

Q And the accretion estimate is an estimate for the future, right?

A Yes.

Q So would it be incorporated into that sentence you just read for me?

A No.

Q So is it reflected anywhere in here?

A I believe it's reflected in the earnings guidance.

Q Okay. But the Cordis accretion estimate is not mentioned anywhere in the comments, correct?

A Not separately, no.

Q Is -- is that because the accretion estimate just really wasn't that important and -- and -- and -- and Mr. Sonderling --

A You're asking me to speculate on Mr. Sonderling's point of view.

MR. JANOSKI: Object to form.

BY MS. SADINSKY:

Q Did you understand that the reduction in

Page 228

the accretion estimate wouldn't have had a big impact on Mr. Sonderling's valuation of Cardinal Health?

MR. JANOSKI: Object to form.

THE WITNESS: Yeah, I can't speculate on Mr. -- Harlan's reason for not mentioning that specifically. I can only discuss my own opinions on it.

BY MS. SADINSKY:

Q How did Columbia use the information in this report?

A It would have been one of our information sets that we would have incorporated into our analysis as PMs.

Q Okay. And you're a PM and you read this report and you incorporated it into your own analysis of Cardinal, correct?

A Yes.

Q And when you read a report that does not mention a reduction in an accretion estimate, what does that mean to you? Does it mean that that's not that important to the analyst covering it when they are assessing Cardinal Health's performance?

MR. JANOSKI: Object to form.

THE WITNESS: I don't know how to answer

Page 229

that question. It's too generic and broad depending -- it's very -- very -- it would be very case specific.

BY MS. SADINSKY:

Q I'm asking how you interpret this. You receive information from analysts, internal and external. If information that you receive does not highlight the reduction in an accretion, does that indicate to you -- sitting here today, does that indicate to you that that reduction is just not all that important to that analyst in assessing the company?

MR. JANOSKI: Object to form.

THE WITNESS: It indicates to me that Harlan did not break it out separately in this report, and that's pretty much all it indicates to me.

BY MS. SADINSKY:

Q Would you expect, if generic deflation -- it actually -- if generic -- if challenges with generic inflation turned to generic deflation, would you expect that to be broken out in this report?

MR. JANOSKI: Object to form.

THE WITNESS: I would expect it to be mentioned.

Page 230

BY MS. SADINSKY:

Q And would you expect Cordis accretion reduction to be mentioned?

MR. JANOSKI: Object to form.

THE WITNESS: Not necessarily. It's five cents --

BY MS. SADINSKY:

Q Why --

A -- against $5.48 to $5.73 of guided earnings. It's less than 1 percent.

Q So is it fair to say that you would expect generic deflation to be reflected and not the accretion reduction for Cordis because a generic deflation would have a more significant impact on Cardinal Health's earnings?

MR. JANOSKI: Object to form.

THE WITNESS: It depends on the --

BY MS. SADINSKY:

Q At this time.

A -- amount of generic deflation that you're referencing, and you did not give me any guidelines or reference points. So if it were a large amount and rose to a material, significant level, then, yes, I would expect it to be mentioned.

Q Okay. In this same Comments section on

Page 231

that bullet that you were looking at where it says: "I am not sure how to forecast Medical revenue growth and margin," what do you understand that to mean?

A I apologize. Where are you looking?

Q It was that bullet that you were looking at where Cordis is mentioned, the medical rose 19 percent.

A Okay.

Q The -- the sentence after that says: "I am not sure how to forecast Medical revenue growth and margin."

Do you see that?

A I do.

Q What do you understand that to mean?

MR. JANOSKI: Object to form.

THE WITNESS: I interpret that as Harlan does not know how to forecast medical revenue growth and margin at this point in time.

BY MS. SADINSKY:

Q I know what the words say, but do you know why?

A I don't know why he wrote that.

Q Did you ever have a conversation with him about concerns over the medical segment around this

Page 232

time?

A I did not. The medical segment was performing well this quarter, and so I did not do a deep dive into that, and I certainly did not have that conversation with him about that sentence.

Q And so you don't know why he was unable to forecast medical revenue growth and margin, right?

A I do not.

Q And he has, at the bottom here: "Let's discuss with George Barrett."

Do you see that?

A Yes, I do.

Q And the last bullet there says: "Normal Medical segment growth potential"?

A Yes.

Q Did you -- did he have a call with George Barrett?

A I don't recall if he had a call with George Barrett. That was a question that I was wrestling with at the time as well, and I believe it's reflected in my notes.

Q What does that mean?

A I was also trying to figure out what a normal medical growth rate should be for that segment --

Page 233

Q   Can you --

A   -- of the deal.

Q   Can you describe that, what you're -- what that means?  Because you're just repeating what's on the document.  I want to understand what that actually means.

A   Sure.  Now that they have Cordis integrated into the medical segment, in order to value it, I need to know what the growth rate of that segment is without M&A.  So I would have been trying to get management or the investor relations to provide to the street or in their guidance what the growth rate of the medical segment should be over the long term.  Not just one year out, but over the three- to five-year time frame.

Q   When you say "without M&A," can you just explain that a little bit more?  I'm just not sure I'm totally following.

A   The growth number that you see here: "Medical rose 19%," reflects the Cordis acquisition.  So I would like to know how much the )growth of this segment could be without any mergers or acquisitions.

Q   I see.

So when Mr. Sonderling says:  "I am not

Page 234

sure how to forecast Medical revenue growth and margin"?

A   That may be what he is referring to.

Q   And that's the same problem that you had.  So you do know what it means.

A   I don't know what he means.

MR. JANOSKI:  Object to form.

THE WITNESS:  I'm telling you what I was wrestling with.

BY MS. SADINSKY:

Q   Okay.  Did you have a call with -- with Mr. Barrett where you talked about what normal medical segment growth potential would be?

A   I don't recall.

Q   Did you ever talk about the reduced accretion estimate for Cordis with Mr. Barrett or anyone else from Cardinal Health?

A   Not that I recall.

Q   If -- if you had a call with them at this time, would that have been something that you would have asked about?

A   I don't know what my state of mind was at the time and whether I would have asked that.

Q   Sitting here today, do you think that that would be something that you would ask about, or

Page 235

would you be focused on things like generic deflation?

MR. JANOSKI:  Object to form.

THE WITNESS:  The answer is I don't know.  I don't know.  I would have been focused on what I felt were the highest-level impacts on earnings at the time.  I would have been more focused on the medical segment overall and much less focused on just a five-cent change in the accretion number of the specific Cordis acquisition.

BY MS. SADINSKY:

Q   Got it.

MS. SADINSKY:  Okay.  Next as Exhibit 24, let's mark Tab 29.

- - -

(Columbia Exhibit 24 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Exhibit 24 is an October 31st, 2016 report from Mr. Sonderling titled "Cardinal Health reduces fyJune2017 earnings guidance by 2%, with mix shift to Medical; retain 2; buy weakness; CEO call 200 pm EDT."

Have you seen this before?

Page 236

A   Again, most likely, but I cannot recall specifically reading it.

Q   Okay.  If we -- where am I?

If we go to page 2, the second-to-last bullet says:  "Medical segment revenue rose 12%, maybe half organic, and operating income rose 26%, which will moderate over the year.  Cardinal reduced Cordis accretion from 20 to 15 cents due to currency, not unreasonable.  The Medical segment is providing the earnings ballast Cardinal envisioned over recent years, which will persist."

Do you see that?

A   Yes.

Q   When he says:  The reduced accretion estimate due to currency is not unreasonable, what do you understand that to mean?

A   It's not a big deal.

Q   And the -- it's not a big deal meaning the reduced accretion estimate is not a big deal?

A   No.  I mean there were a lot of companies facing foreign exchange, and so Harlan felt that that five-cent change would have been within what other companies were indicating as well.

Q   Okay.  And then it says:  Reports -- sorry.  Then it says:  "...Medical segment is providing the

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 237

earnings ballast Cardinal envisioned over recent years, which will persist."

Q What does "earnings ballast" mean?

A You're asking me to interpret Harlan's writing, which is a little unfair.

Q Well, you're probably better at it than I am. So how would you interpret that?

MR. JANOSKI: Object to form.

THE WITNESS: I would interpret it to mean that the medical segment is finally showing some earnings growth.

BY MS. SADINSKY:

Q Okay. And "will persist" means that you -- that he expects the medical segment's earnings growth to continue?

MR. JANOSKI: Object to form.

THE WITNESS: I believe --

BY MS. SADINSKY:

Q Sorry?

A I believe so.

Q Did you share that view?

A My view at this time was also becoming more positive on the medical segment and the potential valuation that it could hold.

Q And what was the basis for that belief?

Page 238

A That the medical segment was finally showing some revenue growth as well as some earnings growth.

Q And okay. And let's now mark as Exhibit 25, Tab 30.

- - -

(Columbia Exhibit 25 was marked for identification.)

- - -

MS. SADINSKY: We're going to switch between a couple documents, Max, so just keep them all in the tabs.

BY MS. SADINSKY:

Q Okay. Tab -- Exhibit 25 --

MS. SADINSKY: Do you have that one?

MR. OBMASCIK: Yeah.

MS. SADINSKY: Next we're going to do L.

BY MS. SADINSKY:

Q Did you write this report?

A Yes.

Q And if you look under "what happened," it says: "Cardinal posted a small beat to" -- sorry.

Exhibit 25 is a report Columbia produced from your files with the file name October 31st, 2016 Cardinal Health Q4.

Page 239

If you look under "what happened," it says: "Cardinal posted a small beat to their guidance, a relief after MCK's terrible report on Friday which caused CAH to drop 10%."

Do you see that?

A Yes.

Q Right, that a bad report by McKesson caused Cardinal Health stock price to drop? Why would a bad report by McKesson affect Cardinal Health's stock price?

A Because McKesson and Cardinal are viewed as being in the -- as similar businesses through the pharmaceutical businesses that they operate.

Q And a bad report by McKesson could be about something that, you know, wouldn't even affect Cardinal and still affect Cardinal Health's stock price?

A In this case, the report from McKesson was related to the pharmaceutical side of the business, and it was more macro related as in economic-wide -- economy-wide related, and, therefore, analysts and investors would assume that it would affect Cardinal similarly.

Q Was it about the generic deflation?

A I don't recall.

Page 240

Q You just remember that there was a macro-level report?

A I don't. I'm interpreting my own words for you.

Q Okay. Let's go to Tab L. We'll mark it as Exhibit 26. And we're going to come back to this one, so just don't put that one down.

- - -

(Columbia Exhibit 26 was marked for identification.)

- - -

BY MS. SADINSKY:

Q I am marking an email exchange between Robert Willoughby, Harlan Sonderling, and Richard Hightower from -- when is this? November 1st, 2016.

Is this Robert Willoughby at Credit Suisse the same Bob Willoughby we looked at earlier who was from a different company at that time?

A I believe so.

Q And the email is from Credit Suisse to Harlan. Cardinal -- "CAH called me to ask if I am hearing anything from MCK's impromptu Boston day with JP Morgan that would be driving its stock down. I find it highly credible that MCK is doing just that, but I wanted to understand the points. No

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 241

worries if you can't relay."

Harlan says --

MR. JANOSKI: I'm sorry. I don't see -- I don't see why you're reading.

MS. SADINSKY: Sorry. Bottom of this chain. Just scroll down. There you go. Sorry about that.

BY MS. SADINSKY:

Q And if we scroll up, Harlan says: "Mck not knocking Cardinal, all on abc. Could be fear that Cardinal has to go more toward mck' kitchen sink."

And then Credit Suisse -- Bob Willoughby writes back: "Interesting. I wonder why CAH is so thin skinned. Thank you."

When you read this exchange, what do you understand it to be about? I just don't understand it at all.

MR. JANOSKI: Object to form.

THE WITNESS: I have not seen this exchange before. The word "kitchen sink" means for a company to reduce their earnings guidance to a point low enough that they will almost certainly beat it when they report earnings.

BY MS. SADINSKY:

Q So it's talking about McKesson lowering its

Page 242

guidance low enough so --

A I actually don't know if that's what it's saying or not. I cannot infer that from it.

Q Okay. But it is your general take, if you look at the Bob Willoughby email at the bottom essentially saying that McKesson is driving its own stock price down?

MR. JANOSKI: Object to form.

BY MS. SADINSKY:

Q I just want to know -- I'm just trying to understand if there's anything about Cardinal here that's -- that's actually --

A Yeah, I -- I don't want to speculate on what Bob Willoughby is asking Harlan about because I do not recall at all what McKesson might have said at this point in time, and I don't recall why it would have had a knock-on effect to Cardinal specifically.

Q Okay. Let's go back to Tab -- or Exhibit 25, and if you'd go to the What to do section towards the bottom of this first page: "Hold for now. While industry headwinds are clearly negative, the re-valuation appears to have occurred. At 12x I don't see much downside even in a weak environment with another bad quarter coming up in

Page 243

Q2. Q3 has better comps given Safeway comp, so if we can get comfortable that most of 2017 issues are now priced in, I see more upside than downside from here. 2018/19 generic launches should respark interest in the sector, and it makes sense to hold through."

And then in the Valuation section right above it -- where are we? -- in the middle of this paragraph where the sentence is starting with "Also, while I want to get excited about 2018, underlying EPS growth of 10%+ is uncertain given generic pricing."

I want to talk about some of that stuff I just read. So in the What to do section, you say: "...industry headwinds are clearly negative."

What were the industry headwinds at this time?

A I'm speculating a little bit here in terms of timing. I believe I'm referencing that there was generic deflation occurring and there was also a lack of new generic launches.

Q And then you say here: "...given Safeway comp."

What does that mean?

A I believe that Cardinal had a contract with

Page 244

Safeway to distribute drugs to their pharmacies that they lost that contract the prior year, and as we would be coming up on the loss of that contract one year later, it would make the earnings look better on a -- on a comparable basis to the quarter where they lost those earnings.

Q Okay. So these industry headwinds that we're just talking about, generic deflation and generic launches were affecting the pharmaceutical segment at this time?

A I apologize. Could you repeat that question.

Q Are these industry headwinds that we just discussed, these were affecting the pharmaceutical segment around this time in -- I don't know what date we're on -- October or November 2016, right?

A Yes.

Q And you believed these headwinds would persist through 2018, correct?

A Let me -- if you don't mind me referencing my notes here, I --

Q The Valuation section.

A Yeah, I believe I'm specifically saying they will persist through 2017 and that 2018 will look a little bit more clean with a more normalized

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 245

growth rate.

