# EXHIBIT 8

| LA Sheriffs' Pension<br>v. Cardinal Health Inc. | FINAL<br>CONFIDENTIAL | May 12, 2022<br>Jeff Agne |
|---|---|---|

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION

-----------------------------------------

LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated,

    Plaintiffs

    v.

CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON,

    Defendants

Case No. 2:19-CVL-03347

----------------------------------------

REMOTE VIDEO DEPOSITION OF
Jeff Agne
May 12, 2022
Lead: Elizabeth N. Brandt, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING  1-800-825-3341

**Page 2**

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF

    Christopher R. Kinnon, Esquire
    Laurie L. Largent, Esquire
    Jennifer N. Caringal, Esquire
    J. Marco Janoski Gray, Esquire
    Megan A. Rossi, Esquire
    Robbins Geller Rudman & Dowd LLP
    655 West Broadway
    Suite 1900
    San Diego, California 92101
    (619) 239-3247

ATTORNEYS FOR DEFENDANTS

    Elizabeth N. Brandt, Esquire
    Wachtell Lipton Rosen & Katz
    51 West 52nd Street
    New York, New York 10019
    (212) 403-1000

**Page 3**

A P P E A R A N C E S   C O N T I N U E D

ATTORNEYS FOR ROTHSCHILD & CO ASSET MANAGEMENT US INC. AND THE DEPONENT

    Daniel H. Tabak, Esquire
    Cohen & Gressler, LLP
    800 Third Avenue
    New York, New York 10022
    (212) 957-7600

ALSO PRESENT:

    Gabriel Hutter, Document Clerk
       Robbins Geller Rudman & Dowd LLP
    Dina Clements, Esquire
       Senior Regulatory and Compliance Advisor
       Rothschild & Co
    Jackson Martin, Paralegal
       Wachtell Lipton Rosen & Katz

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    Joan V. Cain, Court Reporter
    Joseph Salinas, Videographer

**Page 4**

TABLE OF CONTENTS

Witness:
Jeff Agne

Examination
By Ms. Brandt.............................Page 7

Reporter Certificate.......................Page 234

Notice to Read and Sign....................Page 236

Index of Exhibits.........................Page 238

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 125

Q  What form would that take?

A  So if -- if another team member saw something interesting on Cardinal Health, for instance, they may come to my office to talk about it, or they may send a quick email. Things of that nature.

Q  And did you receive information on Cardinal Health from analysts outside of Rothschild?

A  Yeah, I'm sure that I was on several analyst distribution lists on -- on drug distributors and Cardinal Health at the time.

Q  From which organizations?

A  I don't -- I don't recall specifically, but, you know, a lot of the sort of big banks like we talked about earlier.

Q  So JPMorgan?

A  Yeah.

Q  Cohen? Goldman? Bank of America?

A  Yeah. Banks like that, yes.

Q  Okay. Would you get information on Cardinal Health from news reports?

A  Possibly.

Q  Which news sources?

A  You know, I typically scan through The Wall Street Journal and then, you know, outside of that,

Page 126

Bloomberg, CNBC. Things like that. I don't read a ton of industry rags on drug distributors.

Q  Did you get information on Cardinal Health from any trade magazines?

A  Not that I can recall.

Q  Endovascular Today?

A  No.

Q  Clinica MedTech?

A  No.

Q  Have you ever even heard of those trade organizations --

A  No.

Q  Sorry -- trade magazines?

A  No.

Q  Did you get any information on Cardinal Health from Rothschild clients?

A  No.

Q  From SEIU?

A  Sorry? From SEIU, no.

Q  Did anyone at Rothschild ever have access to information about Cardinal Health that was not publicly available?

A  Not to my knowledge, no.

Q  How do you think about mergers and acquisitions in assessing a company's value?

Page 127

MR. KINNON: Objection to form.

THE WITNESS: You know, it depends on the company and what their financial profile is, what they're buying. You know, there's sort of a lot that can go into it.

BY MS. BRANDT:

Q  Can you expand on that a little bit?

A  Yeah. So if a -- you know, if a company is able to, you know, buy assets at good prices in, you know, new segments that might be growing really quick and have great margins, you know, that -- I'm all for that. Assuming they can integrate them, I have no problem with that.

Q  So is it fair to say that you generally see acquisitions as a good thing?

MR. TABAK: Objection to form.

THE WITNESS: It's a case-by-case basis.

BY MS. BRANDT:

Q  Okay. So other than the reports that we've talked about, how else did you share your views on Cardinal Health with your colleagues?

A  You know, so, again, it would just be daily conversation, emails, you know. Formal write-ups is typically how we would do it.

Q  And with whom would you have shared those?

Page 128

A  The team, large-cap team members.

Q  And remind me who was on the large-cap team from 2015 to 2018.

A  Yeah. So it was myself, Paul Roukis, Chris Kaufman, Luis Ferreira, Mark Tavel, and then Tiffany Li joined, I think, in 2017. She covers technology. Mark Tavel left, I think, in 2018, and a guy name Jason Smith joined when Mark left -- or they -- sorry. Those two overlapped for a small period of time.

Q  Okay. Mr. Agne, if it's okay with you, I think this might be a good time to break for lunch. Does that work?

A  Sure.

Q  How -- how long do you want to take? 30 minutes? An hour?

MR. TABAK: Do you want to just go off the record for the lunch discussion?

THE VIDEOGRAPHER: Going off the record at 12:40 p.m.

