# EXHIBIT 20

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION
-------------------------------------------
LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated,
        Plaintiffs

    v.

CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON,
        Defendants

Case No. 2:19-CVL-03347
-----------------------------------------

REMOTE VIDEO DEPOSITION OF
Gabriel Ristorucci
Individually and as Corporate Designee of 1199 SEIU Health Care Employees Pension Fund
May 17, 2022
Lead: Alexandra P. Sadinsky, Esquire
Firm: Wachtell Lipton Rosen & Katz


FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING  1-800-825-3341

Page 2

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF
    Spencer A. Burkholz, Esquire
    Jennifer N. Caringal, Esquire
    J. Marco Janoski Gray, Esquire
    Christopher R. Kinnon, Esquire
    Megan A. Rossi, Esquire
    Robbins Geller Rudman & Dowd LLP
    655 West Broadway
    Suite 1900
    San Diego, California 92101
    (619) 239-3247

  -AND-

    Nancy M. Juda, Esquire
    Robbins Geller Rudman & Dowd LLP
    905 16th Street, Northwest
    Washington, D.C. 20006
    (202) 822-6762

Page 3

A P P E A R A N C E S   C O N T I N U E D

ATTORNEYS FOR DEFENDANTS
    Alexandra P. Sadinsky, Esquire
    Lauren M. Kofke, Esquire
    Danika L. Kritter, Esquire
    Wachtell Lipton Rosen & Katz
    51 West 52nd Street
    New York, New York 10019
    (212) 403-1000


ALSO PRESENT:
    Jackson Martin, Paralegal
        Wachtell Lipton Rosen & Katz
    Sasa Trivunic, Esquire, Cardinal Health, Inc.
    Nicole Kim, Esquire, Cardinal Health, Inc.


JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    Joan V. Cain, Court Reporter
    Joseph Salinas, Videographer

Page 4

TABLE OF CONTENTS

Witness:
Gabriel Ristorucci


Examination
By Ms. Sadinsky..........................Page 7


Reporter Certificate.......................Page 344

Notice to Read and Sign....................Page 346

Index of Exhibits.........................Page 348

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 5

PROCEEDINGS
- - -
9:59 a.m. EDT
May 17, 2022
- - -

THE VIDEOGRAPHER:  This deposition is being taken via remote connection.  All participants are attending remotely, including the court reporter and videographer.  The deposition video recording quality is relying on the witness's individual bandwidth.

Here begins Media No. 1, Volume 1 in the deposition of 1199SEIU (b)(6) designee, Gabriel Ristorucci, in the matter of Louisiana Sheriffs' Pension & Relief Fund versus Cardinal Health, Incorporated.

Today's date is May 17th, 2022.  The time is now 10 a.m.  My name is Joseph Salinas, the videographer.  The court reporter is Joan Cain from Jane Rose Reporting, New York, New York.

Counsel, please identify yourselves and state whom you represent, beginning with the party noticing this deposition.  Please speak slowly for the court reporter.

MS. SADINSKY:  Alexandra Sadinsky from

Page 6

Wachtell Lipton for Cardinal Health and the rest of the defendants.  With me I have Lauren Kofke, Danika Kritter, and Jackson Martin.

MR. BURKHOLZ:  Spence Burkholz, Robbins Geller, on behalf of the plaintiffs, and I have with me Jen Caringal, Megan Rossi, Marco Janoski, and Chris Kinnon, and I believe Nancy Juda from my firm.

THE COURT REPORTER:  Good morning.  My name is Joan Cain.  I am a court reporter and a Notary Public in the Commonwealth of Virginia.  I am the deposition officer for today's deposition.

All parties in today's deposition are appearing remotely to comply with the guidance of the Centers for Disease Control in response to the COVID-19 pandemic occurring in our country at this time.  I have collected everyone's appearances off the record, and they will appear on the appearance page of the transcript.

Before we proceed, I will ask counsel for today's deposition to stipulate on the record that this deposition officer may swear in the deponent, even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

Page 7

Let's start with the noticing attorney, please.

MS. SADINSKY:  We so stipulate.

MR. BURKHOLZ:  Plaintiffs stipulate.

GABRIEL RISTORUCCI, having been duly sworn under penalties of perjury by the Notary Public, was examined and did testify as follows:

THE COURT REPORTER:  Thank you.  Please begin.

EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MS. SADINSKY:

Q   Hi, Mr. Ristorucci.  I'd like to start by covering some parameters for today.  It's my job to ask you questions, and it's your job to answer them as best as you can.  If you don't understand a question, please tell me, so I can try to rephrase or explain.  Please give audible, verbal responses to the questions.  The transcript cannot reflect if you're merely nodding your head.

When I refer to "plaintiff," "lead plaintiff," or "SEIU," I'm referring to 1199 SEIU Health Care Employees Pension Fund.  Okay?

A   Okay.

Q   Remember that you're testifying on behalf

Page 8

of SEIU.  There will be times when I'm also asking for your personal knowledge or experience as an employee of SEIU.  If you're ever unsure whether I'm asking you a question personally or as SEIU's representative, please ask me, and I'll be happy to clarify.

If you need to take a break, just let me know.  We can take a break any time as long as there's not a question pending.

Your lawyer may object to certain of my questions for purposes of the record, but unless your lawyer instructs you not to answer, you should fully and completely answer the question.

Do you understand that you're testifying under oath today just as you would be testifying under oath at a trial?

A   I do.

Q   Is there anything that would prevent you from testifying truthfully today?

A   No, there's not.

Q   Is there any reason, medical or otherwise, why you can't testify completely and accurately today?

A   No.

Q   Is anyone present with you?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 9

A   No.
Q   Do you understand that while we're on the record, you must put away and not look at electronic devices not being used for this deposition?
A   I do.
Q   Do you understand, while we're on the record, there shall be no other programs displaying images on your screen other than the programs being used to conduct the deposition and to show deposition exhibits?
A   Yes.
Q   Do you currently have any other programs open on your computer screen?
A   Oh, hold on.
No, I do not.
Q   No email?
A   No email.
Q   No notes?
A   No notes.
Q   No text message?
A   No text message.
Q   And do you understand that while we're on the record, you will not communicate with anyone except as reflected on the record?
A   I understand that.

Page 10

Q   Okay.  So let's -- let's begin.
Have you been deposed before?
A   I have not.
Q   Have you testified in court before?
A   I don't believe so, no.
Q   You don't believe so?
A   I don't -- I have no recollection of ever having testified in court.
Q   Have you been a defendant in a lawsuit before?
A   No.
Q   Have you been a potential witness in a lawsuit before?
A   No.
Q   Okay.  Are you sure?
A   I'm sure.
Q   Do you understand that you've been designated as a witness to testify on behalf of SEIU with regard to certain topics identified by the parties in advance of this deposition?
A   Yes.
MS. SADINSKY:  Let's mark as Exhibit 1, Tab 2, the 30(b)(6) deposition notice.
- - -
(Deposition Exhibit 1 was marked for

Page 11

identification.)
- - -
BY MS. SADINSKY:
Q   And Jackson will put it on the screen, and he'll also drop it into the chat for others to open up on their own screen.
Let's -- do you recognize this document?
A   Yes, I've seen it before.
Q   Let's turn to page 4.  This is Exhibit A. Do you see that Exhibit A lists topics that will be covered at today's deposition or instructions for today's deposition?
A   Yes.
THE COURT REPORTER:  I'm sorry.  I didn't hear the answer.
THE WITNESS:  I said yes.
BY MS. SADINSKY:
Q   Let's turn to page 7.  So at the bottom of page 7, under header 2, it says:  "Topics for Examination Upon Deposition."
Do you see that?
A   Yeah.
Q   So I want you to just read through those, and you can just let us know when we need to turn the pages.

Page 12

A   I've read it.
I've read it.
I've read it.
I've read it.
I've read it.
Q   Are you prepared to testify about all the topics listed on the notice?
A   Yes.
Q   Are there any that you are not prepared to testify about?
A   No.
MS. SADINSKY:  Let's put that document down so we can make the witness full screen.
BY MS. SADINSKY:
Q   What did you do to prepare for this deposition?
A   I had some conversations with our counsel. I reviewed documents related to the -- the action. I spoke with our -- Jeff Stein, our general counsel -- former general counsel.  I also spoke with members of our investment group, reviewed some of the elements of the documents that were produced, and worked on helping to produce some of those documents.
Q   You said you had convos with your

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 13

counsel -- conversations with your counsel, correct?
A   Correct.
Q   Who did you have conversations with, what counsel?
A   Our counsel at Robbins Geller Rudman & Dowd, Spence Burkholz and Nancy Juda.
Q   Who was the second person?
A   Nancy Juda.
Q   How many times did you speak to Spence and Nancy Juda in preparation for today's deposition?
A   Three times.
Q   Were they -- were those meetings in person or virtually?
A   They were virtual.
Q   On the phone or on video?
A   Video.  Some video.  Some phone.
Q   Of the three meetings, were two video, one phone, or two phone, one video?
A   They were two phone, one video -- excuse me.  Two video, one phone.  I'm actually realizing we also had an in-person meeting several months ago that was more general, not -- not necessarily directly in preparation for the deposition.
Q   So those four meetings, are those the only four times you've spoken to someone from Robbins

Page 14

Geller?
A   No.  We've spoken other times.
Q   So let's start with the in-person meeting. When was that?
A   That was I believe in January or February of this year -- or actually, no. December of last year.
Q   Okay.  And what was the purpose of that meeting?
A   That was just general, you know, discussion about how -- you know, how litigation would proceed, what would -- the steps involved.
Q   Where was that meeting?
A   That -- that was in -- that was at our -- our offices here.  I do not -- that was -- that was Nancy Juda, who is here.
Q   Is Nancy Juda the only Robbins Geller attorney?
A   I believe so, yes.  Yes.
Q   Who from SEIU was at that meeting?
A   I was, our counsel, other lawyers in our general counsel's office, Jeff Stein and Suzanne Metzger were there, and Peter Andreou from our investment group was there.
Q   Were there any trustees there?

Page 15

A   No trustees were there.
Q   How long was the meeting?
A   I'd say it was under an hour.
Q   And that was at your offices in New Jersey?
A   In New York.
Q   Okay.  So then you said you had two video and one phone.  When were those?
A   The one phone was -- the phone call was a few minutes before this, about 9:45 today.
Q   Who was on it?
A   Nancy Juda and Spence Burkholz, our counsel.
Q   Anyone from SEIU?
A   Nobody besides myself.
Q   And how long was it?
A   About ten minutes.
Q   Okay.  And then the two video?
A   One of those was on May -- earlier this month.  I think it was May 10th.
Q   Who was involved?
A   It involved Nancy Juda and Spence Burkholz.
Q   Anyone from SEIU?
A   No one besides myself.
Q   How long was it?
A   About an hour.

Page 16

Q   And when was the second video?
A   That was the second one.  The previous one was at the -- within the last couple of weeks of April.
Q   Okay.  And who was involved?
A   Myself, Spence Burkholz, and Nancy Juda.
Q   No one else?
A   No one else.
Q   And who -- and how long was it?
A   That was about, I would say, an hour and a half to two hours.
Q   Okay.  And then you said you reviewed documents, right?
A   That's correct.
Q   How many documents?
A   I'd say about 20 to 30 documents.
Q   What types of documents?
A   The responses, filings related to the litigation, Investment Management Agreements, some communications between investment managers in our investment group, and some documents relating to causes of action -- well, some of the publicity around the Cardinal Health litigation.
Q   What do you mean by that?
A   Well, they describe the -- what the -- what

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 17

the allegations were or what the -- sort of what the announcements had been by Cardinal Health or different public announcements and some of the responses.

Q   Okay. So you reviewed Cardinal Health's disclosures?

A   Yes.

Q   Like 10-Ks, 10-Qs?

A   No, I did not review their 10-Ks or 10-Qs. In fact, they're probably more accurately described as some of the excerpts of public announcements by Cardinal that were in the various filings related to the case.

Q   Okay. So you reviewed allegations of the complaint?

A   Right.

Q   And you said you reviewed some communications. Were all of the communications you reviewed produced?

A   Yes.

Q   Did you review any minutes?

A   No.

Q   Okay. You said you also spoke with Jeff Stein in preparation for today, correct?

A   That's correct.

Page 18

Q   When was that?

A   Spoke probably a few times. Late last month, during -- probably in December of 2021 and probably periodically between then.

Q   Were lawyers involved?

A   Well, we're both lawyers.

Q   Sorry. Were -- was outside counsel involved?

A   No.

Q   And you said you spoke last month and then before that, December 2021?

A   That's correct.

Q   Last month was the -- the focus of your discussion this deposition?

A   Well, yes. I'm mentioning -- I speak to him intermittently about many issues, but that specifically came up last month.

Q   Did you have a specific meeting about it?

A   Just a conversation, where that was one of the issues that we -- that we discussed.

Q   Did you review documents related to the litigation during that conversation?

A   We discussed the -- the process of deciding how to -- of entering into the litigation and our participation.

Page 19

MR. BURKHOLZ: Counsel, I'm just going to step in here and you're now getting into privileged communications, and I'm sure you're aware of that. I'm going to give you a little leeway about process, asking questions about process without getting into the substance of communications.

MS. SADINSKY: Understood. Thanks.

BY MS. SADINSKY:

Q   Okay. You said that you also spoke with the investment group, correct?

A   Correct.

Q   Who from the investment group?

A   I spoke with Dilay Altiner and Peter Andreou.

Q   When did you speak to both of them?

A   I spoke with Dilay in the first week of May.

Q   For how long?

A   About an hour.

Q   In person?

A   Over the phone.

Q   Was that the first time you had spoken to her?

A   About -- specifically about the litigation or -- we've worked together frequently.

Page 20

Q   Was that the first time you spoke to her about the litigation?

A   No. We've spoken previously about what's involved in document production, other parts of the litigation.

Q   Did you ever speak to her about Cardinal Health prior to this litigation?

A   Never.

Q   And Peter Andreou, did I say that correctly? When did you speak with him?

A   I spoke with him in April and March. We had -- I mean, we speak -- we speak rather frequently, but I'm thinking about when the topic of the Cardinal litigation came up first time, April, March, or maybe earlier in the year.

Q   Okay. And was that in person? On the phone?

A   More likely in -- over the phone. There may have been some in person, but for the most part, people are working remotely now and sometimes they're in the office.

Q   Okay. For any of the meetings that you had with Dilay Altiner or Peter Andreou, did you look at -- about this litigation, did you look at any documents related to the litigation together?

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 21

A   No.
Q   Okay.  And to the best of your knowledge, all of the documents that you looked at are either publicly filed or were produced in this litigation; is that right?
A   That's right.
Q   Have you discussed this deposition with anyone other than SEIU's investment group, Spence Burkholz, Nancy Juda, and Jeff Stein, and I think you said one other person?
A   Suzanne Metzger.
Q   Suzanne Metzger, have you spoke about this deposition with anyone else?
A   No.
Q   Have you discussed the other -- have you discussed with anyone the other depositions that have taken place in this case?
A   I'm not sure what you mean.
Q   Did you know that other depositions have taken place in this case?
A   Yes.
Q   Okay.  Did you discuss those with anyone?
A   No -- well, not the content, just that there'd been depositions in the case.
Q   Did you discuss who was deposed in this

Page 22

case?
A   I know that some managers have been -- investment managers have been deposed.
Q   Do you know which ones?
A   That I do not know.
Q   And --
A   I know who's scheduled to be deposed, but I don't know specifically -- the discussion did not relate to specific managers.
Q   So you discussed -- you discussed who we were scheduling depositions of, but not the content of those depositions, correct?
A   Correct.
      MR. BURKHOLZ:  Objection to form.
BY MS. SADINSKY:
Q   Did you review any deposition transcripts?
A   No.
Q   Did you do anything else to prepare?
A   Do anything else besides?
Q   Meeting with your -- meeting with your counsel, meeting with the investment group, looking at filings, investment manager agreements, communications with investment managers.  Other than the things that we've just discussed, have you had done anything else to prepare for today's

Page 23

deposition?
A   I reviewed retainer agreements and relationships with our attorneys and some of the process involved in -- in the decision-making to enter -- enter the litigation as -- in the role of the lead plaintiff.
Q   If you had to give your best estimate, what's the total amount of time you spent preparing for your deposition today?
A   I would say about eight hours.  Eight to ten hours.
Q   Okay.  Can you describe your educational background?
A   Sure.  Would you -- where would you like me to start?
Q   Where did you go to college?  When did you graduate?  When did you go to law school?  When did you graduate?
A   Sure.  I graduated from college, Oberlin College in 1995.  I went to law school from 2001-2004, graduated in 2004 from Cornell Law School, and then in 2013, I obtained an LLM in tax from NYU Law School.
Q   Other than your law degrees, do you have any other degrees or certifications?

Page 24

A   No, I do not.
Q   Do you have any securities-related licenses?
A   No.
Q   Any other professional licenses?
A   No.
Q   Are you currently a member of the state bar?
A   New York State Bar.
Q   Only New York?
A   Only New York.
Q   Can you walk me through your post -- or post-law school employment history?
A   Sure.  I -- after law school, I worked for UBS in their -- as a lawyer in their fixed income group.  It was more a compliance role -- legal and compliance role.  After that I worked at a law firm called Thacher Proffitt & Wood on -- in structured finance.  Then I worked for Change to Win.  I left there in 2008 perhaps, which is a -- at the time was a labor federation.
      Then in 2011 I moved back to New York, and I worked for -- briefly for a law firm called Gladstein Reif & Meginniss, and then for a not-for-profit group called the New -- it's now

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 25

called the New Economy Project.

After that I got my -- I obtained the LLM in taxation from NYU.  Upon completion then I worked for Sidley Austin Brown & Wood for, I think, three years, and then I came -- joined here in 2018.

Q   When in 2018 did you join SEIU?

A   March of 2018.

Q   How did you come to join SEIU?

A   I reached out -- well, I had some offers from some other law firms, but I was thinking that I'd be interested in going in-house.  I reached out to Jeff Stein, who I knew previously, to see if they were looking for anybody with a skill set that aligned with my skill set, and it turned out that it worked out, and I decided that I would like to work here, and so I accepted an offer to work here.

Q   How did you know Jeff Stein previously?

A   Before -- well, that's a good question. I -- well, actually, when I was in NYU, I -- I had been meeting with various folks just to figure out next steps or, you know, what sort of -- what sort of positions I might be looking for, and he was just somebody who was recommended to meet with.  We got along and ended up keeping in communication with each other, and that's how -- basically, how our

Page 26

relationship --

Q   I'm sorry.  What year did you graduate from NYU again?  2011?

A   I think May of 2013 or '14.  It's not -- in the --

THE COURT REPORTER:  I didn't hear the last few words.

THE WITNESS:  I think it was May of 2013, but it could have been 2014.

BY MS. SADINSKY:

Q   Okay.  So you've known Jeff Stein since May 2013?

A   Mm-hmm.

Q   And since that initial meeting, how often would you say you kept in touch with him between 2013 and the time you started at SEIU?

A   Probably two or three emails -- or just some emails, I would say.  Maybe a handful of times a year at most.

Q   You emailed a few times a year?

A   Yeah.

Q   What's your current job title?

A   Assistant general counsel.

Q   And was that the job title you had when you began in May 2018?

Page 27

A   Yes.

Q   How many people are in the -- how many people are assistant general counsels?

A   There's two other assistant general counsels and a general counsel.

Q   Okay.  Who -- can you name the two other assistant general counsels?

A   Yes.  The -- one of them is Elizabeth Chesler, and Ian Weinberger.

Q   And the general counsel is Jeff Stein?

A   Jeff's -- he's now -- he's a consultant counsel.  The general counsel is Suzanne Metzger.

Q   What is Mr. Stein's role now?

A   He advises on issues that come up that he's been -- he has -- that he has experience in or he's -- but he -- he's worked at -- he was general counsel at the fund for well over 20 years, so it's been helpful to have him advise us on why -- why certain structures may have been in place, just a general -- general -- answer, basically, the questions that we work on, and he tends to work on certain larger provider relation agreements.

Q   And how -- how many hours would you say he works a week?

A   I don't know for sure how many hours he

Page 28

works per week.

Q   Does he work less than when he was general counsel?

A   Yes.

Q   When did Suzanne Metzger take over as general counsel?

A   I think June of 2021.

Q   If you had to compare the amount of time, you know, you -- you worked with Jeff Stein before he switched to this consultant role to the amount of time you work with him now, how would you say it compares?

A   I'd say I work with him less than I -- I work less now than I did previously.

Q   How much less?  50 percent less?  75 percent less?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  If I were to try and put a number on it, I would probably say about 20 percent of the time currently than we used to -- than I used to, 20 to 25 percent.

BY MS. SADINSKY:

Q   Do you work with --

A   25 percent of what I used to work, not a 25 percent reduction.  25 percent of the total we

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 29

worked together.

Q   Okay.  So a 75 percent reduction?

A   I guess, yes.  I don't know how -- how you would -- yes, 75 percent reduction.

Q   Okay.  So your current job title is assistant general counsel, correct?

A   Correct.

Q   Is that role for any funds other than the 1199SEIU Health Care Employees Pension Fund?

A   I'm sorry.  Could you repeat that?

Q   Is your role specifically for this plaintiff, 1199SEIU Health Care Employees Pension Fund, or is it for other funds within the service employees union -- I forget exactly what it's called.

A   Okay.  So, my direct -- I work for the 1199SEIU Benefit & Pension Funds, so that encompasses a number of funds including training funds, healthcare funds, and the pension fund, a large -- and then some labor management cooperation act firms -- organizations.

Q   How many organizations do you work for?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I work for -- my direct employer is the National Benefit Fund.  We service

Page 30

as -- as the general counsel's office for the National Benefit Fund.  We service these other funds as well.

BY MS. SADINSKY:

Q   How many funds is it?

A   It's about 22 other funds.

Q   And so the lawyers for the National Benefit Fund and those 22 other funds are you, Elizabeth Chesler, Ian Weinberger and Suzanne Metzger?

A   Yes, and Jeff Stein.

Q   And Jeff Stein.  Is there anyone else involved?

A   In our -- well, in our general counsel's office?  There's a general counsel's office.  Then there's also -- there may be some other lawyers in the organization.  We have a legal operations organiz- -- a group that handles more operational issues.  We tend to focus, not mostly, but not exclusively, on regulatory compliance and some specific -- on some specific groups within the funds.

Q   Do you report to Suzanne Metzger?

A   Yes.

Q   Does Suzanne Metzger report to anyone?

A   Well, she's general counsel, but,

Page 31

ultimately, she reports to the trustees and to the executive director of the funds.

Q   Who's the executive director?

MR. BURKHOLZ:  Objection to form.  Which fund?

BY MS. SADINSKY:

Q   Are there multiple executive directors, or is there one executive director for all of the National Benefit Fund?

A   That would be Donna Rey.  She's the executive director and CEO.

Q   Of the National Benefit Fund?

A   Yes.

Q   Are there executive directors for other funds, the 22 other funds that are within the National Benefit Fund?

A   Yes.

MR. BURKHOLZ:  Objection to form.
Go ahead.

THE WITNESS:  So there's no -- the training funds, what we call the training and employment funds, there's a few sort of what are known as education benefit funds, and then some labor management cooperation entities.  Those are -- fall under what we call the training employment funds,

Page 32

and the executive director for that entity is Sandi Vito.  Suzanne does not report directly to Sandi Vito.

The -- there's also childcare funds, which provide childcare benefits for members of, you know, people who are -- people who are beneficiaries pursuant to Collective Bargaining Agreements.  The name of that -- the executive director of that -- they have their own executive director.  That is Rossmery Dais, and neither one of those funds has anything to do with investing.

BY MS. SADINSKY:

Q   How many funds have to do with investing?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  So when the funds -- so currently the only funds that have -- somewhat depends how you define "investing."  If you -- all these funds have assets.  Most of them have assets mostly in a form that are not -- we would not consider investments.  They're just sort of, like, very safe money markets or mutual funds or something like that.

The pension funds have investments that are much more diverse, much larger because they have to keep a much larger pool of assets that earn money on

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 33

an ongoing -- or funds for ongoing future liabilities in a way that the other funds do not, and there are three pension funds.

BY MS. SADINSKY:

Q   What are those three pension funds?

A   There's the Health Care Employees Pension -- well, 1199 SEIU Health Care Employees Pension Funds -- Health Care Employees Pension Fund, which is the fund we're talking about.  There's the 1199SEIU Home Care Employees Pension Fund, and then there's the 1199SEIU Greater New York Pension Fund.

Q   Is the general counsel's office for the lead plaintiff 1199 the Home Care Fund, I'll just call it, and the Greater New York fund -- is the general counsel for those three funds Suzanne Metzger?

A   Yes.

Q   And the executive director and CEO is Donna Rey?

A   Yes.

Q   And how long has Donna Rey been in her position?

A   About a year.

Q   And who was the executive director before Donna Rey?

Page 34

A   Mitra Behroozi.

Q   And what is Mitra Behroozi's role now?

A   She has retired.  I don't know the -- what her exact current role is.

Q   How long was she in her role as executive director?

A   Her time -- she started well before I did, but I would say about 15 years, but that's an estimate.

Q   And how long has Elizabeth Chesler been assistant general counsel?

A   Seven months, eight months.

Q   How about Ian Weinberger?

A   About ten or 11 months.

Q   So are they new additions to the general counsel's office?

A   Compared to other people, yes, they're newer.

Q   Since the time you joined SEIU in March 2018, has there been anyone else in the general counsel's office?

A   Yes.  Jennifer Weekley.

Q   Jennifer?

A   Weekley.

Q   And how long was she there?

Page 35

A   So that -- I think about five years.

Q   When did she leave?

A   She left in June of 2021.

Q   Okay.  So at the time -- and I just want to make sure I have this right.

At the time that you began, the general counsel's office was Jeff Stein as general counsel and the assistant general counsels were yourself, Suzanne Metzger, and Jennifer Weekley, correct?

A   That's correct.

Q   And up -- and that was everyone in the general counsel's office up until -- up until June 2021, correct?

A   Correct -- well --

Q   And in --

A   Ian Weinberger started, I believe, in early June 2021.

Q   Okay.  So in June 2021, the general counsel's office changed.  Jeff Stein moved to a consulting role, Suzanne Metzger became general counsel, and the assistant general counsels were yourself and Ian Weinberger, correct?

A   Yes.

Q   And then sometime in late 2021, Elizabeth Chesler joined as well?

Page 36

A   Yes.  So let me just supplement that.  I believe Ian left in -- joined -- excuse me -- early to mid June of 2021, and I believe Jennifer Weekley left late May, early June 2021.

Q   Okay.

A   There was no overlap, but I'm just not a hundred percent sure of the exact dates.

Q   Okay.  So between late May and early June, the general counsel's office was Jeff Stein, Suzanne Metzger, and you, and no one else, correct?

A   That's -- that sounds correct.

Q   What are your responsibilities in your role?

A   So I work with our finance group, our investment group, and generally with our legal ops group when they raise certain issues on regulatory compliance, contract review, worked with -- working with them on -- worked with our finance group around some aspects related to audit and other issues with tax compliance.

In -- other than that, I would say mostly we focus on tax, ERISA compliance, and then, in addition, certain issues that are unique to health and benefit funds, including sort of -- you know, isolated topics like HIPPA compliance and

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 37

cybersecurity issues as they pop up and become more important, both on an ERISA basis and just because they've become really important over the past ten years or so.

Q   And what about Elizabeth Chesler and Ian Weinberger, do they have the same types of responsibilities that you do?

A   Their roles are -- yeah, I mean, in general, we have similar responsibilities.  I was just sort of thinking -- I also tend to work with our education funds, and I don't work with our childcare funds.  I would say Elizabeth and Ian work -- tend to work more on the healthcare funds than I do.  Ian tends to work more with -- on HR functions, and on litigation generally.

Q   Ian does?

A   Yes. Litigation when we are either defending a claim or bringing a claim directly, for the most part -- actually, not when we're bringing a claim.  Responding to claims.  We're responding to appeals processes related to benefit denials or objections from medical providers.  Things like that.

Elizabeth works also on litigation.  She's also been doing work on major service provider

Page 38

contracts, medical service providers.

Q   Do Ian and Elizabeth report to you?

A   No, they don't.

Q   They report to Suzanne Metzger?

A   Yes.

Q   What are Ms. Metzger's responsibilities as general counsel?

A   I wouldn't want to speak for her what she considers her responsibilities, but she's general counsel for the funds, and so other -- that raises a whole host of issues.  Both, she has to -- like, the other assistant general counsels report to her.  Then she also works directly with trustees on certain issues.

We have our health and -- our health benefit funds, our large funds, and there's a number of regulatory issues that any sort of entity that provides -- reimburses medical providers has to comply with.  There's internal processes related to providing members or beneficiaries with their benefits and what the level of benefits -- when there are denials, what is the process for ensuring compliance with both the responsibilities of a benefit fund as an ERISA entity that has to meet a fair amount of diligence and due process, and then

Page 39

also regulatory things like compliance with ACA regulations as they come, as they're developed and implemented.

So what she considers her -- what are the main functions of her role, she does not report to me, so I would not be able to say for certain now.

Q   You say she works directly with the trustees, correct?

A   Yes -- well, she reports to the trustees.

Q   How often does she report to the trustees?

A   I don't know.

Q   Have you ever met with the trustees?

A   Yes.

Q   How often?

A   So there are regular meetings.  When you speak trustees, which trustees are you speaking -- asking about?

Q   Any trustees.

A   So for the -- for the healthcare employees pension funds, they have at least biannual trustee meetings, and at those meetings I will be there and interact with them.  There's also the investment committees which have been -- or the investment committee of the healthcare employees pension fund has been delegated fiduciary responsibility over

Page 40

certain aspects of the investment portfolio.

They -- we have monthly meetings scheduled.  They don't always occur, but at that point we also meet.  Obviously, for the past couple of years that's been through Zoom for the most part, rather than in-person.  There's also conversations that occur over the phone that sometimes involve trustees, sometimes involve the trustee counsel.

Q   Who is the trustee counsel?

A   So the -- the board of trustees are appointed by two different groups:  One, the employers that are -- for the healthcare employees pension fund, the League of Voluntary Hospitals appoints trustees on behalf of -- pursuant to the trust agreement, and the 1199 SEIU healthcare workers use a set of points -- use a set of trustees.

They each -- each set of trustees has equal representation, and each set of trustees -- there's counsel that are considered co-counsel, and that's -- the league has -- the League of Voluntary Hospitals has their employees' counsel directly, and then there's a firm called Levy Ratner that tends to represent each -- the union trustees or work with union trustees, but they're co-counsel to the

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 41

trustees generally.

Q   Okay.  So -- so the union trustees are represented by which firm?

A   I would -- I wouldn't say that they're represented by them.  They tend to work with them also on other -- the co-counsel all work -- they represent the trustees as a whole.  They work together on issues relating to the pension fund: Meeting their ERISA requirements in terms of monitoring and other issues that might arise, and that's Levy Ratner for -- and that's --

Q   Okay.  Say the -- I'm sorry.  I just -- I can't understand the name of the firm.

A   L-E-V-Y, Levy, and then the second name, you know, Ratner, R-A-T-N-E-R.

Q   Okay.  And that is -- they work with the union trustees, correct?

A   Yes.

Q   Who's the -- who's the counsel that works with the employer trustees?

A   Jenna Hayes, J-E-N-N-A, last name, Hayes, H-A-Y-E-S.

Q   And how long have they been working with them?

MR. BURKHOLZ:  Objection to form.  Are you

Page 42

asking about working for the fund?  Is that the question?

BY MS. SADINSKY:

Q   How long -- how long has Levy Ratner been providing legal services to the union trustees?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  They're -- let me just be a little clearer.  They are on retainer.  They're on retainer by the -- well, the benefit fund itself has the -- pension fund has them as a retainer -- on retainer, each set of attorneys.  They tend to work with the employers generally.

So they've been representing -- they've been on retainer a number of years.  I don't know how far it goes back, but -- and Jenna Hayes has been working with the employer trustees for about two years, two or three years.

BY MS. SADINSKY:

Q   Who was working with the employer trustees before that, as counsel?

A   I don't know actually.  I think they might have only had outside counsel, but I'm not sure.

Q   And then Levy Ratner you said has been working for them for a while.  Has Levy Ratner been working with them before you started at SEIU?

Page 43

A   Yes.

MR. BURKHOLZ:  Objection to form.

BY MS. SADINSKY:

Q   So since before March 2018, correct?

A   Correct.

Q   Okay.  And how long has Ms. Metzger been at SEIU?

MR. BURKHOLZ:  Asked and answered.

THE WITNESS:  I'm not -- I'm not certain how -- I think about 15 years.

BY MS. SADINSKY:

Q   And what did she do before joining SEIU?

A   I'm -- I'm not familiar with what she did before.  I can speak -- I couldn't speak precisely as to what she did before she was at SEIU.

Q   Do you know what Jeffrey Stein did before he joined SEIU?

A   I believe -- I'm not certain.

Q   Has Ms. Metzger been deposed before on behalf of SEIU?

A   I'm -- I'm not sure.

Q   Has Mr. Stein?

A   I'm not sure.

Q   Has Ms. Chesler?

A   I don't believe so.

Page 44

Q   Mr. Weinberger?

A   I don't believe so either.

Q   Mr. Weekley -- or Ms. Weekley?  Sorry.

A   Ms. Weekley, I couldn't speak to that.

Q   So you don't know if Mr. Stein, Ms. Metzger, Mr. Weinberger, Ms. Chesler, or Ms. Weekley have ever been deposed on behalf of SEIU?

A   I don't know.

Q   Has Ms. Metzger testified in trial on behalf of SEIU?

A   I don't know.

Q   Mr. Stein?

A   I don't know either.

Q   Ms. Weinberger -- Mr. Weinberger?

A   I don't know -- oh, well, I mean, he's been here -- I suspect no for those.  Ms. Chesler and Mr. Weinberger, I'm not aware of them having testified on behalf of SEIU.

Q   So for Mr. Weinberger and Ms. Chesler, you're not aware of them having testified, and for Mr. Stein and Ms. Metzger, you don't know, correct?

A   That's correct.

Q   And then Ms. Weekley you don't know either?

A   That's correct.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 45

Q   Do you have any investment experience?

MR. BURKHOLZ: Objection to form. Vague.

THE WITNESS: Yes, can you be a little more precise?

BY MS. SADINSKY:

Q   Sure.

Have you served as an investment analyst, done any sort of work assisting investment analysts previously?

MR. BURKHOLZ: Same objection to form. Vague.

THE WITNESS: So as -- as a professional, I've not dispensed investment advice.

BY MS. SADINSKY:

Q   Okay. And you said as a professional, but what about personally?

A   Oh, I mean, I assume you don't care that I worked with my 401(k), but the -- the -- I did work at a bank and I did work for a -- I did work at a law firm, and sometimes we get asked legal questions. I don't know if investor -- investment analysts ever utilized that information in some way of doing some diligence on an investor -- some sort of investment. I don't know.

But I -- it's not -- I've never thought of

Page 46

myself as dispensing investment advice or working as an investment analyst.

Q   Does Mr. Stein or Ms. Metzger have any professional investment experience as we've redefined it in this conversation?

MR. BURKHOLZ: Objection to form.

THE WITNESS: I don't know what their -- their prior investment -- I don't know -- I mean, their history, what they -- what roles they've played in investments.

BY MS. SADINSKY:

Q   Same answer for Mr. Weinberger, Ms. Chesler, and Ms. Weekley?

