# EXHIBIT 23

| LA Sheriffs' Pension | REVISED | May 5, 2022 |
| v. Cardinal Health Inc. | FINAL | Steven Feinstein, Ph.D. |

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION
------------------------------------------
LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated,
    Plaintiffs

    v.

CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON,
    Defendants

Case No. 2:19-CVL-03347
----------------------------------------

VIDEO DEPOSITION OF
Steven P. Feinstein, Ph.D., CFA
May 5, 2022
Lead: Lauren M. Kofke, Esquire
Firm: Wachtell Lipton Rosen & Katz

REVISED FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

Page 2

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF
    Spencer A. Burkholz, Esquire
    Laurie L. Largent, Esquire
    Christopher R. Kinnon, Esquire
    Megan A. Rossi, Esquire
    Robbins Geller Rudman & Dowd LLP
    655 West Broadway
    Suite 1900
    San Diego, California 92101
    (619)239-3247

ATTORNEYS FOR DEFENDANTS
    Lauren M. Kofke, Esquire
    Elizabeth N. Brandt, Esquire
    Danika L. Kritter, Esquire
    Wachtell Lipton Rosen & Katz
    51 West 52nd Street
    New York, New York 10019
    (212)403-1000

Page 3

A P P E A R A N C E S   C O N T I N U E D

ALSO PRESENT:
    Jackson Martin, Paralegal
        Wachtell Lipton Rosen & Katz

    Max Obmascik, Paralegal
        Wachtell Lipton Rosen & Katz

    Nicole Kim, Esquire, Cardinal Health, Inc.

    Laura R. Yergesheva, Senior Vice President
        Compass Lexecon

    Daniel S. Bettencourt, Vice President
        Crowninshield Financial Research

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    Joan V. Cain, Court Reporter
    Joseph Salinas, Videographer

Page 4

TABLE OF CONTENTS

Witness:
Steven P. Feinstein, Ph.D., CFA

Examination
By Ms. Kofke................................Page 7

Reporter Certificate.......................Page 304

Errata.....................................Page 305

Index of Exhibits..........................Page 308

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 5

PROCEEDINGS
- - -
10:01 a.m. EDT
May 5, 2022
- - -
THE VIDEOGRAPHER: Here begins Media No. 1, Volume 1, in the deposition of Steve Feinstein in the matter of Louisiana Sheriffs' Pension & Relief Fund versus Cardinal Health, Incorporated.

Today's date is May 5th, 2022. The time is now 10:01 a.m. I am Joseph Salinas, the legal videographer. The court reporter is Joan Cain from Jane Rose Reporting, New York, New York.

Counsel, please identify yourselves and state whom you represent.

MS. KOFKE: This is Lauren Kofke from Wachtell Lipton Rosen & Katz representing the defendants, and I have with me Danika Kritter, Elizabeth Brandt, Jackson Martin, and Max Obmascik, also from Wachtell Lipton.

MR. BURKHOLZ: Spence Burkholz from Robbins Geller Rudman & Dowd. I have with me Chris Kinnon, Megan Rossi, and Laurie Largent.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

Page 6

MS. KIM: Oh, Nicole Kim, in-house counsel on behalf of Cardinal.

THE COURT REPORTER: Good morning. My name is Joan Cain. I am a court reporter and a Notary Public in the Commonwealth of Virginia. I am the deposition officer for today's deposition.

All parties in today's deposition are appearing remotely to comply with the guidance of the Centers for Disease Control in response to the COVID-19 pandemic occurring in our country at this time. I have collected everyone's appearances off the record, and they will appear on the appearance page of the transcript.

Before we proceed, I will ask lead counsel for today's deposition to stipulate on the record that this deposition officer may swear in the deponent, even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

Let's start with the noticing attorney, please.

MS. KOFKE: So stipulated.

THE COURT REPORTER: Mr. Burkholz?

MR. BURKHOLZ: Stipulated.

Page 7

STEVEN P. FEINSTEIN, PH.D., CFA, having been duly sworn under penalties of perjury by the Notary Public, was examined and did testify as follows:

THE COURT REPORTER: Thank you. Please begin.

EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MS. KOFKE:

Q Good morning. Please state your name for the record.

A Steven Feinstein.

Q Now, I know you've been deposed many times before, but I'm going to start with a few introductory matters relating to this deposition.

When I refer to "lead plaintiff," "plaintiff," or "SEIU," I'm referring to 1199 SEIU Health Care Employees Pension Fund, the lead plaintiff in this action.

Is that understood?

A Yes.

Q And when I use the term "Amended Complaint," I'm referring to the Consolidated Amended Complaint filed by the lead plaintiff in this action in September 2020.

Is that understood?

Page 8

A Yes.

Q You understand you're testifying under oath today just as you would be testifying under oath in court?

A Yes.

Q And you understand that there's a remote deposition protocol that applies to this deposition today?

A Yes.

Q And you understand that while we're on the record, pursuant to that protocol, you must put away and not look at electronic devices that are not being used for the deposition?

A I understand.

Q And you understand that while we're on the record, there shall be no other programs displaying images on your screen, other than the program we're using for the deposition and to display the exhibits?

A I understand.

Q Do you have any other programs open on your computer right now, such as email or Microsoft Word or anything like that?

A No.

Q And you understand that while we're on the

LA Sheriffs' Pension
v. Cardinal Health Inc.
REVISED
FINAL
May 5, 2022
Steven Feinstein, Ph.D.

Page 9

record, you will not communicate with anyone except as reflected on the record?

A   I do understand.

Q   Is there any reason, medical or otherwise, why you can't testify completely and accurately today?

A   No.

Q   Okay.  Why don't we mark Tab 2 as Feinstein Exhibit 1, please.

- - -

(Feinstein Exhibit 1 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Is this the report that you submitted in this action?

A   One moment.  I, for a moment, saw a link to a Chat box that had a link to Adobe Acrobat.  I didn't open it.  I'm looking at your shared screen.

Should I open the document?

MR. BURKHOLZ:  Steve, there's -- she's sharing the document with you.  It's not like the other service we've used in the past.

Do you see the document on the screen?

THE WITNESS:  I do see the shared screen,

Page 10

but I also saw, for a moment, a link where I could open the document locally.

MR. BURKHOLZ:  Lauren, is that right?

THE WITNESS:  Yes, it's still here actually.  I can share my screen to show you what I'm looking at.  It's in the Chat box.  It's shared by Max Obmascik.

MS. KOFKE:  So if he clicks on that, can he open a copy of the exhibit locally and look through it?

MR. OBMASCIK:  Yeah.

BY MS. KOFKE:

Q   So if you want to do that, that's perfectly fine, or you're welcome to look at the -- a shared version.

A   So I will download that document on my desktop, and then I will open it in Adobe Acrobat.

MR. BURKHOLZ:  Lauren, I don't want to -- mean to interrupt your deposition, but in prior depositions, video depositions, it's been easier for Steve to have a clean copy of his report with him, and I think he does have that with him.  Just letting you know that.

BY MS. KOFKE:

Q   Okay.  Why don't we identify this exhibit,

Page 11

and once we've done that and confirmed it's your report, I'm happy if you want to refer to a hard copy of that document that you have with you instead of the electronic copy.

A   Okay.  I also just want to make clear for the record that I have two screens.  One screen is you, is the Zoom conference, and the second screen to my right is -- has only the PDF document displayed.

Q   Great.

A   So if I look to my right, I'm looking at that document.

Q   Understood.  Thanks for letting me know.

A   Okay.  And that's what I'm looking at now.

Q   So is Feinstein Exhibit 1 the report that you submitted in this action?

A   Yes, it is.

Q   You understand that this report was submitted to the court as an exhibit to lead plaintiff's Motion for Class Certification?

A   I understand that.

Q   Did you review this report before your deposition today?

A   Yes.

Q   And does this report contain a complete and

Page 12

accurate statement of your opinions in the class certification stage of this case?

A   Yes.

Q   Does it state all the bases and reasons for your opinions?

A   Yes.

Q   Does it state all of the facts and data that you relied upon in forming your opinions?

A   It lists them.  It lists all documents that I considered in the exhibit.  So I think the answer is yes.

Q   Are there any statements in your report that you believe are not accurate?

A   No.

Q   Since the date of your report on March 24th, 2022, have you updated any of the analyses included in your report?

A   No.

Q   Have you identified any errors in your report?

A   No.

Q   Are there any statements in your report that you believe should be corrected or modified in any way?

A   No, not at this time.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 13

Q   So in your report, you state that you reserve the right to amend, refine, or supplement your analyses and opinions in certain circumstances.
    Do you remember that?
A   Yes.
Q   Is there any amendment, refinement, or supplementation that you believe should be made to any of the statements in your report at this time?
A   No.
Q   Do you presently intend to amend, refine, or supplement your report in any way in the future?
A   No.  I mean, although I -- if I have the right, I'd like to retain the right to do so should I learn something new that I didn't know previously.
Q   But sitting here today, you have no present intention to add anything to your report?
A   That's correct.
Q   Okay.  Let's turn to page 62 of Feinstein Exhibit 1, which is Exhibit 2 to your report.
A   I'm there.
Q   So this is the curriculum vitae that was attached to your report.  Does this CV accurately reflect your employment history since 1987?
A   Yes, I believe so.
Q   Did you have any employment since 1987 that

Page 14

is not reflected on this CV?
A   Nothing for compensation.
Q   What kind of uncompensated employment did you have?
A   I think, from time to time, I helped out colleagues or friends with their business endeavors on an ad hoc basis, but I don't recall ever having been paid for any of those things.
Q   Have you ever held any professional certifications other than a CFA?
A   No.
Q   Have you --
A   Unless you consider my academic degrees to be professional certifications.
Q   Putting those aside, other than the CFA, no other professional certifications?
A   Correct.
Q   What about professional licenses?  Have you ever held any professional licenses, including securities licenses?
A   No.  Actually, I do want to go back and amend a prior answer.  I mean, I had done consulting back in the early 1990s, executive education assignments and engagements for a number of firms. That's not listed here, and that was for pay.

Page 15

Q   And was that on a freelance basis, or was it through employment at a business entity?
A   Freelance.
Q   Where do you work currently?
A   Babson College and my own firm, Crowninshield Financial Research.
Q   You're currently an associate professor at Babson College; is that correct?
A   Yes.
Q   And you've had that position since 2000?
A   No.  Earlier.
Q   According to your CV, it's says you've been an associate professor from 2000 to the present; is that correct?
A   Oh, that's right.  Yeah.  No, I've been at Babson College since 1996.  I've been an associate professor since the year 2000.
Q   Is that a tenured position, the associate professor position?
A   Yes.
Q   What courses do you teach at Babson?
A   Well, this semester I taught derivatives, derivative securities.  Last semester I taught security valuation.  Last year I taught derivative security valuation and fixed income analysis.  On

Page 16

the CV, I believe there's a list of courses I've taught, and that would be on page 68.
Q   How long have you worked at Crowninshield Financial Research?
A   Well, that's a firm that I started.  The firm was created in 1996 -- I'm sorry -- 2006. 2006.
Q   Your CV says you've worked there since 2008.  Did you have a position there between 2006 and 2008?
A   Well, between 2006 and 2008, the entity existed, but all of the work was done through The Mitchel-Shaked Group.  So I actually had -- the corporation existed and existed as an LLC between 2006 and 2008, but all Crowninshield work was done under the umbrella of The Mitchel-Shaked Group.  So that's why it says The Mitchel-Shaked Group until 2008, and then Crowninshield went independent in 2008.  So that's why it says Crowninshield from 2008 to the present.
Q   Did you have a position at Crowninshield between 2006 and 2008?
A   Yeah.  I would have been the sole member.
Q   What type of work does Crowninshield do?
A   Financial analysis and financial

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 17

consulting, primarily in the forensic finance realm.

Q   Does Crowninshield provide services to support litigation?

A   Yes.

Q   What kind of services does Crowninshield provide in connection with litigation?

A   Well, we're engaged to answer questions, to engage in research to answer questions that -- where the answer requires financial expertise and financial analysis. So we -- we do research. We do analysis in finance, economics, and accounting, write reports, provide testimony if necessary.

Q   Has Crowninshield always provided services to support litigation since its founding?

A   Yes.

Q   Does Crowninshield do anything else other than provide services to support litigation?

A   Yes.

Q   Approximately what portion of Crowninshield's earnings came from litigation in the past four years would you say?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  Well, it depends how you define that.  Some analysis results in there being no litigation, and then, you know, sometimes the

Page 18

question is -- you know, depending on the answer, is whether or not there will be litigation or not on some consulting cases that we have.

So should I include those as litigation related or not?

BY MS. KOFKE:

Q   Yes.

A   All right.  I would say all of it then.  I would say all of our earnings in the last four years has had some relationship to forensic financial analysis.

Q   Related to a litigation or potential litigation matter?

A   Yeah, with the emphasis on potential as well.

Q   What portion of earnings came from litigation matters that had actually been filed in court?

A   I --

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I don't know.  It's not a hundred percent.  Where between 50 percent and a hundred percent the answer lies, I have never done that analysis or researched.

BY MS. KOFKE:

Page 19

Q   Do you recall testifying previously that 90 percent of Crowninshield revenues and income come from consulting in some way related to securities litigation?

A   When was that did I say that?

Q   That was in a case called In Re Chemical Mining Company of Chile, in October of 2019, in a deposition.

A   It's reasonable.  Like I said, I don't know where between 50 -- as I sit here now, where it is between 50 and a hundred, I don't know.

Q   You think it's reasonable, you believe, that -- strike that.

So can you tell me, sitting here today, approximately what percent of Crowninshield's earnings came from litigation matters that have been filed in court in the past four years?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  No.  Some analysis, some engagements don't result in any litigation, and some result in essentially analysis that's used for a settlement or it doesn't actually get filed.

BY MS. KOFKE:

Q   I'm talking about filed cases.  What percent of Crowninshield's earnings came from

Page 20

litigation support services in the last four years related to cases that had been filed in court?

A   I don't recall.  I don't know.  I don't -- I have to look at the records.  So I previously interpreted your question -- I thought you said that my work was filed with the court.

Now you're saying if anything was filed with the court and my work was related to those cases, that should be included in the number, right?

Q   My question is:  What portion of Crowninshield's earnings came from providing support to litigation matters where those litigation matters involved a case that had been filed in court?

A   Yeah, I don't know.  It's more than 50, and it's less than a hundred percent.  That I can tell you.  It's probably more than 60 and less than a hundred.

Q   What portion of Crowninshield's earnings in the last four years came from providing expert witness services in connection with litigation?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  When you say "expert witness," do you mean a case where I or someone else actually testified or where there was an understanding that we could be called to testify?

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

---

Page 21

BY MS. KOFKE:

Q Both.

A All right. If it's -- if it's -- if it includes cases that we could -- we could be called to testify, it's probably all of it, but if it -- if we're restricting the answer to cases where someone did testify, it's not all of it.

Q Then just to make sure I understand your answer, all of Crowninshield's earnings in the last four years came from matters where a Crowninshield employee was either an expert witness who testified or could potentially testify?

MR. BURKHOLZ: Objection to form.

THE WITNESS: Could potentially, yes. If you include could potentially -- but, also, even there I need to add a qualification.

Some revenue is generated from our support of experts that are not employees of Crowninshield. So I wouldn't say employees. It could be a person working independently who asks us for help on their case or their engagement.

BY MS. KOFKE:

Q Understood.

So all of Crowninshield's earnings in the last four years came from matters where a

---

Page 22

Crowninshield employee was either an expert witness who testified or could potentially testify or where Crowninshield was supporting such a person who may have been employed at another entity?

MR. BURKHOLZ: Objection to form.

THE WITNESS: I want to be careful here. Some engagements, not a majority, but some engagements, the firm will do research or analysis that either immediately leads to a settlement or perhaps is after there has been a settlement. In which case -- well, I think I would have to say no then to your answer now that I'm thinking it through out loud.

If we're engaged after there's already been a settlement and we're engaged to weigh in on what damages -- what the damage number ought to be or to opine as to whether an agreed-upon settlement number is a reasonable approximation of what damages would have otherwise been if the case had gone to trial, well, then, I don't think there's an understanding that anybody would have had to testify in a case like that, and we do get compensated for that kind of research and analysis.

BY MS. KOFKE:

Q What percent of Crowninshield's earnings

---

Page 23

relate to that kind of analysis in the past four years?

A It's substantial. I don't know the exact number.

Q Do you do any litigation work -- strike that.

Do you do any litigation-related work apart from your position at Crowninshield?

A No.

Q You're the founder of Crowninshield?

A Yes.

Q And you're the sole owner of Crowninshield?

A Yes.

Q So any profits earned by Crowninshield would go to you?

A Yes.

Q How many employees does Crowninshield have?

A It varies. We have summer interns. There's -- we have affiliates. Approximately 12.

Q Do any of the other employees of Crowninshield ever serve as expert witnesses?

A Yes.

Q How many?

A You're asking about full-time employees, not affiliates, correct?

---

Page 24

Q Correct.

A Okay. Well, at the moment, one, who has testified and one other who might testify.

Q In the past four years, what portion of expert testimony provided by Crowninshield was provided by you versus employees of Crowninshield?

A Mostly me. The vast majority.

Q And is that answer true --

A Wait. Again, let's make sure we get accuracy on the record.

Can you please repeat the prior question or have the court reporter read the prior question.

Q In the past four years, what portion of expert testimony provided by Crowninshield was provided by you versus other employees of Crowninshield?

A All right. How do you want me in the answer -- do you want the answer to consider affiliates or not to consider affiliates?

Q I'm asking about employees of Crowninshield.

A Okay. Employees of Crowninshield? So not affiliates?

Q Yes. The question said "employees."

A Then my answer was accurate.

---

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 25

Q   Would your answer change if we include affiliates?

A   Yes.

Q   What is the answer if affiliates are included?

A   Less than two-thirds.

Q   What are affiliates of Crowninshield?

A   Well, people who don't work for Crowninshield but engage us to support their work and to help them with their analysis and research.

Q   Did any other Crowninshield employees help you with your work in this case?

A   Yes.

Q   How many?

A   Well, towards the end of every engagement, almost everyone here pitches in to proofread and check the work.  But in the course -- so if that's what you're asking, it'd be 12, approximately.

But on a more consistent basis through the engagement, it would be four or five.

Q   What did those four -- four to five employees do?

A   Well, some people gathered data and documents for me.  Others, under my direction, will actually execute the empirical or statistical

Page 26

programs, computer programs, to run the tests that I want to run.  Some will sit next to me and help me write, and then everyone does quality control checks.

Q   Did you personally review and approve of everything that's stated in your report?

A   Yes.

Q   The principal positions for which you earn compensation are your jobs at Babson and at Crowninshield; is that correct?

A   Yes.

Q   Do you earn any material amount of income from other sources?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  Yes.

BY MS. KOFKE:

Q   What -- what portion do you earn from other sources?

MR. BURKHOLZ:  Objection to form.  It's vague.

THE WITNESS:  I -- I don't know specifically.

BY MS. KOFKE:

Q   What other sources of income do you have, other than Babson and Crowninshield?

Page 27

A   Savings and investments.  Crowninshield and Babson College.

Q   Correct.

I'm not asking what your total annual income is, but of your annual income, whatever it might be, approximately what percentage of your annual income comes from your employment at Babson College?

A   At Babson?  It's varied over the years.  It depends on a number of factors:  What sort of revenue year or income year Crowninshield has had, it depends on whether I'm on sabbatical or not, but it's varied between a third to 10 percent.  Approximately.  These are approximations.

Q   And is that 10 percent to a third applicable to the past four years?

A   I think so.

Q   Approximately, what percentage of your income comes from your work at Crowninshield?

A   It varies too.  I would say the other -- I would say as much as 90 percent, depending on which year, and as little as two-thirds, depending on the year.

Q   Just thinking about the past four years, approximately what percentage of your income came

Page 28

from your work at Crowninshield?

MR. BURKHOLZ:  Objection to form.  Asked and answered.

THE WITNESS:  I don't know precisely.

BY MS. KOFKE:

Q   But somewhere between two-thirds and 90 percent?

A   Yes.

Q   You were retained as an expert witness in this case --

A   In the aggregate, it's certainly less than 90 percent.  In the aggregate, it is certainly less than 90 percent.  I mean, any particular year can be as much as 90 percent, but the aggregate, I would qualify the answer to be two-thirds to 80 percent, even less, perhaps.

Q   And by "in aggregate," do you mean over the past four years?

A   Right.  If that's what you meant by the question.

Q   I see.  You're saying in any one year, it could be up to 90 percent, but looking at the past four years, you believe it's somewhere closer to two-thirds to 80 percent?

A   That's right.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 29

Q   You were retained as an expert witness in this case, correct?
A   Correct.
Q   When were you retained?
A   Well, I should say I was retained as an expert in this case.  The engagement letter says that I will testify to -- to explain my analysis if necessary, but the engagement is as an expert financial analyst.  I was retained in January of this year.
Q   Who retained you to work on this matter?
A   The law firm of Robbins Geller.
Q   Who specifically at Robbins Geller retained you?
A   I don't recall whose name is on the engagement letter.
Q   Let's look at page 71 of your report, which is Feinstein Exhibit 1.  It's Exhibit 3 of your report.
A   I'm there.
Q   This has the title "Testimony Provided in the Last Four Years."
    Do you see that?
A   I do.
Q   Does Exhibit 3 to your report contain a

Page 30

complete list of all the cases in which you provided testimony in the four years prior to the date of your report?
A   I believe so.  That was my intention.
Q   Were there any cases in the past four years in which you provided a report but did not provide testimony?
A   Most likely.
Q   Would those cases be excluded from the list in Exhibit 3 to your report?
A   Yes.
Q   How many cases were there where you provided a report but you did not provide testimony in the past four years?
A   I don't know.
Q   Can you give an approximation?  Was it less than ten?  More than ten?
A   I don't know.  I really couldn't even approximate.  It happens.  I just don't -- my memory's not good enough to tell you exactly how often it happens.
Q   Could it be as many times as you provided testimony in the past four years?
A   No.  I -- unlikely.
Q   But there could be over 20 cases where you

Page 31

provided reports but not testimony that wouldn't appear on this list?
A   I think it's fewer than that, but it could be.
Q   Do you recall any of those cases?
A   No, not as I sit here now.
Q   Did any of those cases involve Robbins Geller retaining you?
A   Possibly.  I just don't know for sure.
Q   Can you recall the last time you submitted a report in a litigation and didn't provide testimony?
A   No.
Q   So, in some instances, a case is listed on Exhibit 3 to your report more than once.  Is that because you provided testimony more than one time in that litigation?
    MR. BURKHOLZ:  Is there a particular case you want to point him to?
BY MS. KOFKE:
Q   Yeah.  I can point you to an example on page 76, the case In Re EQT Corporation Securities Litigation is listed twice.
A   Yes, that is what it means.
Q   Since the date of your report, March 24th,

Page 32

2022, have you provided any testimony that is not listed in Exhibit 3 to your report?
A   I'd have to check.  I can certainly let you know after a break.  I didn't review that.  It's possible.  I don't know for -- I don't remember for sure.
Q   Okay.  If you count the cases listed on Exhibit 3 to your report, there's 33 unique cases listed.
    Does that sound correct to you?
A   I'll take your word for it.
Q   Of the cases listed on Exhibit 3 to your report, in how many were you retained by the plaintiff?
A   All of them.
Q   Of the cases on Exhibit 3 to your report, in approximately how many were you retained by Robbins Geller?
A   I don't know.  I can go through and estimate.  I don't know.
Q   Yeah, why don't we walk through some of these.
    If you look at page 77, you were retained by Robbins Geller in the In Re Super Micro Computer, Inc. Securities Litigation -- correct? -- where you

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 33

testified in January of 2022?

A   Yeah, I see that.

MR. BURKHOLZ:  Steve, she's not asking you to speculate.  If you know, you know.

THE WITNESS:  What's the question?

BY MS. KOFKE:

Q   Were you retained by Robbins Geller in the In Re Super Micro Computer, Inc. Securities Litigation case?

A   I don't recall.  Notice there's two cases with similar names, and so I'd want to check my records.

MS. KOFKE:  Okay.  Why don't we actually mark, as Feinstein Exhibit 2, the expert report that you submitted in In Re Super Micro Computer, Inc.

- - -

(Feinstein Exhibit 2 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Do you have that, Dr. Feinstein?

A   Yes, I have it.

Q   Let's look at page 1, paragraph 1.

A   I see that.

Q   So you were retained by Robbins Geller in

Page 34

this case, correct?

A   Yes.

Q   Okay.  Continuing back to testimony you gave in November of 2021, you were also retained by Robbins Geller in the In Re Wells Fargo & Company Securities Litigation, correct?

A   That's right.

Q   And then going to page 76 of Exhibit 3 to your report, you were also retained by Robbins Geller in the In Re McKesson Corporation Securities Litigation, correct?

A   Yes.

Q   And you were also retained by Robbins Geller in the In Re Apple, Inc. Securities Litigation, correct?

A   That's right.

Q   Let's turn to page 75 of Exhibit 3 to your report, so we're on page 75 of Feinstein Exhibit 1.

You were also retained by Robbins Geller in the In Re Jeld-Wen Holding, Inc. Securities Litigation matter, correct?

A   Do you have that report handy?

Q   We do.  Would you like us to mark it as an exhibit?

A   Sure.

Page 35

MS. KOFKE:  Why don't we mark Dr. Feinstein's report in the Jen -- Jeld-Wen matter as the next exhibit, please.

- - -

(Feinstein Exhibit 3 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Would you look at page 1, paragraph 1, please.

A   Right.  That's -- it's -- they were co-counsel in that case.

Q   So Robbins Geller retained you in that case along with Labaton Sucharow; is that right?

A   I'd have to see the engagement letter to see who retained me, but as explicated in the report here, I was asked by Labaton Sucharow and Robbins Geller to answer certain questions.

Q   Let's turn back to Feinstein Exhibit 1 in your report at page 75.

A   Okay.

Q   You were also retained by Robbins Geller in the In Re Novo Nordisk Securities Litigation matter; is that correct?

A   Yes, but I'd have to look at the report to

Page 36

see if there was co-counsel and who actually issued the engagement letter.

MS. KOFKE:  Why don't we mark his report in the Novo Nordisk matter as the next exhibit, please.

- - -

(Feinstein Exhibit 4 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Do you see, at page 1 in paragraph 1, Robbins Geller retained you in this case along with Bernstein Litowitz and Saxena White; is that correct?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  That's correct.

BY MS. KOFKE:

Q   Let's go back to Feinstein Exhibit 1, your report, at page 75.

You were retained by Robbins Geller in the In Re Envision Healthcare Corporation Securities Litigation, correct?

A   Honestly, as I've already demonstrated, I don't remember specifically for any of these cases who -- who actually engaged me and whether or not there was co-counsel, but both you and I now see

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 37

where the records are located that would indicate that.

I don't know without looking at the report.

MS. KOFKE:  Why don't we mark the report in Envision Healthcare as the next exhibit.

- - -

(Feinstein Exhibit 5 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Look at page 1, paragraph 3.

You were retained by Robbins Geller in the In Re Envision Healthcare Corporation Securities Litigation matter, correct?

A   Yes.

Q   Let's go back to Feinstein Exhibit 1 at page 75.

Robbins Geller also retained you in the In Re Johnson & Johnson Securities Litigation, correct?

A   That's right.

Q   In looking at page 74 of Feinstein Exhibit 1, Robbins Geller also retained you in the In Re Grupo Televisa Securities Litigation, correct?

A   Correct.

Q   Staying on that page, Robbins Geller also

Page 38

retained you in the In Re OvaScience, Inc. Securities Litigation, correct?

A   That's right.

Q   And Robbins Geller also retained you in the In Re Chemical and Mining Company of Chile, Inc. Securities Litigation, correct?

A   I'm taking your word for it.  I'd have to check the report or the engagement letter.

Q   What about In Re Twitter, Inc. Securities Litigation?  Robbins Geller retained you in that matter, correct?

A   Yes.

Q   Let's look at page 73 of Feinstein Exhibit 1.

Robbins Geller retained you in the In Re Southern Company, Inc. Securities Litigation, correct?

A   Yes.

Q   And Robbins Geller retained you in the In Re Puma Biotechnology, Inc. Securities Litigation, correct?

A   Yes.

Q   And the In Re First Solar, Inc. Securities Litigation, you were also retained by Robbins Geller?

Page 39

A   I don't recall that one.  I mean, I recall the case.  I need to check documents to see who the engaging party was.

MS. KOFKE:  Why don't we mark the First Solar declaration as the next exhibit, please, at Tab B-15.

- - -

(Feinstein Exhibit 6 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Do you see that this is a declaration submitted by Robbins Geller in support of an application for an award of attorneys' fees and expenses?

A   I see that.

Q   Let's look at page 4 of this document.

At paragraph 6(g)(ii), do you see here that it refers to Crowninshield Financial Research, and it states that:  Lead Counsel retained the services of the economic consulting firm CFR, and specifically Dr. Steven P. Feinstein?

A   Yes, I see that.

Q   Robbins Geller retained you in the In Re First Solar, Inc. Securities Litigation matter,

Page 40

correct?

A   Yes.

Q   Going back to Feinstein Exhibit 1 at page 72, Robbins Geller also retained you in the In Re Inovalon Holdings, Inc. Securities Litigation, correct?

A   Again, based on my memory, I can't answer the question, but if you show me the documents, I can make a determination.

MS. KOFKE:  Why don't we mark Tab B-16 as the next exhibit.

- - -

(Feinstein Exhibit 7 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Okay.  Do you see that this is a declaration submitted by Robbins Geller in support of an application for an award of attorneys' fees and expenses in the In Re Inovalon Holdings, Inc., matter?

A   I see that.

Q   Let's look at page 3 of this document at paragraph 6(e)(i).

Do you see here it says:  "Lead plaintiff

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 41

retained the services of the economic consulting firm CFR, and specifically Dr. Steven P. Feinstein"?
   A   Yes.
   Q   So Robbins Geller retained you in the case In Re Inovalon Holdings, Inc. Securities Litigation, correct?
   A   Yes.
   Q   Let's go back to Feinstein Exhibit 1 at page 72.
        Robbins Geller also retained you in the case In Re Correction Corporation of America Securities Litigation, correct?
   A   Yes.
   Q   Robbins Geller also retained you in the case In Re Orbital ATK, Inc. Securities Litigation, correct?
   A   Yes.
   Q   Let's turn to page 71 of your report, Feinstein Exhibit 1.
        Robbins Geller also retained you in the case In Re BHP Billiton Limited Securities Litigation, correct?
   A   Again, I vaguely recall that there was co-counsel, so I'm not exactly sure who engaged me in that case.

