UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 2:19-cv-03347 |
| Plaintiff, | ) ) ) | CLASS ACTION |
| vs. | ) ) | District Judge Edmund A. Sargus, Jr. Magistrate Judge Elizabeth A. Preston Deavers |
| CARDINAL HEALTH, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

LEAD PLAINTIFF'S REPLY IN FURTHER SUPPORT OF
MOTION FOR CLASS CERTIFICATION

4875-2998-1480.v1

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  PLAINTIFF MEETS THE ADEQUACY AND TYPICALITY
    REQUIREMENTS OF RULE 23(a).......................................................................3

In its opening brief, Lead Plaintiff 1199SEIU Health Care Employees Pension Fund demonstrated that it meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4) by showing that it shares "'common interests with unnamed members of the class'" and "'will vigorously prosecute the interests of the class through qualified counsel.'" Class Certification Memorandum, ECF 72-1 at PageID 3613-15; *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996)).  Plaintiff has also shown that it meets Rule 23(a)(3)'s typicality requirements by showing that its claim arises from the "'the same event or practice or course of conduct that gives rise to the claims of other class members, and [that] his or her claims are based on the same legal theory.'"  Class Certification Memorandum, ECF 72-1 at PageID 3612; *Shy v. Navistar Int'l Corp.*, 2022 WL 2125574, at *4 (S.D. Ohio June 13, 2022) (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007)).

A.  Plaintiff Will Continue to Vigorously Prosecute This Case Through
    Qualified Counsel .......................................................................................4

Plaintiff has retained highly qualified counsel – Robbins Geller Rudman & Dowd LLP, who for over the past two decades has been the nation's leading plaintiff securities class action law firm – to assist it in prosecuting this case.  Plaintiff has three in-house lawyers monitoring Robbins Geller.  Plaintiff is actively involved in the litigation – reviewing pleadings, responding to discovery, providing testimony at deposition, and regularly communicating with Robbins Geller about the case.  Plaintiff has a clear understanding of the case and is exactly the type of institutional investor that Congress intended to oversee securities fraud class actions under the PSLRA. *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 449-50 (S.D. Ohio 2009).  Defendants' attacks on Plaintiff's adequacy have been repeatedly rejected by other courts.  For instance, leaving litigation strategy to counsel does not render plaintiff inadequate (*Willis v. Big Lots, Inc*, 242 F. Supp. 3d 634, 650 (S.D. Ohio 2017); that plaintiff learned of case through a portfolio monitoring agreement with counsel does not defeat adequacy (*id*. at 650-51); indemnification agreement between Plaintiff and counsel does not undermine adequacy (*Garden City Emps.' Ret. Sys. v. Psych. Sols., Inc.*, 2012 WL 1071281, at *38 (M.D. Tenn. Mar. 29, 2012)).

B.  Plaintiff's Claims Are Typical of the Class and Not Subject to Unique
    Defenses ...................................................................................................10

Plaintiff's claims are typical of the Class because it acquired Cardinal Health common stock at artificially inflated prices during the Class Period and suffered losses as a result of Defendants' alleged misrepresentations and omissions.  Like other putative class members, Plaintiff has identical legal claims in that it alleges Defendants violated §§10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934. *Owens v. FirstEnergy Corp.*, 2020

**Page**

WL 6873421, at *11 (S.D. Ohio Nov. 23, 2020). Plaintiff's investments in hedge funds during the Class Period do not defeat typicality and are irrelevant because those investments are not subject of Plaintiff's claims. Plaintiff would not hold legal title to those securities, or be entitled to any claim for losses connected to those securities under the PSLRA. 15 U.S.C. §78u-4(e)(1) (limiting damages to the "difference between the purchase or sale price paid or received . . . ***by the plaintiff for the subject security*** and the mean trading price of that security during the 90-day period" after the class period); *see also* 15 U.S.C. §78u-4(a)(2)(A)(iv) (requiring representative plaintiff to submit certification that "sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint," which Plaintiff has done here). Hedge funds, and other third-party funds, are legally distinct entities from Plaintiff, and Plaintiff does not have legal title to, and is not a beneficial owner of, the securities invested by these third-party funds. *See, e.g.*, *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) (holding that entity without legal title or ownership of a security has no standing to assert a violation of securities laws). If the Court were to hold otherwise, it would preclude institutional investors, like Plaintiff, who invest billions of dollars in hedge funds, from ever serving as lead plaintiff or class representative.

C.      The Timing of Plaintiff's Purchases Does Not Subject It to Unique Defenses ...........................................................................................................16

Whether Plaintiff purchased Cardinal Health stock after a corrective disclosure or after the end of the Class Period is irrelevant. *Ross*, 257 F.R.D. at 446. Numerous courts in this Circuit have affirmed that it is the majority rule in federal courts that post-disclosure and/or post-class period purchases of a corporate defendants' stock do not defeat Rule 23(a)(3)'s typicality requirement. *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 128 (M.D. Tenn. 2020); *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *8-*9 (E.D. Mich. Nov. 19, 2020); *Cosby v. KPMG, LLP*, 2021 WL 1828114, at *6 (E.D. Tenn. May 7, 2021). Defendants' argument must be rejected here as well.

III.    PLAINTIFF'S PROPOSED DAMAGES METHODOLOGY SATISFIES RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT ............................................................19

A.      Dr. Feinstein's Out-of-Pocket Methodology Is Consistent with Plaintiff's Theory of Liability and Satisfies *Comcast*............................................................20

Plaintiff has satisfied Rule 23(b)(3)'s predominance requirement and the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), by presenting, through its expert Dr. Steven Feinstein, an out-of-pocket methodology demonstrating that damages can be calculated on a class-wide basis consistent with its single theory of liability under §10(b)-5. Where the plaintiff's "'proposed measure for damages is . . . directly linked with their underlying theory of classwide liability . . . [it is] in accord with . . . *Comcast*.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017); *Weiner*, 334 F.R.D. at 137 (same). The Sixth Circuit has held "where there is no chance of aggregated damages attributable to

4875-2998-1480.v1

**Page**

rejected liability theories," as is the case here, "the Supreme Court's concerns [from *Comcast*] do not apply." *In re VHS of Mich., Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015).

B.       Dr. Feinstein's Out-of-Pocket Methodology Has Been Routinely Accepted ........23

Dr. Feinstein's proposed out-of-pocket methodology "'is the standard measurement of damages in Section 10(b) securities cases' . . . [and] *Comcast* did not change this or render the model improper." *Weiner*, 334 F.R.D. at 137; *Cosby*, 2021 WL 1828114, at *7 (same). Dr. Feinstein's out-of-pocket damages methodology has been accepted in more than 20 class certification opinions post-*Comcast*. Defendants' expert Dr. Lehn concedes the out-of-pocket damages methodology is widely considered an acceptable method among financial experts for measuring damages in §10(b) class actions.

C.       Dr. Feinstein's Methodology Can Accurately Measure Artificial Inflation<br>by "Backcasting" from the Corrective Disclosures ................................................26

Dr. Feinstein has demonstrated that under his out-of-pocket methodology, artificial inflation due to Defendants' alleged fraud can be measured through a "backcasting" approach that measures artificial inflation from the corrective disclosure dates. The "backcasting" approach has also been accepted by the Seventh Circuit in *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015). Neither Defendants nor Dr. Lehn cite any authority (legal or academic) that artificial inflation and damages cannot be properly measured by this approach. Plaintiff is only required to prove at trial that "the defendants' false statements caused the stock price to remain higher than it would have been had the statements been truthful," and a damage model that measures inflation from the day of the corrective disclosures is meant to "calculate[] the effect of th[at] truth." *Id.* at 416-19.

D.       Dr. Feinstein's Methodology Can Account at the Merits Stage for<br>Defendants' Hypothetical "Complicating Factors" ................................................28

Defendants criticism that Dr. Feinstein's damages methodology does not address how it will disentangle the effects of factors that may be unrelated to the alleged fraud is a premature loss causation argument that has been repeatedly rejected. In *Erica P. John Fund, Inc v. Halliburton Co.*, 563 U.S. 804 (2011) the Supreme Court held that plaintiffs are not required to prove loss causation loss at class certification. Consistent with *Halliburton*, courts have held that: disaggregation is a loss causation argument not appropriate at this stage (*Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *9-*10 (M.D. Tenn. June 26, 2017)); whether a damage model needs to account for industry or company-specific changes – or the fact that "publicly available information . . . changed over time" – goes to the "accuracy of the damages model and loss causation, but do[es] not prevent class certification" (*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020 WL 5757695, at *15 (D. Minn. Sept. 28, 2020)); whether a "damages model is insufficient because it reflects a misalignment between certain misrepresentations and later corrective disclosures" is an improper merits challenge (*Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502,

**Page**

at *9 (N.D. Cal. Mar. 16, 2016)).  Even if Plaintiff were required to offer a specific damage calculation at this stage of the case, Dr. Feinstein's reports demonstrate that if any specific "complicating" factors arise at the merits stage, standard tools of valuation analysis can be applied as needed on a class-wide basis.

E.	Defendants' Bias Argument Is Improper and Unsupported ...................................33

Defendants' claim lacks both legal and factual support.  Determining the credibility of a witness is an issue for the jury.  *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, 2021 WL 5881775, at *3 (S.D. Ohio Dec. 13, 2021) (Sargus, J.). Dr. Feinstein's testimony also undermines Defendants' argument that he is biased toward, or financially beholden to, Plaintiff's counsel.

F.	Defendants' Vague "Truth-On-The-Market" and "Changing Circumstances" Arguments Are Subject to Class-wide Proof...............................34

Defendants' argument ignores binding Supreme Court authority.  *Basic v. Levinson*, 485 U.S. 224, 242 (1988), holds that class members proceeding under the fraud-on-the-market theory, which Plaintiff and the Class are here, face "common questions of law and fact concerning the falsity or misleading nature of the . . . public statements made by [defendants], the presence or absence of scienter, and the materiality of the misrepresentations."  *See also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)"); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 282 (2014) (same).  Also, courts have routinely held that Defendants' "truth-on-the market" arguments do not defeat predominance.  *See, e.g.*, *Marcus v. J.C. Penney Co., Inc.*, 2016 WL 8604331, at *8 (E.D. Tex. Aug. 29, 2016) ("A 'truth on the market defense' is a 'method of refuting an alleged misrepresentation's materiality' which has no bearing on the predominance inquiry of class certification."), *report and recommendation adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 211 (D. Minn. 2020) (same); *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at *11 (S.D. Cal. Nov. 29, 2017) (same).

IV.	CONCLUSION...........................................................................................................36

As all of the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(3) and 23(g) have been established, the Court should certify the proposed Class, appoint Plaintiff as Class Representative, and appoint Robbins Geller as Class Counsel and Murray Murphy Moul + Basil LLP as Liaison Counsel.

4875-2998-1480.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)................................................................................................19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)........................................................................... *passim*

*Baker v. SeaWorld Ent., Inc.*,
2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) .......................................................36

*Basic v. Levinson*,
485 U.S. 224 (1988)...........................................................................................1, 35

*Beattie v. CenturyTel, Inc.*,
511 F.3d 554 (6th Cir. 2007) .................................................................................4

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
2016 WL 4098741 (D. Minn. July 28, 2016) .......................................................18

*Berwecky v. Bear, Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) .............................................................................16

*Bovee v. Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003) ...........................................................................7

*Brown v. China Integrated Energy Inc.*,
2015 WL 12720322 (C.D. Cal. Feb. 17, 2015)......................................................33

*Burges v. Bancorpsouth, Inc.*,
2017 WL 2772122 (M.D. Tenn. June 26, 2017).............................................7, 8, 29

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
270 F.R.D. 247 (D.S.C. 2010) ............................................................................7, 8

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)........................................................23

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................3, 20

*Corwin v. Seizinger*,
2008 WL 123846 (S.D.N.Y. Jan. 8, 2008) ............................................................11

*Cosby v. KPMG, LLP*,
2020 WL 3548379 (E.D. Tenn. June 29, 2020)......................................................32

4875-2998-1480.v1

**Page**

*Cosby v. KPMG, LLP*,
  2021 WL 1828114 (E.D. Tenn. May 7, 2021)..............................................................18, 24, 32

*Doshi v. Gen. Cable*,
  2017 WL 5178673 (E.D. Ky. Nov. 7, 2017)................................................................................14

*Dougherty v. Esperion Therapeutics, Inc.*,
  2020 WL 6793326 (E.D. Mich. Nov. 19, 2020)....................................................18, 20, 23, 29

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*,
  431 U.S. 395 (1977).......................................................................................................................14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011).............................................................................................1, 19, 27, 28, 29

*Fort Worth Emps' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) .................................................................................................26

*Garden City Emps.' Ret. Sys. v. Psych. Sols., Inc.*,
  2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) .........................................................................8

