# EXHIBIT 1

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

---

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION
-------------------------------------------
LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated,
     Plaintiffs

  v.

CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON,
     Defendants

Case No. 2:19-CVL-03347
-----------------------------------------

REMOTE VIDEO DEPOSITION OF
Gabriel Ristorucci
Individually and as Corporate Designee of 1199 SEIU Health Care Employees Pension Fund
May 17, 2022
Lead: Alexandra P. Sadinsky, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING  1-800-825-3341

---

Page 3

A P P E A R A N C E S  C O N T I N U E D

ATTORNEYS FOR DEFENDANTS
  Alexandra P. Sadinsky, Esquire
  Lauren M. Kofke, Esquire
  Danika L. Kritter, Esquire
  Wachtell Lipton Rosen & Katz
  51 West 52nd Street
  New York, New York 10019
  (212) 403-1000

ALSO PRESENT:
  Jackson Martin, Paralegal
    Wachtell Lipton Rosen & Katz
  Sasa Trivunic, Esquire, Cardinal Health, Inc.
  Nicole Kim, Esquire, Cardinal Health, Inc.

JANE ROSE REPORTING
  74 Fifth Avenue
  New York, New York 10011
  1-800-825-3341
  Joan V. Cain, Court Reporter
  Joseph Salinas, Videographer

---

Page 2

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF
  Spencer A. Burkholz, Esquire
  Jennifer N. Caringal, Esquire
  J. Marco Janoski Gray, Esquire
  Christopher R. Kinnon, Esquire
  Megan A. Rossi, Esquire
  Robbins Geller Rudman & Dowd LLP
  655 West Broadway
  Suite 1900
  San Diego, California 92101
  (619) 239-3247

  -AND-

  Nancy M. Juda, Esquire
  Robbins Geller Rudman & Dowd LLP
  905 16th Street, Northwest
  Washington, D.C. 20006
  (202) 822-6762

---

Page 4

TABLE OF CONTENTS

Witness:
Gabriel Ristorucci

Examination
By Ms. Sadinsky...........................Page 7

Reporter Certificate.......................Page 344

Notice to Read and Sign....................Page 346

Index of Exhibits.........................Page 348

---

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 5

P R O C E E D I N G S

- - -

9:59 a.m. EDT

May 17, 2022

- - -

THE VIDEOGRAPHER: This deposition is being taken via remote connection. All participants are attending remotely, including the court reporter and videographer. The deposition video recording quality is relying on the witness's individual bandwidth.

Here begins Media No. 1, Volume 1 in the deposition of 1199SEIU (b)(6) designee, Gabriel Ristorucci, in the matter of Louisiana Sheriffs' Pension & Relief Fund versus Cardinal Health, Incorporated.

Today's date is May 17th, 2022. The time is now 10 a.m. My name is Joseph Salinas, the videographer. The court reporter is Joan Cain from Jane Rose Reporting, New York, New York.

Counsel, please identify yourselves and state whom you represent, beginning with the party noticing this deposition. Please speak slowly for the court reporter.

MS. SADINSKY: Alexandra Sadinsky from

Page 6

Wachtell Lipton for Cardinal Health and the rest of the defendants. With me I have Lauren Kofke, Danika Kritter, and Jackson Martin.

MR. BURKHOLZ: Spence Burkholz, Robbins Geller, on behalf of the plaintiffs, and I have with me Jen Caringal, Megan Rossi, Marco Janoski, and Chris Kinnon, and I believe Nancy Juda from my firm.

THE COURT REPORTER: Good morning. My name is Joan Cain. I am a court reporter and a Notary Public in the Commonwealth of Virginia. I am the deposition officer for today's deposition.

All parties in today's deposition are appearing remotely to comply with the guidance of the Centers for Disease Control in response to the COVID-19 pandemic occurring in our country at this time. I have collected everyone's appearances off the record, and they will appear on the appearance page of the transcript.

Before we proceed, I will ask counsel for today's deposition to stipulate on the record that this deposition officer may swear in the deponent, even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

Page 7

Let's start with the noticing attorney, please.

MS. SADINSKY: We so stipulate.

MR. BURKHOLZ: Plaintiffs stipulate.

GABRIEL RISTORUCCI, having been duly sworn under penalties of perjury by the Notary Public, was examined and did testify as follows:

THE COURT REPORTER: Thank you. Please begin.

EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MS. SADINSKY:

Q Hi, Mr. Ristorucci. I'd like to start by covering some parameters for today. It's my job to ask you questions, and it's your job to answer them as best as you can. If you don't understand a question, please tell me, so I can try to rephrase or explain. Please give audible, verbal responses to the questions. The transcript cannot reflect if you're merely nodding your head.

When I refer to "plaintiff," "lead plaintiff," or "SEIU," I'm referring to 1199 SEIU Health Care Employees Pension Fund. Okay?

A Okay.

Q Remember that you're testifying on behalf

Page 8

of SEIU. There will be times when I'm also asking for your personal knowledge or experience as an employee of SEIU. If you're ever unsure whether I'm asking you a question personally or as SEIU's representative, please ask me, and I'll be happy to clarify.

If you need to take a break, just let me know. We can take a break any time as long as there's not a question pending.

Your lawyer may object to certain of my questions for purposes of the record, but unless your lawyer instructs you not to answer, you should fully and completely answer the question.

Do you understand that you're testifying under oath today just as you would be testifying under oath at a trial?

A I do.

Q Is there anything that would prevent you from testifying truthfully today?

A No, there's not.

Q Is there any reason, medical or otherwise, why you can't testify completely and accurately today?

A No.

Q Is anyone present with you?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 9

A   No.

Q   Do you understand that while we're on the record, you must put away and not look at electronic devices not being used for this deposition?

A   I do.

Q   Do you understand, while we're on the record, there shall be no other programs displaying images on your screen other than the programs being used to conduct the deposition and to show deposition exhibits?

A   Yes.

Q   Do you currently have any other programs open on your computer screen?

A   Oh, hold on.

No, I do not.

Q   No email?

A   No email.

Q   No notes?

A   No notes.

Q   No text message?

A   No text message.

Q   And do you understand that while we're on the record, you will not communicate with anyone except as reflected on the record?

A   I understand that.

Page 10

Q   Okay.  So let's -- let's begin.

Have you been deposed before?

A   I have not.

Q   Have you testified in court before?

A   I don't believe so, no.

Q   You don't believe so?

A   I don't -- I have no recollection of ever having testified in court.

Q   Have you been a defendant in a lawsuit before?

A   No.

Q   Have you been a potential witness in a lawsuit before?

A   No.

Q   Okay.  Are you sure?

A   I'm sure.

Q   Do you understand that you've been designated as a witness to testify on behalf of SEIU with regard to certain topics identified by the parties in advance of this deposition?

A   Yes.

MS. SADINSKY:  Let's mark as Exhibit 1, Tab 2, the 30(b)(6) deposition notice.

- - -

(Deposition Exhibit 1 was marked for

Page 11

identification.)

- - -

BY MS. SADINSKY:

Q   And Jackson will put it on the screen, and he'll also drop it into the chat for others to open up on their own screen.

Let's -- do you recognize this document?

A   Yes, I've seen it before.

