# EXHIBIT 14

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION

------------------------------------------

LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated,
    Plaintiffs

    v.

CARDINAL HEALTH, INC., GEORGE S. BARRETT, DONALD M. CASEY, JR., MICHAEL C KAUFMANN, JORGE M. GOMEZ, and DAVID J. WILSON,
    Defendants

Case No. 2:19-CVL-03347

------------------------------------------

VIDEO DEPOSITION OF
Steven P. Feinstein, Ph.D., CFA
May 5, 2022
Lead: Lauren M. Kofke, Esquire
Firm: Wachtell Lipton Rosen & Katz

REVISED FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

Page 2

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF
    Spencer A. Burkholz, Esquire
    Laurie L. Largent, Esquire
    Christopher R. Kinnon, Esquire
    Megan A. Rossi, Esquire
    Robbins Geller Rudman & Dowd LLP
    655 West Broadway
    Suite 1900
    San Diego, California 92101
    (619)239-3247

ATTORNEYS FOR DEFENDANTS
    Lauren M. Kofke, Esquire
    Elizabeth N. Brandt, Esquire
    Danika L. Kritter, Esquire
    Wachtell Lipton Rosen & Katz
    51 West 52nd Street
    New York, New York 10019
    (212)403-1000

Page 3

A P P E A R A N C E S   C O N T I N U E D

ALSO PRESENT:
    Jackson Martin, Paralegal
        Wachtell Lipton Rosen & Katz

    Max Obmascik, Paralegal
        Wachtell Lipton Rosen & Katz

    Nicole Kim, Esquire, Cardinal Health, Inc.

    Laura R. Yergesheva, Senior Vice President
        Compass Lexecon

    Daniel S. Bettencourt, Vice President
        Crowninshield Financial Research

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    Joan V. Cain, Court Reporter
    Joseph Salinas, Videographer

Page 4

TABLE OF CONTENTS

Witness:
Steven P. Feinstein, Ph.D., CFA

Examination
By Ms. Kofke...............................Page 7

Reporter Certificate.......................Page 304

Errata.....................................Page 305

Index of Exhibits.........................Page 308

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 5

P R O C E E D I N G S

- - -

10:01 a.m. EDT

May 5, 2022

- - -

THE VIDEOGRAPHER:  Here begins Media No. 1, Volume 1, in the deposition of Steve Feinstein in the matter of Louisiana Sheriffs' Pension & Relief Fund versus Cardinal Health, Incorporated.

Today's date is May 5th, 2022.  The time is now 10:01 a.m.  I am Joseph Salinas, the legal videographer.  The court reporter is Joan Cain from Jane Rose Reporting, New York, New York.

Counsel, please identify yourselves and state whom you represent.

MS. KOFKE:  This is Lauren Kofke from Wachtell Lipton Rosen & Katz representing the defendants, and I have with me Danika Kritter, Elizabeth Brandt, Jackson Martin, and Max Obmascik, also from Wachtell Lipton.

MR. BURKHOLZ:  Spence Burkholz from Robbins Geller Rudman & Dowd.  I have with me Chris Kinnon, Megan Rossi, and Laurie Largent.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

Page 6

MS. KIM:  Oh, Nicole Kim, in-house counsel on behalf of Cardinal.

THE COURT REPORTER:  Good morning.  My name is Joan Cain.  I am a court reporter and a Notary Public in the Commonwealth of Virginia.  I am the deposition officer for today's deposition.

All parties in today's deposition are appearing remotely to comply with the guidance of the Centers for Disease Control in response to the COVID-19 pandemic occurring in our country at this time.  I have collected everyone's appearances off the record, and they will appear on the appearance page of the transcript.

Before we proceed, I will ask lead counsel for today's deposition to stipulate on the record that this deposition officer may swear in the deponent, even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

Let's start with the noticing attorney, please.

MS. KOFKE:  So stipulated.

THE COURT REPORTER:  Mr. Burkholz?

MR. BURKHOLZ:  Stipulated.

Page 7

STEVEN P. FEINSTEIN, PH.D., CFA, having been duly sworn under penalties of perjury by the Notary Public, was examined and did testify as follows:

THE COURT REPORTER:  Thank you. Please begin.

