# EXHIBIT 15

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

LOUISIANA SHERIFFS' PENSION &      )
RELIEF FUND, Individually and      )
on Behalf of All Others            )
Similarly Situated,                )
                                   )
          Plaintiff,               )
                                   )
  VS.                              ) NO. 2:19-cv-03347
                                   )
CARDINAL HEALTH, INC., et al.,     )
                                   )
          Defendants.              )
                                   )

REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

KENNETH M. LEHN, PH.D.

Pittsburgh, Pennsylvania (Witness' Location)

Friday, July 1, 2022

Reported by:

LYDIA ZINN

RPR, FCRR, CSR No. 9223

Job No. SD 5290567

PAGES 1 - 285

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LOUISIANA SHERIFFS' PENSION & )
RELIEF FUND, Individually and )
on Behalf of All Others )
Similarly Situated, )
)
Plaintiff, )
)
VS. ) NO. 2:19-cv-03347
)
CARDINAL HEALTH, INC., et al., )
)
Defendants. )
)

Remotely conducted videotaped deposition of KENNETH M. LEHN, PH.D., taken on behalf of Plaintiffs, at Pittsburgh, Pennsylvania, beginning at 11:07 a.m. Eastern Daylight Time and ending at 5:24 p.m. Eastern Daylight Time, on Friday, July 1, 2022, before LYDIA ZINN, Certified Shorthand Reporter No. 9223.

Page 2

---

APPEARANCES (via videoconference):

For Plaintiffs:

Robbins Geller Rudman &
Dowd, LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
jcaringal@rgrdlaw.com
mjanoski@rgrdlaw.com
llargent@rgrdlaw.com
BY: JENNIFER N. CARINGAL
J. MARCO JANOSKI GRAY
LAURIE L. LARGENT

For Defendant:

Wachtell Lipton Rosen and Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1000
enbrandt@wlrk.com
lmkofke@wlrk.com
BY: ELIZABETH N. BRANDT
LAUREN M. KOFKE

Also Present:
Nicole Kim, Cardinal Health
Brandon Miller, Videographer, Veritext
Max Obmascik, Wachtell, Lipton, Rosen & Katz
Michaela Park, Robbins Geller Rudman & Dowd, LLP
Saša Trivunic, Cardinal Health

Page 3

---

I N D E X

Friday, July 1, 2022

WITNESS                          PAGE
KENNETH M. LEHN, PH.D.
(SWORN)                          6
Examination by Mr. Janoski       6

EXHIBITS MARKED FOR IDENTIFICATION    PAGE
EXHIBIT 9  6.3.2022 Expert Rebuttal Report
of Kenneth M. Lehn              20

EXHIBIT 10  In Re Intuitive Surgical
Securities Litigation, Expert
Report of Kenneth M. Lehn       85

EXHIBIT 11  In Re Intuitive Surgical
Securities Litigation, Order
Certifying Plaintiff Class      92

EXHIBIT 12  Richard Thorpe, et al. v. Walter
Investment Management, et al.,
Expert Report of Kenneth M. Lehn  96

EXHIBIT 13  Decision in Thorpe v. Walter
Investment Management           103

EXHIBIT 14  Glickenhouse & Company v.
Household International, Seventh
Circuit                         149

EXHIBIT 15  3.24.2022 Report on Market
Efficiency, Professor
Steven P. Feinstein, Ph.D., CFA  262

EXHIBIT 16  Nephron Research
CAH-SDOH2. 19-cv-3347-00386249
CAH-SDOH2. 19-cv-3347-00386253  269

PREVIOUSLY MARKED EXHIBITS
PAGE
EXHIBIT 1         129

QUESTION INSTRUCTED NOT TO ANSWER
PAGE    LINE
57      21

Page 4

---

Pittsburgh, Pennsylvania

Friday, July 1, 2022, 11:07 a.m.

THE VIDEOGRAPHER: Good morning. We're going on the record at 11:07 a.m. Eastern Standard Time on July 1st, 2022. Please note microphones are very          11:07:48AM sensitive and may pick up whispering. Also please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be          11:08:10AM recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record. This is Media Number 1 of the video-recorded deposition of Professor Kenneth Lehn taken by counsel for the the          11:08:25AM in the matter of Louisiana Sheriffs' Pension and Relief Fund versus Cardinal Health Inc., filed in United States District Court, Southern District of Ohio, Eastern Division, Case Number 2:19-cv-03347.

My name is Brandon Miller, and I'm representing          11:08:51AM Veritext Legal Solutions. I'm the videographer. The court reporter is Lydia Zinn from the firm Veritext Legal Solutions. This deposition is being conducted remotely using virtual technology. I am not related to any party in this action, nor am I financially          11:09:09AM

Page 5

2 (Pages 2 - 5)

**Page 6**

interested in the outcome.  11:09:12AM

If there are any objections to proceeding, please state them at the time of your appearance. Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning  11:09:23AM with the noticing attorney, and the witness will be sworn in.

Thank you.

MR. JANOSKI: Good morning. This is Marco Janoski from Robbins Geller Rudman & Dowd on  11:09:33AM behalf of the Lead Plaintiffs and proposed class of Cardinal Health investors. And I'm joined off screen by my colleagues Laurie Largent and Jen Caringal.

MS. KOFKE: This is Lauren Kofke from Wachtell, Lipton, Rosen & Katz for the defendants. And  11:09:48AM I'm joined by Elizabeth Brandt and Max Obmascik, also of Wachtell Lipton.

KENNETH M. LEHN, PH.D., called as a witness by the Plaintiff, having been duly sworn, testified as follows:  11:10:11AM

EXAMINATION
BY MR. JANOSKI:

Q   Good morning, Professor Lehn. Could you please state your full name and residential address for the record?  11:10:19AM

**Page 7**

A   Yes. It's Kenneth Lehn, L-e-h-n.  11:10:20AM

5061 Fifth Avenue, Pittsburgh, Pennsylvania 15232.

Q   Since we are doing this deposition by remote video today, could you tell me where you're physically  11:10:35AM located right now?

A   I'm in the -- my home office, at the same address.

Q   Okay. Is there anybody else in the house with you today?

A   There is a housekeeper who I think is out shopping  11:10:45AM now, but she's the only one who will be coming in and out today.

Q   Okay. Now, you've been deposed many times before. Correct?

A   That's correct.  11:10:57AM

Q   Have all of those been in your capacity as an expert witness?

A   Certainly all the ones in -- on my CV. I think I was deposed once in a matter in which I wasn't an expert.  11:11:14AM

Q   Okay. And what was that in relation to; the -- the one time you were deposed as a fact witness?

A   It was a --

MS. KOFKE: Objection to form. Misstates what the witness said.  11:11:26AM

**Page 8**

THE WITNESS: Can you repeat the question?  11:11:29AM

MR. JANOSKI: Yes. And the question is --

And, Lauren, can we just have an agreement going forward that an objection to form will preserve all objections?  11:11:40AM

MS. KOFKE: That's fine.

MR. JANOSKI: Okay.

Q.   And, Professor Lehn, the question was: That one time that you were deposed outside of your capacity as an expert witness, what was that in relation to?  11:11:49AM

A   It was in relation to an accident in which I suffered damages. And I was a plaintiff. I was the plaintiff in that matter.

Q   And approximately how many times do you think you've been deposed as a -- as an expert witness?  11:12:05AM

A   It's -- I think it's over 100.

Q   And you provided trial testimony as an expert witness as well. Correct?

A   That's correct.

Q   And approximately how many times have you  11:12:19AM testified at trial?

A   I don't have an exact number, but I think in the vicinity of maybe 25 times.

Q   I'm sure you understand the rules of how depositions are conducted. My one question: Is there  11:12:33AM

**Page 9**

any reason why you think you can't give true and honest  11:12:37AM testimony today?

A   No.

Q   Okay. And you understand that the oath that you gave today carries the same weight as one that would be  11:12:44AM given in a court of law. Right?

A   I do.

Q   Do you have any documents, notes, or visual aids with you today, sir?

A   The only document I have is my Expert Report. And  11:12:56AM I have no visual aids or anything else related to this case.

Q   And aside from your Expert Report and the documents that we share through the Exhibit Share platform, can you agree not to look at any other  11:13:11AM documents, notes or visual aids while we're on the record today?

A   Yes.

Q   Okay. Have you been provided with a copy of the remote deposition protocol in this matter?  11:13:21AM

A   I'm not sure what you mean by "the remote deposition protocol."

Q   Well, there's -- just for the -- I'll represent to you at that there's a protocol in this place that governs how remote depositions are supposed to be  11:13:36AM

3 (Pages 6 - 9)

conducted. And there's a provision in there that says 11:13:38AM that you won't look at any other programs or devices while we're on the record. Can you agree with that basic principle?

A Sure. 11:13:48AM

And just one clarification. Is -- at the breaks is it okay to use my cell phone to communicate with my son? Okay.

Q Yeah. Breaks are fine. Just while we're on the record. 11:13:59AM

A Got it.

Q Yeah. And it's -- as a general matter, can you agree just not to communicate with anybody else while we're on the record, except as a reflected on the record? 11:14:08AM

A Certainly.

Q Did you do anything to prepare for today's deposition, sir?

A I did.

Q And what did you do exactly? 11:14:17AM

A Well, I reviewed my report and the accompanying materials. I reviewed Dr. Feinstein's report. I reviewed Dr. Feinstein's deposition transcript. And I met with counsel.

Q How many times did you meet with counsel? 11:14:34AM

Page 10

A I -- in terms of preparing for the deposition? 11:14:40AM

Q Yes.

A I think twice.

Q And when did that first meeting occur?

A That would have been Wednesday this week, which I 11:14:52AM think is June 29th.

Q Okay. And how long did that meeting last?

A I think about four or five hours --

Q Okay.

A -- including breaks. 11:15:02AM

Q Was there anybody present other than counsel at that meeting?

A Yes.

Q Who else was present at that meeting?

A There were, I think, three staff members from 11:15:11AM Compass Lexicon.

Q And who were those Compass Lexicon staff members that were present?

A One was Adel Turki. A-d-e-l. Last name T-u-r-k-i. 11:15:26AM

Another one Laura Yergesheva. Y-e-r-g-e-s-h-e-v-a. Don't hold me to that, but I think that's right.

And the third person was Cliff Ang, A-n-g.

Q Aside from counsel and these three individuals 11:15:46AM

Page 11

from Compass Lexicon, was there anyone else present at 11:15:48AM that Wednesday meeting?

A Not that I can recall, no.

Q I think you said you had a second meeting with counsel as well. When was -- when did that occur? 11:16:00AM

A That was this morning at 10:00 a.m. Eastern time.

Q Okay. So for approximately an hour before the -- prior to this deposition?

A Well, I think we spoke for maybe 30 minutes, roughly. It didn't go the entire hour. 11:16:17AM

Q Was -- was counsel present there, or did you have Compass Lexicon staff present as well?

A Yeah. It was the same group that met on Wednesday.

Q Now, aside from your report, Professor Feinstein's 11:16:35AM report, and the deposition testimony of Professor Feinstein, did you review any other documents in preparation for this deposition today?

A I did, but again, I -- when I responded previously, I'd mentioned that I reviewed the materials 11:16:53AM that I reference in my report; not all of them, but some of them.

Q Any particular ones stand out from the materials that you relied on that you looked at again in preparation for this deposition? 11:17:07AM

Page 12

A None stand out. I mean, I did review some 11:17:11AM analysts' reports, conference calls, news stories; but none in particular stand out.

Q Did you speak to anyone at Cardinal Health in preparation for this deposition? 11:17:24AM

A No, I did not.

Q How did you first come to be involved in this case?

A I -- I don't have a specific recollection. I think I was contacted initially by Adel Turki at 11:17:39AM Compass Lexicon. And I believe he asked me if I would have an interest in discussing the case with counsel, and I indicated that I would. And then we had a subsequent meeting with counsel.

Q Do you recall generally when that was? 11:17:58AM

A I don't, again, have a specific date. It was sometime earlier this year. It might have been February/March. Sometime in that time frame.

Q And do you recall precisely when you were retained as a testifying expert? 11:18:16AM

A I do not.

Q It would have been some point in the last few months, though?

MS. KOFKE: Objection to form.

THE WITNESS: Yeah. I -- I don't recall 11:18:29AM

Page 13

4 (Pages 10 - 13)

specifically, but I think it was sometime this calendar 11:18:30AM year. And I think it was in late winter/early spring. Sometime in that -- that vicinity.

BY MR. JANOSKI:

Q And is your retainer agreement with 11:18:42AM Cardinal Health or with defense counsel?

A I don't know. My understanding is that I've been retained by counsel for Cardinal Health; not Cardinal Health.

The complicating factor is that I have an 11:18:57AM affiliation with Compass Lexicon. And Compass Lexicon is the one that enters into the retention agreement with the client. And I'm referenced in the retention agreement, but I'm not -- I don't believe I signed the retention agreement. 11:19:13AM

Q Okay. So it's your understanding that the operating retention agreement with the team would be between Compass Lexicon and Cardinal's counsel. Is that right?

A That's my general understanding. I could be 11:19:25AM correct, but -- incorrect about that, but that's my understanding.

Q Do you know what the scope of your work is in the retention agreement between defense counsel and Compass Lexicon? 11:19:40AM

Page 14

MS. KOFKE: Objection to form. 11:19:42AM

THE WITNESS: Well, it -- it is to provide a report at the class-certification stage, which I've done.

BY MR. JANOSKI: 11:19:49AM

Q Is it limited to offering a report at the class-certification stage, or do you intend on offering Expert Report -- an expert opinion later in this matter as well?

A I don't know. 11:20:01AM

Q So at this point in time, you -- you don't have an intention or agreement to offer further expert testimony in this case?

A That's correct.

Q Now, Professor Lehn, you're being paid for your 11:20:14AM time here today. Right?

A That's correct.

Q And I believe you said in your report that you're being compensated at a rate of $1,250 an hour. Is that right? 11:20:29AM

A That's right.

Q And, to date, how many hours have you worked on this engagement?

A Again, I don't have an exact number, but my guess is it would be perhaps somewhere between 75 to 100 11:20:40AM

Page 15

hours. 11:20:45AM

Q Do you know the total dollar amount that you have billed so far?

A Not off the top of my head, no.

Q Now, those 75 to 100 hours that you estimate -- 11:21:00AM was that all in connection with preparing your Expert Report and preparing for today's deposition, or were there other matters that you worked on?

A No. It would all be related to preparing the report, and then preparing for deposition. 11:21:16AM

Q Now, you were also assisted by staff from Compass Lexicon in putting your Expert Report together. Right?

A That's correct.

Q And was it those same three individuals that you listed earlier? 11:21:33AM

A Those three. And then another person is Anne Marie -- two words -- Yale, like the university, Y-a-l-e.

Q Okay. So four individuals, total, from Compass Lexicon that assisted you? 11:21:50AM

A Right. I can't exclude the possibility there may have been others that assisted those four, but those are the four that I've worked with.

Q Okay. And what precisely did they do to assist you in preparing your Expert Report? 11:22:03AM

Page 16

A Well, a variety of things. One is they provided 11:22:06AM me with information that I requested. Obviously, I requested the Complaint and Dr. Feinstein's report, and then analysts' reports and other information. They would gather that, and send it to me. 11:22:21AM

You know, I certainly talked with them about, you know, the issues that I wanted to address in my report. And we had a few phone calls where we talked about, you know, how to structure the report; what the outline would look like. 11:22:37AM

And then they provided me with some initial drafting of the report, which I then subsequently edited.

Q Anything else you can recall them assisting you with? 11:22:51AM

A They gathered some data. There's not a lot of empirical analysis in my report, but there is some data reference. So they would have gathered that empirical information as well.

Q Was that stock-price data, or anything else? 11:23:05AM

A I mean, there's some data where I reference, for example, the revenue of Cardinal Health, and the revenue of Cordis. And so, you know, pretty basic data; but nonetheless data.

There may be other pieces of information like 11:23:20AM

Page 17

5 (Pages 14 - 17)

that. 11:23:22AM

Q Do you know how many hours, total, those four Lexicon staff members billed in assisting you with your report?

A I do not. 11:23:32AM

Q You mentioned this a little earlier, but can you explain what your affiliation is with Compass Lexicon?

A Yes. I have a contract with Compass Lexicon. And, in short, the contract requires me to enlist them when I'm contacted by counsel to work on a matter. And it also lays out my compensation agreement with Compass Lexicon. 11:23:53AM

Q Okay. And how are you compensated by Compass Lexicon?

A Well, one is I send them my monthly invoices. And so in this matter I'm billing $1,250 an hour. And on a monthly basis I would send the invoice to Compass Lexicon. And they, in turn, would compensate me. And I'm not privy to it beyond that point, but I assume they pass that on to the client. 11:24:08AM 11:24:29AM

And then, in addition, I have an arrangement with Compass Lexicon where I get a so-called "attribution bonus" for working with their staff on particular matters, including this one. And it's been a while since I read that clause, but my recollection is it 11:24:44AM

Page 18

calls for me to receive -- I think it's 20 percent of the non-officer billings on the matter. 11:24:46AM

Q So it's your -- I'm sorry. I'll let you finish if you have more.

A Yeah. And I think the purpose of that is compensation for managing their staff on a particular matter. 11:25:00AM

Q So it's your understanding that you would also get 20 percent of the billing of these for Compass Lexicon staff members that assisted you in preparing your report? 11:25:15AM

A That, I don't know.

Q Okay.

A Because I -- my recollection is that the clause circumscribes the billings to the people who are not officers. And I frankly don't know, of the four that I've worked with, who are officers and who are not. 11:25:23AM

Q So it would be 20 percent of the nonofficers. And you just don't know who was an officer or not, in who assisted you. Is that right? 11:25:43AM

A That's correct.

Q Now, you've stated in your Expert Report that you expect to receive compensation from Lexicon for your work in this matter aside from your hourly rate. Is that what you're describing; this -- 11:25:57AM

Page 19

A Yes. 11:25:59AM

Q -- this 20 percent? Okay.

Professor Lehn, if you refresh Exhibit Share, you should be able to see what we've marked as Plaintiff's Exhibit 9. 11:26:18AM

(Plaintiff's Exhibit 9 marked for identification.)

THE WITNESS: Okay. Actually, I don't see it yet, but -- I go to marked exhibits? Is that correct?

BY MR. JANOSKI:

Q Yeah, the Marked Exhibits folder. And you should be able to see what's marked as Exhibit P0009. 11:26:34AM

A I know I'm not doing something correctly here. I don't actually see it, but...

Q Have you refreshed the Marked Exhibits folder? Sometimes that works, and it will pop up again. 11:27:04AM

A Yeah. The only thing that shows up is bookmark refreshed for marked exhibits, but...

MR. JANOSKI: Lauren, are you able to see?

MS. KOFKE: I am.

Ken, do you see a folder called "Marked Exhibits"? Because when I clicked on that, it appeared. 11:27:22AM

THE WITNESS: Is that up on the left?

MS. KOFKE: Yeah, on the left there's a list of files.

THE WITNESS: Yes. And -- 11:27:35AM

Page 20

THE VIDEOGRAPHER: It has two exclamation points at the end. 11:27:38AM

THE WITNESS: Oh, okay. Got it. Got it. Got it. Okay. I do see it now. Sorry.

MS. KOFKE: Great. 11:27:46AM

THE WITNESS: I told counsel I'm technologically challenged on this. Okay. So now I just open that, Mr. Janoski?

MR. JANOSKI: Yeah. That's right.

THE WITNESS: Okay. Got it. 11:27:55AM

BY MR. JANOSKI:

Q And Plaintiff's Exhibit 9 is a copy of the June 3rd, 2022 report that you submitted in this matter. Right?

A Yeah. The only thing I see is the cover page, but I assume the rest of the report lies behind it. 11:28:08AM

Q Yes. And if you scroll down, you could see the rest of it.

I know you have a physical copy with you today, sir. If that's easier, we could work through that; but this is just so that everyone else present could look at the document as well. 11:28:21AM

A Yeah, I do have a physical copy.

THE VIDEOGRAPHER: Counsel, if you don't mind me interrupting, Professor Lehn, if you could just tilt 11:28:32AM

Page 21

6 (Pages 18 - 21)

your camera down just a tiny bit. Or also, just as a 11:28:36AM reminder, there's a zoom-in function on the document so you don't have to look --

THE WITNESS: Okay.

THE VIDEOGRAPHER: -- so close, and cut off 11:28:50AM your mouth on the screen.

THE WITNESS: Got it. Okay.

THE VIDEOGRAPHER: Great. Thank you.

THE WITNESS: I'll use the hard copy, which maybe alleviates it for this particular line of 11:28:52AM questioning.

MR. JANOSKI: Might as well.

THE VIDEOGRAPHER: Sorry to interrupt again. If you do use the hard copy, just when you look down, just be aware not to look down too far, or to rustle 11:29:01AM the papers too much.

THE WITNESS: Got it.

BY MR. JANOSKI:

Q So, Professor Lehn, if you could first turn to Appendix A, which, for the record, I think, is page 60 11:29:12AM of the PDF, for those that are on Exhibit Share.

A Okay.

Q Is this an up-to-date version of your CV?

A Yes, it is.

Q And if you go to pages A-9 through A-22, there's a 11:29:30AM

Page 22

heading, "Expert Witness Testimony." Do you see that? 11:29:40AM

A I do.

Q Is this a complete list of all the cases in which you have offered expert -- expert testimony?

A I believe so. I can't rule out the possibility 11:29:51AM that I might have missed something, but I think it's comprehensive.

Q Okay. And I believe the earliest case here goes back to 1991. Does that sound right?

A That sounds right. 11:30:02AM

Q Okay. So you have served as a testifying expert witness for -- for quite some time. Right?

A That's correct.

Q Okay. Did you testify on behalf of the plaintiffs in any of the matters listed here? 11:30:12AM

A I don't -- not to quibble with words, but I don't necessarily describe my testimony on behalf of either party; but rather I've been retained by counsel for a party to address a question or questions. And the short answer would be, yes, I've been retained by 11:30:33AM counsel for plaintiffs on many matters.

Q As we go through this list, could you just tell me which matters you were retained by the plaintiff?

A Sure. On page A-10, about the middle of the page, I was retained by counsel for Simon Property Group. 11:31:00AM

Page 23

And then on page A-11, about a third of the way 11:31:11AM down, there are two cases involving Channel Medsystems. And in both of those cases I was retained by counsel for Channel Medsystems.

On page A-12, Wynn Resorts, Limited, I was 11:31:32AM retained by counsel for the plaintiff in that case.

And then right below that, Guardian Protection Services, I was retained by counsel for plaintiff in that matter.

Then a little further down the page, Chrome 11:31:48AM Systems -- it appears three times on that page. And then I was retained by counsel for plaintiff in that matter.

On page A-13, Sue Ann Hamm. I was retained by counsel for plaintiff in that matter. And then that 11:32:12AM carries over a second testimony in the Sue Ann Hamm case, on page A-14.

Also on page A-14, Securities and Exchange Commission versus Life Partners, I was retained by the plaintiff in that case, which was the SEC. 11:32:35AM

THE VIDEOGRAPHER: And, Professor, could I have you tilt down your camera just a little bit more so it picks up your face more?

THE WITNESS: Okay. Tilt it up or down? Like that? 11:32:54AM

Page 24

THE VIDEOGRAPHER: No. Down. 11:32:55AM

THE WITNESS: Down. Okay. More like that.

THE VIDEOGRAPHER: Don't worry. This happens a lot to witnesses. Once you get it situated, it will be good. Thank you so much. 11:33:00AM

THE WITNESS: Okay. Sure.

Then on page A-19 there was a case in Ireland, the third from the top, Fyffes. And I was retained by counsel for plaintiff in that matter.

And then right below that, Oracle Corporation 11:33:53AM appears twice. And I was retained by counsel for plaintiff in that matter.

And then right below that, Sensormatic Electronics Corporation, I was retained by counsel for Sensormatic in that case. 11:34:12AM

And then right below that is Securities and Exchange Commission v. Michael J. Rivers. And I was retained by the SEC in that matter.

And on A-20, the first case, Securities and Exchange Commission v. Robert Prevett, I was retained 11:34:33AM by the SEC in that case.

And then also on that page, Securities and Exchange Commission v. Jack Lau, I was retained by the SEC in that case.

Then further down on that page there are three 11:34:55AM

Page 25

7 (Pages 22 - 25)

criminal matters: US v. Robert Prevett; US v. 11:34:59AM Frank Dubone; and US v. Atul Bhagat. And I was retained by the US Government -- namely, I think, the DOJ -- in those three cases.

Then below that, Consolidated Edison against 11:35:18AM Northeast Utilities. I'm pretty sure I was retained by counsel for ConEd in that case.

Then on the bottom of A-20, Kohler Company v. Sogen International Fund, I was retained by counsel for Kohler in that case. 11:35:39AM

Then on A-21 there are three SEC cases: The Jacob Y. Terner -- two against Terner, and one against Harold Fitzgerald Lenfest and Marguerite Lenfest. And I was retained by the SEC in those matters.

And then right below that, United States v. 11:36:04AM Mark Aronds, I was retained by the US Government in that case.

And then there are four SEC cases that also appear on the bottom of A-21: versus Shahryar Soroosh, Michael Angelos, and Gregory Russell; and 11:36:24AM Jay Goldinger, Bert Cohen, et cetera. I was retained by the SEC in those three cases.

And then on page A-22, Procter & Gamble v. Mafco, I was retained by counsel for the plaintiff in that case as well. 11:36:49AM

Page 26

BY MR. JANOSKI: 11:36:54AM

Q Now, you've also testified in a number of class-action securities litigations. Right?

A That's correct.

Q Now, in -- in all of these matters that you just 11:37:00AM listed where you were retained by the plaintiffs, none of those were securities-fraud class actions. Right?

A They were not class actions. That's correct.

Q Okay. So is it fair to say that, at least in the realm of securities-fraud class actions, your 11:37:14AM experience -- you've been retained solely by the defendants in those cases?

A Again, just to correct it, I think I've been retained by counsel for defendants in those cases.

Q That's right. And you generally hold yourself out 11:37:28AM as an expert in corporate finance. Right, sir?

A Yeah. I would say financial economics generally, with a particular focus on issues related to corporate finance.

Q Is that how you would generally describe all the 11:37:48AM expert opinions that you've offered that are shown here in -- in Appendix B?

MS. KOFKE: Objection to form.

BY MR. JANOSKI:

Q That would fall within the realm of 11:37:58AM

Page 27

corporate-finance opinions? 11:38:00AM

MS. KOFKE: Same objections.

THE WITNESS: Well, again, that's why I think it's a bit broader than that. I would describe the expertise as financial economics generally. Most of my 11:38:07AM professional research and teaching has been in the area of corporate finance, but I wouldn't necessarily limit my expertise to simply corporate finance.

BY MR. JANOSKI:

Q Have you offered any valuation opinions in any of 11:38:21AM these cases listed here?

A I have, yes.

Q Do you have a ballpark estimate of how many valuation opinions you've offered?

A Again, I'd have to go through specifically to give 11:38:34AM you a hard number; but you know, I would say somewhere in the vicinity of 25 to 30.

Q And do you recall specifically what type of asset you were valuing in those cases? Was it securities? Was it a company? A piece of information? 11:38:53AM

A It would vary, I mean, obviously, depending on the case.

Q Do you have experience valuing companies as an expert witness?

A I do. 11:39:06AM

Page 28

Q Okay. And generally how would you go about 11:39:07AM valuing a company?

A Well, it depends on the facts and circumstances of the particular matter. My -- my first preference is to rely on market prices as much as one can. And, 11:39:25AM obviously, depending upon the nature of the case, that either is more or less possible; but all else equal, under most circumstances I've found that market values provide the -- the best indication of value. And, again, obviously it depends on the facts and 11:39:50AM circumstances.

Insofar that reliable market prices are not available for the valuation of a company, my general preference is then for discounted cash flow models. And, again, it all depends upon the facts and 11:40:06AM circumstances of the case; the quality of the projections one has to properly implement a discounted cash flow model.

And then other options would be a so-called "market multiples analysis," which, as a general 11:40:23AM matter, I've found in my experience is usually less reliable than market prices and the discounted cash flow model.

And then depending on the nature, again, of the assignment, there are option pricing models that 11:40:39AM

Page 29

8 (Pages 26 - 29)

sometimes can be used to provide a valuation of an 11:40:44AM
entire firm. And there's a field in valuation referred
to as "the real options approach to valuation." And
that periodically has come up in some of cases that
I've worked on, but I've never actually personally 11:41:00AM
relied upon a real options approach to conduct a
valuation of a company.

Q So is it fair to say that when valuing a company
or when valuing securities of a company, you generally
look to the market price, a potential discount cash 11:41:16AM
flow model, a market multiples model, or an options
pricing model?

MS. KOFKE: Objection to form.

THE WITNESS: Yeah. I wouldn't want to rule
out there may be other approaches that one might take; 11:41:31AM
but in my experience, you know, those would be the four
that would be used most frequently.

BY MR. JANOSKI:

Q Okay. I think you've said that you testified in a
number of securities litigations. Right? 11:41:51AM

A Yes.

Q And you've offered loss-causation and damages
opinions in several of those?

A I have. Yes.

Q And what methodology would you -- would you use in 11:42:02AM

Page 30

offering a loss-causation or damages opinion in a 11:42:06AM
securities litigation?

MS. KOFKE: Objection to form.

THE WITNESS: Yeah. I'm not -- I'm not sure
I fully understand your question. Are you saying in 11:42:15AM
all cases or...

BY MR. JANOSKI:

Q Well, I guess I'll rephrase. You have offered
loss-causation opinions before. Correct?

A Correct. 11:42:28AM

Q And you have offered opinions attempting to
measure damages in securities litigations as well.
Right?

A Correct.

Q What models or tools have you used to measure 11:42:38AM
damages in securities litigations?

A Well, again, it depends on the facts and
circumstances of an individual case. There's no
cookie-cutter approach to this. You know, oftentimes,
and probably more than often, usually, it would start 11:42:58AM
with an event study analysis on the alleged corrective
disclosure dates.

But in most cases, that's just the start; it's not
the end. And every case has its own unique
complexities. And they can vary, obviously, from case 11:43:21AM

Page 31

to case. So it's hard to provide you with a general 11:43:26AM
answer as to what, beyond event study analysis, would
be necessary to provide a reliable measure of damages.

Q Would you say that you would have to learn the
facts of the case before you could figure out what 11:43:44AM
methodology you would apply to -- to accurately measure
damages?

A Well, it depends on what you mean by "the facts of
the case." I mean, there are public facts that don't
require discovery. And then there are facts that 11:43:59AM
presumably would be nonpublic that would only surface
in discovery.

I think as a general matter in loss-causation
damages analysis in N.B. class actions, for example,
there's an abundance of public information that can 11:44:20AM
alert one to the complexities that one is likely to
face before you even get to fact discovery. And those
are facts. They're public facts. And we have them in
this case.

And there are a lot of public facts that indicate 11:44:36AM
that there are complexities in this matter that are
going to require some very complicated analysis, none
of which Dr. Feinstein has described in his so-called
"proposed methodology."

Q I understand. I understand your opinion, sir, but 11:44:55AM

Page 32

my question goes more to when you're actually measuring 11:44:57AM
the damages. When you're actually going about doing
that loss-causation analysis, you -- is it fair to say
that you would want a -- a fulsome record and
understanding of the facts before you make any such -- 11:45:13AM
undertake any such analysis?

MS. KOFKE: Objection to form.

THE WITNESS: When you say "undertake
analysis," my understanding is that the analysis is not
required to be undertaken at this stage; but one can 11:45:27AM
certainly identify issues that a proposed methodology
would have to address before you even get to fact
discovery. At least, in this case that would be -- be
true.

BY MR. JANOSKI: 11:45:44AM

Q Okay. You mentioned earlier that the starting
point you would use to measure damages would be an
event study. Is that right?

A Well, again, I think I am a little more cautious
to say that usually that would be the case. 11:45:55AM
I'm not saying it's always the case.

Q Okay. And I think you said that oftentimes you
find other complexities that arise where an event study
may not be enough. Is that right?

A Yeah. I'm not quite sure I said it wouldn't be 11:46:09AM

Page 33

9 (Pages 30 - 33)

enough, but it would be a starting point. And depending upon the complexities, additional analysis would be required.

Q Okay. And when conducting that additional analysis, would you use those same valuation tools we discussed earlier: Discount cash flow, valuation multiple model, or an option pricing model?

A Perhaps, or perhaps not. It depends on what the complexity is, and how suitable those tools are for addressing that particular issue.

But -- but then there's another issue. And that is that, you know, it's not just a matter of applying a tool, and say that I can use this tool to deal with this issue. But the question is, you know: Will you be able to use that tool in such a way that you will come up with a reliable estimate of damages?

And, you know, an example would be you could say "I'm going to use the discounted cash flow model." But depending on the nature of what you're trying to value, no matter how much one believes in the discounted cash flow model, it may or may not be capable of providing a reliable estimate of the value of the information you're trying to value.

So it takes more than just saying: I'm going to use a tool.

Page 34

You have to, in my opinion, without doing the analysis, describe specifically how will that tool be applied, so that, as a financial economist -- and I'm not speaking as a lawyer -- as a financial economist, I can have confidence that you will be able to reliably estimate damages.

MR. JANOSKI: Okay. And I'll move to strike as nonresponsive.

Q Sir, my question is -- I guess I'll clarify a little bit.

MS. KOFKE: We oppose the motion.

BY MR. JANOSKI:

Q Okay. In your experience, sir, when you have offered damages opinions and you have found complexities to arise, what tools have you yourself used to address those complexities?

