# EXHIBIT 18

Case No.: 5:13-CV-01920-EJD

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE INTUITIVE SURGICAL SECURITIES LITIGATION | ) Case No.: 5:13-CV-01920-EJD |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## EXPERT REPORT OF KENNETH M. LEHN

**October 15, 2015**

Exhibit
P0010

**I.     Qualifications**

1.     I am the Samuel A. McCullough Professor of Finance in the Joseph M. Katz School of Business at the University of Pittsburgh.  I teach undergraduate and graduate level courses in finance, including courses on business valuation, corporate restructuring, and corporate governance.  I also am an affiliated professor of law at the University of Pittsburgh.  I have published 50 scholarly papers, primarily in the field of corporate finance.  I have served on the editorial boards of several scholarly journals and am a founding editor of the Journal of Corporate Finance.

2.     I was chief economist of the Securities and Exchange Commission ("SEC") from 1987 to 1991 and deputy chief economist from 1984 to 1985.  During my time at the SEC, my staff and I assisted the SEC's division of enforcement on dozens of matters involving alleged violations of U.S. securities laws.  Much of this work involved event study analysis that examined how securities prices reacted to the release of information.  Since leaving the SEC, I have been retained by various parties in litigation, including both plaintiffs and defendants, to opine on, among other issues, price impact, materiality, loss causation and damages.  On multiple occasions, I have submitted reports and provided testimony on issues related to class certification.

3.     I received a B.A. in economics from Waynesburg College in 1975, an M.A. in economics from Miami University in 1976, and a Ph.D. in economics from Washington University in 1981.  My curriculum vitae, which lists my publications and recent testimony, is attached hereto as **Exhibit A**.

1

purchases of Intuitive common stock" and that "[w]hen Defendants' prior materially false and misleading statements and omissions began to be disclosed and became known to the market, the price of Intuitive common stock declined precipitously as the prior artificial inflation was removed from the price of Intuitive common stock."[45]  Plaintiffs further claim that "[a]s a result of their purchases of Intuitive common stock at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial economic loss (*i.e.*, damages under the federal securities laws) as the truth was revealed."[46]  Plaintiffs claim that the truth was revealed to the market five minutes before market close on February 28, 2013 and after market close on March 5, 2013, April 18, 2013, July 8, 2013, and July 18, 2013.[47]

19.     Plaintiffs have retained Chad Coffman to "examine and opine on whether the market for Intuitive [] common stock [] was efficient during the Class Period" and "whether damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder…."[48]

20.     Coffman states that in an efficient market "security prices adjust to new publicly available information rapidly and in an unbiased fashion" and that "all publicly available information is reflected in a security's current market price."[49]  Based in

---

45. Amended Complaint, ¶¶ 172-173.  I understand that the only remaining false and misleading statements pertain to the "misleading statements and omissions that concealed da Vinci defects and performance problems in violation of FDA regulations." *Id.*, ¶¶ 182-215.
46. *Id.*, ¶ 173.
47. *Id.*, ¶¶ 174-178.
48. Expert Report of Chad Coffman, CFA, September 1, 2015 ("Coffman Report"), ¶ 1.
49. *Id.*, ¶ 16.

part on his event study analysis of Intuitive's stock price, Mr. Coffman opines that the market for Intuitive's common stock was efficient throughout the Class Period.[50]

21. Mr. Coffman also opines that "[a]lthough I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters, and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole."[51]

22. I have been retained by Counsel for the Defendants to offer opinions on three issues.

23. First, Counsel has asked me to evaluate whether the information that Intuitive allegedly omitted to disclose regarding the Claims was publicly available prior to the end of Plaintiffs' proposed Class Period.

24. Second, Counsel has asked me to evaluate whether there is a reliable basis to conclude, based on an analysis of Intuitive's stock price on the dates of the alleged misrepresentations and/or the alleged corrective disclosures, that the alleged misrepresentations had an impact on Intuitive's stock price during the Class Period.

25. Finally, Counsel has asked me to evaluate whether Mr. Coffman has set forth a well-settled common methodology that can be used to estimate damages in this matter.

---

50. *Id.*, ¶ 6.
51. *Id.*, ¶ 73.

iv. The information in the alleged corrective disclosure on July 8, 2013 that supposedly "corrected" the alleged misrepresentations regarding the three Claims had been previously disclosed. Hence, if the market for Intuitive's stock is efficient then there is no scientific basis to conclude that the alleged corrective disclosure had an impact on Intuitive's stock price on this date. Moreover, the alleged corrective disclosure regarding Intuitive's Q2 2013 earnings could not have been disclosed by Defendants as of the dates of the prior alleged misrepresentations.

v. The information in the alleged corrective disclosure on July 18, 2013 that supposedly "corrected" the alleged misrepresentations regarding the three Claims had been disclosed previously. Hence, if the market for Intuitive's stock is efficient then there is no scientific basis to conclude that the alleged corrective disclosure had an impact on Intuitive's stock price on this date. Moreover, the information about the FDA Warning Letter released on this date could not have been disclosed by Defendants on the prior alleged misrepresentation dates.

