UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| LOUISIANA SHERIFFS' PENSION & RELIEF FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:19-cv-03347 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | District Judge Edmund A. Sargus, Jr. |
| | ) | Magistrate Judge Elizabeth A. Preston Deavers |
| vs. | ) | |
| | ) | |
| CARDINAL HEALTH, INC., et al., | ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

DECLARATION OF LAURIE L. LARGENT IN SUPPORT OF: (1) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (2) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARD TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4)

4886-5560-8940.v1

I, Laurie L. Largent, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California, and I have been admitted *pro hac vice* to appear before this Court in the above-captioned action (the "Action").[1]  I am a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), Lead Counsel for Lead Plaintiff 1199SEIU Health Care Employees Pension Fund ("1199SEIU" or "Lead Plaintiff").  I have been actively involved in the prosecution and resolution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based on my active participation and supervision of all material aspects of the Action.

2.      Pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), I submit this Declaration in support of Lead Plaintiff's motion for approval of the Settlement, which provides for a $109,000,000 all-cash recovery on behalf of the Settlement Class (the "Settlement") and for approval of the proposed Plan of Allocation, as well as Lead Counsel's application of an award of attorneys' fees and expenses and an award to Lead Plaintiff for its time representing the Settlement Class pursuant to 15 U.S.C. §78u-4(a)(4).

3.      Due to the Court's familiarity with this Action, this Declaration does not seek to detail each and every event during the Action.  Rather, the Declaration provides the Court with a summary of the prosecution of the Action, highlights of the events leading to the Settlement, and the bases upon which Lead Plaintiff and Lead Counsel recommend the Settlement's approval.

## I.      PRELIMINARY STATEMENT

4.      The $109,000,000 proposed Settlement is the culmination of over three years of hard-fought litigation.  As detailed below, Lead Counsel zealously prosecuted Lead Plaintiff's claims

---

[1]   All capitalized terms that are not defined herein have the same meanings as set forth in the Stipulation of Settlement (ECF 109) (the "Stipulation" or the "Settlement Agreement").

- 1 -

throughout this Action. The proposed Settlement was only achieved after Lead Plaintiff and Lead Counsel, *inter alia*:

(a) conducted a comprehensive, wide-ranging, investigation into the facts, circumstances, and potential claims and defenses that included analysis of SEC filings, media and analyst reports, press releases, shareholder communications, relevant case law and authorities, and other publicly-available information, and interviewed numerous Cardinal Health and Cordis former employees;

(b) used the materials obtained from its investigation to prepare the detailed, 167-paragraph Consolidated Complaint,[2] then prepared an extensive brief in opposition to Defendants' motion to dismiss the Consolidated Complaint, which the Court denied in full, allowing the claims to proceed;

(c) drafted and then met and conferred regarding document requests and subpoenas it served on all Defendants and more than 30 non-parties and, as a result, obtained and analyzed almost three million pages of documents;

(d) prepared for and attended multiple status conferences with Magistrate Judge Deavers to discuss discovery issues and case status;

(e) responded to Defendants' various discovery requests and interrogatories and produced over 137,000 pages of documents;

(f) moved for and fully briefed a class certification motion and retained market efficiency and damages expert Steven P. Feinstein, Ph.D., CFA, President of Crowninshield Financial Research, Inc., who provided an expert market efficiency report that Lead Plaintiff submitted in support of its class certification motion;

---

[2] "Consolidated Complaint" refers to the Consolidated Amended Complaint for Violations of the Federal Securities Laws. ECF 28.

(g)     in connection with class certification discovery, prepared for and defended the depositions of Dr. Feinstein and Lead Plaintiff's representative; prepared for and took the deposition of Defendants' expert Dr. Kenneth M. Lehn; and prepared for and participated in six depositions noticed by Defendants of Lead Plaintiff's investment advisors;

(h)     retained and consulted supply chain, information technology, acquisition and integration experts; and

(i)     from December 1, 2022 through February 21, 2023, Lead Counsel participated in (and Lead Plaintiff received updates regarding) settlement negotiations, including two all-day, in-person mediation sessions and two virtual mediation sessions with Judge Layn R. Phillips (Ret.) of Phillips ADR Enterprises, which included the exchange of mediation statements, presentations and evidence supporting the parties' respective positions on liability and damages.

5.      As further detailed herein, given Lead Counsel's comprehensive prosecution of this Action, Lead Plaintiff fully understood the strengths of the case as well as the substantial risks in proceeding with the litigation at the time that the Settlement was reached.  And, while Lead Counsel and Lead Plaintiff were confident that the evidence developed through fact discovery supported the Consolidated Complaint's allegations, Lead Plaintiff understood that proceeding to further fact discovery, expert discovery, summary judgment, pretrial motions, and then a jury trial (and possible appeal) would likely present substantial risks.

6.      Lead Plaintiff alleges that Defendants violated §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, by making materially false and misleading statements and omissions concerning Cardinal Health's acquisition and integration of Cordis.  Defendants, on the other hand, have consistently argued that none of their alleged statements about the acquisition, integration or financial performance of Cordis were materially false or misleading; that Defendants repeatedly disclosed to investors the challenges

- 3 -

Cordis was facing; Lead Plaintiff would be unable to prove scienter because Defendants lacked the requisite intent and had a good faith belief in the truth of their statements; and that class members suffered little to no damages resulting from the alleged conduct. *See, e.g.*, ECF 31. Although the SEC investigated some of the same allegations as asserted by Lead Plaintiff with regard to Cordis, the SEC concluded its investigation without any intention to recommend an enforcement action. There is no doubt that Defendants would have continued to vigorously pursue these defenses throughout the Action and at trial.

7. Accordingly, the proposed Settlement avoids the substantial additional costs and risks of further litigating liability and damages if this case were to continue. In agreeing to settle the Action now, Lead Counsel and Lead Plaintiff concluded that the $109,000,000 Settlement was in the Settlement Class's best interest.

8. In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation. The Plan of Allocation, which is set forth in the Notice made available on the case-designated website, provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Proof of Claim and Release forms that are approved for payment by the Court on a *pro rata* basis based on their Class Period purchases or acquisitions and any sales of Cardinal Health common stock.

9. Lead Counsel prosecuted this Action on a fully contingent basis, and incurred significant litigation expenses to date, thus bearing all of the financial risk of an unfavorable result. For our considerable and successful efforts in prosecuting this Action and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees of 30% of the Settlement Amount, which is fair and reasonable in light of the result achieved, and the risks and complexity of the litigation, and is within the range of fee percentages frequently awarded in this type of action.

- 4 -

4886-5560-8940.v1

10.     Both the Settlement and Lead Counsel's fee request have been approved by Lead Plaintiff, an institutional investor with a significant financial interest in the outcome of the case, and which actively monitored the Action and was well informed during settlement negotiations.  *See* Declaration of Gabriel Ristorucci in Support of Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, and Class Counsel's Motion for Attorneys' Fees and Litigation Expenses and Lead Plaintiff's Application for Reimbursement of Litigation Expenses ("Ristorucci Decl."), ¶¶7-8, submitted herewith.  Because this is the type of involvement envisioned by Congress in enacting the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4, *et seq*. (the "PSLRA"), Lead Plaintiff's approval of the relief sought here is entitled to significant weight by the Court in awarding fees to Lead Counsel.

11.     Lead Counsel also seeks an award of $699,334.91 in expenses that were reasonably and necessarily incurred by counsel in the prosecution of this Action.  These expenses include: (a) fees and expenses of Lead Plaintiff's experts and consultants whose services were necessary for the prosecution and analysis of the case; (b) fees for outside investigative services required for a fulsome investigation; (c) hosting and managing the database of close to three million pages of documents produced in the course of discovery; (d) the costs associated with taking or defending fact and expert depositions, such as court reporter and videographer and transcript fees; and (e) mediation expenses. In addition, as allowed under the PSLRA, Lead Plaintiff seeks an award for its time expended in representing the Settlement Class in the amount of $11,539.00.

12.     The following summarizes the primary events that occurred during the course of the litigation and the legal services provided by Lead Counsel.

4886-5560-8940.v1

## II. HISTORY OF THE LITIGATION

### A. Commencement of Litigation and Appointment of 1199SEIU as Lead Plaintiff and Robbins Geller as Lead Counsel

13. On August 1, 2019, the initial class action complaint was filed against Cardinal Health, George S. Barrett, Donald M. Casey, Jr., Michael C. Kaufmann, Jorge M. Gomez and David J. Wilson, alleging violations of the Securities Exchange Act of 1934. *See Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc., et al.*, Case No. 2:19-cv-3347, ECF 1.

14. On September 30, 2019, 1199SEIU moved to be appointed lead plaintiff and for approval of its selection of Robbins Geller as lead counsel. ECF 13. On June 19, 2020, the Court appointed 1199SEIU as Lead Plaintiff and Robbins Geller as Lead Counsel. ECF 22.

