UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LOUISIANA SHERIFFS PENSION &  )
RELIEF FUND, Individually     )
and on Behalf of All Others   )
Similarly Situated,           )
                              )
   PLAINTIFF,                 )     CASE NO. 2:19-cv-3347
                              )
        vs.                   )
                              )
CARDINAL HEALTH, INC., et al.,)
                              )
   DEFENDANTS.                )
_____)

TRANSCRIPT OF FAIRNESS HEARING PROCEEDINGS
BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE
SEPTEMBER 11, 2023; 1:58 P.M.
COLUMBUS, OHIO

APPEARANCES:

   FOR THE PLAINTIFF:
        MURRAY, MURPHY, MOUL + BASIL, LLP
        BY:  JOSEPH F. MURRAY, ESQ.
        1114 DUBLIN ROAD
        COLUMBUS, OH  43215

        ROBBINS, GELLER, RUDMAN & DOWD, LLP
        BY:  SPENCER BURKHOLZ, ESQ.
             LAURIE LARGENT, ESQ.
             ELLEN GUSIKOFF STEWART, ESQ.
        655 WEST BROADWAY, SUITE 1900
        SAN DIEGO, CA  92101

CRYSTAL HATCHETT, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD
COLUMBUS, OHIO  43215
(614) 719-3245

APPEARANCES (CONT'D):

   FOR THE DEFENDANTS:
       PORTER, WRIGHT, MORRIS & ARTHUR
       BY:  ROBERT WARD TRAFFORD, ESQ.
          DAVID S. BLOOMFIELD, JR., ESQ.
       41 SOUTH HIGH STREET, SUITE 2800
       COLUMBUS, OH  43215

       WACHTELL, LIPTON, ROSEN & KATZ
       BY:  LAUREN M. KOFKE, ESQ.
       51 WEST 52ND STREET, 25TH FLOOR
       NEW YORK, NY  10019


                    - - -


    Proceedings recorded by mechanical stenography,
transcript produced by computer.

3

MONDAY AFTERNOON SESSION

SEPTEMBER 11, 2023

- - -

(The following proceedings were had in open court.)

THE COURTROOM DEPUTY CLERK: Case No. 2:19-cv-3347, Louisiana Sheriffs Pension & Relief Fund versus Cardinal Health.

THE COURT: Counsel, good afternoon to all of you. This matter is scheduled for consideration of a proposed settlement, and this is the fairness hearing.

I've received memoranda from the plaintiff's side and application for attorneys fees.

Is there anything else from the plaintiff you wish to present?

MR. BURKHOLZ: Yes, Your Honor, if I may. My name is Spencer Burkholz.

THE COURT: Welcome.

MR. BURKHOLZ: Your Honor, I have with me here today Laurie Largent of my firm, and Ellen Gusikoff Stewart.

If it's okay with Your Honor, we have two pending motions. Ms. Largent will handle the settlement motion. I'll handle the attorneys fees requests. Ms. Gusikoff Stewart has over 25 years of experience on settlement issues. She can handle any of the objection issues that we don't handle.

THE COURT: All right.

4

MR. BURKHOLZ: If I can just make one more comment before we start. That is the fact that we appreciate the Court's granting of the pro hac vice to appear in this case. We take it seriously. I tell the lawyers at my firm, just because you practice in federal courts around the country, you should know how the lawyers practice in this particular jurisdiction.

We have Joe Murray and his firm that worked with us on this case, and I can't thank him enough for advising us on how to litigate this case, how to present our briefs and our arguments in front of Magistrate Deavers, and it was a pleasure also working with the local defense counsel.

And on that, Your Honor, I will turn it over to Ms. Largent.

THE COURT: Thank you.

MS. LARGENT: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. LARGENT: Laurie Largent with Robbins, Geller, Rudman & Dowd.

We are very pleased to bring this $109 million settlement to you for final approval.

Back in April of this year, the Court granted preliminary approval, as Mr. Burkholz mentioned, and we began the Court-approved notice program. I can go over the highlights of that for you, and I would also refer you to two

5

declarations that we filed --

THE COURT: I assure you I've read all of this, so I am familiar.

MS. LARGENT: Oh, you have?

Well, are there any questions that the Court has with respect to final approval, or would you like me to highlight --

THE COURT: You can highlight. I don't mean to cut you short, but I am familiar with the documents and the settlement and the structure. So...

MS. LARGENT: Okay. There's just a couple of points that I would like to make about the fairness and what we believe supports the fairness of the settlement.

One is -- I know Your Honor is aware of the standard for approval, both under Rule 23 and the Sixth Circuit. And I just wanted to point out that our firm spent a significant amount of time investigating this case and reviewing, you know, close to 2 million pages of documents produced by defendants to put together the facts that supported this case.