Q   Okay.  So you didn't expect the industry headwinds to abate until at least 2018?

A   Yes.

Q   And are we talking about fiscal year, Cardinal's fiscal year?

A   I don't know.  I'm -- normally, I try to reference fiscal year, but sometimes I -- I don't always in my reports, and if I don't write it in specifically, the answer is I don't know, looking back.

Q   You generally try and base -- base your analysis on fiscal year?

A   I do, and I believe this is referencing fiscal year because, in the last sentence of my valuation, I'm using -- I specifically say June of 2017, which means my 2018 and 2019 numbers would be based on the June.

Q   Got it.  Okay.

So is it fair to say you didn't expect to see growth in Cardinal Health's stock price during 2017?

MR. JANOSKI:  Object to form.

THE WITNESS:  That is not necessarily true.  Stock prices move based on expectations, and I

Page 246

believed that as people started to look forward into 2018, they would revalue the stock based on 2018 numbers that could occur sooner or later, depending on the whims of Wall Street.

BY MS. SADINSKY:

Q   Okay.  Is it fair to say that you didn't expect to see, you know, growth in Cardinal Health's financial performance in the end of 2017?

MR. JANOSKI:  Object to form.

THE WITNESS:  I don't know.  I don't say anything specifically about that in here.

BY MS. SADINSKY:

Q   Okay.  If you'd go to the Notes section, the second bullet, it says:  "Cordis contributing nicely," and then if you'd go to page 2, the last bullet, the second line there:  "Medical gaining and remaining strong with customer ramps.  Generic early stage so not a huge driver for fiscal but maybe for calendar..."

So on the first bullet, you note that Cordis is contributing nicely.  What does that mean?

A   That means that I believed Cordis was helping the medical segment perform well.

Q   And what was the basis for that belief?

A   I would have to look at the transcript, but

Page 247

my speculation is that management must have said something along those lines, and I copied it into my notes.

Q   Did anyone at -- did you or anyone else at Columbia, that you're aware of, analyze or model the extent to which Cordis was contributing to the medical segment's financial performance at this time?

A   No.

Q   Did the fact that Cordis was contributing nicely at this time affect your assessment of the likelihood that Cardinal Health would achieve the 15 cent accretion estimate disclosed in August 2016?

A   I was not thinking about the accretion estimate any longer.  I was solely looking at the medical segment overall.

Q   You wouldn't have included the accretion estimate into your own estimate of Cardinal Health at this time?

A   No, not anymore.  We were already in fiscal year '17.  I would have assumed it's included in the guidance from the company.

Q   So in fiscal year 2017, you stopped looking at Cardinal Health's accretion estimate for Cordis?

A   It would have been incorporated into the

Page 248

guidance for the full-year number, the full-year EPS number.

Q   But aren't you re- -- reevaluating and reconsidering that number throughout the rest of the year after each earnings call?

A   Yes, but why would I keep breaking that out separately?  It's already incorporated into the guidance the company gave for the full year.

Q   Okay.  So you're -- you're not thinking about the accretion estimate at all as of 2017, the start of 2017?

A   I don't believe I'm thinking about it separately.  Unless my notes show otherwise, I don't recall thinking about it separately.

Q   Okay.  What about the 100 million in synergies estimate?

A   I was no longer thinking about that separately either.

Q   So that -- that would accrue at the end of fiscal year 2018, so why wouldn't you be thinking about that separately?

A   Because it would now be incorporated into my 2018 fiscal year earnings per share estimate.

Q   But you testified earlier that the increased SG&A expenses would have delayed that

LA Sheriffs' Pension                     FINAL                          May 26, 2022
v. Cardinal Health Inc.                                               Nicholas Smith

Page 249

synergies estimate, right?

A   Yes.

Q   So if it was delayed, it would be delayed past the end of fiscal year 2018, right?

A   Yes.  But, again, I'm looking at the company overall now.  That 100 million is a very small portion of the overall cost.

Q   I see.

MS. SADINSKY:  Okay.  Let's mark one more document, and then we can take a quick break.

What exhibit are we on?

MR. OBMASCIK:  Exhibit 27.

MS. SADINSKY:  As Exhibit 27, let's mark Tab J.

- - -

(Columbia Exhibit 27 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   So Exhibit 27 is internal notes from Mr. Sonderling, and I think -- this is how I'm interpreting the document.  I don't know if this is right.  Maybe you can tell me.

I interpret this to be a draft of what's going to go in one of these types of Harlan reports,

Page 250

based on the numbers at the top here, but I don't know.  So this is pretty speculative of me.  I'm just not sure.

Does that seem right to you?

MR. JANOSKI:  Object to form.

THE WITNESS:  I have not seen this before. Do you want me to read it?

BY MS. SADINSKY:

Q   Yeah, you can read it.

A   I do not know what he is referencing in the top section of this, for the record.

Q   Okay.  Well, I'm going to ask you some questions about this -- some statements in this document, and I don't know if it is a full report or not, but anyways.

The last two sentences of this paragraph, so -- so he seems to be talking about the pharma segment in -- in this What's changed section -- right? -- for part of it?

A   Please give me one more minute to read the whole thing.

Q   Yeah.

A   Okay.  I've read it.

Q   So when he says -- I think it's the second to last -- or third-to-last sentence:  "Given how

Page 251

quickly these important drivers seem to be shifting, we struggle to have a high degree of confidence in the outlooks," do you understand him to be talking about the pharmaceutical issues discussed here? What do you -- well, strike that.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   Strike that.

When he says:  "Given how quickly these important drivers seem to be shifting," what do you understand the important drivers to be?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yeah, I don't know specifically.  I can read back to you what he notes in here specifically, but that's as far as I could go.

BY MS. SADINSKY:

Q   Yeah.  As you read this, you know, what would you think these important drivers are, just --

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   I understand you didn't write it.  We have the author of the -- listed on the document.  I'm just asking what you understand him to be referring to.

Page 252

A   He appears to be talking about contract renewals, price reductions to independent pharmacies, and potential speculative buying of pharmaceutical drugs by McKesson.

I am very unclear as to which of these he specifically attributes to McKesson versus Cardinal, and I'm not sure I care to offer an opinion on exactly what he means.

Q   All three -- okay.

All three of these things would affect the pharmaceutical segment and not the medical segment, right?

A   Those would all be related to the pharmaceutical segment as far as I can tell.

Q   Okay.  When it says:  "We struggle to have a high degree of confidence in the outlooks," do you understand him to be saying, "Given these issues related to the pharmaceutical segment, we don't have a lot of confidence in what Cardinal is saying about its guidance"?

MR. JANOSKI:  Object to form.

THE WITNESS:  I do not know if I can interpret that as solely discussing Cardinal.  It may be more generic to the industry overall and the ability to forecast pharmaceutical segments

Page 253

throughout the industry.

BY MS. SADINSKY:

Q   Okay.  Well, the last sentence here says: We're positioned near the low end of Cardinal Health's updated fiscal year guidance range -- fiscal year 17 guidance range, with brand pricing and competitive dynamics key swing factors impacting the achievability of that range.

What does that mean to you?

A   That would imply that Harlan -- I don't know why he uses the word "we," that Harlan has picked an earnings per share estimate for fiscal year '17 near the low end of what Cardinal management guided the street to.

Q   And that was in light of brand pricing and competitive dynamics?

A   That's what he appears to be saying, that he is focusing on those two issues.

Q   And when he says: "...key swing factors impacting the achievability of the range," what do you understand that to mean?

MR. JANOSKI:  Object to form.

THE WITNESS:  Per the sentence, the brand pricing and competitive dynamics are the swing factors.

Page 254

BY MS. SADINSKY:

Q   What is swing -- what are swing factors? What does that term mean?

MR. JANOSKI:  Object to form.

THE WITNESS:  That would mean things that would drive the earnings higher or lower.

BY MS. SADINSKY:

Q   And Cordis is not mentioned in here, right?

A   I did not see it mentioned.

Q   And the medical segment is not mentioned in here, right?

A   I did not see it mentioned.

MS. SADINSKY:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  We are now going off the record at 5:40 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going back on the record at 5:51 p.m.

MS. SADINSKY:  Okay.  I'm going to mark as Exhibit 28 Tab 31, and these are notes of calls that Mike Kaufmann had on November 28th, 2016.

- - -

(Columbia Exhibit 28 was marked for identification.)

Page 255

- - -

BY MS. SADINSKY:

Q   This is a document that Cardinal Health produced, and there are summaries of Mr. Kaufmann's meeting with Columbia that I'd like to focus on with you.  And, again, this is from November 28th, 2016.

So if we could go to the fourth page ending in 55420 -- are you there?  Let's go to the top of the page.  So it shows Columbia Threadneedle.

Do you see that?

A   Yes.

Q   And it says:  "James King (plus one other on the phone -- Harlowe Sonderling.)"

Do you think that's Harlan?

A   I do.

Q   Do you know who James King is?

A   He's another PM that works at Columbia.

Q   He's a what?

A   He's a portfolio manager at Columbia Threadneedle.

Q   What portfolio?

A   I should know, but I don't recall.

Q   I looked him up earlier and it showed the midcap growth fund.  Does that sound right to you?

A   That may be correct, but I'd have to

Page 256

verify.

Q   Okay.  And we looked at a report earlier, that midcap growth fund report.

Do you recall that?

A   Yes.

Q   And do you think that report would have been prepared by a portfolio manager and maybe James King?

MR. JANOSKI:  Object to form.

THE WITNESS:  You're asking me to speculate.  I don't know.

BY MS. SADINSKY:

Q   Do portfolio managers usually prepare reports like that or does someone else?

A   I don't know.  I don't know what type of filing that was specifically and who would have written that.

Q   Do you have reports that look like that for the Contrarian funds?

A   Not ones that I have written.

Q   Who --

A   It's possible we do.  I don't see them.

Q   Okay.  Would another portfolio manager write them, or would it be like a relationship manager that would get information and compile it?

Page 257

A    In recent years I have not written reports like that or seen them in those types of filings, and I don't know the answer as to who writes them now.

Q    Okay.  But is it your understanding that the other portfolio managers for the Contrarian fund also wouldn't write a report like that?

A    Yes.

Q    So if you look -- so this starts on page 4, the notes of the meeting between James King, Harlan Sonderling, and MK I believe refers to Mike Kaufmann.  It spans three pages.  I want to -- or -- is it three pages?  Yeah, four, five, and six.

So I want to look at page 6, which ends in 55422, and if you look, the top of the page has Harlan asking a question about GX pricing.  If you look to James Kim's [sic] second question on this page where it says:  "Guidance for the entire industry..." do you see where I am?

A    JK.  Okay.

Q    So he says:  "Guidance for the entire industry has been moving around.  What are the risks now?"

Mike Kaufmann says:  "Two risks...January price increases" -- "January price

Page 258

increases don't happen or come in way below our estimate (we see that as low risk as manufacturers need to hit their numbers).  We can give more clarity at our 2Q earnings.  GX pricing...if it got more aggressive (although seems odd give no share moved).  We make sure our sales force is not leading price down.

All other risks are sectional risk.  Something like Cordis team doesn't perform (not that they aren't), specialty, China, etc."

King says:  "Long term game plan with Cordis?"

Kaufmann responds:  "We had 100% branded no manufacturing, another one with all the manufacturing.  We wanted to be more of a product company.  We made some acquisitions for things that people don't care that much about...bed pans, gowns, etc. Now we can go to a hospital and offer distribution.  If you want to buy our products, you can save money.  Cordis allows us to have more in the bundle and gets us to the office of someone more senior at the hospital."

Do you see that?

A    Yes.

MR. JANOSKI:  Counsel, one second before

Page 259

you go forward.  I just want to have a standing objection to all questions on this document given that it's an internal Cardinal document, and I don't think the foundation is going to lay it as the authenticity of the transcript.

Go ahead and ask your questions.

BY MS. SADINSKY:

Q    So, in response to a question from Mr. King, Mr. Kaufmann says that there are -- there are some areas of executional risks for Cardinal, right?

A    Yes.

Q    And he includes as an example:  "Something like" -- the -- "Cordis team doesn't perform."

You see that?

A    Yes.

Q    What does -- what do you understand that to mean?

MR. JANOSKI:  Object to form.

THE WITNESS:  You would have to ask him.

BY MS. SADINSKY:

Q    I'm asking you.  What do you understand that to mean?

MR. JANOSKI:  Object to form.

THE WITNESS:  My opinion would be that he,

Page 260

as a senior executive, has an expectation that his team will produce certain sales and earnings numbers.  That's what he means by perform.

BY MS. SADINSKY:

Q    And what does he mean by executional risk?

MR. JANOSKI:  Object to form.

THE WITNESS:  That would be an executional risk, the operations of his company.

BY MS. SADINSKY:

Q    It would be an executional risk that Cordis would not meet his performance expectations?

A    I would interpret it that way.

Q    Okay.  So you're an investment analyst, and if you heard the company's CFO say this, how would you interpret that?

MR. JANOSKI:  Object to form.

THE WITNESS:  I would interpret it as he's covering general risks that may or may not be real, and in fact in the transcript here, he then appears to say:  "Not that they aren't."  In which case, I would almost immediately dismiss that as a real risk.

BY MS. SADINSKY:

Q    Okay.  But did you understand that there was potential executional risk that Cordis would not

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 261

perform?

A   Are you asking about what I'm reading here or what I'm -- what I knew separate from this document?

Q   Let's do both.

Did you understand at this time that there was potential executional risk that Cordis would not perform to the full extent that Cardinal Health management believed that it would?

MR. JANOSKI:  Object to form.

THE WITNESS:  I did not hold an opinion that there would be executional risk from -- or potential risk from Cordis.

BY MS. SADINSKY:

Q   Do you understand here that Mr. Kaufmann is saying that there is potential executional risk related to Cordis, not that they're --

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   -- not that they're not performing now, but that there is potential executional risk related to Cordis?

A   I had never seen this document.  So you're asking my opinion on an internal transcript.  I would interpret this as it is a potential risk, but

Page 262

he appears to dismiss it, and, therefore, I would not actually personally interpret it in that light and make a -- and include it in my notes most likely.

Q   Okay.  So I understand --

A   You're asking an opinion.  Sorry.

Q   This is a conversation that Mike Kaufmann had with an employee of Columbia.  You are designated as the representative of Columbia in this deposition.  So I am asking how a Columbia employee would have interpreted this.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   To the best of your ability, I want to talk about --

A   I will not answer a question on how Mr. King might have -- he is a separate human being.