(Whereupon, at 12:40 p.m., the proceedings in the above-entitled matter were recessed, to reconvene at 1:16 p.m., this same day.)

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 12, 2022
Jeff Agne

Page 137

Q   So how would they be using this type of information in their job?

A   So we would -- you know, as part of owning stocks or looking at stocks, you want to continuously update your views on those stocks that you own.

Q   And how would an announcement like this change your view of a stock?

A   You know, in a general sense, you know, well -- you know, as a very general sense, you know, I would want to know things like what the actual earnings base was.  How much that accretion matters.  Is 20 cents a lot on the earnings base or not?  Does this segment make sense for them to move into or not?  What's the margin profile like or not?  Who are the competitors?  What's pricing like?

You know, those are all of the types of things that I would be thinking about.

Q   And how would the answers to those questions change your investment strategy with respect to Cardinal Health?

A   It depends what the conclusion to those questions were.  If -- if it turns out that this deal is materially accretive or materially adds to the growth rate or is an attractive margin business

Page 138

with great pricing and not a lot of competition, you know, in general, I think that would be viewed favorably.

Conversely, if all of the opposite was true, it would be viewed negatively.

Q   Did Rothschild understand that there was a 100 percent chance -- chance that Cardinal Health would achieve the accretion estimate in this press release?

MR. KINNON:  Objection to form.

THE WITNESS:  I -- I can't speculate what -- what they concluded on with regard to this accretion estimate.

BY MS. BRANDT:

Q   Reading this now, do you think that Rothschild would have understood that there was a 100 percent chance that Cardinal Health would achieve the accretion estimate?

MR. KINNON:  Objection to form.

THE WITNESS:  I don't -- I don't think -- you know, I think if you're sitting in my side of the table, you don't -- you don't think anything is -- is 100 percent certain.

BY MS. BRANDT:

Q   So Rothschild understood that there was a

Page 139

risk that Cardinal Health would not ultimately achieve the full 20 cents accretion estimate from Cordis, correct?

MR. KINNON:  Objection to form.

THE WITNESS:  I can't speculate what -- what they concluded based on this press release.

BY MS. BRANDT:

Q   Based on your experience and reading this press release, would that be your understanding?

A   Based on my experience, I -- I never believe anything is with -- 100 percent certain whether or not it's in a company press release or not.

Q   So you understand that there's a risk that the company may not ultimately achieve the full accretion estimate, correct?

A   Yeah.

Q   And that a 20 cent accretion estimate in this case was not a guarantee, correct?

A   Based on my experience if I was reading this, I would not think anything in here was a hundred percent risk free, any estimates.

Q   So why might Cardinal Health not achieve the full accretion estimate?

A   It could be because the integration goes

Page 140

sloppy.  It could be because pricing in the industry craters.  It could be because competition comes out that has better products.  It could be the estimate was just wildly too high by management.  It could be a whole host of reasons.

Q   Was there a risk that the acquisition would never close?

A   Again, I don't think anything -- you know, every acquisition has risk, risk of closing too.

Q   Was there a risk with retaining customers and employees in the face of the acquisition?

A   In my experience, I would assume that is another risk that's possible.

Q   Is there a risk that there would be challenges in expanding Cordis operations globally?

MR. KINNON:  Objection to form.

THE WITNESS:  That could absolutely be a risk.

BY MS. BRANDT:

Q   And Rothschild would have been aware that these issues presented potential risks to the accretion estimate, right?

MR. KINNON:  Objection to form.

THE WITNESS:  I -- I -- I can only speculate that they would have been.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 141

BY MS. BRANDT:

Q   But you would be aware of that, right?

MR. KINNON:  Objection to form.

THE WITNESS:  You know, in my experience, I would -- you know, I -- I try to -- I try to read most -- most things skeptically.

BY MS. BRANDT:

Q   So that's a yes, right?

MR. KINNON:  Objection to form.  Misstates testimony.

THE WITNESS:  International expansion risk is absolutely a risk, yes.

BY MS. BRANDT:

Q   If you read this press release today, would -- and you were covering Cardinal Health, would you generate a view of the amount of accretion that Cardinal Health was likely to achieve at the time of the announcement?

MR. KINNON:  Objection to form.  Calls for speculation.

THE WITNESS:  Can you explain the last part of that?  Would I -- would I generate a view on the 20 cents?

BY MS. BRANDT:

Q   And how much of that would actually be

Page 142

realized?

MR. KINNON:  Same objection.

THE WITNESS:  You know, if I was reading this today and I was interested in Cardinal Health, I would attempt to, you know, figure out how -- how they're getting to that 20 cent number.  Is it, you know, through synergies in, you know, cost of goods sold, in SG&A?  If so, you know, what percentage of sales force or COGS do they think they can cut out?  Is that realistic versus prior deals?  Is there revenue synergies because they can pump, you know, new product through an existing distribution network or not?

I mean, those are all of the types of things I would try to figure out.

BY MS. BRANDT:

Q   And is that the typical exercise when you come across press releases such as this?

A   For myself, that's typically what I would do.

Q   And is that typical for other equity analysts or portfolio managers?

MR. KINNON:  Objection to form.  Foundation.

THE WITNESS:  I -- I can't speculate how

Page 143

everyone does their job.  You know, there's a lot of different ways to be an equity analyst.  That's just what I do.

BY MS. BRANDT:

Q   And is that consistent with what you would have done in the 2015 to 2018 period?