A   Correct.

Q   Have you ever been convicted of a crime?

A   No.

Q   Has Mr. Stein, Ms. Metzger, Mr. Weinberger, Ms. Chesler or Ms. Weekley?

A   I -- I don't know for certain. I suspect no.

Q   You said earlier that you've never been a defendant in a lawsuit, correct?

A   Correct.

Q   Has Mr. Stein?

A   I don't know.

Page 47

Q   Ms. Metzger?

A   I don't know.

Q   Mr. Weinberger?

A   I don't know.

Q   Ms. Chesler?

A   I don't know.

Q   Ms. Weekley?

A   I don't know.

Q   Have you ever been the subject of a complaint to a state bar?

A   No, not to my knowledge.

MR. BURKHOLZ: Alexandra, we've been going close to an hour. Whenever you have a good time for a break.

MS. SADINSKY: So we just -- we just froze. I just want to make sure that Mr. Ristorucci answers my question before we go on a break.

BY MS. SADINSKY:

Q   I said: Have you ever been the subject of a complaint to a state bar?

A   No.

Q   No? Okay.

MS. SADINSKY: And, counsel, you wanted to take a break?

MR. BURKHOLZ: Yeah, let's take a break to

Page 48

10 after the hour.

MS. SADINSKY: You want a 15-minute break?

MR. BURKHOLZ: Yeah.

MS. SADINSKY: Sure. No problem. We'll see you at 11:10.

THE VIDEOGRAPHER: Going off -- going off the record at 10:55 a.m.

(Recess.)

THE VIDEOGRAPHER: Going on the record at 11:11 a.m.

BY MS. SADINSKY:

Q   So when we left off before the break, I asked you if you'd ever been the subject of a complaint to a state bar, and you said no, correct?

A   That's correct.

Q   And have Mr. Stein or Ms. Metzger?

A   I don't know.

Q   Have you ever been subject to discipline -- disciplinary action by a state bar?

A   No.

Q   Mr. Stein or Ms. Metzger?

A   I don't know.

Q   Have you ever been subject to disciplinary action by SEIU?

A   No.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 49

Q   Mr. Stein or Ms. Metzger?
A   I don't know.
Q   Have you ever been subject to an internal complaint at SEIU?
A   No --
Q   Mr. Stein or Ms. Metzger?
A   -- not to my knowledge.
Q   Mr. Stein or Ms. Metzger?
A   I don't know.
Q   Have you ever been subject to either an internal or external investigation related to your job at SEIU?
A   Not to my knowledge.
Q   Mr. Stein or Ms. Metzger?
A   I don't know.
Q   In the period -- strike that.
   Since 2015 has SEIU ever been accused of engaging in fraud?
   MR. BURKHOLZ:  Objection to form.
   THE WITNESS:  I -- I don't know.  I'd have to look into that.  Not to my knowledge, though.  Just to -- you know, they're -- they're involved in many different -- the health -- the pension fund -- if we're talking about the pension fund, no, not to my knowledge.

Page 50

BY MS. SADINSKY:
Q   Self-dealing or breach of fiduciary duty?
A   Not to my knowledge.
Q   Has SEIU ever been sanctioned by any regulator or governmental authority since 2015?
A   Not to my knowledge.
Q   Has SEIU ever been a defendant in any lawsuit since 2015?
A   Not to my knowledge, but as -- as background, sometimes people will object to what they're -- you know, they may claim that maybe they should have gotten a higher pension or, you know, some sort of -- or some sort of different benefit that might -- that, you know, they think that the funds should have calculated differently or something, and that may -- that could go to -- that could go to court.
   So there would be -- that's the natural process of an appeal.  If somebody goes to -- appeals a decision that's been finally made by our internal appeals process, they have the right to go to federal court.  In that case, the pension fund might have been a defendant, but I'm not -- I'd have to look into that.
Q   Has that happened since 2015, to your

Page 51

knowledge?
A   I'm not sure.
Q   Where does SEIU get the assets that it invests?
A   Employers -- well, so 1199SEIU, the Health Care Workers Union enters its Collective Bargaining Agreements with employers.  For this pension fund, the employers are voluntary hospitals in the New York -- for the most part in New York City, but also the greater New York City area, and pursuant to those Collective Bargaining Agreements, employers make contributions to the funds, and that's where the contributions come from.
Q   And how much -- what is SEIU's total amount of assets?
A   The pension --
   MR. BURKHOLZ:  Objection to form.  Are you asking now at this time?
BY MS. SADINSKY:
Q   Yes, now at this time.
A   So the portfolio assets of the pension fund are -- they fluctuate with the value of the market, but the most recent one I would say -- what are we?  In May -- so at the end of April, it was probably about $15.5 billion.

Page 52

Q   15.5 you said?
A   Somewhere between 15 and $16 billion.
Q   And what about between 2015 and 2018?
A   I don't -- I'm not sure of the exact amount of the portfolio at that point.
Q   Can you give me a rough estimate?
A   So we're talking about a three-year period from 2015 to 2018.  Keeping in mind I started in 2018, and 2015 there were still a lot of the experience from the financial crisis -- could still be felt very severely.  So I would say somewhere between 6 and $9 billion at that point.
   MS. SADINSKY:  Let's mark tab -- let's mark as Exhibit 2 Tab 8.
          - - -
   (Deposition Exhibit 2 was marked for identification.)
          - - -
BY MS. SADINSKY:
Q   Exhibit 2 is -- which Jackson will put up on the screen -- is a website page from nonprofitlight.com providing a list of executives for 1199SEIU National Benefit Fund for Health and Human Service Employees as of June 2021.  If you see on the bottom of this page, there's a list of names,

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 53

and it goes on to a second and third page. Are -- are these the -- are the people listed --

MS. SADINSKY: If you can scroll down, Jackson.

BY MS. SADINSKY:

Q -- on this page after Joshua Sorensen, are the people listed the current trustees?

MS. SADINSKY: There's another page too, we can turn.

MR. BURKHOLZ: Can you go back to the first page? We barely saw the first page.

MS. SADINSKY: Sure, and you should also have a copy of this in the chat function.

MR. BURKHOLZ: Well, that's -- we're going to do share docs here with the witness, but thank you.

If you can scroll through it for him. Thanks.

THE WITNESS: Could you stop or keep it on page 3 for just a second?

Okay.

BY MS. SADINSKY:

Q Are these the current trustees of SEIU?

A Some of those people are trustees. Some of them are not. I'm not exactly sure of the exact

Page 54

name. At the beginning -- exactly -- who no longer is, but at the beginning of -- usually at the beginning of a year, calendar year, there's turnover of appointments, and then there's sometimes people who retire and somebody else is appointed, but all of these people would have been trustees at one point. None of them are not -- none of them are non-trustees.

Q How many trustees are there at any given point?

MR. BURKHOLZ: Objection to form. Are you asking him about a particular fund?

MS. SADINSKY: I'm talking -- unless I specify otherwise, I'm talking about the plaintiff in this case.

MR. BURKHOLZ: Okay.

THE WITNESS: So usually there are about 20 -- somewhere between 24 and 32. Because you -- the reality of the way these pension funds work -- or this trust -- this Taft-Hartley fund works is that the union trustees on one point -- well, the union-appointed trustees and the employer-appointed trustees have an equal point. So even if there say -- say, for instance, there would be ten union trustees and, you know, 14 employer trustees, they

Page 55

would each have one vote. So the union trustees as a group -- it's called group voting. So they'd have one vote and the employer trustees would have one vote.

So there can sometimes be turnover, additions, and/or even a time period where somebody that maybe hasn't been a trustee appointed to replace one trustee, but functionally there's still an equal representation among the union and the employer for representation.

BY MS. SADINSKY:

Q Let's go to page 2.

Middle of the page, it says: "Marc Kramer" -- I don't know. It's right in the middle. Do you see that? It says: "Marc Kramer -- Employee Trustee (Began: 1/19)."

Do you see that?

A I do.

Q Do you know Marc Kramer?

A Yes.

Q Do you speak to Marc Kramer regularly?

MR. BURKHOLZ: Objection to form. Time period.

BY MS. SADINSKY:

Q Since you joined SEIU, how many times have

Page 56

you spoken to Marc Kramer?

A I don't -- I've been in discussions with -- participating discussions with Marc Kramer. So he is typic- -- he is -- say for -- excuse me -- say, for example, at investment committee meetings, which are regularly scheduled, he is usually present there; I am usually present there. So that would be several times a year.

There are other things not related specifically -- or other items not specifically related to monitoring the investment portfolio where we might be on the same conversation as well because there are other trustee meetings or some other issues just related to the administration of a Taft-Hartley trust just come up.

Q So Marc Kramer's on the investment committee?

A Yes.

Q Is he on any other committees?

A Well, so he's on the board of trustees. I know he's also on -- he's on the audit committee because I work with the audit committee. I suspect he's on other committees as well.

Q So he's on the audit committee, the investment committee, and possibly others?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 57

A   Yes.

Q   You meet with the investment committee monthly you said earlier, correct?

A   They're scheduled monthly.  Sometimes when there's not a -- there's not a specific reason to meet, they may be canceled, but there's usually -- they're scheduled on a monthly basis.

Q   Who else is on the investment committee?

A   From this list?

Q   Just in general.

A   So from -- on the employer's side -- well -- so Maria Castaneda is on the investment committee.  Patrick Forde is on the investment committee.

Q   Patrick, what was the last name?

A   Forde.

Q   Patrick Forde?

A   Yes.  Robert Oliver.

Q   Robert Oliver?

A   Mm-hmm.

Q   Anyone else?

A   There are others.  I'm having a hard time putting last names and first names together.

Q   How long has Marc Kramer been on the investment committee?  Since he began at SEIU in

Page 58

January 2019?

A   Yes.  I believe in -- yeah, I'm not certain.  I know when I started here in 2018, he was on the investment committee.

Q   He was on the investment committee when you started in 2018?

A   I believe so, yes.

Q   When did he join SEIU?

A   He's not on SEIU.  He's president of the League of Voluntary Hospitals.  He's a trustee.  So if he began in 1/19, I suppose it's possible that I saw him at meetings and did not realize he was not a trustee, but he was -- he certainly has been a trustee since 1/19.  That's definitely true.

Q   Okay.  But he's been on the investment committee since you started in 2018, correct?

A   I believe so, yes.

Q   And how long has Maria Castaneda -- Castaneda?

A   She's been on the investment committee while I've been there as well.

Q   The whole time you've been there?

A   Yes.

Q   You said Marc Kramer is also on the audit committee?

Page 59

A   Yes.

Q   Who else is on the audit committee?

A   Well, Barbara Logan and Maria Castaneda.  So the audit committee does -- well, okay.  They're not solely -- they're not solely responsible for the audit of the portfolio.  They have an audit of the overall organization.

Q   Okay.  Understood.  So the audit committee is Marc Kramer, Maria Castaneda, Barbara Logan.  Anyone else?

A   Robert Oliver.

Q   Anyone else?

A   There are others.  I'd have to -- I don't know the names off the top of my head.

Q   Is Marc Kramer on any other committees?

A   Well, he's on the cross-funds committee as well, cross-funds joint administrative committee.

Q   Is he on the executive committee?

A   Yes.

Q   Who else is on the executive committee?

A   So while the exec- -- Maria Castaneda's also on the executive committee, and I'm taking you mean of the pension fund.

Q   Okay.  So Marc Kramer, Maria Castaneda are on the executive committee?

Page 60

A   That's correct.

Q   Is anyone else on the executive committee?

A   Oh, George Gresham's on the executive committee.

Q   George?

A   Gresham.

Q   Anyone else?

A   That I'm not sure.

Q   So Marc Kramer's on the investment committee, the audit committee, and the executive committee, correct?

A   Correct.

Q   And what is Maria Castaneda on, what committees?

A   She's on the committees you just mentioned.

Q   Any others?

A   Is Maria Castaneda on any other committees?  Is that what you're asking?

Q   Yeah.

A   I'm not certain.

Q   Has Maria Castaneda and Marc Kramer been on all three of these committees:  The audit, the investment committee, and the executive committee since you joined SEIU?

A   Maria Castaneda certainly has.  Marc

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 61

Kramer, for the -- for most of the time I've been there. I can't speak to the first few months that I was there.

Q   He's been on all of those committees since at least January 2019?

A   Yes.

Q   Do you know where Mr. -- can you describe Mr. Kramer's employment history prior to becoming involved with the League?

MR. BURKHOLZ: Objection.

If you know.

THE WITNESS: I don't know exactly his employment history.

BY MS. SADINSKY:

Q   Do you know generally?

A   No, I don't.

Q   Do you know Ms. Castaneda's employment history?

A   I think she's been at the 11 -- the 1199SEIU Healthcare Workers East for over 20 years.

Q   Do any of the committees have authority over retaining law firms?

MR. BURKHOLZ: Objection to form. Vague.

BY MS. SADINSKY:

Q   So we've discussed a few retainer

Page 62

agreements. I think you told us about a retainer agreement with Levy Ratner, you said you were -- you had a retainer with Robbins Geller. Do any committees -- is entering into those retainer agreements, discussing retaining law firms, is that within the purview of any particular committee?

A   They would -- well, so the cross-funds joint administrative committee probably over -- they would be seen as overseeing the overall administration of these different funds that we've been talking about earlier, and they would monitor the retention of -- of -- of law firms.

Q   Who's on that committee?

A   Marc Kramer, Maria Castaneda, George Gresham currently. You know, sometimes there's some rotation. I'd have to check who's currently on there.

Q   Can you think of anyone else who's been on that committee since 2019?

A   I believe Steve Kramer was there, but he's since retired.

Q   Okay. So to the best of your recollection, the only people -- the only trustees that have been on the cross-funds committee since 2019 are Marc Kramer, Maria Castaneda, Mr. Gresham, and Steve

Page 63

Kramer, correct?

A   Well, I know there are -- there are three trustees -- well, so then there's also Michael Balboni for the employer. So there's -- each -- there are three union-appointed trustees and there are three employer trustees. So there may be rotation at different times.

Q   So six people on the committee?

A   Yes.

Q   Marc Kramer, Steve Kramer, Maria Castaneda, Mr. Gresham, Mr. Balboni -- who are we missing?

A   I'm not sure.

Q   And does the cross-funds committee also have authority over filing litigation on behalf of SEIU?

A   Again, it's -- it would be more -- it would be a monitoring responsibility. So the general counsel would have reports, and if there were -- you know, if there were specific -- they generally have the responsibility of monitoring, and then they will sign off on certain types of arrangements.

Q   Okay. So the cross-fund committee -- within the purview of the cross-funds committee is monitoring the retention of law firms, monitoring and receiving reports from the general counsel on

Page 64

litigation that SEIU files, and signing off on certain aspects of litigation; is that correct?

A   Well, so they -- they monitor, I would say, the more -- each -- the pension fund itself would -- would monitor -- or the investment -- the investment committee and the pension fund itself would actually be more directly involved.

They -- the cross-funds has an overall -- what's the best way -- of monitoring of the overall sort of operations on an efficient basis, financial and the budget with respect to this, but probably not with -- well, not probably -- not with respect, necessarily, to specific retention agreements and certainly not -- because there -- there's many types of litigation, so they might have more role in certain types of litigation but not others.

Q   And if -- let's focus on securities litigation. Who signs off on the retention of law firms for securities litigation, what committee?

MR. BURKHOLZ: Objection to form.

THE WITNESS: Which type of securities litigation? So for something like -- we're often commonly members of a class. We have -- we have firms that we retain that just monitor -- or monitor to let us know when there's been settlements so that

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 65

our operations group can just make -- work with our custodian to make sure we're receiving or participating in whatever class awards there would be.

For -- in general, because we have a general counsel, those decisions -- you know, there's some decisions that are -- they can be left to the general counsel to make -- and the general counsel, you know, reports annually or somewhat of a regular basis about what types of litigation we're involved in.

BY MS. SADINSKY:

Q   Reports to who?  What -- is it a committee?

A   To the trustees.  To the board of trustees.

Q   The board of trustees.  So no particular committee has oversight over the retaining of law firm for SEIU to file securities litigation?

A   No.  That's correct.

Can you repeat that?  There's no -- I would -- there's not a securities litigation committee, and there's not a committee with specific jurisdiction that would say we are -- we are responsible for entering into securities litigation.

Q   Okay.  So when SEIU files a securities litigation and the general counsel reports on that

Page 66

securities litigation, the general counsel will give those reports to the full board and not a committee, correct?

A   I wouldn't -- well, no.  The -- depending on the type of litigation, if for -- there might be a report to a particular board -- particular committee and then an over -- a more general, or depending on the importance of the litigation, overall report to the board of trustees of that particular fund in general.

So for the pension fund, there's a board of trustees that oversees the total -- the total fund. If there's -- there's a -- generally at the meetings or annually there's an attorney report.  Might be written.  Might be written and verbal.  And they will discuss, you know, some -- some of the highlights of what -- or what's considered the most important litigation.

If there's a litigation that we're -- that also specifically impacts what is monitored by a certain committee, they'd probably be reported at that committee as well or discussed at least.

Q   Okay.  This particular litigation, who receives reports on this particular litigation?  Is it the full board of trustees?  Is it the investment

Page 67

committee?  Is it the cross funds committee?  Is it the audit committee?

MR. BURKHOLZ:  Objection to form.
You can answer.

THE WITNESS:  So we in the -- we in the general counsel's office will receive reports on the updates on the -- on the litigation, the status of litigation.  That will then be, depending on how important -- well, this will be mentioned both at the investment committee and the -- or reported -- reported to those investment committee trustees, and it may also be included in the full report made to the full board of trustees.

BY MS. SADINSKY:

Q   So reports on this litigation go to the investment committee and/or the full board of trustees, correct?

A   Correct.

Q   Not any other committees -- correct? -- to the best of your knowledge?

A   To the best of my knowledge, it would not show up with other committees.

Q   Okay.  Let's talk about the investment committee.

I noticed in the Trust Agreement there's --

Page 68

it refers to both an investment committee and an investment subcommittee.  What's the difference?

A   Well, the investment committee -- the investment committee has the larger role in terms of determining overall goals for the -- for the portfolio, making sure monitoring of investment managers, monitoring of -- monitoring of the investment group, consultation with the investment advisor, asset allocation studies, these specific -- the investment subcommittee at this point is more appointed if there's a specific project and it hasn't -- or deals with specific projects, and I don't think that there's -- I'm not aware of a particular project at this point that the investment subcommittee is working on.

Q   So to the best of your knowledge, there's no investment subcommittee right now?

A   To the best of my knowledge, no.

Q   And you said --

A   There's no -- not that -- there's no projects of that investment subcommittee that they're working on, if it's constituted.

Q   But is there an investment subcommittee?

A   To my knowledge, currently, there's not an active investment subcommittee.

Page 69

Q   And you said earlier that the trustees have delegated fiduciary responsibility to the investment committee, correct?

A   Yes, for -- for monitoring of -- for monitoring the -- of certain duties:  monitoring portfolio development, monitoring -- monitoring the investment group, monitoring, essentially, the performance of the pension fund for monitoring to make sure our advisors are being -- that we are happy with our advisors, monitoring -- monitoring proxy votes.  Things like that.

Q   And you said you had experience in ERISA law, right?

A   Yes.

Q   So you understand what it means to be a fiduciary, correct?

A   Correct.

Q   And as a fiduciary, would the investment committee and subcommittee tell SEIU's investment managers if those investment managers were investing SEIU's assets in a company that SEIU had believed committed securities fraud?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I'm sorry.  Could you --

BY MS. SADINSKY:

Page 70

Q   Sure.

As a fiduciary, would the investment committee tell SEIU's investment managers if those investment managers were investing SEIU's assets in a company SEIU believed had committed securities fraud?

MR. BURKHOLZ:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  If an individual trustee or any trustee knew for a legal fact or certainty that the fund was investing in a company engaged in fraud, they would -- there would be a duty to discuss it with other -- raise it with other trustees and then report it and -- with our CIO, chief investment officer, and then, in theory -- well, this is somewhat speculative because our trustees would simply -- it's somewhat unlikely to imagine the scenario where a trustee becomes -- first off, they don't necessarily know what entities we're investing in, especially on a micro level, that they would have some information that led them to believe that there was fraud among an entity that we believed in, it would be outside of their sort of knowledge.

They can raise the issue, but it would not

Page 71

be something that -- that would be their legal expertise to determine.

BY MS. SADINSKY:

Q   So I just want to understand -- I want to make sure I understand your testimony.

If a member of the investment committee knew for a legal certainty that a company that SEIU had invested in had committed securities fraud, would they have a duty to discuss it with SEIU's investment managers and tell those investment managers or instruct someone else to tell those investment managers to stop investing in that company?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion, in particular, the phrase "legal certainty."

THE WITNESS:  So it's hard to imagine that anybody knows -- that a trustee -- well, that a trustee would be able to say for a legal certainty that somebody had invest -- committed fraud or securities fraud.

But what the investment -- what our trustees do is delegate to our investment managers the -- the -- the fiduciary responsibility for management of the -- of our portfolio assets.  They

Page 72

have a duty to monitor.

So they would raise that issue with our CIO or -- if they knew for a legal certainty, and I don't believe that they would have -- I -- you know, until -- until there's a final decision on something -- a final decision or a final determination on any issue, it's really hard to imagine somebody saying that they know something to a legal certainty and making portfolio decisions based on that, and certainly directing an investment manager who has fiduciary responsibility on how to invest portfolio assets.

Because there's also a duty on the part of the trustees to oversee an overall diverse portfolio, items like that, make sure that long-term growth, and if you're -- once the trustees start getting involved in making picks on individual stocks, it sort of undermines the whole structure of how we've set up our portfolio -- or set up our portfolio management.

BY MS. SADINSKY:

Q   I understand all that.  I'm asking a very simple question.

If a trustee knows that a company committed securities fraud, is your testimony that they should

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 73

discuss that with the CIO and come up with a plan with the CIO to stop investing in the company that they believe is committing the securities fraud? And when I use the term "legal certainty," I'm using the language that you used.

MR. BURKHOLZ: I'm going to object to the question. It's been asked and answered twice, and now you're -- you're almost badgering the witness.

The same objections: Calls for a legal conclusion and speculative question. Your question is also speculative.

BY MS. SADINSKY:

Q You can answer.

MR. BURKHOLZ: Object. It's been asked and answered twice.

But you can go ahead for the final time.

THE WITNESS: So, first off, I guess this depends on -- a legal certainty means that the fraud has already occurred. The way we would determine it -- it's already -- the company's already, I guess, either paid a fine or corrected somehow. It's not an ongoing fraud, presumably, at that point if there's been a final determination.

So I think it would be worth -- as a general matter, we incorporate -- our trustees

Page 74

incorporate or -- our investment -- you know, ESG and governance issue -- or governance issues in particular are something that are monitored by our investment advisor and reported back to our trustees, and at that point they can review the issues that are raised.

So at the point that there's, in theory, a final determination that there's been fraud, if there's ongoing fraud, it presents an investment risk, and, presumably, our investment managers are already aware of that having incorporated that and that's incorporated into our review of our investment managers. Our monitoring of investment managers by our investing -- by our investment advisor and by our -- I'm speaking for SEIU at that point.

BY MS. SADINSKY:

Q The CIO is Lorraine Monchak?

A Correct.

Q So the trustees would have this type of conversation with Ms. Monchak, correct?

MR. BURKHOLZ: Same objection.

BY MS. SADINSKY:

Q Based on your testimony that they would have a conversation with the CIO, that means that

Page 75

the conversation would happen with Ms. Monchak?

A Yes. This --

MR. BURKHOLZ: Same objection. Speculative. Calls for a legal conclusion.

You can answer.

THE WITNESS: Yes, if they're -- if -- if there was something the trustees perceived as a risk, an ongoing risk to the portfolio that they knew about that they did not think the CIO or our investment advisor knew about or our investment managers knew about, then they -- then they should raise it with them. But the likelihood that there's a fraud-related risk at an investment -- an entity in which we invest, that the investment managers, our investment advisor, our investment group are unaware of is remote.

BY MS. SADINSKY:

Q Okay. Is Lorraine Monchak a trustee?

A She is not.

Q How long has she been CIO?

A So that's -- she's been the CIO for at least 15 or 16 years.

Q Dilay Altiner is the portfolio manager for SEIU?

A Correct -- well, she's a -- she's a

Page 76

portfolio manager. She manage -- she monitors the equity -- equity portfolios -- equity ratifications.

Q How many equity portfolios are there?

A Public -- public equity.

Q How many public equity portfolios does she manage?

MR. BURKHOLZ: Objection to form.

THE WITNESS: She oversees the overall public equity portfolio. That's based on asset allocation decisions. That includes things like -- things like emerging markets, equity portfolio, U.S. portfolio. It can also break down into smaller subdivisions like small cap, medium cap, large cap.

BY MS. SADINSKY:

Q And so you said there's other portfolio managers too, right?

A There's other people who have specific oversight with respect to different types of -- different components of the portfolio -- of the overall portfolio.

Q Can you tell me who?

A So there's Joshua Sorensen.

Q What does he oversee?

A He oversees more of the private equity.

Q Okay. Who else?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 77

A    YK Kwon-Costanzo.
Q    Can you spell that?
A    The last name is spelled, I believe, C-O-S-T-A-N-Z-O.
Q    Okay.  And what does she oversee?
A    She's fixed income portfolio, fixed income investments.
Q    Okay.  Who else?
A    There's also Michael Redmond.
Q    Michael Redmond?
A    Yes.
Q    What does he oversee?
A    He oversees special opportunities.
Q    What does that mean?
A    So there -- these are investments that might be short term or opportunistic in nature that may not be a type of investment that would be something made for 15 or 20 years, but more for there's a ten-year opportunity to invest in a certain area or with a certain manager --
Q    Okay.  Anyone else?
A    -- a more discrete period.  And he -- but he's only joined -- he only joined the pension fund last year.
Q    Okay.  Other than these four, are there any

Page 78

other portfolio managers?
A    That's -- that's it.
Q    How many people are on Dilay's team?
A    I mean, she -- she's somewhat self-contained, but she has -- there are people who conduct research for the investment group generally.  I'm not sure if people report exclusively to her or how they have that structured.
Q    Who are the research analysts?
A    I don't know their names.
Q    Robert Harwood?
A    He's under -- I don't know his -- I don't know his responsibilities.
Q    Cynthia Chen?
     THE COURT REPORTER:  I'm sorry.  I missed the first name.
BY MS. SADINSKY:
Q    Cynthia Chen?
A    I don't think she's in the investment group anymore, but I'm not sure what her exact -- what her responsibilities were.
Q    But she previously was in research in the investment group?
A    I believe so.
Q    Samuel Heller?

Page 79

A    Samuel Heller is the former CFO of the funds, generally.
Q    When did he leave?
A    I believe in 2020.
Q    Okay.  So you said there's four portfolio managers and some research analysts.  How many research analysts would you say there are?
A    I don't know.
Q    More than ten or less than ten?
A    Less than ten.
Q    More than five or less than five?
A    I would say -- I would say probably less than five.
Q    So, like, two or three?  Is there more than one?
A    I believe there's more than one.
Q    Okay.  More than one, less than five.  So two to four.
     Does SEIU have an investment philosophy?
     MR. BURKHOLZ:  Objection to form.  Vague.
     THE WITNESS:  So I -- it's not a particular philosophy you need at SEIU, but the pension fund -- we take the strategy that we're a long-term investor.  So that means that we want to participate in the growth in the market generally.  Obviously,

Page 80

hope to do better and take advantage fully of growth and try and protect against downsides, but, in general, the idea is to -- that we're not stock pickers.  We're not trying to take -- we're not trying to -- we don't believe that there's much of a -- there's much to be gained by trying to time the market, for instance.
     So the idea is that we participate in the long-term growth and, as a result, diversify in the types of investments that there are, both because there's a fiduciary responsibility to diversify, but also because we think that's, in the long term, the most -- will -- will produce the most consistent positive gains for the portfolio.
BY MS. SADINSKY:
Q    Okay.  And you said that SEIU has investment managers and they've delegated responsibility for overseeing the portfolio to those investment managers, correct?
A    Yes.
Q    And the investment managers are fiduciaries of SEIU, right?
A    With respect to the -- the assets they have that they manage, yes.
Q    And so as fiduciaries of SEIU with respect

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 81

to the assets of SEIU that they manage, SEIU expects them to conduct appropriate diligence before making an investment, right?

A That's correct. In fact, just to supplement the answer before, part of the strategy of the fund is to engage high-quality -- high-quality managers.

Q And you said before that SEIU does not direct or have input into its individual investments with an investment manager, correct?

A Certainly not with public equity.

Q Not with public equity, but they might within PE, fixed --

A They never -- they never engage in stock picking in particular at all. What I mean is that within private equity, we may get more specific reports about specific investments. So -- but there's not -- there's not a direction not to invest or to invest in another specific asset.

Q Does SEIU ever discuss specific public equity transactions with its investment managers? Let me -- let me rephrase.

Before an investment manager buys or sells a security, will SEIU have a conversation with them about that potential transaction?

Page 82

A No, not to my knowledge.

Q Does SEIU ever tell its investment managers to engage in a specific transaction?

A No.

Q So SEIU never instructs its investment managers to buy or sell a security; is that correct?

A That's -- to my knowledge, that's correct. I don't -- I'm not aware of that ever happening.

Q And SEIU has delegated investment authority to its investment managers to make investments on SEIU's behalf, correct?

A Correct.

Q Does SEIU make any investments directly, in other words, without the assistance of investment managers?

A No.

Q No? Never?

A If you mean by "never," has it ever happened? I don't know. Our current strategy is not to make direct invest -- does not include making direct investments. The fund has been around for many years, though, so it's possible that it has happened at one point in the past.

Q To the best of your knowledge, has SEIU ever told any of its investment managers not to

Page 83

invest in a particular security?

MR. BURKHOLZ: I'm going to object to the form. Are you asking for a particular time period here? Can we cabin it by the class period?

MS. SADINSKY: Sure.

BY MS. SADINSKY:

Q So, since 2015, has SEIU ever told any of its investment managers not to invest in the security of a particular company?

A Not that I'm aware of. It would be -- no.

Q Has SEIU ever told any of its investment managers to purchase Cardinal Health stock?

A No.

Q Has SEIU ever told any of its investment managers to sell Cardinal Health stock?

A No.

Q Mr. Kramer -- has Mr. Kramer ever discussed SEIU's investments in Cardinal Health stock with Ms. Monchak?

A Not -- I'm sorry. Could you repeat the question.

Q Has Mr. Kramer, Marc Kramer, the trustee, has he ever discussed SEIU's investments in Cardinal Health stock with Lorraine Monchak?

MR. BURKHOLZ: Objection to form.

Page 84

THE WITNESS: He's not -- he's not discussed the purchase and sale of -- in a -- of Cardinal Health stock.

BY MS. SADINSKY:

Q Has he discussed Cardinal Health with Lorraine Monchak?

MR. BURKHOLZ: Objection to form. Vague.

THE WITNESS: Well, not to my -- they -- Marc Kramer and Lorraine Monchak will have -- I'm sure have many discussions that I am not aware of. Is it possible that they had a conversation where it was mentioned that we were entering litigation relating to Cardinal Health? Possibly. But it would have been -- a discussion would have been about that litigation, if it happened, and not about Cardinal Health stock as a stock. More as a --

BY MS. SADINSKY:

Q Do you know if they discussed the litigation? Did you ask him?

A No, I did not.

Q So you don't know if Marc Kramer has ever discussed this litigation or Cardinal Health with Lorraine Monchak?

A I don't know.

Q What about Maria Castaneda, same question.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 85

Do you know if she has ever discussed this litigation or Cardinal Health with Lorraine Monchak?

A   I don't know.

Q   So the trustees can act either through voting at a meeting or referendum, correct?

A   I'm sorry?

Q   So when --

MR. BURKHOLZ:  Objection to form.

MS. SADINSKY:  Yeah, sorry.

MR. BURKHOLZ:  Objection to form.

BY MS. SADINSKY:

Q   Let me try again.

When the trustees take a formal action, they decide to take that formal action either by voting at a meeting or through referendum, correct?

MR. BURKHOLZ:  Objection to form.  Vague.

THE WITNESS:  Well, when a formal action is necessary, they would either do it through a vote at a meeting, they might do it also through a -- where they might sign something that's been agreed to, the document itself.

BY MS. SADINSKY:

Q   Okay.  And the committees can also take action -- correct? -- formal action?

A   The investment committee or -- which

Page 86

committee?

Q   Any committee.

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  Any?  Any committee can take formal --

BY MS. SADINSKY:

Q   Basically what I want to know is:  The same type of voting and referendum or signed document, does that apply to action taken by both the board and action taken by the committees?

MR. BURKHOLZ:  Objection to form.  It's vague and ambiguous.

THE WITNESS:  The committees may have their own -- they can take -- certainly, they can take actions formally, or they can make decisions in -- well, any committee can make a decision formally, and of course sometimes things could happen.  If it's something -- if it's a decision that requires a vote of the committee, then obviously it would have to be a formal action in some form -- well, in some format.

BY MS. SADINSKY:

Q   If there is a formal action taken by a committee, will it be reported to the full board?

MR. BURKHOLZ:  Objection to form.

Page 87

THE WITNESS:  If there is a formal action, it would -- taken at a meeting, it would be in the -- in the meeting minutes that are then eventually received by the full board.

BY MS. SADINSKY:

Q   So you said earlier that SEIU has portfolio monitoring agreements with certain law firms.  You said some for, you know, monitoring potential class action settlements, things like that, right?

A   Yes.

Q   Is action by the board of trustees required in order for SEIU to engage a law firm for portfolio monitoring services?

A   No.

Q   No?

A   Engage for portfolio monitoring services? No.

Q   Why not?

A   Well, we have a general counsel who's generally responsible for legal -- items falling under a legal rubric or certain types of legal rubrics -- certain types of legal actions, and so that general counsel can enter into retention agreements.

If there was something that rose to a

Page 88

certain level that involved -- involved a certain level of commitment or financial impact or the potential outcome would have a substantial impact on the fund, then perhaps it would require obtaining board approval or committee approval, depending on who has jurisdiction.  But signing a retention agreement to monitor certain things related to securities might not reach that level.

Q   So the general counsel is -- has oversight, has authority, decision-making power with respect to entering into a portfolio monitoring agreement with a law firm, correct?

A   Correct.

Q   And would that decision -- would the decision to enter into a portfolio monitoring agreement with a law firm, would the general counsel report on that decision to the board of trustees?

A   I don't know that the actual -- a decision to enter into the -- that agreement would get reported -- would need to be reported, although it likely would.

Q   To the full board?

A   Clearly -- well, the annual -- yes, I would say that we probably discuss what -- what our -- how we've worked together with different -- with

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 89

different outside counsel if -- if the impact on the fund was substantial enough.  If it was -- you know, for instance, a portfolio monitoring, receiving reports about different aspects of securities litigation potentially is not necessarily -- you know, depending how the general counsel -- general counsel's office evaluates what's been stated in those reports, may not raise to the level this is something that we feel like the trustees would need to know about, though they might know that the general counsel's office is generally monitoring those issues.

Q   Let me ask it a little bit differently. Do the trustees know what portfolio monitoring agreements SEIU has entered into?

A   I don't -- I'm not sure.

Q   Would anyone tell them?

A   We would probably include it to the extent there's something material that's reported, that this is how -- our relationship with this firm. This is where we got the information, if there was something we thought the trustees needed to know in order to -- to monitor -- to fulfill their duties or to monitor what's going on.