Page 42

   MS. KOFKE:  Why don't we mark Tab B-19.
        - - -
        (Feinstein Exhibit 8 was marked for identification.)
        - - -
BY MS. KOFKE:
   Q   If you look at page 1, paragraph 1, Robbins Geller retained you in the In Re BHP Billiton Limited Securities Litigation, correct?
   A   Yes.
   Q   Let's go back to Feinstein Exhibit 1, your report at page 71.  Robbins Geller retained you in the case In Re El Pollo Loco Holdings, Inc. Securities Litigation, correct?
   A   That's right.
   Q   And Robbins Geller retained you in the case In Re Deutsche Bank AG Securities Litigation, correct?
   A   Yes.
   Q   So we've gone through the records for the cases listed on Exhibit 3 to your report, and of the 33 cases listed, we identified 21 where public records indicated you had been retained by Robbins Geller.
        Does that sound accurate to you?

Page 43

   A   I think the record speaks for itself.  I didn't count.
   Q   You agree that in more than half the cases in which you testified over the past four years you were retained by Robbins Geller?
   A   If your count is correct, yes.
   Q   You work for Robbins Geller more than you work for any other law firm, correct?
        MR. BURKHOLZ:  Objection to form.
        THE WITNESS:  That's right.
BY MS. KOFKE:
   Q   Based on our review of the records, the firm that engaged you the most in the past four years to provide testimony, other than Robbins Geller, was Bernstein Litowitz.  Is that accurate to your recollection?
   A   Are you talking about engaging me personally or engaging the firm?
   Q   Engaging you personally.
   A   I really would have to check the records.
   Q   Thinking about the law firm that engaged you the second most after Robbins Geller, about how many cases did that firm engage you to provide testimony?
        MR. BURKHOLZ:  Objection to form.

Page 44

        THE WITNESS:  I don't know.  I didn't count.
BY MS. KOFKE:
   Q   Robbins Geller has been your biggest client in the past four years, correct?
        MR. BURKHOLZ:  Objection to form.
        THE WITNESS:  That's correct.
BY MS. KOFKE:
   Q   In the past four years, did you earn more in fees from cases involving Robbins Geller than any other law firm?
   A   Right.  Than any other firm, yes.
   Q   Did Crowninshield earn more than half its fees from Robbins Geller in the past four years?
   A   I don't think so.
   Q   What percent of Crowninshield's fees over the past four years was earned from Robbins Geller?
   A   I don't know, but I don't think it's more than half.
   Q   Do you think it's 40 percent?
   A   I don't know.
   Q   Can you provide any estimation between zero and 50 percent as to what percentage of Crowninshield's fees over the past four years came from Robbins Geller?

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 45

A    I think it's in the neighborhood of 50 percent.
Q    If Robbins Geller stopped engaging Crowninshield, that would have a significant negative impact on Crowninshield's annual income, correct?
MR. BURKHOLZ:  Objection to form.
THE WITNESS:  Not necessarily.
BY MS. KOFKE:
Q    Why not?
A    There are numerous other projects we could be working on.
Q    But you'd have to fill a 50 percent hole in your annual income, correct?
A    No.
Q    Do you think you could -- well, strike that.
Do you give Robbins Geller any special terms that you don't offer to other law firms on Crowninshield's services?
A    No.
Q    Do you give Robbins Geller any discount on your fees that you don't give to other law firms that hire you?
A    No.

Page 46

Q    And I think you already said you don't recall if there's any cases in the past four years where Robbins Geller engaged you to provide a report but you did not testify; is that right?
A    I just want to make sure that the words that you chose are accurate.
I don't recall.
Q    Have you ever been engaged by a party that was adverse to Robbins Geller in any case in the last four years?
A    No.
Q    Have you ever been engaged by a party that was adverse to Robbins Geller at any time?
A    I think so.
Q    When?
A    I -- well, I mean, I've been serving as a forensic expert since 1996, and I recall there were times that I was engaged by one firm or another to estimate damages suffered by various investors, and sometimes that analysis is used adverse to Robbins Geller or adverse to any other -- some other law firm as they vie for lead counsel status.
Q    Can you recall when was the last time that you provided that type of advice that was used adverse to Robbins Geller?

Page 47

A    I don't recall.
Q    Have you ever taken a position adverse to Robbins Geller at the class certification stage of any securities litigation at any time?
A    Probably.  I mean, probably in the course of my analysis, results I have presented might have been adverse to elements of their case.  I mean, I tell it like it is, and sometimes I disagree with what Robbins Geller may have written in their complaint or what they may be pleading to the court.
Q    Can you recall any specific case where that happened?
A    Not specifically, but I recall it occurs from time to time.
Q    But not in the past four years, correct?
A    No.  I didn't say that.  I think it may very well have happened in the past four years.
Q    So you think in the past four years you've taken a position adverse to Robbins Geller at the class certification stage of a securities litigation?
A    I think some of my findings may have been unhelpful to Robbins Geller at the class certification stage.
Q    You can't recall a specific case?

Page 48

A    Correct.
Q    Is it one of the cases listed on Exhibit 3 to your report?
A    Maybe.  I don't know.
Q    Not one of the cases where you were engaged by Robbins Geller, correct?
A    No.  It would have been -- I mean, it may have been.  Most likely was.
Q    So you're saying in cases where you were engaged by Robbins Geller, you may have taken a position that was adverse to them?
MR. BURKHOLZ:  Objection to form.
Steve --
THE WITNESS:  I -- it depends how you're defining take a position adverse to them.  Sometimes my findings are unhelpful to elements of their arguments.
BY MS. KOFKE:
Q    Have you ever worked with Mr. Burkholz before?
A    Yes.
Q    About how many cases have you worked with Mr. Burkholz on in the past four years?
A    I don't know.
Q    I can tell you, as far as we can tell based

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 49

on public records, it looks like you've worked with Mr. Burkholz and Ms. Largent in five cases on Exhibit 3 to your report.

Does that sound roughly accurate to you?

A   I didn't do the count that you did, so I couldn't confirm it.

Q   Do you recall working with Mr. Burkholz multiple times in the past four years?

A   I'm sorry.  I didn't hear your question.

Q   Do you recall working with Mr. Burkholz on multiple cases in the past four years?

A   Yes.

Q   About how many attorneys have you worked with at Robbins Geller in the last four years in total?

A   I don't know.

Q   More than 20?

A   I think it's probably in that neighborhood, and it depends how you're defining "worked with."

Q   How do you define "worked with"?

A   Well, there's numerous ways you could define it.  So could be the sole contact person; in which case, I don't think it's 20.  It could be people that I've met with in preparation for a trial or testimony; in which case, it might be even more

Page 50

than 20.

So, I mean -- and then there's a range of numbers and relationships in between.

Q   You mentioned earlier that there's an employee at Crowninshield that has also provided expert testimony, apart from you, in the past four years; is that right?

A   Yes.

Q   What percentage of the cases in which that employee was retained -- strike that.

In what percentage of the cases where that Crowninshield employee served as an expert was the employee retained by Robbins Geller?

A   I don't understand the question.

Q   There's one other employee at Crowninshield who provides expert witness services, apart from yourself, correct?

A   No.

Q   How many other employees at Crowninshield provide expert witness services, apart from yourself?

A   One has and as many as three are ready to or would.

Q   Okay.  One has in the past provided expert witness services, apart from yourself?

Page 51

A   Correct.

Q   About how many cases has that person provided expert witness testimony in the past four years?

A   How many times, did you ask?

Q   How many cases has that person provided expert testimony in the past four years?

A   It's either one or two.

Q   In those one or two cases, was that employee of Crowninshield retained by Robbins Geller?

A   I don't think so, but I would have to check to know for sure.

Q   Do you recall what those cases were?

A   No.

Q   Since you founded Crowninshield, have you ever been retained on behalf of a defendant in securities litigation?

A   Well, no.

Q   You're being compensated in this case, correct?

A   Yes.

Q   According to your report, your firm is being compensated at the rate of $950 per hour for your work.

Page 52

Is that an accurate statement?

A   Yes.

Q   And in your report, when it uses the terminology "my firm," is that referring to Crowninshield?

A   Yes.  Where does it say that?

Q   If you look at -- let's look at Feinstein Exhibit 1, page 4, paragraph 16.

A   Oh, I see, yes.  It is Crowninshield.

Q   And Crowninshield is being compensated at a range of lower rates for analysts and other personnel assisting you in this case; is that correct?

A   That's right.

Q   Will either you or Crowninshield receive any sort of compensation beyond the hourly rates described in paragraph 16 of your report in connection with this case?

A   No.

Q   Will you also earn the profits Crowninshield earns related to this engagement?

MR. BURKHOLZ:  Objection to form. What's the question?

BY MS. KOFKE:

Q   As I understand it, Dr. Feinstein is the

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 53

sole owner of Crowninshield, correct?

A   Yes.

Q   Crowninshield, to the extent it earns profits off of this engagement, those profits will be received by Dr. Feinstein, correct?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  That's correct, as explained in the report, and I think you asked that earlier as well.

BY MS. KOFKE:

Q   Is your compensation contingent in any way on the outcome of this case?

A   No, and it says that in paragraph 16.

Q   Do either you or Crowninshield receive any additional compensation if the lead plaintiff wins or achieves a settlement in this case?

A   No.

Q   Do any of the people assisting you in this case receive any additional compensation if the lead plaintiff wins or achieves a settlement?

A   No.

Q   Does Robbins Geller provide you with any compensation other than for your work on litigation-related matters?

A   No.

Page 54

Q   Has Robbins Geller provided you with any compensation in the past four years other than for your work on litigation matters?

A   No.

Q   Do you have any interest in the outcome of this case?

A   None.

Q   Do you own Cardinal Health securities?

A   No, I do not.

Q   Did you own any Cardinal Health securities during the proposed class period in this matter, which is March 2nd, 2015 through May 2nd, 2018?

A   No.

Q   Approximately, how many times have you been deposed?

A   I don't know.  Since 1996 would be the time frame we're talking about, and that's 26 years.  More than a hundred, figuring an average of -- well, during some years four and other years more.

Q   Has a court ever found you not qualified to serve as an expert?

A   No.

Q   Has a court ever found that your opinion was not reliable?

A   Yes.

Page 55

Q   What cases did a court make that finding?

A   Well, there was a -- in Freddie Mac, the Freddie Mac Securities Litigation case, there was a formal finding of that.  There was a valuation appraisal around 2002, so that's 20 years ago.  It wasn't a formal finding, but there may have been some commentary to that effect by the judge.

So out of over a hundred cases, those two times that I'm aware of.

Q   The appraisal case, was that Finkelstein v. Liberty Digital in Delaware Chancery Court?

A   Yes.

Q   Other than the Freddie Mac case and the Liberty Digital case, was there any other cases where a court found that your opinion was not reliable?

A   No, not that I'm aware of.

Q   Has a court ever determined not to accept the opinions you offered in a litigation, apart from those two cases?

A   I don't think so.  I think the answer is no.

Q   Have any judicial decisions regarding your work caused you to modify your approach to preparing your expert reports?

Page 56

MR. BURKHOLZ:  Objection to form.

Go ahead.

THE COURT REPORTER:  I didn't hear the answer.

THE WITNESS:  The answer's yes.

BY MS. KOFKE:

Q   What decisions?

A   Well, Freddie Mac in particular.  The -- there's certain methodologies that -- and certain tests that I -- my choice of tests and methodologies takes into account what the criticisms were in that case.

Q   How does your choice of tests and methodologies take into account the criticisms in the Freddie Mac case?

A   Okay.  Well, I ran a statistical test.  It was the statistical driver underlying an empirical test of market efficiency.  That's called a z-test.  Even though the z-test has been used in other cases and is supported by literature, defense counsel pointed out to the judge that it could be unreliable depending on the number of observations considered in the z-test.  I disagreed, and I had reasons for disagreeing.

But, nonetheless, there is an alternative

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 57

test called Fisher's exact test, which doesn't have that prerequisite of a certain number of observations for reliability, and so going forward, I've always used the Fisher's exact test instead of the z-test as the underlying statistical driver for collective event study tests. That's one thing.

I've been very careful since Freddie Mac to explain the difference between a valuation model and a damage model and to use the term "valuation tools" so that it's not confused with a damage model. Because I understand there was confusion in the Freddie Mac case from my use of the term "model."

That's what comes to mind. There -- I mean, I -- I always take into account what opposing experts and judges say, and to the extent they make good points, I learn from what they say.

Q   Sitting here today, other than what you've described, is there any other way that you've changed your approach to preparing your expert reports in response to the Freddie Mac case?

A   There might be, but nothing comes to mind -- actually -- oh, no. Freddie Mac.

I think I include more in my market efficiency reports to explain why you can draw a conclusion about market efficiency even without an

Page 58

event study or empirical tests. So I think I've beefed up that section with more cites from the literature, and, in fact, I've contributed to the literature, the published literature, on that subject since the Freddie Mac case.

Q   What did you do to prepare for your deposition today?

A   I read the complaint. I read the Motion to Dismiss Order. I read my report. I reviewed my report with staff here at Crowninshield, and I had a brief virtual meeting with plaintiff's counsel yesterday.

Q   How long did you spend preparing in total?

A   About eight hours.

Q   And the -- the brief virtual meeting with plaintiff's counsel yesterday, was that with Robbins Geller?

A   Yes.

Q   Who was present for that meeting?

A   That's a tough question. Mr. Burkholz was on camera, but there were -- he says there were other attorneys in the room with him that were off camera, so I don't -- I couldn't tell you who else. I think Laurie Largent was there, but I know there were others. I just don't know who.

Page 59

Q   Were any attorneys not from Robbins Geller present?

A   I don't know.

Q   And was that the only time that you met with counsel to prepare for this deposition?

A   Yes.

Q   How long was that meeting?

A   Two hours. Maybe less -- no. Wait. No. I'm sorry.

It started at noon our time, which is 9 a.m. their time, and I'm pretty sure I was at the supermarket by 3 p.m. So somewhere between two and three hours.

Q   Did you review any documents that are not listed in your expert report in preparing for your deposition today?

A   No. No.

Q   Did you review any documents that have been produced in discovery in this action by third parties?

A   That are not listed in the report or that are listed?

Q   Correct. Correct. That are not listed in the report.

A   Oh, no, nothing that's not list- -- I

Page 60

didn't review anything that's not listed in the report. Everything I reviewed is listed in the report.

Q   You didn't review any deposition transcripts? I can tell you there weren't any listed in your report.

A   I -- I heard that there were depositions since the time of my report. I didn't hear anything --

Q   I'm not looking for privileged communications with your attorneys. I just want to make sure that's clear with respect to the scope of my question.

Did you review any deposition transcripts in connection with preparing for your deposition?

A   No.

Q   And I take it that the preparation you did for this deposition did not lead you to conclude that any of the statements or opinions in your report were no longer accurate?

A   That is correct. I've not changed my opinion.

Q   Let's look at Feinstein Exhibit 1, your report.

Did you write the report at Feinstein

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 61

Exhibit 1?

MR. BURKHOLZ: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. KOFKE:

Q  How many hours did you personally spend preparing your report?

A  I believe it's close to 40.

Q  How many hours did employees at Crowninshield spend working on your report?

A  I just want to amend the prior answer. That 40 would include research and analysis and directing others to do research and analysis at Crowninshield.

Okay. So other people at Crowninshield? I mean, there's usually a three-to-one ratio, so I'd be estimating in the neighborhood of 120 for other folks.

Q  So you think other employees of Crowninshield spent 120 hours doing work on your report?

A  No. I'm saying that that would be a reasonable estimate. I don't know. I would have to check our records.

Q  You reference some judicial case law in

Page 62

your report. Do you recall that?

A  Yes.

Q  Did you select those cases for inclusion in your report?

MR. BURKHOLZ: I object to form.

Are there particular -- Steve, you can answer.

But are there particular cases you're referring him to?

BY MS. KOFKE:

Q  Yeah. Actually, if you look at page 61 of your report -- actually, it's page 60 going onto 61 -- there's a section called Legal Cases.

Do you see that?

A  I do.

Q  Did you select these legal cases -- well, actually, strike that.

Did you consider these legal cases listed here on pages 60 and 61 in connection with preparing your report?

A  Yes.

Q  Did you select these legal cases for consideration?

A  Yes.

Q  Are you offering any opinion as to the

Page 63

applicability of any of the cases referenced in your report to any of the issues that are under consideration by the court in this case?

A  Well, I'm not offering any legal opinions. If you look at -- in the report, the context of citing other cases is to essentially point out that the analysis that I'm using in this case is analysis that has been accepted in other cases.

So that's -- over the last 25 years, that's, I feel, part of my job and part of my expertise to understand what kind of financial analysis the courts find compelling.

Q  I see. So you're not offering an opinion as a legal matter as to whether any of the findings in those cases are applicable to this case?

MR. BURKHOLZ: Objection to form.

THE WITNESS: Can you say that again slower, please.

BY MS. KOFKE:

Q  You're not offering an opinion, as a legal matter, to the court in this case as to whether any of the findings in the legal cases that you cite in your report are applicable to this case?

MR. BURKHOLZ: Same objection.

THE WITNESS: Well, I'm not offering any

Page 64

legal opinions whatsoever. These are all conclusions from financial analysis that I offer.

BY MS. KOFKE:

Q  You've been asked by Robbins Geller to opine on three subjects in connection with this litigation; is that correct?

Take a look at page 1, paragraphs 1 and 2 of your report. That might help.

A  Okay. I thought it was two, but you're breaking down the second one into two to make it three. That's fair.

Q  Do paragraphs 1 and 2 of your report describe the three subjects on which Robbins Geller asked you to opine in this case?

A  Again, I mean, whether you call this two or three is something reasonable people can disagree about, and then having said that, I think I need to hear your question again.

Q  Do paragraphs 1 and 2 of your report describe the two or three subjects on which Robbins Geller asked you to opine in this case?

A  Yes.

Q  Are the matters in paragraphs 1 and 2 of your report the only matters on which you are offering an opinion at this stage of the litigation?

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 65

A   Yes.

Q   Have you been asked --

MR. BURKHOLZ: Objection. Object to form on the last question.

BY MS. KOFKE:

Q   Have you been asked to opine in this case on any matters other than the matters listed in paragraphs 1 and 2 of your report?

A   No.

Q   Look at page 4 of your report, paragraphs 17 through 19.

A   Okay.

Q   Do paragraphs 17 through 19 summarize the conclusions that you have reached in this litigation?

A   Yes.

Q   Are you offering any opinions that are not summarized in paragraphs 17 through 19 of your report?

A   Not at this time.

Q   Are you offering any opinion on the truth or falsity of the allegations in the Amended Complaint?

A   Well, I mean -- can you say that again, please.

Page 66

Q   Are you offering any opinion on the truth or falsity of the allegations in the Amended Complaint?

A   No, except to the extent that the complaint may say or assert that the market's an efficient market and that damages can be calculated with a common damage methodology; in which case, I am offering an opinion about those subjects.

Q   Are you offering any opinion on the truth or falsity of the allegations in the Amended Complaint related to the defendants' conduct?

A   No.

Q   Are you offering any opinion as to the liability of any defendants in this matter?

A   No.

Q   Are you offering any opinion on what caused Cardinal Health's stock price to increase or decrease on any particular date?

A   Yes.

Q   What opinion are you offering on that subject?

A   There's numerous dates that I've identified where it's company-specific information that caused the stock price to either rise or fall.

Q   You're referring to the 9 out of 12

Page 67

earnings statement dates that are referenced in your report?

A   Yes.

Q   Apart from that, are you offering any opinion on what caused Cardinal Health's stock price to increase or decrease on any particular date?

A   Yes.

Q   What opinion are you offering?

A   Well, I mean, this is a finding that's presented in my report. It's not one of the primary conclusions that I'm offering. But I explained that I do find that the market sector had an impact -- I mean, the market had an impact and the sector also had an impact on Cardinal Health's price dynamics.

Q   Are you offering any opinion on the amount of any alleged inflation in Cardinal Health's stock price either over the proposed class period or at any given point in the class period?

A   Not -- not at this stage.

Q   Are you offering any opinion concerning the amount of damages that any member of the proposed class is entitled to in this matter?

A   No. No. It's not -- no.

Q   Are you offering -- are you opining that any member of the class will be entitled to damages

Page 68

at all?

MR. BURKHOLZ: Objection to form.

THE WITNESS: No. I haven't done a loss causation or damages analysis yet. I explain how it would be done, but I haven't actually completed it.

BY MS. KOFKE:

Q   So you're not offering any opinion on loss causation at this time?

A   Correct.

Q   And you haven't done any work to calculate the amount of damages that potentially could be recoverable in this case?

A   Correct.

Q   At this time, have you been engaged to provide an opinion concerning the amount of damages that may be recoverable in this case?

MR. BURKHOLZ: Objection to form.

THE WITNESS: No.

BY MS. KOFKE:

Q   Do you anticipate that if the case continues, you will be engaged to provide an opinion concerning the amount of damages that may be recoverable in this case?

A   It's possible, but it's not certain.

Q   Have you done any additional work with

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 69

respect to the opinions in your report since you issued the report on March 24th, 2022?

A   No.  No.

MR. BURKHOLZ:  Lauren, is there a good time to break?  I think we've been going about an hour and 20 minutes.

MS. KOFKE:  This is a great time, actually. Why don't we take a five-minute break?

MR. BURKHOLZ:  Ten minutes.  Let's start at half-past, like eight minutes.

MS. KOFKE:  Perfect.

THE VIDEOGRAPHER:  Going off the record at 11:22 a.m.

(Recess.)

THE VIDEOGRAPHER:  Going on the record at 11:33 a.m.

BY MS. KOFKE:

Q   In any expert opinion you have offered in a securities litigation in the past four years, have you ever concluded that the market for the security at issue was not efficient?

A   No.  I have had engagements where I concluded it could not be proved to be efficient, but I haven't proved in any cases that a security was trading inefficiently.

Page 70

Q   Have you ever offered an opinion, as an expert witness in the past four years, that the market for the security at issue could not prove -- could not be proved to be efficient?

A   No.

Q   Let's look at page 12 of Feinstein Exhibit 1, your report.  In paragraph 41, you state that: "An efficient market, as defined..." by various sources, is:  "...a market in which available information is incorporated into the price of a security such that the trading price reflects available information with reasonable promptness."

Is that your understanding of the term "efficient market"?

A   Yeah.  The type of efficiency that is relevant to a securities case.

Q   What is "reasonable promptness"?

A   It varies depending on the context.  What it means is that the market's aware of the information, is not ignoring it for any material length of time.

Q   With respect to Cardinal Health securities, what period of time would you expect would be reasonable promptness?

A   Well, it depends on the nature of the

Page 71

information.  The information I was looking at for the test would be reflected within a day, a trading day.

Q   What is "available information"?

A   Information available to investors and analysts.  Public --

THE COURT REPORTER:  I'm sorry.  One at a time.

THE WITNESS:  I was going to elaborate. You know, it's public information.

BY MS. KOFKE:

Q   That's exactly what I was going to ask.

So available information is information that's publicly available to investors and traders in the marketplace?

A   Correct.

Q   Would available information incorporated into the price of a security include information that's publicly disclosed by the company itself?

A   Disclosed by the company itself?  That's what you asked?

Q   Yes.

A   I would say so.

Q   Would available information incorporated into the price of a security in an efficient market

Page 72

include news reports?

A   Generally, yes.  I mean, depending on what the news source is.

Q   Would it include analyses published by securities analysts?

A   Again, generally, yes, although there could be exceptions depending on who the analyst is, where their information is published or disseminated, or even if their is information is -- and reports are published and disseminated.

Q   Does available information incorporated into the price of a security in an efficient market include publicly available information concerning the risks faced by a company?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  Sometimes you talk a little bit fast.  I know I do that too.  And the --

BY MS. KOFKE:

Q   I'm happy to repeat the question, if that would help.

A   That's what I'm asking, yes.

Q   Does available information incorporated into the price of a security in an efficient market include publicly available information concerning the risks faced by a company?

LA Sheriffs' Pension               REVISED                    May 5, 2022
v. Cardinal Health Inc.            FINAL                Steven Feinstein, Ph.D.

Page 73

MR. BURKHOLZ: Objection to form.

THE WITNESS: Yes, I would say so. I mean, exactly how is a separate question, and what the information means to the market is not what you asked about. But would the information be considered incorporated? I would be -- generally, in an efficient market, yes.

BY MS. KOFKE:

Q   So just speaking hypothetically, if there was publicly available information that indicated that there were risks associated with Cardinal Health's acquisition of Cordis, you would expect the information concerning those risks to be incorporated into the price of Cardinal Health's stock?

MR. BURKHOLZ: Objection to form.

THE WITNESS: I would think that the announcement would be considered, and depending on what the implications of the announcement were, that information would be reflected in the stock price in an efficient market.

BY MS. KOFKE:

Q   And if the publicly available information concerning risks associated with the Cordis acquisition changed over time, then the changing

Page 74

level of risk would be incorporated into the price of the stock, correct?

MR. BURKHOLZ: Objection to form.

THE WITNESS: Well, if there was public information about it, then, yes. But I just want to be real careful here that my answers aren't going to be taken out of context.

I mean, I understand there's some disagreement about, you know, whether it was just the existence of risk or the -- that was disclosed or conditions that would have provided more color about the materialization or prior materialization of risks or adverse conditions that's at issue.

So, I mean, yeah, I would think that what is disclosed will be considered and reflected in the stock price in an efficient market, but it's a whole separate question of what is the information that was disclosed and was it truthful or not.

BY MS. KOFKE:

Q   And I'm not -- I'm not asking you anything about what was disclosed and whether it was truthful or not.

My question is: If the publicly disclosed information about Cordis reflected a change in the risks associated with the Cordis acquisition, in an

Page 75

efficient market, that would be reflected in the price of Cardinal Health's stock, correct?

MR. BURKHOLZ: Objection to form.

THE WITNESS: The information that's disclosed would be, yes.

BY MS. KOFKE:

Q   Do you agree that in an efficient market, a company's stock price will react to new company-specific information?

A   Yes.

Q   What is new information?

A   Well, something that's not already known previously to the market.

Q   Have you heard the term "stale information"?

A   I've heard it.

Q   What does the term "stale information" mean to you?

A   Information that's already previously been reported and is, therefore, fully reflected.

Q   So stale information would not move a stock price; is that correct?

MR. BURKHOLZ: Objection to form.

THE WITNESS: Well, almost by definition, if you're calling it stale -- although sometimes the

Page 76

reiteration of information itself is news and sometimes the source of the reiteration is itself news. So you have to be careful that it's truly not new information.

But if it, in fact, truly were not new information, it's -- except for certain exceptions that I can imagine, I mean, it would not move the market.

BY MS. KOFKE:

Q   Well, all else being equal, information is disclosed again after having previously being disclosed, that should not affect the price of the company's stock, correct?

MR. BURKHOLZ: Objection to form.

THE WITNESS: It depends on the manner -- it depends on certain case-specific facts and circumstances. Sometimes a new source of old information makes the news new. Now you've got corroboration from another party or maybe corroboration or announcement from a more reliable party or more believable party or just another party that adds weight to what otherwise might have been uncertain.

So if it truly is not new and there's nothing new learned from the announcement, it won't

JANE ROSE REPORTING                National Court-Reporting Coverage
1-800-825-3341                     janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 77

move the price, but you've got to be careful to establish that it truly is not new.

BY MS. KOFKE:

Q So if there truly is no new information content in a disclosure, then that disclosure should not affect the company's stock price, correct?

A I'm a little wary of the way you rephrased what I said. Not just the content, but if there's nothing new learned from the information, then the mix of information hasn't changed and the stock price should stay where it was, except for other factors that might simultaneously be impacting the stock price.

But the reiteration of old information from a new source may, under certain circumstances, be considered new information.

Q But there has to be something new in the disclosure or about the disclosure to move the stock price?

MR. BURKHOLZ: Objection to form.

THE WITNESS: I'd agree with that.

BY MS. KOFKE:

Q You concluded that Cardinal Health's stock trades in an efficient market, correct?

A Yes.

Page 78

Q So as a result, you would expect that Cardinal Health's stock price would reflect all publicly available information with reasonable promptness, correct?

A Yes.

Q Cardinal Health's stock price would reflect available information about risks to Cardinal Health's business, correct?

A Yes.

MR. BURKHOLZ: Objection to form.

THE WITNESS: Yes.

BY MS. KOFKE:

Q Cardinal Health's stock price would reflect available information about either the Cordis acquisition or integration, correct?

A Yes.

Q And the Cardinal Health stock price would reflect available information about risks related to the Cordis acquisition, correct?

MR. BURKHOLZ: Objection to form.

THE WITNESS: Yes, the public information about the risks.

BY MS. KOFKE:

Q If Cardinal Health made public statements about problems affecting the performance of the

Page 79

Cordis acquisition, you would expect those statements to, with reasonable promptness, be incorporated into the price of Cardinal Health common stock, correct?

A Yes.

Q Let's look at page 17 of Feinstein Exhibit 1, your report, at paragraph 58.

In this paragraph, you state that securities analysts: "...conduct research and provide valuation opinions, helping market participants acquire relevant information and understand the implications of that information for valuation and investment decisions. Consequently, securities analysts facilitate the flow of information and the digestion of information within the marketplace."

Do you see that?

A I do.

Q What is "the digestion of information within the marketplace"?

A It means the processing of the information and the determination in the consensus of the market as to what the information implies for the security price and the reflection of that information, therefore, in the security price.

Page 80

Q How do securities analysts facilitate the digestion of information?

A Well, they have expertise -- well, first of all, it's -- their job is to gather that information. So they conduct research. They attend conference calls. They attend conferences. They read trade publications and available publications. Sometimes they do -- you know, it could be considered detective work to gather information about companies.

And then they have the expertise, most of them, to process that information and determine what it means as far as what impact it should have on the stock price, and sometimes, you know, then they will draw a bottom-line conclusion. They'll rate the stock and make a forecast as to whether they think the stock will go up or down based on the information.

Q And would you expect the publicly available opinions of securities analysts would be incorporated into the price of Cardinal Health stock?

A Generally, yes, but you've got to take into account that there's not -- there's rarely unanimity in the financial markets, and sometimes what one

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 81

analyst is opining, another analyst may disagree with.  But well-known, reputable analysts are generally not ignored.  Their opinions will be taken into account to some extent somehow.

Q    Would you expect that the total mix of the securities analysts' opinions that are publicly available would be incorporated into the price of Cardinal Health stock?

A    If there's a consensus, the consensus would be incorporated.

Q    Are you saying there could be a published report of an analyst that disagrees with the consensus that's available to the public that would not be incorporated into the price of Cardinal Health common stock?

A    No, that's not what I said.  I said it might be considered, but it might not be given much weight if in fact that particular analyst is an outlier or has -- or did not present his or her opinion in a compelling way.

Q    I just want to make sure I completely understand your definition of an efficient market.