*Gelman v. Westinghouse Elec. Corp.*,
  73 F.R.D. 60 (W.D. Pa. 1976) .....................................................................................................35

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...............................................................................16

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) .........................................................................................26, 27, 33

*Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*,
  __ U.S. __, 141 S. Ct. 1951 (2021)..........................................................................................1, 32

*Gordon v. Sonar Cap. Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015)...........................................................................................13

*Hatamian v. Advanced Micro Devices, Inc.*,
  2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)..........................................................................32

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)....................................................................................................................1, 35

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) .....................................................................................................30

**Page**

*In re Accredo Health, Inc.*,
    2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006)......................................................................5

*In re AEP ERISA Litig.*,
    2008 WL 4210352 (S.D. Ohio Sept. 8, 2008) .........................................................................7

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) ...............................................................................................3, 7

*In re Bausch & Lomb Inc. Sec. Litig.*,
    244 F.R.D. 169 (W.D.N.Y. 2007).........................................................................................13

*In re BofI Holding, Inc. Sec. Litig.*,
    2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) ......................................................................32

*In re Bos. Sci. Corp. ERISA Litig.*,
    254 F.R.D. 24 (D. Mass. 2008).............................................................................................14

*In re Bridgestone Inv. Corp. Ltd.*,
    2019 WL 1455334 (N.D. Cal. Apr. 2, 2019) ........................................................................14

*In re Cardinal Health, Inc. Sec. Litig.*,
    226 F.R.D. 298 (S.D. Ohio 2005).....................................................................................13, 16

*In re Cardinal Health Inc. Sec. Litig.*,
    No. 2:04-cv-00575-ALM (S.D. Ohio) .....................................................................................9

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
    337 F.R.D. 193 (D. Minn. 2020)...........................................................................................35

*In re Comput. Scis. Corp. Sec. Litig.*,
    288 F.R.D. 112 (E.D. Va. 2012) ...........................................................................................18

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014) ..........................................................................................26

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene
    Hernia Mesh Prods. Liab. Litig.*,
    2021 WL 5881775 (S.D. Ohio Dec. 13, 2021) .....................................................................33

*In re Direct Gen. Corp.*,
    2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006) .....................................................................12

*In re Enron Corp. Sec. Litig.*,
    No. 4:01-cv-03624 (S.D. Tex.) ...............................................................................................9

**Page**

*In re Grupo Televisa Sec. Litig.*,
2020 WL 3050550 (S.D.N.Y. June 8, 2020) ...........................................................................12

*In re HealthSouth Corp. Sec. Litig.*,
No. 2:03- cv-01500-KOB-TMP (N.D. Ala.)............................................................................10

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016).........................................................................25

*In re Intuitive Surgical Sec. Litig.*,
No. 5:13-cv-01920-EJD (N.D. Cal.).......................................................................................24

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014).............................................................................................9

*In re Perrigo Co. PLC Sec. Litig.*,
493 F. Supp. 3d 291 (S.D.N.Y. 2020)........................................................................................9

*In re Providian Fin. Corp. Sec. Litig.*,
2004 WL 5684494 (N.D. Cal. Jan. 15, 2004)..........................................................................18

*In re Quarterdeck Off. Sys., Inc. Sec. Litig.*,
1993 WL 623310 (C.D. Cal. Sept. 30, 1993) .........................................................................14

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
No. 1:01-cv-01451-REB-KLM (D. Colo.) ..............................................................................10

*In re Select Comfort Corp. Sec. Litig.*,
202 F.R.D. 598 (D. Minn. 2001)........................................................................................18, 19

*In re Spectranetics Corp. Sec. Litig.*,
2009 WL 1663953 (D. Colo. June 15, 2009)..........................................................................11

*In re Storage Tech. Corp. Sec. Litig.*,
113 F.R.D. 113 (D. Colo. 1986) .............................................................................................35

*In re Teva Sec. Litig.*,
2021 WL 868847 (D. Conn. Mar. 9, 2021) ............................................................................12

*In re Teva Sec. Litig.*,
2021 WL 872156 (D. Conn. Mar. 9, 2021) ............................................................................21

*In re Twitter Inc. Sec. Litig.*,
326 F.R.D. 619 (N.D. Cal. 2018).............................................................................................32

4875-2998-1480.v1

**Page**

*In re UnitedHealth Grp. Inc. PSLRA Litig.*,
  No. 0:06-cv-01691-JMR-FLN (D. Minn.) ...............................................................................10

*In re Valence Tech. Sec. Litig.*,
  1996 WL 119468 (N.D. Cal. Mar. 14, 1996) .........................................................................16

*In re VHS of Mich., Inc.*,
  601 F. App'x 342 (6th Cir. 2015) ..........................................................................................20

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
  722 F.3d 838 (6th Cir. 2013) .................................................................................................20

*J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*,
  628 F.2d 994 (7th Cir. 1980) .................................................................................................35

*Jaffe Pension Plan v. Household Int'l, Inc.*,
  756 F. Supp. 2d 928 (N.D. Ill. 2010) ..............................................................................13, 14

*Johnson v. Aljian*,
  257 F.R.D. 587 (C.D. Cal. 2009) .............................................................................................6

*Kasper v. AAC Holdings, Inc.*,
  2017 WL 3008510 (M.D. Tenn. July 14, 2017) ....................................................................23

*Katz v. Comdisco, Inc.*,
  117 F.R.D. 403 (N.D. Ill. 1987) ............................................................................................14

*Lawrence E. Jaffe Pension Plan v. Household Int'l Inc., et al.*,
  No. 1:02- cv-05893 (N.D. Ill.) .................................................................................................9

*Loritz v. Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015) ........................................................................25

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ............................................................................................31, 32

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  256 F.R.D. 586 (N.D. Ill. 2009) ............................................................................................14

*Marcus v. J.C. Penney Co., Inc.*,
  2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ......................................................................35

*Milbeck v. TrueCar, Inc.*,
  2019 WL 2353010 (C.D. Cal. May 24, 2019) .........................................................................9

4875-2998-1480.v1

**Page**

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
676 F. Supp. 486 (S.D.N.Y. 1987)..................................................................13, 14

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019)..........................................................21, 22, 24, 26

*Morris v. Wachovia Sec., Inc.*,
223 F.R.D. 284 (E.D. Va. 2004) ...................................................................35

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ...............................................26

*Owens v. FirstEnergy Corp.*,
2020 WL 6873421 (S.D. Ohio Nov. 23, 2020).........................................10

*Pearlstein v. BlackBerry Ltd.*,
2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) .................................................33

*Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019)................................................................21

*Plumbers & Pipefitters Nat. Pension Fund v. Burns*,
292 F.R.D. 515 (N.D. Ohio 2013) .....................................................................8

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
2020 WL 5757695 (D. Minn. Sept. 28, 2020) ............................................... *passim*

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ....................................................26

*Rocco v. Nam Tai Elecs., Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007) .......................................................................16

*Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*,
136 F.R.D. 658 (D. Or. 1991) ...........................................................................16

*Ross v. Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009) ................................................................. *passim*

*Rougier v. Applied Optoelectronics, Inc.*,
2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ...................................................32

*Shy v. Navistar Int'l Corp.*,
2022 WL 2125574 (S.D. Ohio June 13, 2022) ..................................................4

- x -

**Page**

*Sicay v. James Jun Wang*,
　2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ............................................................26

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
　2022 WL 1078460 (S.D.N.Y. Apr. 11, 2022)..........................................................18

*Smith v. Fahnestock & Co., Inc.*,
　2002 WL 334511 (S.D.N.Y. Mar. 1, 2002) ..............................................................14

*Stanich v. Travelers Indem. Co.*,
　259 F.R.D. 294 (N.D. Ohio 2009) ..............................................................................7

*Stein v. U.S. Xpress Enters., Inc.*,
　2021 WL 1410035 (E.D. Tenn. Feb. 12, 2021) ..........................................................7

*Strougo v. Tivity Health, Inc.*,
　2022 WL 2037966 (M.D. Tenn. June 7, 2022)....................................................23, 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
　551 U.S. 308 (2007)...................................................................................................14

*Thorpe v. Walter Inv. Mgmt. Corp.*,
　2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)......................................................25, 29

*Thorpe v. Walter Inv. Mgmt. Corp.*,
　No. 14-cv-20880-UU (S.D. Fla.) ..............................................................................24

*UA Local 13 Pension Fund, et al. v. Sealed Air Corp., et al.*,
　No. 1:19-cv-10161 (S.D.N.Y. July 16, 2021)...........................................................12

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
　549 F.3d 100 (2d Cir. 2008).......................................................................................11

*Waggoner v. Barclays PLC*,
　875 F.3d 79 (2d Cir. 2017)..........................................................................................20

*Weiner v. Tivity Health, Inc.*,
　334 F.R.D. 123 (M.D. Tenn. 2020) ................................................................17, 23, 30

*Willis v. Big Lots, Inc.*,
　2017 WL 1074048 (S.D. Ohio Mar. 17, 2017)..........................................................28

*Willis v. Big Lots, Inc.*,
　242 F. Supp. 3d 634 (S.D. Ohio 2017) ...........................................................4, 7, 8, 23

4875-2998-1480.v1

**Page**

*Wilson v. LSB Indus., Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)...............................................................22, 30

*Young v. Nationwide Mut. Ins. Co.*,
  693 F.3d 532 (6th Cir. 2012) .........................................................................................3

*Zandman v. Joseph*,
  102 F.R.D. 924 (N.D. Ind. 1984)..................................................................................35

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78j(b)..................................................................................................... *passim*
  §78t(a) .........................................................................................................10
  §78u-4(a)(2)(A)(iv)......................................................................................10
  §78u-4(e)(1) .................................................................................................11

Federal Rules of Civil Procedure
  Rule 10-b(5).................................................................................................10
  Rule 23(a)............................................................................................3, 10, 16
  Rule 23(b)(3).......................................................................................... *passim*
  Rule 23(g) .....................................................................................................9

**SECONDARY AUTHORITIES**

H.R. Rep. No. 104-369 (1995) (Conf. Rep.)..................................................................14

4875-2998-1480.v1

## I.    INTRODUCTION

Lead Plaintiff 1199SEIU Health Care Employees Pension Fund ("Plaintiff" or the "Fund") meets the requirements for class certification under Federal Rule of Civil Procedure ("Rule") 23.  In fact, Defendants do not challenge numerosity or commonality.[1]  Most importantly, they abandon a key class certification battleground fight that has played out in the U.S. Supreme Court over the past decade by conceding that Plaintiff satisfies predominance by proving class-wide reliance under *Basic v. Levinson*, 485 U.S. 224 (1988).  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) ("*Halliburton I*") (loss causation not an appropriate issue at class certification); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) (materiality not an issue at class certification); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*") (Court clarifies that defendants can seek to rebut the *Basic* presumption of reliance with direct evidence showing no price impact from defendants' statements and their correction); *Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*, __ U.S. __, 141 S. Ct. 1951 (2021) (defendants bear the burden of persuasion on the issue of price impact).  In this case, Defendants do not seek to rebut the *Basic* presumption and concede price impact.

Instead, Defendants challenge class certification on two grounds repeatedly rejected by courts across the country.  ***First***, Defendants argue in vain that the Fund is not adequate or typical. Yet Plaintiff is a large institutional investor with over $11 billion in assets, exactly the sort of lead plaintiff envisioned by Congress when it passed the Private Securities Litigation Reform Act ("PSLRA") in 1995.  Plaintiff has demonstrated its adequacy by assiduously fulfilling its duties as a class representative.  Plaintiff has three in-house lawyers monitoring Lead Counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), and is actively involved in the

---

[1]    "Defendants," collectively, are Cardinal Health, Inc. ("Cardinal Health"), George S. Barrett, Donald M. Casey, Jr., Michael C. Kaufmann, Jorge M. Gomez, and David J. Wilson.

4875-2998-1480.v1

litigation – reviewing pleadings, responding to discovery, providing testimony at deposition, and regularly communicating with Lead Counsel about the case. The Fund is a sophisticated plaintiff that understands what the case is about and closely monitors the efforts of Lead Counsel. The Fund's reliance on Lead Counsel – who for over the past two decades has been the nation's leading plaintiff securities class action law firm – to actually litigate the case is exactly what an adequate class representative should do.