Q   Let's turn to page 4.  This is Exhibit A. Do you see that Exhibit A lists topics that will be covered at today's deposition or instructions for today's deposition?

A   Yes.

THE COURT REPORTER:  I'm sorry.  I didn't hear the answer.

THE WITNESS:  I said yes.

BY MS. SADINSKY:

Q   Let's turn to page 7.  So at the bottom of page 7, under header 2, it says:  "Topics for Examination Upon Deposition."

Do you see that?

A   Yeah.

Q   So I want you to just read through those, and you can just let us know when we need to turn the pages.

Page 12

A   I've read it.

I've read it.

I've read it.

I've read it.

I've read it.

Q   Are you prepared to testify about all the topics listed on the notice?

A   Yes.

Q   Are there any that you are not prepared to testify about?

A   No.

MS. SADINSKY:  Let's put that document down so we can make the witness full screen.

BY MS. SADINSKY:

Q   What did you do to prepare for this deposition?

A   I had some conversations with our counsel. I reviewed documents related to the -- the action. I spoke with our -- Jeff Stein, our general counsel -- former general counsel.  I also spoke with members of our investment group, reviewed some of the elements of the documents that were produced, and worked on helping to produce some of those documents.

Q   You said you had convos with your

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 13

counsel -- conversations with your counsel, correct?

A    Correct.

Q    Who did you have conversations with, what counsel?

A    Our counsel at Robbins Geller Rudman & Dowd, Spence Burkholz and Nancy Juda.

Q    Who was the second person?

A    Nancy Juda.

Q    How many times did you speak to Spence and Nancy Juda in preparation for today's deposition?

A    Three times.

Q    Were they -- were those meetings in person or virtually?

A    They were virtual.

Q    On the phone or on video?

A    Video. Some video. Some phone.

Q    Of the three meetings, were two video, one phone, or two phone, one video?

A    They were two phone, one video -- excuse me. Two video, one phone. I'm actually realizing we also had an in-person meeting several months ago that was more general, not -- not necessarily directly in preparation for the deposition.

Q    So those four meetings, are those the only four times you've spoken to someone from Robbins

Page 14

Geller?

A    No. We've spoken other times.

Q    So let's start with the in-person meeting. When was that?

A    That was I believe in January or February of this year -- or actually, no. December of last year.

Q    Okay. And what was the purpose of that meeting?

A    That was just general, you know, discussion about how -- you know, how litigation would proceed, what would -- the steps involved.

Q    Where was that meeting?

A    That -- that was in -- that was at our -- our offices here. I do not -- that was -- that was Nancy Juda, who is here.

Q    Is Nancy Juda the only Robbins Geller attorney?

A    I believe so, yes. Yes.

Q    Who from SEIU was at that meeting?

A    I was, our counsel, other lawyers in our general counsel's office, Jeff Stein and Suzanne Metzger were there, and Peter Andreou from our investment group was there.

Q    Were there any trustees there?

Page 15

A    No trustees were there.

Q    How long was the meeting?

A    I'd say it was under an hour.

Q    And that was at your offices in New Jersey?

A    In New York.

Q    Okay. So then you said you had two video and one phone. When were those?

A    The one phone was -- the phone call was a few minutes before this, about 9:45 today.

Q    Who was on it?

A    Nancy Juda and Spence Burkholz, our counsel.

Q    Anyone from SEIU?

A    Nobody besides myself.

Q    And how long was it?

A    About ten minutes.

Q    Okay. And then the two video?

A    One of those was on May -- earlier this month. I think it was May 10th.

Q    Who was involved?

A    It involved Nancy Juda and Spence Burkholz.

Q    Anyone from SEIU?

A    No one besides myself.

Q    How long was it?

A    About an hour.

Page 16

Q    And when was the second video?

A    That was the second one. The previous one was at the -- within the last couple of weeks of April.

Q    Okay. And who was involved?

A    Myself, Spence Burkholz, and Nancy Juda.

Q    No one else?

A    No one else.

Q    And who -- and how long was it?

A    That was about, I would say, an hour and a half to two hours.

Q    Okay. And then you said you reviewed documents, right?

A    That's correct.

Q    How many documents?

A    I'd say about 20 to 30 documents.

Q    What types of documents?

A    The responses, filings related to the litigation, Investment Management Agreements, some communications between investment managers in our investment group, and some documents relating to causes of action -- well, some of the publicity around the Cardinal Health litigation.

Q    What do you mean by that?

A    Well, they describe the -- what the -- what

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 17

the allegations were or what the -- sort of what the announcements had been by Cardinal Health or different public announcements and some of the responses.

Q   Okay.  So you reviewed Cardinal Health's disclosures?

A   Yes.

Q   Like 10-Ks, 10-Qs?

A   No, I did not review their 10-Ks or 10-Qs. In fact, they're probably more accurately described as some of the excerpts of public announcements by Cardinal that were in the various filings related to the case.

Q   Okay.  So you reviewed allegations of the complaint?

A   Right.

Q   And you said you reviewed some communications.  Were all of the communications you reviewed produced?

A   Yes.

Q   Did you review any minutes?

A   No.

Q   Okay.  You said you also spoke with Jeff Stein in preparation for today, correct?

A   That's correct.

Page 18

Q   When was that?

A   Spoke probably a few times.  Late last month, during -- probably in December of 2021 and probably periodically between then.

Q   Were lawyers involved?

A   Well, we're both lawyers.

Q   Sorry.  Were -- was outside counsel involved?

A   No.

Q   And you said you spoke last month and then before that, December 2021?

A   That's correct.

Q   Last month was the -- the focus of your discussion this deposition?

A   Well, yes.  I'm mentioning -- I speak to him intermittently about many issues, but that specifically came up last month.

Q   Did you have a specific meeting about it?

A   Just a conversation, where that was one of the issues that we -- that we discussed.

Q   Did you review documents related to the litigation during that conversation?

A   We discussed the -- the process of deciding how to -- of entering into the litigation and our participation.

Page 19

MR. BURKHOLZ:  Counsel, I'm just going to step in here and you're now getting into privileged communications, and I'm sure you're aware of that. I'm going to give you a little leeway about process, asking questions about process without getting into the substance of communications.

MS. SADINSKY:  Understood.  Thanks.

BY MS. SADINSKY:

Q   Okay.  You said that you also spoke with the investment group, correct?

A   Correct.

Q   Who from the investment group?

A   I spoke with Dilay Altiner and Peter Andreou.

Q   When did you speak to both of them?

A   I spoke with Dilay in the first week of May.

Q   For how long?

A   About an hour.

Q   In person?

A   Over the phone.

Q   Was that the first time you had spoken to her?

A   About -- specifically about the litigation or -- we've worked together frequently.

Page 20

Q   Was that the first time you spoke to her about the litigation?

A   No.  We've spoken previously about what's involved in document production, other parts of the litigation.

Q   Did you ever speak to her about Cardinal Health prior to this litigation?

A   Never.

Q   And Peter Andreou, did I say that correctly?  When did you speak with him?

A   I spoke with him in April and March.  We had -- I mean, we speak -- we speak rather frequently, but I'm thinking about when the topic of the Cardinal litigation came up first time, April, March, or maybe earlier in the year.

Q   Okay.  And was that in person?  On the phone?