EXAMINATION BY COUNSEL FOR DEFENDANTS BY MS. KOFKE:

Q   Good morning.  Please state your name for the record.

A   Steven Feinstein.

Q   Now, I know you've been deposed many times before, but I'm going to start with a few introductory matters relating to this deposition.

When I refer to "lead plaintiff," "plaintiff," or "SEIU," I'm referring to 1199 SEIU Health Care Employees Pension Fund, the lead plaintiff in this action.

Is that understood?

A   Yes.

Q   And when I use the term "Amended Complaint," I'm referring to the Consolidated Amended Complaint filed by the lead plaintiff in this action in September 2020.

Is that understood?

Page 8

A   Yes.

Q   You understand you're testifying under oath today just as you would be testifying under oath in court?

A   Yes.

Q   And you understand that there's a remote deposition protocol that applies to this deposition today?

A   Yes.

Q   And you understand that while we're on the record, pursuant to that protocol, you must put away and not look at electronic devices that are not being used for the deposition?

A   I understand.

Q   And you understand that while we're on the record, there shall be no other programs displaying images on your screen, other than the program we're using for the deposition and to display the exhibits?

A   I understand.

Q   Do you have any other programs open on your computer right now, such as email or Microsoft Word or anything like that?

A   No.

Q   And you understand that while we're on the

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 45

A    I think it's in the neighborhood of 50 percent.

Q    If Robbins Geller stopped engaging Crowninshield, that would have a significant negative impact on Crowninshield's annual income, correct?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  Not necessarily.

BY MS. KOFKE:

Q    Why not?

A    There are numerous other projects we could be working on.

Q    But you'd have to fill a 50 percent hole in your annual income, correct?

A    No.

Q    Do you think you could -- well, strike that.

Do you give Robbins Geller any special terms that you don't offer to other law firms on Crowninshield's services?

A    No.

Q    Do you give Robbins Geller any discount on your fees that you don't give to other law firms that hire you?

A    No.

Page 46

Q    And I think you already said you don't recall if there's any cases in the past four years where Robbins Geller engaged you to provide a report but you did not testify; is that right?

A    I just want to make sure that the words that you chose are accurate.

I don't recall.

Q    Have you ever been engaged by a party that was adverse to Robbins Geller in any case in the last four years?

A    No.

Q    Have you ever been engaged by a party that was adverse to Robbins Geller at any time?

A    I think so.

Q    When?

A    I -- well, I mean, I've been serving as a forensic expert since 1996, and I recall there were times that I was engaged by one firm or another to estimate damages suffered by various investors, and sometimes that analysis is used adverse to Robbins Geller or adverse to any other -- some other law firm as they vie for lead counsel status.

Q    Can you recall when was the last time that you provided that type of advice that was used adverse to Robbins Geller?

Page 47

A    I don't recall.

Q    Have you ever taken a position adverse to Robbins Geller at the class certification stage of any securities litigation at any time?

A    Probably.  I mean, probably in the course of my analysis, results I have presented might have been adverse to elements of their case.  I mean, I tell it like it is, and sometimes I disagree with what Robbins Geller may have written in their complaint or what they may be pleading to the court.

Q    Can you recall any specific case where that happened?

A    Not specifically, but I recall it occurs from time to time.

Q    But not in the past four years, correct?

A    No.  I didn't say that.  I think it may very well have happened in the past four years.

Q    So you think in the past four years you've taken a position adverse to Robbins Geller at the class certification stage of a securities litigation?

A    I think some of my findings may have been unhelpful to Robbins Geller at the class certification stage.

Q    You can't recall a specific case?

Page 48

A    Correct.

Q    Is it one of the cases listed on Exhibit 3 to your report?

A    Maybe.  I don't know.

Q    Not one of the cases where you were engaged by Robbins Geller, correct?

A    No.  It would have been -- I mean, it may have been.  Most likely was.

Q    So you're saying in cases where you were engaged by Robbins Geller, you may have taken a position that was adverse to them?

MR. BURKHOLZ:  Objection to form.

Steve --

THE WITNESS:  I -- it depends how you're defining take a position adverse to them.  Sometimes my findings are unhelpful to elements of their arguments.

BY MS. KOFKE:

Q    Have you ever worked with Mr. Burkholz before?