A I'd have to go back and look on a case-by-case basis. In many if not most of the matters in which I've testified in securities class actions, you know, I've pointed out the deficiencies in what the opposing expert has done, without necessarily volunteering an affirmative estimate of damages.

Now, there may be some cases in which I did; but I don't recall as I sit here today, if there are such matters, what tools I might have used. And it would

Page 35

depends on the facts and circumstances.

Q Now, aside from loss-causation and damages opinions, you've also offered a few expert opinions in securities class actions at the class-certification stage. Right?

A Correct.

Q All right. So you've issued price-impact opinions before?

A Yes. I have.

Q Okay. And you've also opined on whether or not a defendant corporation traded in an efficient market. Right?

A It's -- I don't -- it's possible. I don't want to rule it out. I don't recall any as I sit here, but it's possible.

Q And you've also offered similar critique to your opinion here, where you've challenged the damages methodology that a plaintiff has put forward. Right?

A Correct.

MS. KOFKE: Objection to form.

BY MR. JANOSKI:

Q. Okay. Are you familiar, then, with the general case-law standards and procedural phases of securities fraud class actions, then?

A Not -- I'm not an attorney, so I'm -- I'm

Page 36

certainly not aware in the way that a legal scholar would be aware; but by virtue of having worked on a number of these matters, I have a broad understanding.

Q And what is your understanding of what a plaintiff is required to show at the class-certification stage?

MS. KOFKE: Objection to form.

THE WITNESS: Well, again, with the caveat that I'm not an attorney, you know, my understanding is that plaintiffs' expert needs to show or propose a damages methodology that will reliably measure damages on a classwide basis, consistent with the plaintiffs' theory of liability.

BY MR. JANOSKI:

Q Is it your opinion that any potential valuation complexities, as you -- as you named them, need to be articulated and addressed at the class-certification stage?

MS. KOFKE: Objection to form. You're asking for a legal conclusion.

BY MR. JANOSKI:

Q You could still answer, sir.

A Yeah. Again, I'm not an attorney, so I'm not here to opine as to what the legal standard is; but I've been asked by counsel to evaluate whether Professor Feinstein has proposed such a methodology.

Page 37

10 (Pages 34 - 37)

And my view is from the perspective of a financial economist. And from a financial economist's perspective I would say, yes, it's important to identify the complexities that you know you're going to have to address, and then describe the methodology that you will use in order to adequately address them.

Whether that's the legal standard is obviously beyond my expertise.

(Saša Trivunic joins the Zoom videoconference.)

BY MR. JANOSKI:

Q Does it matter to your opinions here today how courts have set forth the standard for describing a damage methodology at the class-certification stage?

MS. KOFKE: Objection to form.

THE WITNESS: Well, it matters indirectly, because, you know, I -- I don't know how that factors into what the legal ruling will be in this matter, but I don't want to say it doesn't matter.

But you know, counsel has asked me to evaluate what Professor Feinstein has proposed, and whether or not he has proposed a methodology that will reliably measure damages on a classwide basis consistent with plaintiffs' theory of liability.

And I think I've addressed that in my report from the perspective of a financial economist. And so my

Page 38

opinions are independent of the previous case law in this matter.

BY MR. JANOSKI:

Q Have you reviewed any case law on damage methodologies being proposed in securities litigations that at the class-certification stage?

A I don't believe so, no.

Q Professor Lehn, if you could turn to Appendix C of your report, I believe this appendix lists the materials that you relied upon in forming your expert opinion in this case. Is that right?

A That's correct.

Q Okay. And how did you decide what materials to review to form your opinion?

A Well, you know, there are some documents that are obviously documents that I want to review, such as the Complaint. And so the court documents that you see here are -- you know, I think were -- were documents that I asked about early on in the assignment. And I think even before probably my first meeting with counsel I was sent the Complaint.

But then I typically like to seek out, you know, the motions for class certification, and also any opinions that the Court has rendered to that point.

Obviously, the Expert Report of

Page 39

Professor Feinstein was -- I don't know if I had to explicitly request that, or whether that was just assumed that I would want to see that.

The deposition transcripts -- you know, I don't know what the full record is, but you know, one of the questions that I was curious about is whether or not the investment managers for Lead Plaintiff had said anything in deposition that would be relevant to the opinions that I express in my report. I think I translated that to Compass Lexicon staff. And I think they received those deposition transcripts from counsel, which I reviewed.

The SEC documents are, you know, documents I typically want to look at in -- in class action securities cases.

The academic literature is literature that I'm familiar with. And, you know, some of these I've cited before in class-certification reports.

And then in this case I asked Compass Lexicon staff to get the Sirower book, the Synergy Trap, which I was familiar with from when I taught mergers and acquisitions.

And then with respect to analysts' reports, there's a long list of those. And, you know, I had asked Compass Lexicon staff to, you know, collect the

Page 40

analysts' reports over the Class Period. Those are the ones that I relied upon. I reviewed many more than those that are listed there.

And then the same for the investor conference call transcripts, and the earnings conference call transcripts. You know, those are typically things that I request at the beginning of an assignment like this.

The earnings presentation -- the same thing; that, you know, I had requested information on that.

The news articles and press releases on page B-8 -- again, that's a fairly standard thing that I request, is that we do a pretty complete news search on the company involved in the litigation.

And then the last item is the data. And it's a commonly used database. It's one that I typically use: The CRSP database. C-R-S-P. And, you know, I had requested Compass Lexicon gather, you know, some data from that database.

Q So did you review the entirety of each document that's listed in this appendix?

A I didn't read the entirety of each document.

So on the deposition transcripts, for example, I had requested information. Compass Lexicon pointed me to the salient passages. You know, I read some of the surrounding pages around that, and I kind of briefly

Page 41

11 (Pages 38 - 41)

flipped through the depositions; but I certainly didn't 11:56:51AM read every word.

And the same would probably be true of some of the news articles and analysts' reports, and even the SEC filings. I mean, I certainly didn't read every word of 11:57:02AM every 10-K and 8-K; but you know, I have general familiarity of how those documents are organized. So I was able to get to the sections that I -- I thought was most relevant.

Q   So with respect to the deposition transcripts, is 11:57:16AM it fair to say that you asked Compass -- Compass Lexicon to find testimony that you think -- you thought would be helpful to your opinion?

A   Not only helpful, but just relevant for it one way or another. 11:57:32AM

Q   And you don't know how they went about selecting those particular passages to be included in your report. Is that right?

A   Well, I do know. I mean, I -- you know, I asked, for example, with respect to the investment managers 11:57:44AM for plaintiff, you know, if they had acknowledged that there are risks associated with acquisitions. And I think the passages that they provided to me, you know, are evident that they were aware of such risk. So I -- I was comfortable that they had satisfied my request. 11:58:05AM

Page 42

Q   But you yourself didn't go and review the whole 11:58:08AM deposition transcripts to see if they had elaborated or touched on that same issue later or earlier in the transcript. Right?

MS. KOFKE:  Objection to form. 11:58:19AM

THE WITNESS:  Well, again, I reviewed it with an eye towards passages that might be relevant, but I certainly didn't read every word.

BY MR. JANOSKI:

Q   And with respect to the analysts' reports I -- I 11:58:30AM think you acknowledged here that this list doesn't include -- isn't a complete set of all of the analysts' reports that were issued during the Class Period. Right?

A   I don't believe so. Yeah. I believe the list is 11:58:42AM much longer.

Q   So are -- is it the case, then, that you read other analysts' reports, but these are just the ones that you relied on or cited in your report?

A   Well, again, I -- I don't want to suggest that I 11:58:57AM read every word of every analyst's report, but -- but early on one of the first things I got -- and I'm an old-fashioned guy, so I got it in hard copy. And I have many, many binders of analysts' reports that were released during the Class Period. And I did review 11:59:13AM

Page 43

every binder in its entirety, just to gain familiarity 11:59:17AM with the -- the overall flavor of what analysts were discussing during the entire Class Period; but then, obviously, I only relied upon a subset of those in the preparation of my report. 11:59:32AM

Q   Now, looking through Appendix B, you didn't rely on any internal Cardinal Health documents to form your opinions. Right?

A   Correct.

Q   Did you review any internal Cardinal Health 11:59:47AM documents in the course of preparing your Expert Report?

A   I don't believe so. I certainly didn't request any. And at this stage I don't -- I can't think as I sit here of any reason why that would have informed the 11:59:59AM opinions that I expressed in my report.

Q   Okay. So you never got access to the database of documents that's been produced in this litigation?

A   I may have. I know Compass Lexicon set up an FTP account or a secure website. Whether or not there were 12:00:15PM such materials there, I don't recall. But even if there were, it's not something that I would have consulted at -- certainly, for preparing a class certification report.

Q   I think you've said that as you sit here -- as you 12:00:41PM

Page 44

sit here right now, you can't think of any reason why 12:00:44PM you would need internal Cardinal Health documents to -- to form your opinion. Why is that, sir?

A   Well, again, I think you have to go back and look at what with my assignment is. And it was to evaluate 12:00:55PM whether Professor Feinstein had proposed a damages methodology that satisfied the three criteria that I described. And for purposes of evaluating what he proposed, it was unnecessary to look at internal Cardinal documents. 12:01:18PM

Q   Would you agree with the general principle that before a full-blown damages analysis could be conducted in this case, there needs to be a fulsome and complete record established?

MS. KOFKE:  Objection to form. 12:01:34PM

THE WITNESS:  Can you repeat that?

BY MR. JANOSKI:

Q   Yes. The question was: Would you agree with the general principle that before a full-blown damages analysis could be conducted, there needs to be a 12:01:43PM fulsome and complete record established?

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I think it depends on the -- well, in some sense, you've assumed the answer by saying "a fulsome record." 12:02:00PM

Page 45

12 (Pages 42 - 45)

I mean, whether or not that includes private 12:02:03PM emails or private documents depends upon the specific facts and circumstances of a case. And it also depends upon the particular complexity that one is attempting to address. 12:02:19PM

So it's clear to me from the publicly available information that there are inevitable complexities in this case that will have to be addressed by plaintiffs' damages expert. And one doesn't need the complete record before one can identify what those complexities 12:02:37PM are.

Now, when it comes to actually performing the damages analysis, I don't want to rule out the fact that there may be some private information that can come into play, but certainly at this stage I don't 12:02:50PM think it's necessary to have full access to the record in order to identify issues that will have to be addressed by plaintiffs' expert.

BY MR. JANOSKI:

Q And, again, I'm not trying to put words in your 12:03:06PM mouth, sir. I just want to make a distinction here. So are you saying that at this stage, you believe you've identified what complexities may arise in the damages analysis? But would you admit that internal documents maybe helpful for actually addressing and 12:03:22PM

Page 46

calculating those complexities in the damages analysis? 12:03:24PM

MS. KOFKE: Objection to form.

THE WITNESS: Well, two things, sir. I think you might have said -- and if you didn't, I apologize -- I think you said "the complexities." I've 12:03:35PM identified complexities. There may be more complexities that will surface, but I've certainly identified a number of complexities that will have to be addressed.

In terms of the methodology that would be used to 12:03:49PM address them, I'm not sure the methodology depends upon what is uncovered in fact discovery. You know, there may be some internal documents that for a particular complexity may or may not be relevant, and it may factor in. 12:04:04PM

But as I sit here today, I don't see how that would affect the identification of complexities that we know are there, and the identification of a methodology that would address each of those complexities.

BY MR. JANOSKI: 12:04:21PM

Q. Why don't we turn to paragraph 6 of your report, which is the summary of your conclusions in this case?

A Okay.

Q So you've been tasked here with reviewing and responding to the Expert Report that plaintiffs' expert 12:04:44PM

Page 47

Professor Feinstein submitted. Right? 12:04:48PM

A Right. But it -- but it's not the entire report. It was with respect to the damages methodology that he's proposed.

Q Okay. So you're not challenging Professor 12:05:01PM Feinstein's opinion that Cardinal Health securities traded in an efficient market. Right?

A Correct. I don't have an opinion on that. I haven't done the analysis. I haven't been asked to do the analysis. 12:05:13PM

Q Based on your -- the review of -- strike that. Based on your review of facts in this case, do you think Cardinal Health securities traded in an efficient market?

MS. KOFKE: Objection to form. It's outside 12:05:27PM the scope of his opinion.

THE WITNESS: Yeah. It's not a matter of what I think. I mean, before I offer an opinion, I want to conduct the analysis, and I haven't done that.

BY MR. JANOSKI: 12:05:38PM

Q Okay. So are you familiar with the Cammer and Krogman factors that courts usually look at in --

A I am.

Q Okay. So you didn't look at any of the Cammer and Krogman factors? 12:05:47PM

Page 48

A Well, I didn't independently assess it. 12:05:56PM

(Reporter requested clarification.)

MR. JANOSKI: It's Cammer and Krogman. C-a-m-m-e-r and K-r-o-g-m-a-n.

THE WITNESS: I reviewed what 12:06:08PM Professor Feinstein has done in that area, so I'm familiar with the data he's compiled; but I haven't independently assessed that.

BY MR. JANOSKI:

Q Okay. So you're aware that Cardinal Health is one 12:06:21PM of the largest publicly traded companies in the country. Right?

MS. KOFKE: Objection to form.

THE WITNESS: Yeah. I'm not sure quite what you mean by "one of the largest"; whether you're 12:06:33PM talking about one of the 5 largest, 10 largest, 100 largest.

BY MR. JANOSKI:

Q Well, it's --

A I don't know. 12:06:41PM

Q It's on the Fortune 500. Right?

A I -- I don't know either way, as I sit here.

Q Okay. And -- well, you're -- and you're aware that there's a large number of analyst firms that follow the company. Right? You you've reviewed a good 12:06:54PM

Page 49

13 (Pages 46 - 49)

amount of analysts' reports in this case? 12:06:56PM

A   I have. Yes.

Q   Yeah. And you don't have any thought one way or another as to whether the market for Cardinal Health securities was efficient or not? 12:07:04PM

MS. KOFKE: Objection to form. Asked and answered.

THE WITNESS: If you're asking for an opinion, sir, I -- I don't offer opinions unless I've done the analysis. And I haven't done the analysis. I 12:07:13PM haven't been asked to do the analysis. So as I sit here, I simply don't have an opinion on that.

BY MR. JANOSKI:

Q   I'm not asking for your expert opinion, sir; but do you have any thought one way or another as to 12:07:24PM whether Cardinal Health traded in an efficient market?

MS. KOFKE: Objection to form on the same basis.

THE WITNESS: Yeah. And I'm a cautious guy, so I'm not going to just give you my off-the-cuff 12:07:36PM reaction, without conducting the analysis.

BY MR. JANOSKI:

Q   Okay. Would you -- would you accept Professor Feinstein's market-efficiency opinion at face value, then? 12:07:51PM

Page 50

MS. KOFKE: Objection to form. 12:07:53PM

THE WITNESS: Again, I -- for purposes of my class-certification report, I'll assume that the market for the stock is efficient, but I don't have an opinion on that either way. 12:08:04PM

BY MR. JANOSKI:

Q   Okay. And you're not offering an opinion in this case as to whether any of the alleged misrepresentations impacted Cardinal Health's stock price; are you? 12:08:22PM

A   That's correct.

Q   Is there any reason why you're not offering that opinion in this case?

A   A simple one. I was not asked to.

Q   Do you have any idea why you weren't asked to 12:08:35PM challenge price impact at class certification?

MS. KOFKE: Objection to form. We also have an expert protocol that protects communications between the expert and counsel, so to the extent the answer would invade that limitation, I 12:08:46PM instruct the witness not to respond. Otherwise, you can answer the question.

BY MR. JANOSKI:

Q   Can you answer that question without revealing any communications with counsel, sir? 12:09:00PM

Page 51

A   Can you repeat the question? 12:09:01PM

Q   The question was: Do you have any idea why you weren't asked to challenge price impact at class certification here?

A   No. 12:09:10PM

Q   So the -- the one challenge that you are offering is to Professor Feinstein's proposed damages methodology. Right?

A   Correct.

Q   And is it your opinion, then, that his proposed 12:09:25PM damages methodology not be applied on a classwide basis to reliably measure damages in a manner that is consistent with plaintiffs' theory of liability?

A   Yes. That's my overarching opinion.

Q   Okay. So let's break that down. There's a few -- 12:09:40PM a few different --

(Reporter requests clarification.)

BY MR. JANOSKI:

Q   I'll start my question again, sir. Just breaking down a few, I guess, assumptions or subsets within that 12:10:06PM opinion, is it your opinion that Professor Feinstein's proposed damage methodology cannot be consistently applied on a classwide basis?

A   To reliably measure damages, yes.

Q   Okay. Well, speaking aside from the reliability 12:10:26PM

Page 52

of the damage measure, do you have an opinion whether 12:10:31PM or not -- whether his methodology can be applied on a classwide basis?

A   Well, in -- and in some sense it's hard to answer that until he first establishes that he has a 12:10:42PM methodology that can reliably measure damages. And he's not done that. So without doing that, I'm not in a position to say whether or not his methodology could be applied on a classwide basis. His methodology is too vague in order to answer that properly. 12:10:59PM

Q   Well, sir, you're aware that he's offered to construct an inflation ribbon in this case to measure damages. Right?

A   He claims he has a methodology to do so, but he's not, in my opinion, described a methodology that will 12:11:15PM reliably do that.

Q   Okay. But would you agree that, setting aside reliability, whether or not it's reliable or it's not, his methodology would be consistently applied to all class members? 12:11:32PM

MS. KOFKE: Objection to form.

THE WITNESS: I -- I can't tell because, again, I don't think he's provided enough granularity as to his methodology to know whether he has or he hasn't. 12:11:42PM

Page 53

14 (Pages 50 - 53)

BY MR. JANOSKI: 12:11:45PM

Q So you think his methodology can't be consistently applied? Again, setting aside the reliability of the actual measure of damages, you don't think it could be consistently applied on a classwide basis? 12:11:57PM

MS. KOFKE: Objection to form.

THE WITNESS: Well, again, it's -- it's hard, Mr. Janoski, to answer that, because, you know, I've identified a number of complexities that he will have to address. And he's -- in most cases, has not even 12:12:11PM acknowledged the complexities. And in all cases, he has not proposed a methodology that will address those complexities.

And until he addresses those complexities, there's no way for me to be able to answer whether his 12:12:26PM methodology can be applied on a classwide basis. He hasn't described it sufficiently to allow me to say, yes, it can be applied on a classwide basis.

BY MR. JANOSKI:

Q Well, aren't the complexities that you've 12:12:41PM identified -- don't they affect all class members in the same way?

A Not necessarily.

And, again, you're asking me to bless his methodology with respect to whether it can be applied 12:12:52PM

Page 54

on a classwide basis. He hasn't described a 12:12:55PM methodology with sufficient granularity that I can answer that question.

Q What more do you think he would have to provide to -- (audio interruption) -- figure out whether or not 12:13:07PM an inflation ribbon can be applied on a classwide basis to all class members?

(Reporter requested clarification.)

BY MR. JANOSKI:

Q I'll rephrase. We could strike that question. 12:13:28PM

You're aware that Professor Feinstein has stated that his out-of-pocket damages methodology would create an artificial inflation ribbon to measure the artificial inflation in the stock during each day of the Class Period. Right? 12:13:45PM

A He asserts that, but he hasn't shown that.

Q Okay. Well, getting out of semantics --

(Audio interruption.)

THE REPORTER: May we go off the record?

MR. JANOSKI: Yeah. Can we go off the record 12:14:06PM for a second?

THE VIDEOGRAPHER: Stand by. This marks the end of Media Number 1. Going off the record at 12:14 p.m.

(Recess taken from 12:14 p.m. until 12:27 p.m.) 12:14:12PM

Page 55

THE VIDEOGRAPHER: We are back on the record 12:27:56PM at 12:27 p.m. Eastern, and this marks the beginning of Media Number 2 in the deposition of Professor Kenneth Lehn.

Please proceed, Counsel. 12:28:07PM

BY MR. JANOSKI:

Q Welcome back, Professor Lehn.

A Thank you.

Q You understand that you're still under oath?

A I do. 12:28:14PM

Q Did you review any documents during the break just now?

A I did not.

Q Okay. Did you discuss the substance of your testimony with anybody just now? 12:28:21PM

A Not really, no.

MS. KOFKE: Objection. Objection to the extent you're asking about any communications with counsel. Those are protected from discovery by the expert discovery protocols. 12:28:32PM

BY MR. JANOSKI:

Q Without revealing what you discussed with counsel, did you discuss the substance of your testimony at all during the break now, sir?

A I don't believe so. 12:28:41PM

Page 56

MS. KOFKE: I'd also object that question 12:28:42PM would invade the limitations of the stipulation and order concerning expert discovery.

MR. JANOSKI: I don't think that's the case if he's not revealing what you actually talked about. 12:28:51PM

Q My question is simply whether you discussed the substance of your testimony with anybody, sir.

MS. KOFKE: Asked and answered. And the protocol says that the parties shall not be required to disclose or produce in discovery or at trial 12:29:03PM communications between the testifying expert and counsel. So I think your question does invade the protocol.

MR. JANOSKI: Again, I'm not asking him to disclose what those communications were. 12:29:15PM

MS. KOFKE: The fact of the communication is covered by the protocol.

MR. JANOSKI: If you want to instruct him not to answer, you could do that. I think that's improper instruction, but you could do that. 12:29:26PM

Q My question, sir, was simply -- you said "I don't believe so." My question is: Did you at all discuss the substance of your testimony during the break time?

MS. KOFKE: I instruct him not to answer to the extent it would relate to communications with 12:29:37PM

Page 57

15 (Pages 54 - 57)

counsel.                    12:29:39PM

BY MR. JANOSKI:

Q    And are you going to follow your counsel's instruction?

A    I will.                    12:29:44PM

Q    Following up on something that we were talking on before the break, Mr. Lehn, I understand that you -- you don't believe that Professor Feinstein has offered a reliable damage model. But again, putting aside the reliability, if an inflation ribbon is constructed that   12:30:02PM measures artificial inflation during each day of the Class Period, would you agree that the methodology would at least be consistently applied to members of the class?

        MS. KOFKE: Objection to the form.   12:30:17PM

        THE WITNESS: It's hard to address that, because I don't know how -- what methodology Professor Feinstein will use to construct the inflation ribbon --

BY MR. JANOSKI:                    12:30:35PM

Q    Well --

A    -- to address the various complexities in the case. And I'm a cautious man. So until I know the various methodologies he will use, it's hard for me to tell you, yes, you can apply this on a classwide basis.   12:30:49PM

Page 58

Q    Well, would you agree that if his methodology   12:30:52PM inaccurately measures damages, then it's inaccurately measuring damages for every member of the class?

A    Again -- again, it's hard to say yes to that, because there are several complexities in this matter   12:31:08PM that require a methodology that will adequately address them. And depending on what he does to address those issues, it may or may not be equally applied across all class members.

Q    Could you give me an example of how one of these   12:31:29PM complexities you raise would affect one class member differently from another?

A    Well, it depends. I mean, if his methodology, for example, of trying to tie alleged artificial inflation to each specific alleged misrepresentation -- if that   12:31:46PM methodology does not allow him to do that reliably, then the inflation ribbon he constructs could affect some class members more than others, depending on when they were buying and selling securities.

Q    But --                    12:32:07PM

A    So it could result -- I mean, when you say it's equally flawed, it likely would affect some class members differently than others.

Q    But would you agree that all class members that bought or sold stock on the same day would be treated   12:32:20PM

Page 59

equally in such an occasion?                    12:32:23PM

        MS. KOFKE: Objection to form.

        THE WITNESS: No, but it's not only when they bought or -- or when they sold or whether they held.

        And, again, the challenge here is he -- and he   12:32:33PM claims that it will be "straightforward" to create an inflation ribbon where he estimates artificial inflation on every day.

        It's far from straightforward. And until we know how he's going to create that inflation ribbon on a   12:32:47PM daily basis, we -- we can't say that even if two individuals bought on the same day, depending on when they sold or if they held, and depending upon other errors that he might have in his inflation ribbon, it could affect them differently.                    12:33:05PM

BY MR. JANOSKI:

Q    Now, these bullet points that you identify in paragraph 6 of your report -- are those just a generalized summary of what your main critiques are of Professor Feinstein's proposed methodology?                    12:33:18PM

A    Yeah, I think that's fair. There's a more fulsome discussion of each in the report.

Q    Okay. And just walking through those, that first critique in the first bullet point -- is it your opinion that Professor Feinstein doesn't tie the   12:33:35PM

Page 60

artificial inflation to each misrepresentation in the   12:33:39PM case?

A    Well, that's not exactly the opinion at this stage, because it's not expected, as I understand, that he would do so at this stage.                    12:33:51PM

        What he -- my understanding of the legal standard is he's expected to have a damages methodology that satisfies the three criterion that I provided.

        And as a financial economist -- and, again, I'm not speaking as a lawyer. But as a financial   12:34:08PM economist, the methodology -- quote, unquote -- that he proposes doesn't really address how he's going to estimate the amount of artificial inflation associated with each individual alleged misrepresentation.

Q    Okay. So is it your opinion that he needs to   12:34:29PM measure the artificial inflation that was caused by each alleged misstatement?

        MS. KOFKE: Objection to form.

        THE WITNESS: Again, when you say that he has to do that, I'm not -- what I'm saying is: He's not   12:34:42PM proposed a methodology that is capable of reliably doing that. And that would be necessary, yes, if one was constructing a reliable inflation ribbon.

BY MR. JANOSKI:

Q    Well, you -- I'm sorry. I believe you yourself   12:34:56PM

Page 61

16 (Pages 58 - 61)

said that if you were constructing a damages 12:34:59PM methodology, you usually work backwards from the corrected disclosure dates. Right?

MS. KOFKE: Objection to form. Misstates prior testimony. 12:35:08PM

THE WITNESS: Not necessarily; and, in fact, I've been involved in class-certification matters where the key was not what happened at the end, but the key was what happened on the dates of alleged affirmative misstatements. 12:35:21PM

BY MR. JANOSKI:

Q. Okay.

A And this is one of the points that I make, is that he acknowledges -- this is another point about Professor Feinstein's report. He acknowledges that 12:35:27PM alleged misrepresentations can be either alleged affirmative misstatements or alleged omissions. He acknowledges this.

The methodology to be used for estimating the artificial inflation created by an alleged affirmative 12:35:44PM misstatement is different from the methodology one would use to estimate the artificial inflation associated with an alleged omission. And he does not even address that.

Page 62

MR. JANOSKI: Okay. And I'll move to strike 12:35:58PM as nonresponsive.

Q. Sir --

MS. KOFKE: Oppose the motion.

MR. JANOSKI: Okay. That's fine. 12:36:03PM

Q. So is it your testimony you didn't -- you don't think you said earlier that you usually construct -- you usually conduct an event -- a study by working backwards from the corrective disclosure date? You don't think that was your prior testimony? 12:36:19PM

MS. KOFKE: Objection to form.

THE WITNESS: I didn't say that, sir.

It usually doesn't mean all the time. It depends on the facts and circumstances of the case. And in many cases, only alleged omissions are involved. 12:36:31PM

But when there's an acknowledgment by the plaintiffs' expert that they were both alleged affirmative misstatements and alleged omissions, there should be an appreciation for the fact that the methodology you use for one is different from the 12:36:44PM methodology you use for the other. And Professor Feinstein doesn't even address that issue.

BY MR. JANOSKI:

Q. Okay. And what is your basis for the statement that the methodology has to be different from a alleged 12:36:54PM

Page 63

omission and alleged affirmative misstatement? 12:36:58PM

A Well, again, I think you're mischaracterizing my testimony. I didn't say it has to be different. I said it is different. And it is different in the following sense; that on the date of an alleged 12:37:08PM affirmative misstatement, one can conduct an event study on the date of that alleged affirmative misstatement. Now, the event study here, too, again, is just the beginning; it's not the end. But you can conduct an event study on date that the alleged 12:37:25PM affirmative misstatement was made.

In the case of an alleged omission, the event study analysis on the date of the alleged omission is not probative at all as to whether or not the alleged omission caused artificial inflation. 12:37:40PM

So for alleged omissions, one is required to look at the residual returns; i.e., conduct event study analysis on the alleged corrective disclosure date. And there, too, that's just the beginning. It's not the end, because there are other complexities that have 12:38:00PM to be addressed.

But -- but -- but the date that you use for the event study analysis is different for the alleged affirmative misstatements than it is for the alleged omissions. 12:38:13PM

Page 64

MR. JANOSKI: And I'll move to strike as 12:38:14PM nonresponsive.

Q. Sir, my question is --

MS. KOFKE: Oppose the motion.

BY MR. JANOSKI: 12:38:19PM

Q. What is your basis for the statement that the methodology for affirmative misrepresentation is different than for omissions?

MS. KOFKE: Asked and answered.

BY MR. JANOSKI: 12:38:31PM

Q. -- something you read in the academic literature? Is it a court opinion? Is it your own opinion?

MS. KOFKE: Same objection.

THE WITNESS: Well, I mean, you know, clearly when there's an alleged affirmative misstatement that 12:38:41PM was alleged to have added inflation in the stock price, conducting event study analysis on the date of that alleged affirmative misstatement is appropriate to test whether or not that alleged affirmative misstatement did cause a statistically significant increase in the 12:38:59PM subject company's stock price. And I've had a class-certification case where that ultimately determined whether the class was certified by looking at what happened on the date of the alleged affirmative misstatement. 12:39:15PM

Page 65

17 (Pages 62 - 65)

BY MR. JANOSKI:

Q Okay. And, sir, my question is just, again: What is the basis for that statement? Is that found in the academic literature? Is that found in a court opinion that you're aware of, or is that something that is just your opinion?

A It's based on basic principles of financial economics. If the allegation is that you said something on a particular day that caused the stock price to increase, then you can test that with event study analysis, just as you can test whether the announcement of a merger caused a company's stock price to increase on the day it was announced.

Q Okay. Would you --

A So there's that.

With respect to an alleged omission, there is no necessity of conducting an event study on the day of the alleged omission, because if information was not publicly disclosed, then there's nothing for the market to react to. And so the appropriate event study in the case of an alleged omission is to go to when the truth was revealed about the alleged omission -- i.e., the alleged corrective disclosure date -- and conduct an event study analysis on that date.

Q Sir, would you agree that a misstatement could introduce artificial inflation into a stock price without a corresponding increase in the market price?

A Can you repeat that?

Q Would you introduce -- sorry. Strike that. Would you agree that a statement could introduce artificial inflation into a stock price without a corresponding increase in the market price?

A You're saying an affirmative statement or a statement that omitted information?

Q Either one. Any statement.

A Well, it depends. That's my whole point, is if the statement is an affirmative misstatement, that's different from a statement that includes omitted information or did not reveal information that is allegedly important to investors.

Q Okay. And how do you draw the line of what's an affirmative misstatement versus what's a misleading statement versus omitted information? How do you conduct that analysis?

A Well, I mean, I typically rely on counsel to identify what are the alleged affirmative misstatements and what are the alleged omissions.

And I believe Professor Feinstein acknowledges that both are potentially operative here. He acknowledges this issue; that there can be both. And yet, even though the methodology for addressing them are different, he is completely silent as to how his methodology would be different for alleged affirmative misstatements than it is for alleged omissions.

Q Okay. And, sir, can you -- can you point me to anything -- any academic article or any court opinion that says the methodology has to be different for affirmative misstatements and omissions?

A Well, with respect to academic literature, this issue is, you know, frankly somewhat unique to securities litigation. And, at least in the financial economics literature, I'm not aware of anyone who has specifically addressed this topic. There may be, but it's not typically a topic that would be addressed in the literature.

But everything I've just said to you, I think, is consistent with the fundamental principles of conducting event study analysis.

Q Okay. So would you say that your belief is based on your experience -- your experience as an expert witness in this matter?

MS. KOFKE: Objection to form.

THE WITNESS: So it's based on two things. It's based on the academic literature on event study analysis, and what event study analysis is capable of measuring, and what it's not capable of measuring.

But it's also based on my experience as an expert witness. And it's been certainly my experience that there's a general recognition among experts that, for alleged affirmative misstatements, it is appropriate to conduct an event study on the date of the alleged affirmative misstatement; but for alleged omissions, it's appropriate to look at the -- conduct the event study analysis on the alleged corrective disclosure dates as a starting point, not as an ending point.

BY MR. JANOSKI:

Q Great. And that general recognition among experts that you -- that you articulate -- is that memorialized anywhere in any type of academic paper or court opinion?

A Well, again, I'm not aware of academic literature that directly addresses this topic. It might be out there. Maybe there are law journals. But in the finance literature, I'm not aware of that.

With respect to whether this has been memorialized in a court document, I'm not a legal scholar, so I don't know.