3. Mr. Coffman does not demonstrate that alleged class-wide damages can be calculated in this matter subject to a common and reliable methodology consistent with Plaintiffs' claims.

   a. For the same reasons that the alleged corrective disclosures cannot be used to demonstrate price impact, they cannot be used to establish loss causation and damages.

   b. Mr. Coffman's proposed methodology does not isolate the impact of each alleged misrepresentation on Intuitive's stock price. As a result, Mr. Coffman has not proposed a methodology that allows him to adjust his estimate of damages if the Court finds Defendants liable for some but not all of the alleged misrepresentations.

   c. Mr. Coffman does not provide a methodology for disentangling the effect of confounding information about Intuitive released on the alleged corrective disclosure dates from the effects of the alleged corrective disclosure.

   d. Mr. Coffman does not provide a reliable methodology for distinguishing the effect of the alleged corrective disclosure from the effect of the alleged misrepresentation on April 18, 2013.

28. I elaborate upon and provide the bases for my opinions in the remainder of this report.

15

date, but not the *fact* that FDA would issue a Warning Letter. Yet, this risk was publicly disclosed when the FDA published the Form 483 on its website on June 25, 2013. Hence, the information regarding the FDA Warning Letter released on July 18, 2013 represents the materialization of a known risk, not the disclosure of an allegedly concealed risk.

74. For the aforementioned reasons, the alleged corrective disclosure on July 18, 2013 does not demonstrate price impact.

**V. Mr. Coffman does not demonstrate that alleged class-wide damages can be calculated subject to a well-settled common methodology consistent with Plaintiffs' remaining claims**

75. Mr. Coffman opines that "it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the 'out-of-pocket' method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale…."[107] Mr. Coffman further claims that "the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class."[108] However, the "most common methodology" by itself cannot account for the facts and circumstances in this case for several reasons as explained below. Consequently, Mr. Coffman does not demonstrate that

---

107. Coffman Report, ¶ 72.
108. *Id.*, ¶ 73.

39

alleged class-wide damages can be calculated in this matter subject to a well-settled and common methodology consistent with Plaintiffs' remaining claims.

76.     As explained above, there is no reliable basis to conclude that event study analysis of Intuitive's stock price on the alleged misrepresentation and alleged corrective disclosure demonstrates price impact.  For the same reasons, the event study methodology proposed by Mr. Coffman does not provide a reliable estimate of the alleged inflation, if any, in Intuitive's stock price during the Class Period that is due to the alleged misrepresentations.  As a result, Mr. Coffman does not establish that he has a reliable methodology to estimate the alleged artificial inflation in Intuitive's stock price and class-wide damages in this matter.

77.     Moreover, Plaintiffs claim multiple alleged misstatements regarding the alleged safety of the da Vinci during the Class Period.  Mr. Coffman's methodology does not isolate the effect of each alleged misstatement on Intuitive's stock price.  As a result, Mr. Coffman has not proposed a methodology that would allow him to adjust his estimate of alleged inflation if the Court finds Defendants liable for some but not all of the alleged misstatements.  As presently described Mr. Coffman's estimate of per share inflation is identical regardless of whether the Court finds Defendants liable for one, some, or all of the alleged misstatements.  Similarly, Mr. Coffman's estimate of per share inflation is identical regardless of whether the Court finds Defendants liable for one or more of the Claims.

78.     Mr. Coffman does not provide a reliable methodology for disaggregating the effects on Intuitive's stock price of confounding information released on

40

the alleged corrective disclosure dates from the effects, if any, of the alleged corrective disclosures. This is particularly relevant for the alleged corrective disclosures on April 18, 2013, July 8, 2013, and July 18, 2013 when confounding negative information about Intuitive was released concurrently with the alleged corrective disclosure.

79. Plaintiffs claim that the news of the FDA survey and possible safety concerns impacted Intuitive's Q1 2013 financials as announced on April 18, 2013 and its preliminary Q2 2013 financials as announced on July 8, 2013, which in turn allegedly impacted Intuitive's stock price.[109] Even if one hypothetically assumes that Plaintiffs' allegations are true, in order to estimate the artificial inflation in Intuitive's stock price caused by the alleged misrepresentations, Mr. Coffman must show how he will reliably estimate (1) the impact on the Company's financials from the allegedly concealed information as opposed to other factors (seasonality, lower admission rates, lower capital expenditure spending by hospitals, and so forth), (2) the impact on the Company's financials from the revelation of the alleged fraud as opposed to other "negative news" (e.g., AAGL, JAMA, ACOG), and (3) the impact of the resulting change in the Company's financials on the Company's stock price. An event study, as proposed by Mr. Coffman, by itself cannot be used to analyze any of these three issues in a reliable way.