### B. Lead Plaintiff's Factual Investigation, and Filing of the Consolidated Complaint

15. Lead Counsel undertook an extensive investigation in connection with this Action and in preparing the Consolidated Complaint, which covers a three-year Class Period, including: (a) review and analysis of Defendants' public disclosures, including: (i) transcripts of Cardinal Health's quarterly conference calls held to discuss the Company's financial results and other presentations made by Defendants at investor conferences; (ii) the Company's periodic SEC filings, including reports on Forms 10-K, filed annually, and Forms 10-Q, filed quarterly; and (iii) Cardinal Health press releases and media reports; (b) a thorough review and analysis of relevant third-parties' public disclosures, such as analyst reports; (c) an examination of records reflecting the Individual Defendants' and other Company insiders' trades involving Cardinal Health stock in Form 4s filed with the SEC; (d) an analysis of industry and Company stock price reactions to Defendants' alleged misstatements and corrective disclosure, including detailed reports discussing Cardinal Health and its public disclosures issued by industry analysts on a regular basis; and (e) conducting extensive interviews of former Cardinal Health and Cordis employees.

4886-5560-8940.v1

16.     Lead Counsel used both in-house and outside investigators to assist in gathering detailed and specific information critical to pleading facts sufficient to meet the heightened pleading standards mandated by the PSLRA.  Lead Counsel retained experienced outside investigators from L.R. Hodges & Associates, Ltd. ("LRH&A") to perform investigative services relating to the Action. LRH&A has significant experience in investigations involving federal and state securities class action cases.  At the direction of Lead Counsel, LRH&A helped identify, locate, and interview former Cardinal Health and Cordis employees likely to have information pertinent to Lead Plaintiff's claims.  Under the direction and supervision of Lead Counsel, LRH&A interviewed several potential witnesses and discussed their findings and research with Lead Counsel.

17.     In addition, Lead Counsel was also assisted by the law firm of Labaton Sucharow LLP, which provided assistance in connection with identifying, locating, and interviewing former Cardinal Health and Cordis employees likely to have information pertinent to Lead Plaintiff's claims.

18.     Following the foregoing extensive research, investigation, and analysis, Lead Plaintiff filed the Consolidated Complaint on September 8, 2020.  ECF 28.

**C.     Lead Plaintiff Successfully Opposed Defendants' Motion to Dismiss**

19.     On November 6, 2020, Defendants moved to dismiss the Consolidated Complaint. ECF 31.  The motion raised numerous legal issues aimed at undermining Lead Plaintiff's allegations. In support of their motion, Defendants submitted 102 exhibits that spanned over 2,700 pages, which Lead Counsel was tasked with reviewing and analyzing in order to respond to Defendants' arguments.  Among other claims, Defendants' motion asserted that the Consolidated Complaint failed to allege any material misrepresentations and omission because Defendants' alleged statements were either vague, inactionable puffery, forward-looking statements protected by the PSLRA's safe harbor, and/or accurate statements of historical fact.  Defendants also claimed that the

Consolidated Complaint's allegations did not support scienter because Defendants regularly disclosed Cordis's alleged integration problems to investors during the Class Period. Defendants further asserted scienter was negated by the fact that Defendants increased their net holdings of Cardinal Health stock during the Class Period. Defendants also argued that Lead Plaintiff failed to meet the pleading requirements required for a §20(a) control person claim and §20A for contemporaneous insider trading.

20. On December 21, 2020, Lead Plaintiff filed a comprehensive opposition to Defendants' motion to dismiss and filed a motion to strike 75 of the 102 exhibits submitted with Defendants' motion. ECF 32-33. In its 53-page opposition, Lead Plaintiff argued that each of Defendants' arguments to dismiss the Consolidated Complaint should be rejected and explained the reasons why Defendants' alleged misstatements and omissions concerning the Cordis acquisition and integration were materially misleading. Lead Plaintiff's opposition also highlighted key indicia of Defendants' scienter, including Defendants' knowledge of the problems associated with the Cordis integration and its adverse financial impact on Cardinal Health, the departures of high-level Cardinal Health executives during the Class Period, and Defendants' Class Period sales of over $113 million of Cardinal Health stock. Lead Counsel spent significant time and resources performing the legal research and factual analysis necessary to draft an effective opposition and satisfy the strict pleading burden imposed by the PSLRA.

21. On February 5, 2021, Defendants filed their reply in support of the motion to dismiss. ECF 36.

22. On September 27, 2021, the Court issued an order denying in full Defendants' motion to dismiss. ECF 39. As a result, discovery could proceed.

23. Following the Court's order denying Defendants' motion to dismiss, the parties met-and-conferred regarding the submission of a Rule 26(f) report and pre-trial schedule, which the

parties filed on November 29, 2021.  ECF 50.  On December 14, 2021, the parties attended a preliminary pre-trial conference before Judge Deavers and were ordered to submit a revised Rule 26(f) report with a shortened proposed pre-trial schedule.  The parties met and conferred on the issue and filed a revised pre-trial schedule on December 27, 2021, which the Court adopted on December 29, 2021.  ECF 58-59.

### D. Lead Plaintiff's Motion for Class Certification

24.     On March 25, 2022, Lead Plaintiff filed its motion for class certification, supported by a memorandum of law, the report of Lead Plaintiff's expert Steven P. Feinstein, Ph.D., CFA, and a declaration demonstrating 1199SEIU's adequacy to serve as Class Representative.  ECF 72.  Lead Plaintiff sought certification of a class of all purchasers and/or acquirers of Cardinal Health common stock between March 2, 2015 and May 2, 2018, inclusive.  Lead Plaintiff's motion set forth the relevant facts in the case, detailed the reasons why 1199SEIU was an appropriate class representative, and explained how the requirements of Fed. R. Civ. P. 23(a) – numerosity, commonality, typicality, and adequacy – were met, as were the predominance and superiority requirements of Fed. R. Civ. P. 23(b)(3).  With respect to the Rule 23(a) requirements, Lead Plaintiff's motion explained, *inter alia*, that 1199SEIU's injury was typical of the other members of the Class, 1199SEIU had been harmed by the same alleged course of conduct as had the other Class members, and would fairly and adequately protect the interests of the Class.  Through Dr. Feinstein's detailed report that included an event study and a proposed damages methodology, Lead Plaintiff demonstrated that the market for Cardinal Health common stock was efficient during the Class Period and that the Class was entitled to the fraud-on-the-market presumption of reliance and that damages could be measured on a class-wide basis at the time of trial.

25.     As part of class certification discovery, Defendants noticed the deposition of the Rule 30(b)(6) designee for 1199SEIU.  On May 17, 2022, Lead Counsel defended a nine-hour deposition

of the Rule 30(b)(6) designee for 1199SEIU, Gabriel Ristorucci.  Lead Counsel met with Mr. Ristorucci in advance of his deposition.

26.      On May 5, 2022, Defendants deposed Dr. Feinstein.  Lead Counsel prepared for and defended the all-day deposition.

27.      Additionally, Defendants issued document subpoenas to 1199SEIU's investment managers for records relating to 1199SEIU's transactions in Cardinal Health's stock.  In April and May 2022, Defendants deposed multiple representatives from 1199SEIU's investment managers, which included Rothschild & Company Asset Management US Inc. (one deposition on May 12, 2022), Columbia Management Investment Advisers (two depositions on May 19 and 26, 2022), Boston Partners (two depositions on April 25 and 26, 2022), and LSV Asset Management (one deposition on April 28, 2022).  In preparation for these depositions, Lead Counsel reviewed the documents produced by each investment manager as well as documents produced by Lead Plaintiff, and participated in each of these depositions.

28.      On June 3, 2022, Defendants filed their opposition to Lead Plaintiff's motion for class certification.  ECF 85 (redacted version).  In opposing Lead Plaintiff's motion, Defendants retained Dr. Kenneth M. Lehn to evaluate Dr. Feinstein's proposed damages methodology and opine whether it could be applied on a class-wide basis to reliably measure damages consistent with the theory of liability asserted in the Consolidated Complaint.  Defendants argued in their opposition papers (in part via expert analysis) that Lead Plaintiff's proposed damage model failed to satisfy the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and that continual disclosures of new information during the Class Period about Cordis created individualized issues of materiality, scienter, and falsity that defeated the predominance requirements of Rule 23(b)(3).  Defendants also challenged 1199SEIU's ability to represent the Class claiming that 1199SEIU was atypical as it did not suffer the same injury as other class members and was subject to unique defenses.

- 10 -

4886-5560-8940.v1

29. In preparing to respond to Defendants' opposition brief, Lead Counsel meticulously reviewed and researched the briefing and evidentiary material, including Dr. Lehn's 124-page report, Defendants submitted in support of their opposition. Lead Counsel also prepared extensively for and, on July 1, 2022, deposed Defendants' expert, Dr. Lehn, which allowed Lead Counsel to question Dr. Lehn on the bases for his expert conclusions and report. In preparing for the deposition of Dr. Lehn, as well as for briefing the reply brief in support of class certification, Lead Counsel consulted with its economics and loss causation experts. On July 22, 2022, Lead Plaintiff filed its reply brief in support of its motion for class certification. ECF 94. Lead Plaintiff's motion for class certification was fully briefed and pending decision at the time the Settlement was reached.