And the SEC also looked at this case and did their own investigation and ultimately did not pursue any action.

We think that the fact that we pursued and built this case is a credit to our tenacity and the recovery that we were able to obtain here.

In terms of how the settlement fairs to estimated damages, this case had some complicated issues on lost

causation and damages. There were two stock drops, and defendants' primary argument on those drops -- they had many, but was that not all of the price declines were related to our case.

So if a jury were to accept plaintiff's damages analysis by their expert, then the settlement would be probably in about a 10 percent recovery; and the defendants likely position at trial, the close -- it would be closer to a 55 percent recovery, the settlement would be.

In either case scenario, I think that the settlement is an excellent recovery for the class. I think our briefs highlighted the extensive mediation efforts that we put into this case. The Court administratively stayed the case for a period of time so that we could focus on that. We attended four mediations and continued ongoing discussions through our mediator, Layn Phillips, who is highly regarded and has worked on a number of these security class action cases.

Also, the other important factor that we see are the risks that plaintiff had going forward. You know this is under -- the case is under the Securities Exchange Act of 1934, and defendants denied wrongdoing throughout the entirety of the case. They challenged falsity, scienter, lost causation, and damages. And if they were able to successfully counter any one of these elements, then plaintiff and the class would not have recovered anything.

So just to short circuit it, if you have any questions, I'm happy to answer those.  Otherwise, I do believe we have some Folsom briefs.

THE COURT:  Thank you.

MS. LARGENT:  Thank you.

MR. BURKHOLZ:  Your Honor, on the attorney fee and expense requests, I'll just highlight a few things that -- I know we have everything in our briefs, but I wanted to point out that the Sixth Circuit has set forth the standard.  It needs to be reasonable, but enough to attract competent counsel, yet avoid a windfall.  Which, we don't believe -- there was certainly no windfall in this case.

And the fee requests of 30 percent is within the range that's been approved by this Court and courts within the Sixth Circuit, as we noted in our brief.

Ms. Largent pointed to the risks of the litigation, and I just wanted to give Your Honor three examples from my career, and they're relatively recent.  I've had a lot of successes, but I've had my losses too, and it really highlights the risk --

THE COURT:  Most lawyers don't want to admit that, so I appreciate your candor.

MR. BURKHOLZ:  Well, you have to.

I'm involved in a case against Goldman Sachs.  It's a pretty highly publicized case in our practice.  It comes from

8

the financial crisis.  It's been going on for 13 years.  We've been up and down the Second Circuit three times, and a trip to the Supreme Court.  And we won all along the way, until recently the Second Circuit reversed the district court certification of the case.

In that particular case, we probably have twice as much time as we have in this case and many multiples of expenses, but that's just an example of what can happen in a case.

THE COURT:  Well, let me focus you on something on my mind, and you're the perfect person to answer it perhaps.

We can look at a couple of different benchmarks here.  The first is the 30 percent figure, which is certainly something I would think of in the range of normal billing.  Maybe a little bit on the low end, but not much, little bit.

Sometimes that number is all we need to look at, and the case law says that in some cases.

In the event of a windfall, sometimes the lodestar comes back into play when there's a computation of number of hours, hourly rate, and then understanding that this is not an hourly rate that's paid every month.  There's a risk of no payment at all, and there's time delay.  All those things factor in, in why the lodestar number usually is a multiplier of certainly over one.  Depending on the amount of risk, it goes up.

You're following a case involving First Energy where I had the same issue. You may or may not be familiar with it. That case, I would say, by comparison -- this is all of record -- was a lower risk than yours.

You may know or you may not, but attorneys fees and hourly rates are something closely watched by the Bar, and I'm always sensitive to that. I don't think you're asking me to approve an hourly rate, as much as you're asking me to look at a lodestar in relationship to the 30 percent figure. Would that be your position?

MR. BURKHOLZ: That is correct.

And I have read the ratepayer transcript, and I'm ready to address those issues.

THE COURT: Well, I'm not sure we need to, is what I'm saying.

MR. BURKHOLZ: Okay.

THE COURT: That case, to be blunt, had a deferred prosecution agreement of the named defendant that basically was filed before the lawsuit. You didn't have anything remotely similar to that in this case.

But there I found, for example, $1,200 an hour was not a beginning point for the lodestar. We had that in this case, but we also have a lot more risk.

So I think the case law is pretty clear. I can go in either direction, the 30 percent or compute the number of hours

to pick an hourly rate and then do a multiplier.

MR. BURKHOLZ: Correct, and if I can just comment on the hourly rate.