Q   Mr Smith.  Mr. Smith.

THE COURT REPORTER:  One at a time.

MR. DeWITT:  I'm going to object.

To the extent that you can understand what she's asking about how you would interpret this, you can do that.  You can't --

THE WITNESS:  I have expressed my opinion on how I interpret this.  I cannot express an

Page 263

opinion on how any other portfolio manager, especially Mr. King, who tends to have very strong opinions of his own, would interpret this.

BY MS. SADINSKY:

Q   Okay.  I haven't finished asking my question, so let me ask my question, and then you can answer.  Because I wasn't even going to go there.

I want to talk about what are the potential ways that there could be executional risk with Cordis at this time.  So I'm going to ask you about potential executional risks, and I want you to tell me if those would have existed at this time in November 2016 or not.  Okay?

A   Okay.

Q   Decisions by management regarding how the integration was implemented, could that pose a challenge to Cordis's performance?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   Difficulties in retaining customers or employees, could that pose a challenge to Cordis's performance going forward around this time in 2016?

A   Yes.

Page 264

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   Difficulties in integrating international operations, could that pose a challenge to Cordis's performance going forward at this time?

A   Yes.

MR. JANOSKI:  Standing objection to this line of questioning.

BY MS. SADINSKY:

Q   Difficulties posed by the size of Cordis's international business as compared to its U.S. business, could that pose a challenge to Cordis's performance going forward at this time in 2016?

A   Yes.

Q   Higher-than-expected SG&A investments, could that pose a challenge to Cordis's performance going forward at this time in 2016?

A   Yes.

Q   And you are aware of -- oh, sorry.

And foreign exchange, could that pose a risk to Cordis's performance going forward at this time in 2016?

A   Yes.

Q   You're aware that these risks associated with Cordis's performance existed before this time

Page 265

in November 2016, right?

A I was aware that there were potential risks, but I had not delineated them out in a list the way you just did.

Q But you were aware of SG&A investments and FX challenges at this time, right?

A I was primarily aware of the FX challenges.

Q But you were also aware of the SG&A investments being higher than expected at this time, right?

A I was aware, but I was not giving it much weight.

Q But you were aware, correct?

A Yes.

MS. SADINSKY: Okay. As Exhibit 29, I'm going to mark Tab C.

- - -

(Columbia Exhibit 29 was marked for identification.)

- - -

BY MS. SADINSKY:

Q And this document is also a document that was produced last night. So I don't have the Bates stamped version yet. It just has our internal control numbers.

Page 266

Tab C -- or Exhibit 29 is a report titled "Daiwa SB Investments UBS - Columbia U.S. Contrarian Fund Investment Review."

What is this?

A This appears to be one of our standard marketing decks.

Q What is Daiwa SB Investments UBS?

A That would be a potential client of ours, or perhaps actual client of ours. I do not know.

Q So this is a deck that you would give to -- or present to a client?

A This is a deck that we would present to a client.

Q Have you ever been involved in preparing a deck like this?

A I have been tangentially involved in preparing and reviewing these decks, but it is not something I'm actually allowed to put together. It's done by separate teams.

Q Okay. So you would provide information based on the securities that you cover and review it, but not draft it?

A I would potentially review it and address any insufficiencies or other mistakes that I would come across.

Page 267

Q Got it. Okay.

And if we go to slide 18 -- oh, sorry. Actually, stay on that first page.

This is as of December 31st, 2016. You see that, right?

A Yes.

Q Now if we go to slide 18, this slide is titled "Top contributors and detractors year-to-date-as of 31 December 2016."

So this is a slide listing the securities in the Contrarian portfolio that have been the biggest contributors and the biggest detractors in calendar year 2016?

A Yes.

Q Okay. And you have absolute contributors and -- and detractors, and then you have relative contributors and detractors.

What is the difference between absolute and relative?

A An absolute contribution to return would be the actual dollar decline or, in this case, 35 basis points from Cardinal in that bottom-left row.

And a relative detractor would take into account the percentage of Cardinal that is in our index and adjust the contribution accordingly.

Page 268

Q Okay.

A So because Cardinal is in the index, but at a much smaller weight than we owned it, the relative contribution to return is only negative 30 basis points; whereas, the absolute contribution to return is negative 35 basis points.

Q Okay. And in calendar year 2016, Cardinal was one of the biggest detractors in the Contrarian portfolio?

A According to this slide, yes. That would be correct.

Q Do you have any reason to believe that this slide is not correct?

A I do not.

Q Do you recall in 2016 Cardinal being a detractor in the Contrarian portfolio?

A Yes.

Q Why was it a detractor in the Contrarian portfolio in 2016?

A Because the price went down.

Q What were the reasons?

MR. JANOSKI: Object to form.

THE WITNESS: I do not recall all the specific reasons, but the main reason in my mind would have been the pharmaceutical segment

Page 269

underperforming.

MS. SADINSKY: Okay. Let's mark as Exhibits 30 and 31, Tabs 32 and 33. Let's start with 32.

- - -

(Columbia Exhibits 30 and 31 were marked for identification.)

- - -

BY MS. SADINSKY:

Q   Exhibit 30 is a schedule -- Cardinal Health's meeting schedule from JPMorgan's 2017 Healthcare Conference.

Did Columbia attend JPMorgan's 2017 Healthcare Conference?

A   I do not know who specifically attended, as there may or may not have been people attending --

Q   Okay. Let's scroll --

A   -- from my firm. I'd have to -- you might know.

Q   Yeah. Let's scroll -- I'm just trying to find it -- to the second entry for January 10th, the 8:30 a.m. It's kind of hard to read, but you'll see at the bottom of the 8:30 a.m.: Columbia Threadneedle, Harvey Liu, Harlan Sonderling?

A   Yes.

Page 270

Q   And Harvey Liu is one of the portfolio managers for the Contrarian fund, right?

A   Yes.

Q   And Harlan is the analyst that covered Cardinal, right?

A   Yes.

Q   So they attended the 2017 JPMorgan Healthcare Conference, correct?

A   According to your document here, that appears correct.

Q   Why would Harvey Liu attend the meeting with Cardinal and not you, if Cardinal was in the quarter of the portfolio that you are covering?

A   We are generalists. We are expected to be able to talk about all the names in our portfolio with some degree of knowledge, and when we do client meetings, often only one or two of us will be in attendance, and, again, we have to be able to speak to all the names knowledgeably.

So our goal is always to learn as much as we can, even about names that might be covered by a different portfolio manager.

Q   I see.

So the reason he wasn't -- he was attending wasn't because you couldn't attend. It was just

Page 271

this is how you do in the normal course?

A   Well, there's also regional --

Q   Oh, okay.

A   -- considerations.

Q   Okay. So if they attended the 2017 Healthcare Conference and had a meeting with Cardinal Health -- I think the name circled here shows they had a meeting with George Barrett and Sally Curley -- would you expect them to attend Cardinal Health's presentation as well?

A   I would not know. It depends on the number of meetings that they were scheduled into and whether that would even be possible.

Q   If there was a -- so we're going to look at the transcript. Is that something that you would have read? You said you read industry conference transcripts, right?

A   If -- if they are posted into FactSet or potentially Bloomberg as a backup, then I will often try to read them. If it's during a conference season, where the company might present at two or three separate conferences, I would likely only read one or two of those, not all of them.

Q   Okay. Let's look at the conference transcript. It's Exhibit 31, Tab 33. And let's go

Page 272

to page 5. And I'm going to look at the -- sorry. I'm just trying to find my spot.

MS. SADINSKY: Can you, Max, control-F4 the question is about Cordis?

MR. OBMASCIK: It's on the screen.

MS. SADINSKY: I see it. I see it.

BY MS. SADINSKY:

Q   So where Max just highlighted, the question by an unidentified audience member, two questions on generics first, what do we need to do to grow -- actually, I'm sorry. I just missed it again. I lost it.

MS. SADINSKY: Can you highlight it again? What page is this on? Sorry. I was on page 4. Okay. Page 5.

BY MS. SADINSKY:

Q   "Unidentified Audience Member: Can you give us a little bit of an update on Cordis?"

Do you see that?

A   Yes.

Q   Okay. And Barrett -- and Barrett responds, right?

A   Yes.

Q   He says: "The question is about Cordis and how it's going, and is it going sort of according to

Page 273

model. It's going really well. It's a big complex business, global business, as you know. So there was some startup costs, particularly in some markets where we didn't have an existing infrastructure sort of order to cash and we had to do some TSA agreements with J&J, and then are moving -- transitioning those off. So other than those going a little more slowly than we modeled, and really going more slowly because we chose to go more slowly to make sure we got them right because we didn't want to do anything that could disrupt patient care, it's actually going well.

"What we did announce at the beginning of the year, because of that, our accretion that we expected was a little bit slower than the original model, but it really was just about the costs associated with these transition agreements. But market wise we're doing well. Each market is a little different than we modeled, but net/net it's roughly as we modeled it. So it's going pretty well."

Q So Barrett was discussing the integration of Cordis, right?

A Yes.

Q And he mentioned that there were challenges

Page 274

with setting up an infrastructure -- right? -- a global infrastructure, particularly in some markets where we didn't have an existing infrastructure?

MR. JANOSKI: Object to form.

THE WITNESS: I apologize. My son stepped into the room for a second. Could you repeat the question?

BY MS. SADINSKY:

Q Sure.

And Mr. Barrett said there were challenges with setting up a global infrastructure, right?

MR. JANOSKI: Object to form.

THE WITNESS: He said there were start-up costs. I didn't see the word "challenges." Did I miss it?

BY MS. SADINSKY:

Q Well, he says: "...other than those going a little more slowly than we modeled."

Do you see that?

A "So other than those going a little more slowly than we modeled," yes.

Q So he's talking about infrastructure costs and TSA agreements, right?

A Yes.

Q Okay. So you understood at this time -- or

Page 275

he discussed at this time that the -- the costs associated or -- costs associated with setting up a global infrastructure were different from the original deal model, right?

A Yes.

Q And he said, at this time, that transitioning off the TSA agreements with Johnson & Johnson were a little bit different than the original deal model, right?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

BY MS. SADINSKY:

Q And he said, also at this time, and this is more towards the bottom of the paragraph, that there were challenges associated with realizing the accretion estimates, right? "Our accretion that we expected was a little bit slower than the original model"?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

BY MS. SADINSKY:

Q And -- and did you understand, at this time, that these things were affecting or had affected Cordis's performance?

MR. JANOSKI: Object to form.

Page 276

THE WITNESS: I interpreted this in a positive light based on his comments near the top of the first paragraph.

BY MS. SADINSKY:

Q Right.

But he was talking about challenges they had faced that were different from the original deal model, right?

A Yes.

Q And three of those were infrastructure, TSA agreements, and accretion, right?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

BY MS. SADINSKY:

Q So some of the potential risks associated with the Cordis acquisition were realized, right?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

BY MS. SADINSKY:

Q When he says, in the first sentence: It's [sic] going sort of according to model, what does that mean to you?

MR. JANOSKI: Object to form.

THE WITNESS: Pretty much exactly what it says. It's --

LA Sheriffs' Pension          FINAL          May 26, 2022
v. Cardinal Health Inc.          Nicholas Smith

Page 277

BY MS. SADINSKY:

Q   Does that mean --

A   It's mostly following their model that they had going into the deal.

Q   Does it mean that it's not exactly following their model?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   There are some challenges that were unexpected at the time of the acquisition?

MR. JANOSKI:  Object to form.

THE WITNESS:  I wouldn't always interpret that to mean some challenges.  It could also mean some positives.

BY MS. SADINSKY:

Q   Well, in light of this paragraph that we just read and went through together, where we talked about three challenges that were different from the deal model, where you read it here, does it mean that there were some challenges that were different from the original deal model?

MR. JANOSKI:  Object to form.

THE WITNESS:  That is a logical interpretation.

Page 278

BY MS. SADINSKY:

Q   Okay.  And then when he says:  "It's roughly as we modeled it" -- that's at the end of that paragraph -- does that mean it's exactly as we modeled it?

MR. JANOSKI:  Object to form.

THE WITNESS:  I would have focused on the entire half of that clause, the:  "...but net/net it's roughly as we modeled it."

BY MS. SADINSKY:

Q   Does that mean it's exactly as we modeled it?

A   No.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   Does it mean that the Cordis integration has proven to be somewhat, in some ways, different from the original deal model?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

MS. SADINSKY:  Okay.  Let's mark -- what exhibit are we on?

MR. OBMASCIK:  Exhibit 32.

MS. SADINSKY:  Exhibit 32.

Let's mark Tab 34 as Exhibit 32.

Page 279

- - -

(Columbia Exhibit 32 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Did you prepare this report?

A   Yes.

Q   Okay.  Exhibit 32 is a report Columbia produced from your files with the file name February 7th, 2017 Cardinal Health Q2.

And it says -- where are we? -- in the Notes section, the last two lines there, it says: "Medical gaining and remaining strong with customer ramps.  Generic early stage so not a huge driver for fiscal but maybe for calendar..."

What does that mean?

A   The first sentence refers to medical, which in my mind was doing well and growing their customer base.  By gaining, I was referring, I believe, to market share, and I would have interpreted that from management comments at some -- in some way, shape, or form.

Generic early stage would have referred to the pharma -- actually, I apologize.  I don't know what I'm referring to with generic.  Generic could

Page 280

refer to medical or to pharma in this particular sentence, and I don't recall what my reference point is here.

Q   Why -- what would early stage be?  Does early stage indicate that it's medical because of all of these new acquisitions in medical at this time?

A   Yeah, I don't know is the problem.

Q   Is it --

A   I don't know.  I don't know what I'm referring to there specifically anymore.

Q   Is that the more likely reading?

MR. JANOSKI:  Object to form.

THE WITNESS:  It is not the more likely reading.  It's an equal potential reading with the pharma generics coming back, as in more generic launches potentially could also be an alternate interpretation, which is why I don't know how to interpret that right now.

BY MS. SADINSKY:

Q   Why would something not be a huge driver for fiscal but maybe for calendar?

A   You're asking me to interpret both interpretations now to answer that.  If it were medical devices, it's possible they were launching,

LA Sheriffs' Pension                    FINAL                    May 26, 2022
v. Cardinal Health Inc.                                          Nicholas Smith

Page 281

and it takes a while to grow them.  If it's pharma, it's possible that there were generic launches later in the year.

Again, I don't recall what I was referring to there.

Q   Okay.  Okay.  The bottom of this report indicates you had a call with George.  Is that referring to George Barrett?