A   As a general rule, yeah.

Q   Okay.  Let's look at the synergies estimate.

The press release says that Cardinal Health:  "...assumes that synergies will exceed $100 million annually by the end of fiscal 2018."

Do you see that?

A   I do.

Q   Did Rothschild have a view, at the time of the announcement, as to whether the Cordis acquisition would lead to synergies for Cardinal Health?

MR. KINNON:  Objection to form.  Again, he said he wasn't there.

THE WITNESS:  Again, I can't speculate on what they thought in March of 2015.

BY MS. BRANDT:

Q   Would Rothschild have considered this synergies estimate when assessing the value of

Page 144

Cardinal Health?

MR. KINNON:  Objection to form.

THE WITNESS:  You know, my guess is if you're -- if you're assessing an acquisition, you would typically assess the synergy estimate.

BY MS. BRANDT:

Q   Reading this now, do you think that this information is something that Rothschild would have focused on at the time?

MR. KINNON:  Objection to form.  Calls for speculation.

THE WITNESS:  Yeah, I can only speculate that this is something that Rothschild would have seen and discussed with the team.

BY MS. BRANDT:

Q   Why is that?

A   Because it was a -- it was a portfolio holding, and, you know, an acquisition of $1.9 billion would certainly be something that people on the team would be interested in knowing about and portfolio managers would want to know about.

Q   And how does Rothschild's investment strategy account for information like this?

MR. KINNON:  Objection to form.  Vague.

THE WITNESS:  Yeah, so, as a general rule,

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 145

as part of the day-to-day job of sort of maintenance research, whether or not we own a name or not, news stories like this typically will get read and discussed amongst the team.

BY MS. BRANDT:

Q   And what do those discussions entail?

A   You know, again, it's -- it's the sort of facts of the deal, and then, you know, as an analyst, to the extent you can, if there are comparable transactions, you'd want to try to provide some context to, you know, things like synergy estimates so that the team can, you know, start to, you know, put in the back of the mind whether or not this -- this deal makes sense or not.

Q   Reading this now, do you think that Rothschild understood that there was a 100 percent chance that Cardinal Health would achieve the $100 million in synergies from Cordis?

MR. KINNON:  Objection to form.

THE WITNESS:  You know, I can't speculate. You know, just me reading it, I -- I think, as we discussed, you know, every analyst, every portfolio manager knows that every investment has risk, and nothing is 100 percent certain.

BY MS. BRANDT:

Page 146

Q   So you understand that there was a risk that Cardinal Health would not ultimately achieve $100 million in synergies?

MR. KINNON:  Objection to form.

THE WITNESS:  That's -- that's my -- that -- that would be my interpretation had I read this in 2015.

BY MS. BRANDT:

Q   And when might Cardinal Health not achieve the full synergies estimate here?

A   You know, again, it's for all of the sort of reasons cited.  It could be, you know, this estimate was too high.  It could be, you know, competition.  It could be they -- they didn't -- weren't able to, you know, cover as much cost as they had forecasted.  It could be revenue synergies that just didn't play out, competition, pricing, regulation.

It -- you know, there's a whole host of reasons.

Q   And it was possible that the acquisition would never close, right?

A   You know, in my experience, no acquisition is always a hundred percent certain to close.

Q   And it was possible that they would

Page 147

encounter challenges with integrating the acquisition, right?

MR. KINNON:  Objection to form.

THE WITNESS:  That would be my interpretation, yes.

BY MS. BRANDT:

Q   And it was possible that there would be risks retaining customers and employees in the acquisition, right?

A   That would be my interpretation, yes.

Q   And it was possible that there was risks involved in expanding the operations globally, correct?

MR. KINNON:  Objection to form.

THE WITNESS:  That would be my understanding, yes.

BY MS. BRANDT:

Q   And an investment manager like Rothschild with lots of experience in acquisitions such as this would be aware of all of those risks, right?

MR. KINNON:  Objection to form. Foundation.

THE WITNESS:  That would be my understanding, yes.

BY MS. BRANDT:

Page 148

Q   At the time of the announcement, are you aware of any discussions at Rothschild of what Cardinal Health would need to do to successfully integrate Cordis?

MR. KINNON:  Objection to form.  He said he wasn't there.

THE WITNESS:  I'm not aware of any.

BY MS. BRANDT:

Q   Did you ever have any conversations about what Cardinal Health would need to do to successfully integrate Cordis?

A   Not that I can recall.

Q   Based on this press release and your experience at Rothschild, do you think that Rothschild would have had an understanding of any challenges at this time, at the time of the announcement, that Cardinal Health might face in integrating Cordis?

MR. KINNON:  Objection to form.

THE WITNESS:  Can you -- can you repeat the first part?  I'm sorry.

BY MS. BRANDT:

Q   Sure.

Based on this press release and your experience at Rothschild, do you think that

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 169

cents until it's proven to be 20 cents.

BY MS. BRANDT:

Q   And that stock price would flow into the ranking system for Rothschild, correct?

MR. KINNON:  Objection to form.

THE WITNESS:  This stock -- stock price is in -- yeah, the stock price is an input into the ranking system.

BY MS. BRANDT:

Q   And do you know if Rothschild was modeling out the accretion estimates in the -- in their model?

MR. KINNON:  Objection to form.

BY MS. BRANDT:

Q   I'm sorry.  I didn't hear your answer.

A   I'm sorry.  I do not know.

Q   Okay.