But if it were something that was not

Page 90

sufficiently material, then it might not get reported to them.

Q   Okay.  So the general counsel has authority to enter into portfolio monitoring.

A   Mm-hmm.

Q   So how was that -- how did the general counsel receive that authority?  Did the trustees delegate that authority?

A   Well, they hired the general counsel, and that's -- he's -- he's responsible for overseeing the -- the legal -- the general counsel's office, which has the responsibility for overseeing litigation and different types -- different aspects of compliant -- regulatory compliance, which would include monitoring our portfolio.

Q   Okay.  Is there a charter?

A   For the general counsel's office?

Q   Yes.

A   Not that I'm aware of, no.

Q   Okay.  So to the best of your knowledge, there's no written authorization for the general counsel to enter into portfolio monitoring agreements?

MR. BURKHOLZ:  Objection to form.

BY MS. SADINSKY:

Page 91

Q   I just want to know if there's anything in writing that says that.  I understand if there could be a verbal agreement or something that's understood, but is there anything in writing that says the general counsel has authority to enter into portfolio monitoring agreements?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I'm not sure.

BY MS. SADINSKY:

Q   Is action by the board of trustees required in order for SEIU to engage a law firm to represent it in securities litigation, to file securities litigation on its behalf?

A   I would say we -- well, to file securities litigation on its behalf?  To initiate the litigation -- can you -- I'm taking it that you're asking:  Is there authority to initiate securities litigation on behalf of the --

Q   I'm asking you if the board of trustees has to approve the decision to retain a law firm to file securities litigation on SEIU's behalf.

A   This -- this would be something that you'd want to engage -- assuming that -- it depends on the nature of the responsibilities that came with this litigation.

Page 92

If there was significant -- if the fund itself was taking on a significant responsibility, or a significant risk, or something of that nature, then you -- the general counsel would want to certainly consult with the trustees and make sure that they were aware of -- aware of the -- the nature of the engagement and who -- and who the firm was that we were retaining and why we were -- why the general counsel was retaining that firm.

Q   If there were significant responsibilities, for example, if the fund is going to be the lead plaintiff in a securities litigation, would the board of trustees approve the retention of a law firm for that purpose?

A   They might not be -- it might raise to the level where you'd need formal approval or have, like, a full all-together meeting of the board, but the general counsel would want to reach out to discuss with the trustees and ensure that there was -- ensure that they're -- that the trustees were generally -- general agreement with the direction of that -- the general counsel -- or the decision the general counsel had made.

Q   Would the trustees vote on whether or not to file a securities lawsuit on behalf of SEIU?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 93

A   Would they vote?  You probably wouldn't need to have a vote as long as you discuss with the trustees and the trustees had approved, either through a written -- a written document or some other sort of document that showed approval of what the direction -- the direction the trust -- the general counsel was going in.

Q   So if there was unanimous approval by the trustees, you wouldn't need a vote?  Is that your testimony?

A   No.  If the trustees themselves -- after discussion with trustees and discussion with trustee counsel, or you could have a -- well, you could have a scenario where you had unanimous consent of the trustees.  That would certainly be -- that would certainly be -- would certainly be formal authorization.  I don't know that that would be -- I don't think that that would be necessary to go forward with a class action suit.

What you would want to do is make sure at least that the trustees are aware that that -- that that decision has been made afterward or -- and engage them in the decision to make that decision -- to make -- to sign onto that retention -- or to retain the counsel and to sign on to be a lead

Page 94

plaintiff or take on that responsibility as you were making that decision.

MR. BURKHOLZ:  We've been going for about an hour, Alexandra, so whenever there's a good break.

MS. SADINSKY:  Maybe like five -- five more minutes.

MR. BURKHOLZ:  Okay.

BY MS. SADINSKY:

Q   Okay.  So there's -- the general counsel does not necessarily need to discuss entering into a portfolio monitoring agreement with a trustee -- with the trustees, but the general counsel will generally discuss hiring law firms for the purpose of filing a federal securities litigation on behalf of SEIU, correct?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  So with -- yeah, with the portfolio monitoring, so long as the general counsel did not see entering into that agreement as something with potential impacts that merited trustee monitoring or trustee understanding or, you know, on an -- on a live basis, then, yes, then the general counsel could do that, but that general counsel would presumably make that judgment.

Page 95

With regard to entering into a claim itself where -- I guess we're talking about a claim where we're taking on the responsibility of a lead plaintiff, then, yes, there'd be more -- more engagement with -- there should be more engagement with the trustees.

BY MS. SADINSKY:

Q   Okay.  A couple quick -- more of these general questions, and then we can take a break.  It should only take me a couple minutes.

So you said before Joshua Sorensen monitors private equity firms, right?

A   Yes.

Q   And does he monitor other types of alternative investments, like hedge funds, ETFs?

A   He does not manage hedge funds.  ETFs, now, I think that would normally fall under the rubric of public equity, but if -- if for whatever reason -- he would not -- he would not engage in -- if we had -- he would be more -- from a private equity manager standpoint, he would be responsible for overseeing the hiring of managers who might engage in the purchase of ETFs if they were tied to some sort of -- reproducing some sort of private market.

Q   Who oversees hedge funds?

Page 96

A   The hedge funds -- hedge funds are a relatively small component of our portfolio.  Lorraine Monchak would oversee hedge funds.

Q   Lorraine Monchak oversees them directly?

A   I believe so, yes.

Q   Okay.  So you have five people that oversee -- or -- yeah, five people that oversee SEIU's portfolios then.  Lorraine also oversees hedge funds directly?

A   Well, Lorraine is the CIO, so she oversees, in a sense, everybody, and then the other -- the other people we mentioned have, I guess you would call them -- not silos, because I'm sure they consult with each other, but they have specific responsibilities tied to specific market sectors.

Q   And Dilay oversees public equity.  Other than Lorraine Monchak overseeing hedge funds, is there anything that she oversees that no other portfolio managers oversee?

A   Not to my knowledge, no.

Q   And then you said before that you have a couple research analysts between, you know, two and four.  Can you just generally describe to me what research analysts do?

A   I don't -- I don't know exactly what they

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 97

do.  Any description would be inexact.

Q   Do they do research on the companies within SEIU's portfolio?

A   I think they do -- they're more engaged in research on managers, but that's -- most -- you know, we also -- when we do analysis, it's not just -- I mean, they don't -- I don't -- there's not -- it's not really investing in typical -- like, it's not analysis typically of a particular company.  It's usually -- it's analysis of, like, you know, how are -- you know, how are assets allocated.  What are different -- how are we doing compared to different other -- other managers -- excuse me -- other sort of investment funds, not necessarily -- or, you know, if we had -- if we had a different -- if the fund in itself had a different philosophy -- not -- well, a different allocation of assets, you know, what would be the expectation, but I don't think that -- I don't think their -- their -- their analysis is focused on managers for the most part.

Q   Okay.  Dilay, Lorraine, Joshua Sorensen, Mike Redmond, and then the other person you said, Costanzo?

A   YK Kwon-Costanzo.

Q   Do they make reports to the investment

Page 98

committee?

A   Yes.

Q   And are those in writing?  Are they in-person?

A   Well, I mean, if we, over the past few years include in-person as Zoom or video, yes.  So there's delivery of a report that's usually through -- I don't know what you call it -- like, a website so trustees can access the reports before the meeting and then on an ongoing basis, and then there's also -- they make verbal presentations, either live or -- either in-person or through video.

Q   The written report, is that in advance of every monthly meeting, or is that annually?

A   So they are our reports that are made every meeting and they're delivered.  They may not be the same report.  So, for instance, there will be a report on how real estate investments are doing and how are managers doing, and there may be a presentation by the manager as well, and the manager, meaning the outside entity, will deliver a report along with the presentation.

They will -- the internal staff may produce reports about how our managers are doing, how the return has been, what their expectations are, how

Page 99

the managers are doing compared to other managers in their field, how they're doing compared to the benchmarks.

Q   Okay.  And how -- and those are every meeting, and you said they meet about monthly.  So ten to 12 written reports a year, right?

A   Well, ten to 12 -- I wouldn't -- I don't know specifically how much each manager -- or, I guess, analyst or relation -- portfolio manager -- whatever title you're using -- I'm not sure how much each individual makes each year.  You're correct.  There's probably nine to ten meetings per year, and in those meetings, there is several reports.  Some by our managers and some by our -- our managers usually reporting on how investments that they manage are doing and maybe an outlook on that particular market, and then the staff produces reports on how our managers are doing in comparison to other managers, in comparison to the benchmark, in comparison -- and over a period of time.

MS. SADINSKY:  Okay.  Let's go off the record.

MR. BURKHOLZ:  Can we take a ten-minute break?

THE VIDEOGRAPHER:  Going -- going off the

Page 100

record at 12:17 p.m.

(Recess.)

THE VIDEOGRAPHER:  Going on the record at 12:32 p.m.

BY MS. SADINSKY:

Q   What is Cordis?

A   Excuse me?

Q   What's Cordis?

A   Cordis?  Cordis is a -- well, it's a -- it's, I guess, a subentity -- a subentity of Cardinal Health at this point.

Q   It's a subentity of Cardinal Health right now?

A   Or being purchased by Cardinal Health, yeah.

Q   And Cardinal Health owns Cordis right now?

MR. BURKHOLZ:  If you know.  Objection.

THE WITNESS:  I --

BY MS. SADINSKY:

Q   Does Cardinal Health own Cordis?

A   That's my understanding, yes.

Q   Can you describe Cordis's business between 2015 and 2018?

A   Yes.  Well, it seems that they're involved

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 101

in two things:  One, mostly distribution of generic drugs, buying and selling; and also they -- I'm sorry.  That's Cardinal Health.

Cordis was involved in the distribution of different sorts of medical implementation or medical equipment and the production of selling it in different parts of the world, the U.S. and abroad.

Q   When did you first hear about Cordis?

A   I first heard about Cordis when it was -- when I started reviewing the litigation related to the Cardinal Health claim.

THE COURT REPORTER:  The Cardinal Health what?  I'm sorry.  I didn't hear that.

THE WITNESS:  The Cardinal Health claim.

BY MS. SADINSKY:

Q   So you started -- you started learning about Cordis when you got involved with this litigation, correct?

A   Correct.

Q   And was anyone else at SEIU involved in reviewing or learning about Cordis before that?

MR. BURKHOLZ:  Objection.

THE WITNESS:  I'm sorry.  So before -- do you mean Cordis as an investment or Cordis the -- the issue surrounding its purchase by Cardinal

Page 102

Health?

BY MS. SADINSKY:

Q   Let me try and approach this differently.

What year did Cardinal Health purchase Cordis?

A   It was in 2015.

Q   Okay.  Did anyone at SEIU know about it then?  Did you know about it then?

A   I did not know about it.

Q   Did anyone at SEIU undertake any analysis regarding the Cordis acquisition in 2015?

A   I don't know.

Q   Would you expect that someone would have?

A   No.

Q   No?

A   No.

Q   Why not?

A   Well, it was a sub of Johnson & Johnson, and, in general -- in general -- well, assuming that we're talking about the only people who would have reason to invest or to know about companies would be our investment group.  They do not do analysis on a company-by-company level.

Q   Okay.  Do you know if anyone at SEIU had a view about whether the Cordis acquisition was a good

Page 103

idea for Cardinal Health in 2015?

A   No.

Q   Between 2015 and 2018, did anyone at SEIU have any communications regarding Cordis?

A   That I don't know.  It's -- it's possible that there were communications where there was just general information about the acquisition of Cordis that we would have received because investment managers give us updates on how their portfolio is doing and why the portfolio is, you know, either doing well or not doing well or what -- just general examples of what strategies have been engaged in by the manager.  But that would --

Q   Do you know if that happened or not?

A   I'm not -- I'm not sure.

Q   So you don't know if that happened, correct?

A   Sure.  Right.

Q   Did you ask anyone if they ever communicated with any investment manager -- any investment manager regarding Cordis?

A   I did.  And nobody --

Q   What did they say?

A   They don't ever recall that having happened.

Page 104

Q   Okay.  So it's -- it's likely not possible?

A   Yeah.

Q   No one ever recalls speaking to any investment manager about Cordis?

A   Right.

Q   Between 2015 and 2018 or ever?

A   Well, aside from having it -- having it come up in litigation, they would not have heard about it otherwise, but -- well, as I said, it could have been included in a report or when, you know --

Q   I want to know what you know, not what could have happened.

So you spoke with the investment team, and they said they do not recall ever speaking to their investment managers about Cordis, correct?

A   Correct.

Q   And did -- was that limited to a particular time frame, or did they say they don't recall ever speaking about Cordis with their investment managers ever?

A   I think it was probably more -- the way we were talking about it, it was more about the time frame when an investment decision would have been made.

Q   Well, what time frame?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 105

A   Well, when I asked them, I asked them, do you ever -- when I had the discussions with our analysts, it's usually do you -- first off, do you have any engagement about -- do you ever talk about individual stocks or know about individual stocks, and they said, no, we don't -- the response is that they don't. That is not something that they're interested in knowing on a buy or sell level. It may be something that comes up when a manager is explaining why did one sector do one and one sector did not. That type of thing.

And when we -- when we asked specifically were they familiar with this issue with Cardinal Health and why, you know, the -- sort of the correlation between the company's shares and information coming out regarding -- or information being made public that had not previously been made public relating to Cordis, they said they had -- they had not been previously aware of that, although it's possible, and that they had not speak -- spoken or initiated or have communication with managers particularly about that or didn't recall it.

Q   Okay. So the investment team had not spoken to investment managers about Cordis.

And at any point during 2017 or 2018, did

Page 106

anyone at SEIU have the view that Cardinal Health had made misleading statements about Cordis?

Again, I'm focused on 2017 and 2018.

MR. BURKHOLZ: Objection. Calls for a legal conclusion.

THE WITNESS: I'm sorry. Can you -- you're asking if whether any -- between 2015 and 2018 anybody at Card- -- at -- in our 1199SEIU pension fund had a -- had made a determination that Cardinal Health had -- had been making misleading statements?

BY MS. SADINSKY:
Q   Yes.
A   Not that I'm aware of.
MR. BURKHOLZ: Same objection. Calls for a legal conclusion.

BY MS. SADINSKY:
Q   Not that you're aware of?
A   Not that I'm aware of.
Q   At any point during 2017 or 2018, did anyone at SEIU express the view that Cardinal Health had made misleading statements about Cordis?
MR. BURKHOLZ: Same objection. Calls for a legal conclusion. Asked and answered.
THE WITNESS: I'm -- I'm not sure I understand the question. Can you repeat it.

Page 107

BY MS. SADINSKY:
Q   During 2017 and 2018 --
A   Oh, 2017.
Q   -- do you know if anyone at SEIU ever said that Cardinal Health had made misleading statements at Cordis?
MR. BURKHOLZ: Same objection. Legal conclusion. Asked and answered.
You can answer.
THE WITNESS: I don't believe so.
BY MS. SADINSKY:
Q   And at any point during 2017 or 2018, did anyone at SEIU ever tell any of SEIU's investment managers that Cardinal Health had made misleading statements about Cordis?
MR. BURKHOLZ: Same objection.
THE WITNESS: I don't believe --
MR. BURKHOLZ: Legal conclusion.
THE WITNESS: I don't believe so.
BY MS. SADINSKY:
Q   At any point during 2017 or 2018, did SEIU seek to engage counsel in connection with litigation against Cardinal Health?
A   No.
Q   At any point during 2017 or 2018, did SEIU

Page 108

do anything at all to investigate whether Cardinal Health had made misleading statements about Cordis?
MR. BURKHOLZ: Same objection to legal conclusion.
You can answer.
THE WITNESS: Not to my knowledge.
BY MS. SADINSKY:
Q   Did SEIU, during 2015 to 2018, ever obtain information about Cardinal that was not publicly available?
A   Not to my knowledge.
Q   Did SEIU, during 2015 to 2018, ever obtain information about Cordis that was not publicly available?
A   Not to my knowledge.
Q   When SEIU has alleged fraud against a company in a lawsuit, is there any discussion with the investment managers about staying invested in that company?
A   I don't believe so, no.
Q   Why not?
A   Why is there not a discussion with an investment manager about staying involved in a company after there's been a liti- -- a lawsuit?
Q   Being invested, not involved.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 109

MR. BURKHOLZ: Objection. Irrelevant.

THE WITNESS: So as we've discussed, that generally -- not generally. We leave investment decisions except for extraordinary circum- -- well, we leave investment decisions to invest managers, particularly in public equities. That's what they're hired for. That's what they have the expertise in.

BY MS. SADINSKY:

Q So -- so your testimony is when SEIU files a lawsuit against a company alleging that that company has engaged in securities fraud, SEIU doesn't have a fiduciary responsibility to tell its investment managers to stop putting SEIU's money into that company?

MR. BURKHOLZ: Objection to form. Calls for a legal conclusion. Irrelevant.

BY MS. SADINSKY:

Q Is that your testimony, yes or no?

MR. BURKHOLZ: Same objections.

THE WITNESS: After a company has already been engaged -- has already engaged in fraud, still operating company --

BY MS. SADINSKY:

Q When SEIU files a lawsuit against a company

Page 110

alleging that company engaged in securities fraud.

MR. BURKHOLZ: I'm going to object. Same objections.

And if you can let the witness answer the question next time, I'd appreciate it, without cutting him off.

THE WITNESS: I don't -- I don't believe we have that, that SEIU has that obligation, no.

BY MS. SADINSKY:

Q So SEIU has no fiduciary obligation to tell its investment managers to stop putting SEIU's beneficiaries' money into a company that SEIU believes engaged in securities fraud; that's your testimony?

MR. BURKHOLZ: Objection. Asked and answered. Calls for a legal conclusion.

THE WITNESS: No, I don't believe so.

BY MS. SADINSKY:

Q Why?

MR. BURKHOLZ: Same objections.

THE WITNESS: Why does it not have an obligation?

BY MS. SADINSKY:

Q Yeah.

A So a pension fund has in place different

Page 111

monitors. It has investment advisors. It hires investment managers, and each one of those entities has an obligation to evaluate and incorporate corporate governance into the factors in how it's evaluating an investment.

As long as SEIU is monitoring and working with its investment advisor to make sure that those processes are in place and those -- that we believe the managers overall are taking -- incorporating corporate governance into those invest- -- into their investment decisions, then I -- then I think that they've met their duty.

Q SEIU has agreed to act as lead plaintiff in this lawsuit, right?

A Yes.

Q When did SEIU form the belief it had been allegedly defrauded by Cardinal Health?

MR. BURKHOLZ: Objection to the form. That's a legal conclusion. Vague.

BY MS. SADINSKY:

Q I'm asking when did SEIU believe it had a claim against Cardinal Health.

MR. BURKHOLZ: Same objection. Calls for a legal conclusion. Vague.

THE WITNESS: So we receive monitoring

Page 112

reports from our counsel about developments or potential claims related to securities fraud. So I believe we received those and initial reports probably in maybe September, August, September of 2020.

Based on those reports, we had -- based on those reports and then some further discussion, that's when the -- the pension fund made the decision to move forward with the claim and determine that it had -- it had a claim related to securities fraud based on Cardinal Health's actions or lack of actions.

BY MS. SADINSKY:

Q I just heard a phone. That's not your phone, is it?

A No.

Q So you received the initial report about -- from Robbins Geller about portfolio monitoring that raised this potential litigation in September or August of 2020?

A I believe in September of 2020.

Q September of 2020. Okay.

So SEIU first learned about a potential securities claim against Cardinal Health from the portfolio monitoring agreement report that it

Page 113

received from Robbins Geller?

A   Correct.  And when you said -- asked me earlier, you said "you," it was in the capacity as what we'd discussed earlier about being the pension fund.

Q   Yeah.  SEIU.

A   Yeah.

Q   SEIU.  Okay.

So SEIU first learned about a potential lawsuit in September 2020.  And the --

MR. BURKHOLZ:  Counsel, you know that he's got the year wrong because you know from the documents in this case.  So why don't you show him the documents that have been produced in this case, including a retainer agreement.

MS. SADINSKY:  Yeah, we'll get there.

BY MS. SADINSKY:

Q   When is the first communication that SEIU had with Robbins Geller about --

A   It would have been, I believe -- I'm sorry.  Keep going.

Q   Okay.  Okay.  So your counsel is referring to the year 2019.

A   Right.

Q   So the first time that you received a

Page 114

report was September of 2019, correct?

A   Correct.  Because we were still in person at that point.

Q   Okay.  And you received the report -- like, was it in an email or -- what was your first communication with Robbins Geller about this -- this potential lawsuit?

A   So when you say "you," again, it wasn't me because I wasn't involved.  Our general counsel received the reports, and I believe it was September of 2019, and it was basically a description of the claim, what the history of -- how -- well, it was just a history of the documents or the history of the statements, the history of the acquisition of Cordis by Cardinal Health and developments since then.

Q   What kinds of developments?

MR. BURKHOLZ:  At this point, I'm going to -- you're getting into attorney-client communications.

MS. SADINSKY:  Okay.

MR. BURKHOLZ:  You can ask him about the process of starting this case, which I believe he's started to talk about, but you can't get into the communications or what our documents said.

Page 115

MS. SADINSKY:  Okay.

BY MS. SADINSKY:

Q   So the first time that SEIU spoke with Robbins Geller as to the prospect of seeking lead plaintiff status was sometime September 2019, right?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  (Nodding.)

BY MS. SADINSKY:

Q   And who authored the reports that went to SEIU about Cardinal Health, who from Robbins Geller?

A   That I don't recall.  I believe it was -- I believe we received the reports from Nancy Juda, but I could be wrong.

Q   Nancy Juda.  Okay.  And Nancy Juda sent them to?

A   Jeff Stein.

Q   Jeff Stein.  Okay.  And the format of the communication was just, you know, a written report, a compilation of disclosures and -- and the litigation process.

Were you aware or was anyone at SEIU aware that SEIU was invested in Cardinal Health stock prior to being contacted by Robbins Geller about this litigation?

A   Well, no -- well, I -- I imagine that to

Page 116

the extent anybody was aware that there was a company called Cardinal Health that we were invested in it because we invest very broadly in most -- we try and reproduce the public equity markets, but nobody was particularly aware that -- what level of investment or anything like that.

Q   Did anyone at SEIU think Cardinal Health had made misleading statements about Cordis prior to being contacted by Robbins Geller about this case?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

You can answer.

THE WITNESS:  I'm not sure.

MS. SADINSKY:  Okay.  Let's mark as -- are we on Exhibit 3?

MR. MARTIN:  Yeah.

MS. SADINSKY:  Let's mark as Exhibit 3 Tab 11.  Put it up on the screen.

- - -

(Deposition Exhibit 3 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Do you recognize this document?

A   Yes.  I've seen it.

LA Sheriffs' Pension      FINAL      May 17, 2022
v. Cardinal Health Inc.      CONFIDENTIAL      Gabriel Ristorucci

Page 117

Q   What is it?
A   Well, it's a retainer agreement.
Q   Okay.  So Exhibit 3 is the retention letter that SEIU signed with Robbins Geller in this case, correct?
MR. BURKHOLZ:  Would you show him the second page and the third page.
BY MS. SADINSKY:
Q   If you want to go back to the first page, it shows the subject line.
Is this the retention letter that SEIU entered into with Robbins Geller for this case?
A   Yes.
Q   And let's go -- at the top of page 1, do you see the date?
A   Yes.
Q   Dated September 6th, 2019, correct?
A   Yes.
Q   So Robbins Geller must have been in touch with SEIU some point prior to September 6, 2019?
A   I guess it was August.
Q   Robbins Geller was in touch with SEIU about this litigation prior to entering into this retention agreement, correct?
A   Correct.

Page 118

Q   And prior to being contacted by Robbins Geller, SEIU was not considering filing litigation against Cardinal, right?
A   Correct.
Q   And prior to being contacted by Robbins Geller, SEIU had not engaged any counsel to represent it in litigation against Cardinal, correct?
A   Correct.
Q   And prior to being contacted by Robbins Geller, SEIU had not communicated with any law firms about litigation against Cardinal, correct?
A   Correct.
Q   At the top of the letter, on the right-hand side, it says: "Via E-Mail."
Do you see that?
A   Yes.
Q   And Jeff Stein received this, right?
A   Yeah.
Q   What email address?
A   I believe it would have been -- I'm not sure what email address he brought it -- he received it at.
Q   Does he have multiple?
A   He only has one -- well, he has personal.

Page 119

I mean, I assume he got it at Jeffrey.Stein@1199SEIU Funds.org but --
Q   Let's go to page 3.
Darren Robbins signed this on behalf of Robbins Geller, correct?
A   Yes.
Q   Who is Darren Robbins?
A   I suppose he's the Robbins in Robbins Geller.
Q   Have you ever spoken to him?
A   Not to my knowledge, no.
Q   Do you know if he has a role in this litigation?
A   I'm not sure.
Q   What other Robbins Geller attorneys are involved in this litigation?
A   I know Spence Burkholz is involved, and I know Nancy Juda is involved.
Q   Anyone else?
A   I'm not sure.  I -- I mean, I'm not sure.
Q   Have you communicated with anyone from Robbins Geller other than Spence -- Spence and Nancy?
Do you know if you've spoken to anyone other than Spence and Nancy about this litigation,

Page 120

from Robbins Geller?
A   Yeah, I don't -- I don't recall speaking with anybody else.  We may have -- I may have spoken to somebody at the firm when we were trying to do document production, but I don't recall their name.
Q   And the first time Robbins Geller contacted SEIU about a potential claim against Cardinal Health was in August 2019, correct?
A   Yes, that's my understanding.
Q   Okay.  So Jeffrey Stein signed this letter on September 6th, 2019.
Do you see that on the same page there?
A   Mm-hmm.
MR. BURKHOLZ:  Objection to form.
Hold on a second.  Did you say September 6th or September 26th?
MS. SADINSKY:  I think I said September 26th, but maybe I got garbled.
MR. BURKHOLZ:  Yeah.
BY MS. SADINSKY:
Q   So Jeffrey Stein signed this letter on September 26, 2019.
Do you see that?
A   Correct.  Yes, I see it.
Q   And what is his role in the litigation,

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 121

Mr. Stein's role?

A   Well, he's general counsel for the fund, so he, at the time, in particular, but even now is aware we receive communications from and review -- and documents from Robbins Geller & Dowd relating to the funds and -- relating to the litigation.

Q   So as general -- the reason that Jeffrey Stein signed this letter is because he is general counsel of the fund?

A   He signed it because he's general counsel, and he was authorized to do so by the trustees to sign this fund [sic].

Q   Who -- how was he authorized?

A   Marc Kramer and Maria Castaneda both agreed, after discussion with Jeffrey Stein and reviewing these documents and discussion with trustee counsel, to -- to move forward with this claim, to sign this agreement.

Q   Discussion with trustee counsel, so discussion with Levy Ratner and Jenna Hayes?

A   Correct.

Q   Okay.  Walk me through -- can you walk me through the process?  So did, you know, Robbins Geller contact SEIU about a potential claim and Jeffrey Stein told Maria Castaneda and Marc Kramer

Page 122

that he went and spoke to the rest of the trustees?

How does -- just, how does it work?

MR. BURKHOLZ:  Objection to the form.

But you can generally answer.

THE WITNESS:  So in this case, as I recall, we -- this -- the outreach was reached -- was received at a time in between meetings and there wasn't one scheduled.

So in order to facilitate decision, Jeff reached out to trustee counsel and then also the trustees themselves to move forward to see if there was agreement on whether this was something to move forward and discussed -- discussed whatever they considered, the criteria they would use for entering into a claim or taking on the responsibility, and in the end, they agreed to -- they agreed to do this. There was agreement on moving forward with it.

BY MS. SADINSKY:

Q   Okay.  So the initial outreach from Robbins Geller in August 2019 was between meetings of the trustees and another wasn't scheduled for some time, correct?

A   Correct.

Q   And Mr. Stein then reached out to the trustees' counsel about moving forward with this

Page 123

potential litigation, correct?

A   Correct.  Trustees' counsel, yeah.

Q   Who did he reach out to at Levy Ratner?

A   Ryan Barbur.

Q   Ryan Barbur?

A   Yeah.

Q   Anyone else?

A   Well, Ryan Barbur and possibly also Dan Ratner.

Q   Ryan Barbur and Dan Ratner.

And who did he -- and who was the other third -- who's the other counsel?  Jenna Hayes?

A   Correct.

Q   And she's just -- he just reached out to Jenna Hayes, no one else?

A   Well, Jenna Hayes is counsel to the League of Voluntary Hospitals, who appoints the trustees, and so they also engaged -- then the process would also have -- after they determined what the issues are -- not determined what the issues are, but reviewed what was involved and the report that had been provided by Robbins Geller, they also reached out to the trustees, Maria Castaneda and Marc Kramer.

Q   Why did -- so -- so who reached out to the

Page 124

trustees?  Was it Ryan Barbur and/or Dan Ratner and Jenna Hayes, or was it Jeff Stein?

A   They all reached out to them.  So they're -- so they're -- Jenna Hayes would have discussed the issue with Marc Kramer, and Ryan Barbur and/or Dan Ratner would have reached out to Maria Castaneda and other union trustees, potentially.

Q   And why was this decision to retain Robbins Geller discussed with -- with Maria Castaneda and Marc Kramer specifically?

A   Well, Marc Kramer is the president of the League of Voluntary Hospitals, and they appoint the trustees to the pension fund, and he's -- he's been tasked with monitoring -- monitoring or taking on responsibilities for overseeing the League of Voluntary Hospitals' responsibilities, including those of trustees -- trusteeship and their -- their relation with these different -- with the pension fund, for example, their responsibilities with respect to the pension fund.

Q   So Marc Kramer -- the decision was made by Marc Kramer because of his role as president of the league?

A   Correct.  Well, he's -- he's a trustee and

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 125

he's a head of the organization that appoints the trustees.

Q   What about Maria Castaneda?

A   She's the secretary/treasurer at the union, and she's the union trustee within the -- within the interest.  She takes a lead role with responsibilities for the pension funds or -- and the other Taft-Hartley funds.

Q   Okay.  So Marc Kramer because of his role as president of the league and Maria Castaneda because of her role as secretary and treasurer of the union?

A   Yeah, although it's not in her -- it's not because she's also secretary/treasurer of the union.  It's just that's her title at the union.  She also takes on the responsibility with respect -- with respect to the pension fund of -- of making sure other trustees are apprised that -- of what's going on with these different funds and different issues that come up.

Q   So are the only trustees that approved the decision to retain Robbins Geller for the Cardinal Health litigation Marc Kramer and Maria Castaneda?

A   Those -- no.  Those are trustees who were -- who let us know that the trustees were fine

Page 126

with moving forward.  And then later -- you know, so we signed the agreement.  Then later it gets into what the developments and decision to move forward was what further updated at -- for other trustee meetings.

Q   I'm asking specifically about the decision to enter into this retainer agreement.

A   Mm-hmm.

Q   Was -- were the only trustees that approved that decision Marc Kramer and Maria Castaneda?

MR. BURKHOLZ:  Objection.  Misstates testimony.

THE WITNESS:  So I'm not -- they were -- they were the ones who we had -- we received direction from that the trustees were on board with the moving forward with the litigation.

BY MS. SADINSKY:

Q   So all of the trustees approved moving forward with the litigation, correct?

A   I'm not sure of the exact composition of how the trustees felt about it, although we haven't heard any further objections.  But, as I said, when -- each set of trustees has one vote.  So as long as -- as -- as long as those trustees -- each group would have been ready to move forward with it,

Page 127

those trustees overall had approved it.

Q   And so how was the trustees' approval conveyed to Mr. Stein?

A   By -- by email.

Q   So Mr. Kramer sent an email and Ms. Castaneda sent an email?

A   They're -- they either sent the email or were copied on emails by their lawyers saying that they were fine with moving -- that they were supportive of moving forward with the -- with the litigation.

Q   Was there a discussion about the litigation -- so -- so you said there was no board meeting at this time.  So the discussion about the litigation between Marc Kramer and Maria Castaneda and their counsel and/or Jeff Stein was by email or phone?

A   Correct.

Q   So this -- the decision to enter into this retainer agreement was never discussed at a meeting of the board of trustees --

A   No.

Q   -- at this time?

A   As of September 26th, no.

Q   So as of September 26, 2019, the board of

Page 128

trustees did not meet to discuss the decision to retain Robbins Geller, correct?

MR. BURKHOLZ:  Objection to the -- objection to the -- to the -- to the form and vague as to "meet."

THE WITNESS:  They did not sit around a table, but they were -- there were discussions that were had and that were reported back to us that they were supportive of moving forward.

BY MS. SADINSKY:

Q   So how did -- how did you know that all the trustees were supportive of moving forward?  Did they -- did each individual trustee send an email saying they -- they approved of the decision?

A   No.  The trustees that were generally considered the executives of the -- or the leads in their field reported back to us that -- at this time that the trustees were supportive of moving forward with the litigation.

Q   Is there a reason that Mr. Kramer and Ms. Castaneda didn't sign the retention letter with Robbins Geller?

A   Not that I can think of.  There was no -- I don't think it was viewed as necessary.

Q   Could Mr. Stein have entered into this

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 129

retention letter without first discussing it with Mr. Kramer and Ms. Castaneda?

A   I think he would have had to make a judgment -- that would have had to have been a judgment on his part that it was not -- that it did not meet the standard of having to have -- he did consult with the trustees.

So -- but in order for him to have signed it without having the support of the trustees, he would have to make the decision -- the determination that it was not sufficiently material, either in its responsibility being taken care of -- taken on by the -- by the pension fund or in the risk -- potential risk taken on by the pension fund that it was not necessary.  He would -- he would have had to make that determination.

Q   So we've discussed -- you've mentioned a couple times that, you know, if something is more material or significant, he has to discuss it with the board of trustees, if something is not, he does not have to.

But there's no written policy as to what needs to be discussed with the board of trustees, correct?

A   Well, with respect to entering into a

Page 130

litigation, I don't believe that there's a written policy covering taking on a lead plaintiff role in a securities litigation.

Q   Did anyone on the board oppose the decision to enter into this retainer agreement?

A   No.

Q   Okay.  On the retainer agreement, let's turn back to page 1, and paragraphs 1 and 2 say: "We will prosecute the action on a contingency fee and cost basis."

Number two: "We will advance all fees and expenses necessary to prosecute the case regardless of whether the case ultimately proceeds as a class action or individual action."

Do you see that?

A   I see it.

Q   And then it says: "1199 will have no responsibility for legal fees and expenses.  Legal fees and expenses will be paid only out of recovery (i.e., judgment or settlement).  If the matter is certified as a class action, legal fees and expenses are paid only after notice to the class and as approved by the court after a hearing."

Do you see that?

A   Yes.

Page 131

Q   Has SEIU paid Robbins Geller any legal fees in connection with this case?

A   Has SEIU paid Robbins Geller any legal fees in connection with this case?  Is that what you said -- asked?

Q   Yes.

A   No, it has not.

Q   Levy Ratner?

A   Has the firm paid Levy -- who -- has the pension fund paid Levy Ratner any fees in connection with this case?  Not to my knowledge, no.

Q   Jenna Hayes?

A   No.

Q   Has Levy Ratner or Jenna Hayes received any compensation for the work they have done for SEIU in connection with entering into this retainer agreement?

A   Well, they're on retainer, so they -- they may have received some -- I mean, if they billed it as part of -- they may have.  I'm not sure, though.

Q   Has Robbins Geller paid them any money?

A   I would -- I don't know.  I don't believe so.

Q   Has SEIU paid any expenses in connection with this case?