Are you saying that in an efficient market there could be some publicly available information that is given less weight and, therefore, not

Page 82

incorporated into the price of the -- a company's stock?

A    No.  I'm saying it would be -- if it's given less weight, the consideration of it might have little or no impact on the stock price.  The correct appropriate incorporation would be to have no impact.

Q    But all publicly available information -- I'm sorry.  Please continue.

A    In the -- we're talking in the hypothetical realm.  We haven't cited any specific example.  I just want to be clear of that.

Q    So it is the case that you'd expect that all publicly available information about the opinions of securities analysts would be incorporated into the price of Cardinal Health stock?

A    To the extent that it's appropriate to, and the extent that it's appropriate to might be to have little or no impact if it's an outlier opinion or not very compelling or not well supported.

Q    In any securities litigation where you have offered expert testimony, have you ever concluded that there was not a common damages methodology that could be applied consistent with the plaintiff's

Page 83

theories of liability?

A    Well, I can tell you certainly that in 10b-5 cases, I'm well aware that there's a -- the out-of-pocket damage methodology is typically applied in 10b-5 cases.  It's almost always.  So it'd have to be a very unusual case for a 10b-5 -- for the out-of-pocket damage methodology not to apply to a 10b-5 case, and I'm thinking of others.

I think I've offered opinions that there may be more than one way to look at how to calculate damages, but I don't think I've ever said there's no way to look at and compute damages commonly.

Q    In this case, you conclude that the out-of-pocket damage methodology can be applied commonly for all class members in the 10b-5 claim, correct?

A    Yes.

Q    In your view, is the out-of-pocket damage method appropriate in all cases asserting 10b-5 claims?

A    Well, in all cases that I've ever seen, the answer would be yes.  I -- maybe something really perverse will come down the pike someday where it can't be applied or that plaintiff's theory of liability is so different that the common, typically

Page 84

applied methodology won't work or isn't appropriate.

Like I said, I've never seen an example of a 10b-5 case where the out-of-pocket damage methodology was inappropriate, and this is certainly not a case where the out-of-pocket damage methodology is inappropriate and can't be applied commonly for all -- for all class members.

Q    Can you think of any circumstances where the out-of-pocket damages model could not be applied on a classwide basis consistent with plaintiff's theory of liability in a 10b-5 case?

A    I think I just said that.  Right now, as I'm sitting here, I've never encountered one, and I couldn't think of one.  That'd be an interesting exercise.

It really would depend on if plaintiff's theory of liability was very different from what plaintiff's theory of liability usually is in a class action securities case.  So that's what -- those are along the lines that I would think of for a hypothetical.

Q    What kind of plaintiff's theory of liability might make it not appropriate to apply the out-of-pocket damage methodology to a 10b-5 claim?

MR. BURKHOLZ: Objection.  Asked and

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 85

answered.

THE WITNESS: Okay. I do know that in that BP Gulf of Mexico oil explosion case, the theory of liability was -- you know, for some class members was different from the typical theory of liability in a class action securities case, and the judge appropriately said that the out-of-pocket damage methodology didn't apply.

So, I mean, what that one was, the theory of liability that was so different in that case was that it all depended on the risk aversion of any particular investor, whether or not that investors would have invested in BP stock had they known the truth.

So if that's the theory of liability that some investors would have bought and some investors, you know, may not have bought if they had known the truth, if that's the theory of liability, then the out-of-pocket damage methodology doesn't apply.

BY MS. KOFKE:

Q   In your understanding, is the lead plaintiff here asserting the same theory of liability as in the BP case?

A   Absolutely not. The theory of liability here is different, and that's why the out-of-pocket

Page 86

damage methodology does apply.

Q   Let's look at page 41 of Feinstein Exhibit 1, your report.

A   Which paragraph?

Q   It's paragraph 147 on page 41.

A   Got it.

Q   It says there: "First, valuation tools, which would include event study analysis, and potentially other empirical analyses, if necessary, would be used to establish if the disclosures correcting the alleged misrepresentations and omissions, caused the price of Cardinal stock to fall."

Do you see that?

A   I do.

Q   So the first step you would take to calculate damages would be to establish if the disclosures correcting the alleged misrepresentations and omissions caused the price of Cardinal Health stock to fall; is that right?

A   Yes.

Q   Is it correct that you would use an event study to do that?

A   Yes.

Q   How would an event study be used to

Page 87

determine if the alleged corrective disclosures caused the price of Cardinal Health stock to fall?

A   Well, once the corrective disclosures are identified and when they were made, you can run the event study to see if whether or not company-specific information caused the price of Cardinal stock to move that day. Assuming that it was -- the movement was statistically significant that day, you will have a -- proved that it was Cardinal information -- Cardinal-specific information that caused the stock price to move.

Then you check to see if it's actually a decline. If it is in fact a decline, the residual stock price movement -- meaning you've factored out the market and sector effects -- if that residual stock price decline is statistically significant, you will have proved that it was caused by company-specific information.

The next step is then to consider if there was any other company-specific information disseminated that day or in the reasonable time frame before that movement, aside from allegation-related information, that could have contributed. If there is none, you're done with the proof. If there is no other confounding information

Page 88

that may have contributed to the stock price decline, you've proved that the corrective disclosure is what made the stock price fall.

Q   Are there any other valuation tools, apart from an event study, that would be necessary in this case to determine if the alleged corrective disclosures caused the price of Cardinal Health stock to fall?

A   Possibly. It depends on whether or not there is confounding information on the same day. If there is confounding information, you would use valuation tools to assess the valuation impact of that other information. If that -- if, based on valuation principles and tools, the other information reasonably could account for or could have caused all of the residual stock price decline, well, then, it's possibly doubtful that it was the corrective disclosure that made the stock price decline.

If, on the other hand, the confounding information does not explain all of the decline, well, then, it's -- the appropriate conclusion is that the misrep- -- that the corrective disclosure correcting the misrepresentations and omissions caused a substantial portion of the stock price

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 89

decline that day.

Q    So if I understand you correctly, if there's no confounding information, then all you need for step 1 of your methodology is an event study?

A    It's a little bit of semantics we have to clear up.  I mean, some people might say the analysis of confounding information is part of the event study, and other people might say it's external to the event study.  I mean, that's just the semantics, though.

But I would say the statistical analysis of the event study would be enough if you've identified that there was a corrective disclosure that day and that the residual stock price decline was statistically significant.

If the residual stock price decline either was not statistically significant or there's confounding information, other valuation tools can be brought to bear on the question of what caused the stock price to fall that day.

Q    At this point in time, have you assessed whether there was confounding information at the time of either of the two alleged corrective disclosures in this case?

Page 90

A    Well, I have not done a loss causation or damages analysis yet.  I'm aware of dates that the plaintiffs are saying were corrective disclosures, and I'm aware that there was a mix of information on those dates, but I have not yet evaluated whether that mix of information constitutes confounding information.

Q    Do you know, sitting here today, whether the first step of your damages methodology would require application of any valuation tools in addition to an event study?

A    Well, I haven't proved for sure that it does require them.  I'm certain, though, that if it -- if the circumstances require valuation tools, the valuation tools are at my disposal or the disposal of whoever is doing the loss causation analysis.

Q    I think we might be speaking past each other a little bit here.

My question is:  Have you determined yet whether circumstances will require the application of any valuation tools, apart from an event study, with respect to the first step in your proposed damages methodology?

A    No.  No.  I mean, it's possible that no

Page 91

valuation tools will be necessary, or it's also possible that the full toolkit of valuation tools will be brought to -- will be necessary.  So I haven't made that determination yet.

Q    You have determined that an event study will be necessary?

A    Yes.

Q    Is it correct that an event study is the only tool that you've determined at this point will be part of the damages analysis in step 1 of your methodology?

A    No.  I mean, I explained that a news analysis is also required to investigate when in fact there were corrective disclosures and if on those -- if simultaneous with the corrective disclosures there was confounding information.

Q    So apart from an event study and a news analysis, are there any specific valuation tools that you've determined at this point will be required to evaluate or to perform step 1 of your damages methodology?

A    I think I answered that already.  I mean, you asked exactly that question, and I answered it.

Q    I'm pretty sure I didn't.

A    Well, what I said the last time you asked

Page 92

that question was that it's possible that no valuation tools will be necessary, and it's possible that the full toolkit of valuation tools will be necessary, depending on whether there's confounding information and what kind of confounding information the news analysis turns up.

Q    So sitting here today, you can't specifically name a valuation tool, other than an event study, that you know will be required for step 1 of your damages analysis?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I can name a lot of valuation tools that are available should valuation tools be necessary, and I am a hundred percent confident that confounding information can be disaggregated.  Because that's what valuation experts do every single day when they price securities in the market and price hypothetical scenarios that may occur.

But the -- I know what the available array of tools is, but which of those tools will be necessary depends on what confounding information specifically appears to be at play on the day of the corrective disclosure.

BY MS. KOFKE:

Q    So is it fair to say, as part of the

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 93

analysis you've done so far, you haven't determined, from that array of available tools, any tool, other than an event study, that will be necessary to perform step 1 of your damages analysis?

MR. BURKHOLZ: Objection. Asked and answered.

THE WITNESS: No. What I've determined is what the tools that are available to use are. I mean, we can use discounted cash flow analysis. We can use valuation multiples analysis. We can refer to the literature on various valuation impacts of certain kinds of information.

But which of those tools is selected to address a challenge depends on what the challenge is, and I haven't done the loss causation analysis yet.

BY MS. KOFKE:

Q Can you name one valuation tool that it's your opinion will be used to calculate -- strike that.

Name one valuation tool that will be used, apart from an event study, to apply step 1 of your damages methodology.

MR. BURKHOLZ: Objection. Asked and answered twice.

Page 94

THE WITNESS: I mean, I -- it's the --

BY MS. KOFKE:

Q If you can't name one, you can just say that you haven't determined specifically what valuation tools you'll use yet.

A A carpenter knows what tools to bring to the construction site, but whether he's going to be hammering that day or sawing that day, you know, depends on what the job to do that day is. Same thing here. I know what the tools are that are available to me and valuation experts to disaggregate confounding information if there is any.

So I can tell you exactly what tools I'm going to bring to the construction site: I'm going to bring the discounted cash flow model to the construction site. I'm going to bring valuation multiples. I'm going to bring the entire literature on valuation effects of various pieces of information so that whatever I encounter is compounding information -- if I encounter any confounding information, I'll have the tool at my disposal to deal with it, but, you know, which of the tools I take out of my toolbox depends on what confounding information is encountered.

Page 95

Q So at this point in time, you don't know what tools you'll actually end up taking out of your toolbox in this case, correct?

A I think that's fair to say.

Q So at this point in time, you have not identified specifically what valuation tools in the array that are available to you will be necessary to apply step 1 of your damages methodology, apart from an event study, correct?

MR. BURKHOLZ: Objection.

THE WITNESS: I think I've identified -- I think it's important that I be able to identify, and I did identify, the array of tools that are available to a valuation expert to deal with the problem of confounding information. Confounding information is something that very well might be encountered.

In order to deal with confounding information, I will bring to bear the discounted cash flow model, the valuation multiple model, and all the principles in valuation textbooks and valuation courses that help disaggregate confounding information from a corrective disclosure. I will bring those tools to this job. If -- and then -- period.

Page 96

BY MS. KOFKE:

Q Is it possible that -- it's possible -- strike that.

Is it possible that other valuation tools, apart from an event study, will not be needed in this case?

A Yes.

Q In paragraph 147, it talks about controlling for potentially non-fraud-related information.

Can an event study, by itself, control for potentially non-fraud-related information?

A Yes, if you consider the addressing of confounding information and the news analysis to be within the definition of the event study; many people do.

Q An event study will indicate if there's a statistically significant residual return attributable to company-specific information, correct?

A Well, I don't think you have to define that as the end-all of the event study. But --

Q I'm not.

A Because you can define that as being a statistical component of the event study, and the

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 97

event study also comprises the addressing of confounding information and the news analysis that was required in order to identify the events. In fact, if you look at the MacKinlay article that's a seminal survey of event study methodology, he says in there: One of the important steps is identifying the news of interest. So his definition includes the news analysis.

Some people have slightly different definitions. In other words, we all agree on the generally accepted methodology, but for the definition of event study, some people have wide parameters and include the news analysis and confounding information. Other people define the event study more narrowly and consider the other analyses as being supplementary.

Q   Defining an event study to exclude a news analysis, can an event study by itself control for potentially non-fraud-related information?

A   I'm not sure why you want to define it that way, but if you were to define it that way -- so I think what you're asking is: Okay. Just focus on the statistical driver -- right? -- the t-test.

All right. So if I just focus on the t-test, what's the question?

Page 98

Q   Can the event study, by itself, control for potentially non-fraud-related information?

A   Okay. If -- you're asking there, does the t-test by itself -- the statistical t-test, does it account for non- -- does it disaggregate non-fraud-related confounding information.

No, the t-test itself will not disaggregate the non-fraud-related confounding information.

Q   How will the damages methodology you propose control for potentially non-fraud-related information?

A   Well, first we have to see if there exists any. I mean, so, first a news analysis is necessary to review all the news that -- I mean, if it's a one-day window we're looking at, you would look at all the news from the end of the prior trading day to the end of the trading day at issue, evaluate that news relative to generally accepted financial valuation principles to see if it's material information, economically material information. Is it new? Is it the kind of information that principles dictate should or could affect the stock price?

And if those two screens are passed, evaluate it. You know, what is the value of that

Page 99

additional information? Does it make the stock price go up generally? Does it make the stock price go down generally? And how much?

Q   The second step in your proposed methodology for calculating damages will be to construct an inflation ribbon; is that correct?

A   Yes.

Q   What is an inflation ribbon?

A   An inflation ribbon is a time series of the difference between a stock's actual price observed in the marketplace and the estimated price that the stock would have traded at each day had there been full disclosure.

Q   Okay. It says, in paragraph 147(ii) of your report, that: "...inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure that eliminates all remaining artificial inflation from the stock price, back to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred."

Is it correct that your methodology would look at the stock price decline after the final corrective disclosure, use that to construct inflation, and then apply that inflation

Page 100

chronologically backwards to the beginning of the class period?

A   No.

Q   What was incorrect in what I said?

A   That might be what the facts dictate, but everything you said was -- I'm pretty sure everything you said was correct up to where you said determine that the inflation was constant from the time it was dissipated back to the start of the class period. That might not be the case.

Q   Is it correct that you would use the decline in stock price following the corrective disclosure to estimate artificial inflation earlier in the class period?

A   Well, if by earlier you mean immediately prior to the corrective disclosure, then the answer is absolutely yes.

Q   But potentially not earlier in the class period?

A   Potentially.

Q   Why would it be the case that you would not use the decline in stock price following the final corrective disclosure to estimate artificial inflation at an earlier time in the class period?

A   There may have been changes in artificial

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 101

inflation between the time of the corrective -- the last corrective disclosure and the beginning of the class period. There might have been additional misrepresentations and omissions that raised artificial inflation. There might have been disclosures that lowered artificial inflation is one answer, is one reason why the inflation ribbon may not be constant.

Q  So how is it that an inflation ribbon is constructed by working chronologically backwards?

A  Well, I actually explain that there. The inflation that comes out of the stock price was previously in the stock price. So that means the inflation before the corrective disclosure had to have been bigger than the inflation after the corrective disclosure by the amount that was dissipated.

Q  Would an inflation ribbon have to be calculated for each day in the proposed class period?

A  I think, yes, given how active the trading was in Cardinal Health stock. So I think the answer is yes.

Q  Would the inflation ribbon be adjusted on a daily basis?

Page 102

A  Yes. I mean, the adjustment might be to keep it constant, but it also might not be to keep it constant. There might be an increase or a decrease or a change for other reasons.

Q  As part of the second step in your damages methodology, your report states that -- and this is in (iii) on page 42 of your report.

It says: "Supplementing event study results, the full array of generally accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for stock prices under the assumption of prior full disclosure."

Do you see that?

A  Yes.

Q  If you look at paragraph 146 of your report, there's a list of valuation tools.

Do you see that?

A  I do.

Q  Are those --

MR. BURKHOLZ: I'm sorry. What page are you on? You said 146?

MS. KOFKE: Page 41, paragraph 146.

MR. BURKHOLZ: Okay. Thank you.

BY MS. KOFKE:

Q  The list of valuation tools in that

Page 103

paragraph, do you see that?

A  I do.

Q  The valuation tools in paragraph 146, are those the valuation tools that you were referring to in the quote from your report that I just read?

A  Well, the quote said "the full array," and 146 is the most commonly used tools. 146 specifically says this list is among the commonly used tools. So there could be additional tools.

Q  What additional tools were you referring to in -- whenever you said "the full array of generally accepted and widely used valuation tools"?

A  Well, I leave the door open that if some -- if there's a piece of confounding information that's unusual, I might go to the literature and see what the literature says about that specific type of information and how other people have dealt with it before.

Q  Sitting here today, is there any specific additional valuation tool that you might apply in this case, apart from those listed in paragraph 146?

A  You just asked is there something I can cite to besides what I've already cited to, right?

Q  Correct.

A  Yes.

Page 104

Q  What?

A  There's a whole array of accounting metrics aside from the ones listed in paragraph 146, and depending on facts and circumstances, different analysts will, on occasion, use a valuation multiple based off of one of those alternative metrics. So, you know, this is not the full list of valuation metrics.

What do we have? We have EBITDA, we have revenue, we have earnings, and there could be things like -- I don't know -- operating income for example. Or --

Q  You're saying there could be other valuation tools that would be needed in this case, apart from the ones listed in paragraph 146?

A  Really what I'm saying is that there are other valuation tools that are available depending -- and they may be necessary, depending on what's encountered if -- although, frankly, that's unlikely.

Q  Okay. Well, sitting here today, other than what you mentioned about possibly having a multiples model based on a metric that's not listed in paragraph 146, is there any other valuation tool that you can think of that may be needed in this

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 105

case, other than what's listed in 146?
A I'm sure there would be if I -- if I spent, like, the next hour thinking about it, but, you know, in this moment, no.
Q Have you applied any of the possible valuation tools in paragraph 146 to this case at this time?
A No -- well, yeah. Wait. 146 includes event study analysis, and I have done event study analysis.
Q Apart from an event study analysis, have you applied any of the valuation tools in paragraph 146 to this case at this time?
A No.
Q Have you determined if you would need to use any specific valuation tools to calculate an inflation ribbon in this case, other than an event study?
A May I please hear that again.
Q Have you determined if you would need to use any specific valuation tools to calculate an inflation ribbon in this case, other than an event study?
A The only way to know the answer to that -- the only way to know specifically what challenges

Page 106

will be encountered in the course of the loss causation analysis and how to solve -- how to overcome those challenges would be to do the loss causation analysis, and I have not yet done the loss causation analysis.
Q So the answer to my question would be, no, you have not yet determined if you would need to use any specific valuation tools to calculate an inflation ribbon in this case, other than an event study?
A The way I would like to say it is: I have not conducted a loss causation analysis yet. I have not been asked to. My understanding is that it's not appropriate to do one at this stage in the legal process. And that is the only way one would know for sure what sort of potentially confounding information challenges might arise, which would then dictate what tools need to be used to address it.
Q So because you have not yet done the loss causation analysis required to answer the question, you have not yet determined if you would need to use any specific valuation tools to calculate an inflation ribbon in this case, other than an event study, correct?
MR. BURKHOLZ: Objection. Asked and

Page 107

answered.
THE WITNESS: So was that a question?
BY MS. KOFKE:
Q Yes.
A I have not done a loss causation analysis yet. I don't think it -- I wasn't asked to, and I don't think it's required of anyone to do one at this stage in the process, and a loss causation analysis is the only way one would know for sure what sort of challenges might be encountered in the course of the loss causation analysis, and, therefore, what sort of tools need to be brought to bear to address those challenges.
Q Have you examined at this time, having not done a loss causation analysis, whether there are any specific facts and circumstances in this case that call for the use of any specific valuation tool listed in paragraph 146, other than an event study?
MR. BURKHOLZ: Objection. Asked and answered four times.
THE WITNESS: That was a long question. There are a lot of parts to it.
I think I'm being responsive if I say that I do know I'm going to have to review all the information the company announced on the dates of

Page 108

the alleged corrective disclosures and the dates that I determine were corrective disclosures, and I'll have to do an analysis to determine if any of those are new information and economically material information.
And most likely that will involve the application of generally accepted valuation principles, such as: The information needs to be new and impacting some characteristic of the firm that is generally accepted to be valuation relevant.
BY MS. KOFKE:
Q Did you read the entire Amended Complaint?
A Yes.
Q How much time did you spend reviewing the Amended Complaint?
A I think I read it on three occasions. I read it when the -- to answer your question, I don't know for sure, but probably four or five hours altogether.
Q What is lead plaintiff's theory of liability in this case?
A That there were misrepresentations or omissions that caused the stock price to be artificially inflated that caused investors to overpay for the stock and that, upon disclosure of

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 109

the truth, the stock price fell and investors, therefore, suffered losses.

Q   Is lead plaintiff asserting a theory of liability based on corrective disclosure or materialization of an undisclosed risk?

MR. BURKHOLZ:  Objection to form.  Legal conclusion.

THE WITNESS:  Well, the corrective disclosure is announcements and events that reverse the misinformation that had been in the market as a result of the misrepresentations and omissions.  I think it's -- I don't think I -- an economist has to characterize it as materialization of the risk -- I mean, corrective disclosure can be a materialization of the risk.  So I don't see the distinction from the economics point of view.

BY MS. KOFKE:

Q   In this case, are any of the corrective disclosures -- actually, strike that.

In this case, is lead plaintiff alleging that any of the misrepresentations involved the failure to disclose a risk?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

THE WITNESS:  My understanding is that lead

Page 110

plaintiff is alleging that the conditions at Cardinal involving the acquisition and integration of Cordis were misrepresented to the market.

BY MS. KOFKE:

Q   Do you have an understanding as to whether lead plaintiff is alleging that defendants misrepresented or concealed risks related to the Cordis acquisition?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

BY MS. KOFKE:

Q   To be clear, I'm just asking for your understanding of plaintiff's allegations.

MR. BURKHOLZ:  And the objection is it has been asked and answered.

THE WITNESS:  Right.  My understanding is that it's conditions and events that were misrepresented or omitted what the allegations center on.

BY MS. KOFKE:

Q   Your understanding is that plaintiff is not alleging that defendants misrepresented or concealed risks related to the Cordis acquisition?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I'd have to check again to

Page 111

see if they used the word "risk."  And whether they did or didn't, from an economics point of view, I would need to assess whether the conditions that were alleged to have been misrepresented entail or engender a misappreciation of risks.  That's what I would need to do to refresh my memory on that.

BY MS. KOFKE:

Q   But sitting here today, you haven't reached a determination as to whether lead plaintiff is alleging that there was a misrepresentation or concealment of a risk concerning the Cordis acquisition?

A   I mean, if they did use the word "risk," my understanding, from everything else in the complaint, is that it was -- whether or not the acquisition was on track, whether or not due diligence -- appropriate due diligence had been performed, that was where the market was misled.

So whether that creates risks or not or whether the complaint was written to say that it was risks rather than conditions, it wasn't germane to my analysis.  My analysis handles it either way, and I'd want to see the complaint to see if the word "risk" appears or not.  I don't recall whether it does or doesn't.

Page 112

Q   Your view is that it doesn't matter, for application of your proposed damages methodology, whether lead plaintiff is alleging failure to disclose a risk?

A   Correct.  Because the model is I would assess how does whatever was disclosed cause the stock price to be -- how does -- whatever is alleged to have been concealed, how did it inflate the stock price and what happened to the stock price when the truth was revealed.  And whether it's conditions or a risk, it's the same approach.  The model -- the damage model, the damage -- the damage model would be applied the same way.

Q   You agree that using the entire stock drop following the realization of a risk would overcompensate a plaintiff who alleged that the defendant misrepresented the size of a risk?

MR. BURKHOLZ:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  Not necessarily.

BY MS. KOFKE:

Q   Do you agree that the stock drop following the realization of a risk reflects the certainty that the risk would occur?

MR. BURKHOLZ:  Same objection.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 113

THE WITNESS: Yes, but that might be a lower adverse impact on the firm than what could have happened. It doesn't necessarily cause a smaller impact on the stock price than what would have been anticipated by investors previously.

BY MS. KOFKE:

Q But do you agree that a plaintiff that alleges that the size of a risk was misrepresented should only recover based on the amount of inflation in the stock price that was caused by the misrepresentation of the size of the risk, not the entire loss of value caused when the risk is realized?

MR. BURKHOLZ: Objection to the form. It's compound.

THE WITNESS: Yeah, I had trouble following.

BY MS. KOFKE:

Q Okay. Why don't we do a hypothetical? Let's imagine that a company has a 1 percent chance of losing a significant customer and, if it lost the customer, the company would suffer a loss of $1 million.

A Well, why are we assuming only $1 million and only 1 percent? Isn't there a --

Page 114

Q It's a hypothetical. I'm determining the factors and features of this hypothetical. I'd like to get your opinion on the hypothetical as I define it.

Is that a problem?

A It is.

Q Why?

A Well, it's just an unrealistic hypothetical. I mean, if it really hasn't --

Q Realistic to what? I'm creating the hypothetical.

MR. BURKHOLZ: You're interrupting, Counsel. He's trying to explain your response, and you're interrupting him.

THE WITNESS: Yes, there may be a 1 percent risk of losing a customer, but losing that customer could have a whole wide range of potential distribution of impacts. So you're defining a probability and a price impact. That's usually not what happens in financial markets.

BY MS. KOFKE:

Q In my hypothetical, as I define it, the company has a 1 percent chance of losing a significant customer and, if the customer is lost, the company will suffer a loss of $1 million and no

Page 115

other loss or any other impacts. That's the hypothetical.

Do you understand it?

A Let me make sure I do. So everyone knows in advance that there's a -- okay.

The truth -- you haven't defined who knows the truth, but the truth is that there's a 1 percent chance of losing the customer and, if that customer is lost, it's a $1 million impact on the valuation of the company, correct?

Q Correct.

A Got it.

Q So at the time the company disclosed the 1 percent risk of losing the company -- the customer, the stock price should reflect an expected loss of $10,000, or 1 percent of 1 million, correct?

A Only if everybody knows and agrees on the impact of losing the customer --

Q Correct.

A -- which is unrealistic because there's probably a wide array of valuation impacts of losing a particular customer that could be --

Q In the hypothetical, the only impact is the $1 million loss.

A Well, you're also assuming that everybody

Page 116

knows that. You're also assuming --

Q That's what I said.

A They all know it. They all agree on it. I'm not going to argue with you. I'm just trying to answer your question so that it's -- I'm trying to answer your question. I'm trying to understand your question.

Q I'm trying to support a simple hypothetical here. I'd like you to support the facts of the hypothetical and give me your opinion. The hypothetical whether it's realistic or not is really beside the point. So can we continue with this?

MS. KOFKE: Because if it's going to keep on going like this, Spence, this is not appropriate in my view. I think the answers are nonresponsive, and the witness is not answering my questions in a productive matter.

MR. BURKHOLZ: I completely disagree with you. He has a different view on the -- I guess the result of your hypothetical that you don't agree with, and he's trying to answer your question based on your hypothetical, which he's been doing for the last ten minutes, and he's acting nothing but professional in his responses.

So we'll continue with this. I would like

Page 117

to take a break when you're -- you know, we've been going another hour, but you can continue questioning him, but to say that he's not acting professionally is inappropriate.

BY MS. KOFKE:

Q   Let's get back to the hypothetical.

So at the time the company disclosed the 1 percent risk of losing the customer, the stock price should reflect an expected loss of $10,000, or 1 percent of 1 million; is that correct?

A   It's hard to answer your question now because it's an incomplete hypothetical.  So I can ask some questions for clarification to make it more complete if you like.

Q   Please.

A   Does everyone in the marketplace know that it's a $1 million impact of losing the customer?

Q   Yes.

A   There's no disagreement whatsoever among any market participants about what the dollar impact of losing the customer would be?

Q   Correct.

A   Does everybody know that it's a 1 percent chance?

Q   The company disclosed that, yes.

Page 118

A   Does everyone in the marketplace agree that it's a 1 percent chance?

Q   Yes.

A   How does the company know it's a 1 percent chance?

Q   Look, this is just completely unproductive.

MS. KOFKE:  Why don't we take a break.

MR. BURKHOLZ:  Okay.  Let's take a ten-minute break.

MS. KOFKE:  Let's go off the record.

MR. BURKHOLZ:  Can I just get a clarification from you?

THE COURT REPORTER:  Are we on or off the record, Counsel?

MR. BURKHOLZ:  We're on the record.

So we have a stipulation in the case that our communications with our experts are privileged, and I just want to make sure that -- that we can communicate during breaks during deposition -- our expert's depositions and those communications will be privileged.

MS. KOFKE:  I'll have to consider that.

MR. BURKHOLZ:  Well, we need to know whether or not -- we have a stipulation that provides that, and it's not fair for you to say

Page 119

you'll consider that.  Either we have an agreement that we can freely communicate with our experts or we don't.

It shouldn't be that you can consider it and then start asking questions after we communicate on the break.

MS. KOFKE:  I'm willing to abide by the terms of the stipulation we've agreed to.

MR. BURKHOLZ:  Okay.  And that stipulation provides that we can communicate with our experts during breaks in depositions, right?

MS. KOFKE:  It does not provide that.

MR. BURKHOLZ:  Okay.  So, then, we're going to apply the same rule to your expert.  There will be no communications about the deposition with your expert.

MS. KOFKE:  I'm not saying you can't talk to your witness during a break.  I'm saying there's ethical rules that may apply in addition to the stipulation.

I don't know what you plan to communicate about.  There's absolutely no way in advance I can say anything other than that I agree to abide by the terms of the stipulation we've reached.

MR. BURKHOLZ:  Okay.  And so the

Page 120

stipulation we reached said that neither side -- that the communications with our experts are privileged and that --

MS. KOFKE:  I don't think that's what it says at all, but, you know, you're free to look at it at the break.

MR. BURKHOLZ:  Well, that's our interpretation of it, and we should have an agreement before we break for --

MS. KOFKE:  I'm not going to agree to this without looking at the stipulation.  You can look at it and make your own decision.

MR. BURKHOLZ:  Fair enough.

We're going on a break.  We'll be back in 10 minutes.

THE VIDEOGRAPHER:  Going off the record at 12:36 p.m.

(Recess.)

THE VIDEOGRAPHER:  Going on the record at 12:50 p.m.

BY MS. KOFKE:

Q   Are you familiar with the term "price maintenance"?

A   Yes.

Q   What does that term refer to?

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 121

A   Well, I think it's a legal term, but I am familiar with it.  It refers to the fact that a misrepresentation or omission, rather than introducing new inflation -- I'm sorry -- rather than causing the stock price to rise, can actually keep it from falling.