Defendants' typicality challenge also fails. The case law forecloses Defendants' argument that post-class period purchases by the Fund of Cardinal Health common stock defeat typicality. And Defendants cannot support their conjecture that the Fund's claims are not typical, because in addition to its ***direct*** purchases of and sales of Cardinal Health stock that form the basis of its legal claim for damages under the PSLRA, it also invested in hedge funds or other third-party funds that ***may*** have profited from shorting Cardinal Health stock. First, there is no evidence that any of the hedge funds that the Fund invested in even purchased or sold short Cardinal Health stock between March 2, 2015 and May 2, 2018, inclusive (the "Class Period"), let alone profited by such hypothetical trades. Second, even if the hedge funds did purchase Cardinal Health stock during the Class Period, Plaintiff would not hold legal title to those securities and could not seek to include those losses in its claim under the PSLRA. Such hedge funds would be potential class members in this case, and any claim for damages or offsetting gains for those transactions would belong to the hedge funds, not Plaintiff. In fact, if this case was not a class action, the hedge funds or any other third-party fund would have the legal claim to file an individual action for damages under the PSLRA. Defendants' proposed rule that institutional investors must offset losses with any gains in hedge funds or other third-party funds they invested in that ***may*** have traded in the securities at issue is not only contrary to the PSLRA, but would obliterate Congress' explicit intent to prioritize institutional investors in securities fraud cases. If adopted, it would preclude institutional investors,

- 2 -

like Plaintiff, who collectively and regularly invest billions of dollars in hedge funds from ever serving as a lead plaintiff or class representative because they would be deemed not "typical," when in fact they are typical of all other class members, including institutional and individual investors that regularly invest in hedge funds, mutual funds, or other third-party funds.

Second, Defendants' argument that Plaintiff's proposed out-of-pocket damage methodology does not satisfy Rule 23(b)(3)'s predominance requirement under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), has been repeatedly rejected by the Sixth Circuit and other courts across the country. Since Plaintiff's damage model is directly linked to Plaintiff's single theory of liability, it satisfies *Comcast*.  By arguing that Plaintiff's expert must address in detail how he will measure inflation under various factual scenarios (that may or may not come to fruition), Defendants prematurely demand a loss causation analysis.  Loss causation is properly conducted after merits discovery with a complete factual record.  Requiring Plaintiff's expert to perform a loss causation analysis now would not only violate the Supreme Court's holding in *Haliburton I* that loss causation is a common issue for the class and not required at this stage, but it is also not required under *Comcast*.  Finally, Plaintiff's expert has addressed the various inflation-related issues raised by Defendants in other cases at the loss causation stage, further demonstrating that damages can be proven on a class-wide basis and predominance is satisfied.

For the reasons set forth in Plaintiff's opening brief, and the additional reasons set forth below, Plaintiff's Motion for Class Certification (ECF 72) should be granted in its entirety.

## II.   PLAINTIFF MEETS THE ADEQUACY AND TYPICALITY REQUIREMENTS OF RULE 23(a)

To determine whether a plaintiff will adequately represent a class, courts must resolve whether the representative: (i) shares "'common interests with unnamed members of the class[;]'" and (ii) "'will vigorously prosecute the interests of the class through qualified counsel.'" *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (quoting *In re Am. Med. Sys., Inc.*, 75

- 3 -

4875-2998-1480.v1

F.3d 1069, 1083 (6th Cir. 1996)). As for Rule 23(a)(3)'s typicality requirement, "'[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Shy v. Navistar Int'l Corp.*, 2022 WL 2125574, at \*4 (S.D. Ohio June 13, 2022) (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007)). "'The threshold for satisfying the typicality prong is a low one,'" and "'[i]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent members.'" *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 645 (S.D. Ohio 2017).

As demonstrated in its opening brief, Plaintiff is adequate and its claims are typical. Memorandum in Support of Lead Plaintiff's Motion for Class Certification ("Class Certification Memorandum"), ECF 72-1 at PageID 3612-15. Defendants' challenges fail because they ignore controlling Sixth Circuit law, have been repeatedly rejected by courts around the country, and rely on factual misrepresentations and speculation.

### A. Plaintiff Will Continue to Vigorously Prosecute This Case Through Qualified Counsel

Plaintiff is a Taft-Hartley multiemployer pension fund with approximately $11.5 billion in assets under management that provides benefits to thousands of beneficiaries nationwide. Memorandum in Support of the Fund's Motion for Lead Plaintiff, ECF 13-1 at PageID 226. As an institutional investor with decades of experience as a fiduciary under the Employee Retirement Security Act of 1974 (*id.*; *see also* Declaration of Spencer A. Burkholz in Support of Lead Plaintiff's Motion for Class Certification ("Burkholz Decl."), ECF 72-2 at PageID 3629-30), Plaintiff is exactly the type of sophisticated institutional investor Congress intended to lead securities fraud class actions when it passed the PSLRA. *See Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 449-50 (S.D. Ohio 2009) ("one of the purposes of the [PSLRA] was to encourage institutional investors to oversee

- 4 -

more securities actions"); *see also In re Accredo Health, Inc.*, 2006 WL 1716910, at *4 (W.D. Tenn. Apr. 19, 2006). Because of its significant financial interest in this litigation (losses in excess of $2 million), Plaintiff is motivated to vigorously prosecute this case on behalf of the Class. *See* Declaration of Darren J. Robbins in Support of the Fund's Motion for Lead Plaintiff ("Robbins Decl."), Ex. C, ECF 13-5 at PageID 246-50; *see also Accredo Health*, 2006 WL 1716910, at *5 (finding that the representative's financial interest provided "significant incentive to pursue this action").[2] In fact, Plaintiff and Lead Counsel have vigorously pursued the claims on behalf of the Class since the Fund's appointment as Lead Plaintiff, including filing a detailed amended complaint, successfully defeating Defendants' motion to dismiss, seeking class certification, and pursuing merits-based discovery from Defendants and third parties. *See generally* Consolidated Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint"), ECF 28; Opinion and Order Denying Defendants' Motion to Dismiss, ECF 39; Lead Plaintiff's Motion for Class Certification, ECF 72.

Furthermore, Plaintiff understands the responsibilities of serving as a class representative and has demonstrated a willingness and ability to prosecute this case. *See* Burkholz Decl., ECF 72-2 at PageID 3629-30; Ex. 1 at 203:13-25; Robbins Decl., Ex. B, ECF 13-4 at PageID 239.[3] Plaintiff has reviewed the pleadings in this case, hundreds of pages of case documents, as well as quarterly reports regarding the case it receives from Lead Counsel. *See* Ex. 1 at 16:12-23, 186:7-22. Plaintiff also responded to Defendants' discovery requests by locating and producing documents, preparing and sitting for deposition, and assisting Lead Counsel with preparing interrogatory responses. *See* Burkholz Decl., ECF 72-2 at PageID 3630; Ex. 1 at 12:15-24, 16:12-23, 17:14-25, 23:7-11, 196:10-

---

[2]  "Class" as defined in the Class Certification Memorandum, ECF 72-1 at PageID 3605.

[3]  All stand alone "Ex. _" references herein are to exhibits attached to the Declaration of Spencer A. Burkholz in Support of Lead Plaintiff's Reply in Further Support of Motion for Class Certification, filed concurrently herewith.

- 5 -

4875-2998-1480.v1

24. Contrary to Defendants' claim, Plaintiff communicates regularly with Lead Counsel about this case and testified that it controls and has ultimate decision-making authority over this case. *See* Burkholz Decl., ECF 72-2 at PageID 3629-30; Ex. 1 at 13:24-14:2, 88:9-13, 120:25-121:6, 145:20-146:1, 148:11-14, 180:20-183:1, 184:1-21, 185:5-21.

Desperate to avoid these facts, Defendants leap to untenable conclusions and mischaracterize Plaintiff's deposition testimony, taking it "out of context and presenting it in a manner that borders on misleading." *Johnson v. Aljian*, 257 F.R.D. 587, 596 (C.D. Cal. 2009). For instance, Defendants claim that Plaintiff's representative at deposition did not know the basic facts of the case. Defendants' Memorandum in Opposition to Plaintiff's Motion for Class Certification ("Opp."), ECF 93 at PageID 5435. Not so. At his deposition, Plaintiff's in-house counsel Mr. Ristorucci testified accurately about the main legal theory of the case, stating:

> As is stated or, you know, provided in the complaint, Cardinal Health purchased a subsidiary of Johnson & Johnson with the idea that they were going to be bringing some expertise with regard to logistics to this Cardinal Health that was not previously existing there.
>
> They – they apparently reported that this integration of their logistics expertise was going well and was – and was going – there was going to be, essentially, a synergy between the expertise that Cardinal Health brought and that existed in Cordis.
>
> They had reason to believe that this integration was not going well, apparently, and did not – did not disclose that information to the public, and in fact may have been indicating that the – that the disclosure was – or that the integration was going well or that to the extent it was not going well was unrelated to the – a lack of – a lack of – a lack – a failure in the integration, and, as a result, had to write off a fair amount of goodwill, and it was later determined that – and also lost a lot of inventory.
>
> At the same time, when they finally did make the disclosures public, the share value of the stocks declined significantly. And prior to that public disclosure, several of the executives had sold their shares in the – that they had in Cardinal Health and had a – and had avoided the losses that would have otherwise been involved if they had – if they had – if the public disclosure had been made timely.

Ex. 1 at 205:23-207:4.

- 6 -

Plaintiff's clear understanding of the case and knowledge of the facts, coupled with Plaintiff's willingness and ability to participate in discovery, easily demonstrate its adequacy and nothing more is needed. *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at \*6 (M.D. Tenn. June 26, 2017); *see also Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 615 (S.D. Ohio 2003) (finding the plaintiff adequate as he produced documents, monitored the litigation, provided information, and gave deposition testimony); *Ross*, 257 F.R.D. at 450-51 (same); *Stein v. U.S. Xpress Enters., Inc.*, 2021 WL 1410035, at \*8 (E.D. Tenn. Feb. 12, 2021) (finding adequate plaintiffs that understood allegations and expended time on behalf of class).

Defendants' claim that Plaintiff is "'merely a pawn of the class lawyers'" and has "abdicated control and direction of this case to Robbins Geller" is meritless. Opp., ECF 93 at PageID 5445, 5448.[4] Not only is there no evidence that Plaintiff has "abdicated control of this lawsuit to [its] attorneys to an unreasonable or unusual degree" (*Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 317-18 (N.D. Ohio 2009)), but as Mr. Ristorucci testified, Plaintiff's interactions with its attorneys to date "has been typical of the usual attorney-client relationship – [it] has participated in discovery, reviewed the . . . complaint, and talked to [its] counsel about the duties of a class representative." *Stanich*, 259 F.R.D. at 318; Ex. 1 at 179:14-183:1. Also, Defendants' criticism that Plaintiff deferred to Lead Counsel on litigation issues such as retaining Plaintiff's expert Dr. Steven Feinstein and selection of local counsel does not undermine adequacy. *Willis*, 242 F. Supp. 3d at 650 (the fact that plaintiff testified that it leaves litigation strategy decisions to counsel does not defeat adequacy);

---

[4]   Defendants' reliance on *In re AEP ERISA Litig.*, 2008 WL 4210352, at \*2 (S.D. Ohio Sept. 8, 2008) for the assertion that Plaintiff in this case is "merely a pawn of the class lawyers," is misplaced. Unlike Plaintiff here, the individual investor in *AEP* had not received or reviewed the complaints filed in that action, was not aware of any rulings issued by the court, never received any status updates about the progress of the litigation, and had not supervised his counsel's work. *Id.* at \*3.

4875-2998-1480.v1

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co*., 270 F.R.D. 247, 252-53 (D.S.C. 2010) (rejecting plaintiff's "deferral to counsel" on litigation matters as showing lack of adequacy).[5]

Likewise, Defendants' assertion that Plaintiff is inadequate because it only learned of this litigation through a portfolio monitoring agreement with Robbins Geller has been routinely rejected by district courts across the Sixth Circuit. *See Willis*, 242 F. Supp. 3d at 650-51 (the fact that plaintiff learned of the case through a monitoring agreement does not defeat adequacy); *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 292 F.R.D. 515, 523-24 (N.D. Ohio 2013) (same); *Burges*, 2017 WL 2772122, at *4-*6 (same). Similarly, the indemnification clause in the retention agreement between the Fund and Robbins Geller does not undermine Plaintiff's adequacy to serve as class representative. *See Garden City Emps.' Ret. Sys. v. Psych. Sols., Inc.*, 2012 WL 1071281, at *38 (M.D. Tenn. Mar. 29, 2012); *see also Ann Arbor*, 270 F.R.D. at 252-53 (rejecting plaintiff's indemnification agreement as an indicator of lack of adequacy); *Milbeck v. TrueCar, Inc.*, 2019 WL

---

[5] Defendants incorrectly suggest that the Burkholz Declaration filed with Lead Plaintiff's Motion for Class Certification is the "sole piece of evidence" submitted by Plaintiff in support of adequacy and is not sufficient to meet Plaintiff's burden of proof. Opp., ECF 93 at PageID 5450. But Defendants ignore that the declaration contains Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories, which were approved by Plaintiff and stand alone as evidence of Plaintiff's adequacy. Burkholz Decl., Ex. B, ECF 72-4 at PageID 3804-27. Moreover, Plaintiff has submitted other evidence that demonstrates its adequacy to serve as class representative, including its original PSLRA certification. Robbins Decl., Ex. B, ECF 13-4 at PageID 239. And, contrary to Defendants' assertions, Mr. Ristorucci's deposition testimony further confirms Plaintiff's adequacy to serve as class representative and confirms the accuracy of the declaration. Ex. 1 at 179:14-17 (Q. "It says you were involved in monitoring the litigation along with Mr. Stein and Ms. Metzger. Is that an accurate statement? A. Yes."); *id*. at 185:5-17 ("Q. It says: 'RGRD has provided the Fund with written quarterly updates.' Do you see that? A. Yes. Q. Is that true? A. Yes. Q. And then it says: 'RGRD has' – on the next page – 'communicated numerous times with these three lawyers and others at the Fund.' Do you see that? A. Yes. Q. Is that accurate? A. Yes."); *id*. at 190:6-16 ("Q. So let's say over the last six months, how much time have you spent working on this case? . . . A. It really varies about – you know, if there is a filing, then, obviously, there would be more time looking at that than if there's not a filing. But the past six months? Probably – you know, I wouldn't be surprised – I wouldn't be surprised if it's between 20 and 40 hours."); *id*. at 203:13-25 ("Q. What are SEIU's responsibilities in this litigation? A. Well, we have a responsibility to make sure that the class is adequately being represented, that the lawyers are competent and performing well – Q. And to monitor – A. – prosecuting the case – monitor – monitor their progress and the actions that are taken. Q. Have you been doing that? . . . A. Yes.").