A   More likely in -- over the phone.  There may have been some in person, but for the most part, people are working remotely now and sometimes they're in the office.

Q   Okay.  For any of the meetings that you had with Dilay Altiner or Peter Andreou, did you look at -- about this litigation, did you look at any documents related to the litigation together?

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 21

A   No.

Q   Okay.  And to the best of your knowledge, all of the documents that you looked at are either publicly filed or were produced in this litigation; is that right?

A   That's right.

Q   Have you discussed this deposition with anyone other than SEIU's investment group, Spence Burkholz, Nancy Juda, and Jeff Stein, and I think you said one other person?

A   Suzanne Metzger.

Q   Suzanne Metzger, have you spoke about this deposition with anyone else?

A   No.

Q   Have you discussed the other -- have you discussed with anyone the other depositions that have taken place in this case?

A   I'm not sure what you mean.

Q   Did you know that other depositions have taken place in this case?

A   Yes.

Q   Okay.  Did you discuss those with anyone?

A   No -- well, not the content, just that there'd been depositions in the case.

Q   Did you discuss who was deposed in this

Page 22

case?

A   I know that some managers have been -- investment managers have been deposed.

Q   Do you know which ones?

A   That I do not know.

Q   And --

A   I know who's scheduled to be deposed, but I don't know specifically -- the discussion did not relate to specific managers.

Q   So you discussed -- you discussed who we were scheduling depositions of, but not the content of those depositions, correct?

A   Correct.

MR. BURKHOLZ:  Objection to form.

BY MS. SADINSKY:

Q   Did you review any deposition transcripts?

A   No.

Q   Did you do anything else to prepare?

A   Do anything else besides?

Q   Meeting with your -- meeting with your counsel, meeting with the investment group, looking at filings, investment manager agreements, communications with investment managers.  Other than the things that we've just discussed, have you had done anything else to prepare for today's

Page 23

deposition?

A   I reviewed retainer agreements and relationships with our attorneys and some of the process involved in -- in the decision-making to enter -- enter the litigation as -- in the role of the lead plaintiff.

Q   If you had to give your best estimate, what's the total amount of time you spent preparing for your deposition today?

A   I would say about eight hours.  Eight to ten hours.

Q   Okay.  Can you describe your educational background?

A   Sure.  Would you -- where would you like me to start?

Q   Where did you go to college?  When did you graduate?  When did you go to law school?  When did you graduate?

A   Sure.  I graduated from college, Oberlin College in 1995.  I went to law school from 2001-2004, graduated in 2004 from Cornell Law School, and then in 2013, I obtained an LLM in tax from NYU Law School.

Q   Other than your law degrees, do you have any other degrees or certifications?

Page 24

A   No, I do not.

Q   Do you have any securities-related licenses?

A   No.

Q   Any other professional licenses?

A   No.

Q   Are you currently a member of the state bar?

A   New York State Bar.

Q   Only New York?

A   Only New York.

Q   Can you walk me through your post -- or post-law school employment history?

A   Sure.  I -- after law school, I worked for UBS in their -- as a lawyer in their fixed income group.  It was more a compliance role -- legal and compliance role.  After that I worked at a law firm called Thacher Proffitt & Wood on -- in structured finance.  Then I worked for Change to Win.  I left there in 2008 perhaps, which is a -- at the time was a labor federation.

Then in 2011 I moved back to New York, and I worked for -- briefly for a law firm called Gladstein Reif & Meginniss, and then for a not-for-profit group called the New -- it's now

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 85

Do you know if she has ever discussed this litigation or Cardinal Health with Lorraine Monchak?

A   I don't know.

Q   So the trustees can act either through voting at a meeting or referendum, correct?

A   I'm sorry?

Q   So when --

MR. BURKHOLZ:  Objection to form.

MS. SADINSKY:  Yeah, sorry.

MR. BURKHOLZ:  Objection to form.

BY MS. SADINSKY:

Q   Let me try again.

When the trustees take a formal action, they decide to take that formal action either by voting at a meeting or through referendum, correct?

MR. BURKHOLZ:  Objection to form.  Vague.

THE WITNESS:  Well, when a formal action is necessary, they would either do it through a vote at a meeting, they might do it also through a -- where they might sign something that's been agreed to, the document itself.

BY MS. SADINSKY:

Q   Okay.  And the committees can also take action -- correct? -- formal action?

A   The investment committee or -- which

Page 86

committee?

Q   Any committee.

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  Any?  Any committee can take formal --

BY MS. SADINSKY:

Q   Basically what I want to know is:  The same type of voting and referendum or signed document, does that apply to action taken by both the board and action taken by the committees?

MR. BURKHOLZ:  Objection to form.  It's vague and ambiguous.

THE WITNESS:  The committees may have their own -- they can take -- certainly, they can take actions formally, or they can make decisions in -- well, any committee can make a decision formally, and of course sometimes things could happen.  If it's something -- if it's a decision that requires a vote of the committee, then obviously it would have to be a formal action in some form -- well, in some format.

BY MS. SADINSKY:

Q   If there is a formal action taken by a committee, will it be reported to the full board?

MR. BURKHOLZ:  Objection to form.

Page 87

THE WITNESS:  If there is a formal action, it would -- taken at a meeting, it would be in the -- in the meeting minutes that are then eventually received by the full board.

BY MS. SADINSKY:

Q   So you said earlier that SEIU has portfolio monitoring agreements with certain law firms.  You said some for, you know, monitoring potential class action settlements, things like that, right?

A   Yes.

Q   Is action by the board of trustees required in order for SEIU to engage a law firm for portfolio monitoring services?

A   No.

Q   No?

A   Engage for portfolio monitoring services?  No.

Q   Why not?

A   Well, we have a general counsel who's generally responsible for legal -- items falling under a legal rubric or certain types of legal rubrics -- certain types of legal actions, and so that general counsel can enter into retention agreements.

If there was something that rose to a

Page 88

certain level that involved -- involved a certain level of commitment or financial impact or the potential outcome would have a substantial impact on the fund, then perhaps it would require obtaining board approval or committee approval, depending on who has jurisdiction.  But signing a retention agreement to monitor certain things related to securities might not reach that level.

Q   So the general counsel is -- has oversight, has authority, decision-making power with respect to entering into a portfolio monitoring agreement with a law firm, correct?

A   Correct.

Q   And would that decision -- would the decision to enter into a portfolio monitoring agreement with a law firm, would the general counsel report on that decision to the board of trustees?

A   I don't know that the actual -- a decision to enter into the -- that agreement would get reported -- would need to be reported, although it likely would.

Q   To the full board?

A   Clearly -- well, the annual -- yes, I would say that we probably discuss what -- what our -- how we've worked together with different -- with

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 121

Mr. Stein's role?

A   Well, he's general counsel for the fund, so he, at the time, in particular, but even now is aware we receive communications from and review -- and documents from Robbins Geller & Dowd relating to the funds and -- relating to the litigation.

Q   So as general -- the reason that Jeffrey Stein signed this letter is because he is general counsel of the fund?

A   He signed it because he's general counsel, and he was authorized to do so by the trustees to sign this fund [sic].

Q   Who -- how was he authorized?

A   Marc Kramer and Maria Castaneda both agreed, after discussion with Jeffrey Stein and reviewing these documents and discussion with trustee counsel, to -- to move forward with this claim, to sign this agreement.