A    Yes.

Q    About how many cases have you worked with Mr. Burkholz on in the past four years?

A    I don't know.

Q    I can tell you, as far as we can tell based

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 89

decline that day.

Q   So if I understand you correctly, if there's no confounding information, then all you need for step 1 of your methodology is an event study?

A   It's a little bit of semantics we have to clear up.  I mean, some people might say the analysis of confounding information is part of the event study, and other people might say it's external to the event study.  I mean, that's just the semantics, though.

But I would say the statistical analysis of the event study would be enough if you've identified that there was a corrective disclosure that day and that the residual stock price decline was statistically significant.

If the residual stock price decline either was not statistically significant or there's confounding information, other valuation tools can be brought to bear on the question of what caused the stock price to fall that day.

Q   At this point in time, have you assessed whether there was confounding information at the time of either of the two alleged corrective disclosures in this case?

Page 90

A   Well, I have not done a loss causation or damages analysis yet.  I'm aware of dates that the plaintiffs are saying were corrective disclosures, and I'm aware that there was a mix of information on those dates, but I have not yet evaluated whether that mix of information constitutes confounding information.

Q   Do you know, sitting here today, whether the first step of your damages methodology would require application of any valuation tools in addition to an event study?

A   Well, I haven't proved for sure that it does require them.  I'm certain, though, that if it -- if the circumstances require valuation tools, the valuation tools are at my disposal or the disposal of whoever is doing the loss causation analysis.

Q   I think we might be speaking past each other a little bit here.

My question is:  Have you determined yet whether circumstances will require the application of any valuation tools, apart from an event study, with respect to the first step in your proposed damages methodology?

A   No.  No.  I mean, it's possible that no

Page 91

valuation tools will be necessary, or it's also possible that the full toolkit of valuation tools will be brought to -- will be necessary.  So I haven't made that determination yet.

Q   You have determined that an event study will be necessary?

A   Yes.

Q   Is it correct that an event study is the only tool that you've determined at this point will be part of the damages analysis in step 1 of your methodology?

A   No.  I mean, I explained that a news analysis is also required to investigate when in fact there were corrective disclosures and if on those -- if simultaneous with the corrective disclosures there was confounding information.

Q   So apart from an event study and a news analysis, are there any specific valuation tools that you've determined at this point will be required to evaluate or to perform step 1 of your damages methodology?

A   I think I answered that already.  I mean, you asked exactly that question, and I answered it.

Q   I'm pretty sure I didn't.

A   Well, what I said the last time you asked

Page 92

that question was that it's possible that no valuation tools will be necessary, and it's possible that the full toolkit of valuation tools will be necessary, depending on whether there's confounding information and what kind of confounding information the news analysis turns up.

Q   So sitting here today, you can't specifically name a valuation tool, other than an event study, that you know will be required for step 1 of your damages analysis?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I can name a lot of valuation tools that are available should valuation tools be necessary, and I am a hundred percent confident that confounding information can be disaggregated.  Because that's what valuation experts do every single day when they price securities in the market and price hypothetical scenarios that may occur.

But the -- I know what the available array of tools is, but which of those tools will be necessary depends on what confounding information specifically appears to be at play on the day of the corrective disclosure.

BY MS. KOFKE:

Q   So is it fair to say, as part of the

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 105

case, other than what's listed in 146?

A    I'm sure there would be if I -- if I spent, like, the next hour thinking about it, but, you know, in this moment, no.

Q    Have you applied any of the possible valuation tools in paragraph 146 to this case at this time?

A    No -- well, yeah.  Wait.  146 includes event study analysis, and I have done event study analysis.

Q    Apart from an event study analysis, have you applied any of the valuation tools in paragraph 146 to this case at this time?

A    No.

Q    Have you determined if you would need to use any specific valuation tools to calculate an inflation ribbon in this case, other than an event study?

A    May I please hear that again.

Q    Have you determined if you would need to use any specific valuation tools to calculate an inflation ribbon in this case, other than an event study?

A    The only way to know the answer to that -- the only way to know specifically what challenges

Page 106

will be encountered in the course of the loss causation analysis and how to solve -- how to overcome those challenges would be to do the loss causation analysis, and I have not yet done the loss causation analysis.