Q Okay. Now, aside from those two critiques that we mentioned -- I guess the tying to the

Page 66

Page 67

Page 68

Page 69

18 (Pages 66 - 69)

misrepresentations, and what you called the failing to    12:44:20PM
account for omissions versus affirmative
misstatements -- these bullet points also identify the
potential complexities that you -- that you raised in
this case. Right?    12:44:32PM
A    Various complexities, correct.
Q    Okay. And in looking at the third bullet point,
you claim that Professor Feinstein's methodology
doesn't account for the changing value of information
reported during the Class Period. Right?    12:44:46PM
A    Correct.
Q    So are you familiar with the term "time-varying
inflation"?
A    Generally, yes.
Q    Okay. Is it fair to say that one of your primary    12:44:55PM
critiques is that he doesn't account for time-varying
inflation, in that he hasn't offered a methodology to
alter the inflation ribbon during the Class Period?
       MS. KOFKE: Objection to form.
       THE WITNESS: Well, before I agree or    12:45:13PM
disagree, maybe you can provide me with your definition
of time-varying inflation.
BY MR. JANOSKI:
Q.    Yeah. I would use the phrase time-varying
inflation similarly to how you do, to account for    12:45:21PM

Page 70

different levels of inflation during the Class Period    12:45:26PM
for the principle that -- that could vary over time.
A    But that -- that can arise for reasons other than
the changing value of information related to Cordis.
There can be additional alleged misrepresentations that    12:45:42PM
can cause inflation to change over time. The point in
the third bullet is different from that.
Q    Okay. So is the point in the third bullet just
focused on the changing value of Cordis over the Class
Period?    12:45:58PM
A    The changing value of information about Cordis,
yes.
Q    Okay. And then the fourth bullet point, you claim
that he doesn't explain how he'll reliably parse out
materialization of known versus unknown risks. Right?    12:46:12PM
A    Correct.
Q    Okay. The following bullet point, you criticize
Professor Feinstein for not offering a methodology that
could reliably parse out confounding information. Is
that right?    12:46:27PM
A    Correct.
Q    And then the final bullet point, the final
critique there is that -- is it your critique that he
just -- that Professor Feinstein fails to explain how
he would use standard valuation tools?    12:46:40PM

Page 71

A    Right. Not only use them, but how he would use    12:46:45PM
them to reliably address the various complexities in
this case.
Q    Okay. So is it your opinion that, in
affirmatively offering a damage model,    12:46:58PM
Professor Feinstein is required to account for all
potential complexities in this case?
       MS. KOFKE: Objection to form.
       THE WITNESS: Again, I'm not offering a legal
opinion.    12:47:11PM
    So I am not saying legally he is required to do
so, but what I'm saying -- that, as a financial
economist, he's ignored the tough issues in this case
that are going to challenge him or anyone else to
estimate damages, given the unique complexities of this    12:47:25PM
case.
    And each of these complexities requires its own
methodology to reliably estimate damages. And in most
of these cases, he's not even acknowledged the
complexity, let alone proposed a methodology that can    12:47:41PM
address it.
    So as a financial economist, he has not provided
me with any confidence that he is capable of reliably
estimating damages in this matter.

Page 72

BY MR. JANOSKI:    12:47:55PM
Q    So did you conduct any quantitative analysis to
determine that the complexities you raise are actually
present here?
A    I'm not sure what you mean by "quantitative    12:48:08PM
analysis."
Q    Okay. Did you do any quantitative analysis to
determine whether the value of information related to
Cordis changed over the course of the Class Period?
A    What do you mean by "quantitative analysis"?    12:48:21PM
Q    Did you -- any type of valuation as to what the
information related to Cordis was, and how it might
have changed over the Class Period. Did you do any,
yourself?
A    No, but my understanding is that I'm not required    12:48:35PM
to propose a damages methodology that satisfies the
three criteria; Professor Feinstein is. And --
Q    Okay.
A    -- he's not done that.
Q    Well, how do you know that that's actually an    12:48:48PM
issue in this case, if you haven't conducted that
analysis to determine whether or not the value of
information of Cordis changed over the course of the
Class Period?
A    Well, I think there are two things to say about    12:48:58PM

Page 73

19 (Pages 70 - 73)

that.                                    12:49:00PM

One is that it is almost certainly the case that the value of Cordis to Cardinal changed over the period.

We know that Cardinal made a number of acquisitions after the Cordis acquisition which would change -- that, in and of itself, would change the relative size of Cordis.

We also know that the non-Cordis businesses of Cardinal, in a very general sense, had a decline in performance over certainly the second half of the Class Period.

We know that the market capitalization of Cardinal fell from roughly $30 billion at the start of the Class Period to about $15 billion at the end of the Class Period.

So unless those value changes were identical to the percent-value changes in Cordis, which, based on my experience, would be highly unlikely -- that all business units of a multi-business firm would change by the same proportion over a three-year period.  That's almost unheard of.

I think it's almost certainly the case that the relative size of Cordis changed during the period.  And if it did, the value of information about Cordis with

Page 74

regard to Cardinal's stock price would have changed.

Q   Okay.

A   So that's almost certain.

But the second point of my answer is, at a minimum, this is an issue that Professor Feinstein will have to address.  And -- and if he finds somehow that on every day of the Class Period, Cordis was equally significant to Cardinal, which I think is highly unlikely -- but if, based on his methodology and analysis, that's what he found, then that's what he found.  I'm raising this as an issue that is an obvious issue that has to be addressed, and he hasn't even acknowledged it.

Q   Well, he hasn't had the chance to respond to your Expert Report; has he yet?

A   Not yet; but again, my understanding is that he was supposed to propose a methodology that satisfied the three criteria.  And this is an important issue. And he swept it under the rug; didn't even acknowledge it.

Q   So is it -- is it your understanding that Professor Feinstein was supposed to identify all potential complexities that may arise in conducting a damages analysis in his affirmative Expert Report?

MS. KOFKE:  Objection to form.      12:51:26PM

Page 75

THE WITNESS:  Well, I think I answered that previously.  I'm not here offering an opinion as to what is legally required.

But if I can make an analogy -- I mean, I've served on many doctoral dissertation committees.  And I've served on grant committees that review grants. And whether it's a Ph.D. student proposing a doctoral topic -- dissertation topic or whether it's someone applying for a grant, as a reviewer, you don't expect them to have conducted the analysis; but you do expect them to identify the topic they want to address, the complexities associated with the topic, and the methodology that they will use to address the topic generally, and the complexities individually.  And whether or not you approve the doctoral dissertation topic or you approve the grant depends on the ability of a person to adequately propose a methodology that gives you confidence that they can do this.

And so I'm viewing it in that lens as a financial economist, without regard to what the legal standard is.  And what I'm saying is unambiguously Professor Feinstein has not done that.  And not only has he not done that, but he's indicated that this exercise will be straightforward; and it is anything but straightforward.                    12:52:48PM

Page 76

MR. JANOSKI:  Okay.  And I'll move to strike as nonresponsive.

Q   Again, my question --

MS. KOFKE:  Oppose the motion.

MR. JANOSKI:  I understand that.  You can let me finish my -- get me question out, Lauren.

Q   My question is:  Do you think that Professor Feinstein should have identified every single complexity that may arise in this case in his affirmative report?

MS. KOFKE:  Asked and answered.

THE WITNESS:  I'm not here to provide a legal opinion.  So I don't know what the legal standard is. I don't know if he's required to do that under the law.

As a matter of economics, when you say "every complexity," I can't say that the list that I've identified is every.  I might think of others.  And others might crop up in the course of work on this project.

But he should have identified, at a minimum, at least those that I was able to identify based on public information.  And he should have not only identified them, but proposed a methodology to address those complexities.  And he's failed to do that.

Page 77

20 (Pages 74 - 77)

BY MR. JANOSKI: 12:53:50PM

Q And that's based on your opinion that you think he should have done that?

A From the perspective of a financial economist who has had to review proposed methodologies in other contexts over my career. 12:53:58PM

And if anyone said, "This is the topic I want to address," and they had proposed a methodology similar to Professor Feinstein, I would have failed them. I would have said, "You haven't provided a methodology that gives me confidence that you can do this." 12:54:13PM

Q When these type of complexities arise in securities fraud litigation, such as confounding information, time-varying inflation, the complexities that you identify, is it your opinion that it makes any potential valuation or damages analysis impossible? 12:54:30PM

A No. I think, again, depends upon the facts and circumstances. It depends on the nature of the complexity; the availability of data. It may well be that some of those complexities can be dealt with in a reliable way, but it also may be that some of them cannot. And it just depends upon the facts, circumstances, and -- and the nature of the complexities. 12:54:48PM

Q You haven't developed your own methodology for 12:55:06PM

Page 78

calculating damages in this case. Right? 12:55:08PM

A That's correct. My assignment was to evaluate Professor Feinstein's proposed methodology.

Q Okay. If you were asked to propose a damages methodology here, how would you go about doing it? 12:55:20PM

MS. KOFKE: Objection to form.

THE WITNESS: Well, I mean, I can't give you an answer off the cuff here, because I haven't been asked.

And if I was asked, it would probably take several weeks of thinking about it before I'd be willing to propose a methodology. 12:55:31PM

BY MR. JANOSKI:

Q Okay. Well, let's say you're ultimately asked to do a loss-causation or damages opinion in this case. Is it your opinion that damages cannot be reliably measured in any manner? 12:55:42PM

A No. I mean, again, it would require the work. And the work has not been done yet.

Q Okay. You'd agree that a reliable damages estimate would just require more work to be done? 12:55:56PM

MS. KOFKE: Objection to form.

THE WITNESS: I think you're minimizing what I'm saying. I -- one is -- these are challenging complexities. They are not straightforward, by any 12:56:07PM

Page 79

means. And it's not obvious how one would reliably address some of these complexities, if not all of them. 12:56:10PM

I'm not here to tell you that it can't be done. Maybe it can be done; but certainly Professor Feinstein has not described a methodology that is capable of reliably addressing these issues. 12:56:26PM

BY MR. JANOSKI:

Q Are you familiar with the 2013 Supreme Court case Comcast v. Behrend?

A In -- in very general terms, but... 12:56:40PM

Q And what is your general understanding of what that case stands for?

A I -- I think generally that is the case where it's required that plaintiffs' expert at the class-certification stage proposes a methodology that, you know, meets the criteria that I've described. 12:56:54PM

Q All right. If I use the phrase "Comcast challenge" or "Comcast opinion," do you know what I'm generally referring to?

MS. KOFKE: Objection to form. 12:57:13PM

THE WITNESS: Not unless you tell me.

BY MR. JANOSKI:

Q Are you aware that the type of opinion you have offered here, where one challenges a plaintiffs' expert proposed damages methodology at the class-certification 12:57:25PM

Page 80

stage, is generally referred to as a Comcast challenge? 12:57:27PM

A I've heard it characterized as such, yes.

Q Yeah. Okay. So if I use that phrase going forward, do you understand that's what I'm generally referring to? 12:57:40PM

A I -- I will assume that if you'd like, yeah.

Q Okay. You've issued --

MS. KOFKE: I'm going to object to that definition, to the extent it incorporates the idea that the -- that Dr. Lehn is providing some kind of legal analysis of meeting the Comcast requirements. 12:57:51PM

MR. JANOSKI: Okay.

MS. KOFKE: Just a standing objection to that aspect of the definition, if it -- if it's there.

MR. JANOSKI: Okay. Objection noted. 12:58:03PM

Q You've -- you've issued these type of Comcast challenges or damage opinions in other class actions; have you not?

A I'm not sure what you mean by "these types."

Q Well, you've -- say you've -- you've issued opinions challenging a plaintiffs' expert damage methodology at the class-certification stage in other securities class actions; have you not? 12:58:16PM

A I have. Yes.

Q Okay. About how many times have you done that? 12:58:27PM

Page 81

21 (Pages 78 - 81)

A    Oh, I -- don't know.  Maybe -- maybe ten times.    12:58:30PM

Q    Okay.  Are you aware of any court that has adopted one of your opinions in those matters as a basis for denying class certification?

MS. KOFKE:  Objection to form.    12:58:46PM

THE WITNESS:  When you say adopt my opinion, I -- I know of a case where the -- I believe the class was not certified, and it was related to analyses that I did, but --

BY MR. JANOSKI:    12:59:03PM

Q    Okay.

A    -- I don't recall the specific language in the opinion to say that -- you know, to discern whether or not the Court relied on it.  I think they did, but...

Q    Okay.  And what case was that?    12:59:14PM

A    I forget the full name, but it involved a company by the name of Best Buy, B-u-y.

Q    Yeah.  That Best Buy case that -- that went to the Eighth Circuit.  Right?

A    Again, I'm not a legal scholar, sir.  I forget.    12:59:27PM

Q    And that was -- you offered a price-impact opinion in that case as well.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  You say "as well" -- I'm sorry -- I'm not sure what you mean by "as well."    12:59:38PM

Page 82

BY MR. JANOSKI:    12:59:41PM

Q.   Isn't it true that in that Best Buy case, you offered an expert opinion at class certification, challenging price impacts and the damages methodology?

A    I believe that's correct.  I know definitely price    12:59:51PM impact.  And I think it was also related to the methodology.

Q    Okay.  And isn't it true that ultimately the class was not certified in that case on the price-impact issue, not the damages methodology?    1:00:04PM

MS. KOFKE:  Objection to form.  You're asking him to interpret a legal opinion by a Court.  He's a financial economist.

MR. JANOSKI:  Okay.  Lauren, could you please limit your objections to form?  We had this issue at    1:00:13PM the last investment-manager depo, where I was told by your local counsel that it's the practice to object to form.  And we had that agreement at the beginning of this.

MS. KOFKE:  To the extent I think it's    1:00:23PM necessary to elaborate on my objections, I will.  And I will keep them concise, as per the rules.

MR. JANOSKI:  Okay.  I don't think that's the way your local counsel acted when I was -- I was doing the same, but if it's rules for thee and not for me,    1:00:35PM

Page 83

that's fine.    1:00:39PM

MS. KOFKE:  I was not part of that deposition.  And I'm going to -- I'm not going to agree with your characterization of what our local counsel may or may not have said.    1:00:47PM

But with that said, let's proceed.

MR. JANOSKI:  Well, I was there.  So you should ask for right what they said was practice in the Southern District of Ohio.

Q    But sir -- so my question is just:  Are you aware    1:00:56PM whether or not, in that Best Buy opinion, that the price-impact issue is ultimately what decided class certification, not the damages opinion?

MS. KOFKE:  Objection to form.

THE WITNESS:  I don't recall, I mean, the    1:01:10PM opinion.  I mean, I know that prime impact was an issue; but whether or not there were other issues, I don't recall.

BY MR. JANOSKI:

Q    Okay.  Well, I'll represent to you that that court    1:01:19PM opinion was ultimately decided on price impact, not on the Comcast damages issue.

Are you aware of any court that has accepted your -- your damage-methodology challenge as a basis for denying class cert.?    1:01:35PM

Page 84

MS. KOFKE:  Objection to form.    1:01:38PM

THE WITNESS:  I don't -- I don't know.  I don't recall either way.

MR. JANOSKI:  Okay.  Give me one second.

Technical issue with this exhibit.    1:02:09PM

(Plaintiff's Exhibit 10 marked for identification.)

BY MR. JANOSKI:

Q    Okay.  Professor Lehn, you should be able to see what's been marked as Plaintiff's Exhibit 10.  Let me know when you're able to see it.    1:02:35PM

A    Okay.  Yes, I do.

Q    Plaintiffs Exhibit 10 is an Expert Report dated October 15, 2015 that you submitted in the Intuitive Surgical Securities Litigation.  Right?

A    Again, I only see the cover page, but I believe    1:02:55PM that's correct.

Q    Okay.  And if you go to the very last page, that's your signature there on page 44.  Right?

A    It is.  Yes.

Q    And you've submitted this Expert Report in    1:03:17PM connection with the defendant's opposition to class certification.  Right?

A    It's been a while, but I think that's correct.

Q    Okay.  If you look at paragraph 2 of this report, you describe some of your work at the SEC.  Right?    1:03:34PM

Page 85

22 (Pages 82 - 85)

A   I do.                                    1:03:38PM

Q   And you write that much of your work at the SEC involves conducting event study analysis to determine how securities reacted to the released information. Right?                                    1:03:48PM

A   Correct.

MS. KOFKE:  Objection to form.

THE WITNESS:  Yes.

BY MR. JANOSKI:

Q   And you also write that you had submitted -- on   1:03:52PM multiple occasions that you had submitted reports and provided testimony on issues related to class certification.  Right?

A   Correct.

Q   If you go to page 11 of this report, paragraph 19,   1:04:05PM you give a summary of what the plaintiffs' expert had offered as an opinion in this case.  Do you see that?

MS. KOFKE:  Counsel, could you point to a specific paragraph?  Are you at 19?

MR. JANOSKI:  Yeah, I said paragraph 19.   1:04:27PM

MS. KOFKE:  Oh, paragraph 19.  Okay.  Thanks.

THE WITNESS:  Yeah.  I think that just describes what the plaintiffs' expert was retained to opine on.

Page 86

BY MR. JANOSKI:                                    1:04:39PM

Q   Yes.  So in -- in this specific case it looks like the plaintiffs' expert, Chad Coffman, offered opinions on market efficiency, and whether there was a common damage methodology that could be applied.  Right?   1:04:49PM

A   It appears to be.  There might be more, but that's certainly what's in paragraph 19.

Q   Okay.  And those are the same type of opinions that Professor Feinstein is offering in support of class certification here.  Right?   1:05:04PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah.  I think that latter part is -- is worded differently in this matter than it was in that matter.

BY MR. JANOSKI:                                    1:05:16PM

Q   It is worded differently, but substantively it's the same type of opinion -- right? -- as to whether there's a common damage methodology --

MS. KOFKE:  Objection to form.

BY MR. JANOSKI:                                    1:05:28PM

Q   -- for the Proposed Class.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah.  I don't see reference to reliable damages consistent with plaintiffs' theory of liability.  Maybe it's there, but I -- in the fuller   1:05:43PM

Page 87

sentence, but I don't see it in paragraph 19.   1:05:46PM

BY MR. JANOSKI:

Q   Well, semantics aside, do you recall anything unique about Mr. Coffman's proposed damage methodology that distinguishes it from what Professor Feinstein has   1:05:56PM proposed here?

MS. KOFKE:  Objection to form.

THE WITNESS:  I mean, I -- frankly, that was 2015.  So seven years later I can't recall what Professor -- or Mr. Coffman was proposing.   1:06:11PM

BY MR. JANOSKI:

Q   That's fine if you don't recall.

If we go to paragraph 25, it looks like one of your tasks in this case was to respond to Mr. Coffman's opinion and evaluate whether he had put forth a   1:06:27PM well-settled, common methodology to estimate damages. Right?

A   Correct.

Q   Okay.  If you go to page 15 -- this is subparagraph 3 of paragraph 27.  It looks like you --   1:06:42PM this is a summary of the opinions that you offered. Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm sorry.  So page 15, paragraph 3?  Is that what you said?   1:06:55PM

Page 88

BY MR. JANOSKI:                                    1:06:58PM

Q   Yes.

A   Okay.

Q   Do you see there that you write that "Mr. Coffman does not demonstrate that alleged classwide damages can   1:07:02PM be calculated in this matter subject to a common and reliable methodology consistent with Plaintiffs' claims"?  Do you see that?

A   I do.

Q   That's -- that's similar to the type of opinion   1:07:14PM that you're offering in this case.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, in terms of the overriding opinion, yes; but as for the reasons for that, I don't recall what they were in Intuitive   1:07:28PM Surgery, and they might be different than what they are here.

BY MR. JANOSKI:

Q   Okay.  But, big picture, that's the ultimate conclusion that you offered.  Right?   1:07:39PM

MS. KOFKE:  Objection to form.

THE WITNESS:  If I can just scroll up, I don't know if that's the only conclusion, but...

BY MR. JANOSKI:

Q   With respect to plaintiffs' damage methodology.   1:07:50PM

Page 89

23 (Pages 86 - 89)

Right?                                              1:07:51PM
MS. KOFKE:  Objection to form.
THE WITNESS:  I'm going to have to review, if you don't mind, the full context of that.
BY MR. JANOSKI:                                     1:07:59PM
Q   Yes.
A   And I think that's fair.  I think the -- the third point there on page 15 is addressing the methodology issue, yes.
Q   Yeah.  And that's the same type of opinion that   1:08:33PM you're offering here against Professor Feinstein.  Right?
MS. KOFKE:  Objection to form.
THE WITNESS:  I wouldn't say the same.  I would say similar.                                    1:08:43PM
BY MR. JANOSKI:
Q.  Similar.  If you go to subparagraph b, it looks like you critique the plaintiffs' expert in this case for not isolating the impact of each alleged misrepresentation.  Right?                          1:08:56PM
A   If I could just read that.  I'm sorry.
Q   Yeah.
A   Right.  That's similar to one of the complexities that exists in this case.
Q   Yes.  It's a similar critique that you have of    1:09:14PM

Page 90

Professor Feinstein's methodology.  Right?          1:09:17PM
MS. KOFKE:  Objection to form.
THE WITNESS:  Well, I'm not sure I'd go that far, because I -- this is just a summary, and I don't recall the more fulsome discussion of this in the    1:09:26PM Intuitive report, and how it compares to the more fulsome discussion of this in -- in this report.
BY MR. JANOSKI:
Q   Would you say that it's a similar complexity that you identified that you claimed the plaintiffs' expert  1:09:40PM failed to account for?
MS. KOFKE:  Objection to form.
THE WITNESS:  When you say "it," meaning the issue about not proposing a methodology to isolate the impact of each alleged misrepresentation on, in this   1:09:53PM case, Intuitive's stock price?
BY MR. JANOSKI:
Q   Yes.  That's similar to the critique that you're lodging against Professor Feinstein here.  Right?
A   It's similar to --                               1:10:07PM
MS. KOFKE:  Objection to form.
THE WITNESS:  Yeah.  It's similar to one of the critiques that I make in my report in this case.
BY MR. JANOSKI:
Q   Okay.  And the next one in subparagraph c, you had  1:10:15PM

Page 91

critiqued plaintiffs' expert in this Intuitive case   1:10:21PM about not providing a methodology to disentangle the effect of confounding information.  Right?
A   That appears to be one of the critiques here, yes.
Q   Okay.  That's similar to one of the critiques that  1:10:35PM you have of Professor Feinstein's methodology in this case.  Right?
MS. KOFKE:  Objection to form.
THE WITNESS:  That's true.
BY MR. JANOSKI:                                       1:10:45PM
Q   Now, the Court in this Intuitive Surgical Securities Litigation ultimately certified the class of proposed investors.  Right?
A   I don't have a fresh recollection, but I think that's correct.                                        1:11:08PM
Q   Okay.  Do you recall that the Court in this case also rejected the Comcast challenge that the defendants had offered?
MS. KOFKE:  Objection to form.  Calls for a legal analysis.                                        1:11:19PM
THE WITNESS:  Yeah.  I don't recall either way.
(Plaintiff's Exhibit 11 marked for identification.)
MR. JANOSKI:
Q   Mr. Lehn, if you refresh Exhibit Share, you should  1:11:54PM

Page 92

be able to see what's been introduced as Plaintiff's  1:11:56PM Exhibit 11.
A   Okay.
Q   For the record, Plaintiff's Exhibit 11 is a Westlaw printout of the class certification decision in   1:12:08PM the Intuitive Surgical Securities Litigation.
A   Okay.
Q   And, just looking at the cover page here, it shows that the Court ultimately certified the plaintiff class in this case.  Right?                                  1:12:25PM
A   Based on the header that says, "Order Certifying Plaintiff Class," I would presume that to be the case.
Q   And if you go to page 13 of the PDF, do you see the subsection titled "Damages Methodology"?
A   Scrolling down.  I do.  Yes.                      1:12:48PM
Q   Okay.  And do you see -- I guess it's the third paragraph of that section, where it says "Plaintiffs state that they will use the 'out-of-pocket' methodology, which is the standard approach used for calculating damages in Section 10(b) securities cases."  1:13:14PM Do you see that?
A   I do.  Yes.
Q   And Professor Feinstein has proposed using that out-of-pocket damages methodology as well.  Right?
MS. KOFKE:  Objection to form.                   1:13:27PM

Page 93

24 (Pages 90 - 93)

THE WITNESS:  I believe for the 10(b) claims, 1:13:28PM yes.  I don't think for the 20A claim.

BY MR. JANOSKI:

Q   Okay.  Would you agree that the out-of-pocket damage methodology for 10(b) claims is the standard 1:13:35PM approach used in these type of cases?

MS. KOFKE:  Objection.  Form.

THE WITNESS:  Again, I'm not a legal scholar.  So when you say "the standard," I can't really opine from a legal perspective; but as a matter of economics, 1:13:46PM that's been my experience, yes.

BY MR. JANOSKI:

Q   Okay.  Would you agree with the Court's finding here that says "This method is widely considered an accepted method for the evaluation of materiality 1:13:57PM damages to a class of stockholders in a defendant corporation"?

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah.  When he says "widely considered," I don't know if it's referring to 1:14:22PM considered by courts, in which case I don't have an opinion, or...

BY MR. JANOSKI:

Q   What about among financial experts?  Would you -- would you agree that it's considered an accepted method 1:14:34PM

Page 94

for measuring damages? 1:14:37PM

MS. KOFKE:  Objection to form.

THE WITNESS:  And, again, I'm always a little cautious, sir.  I see the adjective "materiality damages," as opposed to just "damages," so I don't know 1:14:52PM if the adjective "materiality" complicates what I would just have referred to as the evaluation of damages, so I just don't know.

BY MR. JANOSKI:

Q   Well, setting aside the specific quote here, would 1:15:06PM you just agree that the out-of-pocket methodology is an accepted method for measuring damages in these type of cases?

MS. KOFKE:  Objection to form.

THE WITNESS:  And when you say "accepted," 1:15:19PM again, accepted by whom?

BY MR. JANOSKI:

Q   Again -- well, the Court here is saying that it's widely accepted.  You -- I think your follow-up question was whether 1:15:27PM or not -- you weren't aware whether it was accepted in the legal community.  My question is:  Among financial experts, would you agree that out-of-pocket damages is considered an accepted method for measuring damages this these type 1:15:39PM

Page 95

of cases? 1:15:42PM

MS. KOFKE:  Objection to form.

THE WITNESS:  And when you say "in these types of cases," what are you referring to?

MR. JANOSKI:  I'm referring to Section 10(b) 1:15:49PM cases.

THE WITNESS:  Yes.  Okay.  I would agree generally with that.

MS. KOFKE:  Objection to form.

BY MR. JANOSKI: 1:15:56PM

Q   And, again, as you're sitting here today, can you recall anything specific about the plaintiffs' proposed damages methodology in this case that is distinguishable from what Professor Feinstein has proposed? 1:16:05PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, again, this was seven years ago.  And I suspect there are different complexities in this matter than there were in that matter, but I just don't recall as I sit here. 1:16:15PM

MR. JANOSKI:  Okay.  That's fine.

(Plaintiff's Exhibit 12 marked for identification.)

BY MR. JANOSKI:

Q   Mr. Lehn, if you refresh Exhibit Share, you should be able to see what's been marked as Plaintiff's 1:16:48PM

Page 96

Exhibit 12. 1:16:51PM

A   Okay.

Q   Okay.  And Plaintiff's Exhibit 12 is an Expert Report dated September 30th, 2015 that you submitted in the Thorpe v. Walter Investment Management litigation. 1:17:06PM Right?

A   Again, I only see the cover page, but I assume the rest of the report lies behind it.

Q   Okay.  If you scroll to the very last page, do you see the signature there at the end? 1:17:23PM

A   I do.

Q   And this case is another securities fraud class action.  Right?

A   I believe so, if I can just refresh my recollection here. 1:17:39PM

Q   Yes.

A   Yes, it -- yes, it is.  Yeah.

Q   And this is another report that you submitted in connection with the defendants' opposition to class certification.  Right? 1:17:52PM

A   I believe that's correct.

Q   Okay.  If you look at page 6, paragraph 12, it looks like the plaintiffs in this matter had engaged an expert, Dr. Zachary Nye, to offer an opinion on the price impact, and whether damages could be measured in 1:18:15PM

Page 97

25 (Pages 94 - 97)

**Page 98**

a method that is common to the class. Do you see that?  1:18:20PM

A   I do. Yeah.

Q   Okay. And if you look at paragraph 14, you give a little more summary of Dr. Nye's damages opinion. Do you see that?  1:18:44PM

A   Yes, I do.

Q   Okay. And the plaintiffs had offered a methodology that would measure price inflation by the change in the securities price caused by corrective disclosure or materialization of a concealed risk.  1:19:10PM Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  That appears to be the case; at least, that's what Dr. Nye is saying.

BY MR. JANOSKI:  1:19:24PM

Q   Okay. And, as you sit here today, do you recall anything unique about Dr. Nye's proposed damages methodology that distinguishes it from what Professor Feinstein has proposed here in this case?

MS. KOFKE:  Objection to form.  1:19:38PM

THE WITNESS:  I don't recall what Dr. Nye had proposed, so I don't have an opinion on that either way.

BY MR. JANOSKI:

Q   If you look at paragraph 15, it looks like you  1:19:47PM

**Page 99**

were retained to respond to both Dr. Nye's price impact  1:19:50PM opinion, and his proposed damages methodology. Right?

A   That appears to be the case, yes.

Q   Okay. And if you go to page 11 of this report, do you see the bullet point that summarizes your  1:20:08PM conclusions regarding Dr. Nye's proposed damages methodology?

A   I do, yes.

Q   Okay. And the second subpoint there points to -- you claim that Dr. Nye's proposed methodology does not  1:20:29PM isolate the effects of the specific alleged misstatements. Do you see that?

A   I do.

Q   And that was one of the same critiques you had lodged against plaintiffs in the Intuitive Securities  1:20:41PM case. Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I don't want to go as far as to say "same." It's similar, and...

BY MR. JANOSKI:  1:20:52PM

Q   Well, that's fair. And it's a similar critique that you have lodged against Professor Feinstein here. Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  At a high level it's similar,  1:21:01PM

**Page 100**

yes.  1:21:02PM

BY MR. JANOSKI:

Q   Okay. And then the subpoint iii, you also criticized Dr. Nye for failing -- or for not offering reliable basis to conclude whether the effect of  1:21:15PM misrepresentations was the same during the end of the Class Period as during earlier parts. Do you see that?

A   I'm sorry. Let me just -- here.

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm sorry. Can you repeat  1:21:33PM that?

BY MR. JANOSKI:

Q   Yeah. So the subpoint iii that goes from page 11 to page 12 --

A   Yeah.  1:21:40PM

Q   -- it looks like in this case, you had criticized the plaintiffs' expert's damage methodology for not being able to account for the effect that the alleged misrepresentation had at the start of Class Period versus later on in the Class Period. Is that right?  1:21:55PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah. I mean, I think it speaks for itself; that he's provided -- I was claiming that Dr. Nye provided no reliable basis to conclude that the effect of the alleged misrepresentations at  1:22:18PM

**Page 101**

the start of the Class Period was the same as the  1:22:23PM effect of the alleged corrective disclosure, including the one at the end of the Class Period.

BY MR. JANOSKI:

Q   Okay. Isn't that somewhat similar to the critique  1:22:34PM you're offering of Professor Feinstein here of failing to account for the change in value of Cordis over the course of the Class Period?

MS. KOFKE:  Objection to form.

THE WITNESS:  No. It's a different issue  1:22:47PM because it's looking at the number of loans that were being serviced and how that change over the period, but -- so it's a very, very different issue; but you know, similar in some sense.

BY MR. JANOSKI:  1:22:59PM

Q   Okay. Similar in that you claim he's failing to account for what I would term "time-varying inflation," if you understand that term?

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah. I'd prefer -- I wouldn't  1:23:11PM phrase it the way you did, so I'm not necessarily buying into the way you articulated it; but obviously, one of my critiques of what Professor Feinstein has proposed is that he didn't take into account the possibility that the value of information about Cordis  1:23:28PM

26 (Pages 98 - 101)

changed over the Class Period. 1:23:32PM

BY MR. JANOSKI:

Q It's not listed here in your summary of opinions, but if you go to page 33 of this report, paragraph 51, do you see that, under item (3) there, you also had 1:23:51PM criticized the plaintiffs' expert for not providing a methodology that could disentangle the effects of confounding information? Do you see that?

MS. KOFKE: Objection to form.

THE WITNESS: You're referring to the third 1:24:08PM point, three lines from the bottom?

BY MR. JANOSKI:

Q Yes.

A Correct.

Q That's a similar critique to what you had lodged 1:24:17PM against the plaintiffs in the Intuitive Surgical Securities Litigation. Right?

MS. KOFKE: Objection to form.

THE WITNESS: Yeah. Every case is different; but in a high-level sense it's similar, correct. 1:24:29PM

BY MR. JANOSKI:

Q. Okay. And, in a high-level sense, it's similar to the critique that you're lodging against Professor Feinstein in this case. Right?

MS. KOFKE: Objection to form. 1:24:40PM

Page 102

THE WITNESS: To one of the critiques, 1:24:43PM correct.

BY MR. JANOSKI:

Q Okay. Now, the Court in this Thorpe v. Walter Investment Management securities litigation ultimately 1:24:50PM certified the class of proposed investors. Right?

A I don't recall.

MR. JANOSKI: Okay. Well, why don't we look at the exhibit itself? If you refresh Exhibit Share, you should be able to see what's been marked as 1:25:05PM Plaintiff's Exhibit 13.

(Plaintiff's Exhibit 13 marked for identification.)

BY MR. JANOSKI:

Q For the record, Plaintiff's Exhibit 13 is a Westlaw printout of the Court decision and class 1:25:20PM certification in Thorpe v. Walter Investment Management.

Sir, do you know if you have reviewed this Court decision before?

A It's possible. I don't recall that I have. 1:25:37PM

Q Is it your practice to review Court opinions of cases that you have worked on?

A Not necessarily.

Q Okay. If you look at the bottom of page 1, right before the section on background, do you see where it 1:25:54PM

Page 103

says that the Court has granted the plaintiffs' motion 1:25:56PM for class certification?

A Yes. I see "Plaintiffs' Motion is granted," so I presume it's a motion to certify the class.

Q Yeah. And that's what? 1:26:11PM

THE VIDEOGRAPHER: Counsel, I'm sorry to interrupt.