80. Similarly, Mr. Coffman's proposed event study cannot be used to assess what portion of the stock price decline on July 19, 2013, if any, was caused by the Company's disclosure that it had received an FDA Warning Letter as opposed to other news

_____

109.    Order, at 4.

41

released by the Company, namely lower than expected guidance and reimbursement issues in Japan. In fact, as discussed in the previous section, analyst commentary suggests that most, if not all, of the decline on that day was caused by the Company's lowered guidance, which Plaintiffs do not allege is a corrective disclosure.

> Intuitive Surgical (ISRG) reported 2Q13 results that were inline with the negative pre-announcement [], but significantly cut guidance and suggested that the pressure on system placements will continue into 2H. Along with the guidance cut, management also commented that they do not expect additional procedures to gain reimbursement in Japan during the April 2014 insurance revision, a clear negative, given that many investors view Japan as one of the primary growth drivers in the future (and since reimbursement can only be obtained every other year, ISRG is unlikely to see additional procedures covered until 2016).[110]

> Lowered Guidance Reflects Persisting Procedure/System Headwinds. Bottom Line: ISRG's lowered 2013 sales growth outlook, though anticipated (following last week's preannouncement), was even lower than we and the Street had expected. While we could gradually begin to get more constructive on ISRG following yet another expectation (and stock price) "re-set," for now we stay at MP pending greater clarity: (1) slowing system trends are more macro/transient vs. structural in nature, and/or (2) that increased adoption into key general surgery applications can begin to offset incremental headwinds in benign dvH. Our valuation reduces to $410 (vs. $560).[111]

> Last night, Intuitive Surgical provided updated guidance that now reflects a meaningfully weaker system placement outlook for the remainder of 2013. Sales and net income for 2Q13 were largely in-line with the lower-than-expected preliminary results announced earlier this month, reflecting soft GYN growth that drove weaker-than-expected procedure volumes and lower y/y U.S. unit placement. Guidance now calls for 2013 sales growth to be flat

---

110. "Perfect Storm – Guidance Slashed, Additional Japan Reimbursement Unlikely in 2014, and FDA Warning Letter Received," J.P. Morgan, July 19, 2013.

111. "Lowered Guidance Reflects Persisting Procedure/System Headwinds," Leerink Partners, July 19, 2013.

to +7% versus the prior "high-end" of 16-19% range, reflecting declining system sales in 2H13. We expect estimates to move lower to reflect the revised 2013 outlook but we are inclined to think management's new outlook reflects a conservative view for the remainder of the year that to us seems achievable, possibly beatable….Updated guidance now reflects a lower and wider range given uncertainty around benign GYN growth and the resulting impact to U.S. system placements.[112]

81.     Mr. Coffman's proposed methodology also does not describe how he plans to address the fact that both an alleged misrepresentation as well an alleged corrective disclosure were made on April 18, 2013.[113]  According to Plaintiffs' claims, the alleged corrective disclosure had a negative effect on Intuitive's stock price, whereas the alleged misrepresentation had the effect of either adding artificial inflation to Intuitive's stock price or maintaining some amount of the alleged inflation in Intuitive's stock price.  Given that there was not a statistically significant decline in Intuitive's stock price on April 19, 2013, Plaintiffs' claim must be that but for the alleged misrepresentation on this date Intuitive's stock price would have declined further.  But Mr. Coffman has not described a reliable methodology for parsing the alleged countervailing effects of the alleged corrective disclosure and the alleged misrepresentation on Intuitive's stock price on April 19, 2013, nor am I aware of a reliable methodology that is capable of doing this.

82.     Mr. Coffman also provides no reliable basis to assume that the impact of any alleged misrepresentations regarding any of the Claims would have been the same at the start of the Class Period as it was at the end of the Class Period or at any point in

---

112.    "ISRG: Lowered 2013 Guidance Appears Conservative," Wallach Beth Capital, July 19, 2013.
113.    Amended Complaint, ¶¶  176, 211-215.

43

between.   This appears important because the number of lawsuits and negative public press distinct from the allegations, i.e., the statements by AAGL and ACOG and the study in JAMA, was substantially more prevalent during the period of the alleged corrective disclosures as opposed to at the beginning of the Class Period.

83.     In sum, Mr. Coffman has failed to demonstrate a reliable methodology for calculating class-wide damages in this matter.


_Kenneth M. Lehn_

Kenneth M. Lehn

44