**E. Lead Plaintiff Conducted Significant Discovery from Defendants and Third Parties**

30. Following resolution of Defendants' motion to dismiss, Lead Plaintiff promptly commenced fact discovery. As set forth herein, Lead Plaintiff's discovery efforts included requesting, negotiating for, obtaining and reviewing close to three million pages of documents; engaging in an exhaustive meet and confer process related to electronic discovery; and seeking discovery from more than 30 third parties. The fact discovery in the Action was extremely complex as the case covered a three year class period, and involved the acquisition, and attempted integration, of a global company (Cordis) operating in over 70 countries, which involved numerous people from multiple working groups and corporate functions within Cordis and Cardinal Health.

**1. Document Requests to Defendants**

31. On November 12, 2021, Lead Plaintiff propounded its first request for the production of documents to Defendants. The request included over 50 discrete requests seeking documents on a variety of relevant topics, including Cordis' financial performance; Cordis' supply chain and inventory management issues; Cardinal Health's due diligence in the acquisition of Cordis; and the integration of Cordis' global operations into Cardinal Health. Defendants submitted their responses

- 11 -

and objections to the document requests to Lead Plaintiff on January 14, 2022. Lead Counsel engaged in numerous meet-and-confer discussions with Defendants' counsel to address their responses and objections to the document requests, to negotiate the scope and manner of the discovery, and to arrange for the production of responsive documents. Given the scope of the issues on which discovery was sought, as well as the disputes that arose regarding relevancy, burden, and privilege, from the outset the discovery process required extensive coordinated efforts and expenditures of substantial time and money on Lead Counsel's part.

32.     During fact discovery, Lead Counsel also spent a significant amount of time discussing and negotiating with Defendants the discovery and production of Cardinal Health's relevant electronically stored information ("ESI"). The parties discussed the relevant data sources that could be searched and retrieval methodologies for obtaining relevant ESI. The parties conducted numerous meet and confers to identify the custodians whose files would be searched, the relevant time frames and search terms to be used, and the protocol for the format of the production, including the production of metadata. The negotiations and discussions led to the production of ESI from numerous Cardinal Health data bases.

33.     In connection with fact discovery the parties also spent substantial time conferring and negotiating over the terms of a production and ESI protocol agreement and confidentiality agreements for documents produced, including documents that were being produced by Cardinal Health from outside of the U.S. and were potentially governed by foreign data protection laws. ECF 61, 66 and 99.

34.     As a result of Lead Plaintiff's discovery requests and efforts, Defendants made 30 rolling productions over a nine-month period (February 2022 to November 2022), comprised of over 500,000 documents, totaling nearly 1,940,000 pages. The careful examination and analysis of the documents produced by Defendants required a massive undertaking by a large team of attorneys.

For example, the attorneys organized and analyzed the documents, selected those that proved or might undermine the Consolidated Complaint's allegations, identified relevant witnesses and issues, and established procedures to identify additional documents and information that had not been produced. Lead Counsel then reviewed and analyzed the documents to determine what information the documents conveyed and how they were relevant to Lead Plaintiff's claims. Lead Counsel also applied that understanding to other documents that had been produced. Further, because Defendants' production included complex documents, presentations and excel spreadsheets regarding the Cordis acquisition and integration, Cordis' inventory management and supply chain systems and the accounting and valuation of Cordis inventory, Lead Counsel and its in-house forensic accounting team and industry consultant performed a painstaking review and specialized analysis of these dense communications, PowerPoint presentations, and spreadsheets.

35. Also in connection with fact discovery, Lead Counsel spent considerable time and analysis meeting and conferring with Defendants on the number of depositions Lead Plaintiff should be allowed beyond the presumptive limits under the Federal Rules of Civil Procedure. In connection with these discussions, Lead Counsel prepared detailed analyses of potential witnesses, illustrating why the depositions of at least 30 non-defendant Cardinal Health current/former employees was reasonable based on the facts of the case. The parties reached the Settlement before any formal motion was filed on this issue.

### 2. Document Requests and Interrogatories to Lead Plaintiff

36. On January 4, 2022, Defendants served their first request for the production of documents on Lead Plaintiff, seeking 74 categories of documents. Lead Plaintiff produced responsive, non-privileged documents on February 15, 2022, March 18, 2022, and April 1, 2022, totaling over 137,00 pages of documents.

- 13 -

37.     On February 7, 2022, Defendants served their First Set of Interrogatories on Lead Plaintiff.  Lead Plaintiff, through Lead Counsel, served its Responses and Objections on March 9, 2022.

### 3.     Third Party Discovery

38.     Commencing on November 29, 2021, Lead Plaintiff began issuing document subpoenas to numerous relevant non-parties, including: Johnson & Johnson, which sold Cordis to Cardinal Health; consultants, such as KPMG LLP, Deloitte Transactions and Business Analytics LLP, Alvarez & Marsal Holdings, LLC, and McKinsey & Co., all of which performed work for Cardinal Health in connection with the Cordis acquisition and integration; Cardinal Health's external auditor PricewaterhouseCoopers LLP; and over 18 securities analysts who followed Cardinal Health during the Class Period.

39.     Following service of the third-party document subpoenas, Lead Counsel engaged in numerous meet-and-confers with the third parties to discuss written objections to the subpoenas, negotiate the scope of production, and arrange for the production of responsive documents.  This required extensive coordinated efforts and expenditures of time and resources on Lead Counsel's part.  In all, Lead Plaintiff subpoenaed documents from over 30 third parties, and the document productions from the third parties exceeded 94,000 pages.

### F.     Reaching the Settlement

40.     The Settlement Agreement is the product of hard-fought arm's-length negotiations, that included Lead Counsel's participation in two full-day, in-person mediation sessions and two virtual sessions, all before Judge Phillips, and numerous follow-up calls over the two-month period that the mediations took place.

41.     The first mediation took place on December 1, 2022, in Corona del Mar, California. In advance of the mediation, the parties submitted and exchanged statements with detailed

4886-5560-8940.v1

descriptions of the evidence supporting their claims and defenses.  Lead Plaintiff's mediation statements included 49 exhibits.  Defendants' mediation statements included 78 exhibits. Following the December 2022 mediation session, Lead Counsel attended two subsequent virtual mediation sessions focused on specific issues in the case on January 4, 2023 and January 20, 2023.  During these virtual sessions, the parties gave detailed presentations, supported by evidence, on their respective positions on loss causation and damages.  On February 8, 2023, the parties attended a second in-person, full-day, mediation session in New York City with Judge Phillips.

42.     Although the parties did not settle this Action during the February 2023 mediation, the Settling Parties continued their good faith efforts to resolve the case with the assistance of Judge Phillips.  On February 21, 2023, Judge Phillips made a mediator's recommendation to settle the case for $109 million, which the parties accepted.

43.     Thereafter, Lead Counsel worked diligently to negotiate the terms of the Settlement Agreement with Defendants' counsel, including meeting with Judge Phillips to assist with term disputes.  On April 3, 2023, Lead Plaintiff filed an unopposed motion seeking preliminary approval of the proposed Settlement.  ECF 108.  The Court granted Lead Plaintiff's motion for preliminary approval and set the final settlement hearing for September 11, 2023.  ECF 110.

III.     NATURE AND ADEQUACY OF THE SETTLEMENT

44.     Lead Plaintiff, by and through Lead Counsel, zealously litigated this Action and the Settlement was reached only after Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and potential weaknesses of the claims alleged in the Consolidated Complaint.  As discussed above, Lead Counsel conducted an extensive pre-filing investigation, including interviews with former Cardinal and Cordis employees, analyzed and reviewed close to three million pages of documents produced by Defendants and third parties, engaged in class certification discovery, which

- 15 -

included taking and defending depositions and the exchange of expert reports, and exchanged with Defendants several mediation statements and presentations, including supporting evidence.

45. While Lead Plaintiff and Lead Counsel believe the case against Defendants has merit and were prepared to proceed with further discovery, summary judgment and trial, there were a number of factors that made the outcome of continued litigation uncertain. Some of the risks Lead Plaintiff faced are discussed in the following paragraphs. Lead Plaintiff and Lead Counsel carefully considered each of these risks, which informed Lead Plaintiff and Lead Counsel's decision as to the Settlement.

### A. Risks to Proving Falsity

46. Defendants argued that the alleged misstatements were inactionable puffery and/or protected by the PSLRA's Safe Harbor for forward-looking statements. Defendants also argued that the alleged misrepresentations and omissions about Cordis were immaterial to investors given that Cordis accounted for less than 1% of Cardinal Health's total revenues at the time of the acquisition. Defendants also challenged falsity and materiality, claiming that during the Class Period Defendants made multiple and repeated disclosures to investors concerning the challenges Cordis was facing, and that their statements about Cordis and its expected accretion and synergies were true at the time they were made. Defendants also argued that the alleged false statements concerning the due diligence performed in connection with the Cordis acquisition lacked any merit because it did not make logical sense that Cardinal Health would invest $1.9 billion in Cordis knowing it was going to fail. While Lead Plaintiff disputed Defendants' arguments on falsity and believes the documentary evidence contradicted most of Defendants' claims, there was a real risk that the Court at summary judgment, or a jury at trial, could find otherwise for some or all of the alleged misrepresentation and omissions.