And I appreciate the Court's comments at the ratepayer case hearing. Our rate is, you know, I would consider it a market rate. If you look at -- you know, we do have a national practice.

But, actually, the local firms here that do these cases, Jones Day, one of the firms in this case, Baker Hostetler, their rates are above -- I mean, I'm a 35-year lawyer, and my rate is 1,200 an hour, and Ms. Largent is 1,150, I think, and their rates are more than ours.

And the Wachtell Lipton firm, one of the best firms in the country -- and this is in a public filing from the Twitter litigation -- my contemporary there bills out at 1,850, and their eighth-year associate bills out at the rate of myself and Ms. Largent.

My point being that it's -- and, of course, Mr. Murray has an $800 an hour rate for his partners.

So I think our rates are fair in the context of this litigation in this Court.

THE COURT: Well, to be blunt, I'm trying to avoid a finding of a certain hourly rate here. What I'm tasked with doing is making sure the rate is reasonable and consistent with the parties' own agreement.

11

MR. BURKHOLZ:  Great.  Okay.

I guess the only other -- the last thing, Your Honor, the lead plaintiff award, just to make -- I just wanted to make clear, because some courts get confused on this request.

You know, you have these anti-trust cases and consumer cases where people come in for incentive awards.  In our cases under the 1934 Act, there's a specific provision, when Congress amended in 1995 the statute, which had a lot of changes, and the provision, 15 U.S.C. 78u-4(a)(4), provides for reimbursement of expenses for those that take on the role of leading these cases.

And in this case we have a relatively modest request of $11,539.  It's for the in-house lawyers that helped us on the case, sat for deposition.  And so it is really different in our field than in some of these other type of cases where it's just an incentive award.  We have a statute that provides for it, and we request that it be awarded.

Unless the Court has any further questions --

THE COURT:  I don't.  Thank you.

MR. BURKHOLZ:  Thank you.

THE COURT:  All right.

MR. BLOOMFIELD:  Your Honor, I'll introduce -- David Bloomfield on behalf of --

THE COURT:  Nice to see you again.  It's been quite a while.

12

MR. BLOOMFIELD:  Good to see you too, Your Honor.

My partner, Buzz Trafford, is in the back here from Porter Wright --

THE COURT:  Welcome.

MR. BLOOMFIELD:  -- representing the defendants, Cardinal Health, Inc., George Barrett, Don Casey, Jorge Gomez, Michael Kaufmann, and David Wilson.

With me, and who is going to address the Court, is Lauren Kofke from the firm of Wachtell, Lipton, Rosen & Katz. And also I should mention that not as counsel of record, but has come here from New York, is Stephen Levandoski.

THE COURT:  Welcome to all of you.

And you may proceed.

MS. KOFKE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. KOFKE:  Lauren Kofke from Wachtell, Lipton, Rosen & Katz.  I'll be brief.

On behalf of the defendants, we support the settlement.  We agree that it should be approved as fair, reasonable, and adequate.

With respect to the application for attorneys fees and expenses, as stated in the stipulation of settlement, the defendants take no position on attorneys fees or expenses, so we take no position on that aspect of the application.

Otherwise, we have nothing further to add in addition

to the submissions already before the Court.  Although, we're, of course, very happy to answer any questions that you may have.

THE COURT:  I don't have any, but thank you.

MS. KOFKE:  Thank you.

THE COURT:  Appreciate it.

And we have an objector who I understand wishes to be heard, so he may come forward, and that would be Mr. Killion.

Good afternoon.  If you wouldn't mind coming up to the podium, please.

I'm sorry.  Mr. Mollmann.  Excuse me.

Welcome.  And what would you like to say?

MR. MOLLMANN:  Thank you, Your Honor.

I guess I have some notes, and I would like to add -- I have a copy for you, if you would like, of what I'm going to say, and I have a copy for the plaintiff's attorneys.  There's two copies, one for the record.

THE COURT:  All right.  Thank you.

MR. MOLLMANN:  I wasn't sure whether you guys needed one.

MS. KOFKE:  Thank you.

MR. MOLLMANN:  With the Court's permission, I would like to -- do you need my name and address?

THE COURT:  Please, yes.

MR. MOLLMANN:  Lawrence Mollmann.  I live at --

14

THE COURT:  Actually, just -- we always keep personal addresses private.

MR. MOLLMANN:  Sorry.

THE COURT:  What city do you reside?

MR. MOLLMANN:  Delaware, Ohio, sir.

THE COURT:  Very good.  Welcome.

MR. MOLLMANN:  With the Court's permission, I would like to read a statement into the record, and a written copy of this statement filed with the records of the case.