A   Yes.  It says "CEO" on there.

Q   And do you remember this call?

A   I don't remember it.

Q   So the notes under here, is this summarizing what Mr. Barrett said on the call?

A   This would probably be a combination of comments he made and/or my thoughts at the time.

Q   Okay.  So where am I here?

Okay.  So top of page 2, at the end of that first line there, it says: "Medical business doing well finally with extra scale from Cordis."

What does "extra scale from Cordis" mean?

A   It meant that Cordis made the business much larger and, therefore, extra scale.

Q   So given what was said here about the extra scale from Cordis, would this have impacted how you were thinking about the medical segment, which

Page 282

includes Cordis?

A   Yes.

Q   And would this have given you higher confidence in the medical segment's ability to achieve a result with the Cordis's -- with Cordis's integration?

A   Yes.

Q   And higher confidence in the medical segment's ability to achieve the results with the -- the synergies associated with the Cordis integration disclosed at the time the deal was announced?

A   Yes.

Q   So at this time, you would have had more confidence in the 15 cent accretion estimate and the 100 million synergies estimates than you had at the time the accretion estimate was disclosed in August 2016 and at the time the synergies estimate was disclosed in March 2015?

MR. JANOSKI:  Object to form.

THE WITNESS:  I would have had more confidence in the medical segment and its ability to grow going forward.  I would not have been looking backwards anymore at the accretion numbers that you cited or thought about them.

I would only be looking forward from here.

Page 283

Those numbers would be fully incorporated into whatever my estimates of medical growth would be.

MS. SADINSKY:  Okay.  Let's mark Tab 35 as Exhibit 33.

- - -

(Columbia Exhibit 33 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Did you prepare this?

A   Yes.

Q   Exhibit 33 is a report produced from your files with the file name April 18th 2017 Cardinal Health Update.

On page 1 under "What happened," right at the top, it says:  "Cardinal pre-announced weak guidance...the third reduction in a row...The 2018 guide includes + $.21 from the Medtronic acquisition..."

On page 1 still under "Main points," the fourth bullet, at the end of that bullet, it says -- well, actually, the bullet says:  "2019 guidance $5.65 with..." and at the end of the bullet: "...medical operating profit up 'significantly' on synergies and M&A."

Page 284

Do you see that?

A   "...on synergies and M&A," yes.

Q   Then the sixth bullet:  "Medical:  2018 operating income +" -- or is up -- "8-9% (or higher, feels like synergies may drive this higher.)"

And then the last bullet:  "Margins goal 2.5% Pharma (suspended or lower margin mail order customer), 5.75% Medical (from Q2 still) Pharma down 1.81% versus 2.22%.  Med Devices will be higher than target by 2019 with new purchase."

Do you see that?

A   Yes.

Q   You're referring to the Medtronic acquisition, when you say new --

A   Yes.  Yes.

Q   And so you're noting positive performance from the medical segment at this time in April 2017, correct?

A   Yes.

Q   And your -- and in the Notes section, the third bullet says:  "Cordis contributing well in Europe."

Do you see that?

A   Yes.

Q   So you're noting positive performance from

Page 285

Cordis at this time too, right?

A   Yes.  That note may have been in a prior -- in the prior quarter note as well.  I don't recall.

Q   Okay.  But the -- you're still noting positive performance from Cordis around this time, right?

A   Yes.

Q   And then in the What to do section -- well, actually, the Valuation section -- well, actually, the What to do section, you say:  "Sell for now."

Do you see that?

A   Yes.

Q   So you're still recommending selling Cardinal in light of -- you're still recommending selling Cardinal despite the positive performance from the medical segment in Cordis, correct?

A   Yes.

Q   Why?

A   I specifically used the words "industry headwinds."  In this case, the pharmaceutical division was unlikely to perform well over the next few quarters or even potentially year, and if you read the last sentence of my What to do, it's not until 2019 that we were expecting generic launches that would help the profitability of the

Page 286

pharmaceutical sector.

Q   So at the time you wrote this report in April 2017, you thought that Cardinal Health would not do well for at least the next year?

MR. JANOSKI:  Object to form.

THE WITNESS:  Specifically, I thought it would underperform until the end of 2017, and I am interpreting my note here to mean calendar year 2017 in that specific sentence.

BY MS. SADINSKY:

Q   Okay.  So you're talking about underperform through the end of calendar year 2017.

And what does the comment about 2019 generic launches indicate about Cardinal Health's performance in 2018?

A   Again, Wall Street tends to look forward, and so depending on where the stock price would be at the end of 2017, people would start to look at the 2019 earnings as you move into 2018, and that could determine -- that could potentially create upside to the stock price as people started to look at those forward earnings and if they came in higher than where people were today.

Q   And at this time in April of 2017, was the pharmaceutical segment still more important to you

Page 287

in assessing Cardinal Health's financial performance than the medical segment?

A   Yes.

Q   And at this time in April 2017 in your experience as an investment -- investment analyst, do you believe that other investors and securities analysts believed the pharmaceutical segment's performance was more important in assessing Cardinal Health's financials than the medical segment?

MR. JANOSKI:  Object to form.

THE WITNESS:  I do not believe that that was true for all analysts.  As we approached the end of 2017 -- and I apologize.  I don't know names -- but there were definitely conversations about the value of just the medical segment and what that would look like if it were spun off.

BY MS. SADINSKY:

Q   Okay.  But I'm now focused on a report from April 2017.  We're not at the end of 2017.  So at this time in April 2017 --

A   At this time, this was my opinion and my valuation.  I cannot speak for how other analysts in the space might have been valuing Cardinal at this time.

Q   Well, based on --

Page 288

A   You asked me, and I told you some of them may have already been starting to consider the medical segment and its value as a stand-alone entity --

Q   Okay.  Because you said --

A   -- in the report.

Q   Okay.  Your testimony was the end of 2017 --

A   Right.

Q   -- people were looking at it as a stand-alone entity.  So -- so --

A   I know for -- I recall definitely having conversations at the end of 2017.  I do not know and do not recall whether some analysts had already done a sum-of-the-parts as early as April of 2017.

Q   Got it.  Okay.

MS. SADINSKY:  What exhibit are we on?

MR. OBMASCIK:  Exhibit 34.

MS. SADINSKY:  Exhibit 34.  So let's mark Tab 36 as Exhibit 34.

- - -

(Columbia Exhibit 34 was marked for identification.)

- - -

BY MS. SADINSKY:

Page 289

Q   I am marking Mr. Sonderling's report titled "Cardinal reduces fiscal year 2017; initiates poor fiscal year 2018 core Pharmaceutical segment guidance, a material negative; buys Medtronic's PMR, decent capital use" report dated April 21st 2017 as Exhibit 34.

And you would have seen this, right?

A   Again, most likely would have seen it.

Q   Okay.  Under the Comments section, in the first, you know, full, longer paragraph, Mr. Sonderling writes: "On Cardinal's acquisition of Medtronic's Patient Monitoring & Recovery Division, a decent, not great, use of capital and accretive, Cardinal is paying $6.1 billion cash, of which $4.5 is borrowed.  Accretion fiscal year June 2019 and about 10% and more thereafter, but Cardinal is spending about 20% of market cap.  The deal fits well within Cardinal's Medical segment growth strategy."

Do you see that?

A   Yes.

Q   So Mr. Sonderling is discussing Cardinal Health's acquisition of Medtronic's patient recovery business, right?

A   Yes.

Page 290

Q   Can I just call it the Medtronic acquisition?  Because Medtronic patient recovery business acquisition is a mouthful.

Do you understand what I mean?

A   Yes.

Q   And he mentions some concerns regarding the price being paid for the acquisition, right?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   And did you have any concerns about the price Cardinal was paying for the Medtronic acquisition?

A   I largely agreed with Harlan's assessment that Cardinal could have bought back much more of their own stock rather than done this deal at the time.

Q   And why would that have -- why would you have preferred that?

A   Because they could have increased the earnings per share more if they had bought their own stock than by doing this deal.

Q   So is it fair to say that you and Harlan were more negative on the Medtronic acquisition than positive on it?

Page 291

MR. JANOSKI:  Object to form.

THE WITNESS:  No.  I cannot speak for Harlan.  I can only give you my opinion of the Medtronic deal.  I thought that they could -- that Cardinal could have grown earnings more by buying back their stock, but I was willing to give them some leeway on this deal.  Because by doing this deal, the medical segment could have achieved a size that would have allowed them to spin it off and create more value for shareholders, and medical companies were trading at higher multiples at this point in time.

BY MS. SADINSKY:

Q   So you --

A   So that would have created more value by them doing this deal.  So I was somewhat neutral on the -- on the outcome here pending what the future would bring.

Q   So you've referred a few times in this deposition to the medical business spinning off.  Where did you get the belief that that would occur?

A   I had met with Cardinal, and I do not recall the date.  It was in Phoenix, Arizona, at one of the conferences many years ago, and they had spoken about how they have a history of building up

Page 292

non-pharmaceutical businesses to critical mass and spinning them off.

This was prior even -- I believe prior to the Cordis deal being done.  But it gave me the comfort at the time that management might have a decent track record and knowledge of how to build a business through M&A and then spin it off and create shareholder value.

So that was -- that would -- that would be in the back of my mind as part of our investment here throughout this investment.

Q   So that was influencing how you were thinking about Cordis?

A   Yes, to some extent.

Q   Okay.  And so Cardinal's announcing this acquisition of Medtronic -- and they're paying 6.1 billion, right?  Yeah.  6.1 billion, right?

A   That's per Harlan's notes.  I -- I don't know.  I'd have to look up the deal again.

Q   Do you have any reason to believe Harlan would put the wrong acquisition price in his notes?

A   No.

Q   And that's three times more than Cardinal paid for Cordis, right?  We looked at it earlier.  I think it was 1.9.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 293

A   Yes.

Q   So the Medtronic acquisition was a big acquisition, right?

A   It was relatively bigger, yes.

Q   Were you ever concerned about Cardinal's ability to execute on multiple recent acquisitions within the medical business at the same time?

A   What other acquisitions are you referring to?

Q   So we had just looked at comments that Barrett made about the integration challenges with Cordis, right?  We just looked at that transcript.

MR. JANOSKI:  Object to form.

THE WITNESS:  The answer is no.

BY MS. SADINSKY:

Q   Why not?

A   The Cordis -- I did not consider Cordis to be recent anymore.

Q   Okay.  And in the second paragraph, Mr. Sonderling says:  "This is overshadowed by news of worse generic price declines..."

Do you see that?

A   Yes.

Q   And so Mr. Sonderling was also aware of generic pricing issues affecting the pharmaceutical

Page 294

segment at this time, right?

A   Yes.

MS. SADINSKY:  Let's mark Tabs -- what --

MR. OBMASCIK:  Exhibit 35.

MS. SADINSKY:  As Exhibits 35 and 36, Tabs 37 and 38.

- - -

(Columbia Exhibits 35 and 36 were marked for identification.)

- - -

BY MS. SADINSKY:

Q   Okay.  I'm going to mark Cardinal Health's press release and a transcript of its earnings call from the third quarter of 2017 dated May 1st, 2017.

So Exhibit 35 will be the press release, and Exhibit 36 will be the transcript.  I'm going to switch back and forth between them.

MS. SADINSKY:  And, actually, why don't we also mark Tab 39 as -- what is that?  Exhibit 37?  And we're going to switch between all of these.

And then I'm going to mark as Exhibit 37 a report Columbia produced from your files dated May 17, 2017 on Cardinal Health.  Let's pull up the press release.

- - -

Page 295

(Columbia Exhibit 37 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   And let's go to page -- so you would have reviewed the press release -- right? -- the earnings press release?

A   Yes.

Q   Now let's go to page 2, top of the page --

MS. SADINSKY:  Actually, let's go to the bottom of page 1, so he can see the section that we're under, Medical segment.

BY MS. SADINSKY:

Q   Do you see that?

A   Yes.

Q   And then if you'd go to the top of page 2, it says:  "A decline in Cordis performance reflected increased SG&A expenses and the net favorable impact of two larger inventory adjustments in the year-over-year comparison."

Do you see that?  It's the second --

A   Yes, I see it.

Q   And then let's go to the transcript, Exhibit 36, and let's go to page -- and you would have looked at this as well, right?

Page 296

A   Or listened to it.

Q   And then it's at 8:30 a.m., so that's before markets opened, right?

A   Yes.

Q   Let's go to page 6 -- actually, let's go to page 4.  I just want to show you that it's Mike Kaufmann talking.

Do you see that?

A   Yes.

Q   Let's go to page 6.  It's still him talking, and let's look at the first paragraph.  I'm going to read it since it's kind of hard to see.  Let me -- or actually, the fourth paragraph:

"The quarter was unusual, in that we saw a decline in Cordis profit.  This decline was mostly related to increased SG&A expenses to support our investment in an international infrastructure.  This investment will benefit us as we integrate the patient recovery business.  The increased SG&A expense was partially offset by the net impact of the Cordis inventory adjustments.

"Let me explain the third quarter inventory adjustments in more detail.  First, this year benefitted from the absence of the inventory step-up, which we recorded in the prior year.  This

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 297

benefit was largely offset by an increase to an inventory reserve in the quarter -- in the current year. This reserve is an estimate based on information often provided by third parties, including under the transition service agreements and from various service providers. During the period, we received more detailed information for this reserve and have adjusted it accordingly.

"As both George and I have mentioned in the past, the exit from the transition service and manufacturing agreements could result in some lumpiness to the Cordis earnings, but we fully expect this to diminish as we move forward."

Q   Do you see that?

A   Yes.

Q   Okay.  And do you recall learning around this time about a decline in Cordis profits?

A   I do not recall this commentary anymore.

Q   But you would have either listened or read this and the press release, right?

A   Yes.

Q   And so you learned at this time that -- about increased SG&A expenses that had impacted Cordis's performance?

A   Yes.

Page 298

Q   And you learned at this time that an increase in inventory reserves had impacted Cordis's performance?

A   Yes.

Q   And so you understood there were challenges with the Cordis business at this time in May 2017, correct?

A   Yes.

Q   You understood that there were SG&A challenges in May 2017, correct?

A   Yes.

Q   And you knew that before, right?

MR. JANOSKI:  Object to form.

THE WITNESS:  What did I know before?

BY MS. SADINSKY:

Q   You knew about challenges with higher-than-expected SG&A investments, right?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   You learned about that on multiple occasions prior to May 1st, 2017, correct?

A   Yes.