MS. BRANDT:  All right.  Let's mark Tab 29. That's going to be Rothschild Exhibit 17, and the Bates number here is ROTHSCHILD-00020466.

- - -

(Rothschild Exhibit 17 was marked for identification.)

- - -

BY MS. BRANDT:

Page 170

Q   Have you ever seen this document before?

A   I believe I have.

Q   What is it?

A   This looks like it's an email from Ross Muken, who was at ISI at the time.

Q   To whom?

A   To presumably myself and everyone on his distribution list.

Q   And it's dated November 2nd, 2015, correct?

A   That is correct.

Q   And this is the type of document that you would expect to receive and review in the ordinary course of business?

A   This is that -- this is that type of document, yes.

Q   And this is about eight months following the announcement of the Cordis acquisition, correct?

MR. KINNON:  Objection to form.

THE WITNESS:  Yes.

BY MS. BRANDT:

Q   And how would Rothschild use a document like this in its analysis of Cardinal Health?

A   You know, so, again, I -- this is the type of document that I would possibly discuss with the team as part of our daily research meeting or with

Page 171

the portfolio managers as part of my sort of day-to-day job.

Q   Do you recall receiving this email?

A   Not specifically, no.

Q   Do you recall reviewing this document?

A   Not in 2015 -- or 2016.  Sorry.  2015.

Q   Do you see under Price Target, where it says: "Key Downside Risks"?

A   Yeah.

Q   And then the third key downside risk listed is "Difficulties in integrating/executing against Cordis/Harvard Drug/Metro medium term"?

A   Yes.

Q   What do you understand the -- the analyst to mean by that?

A   So this analyst is trying to lay out what would be a positive risk and what would be a negative risk, and one of those negatives risks is the integration of the recent acquisitions that this company had done.

Q   And what difficulties existed with respect to Cordis?

MR. KINNON:  Objection to form.

THE WITNESS:  So with respect to Cordis, it was all of the sort of typical acquisition risks

Page 172

that we've talked about:  synergies, pricing, competition, expansion, et cetera.

BY MS. BRANDT:

Q   Integration, right?

A   Integration.

Q   Foreign exchange, right?

A   Yeah.

Q   And how do you interpret medium term in this context?

A   You know, me personally, when I think medium term I'm sort of thinking 12 to 24 months down the road.

Q   So that indicates that these risks could be relatively protracted, right?

MR. KINNON:  Objection to form.

THE WITNESS:  In my opinion, that -- that's what medium risk means.

BY MS. BRANDT:

Q   Did you agree with this analyst at the time?

A   I don't recall.

Q   Did you have a view on the Cordis acquisition at this time?

A   Not that I can recall.

Q   Did Rothschild agree, in November of 2015,

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 173

with this analyst?

A   I don't recall.

Q   Is it fair to say that the market generally understood there to be risks relating to the integration of the Cordis business into Cardinal Health?

MR. KINNON:  Objection to form.

THE WITNESS:  You know, in my opinion, yes.

BY MS. BRANDT:

Q   And when did those risks become apparent to you?

A   I don't recall specifically.

Q   Would they have been apparent to you at this point when you received this email?

A   You know, if I recall correctly, I'd only been with Rothschild for a couple months, and at that point, I was still trying to, you know, learn the holdings that were in the portfolio as well as look for new ideas.  So I don't specifically recall whether or not, you know, I had a view on Cardinal at this time.

Q   When do you think those risks became apparent to the market as a whole?

MR. KINNON:  Objection to form.

THE WITNESS:  I can only speculate, and I

Page 174

think every investor probably has -- would answer it differently.  So, you know, some people might have liked the acquisition and thought it was a good deal and made sense for them to expand in -- further into the medical segment, and I'm sure there were other investors that had the opposite view.

BY MS. BRANDT:

Q   And is it fair to say that the risks relating to the Cordis acquisition were changing over time as additional information became available?

MR. KINNON:  Objection to form.

THE WITNESS:  You know, I'd have to probably see what those risks were as they evolved, but I -- you know, again, it's, like, pretty standard set of assumptions with acquisitions in terms of possible risks.

BY MS. BRANDT:

Q   Sorry.  Are you saying that it's standard for the risks involving an acquisition to change as the market gathers more information about risks -- about those risks?

MR. KINNON:  Objection to form.  Misstates testimony.

THE WITNESS:  I think, you know, like we've

Page 175

discussed, I think with any acquisition there's a series of risks, some of which are more relevant maybe than others, but they -- they all still always exist, and it's certainly possible that they would evolve over time in importance.

MS. BRANDT:  Let's mark Tab 30 as Rothschild Exhibit 18 I think we're on, and the Bates number here is ROTHSCHILD-00094884.

- - -

(Rothschild Exhibit 18 was marked for identification.)

- - -

BY MS. BRANDT:

Q   Have you seen this document before?

A   No.  You know, not that I can recall. Possibly.

Q   What is it?

A   Sell-side research note.

Q   And it's an email from someone at Barclay, right?

A   Yeah.

Q   And is your email address Jeff.Agne@Rothschild.com?

A   Yes.

Q   So is this an email to you?

Page 176

A   Yeah.  You know, this is an email from a distribution list of probably hundreds of clients, is my guess.

Q   And it's dated November 16th, 2015, correct?

A   Yes.

Q   And, again, a document that you would expect to receive and review in the ordinary course, correct?

A   Yes.

Q   And this document is dated about eight months following the announcement of the Cordis acquisition, correct?