Page 132

A   No.

Q   SEIU -- is SEIU represented by any counsel, other than Robbins Geller, in connection with this case?

MR. BURKHOLZ:  Objection to form.

BY MS. SADINSKY:

Q   Did you hear my question?

A   Yeah.  I'm just trying to think what -- we have not paid any -- anybody else in connection with this case.

Q   I'm asking if SEIU has engaged any other counsel in connection with this case.

A   Oh, no.

Q   SEIU is not represented by local counsel in this action?

A   Well, I know that we have -- that Robbins Geller has -- has engaged local counsel through this -- for this action.

Q   So Robbins Geller engaged local counsel, not SEIU, correct?

A   Well --

MR. BURKHOLZ:  Objection to form.

BY MS. SADINSKY:

Q   Has SEIU entered into a retention agreement with another law firm, other than Robbins Geller, in

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 133

this case?

A   Well, we -- we do act through local counsel on -- on the claim.

Q   Is local counsel retained by SEIU or Robbins Geller?

A   I'd have to -- I believe -- my understanding is that it's engaged by Robbins Geller.

Q   And you don't know who the local counsel firm is?

MR. BURKHOLZ:  Objection to form.

Do you want to show him the complaint?

MS. SADINSKY:  No.

BY MS. SADINSKY:

Q   I want to know:  Do you know who your local counsel is, what firm?

A   I don't --

MR. BURKHOLZ:  Why don't you show him the complaint instead of having a guessing game?

MS. SADINSKY:  No.  I'm asking him a question.  It's my deposition.

BY MS. SADINSKY:

Q   Do you know who your local counsel is?  What is the name of the firm?  If you don't know, tell me you don't know.

Page 134

A   I don't know exactly, but we rely on the judgment of Robbins Geller to make determinations about who's appropriate counsel.

Q   Understood.

A   And if they need -- they need -- they are a well-respected Ohio firm.

Q   Did SEIU consider hiring any other firms, other than Robbins Geller, to represent it in this case before engaging Robbins Geller in September 2019?

A   No.

Q   Did you interview any other firms?

A   Did we interview?  No, we did not.

Q   Why not?

A   Why not?  Well, it's a well-respected firm.  They have a history of litigation involving -- in this area and, in particular, with this company, and they're -- I mean, our general counsel has high -- high esteem for their work or their -- respect for their work and their reputation.

Q   Is -- your general counsel, you're referring to Jeff Stein, right?

A   Our general -- right, at the time of the engagement.

Q   Okay.  And did Jeff Stein personally know

Page 135

anyone at Robbins Geller?

A   Did he personally know anybody?  I mean, he knew who they were before we hired them.  We have a relationship with them.

Q   Okay.  Okay.  Let's see.

If you'd go to -- okay.  If you go to the second page, the bottom of the page, it says:  "Enclosed is a Complaint and a certification form which a designated representative of 1199 should execute."

Do you see that?

A   Yes.

Q   Was this letter accompanied by a complaint against Cardinal?

A   It was -- it was accompanied by a draft complaint.

Q   And a draft certification form?  Was it accompanied by a draft certification form?

A   Designate -- I believe the certification form was -- I mean, are you asking if the certification itself was a draft or --

Q   Was it accompanied by a certification form?

A   Yes.  I'm not sure -- it says it in the letter.

Q   Did you see it?

Page 136

A   Did I see it?

Q   Yes.

A   I've seen our certification, yes.

Q   On September 30th, SEIU filed a motion to be appointed lead plaintiff, correct?

A   I'm sorry.  Could you repeat the question.

Q   On September 30th, 2019, SEIU filed a motion to be appointed lead plaintiff, correct?

A   Correct.

Q   Were you involved in preparing that motion?

A   I was not personally involved.

Q   Who was, from SEIU?

A   Well, it would have been Jeff Stein.  He would have reviewed it.

Q   Anyone else?

A   That would have been it.

Q   Did the board review or approve the Motion for Appointment of Lead Plaintiff before it was filed?

A   Did the board --

MR. BURKHOLZ:  Object to the form.

Hold on.  Object to the form of the question.

BY MS. SADINSKY:

Q   Did the board review the Motion for

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 137

Appointment of Lead Plaintiff before it was filed?

A   No, it did not.

Q   Did Marc Kramer?

A   I'm not sure.  I don't know.

Q   Do you have any reason to believe that he did?

A   No.  I believe it would be something he would have had -- to the extent he would have had anybody reviewing, it would have been his counsel.

Q   Jenna Kramer?

A   Jenna Hayes, yes.

Q   Oh, sorry.

A   I would not have referred to Jeffrey Stein as general counsel to the board.

Q   Okay.  And did any other trustees approve the Motion for Appointment of Lead Plaintiff before it was filed?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  You're asking about the document itself?  Did the trustees review the document itself?

BY MS. SADINSKY:

Q   Yes.

A   Trustees would not review a legal document like that.

Page 138

Q   Okay.  Let's take a quick break.

MS. SADINSKY:  Want to come back at -- let's go off the record.

THE VIDEOGRAPHER:  Going off the record at 1:18 p.m.

(Whereupon, at 1:18 p.m., the proceedings in the above-entitled matter were recessed, to reconvene at 1:52 p.m., this same day.)

AFTERNOON SESSION

(1:52 p.m.)

THE VIDEOGRAPHER:  Going on the record at 1:52 p.m.

MS. SADINSKY:  Okay.  I'm going to mark as Exhibit 4 Tab 12, and if we could pull up page 19.

- - -

(Deposition Exhibit 4 was marked for identification.)

- - -

MR. BURKHOLZ:  Can you show the witness?

MS. SADINSKY:  Yeah.  We're putting it up now.

MR. BURKHOLZ:  Thanks.

CONTINUED EXAMINATION BY COUNSEL FOR DEFENDANTS

BY MS. SADINSKY:

Q   So do you recognize this document?

Page 139

MS. SADINSKY:  Go back to the first page quickly.

THE WITNESS:  I've seen it before, yes.

MS. SADINSKY:  Okay.  If you'd go to page 19.  And if you could highlight the language of the second paragraph of Interrogatory No. 16 and zoom in for us.

BY MS. SADINSKY:

Q   Okay.  So do you see the last sentence of that paragraph that's highlighted:  "On behalf of the Fund, Marc Kramer (Employer Trustee) and Maria Castaneda (Union Trustee) approved..." and then it says at the end there:  "...the decision to seek to be appointed as Lead Plaintiff in this Action."

Do you see that?

A   Yes.

Q   Is that true?

A   Yes.  What's in the interrogatory, that's true.

Q   Did they have authority?

A   Yes.

MR. BURKHOLZ:  Objection.  Asked and answered.

BY MS. SADINSKY:

Q   Who gave the authority?

Page 140

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  Who gave who the authority?

BY MS. SADINSKY:

Q   Gave Marc Kramer, Maria Castaneda the authority to approve the decision to seek to be appointed as lead plaintiff in this action.

A   That's pursuant to the power inherent in the trust agreement and policies and resolutions issued pursuant thereto over the years.

Q   So the decision -- so they had authority based on the trust agreement, correct?

A   Well, the trust governing documents generally, yes.

MS. SADINSKY:  And I'm just going to mark quickly as Exhibit 5 the trust agreement.

Which document is that?

Tab 7.

- - -

(Deposition Exhibit 5 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Do you recognize this document?

A   Yes.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 141

Q    What is it?
A    The Amended and Restated Trust Agreement through July 21, 2010.
Q    Is this the current version of the amended [sic] and declaration of trust?
A    Yes.
Q    Have there been any further amendments since July 21st, 2010?
A    Yes, there have been.
Q    When?
A    There was an amendment in 2018 authorizing the -- well, we didn't really -- specifying that the trust was authorized to borrow funds.
Q    Were there any other amendments?
A    I'm not aware of any, no.
      MS. SADINSKY:  Okay.  Let's -- you can put that document down.
      Let's mark as Tab 6 -- or Exhibit 6 Tab 13.
                    - - -
      (Deposition Exhibit 6 was marked for identification.)
                    - - -
BY MS. SADINSKY:
Q    And sorry.  One more question quickly.  So we just looked at the interrogatories that said

Page 142

Mr. Kramer and Ms. Castaneda approved the decision to be lead plaintiff, and is that approval documented?
A    You're asking whether that approval is documented?  Yes.  Through email.
Q    Through email.
      MS. SADINSKY:  Okay.  Mark -- what exhibit are we on?
      MR. MARTIN:  Exhibit 6.
      MS. SADINSKY:  Exhibit 6, Tab 13.
BY MS. SADINSKY:
Q    Do you recognize this document?
      MS. SADINSKY:  Go to the next page.  Second page.  Zoom in.
      MR. BURKHOLZ:  Can you make the font bigger.  Thanks.
      MS. SADINSKY:  Zoom in more.
      MR. BURKHOLZ:  Can you scroll through the document, please.
      MS. SADINSKY:  Scroll.
BY MS. SADINSKY:
Q    Do you recognize this document?
A    I've seen it before.
Q    What is it?
A    It's a certification signed by Jeff Stein

Page 143

in connection with the complaint.
Q    Were you involved in preparing it?
A    I personally was not.
Q    Was anyone from SEIU?
A    Which part are you talking about?  The --
      MS. SADINSKY:  Go back to the main page with the text.
BY MS. SADINSKY:
Q    This part (indicating).
A    I believe it was drafted by our counsel and then reviewed by our general counsel.
Q    Did Jeffrey Stein personally sign this document?
A    Yes.
Q    How do you know?
A    I spoke to him and he signed it and that's his signature.
Q    You spoke to him at the time he signed it, or you spoke to him in advance of this deposition?
A    In -- well, not at the time, but in advance of the deposition.
Q    The last line --
      MS. SADINSKY:  If you could zoom in.
BY MS. SADINSKY:
Q    "I declare under penalty..." the last line

Page 144

suggests it was signed at some point in September 2019, correct?
A    Correct.
Q    But it's not dated, right?
A    The day of the month is not dated.  The day of the month is not provided.
Q    Why?  Do you know why?
A    I don't know specifically why.
Q    Well, is Mr. Stein authorized to sign this document on behalf of SEIU?
A    Yes.
Q    How so?
      MR. BURKHOLZ:  Objection.  Asked and answered.
      THE WITNESS:  Well, as you alluded to in the previous, you know, authorized in conjunction approved by the trustees and with his authority under the -- in his capacity as general counsel.
BY MS. SADINSKY:
Q    Did Mr. Kramer and Ms. Castaneda authorize Mr. Stein to sign this document on behalf of SEIU?
      MR. BURKHOLZ:  Objection.  Asked and answered.
      THE WITNESS:  If -- if you're asking whether they approved the signature of this specific

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 145

document, I don't know.

Whether they would have said to him -- whenever we -- when trustees enter into some sort of -- any sort of action, they're typically -- you know, they're typically authorizing and empowering staff or even other trustees to sign appropriate documents consistent with the decision made by the trustees.

MS. SADINSKY:  Let's mark as Exhibit 7 Tab 14.

- - -

(Deposition Exhibit 7 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   What is this document?

A   That's the amended complaint.

Q   You've seen this before?

A   Yes.

Q   Did SEIU review the amended complaint before it was filed?

A   Yes.  It was sent to us for review.

Q   And did you personally review it?

A   I personally did not review it.

Q   Who personally reviewed it?

Page 146

A   That would have been Jeff Stein.

Q   Jeff Stein.  Did Jeff Stein provide comments on the amended complaint before it was filed?

A   I don't know.

Q   You don't know?

A   I don't -- I don't know.  Typically -- well, I don't know.

Q   Did SEIU undertake any inquiry or investigation or checking of any nature whatsoever as to the allegations of the amended complaint before it was filed?

MR. BURKHOLZ:  Objection to the form.

THE COURT REPORTER:  I didn't hear your answer.

THE WITNESS:  I'm not sure.

BY MS. SADINSKY:

Q   You're not sure if SEIU investigated the complaint before it was filed?

A   Well, if you're saying -- I thought I heard you say independent review.  Perhaps I might have misheard.

Q   Yes.  Independently.

A   I'm not --

MR. BURKHOLZ:  Same objection.  Same

Page 147

objection to the form.

BY MS. SADINSKY:

Q   What was your answer?

A   You know, I suppose it depends what you mean by "independently."  We had a consultation with our counsel on it, discussed the issue, and then the -- you know, relevant counsel and trustees also discussed it.

That's -- that's probably the -- most likely the extent of the review.  Probably -- if, for instance, you're asking whether somebody else was hired to also research the case, the answer would have been no.

Q   Okay.  So the only discussion as to the allegations of the amended complaint were with Robbins Geller, Levy Ratner, and Jenna Hayes, correct?

A   Correct.

Q   So it's fair to say that all of SEIU's knowledge about the allegations in the amended complaint comes from Robbins Geller?

A   Well, yes, and the -- you know, the independent sources that were provided that they cite in their reports.

Q   SEIU's -- but -- I'm sorry.

Page 148

You're talking about Cardinal Health's disclosures.  I'm asking about any investigation that SEIU did.  You said they only spoke to their counsel, correct?

A   Correct.

Q   So fair to say that all of SEIU's knowledge about the allegations in the amended complaint comes from Robbins Geller, correct?

A   That's the origins of the sources of information.

Q   Did SEIU authorize Robbins Geller to file this version of the amended complaint, the one that was filed, before it was filed in September 2020?

A   Yes.

Q   Who authorized that filing?

A   Jeff Stein.

Q   And how did Jeff Stein have authority to make that decision on behalf of SEIU?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  As I -- as I believe I've stated before, he had the authority, both in conjunction with the decision approved for by the trustees in consultation with them, and then also in carrying out those responsibilities.

Page 149

BY MS. SADINSKY:

Q   Is that authority in writing?

MR. BURKHOLZ:  Objection to the form. Asked and answered actually.

THE WITNESS:  The authority -- I'm sorry. The authority that Jeff Stein had to sign -- to say that this is the -- that we're -- the complaint is satisfactory after the -- that's --

BY MS. SADINSKY:

Q   So earlier we looked at the certification which was filed in September 2019.

A   Mm-hmm.

Q   This version of the amended complaint in front of you was filed in September 2020.

A   Okay.

Q   So did Jeff Stein have authority to authorize the filing of this complaint, and is that authorization in writing?

MR. BURKHOLZ:  Objection to the form. Asked and answered.

THE WITNESS:  He has the -- yes.  He has the -- he was authorized to approve the -- review that complaint and approve of it and authorize it, and his -- in his capacity as general counsel.

BY MS. SADINSKY:

Page 150

Q   Was Marc Kramer involved in reviewing this amended complaint?

A   No.  Most likely not.

Q   Did Marc Kramer authorize the filing of this amended complaint?

A   He -- when they -- when he authorized -- when the trustees approved moving forward with the class action and pursuing the lead plaintiff status, they -- Jeff Stein was empowered to -- as general counsel -- in his capacity as general counsel, to make decisions or -- and to review documents and work with -- work with our external counsel in approving such filings.

Q   Okay.  So fair to say the board -- the board of trustees, Marc Kramer, and Ms. Castaneda have not formally authorized any action since the Motion for Appointment of Lead Plaintiff, correct?

MR. BURKHOLZ:  Objection to the form. Asked and answered.  Mischaracterized the testimony.

THE WITNESS:  If your question is did they ever -- are they constantly renewing their authorization provided, no.  When they provided the authorization, that was sufficient authorization, and the authorization is ongoing.

MS. SADINSKY:  Let's mark as Exhibit 8 Tab

Page 151

No. 15.

- - -

(Deposition Exhibit 8 was marked for identification.)

- - -

MS. SADINSKY:  And let's just zoom in on the front there.

BY MS. SADINSKY:

Q   Do you recognize this document?

A   Yes.

Q   What is it?

A   This is the -- well, the agreement to -- as it says on the top, engage for -- engage Robbins Geller Dowd for the portfolio monitoring.

Q   Okay.  And then let's look at the date.

MS. SADINSKY:  Go to page 4.

BY MS. SADINSKY:

Q   The date there, what is it?

A   Well, there are a couple of dates, but the date that Jeff Stein signed is March 19th, 2019.

Q   Have there been any subsequent amendments?

A   I don't believe so, no.

Q   Is this agreement still in effect?

A   Yes.

Q   Was there an earlier portfolio monitoring

Page 152

agreement between SEIU and Robbins Geller?

A   Not to my knowledge.

Q   Is this the only agreement between Robbins Geller and SEIU related to portfolio monitoring?

A   Well, if you -- if you don't count the retention for -- relating to the action itself, that's the only one, to my knowledge.

Q   Does Robbins Geller have agreements with other SEIU funds relating to portfolio monitoring?

A   I believe it does.

Q   Which ones?

A   I believe the Greater New York Pension Fund there's one in place.  But I have not seen that one.

Q   Any others?

A   I don't believe so.

Q   Was the Greater New York Pension Fund agreement entered into around the same time?

A   I believe it was earlier.

Q   How much earlier?

A   I -- I couldn't say for certain.

Q   A year?

A   More than a year.  I believe -- I believe it was -- well, I believe it's been a long-standing one, five to ten years at least.

Q   Who from SEIU decided to enter into the --

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 153

this portfolio monitoring agreement?

A  Jeff Stein.

Q  Was it approved by the trustees?

A  I don't know if there were specific authorization approval sought for this -- entering into this agreement.

Q  If there was approval sought, would it be in writing?

A  Possibly, but not necessarily.

Q  Was this the first ever portfolio monitoring agreement that this SEIU plaintiff had ever entered?

A  No.

Q  Who are the others?

A  We engage a few firms with portfolio monitoring.  One is Scott & Scott, and the other is Labaton Sucharow.

Q  Am I correct that the purpose of this portfolio monitoring agreement is to bring to SEIU's attention potential lawsuits as to which SEIU may be prepared to act as lead plaintiff?

A  I mean, that could be interpreted as one purpose of it, but, in general, we think of it as providing reports on securities fraud in our portfolio, generally.

Page 154

Q  Does Robbins Geller receive any compensation for doing that?

A  No.

Q  Does SEIU bear any costs associated with Robbins Geller's portfolio monitoring services?

A  No.

Q  Why would Robbins Geller be willing to provide portfolio monitoring services to SEIU for free?

MR. BURKHOLZ:  Objection.  Calls for speculation.

THE WITNESS:  I don't -- I don't know the specific reason why they decide to do it for free.

BY MS. SADINSKY:

Q  Really?  You have no idea why Robbins Geller is willing to provide portfolio monitoring services to SEIU at no charge?

MR. BURKHOLZ:  I'm going to object and asked and answered.  Calls for speculation.

BY MS. SADINSKY:

Q  You can answer.

MR. BURKHOLZ:  You can answer once more the same way, and then we can move on.

THE WITNESS:  One could think of different motivations, but I don't specifically know what

Page 155

their motivations are by providing the portfolio monitoring.

BY MS. SADINSKY:

Q  Okay.  So it never occurred to you that Robbins Geller might expect to be hired to prosecute the claims that it brings to SEIU's attention.  That's your testimony?

A  Well, I being -- in the case again where I say "you," I mean the pension fund.  That would be one thing you might think that was being contemplated by Robbins Geller.  Could have been other things, I suppose.

Q  How many times has Robbins Geller brought a potential claim to SEIU's attention and SEIU decided to file a lawsuit related to that claim?

A  I know of a -- I know of three.

Q  Three times?

A  For -- I believe three times, yes.

Q  In any of those cases, has SEIU, you know, considered --

A  Can you repeat the question again?  I might have answered incorrectly.

Q  How many times has Robbins Geller brought a potential claim to SEIU's attention and SEIU decided to file a lawsuit related to that claim?

Page 156

A  Oh, and decided.  Okay.  Yes, three.

Q  And how many times has SEIU [sic] brought a potential claim to SEIU's attention and SEIU has not decided to file a claim?

A  I'm not sure about that, but there have been -- that has occurred.  I'm not sure of the exact number.

Q  More than once?

A  I honestly don't know.  I would not have been involved in the decisions at the time.

Q  How do you know that they occurred?

A  I've been told that they occurred.

Q  Who told you?

A  Jeff Stein has told me.  It's come up in preparation for the depositions as well.

Q  In any of the cases that we've just discussed, has SEIU hired a firm other than Robbins Geller to bring a claim that Robbins Geller brought to its attention?

A  No.

Q  So every time SEIU has pursued a claim brought to its attention by Robbins Geller, it has hired Robbins Geller to work on that claim?

A  That's my -- that's my understanding, yes.

Q  Is it fair to say that if SEIU decides to

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 157

bring a lawsuit called to its attention by Robbins Geller pursuant to the portfolio monitoring agreement, SEIU will retain Robbins Geller for such claim?

MR. BURKHOLZ: Objection to the form of the question and the document.

BY MS. SADINSKY:

Q   You can answer.

A   I -- this -- this agreement's been in place for just a couple of -- just a few years. I don't know that I would be, at this point, willing to say that there's a definitive -- a definite practice or a practice relating to how we would decide to move forward with a claim. If we thought some -- if we thought there -- another firm would do a substantially better job or better represent the interests, I suppose we would think about it. But it hasn't really been an issue yet since we've been happy with the -- happy with the representation at this point.

Q   Okay. So you see this agreement is signed in April 2019, correct?

A   I mean, that's when it's -- I would suspect -- I guess that's what we would call the effective date since that's the second date of

Page 158

this -- the last date -- the last date on the signature page.

Q   So either in March or April of 2019. Between March and April 2019, at that time did SEIU have portfolio monitoring agreements with any other law firms?

A   Yes.

Q   In March and April of 2019?

A   I believe so, yes.

Q   Which ones?

A   The ones I mentioned: Scott & Scott and Labaton Sucharow.

Q   At the time SEIU engaged Robbins Geller to represent it in connection with this litigation against Cardinal Health, which I think was September 2019, did SEIU have portfolio monitoring agreements with any other law firms?

MR. BURKHOLZ: Objection. Asked and answered.

Go ahead.

THE WITNESS: Yes. With the -- the same two firms that I've mentioned.

BY MS. SADINSKY:

Q   Does SEIU still have portfolio monitoring agreements with Scott & Scott and Labaton?

Page 159

A   Correct.

Q   When did SEIU enter into those agreements?

A   I'm not certain. They would have been before I started here.

Q   And they were before SEIU entered into the portfolio monitoring agreement with Robbins Geller, correct?

A   Yes.

Q   Does SEIU have portfolio monitoring agreements with any firms other than Robbins Geller, Scott & Scott, and Labaton?

A   Not to my knowledge, no.

MS. SADINSKY: And, Jackson, you can put this document down.

BY MS. SADINSKY:

Q   Are there any differences in the terms of the agreements between Robbins Geller, Scott & Scott, and Labaton?

A   I don't know.

Q   You said earlier that some of the firms provide portfolio monitoring services for ensuring that SEIU is involved in its class action settlements.

What portfolio monitoring agreement is that?

Page 160

A   Oh, yeah, in that sense, Scott & Scott has responsibilities that I would say that Robbins Geller does not have. They -- or at least they take on the responsibility. They report on settlements in class action claims and then let us know, and our -- it's also monitored by our custodians. So it helps our -- our operations, our investment group operations.

They utilize that to cross-check to make sure that any -- that our custodian is appropriately participating in settlements.

Q   Okay. So Scott & Scott is focused on settlements.

What about Labaton?

A   They also raise -- bring attention about -- send us reports and bring to our attention potential claims relating to -- relating to our investments. I would say, generally, they operate more -- well, we receive more updates from them with relationships -- actions that take place outside of the United States.

Q   Okay. So Labaton brings to SEIU's attention potential claims relating to its international investments?

A   That's what I've noted, that they've done

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 161

more -- that they've had more focus on.

Q   So each of the three law firms has a slightly different role, correct?

Robbins Geller focused on federal securities lawsuits in the United States, Labaton focused outside the United States in securities law, and Scott & Scott is responsible for class action settlement-type things?

MR. BURKHOLZ:  Objection to the form. Misstates the testimony.

THE WITNESS:  I'd say they perform -- they seem to take on performatory responsibilities and take on different responsibilities.  I don't know that we review -- review any of those firms as having that role with respect to the pension fund.

BY MS. SADINSKY:

Q   Okay.  Did Scott & Scott notify SEIU of the alleged fraud in this case?

A   Not to my knowledge.

Q   Did Labaton?

A   Not to my knowledge.  I don't -- I don't recall.

Q   Does Scott & Scott receive any compensation for its portfolio monitoring services to SEIU?

A   No.

Page 162

Q   Was the answer, no, or I don't know?

A   No.  I -- I don't believe so.

Q   Does Labaton receive any compensation for the portfolio monitoring services it provided to SEIU?

A   They don't receive any compensation from SEIU.

Q   Who did they receive compensation from?

A   They would receive compensation with the settlement outside -- or when there's a final settlement -- when there's an award on the actions that take -- take place outside the United States.

Q   Does Scott & Scott or Labaton bring potential federal securities fraud claims that may exist in the United States to SEIU's attention?

A   I don't -- I don't recall them bringing that to our attention.

Q   So Robbins Geller is the only firm that does that, right?

A   Yes.  On a consistent basis, yes.

Q   Do you know if Scott & Scott has any agreements with Robbins Geller regarding portfolio monitoring for SEIU?

A   I don't know.

Q   Do you know if Labaton does?

Page 163

A   I don't know.

Q   So you explained to me how Labaton gets paid if there's a settlement or award in a securities action.

How does Scott & Scott get paid?

A   I don't know what their -- I don't -- I don't know what they're -- how they get paid.  Maybe they -- I don't know.

Q   Does Scott & Scott, Labaton, and Robbins Geller coordinate in any way in providing portfolio monitoring services to SEIU?

A   Not to my knowledge, no.

Q   Under the portfolio monitoring agreement, SEIU provides transaction reports to Robbins Geller, correct?

MR. BURKHOLZ:  Will you show him the agreement?

MS. SADINSKY:  Yeah.  Let's bring back up the portfolio monitoring agreement and go to paragraph -- or page 1, paragraph 3.

MR. MARTIN:  Tab 15?

MS. SADINSKY:  Yes.

Go to paragraph 3.  Just zoom in.

BY MS. SADINSKY:

Q   Do you see where it starts:

Page 164

"Additionally"?

"Additionally, Client will ensure that Client or Client's custodian or managers provide at least monthly...updates of Client's...transactions to RGRD on an ongoing basis."

A   Yes, I see it.

Q   So SEIU provides transaction reports to Robbins Geller, correct?

A   Correct.

MR. BURKHOLZ:  Objection to the form.

BY MS. SADINSKY:

Q   How often?

MR. BURKHOLZ:  Objection to the form of the question.

THE WITNESS:  I don't -- I -- the language of the agreement says at least monthly, and our custodians, I imagine, are pretty good, but I'm not monitoring how often the custodian is sending reports to -- or the managers are sending the reports to RGRD.

BY MS. SADINSKY:

Q   Who's the custodian?

A   The custodian is Northern Trust.

Q   How long have they been your custodian?

A   They've been the custodian for over 25

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 165

years.

Q   Does SEIU have any other custodians since 2015?

A   Well, our managers may have -- well, our managers that are -- we don't directly hire any other custodians for the -- for the most part. There may be the case that there are -- either through our investment managers or others, that our -- our securities are indirectly owned by the fund -- by the pension fund are held by other custodians.

Q   Any idea how many publicly traded securities SEIU generally holds at any given time?

A   No.

Q   Hundreds?

A   More than hundreds.

Q   Thousands?

A   Thousands, more likely, yeah.

Q   Hundreds of thousands?

A   Could be hundreds of thousands.  But --

Q   So under the portfolio monitoring agreement, Robbins Geller receives thousands -- receives reports on thousands of securities each month for SEIU?

A   Well, it depends on how many are involved

Page 166

in transactions.  Sorry.

If the question is thousands, yes, I would suspect they receive thousands.

Q   You said Northern Trust is a custodian, right?

A   Correct.

Q   Does Northern Trust send the -- send its reports, the monthly electronic reports, directly to Robbins Geller, or does SEIU send the reports to Robbins Geller?

A   I believe it goes from the custodian directly.

Q   Do you know what's in those reports?

A   I've not personally reviewed them.

Q   Have you ever seen one?

A   A transaction report?

Q   A Northern Trust report.

A   Yeah.

Q   So does it generally --

A   So I don't know -- you know, my ability to read them would be -- would be not a major part of my job.  So --

Q   Do you understand that they -- a Northern Trust report generally includes all of SEIU's holdings at a given period of time, at the time the

Page 167

report is issued?

A   Well, if they're -- I understand that Northern Trust would have that information, or at least the information about thousands of positions held.  Whether that's included in a monthly transaction report, I'm not certain just because I don't know -- I don't know if every single position is bought or sold during a month.

Q   Is it accurate to say that Robbins Geller monitors SEIU's holdings for securities transactions that may provide SEIU with standing to bring a lawsuit?

A   I'm sorry.  Is it fair to say that Robbins --

Q   Is it fair to say Robbins Geller monitors SEIU's securities holdings --

A   Mm-hmm.

Q   -- to determine which ones may lead to SEIU moving for appointment of lead plaintiff in a securities litigation?

A   I suspect that the -- those reports would include information that would be useful to knowing that.

Q   If Robbins Geller identifies a potential claim that SEIU may bring, will it bring that claim

Page 168

to SEIU's attention?

MR. BURKHOLZ:  Objection.  Calls for speculation.

THE WITNESS:  That -- I think -- well, I'm not sure.  They may -- if they're bringing it to our attention, I imagine they would have to first think whether it would make sense from our perspective to put the effort or the resources into pursuing that claim.

BY MS. SADINSKY:

Q   Is the idea that, under the portfolio monitoring agreement, Robbins Geller will come to SEIU to see whether SEIU wants to pursue a lawsuit rather than SEIU as a client having a grievance and seeking advice from Robbins Geller?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  Well, so we've retained Robbins Geller.  It might not have been something that -- you know, if they had not approached us, we might not have actively sought them.

That said, we have an agreement with them. So -- and they bring to our attention different types of claims.  So they, you know -- would we be aware of them if Robbins Geller did not bring them to our attention?  Probably not.  But we do have an

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 169

agreement with them whereby we decide if that's information that we would want.

BY MS. SADINSKY:

Q   Under the engagement, the retention letter with Robbins Geller, Robbins Geller has agreed to indemnify SEIU with regard to any sanctions associated with this litigation; is that correct?

MR. BURKHOLZ:  Will you show the witness the document, please, if you're going to refer to it.

MS. SADINSKY:  Bring up Tab 11.  I'm not sure what exhibit that is.  What exhibit is it?

MR. MARTIN:  Exhibit 3.

MS. SADINSKY:  We're bringing up Exhibit 3.  Go to paragraph 9 and zoom in.

BY MS. SADINSKY:

Q   Do you see there it says:  "Robbins Geller will defend and indemnify" -- 199 for -- "1199 for any claims asserted against 1199 for its institution, prosecution, and/or resolution of this action including, but not limited to, claims or sanctions involving attorneys' fees or costs"?

Do you see that?

A   I do.

Q   So under the engagement letter with Robbins

Page 170

Geller, Robbins Geller has agreed to indemnify SEIU as to any sanctions associated with this litigation, correct?

A   I see that agreement, yes.

Q   Do you think that, as lead plaintiff, it was appropriate for SEIU to enter into an agreement to shield SEIU from responsibility for improper conduct in this litigation if the court found such responsibility existed?

MR. BURKHOLZ:  This is a completely inappropriate question.  The document speaks for itself.

BY MS. SADINSKY:

Q   You can answer.

A   I'm sorry.  Can -- you're asking if I've -- if we thought it would -- if I think it was irresponsible of SEIU to seek indemnification for claims brought against SEIU?

Q   Yes.  If -- if -- if the court were to find that SEIU's conduct in this litigation as lead plaintiff was improper, do you think it's proper for SEIU to be indemnified for its improper conduct?

MR. BURKHOLZ:  Objection to the form.  Asked and answered.

BY MS. SADINSKY:

Page 171

Q   Yes or no?

A   No.

Q   It was improper?

A   I'm sorry.  You're asking me whether I think it's improper to put it into a -- put a clause into a contract agreement that's then subject to legal enforceability restrictions on its own?

A provision stating that the pension fund will be indemnified by a counterparty against claims that might be brought against the pension fund for actions that might be items that -- that the pension fund should be held accountable for ideal- -- or in some sense should be held liable for?

Q   Is that proper?

A   I think, you know, as a pension fund, we have a responsibility to protect the corpus of the -- of the trust, the pension fund, the funds because they're used to pay the benefits -- the retirement and security -- provide retirement security -- retirement benefits to our members.

It's incumbent -- it's important that we include in contracts provisions, to the extent enforceable, that will be -- that will protect that fund and thereby protect the benefits of our members in the future.

Page 172

These common -- these types of provisions are common in contracts of all types, and there's, in general, limits to their enforceability.

Q   Do you think that, as lead plaintiff, it was appropriate for SEIU to enter into an agreement to shield SEIU from responsibility for improper conduct in this litigation if the court found such responsibility existed?

MR. BURKHOLZ:  I'm going to object to the form.  This has been asked and answered twice now, and I think you need to move on.  It's completely inappropriate, what you're doing here.  He's answered the question about the provision, and you keep asking the same question again and again and trying to confuse him.

BY MS. SADINSKY:

Q   You can answer.  You have not answered my question.  It's a yes-or-no question.  Do you --

A   I've answered.  I think it's an appropriate provision to include in a contract for any --

Q   And did SEIU seek legal advice as to the enforceability of this provision?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  I'm sorry.  Did we seek legal advice about the enforceability of the provision?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 173

BY MS. SADINSKY:

Q   Yes.

A   We deal with indemnification clauses quite frequently in agreements, so I don't -- I don't --

Q   Did you seek legal advice about the enforceability of this provision?  It's a yes-or-no question.

A   No.

Q   Do you have any reason to believe that -- that you or SEIU will receive anything of value, directly or indirectly, from Robbins Geller in connection with this litigation?

A   We will not be receiving anything of value directly from Robbins Geller.

Q   What about -- what about from any parties other than Robbins Geller?

A   Can you repeat the question.

Q   Will you receive anything of value, directly or indirectly, from anyone other than Robbins Geller in connection with this litigation?

MR. BURKHOLZ:  Object to the question as -- as vague.  If you're referring to a potential settlement or judgment, or are you referring to payment from another firm for being involved in this case?

Page 174

BY MS. SADINSKY:

Q   I'm referring to anything of value other than your pro -- other than SEIU's pro rata share of any settlement or judgment.

Does SEIU respect -- expect to receive anything else of value, directly or indirectly, from any parties in connection with its conduct in this litigation?

A   Outside of settle -- anything received in conjunction with settlement, we do not expect to receive any compensation from -- or anything of value from any other entity in connection with this litigation.

Q   Do you have any knowledge, information, or reason to believe that any third party is bearing all or any of the expenses of this litigation?

A   Any third party besides counsel and --

Q   Besides Robbins Geller.

A   Well -- well, besides Robbins Geller and entities that they may retain, no.

Q   Besides Robbins Geller what?

A   And entities -- you know, other -- the other counsel that they may retain that may not be directly employed by Robbins Geller, no.

Q   Who are the other counsel that Robbins

Page 175

Geller needs to retain?

A   Well, there's local counsel.

Q   Is there anyone else?

A   Not to my knowledge.

Q   Have you ever discussed whether Robbins Geller could retain any counsel other than local counsel in connection with this litigation?

A   Not to -- not to my knowledge, but they are -- would be -- would be within the agreement that they could retain other counsel where necessary.