Q   And is the term "inflation maintenance" sometimes used interchangeably with the term "price maintenance," or is that a different concept?

MR. BURKHOLZ:  Objection to form.

Go ahead.

THE WITNESS:  I think -- I think I have seen it used interchangeably, but I would prefer that they -- that there be a distinction made in the definitions.

BY MS. KOFKE:

Q   What's the distinction between inflation maintenance and price maintenance, in your view?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

Go ahead.

THE WITNESS:  Price maintenance is that a misrepresentation or omission can keep the stock price from falling.  That might actually introduce inflation for the first time.  If the -- if there's

Page 122

no inflation previously and the stock price should have fallen $5 and it didn't fall $5, that creates a new $5 of inflation.  So even though the price was maintained, inflation increased.

Inflation maintenance is the new -- is the idea, the principle, that a misrepresentation or omission can cause inflation from not changing, where, had there not been the misrepresentation or omission, inflation might have fallen.

BY MS. KOFKE:

Q   Do you agree that in order to offer your damages opinion, you had to assess whether the damages methodology described in your report was consistent with lead plaintiff's theory of liability in this case?

A   I offered an opinion about the damage model, the existence of a common damage methodology that can be used to calculate damages for all class members and that that damage model is consistent with plaintiff's theory of liability.  I didn't offer a damage quantification or loss causation opinion yet.

Q   So you had to understand what plaintiff's theory of liability in this case was in order to offer an opinion that your damages methodology was

Page 123

consistent with that theory of liability, correct?

A   I think I understand plaintiff's theory of liability.  I explained plaintiff's theory of liability and how it doesn't matter whether they used the word "risk" or not in their complaint.

Q   Is lead plaintiff asserting a theory of liability based on price maintenance or inflation maintenance?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

THE WITNESS:  I've already explained plaintiff's theory of liability.

THE COURT REPORTER:  I'm sorry.  I missed the first few words.

THE WITNESS:  I've already explained plaintiff's theory of liability.  Whether you characterize that with -- whatever legal terminology you characterize it with is inconsequential to how it affects the economics to the matter.

BY MS. KOFKE:

Q   Your understanding is that the lead plaintiff is asserting that the alleged misstatements in this case caused the Cardinal Health's stock price to increase?

A   No.

Page 124

MR. BURKHOLZ:  Objection.

Go ahead.

THE WITNESS:  That's not their allegation.  It caused -- their allegation is that it caused Cardinal's stock price to be greater than it otherwise would have been, and I guess some people would call that price maintenance.

BY MS. KOFKE:

Q   Is lead plaintiff asserting a theory of liability that some members of the class were harmed because they purchased Cardinal Health stock when absent the alleged misrepresentations they would not have purchased Cardinal stock at all?

MR. BURKHOLZ:  Objection to form.  That's compound.  I don't understand.

Go ahead, if you can answer it.

THE WITNESS:  My understanding is the theory of liability is that people who did buy it, bought it at an inflated price.

BY MS. KOFKE:

Q   Is lead plaintiff asserting that any members of the class were harmed by virtue of the fact that they wouldn't have bought Cardinal stock at all if it hadn't been for the misrepresentations?

MR. BURKHOLZ:  Objection to form.

LA Sheriffs' Pension                    REVISED                          May 5, 2022
v. Cardinal Health Inc.                 FINAL                   Steven Feinstein, Ph.D.

Page 125

THE WITNESS: No. Again, my understanding is that the class members are investors who bought during the class period at an inflated price, and they were harmed because the price was inflated.

BY MS. KOFKE:

Q   What is confounding information?

A   Information unrelated to the allegations, either unrelated to the misrepresentations and omissions or unrelated to the corrective disclosure of the misrepresentations and omissions that is disseminated simultaneous with either the misrepresentations and omissions or the corrective disclosure.

Q   Do you recall that plaintiff alleges two corrective disclosure dates: one on August 2nd, 2017 and one on May 3rd, 2018?

A   No. No. That's not correct.

Q   What's incorrect about that?

A   The corrective disclosure, I believe, was on May 2nd, 2018, after the close.

Q   So your understanding is that the second corrective disclosure was on May 2nd, 2018?

A   No. I'm sorry. I erred. It's -- you were right. You were right. It's May 3rd. It's May 3rd before the open.

Page 126

Q   Do you know whether there was any confounding information released on either of the alleged corrective disclosure dates?

MR. BURKHOLZ: Objection. Asked and answered a number of times.

THE WITNESS: There very well might have been is what I -- is what I observed.

BY MS. KOFKE:

Q   Do you agree that your report does not address whether confounding information was released on the dates of the alleged corrective disclosures?

A   I address what to do if it's determined that there's confounding information. I did address that and how to handle it. I haven't done the loss causation and damages analysis yet, so I haven't specified any specific confounding information.

Q   And you agree that your report does not describe what specific valuation tools would need to be applied to address any specific item of confounding information that may be found to have been released at the same time as the corrective disclosures?

A   Just sounds like the way you phrased that, I just think that that's not a fair characteristic of what's in my report or in my testimony today.

Page 127

Q   Can you name any item of confounding information that was released at the same time as one of the corrective disclosures?

A   I've described why it's reasonable that there would be confounding information, that these corrective disclosures were made on earnings announcement dates, dates when the company communicated with the marketplace.

And so there was a lot of information disclosed, and I described how one would handle that.

Q   If you haven't identified what confounding information was disclosed on either of the corrective disclosure dates, how can you know that the valuation tools described in your report will be sufficient to address that confounding information?

MR. BURKHOLZ: Objection. Asked and answered five times before.

THE WITNESS: Because these are the tools that are brought to bear on this kind of confounding information, not only by me in other cases like this one, but by investment analysts and investment professionals every day, as they anticipate what could happen to a company and as they evaluate various scenarios.

Page 128

I mean, this is -- this is what financial analysts and investment analysts do every day with virtually every publicly traded security, and these are the tools they use.

BY MS. KOFKE:

Q   When you say "investment analysts," you're talking about outside of the litigation context?

A   Yes.

Q   Outside of the litigation context, are investment analysts every day constructing historical inflation ribbons to calculate damages in securities cases?

A   No. But they're evaluating the valuation impact of hypotheticals, which is exactly what the analysis of confounding information calls for. What would the price have been had it not been for the confounding information? What impact did the confounding information specifically have on the stock price?

Those are the questions that investment analysts and investment professionals address and answer every day, I mean, continuously through every day for virtually every publicly traded security out there.

Q   Do securities analysts every day attempt to

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 129

calculate but-for historical prices of a stock without alleged fraudulent statements?

A    They -- not fraudulent.  I would take the word "fraudulent" out of that, but they certainly calculate what the price would have been with and without different pieces of information backward, and they look at what the price would -- is expected to be going forward without different pieces of information.

Q    Do you think every day securities analysts are looking backward to evaluate what the price of a company's stock would have been historically?

A    That's a common analytic that they do engage in, yes, so that they can better understand what drives the valuation of the security they're interested in and what might drive the valuation going forward and what the value might be going forward.

Q    Do securities analysts apply event studies?

A    Yes.

Q    Outside of the litigation context?

A    Yes.

Q    In any of the analyst reports that you reviewed related to Cardinal Health in preparing your report, did any of them involve an event study?

Page 130

A    I don't recall.  Can I have just one moment?  I'd like to look at something in my report.

Q    Go ahead.

A    I want to make sure something I said previously was correct, and we have the report right here.

Okay.  No, nothing to correct.  Thank you.

Q    Would you expect that any securities analysts have constructed an inflation ribbon related to the alleged fraudulent statements in this case?

A    No.  I mean, it's possible, but I doubt it.

Q    Would the damages methodology described in your report examine whether Cardinal Health's stock price reacted to the alleged misrepresentations at the time they were made?

A    I'm looking for the verb.  I need to hear it again so I can hear the verb in your question.

Q    Would the damages methodology described in your report examine whether Cardinal Health's stock price reacted to the alleged misrepresentations at the time they were made?

A    I'm still having a little trouble understanding the question.

The analysis I did does illuminate the

Page 131

inflation introduced and maintained at the time the misrepresent- -- the alleged misrepresentations or omissions were made.  I mean, that's -- I'm sorry.

The analysis that I would do if I were -- when doing a loss causation and damages report would do that.

Q    So would that analysis involve at all looking at how the stock price changed around the time of each of the alleged misrepresentations?

A    It's not the most reliable way to do it, but I wouldn't ignore what comes out of that.  I'd probably have a look at it.

The problem with that methodology is that if the statements are consistent with what the market was previously led to believe, they wouldn't show up as causing -- there wouldn't necessarily be a stock price movement that is identifiably attached to the misrepresentations and omissions at that time.

You see the stock price movement when the mix of information in the marketplace changes, and that would happen later, upon disclosure.

Q    To the extent your analysis did examine the stock price movements around the time of the alleged misrepresentations, would it be important in that

Page 132

analysis to control for confounding information?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  Well, I just want to show you, I mean, I have an exhibit in my report that runs event studies.  It has event study results for every single day in the class period.  So, I mean, that's what we're referring to.  I didn't draw any conclusions about loss causation or the quantification of damages because I haven't -- that wasn't the scope of the project.

But I think it makes sense to consider if there is confounding information on the front end and the back end.  You won't necessarily learn something from that examination, but those are -- you know, you should try to be as thorough as possible when doing this sort of analysis.

BY MS. KOFKE:

Q    Sitting here today, do you know whether confounding information was released at the same time as any of the alleged misrepresentations in this case?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  Well, I haven't evaluated whether it was material, whether there was any material confounding information.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 133

I'm looking on page 6 and 7 of my report. The -- I mean, the initial misrepresentations and omissions and then the subsequent ones, yeah, they were most likely accompanied at some points in time by information that was not about the Cordis acquisition or integration.

I think it's pretty clear that if we look at every one of the alleged misrepresentations and omissions, at least some of them would have been accompanied by other information announced on the same day, and -- but I haven't analyzed whether it's material or not.

MS. KOFKE: Let's mark Tab 11 as the next exhibit, please.

- - -

(Feinstein Exhibit 9 was marked for identification.)

- - -

BY MS. KOFKE:

Q    So this is an earnings release from August 2nd, 2017.

A    Is this also being downloaded?  Yeah.

Q    Do you have that, Dr. Feinstein?

A    Not yet.

Now I do.

Page 134

Q    Do you see that this is an earnings release from August 2nd, 2017?

A    I do.

Q    Did you review this document in preparing your report?

A    Yes.

Q    Did you examine whether this earnings release contained any confounding information that could have caused Cardinal Health's stock price to decline that was unrelated to the alleged fraud?

MR. BURKHOLZ: Objection.  Asked and answered.

THE WITNESS: It depends how you're defining your terms.  I examined the information in this press release.  I didn't examine it for the purpose of determining whether it was confounding information or not.  I didn't make a determination that it was -- that any of this information was material confounding information.

BY MS. KOFKE:

Q    Understood.

Let's look at page 1.  There's a section called Pharmaceutical Segment.

A    One moment, please.

Q    Sure.

Page 135

A    Okay.  And you want to look at page 1, where it says: "Pharmaceutical Segment."  Okay.

Q    Correct.  And then it says, for the fourth-quarter, and going down a little bit in that paragraph: "Segment profit decreased 7 percent to $505 million.  This decrease was driven by generic pharmaceutical pricing and the company's ongoing investment in its Pharmaceutical IT platform."

Do you see that?

A    Yes.

Q    And then in the next paragraph, it says: "Segment profit for the year decreased 12 percent to $2.2 billion driven by generic pharmaceutical pricing, and to a lesser extent, the impact of the loss of Safeway and reduced levels of branded manufacturer price appreciation."

Do you see that?

A    I do.

Q    Are these disclosures about the performance of the pharmaceutical business confounding information that would need to be addressed in applying the damages methodology in your report?

MR. BURKHOLZ: Objection.  Asked and answered six times.

THE WITNESS: They might be.  I haven't

Page 136

made that definitive determination yet.

BY MS. KOFKE:

Q    What valuation tools would your methodology use to assign a portion of the residual return to this information about the pharmaceutical segment?

MR. BURKHOLZ: Objection.  Asked and answered before.  Outside the scope of his report.

THE WITNESS: All right.  So, like I said, I did not yet do a damage quantification or a loss causation analysis.  I can do that.  I'm certainly going to spend more time on it than I think the amount of time I'm allotted for answering this question.

But this is exactly the kind of information that lends itself to standard, traditional, commonly used, generally accepted valuation tools as the ones I listed in my report.  We have metrics here.  We have profit number affected.  I would want to -- I mean, we have a profit number here.  I mean, one could -- one might determine that it's reasonable to compare this profit number to what was expected and look at the valuation impact of a dollar profit surprise, taking into account that the company did say here that this surprise, negative surprise, was offset by solid performance from Red Oak Sourcing.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 137

So I wouldn't take all of that into account, but how profits and revenue impact the valuation of a company is standard valuation analysis.

BY MS. KOFKE:

Q   What valuation tool would you use to look at the impact of the generic pharmaceutical pricing challenges referenced here?

MR. BURKHOLZ:  I'm going to object.  This is now the seventh or eighth time you asked him for an answer to a question which is outside the scope of his report since it's a loss causation analysis. He's testified to that a number of times, and it's not fair to continue to ask him questions that are outside the scope of his opinion at this point.

MS. KOFKE:  Well, I completely disagree that trying to clarify how his damages methodology would be applied to the facts and circumstances of this case is outside the scope of his report, given that his opinion is that this damages methodology can be applied classwide, consistent with lead plaintiff's theory of liability in this case.

So I think it's highly relevant to understand exactly what the parameters are of the damages methodology that he's proposed.

Page 138

MR. BURKHOLZ:  And he's testified seven or eight times about the tools that he could use, that it would involve a loss causation analysis to do a disaggregation, and he hasn't done it at this time and that he would do it at a later stage when it's required.

MS. KOFKE:  Well, I guess we can disagree on what's required and what isn't at this stage.

MR. BURKHOLZ:  Well, you're asking him to speculate about something he hasn't looked at in the loss causation context, and that's not a fair question for him at this point based on his report.

MS. KOFKE:  Well, I disagree with you.

BY MS. KOFKE:

Q   Dr. Feinstein, do you agree that Cordis was a small portion of Cardinal Health's business?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  No.

BY MS. KOFKE:

Q   Why not?

A   Well, I mean, they paid $1.9 billion for it, and the market cap of the company is about 25 billion, so that's a sizable, substantial portion.

Q   Let's look at Exhibit 1, your report, at page 5, paragraph 21.

Page 139

A   Can we look -- I'm sorry.

Where are we looking?

Q   Paragraph 21 on page 5 of your report.

A   Okay.

Q   So this indicates that for fiscal year 2015, Cardinal reported total net revenues of 102.5 billion, correct?

A   Yes.

Q   And this paragraph also indicates that 89 to 90 percent of Cardinal Health's net revenues during fiscal year 2015 to 2018 came from the pharmaceutical segment and 10 to 11 percent came from the medical segment; is that right?

A   Yes.

Q   And Cordis was part of the medical segment, correct?

A   That's right.

Q   During the same period, the pharmaceutical segment accounted for between 75 percent and 84 percent of the company's non-GAAP operating earnings, correct?

A   Can you say that again, please, slower?

Q   Sure.

During the same period, the pharmaceutical segment accounted for between 75 and 84 percent of

Page 140

the company's non-GAAP operating earnings; is that correct?

A   Right.  That period being fiscal years 2015 through 2018.

Q   Correct.

Are you aware that plaintiff alleges that the annual revenues of Cordis in 2014, prior to the acquisition, were $780 million?

A   You know, these kind of numbers I like to see rather than hear.  I'm trying to follow, but I'm having a little trouble.  So can you say that again, please?

Q   Sure.

I'm just wondering if you recall that plaintiff alleges in the complaint that Cardinal's revenues in 2014 were approximately $780 million.

A   In 2014?

Q   Correct.

A   I don't recall that number in the complaint.

Q   Well, if plaintiff is correct that it's 780 million -- strike that.

If plaintiff is correct in the allegation that Cordis accounted for approximately 780 million in revenues in 2014 -- actually, strike that again.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 141

If plaintiff is right that Cordis had approximately 780 million in revenues in 2014, then when Cardinal purchased it, it would have been 1 percent or less of Cardinal Health's total revenues, correct?

A Not necessarily.

Q Why not?

A I mean, the company made representations about how they would run Cordis differently and that it would be earnings accretive and there'd be cost savings. I didn't delve into what the impact of the company's representations would be on revenue, but it's possible that when I do that analysis I'll see that it's not exactly 1 percent, or I'll know better whether it's more or less.

Q At this point in time, do you have any sense of what percent of Cardinal Health's revenues were accounted for by Cordis during the class period?

A I don't think I have that in the report, but what's more relevant that I do have in the report is a linkage between what was announced in the corrective disclosures and the earnings surprise that shocked the market when there were corrective disclosures.

Page 142

Q Yeah, my question is a lot more basic than that. It's just whether you know what percent of Cardinal Health's revenues were accounted for by Cordis during the class period.

A It wasn't relevant or germane to my analysis, so I didn't record it in the report. The documents I reviewed certainly had that information, so at one point I did review it. I don't remember it because it's not in my report. It's not in my report because it wasn't necessary for the conclusions I drew and the analysis I did for market efficiency and the damage model.

Q So at this point, you haven't done any analysis to examine the size of Cordis compared to the rest of Cardinal Health because it wasn't germane to your work.

A I wouldn't say that I didn't do any. I do have excerpts in my report about the -- from the corrective disclosures, and they're -- and they can be characterized as evidencing the importance of Cordis to Cardinal.

Q Let's go to the beginning of the class period.

At that time, why would news about Cordis be important to Cardinal investors, given its

Page 143

comparatively small size?

MR. BURKHOLZ: Objection to form.

THE WITNESS: It's got nothing to do with the scope of what I was asked to investigate. You can do a market efficient analysis on a company not involved in litigation at all. So it wasn't necessary to address those sort of questions in the course of assessing whether the market was efficient or whether or not the theory of liability made the out-of-pocket damage model the appropriate model.

So I can review -- I can answer that question, but not as I sit here now.

BY MS. KOFKE:

Q In constructing an inflation ribbon pursuant to your damages model, will it be important to understand the importance of Cordis to investors at different points in the class period?

A Well, it might be.

MR. BURKHOLZ: Objection.

THE WITNESS: Depends what you mean by "importance." I mean, yeah, it'll be important to know whether it was valuation relevant and whether what was happening at Cordis influenced the market's determination of the value of Cardinal stock. That would be important.

Page 144

BY MS. KOFKE:

Q Do you know if the importance of Cordis to Cardinal Health's performance changed over the course of the class period?

MR. BURKHOLZ: Objection. Outside the scope.

THE WITNESS: So how are you defining "importance"?

BY MS. KOFKE:

Q The value relevance to investors of Cordis.

MR. BURKHOLZ: Same objection. Outside the scope.

THE WITNESS: I'm pretty sure the value of Cordis -- I'm sure invest- -- from what I know now, it appears that investors did assess that there was a change in the value of Cordis during the class period.

BY MS. KOFKE:

Q Yeah, I think my question is actually going more toward the value of information about Cordis.

Do you think information about Cordis was possibly more -- strike that.

Do you think the value of information about Cordis to investors changed during the class -- during the course of the class period?

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 145

MR. BURKHOLZ: Objection. Outside the scope of his opinions -- efficiency opinion.

THE WITNESS: That's a quantification. That's a -- that's a quantitative question that I'd need to do quantitative analysis to answer. I don't have an opinion about it yet. I mean, I know how to go about that analysis, but I haven't done it yet.

BY MS. KOFKE:

Q   Do you agree that if Cordis became more --

THE COURT REPORTER: I'm sorry. There was a noise there. I missed a word.

MS. KOFKE: Sure. I'll start over.

BY MS. KOFKE:

Q   Do you agree that if Cordis became more important to Cardinal over time, then information disclosed about Cordis at the end of the class period could have a valuation impact that reflected the changed importance of Cordis?

MR. BURKHOLZ: Objection. Outside the scope of his opinions.

THE WITNESS: Well, you said "could," and at this point, anything's possible. I haven't done the analysis yet.

BY MS. KOFKE:

Q   Well, I'll revise my question.

Page 146

If Cordis became more important to Cardinal over time, would information disclosed about Cordis at the end of the class period have a valuation impact that reflected that changed importance?

MR. BURKHOLZ: Objection. Outside the scope.

THE WITNESS: Possibly, but not necessarily.

BY MS. KOFKE:

Q   So thinking about the August 2nd, 2017 corrective disclosure, does lead plaintiff allege that Cardinal Health should have disclosed all of the information in the August 2nd, 2017 corrective disclosure at the start of the class period on March 2nd, 2015?

A   No.

Q   With respect to the second corrective disclosure on May 3rd, 2018, has lead plaintiff alleged that Cardinal Health should have disclosed all the information in the May 3rd, 2018 corrective disclosure at the start of the class period?

MR. BURKHOLZ: Objection. Outside the scope of his opinion.

THE WITNESS: That's not what lead plaintiff is alleging. I mean, they -- I can go

Page 147

over it again what they are alleging, and what they are alleging should have been disclosed might have made those disclosures unsurprising when they did occur. But that's loss causation and damages analysis that I haven't done yet.

BY MS. KOFKE:

Q   Do you agree that if some part of the stock drop following the corrective disclosures was caused by information that could not have been disclosed at the start of the class period, then inflation related to that piece of information should not be part of the inflation ribbon at the start of the class period?

MR. BURKHOLZ: Objection. Outside the scope.

THE WITNESS: By way of principle, I don't agree with that. Because one would have to assess whether what couldn't have been disclosed but was disclosed would have still been as surprising had there been full disclosure earlier rather than what actually did happen.

BY MS. KOFKE:

Q   I guess -- I'm not sure if we're totally understanding each other.

If there was a fact that couldn't have been

Page 148

disclosed at the start of the class period because maybe the fact didn't exist yet, there comes a point in time where the fact existed and it allegedly could and should have been disclosed, and then at the end of the class period, it is disclosed and there's a stock drop.

Can you carry the part of the stock drop related to that fact all the way back to the beginning of the class period before the fact even existed?

MR. BURKHOLZ: Objection to the form. Outside the scope.

THE WITNESS: You very well might be able to, and I can explain why, if you would like me to.

BY MS. KOFKE:

Q   I would actually.

A   All right. Well, let me try an analogy to get the basic point explained.

So let's say, you know, I'm a Red Sox fan. I like the Boston Red Sox baseball team here, and let's say that a news reporter asks the manager of the Red Sox, "How's the team feeling today?" And he lies and says that they're all feeling fine, but in fact they all are suffering from the flu really badly.

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 149

Well, now they play the game and the Red Sox lose to the Yankees ten to nothing. Well, nobody could have known that the score would be ten to nothing or exactly how much the Yankees would beat the Red Sox by because that hadn't happened yet. Had the truth been told rather than the misrepresentation, the fans would not have been surprised by the loss.

So it's a similar thing. I mean, what matters for the inflation ribbon and whether or not you can carry the inflation that's dissipated at the end back to the beginning is whether or not what ultimately happened, even if it hadn't happened yet at the start of the class period, what ultimately happened wouldn't have been surprising when it did happen if the truth had been told from the outset.

That's an element of loss causation and damages analysis that I would do but haven't yet done. And I hope the analogy was clear to explain that even things that haven't happened yet might not have been surprising had the truth been told.

Q    That was actually extremely helpful.

So you agree, though, that you couldn't carry the inflation back to before the team had the flu?

Page 150

A    Well, now you're going to challenge my hypothetical the way I challenged yours.

They -- you can certainly carry it back to when the misrepresentation was made. Because at that point they had the flu. You could not carry it back to before there were any misrepresentations and omissions, I would think.

Q    Does the Amended Complaint allege that the defendants' knowledge about the issues affecting Cordis changed over the course of the class period?

A    I just wish your questions were a little shorter. By the end, I forget the beginning.

Can you say it again, please.

Q    Does the Amended Complaint allege that the defendants' knowledge about the issues affecting Cordis change over the course of the class period?

A    I think it does. I haven't done -- you know, none of that was relevant for -- for any of my conclusions, but I think they do acknowledge that defendants had more information after the acquisition than they did before.

But I think that also ties into the misrepresentation -- the alleged misrepresentation that they had done adequate due diligence.

Q    Let's look at the Amended Complaint.

Page 151

MS. KOFKE:  Can we mark that as an exhibit. I don't think we have yet. It's Tab 10.

- - -

(Feinstein Exhibit 10 was marked for identification.)

- - -

THE WITNESS:  Got it.

BY MS. KOFKE:

Q    Please look at page 24. I'm looking at the romanette 2 on that page.

A    Okay. What page? 24?

Q    Page 24. It's a paragraph that starts with (ii).

A    Got it. J&J.

Q    And it says, at the end of that paragraph: "In the first two and a half years following the acquisition, defendants discovered hundreds of millions of dollars in Cordis consignment and warehouse inventory."

Do you see that?

A    Yes.

Q    And then if you continue down on page 25 to the paragraph starting with "2," it says: "Defendants discovered during this period that Cordis had been carrying between at least $200

Page 152

million and $300 million in excess, obsolete, missing and/or unaccounted for inventory in its warehouses around the world."

Do you see where it says that?

A    Yes.

Q    So you'd agree that this indicates that defendants discovered hundreds of millions of dollars in Cordis inventory in the years following the acquisition; correct?

A    Well, I take the factual allegations as an assumption. I didn't -- I didn't verify this independently.

Q    You agree that defendants could not have disclosed something before they discovered it?

A    Well, generally, yes. But my understanding is the allegation with respect to that issue is -- the allegation is that they made a representation that they had done appropriate due diligence previously so that the market would have -- so it would be surprising to investors that they were just learning that then.

Again, that has nothing to do with market efficiency. You know, these specific facts -- or, rather, these specific assertions that if I were to do a loss causation and damages analysis, I would be

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 153

accepting as facts or assuming to be facts.

Q   You agree that defendants could not have disclosed what they learned about Cordis inventory in the years following the acquisition at the start of the class period?

A   Well, they could have disclosed that they didn't know or that -- again, I haven't verified any of these facts independently, so, I mean, I don't know what they did know and what they didn't know.

Look, as a general principle, you can't disclose what you don't know, but my understanding is that plaintiff's allegations are that they suggested to the marketplace that they did know what they needed to know.

Q   So how would your damages methodology parse the impact of an alleged misstatement about due diligence along with changing knowledge of the defendants over the course of the class period with respect to the specific inventory of Cordis?

How would you construct an inflation ribbon given these variables?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  Well, it takes more time than one day.  You know, we have a day for this deposition, and it would take more time than just

Page 154

this one day or just the time allocated to this one question to do it.

But I would track what was known when, what was said when, what the gap was between what the company told the public and what they could have told the public.  I'd take all those things into account.  If -- if -- I would assess the valuation impact of what they did know and didn't disclose and also what they didn't yet know and then later learned.  I mean, those things would be assessed using valuation tools.

But then also, you know, a lens to evaluate all of those findings under is the question of how much of what ultimately was disclosed would have been surprising to the marketplace had the full truth been known, including what the true nature of the due diligence was initially, and -- and based on valuation principles, what valuation impact that truth would have had at earlier points in time.

So, for example -- I haven't done this, but I could imagine it going this way:  If the allegation is that the company should have told the public that they didn't do due diligence or appropriate due diligence, they didn't investigate inventory levels and what was obsolete, if that's

Page 155

the allegation, we can use valuation principles to assess how the marketplace would have reacted to that disclosure at the start of the class period and also how they would have reacted to that disclosure coupled with what was found later.

It's altogether possible that the valuation impact of telling the marketplace that due diligence was not done would have been even greater than the drop in price when the disclosures actually were made.

BY MS. KOFKE:

Q   Is it your understanding that the alleged failure to disclose that adequate due diligence was not done was the concealment of a risk?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I have -- I mean, for the --

MR. BURKHOLZ:  Outside the scope.

Go ahead.

THE WITNESS:  Well, for loss causation and damages analysis, it's appropriate for the forensic analyst to assume the factual allegations of the plaintiff.  I haven't done that yet.  So -- so I'm not really in a position to be assuming any facts at all.  It wasn't necessary to assume any facts -- any of the factual allegations for conducting the market

Page 156

efficiency analysis.

And having said that, let me make sure I'm giving you a comprehensive answer by hearing the question again.

BY MS. KOFKE:

Q   Is it your understanding that the alleged failure to disclose that adequate due diligence was not done was the concealment of a risk?

MR. BURKHOLZ:  Objection.  Outside the scope.

THE WITNESS:  Well, I would -- it certainly creates risks to learn that due diligence hasn't been done, but it's really the concealment of a -- of a condition, of a current condition, not a risk of what might happen -- not only a risk of what might happen later, but it's the concealment of a current condition.

BY MS. KOFKE:

Q   You agree that failure to do adequate due diligence leads to the risk that one might discover things that one doesn't know?

A   That sounds reasonable.  If you disclose -- not doing due diligence creates risks.

Q   So by failing to disclose that one didn't do due diligence, one is hiding a level of risk

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 157

associated with a situation, correct?

A   That's not all they're hiding.  I would agree with that.  But they're also -- that's not all they're hiding.  And the risk that -- that's realized could be much worse.  The distribution of outcomes would include outcomes that are much worse than what actually happened as well as less worse than what actually happened.

Q   Do you recall that plaintiffs alleged that Cordis did not have sufficient inventory controls during the class period?

A   That's an allegation.  I understand that that's an allegation, and it's an allegation that they didn't disclose that.

Q   And does not having sufficient internal controls around inventory create risk for a business?

MR. BURKHOLZ:  Objection.  Outside the scope.

Go ahead.

THE WITNESS:  Yes.

BY MS. KOFKE:

Q   So do you agree that failing to disclose that a company doesn't have adequate inventory controls is failure to disclose a risk associated

Page 158

with that business?

A   Well, as you lawyers say, "including, but not limited to."  I mean, it would include that risk.  You know, what it -- the adversity it creates is that risk, but it's not limited to that risk.  I mean, it's a current condition that investors would -- if they knew about it, they would discount the value of the company currently, not waiting for the future to happen.

Q   Do you understand that at the merit stage of this case, the court could determine that some of the alleged misstatements are not actionable under the law?

A   That's possible.

Q   How would the damages methodology you propose to use calculate -- strike that.

How would the damages methodology you propose to use account for the circumstance where certain misstatements are no longer actionable?

A   That's -- this is precisely why -- one of the reasons why precisely I have not yet done the loss causation and damages analysis.  The record hasn't yet -- been completed yet.