2353010, at *4 (C.D. Cal. May 24, 2019) (same); *In re Perrigo Co. PLC Sec. Litig.*, 493 F. Supp. 3d 291, 295-96 (S.D.N.Y. 2020) (same).

This Court has held that when class counsel is qualified, as Robbins Geller is here, a defendant may only show lack of adequacy if the representative's "'participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case.'" *Ross*, 257 F.R.D. at 451. Indeed, holding otherwise may "'prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights.'" *Id*. As discussed above, the Fund has communicated with Lead Counsel numerous times, reviewed drafts of important pleadings, received regular litigation updates, sat for deposition, actively participated in discovery responses, provides input into decisions concerning the litigation, and has detailed knowledge of the facts underlying the case. This evidence overwhelmingly supports Plaintiff's adequacy to serve as class representative and renders Defendants' out of circuit case law inapposite. *See In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 146-47 (N.D. Tex. 2014) (the plaintiff provided only conclusory assertions of involvement in and understanding of the case).

The fact that Plaintiff has relied on Lead Counsel to litigate the case is reasonable and in the best interests of the Class. Robbins Geller has a team of experienced trial lawyers and forensic accountants prosecuting this case. Robbins Geller is the leading plaintiff securities class action law firm in the country, having recovered billions for investors – including a $600 million recovery in *In re Cardinal Health Inc. Sec. Litig.*, No. 2:04-cv-00575-ALM (S.D. Ohio), which remains the largest securities class action recovery in the Sixth Circuit and Southern District of Ohio.[6] Notably, Defendants do not challenge Robbin Geller's adequacy under Rule 23(g) to serve as Class Counsel.

---

[6] Robbins Geller lawyers have also obtained the largest securities fraud class action recoveries in the Fifth, Seventh, Eighth, Tenth, and Eleventh Circuits. *See In re Enron Corp. Sec. Litig.*, No. 4:01-cv-03624 (S.D. Tex.) ($7.3 billion recovery is largest securities class action recovery in U.S. history and in the Fifth Circuit); *Lawrence E. Jaffe Pension Plan v. Household Int'l Inc., et al.*, No. 1:02-cv-05893 (N.D. Ill.) ($1.575 billion recovery is the largest securities class action recovery following a

- 9 -

Thus, Plaintiff has satisfied Rule 23(a)(4)'s adequacy requirement by demonstrating it will fairly and adequately protect the interests of the Class through vigorous prosecution of this case with highly qualified counsel. No more is needed. *See Ross*, 257 F.R.D. at 451 ("The Court finds that Plaintiff is an adequate class representative. It has vigorously prosecuted the interests of the class through qualified counsel and will likely continue to do so.").

### B. Plaintiff's Claims Are Typical of the Class and Not Subject to Unique Defenses

Plaintiff easily satisfies the typicality requirement of Rule 23(a) because, like all other class members, Plaintiff acquired Cardinal Health common stock during the Class Period at prices artificially inflated by Defendants' misrepresentations and omissions. And when the truth of Defendants' fraud was revealed, the price of Cardinal Health common stock declined significantly, and Plaintiff suffered losses (over $2 million), along with the rest of the Class. *See* Robbins Decl., Ex. C, ECF 13-5 at PageID 246-50; *Owens v. FirstEnergy Corp.*, 2020 WL 6873421, at *11 (S.D. Ohio Nov. 23, 2020) (plaintiff's "claims are therefore typical of the class" because plaintiff "purchased [the defendant's] securities at artificially inflated prices during the Class Period and suffered a loss as a result of Defendants' alleged misrepresentations and omissions . . . and [with] the other putative class members ha[s] identical legal claims in that all movants allege Defendants violated §§10(b) and 20(a) of the Exchange Act and Rule 10-b(5), promulgated thereunder").

Defendants argue that Plaintiff is atypical because it cannot show that it has the same losses as other class members, and assert that even if it could, the purported difficulty in proving its losses

---

trial as well as the largest securities class action recovery in the Seventh Circuit); *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 0:06-cv-01691-JMR-FLN (D. Minn.) ($925 million recovery is the largest securities class action recovery in the Eighth Circuit); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 1:01-cv-01451-REB-KLM (D. Colo.) ($445 million recovery is the largest securities class action recovery in the Tenth Circuit); *In re HealthSouth Corp. Sec. Litig.*, No. 2:03- cv-01500-KOB-TMP (N.D. Ala.) ($671 million recovery is the largest securities class action recovery in the Eleventh Circuit).

4875-2998-1480.v1

would present unique defenses. Opp., ECF 93 at PageID 5451-57. But the sole basis for this attack is Defendants' unsupported speculation that Plaintiff's hedge fund and third-party investments during the Class Period *may* have made money shorting Cardinal Health stock. These arguments are pure speculation and meritless.

Whether Plaintiff invested in hedge funds, or any other third-party funds, that may have invested in Cardinal Health common stock during the Class Period is legally irrelevant. The PSLRA only requires disclosure of a *plaintiff's* transactions (not a hedge fund or third party's) in the security that is the subject of the complaint. 15 U.S.C. §78u-4(a)(2)(A)(iv). In fact, the PSLRA *limits* a plaintiff's damages and its recovery to the "difference between the purchase or sale price paid or received . . . *by the plaintiff for the subject security* and the mean trading price of that security during the 90-day period" after the class period. 15 U.S.C. §78u-4(e)(1). In other words, a plaintiff is *not* entitled to recover the losses under the PSLRA on the transactions of a third party, and there is no requirement under the federal securities laws that plaintiffs disclose the transactions of another legally distinct entity. Hedge funds, and other third-party funds, are legally distinct entities from Plaintiff, and Plaintiff does not have legal title to, and is not a beneficial owner of, the securities invested by these third-party funds. *See, e.g.*, *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) (holding that entity without legal title or ownership of a security has no standing to assert a violation of federal securities laws); *Corwin v. Seizinger*, 2008 WL 123846, at *4 (S.D.N.Y. Jan. 8, 2008) (finding movant was not required to disclose trading by another fund because they were "legally independent entities"); *In re Spectranetics Corp. Sec. Litig.*, 2009 WL 1663953, at *4 (D. Colo. June 15, 2009) (declining to appoint movants as lead plaintiff where another "separate legal entity" owned the security at issue). Thus, whether any hedge fund that Plaintiff invested in lost money purchasing Cardinal Health stock, or made money shorting Cardinal Health stock, is irrelevant to Plaintiff's legal claim for damages. Moreover, as detailed

- 11 -

below, there is also **zero** evidence that any of the hedge funds invested in Cardinal Health stock – long or short.[7]

Defendants' reliance on *In re Grupo Televisa Sec. Litig.*, 2020 WL 3050550 (S.D.N.Y. June 8, 2020) is misplaced. *Grupo* is an outlier case subsequently distinguished by the same judge in another case. *See UA Local 13 Pension Fund, et al. v. Sealed Air Corp., et al.*, No. 1:19-cv-10161, ECF 52 at 1 (S.D.N.Y. July 16, 2021) ("*Sealed Air*"). Like here, defendants in *Sealed Air* argued to Judge Stanton, the *Grupo* judge, that under *Grupo*, the plaintiffs' stock transactions in the corporation through other investment vehicles was relevant and that "'[p]laintiffs should be required to disclose all of their holdings in the securities at issue.'" Judge Stanton rejected this argument, noting that defendants' "assumption is wrong" and explaining that *Grupo* presented a unique situation where the "short sales and the identity of the short-seller were known." *See Sealed Air*, ECF 54 at 1-2 (S.D.N.Y. July 21, 2021). As in *Sealed Air*, those distinct *Grupo* facts are not present here.

*Grupo* was also distinguished in *In re Teva Sec. Litig.*, 2021 WL 868847, at *2 (D. Conn. Mar. 9, 2021), where defendants moved to delay ruling on plaintiffs' pending motion for class certification and sought additional discovery concerning "the existence of all third parties who might possess relevant information regarding the Plaintiffs' transactions in Teva securities." Like here, the institutional plaintiff in *Teva* held "'indirect and passive' investments in such funds, but . . . it never held legal title to the securities bought and sold by those funds." *Id.* at *2 n.2. Relying on *Grupo*, the defendants in *Teva* "claim[ed] that information about those third-party funds could be relevant to

---

[7] Defendants also wrongly assert that the purported uncertainty about whether Plaintiff suffered any losses subjects Plaintiff to the unique defense of lack of standing and defeats typicality. Not so. In *In re Direct Gen. Corp.*, 2006 WL 2265472, at *3 (M.D. Tenn. Aug. 8, 2006), the court specifically rejected this argument, finding that "for purposes of class certification, the common question of whether the registration statements were materially misleading predominates over any secondary [damage] issues that might be encountered later in the litigation."

4875-2998-1480.v1

determining Ontario Teachers' typicality." *Id.* The court in *Teva* rejected this argument, distinguishing *Grupo* on the grounds that the "lead plaintiff was atypical because 'the price drop which injured the other class members enriched' the lead plaintiff, which owned 75 percent of a fund that shorted the relevant securities." *Id.* The *Teva* court held that "[a]ny analogy between that case and this case is speculative." *Id.* Accordingly, the *Teva* court rejected defendants' argument that such information was relevant and further held "there is no dispute that the Plaintiffs long ago fully and accurately disclosed all their transactions during the Class Period in Teva securities that are at issue in this case." *Id*. at *3. The same distinction applies here; there is no evidence that Plaintiff held legal title or ownership to the hedge funds and third-party investments at issue, which makes those investments irrelevant to Plaintiff's claims in this case.