Q   Discussion with trustee counsel, so discussion with Levy Ratner and Jenna Hayes?

A   Correct.

Q   Okay.  Walk me through -- can you walk me through the process?  So did, you know, Robbins Geller contact SEIU about a potential claim and Jeffrey Stein told Maria Castaneda and Marc Kramer

Page 122

that he went and spoke to the rest of the trustees?

How does -- just, how does it work?

MR. BURKHOLZ:  Objection to the form.

But you can generally answer.

THE WITNESS:  So in this case, as I recall, we -- this -- the outreach was reached -- was received at a time in between meetings and there wasn't one scheduled.

So in order to facilitate decision, Jeff reached out to trustee counsel and then also the trustees themselves to move forward to see if there was agreement on whether this was something to move forward and discussed -- discussed whatever they considered, the criteria they would use for entering into a claim or taking on the responsibility, and in the end, they agreed to -- they agreed to do this.  There was agreement on moving forward with it.

BY MS. SADINSKY:

Q   Okay.  So the initial outreach from Robbins Geller in August 2019 was between meetings of the trustees and another wasn't scheduled for some time, correct?

A   Correct.

Q   And Mr. Stein then reached out to the trustees' counsel about moving forward with this

Page 123

potential litigation, correct?

A   Correct.  Trustees' counsel, yeah.

Q   Who did he reach out to at Levy Ratner?

A   Ryan Barbur.

Q   Ryan Barbur?

A   Yeah.

Q   Anyone else?

A   Well, Ryan Barbur and possibly also Dan Ratner.

Q   Ryan Barbur and Dan Ratner.

And who did he -- and who was the other third -- who's the other counsel?  Jenna Hayes?

A   Correct.

Q   And she's just -- he just reached out to Jenna Hayes, no one else?

A   Well, Jenna Hayes is counsel to the League of Voluntary Hospitals, who appoints the trustees, and so they also engaged -- then the process would also have -- after they determined what the issues are -- not determined what the issues are, but reviewed what was involved and the report that had been provided by Robbins Geller, they also reached out to the trustees, Maria Castaneda and Marc Kramer.

Q   Why did -- so -- so who reached out to the

Page 124

trustees?  Was it Ryan Barbur and/or Dan Ratner and Jenna Hayes, or was it Jeff Stein?

A   They all reached out to them.  So they're -- so they're -- Jenna Hayes would have discussed the issue with Marc Kramer, and Ryan Barbur and/or Dan Ratner would have reached out to Maria Castaneda and other union trustees, potentially.

Q   And why was this decision to retain Robbins Geller discussed with -- with Maria Castaneda and Marc Kramer specifically?

A   Well, Marc Kramer is the president of the League of Voluntary Hospitals, and they appoint the trustees to the pension fund, and he's -- he's been tasked with monitoring -- monitoring or taking on responsibilities for overseeing the League of Voluntary Hospitals' responsibilities, including those of trustees -- trusteeship and their -- their relation with these different -- with the pension fund, for example, their responsibilities with respect to the pension fund.

Q   So Marc Kramer -- the decision was made by Marc Kramer because of his role as president of the league?

A   Correct.  Well, he's -- he's a trustee and

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 145

document, I don't know.

Whether they would have said to him -- whenever we -- when trustees enter into some sort of -- any sort of action, they're typically -- you know, they're typically authorizing and empowering staff or even other trustees to sign appropriate documents consistent with the decision made by the trustees.

MS. SADINSKY:  Let's mark as Exhibit 7 Tab 14.

- - -

(Deposition Exhibit 7 was marked for identification.)

- - -

BY MS. SADINSKY:

Q   What is this document?

A   That's the amended complaint.

Q   You've seen this before?

A   Yes.

Q   Did SEIU review the amended complaint before it was filed?

A   Yes.  It was sent to us for review.

Q   And did you personally review it?

A   I personally did not review it.

Q   Who personally reviewed it?

Page 146

A   That would have been Jeff Stein.

Q   Jeff Stein.  Did Jeff Stein provide comments on the amended complaint before it was filed?

A   I don't know.

Q   You don't know?

A   I don't -- I don't know.  Typically -- well, I don't know.

Q   Did SEIU undertake any inquiry or investigation or checking of any nature whatsoever as to the allegations of the amended complaint before it was filed?

MR. BURKHOLZ:  Objection to the form.

THE COURT REPORTER:  I didn't hear your answer.

THE WITNESS:  I'm not sure.

BY MS. SADINSKY:

Q   You're not sure if SEIU investigated the complaint before it was filed?

A   Well, if you're saying -- I thought I heard you say independent review.  Perhaps I might have misheard.

Q   Yes.  Independently.

A   I'm not --

MR. BURKHOLZ:  Same objection.  Same

Page 147

objection to the form.

BY MS. SADINSKY:

Q   What was your answer?

A   You know, I suppose it depends what you mean by "independently."  We had a consultation with our counsel on it, discussed the issue, and then the -- you know, relevant counsel and trustees also discussed it.

That's -- that's probably the -- most likely the extent of the review.  Probably -- if, for instance, you're asking whether somebody else was hired to also research the case, the answer would have been no.

Q   Okay.  So the only discussion as to the allegations of the amended complaint were with Robbins Geller, Levy Ratner, and Jenna Hayes, correct?

A   Correct.

Q   So it's fair to say that all of SEIU's knowledge about the allegations in the amended complaint comes from Robbins Geller?

A   Well, yes, and the -- you know, the independent sources that were provided that they cite in their reports.

Q   SEIU's -- but -- I'm sorry.

Page 148

You're talking about Cardinal Health's disclosures.  I'm asking about any investigation that SEIU did.  You said they only spoke to their counsel, correct?

A   Correct.

Q   So fair to say that all of SEIU's knowledge about the allegations in the amended complaint comes from Robbins Geller, correct?

A   That's the origins of the sources of information.

Q   Did SEIU authorize Robbins Geller to file this version of the amended complaint, the one that was filed, before it was filed in September 2020?

A   Yes.

Q   Who authorized that filing?

A   Jeff Stein.

Q   And how did Jeff Stein have authority to make that decision on behalf of SEIU?

MR. BURKHOLZ:  Objection.  Asked and answered.

THE WITNESS:  As I -- as I believe I've stated before, he had the authority, both in conjunction with the decision approved for by the trustees in consultation with them, and then also in carrying out those responsibilities.

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

---

Page 177

lawyers -- of other people operating in the field where a pension fund might know whether other firms -- or people working at a pension fund might know about different firms in the area, that -- or practicing in this area. That's what I -- that's what I know. If there's another question, I'm not sure what the question is.

BY MS. SADINSKY:

Q Is any firm other than Robbins Geller and local counsel sharing fees in this case?

A Are there other firms sharing fees?

Q Are there any law firms, other than Robbins Geller and local counsel, that may share in a legal fee award in this case?

A Oh, there may be. I'm not sure.

Q Have you ever discussed that with Robbins Geller?

A I believe that's covered by -- that's covered by -- in the retainer agreement that there may be other firms involved.

MS. SADINSKY: I'd like to take a short break.

Let's go off the record.

THE VIDEOGRAPHER: Going off the record at 2:40 p.m.