Q    So the answer to my question would be, no, you have not yet determined if you would need to use any specific valuation tools to calculate an inflation ribbon in this case, other than an event study?

A    The way I would like to say it is:  I have not conducted a loss causation analysis yet.  I have not been asked to.  My understanding is that it's not appropriate to do one at this stage in the legal process.  And that is the only way one would know for sure what sort of potentially confounding information challenges might arise, which would then dictate what tools need to be used to address it.

Q    So because you have not yet done the loss causation analysis required to answer the question, you have not yet determined if you would need to use any specific valuation tools to calculate an inflation ribbon in this case, other than an event study, correct?

MR. BURKHOLZ:  Objection.  Asked and

Page 107

answered.

THE WITNESS:  So was that a question?

BY MS. KOFKE:

Q    Yes.

A    I have not done a loss causation analysis yet.  I don't think it -- I wasn't asked to, and I don't think it's required of anyone to do one at this stage in the process, and a loss causation analysis is the only way one would know for sure what sort of challenges might be encountered in the course of the loss causation analysis, and, therefore, what sort of tools need to be brought to bear to address those challenges.

Q    Have you examined at this time, having not done a loss causation analysis, whether there are any specific facts and circumstances in this case that call for the use of any specific valuation tool listed in paragraph 146, other than an event study?

MR. BURKHOLZ:  Objection.  Asked and answered four times.

THE WITNESS:  That was a long question.  There are a lot of parts to it.

I think I'm being responsive if I say that I do know I'm going to have to review all the information the company announced on the dates of

Page 108

the alleged corrective disclosures and the dates that I determine were corrective disclosures, and I'll have to do an analysis to determine if any of those are new information and economically material information.

And most likely that will involve the application of generally accepted valuation principles, such as:  The information needs to be new and impacting some characteristic of the firm that is generally accepted to be valuation relevant.

BY MS. KOFKE:

Q    Did you read the entire Amended Complaint?

A    Yes.

Q    How much time did you spend reviewing the Amended Complaint?

A    I think I read it on three occasions.  I read it when the -- to answer your question, I don't know for sure, but probably four or five hours altogether.

Q    What is lead plaintiff's theory of liability in this case?

A    That there were misrepresentations or omissions that caused the stock price to be artificially inflated that caused investors to overpay for the stock and that, upon disclosure of

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 109

the truth, the stock price fell and investors, therefore, suffered losses.

Q   Is lead plaintiff asserting a theory of liability based on corrective disclosure or materialization of an undisclosed risk?

MR. BURKHOLZ:  Objection to form.  Legal conclusion.

THE WITNESS:  Well, the corrective disclosure is announcements and events that reverse the misinformation that had been in the market as a result of the misrepresentations and omissions.  I think it's -- I don't think I -- an economist has to characterize it as materialization of the risk -- I mean, corrective disclosure can be a materialization of the risk.  So I don't see the distinction from the economics point of view.

BY MS. KOFKE:

Q   In this case, are any of the corrective disclosures -- actually, strike that.

In this case, is lead plaintiff alleging that any of the misrepresentations involved the failure to disclose a risk?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

THE WITNESS:  My understanding is that lead

Page 110

plaintiff is alleging that the conditions at Cardinal involving the acquisition and integration of Cordis were misrepresented to the market.

BY MS. KOFKE:

Q   Do you have an understanding as to whether lead plaintiff is alleging that defendants misrepresented or concealed risks related to the Cordis acquisition?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

BY MS. KOFKE:

Q   To be clear, I'm just asking for your understanding of plaintiff's allegations.

MR. BURKHOLZ:  And the objection is it has been asked and answered.

THE WITNESS:  Right.  My understanding is that it's conditions and events that were misrepresented or omitted what the allegations center on.

BY MS. KOFKE:

Q   Your understanding is that plaintiff is not alleging that defendants misrepresented or concealed risks related to the Cordis acquisition?

MR. BURKHOLZ:  Objection to form.

THE WITNESS:  I'd have to check again to

Page 111

see if they used the word "risk."  And whether they did or didn't, from an economics point of view, I would need to assess whether the conditions that were alleged to have been misrepresented entail or engender a misappreciation of risks.  That's what I would need to do to refresh my memory on that.