Professor, if I could have you tilt down your camera, because critical answers are not being captured by the video. 1:26:21PM

THE WITNESS: Okay. Is that better?

THE VIDEOGRAPHER: As a reminder, you can always zoom in on the document. Thank you.

THE WITNESS: Okay.

BY MR. JANOSKI: 1:26:30PM

Q And do you see that the Order begins stating that, "THE CAUSE is before the Court on Plaintiffs' Motion for Class Certification..."?

A I do.

Q So is it fair to say that this is an Order 1:26:40PM granting Plaintiffs' Motion for Class Certification?

A It appears to be, yes.

Q Okay. If you go to page 15 of the PDF, there is a section titled "G. Calculation of Damages." Do you see that? 1:26:56PM

Page 104

A Scrolling down. Excuse me. But almost there. 1:27:00PM Page 15?

Q Yes. Do you see --

A Mine is page 13, it says, on the bottom, but I'm assuming that's what you're referring to. 1:27:20PM

Q There's a page -- sorry. Yes, it is page 13. Sorry. That is from my printout, but yes. So page 13 is where -- do you see the section says "Calculation of Damages"?

A I do. 1:27:47PM

Q Okay. And if you go on to the next page, page 14, do you see there's an overview of the plaintiffs' theory of liability, first full paragraph there?

A Yes, I do.

Q Okay. And in this case, the plaintiffs' theory of 1:28:01PM liability was that defendants had made misstatements that artificially maintained the stock price; and when the truth was later revealed through corrective disclosures, the inflation was removed from the stock price. Do you see that? 1:28:16PM

A Where specifically, sir? I'm sorry. I'm behind you.

Q Yeah. The -- we're on page 14, the first full paragraph, discussing plaintiffs' theory of liability.

A Correct. 1:28:29PM

Page 105

27 (Pages 102 - 105)

Q   And you saw that in this case, the plaintiffs'   1:28:30PM theory of liability was that the defendant made public misstatements that artificially maintained the stock price.  Right?

A   Correct.   1:28:38PM

Q   And that inflation was removed from the stock price when the truth was later revealed through corrective disclosures.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS: Correct.   1:28:49PM

BY MR. JANOSKI:

Q   And that's similar to the theory of liability that's at issue in this case.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I think that requires a legal   1:28:59PM judgment.  And it's been a while since I've reviewed the Walter case, so, you know, I -- I think that I'm not in a position to answer that as I sit here.

BY MR. JANOSKI:

Q   Okay.  As you sit here today, can you identify any   1:29:14PM differences in the theory of liability that the plaintiffs had there from the theory of liability in this case?

MS. KOFKE:  Objection to form.

THE WITNESS:  No, I can't identify   1:29:28PM

Page 106

differences or similarities as I sit here today.   1:29:29PM

BY MR. JANOSKI:

Q   Okay.  And if you look at the following paragraph that's quoting the plaintiffs' expert, do you see that?

A   I do.   1:29:41PM

Q   Do you see that the -- at the bottom paragraph, the plaintiffs' expert proposed estimating the amount of inflation using the abnormal returns on response to alleged corrective disclosure dates?

A   If I could just read the full paragraph.  Sorry.   1:29:57PM

Q   Yeah.

A   I do see that.  Correct.

Q   Okay.  And the plaintiffs had proposed using the abnormal returns on the alleged corrective disclosure dates, and adjusting for any confounding news.  Right?   1:30:18PM

THE WITNESS:  That's what the words say.

MS. KOFKE:  Objection to form.

BY MR. JANOSKI:

Q   And isn't that similar to the damages framework that Professor Feinstein has proposed here?   1:30:28PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I'd have to go back and review what Professor Nye had proposed in this case before I can say whether it's similar or dissimilar from Professor Feinstein.   1:30:40PM

Page 107

BY MR. JANOSKI:   1:30:42PM

Q   But as you sit here today, can you recall anything distinguishable about Dr. Nye's proposed damage methodology and what Professor Feinstein has proposed here?   1:30:53PM

MS. KOFKE:  Objection to form.

THE WITNESS:  And, again, I can't recall anything that is similar or anything that is different.  I also can't recall whether the complexities in this case are different from the complexities of the   1:31:03PM Walter case, which, you know, likely is the case.

BY MR. JANOSKI:

Q   And if you look at the following paragraph, the Court concluded that the plaintiffs' damage model was consonant with a theory of liability.  Right?   1:31:18PM

A   That's what it says.

Q   Okay.  And the Court also held that to the extent defendants argue that confounding information will be difficult to disaggregate, plaintiffs are not required to prove loss causation at the class-certification   1:31:32PM stage.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  That's what it says.  Correct.

BY MR. JANOSKI:

Q   Do you agree with that statement by the Court?   1:31:41PM

Page 108

MS. KOFKE:  Objection to form.   1:31:44PM

THE WITNESS:  I think that requires a legal opinion.  And I'm not a lawyer.  I don't have expertise to provide such an opinion.

BY MR. JANOSKI:   1:31:51PM

Q   Okay.  So you have no opinion one way or another as to whether you agree with the Court's statement that confounding issues can be dealt with at the loss-causation stage?

MS. KOFKE:  Objection to form.   1:32:03PM

THE WITNESS:  Well, I'm not -- what I'm reading is the statement "Plaintiffs are not required to prove loss causation at the class-certification stage..."

BY MR. JANOSKI:   1:32:13PM

Q   Yeah.  And that's in response to defendants' argument that confounding information would be difficult to disaggregate.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I'd have to go and see what it   1:32:21PM was in response to.

BY MR. JANOSKI:

Q   Okay.  Well, you see that sentence where it says "To the extent that Defendants argue that confounding information would be difficult to disaggregate from the   1:32:30PM

Page 109

28 (Pages 106 - 109)

impact of the alleged corrective disclosures, 1:32:32PM Plaintiffs are not required to prove loss causation at the class-certification stage, and 'nothing in Comcast requires an expert to perform his analysis at the class-certification stage.'" 1:32:43PM

(As read.)

Do you see that sentence right there?

A Right, with one correction. I think you said "disaggregate." I think that this statement says "desegregate." 1:32:50PM

Q It does say "desegregate." I think the Court likely had a typo there.

But -- but you do see that sentence. Right, sir?

A I see the sentence. Correct.

Q Okay. And you have no opinion one way or another 1:33:03PM as to whether this -- this statement is accurate?

MS. KOFKE: Objection to form.

THE WITNESS: When you say "accurate," meaning from a legal perspective?

BY MR. JANOSKI: 1:33:18PM

Q. Would you agree that this is -- that plaintiffs are not required to prove loss causation at the class-certification stage?

MS. KOFKE: Objection to form.

THE WITNESS: That requires a -- a legal 1:33:27PM

Page 110

opinion, as -- you know. So I can't opine on the law 1:33:30PM here, but what I can say from a perspective of an economist -- so I'm not making a legal -- I'm not offering a legal opinion here, but where it says "nothing in Comcast requires an expert to perform his 1:33:47PM analyses at the class-certification stage," just to clarify, it's certainly not my position that Professor Feinstein should be performing the analyses at this point; but based on my assignment and my understanding of what he is asked to do, he hasn't 1:34:09PM proposed a methodology that, in my opinion, provides confidence that he can reliably do the analysis that will be necessary for estimating damages.

So I would just, as a pure matter of the economics, distinguish the analyses at this stage from 1:34:33PM proposing a methodology that would allow one to do the analysis.

MR. JANOSKI: I'll move to strike everything beyond "the analyses at this point" as nonresponsive?

MS. KOFKE: Objection. We oppose the motion. 1:34:50PM

MR. JANOSKI: Noted.

Q. Again, but in this case, based on what the Court is saying here and on your Expert Report, the defendants were arguing that confounding information would make the damages analysis difficult. Right? 1:35:03PM

Page 111

MS. KOFKE: Objection to form. 1:35:07PM

THE WITNESS: Again, I don't have a fresh recollection, other than what I'm reading in this paragraph. And based on what I'm reading, that would appear to be the case. 1:35:17PM

BY MR. JANOSKI:

Q Okay. And, again, as you sit here today, you can't recall any differences between the methodology that Dr. Nye proposed and what Professor Feinstein is proposing here? 1:35:28PM

MS. KOFKE: Asked and answered.

THE WITNESS: Yeah. I can't recall either similarities or differences, because I simply don't recall what Dr. Nye was proposing.

MR. JANOSKI: Okay. We've been going for 1:35:43PM about another hour. I don't know if you want another break. Is this a good transition?

MS. KOFKE: I think that works. Dr. Lehn, does that work for you?

THE WITNESS: Sure. That sounds great. 1:35:50PM

MS. KOFKE: You want to take a little bit longer, Marco?

MR. JANOSKI: I know it's later over there on the East Coast.

MS. KOFKE: We don't need a full lunch break, 1:35:59PM

Page 112

but maybe 20 minutes? 1:36:02PM

MR. JANOSKI: That's fine. Okay.

THE WITNESS: Okay. Good.

THE VIDEOGRAPHER: Thank you. Stand by, everyone, please. This marks the end of Media 1:36:07PM Number 2. Going off the record at 1:36 p.m. Eastern.

(Recess taken from 1:36 p.m. until 1:59 p.m.)

THE VIDEOGRAPHER: We are back on the record at 1:59 p.m. Eastern, and this marks the beginning of Media Number 3 of the deposition of 1:59:25PM Professor Kenneth Lehn.

Please proceed, counsel.

BY MR. JANOSKI:

Q Welcome back, Professor Lehn. You understand that you're still under oath? 1:59:34PM

A I do.

Q Did you review any documents during the break just now?

A I did not.

Q Did you discuss with the substance of your 1:59:40PM testimony with anybody during the break?

MS. KOFKE: Objection on the basis of the stipulation and order concerning expert discovery, to the extent you're seeking information about a communication between Dr. Lehn and counsel. 1:59:50PM

Page 113

29 (Pages 110 - 113)

BY MR. JANOSKI: 1:59:53PM

Q Can you answer that question without revealing any communications with counsel -- the substance of any communications with counsel?

THE WITNESS: I don't believe I did, no. 2:00:03PM

BY MR. JANOSKI:

Q Turning back to your Expert Report, which is Plaintiffs' Exhibit 9, on page 5 we have the Background section here. Do you see that?

A I do. 2:00:17PM

Q And in Subsection A you give a brief overview of plaintiffs' allegations. Right?

A Correct.

Q Okay. In paragraph 8 you identify the two corrective disclosures that the plaintiffs allege in 2:00:32PM this case. Do you see that?

A I do. Yes.

Q So you're aware that plaintiffs allege that the earnings releases in August 2017 and May 2018 are corrective disclosure in this case? 2:00:44PM

A That's my understanding. Correct.

Q Okay. What is your understanding of plaintiffs' theory of liability for loss causation and damages for these corrective disclosures?

MS. KOFKE: Objection to form. 2:00:58PM

Page 114

THE WITNESS: Well, my understanding is that 2:00:59PM plaintiffs are alleging that the defendant's misrepresented information concerning its acquisition of Cordis in 2015.

And a little more specifically, my understanding 2:01:12PM is that they're alleging that they've misrepresented information with respect to the due diligence that they performed. They said that they had not provided adequate due diligence, according to plaintiffs.

They -- they claimed that they -- they incorrectly 2:01:29PM said that they would apply their supply-chain expertise and inventory expertise to Cordis' management of inventory, which allegedly would cause sales growth in Cordis, and improve the efficiency with which it managed its inventory. 2:01:51PM

I think they further alleged that it was misrepresented that the acquisition would result in accretion of earnings of 20 cents a share by the end of 2017, and that it would become increasingly accretive beyond that year. 2:02:08PM

I think it was further alleged that management or defendants misrepresented that there would be $100 million of annual synergies by the end of fiscal year 2018.

I think plaintiffs alleged that defendants 2:02:20PM

Page 115

misrepresented that Cordis would be a major growth 2:02:23PM driver of -- of Cardinal.

And then, following the acquisition, I think it's alleged by plaintiff that defendants misrepresented that the integration of Cordis was "on track," and that 2:02:35PM Cordis was performing well, and as it was expected to perform.

BY MR. JANOSKI:

Q And aside from the theory of liability with respect to the alleged misstatements, for the two 2:02:49PM corrective disclosures, do you have an understanding as to what plaintiffs' theory of loss is?

MS. KOFKE: Objection to form.

THE WITNESS: When you say "theory of loss," you mean what was the particular alleged corrective 2:03:02PM disclosure?

BY MR. JANOSKI:

Q Or what was the harm suffered by plaintiffs? Do you know -- do you understand what the theory of liability is with respect to that? 2:03:10PM

A Well, if I understand your question correctly, I -- I think what plaintiffs are alleging is on the two alleged corrective disclosures dates, the so-called "truth" about the alleged misrepresentations was revealed to the market, and there was an associated 2:03:24PM

Page 116

decline in Cardinal's stock price, and that's the 2:03:27PM source of the loss suffered by investors.

Q Is it your opinion that Dr. Feinstein's -- Professor Feinstein's methodology doesn't fit with plaintiffs' theory of liability here? 2:03:42PM

MS. KOFKE: Objection to form.

THE WITNESS: Well, I think that's -- I don't want to say it doesn't fit. What I would -- what I would say is that he's not proposed a methodology that, in my opinion, would result in an estimate of reliable 2:03:58PM damages that are consistent with plaintiffs' theory of liability.

BY MR. JANOSKI:

Q And we got into this a little bit before. Just taking -- taking out the reliability aspect -- I 2:04:09PM understand you have the critiques that you claim he doesn't address the potential complexities that could arise in this case; but just with respect to how his model matches plaintiffs' theory of liability, do you think there's a disconnect there? 2:04:26PM

MS. KOFKE: Objection to form.

THE WITNESS: When you -- well, I don't know what you mean by "disconnect."

What I'm saying is that he's not proposed a methodology that would result in a reliable estimate of 2:04:38PM

Page 117

30 (Pages 114 - 117)

damages that is consistent with plaintiffs' theory of 2:04:43PM
liability.

BY MR. JANOSKI:

Q Okay. If -- if plaintiffs' theory of liability is that they were harmed when artificial inflation left 2:04:52PM the stock on the two corrective disclosure dates, and Professor Feinstein proposes measuring damage from those two artificial disclosure dates, in what sense would his model not fit with plaintiffs' theory of liability? 2:05:08PM

MS. KOFKE: Objection to form.

THE WITNESS: Well, in any number of ways. It would not provide a reliable estimate of damages that is consistent with plaintiffs' liability. And, in my view, you can't separate the two; that, you 2:05:22PM know, there are the complicating factors that I summarize in my report. We've talked about some of them. And they're highly relevant to plaintiffs' theory of liability in this case.

And Mr. Feinstein has ignored them, let alone 2:05:37PM proposed a methodology to address them.

BY MR. JANOSKI:

Q Well, let's talk about some of those. For example, confounding information. Assume -- assume that Professor Feinstein, in conducting his damage 2:05:51PM

Page 118

analysis, reliably disaggregates confounding 2:05:54PM information. Would you agree, then, that his model would fit the plaintiffs' theory of liability?

MS. KOFKE: Objection to form.

THE WITNESS: But again, my understanding is 2:06:09PM that he is to provide a methodology that would result in a reliable estimate of damages, consistent with plaintiffs' theory of liability. And one part of that is acknowledging -- not only acknowledging that there's confounding information, but proposing a methodology 2:06:25PM that would address the confounding information, which he's not done.

So you're asking me: Would he result in -- would his methodology result in damages consistent with plaintiffs' theory of liability? 2:06:43PM

It would not. He's given no assurance that he can reliably estimate those damages that are consistent with plaintiffs' theory of liability.

BY MR. JANOSKI:

Q Okay. Is it fair to say that your primary 2:06:53PM critique is just the reliability of the model, then; not the way the model is structured itself?

MS. KOFKE: Objection to form.

THE WITNESS: Well, no. It's a couple of things. 2:07:06PM

Page 119

One is he is supposed to, as I understand it, 2:07:07PM provide a methodology; a damages methodology that can be applied on a classwide basis to reliably measure damages in a manner consistent with plaintiffs' theory of liability. 2:07:23PM

In order to do that, there are a number of issues in this case that will become an inherent part of a damages analysis. And he's not acknowledged most of these complexities. And he certainly hasn't proposed a methodology that will address those complexities. 2:07:39PM

BY MR. JANOSKI:

Q Let's say professor Feinstein addresses the complexities that you raised to your satisfaction, whatever level that may be.

Are you -- are you saying that the model of 2:07:57PM constructing an inflation ribbon backwards from the corrective disclosure date's inconsistent with plaintiffs' theory of liability?

MS. KOFKE: Objection to form.

THE WITNESS: Until he sets forth what his 2:08:09PM methodology is, it's, again, impossible to say, because the methodology he uses, for example, to deal with the issue of confounding information or the methodology he uses to deal with the issue of the materialization of known versus unknown risks may or may not be consistent 2:08:29PM

Page 120

with plaintiffs' theory of liability. That's the whole 2:08:33PM point: He hasn't described a methodology that would allow one to make that judgment.

BY MR. JANOSKI:

Q Doesn't that go to -- aren't those issues that you 2:08:42PM raised just go to what the proper measure of damages is? How is it that it's inconsistent with the theory of liability?

A Because the methodology itself is an attempt to estimate damages that are to be tied to the plaintiffs' 2:08:57PM theory of liability.

And insofar that that methodology either overstates damages or it could understate damages, then you're now measuring damages in a way that's not consistent with plaintiffs' theory of liability. 2:09:12PM

Q Okay. You would agree that ultimately in this case, though, it's up to the jury to determine which and what facts are -- sorry -- which and one statements are false or misleading. Right?

A Again, I'm not a legal scholar. 2:09:27PM

MS. KOFKE: Objection to form.

THE WITNESS: I would say the Court. I don't know whether it's the jury or the Judge, but -- but my understanding is that would be left for the Court to determine. 2:09:39PM

Page 121

31 (Pages 118 - 121)

BY MR. JANOSKI:   2:09:40PM

Q  Okay. And it would also be up to the Court and the jury to determine whether or not the alleged misstatements were a substantial factor in causing plaintiffs' loss. Right?   2:09:48PM

A  I would presume that to be the case. Correct.

Q  Would you agree, then, that in this type of case, a damage methodology is meant to be used in conjunction with those liability findings?

MS. KOFKE: Objection to form.   2:10:02PM

THE WITNESS: When you say "in conjunction," I'm not sure exactly what you mean.

BY MR. JANOSKI:

Q  Well, any damages model would ultimately be limited by either the Court's or the jury's finding on   2:10:12PM liability. Right?

MS. KOFKE: Objection to form.

THE WITNESS: Right. But the damages should measure the economic loss associated with the -- the alleged or, if it turned out the jury said there was   2:10:28PM wrongdoing, to the wrongdoing, and so it has to be tethered to the liabilities.

BY MR. JANOSKI:

Q  In what sense do you think it needs to be tethered?   2:10:43PM

Page 122

A  Well, my understanding -- again, I'm not offering   2:10:46PM a legal opinion; but as a matter of economics, loss causation should measure the loss that plaintiffs suffered because of the alleged wrongdoing by the defendants. We have to identify what is that alleged   2:11:00PM or actual wrongdoing.

And then the damages model should measure the loss that was incurred by plaintiff because of that wrongdoing.

Q  But you would agree that it's ultimately up to the   2:11:12PM Court or the jury to determine whether or not an alleged misstatement was the cause or substantial cause of the plaintiffs' loss. Right?

A  I mean, again, I'm not a lawyer; but that would be my understanding; that ultimately it would be a courts   2:11:31PM decision.

Q  Going back to your report this Subsection B, this section is meant to give an overview of Professor Feinstein's proposed damages methodology. Right?   2:11:44PM

A  Correct.

Q  And in paragraph 10 you write that Professor Feinstein proposes using an out-of-pocket damages methodology. Do you see that?

A  I do.   2:11:54PM

Page 123

Q  Okay. And I think we've talked about this before,   2:11:55PM but would you agree that this methodology is the standard method used to calculate damage in Section 10(b) cases?

MS. KOFKE: Objection to form.   2:12:05PM

THE WITNESS: At a high level, that's been my -- my general experience. Correct.

BY MR. JANOSKI:

Q  There's also a quote in here going on to page 7, where Professor Feinstein states that "...economic   2:12:15PM analyses, including valuation and empirical event study analyses, can be used to estimate the relationship between specific statements or sets of statements and the subsequent effect on prices..." Do you see that?

A  I do.   2:12:30PM

Q  Do you agree with that statement, that valuation and empirical event study analysis can be used to study that relationship?

MS. KOFKE: Objection to form.

THE WITNESS: I would phrase it differently.   2:12:44PM I -- first of all, I -- I think it's vague to refer to "economic analyses, including valuation and empirical event study analyses." You know, in this context, perhaps it would be okay, but he doesn't go on to describe what specifically he's referring to here.   2:13:04PM

Page 124

And then I would further say that -- I would   2:13:09PM qualify it by saying that it may or may not be capable of estimating a reliable relationship between statements and subsequent effect on prices.

BY MR. JANOSKI:   2:13:25PM

Q  Wasn't much of your -- I think we saw in one those prior reports you submitted that much of your work at the SEC was conducting event study analysis to examine the relationship between stock prices and certain pieces of information. Is that right?   2:13:39PM

MS. KOFKE: Objection to form.

THE WITNESS: Some of the work was, correct.

BY MR. JANOSKI:

Q  Okay. Do you think you were able to reliably estimate the impact that certain pieces of information   2:13:55PM had on stock price while you were at the SEC?

MS. KOFKE: Objection to form.

THE WITNESS: In -- in some cases, yes; and in some cases, no.

I mean, we worked closely with the Division of   2:14:07PM Enforcement at the SEC. And most of the event study analysis that was used was intended to test whether information was material. And there were many instances where we would conduct event study analysis, and provide information to the Enforcement Division   2:14:24PM

Page 125

32 (Pages 122 - 125)

that, you know, we thought it would -- would ultimately 2:14:28PM show that certain information was material.

But there were other cases where we were unable to show that, and we felt event study analysis did not support the opinion that information was material. 2:14:41PM

So it's all fact specific.

BY MR. JANOSKI:

Q   In paragraph 11 here you summarize Professor Feinstein's statement that he intends to construct an inflation ribbon to measure artificial 2:14:56PM inflation that's caused by the alleged misstatements and omissions in this case.  Do you see that?

A   You're referring to the second sentence?

Q   Yes.

A   Okay.  Yes, I do see that. 2:15:07PM

Q   Have you ever constructed an inflation ribbon before?

A   I believe so.  I can't recall specifically as I sit here, but I believe I have.

Q   Okay.  Do you recall how you would have gone about 2:15:35PM doing that?

A   I do not.

Q   Do you disagree with Professor Feinstein's statement here that inflation ribbons are often constructed by working backward from the final 2:15:48PM

Page 126

corrective disclosure? 2:15:51PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah.  I think -- I mean, I don't disagree with the fact that inflation ribbons in litigation often are constructed in such a way, but 2:16:26PM that doesn't necessarily mean that it provides a reliable estimate of inflation, and certainly not unless additional work is done.

So I think that statement is probably reasonably accurate, but it doesn't speak to, you know, the facts 2:16:45PM in a particular case that would require more than just so-called "back casting" the stock-price drop at the end in order to construct an inflation ribbon.

BY MR. JANOSKI:

Q   Okay.  And -- and the "more" that you're 2:17:01PM discussing is the additional work that would be done to address the complexities that you identify.  Right?

A   That, correct.

But the other issue pertains to our previous discussion that, in the case of alleged affirmative 2:17:18PM misstatements, one need not look at the stock-price drop at the end.  One can also conduct an event study on the days that the alleged affirmative misstatements were -- were made.

Q   Go on to the next section of your report that 2:17:38PM

Page 127

starts on page 8, on Company Background.  Here you give 2:17:40PM just some select information on Cardinal and Cordis and the Cordis acquisition.  Right?

A   Correct.

Q   Okay.  This is a lot of the data that you had 2:17:52PM Compass Lexicon help pull.  Right?

A   That's correct.

Q   Okay.  If you go to paragraph 16, you write that "...Cordis accounted for a small percentage of the Company's overall revenue and earnings..."  Do you see 2:18:08PM that?

A   I do.

Q   Did you do any analysis to see how Cordis was expected to contribute to margin growth?

A   I did not.  No. 2:18:18PM

Q   Okay.  So you don't have an opinion one way or another as to whether the Cordis acquisition was important for improving margins?

A   Correct.

Q   Okay.  Did you look at analysts' reports 2:18:29PM surrounding the disclosure of the Cordis transaction?

A   I did, yes.

Q   Okay.  Do you recall whether analysts generally looked at the deal favorably or not?

A   I don't recall.  I know the market didn't react 2:18:48PM

Page 128

much.  The stock price of Cardinal didn't change; 2:18:51PM certainly not in a statistically significant way.

MR. JANOSKI:  Well, let's -- let's look at when... Let's see.  If you -- if you refresh the Marked Exhibits folder, you should be able to see what 2:19:12PM has been previously marked as Plaintiff's Exhibit 1.

THE WITNESS:  Oh, let's see.  Actually, I don't see it yet.

BY MR. JANOSKI:

Q   Okay.  Because it's a previously marked exhibit, 2:19:35PM it --

A   Oh, I see it.

Q   Exhibit prefix -- it's prefixed 07_Previously Marked Exhibit 1.

A   Okay.  I think I have what you are asking me to 2:19:55PM look at.

Q   It's an analysts report from Leerink that was emailed to one of plaintiffs' investment managers.  Do you see this?

A   Yes.  Is it from David Larsen, at the top? 2:20:05PM

Q   Yes.  Correct.  Yeah.

A   Okay.  Great.

Q   Now, I note this Leerink report wasn't in your Materials Relied Upon.  Do you recall if you looked at this report in -- in initially forming your opinions 2:20:17PM

Page 129

33 (Pages 126 - 129)

for this case?                    2:20:21PM

A   I probably did. I mean, I can't swear to it, but I think it was included in the binders that I received from Compass Lexicon.

Q   Okay. And at least this particular Leerink   2:20:30PM analyst viewed the Cordis deal as a significant positive for the company. Right? That's what this headline says?

A   Yeah, based only on the headline. I haven't read the entire report here.            2:20:44PM

Q   Okay. And the headline also says they believe that it would help drive margins. Right?

A   Yeah. I can only look what the words say. It says "...Driving Towards 5.75 Percent Margin..." I don't see "Driving Towards" -- well, I see   2:20:59PM "Driving Towards," but -- but yeah, I can't go beyond what the words say.

Q   And do you recall generally from -- from your review whether other analysts viewed the deal favorably when it was first announced?            2:21:15PM

MS. KOFKE: Asked and answered.

THE WITNESS: I haven't done a systematic review with that in mind, so I don't recall.

BY MR. JANOSKI:

Q.  Okay. But you've said you've looked at the   2:21:24PM

Page 130

residual returns on the trading days that followed the   2:21:26PM initial leak of the acquisition until the official announcement. Right?

A   Correct.

Q   Okay. I think you -- at paragraph 16 it looks   2:21:34PM like you looked at the residual returns on the next trading day after the leak on February 23rd. Right?

A   Correct.

Q   And you also looked at the residual returns on March 2nd, when the deal was formally announced.   2:21:49PM Right?

A   That is correct. That's based, again, on the residual returns in the Feinstein report, Exhibit 8.

Q   Okay. Did you look at the movements in the Cardinal Health stock in the days between the leak and   2:22:05PM the official announcement?

A   I'm sorry. In the days during what period?

Q   In that -- in the time between the leak and the official announcement, did you do any analysis of Cardinal Health stock-price movements?            2:22:17PM

A   I did not.

Q   Okay. Are you aware that the price went up in that time period, generally?

A   I don't have a fresh recollection. But it's not only whether it went up, but did it   2:22:31PM

Page 131

increase by a statistically significant amount; and if   2:22:35PM it did, was there other information released during the period that might also explain that?

Q   Did you look to see whether there was any other information released on these two trading days that   2:22:49PM would have negatively affected the stock?

A   I did not, no.

Q   Okay. So you didn't look if there was any confounding information the opposite way on these trading days?            2:23:01PM

A   Correct.

Q   Okay. Paragraph 17 you write that "...the significance of Cordis to Cardinal Health changed throughout the Class Period." Do you see that?

A   Correct.            2:23:19PM

Q   And, again, in what ways do you think its significance changed?

A   Well, again, as we talked about previously, we know that Cardinal made additional acquisitions during this period, which can change the relative size of   2:23:32PM existing business units becoming a smaller part of the company as they make more acquisitions.

On the other hand, we know that a lot of the business units at Cardinal suffered declines in performance, especially in the pharma segment, during   2:23:48PM

Page 132

the Class Period. So the relative values of the other   2:23:53PM units were changing.

And, you know, as I indicated, you know, certainly based on my experience, you know, it's highly, highly unlikely that, you know, Cordis remained the same   2:24:03PM percentage of value for Cardinal throughout the entire three-year period, given all those changes.

And as I indicated, I think, previously, the market capitalization -- i.e., the market value of Cardinal's equity -- declined from roughly around   2:24:20PM $30 billion at the beginning of the Class Period, to $15 billion at the end of the Class Period. So it would be almost a miracle if Cardinal's [sic] relative value to Cardinal had not changed during that three-year period.            2:24:36PM

Q   In your opinion, would Cordis have become more important or less important to Cardinal over the course of the Class Period?

A   I don't know. It could be either way.

And that's the point, is that the value of   2:24:49PM information about Cordis to Cardinal -- and especially the implications of that value for Cardinal's stock price -- would be different at different times in the Class Period based on how significant Cordis was to Cardinal.            2:25:06PM

Page 133

34 (Pages 130 - 133)

And my point at this stage is not to affirmatively 2:25:08PM say one way or another, but simply to indicate that a reliable damages methodology would have to take that into account. And Professor Feinstein has not only ignored the issue, but he obviously has not set forth a 2:25:22PM methodology for how he plans to address that issue.

Q   So you yourself haven't done any quantitative analysis to determine whether Cordis became more or less important during the course of the Class Period. Right? 2:25:40PM

MS. KOFKE:  Objection to form.

THE WITNESS:  I haven't; but again, that's -- that would go beyond the scope of my assignment, which was to evaluate what Professor Feinstein has proposed.

And I'm simply pointing this out as an issue that 2:25:52PM he will have to address or plaintiffs' expert will have to address in order to come up with a reliable estimate of damages; and he's ignored it completely.

BY MR. JANOSKI:

Q.  In that same paragraph, paragraph 17, you write 2:26:07PM that "...the effect of Cordis-related disclosures on Cardinal Health's stock price likely would have changed over time." Right?

A   Correct.

Q   And you also write in the next sentence that 2:26:16PM

Page 134

"...the effect of a Cordis-related disclosure on 2:26:18PM Cardinal Health's stock price at the end of the Class Period could be higher or lower than it would have been earlier in the Class Period." Right?

A   Correct. 2:26:27PM

Q   So you haven't come to a definitive conclusion one way or the other on these issues. Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I -- I have not; but I have unambiguously flagged this as an issue that one would 2:26:37PM have to analyze in order to estimate damages in a reliable fashion, and Dr. Feinstein has ignored the issue completely.

BY MR. JANOSKI:

Q   Paragraph 18, you write about the performance of 2:26:52PM other Cardinal Health business units declining during the Class Period. Do you see that?

A   I do.

Q   And it's -- it's your opinion that the decline in other business units would change the relative value of 2:27:06PM Cordis to Cardinal Health during the Class Period. Is that right?

A   It -- it could very well, yes.

Q   Okay. The declines in the other business units -- wouldn't that get incorporated into the stock price 2:27:26PM

Page 135

when their performance was actually disclosed to the 2:27:28PM market?

A   Well, the information that was disclosed would be reflected in the stock price, correct, insofar as that the market for the stock was efficient. 2:27:39PM

Q   In paragraph 19 and 20 you describe certain disclosures that the company made regarding its pharmaceutical segment. Right?

A   Correct.

Q   And, again, if this information was publicly 2:27:54PM disclosed, one would expect that the effect of these disclosures would have gotten incorporated into the stock price. Right?

A   Right, on the assumption that the market for the stock was efficient. That's correct. 2:28:07PM

Q   Okay. And one of the main recurring issues that summarized in these paragraphs is generic pharmaceutical pricing. Right?

A   Correct.

Q   Are you aware of whether or not generic 2:28:20PM pharmaceutical pricing was an industrywide issue, as compared to a company-specific issue at this point in time?

A   I believe it was both an industry issue and a company issue. 2:28:33PM

Page 136

Q   Have you done any analysis to determine how much 2:28:38PM of that generic-pricing issue affected other pharmaceutical companies at this time?

A   No. And, again, I don't think that was necessary for the opinions that I express in my report. 2:28:49PM

(Reporter requested clarification.)

MR. JANOSKI:  No, just -- are you asking for my question?  I think I said "issue."

THE REPORTER:  Thank you.  I will clean that up. 2:29:20PM

BY MR. JANOSKI:

Q   In paragraph 21 here you describe certain disclosures that Cardinal Health made regarding difficulties related to the Cordis acquisition. Right?

A   Correct. 2:29:39PM

Q   And, again, at this point in time you haven't looked at any contemporaneous internal documents that reveal what the company was aware of at the time they made these disclosures. Right?

A   That is correct. 2:29:52PM

Q   Okay. So as you sit here today, you don't know one way or another whether or not these disclosures were truthful and fulsome at the time they were made. Right?