4886-5560-8940.v1

## B.     Risks to Proving Scienter

47.     Lead Plaintiff also faced considerable challenges in demonstrating Defendants' scienter (*i.e.*, the requisite state of mind to establish securities fraud).  Defendants argued they would credibly testify that they believed each of their statements about Cordis were complete and accurate at the time they were made and that Cardinal Health maintained a robust internal process for assuring its public disclosures were not misleading or omitted material information.  Defendants also claimed that the alleged insider stock sales and executive departures failed to prove scienter because during the Class Period Defendants Barrett and Casey actually increased their Cardinal Health stock holdings and during the same period two of the Defendants were promoted to positions as CEO and CFO of Cardinal Health.

48.     While Lead Plaintiff believed it would have been able to support its claims regarding scienter with persuasive evidence and expert testimony at summary judgment and/or trial, it is impossible to predict the Court's or jury's reactions, interpretations, and inferences gleaned from the evidence and testimony concerning Defendants' stock sales, reasons for departures, and state of mind.  Indeed, the SEC investigated matters similar to Lead Plaintiff's allegations, and concluded its investigation without any intention to recommend an enforcement action.

## C.     Defendants' Challenges to Class Certification, Loss Causation, and Damages

49.     Even if the Court or a jury found Lead Plaintiff succeeded in proving falsity and scienter, there remained a risk related to Lead Plaintiff's pending motion for class certification and its ability to prove loss causation and damages as the Action proceeded.

50.     In opposing class certification, Defendants argued that Lead Plaintiff's proposed damage model could not satisfy Rule 23(b)(3)'s requirement that class-wide issues predominate, claiming that the model was unreliable because it did not adequately address non-fraud information released on the disclosure dates and other factors that must be considered in estimating damages.

- 17 -

Defendants also argued that even if the Court granted class certification, Lead Plaintiff's proposed damage model would still be subject to legal challenge at summary judgment or in a motion to exclude. Moreover, if the Court rejected Defendants' predominance arguments at class certification, Defendants would likely seek to file an appeal under Fed. R. Civ. P. 23(f), the outcome of which would be uncertain and the litigation of which would entail additional delays and expenses.

51.     Defendants also challenged Lead Plaintiff's ability to prove loss causation and recover damages by claiming that the price declines in Cardinal Health stock following the alleged August 2017 and May 2018 disclosures were not caused by the alleged fraud but rather by non-fraud information (generic prescription drug deflation and pricing issues), relating to Cardinal Health's much larger Pharmaceutical segment, which accounted for 90% of Cardinal Health's revenues. Defendants also repeatedly argued that the Class Period should be considerably narrowed by a year or more based on the factual record, thus significantly reducing potential damages.

52.     Although Lead Plaintiff was confident it would have been able to prove loss causation and damages with qualified and persuasive expert testimony, jury reactions to competing experts are difficult to predict, and Defendants would have presented highly experienced experts to support their various defenses to liability. Accordingly, in the absence of a settlement, there was a very real risk that the Settlement Class would have recovered an amount significantly less than the total Settlement Amount – or even nothing at all.

53.     Given the risks to proceeding with litigation and the substantial recovery obtained, Lead Plaintiff and Lead Counsel respectfully request that the Court find that the proposed Settlement is fair, reasonable and adequate, approve it in full, and enter the proposed Judgment.

IV.     **THE PLAN OF ALLOCATION**

54.     The Net Settlement Fund will be distributed to Settlement Class Members who, in accordance with the terms of the Stipulation, submit a valid and timely Proof of Claim and Release

- 18 -

form and whose *pro rata* recovery is $10.00 or more. The Plan of Allocation, which was set out in the Notice, provides that a Settlement Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Settlement Class Member has an overall net loss on all of his, her, or its transactions in Cardinal Health common stock during the Class Period.

55. For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with its economics and damages expert, and the proposed Plan of Allocation reflects an assessment of the damages that could have been recovered by Settlement Class Members had Lead Plaintiff prevailed at trial. The plan is premised on the out-of-pocket measure of damages and is designed to measure the difference between what Settlement Class Members paid for Cardinal Health common stock during the Class Period and what the price of Cardinal Health's stock would have been had the allegedly omitted information been disclosed. To date, not a single Settlement Class Member has objected to the proposed Plan of Allocation.

## V. THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

56. For its extensive efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.[3] The percentage method is the appropriate method of fee recovery in a common fund recovery such as this because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances,

---

[3] Lead Counsel's application for attorneys' fees and expenses includes the time and expense incurred by Lead Plaintiff's local counsel Murray Murphy Moul + Basil LLP, and additional counsel Labaton Sucharow LLP. *See* Declaration of Spencer A. Burkholz Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("RGRD Decl."), Declaration of Joseph F. Murray Filed on Behalf of Murray Murphy Moul + Basil LLP in Support of Application for Award of Attorneys' Fees and Expenses ("MMM+B Decl."), and Declaration of Alfred L. Fatale III Filed on Behalf of Labaton Sucharow LLP in Support of Class Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Labaton Sucharow Decl.") (collectively, "Counsel Declarations"), submitted herewith. Lead Counsel, Murray Murphy Moul + Basil, and Labaton Sucharow are collectively referred to as "counsel" in this section.

4886-5560-8940.v1

is supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature, and represents the method for calculating fees in common fund cases in most circuits, including the Sixth Circuit.

57. The fee application is being submitted with the prior approval of Lead Plaintiff, which has actively monitored the Action and developed an understanding of the strengths and weaknesses of this case, the risks to continued litigation, and the nature and extent of Lead Counsel's efforts on behalf of the Settlement Class. Ristorucci Decl., ¶¶7-8. As set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) ("Fee Memorandum"), a 30% fee is a fair and reasonable attorneys' fee percentage request in common fund cases such as this and is within the range of the percentages typically awarded in securities class actions in this Circuit.

58. In addition, should the Court consider it, Lead Counsel's "lodestar," the number of hours worked multiplied by the applicable hourly rate, in this case was $17,488,802.00.[4]

59. As more fully set forth in the Fee Memorandum, counsel believe that the fee request is reasonable given the significant recovery obtained for the benefit of the Settlement Class, the risks of litigation, the contingent nature of counsel's representation, the complexity of the legal and factual questions at issue, and the extensive efforts of counsel.

### A. Consideration of Relevant Factors Justify a 30% Fee in This Case

#### 1. The Significant Results Achieved

60. The $109,000,000 cash Settlement here provides an immediate and certain benefit to the Settlement Class. As explained in the Fee Memorandum, the $109,000,000 cash Settlement well exceeds the median percentage recovery for securities class actions settled in 2022 (1.8%). *See*

---

[4] The lodestars of Murray Murphy Moul + Basil, and Labaton Sucharow, are set out in their respective declarations.

- 20 -

Janeen McIntosh, Svetlana Starykh, and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review* at 18 (NERA Jan. 24, 2023), attached hereto as Ex. A.  The Settlement Amount is also more than eight times the 2022 median settlement value in securities class action settlements under $1 billion, *id*. at 15, and almost seven times the first-half 2023 median settlement value in the same category.  *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: H1 2023 Update* (NERA Aug. 2, 2023) ("Aug. 2023 NERA Report") at 9, attached hereto as Exhibit B.  In fact, in the first half of 2023, only 3% of securities class actions have settled for $100 million or more.  *Id*. at 10.

61.     This favorable Settlement was achieved as a result of the extensive prosecutorial and investigative efforts of counsel and contentious and complicated motion practice, extensive fact discovery, class certification discovery, and settlement negotiations, as detailed herein.  As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very real risk of no recovery in the absence of a settlement.

### 2.     The Diligent Prosecution of This Action

62.     A 30% fee is also warranted in light of the extensive efforts on the part of counsel, as outlined above, that were required to produce this Settlement.  For instance, Lead Counsel and its in-house professionals spent over 27,000 hours of time on the case, *inter alia*, conducting formal and informal discovery, reviewing and analyzing close to three million pages of documents, mastering the relevant facts and dynamics of Cardinal Health's and Cordis' businesses and the attempted integration of Cordis into Cardinal Health, drafting the Consolidated Complaint as well as comprehensive memoranda of law concerning difficult and novel issues in connection with the motion to dismiss, class certification discovery and briefing, conducting several status conferences with Magistrate Deavers, formulating strategy, working with experts and other consultants in order

- 21 -

to make effective arguments on the merits and to conduct meaningful settlement discussions, and otherwise preparing this case for further fact discovery, summary judgment, and trial.

### 3. The Complexity of this Action's Factual and Legal Questions

63. Courts have recognized that the novelty and difficulty of the issues in a case are significant factors to be considered in making a fee award. As demonstrated by the discussion above of the contested issues in the Action, had this Settlement not been reached, the complex factual and legal questions at issue would continue to be the subject of substantial analysis and dispute. Numerous complex issues would be involved in proving liability, including whether Defendants' statements were false, whether those alleged misstatements were material, whether Defendants had a duty to disclose, whether Defendants acted with scienter, whether the alleged false statements and omissions were the legal cause of Lead Plaintiff's and the Settlement Class's damages, and whether Lead Plaintiff and the Settlement Class suffered damages, and if they did, the amount thereof.