I request the Court to take into account my initial objections, which were filed previously, and the statement.

Thank you for your -- am I allowed to proceed?

THE COURT:  Sure.

MR. MOLLMANN:  Thank you.

Thank you, Your Honor, for allowing me to speak.

First of all, on this anniversary of 9/11, I want to tell the beneficiaries of the Louisiana Sheriffs Pension Fund, the plaintiffs, how much I want to thank them and all of the first responders for all that they do to protect us, and all of those that are in service to our country who protect our freedom.

I wasn't sure on which side of the aisle -- but I guess there isn't really one -- to sit on.  Since I'm a shareholder still of Cardinal, I feel that I should be on their side; but I also want to make sure that I, along with all of

15

the shareholders, large and small, get what we are owed.

From looking at the documents that I received from the plaintiff attorneys, it still seems that it may be a done deal, with everything ready for you to sign, but I would still like to expand on my objections.

First of all, my initial reason for objecting to the fees to be paid to the attorneys is their poor form design, which I detailed in my initial response.  As previously mentioned, I have problems with the way they handled names, dollar amounts, share amounts, lack of adequate lines for purchases entry, et cetera.

THE COURT:  So let me stop you.  I want to understand your position, and I don't have the form in front of me.

MR. MOLLMANN:  Okay.

THE COURT:  So give me an idea, what was the problem?

MR. MOLLMANN:  The way they enter a name is your last name, your middle initial, and your first name.  I guess I'm not sure that that's done anywhere in the United States.

Their number of shares had the cents thing filled in. I'm a small shareholder.  To me, Your Honor, pennies -- you know, I mean, I go down to the pennies.  Okay?

Same thing with number of shares.  It was -- they had -- you know, it was -- I have fractional shares, so I wanted to fill that in.  It wasn't set up to handle that.

THE COURT:  So you couldn't put the precise number of

16

shares in?

MR. MOLLMANN:  Correct.

THE COURT:  Okay.

MR. MOLLMANN:  I had -- I kept the shares, so I kept reinvesting the dividends so I had -- you know, this period covered three years.  Okay?

That was -- so dividends are quarterly, so there was 12 payments of shares that were purchased in the period.  They only have room for five entries on their purchase line.

So, I mean, it's just items like that that kind of frustrated me to no end.

THE COURT:  That helped.  Thank you.

MR. MOLLMANN:  Okay.  So as I was filling out the form, I just got more and more upset as I saw these issues.  I guess I'm just wondering if the major plaintiff had to file this form also.

I was told by one of the attorneys that this form has been used hundreds of times.  Just because it's used hundreds of times doesn't make it correct.  It's maybe a long-standing effort, even, to dissuade and eliminate the small shareholders from any receipt of a claim.

The print size on the postcard, you know, that I got, looked at it, couldn't -- I'm sorry, let me back up -- is also discouraging.  Of all the people that I asked that got the postcard, they looked at it, couldn't read it, and just pitched

17

it.

And the responses to my objections, the plaintiff attorneys glossed over my form objections and instead concentrated on my objection to the de minimus amount. All of these items reinforce the idea that they do what they can to have the small shareholder not claim what may be due them.

I guess the attorneys mentioned all the costs that they incurred which they weren't reimbursed. After completing the form, it cost me over $10 just to mail it in.

THE COURT: So is that postage primarily?

MR. MOLLMANN: Yes, sir.

THE COURT: Okay.

MR. MOLLMANN: Your Honor.

THE COURT: That's fine.

MR. MOLLMANN: I apologize.

THE COURT: That's a proper way to address me, no problem.

MR. MOLLMANN: I have also the time, you know, to gather my information, you know, fill in the difficult form, print it, take it to the post office. I have even the additional cost of coming here and parking, which I'm sure will be included in their fees.

Sometimes you wonder whether what's driving the attorney fees is greed or incompetence. The total revenue from these -- what is the total revenue? I guess I heard the number

18

$30 million or something. You know, is the public aware of how much this is?

THE COURT: To be precise, it's 30 percent of, I think, $109 million. So a little bit more than that, 32-something.

MR. MOLLMANN: Yeah, 30 million plus.

THE COURT: Right.

MR. MOLLMANN: So I guess there was some additional lack of attention by the law firm that I've, you know, defined on here.

There was a FedEx package that was dated -- contained over 100 pages -- I mean, you know, I can see why their page count is so high -- that was marked as next-day delivery with a date of September 1st. I guess I received it September 5th.

Additionally, they misspelled my name on their letter to me.

I guess when you look at their website, they don't even know how to spell district properly. I can go into that if you would like.