Q   And you learned that the SG&A challenges or the SG&A costs were different than the original deal

Page 299

model on several occasions before this, correct?

A   Yes.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   And you understood, at this time, that there were challenges respect -- with respect to inventory reserves, right?  Mr. Kaufmann --

A   I did not understand prior to this.

Q   I said "at this time."

A   I learned at this time that there were additional inventory reserves taken.

Q   So at this time, you were aware that Cordis's profits were being impacted by higher-than-expected inventory reserves, right?

A   Yes.

Q   Okay.  And -- and at the time you were told that the SG&A expenses and inventory reserves were impacting Cordis's performance, correct?

A   Yes.

Q   And you were told that they could cause some lumpiness in earnings -- in Cordis's earnings, correct?

A   Yes.

Q   So you were aware at this time that there were challenges related to SG&A expenses and

Page 300

inventory reserves that could cause some lumpiness in Cordis's earnings, correct?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   All right.  Let's look at -- actually, before I do that, I'm going to ask you your favorite question.

Did these -- did -- what you learned here about, you know, this Cordis having a decline in profit because of higher-than-expected SG&A costs and inventory reserves, did this give you more or less confidence in the medical segment's ability to achieve the results associated with the Cordis integration?

MR. JANOSKI:  Object to form.

THE WITNESS:  That was not a question I asked myself at this time.

BY MS. SADINSKY:

Q   Sitting here today, would an announcement of a decline in Cordis profits due to higher-than-expected SG&A expenses and issues with an inventory reserve give you more or less confidence in the medical segment's ability to achieve the results it announced associated with the

Page 301

Cordis integration?
    MR. JANOSKI: Object to form.
    THE WITNESS: Less.
BY MS. SADINSKY:
    Q   The answer is less?
    A   Less.
    Q   Okay. Let's look at your report,
Exhibit 37, and where am I?
    So I want you to skim, or you can read as
you want, the first page through the What to do
section before we get to the CEO call section, and
just let me know when you're done.
    A   You want me to start at the top and read
down?
    Q   Yeah. I just want you to tell me if Cordis
is mentioned anywhere on this page.
    A   Okay.
    Will you scroll down, please.
    Stop.
    Okay. I've gone to the "What to do." Do
you want me to read the What to do section as well?
    Q   The end until you get to -- you don't need
to read the CEO call. I just want you to finish the
regular part of your report.
    A   Okay.

Page 302

    Okay. I'm done.
    Q   So Cordis isn't mentioned, right?
    A   No.
    Q   And why wasn't the decline in Cordis's
profit mentioned?
    A   Because the medical segment overall was
outperforming and the Medtronic deal was creating
accretion and upside from synergies.
    Q   So was the decline in Cordis profits
something that you focused on?
    A   No.
    Q   And at this time, would it have been
something that was important to you?
    MR. JANOSKI: Object to form.
    THE WITNESS: No.
BY MS. SADINSKY:
    Q   And so if you'd go to -- on this What to do
section, you say that you're comfortable adding back
to our position.
    Do you see that?
    A   On weakness in the stock from here.
    Q   So you're -- adding to our position means
buying more in Cardinal, right?
    A   Yes, but only if the stock goes down from
where it is when I wrote this report.

Page 303

    Q   Okay. So you're not recommending to buy
Cardinal at this time, but if the stock goes down,
you said you're recommending to buy?
    A   I was recommending or saying I would be
comfortable recommending buying the stock if the
stock price got cheaper from here.
    Q   Okay. So you would recommend buying
Cardinal Health stock even though there was a
decline in Cordis profit and issues disclosed with
related -- relating to inventory reserves and
Kaufmann said there could be some lumpiness in the
Cordis numbers?
    MR. JANOSKI: Object to form.
BY MS. SADINSKY:
    Q   You would still recommend buying in light
of that?
    MR. JANOSKI: Object to form.
    THE WITNESS: That's not what I said here.
BY MS. SADINSKY:
    Q   I don't understand.
    Did you recommend buying -- you said you
would recommend buying if the stock price went down,
right?
    A   Yes, if the stock price went down from
here.

Page 304

    Q   If the stock price went down here and --
was your recommendation after you already knew about
some lumpiness in Cordis numbers, right?
    MR. JANOSKI: Object to form.
    THE WITNESS: Yes.
BY MS. SADINSKY:
    Q   So you're making this recommendation when
you already knew about some lumpiness in Cordis
numbers, correct?
    MR. JANOSKI: Object to form.
    THE WITNESS: Yes.
BY MS. SADINSKY:
    Q   So you're making that recommendation
irrespective of the disclosures of problems with
Cordis, correct?
    MR. JANOSKI: Object to form.
    THE WITNESS: Yes.
BY MS. SADINSKY:
    Q   Okay. Then we have the CEO call on this
page. So you had a call with Mr. Barrett on
May 1st, 2017, correct?
    A   Yes.
    Q   And the second sub-bullet says: "Might
have been possible that they didn't need to reduce
numbers that much going into MDT deal" -- that's

Page 305

Medtronic, correct?

A   Yes.

Q   -- "but CEO did not want to be in a position of having to bring numbers down in the future."

What does that mean?

A   That means that they indicated that they were guiding conservatively after three earnings misses in a row.

Q   Okay.  And the third sub-bullet:  "Company management goals had gotten away from rest of organization, so needed to re-align to get focus back on long term."

What does that mean?

A   I don't know what that's referencing any longer.

Q   Did you ever hear about diverging -- or about issues with management goals diverging from the goals of the rest of the organization?

A   The CEO must have been speaking about that, and I incorporated it into my notes, but I do not recall what the specifics were at this time.

Q   Okay.  Do you recall what was being done to realign those goals?

A   No.

Page 306

Q   And then the last bullet of the CEO call says:  "Thinks multiple valuation will catch up to growth in Medical.  One part of the business is helping the other, so not thinking about separation now."

Let's take that in parts.  What does "...multiple valuation will catch up to the growth in Medical," mean?

A   The multiple that Cardinal is trading at as a company should go up, and this would be the CEO's opinion, I believe, that I'm referencing here.

Q   So does that mean -- I'm just trying to understand exactly what that means, and you have a lot more investment experience than I do, which is zero.

Does that mean that analysts were not --

A   No.  It means the CEO of Cardinal felt that the company was not being valued -- or was not valuing the medical segment as part of the whole properly.

Q   So the CEO felt that the medical segment was being undervalued?

A   Yes.  That's what this implies.

THE COURT REPORTER:  I'm sorry.  Was there an objection?

Page 307

MR. JANOSKI:  Yes.  Objection to form.

BY MS. SADINSKY:

Q   And did you agree with that view?

A   I did not have a strong opinion on that view.  I was merely writing it down as part of our conversation at this time.

Q   Did you have -- did you have any view about whether -- whether the medical segment was being undervalued by analysts?

A   In my valuation, I believe in this report I did a sum-of-the-parts to see or verify what the upside would be if the medical traded in line with peers.

Q   And --

A   My conclusion was that there was some upside, but not as much as I would have hoped to see.

Q   So, in other words -- tell me if I'm just understanding correctly -- the medical segment was being undervalued, but not by as much as you thought it was?

A   The combined valuation of the company did not reflect enough upside to where the stock price could go to get me very excited at this point in time.  That's why, in my recommendation, I was

Page 308

comfortable adding back only if we saw further weakness in the stock from here, which would have increased the valuation upside potential.

Q   Okay.  In your sum-of-the-parts analysis, when you say you saw some upside in the medical segment, does that mean that the medical segment was being undervalued to some extent?

A   That -- valuations are opinions.  This was merely my opinion of what it was -- what it could be worth, and I was just doing a very hasty back-of-the-envelope comparison to other companies.

Q   I understand.

But was it your opinion -- if there was some upside in the sum-of-the-parts analysis, was it your opinion that the medical segment was being undervalued to some extent?

MR. JANOSKI:  Object to form.

THE WITNESS:  It was my opinion that it might be undervalued, but I wasn't certain, and I did not hold a strong positive or negative opinion about my valuation.

BY MS. SADINSKY:

Q   So it was your opinion that it might be undervalued, and it was the CEO's opinion that the medical segment was undervalued as well, correct?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 309

A   Yes.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   On the call that you had with Mr. Barrett on May 1st, 2017, did you ask any questions about the decline in Cordis profit, the SG&A expenses, the inventory reserve increases, or the lumpiness in Cordis numbers?

A   I do not recall.

Q   Sitting here today, do you think that's something that you would have asked about?

MR. JANOSKI:  Object to form.

THE WITNESS:  I do not believe I would have asked about Cordis specifically.  I would have asked about the medical segment overall.

MS. SADINSKY:  Okay.  What exhibit are we on, Max?

MR. OBMASCIK:  Exhibit 38.

MS. SADINSKY:  Let's mark as Tab 40, Exhibit 38.

- - -

(Columbia Exhibit 38 was marked for identification.)

- - -

BY MS. SADINSKY:

Page 310

Q   And this is an analyst report published by Baird Equity Research.

Oh, sorry.  It's not up yet.

Dated May 1st, 2017.  It looks like Guy Pope received it.  We received this production late.  So there may have been a version that went to you.  I just didn't have time to finish going through all of your documents before today.

But is this the type of sell-side analyst report that you would have received and looked at?

A   This is a type of sell-side report I would receive and look at.  I do not know if I received this report.

Q   Okay.  But this is the type of report that you would have received?

A   Yes.

Q   So if you'd scroll down on this first page to the fourth bullet that says: "Medical segment" --

MS. SADINSKY:  And, Max, maybe you can zoom in right there as much as we can on that paragraph.

BY MS. SADINSKY:

Q   It says: "Medical segment: Cordis choppiness was the primary culprit of downside versus our model."

Page 311

Do you see that?

A   Yes.

Q   When you read the phrase "Cordis choppiness," what does that mean to you?

MR. JANOSKI:  Object to form.

THE WITNESS:  It means that Cordis earnings were not what the analysts had thought they would be.

BY MS. SADINSKY:

Q   And what was choppy about Cordis at this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  I can't speculate what he's referring to with the word "choppiness" here, other than the numbers were not what he expected.

BY MS. SADINSKY:

Q   Would it be the decline in Cordis profit announced on this day that would be what he's referring to?

A   Most likely.

Q   So that would include the SG&A expenses and inventory reserve adjustments that were the two key things highlighted in Mr. Kaufmann's statements and in Cardinal Health's press release, right?

MR. JANOSKI:  Object to form.

Page 312

THE WITNESS:  That's what his paragraph here says.

BY MS. SADINSKY:

Q   And you were aware of the decline in Cordis's profit and the SG&A -- increased SG&A costs and inventory reserves adjustments at this time in May 2017, correct?

A   I was aware.

Q   And you were aware that those issues, the increased SG&A expenses and inventory reserve adjustments had impacted Cordis's performance in May of 2017, correct?

A   Yes.

Q   Do you recall whether you had any concern at this time in May 2017 as to whether the Cordis issues would continue?

A   I do not recall.

Q   Mr. Kaufmann said on the earnings calls that those issues could cause some, quote, Lumpiness in our numbers, correct?

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   Correct?  Do you want us to go back to it?

A   I would say yes, based on what we looked at prior.

Page 313

Q   And so he had said that it could cause some lumpiness in our numbers, and that's talking about numbers in the future, right?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   Yeah.  You said yes?

A   Yes.

Q   Okay.  So you were aware that there were problems with the Cordis business that could impact Cordis's performance going forward in May 2017, correct?

A   Yes.

MS. SADINSKY:  Let's mark as Exhibit 39, Tab 52.

- - -

(Columbia Exhibit 39 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   And this is an equity report by William Blair.  And, again, I didn't have time to figure out which one went to you or not, so I just pulled the first one I saw, and this one went to Harlan, and this is dated May 1st, 2017.

Page 314

Do you see that?

A   Yes.

Q   Okay.  And I want to focus on the -- I guess it's the second bullet:  "The company maintained its..."

Do you see that?

A   Yes.

Q   Okay.  At the very end of that bullet, the last sentence:  "We believe the key topic on today's call will revolve around any updates to the competitive pricing environment for generics, and some apparent weakness in the previously acquired Cordis business within the medical segment."

Do you see that?

A   Yes.

Q   So William Blair was -- also commented on the weakness in Cordis on May 1st, 2017, correct?

A   Yes.

Q   And so when you read the phrase "some apparent weakness in the previously acquired Cordis business," what does that mean to you?

MR. JANOSKI:  Object to form.

THE WITNESS:  That means that Cordis did not put up the earnings that were expected this quarter.

Page 315

BY MS. SADINSKY:

Q   And that means that there were some issues with the Cordis acquisition that -- that were disclosed this quarter?

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   It didn't hit the accretion, or they're indicating that there's a decline in Cordis profit?

A   They're indicating that the Cordis earnings were not what the analysts had expected in this particular case.

Q   And disclosing that the earnings were not what -- or disclosing that there was a decline in the profit, would that affect expected accretion?

A   Again, I -- the analysts might have had an opinion on that.  I was not looking at accretion at this point.  I was looking at the company overall.

Q   Okay.  But in your experience as an investment professional, would a decline in Cordis's profit impact its ability to achieve its expected accretion?

MR. JANOSKI:  Object to form.

THE WITNESS:  Cordis specifically, yes. Not necessarily for the medical segment as a whole. There were lots of different, moving pieces in

Page 316

there.

BY MS. SADINSKY:

Q   Yeah.

But we're talking about the expected accretion for Cordis, and we're talking about Cordis's decline in profits.

A   Yes.  But I wasn't looking at Cordis specifically when I did my analysis.

Q   I understand.  I understand.

I'm asking in your experience as an investment professional --

A   Mm-hmm.

Q   -- if a business reports a decline in profits, how does that expect their ability to hit their accretion estimate?

MR. JANOSKI:  Object to form.

THE WITNESS:  Your question is overly vague to answer.  There could always be offsets, either from a cost side or other sides.  So I understand where you're trying to go directionally, but the question is overly vague.

BY MS. SADINSKY:

Q   Well, we looked at the disclosures about Cordis, right?  So what I want to know is if a company says this company that we have that we

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 317

expect accretion from reported a decline in profits and we expect some lumpiness in this company's numbers going forward, do you think that that company is more likely to hit its accretion estimate or less likely to hit its accretion estimate?

A   Less.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   Less, right?

A   Less.

Q   Less.  Thank you.

MS. SADINSKY:  Okay.  Let's mark as Exhibit 40, Tab 53.