MR. KINNON:  Objection to form.

THE WITNESS:  Yes.

BY MS. BRANDT:

Q   And how would Rothschild have used a document like this in its analysis of Cardinal Health?

A   So, similarly to the other ones we discussed, this would be possibly reviewed and discussed with other members of the large-cap team.

Q   And let's look at the second page.  After the bolded sentence, where it says: "Increased guidance for FY16 suggests risks/concerns which were

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 177

present just three months ago have abated."
Do you see that?
A   Sorry.  Where is that?
Q   So right after the first bolded sentence on the second page --
A   Okay.  Yeah.  Sorry.  Yes, I see that.
Q   And what do you understand the analyst to mean by that?
A   So my sense is that this analyst believes that the increase in guidance for this company's fiscal '16 suggests that the Cordis risk of integration or accretion risk is -- is starting to -- to, you know, move lower.
Q   And what concerns do you understand the analyst to be referencing?
MR. KINNON:  Objection to form.
THE WITNESS:  I -- I can't speculate. Presumably -- I can't really speculate, I guess. I'd have to go back and see, you know, three months prior to this what sort of, maybe, the concerns in the market were.
BY MS. BRANDT:
Q   And at the time you received this analyst report, did you agree with its conclusions?
A   I don't recall.

Page 178

Q   Did Rothschild agree with its conclusions in November 2015?
A   I don't recall.
Q   And did you have a view of the Cordis acquisition as of this time?
A   No.
Q   Okay.  So let's go back to the fiscal year 2015 10-K that we've already discussed.  I think it is Rothschild Exhibit 11, and we're going to look at page 36.
So on the bottom left, the 10-K says: "Acquisitions can have unanticipated results.  An important element of our growth strategy has been to acquire other businesses that expand or complement our existing businesses.  In fiscal 2015, we spent $503 million to acquire other businesses, and we acquired Harvard Drug in July 2015 for $1.1 billion and entered into an agreement to acquire Cordis for $1.9 billion.  Acquisitions involve risks:  We may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition; future developments may impair the value of our purchased goodwill or intangible assets; or we may encounter unforeseen accounting, internal control, regulatory or compliance issues.

Page 179

Once completed, the Cordis acquisition will subject us to additional risks relating to regulatory matters, legal proceedings, tax laws or positions and, as discussed later in this section, global operations."
Do you see that?
A   Yes.
Q   Do you recall seeing this document?
A   No.
Q   Would you have reviewed it at the time?
MR. KINNON:  Objection to form.
THE WITNESS:  Possibly.  I can't -- can't really say with certainty.
BY MS. BRANDT:
Q   Would Rothschild have received this document?
MR. KINNON:  Objection to form.
THE WITNESS:  Sorry.  This was the 10-K?
BY MS. BRANDT:
Q   That's right.
A   You know, my guess is Rothschild would not have received this via email.  They would have had to go to search and find this document if they wanted to review it.
Q   And would they typically do that?

Page 180

A   You know, I can't -- I can't speculate.  It probably depends on the analyst.
Q   Do you typically do that?
A   You know, it's probably 50/50.
Q   Why is that?
A   You know, sometimes, you know, I'll -- I'll read parts of the 10-K, like an MD&A section and skim over the risk section as well, and sometimes I feel like I know names well enough I just kind of know -- or at least I think I know what the risks are.
Q   Is it generally common practice for analysts at Rothschild to review SEC filings?
A   I would say it's pretty common.
Q   Was it common during the time period of 2015 to 2018?
MR. KINNON:  Objection to form.
THE WITNESS:  I can only speculate for myself.
BY MS. BRANDT:
Q   Was it common practice for you from 2015 to 2018?
A   You know, again, it depends on the name and how well I think I knew it.
Q   Okay.  Do you agree that acquisitions can

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 181

have unanticipated results?

A    Yes.

Q    And you agree that acquisitions involve risk, correct?

A    I agree that almost everything involves risk, yeah.

Q    In 2015 did you and/or Rothschild understand that the Cordis acquisition involved risks?

MR. KINNON:  Objection to form.  Compound.

THE WITNESS:  In -- you know, in 2015 I can't speculate prior to, you know, my time certainly at Rothschild, what the team thought on acquisition risk.

BY MS. BRANDT:

Q    What about when you were at Rothschild?

A    Yeah, so since I'm at Rothschild, just in a general rule, I think -- you know, I think acquisitions involve risk.

Q    And in your experience, what kind of risks are associated with acquisitions?

A    Yeah, so, I mean, again, it's synergy risk, FX risk, regulatory risk, expansion risk, pricing risk, competition risk, innovation risk, et cetera.

Q    Risk that the acquisition wouldn't close,

Page 182

right?

A    Yeah.

Q    Or that Cardinal Health wouldn't be able to successfully integrate Cordis, right?

A    That's certainly a risk with any deal.

Q    And there was a risk that expenses would be greater than expected, right?

MR. KINNON:  Objection to form.

THE WITNESS:  I think that's a risk.

BY MS. BRANDT:

Q    And was there a risk that growth would be lower than expected?

MR. KINNON:  Objection to form.

THE WITNESS:  Yes.

BY MS. BRANDT:

Q    And was there a risk to losing key personnel during the acquisition and integration?

MR. KINNON:  Objection to form.

THE WITNESS:  I think that's a pretty standard risk.

BY MS. BRANDT:

Q    And did Cardinal Health face a risk of losing key customers or contracts during the acquisition and integration of Cordis?