Q   Is either SEIU or any individual at SEIU being compensated in any way for SEIU's service as a lead plaintiff in this litigation?

A   No.

Q   To your knowledge, did any firm refer Robbins Geller to SEIU?

A   No.  I have no knowledge -- I have no knowledge about that.

Q   It's your testimony that you have no knowledge of how the relationship between Robbins Geller and SEIU began?

MR. BURKHOLZ:  I'm going to object to the question.  Now, this was asked earlier, and you spent about an hour with him going over the

Page 176

monitoring agreement and then the retention in this case.  So I'd like you to move on.  You've done enough questions in this area.  You've asked him a number of times, and I'd appreciate it if you'd move on from questions you've already asked.

MS. SADINSKY:  Are you directing the witness not to answer?

MR. BURKHOLZ:  I'm not.  But you already asked him about the monitoring agreement being executed in 2019 and then the retention agreement for this case.  You spent a lot of time on that.

BY MS. SADINSKY:

Q   Okay.  I just would like to ask briefly: Is it your testimony that you have no knowledge of how the relationship between Robbins Geller and SEIU began?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  I did not understand that to be the question.  I have some -- I have knowledge about how the -- the process by which the retention agreement was brought in and that there may have been some relationship between -- or some knowledge that people knew -- you know, professional relationships that people -- people know of other

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 177

lawyers -- of other people operating in the field where a pension fund might know whether other firms -- or people working at a pension fund might know about different firms in the area, that -- or practicing in this area. That's what I -- that's what I know. If there's another question, I'm not sure what the question is.

BY MS. SADINSKY:

Q   Is any firm other than Robbins Geller and local counsel sharing fees in this case?

A   Are there other firms sharing fees?

Q   Are there any law firms, other than Robbins Geller and local counsel, that may share in a legal fee award in this case?

A   Oh, there may be. I'm not sure.

Q   Have you ever discussed that with Robbins Geller?

A   I believe that's covered by -- that's covered by -- in the retainer agreement that there may be other firms involved.

MS. SADINSKY:  I'd like to take a short break.

Let's go off the record.

THE VIDEOGRAPHER:  Going off the record at 2:40 p.m.

Page 178

(Recess.)

THE VIDEOGRAPHER:  Going on the record at 2:54 p.m.

MS. SADINSKY:  I'm going to mark as Exhibit 9 Tab 30.

- - -

(Deposition Exhibit 9 was marked for identification.)

- - -

MS. SADINSKY:  And let's zoom in to the title.

BY MS. SADINSKY:

Q   Do you recognize this document?

A   Yes.

Q   What is it?

A   It's the declaration of Spencer Burkholz in connection with the filing of a class certification.

Q   Were you -- did you assist in preparing this?

A   I did not personally assist.

Q   Who did from SEIU?

A   It would have been Jeff Stein.

Q   Did anyone else?

A   That I don't -- I don't believe so.

MS. SADINSKY:  Okay. Let's go to the

Page 179

second page. Let's zoom in on paragraph 4, which starts at the bottom of the page, and maybe we can get it all on one page if you scroll out -- zoom out a little bit.

BY MS. SADINSKY:

Q   I'm just going to read it:  "Since the Fund's retention of RGRD in September 2019, RGRD has provided the Fund with written quarterly updates regarding the status and progress of this litigation. Jeffrey Stein and two other experienced lawyers (Suzanne Metzger and Gabriel Ristorucci), are involved in monitoring the litigation."

I'm going to stop there for now.

It says you were involved in monitoring the litigation along with Mr. Stein and Ms. Metzger. Is that an accurate statement?

A   Yes.

Q   Have you been involved in monitoring the litigation since it was filed in September 2019?

A   Yeah. Well, I've been aware -- aware of discussions since then or actively reviewing documents sent at different points.

Q   You've been aware of discussions and actively --

A   Aware or been, you know, updated on what --

Page 180

on the -- on the action, and then as time probably -- as time went on, I might become -- I've become more involved of late, since then.

Q   Were you -- were you involved in September 2019?

MR. BURKHOLZ:  Objection to the form. Involved in what?

BY MS. SADINSKY:

Q   Were you involved in this litigation in September 2019?

A   In that month I probably was not involved in the litigation, but since September two thousand -- excuse me -- since September 2019 I have been involved in the litigation.

Q   You were involved in October, November, and December 2019?

A   Well, yes. But it was less extensive than it is now.

Q   In what ways?

A   Well, early on we discussed what are the types of things that -- what are the types of issues or reasons why the fund might become involved in litigation, what would make sense -- get involved in litigation in this sort of role.

And then later over time, I would start

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 181

being -- having documents copied or sent to me. I would review them and help and assist in -- assist in document -- excuse me -- in discovery -- document production for discovery and activities such as that.

Q   Okay.  So what steps have you taken to monitor the litigation?

MR. BURKHOLZ: I'm going to object and just ask for clarification.  Are you asking about him as opposed to the -- the fund, the other two lawyers at the fund?

BY MS. SADINSKY:

Q   Yes, you personally, Mr. Ristorucci.  What steps have you personally taken to monitor the litigation?

A   So there have been a couple of different areas.  This -- this litigation has involved a fair amount of document production or requests for document -- requests for document production.  I assisted our investment group and then worked with Robbins Geller in trying to facilitate document production for going back several years.

When it comes to the action -- the filings submitted in case -- in connection with the action, I've reviewed, read over the responses.  I've

Page 182

generally relied on Robbins Geller's expertise -- expertise and then review some of the documents that led to -- that have led up to the case -- or led up to -- led up -- been -- been a part of the litigation.

Q   And did you review any documents prior to 2022, prior to the start of this year?

MR. BURKHOLZ: Objection. Asked and answered.  But go ahead.

THE WITNESS:  The answer is yes.  It's so hard to keep track of time.  Yes.  So there have been -- when there were responses to document -- responses to document production requests, some of the -- some of the filings preceding that I reviewed.  To be honest, I've not had much to say about it but -- because -- but there have been some items that we've wanted to make sure that are --

BY MS. SADINSKY:

Q   Understood.  Okay.

So the filings related to document requests were in 2022.  Have you reviewed any documents prior to the start of this year, yes or no?

A   I believe I had -- I believe I saw or was -- I saw the amended complaint, but since then most of the response -- most of the monitoring has

Page 183

been this year.

Q   What steps has Mr. Stein taken to monitor the litigation?

A   Well, he would generally review -- review the different filings, and in general it's -- we rely on our counsel and defer to their judgment on most issues.

Q   What steps has Mr. Stein personally taken to monitor the litigation, apart from relying on Robbins Geller?

MR. BURKHOLZ: Objection.  Asked and answered.

Go ahead.

THE WITNESS:  As I said, he would review the documents that they sent to him.

BY MS. SADINSKY:

Q   What has Ms. Metzger done to monitor the litigation?

A   That I'm not sure.  I assume she -- well, I'm not sure.

Q   Has she taken any steps to monitor the litigation?

A   Yes.  I've certainly discussed it with her, and she seems to know what is going on with the litigation.

Page 184

Q   What do you do to monitor your attorneys' conduct in the litigation, you personally?

MR. BURKHOLZ: Objection to the form.  Vague as to "conduct."

BY MS. SADINSKY:

Q   You can answer.

A   Well, other than reviewing the filings and work with -- work with document production and discuss what are appropriate -- well, those are -- we review the documents, discuss the status of the case, have discussed what our -- what expectations should be and what our realistic -- what -- what strategy there is for -- well, not strategy, but what we think are appropriate levels of production or requests for production.

But I've never had -- I've never had reason to question the conduct as you seem to be -- there's an implication when somebody says conduct, sort of ethical boundaries, and we've not seen anything that would make me think there's been anything unethical or untoward occurring.

MS. SADINSKY:  Can you zoom in, Jackson, to the top of page 2.  I want to look at the first sentence at the top of page 2.

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 185

Q   It says: "In addition to" --

MS. SADINSKY:  Sorry.  Go back to page 1.
Sorry about that.

BY MS. SADINSKY:

Q   It says: "RGRD has provided the Fund with written quarterly updates."

Do you see that?

A   Yes.

Q   Is that true?

A   Yes.

Q   And then it says: "RGRD has" -- on the next page -- "communicated numerous times with these three lawyers and others at the Fund."

Do you see that?

A   Yes.

Q   Is that accurate?

A   Yes.

Q   The updates that you receive from Robbins Geller, how long are they?

A   They're usually, I'd say, between six to ten pages.

Q   Do they include discussion of any litigation other than this case?

A   Updates about this litigation?

Q   Do they --

Page 186

A   They're reports that update -- that include this litigation but also provide updates about other litigation, but then they're also discrete.  They're in their own sections.  And then there have been some -- some reports that have been just about this case, I believe, or at least discussions.

Q   Are the quarterly reports typically a report on multiple litigations?

A   I guess, you know, the issue is when I'm receiving a report, I'm not sure if I think of it as the quarterly report.  There have certainly been some reports where other litigation is discussed.

Q   So in those reports where other litigation is discussed, how long is the portion of the report about this litigation?

A   I'd say about four to six pages, three to six pages.

Q   So you receive a report that is three to six pages long every quarter about this litigation?

A   I don't -- after I read something, I'm not sure I really keep track of how many pages were involved, but that sounds right to me.

Q   So it says here Robbins Geller has communicated with others at the fund; is that true?

A   Yes.

Page 187

Q   Who are the others at the fund?

A   They have communicated, at the very least, with Peter Andreou and Dilay Altiner.

Q   Anyone else?

A   Well, in connection with determining -- there have been some communications with people from IT on how to make sure we capture everything in our document productions.  So --

Q   Have they ever communicated any of --

THE COURT REPORTER:  I'm sorry.  You stepped on his answer.

MS. SADINSKY:  I'm sorry.

THE WITNESS:  Those aren't -- you know, they don't discuss the nature of the case.  They're just technical -- usually technical matters that may be just some searches.

BY MS. SADINSKY:

Q   Understood.

Does Robbins Geller communicate with any of the trustees?

A   I don't believe they do so directly, unless they're also receiving directly reports that we would send them anyway.

Q   When we were discussing the quarterly reports a moment ago, what subjects are covered in

Page 188

those reports?

A   There's usually a summary of what the underlying issues are in the case, procedural posture, and the -- what the expected future developments are.

MR. BURKHOLZ:  Yeah, at this point, Counsel, I've given you a lot of leeway.  I think you're starting to get into some attorney-client communications.  So I think I've given you enough leeway to -- for the purpose of these questions and --

MS. SADINSKY:  Sure.

BY MS. SADINSKY:

Q   Without revealing any legal advice, the portion of the update that provides a summary of the case and the procedural posture, does that typically stay the same from report to report?

MR. BURKHOLZ:  Objection to the form.
It's -- it's -- the entire document is legal advice.
It's a legal communication.  So it's protected.  I allowed him to answer some questions just generally.
So since it went to the issue of their monitoring of the case, but now you're getting into specific questions, which I think are not appropriate.

MS. SADINSKY:  We're trying to understand

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 189

if there's new updates each month and how much of the update is new. So I'm not asking about what is said in the update.

BY MS. SADINSKY:

Q I'm asking if you have a report, you said it's usually three to four pages about this litigation. Are three of the four pages the same from report to report, and the last page is the only one that's updated --

MR. BURKHOLZ: If he knows.

BY MS. SADINSKY:

Q -- what's to come, what expected?

MR. BURKHOLZ: I'm going to object to the question. It's -- it's a little bit vague, but if he knows, he can answer.

THE WITNESS: I have not -- I have not noticed that they're repetitive -- I mean, well, I have not noticed that they're exactly the same. There is some repetition of information as -- but -- because sometimes there's certain things that don't change, and part of the way you know something didn't change is that something says, "This is still the case."

BY MS. SADINSKY:

Q Does anyone at SEIU communicate with your

Page 190

local counsel?

A No.

Q How much time do you spend working on this case?

A Oh, that can vary.

Q So let's say over the last six months, how much time have you spent working on this case?

MR. BURKHOLZ: If you can provide an estimate.

THE WITNESS: It really varies about -- you know, if there is a filing, then, obviously, there would be more time looking at that than if there's not a filing.

But the past six months? Probably -- you know, I wouldn't be surprised -- I wouldn't be surprised if it's between 20 and 40 hours.

BY MS. SADINSKY:

Q 20 and 30 hours. And what about --

A 20 and 40, but the last six months. Okay. So we're going to December of last year. Yeah, more like 20 to 30 hours.

Q And then before that, how much time would you say total?

MR. BURKHOLZ: Again, I ask the witness not to speculate. She's entitled to an estimate, if you

Page 191

know.

THE WITNESS: I'm not sure, honestly.

BY MS. SADINSKY:

Q You were going to answer before your counsel interrupted, so if you had to give your best estimate of how much time you spent on this case more than six months ago, what would your estimate be?

A What I was going to say is that over a year-long period, it can be hard to estimate how much time is directly spent on an activity. Knowing though that was something on my -- sort of on the agenda of things that we're responsible for, so sometimes it can occupy mind space even when you're not actually doing something directly at that moment on something.

So I know for the past, probably last -- you know -- you know, as time gone -- as time has gone on, it takes up more time and just is something to acknowledge that things need to be done.

Q Between September 2019 and December 2021, did you spend more than ten hours actively working on this case?

MR. BURKHOLZ: Objection to the form.

THE WITNESS: Between September -- I'm

Page 192

sorry. September '19 and December 2021, yes, more than ten hours.

BY MS. SADINSKY:

Q More than 20?

A That I don't know.

Q More than 15?

A I just -- I don't know.

Q Okay. So somewhere between 10 and 15 hours you spent between --

A No. I'm not saying 10 to 15. I'm saying I don't know. It could have been -- it could have been more than that.

Q How much time has Mr. Stein spent working on this case?

A Oh, I don't know. I know it's been something he's been working on, but I don't -- I don't monitor his hours.

Q How much time has Ms. Metzger spent working on this case?

A Similarly, I don't know.

Q How have you, Mr. Stein, and Ms. Metzger divided responsibilities for monitoring this case?

MR. BURKHOLZ: Objection. Object to the form.

THE WITNESS: I would say for -- at the --

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 193

when it first started, Jeff Stein was primarily responsible for monitoring the case, and Suzanne and I would be involved in discussions. Perhaps because it was related to investments, I might have been a little bit more -- paying attention to it than she does; on the other hand, she's usually -- she's a litigator and I am not.

As -- as time has progressed, it's become more and more my responsibility -- my primary responsibility.

BY MS. SADINSKY:

Q   So you said Mr. Stein -- so Ms. Metzger took over as general counsel in June 2021, correct?

A   Correct.

Q   And Mr. Stein, you said, is a consultant or has more of a consulting role?

A   Yeah, he's -- I'm not sure of his exact title. But it's, yes, more -- certainly a reduction in hours than what it was when he was general counsel.

Q   Is he an employee at SEIU, or is he an independent consultant?

A   I think he's an employee.

Q   So he --

A   He's an employee.

Page 194

Q   And how many hours a week does he work?

A   I don't know how many hours he works because I'm not -- I'm not aware of all times when he's working, and we're not all in the office these days, and nor do we only do work when we're in the office.

Q   You --

A   I would say he's probably at a quarter of what his hours once were, as we discussed earlier.

Q   Does Mr. Stein consult for any organizations other than SEIU?

A   He -- like I said, he's an employee here. He might have the title "consultant" or something like that, but he's an employee.

Yeah, I don't know. I don't think as, like, a -- I don't know. I know he has volunteer activities that he does. So --

Q   Is there an agreement between Mr. Stein and SEIU relating to this new role?

A   Yes. He has -- he has an agreement. He has an employment contract.

Q   Do you expect Mr. Stein to continue to be involved in this litigation going forward in light of this change in his role?

A   At a much reduced capacity, yes, although,

Page 195

I'm sure he will be available if I have questions about something.

Q   Between June 2021 and today, has Mr. Stein reviewed any filings in this case?

A   I'm not sure.

Q   Would you expect him to have reviewed any filings in this case between June 2021 and today?

A   I would say any filings in the second half of 2021, I would have expected that he would have taken -- he would have looked at the filings.

Q   Okay. It also says in this paragraph: "In addition to the quarterly updates" -- that's where I'm starting -- "RGRD lawyers have communicated numerous times." Then it says: "RGRD has provided drafts of important pleadings such as the consolidated amended complaint and opposition to defendants' motion to dismiss to the Fund for their review prior to filing."

Is that an accurate statement?

A   Yes.

Q   Did anyone review those documents?

MR. BURKHOLZ: Objection. Asked and answered.

You can answer again.

THE WITNESS: I recall reviewing at least

Page 196

some of those documents.

BY MS. SADINSKY:

Q   Which ones?

A   I believe the Opposition to Defendants' Motion to Dismiss.

Q   Did you comment on that document prior to it being filed?

A   I had comments on some documents. I don't know if it was that one.

Q   What other documents have you reviewed, other than the document requests and the opposition to Motion to Dismiss before they were filed?

MR. BURKHOLZ: Objection. Misstates his testimony -- prior testimony.

THE WITNESS: So prior to filing, I've read -- I've also reviewed some -- some of the response -- responses to the discovery requests -- oh, and the interrogatories.

BY MS. SADINSKY:

Q   So you've reviewed responses to interrogatories, responses to document requests, and the opposition to Motion to Dismiss prior to filing, correct?

A   Correct.

Q   Did Ms. Metzger review any filings prior to

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 197

them being filed?

A   I'm not -- I'm not certain.

Q   Okay.  Let's go to the bottom of page 2.  Who signed this document?

A   Spence Burkholz.

Q   This declaration is attesting to what SEIU has done to fulfill their duties as class representative, right?

MR. BURKHOLZ:  Objection to the form.  Document speaks for itself.

THE WITNESS:  Are you asking me if that's what -- that's what it is, yes.

BY MS. SADINSKY:

Q   And why didn't SEIU sign this declaration attesting to what SEIU has been doing to monitor the litigation?

MR. BURKHOLZ:  Objection to the form.  Irrelevant.

THE WITNESS:  You know, I don't know.

MR. BURKHOLZ:  Calls for -- calls for legal communications.

BY MS. SADINSKY:

Q   You can answer.

A   I'm not sure.

Q   Did anyone ever ask you to sign this

Page 198

document?

MR. BURKHOLZ:  Objection.  Calls for -- you're getting into legal communications between counsel and the fund.

MS. SADINSKY:  I disagree.  I'm asking if Robbins Geller asked Mr. Ristorucci to sign this document or not.  I don't know that there's legal advice there.

MR. BURKHOLZ:  The document doesn't have his name on it.  It has my name on it.  So why would they sign the document?

BY MS. SADINSKY:

Q   Mr. Ristorucci, has Robbins Geller asked you to sign this document?  Did Robbins Geller ask you to sign this document?

A   I don't -- I don't recall being asked to sign the document.

Q   They did not ask you.  That's your testimony?

A   I just don't recall.  March 25th I was actually out of the country.  So it might have been --

Q   Did they ask Mr. Stein to sign this document?

A   I'm not sure.

Page 199

Q   Did they ask Ms. Metzger to sign this document?

A   I'm not sure.

MS. SADINSKY:  Can we mark as Exhibit -- whatever the next exhibit is, Tab 29.

MR. MARTIN:  Exhibit 10.

- - -

(Deposition Exhibit 10 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Do you recognize this document?

MR. BURKHOLZ:  Do you want to scroll through the document and show it to him.  If you can answer -- if you can answer on its face, it's fine.  But --

BY MS. SADINSKY:

Q   Do you recognize this document?

A   Could you scroll through it a little bit?  I mean, I've seen it -- yes, I've seen it before.  I've looked at it before.

THE COURT REPORTER:  I didn't hear that.  I'm sorry.

THE WITNESS:  I've looked at this before.

MS. SADINSKY:  Let's go to the last page of

Page 200

it to show Mr. Ristorucci the date.

BY MS. SADINSKY:

Q   This is dated March 25th, right?

A   Yeah.

Q   You were out of the country at this time, right?

A   Or actually I got back March 25th.

Q   Did anyone review this document before it was filed at SEIU?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   Who?

A   That would have been me.

Q   I thought you said that you were out of the country.

A   Well --

MR. BURKHOLZ:  Counsel, you asked him if he reviewed a draft.  He said he was out of the country on the 25th.  Why don't you lay a foundation for a proper question?

BY MS. SADINSKY:

Q   All right.  Let's go back to the declaration.  And let's go down to the signature.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 201

So why don't you read through this and start from the first page, and let us know if there's any statements in here that are inaccurate.

A  Okay. Scroll down, please.

Okay.

Yes, I --

Q  Yes, everything is accurate?

A  I'm just reading the final -- I was going to say, yes, I can read this.

Yeah, everything is -- well, everything is accurate as far as I know. I don't see any inaccuracy.

Q  Is there any statement that requires additional explanation?

A  No. What I mean by that is I don't -- I am not somebody else, and can't attest to specific, you know --

Q  Did you authorize the statements made about you in this declaration?

A  The statement that involved in -- yes. I mean --

Q  You authorized those statements?

A  I didn't specifically authorize them to be stated, but they're accurate, which would --

Q  Did Ms. Metzger -- did Ms. Metzger

Page 202

authorize the statements about her to be made?

A  Can you go up to the statements about Ms. Metzger? I'm not -- I'm not sure what communications Ms. Metzger has had.

Q  Do you see it says here that Ms. Metzger's involved in monitoring the litigation as of the --

A  Yes.

Q  And you don't know whether or not that's true?

A  No. I know that's true. I don't know if Ms. Metzger authorized her name to be included specifically in a -- in the certification, but it's accurate.

Q  It's accurate? She's involved in monitoring the litigation?

A  Yes.

Q  And you don't know how much time she spends doing so, correct?

A  That's correct.

Q  And you don't know how much time Mr. Stein spends doing so, correct?

A  I don't. I know that I've been involved with meetings with them discussing this. I know we've discussed with -- we've had communications with our counsel as well.

Page 203

Q  And you don't know if Mr. Stein is going to be involved in this case or the extent to his involvement going forward, correct?

MR. BURKHOLZ: Objection. That's not -- misstates his prior testimony.

THE WITNESS: I don't know the level of -- well, I don't know to what extent he will stay -- he will continue to be involved. He will likely be involved. The extent to which he's involved in some sense depends on how -- how much of his attention is required.

BY MS. SADINSKY:

Q  What are SEIU's responsibilities in this litigation?

A  Well, we have a responsibility to make sure that the class is adequately being represented, that the lawyers are competent and performing well --

Q  And to monitor --

A  -- prosecuting the case -- monitor -- monitor their progress and the actions that are taken.

Q  Have you been doing that?

MR. BURKHOLZ: Objection. Asked and answered about five times.

THE WITNESS: Yes.

Page 204

MS. SADINSKY: Can you pull this document down.

BY MS. SADINSKY:

Q  Can you describe to me what SEIU thinks Cardinal did wrong that warrants the lawsuit SEIU is bringing against them?

MR. BURKHOLZ: Objection. Asks for a legal conclusion and --

BY MS. SADINSKY:

Q  I'm not asking you to reveal any legal advice. I just want to know why you're bringing this lawsuit against Cardinal.

What do you think Cardinal did wrong?

MR. BURKHOLZ: Objection. The amended complaint speaks for itself. You're getting into communications about why they brought the case. That's -- those are privileged communications.

MS. SADINSKY: Are you directing your client not to answer?

MR. BURKHOLZ: It depends on the question that you're asking. Because it seems like you're asking him a question about -- that would be formed from discussions with legal counsel, and that is a privileged communication.

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 205

Q   Can you tell me who the defendants are in this case?

A   Well, it's Cardinal Health and some executives at Cardinal Health.

Q   Who?

A   I'm not recalling the names of the executives at the moment.

Q   Can you recall the name of one?

A   No.

MR. BURKHOLZ:  Do you want to show him the amended complaint, or do you want to continue to have a guessing game?

MS. SADINSKY:  I'm -- I'm asking about Mr. Ristorucci's knowledge of the litigation as the class representative.  I don't want to show him a document to discuss that.

BY MS. SADINSKY:

Q   What is SEIU alleging Cardinal Health did wrong?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

But you can answer the general allegations.

THE WITNESS:  As is stated or, you know, provided in the complaint, Cardinal Health purchased a subsidiary of Johnson & Johnson with the idea that

Page 206

they were going to be bringing some expertise with regard to logistics to this Cardinal Health that was not previously existing there.

They -- they apparently reported that this integration of their logistics expertise was going well and was -- and was going -- there was going to be, essentially, a synergy between the expertise that Cardinal Health brought and that existed in Cordis.

They had reason to believe that this integration was not going well, apparently, and did not -- did not disclose that information to the public, and in fact may have been indicating that the -- that the disclosure was -- or that the integration was going well or that to the extent it was not going well was unrelated to the -- a lack of -- a lack of -- a lack -- a failure in the integration, and, as a result, had to write off a fair amount of goodwill, and it was later determined that -- and also lost a lot of inventory.

At the same time, when they finally did make the disclosures public, the share value of the stocks declined significantly.  And prior to that public disclosure, several of the executives had sold their shares in the -- that they had in

Page 207

Cardinal Health and had a -- and had avoided the losses that would have otherwise been involved if they had -- if they had -- if the public disclosure had been made timely.

BY MS. SADINSKY:

Q   Mr. Ristorucci, do you understand you're under oath?

A   Do I understand that I'm under oath?

Q   Yes.  Are you reading notes right now?

A   No.

Q   What are you looking down at?

A   My desk more --

Q   What about -- what about to the side, the other side?

MR. BURKHOLZ:  Counsel --

THE COURT REPORTER:  I'm sorry.  I didn't hear that, the witness.

THE WITNESS:  If you would like me to take my computer and show you what's there, there's a mouse pad that is also -- tells you how to -- our document management system.  That's from -- I've had that there basically since the day I started here.

BY MS. SADINSKY:

Q   Okay.  So you have no notes with you?

A   No notes.

Page 208

Q   Okay.  And so you don't know who the defendants are in this lawsuit, other than --

MR. BURKHOLZ:  Objection.

THE WITNESS:  I actually was not concerned with their names.  They're fairly generic names.  They're not famous, so I don't know.  The name of the individuals was never particularly important to me.

BY MS. SADINSKY:

Q   Do you know who George Barrett is?

A   That name, now that you remind me, is one of the executive's names.

Q   Do you know what he did wrong?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

BY MS. SADINSKY:

Q   Can you give me some examples of the allegations in the complaint that are based on things that George Barrett said?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

If you want to show him the complaint, show him some of the statements, you can go ahead.  This is just completely inappropriate.

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 209

Q   Go ahead.

A   I'm sorry.  Could you repeat the question, please.

Q   Can you give me an example of one allegation in the complaint based on a statement George Barrett made?

A   Like I say, I don't remember the -- the name.  I'm not -- I'm just not associating the names with the executives.  It wasn't -- when I'm -- when I'm reviewing the complaint, I'm not thinking is this -- you know, is this particular individual -- what's the story line with this individual.  I'm thinking what's the -- what's being stated.  Does this -- is this claim making sense.  Is the argument thorough.

I have -- we have -- we have counsel, outside, external counsel, to handle the, you know, what I'd call the extreme details of the -- of the litigation.

Q   Mr. Ristorucci, I'm going to ask you a series of yes-or-no questions, and if you want to explain them in more detail, your counsel can explore that to you when they get to do a redirect.

Okay?

Do you know who Mike Kaufmann is?

Page 210

A   No.  That also -- that name also is in the complaint, though.

Q   Can you give me an example of one allegation in the complaint based on Mike Kaufmann?

MR. BURKHOLZ:  Objection to the form.  Document speaks for itself.

You can answer.

THE WITNESS:  I don't remember the exact statements that are -- or actions made by the -- Mike Kaufmann.

BY MS. SADINSKY:

Q   So the answer is no?

A   No.

Q   Do you know who Jorge Gomez is?

A   No.

Q   Can you give me an example of one allegation in the complaint that is a statement by Mr. Gomez?

MR. BURKHOLZ:  Objection to the form.  The amended complaint speaks for itself.

You can answer.

THE WITNESS:  No.

BY MS. SADINSKY:

Q   Do you know who Donald Casey is?

A   No.

Page 211

Q   Can you give me an example of one allegation in the complaint based on a statement by Mr. Casey?

MR. BURKHOLZ:  Objection to the form.  The amended complaint speaks for itself.

You can answer.

THE WITNESS:  No.

BY MS. SADINSKY:

Q   Do you know who Mr. Wilson is -- David Wilson is?

A   No.

Q   Can you give me an example of one allegation in the complaint based on a statement by Mr. Wilson?

MR. BURKHOLZ:  Objection to the form.  The amended complaint speaks for itself.

THE WITNESS:  No.

BY MS. SADINSKY:

Q   There is a -- there's one claim in the complaint that's made against only one defendant.  Do you know what that claim is?

MR. BURKHOLZ:  Objection to the form.  The amended complaint speaks for itself.

You can answer if you know.

THE WITNESS:  No.

Page 212

BY MS. SADINSKY:

Q   As we -- as we discussed earlier, SEIU has investment managers, right?

A   Yes.  That's correct.

Q   And it has investment managers that have transacted in Cardinal Health securities on SEIU's behalf, correct?

A   Correct.

Q   And SEIU monitors the performance of those investment managers, correct -- the investment committee does, correct?

A   Staff and advisers and trustees play a role in monitoring our investment managers.

Q   And SEIU has a fiduciary duty to individuals whose pensions it invests, right?

A   They have fiduciary responsibilities as trustees, yes.

Q   And SEIU's investment managers have a fiduciary duty to SEIU as well, right?

A   Correct.

Q   Did anyone at SEIU ever discuss Cardinal Health with any of its investment managers, other than about this litigation, in the last month?

MR. BURKHOLZ:  Objection.  Asked and answered.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 213

But you can answer.

THE WITNESS: No, not to my knowledge. There may -- but as I said, there may at times be an analysis of Cardinal Health that's included in an overall industry or sectoral analysis, but not Cardinal Health in particular as an investment to be made or not to be made.

BY MS. SADINSKY:

Q Okay. Are there any investment managers -- sorry. Strike that.

How many investment managers has SEIU used since 2015?

A I'm not sure. At any given time, we have many investment managers. In the tens.

Q In the tens?

A Yeah.

Q Do you know how many investment managers SEIU used between 2015 and 2018?

A For equities, I would imagine it was between six to eight investment managers.

Q What about for the other strategies? You told me them before: hedge funds, private equity, fixed income investments, and special opportunities.

A Well, fixed income, probably talking under ten, five to ten. Private equity, it depends.

Page 214

Probably -- probably, depending on -- probably about five -- or under five really at that time. Real estate, probably have one or two managers at most -- well, at least one, but not more than two.

For special ops, there's some overlap between special ops and private equity, so you might be looking another one or two there. Hedge funds, I would say one or two. And I think -- and then I guess -- well, yeah. Were there any others that I missed?

Q I think so. Who were the one to two investment managers you used to -- for hedge funds?

A The name is escaping me currently. Might be Artisan, but between 2015 and 2018, I'm not certain that they would have been the manager in place -- for 2015 to 2017.

Q During the period of 2015 to 2018, you had one to two investment managers that managed hedge funds, correct?

A That would be what I would expect.

Q Did any of SEIU's investment managers ever short Cardinal Health stock during the period of 2015 to 2018?

A Not to my knowledge. It's -- we wouldn't have visibility into that, but it also would seem

Page 215

unlikely to -- like an unlikely strategy, but we wouldn't know.

Q Why wouldn't you know?

A Well --

MR. BURKHOLZ: I have an objection. I have an objection.

Are you asking him about the hedge fund managers or the equity managers?

MS. SADINSKY: I'm asking him about any.

THE WITNESS: Oh. Equity managers, certainly not. Hedge funds, their role within the portfolio is generally to be less risky than equity and more -- but more -- a higher return than fixed income. So it seems unlikely that they would be involved in shorting, but we wouldn't actually have visibility into that because when -- we would see our custodian reports, which would just show that we have a position with a certain manager or fund.

Equity, our Investment Management Agreements don't allow for shorting, but we also -- we're not aware and we have not seen any shorting positions in our custodial reports.

BY MS. SADINSKY:

Q Do you have Investment Management Agreements with the hedge fund managers?

Page 216

A Yes.

Q Those haven't been produced. Can those be produced to us, please?

MR. BURKHOLZ: Counsel, we'll take that under advisement. You know that our position is that those agreements -- or the hedge fund investments are completely irrelevant to this litigation, but we will -- we can discuss with that -- that with you outside the contours of this deposition.

BY MS. SADINSKY:

Q Did any of SEIU's investment managers transact in Cardinal Health options or other derivatives tied to Cardinal Health stock between 2015 and 2018?

A Which -- which securities?

Q Anything other than common stock. Anything other than Cardinal Health common stock. Any other Cardinal derivatives.

MR. BURKHOLZ: Are you asking about the equity managers?

BY MS. SADINSKY:

Q Any manager that SEIU had, did it transact in Cardinal Health options or any sort of Cardinal Health derivative other than Cardinal Health common

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 217

stock?

A    Not to my knowledge.

Q    Did --

A    If you're saying specifically derivatives, I've not -- I will think not.

Q    And that applies to hedge funds too?

A    As well.  But I guess what I'm saying is you're saying securities and derivatives and sometimes people would think of bonds or debts as securities.  So, I don't know about -- that seems like a more likely thing that can happen than a derivative-based security.

Q    Okay.  During 2015 to 2018, were any of SEIU's assets invested in hedge funds?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  Yes, they were.

BY MS. SADINSKY:

Q    How much?

A    That would probably be between 5 to 10 percent of the portfolio.

Q    And how big is the portfolio -- or how big was the portfolio at that time?

A    You know, as I said, as an estimate, it would have been between five to eight, maybe five to

Page 218

$9 billion.

Q    I'm going to represent to you in your Motion for Appointment of Lead Plaintiff, you said the total amount of assets that SEIU has is 11.5 billion.

Would that have been an accurate statement if it was put in the motion for lead plaintiff?

A    It depends what date you're talking about.

Q    That was in September 30th, 2019.

A    That sounds about right.

Q    And so 5 to 10 percent of that amount was invested in hedge funds?

A    Mm-hmm.

Q    And were those -- and the investments in hedge funds you said were done by investment managers; is that right?

A    Correct.

Q    Do you think there's one to two --

A    Just to clarify, the investment managers themselves might not have made the investment.  They would have made a further investment with other managers that might have made the investment into -- that's more likely to be the scenario where that sub-manager -- I guess you'd call it sub-manager, but it's really like a fund of funds -- would have

Page 219

made the investment, but it could have even gone down lower than that.

Q    And so the one to two investment managers that did this, you don't know which ones they are?

A    Correct.

Q    And I think you said earlier Lorraine Monchak supervised these investments; is that right?

A    She doesn't supervise the investments.  She supervises or, I guess, monitors the relationship with the managers.  So she would be -- she would monitor and be involved in manager selection and then review overall portfolio performance with those managers and evaluate those managers' performance.

Q    And you said earlier that you don't have visibility into whether any of those hedge funds engaged in shorting -- in short sales, right?

A    Yeah.  We -- we would not have visibility into -- into that.

Q    So is it possible that the hedge funds shorted Cardinal Health stock?

A    It's -- it's possible, but, like I said, it seems unlikely given their mandate because shorting is a risky activity, and so it's more risky than, for instance, like, just buying equity.  And the purpose of the hedge fund investments is generally

Page 220

to be less risky than equity, but to produce -- you know, not as safe as -- you know, safe as -- safe as any fixed income, but produce a better return than fixed income.