So once I know what the actionable statements are, I can evaluate the evaluation impact

Page 159

and, frankly, only then -- well, I don't want to say "only then."  I mean, I could do it on a hypothetical basis, and I can present an array of outcomes depending on what's determined.

But it's -- one of the reasons for waiting for the development of the record before you do the loss causation and damages analysis is to gain clarity as to what are the misrepresentations that need to be evaluated.

Q   So as part of your damages methodology, will it be necessary to attribute inflation to each of the misrepresentations that remain in the case?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  They don't need to be, like, on a one-for-one basis.  You know, the damage dollars or cents don't have to be allocated on a one-for-one basis to each particular misrepresentation.  That's not how financial markets process information generally, and that's not what would be necessary in a loss causation or damages analysis.

I would -- whatever the -- whatever the collection of actionable misrepresentations and omissions ends up being -- well, I can -- I would -- I could evaluate their -- their collective effect on

Page 160

the stock price.  And, in some circumstances, if it's necessary to and if I'm asked to, I can evaluate what the inflation and damages would be with and without some subset of them.

I think you said Motion -- I thought there was already a Motion to Dismiss Order, right?

BY MS. KOFKE:

Q   There was.

A   So, again, I'm not making a -- I'm not drawing a conclusion or representation about further Motion to Dismiss outcomes.

MR. BURKHOLZ:  Lauren, if there's a good break, we've been going for almost 55 minutes.

MS. KOFKE:  That's great.  Do you want to take a lunch break?

MR. BURKHOLZ:  Steve, it's up to you.  Do you want lunch?

THE WITNESS:  Short break?  15 minutes?

MS. KOFKE:  Perfect.  Back at 2:00.

THE VIDEOGRAPHER:  Going off the record at 1:45 p.m.

(Recess.)

THE VIDEOGRAPHER:  Going on the record at 2:10 p.m.

BY MS. KOFKE:

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 161

Q   Under your damages methodology, can class members recover damages based on the impact of decisions about how to run the Cordis business?

MR. BURKHOLZ: Objection to form.

THE WITNESS: That's not what the damage model captures. What the damage model captures is how much they overpaid as a result of the alleged misrepresentations and omissions and, of the amount they overpaid, how much they lost if -- if and when during their holding period they -- there were corrective disclosures correcting the misrepresentations and omissions that have inflated the stock price.

BY MS. KOFKE:

Q   How would your damages methodology distinguish between impacts on the price of Cardinal Health stock due to the alleged fraud versus other business decisions that impacted Cordis?

MR. BURKHOLZ: Objection to form.

THE WITNESS: Well, that's what it would do. It would look to investigate whether the stock price was moving because of what had been concealed from them previously or, alternatively, something else.

BY MS. KOFKE:

Page 162

Q   Let's look at the Amended Complaint, which we've already marked as an exhibit.

A   Okay. Got it.

MS. KOFKE: Which exhibit is that?

MR. OBMASCIK: Exhibit 10.

MS. KOFKE: Exhibit 10.

BY MS. KOFKE:

Q   Page 29, paragraph 67(d)(i).

A   Got it.

Q   It says here: "Cordis did not have enough sales representatives to service customers when Cardinal acquired Cordis, and many sales representatives also left after the acquisition. Cardinal then failed miserably to train its own sales representatives to sell Cordis's products, which were much more complicated and difficult to understand than Cardinal's legacy products and Access Closure products. In order to sell Cordis products, Cardinal's salespeople were required to be able to accurately advise healthcare professionals on their use and be able to proctor procedures using Cordis products. Properly training Cordis sales representatives required months and up to an entire year. Cardinal, however, trained its sales representatives over a period of two weekends in

Page 163

Atlanta, which was not nearly sufficient time to train them in Cordis's full cardiovascular and endovascular portfolios. In addition, Cardinal did not train its representatives to know Cordis's competitors' products, which was critical to retain customers."

Under your methodology, can members of the proposed class recover damages from any decline in Cardinal Health's stock price caused by business impacts --

THE COURT REPORTER: I'm sorry. You're going way too fast.

MS. KOFKE: All right.

THE COURT REPORTER: I'm still trying to catch up in the reading and then the question.

MS. KOFKE: Got it. Let me know if I should pause for a moment.

THE COURT REPORTER: Now ask your question, please.

MS. KOFKE: Thanks.

BY MS. KOFKE:

Q   Can members of the proposed class recover damages from any decline in Cardinal Health's stock price caused by business impacts from the alleged failure to adequately train salespeople.

Page 164

MR. BURKHOLZ: Objection. Outside the scope of this report.

THE WITNESS: Right. I haven't done the full damages analysis or even the loss causation analysis, but possibly. It depends on whether or not the market's ignorance of this was borne of the misrepresentations and omissions and also whether or not the outcome of this would have been surprising or not surprising had there not been any misrepresentations and omissions.

So, in other words, I mean, it's altogether possible, and I think it's the allegations of the plaintiff, that if -- if there had been full, forthcoming disclosure at the outset, a lot of the adversity that later unfolded would not have been surprising to the market and, therefore, the drop in value that occurred when the truth came out is actually traceable to the initial misrepresentations and omissions.

BY MS. KOFKE:

Q   I just want to make sure I understand. Are you saying, under your damages methodology, if the failure to train salespeople that's alleged here happened, and we're -- we contest that it happened, but assuming it did happen

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 165

and it negatively affected Cordis earnings and that affected the stock price, could class members recover for that?

A   Well, I have to investigate it further.  I haven't done the analysis yet, but it's not outside the realm of reasonability.  If the company told the public, told investors that the integration was on track and because they said that, this kind of information -- these kind of conditions were concealed from the public and not disclosed.  They were omitted from the public, and then when the market learns exactly this, the price goes down, that would fit the definition of inflation and damages caused by misrepresentations and omissions.

Q   So you're saying if the company failed to disclose failure to train salespeople, then any stock price decline flowing from the business impact of the failure to train salespeople is recoverable as damages?

MR. BURKHOLZ: Objection.  Outside the scope.  Asked and answered.

THE WITNESS:  Right.  You know, I'm not a lawyer, and I haven't done the damages -- the economic analysis of damages and loss causation yet.

But even from an economics point of view,

Page 166

it seems reasonable that if -- if -- if it's determined that the company had an obligation to disclose to the investors the true condition of what was -- of the integration and that the market was unaware of the true condition of the integration because of the misrepresentations and omissions and the true condition contained or comprised what's written in this paragraph, then the losses ultimately realized on account of this would only have been unanticipated because of the misrepresentations and omissions, and, therefore, the losses that came of this would -- would have been artificial inflation and, therefore, damages.

I don't know for sure because I haven't done the analysis.  I'm just saying it's the kind of thing I will investigate if I'm doing an analysis of damages and loss causation.

BY MS. KOFKE:

Q   Have you applied the damages methodology described in your report to actually calculate damages in other cases involving 10b claims?

A   Yes.

Q   How many cases?

A   Many.  At least 50.  About maybe -- probably a hundred.

Page 167

Q   In any of those cases, were you not able to disaggregate the impact of confounding information?

A   Well, sometimes -- well, sometimes, in order to provide a conservative estimate of damages, I'll choose not to if in fact the confounding information had a positive impact on the stock price.

So I would say that, you know, here's some information that's confounding but it actually caused the stock price to go up, and so if we just not disaggregate it, what we would -- what I then would conclude as being, you know, the net impact -- what I would then conclude as being the impact of the corrective disclosure is actually a conservatively low estimate.

So I don't think there's ever been a time when it was just absolutely impossible, but there have been times when I've chosen not to just to make the estimate conservative and, you know, to kind of bridge the gap between plaintiff's and defendant's experts.

Q   In connection with your opinion on market efficiency, you conducted an event study, correct?

A   Yes.

Q   And as part of that event study, you ran a

Page 168

regression analysis of the return on Cardinal stock during the proposed class period; is that right?

A   Numerous regressions.  It was rolling regressions.

Q   Let's look at Exhibit 1, your report, page 152.  It's Exhibit 8 to your report.

A   Got it.

Q   Can you explain what is reflected in Exhibit 8 to your report?

A   Let me go to the first page of it, and that would be page 152.

So for every -- when it says "Date," that's the date of the -- essentially the event date being tested.  For every event date being tested, a regression is run on the year of data preceding that date.

So let's skip -- so the first column is the date of the event being tested.  So the very first entry is March 2nd, 2015.  The next column is the Cardinal stock price on the trading date before the event date.  So this would have been one day before March 2nd, 2015.

The next column is whether or not there was a dividend paid on March 2nd, 2015.  Here it says there was not.  It's a zero because there was not.

LA Sheriffs' Pension
v. Cardinal Health Inc.
REVISED
FINAL
May 5, 2022
Steven Feinstein, Ph.D.

Page 169

If you look down, March 30th has a dividend. A dividend was paid on that day. Actually, it's the ex-dividend date is March 30th for that 34 cent dividend -- I made a mistake.

The 89.52 on the first line is the closing price on March 2nd. The fourth column, 87.99, is the closing price the day before. So everything I said about the day before, that's in the fourth column.

The fifth column, Cardinal Logarithmic Return, that's a measure of the return. It's similar to the percent return, but it's slightly different. It's the logarithm of the ratio of the March 2nd price to the price before March 2nd. It's -- I have an appendix explaining logarithmic returns, but they're very similar to percent price re- -- percent price changes.

The next column is how the market did that day, the overall stock market. I used a comprehensive market index provided by CRSP that includes a valuated average of all the returns of all the stocks traded in the United States on public exchanges.

The next column after that is the Sector Index. It's in the report. I think it's -- it's a

Page 170

healthcare sector index.

The next column after that says: "Explained Return." That's the return from -- that's the part of the return that -- according to the regression that was run, that's explained by an intercept term, the market index, and the sector index. So what that says is that according to the regression, had there been no company-specific information that day, Cardinal would have risen .72 percent.

The next column after that is the Residual Return, how much above and beyond .72 Cardinal -- Cardinal's return was. There's a little bit of rounding error that's in these numbers, but there's no rounding error in each individual number. The -- Cardinal's logarithmic return was 1.72 percent. The explained return is .72 percent. The difference between the two is 1 percent, or here it's 1.01 percent residual return.

The next number takes the residual return. The t-statistic is the residual return divided by the standard error of the regression. So it normalizes the residual return so that you can determine whether it's an extreme residual return or not such an extreme residual return.

Page 171

A 1.1 t-statistic is a pretty sig- -- it's a pretty large residual. It indicates that the residual return is very large, but not so large that it would happen fewer than 5 percent of the time based on random volatility alone.

And then the rest of the exhibit -- I think we have 800 entries here -- is the exact same analysis for every other day in the class period.

Q   What is the significance of the t-statistic for a date that's greater than 1.96? Is that the 5 percent level you were referencing?

A   Right. So a random chance alone could cause a t-statistic greater than 1.96 5 percent of the time. So if you see a t-statistic -- and let's look at one. These are marked by asterisks.

Here, if you'd go down to April 30th, 2015, you have a t-statistic of negative 4.76. That's a very extreme t-statistic, and it would be very rare for that to happen on account of random volatility alone. That's what the asterisk means. That's what any number bigger than 1.96, either positive or negative, means.

It would be very rare for random volatility to be able to cause a t-statistic so extreme. Because it's very rare, we can rule out random

Page 172

volatility as the cause of the return that day. So because we control for market index and control for sector index and we can also rule out random volatility, the reasonable conclusion is that company information is what made the stock price move that day.

Q   What does it mean if a residual return is not statistically significant on a particular date when company-specific information was disclosed?

A   Well, it means that you can't rule out random volatility as having been the cause, but you also can't rule out anything else, like company-specific information.

So the test is indeterminate between deciding between whether it was random volatility or company-specific information responsible for the residual return.

Q   If you have a situation where the residual return is not statistically significant because the company-specific information disclosed on that date was not new --

A   That could be the reason. I mean, that's -- if the return is not statistically significant or the residual return is not significant, it may be because the information was

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 173

not new and, therefore, the market didn't react to it for the first time that day. They may have reacted to that information a prior day.

It's not to say that that information is irrelevant. That information, essentially, would be maintaining the stock price where it landed on account of the first time the information was disclosed.

Q If you have a statistically insignificant residual return on a date where company-specific information was disclosed, could it also mean that the information disclosed on that date was not important to investors?

A Well, first of all, I think the proper terminology is nonsignificant. Because even a nonsignificant return could be important. So we wouldn't say it's insignificant information or an insignificant return. It's just not significant.

Yeah. Another explanation -- and I write about this in the report. It could be that the -- yeah. A nonsignificant return could be because of the information not being important to investors, but we don't know.

Whether it's because it's -- you know, maybe it's information that was disclosed earlier.

Page 174

Maybe it's information that is countervailed. I mean, maybe it's extremely important, new information that would have driven up the stock price, but it's countervailed by negative news that same day, so the net effect is not significant.

I mean, there are a number of reasons why you might have a nonsignificant return, even if the information is important.

Q So just looking at the residual return does not tell you what information was causing the stock to move that day, within the universe of company-specific information that was released that day?

A I mean, that's fair to say. So you -- you would couple that statistical analysis with the news analysis to see, well, what information did come out that day and is that information generally believed to be material economic -- economic material information? Is it the kind of information that analysts cared a lot about in order to write about or that the news media picked up on? It would help you determine what company information was at play.

Q In forming your opinions in this case, did you examine whether the dates on which the alleged misrepresentations occurred showed positive

Page 175

statistically significant residual returns?

A No. It wasn't necessary. I mean, that's something to do during a loss causation or a damages analysis. It's not necessary during a market efficiency analysis.

Q Are you aware that, according to the event study results in Exhibit 8 to your report, 32 of the 37 alleged misrepresentation dates did not have residual returns that were statistically significant and positive?

A I was aware of the first one, March 2nd, but it's also not surprising to me that that's the case, given that it's information that runs contrary to what the market previously knew that moves the market, that moves the stock price.

And so once misrepresentations and omissions are established, if there are subsequent misrepresentations and omissions that are confirmatory to what was previously said or not inconsistent with what was previously said, they reasonably and often don't have the effect of moving the stock price a significant amount that day.

Q So that number, 32 of 37 misrepresentations, not having a statistically significant positive price impact, that doesn't

Page 176

strike you as surprising?

A Correct. That's typically the case. That's what we were talking this morning, about inflation maintenance or price maintenance. That's -- the fact that there's words for it and terms for it, means that it's a common phenomenon.

Q If the residual return on the date of an alleged misrepresentation was not statistically significant and positive, doesn't that mean that an event study based on that date cannot be used to estimate the impact of the alleged misrepresentation on Cardinal Health's stock price?

MR. BURKHOLZ: Objection. Outside the scope of his efficiency report.

THE WITNESS: No, not necessarily. Sometimes there could be other analysis that could indicate that even a return on a nonsignificant level was in fact caused by company-specific information.

So an event study and a t-statistic is one way to prove price impact. There are others.

BY MS. KOFKE:

Q In applying your damages methodology, if there were not positive, statistically significant price movements on the dates of the

LA Sheriffs' Pension
v. Cardinal Health Inc.
REVISED
FINAL
May 5, 2022
Steven Feinstein, Ph.D.

Page 177

misrepresentations, does that make the role of the event study results, based on the corrective disclosures, more important?

MR. BURKHOLZ: Objection to the form. It's vague.

THE WITNESS: Well, if the -- the theory -- economic theory tells you that you're more likely to see the valuation of information when it's -- or you're more likely to see the valuation impact of a misrepresentation when it's corrected than when it's made if when it was made it's confirmatory of what the market previously expected.

BY MS. KOFKE:

Q    So would you agree that the information you would get from an event study, based on the corrective disclosure dates, would be more valuable to the damages analysis than the information yielded from an event study on the dates of the misrepresentations?

MR. BURKHOLZ: Objection to the form. You can answer.

THE WITNESS: It depends. Depends on how the news came out. You know, it depends on what the actions and behavior of the parties involved were and how the market learned the truth.

Page 178

BY MS. KOFKE:

Q    Are you aware that according to the results of your event study set forth in Exhibit 8 to your report, the first date of an alleged misrepresentation that had a positive and statistically significant residual return was on August 2nd, 2016?

MR. BURKHOLZ: Objection to the form. Outside the scope.

THE WITNESS: I hadn't looked at that. It wasn't necessary to look at that.

BY MS. KOFKE:

Q    Well, does the fact that your event study shows that the first date of an alleged misrepresentation with a statistically significant and positive residual return was more than a year after the proposed class period began have any implications for application of the damages methodology described in your report?

A    No, not of the methodology. I mean, it's -- it's an incomplete observation. I mean, it's an observation, but it's not -- it's incomplete analysis. I mean, I would also want to know, you know, were there discussions of the acquisition prior to March 2nd. Were there rumors? Was there

Page 179

leakage? Was there any commentary? Did it appear in the press anywhere? What was the market led to believe?

I mean, you know, basically setting the stage. I would want to know how the stage was set for the first set of misrepresentations and omissions.

Q    So what tools would you use in applying your damages methodology to establish that there was artificial inflation in Cardinal Health stock prior to August 2nd, 2016?

MR. BURKHOLZ: Did you say August 2nd, 2016?

MS. KOFKE: Correct.

MR. BURKHOLZ: Okay.

THE WITNESS: Well, I would do the full news analysis to see what the market knew and when they knew it, what the company had -- was saying and when they said it, what the allegations were about the truth that could have been disclosed. I'd also look at analyst reports. I'd look at news reports.

I mean, what I generally do is I look at financial principles to assess whether what's alleged to have been concealed is economically material. I look at company statements, analyst

Page 180

statements before disclosures and analyst statements after disclosures, news reports in both periods, and -- and then the corrective disclosures. What did the market learn and what happened to the stock price when the market learned it?

BY MS. KOFKE:

Q    What would you use that information to do?

A    Well, just exactly what you asked: Assess whether there was inflation in the stock price at any particular point in time.

Q    Is there any kind of economic tool that you would use to determine the importance that should be given to any piece of information that you described?

A    I don't understand your question.

Q    Well, I assume you're not just planning to read news articles and disclosures and then come up with a number reflecting inflation in the stock.

What would bridge the gap for you between the information you get from your review of disclosures and news articles and coming up with an inflation number?

MR. BURKHOLZ: Objection to the form. Go ahead. You can -- you can answer.

THE WITNESS: Well, that's explained.

LA Sheriffs' Pension
v. Cardinal Health Inc.
REVISED
FINAL
May 5, 2022
Steven Feinstein, Ph.D.

Page 181

It's -- an event study on a corrective disclosure date is like a controlled experiment.  You can see what the valuation was with the information, which is after the disclosure, and what the valuation was without the information just prior to the disclosure.  If you also account for and control for confounding information, that's a way of putting a number on -- a valuation number on the information that was previously concealed and is now disclosed.  And then I would use all the other analysis.

I thought you were asking about once I had that number, how would I trace it back to see if it's the same number at the start of the class period or whether that number changed, and that's where I would look at company statements, financial principles, analyst statements, and the like.

BY MS. KOFKE:

Q   At this time, are you offering any opinion about whether any of the alleged misstatements contained new information that had not previously been disclosed?

A   No.

Q   Do you agree that for multiple of the dates on which lead plaintiff alleges there were misrepresentations, the complaint identifies more

Page 182

than one misrepresentation on each date?

A   I'm aware of that.

Q   How would your damage methodology parse the inflation impact of multiple misrepresentations on the same date?

A   But I think you're assuming it's necessary to parse it.  I'm not -- I haven't determined that it would be necessary to parse it.  It could be that -- you know, that any one of the misrepresentations would have been sufficient to cause the inflation or that the consistency among the misrepresentations is what caused the inflation.  I would look at that and assess that.

Q   If it was necessary to attribute inflation to different misrepresentations on the same day, how would your methodology do that?

A   Valuation principles and looking to see how -- what the market's reaction in terms of commentary and coverage was to company statements.  I mean, generally, if the company says, "A is true," and then they say -- I guess that's misrepresentation number one, and then they say it again, "A is true.  A is true."  You know, we can observe easily the impact of that collection, and we know that -- if the company says, "A is true," and

Page 183

then they immediately say, "A is not true," we know that there's going to be a different market reaction than if they say, "A is true," and then again say, "A is true."

So that would suggest that all of the misrepresentations caused the misrepresentation, and even if one of them wasn't an explicit misrepresentation, the others would have been sufficient to create and maintain the same level of inflation.

Q   Have you done any analysis at this time to determine if the alleged misstatements were either affirmative misstatements, omissions, concealment of a risk, or some combination thereof?

MR. BURKHOLZ: Objection.  Outside the scope.  Calls for a legal conclusion.

You can answer.

THE WITNESS: Well, I mean, just in the course of reading what I did read, it wasn't the scope of the project to make that determination, but it certainly seems like there were misrepresentations and omissions that are being alleged, both misrepresentations and omissions, and while they do create a risk, it seems pretty clear from the complaint that plaintiffs are focusing on

Page 184

conditions, current, contemporaneous conditions that were misrepresented, not exclusively the risks of things that might happen as a result of those current conditions.

BY MS. KOFKE:

Q   Let's look at the Amended Complaint, which is Exhibit 10.  Look at paragraph 41.

A   Okay.

Q   Do you see where it says:  "...on March 10, 2015, Cardinal presented at a Barclays Healthcare Conference.  At the conference, Barrett confirmed 'we realized given our history in supply chain management that there are tools that we can bring, and services that we can bring, and we can validate this now, that can reduce cost, eliminate waste, prevent redundancy, reduce errors...'"

Do you see that?

A   Yes.

Q   Was that an affirmative misstatement, an omission, a concealment of a risk, or some combination thereof?

A   Well, I assume you're not asking me to independently verify this statement as being any of those things, right?

Q   Is this alleging an affirmative

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 185

misstatement, omission, a concealment of a risk, or some combination thereof?

MR. BURKHOLZ: Objection. Calls for a legal conclusion. Outside the scope.

THE WITNESS: I think in order to answer that question, we have to look at paragraphs above, because it says: "For example..." this paragraph doesn't say -- this paragraph by itself doesn't say that it's a misrepresentation or an omission or that it -- or that it is a statement that makes other information an omission. I think we have to find out what it -- what it's an example of.

BY MS. KOFKE:

Q   Assuming that plaintiff's alleged that this is a false and misleading statement, do you have a view on whether it's an alleged affirmative misstatement, omission, or concealment of a risk?

MR. BURKHOLZ: Objection. Calls for a legal conclusion. Outside the scope of his efficiency report.

THE WITNESS: Well, I mean, speaking as an economist, because I don't want to be, you know, led into making legal -- offering legal opinions, but, you know, speaking as an economist answering the question as you asked, it seems that plaintiffs are

Page 186

alleging that this is a misrepre- -- well, I don't know. I've got to look further into it.

Whether this is -- whether they allege -- like I said, 41 doesn't tell you whether plaintiffs are saying this is false. It says, "For example," and I've got to look back to see what it's an example of. It could either be that they're alleging some of this was false or this is an opportunity for the company to disclose what was previously omitted.

BY MS. KOFKE:

Q   Let's look at paragraph 67 on page 23. It says: "Defendants' statements alleged in paragraphs 31 to 65 were materially false or misleading at the times they were made, and/or omitted material information at the time required to be disclosed."

Does that help answer the question?

A   Absolutely not. It's exactly what I was thinking when I said that it's not clear. I mean, here in 67 they're saying it's either false or misleading or set the groundwork for there being an omission -- material omission.

Q   Let's look back at -- I'm sorry. Were you finished? I didn't mean to cut you off.

A   I mean, I think what plaintiffs are saying

Page 187

here is that this statement would have misled the market or would have continued the market to be misled about the condition of the integration, but whether it is false or alternatively misleading or alternatively opens the door such that omissions should have been corrected at that time, I can't tell without further research and analysis and --

Q   What about the last statement in paragraph 41? It says: "On an April 30, 2015 Cardinal earnings conference call for Q3 2015, Kaufmann confirmed, 'in FY17, the first full year post-close, we expect the transaction to be greater than $0.20 accretive and increasingly accretive thereafter. We still expect operational synergies of at least $100 million annually by the time we exit FY18.'"

Is that an alleged affirmative misstatement, omission, concealment of a risk, or a combination?

MR. BURKHOLZ: Objection to the form. Asks for a legal conclusion. Outside the scope of his report -- his current report.

THE WITNESS: I would defer to the paragraph in the 60s that we just read. Plaintiffs themselves described it as being false or misleading or creates an actionable -- an actionable omission.

Page 188

BY MS. KOFKE:

Q   Let's look at your report, Feinstein Exhibit 1, at page 152.

A   Page 52?

Q   I'm sorry. 152.

A   Paragraph 152?

Q   Page 152. So we're back in Exhibit 8 of your report. Page 152.

A   Okay. I'm there.

Q   If you look at April 30th, 2015 --

A   Yes.

Q   -- there's a t-statistic of negative 4.76 associated with that date.

Do you see that?

A   I do.

Q   And that indicates that there was a statistically significant negative residual return on April 30th, 2015, correct?

A   Correct.

Q   And a negative statistically significant residual return is inconsistent with the conclusion that the alleged misstatements on that date introduced inflation into Cardinal Health's stock price; isn't it?

A   No.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 189

MR. BURKHOLZ: Objection to the -- I'm going to object to the form. It's outside the scope of his report.

Go ahead.

THE WITNESS: It's not inconsistent.

BY MS. KOFKE:

Q   Why not?

A   Maybe the stock price would -- I mean, first of all, I have to look at the facts. I don't remember the facts about April 30th specifically. Nonetheless, the price could fall, and on account of misrepresentations and omissions, it might not have fallen as much as it otherwise would have but for the misrepresentations and omissions.

I've seen a number of cases where, you know, there's bad news, and in order to try to staunch the effect of the bad news, a company will make misrepresentations or omissions. I don't know if that happened here, but it certainly could have.

Q   Do you agree that even if there is a statistically significant price impact on the date of a misstatement, you would still have to analyze the information that was disclosed on that day to determine whether the alleged misstatement caused the price to increase?

Page 190

MR. BURKHOLZ: Objection to the form. Outside the scope.

THE WITNESS: I think you're -- I think you're asking if there's a statistically significant increase -- is that what you said?

BY MS. KOFKE:

Q   Correct.

A   I would need to look at the news in order to assess if it was the news that made the stock price increase.

Q   The alleged misstatement?

A   I would have to look at the news to assess if it was a misstatement that made the stock price increase.

I -- I think I have to say yes. I mean, you'd want to know if there was any news, so you'd want to look at the news before drawing a conclusion. You'd want to know what the news was before drawing a conclusion, at least that. I mean --

Q   Yeah, just to clean up the record a bit because we had some back and forth, so you agree that even if there is a statistically significant positive price increase on the date of a misstatement, you would need to analyze the news

Page 191

that was disclosed on that day, other than the misstatement, to determine whether the misstatement caused the price to increase?

MR. BURKHOLZ: Objection to the form. Outside the scope.

THE WITNESS: That's not what you said before, and that's not what I agreed to. You said "examined." I agreed that you would need to examine what news occurred that day before drawing a conclusion. How it's examined, that depends on the nature of the news.

BY MS. KOFKE:

Q   But you agree that the other news disclosed on that day would need to be examined to reach a conclusion as to whether the alleged misstatement caused the price to increase on that day?

A   Right. I would agree with that.

Q   Is there any securities litigation where you've proposed a damages methodology for a Section 10b claim that's different than the method you proposed in this case?

A   Now, are you talking about the damage model that I've identified, or the specific implementation of the damage model?

Q   The damage model.

Page 192

A   No, not that I can recall.

MS. KOFKE: Let's mark Tab 20 as the next exhibit.

- - -

(Feinstein Exhibit 11 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Do you have that exhibit?

A   I have it.

Q   You have it? Okay. I wasn't sure if you did.

Is this the report that you submitted in the Ohio Public Employees Retirement System litigation involving Freddie Mac?

A   It's one of the reports.

Q   Let's look at page 41.

MR. BURKHOLZ: Can you share screen that, Lauren, please, the document you're using?

MS. KOFKE: We'll try to do that now.

MR. BURKHOLZ: Thank you.

MS. KOFKE: Are we able to do that?

MR. BURKHOLZ: Thanks.

BY MS. KOFKE:

Q   We're on page 41, paragraph 149. There's a

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 193

Section IX of this report called "Per Share Damage Methodology."

Do you see that?

A   Yes.  Section 10(b) Per Share Damage Methodology.

Q   Are you on page 41 of the current screen?

A   Okay.  It's called "Per Share Damage Methodology."

Q   Okay.  I wanted to make sure that we were looking at the same thing.

So this section runs from page 41 to page 45, and I'm going to ask you a couple questions about it.  So if you would just take a minute to look it over.

Let me know when you're ready.

A   Okay.  I'm ready.

Q   Is the damages methodology that you proposed in this report the same as the methodology you proposed to be applied in this case?

A   The model -- the damage model is the same.  The methodology is more -- is articulated with more specificity in the Cardinal report than in the Freddie Mac report.

Q   How is it articulated with more specificity in the Cardinal report?

Page 194

A   Well, I can give you numerous examples, but for one, the Cardinal report names valuation tools; whereas, the Freddie Mac report simply said the full range of valuation tools and didn't actually give examples of specific valuation tools.  That's one example.

Q   Are there any other examples of how the damages model is articulated with more specificity in the Cardinal report than the Freddie Mac report?

A   Well, when people ask me to do that kind of comparison, I usually use comparison tools.  I can do it here, but it's going to be somewhat slow.  I'll do it if you ask.

Q   So just so I understand, so you're saying the model is the same.  You just described it differently in the Cardinal report than the Freddie Mac report?

A   Well, I not just describe it differently, but describe it with more particularity in the Cardinal report.  I mean, if you recall the criticism from the judge in the Freddie Mac report was that I didn't specify in advance the kind of tools that I might apply -- the kind of valuation tools I might apply to deal with confounding information, for example.

Page 195

So I was careful subsequently in subsequent reports, including Cardinal, to do that.

I also am having a little trouble putting these two reports side by side, but I seem to recall that I also pointed out in -- well, let me not speculate.  Let me look for sure.

I'm having a little bit of difficulty putting them side by side, and that's what I really need to do.

Okay.

Q   So do you, at this point, have your report side by side with the Freddie Mac report?

A   Well, they're both mine, but I have the Cardinal report side by side with the Freddie Mac report.

Q   Fair enough.

A   I -- okay.  Well, for one thing, paragraph 141 in the Cardinal report points out, for the benefit of the court and all interested parties, that the out-of-pocket damage model is used to compute damages in virtually all Section 10(b) class action security cases and is acknowledged as the appropriate model in numerous legal cases and in published legal scholarship, and I provide citations to support that point.  I didn't have that

Page 196

additional support in the Freddie Mac report.

Q   Anything else that you see as an additional clarification in the Cardinal Health report versus the Freddie Mac report?