Defendants' other authority as to the purported relevance of Plaintiff's hedge fund and other third-party investments fares no better. In *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005), *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 171 (W.D.N.Y. 2007), and in *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015), the courts were concerned with the prospective lead plaintiffs' status as a net seller and a net gainer of the securities at issue. The concern, however, was over the net gain that the prospective lead plaintiffs *themselves* had in the actual securities at issue – there was no discussion or inference that the issue dealt with the lead plaintiffs' investments in a separate, legally distinct entity such as hedge funds that may have had a gain in the securities at issue. Similarly, in *Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 935 (N.D. Ill. 2010), the court's damages discussion concerned how "plaintiffs' losses be netted against *their* profits attributable to the same fraud." Defendants' reliance on *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 490 (S.D.N.Y. 1987), is misplaced for the same reasons. In *Minpeco*, the court only offset plaintiff's *own* "claimed damages on its silver futures positions . . . by the measure of the increase in value which accrued to its own physical silver

- 13 -

4875-2998-1480.v1

holdings – ***but not . . . those of its clients*** – as a result of defendants' allegedly manipulative behavior." *Id.*[8]

Importantly, if the Court were to adopt Defendants' specious rule – that a proposed class representative is not typical because it invested in hedge funds that ***may*** have made money shorting a stock – then the very institutional investors that Congress legislated to lead securities class actions like this one would largely be foreclosed from serving as lead plaintiffs. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320-21 (2007) (PSLRA encourages institutional investors to serve as lead plaintiffs); H. Rep. No. 104-369 at 34 (1995) (Conf. Rep.) ("Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake."); *id*. ("[T]he lead plaintiff provision will encourage institutional investors to take a more active role in securities class action lawsuits."). Institutional investors, like Plaintiff, invest billions of dollars in hedge funds and other third-party investment funds. *See, e.g.*, Hannah Zhang, *Asset Owners Haven't Put This Much New Money Into Hedge Funds in 7 Years*, Institutional Investor (Apr. 25, 2022) ("Institutional investors deployed $19.8 billion in hedge funds in the first quarter, marking the highest quarterly inflow in seven years,

---

[8]  The same holds true to the myriad of other cases that Defendants cited: those courts were concerned with the plaintiffs' ***own*** purchases/sales, not those of a separate legal entity. In *Smith v. Fahnestock & Co., Inc.*, 2002 WL 334511, at *1 (S.D.N.Y. Mar. 1, 2002), the issue was over the plaintiff's ***own*** investments that the plaintiff asserted she was improperly induced into making – not that of a third party. In *In re Bridgestone Inv. Corp. Ltd.*, 2019 WL 1455334, at *1 (N.D. Cal. Apr. 2, 2019), the court was concerned with the lead plaintiff candidate's ***own*** long and short positions. *See also Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 600 (N.D. Ill. 2009) (issue was plaintiff's ***own*** gain of Tellabs stock from his purchases and sales); *In re Quarterdeck Off. Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *3 (C.D. Cal. Sept. 30, 1993) (plaintiffs' lack of standing was related to the timing of the plaintiffs' ***own*** purchases in the company's stock); *Doshi v. Gen. Cable*, 2017 WL 5178673, at *4 (E.D. Ky. Nov. 7, 2017) (lead plaintiff candidate had no loss causation based on the sale of all of ***its*** holdings in the defendant company's stock prior to the end of the Class Period); *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 407-08 (N.D. Ill. 1987) (plaintiff's net sale of the stock exceeded ***his*** expenditures, making him personally a beneficiary); *In re Bos. Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 32 (D. Mass. 2008) (same). And *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 395 (1977) is completely irrelevant – the case was not a securities class action and concerned the Civil Rights Act of 1964.

- 14 -

according to the latest report by Hedge Fund Research.").[9]  If anything, Plaintiff is typical of other institutional investors as well as individual investors that also invest in hedge funds, mutual funds, or other third-party funds that may have purchased or sold Cardinal Health stock.

Last, Defendants' speculation that Plaintiff *may* have reaped a gain on its Cardinal Health investments through hedge funds and third-party investments is belied by the record.  First, Plaintiff's agreements with its investment managers for securities invested where the Fund had legal title expressly prohibited shorting stock.[10]  Indeed, several of Plaintiff's investment managers confirmed that they did not short any Cardinal Health security or put options on any Cardinal Health security.[11]  And Defendants' Exhibit 24, ECF 93-25 at PageID 6250-53, which purports to show over $500 million of Plaintiff's investments in hedge funds and other funds, only confirms that Defendants are grasping at straws.  There is no indication that any of the funds invested in Cardinal Health at all during the Class Period, and several of the funds do not appear to invest in Cardinal Health based on their fund strategy.  For example, CF Makuria Credit Fund Ltd CL A "tries to make money trading corporate credit, including distressed bonds."  *See* Laurence Fletcher, *UK hedge fund*

---

[9]  Available at https://www.institutionalinvestor.com/article/b1xrwr2f7l6v97/Asset-Owners-Haven-t-Put-This-Much-New-Money-Into-Hedge-Funds-in-7-Years.

[10]  *See* Ex. 1 at 215:19-22 ("[O]ur Investment Management Agreements don't allow for shorting, but we also – we're not aware and we have not seen any shorting positions in our custodial reports.); Ex. 2 at 1199SEIUHC0000050; Ex. 3 at 1199SEIUHC0000105; Ex. 4 at 1199SEIUHC0000147; Ex. 5 at 1199SEIUHC0000191; Ex. 6 at 1199SEIUHC0000249; Ex. 7 at 1199SEIUHC0000300; Ex. 8 at 1199SEIUHC0000341; Ex. 9 at 1199SEIUHC0000378.

[11]  *See* Ex. 10 at 39:11-18 (Q.  "Has the Contrarian strategy ever taken a short position in any security? A. No. Q. Why not? A. We're a long-only fund. Q. Has the Contrarian strategy ever held put options on any security? A. No."); Ex. 11 at 70:10-20 ("Q. Has the SEIU portfolio with Rothschild at any time had a short position in any Cardinal Health security? A. No. . . . Q. Has the SEIU portfolio with Rothschild at any time had put options on any Cardinal Health security? . . . . A. No."); Ex. 12 at 196:21-24 ("Q. Has the SEIU portfolio with Boston Partners at any time held a short position in any Cardinal Health security? A. I don't know, but not to my knowledge."); Ex. 13 at 185:11-18 ("Q. Has the SEIU portfolio with LSV at any time had a short position in any Cardinal Health security? A. No. Q. Has the SEIU portfolio with LSV at any time had put options of any Cardinal Health security? A. No.").

- 15 -

4875-2998-1480.v1

*Makuria hit by oil slide and lockdown effects*, Financial Times (Sept. 17, 2020).[12] The CF Juniperus Insurance Opportunity funds (now called Pillar Capital) are "dedicated to investing in insurance related instruments." *See* Pillar Capital Management Limited (last visited July 20, 2022).[13] And CF Cadian Offshore Fund is described as "tech heavy" (Stephen Taub, *Tech-Heavy Cadian Maintains High-Teen Gains Despite Octave Losses*, Institutional Investor (Nov. 12, 2018) (available at https://www.institutionalinvestor.com/article/b1bsqnd8585n38/tech-heavy-cadian-maintains-high-teens-gains-despite-october-losses)) with a "[s]tock selection is driven by fundamental research with a value oriented long-term approach" (*see Cadian Capital. The intersection of tech and value*, Cadian Capital (last visited July 20, 2022) (available at https://www.cadiancap.com/#home/1)). If any of them did invest in Cardinal Health stock, the hedge fund's transactions – long or short – would be calculated for their damage claim. If they had a net loss, the hedge funds would have the legal claim for any such damages in this case – not Plaintiff.

In the end, Plaintiff is not atypical because of investments in legally separate hedge funds or other third-party funds that may or may not have purchased or sold Cardinal Health securities.

### C. The Timing of Plaintiff's Purchases Does Not Subject It to Unique Defenses

Whether Plaintiff purchased Cardinal Health common stock after a corrective disclosure or after the end of the Class Period is irrelevant. *Ross*, 257 F.R.D. at 446.[14] "It is not inconsistent with

---

[12] Available at https://www.ft.com/content/115f9e86-ac2b-4d69-9998-c294c67a0ee6.

[13] Available at https://pillar-capital.com/.

[14] Tellingly, Defendants do not cite any in-Circuit decisions denying class certification based on post-disclosure purchases. *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007), *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000), *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991), and *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, at *6 (N.D. Cal. Mar. 14, 1996) are all dated, out of Circuit opinions that involved unique factual scenarios not present here. Similarly, *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) involved complex trading distinct from Plaintiff's trading here. *Cardinal Health*, 226 F.R.D. 298, was a lead plaintiff decision, not a denial of class certification based on a

- 16 -

the pleadings for Plaintiff to have purchased stock after its price had been deflated by curative disclosures" because "a party may believe a stock to be a bargain after such deflation, and may believe that it is 'now trading at a price with defendants' fraud removed from it.'" *Id.*

> At a minimum, a proposed class representative "is [not] as a matter of law categorically precluded from meeting the requirements of Rule 23(a) simply because of a post-disclosure purchase of the defendant company's stock," and this is "particularly so after the stock price has been 'corrected' by the market's assimilation of the new information."

*Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 130 (M.D. Tenn. 2020). This aligns with Plaintiff's testimony, who confirmed that any investments in Cardinal Health even after filing of the litigation were appropriate because:

> [W]e would assess that since this information is public, then that's now incorporated into the price of a share and that investment managers have the ability to evaluate whether that share price is appropriate and merits further investment.
>
> That said, we also understand that our investment managers may be making investments based on participating in a growth of a particular sector or a particular – in terms of what industry that – that investment is in or what level and what – what capitalization they represent to the market. There are a host of factors that we would want our investment managers to take into account when making an investment.

Ex. 1 at 311:11-312:2.

Several recent cases in this Circuit have affirmatively stated that this is the ***majority rule*** in federal courts. *See Weiner*, 334 F.R.D. at 130 (granting plaintiffs' motion for class certification where lead plaintiff purchased stock after a corrective disclosure because "'courts routinely certify a class with representatives who purchased stock during and after a class period'"); *Dougherty v.*

---

plaintiff's post-disclosure or post-class period purchases. Moreover, *Cardinal Health* involved purchases made after the crux of the fraud had already been disclosed – the plaintiff purchased 175,000 shares the day after a disclosure revealing a "significant earnings shortfall, the existence of an SEC subpoena regarding its revenue accounting methods, and an investigation into the same by the United States Attorney's Office." *Id.* at 310. Here, Defendants complain of 29,000 shares purchased after the first corrective disclosure and approximately 7,000 additional shares purchased in 2018 and 2020. Plaintiff, however, purchased the overwhelming majority of its 167,603 Class Period shares prior to the first corrective disclosure.

- 17 -

*Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *8-*9 (E.D. Mich. Nov. 19, 2020) (holding that plaintiff's post-disclosure purchases – including one two weeks after plaintiff requested to be lead plaintiff – did not render them atypical); *Cosby v. KPMG, LLP*, 2021 WL 1828114, at *6 (E.D. Tenn. May 7, 2021) ("Though defendant notes a disagreement among district courts about this issue, defendant does not argue why those cases are better reasoned, more persuasive, or more applicable other than reaching their desired conclusion.").  And courts nationwide are in accord.  *See, e.g.*, *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2022 WL 1078460, at *3 (S.D.N.Y. Apr. 11, 2022) (Rejecting argument that there was a purported conflict where plaintiff bought securities after a partial disclosure, noting that "[d]efendants do not cite a single case in which such a purported conflict precluded class certification.  Thus, the argument must be and is rejected."); *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020 WL 5757695, at *6 (D. Minn. Sept. 28, 2020) ("[T]he great weight of the authority provides that purchasing shares after a disclosure does not destroy typicality, because, in an efficient market, the investor still relies on the fact that the disclosure information will be absorbed by the market and reflected in the new share price."); *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 607 n.12 (D. Minn. 2001) ("Courts routinely certify a class with representatives who purchased stock during and after a class period."); *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 4098741, at *4 (D. Minn. July 28, 2016) ("[P]ost-disclosure purchases do not destroy typicality."); *In re Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 123-24 (E.D. Va. 2012) (finding that post-suit purchases do not destroy typicality); *In re Providian Fin. Corp. Sec. Litig.*, 2004 WL 5684494, at *2 (N.D. Cal. Jan. 15, 2004) (holding that class representative's purchase of shares both after the first corrective disclosure and one week after the lawsuit was filed did not render it atypical).

Post-disclosure and post-class period purchases do not defeat typicality because all that is required is that Plaintiff "purchased [Cardinal Health] stock during the class period, and like all other

class members, allegedly overpaid because the stock price was artificially inflated due to defendants' purportedly misleading statements." *Select Comfort*, 202 F.R.D. at 608. Here, Plaintiff purchased Cardinal Health common stock during the Class Period at allegedly artificially inflated prices due to Defendants' misleading statements regarding the acquisition and performance of Cordis Corporation ("Cordis") – thereby satisfying Rule 23(a)'s typicality requirement.

## III. PLAINTIFF'S PROPOSED DAMAGES METHODOLOGY SATISFIES RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT

The Supreme Court has recognized that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). This securities fraud case is no different. Nevertheless, Defendants assert that Plaintiff cannot meet Rule 23(b)(3)'s predominance requirement because: (a) Plaintiff's proposed damages methodology cannot reliably measure damages on a class-wide basis consistent with its theory of liability (Opp., §II.A., ECF 93 at PageID 5459-70; Expert Rebuttal Report of Kenneth M. Lehn ("Lehn Report"), ¶6, ECF 93-2 at PageID 5484-85); and (b) Defendants' disclosure of Cordis-related information throughout the Class Period creates individualized issues that defeat predominance (Opp., §II.B., ECF 93 at PageID 5470-72). As explained below, both arguments are meritless.

Plaintiff's expert economist, Dr. Steven Feinstein, has presented an "out-of-pocket" damages model that satisfies Rule 23(b)(3) and *Comcast*, and is consistently recognized by courts as the standard approach for measuring damages in §10(b) securities fraud cases such as this one. Defendants' criticisms of Dr. Feinstein's model, on the other hand, are routinely rejected and found to be inapposite to the issue of class certification, because they are all loss causation issues that are not to be addressed at this stage. *See Halliburton I*, 563 U.S. at 807 ("The question presented in this case is whether securities fraud plaintiffs must also prove loss causation in order to obtain class certification. We hold that they need not."). In addition, Defendants' arguments fail because when the appropriate time comes, Dr. Feinstein's model and methodology is fully capable of isolating the

- 19 -

allegations-related stock price inflation and addressing the "complicating factors," if any, Defendants and their expert identify.