---

Page 178

(Recess.)

THE VIDEOGRAPHER: Going on the record at 2:54 p.m.

MS. SADINSKY: I'm going to mark as Exhibit 9 Tab 30.

- - -

(Deposition Exhibit 9 was marked for identification.)

- - -

MS. SADINSKY: And let's zoom in to the title.

BY MS. SADINSKY:

Q Do you recognize this document?

A Yes.

Q What is it?

A It's the declaration of Spencer Burkholz in connection with the filing of a class certification.

Q Were you -- did you assist in preparing this?

A I did not personally assist.

Q Who did from SEIU?

A It would have been Jeff Stein.

Q Did anyone else?

A That I don't -- I don't believe so.

MS. SADINSKY: Okay. Let's go to the

---

Page 179

second page. Let's zoom in on paragraph 4, which starts at the bottom of the page, and maybe we can get it all on one page if you scroll out -- zoom out a little bit.

BY MS. SADINSKY:

Q I'm just going to read it: "Since the Fund's retention of RGRD in September 2019, RGRD has provided the Fund with written quarterly updates regarding the status and progress of this litigation. Jeffrey Stein and two other experienced lawyers (Suzanne Metzger and Gabriel Ristorucci), are involved in monitoring the litigation."

I'm going to stop there for now.

It says you were involved in monitoring the litigation along with Mr. Stein and Ms. Metzger. Is that an accurate statement?

A Yes.

Q Have you been involved in monitoring the litigation since it was filed in September 2019?

A Yeah. Well, I've been aware -- aware of discussions since then or actively reviewing documents sent at different points.

Q You've been aware of discussions and actively --

A Aware or been, you know, updated on what --

---

Page 180

on the -- on the action, and then as time probably -- as time went on, I might become -- I've become more involved of late, since then.

Q Were you -- were you involved in September 2019?

MR. BURKHOLZ: Objection to the form. Involved in what?

BY MS. SADINSKY:

Q Were you involved in this litigation in September 2019?

A In that month I probably was not involved in the litigation, but since September two thousand -- excuse me -- since September 2019 I have been involved in the litigation.

Q You were involved in October, November, and December 2019?

A Well, yes. But it was less extensive than it is now.

Q In what ways?

A Well, early on we discussed what are the types of things that -- what are the types of issues or reasons why the fund might become involved in litigation, what would make sense -- get involved in litigation in this sort of role.

And then later over time, I would start

---

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 181

being -- having documents copied or sent to me. I would review them and help and assist in -- assist in document -- excuse me -- in discovery -- document production for discovery and activities such as that.

Q   Okay.  So what steps have you taken to monitor the litigation?

MR. BURKHOLZ:  I'm going to object and just ask for clarification.  Are you asking about him as opposed to the -- the fund, the other two lawyers at the fund?

BY MS. SADINSKY:

Q   Yes, you personally, Mr. Ristorucci.  What steps have you personally taken to monitor the litigation?

A   So there have been a couple of different areas.  This -- this litigation has involved a fair amount of document production or requests for document -- requests for document production.  I assisted our investment group and then worked with Robbins Geller in trying to facilitate document production for going back several years.

When it comes to the action -- the filings submitted in case -- in connection with the action, I've reviewed, read over the responses.  I've

Page 182

generally relied on Robbins Geller's expertise -- expertise and then review some of the documents that led to -- that have led up to the case -- or led up to -- led up -- been -- been a part of the litigation.

Q   And did you review any documents prior to 2022, prior to the start of this year?

MR. BURKHOLZ:  Objection. Asked and answered.  But go ahead.

THE WITNESS:  The answer is yes.  It's so hard to keep track of time.  Yes.  So there have been -- when there were responses to document -- responses to document production requests, some of the -- some of the filings preceding that I reviewed.  To be honest, I've not had much to say about it but -- because -- but there have been some items that we've wanted to make sure that are --

BY MS. SADINSKY:

Q   Understood.  Okay.

So the filings related to document requests were in 2022.  Have you reviewed any documents prior to the start of this year, yes or no?

A   I believe I had -- I believe I saw or was -- I saw the amended complaint, but since then most of the response -- most of the monitoring has

Page 183

been this year.

Q   What steps has Mr. Stein taken to monitor the litigation?

A   Well, he would generally review -- review the different filings, and in general it's -- we rely on our counsel and defer to their judgment on most issues.

Q   What steps has Mr. Stein personally taken to monitor the litigation, apart from relying on Robbins Geller?

MR. BURKHOLZ:  Objection.  Asked and answered.

Go ahead.

THE WITNESS:  As I said, he would review the documents that they sent to him.

BY MS. SADINSKY:

Q   What has Ms. Metzger done to monitor the litigation?

A   That I'm not sure.  I assume she -- well, I'm not sure.

Q   Has she taken any steps to monitor the litigation?

A   Yes.  I've certainly discussed it with her, and she seems to know what is going on with the litigation.

Page 184

Q   What do you do to monitor your attorneys' conduct in the litigation, you personally?

MR. BURKHOLZ:  Objection to the form. Vague as to "conduct."

BY MS. SADINSKY:

Q   You can answer.

A   Well, other than reviewing the filings and work with -- work with document production and discuss what are appropriate -- well, those are -- we review the documents, discuss the status of the case, have discussed what our -- what expectations should be and what our realistic -- what -- what strategy there is for -- well, not strategy, but what we think are appropriate levels of production or requests for production.

But I've never had -- I've never had reason to question the conduct as you seem to be -- there's an implication when somebody says conduct, sort of ethical boundaries, and we've not seen anything that would make me think there's been anything unethical or untoward occurring.

MS. SADINSKY:  Can you zoom in, Jackson, to the top of page 2.  I want to look at the first sentence at the top of page 2.

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 185

Q   It says: "In addition to" --

MS. SADINSKY:  Sorry.  Go back to page 1. Sorry about that.

BY MS. SADINSKY:

Q   It says: "RGRD has provided the Fund with written quarterly updates."

Do you see that?

A   Yes.

Q   Is that true?

A   Yes.

Q   And then it says: "RGRD has" -- on the next page -- "communicated numerous times with these three lawyers and others at the Fund."

Do you see that?

A   Yes.

Q   Is that accurate?

A   Yes.

Q   The updates that you receive from Robbins Geller, how long are they?

A   They're usually, I'd say, between six to ten pages.

Q   Do they include discussion of any litigation other than this case?

A   Updates about this litigation?

Q   Do they --

Page 186

A   They're reports that update -- that include this litigation but also provide updates about other litigation, but then they're also discrete.  They're in their own sections.  And then there have been some -- some reports that have been just about this case, I believe, or at least discussions.

Q   Are the quarterly reports typically a report on multiple litigations?

A   I guess, you know, the issue is when I'm receiving a report, I'm not sure if I think of it as the quarterly report.  There have certainly been some reports where other litigation is discussed.

Q   So in those reports where other litigation is discussed, how long is the portion of the report about this litigation?

A   I'd say about four to six pages, three to six pages.

Q   So you receive a report that is three to six pages long every quarter about this litigation?

A   I don't -- after I read something, I'm not sure I really keep track of how many pages were involved, but that sounds right to me.

Q   So it says here Robbins Geller has communicated with others at the fund; is that true?