BY MS. KOFKE:

Q   But sitting here today, you haven't reached a determination as to whether lead plaintiff is alleging that there was a misrepresentation or concealment of a risk concerning the Cordis acquisition?

A   I mean, if they did use the word "risk," my understanding, from everything else in the complaint, is that it was -- whether or not the acquisition was on track, whether or not due diligence -- appropriate due diligence had been performed, that was where the market was misled.

So whether that creates risks or not or whether the complaint was written to say that it was risks rather than conditions, it wasn't germane to my analysis.  My analysis handles it either way, and I'd want to see the complaint to see if the word "risk" appears or not.  I don't recall whether it does or doesn't.

Page 112

Q   Your view is that it doesn't matter, for application of your proposed damages methodology, whether lead plaintiff is alleging failure to disclose a risk?

A   Correct.  Because the model is I would assess how does whatever was disclosed cause the stock price to be -- how does -- whatever is alleged to have been concealed, how did it inflate the stock price and what happened to the stock price when the truth was revealed.  And whether it's conditions or a risk, it's the same approach.  The model -- the damage model, the damage -- the damage model would be applied the same way.

Q   You agree that using the entire stock drop following the realization of a risk would overcompensate a plaintiff who alleged that the defendant misrepresented the size of a risk?

MR. BURKHOLZ:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  Not necessarily.

BY MS. KOFKE:

Q   Do you agree that the stock drop following the realization of a risk reflects the certainty that the risk would occur?

MR. BURKHOLZ:  Same objection.

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

---

**Page 121**

A   Well, I think it's a legal term, but I am familiar with it.  It refers to the fact that a misrepresentation or omission, rather than introducing new inflation -- I'm sorry -- rather than causing the stock price to rise, can actually keep it from falling.

Q   And is the term "inflation maintenance" sometimes used interchangeably with the term "price maintenance," or is that a different concept?

MR. BURKHOLZ:  Objection to form.

Go ahead.

THE WITNESS:  I think -- I think I have seen it used interchangeably, but I would prefer that they -- that there be a distinction made in the definitions.

BY MS. KOFKE:

Q   What's the distinction between inflation maintenance and price maintenance, in your view?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

Go ahead.

THE WITNESS:  Price maintenance is that a misrepresentation or omission can keep the stock price from falling.  That might actually introduce inflation for the first time.  If the -- if there's

---

**Page 122**

no inflation previously and the stock price should have fallen $5 and it didn't fall $5, that creates a new $5 of inflation.  So even though the price was maintained, inflation increased.

Inflation maintenance is the new -- is the idea, the principle, that a misrepresentation or omission can cause inflation from not changing, where, had there not been the misrepresentation or omission, inflation might have fallen.

BY MS. KOFKE:

Q   Do you agree that in order to offer your damages opinion, you had to assess whether the damages methodology described in your report was consistent with lead plaintiff's theory of liability in this case?

A   I offered an opinion about the damage model, the existence of a common damage methodology that can be used to calculate damages for all class members and that that damage model is consistent with plaintiff's theory of liability.  I didn't offer a damage quantification or loss causation opinion yet.

Q   So you had to understand what plaintiff's theory of liability in this case was in order to offer an opinion that your damages methodology was

---

**Page 123**

consistent with that theory of liability, correct?

A   I think I understand plaintiff's theory of liability.  I explained plaintiff's theory of liability and how it doesn't matter whether they used the word "risk" or not in their complaint.

Q   Is lead plaintiff asserting a theory of liability based on price maintenance or inflation maintenance?

MR. BURKHOLZ:  Objection.  Calls for a legal conclusion.

THE WITNESS:  I've already explained plaintiff's theory of liability.

THE COURT REPORTER:  I'm sorry.  I missed the first few words.

THE WITNESS:  I've already explained plaintiff's theory of liability.  Whether you characterize that with -- whatever legal terminology you characterize it with is inconsequential to how it affects the economics to the matter.

BY MS. KOFKE:

Q   Your understanding is that the lead plaintiff is asserting that the alleged misstatements in this case caused the Cardinal Health's stock price to increase?

A   No.

---

**Page 124**

MR. BURKHOLZ:  Objection.

Go ahead.