A   That is correct. 2:30:01PM

Page 137

35 (Pages 134 - 137)

Q   Okay.  Go to the next page, page 14.  You have the section -- I think it's an overview on the out-of-pocket damages methodology.  Do you see that?

A   I do.

Q   And you cite an article by Mr. Daniel Fischel for the proposition of what this methodology is meant to measure.  Right?

A   Let me just refresh my memory on the cite to Professor Fischel.

That is correct.

Q   Okay.  And who is Professor Fischel?  Why did you cite this particular article?

A   Well, it's a frequently cited paper, including in litigation.  And it's relevant to the point that I was making.

Q   And Professor Fischel -- he's the chairman and president of Compass Lexicon.  Right?

A   I know he's a leader of -- I don't know his exact title, but he's -- yeah, he's one of the heads of Compass Lexicon, yes.

Q   Do you interact with him at all in working for Compass Lexicon?

A   Periodically I do, yes.

Q   Is he your boss there?

    MS. KOFKE:  Objection to form.

Page 138

THE WITNESS:  I don't -- I don't view him that way, and I don't think Dan views it that way.  I'm not an employee of Compass Lexicon.  I am an independent contractor, if you will.

BY MR. JANOSKI:

Q   Understood.

    Going on to the next paragraph, 4, here you write that "Typically, and event study analysis is used to test whether there was a statistically significant increase in the security on the date that an affirmative misstatement is made."

(As read.)

    Right?

A   Correct.

Q   Okay.  And, again, I think we went over this earlier, but you're not aware of any academic literature or court opinions that specifically state that as a requirement.  Right?

    MS. KOFKE:  Objection to form.

    THE WITNESS:  When you say "a requirement," you mean a legal requirement?

BY MR. JANOSKI:

Q   As a requirement, or as a best practice, or any of the above.

    MS. KOFKE:  Objection to form.

Page 139

THE WITNESS:  Well, certainly not aware of academic literature in the financial/economics arena that would say this is a requirement as a matter of law.

    Again, this topic is not one that attracts much academic attention, because it's specific, really, to securities litigation.

    But the underlying premise, I think, is rooted in traditional event study analysis.  So I think the fundamental principles behind that statement are well accepted in the academic literature.

BY MR. JANOSKI:

Q   And beyond academic literature, are you aware of any court legal opinions that stand for this same proposition that an affirmative misstatement should be measured -- sorry -- the artificial inflation misstatement should be measured from the date of the misstatement?

    MS. KOFKE:  Objection to form.

    THE WITNESS:  I can't cite a specific case.

    I can only tell you that it's certainly been my experience, you know, for roughly 30 years that this is commonly done in securities litigation; that when there's an alleged affirmative misstatement, there's a general recognition that it can be appropriate to

Page 140

conduct an event study on the date that the alleged affirmative misstatement was made.

BY MR. JANOSKI:

Q   Okay.  And is that based on just your -- your experience, or is that general recognition memorialized anywhere?

A   Well, again, I'm not an attorney, so I can't tell you whether it has been or it has not been memorialized somewhere.

Q   Okay.  Have you done any type of research or analysis to determine how often securities litigation artificial inflation is measured backwards from the date of the corrective disclosure versus forwards from the date of the misstatement?

    MS. KOFKE:  Objection to form.

    THE WITNESS:  I have not, but any such study, I think, would have to be sensitive to whether the allegation is that there was an alleged affirmative misstatement or an alleged omission or both.

BY MR. JANOSKI:

Q   Okay.  And that's your opinion.  Right?  That's, again, not memorialized anywhere in academic literature or court opinion?

    MS. KOFKE:  Objection to form.  Misstates prior testimony.

Page 141

36 (Pages 138 - 141)

**Page 142**

THE WITNESS: Again, I'm not aware of memorialization, certainly not in law. And I -- I don't want to repeat my prior answer, but I think it pertains to this question as well.

BY MR. JANOSKI:

Q Would you agree with the basic principle that a misrepresentation can introduce artificial inflation without the corresponding statistically significant price increase on the day that the misrepresentation is made?

MS. KOFKE: Objection to form.

THE WITNESS: It's theoretically possible; but as a matter of economic evidence, if there's not a statistically significant price increase, then one can't be confident that any price increase, even a residual price increase, is nothing more than just a random movement in the stock price.

So it's theoretically possible; but as an empirical matter, you know, it -- in order to have confidence that what you're observing is the introduction of alleged artificial inflation, one would look for a statistically significant residual price increase.

BY MR. JANOSKI:

Q Have you heard of the theory of -- price

**Page 143**

maintenance theory of inflation?

A I'm sorry. I missed the first part of the question.

Q Have you heard of the price maintenance theory of inflation?

A I have, yes.

Q Okay. And what is your general understanding of what that theory states?

A Well, again, I don't want to say this is everyone's understanding, but my general understanding is that it references a case where you may have artificial inflation in a stock price that was introduced at an earlier period; and then subsequent statements maintain that amount of artificial inflation, typically by omitting information that allegedly should have been disclosed.

Q Would you agree that a misstatement can introduce artificial inflation without changing the stock price if it's -- if the information given is in line with market expectations?

A I'm sorry. Can you repeat that?

Q Yeah. Would you agree that a misstatement can introduce artificial inflation into a stock without changing the stock price, if that statement is in line with market expectations?

**Page 144**

MS. KOFKE: Objection to form.

THE WITNESS: The only word I'm getting hung up on is "introduce."

BY MR. JANOSKI:

Q Okay.

A Because I -- the way I think of it in terms of the definition is that the inflation has already been introduced, and it's now being maintained.

So there's no significant price movement, but the statement theoretically, at least, could be a misrepresentation if it simply maintains artificial inflation that had been previously introduced.

Q Well, let's say it's the first time a company issues a statement on a topic -- they had never issued a statement before -- but that statement is in line with market expectations. Couldn't that be the first time that artificial inflation is introduced into the stock, as opposed to maintaining it?

A So you're saying that the initial misrepresentation is an omission, and but for the misrepresentation the stock price would have fallen. So therefore, even if you don't get an increase in the stock price, the avoidance of a stock-price drop is the source of the inflation, if I'm understanding your -- your question.

**Page 145**

Q I'm not saying it's an omission. It could be either one. It could be any type of misstatement.

But if it's -- if the misstatement is in line -- if the information conveyed to the market is in line with market expectations, wouldn't that introduce inflation without a corresponding change in the stock price?

MS. KOFKE: Objection to form.

THE WITNESS: Yeah. The difficulty I'm having, though, is if -- if it's a misrepresentation, but it's in line of market expectations, I'm not sure why it's a misrepresentation then, because nothing's being misrepresented if that's what the market expected, in your hypothetical.

BY MR. JANOSKI:

Q Well, it's still not revealing the true facts of what's going on at the company.

A But then it's not meeting expectations. Right?

Q Or it isn't accurately reflecting what's going on in the company, but just not something that's being communicated to the market at that point?

A But then it is different from expectations. Right?

Q Not necessarily. Not if the market's not aware of that information beforehand. Right?

37 (Pages 142 - 145)

Well, I think we're going down a theoretical -- maybe I'll just dial this back a bit.

Would you also agree that artificial inflation could be introduced into the stock without a corresponding increase in the stock price, if there is confounding negative information released at the same time?

A   That is theoretically possible, yes.

Q   Could you go to paragraph 27? I guess in paragraph 26 you begin talking about using an event study from the date of the corrective disclosures.

And in paragraph 27 you write that additional work needs to be done. Right?

A   Sorry. What's the first part of the question? I...

Q   Sure. In paragraph 27 you write that whenever an event study is done on corrective disclosures, additional work needs to be done to establish that the stock-price decline reliably measured information that could have been known and disclosed earlier in the Class Period. Right?

A   Correct.

Q   Okay. But again, you would agree that it's ultimately up to the Court or the jury to determine what could have been disclosed at earlier points in the

Page 146

Class Period. Right?

A   Again, I'm not a lawyer, so I'm not sure I have the expertise to answer that, but that's my general understanding, correct.

Q   Okay. Would you agree that if the Court or the jury determined that there's no liability at a certain point in time because the defendants didn't know about it, there's no risk of artificial inflation overstating damages at any point earlier than that period?

MS. KOFKE: Objection to form.

THE WITNESS: Well, there might be, because, again, there may be complexities that have not been addressed by the expert who is providing damages analysis. So unless you circumscribed it by saying: All else equal, and assuming everything else is done properly in a reliable way, it may or may not be the case.

BY MR. JANOSKI:

Q   Well, all else being equal, again, let's say a model is put together that substantially addresses the complexities that you believe are present.

Isn't -- isn't it true that that model would ultimately be limited by any findings on liability?

MS. KOFKE: Objection to form.

THE WITNESS: I -- I would presume that to be

Page 147

the case, but again, I'm not an attorney.

BY MR. JANOSKI:

Q   Are you familiar with the Household International Securities Litigation?

A   Not really. I have a vague recollection, but I couldn't tell you much about it.

Q   Okay. Are you aware that that's one of the few securities class actions that's been tried to a verdict?

A   I -- I have a vague recollection of that, yes.

Q   Yeah. Are you also aware that it was appealed to the Seventh Circuit on loss-causation and damages grounds?

MS. KOFKE: Objection to form.

THE WITNESS: No, I was not aware of that.

BY MR. JANOSKI:

Q   Okay. Do you think it's helpful to your opinion on damage methodologies to look at court opinions that address how damage methodologies are ultimately applied at trial?

A   Well, I think that is likely to be an important issue; but I, again, take the assignment that I was given from counsel. And I'm simply, you know, fulfilling the assignment that I was provided by counsel. So insofar that my assignment is guided by

Page 148

previous case law, then indirectly, yes, it would be -- be relevant.

(Plaintiff's Exhibit 14 marked for identification.)

BY MR. JANOSKI:

Q   If you watch Exhibit Share, you should be able to see what's been marked as Plaintiff's Exhibit 14.

A   Okay.

Q   For the record, Plaintiff's Exhibit 14 is a Westlaw printout of the Seventh Circuit's Opinion in Glickenhaus versus Household International, 787 F. 3d. 408, decided in 2015.

A   Mm-hm.

Q   And if you go to page 7 of this document, there's a section titled "Loss Causation." Do you see that?

Again, this may be actually a different --

A   Yes, I do see it.

Q   Okay. One second. I'm not sure if you could see in the second -- in the second paragraph there, the Second Circuit writes that it's difficult to know exactly how much stock-price inflation a false statement caused. Do you see that?

A   I do.

Q   And they go on to write that "It's tempting to think that inflation can be measured by observing what happens to the stock immediately after a false

Page 149

38 (Pages 146 - 149)

statement is made. But that assumption is often 2:45:01PM wrong." Do you see that?

A   I do.

Q   Would you agree with that statement there?

MS. KOFKE: Objection to form. 2:45:09PM

THE WITNESS: Do I agree with the statement that it is tempting to think that?

BY MR. JANOSKI:

Q   That inflation -- that the assumption that inflation can be measured by observing what happens 2:45:35PM afterwards is often wrong.

MS. KOFKE: Objection to form.

THE WITNESS: I just want to be clear as to what you're asking me if I agree with is that it's not the predicate that it's tempting to think that. 2:45:49PM

Or you're just asking do I agree that inflation can be measured by observing what happens to the stock immediately after a false statement?

BY MR. JANOSKI:

Q   Well, I think I could -- they probably state it 2:46:01PM more clearly in the next paragraph. Do you see where they say "So the movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused"? Do you see that? 2:46:13PM

Page 150

A   Let me scroll up. Maybe it's in the -- 2:46:15PM

Q   That same page 7. It's just --

A   Okay.

Q   -- on the paragraph to the right --

A   Okay. 2:46:23PM

Q   -- in the right column.

A   Which paragraph to the right? The --

Q   The first full paragraph --

A   Okay. I see.

Q   -- to the right. 2:46:30PM

A   So the first full paragraph, the last sentence. "So the movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused." So you're asking if I agree with that? 2:46:44PM

Q   Yes.

A   The only word I would quibble with is "often." I haven't done an empirical study to know whether it's often.

But I would agree that, depending on the facts and 2:46:55PM circumstances, the movement of a stock price immediately after a false statement might tell you very little or nothing about how much inflation the false statement caused.

Q   Okay. But you dedicated about 22 paragraphs of 2:47:09PM

Page 151

your report to analyzing the stock movements after the 2:47:12PM alleged misstatements. Right?

MS. KOFKE: Objection to form.

THE WITNESS: Well, again, this is -- what I'm agreeing to here is that, insofar as a statement is 2:47:19PM deemed false because it contained omissions, then I would agree with that statement.

MR. JANOSKI: Okay.

THE WITNESS: But insofar as a statement contained affirmative misrepresentations, then I would 2:47:31PM disagree with the statement, holding everything else equal.

BY MR. JANOSKI:

Q   You see, the Seventh Circuit here doesn't make a distinction between omissions. They just say after 2:47:41PM measuring inflation after a false statement. Right?

MS. KOFKE: Objection to form.

THE WITNESS: I don't know, sir. One, I'm not a lawyer. Two, I haven't reviewed this case. So, you know, I'd have to see the full case and the full 2:47:53PM context. But what I'm offering to you is an economics perspective. I'm not making a legal judgment here.

BY MR. JANOSKI:

Q   Okay. The next sentence right afterwards says "The best way to determine the impact of a false 2:48:05PM

Page 152

statement is to observe what happens when the truth is 2:48:07PM finally disclosed, and use that to work backward..." Do you see that?

A   Correct.

Q   Would you agree with that statement, or do you 2:48:15PM have the same distinction on false versus -- false statements versus omissions?

MS. KOFKE: Objection to form.

THE WITNESS: Again, I'm not making a legal judgment; but as a matter of economics, it depends on 2:48:27PM the facts and circumstances.

So in the Best Buy case, for example, it was the date on which the alleged misstatement was made that ultimately determined, according to what you reviewed for me, whether the class was certified. It wasn't the 2:48:40PM stock-price change at the end of the Class Period. So it depends on the facts and circumstances.

BY MR. JANOSKI:

Q   Okay. And what facts and circumstances would those be? 2:48:51PM

MS. KOFKE: Objection to form.

THE WITNESS: Well, it does go back to, I think, our previous discussion that it would depend on whether the alleged misrepresentations are alleged affirmative misstatements, alleged omissions or both. 2:49:02PM

Page 153

39 (Pages 150 - 153)

BY MR. JANOSKI:                                    2:49:06PM

Q   Okay.  So in your opinion, alleged affirmative misstatements should be measured from the date the statement is made.  Right?  The inflation should be measured begin on that day?                    2:49:16PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, again, that would be the starting point, but -- and this is, again, part of my critique of Professor Feinstein, is that he shows no appreciation for the complexities in this case.      2:49:32PM

So one is, yes, you could start by looking at doing the event study analysis on the dates of the alleged affirmative misstatements.

But as I point out in my report, insofar that there are alleged affirmative misstatements, the dates      2:49:49PM on which they occurred are complicated by a number of factors that would require analysis, including the possibility that the statements had been previously made or similar statements had been previously made, and the extent to which there's confounding      2:50:05PM information.

And if one concluded that there is no reliable way to ascertain how much of the price effect on that day was due to the alleged affirmative misstatement versus other factors, then I don't want to rule out the      2:50:21PM

Page 154

possibility that looking at the residual stock-price      2:50:25PM declines on the alleged corrective disclosure date might -- again, might, depending on the facts -- provide you with a reliable basis for estimating the artificial inflation associated with those alleged      2:50:41PM affirmative misstatements.

BY MR. JANOSKI:

Q   So you don't think it's the best way.  You think you should only start looking at artificial inflation from the corrective disclosure dates after that initial      2:50:51PM analysis has been conducted?

MS. KOFKE:  Objection to form.

THE WITNESS:  That would be my general approach.

And, you know, for example, if there's an alleged      2:51:00PM affirmative misstatement, and it was the first time that that statement had ever been made, and there was no confounding information, then I -- I think in most cases -- again, there could be other facts and circumstances that I can't think of as I sit here with      2:51:19PM my example, but in most cases, the event study analysis on the date that that alleged affirmative misstatement was made would probably be the best estimate of the amount of artificial inflation that entered the stock price on the day of that alleged misrepresentation.      2:51:35PM

Page 155

And, again, everything is circumscribed by the      2:51:38PM fact that, you know, it depends on the facts and circumstances of each case.

BY MR. JANOSKI:

Q   Well, sir, doesn't that introduce more      2:51:46PM subjectivity, because then you have to first parse what's an affirmative misstatement; what's an omission; whether or not that information had been disclosed?  Doesn't that just inject more complicating factors to measure each affirmative misstatement date?      2:51:58PM

A   Well, in certain --

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm only basing it on my experience.  Certainly did not in Best Buy, where I think there was a general acknowledgment that there was      2:52:09PM an alleged affirmative misstatement.  You know, an economist can make a judgment on that.

But in matters such as this, I defer to counsel typically to identify which are the alleged affirmative misstatements versus what are the alleged omissions,      2:52:23PM because obviously that would require some legal judgment which I don't have.

BY MR. JANOSKI:

Q   So I guess just going back to the statement from the Seventh Circuit where they say the best way to      2:52:35PM

Page 156

determine the impact of a false statement is to observe      2:52:37PM what happened when the truth is finally disclosed, and use that to work backwards, does your opinion in any way conflict with that statement?

MS. KOFKE:  Objection to form.      2:52:51PM

THE WITNESS:  I would circumscribe it by saying it depends on the facts and circumstances.

And as a matter of economics -- again, I'm not making a legal judgment on this Court decision, but as a matter of economics, I think it depends.      2:53:02PM

And, you know, if -- if the alleged truth was finally disclosed three years after the beginning of the Class Period, and if you have an alleged affirmative misstatement earlier in the Class Period, an event study analysis can allow you to ascertain      2:53:18PM what, if any, impact that alleged affirmative misstatement had on the company's stock price, I think looking at the event study on the date of the alleged misstatement would be more reliable, as a general matter, than looking at the stock-price drop at the end      2:53:36PM three years later.

But again, it all depends on the facts and circumstances of the case.

BY MR. JANOSKI:

Q   Do you think your opinion should hold more weight      2:53:49PM

Page 157

40 (Pages 154 - 157)

than a federal appellate court in determining what's required to be shown for damages in these type of cases?

MS. KOFKE: Objection to form.

THE WITNESS: I'm not -- I haven't -- I'm not offering an opinion on that, sir. I'm not making a legal judgment. I'm not critiquing this court decision.

My report is from the perspective of financial economics, and whether what Professor Feinstein has done is -- is reliable, and provides confidence that he can reliably estimate damages; but I'm not here to question previous court decisions.

BY MR. JANOSKI:

Q Okay. But you do opine -- you state, I guess in paragraph 32 of your report, that there's different requirements for methodologies of measuring affirmative and omissions.

You state that Professor Feinstein's methodology doesn't account for the differences between affirmative misstatements and omissions, because you say each requires a different methodology.

Doesn't that conflict with what the Seventh Circuit is saying here, that the best way to determine the impact of a false statement is to measure

Page 158

backwards?

MS. KOFKE: Objection to form. Asked and answered.

THE WITNESS: Again, I'm not making a legal judgment. And courts obviously can be guided by -- by different criteria than a financial economist. I'm simply providing you with my opinion as a financial economist.

BY MR. JANOSKI:

Q And the opinions that each methodology -- each type of statement requires a different methodology -- is that something that you just made up, or -- that's not memorialized anywhere. Right?

MS. KOFKE: Objection to form.

THE WITNESS: I think I've told you I'm not aware. I'm not a legal scholar, so if you're asking if it's memorialized in case law, I don't know.

But what I am telling you is, based on my experience in securities litigation, it's generally accepted that there's a distinction between alleged affirmative misstatements and alleged omissions. And the methodology that is used should be different.

And all of that is rooted in the academic literature on event study analysis, and the conditions under which event study analysis is and is not

Page 159

appropriate.

BY MR. JANOSKI:

Q And so when you state that each type of statement requires a different methodology, you're not aware of any literature or court statement that sets forth such a requirement. Right?

MS. KOFKE: Objection to form.

THE WITNESS: Again, as I think I've repeatedly said, I'm not a lawyer, I don't have legal expertise, and I'm not offering legal opinions on that.

BY MR. JANOSKI:

Q All right. Going back to this -- this Household opinion, right after that sentence we've been looking at, it describes the plaintiffs in that case had hired Professor Fischel to put forth a damage methodology. Do you see that?

A I do.

Q Would you trust Professor Fischel to propose a methodology that accurately measures damages in Section 10(b) cases?

MS. KOFKE: Objection to form.

THE WITNESS: I am not sure what you mean by "trust."

BY MR. JANOSKI:

Q Well, you cite him as an authority in this field.

Page 160

Right? Would you -- based on your interactions with him and your knowledge of his body of work, do you think that he has the expertise to propose methodologies that would reliably measure damages in Section 10(b) cases?

A I do as a general matter, but that doesn't mean I would necessarily agree with everything that Professor Fischel would do.

THE VIDEOGRAPHER: Counsel, pardon me. Professor, could I have you tilt down your camera just a little bit?

THE WITNESS: Okay.

THE VIDEOGRAPHER: Thank you. Please proceed.

BY MR. JANOSKI:

Q If you go to the next paragraph, it describes what Professor Fischel did in this case. It says that he prepared two different models. One of them is termed the "specific disclosure model." And if you look later, it describes a leakage model that he put together as well. Are you familiar with those two different type of damages models?

A I am not.

Q Okay. Have you ever used the term "specific disclosure model"?

Page 161

41 (Pages 158 - 161)

A   I don't believe so.

Q   Okay.  Well, if you look at that paragraph, that very last sentence says that the amount of inflation in the stock in any given day is the sum of the effect of all subsequent disclosure of the prior false statement.  Do you see that?

A   I see the sentence, yes.

Q   Isn't that the same methodology that Professor Feinstein has proposed here?

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm not sure I even understand the sentence, standing alone.  I mean, I think I'd need to read the surrounding language, if not the entire case, to make sure I understand what that means; but I don't understand that sentence, in and of itself.

BY MR. JANOSKI:

Q   All right.  Well, if you look at that whole paragraph discussing the specific disclosure model, it states that Professor Fischel identified each major disclosure event and then measured the disclosure's effect on the stock price that day.  Right?

A   Okay.

Q   Do you see that?

And then he also used a regression analysis to get the abnormal return.  Right?

Page 162

A   I'm not following, sir.  I -- I'm not familiar with what Professor Fischel did.  So if you want me to read his report or if you want me just to read this paragraph, and...

Q   Yeah.  If you could read this paragraph, I think it -- it sets forth a basic understanding of what his specific disclosure model is.

A   I mean, just as a -- I don't even know what the issues were in this case.  So, I mean, I'm not sure if I need more background before jumping to this paragraph; but I'll -- if you want me to read it, I'll read it, but I may not be able to answer anything about it.

Okay.  I've read the entire paragraph now.

Q   Okay.  Isn't that specific disclosure model that's based on the -- measuring inflation from the date of the alleged corrective disclosures -- isn't that similar to what Professor Feinstein is offering to do here?

MS. KOFKE:  Objection to form.

THE WITNESS:  I mean, again, I haven't read Professor Fischel's report, so all I can do is infer, perhaps inaccurately, what he did from this one paragraph; but this one paragraph certainly doesn't reflect the complexities that we know exist in

Page 163

Cardinal Health.  Whether or not they exist in Household, I don't know, but --

BY MR. JANOSKI:

Q.  I'm --

A   -- whatever Professor Fischel is doing here, if this is what Professor Feinstein is purporting to do, he hasn't shown he can do it.  He hasn't proposed a methodology that gives confidence that he will be able to isolate the impact of the alleged corrective disclosures on Cardinal's stock price from confounding information, nor has he proposed a methodology to deal with the myriad other complexities.

So at most -- and again, with the caveat that I haven't read what Professor Fischel did, at the very, very most, at a high level, this might be what Professor Feinstein aspires to do, but he hasn't shown he can do it.

MR. JANOSKI:  I'll move to strike as nonresponsive.

Q   Sir --

MS. KOFKE:  Oppose the motion.

MR. JANOSKI:  Lauren, could you please --

MS. KOFKE:  I need to oppose your motion after you make it.

MR. JANOSKI:  You could state that on the

Page 164

record once I'm done speaking, but my question --

MS. KOFKE:  You can give me a moment to oppose your motion before asking your question.  It's a simple courtesy.

MR. JANOSKI:  You interrupt me every time I move to strike.

MS. KOFKE:  When you move to strike, I want an opportunity to oppose your motion.  Then you can ask your question.

MR. JANOSKI:  When I'm doing speaking, Lauren.

MS. KOFKE:  I don't want to have to oppose the motion after you introduce a question, but if you want to ask your --

MR. JANOSKI:  Yes.  From now on, could you please wait till I --

MS. KOFKE:  No.  I can't.  I'm going to oppose your motion after you make it.

MR. JANOSKI:  You're just going to interject every time I talk?

MS. KOFKE:  After you make a motion that I oppose, I'm going to oppose it.  You could take a pause, let me say those three words, and then ask your next question.  That would create a clean record.

MR. JANOSKI:  I think the record would be

Page 165

42 (Pages 162 - 165)

cleaner if you let me finish speaking, and then you lodge your objection.

MS. KOFKE: I disagree. I disagree. I have a right to object when you make a motion. You should afford me the opportunity to assert my right to object.

MR. JANOSKI: We'll see how clear this record is when you keep on interjecting, but I'm saying if you could please --

THE REPORTER: Counsel, I cannot record what you're both saying. You're going to have to let one another finish speaking, because I'm making a terrible record in the last page. I'm sorry.

MS. KOFKE: Please give me an opportunity to assert my objections in opposition to your motion, as I have the right to do. Thank you.

MR. JANOSKI: I will. And I just ask that you let me finish speaking before you interject. That's all I'm asking.

MS. KOFKE: I'll allow you to finish making your motion. And then I want the opportunity to oppose it.

MR. JANOSKI: Okay.

Q. Sir, my question, again, if you go back to this -- I understand you have all these complexities that you address that you say Professor Feinstein has to account

Page 166

for, but as a starting point of using the corrective disclosure dates and measuring the residual return by taking out the movements in either a larger index across the market or industrywide index -- isn't that essentially what Professor Feinstein proposes as his initial point before accounting for any complexities that you say exist in this case?

MS. KOFKE: Objection to form.

THE WITNESS: No. I disagree. I mean, he's avoided -- he's swept the tough issues under the rug. And if he thinks he can simply say that the amount of inflation is the stock-price drops on the alleged corrective disclosures dates, without addressing all of these complexities, then I frankly think he's providing no confidence that he's capable of reliably estimating damages.

BY MR. JANOSKI:

Q. Are you talking about Professor Feinstein?

A Yes.

Q Okay. So did you read the section of his report where he said that if complexities are addressed, he could use valuation tools? Right?

A But that doesn't cut the mustard, sir. That doesn't describe a methodology that gives confidence that he can do so reliably. It's sweeping everything

Page 167

under the rug. He doesn't even acknowledge the complexities in this case.

Q Again, you -- you haven't made the determinative conclusion that these complexities exist on a quantitative level; have you?

MS. KOFKE: Objection to form.

(Counsel and the witness speak simultaneously.)

THE WITNESS: I mean, I think unambiguously some of these complexities clearly exist.

BY MR. JANOSKI:

Q -- foresight, sir? That doesn't seem -- that doesn't seem reasonable; that he's supposed to read your mind as to what all the --

THE REPORTER: Counsel, I am off the Record. I cannot record both of you speaking at once, and so I missed the beginning of your question to the witness because I was recording his answer.

MR. JANOSKI: Yes. Let me see if I can find it.

Q So is it your -- is it your belief that at the class-certification stage a plaintiff is supposed to foresee whatever complexities defendants may conjure up and address them in their affirmative report, without doing any analysis if they actually exist in this case?

MS. KOFKE: Objection to form.

Page 168

THE WITNESS: Well, two things, again. I'm not offering a legal opinion as to what's required.

Also I don't know what you mean by "conjure up." "Conjure up" has certain connotations.

What I'm referring to are significant methodological challenges that anyone will face in estimating damages in a reliable way on a classwide basis consistent with plaintiffs' theory of liability. And I was able to identify a half dozen without the benefit of fact discovery. And these are challenging issues. These are issues that in the academic literature people had to grapple with them they would be challenging issues.

Mr. Feinstein describes them as straightforward --

BY MR. JANOSKI:

Q Well --

A -- which is completely wrong. Straightforward -- the dictionary definition of "straightforward" means easy, simple, uncomplicated.

These are obvious complexities, and they're none of the above. And he's provided no methodology to describe how he will address them.

Q Well, sir, isn't confounding information -- isn't that an issue that's common in every securities

Page 169

43 (Pages 166 - 169)

litigation?  3:07:28PM

A   That doesn't undermine the fact that it is -- it can be complex to deal with it.

I mean, one of the pieces of confounding information that is obvious that you don't need fact   3:07:37PM discovery for, you know, is obviously the fact that many of the events occurred on dates of earnings announcements.  Not only was there earnings information revealed to the market; on some of the dates, information was revealed about the loss of major   3:07:54PM customers.

That's something very visible to Mr. Feinstein. It's something he knows he's going to have to deal with.  And the question is:  How is he going to deal with that?   3:08:07PM

Q   All right, but you're not --

A   He's proposed no methodology that describes how he will deal.  And that's just one of many examples, sir.

Q   Sir, I understand.  But you're not saying it's impossible for him to address these issues.  Right?   3:08:18PM

A   No, but -- but my understanding is that he is to provide a methodology that meets the three criteria. This is an obvious issue that requires a methodology, and he's not described one.

Q   So your critique is that he hasn't described fully   3:08:32PM

Page 170

how he's going to address all of these issues yet.  Is   3:08:35PM that fair to say?

MS. KOFKE:  Objection to form.

THE WITNESS:  When you say "all these issues," I want to make it clear I'm not saying that he   3:08:41PM needs to identify all the confounding information; but there are categories of confounding information that, you know, spring off the pages of -- of the releases.

Clearly, there's earnings information.  He knows he's going to have to deal with that.  There's   3:08:56PM loss-of-customer information.  He knows he's going to have to deal with that.  And we're just talking here about confounding information.

If a Ph.D. student was proposing they wanted to do an analysis of this sort for a dissertation, and they   3:09:10PM came in and basically said "I'm going to do an event study.  And then just trust me that I'll be able to figure out how to deal with these other issues," that doesn't pass muster; not as a matter of economics.

And it would not pass muster in peer-review   3:09:26PM journals.  And I doubt that you would get a grant if you proposed a grant for something -- a study of this sort, if all you said is "Just trust me.  I'll be able to do it."

Page 171

BY MR. JANOSKI:   3:09:39PM

Q.  So what level of detail do you think is required at the class-certification stage, even before defendants have raised what they think are the complicating issues?   3:09:46PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I'm not offering a legal opinion as to what is required; but as a matter of the economics, it's to identify the issues that you know you're going to have to confront, and then describe a   3:09:56PM methodology that indicates how you're going to address those issues.

And he's done that -- he's not done that.

BY MR. JANOSKI:

Q   I think we will just have to agree to disagree on   3:10:08PM many of those points.

If we go back to this Household opinion, if you go to the page 8, there's a statement as to what the specific disclosure model actually measures.  And I want your opinion on this.   3:10:28PM

If you see the first paragraph on the right column, it says "The most important thing to understand about both models" -- and again, it's speaking about the specific-disclosure and leakage models -- "is that they don't directly measure inflation caused by the   3:10:42PM

Page 172

false statements; instead they measure the value of   3:10:44PM truth."  Do you see that?

A   I do.  Yeah.

Q   Do you agree with that general principle that measuring artificial inflation backwards from the date   3:10:53PM of a corrective disclosure is intended to give an estimate value of the truth?

MS. KOFKE:  Objection to form.

THE WITNESS:  I don't think that's what the sentence is saying, sir.   3:11:09PM

BY MR. JANOSKI:

Q   No?

A   The sentence is referring to the most important thing to understand about two models; two models that I have not studied.  So I don't really know what those   3:11:18PM two models -- I don't even know what the models are, let alone what the most important things in the models are, so I can't possibly give you an informed response as to that statement.

Q   Well, again, a specific -- I'll just represent to   3:11:32PM you that my use of the term "specific disclosure model" is measuring artificial inflation from a corrective disclosure date.  That's what is described Professor Fischel's methodology here.  Do you see that?

A   Well, I see reference to both models.  You've just   3:11:53PM

Page 173

44 (Pages 170 - 173)

described one model.                    3:11:57PM

Q   Well, there's also the leakage model.  If you want, you could read that, as to what the alternative model that Professor Fischel offered; but that's not the model that Professor Feinstein has offered here, so     3:12:06PM I don't think that's that's relevant.  But if -- if you want, you could read that, and see what the difference is.

But I'll represent to you that the specific disclosure model is measuring inflation from a     3:12:17PM corrective disclosure date -- from specific corrective disclosure dates.

A   Okay, but if I accept that, sir, then it becomes tautological.  If that's what you're saying, then that's what it's doing; and that sentence simply says     3:12:32PM that's what it's doing.

Q   All right.  Well, setting aside the fact that it's referring to the specific models that were introduced in this case, do you agree generally that the principle of back casting from a corrective disclosure date is     3:12:43PM meant to measure the value of truth?

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm sorry.  Can you repeat the question?

Page 174

BY MR. JANOSKI:                    3:12:55PM

Q.  Yeah.  Would you agree that a back-casting method like what Professor Feinstein has offered that creates an artificial inflation ribbon backwards from the date of the corrective disclosures -- that that is intended     3:13:07PM to measure the value of truth, not necessarily the value of each misstatement?