### 4. The Risks of Litigation and the Contingent Nature of the Representation

64. A determination of a fair fee must include consideration of the contingent nature of the fee, the financial burden carried by counsel, and the difficulties that were overcome in obtaining the settlement.

65. This Action was undertaken by counsel on a wholly contingent basis, and counsel pursued the Settlement Class's claims against a large, sophisticated corporation with virtually limitless resources to fight such allegations. From the outset, counsel understood they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the investment of time and money the case would require. In undertaking that responsibility, counsel were obligated to assure that sufficient attorney resources were dedicated to the prosecution of this Action and that funds were available to compensate staff and to pay for the considerable out-of-pocket expenses which a case such as this entails.

- 22 -

4886-5560-8940.v1

66. Because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation. With it often taking years for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

67. As discussed above, Lead Counsel alone committed over 27,000 hours of attorney and in-house professional time in the prosecution of the Action and for nearly three years fully assumed the risk of an unsuccessful result. Lead Counsel has received no compensation for its services during the course of this Action and has incurred significant expenses in litigating for the benefit of the Settlement Class. Any fee or expense award to counsel has always been at risk and completely contingent on the result achieved and on this Court's exercise of its discretion in making any award. Moreover, as noted above, Lead Counsel incurred and/or paid over $692,000 in expenses alone – a very significant amount with a very real risk of not recovering any of it – in order to vigorously litigate this case to a successful conclusion.

68. The above does not even take into consideration the possibility of no recovery. It is wrong to assume that a law firm handling complex contingent litigation always wins. Tens of thousands of hours have been expended in losing efforts. The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

69. As discussed above, this case had significant risk factors concerning liability, causation, and damages. Lead Plaintiff's success was by no means assured, as both sides claimed the evidence supported their assertions. Success hinged on Lead Plaintiff's ability to win challenging arguments on every element of the causes of action. Were this Settlement not achieved, Lead Plaintiff faced years of costly and risky litigation against Defendants, with ultimate success far from certain.

70. There was no guarantee that Lead Plaintiff would succeed in convincing the Court or a jury that the statements made by Defendants during the Class Period were false, or, if such statements were found to be false, that they were material, or if they were false and material, that they were made with scienter, or that there were substantial damages. Indeed, Defendants have adamantly denied liability and are represented by experienced and very capable defense counsel.

71. There are numerous cases where plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours, have received no compensation. It is only because defendants and their counsel know that the leading members of the plaintiffs' securities bar are actually prepared to, and will, force a resolution on the merits and go to trial that meaningful settlements in actions such as this can occur.

72. Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to public companies. Vigorous private enforcement of the federal securities laws can only occur if the private plaintiffs can obtain parity in representation with that available to large corporate interests. If this important public policy is to be carried out, the courts must award fees which will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

**B. Counsel's Requested Costs and Expenses Are Fair and Reasonable and Should Be Awarded**

73. In addition to fees, counsel seek $699,334.91 for costs and expenses reasonably and necessarily incurred in prosecuting Lead Plaintiff's claims for over three years. Counsel respectfully submit that this amount is appropriate, fair, and reasonable, and should be approved.[5]

---

[5] Counsel's respective declarations provide further detail of the costs and expenses incurred. *See* RGRD Decl., ¶¶5-6, MMM+B Decl., ¶¶6-7, and Labaton Sucharow Decl., ¶¶5-6.

- 24 -

4886-5560-8940.v1

74. In undertaking this case, counsel knew they might never recover any of the expenses incurred in prosecuting this case. Counsel also understood that, even assuming the case was ultimately successful, an award of expenses would not compensate them for the lost use of the funds they had dedicated to this litigation. Accordingly, counsel was motivated to, and did, take steps to minimize expenses where practicable without jeopardizing the vigorous and efficient prosecution of this Action.

75. As set forth in the Counsel Declarations, the expenses, charges, and costs incurred were necessary and appropriate in light of the complex nature of the Action and were associated with, among other things, hiring experts and consultants, service of process, online legal and factual research, document management, transcript charges, and mediation.

**C.     The Award to Lead Plaintiff Is Reasonable**

76. The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4). Here, as explained in Lead Plaintiff's Declaration, submitted herewith, 1199SEIU is seeking reimbursement in the amount of $11,539.00 for the time related to its active participation in the Action. *See* Ristorucci Decl., ¶9.

77. As discussed in the Fee Memorandum, §IV., many courts, including those in this Circuit, have approved reasonable payments to compensate class representatives for the time and effort devoted by them on behalf of a class. The amount sought here is based on Lead Plaintiff's active involvement in the Action from consideration of appointment as Lead Plaintiff to Settlement. As such, this request should be granted.

- 25 -

- 26 -

## VI. CONCLUSION

78. For all of the foregoing reasons, Lead Counsel respectfully requests the Court grant final approval of the Settlement, approve the Plan of Allocation, award attorneys' fees in the amount of 30% of the Settlement Amount and $699,334.91 in expenses, and award 1199SEIU $11,539.00 for its time incurred in representing the Settlement Class.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of August 2023, at San Diego, California.

_____
LAURIE L. LARGENT

4886-5560-8940.v1

# EXHIBIT A



24 January 2023



# Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review

## Federal Filings Declined for the Fourth Consecutive Year

## Average and Median Settlement Values Increased by More than 50% Compared to 2021

By Janeen McIntosh, Svetlana Starykh, and Edward Flores

Insight in Economics™

# Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review

## Federal Filings Declined for the Fourth Consecutive Year

## Average and Median Settlement Values Increased by More than 50% Compared to 2021

By Janeen McIntosh, Svetlana Starykh, and Edward Flores[1]

24 January 2023

## Foreword

I am excited to share NERA's Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review with you. This year's edition builds on work carried out over more than three decades by many members of NERA's Securities and Finance Practice. This year's report continues our analyses of trends in filings and settlements and presents new analyses related to current topics such as event-driven litigation. Although space does not permit us to present all the analyses the authors have undertaken while working on this year's edition or to provide details on the statistical analysis of settlement amounts, we hope you will contact us if you want to learn more about our research or our work related to securities litigations. On behalf of NERA's Securities and Finance Practice, I thank you for taking the time to review our work and hope you find it informative.

**Dr. David Tabak**, Managing Director

## Introduction

Filings of new securities class actions declined each year from 2019 through 2022. In 2022, there were 205 new federal securities class action suits filed. This significant decline from the 431 cases filed in 2018 was largely due to the lower number of merger-objection and Rule 10b-5 cases filed in 2022. Similarly, there were fewer cases resolved in 2022 than in 2021. The decline in resolutions, since 2021, was driven by the decrease in dismissed non-merger-objection and non–crypto unregistered securities cases, a category that declined by more than 30%.[2] The aggregate settlement amount for cases settled in 2022 was $4 billion, which is approximately $2 billion higher than the inflation-adjusted amount for 2021. With more cases settling for higher values in 2022 compared to 2021, the average settlement value increased by over 70% to $38 million and the median settlement value increased by over 50% to $13 million.

## Trends in Filings

For the fourth consecutive year, there was a decline in the number of new federal securities class action suits filed (see Figure 1).[3] In 2022, there were 205 new cases filed, a decline from the 210 new cases filed in 2021. This decline is a continuation of the downward trend observed since 2018, when more than 400 cases were recorded. This decline has been driven by the lower levels of merger-objection cases and cases with only Rule 10b-5 claims filed in each year (see Figure 2). Of the cases filed in 2022, suits against defendants in the health technology and services sector and the electronic technology and services sector were the most common, each accounting for 27% of total cases (see Figure 3). Although there was a decline in the aggregate number of cases filed in the Second, Third, and Ninth Circuits to the lowest level within the 2018–2022 period, the majority of new filings continue to be concentrated in these jurisdictions (see Figure 4). Of the cases filed in 2022, 33% included an allegation related to misled future performance, the most common allegation for the year. The proportion of cases with an allegation related to a regulatory issue increased from 19% in 2021 to 26% in 2022 (see Figure 5).[4]

Figure 1. **Federal Filings and Number of Companies Listed in the United States**
January 1996–December 2022



Note: Listed companies include those listed on the NYSE and Nasdaq. Listings data obtained from World Federation of Exchanges (WFE).
The 2022 listings data is as of November 2022.

Figure 2. **Federal Filings by Type**
January 2013–December 2022



*For the fourth consecutive year, there was a decline in the number of new federal securities class action suits filed.*

Figure 3. **Percentage of Federal Filings by Sector and Year**
Excludes Merger Objections and Crypto Unregistered Securities
January 2018–December 2022



Note: This analysis is based on the FactSet Research Systems, Inc. economic sector classification. Some of the FactSet economic sectors are combined for presentation.