I mean, how many other mistakes are there? Could they possibly have mistakenly put a one in front of a zero for the lowest claim amount they will pay?

I guess I'm not sure why I had to answer the question how many times I've objected in the past. This is my first time. I feel that this type of question may be viewed as an

attempt to quash objections.

I guess -- I also noticed, I guess, that these law firms have participated in many class action lawsuits, one -- a previous one against Cardinal, and there also may have been several by other pension funds that I noticed.

I guess there seems to be a cottage industry. I guess are these continual lawsuits, you know, for class actions to support a cottage industry?

I know there's a Mr. Ross Murray of Gilardi, which is a support firm. I don't know if he's related to Mr. Joseph Murray. I guess --

THE COURT: Let's clear that up.

Mr. Murray, is he related?

MR. MURRAY: No.

MR. MOLLMANN: Thank you, Your Honor.

THE COURT: Okay. I didn't mean to imply anything by asking you. I just wanted to put it on the record.

MR. MOLLMANN: You know, I want to kind of skip through some of this, Your Honor, for time constraints.

But I guess they sent out over 400,000 cards. How many got returned? Maybe it's -- do they make it hard for us to claim?

I guess, you know, this came up earlier today, you know -- or, yeah, the fees, but also they count -- routinely counter -- or say that court's routinely approve not paying

20

claims under $10. Maybe it is time to give justice back to the small shareholders.

How many de minimis claims are there? What is the total dollar amount of de minimis claims?

Since all of this information is available in their database and they would use that database to generate the checks, the only additional cost is for the paper and the postage to mail the checks.

Yes, there's administrative costs, but that's why there was an administrative settlement fund set up.

When we compare the costs to mail everyone what is due versus the amount paid to the attorneys, is it really that much? 30 percent of over 100 million, like we said, is 30 -- I think the number is like 32 million, versus what they could pay the small shareholders.

A better solution might be to pay the small shareholders $25 to cover their claims and cost. If you incentivize the claimant to cash the check -- because that was one of the things that they mentioned, that the checks go out, they don't get cashed, and then they have to go, you know, follow up on that, that maybe a reasonable person will cash his check and they will reduce their costs.

I guess, also, I have shares of the mutual funds that are S&P 500 Index funds, and Cardinal is part of the S&P 500. Am I to presume that my mutual fund will add the claimant

21

amount to my account, or are they considered also small shareholders?

I respectfully ask Your Honor not to sign the attorneys' proposed final judgment, but to amend it and find merit in my objections and pay all de minimis shareholders a minimum of $25 to bring justice and equity to the common man and the small shareholders.

I guess -- and then there was an additional thing, and I apologize that it isn't in my notes, but there was -- I found it last night, and it's marked in here, but it was from one of the attorneys justifying their things -- or their costs.

They mentioned that they spent 27,000 hours, which -- and if you take the 32 million, it's like over $1,200 an hour for all attorneys and all -- you know, whatever they did. I mean, we heard Mr. Murray only makes $800 an hour. Maybe we could find a better number there.

They said that they had 3 million pages of documents. When you take the 27,000 hours and the 3 million pages, they spent, you know, reading -- on average, they had to spend, of those 27,000 hours -- they read 110 pages an hour in that time? I mean, there's a lot of time they either spent reading or whatever else.

So there might be justification, Your Honor, for reducing the attorneys fees somewhat to help pay the small shareholders.

22

Thank you.

THE COURT:  Before you leave, there are several things I want to discuss with you.

So, first, I wouldn't minimize the authority I have here, but I want you to understand my job is to either approve the settlement or turn it down.  I can turn it down, no question.  Can I modify it?  No.

So I'm not in a position to simply say, all right, let's shave off X millions of dollars and send it to the shareholders.  That's something the parties have to agree to; it's not something I can order.  We haven't had a trial in this case.  I'm not making a decision based on testimony.  That's number one.

Number two, I want you to be clear, and I want the record clear as well, there have been lots of notifications sent out, and I'm assuming -- because we do have probably a lot of people who get this in the mail, long form, they may be in this for a couple of dollars, I'm assuming a high percentage of those people don't fill out the form.

The money's computed on everybody getting the money.  What happens to the residual funds here?  On the plaintiff's side, again, I know you can answer that.

MR. BURKHOLZ:  Ms. Stewart will address these questions.

MS. STEWART:  There's no residual to -- there's no

money going back to Cardinal.  We're going to distribute the money based on the plan of allocation that we have -- we're asking the Court to approve today.  We'll send out, once all the claims are processed -- we have over 250-something thousand claims that have come in.

THE COURT:  And that's out of a total of how many potential claimants?