- - -

(Columbia Exhibit 40 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   And this is a May 1st, 2017 report by Leerink sent to Harlan Sonderling.  You may have received it as well too.  We just haven't gone through all of your documents yet.

And did you generally look at reports from Leerink?

A   If I received them in my email, I would

Page 318

have read them at the time.

Q   Okay.  And I want to -- where am I?

MS. SADINSKY:  Can you just control-F for "inventory adjustment"?  I know it's here.

BY MS. SADINSKY:

Q   Okay.  In this first paragraph up here, where it says:  "Brand inflation trends..." in the middle, do you see that?

A   Yes.

Q   "Brand inflation trends are less favorable than the +7-9%...growth that had been guided, generic deflation is also trending in the 'low double digits' and we are negatively surprised by the 'inventory adjustment' for Cordis that occurred during the quarter."

Do you see that?

A   Yes.

Q   Is that referring to the inventory adjustment that Mr. Kaufmann was talking about that caused a decline of Cordis's numbers in May of 2017, correct?

MR. JANOSKI:  Object to form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   Okay.  And you were aware of these

Page 319

inventory issues in May 2017, correct.

A   Yes.

Q   Okay.  And these issues made it less likely that Cordis would achieve its accretion estimates -- or strike that.

I know you didn't look at the accretion estimates at this time.  In your experience as an investment professional, you would agree that those inventory issues would make it less likely that Cordis would achieve its accretion estimates, correct?

A   Yes.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   Your answer got cut off.  What was it?

A   Yes.

MS. SADINSKY:  Okay.  Let's go to Tab 41.  We'll mark that as Exhibit 41.  Nice -- actually, sorry.  We can skip that one.  Sorry.

Let's go to Tabs 42 and 43.  Let's mark these Exhibits 41 and 42.

- - -

(Columbia Exhibits 41 and 42 were marked for identification.)

- - -

Page 320

MS. SADINSKY:  And why don't you also mark as Exhibit 43 Tab 44.  We're going to go through a whole bunch of these.

- - -

(Columbia Exhibit 43 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Okay.  All right.  Exhibit 42 and 43 I'm marking Cardinal Health's press release announcing its fiscal 2017 results and the transcript of the earnings call.  Both of these are from August 2nd, 2017.

Exhibit 41 is the press release.

Exhibit 42 is the earnings call transcript.

And these are things that you would have reviewed, correct?

A   I only see one on the screen.  I would have reviewed the press release.

MS. SADINSKY:  And show him the transcript.

THE WITNESS:  I would have listened to or read the transcript.

BY MS. SADINSKY:

Q   And the transcript there shows the time is at 8:30, right?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 321

A   Yes.

Q   Before markets open, right?

A   Yes.

Q   Okay.  Let's go to the press release and look -- let's look at the Pharmaceutical segment results at the bottom of page 1, and I'm looking at the second sentence under Segment results: Pharmaceutical segment:  "Segment profit decreased 7 percent...This decrease was driven by generic pharmaceutical pricing and the company's ongoing investment in its Pharmaceutical IT platform...Segment profit for the year decreased...driven by generic pharmaceutical pricing, and to a lesser extent, the impact of the loss of Safeway and reduced levels of branded manufacturer price appreciation."

Do you see that?

A   Yes.

Q   Do you understand that there were challenges with the pharmaceutical segment in August 2017?

A   Yes.

Q   There were challenges with generic pricing?

A   Yes.

Q   Those were affecting Cardinal Health's

Page 322

financial performance in August 2017?

A   Yes.

Q   Do you understand there were challenges related to the ongoing investment in IT?

A   That was new information at that time to me.

Q   You understood, on August 2nd, 2017, that there were challenges related to the ongoing investment in IT?

A   Yes.

Q   And those challenges related to the ongoing investment in IT were affecting Cardinal's financial performance in August 2017?

A   Yes.

Q   You understood on this day -- or you learned on this day there were challenges related to the loss of Safeway?

A   No.  I didn't.

Q   Look at the bottom paragraph of the press release:  "Segment profit for the year decreased...driven by generic pharmaceutical pricing...to a lesser extent, the impact of the loss of Safeway."

A   Okay.

Q   So you understood there were challenges

Page 323

related to the loss of Safeway?

A   Yes, to some extent.

Q   And those were affecting Cardinal Health's financial performance in August 2017?

A   Yes.

Q   And you understood there were challenges with branded manufacture of price appreciation?

A   Yes.

Q   Those were affecting Cardinal Health's financial performance in August 2017?

A   Yes.

Q   You factored in these challenges into your own analysis of Cardinal?

A   Yes.

Q   Let's go to the transcript and go to pages 10 to 11.

And this is -- if you go actually to page 7 at the bottom, it shows Mike Kaufmann talking, but page 10 to 11 --

MS. SADINSKY:  And let's zoom in.  I'm going to start with the second-to-last paragraph on page 10, Max.

BY MS. SADINSKY:

Q   And so -- since this is kind of hard for me to read on the screen, so I'm going to read it in

Page 324

the binder.

"I know that George gave you some high-level thoughts on Cordis, so let me give you some further details.  As you know, we've been working over the past 18 months to build out our global infrastructure for Cordis.  The costs of this build out have been more than expected and have had a negative impact on SG&A and gross margin for the quarter and year.  Specifically, the costs of moving manufacturing and standing up our back office services has been more expensive than we modeled, but I feel we have solid plans to address this in the first half of FY18.  Mainly due to these increased costs, we did not achieve our fiscal 17 accretion target of $0.15.

"In addition to the higher SG&A manufacturing costs, mainly outside the U.S., there are two other factors that affected the accretion this fiscal year.  First, we experienced lower-than-anticipated sales from partnership agreements.  These agreements, while behind our original projections, are on a significant growth trajectory.  And second, we incurred higher-than-planned write-offs for excess inventory."

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 325

And then it goes on to talk about the patient recovery business. Do you see that?

A   Yes.

Q   So on August 2nd 2017 Cardinal Health announced it didn't meet its 15 cent accretion estimate for Cordis. Were you surprised by this?

A   Yes. This was the first time they had indicated they were going to miss it.

Q   But you understood that there were challenges with SG&A costs before this, right?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

BY MS. SADINSKY:

Q   And that was one of the reasons for the miss on the accretion, right? That was the first reason they gave?

A   No. Foreign exchange was the main reason for reducing the accretion from 20 cents to --

MR. JANOSKI: Object to form.

THE COURT REPORTER: I'm sorry. Can you start your answer over.

THE WITNESS: The original accretion from 20 cents to 15 was mostly due to foreign exchange. This report is the first time that I saw that SG&A was now becoming a much larger piece of the miss on

Page 326

accretion.

BY MS. SADINSKY:

Q   So the report that we just looked at right before this, the May 1, 2017, where it talked about a decline in Cordis profit and some lumpiness in --

A   Yes.

Q   -- Cordis numbers going forward, there's nothing about FX challenges there, right?

A   No. That was related to the 20 cents being guided down to 15. The May report was referencing SG&A.

Q   Right. Right.

A   It was not clear at the time to me that the SG&A was going to have a large enough impact to miss the 15 cent accretion number.

Q   Okay.

A   Again, I wasn't looking at that number either, though.

Q   Okay. But you were aware before August 2nd, 2017 that there were issues relating to SG&A expenses, correct?

MR. JANOSKI: Object to form.

THE WITNESS: I was aware that they were spending more money on their international operations to build them out, yes.

Page 327

BY MS. SADINSKY:

Q   And so when they reduced their accretion estimate, that was -- I think was in August 2016, and then the May 2017 was, you know, nine months later.

So you had known that the SG&A expenses issues had been continuing, correct?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

BY MS. SADINSKY:

Q   Did you say yes?

A   Yes.

Q   Okay. So you understood that there were challenges related to SG&A expenses before this time in August 2017, correct?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

BY MS. SADINSKY:

Q   And as we saw -- or as we looked at before, you understood that those SG&A challenges were affecting Cordis's performance, right? It was causing some lumpiness in Cordis's numbers. We saw that in May 2017, correct?

A   Yes.

Q   Okay. And did you understand at this time

Page 328

that there were challenges with inventory write-offs or inventory reserves?

A   Yes.

Q   And you understood that those inventory problems were affecting Cordis's performance before this in August 2017, right? We saw that it was causing some lumpiness in Cordis's numbers in May 2017, correct?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

BY MS. SADINSKY:

Q   And so it also says here, in this transcript, at the bottom of the page, that they experienced some lower-than-anticipated sales from partnership agreements.

Do you see that?

A   Yes.

Q   And after that sentence, it says these issues are on a -- or the partnership agreements are on a significant growth trajectory.

Do you see that?

A   Yes.

Q   And then you have the next sentence about higher-than-planned write-offs for excess inventory.

Do you see that?

Page 329

A   Yes.

Q   Do you see anything after that that says those inventory write-offs are on a significant growth trajectory?

MR. JANOSKI:  Object to form.

THE WITNESS:  I'm sorry.  I don't understand the question.

BY MS. SADINSKY:

Q   I'm asking -- okay.

So you see the issue with partnership agreements here, right?

A   Yes.

Q   And then they say:  "These agreements...are on a significant growth trajectory."

Do you see that?

A   Yes.

Q   And that means that these are getting better?

A   That would be my interpretation.

Q   Okay.  And then you see another issue: "And second, we incurred higher than planned write-offs for excess inventory."

Do you see that?

A   Yes.

Q   And Max can scroll down a little bit if

Page 330

you'd like.

Do you see anything after that sentence that says those issues are getting better?

A   It would be my assumption, as an investor, that inventory write-offs would be largely done at this point, based on this transcript.

Q   Okay.  Well, let's look at the paragraph with SG&A expenses.

So they say, at the end of the SG&A expenses:  "...I feel we have solid plans to address this."

Do you see that?

A   I do not see that yet.  Where is that?

Q   In the sentence saying "specifically."

MS. SADINSKY:  Maybe you can highlight it for him, Max.

THE WITNESS:  "Specifically, the costs of moving manufacturing," that sentence?

BY MS. SADINSKY:

Q   Yes, and it says:  "...but I feel we have solid plans"?

A   Yes, I see that.

Q   So they say we have this issue with SG&A, we have plans to address it, right?

A   Yes.

Page 331

Q   And they say we have this issue with partnership agreements, but those are getting better, right?

A   Yes.

Q   And they say we have this issue with inventory, and then they say nothing, right?

A   Correct.

Q   So they didn't say that they had a plan to address or fix the inventory, right?

MR. JANOSKI:  Object to form.

THE WITNESS:  From an accounting standpoint, inventory write-offs tend to be discrete rather than recurring.  The other two items in here are related to recurring ongoing operational items. So my interpretation would be that inventory should not be getting written off on a going-forward basis.

BY MS. SADINSKY:

Q   So in the last earnings transcript we looked at, we learned about increased inventory reserves, right?

A   Yes.

Q   So that's May to August, so that's two quarters.  Half a year of problems with inventory, right?

A   Inventory write-ups related to M&A deals,

Page 332

and I am not an accounting expert, but you have a one-time write-up when you do the deal, and I believe this inventory -- and you will need to talk to an expert to verify this -- was related to obsolete inventory, which is different.  I did not delve into the details, and I cannot confirm that.

Q   That's --

A   My understanding, when you write-off obsolete inventory, you are supposed to write all of it off, and it should not occur over and over again each quarter.

Q   I see.

So you think that the inventory issues in May 2017 were different from August 2017?

A   I don't know.

Q   And it would depend on when the inventory becomes obsolete, wouldn't it?

A   Yes.

Q   And where does your understanding of inventory that this had to do with obsolete inventory come from?

A   That was merely my interpretation of why they were writing it down here.

Q   Where -- why?  Where does that interpretation come from?  Is obsolete mentioned?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 333

A   They mentioned excess inventory.

Q   Is excess different than obsolete?

A   It probably is from an accounting or a legal definition. In my mind, though, it means they had the wrong inventory or too much inventory and had to take a write-down.

Q   Okay. Okay. So did the issues here affect your assessment of Cordis's performance going forward?

A   Again, I wasn't looking at Cordis's performance stand-alone.

Q   Okay. And at this time, was the pharmaceutical -- sorry.

MS. SADINSKY:  Okay. I want to mark, as my next exhibit -- what are we on?

MR. OBMASCIK:  Exhibit 44.

MS. SADINSKY:  Let's mark Tab 45.

- - -

(Columbia Exhibit 44 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   This is another analyst report, also from Baird, dated August 2nd, 2017, the same day, and if you look at the first paragraph here, it says: "The

Page 334

supply chain environment remains choppy...while this isn't the only headwind, incremental 'customer initiatives and actions' appear to be the primary explanation for the fiscal year 18 guide down."

And "...customer initiatives and actions..." what do you understand that to mean?

A   I don't recall what he's referring to.

Q   Was that related to the Cordis SG&A and inventory or the pharmaceutical segment issues we just looked at: the loss of Safeway, the IT investments, generic inflation, branded manufacturer, whatever it's called?

MR. JANOSKI:  Object to form.

THE WITNESS:  I would read that to apply to the pharmaceutical segment.

BY MS. SADINSKY:

Q   Okay. And so primary -- he says the incremental customer initiatives and actions were the -- or appear to be both the primary explanation for the guide down.

What do you understand that to mean?

A   I understand it to mean pricing.

Q   Okay. So the stock price fell or the company --

A   No.

Page 335

Q   -- guidance fell because of that?

A   Sorry. Repeat the question.

Q   The company decreased its guidance because of those -- those pharmaceutical segment issues mostly?

A   Yes.

Q   Okay. And so after this -- this disclosure on August 2017, Cardinal Health's stock price decreased.

Do you agree that there were several factors that led to the decrease on Cardinal Health stock price in August 2017?

MR. JANOSKI:  Object to form.

THE WITNESS:  I agree that there were negative factors that contributed to the stock price not performing well.

BY MS. SADINSKY:

Q   And there were -- it wasn't just one thing. It was a combination of things?

A   I don't recall, but most likely.

Q   Would you agree the market was concerned about issues with generic's pricing?

A   Yes.

Q   Would you agree the market was concerned about ongoing investment in IT?

Page 336

MR. JANOSKI:  Object to form.

THE WITNESS:  To a lesser extent, yes.

BY MS. SADINSKY:

Q   Did you say "to a lesser extent"?

A   To a lesser extent, yes.

Q   Okay. Did you agree the market was concerned about technology and client services investments?

A   I don't know.

Q   Do you agree the market was concerned about reduced levels of branded manufacture or price depreciation?

MR. JANOSKI:  Object to form.