MR. KINNON:  Objection to form.

Page 183

THE WITNESS:  I -- you know, I specifically don't recall, but that seems like a risk with, you know, most acquisitions, yes.

BY MS. BRANDT:

Q    And did Cardinal face -- Cardinal Health face regulatory risk in the context of the acquisition?

MR. KINNON:  Objection to form.

THE WITNESS:  I don't recall.

BY MS. BRANDT:

Q    Do companies generally face regulatory risk in the face of acquisitions?

MR. KINNON:  Objection to form.

THE WITNESS:  As a general rule, I would say yes.

BY MS. BRANDT:

Q    And was there a risk to Cardinal in its expansion into new products or jurisdictions with which the company was unfamiliar?

MR. KINNON:  Objection to form.

THE WITNESS:  Yes.

BY MS. BRANDT:

Q    And was there risk to Cardinal Health relating to how the two company's cultures would be integrated and work together?

Page 184

MR. KINNON:  Objection to form.

THE WITNESS:  That could be a risk, yes.

BY MS. BRANDT:

Q    Was there geopolitical risk?

MR. KINNON:  Objection to form.

THE WITNESS:  You know, I don't -- I don't recall specifically, but that could be a risk.

BY MS. BRANDT:

Q    Macroeconomic risk?

MR. KINNON:  Objection to form.

THE WITNESS:  Yes.

BY MS. BRANDT:

Q    The risk of natural disasters or unforeseeable events?

MR. KINNON:  Objection to form.

THE WITNESS:  Yes.

BY MS. BRANDT:

Q    Any other risks you can think of that would have been present in 2015 that we haven't talked about in relation to the Cordis acquisition?

A    Not that I can think of.

Q    And what kinds of risks do acquiring companies typically face?

MR. KINNON:  Objection to form.

THE WITNESS:  You know, all of the risks

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 185

you just outlined.
BY MS. BRANDT:
   Q   How about the risk of a topping bidder?
   A   Sure.  It's possible.
   Q   How about risks relating to intellectual property?
   A   Yeah.
   Q   And all of the risks that we just discussed, right?
      MR. KINNON:  Objection to form.
      THE WITNESS:  That's right.
BY MS. BRANDT:
   Q   Any other risks that you can think of for acquiring companies?
   A   Not that I can think of.
   Q   And did all those risks apply to the Cordis acquisition?
      MR. KINNON:  Objection to form.
      THE WITNESS:  Sorry.  You broke up.  Don't those risks apply to the Cardis -- Cordis acquisition?  They possibly could.  They could possibly.
BY MS. BRANDT:
   Q   And what impact can these types of risks have on a company's performance?

Page 186

      MR. KINNON:  Objection to form.
      THE WITNESS:  So, you know, failure to integrate can lead to stocks underperforming.
BY MS. BRANDT:
   Q   Can each of these risks lead to stocks underperforming?
      MR. KINNON:  Objection to form.
      THE WITNESS:  They could.
BY MS. BRANDT:
   Q   Sitting here today, do you believe that Rothschild understood in 2015 that the Cordis acquisition involved risk?
      MR. KINNON:  Objection to form.  He's testified he wasn't there for most of 2015.
      THE WITNESS:  I can't speculate what they -- what they understood about Cordis.
BY MS. BRANDT:
   Q   And how about once you arrived in 2015?
   A   So once I arrived in 2015, you know, I think over time I started to follow Cardinal in -- you know, Cardinal Health with a little more detail, and, you know, I think I concluded that there were better opportunities to invest in.
   Q   What do you mean by that?
   A   You know, I think in 2015 into 2016, at

Page 187

least from -- on the drug distribution side of the business, you know, this wave of sort of new generic drugs that had come to the market from -- call it 2012 to 2015 -- had started to wane a little bit, and so at the same time I think there were other investment ideas I had come up on my own since I joined Rothschild that I thought were more interesting.
   Q   What does more interesting mean?
   A   Better investment opportunities.
   Q   Okay.  In evaluating the potential impact of acquisition -- acquisitions in securities that Rothschild carries, is Rothschild typically cognizant of the risks that we've discussed today?
      MR. KINNON:  Objection to form.
      THE WITNESS:  As a general rule, I would say yes.
BY MS. BRANDT:
   Q   Are you aware of any research indicating that acquisitions are often not successful?
   A   Not to my knowledge.
   Q   In your view, is it correct that acquisitions are often not successful?
   A   No, I -- I don't have a view, you know, a general view on acquisitions either being successful

Page 188

or not.  I think it's all on a case-by-case basis.
   Q   Okay.  Do you agree that it's difficult to achieve synergies in connection with an acquisition?
      MR. KINNON:  Objection to form.
      THE WITNESS:  I think it all -- it all depends on what -- what sort of synergies you're trying to achieve.
      MS. BRANDT:  Okay.  Let's mark Tab 18 as Exhibit 19, I think.
      MR. TABAK:  Beth, whenever there's a good time for a break, we've gone a little over an hour.  So I don't know if you want to do it before or after this exhibit.
      MS. BRANDT:  Sure.  Should we take a five-minute break?
      MR. TABAK:  Works for me.  Does it work for you, Jeff?
      THE WITNESS:  That's fine.  12:25?  12:26?
      MS. BRANDT:  Sounds good.
      Can we go off the record?
      MR. TABAK:  Sure.
      THE VIDEOGRAPHER:  Going off the record at 2:21 p.m.
         (Recess.)
      THE VIDEOGRAPHER:  We are now on the record

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 221

negative change in our effective tax rate primarily associated with our Cordis business and reduced its full-year guidance.