Q    Is it possible that the hedge funds shorted Cardinal Health stock, though, yes or no?

A    You know, without knowing exactly what the -- what it is, I can't rule it out.

Q    And can't shorting be used to hedge risks?

MR. BURKHOLZ:  Objection to the -- objection to the form.  It's vague.  I don't know what you're asking him about.

BY MS. SADINSKY:

Q    Did any of the hedge funds engage in options transactions?

A    I -- I don't know.

Q    And I'm sorry.  I didn't catch your answer to my last question.

Can't shorting be used to hedge risks?

MR. BURKHOLZ:  Objection.  Vague and the form.

THE WITNESS:  I suppose I'd have to know more about a strategy, but I suppose -- I suppose it's possible, but it seems, again, unlikely as something you'd short a relatively minor -- or

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 221

relatively -- it's hard to imagine what shorting on Cardinal would accomplish, what risk it would be balancing off. But that's really outside my area of expertise, so it's possible.

BY MS. SADINSKY:

Q   Is it possible that the hedge funds that SEIU invested engaged in options transactions involving Cardinal Health stock?

MR. BURKHOLZ: Objection. Objection. Asked and answered. Also irrelevant. Legally irrelevant.

THE WITNESS: I'm sorry?

BY MS. SADINSKY:

Q   Is it possible that the hedge funds that SEIU transacted in engaged in options transactions involving Cardinal Health stock? Is it possible, yes or no?

MR. BURKHOLZ: Same objection. Asked and answered. Legally irrelevant to this case.

You can answer.

THE WITNESS: It's possible, but remote.

BY MS. SADINSKY:

Q   Other than hedge funds, during 2015 and 2018, was any of SEIU's assets invested in any other type of fund or investment vehicle that could have

Page 222

possibly shorted Cardinal Health stock?

A   I don't -- not that I'm aware of.

Q   None of the special opportunities, fixed income, or PE funds?

A   No. I mean, they -- I mean, it's a public equity. It's not the particularly sort of like -- it wouldn't fit in with those other mandates.

Q   Okay. And during 2015 to 2018, were any of SEIU's assets invested in any other types of funds or investment vehicles that could have engaged in options transactions in Cardinal Health stock?

MR. BURKHOLZ: Same -- same objection.

THE WITNESS: I'm not -- I'm not seeing the distinction between the previous question.

BY MS. SADINSKY:

Q   The previous question was related to shorting. Now I'm focusing on options transactions.

A   Yeah, same answer, though. It would be un- -- it would not seem to fit within the other mandates.

Q   So it's not possible?

A   Lets see what you're saying. Private equity, no. Special opportunities, I would -- no, that would not have fallen under special opportunity. Real estate, no. Fixed income, no.

Page 223

That would -- listen, I mean, you never know -- it would not fit within the mandates of the other -- the other areas.

Q   Okay. Are any of -- if any of SEIU's assets were invested in hedge funds or other funds, would those investments be reflected on the Northern Trust reports?

A   If they were a direct investment, yes. I would -- well, if -- if our -- if it was a public equity -- if it was an equity manager, we would see the -- what the -- what the shares were held. If they were held by -- you would see the ones that Northern Trust reports in terms of fund of fund managers, which is what hedge fund managers are. What you would see is a position held in a particular fund manager or fund. You would not see what the underlying security is on the report -- you know, what that -- what that underlying security is, and we probably -- we would not have visibility into that on a -- on a regular basis.

Q   Does SEIU currently hold a short position in Cardinal Health stock?

A   Not to my knowledge.

Q   Does SEIU --

A   No, not to my knowledge.

Page 224

Q   Is SEIU currently invested in any funds that hold a short position in Cardinal Health stock?

A   I don't know.

MS. SADINSKY: And I want to mark as the next exhibit -- what are we on?

MR. MARTIN: We're on Exhibit 11.

MS. SADINSKY: I'm going to mark as Exhibit 11, Tab 51.

MR. BURKHOLZ: Can we -- are we at a good point for you to take a break?

MS. SADINSKY: Yes, we can take a break. How long do you -- let's go off the record.

MR. BURKHOLZ: Just ten minutes.

THE VIDEOGRAPHER: Going off the record at 3:52 p.m.

(Recess.)

THE VIDEOGRAPHER: Going on the record at 4:09 p.m.

MS. SADINSKY: I'm going to mark as Exhibit 11 Tab 51.

- - -

(Deposition Exhibit 11 was marked for identification.)

- - -

MS. SADINSKY: I'm going to zoom out so

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 225

Mr. Ristorucci can see the whole cover.

BY MS. SADINSKY:

Q   Do you know what this is?

A   Yes.

Q   What is it?

A   I'm sorry.  Did you ask me what it is?

Q   Yes.

A   It's the, basically, Investment Management Agreement that the pension fund has with one of its managers, in this case Columbia Management.

Q   And is this agreement entered into in the ordinary course of business?

A   Yes.  I mean, we don't -- yes, there's a process by which managers are selected and there's an approval process, but they're -- it's a common -- a common agreement that we enter into.

Q   Let's turn to page 26.
    This page is titled "Asset Mix Policy."
    Do you see that?

A   Yes.

Q   Under, it says:  "As of January 2010."
    Do you see that?

A   Yes.

Q   And if you look about halfway down the page, there's a row for hedge funds.

Page 226

    Do you see that?

A   Mm-hmm.

Q   And it shows a policy target for hedge funds of 12 percent.
    What does that mean?

A   So that would have been that in -- at that time period as of January 2010, the goal, you know -- until the policy had changed, the goal -- the goal of the overall portfolio would have been to have about 12 percent of the portfolio in hedge funds.

Q   So the January 2010 -- so strike that.
    An asset mix policy is SEIU's policy regarding, you know, what percentages to put its assets in?  Can you just describe what an asset mix policy is?

A   So an asset mix policy is an overall strategic goal for the allocations of assets for the portfolio in general.  Assets being, you know, essentially money or what you're going to do with the money and those employer contributions that have -- that came in that we discussed earlier.
    So for an individual investment manager, they don't really -- I'm not sure how useful this is for them, but it is some -- some people think it's a

Page 227

good idea to include in the Investment Management Agreement, but the staff of the funds would be responsible for -- they would be monitoring in conjunction with the investment advisers and then reporting to the trustees how successful or how in line with this policy target the actual portfolio is.

Q   Okay.  So this shows a policy target for hedge funds of 12 percent?

A   Right.

Q   And then it also shows a policy range for hedge funds of 9.5 percent to 14.5 percent.
    What does that mean?

A   So it looks like they would have, like, a plus or minus 2.5 percent for the -- within basically a range of what would be acceptable.  Different sorts of assets, the value can fluctuate based on business cycle or just, you know, different types of world events.
    And the idea -- the idea here is that -- so, for instance, say we were talking about real estate and all of a sudden because real estate had done really well, it went up above the 8 percent or even above the 10 percent potentially, you might not want to adjust your portfolio because you have the

Page 228

expectation, perhaps, that some other parts -- that it might -- that it might occur -- that -- that the policy -- or the asset allocation might come back in line sort of naturally or just it would be based on what's expected.
    But, in general, once -- once -- once a particular asset's taking -- going either below or above the actual policy range, the investment fund -- or the staff would have to start considering -- and the -- you know, in conjunction with the trustees and the investment advisor whether we wanted to reallocate some -- essentially, liquidate assets in one part of the portfolio and put it another part, or perhaps just shift incoming contributions if contributions are exceeding benefit payments to those -- to those areas that were at that point under the policy range.

Q   A policy range of 9.5 percent to 14.5 percent, does that mean that 9.5 percent to 14.5 percent of all of the assets in the overall portfolio for SEIU would be invested in hedge funds?

A   Sure, in theory.  It doesn't always line up because, as I said, sometimes the -- the actual performance may indicate that some fund is -- or some asset is doing worse or -- or it's undervalued

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 229

related to the -- well, it's gone down in value, so it's not hitting the policy target.

So sometimes, you know, there'd be an evaluation and sometimes it might mean, well, let's shift some assets into hedge funds. As it happens, though, I think hedge funds have been an underperforming asset for a while now. So they may not have done -- even if they were below the target, they may not have, but I suspect it was probably within the range.

So that would suggest, yes, that it would be within the range, though events might dictate otherwise. I would -- I would also point out that it's as of January 2010.

Q   Okay.

A   That would have changed over time because, you know, over a period of years there'll be an asset allocation study and there will be a different asset allocation or, you know, there's usually a determination that a different asset mix policy is desirable, and hedge funds have been declining in what's considered -- well, it's been determined that -- that the trustees have -- have built into approved policies that reduced the percentage of the portfolios that should be held in hedge funds.

Page 230

Q   Okay.

MS. SADINSKY:  Turn to page 3, please.

And zoom in on that to that paragraph there.  A little more.

BY MS. SADINSKY:

Q   It says: Investment Management Agreement, and it has the date there.

Do you see it?

A   Yes.

Q   What is the date?

A   June 15th, 2015.

Q   Does that indicate to you that the January 2010 asset mix policy remained in effect as -- in effect as of the date of this Investment Management Agreement in June 2015?

A   Yeah, as -- as of that date, it would have been in effect.

Q   Okay.

MS. SADINSKY:  Let's go back to page 26.

BY MS. SADINSKY:

Q   This page also refers to spec ops.  What does that mean?

A   That's special ops.

Q   And can that include hedge funds?

A   No.  I think they're -- they're typically

Page 231

more active investments.  They're expected to have a higher -- a little bit -- you know, a little higher risk, a little higher reward component, and that would not fall into hedge funds.

Q   Can you give me an example of what a spec ops would be?

A   Well, one example would be if you -- one example would be if, say, for instance, you thought that, like, there was a particular set of properties that were -- not you, a manager came and, like, made an evaluation.  You would hire a manager who would make that sort of -- make that assessment, and based on what their performance had been, you would say, "Okay.  We'll hire that manager and we'll trust his assessment."

But it would usually be -- for example, if you thought the -- if the manager thought that some set of properties like, say, real estate in a particular area or particular -- owned by a particular company, for whatever reason, was undervalued or not performing well because perhaps the -- there'd been some sort of unique event that caused liquidity problems that created an opportunity -- quote, special opportunity that had a higher -- that, on the one hand, because it's

Page 232

depressed and because perhaps it's undervalued, maybe it's more risky to get involved in.

Obviously, if it's undervalued, then it's not as risky because that implies that it's really valued more, but it's performing badly.  And -- but you think that -- the investment manager thinks there's an opportunity to get a significant return on that investment.

So higher than we'd been expecting, say, equity, which, you know, depending on -- you know, depending on who you're talking to, you might expect, say, a 7.5 percent return.  The idea of a special opportunities would be that you'd get between 10 and 15 percent return.

Q   Okay. Understood. Understood. I'm going to ask you a couple of yes-or-no questions.

Is it your understanding that SEIU complied with the asset mix policy?

MR. BURKHOLZ:  Objection. Are you asking a particular time frame, please?

BY MS. SADINSKY:

Q   From -- in 2015 or --

A   The year?

Q   Between 2015 and 2018, did SEIU generally comply with whatever asset mix policy was in place

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 233

during that time frame?

A   So I would think at all times there's usually at least one asset that's above or below the policy range. What happens, though, is that there's discussion about whether that's acceptable or do you want to correct, or what's -- and if you do want to correct, what steps you would take to correct.

With -- with respect to hedge funds, I don't know if they were always in that range, but it would -- in general, it's -- it's a target and a guideline that informs -- informs decisions.

If there's going to be an active decision not to -- not to do something about coming into the -- coming into the policy range, then there would be an approval -- an approval by -- a recommendation with respect to that, a discussion with -- by the investment group staff, a consultation with the investment advisor for the funds, and then an approval by the investment committee.

But, in general, you would expect -- so, for instance, there's this 9.5 to 14.5 percent range --

Q   Mr. Ristorucci, I'm --

A   What I'm going to say to you is that if it

Page 234

was much more than a percent or two, that would be unusual. So there's definitely always -- there was hedge fund investments at the time, which is I think what you're getting at, and that was a part of the investment portfolio.

Q   Was there any approval by the trustees to allow a significant deviation from the ranges in this asset mix policy or any other asset mix policy in effect between 2015 and 2018?

A   I -- well, I'm not sure.

Q   Did you ask in advance of today's deposition?

A   I did not ask, but I do believe that -- I know since then there's been a -- a decrease in what the hedge fund allocation has been.

Q   When?

A   I think it was in 2018 or 2019.

Q   So between --

A   But it's not -- yeah, not in the class period. It's not in the period we're talking about.

Q   I'm focused on the class period. Between May 2nd, 2015 -- or between March 2, 2015 and May 3rd 2018 -- or May 2nd 2018, is it your understanding that SEIU generally complied with the asset mix policy?

Page 235

MR. BURKHOLZ:  Is it -- is it just the -- I'm sorry. Is the question about the entire policy or the -- or the hedge funds?

MS. SADINSKY:  The hedge funds.

MR. BURKHOLZ:  Okay.

THE WITNESS:  I don't know specifically with the hedge funds. I know -- I know that there have been times -- there were certainly different assets where it was determined that they were either under or below the policy range and there was just going to be an evaluation to see if they would come back into range or an expectation that they would based on what they call secular factors, meaning that that's the way the economy would go, and --

BY MS. SADINSKY:

Q   Mr. Ristorucci, you told me that the board needs to approve any significant deviations. Was there a significant deviation with respect to hedge funds that was approved by the board between 2015 and 2018?

MR. BURKHOLZ:  Objection. Asked and answered. And you can stop cutting him off when he's answering a question.

THE WITNESS:  So I would expect that that was the range. What I'm saying is that the policy

Page 236

is a -- is a policy, but it's not one that if you were not within that range you'd say we're not in compliance. You would say, well, are we okay with this for now.

But do I -- am I aware of any change in what was considered the hedge fund allocation or -- or any approval to go below or above or remain -- remain okay with, you know, above or below that policy range? I'm not aware of that.

MS. SADINSKY:  I next want to mark as Exhibit 12 Tab 52.

- - -

(Deposition Exhibit 12 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   What is this document? What is this document?

A   Oh, that's the Discretionary Investment Manager Agreement between the pension fund and Rothschild Asset Management.

Q   You've seen this before?

A   Yes.

MS. SADINSKY:  Can you go to page 26. Zoom in to the top.

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 237

BY MS. SADINSKY:

Q   This is the asset mix policy.  Can you see the date?

A   April 2016.

Q   This is the asset mix policy in effect as of April 2016, correct?

A   Right.  So that's when the -- that was probably when they did a different -- they put into -- put into impact -- excuse me -- put into effect a new asset mix policy.

Q   Okay.  And there was no asset mix policy -- there was no other asset mix policy between January 2010 and April 2016; is that right?

A   Correct.  Yeah.  That's my understanding. I wouldn't -- yes.

Q   Okay.  Let's look at -- and was there an asset mix policy in effect -- or was this asset mix policy changed between April 2016 and May 2018?

A   Not -- not to my knowledge, no.  No, not to my knowledge.

Q   Let's look at the hedge fund section.

The policy target increased for hedge funds from 12 percent in the January 2010 policy to 12.5 percent in the April 2016 policy, right?

A   Yes.

Page 238

Q   And the policy range increased from 9.5 to 14.5 percent in the January 2010 policy to 9.5 percent to 15.5 percent in the April 2016 policy, correct?

A   Correct.

Q   So between April twenty -- so between April 2016 and the end of the proposed class period, SEIU would invest between 9.5 percent and 15.5 percent of its assets in hedge funds, correct?

A   Based on that, yes, but I do not believe that's current -- that's -- well, during -- yes, during the 2015 to 2018, that would -- that seems like that would be correct, yes.

Q   And earlier we discussed that SEIU's assets during 2015 to 2018 were around 11.5 billion.

Do you remember that?

MR. BURKHOLZ:  Objection.  Misstates the testimony.

THE WITNESS:  I'm sorry.  Sometime between, you know, maybe mid-2018 to 2019, 11.5 billion sounds correct.

BY MS. SADINSKY:

Q   Okay.

A   One of those years was a significantly bad year followed by a significantly good year.

Page 239

Q   Okay.  Between 2015 and 2018, would you say the assets were at least -- or somewhere around 10 billion?

A   Probably a little under, but, you know, for purposes of saying -- yes --

Q   Okay.

A   -- 9 billion.

Q   Okay.  And so between 2015 and 2018, you would expect that over 1 billion of SEIU's assets would have been invested in hedge funds?

A   I don't know if I'd say over.  If you told me it was a billion, I wouldn't say -- I wouldn't be surprised.

Q   At least a billion dollars of SEIU's assets were invested in hedge funds?

A   I'd say as much as a billion.

Q   Okay.  Does SEIU receive any reports from the hedge funds it invests in?

A   Well, they receive performance reports, yes.

Q   What is reflected in those performance reports?

A   Well, the managers -- the managers would let us know how the different -- how the different investments in the different hedge funds are

Page 240

performing.  The reports might also include, you know, based on sectors or other -- other sort of criteria why one area was performing well or not so well and what that might be attributable to.  What did they attribute it to?  An earnings strategy? Some specific one-off event?  Things like that.

Q   Do any of the reports discuss specific securities in the hedge fund's portfolios?

A   I would think so that they would say -- you know, if they were -- if they might -- they might refer to specific securities that -- that had done extremely well or had done extremely badly just as sort of highlights to -- to explain why or, you know, in particular if there was -- if there had been a negative performance, they might say, oh, you know, the manager or the sub-manager might say, well, it was this -- this sub-manager performed badly because of one -- and if it happened to be because of a particular security, they might raise that in that report.

Q   And earlier you said you don't know who are the investment managers for SEIU's hedge fund transactions, correct?

A   I don't -- I'm not recalling the name of the managers, correct.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 241

Q  Who from SEIU would know that information?

A  I mean, I could go look at our investment report and find out. I mean, anybody in our investment group would know. So --

Q  Assume that a hedge fund in which SEIU invested shorted Cardinal Health stock. Would SEIU receive any report reflecting that short position?

MR. BURKHOLZ: Objection. Irrelevant to legal issues in this case.

But you can answer the question. It's been asked and answered, but go ahead.

THE WITNESS: If a report -- if -- if that -- if that short had worked out really well or really badly, in theory that might show up as a reason why, but as I said, I don't think that they would normally be involved in shorts.

But the -- what would show up would be the performance of a particular manager that had made that investment or made that strategic choice.

BY MS. SADINSKY:

Q  If SEIU wanted to find out whether a hedge fund that it had invested in had shorted Cardinal Health stock, could it obtain that information?

MR. BURKHOLZ: Same objection. Irrelevant to the legal issues in this case. Asked and

Page 242

answered.

THE WITNESS: I'm --

BY MS. SADINSKY:

Q  Yes, please answer.

A  If -- if --

Q  If SEIU wanted to find out --

A  If there were -- if there were a manager that had shorted, I suppose -- it would depend when it happened, and part of it might depend on whether we actually still have -- have the investment manager that was -- if we still had a relationship with the investment manager pursuant to which that underlying manager had been hired.

So I -- you know, I don't know. It's possible in some cases, yes, but in some cases, maybe not.

Q  So SEIU had one to two investment managers that oversaw investments in hedge funds, and if -- and if SEIU wanted to find out if it shorted Cardinal Health stock, all it had to do was go ask those two investment managers?

MR. BURKHOLZ: Objection. Mischaracterizes the testimony.

THE WITNESS: I don't -- I don't know. It seems like it would be a hard -- it would be -- it

Page 243

would be more than just asking that investment manager. There'd have to be -- I mean, there's a little bit of a -- because those investment managers usually hire managers that hire managers and, in some cases, even hire more managers.

BY MS. SADINSKY:

Q  How does SEIU benefit from investments in hedge funds?

A  So any investment would make the benefit, comes to the extent there's a positive return at a given time. You know, hopefully, a consistent positive return.

If you're asking -- I'm not sure.

Q  Yeah, let me be more specific.

Does -- does SEIU own a share in a hedge fund? Is that how it works?

A  Yeah, essentially that would be the way you would think about it. We -- say we're talking about -- say speculatively, like the 1 billion number you used earlier, if we allocated, say, 300 million of that to a particular manager, we would -- that manager would then allocate -- sub-allocate that allocation to more managers, and we would see, ultimately, what funds -- or, you know, what funds that that manager had invested in. And so we'd have

Page 244

a position in -- basically in a fund.

And so if the fund went up 3 percent, you would see value of the fund, how much it's gone up, other types of things. You know, if they'd sold its shares, how much was made on those, how much was lost.

Q  Okay. So when SEIU invests in a fund, if the fund does -- if the fund increases in value, then SEIU makes money, and if the fund decreases in value, then the fund loses money; is that fair?

A  Yeah. That's correct.

Q  And so if a hedge fund makes a profit on a security transaction, that benefits SEIU, right?

A  If the hedge fund makes a -- well, if there's a gain in that -- in that, yes. Essentially, yes, but if there's a gain in that portfolio or investment, then yes.

Q  Right. And then if -- if a hedge fund in which SEIU invested in made a profit from a short sale, that would also benefit SEIU, right?

MR. BURKHOLZ: Objection. Legal -- legally irrelevant to this case. I'm giving you leeway to ask all these questions. It's your deposition, but all these questions are legally irrelevant to the extent you're asking about hedge funds and their

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 245

investment in hedge funds.

But go ahead.  You can answer.

THE WITNESS:  Yes.  So any -- any asset, including a short position where our investment -- well, where the investment vehicle in which we have an interest gains a profit, our -- our -- there's an overall positive impact on the pension fund.

BY MS. SADINSKY:

Q   SEIU invested in exchange-traded funds too, correct?

A   I think that's correct.  Yes.

Q   Did any of the exchange-traded funds that SEIU invested in engage in short sales of Cardinal Health stock?

A   I'm not sure.

Q   Is it possible, yes or no?

A   I'm just thinking through the process.  If you invest in an ETF, and which is designed to usually mimic a specific -- specific type of investment, I suppose, yes.

Q   Is it possible that any of the exchange-traded funds that SEIU invested in engaged in options transactions in Cardinal Health stock?  Again, simply asking if it's possible.

A   It's possible.

Page 246

MS. SADINSKY:  Next, I -- we can put this document down.

BY MS. SADINSKY:

Q   I am going to mark four exhibits, and we'll go through them, and I'll do them one at a time, but they each have specific pages from SEIU's transaction records from January 2018.

I -- I told your counsel about the potential transaction records I'd use, and they were going to make -- make the full one available for you, but they're very long.  So we're not going to put them on the screen.  We're just going to use excerpts.

MR. BURKHOLZ:  Just to be -- just to be clear, I made it clear to you that you can use the excerpts with him.

BY MS. SADINSKY:

Q   I just wanted to let you know that it's an excerpt, and you could have the full one if you wanted.

What portion -- before I do that, though, what portion of SEIU's assets were in exchange-traded funds between 2015 and 2018?

A   I'm not aware.  I'm not sure.

MS. SADINSKY:  Okay.  I am going to mark --

Page 247

what are we on?  Exhibit 13?

MR. MARTIN:  Yeah.

MS. SADINSKY:  -- Exhibit 13, Tab 54.

- - -

(Deposition Exhibit 13 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   And -- and sorry.

You said you weren't aware of how much was invested in exchange-traded funds?

A   That's correct.  I'm not aware of.

Q   Can you give me a rough estimate of how much was in exchange-traded funds between 2015 and 2018?

MR. BURKHOLZ:  If you know.

THE WITNESS:  I don't have -- it would be -- I don't know.

BY MS. SADINSKY:

Q   More or less than 5 percent?

A   To be -- to be honest, I'm not sure what we would have been using exchange-traded funds to accomplish at the time, so I'm not sure.

Q   Okay.  Tab 54.

Okay.  So let's go to -- so this is an

Page 248

excerpt from the January 2018 Northern Trust report, and I've included the Table of Contents and then, you know, the specific pages we're going to discuss.

MS. SADINSKY:  So let's go to the last page.

Top of this page -- let's zoom in.

BY MS. SADINSKY:

Q   Top of this page says:  "Asset Summary by Account."

Do you see that?

A   Yes.

Q   And under that it says:  ███0453-ZZ1199 Mesirow - Pershing Square.

Do you see that?

A   Yes.

Q   And under that -- and sorry.

Okay.  What do you understand that to mean?  Do you understand -- do you understand that this page summarizes SEIU's assets held in an account SEIU has with Mesirow, account ███0453?

A   That appears to be what it's saying.  Mesirow, and I think -- I suppose Pershing Square would be a particular -- either -- something held through Mesirow with either another sub or just a particular strategy.

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 249

Q   So Pershing Square would be a Mesirow investment -- or something affiliated with Mesirow?

A   Yeah, it could either be -- I would suspect it's -- I would think it's a strategy within Mesirow.

Q   So this page contains market value and unrealized gain and loss information for SEIU's assets in this account with Mesirow Pershing Square; is that correct?

Do you see the market value column --

A   Right.

Q   -- it's the third column, and then on the unrealized gain/loss, the sixth column, it says "Total"?

Do you see that?

A   Yes.  I see the column, yes.

Q   Okay.  And under the equities section, do you see the line that says "Equities"?

A   Right.

Q   Do you see that?

A   Yes.

Q   Under that, it says:  "Funds - common stock."  What does funds - common stock refer to?

MR. BURKHOLZ:  Objection.  Document speaks

Page 250

for itself.

BY MS. SADINSKY:

Q   What does funds - common stock refer to?

A   It looks to -- it seems how much common stock that fund -- is the market value of the common stock held in that particular fund or manager.

Q   Is Mesirow a hedge fund?

A   I'm not certain.  That sounds like -- I'm not certain, but they could be a hedge fund.

Q   How do I tell from this page if this is held with an investment manager?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  So every asset we held -- hold is through an investment manager.  To the extent they're on the page, it would be under the line by that account.

BY MS. SADINSKY:

Q   So Mesirow.  Okay.

MS. SADINSKY:  Let's go to PDF page 7, and this is the page ending in Bates 75593.

BY MS. SADINSKY:

Q   Do you see -- are we on that page?  Yeah.

Do you see under -- this page is titled "Asset Detail by Account."

Do you see that?

Page 251

A   Yes.

Q   So this -- this page provides the a bit more detail on the asset.  Under asset detail by account, it has -- it refers to the same Mesirow account number that we just looked at, right, ▇8053, Mesirow Pershing Square?

A   Yeah, I did not -- I did not memorize, but I'll take your word that that's the same account number.

Q   Under equities it lists:  "CF Pershing Square International LTD CL E Series 1E," right?

A   Correct.

Q   What is Pershing Square International?  What does that mean?

A   So what I suspect is that the Pershing Square International description of the manager and, you know, what particular type of investment that is.  So it seems like it would be an international investment, and the Cusip -- well, I'm not sure what else, but the Cusip would be like the -- basically, the identifier of how the interest in this series of -- whatever this investment vehicle is.

Q   And so you understand that the -- the investment or strategy that SEIU is invested in through Mesirow?

Page 252

A   I'm sorry.  What -- what --

Q   Do you understand the CF Pershing Square International to be the, you know, particular strategy or investment that SEIU has through Mesirow?

A   That may be one of them.  But --

Q   One of them.  Is this one of them?

A   Well, I don't know.

Q   Do you understand, where it says under United States --

A   Mm-hmm.

Q   -- it lists CF International Pershing Square, you just said to me --

A   So --

Q   You said -- you said:  It seems -- so what I suspect is that Pershing Square International description of the manager and, you know, what particular type of investment that is.

So do you understand that SEIU invested in CF Pershing Square International Limited CEL [sic] E Series 1E through Mesirow?

A   That would be my understanding, yes.

Q   Is Pershing Square a hedge fund?

A   That I'm -- that I'm not certain how they describe them.

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 253

MS. SADINSKY:  Okay.  I want to mark as Exhibit 14 Tab 58.

- - -

(Deposition Exhibit 14 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   I've just marked as Exhibit 14 --

MS. SADINSKY:  Let's zoom out.

BY MS. SADINSKY:

Q   -- Pershing Square Holdings 2017 annual report.

MS. SADINSKY:  Let's go to page 1, last paragraph.  Let's zoom in.

BY MS. SADINSKY:

Q   It says here, in this last paragraph -- and this is --

MS. SADINSKY:  If you just zoom up to the top of this page.

BY MS. SADINSKY:

Q   This says "Annual Report," and it's describing the company.

Do you see that?

A   I see that that's the report describing the company, yeah.

Page 254

Q   Okay.  And so the last paragraph says: "The Company's investment objective is to preserve capital and to seek maximum long-term capital appreciation commensurate with reasonable risk.  The Company seeks to achieve its investment objectives through long and occasionally short positions in equity or debt securities of public U.S. and non-U.S. issuers."

Do you see that?

A   The last paragraph, yes.

Q   And SEIU invested in Pershing, correct?

MR. BURKHOLZ:  Objection.  Lack of foundation as to whether or not this is the particular fund they invested in.

BY MS. SADINSKY:

Q   Mr. Ristorucci?

A   So what I can tell from the page that you've showed me is that -- that the pension fund invested in some Pershing vehicle and that what this report says is that Pershing Square has vehicles pursuant to which they would make -- they may make an investment that has -- that includes the different types of investment described here.

But, you know, whether this -- whether that's included in that Series E designation, I'm

Page 255

not certain.

Q   Okay.  So --

A   It's --

Q   Let's go back to the other exhibit.

Did the Pershing fund, which is listed here, that SEIU invested in engage in short sales?

A   I don't know.

Q   Is it possible?

A   It's possible.

Q   Do you see, on this page --

MS. SADINSKY:  If we can zoom in more.

BY MS. SADINSKY:

Q   -- under the unrealized gain/losses under the total, do you see that this particular investment had a gain of 459,000 in January 2018?

A   Yes.

Q   Let's turn now to PDF pages 8 to 9, ending in Bates Nos. 76554.  Let's start there.

Under account summary, it says: "▮1502 -- ZZ Mesirow Consolidated."

Do you see that?

MR. BURKHOLZ:  Can you make -- please make the font bigger for us.

Thank you.

BY MS. SADINSKY:

Page 256

Q   Do you see that?

A   The ▮1502, yes.

Q   You understand this page summarizes SEIU's assets held in a different account SEIU has with Mesirow?

A   That would -- that would -- yes, that would be my understanding.

Q   And like the other page that we just reviewed, this page also contains market value and unrealized gain and loss information for SEIU's assets in this account with Mesirow; is that correct?

A   Correct.

Q   Okay.  And that information is broken out by the type of investment here, right?

A   By the particular investment, yes.  By global versus --

Q   There are market value and unrealized gain and loss information for investments in venture capital and partnerships --

MS. SADINSKY:  And if you want to zoom down, Jackson.

BY MS. SADINSKY:

Q   -- other assets and then hedge fund there.

Do you see that?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 257

A    By geography, yes.
Q    Okay.  So under "Hedge Fund" -- I want to focus there.
     MS. SADINSKY:  So let's zoom in just under what's there.
BY MS. SADINSKY:
Q    The total market value for assets that invested in a U.S. Hedge Equity for account ████1502 is 26.4 million?
     Do you see that?
A    I -- yes, in that second column.
Q    Okay.  And what is U.S. Hedge Equity?
A    My read -- my read -- excuse me.
     My read of it would be that of the investment, or this vehicle, 26.5 million -- approximately $26.5 million are invested in Hedge Equity in the United States.
Q    What is Hedge Equity?  Does that -- does Hedge Equity include funds that invest in U.S. stocks?
A    By -- by the name of it, that sounds what it would be like.
Q    So U.S. Hedge Equity includes funds that invest in U.S. stocks, correct?
A    That would be my read.

Page 258

Q    Do any of the other types of Hedge Equity listed here include funds that invested in U.S. stocks?  Focus on Hedge Equity.
A    Okay.
     MR. BURKHOLZ:  I'm just going to object to the form of the question and ask the witness not to speculate.  If you know.
     THE WITNESS:  Based on the description, those -- the names in the first three columns would not typically be associated with U.S. investments. They would be U.S. dollar denominated, but not U.S. investments.
BY MS. SADINSKY:
Q    And the U.S. --
A    But, again, not having insight into what's in those vehicles, I can't say for certain.
Q    And the U.S. column would include only U.S. common stocks?
A    I'm not sure.
Q    Okay.  Let's go to PDF pages -- page 2, ending in 7545 -- 483, and the top of this page has "Asset Detail by Account."
     Do you see that?
A    Yes.
Q    And under that, it refers to the same

Page 259

Mesirow account in the upper left, correct, the ████1502 account?
A    Correct.
Q    And let's turn to PDF page 4 ending in 75485.  I'm turning to the Hedge Equity section.
     Do you see that?
A    Yes.
Q    Okay.  And under the Hedge Equity section, under "United States" -- do you see where United States is?
A    The next line, yes.
Q    Okay.  There are four funds listed:  two Makuria funds, one Corvex fund, and one Merion ERISA fund.
     Do you see that?
A    Yes.
Q    And those four funds are listed under United States Hedge Equity; is that right?
A    It's listed under -- yes, under the United States subsection of Hedge Equity.
Q    Are these the Mesirow strategies that SEIU invested in, these four things listed here?
A    Could -- based on this paper -- based on this page and that it's the same account number, it seems that that's correct.  Yes.

Page 260

Q    Are you familiar with these four funds?
A    No.
Q    Do you know anything about them?
A    No.
Q    You know they're hedge funds, though, right?
A    I know that they are funds that fall within a hedge fund portfolio.
Q    And they're -- they fall within the Hedge Equity section of the hedge fund portfolio?
A    Right.
Q    Which means they invest in U.S. stock, correct?
A    It would mean that we've invested them -- through them through a hedge fund manager.  Whether they self-identify as hedge funds, I'm not certain, but they're within the hedge fund portfolio.
Q    Okay.  And then under Market Value for total United States -- not total Hedge Equity, total United States, you see again the 26.4 million, right?
A    Right.
Q    So all of the 26.4 million that SEIU had invested in Mesirow U.S. Hedge Equity was invested in these four funds, correct?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 261

A   Sorry.  Could you repeat the question.

Q   On the asset summary page before, we saw that SEIU had 26.4 million invested in U.S. Hedge Equity.

Do you remember that?

A   No.  I had not recalled the number, but okay.

Q   So all of the 26.4 million that SEIU had invested in Mesirow U.S. Hedge Equity was in these four funds, correct?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  All the -- all the -- from what I can tell from what's been provided, this is a reflection of at least one component of the investment in Mesirow, and it's all U.S. Hedge Equity.

BY MS. SADINSKY:

Q   Okay.  Okay.  And on this same page, do you see that this particular investment -- again, these four funds, had a gain of 1.4 million in the right-hand column under total -- "Total United States"?

A   Yes.

Q   So as of January 2018, this particular investment had a gain of 1.4 million, correct?

Page 262

A   That's what it -- yes.  Well, yes.  I'm not sure over what time period, but some date there at least was a 1.4 million.

Q   Okay.

MS. SADINSKY:  Let's -- let's scroll up under -- right there.

BY MS. SADINSKY:

Q   Accounting by account, you see the date?

A   Mm-hmm.

Q   What is it?

A   January two thousand -- well, January 31st, 2018.

Q   So this account -- this is an account statement as of January 31st, 2018, correct?

A   Right.

Q   Okay.

MS. SADINSKY:  Let's go to PDF pages 8 to 9.  Let's start on 8, and it ends in 76554, and let's zoom all the way in.