A   Can you point out in the Cardinal report -- let me just check to see if it's here in Freddie Mac.

Right.  I point out, in paragraph 145, that valuation -- of the Cardinal report, that "valuation analysis is undertaken continuously, every day, for virtually every publicly traded security and these tools address the very complexities that could potentially be encountered in the course of computing inflation and damages in this case."  The Cardinal case.

"Valuations assuming alternative scenarios are commonly conducted by analysts and investors."

So I'm pointing out, in the Cardinal case, that there's nothing unusual or highly esoteric about the valuation tools that would be brought to bear to address any valuation issues in the computation -- necessary in the computation of damages.  I'm not done.

Then 146 lays out the tools, the valuation tools, names them.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 197

Q    Are there clarifications in the Cardinal Health report as compared to the Freddie Mac report?

A    Yes, there are.

Q    Where?

A    The -- the Cardinal report explains that any valuation analysis that needs to be done in the computation of damages would apply on a classwide basis commonly for all class members.  So it doesn't create any differences among class members.  There's no different treatment needed for different class members.  That's in 147(i) -- well, actually, no.  That's also in Freddie Mac.

MR. BURKHOLZ:  Lauren, if there's a good break point in the next five minutes or so, we've been going almost an hour.

MS. KOFKE:  It would be great if we could just finish up this line of questions, which I think should be almost done.

BY MS. KOFKE:

Q    Is there anything else that you see that is a clarification in the Cardinal Health report as compared to the Freddie Mac report?

A    I'm not done comparing them.

So, like I said before, the model is the commonly used out-of-pocket damage model as modified

Page 198

by case law and statute.  It's really the explication of the model that I think is better in the Cardinal report.

The -- I was -- I actually was correct.  The (iii) under what's paragraph 147 in the Cardinal report is not in the Freddie Mac report.  So it makes more clear again that, you know, the value -- the dealing with confounding information or anything else that requires the application of valuation tools is common on a classwide basis.

The -- I'd like to finish to give a complete answer.

Q    All right.

A    Okay.  I'm finished.

Q    So other than what you said already -- well, strike that.

Other than what you've described thus far, are there any other clarifications in the Cardinal Health report that weren't in the Freddie Mac report, based on your review during the deposition?

A    I want to say based on this very quick cursory review during the deposition, I think I've laid out the differences in the explication.

Q    Other than listing the names of the valuation tools in the Cardinal Health report, is

Page 199

there any difference between the two reports in terms of the detail with which you describe how you will apply the damages methodology?

A    No.  I think that's an unfair way to pose a question.  You're saying "Other than the detail, is there any additional detail?"  There's plenty of additional detail in my explication in the Cardinal report.  I wrote the extra detail to specifically remedy what the judge found lacking in the Freddie Mac case.  So there's a lot of extra detail, abundant extra detail provided about how the model would be implemented and even above and beyond that detail, we've been talking about additional details all day today.

So I think it's unfair to say, "aside from the extra detail, is there any additional detail."  There is additional detail in the Cardinal explication.

Q    Do you agree that neither the Cardinal Health nor the Freddie Mac report identify which valuation tools will actually be needed in the case at issue?

A    I disagree with your semantics -- your use of the semantics here.  No, I do disagree that the valuation tools are not identified.  I have

Page 200

identified the valuation tools.

Q    But in both the Freddie Mac and the Cardinal Health report, you don't reach an opinion as to whether one or all or any of those valuation tools, other than an event study, may actually be needed in the case?

A    I've been very clear all day today and in my report, the Cardinal report, that if valuation analysis needs to be executed, these are the valuation tools that can be used to do so.

MS. KOFKE:  Shall we take a break?

MR. BURKHOLZ:  Yeah, for ten minutes would be great.  Thanks.

THE VIDEOGRAPHER:  Going off the record at 3:11 p.m.

(Recess.)

THE VIDEOGRAPHER:  Going on the record at 3:24 p.m.

BY MS. KOFKE:

Q    Let's go back to your Feinstein Exhibit 1, your report, at page 41.

A    Got it.

Q    Okay.  In paragraph 146, it says that among the commonly used valuation tools that are available, is literature regarding valuation effects

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 201

of factors such as mergers, acquisitions, and impairments.
Do you see that?
A   Yes.
Q   Did you consider any of that literature in forming your opinions in this case?
A   Yes.  The opinion that that literature's available to assist with valuation issues.
Q   Let's look at page 58 of your report.  This is Exhibit 1 to your report.  There's a section called "Academic and Professional Literature."
Do you see that?
A   Yes.
Q   Does this section contain a list of the academic and professional literature you considered in preparing your report?
A   No.  When I said that and wrote that, I was relying on my academic training, and, you know, my mastery of the finance -- economic finance literature.  I know it's there.  I didn't specifically read any article solely for writing this particular report.
Q   That's exactly what I wanted to clarify.
So this section of your report in Exhibit 1, Academic and Professional Literature,

Page 202

lists the academic and professional literature that you considered in preparing your report in terms of specific articles that you considered?
A   Well, articles that I cited.  Articles that I read specifically for the contents of this report.  I mean, I didn't write every article that I know about that informs my background knowledge and qualifies me to write a report like this.
Q   Is the literature regarding the valuation effects of mergers, acquisitions, and impairment listed in Exhibit 1 to your report?
A   It's an extensive literature, so, no, not all of it.
Q   Are any of the articles under Academic and Professional Literature in Exhibit 1 to your report part of the literature you were referencing with respect to mergers, acquisitions, and impairments?
A   The very last part of your sentence, with respect to what?  Mergers, acquisitions, and impairments, is that what you said?
Q   Correct.
A   Most likely.  Let's find one.
I'm sure it's mentioned in the William Beaver book Prentice Hall, 1998, mergers, acquisitions, and/or impairments.

Page 203

Q   Which -- where are you?
A   Financial Reporting:  An Accounting Revolution, William Beaver, on page --
Q   What page is that on?
A   58.
Q   The one that's called Information Content of Annual Earnings Announcements?
A   No.  The one below that.
Q   Oh, the one called Financial Reporting:  An Accounting Revolution?
A   Right.  But I'm not done.
I think Reilly/Brown probably has something on mergers and acquisitions.
Q   What page are you on?
A   The next page, 60.  Page 60.  Organization and Functioning of Security Markets of Pearson from the CFA curriculum.
Okay.  Those are -- those are two.
Q   Is it correct that there is a literature related to mergers, acquisitions, and impairments that you were referring to in paragraph 146 that is not included in Exhibit 1 to your report?
A   Of course.
Q   And it's that broader literature that is not referred to in Exhibit 1 to your report that you

Page 204

might draw upon to analyze damages in this case?
A   Well, I'm not sure it's not referred -- I think I just pointed out two sources that probably reference the literature.  I'm trying to understand your question.
There's definitely a literature on mergers and acquisitions and -- mergers and acquisitions and there's a literature on impairments and there's a literature on how these effects -- how these factors affect valuation, and I think some of that literature is referenced by some of the sources I do have listed here.
But of course I don't have the entire bibliography of the extensive literature cited in my report.  I was citing that I know that there is this literature and I'm familiar with it.
Q   What does the literature on mergers and acquisitions say?
MR. BURKHOLZ:  Objection to form.
THE WITNESS:  There are -- there are courses.  There are introductory courses and advanced courses on mergers and acquisitions.  There are dozens of books.  There are many dozens of articles that talk about the effects of mergers, acquisitions, what can go right, what can go wrong,

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 205

and so on.

BY MS. KOFKE:

Q   Are you familiar with the literature on the risks of acquisitions?

A   It's a component of the literature on acquisitions, yes.

Q   What does the literature say about risks of acquisitions?

MR. BURKHOLZ:  Objection.  Outside the scope.

THE WITNESS:  Well, it says that it's important to understand the kind of things that plaintiffs are -- among other things, it says that, you know, the facts of the sorts that plaintiffs are alleging were concealed are material -- economically material, are important.

There's a literature -- there's a number of articles addressing what's called the hubris hypothesis that points out that usually acquirers do not create value when they acquire, and that literature tells you when they will create value and when they won't create value and what an investor should look for to determine that an acquisition will be value creating as opposed to value destroying, will be earnings accretive rather than

Page 206

not, whether there will be synergies or not.

It tells you -- it tells the investor what kind of information to watch out for and listen for.

BY MS. KOFKE:

Q   What does the literature say about the success rate of acquisitions?

MR. BURKHOLZ:  Objection.  Outside the scope.

MS. KOFKE:  I'd just like to clarify.  How is it outside the scope when I'm asking him about a literature that he refers to in his report?

MR. BURKHOLZ:  Because he's referring to literature that -- that he will use at a later date for any -- if there is any valuation changes that he has to make on the corrective disclosure dates.

So, I mean, I've given you a lot of leeway today to ask questions about eventually what he would use if he had to do a disaggregation, and you can ask him the questions.  But he hasn't done the work and -- at this time, like he said in his report.

So go ahead.

BY MS. KOFKE:

Q   I think the question is:  What does the literature say about the success rate of

Page 207

acquisitions?

A   That it depends on the condition of each company and on their -- and on a number of factors that are specific to the condition of each company.

MS. KOFKE:  Let's mark Tab 23.

- - -

(Feinstein Exhibit 12 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Do you have that?

A   It's coming.

MR. BURKHOLZ:  Can you share the document, please.

BY MS. KOFKE:

Q   So you can see this is from a book called Mergers and Acquisitions, a Guide to Creating Value for Stakeholders.

Are you familiar with this book?

A   I'm not familiar with this book, but I am familiar with what they're citing on page 5.

Q   So if you look at page 5, there's a section called "Acquisitions Often Fail."

A   Yes.  It's --

Q   I think you have to go -- yeah, there you

Page 208

go.

So if you look at that first paragraph -- I'm not going to read the entirety of it into the record, but you can see it starts out with: "Despite their popularity and importance among large and small firms alike, many acquisitions do not produce the financial benefits expected or desired for the acquiring firm."

It then talks about various studies on that subject, and it concludes that -- in the last sentence:  "The point is that there clearly are risks involved in mergers and acquisitions."

Do you see that?

A   No, I didn't see where you said it concludes.  Where is that?

Q   The very last sentence in the first paragraph.  It says:  "The point is that there clearly are risks involved in mergers and acquisitions."

A   Right.  And that's why it's all the more important that accurate information about the condition of due diligence in the acquiring company is important to -- this is why they want that information.  This is why investors want truthful information about whether or not there was due

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 209

diligence done and whether or not an integration truly is on track.

I mean, the Michael Jensen article is the one about the hubris hypothesis -- I think I referenced it earlier -- that oftentimes the acquiring company does not create value, and this book seems to tell investors what they should be looking for and listening for to find out whether the acquisition they're interested in is a value creator or a value destroyer.

Q   Mm-hmm.  So you're familiar with studies showing that many acquisitions do not produce the expected financial benefits?

A   It depend -- I'm not sure -- I think we're interpreting the word "expected benefits."  Jensen pointed out that you should not necessarily expect benefits from an acquisition.  That's the point of the Jensen article.  I mean, the date of this book is what?  The Jensen article was much earlier than 2001.

The Jensen article pointed out that while oftentimes a company will tout an acquisition as being value creating, usually they're not value creating.  He calls it the hubris hypothesis.  He says, "Why do the companies do it if it doesn't

Page 210

create value?"  He says, "Maybe it's because of hubris," and then he warns, and it looks like this book warns too, investors should watch out for these signals and get this information so that they will know the truth, and that seems to be what this case is about.

Q   Is there -- I just want to clarify.  The literature that you're referring to that says acquisitions may not have any benefits at all, they're not saying that they may not have any benefits at all because there's some kind of misrepresentation related to the acquisition.

They're just talking about acquisitions, correct?

A   No, I don't think you could say that, necessarily.  Jensen points out that acquiring companies often do not benefit from acquisitions, and that's why investors need to do analysis armed with information to determine whether an acquisition that -- that they have an interest in is value creating or not.

If anything, this literature says the kind of information plaintiffs are alleging was concealed is highly important, not unimportant, because it's a crapshoot.  It's not a crapshoot, according to

Page 211

Jensen and the literature.

Q   Do you know whether there's a consensus in the literature that synergies for mergers and acquisitions are hard to achieve?

A   I know that the point is made.  I'm not sure if there's a consensus in the profession, or I don't know how you would -- I never added up articles on both sides of this, but there's a consensus that synergies need to be evaluated -- need to be evaluated with -- with correct information, that the prospect for synergies depends -- assessing the prospects of synergies depends on having accurate information.

Q   In your view, do investors understand that mergers and acquisitions often are not successful?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  Yeah, I think they -- I think investors -- well, I think sophisticated investors and analysts do know that, and that's why they pay extreme attention to representations made about the acquisitions.  That's why -- period.  Full stop.

MS. KOFKE:  Let's mark Tab 24.

- - -

(Feinstein Exhibit 13 was marked for identification.)

Page 212

- - -

BY MS. KOFKE:

Q   Do you have that?

Let's look at page 6 of this document.

There's a paragraph at the bottom of page 6 -- I think you have it there.  Right.

It says:  "Plaintiffs typically try to prove the amount of inflation indirectly:  They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation."

A   I don't see where you're reading from.

Q   You don't see that?  It's at the bottom of page 6.  It starts, "Plaintiffs typically."

A   Bottom of my page 6 says:  "Goldman also argues that the Second Circuit erred."

Q   I think you -- oh, okay.  One column to the left.

A   "The generic nature of a misrepresentation" -- "plaintiffs typically" --

Q   Correct.

A   Now I see it.  It's in the middle, right?

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 213

Q "Plaintiffs typically try to prove the amount of inflation indirectly," and I read that sentence. There's a few citations at the end I'm going to skip, and then it says: "But that final inference -- that the back-end price drop equals front-end inflation -- starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."

Do you see that?

A I see it.

Q Do you agree, as an economic matter, that the inference that the back-end price drop equals front-end inflation starts to break down when there's a mismatch between the contents of the misrepresentation and the corrective disclosure?

MR. BURKHOLZ: I'm going to object. This is outside the scope of his report. It goes to the issue of price impact, which is clearly outside of his current report. It may be subject to his future report if raised by defendants.

But this line of questioning is completely inappropriate based on his current report.

MS. KOFKE: We think it's within the bounds of his current report because it goes to how his damages methodology would be applied in a situation

Page 214

where there's a mismatch between a misrepresentation and a corrective disclosure.

But we can agree to disagree at this time.

BY MS. KOFKE:

Q So my question is: Do you agree, as an economic matter, that the inference that the back-end price drop equals front-end inflation starts to break down when there's a mismatch between the contents of the misrepresentation and the corrective disclosure?

MR. BURKHOLZ: I'm going to have the same objection. Calls for a legal conclusion and an analysis that he has not done that is outside the scope of his current report. It's a price impact analysis.

MS. KOFKE: Are you instructing the witness not to answer the question?

MR. BURKHOLZ: I'm not. I just think this line of questioning is inappropriate because he hasn't done the analysis because we don't know whether or not the defendants and their expert are going to be raising a price impact challenge.

BY MS. KOFKE:

Q Dr. Feinstein, do you agree with the statement that I read?

Page 215

A I mean, it starts to break down is one way of saying it. I think if the corrective disclosure is substantially different or discloses different information from what the alleged misrepresentations and omissions were about, then additional analysis needs to be done in order to relate the drop at the end to the inflation earlier.

But it's still related. It's still -- it's not as clean a controlled experiment, but it still is somewhat of a controlled experiment that measures the security price with and without certain information.

So I do agree that when there is a mismatch between what's disclosed and the subject matter of the alleged misrepresentations and omissions, additional analysis may be called for. And I said that in my report. In my report I didn't say that I would definitely use pure backcasting. I said I would consider it and then amend it if necessary with the valuation tools to value the information at issue.

Q In the work you've done so far, have you examined whether there is a mismatch between the contents of the alleged misrepresentations and the corrective disclosures in this case?

Page 216

A Well, I mean, frankly, not. Not before today. It wasn't necessary to. But as we've discussed today, you know, you asked about specifics of the disclosures that were, you know, specific numbers that couldn't have been predicted with precision earlier, and I pointed out that it's not whether or not those specific numbers could have been disclosed earlier with precision, but, rather, did the alleged misrepresentations and omissions make the announcement of those numbers surprising.

And if in fact the misrepresentations and omissions made those numbers surprising, and those numbers would not have been surprising but for the misrepresentations and omissions, then even though there's some degree of mismatch between the misrepresentations and omissions in the latter corrective disclosure, the price reaction to the corrective disclosure does provide good information about how much inflation was in the stock price previously.

Q If there was a mismatch in this case between the contents of the misrepresentation and the corrective disclosure, how would your damages methodology address that situation?

A Well, I would -- one of the -- one of the

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 217

important steps would be to test or check to what extent investors were surprised because of the misrepresentations and omissions and to what extent they would not have been surprised had it not been for the misrepresentations and omissions.

Q   And how would you test or check that?

A   I'd look at analyst reports, news coverage, company statements, financial principles, and the event study.

Q   Let's look at Exhibit 10, the Amended Complaint.

A   Okay.

Q   Paragraph 31.

So in paragraph 31, plaintiff alleges that on March 2nd, 2015, Cardinal issued a press release stating that for fiscal 2017 first full post-close year, accretion is expected to be greater than 20 cents in non-GAAP diluted earnings per share from continuing operations; increasingly accretive thereafter.

Do you see that?

A   I do.

Q   And that's one of the alleged false and misleading statements in the amended complaint, correct?

Page 218

A   Right, and I just want to point out -- I feel like I have to -- that it's this statement that would -- if believed by investors would convince investors that it's not hubris, as Jensen suggested, that's motivating this acquisition, but, rather, value creation.

So if investors were to believe this, they would believe that this investment was going to create value for Cardinal.

Q   Let's look at paragraph 55 in Exhibit 10.

In this paragraph, it's alleged that during a conference call, Kaufmann announced that Cardinal lowered Cordis's expected fiscal year 2017 accretion in non-GAAP diluted earnings from 20 cents to 15 cents per share in August 2016.

Do you see that?

A   I do.

Q   And, actually, if you look at the prior paragraph, it's a call that was alleged to be on August 2nd, 2016.

Do you see that?

A   I'm sorry.  This is -- this is -- the conference call following the August 2nd, 2016 earnings announcement is what this is.

Q   Correct.  Correct.

Page 219

And that's when Cardinal announced that Cordis had missed the 15 cent per share accretion target?

A   The first alleged --

Q   Actually -- sorry.  My fault.  My fault.

No.  This is the call -- so in paragraph 55 -- so, this is a call where Cordis announced -- sorry.  Cardinal lowered Cordis's expected accretion to 15 cents per share, correct, on August 2nd, 2016?

A   One second, please.

Q   Are you with me?  I apologize.

A   I want to check something, please.

Q   Let me know when you're ready.

A   I'm not ready yet.  It's getting later in the day.  I need to rely more on my report and less on memory.

All right.  So we're looking at --

Q   Why don't we look at paragraph 54 of the Amended Complaint.

A   Okay.

Q   So it says:  "On August 2nd, 2016, Cardinal hosted an earning conference call..."

Do you see that?

A   I will in a moment.

Paragraph 54.  Okay.  This is not -- all

Page 220

right.  Yeah.  Fine.  I'm there.

Q   Okay.  So, "On August 2, 2016, Cardinal hosted an earning conference call."

That's what is alleged in paragraph 54, correct?

A   Yes.

Q   Okay.  And then going to paragraph 55, it says:  "During the conference call...Kaufmann announced that Cardinal lowered Cordis's expected fiscal year 2017 accretion in non-GAAP diluted earnings from $0.20 to $0.15 per share."

Do you see that?

A   Boy, I mean, you didn't finish the rest of the sentence.

Q   I'm just asking if you see the part that I read.

A   Right, but I also see that it says: "'Largely due to currency impacts, as well as some increased SG&A investments compared to our original business case.'"

Q   Okay.  Let's look at paragraphs 69 and 70 of the complaint, which are on page 30 and 31. Let's start with paragraph 69.

MR. BURKHOLZ:  Can you wait a second. We're trying to get to it.

LA Sheriffs' Pension        REVISED        May 5, 2022
v. Cardinal Health Inc.        FINAL        Steven Feinstein, Ph.D.

Page 221

BY MS. KOFKE:

Q  I think it's up on the shared screen.

A  I have it. I'm there.

Q  Okay. Paragraph 69 of the Amended Complaint, it says: "Following the 4Q FY 2017 release and before the markets opened for trading, Defendants held a conference call for analysts and investors on August 2, 2017, during which Defendants disclosed for the first time that Cardinal did not achieve its FY 2017 accretion target for Cordis of $0.15 due to sales, inventory, and related cost issues."

Do you see that sentence?

A  I do, yes.

Q  So would you agree that the residual return, if any, on August 2nd, 2017 would reflect the news that Cardinal missed the lowered 15 cent per share accretion figure and not the original 20 cent accretion figure?

MR. BURKHOLZ: Objection. Outside the scope.

THE WITNESS: Not necessarily.

BY MS. KOFKE:

Q  Why not?

A  Because -- because of the part of the -- of

Page 222

the quote that you omitted originally when we were reading about 2016. The company attributed it to currency fluctuations which are non-recurring and reversible rather than to structural problems.

So this is a more fulsome corrective disclosure than the disclosure that was made earlier -- or the announcement that was made earlier.

Q  Well, in paragraph 55, it said that the reduction in the accretion estimate from 20 cents to 15 cents was largely due to currency impacts as well as some increased SG&A investments compared to our original business case.

A  Right. So if currency fluctuates -- and it can go up; it can go down -- that doesn't tell you that they're abandoning their forecast for 2018, which they made at the outset of the -- in order to pitch the acquisition at the outset.

Q  So, I mean, just to be clear, your view is that the miss of the 15 cent accretion number may have been interpreted by investors -- actually, strike that.

How would your damages methodology measure the inflation from the 20 cent accretion figure as opposed to the inflation associated with the lowered

Page 223

15 cent accretion figure?

MR. BURKHOLZ: I'm going to object to the form.

THE WITNESS: Well, just to be clear, I haven't done the loss causation and damages analysis, and just to be clear, your questions are asking if I would draw a conclusion, and I'm telling you over and over again that I'm not going to draw a definitive conclusion now. Every conclusion that you're posing, I'm saying could be right or it might not be right depending on the analysis I would do.

That's why I'm disagreeing every time when you say, "Is this your conclusion?" I'm saying, "No, it's not." It can go either way depending on what the analysis shows. Just because I don't agree with conclusion A doesn't mean I necessarily believe A is false at this stage.

Now, having said that, let me respond specifically to what you asked. Could I hear the question again.

BY MS. KOFKE:

Q  Yeah. It was: How would your damages methodology measure the artificial inflation from the 20 cent accretion figure as opposed to the lowered 15 cent accretion figure?

Page 224

MR. BURKHOLZ: Same objection. Outside the scope. Also to the form.

THE WITNESS: I would not ignore. I would take into account the event study results for each day to see if there's evidence that the news was impacting the stock price. I would then compare the news to the misrepresentations and omissions and determine to what extent the news was surprising because of the misrepresentations and omissions.

If in fact the news was surprising because of the misrepresentations and omissions, then it -- then it -- then the decline attributable to that specific news is the dissipation of artificial inflation caused by misrepresentations and omissions.

BY MS. KOFKE:

Q  Could the residual return from the miss of the 15 cent accretion estimate be used as a measure of the artificial inflation introduced by the original 20 cent estimate?

MR. BURKHOLZ: Same objection.

THE WITNESS: Well, it's not just the 20 cent estimate. We've got to be really clear about that. It's the 20 cent estimate supported by representations that there would be earnings

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 225

accretion and cost synergies and that what made this deal valuable to Cardinal was specifically the earnings accretion, cost synergies, and -- and -- derived from Cardinal's expertise, and that they believed that they would achieve these because of the due diligence they had done.

It looks to me like that wasn't disclosed in 2016, that those representations were false and misleading, and it seems that they -- it may have been disclosed on August 2nd, 2017, in which case the price decrease elicited by that new disclosure would represent inflation that goes back to the original misrepresentations and omissions at the start of the class period.

I mean, I would do some additional analysis to see if there's some adjustment to the valuation. Are people valuing information differently now than they were then? But if that doesn't turn up anything, I think it would be a reasonable conclusion that had people known at the start of the class period exactly, you know, what -- what they learned about the company's ability to generate cost synergies and earnings accretion, if they had known at the beginning of the class period what they learned about that, those conditions, the price

Page 226

would have fallen at the start of the class period.

MS. KOFKE: Let's mark Tab 26 -- I think it may actually already be an exhibit.

We'll mark that one.

THE COURT REPORTER: I'm sorry. Is that a new exhibit?

MS. KOFKE: Yes. What number are we up to?

MR. OBMASCIK: Exhibit 14.

- - -

(Feinstein Exhibit 14 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Do you have that, Dr. Feinstein?

A   I'm looking at No. 26.

Q   It's Exhibit 14, right?

A   Oh. Well, I don't know. Exhibit 14 or Exhibit 26?

Q   The file just sent to you, does it have the title "26"? It's titled "26," but it's actually Exhibit 14.

MR. BURKHOLZ: Steve, you can see it on the screen. She shared it now.

THE WITNESS: I have it. Great.

BY MS. KOFKE:

Page 227

Q   This is a March 2nd, 2015 press release.

Do you see that?

A   I do.

Q   Did you review this document in connection with preparing your report?

A   I think so.

Q   So in the second paragraph, it talks about the accretion and synergies estimates, and it says, "Assuming this timing, Cardinal Health expects fiscal 2017 accretion in non-GAAP diluted earnings per share from continuing operations of greater than $0.20 per share."

And then at the end of that paragraph, it says: "The company expects the acquisition to be increasingly accretive thereafter and assumes that synergies will exceed $100 million annually by the end of fiscal 2018."

Do you see that?

A   Yeah, I cited that in my report, so I know I reviewed this.

Q   Okay. Do you agree that investors would have understood that the accretion estimate disclosed in this press release was not a guarantee that Cardinal would achieve that level of accretion?

MR. BURKHOLZ: Objection. Outside the

Page 228

scope.

THE WITNESS: I think they would have understood that it's not a guarantee, but that the company had reason to believe that this was a reasonable forecast, and it's the -- that the conditions of the -- the conditions of Cordis and the conditions of Cardinal and Cardinal's ability to integrate Cordis were such that the company had a valid reason to make this forecast.

But -- but, yes, they would have understood.

BY MS. KOFKE:

Q   You agree that investors --

A   -- guarantee they would have been --

Q   I apologize. I interrupted you.

THE COURT REPORTER: One at a time.

BY MS. KOFKE:

Q   Please continue.

A   It would have invited analysts covering the company to assess how likely and how reasonable such a forecast was.

Q   Do you agree that investors would have understood that the accretion estimate might not be achieved?

MR. BURKHOLZ: Objection. Outside the

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 229

scope.

THE WITNESS: Can you say that again, please.

BY MS. KOFKE:

Q Do you agree that investors would have understood that the accretion estimate here might not be achieved?

MR. BURKHOLZ: Same objection.

THE WITNESS: Right. So the facts that were revealed to the investment community would have been evaluated by analysts and investors and reflected in the stock price at that time.

BY MS. KOFKE:

Q Do you agree that investors would have understood that the $100 million synergies estimate might not be achieved?

MR. BURKHOLZ: Same objection. Outside the scope.

THE WITNESS: The way this -- well, I mean, the way the financial markets work is investors and analysts would have been following this company, and what sophisticated analysts and investors determine gets reflected in the price that is paid by all investors.

I think the way financial markets work is

Page 230

they would have -- they would have believed that the company had a valid basis for making this forecast even though -- and they would have evaluated the valid basis. They would have evaluated the facts that provided that basis and probably put more weight on that -- on -- on the basis of the forecast than the number itself.

BY MS. KOFKE:

Q Do you agree that investors would have understood that the synergies estimates might not actually be achieved?

MR. BURKHOLZ: Same objection. Completely outside the scope of his efficiency report.

THE WITNESS: I think it's a point estimate within a distribution is how the analysts and investors would have appreciated this.

BY MS. KOFKE:

Q What does that mean?

A Well, I think some analysts and investors might have thought it would be bigger than 100 million. Some might have thought it would be less than 100 million. But they would have taken that $100 million number and inferred from it -- from it and other statements made and things not said by the company to portray the condition of the company.

Page 231

Q Let's look at the third page. There's a section called "Cautions Concerning Forward-looking Statements."

A Yes.

Q And if you'd go about one-third of the way down, it says: "These risks and uncertainties include" --

A Hold on. I need to find it if you're going to --

Q Sure. So there's a section called "Cautions Concerning Forward-Looking Statements." Do you see that?

A That part I found, and I now found where you're reading, like fourth word in on some lines down.

Q Right. So it says: "These matters are subject to risks and uncertainties that could cause actual results to differ materially from those projected, anticipated or implied." Do you see that, where I am?

A Yes.

Q Okay. And then it says: "These risks and uncertainties include: The ability to successfully complete the acquisition of Cordis on a timely basis, including receipt of required regulatory

Page 232

approvals and satisfaction of other conditions; the ability to retain customers and employees of the acquired business and to successfully integrate the acquired business into Cardinal Health's operations, if the acquisition is completed; the ability to achieve the expected synergies as well as accretion in earnings, if the acquisition is completed." Do you see that?

A I see all that.

Q So would you agree that Cardinal Health disclosed, in connection with the Cordis acquisition, that there were risks to Cardinal's ability to retain customers and employees of Cordis?

A I see that they -- it's hard for me to answer that question because I know that that's kind of the crux of what's -- one of the -- it's the crux of what's at issue in this case. I know the judge addressed that argument. I know that plaintiffs addressed that argument.

My understanding is that it can be argued that although, seemingly, risks were disclosed, the facts that would help people to assess those risks were not. I mean, that's what the allegations are. Or that it's not whether or not risks were disclosed that's at issue, but, rather, the conditions.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 233

And also perhaps it could be argued -- I mean, I'm not saying I'm arguing this or I've made a determination, but I understand that the judge considered this and plaintiffs are arguing that it's not the risks and uncertainties that caused the forecast to be missed, but, rather, conditions -- certain conditions that could have been disclosed.

Q   Assuming the Cardinal Health stock price was efficient, this information about risks in Exhibit 14 should have been incorporated into Cardinal Health's stock price, correct?

A   Well, is it information or misinformation is what's at issue here.  If this is misinformation, then, yes, this misinformation was reflected.  It's not for me to determine whether it's information or misinformation.  But if it was information, yes, it was reflected, and if it's misinformation, that too is reflected.

Q   Do you agree that the stock price reaction to relevant information is based on what is known at the time a disclosure is made?

A   Let me hear the words again, please.