### A. Dr. Feinstein's Out-of-Pocket Methodology Is Consistent with Plaintiff's Theory of Liability and Satisfies *Comcast*

In *Comcast*, the Supreme Court held that in order to satisfy Rule 23(b)(3)'s predominance requirement, plaintiffs need only present a model demonstrating that damages can be calculated on a class-wide basis consistent with their theory of liability. 569 U.S. at 34-35.[15] The Sixth Circuit has since clarified that *Comcast* "breaks no new ground on the standard for certifying a class action" (*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013)), and that it only "applies where multiple theories of liability exist, those theories create separable anticompetitive effects, and the combined effects can result in aggregated damages" (*In re VHS of Mich., Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015)). That is, where "there is no chance of aggregated damages attributable to rejected liability theories, the Supreme Court's concerns [from *Comcast*] do not apply." *Id.*; *Dougherty*, 2020 WL 6793326, at *6; *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (Where the plaintiff's "'proposed measure for damages is . . . directly linked with their underlying theory of classwide liability . . . [it is] in accord with . . . *Comcast*.'").

Here, Dr. Feinstein's damages model is directly linked to Plaintiff's theory of liability. Plaintiff has alleged a single theory of liability with respect to the §10(b) claim, which is clearly articulated in the Amended Complaint:

---

[15]    In *Comcast*, the plaintiffs alleged four distinct theories of antitrust liability, but in granting class certification, the district court found that only one theory was capable of class-wide proof. 569 U.S. at 31. The plaintiffs presented a methodology that "did not isolate damages resulting from any one theory of antirust impact," and instead they calculated damages collectively. *Id.* at 32. As a result, the Supreme Court found the proposed methodology did not demonstrate damages could be measured on a class-wide basis because it "identifie[d] damages that [were] not the result of the wrong." *Id.* at 37. That is completely inapposite to the situation here, where Plaintiff is proceeding under a single theory of liability.

Throughout the Class Period, Cardinal's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiff and other members of the Class purchased or otherwise acquired Cardinal common stock relying upon the integrity of the market price for Cardinal's common stock and market information relating to Cardinal, and have been damaged thereby.

When the relevant truth began to emerge, the price of Cardinal's common stock declined immediately as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiff and the Class.

Amended Complaint, ¶¶131-132, ECF 28 at PageID 476-77.  Dr. Feinstein succinctly reiterated that theory of liability at his deposition:

Q.  What is lead plaintiff's theory of liability in this case?

A.  That there were misrepresentations or omissions that caused the stock price to be artificially inflated that caused investors to overpay for the stock and that, upon disclosure of the truth, the stock price fell and investors, therefore, suffered losses.

Ex. 14 at 108:20-109:2; *see also id.* at 124:4-125:4.[16]  Thus, while Plaintiff has alleged a number of false and misleading statements and omissions throughout the Class Period regarding the Cordis acquisition, they all relate to ***one*** theory of liability with respect to the §10(b) cause of action.[17]

Dr. Feinstein proposes using the universally-accepted "out-of-pocket" methodology for calculating §10(b) damages, and explains how it would be applied commonly to the Class consistent

---

[16]  Defendants' expert, Dr. Kenneth Lehn, understood this to be Plaintiff's theory of liability as well.  Ex. 15 at 116:22-117:2 ("I think what plaintiffs are alleging is on the two alleged corrective disclosures dates, the so-called 'truth' about the alleged misrepresentations was revealed to the market, and there was an associated decline in Cardinal's stock price, and that's the source of the loss suffered by investors.").

[17]  Alleging multiple misrepresentations does not create more than one "theory of liability." *In re Teva Sec. Litig.*, 2021 WL 872156, at *42 (D. Conn. Mar. 9, 2021) (Finding one theory of liability where "the [d]efendants allegedly lied about numerous different (yet intimately related) topics . . . . But the [d]efendants' various misstatements and omissions were 'part of a network of interrelated lies all collectively aimed at perpetuating a broader, material lie.'") (quoting *Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 174 (D. Conn. 2019)); *see also Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 398 (N.D. Ga. 2019) ("'Plaintiffs' sole theory of liability' – misrepresentations regarding the Kemper Plant – 'giving rise to their sole alleged harm, artificial stock inflation, is straightforward.'").

with this theory of liability. *See* Report on Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Report"), ¶¶140-149, ECF 72-3 at PageID 3675-78; *see also* Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA, dated July 22, 2022 ("Feinstein Rebuttal") (filed concurrently herewith as Exhibit 16), ¶¶35-40. Dr. Feinstein's report specifically details how he would apply the out-of-pocket method here:

- First, Dr. Feinstein will use "valuation tools, which would include an event study analysis," to measure the artificial inflation in the stock due to the alleged misrepresentations and omissions, as well as the corresponding dissipation caused by corrective disclosures to establish if the alleged corrective disclosures caused the price of Cardinal Health stock to fall. Feinstein Report, ¶147(i), ECF 72-3 at PageID 3676. This analysis would "control[] for potentially non-fraud-related information" and "would apply on a class-wide basis." *Id.*

- Second, Dr. Feinstein will create an "inflation ribbon" (*i.e.*, "a time series of the difference between a stock's actual price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure") to determine the extent of artificial inflation in the stock's price on each day of the Class Period. *Id.*, ¶147(ii), ECF 72-3 at PageID 3677.

- Third, Dr. Feinstein will calculate per share damages for each class member by determining "the difference between the inflation on the date the shares were purchased and the inflation on the date those same shares were subsequently sold." *Id.*, ¶147(iv), ECF 72-3 at PageID 3677. Dr. Feinstein will also limit per share damages to be no greater than the decline in share price over the holding period. *Id.*, ¶147(v), ECF 72-3 at PageID 3677.

Dr. Feinstein also explained that, to the extent there are specific merits-related issues that complicate the quantification of artificial inflation, standard valuation tools would be used to adjust the inflation ribbon accordingly – such as valuation multiple or discounted cash flow (DCF) models. *Id.*, ¶¶144-146, ECF 72-3 at PageID 3676; Feinstein Rebuttal, ¶¶41-44.[18]

---

[18] Notably, these are the precise same valuation tools that Dr. Lehn admits he would use, and that equity analysts used throughout the Class Period, to value Cardinal Health stock and address the "complexities" raised in his report. *See* Ex. 15 at 30:8-17, 222:4-18, 257:18-25, 264:4-21, 279:22-280:3. And while Defendants criticize Dr. Feinstein for not specifying which valuation tool(s) he would ultimately use to calculate damages (Opp., ECF 93 at PageID 5461), such criticisms are routinely rejected by courts at the class certification stage. *See Monroe*, 332 F.R.D. at 399 (finding proposed methodology complied with *Comcast* even though Dr. Feinstein "ha[d] not yet specified which valuation tools . . . he [would] ultimately use"); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *17 (S.D.N.Y. Aug. 13, 2018) (rejecting argument that Dr. Feinstein was required to specify "valuation tools" because "such specificity is not required at this stage").

The methodology proposed by Dr. Feinstein to "[m]easur[e] damages using 'the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale' matches precisely with Plaintiff['s] out-of-pocket theory of liability," and "numerous courts in the Sixth Circuit (and beyond) have found [this] proposed methodology sufficient in securities fraud claims based on misstatements or omissions." *Dougherty*, 2020 WL 6793326, at *6; *Willis*, 242 F. Supp. 3d at 652 (certifying securities class action and holding that plaintiffs "satisfied *Comcast*," as the proposed out-of-pocket event study methodology was "consistent with Plaintiffs' theory of liability"); *Kasper v. AAC Holdings, Inc.*, 2017 WL 3008510, at *14 (M.D. Tenn. July 14, 2017) (same).

Contrary to Defendants' claim, Plaintiff has satisfied *Comcast* by providing a common methodology that would measure those damages resulting from Plaintiff's single theory of §10(b) liability.  Nothing more is needed.  *Weiner*, 334 F.R.D. at 137 (Out-of-pocket damages model that sought to "'measure damages as the artificial inflation per share at the time of purchase less the artificially inflation at the time of the sale'" was "'directly linked with [the] underlying theory of classwide liability . . . [and] in accord with the Supreme Court's . . . decision in *Comcast*.'").

### B.    Dr. Feinstein's Out-of-Pocket Methodology Has Been Routinely Accepted

Courts in the Sixth Circuit and around the country routinely recognize that the "[u]se of the out-of-pocket damages model in securities cases is hardly new or novel – ***it 'is the standard measurement of damages in Section 10(b) securities cases' . . . [and] Comcast did not change this or render the model improper***." *Weiner*, 334 F.R.D. at 137 (quoting *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3, *7 n.2 (N.D. Cal. Oct. 11, 2018) (collecting cases)).[19]  Thus, it is unsurprising that ***more than 20*** class certification opinions post-

---

[19]    *See also Strougo v. Tivity Health, Inc.*, 2022 WL 2037966, at *9 (M.D. Tenn. June 7, 2022) ("using an event study to calculate out-of-pocket damages, is hardly new or novel . . . '[i]t is a

- 23 -

*Comcast* have accepted Dr. Feinstein's out-of-pocket damages methodology.  *See* Ex. 17 (chart identifying post-*Comcast* class certification opinions allowing Dr. Feinstein's out-of-pocket methodology); *Monroe*, 332 F.R.D. at 398 ("Professor Feinstein's proposed damages model has been accepted in securities fraud class actions in cases like this one, where Plaintiffs seek out-of-pocket damages to recover artificial inflation caused by Defendants' misrepresentations.") (collecting cases).[20]  In fact, as Defendants' expert Dr. Lehn conceded at his deposition, the out-of-pocket damages methodology is widely considered an acceptable method among financial experts for measuring damages in §10(b) class actions.  *See* Ex. 15 at 95:18-96:8.

In stark contrast to the widely-accepted damages methodology proposed by Dr. Feinstein, Defendants have not and cannot identify a single court that has ever adopted a *Comcast* challenge from Dr. Lehn as a basis for denying class certification.  *See id.* at 84:20-85:3.  Indeed, Dr. Lehn lodged nearly identical *Comcast*-based critiques of securities fraud plaintiffs' proposed damage methodologies in both *In re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920-EJD (N.D. Cal.) and *Thorpe v. Walter Inv. Mgmt. Corp.*, No. 14-cv-20880-UU (S.D. Fla.).  *See* Ex. 18 at 15 (Dr. Lehn opining that plaintiffs' expert had not demonstrated that class-wide damages could be calculated subject to a common and reliable methodology consistent with plaintiffs' claims); Ex. 19 at 11-12 (same).[21]  And in both cases, the courts rejected defendants' and Dr. Lehn's *Comcast*-based

---

feature of virtually every securities action, which must account for stock fluctuations unrelated to the particular theory of liability asserted in the case'"); *Cosby*, 2021 WL 1828114, at \*7 (certifying a class of §10(b) investors and describing plaintiffs' proposed out-of-pocket damages model as a "well-settled methodology used and approved in similar cases").

[20]  Upon completion of discovery and development of the full factual record in this case, there is no doubt that Dr. Feinstein can calculate class members' §10(b) damages using the methodology he proposes, as his expert testimony on loss causation and damages has been offered in more than 30 securities cases, and has never been excluded.

[21]  Specifically, in both *Intuitive* and *Thorpe*, Dr. Lehn criticized the plaintiffs' damage methodologies for purportedly failing to: (a) isolate the impact of each alleged misstatement; (b) disentangle the effects of confounding information; and (c) account for how inflation might have

- 24 -

challenges to the plaintiffs' proposed damage methodology and granted class certification.  *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *17 (N.D. Cal. Dec. 22, 2016) (recognizing that the "out-of-pocket" methodology that "measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale" is "widely considered 'an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation'"); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, at *16 (S.D. Fla. Mar. 16, 2016) (holding that where plaintiffs' theory of liability was that defendants "made public misstatements that 'artificially maintained the stock price,'" a damages methodology that "estimat[es] the amount of inflation throughout the Class Period using the abnormal return in response to the alleged corrective disclosures" is "consonant with their theory of liability and thus satisfies Rule 23(b)(3)").

Defendants rely on inapposite authority to claim that Dr. Feinstein offers "'no model at all.'"  *See* Opp., ECF 93 at PageID 5461-63.  For instance, in *Loritz*, relied on by Defendants, the plaintiff "failed to set forth any model of damages (let alone one tied to their theory of liability)."  *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015).  Here, in contrast, the record establishes that in addition to an event study, Dr. Feinstein has specified the valuation tools he could use at the loss causation and damages stage to calculate per share damages in this case.[22]

---

changed during the course of the class period.  Ex. 18 at 15; Ex. 19 at 11-12, 33.  Those are essentially the same critiques that Dr. Lehn has lodged against Dr. Feinstein's methodology in this litigation.  Lehn Report, ¶6, ECF 93-2 at PageID 5484-85.