A   Yes.

Page 187

Q   Who are the others at the fund?

A   They have communicated, at the very least, with Peter Andreou and Dilay Altiner.

Q   Anyone else?

A   Well, in connection with determining -- there have been some communications with people from IT on how to make sure we capture everything in our document productions.  So --

Q   Have they ever communicated any of --

THE COURT REPORTER:  I'm sorry.  You stepped on his answer.

MS. SADINSKY:  I'm sorry.

THE WITNESS:  Those aren't -- you know, they don't discuss the nature of the case.  They're just technical -- usually technical matters that may be just some searches.

BY MS. SADINSKY:

Q   Understood.

Does Robbins Geller communicate with any of the trustees?

A   I don't believe they do so directly, unless they're also receiving directly reports that we would send them anyway.

Q   When we were discussing the quarterly reports a moment ago, what subjects are covered in

Page 188

those reports?

A   There's usually a summary of what the underlying issues are in the case, procedural posture, and the -- what the expected future developments are.

MR. BURKHOLZ:  Yeah, at this point, Counsel, I've given you a lot of leeway.  I think you're starting to get into some attorney-client communications.  So I think I've given you enough leeway to -- for the purpose of these questions and --

MS. SADINSKY:  Sure.

BY MS. SADINSKY:

Q   Without revealing any legal advice, the portion of the update that provides a summary of the case and the procedural posture, does that typically stay the same from report to report?

MR. BURKHOLZ:  Objection to the form. It's -- it's -- the entire document is legal advice. It's a legal communication.  So it's protected.  I allowed him to answer some questions just generally. So since it went to the issue of their monitoring of the case, but now you're getting into specific questions, which I think are not appropriate.

MS. SADINSKY:  We're trying to understand

LA Sheriffs' Pension
v. Cardinal Health Inc.
FINAL
CONFIDENTIAL
May 17, 2022
Gabriel Ristorucci

Page 189

if there's new updates each month and how much of the update is new. So I'm not asking about what is said in the update.
BY MS. SADINSKY:
Q I'm asking if you have a report, you said it's usually three to four pages about this litigation. Are three of the four pages the same from report to report, and the last page is the only one that's updated --
MR. BURKHOLZ: If he knows.
BY MS. SADINSKY:
Q -- what's to come, what expected?
MR. BURKHOLZ: I'm going to object to the question. It's -- it's a little bit vague, but if he knows, he can answer.
THE WITNESS: I have not -- I have not noticed that they're repetitive -- I mean, well, I have not noticed that they're exactly the same. There is some repetition of information as -- but -- because sometimes there's certain things that don't change, and part of the way you know something didn't change is that something says, "This is still the case."
BY MS. SADINSKY:
Q Does anyone at SEIU communicate with your

Page 190

local counsel?
A No.
Q How much time do you spend working on this case?
A Oh, that can vary.
Q So let's say over the last six months, how much time have you spent working on this case?
MR. BURKHOLZ: If you can provide an estimate.
THE WITNESS: It really varies about -- you know, if there is a filing, then, obviously, there would be more time looking at that than if there's not a filing.
But the past six months? Probably -- you know, I wouldn't be surprised -- I wouldn't be surprised if it's between 20 and 40 hours.
BY MS. SADINSKY:
Q 20 and 30 hours. And what about --
A 20 and 40, but the last six months. Okay. So we're going to December of last year. Yeah, more like 20 to 30 hours.
Q And then before that, how much time would you say total?
MR. BURKHOLZ: Again, I ask the witness not to speculate. She's entitled to an estimate, if you

Page 191

know.
THE WITNESS: I'm not sure, honestly.
BY MS. SADINSKY:
Q You were going to answer before your counsel interrupted, so if you had to give your best estimate of how much time you spent on this case more than six months ago, what would your estimate be?
A What I was going to say is that over a year-long period, it can be hard to estimate how much time is directly spent on an activity. Knowing though that was something on my -- sort of on the agenda of things that we're responsible for, so sometimes it can occupy mind space even when you're not actually doing something directly at that moment on something.
So I know for the past, probably last -- you know -- you know, as time gone -- as time has gone on, it takes up more time and just is something to acknowledge that things need to be done.
Q Between September 2019 and December 2021, did you spend more than ten hours actively working on this case?
MR. BURKHOLZ: Objection to the form.
THE WITNESS: Between September -- I'm

Page 192

sorry. September '19 and December 2021, yes, more than ten hours.
BY MS. SADINSKY:
Q More than 20?
A That I don't know.
Q More than 15?
A I just -- I don't know.
Q Okay. So somewhere between 10 and 15 hours you spent between --
A No. I'm not saying 10 to 15. I'm saying I don't know. It could have been -- it could have been more than that.
Q How much time has Mr. Stein spent working on this case?
A Oh, I don't know. I know it's been something he's been working on, but I don't -- I don't monitor his hours.
Q How much time has Ms. Metzger spent working on this case?
A Similarly, I don't know.
Q How have you, Mr. Stein, and Ms. Metzger divided responsibilities for monitoring this case?
MR. BURKHOLZ: Objection. Object to the form.
THE WITNESS: I would say for -- at the --

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 193

when it first started, Jeff Stein was primarily responsible for monitoring the case, and Suzanne and I would be involved in discussions. Perhaps because it was related to investments, I might have been a little bit more -- paying attention to it than she does; on the other hand, she's usually -- she's a litigator and I am not.

As -- as time has progressed, it's become more and more my responsibility -- my primary responsibility.

BY MS. SADINSKY:

Q   So you said Mr. Stein -- so Ms. Metzger took over as general counsel in June 2021, correct?

A   Correct.

Q   And Mr. Stein, you said, is a consultant or has more of a consulting role?

A   Yeah, he's -- I'm not sure of his exact title.  But it's, yes, more -- certainly a reduction in hours than what it was when he was general counsel.

Q   Is he an employee at SEIU, or is he an independent consultant?

A   I think he's an employee.

Q   So he --

A   He's an employee.

Page 194

Q   And how many hours a week does he work?

A   I don't know how many hours he works because I'm not -- I'm not aware of all times when he's working, and we're not all in the office these days, and nor do we only do work when we're in the office.

Q   You --

A   I would say he's probably at a quarter of what his hours once were, as we discussed earlier.

Q   Does Mr. Stein consult for any organizations other than SEIU?

A   He -- like I said, he's an employee here.  He might have the title "consultant" or something like that, but he's an employee.

Yeah, I don't know.  I don't think as, like, a -- I don't know.  I know he has volunteer activities that he does.  So --

Q   Is there an agreement between Mr. Stein and SEIU relating to this new role?

A   Yes.  He has -- he has an agreement.  He has an employment contract.

Q   Do you expect Mr. Stein to continue to be involved in this litigation going forward in light of this change in his role?

A   At a much reduced capacity, yes, although,

Page 195

I'm sure he will be available if I have questions about something.

Q   Between June 2021 and today, has Mr. Stein reviewed any filings in this case?

A   I'm not sure.

Q   Would you expect him to have reviewed any filings in this case between June 2021 and today?

A   I would say any filings in the second half of 2021, I would have expected that he would have taken -- he would have looked at the filings.