THE WITNESS:  That's not their allegation.  It caused -- their allegation is that it caused Cardinal's stock price to be greater than it otherwise would have been, and I guess some people would call that price maintenance.

BY MS. KOFKE:

Q   Is lead plaintiff asserting a theory of liability that some members of the class were harmed because they purchased Cardinal Health stock when absent the alleged misrepresentations they would not have purchased Cardinal stock at all?

MR. BURKHOLZ:  Objection to form.  That's compound.  I don't understand.

Go ahead, if you can answer it.

THE WITNESS:  My understanding is the theory of liability is that people who did buy it, bought it at an inflated price.

BY MS. KOFKE:

Q   Is lead plaintiff asserting that any members of the class were harmed by virtue of the fact that they wouldn't have bought Cardinal stock at all if it hadn't been for the misrepresentations?

MR. BURKHOLZ:  Objection to form.

---

LA Sheriffs' Pension
v. Cardinal Health Inc.

REVISED
FINAL

May 5, 2022
Steven Feinstein, Ph.D.

Page 125

THE WITNESS: No. Again, my understanding is that the class members are investors who bought during the class period at an inflated price, and they were harmed because the price was inflated.

BY MS. KOFKE:

Q   What is confounding information?

A   Information unrelated to the allegations, either unrelated to the misrepresentations and omissions or unrelated to the corrective disclosure of the misrepresentations and omissions that is disseminated simultaneous with either the misrepresentations and omissions or the corrective disclosure.

Q   Do you recall that plaintiff alleges two corrective disclosure dates: one on August 2nd, 2017 and one on May 3rd, 2018?

A   No. No. That's not correct.

Q   What's incorrect about that?

A   The corrective disclosure, I believe, was on May 2nd, 2018, after the close.

Q   So your understanding is that the second corrective disclosure was on May 2nd, 2018?

A   No. I'm sorry. I erred. It's -- you were right. You were right. It's May 3rd. It's May 3rd before the open.

Page 126

Q   Do you know whether there was any confounding information released on either of the alleged corrective disclosure dates?

MR. BURKHOLZ: Objection. Asked and answered a number of times.

THE WITNESS: There very well might have been is what I -- is what I observed.

BY MS. KOFKE:

Q   Do you agree that your report does not address whether confounding information was released on the dates of the alleged corrective disclosures?

A   I address what to do if it's determined that there's confounding information. I did address that and how to handle it. I haven't done the loss causation and damages analysis yet, so I haven't specified any specific confounding information.

Q   And you agree that your report does not describe what specific valuation tools would need to be applied to address any specific item of confounding information that may be found to have been released at the same time as the corrective disclosures?

A   Just sounds like the way you phrased that, I just think that that's not a fair characteristic of what's in my report or in my testimony today.

Page 127

Q   Can you name any item of confounding information that was released at the same time as one of the corrective disclosures?

A   I've described why it's reasonable that there would be confounding information, that these corrective disclosures were made on earnings announcement dates, dates when the company communicated with the marketplace.

And so there was a lot of information disclosed, and I described how one would handle that.

Q   If you haven't identified what confounding information was disclosed on either of the corrective disclosure dates, how can you know that the valuation tools described in your report will be sufficient to address that confounding information?

MR. BURKHOLZ: Objection. Asked and answered five times before.

THE WITNESS: Because these are the tools that are brought to bear on this kind of confounding information, not only by me in other cases like this one, but by investment analysts and investment professionals every day, as they anticipate what could happen to a company and as they evaluate various scenarios.

Page 128

I mean, this is -- this is what financial analysts and investment analysts do every day with virtually every publicly traded security, and these are the tools they use.

BY MS. KOFKE:

Q   When you say "investment analysts," you're talking about outside of the litigation context?

A   Yes.

Q   Outside of the litigation context, are investment analysts every day constructing historical inflation ribbons to calculate damages in securities cases?

A   No. But they're evaluating the valuation impact of hypotheticals, which is exactly what the analysis of confounding information calls for. What would the price have been had it not been for the confounding information? What impact did the confounding information specifically have on the stock price?

Those are the questions that investment analysts and investment professionals address and answer every day, I mean, continuously through every day for virtually every publicly traded security out there.

Q   Do securities analysts every day attempt to