MS. KOFKE:  Objection to form.

THE WITNESS:  And when you say "the value of truth," you mean the truth as revealed by the alleged     3:13:21PM corrective disclosures?

BY MR. JANOSKI:

Q   Yes.

A   And you're asking:  Is that what it's intended to do?                    3:13:33PM

Q   I was -- yes.  I'm asking:  Is it your opinion that back casting is meant to measure the value of the true information that comes out?

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah.  I can't necessarily get     3:13:46PM into intent of opposing experts.  I don't know what their intent is.  I can only look at what they've proposed to do.  So when you ask is that what they -- it's intended to do, I don't know what it's intended to do.  All I know is what they say they're going to do.     3:14:02PM

Page 175

And I can evaluate that, regardless of its intent.     3:14:05PM

BY MR. JANOSKI:

Q   Well, would you agree that the back-casting method at least attempts to value the information that's released on the specific disclosure dates?  Right?     3:14:15PM

MS. KOFKE:  Objection to form.

THE WITNESS:  And, again, the word "attempt" -- I mean, it depends.  I mean "attempt" would suggest that you would be sensitive to the additional work that's required before you can start to roll back the     3:14:31PM residual price decline on the alleged corrective disclosure date.  So if you were truly attempting to do so, I would expect one to recognize the additional work that first would have to be done, before you could even start so-called "back casting" the residual price     3:14:46PM decline.

BY MR. JANOSKI:

Q   Okay.  All else being equal, if a model accounts for all these complexities that you raised sufficiently to your -- to whatever standard you hold, would you     3:14:58PM agree that the back-casting method is meant to accurately measure the value of the information that's ultimately disclosed later on?

MS. KOFKE:  Objection to form.

THE WITNESS:  With -- with all of those     3:15:14PM

Page 176

caveats, which are big caveats, and particularly     3:15:15PM relevant in this -- this matter -- but with that, I would then generally agree.

BY MR. JANOSKI:

Q   Okay.  And then would you also agree that it's     3:15:23PM ultimately up to the jury or the Court to determine whether that information is corrective, in -- in that it proves a false statement earlier on?

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I'm not a legal scholar,     3:15:36PM but I presume that to be true.

BY MR. JANOSKI:

Q   Okay.  One of the critiques that you lodge here against Professor Feinstein is that you claim he failed to tie the measure of artificial inflation to specific     3:15:47PM misstatements.  Right?

A   Correct.

Q   All right.  And I think one of the critiques that you -- you say that as a result, if the jury or the Court were to find certain statements not actionable,     3:16:02PM there would be no way to measure damages, or that damages would be overstated for earlier periods of the time period.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Sorry.  Can you repeat that?     3:16:16PM

Page 177

45 (Pages 174 - 177)

BY MR. JANOSKI: 3:16:18PM

Q Yes. I think -- you -- again, going back, you critiqued Professor Feinstein for not tying the measure of artificial inflation to specific misstatements. Right? 3:16:32PM

A Correct.

Q Okay. And then I think in the summary of your opinions you also go on to say that because it's not tied to a specific misstatement, if a jury or judge were to find certain statements not actionable, damages 3:16:43PM would be overstated at earlier periods of the time period -- of the Class Period. Right?

MS. KOFKE: Objection to form.

THE WITNESS: If we could maybe turn to my report, I just want to make sure that we're accurately 3:16:57PM capturing what I said there.

BY MR. JANOSKI:

Q Yeah. And it's summarized in paragraph 6, that first bullet point. Is --

A Yeah, but I -- that's the reason I wanted to -- I 3:17:21PM don't think I said that it would be overstated.

I simply said that if the Court finds that only some of the alleged misrepresentations are actionable, then Professor Feinstein has not provided a reliable methodology to estimate damages. 3:17:33PM

Page 178

Q Okay. And why would that be the case? 3:17:36PM

A Because if only some of the alleged misrepresentations are actionable, and you haven't estimated the effect of each individual alleged misrepresentation or artificial inflation, you don't 3:17:50PM know how much artificial inflation would be affected if you now removed certain alleged misrepresentations.

Q Well, that's precisely what happened in this Household case. Right? If you go back and look at this, it says that of 40 alleged misstatements, the 3:18:08PM jury only found 17 of them to be actionable. Right?

MS. KOFKE: Objection to form.

THE WITNESS: Again, I'm not familiar with the case, sir. If you want to refer me to what you just read, I don't know if that would be enough 3:18:19PM information to answer your question, but...

BY MR. JANOSKI:

Q. Yes. Going back to page 8, where we were talking about the measure of truth, in this case -- and, again, it's two paragraphs down page 8 on -- on the right 3:18:29PM column. It said that the jury found 17 actionable misrepresentations out of 40. Do you see that?

A "Of the 40 possibilities, the jury found 17 actionable misrepresentations, the first of which occurred on March 23rd, 2001." Okay. 3:18:51PM

Page 179

Q And they were instructed to find zero price 3:18:54PM inflation on all the dates prior to the first misrepresentation. Do you see that?

A As instructed by the Court? Is that --

Q By the Court. Yes. 3:19:08PM

A Okay. I'm not sure I fully understand the context of all this, but okay.

MS. KOFKE: Marco, maybe we could take a break at some opportune moment. I think it's been almost an hour and a half. So not to cut -- not to cut 3:19:27PM you off here if you want to finish up, but maybe when there's a good breaking point relatively soon, that -- that would be nice.

MR. JANOSKI: Yeah. I'm almost done with this document. 3:19:35PM

Q. Well, sir, you agreed here that it says that the jury only found 17 out of 40 misstatements actionable. Right?

A I do see the words there, yeah.

Q Okay. So -- and, again, it seems like the Court 3:19:48PM had no issue with that here. Right?

MS. KOFKE: Objection to form.

BY MR. JANOSKI:

Q -- instructed the jury not to find any inflation prior to the first actionable misstatement? 3:20:01PM

Page 180

MS. KOFKE: Objection to form. 3:20:05PM

THE WITNESS: Again, I'm not familiar with the case, sir. And I don't know the context. And so I -- I just don't know.

BY MR. JANOSKI: 3:20:13PM

Q Okay. Well, sir, if a -- if a court is -- ultimately instructs the jury not to find any artificial inflation prior to the first statement that's found to be actionable, doesn't that address your concern about tethering the inflation -- 3:20:25PM artificial inflation to a specific statement?

MS. KOFKE: Objection to form.

THE WITNESS: Not as a matter of economics, sir. Again, I -- you know, I'm not speaking as a matter of law; but as a matter of economics, my point 3:20:41PM holds.

BY MR. JANOSKI:

Q Well, isn't the jury simply meant to use the damage model in conjunction with their own liability findings? 3:20:55PM

MS. KOFKE: Objection to form.

THE WITNESS: Again, that might require a legal judgment, but that's my general understanding, yes.

Page 181

46 (Pages 178 - 181)

BY MR. JANOSKI: 3:21:04PM

Q   So isn't it true that their liability findings ultimately address any concern you have about tying the inflation to specific misstatements?

MS. KOFKE:  Objection to form. 3:21:14PM

THE WITNESS:  But you know, again, in this case I'm not sure what the basis was for the Court to instruct the jury to find zero stock-price inflation prior to that date.  I don't know enough about -- I don't know anything about the facts here; about how 3:21:32PM many alleged misrepresentations there were, and how ultimately the jury did tether damages to what remained as actionable misrepresentations.  I just -- I know nothing about that.  So I'm really not in a position to address what you're asking me. 3:21:50PM

BY MR. JANOSKI:

Q   Okay.  Well, I'll just have some final questions about some of the concepts that are discussed later in this case.  If you go to page 9 and read the second full paragraph there, they discuss about two different 3:22:03PM concepts here:  Actual inflation versus fraud-induced inflation.  Do you see that?

A   Yes.  I do.

Q   Okay.  Have you ever used those terms?  Are you familiar with what those terms refer to? 3:22:18PM

Page 182

A   I don't believe I've ever used them.  And, as I 3:22:21PM sit here, I'm not -- not aware of what -- what they mean.  And I can read what's in the case here, but...

Q   Well, as Seventh Circuit describes it, actual inflation is the difference between what the stock 3:22:42PM price would have been if the truth had been known, and what it ultimately was in -- what the market price was.  Right?

A   You know, again, all I can do is read the words here. 3:23:01PM

Q   Yeah.  I guess my question is, I guess, more to the conclusion that they get to that -- do you agree that there can be actual inflation in a stock before there's inflation caused by defendants' false statements? 3:23:26PM

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm not sure I understand the question.  You're saying actual inflation, as defined here, is the difference between the stock price, and what the price would have been if the truth had been 3:23:45PM known.  And you're asking if there can be actual inflation before there's fraud-induced inflation?  Is that --

BY MR. JANOSKI:

Q.  Yeah.  Right.  That's what the Seventh Circuit is 3:24:02PM

Page 183

essentially saying here; is it not?  They're saying 3:24:05PM that the model is meant to measure the actual inflation; but it's the jury's job to determine fraud-induced inflation by taking that model and applying it to their liability findings? 3:24:17PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I don't know enough about this case, sir.

I mean, I -- in reading this paragraph, if the question is "Can there be a difference between a 3:24:30PM company's stock price and what it would have been if the truth had been known before there is a fraud-induced inflation?" it's a matter of economics; not a matter of law.

I think the answer is yes in the sense that you 3:24:47PM can have actual inflation that is caused by an alleged omission.

And then, as I see fraud-induced inflation, it would suggest to me that it's referencing perhaps an affirmative -- an alleged affirmative 3:25:04PM misrepresentation.

And so, again, I'm just reading the words on paper; but if -- if that's your question, then I don't see any reason why you couldn't have an inflated price because of, first, an alleged omission, and then in 3:25:19PM

Page 184

addition to the alleged inflation, because of an 3:25:23PM alleged affirmative misstatement.

But again, that's an economist reading these words.  And perhaps the Court had a different meaning there. 3:25:34PM

BY MR. JANOSKI:

Q   Okay.  I -- I don't think there's in here language distinguishing omissions from affirmative misstatements.  Right?

MS. KOFKE:  Objection to form. 3:25:44PM

THE WITNESS:  Well, again, I'm just giving you an economic -- an economic -- I'm not saying it's the only economic, but an economic interpretation, because the actual inflation is not referencing what the defendants had spoken, which might suggest 3:25:57PM omission.  Whereas a fraud-induced -- it's referring to if the defendants had spoken truthfully.  And that kind of suggests to me perhaps an affirmative misstatement; but that's, again, purely from an economics perspective. 3:26:16PM

THE VIDEOGRAPHER:  Counsel, just to let you know, we have a three-minute warning.  I need to change the media.  I'll give you a one-minute warning.  Thank you.

Page 185

47 (Pages 182 - 185)

MR. JANOSKI: Okay.  3:26:25PM

Q.  Would you agree that there could be innocuous reasons for inflation?

MS. KOFKE: Objection to form.

THE WITNESS: I'm not sure what you mean by  3:26:37PM "innocuous reasons."

BY MR. JANOSKI:

Q  Well, do you agree that a company could have its stock price inflated for reasons other than false or misleading statements?  3:26:48PM

MS. KOFKE: Objection to form.

THE WITNESS: What do you mean by "inflated" then?

BY MR. JANOFSKI:

Q  Well, for instance, if a company is unaware  3:26:55PM that -- you know, for liability finding if they're found to not have known about certain information, do you agree that a stock could be inflated, but it's not due to any fraud or misconduct on the part of executives?  3:27:15PM

MS. KOFKE: Objection to form.

THE WITNESS: I apologize.  I'm not following.

BY MR. JANOSKI:

Q  Okay.  Do you agree that a stock could be  3:27:24PM

Page 186

overpriced because there is -- the true information has  3:27:26PM not been revealed to the market, but that it is not due to the misconduct of management?

A  But what do you mean by "overpriced" or "overvalued" or "inflated"?  I just -- that's the part  3:27:45PM I'm having trouble understanding.

Q  Okay.  That the -- that the true circumstances aren't known to the market --

A  Right.  I mean --

Q  -- and that -- and that the company is overvalued  3:27:57PM because those true circumstances aren't known to the market, but that it is not due to any misconduct on the part of executives.  Do you agree that there could be innocuous inflation in a case like that?

MS. KOFKE: Objection to form.  3:28:11PM

THE WITNESS: So if I'm -- if I'm understanding correctly, what you're asking is: Can there be material nonpublic information that could cause a stock price based on public information to be higher than it would be if the MNPI had been disclosed  3:28:26PM without there being any fraud associated with the MNPI?

THE VIDEOGRAPHER: One-minute warning. Please finish this line of questioning.  Thank you.

BY MR. JANOSKI:

Q  Yes.  That's one circumstance, I would say.  Yeah.  3:28:41PM

Page 187

A  So if that's the question, then, you know,  3:28:45PM certainly that can be the case.

Q  Okay.  And then would you agree that it's ultimately up to the jury to determine whether or not inflation was caused by defendants' misconduct?  3:28:55PM

A  Again, I'm not a lawyer --

MS. KOFKE: Objection to form.

THE WITNESS: -- but I would presume that to be the case.

MR. JANOSKI: All right.  We can go off the  3:29:04PM record.

THE VIDEOGRAPHER: Okay.  Stand by.  This marks the end of Media Number 3.  Going off the record at 3:29 p.m. Eastern.

(Recess taken from 3:29 p.m. until 3:45 p.m.)  3:31:18PM

THE VIDEOGRAPHER: We are back on the record at 3:45 p.m. Eastern, and this marks the beginning of Media Number 4 in the deposition of Professor Kenneth Lehn.

Please proceed, Counsel.  3:45:36PM

BY MR. JANOSKI:

Q  Welcome back, Professor Lehn.  Do you understand that you're still under oath?

A  I do.

Q  Okay.  Did you review any documents during the  3:45:42PM

Page 188

break just now?  3:45:44PM

A  I did not.

Q  And did you discuss the substance of your testimony with anybody during the break?

MS. KOFKE: Object to the extent it seeks  3:45:52PM communications with counsel.

THE WITNESS: Yeah.  I don't believe so, no.

BY MR. JANOSKI:

Q  Okay.  Turning back your Expert Report, if you go to page 21, there's the Subsection B here, where you  3:46:01PM claim that professor's methodology does not allow him to establish that any affirmative misstatement caused the stock price to be inflated.  Right?

A  Which sentence in particular?  I'm sorry.

Q  Well, this -- this section -- this entire  3:46:28PM section -- right? -- is -- is based on your premise that for affirmative misstatements, it's necessary to examine whether there were statistically significant increases on the days the statements were made?  Right?

MS. KOFKE: Objection to form.  3:46:45PM

THE WITNESS: I'm not sure I say it's necessary.

I'm saying that, you know, that is typically what you would look at.  And if, for whatever reasons -- confounding information or other reasons -- then you  3:46:54PM

Page 189

48 (Pages 186 - 189)

may be confined to looking at the alleged corrective 3:46:57PM disclosure date, which also might be plagued by the same problems.

But what I am saying is that, you know, absent confounding information and perhaps other factors, you 3:47:06PM could look at the date of the alleged affirmative misstatement, and conduct your event study analysis on that date.

BY MR. JANOSKI:

Q Sir, in paragraph 34 you write that as a starting 3:47:16PM point to demonstrate that artificial inflation entered the stock price, "...it is necessary to examine whether the alleged affirmative misstatements caused statistically significant increases ... on the dates that they were made." Right? 3:47:32PM

A Correct.

Q. So are you backing down from that now? Do you -- are you saying that it's not a necessity?

MS. KOFKE: Objection to form.

THE WITNESS: No. I'm agreeing. I mean, I 3:47:41PM wrote the statement, so I agree with it. It says "a starting point."

BY MR. JANOSKI:

Q Mm-hm.

A And if you had circumscribed your question with 3:47:47PM

Page 190

that, I apologize if I didn't hear that. 3:47:51PM

As a starting point, I think it is necessary to do what I describe her.

Q Yes.

A But you if you can't, for whatever reason, conduct 3:47:58PM an event study on that date, then you may have to look at the residual stock price declines on the alleged corrective disclosure date. And that presents its own set of challenges, for reasons that I discuss in my report. 3:48:14PM

Q Okay. So, again, you say that that's a starting point. So this entire section is -- is based on that premise -- right? -- that it's -- that it's necessary to look at the date of affirmative misstatements?

MS. KOFKE: Objection to form. 3:48:28PM

THE WITNESS: When you say "this entire section," it's a long section, where I go through a lot of dates.

BY MR. JANOSKI:

Q Yes. Paragraphs 33 through 54. Right? That's -- 3:48:35PM

A Correct.

Q -- all the dates of the affirmative misstatements, and looking at the stock --

A Well --

Q -- prices for those dates. Right? 3:48:43PM

Page 191

A -- I wouldn't quite articulate it that way. 3:48:45PM

Again, I haven't made a determination, nor has Professor Feinstein, as to which alleged misrepresentations were alleged affirmative misstatements as opposed to alleged omissions. 3:48:57PM

But when you do the -- when -- I haven't done my own event study, but using Professor Feinstein's event study, he finds significant positive residual returns on only 5 of the 37 dates on which there were alleged misrepresentations, which means that if there were 3:49:17PM alleged misrepresentations on those dates, they potentially could have caused Cardinal's price to increase.

But for reasons that I go through on each date, there would be no reliable basis to believe that, until 3:49:35PM after one had controlled properly for confounding information.

Also, on all five of those dates, similar statements had been made previously. And insofar that they represent repetition of previously disclosed 3:49:51PM information, if the market for Cardinal stock is efficient, there would be no reliable basis to believe that they were contributing any inflation to Cardinal's stock price.

So I didn't say those five dates are dates on 3:50:06PM

Page 192

which they were alleged affirmative misstatements; but 3:50:08PM I'm saying if there were, these are the challenges that Professor Feinstein will -- will confront.

MR. JANOSKI: Okay. And I'll move to strike as nonresponsive. 3:50:21PM

MS. KOFKE: Oppose the motion.

BY MR. JANOSKI:

Q. What I'm asking for here, sir, is that this is all based on the premise that omissions and affirmative misstatements need to get measured under different 3:50:33PM methodologies. Right?

A Again, I think you're mischaracterizing what I just said, sir. I said as a starting point, you look at the date of the alleged affirmative misstatements.

Q And you also said that Professor Feinstein hasn't 3:50:48PM identified what's an affirmative misstatement versus an omission. Right?

A Correct.

Q Okay. And this is all, again, based on the statements in paragraph 32 and 30 -- I'm sorry -- 34 3:51:02PM and 33, where you state that omissions and affirmative misstatements require different methodologies.

MS. KOFKE: Objection to form.

THE WITNESS: When you say "This is all based," I don't know what you mean by "all." When you 3:51:20PM

Page 193

49 (Pages 190 - 193)

say "This is all based," I don't understand that.

BY MR. JANOSKI:

Q This entire section, Subsection B, which is paragraph 33 through 54, is -- isn't it true that this section is based on the premise that affirmative misstatements need to be measured from the date of the statement -- the artificial inflation caused by affirmative misstatements need to be caused -- measured from that date?

MS. KOFKE: Objection to form.

THE WITNESS: No. You're mischaracterizing what I've said and what I say in my report, sir.

I say as a starting point one should look at the date the alleged affirmative misstatement made.

I'm not saying that there were alleged affirmative misstatements made on those five dates.

What I am saying is there are only 5 of the 37 dates on which, according to Professor Feinstein's study, there were significant positive residual returns.

And insofar that there were alleged affirmative misstatements on those days, there are complexities that he would have to address that I describe in this section. That's all I'm saying in this section.

Page 194

BY MR. JANOSKI:

Q Again, sir, I think we're just talking past each other. If you look at paragraph 32 -- right? -- you write that a claim of affirmative misstatement "...requires a damages methodology that reliably determines whether the ... affirmative misstatements created artificial inflation, and the evolution of that inflation going forward in time to the end of the Class Period."

(As read.)

Right?

A Correct.

Q Okay. And you state that omissions are different, in that they require a methodology that measures backwards. Right?

A Correct.

Q So your opinion is that there are -- these types of claims require two different methodologies. That's what you say here at the very last sentence. Right?

A Of paragraph 32?

Q Yeah.

A Correct. But again, what I'm saying is the first type of claim requires a damages methodology that reliably determines whether the alleged affirmative misstatements created artificial inflation, and the

Page 195

evolution of that inflation going forward in time to the end of the Class Period.

Q Yes.

A And then in the next section, paragraph 34, I say when dealing with alleged affirmative misstatements, as a starting point, you look at the date on which the alleged affirmative misstatement was made.

And, as I indicated, in the Best Buy case that was a clean date of an alleged affirmative misstatement. And not only did I look at that, but the Court looked at that. So that's a perfectly appropriate thing to start with.

If there are complications that make it difficult for you to measure the alleged artificial inflation on the date on which the alleged affirmative misstatement is made, then you might resort to the residual price declines on the corrective disclosure, and then try to roll it back to the date of the alleged affirmative misstatement.

So I'm not precluding the fact that that might be a possibility; but I'm saying as a starting point, you look at the date on which the alleged affirmative misstatement was made.

Q Well, sir, doesn't that approach contradict what the Seventh Circuit said; that the best way to

Page 196

determine the impact of a false statement is to measure backward when the truth is finally disclosed?

MS. KOFKE: Objection to form.

THE WITNESS: Again, I'm not a lawyer, sir, so I can't offer a legal opinion.

And I'm not familiar with that case, so I can't tell you even as a matter of economics whether there's an inconsistency there.

BY MR. JANOSKI:

Q Okay. But just as someone who reads English, doesn't that conflict with the statement that the Seventh Circuit made that the best way to measure the impact of a false statement is to observe what happens when the truth is disclosed, and to work backward?

MS. KOFKE: Objection to form.

THE WITNESS: And I don't know the context of that case. If it was a case entirely about alleged omissions, then there's nothing inconsistent with that statement and what I'm saying in my -- my report.

BY MR. JANOSKI:

Q Okay. We looked at that case earlier, sir. The language in there is false statements. Right? There was nothing in there about omissions in that Household language that we looked at?

MS. KOFKE: Objection to form.

Page 197

50 (Pages 194 - 197)

THE WITNESS: But again, I'm not a lawyer. 3:55:45PM And I believe that some people would refer to a false statement as one that omitted to provide certain information to the market, and it was false because of the omission. 3:55:55PM

BY MR. JANOSKI:

Q If it's true, then how do you distinguish between false statements and omissions, if that's the case?

MS. KOFKE: Objection to form.

THE WITNESS: When you say "false statements 3:56:03PM and omissions," you mean false affirmative misrepresentations and omissions?

BY MR. JANOSKI:

Q Yeah. Well, you say some people refer to a false statement as one that omitted to provide certain 3:56:15PM information. Doesn't that just highlight the complexities of trying to parse between what's affirmatively false or what's misleading by omission?

MS. KOFKE: Objection to form.

THE WITNESS: With all due respect, sir, I 3:56:27PM think it's a red herring. Professor Feinstein himself acknowledges that there are alleged affirmative misrepresentations and alleged omissions. He himself says that.

Page 198

BY MR. JANOSKI: 3:56:38PM

Q Yes, but don't you agree that that just adds additional complication as to the subjective determination if something's affirmatively false? I mean, you yourself said people view false statements as 3:56:47PM false for omitting information.

A Well, I think you're making my --

MS. KOFKE: Object to form.

THE WITNESS: I think you're making my point. There are complexities. And these are complexities 3:56:54PM that -- in this case, he acknowledges that there are alleged affirmative misstatements and alleged omissions, but he doesn't get into the complexities about how do you measure the alleged artificial inflation associated with both. 3:57:07PM

BY MR. JANOSKI:

Q Well, sir, aren't you the one introducing more complexities by suggesting different methodologies, without identifying a way to determine what's an omission and what's a false statement? 3:57:17PM

MS. KOFKE: Objection to form.

THE WITNESS: My criticism is grounded in the fundamentals of event study analysis in the academic literature.

And, as I've said, I've had one experience at 3:57:28PM

Page 199

least where conducting an event study on the date of 3:57:30PM the alleged affirmed misstatement -- namely the Best Buy case -- was what the Court, I think, ultimately relied upon in determining not to certify the class.

And it wasn't a stock-price drop at the end. It 3:57:42PM was the absence of a stock-price increase on the date of the alleged affirmative misstatement.

BY MR. JANOSKI:

Q Again -- and then that case it was in the context of price impact -- right? -- not in the measurement of 3:57:50PM damages?

THE REPORTER: I'm so sorry. I missed your question. Would you kindly slow down? I think my brain is not keeping up with you today. I apologize.

MR. JANOSKI: I'm sorry. I know it's a lot 3:58:03PM of terminology we've thrown back and forth.

Q That -- sir, that Eighth Circuit case, the Best Buy case -- that was in the issue of price impact. Right? That wasn't discussing the proper measure of damages? 3:58:14PM

A That is true --

MS. KOFKE: Objection to form.

THE WITNESS: -- I think.

BY MR. JANOSKI:

Q Okay. All right. And, again, I think you've said 3:58:17PM

Page 200

this earlier; that there's nothing in the academic 3:58:19PM literature that says affirmative misstatements -- to measure an artificial of affirmative misstatements, you have to look at the date of the misstatements themselves. Right? 3:58:30PM

MS. KOFKE: Objection to form.

THE WITNESS: Again, I think you're mischaracterizing what I've said.

I've said the academic literature in the finance area, at least, generally doesn't address that topic; 3:58:40PM but there's an abundance of academic literature on event study analysis, and what event study analysis is capable of doing, and what it's not capable of doing. And that is the basis for saying that when there's an alleged affirmative misstatement, it is highly 3:58:55PM appropriate to conduct an event study analysis on the date of that alleged affirmative misstatement, just as we've done in Best Buy.

Regardless of whether it was price impact or methodology, there was an acknowledgment that it was an 3:59:08PM alleged affirmative misstatement. And it was appropriate to conduct event study analysis on that date. And that's perfectly consistent with the academic literature on event study analysis.

With an alleged omission, an event study analysis 3:59:23PM

Page 201

51 (Pages 198 - 201)

on the day of an alleged omission will not inform one 3:59:25PM as to whether or not the omission was contributing to artificial inflation on that day, because one would not expect the absence of a disclosure to have an impact directly on the stock price that would be discernible 3:59:39PM with event study analysis.

BY MR. JANOSKI:

Q Okay. And, sir, you understand that the defendants aren't challenging price impact here. Right? 3:59:49PM

A I don't know.

MS. KOFKE: Objection to form.

THE WITNESS: I don't know what they're challenging; but all I know is what I've been asked to do, and it doesn't deal with price impact. 3:59:57PM

BY MR. JANOSKI:

Q. You haven't been asked to issue a price-impact opinion in this case. Right?

A Correct.

Q Okay. And, sir, would you agree -- or I guess 4:00:04PM strike that.

If the Court agrees that the proper way to measure damages is to accept what the Seventh Circuit said and measure backward from the time of the corrective disclosure, could you tell me how this section, 4:00:22PM

Page 202

paragraph 33 to 54, is at all relevant to assessing the 4:00:23PM damage methodology?

MS. KOFKE: Objection to form.

THE WITNESS: I'm not a lawyer, sir. So I -- first of all, I don't even -- I mean, I -- you said if 4:00:33PM the Seventh Circuit accepts?

BY MR. JANOSKI:

Q I'm saying if the Court here accepts the statement that we saw in the Household opinion from the Seventh Circuit that the best way to measure damages, 4:00:45PM artificial inflation, is to back-cast from the date of the corrective disclosures -- if the Court accepts that that's the proper method here, is this section in any way relevant to assessing damage methodology?

MS. KOFKE: Objection to form. 4:01:03PM

THE WITNESS: I mean, you're asking me to render a legal opinion as to how relevant it would be to the Court. And I'm not a legal scholar, so I can't possibly answer that.

BY MR. JANOSKI: 4:01:13PM

Q My question is simply if the proper way -- just assuming that the proper way to measure damages is to back-cast, is there anything in this section, paragraph 33 to 54, that are relevant to your criticisms of Professor Feinstein's back-casting 4:01:27PM

Page 203

method? 4:01:30PM

MS. KOFKE: Objection to form.

THE WITNESS: Again, to place it in proper perspective, Mr. Janoski, I'm not a lawyer. I'm not here to offer legal opinions. 4:01:37PM

I'm offering economic analysis of what Professor Feinstein has proposed. And nothing a Court says will affect the economic analysis that I've provided. Whether the Court accepts the economic analysis or not is up to the Court. But everything 4:01:51PM that I've said in these paragraphs stands, regardless of a Court opinion.

Now, how it gets used in this case is obviously up to the Court.

BY MR. JANOSKI: 4:02:06PM

Q My question is much simpler, sir. Is there anything in this section, paragraphs 33 to 54, that you think is relevant to Professor Feinstein's proposed back-casting method? Again, not asking for a legal opinion. In your expert opinion, in the critiques that 4:02:19PM you lodge against Professor Feinstein, are any of the points here in paragraphs 33 to 54 relevant to critiquing the back-casting method?

MS. KOFKE: Objection to form.

THE WITNESS: Under what assumption? 4:02:38PM

Page 204

BY MR. JANOSKI: 4:02:40PM

Q The assumption that the back-casting method is proper.

A But then you're asking me to --

MS. KOFKE: Objection to form. 4:02:49PM

THE WITNESS: -- change the answer. I don't think it's proper.

BY MR. JANOSKI:

Q No, sir, I'm not asking you to say whether it's proper or not. 4:02:55PM

I'm just asking. You have a whole further section where you lodge your critiques against Professor Feinstein's proposed back-casting method. I understand that. But this section alone, Subsection B, paragraphs 33 to 54 -- would you agree that this 4:03:07PM section doesn't pertain to the proposed back-casting method?

MS. KOFKE: Objection to form.

THE WITNESS: And what do you mean by "pertain"? 4:03:22PM

BY MR. JANOFSKI:

Q In that this whole section is based from the starting point, like you said, or the premise that affirmative misstatements should have artificial inflation measured from the dates the statement was 4:03:37PM

Page 205

52 (Pages 202 - 205)

made. 4:03:39PM

A    Well, it -- again, as a matter of economics -- I'm not rendering a legal opinion, but as a matter of economics, it does pertain in the following sense. If, on the day of an alleged affirmative misstatement, one can conduct event study analysis, and one finds that properly implemented event study analysis, properly controlling for confounding information and so forth -- if, after doing all that, you find on the date of the alleged affirmative misstatement there was no statistically significant price movement, then there would be no reliable basis to believe that that alleged misrepresentation caused any artificial inflation in Cardinal's stock price.

If, instead of doing that, one were to use, as you define it, Professor Feinstein's vaguely described back-casting method, and that back-casting method resulted in some estimate of artificial inflation on that day, I would say as a matter of economics that there are problems with the back casting because, on the day where the alleged affirmative misstatement was made, there is, in my hypothetical, no statistically significant residual return. So any back-casting approach that assigned inflation to that day would be inconsistent with what actually happened to the stock

Page 206

price on that day. It would still pertain as a matter of economics.

Q    Okay. So I just -- I guess I want to understand what you just said there. It's your opinion that even if you're using the back-casting method, and artificial inflation is found for a certain day, it's proper to go -- whether it's a competing expert offering, or whatever, to look at these stock-price movements that day as a way to rebut or double-check whether inflation was properly there in the stock?

A    No.

What I'm saying is, as a matter of economics, especially in a case where you have alleged corrective disclosure dates that are three years after the beginning of the Class Period, if someone were to use a back-casting method to estimate artificial inflation on days where there were alleged affirmative misstatements, the error rate is likely to be high, because you have all these complexities that I discuss in my report that plagued the back-casting approach that Mr. Feinstein is proposing.

He doesn't acknowledge the complexities, other than confounding information. And in none of these instances does he propose a methodology to show how he's going to fine-tune the back-casting to properly

Page 207

account for these complexities. 4:06:28PM

So, having said that, if, let's say, hypothetically in this case, plaintiffs claim that there was an alleged affirmative misstatement earlier in the Class Period, three years before the alleged corrective disclosure, the most direct way of estimating whether that alleged affirmative misstatement caused any artificial inflation in Cardinal's stock price would be to conduct the event study on the day the alleged affirmative misstatement was made.

And I'm saying hypothetically if after doing that one concluded that there was no reliable basis to conclude based on event study analysis that on the day the alleged affirmative misstatement was made, there was any artificial inflation added to Cardinal's stock price, that would be a much more reliable method than back-casting in a haphazard way based on a residual decline three years later. And so that's where it does pertain to a so-called "back-casting approach."

Q    Okay. So, again, I'm not trying to put words in your mouth. I'm just trying to understand the concept.

I think -- is it right that you're saying that measuring the artificial inflation to be used as a check against -- sorry. I'll restate that.

Page 208

Measuring artificial inflation of the date of affirmative misstatements could be used as a check against a back-casting method?

A    No.

What I'm saying is that, as I say in the paragraph -- what is it? -- 34, as a starting point, in the case of alleged affirmative misstatements, it's most appropriate to start by doing an event study on that date.

Now, it might be that there's sufficient confounding information, or maybe the statements had been previously made, so there may be other reasons why you ultimately would say "I'm not going to use the residual return on that day to measure artificial inflation"; but at least as a starting point, that would be the most reliable method of determining whether that alleged affirmative misstatement caused Cardinal's stock price to increase artificially on that date.

So it's not a check. I would say that's the most direct measure.