*Filings against defendants in the health technology and services sector and the electronic technology and services sector were the most common in 2022, each accounting for 27% of total cases.*

Figure 4. **Federal Filings by Circuit and Year**
Excludes Merger Objections and Crypto Unregistered Securities
January 2018–December 2022



*Although there was a decline in the aggregate number of cases filed in the Second, Third, and Ninth Circuits to the lowest level within the 2018–2022 period, the majority of new filings continue to be concentrated in these jurisdictions.*

Figure 5. **Allegations**
Shareholder Class Actions with Alleged Violations of Rule 10b-5, Section 11, and/or Section 12
January 2018–December 2022



## Event-Driven and Special Cases

Here we summarize activity and trends in filings over the 2019–2022 period in potential development areas we have identified for securities class actions (see Figures 6 and 7).[5]

### ESG Cases

Environmental, social, and governance (ESG) disclosures and companies' commitments to meet disclosure guidelines have been a developing area of interest to investors and government agencies such as the Securities and Exchange Commission over the recent decade.[6] Along with that interest have come waves of lawsuits filed by plaintiffs alleging fraud related to ESG disclosures. For example, in a securities class action suit filed against CBS Corporation in 2018, plaintiffs alleged the defendant made false and misleading statements and/or failed to disclose that CBS executives engaged in widespread workplace sexual harassment and that the defendant's purported policies were inadequate to prevent the conduct. This suit was settled in 2022 for $14,750,000. Similarly, in the ongoing securities suit filed against Activision Blizzard, Inc., in 2021, plaintiffs allege the defendant made false and misleading statements and/or failed to disclose that there was discrimination against women and minority employees and the existence of numerous complaints about unlawful harassment, discrimination, and retaliation made to human resources that were not addressed. As focus and interest in this area continues, this may lead to a higher number of ESG-related cases being filed.

### Crypto Cases

The first securities class action related to cryptocurrency was filed against GAW Miners, LLC, in June 2016. Since 2017, there have been year-to-year fluctuations in the number of new crypto federal filings each year. In 2022, there were 25 crypto federal class actions suits filed. This is more than double the number of similar suits filed in 2021. This uptick was driven by the increase in the number of crypto unregistered securities cases.

Figure 6. **Number of Crypto Federal Filings**
January 2016–December 2022



### Bribery/Kickbacks

Over the 2019–2020 period, there were 14 cases filed related to allegations of bribery or kickbacks. In 2021, there was a reduction in the number of these cases filed, with only one bribery/kickback-related case filed in that year. In 2022, four such cases were filed.

### Cannabis

In 2019 and 2020, there were seven and six securities class action cases filed against defendants in the cannabis industry, respectively. Since then, there has only been one suit filed against these defendants each year.

### Cybersecurity Breach

Since 2019, there have been at least three securities class action suits filed each year related to a cybersecurity breach. More specifically, between 2019 and 2020, there were a total of six such cases filed, and an additional five suits brought in 2021. In 2022, the number of new federal suits declined slightly to three filings.

### COVID-19

Since the emergence of the COVID-19 pandemic in March 2020, 77 securities class action suits have been filed with claims related to the pandemic. Between March 2020 and December 2020, 33 cases were filed with COVID-19-related claims. In 2021, the number of suits filed declined to 20, but then increased slightly to 24 in 2022.

### Environment

Over the 2019–2022 period, 12 environment-related securities class action suits have been filed. Of these, only three were filed in 2021–2022.

### Money Laundering

In 2019 and 2020, there were three cases filed each year with claims related to money laundering. Between 2021 and 2022, only one such suit has been filed.

### SPAC

In 2019, only one case related to special purpose acquisition companies (SPACs) was filed. Since then, new federal cases related to these claims have increased substantially, with six filings in 2020 and 33 cases filed in 2021. During 2022, there were 24 securities class action suits filed related to SPACs, a 27% decline from 2021.[7]

Figure 7. **Event-Driven and Other Special Cases by Filing Year**
January 2019–December 2022



Number of Filings

## Trends in Resolutions

The number of resolved cases—dismissed and settled cases—declined in 2022 to 214 from 248 in 2021 (see Figure 8).[8] Although 2022 was a record-setting year for the number of settled non-merger-objection, non–crypto unregistered securities cases during the 2013–2022 period, there was a larger decrease in the number of dismissed non-merger-objection, non–crypto unregistered securities cases, which led to a decline in overall resolutions. In addition, in 2022, the number of merger-objection cases resolved declined to 14, a substantial decrease from the 2017–2020 period, when more than 130 such cases were resolved each year. Of the cases filed since 2015, as of 31 December 2022, a larger portion has been dismissed than have settled (see Figure 9). This is consistent with historical trends, which indicate that settlements occur later in the litigation cycle and dismissals tend to occur in the earlier stages. Taking the time between first complaint and resolution to represent the length of time taken to resolve a suit, more than half the cases resolve between one and three years, and 17% of cases resolve more than four years after the first complaint was filed (see Figure 10).

Figure 8. **Number of Resolved Cases: Dismissed or Settled**
January 2013–December 2022



Figure 9. **Status of Cases as Percentage of Federal Filings by Filing Year**
Excludes Merger Objections, Crypto Unregistered Securities, and Verdicts
January 2013–December 2022



Note: Dismissals may include dismissals without prejudice and dismissals under appeal. Component values may not add to 100% due to rounding.

Figure 10. **Time from First Complaint Filing to Resolution**
Excluding Merger Objections and Crypto Unregistered Securities
Cases Filed January 2003–December 2018 and Resolved January 2003–December 2022



## Analysis of Motions

NERA's federal securities class action database tracks filing and resolution activity as well as decisions on motions to dismiss, motions for class certification, and the status of any motion as of the resolution date. For this analysis, we include securities class actions that were filed and resolved over the 2013–2022 period in which purchasers of common stock are part of the class and in which a violation of Rule 10b-5, Section 11, and/or Section 12 is alleged.

### Motion to Dismiss

A motion to dismiss was filed in 96% of the securities class action suits filed and resolved. A decision was reached in 73% of these cases, while 18% were voluntarily dismissed by plaintiffs, 8% settled before a court decision was reached, and 1% of the motions were withdrawn by defendants. Among the cases where a decision was reached, 61% were granted (with or without prejudice) and only 20% were denied (see Figure 11).

Figure 11. **Filing and Resolutions of Motions to Dismiss**
Cases Filed and Resolved January 2013–December 2022



### Motion for Class Certification

A motion for class certification was filed in only 17% of the securities class action suits filed and resolved, as most cases are either dismissed or settled before the class certification stage is reached. A decision was reached in 60% of the cases where a motion for class certification was filed. Almost all of the other 40% of cases were resolved with a settlement. Among the cases where a decision was reached, the motion for class certification was granted (with or without prejudice) in 86% of cases (see Figure 12). Approximately 65% of decisions on motions for class certification occur within three years of the filing of the first complaint, with nearly all decisions occurring within five years (see Figure 13). The median time was about 2.7 years.

Figure 12. **Filing and Resolutions of Motions for Class Certification**
Cases Filed and Resolved January 2013–December 2022



Figure 13. **Time from First Complaint Filing to Class Certification Decision**
Cases Filed and Resolved January 2013–December 2022



## Trends in Settlement Values

Aggregate settlements for 2022 totaled $4 billion, which is more than double the inflation-adjusted total for 2021 of $1.9 billion.[9] In 2022, the average settlement value was $38 million, an increase of more than 70% compared to the 2021 inflation-adjusted average settlement value (see Figures 14 and 15). The distribution of 2022 settlement values differed from the settlements in 2021, with more cases settling for higher values, and more consistent with the distribution of settlement values observed in 2020 (see Figure 16). This shift is also evident in the median settlement values. The median settlement value for 2022 is $13 million, which is approximately $5 million higher than the 2021 inflation-adjusted median value of $8 million (see Figure 17).[10]

Figure 14. **Average Settlement Value**
Excludes Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2013–December 2022



Figure 15. **Average Settlement Value**
Excludes Settlements over $1 Billion, Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2013–December 2022



Figure 16. **Distribution of Settlement Values**
Excludes Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2018–December 2022



Figure 17. **Median Settlement Value**
Excludes Settlements over $1 Billion, Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2013–December 2022



## Top Settlements

The top 10 settlements in 2022 ranged from $98 million to $809.5 million and totaled $2.2 billion. The highest settlement reached was against Twitter, Inc., for a case filed in California in 2016 (see Table 1).