MS. STEWART:  We sent out over 400,000.  We got about 250 --

THE COURT:  So you got about a little over 60 percent returned.  Which is fairly high, isn't it?

MS. STEWART:  We don't really yet know how many of those are valid, because the claims deadline has just passed, but we got a very robust response to the notices.

THE COURT:  All right.  So about 60 percent of the people, roughly, have responded.  They haven't necessarily been approved, but that's the process that's underway.

MS. STEWART:  Correct.

We will -- once the claims processing is done and the claimants, if they receive a rejection notice or a deficiency notice, they will be given an opportunity to cure that deficiency.  The claims administrator -- the claims administrator bends over backwards to make sure as many claimants, as many class members as possible recover.

THE COURT:  The number of valid claims is then used to

24

determine how to divide the money that's part of the settlement?

MS. STEWART:  Well, not the number of claims, but the number of shares that are represented in each --

THE COURT:  Exactly, yeah.

So in other words, that's where the entirety of the money will go; there will be nothing held back?

MS. STEWART:  Nothing is being held back.

And if we send out the net settlement funds, and after efforts by the claims administrator to get those checks cashed and to reissue checks -- and all of this takes time -- if it's economically feasible -- and it is in, like, 90 percent of the cases -- we'll do a second distribution to those class members who cashed their first checks and who would receive -- if this $10 de minimis stays in the case, then if you were -- if you cash your first check and you get $10, you'll get a second check.

And we'll do it until it's no longer economically feasible to do it, and then we would donate what I call a de minimis residual, and it would -- you know, if it's down in the hundreds or a couple of thousand dollars, given the size of this class, it just doesn't make any economic sense to distribute that; and we would donate that to a nonprofit unaffiliated with any of the parties, the Investor Protection Trust, some organization designed to assist in investor

25

education.

And so I just want to respond, there's no -- there's no effort to discourage small shareholders from filing claims.

THE COURT:  Well, there's a -- I mean, the problem in a case like this is there's a financial disincentive.  If I know I'm going to recover 25 cents, there's a limit to what I'm going to do.  That can't necessarily be helped, but that is a problem.

I'm with Mr. Mollmann on one thing.  You need to make the print bigger.

MS. STEWART:  The problem -- and I understand, and I see that -- I think that Mr. Mollmann's presentation today is probably in that same print, probably to send a message to us that the print is small.

But --

MR. MOLLMANN:  Your Honor, I did.  I printed their copy of the letter in the same print as the postcard.  I think I may have even compared it, and it is a little bigger.

THE COURT:  Well, and what I really want, Mr. Mollmann -- I don't necessarily expect you to agree with me, that's not my point here.  A couple of things.

If people don't make claims, that money is not going back to Cardinal and it's definitely not going to the plaintiff's attorneys.  You understand that?

It will benefit the people who did make claims by

26

having the other people not follow through.

MR. MOLLMANN: Well, Your Honor, I guess, I -- you know, like I said, I'm still a shareholder of Cardinal. You know, I'm -- I lose either way. Maybe I gain, I don't know. But, you know, earlier I was going to say, there's only two people really making money in this whole process.

THE COURT: Understood.

Is there anything else you would like to tell me?

MR. MOLLMANN: No, Your Honor. I thank you. I appreciate the opportunity to speak.

THE COURT: Well, thank you for being here. I appreciate that.

All right. Is there anything else anyone would like to address?

MS. STEWART: If I may, I'm just going to -- I just wanted to address Mr. Killion's objection.

THE COURT: All right. And he's the second objector?

MS. STEWART: He's the second objector.

And Mr. Killion has objected in 10 other litigations. He files these boilerplate -- and I'm aging myself when I say a word processer objection, but it is literally -- if the Court reads the attachment to his objection, there's this form, basically, that whoever -- whatever organization put together that attachment, has this objection form on how a -- how an objection should read. It's copied and pasted.

And as Judge Kendall in the Northern District of Illinois found in the Exelon case just this past Friday, that he has copied and pasted the same argument in objections to fees in other cases. And there, as here, it lacks any evidence for the agreement -- lacks any evidence of any argument why the fee should not be approved.

And one thing that he has raised, and I -- it happened in another case, and it really insults the Court for Mr. Killion to call a fee application a rubber stamp.

And I was in front of Judge Castel in the Southern District of New York not long ago on an identical objection, and he was quite offended by that term. He basically said, If he thinks this is a rubber stamp, he's never been in my courtroom before.

And I really do -- I take offense to the work that is done to present a fee application at the end of a very long and hard fought litigation.

So I would ask that the Court overrule Mr. Killion's objection.