THE WITNESS:  To a lesser extent than the generics, yes.

BY MS. SADINSKY:

Q   Market was concerned about the loss of Safeway?

MR. JANOSKI:  Object to form.

THE WITNESS:  I don't know.

BY MS. SADINSKY:

Q   So you agree that generics pricing was probably one of the biggest reasons driving Cardinal Health stock price decline at this time?

MR. JANOSKI:  Object to form.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 337

THE WITNESS: My opinion is that generic pricing was the main contributing factor.

BY MS. SADINSKY:

Q It was a bigger contributing factor than Cordis?

A Yes.

MR. JANOSKI: Object to form.

BY MS. SADINSKY:

Q Was the ongoing -- or was the branded manufacturer price appreciation issues a bigger contributing factor than Cordis in your opinion?

MR. JANOSKI: Object to form.

THE WITNESS: I don't know anymore. I don't know.

BY MS. SADINSKY:

Q Sitting here today, would you be more concerned about branded manufacture and price appreciation, loss of Safeway, and ongoing investment in IT than you would be with Cordis?

MR. JANOSKI: Object to form.

THE WITNESS: I don't know. I don't know the relative sizes of each of those. It's been too long.

BY MS. SADINSKY:

Q Okay. But you would agree that the main

Page 338

driver was -- of the stock price decline was generics pricing in your opinion at this time?

MR. JANOSKI: Object to form.

THE WITNESS: Yes.

MS. SADINSKY: Hold on. Can we go off the record?

THE VIDEOGRAPHER: We're now going off the record at 7:28 p.m.

(Recess.)

THE VIDEOGRAPHER: We are now going back on the record at 7:38 p.m.

MS. SADINSKY: Mark as Exhibit 5 [sic], Tab 46, and just share it.

- - -

(Columbia Exhibit 45 was marked for identification.)

- - -

BY MS. SADINSKY:

Q And this is an email and attachment. It's from Fran -- or from Wanda Niola at Columbia. Who is that?

A Are you asking me who that is?

Q Yeah.

A I don't know.

Q It says, under her name: "Senior

Page 339

Relationship Manager."

You say you don't know her?

A No.

Q Okay. And then it's sent to Dilay Altiner and copies Robert Harwood and Fran Asselta.

Fran Asselta is from Columbia. Do you know Fran?

A The name is vaguely familiar but I -- No. I don't know her.

Q Do you know Dilay Altiner or Robert Harwood?

A No.

Q So this is attaching the third quarter commentary on SEIU's investments, and if we could go to page 5 of the attachment -- sorry. I have to go to the cover page so he sees what it is.

It shows it's as of September 30th, 2017, right?

A Yes.

Q So this is as of, you know, a month after that earnings announcement related to the pharmaceutical segment issues and the Cordis issues -- right? -- that we just looked at?

A Yes.

Q Go to page 5. Under Detractors on page 5,

Page 340

the first bullet there, "Cardinal Health detracted from performance in the period. Generic drug pricing deflation as well as company spending initiatives hurt the growth outlook, resulting in investor disappointment."

Do you see that?

A Yes.

Q Direct pricing -- direct pricing, deflation, and spending initiatives refer to the pharmaceutical segment, right?

A That would be my interpretation.

Q Okay. Nothing here to do with Cordis, right?

A No.

Q Columbia is attributing Cardinal Health stock price performance to issues in the pharmaceutical segment at this time, correct?

A The person who wrote this is. I would agree with that statement.

Q You agree with that?

A I would agree with the statement that they make here, yes.

Q Okay. So you would agree that the Cardinal stock price performance was being impacted by issues from the pharmaceutical segment at this time,

LA Sheriffs' Pension          FINAL          May 26, 2022
v. Cardinal Health Inc.          Nicholas Smith

Page 341

correct?
   A   Yes.
   Q    Did -- as far as you're aware, did Columbia ever tell SEIU that anything other than drug pricing deflation and spending initiatives led to Cardinal Health's poor performance in the third quarter of 2017?
   A   I don't know.
   Q    And nothing here references Cordis, right?
   A   I -- on this page, I do not see the name "Cordis" show up.
      MS. SADINSKY:  And let's go to Exhibit 46, which is Tab 49.
            - - -
      (Columbia Exhibit 46 was marked for identification.)
            - - -
BY MS. SADINSKY:
   Q    This is an email from Fran Asselta, again, to Dilay and others at SEIU.
      Do you see that?
   A   Yes.
   Q    Okay.  And she attaches -- and you don't know who Dilay Altiner, Robert Harwood, or Cynthia Chen is, right?

Page 342

   A   No.
   Q    Okay.  If you'd go to the attachment, the attachment is the Columbia Contrarian Large-Cap Core, and it talks about buys and sells.
      Have you seen a report like this before?
   A   Yes.
   Q    Okay.  And if you'd go to, under Buys, AmerisourceBergen:  "This stock was purchased in favor of Cardinal Health, which left the portfolio on the news that Amazon would be entering the pharmaceuticals area.  The team believes that Amerisource, 20% of whose offerings are specialty drugs which are relatively safe from external pricing pressures, should fare better than Cardinal which offers drugs that are more commoditized and more susceptible to increasing competition."
      Do you see that?
   A   Yes.
   Q    Go to the next page, page 2, under Sells. Under Cardinal Health, it says:  "Cardinal was sold because we believe Amazon's effective entry into the pharmaceutical distribution business will result in heightened pricing pressures."
      Do you see that?
   A   Yes.

Page 343

   Q    So this is indicating that the Contrarian strategy sold off Cardinal Health stock at this time in the fourth quarter of 2017, correct?
   A   Yes.
   Q    And this -- and is it correct that Columbia sold off its position in Cardinal Health in the fourth quarter of 2017 in the Contrarian strategy due to Amazon's entry into the pharmaceutical distribution business?
   A   That is the factor cited here.
   Q    Do you agree with that?
   A   I would agree it is one of several factors that were in our minds at that time.
   Q    What were the other key factors?
   A   One factor to me would be multiple quarters of earnings provisions down by the Cardinal management team.
   Q    And that was related to the pharmaceutical segment, correct?
      MR. JANOSKI:  Object to form.
      THE WITNESS:  That was related primarily to the pharmaceutical segment's underperformance.
BY MS. SADINSKY:
   Q    So the main reasons that Columbia -- or the Contrarian strategy sold off its position in

Page 344

Cardinal was primarily due to Amazon's entry into the marketplace and the earnings misses, which I think generally related to generic pricing pressures, right?
      MR. JANOSKI:  Object to form.
      THE WITNESS:  Yes.
BY MS. SADINSKY:
   Q    Okay.  And so the reason Columbia sold its position in Cardinal was not due to Cordis, right?
   A   No.
   Q    Who made the decision to sell off the Cardinal position in the Contrarian strategy?
   A   It would have been a combination of my opinion and Guy's opinion.
   Q    Okay.  And nothing in here references Cordis as a reason for selling Cardinal, right?
   A   No.
   Q    Nothing here references potential securities fraud by Cardinal, right?
   A   No.
   Q    Nothing here references potential securities fraud by Cardinal's executives, right?
   A   No.
   Q    Nothing here references any wrongdoing by Cardinal or its executives, right?

Page 345

A   No.

Q   Did you ever hear anyone at Columbia ever say they believed Cardinal or its executives had engaged in securities fraud related to Cordis?

MR. JANOSKI:  Object to form.

THE WITNESS:  No.

BY MS. SADINSKY:

Q   Did you ever hear anyone at Columbia say that SEIU told them that they believed that Cardinal or its executives had engaged in securities fraud related to Cordis?

MR. JANOSKI:  Object to form.

THE WITNESS:  No.

BY MS. SADINSKY:

Q   Did Columbia ever tell anyone that it sold its position in Cardinal because Cardinal or its executives had engaged in securities fraud?

A   I don't know.

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   As far as you're aware, did Columbia ever tell anyone that?

A   Not as far as I am aware.

Q   Have you ever believed that Cardinal or its executives engaged in securities fraud?

Page 346

MR. JANOSKI:  Object to form.

BY MS. SADINSKY:

Q   Related to Cordis?

A   No.

Q   Did -- so this is in the fourth quarter of 2017.

Did you continue, or was there a continued tracking of Cardinal after -- so strike that.  I'm getting tired too.

You told me earlier that after -- when you're not actively covering a company or actively invested in a company, there's some tracking, but not the same types of reports that we've been looking at, right?

A   Yes.

Q   So did you continue doing some tracking after this?

A   Yes.

Q   Okay.  And did -- do you still do some tracking of Cardinal?

A   Yes.

Q   Do you prepare formal reports -- or the reports of it now?

A   They are much less specific.  Frequently, just a few notes.

Page 347

Q   Okay.  Are you --

A   And --

Q   Sorry.

A   Go ahead.

Q   No.  No.  No.  You go.

A   That was it.  They're just a few notes.

Q   Are you are aware of whether the Contrarian strategy has invested in Cardinal Health since it sold it off at this time?

A   To the best of my knowledge, we have not.

Q   Okay.  Let's turn to Exhibit 47, Tab 58.

- - -

(Columbia Exhibit 47 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   This is an email from Harlan Sonderling to the Equity Research Materials Distribution.

Are you part of that distribution list?

A   Yes, I believe I am.

Q   Okay.  And the email is January 8th, 2018.

Do you see that?

A   Yes.

Q   And this email says -- it's kind of hard to read on this screen.  It says:  "New CEO Kaufmann

Page 348

has a big job managing through weak generic pricing and Medical segment acquisition hangover.  First, do no harm:  stabilized generic pricing means he may not have to cut guidance again, enabling the company to set an attractive valuation base.  However, the Medical segment remains challenged, and recovery will be protracted, a risk to earnings.  At least some of the Cordis missteps can help inform the Medtronic patient recovery acquisition integration."

When you read "Cordis missteps" here, what does that mean to you?

MR. JANOSKI:  Object to form.

THE WITNESS:  To me it means the specific areas that we have already discussed relating to Cordis not hitting their earnings targets.

BY MS. SADINSKY:

Q   Okay.  And you were aware there were missteps with the Cordis integration in January 2018, correct?

A   Yes.

Q   Was it widely known amongst securities analysts that the Cordis integration had missteps in January 2018?

MR. JANOSKI:  Object to form.

THE WITNESS:  I can't speak for other

Page 349

securities analysts, but based on the reports that you have presented here and my knowledge and Harlan's knowledge, it should have been known to most professionals covering Cardinal Health at the time.

BY MS. SADINSKY:

Q   And you read sell-side analyst reports, right?

A   Yes.

Q   And were sell-side analysts -- did they reference -- were they aware of issues with Cordis -- Cordis missteps, based on the reports that you read?

MR. JANOSKI:  Object to form.

THE WITNESS:  Again, I don't recall all the reports that I've read, but I do recall seeing Cordis mentioned in many of the reports that I've read over the time period that we have discussed here.

BY MS. SADINSKY:

Q   Okay.  So at this time, when you knew that the Cordis integration had missteps or you knew that it hadn't met its accretion target, would that -- would that have affected your assessment of whether the Cordis acquisition would ever be accretive to

Page 350

Cardinal Health?

MR. JANOSKI:  Object to form.

THE WITNESS:  At this point, I would have no longer been thinking about Cordis or accretion related to it.

BY MS. SADINSKY:

Q   So you would have factored in no accretion from Cordis into your own estimates at this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  That is incorrect.

BY MS. SADINSKY:

Q   Okay.  What -- what amount of accretion would you factor into your estimates at this time?

A   I would not be thinking about Cordis accretion separately from the medical segment at this time.  I would only be looking at the medical segment as a whole.

Q   Okay.  Would you factor in any benefits of the Cordis acquisition into your valuation of the medical segment at this time?

A   Yes.

Q   And how would you determine those?

A   They would simply be a part of the overall sales and EBIT and EPS numbers that would come out of that segment.

Page 351

Q   Okay.  Would you have more concerns about the Cordis -- about Cordis's contribution to the medical segment in light of the issues disclosed at this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  I would have considered Cordis to have a higher risk of causing problems in the future versus other parts of the medical segment that had been outperforming.

BY MS. SADINSKY:

Q   And would that be reflected in your valuation of Cardinal Health's stock or -- or valuation of the medical segment if you were doing a sum-of-the-parts at this point?

A   Yes.

Q   And you said you -- and you said a higher risk of causing problems.  Does that mean you -- it could actually detract from the medical segment in your view at this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  I don't know.  I was not doing a valuation of Cardinal and the medical segment, once we had sold the stock, any longer.

BY MS. SADINSKY:

Q   In your experience as an investment

Page 352

professional, is it possible that, you know, a -- one part of a business could be doing so poorly that you would consider, you know, a discount to the entire portion of that business?

Do you understand what I'm trying to say?

Like, if Cordis is doing so bad and you're so concerned about it that you could think it could hurt the entire medical segment and you would decrease your estimates for the entire medical segment as a result?

MR. JANOSKI:  Object to form.

THE WITNESS:  It is possible, yes.

BY MS. SADINSKY:

Q   Do you -- in your experience as an investment professional, would you believe that some sell-side analysts -- some.  I'm not saying all -- some may have done that at this time?

MR. JANOSKI:  Object to form.

THE WITNESS:  I believe investors would have factored in Cordis's performance within the medical segment when valuing the overall medical segment.

BY MS. SADINSKY:

Q   And they may have factored in negative numbers for Cordis?

LA Sheriffs' Pension                    FINAL                    May 26, 2022
v. Cardinal Health Inc.                                          Nicholas Smith

Page 353

MR. JANOSKI:  Object to form.

THE WITNESS:  They may have attributed a lower valuation to the segment because of the Cordis integration and how it performed.

MS. SADINSKY:  Okay.  Let's mark Tab 59 as Exhibit 48.

- - -

(Columbia Exhibit 48 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Yeah.  Okay.  So this is an email from Shantha Ozgen from Credit Suisse, and I think this was sent to you, but the emails that your counsel produced are not -- didn't have your name, so I'm not really sure.  This is produced -- this is sent to either you or Guy Pope or Harlan Sonderling.

Do you know if you received this?

A   I receive far too many emails per day to have any recollection of a specific one from 2018. I am sorry.

Q   That's okay.

Is this something that you would have received, an email from Credit Suisse?

A   It is possible.

Page 354

Q   Okay.

A   Some of us -- some of us receive research emails from different investment banks and others don't.  So it is possible.

Q   Okay.

A   I don't know.