In the middle of the first page, do you see where it says: "Our non-GAAP operating earnings came in largely as expected this quarter. However, our non-GAAP EPS was adversely affected by a significant negative change in our effective tax rate primarily associated with our Cordis business"?

A    I see it, yes.

Q    Would anyone at Rothschild have reviewed this press release?

MR. KINNON:  Objection to form.  Same standing objection.

THE WITNESS:  My guess is probably not.

BY MS. BRANDT:

Q    Would you have learned about it in some other way?

A    Probably not.

Q    Would this have factored into the ranking system for Cardinal Health at Rothschild?

MR. KINNON:  Same standing objection.

THE WITNESS:  It's possible that, you know, as a result of this, the sell side, again, made earnings estimate changes, and ultimately those

Page 222

would flow through to our system over time.

BY MS. BRANDT:

Q    So would it have affected Rothschild's assessment of Cardinal Health?

MR. KINNON:  Same objection.

THE WITNESS:  You know, there was no assessment of Cardinal Health at this time.

BY MS. BRANDT:

Q    Even through the ranking system?

MR. KINNON:  Asked and answered.  Same form objection.

THE WITNESS:  The ranking system would -- you know, runs daily.

MS. BRANDT:  I think I'm done with this document.

BY MS. BRANDT:

Q    When was the first time Rothschild became aware of SEIU's pending lawsuit against Cardinal Health?

A    You know, I don't specifically recall that. I think a few months ago Dina Clements reached out to Paul and myself, maybe, and made us aware of it.

Q    And do you know how Ms. Clements came to be aware of the lawsuit?

A    You know, I don't -- I don't know.  She,

Page 223

presumably, got an email about it.

MS. BRANDT:  Okay.  Let's mark Tab 26 Rothschild Exhibit 26.

- - -

(Rothschild Exhibit 26 was marked for identification.)

- - -

BY MS. BRANDT:

Q    Have you ever seen this document?

A    I'm not sure.

Q    Can you tell what it is?

A    Is this a copy of the -- the lawsuit?

Q    Yes, this is the complaint filed by SEIU against Cardinal Health --

A    Okay.

Q    -- that was filed in September of 2020.

Did you or anyone else from Rothschild ever discuss SEIU's complaint against Cardinal Health with anyone from SEIU?

A    Not that -- not to my knowledge, no.

Q    Did you or anyone else from Rothschild ever discuss SEIU's complaint against Cardinal Health with anyone from the law firm Robbins Geller?

A    Not to my knowledge, no.

Q    Did Rothschild ever discuss the lawsuit

Page 224

with SEIU?

A    Not to my knowledge.

Q    Did Rothschild ever discuss the lawsuit with anyone from Robbins Geller?

MR. KINNON:  Asked and answered. Objection.

THE WITNESS:  Not to my knowledge.

BY MS. BRANDT:

Q    Did anyone at Rothschild ever tell SEIU that Cardinal Health committed securities fraud?

A    Not to my knowledge.

Q    Did anyone at SEIU ever tell anyone at Rothschild that Cardinal Health committed securities fraud?

A    Not to my knowledge.

Q    Did Rothschild ever discuss SEIU's fraud allegations against Cardinal Health with anyone from SEIU?

A    Not to my knowledge.

Q    Did Rothschild ever discuss SEIU's fraud allegations against Cardinal Health with anyone from the law firm Robbins Geller?

A    Sorry.  Is -- which -- who -- is Robbins Geller Daniel's law firm?

Q    It's plaintiffs' law firm.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 12, 2022
Jeff Agne

Page 225

A Oh, no. Sorry. No. Sorry.

Q Did anyone from SEIU ever say to you or anyone else from Rothschild that they believed Cardinal Health had committed securities fraud in connection with the company's statements about the acquisition or integration of Cordis?

A Not to my knowledge.

Q At any point, did anyone from SEIU ever say that they didn't want SEIU's money invested in Cardinal Health?

A Not to my knowledge.

Q So even though SE -- SEIU filed this complaint in September 2020, SEIU never notified Rothschild of the -- of the litigation?

MR. KINNON: Objection to form.

THE WITNESS: You know, not to my knowledge.

BY MS. BRANDT:

Q So SEIU never told Rothschild to stop trading in Cardinal Health securities after it filed the complaint?

MR. KINNON: Objection to form. Asked and answered.

THE WITNESS: Not to my knowledge.

BY MS. BRANDT:

Page 226

Q As a fiduciary, if Rothschild believed that Cardinal Health was a dishonest company, would Rothschild invest its clients' money in Cardinal Health stock?

MR. KINNON: Objection.

THE COURT REPORTER: Please repeat the answer.

THE WITNESS: No, that would not be likely.

BY MS. BRANDT:

Q And as a fiduciary, if Rothschild believed that Cardinal Health had committed securities fraud, it wouldn't have invested its clients' money in Cardinal Health stock, would it?

MR. KINNON: Objection to form.

THE WITNESS: I don't believe so, no.

BY MS. BRANDT:

Q All right. Do the folks who work at Rothschild regularly communicate by email?

A Yes.

Q Are there any other forms of communication that are regularly used at Rothschild?

A No. Email is the primary form.

Q Do you typically have virtual meetings?