BY MS. SADINSKY:

Q   This is that same account.  You see that at the top of this screen:  "█1502"?

A   Yes.

Q   And let's go to the bottom of this page:  It says:  "Hedge event driven."

Page 263

Do you see that?

A   Yes.

Q   And let's go to the top of the next page.  It says:  "Hedge multi strategy."

Do you see that?

A   Yes.

Q   What does that mean?  What do both of those things mean?

A   What is "hedge multi strategy" and what does "hedge event driven" mean?

Q   Yes.

A   I don't -- I don't know.

Q   Could they include investments in U.S. common stock?

A   They could.

Q   Could they include investments in Cardinal Health?

A   If they could invest -- if they could -- if that -- if that term could include investments in U.S. common stock, then it could include investment in Cardinal Health unless there was some other restriction.

Q   Okay.  And then the total market value -- the total hedge fund -- do you see where it says:  "Total hedge fund" right above "Liabilities"?

Page 264

A   Yes.

Q   What is the total market value of assets listed for this █1502 account in total hedge funds?

A   It's $127,301,089.58.

Q   So does SEIU have any information regarding the securities owned by the hedge funds that it invested in through Mesirow?

A   Did it have any information?  Yes, it has --

Q   Do you know what securities SEIU invested in, in the Mesirow -- in its Mesirow Pershing Square account or this Mesirow consolidated account?

A   I don't --

MR. BURKHOLZ:  Objection.  Asked and answered.

But go ahead.  You can answer.

THE WITNESS:  I don't know what securities were included in those accounts.

BY MS. SADINSKY:

Q   Does SEIU have any information about the specific transactions engaged in by the Mesirow Pershing Square or the Mesirow funds in the Mesirow consolidated account?

A   I'm not -- I'm not aware of specific

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 265

information about specific transactions.

Q   Did any of the hedge funds that SEIU invested in through Mesirow engage in short sales of U.S. stocks?

A   Not to my knowledge.

Q   Is it possible?

A   I -- I cannot rule it out, no.

Q   Did any of the hedge funds that SEIU invested in through Mesirow engage in short sales of Cardinal Health stock?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  Did any?  I'm not sure.

BY MS. SADINSKY:

Q   Is it possible?

A   Is it possible?  Yes.

Q   Did any of the hedge funds that SEIU invested in through Mesirow engage in options trades related to Cardinal Health?

A   I'm not -- I'm not aware of any, but I'm not sure.

Q   Is it possible?

A   Is it possible that these related -- it's possible.

Q   Do you agree that the information provided

Page 266

in the Northern Trust report is insufficient to establish whether SEIU shorted Cardinal Health stock?

MR. BURKHOLZ:  Objection to the question -- to the form of the question.

THE WITNESS:  It's -- it's not possible to determine whether there has been an investment in shorted Cardinal Health stock.

BY MS. SADINSKY:

Q   And do you agree that the information provided in the Northern Trust report is insufficient to establish whether SEIU engaged in options transactions in Cardinal through its Mesirow investments?

MR. BURKHOLZ:  Same -- same objection to the form of the question.  Legally irrelevant since the fund does not have legal title to any of the securities that any of these hedge funds invest in.

BY MS. SADINSKY:

Q   Mr. Ristorucci, please answer.

A   So the fund would have -- would have held interests -- could have --

Q   Mr. Ristorucci --

MR. BURKHOLZ:  Let him answer the question. You asked a question and he's trying to answer it.

Page 267

BY MS. SADINSKY:

Q   I'm asking about the Northern Trust report, Mr. Ristorucci.  I'm not asking about legal title.

I'm asking:  Do you agree that the information provided in the Northern Trust report is insufficient to establish whether SEIU engaged in options transactions in Cardinal through its Mesirow investments?

MR. BURKHOLZ:  Same objection.  Calls for a -- it's an inappropriate question, a legal question.

In this case, the Northern Trust documents show legal title to certain securities.  Hedge funds, they do not show legal title is owned by the fund, and that's what he was trying to explain to you.

BY MS. SADINSKY:

Q   Mr. Ristorucci, am I able to figure out, from this Northern Trust report, whether SEIU engaged in options transactions in Cardinal Health through its Mesirow investments, yes or no?

MR. BURKHOLZ:  Same objection.

THE WITNESS:  I guess what I'm just trying to make a distinction between is that the fund itself would not have engaged in the trades.  Would

Page 268

they have -- have investment interest or allocated funds to be invested by managers who then invested in sub-managers who may have engaged in -- in option -- or short selling the transactions, as you're describing them, that would not be reflected in this -- in this paper.

BY MS. SADINSKY:

Q   Thank you.

So if SEIU wanted to obtain information about those transactions in hedge funds it invested in through Mesirow, how would it do so?

MR. BURKHOLZ:  Objection.

BY MS. SADINSKY:

Q   Would it have to go to the specific funds?

MR. BURKHOLZ:  Objection.  Legally irrelevant to this case.

You can answer.

THE WITNESS:  To be -- I mean, to the extent it's possible, which it may be extremely difficult at this point to determine, there would have to be some outreach to the managers who would then have to -- they would have to request that information from the fund in -- the actual manager in particular where -- it's theoretically possible, but not, you know, even if unlikely.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 269

BY MS. SADINSKY:

Q   Okay.  So we just looked at five different fund -- we looked at the Pershing fund and then the four funds that SEIU invested in through Mesirow: the Markuria Credit, the Corvex, the Merion ERISA.

So to get this information, we'd have to go to each of those five funds; is that -- is that accurate?

A   Those would be the funds that would have the information.  I don't know if there's other ways of determining that.

Q   So SEIU itself does not possess information showing whether Mesirow has shorted Cardinal Health stock, correct?

A   Correct -- well, we have nothing indicating that we've shorted Cardinal Health stock, but we don't have visibility into all of our investments.

Q   And you have nothing indicating that Mesirow has or has not shorted Cardinal Health stock, correct?

A   To my knowledge, that's correct.

Q   You haven't asked Mesirow whether they have shorted Cardinal Health stock, correct?

A   Not to my knowledge.

MR. BURKHOLZ:  Objection.  Objection to the

Page 270

form.

MS. SADINSKY:  Next I want to mark Tab 55.  What exhibit are we on?

MR. BURKHOLZ:  If you have a good time to break, we've been going for almost an hour.  It's getting late in the day.

MS. SADINSKY:  Sure.  Let's go off the record.

MR. BURKHOLZ:  Okay.  Let's take --

THE VIDEOGRAPHER:  Going off the record at 5:04 p.m.

(Recess.)

THE VIDEOGRAPHER:  Going on the record at 5:18 p.m.

MS. SADINSKY:  I'm going to mark as Exhibit 15 Tab 53.  This is another excerpt from the January 2018 transaction reports.

- - -

(Deposition Exhibit 15 was marked for identification.)

- - -

MS. SADINSKY:  Let's go to PDF page 2, ending in 75577.  The top of the page says: "Asset Detail by Account," and this page refers to an Alger account it looks like, ███ 1544 - 1199 Healthcare -

Page 271

Alger Spec-SL.

BY MS. SADINSKY:

Q   Do you see that?

A   Yes.

Q   And you understand that to be the Alger account summarized on this page?

A   Correct.

Q   And under the equities section, it says: "Funds - common stock."

Do you see that?

A   Yes.

Q   And under United States it says:  "CF Alger Collective Trust Spectra Series."

Do you see that?

A   I do.

Q   Is that the Alger strategy that SEIU was invested in?

A   That appears to be what the page shows.

Q   Do you know anything about that strategy?

A   No.

Q   Do you know if that strategy engaged in short sales?

A   I do not.

Q   Is it possible?

A   Yes.  Any type of investment would be

Page 272

possible.

Q   Okay.  Let's go --

MS. SADINSKY:  Mark as Tab 57 Exhibit 16.  I'm marking as Exhibit 16 the Alger Spectra Fund Factsheet available on Alger website.

- - -

(Deposition Exhibit 16 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   And so we just looked at the transaction record showing an investment in the Spectra sees, right?

A   Yes.

Q   Okay.  Can you read to me -- if we go --

MS. SADINSKY:  Can we zoom in?

BY MS. SADINSKY:

Q   On the left-hand column, do you see Investment Strategy?  Can you read that out loud?

A   "Investment Strategy:  Primarily invests in growth equity securities of U.S. companies identified through our fundamental research as demonstrating promising growth potential, and engages in short selling (up to approximately 10% of the market value of the portfolio)."

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 273

Q   So SEIU invested in the Spectra Series.  We saw that in the account statement, right?

MR. BURKHOLZ:  Objection to the form, whether or not this is the same exact fund as the one that they were in five years before.

BY MS. SADINSKY:

Q   Mr. Ristorucci, you can answer.

A   I'm sorry.  Could you repeat the question.

Q   So SEIU invested in a Spectra Series, correct?

A   Correct.  Well, that's what that -- that's what the Northern Trust report indicated.

MS. SADINSKY:  And if you scroll up on the top of this page.

BY MS. SADINSKY:

Q   The Spectra Fund that -- the Spectra Fund engages in short sales -- right? -- as part of its investment strategy, right?

A   Correct.

Q   And so you agree that this Factsheet that the fund SEIU may have invested in may have engaged in short sales?

MR. BURKHOLZ:  Objection to the form of the question.  You haven't laid a foundation that this is the same exact fund that they were invested in

Page 274

five years before.

BY MS. SADINSKY:

Q   Is it possible that the Alger Spectra Fund that SEIU invested in engaged in short sales?

A   Yes.  As we said, yes.

Q   Okay.

MS. SADINSKY:  And let's go back to whatever exhibit it was -- Exhibit 14 -- Exhibit 15.

BY MS. SADINSKY:

Q   So if you look here under market value total funds common stock, you see 195 -- 199.5 million, right?

A   Yes, approximately.

Q   So SEIU had invested in the CF Alger Collective Trust Spectra Series, $199.5 million as of January 31st, 2018, correct?

A   Correct.

Q   And do you see that, as of January 31st, 2018, this particular investment in the Alger Spectra Series had a gain of 54.1 million?

Do you see that?

A   Correct.

Q   Does SEIU know if this Alger fund engaged in any short sales of Cardinal Health stock?

A   Not that I'm aware of.

Page 275

Q   Is it possible?

A   It's possible.

Q   Is it possible that SEIU could have shorted Cardinal Health stock through its investment with Alger?

MR. BURKHOLZ:  Objection to the form of the question.  Calls for a legal conclusion about the legal title of this particular investment and whether or not SEIU had legal title, which they did not, to the underlying securities.

BY MS. SADINSKY:

Q   Does SEIU know if Alger engaged in options transactions?

A   I -- I don't know.

Q   Does SEIU know if this Alger fund engaged in any options transactions involving Cardinal Health stock?

A   That there's -- we're not aware of.

Q   Is it possible that they did?

A   It's possible that Alger, in respect to this Spectra Series, did engage in derivatives or options selling with respect to Cardinal Health stock.

Q   Do you -- does SEIU possess information about whether or not Alger shorted Cardinal Health

Page 276

or engaged in option transactions in Cardinal Health through its investments with Alger?

MR. BURKHOLZ:  Objection.  Asked and answered.

You can answer again.

THE WITNESS:  SE -- SEIU does not know whether Alger engaged in those sorts of transactions.

BY MS. SADINSKY:

Q   Okay.

MS. SADINSKY:  What exhibit are we on?

MR. MARTIN:  Exhibit 17.

MS. SADINSKY:  Let's mark as Exhibit 17 Tab 55.

- - -

(Deposition Exhibit 17 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   This is another excerpt from the January 2018 transaction report, and we are going to turn to PDF page 6 ending in 76130.

Top of this page, if we zoom all the way in there:  "Asset Detail by Account," and it lists there:  "▮LT56 -- 1199 Health Care Corbin Consol,"

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 277

right?

A   Correct.

Q   Do you understand that to be the account that SEIU has with Corbin that is summarized on this page?

A   Yeah. Yes.

Q   Okay. And under the Hedge Equity section -- you see where it says: "Hedge Equity"?

A   Yeah.

MS. SADINSKY: Let's scroll down, Jackson, to the United States section beginning at the bottom of this page.

BY MS. SADINSKY:

Q   Do you see United States?

A   Yes.

Q   And it lists: "CF Cadian Offshore Fund," right?

A   Correct.

Q   Let's go to the next page.

And we have five other funds listed here: the Cadian Offshore Fund three more times -- there's different months there -- the Corbin ERISA Opportunity Fund, and the Merion ERISA Fund, right?

A   Correct.

Q   And are these six funds listed under United

Page 278

States U.S. Hedge Equity, are these six funds the Corbin strategies that SEIU was invested in?

A   They are six -- they are six Corbin strategies that SEIU was invested in.

Q   And do you know -- sorry.

If you'd go under Total United States, on this page under Market value -- do you see that? There was 82.5 million invested in these six U.S. Hedge Equity strategies through Corbin; is that right?

A   At that point, yes, there was 82 million in market value invested in hedge -- in those vehicles.

Q   And as of January 2018, what was the gain on these six funds with Corbin and U.S. Hedge Equity?

Do you see them in there?

A   Is this the total on the right you're asking?

Q   The total column on the right for total United States total and then it says: "Hedge Equity," right-hand column.

A   Yes, so according to that, the -- the equity -- the gain was $8,649,170.01.

Q   Okay. Could this 8.6 million gain on 82.5 million investment in these six funds include

Page 279

investments in U.S. common stock?

A   It would appear so, yes.

Q   And could it include investments in Cardinal Health common stock?

A   Possibly.

Q   Possible. Okay.

MS. SADINSKY: Let's go to PDF page 13 ending in 76691. And scroll down a bit.

BY MS. SADINSKY:

Q   Do you see the section -- do you see, at the top of the page, the same account number, the ▮LT56?

A   Yes.

Q   Okay.

MS. SADINSKY: And if you scroll down under this hedge fund section.

BY MS. SADINSKY:

Q   We just talked about the Hedge Equity. If you look at "hedge fund of funds," what is that?

A   I'm not certain. It might be another specific Corbin vehicle.

Q   Could it be hedge funds --

A   Sorry.

Q   Sorry. I didn't mean to cut you off.

A   No. Go ahead.

Page 280

Q   Could it be hedge funds of the funds that Corbin invested SEIU's money in?

A   I mean, if you're -- I think you're asking whether it could be a specific fund that further invested funds that came from us. That's possible.

Q   It's possible?

A   Yes.

Q   Okay. And then below that, you have "hedge market independent."

Do you see that?

A   Yes.

Q   What is that?

A   I -- well, I mean, it's a U.S.-based investment. I would -- in general, the term "market independent" means that it's geared not to, like, basically be -- have characteristics that will make it not line up or be not necessarily correlative with overall equity investments, but I don't know that that's what it -- what it reflects here.

MS. SADINSKY: Scroll down some more.

BY MS. SADINSKY:

Q   It says: "Hedge market dependent," right after that. What does that mean?

A   So that might be the inverse of that, that you'd expect something to do well in the markets,

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 281

doing well versus not, and then not as well as when the markets go up, but, again, that does not necessarily mean that that's the strategy engaged here.

Q   Okay.  Let's go to the next page.

The next page also lists "hedge event driven" and "hedge multi strategy," which we discussed before.  For any of these, hedge fund of funds, hedge market independent, hedge market dependent, hedge event driven, or hedge multi strategy, would any of them --

THE COURT REPORTER:  I'm sorry.  You went through those way too fast.  Can you slow down, please, and repeat.

BY MS. SADINSKY:

Q   Sure.

For hedge fund of funds, hedge market independent, hedge market dependent, hedge event driven, and hedge multi strategy, could any of these include investments in U.S. common stock?

A   It's possible.

Q   And could any of these include investments in Cardinal Health common stock?

MR. BURKHOLZ:  Objection to the form. Relevance.

Page 282

THE WITNESS:  The ones located in United States could.

BY MS. SADINSKY:

Q   Okay.  And at the bottom of this page under "total hedge fund" -- do you see the line for "total hedge fund" before "cash and cash equivalents"?

A   Yes.

Q   It shows that the total market value of assets listed for account ▮LT56 in hedge funds is $503.78 million, correct?

A   Correct.

Q   Did any of the hedge funds that SEIU invested in through Corbin engage in short sales of Cardinal Health stock?

MR. BURKHOLZ:  Objection to the legal relevance.

You can answer.

THE WITNESS:  I don't know.

BY MS. SADINSKY:

Q   Is it possible?

MR. BURKHOLZ:  Same objection.

THE WITNESS:  Based on the information here, it's possible.

BY MS. SADINSKY:

Q   Did any of the hedge funds that SEIU

Page 283

invested in through Corbin engage in options trades related to Cardinal Health?

MR. BURKHOLZ:  Same objection.

THE WITNESS:  I don't know.

BY MS. SADINSKY:

Q   Is it possible?

MR. BURKHOLZ:  Same objection.

THE WITNESS:  It's -- based on this description, it's possible.

BY MS. SADINSKY:

Q   Does SEIU have information about the transactions in the hedge funds that it invested in through Corbin?  Does SEIU possess that information today?

A   Does SEIU -- I'm sorry.

Does SEIU possess information indicating that there have been options trading or other types of short selling with respect to Corbin -- excuse me -- Cardinal common stock?  We don't have information indicating that.

Q   You don't have information indicating that one way or the another, right?

A   No.

Q   You're not able to verify that based on the information SEIU has today, correct?

Page 284

A   Correct.

Q   And we'd have to get that from Corbin or the other funds that -- that SEIU invested in for Corbin, correct?

A   That would be one potential source, yeah.

Q   And then we talked about earlier hedge funds of funds.  How would SEIU get information about the transactions in the funds that were part of funds in funds?

MR. BURKHOLZ:  Objection to the form. Lacks foundation.

THE WITNESS:  There would have to be a very active -- well, I mean, in particular, because we're talking about 2015 to 2018 potentially, I'm not sure how -- how many steps would have to be taken to make that determination.

BY MS. SADINSKY:

Q   Do you think it would be possible to get the information at all?

MR. BURKHOLZ:  Objection to the form. Legally irrelevant.

THE WITNESS:  In some cases, perhaps, yes. In some cases, it might not be possible.

BY MS. SADINSKY:

Q   So it might not be possible to ever

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 285

understand the securities that SEIU invested in through funds of funds?

MR. BURKHOLZ: Objection. Misstates his testimony. That's not what he said.

THE WITNESS: Right now if we needed to find out what -- if our -- if our staff needed to determine what was in every single security in the portfolio, there would be mechanisms to do so because we have active relationships with the managers, and that meant they will have that information, presumably, easily accessible because they know what they're invested in.

It might be more challenging to go back five or six years to managers who, in some cases, you don't know if they exist. You know, it's just not -- it would just be more challenging. So -- but I -- if it was current, yes, it seems like it would be -- might take -- it might not be in the nature of what our staff does because what we try and do is manage -- you know, monitor the manager rather than individual stock selection or positions, but it would be something that could be done.

And the other issue is that we don't -- we don't want there to be an implication usually that -- well --

Page 286

BY MS. SADINSKY:

Q   Yeah.  I want to just --

A   -- think that we were telling them one way or another to sell or not sell on particular positions.

Q   I just want to focus, by the way, just on the period of 2015 to 2018.  So if it's possible to get the information about current investments, that's separate.

I really just want to just focus on 2015 to 2018 and whether it's possible to get that information.  Okay?

A   Okay.  But -- okay.

MS. SADINSKY:  So let's now mark -- what are we on?

MR. MARTIN:  Exhibit 18.

MS. SADINSKY:  Exhibit 18, Tab 56.

- - -

(Deposition Exhibit 18 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   And this, again, is an excerpt from the January '18 transaction reports.

MS. SADINSKY:  Let's go to page 2 ending in

Page 287

75628, and let's zoom in to the top.

BY MS. SADINSKY:

Q   The top of the page shows that -- it lists "███8275 - 1199 Health Care Entrust SL."

Do you see that?

A   Yes.

Q   And so this is a page summarizing SEIU's assets in account ███8275 with Entrust?

A   Correct.

Q   Okay.  And then do you see where it says: "Equities"?

A   Oh, yes.

Q   And under there it says:  "Funds - common stock United States," correct?

A   Correct.

Q   And under that it lists CF Pershing Square International Limited CLE -- E series 1E, right?

A   Correct.

Q   And we saw earlier that Mesirow was invested in this -- this same fund -- or that SEIU invested in the same fund through Mesirow, right? Right?

A   That looks right.  I did not commit to memory that exact name, but I take it that that does look -- that does look the same.

Page 288

Q   So SEIU is also invested in the Pershing Square fund through Entrust, and this fund could have possibly engaged in short sales, correct?

A   If it -- if it engaged in the same strategies that had been described, and I think the publication you showed me, then that's correct.

Q   And -- and it shows here the total market value of SEIU's investment in the Pershing Square fund through Entrust was 10.5 million, right?

A   That's what this page shows.

Q   And do you see that, as of January 2018, this particular investment had a loss of 479,000?

A   Yes.

Q   Let's go to PDF page 5, 75631.

So we have an account name here: ███8275. The same account name, right?

A   Yes.

Q   Okay.  So this is still the account that SEIU had invested with Entrust.

Do you see the hedge fund section under Hedge Equity?

A   Yes.

Q   And then do you want to go down to United States?

MS. SADINSKY:  And let's get all the United

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 289

States on the page.

BY MS. SADINSKY:

Q   Do you see there's one, two, three, four, five, six -- eight funds listed here:  Special Situation funds?

Do you see that?

A   Correct.  Yes.

Q   And these are the Entrust strategies or funds that SEIU was invested in through Entrust?

A   Yes.

Q   And do you know anything about these strategies or funds?

A   No.

Q   But you know that they're hedge funds, right?  They're listed under the hedge funds section.

A   Right.  I know that they're -- yes, they're described as hedge funds.  I'm not -- I don't know particularly what strategy is for each fund.

Q   Okay.  And then do you see, at the bottom of this page, it shows the total market value of -- it says total United States.  The total market value of SEIU's investments in U.S. Hedge Equity through Entrust is 4.178 million.

Do you see that?

Page 290

A   Yes.

Q   So all -- so -- so the -- so SEIU had $4.1 million invested in Entrust U.S. Hedge Equity through these eight funds, correct?

A   Correct.

Q   And then do you see that the investment here had a loss of 2.3 million as of January 31st, 2018?

A   Correct.

Q   Okay.  And let's go to the last two pages, 76616 to 17.

Here, it's the same account number.  You see that?  ███8275, right?

A   I see it.

Q   And under here we have Hedge Equity that we just looked at, right?

A   Correct.

Q   And then we have Hedge Fund of Funds, Hedge Market Independent, Hedge Event Driven, and Hedge Multi Strategy.

Do you see that?

A   I don't see it, but looks like it's there at the next row.

Q   You don't see it?

A   Now I see it.

Page 291

Q   Okay.  Could any of these categories -- could any of these categories have included investments in U.S. common stock?  Is it possible?

A   It's possible.

Q   And is it possible that any of these categories could have included investments in Cardinal Health common stock?

A   Well, you know, I -- the top four -- yes, it seems like the bottom one: "Hedge multi strategy" might have been more internationally driven, but it's possible, I suppose.

Q   Okay.  And so the total market value of all assets listed for account ███8275 in hedge funds is 206 million.

Do you see that?

MS. SADINSKY:  Next page.

BY MS. SADINSKY:

Q   Total market value right at the top there.

A   That -- yes, that's the total market value, it seems, of the hedge funds through Entrust.

Q   Yes.  Did any of the hedge funds that SEIU invested in through Entrust engage in short sales of Cardinal Health stock?

A   I don't know.

Q   Is it possible?

Page 292

A   Is it possible?  It's possible.

Q   Did any of the hedge funds that SEIU invested in through Entrust engage in options related to Cardinal Health stock?

A   It's possible.

Q   Does SEIU possess information about whether any of the hedge funds -- strike that.

Does SEIU possess information about whether Entrust or any of the investments SEIU had, through Entrust, shorted Cardinal Health stock between 2015 and 2018?

A   We don't possess information about whether those hedge funds shorted Cardinal Health stock in 2015 and 2018.

Q   Does SEIU possess information about whether Entrust, or any of the funds or strategies Entrust invested SEIU's money in, engaged in options transactions in Cardinal Health stock between 2015 and 2018?

A   I'm sorry.  Could you repeat the -- repeat the question again.

Q   Does SEIU possess information showing whether Entrust shorted -- or showing whether Entrust engaged in options trades in Cardinal Health stock on SEIU's behalf between 2015 and 2018?

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 293

A    So when it comes to these questions about whether the hedge funds -- to the extent whether we have information as to whether they've engaged in the trading we're talking about with short sales or options, I am not aware of us having that information.

There could be other reasons -- and based on the descriptions in -- you know, the description in the Northern Trust statements, there may be other information about this strategy that we possess that would say, oh, yes, they probably would not because, for instance, this hedge fund was geared toward manufacturing -- or maybe not manufacturing, but high tech or something like that, which would say that you're not.  But I am not aware of that information.

MS. SADINSKY:  You can put this document down.

BY MS. SADINSKY:

Q    In your motion to be appointed lead plaintiff, SEIU claimed that it had suffered over $2.1 million in losses as a result of the misconduct alleged in the complaint; is that right?

A    Yes.

Q    Okay.  So SEIU had far, far more than $2.1

Page 294

million invested in hedge funds than it did in Cardinal Health stock; is that correct?

MR. BURKHOLZ:  Objection to the question.  This whole line of questioning is legally irrelevant since they don't hold legal title to any of the securities in the hedge funds.

BY MS. SADINSKY:

Q    Is that correct?  We just went through the market values for all of these.

A    The market value held in hedge fund common stock -- well, what we -- what we know is what was held in the hedge funds.  We don't know if that was common stock, or we haven't really sort of broken down how those hedge fund assets were held.

But the value of what was held in hedge funds exceeded the value of losses suffered by common stock -- sales of Cardinal Health common stock in that period.

Q    And then the unrealized gain also exceeded 2.1 million, correct?

MR. BURKHOLZ:  Objection.  Objection to the form of the question.  Again, legally irrelevant.  Documents speak for themselves.

BY MS. SADINSKY:

Q    Is that correct or not correct?  Fred Alger

Page 295

Management alone had a gain of 54 million in January 2018.  Is that more or less than 2.1 million?

A    Well, that number is larger.  What those did not show was -- so it would be hard to -- if you were to ask me were gains in hedge funds over -- well, in that 2015 to 2018 period?

So there were more gain -- well, likely more gains.  But what we did not see in those reports is when [sic] they were measuring gain against.  I don't know if the incept -- what the date was going back to 2010, two thousand -- maybe just the first of that year.  I'm not -- I'm not certain.  If it was the gain -- if it was just the first of that year, within January of that year, that number that you showed exceeds the losses that were registered that we articulated in the complaint.

Q    Okay.  Is it possible -- again, is it possible that the $2.1 million in losses that SEIU suffered could have been offset by short positions or options transactions that these funds took in Cardinal Health common stock?

MR. BURKHOLZ:  Objection to the form of the question.  Again, calls for a legal conclusion since

Page 296

the fund did not have legal title to the underlying securities in the hedge fund investments, and calls for speculation since he's already testified that the fund does not have any information about particular security gains or losses in these hedge funds.  So you're asking him to speculate.

BY MS. SADINSKY:

Q    Is it possible that the 2.1 million in losses could have been offset by short positions or options transactions that these funds that we just went through took in Cardinal Health securities?  Is it possible?

MR. BURKHOLZ:  Same objection.  Calls for speculation.

THE WITNESS:  No.  I'm not sure.  I would have to know how much one can make in a short sale.  Typically, our hedge fund -- our Investment Management Agreements and the investment guidelines have limits on a certain position.

So I -- I don't know, like -- I don't know how much each one of those funds might have as a limit, the total amount that a short -- any particular position could take and then what the potential profit would be.

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 297

Q   So we saw that --

A   Just that I don't have the kind of -- I'm not able to make that calculation.

Q   So we saw that the Alger fund, which there was a gain of 54 million in, we saw that they are allowed to invest up to 10 percent in short positions.  We saw that, right?  We looked at a document.

MR. BURKHOLZ:  Objection.  Calls -- I mean, that document says what it says.  You haven't laid a foundation that that was the particular investment that they were in five years before.

You can ask the question.

BY MS. SADINSKY:

Q   And you -- you can't say that any gain SEIU had on investments in funds that engaged in shorting or options transactions in Cardinal offset the alleged losses on its holdings in Cardinal Health stock?

MR. BURKHOLZ:  Same objection.  Calls for speculation.

THE WITNESS:  I -- I'm not sure what the potential return on an investment in a short would have been on Cardinal Health stock.  So it's hard for me to make that calculation.  I do know that

Page 298

there are limits to -- and while -- while that -- that particular Alger vehicle might have had a limitation on what the -- if I'm recalling correctly what we're -- what you were referring to with the 10 percent limit, I would be -- it would be unlikely that our overall investment -- you know, our overall agreement would allow for any one position to constitute 10 percent of that portfolio, and there would be other -- other limits in place.

So, you know, you're --

BY MS. SADINSKY:

Q   Can you say what --

A   I'm not -- I'm not -- from my -- I don't have enough investment -- well, I just wouldn't -- I don't have enough information to say whether it's true.  Whether -- is it possible that there were gains and that there were significant gains, I guess, from experience by our hedge fund managers in which we had an interest by shorting Cardinal stock?  It seems possible that any particular one might have had some notable gains.

Typically, they will inform us, and we've not received information stating that that's -- you know, when there's a -- you know, when something went well, we usually get -- you know, that's

Page 299

usually part of, like, the oral report.  We did not receive that information.  But that doesn't mean -- you know, they're not obligated to tell, "Hey, this is exactly where our best investment was," which could have been, theoretically, shorting Cardinal stock.

But it seems unlikely that every single one of those funds would have had an investment in Cardinal stock or that our agreements would have -- that the managers -- that the managers overseeing it would have been able to -- would have allowed such -- would have allowed a particularly large position overall in -- in one particular security.

But that said, you know, it's -- it's not impossible, but it seems un- -- not knowing the actual -- what a return would have been -- if it was -- if there was a significant, significant return, I suppose it's possible on -- on a short sale.  But it seems -- given the limitations on what managers and what I suspect might have been a good return, but not, you know -- well, it seems -- it seems unlikely, but I cannot rule it out.

Q   Okay.  So sitting here today, you can't say whether any gain that SEIU had on investments in funds that shorted Cardinal Health offset its

Page 300

alleged $2.1 million loss on holdings in Cardinal Health stock?

MR. BURKHOLZ:  Same objection.  This has been asked and answered twice already.  Same objection.

Since they didn't have legal title to any of the investment underlying securities in the hedge funds, your question lacks foundation and is improper and calls for speculation.  There's been no foundation laid that any of these hedge funds actually shorted Cardinal stock.

BY MS. SADINSKY:

Q   Please answer the question.

A   I would have to know more information whether it was possible or impossible.

Q   You can't say whether any gain SEIU had on investments in funds that shorted Cardinal offset its alleged 2.1 million in loss?  You can't say, right?

MR. BURKHOLZ:  Same objection as before that I've stated four times on the record.  And it calls for speculation.  And he's asked and answered the question three times.

THE WITNESS:  What I -- what I can say is that it's -- there are -- the gains that -- there's

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 301

two variables here that I'm not -- it's hard to make -- to assess what they mean. The gain over -- that's on the -- that reflect -- the unappreciated gain that's reflected in the custodial report, which could be either a short-term gain, or it could be something that's been based on an investment since inception, in which case, an increase in market value doesn't really represent -- well, the bigger thing is I just don't know how -- how great a return a loss would be compared -- or having held a short position in Cardinal, how great that return would be.

So without knowing that, it seems like somebody might be able to tell -- it doesn't seem likely, but we also have positions in place -- we also have limitations in place on the managers to restrict -- or should limit the risk that there's any one position held by -- in any one large amount by large -- lots of managers, but that -- so it's hard for me to say one way or the other whether it's possible or impossible.

So, if what I'm trying to say -- if what you're asking is, is it possible? Yes, but in the sense -- but not -- we would need a lot more information to say, "Yes, it's possible." Well, we

Page 302

would need to know certainly how much -- what sort of -- what sort of gain you would need or return you would need on a short to even start to assess that or whether that's possible.

BY MS. SADINSKY:

Q   So with all of the caveats that you just said, the answer is, it's possible. You don't know that it's not impossible, correct?

A   So I don't know. I don't know if us know -- when you say "you," meaning SEIU, I don't know. It's possible that we would have other -- other knowledge that would say, "Oh, yes, it's probably not possible," because I just don't have -- you know, this is not the type of investment that that hedge fund would make. Because even if they're making option investments, maybe they're restricted from making option investments in a certain field.

Q   Okay. Sitting here today, you don't know whether or not it's possible, correct? It is possible sitting here?

A   Right, I don't know.

Q   Okay. Can you say for sure, with a hundred percent certainty, that SEIU was -- actually suffered economic loss by the decline in value of Cardinal Health shares during the class period, a

Page 303

hundred percent certainty, can you say?

MR. BURKHOLZ: Objection. Objection. Calls for a legal conclusion in this case. And you're asking him to include hedge fund investments in which the fund does not have legal title to the underlying securities.

And you're asking him for speculation since you haven't laid a foundation that any of these hedge funds were actually short Cardinal stock and profited from it.

MS. SADINSKY: Mr. Burkholz, you have explained your objection. I understand it. If you say "objection," we'll know what you're talking about.

BY MS. SADINSKY:

Q   Mr. Ristorucci, can you say with a hundred percent certainty that SEIU actually suffered economic loss by the decline in value of Cardinal Health shares during the class period? Can you say that with a hundred percent certainty sitting here today?

MR. BURKHOLZ: Same objection. Calls for a legal conclusion. Same objection I just made. It's an improper question.

THE WITNESS: So if I understand it,

Page 304

you're -- you're making -- you're suggesting that because hedge funds that we have invested -- managers that we invest in through our hedge fund portfolio have held positions -- may have held positions, seemingly, a significant portion of their portfolio, and we experienced a gain in their portfolio as a result of, I guess, short -- you know, short -- opportunistically short selling Cardinal Health, offset the -- was greater than $2.1 million.

I can't say a hundred percent confidence in anything. I could give you -- that would be -- seem like a very unlikely scenario, but I cannot say a hundred percent with confidence that that happened.

MS. SADINSKY: I would like to mark as -- what exhibit are we on?

MR. MARTIN: Exhibit 19.

MS. SADINSKY: -- Exhibit 19 Tab 45, but hold on. Don't put it up yet.

- - -

(Deposition Exhibit 19 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   Does SEIU currently own any Cardinal Health

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 305

stock?

A   I -- I'm not sure.  I would suspect yes, since they are a public equity and try and participate in overall -- trying -- they're U.S. equity, and we have a heavy investment in U.S. equities.

Q   Since SEIU moved for lead plaintiff in this case in September 2019, has SEIU purchased Cardinal stock?

MR. BURKHOLZ:  Objection to the form of the question.  It's irrelevant, and I'd ask the witness not to speculate to any of these questions.  Only if he knows.

THE WITNESS:  I don't know.

MS. SADINSKY:  Let's -- let's pull up Exhibit 19.

BY MS. SADINSKY:

Q   I'm marking the transaction records that LSV produced indicating its purchases and sales of Cardinal Health's stock on behalf of SEIU.

MS. SADINSKY:  Go to the second page there.  And if -- it's kind of hard to read.  If you'd zoom all the way in -- if you'd go to the last highlighted column -- this is how it was produced to us -- it should have the date there.  Zoom in on the

Page 306

date -- date for Mr. Ristorucci.