Q   Do you believe that the stock price reaction to relevant information is based on what is known at the time the disclosure is made?

Page 234

A   I'm having a hard time interpreting that question or the statement that I'm being asked to evaluate.

One more time, and slower, please.  Please, with all due respect.

Q   Do you agree that the stock price reaction to relevant information is based on what is known at the time the disclosure is made?  In other words, do [sic] this background information at the time a disclosure is made have an impact on how that information affects the stock price?

A   Well, are you asking also if how a stock price reacts to information is or cannot be related to what is not known at the time?

Q   I'm just asking what I asked.

A   Well, I think it depends on --

Q   That's fine.  I mean, if it's not an answerable question, just let me know.

A   No.  It's not answerable because it's not clear whether you're asking if -- if an affirmative answer to that question forecloses that how a stock price reacts to information is a function also of what's not known at the time.

Q   I'm not -- what is known is the mirror image of what is not known, or is the -- the other

Page 235

part of what is not known.  So I think my question incorporates your concern.

A   I don't think so.  I think we can phrase it in a way that it would be unambiguous, but the way it's phrased is ambiguous.

Q   You agree that the valuation impact of a piece of information could be different if the information is disclosed earlier in a class period than if it's disclosed later in the class period?

A   That's possible, and there are ways of evaluating that.

Q   What are the reasons that might be the case?

MR. BURKHOLZ:  Objection.  Outside the scope.

THE WITNESS:  Well, I mean, it depends. There -- I mean, I can't give you every possible reason, but examples would be that, you know, the value of earnings has changed marketwide, for example, or the value of earnings or revenue has changed sector-wide or that due to the experience of the company, a particular disclosure reflects badly at the -- at the out -- at the end -- you know, differently, worse or better at one point in time than another point in time with respect to the

Page 236

reputation of the company.

There's one more thing I want to add to that, though.  It could be that if it's disclosed at the outset and there's a distribution of potential adverse outcomes that the exact adverse outcome that is realized is not nearly as bad as what might have been feared at the beginning.  That's another reason why it might change over time.

So, in other words, it's altogether possible that, you know, people learn at the end, "Gee, the company had problems we didn't know about, but for the most part, we dodged the bullet and it's not so bad."  Whereas, at the outset, they might have thought, this is a really serious problem that could bring down the whole company.

I mean, these are just -- I'm not saying they pertain precisely to this case.  But this is why information disclosed at one point in time might have a different impact than information disclosed at a different point in time.  There's ways of dealing with that.  There's things to consider, such as the proposition that investors on average don't make systemic mistakes and get it right on average when they're given fulsome information.

BY MS. KOFKE:

LA Sheriffs' Pension     REVISED     May 5, 2022
v. Cardinal Health Inc.     FINAL     Steven Feinstein, Ph.D.

Page 237

Q   At this point in time, have you done any analysis to identify whether any of the information that lead plaintiff claims was part of the corrective disclosures would have had a different impact on Cardinal Health's stock price if the same information had been disclosed earlier in the class period?

MR. BURKHOLZ:  Objection.  Asked and answered.

Go ahead.

THE WITNESS:  I certainly considered that that might be the case, and I explained how I would deal with it.  But I haven't determined that it is the case.

BY MS. KOFKE:

Q   So how would you deal with it?

MR. BURKHOLZ:  Objection.  Asked and answered.  Outside the scope at this point.

THE WITNESS:  There are tests -- I mean, there are tests that can be run to see if valuation metrics have different valuation impacts at different points in time.  That's one thing that can be looked at.

BY MS. KOFKE:

Q   What tests?

Page 238

A   Well, valuation multiples.  You know, tracking whether valuation multiples have changed.  I'm not saying that's necessarily an appropriate analysis in this case because I haven't yet uncovered any evidence that the changing value -- that there is a changing value of information in this particular case over the time frame at issue.

I'm just saying that there is an arsenal of tools that can be marshalled if in fact there's such evidence.

MR. BURKHOLZ:  Lauren, whenever there's a good break for you, we've been going another hour.

MS. KOFKE:  Why don't we take a break right now.

MR. BURKHOLZ:  Like, ten minutes would be good.

THE VIDEOGRAPHER:  Going off the record at 4:19 p.m.

(Recess.)

THE VIDEOGRAPHER:  Going on the record at 4:33 p.m.

BY MS. KOFKE:

Q   Do you agree that the valuation impact of an alleged misstatement might change over the course of the class period based on changing perceptions of

Page 239

risk related to a company?

A   It's possible.

Q   So, for example, if a company allegedly misrepresented that it could achieve $100 million in synergies from an acquisition, the inflation introduced by that statement would decline over time if investors' perception of the risk of not achieving the synergies was increasing over time; is that correct?

A   No, not necessarily.

THE COURT REPORTER:  I'm sorry.  Mr. Burkholz, you're on mute.  Did you say something?

MR. BURKHOLZ:  Thanks.  We have a double mute thing here.

I objected to the form.  Outside the scope.

He can answer.

THE WITNESS:  So I said, no, not necessarily.

BY MS. KOFKE:

Q   Why not?

A   Well, I mean, there's -- even if risks were to change, risk preferences might also change.

Q   What do you mean by that?

A   Well, I mean, the effect of risk on

Page 240

valuation is a function of both the level of the risk and the tolerance for risk in the marketplace.  If one -- I mean, if there are multiple things changing simultaneously, valuation effects can go up or down.  Neither of these things happened, but both of them could, potentially.

Q   Assuming that risk tolerance remained the same, the company represented that it could achieve -- strike that.

If risk tolerance remained the same and a company allegedly misrepresented that it could achieve $100 million in synergies from an acquisition, would the inflation related to that misstatement decline as investors' perception of the risk of not achieving those synergies increased?

A   Not necessarily.

Q   What reason, other than risk tolerance, could lead to that statement not being correct?

A   The market's risk premium.  The company's discount rate.

Q   What about all else being equal?  Is that statement generally correct?

MR. BURKHOLZ:  Objection to form.  It's outside the scope of his report.

THE WITNESS:  I want to hear the question

Page 241

again then.

BY MS. KOFKE:

Q   If a company allegedly misrepresented that it could achieve $100 million in synergies from an acquisition, the inflation introduced by that statement would decline over time if investors' perception of the risk of not achieving the synergies was increasing over time, correct?

A   Well, I mean, what if -- in your hypothetical, what if their knowledge that the target would not be achieved is increasing, or the probability they assigned to it not being achieved rather than -- I mean, by risk -- what do you mean by risk exactly?  Do you mean like the --

Q   I'll try to simplify.

All else being equal, would there be a different price reaction to the disclosure of a 5 percent risk of a $1 million loss than the disclosure of a 75 percent risk of a $1 million loss?

MR. BURKHOLZ:  Objection to form and the hypothetical.

THE WITNESS:  So you're assuming that the outcome is just binary.  It either happens -- the --

BY MS. KOFKE:

Page 242

Q   I'm assuming literally only the facts in the hypothetical.

MR. BURKHOLZ:  Same objection.

THE WITNESS:  I'm trying to understand what those facts are.  So you're saying that it's --

BY MS. KOFKE:

Q   As a financial economist, are you telling me that the disclosure of a 5 percent risk of a million dollar loss and the disclosure of a 90 percent risk of a million dollar loss might have the same stock price impact, all else being equal?

A   That's why I'm trying to get clarification.  Is it just binary?  The loss happens or it doesn't happen?  And if it does happen, it's only going to be 5 million?  And everybody knows in advance that the 5 million is not the center of a distribution; the 5 million is the only possible loss; there's no way it could be 4,999,000.

Is that what you're saying?

Q   Yes.

A   So it's binary.

Q   Correct.

A   So it's an unrealistic hypothetical because it's a binary outcome.  It's either 5 million or not 5 million.  There's no chance of 4,999,000, there's

Page 243

no million of five hundred -- 5 million and one.  It's just 5 million or not 5 million, and the only thing that changes now is an assessment of the risk, and all market participants have the same assessment of the risk.  And, by assessment of the risk, we mean the probability of the binary outcome; is that right?

Q   Yes.

A   All right.  Well, under those unrealistic hypotheticals -- hypothetical conditions, if there's -- you're saying that there's a lower -- there's a higher probability of the risk, right?  You're saying it's a higher probability of the risk, or a lower probability?

Q   Let's just -- let me put it to you this way, not even assuming all that stuff.  Just in the real world, the company puts out a press release saying, "We have a 5 percent risk of a $1 million loss" and then they put -- versus a press release that says, "We have a 75 percent chance of a $1 million loss."

Is it your view that those very well might have the same price effect?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  No.  More likely the 75

Page 244

percent announcement would have a bigger price effect than the 5 percent announcement.

BY MS. KOFKE:

Q   Do you agree that there would be a different price reaction to the disclosure of the realization of an event?  So that's when the probability of the event occurring is a hundred percent compared to an earlier disclosure that the event could occur, but the probability was less than a hundred percent?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  You asked that earlier today, and I was trying to explain -- I was trying to get clarification about the hypothetical.  Again, we're talking about a binary outcome that the -- everyone knows in advance that if the adverse event happens, it'll have a very specific dollar effect.

Is that what you're saying?  There's no distribution on how bad it could be or how --

BY MS. KOFKE:

Q   I'm really just saying let's imagine a company puts out a press release that says, "There's a hundred percent chance our oil pipeline is going to suffer a terrible spill and it's going to cost us $5 billion," and as compared to a situation where

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 245

that same company puts out a press release that says, "We think there's a 2 percent chance that our oil pipeline could suffer a terrible accident, and we could suffer a loss of $5 billion."

Do you think those press releases would have the same impact in an efficient market?

A   Well, for one thing, it depends on how believable the company is, but what are the two -- you said -- they're each talking about a spill, and you're saying the two press releases differ only in the probability assigned to the spill; is that right?

Q   Correct.

A   Well, to the extent that -- and they're both made a priority?  There's no spill yet, they're just announcing the probability of a spill?

Q   Right.

A   I would think that the press release that has the higher probability will have a bigger negative impact.

Q   In formulating the damages methodology in your report, did you examine whether Cardinal made any disclosures about the risks of the Cordis acquisition?

MR. BURKHOLZ:  Objection.  Outside the

Page 246

scope.

THE WITNESS:  I -- I read the judge's Motion to Dismiss Order, and the judge discussed risks and risk disclosures, and so I considered them in that context.

BY MS. KOFKE:

Q   Is the damages methodology that you propose capable of distinguishing the reaction of Cardinal Health's stock price to risks that were disclosed versus risks that were allegedly concealed?

A   Well, the damage methodology is -- is consistent with plaintiff's theory of liability, which is about conditions that were concealed versus conditions -- contemporaneous existing conditions that were not disclosed.

So your question about just risks is irrelevant to the theory of liability as it's been posed.

Q   So in your view, plaintiff's theory of liability does not include the concealment of risks related to the Cordis acquisition?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  Yeah, it was asked and answered this morning.

Page 247

I mean, the conditions give rise to risks, but it was the conditions that were concealed.  The end-all of the allegations is not just risks.

BY MS. KOFKE:

Q   If the record in this case ultimately were to show that there were certain risks that were disclosed and certain risks that were concealed, how would your damages methodology be able to distinguish the effect of disclosed versus concealed risks?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  Can you be a little more specific and describe what kind of risk you mean and what you mean by "risk"?  Do you mean a distribution of outcomes versus a certainty of outcomes?

Is that what risk means in your question?

BY MS. KOFKE:

Q   Yes.

MR. BURKHOLZ:  Same objection.  Lacks foundation.

THE WITNESS:  One approach that's commonly used is -- what the damage methodology requires here is that the forensic analyst now, at this point in time after the event, estimate how investors would have reacted to an announcement earlier.  And it

Page 248

makes sense that because investors are not systematically wrong, the best estimate, you know, the maximum likelihood estimate of what they would have forecasted if they had been given full, correct information is what ultimately did happen.

Therefore, the best estimate of how they would have reacted to full information at the outset is how much the stock price fell ultimately.

MS. KOFKE:  Let's look at -- let's mark Tab 28.

- - -

(Feinstein Exhibit 15 was marked for identification.)

- - -

BY MS. KOFKE:

Q   I just want to go back to your last answer before we go to this exhibit.

So let's just say hypothetically that the record were to show that Cardinal disclosed that there was a 10 percent risk to the synergies estimate from the Cordis deal, but in reality there was an 80 percent risk to that estimate.

Are you saying the stock drop at the end of the class period would be an appropriate -- the full stock drop at the end of the class period would be

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 249

an appropriate measure of the value of that misrepresentation earlier in the class period?

MR. BURKHOLZ: Objection to form.

THE WITNESS: It all depends on what you're holding constant in your hypothetical. If they had made different disclosures at the outset, the stock price would have been different throughout the entire class period, and, therefore, the drop at the end with full disclosure would have been different.

BY MS. KOFKE:

Q   Okay. Let's go to Tab 28, which is I think Exhibit 15.

MS. KOFKE: Is that right?

BY MS. KOFKE:

Q   This is an analyst report from Deutsche Bank, dated March 2nd, 2015.

Do you see that?

A   I see that.

Q   And at the bottom of the first paragraph, under the heading "Cardinal to Acquire JNJ's Cordis," it says: "While the deal is accretive" --

A   Whoa. Where are you reading?

Q   It's at the end of the first paragraph.

A   Okay.

Q   "While the deal is accretive and the price

Page 250

is not unreasonable, we take a mixed view of the deal as it adds risk to Med/Surg execution and could slow growth."

Do you see that?

A   Well, I saw the last sentence saying: "We maintain our Hold rating on CAH shares on valuation."

I think you read something before that, right?

Q   I did, yes. Do you see both of the sentences?

A   Now I see it. I was looking at the last sentence.

Q   Does this analyst report support the conclusion that investors recognize that the Cordis acquisition created execution risk with respect to Cardinal Health's medical business?

MR. BURKHOLZ: Okay. So this is completely outside the scope of his report, and I've given you a lot of leeway today. He did an efficiency report opinion, and he did a damage methodology opinion, and this is completely outside the scope of those two opinions, where you're asking about particular statements and reactions by analysts at the beginning of the class period.

Page 251

MS. KOFKE: Well, I -- we disagree that it's outside the scope of the report since the level of investors' perception of risk is directly relevant to forming the inflation ribbon that is the primary component of his damages methodology.

MR. BURKHOLZ: If you're going to ask him -- you asked him earlier today what is he going to consider, including analyst reaction to the corrective disclosures. He said that he's going to look at all available information during the class period, and it's not appropriate to be asking him about those things when he hasn't done the later analysis that would be done at a loss causation stage.

MS. KOFKE: Are you directing him not to answer the question?

MR. BURKHOLZ: I'm not, but I think a lot of -- a lot of today has been inappropriately wasted with questions outside the scope of his report. I've given you a lot of leeway, and I'm not instructing him not to answer.

BY MS. KOFKE:

Q   So, Dr. Feinstein, does this analyst report support the conclusion that investors recognize that the Cordis acquisition created execution risk with

Page 252

respect to Cardinal Health's medical business?

A   You know, it sounds -- one thing that has changed over time is you're asking your questions faster now, and I'm hearing them slower. So there we have a mismatch. If you can ask that again, please, that would be helpful.

Q   Does this analyst report support the conclusion that investors recognized that the Cordis acquisition created execution risk with respect to Cardinal Health's medical business?

MR. BURKHOLZ: Same objection. Outside the scope.

THE WITNESS: Well, I mean, the words on the page say they view the deal mixed, as it adds risk to med/surg execution and could slow growth. You know, whether this is an outlier opinion or the core opinion is not something I've formed an opinion -- I mean, a consensus opinion or an outlier opinion, I haven't formed an opinion on, and what Deutsche Bank said, if they said anything previously or subsequently, I would also want to look at.

But the words on the page, they say "It adds risk," and I'm sure that, to some extent, tempered price target Deutsche Bank put out and -- well, and is some way reflective in the market price

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 253

of Cardinal Health stock.

MS. KOFKE:  Let's mark Tab 32 as the next exhibit.

- - -

(Feinstein Exhibit 16 was marked for identification.)

- - -

THE WITNESS:  I want to point out that -- I mean, if risk means uncertainty or risk means the breadth of the distribution of potential outcomes, full disclosure, assuming plaintiff's allegations are correct, might have reduced risk.  People would have known that -- would have known more surely what was likely to happen.

Again, that's the kind of thing I would consider when doing a valuation or a damages analysis.

MS. KOFKE:  I think we're up to Exhibit 16.

BY MS. KOFKE:

Q  This is an analyst report from Leerink, dated July 30th, 2015.

Do you see that?

A  Well, I need -- I don't see the top of the -- just using your screen, I don't see the top.

There we go.  July 30, 2015, Leerink, yes,

Page 254

I see that.

Q  On page 1, the last bullet point, it says: "Overall, we believe Cardinal is well positioned heading into F2016, with several recently announced and completed acquisitions rolling on over the course of the fiscal year," and one of those acquisitions listed is Cordis.

Do you see where it says that?

A  I hate to say it, but can you direct me to where that is?

Q  The cursor is next to it.  Do you see that now?

A  Yes.

Q  Okay.  Let's look at page 3.  There's a section called "Risks to Valuation."

Do you see that?

A  I'm going to download it.

Page 3.  "Risks to Valuation."  Okay.  I'm there.

Q  We're actually going to page 4, which is part of that section.  Do you see the sub-header that says:  "Acquisition Integration Could Be a Risk"?

A  Right.

Q  And as part of that section, it says: "If

Page 255

the company fails to integrate any of these acquisitions onto its platform or if there are any information technology, personnel, or structural issues with the integration process, then the company's earnings could be at risk."

Do you see that?

A  I see it.

Q  Does this analyst report support the conclusion that investors recognize that there was risk to Cardinal Health's ability to successfully integrate the Cordis acquisition?

MR. BURKHOLZ:  Same -- same objection to this.  It's outside the scope of his report.  It's been asked and answered.

But you can go ahead on this document.

THE WITNESS:  I mean, does your question presuppose that there was risk?  That there was some chance of success?

BY MS. KOFKE:

Q  Yes.

A  And so you're asking whether this analyst thought that there was increased risk?

Q  I'm just asking whether this report reflects that this analyst recognized that there was risk to Cardinal Health's ability to successfully

Page 256

integrate the Cordis acquisition.

MR. BURKHOLZ:  Same objection.

THE WITNESS:  This analyst assessed the risk based on what this analyst knew and based on what this -- and the assessment of that risk was a function of what this analyst knew.

BY MS. KOFKE:

Q  And the analyst assessment was that acquisition integration could be a risk, correct?

MR. BURKHOLZ:  Same objection.  Outside the scope.

THE WITNESS:  It's not clear.  Let me -- give me a moment, please.

BY MS. KOFKE:

Q  I think we talked before about how reviewing and analyzing the contents of analyst reports would form part of your damages methodology in determining the inflationary impact of the alleged misstatements, correct?

A  Exactly.  And I would spend a lot more time doing that than the time you're allocating to it.

I mean, I'll tell you what's puzzling me.  I mean, there's a lot of held assumptions in your questions.  Such as that uncertainty -- or that higher probability of failure is what's meant by

LA Sheriffs' Pension                REVISED                May 5, 2022
v. Cardinal Health Inc.             FINAL                  Steven Feinstein, Ph.D.

Page 257

risk. That's not necessarily true. I mean, what's meant by risk is a wider range of potential outcomes.

So this analyst isn't thinking that there's necessarily an elevated chance of failure. This analyst is thinking, "Well, it could succeed or it could fail," and there's a wider range of possibilities, but this analyst's assessment of that risk, of the range of potential outcomes, is informed by what this analyst was told by the company.

So just to say -- I mean, the words on the page say what they say. They speak for themselves, but, you know, how they relate to the allegations, I haven't formed an opinion yet.

Q We talked before about how the company on August 2nd, 2016 lowered the accretion estimate from greater than 20 cents to 15 cents.

Do you remember that?

A I do.

Q Would the company lowering the accretion estimate related to the Cordis acquisition have affected investors' perception of risk with respect to that acquisition?

MR. BURKHOLZ: Objection. Completely

Page 258

outside the scope.

THE WITNESS: Possibly, but not necessarily.

BY MS. KOFKE:

Q And I take it you haven't formed an opinion as of now as to whether that reduction in the estimate impacted investors' perception of risk or not?

A Again, by "risk," do you mean the probability of failure, or do you mean the range of outcomes -- of potential outcomes?

Q The range of potential outcomes.

A Well, it sounds like it reduced -- it very -- I haven't finished the analysis yet, but it's very likely that that announcement reduced the level of risk perceived by investors. I'm not sure. It could go either way.

Q So you think the company reducing its accretion estimate to 15 cents from 20 cents would have led investors to conclude that there was less risk to the accomplishment of synergies related to the Cordis acquisition?

MR. BURKHOLZ: Objection. Outside the scope.

THE WITNESS: I asked you if by risk you

Page 259

meant the probability of failure, or by risk you meant the distribution of outcomes. Now you're changing your definition of risk as saying that risk means the probability or likelihood of not achieving the synergies.

So that's why I needed the clarification. I think we both need the clarification. What do you mean by risk?

BY MS. KOFKE:

Q Well, let's go with the second version.

Would your answer change?

MR. BURKHOLZ: Same objection. Outside the scope of his current report.

THE WITNESS: Okay. If now we mean by risk the probability of not achieving the synergies and the company attributed the lowering from 20 cents to 15 cents to currency fluctuations primarily, that doesn't affect the probability of not achieving the synergies.

The second explanation I think they said was selling, administrative, and general costs. I need to look deeper into that to see to what extent that relates to the original outlook of synergies.

BY MS. KOFKE:

Q Have you -- are you offering any opinion in

Page 260

this matter as to whether the reduction in the accretion estimate on August 2nd, 2016 increased or decreased investors perception of risk?

A No. I haven't done a loss causation or damages analysis yet, and in the course of a loss causation or damages analysis, I would form those opinions.

You'll notice it's not in my report, that opinion that you were asking about.

MS. KOFKE: Let's go to Tab 13. If we can mark that as Exhibit 17.

- - -

(Feinstein Exhibit 17 was marked for identification.)

- - -

BY MS. KOFKE:

Q So this is an analyst report from Cowen, dated August 2nd, 2017.

Do you see that?

A Yes.

Q Let's look at page 13, which has the Bates number ending in 137.

Do you see there's a section called "Risks to the Price Target"?

A I do. Let me review it, please.

Page 261

I see it.

Q   And under the heading "Risks to the Price Target," it says: "There are a number of company-specific risks associated with our PT," -- which I'm going to assume refers to price target -- "including: (1) CAH's ability to turnaround the Medical segment, (2) integration risk related to Cordis and Harvard Drug Group."

Do you see that?

A   I do.

Q   Is that the kind of evidence in an analyst report that would support the conclusion that investors recognize that integration risks related to Cordis could affect the performance of Cardinal Health?

MR. BURKHOLZ: Objection. Completely outside the scope of his report.

THE WITNESS: Well, that's relevant, but so would be the facts that the company -- that Cowen is presenting and relying upon for the assessment of any risks and the narrative that they provide that might indicate to what extent they have accepted the company's representations and incorporated them into its assessment.

BY MS. KOFKE:

Page 262

Q   Have you considered whether the disclosure of problems related to Cordis at the end of a class period may have had a larger impact on the price of Cardinal's stock because investors concluded that the issues with Cordis could potentially affect Cardinal's other acquisitions?

MR. BURKHOLZ: Objection. Outside the scope of his report.

THE WITNESS: I've thought about it, but I haven't formed any conclusion, one way or the other.

MS. KOFKE: Let's mark Tab 48.

- - -

(Feinstein Exhibit 18 was marked for identification.)

- - -

BY MS. KOFKE:

Q   Do you see that?  It's an August 3rd, 2017 Needham report.

A   I do.

Q   Let's look at page 2, the Bates ending in 941. It says: "The Medical segment's Cordis business is behind expectations just as the company is onboarding its transformative MDT acquisition."

MR. BURKHOLZ: Can you point to where you're reading from?

Page 263

MS. KOFKE: Sure. It's right in the middle of the first big paragraph under Investment Thesis.

MR. BURKHOLZ: Steve, can you see where she is?

MS. KOFKE: Can you put the cursor over the line.

THE WITNESS: Right near the word "China"?

BY MS. KOFKE:

Q   Yes. Just a couple lines down from that. It says: "The medical segment's Cordis business is behind expectations just as the company is onboarding its transformative MDT acquisition."

Do you see that?

A   That's not the full sentence.

Q   Yes. I'm reading part of the sentence.

Do you see that part of the sentence?

A   I did, but I'd like to read the full sentence.

Q   By all means.

Have you read the sentence?

A   Now I have.

Q   A little bit farther down, it says:  The "Cordis integration is behind schedule, thus creating some doubt for investors on how well the company can bring the $6 billion MDT acquisition on

Page 264

board."

Do you see that?

A   Yes.

Q   Then going a little farther down, there's a section called: "What Happened to Cordis?"  And it's the -- actually, I think it's the third sentence. It says: "The company admitted it has taken longer to achieve the synergy targets it originally set out, especially outside the U.S. This is a little troubling, as a big part of the MDT Patient Recovery Business accretion is achieving $150M in synergies.  Plus, 25% of the MDT business is outside the U.S., where CAH is behind its own schedule on Cordis."

Do you see that?

A   I do.

Q   Do you agree that these statements support the conclusion that information about Cordis was viewed by investors as also providing information about the Medtronic acquisition?

MR. BURKHOLZ: Objection. Outside the scope.  Not relevant to his current opinions. He hasn't done a loss causation or price impact analysis.

THE WITNESS: I haven't formed an opinion

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 265

about that one way or the other yet.

BY MS. KOFKE:

Q   Do you agree that it's possible that the value of information about Cordis might have been different after the Medtronic acquisition than before?

MR. BURKHOLZ:  Same objection.  Outside the scope.

THE WITNESS:  Well, anything's possible. That's why I would do the analysis and the research, to determine what the facts really are.

BY MS. KOFKE:

Q   How would your damages methodology account for the potential difference in value of information about Cordis at different points in the class period?

A   Well, I could value -- I could do a company valuation for any particular day in the class period based on the information that is either actually disclosed or hypothetically could have been disclosed.

Q   If you haven't at this point in time examined what information was disclosed or hypothetically could be disclosed, how can you have the opinion that your methodology could address any

Page 266

possible complexity that might arise?

A   Because that's what valuation experts do every day for virtually every publicly traded security in the country.  Every day, valuation experts, investment analysts are valuing the company under the information that is disclosed and also forming hypotheses about what the value would be if the information set changed.  That's what we do.

There are courses that I teach on valuation; courses that I teach in security valuation as a main part of the Chartered Financial Analyst curriculum that I've mastered in order to achieve the Chartered Financial Analyst designation.

That's what we do.  We value companies.  We teach how to value companies, and we value them under the information set that exists.  We also value them under information sets that could exist.

Q   So you don't need to know what specific complexities might arise during the course of the class period in order to give the opinion that your damages methodology can handle anything that might come up?

A   Valuation is a human exercise.  Valuation is the estimation of what one fully informed investor or person would pay another fully informed

Page 267

investor in order to transact.  There's -- there's a science and an art to doing it.  There's a literature on how to do it.

Rarely do you ever see a security that -- you know, where all the investors throw up their arms and say, "We just have no idea what Ford Motor Company should trade at today."  There's a price that's determined in the marketplace, and the experts, myself included, our job is to figure out what that price -- why that price is what it is and what that price might become if the information set changes.

That's what we do.  And the literature is what supports our ability to do that.

Q   So you're basically saying, based on your experience and the knowledge you have access to, the court should trust that you can handle any curveball that might be thrown your way in terms of complexities in calculating damages in this case?

MR. BURKHOLZ:  Objection to the form.

THE WITNESS:  Well, I've -- we've spent the last eight hours -- seven hours talking about the specifics of how the tools in the literature address the complexities that might arise.  So I'm not asking them just to take it on faith.  I think I've

Page 268

explained how I would go about these computations.

But, I mean, if that's not satisfying to any -- to the court or to anyone else, I would point out that there are courses that teach how to value securities, and virtually every security has a valuation.  And that the market is populated by thousands of securities, and all of them at any point in time have a valuation, which proves that we can value securities under a wide variety of circumstances.

BY MS. KOFKE:

Q   Have you done an analysis to determine if there are any complexities that would come up with respect to creating an inflation ribbon over the three-year class period in this case?

A   Say that again.

Q   Have you done an analysis to determine if there are any complexities that would come up with respect to creating an inflation ribbon over the three-year class period in this case?

A   Well, I explained in my report what documents I reviewed and read and what data I've looked at, and so in the course of reading analyst reports, news articles, looking at the data, I explained to you earlier this morning that I did

LA Sheriffs' Pension                    REVISED                    May 5, 2022
v. Cardinal Health Inc.                 FINAL                      Steven Feinstein, Ph.D.

---

Page 269

observe that when corrective disclosures were made, there was also other earnings announce -- information that was presented.

So, yes, I have done analysis that indicates that I will have to consider whether or not there was confounding information, and I know how to deal with it, and I've explained to you how I would deal with it.

Q   Are there any -- what are the specific valuation tools you would use to deal with confounding information in this case?

MR. BURKHOLZ: Objection. Asked and answered about ten times.

THE WITNESS: Yeah, I've already --

BY MS. KOFKE:

Q   Would you use DCF analysis to deal with confounding information in this case?

A   I would certainly consider it. It would be among the tools to consider. It very well might be the particular tool that provides the valuation necessary. If not that one, then it might be a valuation multiple tool. It might be one based on EBIT or net income or EBITDA or even revenue perhaps, but probably unlikely.

I might look at accounting numbers. I

Page 270

might look at book value. All of -- in fact, probably I would look at all of them in order to form a valuation opinion.

MR. BURKHOLZ: We've been going about 45 minutes. It's kind of late in the day. I'd like to give him a break less than an hour each time now, so if we could take a break at a point --

MS. KOFKE: This is a perfectly good time for a break.

MR. BURKHOLZ: Okay. Come back in ten minutes.

THE VIDEOGRAPHER: Going off the record at 5:15 p.m.

(Recess.)

THE VIDEOGRAPHER: Going on the record at 5:27 p.m.

BY MS. KOFKE:

Q   In any case where you have applied the damages methodology set forth in your report in this case, have you used the tools identified in this matter, other than an event study, to calculate damages in a 10b case?

A   Yes.

Q   Have you ever used a DCF analysis to calculate damages in a Section 10b case?

Page 271

A   I may have. I certainly have taken into account cash flows.

Q   But you can't recall a specific case where you applied a DCF analysis?

A   As I sit here now, no. But I know that I have done valuations based on cash flows.

Q   Were those valuations other than a DCF analysis?