[22]  Feinstein Report, ¶147(i), ECF 72-3 at PageID 3676 (detailing how he will use an event study analysis "to establish if the disclosures correcting the alleged misrepresentations and omissions, caused the price of Cardinal stock to fall"); *see also id.*, ¶¶144-146, ECF 72-3 at PageID 3676 (describing other valuation tools he could use to address any unique complexities in this case, including valuation multiple models and discounted cash flow models); Feinstein Rebuttal, ¶¶74-79 (explaining how the same valuation tools identified in the Feinstein Report are used by equity analysts to value Cardinal Health, and could be used to measure and accommodate any potential adjustments to the inflation ribbon should the need arise).

- 25 -

Defendants' reliance on *Freddie Mac* fails for the same reason.  In *Freddie Mac*, the court wrongly rejected Dr. Feinstein's damages model because it purportedly only referred to "unspecified 'tools' available to measure damages." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at \*19 (N.D. Ohio Aug. 14, 2018) ("*Freddie Mac*").  Courts have since rejected *Freddie Mac*'s reasoning, finding it to be an outlier against the weight of authority.  In *Monroe*, for example, the court declined to follow *Freddie Mac*, correctly noting that "although [the expert] has not yet specified valuation tools – an input into the damages model – he will ultimately use, such specification is not required at this stage." 332 F.R.D. at 399; *see also Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at \*9 n.8 (N.D. Ill. Feb. 26, 2020) (distinguishing *Freddie Mac* and noting that it was "little wonder" that the court found no congruence between the theory of liability and the theory of damages as the court had already held that "plaintiffs' liability theory did not hold together").  Defendants' remaining authority has no relevance to the issues here, where class members are entitled to a presumption of reliance.[23]

### C. Dr. Feinstein's Methodology Can Accurately Measure Artificial Inflation by "Backcasting" from the Corrective Disclosures

As Dr. Feinstein explained in his opening report, the artificial inflation ribbon used to measure damages on each day of the Class Period "is often constructed by working chronologically backwards from the final corrective disclosure that eliminates all remaining artificial inflation from the stock price, back to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred." Feinstein Report, ¶147(ii), ECF 72-3 at PageID 3677.  This

---

[23]  For instance, *Fort Worth* is inapposite because it involved misstatements in the registration of mortgage-backed certificates, an inquiry the court recognized was complicated by the illiquidity of the securities. *Fort Worth Emps' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116 (S.D.N.Y. 2014). *Sicay* is unpersuasive because the sole basis for liability there was "an unusual theory of classwide liability" to which the court referred as an "'insider sale' theory of liability." *Sicay v. James Jun Wang*, 2015 WL 268855, at \*2 (S.D.N.Y. Jan. 21, 2015).  Finally, *ConAgra* is a deceptive advertising action that does not involve securities fraud at all. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014).

- 26 -

"backcasting" approach is in accord with the well-settled principle that "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015).[24] That is precisely why the standard out-of-pocket damage model typically measures artificial inflation from the corrective disclosure dates, and why Dr. Lehn himself admitted that, in his experience measuring damages in securities litigations, "oftentimes, and probably more than often, usually, it would start with an event study analysis on the alleged corrective disclosure dates." Ex. 15 at 31:8-22.

Nevertheless, Defendants and Dr. Lehn surprisingly suggest that Dr. Feinstein is required to measure inflation "at the time of the alleged misstatements," and that he would have to "adjust his methodology to estimate the impact of alleged affirmative misstatements versus omissions . . . which require different methods of analysis." Opp., ECF 93 at PageID 5464-65; Lehn Report, ¶¶24-25, 32, ECF 93-2 at PageID 5495, 5500. Notably, neither Defendants nor Dr. Lehn cite any authority (either legal or academic) for this principle. *See* Ex. 15 at 68:5-69:23, 159:4-17. Indeed, the Seventh Circuit explicitly rejected an identical argument in *Household*, noting that "[t]here is no law to support th[e] proposition" that a plaintiff must "prove how the inflation was introduced into the stock price in the first place." 787 F.3d at 418. All a plaintiff is required to prove at trial is that "the defendants' false statements caused the stock price to remain higher than it would have been had the statements been truthful," and a damage model that measures inflation from the day of the corrective disclosures is meant to "calculate[] the effect of th[at] truth." *Id.* at 416-19.

---

[24] Because the *Household* litigation is one of the few securities class actions tried to a verdict and was appealed on grounds of loss causation and damages, the Seventh Circuit's opinion there is particularly instructive on how an expert's damage model is actually applied at trial. 787 F.3d 408.

- 27 -

**D.**     **Dr. Feinstein's Methodology Can Account at the Merits Stage for Defendants' Hypothetical "Complicating Factors"**

Defendants argue prematurely that "there are multiple complicating factors that must be addressed . . . to reliably measure any damages attributable only to Plaintiff's claims." Opp., ECF 93 at PageID 5465. Specifically, Defendants claim that Dr. Feinstein's methodology fails to account for the impact of: (1) confounding information; (2) changing information about Cordis; (3) known versus unknown risks; (4) changing value of information; (5) mismatched disclosures; or (6) individual misrepresentations. Opp., ECF 93 at PageID 5465-69. However, "[a]ll of these criticisms go to the accuracy of the damages model and loss causation, but do not prevent class certification because all of these alleged obstacles for accurate calculation of the damages are the same if there is one plaintiff or one million plaintiffs." *Plymouth Cnty.*, 2020 WL 5757695, at \*15; *see also Halliburton I*, 563 U.S. at 807 ("[P]laintiffs [are not required to] prove loss causation in order to obtain class certification."). Thus, Defendants may "argue the merits of Plaintiff['s] proposed damages model at summary judgment or trial, but whether the Court certifies a class or not has no impact on those arguments." *Plymouth Cnty.*, 2020 WL 5757695, at \*15; *see also Willis v. Big Lots, Inc.*, 2017 WL 1074048, at \*7 (S.D. Ohio Mar. 17, 2017) (rejecting defendants' argument at class certification that plaintiff's expert's damage model "'fails to account for the fact of this case' in the sense that he has not already performed the damage calculation specific to this case").

But even if Plaintiff were required to offer a specific damage calculation at this stage of the case, Defendants' arguments fail. Dr. Feinstein's report is clear: "To the extent that there may be specific issues complicating the quantification of artificial inflation encountered in the execution of the out-of-pocket damage methodology due to potentially unique facts and circumstances of this case, the standard tools of valuation analysis can be applied as needed." Feinstein Report, ¶144, ECF 72-3 at PageID 3676. Even Dr. Lehn admits that he would use the same valuation tools Dr. Feinstein identifies – *i.e.*, a discounted cash flow model or valuation multiple model – if he were to

- 28 -

try and account for these complexities. *See* Ex. 15 at 222:4-18, 257:18-25, 264:4-21. And as further explained in his rebuttal report, Dr. Feinstein has applied these valuation tools to address the same "complicating factors" in countless other cases at the loss causation stage. *See* Feinstein Rebuttal, ¶¶49-51, 57-60, 68, 70, 77. Regardless, these factors pose no bar to class certification.

  ***Confounding Information***. Defendants' contention that Dr. Feinstein's model fails to "disentangle" the effects of confounding information is not supported by a single case and has been universally rejected by courts as a premature loss causation analysis at this stage of litigation. Opp., ECF 93 at PageID 5465-66. Indeed, the Supreme Court held in both *Halliburton I*, 563 U.S. 804, and *Amgen*, 568 U.S. 455, that the task of parsing alleged confounding information is reserved for a loss causation analysis and need not be shown at class certification. *See Halliburton I*, 563 U.S. at 807; *Amgen*, 568 U.S. at 475; *see also Burges*, 2017 WL 2772122, at *9-*10 (M.D. Tenn. June 26, 2017*)* (disaggregation is a loss causation argument not appropriate at this stage).[25]

  Nonetheless, Dr. Feinstein's proposed event study methodology would account for non-fraud, market and industry factors, and inflation coming out of the price of Cardinal Health common stock on the corrective disclosure dates. *See* Feinstein Report, ¶147(i), ECF 72-3 at PageID 3676 (explaining that the event study analysis would "control[] for potentially non-fraud-related information"); Ex. 14 at 92:14-18 ("I am a hundred percent confident that confounding information

---

[25]  *See also Dougherty*, 2020 WL 6793326, at *7 (Whether the expert's event study can disaggregate confounding factors "is really a merits inquiry into loss causation" that "is not required for class certification" and further recognizing that, even if confounding information "was partially responsible for the decline in [defendants'] stock price, the extent to which damages would need to be disaggregated is an issue common to all class members."); *Plymouth Cnty.*, 2020 WL 5757695, at *14 ("Defendants' concerns that [plaintiffs' expert] has not yet calculated an inflation ribbon or adequately addressed disaggregation are loss causation disputes that are not appropriate for resolution at class certification."); *Thorpe*, 2016 WL 4006661, at *16 ("To the extent that Defendants argue that confounding information will be difficult to desegregate from the impact of the alleged corrective disclosure, Plaintiffs are not required to prove loss causation at the class certification stage, and 'nothing in *Comcast* requires an expert to perform his analyses at the class certification stage.'").

can be disaggregated.  Because that's what valuation experts do every single day when they price securities in the market and price hypothetical scenarios that may occur.").  But while Plaintiff must ultimately "'prove that portion of the price fall that they seek in damages is directly attributable to the misrepresentation, . . . *they do not need to prove it at the certification stage*.'"  *Weiner*, 334 F.R.D. at 131.

*Changing Information or Value of Information (i.e. Time-Varying Inflation)*.  Whether a damage model needs to account for industry or company-specific changes – or the fact that "publicly available information . . . changed over time" – goes to the "accuracy of the damages model and loss causation, but do[es] not prevent class certification." *Plymouth Cnty.*, 2020 WL 5757695, at *15; *Wilson*, 2018 WL 3913115, at *17 (rejecting argument that "'Dr. Feinstein must propose a model capable of measuring changing levels of inflation'" at the class certification stage).  Indeed, Dr. Lehn himself has not yet determined whether the value of Cordis-related information even changed during the Class Period.  Ex. 15 at 219:9-12; Lehn Report, ¶59, ECF 93-2 at PageID 5514 (claiming "investors *would likely* have processed the same piece of information differently earlier in the proposed Class Period as opposed to later in the Class Period" and that "a given piece of information *is likely* to have a different valuation impact at different times during the Class Period").  And Defendants' argument that a corrective disclosure might implicate a reaction to information not known during the entire Class Period is a class-wide liability question on the merits of loss causation.[26]  In any event, to the extent discovery reveals that the artificial inflation ribbon should be adjusted at different points in the Class to account for various changed circumstances, the valuation

---

[26]  Defendants' own authority, *Hubbard* reinforces the point that whether or not a corrective disclosure "reflected the market's reaction to facts that could not possibly have been disclosed" is a question for the merits – not class certification. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 728 n.27 (11th Cir. 2012) (affirming judgment as a matter of law on the grounds that there was insufficient evidence to support a finding of loss causation).

4875-2998-1480.v1

tools identified by Dr. Feinstein allow him to readily account for time-varying inflation – a common issue that he has dealt with in other cases.  *See* Feinstein Rebuttal, ¶¶49-52; Ex. 15 at 222:4-23.

***Known Versus Unknown Risks***.  While not necessary to calculate at class certification (*see Plymouth Cnty.*, 2020 WL 5757695, at *15), Dr. Feinstein's model and methodology can also account for the impact of "known versus allegedly undisclosed risks" (Opp., ECF 93 at PageID 5467) should fact discovery reveal that such a calculation is warranted.  *See* Feinstein Rebuttal, ¶¶66-68.  Notably, Dr. Lehn acknowledges that "known risks" are already "incorporated into the valuation of stock price of the company" and "reflected in Cardinal's stock price." Ex. 15 at 237:25-238:3, 241:19-242:6.  Nor has Dr. Lehn done any analysis at this point to determine whether any of the stock price declines were actually caused by known versus unknown risks.  *Id.* at 250:3-7.