Q   Okay.  It also says in this paragraph: "In addition to the quarterly updates" -- that's where I'm starting -- "RGRD lawyers have communicated numerous times."  Then it says: "RGRD has provided drafts of important pleadings such as the consolidated amended complaint and opposition to defendants' motion to dismiss to the Fund for their review prior to filing."

Is that an accurate statement?

A   Yes.

Q   Did anyone review those documents?

MR. BURKHOLZ:  Objection.  Asked and answered.

You can answer again.

THE WITNESS:  I recall reviewing at least

Page 196

some of those documents.

BY MS. SADINSKY:

Q   Which ones?

A   I believe the Opposition to Defendants' Motion to Dismiss.

Q   Did you comment on that document prior to it being filed?

A   I had comments on some documents.  I don't know if it was that one.

Q   What other documents have you reviewed, other than the document requests and the opposition to Motion to Dismiss before they were filed?

MR. BURKHOLZ:  Objection.  Misstates his testimony -- prior testimony.

THE WITNESS:  So prior to filing, I've read -- I've also reviewed some -- some of the response -- responses to the discovery requests -- oh, and the interrogatories.

BY MS. SADINSKY:

Q   So you've reviewed responses to interrogatories, responses to document requests, and the opposition to Motion to Dismiss prior to filing, correct?

A   Correct.

Q   Did Ms. Metzger review any filings prior to

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 201

So why don't you read through this and start from the first page, and let us know if there's any statements in here that are inaccurate.

A   Okay.  Scroll down, please.

Okay.

Yes, I --

Q   Yes, everything is accurate?

A   I'm just reading the final -- I was going to say, yes, I can read this.

Yeah, everything is -- well, everything is accurate as far as I know.  I don't see any inaccuracy.

Q   Is there any statement that requires additional explanation?

A   No.  What I mean by that is I don't -- I am not somebody else, and can't attest to specific, you know --

Q   Did you authorize the statements made about you in this declaration?

A   The statement that involved in -- yes.  I mean --

Q   You authorized those statements?

A   I didn't specifically authorize them to be stated, but they're accurate, which would --

Q   Did Ms. Metzger -- did Ms. Metzger

Page 202

authorize the statements about her to be made?

A   Can you go up to the statements about Ms. Metzger?  I'm not -- I'm not sure what communications Ms. Metzger has had.

Q   Do you see it says here that Ms. Metzger's involved in monitoring the litigation as of the --

A   Yes.

Q   And you don't know whether or not that's true?

A   No.  I know that's true.  I don't know if Ms. Metzger authorized her name to be included specifically in a -- in the certification, but it's accurate.

Q   It's accurate?  She's involved in monitoring the litigation?

A   Yes.

Q   And you don't know how much time she spends doing so, correct?

A   That's correct.

Q   And you don't know how much time Mr. Stein spends doing so, correct?

A   I don't.  I know that I've been involved with meetings with them discussing this.  I know we've discussed with -- we've had communications with our counsel as well.

Page 203

Q   And you don't know if Mr. Stein is going to be involved in this case or the extent to his involvement going forward, correct?

MR. BURKHOLZ:  Objection.  That's not -- misstates his prior testimony.

THE WITNESS:  I don't know the level of -- well, I don't know to what extent he will stay -- he will continue to be involved.  He will likely be involved.  The extent to which he's involved in some sense depends on how -- how much of his attention is required.

BY MS. SADINSKY:

Q   What are SEIU's responsibilities in this litigation?

A   Well, we have a responsibility to make sure that the class is adequately being represented, that the lawyers are competent and performing well --

Q   And to monitor --

A   -- prosecuting the case -- monitor -- monitor their progress and the actions that are taken.

Q   Have you been doing that?

MR. BURKHOLZ:  Objection.  Asked and answered about five times.

THE WITNESS:  Yes.

Page 204

MS. SADINSKY:  Can you pull this document down.

BY MS. SADINSKY:

Q   Can you describe to me what SEIU thinks Cardinal did wrong that warrants the lawsuit SEIU is bringing against them?

MR. BURKHOLZ:  Objection.  Asks for a legal conclusion and --

BY MS. SADINSKY:

Q   I'm not asking you to reveal any legal advice.  I just want to know why you're bringing this lawsuit against Cardinal.

What do you think Cardinal did wrong?

MR. BURKHOLZ:  Objection.  The amended complaint speaks for itself.  You're getting into communications about why they brought the case.  That's -- those are privileged communications.

MS. SADINSKY:  Are you directing your client not to answer?

MR. BURKHOLZ:  It depends on the question that you're asking.  Because it seems like you're asking him a question about -- that would be formed from discussions with legal counsel, and that is a privileged communication.

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 205

Q   Can you tell me who the defendants are in this case?

A   Well, it's Cardinal Health and some executives at Cardinal Health.

Q   Who?

A   I'm not recalling the names of the executives at the moment.

Q   Can you recall the name of one?

A   No.

MR. BURKHOLZ:  Do you want to show him the amended complaint, or do you want to continue to have a guessing game?

MS. SADINSKY:  I'm -- I'm asking about Mr. Ristorucci's knowledge of the litigation as the class representative.  I don't want to show him a document to discuss that.

BY MS. SADINSKY:

Q   What is SEIU alleging Cardinal Health did wrong?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

But you can answer the general allegations.

THE WITNESS:  As is stated or, you know, provided in the complaint, Cardinal Health purchased a subsidiary of Johnson & Johnson with the idea that

Page 206

they were going to be bringing some expertise with regard to logistics to this Cardinal Health that was not previously existing there.

They -- they apparently reported that this integration of their logistics expertise was going well and was -- and was going -- there was going to be, essentially, a synergy between the expertise that Cardinal Health brought and that existed in Cordis.

They had reason to believe that this integration was not going well, apparently, and did not -- did not disclose that information to the public, and in fact may have been indicating that the -- that the disclosure was -- or that the integration was going well or that to the extent it was not going well was unrelated to the -- a lack of -- a lack of -- a lack -- a failure in the integration, and, as a result, had to write off a fair amount of goodwill, and it was later determined that -- and also lost a lot of inventory.

At the same time, when they finally did make the disclosures public, the share value of the stocks declined significantly.  And prior to that public disclosure, several of the executives had sold their shares in the -- that they had in

Page 207

Cardinal Health and had a -- and had avoided the losses that would have otherwise been involved if they had -- if they had -- if the public disclosure had been made timely.

BY MS. SADINSKY:

Q   Mr. Ristorucci, do you understand you're under oath?

A   Do I understand that I'm under oath?

Q   Yes.  Are you reading notes right now?

A   No.

Q   What are you looking down at?

A   My desk more --

Q   What about -- what about to the side, the other side?

MR. BURKHOLZ:  Counsel --

THE COURT REPORTER:  I'm sorry.  I didn't hear that, the witness.

THE WITNESS:  If you would like me to take my computer and show you what's there, there's a mouse pad that is also -- tells you how to -- our document management system.  That's from -- I've had that there basically since the day I started here.

BY MS. SADINSKY:

Q   Okay.  So you have no notes with you?

A   No notes.

Page 208

Q   Okay.  And so you don't know who the defendants are in this lawsuit, other than --

MR. BURKHOLZ:  Objection.

THE WITNESS:  I actually was not concerned with their names.  They're fairly generic names.  They're not famous, so I don't know.  The name of the individuals was never particularly important to me.