And if you can't do it, then maybe you would have to resort to looking at the residual decline at the end, but then you have to address the issues that I've identified. And, again, Mr. Feinstein has not even

Page 209

53 (Pages 206 - 209)

acknowledged most of the issues, let alone proposed a methodology to deal with it.

Q   Okay. And, again, I just want to make sure I'm understanding the basis for this. The basis for this is based on your experience, and just the general principles of -- of economic finance?

MS. KOFKE:  Objection to form.

BY MR. JANOSKI:

Q   It's not that type of approach about starting with the affirmative misstatements, and then potentially back casting?  That's not articulated in the academic literature anywhere?

MS. KOFKE:  Objection to form.

THE WITNESS:  When you say "that's not articulated," what is the "that"?

BY MR. JANOSKI:

Q   Your approach of saying that the first step should be to look at the artificial inflation on the dates of affirmative misstatement, and that only then go to a back-casting method?

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah.  I mean, if the facts and circumstances lead you to believe that you can't reliably estimate artificial inflation that might have been added on the day of the alleged affirmative

Page 210

misstatement, then perhaps you go to the residual price climb at the end, but then you have to deal with all these other issues that, of course, I discuss in my report.

So the most direct way, at least to start, is to do the event study on the date of the alleged affirmative misstatement.

BY MR. JANOSKI:

Q   Now, you didn't do your own event study here. Right?  You just looked at the residual returns from Professor Feinstein's event.  Is that right?

A   Correct.

Q   Okay.  And in paragraph 35 it looks like you relayed that for 32 dates -- 32 of the 37 dates on which there were alleged misrepresentations, the residual returns were not positive and statistically significant.  Right?

A   Correct.

Q   Did you do anything in particular to analyze the statements on those 32 days to assess their nature?

A   Nothing beyond what I have in my report, no.

Q   Okay.  So you didn't analyze to see whether the statements released on those days reiterated information that had been previously disclosed?

A   Correct.

Page 211

MS. KOFKE:  Objection to form.

(Reporter requested clarification.)

THE WITNESS:  Yeah.  I said "Correct."

BY MR. JANOSKI:

Q   And you didn't analyze whether or not any of those alleged misstatements put out information that was in line with market expectations.  Right?

A   Correct.

Q   All right.  And I didn't analyze any of those 32 dates to see if there was any confounding negative news that could have affected the stock in the opposite direction.  Right?

A   Correct.

Q   Okay.  Why didn't you do any of that?

A   It was not necessary.  I'm not offering an affirmative analysis.  I'm certainly not offering loss-causation analysis.  But I'm identifying issues that a proposed-damages methodology would have to confront.  And in this section, I've highlighted it.

And I think you're adding to my case, frankly, by asking those questions.  Those are all things that -- a proposed methodology should describe how they're going to do that.  But at this point, I'm just raising them as issues that Mr. Feinstein has either ignored, or certainly hasn't proposed a methodology that will

Page 212

adequately deal with those issues.

Q   But you wouldn't have to deal with that if he's back casting.  Right?

MS. KOFKE:  Objection to form.

BY MR. JANOSKI:

Q   You wouldn't have to look at these 35 dates -- these 32 dates if he's back casting.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, if they're dates of alleged omissions, yes, he would.

And even the dates -- the five dates that I've identified -- if ultimately he decides either independently or based on advice from counsel that the five dates that I've identified were dates of alleged omissions, then presumably he's going to have to use his back-casting methodology, but presumably in a way that deals with the complexities that I've identified.

BY MR. JANOSKI:

Q.   Okay.  But you write off these 32 dates in your analysis just based on the statistically significant movements in the -- in the -- in the stock price. Right?  The fact that they were not positive and statistically significant?

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah.  I don't know what you

Page 213

54 (Pages 210 - 213)

mean by I write them off.                     4:13:40PM

BY MR. JANOSKI:

Q   Well, you -- you don't conduct any further analysis on them.  Right?

You go on to discuss the five days; do analysis on     4:13:45PM the five dates where there were statistically significant residual increases.  Right?

A   Right.  And those are five dates where, you know, if it is alleged that there were alleged affirmative misstatements, then potentially the fact that there are     4:14:02PM positive residual returns might provide potentially evidence on the surface that there was artificial inflation added to Cardinal's stock price that day.

But before one can reach that conclusion, as I point out, for all five dates, Professor Feinstein     4:14:21PM would have to address the fact that similar statements had been previously made.  And insofar that the alleged affirmative misstatements were stale, there's no reliable basis to believe in an efficient market that it would affect Cardinal's stock price.  And on all     4:14:39PM five dates there was confounding information which he would have to control for, which -- he doesn't describe how he'll do that.

With respect to the remaining 32 days, you're right.  There are not statistically significant     4:14:53PM

Page 214

positive residual returns.  However, even if it's     4:14:58PM alleged that on some of those dates there were alleged affirmative misstatements, Professor Feinstein or any reliable damages methodology might be able to account for the fact that on those dates there was     4:15:15PM countervailing negative confounding information.  And if one could properly control for that, it would show that really in -- what happened on that date was that there would have been artificial inflation, but for -- or there would have been a statistically significant     4:15:32PM positive return, but for the negative confounding information.  But that's all analysis that would have to be done.  And, again, Professor Feinstein has not proposed a methodology that's capable of doing that.

Q   When you say that's all analysis that would have     4:15:50PM to be done, that's analysis that would have to be done under your approach that states the first step is to look at affirmative misstatements on the -- inflation affirmative misstatements on the date they were made.  Right?                     4:16:04PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah.  I don't want to take ownership of that approach.  I mean, I certainly agree with that; but again, I think a lot of other people agree with that as well.                     4:16:14PM

Page 215

BY MR. JANOSKI:                     4:16:16PM

Q   Would you go to the next section, section -- it starts on page 32, I believe.  This is where you begin to discuss the proposed methodology back casting from the corrective disclosures.  Right?                     4:16:38PM

A   Yeah, I wouldn't really describe it that way, but I suppose it touches on what you described.

Q   Okay.  And in paragraph 35, again, you -- you -- you critique Professor Feinstein for not tying the artificial inflation to each individual alleged     4:17:01PM misrepresentation.  Right?

A   Correct.

Q   Okay.  And you state that if the Court finds some statements not actionable, then there's no reliable basis to estimate the inflation caused by the remaining     4:17:15PM statements.  Right?

A   Correct.

Q   And that's the same critique that you lodged against the plaintiffs' experts in Intuitive Surgical and Walter Investment Securities Litigations we looked     4:17:26PM at.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I'd be reluctant to say "same."  I mean, it's certainly similar, but...

Page 216

BY MR. JANOSKI:                     4:17:38PM

Q   Right.  And neither court accepted that critique as a basis for denying class certification.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah, I don't recall.     4:17:48PM

BY MR. JANOSKI:

Q   Okay.  And we also looked at that Household Seventh Circuit opinion -- right? -- where the jury found only 17 out of 40 alleged misstatements to be reliable.  Right?                     4:18:04PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I just can recall the language in what you had me read, and I -- that's what it said, I believe.

BY MR. JANOSKI:                     4:18:12PM

Q   Okay.  And when combined with the jury's liability finding, there wouldn't be a specific issue as to whether damages were being improperly attributed to statements where there's no liability.  Right?

MS. KOFKE:  Objection to form.     4:18:30PM

THE WITNESS:  I don't know.

BY MR. JANOSKI:

Q   Move to the next section, Subsection D, which starts on page 33.  Is it fair to say that this -- this section is focused on your critique of     4:18:54PM

Page 217

55 (Pages 214 - 217)

Professor Feinstein failing to account for time-varying 4:18:56PM inflation?

MS. KOFKE: Objection to form.

THE WITNESS: Well, again, I don't think I ever used that phrase. I'm not sure 4:19:08PM Professor Feinstein uses that phrase. So I'm reluctant to answer, unless, again, you give me a specific definition of what you mean by that.

BY MR. JANOSKI:

Q Yeah. I guess -- I guess the way I use 4:19:18PM "time-varying inflation" would be the need to adjust an inflation ribbon for different circumstances of the Class Period at different times.

A I think that's fair. Right? And, you know, the two major issues are the fact that the value of 4:19:39PM information can change over time; and then another factor is, of course, the information revealed in the alleged corrective disclosure is not necessarily information that could have been known or should have been known by defendants earlier in the Class Period. 4:19:58PM

Q So addressing those two in turn, on the first one, again, you haven't done any empirical analysis to determine how or whether the value of Cordis-related information changed over the course of the Class Period. Right? 4:20:19PM

Page 218

MS. KOFKE: Objection to form. 4:20:22PM

THE WITNESS: Yeah. Well, I've done analysis in the sense that I've identified that as an issue that a reliable damages methodology will have to address. And Dr. Feinstein has not identified that issue; 4:20:38PM at least, not in his report. And he certainly hasn't described a methodology that would address that issue.

BY MR. JANOSKI:

Q But you haven't come to a determinative conclusion as to whether or not the value of Cordis-related 4:20:55PM information changed from the Class Period. Right?

A Correct. But again, as I've said a couple times, it would be a miracle if the importance of Cordis to Cardinal did not change during a three-year period, certainly, based on my experience of looking at 4:21:14PM multi-business firms. And it would be a miracle if all of the business units changed in the same proportion over a three-year period.

Plus, as I indicated, you know, following the Cordis acquisition, Cardinal made more acquisitions, 4:21:28PM which presumably would change the relative importance of Cordis.

I -- I think it's simply an issue that obviously needs to be addressed, regardless of what the ultimate outcome is. 4:21:42PM

Page 219

And, again, Dr. Feinstein hasn't even acknowledged 4:21:43PM the issue, let alone proposed a methodology to account for the possibility that Cordis changed in its significance to Cardinal over the Class Period.

Q Okay. And you would have expected him to have 4:21:59PM acknowledged that issue before defendants even raised it?

MS. KOFKE: Objection to form.

THE WITNESS: I mean, it was an issue I was able to identify based on publicly available 4:22:08PM information. And if I had been asked to propose a damages methodology, that would be something that, you know, I would have thought about, and thought about how I might address that issue, and included it in my proposed methodology. 4:22:27PM

BY MR. JANOSKI:

Q And how would you address that issue if you were asked to calculate damages here?

A I haven't been asked, so that, again, I'm pointing out an issue that a reliable methodology should 4:22:37PM address. I have not to this date been asked to provide a reliable methodology.

Q I understand that, sir, but you've offered countless expert opinions before. You've done many valuation opinions. How would you go about valuing the 4:22:50PM

Page 220

change or accounting for the change in the value of 4:22:55PM Cordis information during the Class Period if you were asked to put forth a damage model here?

MS. KOFKE: Objection to form.

THE WITNESS: I don't know as I sit here. I 4:23:06PM haven't been asked yet. And I -- it would require thought and -- and, you know, I don't just shoot from the hip and tell you here's how I would do it. You'd have to think long and hard. And these are challenging issues that would require a lot of thought. 4:23:20PM

So, you know, I'm not prepared to tell you how I would do it. I haven't been asked.

He has been asked to provide a proposed methodology. And, in my opinion, one of the reasons he's failed to provide a reliable methodology is that 4:23:31PM he hasn't acknowledged this issue, among others.

BY MR. JANOSKI:

Q So you have no idea as to how one might go about accounting for the changing value of information over time? 4:23:44PM

MS. KOFKE: Objection to form.

THE WITNESS: Again, I think you're mischaracterizing me, sir. I didn't say I had no idea. I mean, there are possible ways to do it. It depends on data availability. It depends on thought. 4:23:54PM

Page 221

56 (Pages 218 - 221)

And so there are possible ways to do it, but that would require more investigation.

BY MR. JANOSKI:

Q   So what are some of the possible ways to account for the changing value of information over time?

A   Well, first you would start by looking at the changing value of Cordis to Cardinal Health over time. And that might require a discounted cash flow analysis, but that's only as good as the projections that one has. But you could just throw out the phrase "I'm going to do a DCF," but if you don't have good projections, no matter how sound the DCF is, it's sort of garbage in/garbage out, in which case you won't have a reliable estimate.

So there might be other ways you might ascertain value, such as maybe a market-multiples approach, but that would depend upon whether there are good comparable companies to just Cordis.

So there are a lot of layers to this that one would have to think about in terms of what the most appropriate methodology would be to come up with a reliable measure of how important Cordis was to Cardinal.

Q   Okay.  Well, you're aware that Professor Feinstein identified both those models -- right? -- the DCF model

Page 222

and the market-multiples approach, as potential valuation tools to address the issue of time-varying inflation?

MS. KOFKE:  Objection to form.

THE WITNESS:  Right.

I also said you can't just say, "Okay, DCF. Multiple."  I mean -- I mean, if he doesn't have good projections for Cordis, is he still going to use a DCF? If he can't -- if he can't find good comparable companies to just Cordis, is he going to use market multiples?

I mean, you can't just throw these phrases around without giving some thought to how appropriate they are to the problem you're trying to address.

And that's the problem, is he talks about standard valuation tools, but sometimes those standard valuation tools are not going to provide you with a reliable estimate.

BY MR. JANOSKI:

Q   Well, he identifies the same tools that you just identified.  Right?  Is it your critique that he just hasn't explained how he's going to use them?

A   Well, he was the one, again, who was asked to propose a methodology that can reliably estimate damages; I was not.

Page 223

You asked me.

I told you it would require more thought, more investigation, more understanding of what kind of data is available.

So I'm certainly not disputing the fact that those are potential valuation tools that, for that issue, might be appropriate; but they might not be.

Q   So you'd want to thoroughly investigate and look into the issue before you propose any type of methodology like that.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm not saying thoroughly investigate, in the sense that you have to conduct the analysis; but you know, you could indicate that this is the methodology that I'm anticipating I will use, and it will depend upon the following factors.

And if those factors don't realize -- if they can't be realized -- so, for example, with the DCF, if you don't have good projections for Cordis, you really can't do a meaningful DCF.

And so you could say I -- you know, I planned to do a discounted cash flow model, pending the availability of good projections.  In the absence of good projections, I will then use the following methodology that requires me to identify perhaps good

Page 224

publicly traded comps that are comparable to Cordis.

I mean, there's -- if the goal is to provide comfort that what you're going to end up with is reliable, to me, it's necessary to kind of go through that type of analysis without conducting the analysis.

BY MR. JANOSKI:

Q.  So you'd want him to identify all of the potential inputs and assumptions that may go into the model, without actually making a decision as to which one he's going to use?

MS. KOFKE:  Objection to form.

THE WITNESS:  I mean, I'm not saying all of the inputs.

What I'm saying is that a general recognition that you can only do a meaningful DCF really if you have meaningful projections.

And to just say "I can do a DCF" -- you can.  I mean, you can go through the motions if you don't have good projections, but what you'll end up with is not reliable.

And if the purpose is to propose a methodology that will provide a reliable estimate of damages, in my opinion, again, from the perspective of a financial economist, in order to give me confidence that Mr. Feinstein can do this, I would like him to explain

Page 225

57 (Pages 222 - 225)

on this particular issue: What is your methodology? 4:28:32PM

Q. Wouldn't the best projections of Cordis be housed at Cardinal?

MS. KOFKE: Objection to form.

THE WITNESS: I presume that would be the 4:28:44PM case, but I -- you know, I don't know firsthand, but I presume that's true.

BY MR. JANOSKI:

Q So to determine whether or not that data is even available, wouldn't you have to conduct some discovery, 4:28:54PM and actually look at whether those projections were available or not?

MS. KOFKE: Objection to form.

THE WITNESS: And that's fine. I mean, if -- if he had said -- first of all, he didn't even 4:29:04PM acknowledge this issue, Mr. Janoski.

But if he had, and he had said, "The way I'm going to deal with this as part of my methodology is to estimate the relative value of Cordis. And I plan to use a DCF valuation of Cordis, pending the availability 4:29:19PM of projections which we hope to receive in fact discovery," or something like that -- and then, failing that, if no such projections exist, then the question is: How do you do it?

Page 226

BY MR. JANOSKI: 4:29:35PM

Q Would you be satisfied with a statement like that?

A I mean, it would depend on how --

MS. KOFKE: Objection to form.

THE WITNESS: -- the statement is. 4:29:41PM

As -- again, not as a matter of law, but as an economic issue, the ultimate test would be: Has he provided confidence that he can do this?

And potentially if he said "This is my preferred approach, pending the availability of data. If this 4:29:57PM data is not available, then this will be my second-best approach" --

BY MR. JANOSKI:

Q All right.

A -- and then talk about what's necessary to do 4:30:08PM that.

But the question is, at the end of the day: Can you do this in a reliable manner?

Q Yeah. And it's up to the Court to ultimately determine whether the methodology's reliable or not. 4:30:20PM Right?

A That would certainly be my presumption, sure.

Q In paragraphs 60 through 63, I think these go to the other big point that you mentioned where you claim that his methodology doesn't account for information 4:30:37PM

Page 227

that could not have been known earlier in the Class 4:30:41PM Period. Do you see that?

A Correct. Yes.

Q Wouldn't that issue be resolved by the jury's liability findings, in that, if they find there's no 4:30:49PM liability at the beginning of the Class Period because the defendants didn't know, doesn't that kind of take your concern off the table?

MS. KOFKE: Objection to form.

THE WITNESS: I mean, all else equal. But 4:31:04PM again, there are so many complex issues in this case, that with respect to that one issue, perhaps. But again, that doesn't necessarily bless what otherwise the inflation ribbon would be.

BY MR. JANOSKI: 4:31:19PM

Q. Okay. But again, going back to what the Seventh Circuit said in that Household opinion, if the job of the jury is to take the model and apply it to their liability findings, doesn't that alleviate the concern of the model back casting too far if the jury finds 4:31:35PM that there's no liability at a certain point in time?

MS. KOFKE: Objection to form.

THE WITNESS: Well, this also now dovetails a bit with the issue we just discussed a little while earlier, which is that Professor Feinstein hasn't tied 4:31:48PM

Page 228

the individual alleged misrepresentations to a certain 4:31:55PM amount of artificial inflation.

BY MR. JANOSKI:

Q Okay. And, again, wouldn't that be addressed by a jury finding? 4:32:07PM

MS. KOFKE: Objection to form.

THE WITNESS: When you say that. But again, as a matter of economics, I'm not sure it is addressed by a jury. Maybe as a matter of law. But as a matter of economics, I mean, the issue still remains that, you 4:32:19PM know, if certain alleged misrepresentations are not actionable because it was determined that the defendants didn't have knowledge, but you haven't disaggregated the overall inflation ribbon to account for each individual alleged misrepresentation, then, as 4:32:34PM a matter of economics, I don't know how long you would reliably dismiss some of the alleged misrepresentations that are deemed by the Court to be not actionable, because all you have is one lump-sum inflation number.

BY MR. JANOSKI: 4:32:54PM

Q Well, is it -- again, isn't that what the Household case talks about; about measuring the value of truth instead of trying to measure the value of each misstatement?

MS. KOFKE: Objection to form. 4:33:07PM

Page 229

58 (Pages 226 - 229)

THE WITNESS: Again, I haven't studied the Household case, sir, so I can't give you an opinion as to what that case was saying.

BY MR. JANOSKI:

Q In any event, for your -- your multiple critiques about what I termed "time-varying inflation," isn't it true that whether or not the inflation ribbon properly accounts for the changing value of information or the changing value of the defendants' knowledge -- isn't that still an issue that's common to all of the class members?

A I'm sorry. Can you repeat that?

Q Yeah. Isn't -- isn't the inflation ribbon, and whether or not the inflation ribbon reliably accounts for changing information, or defendants' knowledge, all these complexities that you address -- isn't the issue of time-varying inflation common to all the class members, in that no class member would be treated differently? Even if the ribbon's accurate or inaccurate, it's still treating them all the same?

A Well, but again, you know, Professor Feinstein has not described the methodology with any real specificity. And there are these complex issues that we keep talking about. And without a methodology that describes how he's going to address those issues, I --

Page 230

I don't see how I'm in a position to say, without even knowing the methodologies that would have to be used, whether or not it would be applied equally across all class members. I -- until he sets forth what those methodologies are, there's no way to know that.

Q Well, let's say you're valid. And let's say a Court agrees that he fails to account for some complexity that you addressed. Right? Wouldn't that failure be true for all class members?

MS. KOFKE: Objection to form.

THE WITNESS: And, again, I'm not an attorney.

It might be; but it might affect them differentially depending on when they were buying, when they were selling.

And without knowing how he's going to address these issues, as a matter of economics I don't know whether that's correct or not. I'm not making a legal judgment on that, though.

BY MR. JANOSKI:

Q Going to the next section of your report, Section E, which starts on page 37 at paragraph 64, again, one of the uncertainties or complexities that you address is the need to account for known versus unknown risks. Right?

Page 231

Is that right, sir? Is that what you're --

A I am sorry. I thought I said "Correct." I'm sorry. I didn't know you were waiting for an answer.

Q Yeah. And again, similar to what we've just discussed, if -- if the realization of a known versus unknown risk needs to be accounted for in the inflation ribbon, isn't that -- doesn't that affect all class members equally?

A Again, I -- I think the issue has to be -- in order for the damages estimate to be reliable, this is an issue that has to be addressed. This is one where it's not clear how valuation tools directly would allow Mr. Feinstein to address this topic, but somehow it would have to be addressed if one is going to have a reliable estimate of damages.

And, depending on how he addresses it, I don't know whether it would affect class members equally from an economics perspective.

Q Okay.

A But again, I'm not making a legal judgment.

Q And you understand that part of plaintiffs' allegations here are that the company misled investors about the likelihood of success of the Cordis integration and acquisition generally. Right?

A If you want to direct me to the Complaint on that,

Page 232

I mean, I -- I'd prefer to look at the specific language, but I don't recall the word "likelihood" in the Complaint. I could be wrong, but...

Q Okay. Well, I'm not sure if that's -- if it's phrased the exact way I phrased it.

I'm just saying from a general, 50,000-foot level, you generally understand that the misrepresentations in this case are about the success of the Cordis acquisition and integration. Right?

A Among other things, I think the allegation is there were misrepresentations about the integration and success.

Q Yeah. And you're not offering any opinion at this point as to whether investors were provided fulsome and accurate information to assess the risks of the Cordis integration. Right?

A Correct.

Q And, generally speaking, when you talk about known versus unknown risks, how do you -- how do you determine what's known and what's unknown? Is it just public information versus nonpublic information?

A Well, that's a good question. And that's another indication of how complex these issues are. And it's an issue that, again, Dr. Feinstein didn't even acknowledge in his report, and certainly didn't propose

Page 233

59 (Pages 230 - 233)

a methodology for dealing with.

So as I sit here today, again, I haven't been asked to propose a methodology. If I did, I'd give thought to that.

Q   But sir, this is -- this is one of the complexities that you yourself raise. So given that it's in your report, how do you use the term "known" versus "unknown risks"?

A   Well, certainly there are -- there are risks that are known to the market.

And, as I indicate in my report, you know, there are three broad bases for that. One is that there's an abundance of literature in the academic and also practitioner literature that, you know, clearly recognizes that acquisitions generally and expected synergies more specifically are risky, and often are not achieved. And that's known, you know, in the public markets.

Second is we know that Cardinal itself disclosed that the acquisition was risky even on the first day of the Class Period when they announced the acquisition, you know, they stated that the actual results may differ materially -- I believe was what they said -- from what is expected, which the market probably would know anyway, but the company certainly disclosed that.

Page 234

And throughout the Class Period the company made statements such as "This is not a simple integration process. We wish we had more visibility into inventory," and so on and so forth, all of which, you know, was indicative of the fact that there are risks associated with this integration.

And then, third, we had the analysts' reports. And I, you know, document the frequency with which analysts made statements indicating that, you know, they, among other market participants, recognized that there were risks associated with acquisitions generally, and this one in particular.

And then I guess the fourth bucket of information that I cite are the plaintiffs' own investment managers that recognized there was risk associated with this acquisition.

Q   Okay. So generally speaking, then, when you use the term "known risks," you would mean risks that were available in the marketplace that were publicly available. Right?

A   I think that's fair.

Q   Okay. And going through the section, I know you just discussed some of these, but you cite the academic literature -- right? -- for the proposition that acquisition synergies are not often realized. Right?

Page 235

A   Correct.

Q   All right. Do you think investors take that academic literature to give announced synergies and accretion benefits with a grain of salt when they're announced by a company?

MS. KOFKE: Objection to form.

THE WITNESS: I don't know what you mean by "a grain of salt." I mean, I do know a lot of my academic research has been on mergers and acquisitions, and how the stock prices of acquiring firms as well as targets react to acquisitions. And there's a lot of variation. So it, again, depends on facts and circumstances.

But you know, there are many instances where a company will announce an acquisition, and notwithstanding the fact that they say they think there are lots of synergies involved, the market decreases the acquiring firm's stock price. And oftentimes that means they're disagreeing with management as to whether or not there are likely synergies.

So, again, I don't know what you mean by "a grain of salt," but then there are other cases where the acquiring company's stock price increases when they announce an acquisition, in which case the market generally is concurring; that they agree that there are

Page 236

substantial synergies here. So I think it's very fact specific.

BY MR. JANOSKI:

Q   You also cite some of the company's disclosures about the risk of integration in the following paragraph. Right? Paragraph 66.

A   Correct.

Q   You -- you cite some of the risk-disclosure language from the press release. Right?

A   And you're talking about the first bullet point?

Q   Yeah, the first bullet point.

A   Correct.

Q   And -- you go on to quote the defendants at various points in the Class Period, where they generally talked about difficulties with integration process. Right?

A   Among other things, correct.

Q   Yes. You also cited analysts' reports discussing the risks of integration. Right?

A   Correct. That's paragraph 67.

Q   Yeah. And then you go on and cite several of the plaintiffs' investment managers about the risks of integration. Right?

A   That's right.

Q   So if all these risks are known in the

Page 237

60 (Pages 234 - 237)

marketplace, wouldn't those be incorporated into the valuation of stock price of the company?

A   The known risks would be, correct.

Q   Yes.  So if the known risks are already incorporated into the market price, those wouldn't necessarily need to be accounted for in a damages model.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm not sure what you mean by "accounted for."

BY MR. JANOSKI:

Q   Well, you say that any proposed damage methodology that Professor Feinstein put forth needs to account for the differences between known and unknown risks, but if the known risks are already incorporated into the stock price, isn't that already taking those off the table?

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, again, I don't know what you mean by "off the table," sir, in the following sense; that -- so if you have an alleged corrective disclosure that reveals that the expected synergies --

I'm not talking about Cardinal; just as a theoretical matter.

-- that expected synergies were not realized, and you see a stock-price decline, that stock-price decline

Page 238

could represent materialization of risks that were known to the market and already baked into the stock price, or it could be the materialization of an undisclosed risk.

And at the risk of putting -- using the word "risk," just maybe a simple numerical example would illustrate what I'm getting at here.

Q.  Sure.  If you think it's helpful, yeah.

A   So, to make it very simple, let's just say that at the time of an acquisition, the market assumes there's a 20 percent chance that $100 million of value that is expected to be created will not be realized, which means there's an 80 percent chance, according to the market, that it will be.

So the simple -- so the simple math would be, even though what's projected is a $100 million, the market says, "Well, we think there's only an 80 percent chance of that," so the company's value only goes up by $80 million.

And now let's say there's an allegation that certain risks were not disclosed.  And one then would have to conduct analysis as to how the concealment of that risk would change the market's assessment of the probability that the synergies wouldn't be achieved.

And let's say, after doing a reliable analysis,

Page 239

one concludes that, but for the alleged misrepresentation, the market would have viewed the probability that the synergies wouldn't be achieved would be 30 percent, not 20 percent.  So it raised that probability by 10 percentage points, which means instead of increasing the value of the company by $80 million, the concealment of this information caused the stock price to be $10 million overvalued, because if the market had the true information, it would have realized that there's a 30 percent chance that the $100 million would not be realized.  So the real value of that allegedly concealed risk is only $10 million.

Now you roll forward to the alleged corrective disclosure date.  And the market finds out that the synergies are not achieved.  And the stock price again had $80 million baked into it with expected synergies.  So that now drops to zero.

And if one ignores this issue, one would basically say, presumably, that the alleged damages here is $80 million, when the proper analysis would have shown the damages was only 10 million, because the allegedly concealed information would have only raised the probability of the synergies don't get achieved by 10 percentage points.

But all you know at the end is there's a

Page 240

materialization of risk.  And some of it is the materialization of the risk that was known -- the 20 percent probability -- as well as the risk that was unknown, which was the 10 percentage points, which was concealed.

But you can't take the full price movement at the end and say that that's a reflection of the damages that investors incurred because of the alleged misrepresentation.

And, again, this is an issue that is fairly fundamental.  I think Professor Feinstein should have known that a reliable damages methodology will have to address it.  And he doesn't even mention it in his report.  I think in his deposition he acknowledged that indirectly, that this is an issue; but he certainly doesn't propose a methodology that would give an economist comfort that he can reliably estimate damages here.

Q   Now there's a lot to unpack there, sir.

What do you mean when you say actual level of risk?  Because the company never goes out and discloses:  We have an 80 percent chance of making our synergy targets.  Right?

How would one determine the actual level of risk percentagewise like that, when that type of information

Page 241

61 (Pages 238 - 241)

**Page 242**

is never out there? 4:49:51PM

MS. KOFKE: Objection to form.

THE WITNESS: That's a great question. We know that -- and I think Professor Feinstein acknowledged in his deposition that the known risks 4:50:01PM would be reflected in Cardinal's stock price.

And you're asking a great question: How does one measure that?

And that's my point, is that this is an issue that a reliable damages methodology will have to confront. 4:50:12PM

And the question is: How do you do it?

And it's not obvious how one does it.

And Professor Feinstein will have to propose, as a matter of economics -- I'm not making a legal statement. But as a matter of economics, he would have 4:50:27PM to propose a methodology to reliably do that, if the goal is to have a reliable estimate of damages.

BY MR. JANOSKI:

Q   Sir, is that anywhere in the academic literature; that he would have to do this type of calculation? 4:50:40PM

A   Well, again, I think this is based on fundamental valuation analysis that, you know, the market is based on risks and probabilities.

I think Professor Feinstein himself acknowledges that one of the risks with an acquisition is the risk 4:50:55PM

**Page 243**

you may not achieve the synergies. 4:50:59PM

Now the question is: How do you measure this?

And that's your question. That's a great question. And that's a question that will have to be addressed if one is going to have a reliable measure of 4:51:08PM damages.

Q   But aren't you constructing an impossible standard here? Because you want the expert to not only calculate the actual level of risk, but what the market's perception is, including all -- the countless 4:51:20PM number of market participants who have varying levels of risk and acceptance of levels of risk, when that information is already incorporated into the stock price.

MS. KOFKE: Objection to form. 4:51:34PM

THE WITNESS: Well, first of all, I'm going to say I'm not asking him to do something impossible. Again, I'm not offering a legal opinion.

What I'm saying is that this is a challenging economic issue. And if the goal is to have a reliable 4:51:42PM estimate of damages, it has to be addressed. And --

BY MR. JANOSKI:

Q   But --

A   -- no matter how difficult it may be, what is the alternative? That you don't address it, and then you 4:51:56PM

**Page 244**

have an unreliable measure of damages? 4:51:58PM

Q   But if the concealed risks are precisely what the company misled the market about, isn't that accounted for in the damages model as it is?

MS. KOFKE: Objection to form. 4:52:09PM

THE WITNESS: No, because if you go back to my example -- and I apologize if it was on the spot and long-winded, but if you go to my example and unpack it, if you take the stock-price drop at the end of my example, that's $80 million, but that's the 4:52:20PM materialization of both the known risk and the unknown risk.

And if you only looked at the unknown risk on an ex-ante basis -- i.e., before the world learned that the synergies would not be achieved -- the damages 4:52:34PM would only be $10 million, and yet that stock-price drop at the end would vastly overstate the damages associated with the alleged concealment of that risk.

BY MR. JANOSKI:

Q.   But how is that the case, if the known risks are 4:52:48PM already incorporated into the stock price?

A   Because the materialization is a materialization of both the known and the unknown risk.

Again, simple example. I won't go through the whole thing, but if, based on all of the public 4:53:01PM

**Page 245**

information, the market came to the judgment 4:53:05PM collectively -- individuals can differ, but collectively -- that there was a 20 percent probability that $100 million of synergies would not be achieved, then only $20 million would be taken out of that value 4:53:15PM at that time.

But now you roll forward three years. And if the synergies were not achieved, the stock-price drop would be the full $80 million, because the market was expecting $80 million of synergy value, and they got 4:53:29PM none. So the value drops by 80 million, even without fraud. And that's the materialization of the known risk.

But -- but it seems if you don't acknowledge this issue, you're going to attribute that entire 4:53:44PM stock-price drop at the end to the materialization of the alleged conceal risk, which -- my example only amounted to $10 million of damages; not the full stock-price drop at the end.

Q   Okay. But then how do you -- again, how do you 4:54:01PM measure what's concealed versus what's a known risk? Isn't that a fully qualitative subjective standard?

MS. KOFKE: Objection to form.

THE WITNESS: I think you're asking me exactly what the point of my report is, which is that 4:54:12PM

this is an important issue. It's -- it's not -- this is an issue that -- he doesn't address it, but he claims that everything's going to be straightforward.

This is not straightforward. And this is something that is important if one is to have a reliable damages estimate.

And your question is exactly right. It's a very, very difficult issue. And Professor Feinstein has not given us any comfort that he has a methodology that will appropriately deal with this.

BY MR. JANOSKI:

Q. Well, do you have an opinion as to how you would measure what the actual risk was of Cordis successfully hitting its accretion and synergy targets?