Table 1. **Top 10 2022 Securities Class Action Settlements**

| Ranking | Defendant | Filing Date | Settlement Date | Total Settlement Value ($Million) | Plaintiffs' Attorneys' Fees and Expenses Value ($Million) | Circuit | Economic Sector |
|---|---|---|---|---|---|---|---|
| 1 | Twitter, Inc. | 16 Sept 16 | 11 Nov 22 | $809.5 | $185.7 | 9th | Technology Services |
| 2 | Teva Pharmaceutical Industries Ltd. | 6 Nov 16 | 2 Jun 22 | $420.0 | $109.3 | 2nd | Health Technology |
| 3 | Luckin Coffee Inc. | 13 Feb 20 | 22 Jul 22 | $175.0 | $31.3 | 2nd | Consumer Non-Durables |
| 4 | BlackBerry Ltd. | 4 Oct 13 | 29 Sept 22 | $165.0 | $59.5 | 2nd | Technology Services |
| 5 | Granite Construction Inc. | 13 Aug 19 | 24 Feb 22 | $129.0 | $21.7 | 9th | Industrial Services |
| 6 | Endo International plc. | 14 Nov 17 | 23 Feb 22 | $113.4 | $20.9 | 3rd | Health Technology |
| 7 | Walgreen Co. | 10 April 15 | 7 Oct 22 | $105.0 | $31.1 | 7th | Retail Trade |
| 8 | Novo Nordisk A/S | 11 Jan 17 | 27 Jun 22 | $100.0 | $31.7 | 3rd | Health Technology |
| 9 | Stamps.com, Inc. | 13 Mar 19 | 24 Jan 22 | $100.0 | $17.3 | 9th | Commercial Services |
| 10 | Mattel, Inc. | 24 Dec 19 | 2 May 22 | $98.0 | $14.8 | 9th | Consumer Durables |
| | **Total** | | | **$2,214.9** | **$523.4** | | |

The top 10 federal securities class action settlements, as of 31 December 2022, consists of settlements ranging from $1.14 billion to $7.24 billion. From 2018 to 2021, this list remained unchanged because there were no settlements reached in excess of $1.1 billion during this time. In 2022, this list was updated to incorporate the $1.21 billion partial settlement in the ongoing suit against Valeant Pharmaceuticals International, Inc. (see Table 2).

Table 2. **Top 10 Federal Securities Class Action Settlements** (As of 31 December 2022)

| | | | | | Codefendent Settlements | | | | |
| | | | | | Financial Institutions Value ($Million) | Accounting Firms Value ($Million) | Plaintiffs' Attorneys' Fees and Expenses Value ($Million) | | |
| Ranking | Defendant | Filing Date | Settlement Year(s) | Total Settlement Value ($Million) | | | | Circuit | Economic Sector |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ENRON Corp. | 22 Oct 01 | 2003–2010 | $7,242 | $6,903 | $73 | $798 | 5th | Industrial Services |
| 2 | WorldCom, Inc. | 30 Apr 02 | 2004–2005 | $6,196 | $6,004 | $103 | $530 | 2nd | Communications |
| 3 | Cendant Corp. | 16 Apr 98 | 2000 | $3,692 | $342 | $467 | $324 | 3rd | Finance |
| 4 | Tyco International, Ltd. | 23 Aug 02 | 2007 | $3,200 | No codefendant | $225 | $493 | 1st | Producer Manufacturing |
| 5 | Petroleo Brasileiro S.A.- Petrobras | 8 Dec 14 | 2018 | $3,000 | $0 | $50 | $205 | 2nd | Energy Minerals |
| 6 | AOL Time Warner Inc. | 18 Jul 02 | 2006 | $2,650 | No codefendant | $100 | $151 | 2nd | Consumer Services |
| 7 | Bank of America Corp. | 21 Jan 09 | 2013 | $2,425 | No codefendant | No codefendant | $177 | 2nd | Finance |
| 8 | Household International, Inc. | 19 Aug 02 | 2006–2016 | $1,577 | Dismissed | Dismissed | $427 | 7th | Finance |
| 9 | Valeant Pharmaceuticals International, Inc.* | 22 Oct 15 | 2020 | $1,210 | $0 | $0 | $160 | 3rd | Health Technology |
| 10 | Nortel Networks | 2 Mar 01 | 2006 | $1,143 | No codefendant | $0 | $94 | 2nd | Electronic Technology |
| | **Total** | | | **$32,334** | **$13,249** | **$1,017** | **$3,358** | | |

*Denotes a partial settlement, which is included here due to its sizable amount. Note that this case is not included in any of our resolution or settlement statistics.

## NERA-Defined Investor Losses

To estimate the potential aggregate loss to investors as a result of investing in the defendant's stock during the alleged class period, NERA has developed a proprietary variable, NERA-Defined Investor Losses, using publicly available data. The NERA-Defined Investor Loss measure is constructed assuming investors had invested in stocks during the class period whose performance was comparable to that of the S&P 500 Index. Over the years, NERA has reviewed and examined more than 2,000 settlements and found, of the variables analyzed, this proprietary variable to be the most powerful predictor of settlement amount.[11]

A statistical review reveals that settlement values and NERA-Defined Investor Losses are highly correlated, although the relationship is not linear. The ratio is higher for cases with lower NERA-Defined Investor Losses than for cases with higher Investor Losses (see Figure 18). Since 2013, annual median Investor Losses have ranged from a high of $972 million to a low of $358 million. For cases settled in 2022, the median Investor Losses were $972 million, which is 33% higher than the 2021 value and the highest recorded value during the 2013–2022 period. Between 2020 and 2022, the median ratio of settlement amount to Investor Losses has been stable at 1.8% (see Figure 19).

Figure 18. **Median Settlement Value as a Percentage of NERA-Defined Investor Losses**
By Investor Losses
Cases Filed and Settled December 2011–December 2022



Figure 19. **Median NERA-Defined Investor Losses and Median Ratio of Settlement to Investor Losses by Settlement Year**
January 2013–December 2022

NERA has identified the following key factors as driving settlement amounts:

- NERA-Defined Investor Losses;
- The market capitalization of the issuer immediately after the end of the class period;
- The types of securities (in addition to common stock) alleged to have been affected by the fraud;
- Variables that serve as a proxy for the merit of plaintiffs' allegations (e.g., whether the company has already been sanctioned by a government or regulatory agency or paid a fine in connection with the allegations);
- The stage of litigation at the time of settlement; and
- Whether an institution or public pension fund is named lead plaintiff (see Figure 20).

Figure 20. **Predicted vs. Actual Settlements**
Investor Losses Using S&P 500 Index
Cases Settled December 2011–December 2022



*Among cases settled between December 2011 and December 2022, factors in NERA's statistical model account for a substantial fraction of the variation observed in actual settlements.*

## Trends in Plaintiffs' Attorneys' Fees and Expenses

In 2022, aggregate plaintiffs' attorneys' fees and expenses amounted to $1 billion (see Figure 21). This marks the first year since 2018 that aggregate plaintiffs' attorneys' fees and expenses exceeded $1 billion. The 2022 aggregate fees and expenses is double the amount observed in 2021, driven by an increase in the aggregate fees and expenses associated with settlements between $10 million and $499.9 million and by the $186 million in fees and expenses associated with settlements between $500 million and $999.9 million. Although there are year-to-year fluctuations in the aggregate fees and expenses, the trend in the median of plaintiffs' attorneys' fees and expenses as a percentage of settlement amount has remained stable (see Figure 22). The data reveal that fees and expenses represent an increasing percentage of settlement value as settlement value decreases—a pattern that is consistent in cases settled since 2013 as well as in cases settled between 1996 and 2012. For cases settled in the recent period with a settlement value of $1 billion or higher, fees and expenses accounted for 8.8% of the settlement value. This percentage increases to more than 30% for cases with a settlement value under $10 million.

Figure 21. **Aggregate Plaintiffs' Attorneys' Fees and Expenses by Settlement Size**
January 2013–December 2022



Figure 22. **Median of Plaintiffs' Attorneys' Fees and Expenses by Size of Settlement**
Excludes Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class



Note: Component values may not add to total value due to rounding.

## Conclusion

In 2022, new filings of federal securities class actions declined for the fourth consecutive year as a result of fewer merger-objection and Rule 10b-5 cases filed. Of the 205 cases filed in 2022, more than 20% were SPAC or crypto-related filings. Total resolutions declined by 14% from 248 in 2021 to 214 in 2022 due to the continued reduction in non-merger-objection and non-crypto unregistered cases. The average settlement value and median settlement value for cases settled in 2022 were $38 million and $13 million, respectively, an increase over the 2021 values.

## Notes

1 This edition of NERA's report on "Recent Trends in Securities Class Action Litigation" expands on previous work by our colleagues Lucy P. Allen, Dr. Vinita Juneja, Dr. Denise Neumann Martin, Dr. Jordan Milev, Robert Patton, Dr. Stephanie Plancich, and others. The authors thank Dr. David Tabak and Benjamin Seggerson for helpful comments on this edition. We thank Vlad Lee and other researchers in NERA's Securities and Finance Practice for their valuable assistance. These individuals receive credit for improving this report; any errors and omissions are those of the authors. NERA's proprietary securities class action database and all analyses reflected in this report are limited to federal case filings and resolutions.

2 In this study we introduced a new category of "special" cases, crypto cases, which consist of two mutually exclusive subgroups: (1) crypto shareholder class actions, which include a class of investors in common stock, American depositary receipts/ American depositary shares (ADR/ADS), and/or other registered securities, along with crypto- or digital-currency-related allegations; and (2) crypto unregistered securities class actions, which do not have class investors in any registered securities that are traded on major exchanges (New York Stock Exchange, Nasdaq). We include crypto shareholder class actions in all our analyses that include standard cases. Crypto unregistered securities class actions are excluded from some analyses, which is noted in the titles of our figures.