We would also -- and I appreciate Mr. Mollmann appearing today. I would also -- I would ask that the Court overrule his objection. I think the September 1st -- I don't want to get too deep into this. But over Labor Day weekend, FedEx must not have delivered. So the letter went out on September 1st. It was delivered on the 5th because it was

28

Labor Day weekend in the beginning -- in the middle there.

Second, we ask how many objections an objector has filed because Mr. Killion -- the objections like Mr. Killion's exist.

There are many cases where objectors file objections and they have valid and good, well-founded objections to settlements that may not be good. This is not one of them, but there are valid reasons. But when you have somebody like Mr. Killion who files in case after case, and he files the same objection, makes the same argument, regardless of the case --

THE COURT: What I take this to mean is he's objecting to the whole notion of class action and contingency fees.

So, I mean, I can see this for what it is.

MS. STEWART: And I appreciate that, Your Honor. But that's why we ask how many objections have been made, because you end up with someone like Mr. Killion who is -- would be called by other courts a serial objector.

Unless the Court has any other questions, I would just ask -- and I appreciate Mr. Mollmann's concerns. I take -- I do take note of the postcard print. It's only a postcard. Once we make the postcard much bigger, there's no point in doing a postcard anymore.

But it's much less expensive to send a postcard than it is to send a 20-page, full-on notice package. Which is available either from the website or, if you get this postcard

and you want the 20-page notice, e-mail or call the claims administrator. They're happy to send it out. But there's no reason to send out 400-and-something thousand of those when the vast majority of claims are filed online, in any event.

THE COURT: All right. Thank you.

MS. STEWART: Thank you, Your Honor.

MR. BURKHOLZ: Your Honor, two quick points in responding to Mr. Mollmann.

He asked about the mutual fund. They file claims in our cases. So whatever they receive, I'm sure he would get back in whatever form from them.

Then just to be clear on the record from what Ms. Stewart said. There were 398,000 notices sent out. We determined that with the administrator from the transfer records from the defendants. Those are potential class members.

THE COURT: All right.

MR. BURKHOLZ: And then from that -- it doesn't mean that there really were 398,000 class members of the 237,000 that filed claims.

So that's really not a 60 percent claims return rate. It's that amount -- and of those, at this point we've identified 90,000 claims that have potential recovery.

So you really can't -- what you do know from those claims is that --

THE COURT:  What weeds out the ones that didn't have a claim?

MR. BURKHOLZ:  Right.  They either made a profit during the class period -- their transactions don't show up in a recognized loss.

THE COURT:  Okay.  Wrong dates, wrong sell times?

MR. BURKHOLZ:  Exactly.  There's something wrong with the claims.

THE COURT:  All right.

MR. BURKHOLZ:  What we do know from the potential claims that are -- the claims administrator isn't even done with the work they have to do, which is important.

There's about 257 million damaged shares.  That means the class members that have potential claims, that's how many shares.  And when we estimated, which both sides do in this case, you try to estimate how many damaged shares were out there when we're trying to figure out the total damages in the case.  We estimated about 200 million shares, 160 to 200 million.

So basically what I'm getting at is, most of the damages suffered by class members will be -- they will have filed claims in this case.  Close to a 90 percent claims rate, if you look at it that way.

THE COURT:  All right.

MR. BURKHOLZ:  Thank you, Your Honor.

31

THE COURT:  Thank you.

MS. KOFKE:  Your Honor, for defendants, I'll be brief.

In terms of Mr. Killion's objection, that relates to attorneys fees and expenses.  And as I stated previously, defendants take no position on that, so we take no position as to that objection.

With respect to Mr. Mollmann's objection, again, to the extent it relates to attorneys fees, we take no position and otherwise we agree that that objection should be overruled for the reasons that have already been put forward by the plaintiffs and are in front of the Court.

THE COURT:  Thank you.

MS. KOFKE:  Thanks.

THE COURT:  All right.  This matter has been well-presented.  My task is to determine if the class settlement agreement should be approved, whether it's fair and reasonable.  And then also what's been scheduled for today is approval of the -- or disapproval of the proposed attorneys fees.

I want to thank Mr. Mollmann for being here.

I think most of us, once a year it seems, or more, get a card in the mail from an airline, a credit card company, a bank, or somebody with indication that you might be part of a class.

And, Mr. Mollmann, I thank you for your diligence.

32

You took the card seriously. You're here. This is an open court, so your comments are welcome.

The first issue is whether the settlement agreement is fair, because the representative plaintiffs and their counsel represent a lot of people, many of whom are small stakeholders, but nonetheless stakeholders. So there is, in a certain sense, a fiduciary obligation on their part to negotiate a settlement that's in everybody's interest.