Q   Okay.  So if you look at -- and this is dated January 17th, 2018.  If you look at the second bullet here:  "The most common concern I have heard from some investors is that the Cardinal med surg business faced many challenges including integration of the Cordis deal when Don Casey, the new XRAY CEO was in charge of that business.  So there is some concern that he may have challenges with the integration of the XRAY-Sirona business."

Do you see that?

A   Yes.

Q   So would you agree it was widely -- or known that there -- known amongst the investors -- or the analyst community that there were challenges with the Cordis integration in -- in January 2018?

MR. JANOSKI:  Object to form.

THE WITNESS:  Among people who followed Cardinal, the answer would be yes.  I disagree that it was widely known among all investors, especially

Page 355

those who did not follow Cardinal.  They would have had no reason to know that.

BY MS. SADINSKY:

Q   Ones that followed Cardinal, experienced analysts in this field, I guess.

And so the people that follow Cardinal -- the analysts that followed Cardinal, understood that there were integration challenges and that those integration challenges could continue.  They understood that in January 2018, correct?

MR. JANOSKI:  Object to form.

THE WITNESS:  They understood that there were integration challenges looking backwards.  I don't agree that they necessarily -- and I will not speculate as to whether they would continue going forward.

BY MS. SADINSKY:

Q   Okay.  And people -- and we looked at a report before, the Medtronic one, Harlan's email about Medtronic.  Harlan was -- wanted Cardinal Health to think about all the issues with Cordis and thinking about its integration of the Medtronic deal, right?

MR. JANOSKI:  Object to form.

THE WITNESS:  Harlan's email, if I

Page 356

interpreted it correctly, was indicating that Cardinal should have learned lessons from the Cordis integration that they could avoid making the same errors with the Medtronic integration.

BY MS. SADINSKY:

Q   Do you know if -- did you ever hear any sell-side analysts or anyone at Columbia ever say that they were concerned about Cardinal's ability to integrate the Medtronic acquisition in light of its difficulty integrating the Cordis acquisition?

A   I do not recall.

Q   Would that be something that you would think about if you were still covering Cardinal at that time?

MR. JANOSKI:  Object to form.

THE WITNESS:  It is possible I would have considered that.

BY MS. SADINSKY:

Q   Because they're both global businesses in the same segment, right?

MR. JANOSKI:  Object to form.

THE WITNESS:  Primarily, because it would be the same management team trying to run them.

BY MS. SADINSKY:

Q   So concern about integration challenges

Page 357

with one entity could affect your view of the ability to integrate another entity, correct?

A   Yes.

Q   And that could, you know, detract from your views of the company as a whole, correct?

MR. JANOSKI:  Object to form.

THE WITNESS:  It could detract from the valuation I would be willing to ascribe to that segment.

BY MS. SADINSKY:

Q   A couple quick final questions.

When was the first time you became aware of this litigation?

A   I would have to check my emails, but it would have been several months ago, and I do not recall the exact date.

Q   Was the first time you became aware of this litigation when you became aware of the subpoena Columbia received?

A   I believe so.

Q   Did you ever read the complaint?

A   I have not read the full complaint.

Q   Have you read part of it?

A   I do not recall if I've even read part of it.

Page 358

Q   Have you performed any analysis relating to the complaint and this lawsuit?

A   No.

Q   Are you aware of anyone else at Columbia who has done so?

A   I am not aware.

Q   Has there ever been a point in time when you believed Cardinal Health or its executives committed securities fraud?

MR. JANOSKI:  Object to form.

THE WITNESS:  Could you repeat the question.

BY MS. SADINSKY:

Q   Has there ever been a point in time where you believed that Cardinal Health or its executives committed securities fraud?

MR. JANOSKI:  Object to form.

THE WITNESS:  No.

MS. SADINSKY:  Okay.  I'm going to reserve my five minutes for rebuttal.

MR. JANOSKI:  No questions from plaintiff.  Thank you for your time, Mr. Smith.

MS. SADINSKY:  Thank you.

We can go off the record.

THE COURT REPORTER:  Do you need to

Page 359

designate this?

MS. SADINSKY:  It's up to Mr. DeWitt.  I don't need to.

MR. DEWITT:  We'll reserve the right to read.  I don't know if we will, but we'll reserve the right to do it.

THE VIDEOGRAPHER:  Excuse me.

We're now going off the record at 7:59 p.m.

(Signature having not been waived, the deposition of Nicholas Smith was concluded at 7:59 p.m.)

Page 360

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Joan V. Cain, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 26th day of May 2022.

My commission expires:
May 31, 2025

_____

NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA
VIRGINIA NOTARY REGISTRATION NO. 107144

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 361

INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel
that notary public signature is required.

Please return a copy of the signed errata within
30 days of receipt, unless otherwise agreed upon
by counsel.  Once we receive the signed errata,
we will distribute an electronic copy to all
parties.

RETURN A SIGNED COPY VIA FAX, E-MAIL OR MAIL TO:
FAX:  1-800-825-9055
E-MAIL:  janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
PO Box 542
Luck, WI 54853

Page 363

PAGE  LINE  CHANGE    REASON

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

___ / ____ / _____ / _____

Page 362

NOTICE TO READ & SIGN

This transcript was electronically distributed
to DEWITT LAW, LLC to forward to witness.

ACKNOWLEDGMENT OF DEPONENT

I, Nicholas Smith, do hereby certify
that I have read the foregoing pages and that
the same is a correct transcription of the
answers given by me to the questions therein
propounded, except for the corrections or
changes in form or substance, if any,
noted in the attached Errata Sheet.

_____  _____
(DATE)   Nicholas Smith

Signed and subscribed to before me this
____ day of _____ 2022.

_____
Notary Public

Page 364

I N D E X  O F  E X H I B I T S

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 1    Deposition Subpoena of        13
             Columbia Management
             Investment Advisers, LLC,
             5/4/22

EXHIBIT 2    List of Columbia's Trades in   27
             Cardinal Health from
             March 2015 to March 2018, 50
             Pages

EXHIBIT 3    Report on Cardinal Health      57
             Prepared by Mr. Smith,
             4/30/15, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00017175-00017176

LA Sheriffs' Pension          FINAL                    May 26, 2022
v. Cardinal Health Inc.                                Nicholas Smith

Page 365

INDEX OF EXHIBITS (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 4    Cardinal Health Reports Good    79
             3Q FY June 2015 Report by
             Mr. Sonderling, Bates No.
             CTI-CAH-SDOH2_19-cv-2491-
             00000793

EXHIBIT 5    Updated Rankings:               85
             Healthcare and Insurance by
             Jeffrey Cicirelli, 02/12/15,
             Bates Nos. CTI_CAH-SDOH2_
             19-cv-2491-00000780-00000781

EXHIBIT 6    Bloomberg Article, J&J Said     88
             to Be in Talks on Sale of
             Cordis, with Cardinal
             Leading, 2/20/15

Page 366

INDEX OF EXHIBITS (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 7    Report on Cardinal Health       93
             Prepared by Mr. Smith, Bates
             Nos. CTI_CAH-SDOH2_
             19-cv-2491-00017166-00017167

EXHIBIT 8    Cardinal Health Press           98
             Release, 03/02/15, Bates
             Nos. CAH-SDOH2.19-cv-
             3347-00004564-00004566

EXHIBIT 9    Cardinal Health Reports        112
             Strong 2Q FY June 2015
             Report by Mr. Sonderling,
             Bates Nos. CTI_CAH-SDOH2_
             19-cv-2491-00000777-00000779

Page 367

INDEX OF EXHIBITS (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 10   April 30, 2015 Cardinal        128
             Health Report, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00017173-00017174

EXHIBIT 11   CAH:  Moving BBB+/R2/          134
             Marketperform to New Issue
             (3.75% '25), 06/19/15, Bates
             Nos. CTI_CAH-SDOH2_
             19-cv-2491-00000806-00000809

EXHIBIT 12   July 30th, 2015 Cardinal       138
             Health Report by Mr. Smith,
             Bates Nos. CTI_CAH-SDOH2_
             19-cv-2491-00017173-00017174

Page 368

INDEX OF EXHIBITS (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 13   Cardinal Health's 10-K for     153
             Fiscal Year 2015, Bates Nos.
             CAH-SDOH2.19-cv-00472611-
             00472701

EXHIBIT 14   Cardinal Health Reports Huge   161
             1Q FY June 2016 Earnings and
             Raises Annual Guidance by
             Full Upside; Retain 2,
             11/02/15, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00000823-00000824

EXHIBIT 15   Morning Meeting Recap by       168
             Christopher Vandergrift,
             1/12/16, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00000828-00000830

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 369

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 16   Transcript from the January      175
             12th, 2016 JPMorgan
             Conference CAH-SDOH2.19-cv-
             3347-00005915-00005924

EXHIBIT 17   February 1st, 2016 Cardinal      179
             Health Q2 Report Prepared by
             Mr. Smith, Bates No.
             CTI_CAH-SDHO2_19-cv-2491-
             00017165

EXHIBIT 18   April 28, 2016 Report from       185
             Mr. Sonderling, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00000837-0000838

Page 371

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 22   August 2nd, 2016 Cardinal        219
             Health Q4 Report, Bates No.
             CTI_CAH-SDOH2_19-cv-2491-
             00017183

EXHIBIT 23   August 24, 2016 Report from      225
             Mr. Sonderling, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00000842-00000843

EXHIBIT 24   October 31, 2016 Report from     235
             Mr. Sonderling, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00000849-00000850

Page 370

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 19   April 28th, 2016 Cardinal        194
             Health Q3 Report, Bates No.
             CTI_CAH-SDOH2_19-cv-2491-
             00017172

EXHIBIT 20   Columbia Midcap Growth Fund      204
             Document, Wachtell Control
             No. EF00001442

EXHIBIT 21   Q4 FY16 Cardinal Health,         214
             Inc. Earnings Conference
             Call Transcript, Bates Nos.
             CAH-SDOH2.19-cv-3347-
             00390661-00390693

Page 372

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 25   October 31, 2016 Cardinal        238
             Health Q4 Report from
             Mr. Smith, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00017160-00017161

EXHIBIT 26   Email Chain, 11/1/16,            240
             Wachtell Production No.
             EF00001281

EXHIBIT 27   Email from Mr. Sonderling to     249
             Himself, 11/1/16, Wachtell
             Control No. EF00001262

EXHIBIT 28   Notes of Calls Made by           254
             Mr. Kaufmann on 11/28/16,
             Bates Nos. CAH-SDOH2.19-cv-
             3347-00455417-00455430

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 373

INDEX OF EXHIBITS (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 29   Daiwa SB Investments UBS -     265
    Columbia US Contrarian Fund
    Investment Review, as of
    12/31/16, Wachtell Control
    No. EF00000731

EXHIBIT 30   Cardinal Health's Meeting     269
    Schedule from JPMorgan's
    2017 Healthcare Conference,
    Beginning Bates No.
    CAH-SDOH2.19-cv-3347-
    00455285

EXHIBIT 31   Transcript of JPMorgan's     269
    2017 Healthcare Conference
    Q&A Session, Bates Nos.
    CAH-SDOH2.19-cv-3347-
    00005624-00005629


Page 375

INDEX OF EXHIBITS (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 34   Cardinal Reduces Fiscal Year     288
    2017; Initiates Poor Fiscal
    Year 2018 Core
    Pharmaceutical Segment
    Guidance, a Material
    Negative; Buys Medtronic's
    PMR, Decent Capital Use
    Prepared by Mr. Sonderling,
    4/21/17, Bates Nos.
    CTI_CAH-SDOH2_19-cv-2491-
    00000868-00000869

EXHIBIT 35   Cardinal Health Press     294
    Release, 5/1/17, Bates Nos.
    CAH-SDOH2.19-cv-3347-
    00398600-00398613


Page 374

INDEX OF EXHIBITS (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 32   February 7th, 2017 Cardinal     279
    Health Q2 Report Prepared by
    Mr. Smith, Bates Nos.
    CTI_CAH-SDOH2_19-cv-2491-
    00017168-00017169

EXHIBIT 33   April 18th 2017 Cardinal     283
    Health Update Prepared by
    Mr. Smith, Bates Nos.
    CTI_CAH-SDOH2_19-cv-2491-
    00017170-17171


Page 376

INDEX OF EXHIBITS (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 36   Transcript of Cardinal     294
    Health Q3 FY17 Earnings
    Conference Call, Bates Nos.
    CAH-SDOH2.19-cv-3347-
    00393068-00393094

EXHIBIT 37   Cardinal Health Report,     295
    5/17/17, Bates Nos.
    CTI_CAH-SDOH2_19-cv-2491-
    00017177-17179 000

EXHIBIT 38   Email from Mr. Ling to     309
    Mr. Pope, 5/1/17, Wachtell
    Control No. EF00002698

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL

May 26, 2022
Nicholas Smith

Page 377

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 39   Email from Mr. Kreger to          313
             Mr. Sonderling, 5/1/17,
             Wachtell Control No.
             EF00001562

EXHIBIT 40   Email from Mr. Larsen to          317
             Mr. Sonderling, 5/1/17,
             Wachtell Control No.
             EF00001574

EXHIBIT 41   Cardinal Health Reports Q4        319
             and Fiscal 2017 Results,
             Provides 2018 Guidance Press
             Release, Bates Nos.
             CAH-SDOH2.19-cv-3347-
             00277875-00277884

Page 378

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 42   Q4 FY17 Cardinal Health,          319
             Inc. Earnings Conference
             Call, 8/2/17, Bates Nos.
             CAH-SDOH2.19-cv-.3347-
             00393446-00393475

EXHIBIT 43   Notes Prepared by Mr. Smith,      320
             8/2/17, Bates Nos.
             CTI_CAH-SDOH2_19-cv-2491-
             00017184-00017186

EXHIBIT 44   Email from Mr. Ling to            333
             Mr. Pope, 8/2/17, Wachtell
             Control No. EF00002837

Page 379

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 45   Email with Attachment from        338
             Ms. Niola to Ms. Altiner and
             Others, 10/30/17, Bates Nos.
             1100SEIUHC0136382-0136387

EXHIBIT 46   Email with Attachment from        341
             Ms. Asselta to Ms. Altiner
             and Others, 1/16/18, Bates
             Nos. 1199SEIUHC0136298-
             0136300

EXHIBIT 47   Email Chain, 1/9/18,              347
             Wachtell Control No.
             EF00002414

Page 380

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 48   Email from Ms. Ozgen to           353
             Unknown Recipient, 1/17/18,
             Wachtell Control No.
             EF00002096