A Well, since COVID has happened, we've -- we have phone calls and -- and virtual meetings, but --

Page 227

and share emails.

Q How about texting?

A We -- you know, we -- I text with some of my colleagues. It's very rarely about work.

Q Ever about Cardinal Health?

A No.

Q Ever about Cordis?

A No.

Q So is email the primary means of communication at Rothschild?

A Yeah, email or, as you mentioned, maybe, you know, video calls or phone calls, but, primarily, yes, it is email.

Q Do you ever email other people at Rothschild about SEIU?

A You know, maybe an occasional person in marketing just to get, like, you know, time or presentation books or -- or more monthly commentary. Things of that nature like we discussed.

Q Who in marketing would you email?

A You know, it could be, you know, Anna Niziol or someone on her team.

Q Did you ever email other people at Rothschild about Cardinal Health?

A I don't believe so.

Page 228

Q How about Cordis?

A I mean, it's possible that years ago I -- I sent emails regarding Cardinal Health and Cordis to members of the marketing team or members of the large-cap team, but, you know, that would be it. It wouldn't really -- it was unlikely to be anyone outside of that.

Q And who on the large-cap team or in the marketing team would receive those emails?

A So it could be, you know, the whole large-cap team, all the members we've already mentioned, or it could be any members of the marketing team if they were going to do a client call, for instance.

Q And what sort of things would you email them about with respect to Cardinal Health and Cordis?

A It could be, you know, whether or not we added or trimmed our position. It could be sort of a general thesis on why, you know, the name I think was originally recommended, my sort of interpretation of the original thesis, or, you know, in case they get asked about any of the holdings, some of the salespeople like to have just a couple bullet points that they can talk to.

LA Sheriffs' Pension          FINAL          May 12, 2022
v. Cardinal Health Inc.      CONFIDENTIAL      Jeff Agne

**Page 233**

You're a free man.

THE VIDEOGRAPHER: Going off the record at 3:30 p.m.

(Signature having not been discussed, the deposition of Jeff Agne was concluded at 3:30 p.m.)

**Page 234**

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Joan V. Cain, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 12th day of May 2022.

My commission expires:
May 31, 2025

_____
NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA
VIRGINIA NOTARY REGISTRATION NO. 107144

**Page 235**

INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel that notary public signature is required.

Please return a copy of the signed errata within 30 days of receipt, unless otherwise agreed upon by counsel. Once we receive the signed errata, we will distribute an electronic copy to all parties.

RETURN A SIGNED COPY VIA FAX, E-MAIL OR MAIL TO:
FAX: 1-800-825-9055
E-MAIL: janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
PO Box 542
Luck, WI 54853

**Page 236**

NOTICE TO READ & SIGN

This transcript was electronically distributed to COHEN & GRESSLER, LLP to forward to witness.

ACKNOWLEDGMENT OF DEPONENT

I, Jeff Agne, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____  _____
(DATE)   JEFF AGNE

Signed and subscribed to before me this
_____ day of _____ 2022.

_____
Notary Public

## ERRATA SHEET FOR THE TRANSCRIPT OF:

**Deposition of Jeff Agne – May 12, 2022**
Case Name: *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 19-cv-3347
(S.D. Ohio)

| Page/Line | Existing Text | Corrected Text | Reason |
|---|---|---|---|
| 13:3 | analysts | analyst | Transcription error |
| 17:17 | for sell | or sell | Transcription error |
| 17:18 | median | maintenance | Transcription error |
| 17:25 | we've | I've | Transcription error |
| 18:4 | aerospace defense | aerospace and defense | Transcription error |
| 19:2 and 19:3 | You know, not -- I don't think officially.  You know, not -- I don't think officially. | You know, not -- I don't think officially. | Transcription error (duplication) |
| 20:11-12 | be a benchmark | beat a benchmark | Transcription error |
| 30:6 | So much | So, much | Grammar |
| 31:11-12 | I believe the number is between two and 300 million.  We can get you that exact figure. | I believe the number is between two and 300 million.  We can get you that exact figure, which is a little over $300 million. | Correction and supplementation of record |
| 34:13 | Tina | Dina | Transcription error |
| 35:13 | them quarterly in an annual | them a quarterly and an annual | Transcription error |
| 39:8 | I covered | is covered | Transcription error |
| 86:10 | gross value | growth value | Transcription error |
| 103:3 | SMID | mid | Transcription error |
| 120:2 | verse | versus | Transcription error |
| 125:18 | Cohen | Cowen | Transcription error |
| 127:23 | is typically | is not typically | Transcription error |
| 128:7 | name | named | Transcription error |
| 138:21 | in | on | Transcription error |
| 146:15 | cover | cut | Transcription error |
| 155:19 | page at least of emails | page of emails | Transcription error |
| 175:18 | Sell-side | A sell-side | Transcription error |
| 175:19 | Barclay | Barclays | Transcription error |
| 185:19 | Don't | Do | Transcription error |
| 187:6 | up on | up with on | Transcription error |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

I, Jeff Agne, hereby certify that I have read the transcript of my testimony given on May 12, 2021, and that it is true, correct and complete to the best of my knowledge, recollection, and belief, subject to the foregoing list of corrections:

Jeff Agne

JA

Sworn to before me this 3rd day of June, 2022

Notary Public

2

MICHAEL A. GALLIO
NOTARY PUBLIC OF CONNECTICUT
My Commission Expires 07/31/2026