BY MS. SADINSKY:

Q   12/22/2020 -- do you see that? -- recognition date and contractual --

A   I don't see it highlighted.  But --

Q   The highlighted row.  The yellow highlighted row.

A   Oh, contractual -- yes, I see that.

Q   What date is that?

A   December 22nd, 2020.

Q   Okay.

MS. SADINSKY:  And then let's move over to the right.

BY MS. SADINSKY:

Q   The transaction amount, do you see that?

A   Oh, second -- transaction amount local, is that what you're --

Q   Yeah.  That's the money spent to purchase the shares.

A   Okay.

Q   So it shows that there was a purchase of stock on December -- I guess it was recognized on December 18th and closed on December 22nd, 2020, right?

A   Correct.  Yes.

Page 307

Q   Does it surprise you to hear that SEIU purchased Cardinal Health stock after it moved for lead plaintiff?

MR. BURKHOLZ:  Objection to the form.  Irrelevant to any legal issue left in the case.

THE WITNESS:  No, it doesn't surprise me.

BY MS. SADINSKY:

Q   SEIU purchased Cardinal Health stock after it filed a case alleging that Cardinal Health committed securities fraud, correct?

MR. BURKHOLZ:  Same objection.  We can stipulate to the purchase if you have proper documentation.  The questions are irrelevant.

MS. SADINSKY:  I would -- I would like the witness to answer.

BY MS. SADINSKY:

Q   SEIU purchased Cardinal Health stock after it filed a case alleging that Cardinal Health committed securities fraud; is that correct?

MR. BURKHOLZ:  Same objection.  Irrelevant.

THE WITNESS:  That's -- that's correct.

BY MS. SADINSKY:

Q   Do you think, as a fiduciary, SEIU had a responsibility to sell its holdings in Cardinal Health stock after it filed a case against Cardinal

Page 308

Health alleging Cardinal Health had engaged in securities fraud?

MR. BURKHOLZ:  Objection to the form.  Irrelevant to any legal issues left in the case.

THE WITNESS:  I do not.

BY MS. SADINSKY:

Q   Do you know that you are suing Mike Kaufmann?

A   It's in the -- in the complaint.  I knew we were -- I knew we're -- we are suing some executives that are at Cardinal Health.

Q   Do you know that Mike Kaufmann is the current CEO of Cardinal Health?

A   I did -- I was not -- I am aware of it, and you just pointed out it was not in my conscious knowledge, but I was aware that some Cardinal Health executives were still there even though that they're -- they're being sued.

Q   Do CEOs of public companies make public statements on behalf of the company and the company's performance?

A   Yes.

Q   Do you trust what Mike Kaufmann -- or does SEIU trust what Mike Kaufmann tells the market about Cardinal Health's financial performance?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 309

MR. BURKHOLZ:  Objection to the form. Irrelevant to the time.

I assume you're asking current -- current time period?

MS. SADINSKY:  Yes.

THE WITNESS:  So in evaluating public statements about a company or any other aspect of the company, we delegate that responsibility to our investment managers, and we being, again, the pension fund.

THE COURT REPORTER:  We what?  I missed that.

THE WITNESS:  We being the pension fund.

BY MS. SADINSKY:

Q   But the pension fund has a fiduciary responsibility to the 260,000 plan beneficiaries, correct?

A   The pension fund trustees have a fiduciary duty to the -- to the -- that -- the beneficiaries.

Q   260,000 beneficiaries, correct?

A   For the Health Care Employees Pension Fund? That sounds about right, yes.

Q   So if the trustees were aware that a company that they had filed a lawsuit against alleging securities fraud and the CEO of that

Page 310

company, who they had also alleged committed fraud, it is your testimony that the trustees would not have an obligation to tell its investment managers to stop investing in Cardinal Health?

MR. BURKHOLZ:  Objection to the form. Irrelevant to any legal issues in the case.

You can answer.

THE WITNESS:  That's correct.

BY MS. SADINSKY:

Q   That's correct.

It's consistent -- how is it consistent with SEIU's fiduciary duty to -- to -- to its plan participants to remain invested in a company where it does not trust the CEO to make truthful statements about the company's performance?

MR. BURKHOLZ:  Objection to the form. Lacks foundation.

THE WITNESS:  So the -- the trustees have what -- the strategy that's been employed by our trustees has been to -- and it has been to hire investment managers who are high quality, have good -- have good histories, have good performance, and replace them when needed if they do not have those performances or we feel like they are not somehow meeting the goals that we've established as

Page 311

a fund.

Investment managers will make their -- have their ability to make an evaluation about the truthfulness, and they can take into account an executive's history of making false or -- false statements, and they can make that judgment about what that says about the current value of their stock price or if they're going -- if they're making -- if they're going to that micro a level about investment choices.

But our trustees, their strategy is to participate in the growth of the current -- we believe, based on -- we would assess that since this information is public, then that's now incorporated into the price of a share and that investment managers have the ability to evaluate whether that share price is appropriate and merits further investment.

That said, we also understand that our investment managers may be making investments based on participating in a growth of a particular sector or a particular -- in terms of what industry that -- that investment is in or what level and what -- what capitalization they represent to the market.  There are a host of factors that we would want our

Page 312

investment managers to take into account when making an investment.

What we would also know though -- what we would also want to do is make sure that if there is a loss that has occurred because there was fraud or alleged fraud, then we would want to make sure that that claim was pursued appropriately.

BY MS. SADINSKY:

Q   Has -- has the trustees or anyone at SEIU ever told Boston Partners about this litigation?

A   Has a trustee reached out to Boston Partners to inform them about the litigation?

Q   Or SEIU.

A   I'm sorry?

Q   Has anyone --

A   They know this litigation exists. They're -- I'm not sure, but Boston Partners knows about the litigation.

Q   Before Boston Partners received a subpoena in this litigation, had SEIU ever discussed the litigation with Boston Partners?

A   I'm not sure.

Q   Had SEIU ever discussed the litigation with Rothschild?

A   I'm not -- I'm not sure.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 313

Q Had SEIU ever discussed the litigation with RhumbLine?

A I'm not sure.

Q Did SEIU ever discuss the litigation with State Street?

A I'm not sure.

Q Had SEIU ever discussed the litigation with Columbia?

A I'm not sure.

Q With LSV?

A I'm not sure. Just to -- I'm saying I'm not sure. Really the answer is to my knowledge, no, but I'm not sure.

Q So to your knowledge, SEIU has never discussed the litigation with any of its investment managers prior to those investment managers getting a subpoena in this case; is that correct?

A That is -- that's correct.

MR. BURKHOLZ: Alexandra, we've been going for another 40 minutes or so. If we could just take one more break, I'm sure you have a little more time, unless you think you're done.

MS. SADINSKY: Let's -- no, I'm not done. Let's go off the record.

THE VIDEOGRAPHER: Going off the record at

Page 314

6:10 p.m.

(Recess.)

THE VIDEOGRAPHER: Going on the record at 6:24 p.m.

BY MS. SADINSKY:

Q Mr. Ristorucci, earlier today, many hours ago, you had mentioned that SEIU is a plaintiff in other federal securities litigation.

Do you remember that?

A I -- yes.

Q How many federal securities litigations is SEIU involved in?

A I believe we're currently involved in one other litigation where we've been -- we're identified as the plaintiff -- as the lead plaintiff.

Q And is -- so you also mentioned that the general counsel group services 22 funds. You said that earlier, right?

A Yes.

Q Have any of the other funds -- are any of the other funds involved in federal securities litigation?

A No.

Q No? Not one?

Page 315

A Involved, meaning as a lead plaintiff or pursuing that -- or pursuing those strategies, no -- or pursuing that status? No.

But to the other pension funds, the New York Pension Fund, the Home Care Pension Fund that I mentioned earlier may be part of a class that -- that benefits, although they have -- that would benefit from a settlement.

Similarly, the Health Care Funds, the Health Care Benefit Fund, the Greater New York Health -- Greater New York Health Care Benefit Fund and -- just the Greater New York Health Care Fund and the Home Care Benefit Fund at one point might have held some equity securities, but currently don't and, in theory -- so I don't know whether any of the other -- those three have any -- any connection to any class -- class action securities litigation.

Q Now, is Franchi versus Smile Direct Club the other action you're involved in where you've been selected as lead plaintiff?

A Yes.

Q Are you monitoring that litigation?

A I'm not responsible for -- well, I review -- it hasn't -- there hasn't been -- for me

Page 316

at this point, there hasn't been as much, but I have reviewed summaries and other elements of discussing what's going on -- what there -- on that case, but there hasn't been -- I think it's -- that -- that action has not progressed as much as this one.

Q Who's primarily responsible for that case?

A Well, similarly, at one point it was Jeff. I'll be taking on more responsibility as it -- as it arises.

Q Is Ms. Metzger involved?

A She's general counsel, so she's -- she monitors it also -- monitors that as well.

Q And did Mr. Kramer and Ms. Castaneda approve the decision of SEIU to move for lead plaintiff in that case?

A Yes.

MR. BURKHOLZ: Objection. Objection. Relevance.

But go ahead.

BY MS. SADINSKY:

Q And you're represented by Robbins Geller in that case, right?

A Yes.

Q Do you have local counsel?

A I'm not sure.

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 317

Q   Okay.  And then the next case is Dang verse Amarin, and are you involved in that case?

A   Meaning the pension fund is involved in that case as well.  I've also similarly reviewed summaries related to Amarin.

Q   Your -- you personally are involved in monitoring that action?

A   Yes, but it's not -- similar -- similar to Smile Direct, it's not had as much at this point related to --

Q   So Smile Direct, if I was reading the docket right, had a lead plaintiff -- right? -- and SEIU was chosen and then Robbins Geller filed a consolidated complaint and then there was a Motion to Dismiss briefing and then Robbins Geller filed an amended complaint and then there was a Motion to Dismiss briefing.

Were you involved in each stage?

MR. BURKHOLZ:  Objection to the form.  Irrelevant.

But you can answer.

THE WITNESS:  But I was -- I -- I was involved in that.  I was monitoring.  I did not have significant communications related to that one.

BY MS. SADINSKY:

Page 318

Q   Okay.  And then in the Dang verse Amarin case, you've been monitoring that as well, and counsel for you there is Robbins Geller as well, right?

A   Correct.

Q   And that case is pending, right?

A   Yes.

MR. BURKHOLZ:  Objection to -- objection to the form.

BY MS. SADINSKY:

Q   And that case, the Dang verse Amarin case, is an open case, right?  The case is ongoing?  There's no resolution of it?

A   That's correct.

MR. BURKHOLZ:  Objection to the form.  Just to be clear -- just to be clear, there's been no lead plaintiff decision in that case.

MS. SADINSKY:  Understood.

BY MS. SADINSKY:

Q   And Franchi versus Smile Direct Club is ongoing as well, right?  That case hasn't closed?

A   That's correct.

Q   And the third one is Ciccarello verse Alibaba?

A   That's a -- yes.  We're not a lead

Page 319

plaintiff in that case.

Q   But SEIU moved for lead plaintiff in that case, right?

A   Yes.

Q   And it did so with Robbins Geller?

A   Yes.

Q   And so if SEIU is appointed lead plaintiff in the Dang verse Amarin case, you'll be monitoring three federal securities class actions at the same time?

A   Well, that would be a possibility.  We might decide that it would make sense to bring somebody else to -- somebody else who works on the team here to take on more responsibility with respect to that claim.

Q   There's four people in the general counsel's office, right?

A   Four full time and then, additionally, Jeff Stein.

Q   And so you said Jeff Stein was involved in all of these litigations, didn't you?

A   In the earlier stages, he was -- he was involved, yes.

Q   You said Ms. Metzger was involved in all of these cases too, didn't you?

Page 320

A   Correct.

Q   So you would just bring one other person on?

A   I'm not sure how we would handle it.

Q   Okay.  Has anyone from SEIU been deposed in any of these cases?

A   Not to my knowledge.

Q   Has SEIU received anything of value in any of these cases?

A   No.

Q   Has SEIU ever identified a potential securities claim without the assistance of Robbins Geller?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  I'm not sure what you're asking.  We have other -- as I mentioned, we have other portfolio monitoring counsel, and they have suggested claims that we would -- we could bring, and in some -- both -- both Scott & Scott and Sucharow have raised -- Sucharow Labaton have suggested potential claims.

BY MS. SADINSKY:

Q   Have -- has SEIU ever identified a potential -- a potential U.S.-based federal

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 321

securities claim without the assistance of Robbins Geller?

MR. BURKHOLZ:  Same objection.

THE WITNESS:  Yes.  You know, so the emphasis on -- the emphasis by Sucharow -- Labaton Sucharow has been, you know, in terms of what we ended up pursuing internationally, but they also propose claims related to U.S. equities holdings, and Scott & Scott does as well.  We just have not chosen to pursue some of the claims that have been raised to our attention -- brought to our attention.

BY MS. SADINSKY:

Q   When is the last time Labaton brought a U.S.-based federal securities claim to your attention?

MR. BURKHOLZ:  Objection.  Relevance.

THE WITNESS:  I think within the past couple of months they've raised a couple of potential claims.

BY MS. SADINSKY:

Q   U.S.-based securities claims?

A   Yes.

Q   Is -- are they claims that Robbins Geller have brought to you as well?

A   I'm not sure.  I'm not sure.

Page 322

Q   Well, you testified earlier that Labaton did not generally bring U.S.-based federal securities claims to SEIU's attention.  Now that's changed?

A   I suppose it depends what "generally" means.  They have brought them to our attention. What we have worked more -- ended up working with them more on have been some international claims. So that's been -- that would be what I would be thinking about.

But they have raised -- they did raise a couple of other claims fairly recently, the details of which I don't recall, but we determined that it was not something that aligned with our interests.

Q   Did you determine -- did the claim concern a publicly traded equity security?

A   Yeah.  Yes.

Q   Has Robbins Geller retained any consultants or experts in connection with this litigation?

MR. BURKHOLZ:  Objection.  Objection to the form.

THE WITNESS:  Yes.

BY MS. SADINSKY:

Q   Who?

A   Well, in the complaint, you can see they

Page 323

brought in some people who -- or at least individuals who would work on -- who somehow engaged in measuring damages.  They also have worked with people to identify what are -- to do research in the area of -- well, relating to the case, the factual matters related to the case.

Q   Can you name any of those people?

MR. BURKHOLZ:  You know, Counsel, now you're getting into attorney-client communications about our work on the case, and I think that's completely inappropriate.

MS. SADINSKY:  I'm asking about his knowledge of expert witnesses.

THE WITNESS:  I don't --

MR. BURKHOLZ:  Experts that have been identified in the case?

MS. SADINSKY:  Yes.

BY MS. SADINSKY:

Q   Mr. Ristorucci, are you aware of any experts that have been identified in this case?

A   If you're asking about their names, that's not something I can recall at the moment, but there was also experts who worked on why -- factors that would be used in evaluating whether there was a class -- an appropriate class and whether we were an

Page 324

appropriate representative.

Q   So there's been an expert report filed; is that right?

A   I'm not sure how you would classify it, but that was -- that -- there was -- one of the -- some -- in one of the -- one of the filings submitted by Robbins -- well, through local counsel, it was discussed, the factors relating to whether -- how to identify the appropriate lead plaintiff or what -- and -- and the factors in considering whether there was a class -- whether the -- the plaintiff group was a class period involved somehow just by outside people.

Q   Okay.  I'm not asking for a description of the report.  I'm just going to ask you a series of yes-or-no questions.  If you could just answer them directly, and your counsel can explore if you want to explain anything when he has time to ask you some more questions.

Do you agree that it's important that an expert witness should be able to give an independent opinion?

A   Do you mean in testimony or when they're advising as a --

Q   In testimony.  If an expert witness were to

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 325

come to court or submit an affirmation or declaration to the court, anything to the court, should that be based on their independent opinion?

MR. BURKHOLZ: You're asking him -- I'm going to object. You're asking him for a legal conclusion about the proper scope of an expert witness under the federal rules. He's not -- and -- and I don't believe that was a topic of your examination today.

BY MS. SADINSKY:

Q Mr. Ristorucci, go ahead.

A So my -- my framework for thinking about this would be that an expert witness is supposed to bring -- independently develop -- or individually developed knowledge that's beyond a layperson, and so as a result, part of what they would be doing would be providing their independent analysis of their opinion or of an issue.

THE COURT REPORTER: Of their opinion or of?

THE WITNESS: Of an issue.

BY MS. SADINSKY:

Q The expert witness in this case that Robbins Geller submitted an expert report from is Steven Feinstein.

Page 326

Do you know who retained Dr. Feinstein? Was it Robbins Geller or was it SEIU?

A Oh, it's Robbins Geller.

Q And is Robbins Geller -- is Robbins Geller paying his fees, or is SEIU paying Dr. Feinstein's fees?

MR. BURKHOLZ: Objection. Asked and answered.

Go ahead.

THE WITNESS: SEIU is not paying Dr. Feinstein's fees.

BY MS. SADINSKY:

Q Did Robbins Geller discuss the retention of Dr. Feinstein with SEIU before Robbins Geller retained Dr. Feinstein?

MR. BURKHOLZ: Objection to the question. It goes to attorney-client communications.

BY MS. SADINSKY:

Q I'm asking whether or not you discussed it. I'm not asking the substance.

A I don't know that Dr. Feinstein was specifically mentioned. In describing the process that would be involved, we understood that there would be an -- that Robbins Geller would identify experts and to work on different aspects of the

Page 327

case, including items like measuring damages.

Q Did SEIU approve the decision to retain Dr. Feinstein specifically?

A No. No, we did not.

Q And did SEIU ever discuss Dr. Feinstein specifically with Robbins Geller before Dr. Feinstein was retained?

A Not to my knowledge.

Q Do you know if Dr. Feinstein has worked with Robbins Geller before?

A I don't know.

Q You're not aware that in 21 of the 33 cases in which Dr. Feinstein has testified in the past four years he was hired by Robbins Geller?

A I'm not -- no, I'm not aware of that.

Q Are you aware that Dr. Feinstein testified that he earned more in fees in the past four years from cases involving Robbins Geller than from any other law firm?

A No.

Q Does that concern you?

MR. BURKHOLZ: Objection. Relevance.

THE WITNESS: Does it concern me? Could you repeat the statement again.

BY MS. SADINSKY:

Page 328

Q Are you aware that 21 of the 33 cases have been with -- that Dr. Feinstein has done in the last four years have been with Robbins Geller, and Dr. Feinstein testified that he earns more in fees from Robbins Geller than any other law firm? Does that concern you?

MR. BURKHOLZ: Objection. Lacks foundation.

But you can answer the question.

THE WITNESS: It doesn't -- it doesn't concern me.

BY MS. SADINSKY:

Q Does it indicate to you that Dr. Feinstein may not be able to give an independent expert opinion?

MR. BURKHOLZ: Objection. Lacks foundation. Completely inappropriate.

THE WITNESS: Dr. Feinstein is evaluating damages?

BY MS. SADINSKY:

Q Dr. Feinstein is evaluating SEIU's witness -- or ability to serve as a class representative.

Didn't you review the expert report?

MR. BURKHOLZ: Objection. That lacks

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 329

foundation.

THE WITNESS: So it would not -- it would not in of itself concern me.

BY MS. SADINSKY:

Q  Would it raise any concern for you that Dr. Feinstein's opinion could be influenced by a desire to continue doing business for Robbins Geller in the future?

MR. BURKHOLZ: Objection. Lacks foundation. Relevance.

THE WITNESS: No, it does not. It does not concern me.

BY MS. SADINSKY:

Q  Does it raise any concern for you at all?

MR. BURKHOLZ: Same objection.

THE WITNESS: Well, it obviously -- it's something I would have to think about -- makes me think for a minute, but after I think about it, it's not a particular -- not a particular concern.

BY MS. SADINSKY:

Q  Would you have liked to be able to think about it before Robbins Geller retained Dr. Feinstein in this case?

MR. BURKHOLZ: Objection. Relevance.

THE WITNESS: I think selection of experts

Page 330

in this area would probably be something that we'd be inclined to defer to our counsel on this, given -- given their expertise in the area.

BY MS. SADINSKY:

Q  So you don't think that hiring an expert that earns a material portion of their income from Robbins Geller will disadvantage the class that you represent in any way?

MR. BURKHOLZ: Objection. Asked and answered a couple times now. Irrelevant.

You can answer.

THE WITNESS: I -- I just don't see that as being a major concern.

BY MS. SADINSKY:

Q  Okay. Does anyone at SEIU have any social relationships with any attorney at Robbins Geller?

MR. BURKHOLZ: Objection to the form. Relevance. Vague.

THE WITNESS: Yeah, I'm just -- social relationship can be -- can have a wide meaning. I would -- used in its most general terms, I would suspect somebody at Robbins Geller has a social relationship with somebody at SEIU.

BY MS. SADINSKY:

Q  Who? Who at SEIU?

Page 331

A  I don't know. I don't know.

Q  Do you know of any, you know, personal relationship? Anything other than a professional relationship that anyone at SEIU has with anyone at Robbins Geller?

A  No.

Q  Has anyone at SEIU ever worked at Robbins Geller?

A  I don't know.

Q  Does anyone at SEIU have any family relationships with any attorneys at Robbins Geller?

A  I don't know.

Q  Does Robbins Geller make charitable donations to causes supported by SEIU?

A  I don't know.

MR. BURKHOLZ: Objection.

MS. SADINSKY: I'm going to save the rest of my time for rebuttal or redirect, whatever.

MR. BURKHOLZ: I have no further questions. The deposition's complete.

MS. SADINSKY: We want to take a quick break. I just want to discuss if I want to use the rest of my time.

MR. BURKHOLZ: You said you would reserve your time for rebuttal or redirect, and I didn't

Page 332

have any further questions, so the deposition is complete.

MS. SADINSKY: I don't think that's how it works.

Let's go off the record for a second so it's not wasting the rest of my time.

THE VIDEOGRAPHER: Going off the record at 6:46 p.m.

(Recess.)

THE VIDEOGRAPHER: Going on the record at 6:52 p.m.

MR. BURKHOLZ: So do you have a few more questions, you said, Alexandra?

MS. SADINSKY: Yes.

MR. BURKHOLZ: How many minutes of questions do you have left?

MS. SADINSKY: Can we go back off the record? We just went on the record. Let's go off the record.

THE VIDEOGRAPHER: Going off the record at 6:52 p.m.

(Recess.)

THE VIDEOGRAPHER: Going on the record at 6:53 p.m.

MR. BURKHOLZ: I'm just making an objection

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 333

to further questions by counsel for the defendants. She was finished with her questions of this witness. I did not ask any questions of the witness, and under the rules, the witness has been passed, and the deposition should be complete.

But in the spirit of cooperation, I will allow her to continue, but I do object to this portion of the deposition continuing.

MS. SADINSKY: Thank you. The rules allow for 7 hours, and there's no rule about passing the witness.

As my next exhibit, I'd like to mark Tab 34.

Which exhibit is this?

MR. MARTIN: Exhibit 20.

MS. SADINSKY: As Exhibit 20.

- - -

(Deposition Exhibit 20 was marked for identification.)

- - -

MS. SADINSKY: And if you want to zoom out really quick.

BY MS. SADINSKY:

Q   Do you recognize this document?

A   The Rule 26 disclosures.

Page 334

Q   Do you recognize it?

A   I've seen it before, yes.

Q   Were you involved in preparing it?

A   Not in preparation, but I would have seen it before it was filed.

MS. SADINSKY: Let's go to the bottom of page 2 and zoom in.

BY MS. SADINSKY:

Q   Do you see B there? Investment managers?

A   Yes, I do see that.

Q   I want you to read this list, and when you're done, we'll go to the next page, and I want you to just tell me if this is the current list of the investment managers that transacted in Cardinal Health common stock on behalf of SEIU between 2015 and 2018.

A   LSV Asset Management; Artisan Partners; Boston Partners and/or Robeco Investment Management, Inc.; ICAP and/or TP ICAP; Rothschild Asset Management, Inc.; RhumbLine Advisers; State Street Global Advisers, Inc.; and Columbia Management Investment.

Q   Is that a complete and accurate list?

MR. BURKHOLZ: Objection to the form.

Just for the record, we've identified to

Page 335

the defendants the six managers in this case after this document was prepared.

THE WITNESS: So based on -- this is my understanding of who the equity managers are who -- or the investment managers are who would have purchased Cardinal stock -- Cardinal Health stock.

BY MS. SADINSKY:

Q   Do you know that there was initial disclosures issued before this that had different investment managers identified?

A   I don't recall that. But --

Q   You don't recall that happening?

A   No. But I -- it doesn't --

Q   But you don't know what --

A   I'm not -- I'm not recalling exactly what would have caused that.

Q   Okay. You don't know what caused that, but you reviewed these before they were filed, correct?

A   I'm not sure what -- did I -- any -- anything we would have filed, we would have filed or provided on the idea -- on the basis that we thought it was correct.

Q   I -- sorry. Maybe you misheard me. I said: You don't know what caused that, but you reviewed the documents before they were

Page 336

filed. You reviewed these initial disclosures before they were filed, correct?

MR. BURKHOLZ: Objection to the form.

BY MS. SADINSKY:

Q   My question is simply: Did you review this document before it was filed?

A   I'm not sure that I reviewed this document before it was filed. I know people from -- but I know we did review this file, and I've seen -- I've seen this before.

Q   Who are the people that did review this file?

A   Jeff Stein would have. I -- I may have as well.

Q   Let's go back to an exhibit I marked earlier, the amended complaint. I don't know the exact number.

MR. MARTIN: Exhibit 7.

MS. SADINSKY: Exhibit 7, and let's turn to page 24.

And let's zoom in to A. Zoom in. I can't see. A (ii).

MR. BURKHOLZ: Can -- can you show the witness what leads into this particular paragraph for context?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 337

MS. SADINSKY: Sure. Let's go to the top of 67. Right there.

MR. BURKHOLZ: So he can read the whole thing.

BY MS. SADINSKY:

Q   Why don't you read that first part of 67.

A   "Defendants' statements alleged in paragraphs 31-65 are materially false or misleading at the times they were made, and/or omitted material information required to be disclosed, because they failed to disclose the following adverse information that was known to Defendants or recklessly disregarded by them."

Q   Why don't you just read A, actually. We don't need -- go down.

A   "Defendants were unable to accurately track, how much Cordis consignment and warehouse inventory existed, how much was excess and obsolete or about to expire, how much of it was missing or unaccounted for and where it was located around the world. Defendants lacked fundamental visibility into Cordis's global inventories, the largest and most critical physical component of Cardinal's acquisition, for the following reasons."

Q   Why don't you read the first sentence of

Page 338

the next paragraph?

A   "Before completing the acquisition of Cordis, Cardinal did not perform adequate due diligence, and also did not conduct nearly the financial due diligence it customarily did for other acquisitions for several reasons."

Q   What is the factual basis for this allegation?

MR. BURKHOLZ: Objection. Calls for a legal conclusion. Document speaks for itself.

BY MS. SADINSKY:

Q   What is the factual basis for this allegation? Do you know?

A   Well, I think the idea was that it was rushed and because Cardinal was in a -- their specialty was -- well, Cardinal's specialty was generic manufacturers of pharmaceuticals, and that was not seen as -- not seen as an area of growth for -- and, in fact, might be -- might be an area of increased competition.

So as a result, they wanted to acquire a business that was seen as an area of growth and were motivated to get to that quickly.

Q   Mr. Ristorucci, I understand what the allegation says. What is the factual basis for it?

Page 339

Why was this added to the complaint? How do you -- how do you know whether or not this is true?

MR. BURKHOLZ: Same objection. Calls for a legal conclusion. Document -- the complaint speaks for itself.

THE WITNESS: Well, if they did not -- if they had done adequate due diligence, then they would not have been in the -- if they conducted adequate due diligence, they would have not been in a position where they did not realize that their -- their mechanisms for marketing are -- for monitoring inventories were not -- were not perhaps aligned with what would be necessary for a global presence, and, in particular, because they were dealing with a different type of product, they did not think about -- their history was in terms of conducting sort of --

BY MS. SADINSKY:

Q   Is that your opinion or is that based on a source? Did someone -- is there a source that you have talked to or you know about that said Card- -- that Cardinal Health did inadequate due diligence, or are you guessing?

MR. BURKHOLZ: Objection. Calls -- you're asking him for a legal conclusion. The document

Page 340

speaks for itself. The complaint has factual allegations in it, and he's merely -- you're asking him questions about those factual allegations that are in the document.

BY MS. SADINSKY:

Q   I want to know, Mr. Ristorucci, if you know what this allegation is based on.

MR. BURKHOLZ: Same objection. Document -- the sources of the allegations in the document speak for themselves.

THE WITNESS: I mean, I guess I'm not sure exactly how to answer the question that you're asking.

BY MS. SADINSKY:

Q   Let's look at something more specific. Go to the next page.

That No. 1 there, first sentence: "J&J manufactured 80%-90% of Cordis products in Juarez, Mexico."

What is that based on?

MR. BURKHOLZ: Can you please show the witness the lead-in to this particular sub-allegation for context?

THE WITNESS: Okay.

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 341

Q   Okay.  So:  "J&J manufactured 80%-90% of Cordis products in Juarez, Mexico."

What is that the factual basis for that?  How do you know that's true?

MR. BURKHOLZ:  Objection to the form.  The complaint sets forth the allegations in detail, including that they were based on the investigation of --

MS. SADINSKY:  I am asking -- I am asking the witness to testify what he knows.  I'm not asking for you to tell the witness what the complaint says.  Please stop coaching your witness.

BY MS. SADINSKY:

Q   Mr. Ristorucci, do you know what that allegation is based on, or do you not know?

MR. BURKHOLZ:  Same objection.  Calls for -- same objection that I had before.  Document speaks for itself.

THE WITNESS:  It would be based on there being 80 to 90 percent of -- J&J manufactured 80 percent -- 80 to 90 percent of -- of Cordis's products in Juarez, Mexico.

BY MS. SADINSKY:

Q   But you don't know where that 80 to 90 percent number came from or the information about

Page 342

Juarez.  You don't know how that number and that information got into the complaint, correct?

MR. BURKHOLZ:  Same objection.  Calls for -- the document speaks for itself.  It's based on -- on legal counsel's investigation --

MS. SADINSKY:  Excuse me.  I have asked you again to stop coaching your witness.  I'm asking Mr. Ristorucci --

MR. BURKHOLZ:  This line of question's -- this line of question's completely inappropriate.

MS. SADINSKY:  Whether or not Mr. Ristorucci knows the factual basis for the allegations in the complaint that he filed against our defendants I think is perfectly appropriate.

BY MS. SADINSKY:

Q   Mr. Ristorucci, do you or do you not know what that allegation is based on?

MR. BURKHOLZ:  Same -- same objection.

THE WITNESS:  If you're asking me what's the specific research that that information is based on, I did not read the research underlying that -- that sentence.

MS. SADINSKY:  No further questions.  Thank you.

MR. BURKHOLZ:  Okay.  Deposition's over.

Page 343

THE VIDEOGRAPHER:  Going off the record at 7:06 p.m.

(The following proceedings were held off the video record:)

THE COURT REPORTER:  Counsel, is this confidential?

MR. BURKHOLZ:  Yes, it is.  I designate it confidential.

(Signature having not been discussed, the deposition of Gabriel Ristorucci was concluded at 7:06 p.m. EDT)

Page 344

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Joan V. Cain, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of May 2022.

My commission expires:
May 31, 2025

_____

NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA
VIRGINIA NOTARY REGISTRATION NO. 107144

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 345

INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel
that notary public signature is required.

Please return a copy of the signed errata within
30 days of receipt, unless otherwise agreed upon
by counsel.  Once we receive the signed errata,
we will distribute an electronic copy to all
parties.

RETURN A SIGNED COPY VIA FAX, E-MAIL OR MAIL TO:
    FAX:  1-800-825-9055
    E-MAIL:  janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
PO Box 542
Luck, WI 54853

Page 347

PAGE  LINE    CHANGE     REASON

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

Page 346

NOTICE TO READ & SIGN

This transcript was electronically distributed
to ROBBINS GELLER RUDMAN & DOWD LLP to forward to
witness.

ACKNOWLEDGMENT OF DEPONENT

I, Gabriel Ristorucci, do hereby certify
that I have read the foregoing pages and that
the same is a correct transcription of the
answers given by me to the questions therein
propounded, except for the corrections or
changes in form or substance, if any,
noted in the attached Errata Sheet.

_____  _____
(DATE)   Gabriel Ristorucci

Signed and subscribed to before me this
_____ day of _____ 2022.

_____
Notary Public

Page 348

INDEX OF EXHIBITS

EXHIBIT          DESCRIPTION          PAGE

EXHIBIT 1    30(b)(6) Deposition Notice       10
             to 1199 SEIU Health Care
             Employees Pension Fund

EXHIBIT 2    Printout from                    52
             Nonprofitlight.com List of
             Executives for 1199SEIU
             National Benefit Fund for
             Health and Human Service
             Employees as of June 2021

EXHIBIT 3    Retainer Agreement Between      116
             Robbins Geller and 1199
             SEIU, Bates Nos.
             1199SEIUHC0000005-0000007

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 349

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION                PAGE

EXHIBIT 4    Lead Plaintiff's Responses          138
             and Objections to
             Defendants' First Set of
             Interrogatories

EXHIBIT 5    Amended and Restated Trust          140
             Agreement through July 21,
             2010, Bates Nos.
             1199SEIUHC0135942-0135985

EXHIBIT 6    Certification Signed by Jeff         141
             Stein, September 2019

EXHIBIT 7    Consolidated Amended                 145
             Complaint for Violations of
             the Federal Securities Laws

Page 351

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION                PAGE

EXHIBIT 12   Discretionary Investment            236
             Management Agreement with
             Rothschild, Bates Nos.
             1199SEIUHC0000308-0000344

EXHIBIT 13   Excerpts from the January           247
             2018 Northern Trust Report
             Re: Mesirow Pershing Square

EXHIBIT 14   Pershing Square Holdings            253
             2017 Annual Report

EXHIBIT 15   Excerpts from the January           270
             2018 Northern Trust Report,
             Bates Nos.
             1199SEIUHC0072329, -0075577,
             and -0076573

Page 350

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION                PAGE

EXHIBIT 8    Engagement Agreement for            151
             Portfolio Monitoring, Bates
             Nos. 1199SEIUHC0000001-
             0000004

EXHIBIT 9    Declaration of Spencer A.           178
             Burkholz in Support of Lead
             Plaintiff's Motion for Class
             Certification

EXHIBIT 10   Memorandum of Law in Support        199
             of Lead Plaintiff's Motion
             for Class Certification

EXHIBIT 11   Discretionary Investment            224
             Management Agreement, Bates
             Nos. 1199SEIUHC0000074-
             0000113

Page 352

I N D E X   O F   E X H I B I T S (Cont'd)

EXHIBIT          DESCRIPTION                PAGE

EXHIBIT 16   Alger Spectra Fund Factsheet        272
             as of 3/21/22

EXHIBIT 17   Excerpts from the January           276
             2018 Northern Trust Report
             Re: Corbin Funds

EXHIBIT 18   Excerpts from the January           286
             2018 Northern Trust Report
             re: Entrust Funds

EXHIBIT 19   Excel Spreadsheet, Bates No.        304
             LSV0001099

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 353

I N D E X   O F   E X H I B I T S (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| EXHIBIT 20 | Lead Plaintiff's Amended Initial Disclosures Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure | 333 |

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com