A   It depends what you mean by "DCF analysis." I mean, I've taken into effect -- taken into account whether certain information affects cash flow or not and, based on that, it would affect valuation or not.

Q   Yeah. I'm referring to the discounted cash flow, DCF, model referenced in paragraph 146 of your report.

Have you ever applied the DCF model referenced in paragraph 146 of your report in another case to calculate damages in a Section 10b claim?

A   Yes.

Q   What case?

A   I don't know, as I sit here now, the name of a particular case, but I've certainly taken into account cash flows and discounted cash flows to

Page 272

inform correct valuation and correct damage calculation.

Q   Any case in the past four years?

A   Probably.

Q   How many cases in the past four years?

A   I don't know.

Q   Have you ever applied a multiples analysis to calculate damages in a Section 10b case?

A   Yes.

Q   What case?

A   Same answer. I mean, I don't have all -- I'm prepared today to talk about this case. You know, if you show me the reports, I'll show where in the reports I've used multiple analyses or cash flow analyses.

Q   If we pull the expert reports that you've filed in the past four years, will we been able to find one that applied a valuation multiple analysis to calculate damages in a Section 10b case?

A   Certainly.

Q   How many such reports do you think there are?

A   I don't know.

Q   More than one? More than five?

A   More than one.

---

LA Sheriffs' Pension                REVISED                    May 5, 2022
v. Cardinal Health Inc.             FINAL                Steven Feinstein, Ph.D.

Page 273

Q   Somewhere between one and five?
A   No.
Q   Can you give any approximation other than more than one?
MR. BURKHOLZ:  You have to be audible, Steve.  I don't think we heard you.
THE WITNESS:  The answer was no.  I just -- I don't remember the specifics of those elements of every report I've written.  I know there's a record of the reports, and that's where we would look to get a precise answer to your question.
BY MS. KOFKE:
Q   Have you applied scenario analysis to calculate damages in any case involving a 10b-5 claim?
A   I think so.  I have to think more about that.  It's available.  I'm not sure.
Q   So you can't recall a specific case?
MR. BURKHOLZ:  Are you asking now going back to 1996 or the last four years?
MS. KOFKE:  Right now I haven't put a temporal limit on the question.
THE WITNESS:  I think the answer's -- I'm pretty sure the answer's yes, but I just can't give you more specificity than that.

Page 274

BY MS. KOFKE:
Q   And you can't -- you can't recall a specific case we could look at, sitting here today?
A   Well, I mean, from memory?  No.  I mean, you know, given a day or two to go through all my old reports, I probably would be able to.  You're probably going to ask.  So I'm ready.
But, I mean, I can do it, you know, if you give me a couple of days to do it, but I can't do it as I sit here now.
Q   Is it correct that you haven't formed any opinion, as of now, as to whether the information in the two alleged corrective disclosures in this case was actually corrective of the alleged misstatements?
MR. BURKHOLZ:  Objection.  Asked and answered.
THE WITNESS:  That would be correct.
BY MS. KOFKE:
Q   And is it also correct that you have not formed an opinion for either of the alleged August 2nd, 2017 or May 3rd, 2018 corrective disclosures as to what specific misrepresentations plaintiff is alleging or being corrected?
MR. BURKHOLZ:  Same objection.  Asked and

Page 275

answered.
THE WITNESS:  I haven't done a loss causation or a damages analysis, and that's what you're asking, are the elements of a loss causation and damages analyses and then a market efficiency analysis.  And I presented the appropriate model for calculating damages in a 10b-5 case and articulated it with specificity, but I did not do a loss causation or damages analysis yet.  I will do one if I'm asked to.
BY MS. KOFKE:
Q   So the answer to the question I asked is, no, you're not -- you have not yet formed an opinion as to what specific misrepresentations, if any, are being corrected by the alleged corrective disclosures in this case?
A   It's no, and you know it's no because you asked me if all of my opinions were listed in the Conclusion section, and I said, "Yes," and that opinion is not in the Conclusion section.  It's not anywhere in my report.
Q   Let's talk about your 20a claim analysis -- it's not your claim.  Your damages analysis related to the Section 20a claim.
Will calculation of a Section 20a claim

Page 276

damages involve construction of an inflation ribbon as you proposed for the Section 10b claim?
A   I'd like to look at the report again, my report.
Q   Sure.
A   I know that it's important to know when all inflation was out, but that's not the same thing as constructing a ribbon.
No, it's not necessary to construct the inflation ribbon.  What's necessary is to determine when all inflation has dissipated.
Q   Will the calculation of Section 20a damages involve use of an event study?
A   I think so.  I think the event study would be very informative about when inflation dissipated.
Q   Other than applying an event study to determine when inflation dissipated, do you anticipate any other use of an event study in calculating Section 20a damages?
A   Well, to assess that there had been inflation and that inflation then at some point dissipated.  Those would be the uses for the event study.
Q   So to calculate 20a damages, you would need to determine that there was inflation in the

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 277

Cardinal Health stock price?

A   Yes.

Q   Why?

A   That's explained in my report on page 44. On the statute, it says -- paragraph 152 says: "Any person who..." -- I mean, liability is established if the insider is trading while in possession of material nonpublic information. The event study will indicate whether the information was material, whether it had a valuation impact. And I'm defining "material" here as being economically material, meaning, valuation impactful.

But let me read further to refresh my memory.

Yeah. As explained in 153 -- 153 is how I'm understanding the statute -- the trade has -- in order to be an insider trade for which a defendant is liable for damages, the trade would have to be while the stock was inflated. That's what it says in the first sentence of 153. The event study will determine when the stock was inflated and when it wasn't inflated.

Q   So your damages methodology contemplates that damages would only be available for trades that were shown by an event study to have happened at a

Page 278

time when there was inflation in Cardinal Health stock?

A   A purchase -- can you ask the question again, please? Because in order for there -- as -- as it's spelled out in my report, the -- a plaintiff's trades can be initiated or the purchase can be when there was inflation and then there could be a sale when there was no inflation, and the loss sustained between those two trades is one of the arguments in the damage formula.

So the way you've asked the question to suggest that trades when there was no inflation is irrelevant. If that's what you intended, that would be incorrect.

So can you please ask the question again.

Q   Actually, let's just strike that question.

Is it the case that you're not offering an opinion on whether a class member could recover damages under both Section 10b and Section 20a?

A   I'm not making that -- offering a legal opinion at all or that legal opinion.

Q   Is it correct that you would calculate losses avoided on a particular stock sale by subtracting the market price of Cardinal Health common stock following the final corrective

Page 279

disclosure from the market price of Cardinal Health common stock on the date the defendant sells?

A   I need to hear the question again so I can mentally picture it.

Q   Is it correct that you would calculate losses avoided on a particular stock sale by subtracting the market price of Cardinal Health common stock following the final corrective disclosure from the market price of Cardinal Health common stock on the date of the defendant's sale?

A   Honestly, that's just too complicated a question for me to answer without seeing it in writing.

Are you reading from my report by any chance?

Q   If you look at paragraph 153 of your report on page 44 -- that's Feinstein Exhibit 1.

A   Yes.

Q   -- are you -- do you see that paragraph?

A   I do.

Q   And you see it says: "For the computation, one would identify when defendants sold shares during the Class Period at inflated prices, and measure their losses avoided, equal to the decline in the share price between the date of sale and the

Page 280

later date when artificial inflation was fully dissipated by corrective disclosure. The decline in share price over this period is the per share loss avoided by the defendants."

Do you see that?

A   I do.

Q   And is that an accurate statement of how you'd identify losses avoided on the Section 20a claim?

A   Yes.

Q   Okay. So how would you determine the price on the date of sale?

A   Well, there's -- we can either look at the actual price from a confirmation or, if that confirmation was unavailable, as a proxy, we can use the closing sale price, or if there was some indication as to when during the day the sale took place, we can use -- they call it trade and quote data that has intraday prices to identify what the likely price was at the time of sale.

Q   If a confirmation is available, would you use the price at which the defendant actually sold?

A   Yes.

Q   And only if that's not available, you'd look to the closing price or some approximation of

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 281

the price of a sale?

A   That's a reasonable approach, yes.

Q   How would you identify the price at which artificial inflation was fully dissipated by corrective disclosure?

A   The best estimate of that is the -- well, I mean, if it's -- if it's -- again, if it's an actual trade price indicated by a confirmation and it took place -- I'm sorry.

Can you ask the question again?

Q   Sure.

So it says here to measure losses avoided, you'd look to the decline in the share price between the date of sale and the later date when artificial inflation was fully dissipated by corrective disclosure.

How would you determine the price at which point artificial inflation had been fully dissipated.

A   Well, I haven't done the analysis yet, but if it's the type of information that would be fully incorporated within one day, I would use the closing price follow- -- the closing price following the corrective disclosure.

Sometimes it's the case where it takes more

Page 282

than one day for information to be fully incorporated, and then I would use the closing price after that window had been completed.

Q   How would you -- what tools would you use to determine whether you should use the closing price on the date of the corrective disclosure or some other price?

A   Well, I mean, the choices are the closing -- the closing price on the date of -- closing price on the date of the corrective disclosure or perhaps a later closing price if it's a protracted window. The tools to use to assess whether a protracted window -- meaning more than one day is appropriate -- include examining to see whether there continued to be significant price movements in the same direction that were not caused by any other identifiable information and looking to see whether there was continued coverage by either analysts or the media of the corrective disclosure.

That's typically what one uses to determine if more than one day was necessary by the market to fully incorporate and digest the information.

Q   Actually, so let's look at the part of the analysis related to investor losses. I think that's in paragraph 154.

Page 283

A   Okay.

Q   It says:  The "...loss would be the decline in the value of the Cardinal stock position between the time of purchase and the later sale date, or the date of full corrective disclosure that dissipated the artificial inflation in the security's price, whichever occurred first."

A   Okay.

Q   So what price would you use on a later sale date before the end of the class period?

A   No.  The later sale date would be after the end of the class period, right?

Oh, later than the purchase date.  All right.  So an investor buys the stock during the class period at an inflated price, and then he or she sells it at a subsequent date before the end of the class period.  If -- if there was a loss on that sale, the sustained loss would be that particular loss, the initial price minus the subsequent price. The purchase price minus the sale price.

Q   So is it correct that your methodology would count as loss the entire stock drop between the investor's purchase date and either sale date or the date of the full -- the incorporation of the full corrective disclosure?

Page 284

A   Yes.  It's the entire loss.  My understanding is that's consistent with the statute and case law.

Q   So your understanding is that investors could recover that full loss even if part of the stock drop was due to factors unrelated to the alleged fraud?

A   We're talking 20a, not 10b?

Q   Correct.

A   Yes -- well, for one thing, that loss would have to be less.  It cannot recover the full loss if that full loss is greater than the loss avoided by defendants having traded on inside information.  So it isn't necessarily the full loss.  It's only the full loss if that full loss is less than the loss avoided by defendants.  But -- but there's more.

No.  That's complete.  So the answer is they don't necessarily recover the full loss that they sustained.  Only if that full loss is greater than the loss avoided by defendants.

Q   You agree that the calculation of losses sustained by investors in paragraph 154 would not exclude from losses the portion of the stock drop between the purchase and sale date or date of dissipation of artificial inflation that was

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 285

attributable to factors other than the fraud?
   A   You mean the fraud as defined by Section 10b, right?
   Q   The fraud alleged by plaintiffs in this case, correct.
   A   Well, I'm not sure 20a is about fraud.
   Q   I'm really just asking whether this calculation includes a methodology for including any part of the decline in price between when an investor purchased and either sold or the inflation was dissipated -- oh, actually. Sorry. It should have been excluding.
      Does the calculation of investor losses in paragraph 154 provide for an exclusion of any part of a loss that was not attributable to the 10b fraud alleged in this case?
      MR. BURKHOLZ: Objection to form.
      THE WITNESS: I'm trying to understand your use of the term "fraud" with respect to 20a damages. I don't think the statute, as I have it excerpted in paragraph 152, mentions any fraud.
BY MS. KOFKE:
   Q   I'm really not asking you what the statute mentions, but let's just move on.
      So you talk about calculating damages on a

Page 286

pro rata basis, correct?
   A   If necessary. If the amount of loss avoided by defendants is less than the losses sustained by plaintiffs, then the losses -- the compensation for losses to plaintiffs would be allocated on a pro rata basis.
   Q   When you say "pro rata," would that be pro rata based on each individual's proportional loss or some other method?
   A   Well, you would -- you would add up all the losses sustained by plaintiffs, according to the 20a calculation, and if that number is greater than the loss avoided by defendants, the pool of -- the pool of compensation would be the loss avoided by defendants, and that pool would be allocated based on who among the plaintiffs had the larger losses, had the larger sustained losses.
      So if someone had, let's say, 5 percent of all the sustained losses, they would get 5 percent of the pool.
   Q   Have you done any analysis to determine the number of class members that would have standing to seek 20a damages?
   A   No.
      MR. BURKHOLZ: Objection to form.

Page 287

Objection to the form of the question.
      THE WITNESS: No, I have not.
BY MS. KOFKE:
   Q   Have you ever, in a prior case, proposed a different methodology for measuring Section 20a damages?
   A   Possibly, but I don't recall specifically.
   Q   Have you -- have you ever proposed a methodology using an inflation ribbon?
   A   I don't recall that I did.
   Q   Is it possible that you did?
   A   Over 26 years? Possible, yes.
   Q   Have you ever concluded that damages on a Section 20a claim could not be calculated on a classwide basis?
   A   What do you mean by "on a classwide basis"? Do you mean the same methodology would be applied classwide?
   Q   Correct.
   A   It's one methodology, and it would -- no, I have not. This methodology could apply to anybody who has a claim.
      MS. KOFKE: Let's mark Tab 7. Are we up to Exhibit 18?
      MR. OBMASCIK: Exhibit 19.

Page 288

      MS. KOFKE: Exhibit 19.
      - - -
      (Feinstein Exhibit 19 was marked for identification.)
      - - -
BY MS. KOFKE:
   Q   Do you recognize this document?
   A   I do.
   Q   Have you read this decision before?
   A   Oh, yes.
   Q   How recently have you read it?
   A   Probably not within the last year.
   Q   And this is a decision from the Delaware Court of Chancery from 2005 that discusses an expert report that you submitted, correct?
   A   Yes.
   Q   Did the court in this decision criticize your opinions?
   A   Yes.
   Q   What do you recall about what the court said?
   A   Well, the court was critical of my valuation. This was an appraisal hearing on a -- back then what we used to call a new economy stock. The company didn't have revenue, earnings, cash

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 289

flow, or income, and I was asked to value it, and the court cited Shiller's book, Robert Shiller's book on Irrational Exuberance, and said that the entire market was acting irrationally and I bought into that irrationality, essentially, and had some harsh words along those lines.

Q   Let's look at page star 14 of this case.

A   What do you mean "star 14"?

Q   It's on page 11 of the document.

Do you see there's a section called Feinstein's DCF Analysis?

A   Yes, I do see it.

Q   And at the end of the first paragraph, it says: "After describing the foundation of Feinstein's valuation, I will compare that to the actual facts facing Liberty Digital at that time. What will be seen is that Feinstein's assumptions bear no relationship to reality."

Do you see that?

A   Yes.

Q   Let's look at star 15, which is on page 12. It's in the middle of the column on the left.

It says: "There is a well-known phrase, 'if wishes were horses, then beggars would ride.' If Feinstein's wishes were horses, the petitioners

Page 290

would have ridden and owned Secretariat, Seattle Slew, and (the trial judge's favorite) Affirmed, Triple Crown winners all.  The problems with his DCF analysis are so pervasive and numerous that it is impossible to describe all of them."

Do you see that?

A   I do.

Q   And then let's look at star 17, which is on page 13.

A   Okay.

Q   It says: "For these and other reasons too numerous to set forth, I find Feinstein's DCF valuation to be unreliable and to provide no rational insight into Liberty Digital's value."

Do you see that?

A   I didn't see it, but I'll take your word for it.

Q   So the court in this case concluded that your DCF valuation was unreliable and provided no rational insight, correct?

A   Correct.

Q   Was the court correct in its analysis of your opinions?

A   Well, of course I disagreed with the court's conclusion, but I respect it.  I mean, it's

Page 291

ironic that we're talking about, essentially, internet commerce and whether it had a future or not.

Q   The asset that you were valuing in this case was an access agreement between a company called Liberty Digital and AT&T.

Do you recall that?

A   Yes.  It was a -- not just the access agreement.  It was the business built around the access agreement.

Q   And your view was that the asset being valued was worth $2.2 billion, correct?

A   Yes.

Q   And the court found it was worth only $135 million, correct?

A   I don't recall the specifics, but that sounds reasonable -- I mean it sounds correct.

Q   Now, a DCF analysis is one of the valuation tools that you propose would be applied to calculate damages on a classwide basis in this case, correct?

A   Yes, but there's a big difference.  This company, Liberty Digital, being a new economy stock at the time, was not an established company.  It was, essentially -- it was part of the tech bubble, as they call it, where companies were being --

Page 292

companies needed to be valued, companies that didn't have revenue, earnings, and cash flow.  So it was all prospective, based on assumptions of what -- what could be developed in the new economy of, essentially, the internet.

Cardinal Health is not that at all. Cardinal Health is an established company, as is Cordis, with revenue, income, cash flow that lends itself to a much more definitive data-based DCF analysis.

Q   Have you considered the facts and circumstances in this case to identify what cash flows you might need to do a DCF analysis on?

MR. BURKHOLZ: Objection to the form. It's been asked and answered.

But are you asking him about, if there's a disaggregation issue, whether this tool -- how he will use that tool?

Is that what you're asking him?

MS. KOFKE: I'm just asking him if he has identified what cash flows might need to be subject to a DCF analysis in this case.

MR. BURKHOLZ: Okay.  Object.  It's been asked and answered.

THE WITNESS: I mean, the choices are

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 293

company cash flows and subsidiary cash flows. I have not done a DCF analysis. I haven't done a loss causation or damages analysis. I haven't yet even confronted a valuation problem in the course of this analysis that requires a DCF analysis, but DCF analysis is available to be applied if necessary.

BY MS. KOFKE:

Q So you wouldn't expect that in this case you'd need to do a DCF analysis of cash flows related to loss of a particular customer for example?

MR. BURKHOLZ: Objection to the form. It's been asked and answered.

THE WITNESS: I mean, it's possible. I just don't know for sure yet.

BY MS. KOFKE:

Q So it's conceivable you might have to apply a DCF analysis in this case that wasn't just a DCF of either Cardinal's cash flows as an entire corporation or Cordis's cash flows as a subsidiary?

MR. BURKHOLZ: Objection to the form.

THE WITNESS: I -- I don't see how that's possible. I mean, I think the cash flows would have to relate to one of the entities involved in the case.

Page 294

BY MS. KOFKE:

Q Well, in this case, you used a DCF analysis to value the cash flows related to a particular agreement and the business around that agreement. It was only part of the company's value, correct?

A Oh, it was the major part. I remember that.

Q Is it your view that the only DCF analysis that might be needed in this case is either a DCF of Cordis's cash flows or Cardinal Health's cash flows?

MR. BURKHOLZ: Objection. Again, outside the scope. It's been asked and answered.

THE WITNESS: I can't imagine that it's -- that the cash flows will be unrelated to Cordis or Cardinal. I mean, I could be surprised when I do the analysis, but as I sit here now, not having done the analysis, I would think that the cash flows would have to be related to Cordis or Cardinal.

BY MS. KOFKE:

Q I'm not asking if there are cash flows that are related to one or the other.

I'm asking whether you anticipate a DCF analysis might be needed of something other than Cordis's entire cash flows as an entity and Cardinal's entire cash flows as an entity.

Page 295

MR. BURKHOLZ: Same objection.

THE WITNESS: It's altogether possible that DCF tools can be applied to value a stream of cash flows that's only a portion of either entity's cash flows. That's entirely possible and also entirely appropriate.

BY MS. KOFKE:

Q Having not looked at the facts and circumstances of this case, how can you be sure that a DCF analysis could be applied more reliably here than in the Liberty Digital case?

A Oh, that's actually an easy question. I mean, Liberty Digital, as I explained, was one of the new economy stocks that arose during the tech bubble of 2000. It didn't have a history, period. It didn't have a history. Cardinal has a history. Cordis has a history. Liberty Digital didn't have established cash flows, earnings, or revenue. Cordis and Cardinal do and did at this time.

So it's much more definitive. There's less -- I would -- I can rely more on the history and on trends in Cardinal if I needed to rather than relying on forecasting of -- by analysts, which I did in Liberty Digital and perhaps, you know -- well, as the judge in Liberty Digital said, you

Page 296

know, the Irrational Exuberance, quoting Robert Shiller, was really what we had to go on in Liberty Digital. It was not as established a company.

MS. KOFKE: Okay. Spence, we can stop there, and we'd like to reserve the rest of our time for redirect.

MR. BURKHOLZ: I have no questions of the witness.

MS. KOFKE: Okay. Why don't we take a short break, and we'll see what we might have left to cover.

MR. BURKHOLZ: Okay. I thought you were done, but that's fine. Why don't we just take five minutes?

MS. KOFKE: Great.

THE VIDEOGRAPHER: Going off the record at 6:06 p.m.

(Recess.)

THE VIDEOGRAPHER: Going on the record at 6:16 p.m.

BY MS. KOFKE:

Q Dr. Feinstein, you mentioned this morning that there were some employees at Crowninshield that assisted in the preparation of your report.

Do you remember that?

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 297

A   Yes.

Q   Could you name those employees, apart from the ones who did the proofreading?  Just the ones who did some type of substantive work other than proofreading.

A   Yeah.  That'd be Dan Bettencourt, Lucy Culleton, and Miguel Villanueva.

Q   And what did Dan Bettencourt do with respect to your report?

A   Well, he helped me with the writing.  He's essentially a case manager.  He organized documents and was a sounding board.  He and I would discuss the approach.  Not that there was anything novel or unique or difficult about this particular engagement, but we always discuss the analysis that's going to go into the report and how we're going to present it.

Q   And the second person you mentioned, first name Lucy, what did she do to assist you with your report?

A   So she's a more junior person.  She downloaded data, assembled data, checked quotes.  Things like that.

Q   And the third person that you mentioned?

A   Oh, Miguel.  Miguel Villanueva is our

Page 298

senior quantitative analyst.  He runs the computer program.  So I'll tell him to run the ordinary least squares regressions or check Breusch-Pagan tests.  That sort of thing.

THE COURT REPORTER:  I'm sorry.  I didn't hear you.  "I'll tell him to run the ordinary"?

THE WITNESS:  Least squares regression, run diagnostic tests, and he'll actually execute the tests.  He does computer coding and statistical analysis under my direction.

BY MS. KOFKE:

Q   I think you mentioned this morning that you might be able to check during a break on whether you had provided any testimony after the date of your report that wasn't listed in the exhibit to your report.

Were you able to check on that?

A   I did, and I did not.  I mean, I did check, and I did not do additional testimony.

Q   Got it.  Thank you for looking into that.

Let's look at Feinstein Exhibit 1, your report, paragraph 153.

A   Okay.

Q   So it says: "For the computation, one would identify when defendants sold shares during

Page 299

the Class Period at inflated prices, and measure their losses avoided, equal to the decline in the share price between the date of sale and the later date when artificial inflation was fully dissipated by corrective disclosure.  The decline in share price over this period is the per share loss avoided by the defendants."

Do you see that?

A   Yes.

Q   So is it correct that the loss avoided by defendants under this damage methodology would be calculated by the share price on the date of sale minus the share price on the later date when artificial inflation was fully dissipated?

A   Yes.

Q   What if the price decline between the date of sale by the defendant and the date when artificial inflation was fully dissipated by corrective disclosure was in part due to factors unrelated to the material information that allegedly was not disclosed in this case?

MR. BURKHOLZ:  Objection to form.

BY MS. KOFKE:

Q   Does that have any impact on the calculation in paragraph 153?

Page 300

A   No, it does not.  But if there's a legal determination that it should have an impact, that would be an easy adjustment.

Q   How would that adjustment be made?

A   I'm not saying that there has been a determination or that there likely will be a determination.  Only the change of inflation needs to be compensated, but if so, then it would be the difference in the inflation number at the time of sale and the inflation number -- and zero.  It would be the full inflation number that was in the stock price at the time of sale by the defendants.

Q   And in that circumstance, would inflation be calculated by the same method it would be calculated under the 10b claim damages methodology?

A   I just want to point out that we're getting two degrees of hypothetical here.  One, we're assuming hypothetically that there would be a determination that the formula has to be modified to not be the entire loss avoided, but just that portion of loss attributable to the change of inflation.

I mean, if that were the case and one were to calculate that based on the inflation ribbon, then, yes, it would be the same inflation ribbon as

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 301

the inflation ribbon used for 10b-5 damages.

Q   And moving to paragraph 154, it says: "The damage computation must also compute losses sustained by investors on the shares they purchased contemporaneously with the defendants' identified sales.  Such a sustained loss would be the decline in the value of the Cardinal stock position between the time of purchase and the later sale date, or the date of full corrective disclosure that dissipated the artificial inflation in the security's price, whichever occurred first."

Do you see that?

A   Yes.

Q   Okay.  So the losses sustained by investors would be calculated if they sold the stock before the end of the class period as the purchase price minus the later sale price?

A   Correct.

Q   And if they held the stock through the end of the class period, then the investor loss sustained would be calculated as the purchase price minus the price on the date of full disclosure that dissipated the artificial inflation?

A   That's right.

Q   And --

Page 302

A   I mean -- I mean with the caveat that depending on what the analysis turns up, that's on the assumption that it's a -- that the corrective disclosure is fully incorporated within one day.

Q   And the calculation of the losses sustained by an investor would not include an exclusion of any part of the decline in the price that was caused by factors unrelated to the alleged 10b fraud in this case?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  Same answer as before.

BY MS. KOFKE:

Q   What was the answer before?

A   If I heard your question right, the formula that I present here does not exclude -- I mean, the formula here includes all the losses that the investor suffered between the time they bought, which was when defendants were selling, and when full corrective disclosure was made, not just the portion of that that represents the change of inflation.

Q   What if an investor sold stock on the date of the final corrective disclosure?  Is it possible that that sale price would be at a point before

Page 303

artificial inflation had dissipated?

A   Yes.  Then you would use the actual sale price.

Q   I see.

So anybody who sold before the final price that reflected dissipation of all artificial inflation, the price you would use would be that actual sale price?

A   Right.

Q   Okay.

Okay.  I think we have no further questions at this time.  Thank you for your time, Dr. Feinstein.

MR. BURKHOLZ:  No questions from plaintiffs.

THE VIDEOGRAPHER:  Going off the record at 6:25 p.m.

(Signature having not been discussed, the deposition of Steven P. Feinstein, Ph.D., CFA was concluded at 6:25 p.m.)

Page 304

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Joan V. Cain, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 5th day of May 2022.

My commission expires:
May 31, 2025

_____

NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA
VIRGINIA NOTARY REGISTRATION NO. 107144

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 305

INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel
that notary public signature is required.

Please return a copy of the signed errata within
30 days of receipt, unless otherwise agreed upon
by counsel.  Once we receive the signed errata,
we will distribute an electronic copy to all
parties.

RETURN A SIGNED COPY VIA FAX, E-MAIL OR MAIL TO:
FAX:  1-800-825-9055
E-MAIL:  janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
PO Box 542
Luck, WI 54853

Page 307

PAGE  LINE   CHANGE      REASON

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

Page 306

ACKNOWLEDGMENT OF DEPONENT

I, Steven P. Feinstein, Ph.D., CFA, do hereby
certify that I have read the foregoing pages and
that the same is a correct transcription of the
answers given by me to the questions therein
propounded, except for the corrections or
changes in form or substance, if any,
noted in the attached Errata Sheet.

_____   _____

(DATE)   Steven P. Feinstein, Ph.D., CFA

Signed and subscribed to before me this
____ day of _____ 2022.

_____

Notary Public

Page 308

INDEX OF EXHIBITS

EXHIBIT          DESCRIPTION             PAGE

EXHIBIT 1    Expert Report of            9
             Dr. Feinstein, 3/24/22

EXHIBIT 2    Expert Report of            33
             Dr. Feinstein, In Re Super
             Micro Computer, Inc., 9/1/21

EXHIBIT 3    Expert Report of            35
             Dr. Feinstein, In Re
             Jeld-Wen Holding, Inc.,
             Securities Litigation,
             1/4/21

EXHIBIT 4    Expert Report of            36
             Dr. Feinstein, In Re Novo
             Nordisk Securities
             Litigation, 4/1/19

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension v. Cardinal Health Inc.  REVISED FINAL  May 5, 2022  Steven Feinstein, Ph.D.

Page 309

I N D E X   O F   E X H I B I T S (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 5 | Expert Report of Dr. Feinstein, In Re Envision Healthcare, 11/9/20 | 37 |
| EXHIBIT 6 | Declaration of Luke O. Brooks, 4/24/20 | 39 |
| EXHIBIT 7 | Declaration of Shawn A. Williams, 6/7/19 | 40 |
| EXHIBIT 8 | Expert Report of Dr. Feinstein, In Re BHP Billiton Limited Securities Litigation, 3/14/18 | 42 |

Page 310

I N D E X   O F   E X H I B I T S (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 9 | Cardinal Health Earnings Release, 8/2/17, Bates Nos. CAH-SDOH2.19-cv-3347-00393368-00393381 | 133 |
| EXHIBIT 10 | Consolidated Amended Complaint, 9/8/20 | 151 |
| EXHIBIT 11 | Expert Report of Dr. Feinstein In Re OPERS, 6/7/17 | 192 |
| EXHIBIT 12 | Excerpted Pages from Mergers and Acquisitions, a Guide to Creating Value for Stakeholders, by Hitt, et al. | 207 |

Page 311

I N D E X   O F   E X H I B I T S (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 13 | Westlaw Article Re Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement | 211 |
| EXHIBIT 14 | Cardinal Health Press Release, 3/2/15, Bates Nos. CAH-SDOH2.19-cv-3347-00004564-00004566 | 226 |
| EXHIBIT 15 | Deutsche Bank Analyst Report, 3/2/15, Bates Nos. CAH-Feinstein-CFR0004412-0004417 | 248 |
| EXHIBIT 16 | Leerink Analyst Report, 7/30/15, Bates Nos. CAH-Feinstein-CFR0003841-0003848 | 253 |

Page 312

I N D E X   O F   E X H I B I T S (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 17 | Cowen Analyst Report, 8/2/17, Bates Nos. CAH-Feinstein-CFR0008125-0008142 | 260 |
| EXHIBIT 18 | Needham Report, 8/3/17, Bates Nos. CAH-SDOH2.19-cv-3347-00398940-00398953 | 262 |
| EXHIBIT 19 | Westlaw Article Re Finkelstein v. Liberty Digital, Inc. | 288 |