Defendants' reliance on *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) is misplaced. The "materialization of the risk" damage theory that was rejected in *Ludlow* "hinge[d] on a determination that each plaintiff would not have bought BP stock ***at all*** were it not for the alleged misrepresentations – a determination not derivable as a common question, but rather one requiring individualized inquiry." *Id.* at 690 (emphasis in original).[27]  Here, Plaintiff is not proceeding under that damage theory, but rather under the standard out-of-pocket damages methodology routinely used to measure §10(b) damages – one that *Ludlow* held was in accordance with *Comcast*. *Id.* at 685.  Thus, courts have consistently rejected securities fraud defendants' attempts to misconstrue

---

[27]  There were actually two damage models at issue in *Ludlow*, where the Fifth Circuit affirmed a district court's decision to certify a "Post-Spill" class of investors who purchased British Petroleum ("BP") shares after the Deepwater Horizon oil spill, and to deny certification to a "Pre-Spill" class who purchased BP shares before the oil spill.  *Id.* at 677.  The Pre-Spill class relied on a "materialization of the risk" damages theory, which the court found was not "capable of class-wide determination."  *Id*. at 690.  The Post-Spill class, however, relied on an "out-of-pocket losses" measure similar to Plaintiff's damages model here, which calculated "the difference between the inflated price at which the plaintiffs bought their stock," and the "theoretical price that the . . . stock would have traded for had the relevant information been properly disclosed."  *Id*. at 683 (emphasis omitted).  Notably, the Fifth Circuit found that the Post-Spill class's measure of damages satisfied the requirements of *Comcast*, which "requires a 'sound' methodology, not certainty."  *Id*. at 685.

4875-2998-1480.v1

*Ludlow* as a basis for precluding certification when out-of-pocket damages are alleged. *See Cosby v. KPMG, LLP*, 2020 WL 3548379, at *28 (E.D. Tenn. June 29, 2020) (finding defendants' "reliance on the decision unpersuasive" when plaintiffs relied on an out-of-pocket methodology), *report and recommendation adopted*, 2021 WL 1828114 (E.D. Tenn. May 7, 2021); *see In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 630 (N.D. Cal. 2018) (same); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *16-*18 (S.D. Tex. Nov. 13, 2019) (same), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).

***Mismatched Disclosures***.  Defendants also argue that Dr. Feinstein fails to account for "mismatches between the contents of the alleged misrepresentations and corrective disclosures." Opp., ECF 93 at PageID 5469.  This argument, like the others, is premature at this stage of the litigation under a *Comcast* challenge.  *See Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) (rejecting argument that plaintiffs' "damages model is insufficient because it reflects a misalignment between certain misrepresentations and later corrective disclosures" as improper merits challenge); *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *7 (S.D. Cal. Aug. 24, 2021) (finding issue of whether there is "some 'fit' between the [alleged corrective disclosure] and Defendants' earlier misrepresentations" as "irrelevant to the predominance inquiry underlying *Comcast*").  Indeed, Defendants' own authorities reject this argument.  *See Ludlow*, 800 F.3d at 688 ("the tightness of that fit is a question common to the class, for which *Amgen* did not require proof at the certification stage").[28]

***Individual Misrepresentations***.  Finally, Defendants assert that a proper damages model "would need to isolate the valuation impact of only those alleged misstatements that remain in the

---

[28]  As the Supreme Court recently noted, the question of whether or not "there is a mismatch between the contents of the misrepresentation and the corrective disclosure" is a consideration that goes to the issue of price impact (*Goldman*, 141 S. Ct. at 1961) – which Defendants do not challenge here.

- 32 -

case" in the event that certain statements are dismissed at summary judgment or trial.  Opp., ECF 93 at PageID 5469.  As discussed above, however, the Seventh Circuit's holding in *Household* forecloses this argument.  Notably, the jury in *Household* found only 17 of the 40 alleged misrepresentations actionable, but the plaintiffs' backcasting damages model was properly applied when the jury was instructed to find zero stock-price inflation prior to the date of the first actionable misrepresentation.  787 F.3d at 417.  In short, there is no need to value the impact of each alleged misstatement that omits the same type of material information when one measures artificial inflation as the "value of the truth" from the date of the corrective disclosures.  *See id.* at 416-19; *see also Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *22-*23 (S.D.N.Y. Jan. 26, 2021) (accepting Dr. Feinstein's damages model and rejecting the arguments "that a damages model must isolate the amount of price impact attributable to each specific misstatement" and that the "model does not measure damages specifically attributable to [defendants'] specific statement").

### E.      Defendants' Bias Argument Is Improper and Unsupported

As Defendants' own case from this Court explains: "Determining the credibility of a witness, which includes '[a]ssessing the potential bias of the expert witness,' ***is ultimately an issue for the jury***."  *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, 2021 WL 5881775, at *3 (S.D. Ohio Dec. 13, 2021) (Sargus, J.).  Defendants attempt to usurp the jury's role by declaring Dr. Feinstein biased, implying bizarrely (and without any legal basis) that Dr. Feinstein's income is relevant to his objective and common damages methodology.  Opp., ECF 93 at PageID 5469-70.  Yet, Defendants do not even argue (let alone explain) how Dr. Feinstein's purported bias infects any specific aspect of his methodology.

Unsurprisingly, Defendants provide no case law supporting their argument, which at least one court has explicitly rejected.  *See Brown v. China Integrated Energy Inc.*, 2015 WL 12720322, at *6-*7 (C.D. Cal. Feb. 17, 2015) (holding that a witness was "sufficiently qualified to opine on

- 33 -

event studies, market efficiency, and the proper methods for conducting an event study" at the class certification stage over plaintiffs' argument that the expert was biased because he "gained almost of [sic] all of his income as a market efficiency critic" at one company representing defendants). Regardless, Dr. Feinstein's testimony under oath undermines Defendants' argument that he is biased toward or "financially beholden to Plaintiff's counsel Robbins Geller." Opp., ECF 93 at PageID 5469; *see* Ex. 14 at 45:3-25 ("Q. If Robbins Geller stopped engaging Crowninshield, that would have a significant negative impact on Crowninshield's annual income, correct?. . . . THE WITNESS: *Not necessarily*. . . . Q. Why not? A. *There are numerous other projects we could be working on*. Q. But you'd have to fill a 50 percent hole in your annual income, correct? A. No. Q. . . . Do you give Robbins Geller any special terms that you don't offer to other law firms on Crowninshield's services? A. No. Q. Do you give Robbins Geller any discount on your fees that you don't give to other law firms that hire you? A. No.").[29]

### F. Defendants' Vague "Truth-On-The-Market" and "Changing Circumstances" Arguments Are Subject to Class-wide Proof

In a final attempt to defeat predominance, Defendants disregard binding Supreme Court precedent to argue that Cardinal Health's public disclosures of "challenges and risks at Cordis" over the course of the Class Period create "'different question[s] of proof on the materiality issue'" for class members who purchased at different times. Opp., ECF 93 at PageID 5470-71. Defendants similarly assert that because Defendants' knowledge about issues at Cordis purportedly changed during the Class Period, "proof of scienter and falsity will also necessarily vary for purchasers at different times during the Class Period." Opp., ECF 93 at PageID 5471-72. But Defendants'

---

[29] Defendants' own expert Dr. Lehn: (a) is being compensated at $1,250/hour (Ex. 15 at 15:15-21); (b) receives 20% of the billing by all non-officer Compass Lexecon staff who assist him in this matter (*id*. at 18:15-19:21); and (c) has only represented corporate defendants in the numerous securities class actions in which he has been involved (*id*. at 27:2-14). These questions of bias, however, are properly examined at trial – not class certification.

4875-2998-1480.v1

arguments rely exclusively on inapposite, decades-old cases that ***did not*** proceed under the "fraud-on-the market" theory invoked by Plaintiff and articulated in *Basic*, 485 U.S. 224.[30] In *Basic*, the Supreme Court held that class members proceeding under the fraud-on-the-market theory face "common questions of law and fact concerning the falsity or misleading nature of the . . . public statements made by [defendants], the presence or absence of scienter, and the materiality of the misrepresentations." 485 U.S. at 242. Since *Basic*, the Supreme Court has consistently reiterated this fundamental principle, which directly contradicts Defendants' assertion that the issues of "materiality, scienter, and falsity are not subject to classwide proof." Opp., ECF 93 at PageID 5472; *see, e.g.*, *Amgen*, 568 U.S. at 475; *Halliburton II*, 573 U.S. at 282. Moreover, Defendants' claim that the Cordis-related disclosures issued throughout the Class Period require individualized inquiries into materiality directly contravenes the Supreme Court's unambiguous instruction that "***materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)***." *Amgen*, 568 U.S. at 467. For this reason, post-*Amgen* courts have routinely held that defendants' "truth-on-the market" arguments do not defeat predominance. *See Marcus v. J.C. Penney Co., Inc.*, 2016 WL 8604331, at *8 (E.D. Tex. Aug. 29, 2016) ("A 'truth on the market defense' is a 'method of refuting an alleged misrepresentation's materiality' which has no bearing on the predominance inquiry of class certification."), *report and recommendation adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 211 (D. Minn. 2020) ("[A]t the class certification stage, a truth-on-the-market defense raises common class-wide issues."); *Baker v.*

---

[30] Three of the cases relied on by Defendants – *J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994 (7th Cir. 1980), *Zandman v. Joseph*, 102 F.R.D. 924 (N.D. Ind. 1984), and *Gelman v. Westinghouse Elec. Corp.*, 73 F.R.D. 60 (W.D. Pa. 1976) – predate *Basic* and thus focused on individualized inquiries into investor considerations. *See In re Storage Tech. Corp. Sec. Litig.*, 113 F.R.D. 113, 117 (D. Colo. 1986) (noting that both *J.H. Cohn* and *Zandman* "do not appear to accept the fraud on the market theory"). The fourth and final case relied on by Defendants, *Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284 (E.D. Va. 2004), involved allegations that explicitly "d[id] not arise under a 'fraud-on-the-market' theory." *Id.* at 301.

4875-2998-1480.v1

*SeaWorld Ent., Inc.*, 2017 WL 5885542, at \*11 (S.D. Cal. Nov. 29, 2017) ("[T]o the extent Defendants seek to challenge the materiality of the alleged misrepresentations, such an argument is a premature truth-on-the-market defense. . . .  Accordingly, Defendants' argument that the alleged misrepresentations did not alter the total mix of information is premature.").

## IV.     CONCLUSION

As all of the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(g) have been established, the Court should certify the proposed Class, appoint Plaintiff as Class Representative, and appoint Robbins Geller as Class Counsel and Murray Murphy Moul + Basil LLP as Liaison Counsel.

DATED:  July 22, 2022                                   Respectfully submitted,

MURRAY MURPHY MOUL + BASIL LLP


                                                            s/ Joseph F. Murray
                                              JOSEPH F. MURRAY (0063373)
                                              1114 Dublin Road
                                              Columbus, OH  43215
                                              Telephone:  614/488-0400
                                              614/488-0401 (fax)
                                              murray@mmmb.com

                                              Local Counsel for Lead Plaintiff

- 36 -

4875-2998-1480.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
TOR GRONBORG
LAURIE L. LARGENT
JENNIFER N. CARINGAL
CHRISTOPHER R. KINNON
J. MARCO JANOSKI GRAY
MEGAN A. ROSSI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
torg@rgrdlaw.com
llargent@rgrdlaw.com
jcaringal@rgrdlaw.com
ckinnon@rgrdlaw.com
mjanoski@rgrdlaw.com
mrossi@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 37 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 22, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Joseph F. Murray
JOSEPH F. MURRAY

MURRAY MURPHY MOUL + BASIL LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)

Email:  murray@mmmb.com

4875-2998-1480.v1

# Mailing Information for a Case 2:19-cv-03347-EAS-EPD Louisiana Sheriffs Pension & Relief Fund v. Cardinal Health, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Laura M Andracchio**
  landracchio@rgrdlaw.com

- **David S Bloomfield , Jr**
  dbloomfield@porterwright.com,mruyf@porterwright.com,LMKofke@wlrk.com,djosef@porterwright.com,ARNarahari@wlrk.com,wdsavitt@WLRK.com

- **Elizabeth N. Brandt**
  enbrandt@wlrk.com

- **Spencer Burkholz**
  SpenceB@rgrdlaw.com

- **Jennifer Caringal**
  JCaringal@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com,ckopko@rgrdlaw.com

- **Edward John Jacobs**
  ejacobs@bakerlaw.com

- **Marco Janoski**
  mjanoski@rgrdlaw.com

- **Christopher R. Kinnon**
  CKinnon@rgrdlaw.com,agonzales@ecf.courtdrive.com

- **Lauren M. Kofke**
  lmkofke@wlrk.com

- **Laurie Largent**
  llargent@rgrdlaw.com,AGonzales@rgrdlaw.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **Todd Aaron Long**
  tlong@mcneeslaw.com,kfoster@mcneeslaw.com,talattorney@gmail.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,murray@ecf.courtdrive.com

- **Darren J Robbins**
  tedp@rgrdlaw.com

- **Megan Allison Rossi**
  MRossi@rgrdlaw.com

- **Alexandra P. Sandinsky**
  APSadinsky@wlrk.com

- **William Savitt**
  wdsavitt@wlrk.com

- **Robert Ward Trafford**
  rtrafford@porterwright.com,tmagley@porterwright.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)