BY MS. SADINSKY:

Q   Do you know who George Barrett is?

A   That name, now that you remind me, is one of the executive's names.

Q   Do you know what he did wrong?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

BY MS. SADINSKY:

Q   Can you give me some examples of the allegations in the complaint that are based on things that George Barrett said?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

If you want to show him the complaint, show him some of the statements, you can go ahead.  This is just completely inappropriate.

BY MS. SADINSKY:

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 213

But you can answer.

THE WITNESS: No, not to my knowledge. There may -- but as I said, there may at times be an analysis of Cardinal Health that's included in an overall industry or sectoral analysis, but not Cardinal Health in particular as an investment to be made or not to be made.

BY MS. SADINSKY:

Q Okay. Are there any investment managers -- sorry. Strike that.

How many investment managers has SEIU used since 2015?

A I'm not sure. At any given time, we have many investment managers. In the tens.

Q In the tens?

A Yeah.

Q Do you know how many investment managers SEIU used between 2015 and 2018?

A For equities, I would imagine it was between six to eight investment managers.

Q What about for the other strategies? You told me them before: hedge funds, private equity, fixed income investments, and special opportunities.

A Well, fixed income, probably talking under ten, five to ten. Private equity, it depends.

Page 214

Probably -- probably, depending on -- probably about five -- or under five really at that time. Real estate, probably have one or two managers at most -- well, at least one, but not more than two.

For special ops, there's some overlap between special ops and private equity, so you might be looking another one or two there. Hedge funds, I would say one or two. And I think -- and then I guess -- well, yeah. Were there any others that I missed?

Q I think so. Who were the one to two investment managers you used to -- for hedge funds?

A The name is escaping me currently. Might be Artisan, but between 2015 and 2018, I'm not certain that they would have been the manager in place -- for 2015 to 2017.

Q During the period of 2015 to 2018, you had one to two investment managers that managed hedge funds, correct?

A That would be what I would expect.

Q Did any of SEIU's investment managers ever short Cardinal Health stock during the period of 2015 to 2018?

A Not to my knowledge. It's -- we wouldn't have visibility into that, but it also would seem

Page 215

unlikely to -- like an unlikely strategy, but we wouldn't know.

Q Why wouldn't you know?

A Well --

MR. BURKHOLZ: I have an objection. I have an objection.

Are you asking him about the hedge fund managers or the equity managers?

MS. SADINSKY: I'm asking him about any.

THE WITNESS: Oh. Equity managers, certainly not. Hedge funds, their role within the portfolio is generally to be less risky than equity and more -- but more -- a higher return than fixed income. So it seems unlikely that they would be involved in shorting, but we wouldn't actually have visibility into that because when -- we would see our custodian reports, which would just show that we have a position with a certain manager or fund. Equity, our Investment Management Agreements don't allow for shorting, but we also -- we're not aware and we have not seen any shorting positions in our custodial reports.

BY MS. SADINSKY:

Q Do you have Investment Management Agreements with the hedge fund managers?

Page 216

A Yes.

Q Those haven't been produced. Can those be produced to us, please?

MR. BURKHOLZ: Counsel, we'll take that under advisement. You know that our position is that those agreements -- or the hedge fund investments are completely irrelevant to this litigation, but we will -- we can discuss with that -- that with you outside the contours of this deposition.

BY MS. SADINSKY:

Q Did any of SEIU's investment managers transact in Cardinal Health options or other derivatives tied to Cardinal Health stock between 2015 and 2018?

A Which -- which securities?

Q Anything other than common stock. Anything other than Cardinal Health common stock. Any other Cardinal derivatives.

MR. BURKHOLZ: Are you asking about the equity managers?

BY MS. SADINSKY:

Q Any manager that SEIU had, did it transact in Cardinal Health options or any sort of Cardinal Health derivative other than Cardinal Health common

LA Sheriffs' Pension
v. Cardinal Health Inc.

FINAL
CONFIDENTIAL

May 17, 2022
Gabriel Ristorucci

Page 309

MR. BURKHOLZ: Objection to the form. Irrelevant to the time.

I assume you're asking current -- current time period?

MS. SADINSKY: Yes.

THE WITNESS: So in evaluating public statements about a company or any other aspect of the company, we delegate that responsibility to our investment managers, and we being, again, the pension fund.

THE COURT REPORTER: We what? I missed that.

THE WITNESS: We being the pension fund.

BY MS. SADINSKY:

Q   But the pension fund has a fiduciary responsibility to the 260,000 plan beneficiaries, correct?

A   The pension fund trustees have a fiduciary duty to the -- to the -- that -- the beneficiaries.

Q   260,000 beneficiaries, correct?

A   For the Health Care Employees Pension Fund? That sounds about right, yes.

Q   So if the trustees were aware that a company that they had filed a lawsuit against alleging securities fraud and the CEO of that

Page 310

company, who they had also alleged committed fraud, it is your testimony that the trustees would not have an obligation to tell its investment managers to stop investing in Cardinal Health?

MR. BURKHOLZ: Objection to the form. Irrelevant to any legal issues in the case.

You can answer.

THE WITNESS: That's correct.

BY MS. SADINSKY:

Q   That's correct.

It's consistent -- how is it consistent with SEIU's fiduciary duty to -- to -- to its plan participants to remain invested in a company where it does not trust the CEO to make truthful statements about the company's performance?

MR. BURKHOLZ: Objection to the form. Lacks foundation.

THE WITNESS: So the -- the trustees have what -- the strategy that's been employed by our trustees has been to -- and it has been to hire investment managers who are high quality, have good -- have good histories, have good performance, and replace them when needed if they do not have those performances or we feel like they are not somehow meeting the goals that we've established as

Page 311

a fund.

Investment managers will make their -- have their ability to make an evaluation about the truthfulness, and they can take into account an executive's history of making false or -- false statements, and they can make that judgment about what that says about the current value of their stock price or if they're going -- if they're making -- if they're going to that micro a level about investment choices.

But our trustees, their strategy is to participate in the growth of the current -- we believe, based on -- we would assess that since this information is public, then that's now incorporated into the price of a share and that investment managers have the ability to evaluate whether that share price is appropriate and merits further investment.

That said, we also understand that our investment managers may be making investments based on participating in a growth of a particular sector or a particular -- in terms of what industry that -- that investment is in or what level and what -- what capitalization they represent to the market. There are a host of factors that we would want our

Page 312

investment managers to take into account when making an investment.

What we would also know though -- what we would also want to do is make sure that if there is a loss that has occurred because there was fraud or alleged fraud, then we would want to make sure that that claim was pursued appropriately.

BY MS. SADINSKY:

Q   Has -- has the trustees or anyone at SEIU ever told Boston Partners about this litigation?

A   Has a trustee reached out to Boston Partners to inform them about the litigation?

Q   Or SEIU.

A   I'm sorry?

Q   Has anyone --

A   They know this litigation exists. They're -- I'm not sure, but Boston Partners knows about the litigation.

Q   Before Boston Partners received a subpoena in this litigation, had SEIU ever discussed the litigation with Boston Partners?

A   I'm not sure.

Q   Had SEIU ever discussed the litigation with Rothschild?

A   I'm not -- I'm not sure.