MS. KOFKE: Objection to form.

THE WITNESS: Again, I haven't been asked to propose a methodology; he has.

And I'm just pointing this out as an issue that he would have to deal with.

If I had been asked to do this, you know, I would give it a lot of thought. And it would be very, very challenging. And whether or not I could find the tools in finance or anywhere else to reliably estimate it is something I don't know. Maybe I would. Maybe I wouldn't.

Page 246

But the bottom line is that the goal is to have a reliable estimate of damages. You have to deal with this issue in a reliable way.

BY MR. JANOSKI:

Q. And you'd agree, though, that the company never spoke about levels of risk in percentage terms. Right?

A. I can't say what they ever did. I don't know.

Q. Okay. All right. Are you aware of any situation in which the company gave a percentage number of risks to the success of its -- of the Cordis integration?

A. I don't know either way.

Q. And are you aware of any investors or analysts that would have articulated the percentage of risk that they viewed on these same items?

A. I don't know.

Q. In paragraph 73 you criticized Professor Feinstein's approach of using the residual declines, because you state that it implicitly assumes that market participants had assumed there was a hundred percent probability that the projected synergies from the Cordis acquisition would be realized.

What's the basis for that statement that it assumes market participants assume a hundred percent possibility [sic]?

Page 247

A. Well, the fact that he didn't even acknowledge there was any risk associated with the synergies. And, again, this is an obvious point that doesn't require fact discovery. This is based on publicly available information. It should have been obvious. And I think when I read his deposition, he now acknowledges that, yes, there are risks associated with synergies.

So, again, just taking that stock-price drop at the end, and recognizing that some of it may be a materialization of both known and unknown risks, you know, indicates that you can't take the full price drop at the end. You have to fix it for how much was materialization of known versus unknown.

When I wrote this, it appeared from his report that he wasn't even acknowledging the notion of risk. And when he said, "I'll just do the event study at the end, and I'll back-cast," that certainly suggests that there was no appreciation for the fact that some of that price drop at the end could have been materialization of a known risk.

And by ignoring risk completely, it certainly sent the message to me that if he was going to take the stock-price drop at the end, he must have thought that investors believed that, you know, the -- that the synergies would be achieved with a hundred percent

Page 248

probability.

Perhaps he would say, "No, that's not what I meant," in which case he then was acknowledging that there were known risks, which I think then would be an acknowledgment that he has to separate the materialization of known versus unknown risk.

Q. I guess I'm -- sir, I'm just still having trouble understanding how taking the residual decline assumes that the investors themselves assumed a hundred percent risk, when -- sorry -- a hundred percent probability, when we know that the risk that they took into account would already be incorporated into their valuation, and then, in turn, the stock price.

A. He never said that in his report, sir. When he proposed his methodology, he never addressed the issue. He basically said, "Do the event study at the end. We'll back-cast." Never even recognized this issue.

Q. Well, sir --

A. Now, in his deposition he did acknowledge upon questioning that, yeah, the risks would be reflected in the stock price, but he never said that in his report.

And if you're proposing a methodology to estimate damages, and you're going to rely upon the stock-price drop at the end, it should be obvious that you're going to have to account for how much of that stock-price

Page 249

63 (Pages 246 - 249)

drop at the end reflected the materialization of known risks versus unknown risk.

Q   Sir, you haven't done any analysis to determine how much of that stock-price drop was from a known versus unknown risk.  Right?

A   No.  And, again, I think that goes beyond my assignment.  I wasn't asked to do that.

Q   So, again, why are you expecting Professor Feinstein to account for that, when it's not even clear that that's an issue in this case yet?

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, two things.

He, as I understand it, is supposed to propose a methodology that would provide a reliable estimate of damages.  And if you're not going to address this issue, your estimate of damages will not be reliable.

And when you say this may or may not be an issue in the case, I'm not, again, speaking from a lawyer's perspective, so I'm not saying legally whether it will or it won't.  As a matter of economics, it fundamentally is a part of this case.  And reliable estimate of damages very much has to account for this.  You can't just hand-wave, and say "Let's look at the stock-price drop at the end."  Tell me how you're going to deal with this, Professor Feinstein.

Page 250

And he hasn't yet told us.

BY MR. JANOSKI:

Q   Okay.  All right.  I mean, it seems to be a similar critique you have with all of these, is that he didn't address every possible contingency that may arise in this case.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm not sure I have identified every possible contingency.  I've identified a half dozen or so that are very, very evident, just based on the public record.  And a methodology that purports to reliably estimate damages is necessarily going to have to confront these issues.

BY MR. JANOSKI:

Q   Can you go to page -- sorry -- page 46, Section G?

MS. KOFKE:  Marco, if you're going to move to another section, could we take a break?  It's been, I think, an hour fifteen.

MR. JANOSKI:  Yeah.  That's fine.

MS. KOFKE:  How about ten minutes?  Is that good?

THE WITNESS:  Sounds great.

THE VIDEOGRAPHER:  Thank you.  Stand by.  This marks the end of Media Number 4.  Going off the record at 5:01 p.m. Eastern.

Page 251

(Recess taken from 5:01 p.m. until 5:16 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 5:16 p.m. Eastern, and this marks the beginning of Media Number 5 in the deposition of Professor Kenneth Lehn.

Please proceed, Counsel.

BY MR. JANOSKI:

Q   Welcome back, Professor Lehn.  You understand that you're still under oath?

A   I do.

Q   Okay.  Did you review any documents in the break just now?

A   I did not.

Q   Okay.  And did you discuss the substance of your testimony with anybody?

MS. KOFKE:  Objection to the extent it seeks communications with counsel.

THE WITNESS:  I don't believe so.  No.

BY MR. JANOSKI:

Q   Okay.  Going back to your report, we're on page 46, Subsection G.  This section concerns your critique Professor Feinstein for purportedly failing to describe how he would account for confounding information.  Right?

A   Correct.

Page 252

Q   And that's a similar critique that you lodged against the plaintiffs' experts in the Intuitive Surgical and Walter Investment cases that we looked at earlier right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Yeah, I'd say it's similar.  Not identical, but similar.

BY MR. JANOSKI:

Q   Okay.  And neither court accepted that critique as a basis to deny class certification.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I don't recall.

BY MR. JANOSKI:

Q   Okay.  But you would agree that accounting for confounding information is a loss-causation analysis that doesn't need to take place at the class-certification stage.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  I'm not an attorney.  It's my understanding that the analysis is not expected to be performed at this stage, but that's different from a methodology that would allow one to estimate damages.

BY MR. JANOSKI:

Q   So, again, your critique is just that you claimed the methodology hasn't been officially articulated at

Page 253

64 (Pages 250 - 253)

this stage.  Right?                          5:18:04PM

A   Well, again, if the goal is to propose a methodology that will provide a reliable estimate of damages, you know, this is an issue that will have to be addressed.  And there's no discussion of the methodology that Professor Feinstein will use to address it.          5:18:15PM

So, again, as a financial economist I can't have confidence that he will be reliably able -- able to reliably estimate damages in this matter until he describes the methodology he will use.          5:18:32PM

Q   Isn't confounding information a fairly common issue in securities litigations that deal with corrective disclosures on earnings dates?

A   It is, yes.                             5:18:49PM

Q   And you're not saying that it's impossible to disaggregate the confounding information in this case; are you?

A   I am not saying that.

What I'm saying is you don't know the extent to which you can reliably control for confounding information, unless you've developed a methodology that you believe will allow you to do so.          5:18:58PM

Q   If you were asked to give a loss-causation or damages opinion in this case, how would account for          5:19:16PM

Page 254

confounding information?                      5:19:19PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, I haven't been asked.

BY MR. JANOSKI:

Q   But how would you -- sir, you've done it before; haven't you?          5:19:25PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Every case is different.  And it depends on the facts and circumstances.  And I haven't been asked to do it in this case, so therefore I'm not prepared to provide an answer as to how I would do it.          5:19:34PM

BY MR. JANOSKI:

Q   I understand you haven't been asked, sir; but again, given your nearly 30 years of expertise as a testifying expert, you don't have any idea as to how you would possibly value confounding information in a case like this?          5:19:43PM

MS. KOFKE:  Objection to form.

THE WITNESS:  Again, I haven't been asked at this stage.  I've raised it as an issue.  And if I am asked, at some point, then this is an issue I will have to deal with as well; but I haven't been asked at this point.  So as I sit here today, I don't have an opinion as to how I would deal with it.          5:19:55PM / 5:20:09PM

Page 255

BY MR. JANOSKI:                              5:20:10PM

Q   Again, I understand you don't have a formal opinion, and you haven't been asked to offer that here yet; but do you have any idea how you could possibly measure confounding information in this case if you were asked to do so?          5:20:19PM

A   Again, you know, there are a number of potential tools that could be used.  And if I was asked to develop a methodology to reliably estimate damages, I would lay out the categories of confounding information, and the tools that I think are most appropriate for addressing that confounding information.  But I haven't been asked to do that, so I'm not prepared to answer that.          5:20:39PM

Q   Okay.  So you -- you think that you would have to, as a first step, identify all of the confounding information before -- while -- when you're first proposing that damages methodology?          5:20:54PM

MS. KOFKE:  Objection to form.

THE WITNESS:  No.  And, again, I think I've answered this before.          5:21:06PM

I -- I think it's obvious that there are certain categories of information that would be confounding information, and that doesn't require fact discovery.

And there are certain tools that may or may not be          5:21:20PM

Page 256

appropriate for valuing that information.  And we talked before that potentially a discounted cash flow model, but that depends on projections.          5:21:23PM

And so one can go through possible ways to address the issue, pending the availability of the appropriate data, and then indicate that, in the absence of such data, you will address it in an alternative way.  But -- but have some general discussion, without doing the analysis, that, you know, would raise confidence that one can reliably control for the confounding information.          5:21:36PM / 5:21:53PM

BY MR. JANOSKI:

Q   And are you aware of any court opinion that has required a plaintiffs' expert to give that level of detail at the class-certification stage?          5:22:06PM

A   I'm not, but I'm not a legal scholar, so there's no reason why I would be aware of that.

Q   Again, you discussed potential tools, and you mentioned discount cash flow model.  Any other potential tools that you could use to disaggregate confounding information?          5:22:19PM

A   Well, it again depends on the nature of the confounding information.  So, you know, there potentially would be other tools, but it would depend on what the information was.          5:22:34PM

Page 257

65 (Pages 254 - 257)

Q    And what are those potential other tools?    5:22:37PM

A    Well, again, you know, we've discussed this.  I mean, you know, from a valuation point of view, absent market prices, the two most commonly used tools when the data is available would be the discounted cash flow    5:22:53PM model, and market multiples; but market multiples are often not going to provide you with a reliable estimate, unless you can find companies that are truly comparable to the one you're trying to value.  So, depending on the nature of the information that is    5:23:14PM confounding, the market-multiples approach may or may not provide a reliable estimate of value.

So those -- those are two possibilities, but you can't just say you're going to do them, and then be assured that that will give you a reliable estimate,    5:23:34PM because many times neither the discounted cash flow model nor the market multiples will provide you with a reliable estimate of value.

Q    So what level of detail do you think would be required for you to get comfortable with a reliable    5:23:48PM method of disaggregating confounding information?

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, again, to show first of all an appreciation for the fact that, you know, here is the type of confounding information that was    5:24:02PM

Page 258

released on the key dates by categories; and then    5:24:04PM indicate, you know, what are the proposed methodologies for controlling for the effect of that confounding information, because if you can't reliably control for the effect of the confounding information, you cannot    5:24:20PM reliably estimate damages as a matter of economics.

Again, I'm not offering a legal opinion.

BY MR. JANOSKI:

Q    Okay.  So you think that in your -- again, not -- not legally, but just in your own opinion, you think    5:24:39PM that at the class-certification stage there should be an identification of the different categories of confounding information that were released on the corrective disclosure dates?

MS. KOFKE:  Objection to form.    5:24:55PM

THE WITNESS:  But unpacking your question, I just have trouble with it, sir, because I think you said you acknowledge.  Okay.  It's not a legal opinion, but you feel at the class-certification stage -- you know, you're asking me to make a legal opinion.    5:25:07PM

I'm not referring to what's required at the class-certification stage as a matter of law.

But counsel has asked me to evaluate whether Professor Feinstein has proposed a methodology that meets the three criteria that I raised before.    5:25:21PM

Page 259

And unless you can provide confidence that you can    5:25:25PM reliably control for the effect of confounding information, I don't see how his proposed methodology can provide confidence that he can reliably estimate damages.  And it's not obvious how one would control    5:25:44PM for confounding information in this case.

So, as a matter of economics, yes, I would expect him to describe the methodology he will use generally to control for confounding information.

BY MR. JANOSKI:    5:25:56PM

Q.  Well, doesn't potential confounding information affect all class members equally?

A    I'm always reluctant to make broad statements.  And until he proposed a methodology, I don't see how I could agree to that.  I mean, it would depend on how he    5:26:12PM does it.

Q    Could you think of a situation in which confounding information released on a corrective disclosure date would affect one class member differently from another?    5:26:25PM

A    No, but if he's going to control for confounding information in a way that will affect the inflation ribbon or the alleged inflation ribbon, until I know what methodology he's going to use, I -- I don't see how I can agree to the fact that whatever methodology    5:26:44PM

Page 260

he uses can be used on a classwide basis, because he    5:26:48PM hasn't disclosed a methodology.

Q    Okay.  Well, let's -- let's assume that he's constructing an artificial inflation ribbon, back casting from the corrective disclosure dates, and    5:26:59PM accounts for confounding information with either a DCF model or a valuation model.  Is there any way in which class members would be treated differently under that methodology?

MS. KOFKE:  Objection to form.    5:27:17PM

THE WITNESS:  Are you asking me to assume that he reliably controls for --

BY MR. JANOSKI:

Q    Yes.

A    -- the confounding information?    5:27:26PM

Q.  Yes.

A    I mean, if you bake all of those assumptions in, as I sit here, I can't see why.

Q    Yeah.  In paragraph 75 you state that Professor Feinstein "...does not describe what    5:27:40PM 'standard tools of valuation' he would actually apply, or how any tools can reliably address the different pieces of confounding information that were released by Cardinal Health throughout the proposed Class Period."

Again, you saw the section where    5:27:56PM

Page 261

66 (Pages 258 - 261)

**Page 262**

Professor Feinstein listed earnings multiples valuation 5:27:57PM models and discounted cash flows as examples of the tools he would actually apply. Right?

A   If you could refer me to his report.

MR. JANOSKI: Yeah. Do you have -- here I 5:28:10PM could -- I think that's Exhibit 14 right here. Could you refresh Exhibit Share? You should see as Plaintiff's Exhibit 15 --

(Plaintiff's Exhibit 15 marked for identification.)

THE WITNESS: Yes, I do see it. Yep. 5:28:51PM

BY MR. JANOSKI:

Q   Okay. And if you go to page 41 of his report, I believe that's where he lists some of the valuation tools?

A   Okay. That's paragraph 146. 5:29:06PM

Q   So do you see he lists valuation multiple models and discounted cash flow models?

A   Correct.

Q   Are those two of the models that you identified as potential tools to measure confounding information. 5:29:39PM Right?

A   Yeah, but I think you accurately said "potential." What I say in this sentence is he doesn't describe what he would actually apply.

Q   Okay. So, again, I just want to make sure your 5:29:51PM

**Page 263**

critique is not that he hasn't identified tools that 5:29:57PM would -- that would be -- situation; just he hasn't described the approach for which specific tool he's going to use at this point?

MS. KOFKE: Objection to form. 5:30:09PM

THE WITNESS: Well, it's more involved than that, Mr. Janoski. Again, he's not identified the unique complexities this case and identified the issues that he would have to address if he was to develop a reliable damages analysis. So one is he hasn't 5:30:25PM identified those issues.

And then, other than just listing a laundry list of so-called "valuation tools," he doesn't say with any specificity which tools would be used to address which issues. And, again, a fulsome description of a 5:30:44PM reliable methodology would do so, and he has not.

BY MR. JANOSKI:

Q   So you think he -- at this stage he should decide which tools he would use, and how he would apply it?

MS. KOFKE: Objection to form. 5:31:05PM

THE WITNESS: Again, I'm not offering a legal opinion as to what is required. But as a matter of financial economics, the methodology he has proposed sweeps the tough issues under the rug, and doesn't provide any confidence that he is capable or the 5:31:21PM

**Page 264**

methodology that he's described is capable of 5:31:24PM generating a reliable estimate of damages in this case.

BY MR. JANOSKI:

Q   But you would agree that, generally speaking, discount cash flow models and valuation multiple models 5:31:36PM can be used to value certain pieces of information or to disaggregate certain pieces of confounding information?

MS. KOFKE: Objection to form.

THE WITNESS: They can, but there's also a 5:31:50PM recognition in the valuation literature that they can be abused. I mean, there's nothing inherent in a discounted cash flow model or a market multiples model that says simply because you're using those models, you're going to get a reliable estimate of value. They 5:32:05PM can be manipulated. They can be abused.

There are oftentimes battles over the quality of a DCF or the quality of a market multiples analysis. And you can't just say "I'm going to use one of these models. And trust me. I'll come up with a reliable 5:32:21PM estimate."

I mean, again, as an economist, you would expect there to be more detail; more discussion of what are the potential advantages, what are the shortcomings of these different approaches, and which is the preferred 5:32:33PM

**Page 265**

approach that the person is going to use. 5:32:36PM

And, again, Mr. Feinstein does nothing more than present the laundry list in paragraph 146.

BY MR. JANOSKI:

Q   In paragraph 76 through 79 you discuss examples of 5:33:07PM potential confounding information that was disclosed on dates of the affirmative -- what you deem -- or sorry. Excuse me. Strike that.

Paragraph 76 through 79 you discuss examples of potential confounding information that were disclosed 5:33:34PM on the dates of some of the alleged misrepresentations. Right?

A   Correct. That's right.

Q   Would those -- if the proper methods to measure damages is to back cast from the corrective disclosure 5:33:49PM dates, is there any need to analyze confounding information that's disclosed on the dates of the misstatements?

MS. KOFKE: Objection to form.

THE WITNESS: Well, I -- again, we say if 5:34:01PM it's appropriate to back-cast. Again, we're back to another issue, which is, insofar that there are alleged affirmative misstatements, which I think Professor Feinstein acknowledges there may well be, then I would take issue with the fact that back casting 5:34:19PM

67 (Pages 262 - 265)

is the appropriate method for creating an inflation ribbon, for all of the reasons that we discussed previously about affirmative -- alleged affirmative misstatements versus alleged omissions, in which case, then, looking at these 37 dates and looking at confounding information on the 37 dates is highly relevant.

BY MR. JANOSKI:

Q   Okay.  But again, that's not quite my question, sir.  If we could just agree, hypothetically speaking, if it's -- if the proper method is to measure backwards from the date of the corrective disclosure, regardless of the type of statement, and the back casting reliably accounts for the confounding information that was released on the date of the corrective disclosure, there wouldn't be any need to look at the confounding information that was released on the dates of the alleged misstatements.  Right?

MS. KOFKE:  Objection to form.

THE WITNESS:  Well, again, from an economics perspective, I would say that if there is an agreement, that all of the alleged misrepresentations were alleged omissions, and there were no alleged affirmative misstatements, then I think I accept your proposition that one would not really have to worry about

Page 266

confounding information on the dates of the alleged misrepresentations.

But insofar that there is an acknowledgment that there are at least some alleged affirmative misstatements, then I would take issue with the hypothetical that back casting would be the appropriate way to go, because I just think it's fundamentally incorrect.

BY MR. JANOSKI:

Q   I understand there's disagreement here as to whether back casting is appropriate for the affirmative misstatements; but again, just all else being equal, if that's -- if that's true, if that's the correct approach for even affirmative misstatements, and the confounding information is accounted for in the corrective disclosure date, isn't it true that you wouldn't need to account for any confounding information in the -- on the dates of the actual misstatements?

MS. KOFKE:  Objection to form.

THE WITNESS:  If you make all of those assumptions, but in order for you to determine that on the alleged affirmative misstatement date, you can't look at the residual return because you can't control for confounding information.  You would have had to

Page 267

look at the confounding information to make that judgment.

That may lead you to say, "Yes.  We'll look at the alleged corrective disclosure," but I don't think -- I don't think the answer to your question is, yes, you could just ignore it.  In order to get to where you want to get -- namely, the back casting -- you would have had to look at the confounding information.

BY MR. JANOSKI:

Q   Under your approach.  Right?  Under looking -- under looking -- taking that first step for what you deem affirmative misstatements.  Right?

A   Correct.  I wouldn't -- again, I'm not taking ownership of the approach.  When you say my approach, I...

Q   The approach you say is the required first step here.  Right?

A   In my experience, it's a generally accepted approach for affirmative alleged affirmative misstatements.

Q   Okay.  And if you look at paragraphs 80 through 38, you discuss and cite some examples of potential confounding information that was disclosed on the dates of the alleged collective -- corrective disclosures.  Right?

Page 268

A   Correct.

Q   Okay.  And specifically on paragraphs 82 and 83, you cite certain portions of analysts' reports from the corrective disclosures described?

A   Correct.  That's right.

Q   Okay.  Did you review any analysts' reports to determine if they valued the Cordis-related disclosure on that date, as opposed to the other -- what you deemed confounding disclosures?

A   I'm sorry.  Can you repeat that question?

Q   Yeah.  Did you review any analysts' reports to see if they put specific valuation on the Cordis-related disclosures as posed to the non-Cordis-related disclosures?

A   I don't recall that I did, no.

(Plaintiff's Exhibit 16 marked for identification.)

BY MR. JANOSKI:

Q.  Okay.  If you refresh Exhibit Share, Mr. Lehn, you should be able to see what's been marked as Plaintiff's Exhibit 16.  For the record, Plaintiff's Exhibit 16 is a May 3rd, 2018 report from Nephron Research --

A   Mm-hm.

Q   -- bearing Bates Number CAH-SDOH2.19-CV-3347-00386249 through -253.

Professor Lehn, I know this report wasn't listed

Page 269

68 (Pages 266 - 269)

in the material that you relied upon, but do you recall reviewing this report at all when you were looking at your big binder balance reports?

A   It's possible. I don't -- don't recall offhand.

Q   Okay. If you look at the very bottom of the first page, there's boded language on commentary for fiscal year '19. Do you see that?

A   Yeah. I do.

Q   And the sentence after that, it looks like this particular analyst used an earnings multiple model. Is that -- is that right? Is that what they're -- you glean from that sentence?

A   I'm sorry. Which sentence? We're lowering our price target?

Q   Yeah.

A   Right. It appears to be. Yep.

Q   It looks like the price target was based on an earnings multiple of EPS. Right?

A   It appears to be, yes. Yeah.

Q   Okay. And if you look at the next page, page 2, what happened at Cordis -- it looks like they attributed certain EPS figures to the Cordis-related disclosures. Right?

    MS. KOFKE: Objection to form.

    THE WITNESS: If you could direct me.

Page 270

BY MR. JANOSKI:

Q   Yeah. Under the -- the first bullet point under that heading, "What Happened at Cordis," this Nephron analyst estimates an eight- to ten-cent EPS impact for the inventory reserve adjustment that Cordis took. Right?

A   It appears to be. Correct.

Q   Okay. And under the next bullet point he identified 13-cent EPS impact from the change in effective tax rate that was caused by the Cordis inventory reserve. Right?

A   It appears to be, yes.

Q   Okay. And they even go on in that sentence to identify six items -- or six cents of discrete items on the tax rate that was not related to Cordis. Right?

A   I'm sorry. What are you reading there? Sorry.

Q   Do you see at the last sentence of that second bullet point, where it says the tax rate was also impacted by six cents of the --

A   Yes.

Q   -- discrete items not related to Cordis?

    THE VIDEOGRAPHER: Sorry. Professor Lehn, tilt your camera.

    THE WITNESS: Okay. Yeah.

    THE VIDEOGRAPHER: Thank you. Continue, please.

Page 271

please.

BY MR. JANOSKI:

Q   So this particular analyst was able to have EPS estimates valuing the impact of the Cordis-related disclosures against the other disclosures that day. Right?

    MS. KOFKE: Objection to form.

    THE WITNESS: It appears they're trying to segregate the effect of the Cordis news from others; that -- or at least with respect to these items, yes.

BY MR. JANOSKI:

Q   And given that they've put this out on the same day of the actual disclosures, is it fair to say that it wouldn't be that complicated a task to assign or estimate value of certain pieces of information related to Cordis; confounding information?

    MS. KOFKE: Objection to form.

    THE WITNESS: I would -- I would disagree with that, sir.

BY MR. JANOFSKI:

Q   Why is that?

A   Well, I mean, valuation is a very challenging subject. If -- if you're suggesting that valuation is a simple as applying the 12.1 multiple to these EPS numbers, it's complicated. It's not as easy as you're

Page 272

suggesting for a number of reasons.

    First of all, this is one analyst. So it's one analyst changing the price target on the consolidated entity with a multiple of 12.1, without knowing where the 12.1 is coming from. But -- but wherever it's coming from, it's for the consolidated EPS.

    The appropriate multiple for one business is not necessarily the same as the multiple for the consolidated entity, because multiples depend on things like the riskiness of the company or the unit. And the riskiness of Cordis might be different from the risk of the entire Cardinal company.

    It also depends on the expected growth.

    It depends on the return on invested capital for the company versus the unit.

    And so there's no reason to believe that the multiple for the consolidated entity can just be attached, willy-nilly, to an EPS number for an individual business unit.

    Second is that, you know, they mention down below that certain items are not recurring. And it's not appropriate to apply multiples to items that are not recurring items.

    And I'm not even sure that the $40 million reserve adjustment should be treated as a recurring item that

Page 273

69 (Pages 270 - 273)

would be subject to a multiple. Again, I haven't investigated this, so maybe it would, but on the surface it's not obvious that it would.

So to suggest that this is a simple valuation exercise is far from -- far from accurate.

BY MR. JANOSKI:

Q You'd agree that research analysts value the company every single day. Right?

MS. KOFKE: Objection to form.

THE WITNESS: I don't think every single day. Price targets are lumpy. They change. Sometimes they are maintained for weeks or months.

BY MR. JANOSKI:

Q. Well, whatever periodic basis they update their models or their targets, that they're continuously valuing companies. Right?

A For the consolidated company, correct.

Q And at least this is one example of the analyst being able to put an EPS estimate onto the Cordis-related disclosures, as opposed to the non-Cordis-related disclosures. Right?

MS. KOFKE: Objection to form.

THE WITNESS: Again, at least with respect to some items, yes. I don't know about every item.

Page 274

BY MR. JANOSKI:

Q Okay. So it's not your opinion -- right? -- that Professor Feinstein can't do a similar analysis. It's just your opinion that he hasn't articulated how he's going to do that analysis yet. Is that right?

MS. KOFKE: Objection to form.

THE WITNESS: Well, I mean, first of all, I'm not sure I would necessarily buy into the fact that what Nephron has done would give you a reliable estimate. Maybe it would. Maybe it wouldn't. But it's only one estimate.

And to certainly -- I mean, to imply that you could take the multiple for the entire company, and just apply it to the different EPS estimates for the different Cordis-related actions is just not correct. I mean, you can't do that, for the reasons that you gave.

So the question would be if Professor Feinstein ultimately decides he's going to use multiples analysis to try to value, you know, this salient information about Cordis, I would expect he's going to have to defend the multiple that he uses.

And -- and that's -- you can't just take the company multiple and apply it to one business unit, without doing analysis to make sure that the business

Page 275

unit would deserve the same multiple that the consolidated entity did, which is highly unlikely.

BY MR. JANOSKI:

Q Would you agree, then, that whatever model is used, the inputs -- whether it's a valuation model -- and the multiple and the type of multiple used requires a thorough analysis?

A Exactly. And I'm not suggesting the analysis be done at this stage, just like the Ph.D. proposal doesn't have to do the analysis.

But you have to provide a methodology that says "I can do this," and Professor Feinstein has not done that.

Q Okay. But you're not saying that it's impossible to disaggregate confounding information in a reliable manner. Right?

A It's not impossible, but it may be that, depending on the nature of the issue, one comes to the conclusion that none of the tools that Professor Feinstein has listed are capable of providing a reliable estimate. I mean, that's a very real possibility. And if you don't have a reliable estimate, you don't have a reliable damages model.

Q But you haven't done that type of analysis yet -- right? -- to determine whether or not an EPS model or

Page 276

valuation multiple model would be reliable for disaggregating confounding information?

MS. KOFKE: Objection to form.

THE WITNESS: No. I think that is the whole point, Mr. Janoski. I'm not suggesting he do the analysis, but what I am suggesting is -- not only suggesting, but claiming -- that in order to develop a reliable damages methodology, he's going to have to address this issue.

And he tells us nothing really about how he's going to do it. And so how can one have confidence that his proposed methodology will provide us with a reliable estimate of damages?

BY MR. JANOSKI:

Q Well, that's the same critique that was lodged against the plaintiffs' expert in the Walter Investment case -- right? -- that they hadn't articulated how they were going to deal with the complexities of the confounding information?

MS. KOFKE: Objection to form.

THE WITNESS: Again, I don't think it was the same. It might be similar.

And, again, I'm not making a legal judgment here.

And, you know, the arguments that I raised or the issue I raised in those other cases still hold as a

Page 277

70 (Pages 274 - 277)

matter of economics, regardless of the Court ruling. 5:49:56PM And I respect the courts, but -- and the Court in this matter can, you know, use the information that I provide in the class-cert. stage as it sees fit.

But as a matter of economics, in order to get a 5:50:11PM reliable estimate of damages, you have to reliably control for confounding information. And Dr. Feinstein has not told us how he plans to do that.

BY MR. JANOSKI:

Q   Okay. But when that same critique was lodged 5:50:23PM against the plaintiffs in Walter Investment, the Court said that that should be left for the loss-causation stage. Right?

MS. KOFKE: Objection to form.

THE WITNESS: I don't recall what the Court 5:50:35PM said.

BY MR. JANOSKI:

Q   Go to the last section of your report, which is page 56, beginning at paragraph 85. So this section, you criticized Professor Feinstein for not providing 5:50:50PM specific details about valuation tools that he listed. Right?

A   Among other things, correct.

Q   But you do -- you do acknowledge that he's identified potential tools he could use. It's -- your 5:51:07PM

Page 278

critique is just that he hasn't explained how he would 5:51:10PM use them?

MS. KOFKE: Objection to form.

THE WITNESS: Again, among other things, that's correct. 5:51:23PM

BY MR. JANOSKI:

Q   Okay. And, again, you haven't offered a damage methodology in this case. Right?

A   I was not asked to.

Q   All right. 5:51:35PM

A   So I haven't.

Q   Okay. And do you have an opinion one way or another as to what valuation tools would ultimately appropriate for the facts and circumstances of this case? 5:51:45PM

A   Not as I sit here today. Again, I've identified a number of issues that will have to be addressed, but I haven't been asked to develop a methodology to address them. If I am at some point, then I obviously will give thought to that; but as I sit here today, I don't 5:52:00PM have an opinion on that.

Q   And you're aware that equity analysts that followed Cardinal Health during the Class Period used valuation multiple models to value Cardinal stock?

A   I believe some did. Yes. 5:52:17PM

Page 279

Q   And you're aware that other analysts used DCF 5:52:19PM models to value Cardinal stock during the Class Period?

A   I believe that's correct.

Q   Okay. And then, sir, can you just point me, in your time working as a class -- you know, as a defense 5:52:34PM expert in the class-certification stage for these securities litigations, can you point me to any other case where a plaintiff has provided the type of information that you're asking for at the class-certification stage? 5:52:49PM

MS. KOFKE: Objection to form.

THE WITNESS: I can't recall any, as I sit here today.

MR. JANOSKI: Okay. I have no further questions for you. Thank you for your time today, 5:53:03PM Professor Lehn.

THE WITNESS: Thank you, Mr. Janoski.

MS. KOFKE: We have no questions.

THE VIDEOGRAPHER: Okay. Stand by, everyone, please. 5:53:15PM

Is there anything else from the court reporter or counsel before I conclude the record?

MS. KOFKE: Oh, actually, one thing. We -- Dr. Lehn would like the opportunity to review the transcript and submit errata, if appropriate. 5:53:28PM

Page 280

MR. JANOSKI: And, Lydia, can we get an 5:53:33PM expedited order on the transcript?

THE REPORTER: How soon do you wish to receive it, sir?

MR. JANOSKI: Any time next week, if 5:53:49PM possible. Or we can talk about this off the record. I didn't realize we were still on.

THE VIDEOGRAPHER: This concludes today's deposition of Professor Kenneth Lehn. Total number of media used is five. Going off the record at 5:24 p.m. 5:53:59PM Eastern Standard Time.

(Time noted: 5:24 p.m.)

Page 281

71 (Pages 278 - 281)

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: July 5, 2022

LYDIA ZINN, RPR, FCRR
CSR No. 9223

Page 282

---

LAUREN M. KOFKE, ESQ.
lmkofke@wlrk.com
July 5, 2022
RE: LOUISIANA SHERIFFS' PENSION & RELIEF FUND
JULY 1, 2022, KENNETH M. LEHN, PH.D., JOB NO. 5290567
The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:
__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.
__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, noting the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.
__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.
__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 283

---

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, noting the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.
__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 284

---

RE: LOUISIANA SHERIFFS' PENSION & RELIEF FUND
KENNETH M. LEHN, PH.D., JOB NO. 5290567
E R R A T A  S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

_____  _____
WITNESS                      Date

Page 285

72 (Pages 282 - 285)