3 NERA tracks securities class actions that have been filed in federal courts. Most of these cases allege violations of federal securities laws; others allege violations of common law, including breach of fiduciary duty, as with some merger-objection cases; still others are filed in federal court under foreign or state law. If multiple actions are filed against the same defendant, are related to the same allegations, and are in the same circuit, we treat them as a single filing. The first two actions filed in different circuits are treated as separate filings. If cases filed in different circuits are consolidated, we revise our count to reflect the consolidation. Therefore, case counts for a particular year may change over time. Different assumptions for consolidating filings would probably lead to counts that are similar but may, in certain circumstances, lead observers to draw a different conclusion about short-term trends in filings. Data for this report were collected from multiple sources, including Institutional Shareholder Services, Dow Jones Factiva, Bloomberg Finance, FactSet Research Systems, Nasdaq, Intercontinental Exchange, US Securities and Exchange Commission (SEC) filings, complaints, case dockets, and public press reports.

4 Most securities class action complaints include multiple allegations. For this analysis, all allegations from the complaint are included and thus the total number of allegations exceeds the total number of filings.

5 It is important to note that due to the small number of cases in some of these categories, the findings summarized here may be driven by one or two cases.

6 ESG securities class action cases filed in federal courts are included in NERA's database and the analyses in this report. For this update, no analyses have been prepared on this development area specifically.

7 Report updated on 7 February 2023. Analyses for the "SPACs" group were updated to incorporate "blank check" company-related cases and cases that were not originally classified as SPACs prior to publishing.

8 Here "dismissed" is used as shorthand for all class actions resolved without settlement; it includes cases in which a motion to dismiss was granted (and not appealed or appealed unsuccessfully), voluntary dismissals, cases terminated by a successful motion for summary judgment, or an ultimately unsuccessful motion for class certification.

9 While annual average settlement values can be a helpful statistic, these values may be affected by one or a few very high settlement amounts. Unlike averages, the median settlement value is unaffected by these very high outlier settlement amounts. To understand what more typical cases look like, we analyze the average and median settlement values for cases with a settlement amount under $1 billion, thus excluding these outlier settlement amounts. For the analysis of settlement values, we limit our data to non-merger-objection and non–crypto unregistered securities cases with settlements of more than $0 to the class.

10 For our analysis, NERA includes settlements that have had the first settlement-approval hearing. This means we do not include partial settlements or tentative settlements that have been announced by plaintiffs and/or defendants. As a result, although we include the Valeant partial settlement in Table 2 due to its sizable amount, this case is not included in any of our resolution or settlement statistics.

11 NERA-Defined Investor Losses is only calculable for cases involving allegations of damages to common stock based on one or more corrective disclosures moving the stock price to its alleged true value. As a result, we have not calculated this metric for cases such as merger objections.

## About NERA

NERA Economic Consulting (**www.nera.com**) is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For more than six decades, we have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real-world industry experience to issues arising from competition, regulation, public policy, strategy, finance, and litigation.

NERA's clients value our ability to apply and communicate state-of-the-art approaches clearly and convincingly, our commitment to deliver unbiased findings, and our reputation for quality and independence. Our clients rely on the integrity and skills of our unparalleled team of economists and other experts backed by the resources and reliability of one of the world's largest economic consultancies. Continuing our legacy as the first international economic consultancy, NERA serves clients from major cities across North America, Europe, and Asia Pacific.

## Contacts

For further information, please contact:



**Janeen McIntosh**
Senior Consultant
New York City: +1 212 345 1375
janeen.mcintosh@nera.com



**Svetlana Starykh**
Senior Consultant
White Plains, NY: +1 914 448 4123
svetlana.starykh@nera.com



**Edward Flores**
Senior Consultant
New York City: +1 212 345 2955
edward.flores@nera.com

*The opinions expressed herein do not necessarily represent the views of NERA Economic Consulting or any other NERA consultant.*



To receive publications, news, and insights from NERA, please visit **www.nera.com/subscribe**.



Visit **www.nera.com** to learn more about our practice areas and global offices.

© Copyright 2023
National Economic Research
Associates, Inc.

All rights reserved.
Printed in the USA.

# EXHIBIT B



2 August 2023



# Recent Trends in Securities Class Action Litigation: H1 2023 Update

## Filings Are on Track to be Above 2022 Levels

## Resolutions Slowed in H1 2023

By Edward Flores and Svetlana Starykh

Insight in Economics™

# Summary

During the first half of 2023, 118 new federal securities class action cases were filed. Standard cases, which contain alleged violations of Rule 10b-5, Section 11, and/or Section 12, accounted for most new filings with 105. Merger-objection and crypto unregistered securities cases have remained flat relative to 2022, with four and eight cases filed, respectively. Assuming filings continue at the same pace in the second half of 2023, annual filings for 2023 will be 236, which would represent a 15% increase relative to 2022.

Excluding merger-objection and crypto unregistered securities cases, the electronic technology and technology services sector accounted for 23% of new filings, the largest proportion of any sector. The finance sector accounted for 22% of new filings, nearly triple the percentage relative to 2022. On the other hand, the percentage of suits in the health technology and services sector declined by half to 13%, partially driven by a decline in COVID-19-related suits filed. The Second, Third, and Ninth Circuits continue to be the jurisdictions with the most cases filed, each accounting for 27, 16, and 33 filings, respectively. There were 11 cases filed in the Eleventh Circuit, marking a 5-year high.

Among filings of standard cases, 32% included an allegation related to misled future performance and 29% included an allegation related to regulatory issues. Meanwhile, the percentage of standard cases containing an allegation related to merger-integration issues declined by half to 8%, partially driven by a decline in SPAC-related filings.

There were 76 cases resolved in the first half of 2023, of which 41 were dismissed and 35 were settled. Assuming resolutions continue at this pace for the rest of the year, the number of resolved cases for 2023 will be 152, which would mark the lowest recorded level in the past 10 years and a decline of 29% relative to 2022. The decline in resolutions is seen across all categories of dismissed and settled cases.

For cases settled in the first six months of 2023, the average settlement value was $21 million, a 47% decrease compared to the 2022 inflation-adjusted average settlement value of $39 million. The median settlement value was $16 million, a $3 million increase from the 2022 inflation-adjusted median settlement value of $13 million. The shift in 2023 average and median settlement values relative to 2022 is driven in part by a decrease in the percentage of settlements between $10 and $19.9 million, a substantial increase in the percentage of settlements between $20 to $49.9 million, and a decrease in the percentage of settlements greater than $50 million.

Figure 1. **Federal Filings and Number of Companies Listed in the United States**
January 1996–June 2023



Note: Listed companies include those listed on the NYSE and Nasdaq. Listings data obtained from World Federation of Exchanges (WFE).
The 2023 listings data is as of June 2023.

Figure 2. **Federal Filings by Type**
January 2014–June 2023



Figure 3. **Percentage of Federal Filings by Sector and Year**
Excludes Merger Objections and Crypto Unregistered Securities
January 2019–June 2023



Note: This analysis is based on the FactSet Research Systems, Inc. economic sector classification. Some of the FactSet economic sectors are combined for presentation.

Figure 4. **Federal Filings by Circuit and Year**
Excludes Merger Objections and Crypto Unregistered Securities
January 2019–June 2023



Figure 5. **Allegations**

Shareholder Class Actions with Alleged Violations of Rule 10b-5, Section 11, and/or Section 12
January 2019–June 2023



Figure 6. **Number of Resolved Cases: Dismissed or Settled**
January 2014–June 2023



Figure 7. **Average Settlement Value**
Excludes Settlements over $1 Billion, Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2014–June 2023



Figure 8. **Median Settlement Value**

Excludes Settlements over $1 Billion, Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2014–June 2023



Figure 9. **Distribution of Settlement Values**
Excludes Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2019–June 2023



## About NERA

NERA Economic Consulting (**www.nera.com**) is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For more than six decades, we have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real-world industry experience to issues arising from competition, regulation, public policy, strategy, finance, and litigation.

NERA's clients value our ability to apply and communicate state-of-the-art approaches clearly and convincingly, our commitment to deliver unbiased findings, and our reputation for quality and independence. Our clients rely on the integrity and skills of our unparalleled team of economists and other experts backed by the resources and reliability of one of the world's largest economic consultancies. Continuing our legacy as the first international economic consultancy, NERA serves clients from major cities across North America, Europe, and Asia Pacific.

## Contacts

For further information, please contact:

**Edward Flores**
Senior Consultant
New York City: +1 212 345 2955
edward.flores@nera.com

**Svetlana Starykh**
Associate Director, Securities Class Actions Database
White Plains, NY: +1 914 448 4123
svetlana.starykh@nera.com

 To receive publications, news, and insights from NERA, please visit **www.nera.com/subscribe**.

*The opinions expressed herein do not necessarily represent the views of NERA Economic Consulting or any other NERA consultant. Please do not cite without explicit permission from the authors.*



Visit **www.nera.com** to learn more about our practice areas and global offices.

© Copyright 2023
National Economic Research Associates, Inc.

All rights reserved.
Printed in the USA.