The Sixth Circuit has come up with seven factors for me to consider. The first is risk of fraud or collusion, which is not an issue in this case.

The second is the complexity, expense, and likely duration of the litigation. I note that the number of 27,800 hours is part of this case. And I understand the defendants are not taking a position, but the record contains no objection to that number, so I take that as a given. That's an enormous number of hours. That would be the equivalent of 12 or 13 lawyers billing 2,000 hours a year.

So the Court is confident this is complex. I've had enough contact with this case to know that the amount of litigating was large and the issues were complex, a number of issues. Lost causation can be complicated in cases of this sort. And from what I've heard from counsel, that's exactly how this litigation proceeded.

The third factor I'm to look at is the amount of

33

discovery engaged in. I'm sure that's represented in the number of hours I just mentioned.

The fourth is the likelihood of success on the merits. At this stage of the case, from a judge's standpoint, that's not necessarily the easiest thing to do. But at the same time, I know there are defenses. I know there are damage issues that would have to be litigated and resolved.

So I assume that this case had a likelihood of success on the merits, but also had a high risk to the plaintiffs and their attorneys.

I'm to consider the opinions of class counsel and class representatives who, of course, have a stake in the highest possible award on behalf of the class.

I'm to look at the reaction of absent class members. I've done that with the two objectors.

And then, if appropriate, the public interest, which I find is also a factor that is at play in this case.

Putting all of this together in terms of the settlement number, I'm confident that both sides engaged in arm's length bargaining, hard litigation, and each side was well-represented by highly qualified counsel on both ends.

So I am going to approve the settlement that has been proposed in this case.

The second issue has to do with attorneys fees, and I want to address my comments to Mr. Mollmann, but also to the

34

record.

Attorneys fees are always a sore subject. I practiced law for 15 years, so I have at least some experience in speaking on attorneys fees from a personal end, but I'm also called upon as a judge to benchmark attorneys fees.

I want to be clear -- and I'm hedging a little bit here as far as hourly rates go. There is a standard in this Court that's consistent with the practice in Columbus, which is what I'm supposed to apply in this case. This has more to do with a case that doesn't involve a contingency fee of 30 percent. It has more to do with the losing party being made to pay a fee that is not directed by the Court as the only reasonable fee, but is the benchmark reasonable fee in this Court.

I'm more looking at the 30 percent here, and I want to start with a couple of numbers.

Just doing some basic math. The attorneys fees by an hourly rate, that's actually below the market value in Columbus. If I just picked, for ease of numbers, $500 an hour, 27,800 hours would still take us to just shy of $14 million.

An hourly rate is -- in my view, and I think in the practice of law, is something that's due the next month, something that's due regardless of the outcome of a case.

That's not a contingency fee. A contingency fee is one in which you're paid if you win. If you lose, you're not

35

paid at all.

And there's always delay. This case was filed in 2019, so it's four years old. There's a time value of money to be considered, and that is something that a straight hourly rate computation wouldn't do.

So in looking at the amount -- I know it's a large amount, no question about that, roughly $32,700,000. But at the same time, the 27,800 hours are also significant, and the risk of loss in this case was significant.

So I believe under all of those circumstances, the proposed attorneys fee is fair and reasonable.

With regard to the objection made by Mr. Killion, I first note that the objection really takes issue with the class action system. We can all debate whether this is working the way it should. Everybody is entitled to their opinion, but the law is what it is.

And it's not my job to determine if this is a good or a bad set, where a number of small-dollar plaintiffs are given collectively a large-dollar amount and the attorneys fees that go with it are commensurate with regard to the 30 percent figure.

But I think all of this is in accord with the case law, and I accept the proposed attorneys fees as well.

Are there any other issues either side wishes me to address?

MS. LARGENT:  Yes, Your Honor.  Would you like me to go to the podium?

THE COURT:  Yes.

If I didn't mention the expenses, I'm going to cover all of those in the order as well.

MS. LARGENT:  I was going to mention the plaintiff allocation.  Is that also on your list?

THE COURT:  Yes.

MS. LARGENT:  Okay.

THE COURT:  All right.  Anything else?

MR. BURKHOLZ:  No, Your Honor.

THE COURT:  All right.  Thank all of you very much.

With that, we'll be in recess.

(Proceedings concluded at 2:43 p.m.)

- - -

37

C E R T I F I C A T E

        I, Crystal Hatchett, RPR, CRR, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the HONORABLE EDMUND A. SARGUS, JR., Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


                        s/Crystal Hatchett_____
                        Crystal Hatchett, RPR, CRR
                        Official Federal Court Reporter
                        September 15, 2023